# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GARLOCK SEALING TECHNOLOGIES | ) | |
| LLC, | ) | Case No. 10- _____ |
| | ) | |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| GARRISON LITIGATION | ) | Case No. 10-_____ |
| MANAGEMENT GROUP, LTD., | ) | |
| | ) | |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| THE ANCHOR PACKING COMPANY, | ) | |
| | ) | Case No. 10-_____ |
| | ) | |
| Debtor. | ) | (Joint Administration Requested) |
| ——————————————— | ) | |

## AFFIDAVIT OF DONALD G. POMEROY, II
### IN SUPPORT OF FIRST DAY RELIEF

I, Donald G. Pomeroy, II, hereby declare under penalty of perjury:

1.    I am the Chief Financial Officer of Garlock Sealing Technologies, LLC.

I submit this Affidavit in support of the Motions and Applications of Garlock Sealing Technologies

LLC ("Garlock"), Garrison Litigation Management Group, Ltd. ("Garrison") and The Anchor

Packing Company ("Anchor"), debtors and debtors-in-possession in the above- captioned cases (the

"Debtors"), filed contemporaneously with the filing of the chapter 11 petitions.

2.    I am generally familiar with the Debtors' day-to-day operations, business

affairs and books and records.

3.     On June 5, 2010 (the "Petition Date"), the Debtors commenced their respective cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Western District of North Carolina (collectively, the "Chapter 11 Cases"). The Debtors continue to operate in the ordinary course of business as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Contemporaneously herewith, the Debtors have filed a motion seeking to procedurally consolidate their Chapter 11 Cases for administrative purposes only.

4.     This Court has jurisdiction over the Chapter 11 Cases under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The Debtors are not in business distress, but are overwhelmed by the financial and institutional costs of defending and resolving tens of thousands of asbestos claims in state and federal courts across the country. As described in the Debtors' Information Brief, they have filed these cases for the purpose of resolving their alleged asbestos liability in a single forum that offers an efficient and fair means of determining and satisfying the Debtors' responsibility for the mass of asbestos personal injury claims pending against them and expected to be filed in the future. The Debtors' goal in these cases is to pay all creditors, asbestos and non-asbestos, the full amount of their allowed claims. The Debtors are confident they can achieve this goal if Garlock is able to continue its history of profitable operations by maintaining its operations in the same manner it did pre-petition. However, in order to do so, the Debtors, including Garlock, must maintain their commitments to customers, creditors and employees. Those commitments are in turn dependent on the Debtors maintaining both financial as well as operational stability. With such stability in mind, the Debtors seek to continue to operate in the ordinary course of business during and subsequent to these Chapter 11 Cases, and have filed a number of motions on the Petition Date,

{00178588 v 1}

-2-

seeking this Court's authority to take steps necessary to ensure a seamless transition into these Chapter 11 Cases (collectively, the "First Day Motions").

6.      I am authorized to submit this affidavit in support of the Debtors' petitions for relief under the Bankruptcy Code and the First Day Motions.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the referenced First Day Motion.  All facts set forth in this affidavit are based on my personal knowledge, upon information supplied to me by employees of the Debtors and their affiliates, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this affidavit.

7.      Part I of this affidavit describes the Debtors' businesses, assets and the circumstances surrounding the commencement of these Chapter 11 Cases.  Part II sets forth the relevant facts in support of the Debtors' motion to obtain debtor-in-possession financing and use cash collateral.  Part III sets forth the relevant facts in support of the other First Day Motions.

## I.   <u>BACKGROUND</u>

### A.   <u>History and Corporate Structure</u>

8.      Garlock, a North Carolina limited liability company, and Garrison, a North Carolina corporation, are wholly owned subsidiaries of Coltec Industries Inc ("Coltec"), a Pennsylvania corporation, which is in turn wholly owned by EnPro Industries, Inc. ("EnPro" and, collectively with Coltec, the "Parent"), a North Carolina corporation headquartered in Charlotte, North Carolina and manufacturer of engineered industrial products.  EnPro is a publicly traded company whose shares are traded on the New York Stock Exchange.  According to EnPro's annual report on Form 10-K as of and for the year ended December 31, 2009, EnPro's total shareholders'

equity was approximately $311,600,000 as of December 31, 2009. Anchor, a North Carolina corporation, is a wholly-owned subsidiary of Garrison.

9.     Garlock's business was founded in 1887 in Palmyra, New York. Garlock produces and sells high performance fluid-sealing products, including gaskets and compression packing used in internal piping and valve assemblies in numerous industries. Garlock employs approximately six hundred people, and Garlock has a global sales presence serviced from manufacturing facilities in Palmyra, New York and Houston, Texas. Garlock also owns three non-debtor foreign subsidiaries that own manufacturing operations in Canada, Mexico and Australia. In 2009, Garlock had global sales of approximately $113 million, down from $150 million in 2008, and has had operating income (exclusive of insurance receipts and payments of asbestos settlements, judgments and legal fees) in excess of $12 million each of the past five years. Garlock continuously develops innovative products to meet the changing needs of its customers. Garlock also strives to be an industry leader in lean manufacturing as reflected by its extensive ongoing $40 million multi-year project begun in 2006 to modernize its Palmyra manufacturing campus by building state-of-the-art manufacturing facilities and adding new equipment that enable it to compete more effectively.

10.     Anchor is a non-operating subsidiary of Garrison. For many years, Anchor distributed fluid sealing materials, including gaskets and packing.

11.     Some of the gaskets and packing produced and/or sold by Garlock (prior to 2001) and Anchor (prior to 1993) contained encapsulated asbestos. Since the 1970s, Garlock and Anchor have received hundreds of thousands of claims by individuals ("Asbestos Claimants") alleging that they suffer from personal injuries related to exposure to such products ("Asbestos Claims").

12.     Garrison, which is headquartered in Rochester, New York, was formed in 1996 to manage the defense and settlement of Asbestos Claims against Garlock. To this end,

Garrison (a) supervises a nationwide network of local defense law firms that represent the Debtors in Asbestos Claims in various states; (b) assists in defending Asbestos Claims before and during trial; (c) settles Asbestos Claims; (d) pays judgments, settlements and defense costs; and (e) makes claims against, collects payments from and facilitates audits as required by insurers in connection with Garlock Asbestos Claims.  Garrison currently employs eleven people, including three staff attorneys supported by paralegals, and finance and data entry personnel.  Garrison's oversight of all aspects of Asbestos Claims has enabled Garlock to focus on continuing its successful history of profitable and innovative manufacturing.

**B.**    **Events Leading To the Petition Date**

13.    For a detailed description of the circumstances that led the Debtors to seek protection under chapter 11, see the Debtors' Information Brief, filed on the Petition Date or shortly thereafter.

14.    The Debtors' asbestos-containing gaskets and packing contained encapsulated, nonfriable asbestos that generally did not release asbestos fibers. Removal of some gaskets or packing from pipe joints, valves, and equipment could release trace levels of asbestos that generally would not exceed the current permissible exposure limit (PEL) established by the Occupational Safety and Health Administration ("OSHA").[1] The Debtors added warnings to their products in 1977, and discontinued producing and selling products that contained asbestos in 2000, even though none of the Environmental Protection Agency, OSHA or any other federal or state agency ever required asbestos-containing gaskets or packing to have warning labels or banned their production or use.

---

1    In 1971, the newly established OSHA started regulating asbestos. OSHA's initial standard set the permissible exposure limit (PEL) at 12 f/cc (8-hour time-weighted average (TWA).  As the dangers of asbestos became progressively better understood, OSHA periodically lowered the exposure limit.  In 1994, OSHA set the PEL at 0.1 f/cc (8-hour TWA), where it remains today.

15.     Despite having produced and sold lawful and safe products, which can still be legally sold today, the Debtors are overwhelmed by Asbestos Claims.  As of December 31, 2009, the Debtors had processed over 900,000 claims to conclusion and paid in over $1.4 billion in settlements and judgments and over $400 million in legal costs to resolve such claims, of which approximately $1.37 billion and approximately $389 million, respectively, relate to alleged liability of Garlock. Approximately 100,000[2] such claims remain pending today.  Garrison pays over $100 million annually to defend and resolve Asbestos Claims.

16.     The Debtors' cost of resolving an individual Asbestos Claim has on average multiplied over eightfold since early 2000, when a bankruptcy wave commenced that eventually swept nearly all of the major manufacturers of dangerous, friable, asbestos products into bankruptcy.[3]  As a result of joint and several liability principles applicable in many jurisdictions and improper targeting of product exposure evidence by plaintiffs' firms (described in the Information Brief), the bankruptcy wave left peripheral defendants like Garlock, whose products contained non-friable asbestos, to pay the enormous liabilities of such bankrupt defendants.

17.     Garlock believed until recently that it would survive the bankruptcy wave because most of the major asbestos manufacturers have emerged from bankruptcy by funding post-

---

2       Garlock has approximately 100,000 asbestos-related claims currently pending against it, and Anchor has approximately 83,000 such claims, however the Debtors believe most of the claims against Anchor are duplicative of claims against Garlock, related to Garlock products sold and distributed by Anchor.

3       The companies driven into bankruptcy by asbestos litigation since January 1, 2000 include: Pittsburgh Corning (2000); Owens Corning (2000); Fiberboard (2000); Babcock & Wilcox (2000); Armstrong World Industries (2000); GAF (2001); U.S. Gypsum (2001); Turner & Newell (2001); A.P. Green (2002); Harbison Walker (2002); North American Refractories Company Inc. (NARCO) (2002); W.R. Grace (2001); Skinner Engine Co. (2001); E.J. Bartells (2001); United States Minerals Products (2001); Murphy Marine Services (2001); Insul Co. (2001); Swan Transportation (2001); North American Refractories Corp. (2002); Kaiser Aluminum (2002); Harbison-Walker (2002); A.P. Green (2002); Plibrico Co. (2002); Shook & Fletcher (2002); Porter-Hayden Co. (2002); Artra Group, Inc. (2002); Special Metals Corp. (2002); Asbestos Claims Management Corp. (2002); ACandS (2002); JT Torpe Co. (2002); A-Best Products (2002); Western MacArthur/Western Asbestos (2002); C.E. Thurston (2003); Combustion Engineering (2003); Congoleum Corp. (2003); Mid-Valley (Halliburton subsidiaries) (2003); Muralo Co. (2003); Flitkote Co. (2004); Oglebay Norton Co. (ONCO) (2004); Special Electric (2004); Quigley Co. (2004); Utex Industries (2004); API, Inc. (2005); Asarco (2005); Brauer Supply Co. (2005); Dana Corporation (2006); ABB Lummus Global (2006); and Lloyd E. Mitchell Co. (2006).

{00178588 v 1}

confirmation trusts under section 524(g) of the Bankruptcy Code with over $20 billion to pay

injuries caused by their products.  Other major bankrupt manufacturers have reached agreement with

asbestos claimants and will soon add another $10 billion plus to the 524(g) trust availability.  In

2006, the trusts began making claim payments and today trusts pay billions of dollars annually to

many of the same claimants who pursue damages from the Debtors.

18.    The establishment of a system of extraordinarily wealthy asbestos trusts,

however, has not abated Garlock's inflated costs of resolving Asbestos Claims.  The asbestos claims

resolution system has been irrevocably fractured into two tracks—a system of trusts that have

assumed liability for friable asbestos products that most plausibly caused plaintiffs' diseases, and a

tort system where peripheral defendants like Garlock that produced encapsulated asbestos products

are isolated and targeted.  Garlock is paying more than its share of liability because the trust system

operates completely independent of the tort system.  Claimants generally are able to target Garlock

and other peripheral defendants in the tort system, collecting their full damages while denying that

they have evidence of exposure to dangerous, friable products of bankrupt defendants. Claimants

then collect significant damages again from trusts based on evidence they submit alleging exposure

to the same friable products about which they disavowed knowledge in the tort system.

19.    While Garlock continues to produce safe and useful products and provides

good jobs to hundreds of workers, the continued cost of resolving Asbestos Claims unfairly targeted

against Garlock at values improperly inflated by bankruptcies of culpable producers of friable

asbestos products threatens Garlock's core business. The cash flows necessary to defend and resolve

Asbestos Claims in the tort system threaten to deplete rapidly both the remaining insurance available

to Garlock for such claims and Garlock's cash flow from operations. Without chapter 11 protection,

the value of the Debtors' core businesses and the Debtors' ability to compete effectively in the

marketplace will be irrevocably damaged.  If Garlock's responsibility for Asbestos Claims is

determined in a single forum under a process that guarantees integrity through application of the rules of evidence and the rule of law, Garlock has sufficient insurance and other assets to fund a post-confirmation trust that will pay Asbestos Claims in full. Therefore, the Debtors have determined that filing these Chapter 11 Cases provides the Debtors their only means of determining and resolving their true liability for Asbestos Claims.

C.      **The Debtors' Primary Assets and Pre-Petition Debt Structure**

20.     In addition to cash on hand generated from business operations, property, plant and equipment, inventory and accounts receivable, the Debtors have several other primary assets.

21.     In the 1950s, 1960s and 1970s, Coltec purchased over one billion dollars of products liability insurance policies to cover losses associated with, among other things, product liability claims against Coltec and certain of its subsidiaries (collectively, the "Affiliates"), including Garlock (the "Insurance Policies"). As a Coltec subsidiary, Garlock is entitled under the Insurance Policies to be indemnified for losses associated with Asbestos Claims that trigger such Insurance Policies. Prior to these Chapter 11 Cases, proceeds from the Insurance Policies have been used to pay a portion of the indemnity payments made to resolve Asbestos Claims against Garlock. In addition to Garlock, the Affiliates also have indemnity rights against the carriers under the Insurance Policies protecting the Insured Affiliates from asbestos-related losses. To the extent that any Insured Affiliate is required to defend and pay any future asbestos litigation or pending asbestos litigation, such Insured Affiliate is entitled to be indemnified under the Insurance Policies for any such claim that triggers such policies.

22.     As of December 31, 2009, $238.6 million dollars of insurance coverage or insurance receivables arising from settlements with insurance carriers existed under the Insurance Policies (the "Available Shared Insurance"). As of the Petition Date, however, the continuous flow

of claims settlements required by trial dockets had reduced the Available Shared Insurance to approximately $194 million.  The Debtor's interest in the Available Shared Insurance is one of the largest assets of the estates of the Debtors.

23.     In addition to indemnity rights under the Insurance Policies held by the Debtors, Garlock holds two separate promissory notes in the aggregate face amount of approximately $227 million issued by Coltec ($73,381,000) and Stemco LP, a Texas limited partnership wholly owned by  Coltec ($153,865,000) (collectively, the "Coltec Notes").  Garlock received the Coltec Notes from Coltec and Stemco LP in 2005 in exchange for three of Garlock's businesses that never produced asbestos-containing products, (i) Stemco, LLC, (ii) Coltec Industrial Products, Inc., and (iii) GGB LLC.

24.     Pre-petition, Garlock and Garrison were borrowers under a senior secured revolving credit facility evidenced by an Amended and Restated Loan and Security Agreement, dated as of April 26, 2006 (as amended, the "Pre-Petition Credit Facility") among Garlock, Garrison and certain non-debtor affiliated entities with Bank of America, N.A. ("BOA"), as a lender and as collateral agent and administrative agent for the lenders, Wells Fargo Bank, National Association (successor by merger to Wachovia Bank, National Association) and SunTrust Bank .   The Pre-Petition Credit Facility was collateralized by receivables, inventories, general intangibles, including intellectual property, insurance receivables and other personal property (other than fixed assets) of EnPro and its direct and indirect domestic subsidiaries and the pledge of the equity of EnPro's direct and indirect domestic subsidiaries and 65% of the equity of first-tier foreign subsidiaries of EnPro's direct and indirect domestic subsidiaries.

25.     By virtue of an agreement entered by Garrison and Garlock in 1996, the cash management systems of Garrison and Garlock are connected through automatic transfers.  On September 13, 1996, Garlock and Garrison entered into a reciprocal arrangement (the "Letter

{00178588 v 1}

Agreement") under which Garlock agreed to provide Garrison with a line of credit up to $200 million for working capital purposes and Garrison agreed to loan Garlock any available cash held by Garrison in excess of its working capital requirements.  Advances by Garlock to Garrison for working capital requirements are evidenced by a $200 million Revolving Note (the "Garrison Note").  Garrison advances of available cash to Garlock are evidenced by a separate $200 million Demand Grid Note (the "Demand Grid Note").  Under the terms of the Letter Agreement, any transfers of available cash by Garrison to Garlock will first be applied to repay open balances in the Garrison Note, if any, before any transfer is considered a borrowing by Garlock under the Demand Grid Note and, conversely, any advances by Garlock to Garrison will first be applied to the Demand Grid Note before constituting an advance to Garrison under the Garrison Note.  In accordance with the Letter Agreement, whenever a disbursement is presented for payment in a Garrison account, Garlock funds the disbursement from a Garlock disbursement account on behalf of Garrison and charges Garrison for the amount of such disbursement through the Garrison Note and whenever Garrison receives cash in its lockbox account, the cash is transferred to the Garlock funding/concentration account as a repayment of the Garrison Note.  As of May 31, 2010, Garrison owed $170,104,552 million to Garlock under the Garrison Note and, as such, there were no balances outstanding under the Demand Grid Note.

## II.    THE DEBTORS' NEED FOR POSTPETITON FINANCING FACILITY AND FOR USE OF CASH COLLATERAL

26.    As a consequence of the circumstances set forth above and without the relief available in Chapter 11, the Debtors need access to a postpetition credit facility and use of cash collateral to ensure that the Debtors have access to sufficient cash to meet ongoing obligations necessary to operate its businesses.  The credit facility and the authority to use cash collateral would assure that the Debtors can purchase the goods and services that they need to protect the value of

their business operations, and pay the wages, salaries, rent, utilities and other expenses associated with protecting their businesses and the value of their assets.

27.    The Debtors are filing a motion for entry of interim and final Orders, pursuant to sections 105, 345(b), 361, 363 and 364 of title 11 of Bankruptcy Code and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing post-petition loans with BOA and use of cash collateral (the "DIP Motion").   The DIP Motion seeks authority for and approval of both an Interim and a Final DIP Financing Order[4] (a) authorizing the Debtors to use the cash collateral of BOA;  (b) authorizing Garlock and Garrison to obtain credit and incur debt pursuant to that $10,000,000 financing arrangement (the "DIP Facility") with BOA, which is contemplated by that certain Post-Petition Loan and Security Agreement substantially in the form annexed to the DIP Motion and by all of the DIP Loan Documents, secured by the Collateral and Liens as set forth more fully in the DIP Motion;  (c) authorizing the Debtors to incur the obligations as provided for in the DIP Facility; and (d) scheduling a final hearing with respect to each of the foregoing matters.

28.    Based on the foregoing, it is evident that the consequences of leaving the Debtors without access to cash collateral and a postpetition debtor-in-possession financing facility may have a materially adverse effect on the Debtors' estates and creditors.  Without the immediate access to the DIP Facility to support letters of credit and similar needs, the value of the Debtors' business operations could be damaged.

29.    Without access to the DIP Facility, the Debtors may suffer a strain on its liquidity that could restrict or hinder the Debtors' ability to maintain the ordinary course of its business operations and the value of its enterprise.

---

4 Any capitalized terms not defined herein shall have the meaning attributed to them in the Post-Petition Loan and Security Agreement described herein.

{00178588 v 1}

30.     The Debtors negotiated the terms of the DIP Facility with BOA at arm's length and in good faith.  Based upon BOA's role as agent and participant in the Pre-Petition Credit Facility, BOA is very familiar with the Debtors' assets and potential liabilities including, without limitation, the Asbestos Claims. Based upon the existence of the Asbestos Claims, attempting to negotiate alternative financing with any lender group other than BOA would have been very difficult.

31.      For these reasons, access to credit under the DIP Facility and use of cash collateral is critical to protect the value in the Debtors and their assets until their chapter 11 reorganization can be completed.

32.     The Debtors are unable to obtain unsecured credit allowable solely as an administrative expense or credit secured by junior liens.  The proposed DIP Facility reflects the exercise of sound and prudent business judgment.  The Debtors believe that it would not have been able to obtain financing on any other basis.  In the Debtors' considered business judgment, the DIP Facility is the best financing option available in the circumstances in this case.

### III.   OTHER FIRST DAY MOTIONS

33.     Concurrently with the filing of this Chapter 11 Case, the Debtors have filed a number of First Day Motions, each of which is described briefly below.  I have reviewed each of the First Day Motions (including the exhibits thereto, if any) and I believe that the relief sought in each of the First Day Motions (a) is necessary to enable the Debtors to operate in chapter 11 with a minimum of disruption or loss of value and (b) constitutes a critical element in achieving a successful Chapter 11 reorganization of the Debtors. The First Day Motions consist of the pleadings described below:

A.      **Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases**

34.     The Debtors will present a motion requesting the entry of an order providing for the joint administration of their Chapter 11 Cases.  Such an order is a necessary administrative convenience for the Court, the Office of the Clerk of the Court and all parties in interest.  Further, joint administration of the Chapter 11 Cases is a condition to the DIP Facility described above.

B.      **Motion of the Debtors for Entry of an Order Under 11 U.S.C. §§ 363, 364, 1107 and 1108, (I) Authorizing (A) Continued Use of Existing Cash Management System, (B) Maintenance of Existing Bank Accounts, (C) Continued Use of Existing Business Forms and (D) Waiver of Deposit Guidelines and Continued Use of Investment Policies; and (II) (A) Granting Administrative Priority Status to Post-Petition Intercompany Claims and (B) Authorizing Continued Performance Under Intercompany Arrangements (the "Bank Account Motion ")**

35.     The Debtors seek the immediate entry of an order (a) waiving the requirement that it open a new set of books and records as of the Petition Date, (b) authorizing it to continue to use its existing business forms, (c) waiving the requirement that it open new bank accounts to replace all of its existing Accounts, (d) authorizing it to continue to use its Cash Management System, (e) granting administrative priority status to postpetition intercompany claims, and (f) authorizing performance under intercompany arrangements.

36.     The Debtors respectfully submit that opening a new set of books and records would create unnecessary administrative burdens, causing unnecessary expense and utilization of resources.  The Debtors believe they can separate operations occurring prior to the Petition Date from those activities after the Petition Date. Additionally, the Debtors, in the ordinary course of their businesses, use many checks, invoices, stationery and other business forms.  In order to continue their operations in an orderly fashion, the Debtors need to be permitted to use their existing business forms without alteration or change.  A substantial amount of time and expense would be required in

order to print new checks and other business forms.  Although it is possible to change these forms, the Debtors submit that this would create confusion and delay among their employees and third-parties.

37.    Before the Petition Date, the Debtors, in the ordinary course of business, maintained eleven (11) primary bank accounts at BOA; one (1) bank account at Scotiabank in Canada and one (1) investment account with Banc of America Securities, LLC (collectively, the "Bank Accounts") through which the Debtors manage cash receipts, transfers, disbursements and investments for the Debtors' domestic corporate enterprise (the "Cash Management System"). Each of these accounts is described in greater detail in the Bank Account Motion and in the chart of the Cash Management System attached as Exhibit A thereto.  The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between such accounts by various methods, including checks, electronic funds transfers and direct deposits. All of the domestic bank accounts are maintained by financially stable banking institutions with Federal Deposit Insurance Corporation insurance.

38.    The Debtors believe that requiring them to close the Bank Accounts and open new bank accounts would unnecessarily disrupt the Debtors' businesses. The Debtors believe that if the Bank Accounts are continued in their current form then the transition through chapter 11 be smooth and orderly.  The Debtors' personnel can distinguish between prepetition and postpetition obligations and disbursements without closing existing Bank Accounts and opening new ones. Accordingly, the Debtors respectfully request that the Bank Accounts be maintained in the ordinary course of business, provided that no prepetition checks, drafts, wire transfers, or other forms of tender that have not yet cleared the relevant drawee bank as of the Petition Date will be honored unless authorized by separate order of this Court.

39.    The Debtors, prior to the commencement of these Chapter 11 Cases, utilized a

centralized Cash Management System in the ordinary course of their businesses. The primary

operating Bank Accounts utilized in the system are maintained at BOA.

40.     The Debtors' Cash Management System allows the Debtors to effectively and

efficiently run their businesses. The Debtors believe that to maintain the value of their businesses

there must be minimal disruption to their administrative affairs, and that the maintenance of their

current Cash Management System, is essential to limiting disruptions to the Debtors' operations.

Maintenance of the Bank Accounts would greatly facilitate the Debtors' "seamless transition" to

postpetition operations. To avoid delays in payment of debts incurred postpetition and to ensure as

smooth a transition into chapter 11 as possible, the Debtors should be permitted to continue to

maintain the existing Bank Accounts and, if necessary, to open new accounts. Otherwise, the

transfer of the Bank Accounts will be disruptive and time consuming.

41.     The basic structure of the Cash Management System described in more detail

in the Bank Account Motion has been utilized by the Debtors and it constitutes the Debtors'

ordinary, usual and essential business practices. The Cash Management System is similar to those

commonly employed by corporate enterprises comparable to the Debtors in size and complexity.

The widespread use of such systems is attributable to the numerous benefits they provide, including

the ability to (a) accurately track, and thus control, all corporate funds through the access of real-

time reporting on all accounts, (b) ensure cash availability, and (c) reduce administrative expenses

by facilitating the movement of funds and the development of timely and accurate account balance

and presentment information. These controls are particularly important here, given the significant

amount of cash that flows through the Debtors' integrated Cash Management System on an annual

basis.

42.     In addition, given the corporate and financial structure of the Debtors, it

would be difficult for the Debtors to establish an entirely new system of bank accounts. For

example, if the Debtors were required to open separate bank accounts as debtor-in-possession and rearrange their Cash Management System, it would necessitate reopening several separate accounts and attendant delays in the Debtors' ability to operate their businesses while pursuing these arrangements.   Thus, under the circumstances, maintenance of the Debtors' Cash Management System is not only essential, it is also in the best interests of their respective estates and creditors (of course, the Debtors will continue to maintain strict records with respect to all transfers of cash, so that all transactions can be readily ascertained, traced and recorded properly). Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Debtors' Cash Management System obviously will facilitate the Debtors' reorganization efforts.

43.     The Debtors seek the entry of an order waiving the investment and deposit requirements imposed by Bankruptcy Code section 345(b) for the reasons set forth in the Bank Account Motion.  The Debtors believe that its investment policies as set forth in the Bank Account Motion provide both secured investments and flexibility which would not unnecessarily disrupt the Debtors' businesses and impair their efforts to preserve the value of the Debtors' estate. Accordingly, the Debtors seek a waiver of these requirements.

44.     The Debtors maintain business relationships with each other and their non-debtor affiliates and, as a result, there are intercompany claims that reflect intercompany receivables and payables made in the ordinary course of the Debtors' businesses.

45.     The Debtors are filing separate motions dealing with certain intercompany service agreements and intercompany vendor issues; however, to ensure that each individual Debtor can continue to pay intercompany claims in the ordinary course of business after the Petition Date

postpetition intercompany claims should be granted administrative priority expense status.[5]

46.    If intercompany claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

47.    As set forth above, in Paragraph 25, Garlock and Garrison have operated under the Letter Agreement and under a connected Cash Management System through the use of automatic transfers.    The advances between Garlock and Garrison are recorded by continuing adjustments to the Garrison Note and the Demand Grid Note.   As described above, as of May 31, 2010, Garrison owed $170,104,552 million to Garlock under the Garrison Note and, as such, there were no balances outstanding under the Demand Grid Note.

**C.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Continue Payroll and Payroll Related Practices Including Payment or Reimbursement of Certain Pre-Petition  (A) Wages, Salaries, Vacation Pay and Other Compensation and Amounts Withheld from such Compensation; (B) Employee Medical Claims, Health Benefits, and Similar Benefits; (C) Reimbursement of Employee Expenses; and (D) Payment of Costs Incident thereto and (II) Authorizing Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay Certain Checks and Transfers (the "Payroll Motion")**

48.    The Debtors seek the entry of an order authorizing, among other things, the Debtors, in the Debtors' sole discretion, to pay (a) pre-petition claims for payment or reimbursement of (i) employee salary, wages, commissions, bonuses, accrued but unused paid time off, and related payments and (ii) employee benefits to or for the benefit of their employees, (b) all costs and expenses incident to such claims, and (c) authorizing the Debtors to continue pre-petition employment policies and practices including certain severance and incentive plans post-petition.

---

5 These post-petition intercompany claims will be subordinate to any claims that the Court may award to the BOA as the Debtors' debtor-in-possession lender and first lien holder pursuant to sections 503(b), 364(C) and 507 of the Bankruptcy Code to secure the DIP Obligations as more fully set forth in the Interim DIP Order.

49.    Garlock's workforce includes approximately 600 full- and part-time employees and Garrison's workforce includes 11 full-time salaried employees (collectively, the "Employees").  As described more fully in the Payroll Motion, the Debtors owe certain wages and commissions to its Employees as of the Petition Date, owe accrued vacation and certain benefits to its Employees, and owe the Parent certain reimbursement obligations for payroll and benefits advanced by the Parent.  Additionally, some of the Employees have outstanding claims for reimbursable business expenses that were incurred and paid by them pre-petition but for which they have not yet been reimbursed.

50.    The Debtors believe that all but two of the Employees' claims for pre-petition wages, salaries, commissions, bonuses, accrued but unused paid time off, and related payments fall below the $11,725.00 priority limit of section 507(a)(4) of the Bankruptcy Code; however, these amounts are mostly comprised of unused vacation, and the Debtors expect that these Employees will take their paid time off in the ordinary course of business, and do not anticipate making a cash payment that will exceed the established limit.  The Debtors nonetheless seek authority to pay out these amounts to the extent they exceed $11,725.00 if the Employee is terminated post-petition, and request authority to allow these Employees to take their paid time off in the ordinary course of the Debtors' businesses.

51.    The Parent pays, on Garlock and Garrison's behalf, certain payroll and benefit obligations, the actual cost of which have historically been charged back to each Debtor through use of intercompany accounts and notes, and which are now covered by (i) that certain Intercompany Services Agreement effective as of June 1, 2010 by and between (a) Garlock and (b) the Parent (the "Garlock Services Agreement") and (ii) that certain Intercompany Services Agreement effective as

of June 1, 2010 by and between (a) Garrison and (b) the Parent (the "Garrison Services Agreement"
and, collectively with the Garlock Services Agreement, the "Services Agreements"). These payments
fall into one of several categories:

  i. <u>Parent Benefit Plans</u>

   The Parent offers certain employee benefit plans in which certain Employees are
eligible to participate. These plans include: health insurance plans (including
medical, dental and vision plans), life insurance, long-term disability insurance,
accidental death and dismemberment insurance, workers compensation insurance,
retirement savings plans ("401(k) Plans"), defined benefit plans, deferred
compensation plans, bonus and incentive plans, and employee assistance plans
(collectively, the "Parent Plans"). The Debtors collect full or partial premiums or
contributions from Employees for certain of these plans and the Parent advances
payment of all employer and employee premiums or contributions on behalf of the
Employees and charges the Debtors for such advances pursuant to the Services
Agreements. Thus, with only minor exceptions described in detail in the Payroll
Motion, only the cost of the employer and employee premiums or contributions
advanced by the Parent to third parties on behalf of the Debtors are charged back
to the Debtors, and the portion of those charges that represent Employee portions
of premiums or contributions are offset by premiums the Debtors collect from
Employees. The Debtors benefit from this arrangement because they do not have
to provide stand-alone plans in order to offer these benefits to the Employees and
the Parent is generally able to negotiate lower premiums and better coverage for
the Employees because a Parent-wide plan covers far more employees than a
Debtor-only plan. Further, the Parent does not charge the Debtors any fee or

interest for advancing funds on behalf of the Debtors or coordinating such advances.

ii.  <u>Administrative Convenience Pass-Through Payments</u>

Pursuant to the Services Agreements and consistent with historical practice, the Parent also advances payment directly to third parties on behalf of the Debtors for certain payroll obligations of the Debtors, contributions to 401(k) Plans for employer and employee contributions related to Employees and obligations of the Debtors arising from certain employee benefit plans sponsored by the Debtors (collectively, the "Pass-Through Payments").  The Debtors reimburse the Parent for the Parent's actual cost of the Pass-Through Payments pursuant to the Services Agreements.  The Debtors benefit from this arrangement because the Parent absorbs the administrative burden of arranging payment to a variety of third parties and does not charge the Debtors any fee for advancing funds on behalf of the Debtors or coordinating such advances.

Under the Services Agreements, Garlock and Garrison will accrue liability for the services provided by the Parent throughout the course of a year, and will pay annually for such services in a lump sum on or before January 31 of the following year, as described in greater detail in the Debtors' Motion for (I) Interim Authorization to Continue Performance Under Pre-Petition Services Agreements with EnPro Industries, Inc. and Coltec Industries, Inc. and (II) to Assume Services Agreements.

52.    In addition to the payments described in paragraph 51, above, the Debtors pay certain employee benefits directly to or on behalf of the Employees, fund required or voluntary contributions to the Pension Plan for Hourly Employees at its Palmyra, New York facility, and

reimburse the Employees for any business-related expenses incurred by the Employee and authorized for reimbursement by the Debtors.

53.    Failure to pay the pre-petition Employee salary, wage and benefits claims as described in the Payroll Motion would severely undermine the Employees' morale and result in significant hardship to the Employees.  To retain the services of the Employees and maintain their morale and loyalty during these Chapter 11 Cases, the Debtors seek authority to satisfy the pre-petition Employee claims as set forth in the Payroll Motion. The continued and uninterrupted service of the Debtors' Employees is essential to the Debtors continuing operations and their ability to successfully reorganize.  Any delay in the provision of the pre-petition Employee claims set forth in the Motion will substantially impair the Debtors' relationship with their Employees and destroy Employee morale at the very time when the dedication, confidence and cooperation of the Debtors' Employees is most critical.  At this critical early stage, the Debtors simply cannot risk the substantial disruption of business operations that would inevitably result from any decline in workforce morale attributable to the Debtors' failure to satisfy their pre-petition Employee claims in the ordinary course of their businesses.

54.    Additionally, the authority to continue to compensate the Debtors' Employees (including, without limitation, maintenance of the Annual Incentive Plan, the Annual Performance Plan, the Long-Term Incentive Plan, the Equity Compensation Plan, the Deferred Compensation Plan and the Severance Policy, each as defined in the Payroll Motion) and to maintain the Employee benefits provided to the Employees in the same manner as such compensation and benefits were provided pre-petition is necessary to ensure that the Debtors can retain personnel that are knowledgeable about the Debtors' businesses, to provide an incentive for the Employees to continue

to provide quality services to the Debtors at a time when they are clearly needed and to allow the Debtors to remain competitive in the job markets in which they maintains operations. The Debtors operate in a very competitive market for employees with skill sets such as the Debtors' Employees'. It is extremely difficult for companies such as the Debtors to retain employees, or to attract and hire replacement employees, if payrolls are not met and benefits are not continued. Accordingly, preserving Employee morale and retaining current Employees is critical to the Debtors' ability to maintain business operations in the ordinary course.

55.    Additionally, as noted above, the Debtors request the authority, in their sole discretion, to continue payment of their workers' compensation obligations in the Payroll Motion. Under applicable state law, the Debtors are required to maintain workers' compensation insurance to provide Employees with compensation for injuries arising from or related to their employment with the Debtors. The Debtors estimate that there are currently forty-two (42)[6] reported but unpaid workers' compensation claims for which the Debtors may be liable with projected liability totaling approximately $1,997,800.00.[7]    The Debtors have net expenditures averaging approximately $22,085 per month[8] in payment of workers' compensation claims, all of which are paid to the Parent through the Services Agreements. The Debtors seek authority to pay any and all pre- and post-petition obligations, including any obligations to the Parent, related to the Workers' Compensation Plan.

---

6 Approximately half of these open claims predate the Debtors' current workers' compensation insurance coverage, and were incurred during a period when the Debtors were self-insured. In addition to the Parent's Letter of Credit, the Debtors have posted a bond with a face amount of $3,894,900, and pay annual assessments required by the State of New York from self-insured employers. Payments on these self-insured claims, as well as the State of New York assessments, are included in the total average monthly expenditure noted in this paragraph.

7  This estimate is based upon all reported and estimated incurred but not reported claims against the Debtors as of February 2010.

8  The Debtors average per month was approximately $22,085 during the two years and three months preceding the Petition Date (includes claim costs, self assessment charges, and are net of income returned from various second injury

56.     It is critical that the Debtors be permitted to continue to pay workers' compensation claims and maintain the Workers' Compensation Plan.  If the Workers' Compensation Plan is not maintained, the Debtors could be required to make alternative arrangements for workers' compensation coverage — potentially at a higher cost — because such coverage may be required under applicable state workers' compensation laws, with severe penalties if an employer fails to comply with such laws.  In fact, if workers' compensation coverage is not maintained, without interruption, (a) employees could bring lawsuits for potentially unlimited damages, (b) the Debtors' ongoing business operations could be enjoined and (c) the Debtors' officers could be subject to criminal prosecution.  Furthermore, the Debtors believe that any delay in the timely payment of the pre-petition workers' compensation claims would have a negative impact on the morale of the Debtors' current employees at a time when the support of such employees is most critical.

**D.     Debtors' Motion for Order (I) Authorizing Payment of Pre-Petition Sales and Use Taxes, and (II) Authorizing the Debtors' Banks to Honor Pre-Petition Checks for Payment of Such Amounts (the "Sales Tax Motion")**

57.     The Debtors: (a) collect value added taxes from their Canadian customers in the ordinary course of business for ultimate remittance to taxing authorities (the "Sales Taxes"); and (b) pay state use taxes for the purchase of various non-tax exempt materials and supplies necessary for the operation of their businesses which, because they are not located in-state, do not charge the Debtors Sales Tax in connection with such purchases (the "Use Taxes" and together with the Sales Taxes, the "Sales and Use Taxes").  Without limitation, the Debtors remit Sales and Use Taxes on a monthly, quarterly or annual basis to the following states and countries: New York, Texas, Washington and Canada.  By the Sales Tax Motion, the Debtors request the entry of an order authorizing the Debtors but not directing them to pay the Sales and Use Taxes to various state taxing authorities in the ordinary course of business, regardless of whether the debts were incurred prior to

or following the Petition Date.[9]  Such relief will be without prejudice to the Debtors' rights to

contest the amounts of any Sales and Use Taxes on any grounds.  The Debtors estimate that, as of

the Petition Date, they are liable for accrued but unpaid Sales and Use Tax obligations of

approximately $29,790.

58.    In the sound business judgment of the Debtors, the relief requested is in the

best interest of the estate and its creditors.

**E.    Debtors' Motion for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Pre-petition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Requests for Additional Assurance of Payment (the "Utility Motion")**

59.    In connection with the operation of the offices and plant and the protection of

their assets and business operations, the Debtors obtain electricity, natural gas, water, telephone

services and/or similar services through numerous accounts with various Utility Providers

(collectively, the "Utility Providers").  Utility services are essential to the ability of the Debtors to

sustain their operations while these Chapter 11 Cases are pending.  Any interruption of these

services would severely disrupt the Debtors' day-to-day operations and potentially cause such

operations to be shut down.

60.    To avert disruption to their businesses, the Debtors would be required to pay

whatever amounts are demanded by the Utility Providers to avoid the cessation of necessary

services.  Accordingly, the Debtors seek the entry of an order (a) prohibiting the Utility Providers

from altering, refusing or discontinuing services on account of prepetition invoices and (b)

establishing procedures for determining requests for additional adequate assurance of payment.

---

9 The Debtors have also requested that the Court enter an Order  granting the Payroll Motion authorizing the Debtors to pay any and all payroll taxes which were withheld from employees' paychecks, regardless of whether those payroll taxes accrued pre- or post-petition.

{00178588 v 1}

61.     Prior to the Petition Date, the Debtors were current within terms in the payment of invoices received from Utility Providers.  The Debtors submit that their ability to continue paying for utility services is adequately assured for a number of reasons.  First, the Debtors should have adequate liquidity through their operations, cash on hand and under the terms of the DIP Facility to pay for post-petition utility services on a current basis.  Second, the Debtors propose to make a deposit of one (1) month's average billing with each Utility Company.  Third, the Utility Providers are protected by their entitlement to an administrative expense priority for any unpaid post-petition utility services.  Fourth, the Debtors have a good payment history with the Utility Providers and were generally current on the Petition Date.  Fifth, the Debtors will continue to pay for utility services in the ordinary course of business, including, upon Court approval, services that accrued or were incurred pre-petition.

62.     Under the relief requested in the Debtors' utility motion, the Utility Providers retain the right to seek additional adequate assurance, which may be stipulated to by the parties or be determined by further order of this Court.

63.     In the sound business judgment of the Debtors, the relief requested is in the best interest of the estate and its creditors.

**F.      Debtors' Motion for Entry of an Order for Authority to Honor Certain Pre-Petition Obligations and Otherwise Continue in the Ordinary Course Pre-Petition Programs and Practices with Customers**

64.     Garlock's business operations have developed a reputation for reliability and dependability among its customers.  This reputation depends in part upon Garlock's willingness to stand behind the quality of its products.

65.     Prior to the Petition Date and in the ordinary course of its business, Garlock engaged in certain practices and programs to develop and sustain positive reputations in the marketplace for its products and services.  These practices include, without limitation, (a) various

returns and allowances provided to their customers, (b) various warranties provided in connection with the sale of goods, (c) certain customer incentive and rebate programs and (d) other similar practices and commitments directed at Garlock's customers (collectively, the "Customer Practices"). Garlock instituted these Customer Practices to meet competitive pressures, ensure customer satisfaction and generate goodwill, thereby retaining current customers, attracting new customers and ultimately enhancing the Debtors' business.

66.    The Debtors believe the uninterrupted maintenance of the Customer Practices is essential to preserve their critical business relationships and goodwill for the benefit of their estates and, thus, is critical to the preservation of Garlock's business as a going concern and the preservation of the value of the Debtors' assets.   The harm to Garlock's business if it is unable to honor the pre-petition obligations under these Customer Practices could be devastating, as Garlock could lose the confidence of its customers and substantial goodwill, which are critical to Garlock's continued success.  The Debtors estimate that continued performance of the pre-petition obligations under the Customer Practices will cost approximately $610,000, consisting of credit balances of approximately $250,000 and a reserve for estimated returns, allowances and warranties of $360,000.

67.    In the sound business judgment of the Debtors, the relief requested is in the best interest of the estate and its creditors.

**G.    Debtors' Motion for Entry of an Order for Authority to Honor Certain Pre-Petition Obligations and Continue in the Ordinary Course Pre-Petition Shipping Programs and Practices with Common Carriers**

68.    Garlock's business operations have developed a reputation for reliability and dependability among their customers.  This reputation depends in part upon the timely delivery of orders and related items to their various facilities and to customer.  This supply system involves use of reputable common carriers, shippers, and truckers (collectively, the "Common Carriers"). Garlock coordinates all shipping through AFS Logistics, which audits and coordinates payment of

all Garlock shipping invoices and creates a detailed shipping profile that Garlock can use to identify opportunities for favorable changes to its shipping relationships with its common carriers.  It is essential to the ability of the Debtors to continue operating as a going concern, and thus preserve the maximum value for the Debtors' assets, that Garlock maintain a reliable and efficient supply system.  The Common Carriers also ship, transport, and deliver goods and other finished products to Garlock.  If Garlock does not continue to receive delivery of goods on a timely and uninterrupted basis, its ability to operate will be severely harmed.

69.     The Debtors anticipate that the Common Carriers may argue that they are entitled to possessory liens for transportation and storage, as applicable, of the goods in their possession on the Petition Date and may refuse to deliver or release such goods until their claims have been satisfied.  The Debtors also expect that, as of the Petition Date, certain Common Carriers will have outstanding invoices for goods that were delivered to Garlock or its customers prior to the Petition Date for which the Debtors are responsible (the "Shipping Charges").  The Debtors believe that, if they refuse to pay these Shipping Charges, those Common Carriers may discontinue services and withhold shipment of essential goods.  The value of the goods in the possession of the Common Carriers and the potential injury to the Debtors if the goods are not delivered will far outweigh the Shipping Charges.  The Debtors therefore believe that it is essential to the preservation of the value of their estates to pay certain pre-petition Shipping Charges.

70.     The Debtors submit that the total amount to be paid to the Common Carriers pursuant to the requested relief is minimal compared to the importance and necessity of delivery of the goods currently in transit and in the possession of the Common Carriers.  The Debtors estimate that, as of the Petition Date, the outstanding amount owed to the Common Carriers totals approximately $100,000.

    **H.**     **Debtors' Motion, Pursuant to Sections 105(a), 362, 503(b)(9) and 546(c) of**

**the Bankruptcy Code and Bankruptcy Rule 9019(b), for Entry of an Order (A) Granting Authority to the Debtor to Pay Certain Administrative Expense Obligations Arising from Pre-Petition Operations, (B) Establishing Procedures for Resolving Reclamation Claims and (C) Granting Certain Related Relief (the "Administrative Claims Motion")**

71.     While the Debtors filed the Administrative Claims Motion on the Petition Date, the Debtors will not seek any relief related to this motion on an emergency basis.  However, the Debtors will seek a hearing on the Administrative Claims Motion as soon as practicable, as the relief requested is critical to the Debtors' ongoing operations.  As of the Petition Date, the Debtors were in possession of certain goods delivered to them within twenty days of the Petition Date on credit, but for which they have not yet paid, and anticipates that the Debtors' vendors will assert administrative priority claims for such goods under Section 503(b)(9) of the Bankruptcy Code (the "Twenty Day Administrative Claims").

72.     The Debtors seek entry of an order authorizing, but not directing, the Debtors to pay invoices for all goods they received on credit within twenty days prior to the Petition Date in the ordinary course of their business (the "Twenty-Day Goods") including, without limitation, any goods received from a supplier which is an Affiliated Entity (as defined in paragraph 101).

73.     Additionally, as of the Petition Date, the Debtors were in possession of certain goods delivered to them on credit within 45 days of the Petition Date, but for which they have not yet paid.  As a result of the commencement of the Chapter 11 Cases, the Debtors expect to receive a number of written reclamation demands from various vendors or other parties with respect to such goods.  To avoid piecemeal litigation that would interfere with the Debtors' reorganization efforts, the Debtors seek entry of an order establishing the procedures set forth in the Administrative Claims Motion (the "Reclamation Procedures") for resolving all asserted reclamation claims in the Chapter 11 Cases.

74.     The Debtors believe the uninterrupted supply of raw materials and other

goods used in the Debtors' manufacturing processes, including raw materials and goods supplied by the Affiliated Entities, is essential to providing continuity in their ongoing operations. The agreement of suppliers to continue providing post-petition trade credit is critical to the preservation of the Debtors' business as a going concern and the value of the Debtors' assets. In fact, the Debtors purchase products from these suppliers, including certain Affiliated Entities, which the Debtors cannot otherwise produce and that are not readily available from other sources. Further, the Debtors' expectation in these cases is that they will pay all creditors, asbestos and non-asbestos, the full amount of their allowed claims. I believe that allowing the Debtors to honor these claims in the ordinary course of business will not result in prejudice to any other creditor or party in interest in the Chapter 11 Cases.

75.     Alternatively, the harm to the Debtors' business if they are unable to honor the Twenty-Day Administrative Claims could be devastating. The holders of these claims are under no obligation to continue shipping raw materials and goods to the Debtors at all, much less on favorable trade credit terms. Without the continued support of these suppliers, which the relief requested herein will galvanize, the Debtors could face interruption in their manufacturing processes, in turn costing them the ability to meet customers' needs. The logical result of this snowball effect is lost sales volume and narrowing margins for the Debtors. The Debtors estimate that pre-petition obligations with respect to Twenty-Day Administrative Claims amount to approximately $3,025,000, and that Twenty-Day Administrative Claims of affiliates comprise approximately $1,125,000 of this amount.

76.     Just as a continuous supply of goods and raw materials is necessary to the Debtors' reorganization, so too is the avoidance of costly and distracting litigation. The Reclamation Procedures satisfy this necessity. If the Debtors are unable to establish and implement uniform procedures for addressing reclamation claims, the Debtors will face the prospect of

{00178588 v 1}

simultaneously defending multiple reclamation proceedings or other enforcement efforts at a time

when they need to focus on critical aspects of the reorganization process.

77.     For the reasons set forth above, in the sound business judgment of the

Debtors, the relief requested is in the best interest of the estate and its creditors.

**I.      Motion for Authority to Employ and Compensate Professionals for Specific Services Rendered to the Debtors in the Ordinary Course of Business (the "Ordinary Course Professionals Motion")**

78.     While the Debtors filed the Ordinary Course Professionals Motion on the

Petition Date, the Debtors will not seek any relief related to this Motion on an emergency basis.

However, the Debtors will seek a hearing on this Motion as soon as practicable, as the relief

requested is critical to the Debtors' ongoing operations.  The Debtors retain the services of various

professionals identified on <u>Exhibit A</u> to the Ordinary Course Professionals Motion in the ordinary

course of operating their business (the "Ordinary Course Professionals").  These Ordinary Course

Professionals provide services to the Debtors in a variety of discrete matters including, but not

limited to, the following areas:  state and local regulatory issues, environmental concerns, tax issues,

employee benefit matters, intellectual property issues, litigation, general corporate matters, real

estate matters and labor and employee concerns.   The Ordinary Course Professionals will not be

involved in the administration of these Chapter 11 Cases, but instead will provide services in

connection with the ongoing management of the Debtors' operations and affairs.

79.     Because of the large number and geographic diversity of the professionals that

are regularly retained by the Debtors, it would be unwieldy and burdensome to both the Debtors and

this Court to request each Ordinary Course Professional to apply separately for approval of its

employment and compensation.  Although the automatic stay imposed by section 362 of the

Bankruptcy Code and other issues in these cases may decrease the Debtors' need for the services of

some Ordinary Course Professionals, the Debtors cannot quantify or qualify such need at this time.

For example, many of the Debtors' Ordinary Course Professionals consist of counsel to act as defense counsel in asbestos litigation in all fifty states as well as other jurisdictions.  While the asbestos litigation will be stayed during the pendency of these Chapter 11 Cases, and the Debtors anticipate confirming a plan of reorganization that will channel all Asbestos Claims into a trust established under Section 524(g) of the Bankruptcy Code[10], the Debtors' ordinary course asbestos counsel have a wide range of knowledge about the asbestos claims pending against the Debtors, and their services may be needed as part of the Asbestos Claims resolution process.  Consequently, consistent with the dimensions of these cases, the Debtors request that they be permitted to employ and retain the Ordinary Course Professionals on terms substantially similar to those in effect prior to the Petition Date, but subject to the conditions described in the Professionals Motion including each Ordinary Course Professional's submission of a declaration demonstrating that the professional does not hold an interest adverse to the Debtors on the matter for which the professional is to be engaged.

80.     The Debtors propose that they be permitted to pay, without formal application to the Court by any Ordinary Course Professional, 100% of the monthly interim fees and disbursements to each of the Ordinary Course Professionals upon the submission to the Debtors of an appropriate invoice setting forth in reasonable detail the nature of the services rendered after the Petition Date, provided that such monthly interim fees and disbursements do not exceed $50,000 per month (the "Monthly Cap") and $500,000 per year for each Ordinary Course Professional (the "Annual Cap").  Should the compensation requested by any Ordinary Course Professional exceed the Monthly or Annual Cap, such professional would be required to follow the procedures outlined in this Motion.

---

10 The Debtors reserve all rights with respect to any proposed plan of reorganization, including, without limitation, the right to seek confirmation of such a plan without use of the mechanisms set for in Section 524(g) of the Bankruptcy Code.

{00178588 v 1}

81.    In addition to the Ordinary Course Professionals set forth on <u>Exhibit A</u> of the Professionals Motion, the Debtors also use certain professional services provided by the Parent.  The Parent has certain employees, including staff attorneys, accountants and tax professionals, who provide services to its subsidiaries, including the Debtors, in the ordinary course of business.  As set forth in detail in the Debtors' Motion (I) for Interim Authorization to Continue Performance under Pre-Petition Services Agreements with EnPro Industries, Inc. and Coltec Industries Inc and (II) to Assume Services Agreements, filed contemporaneously with this Motion (the "Services Agreements Motion"), which is discussed in greater detail later in this Affidavit, the services provided by the Parent are primarily of an administrative nature and will have no substantive role in these Chapter 11 Cases.  However, the Parent employees providing these services have substantial institutional knowledge regarding the Debtors and, if the Debtors are not permitted to continue to employ the Parent employees' services in the ordinary course of business, the Debtors will incur substantial costs and lose access to the immense institutional knowledge of the Debtors' affairs held by the Parent professional in-house employees.  The annual charge to the Debtors by the Parent under the Services Agreements for services provided to the Debtors by in-house legal, accounting and tax staff is estimated not to exceed $200,000.

82.    The Debtors request that the Court authorize the Debtors to continue to use the services of the Parent employees, including without limitation staff attorneys, accountants and tax professionals, and that payment for such services be permitted as set forth in the Services Agreements Motion without the need for such employees to file employment applications or fee applications with the Court, and that the Parent employees be exempt from the requirement of the Ordinary Course Professionals to file a declaration demonstrating that the professional does not hold an interest adverse to the Debtors on the matter for which the professional is to be engaged.  Because these Parent employees are not providing services through an independent, third party professional

{00178588 v 1}

-32-

firm, the contents of such a disclosure statement are not applicable to such employees.  Finally, the

Debtors request all services rendered by Parent employees not be subject to the Monthly Cap or the

Annual Cap, but instead be governed by the Services Agreements and any order approving such

agreements.

> **J.**  **Debtors' Motion for Administrative Order Under 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals (the "Interim Compensation Motion")**

83.     While the Debtors filed the Interim Compensation Motion on the Petition

Date, the Debtors will not seek any relief related to this Interim Compensation Motion on an

emergency basis.  However, the Debtors will seek a hearing on this Interim Compensation Motion as

soon as practicable, as the relief requested is critical to the Debtors' ongoing operations.  I am

advised that pursuant to section 331 of the Bankruptcy Code, professionals retained by the Debtors

are entitled to submit applications for interim compensation and reimbursement of expenses every

120 days "or more often if the court permits."  11 U.S.C. § 331.

84.     The Debtors respectfully request entry of an order establishing certain

streamlined procedures for compensating and reimbursing professionals retained in the Chapter 11

Cases.  In summary, the requested procedures would require the presentation of a detailed statement

of services rendered and expenses incurred by each professional for each prior month to (a) the

Debtors and their undersigned counsel, (b) the Office of the Bankruptcy Administrator, (c) counsel

for the Official Committee of Unsecured Creditors in these cases, once appointed, (d) counsel for the

Official Committee of Asbestos Claimants in these cases, once appointed, (e) the Asbestos Future

Claims Representative, once appointed, and (f) counsel to BOA as the provider of the Debtors'

senior secured post-petition DIP Facility if approved by the Court.  If there are no timely objections,

the Debtors would be permitted to pay ninety percent (90%) of the amount of the fees incurred for

the month, with a ten percent (10%) holdback, and one hundred percent (100%) of the expense

disbursements recorded for the month.  As set forth more fully in the Interim Compensation Motion,

these payments would be subject to the Court's approval as part of the interim fee application

process approximately every 120 days, and as part of the final fee application process after the

conclusions of these cases.

85.     I believe establishment of these procedures are in the best interest of the

Debtors and other parties in interest in these cases.  These suggested procedures will enable all

parties to monitor closely the costs of administration of these Chapter 11 Cases, maintain more level

cash flow availability and implement efficient cash management.

**K.     Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 102 and 105(a) and Bankruptcy Rules 2002(m) and 9007 Establishing Case Management and Notice Procedures (the "Case Management Motion")**

86.     By this Motion, the Debtors seek an order establishing certain notice and case

management procedures, all subject to further order of the Court, including: (a) limiting the notice

procedures in these chapter 11 cases and (b) designating the parties upon whom notice must be

served.  Regulating the service, notice and filing requirements at the outset of these cases will

minimize confusion regarding such important procedural matters.  Further, these proposed

procedures will ease the Court's administration of these cases and dramatically reduce the economic

burdens on the Debtors' estates.

87.     Specifically, the Debtors propose that every notice, motion or application, and

all briefs, memoranda, affidavits, declarations or other documents filed concurrently in support

thereof in these cases (collectively, the "Filings") and all Filings, complaints and other pleadings

filed in any adversary proceeding commenced in these cases shall be subject to the notice procedures

described in the Case Management Motion (the "Notice Procedures"), unless otherwise ordered by

the Court.

88.     There are potentially over one hundred thousand creditors and other parties in

interest involved in these cases, each of which may be entitled to certain notices. The Debtors expect

numerous parties to file notices of appearance and requests for notices and copies of pleadings as

these cases proceed.

89.    The costs associated with copying and mailing or otherwise serving all notices

and motions to all creditors and parties in interest would impose an expensive administrative and

economic burden on the Debtors' estates and on creditors. Such mass mailings would be

extraordinarily costly to the Debtors' estates and require the Debtors to divert limited resources to

comply with these administrative requirements. Additionally, the repeated drafting and filing of

motions to limit notice for each use, sale or lease of the Debtors' property out of the ordinary course

of business, asset sales and for various compromises and settlements, increase the administrative and

economic burden on the Debtors' estates.

90.    The Debtors believe that adopting the Notice Procedures will substantially

reduce administrative burdens and result in substantial cost savings to the Debtors' estates because

of the reduction of time and money the Debtors will have to expend on the Filings. The Debtors

further believe that adopting the Notice Procedures will also significantly reduce the administrative

and economic burden placed on creditors and parties in interest when filing the Filings.

91.    The Notice Procedures have been tailored to attempt to ensure that all parties

in interest that may be directly affected by the relief sought by a particular Filing will receive notice

of such filing directly from the party submitting the filing to the Court. Thus, the Debtors believe no

party will be adversely affected.

**L.    Debtors' Motion for (I) Interim Authorization to Continue Performance Under Pre-Petition Services Agreements with Enpro Industries, Inc. and Coltec Industries, Inc. and  (II) to Assume Services Agreements**

92.    The Debtors seek authorization, on an interim basis, to continue to perform

under the Garlock Services Agreement and the Garrison Services Agreement, and further request

that Court authorize the Debtors to assume those agreements after additional notice to parties in interest.

93.     Pursuant to the Garlock Services Agreement, the Parent provides Garlock certain operational and financial process engineering and management, strategic planning and business development, information technology, human resources, supply chain management, legal, working capital improvement, environmental, health and safety, taxation and treasury and cash management functions on an as-needed basis (the "Services").  Under this agreement, the Parent charges Garlock for a portion of the costs of the compensation and benefits of the employees providing such services and other costs of these services based upon one of the following: (a) an estimate of the percentage of time the Parent's employees devote to Garlock projects, (b) the number of employees of Garlock in proportion to the total U.S. headcount of the Parent's subsidiaries, (c) the number of bank accounts of Garlock in proportion to the total bank accounts of the Parent's subsidiaries or (d) the U.S. sales of Garlock in proportion to total U.S. sales of the Parent's subsidiaries.

94.     The Garlock Services Agreement also provides for Garlock's continued participation in certain of the Parent's insurance policies (the "Insurance Coverages").  Garlock's premium or claims responsibility is determined based on objective formulas set forth in the Garlock Services Agreement.

95.     Under the Garrison Services Agreement, the Parent provides certain payroll, automobile leasing, legal, taxation, human resources, treasury and accounting and other financial services, as well as coverage under the Parent's executive liability insurance and malpractice insurance for an annual fee of $100,000 (the "Garrison Services Charge"), which the Debtors believe to be fair, arms-length pricing for the services and coverages provided to Garrison.

96.     As described more fully in the summary of the Payroll Motion, under both

Services Agreements, the Parent will continue to permit eligible Garlock and Garrison employees to participate in the Parent Plans, and will continue to make the Pass-Through Payments (collectively, the "Payments").

97.     Under the Garrison Services Agreement, Garrison will accrue liability to the Parent for the annual Garrison Services Charge and the Payments made by the Parent on behalf of Garrison during the calendar year (collectively, the "Annual Garrison Charge").  On or before January 31 of each year, Garrison will pay the Parent an amount equal to the Annual Garrison Charge for the previous calendar year first, by Garlock to the Parent, through the settlement procedures outlined in paragraph 98 below, on behalf of Garrison as an advance by Garlock to Garrison under the Garrison Note; and second by Garrison to the Parent in cash, in an amount equal to any unpaid Annual Garrison Charge that remains outstanding on the Garrison Settlement Date.

98.     Garlock will accrue liability for amounts due to Parent for the Services, Insurance Coverages and Payments provided by the Parent throughout the course of a year (the "Annual Garlock Charge"), and will pay The Annual Garlock Charge on or before January 31 of each year.  The Annual Garlock Charge is to be made first through a corresponding reduction in the amount of interest due and payable in cash to Garlock from Stemco LP under its $153.9 million note to Garlock and then from Coltec under its $73.4 million note to Garlock.  If any unpaid charges remain outstanding after application to the cash interest due on these notes, such charges would be applied against deferred, payment-in-kind interest under these notes and then against the principal of these notes, in the same order of application, with any excess charges to be paid in cash. However, given the offsets described above, it is unlikely that Garlock will pay for any of the amounts due under either the Garlock Services Agreement in cash.

99.     The Debtors rely on the Parent for the provision of the Services, the Insurance Coverages and the Payments and the uninterrupted continuation of the Services provided to the

Debtors under the Services Agreements are critical for a smooth transition into these Chapter 11 Cases. Should the Debtors be required to obtain the Services, the Insurance Coverages or the Payments elsewhere, either from a third party or by hiring employees capable of providing the Services and managing the Insurance Coverages and the Payments, it would create (a) significant additional costs to the Debtors and (b) major disruption to the Debtors' business operations during any transition. Many of the Services return benefits to the Debtors far exceeding the cost charged to the Debtors by the Parent. For example, the Parent's continuous improvement teams, which focus on pricing, commercial excellence and operational excellence, design and implement processes and procedures that provide returns typically in excess of ten times the charges to Garlock for these Services. In addition, the centralized payment administration provided by the Parent with respect to certain of the Debtors payroll and benefit obligations, and the combined coverage under Parent benefit plans and insurance policies, provide substantial benefits to the Debtors in the form of administrative convenience and because the Parent is able to negotiate lower premiums and better coverage, since Parent-wide plans and policies cover far more employees and property than a plan or policy covering only the Debtors. While the timing and form of payment set forth in the Services Agreements is different than past practice, the formalized relationships set forth in the Services Agreements are substantially identical to the intercompany operational relationship between the Debtors and the Parent as it has existed for some time. The Debtors have had a long history of profitable operations, and continue to operate profitably today, demonstrating that the relationship between the Debtors and Parent as set forth in the Services Agreements is beneficial to the Debtors and their estates. Further, the Parent treats other of its subsidiaries substantially the same as the Debtors with respect to the Services, Insurance Coverages and Payments provided and the charges and reimbursements for those Services, Insurance Coverages and Payments.

          100.     In the exercise of their business judgment, and for the reasons set forth above,

the Debtors have determined that the Services Agreements should be assumed.  In short, the

Services, Insurance Coverages and Payments provided to the Debtors by the Parent under the

Services Agreements are vital to the Debtors' ability to continue to operate profitably in the ordinary

course of business.  The Services Agreements formalize the provision of Services, Insurance

Coverages and Payments, and the method of determining the pricing therefore in a manner

substantially similar to the way the relationship has existed for some time.  Therefore, in the

Debtors' informed business judgment, the Debtors believe that assumption of each Services

Agreement is in the best interests of the Debtors, their creditors and their estates.

### M.    Debtors' Motion for Authorization to Continue Ordinary Course Sale and Purchase Transactions with Affiliated Entities (the "Affiliate Transaction Motion")

101.    As noted above, Garlock is a subsidiary of Coltec, which has dozens of direct

and indirect operating subsidiaries worldwide (collectively, with Coltec, the "Affiliated Entities").

The Affiliated Entities primarily (a) produce engineered products, many of which are incorporated

into other Affiliated Entities' products or sold by other Affiliated Entities in their local markets or

(b) distribute such products.  Prior to the Petition Date and in the ordinary course of its business,

Garlock sold and purchased various finished and unfinished goods from Affiliated Entities,

including without limitation, certain direct and indirect subsidiaries of Garlock.  These sales and

purchases are necessary to supply customer demand in Garlock's and other Affiliated Entities'

respective markets.  In general, Garlock sells products to Affiliated Entities that these companies are

incapable of manufacturing, but for which there is demand in their markets; and purchases products

from Affiliated Entities that Garlock cannot produce, but for which there is customer demand in its

markets.  In most cases, the products sold and purchased are not available from other sources and,

therefore, the continued ability to sell and purchase these goods is critical to the continued success of

both Garlock and the other Affiliated Entities.

{00178588 v 1}

102.    In 2009, Garlock sold approximately $10,708,000 in goods to Affiliated Entities, and purchased approximately $11,752,000 in goods from Affiliated Entities.  These amounts are likely to fluctuate in 2010 and beyond based on increases or decreases in total sales to outside customers of Garlock and other Affiliated Entities.  The products are sold and purchased at prices that Garlock believes approximate arms-length pricing, taking into consideration: (a) sales volumes; (b) Affiliated Entities' efforts to increase market share for Garlock's products; (c) the independent sales and marketing burden carried by the purchasing Affiliated Entities; (d) inventory volume carried by Affiliated Entities; and (e) the value added to the products sold by the purchasing Affiliated Entities.

103.    Additionally, Garlock on occasion provides certain services, including research and development, information technology, accounting and finance and managerial services to other Affiliated Entities for which Garlock charges the other Affiliated Entities based on resource allocation.

104.    Payment for purchases and sales of goods and for services provided by Garlock between all Affiliated Entities are made each month through a multilateral netting system (the "Netting System"), which has been outsourced to and is managed by Bank of America-Dublin ("BoA-Dublin").  The Netting System is typical of settlement mechanisms commonly used by multi-national companies to pay for goods and services purchased from affiliated companies, particularly where payments are being made from or to foreign affiliates, necessitating multiple currency conversions.  All payables to Affiliated Entities are input to the Netting System by Garlock and other Affiliated Entities at the beginning of each netting cycle; each intercompany payable generates an offsetting intercompany receivable.  All obligations are reviewed and confirmed by Garlock and all other Affiliated Entities prior to the monthly Netting System settlement.  Upon receiving confirmation and approval, BoA-Dublin calculates the net amount owed or due Garlock and each

{00178588 v 1}

other Affiliated Entity, at which time each Netting System participant pays or receives the net
amount of its intercompany trade in its own currency.

104.    The Netting System is only open for the input of payables for a limited time
each month; it will open again for the input of payables on June 10, 2010, for settlement on June 30,
2010.  The last settlement date was on or about May 27, 2010, at which time all payables were paid
under the procedures of the Netting System.  Therefore, as of the Petition Date, no Garlock payables
are pending within the Netting System, enabling Garlock to ensure no pre-petition claims of
Affiliated Entities will be paid through the Netting System without Court authority.

105.    By the Affiliated Transaction Motion, the Debtors are seeking to confirm
Garlock's ability to continue its pre-petition practice of buying and selling goods from and to other
Affiliated Entities including, without limitation, its wholly-owned subsidiaries, and making or
receiving payments through the Netting System.  By the Affiliated Transaction Motion, the Debtors
are not seeking authority to pay any pre-petition claim owed to any Affiliated Entity, subject to any
other Order of this Court allowing payment of pre-petition claims.

**N.    Motion for an Order Granting Debtors an Extension of Time to File
        Schedules and Statements (the "Extension Motion")**

106.    By the Extension Motion, the Debtors seek entry of an order extending the
time within which the Debtors are required to file their respective schedules of assets and liabilities,
lists of equity security holders, schedules of executory contracts and unexpired leases and statements
of financial affairs (collectively, the "Schedules and Statements").

107.    Due to the number of creditors, as well as the size and complexity of the
Debtors' business operations, there was insufficient time to prepare the Schedules and Statements
prior to the Petition Date.  The Debtors are currently working to prepare the Schedules and
Statements but do not believe that such Schedules and Statements will be complete and filed within

{00178588 v 1}

the time limits prescribed under Bankruptcy Rule 1007(c). The Debtor did file a list of the known

holders of claims with their voluntary petitions on the Petition Date. The Debtors submit that the

accuracy of the Schedules and Statements will be greatly enhanced if the relief requested in the

Extension Motion is granted. Recognizing the importance of the Schedules and Statements in these

Chapter 11 Cases, the Debtors intend to complete the Schedules and Statements as quickly as

possible under the circumstances. Accordingly, the Debtors request that the Court extend the date by

which the Schedules and Statements must be filed for an additional thirty-one (31) days (for a total

of forty-five (45) days) from the Petition Date, or through and including July 20, 2010, in order that

the Debtors may recover information from their records and from records maintained by third parties

for the Debtors.

**O.    Debtors' Motion for an Order Granting Additional Time to File Reports Pursuant to Federal Rule of Bankruptcy Procedure 2015.3(a)**

108.    Garlock wholly or partially owns, directly or indirectly, interests in six (6)

entities that are not debtors in these Chapter 11 Cases (the "Non-Debtors").[11] Five of the Non-Debtors

are directly owned by Garlock[12] and one of the Non-Debtors is indirectly owned by Garlock.

109.    I am informed that Garlock will be required to file certain reporting pursuant to

Bankruptcy Rule 2015.3 regarding the value, financial status and businesses of its wholly or partially-

owned subsidiaries (the "Bankruptcy Rule 2015.3 Reports"), and that those reports are required to be

filed seven days before the first meeting of creditors in these cases. The Debtors' believe cause exists

to extend the deadline for the filing of the Debtors' Bankruptcy Rule 2015.3 Reports based on (a) the

size and complexity of the Debtors' businesses and the number of entities in which the Debtors hold a

---

11 The Non-Debtors are: Garlock Valqua Japan, Inc., Garlock International Inc., Garlock of Canada Ltd, Garlock de Mexico, S.A., Garlock Overseas Corporation and Garlock Pty Limited.

12 Garlock owns a 49% interest in Garlock Valqua Japan, Inc., and a 99.9% interest in Garlock de Mexico, S.A., with the other 0.1% owned by Garlock Overseas Corp., a wholly-owned Garlock subsidiary.

{00178588 v 1}

controlling or substantial interest; and (b) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3(a) on the Debtors' reorganization efforts.

110.     As noted above, the Non-Debtors include six wholly or partially owned entities. Assembling and compiling the financial reports regarding the value, operations, and profitability of these various entities in the very brief period of time permitted by Bankruptcy Rule 2015.3 would be a tremendous burden on the Debtors.  This situation is exacerbated by the concurrent requirement for the Debtors to prepare and file their Schedules and Statements, as well as the process of transitioning the Debtors' businesses into chapter 11.  These tasks have imposed substantial burdens on the Debtors' management, personnel, and advisors in addition to the day-to-day operations of the Debtors' business.

111.     Accordingly, the Debtors propose to file the first financial reports on Tuesday, July 20, 2010 and to file subsequent financial reports every six months thereafter.

112.     The Debtors believe the relief requested herein will not prejudice any party-in-interest.  The Debtors intend to work cooperatively with the Office of the Bankruptcy Administrator for the Western District of North Carolina, any creditors' committee that is appointed, their lenders, their professionals, and other constituents to provide access to the Debtors' books and records, including disclosures relating to the Non-Debtors.  The Debtors and their professionals are working diligently to complete their Schedules and Statements, which will provide considerable information on the Debtors' business operations and financial position to all parties-in-interest.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

{00178588 v 1}

## CONCLUSION

In order to minimize any disruption in continuing the ordinary course of business for the Debtors or any potential loss of value to the Debtors' business operations, the Debtors' immediate objective is to take all necessary and required steps to protect the value of its businesses and the value of its assets following the commencement of the Chapter 11 Cases. The Debtors believe and further I believe that if this Court grants the relief requested in each First Day Motion, the prospect for achieving these objectives, to the maximum benefit of creditors and the Debtors' estate, will be substantially enhanced.

_____
Donald G. Pomeroy, II

Sworn to and subscribed before me
This the 4th day of June, 2010.

_____
[print name]
Notary Public
My Commission Expires: 11/01/2011

```
KANDACE HEINTZELMAN
NOTARY PUBLIC
Mecklenburg County
North Carolina
My Commission Expires Nov. 1, 2011
```

-45-