## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

|  |  |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC,[1] et al.,<br><br>_____ Debtors. | Case No. 10-_____<br><br>Chapter 11<br><br>Jointly Administered[2] |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO CONTINUE PAYROLL AND PAYROLL RELATED PRACTICES INCLUDING PAYMENT OR REIMBURSEMENT OF CERTAIN PRE-PETITION (A) WAGES, SALARIES, VACATION PAY AND OTHER COMPENSATION AND AMOUNTS WITHHELD FROM SUCH COMPENSATION; (B) EMPLOYEE MEDICAL CLAIMS, HEALTH BENEFITS, AND SIMILAR BENEFITS; (C) REIMBURSEMENT OF EMPLOYEE EXPENSES; AND (D) PAYMENT OF ALL COSTS INCIDENT THERETO AND (II) AUTHORIZING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO RECEIVE, PROCESS, <u>HONOR AND PAY CERTAIN CHECKS AND TRANSFERS</u>

Garlock Sealing Technologies LLC ("Garlock"), Garrison Litigation Management, Group, Ltd. ("Garrison") and The Anchor Packing Company ("Anchor"), debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), hereby move (the "Motion") the Court for entry of an order (the "Order"), pursuant to sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Debtors, as applicable, to continue payroll and payroll related practices including payment to employees or reimbursement to the Parent (as defined herein) of certain pre-petition (a) wages, salaries,

---

[1] The Debtors include Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

[2] Contemporaneously with this Motion, the Debtors have filed a Motion for Joint Administration, seeking to jointly administer each of the Debtors' cases with Garlock Sealing Technologies LLC serving as the lead case.

vacation pay and other compensation and amounts withheld from such compensation; (b) employee health insurance claims, contributions to retirement plans, payment of life insurance and other insurance programs for employees' benefit and similar benefits, subject to the modifications and limitations set forth herein; (c) reimbursement of employee expenses; and (d) all costs and expenses incident to the foregoing (collectively, the "Employee Obligations"); and (ii) authorizing applicable banks and other financial institutions to receive, process, honor and pay all pre-petition checks and transfers drawn on the Debtors' accounts to satisfy the Employee Obligations.  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these proceedings and the Motion in this Court is proper under 28 U.S.C. § 1408.

2.      The statutory bases for the relief requested herein are sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code and Rule 6003 of the Bankruptcy Rules.

## BACKGROUND

3.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or statutory committee has yet been appointed in these Chapter 11 Cases.

4.      The Debtors are not in business distress, but are overwhelmed by the financial and institutional costs of defending and resolving tens of thousands of asbestos claims in state and federal courts across the country.  As described in the Debtors' Information Brief, filed on the

Petition Date or shortly thereafter, they have filed these cases for the purpose of resolving their alleged asbestos liability in a single forum that offers an efficient and fair means of determining and satisfying the Debtors' responsibility for the mass of asbestos personal injury claims pending against them and expected to be filed in the future.  The Debtors' goal in these cases is to pay all creditors, asbestos and non-asbestos, the full amount of their allowed claims.  The Debtors are confident they can achieve this goal if Garlock is able continue its history of profitable operations by maintaining its operations in the same manner it did pre-petition.  However, in order to do so, the Debtors, including Garlock, must maintain their commitments to customers, creditors and employees.  Those commitments are in turn dependent on the Debtors maintaining both financial as well as operational stability.  With such stability in mind, the Debtors seek to continue to operate in the ordinary course of business during and subsequent to these Chapter 11 Cases, and have filed a number of motions on the Petition Date, including this Motion, seeking this Court's authority to take steps necessary to ensure a seamless transition into these Chapter 11 Cases.

A.      **History and Corporate Structure**

5.      Garlock, a North Carolina limited liability company, and Garrison, a North Carolina corporation, are wholly owned subsidiaries of Coltec Industries Inc ("Coltec"), a Pennsylvania corporation, which is in turn wholly owned by EnPro Industries, Inc. ("EnPro" and, collectively with Coltec, the "Parent"), a North Carolina corporation headquartered in Charlotte, North Carolina and manufacturer of engineered industrial products.     EnPro is a publicly traded company whose shares are traded on the New York Stock Exchange.  According to EnPro's annual report on Form 10-K as of and for the year ended December 31, 2009, EnPro's total shareholders' equity was approximately $311,600,000 as of December 31, 2009.  Anchor, a North Carolina corporation, is a wholly-owned subsidiary of Garrison.

6.      Garlock's business was founded in 1887 in Palmyra, New York.  Garlock produces and sells high performance fluid-sealing products, including gaskets and compression packing used in internal piping and valve assemblies in numerous industries.  Garlock employs approximately six hundred people, and Garlock has a global sales presence serviced from manufacturing facilities in Palmyra, New York and Houston, Texas.  Garlock also owns three non-debtor foreign subsidiaries that own manufacturing operations in Canada, Mexico and Australia.  In 2009, Garlock had global sales of approximately $113 million, down from $150 million in 2008, and has had operating income (exclusive of insurance receipts and payments of asbestos settlements, judgments and legal fees) in excess of $12 million each of the past five years.  Garlock continuously develops innovative products to meet the changing needs of its customers.  Garlock also strives to be an industry leader in lean manufacturing as reflected by its extensive ongoing $40 million multi-year project begun in 2006 to modernize its Palmyra manufacturing campus by building state-of-the-art manufacturing facilities and adding new equipment that enable it to compete more effectively.

7.      Anchor is a non-operating subsidiary of Garrison.  For many years, Anchor distributed fluid sealing materials, including gaskets and packing.

8.      Some of the gaskets and packing produced and/or sold by Garlock (prior to 2001) and Anchor (prior to 1993) contained encapsulated asbestos. Since the 1970s, Garlock and Anchor have received hundreds of thousands of claims by individuals ("Asbestos Claimants") alleging they suffer from personal injuries related to exposure to such products ("Asbestos Claims").

9.      Garrison, which is headquartered in Rochester, New York, was formed in 1996 to manage the defense and settlement of Asbestos Claims against Garlock.  To this end, Garrison

(a) supervises a nationwide network of local defense law firms that represent the Debtors in Asbestos Claims in various states; (b) assists in defending Asbestos Claims before and during trial; (c) settles Asbestos Claims; (d) pays judgments, settlements and defense costs; and (e) makes claims against, collects payments from and facilitates audits as required by insurers in connection with Garlock Asbestos Claims.  Garrison currently employs eleven people, including three staff attorneys supported by paralegals, and finance and data entry personnel.  Garrison's oversight of all aspects of Asbestos Claims has enabled Garlock to focus on continuing its successful history of profitable and innovative manufacturing.

**B.**     **Events Leading To the Petition Date**

10.     For a detailed description of the circumstances that led the Debtors to seek protection under chapter 11, see the Debtors' Information Brief, filed on the Petition Date or shortly thereafter.

11.     The Debtors' asbestos-containing gaskets and packing contained encapsulated, nonfriable asbestos that generally did not release asbestos fibers. Removal of some gaskets or packing from pipe joints, valves, and equipment could release trace levels of asbestos that generally would not exceed the current permissible exposure limit (PEL) established by the Occupational Safety and Health Administration ("OSHA").[3] The Debtors added warnings to their products in 1977, and discontinued producing and selling products that contained asbestos in 2000, even though none of the Environmental Protection Agency, OSHA or any other federal or state agency ever required asbestos-containing gaskets or packing to have warning labels or banned their production or use.

---

[3] In 1971, the newly established OSHA started regulating asbestos. OSHA's initial standard set the permissible exposure limit (PEL) at 12 f/cc (8-hour time-weighted average (TWA)).  As the dangers of asbestos became progressively better understood, OSHA periodically lowered the exposure limit.  In 1994, OSHA set the PEL at 0.1 f/cc (8-hour TWA), where it remains today.

12.     Despite having produced and sold lawful and safe products, which can still be legally sold today, the Debtors are overwhelmed by Asbestos Claims.  As of December 31, 2009, they had received over 850,000 claims and paid approximately $1.37 billion in indemnity payments and approximately $389 million in legal costs to resolve such claims.  Approximately 100,000[4] such claims remain pending today.  Garrison pays over $100 million annually to defend and resolve Asbestos Claims.

13.     The Debtors' cost of resolving an individual Asbestos Claim has on average multiplied over eightfold since early 2000, when a bankruptcy wave commenced that eventually swept nearly all of the major manufacturers of dangerous, friable, asbestos products into bankruptcy.[5]  As a result of joint and several liability principles applicable in many jurisdictions and improper selective targeting of product exposure evidence by plaintiffs' firms (described in the Information Brief), the bankruptcy wave left peripheral defendants like Garlock, whose products contained non-friable asbestos, to pay the enormous liabilities of such bankrupt defendants.

14.     Garlock believed until recently that it would survive the bankruptcy wave because most of the major asbestos manufacturers have emerged from bankruptcy by funding post-

---

[4]  Garlock has approximately 100,000 asbestos-related claims currently pending against it, and Anchor has approximately 83,000 such claims, however the Debtors believe most of the claims against Anchor are duplicative of claims against Garlock, related to Garlock products sold and distributed by Anchor.

[5]  The companies driven into bankruptcy by asbestos litigation since January 1, 2000 include: Pittsburgh Corning (2000); Owens Corning (2000); Fiberboard (2000); Babcock & Wilcox (2000); Armstrong World Industries (2000); GAF (2001); U.S. Gypsum (2001); Turner & Newell (2001); A.P. Green (2002); Harbison Walker (2002); North American Refractories Company Inc. (NARCO) (2002); W.R. Grace (2001); Skinner Engine Co. (2001); E.J. Bartells (2001); United States Minerals Products (2001); Murphy Marine Services (2001); Insul Co. (2001); Swan Transportation (2001); North American Refractories Corp. (2002); Kaiser Aluminum (2002); Harbison-Walker (2002); A.P. Green (2002); Plibrico Co. (2002); Shook & Fletcher (2002); Porter-Hayden Co. (2002); Artra Group, Inc. (2002); Special Metals Corp. (2002); Asbestos Claims Management Corp. (2002); ACandS (2002); JT Torpe Co. (2002); A-Best Products (2002); Western MacArthur/Western Asbestos (2002); C.E. Thurston (2003); Combustion Engineering (2003); Congoleum Corp. (2003); Mid-Valley (Halliburton subsidiaries) (2003); Muralo Co. (2003); Flitkote Co. (2004); Oglebay Norton Co. (ONCO) (2004); Special Electric (2004); Quigley Co. (2004); Utex Industries (2004); API, Inc. (2005); Asarco (2005); Brauer Supply Co. (2005); Dana Corporation (2006); ABB Lummus Global (2006); and Lloyd E. Mitchell Co. (2006).

confirmation trusts under section 524(g) of the Bankruptcy Code with over $20 billion to pay injuries caused by their products. Other major bankrupt manufacturers have reached agreement with asbestos claimants and will soon add another $10 billion plus to the 524(g) trust availability. In 2006, the trusts began making claim payments and today trusts pay billions of dollars annually to many of the same claimants who pursue damages from the Debtors.

15.     The establishment of a system of extraordinarily wealthy asbestos trusts, however, has not abated Garlock's inflated costs of resolving Asbestos Claims. The asbestos claims resolution system has been irrevocably fractured into two tracks—a system of trusts that have assumed liability for friable asbestos products that most plausibly caused plaintiffs' diseases, and a tort system where peripheral defendants like Garlock that produced encapsulated asbestos products are isolated and targeted. Garlock is paying more than its share of liability because the trust system operates completely independent of the tort system. Claimants generally are able to target Garlock and other peripheral defendants in the tort system, collecting their full damages while denying that they have evidence of exposure to dangerous, friable products of bankrupt defendants. Claimants then collect significant damages again from trusts based on evidence they submit alleging exposure to the same friable products about which they disavowed knowledge in the tort system.

16.     While Garlock continues to produce safe and useful products and provides good jobs to hundreds of workers, the continued cost of resolving Asbestos Claims unfairly targeted against Garlock at values improperly inflated by bankruptcies of culpable producers of friable asbestos products threatens Garlock's core business. The cash flows necessary to defend and resolve Asbestos Claims in the tort system threaten to deplete rapidly both the remaining insurance available to Garlock for such claims and Garlock's cash flow from operations. Without

chapter 11 protection, the value of the Debtors' core businesses and the Debtors' ability to compete effectively in the marketplace will be irrevocably damaged.  If Garlock's responsibility for Asbestos Claims is determined in a single forum under a process that guarantees integrity through application of the rules of evidence and the rule of law, Garlock has sufficient earnings capacity, insurance and other assets to fund a post-confirmation trust that will pay Asbestos Claims in full.  Therefore, the Debtors have determined that filing these Chapter 11 Cases provides the Debtors their only means of determining and resolving their true liability for Asbestos Claims.

17.     In support of this Motion, the Debtors rely on the Affidavit of Donald Pomeroy in Support of their Chapter 11 Petitions and First Day Motions (the "Pomeroy Affidavit").[6]

## **RELIEF REQUESTED**

18.     Garlock employs a total of approximately six hundred (600) people at its operating facilities in Houston, Texas and Palmyra, New York, as well as commissioned sales people throughout the United States, including approximately three hundred fifty (350) hourly Employees and two hundred fifty (250) salaried Employees; three (3) of these Employees work part-time while the rest are full-time employees.

19.     Garrison employs approximately eleven (11) people in its headquarters in Rochester, New York, all of which are full-time salaried Employees.

20.     As set forth in the Pomeroy Affidavit, as of the Petition Date, Anchor has no active employees.

21.     The Debtors' current and former employees are collectively referred to herein as "Employees" or, in the singular, "Employee."

---

[6] Any capitalized terms not defined herein shall have the meaning attributed to them in the Pomeroy Affidavit.

22.     The Employees perform a variety of functions for the Debtors, including, without limitation, manufacturing, sales and marketing, customer service, environmental health and safety, maintenance, and generally sustaining the Debtors' business operations through various administrative, accounting, supervisory and managerial functions.  The Employees' knowledge and handling of operational tasks are essential to the Debtors' efforts to preserve and maximize the value of the Debtors' businesses and assets for the benefit of creditors and other stakeholders in these Chapter 11 Cases.  The Debtors' (and in particular, Garlock's) history of profitable business operations has depended on the efforts of their Employees, and the Debtors have instituted payroll, bonus and benefit plans designed to reward Employees and keep them motivated toward the Debtors' continued success.  Without the continued, dedicated service of the Employees, the Debtors' goal to pay all creditors the full amount of their allowed claims will not be possible.

23.     To minimize the personal hardship that the Employees will suffer if the Employee Obligations are not paid when due or as expected, as well as to maintain morale and assure continuity in the Debtors' workforce and operations, the Debtors seek authority to continue to pay the Employee Obligations, regardless of whether such Employee Obligations arose pre-petition or post-petition, as set forth herein to, or on behalf of, Employees, or, as applicable, to reimburse the Parent for Employee obligations paid, including all costs and expenses incident thereto.

24.     The Debtors also request that the Court authorize applicable banks and other financial institutions to receive, process, honor and pay all pre-petition checks and transfers drawn on the Debtors' accounts to satisfy the Employee Obligations.

## I.    Authority for Debtors to Continue Payroll and Payroll Related Practices

### A.    Payment of Certain Payroll and Benefit Obligations

25.    The Parent pays, on Garlock and Garrison's behalf, certain payroll and benefit obligations, the actual cost of which have historically been charged back to each Debtor through use of intercompany accounts and notes, and which are now covered by (i) that certain Intercompany Services Agreement effective as of June 1, 2010 by and between (a) Garlock and (b) the Parent (the "Garlock Services Agreement") and (ii) that certain Intercompany Services Agreement effective as of June 1, 2010 by and between (a) Garrison and (b) the Parent (the "Garrison Services Agreement" and, collectively with the Garlock Services Agreement, the "Services Agreements").  These payments fall into one of several categories:

i. Parent Benefit Plans

The Parent offers certain employee benefit plans in which certain Employees are eligible to participate.  These plans include: health insurance plans (including medical, dental and vision plans), life insurance, long-term disability insurance, accidental death and dismemberment insurance, workers compensation insurance, Parent-sponsored retirement savings plans ("401(k) Plans"), defined benefit plans, deferred compensation plans, bonus and incentive plans, and employee assistance plans.  The Debtors collect full or partial premiums or contributions from Employees for certain of these plans and the Parent advances payment of all employer and employee premiums or contributions on behalf of the Employees and charges the Debtors for such advances pursuant to the Services Agreements.  Thus, with only minor exceptions described in detail in this Motion, only the cost of the employer and

employee premiums or contributions advanced by the Parent to third parties on behalf of the Debtors are charged back to the Debtors, and the portion of those charges that represent Employee portions of premiums or contributions are offset by premiums the Debtors collect from Employees.  The Debtors benefit from this arrangement because they do not have to provide stand-alone plans in order to offer these benefits to the Employees and the Parent is generally able to negotiate lower premiums and better coverage for the Employees because a Parent-wide plan covers far more employees than a Debtor-only plan.  Further, the Parent does not charge the Debtors any fee or interest for advancing funds on behalf of the Debtors or coordinating such advances.

ii.   Administrative Convenience Pass-Through Payments

Pursuant to the Services Agreements and consistent with historical practice, the Parent also advances  payment directly to third parties on behalf of the Debtors for certain payroll obligations of the Debtors, contributions to Garlock 401(k) Plans for employer and employee contributions related to Employees, and obligations of the Debtors arising from certain employee benefit plans sponsored by the Debtors.  The Debtors reimburse the Parent for the Parent's actual cost of these advances pursuant to the Services Agreements.  The Debtors benefit from this arrangement because the Parent absorbs the administrative burden of arranging payment to a variety of third parties and does not charge the Debtors any fee for advancing funds on behalf of the Debtors or coordinating such advances.

Under the Services Agreements, Garlock and Garrison will accrue liability for the services provided by the Parent throughout the course of a year, and will pay annually for such services in a lump sum on or before January 31 of the following year, as described in greater detail in the Debtors' Motion for (I) Interim Authorization to Continue Performance Under Pre-Petition Services Agreements with EnPro Industries, Inc. and Coltec Industries, Inc. and (II) to Assume Services Agreements.

### B.     Salaries, Wages, Vacation, Paid Time Off, Sick Leave, Payroll Taxes and 401(k) and other Withholdings

26.     <u>Salary and Wages</u>.  The Debtors issue payroll to hourly Employees on a weekly basis and to salaried Employees on a bi-weekly basis.  In addition, commissions, to the extent earned, are paid on a monthly basis.  The Debtors have paid their respective salaried Employees for services rendered through June 4, 2010.  The Debtors have paid their respective hourly Employees for services rendered through May 28, 2010.  Commissions earned during May are scheduled to be paid on or about June 10, 2010.  As of the Petition Date, the Debtors had accrued but unpaid wage obligations of approximately $254,400 for current Employees.  In addition, as of the Petition Date, the Debtors had accrued but unpaid payroll and related obligations for certain Employees of approximately $85,900, which were advanced by the Parent and charged back to the Debtors pursuant to the Services Agreements.

27.     <u>Paid Vacation/Personal Time</u>.  The Debtors offer paid vacation/personal time off ("paid time off") and certain paid holidays to eligible Employees.  The vacation accrual year is from January 1 through December 31.  Any unused vacation time may not be carried forward from year to year.  Upon termination with proper notice, it has been the Debtors' practice to pay accrued but unused paid time off to the terminated Employee.  Vacation is allocated as described

below according to the Employee's status as a union hourly Employee, non-union hourly Employee, or salaried Employee.

28.     Under the terms of the current Collective Bargaining Agreement between Garlock and the International Association of Machinists and Aerospace Workers in Palmyra, New York (the "Union CBA"), full-time union hourly Employees are entitled to receive paid time off based on the following schedule: one week paid time off for those with at least one, but less than two, years of continuous employment, two weeks paid time off for those with two to seven years, three weeks paid time off for those with eight to fourteen years, four weeks paid time off for fifteen to twenty-four years, and five weeks paid time off for those with twenty-five or more full years.  Full-time union Employees may, in the Debtor's discretion, receive unused vacation pay for up to forty hours of unused vacation time at the end of the calendar year, but any other accrued but unused vacation is forfeited at the end of the calendar year.

29.     Full-time, non-union hourly Employees receive paid time off based on the following schedule: one week of paid time off for those with at least six months of service, two weeks paid time off for those with one to four years of service, three weeks paid time off for those with five to nine years of service, four weeks paid time off for those with ten to nineteen years of service, and five weeks paid time off for those with twenty or more full years of service. Full-time, non-union hourly Employees may, in the Debtors' discretion, receive unused vacation pay for up to forty hours of unused vacation time at the end of the calendar year, but any other accrued but unused vacation is forfeited at the end of the calendar year.

30.     Garlock full-time and permanent part-time salaried Employees receive paid time off based on the following schedule: ten days of paid time off for those with one to seven years of service, fifteen days of paid time off for those with eight to fourteen years of service, twenty

days of paid time off for those with fifteen to twenty-four years of service, and twenty-five days for those with twenty-five or more full years of service, subject to grandfathering of certain previous arrangements.  During their first year of employment, new Garlock salaried Employees are eligible for one day of vacation for each month of service, not to exceed ten days.  All accrued but unused vacation is generally forfeited at the end of each year.

31.    Garrison salaried Employees receive two weeks of paid time off for one to four years of service, three weeks paid time off for five to fourteen years of service, and four weeks time off after fifteen full years of service.  New Garrison Employees hired prior to June 1 of a given year are eligible for one week of vacation in their first year of employment after completion of six months of service.

32.    Garlock offers a vacation purchase program to salaried and non-union hourly Employees.  The program allows Employees to purchase one to two full weeks of additional time off, with manager approval.  Any purchased vacation is deducted from the Employees' earnings through payroll.

33.    The Debtors seek authority to continue to allow Employees to take paid time off in accordance with the Debtors' pre-petition practices and procedures, regardless of whether such time was earned pre- or post-petition.  Further, the Debtors seek authority to continue to allow Employees to purchase paid time off, as permitted under the vacation purchase program.

34.    The Debtors estimate that, as of June 5, 2010, obligations to Employees for accrued but unused vacation (excluding holidays) total approximately $1,294,000.

35.    <u>Sick Leave</u>.  The Debtors offer sick leave to certain Employees.  Sick leave varies according to the classification of the Employee.  Union hourly Employees receive no sick leave.  Full-time non-union hourly Employees are entitled to receive up to two days of sick leave per

year.  Full-time non-exempt salaried Employees are entitled to receive up to five days of sick leave per year.  Exempt salaried Employees are permitted to take sick leave in their discretion.

36.     The Debtors seek authority to continue to allow Employees to take sick leave in accordance with the Debtors' pre-petition practices and procedures.

37.     The Debtors estimate that, as of June 5, 2010, obligations to Employees for accrued but unused sick leave is approximately $43,400.

38.     <u>Paid Holidays</u>.  The Debtors typically observe a number of paid holidays throughout the year in the ordinary course of their businesses.  Out of an abundance of caution, the Debtors seek authority to continue observing paid holidays in the ordinary course of their businesses.

39.     As of the Petition Date, two Employees have accrued but unpaid wages and accrued but unused vacation (excluding holidays) exceeding the $11,725.00 limit provided under section 507(a)(4) of the Bankruptcy Code.  As these amounts are mostly comprised of unused vacation, the Debtors expect that these Employees will take their paid time off in the ordinary course of business, and do not anticipate making a cash payment that will exceed the established limit.  However, the Debtors seek authority to pay out these amounts to the extent they exceed $11,725.00 if the Employee is terminated post-petition, and request authority to allow these Employees to take their paid time off in the ordinary course of the Debtors' businesses.

40.     By this Motion, as set forth above, the Debtors seek authority to pay, in the ordinary course of the Debtors' businesses, each individual Employee his or her accrued but unpaid salary, wages, overtime pay, unused vacation and commissions, or reimburse the Parent for all pre-petition salary, wages, overtime pay, unused vacation and commissions under the Services Agreements, as applicable, as of the Petition Date.  Further, the Debtors request that any

payroll service provider be authorized to continue any pre-petition payroll funding process as such process existed prior to the Petition Date, including initiation of ACH or other electronic transfer withdrawals from the Debtors' bank accounts.

41.    <u>Employee Withholdings</u>.  The Debtors deduct certain amounts from Employees' paychecks and are obligated to remit such withholdings on behalf of the Employees including: (a) federal, state and local income taxes and the individual Employee's portion of FICA; (b) contributions to certain employee benefit plans, including contributions to 401(k) Plans and 401(k) Plan loan repayments; (c) deductions for various insurance and other benefit plan premiums for which the Employees are responsible; (d) deductions for court-ordered child support, garnishment, and bankruptcy-related obligations; (e) deductions requested by individual Employees for deposit into such Employee's credit union, savings, or other financial institution accounts; (f) deductions requested by individual Employees for deposit into Employee's flexible spending account; (g) deductions requested by individual Employees for charitable donations; (h) deductions requested by individual Employees for the Political Action Committee; (i) and deductions requested by individual Employees for Union dues.  While the Debtors remit certain of these withholdings directly to the appropriate payee, the Parent advances payment of certain of these withholdings to the appropriate payee on behalf of the Debtors and then charges such advances back to the Debtors under the Services Agreements.  The Debtors seek authority to remit the sums withheld pre-petition that the Debtors are obligated to remit to such third-party payees but have not yet remitted to the appropriate payees or, to the extent applicable, allow the Debtors to pay the Parent for any advances related to such withholdings in accordance with the terms of the Services Agreements, regardless of whether such advances were made pre-petition.

### C.   Employee Health, Medical and Disability Benefits, Life Insurance

42.   The Debtors and the Parent permit eligible Employees to participate in certain employee benefit plans including medical plans, dental plans, vision plan, life insurance, supplemental life insurance, long-and short-term disability plans, and accidental death and dismemberment plans.  Some plan premiums are subsidized in whole or in part by the Debtors (either paid directly or reimbursed to the Parent under the Services Agreements), while the Employees are responsible for all premiums related to other plans.

43.   <u>Health Insurance Plans</u>.  Eligible Employees may participate in health insurance plans (Aetna Choice POS Plan - 80 and Aetna Choice POS II Plan - 90, collectively the "Self-Insured Health Plans") offered by the Parent and administered by Aetna CDHP ("Aetna"), that are underwritten by the Parent, meaning that the Parent is responsible for any payment of claims made against the plans.  Under the Self-Insured Health Plans, depending on the classification of the Employee as union or salaried, the Debtors contribute either 77% or 80% of the premium costs where only the Employee is covered and either 72% or 73% of the premium costs where Employees plus dependent(s) are covered.  The Self-Insured Health Plans each carry a lifetime maximum of $1,000,000 per covered participant, which may include Employees and their spouses and children.  Employees are eligible for a $1,000 rebate in the Employee portion of premium costs for meeting certain wellness parameters.  As the Parent has assumed underwriting risk for the Self-Insured Health Plans, it pays all eligible claims on behalf of the Employees and charges the Debtors a monthly employee and employer premium amount under the Services Agreements, currently approximately $41,000, which amount is adjusted periodically based on a third-party actuarial determination of the premiums applicable to the insurance provided by the

Parent.[7]  As noted in paragraph 29 of this Motion, Employee portions of premiums for the Self-Insured Plans are withheld by the Debtors from participating Employees' paychecks, and offset the monthly Employee portion of the premiums charged by the Parent under the Services Agreements.

44.     The Debtors offer a health insurance plan to eligible Employees ("Blue Choice 25"), administered by Excellus Blue Cross Blue Shield ("Blue Cross"), that is third-party insured, meaning that Debtors are only responsible for the payment of the employer portion of premiums under the plan.   Under Blue Choice 25, depending on the classification of the Employee as union or salaried, the Debtors contribute either 77% or 80% of the premium costs where only the Employee is covered and either 72% or 73% of the premium costs where Employees plus dependent(s) are covered.  Effective January 1, 2011, for union Employees, Debtors will contribute 75% of the premium costs where only the Employee is covered and 70% of the premium costs where Employees plus dependent(s) are covered.  The typical total monthly employer and employee premiums for Employees' participation in Blue Choice 25 are approximately $206,000.  The Debtors withhold the Employees' portion of these premiums and the Parent remits all employer and employee Blue Choice 25 premiums and charges the Debtors under the Services Agreements for the total amount of employee and employer premiums paid on the Debtors' behalf.  The Employee withholdings offset the portion of this charge related to employee premiums.

45.     The Debtors offer a health insurance plan to eligible Employees ("MVP Basix"), administered by MVP Health Care ("MVP"), that is third-party insured, meaning that Debtors are only responsible for the payment of the employer portions of the premiums under the plan.

---

[7] The premium amount charged under the Services Agreements reflects an equalized payment of anticipated claims.

Under MVP Basix, depending on the classification of the Employee as union or salaried, the Debtors contribute either 77% or 73% of the premium costs where only the Employee is covered and either 72% or 73% of the premium costs where Employees plus dependent(s) are covered. Effective January 1, 2011, for union Employees, Debtors will contribute 75% of the premium costs where only the Employee is covered and 70% of the premium costs where Employees plus dependent(s) are covered. The typical total monthly employer and employee premiums for Employees' participation in MVP Basix are approximately $121,000. The Debtors withhold the Employees' portion of these premiums and the Parent remits all employer and employee premiums and charges the Debtors under the Services Agreements for the total amount of employer and employee premiums paid on the Debtors' behalf. The Employee withholdings offset the portion of this charge related to employee premiums.

46.     The Debtors also allow Employees to make contributions to a flexible spending account. The Debtors may have certain amounts that have been collected and not yet deposited. The Debtors request authority to remit those funds to any Employee's flexible spending account as appropriate in their ordinary course of business.

47.     <u>Retiree Medical Plans</u>. The Debtors offer the following three medical plans for eligible retired Employees that are under the age of sixty-five (collectively, the "Under 65 Retiree Plans"): Blue Choice 25, MVP Basix, and HealthSCOPE Comprehensive ("HealthScope"). As discussed in paragraphs 32 and 33 of this Motion, Blue Choice 25 and MVP Basix are third-party insured and administered by Blue Cross and MVP, respectively. For Employees that retired before February 12, 2009 and are participants under Blue Choice 25 or MVP Basix, the Debtors contribute 80% of the premium costs as the employer portion of premiums. While participating retired Employees are responsible for payment of the participant

portion of the premiums, the Debtors remit all of the premiums for all retirees covered under Blue Choice 25 and MVP Basix directly to the respective plan administrator. Certain participants remit their portion of the premiums directly to the Debtor, while others have the pension plan trustee, Vanguard Fiduciary Trust Company, withhold such premium from their pension benefit checks. For administrative convenience, Vanguard Fiduciary Trust Company remits the premiums withheld to the Parent and the Parent subsequently remits such withholdings to the Debtors by making payment by check to the Debtors. HealthScope is a self-insured plan, administered by HealthSCOPE Benefits, Inc., for which the Parent advances payment of the claims on behalf of the Debtors and charges these advances back to the Debtors under the Services Agreements. The Debtors also contribute administrative fees in the amount of $18.85 per participant per month for Employees participating in HealthScope.

48.    The Debtors offer the following three medical plans for eligible retired Employees that are over the age of sixty-five (collectively, the "Over 65 Retiree Plans"): Medicare Blue Choice ("Medicare Blue"), MVP Preferred Gold ("MVP Gold"), and HealthSCOPE Medicare Supplement ("HealthScope Medicare"). Medicare Blue and MVP Gold are third-party insured and administered by Blue Cross and MVP, respectively. For Employees that retired before February 12, 2009 and are participants under Medicare Blue or MVP Gold, the Debtors contribute $76.58 per participant per month directly to the third-party administrators, Blue Cross and MVP. While participating retired Employees are responsible for payment of the participant portion of the premiums, the Debtors remit all of the premiums for all retirees covered under Blue Choice 25 and MVP Basix directly to the respective plan administrator. Certain participants remit their portion of the premiums directly to the Debtors, while others have the pension plan trustee, Vanguard Fiduciary Trust Company, withhold such premium from

their pension benefit checks.   For administrative convenience, Vanguard Fiduciary Trust Company remits the premiums withheld to the Parent and the Parent subsequently remits such withholdings to the Debtors by making payment by check to the Debtors.  HealthScope Medicare is a self-insured plan, administered by HealthSCOPE Benefits, Inc., for which the Parent advances payment of the claims on behalf of the Debtors and charges these advances back to the Debtors under the Services Agreements.  The Debtors also contribute administrative fees in the amount of $15.75 per participant per month for Employees participating in HealthScope Medicare.

49.      Employees who participate in an Under 65 Retiree Plan or an Over 65 Retiree Plan and retired on or after February 12, 2009 are responsible for 100% of the premiums under such plan.  In addition, participants in an Under 65 Retiree Plan that transferred to an Over 65 Retiree Plan on or after February 12, 2009, are also responsible for 100% of the premiums for such Over 65 Retiree Plan.

50.      As of the Petition Date, there are approximately two-hundred fifty (250) total participants in the Under 65 Retiree Plans and Over 65 Retiree Plans.  Typically, the Debtors' aggregate monthly costs for retiree medical benefits are $56,000 for claims, premiums, and administrative fees.  As of the Petition Date, the Debtors estimate that they are liable for payment of approximately $55,000 in accrued but unpaid self-insured medical claims under the self-insured HealthScope and HealthScope Medicare plans.

51.      <u>Dental Insurance Plan</u>.  Eligible Employees may participate in a dental insurance plan offered by the Parent, administered by Aetna Life Insurance Company, which is fully self-insured by the Debtors, meaning that the Debtors are responsible for any payment of claims made by the administrator for reimbursement (the "Self-Insured Dental Plan").  Under the Self-

Insured Dental Plan, Debtors contribute 75% of the cost of claims for all Employees.  The Self-Insured Dental Plan has an annual cap of $1,500 per participant.  The Parent advances payments to the administrator on behalf of the Debtors and charges such advances back to the Debtors under the Services Agreements.  The typical monthly claims charged to the Debtors under the Self-Insured Dental Plan are approximately $34,000, but such amount varies monthly based on actual claims paid by the administrator to or on behalf of Employees.  Employee premiums for the Self-Insured Dental Plan are withheld by the Debtors from participating Employees' paychecks, and partially offset the monthly claims charges.

52.     <u>Vision Insurance Plan</u>.  Eligible Employees may participate in a vision plan offered by the Parent, administered by UnitedHealthcare, that is third-party insured, meaning that the Debtors are only responsible for the payment of the employer portions of the premiums, if any, under the plan (the "Vision Plan").  Under the existing Vision Plan, Employee participants contribute 100% of the premium costs.  The Parent advances all premiums for Employees participating in the Vision Plan to the administrator on behalf of the Debtors and charges such advances, approximately $2,000 per month, back to the Debtors under the Services Agreements.  The Employee portion of the premiums for the Vision Plan are withheld by the Debtors from participating Employees' paycheck and fully offset the monthly charge.

53.     <u>Life Insurance</u>.  Eligible Employees may participate in a life insurance plan offered by the Parent, administered by Sun Life Financial, that is third-party insured, meaning that the Debtors are responsible only for the payment of the employer portions of the premiums under the plan (the "Life Insurance Plan").  Under the Life Insurance Plan, the Debtors contribute 100% of the premium costs for participating Employee.  The Parent advances all premiums for Employees participating in the Life Insurance Plan to the administrator on behalf

of the Debtors and charges such advances, approximately $7,000 per month, back to the Debtors under the Services Agreements. Eligible Employees may also participate in a supplemental life insurance policy and a dependent life insurance policy offered by the Parent and administered by Sun Life Financial (the "Supplemental Life Insurance Plans"), under which Employee participants contribute 100% of the premium costs. The Parent advances all premiums for Employees participating in the Supplemental Life Insurance Plans to the administrator on behalf of the Debtors and charges such advances, approximately $6,000 per month, back to the Debtors under the Services Agreements. Employee premiums for the Supplemental Life Insurance Plans are withheld by the Debtors from participating Employees' paycheck and fully offset the monthly charge.

54.    <u>Long-Term Disability</u>.    Eligible Employees may participate in a supplemental long-term disability plan offered by the Parent, administered by Sun Life Financial, that is third-party insured, meaning that the Debtors are only responsible only for the payment of the employer portions of the premiums under the plan (the "LTD Plan"). Under the LTD Plan, the Debtors contribute 40% to 50% of the premium cost for participating Employees, depending on the classification of such Employee. The Parent advances all employer and employee premiums for Employees participating in the LTD Plan to the administrator on behalf of the Debtors and charges such advances back to the Debtors under the Services Agreements. Employee premiums for the LTD Plan are withheld by the Debtors from the participating Employee's paycheck and partially offset the monthly charge. Typically, the Debtors' monthly reimbursement to the Parent for advanced premiums for Employees participating in the LTD Plan is approximately $10,000.

55.     <u>Short-Term Disability</u>.  Eligible Employees located in New York may participate in a short-term disability plan offered by the Debtors, administered by the state of New York (the "NY State STD Plan").  Under the NY State STD Plan, the Debtors are only responsible for an employer portion of the premium costs and the state of New York covers the remaining premiums.  The Parent advances all employer premiums for the NY State STD Plan to the administrator on behalf of the Debtors and charges such advances back to the Debtors under the Services Agreements.  Typically, the Debtors' monthly costs for employer premiums for Employees participating in the NY State STD Plan are approximately $10,000.

56.     Eligible salaried Employees may participate in a short term disability program (the "Salaried STD Plan") that is self-insured, meaning that the Debtors are responsible for any payment of claims made by the administrator.  The Debtors pay directly any claims under the Salaried STD Plan.

57.     <u>Accidental Death & Dismemberment</u>.  Eligible Employees may participate in an accidental death and dismemberment plan offered by the Parent, administered by OneBeacon Insurance Company, that is third-party insured, meaning that the Debtors are only responsible for the payment of premiums under the plan (the "Basic AD&D Plan").  The Debtors contribute 100% of the premium costs for Employees participating in the Basic AD&D Plan.  Eligible Employees may also participate in a voluntary accidental death and dismemberment plan offered by the Parent and administered by OneBeacon Insurance Company (the "Voluntary AD&D Plan"), under which participating Employees contribute 100% of the premium costs.  The Parent advances all employer and employee premiums for the Basic AD&D Plan and the Voluntary AD&D Plan to the administrator on behalf of the Debtors and charges such advances back to the Debtors under the Services Agreements.  Typically, the total monthly employer and employee

premiums for Employees' participation in the Basic AD&D Plan and the Voluntary AD&D Plan are approximately $1,500.

58.     <u>Employee Assistance Plan</u>.  Eligible Employees at the Palmyra, New York plant may participate in Corporate Care (the "Assistance Plan") offered by the Debtor.  The Debtors' typical total annual cost for Employees' participation in the Assistance Plan is approximately $9,000, which is paid for directly by the Debtors.

59.     By this Motion, the Debtors seek authority to pay any and all pre-petition and post-petition obligations, including those obligations to the Parent, related to the Self-Insured Health Plans, Blue Choice 25, MVP Basix, the Under 65 Retiree Plans, the Over 65 Retiree Plans, the Self-Insured Dental Plan, the Vision Plan, the Life Insurance Plan, the Supplemental Life Insurance Plans, the LTD Plan, the NY State STD Plan, the Salaried STD Plan, the Basic AD&D Plan, the Voluntary AD&D Plan, the Assistance Plan and any and all other similar employee benefit plans which the Debtors had in place as of the Petition Date.

**D.     <u>Workers' Compensation Insurance</u>**

60.     Under applicable state law, the Debtors are required to maintain workers' compensation insurance to provide the Employees with compensation for injuries arising from or related to their employment with the Debtors.  The Debtors presently provide required workers' compensation coverage to their Employees pursuant to a plan administered and insured by Liberty Mutual Insurance Company (the "Workers' Compensation Plan").  Under the Workers' Compensation Plan, the Debtors are self-insured up to a $750,000 deductible per accident per employee and up to an aggregate of $10,000,000 for all claims that were incurred during the policy period.  The Debtor's annual premium under the Workers' Compensation Plan is approximately $249,600.  The Parent advances this premium to Liberty Mutual Insurance

Company on behalf of the Debtors and charges such advances back to the Debtors under the Services Agreements.

61.    Since the Workers' Compensation Plan has a high deductible, the Parent establishes reserves based upon a projection of incurred but not reported Employee claims and the severity of reported Employee claims and the projected cost of satisfying all such claims, with such reserves adjusted monthly based upon the Debtors' claim history and the current status of open claims. The Debtors pay the Parent for the monthly projected claims expense related to such reserve adjustments through charges under the Services Agreements.  The Parent directly reimburses the plan administrator for workers' compensation claims of the Employees paid by the administrator, but does not charge the Debtor for such payments.  The Parent has also posted a letter of credit with a face amount of $4,112,000 to secure the Debtors' (and other affiliates') obligations under the Workers' Compensation Plan (the "Letter of Credit").  The Debtors believe that the continuation of these arrangements will minimize the cost and disruption occasioned by these Chapter 11 Cases and avoid potentially costly demands upon the Letter of Credit.

62.    The Debtors estimate that there are currently forty-two (42)[8] reported but unpaid workers' compensation claims for which the Debtors may be liable with projected liability totaling approximately $1,997,800.[9]    The Debtors have net expenditures averaging approximately $22,085 per month[10] in payment of workers' compensation claims, all of which

---

[8] Approximately half of these open claims predate the Debtors' current workers' compensation insurance coverage, and were incurred during a period when the Debtors were self-insured.  In addition to the Parent's Letter of Credit, the Debtors have posted a bond with a face amount of $3,894,900, and pay annual assessments required by the State of New York from self-insured employers.  Payments on these self-insured claims, as well as the State of New York assessments, are included in the total average monthly expenditure noted in this paragraph.

[9] This estimate is based upon all reported and estimated incurred but not reported claims against the Debtors as of February 2010.

[10] The Debtors average per month was approximately $22,085 during the two years and three months preceding the Petition Date (includes claim costs, self assessment charges, and are net of income returned from various second injury funds).

are paid to the Parent through the Services Agreements.  The Debtors seek authority to pay any and all pre- and post-petition obligations, including any obligations to the Parent, related to the Workers' Compensation Plan.

**E.      Severance Plans**

63.      <u>Salaried Employee Severance Policy</u>.  The Debtors have established a Severance Policy for salaried Employees (as amended) (the "Severance Policy").  Under the Severance Policy, the Debtors make payments to eligible salaried Employees involuntarily terminated without cause.  Specifically, under the Severance Policy, eligible salaried Employees receive a base of two weeks salary plus an additional one week of salary for each full year of service, up to a total maximum of twenty-six weeks of salary.

64.      As of the Petition Date, there are no former Employees entitled to any payment under the Severance Policy.  Furthermore, the Debtors do not currently anticipate any significant payments under the Severance Policy during 2010.  However, the Debtors believe that continuation of the Severance Policy is necessary and appropriate to maintain the morale and loyalty of the Employees during this Chapter 11 Case and, out of abundance of caution, request authority to pay such post-petition sums that arise under the Severance Policy in the ordinary course of business.

65.      <u>Union Severance Plan</u>.  Garlock has established a Severance Policy for Union Employees (as amended) (the "Union Severance Plan").  The Union Severance Policy is set forth in the Union CBA.  Under the Union Severance Policy, the Debtors would make payments to an eligible terminated Employee upon permanent shut-down of the Palmyra Plant or a major department therein.  An eligible terminated Employee will receive severance pay based on the following schedule: two weeks pay for those with at least two years of seniority, three weeks pay

for those with three to five years of seniority, four weeks pay for those with six to fifteen years of seniority, four weeks pay for those with six to fifteen years of seniority, five weeks pay for sixteen to twenty-four years of seniority, and six weeks pay for those with twenty-five or more years of seniority.

66.     As of the Petition Date, there are no former Employees currently entitled to payment under the Union Severance Plan.  However, the Debtors believe that continuation of the Union Severance Plan is necessary and appropriate to maintain the morale and loyalty of the Employees during these Chapter 11 Cases and is also required to be maintained pursuant to the terms of the Union CBA, which the Debtors intend to assume.  Therefore, the Debtors request, out of abundance of caution, authority to pay any post-petition claims under the Union Severance Plan that arise in the ordinary course of business.

**F.     401(k) Plans / Pension**

67.     Salaried 401(k) Plan.  Garlock and Garrison have adopted the Parent's Retirement Savings Plan for Salaried Employees (the "Salaried 401(k) Plan"), administered by trustee Charles Schwab Trust Company, wherein eligible salaried Employees may contribute to an individual retirement account through payroll deductions.  The Salaried 401(k) Plan provides for automatic enrollment of all eligible Employees and the Debtors automatically enroll such Employees and withhold an Employee contribution equal to 6% of compensation each payroll period on behalf of each eligible Employee who does not opt out of the Salaried 401(k) Plan.  Under the terms of the Salaried 401(k) Plan, the Debtors are required to make a matching contribution for each participating Employee equal to 100% of his or her 401(k) contribution, up to a maximum total matching contribution of 6% of such Employee's compensation.  Such matching contributions vest immediately.  In addition, participating Employees who are not

eligible to participate in the EnPro Pension Plan or the Garlock Pension Plan (each as hereinafter defined) are entitled to an additional contribution from the Debtors equal to 2% of compensation of such Employee.  Such additional contributions vest over three years.  As of the Petition Date, the Salaried 401(k) Plan covers two hundred thirty-one (231) Employees.  The Parent advances all employer and employee contributions to the Salaried 401(k) Plan to the trustee on behalf of the Debtors, and charges such advances back to the Debtors under the Services Agreements. Employee contributions to the Salaried 401(k) Plan are withheld by the Debtors from participating Employees' paychecks and offset the portion of the monthly charge related to Employee contributions.

68.     Hourly 401(k) Plan.  Garlock and Garrison have adopted the Parent's Retirement Savings Plan for Hourly Employees (the "Hourly 401(k) Plan"), administered by trustee Charles Schwab Trust Company, wherein eligible hourly Employees may contribute to an individual retirement account through payroll deductions.  The Hourly 401(k) Plan provides for automatic enrollment of all eligible Employees and the Debtors automatically enroll such Employees and withhold an Employee contribution equal to 5% of compensation each payroll period on behalf of each eligible Employee who does not opt out of the Hourly 401(k) Plan.  The Debtors make matching contributions for each participating Employee in an amount equal to 50% of his or her 401(k) contribution, up to a maximum total matching contribution of 3% of such Employee's compensation.   Such matching contributions vest immediately.   In addition, participating Employees who are not eligible to participate in the EnPro Pension Plan or the Garlock Pension Plan (each as hereinafter defined) are entitled to an additional contribution from the Debtors equal to 2% of compensation of such Employee.  Such additional contributions vest over three years.  As of the petition date, the Hourly 401(k) Plan covers two hundred thirty-nine (239)

Employees.  The Parent advances all employer and employee contributions to the Hourly 401(k) Plan to the trustee on behalf of the Debtors, and charges such advances back to the Debtors under the Services Agreements.  Employee contributions to the Hourly 401(k) Plan are withheld by the Debtors from participating Employees' paychecks and offset the portion of the monthly charge related to Employee contributions.

69.   <u>EnPro Pension Plan</u>.  Certain of the Employees are eligible to participate in the Retirement Plan for Employees of EnPro Industries, Inc. (as amended) (the "EnPro Pension Plan") with Vanguard Fiduciary Trust Company as the trustee and Vanguard Institutional Advisory Services as investment manager.  Under the EnPro Pension Plan, each participating Employee receives, or will receive, a monthly retirement pension benefit from the plan assets in an amount determined as the product of his or her years of credited service and the applicable benefit rate.  As of January 1, 2006, new hires and active Employees under the age of 40 at that time were no longer eligible to participate in the EnPro Pension Plan; however, eligible Employees continue to accrue benefits for continued service.

70.   Under the terms of the Services Agreements, the Parent charges the Debtors a monthly pension expense amount for the participation of Employees in the EnPro Pension Plan, wherein such expenses are determined by a third-party actuary.  The trustee of the EnPro Pension Plan makes all payments under such plan to participants from assets of the plan held in the trust account.  The Parent makes all required contributions to the EnPro Pension Plan trust account and does not charge the Debtors for such cash contributions.

71.   <u>Garlock Pension Plan</u>.  Garlock provides a Pension Plan for Hourly Employees of Garlock Sealing Technologies, LLC at its Palmyra, New York facility (the "Garlock Pension Plan"), with Vanguard Fiduciary Trust Company as the trustee and Vanguard Institutional

Advisory Services as investment manager.  Under the Garlock Pension Plan, each participating Employee receives, or will receive, a monthly retirement pension benefit from plan assets in an amount determined as the product of his or her years of credited service and the applicable benefit rate.  As of January 1, 2010, new Employees are no longer eligible to participate in the Garlock Pension Plan; however, eligible Employees continue to accrue benefits for continued service.

72.     Prior to June 1, 2010, mandatory and voluntary contributions to the Garlock Pension Plan were made by the Parent and the Parent charged Garlock a monthly pension expense in the same manner as the EnPro Pension Plan, as described in paragraph 58.  As of June 1, 2010, Garlock assumed the direct responsibility for funding mandatory and voluntary contributions to the Garlock Pension Plan.  From January 1, 2003 through June 1, 2010, the Parent charged Garlock approximately $346,000 more than the Parent contributed to the Garlock Pension Plan.  In order to account for the timing difference reflected by the charges by the Parent in excess of actual contributions, Garlock and the Parent have entered into an arrangement, whereby the Parent will directly fund the next $346,000 of mandatory or voluntary contributions that are due under the Garlock Pension Plan.  The Parent will not charge Garlock for such contributions.  The trustee of the Garlock Pension Plan makes all payments under such plan to participants from assets of the plan held in the trust account.

73.     The Debtors believe that the maintenance of the Salaried 401(k) Plan, the Hourly 401(k) Plan, the EnPro Pension Plan and the Garlock Pension Plan, including the Debtors' contributions to such plans, is essential to maintain the good will of the Employees, and therefore, request authority to pay any such contributions or obligations, including those obligations to the Parent, regardless of whether they are related to pre-petition or post-petition

periods, in the ordinary course of the Debtors' businesses. The Debtors further request that the trustee be authorized to continue payments out of the plan assets of the EnPro Pension Plan and the Garlock Pension Plan to the retired pension plan participants in the ordinary course of business.

### G.    Reimbursement of Employee Costs and Expenses

74.    The Debtors owe certain of their Employees for reimbursement of business-related expenses, including travel, meals and similar charges. The Debtors provide a corporate American Express card for certain Employees for business-related expenses. However, the liability for each American Express card is an Employee liability, and not that of the Debtors, with exception for cards used by the Debtors for business meeting expenses. Reimburseable expenses may have been paid using the American Express card, cash, or an Employee's personal credit card depending on the circumstances. Employees submit expenses for reimbursement, regardless of the original method of payment, on a periodic basis. After appropriate review and approval, expenses are reimbursed to Employees or to American Express on behalf of each Employee, based on the original method of payment. Any business-related expenses that have been charged to the corporate card are paid for by the Debtors directly to American Express. Any personal expenses that have been charged to the corporate card are paid for by the individual Employee directly to American Express. The Parent pays monthly administrative fees to Concur on behalf of the Debtors, which are charged to the Debtors under the Services Agreements. The Debtors' typical monthly reimbursements for business-related expenses owed to management personnel are approximately $104,500.

75.    The Debtors believe that the reimbursement of business expenses incurred by Employees is essential to maintain the good will of the Employees and ensure that Employees are not pursued individually for expenses incurred on behalf of the company, and therefore

request authority to pay any such reimbursements, including any payments to the Parent for administrative fees charged by Concur related to services provided to the Debtors, regardless of whether they are related to pre-petition or post-petition periods, in the ordinary course of the Debtors' businesses.

### H.    Incentive Plans

76.    <u>Annual Incentive Plan</u>.    Garlock has established an Annual Incentive Plan (the "AIP"), in which certain of the Employees are eligible to participate.    The AIP provides opportunities for certain personnel to receive incentive compensation as a reward for high levels of personal performance above the ordinary performance compensated by base salary. Participation by Employees in the AIP is limited to managers and directors, not otherwise eligible for sale commission incentives that have the potential to significantly and positively influence the performance of their division.    Actual awards are determined at the sole discretion of the company's authorized officers ("Management").

77.    Any AIP award is determined based on performance during the Debtors' fiscal year, which runs from January 1 through December 31 (the "Plan Year").    Management assigns each eligible Employee to an incentive category that reflects such Employee's potential impact on important company or division results.    The incentive category defines the target level of incentive opportunity, which is stated as the percentage of such Employee's base salary. Management then assigns each eligible Employee both maximum and threshold award levels. Any awards under the AIP are paid no later than March 31 of the year following the Plan Year. Approximately $471,300 was paid under the AIP for the 2009 Plan Year.

78.    As of the Petition Date, there are no Employees with current entitlement to payment under the AIP because awards, if any, are calculated at year's end.    However, the

Debtors believe that maintenance of the AIP is essential to maintain the good will of the affected Employees, and therefore, out of an abundance of caution, request authority to continue such payments post-petition in the ordinary course of the Debtors' businesses.

79.     Annual Performance Plan.    The Parent has established a Management Annual Performance Plan (the "APP"), in which certain of the Employees are eligible to participate. The APP provides opportunities for certain management personnel to receive incentive compensation as a reward for high levels of personal performance. Participation by Employees in the APP is limited to executives that have the potential to significantly influence the relevant Debtors' performance. Actual awards are determined at the sole discretion of the Parent's management.

80.     Any APP award is determined based on performance during the Plan Year. The Parent assigns each eligible Employee to an incentive category based on such Employee's potential impact. The incentive category defines the target level of incentive opportunity, which is stated as the percentage of such Employee's base salary which will be available to the Employee if the Employee's and relevant Debtors' target performance levels are met for the Plan Year. Parent then assigns each eligible Employee both maximum and threshold award levels. Approximately $475,600 was paid to Employees under the APP for the 2009 Plan Year.

81.     The awards to the Employees under the APP are issued by the Parent to the Employees on behalf of the Debtors and the amount of the Employees' APP award is charged back to the Debtors under the Services Agreements.

82.     While certain Employees are participants in the APP as of the Petition Date, there are no Employees with current entitlement to payment under the APP because awards, if any, are determined at year's end. However, the Debtors believe that continued participation in the APP is essential to maintain the good will of the affected Employees, and therefore, out of an

abundance of caution, request authority to continue such payments, including reimbursement of the Parent for APP advances made by the Parent under the Services Agreements, incurred post-petition in the ordinary course of the Debtors' businesses.

83.     <u>Long-Term Incentive Plan</u>.  The Parent has established a Long-Term Incentive Plan (the "LTIP"), in which certain of the Employees are eligible to participate.  The LTIP provides long-term incentive compensation to certain Employees who are in a position to significantly influence the Debtors' performance and enhance Parent-shareholder value over time.  The Parent's Compensation and Human Resources Committee or a subcommittee of such (the "Compensation Committee") selects Employees from time to time to participate in the LTIP. Employees are selected within 90 days after the beginning of each multi-year performance cycle (the "Performance Period").  Each Performance Period consists of two or more years duration, as determined by the Compensation Committee, ending as of the end of a fiscal year and a new Performance Period will commence in each of the Parent's fiscal years unless the Compensation Committee determines otherwise.

84.     The Compensation Committee assigns each Employee selected to participate with a target award to be earned if the Debtors' target performance levels are met for the Performance Period (the "Target Award").  The Target Award may be expressed as a dollar amount, a number of performance shares, restricted stock units, or a combination of the three.  The Compensation Committee then assigns each participating Employee maximum and threshold award levels, expressed as a percentage of the Target Award.  Performance below the threshold level will result in no incentive payments for the Employee under the LTIP.  Any awards under the LTIP are issued to the Employee no later than March 31 of the year following the Performance Period.

Awards totaling $366,425.00 were issued to Employees of the Debtor under the LTIP for the 2009 Plan Year.

85.     The awards to the Employees under the LTIP are issued by the Parent to the Employees on behalf of the Debtors and the Employees' LTIP award expense is charged back to the Debtors under the Services Agreements.

86.     As of the Petition Date, there are no Employees with current entitlement to payment under the LTIP.   However, the Debtors believe that continued participation by Employees in the LTIP is essential to maintain the good will of the affected Employees, and therefore, out of an abundance of caution, request authority to pay any and all pre- and post-petition obligations, including those obligations to the Parent, related to the LTIP in the ordinary course of the Debtors' businesses.

87.     <u>Equity Compensation Plan.</u>  The Parent has established an Equity Compensation Plan (the "Equity Plan"), in which certain of the Debtors' Employees are eligible to participate. The Equity Plan provides stock based incentives to certain eligible Employees in order to motivate maximum efforts toward continued growth and profitability.   Generally, the Equity Plan serves to establish guidelines for stock based incentives awarded under the LTIP; however, new management level employees have, on occasion, received incentives under the Equity Plan outside of the LTIP.

88.     Certain Employees received pre-petition incentives under the Equity Plan, outside of the LTIP, that will be issued post-petition.   The Debtors believe that continued participation by Employees in the Equity Plan is essential to maintain the good will of affected Employees and, therefore, request authority to pay any and all pre- and post-petition obligations under the Equity Plan in the ordinary course of the Debtors' businesses.

## I.        **Deferred Compensation**

89.    Eligible Employees may participate in a Deferred Compensation Plan (as amended) (the "Compensation Plan") for certain highly compensated individuals offered by the Parent.  The Compensation Plan allows eligible Employees to defer compensation and receive employer contributions which are not otherwise available under the Salaried 401(k) Plan due to limitations imposed by the Internal Revenue Code.  As of the Petition Date, there are four (4) Employees participating in the Compensation Plan.

90.    The Compensation Committee designates Employees who are eligible to participate in the Compensation Plan for the next fiscal Plan Year.  Generally, a participating Employee may elect to defer up to 25% of his or her compensation for a Plan Year and up to 50% of his or her incentive awards for the Plan Year into an individual account maintained for each participating Employee on the books of the Parent.  Subject to certain conditions, the Parent makes a matching contribution to a separate account for each participating Employee equal to the first 6% of the amount deferred by such Employee, up to a maximum of $16,500.  Additionally, for each period that an Employee has compensation in excess of the annual limitation under Internal Revenue Code Section 401(a)(17), the Parent makes a contribution to a separate account for each participating Employee equal to 2% of such Employee's compensation.

91.    Upon first becoming a Compensation Plan participant, each Employee may make an election as to the time and method of payment as follows: (a) lump sum payment following termination of employment, (b) lump sum payment in a specified year, (c) annual installments following termination of employment, or (d) annual installments commencing in a specified year.  The Debtors contributed approximately $27,400 under the Compensation Plan for the 2009 Plan Year.

92.     The Parent advances all amounts contributed to the Employees' Compensation Plan accounts (including amount of employee and employer contributions) on behalf of the Debtor and charges the Debtors for such advances under the Services Agreements.

93.     Debtors believe that the continued ability of Debtors' Employees to participate in the Compensation Plan is essential to maintain the good will of the affected Employees, and therefore, out of an abundance of caution, request authority to continue to pay such obligations, including obligations for reimbursement of the Parent under the Services Agreements, in the ordinary course of the Debtors' businesses, regardless of whether such obligations are related to pre-petition or post-petition periods.

**J.      Company Leased Vehicles**

94.     The Debtors provide company-leased passenger vehicles for forty-nine (49) Employees engaged in sales and marketing activities.  These vehicles are used by Employees in the ordinary course of business.  The Debtors are responsible for reimbursing Employees for all gasoline and oil purchased during business-use mileage, with a receipt of purchase.  The Debtors are also responsible for authorized maintenance and repair of the vehicles.    The Debtors are self-insured against collision and theft and have third-party liability insurance for company owned and company leased vehicles.

95.     The Debtors believe that continued provision of company-leased vehicles to appropriate Employees is essential to maintain the good will of the affected Employees, and therefore, out of an abundance of caution, request authority to pay any such reimbursements and continued use of company-leased vehicles by Employees, regardless of whether they are related to pre-petition or post-petition periods, in the ordinary course of the Debtors' businesses.

### K.      Tuition Assistance

96.      The Debtors provide tuition assistance to eligible Employees who are pursuing continuing education via correspondence courses, professional certification and college level courses.   Participating Employees receive 100% tuition reimbursement for one course per semester, with a $10,000 maximum per employee per year, so long as certain grade requirements are met.  Approximately $94,000 in tuition assistance was paid during fiscal 2009.

97.      Debtors believe that the payment of any such tuition is essential to maintain the good will of the affected Employees, and therefore, out of an abundance of caution, request authority to pay any such tuition, regardless of whether it is related to pre-petition or post-petition periods, in the ordinary course of the Debtors' businesses.

### L.      Relocation Program

98.      The Parent has entered into an Agreement for Relocation Services (the "Relocation Program") with Primacy Relocation, LLC, in which certain Employees are eligible to participate.  The Relocation Program provides relocation assistance to eligible Employees, including insurance, appraisal review, closing services, cost of living analysis, destination services, expense administration, marketing assistance, renter assistance, and travel arrangements.  Approximately $14,300 in relocation assistance was paid for the 2009 plan year.

99.      The Debtors believe that continued participation in the Relocation Program is essential to maintain the good will of the affected Employees, and therefore, out of an abundance of caution, request authority to continue such payments, whether incurred pre-petition or post-petition, in the ordinary course of the Debtors' business.

**M.**     **International Travel & Accident Policy**

100.     Eligible Employees may participate in a business travel accident plan offered by the Parent, administered by OneBeacon Insurance, that is third-party insured, meaning that the Debtors are only responsible for the payment of the employer portions of the premiums under the plan (the "Travel Plan").  The Travel Plan offers coverage for accidental injury sustained by an Employee or a non-employee director, consultant, or guest, while on the business of the policyholder.  The aggregate limit of liability per covered accident is $5,000,000.  The Parent typically pays approximately $25,000 over a three year period for the cost of Employee participation in the Travel Plan.  Due to the low cost of this insurance, the Parent typically does not allocate the cost of these premiums to the Debtors.

101.     The Debtors believe that continued participation in the Travel Plan is essential to maintain the good will of the affected Employees, and therefore, out of an abundance of caution, request authority to assume such payments, should the Parent allocate the cost of these premiums in the ordinary course of the Debtors' business.

**N.**     **Incidental Costs**

102.     With respect to the foregoing, the Debtors request that they be permitted, but not directed, to pay all costs incident to the payment of the Employee Obligations.

**II.**     **Authority for Banks to Honor and/or Reissue Checks**

103.     The Debtors further request that all applicable banks and other financial institutions be authorized to receive, process, honor and pay any and all checks and transfers drawn on the Debtors' accounts, pursuant to any order granting relief requested by this Motion, whether such checks were presented before, or are presented after, the Petition Date.

## BASIS FOR RELIEF REQUESTED

A.    **Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003, the Debtors Should be Authorized to Honor the Employee Obligations**

104.    Section 105(a) of the Bankruptcy Code provides, in pertinent part, that a court may "issue any order, process, or judgment that is necessary to carry out the provisions of this title." A court's use of its equitable power to "authorize payment of a pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)). "Under 11 U.S.C. § 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing In re Ionosphere Clubs, 98 B.R. at 177); see also In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (holding that the court had equitable power under 11 U.S.C. § 105 to authorize payment of pre-petition claims). In addition, section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing. See In re Hendricks Furniture Group, LLC, Case No. 09-50790 (W.D.N.C. 2009).

105.    Similarly, the relief requested is warranted under Bankruptcy Rule 6003, which provides that payment of prepetition debts can be authorized to the extent it is necessary "to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Any delay in honoring the Employee Obligations would immediately and irreparably harm Employees' morale and result in significant hardship to the Employees, at the very time when their dedication and cooperation is most critical. If the relief requested in this Motion is not granted, the Debtors face the imminent risk that their operations may be severely impaired. At this critical stage, the Debtors cannot risk

the substantial disruption to their business operations that would inevitably attend any decline in Employee morale attributable to the Debtors' failure to honor the Employee Obligations. The Debtors' continued operation at this time is required to preserve and maximize the value of the Debtors' estates and, as such, the Employees' dedication and cooperation remain essential.

106.    Furthermore, this is not an entity in financial distress. The Debtors expect all unsecured claims to be paid their full, allowed claim amount.

**B.      The Employees' Claims for Salaries, Wages, Other Compensation and Benefits Have Priority Status under the Bankruptcy Code**

107.    Section 507(a)(4) of the Bankruptcy Code provides priority status for, among other things:

> allowed unsecured claims but only to the extent of $11,725 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for – (A) wages or salaries or commissions, including vacation, severance, and sick leave pay earned by an individual . . .

11 U.S.C. § 507(a)(4). Under this section, the claims of employees for compensation earned within 180 days prior to the petition date including, without limitation, wages, salaries, bonuses, sales commissions, vacation pay and sick pay for individuals, have priority to the extent of $11,725 per individual.

108.    The Debtors respectfully submit that the amounts owed (or that may be owed) to the Employees with respect to certain of the Employee Obligations subject to section 507(a)(4) of the Bankruptcy Code are within the statutory priority amount and would be required to be paid as priority claims against the Debtors. Accordingly, the Debtors should be authorized to pay these obligations in the ordinary course of their business.

109.    Likewise, under section 507(a)(5) of the Bankruptcy Code, each of the Employees may be granted a priority claim for:

> contributions to an employee benefit plan -
>
> > (A)    arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
> >
> > (B)    for each such plan, to the extent of -
> >
> > > (i)    the number of employees covered by each such plan multiplied by $11,725; less
> > >
> > > (ii)    The aggregate amount paid to such employees under paragraph (3) of this subsection [regarding certain wages, salaries or commissions], plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

110.    Because the amounts owed (or that may be owed) to the Employees with respect to certain of the Employee Obligations subject to section 507(a)(5) of the Bankruptcy Code would be required to be paid as priority claims against the Debtors, the Debtors should also be authorized to render payment in the ordinary course with respect thereto.

**C.    Funds Held in Trust Are Not Property of the Debtors' Estates**

111.    Section 541(d) of the Bankruptcy Code excludes "property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest."  11 U.S.C. § 541(d).  It is well established under section 541(d) of the Bankruptcy Code that taxes collected on behalf of the taxing authorities are not property of the estate.  See Begier v. Internal Revenue Service, 496 U.S. 53, 59 (1990) (holding that taxes such as excise taxes, FICA taxes and withholding taxes are property held by the debtor in trust for another and, as such, do not constitute property of the estate).

112.    To avoid serious disruption to the Debtors' efforts to preserve and maximize the value of their estates for the benefit of creditors and other stakeholders during these Chapter 11 Cases that could result from the non-payment of any withholding taxes, this Court should authorize the Debtors and Parent to remit amounts withheld pre-petition, but not remitted on account of federal and state payroll taxes and FICA to the applicable taxing authorities.  These withholdings are held in trust for the benefit of the appropriate federal, state or local taxing authority for the Employees on behalf of whom such payment is being made.  Because these withholdings are held in trust on behalf of others and thus do not constitute property of the Debtors' estates, the remittance of the amounts at issue will not adversely affect the Debtors' estates or their creditors and is warranted.

113.    Further, many federal, state and local taxing authorities impose personal liability on the officers and directors of entities responsible for collecting taxes from employees to the extent any such taxes are collected but not remitted.  Accordingly, if these amounts remain unpaid, there is a risk that the Debtors' officers and directors may be subject to lawsuits on account of any such nonpayment during the pendency of these Chapter 11 Cases.  Any such legal ramifications would constitute a significant distraction for officers and directors at a time when their focus on preserving and maximizing the value of these estates is essential.

114.    The remaining non-tax withholdings primarily represent Employee earnings which have been designated by an Employee or a judicial or governmental authority for payment to appropriate third parties such as retirement or health plans or on account of child support, garnishment or bankruptcy obligations.  The Debtors' failure to remit such amounts could potentially result in severe hardship to certain Employees.

**D.      Continuation of Benefit and Compensation Plans Post-Petition is Critical to the Debtor's Prospects for a Successful Reorganization**

115.    As stated previously, the Debtors' goal in these cases is to pay all creditors the full amount of their allowed claims.  In order to achieve this goal, however, the Debtors believe that Garlock must continue to operate in the same profitable manner that it operated pre-petition.  As in any business, Garlock's success is highly dependant on the morale and satisfaction of its Employees.  In turn, Employee morale is directly correlated to the benefits and incentives offered by the employer.   Consequently, the Debtors consider the maintenance of all pre-petition Employee benefit plans to be an essential component to a successful post-petition reorganization.

**E.      Reimbursement of the Parent for Advanced Payments is Fair and Equitable**

116.    Payments to the Parent under the Intercompany Services Agreements should be permitted because such payments are reimbursements for items that the Debtors would otherwise be permitted to pay directly.   As stated herein, Employee Obligations subject to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code are entitled to priority status.   Further, Employee Obligations that are not subject to the aforementioned sections would likely be permitted as necessary payments pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003.  Consequently, in the absence of the payment of these obligations by the Parent, the Debtors would be compelled to make such payments.  Reimbursement of the Parent, which has acted as a conduit for payment of Employee Obligations that would be otherwise paid directly by the Debtors, is fair and equitable and does not improperly affect the claims of other creditors.

## NOTICE

117.    No trustee, examiner, or creditors' committee has been appointed in these Chapter 11 Cases.  Notice of this Motion has been given to the following parties: (i) the top thirty law

firms by number of asbestos claimants represented who have asserted mesothelioma claims against the Debtors; (ii) the holders of the twenty largest non-asbestos general unsecured claims against Garlock; (iii) the holders of the five largest non-asbestos general unsecured claims against Garrison; (vi) the Office of the United States Bankruptcy Administrator for the Western District of North Carolina; and (v) counsel for Bank of America, as agent under the prepetition lending facility and as the Debtors' proposed post-petition lender.  The Debtors submit that, in light of the nature of the relief requested**,** no other or further notice need be given.

[REMAINDER OF THIS PAGE INTENTIONALLY BLANK]

WHEREFORE, the Debtors respectfully request the Court conduct an emergency hearing on this Motion as scheduled by the Court and enter an Order, substantially in the form attached hereto as <u>Exhibit A</u>, (i) authorizing, but not directing, the Debtors to pay the Employee Obligations and reimburse the Parent under the Services Agreements, except as otherwise set forth herein, in accordance with their pre-petition policies and practices including, without limitation: (a) wages, salaries, vacation pay and other compensation and amounts withheld from such compensation; (b) medical claims, contributions to retirement plans and similar benefits; (c) reimbursement of advanced expenses; and (d) payment of costs and expenses incident thereto; (ii) authorizing applicable banks and other financial institutions to receive, process, honor and pay all pre-petition checks and transfers drawn on the Debtors' accounts to satisfy the Employee Obligations; and (iii) granting the Debtors such other and further relief as is just and proper.

This the 5th day of June, 2010.

RAYBURN COOPER & DURHAM, P.A.

By:   /s/ Shelley K. Abel
C. Richard Rayburn, Jr.
N.C. State Bar No. 6357
Albert F. Durham
N.C. State Bar No. 6600
Shelley K. Abel
N.C. State Bar No. 34370
Ashley K. Neal
N.C. State Bar No. 38286
1200 Carillon, 227 West Trade Street
Charlotte, NC  28202
(704) 334-0891

*Proposed Counsel to the Debtors*

# EXHIBIT A

# PROPOSED ORDER

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

IN RE:

GARLOCK SEALING TECHNOLOGIES
LLC,[1] et al.,

      Debtors.

Case No. 10-_____

Chapter 11

Jointly Administered[2]

**ORDER (I) AUTHORIZING THE DEBTORS TO CONTINUE PAYROLL AND PAYROLL RELATED PRACTICES INCLUDING PAYMENT OR REIMBURSEMENT OF CERTAIN PRE-PETITION (A) WAGES, SALARIES, VACATION PAY AND OTHER COMPENSATION AND AMOUNTS WITHHELD FROM SUCH COMPENSATION; (B) EMPLOYEE MEDICAL CLAIMS, HEALTH BENEFITS, RETIREMENT PLAN BENEFITS AND SIMILAR BENEFITS; (C) REIMBURSEMENT OF EMPLOYEE EXPENSES; AND (D) PAYMENT OF ALL COSTS INCIDENT THERETO AND (II) AUTHORIZING AND APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO RECEIVE, PROCESS, HONOR AND PAY CERTAIN CHECKS AND TRANSFERS**

This matter coming before the Court upon the motion of Garlock Sealing Technologies

LLC ("Garlock"), Garrison Litigation Management, Group, Ltd. ("Garrison") and The Anchor

Packing Company ("Anchor"), debtors and debtors-in-possession in the above-captioned cases

---

[1] The Debtors include Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

[2] Contemporaneously with this Motion, the Debtors have filed a Motion for Joint Administration, seeking to jointly administer each of the Debtors' cases with Garlock Sealing Technologies LLC serving as the lead case.

(the "Debtors"), for entry of an order, pursuant to sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of title 11 of the United States Code and Rule 6003 of the Federal Rules of Bankruptcy Procedure, authorizing the (i) Debtors to continue payroll and payroll related practices including payment of certain pre-petition (a) wages, salaries, vacation pay and other compensation and amounts withheld from such compensation; (b) employee medical claims, contributions to retirement plans and similar benefits; (c) reimbursement of employee expenses; and (d) all costs and expenses incident to the foregoing (collectively, the "Employee Obligations"); and (ii) authorizing applicable banks and other financial institutions to receive, process, honor and pay all pre-petition checks and transfers drawn on the Debtors' account to satisfy payroll obligations (the "Motion"); and due and sufficient notice of the Motion having been given; and it appearing that no other or further notice need be provided; and upon the record therein; and it appearing that the relief requested by the Motion is in the best interest of the Debtors' estates, their creditors and other parties in interest, and after due deliberation and sufficient cause appearing therefore;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      As set forth following this paragraph, the Debtors are hereby authorized and empowered, but not directed, (i) to pay, in accordance with the policies and practices established prior to the Petition Date, to or on behalf of current and former employees (collectively, the "Employees") all pre-petition Employee Obligations that have been earned and accrued by virtue of the services rendered by the Employees prior to the Petition Date; (ii) to perform and honor all other obligations, practices and policies in accordance with the foregoing as described in the Motion; and (iii) to pay all taxes, tax deposits and processing fees in connection with payments

made or other benefits provided pursuant to this Order.  Specifically, and without limitation of

the foregoing, the Debtors are authorized to:

(a)     pay, in the ordinary course of the Debtors' businesses, each Employee his or her accrued but unpaid salary, wages, overtime pay, unused vacation and commissions as applicable, as of the Petition Date including, without limitation, authority for any payroll servicing agent of the Debtors to continue pre-petition payroll funding practices, or reimburse the Parent for all unpaid advances of salary, wages, overtime pay and commissions under the Services Agreements;

(b)     continue to allow Employees to take paid time off, and purchase paid time off, in accordance with the Debtors' pre-petition practices and procedures, regardless of whether such time was earned pre- or post-petition.

(c)     continue to allow Employees to take sick leave in accordance with the Debtors' pre-petition practices and procedures;

(d)     continue to observe paid holidays in the ordinary course of business;

(e)     remit any sums withheld from Employees' paychecks pre-petition that the Debtors are obligated to remit to third-party payees but have not yet remitted or, to the extent applicable, allow the Debtors to pay the Parent for any advances related to such withholdings in accordance with the terms of the Services Agreements, regardless of whether such advances were made pre-petition or post-petition;

(f)     pay the Parent all amounts owed under the Services Agreements with respect to the Self-Insured Health Plans, regardless of whether such claims arose pre-petition or post-petition;

(g)     pay the Parent all amounts owed under the Services Agreements with respect to Blue Choice 25 premiums advanced, regardless of whether such amounts arose pre-petition or post-petition;

(h)     pay the Parent all amounts owed under the Services Agreements with respect to MVP premiums advanced, regardless of whether such amounts arose pre-petition or post-petition;

(i)     pay all retiree medical benefits and administrative fees under the Under 65 Retiree Plans, or reimburse the Parent all amounts owed under the Services Agreements with respect to the claim payments

advanced, regardless of whether such amounts arose pre-petition or post-petition;

(j)    pay all retiree medical benefits and administrative fees under the Over 65 Retiree Plans, or reimburse the Parent all amounts owed under the Services Agreements with respect to the claim payments advanced, regardless of whether such amounts arose pre-petition or post-petition;

(k)    reimburse the Parent all amounts owed under the Self-Insured Dental Plan, regardless of whether such claims arose pre-petition or post-petition;

(l)    pay the Parent all amounts owed under the Services Agreements with respect to Vision Plan premiums advanced, regardless of whether such amounts arose pre-petition or post-petition;

(m)    pay the Parent all amounts owed under the Services Agreements with respect to the Life Insurance Plan premiums advanced, regardless of whether such amounts arose pre-petition or post-petition;

(n)    pay the Parent all amounts owed under the Services Agreements with respect to the LTD Plan premiums advanced, regardless of whether such amounts arose pre-petition or post-petition;

(o)    pay the Parent all amounts owed under the NY State STD Plan with respect to the premiums advanced, regardless of whether such amounts arose pre-petition or post-petition;

(p)    pay all amounts owed under the Salaried STD Plan, regardless of whether such claims arose pre-petition or post-petition;

(q)    pay the Parent all amounts owed under the Services Agreements with respect to the Basic AD&D Plan premiums advanced, regardless of whether such amounts arose pre-petition or post-petition;

(r)    pay all amounts owed with respect to the Assistance Plan premiums advanced, regardless of whether such amounts arose pre-petition or post-petition;

(s)    continue to pay any and all pre- and post-petition obligations, including any obligations to the Parent, related to the Workers' Compensation Plan;

(t)     pay any post-petition sums that arise under the Severance Policy in the ordinary course of business;

(u)     pay any post-petition sums that arise under the Union Severance Policy in the ordinary course of business;

(v)     pay the Parent all amounts owed under the Services Agreement with respect to Salaried 401(k) Plan contributions, regardless of whether such amounts arose pre-petition or post-petition.

(w)     pay the Parent all amounts owed under the Services Agreements with respect to Hourly 401(k) Plan contributions, regardless of whether such amounts arose pre-petition or post-petition;

(x)     allow the Vanguard Fiduciary Trust Company to continue payments to the EnPro Pension Plan participants in the ordinary course of business, and continue to pay the Parent all amounts owed under the Services Agreements with respect to the EnPro Pension Plan, regardless of whether such amounts arose pre-petition or post-petition;

(y)     allow the Vanguard Fiduciary Trust Company to continue payments to the Garlock Pension Plan participants in the ordinary course of business, and authorize Garlock to continue to make contributions to the Garlock Pension Plan in the ordinary course of business;

(z)     reimburse Employees including, without limitation, payments directly to American Express, for business-related expenses, and the Parent for administrative fees charged by Concur, regardless of whether such amounts arose pre-petition or post-petition;

(aa)    pay any post-petition sums that arise under the AIP in the ordinary course of business;

(bb)    pay the Parent all post-petition amounts owed under the Services Agreements with respect to APP incentives paid to Employees;

(cc)    pay the Parent all post-petition amounts owed under the Services Agreements with respect to LTIP incentives awarded to Employees;

(dd)    pay the Parent all amounts owed under the Services Agreements with respect to Equity Plan incentives awarded to Employees, regardless of whether such amounts arose pre-petition or post-petition;

(ee)    pay the Parent all amounts owed under the Services Agreements with respect to contributions under the Compensation Plan for Employees, regardless of whether such amounts arose pre-petition or post-petition;

(ff)    reimburse Employees for company-leased vehicle expenses, regardless of whether such amounts arose pre-petition or post-petition;

(gg)    pay any sums that arise under the tuition assistance program, regardless of whether such amounts arose pre-petition or post-petition;

(hh)    pay all amounts owed under the Relocation Program, regardless of whether such amounts arose pre-petition or post-petition;

(ii)    pay the Parent all amounts owed under the Travel Plan, regardless of whether such amounts arose pre-petition or post-petition;

(jj)    pay all costs incident to the payment of Employee Obligations.

3.      Each bank at which a Debtor maintains a payroll account is authorized to honor all checks drawn on such payroll account, regardless of whether such check was drawn prior to or after the Petition Date and irrespective of whether the employee wage or salary obligation to be paid was incurred prior to or after the Petition Date, and to honor any check or funds transfer request issued to or made by a Debtor for the purpose of paying any of the  liabilities or obligations of such Debtor that are authorized to be paid pursuant to paragraph 2 of this Order, but only to the extent that, in the case of a check, the Debtor has provided such bank with specific identification of the check that is to be honored; provided, however, that nothing herein shall obligate any bank to honor any such check or funds transfer request beyond an amount equal to the available funds of such Debtor in the relevant account with such bank (after giving effect to any rights of offset that such bank may have at the time that any such check is presented for payment or any funds transfer request is made).  No bank shall have any liability to any

Debtor for any errors made in honoring or dishonoring any check or funds transfer request, unless resulting from such bank's willful misconduct or gross negligence.

4.      Each bank is hereby authorized to rely upon all representations and other communications made by any Debtor that such bank's honoring of a particular check or funds transfer request is duly authorized and in compliance with this or other orders of the Court, without any duty on the part of such bank to make any inquiry or exercise other diligence.

5.      The Debtors are authorized to reissue checks to cover amounts owing on any checks covered by this Order that have been dishonored and to reimburse Employees for any resulting charges.

6.      Nothing in the Motion or this Order, nor the Debtors' payment of claims pursuant to this Order, shall be deemed or construed: (a) as an admission as to the validity of any claim against the Debtors; (b) as a waiver of the Debtors' rights to dispute any claim; (c) to waive or release any right, claim, defense or counterclaim of the Debtors or their estates, or to estop the Debtors or their estates from asserting any right, claim, defense or counterclaim; (d) as an approval or assumption of any agreement, contract or lease, pursuant to section 365 of the Bankruptcy Code; or (e) as an admission that any obligation is entitled to administrative expense priority or any such contract or agreement is executory or unexpired for purposes of section 365 of the Bankruptcy Code or otherwise.

7.      The Debtors are authorized and empowered to take such actions as may be necessary and appropriate to implement the terms of this Order.

8.      This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

This Order has been signed electronically.  The judge's                          United States Bankruptcy Court
signature and court's seal appear at the top of the Order.