**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| IN RE: | Case No. 10-_____ |
| GARLOCK SEALING TECHNOLOGIES LLC,[1] et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DEBTORS' SUMMARY OF THE MOTION OF DEBTORS-IN-POSSESSION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS-IN-POSSESSION (A) TO ENTER INTO POST-PETITION LOANS WITH BANK OF AMERICA, N.A. AND (B) TO USE CASH COLLATERAL AND (II) GRANTING RELATED RELIEF**

Pursuant to Rule 4002(c)(1)(B) of the Federal Rules of Bankruptcy Procedure, Garlock Sealing Technologies LLC ("Garlock"), Garrison Litigation Management Group, Ltd ("Garrison") and The Anchor Packing Company ("Anchor"), debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), hereby files this summary (the "Summary")  of the relief requested in the Motion of Debtors-in-Possession for Interim and Final Orders (I)A Authorizing the Debtors-in-Possession (a) to Enter Into Post-Petition Loans with Bank of America, N.A. and (B) To Use Cash Collateral and (II) Granting Related Relief (the "DIP Motion"), which follows immediately after this Summary.  To the extent any inconsistencies may exist between this Summary and the DIP Agreement (as defined in the DIP Motion), the DIP Agreement shall control.  Capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to such terms in the DIP Agreement.

The DIP Agreement provides in detail the terms and conditions of the proposed DIP Facility (as defined in the DIP Motion) and the Interim DIP Financing Order provides in detail the terms and conditions of the proposed use of cash collateral; however, the following is a general summary of the terms and conditions of the DIP Facility (as defined in the DIP Motion):[2]

A.    Credit Facility:  The proposed DIP Facility would provide a senior secured revolving credit facility pursuant to which Borrowers may obtain revolver loans (collectively, the "Revolver

---

[1]    The Debtors include Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd and The Anchor Packing Company.

[2]    The description of the DIP Agreement provided herein is superseded in its entirety by the terms of the Loan Documents, attached to the DIP Motion as Exhibit A.

Loans") from time to time up to a maximum principal amount outstanding at any time of $10,000,000.00.  See definition for "Commitment" under section 1.1 of the DIP Agreement.  The proposed DIP Facility would also contain an $8,000,000 letter of credit sub-facility for standby letters of credit.  Actual borrowing availability at any date would be determined by reference to a Borrowing Base of specified percentages of eligible accounts receivable and inventory, which borrowing base would be reduced by Revolver Loans and letters of credit outstanding and certain reserves.  See definition for "LC Conditions" under Section 1.1 of the DIP Agreement.

      i.   <u>Interest rate</u>: The rate of interest for Revolver Loans (a) made or outstanding as Base Rate Loans equals the Base Rate in effect from time to time plus 2.5% or (b) made or outstanding as LIBOR Loans, the Adjusted LIBOR Rate for the applicable Interest Period plus 3.5%. See Section 3.1.3 of DIP Agreement.

      ii.   <u>Maturity</u>: December 7, 2011, subject to up to four (4) one-year renewals upon the Borrowers' request and the satisfaction of certain conditions to each renewal.  See definition for "Outside Commitment Date" in Section 1.1 of the DIP Agreement.

    B.   <u>Collateral and Grant of Security Interest</u>.   The DIP Facility provides that, to secure the prompt payment and performance of all of the Obligations, each Obligor would grant to DIP Lender (as defined in the DIP Motion) a continuing security interest in and Lien upon all of the following Property and interests in Property of such Obligor, whether now owned or existing or hereafter created, acquired or arising and wheresoever located (irrespective of whether the same existed on or was created or acquired after the Petition Date), but excluding all Fixed Assets and all Software and Intellectual Property embedded in Fixed Assets:

(i)   all Accounts;

(ii)   all Supporting Obligations

(iii)   all Goods, including, without limitation, all Inventory, but excluding all Equipment;

(iv)   all Instruments (including, without limitation, the Intercompany Notes);

(v)   all Chattel Paper, including, without limitation, Electronic Chattel Paper;

(vi)   all Documents;

(vii)   all General Intangibles, including, without limitation, Payment Intangibles, Software and Intellectual Property, excluding, however, rights under (but not proceeds of) any lease, contract or agreement (including any license), that contains an enforceable restriction on such Obligor's right to grant a security interest to DIP Lender, unless and until such Obligor shall have obtained consent from the relevant party or parties thereto to the grant of the security interest;

(viii)   all Deposit Accounts;

(ix)   all Investment Property (including, without limitation, all Investment Property maintained by such Obligor with Banc of America Securities LLC,but excluding any portion thereof that constitutes Margin Stock unless otherwise expressly provided in any

Security Documents);

(x)   all Letter-of-Credit Rights;

(xi)   all Insurance Receivables Rights;

(xii)   all monies now or at any time or times hereafter in the possession or under the control of DIP Lender or a bailee or Affiliate of DIP Lender, including, without limitation, any Cash Collateral in the Cash Collateral Account, but excluding, to the extent the Lien therein constitutes a Permitted Lien under Section 10.2.5(ix) of the DIP Agreement, cash collateral posted in favor of any surety or bonding company in connection with any appeal bond issued by such surety or bonding company;

(xiii) all accessions to, substitutions for and all replacements, products and cash and non-cash proceeds of (i) through (xi) above, including, without limitation, proceeds of and unearned premiums with respect to insurance policies insuring any of the  Collateral and claims against any Person for loss of, damage to or destruction of any of the Collateral; and (xiv) all books and records (including, without limitation, customer lists, files, correspondence, tapes, computer programs, print-outs, and other computer materials and records) of such Obligor pertaining to any of (i) through (xiii) above.

In addition, the DIP Facility provides that, to secure the prompt payment and performance of all of the Obligations to the extent of the amount of the Carve-Out funded by Revolver Loans or use of proceeds of any Collateral, each Obligor would also grant to DIP Lender, effective only upon satisfaction of the Spring Lien Conditions, a continuing security interest in and Lien upon all Springing Lien Collateral whether now owned or existing or here after created, acquired or arising and wheresoever located.  See Section 7.1 of the DIP Agreement.

C.     <u>Liens under 364(c)</u>:     All Obligations under the DIP Facility, including all obligations under or in connection with Bank Products, would be secured by the Collateral and entitled to an administrative status and priority under sections 503(b) and 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out.  See Section 2.1.4 of the DIP Agreement.  In addition, the DIP Agreement provides DIP Lender liens on unencumbered collateral pursuant to section 364(c)(2) and a junior security interest on encumbered collateral pursuant to section 364(c)(3).  See Section 4 of the Interim DIP Financing Order.

D.     <u>Conditions; Representations and Warranties; Covenants</u>: As more specifically provide in the DIP Agreement, the DIP Facility contains conditions, representations and warranties and covenants and events of default that are representative of such provisions in most DIP credit facilities.  See Sections 9, 10, and 11 of the DIP Agreement.

E.     **<u>Required Stipulations by Debtor</u>:  Pursuant to the Interim DIP Financing Order, the Debtors will stipulate that (a) the Pre-Petition Loan Agreement and the Loan Documents as defined therein (the "Pre-Petition Loan Documents") constitute valid and**

binding agreements and obligations of Garlock and Garrison; **(b)** the Pre-Petition Liens (as defined in the Interim DIP Financing Order) granted by Garlock and Garrison **(i)** constitute valid, binding, enforceable and perfected security interests and liens, are not subject to avoidance or subordination, and are subject only to certain security interests and liens that are expressly permitted under the Pre-Petition Loan Agreement to have priority over the Pre-Petition Liens, but only to the extent such permitted liens are valid, enforceable, non-avoidable liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and senior in priority to the Pre-Petition Liens under applicable law after giving effect to any applicable subordination or intercreditor agreements, and **(ii)** are not subject to avoidance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; **(c)** the Pre-Petition Debt (as defined in the Interim DIP Financing Order) constitutes legal, valid and binding obligations of Garlock, Garrison and the other Pre-Petition Affiliate Borrowers (as defined in the Interim DIP Financing Order) and is not subject to equitable subordination, offset, recoupment or recharacterization; **(d)** all amounts paid on or before the Petition Date by Garlock and Garrison to Pre-Petition Credit Parties (as defined in the Interim DIP Financing Order) on account thereof are not subject to any objection, offset, defense or counterclaim of any kind or nature or reduction, disallowance, impairment, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and **(e)** no claims in favor of any Debtor exist against any Pre-Petition Credit Parties under any contract or tort (including, without limitation, lender liability) theories of recovery or pursuant to section 105 or chapter 5 (including, without limitation, sections 510, 544, 547, 548, 549, 550 or 553) of the Bankruptcy Code.** See paragraph E and paragraph 19 of the proposed Interim DIP Financing Order.

      F.   <u>Enforcement of Remedies</u>:  The DIP Lender is requiring that it be granted and authorized certain rights upon or after the occurrence of any Event of Default as specifically provided for in the DIP Agreement and the Interim DIP Financing Order.  Events of Default are listed in Section 12.1 of the DIP Agreement and include:

(i)      failure to pay obligations when due;
(ii)     misrepresentations;  breach of covenant;
(iv)    other defaults on obligations in excess of $5 million;
(v)     uninsured losses;

    (vi)     material adverse effect;

    (vii)    business disruption;

    (viii)   liability under ERISA plans in excess of $5 million;

    (ix)     challenge to or insufficiency of DIP Loan Documents;entry of judgment(s) in excess of $5 million;repudiation or default under guaranty;criminal forfeiture;change of control; and

    (xiv)   certain bankruptcy related defaults, including appointment of a trustee, dismissal of the case or conversion to Chapter 7.G. <u>Certain Conditions to DIP Facility</u>.   DIP Lender's willingness to establish the DIP Facility is conditioned upon, among other things, (i) Debtors' obtaining Court approval of the DIP Agreement and all extensions of credit thereunder; (ii) unless and until the Release Effective Date shall occur, Debtors' provision of adequate protection pursuant to sections 361 and 363 of the Bankruptcy Code for the interests of Pre-Petition Credit Parties in the Pre-Petition Collateral of Garlock and Garrison; (iii) DIP Lender receiving (a) a continuing guaranty agreement from each of Garlock International and Garlock Overseas (collectively, "Guarantors," and individually, a "Guarantor"), (b) a pledge agreement from each Guarantor pursuant to which such Guarantor pledges in favor of DIP Lender 100% of the equity interests of each domestic subsidiary of such Guarantor and the equity interests of each foreign subsidiary of such Guarantor (not to exceed, together with any pledge of such equity interests by any Borrower or Guarantor, 65% of the equity interests of each such foreign subsidiary) and (c) a security agreement, in form and substance satisfactory to DIP Lender, from each Guarantor pursuant to which such Guarantor would grant to DIP Lender, as security for all Obligations, a security interest in all of the assets of such Guarantor that are of the same type as the Working Capital Collateral (as defined in the Interim DIP Financing Order); (iv) DIP Lender receiving, as security for the payment of the DIP Obligations, security interests in and liens upon the Collateral; and (v) Debtors' satisfaction (or DIP Lender's waiver in writing in its sole discretion) of all conditions precedent in the DIP Agreement.  See paragraph I of the proposed Interim DIP Financing Order.

    H.     <u>Provision of Adequate Protection</u>.  Borrowers are providing adequate protection for prepetition claims pursuant to Paragraph 8 of the Interim DIP Financing Order.

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC,[1] et al.,<br><br>　　　　Debtors. | Case No. 10-_____<br><br>Chapter 11<br><br>Jointly Administered |

## MOTION OF DEBTORS-IN-POSSESSION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS-IN-POSSESSION (A) TO ENTER INTO POST-PETITION LOANS WITH BANK OF AMERICA, N.A. AND (B) TO USE CASH COLLATERAL AND (II) GRANTING RELATED RELIEF

Garlock Sealing Technologies LLC ("Garlock"), Garrison Litigation Management Group, Ltd ("Garrison") and The Anchor Packing Company ("Anchor"), debtors and debtors-in-possession in the above- captioned cases (the "Debtors"), hereby move (the "Motion") the Court for entry of emergency and final Orders, pursuant to sections 105, 345(b), 361, 363 and 364 of title 11 of the U.S. Code (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing post-petition loans with Bank of America, N.A. ("BOA") and use of cash collateral.   The Motion seeks authority for and approval of both an Interim and a Final DIP Financing Order:[2]

(a)　　　authorizing the Debtors to use the cash collateral of BOA;

(b)　　　providing adequate protection to BOA for the use of its cash collateral, as set forth more fully herein;

---

[1]　　The Debtors include Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd and The Anchor Packing Company.

[2] Any capitalized terms not defined herein shall have the meaning attributed to them in the DIP Agreement (as defined below).

(c)    authorizing Garlock and Garrison to obtain credit and incur debt pursuant to that $10,000,000 financing arrangement (the "DIP Facility") with BOA, which is contemplated by that certain Post-Petition Loan and Security Agreement substantially in the form annexed to the Motion as <u>Exhibit A</u> and incorporated herein by reference (the "DIP Agreement") and by all of the DIP Loan Documents, secured by the Collateral as set forth more fully herein;

(d)    authorizing the Debtors to incur the obligations as provided for in the DIP Facility (the "Postpetition Obligations"); and

(e)    scheduling a final hearing ("Final Hearing") with respect to each of the foregoing matters.

In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these proceedings and the Motion is proper under 28 U.S.C. § 1408.

2.    The statutory bases for the relief requested herein are sections 105, 345(b), 361, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

## BACKGROUND

3.    On June 5, 2010 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.    The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee, trustee, or examiner has been appointed in these cases.

5.      In support of this Motion, the Debtors rely on the Affidavit of Donald G. Pomeroy, II, Chief Financial Officer of Garlock Sealing Technologies LLC in Support of First Day Motions (the "Pomeroy Affidavit"), filed contemporaneously herewith.

6.      The Debtors are not in business distress, but are overwhelmed by the financial and institutional costs of defending and resolving tens of thousands of asbestos claims in state and federal courts across the country.  As described in the Debtors' Information Brief, they have filed these cases for the purpose of resolving their alleged asbestos liability in a single forum that offers an efficient and fair means of determining and satisfying the Debtors' responsibility for the mass of asbestos personal injury claims pending against them and expected to be filed in the future.  The Debtors' goal in these cases is to pay all creditors, asbestos and non-asbestos, the full amount of their allowed claims.  The Debtors are confident they can achieve this goal if Garlock is able to continue its history of profitable operations by maintaining its operations in the same manner it did pre-petition.  However, in order to do so, the Debtors, including Garlock, must maintain their commitments to customers, creditors and employees. Those commitments are in turn dependent on the Debtors maintaining both financial as well as operational stability. With such stability in mind, the Debtors seek to continue to operate in the ordinary course of business during and subsequent to these Chapter 11 Cases, and have filed a number of motions on the Petition Date, including this Motion, seeking this Court's authority to take steps necessary to ensure a seamless transition into these Chapter 11 Cases.

## BUSINESS BACKGROUND AND EVENTS LEADING TO FILING

### A.      History and Corporate Structure

7. Garlock, a North Carolina limited liability company, and Garrison, a  North Carolina

corporation, are wholly owned subsidiaries of Coltec Industries Inc ("Coltec"), a Pennsylvania corporation, which is in turn wholly owned by EnPro Industries, Inc. ("EnPro" and, collectively with Coltec, the "Parent"), a Charlotte, North Carolina-headquartered manufacturer of engineered industrial products.   Anchor, a North Carolina corporation, is a wholly-owned subsidiary of Garrison.

8.   Garlock's business was founded in 1887 in Palmyra, New York.   Garlock produces and sells high performance fluid-sealing products, including gaskets and  compression packing used in internal piping and valve assemblies in numerous industries.   Garlock employs approximately six hundred people, and Garlock has a global sales presence serviced from manufacturing facilities in Palmyra, New York and Houston, Texas.   Garlock also owns three non-debtor foreign subsidiaries that own manufacturing operations in Canada, Mexico and Australia.   In 2009, Garlock had global sales of approximately $113 million, down from $150 million in 2008.   Garlock continuously develops innovative products to meet the changing needs of its customers.   Garlock also strives to be an industry leader in lean manufacturing as reflected by its extensive ongoing $40 million multi-year project begun in 2006 to modernize its Palmyra manufacturing campus by building state-of-the-art manufacturing facilities and adding new equipment that enable it to compete more effectively.

9.   Anchor is a non-operating subsidiary of Garrison.   For many years, Anchor distributed fluid sealing materials, including gaskets and packing.

10.   Some of the gaskets and packing produced and/or sold by Garlock (prior to 2001) and Anchor (prior to 1993) contained encapsulated asbestos. Since the 1970s, Garlock and Anchor have received hundreds of thousands of claims by individuals ("Asbestos Claimants")

alleging they suffer from personal injuries related to exposure to such products ("Asbestos Claims").

11.    Garrison, which is headquartered in Rochester, New York, was formed in 1996 to manage the defense and settlement of Asbestos Claims against Garlock.  To this end, Garrison (a) supervises a nationwide network of local defense law firms that represent the Debtors in Asbestos Claims in various states; (b) assists in defending Asbestos Claims before and during trial; (c) settles Asbestos Claims; (d) pays judgments, settlements and defense costs; and (e) makes claims against, collects payments from, and facilitates audits as required by, insurers in connection with Garlock Asbestos Claims.  Garrison currently employs eleven people, including three staff attorneys supported by paralegals, and finance and data entry personnel.  Garrison's oversight of all aspects of Asbestos Claims has enabled Garlock to focus on continuing its successful history of profitable and innovative manufacturing.

**B.**    **Events Leading To the Petition Date**

12.    For a detailed description of the circumstances that led the Debtors to seek protection under chapter 11, see the Debtors' Information Brief, filed on the Petition Date or shortly thereafter.

13.    The Debtors' asbestos-containing gaskets and packing contained encapsulated, nonfriable asbestos that generally did not release asbestos fibers. Removal of some gaskets or packing from pipe joints, valves, and equipment could release trace levels of asbestos that generally did not exceed the current permissible exposure limit (PEL) established by the Occupational Safety and Health Administration ("OSHA").[3]  The Debtors added warnings to

---

[3]    In 1971, the newly established OSHA started regulating asbestos. OSHA's initial standard set the permissible exposure limit (PEL) at 12 f/cc (8-hour time-weighted average (TWA)).  As the dangers of asbestos became progressively better understood, OSHA periodically lowered the exposure limit.  In 1994, OSHA set the PEL at 0.1 f/cc (8-hour TWA), where it remains today.

their products in 1977, and discontinued producing and selling products that contained asbestos in 2000, even though none of the Environmental Protection Agency, OSHA or any other federal or state agency ever required asbestos-containing gaskets or packing to have warning labels or banned their production or use.

14.    Despite having produced and sold lawful and safe products, which can still be legally sold today, the Debtors are overwhelmed by Asbestos Claims.  As of December 31, 2009, they had received over 850,000 claims and paid approximately $1.37 billion in indemnity payments and approximately $389 million in legal costs to resolve such claims.  Approximately 100,000[4] such claims remain pending today.  Garrison pays over $100 million annually to defend and resolve Asbestos Claims.

15.    The Debtors' cost of resolving an individual Asbestos Claim has on average multiplied over eightfold since early 2000, when a bankruptcy wave commenced that eventually swept nearly all of the major manufacturers of dangerous, friable, asbestos products into bankruptcy.[5]  As a result of joint and several liability principles applicable in many jurisdictions and improper selective targeting of product exposure evidence by plaintiffs' firms (described in the Information Brief), the bankruptcy wave left peripheral defendants like Garlock, whose

---

[4]    Garlock has approximately 100,000 asbestos-related claims currently pending against it, and Anchor has approximately 83,000 such claims, however the Debtors believe most of the claims against Anchor are duplicative of claims against Garlock, related to Garlock products sold and distributed by Anchor.

[5]    The companies driven into bankruptcy by asbestos litigation since January 1, 2000 include: Pittsburgh Corning (2000); Owens Corning (2000); Fiberboard (2000); Babcock & Wilcox (2000); Armstrong World Industries (2000); GAF (2001); U.S. Gypsum (2001); Turner & Newell (2001); A.P. Green (2002); Harbison Walker (2002); North American Refractories Company Inc. (NARCO) (2002); W.R. Grace (2001); Skinner Engine Co. (2001); E.J. Bartells (2001); United States Minerals Products (2001); Murphy Marine Services (2001); Insul Co. (2001); Swan Transportation (2001); North American Refractories Corp. (2002); Kaiser Aluminum (2002); Harbison-Walker (2002); A.P. Green (2002); Plibrico Co. (2002); Shook & Fletcher (2002); Porter-Hayden Co. (2002); Artra Group, Inc. (2002); Special Metals Corp. (2002); Asbestos Claims Management Corp. (2002); ACandS (2002); JT Torpe Co. (2002); A-Best Products (2002); Western MacArthur/Western Asbestos (2002); C.E. Thurston (2003); Combustion Engineering (2003); Congoleum Corp. (2003); Mid-Valley (Halliburton subsidiaries) (2003); Muralo Co. (2003); Flitkote Co. (2004); Oglebay Norton Co. (ONCO) (2004); Special Electric (2004); Quigley Co. (2004); Utex Industries (2004); API, Inc. (2005); Asarco (2005); Brauer Supply Co. (2005); Dana

products contained non-friable asbestos, to pay the enormous liabilities of such bankrupt defendants.

16.    Garlock believed until recently that it would survive the bankruptcy wave because most of the major asbestos manufacturers have emerged from bankruptcy by funding post-confirmation trusts under section 524(g) of the Bankruptcy Code with over $20 billion to pay injuries caused by their products.  Other major bankrupt manufacturers have reached agreement with asbestos claimants and will soon add another $10 billion plus to the 524(g) trust availability.  In 2006, the trusts began making claim payments and today trusts pay billions of dollars annually to many of the same claimants who pursue damages from the Debtors.

17.    The establishment of a system of extraordinarily wealthy asbestos trusts, however, has not abated Garlock's inflated costs of resolving Asbestos Claims.  The asbestos claims resolution system has been irrevocably fractured into two tracks—a system of trusts that have assumed liability for friable asbestos products that most plausibly caused plaintiffs' diseases, and a tort system where peripheral defendants like Garlock that produced encapsulated asbestos products are isolated and targeted.  Garlock is paying more than its share of liability because the trust system operates completely independent of the tort system.  Claimants generally target Garlock and other peripheral defendants in the tort system, collecting their full damages while denying that they have evidence of exposure to the dangerous, friable products of bankrupt defendants. Claimants then collect significant damages again from trusts based on evidence they submit alleging exposure to the same friable products about which they disavowed knowledge in the tort system.

---

Corporation (2006); ABB Lummus Global (2006); and Lloyd E. Mitchell Co. (2006).

18.    While Garlock continues to produce safe and useful products and provides good jobs to hundreds of workers, the continued cost of resolving Asbestos Claims unfairly targeted against Garlock at values improperly inflated by bankruptcies of culpable producers of friable asbestos products threatens Garlock's core business. The cash flows necessary to defend and resolve Asbestos Claims in the tort system threaten to deplete rapidly both the remaining insurance available to Garlock for such claims and Garlock's cash flow from operations. Without chapter 11 protection, the value of the Debtors' core businesses and the Debtors' ability to compete effectively in the marketplace will be irrevocably damaged.  If Garlock's responsibility for Asbestos Claims is determined in a single forum under a process that guarantees integrity through application of the rules of evidence and the rule of law, Garlock has sufficient insurance and other assets to fund a post-confirmation trust that will pay Asbestos Claims in full. Therefore, the Debtors have determined that filing the Chapter 11 Cases provides the Debtors their only means of determining and resolving their true liability for Asbestos Claims.

## PRE-BANKRUPTCY SECURED LENDING BACKGROUND

19.    Prior to the Petition Date, Garlock and Garrison were participants, either as a borrower or a guarantor, in a senior secured revolving credit facility evidenced by an Amended and Restated Loan and Security Agreement, dated as of April 26, 2006 (as amended, the "Pre-Petition Loan Agreement") among Garlock, Garrison and certain non-debtor affiliated entities with (a) BOA, as a lender and as collateral agent and administrative agent for the current lenders, (b) Wells Fargo Bank, N.A. (successor by merger to Wachovia Bank, N.A.) and (c) SunTrust Bank.  The Pre-Petition Loan Agreement was collateralized, with certain defined exclusions set forth in the Pre-Petition Loan Agreement, by, among other things, all accounts, supporting obligations, goods (including inventory but excluding equipment), instruments,

chattel paper (including electronic chattel paper), documents, general intangibles (including payment intangibles and software), deposit accounts, investment property and letter-of-credit rights (in each case as defined in the Uniform Commercial Code), along with intellectual property, Insurance Receivables Rights (as defined therein), monies in the possession or control of the agent or lender or a bailee or affiliate thereof, all accessions to, substitutions for and replacements, products and cash and non-cash proceeds of the foregoing, and all books and records pertaining to the foregoing (the "Pre-Petition Collateral").

20.    As of the Petition Date, no loans were outstanding under the Pre-Petition Loan Agreement; however, that facility (a) secured letters of credit issued under the Pre-Petition Loan Agreement that were provided for the benefit of Garlock and Garrison, (b) secured certain bank products, such as the cash management system with BOA and commercial credit cards, in each case provided to Garlock and Garrison by BOA and its affiliates in the ordinary course of business of Garlock and Garrison and (c) secured the payment of facility fees and expenses which were paid in the ordinary course of business to the lenders in the Pre-Petition Loan Agreement.

21.    Prior to the Petition Date and pursuant to that certain Fifth Amendment to Amended and Restated Loan and Security Agreement and Amendment to Other Loan Documents ("5th Amendment") and a part of the negotiations for DIP Financing (as defined below), Garlock, Garrison and certain of their subsidiaries negotiated a release of the Debtors and certain of their subsidiaries from the Pre-Petition Loan Agreement and the release of all liens on assets of Garlock, Garrison, and certain of their domestic subsidiaries that had been granted to the Pre-Petition Agent for the benefit of the Pre-Petition Lenders pursuant to the Pre-Petition Loan Agreement.    Garlock and Garrison will be released from Obligations under and as defined

in the Pre-Petition Loan Agreement and any Collateral of Garrison and Garlock will be released subject to the express conditions of the 5th Amendment, including, without limitation, the entry of the Interim DIP Financing Order in form and substance satisfactory to the DIP Lender.

22.     The DIP Financing provides an immediate benefit to Garlock and Garrison in freeing the Debtors from joint and several liability under the Pre-Petition Loan Agreement and releasing their respective assets from the liens provided in that agreement.

## NEED FOR POST-PETITION FINANCING AND
## USE OF CASH COLLATERAL

23.     The Debtors require debtor-in-possession financing ("DIP Financing") in order to make the continued operation of their business operations as seamless as possible in the Chapter 11 Cases. The Debtors have an immediate continuing need for DIP Financing to ensure the continuation of certain Letters of Credit to support certain litigation and insurance bonds and to ensure the continuation of the bank products, such as the cash management system, that are fundamental to the operations of the Debtors' business.    The Debtors further need access to cash available to them, which may constitute cash collateral, to pay the expenses of operating their businesses, including, without limitation, salaries, administrative and leasing costs, utilities, services, repairs, maintenance, insurance costs and acquisitions of inventory in their capacity as debtors-in-possession.  Specifically, without the access to post-petition  financing or use of cash collateral, the cash demands on the Debtors to support their ordinary course operations could restrict such operations.   Further, without the use of cash collateral, the Debtors cannot purchase inventories and supplies needed to maintain their business operations, nor can they pay wages, salaries, rents, utilities and other expenses associated with operating their business.

24.     The Debtors also require the use of cash collateral to fund the administrative expenses of these cases, including the fees and expenses of attorneys, accountants and other professionals authorized by the Court to be employed by the Debtors.

25.     The availability of a DIP Facility and use of cash collateral will provide the Debtors with more than just the necessary cash and credit support they need to operate their businesses.   Of almost equal importance is the sense of confidence that such financing and use of cash collateral will instill in the Debtors' suppliers, customers and employees.  The failure of the Debtors' suppliers and employees to cooperate with the Debtors at this time, and the loss of customer patronage, would be devastating to the business operations of the Debtors.

## DESCRIPTION OF PROPOSED POST-PETITION FINANCING

26.     Garlock and Garrison (the "Borrowers") propose to enter into the DIP Facility with BOA (the "DIP Lender") as described in greater detail herein and in the DIP Agreement.

27.     As described above, BOA served as the agent and one of the Debtors' primary prepetition lenders and has indicated its willingness to continue its lending relationship with the Debtors on a post-petition basis as DIP Lender through the DIP Facility.  BOA has also agreed to continue its relationship with the Debtors pursuant to which it, or its affiliates, provides certain bank products, including the current cash management system[6] and commercial credit cards.

28.     The Debtors negotiated the terms of the DIP Facility with DIP Lender at arms' length and in good faith (as that term is defined in section 364(e) of the Bankruptcy Code), with all parties represented by experienced counsel.   The Debtors require the DIP Facility and the use

---

[6] The Debtors cash management system is described in greater detail in the Motion of the Debtors for Entry of an Order Under 11 U.S.C. §§ 363, 364, 1107 and 1108 (I) Authorizing (A) Continued Use of Existing Cash Management System, (B) Maintenance of Existing Bank Accounts, (C) Continued Use of Existing Business Forms and (D) Waiver of Deposit Guidelines and Continued Use of Existing Investment Policies; and (II) (A) Granting Administrative Priority Status to Postpetition Intercompany Claims and (B) Authorizing Continued Performance Under Intercompany Arrangements (the "Bank Accounts and Cash Management Motion"), filed contemporaneously herewith.

of cash collateral to assist it in the seamless operation of their businesses while in Chapter 11 and

for the Debtors to negotiate alternative financing with any lender group other than BOA, which

is already familiar with the Debtors' operations, corporate structure and financial arrangements,

as well as its cash management system, would be extremely difficult.

29.     In the respective exercise of their business judgment, the Debtors believe that the

terms and conditions of the DIP Facility are fair and reasonable and in the best interest of the

Debtors' estates.

30.     For the foregoing reasons, the Debtors are seeking entry of an Interim DIP

Financing Order and a Final DIP Financing Order, each approving borrowing under the DIP

Facility and the use of cash collateral as proposed herein.  DIP Lender has agreed to provide the

DIP Facility to the Debtors and to consent to use of cash collateral only on the terms and

conditions as are substantially set forth in DIP Agreement and the proposed Interim DIP

Financing Order, substantially in the form attached hereto as <u>Exhibit B</u> and incorporated herein

by reference.

31      The DIP Agreement provides in detail the terms and conditions of the proposed

DIP Facility and the Interim DIP Financing Order provides in detail the terms and conditions of

the proposed use of cash collateral; however, the following is a general summary of the terms

and conditions of the DIP Facility:[7]

A.     <u>Credit Facility</u>:  The proposed DIP Facility would provide a senior

secured revolving credit facility pursuant to which Borrowers may obtain revolver loans

(collectively, the "<u>Revolver Loans</u>") from time to time up to a maximum principal amount

outstanding at any time of $10,000,000.00.  The proposed DIP Facility would also contain an

---

[7]     The description of the DIP Agreement provided herein is superseded in its entirety by the terms of the DIP

{00178626 v 1}                                    12

$8,000,000 letter of credit sub-facility for standby letters of credit.  Actual borrowing availability at any date would be determined by reference to a Borrowing Base of specified percentages of eligible accounts receivable and inventory, which borrowing base would be reduced by Revolver Loans and letters of credit outstanding and certain reserves.   The DIP Facility would be guaranteed by Garlock's two domestic, non-debtor subsidiaries, Garlock Overseas Corporation ("Garlock Overseas") and Garlock International Inc. ("Garlock International" and, together with Garlock Overseas, "Guarantors").   The DIP Facility would be scheduled to mature on December 7, 2011, subject to up to four (4) one-year renewals upon the Borrowers' request and the satisfaction of certain conditions to each renewal as set forth in the DIP Agreement (including amendments to reflect market pricing).

      B.      <u>Collateral and  Grant of Security Interest</u>.   The DIP Facility provides that, to secure the prompt payment and performance of all of the Obligations, each Obligor would grant to DIP Lender a continuing security interest in and Lien upon all of the following Property and interests in Property of such Obligor, whether now owned or existing or hereafter created, acquired or arising and wheresoever located (irrespective of whether the same existed on or was created or acquired after the Petition Date), but excluding all Fixed Assets and all Software and Intellectual Property embedded in Fixed Assets:

(i)     all Accounts;
(ii)    all Supporting Obligations
(iii)   all Goods, including, without limitation, all Inventory, but excluding all Equipment;
(iv)   all Instruments (including, without limitation, the Intercompany Notes);
(v)    all Chattel Paper, including, without limitation, Electronic Chattel Paper;
(vi)   all Documents;
(vii)  all General Intangibles, including, without limitation, Payment Intangibles, Software and Intellectual Property, excluding, however, rights under (but not proceeds of) any lease, contract or agreement (including any license), that

---

Agreement, substantially in the form attached hereto as <u>Exhibit A</u>.

contains an enforceable restriction on such Obligor's right to grant a security interest to DIP Lender, unless and until such Obligor shall have obtained consent from the relevant party or parties thereto to the grant of the security interest;

(viii)   all Deposit Accounts;

(ix)   all Investment Property (including, without limitation, all Investment Property maintained by such Obligor with Banc of America Securities LLC,but excluding any portion thereof that constitutes Margin Stock unless otherwise expressly provided in any Security Documents);

(x)   all Letter-of-Credit Rights;

(xi)   all Insurance Receivables Rights;

(xii)   all monies now or at any time or times hereafter in the possession or under the control of DIP Lender or a bailee or Affiliate of DIP Lender, including, without limitation, any Cash Collateral in the Cash Collateral Account, but excluding, to the extent the Lien therein constitutes a Permitted Lien under Section 10.2.5(ix) of the DIP Agreement, cash collateral posted in favor of any surety or bonding company in connection with any appeal bond issued by such surety or bonding company;

(xiii)   all accessions to, substitutions for and all replacements, products and cash and non-cash proceeds of (i) through (xi) above, including, without limitation, proceeds of and unearned premiums with respect to insurance policies insuring any of the  Collateral and claims against any Person for loss of, damage to or destruction of any of the Collateral; and

(xiv)   all books and records (including, without limitation, customer lists, files, correspondence, tapes, computer programs, print-outs, and other computer materials and records) of such Obligor pertaining to any of (i) through (xiii) above.

In addition, the DIP Facility provides that, to secure the prompt payment and performance of all of the Obligations to the extent of the amount of the Carve-Out funded by Revolver Loans or use of proceeds of any Collateral, each Obligor would also grant to DIP Lender, effective only upon satisfaction of the Springing Lien Conditions, a continuing security interest in and Lien upon all Springing Lien Collateral whether now owned or existing or hereafter created, acquired or arising and wheresoever located.

The Liens and security interests granted to DIP Lender pursuant to the provisions of the DIP Agreement and pursuant to any of the other DIP Loan Documents would be (i) in addition to and not in lieu of all Liens conferred upon DIP Lender pursuant to the terms of the DIP Financing Orders, and (ii) first priority Liens and security interests in the Collateral, except

as otherwise expressly provided in the DIP Financing Orders and subject only to Permitted Senior Liens; provided that, no representation or warranty would made by any Obligor as to the perfection of DIP Lender's Liens in, (i) the Insurance Receivables Rights pursuant to the UCC or (ii) any Pledged Collateral (as defined in any Pledge Agreement) under foreign law. Additional Liens are provided to the DIP Lender on Deposit Accounts, Cash Collateral and other property interests or rights as set forth in the DIP Agreement, including, without limitation, Article 7.

      C.    <u>Superpriority Administrative Expense Priority</u>:   All Obligations under the DIP Facility, including all Banking Relationship Debt, would be secured by the Collateral and entitled to an administrative status and priority under sections 503(b) and 364(c)(1) of the Bankruptcy Code, subject to the DIP Financing Orders.

      D.    <u>Unencumbered Collateral</u>:   The DIP Lender would be granted, pursuant to section 364(c)(2) of the Bankruptcy Code, perfected first priority senior security interests in and liens upon (x) all Collateral that, as of the Petition Date, is not subject to valid, perfected and unavoidable liens or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date), as permitted by section 546(b) of the Bankruptcy Code, and (y) all Collateral that is created, acquired or arises after the Petition Date (other than direct proceeds of Pre-Petition Collateral (prior to the Release Effective Date as defined in the Interim DIP Financing Order) that are subject to valid, perfected and unavoidable pre-petition liens).

      E.    <u>Encumbered Collateral</u>.  The DIP Lender would be granted, pursuant to section 364(c)(3) of the Bankruptcy Code, perfected junior security interests in and liens upon all Collateral that is subject to valid, perfected and unavoidable liens in existence on the Petition Date (other than the Pre-Petition Collateral prior to the Release Effective Date as defined in the

Interim DIP Financing Order) or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date), as permitted by section 546(b) of the Bankruptcy Code.

      F.    <u>Cash Collateral Usage</u>:  On any date that DIP Lender holds any cash proceeds of Collateral that represent available and collected funds ("Cash Collateral"), DIP Lender would make available such Cash Collateral to Borrowers or the Borrower Agent so long as, (i) if no Default or Event of Default exists, there are no outstanding Obligations then due and payable to DIP Lender and no Out-of-Formula Condition exists at the time of or would result from such use of Cash Collateral, or (ii) if a Default or an Event of Default exists, to the extent such Cash Collateral held by DIP Lender exceeds an amount necessary to pay in full or cash collateralize all outstanding Obligations, whether or not then contingent, due or payable. Notwithstanding the foregoing, Borrowers would be permitted in all events to use Cash Collateral to pay down the Obligations.

      G.    <u>Interest, Fees and Charges</u>:  The interest and fees for the DIP Facility are set forth in Section 3 of the DIP Agreement.

      (i)    <u>Interest</u>: The rate of interest for Revolver Loans (a) made or outstanding as Base Rate Loans equals the Base Rate in effect from time to time plus 2.5% or (b) made or outstanding as LIBOR Loans, the Adjusted LIBOR Rate for the applicable Interest Period plus 3.5%.

      (ii)    <u>Fees</u>:  Fees include a closing fee of $100,000 due at Closing. Other fees are set forth in Section 3.2 of the DIP Agreement and include an unused line fee, certain fees associated with letters of credit, certain audit and appraisal costs and expenses, and certain fees in the event the initial term of the

DIP Facility is renewed.

(iii)   <u>Charges</u>:   As set forth in the DIP Agreement, including, without limitation, all ordinary and usual bank charges, fees and costs incurred in the banking and lending relationship between the Debtors and BOA.

H.   <u>Conditions; Representations and Warranties; Covenants</u>:   As more specifically provide in the DIP Agreement, the DIP Facility contains conditions, representations and warranties and covenants and events of default that are representative of such provisions in most DIP credit facilities.

I.   <u>Interim Period and Interim DIP Budget</u>:   The Interim Period under the DIP Facility is the period commencing on the date that the Interim DIP Financing Order is entered by the Court and ending on the sooner to occur of (a) the date that the Final DIP Financing Order is entered by the Court and (b) the date that is forty-five (45) days after the date that the Interim DIP Financing Order is entered by the Court.   The Interim DIP Budget attached to the DIP Agreement is a cash flow forecast projecting, among other things, each Borrower's forecasted cash flow, cash receipts and disbursements (including costs of the Chapter 11 Cases) for each week in the four-week period following the Petition Date as well as a depiction of operating results for the four-week period following the Petition Date as such budget may be amended, modified, restated, extended or supplemented from time to time with DIP Lender's prior written consent.   The Debtors anticipate using cash collateral and obtaining DIP Loans, Letters of Credit and other credit extensions as necessary pursuant to the DIP Agreement during the Interim Period.   The proposed Interim DIP Budget is attached hereto as <u>Exhibit C</u> and incorporated herein by reference.

J.   <u>**Required Stipulations by Debtor**</u>:   **Pursuant to the Interim DIP**

Financing Order, the Debtors will stipulate that (a) the Pre-Petition Loan Agreement and the Loan Documents as defined therein (the "Pre-Petition Loan Documents") constitute valid and binding agreements and obligations of Garlock and Garrison; (b) the Pre-Petition Liens (as defined in the Interim DIP Financing Order) granted by Garlock and Garrison (i) constitute valid, binding, enforceable and perfected security interests and liens, are not subject to avoidance or subordination, and are subject only to certain security interests and liens that are expressly permitted under the Pre-Petition Loan Agreement to have priority over the Pre-Petition Liens, but only to the extent such permitted liens are valid, enforceable, non-avoidable liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and senior in priority to the Pre-Petition Liens under applicable law after giving effect to any applicable subordination or intercreditor agreements, and (ii) are not subject to avoidance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Pre-Petition Debt (as defined in the Interim DIP Financing Order) constitutes legal, valid and binding obligations of Garlock, Garrison and the other Pre-Petition Affiliate Borrowers (as defined in the Interim DIP Financing Order) and is not subject to equitable subordination, offset, recoupment or recharacterization; (d) all amounts paid on or before the Petition Date by Garlock and Garrison to Pre-Petition Credit Parties (as defined in the Interim DIP Financing Order) on account thereof are not subject to any objection, offset, defense or counterclaim of any kind or nature or reduction, disallowance, impairment, recharacterization or subordination pursuant to the

Bankruptcy Code or applicable non-bankruptcy law; and (e) no claims in favor of any

Debtor exist against any Pre-Petition Credit Parties under any contract or tort (including,

without limitation, lender liability) theories of recovery or pursuant to section 105 or

chapter 5 (including, without limitation, sections 510, 544, 547, 548, 549, 550 or 553) of the

Bankruptcy Code.

          K.     <u>Deadline for Challenge to Pre-Petition Liens and Claims</u>.   Each

Debtor will voluntarily make the stipulations contained preceding paragraph J above (the

"Debtors' Stipulations").   In consideration of DIP Lender's agreement to provide Credit

Extensions (as defined in the Interim DIP Financing Order) pursuant to the DIP Loan

Documents, and pursuant to the Interim DIP Financing Order, each Debtor will waive and

would be barred (a) from challenging the amount, validity, extent, perfection or priority of

or seeking to set aside, avoid, offset, subordinate or recharacterize any of the Pre-Petition

Debt of a Debtor or any Pre-Petition Liens in any Pre-Petition Collateral of a Debtor (it

being understood that this paragraph would not prevent the Pre-Petition Liens granted by

Garlock and Garrison upon the Pre-Petition Collateral of Garlock and Garrison from

being released on the Release Effective Date) and (b) from asserting against any Pre-

Petition Credit Party a claim under any contract or tort (including, without limitation,

lender liability) theories of recovery or pursuant to section 105 or Chapter 5 (including,

without limitation, sections 510, 544, 547, 548, 549 or 550) of the Bankruptcy Code.   The

Debtors' Stipulations would be binding on the Debtors, but would be subject to the right of

any part in interest, including, without limitation, a Committee, to the extent that such

party has or is otherwise granted standing to do so, to commence an appropriate adversary

proceeding or contested matter (a "Challenge") objecting to the validity, amount or

allowance of the Pre-Petition Debt or the extent, validity, perfection or non-avoidability of

the Pre-Petition Liens in the Pre-Petition Collateral of a Debtor or seeking disgorgement of

or offset against all or part of the payment of the Pre-Petition Debt by a Debtor, which

adversary proceeding or contested matter must be filed no later than the earlier to occur of

(i) 60 days from the date of engagement of counsel by a Committee or (ii) 90 days after the

Petition Date. If a party in interest has not obtained an order from the Court granting it

standing to pursue any such Challenge, then such party in interest would be required

promptly to seek such an order as a condition to its further prosecution of such Challenge,

subject to any objection by Debtors, Pre-Petition Credit Parties or any other interested

party (provided that the Court may grant standing to a party in interest, including, without

limitation, a Committee, over the objection of Debtors or any other interested party if it

determines such objection to be without merit), and such party in interest's authority to

prosecute such Challenge would be contingent upon its obtaining such an order. In no

event would the filing of any such Challenge affect any of the rights, privileges, powers or

remedies of Pre-Petition Credit Parties or DIP Lender under the Interim DIP Financing

Order, the DIP Loan Documents or the Pre-Petition Loan Documents pending a ruling on

such Challenge.  If such Challenge is not timely filed or if standing to a party in interest in

connection with any such Challenge is not granted, (i) with respect to the Pre-Petition Debt

of a Debtor (until the Release Effective Date has occurred), then all of the Pre-Petition Debt

(until the Release Effective Date has occurred) would be deemed a legal, valid, binding and

enforceable claim that is allowed in full as a secured claim and not subject to subordination

or recharacterization in these cases, in any superseding Chapter 7 cases or in any other

proceedings; (ii) with respect to the Pre-Petition Liens granted by a Debtor as security for

**the Pre-Petition Debt (until the Release Effective Date has occurred), then such Pre-Petition Liens (and all Replacement Liens granted pursuant to the Interim DIP Financing Order therefor), in each case solely until released on the Release Effective Date, would be deemed to be legal, valid, binding, enforceable, perfected and unavoidable in these cases, in any superseding Chapter 7 cases and in any other proceedings; and (iii) all claims and other causes of action (including, without limitation, causes of action or theories of recovery pursuant to section 105 or Chapter 5 of the Bankruptcy Code) would be forever waived and barred.**

L. <u>Enforcement of Remedies</u>:   The DIP Lender is requiring that it be granted and authorized certain rights upon or after the occurrence of any Event of Default as specifically provided for in the DIP Agreement and the Interim DIP Financing Order.

M. <u>Certain Conditions to DIP Facility</u>.  DIP Lender's willingness to establish the DIP Facility is conditioned upon, among other things, (i) Debtors' obtaining Court approval of the DIP Agreement and all extensions of credit thereunder; (ii) unless and until the Release Effective Date shall occur, Debtors' provision of adequate protection pursuant to sections 361 and 363 of the Bankruptcy Code for the interests of Pre-Petition Credit Parties in the Pre-Petition Collateral of Garlock and Garrison; (iii) DIP Lender receiving (a) a continuing guaranty agreement from each of the Guarantors, (b) a pledge agreement from each Guarantor pursuant to which such Guarantor pledges in favor of DIP Lender 100% of the equity interests of each domestic subsidiary of such Guarantor and the equity interests of each foreign subsidiary of such Guarantor (not to exceed, together with any pledge of such equity interests by any Borrower or Guarantor, 65% of the equity interests of each such foreign subsidiary) and (c) a security agreement, in form and substance satisfactory to DIP Lender, from each Guarantor pursuant to

which such Guarantor shall grant to DIP Lender, as security for all Obligations, a security interest in all of the assets of such Guarantor that are of the same type as the Working Capital Collateral (as defined in the Interim DIP Financing Order); (iv) DIP Lender receiving, as security for the payment of the Obligations, security interests in and liens upon the Collateral; and (v) Debtors' satisfaction (or DIP Lender's waiver in writing in its sole discretion) of all conditions precedent in the DIP Agreement.

N.      Interim DIP Financing Order:   The DIP Lender is requiring as a condition to the effectiveness and the implementation of the DIP Facility, and to the consent to use of Cash Collateral, that an Interim DIP Financing Order substantially in the form of Exhibit B attached hereto and incorporated herein by reference and in all respects satisfactory to DIP Lender, be entered by the Court.

O.      Final DIP Financing Order.   The DIP Lender is requiring, as a condition to the continuing effectiveness and the implementation of the DIP Facility and to the continuing consent to use of Cash Collateral, that a Final DIP Financing Order in form and substance containing many of the same provisions of as the Interim DIP Financing Order as is satisfactory to Lender be entered in the cases.

P.      Carve-Out for Professionals.    The Interim DIP Financing Order and the Final DIP Financing Order shall each contain a Carve-Out for fees and expenses of Professional Persons in the Chapter 11 Cases substantially in the form of the Carve-Out provisions in the Interim DIP Financing Order which is incorporated herein by reference.

32.     The Debtors currently anticipate using their existing bank accounts with BOA and have filed, contemporaneously with this Motion, the Bank Accounts and Cash Management Motion requesting relief from any requirement to open new bank accounts.   It is anticipated that

BOA will advance the monies loaned, to the extent of such advances under the DIP Facility, into the existing account or accounts maintained with BOA.

## RELIEF REQUESTED

33.    By this Motion, the Debtors request entry of an Order (i) authorizing them to obtain post-petition secured financing pursuant to section 364 of the Bankruptcy Code by entering into the DIP Facility pursuant to the DIP Agreement and the DIP Loan Documents, (ii) authorizing the Debtors to grant the DIP Lender, pursuant to sections 503(b) and 364(c)(1) of the Bankruptcy Code, a post-petition security interest and administrative expense claim as set forth in the DIP Agreement and DIP Loan Documents, (iii) approving the use of cash collateral and the provision of adequate protection to BOA for the use of the cash collateral, and (iv) setting the final hearing on the relief requested herein pursuant to Bankruptcy Rule 4001(c).

## BASIS FOR RELIEF REQUESTED

### A.    DIP Facility

34.    Section 364 of the Bankruptcy Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business and (c) obtain credit with specialized priority or with security.  If a debtor in possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to a superpriority administrative expense status or is secured by a lien on the debtor's property, or a combination of the foregoing.

35.    The evidence at the interim hearing will show that, since substantially all of the Debtors' accounts, inventory and other personal property are encumbered by the Pre-Petition Loan Agreement, and given the Debtors' current need to maintain their outstanding letters of credit and to have access to their cash management system and other bank products and services

maintained almost exclusively through BOA, that the DIP Facility is reasonable and necessary for the ordinary course operations of the Debtors.  The Debtors believe that the terms proposed by the DIP Lender represent the best post-petition financing opportunity currently available to the Debtors, and that it would be extremely difficult and more costly to obtain post-petition financing from a lender other than BOA on an expedited basis, due to the lack of familiarity of such other lenders with the Borrowers and the significant asbestos liability claims outstanding. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Federal Sav. and Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).

36.    A debtor need only demonstrate "by a good faith effort that credit was not available" without the protection of section 364. Id.   The Debtors believe that the evidence at the interim hearing will satisfy the requirement of section 364 that credit on better or equal terms was not readily available to the Debtors.

37.    The Debtors have been unable to obtain adequate secured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or secured credit in the amount and on as favorable terms as are contemplated in the DIP Agreement and the other DIP Loan Documents.

**B.    Use of Cash Collateral**

38.    The Debtors, pursuant to section 363(c)(2) of the Bankruptcy Code, hereby request authority, immediately and on an ongoing basis, to use the cash proceeds of their assets and properties including without limitation, the collection of any accounts and the sales of inventory and the cash proceeds thereof, to pay the expenses of operating their businesses and other administrative expenses during the pendency of these cases.

39.     The Debtors' use of property of the estates is governed by section 363 of the

Bankruptcy Code, which provides in pertinent part:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the [debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

40.     Section 363(c)(2) of the Bankruptcy Code permits the debtors in possession to use

cash collateral only if either (i) each entity that has an interest in such cash collateral consents; or

(ii) the court, after notice and hearing, authorizes such use in accordance with the provisions of

that section.  If the secured creditor does not consent to the use of its cash collateral, the Court

can authorize the debtor to use such cash collateral under section 363(c)(2)(B) if the court

determines that the debtors has provided "adequate protection" of the secured creditors'

interests.  11 U.S.C. § 363(e).

41.     BOA's asserted secured interest and lien in cash collateral is adequately protected

by the replacement of inventory equal to or greater than the inventory being used to create sales

and replacement account receivable and the greater value of the Debtors' assets by their

continued operation.

## C.     Motion to Maintain Cash Management System and Bank Accounts.

42.     As described herein, the Debtors have contemporaneously filed a separate motion

to continue their cash management system and to maintain their bank accounts with BOA (the

"Bank Accounts and Cash Management Motion").[8]  The Bank Accounts and Cash Management

---

[8]     The Debtors' cash management system and bank accounts are described in greater detail in the Motion of the Debtors for Entry of an Order under 11 U.S.C. §§363,364,1107 and 1108 (I) Authorizing (A) Continued Use of Existing Cash Management System, (B) Maintenance of Existing Bank Accounts, (C) Continued Use of Existing Business Forms and (D) Waiver of Deposit Guidelines and Continued Use of

Motion describes in detail how the cash management system works and the benefits of continuing the sophisticated banking relationship that the Debtors have with BOA.

**D.**    **Interim Authorization**

43.    Unless the Debtors obtain an interim approval of this Motion for the DIP Facility and their continued use of cash collateral pursuant to section 363 of the Bankruptcy Code, the Debtors and their assets would suffer immediate, continuing and irreparable harm since they could not pay for the expenses of their operations in the ordinary course of business.

44.    Because of the sophisticated nature of the Debtors' operations and banking relationships, the Debtors have concluded that, in their business judgment, BOA as a lender who is familiar with the Debtors' business operations, asbestos liabilities, corporate structure, financing arrangements and collateral base offers the best opportunity for a post-petition credit facility to meet the Debtors' immediate financing needs on the terms, and within the time frame, that the Debtors require to provide maximum protection of their assets and the enterprise value of their operations.

45.    The Debtors need immediate access to use of cash collateral.  As with most operating businesses, the Debtors have significant cash needs.  Access to cash collateral and access to a credit facility are necessary to allow for as seamless continuance of the ordinary course of business of the Debtors.  In the absence of immediate access to cash and possibly credit, the Debtors' suppliers could refuse to supply the goods and materials required to maintain operations.

---

Existing Investment Policies; and (II) (a) Granting Administrative Priority Status to Post-Petition Intercompany Claims and (B)  Authorizing Continued Performance Under Intercompany Arrangements and Historical Practices.

46.     Further, the success of these cases depends on the confidence of the Debtors'
suppliers, customers and employees.   Approval of the DIP Financing and of the use of cash
collateral will assist in providing the confidence to suppliers, customers and employees that the
Debtors have access to the cash needed to continue their operations and pursue their
reorganization efforts.   Such approvals will also allow for the purchase of essential goods and
supplies, and the payment of payroll and other ordinary course expenses, required for the
continued operation of the Debtors.

47.     Pending the final hearing, the Debtors require immediate use of cash collateral
and possibly financing for, among other things, the purchase of goods and supplies to continue
their operations, the funding of payroll obligations, the funding of their ongoing business
operations and other working capital needs.   Absent immediate use of cash collateral and
possibly financing for their continuing business operations, the Debtors will be unable to pay
essential operating expenses and purchase of raw materials, and therefore, may be unable to
continue to conduct their businesses pending the final hearing on the relief requested herein.

48.     Accordingly, the Debtors, request that, pending a final hearing, the Court
schedule
an interim hearing as soon as practicable to consider the Debtors' request for authorization to
obtain interim credit under the DIP Facility as needed and for the use of cash collateral.

## NOTICE

49.     Notice of this Motion has been given to the following parties: (i) the top thirty
law firms by number of asbestos claimants represented who have asserted mesothelioma claims
against the Debtors; (ii) the holders of the twenty largest non-asbestos general unsecured claims
against Garlock; (iii) the holders of the five largest non-asbestos general unsecured claims

against Garrison; (vi) the Office of the United States Bankruptcy Administrator for the Western

District of North Carolina; (v) counsel for Bank of America, as agent under the prepetition

lending facility and as the Debtors' proposed post-petition lender; (vi) each creditor known by

Debtors to have or assert a lien upon any Working Capital Collateral; (vii) the Internal Revenue

Service, and (vii) all parties (if any) that have filed requests for notices under Rule 2002 of the

Bankruptcy Rules  The Debtors submit that, in light of the nature of the relief requested**,** no other

or further notice need be given.

50.     The Debtors' proposed interim Order (the "Interim DIP Financing Order") in

connection with this Motion is attached hereto as Exhibit B.

WHEREFORE, the Debtors respectfully request that the Court:

A.     Conduct an emergency hearing on this Motion in Courtroom ____, United States

Courthouse, 401 West Trade Street, Charlotte, North Carolina in accordance with sections 105, 361,

363 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001;

B.     At the emergency hearing, determine that the Debtors have given adequate notice of

the emergency hearing on the approval of the DIP Facility and the use of cash collateral as to

content, persons, and time;

C.     At the emergency hearing, enter the Interim DIP Financing Order approving the

post-petition financing as set forth herein on an emergency interim basis for cause shown, including

without limitation, granting the liens and security interests requested to DIP Lender and approving

the borrowing by the Debtors and the use of cash collateral by the Debtors for the Interim Period;

D.     At the emergency hearing, authorize the Debtors, immediately and on an ongoing

basis, to use any and all of the cash proceeds or cash collateral of their assets to pay the ordinary

expenses of operating their properties and to fund the administrative expenses of these cases;

E.     At the emergency hearing, set this Motion for a final hearing upon due notice, in accordance with sections 105, 345(b), 361, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001;

F.     Authorize the Debtors to execute the DIP Agreement in substantially the form attached hereto as <u>Exhibit A</u>, and any additional DIP Loan Documents reasonably necessary to effectuate the terms set forth herein; and

G.     Grant such other and further relief as the Court deems just and proper.

This the 5th day of June, 2010.

RAYBURN COOPER & DURHAM, P.A.

By:     /s/ Albert F. Durham
        Albert F. Durham
        N.C. State Bar No. 6600
        John R. Miller, Jr.
        N.C. State Bar No. 28689
        Shelley K. Abel
        N.C. State Bar No.  34370
        Suite 1200, 227 West Trade Street
        Charlotte, NC  28202
        (704) 334-0891

        *Proposed Counsel to the Debtors and Debtors-in-Possession*