**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

IN RE:

GARLOCK SEALING TECHNOLOGIES
LLC, et al.,

Debtors.[1]

Case No. 10-BK-31607

Chapter 11

Jointly Administered[2]

---

**INFORMATION BRIEF OF GARLOCK SEALING TECHNOLOGIES LLC**

---

Dated:  June 7, 2010


ROBINSON BRADSHAW & HINSON, P.A.

Garland S. Cassada
Jonathan C. Krisko
Richard C. Worf
Ty E. Shaffer
101 North Tryon Street, Suite 1900
Charlotte, NC  28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000

Proposed Special Corporate and Litigation
Counsel to the Debtors Garlock Sealing
Technologies LLC, Garrison Litigation
Management Group, Ltd., and The Anchor
Packing Company

---

[1]   The debtors include Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

[2]   The debtors have filed a Motion for Joint Administration seeking to jointly administer the debtors' cases with Garlock Sealing Technologies LLC serving as the lead case.

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................. 1

I.  The sealing products containing encapsulated asbestos that Garlock once
    manufactured could not cause injury or disease ................................................. 7

    A.  Asbestos in the United States ................................................................... 7

    B.  Friable asbestos products ......................................................................... 9

    C.  Garlock's encapsulated asbestos-containing products .......................... 10

    D.  Friable asbestos products used near Garlock's asbestos-containing
        products .................................................................................................. 13

    E.  Development of knowledge about asbestos disease ............................... 16

        1.  Knowledge before the 1960s ...................................................... 16
        2.  Asbestos insulation hazards widely recognized in the 1960s ..... 17
        3.  Public health agency response and elimination of friable products ......... 18

    F.  Determining what exposures to asbestos are proven causes of disease .............. 21

        1.  Epidemiology is needed to establish the levels of exposure that are
            proven causes of disease ........................................................... 21
        2.  Dose proven to cause asbestosis ............................................... 24
        3.  Dose proven to cause lung cancer ............................................. 24
        4.  Dose proven to cause mesothelioma .......................................... 25
            (a)  Levels of amphiboles proven to cause mesothelioma ................. 26
            (b)  Chrysotile fibers are not a proven cause of mesothelioma ......... 27

    G.  The friable products surrounding Garlock's gaskets and packing produced
        levels of airborne asbestos fibers that caused asbestos disease .......................... 30

    H.  But no study has linked work with Garlock's gaskets and packing to an
        increased relative risk of asbestos-related disease ............................... 31

        1.  Asbestosis and lung cancer ....................................................... 34
        2.  Mesothelioma ............................................................................ 34

II. Because Garlock's products did not cause plaintiffs' injuries, Garlock for decades
    was able to manage its asbestos litigation by paying de minimis settlements ................ 36

    A.  Courts were long swamped with asbestos claims not involving serious
        disease, which prevented resolution of most claims on their merits .................. 36

## TABLE OF CONTENTS
(continued)

1.      Serious disease cases.................................................................. 37
2.      Non-symptomatic cases ............................................................ 37

B.    Garlock was forced to pay millions of dollars in settlements to avoid
defense costs, but survived in the tort system........................................ 39

1.      Garlock settled both serious disease and non-symptomatic cases
for low values in the 1990s ...................................................... 39
2.      Garlock's mesothelioma resolution values gradually increased
during the 1990s as a result of targeting, but it still survived ................. 41

C.    The cases that were long Garlock's major problem largely disappeared
after 2005 ............................................................................ 44

D.    But the litigation had already forced the most culpable defendants into
Chapter 11, creating a host of new problems for Garlock .................................. 46

III.    The bankruptcies of the companies responsible for causing the serious asbestos-
related diseases resulted in a permanent, unjustified, and unsustainable increase in
Garlock's payments ........................................................................ 49

A.    Beginning in 2000, plaintiffs began failing to identify exposures to the
friable products manufactured by the bankrupts.................................... 49

B.    Simultaneously, plaintiffs' attorneys asserted in the bankruptcies that their
clients were exposed to the friable products ........................................ 52

C.    As a result of targeting, the bankrupts' liability shifted to Garlock.................... 56

D.    The establishment of Trusts with tens of billions of dollars to pay
responsible companies' liabilities should have provided relief to Garlock ......... 58

E.    But the plaintiffs' bar intentionally structured the Trusts so that Garlock's
payments would not return to rational levels..................................... 63

F.    When Garlock realized that the top tier defendants had been permanently
removed from the tort system, it was forced into Chapter 11.............................. 66

IV.    Chapter 11 provides the only meaningful opportunity for Garlock to resolve its
responsibility for asbestos claims .................................................... 70

A.    Bankruptcy courts are uniquely equipped to facilitate fair resolutions of
mass tort litigation that is hopelessly intractable in civil courts ........................ 70

## TABLE OF CONTENTS
(continued)

**Page**

B.  Garlock will follow a proven pathway to resolution of its asbestos litigation ......................................................................................................... 75

C.  Garlock's planned pathway to resolution ........................................................ 77

    1.  Protecting the reorganization process from collateral attack .................. 77

    2.  Appointment of Asbestos Claimants' Committee and Future Claims Representative ............................................................................ 78

    3.  Establishment of asbestos claims bar date and proof of claim process ................................................................................................. 79

    4.  Disallowance of claims through resolution of common threshold issues .................................................................................................... 81

    5.  Estimation of asbestos liability ............................................................ 82

    6.  Confirmation of the reorganization plan ................................................ 84

**Introduction**

The debtors, Garlock Sealing Technologies LLC (a North Carolina limited liability company) and The Anchor Packing Company and Garrison Litigation Management Group, Ltd. (North Carolina corporations), are indirect, wholly-owned subsidiaries of EnPro Industries, Inc., a Charlotte-headquartered manufacturer of engineered industrial products. For over a century, Garlock has made gaskets and packing used to prevent leaks in pipes and valves. Anchor was a sealing products distributor that sold gaskets and packing. Garrison manages the defense and resolution of asbestos claims against Garlock and Anchor.[3]

Some of the gasket and packing products Garlock formerly manufactured contained asbestos bound in rubber or other encapsulating material. Because the asbestos in these products was encapsulated, fibers could not become airborne in more than trace amounts during normal use. Accordingly, although leading researchers warned of the dangers of asbestos insulation and other asbestos products that released large numbers of fibers ("friable" products), the same researchers explained that gaskets and packing posed "no health hazard."[4] Indeed, unlike friable products, most of which have been banned in the United States for thirty-five years, asbestos gaskets and packing are still sold lawfully today by other companies.

Nonetheless, for decades, Garlock has received thousands of claims each year from individuals who allege they suffer from asbestos-related disease caused in part by Garlock's products. Very few, if any, are even arguably legitimate. Yet for many years, Garlock has been forced to spend more than $100 million per year to settle thousands of asbestos cases. In the aggregate, Garlock has paid approximately $1.37 billion in indemnity payments and hundreds of

---

[3]    For convenience, this brief will hereinafter use "Garlock" to refer to the debtors.
[4]    I. Selikoff & D. Lee, *Asbestos and Disease* 467 (1978); P.G. Harries, *Asbestos Dust Concentrations in Ship Repairing: A Practical Approach to Improving Asbestos Hygiene in Naval Dockyards*, 14 Ann. Occup. Hyg. 241, 249 (1971).

millions in defense costs.  It has nearly exhausted over $1 billion in insurance coverage.  Today,

Garlock has approximately 100,000 pending asbestos claims and still receives several hundred

new claims each month.

This brief tells the story of how Garlock has been forced to make these staggeringly large

payments, despite manufacturing a safe product.  For decades, the tort system failed to provide a

rational means for adjudicating asbestos-related liabilities.[5]  Though Garlock survived in that

environment for 35 years, recent developments have made it necessary for Garlock to resolve its

responsibility for asbestos claims in Chapter 11 if it is to remain a viable going concern.

Before 2000, Garlock resolved its claims by making de minimis payments, principally

from insurance, to avoid the prohibitive costs of defending thousands of meritless claims filed

against it each year.  Garlock lacked any significant trial risk because judges and juries in these

years understood that friable asbestos products—not Garlock's encapsulated, non-friable

products—had caused plaintiffs' asbestos diseases.  Garlock was forced to make large aggregate

payments to settle tens of thousands of claims, but it survived.

Then, during a two-year period beginning in January 2000, asbestos litigation against

Garlock changed for the worse.  The nine top tier defendants—the largest sources of plaintiffs'

compensation and the defendants with the most trial risk in the tort system—filed for Chapter 11

protection.  Over 30 additional defendants followed them into bankruptcy.

The exit of the most plausible causes of plaintiffs' diseases caused a fundamental

breakdown in the integrity of the civil justice system.  Plaintiffs now minimized or failed to

identify exposures to the friable products of bankrupt companies.  Instead, they insisted that

---

[5]   *Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation* 2 (1991) [hereinafter Judicial
Conference Report]; *see also Georgine v. Amchem Prods., Inc.*, 157 F.R.D. 246, 265 (E.D. Pa. 1994) (observing
that the Judicial Conference report "was a ringing condemnation of the asbestos litigation process in the tort
system"), *vacated*, 83 F.3d 610 (3d Cir. 1996), *aff'd*, 521 U.S. 591 (1997).

Garlock's non-friable gaskets and packing were a major cause of their diseases.  The new story was inconsistent with positions plaintiffs had taken for decades, with real work practices, and with everything shown by legitimate science.  Yet it was difficult for Garlock to rebut the story consistently and repeatedly before state court juries.  Plaintiffs' attorneys had found an easier way to convince juries that Garlock had caused their clients' injuries.

Garlock's risk of losing at trial immediately increased.  The consequences of a loss were also more severe than before 2000.  Garlock could face joint and several liability and end up responsible for paying damages that previously would have been ascribed to the bankrupts.



Because of this increased leverage in the courtroom, plaintiffs' attorneys could demand larger settlements from Garlock.  Garlock's average resolution value in mesothelioma cases increased exponentially, from approximately $9,000 per case in 1999, before the bankruptcy wave, to almost $80,000 by 2006 (Figure 1).  Its annual aggregate payment to resolve mesothelioma claims increased during the same period from approximately $6 million in 1999 to

approximately $73 million in 2006. These sharply escalating resolution values were a sign of a tort system that was essentially broken.

Yet until recently, Garlock believed it would survive the bankruptcy wave. Many of the companies that filed for bankruptcy in the 2000s resolved their asbestos liabilities by creating wealthy post-confirmation trusts ("Trusts") to assume their liabilities and pay claims to individuals injured by exposure to their products. The Trusts received billions of dollars to pay the very same people suing Garlock.

Garlock expected these Trusts to restore some integrity to the tort system. Once the Trust funds were available, Garlock believed plaintiffs would have neither the incentive nor the ability to deny their exposures to friable products for which the Trusts were now responsible. Garlock also believed plaintiffs would not be able to deny giving Garlock credit against its resolution values for the substantial payments made by the Trusts.

But surprisingly, after the Trusts emerged, Garlock's trial risk and resolution values remained at the same inflated levels. Many plaintiffs continued to target Garlock in the tort system and failed to identify exposure to products entitling them to collect money from Trusts. This belied the reality of work practices, the medical and scientific evidence, and the billions of dollars placed in the Trusts to fund payments to these very same plaintiffs. The tort system remained fundamentally broken.

What is the explanation? Garlock suspects that plaintiffs are simply hiding evidence of exposure to products for which Trusts are now responsible. The procedures of the Trusts (drafted by the plaintiffs' bar) permit plaintiffs to delay their claims and then file them under seal. Plaintiffs can recover settlements from tort system defendants like Garlock, on the theory that the friable products did not play a role, and then turn around and recover money from Trusts

on the inconsistent ground that they *were* exposed to the friable products.  Plaintiffs collect their damages twice, and plaintiffs' firms collect contingency fees on those damages twice.

Since 2008, Garlock has been the most active tort system defendant in attempting to penetrate the veil of secrecy surrounding Trusts in order to uncover evidence confirming its suspicions.  In 2008, Garlock discovered that after it had paid two multi-million dollar judgments in Maryland state court, the plaintiffs had almost immediately turned around and filed claims against Trusts, seeking compensation on the basis of exposure to products they had failed to identify in their cases against Garlock.

Then, earlier this year, in *In re Pittsburgh Corning Corporation*, No. 00-22876 (Bankr. W.D. Pa.), Garlock obtained access to confirmation ballots cast confidentially in November 2009 by over 100,000 workers, in which their attorneys swore under penalty of perjury that they had exposure to Pittsburgh Corning Corporation ("PCC") products.  Garlock compared a random sample of discovery from its tort system cases against ballots cast by the same plaintiffs.  The majority of these plaintiffs had *failed* to identify exposure to PCC products in their cases against Garlock.  Indeed, the vast majority of discovery responses dated *after* the ballots failed to identify exposure to PCC products, despite certifications of exposure by the plaintiffs' attorneys under penalty of perjury in *Pittsburgh Corning*.

This evidence confirmed Garlock's suspicion that the tort system has now become irredeemably defective.  With the plausible causes of plaintiffs' diseases cordoned off in a Trust system that pays billions to the same plaintiffs suing Garlock, the tort system now has no ability to adjudicate Garlock's true responsibility for asbestos claims or achieve a proper allocation of responsibility.

After surviving asbestos litigation for decades and depleting its insurance, Garlock can no longer sustain the cash flows required to fund the inflated payments—approximately $30 million in defense costs and $80 million in settlement payments each year.  The value of Garlock's core businesses and its ability to compete effectively in the marketplace will be damaged without a permanent resolution of its asbestos claims pursuant to the provisions of the Bankruptcy Code.

Bankruptcy court is now the only place where Garlock's asbestos liability can be fairly adjudicated.  Here, Garlock can resolve its responsibility for asbestos claims pursuant to the Bankruptcy Code, under a process that guarantees integrity through application of rules of evidence and the rule of law.  The effect of the bankruptcy wave can be rolled back, and Garlock's true liability for these claims determined and funded.

This brief describes the circumstances that led Garlock to seek protection under Chapter 11, including:

- The history of asbestos-containing products in the United States;

- The history of Garlock's asbestos-containing products;

- The lack of any scientific evidence that Garlock's products caused disease;

- Garlock's asbestos litigation before and after the bankruptcy wave; and

- How the establishment of Trusts did not ameliorate the effects of the bankruptcy wave, ultimately precipitating this bankruptcy filing.

The brief concludes by describing the fundamental legal issues that must be addressed to achieve a successful resolution of these consolidated cases, as well as Garlock's proposal regarding how these cases should proceed.

## I.    The sealing products containing encapsulated asbestos that Garlock once manufactured could not cause injury or disease

### A.    Asbestos in the United States

To understand the asbestos litigation against Garlock, it is first necessary to understand the nature of asbestos and its ability to cause disease. "Asbestos" is a generic commercial term that refers to several varieties of naturally occurring, fibrous minerals found in deposits throughout the United States and around the world. There are two types of asbestos. The most common type used in the U.S. is chrysotile, also known as white asbestos.[6] It is classified as a serpentine mineral because its fibers have a curvy shape, as can be seen in the following photomicrograph of individual chrysotile fibers (Figure 2). Over the years, 95% to 98% of Garlock's asbestos products were made with chrysotile.

Figure 2



The other major variety is the amphibole family. The most significant types of amphibole fibers for commercial purposes are amosite and crocidolite.[7] Tremolite, a non-

---

[6]    *Thurlbeck's Pathology of the Lung* 810 (A. Churg, J. Myers, H. Tazelaar & J.Wright eds., 3d ed. 2005) [hereinafter Thurlbeck].

[7]    Garlock made a small percentage (2–5%) of its gaskets and packing with crocidolite. These products were used in certain corrosive environments.

commercial amphibole, is also significant in asbestos litigation because it was present in some commercially significant deposits of asbestos.

As the photomicrographs demonstrate, individual amphibole fibers are thin and spear-like.  In addition to their differing shape, amphiboles have chemical, electrical, and crystalline features that distinguish them from chrysotile.  The differences between chrysotile and the amphiboles are important biologically because chrysotile "tends to accumulate to only a very limited extent in lung tissue despite continuous exposure, whereas continuous exposure to amphiboles leads to a continuous increase in the amphibole fiber concentration in the lung."[8]  As described in more detail below, chrysotile fibers are much less dangerous than amphibole fibers.

All commercial varieties of asbestos are heat-resistant, fire-retardant, and have high tensile strength, flexibility, and resistance to degradation.  These properties were known to the ancient Romans, who quarried asbestos, which they used for various purposes.[9]  In modern times, asbestos was used in as many as 3,000 different products.[10]  Major use occurred in pipe and boiler insulation; sprayed insulation on walls, ceilings, and equipment; cement pipes, sheets, and construction materials; automotive brake and clutch linings; fire resistant cloth, lagging and curtains; floor tiles; roofing and flooring felts, wallboards, and insulating papers; and spacklings, paints, plastics, filters, and joint compounds.[11]  Not only was asbestos used to cover almost every surface of a building or residence, it could also be found in fireproof gloves, stove-top pads, ironing board covers, and hairdryers.[12]  The snow seen falling in the movies *The Wizard of Oz* and *White Christmas* reportedly consisted of asbestos.

---

[8]   Thurlbeck, *supra* note 6, at 811.
[9]   J. Craighead & A. Gibbs, *Asbestos and Its Diseases* 23 (2008).
[10]   Thurlbeck, *supra* note 6, at 811-12.
[11]   *Id.*
[12]   US Environmental Protection Agency, *Asbestos in Your Home*, http://www.epa.gov/asbestos/pubs/ashome.html (last visited May 28, 2010).

Asbestos exposures occur because of both past industrial use and natural contamination of the air from asbestos in some kinds of rock and soil.[13]  Since asbestos is found throughout the environment, all forms of asbestos can be found in the lungs of the general population.[14]  In fact, in the 1980s, the typical city dweller's lungs contained hundreds of thousands to tens of millions of asbestos fibers.[15]  Yet, as with all dusts, the human body has defenses so that these background levels of asbestos are not associated with disease.[16]

An estimated 13 to 21 million workers, however, experienced much heavier exposure because they applied, installed, or used certain fiber-releasing asbestos-containing products, or worked in proximity to workers who did.[17]  Workers in some trades, including insulators, construction workers, shipyard workers, machinists, millwrights, boilermakers, pipefitters, welders, and laggers, were exposed to large amounts of airborne asbestos released by products such as asbestos insulation, cement, board, felt, joint compound, and fireproofing.[18]

### B.      Friable asbestos products

The danger from asbestos occurs only when large numbers of asbestos fibers become airborne, where they can be inhaled and deposited in the lungs.  This has long been recognized as a potential health hazard in the mining of asbestos and manufacturing of asbestos products.

However, not all asbestos-containing products release significant numbers of fibers into the air during their use.  How fibers are incorporated into products is critical.  Some products are manufactured in ways that allow fibers to be released easily and are known as "friable" products. Friable products, such as asbestos insulation, may be crumbled, pulverized, or reduced to powder

---

[13]   Thurlbeck, *supra* note 6, at 811-12.
[14]   *Id.* at 812–13.
[15]   *Id.* at 816.
[16]   *Id.*
[17]   *See* Judicial Conference Report, *supra* note 5, at 6–7.
[18]   Thurlbeck, *supra* note 6, at 812–13.

by hand pressure.[19]  Certain friable products, such as many now-banned insulation products, are

notorious for their potential to cause disease.

But many of the asbestos products used in the United States were not friable.  In these

non-friable products, the asbestos is bound together and cannot release significant numbers of

fibers into the air under ordinary conditions of use.  As stated by one of the most famous and

respected asbestos researchers, "It is fortunate that the greatest part of [the asbestos in

construction materials] has been in products in which the asbestos is locked in—that is, it is

bound with cement or plastics or other binder so that there is no release, certainly no significant

release, of asbestos fiber in either working areas or general air."[20]  Among non-friable products,

which are not causes of disease, are the asbestos gaskets and packing once manufactured by

Garlock, and still lawfully sold by others today.

C.      **Garlock's encapsulated asbestos-containing products**

Garlock's asbestos litigation has principally involved two asbestos-containing sealing

products: compressed asbestos sheet gaskets and asbestos packing.  A gasket is a thin piece of

material (usually 1/32" to 1/8" thick) used to create a seal between metal surfaces that would

otherwise leak, such as a flange where two metal pipes connect, or where a pipeline attaches to

equipment like pumps and valves.  Illustrations of the location of a pipe flange gasket and valve

flange and bonnet gaskets appear below in Figure 3.  A gasket spends its entire useful life

sandwiched between the metal surfaces.

---

[19]   Occupational Safety and Health Standards Toxic and Hazardous Substances, 29 C.F.R. § 1910.1001 app. G
       (2008) ("Friable means that the material can be crumbled with hand pressure and is therefore likely to emit
       fibers.").
[20]   I. Selikoff, *Partnership for Prevention—The Insulation Industry Hygiene Research Program*, 39(4) Indus. Med.
       & Surgery 162, 164 (1970).

**Figure 3**



Compressed asbestos gaskets were manufactured in sheets and reached the consumer in one of two forms: (1) sheet gasket material that often came in rolls out of which the purchaser cut gaskets to size and (2) pre-cut gaskets that the purchaser ordered to requested sizes and shapes either directly from Garlock or from a gasket supply company that engaged in custom gasket cutting.  The following photographs (Figure 4) show samples of a precut gasket and sheet gasket material.

**Figure 4**





| **Pre-cut gasket** | **Sheet gasket material** |

Garlock's asbestos gaskets were a mixture of asbestos fibers, curing agents, reinforcing fillers, and elastomers (natural rubber or synthetic polymers having the elastic qualities of rubber).  The manufacturing process machine-blended asbestos fibers with the rest of the mixture

until they were thoroughly coated. The entire compound was then heated and rolled into sheets and continually compressed to form a tough, impenetrable, homogenous material that looks like linoleum.

Although Garlock offered many styles of non-asbestos gaskets and packing, customers historically needed asbestos gaskets and packing for certain high-temperature or corrosive environments. Here the physical properties of asbestos were indispensible to both function and safety. In certain contexts, anything other than an asbestos gasket would have created an unreasonable risk of a blown seal. Rubber, vegetable fiber, metal, or other types of gaskets might perform safely in water or oil lines. But in steam lines and certain other applications, function and safety concerns often dictated the use of asbestos-containing gaskets during the time period from which most asbestos claims arise. A blown gasket could lead to catastrophic injury or damage, and the high-tech gaskets that eventually replaced asbestos gaskets in the marketplace were not invented until the 1980s and later.

Packing is braided yarn that is wrapped around the shafts of valves and other equipment to prevent leaks (Figure 5). Garlock asbestos packing was made with asbestos yarn impregnated and coated with lubricants, such as Teflon or graphite. Just as with gaskets, asbestos in packing was encapsulated.

**Figure 5**

Encapsulated Valve Stem Packing



Wrapped Around
Valve Stem
(generally 5 rings)

**D.      Friable asbestos products used near Garlock's asbestos-containing products**

Gaskets and packing were far from the only asbestos products used in high temperature applications.  Friable asbestos products were used as thermal insulation for the pipes and equipment that needed asbestos gaskets and packing.  Asbestos thermal insulation was ubiquitous up until the mid-1970s, used to prevent the release of heat from pipelines and equipment.  Much of it was made with amphibole varieties of asbestos, such as amosite.

Reaching the gasket inside the pipes and equipment nearly always required disturbing the asbestos insulation surrounding the flange inside of which the gasket was installed.  An illustration of the process appears in the following series of diagrams (Figure 6), which are based on Navy flange insulation plans from the 1940s, 1950s, and 1960s.  While the pipeline was operating, the gasket was inaccessible.  It was compressed between the faces of the flange, and the flange itself was completely surrounded by insulation.

13

**Figure 6**

An Insulated Flange







To service the flange, the worker would shut down the line and dig through the various layers of friable asbestos material used to insulate the flange.  In this insulation plan, the material included an amosite asbestos blanket (asbestos cloth filled with amosite asbestos felt), standard sectional amosite pipe covering (two "half-rounds" of pipe covering that would completely surround the pipe), and woven amosite asbestos felt to fill the voids.  In other applications, reaching the gasket could require disturbing asbestos cement, hard or flexible asbestos millboard, loose asbestos, asbestos cloth, and other forms of asbestos insulation products, all of which released large numbers of fibers.  Some of these products are shown in the valve diagram below (Figure 7), which is based on another Navy insulation plan.

**Figure 7**

Valve Is Covered By Asbestos



Thus, only after digging through these thermal insulation materials surrounding the pipe flange or valve would a worker reach the gasket that was located between the faces of the flange. After replacing the gasket, the worker would then re-insulate the flange or valve according to the specification.

Both tearing out the insulation and reinstalling insulation around the flange or valve created high asbestos fiber exposures.  As a result, workers in environments where Garlock gaskets were present had substantial exposures to now-notorious products such as Unibestos manufactured by PCC, Kaylo manufactured by Owens Corning Fiberglas, Thermobestos made by Johns-Manville, and the insulation products sold by Armstrong World Industries, W.R. Grace & Co. ("W.R. Grace"), and Turner & Newell, PLC/Federal-Mogul Corp.  As described in detail below, all of these companies faced thousands of asbestos claims for many years, later passed through Chapter 11, and have established Trusts that are now responsible for paying their liabilities.

The asbestos exposures in workplaces where Garlock gaskets and packing were used also were not limited to the friable insulation products used on pipes.  Other friable products were used in large quantities.  These included construction products sold by W.R. Grace, Harbison

15

Walker, A.P. Green, and many other companies.  All of these products released large numbers of fibers into the air.  For these reasons, nearly every worker who used or was near asbestos-containing Garlock gaskets or packing before the early 1980s breathed in large numbers of asbestos fibers that did not come from Garlock's products and for which Garlock is not responsible, but that instead came from products manufactured by companies that have now established Trusts.

### E.    Development of knowledge about asbestos disease

#### 1.    Knowledge before the 1960s

Doctors knew by the 1930s that excessive inhaled doses of raw asbestos fibers could cause a lung disease called asbestosis.  Asbestosis is a non-malignant respiratory disease in which large amounts of inhaled asbestos scar the parenchyma, the part of the lung that is directly involved in the breathing process.  It can restrict the patient's ability to take air into the lungs because the normal elasticity of the lungs has been replaced by scar tissue.  Asbestosis can result in a loss of total lung capacity, and can cause death.  The disease is caused by heavy occupational exposure to airborne asbestos, usually over long periods of time.[21]

Early guidelines issued by government health authorities such as the United States Public Health Service were crafted to prevent asbestosis.[22]  After studying exposures in the textile mills where workers spun, carded, and wove raw asbestos, the United States Public Health Service recommended in 1938 that employers keep exposures below 5 million particles per cubic foot, or approximately 30 fibers per cubic centimeter ("f/cc") under the exposure measurement methodology used today by industrial hygienists.[23]

---

[21]    Thurlbeck, *supra* note 6, at 823.
[22]    *See* Craighead & Gibbs, *supra* note 9, at 41.
[23]    The conversion from particles per cubic foot to fibers per cubic centimeter is not exact because the methodologies rely on different technologies.  Thurlbeck, *supra* note 6, at 811.

By the mid-1950s, researchers also established that exposure to raw asbestos above these

levels increased the risk of developing lung cancer.  Thus, as of the end of the 1950s, the

asbestos diseases of interest were asbestosis and lung cancer, the workplaces of concern were

mining and manufacturing facilities, and it was generally believed that the problem could be

controlled by keeping exposures below 30 f/cc.[24]  The standard was incorporated into regulations

by both state and federal agencies.[25]

### 2.    *Asbestos insulation hazards widely recognized in the 1960s*

In the 1960s two famous scientists initiated a new era in asbestos research.  The first was

Dr. J. C. Wagner.  In 1960 he reported that an otherwise rare cancer, diffuse malignant

mesothelioma, occurred with alarming frequency in the crocidolite mining region of South

Africa.[26]  Mesothelioma is a rare cancer of the serous membrane that lines the pleural,

pericardial, and peritoneal cavities.[27]  The mesothelioma incidence rate in North America is

approximately 20 cases per million (and declining),[28] much lower than the rate of prostate cancer

(1,453 per million men) or breast cancer (1,177 per million women).[29]  Pleural and peritoneal

mesothelioma are terminal diseases, usually resulting in death within a year or two of diagnosis.

---

[24]   *See* K.J. Isselbacher et al., *Asbestosis and Bronchogenic Carcinoma*, 15(5) Am. J. Med. 721 (1953).

[25]   *See, e.g.*, Walsh-Healey Reg. issued Under Walsh-Healey Auth., Safety & Health Regs. for Ship Repairing,
Final Rule, 25 Fed. Reg. §§ 1543-1563 (Feb. 1960); Safety Div., Dep't Labor & Indus., *Safety Standards for
Protection Against Occupationally Acquired Disease*, Olympia, Wash. (1961); Bureau of Eng'g & Safety, N.J.
Dep't of Labor, *Safety Regulation No. 3: Establishing Threshold Limit Values for Dusts, Vapors, Fumes, Gases,
and Mists* (Oct. 30, 1958); Penn. Dep't of Labor & Indus., *Regulations Establishing Threshold Limits in Places
of Employment*, ch. 4, art. 432 (Jul. 13, 1953); Commonwealth of Penn. Dep't of Health, *Rules & Regulations*
(Oct. 27, 1961); Workmen's Comp. Div., Fla. Indus. Comm'n, *Regulation for the Control & Prevention of
Occupational Diseases* 185S-1 (OD-1957) (June 6, 1960).

[26]   J.C. Wagner, C.A. Sleggs & P. Marchand, *Diffuse Pleural Mesothelioma and Asbestos Exposure in the North
Western Cape Province*, 17 Brit. J. Indus. Med. 260 (1960).

[27]   The term "mesothelioma" will be used throughout this brief to refer to diffuse malignant mesothelioma of the
pleura or peritoneum—diseases associated with exposure to amphibole asbestos and which are involved in
asbestos personal injury litigation.  There are other forms of mesothelioma that are not thought to be caused by
asbestos exposure and account for few cases in the litigation.

[28]   Thurlbeck, *supra* note 6, at 1004.

[29]   U.S. Dep't of Health & Human Servs., Ctrs. for Disease Control and Prevention & Nat'l Cancer Inst., *United
States Cancer Statistics: 2004 Incidence and Mortality* (2007).

By the end of the 1960s, further study confirmed Dr. Wagner's association between crocidolite and mesothelioma, and implicated the other commercial amphibole fiber, amosite.

The other pioneer of asbestos research was Dr. Irving Selikoff.  His studies demonstrated that the risk of disease was not limited to mining and manufacturing environments.  By studying 17,800 members of the insulators' union, Dr. Selikoff found a link between exposure to friable asbestos-containing insulation products and asbestosis.[30]  More troubling, Dr. Selikoff also found a link between exposure to friable insulation products and lung cancer and mesothelioma.[31] Dr. Selikoff ultimately demonstrated that approximately one out of ten deaths in his insulator population occurred from mesothelioma, a much higher rate than among the general population.[32]  Dr. Selikoff warned that existing standards adopted by federal and state governments and the industrial hygiene community were not sufficient to abate the risks of asbestosis or asbestos-related cancers.

Dr. Selikoff organized a conference in 1964 calling for world-wide research into asbestos disease, including the ability of various asbestos fiber types to cause mesothelioma.  Dr. Wagner's and Dr. Selikoff's work led to a sustained effort on the part of medical and public health authorities to understand the link between asbestos exposure and disease, and to develop standards for workplace exposure that would protect workers from increased risk.

### 3.      *Public health agency response and elimination of friable products*

Research into asbestos diseases is difficult because each of the asbestos-related diseases has a long latency period.  The mean latency period is between 30 and 40 years after exposure

---

[30]   I.J. Selikoff, J. Churg & E.C. Hammond, *The Occurrence of Asbestosis Among Insulation Workers in the United States*, 132 Annals N.Y. Acad. Sci. 139 (1965).
[31]   I.J. Selikoff, J. Churg & E.C. Hammond, *Asbestos Exposure and Neoplasia*, 188 J. Am. Med. Ass'n 22 (1964).
[32]   I.J. Selikoff & Herbert Seidman, *Asbestos-Associated Deaths Among Insulation Workers in the United States and Canada, 1967-1987*, 643 Annals N.Y. Acad. Sci. 1, 7 (1991).

first occurs.[33]  Thus, conclusive research can take decades to complete.  Despite the lack of

definitive answers to some questions, in the 1970s, public health agencies responded to the wave

of research initiated by Wagner and Selikoff.

In 1970, the newly established Occupational Safety and Health Administration

("OSHA") started regulating asbestos exposures in the workplace.  OSHA's initial standard set

the permissible exposure limit ("PEL") at 2 million particles per cubic foot or 12 f/cc (8-hour

time-weighted average).[34]  OSHA set an emergency temporary standard at 5 f/cc in 1971.  It then

periodically lowered the exposure limit to 2 f/cc in 1976, 0.2 f/cc in 1986, and 0.1 f/cc in 1994,

where the PEL remains today.[35]  OSHA also required warnings on certain asbestos products.

For similar reasons, government agencies banned various asbestos products.  The

Environmental Protection Agency banned spray-on asbestos insulation and fireproofing in 1973

and all forms of asbestos pipe insulation, block insulation, and asbestos cement in 1975.[36]  The

Consumer Products Safety Commission banned asbestos-containing patching or joint compounds

and textured paints in 1977.[37]

Because of this regulatory activity, new friable asbestos insulation products disappeared

from the market by the mid-1970s.  Yet vast amounts of old friable products remained in place,

creating potential exposures well beyond the 1970s.  Moreover, stopping the sale of new

---

[33]   Thurlbeck, *supra* note 6, at 1004–05.
[34]   Craighead & Gibbs, *supra* note 9, at 320 tbl.13-2.  The standards are all stated in terms of a time-weighted
       average ("TWA").  Asbestos exposure levels in a work environment can change over the course of the day, as
       certain activities cause fibers to be released, and as fibers dissipate over time.  A TWA PEL requires that the
       average exposure over a typical eight-hour day not exceed the applicable limit: in 1971, 12 f/cc.
[35]   *Id.*
[36]   National Emission Standards for Hazardous Air Pollutants Asbestos and Mercury, 40 Fed. Reg. 48,292 (Oct. 14,
       1975) (codified at 40 C.F.R. § 61); National Emission Standards for Hazardous Air Pollutants Asbestos,
       Beryllium, and Mercury, 38 Fed. Reg. 8,820 (Apr. 6, 1973) (codified at 40 C.F.R. § 61).
[37]   Ban of Consumer Patching Compounds Containing Respirable Free-Form Asbestos, 42 Fed. Reg. 63,362
       (Dec. 15, 1977) (codified at 16 C.F.R. § 1304).

insulation could not prevent disease based on past exposure. Diseases would continue to arise for decades because of the long latency period for asbestos disease.

Significantly, although asbestos insulation was banned, the regulatory activity of the 1970s did not restrict the sale and use of asbestos gaskets and packing. Indeed, OSHA exempted encapsulated products from its labeling requirement.[38] Still, by 1977, Garlock had voluntarily placed the OSHA warning on all its asbestos products, despite the fact that exposures associated with use of gaskets and packing were orders of magnitude below exposure limits at the time (and indeed, were less than the OSHA PEL that applies today).

In the 1980s, Garlock led the industry in developing substitutes for asbestos-containing gaskets and packing. Garlock found suitable replacements for asbestos packing in nearly all applications by 1982. Finding adequate substitutes for asbestos gaskets proved to be a more difficult technical task, but Garlock eventually succeeded. Garlock developed the first substitute for asbestos gaskets on steam lines, which the U.S. Navy approved in 1993.

By 2001, Garlock had found substitutes for most industrial applications of asbestos gaskets and discontinued manufacturing them. Yet even today, asbestos gaskets and packing are manufactured by other companies, and unlike insulation that has been banned for 35 years, they are still lawfully sold in the United States. Garlock's products always complied with the applicable workplace asbestos exposure standard. Indeed, from the beginning they complied with the OSHA standard adopted in 1994, the most restrictive in U.S. history.

---

[38]    Standards for Exposure to Asbestos Dust, 37 Fed. Reg. 11,318 (June 7, 1972) (codified at 29 C.F.R. § 1910).

**F.    Determining what exposures to asbestos are proven causes of disease**

   ***1.    Epidemiology is needed to establish the levels of exposure that are proven
   causes of disease***

A key issue in these cases will be whether Garlock's asbestos-containing products were

legal causes of plaintiffs' diseases.  To determine whether working with or around an asbestos-

containing product causes disease, it is necessary to determine the dose of the fiber type in the

product shown to cause disease and the amount of asbestos the worker breathes when working

with and around the product.

Epidemiology is the only reliable way to determine dose that causes disease, while

amount of asbestos released by a product must be determined by the discipline of industrial

hygiene.  "Epidemiologic evidence identifies agents that are associated with an increased risk of

disease in groups of individuals, quantifies the amount of excess disease that is associated with

an agent, and provides a profile of the type of individual who is likely to contract a disease after

being exposed to an agent."[39]  As the Second Circuit said in an asbestos case, "Epidemiological

evidence is indispensable in toxic and carcinogenic tort actions."[40]

Courts look to epidemiology when causation is disputed because it can quantify the

degree of association between a given substance and a disease by assigning a "relative risk" to

the association.[41]  The often-cited benchmark for relative risk is 2.0.[42]  When a study's authors

---

[39]    *See* Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 335–36 (2d ed. 2000).

[40]    *Maiorana v. U.S. Mineral Prods. Co.*, 52 F.3d 1124, 1128 (2d Cir. 1995).

[41]    The following example shows how to calculate relative risk.  "[I]f a study found that 10 out of 1000 women with
breast implants were diagnosed with breast cancer and 5 out of 1000 women without implants (the 'control'
group) were diagnosed with breast cancer, the relative risk of implants is 2.0, or twice as great as the risk of
breast cancer without implants.  This is so, because the proportion of women in the implant group with breast
cancer is 0.1 (10/1000) and the proportion of women in the non-implant group with breast cancer is 0.05
(5/1000).  And 0.1 divided by 0.05 is 2.0."  *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318
F. Supp. 2d 879, 892 (C.D. Cal. 2004).

[42]    *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 n.16 (11th Cir. 1990) ("The threshold for concluding that
an agent more likely than not caused a disease is 2.0."); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180
F. Supp. 2d 584, 591 (D.N.J. 2002) (citing Fed. Judicial Ctr., *supra* note 39, at 384 ("[T]he threshold for

report an association with a relative risk of 2.0, they are saying the disease occurs twice as often in the group exposed to the alleged toxin as in the group that is not exposed, which represents a "doubling of the risk."[43]  These studies are known as 2.0 studies.  Courts say a properly documented doubling of the risk "corresponds to the burden of proof to a preponderance of the evidence."[44]

It is not sufficient to prove that a substance incorporated into a product causes disease at some dose; because "the dose makes the poison," one must prove that the exposure the product actually generates causes disease.[45]  Science and law capture this concept with the terms "general causation" and "specific causation."[46]  General causation means that a substance incorporated into a product is capable of causing disease at some dose, perhaps a very high one.  Specific causation means that the particular dose produced by the product is capable of causing disease.[47]  "[S]tudies can also be probative of *specific* causation, but only if the study shows the relative risk is greater than 2.0, that is, the product more than doubles the risk of getting the disease."[48]

concluding that an agent was more likely than not the cause of an individual's disease is a relative risk greater than 2.0.").

[43]  *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 721 (Tex. 1997).

[44]  *In re W.R. Grace & Co.*, 355 B.R. 462, 482–83 (Bankr. D. Del. 2006); *see also Daubert v. Merrell Dow Pharms., Inc. (Daubert II)*, 43 F.3d 1311, 1321 (9th Cir. 1995); *In re Breast Implant Litig.*, 11 F. Supp. 2d. 1217, 1225–26 (D. Colo. 1998); *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 835–37 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987); *Havner*, 953 S.W.2d at 717–18.

In the context of bankruptcy proceedings arising from the asbestos litigation, proper epidemiology has been key to resolving disputed causation issues.  In *W.R. Grace*, the court surveyed the literature and held that to prove a certain asbestos-containing product posed an unreasonable risk of harm, claimants "must establish causation by a 2.0 relative risk rate."  *In re W.R. Grace & Co.*, 355 B.R. at 483.

[45]  *See* Fed. Judicial Ctr., *supra* note 39, at 475.

[46]  *In re Breast Implant Litig.*, 11 F. Supp. 2d at 1224 (explaining how epidemiologic evidence is used to establish both general and specific causation).

[47]  *Havner*, 953 S.W.2d at 714; *see also Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (quoting *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996)); *In re Viagra Prods Liab. Litig.*, 658 F. Supp. 2d 950, 957 (D. Minn. 2009).

[48]  *Henricksen v. Conoco Phillips Co.*, 605 F. Supp. 2d 1142, 1158 (E.D. Wash. 2009) (citing *Daubert II*, 43 F.3d at 1315).

The importance of proving specific causation is demonstrated by the list of carcinogens found in the foods served at a typical holiday meal.[49]  Apple pie, roast turkey, coffee, and virtually everything else served may contain cancer causing substances.  Holiday diners can nevertheless enjoy the meal because the amounts of those carcinogens are below the thresholds that cause disease.

Similarly, thresholds exist for asbestos disease.[50]  From the dawn of time, humans have inhaled asbestos dust just as they have many other naturally existing mineral dusts.  The body has an array of defenses against mineral dusts.[51]  Disease results only when the levels of dust are high enough to overwhelm these defenses.  Background levels found in lungs can be more than 80 million fibers.[52]  Nevertheless, exposure to asbestos at this level is agreed not to be a proven cause of disease.[53]

The use of epidemiology in asbestos litigation is illustrated by recent appellate opinions in Texas, a jurisdiction where a disproportionately high volume of asbestos cases were once litigated.[54]  Texas courts now demand evidence that the frequency, proximity, and duration of the plaintiff's exposure to the defendant's product were at levels as high as or higher than populations that have been associated with disease in a series of qualifying epidemiological studies.[55]

---

[49]  Harvard University Physics Department, Holiday Dinner Menu, http://phys4.harvard.edu/~wilson/HolidayMenu.html (last visited May 26, 2010).

[50]  Craighead & Gibbs, *supra* note 9, at 107.

[51]  Thurlbeck, *supra* note 6, at 813.

[52]  Thurlbeck, *supra* note 6, at 816.

[53]  *Id.*; *see also* 2 *DeVita, Hellman, and Rosenberg's Cancer: Principles and Practice of Oncology* 1837 (V. DeVita, T. Lawrence & S. Rosenberg eds., 8th ed. 2008).

[54]  Lester Brinckman, *The Asbestos Litigation Crisis: Is there a Need for an Administrative Alternative?*, 13 Cardozo L. Rev. 1819, 1827 (1992); Francis E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U. L. Rev. 659, 664 (1989).

[55]  *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 721 (Tex. 1997).

Though scientists have found that certain exposures to asbestos increase the risk of asbestos-related disease, no 2.0 studies exist showing exposure to Garlock's asbestos-containing products caused or had the potential to cause asbestos disease.

### 2. Dose proven to cause asbestosis

Asbestos epidemiology customarily discusses the risk of asbestos disease in terms of cumulative lifetime exposure. The measure used is fiber-years, where a fiber-year equals a full working year in an environment with a TWA of 1 f/cc. For example, the current OSHA PEL assumes a worker constantly in an environment of 0.1 f/cc for 8 hours a day, five days a week, for a work life of 45 years. He or she would accumulate 4.5 fiber-years of exposure (*i.e.*, 0.1 fiber-year for each year).

Asbestosis is associated with an amphibole dose of at least 25 fiber-years.[56] In other words, it would take 250 years of exposure to amphiboles under the current OSHA standard to have a demonstrably increased risk of clinical manifestations of asbestosis. Chrysotile-induced asbestosis requires doses of 100 fiber-years or more, which would require in excess of 1,000 years of exposure at the current OSHA standard.[57]

### 3. Dose proven to cause lung cancer

The link between asbestos exposure and lung cancer was demonstrated by the famous British epidemiologist Sir Richard Doll. His 1955 study established that workers at risk for asbestosis also had an elevated risk of lung cancer.[58] Of course, as he and every other researcher recognized, smoking was a far more significant cause of lung cancer, and the amount of money demanded and received in lung cancer cases in the asbestos litigation has always reflected that

---

[56] Thurlbeck, *supra* note 6, at 823.
[57] *Id.*
[58] R. Doll, *Mortality from Lung Cancer in Asbestos Workers*, 12 Brit. J. Indus. Med. 81 (1955).

fact.  Moreover, because the dose necessary to increase the risk of lung cancer was widely

accepted to be at the level where an asbestosis risk arose, the demonstration of a lung cancer risk

did not lead to the adoption of new lower PELs.  The levels adopted to prevent asbestosis were

still believed to protect against cancer.

The level of exposure established as sufficient to cause lung cancer has remained tied to

the level necessary to cause clinical manifestation of asbestosis.  In fact, asbestosis has been

recognized as "the only consistently reliable marker for an asbestos-related lung cancer . . .

especially in asbestos workers who are also tobacco smokers."[59]  Thus, the epidemiologically

supportable dose at which a doubling of the risk of lung cancer occurs from asbestos exposure is

at least 25 fiber-years of amphibole exposure.[60]  Lung cancer risk also demonstrates a fiber type

differential.  The lung cancer risk from amphibole exposure is 10 to 50 times higher than for

chrysotile.[61]  For example, a large study of chrysotile miners reported no lung cancer risk below

an exposure of about 800 fiber-years.[62]

### 4.     Dose proven to cause mesothelioma

Currently, asbestos litigation is dominated by cases involving malignant mesothelioma.[63]

Most mesotheliomas occur in the pleura, the thin lining of the lung.  Some occur in the

peritoneum, the lining of the abdomen.  Despite the widespread use of asbestos, and contrary to

the impression created by advertisements from the plaintiffs' bar, mesothelioma remains

extremely rare.  Approximately 2,000 to 3,000 cases occur each year in the United States, which

---

[59]  Philip T. Cagle, *Criteria for Attributing Lung Cancer to Asbestos Exposure*, 117 Am .J. Clin. Path. 9, 14 (2002); *see also* W. Weiss, *Asbestosis: A Marker for the Increased Risk of Lung Cancer Among Workers Exposed to Asbestos*, 115 Chest 536 (1999)

[60]  Thurlbeck, *supra* note 6, at 823, 831.

[61]  *Id.* at 830.

[62]  *Id.* at 831.

[63]  Non-malignant mesothelioma occurs as well.  No reliable proof establishes that the various forms of non-malignant mesothelioma are asbestos related, although claims are occasionally filed asserting that they are.

compares to 219,440 cases of lung cancer, 194,280 cases of breast cancer, or 192,280 cases of

prostate cancer.[64]

The exact biological processes that lead to mesothelioma are not fully understood.

Although it is fortunate that mesothelioma remains a rare disease, its infrequency makes

epidemiological research more difficult.  Another factor confounding research is that

mesothelioma is a cancer, and like all cancers, it can happen spontaneously for reasons unrelated

to any known cause.  These "idiopathic" cases constitute a substantial percentage of reported

malignant mesotheliomas: between 20-40% of malignant mesotheliomas in adult males, and over

50% of malignant mesotheliomas in adult females.[65]

> (a)    *Levels of amphiboles proven to cause mesothelioma*

Broad consensus has long existed that exposure to products made from commercial

amphiboles (crocidolite and amosite) cause mesothelioma. For example, in 1980, a

comprehensive case-controlled epidemiological study published in the influential journal *Cancer*

reported that the relative risk associated with insulation work is 46.0, and that relative risks

greater than 2.0 occurred in other settings where amphibole-containing products were made or

used.[66]  The authors reported these findings to be "consistent with a much greater mesothelioma-

producing potential for crocidolite and amosite than for chrysotile."[67]  Corroboration of the

ability of the amphiboles to cause mesothelioma is found in high relative risk in studies of

---

[64]   American Cancer Society, Cancer Facts & Figures 2009, http://www.cancer.org/downloads/STT/500809web.pdf.
[65]   Craighead & Gibbs, *supra* note 9, at 191.
[66]   A.D. McDonald & J.C. McDonald, *Malignant Mesothelioma in North America*, 46 Cancer 1650, 1653 (1980).
[67]   *Id.* at 1650.

crocidolite miners[68] and in high proportional mortality in studies of workers at factories that made amosite insulation.[69]

The threshold for mesothelioma causation is debated, but there is little debate that exposures above 5 fiber-years of amphibole exposure are sufficient to cause pleural mesothelioma.[70]  On the other hand, as documented by studies authored by Dr. Wagner and Sir Richard Doll, among others, it is generally agreed that very much higher exposure is needed to cause peritoneal mesothelioma.[71]

(b)    *Chrysotile fibers are not a proven cause of mesothelioma*

Historically, analysis of whether chrysotile fibers cause mesothelioma, and if so at what dose, has been confounded by veins of tremolite or other amphiboles (or amphibole-like minerals) that often occur in chrysotile mines.  Early public health warnings about a mesothelioma risk from chrysotile appeared after cases were reported among Quebec chrysotile miners.[72]  Although miners developed mesothelioma at a relatively low rate compared to those exposed to amphibole-containing insulation, those who accumulated hundreds of fiber-years of exposure to ore containing chrysotile and tremolite did have an elevated risk of mesothelioma.[73] As studies of those workers continued, it was eventually discovered that contaminating

---

[68]   N.H. de Klerk et al., *Cancer Mortality in Relation to Measure of Occupational Exposure to Crocidolite at Wittenoom Gorge in Western Australia*, 46 Brit. J. Indus. Med. 529 (1989).

[69]   Jeffrey L. Levin et al., *Tyler Asbestos Workers: Mortality Exposure in a Cohort Exposed to Amosite*, 55 Occupational & Envtl. Med. 155 (1998); H. Seidman, I. Selikoff & E. Hammond, *Short-Term Asbestos Work Exposure and Long-Term Observation*, 330 Annals N.Y. Acad. Sci. 61 (1979).

[70]   E.B. Ilgren & K. Brown, *Asbestos-Related Mesothelioma: Evidence for a Threshold in Animals and Humans*, 13 Reg. Toxicology & Pharmacology 116, 119 (1991).

[71]   Thurlbeck, *supra* note 6, at 1006 (noting that "[p]eritoneal mesotheliomas differ from pleural mesothelioma in that they only occur with very high exposure," citing Richard Doll & Julian Peto, *Asbestos: Effects on Health of Exposure to Asbestos* (1995); J.C. Wagner et al., *Correlation Between Fibre Content of the Lung and Disease in East London Asbestos Factory Workers*, 45 Brit. J. Indus. Med. 305 (1998)).

[72]   C. McDonald, World Health Organization, *Cancer in Chrysotile Mines and Mills* (1973).

[73]   F.D.K. Liddell, A.D. McDonald & J.D. McDonald, *The 1891-1920 Birth Cohort of Quebec Chrysotile Miners and Millers: Development from 1904 and Mortality to 1991*, 41 Annals Occupational Hygiene 13 (1997).

amphiboles at the mines were the likely cause—because the mesothelioma cases tended to occur in more heavily tremolite-contaminated mines.[74]

As study continued, a clear trend emerged that is illustrated in the following graphic taken from data presented (in tabular form) in a standard pathology text authored by professors from the University of British Columbia and the Mayo clinic (Figure 8):[75]

**Figure 8**

## Mesothelioma Deaths by Fiber Type



As these studies show, "it is evident that chrysotile exposure is associated with a much lower mesothelioma rate than is amosite or crocidolite exposure."[76]  And the primary studies suggesting a risk of chrysotile are confounded by amphibole contamination.[77]

---

[74]  Thurlbeck, *supra* note 6, at 1006; A.D. McDonald et al., *Mesothelioma in Quebec Chrysotile Miners and Millers: Epidemiology and Aetiology*, 41(6) Annals Occupational Hygiene 707 (1997).

[75]  Thurlbeck, *supra* note 6, at 1005.

*  Charles Yarborough, *Chrysotile as a Cause of Mesothelioma: An Assessment Based on Epidemiology*, 36 Critical Revs. Toxicology 165 (2006), explains the confounding amphibole contamination in each of the studies identified in Figure 8 marked with an asterisk.  The cement plant study reported on two plants.  In one, 1% of product was amosite, and crocidolite was also used; while in the other, crocidolite was approximately 3% of the

Recent research has failed to establish an association between pure chrysotile and mesothelioma and has confirmed that the risk of pleural mesothelioma from amphibole exposure is hundreds of times higher than the risk for even so-called "contaminated chrysotile" (chrysotile containing significant tremolite).[78]  Some experts retained by plaintiffs in asbestos cases continue to assert that pure chrysotile fibers (though much less potent) cause pleural mesothelioma, and a few still assert that chrysotile fibers cause peritoneal mesothelioma, but there is no valid epidemiologic support for either position.[79]  Thus, seminal researchers in the field like Dr. Wagner and Sir Richard Doll have supported the view that—despite theoretical risks—chrysotile is not a real world cause of mesothelioma in humans.[80]

There are no 2.0 studies demonstrating that pure chrysotile fibers cause mesothelioma. To the contrary, many studies of groups primarily exposed to chrysotile in mining, manufacturing, and use of end products report no increased incidence of mesothelioma.  In the

---

material.  *Id.* at 171.  In the textile plant study, subsequent studies documented above-background levels of amosite or crocidolite in the lung tissue of asbestos workers.  *Id.* at 169.  The Canadian miners were, as discussed in the text of this brief, found to have significant tremolite exposures.  *Id.* at 171.  Lastly, the Balangero mines contained an amphibole like contaminant Balangeroite, which studies have demonstrated to have toxic properties similar to crocidolite.  *Id.* at 173.

[76]  Thurlbeck, *supra* note 6, at 1005.

[77]  Charles Yarborough, *Chrysotile as a Cause of Mesothelioma: An Assessment Based on Epidemiology*, 36 Critical Revs. Toxicology 165 (2006).

[78]  D.W. Berman & K.S. Crump, *A Meta-Analysis of Asbestos-Related Cancer Risk that Addresses Fiber Size and Mineral Type,* 38 Critical Revs. Toxicology 49, 49 (2008) (stating that "[b]est estimates for the relative potency of chrysotile (including data from mining cohorts where tremolite was present) ranged from zero to 1/200th that of amphibole asbestos"); J.T. Hodgson & A. Darnton, *The Quantitative Risks of Mesothelioma and Lung Cancer in Relation to Asbestos Exposure*, 44 Annals Occupational Hygiene 565, 565 (2000) (showing relative fiber per fiber potency 1/100/500 for contaminated chrysotile/amosite/crocidolite).

[79]  *See, e.g.*, Yarborough, *supra* note 77, at 165 (stating that "review of 71 asbestos cohorts exposed to free asbestos fibers does not support the hypothesis that chrysotile, uncontaminated by amphibolic substances, causes mesothelioma"); V. Roggli & P. Coin, *Mineralogy of Asbestos*, *in* Pathology of Asbestos-Associated Diseases 147 (V. Roggli et al. eds., 2d ed. 2004).

[80]  R. Doll, *Mineral Fibres in the Non-Occupational Environment: Concluding Remarks*, Non-occupational Exposure to Mineral Fibres 515–16 (J. Bignon, J. Peto & R. Saracci eds., 1989).

few situations of massive exposure to commercial chrysotile or chrysotile ore where
mesothelioma is reported, another causative agent such as amphibole contamination is likely.[81]

Of course, whether pure chrysotile fibers cause mesothelioma—the "general causation"
question—is only the first issue.  As explained above, "specific causation" is a critical separate
requirement.  The extent of exposure is especially significant in the specific causation inquiry for
chrysotile.  As one standard medical text explains when discussing the role of tremolite-
contaminated chrysotile: "[C]hrysotile ore exposure (when high enough) can produce
mesothelioma in humans. . . . It is important to note that chrysotile-induced mesothelioma only
occurs with very high exposures."[82]  The exposures of miners to contaminated chrysotile was not
comparable to the exposures experienced by end users of gaskets and packing.  First, "chrysotile
significantly 'contaminated' with tremolite appears to be uncommon in manufactured
products."[83]  Second, miners experienced many hundreds of fiber-years of lifetime exposure to
tremolite-contaminated ores—exposures orders of magnitude higher than even exposures
claimed for gaskets and packing by experts for plaintiffs in the litigation.  The bottom line is that
there are no studies of even contaminated chrysotile showing a relative risk greater than 2.0 for
the exposure from gaskets or packing.

G.    **The friable products surrounding Garlock's gaskets and packing produced
levels of airborne asbestos fibers that caused asbestos disease**

Workers using the friable insulation products installed on pipes and equipment where
Garlock's gaskets and packing were used, such as block insulation and pipe covering,
experienced exposures at levels well above exposure levels associated with asbestos diseases.

---

[81]    *See, e.g.*, Vinay Kumar et al., *Robbins & Cotran Pathologic Basis of Disease* (8th ed. 2010) (stating
mesothelioma "only associated with amphibole exposure"); Thurlbeck, *supra* note 6, at 1006; Yarborough,
*supra* note 77, at 171.
[82]    Thurlbeck, *supra* note 6, at 1006.
[83]    Craighead & Gibbs, *supra* note 9, at 192.

On average, insulators' eight-hour TWA was 15 f/cc, or 15 fiber-years during each year of work.[84]  Peak exposures during cutting and installing insulation were reported to be in the tens of fibers per cc, and for insulation removal exposures could exceed 1,000 fibers per cc.  It is thus not surprising that Dr. Selikoff's study of the insulators found that the vast majority developed asbestosis and had a much higher than expected incidence of lung cancer, the two diseases that require a high cumulative dose to develop.  When a worker was accumulating 15 fiber-years each year, it was not difficult to reach the 25 fiber-years of amphibole exposure that could increase the risk of asbestosis and lung cancer.

These high exposures from insulation are also proven to increase the risk of mesothelioma.  As explained above, the relative risk in one study was reported at 46.0.[85]   In another study Dr. Selikoff ultimately demonstrated that approximately 10% of the reported deaths of insulators were caused by mesothelioma, an extraordinary rate for such a rare disease.

Workers who were not insulators, but who worked in environments where insulation and other friable materials were present, could also accumulate exposures proven to cause asbestos disease, sometimes quickly.

### H.    But no study has linked work with Garlock's gaskets and packing to an increased relative risk of asbestos-related disease

Unlike friable insulation products used regularly around its products, for which it does not have legal responsibility, Garlock's gaskets and packing have not been linked scientifically to an increased risk of asbestos disease.[86]  In fact, extensive and repeated studies have shown that even close work with gaskets and packing results in exposures well below current and historical

---

[84]    OSHA, Office of Carcinogen Standards, *Quantitative Risk Assessment for Asbestos Cancers* 45-46 (1983).
[85]    McDonald & McDonald, *supra* note 66, at 1653.
[86]    Garlock's asbestos litigation arises almost exclusively from end-use of the products, not manufacture of the products.  This brief therefore does not address exposures that may have occurred during the manufacturing process.

exposure limits and levels associated with asbestos disease.  Moreover, the many workers who did not work closely with gaskets and packing experienced exposures that were even more attenuated than these below-PEL exposures.  The contrast with friable products could not be more stark.

The gasket studies focused on close work with gaskets, where the likelihood of exposure to fibers from gaskets would be greatest.  One of the first was conducted by the U.S. Navy.[87] Navy industrial hygienists collected more than 160 air samples during various work activities involving gaskets in the Bremerton Naval Shipyard in Bremerton, Washington.  The Navy found that no recommendations were necessary for controlling exposures during the handling or installing of gaskets.  And, for removing gaskets in the ways typically described by plaintiffs, the Navy made no special recommendations to keep exposures below 0.1 f/cc except to place the scrap in a plastic bag, which was its policy regarding all asbestos waste at the time.

Later studies, also not related to litigation, involving many of the same work practices reported similar, if not lower, results.  Louisville Gas & Electric ("LG&E") collected hundreds of samples during gasket work using different techniques in the field.[88]  All results fell well below current exposure limits.  In another study, published in peer-reviewed industrial hygiene literature, the authors collected samples in the field during gasket fabrication and removal at a refinery.[89]  The results for work activities described by plaintiffs were again well below accepted levels.

Garlock also has hired independent certified industrial hygienists to evaluate exposures during gasket and packing operations.  To control for potential contamination of the samples

---

[87]  L.R. Liukonen, *Asbestos Exposure from Gasket Operations* 1–67 (1978).
[88]  Occupational & Envtl. Health Consultants, Various Surveys During Asbestos Gasket Removal at Louisville Gas and Electric, Louisville, KY, 1991-1994 (unpublished).
[89]  R.T. Cheng & H.J. McDermott, *Exposure to Asbestos from Asbestos Gaskets*, 6(7) Applied Occupational & Envtl. Hygiene 588 (1991).

from insulation, which was not done in the field studies by the Navy, LG&E, and the refinery, the industrial hygienists conducted their studies inside isolation chambers, performing activities that occurred in the field, such as gasket removal. The results were as low as or lower than the field studies, finding levels below the current OSHA PEL of 0.1 f/cc. Like the refinery study, two of the studies were published in the peer-reviewed industrial hygiene literature.[90]

As these and many other studies show, gaskets and packing are different in kind from friable insulation products. The binders and lubricants that coat the asbestos fibers inhibit their release, resulting in exposures well below the PEL that OSHA has mandated. The difference this made in terms of cumulative exposure over the course of a worker's lifetime is demonstrated by Figure 9 below. Even assuming a worker who removed gaskets all day, every day, for 45 years, the exposures generated were de minimis compared to exposures produced by activities like insulating, cement product manufacturing, textile manufacturing, and insulation manufacturing. Exposures experienced by actual workers—none of whom removed gaskets all day, every day, for 45 years, and the vast majority of whom did not work closely with gaskets—were of course even lower.

---

[90]   C.A. Mangold, K. Clark, A. Madl & D. Paustenbauch, *An Exposure Study of Bystanders and Workers During the Installation and Removal of Asbestos Gaskets and Packing*, 3 J. Occupational & Envtl. Hygiene 87 (2006); F. Boelter, G. Crawford & D. Podraza, *Airborne Fiber Exposure Assessment of Dry Asbestos-Containing Gaskets and Packings Found in Intact Industrial and Maritime Fittings*, 63(6) Am. Indus. Hygiene Assoc. J. 732 (2002).



Figure 9: Dose of Cohorts Relied on by OSHA vs. Dose from Gasket Removal

### 1. Asbestosis and lung cancer

Because use of Garlock gaskets released fibers at a level well below the PEL, it would take hundreds if not thousands of years for a worker to obtain the accumulated exposure associated with an increased risk of asbestosis or lung cancer. This was true even if a worker dealt with Garlock's gaskets and packing all day, every day, and regardless of whether the products were made with chrysotile (95-98% of the gaskets Garlock produced) or crocidolite (2-5% of the gaskets Garlock produced). In no sense was it possible for Garlock gaskets and packing to make any meaningful contribution to a plaintiff's asbestosis or lung cancer.

### 2. Mesothelioma

Almost all Garlock's gaskets were made with chrysotile. Even assuming that the concentration of tremolite in the chrysotile Garlock used to make its chrysotile gaskets and packing was as high as the concentration in the mines (and there is no evidence that it was), then

34

it would still take more than 100 years of direct work with gaskets for a worker to have an

increased risk of developing mesothelioma.  And, if any worker made the highly improbable

allegation that he worked all day, day-in and day-out, removing Garlock's specialty crocidolite

gaskets and packing, it would still take longer than a working lifetime to be at risk for

mesothelioma.

     If any workers who used Garlock gaskets and packing developed asbestos disease at a

higher rate than the general population, it was not because they used Garlock gaskets and

packing.  Rather, it was because they experienced massive exposures to long-banned friable

asbestos products such as insulation.  These products were invariably found surrounding the

flanges, pipes, valves, and equipment where Garlock gaskets and packing were used, and

Garlock is not responsible for them.  Garlock's gaskets and packing did not cause these

individuals' diseases.  This was why advocates for workers and public health officials, like Dr.

Selikoff and P.G. Harries, reported that there is "no health hazard" associated with asbestos

gaskets and packing.[91]

---

[91]  Selikoff & Lee, *supra* note 4, at 467 (stating that "[n]o health hazard in forms used in shipyard applications"); P.G. Harries, *Asbestos Dust Concentrations in Ship Repairing: A Practical Approach to Improving Asbestos Hygiene in Naval Dockyards*, 14 Annals Occupational Hygiene 241, 249 (1971).

## II.    Because Garlock's products did not cause plaintiffs' injuries, Garlock for decades was able to manage its asbestos litigation by paying de minimis settlements

### A.    Courts were long swamped with asbestos claims not involving serious disease, which prevented resolution of most claims on their merits

Asbestos has given rise to the longest-lasting mass tort litigation in U.S. history.[92]  In the early 1970s, after Irving Selikoff's groundbreaking research and Congress's creation of OSHA, an initial, steady stream of tort claims by workers seeking recovery for asbestos-related diseases arrived at federal and state courts.  In 1973, the Fifth Circuit Court of Appeals held that asbestos product manufacturers could be held strictly liable for injuries to workers caused by exposure to asbestos-containing products.[93]

The decision resulted in a wave of thousands of product liability suits that eventually grew into a tsunami.[94]  By 1982, approximately 20,000 claimants had filed suits against 300 different companies.  By 2002, the numbers had grown to approximately 730,000 asbestos claims against at least 8,400 companies.[95]  Many asbestos defendants were receiving on average over 40,000 new claims each year.[96]  Each plaintiff brought his or her claim against many defendants.[97]

The litigation was (and is) controlled by a relatively small number of plaintiffs' firms.  As early as 1992, ten firms accounted for half the annual filings.[98]  The same was true in 2000.[99]  A small number of other firms accounted (and account) for most of the rest of the cases.  Each of

---

[92] Stephen J. Carroll et al., RAND Inst. for Civil Justice, *Asbestos Litigation* xvii (2005) [hereinafter 2005 RAND Report].

[93] *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir. 1973), *cert. denied*, 419 U.S. 869 (1974).

[94] 2005 RAND Report, *supra* note 92, at 70.

[95] *Id.* at 70, 79.

[96] *See The Fairness in Asbestos Compensation Act of 1999: Hearing on H.R. 1283*, 106th Cong. 4 (1999) (statement of Dean Paul Verkuil, Cardozo School of Law) (stating that "lawsuits continue to arrive at a rate of over 40,000 per year, and over 200,000 cases are now pending").

[97] 2005 RAND Report, *supra* note 92, at 7.

[98] *Id.* at 24 (describing asbestos litigation as "highly concentrated" in a few plaintiffs' firms).

[99] *Id.*

these plaintiffs' firms has hundreds or even thousands of cases at one time, which they refer to as their "inventory." These firms have earned hundreds of millions, if not billions, of dollars in contingency fees from asbestos litigation.

### 1.   *Serious disease cases*

Of the tens of thousands of claims filed each year, a very small portion involved plaintiffs who manifested symptoms of asbestos-related disease. By the late 1990s, only approximately 2000 of the claimants annually had mesothelioma. Only about 8% of the claims overall involved cancer.[100] And few of the non-malignant cases involved asbestosis that would meet the criteria defined by the American Thoracic Society.

This relatively small number of plaintiffs with serious diseases did have large damages, so these cases were often litigated and settled on their merits. In general, the manufacturers of friable, amphibole-containing products paid most of these damages in the form of large settlement payments. These companies had the greatest trial risk because they made the hazardous products that actually caused serious diseases. These companies included Johns-Manville, Owens Corning (manufacturer of Kaylo asbestos insulation), PCC (manufacturer of Unibestos insulation), and many others (hereinafter, the "top tier defendants").

### 2.   *Non-symptomatic cases*

The vast majority of asbestos claims, however, did not involve actual disease, as defined by the American Medical Association. Rather, most of the thousands of claims were brought by plaintiffs' lawyers on behalf of workers who were not and never would be sick, using boilerplate

---

[100]   2005 RAND Report, *supra* note 92, at 75.

allegations against dozens of defendants per case.[101]   Some of these workers had claims of

asbestosis so minor that they did not pass muster under the criteria of the American Thoracic

Society.  Others had pleural plaques or effusions, markers of asbestos exposure that usually

resulted in no asbestos-related impairment or symptom.[102]   The plaintiffs sought damages for

fear of future disease, though most would never develop any asbestos-related disease at all.

Sometimes these plaintiffs alleged they had some level of impairment, but the medical evidence

was clear that plaques were "benign conditions of the pleura that are produced by asbestos [but]

are seldom of any lasting importance."[103]

     Many of the unimpaired plaintiffs were recruited by advertisements from medical

screening companies hired by plaintiffs' firms.[104]   The mass of unimpaired cases swamped

defendants and the tort system, rendering individual resolution on the merits (through settlement

or adjudication) impossible.  Defendants agreed to mass settlements, often for de minimis values,

as the most practical and cost-effective way to resolve these claims.

     Unfortunately, that encouraged more claims.  In 1991, the Judicial Conference Ad Hoc

Committee On Asbestos Litigation appointed by Chief Justice Rehnquist described the litigation

as "a disaster of major proportions to both the victims and the producers of asbestos products"

and concluded that civil courts were "ill-equipped" to handle the avalanche of claims.[105]   The

---

[101]  Estimates of the total number of unimpaired claimants range between two-thirds and 90 percent of all claimants. 2005 RAND Report, *supra* note 92, at 76.

[102]  *Id.* at 14.  Occupational asbestos exposure can cause nonmalignant abnormalities of the pleura, the membrane that lines the chest wall and cushions the lungs.  These include pleural plaques and thickening (scarring of the pleura) and pleural effusions (presence of fluid in the pleural space).  Plaques are not often accompanied with symptoms.  *Id.*  Moreover, there are numerous other, non-asbestos, causes of plaques and effusions.

[103]  Doll & Peto, *supra* note 71, at 2.

[104]  2005 RAND Report, *supra* note 92, at 23.

[105]  Judicial Conference Report, *supra* note 5, at 2.

Supreme Court subsequently observed that the "elephantine mass of asbestos cases . . . . defies customary judicial administration."[106]

Trial courts consistently failed to develop a cost-effective way to identify and compensate only meritorious claims. To the contrary, courts often forced defendants to enter into bulk settlements in an effort to clear their dockets, and threatened to conduct mass trials of non-malignant claims if defendants did not do so.[107] The mass of claims ultimately gave rise to an inefficient settlement marketplace where cases were resolved without detailed attention to their merits.

The settlements in these non-malignant cases tended to be individually small, but because there were so many claims against so many defendants, the aggregate payments amounted to hundreds of millions of dollars annually. This was still cheaper than litigating the merits of every single case. Plaintiffs' firms that recruited the claimants typically collected contingency fees of up to 40% of the settlement amounts, collecting hundreds of millions if not billions of dollars in fees.[108] Plaintiffs' firms had collected an estimated $17 billion in fees by 2002.[109]

**B.    Garlock was forced to pay millions of dollars in settlements to avoid defense costs, but survived in the tort system**

**_1.    Garlock settled both serious disease and non-symptomatic cases for low values in the 1990s_**

Despite making safe products, Garlock was swept into the asbestos litigation tsunami. Garlock has been an asbestos defendant for 35 years. Since 1975, plaintiffs' firms have named Garlock in approximately 835,000 asbestos cases, and Garlock has paid approximately $1.37 billion to plaintiffs. Among gasket makers, Garlock has received by far the most claims, though

---

[106] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999).
[107] 2005 RAND Report, *supra* note 92, at 34.
[108] *Id.* at 103 (estimating typical plaintiffs' firm fee).
[109] *Id.*

Garlock was one of numerous producers of asbestos gaskets.[110]  Garlock's asbestos exposure increased after Coltec (its parent) disclosed that Coltec had over one billion dollars of insurance to cover asbestos litigation against Garlock.

From the late 1980s to 2000, Garlock received 391,237 asbestos claims, or an average of approximately 39,000 new claims each year.  A small portion of Garlock's cases were cancer claims.  The bulk of claims were for non-malignant diseases, most of which were likely non-symptomatic and the result of recruitment by plaintiffs' firms through medical screening.  All or nearly all of the complaints served on Garlock named many dozens of other defendants, including major insulation companies and dozens of other companies that produced dangerous products often found in close proximity to Garlock gaskets and packing.

Garlock had little significant trial risk in any kind of case during this period.  Plaintiffs had trouble proving that Garlock products emitted enough asbestos fibers to cause disease.  Furthermore, in mesothelioma cases, Garlock could show that chrysotile fibers used in Garlock's gaskets and packing do not cause the disease at any dose.  In most every case, Garlock had alternative causes to point to: the friable products that plaintiffs freely identified as causes of their diseases.  Juries were prone to find that the insulation companies and other manufacturers of friable products were responsible for plaintiffs' injuries.

As a result, Garlock was extraordinarily successful when it went to trial before 2000.  It was either completely exonerated or paid very little, even after a verdict was rendered.[111]  Plaintiffs' firms knew this, and were usually willing to dismiss Garlock from cases—even those

---

[110]   Other manufacturers and distributors of asbestos-containing gaskets included Armstrong, Teadit, John Crane, Flexitallic, Greene Tweed, J.M. Walker, Klinger, Nicolet, SEPCO (South Eastern Packing Company), Durametallic, PARS, Sur-Seal, Argo, Keasby & Mattison, Fluorcarbon, Metallo Gasket Co., Durabla, Victor, A.W. Chesterton, and Federal Mogul.

[111]   During the time period January 1, 1997 through December 31, 1999, out of 61 trial verdicts, Garlock received 54 defense verdicts or outright dismissals.  Garlock obtained reversal on appeal of one of the lost verdicts; settled another before exhausting its appeal for a fraction of the verdict amount; and was found 2% responsible in one of the others.

involving serious disease—for de minimis settlements.  In the early 1990s, Garlock paid

approximately $1,200 per case to settle a lung cancer claim and $2,800 per case to settle a

mesothelioma claim.

Garlock's main problem before 2000 was not serious disease cases, but rather the

"elephantine mass" of non-malignant claims.  These claims had no merit.  But because Garlock

received tens of thousands of claims each year, and managing a single case through discovery

and trial could cost $100,000 or more, it was forced to pay de minimis settlements to avoid the

cost of litigation.  Garlock paid approximately $1,000-$2000 on average to settle a non-

malignant claim in the 1990s.

> **2.**      ***Garlock's mesothelioma resolution values gradually increased during the
> 1990s as a result of targeting, but it still survived***

During the 1990s, Garlock's resolution values in mesothelioma cases gradually increased

as the plaintiffs' bar found a way to increase the value of specific claims against low-dose

defendants like Garlock.  Plaintiffs' attorneys periodically threatened to "target" Garlock in

certain cases, either alone or among a small handful of other defendants.  In targeted cases, if

Garlock refused to settle, plaintiffs would deny they had been exposed to products of other

defendants, including manufacturers of friable products, and would exaggerate their exposure to

Garlock's products.  With the plausible causes of their clients' asbestos diseases minimized or

eliminated, cases against Garlock were made to appear much stronger.

The targeting strategy reportedly became standard practice, as evidenced by the

memorandum "Preparing For Your Deposition," drafted by the Baron & Budd firm in Texas, one

of the pioneering plaintiffs' firms in the asbestos litigation and one of the most successful. The

memorandum was disclosed to defense counsel in 1997.[112]

The firm reportedly would show clients pictures of products that the firm wanted in the

case, and record acknowledgments of exposure on "Work History Sheets."[113] The memo then

instructed the client to admit only to exposures on that Work History Sheet. It even provided a

complete script for the client's deposition, including ten pages of detailed product descriptions

for plaintiffs to memorize. The memo nowhere advised the client to tell the truth.

To ensure the targeting strategy worked, the memo warned the client, "Do NOT mention

product names that are not listed on your Work History Sheets. The defense attorneys will jump

at a chance to blame your asbestos exposure on companies that were not sued in your case."[114]

The firm also reportedly encouraged clients to avoid identifying the products of bankrupt

defendants, for the same reason.[115]

The memo (which specifically discussed Garlock), assured the client that defense

attorneys would be powerless to penetrate the carefully composed testimony: "Keep in mind that

these [defense] attorneys are very young and WERE NOT PRESENT at the jobsites you worked

at. They have NO RECORDS to tell them what products were used on a particular job, even if

they act like they do."[116]

The plaintiffs' targeting strategy gradually forced Garlock to increase its settlement

payments. By 1999, Garlock paid approximately $9,100 to settle mesothelioma claims, as

---

[112] This memorandum was reprinted in full in a Senate Report. S. Rep. No. 108-118, at 109–131 [hereinafter Baron & Budd Memo].

[113] Christine Biederman, Thomas Korosec & Julie Lyons, *Toxic Justice*, Dallas Observer (Aug. 13, 1998).

[114] *Id.* at 126; *see also* Thomas Korosec, *Homefryin' With Fred Baron*, Dallas Observer (Mar. 29, 2001) (reporting interviews describing targeting through coached testimony); Biederman et al., *supra* note 113.

[115] Biederman et al., *supra* note 113 (former Baron & Budd paralegal describing discouragement of identification of Johns-Manville exposure). In this article, firm founder Fred Baron was quoted as saying, "Do we implant memories? Yeah, probably we do. Is that something that is wrong? I don't believe it is."

[116] Baron & Budd Memo, *supra* note 112, at 123 (emphasis in original).

compared to $2,800 earlier in the decade.  Still, plaintiffs' firms did not want to target Garlock in

many cases during these years.  The thermal insulation and building materials companies that

made the friable products had the most trial risk, provided the major sources of large settlement

payments, and were usually too valuable to leave out of cases.

Overall, at the end of the 1990s, Garlock's major problem was still the mass of non-

malignant claims.  The number of claims against Garlock grew progressively throughout the

1990s as plaintiffs' firms found more clients through mass screenings and asserted those claims

against Garlock.

Primarily as a result of increasing claim volume, Garlock's aggregate annual costs to

settle asbestos claims increased six fold during the 1990s.  While in 1990 Garlock's aggregate

indemnity payments to resolve asbestos claims were approximately $11.7 million, during 1999,

Garlock paid approximately $69 million. Approximately 84% of the money paid in 1999 went to

settle a pool of 34,000 non-malignant claims, the majority brought by individuals who suffered

no symptoms, but were "discovered" by the plaintiffs' bar through mass screenings.

The situation in 1999 was extremely frustrating.  But Garlock had reason to believe it

could manage its asbestos liability without resorting to Chapter 11.  First, it had approximately

one billion dollars in insurance coverage.  Second, its trial risk was minimized by the presence of

the top tier defendants, and it thus had low per-case resolution values.  Finally, serious asbestos

litigation reform bills were before the United States Congress and the legislatures of several

states that, if enacted, promised to bring rationality to the litigation and curb the abuses brought

on by such practices as mass recruitment.[117]

---

[117] *See* 2005 RAND Report, *supra* note 92, at 131–32.

C.    **The cases that were long Garlock's major problem largely disappeared after 2005**

Between 2003 and 2005, some rationality did enter asbestos litigation when tort reform and the revelation of misconduct by some plaintiffs' firms led to the virtual disappearance of non-malignant claims.

Beginning in 2003 and 2004, the states where many of the non-malignant cases had been filed (including Mississippi and Texas) began to relegate unimpaired plaintiffs to inactive dockets until they manifested symptoms of disease.[118]  Because most plaintiffs never did develop symptoms, this removed the pressure for defendants to settle these cases, and made screenings an unprofitable business for plaintiffs' firms.[119]  The number of filings began to decrease.

The business of mass non-malignant filing was further impacted by the discovery of widespread misconduct in the medical screening process in 2005.  Looking for ways to increase their business, beginning in 2001, some plaintiffs' firms began filing massive numbers of claims against silica companies, alleging that their clients had silicosis.  Many of the clients were recruited through the same mass screening process that identified tens of thousands of asbestos claimants.  In fact, many of the clients had previously filed and settled claims asserting they had asbestos-related non-malignant diseases, even though it is extremely unlikely that a worker would develop both diseases.[120]

In 2003, many of the silica claims were consolidated in a Silica Products Liability Litigation MDL in Corpus Christi, Texas before Judge Janis Jack.[121]  Judge Jack required each plaintiff to submit detailed sworn fact sheets setting forth the diagnosis, its basis, and the identity

---

[118]  Stephen J. Carroll et al., RAND Institute for Civil Justice, *The Abuse of Medical Diagnostic Practices in Mass Litigation: The Case of Silica* 17 n.6 (2009) [hereinafter 2009 RAND Report].
[119]  2005 RAND Report, *supra* note 92, at 26.
[120]  2009 RAND Report, *supra* note 118, at 3.
[121]  *Id.*

of the diagnosing and treating physicians.  The evidence ultimately revealed widespread

deficiencies.  For example, one doctor who performed 78 percent of the alleged examinations

was only paid for positive diagnoses, did not perform physical exams of the patients, relied on

exposure histories taken by law firms and screening companies, and did not consider other

possible causes of lung dysfunction.[122]

On the basis of this and other evidence, Judge Jack concluded that "[i]n a majority of

cases these diagnoses were more the creation of lawyers than of doctors."[123]  She sharply

rebuked the plaintiffs' firms, screening companies and doctors:

> [T]hese diagnoses were about litigation rather than health care. And yet this
> statement, while true, overestimates the motives of the people who engineered
> them.  The word "litigation" implies (or should imply) the search for truth and the
> quest for justice.  But it is apparent that truth and justice had very little to do with
> these diagnoses—otherwise more effort would have been devoted to ensuring
> they were accurate.  Instead, these diagnoses were driven by neither health nor
> justice: they were manufactured for money.[124]

The same tainted process by the same screening companies and most of the same

physicians had been used for over a decade to provide the continuous flow of non-symptomatic,

non-malignant asbestos claims for plaintiffs' firms.[125]  After Judge Jack's discrediting of the

recruitment process, screenings abruptly ended and recruited non-malignant claims largely

disappeared, drastically reducing the aggregate number of asbestos claims filed each year.

Non-malignant claim filings against Garlock ebbed.  In 2002, more than 45,000 non-

malignant claims were filed against Garlock; in 2006, only a few thousand (Figure 10).

Garlock's aggregate expenditure on non-malignant claims was nearly $100 million in 2001; by

2008, it paid only $5 million.

---

[122] *Id.* at 11.
[123] Order No. 29: Addressing Subject-Matter Jurisdiction, Expert Testimony and Sanctions at 149, *In re Silica Prods. Liab. Litig.*, MDL Docket No. 1553 (S.D. Tex.).
[124] *Id.* at 150.
[125] 2009 RAND Report, *supra* note 118, at 3.



Today, Garlock receives only a few thousand non-malignant claims each year.  Most of Garlock's pending non-malignant claims are not actively litigated, are not thought to have any merit, and will never receive payments.  For example, of the 71,038 pending non-malignant claims against Garlock, 63,034 (89%) were filed before January 1, 2006.

**D.     But the litigation had already forced the most culpable defendants into Chapter 11, creating a host of new problems for Garlock**

The significant reduction in non-malignant claims and payments should have ended Garlock's asbestos litigation problem.  Though Garlock's insurance had been severely impacted by the payments on tens of thousands of dubious non-malignant claims, Garlock could have continued paying the same amount it had been paying on its cancer claims in the 1990s and have had no concerns about managing its asbestos litigation going forward.

But whatever benefits Garlock received from the sharp decline in non-malignant claims were more than offset by the impact of the bankruptcies of the top tier defendants on Garlock's

serious disease cases.  In 1997 and again in 1999, the Supreme Court found that attempts to resolve all asbestos litigation through global class action settlements were not permitted by Federal Rule of Civil Procedure 23.[126]  Attempts at global legislation also failed.

Bankruptcy remained as the only way for the top tier defendants to achieve final resolution of their enormous asbestos liabilities.  The asbestos bankruptcy pioneer had been Johns-Manville, the largest manufacturer of asbestos products, which filed in 1982.[127]  In the *Johns-Manville* case, the debtor established a Trust to assume its liabilities and pay the claims. The court then entered a channeling injunction protecting the debtor from asbestos claims and directing all asbestos claims to the Trust for resolution.[128]  Congress provided a safe harbor for future use of this technique in 1994, with the addition of section 524(g) to the Bankruptcy Code.

During 2000 and 2001, the top tier defendants sought bankruptcy protection, with the intent of establishing Trusts under section 524(g) (Figure 11):

### Figure 11: Bankruptcy Filings of Top Tier Defendants

| Petition Date | Company | Products |
|---|---|---|
| 2000 | Babcock & Wilcox Co. | Asbestos-containing boilers and refractory products |
| 2000 | Pittsburgh Corning Corporation | Asbestos insulation |
| 2000 | Owens Corning Fiberglas/Fibreboard | Asbestos pipe and block insulation, cement |
| 2000 | Armstrong World Industries | Asbestos-containing cement, pipe covering, felt, tiles, and gaskets |
| 2001 | W.R. Grace & Co. | Spray-on asbestos fireproofing, asbestos insulation |
| 2001 | USG Corp. | Asbestos-containing plaster, joint compounds, paper, and pipe covering |
| 2001 | Turner & Newell, PLC/Federal-Mogul Corp. | Asbestos-containing insulation, building materials, and gaskets |

---

[126] *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999); *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997).

[127] 2005 RAND Report, *supra* note 92, at 110.

[128] *Id.*

| Petition Date | Company | Products |
|---|---|---|
| 2001 | GAF | Asbestos-containing insulation, roofing shingles, siding, and a variety of other construction products |

The bankruptcies of these top tier defendants precipitated dozens of other bankruptcies.[129]  Most of these companies had appeared routinely as defendants in Garlock's cases, and had borne the real trial risk in serious cases.  Garlock now entered a world where most of the plausible causes of the plaintiffs' mesothelioma were no longer in the tort system.

---

[129]  These additional debtors included Skinner Engine Co. (2001); E.J. Bartells (2001); United States Minerals Products (2001); Murphy Marine Services (2001); Insul Co. (2001); Swan Transportation (2001); North American Refractories Corp. (2002); Kaiser Aluminum (2002); Harbison-Walker (2002) ; A.P. Green (2002); Plibrico Co. (2002); Shook & Fletcher (2002); Porter-Hayden Co. (2002); Artra Group, Inc. (2002); Special Metals Corp. (2002); Asbestos Claims Management Corp. (2002); ACandS (2002); JT Thorpe Co. (2002); A-Best Products (2002); Western MacArthur/Western Asbestos (2002); C.E. Thurston (2003); Combustion Engineering (2003); Congoleum Corp. (2003); Mid-Valley (Halliburton subsidiaries) (2003); Muralo Co. (2003); Flintkote Co. (2004);  Oglebay Norton Co. (ONCO) (2004); Special Electric (2004); Quigley Co. (2004); Utex Industries (2004); API, Inc. (2005); Asarco (2005); Brauer Supply Co. (2005); Dana Corporation (2006); ABB Lummus Global (2006); and Lloyd E. Mitchell Co. (2006).

### III. The bankruptcies of the companies responsible for causing the serious asbestos-related diseases resulted in a permanent, unjustified, and unsustainable increase in Garlock's payments

#### A. Beginning in 2000, plaintiffs began failing to identify exposures to the friable products manufactured by the bankrupts

Despite the generally high value of mesothelioma cases, in 1999, Garlock paid only $9,100 per case in settlement. When evidence of plaintiffs' exposures to all products, including the highly friable products of top tier defendants, was available, judges and juries understood that friable products, not Garlock's, were responsible for causing asbestos disease.

When the top tier defendants began filing for bankruptcy in 2000, Garlock's risk in mesothelioma cases changed almost overnight. Although plaintiffs had valuable bankruptcy claims against the top tier defendants, the major source of payments for these plaintiffs had dried up temporarily.[130]

As a result, plaintiffs' firms began to target Garlock and other peripheral defendants that remained in the tort system. They used the same techniques from the 1990s, now in many more Garlock cases and with far direr consequences. Mesothelioma plaintiffs and their co-worker witnesses abruptly ceased identifying exposure to the bankrupts' friable amphibole products. This was exactly what the Baron & Budd memo had advised in 1997, because "[t]he defense attorneys will jump at a chance to blame your asbestos exposure on companies that were not sued in your case."[131] The Baron & Budd firm had for the same reason reportedly counseled clients to avoid identifying products made by bankrupts, and this technique was now used to exclude evidence against the top tier defendants from the litigation.[132]

---

[130] The bankrupts were viable companies, able to make substantial contributions to Trusts that would assume their liabilities, hence the value of the bankruptcy claims. *See* 2005 RAND Report, *supra* note 92, at 117 (six of the companies filing between 2000 and 2002 were valued at over $1 billion).

[131] Baron & Budd Memo, *supra* note 112, at 126.

[132] Biederman et al., *supra* note 113.

In addition to not identifying friable products of bankrupt defendants, plaintiffs sued Garlock in far more mesothelioma cases than ever before. Garlock paid settlements in 665 cases in 1999; by 2003, it paid in 1,319. This increase in the number of cases where Garlock was forced to pay settlements had no basis in reason or science. Mesothelioma has a long latency period, so whether the disease manifested and the claimant sued in 1999 or a few years later, it had to be caused by exposures that took place decades before. The number of mesothelioma plaintiffs exposed to Garlock products should not have changed significantly between 1999 and 2001. But the number claiming that they had been exposed increased precipitously.

Plaintiffs also exaggerated their exposures to Garlock products. A worker needed to work closely with gaskets and packing in order to generate even the minimal, below-PEL exposures documented by the gasket studies. Yet in case after case, plaintiffs who never worked directly with gaskets claimed that exposures to Garlock gaskets and packing were a major cause of their illnesses. They testified to extraordinary exposures to Garlock gaskets that could not have been produced in the field. Plaintiffs would now claim that they had spent day after day removing old and degraded Garlock gaskets that allegedly released large numbers of asbestos fibers, even though that was not consistent with standard work practices or the reliable industrial hygiene studies.

The plaintiffs' stories were implausible, but there was little Garlock could do to combat the testimony. As the Baron & Budd memorandum counseled, "Keep in mind that these [defense] attorneys are very young and WERE NOT PRESENT at the jobsites you worked at. They have NO RECORDS to tell them what products were used on a particular job, even if they

act like they do."[133]  This testimony focusing on Garlock, presented by sympathetic plaintiffs with serious diseases, had enormous traction with juries.

To lend further credence to the new testimony, plaintiffs' attorneys paid for junk science purporting to support the point that Garlock gaskets released large numbers of asbestos fibers. These studies suffered from numerous flaws and did not meet the scientific standards of epidemiology and industrial hygiene.[134]  Plaintiffs' lawyers enhanced the jury effect of these studies by including videos of gasket and packing work recorded under special theater lighting that appeared to show the worker surrounded by clouds of dust that juries incorrectly were led to believe was toxic.  In fact, these videos did not accurately portray the asbestos emitted by gaskets, and have now been excluded in many courts.[135]  Unfortunately, many state courts allowed juries to see the junk science, and plaintiffs' lawyers concentrated their cases in such jurisdictions.

The attempt to portray Garlock as the cause of plaintiffs' injuries flew in the face of reality.  In actual workplaces, the friable products were commonly found in close proximity to Garlock's products, and released asbestos fibers in amounts that dwarfed any possible contribution by the gaskets and packing.  These products were what really caused mesothelioma. Plaintiffs' firms knew this: before the bankruptcies in 2000, they had routinely sued the top tier defendants, claimed their clients experienced substantial exposures to the products of top tier

---

[133]  Baron & Budd Memo, *supra* note 112, at 123 (emphasis in original).

[134]  *See* Order Relating to Garlock, Inc. Motion to Suppress Testimony of Dr. William Longo and Mr. Richard Hatfield with Findings of Fact and Conclusions of Law at 1, *In re: Lamar County Asbestos Litig. Cases Filed or to Be Filed by Waters & Kraus in Lamar County, Texas* (July 5, 2001) ("The MAS [Longo's company] tests constitute 'junk science.' ").

[135]  *See, e.g.*, *Homa v. Garlock Sealing Technologies, LLC*, Index No. 106152/2008 (N.Y. S.C. April 2009); *Winnemueller v. Garlock Sealing Technologies, LLC*, Case No. 06CV000486 (Milwaukee Cir. Ct. Branch 8 Feb. 2009); *Stewart v. Garlock, Inc.* (Tex. Dist. Ct. 136-Jefferson Cnty. May 2000); *Hines v. Garlock, Inc.*, (Tex. Dist. 354-Hunt Cnty. Feb. 2001).

defendants, and collected large settlements as a result.  Still, plaintiffs now minimized or refused

to identify exposures to the friable products.

**B.    Simultaneously, plaintiffs' attorneys asserted in the bankruptcies that their clients <u>were</u> exposed to the friable products**

It has now become apparent that lawyers for the very same mesothelioma plaintiffs who

were suing Garlock and failing to identify exposure to the friable products *participated* in the

bankruptcies of the top tier defendants, on the basis that these companies *had* caused the injuries,

giving rise to bankruptcy claims.

To avoid exposing the inconsistency, plaintiffs' firms long avoided identifying their

clients with bankruptcy claims to the bankruptcy courts.  Rule of Bankruptcy Procedure 2019

requires that "every entity . . . representing more than one creditor . . . file a verified statement

setting forth" the names of the creditors and a description of the representation.[136]  The plaintiffs'

firms ignored it for years.  When the plaintiffs' firms were finally forced to comply with Rule

2019 in 2004, they obtained orders placing the filings under seal, which prevented tort system

defendants and the general public from viewing the names.[137]  The firms argued that claimants

had a privacy interest in their names, even though these same claimants were suing defendants,

in their own names, on public dockets across the nation—including in case after case against

Garlock.[138]

---

[136]  Fed. R. Bankr. P. 2019.
[137]  *See, e.g.*, Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re Pittsburgh Corning Corp.*, No. 00-22876 (Bankr. W.D. Pa. October 22, 2004) (requiring firms to file exhibits containing names and other information about clients with bankruptcy claims, but providing that debtor and U.S. Trustee "shall keep such exhibits confidential and shall not release the exhibits to any party without further Order of Court"); Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019 But Staying Effective Date, *In re Armstrong World Indus.*, No. 00-4471 (Bankr. D. Del. Oct. 22, 2004) (same); Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019, *In re Owens Corning Corp.*, No. 00-3837 (Bankr. D. Del. Oct. 22, 2004) (same).
[138]  The 2019 Orders allowed disclosure of the names upon "further Order of Court," but Garlock's experience shows how closely the court guarded them.  When Garlock appeared in the *Pittsburgh Corning* case and objected to confirmation (for reasons described below), it sought access to the 2019 statements to prove that

But Garlock managed to break through the wall of confidentiality in early 2010, after it objected to confirmation of the PCC plan.[139]  PCC, one of the last top tier defendants left in bankruptcy, had manufactured a highly dangerous variety of friable amphibole pipe insulation (Unibestos) that was often used near Garlock's products.  Garlock moved for access to 2019 statements filed by plaintiffs' firms in the bankruptcy.  It wished to determine whether plaintiffs who sued Garlock and failed to identify exposure to PCC products were participating in the bankruptcy, claiming they were exposed to PCC products.

The judge denied Garlock access to the 2019 statements, but allowed Garlock to view the ballots cast on the proposed plan by personal injury claimants.  Each plaintiffs' firm had cast a master ballot for its clients, with the names of the clients listed on an attached exhibit.  The master ballot required the attorney to certify, under penalty of perjury, that the claimants listed on the ballot had been exposed to Unibestos or another asbestos-containing PCC product.[140] These ballots were then kept confidential.

After obtaining the ballots, Garlock secured from its defense counsel a random sample of recent discovery responses submitted by a variety of plaintiffs' firms across the nation in tort system litigation against Garlock.  The discovery asked plaintiffs to identify all their exposures to asbestos-containing products.[141]

---

individuals who had failed to identify exposure to PCC products in the tort system were asserting bankruptcy claims in the case.  After the plaintiffs' firms opposed Garlock's motion, the court denied it—even though Garlock was a party in the case and the information was relevant to its objection to confirmation.  Order Denying Expedited Motion of Garlock Sealing Technologies, LLC For Order Authorizing Access to Certain 2019 Statements Filed in Case, *In re Pittsburgh Corning Corp.*, No. 00-22876 (Bankr. W.D. Pa. March 24, 2010).  Plainly, the names were not available to tort system defendants in the ordinary course.

[139] The events that led Garlock to appear in the case are discussed more fully *infra* Part III.C.

[140] The lawyer who signed the ballot certified that (a) the listed clients were indeed holders of "Channeled Asbestos PI Trust Claims," (a term defined in the proposed plan and requiring exposure to Unibestos or other asbestos-containing products manufactured by PCC), and (b) the listed clients had authorized the lawyer to represent that he or she had exposure necessary to give rise to a Claim.  In this way, each lawyer certified under penalty of perjury that the voting clients were exposed to a PCC product.

[141] After determining which of the plaintiffs had voted in PCC and had claimed a mesothelioma injury, Garlock followed up with local counsel to obtain any other discovery in Garlock's possession where the plaintiff may

In total, 255 mesothelioma plaintiffs in the sample had voted in PCC. Only 19 of those voters, however, had disclosed exposure to a PCC product during discovery in the tort system. The vast majority—236, or 92.5%, from 19 different plaintiffs' firms—had failed to identify exposure to PCC products. But every single one of those 236 plaintiffs had cast a ballot in *Pittsburgh Corning*, in which their lawyers certified under penalty of perjury that their clients *had* been exposed to PCC asbestos products.

Garlock had paid 37 of the PCC voters in the sample settlements of $100,000 or more each.[142] In only six of these high-dollar cases did plaintiffs mention exposure to PCC products when asked in the tort system to name all of their exposures. In 84% of these cases, plaintiffs had failed to identify exposure to a PCC product. Yet each of *their* attorneys certified under penalty of perjury in *Pittsburgh Corning* that they did have such exposure.

One of these plaintiffs had been asked by his own counsel in deposition, "Have you ever been exposed to Unibestos insulation?" The plaintiff testified, "No."[143] Three months later, Garlock paid this plaintiff $400,000 to settle his mesothelioma claim. Nine months after the payment, the law firm cast a ballot on his behalf, certifying under penalty of perjury that he had indeed been exposed to PCC's asbestos-containing products.

Another plaintiff had insisted repeatedly in his deposition that he had never been exposed to pipe insulation (such as Unibestos), despite some objective evidence to the contrary.[144] Garlock paid this individual $450,000 to settle his claim in January 2010, before obtaining access to the PCC ballots. Two months before Garlock paid him—and only eight months after his

---

have identified exposure to PCC products. In this second request, Garlock also requested any discovery from PCC voters among its top ten settlements over the past two years with clients of selected firms. Where discovery existed, the results of this request are also included in the sample.

[142] All of these payments occurred before Garlock learned of inconsistent statements made in the bankruptcy.

[143] This plaintiff also failed to identity any other PCC product in written discovery.

[144] For example, the plaintiff filled out an application for federal employment in 1966 stating he had previously performed work "[c]overing pipes with insulation and installing wool on bulkheads." This plaintiff also failed to identify any other PCC product in written discovery.

deposition—his attorney certified under penalty of perjury that he *had* been exposed to PCC products and was therefore entitled to vote in the bankruptcy.

The large-scale inconsistency that Garlock discovered cannot be explained by subsequent discovery of evidence. Most of the discovery in the sample was conducted within a year or two of the balloting. Indeed, 41 different PCC voters in the sample submitted discovery *after* casting a ballot. All but two of these plaintiffs—39, or 95%—failed to identify exposure to Unibestos or another PCC product, despite their lawyers' prior certification to the contrary under penalty of perjury.

**Figure 12: Summary of Inconsistencies Between Exposure Evidence in *Pittsburgh Corning* and Tort System Discovery Sample**



This, Garlock's single foray behind the curtain, strongly suggested what many have long suspected. Plaintiffs' firms prevent evidence regarding exposure to products made by bankrupt top tier defendants from appearing in tort system cases, in order to inflate the trial risk and resolution values of peripheral defendants such as Garlock.[145]

## C.    As a result of targeting, the bankrupts' liability shifted to Garlock

The consequences of the targeting strategy were disastrous for Garlock. With the actual causes of plaintiffs' injuries removed or obscured, exposure to Garlock products exaggerated, and junk science marshaled in support, it became easier to convince juries that Garlock was the real cause of plaintiffs' mesothelioma. Moreover, in joint and several liability jurisdictions, Garlock was now vulnerable to bearing the highly culpable bankrupts' shares of damages as well as any damages the jury assessed to it—even if the jury assigned only minimal fault to Garlock.[146]

Garlock even saw its risk increase in jurisdictions where it theoretically should have been protected from the effect of the bankruptcies. For example, in several liability jurisdictions, each defendant is responsible for only its proportional share of the liability, and the plaintiff bears the risk of a culpable defendant's insolvency.[147] In hybrid jurisdictions, a defendant is protected from joint and several liability so long as the jury assigns fault below a certain culpability threshold.[148] Before the bankruptcies, Garlock rarely if ever was above the threshold. In both

---

[145]    Numerous untapped sources of information about this practice exist, including the ballots in the other bankruptcies; the 2019 statements submitted by the plaintiffs' firms; and the claims that have now been submitted to Trusts, as described more fully below. Garlock will seek access to all of this evidence during this case.

[146]    The majority of states have some form of joint and several liability. Examples of states with pure joint and several liability include Delaware, 10 Del. Code § 6301 *et seq.*, Pennsylvania, 42 Pa. C.S.A. § 8322, Massachusetts, M.G.L. c. 231B § 1, and Maryland, Md. Code Ann. § 3-1401 *et seq.*

[147]    States with pure several liability include Indiana, Ind. Code § 34-51, Mississippi, Miss. Code Ann. § 85-5-7, and Florida, Fla. Statutes § 768.81.

[148]    States with hybrid systems include New York, CPLR § 1601, West Virginia, W. Va. Code § 55-7-24, and Texas, Tex. Civ. Prac. & Rem. Code § 33.013.

several liability and hybrid jurisdictions, the bankruptcies should have had no effect on Garlock's trial risk and resolution values.

But with plaintiffs' exposures to friable products obscured, and exposures to Garlock products exaggerated, Garlock's trial risk in these jurisdictions increased as well. Garlock faced the risk of a high share of liability, resulting in larger damages in several liability jurisdictions, and potentially triggering joint and several liability in hybrid jurisdictions.

When it tried cases to verdict, Garlock still won more than it lost. But the rate of adverse verdicts increased, and when combined with the potentially high damages in the event of a loss, Garlock's overall trial risk increased dramatically. This was in stark contrast to the pre-2000 period, when plaintiffs had freely admitted their exposure to friable amphibole products and had a limited incentive to exaggerate their exposure to Garlock products.

The new possibility of potentially ruinous verdicts in mesothelioma cases fundamentally changed Garlock's asbestos litigation. Garlock's average resolution values in mesothelioma cases increased exponentially: $9,077 in 1999, $23,116 in 2000, $43,545 in 2004, and $78,655 by 2006 (Figure 13).

Garlock also had to pay in far more cases. In 1999 Garlock paid only 665 mesothelioma claimants. By 2003—only four years later—this had doubled to 1,319. Garlock's total annual payments in mesothelioma cases increased from about $6 million in 1999 to over $73 million by 2006.



Thus, even though the non-malignant "elephantine mass" ebbed, Garlock now found itself paying huge amounts to mesothelioma claimants for the first time (Figure 13). The plaintiffs' bar had succeeded in shifting the bankrupts' massive liability for mesothelioma claims to Garlock, despite Garlock's lack of responsibility for these claims, as demonstrated by science and its success in these cases before 2000.

### D.    The establishment of Trusts with tens of billions of dollars to pay responsible companies' liabilities should have provided relief to Garlock

The top tier defendants were only temporarily absent from the litigation. The goal of their Chapter 11 filings was to establish post-confirmation trusts under section 524(g) of the Code that would assume their liabilities and continue paying legitimate claims.[149] The debtors and certain related parties would then receive the protection of a channeling injunction that would funnel all asbestos claims against them to these Trusts.

These Trusts were not established as social insurance, open for business to anyone with an asbestos-related disease. Rather, the Code required them to restrict the payments to

---

[149]  2005 RAND Report, *supra* note 92, at 117.

individuals with legitimate *claims* against the top tier defendants—i.e. individuals whose diseases had been caused by the top tier defendants' products.[150]

To that end, the Trusts were required to adopt Trust Distribution Procedures ("TDP"), which set up an administrative process for paying claims. Claimants would be required to submit evidence showing they were exposed to the bankrupt's products, and evidence of their disease. Then, according to predetermined criteria, they would receive offers of payment from the Trust commensurate with the evidence.[151] In essence the Trusts would stand in for the debtors, though under an administrative process intended to reduce defense costs by keeping the Trusts out of trials in the tort system.

These Trusts were extremely well-funded. The debtors of the 1980s and 1990s had tended to establish relatively poorly funded Trusts because the companies had already been forced to pay most of their value to asbestos claimants in the tort system.[152] But the top tier defendants that filed in 2000 and thereafter were wealthy, willing to make massive payments to Trusts in order to obtain asbestos peace for their viable companies. Further, their parents and affiliates were often willing to make substantial contributions as well to protect themselves.[153] Most important, these companies had *actually caused* serious diseases like mesothelioma, and therefore *should* have been responsible for funding Trusts that could make large payments to

---

[150] 11 U.S.C. § 524(g)(2)(B)(4) (providing that the Trust must use its assets or income to pay "claims and demands" against the debtor).

[151] *See, e.g.*, United States Gypsum Asbestos Personal Injury Settlement Trust Distribution Procedures, available at http://www.usgasbestostrust.com/files/USGTDP.pdf (last visited May 22, 2010) [hereinafter USG TDP]; Amended and Restated Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust Distribution Procedures, available at http://www.armstrongworldasbestostrust.com/files/TDP%20Amended%20and%20Restated%20as%20of%205_6_08.PDF (last visited May 22, 2010) [hereinafter AWI TDP].

[152] *See* 2005 RAND Report, *supra* note 92, at 115.

[153] 2005 RAND Report, *supra* note 92, at 117 (noting that six of the companies filing between 2000 and 2002 were valued at over $1 billion).

these claimants. The Trusts were funded on the basis that they would be paying a large portion

of the approximately 1800 annual mesothelioma claimants.

For these reasons, the Trusts emerging from the bankruptcy wave received billions upon

billions of dollars in assets. The value of assets in Trusts expanded enormously after 2006, as

did the payments made by Trusts to plaintiffs each year (Figure 14). Many Trusts received

assets that exceeded the amount these companies reported they had paid in all their previous

asbestos litigation.

### Figure 14: Funding of Trusts

| Company | Pre-bankruptcy claim payments* | Bankruptcy confirmation | Initial Trust assets |
|---|---|---|---|
| Armstrong World Industries | Not reported | 2006 | $2,100 M |
| Babcock & Wilcox Co. | $1,000 M | 2006 | $1,900 M |
| Fibreboard | $2,800 M | 2006 | $1,500 M |
| Owens Corning Fiberglas | $3,400 M | 2006 | $3,400 M |
| PCC | Not reported | Pending | $2,800 M |
| USG Corp. | $500 M | 2006 | $4,000 M |
| W.R. Grace & Co. | $1,100 M | Pending | $2,300 M |

*Source: Company 10-K filings

Today, numerous Trusts have over $1 billion in assets, and in the aggregate, they have

made billions of dollars in payments to plaintiffs since 2006. In 2009 alone, Trusts paid nearly

$4 billion in the aggregate to claimants.[154] The assets of the confirmed Trusts at the end of 2009

totaled just over $20 billion, not including $9 billion in assets of proposed Trusts awaiting plan

confirmation (Figure 15). The value of these assets to plaintiffs is also more than it would be in

the hands of tort system defendants since less will be devoted to defense costs.

---

[154] Trust payment and assets were estimated from publicly available filings by the Trusts.

**Figure 15: Trust Assets and Payments By Year, 2000-2009**



The average payment made by some Trusts to each mesothelioma claimant is equal to or

(in some cases) far greater than what the top tier defendants were paying in 2000.  The USG

Trust, for example, pays $101,250 to the average mesothelioma claimant, nearly three times the

approximately $34,000 USG paid the average mesothelioma claimant in 1999.[155]  In another

recent case, a prominent plaintiffs' lawyer testified he received a promise from the debtor that his

firm's clients would receive payments equal to their historical resolution values (an amount

exceeding $720,000).[156]  The proposed W.R. Grace Trust would pay mesothelioma claimants on

---

[155]  *See* Dr. Mark A. Peterson, W.R. Grace Projected Liabilities for Asbestos Personal Injury Claims As of April 2001, at 29 (June 2007, revised January 2009) (USG paid average mesothelioma claimant $34,314 in 1999); USG TDP, *supra* note 151.

[156]  *See* Declaration of Peter A. Kraus, *In re T H Agriculture & Nutrition, LLC*, No. 08-14692 (Bankr. S.D.N.Y. May 20, 2009) (stating that Waters & Kraus firm clients "would receive on average the historic litigation value of Waters & Kraus claims previously settled in the tort system" with the debtor, equal to more than $720,000 per claim).

average between $56,250 and $78,750.[157]  This payment is more than the average payment by

W.R. Grace to a mesothelioma claimant in 1999—$49,586.[158]

Today the aggregate Trust payments that typical mesothelioma plaintiffs can expect to

receive may be sufficient to fund their entire damages.[159]  This, of course, is the situation that

existed before 2000, when (commensurate with their culpability) the top tier defendants *did*

make all or nearly all the payments necessary to resolve mesothelioma claims, leaving little or

nothing for defendants like Garlock to pay.

The establishment of Trusts holding billions of dollars in assets for the same claimants

suing Garlock gave Garlock reason to believe that the problems it experienced after 2000 would

be abated—perhaps even resulting in a return to the pre-bankruptcy status quo.  In the first place,

these Trusts would be paying the very same mesothelioma claimants who were now suing

Garlock in great numbers.  Amazingly, Garlock was receiving virtually every one of the 1800 or

so mesothelioma complaints per year, and was paying in more than half; the Trusts were

supposed to be paying this same population of mesothelioma plaintiffs.[160]  Garlock believed its

settlements would have to go down, now that the same plaintiffs suing it inevitably would

receive substantial compensation from the Trusts.

Second, Garlock believed plaintiffs would no longer have either incentive or ability to

obscure the evidence of exposure to the friable products in Garlock's cases.  The Trusts would

---

[157]  *See* Trust Distribution Procedures, Exhibit 4 to Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dates as of September 19, 2008, *In re W.R. Grace & Co.*, No. 01-1139 (Bankr. D. Del. Sept. 19, 2008) (establishing that average mesothelioma claim will be paid at 25–35% of $225,000).

[158]  *See* Dr. Mark A. Peterson, W.R. Grace Projected Liabilities for Asbestos Personal Injury Claims As of April 2001, at 29 (June 2007, revised January 2009).

[159]  *See* Charles E. Bates & Charles H. Mullin, *Having Your Tort and Eating It Too?*, 6:4 Mealey's Asbestos Bankr. Rep. 1 (Nov. 2006) ("For the first time ever, trust recoveries may fully compensate asbestos victims . . . .").

[160]  For example, a witness proffered as an expert by the asbestos claimants' committee in *W.R. Grace* estimated that the proposed W.R. Grace Trust would make payments to a substantial portion of all mesothelioma claimants. Dr. Mark A. Peterson, Preliminary Expert Report on W.R. Grace Trust, at 11–13 (2009).

pay plaintiffs only if they provided "meaningful and credible" evidence of exposure to a product

for which the Trust was responsible.[161]   Once the Trusts were operational, it should have become

impossible for plaintiffs to minimize the role that friable products played in causing their

injuries—at least if they wanted access to the generous and relatively effortless Trust payments.

With the true stories restored to the litigation, and Garlock's truly minor role made clear,

Garlock's risk would decrease.

For these two reasons, in 2004, when Garlock began publishing claims liability estimates

(prepared for public reporting purposes), it assumed that as soon as the pending Trusts began

processing and paying claims, Garlock's resolution values for mesothelioma claims would

decrease toward pre-2000 levels.  Garlock believed that with this relief, it would have insurance

sufficient to fund payments to tort claimants for the foreseeable future.

**E.     But the plaintiffs' bar intentionally structured the Trusts so that Garlock's
        payments would not return to rational levels**

In 2006, billions of dollars in payments began flowing to the same plaintiffs who had

sued or were suing Garlock.  Total Trust payments in 2007 were $1.45 billion; in 2008 $3.36

billion; and in 2009 $3.9 billion (Figure 16).  These were far greater than the amounts that Trusts

had paid to plaintiffs before.  The top tier defendants were far from gone: they had only migrated

out of the tort system, to a new administrative Trust system.

---

[161] *See, e.g.*, USG TDP, *supra* note 151 (purpose of Trust is to pay claims for which debtors "have legal
responsibility"); *id.* § 5.7(b)(3) (Trust not required to pay unless claimant can provide evidence of "meaningful
and credible exposure" to debtor's product); AWI TDP, *supra* note 151 (same).

**Figure 16: Trust Payments By Year, 2006-2009**



Yet against all reason, fairness, and logic, these payments had no effect on Garlock's resolution values in mesothelioma cases (Figure 17).



Garlock found that in the tort system, mesothelioma plaintiffs still failed to identify the role friable asbestos products played in causing their injuries, and they still exaggerated the role that Garlock's gaskets and packing played. Their lawyers' demands for settlements from

Garlock did not decrease.  In fact, the number of mesothelioma cases filed against Garlock increased every year—from 1,607 in 2006 to 1,874 in 2009—despite the declining incidence of mesothelioma in the United States over that period, and the fact that few mesothelioma claimants even worked with gaskets or packing.  Somehow, the plaintiffs' bar had been able to preserve the post-bankruptcy wave status quo and even make things worse for Garlock, notwithstanding the fact that their clients were entitled to billions of dollars in payments from the Trusts, and would need to present real evidence to Trusts in order to receive payments.

Gradually, Garlock began to realize that the TDP for the new Trusts had been structured in a way that allowed plaintiffs to take inconsistent positions in the tort system and the Trust system.  Plaintiffs could recover from Garlock on the theory that Garlock was the major cause of their injuries and that they had no evidence of exposure to the friable products of bankrupt co-defendants, then later make claims against Trusts, alleging that the friable products of bankrupt co-defendants *were* the cause.  This amounted to double payment for the same injury and perpetuated the fundamental breakdown in the integrity of the civil justice system.

Various TDP provisions allowed this to occur.  For example, the TDP allowed claimants to delay making their claims indefinitely, to a time after they had recovered from all tort system defendants.  Then, the TDP required the Trusts to keep the names of the claimants and the fact that their claims existed strictly confidential.[162]  Provisions like these left claimants free to avoid identifying in the tort system exposures to the friable products for which the Trusts were responsible, and then make Trust claims after settling their tort system claims.  The tort system defendants would be powerless to prove the inconsistency, because they would not be privy to the delayed and confidential Trust claims.

---

[162] *See, e.g.*, USG TDP, *supra* note 151, §§ 6.3 (delay), 6.5 (confidentiality); AWI TDP, *supra* note 151, §§ 6.3 (delay), 6.5 (confidentiality).

Garlock was thereby denied both benefits it had anticipated: evidence that the Trusts and not it were responsible, and credit for Trust payments that would insulate Garlock from having to pay the top tier defendants' massive shares of liability. The provisions that facilitated this happening were no accident. The TDP had all been drafted by the plaintiffs' bar in the bankruptcies. Once the debtors agreed to fund Trusts with certain asset values, they had no interest in how the assets were distributed, and thus gave the plaintiffs' bar free reign to draft the TDP.[163] The plaintiffs' bar took advantage by drafting TDP that would give them the ability to continue targeting peripheral tort system defendants like Garlock.

As a result, the state court compensation system for mesothelioma plaintiffs was permanently fractured. In the tort system, it was as if the top tier defendants had never existed, despite the fact that they were the real causes of the plaintiffs' injuries and were still very much present in the form of extraordinarily wealthy Trusts paying the same plaintiffs suing Garlock. The shift of liability from top tier defendants to peripheral defendants like Garlock was made permanent. Plaintiffs could double dip in the tort and Trust systems with impunity.

**F.      When Garlock realized that the top tier defendants had been permanently removed from the tort system, it was forced into Chapter 11**

Garlock first began to wonder what was happening with the Trusts in 2007, when the massive payments by new Trusts failed to impact its resolution values in mesothelioma cases. It began to research the TDP of the new Trusts and look for ways to make sure the evidence submitted to Trusts by mesothelioma plaintiffs and payments received by mesothelioma plaintiffs would have their appropriate impact on Garlock cases.

---

[163] Tort system defendants initially failed to recognize how their interests were being affected or how the plaintiffs would use the TDP provisions, and also feared retaliation from the plaintiffs' bar if they did attempt to intervene. When on rare occasions defendants tried to intervene, they were sometimes denied standing to do so, despite the undoubted impact of the TDP on their substantial interests. *See, e.g.*, Transcript of Telephonic Conference Before the Honorable Robert E. Gerber, *In re T H Agriculture & Nutrition, LLC*, No. 08-14692 (Bankr. S.D.N.Y. January 12, 2009).

In February 2008, Garlock made an immensely troubling discovery.  In Maryland it found that two plaintiffs who had recovered multi-million dollar judgments against Garlock (and had those judgments fully satisfied) had sued another company to recover for the same injuries. In that lawsuit, they had submitted answers to interrogatories where they admitted making claims against Trusts for numerous top tier defendants.  The plaintiffs had not identified many of those defendants' products during discovery in the cases against Garlock.[164]

This is what first led Garlock to suspect that plaintiffs might be taking inconsistent positions in the tort system and against Trusts in order to keep tort system trial risk elevated and resolution values inflated.  In these two cases, it meant Garlock had lacked evidence it could have used to exculpate itself at trial, and perhaps avoid suffering multi-million dollar judgments to these plaintiffs.  Garlock saw that this practice could deny it access to the evidence of exposure and payments that were necessary to bring some rationality to the resolution of mesothelioma claims against it.

Upon closer analysis of the TDP, Garlock saw that the procedures had been handcrafted to permit double dipping in the tort and Trust systems, most notably through delay and confidentiality provisions.  Unfortunately, it was too late to change the TDP of most Trusts, which had already been created and funded by bankruptcy wave defendants.  Each such Trust had a committee composed of prominent plaintiffs' lawyers, who had to consent to any change in the TDP.[165]  For example, the Baron & Budd firm—the author of the "Preparing for Your Deposition" memorandum—served on the committees of 14 of the 26 largest Trusts.

---

[164]  Garlock later sought and obtained the plaintiffs' Trust claim files, which verified that the plaintiffs had not identified these products in tort system discovery.

[165]  *See, e.g.*, United States Gypsum Asbestos Personal Injury Settlement Trust Agreement; Owens Corning/Fibreboard Asbestos Personal Injury Trust Agreement.

Two of the top tier defendants, however—PCC and W.R. Grace—had not yet emerged from bankruptcy.  Their TDP had the same features that Garlock now realized permitted plaintiffs to double dip in the tort system and Trusts.  Garlock appeared in these bankruptcy cases and objected to the TDP.[166]  Although representatives for asbestos claimants vehemently opposed Garlock's objections to the delay and confidentiality provisions, among others, they failed to offer any legitimate purpose for the challenged provisions.  The only plausible explanation for the provisions was to permit claimants to double dip.

Yet Garlock gradually realized that its objections in W.R. Grace and PCC were too little, too late.  Even if successful, they would reform the TDP of only two Trusts, when all the evidence to which Garlock had access showed that the problem was much larger.  The bankruptcies of the top tier defendants had fractured the tort system and eliminated its ability to apportion liability for mesothelioma claimants' injuries, as shown by:

- The increase in mesothelioma claims filed against Garlock as soon as the top tier defendants left the tort system;

- The failure of tort system plaintiffs to confess that the true causes of their injuries, the friable amphibole products, played any role at all in causing their injuries;

- The exponential increase in Garlock's resolution values, out of all proportion to any arguable culpability on the part of Garlock;

- The failure of the Trust payments to impact Garlock's resolution values in mesothelioma cases;

---

[166]  It was through intervening in the Pittsburgh Corning bankruptcy that Garlock acquired the evidence of inconsistent positions in the tort system and under penalty of perjury in the bankruptcy, as described *supra* Section III.A.

- The continued failure of tort system plaintiffs to confess exposures to the true causes of their injuries;

- The evidence of inconsistent statements made by plaintiffs' firms in tort system discovery and under penalty of perjury in *Pittsburgh Corning*;

- The vehement opposition of the organized plaintiffs' bar to revealing the names of plaintiffs for whom they had appeared in the bankruptcies, as recorded in 2019 statements kept under seal;

- The structure of the TDP for the major Trusts, designed to allow double dipping to occur; and

- The vehement opposition of the organized plaintiffs' bar to any change in the TDP that would bring the Trusts into harmony with the tort system.

Garlock therefore concluded that the bankruptcy court is the only forum where its true responsibility for asbestos claims can be determined.

## IV.    Chapter 11 provides the only meaningful opportunity for Garlock to resolve its responsibility for asbestos claims

### A.    Bankruptcy courts are uniquely equipped to facilitate fair resolutions of mass tort litigation that is hopelessly intractable in civil courts

As described above, in the tort system, Garlock is paying, and has paid for many years, amounts in resolution of asbestos claims that vastly exceed its actual responsibility.  The bankruptcies of the top tier defendants resulted in an eightfold increase in Garlock's resolution costs for mesothelioma cases, which were resolved for low payments prior to the bankruptcy wave.  The increase was a consequence of the targeting practices described above along with the effect of joint and several liability.  Establishment of extraordinarily wealthy Trusts that began paying billions of dollars to the very same claimants who sue Garlock did not abate the problem.  This was because the tort system has been irrevocably fractured into two tracks—a Trust system containing the plausible causes of plaintiffs' diseases, and a tort system containing peripheral defendants like Garlock.  Solvent peripheral defendants are paying more than they owe because the Trust system has been completely isolated from the tort system.

Although the bankruptcy wave, followed by the emergence of an isolated, opaque Trust compensation system, has created serious new problems preventing the fair resolution of asbestos claims in the tort system, the lack of a properly functioning tort system is not new.  The Supreme Court recognized many years ago that the tort system was not equipped to fairly address mass asbestos claims, either on a case-by-case basis or through global settlements under federal class action rules.[167]  The Supreme Court urged Congress to act on the asbestos litigation problem.[168]  But Congress never did.

---

[167] *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

[168] *Amchem*, 521 U.S. at 628–29 ("[A] nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure . . . ."); *Ortiz*, 527 U.S. at 865 (Rehnquist, C.J., concurring) (observing that asbestos litigation "cries out for a legislative resolution").

This Court, however, is ideally suited to resolve Garlock's responsibility, and in fact provides the only forum where Garlock's responsibility for asbestos claims can be fairly adjudicated.  The provisions of the Bankruptcy Code have time and again facilitated permanent resolutions of mass asbestos litigation plaguing otherwise healthy companies.  The key features of bankruptcy law that promote mass tort settlements are unique but familiar provisions of the Code that are central to the Chapter 11 reorganization process:

- **Automatic Stay.**  Section 362 stays the prosecution of law suits against the debtor in all courts and bars new law suits by persons claiming injury from the debtor's products.

- **Consolidation of Claims.**  Because the bankruptcy court has exclusive jurisdiction over property of the estate and claimants must file proofs of claim to qualify for distributions from the estate, the filing of a Chapter 11 petition effectively consolidates mass tort litigation against a debtor in one court.

- **Claims Estimation.**  The bankruptcy court and district court together have authority to allow or disallow personal injury tort claims against the estate or, pending resolution, to estimate the debtor's aggregate liability for all such claims for purposes of distribution, voting, feasibility and other purposes.  Estimation sets a fixed limit on the compensation to be provided for contingent tort claims.

Resolution of mass tort cases may also require the bankruptcy court to utilize other familiar but less frequently used powers:

- **Expansion of Automatic Stay.**  To protect property of the estate and the reorganization process, the bankruptcy court has authority to enter orders supplementing the automatic stay by enjoining tort actions against the debtor's

71

affiliates during a case, particularly where such actions would erode assets of the

estate such as insurance or would interfere with officers and other employees who are

key to the debtor's reorganization prospects.

- **Appointment of Futures Representative.**  To ensure due process for future

    claimants (whose identities are unknown) and to enable entry of orders that bind all

    parties in interest, including future claimants, the bankruptcy court can appoint an

    independent representative to appear in the case and represent their interests.

- **Establishment of a Trust.**  The bankruptcy court is empowered to approve a plan

    that establishes a post-confirmation trust that will process and pay present and future

    claims.

In addition, in 1994, Congress enacted Code section 524(g) to facilitate reorganizations

of companies subject to mass asbestos litigation.  The provision was modeled on the solution

developed in the *Johns-Manville* bankruptcy case.[169]  The *Johns-Manville* court resolved the

debtor's current and future asbestos liabilities by permanently enjoining all present and future

tort claims against the debtor and channeling them to a post-confirmation trust for processing and

payment.

The *Johns-Manville* court found it unnecessary to address whether claims based on

conduct that preceded the petition but injuries that arose after the petition ("Future Claims") were

"claims" under section 101(5) that could be discharged under section 1141.[170]  Other courts were

---

[169] *See In re Johns-Manville Corp.*, 340 B.R. 49, 63 n.7 (S.D.N.Y. 2006).
[170] *In re Johns-Manville Corp.*, 36 B.R. 743, 754 (Bankr. S.D.N.Y. 1984).

split on the question, with the Fourth Circuit concluding that Future Claims were Code claims subject to discharge.[171]

In the Bankruptcy Reform Act of 1994, Congress sidestepped the question of whether Future Claims are Code claims. Section 524(g) instead confirmed that district courts in Chapter 11 asbestos cases have authority to issue injunctions that permanently prohibit holders of Future Claims from proceeding against debtors, and instead channel such holders to a Trust for compensation. The amendment remained agnostic on whether Future Claims are Code claims, instead effectively providing that *if* any Future Claim is not a Code claim, the district court may nevertheless discharge and enjoin such claim if numerous conditions delineated in section 524(g) are met. To accomplish this result, the Code defines a new term, "demand," to mean in pertinent part any demand for payment that did not constitute a "claim" during the bankruptcy proceedings.[172] For a channeling order to be valid and enforceable against "demands," the requirements of section 524(g) must be met. The section essentially provides a safe harbor for the solution implemented in *Johns-Manville*.

The 524(g) safe harbor is available if a legal representative has been appointed to represent the interests of demand holders, and certain other conditions have been satisfied. The post-confirmation trust must, among other things:

- Assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property damage

---

[171] *See Grady v. A.H. Robins Co. (In re A.H. Robins Co.)*, 839 F.2d 198, 203 (4th Cir. 1988). *Cf. Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1277 (5th Cir. 1994) (concluding that a claim based on a product that was manufactured prior to the bankruptcy but exploded afterwards was not a Code claim subject to discharge).

[172] 11 U.S.C. § 524(g)(4)(B), (g)(5).

actions seeking recovery for damages allegedly caused by the presence of, or

exposure to, asbestos or asbestos-containing products;[173]

- Be funded in whole or in part by the securities of one or more debtors involved in the

  plan and by the obligation of such debtor or debtors to make future payments,

  including dividends;[174]

- Own, or by the exercise of rights granted under the plan be entitled to own if

  specified contingencies occur, a majority of the voting shares of: each such debtor;

  the parent corporation of each such debtor; or a subsidiary of each such debtor that is

  also a debtor;[175] and

- Use its assets or income to pay claims and demands.[176]

In addition, section 524(g) provides that any separate class or classes of the claimants

whose claims are to be addressed by a section 524(g) Trust must vote, by at least 75 percent of

those voting, in favor of the plan.[177]

Importantly, Congress did not intend for section 524(g) to alter any authority the court

already had to deal with Future Claims prior to the Bankruptcy Reform Act of 1994, either

through discharging those claims or through using the section 105 powers the *Johns-Manville*

court relied upon to channel those claims to a Trust.  The Act expressly states that the

amendment "shall not be construed to modify, impair, or supersede any other authority the court

has to issue injunctions in connection with an order confirming a plan of reorganization."[178]

---

[173]  11 U.S.C. § 524(g)(2)(B)(i)(I).
[174]  11 U.S.C. § 524(g)(2)(B)(i)(II).
[175]  11 U.S.C. § 524(g)(2)(B)(i)(III).
[176]  11 U.S.C. § 524(g)(2)(B)(i)(IV).
[177]  11 U.S.C. § 524(g)(2)(B)(ii)(IV).
[178]  Pub. L. No. 103-394, § 111(b), 108 Stat. 4106, 4117 (1994).

Section 524(g) is therefore only one way that Garlock may permanently resolve its responsibility for asbestos claims.

Garlock's Chapter 11 petition stayed approximately 100,000 pending cases across the country and consolidated them in one forum, where an aggregate adjustment of liability can be made. Garlock and its bankruptcy estate are now free from the duress of mass asbestos litigation—over $25 million in annual defense costs, the constant threat of multiple ruinous judgments, and the tremendous burdens that mass tort cases in dozens of forums place on management. From this point, the path through Chapter 11 to resolution of Garlock's asbestos responsibility is well-worn. Dozens of bankruptcies of mass tort defendants far more culpable than Garlock have resulted in full and final resolutions of defendants' liability through the establishment of post-confirmation trusts to assume, process, and pay current and future tort claims.[179]

### B.    Garlock will follow a proven pathway to resolution of its asbestos litigation

In these Chapter 11 cases, Garlock will first seek to determine the true extent of its responsibility for asbestos claims through a two-stage process: claims allowance and claims estimation.

- In the allowance proceedings, Garlock will ask the Court to establish a bar date for asbestos claims followed by a questionnaire seeking detailed information from claimants who file proofs of claim.[180] Garlock will then object to timely filed asbestos claims for which there is insufficient scientific evidence to hold Garlock responsible.

---

[179] *See, e.g.*, *In re Johns-Manville Corp.*, 78 B.R. 407, 408 (S.D.N.Y. 1987); Order Confirming the Sixth Amended Joint Plan of Reorganization, *In re Owens Corning*, No. 00-3837 (Bankr. D. Del. Sept. 26, 2006) (order confirming plan of reorganization).

[180] *See In re A.H. Robins Co.*, 88 B.R. 742, 745 (E.D. Va. 1988) *aff'd sub nom. Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694 (4th Cir. 1989).

- In the estimation proceedings, Garlock will ask the Court to estimate any liability that Garlock may have for present asbestos claims surviving the claims allowance proceedings, and for Future Claims similar to those present claims.

Through these two stages, an aggregate determination of Garlock's liability will be made, taking into account, among other things, (a) the extent to which the top tier defendants, and not Garlock, caused the plaintiffs' injuries, and (b) the extent to which, even in cases where Garlock may be liable with the top tier defendants, the Trusts are actually compensating plaintiffs for their injuries. This proceeding will effectively reintegrate the Trust and the tort systems to facilitate an accurate determination of Garlock's responsibility for asbestos claims.

After an estimation order determines the amount of Garlock's aggregate liability, Garlock will seek confirmation of a Chapter 11 plan of reorganization pursuant to which Garlock will create a post-confirmation trust to process and resolve all legitimate asbestos claims. Garlock will fund such Trust with assets equal in value to the amount estimated by the Court. In conjunction with the plan, Garlock will seek issuance of a channeling injunction by the district court (a) channeling all asbestos claims to the post-confirmation trust for claims resolution and remedies and (b) enjoining all asbestos claimants from pursuing remedies from Garlock, its affiliates, and other protected persons. This process will fully, fairly, and finally resolve Garlock's responsibility for asbestos claims. It will also provide a means by which persons holding legitimate asbestos claims can receive full compensation, promptly and without high transaction costs.

Almost every case that has followed this path has been successfully resolved through a *consensual* reorganization plan. The successful cases include companies like Garlock engulfed in contentious, expensive litigation where equity was preserved despite allegations by tort

claimants that their liabilities far exceeded the value of the company.[181]  Like most Chapter 11

cases, each successful asbestos case settled before the bankruptcy court rendered an estimation of

the contested value of the tort claims, and Garlock hopes that will occur in these cases.  But

Garlock will move quickly to establish and implement procedures to facilitate prompt resolution

of these cases through litigation if necessary.

### C.    Garlock's planned pathway to resolution

Garlock's anticipated course in these cases is set forth below in more detail.  Each of the

referenced procedures has been employed in previous mass tort bankruptcy cases, including the

leading Fourth Circuit case of *A.H. Robins*.

### 1.    *Protecting the reorganization process from collateral attack*

The automatic stay, effective upon filing of the petitions, will protect the debtors from

pending asbestos litigation as well as new lawsuits.[182]  This and other provisions giving the Court

sole jurisdiction over the debtors' estates will effectively consolidate the asbestos litigation in

this Court.[183]

In addition, Garlock has moved to protect certain Affiliates (as defined in the motion)

from asbestos litigation during the pendency of the cases.  Plaintiffs' firms name Garlock's

Affiliates (principally EnPro and Coltec) in hundreds of cases each year.  These cases generally

allege that the Affiliates should be held liable for the plaintiffs' asbestos-related injuries because

---

[181]  *See, e.g.*, *Official Committee of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456
    F.3d 668, 671 (6th Cir. 2006); Plan Proponents' Phase II Brief Regarding Bank Lender Issues in Support of
    Confirmation of Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code at 1, *In re W.R. Grace
    & Co.*, No. 01-01139 (Bankr. D. Del. Aug. 7, 2009) ("[E]quity would receive value" under the W.R. Grace plan,
    to which the asbestos claimant constituency consented).
[182]  11 U.S.C. § 362(a).
[183]  *See* S. Elizabeth Gibson, Fed. Judicial Ctr., *Judicial Management of Mass Tort Bankruptcy Cases* 17 (2005)
    ("One of the frequently cited advantages of using the bankruptcy system to resolve mass tort litigation is the
    system's capacity to consolidate the pending mass tort litigation in the district in which the bankruptcy case is
    filed.").

they are alter egos or successors in interest to Garlock, or because they used Garlock's products.

Significantly, the Affiliates have never paid a claim, and it has become clear to Garlock and the

Affiliates that claims against the Affiliates are used by plaintiffs as leverage to obtain higher

settlements from Garlock.

    With the automatic stay protecting Garlock, plaintiffs' firms will collaterally attack the

estate by pursuing their claims against the Affiliates.  If Garlock's history is a guide, they will

increase the number of their clients that target the Affiliates.  As set forth in Garlock's Motion

For Temporary Restraining Order and Preliminary Injunction, the Affiliates' losses associated

with such claims are covered in part by the same substantial pool of insurance and other assets

that will be used by Garlock to pay legitimate asbestos claims.  Such claims should be resolved

in these cases, and insurance should not be dissipated in the interim by more of the same

spurious or inflated demands, of the kind that have forced Garlock into bankruptcy.  These issues

are set forth in detail in the motion, filed contemporaneously with this Information Brief.

### 2.    *Appointment of Asbestos Claimants' Committee and Future Claims Representative*

    In asbestos bankruptcy cases, putative tort claimants typically receive representation on a

committee separate from other unsecured creditors.[184]  These Asbestos Claimants' Committees

represent asbestos claimants in matters that affect the interests of the class of such claimants,

which may include the estimation proceedings and formulation of a reorganization plan. The

Court may appoint an Asbestos Claimants' Committee early in the case.

    In addition, to protect the rights of persons who might assert Future Claims and ensure

that any resolution of Garlock's asbestos litigation includes Future Claims, Garlock will move

the Court to appoint a Future Claims Representative ("FCR").  Section 524(g)(4)(B)(i) requires

---

[184]  Gibson, *supra* note 183, at 38.

appointment of such a legal representative to protect the rights of persons who might

subsequently assert demands as a prerequisite to the enforceability of any injunction that the

district court might enter under section 524(g).

The FCR will have the right to engage counsel and other appropriate professionals and

appear and be heard on contested matters that may affect the rights of demand holders,

principally claims estimation and plan formulation and confirmation.  During the estimation trial,

the FCR can put on expert testimony regarding the value of demands against Garlock.

The FCR will also negotiate with other constituents regarding the essential features of the

Chapter 11 reorganization plan, including the amount of funding for the post-confirmation trust,

how Trust assets will be allocated among claims for different types of diseases, and the terms for

liquidation and payment of asbestos claims by the Trust.

### 3.        Establishment of asbestos claims bar date and proof of claim process

Early in the case, Garlock will move to establish a bar date applicable to asbestos

claimants.[185]  Just as in any bankruptcy case, the bar date is necessary to bring the claimants

within the jurisdiction of the Court for purposes of claim allowance/disallowance and voting on

---

[185] *See In re Dow Corning Corp.*, 142 F.3d 433, 1998 WL 180594, at *1 (6th Cir. 1998) (bar date established in mass tort case addressing claims for injuries allegedly caused by breast implants); *Maressa v. A.H. Robins Co.*, 839 F.2d 220, 221 (4th Cir. 1988) (discussing bar date for mass bodily injury claims), *cert. denied*, 488 U.S. 826 (1988); *In re Babcock & Wilcox Co.*, 2000 WL 1511175, at *1 (E.D. La. Oct. 6, 2000) (same); *In re W.R. Grace & Co.*, No. 01-01139 (Bankr. D. Del. Aug. 24, 2006) (setting bar date for asbestos bodily injury claims); *In re Eagle Picher Indus., Inc.*, 137 B.R. 679, 682 (Bankr. S.D. Ohio 1992) (discussing bar date for mass asbestos bodily injury claims).

the plan.[186]  Bar dates have been used in many mass tort bankruptcies, including the *A.H. Robins* case.[187]

Because the asbestos claims against Garlock are contingent and unliquidated, the Code and Rules require proofs of claim.[188]  In cases where liability for tort claims is contested, courts typically order proof of claim forms (or alternatively, questionnaires to accompany proof of claim forms) that require claimants to provide more than the usual level of detail.[189]  Garlock will similarly seek proofs of claim that require claimants to set out their disease category, their medical evidence, and a forecast of their evidence of exposure to Garlock products and other companies' asbestos products, among other information.

This information is necessary for determination and estimation of Garlock's true responsibility.  The proofs of claim will provide the factual predicate for the Court to determine both the validity of the claims and, for any legitimate claims, their value.  Providing this evidence will not be burdensome because all or nearly all of the current claimants are simultaneously litigating against many defendants other than Garlock in the tort system, where they are already generating (or should be responsible for generating) much of the evidence Garlock will seek.

---

[186]  *See First Fid. Bank, N.A. v. Hooker Invs., Inc. (In re Hooker Invs., Inc.)*, 937 F.2d 833, 840 (2d Cir. 1991) (bar date is "an integral part of the reorganization process" because it enables the court to identify claimants, allow and disallow claims, and determine the value of claims); Gibson, supra note 183, at 73 (bar date in an asbestos bankruptcy allows valuation of current claims and identification of persons eligible to vote for the plan).

[187]  *See, e.g.*, *Vancouver Women's Health Collective Soc'y v. A.H. Robins Co.*, 820 F.2d 1359, 1360 (4th Cir. 1987); *In re Babcock & Wilcox Co.*, No. 00-0558, slip op. at 7–8 (E.D. La. Oct. 30, 2000); *In re Dow Corning Corp.*, 211 B.R. 545, 554 (Bankr. E.D. Mich. 1997); *In re Celotex Corp.*, 204 B.R. 586, 593 (Bankr. M.D. Fla. 1996).

[188]  11 U.S.C. §§ 501, 502(a); Fed. R. Bankr. P. 3003(c); Gibson, supra note 183, at 18 ("[A] creditor not listed by the debtor as having an undisputed, non-contingent, liquidated claim must file a proof of claim in the bankruptcy court."); *id.* at 72 ("[T]he Bankruptcy Code requires the holders of these claims to file proofs of claim in order for their claims to be allowed"); *id.* at 131 ("Allowing voting by holders of unliquidated tort claims who have not filed proofs of claim . . . is contrary to the Bankruptcy Code and Rules.").

[189]  *See In re A.H. Robins Co.*, 862 F.2d 1092, 1093 (4th Cir. 1988); Order Regarding Debtors' Motion for Entry of an Order Establishing a Bar Date, Approving the Proof of Claim Form, and Approving the Form and Manner of Notice, *In re Babcock & Wilcox Co.*, No. 00-0558 (E.D. La. Oct. 30, 2000); Case Management Order for the Estimation of Asbestos Personal Injury Liabilities, *In re W.R. Grace & Co.*, No. 01-1139 (Bankr. D. Del. Aug. 29, 2005).

### 4.    *Disallowance of claims through resolution of common threshold issues*

After the proofs of claim have been filed, Garlock will move to consolidate under Federal Rule of Civil Procedure 42 claims that have a common question of law or fact, and then move to disallow claims that are not supported by evidence.[190]  The proofs of claim and questionnaires will provide the medical and exposure evidence necessary to test the claims.  During this process, Garlock will move to exclude any scientific or expert evidence offered to support these claims that does not meet the standards of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), a procedural rule that applies in federal proceedings like this bankruptcy case.[191]  Evidence proffered to show that a product causes disease will not be admissible unless there is "an established scientific connection between exposure and illness," including "information on the level of exposure necessary for a person to sustain" injuries.[192]

If the admissible evidence offered to support a claim is not sufficient to create a jury issue under Rule 56, Garlock will move for summary judgment.[193]  Even if enough evidence exists to go to trial, Garlock may seek consolidation of similar claims for trial under Rule 42.

The kinds of claims Garlock will move to disallow under these principles include at least the following:

- Claims where the only provable injury is lung cancer or non-malignant disease, on the ground that Garlock's non-friable asbestos-containing gaskets and packing cannot have caused these diseases;

---

[190]  11 U.S.C. § 502(b).

[191]  *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 358 (4th Cir. 2007) (Whitney, J., concurring); *In re W.R. Grace & Co.*, 355 B.R. 462, 470 (Bankr. D. Del. 2006); *In re Dow Corning Corp.*, 211 B.R. 545, 590 (Bankr. E.D. Mich. 1997).

[192]  *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir. 1998).

[193]  *See In re Dow Corning Corp.*, 215 B.R. 346, 361 (Bankr. E.D. Mich. 1997) (holding that a bankruptcy court has the power to adjudicate threshold issues under *Daubert* and Rule 56 and disallow claims that could not be sustained under those rules).

- Mesothelioma claims, where the claimant alleges injury solely on the basis of exposure to Garlock's chrysotile-containing products, on the ground that there is no reliable scientific evidence showing that exposure from chrysotile at the levels that occur from ordinary use of gaskets and packing can cause mesothelioma, and that there is substantial evidence to the contrary;

- All other claims where the plaintiff cannot prove exposure to asbestos emitted by Garlock products that conceivably could have caused any asbestos-related disease; and

- Claims not supported by adequate medical evidence, or filed by persons suffering no impairment.

## 5.      *Estimation of asbestos liability*

Once the universe of current claims with any value has been defined, Garlock will seek an estimation of the value of those claims (and future claims like them) against Garlock.  The bankruptcy and district court have the authority to estimate the aggregate liability.[194]  Indeed, it is necessary for the Court to perform an aggregate estimation for many purposes, including to inform the best interests and feasibility analyses that are preconditions to confirmation, to determine whether at least two-thirds of the class in terms of claim value have voted in favor of the plan, and to provide a backdrop against which negotiation of a consensual plan may occur.[195]

As a necessary part of this estimation process, Garlock will seek discovery from the existing Trusts regarding evidence submitted by claimants over the past decade, and payments those claimants received from the Trusts.  As described above, this information is not publicly

---

[194] *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1012 (4th Cir. 1986); *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 681 (Bankr. S.D. Ohio 1995).

[195] *See In re A.H. Robins Co.*, 880 F.2d 709, 720 (4th Cir. 1989) ("As a basis for any plan of reorganization it was necessary that an estimation be made of the unliquidated claims against the debtor under Section 502(c) of the Bankruptcy Code . . . ."); Gibson, supra note 183, at 88.

available, so Garlock will seek to obtain this information from the Trusts early in the case.  Only with this information will Garlock be able to determine how much of the total current and future liability the Trusts are and should be covering, and thus how big Garlock's share of the remaining liability should be now and in the future.

The information on claims filed against the Trusts is also relevant to prove how the Trusts have been isolated from the tort system, contributing to the maintenance of Garlock's resolution values at inflated levels.  Garlock will expose to the light of day the practice of avoiding disclosure of evidence against Trusts to tort system defendants like Garlock.

With the information from the proofs of claim and the Trusts in hand, Garlock's experts will be able to estimate its aggregate liability.  For the sake of efficiency, expert discovery leading up to the estimation trial may run concurrently with the consolidation and disallowance of claims process.  In connection with its motion to establish a bar date, Garlock will propose a detailed Case Management Order to govern the allowance/disallowance and estimation proceedings, as well as the discovery that must occur in conjunction with those proceedings.

Both allowance and disallowance of claims against the estate and estimation of claims generally constitute core proceedings.[196]  There are, however, special jurisdictional rules for personal injury tort and wrongful death claims.[197]  Early in the case, Garlock will, in conjunction with its motion to establish a bar date and a Case Management Order, propose an appropriate division of oversight of such issues between this Court and the district court, consistent with this Court's statutory jurisdiction.

---

[196] 28 U.S.C. § 157(b)(2)(B).

[197] *Id.*

### 6. *Confirmation of the reorganization plan*

Finally, Garlock will propose a plan in which it will fund a Trust to pay one hundred percent of the value of legitimate claims, current and future.  The estimated aggregate liability (plus the expected costs of operating the Trust) will serve as a cap on Garlock's obligation to fund the Trust.[198]  Pursuant to the plan, the asbestos liabilities of the debtors (and related parties) will be discharged.  The debtors (and related parties) will then be protected by an injunction that will channel all current and future asbestos claims to a Trust.

The Trust will also be structured so as to qualify the debtors and related parties for protection under section 524(g) of the Code.[199]  Section 524(g) requires satisfaction of numerous conditions to obtain the protection of the safe harbor, each of which Garlock will seek to satisfy.[200]

Indeed, Garlock has hopes that once claimants without viable claims have been excluded, and Garlock has promised full payment of Garlock's obligation to any remaining current claimants that may exist, it will be possible to confirm a consensual plan.  But history teaches that prior to identification of such claimants, the putative asbestos claimant constituency will likely oppose nearly everything Garlock has proposed here.  This constituency is dominated not by individual asbestos claimants, but by the plaintiffs' firms that have a vested interest in the current fracturing of the Trust and tort systems.

---

[198]  *See, e.g.*, *In re A.H. Robins Co., Inc.*, 88 B.R. 742, 746 (1988), *aff'd sub nom. Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694 (4th Cir. 1989); Gibson, supra note 183, at 87.

[199]  Section 524(g) is not the exclusive means for resolving mass tort liability in bankruptcy, however.  Johns-Manville and other asbestos defendants successfully resolved their liabilities before passage of section 524(g), relying on section 105 and the discharge provisions of the Code.  Indeed, because section 524(g) only applies to asbestos cases, cases involving other kinds of products liability have also relied on section 105 and the discharge provisions to achieve resolution.  *See, e.g.*, *In re A.H. Robins Co., Inc.*, 88 B.R. 742, 754 (1988), *aff'd sub nom. Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694 (4th Cir. 1989).  Finally, the act by which Congress added section 524(g) stated that it "shall not be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."  Pub. L. No. 103-394, § 111(b), 108 Stat. 4106, 4117 (1994).

[200]  *See* Gibson, supra note 183, at 138.

History also shows, however, that the putative asbestos claimant constituency may be willing to enter into a reasonable settlement before these issues are fully litigated.  This result occurred recently in the bankruptcy of W.R. Grace, where the debtor, like Garlock, disputed the size of its aggregate asbestos liability.  The debtors contended that Grace's tort system resolution values vastly overstated its true liability for asbestos claims, and that Grace was solvent, while the asbestos claimants contended that Grace was not solvent given the alleged size of the future asbestos liability.  The court imposed a bar date and a proof of claim process involving detailed questionnaires that claimants were required to complete.  The court then held a trial to estimate Grace's liability for asbestos claims.  Before the trial concluded, the asbestos claimants committee and the future claims representative agreed to a plan that preserved equity.  The common stock in W.R. Grace today is worth over $1.7 billion.[201]  Other cases of disputed liability have also seen settlements where equity preserved value.[202]

In the absence of consent by the putative asbestos claimant constituency, Garlock will seek to confirm a plan over its objection, so that it may fund any legitimate claims that may exist at one hundred cents on the dollar and preserve equity to which Garlock's shareholders are entitled.

---

[201]  Yahoo! Finance, http://finance.yahoo.com/q?s=GRA (last visited June 5, 2010).

[202]  *See, e.g.*, *Official Committee of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668 (6th Cir. 2006) (discussing Dow Corning as a "solvent bankruptcy").

This 7th day of June, 2010.

Respectfully submitted,

/s/ Garland S. Cassada
Garland S. Cassada
N.C. Bar No. 12352
Richard C. Worf
N.C. Bar No. 37143

ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, NC  28246
Telephone:  (704) 377-2536
Facsimile:   (704) 378-4000

gcassada@rbh.com
rworf@rbh.com

*Proposed Special Corporate and Litigation Counsel to the
Debtors Garlock Sealing Technologies LLC, Garrison
Litigation Management Group, Ltd., and The Anchor
Packing Company*