# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

|  |  |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC[1], et al.<br><br>      Debtors. | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered[2] |
| GARLOCK SEALING TECHNOLOGIES LLC, GARRISON LITIGATION MANAGEMENT GROUP LTD., and THE ANCHOR PACKING COMPANY,<br><br>      Plaintiffs<br><br>      v.<br><br>THOSE PARTIES LISTED ON EXHIBIT B TO COMPLAINT, and UNKNOWN ASBESTOS CLAIMANTS,<br><br>      Defendants. | Adversary Proceeding No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

[1]     The Debtors include Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

[2]     The Debtors have filed a Motion for Joint Administration seeking to jointly administer each of the Debtors' cases with Garlock Sealing Technologies LLC serving as the lead case.

The plaintiffs, as debtors and debtors-in-possession in the above-captioned jointly administered Chapter 11 cases (the "Cases"), and as plaintiffs in the above-captioned adversary proceeding, allege for their complaint, upon knowledge of their own acts and upon information and belief as to all other matters, as follows:

## SUMMARY OF ACTION

1.      This is an adversary proceeding brought pursuant to Fed. R. Bankr. P. 7001(7) and (9) and Fed. R. Bankr. P. 7065, for judgment enjoining the Defendants from prosecuting pending asbestos-related actions (the "Pending Asbestos Actions"), and from commencing new actions or proceedings asserting asbestos-related claims (the "Future Asbestos Actions"), against those affiliates or assignees of the Debtors listed on Exhibit A (the "Affiliates"), except pursuant to the terms of any plan or plans of reorganization to be confirmed in the Cases.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and (e), and 157(b)(1).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

3.      Venue of this action in this district is proper pursuant to 28 U.S.C. § 1409.

4.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 362(a)(1) and (a)(3), 11 U.S.C. § 105(a), 28 U.S.C. § 1334, 28 U.S.C. § 2201, and Fed. R. Bankr. P. 7065.

## THE PARTIES

5.      The Debtors are the plaintiffs in this adversary proceeding.

6.      Each Defendant is a plaintiff in one of the Pending Asbestos Actions. A list of the Defendants is attached hereto as Exhibit B.  The list contains over thirty thousand names.  Should the Court require a listing of Defendants in electronic format, an electronic version of this list will be provided upon the Court's request.

- 2 -

7.      The Unknown Asbestos Claimants named as co-Defendants in this adversary proceeding represent plaintiffs in Future Asbestos Actions against the Affiliates, and as such currently are unknown to the Debtors.

## BACKGROUND

### A.      The Debtors and Their Affiliates

8.      On June 5, 2010 (the "Petition Date"), The Anchor Packing Company ("Anchor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

9.      Anchor is a North Carolina Corporation wholly owned by Garrison Litigation Management Group, Ltd. ("Garrison"), a North Carolina corporation that also filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on the Petition Date.

10.     On the Petition Date, Garlock Sealing Technologies LLC, a North Carolina limited liability company (individually "Garlock," and together with Anchor and Garrison, the "Debtors"), also filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

11.     Garrison and Garlock are wholly owned subsidiaries of Coltec Industries Inc ("Coltec"), which in turn is a wholly owned subsidiary of EnPro Industries, Inc. ("EnPro"), which is headquartered in Charlotte, North Carolina.  Neither Coltec nor EnPro are debtors in the Cases or any other case under the Bankruptcy Code.

12.     Each of the Debtors is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  The Debtors expect the Court to order that the Chapter 11 cases be jointly administered.

13.     The Affiliates are affiliates of the Debtors, and indirect subsidiaries of EnPro.

### B.      The Asbestos Litigation

14.     Garlock produces and sells fluid-sealing products, including gaskets and compression packing.  Some of Garlock's former gasket and packing products contained asbestos.  As a result, since the mid-1970s, Garlock has faced hundreds of thousands of claims from individuals alleging that exposure to Garlock's products contributed to asbestos-related personal injuries.

- 3 -

15.     Anchor formerly was a wholly owned subsidiary of Garlock.  Anchor distributed Garlock's gaskets and packing as well as other sealing products, and received a substantial number of asbestos claims related to such products.  Anchor has depleted its insurance, cash and other assets paying asbestos defense and settlement claims and has ceased business operations, but it still receives hundreds of new asbestos claims each year.  Claims against Debtors by individuals alleging that exposure to products produced or sold by Garlock or Anchor contributed to asbestos-related personal injuries are hereinafter referred to as "Asbestos Claims" and the individuals asserting such claims as "Asbestos Claimants."

16.     Garrison manages the defense and resolution of Asbestos Claims, and Garrison has been assigned rights to obtain reimbursement of Garlock's asbestos-related defense costs and liabilities under insurance policies that provide coverage for Asbestos Claims against Garlock.

17.     The Debtors have compelling defenses to liability.  The asbestos in the products made with asbestos was encapsulated.  In the gaskets, the asbestos fibers were mixed with a binder, such as rubber or neoprene.  The packing was made with asbestos yarn impregnated and coated with lubricants, such as Teflon or graphite.  Normal use of the Garlock products made with asbestos did not result in medically significant exposures and any exposure was well below the Permissible Exposure Limits established by the Occupational Safety and Health Administration.  Moreover, the overwhelming majority of the Garlock products at issue were made with chrysotile, an asbestos fiber type with the least potential to cause disease.

18.     Garlock's products were used in environments, however, that contained high quantities of dangerous thermal insulation and other products with highly friable asbestos produced by other manufacturers, including: Pittsburgh Corning, Owens Corning, Fibreboard, Babcock & Wilcox, Armstrong World Industries, GAF, U.S. Gypsum, Turner & Newell, and W.R. Grace (the "Top Tier Defendants").  In addition, many of these products were made with asbestos fiber types with the greatest potential to cause disease.  Individuals who installed and removed Garlock's asbestos-containing gaskets and packing also necessarily handled, or worked in proximity to other workers handling, products

- 4 -

produced by the Top Tier Defendants and other manufacturers of friable asbestos products.  Garlock rarely lost at trial.  Because Garlock's products were so often used in conjunction with numerous products that undoubtedly caused asbestos disease, Asbestos Claimants found it difficult to prove that, in light of myriad friable products releasing asbestos fibers that were used around Garlock's encapsulated asbestos products, Garlock's products were a substantial contributing cause of their injuries.

19.     Moreover, even if a jury found that Garlock's products contributed to an Asbestos Claimant's asbestos-related disease, any portion of damages assigned to Garlock was small or paid at a reduced share whether jurisdictions in which Garlock was sued followed principles of joint and several liability, or only several liability.

20.     As of December 31, 2009, Garlock and Anchor had received over 850,000 Asbestos Claims and paid approximately $1.37 billion in indemnity payments and $387 million in legal costs to resolve such claims.

21.     Prior to 2000, based on the nature of Garlock's products and the relative weakness of plaintiffs' cases against Garlock, Garlock was a peripheral defendant and the Top Tier Defendants, many of which were named in virtually every asbestos case, paid the lion's share of money necessary to resolve Asbestos Claims.  Nevertheless, Garlock incurred annually substantial expenses to defend and resolve tens of thousands of cases.  To avoid the prohibitively high costs of defending Asbestos Claims, Garlock was forced to make de minimis settlement payments to large numbers of claimants.

22.     From January 1, 2000 to December 31, 2002, all of the Top Tier Defendants filed Chapter 11 bankruptcies and the automatic stay under the Bankruptcy Code stopped asbestos litigation in the tort system against such companies.  The Top Tier Defendants' exit from the tort system was catastrophic for solvent defendants because in many states recognizing joint and several liability these remaining defendants faced the risk of bearing the Top Tier Defendants' enormous shares of damages in cases where they might be found even minimally liable.  During and subsequent to the Top Tier Defendants' bankruptcies, over 30 additional asbestos defendants (with the Top Tier Defendants, the "Bankrupts"), many of which produced products containing friable asbestos, also filed for Chapter 11

seeking relief from asbestos litigation.[3]  The automatic stay also stopped asbestos litigation against these

defendants in the tort system and such defendants ceased paying asbestos claims.  The bankruptcies of the

Bankrupts, more than 40 in all, are referred to herein as the "Bankruptcy Wave."

23.    During the Bankruptcy Wave, the cost and risk to the Debtors of Asbestos Claims

increased materially. Existing plaintiffs who had sued Garlock and the Bankrupts looked to the Debtors

(and other solvent peripheral defendants) to pay the lost several shares of the Bankrupts.  Because most of

the settlement payments previously received by plaintiffs were made by the Top Tier Defendants and

other Bankrupts, the transfer of liability was enormous.  Of greater impact, however, was a disturbing

trend in new Asbestos Claims asserted against the Debtors—Asbestos Claimants almost across the board

began testifying that they had no evidence of exposure to products of some or all of the Bankrupts, and in

many cases that Garlock's products were the only product, or one of only a handful of products, that

injured them.  This change in testimony, although highly dubious, was difficult for Garlock to rebut

because Asbestos Claimants alone controlled their testimony regarding which products they worked with

or around.

24.    By taking the position that they were not exposed to some or all of the Bankrupts'

products, Asbestos Claimants increased the trial risk for solvent defendants like the Debtors, effectively

transferring liability from the Bankrupts to solvent companies, even in several liability and hybrid

jurisdictions where the Debtors should have been protected from bearing the risk of the Bankrupts'

insolvencies.

---

[3]    These bankruptcy cases include Skinner Engine Co. (2001); E.J. Bartells (2001); United States
Minerals Products (2001); Murphy Marine Services (2001); Insul Co. (2001); Swan Transportation
(2001); North American Refractories Corp. (2002); Kaiser Aluminum (2002); Harbison-Walker (2002);
A.P. Green (2002); Plibrico Co. (2002); Shook & Fletcher (2002); Porter-Hayden Co. (2002); Artra
Group, Inc. (2002); Special Metals Corp. (2002); Asbestos Claims Management Corp. (2002); ACandS
(2002); JT Torpe Co. (2002); A-Best Products (2002); Western MacArthur/Western Asbestos (2002);
C.E. Thurston (2003); Combustion Engineering (2003); Congoleum Corp. (2003); Mid-Valley
(Halliburton subsidiaries) (2003); Muralo Co. (2003); Flitkote Co. (2004); Oglebay Norton Co. (ONCO)
(2004); Special Electric (2004); Quigley Co. (2004); Utex Industries (2004); API, Inc. (2005); Asarco;
Brauer Supply Co. (2005); Dana Corporation (2006); ABB Lummus Global (2006); and Lloyd E.
Mitchell Co. (2006).

1163711

25.    Because evidence of Asbestos Claimants' exposures to products of Top Tier Defendants and other Bankrupts is crucial to the Debtors' defense, the Debtors for the last decade have sought information in discovery from Asbestos Claimants regarding such exposures.  Asbestos Claimants have, however, consistently and almost uniformly minimized their exposure to products of many (if not all) Top Tier Defendants and other Bankrupts, crippling defenses that were very effective prior to the Bankruptcy Wave.

26.    As a result of joint and several liability principles and Asbestos Claimants ceasing to identify exposures to the Bankrupts' products, the Debtors' trial risk for Asbestos Claims increased substantially during and after the Bankruptcy Wave.  The Debtors not only bore the risk of paying the enormous unpaid several shares of the Bankrupts, but when many Asbestos Claimants targeted the Debtors' nonfriable asbestos products while not admitting to having evidence of exposures to highly friable products of the Bankrupts, it became easier for them to convince juries that trace levels of asbestos released by the Debtors' products contributed to Asbestos Claimants' diseases.

27.    Encouraged by this new, more successful strategy of targeting the Debtors while disclaiming having evidence of their clients' exposures to Bankrupts' products, plaintiffs' firms also began naming the Debtors in progressively higher percentages of cases filed.  The Debtors' average settlement value for mesothelioma claims increased over eight-fold from $9,100 in 1999 to $74,000 in 2009 and, because of the higher claims numbers, the total amount required annually by the Debtors to resolve such claims increased almost twelve-fold from approximately $6 million in 1999 to approximately $70 million in 2009.

28.    Until recently, the Debtors have believed that they would survive the Bankruptcy Wave because their trial risk and settlement values inevitably would decline substantially toward pre-Bankruptcy Wave levels.  This was based on the reasonable assumptions that, once the Top Tier Defendants and other Bankrupts emerged from Chapter 11 with asbestos trusts established and funded pursuant to Section 524(g) of the Bankruptcy Code (each a "524(g) Trust"), and once the 524(g) Trusts began processing and paying claims, (i) Asbestos Claimants would again admit to having been exposed to

- 7 -

products of such defendants so they could collect money from 524(g) Trusts, and (ii) like the Bankrupts before the wave, such 524(g) Trusts would assume most of the responsibility for funding Asbestos Claimants' damages.

29.    In recent years, numerous 524(g) Trusts with aggregate assets exceeding $20 billion indeed have emerged and these trusts have begun paying billions of dollars each year to resolve asbestos claims.  Yet plaintiffs' firms have continued to target the Debtors, and Asbestos Claimants in the tort system still rarely admit the extent to which they were exposed to products of the Bankrupts that established these 524(g) Trusts or that they had evidence of such exposures.

30.    At the same time that a large percentage of Asbestos Claimants have been denying to Garlock that they have exposures to the Bankrupts' products in discovery in the tort system, many of the very same claimants have been participating in bankruptcy cases of such Bankrupts and filing claims against 524(g) Trusts established by the Bankrupts based on certified statements and other evidence that they *did* have exposure to such Bankrupts' products.  Until recently, this evidence has been unknown and unavailable to the Debtors because Asbestos Claimants have appeared and voted in bankruptcy cases of Bankrupts, and filed claims against 524(g) Trusts, under cover of seal or confidentiality provisions.

31.    As a result, notwithstanding that most of the Top Tier Defendants have exited Chapter 11 with 524(g) Trusts paying their several shares, Garlock has been forced to continue to pay Asbestos Claims in numbers and for amounts grossly inflated by the Bankruptcy Wave and the practice of plaintiffs' withholding evidence of exposure to some of the Bankrupts' products.

32.    The Debtors together receive approximately 8,000 Asbestos Claims each year.  Cases against the Debtors appear continuously on trial dockets in state courts across the country.  To avoid suffering a continuous flow of large and ruinous verdicts based on evidentiary records distorted by the Bankruptcy Wave and lack of access to evidence of Asbestos Claimants' exposures to Bankrupts' products, the Debtors have been forced to pay over $100 million annually in settlement payments and defense costs to resolve thousands of Asbestos Claims.  In addition, the Debtors occasionally are unable to settle some Asbestos Claims and, in some resulting trials, Garlock has suffered huge verdicts.

- 8 -

33.     Many Asbestos Claimants also assert their Asbestos Claims against one or more of the Affiliates based on theories of derivative liability.  In addition, each year, several hundred Asbestos Claimants also have asserted their Asbestos Claims against one or more of the Affiliates based on allegations that such Affiliates used Garlock's asbestos-containing gaskets and packing products or other asbestos products in engines, compressors, pumps, and other equipment that such Affiliates produced and sold.  Such Affiliates have never paid a single Asbestos Claim, but Asbestos Claimants have used their claims against these Affiliates to put additional litigation pressure on the Debtors.

34.     Coltec and its predecessors purchased over one billion dollars of products liability insurance policies to cover defense costs and liability payments associated with, among other things, product liability claims against Coltec and its Affiliates, including Garlock (the "Insurance Policies").  As a Coltec subsidiary, Garlock is entitled under the Insurance Policies in effect on or after January 1, 1976 to coverage for defense costs and liability payments associated with Asbestos Claims that trigger such Insurance Policies.  Prior to these Cases, proceeds from the Insurance Policies have been used to pay a portion of the defense costs incurred and indemnity payments made to resolve Asbestos Claims against Garlock.  In addition to Garlock, however, Coltec and its affiliates also have rights to coverage of defense costs and liability payments under the Insurance Policies protecting the Affiliates from asbestos-related losses from Pending Asbestos Actions and Future Asbestos Actions, including those arising from claims alleging injury from Garlock's products.  To the extent that any Affiliate is required to incur defense costs and pay settlements or judgments in any Future Asbestos Actions or Pending Asbestos Actions, such Affiliate is entitled to coverage for defense costs and liability payments under the Insurance Policies for any such claim that triggers such Insurance Policies.

35.     As of December 31, 2009, $238.6 million dollars of insurance coverage or insurance receivables arising from settlements with insurance carriers existed under the Insurance Policies in effect after December 31, 1975 (the "Available Shared Insurance").  As of the Petition Date, however, the continuous flow of claims settlements and defense costs required by trial dockets had reduced the

Available Shared Insurance to approximately $192 million, where it remains today.  The Debtor's interest in the Available Shared Insurance is one of the largest assets of the estates of the Debtors.

36.     In addition to indemnity rights under the Insurance Policies held by the Debtors, Garlock holds two separate promissory notes in the aggregate face amount of approximately $227 million issued by Coltec ($73,381,000) and Stemco LP, a Texas limited partnership wholly owned by Coltec ($153,865,000) (collectively, the "Coltec Notes").  Garlock acquired the Coltec Notes from Coltec and Stemco LP in 2005 in exchange for three of Garlock's businesses that never produced asbestos-containing products, (i) Stemco, LLC, (ii) Coltec Industrial Products, Inc., and (iii) GGB LLC.

37.     In the absence of regular Coltec Note payments, Garlock for several years would have been unable to fund uninsured indemnity payments and defense costs associated with Asbestos Claims. To the extent that either Coltec or Stemco LP suffers any asbestos-related losses associated with Pending Asbestos Actions or Future Asbestos Actions, however, such note maker is entitled to indemnity from Garlock and to set off the amount of such losses against such maker's payments to Garlock as they come due under the applicable Coltec Note.

38.     With Asbestos Claimants unable to pursue their Asbestos Claims against the Debtors by virtue of the automatic stay, Asbestos Claimants will continue to pursue Pending Asbestos Actions and file and pursue an increasing number of Future Asbestos Actions against the Affiliates.  Because the same Insurance Policies available to fund Garlock's defense costs and liability payments for Asbestos Claims are available to fund claims based on Pending Asbestos Actions and Future Asbestos Actions brought against the Affiliates, if litigation proceeds against the Affiliates, the Available Shared Insurance and the Coltec Notes will continue to be reduced, undercutting the value of two principal assets of the estates.

C.     **The Need for Relief Under Chapter 11**

39.     The Debtors were forced to commence these Cases because they have been overwhelmed by increases in the value of Asbestos Claims caused by the Bankruptcy Wave, the transfer of liability from the Top Tier Defendants and other Bankrupts to Garlock pursuant to joint and several liability principles, and Garlock's lack of access to evidence of Asbestos Claimants' claims against and recoveries

- 10 -

from 524(g) Trusts established by the Bankrupts.  The tort system does not provide the Debtors any realistic opportunity to define and resolve their actual responsibility for Asbestos Claims. The Bankruptcy Wave has saddled the Debtors with hundreds of millions of dollars of duplicative claims payments that should be paid, and in fact are being paid, by 524(g) Trusts.

40.     The Debtors have no prospect of near term relief from plaintiffs' continued practice of denying Garlock access to Asbestos Claimants' claims against 524(g) Trusts or evidence supporting such claims.  The Debtors, have sought transparency in the procedures by which Asbestos Claimants file claims against 524(g) Trusts and appear in Chapter 11 cases.  The Debtors also have sought discovery of the identities of Asbestos Claimants who have appeared in Chapter 11 cases of certain Top Tier Defendants alleging they have claims against such companies while simultaneously denying to Garlock in the tort system that they were injured by the products of such companies.  Representatives for the Plaintiffs' Bar have vehemently resisted having to reveal the names of any Asbestos Claimant who may have appeared in the Bankrupts' Chapter 11 cases or filed claims against 524(g) Trusts, and they have objected to any reform that would make filing claims against Bankrupts and 524(g) Trusts transparent.

41.     If the Debtors had continued to defend Asbestos Claims in the tort system, the unabated costs of defending and settling Asbestos Claims would have quickly depleted the Available Shared Insurance and Coltec Notes and threatened Garlock's core business.

42.     Until recently, Garlock believed it would be able to obtain relief from the continuing material losses Garlock has suffered, and continues to suffer, from co-defendant bankruptcies.  Recent events, however, have made it clear that a fair determination of Garlock's responsibility for valid Asbestos Claims can only be obtained in Chapter 11.

43.     As of the Petition Date, two of the Debtors' largest assets are the Available Shared Insurance and the Coltec Notes.

44.     The Debtors intend as part of their Chapter 11 plan of reorganization to use some of the value of these assets to create and fund a Section 524(g) trust, or other post-confirmation trust, that will assume, process and pay the costs of resolving valid Asbestos Claims against the Debtors.

1163711

45.     Pending Asbestos Actions and Future Asbestos Actions against the Affiliates, including those based on alleged injuries from Garlock's products, threaten the successful reorganization by diminishing the Available Shared Insurance and the Coltec Notes, and by distracting the attention of key personnel whose efforts better would be spent on the Debtor's reorganization and development of a Chapter 11 plan.  Likewise, actions against the Affiliates present significant risk of evidentiary prejudice and collateral estoppel inasmuch as the Debtors may be bound by judgments in cases against the Affiliates.

## NATURE OF RELIEF REQUESTED

46.     Pursuant to Section 362(a) of the Bankruptcy Code, asbestos-related personal injury actions have been stayed as against the Debtors.  By this Complaint, the Debtors seek this Court's declaration that, pursuant to Sections 362(a)(1) and (a)(3) of the Bankruptcy Code, continued prosecution of the Pending Asbestos Actions against the Affiliates is stayed during the pendency of the Cases.  The Debtors also seek this Court's declaration that, pursuant to Sections 362(a)(1) and (a)(3) of the Bankruptcy Code, commencement or continuation of Future Asbestos Actions against the Affiliates is likewise stayed during the pendency of the Cases.  In addition, the Debtors seek to enjoin prosecution of the Pending Asbestos Actions and Future Asbestos Actions against the Affiliates, pursuant to Sections 105 and 362 of the Bankruptcy Code, or in the alternative 28 U.S.C. § 1334, during the pendency of the Cases.

47.     The Debtors also seek the issuance of a temporary restraining order to restrain the Defendants from continued prosecution of the Pending Asbestos Actions and Future Asbestos Actions between the date of the filing of this Complaint and the date this Court rules on the Debtors' request for preliminary injunction.

## PLAINTIFFS' FIRST CLAIM FOR RELIEF
(DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201 AND SECTIONS 362(a)(1) AND (a)(3) OF THE BANKRUPTCY CODE)

48.     The Debtors reallege paragraphs 1 through 47 of this Complaint.

- 12 -

49.     A declaratory judgment that Asbestos Claims against the Affiliates are enjoined is warranted in this case because asbestos-related claims against the Affiliates will diminish one or both of two material assets of the Debtors' estates, the Available Shared Insurance and the Coltec Notes.   In addition, many of the Asbestos Claims against the Affiliates are wholly derivative of, and all of the Affiliates' purported liability is identical to, the Debtors' alleged liability.  In these cases, there is such identity of interest between the Debtors and the Affiliates that the Pending Asbestos Actions and Future Asbestos Actions are in reality claims against the Debtors.  Therefore, they should be subject to the automatic stay.

50.     Failure to extend the automatic stay to Pending Asbestos Actions and Future Asbestos Actions will jeopardize the Debtors' reorganization under Chapter 11, and will subject the Debtors to further irreparable harm including but not limited to:

51.     Diminishment of Available Shared Insurance:   Costs incurred by allowing Pending Asbestos Actions to proceed and Future Asbestos Actions to commence against the Affiliates will diminish the Available Shared Insurance and strip the Debtors' Chapter 11 estate.  Because the Available Shared Insurance will be necessary to fund a Section 524(g) Trust as part of the Debtors' Chapter 11 plan of reorganization, allowing asbestos-related claims against Affiliates to proceed threatens the likelihood of a successful reorganization.   In effect, refusal to extend the automatic stay to Pending Asbestos Actions and Future Asbestos Actions against Affiliates will pull the rug out from under the Debtors, subverting the Congressional purpose behind the automatic stay and reducing the likelihood that the Debtors can avail themselves of relief under the Code.  And just as the concealment by Asbestos Claimants and their counsel of evidence of exposure to Bankrupts' products and collections from 524(g) Trusts unfairly has inflated collections from the Debtors, any payments required by Affiliates arising out of Pending Asbestos Actions and Future Asbestos Actions will be at post-Bankruptcy Wave inflated values.  Thus the Debtors face a real risk of accelerated reduction of the Available Shared Insurance if Pending Asbestos Actions and Future Asbestos Actions are not stayed.

- 13 -

52.    <u>Reduction of the Coltec Notes</u>:  Likewise, payments on the Coltec Notes have been used to cover uninsured costs of asbestos litigation, and will continue to be reduced if asbestos-related actions against the Affiliates are not stayed.  As with the Available Shared Insurance, reduction of the Coltec Notes to pay unrestrained Pending Asbestos Actions and Future Asbestos Actions strips the estates of a significant source of value.  Allowing Pending Asbestos Actions to proceed, and Future Asbestos Actions to be commenced, against the Affiliates will deprive the Debtors of property of the estate, compounding the challenges to a successful reorganization under Chapter 11.  The post-Bankruptcy Wave inflation of the value of asbestos-related claims makes the risk of reduction of the Coltec Notes more likely.

53.    <u>Evidentiary Prejudice and Collateral Estoppel</u>:  The Debtors believe that they have meritorious defenses to liability in the Pending Asbestos Actions and all Future Asbestos Actions.  These defenses are jeopardized by adverse resolution in the Pending Asbestos Actions and Future Asbestos Actions of critical fact questions against the Affiliates.  Accordingly, allowing Pending Asbestos Actions to proceed, and Future Asbestos Actions to commence, against the Affiliates is tantamount to allowing those claims to continue against the Debtors.  Similarly, adverse judgments against the Affiliates may put the Debtors at risk of collateral estoppel in those individual cases where they wish to defend against liability.  The purposes of Section 362(a) thus are best served by staying actions against the Affiliates.

54.    <u>Diversion of Persons Key to Debtors' Reorganization</u>:  As evidenced by the overwhelming number of claims and the dollar amount of defense costs and settlements, asbestos-related litigation long has consumed the attention of key personnel within EnPro and its subsidiaries.  Nowhere has this been more evident than with the Debtors, who have been pushed into Chapter 11 by the costs of Asbestos Claims.  Successful reorganization under Chapter 11 will require the attention and availability of key personnel.  For example, the very same individuals required to defend Pending Asbestos Actions and Future Asbestos Actions against the Affiliates will be central to the Debtors' intent to receive, review and evaluate thousands of Asbestos Claims filed against the Debtors and develop and present evidence in the Cases with respect to the estimation of the Debtors' responsibility for Asbestos Claims.  Likewise, key personnel must be available to devote significant time and resources to development and confirmation

- 14 -

of a Chapter 11 plan that includes a Section 524(g) trust.  Dividing the attention of individuals between ongoing and future actions against the Affiliates compromises their ability to participate in, and to prepare for, hearings and other matters vital to the confirmation process and defeats the very purpose of the Cases.

55.    Based on the foregoing, the Debtors seek a declaratory judgment that the continued prosecution of the Pending Asbestos Actions and the commencement of Future Asbestos Actions are stayed under Sections 362(a)(1) and (a)(3) of the Bankruptcy Code.

### PLAINTIFFS' SECOND CLAIM FOR RELIEF
(INJUNCTIVE RELIEF PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND/OR 28 U.S.C. § 1334 PENDING THE CONFIRMATION OF THE DEBTORS' CHAPTER 11 PLAN)

56.    The Debtors reallege paragraphs 1 through 55 of this Complaint.

57.    The continued prosecution of the Pending Asbestos Actions and the commencement of Future Asbestos Actions will diminish the Debtors' Chapter 11 estates and will hinder their efforts to successfully reorganize.

58.    Section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a). Relief under Section 105 is particularly appropriate in a Chapter 11 case when necessary to protect a debtor's ability to reorganize effectively, and particularly when necessary to preserve property of the debtor's estate.  To that end, and for the reasons stated herein, the Debtors request that the Court apply Section 105 to give effect to, or to extend, the Section 362 automatic stay to enjoin the Defendants from prosecuting the Pending Asbestos Actions or commencing Future Asbestos Actions against the Affiliates other than pursuant to a plan or plans of reorganization to be confirmed in the Cases or an order of this Court.

59.    Likewise, or in the alternative, pursuant to the comprehensive jurisdiction granted to bankruptcy courts under 28 U.S.C. § 1334, this Court has the inherent power of courts under their general equity powers and in the efficient management of their dockets to enjoin actions against a debtor and third parties, and in whatsoever court.  To that end, and for the reasons stated herein, the Debtors request that the Court exercise its equitable powers under 28 U.S.C. § 1334 to enjoin the Defendants from prosecuting

the Pending Asbestos Actions or commencing Future Asbestos Actions against the Affiliates other than pursuant to a plan or plans of reorganization to be confirmed in the Cases or an order of this Court.

60.     There is a substantial likelihood that the Debtors will be able to successfully reorganize their affairs through the Cases.

61.     The Debtors will suffer irreparable injury if injunctive relief is denied, including but not limited to: (i) diminishment of the Available Shared Insurance, (ii) reduction of the Coltec Notes, (iii) the risk of evidentiary prejudice and collateral estoppel resulting from the continued prosecution of Pending Asbestos Actions and the commencement of Future Asbestos Actions, and (iv) the distraction of key personnel from implementation of a successful Chapter 11 plan.

62.     The balance of equities tips in favor of the Debtors.  The injunctive relief sought herein will not cause significant prejudice to the Defendants, whose claims are to be addressed by a post-confirmation trust created and funded by the Debtors pursuant to the Bankruptcy Code.  The relief also will work to the benefit of other creditors, whose claims would be primed if Asbestos Claimants are allowed to pursue these claims against the Affiliates—claims that ultimately strip the Debtors' estates of value.  A successful reorganization, featuring a fair and equitable claims estimation and liquidation process, and a fair and adequate post-confirmation trust available to satisfy claims, is the surest means to guarantee fair and funded treatment for all claimants, including the Defendants.

63.     The injunctive relief requested herein will serve the public interest by promoting compliance with the purposes of the Bankruptcy Code—furthering the successful reorganization of debtors under Chapter 11 and utilizing the Section 524(g) trust remedy as intended by Congress.

64.     Accordingly, good cause exists for the entry of injunctive relief pursuant to Section 105 of the Bankruptcy Code, 28 U.S.C. § 1334, and Fed. R. Bankr. P. 7065.

### PLAINTIFFS' THIRD CLAIM FOR RELIEF
#### (APPLICATION FOR TEMPORARY RESTRAINING ORDER)

65.     The Debtors reallege paragraphs 1 through 64 of this Complaint.

66.     In order to preserve the status quo prior to this Court's hearing on the Debtors' Complaint, and to prevent the foregoing harmful effects upon the Debtors' reorganization, the Debtors

- 16 -

request that, without notice, the Court issue a temporary restraining order enjoining the Defendants and their counsel, as well as plaintiffs in Future Asbestos Actions and their counsel, and any other person or party from any further prosecution or commencement of actions against the Affiliates until the Court has issued a ruling on the Debtors' Complaint.

67.     As demonstrated by the specific facts (i) in this Complaint and (ii) in the Affidavit of Paul Grant in Support of Complaint for Declaratory and Injunctive Relief and Motion for Temporary Restraining Order and Preliminary Injunction Staying All Asbestos-Related Claims Against Affiliated Entities, immediate and irreparable injury, loss or damage will result to the applicant before an adverse party or attorney therefor can be heard in opposition.

68.     The issuance of a temporary restraining order and preliminary injunction are warranted for the foregoing reasons, more fully set forth in: (i) Plaintiffs' Memorandum of Law in Support of Complaint for Declaratory and Injunctive Relief and Motion for Temporary Restraining Order and Preliminary Injunction Staying All Asbestos-Related Claims Against Affiliated Entities, filed herewith and incorporated herein by reference; (ii) the Affidavit of Paul Grant in Support of Complaint for Declaratory and Injunctive Relief and Motion for Temporary Restraining Order and Preliminary Injunction Staying All Asbestos-Related Claims Against Affiliated Entities; and (iii) Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction Staying All Asbestos-Related Claims Against Affiliated Entities.

**WHEREFORE**, the Debtors respectfully request relief from this Court as follows:

(a) a declaratory judgment pursuant to 28 U.S.C. § 2201 that the continued prosecution of the Pending Asbestos Actions and the commencement of Future Asbestos Actions against the Affiliates are stayed pursuant to Sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code;

(b) an injunction pursuant to Section 105(a) of the Bankruptcy Code or in the alternative 28 U.S.C. § 1334, enjoining and prohibiting the Defendants from prosecuting the Pending Asbestos Actions or commencing Future Asbestos Actions against the Affiliates other than pursuant to a plan or plans of reorganization to be confirmed in the Cases or an order of this Court;

(c) a temporary restraining order under Fed. R. Bankr. P. 7065 and Section 105(a) of the Bankruptcy Code staying the continuation of the Pending Asbestos Actions and the

1163711

commencement of Future Asbestos Actions pending the hearing on the Debtors' request for a preliminary injunction; and

(d) such other and further relief as the Court deems just and proper.


This June 7th, 2010.

/s/ Garland S. Cassada
Garland S. Cassada
N.C. Bar No. 12352
Jonathan C. Krisko
N.C. Bar No. 28625
Richard C. Worf
N.C. Bar No. 37143
Ty E. Shaffer
N.C. Bar No. 38495

ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, NC  28246
Telephone:  (704) 377-2536
Facsimile:  (704) 378-4000

gcassada@rbh.com
jkrisko@rbh.com
rworf@rbh.com
tshaffer@rbh.com

*Proposed Special Corporate and Litigation Counsel to the Debtors-Plaintiffs Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company*

- 18 -

**Exhibit A**

**List of Affiliates**

Allwest Compressor Products ULC
CAB Compressores Industria e Comercio Ltda.
Central Maloney
Coltec do Brasil Productos Industriais Ltda.
Coltec Finance Company Limited
Coltec Industrial Products LLC
Coltec Industries France SAS
Coltec Industries Pacific Pte Ltd
Coltec Industries Inc
Coltec Int'l Services Co.
Compressor Products Holdings, Inc.
Compressor Products Holdings, Limited
Compressor Products International GmbH
Compressor Products International Inc.
Compressor Products International Ltd.
Compressor Products International Ltda.
Compressor Services Holdings, Inc.
Corrosion Control Corporation (d/b/a Pikotek)
CPI Investments Limited
CPI Pacific Pty Limited
CPI-LIARD SAS
EnPro Corporate Management Consulting (Shanghai) Co. Ltd.
EnPro German Holding GmbH
EnPro Hong Kong Holdings Company Limited
EnPro India Private Limited
EnPro Industries International Trading (Shanghai) Co., Ltd.
EnPro Industries, Inc.
EnPro Luxembourg Holding Company S.a.r.l.
Fairbanks Morse
Fairbanks Morse Engine
Fairbanks Morse Pump
Farnum
Garlock (Great Britain) Limited
Garlock de Mexico, S.A.
Garlock France SAS
Garlock GmbH
Garlock International Inc.
Garlock of Canada Ltd.
Garlock Overseas Corporation
Garlock Pty Limited
Garlock Sealing Technologies (Shanghai) Co., Ltd.
Garlock Valqua Japan, Inc.
GGB Austria GmbH
GGB Bearing Technology (Suzhou) Co., Ltd.
GGB Brasil Industria de Mancais E Componentes Ltda.
GGB France E.U.R.L.
GGB Heilbronn GmbH
GGB Holdings E.U.R.L.

- 19 -

GGB Italy s.r.l.
GGB Kunststoff-Technologie GmbH
GGB LLC
GGB Real Estate GmbH
GGB Slovakia s.r.o.
GGB Tristar Suisse S.A.
GGB, Inc.
Holley Automotive Systems GmbH
HTCI Inc.
Kunshan Q-Tech Air System Technologies Ltd.
QFM Sales and Services, Inc.
Quincy Compressor
Stempro de Mexico, S. de R.L. de C.V.
Stemco Crewson LLC
Stemco Holdings, Inc.
Stemco LP
Texflo Compressor Services, ULC
V.W. Kaiser Engineering

1163711

**Exhibit B**

**List of Plaintiffs in Pending Asbestos Actions**

1163711