IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

In the matter of:                        )
                                         )
                                         )
THE ANCHOR PACKING COMPANY,              ) No. 10-31606
                                         )
    Debtor.                              )

GARLOCK SEALING TECHNOLOGIES, LLC,  ) No. 10-31607
                                         )
    Debtor.                              )

GARRISON LITIGATION MANAGEMENT           ) No. 10-31608
GROUP, LTD.,                             )
                                         )
    Debtor.                              )

                                    Charlotte, NC
                                    June 8, 2010, 9:32 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE J. CRAIG WHITLEY
UNITED STATES BANKRUPTCY JUDGE

Electronic Recorder
Operator:                      Julia Adams

Transcriber:                   Patricia Basham
                               6411 Quail Ridge Drive
                               Bartlett, TN  38135
                               9O1-372-O613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

APPEARANCES:

Albert F. Durham
C. Richard Rayburn, Jr.
Shelley Koon Abel
Rayburn, Cooper & Durham, P.A.
227 West Trade Street, Suite 1200
Charlotte NC, 28202-1672

Natalie D. Ramsey
Montgomery, McCracken, Walker & Rhoads
123 South Broad Street
Philadelphia, Pennsylvania

A. Cotten Wright
Grier Furr & Crisp, P.A.
101 North Tryon Street, Suite 1240
Charlotte, NC  28246

Garland S. Cassada
Jonathan C. Krisko
Ty E. Shaffer
Robinson, Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246

Robert W. Phillips
The Simmons Firm
707 Berkshire Blvd.
P.O. Box 521
East Alton Illinois 62024

C. Edward Dobbs
Douglas A. Nail
Parker, Hudson, Rainer & Dobbs LLP
1500 Marquis Two Tower, 285 Peachtree Center Avenue, N.E.
Atlanta, Georgia  30303

Linda W. Simpson
Bankruptcy Administrator's Office
402 West Trade Street, Room 202
Charlotte, NC 28202

3

(CALL TO ORDER)

THE COURT: Have a seat everyone.  Good morning.  It is first day hearings, it looks like, in three new cases.  For those of you who are not from the district, I am Judge Whitley. These cases are eventually going to get back to Judge Hodges, but he is in Asheville holding a docket up there.  So we are going to just do the best we can until we get you where you belong.

But the cases are announced as Garlock Sealing Technologies, LLC, Garrison Litigation Management Group, Ltd. and The Anchor Packing Company, Inc.  We have a proposed agenda, and we will talk about that in a moment.

I thought probably the next thing we ought to do is get the case appearances from the parties.  So let's start with the folks we have in the courtroom.  Mr. Durham.

MR. DURHAM: Your Honor, my name is Al Durham and with me is Rick Rayburn and Shelley Abel from Rayburn Cooper and Durham, and we are the bankruptcy counsel for all three companies.

THE COURT: All right. This side.  Yes.

MS. RAMSEY: Your Honor, Natalie Ramsey, Montgomery, McCracken, Walker & Rhoads from Philadelphia.  I am appearing today here, Your Honor, with local counsel.  We have not yet sought my admission *pro hac vice*.

THE COURT: Okay.

4

MS. WRIGHT: Your Honor, Cotten Wright, here as local counsel for Ms. Ramsey.

THE COURT: Okay.  And who are you representing again? I am sorry.

MS. RAMSEY: We represent several law firms that represent asbestos plaintiffs.

THE COURT: Okay.  Thank you.  Yes, sir, Mr. Cassada.

MR. CASSADA: Good morning, Your Honor.  Garland Cassada with the firm Robinson, Bradshaw & Hinson.  We are proposed asbestos and – special asbestos and corporate counsel for the debtors.  I am accompanied this morning by two colleagues, Jonathan Krisko and Ty Shaffer.

THE COURT: All right. Others announcing?

MR. PHILLIPS: Your Honor, Robert Phillips of The Simmons Firm.  We are one of the law firms itself representing asbestos plaintiffs.  I had my associate file an entry of appearance and motion for admission *pro hac vice* yesterday. However, I was informed by Ms. Ramsey's local counsel that, under North Carolina rules, I actually need to go ahead and associate local counsel for the motion for *pro hac vice*, but I wanted to alert the court that we have filed that and we will remedy that problem.

THE COURT: Yes, sir.  Okay.

MR. DURHAM: Your Honor, we have no objection to people appearing for purposes of this hearing.

5

THE COURT: Well, as I was about to say, we will let the paper work catch up.  We will need to get the *pro hac vice* admissions, and our district court does require local counsel unless it is going to be something so small and mundane that it wouldn't justify it, but we will let that be done after the court hearing and we will hear from you now in the meantime.

MR. PHILLIPS: Thank you, Your Honor.

MR. DOBBS: Your Honor, I am Ed Dobbs from the Atlanta law firm of Parker, Hudson, Rainer & Dobbs, appearing with Doug Nail on behalf of Bank of America, the proposed DIP lender and prepetition agent for the prepetition syndicate of lenders. And, Your Honor, we, too, are following up on our *pro hac* papers.

THE COURT: Okay.  Mr. Dobbs is announcing on Bank of America.  For those of you all in the back of the courtroom, the mikes are up here at the counsel table, so it is hard to pick you up if we don't get you in the well.  Other announcements?  Ms. Simpson, are you –

MS. SIMPSON: Linda Simpson, Bankruptcy Administrator.

THE COURT: Anyone else in the courtroom announcing?

(No response.)

THE COURT: Anyone appearing telephonically?  Do we have anyone on the line?

COURTROOM DEPUTY: No, sir.

THE COURT: All right. Then the proposed agenda has a

6

batting order, if you will, and I would propose that we just start in that order unless you folks have a feeling that it should go in another direction.

MR. DURHAM: Your Honor, we would like to follow that order. Generally, Your Honor, for a brief introduction, these cases were filed on Saturday, June 5th, and we are asking for relief on certain first-day matters today as final orders and certain ones as just interim orders, and those are set forth, I think, in the motion for expedited hearing.

Your Honor, to clarify one issue, the motion and notice of hearing for today, which was sent out on Saturday by FedEx or by postage if we didn't have an address, used the hearing date of June 8, 2009. We filed an amended notice to that, and we downloaded an order from Your Honor to approve the expedited hearing on those matters, finding that that is both a harmless error and an impossibility. And so we would hope that Your Honor would find that today's hearings have been properly noticed. We believe they have been.

THE COURT: Okay. Any objections to that?

(No response.)

THE COURT: All right. We are going to assume everyone understood we were talking about doing it this year, not last.

MR. DURHAM: That would be correct, Your Honor.

THE COURT: Okay.

MR. DURHAM: Your Honor, to the extent we are asking

7

for immediate relief, we believe that relief is justified as needed to avoid immediate and irreparable harm as set forth in the affidavit of Mr. Don Pomeroy, Your Honor, who is the Chief Financial Officer of Garlock Sealing Technologies. Mr. Pomeroy is present in the courtroom. Your Honor, we intend to proffer Mr. Pomeroy's testimony based upon his affidavit, which is part of the record in the court and was served on the parties.

If we follow the agenda, Your Honor, the first thing we would consider is the court's approval of hearing the matter, which I believe Your Honor may have just did on the expedited basis with the hearing set for today. That would be our first item.

THE COURT: Did we have any objections to hearing these on an expedited basis?

(No response.)

THE COURT: At least not from the folks present at this point in time. Maybe we will hear something later. All right. Assume that that is approved. We will go ahead and –

MR. DURHAM: Your Honor, the next matter is the order authorizing joint administration. The only change we have made to the proposed order that was attached to the motion, that we would propose to download and submit to the court, is we have actually entered the case numbers on this order, Your Honor. And I have a red line if Your Honor needs to see it.

THE COURT: Okay. Does anybody want to be heard about

8

joint administration?

(No response.)

THE COURT: Hearing not – by the way, I have read the pleadings, so we don't need to go into elaborate detail if there is not objections but that is approved, as well.

MR. DURHAM: Your Honor, I take that as an instruction for me to be brief, which is against my nature.

THE COURT: It is hard to do it at the start of a case, but let's go ahead and move on.

MR. DURHAM: Your Honor, the third item on the agenda would be the motion for interim authorization under the prepetition services agreement with EnPro and Coltec and to assume those agreements. Again, this would be an interim relief order only, Your Honor, and would be set for a final hearing, which we hope to get a hearing date through Your Honor for Judge Hodges at the conclusion of this hearing.

THE COURT: Okay.

MR. DURHAM: And I think Mr. Rayburn is going to handle that, Your Honor.

THE COURT: All right. Mr. Rayburn.

MR. RAYBURN: Your Honor, if I may, I would like to – may I approach and hand up an illustrative –

THE COURT: Please.

MR. RAYBURN:  I don't think it is going to become an exhibit but it might help us figure out what we are doing.

What I have handed up, Your Honor, is a vastly simplified chart for the debtors and their related co-debtors.

THE COURT: I wanted to thank you, Mr. Rayburn, for your confidence in the court.  My eyesight hasn't been this good in a period of decades.

MR. RAYBURN: I am going to demonstrate the miracle of Monovision here.  As the chart points out, there is a parent company called EnPro Industries, Inc. up at the top, and it has – its primary subsidiary is something called Coltec Industries, Inc.  Coltec Industries, Inc. has various businesses, not filing, not related to the bankruptcy case, a total of fifty-two of them, direct and indirect subsidiaries and affiliates, literally spread all over the globe.

The debtors are three entities on the right-hand side of the picture.  The one you hear the most about, the big operating company, Garlock Sealing Technologies, the North Carolina entity, it itself is a subsidiary of Coltec but it has non-filing direct and indirect subsidiaries, six of them.  Most of them are foreign and those entities are not filing, no intention of filing, et cetera.  They don't do business in the United States, and they are not traditionally defendants in any asbestos litigation.

It also has, as a sister company, Garrison Litigation Management, a debtor here, and The Anchor Packing Company, a debtor here.

10

The reason for displaying this chart is to try to make clear and in context the motion that's numbered three in the agenda. And that motion, Your Honor, is a motion to continue the prepetition practice which is common to this debtor and to other members of internationally affiliated groups, which is that this debtor obtains certain services and certain benefits from being a member of this big global group.

Those services and benefits are outlined in the motion. I won't bore you with them but, as a general proposition, as Mr. Pomeroy's affidavit sets forth and the papers show, these debtors are able to rely upon the skill and specialized service needs from various people who are housed up inside the EnPro entity.

They are able to buy insurance through the EnPro's purchasing power. They are able to obtain benefit plan services, payroll services and the like, using the purchasing power of the EnPro enterprise, which is some five times the size of Garlock Enterprises, and they are able to accomplish a number of things simply by virtue of the fact that they are part of this worldwide group of companies.

The important thing about this motion for us, Your Honor, is that it is an ordinary course motion but it has an ordering mechanism in it that is important in order to understand the financing in the case. The services are purchased by Garlock and Garrison. They are purchased during

11

the course of the year. In fact, they will be purchased this week if we get authority to do it, but the mechanism for purchasing them is that the parent company, EnPro or Coltec, advances money for the payment of these items. In other words, if we are talking about a payroll situation, EnPro is going to pay the payroll. If we are talking about an insurance purchase, EnPro is going to pay for the insurance.

The advances are going to be made by the parent and its affiliates, and what's going to happen under this motion is that there is going to be an accumulated balance for those advances that are going to build up over the course of the year until next January.

What the motion then sets forth is that, under this services agreement, the debtor does not actually pay cash for these services but the debtor pays for these services or the debtors, plural, pay for these services in January of each year through an offset mechanism. First offsetting against the cash interest due the debtors on two notes, the Stemco note and the Coltec note that total a little over two hundred and twenty million dollars. That cash interest is at six and a half percent. It turns out to be about fourteen point eight million dollars and should be more than enough money to cover all the charges that are incurred between now and the end of the year and in future years if we go along for this mechanism.

And, second, if it is not, there is another ten point

12

two million dollars worth of PIK interest on that note, which the debtors have the right to charge for credit against setoff under this agreement for their obligation.

So it is inconceivable to us, Mr. Pomeroy would testify, that even though there is an ordering provision set up here, it is inconceivable to us that there would be any circumstance under which we would even get beyond the interest, the PIK interest, to the point where we would be asking permission to credit against the principal amount of the Coltec note or the Stemco note.

We have the consent of Mr. Dobbs' client to the crediting to the cash interest and to the crediting to the PIK interest by virtue of consent that modified the subordination agreement, which basically provides that we, the debtors, can't collect on the Coltec note or the Stemco note, can't collect on the principal of it, can only collect to this limited extent on interest because of the subordination of our receivable from Coltec and Stemco to the BofA financing.

So, to make a long story short, this is just to continue to do things the way we have always done them, formalized services agreement, formalized fees and an offset mechanism which we find to be very advantageous to the debtors.

And I would be happy to answer any more questions or put Mr. Pomeroy up and he can give you a very in-depth explanation of exactly the way this works.

13

THE COURT: Other parties wishing to be heard on this motion?

MS. RAMSEY: Yes, Your Honor.  Natalie Ramsey for certain plaintiffs' law firms.  Your Honor, we don't have an objection to the interim entry of this order today but, because we are very acutely aware that there may be alter-ego claims asserted in this case against EnPro and possibly Coltec, we would ask that we have an opportunity to examine the various interrelationships further to ensure that those plaintiffs would not be adversely affected by entry of the approval of these agreements.

THE COURT: Okay.  What did you have in mind, Ms. Ramsey, in terms of an examination period?  Are you talking about doing it between now and a final hearing on assumption?

MS. RAMSEY: That should be sufficient, Your Honor.  We think that this is a case that calls out for an organized asbestos claimants committee, and we would hope that that committee could be formed in the short-term, up and running, and its professionals would have an opportunity to examine the various agreements.

THE COURT: Okay.  Fair enough.  Others?

(No response.)

THE COURT: As I understand it, Mr. Rayburn, the debtor is not asking to assume those contracts today but simply to operate under them?

14

MR. RAYBURN: That's right, Your Honor.  We are only asking for the interim relief, from here to the final hearing, which basically means that Coltec and EnPro are going to be advancing a lot of stuff on our behalf and we are not going to be paying them any money.

THE COURT: Okay.  I guess that takes us to the next point of when final hearings will be had if we have them on cash collateral use and the like?

MR. DURHAM: Your Honor, because of the noticing and trying to get copies out, and one of our reliefs that we are going to ask Your Honor for today is on all the matters, that we are going to serve after the hearing, all the orders, the notices, and notices of the further hearing, that we be allowed three business days after the entry of the orders to do that.

Your Honor, we think, if Judge Hodges is available that Thursday, July the 1st, would give ample time for parties to receive these notices, for us to make sure they get them, and that's a couple extra days, but we believe that that would be beneficial if that's an available date for the court to hear us at that time.

THE COURT: Okay.  Ms. Ramsey, how does that sound?  I realize that's not a lot of time to form a committee and get them up to speed but I suppose we could, if necessary, continue this further to allow that investigation time.

MS. RAMSEY: Yes, Your Honor, I suspect that that will

15

not be sufficient time just logistically in the case, but we certainly have no objection to coming back to the court on that date and making any opposition that we have identified to-date on behalf of separate law firms.

THE COURT: Any idea from the debtor's side of this how much time you are going to require on July 1st?  Judge Hodges left me a note that he would prefer to start – if everything can be done on July 1st, well and good.  If we need more than one day, he would like to start at eleven on June 30th and then roll over into the 1st.  So it is just a question of how much we are going to be dealing with at that time.

MR. DURHAM: Well, Your Honor, what I foresee on for that day would be the continued hearing – a final hearing on the debtor-in-possession financing, and I am not sure there are issues for that but the final hearing on this motion; the final hearing on the inter-company payable or vendor motion; hearing on the motion for reclamation/administrative claims, which has been filed but we would serve that for hearing; a motion on the compensation procedures for professionals in the case; and a motion, I think, for ordinary course professionals.

THE COURT: Right.

MR. DURHAM: Those are the matters that I would know about today that would be on.  I am not sure which of those would require, you know, objections or a lot of hearing time. I am going to guess maybe the inter-company ones would be more

16

attractive of that sort of action than the others.

I think, if we could start on June the 30th at eleven would be fine with us, Your Honor, but I think, based on the number of copies and everything we need to get out, if we could still have some flexibility on getting them out this week, if that would be sufficient notice to parties, then we could start the hearings on June 30th.  And if Judge Hodges felt people needed more time on a particular motion – what we don't want to do is, for example, delay the final DIP hearing if there is no necessity to do that.

THE COURT: Well, as I understand it, the problem becomes, of course, the July 4th weekend and I don't think he is available on the 2nd.  So maybe we ought to set all of these – I hate to do it to the out-of-town lawyers, to ask you to come for two days potentially but let's set them on the 30th and maybe we can see our way clear and, before then, if there is any rescheduling –

MR. DURHAM: Well, I would also hope, Your Honor, that if there are issues with a particular motion, then maybe the parties can agree on a scheduling for that particular motion.

THE COURT: Okay.  All right. Great.  We will set it, then, at June 30th at eleven, and I will approve the relief on an interim basis with the reservations made further that we may have to do some more discussing as to these matters once we get to a final hearing.  Okay.

17

MR. DURHAM: Your Honor, just for clarity sake, there are a bunch of the orders have – or notices will have the final hearing date.  We will obviously use that date for all of them.

THE COURT: Right.

MR. DURHAM: Is Your Honor okay with giving us the three business days after the entry of the order or at least through the balance of this week, I think.

THE COURT: Well, I think one way or the other you are going to need it.  You can only do what you can do.  So we will approve that, as well.

MR. DURHAM: Right.  Your Honor, the next motion we have is the payroll motion and, since that was a very complicated and intricate one, we had Ms. Neal from our office and Ms. Abel have to work on it because they obviously understood it and we didn't.  But I will have Ms. Abel present that one, Your Honor.

THE COURT: I have not asked previously but, from your silence, I take it the other parties are not opposed to using multiple lawyers from the same side to discuss various motions.

MS. RAMSEY: No objection.

THE COURT: Okay.  Good.  Thank you.  Yes, ma'am.

MS. ABEL: Thank you, Your Honor.  At the base of it all, this payroll motion is not unlike your typical Chapter 11 payroll motion.  We have salaries, wages, vacation, PTO, sick leave, 401(k), various health benefit plans, disability, life

18

insurance, worker's comp.  I would note that the debtors are self-insured but have a stopgap insurance plan in place.  There are severance plans.  There is a union, which is a little unusual, and they also have certain benefits.  We have employee reimbursements, incentive plans, deferred comp, company vehicles, tuition reimbursement and various different items that are described in detail in the motion.

Since Your Honor already told us that you have read the pleadings, I will not describe them in great detail but, if there is anything in particular that Your Honor would like to hear on further, I am happy to discuss those.

As Mr. Rayburn explained, a number of these benefits and salaries and various items are paid through the parent company and then will be reimbursed subject to approval of the court at a later time.

And we would ask that the court consider entering this order later this afternoon because we actually have hourly employee payroll that is to be funded tonight and will be going out tomorrow.  So this is one that we would particularly like to have docketed today.

We have made a small change to the proposed order that was submitted to the court with the motion.  It is not yet uploaded but we have just added language to indicate that the failure to have this entered could result in immediate and irreparable harm and thus is necessary to be paid.

19

So if there is nothing further, we would ask that the court enter the motion.

THE COURT: Other parties?

MS. RAMSEY: No objection.

MS. SIMPSON: Your Honor, there is one question about money that Garlock paid into the parent and was not credited to the pension accounts, as I understood, at paragraph 72. Between 2003 to 2010, the parent charged Garlock three hundred and forty-six thousand but they didn't get a credit in their pension plan and there is something about it being remedied. I just had a question about that, when it was remedied, if it has been taken care of.

THE COURT: Mr. Rayburn.

MR. RAYBURN: Can we have multiple lawyers on one motion?  The reference is to a situation which arose as follows:  There was a period of time during which Garlock was making payments to the pension plan based upon an actuarial computation of its accruing pension liability.

On the other side of that entry, there was a pension plan – obviously it is a group-wide pension plan.

THE COURT: Uh-huh.

MR. RAYBURN: There was a corpus in the pension trust that was generating income.  We remember those days when the market was going up.  And so what happened was Garlock was basically being charged on a strict actuarial basis for what

20

the accruals were and was not getting the benefit of the increase in the earnings in the corpus of the pension plan.

What the motion contemplates doing, if it becomes final, is that Garlock won't be paying any more money at all into those pension plans until this disparity between the actual cash costs to providing the benefit, because of the income, and the cost which has been charged to Garlock accrues. So once again, this is a situation where we are effectively having a parent and its affiliates make contributions for the benefit of the debtor.

MS. SIMPSON: The only other thing I wanted to bring up is, since they are self-insured on the worker's comp up to a certain point, we typically deal with insurance in my office. If the court is interested in approving that, we will be glad to have an order to that effect also, Your Honor.

THE COURT: Okay.  Other thoughts, concerns?  Ms. Abel.

MS. ABEL: That's fine, Your Honor.

THE COURT: Okay.  But with regard to the payroll motion overall, I take it there are no extraordinary items in this particular motion; we are not curing old ills or making out of the ordinary course catch-ups on compensation or anything of that nature?

MS. ABEL: No, Your Honor.  I think there's a few days lag in the hourly employees that is going to be prepetition but otherwise everything will be going forward.

21

THE COURT: Okay.  I should have said this earlier, but on these motions, unless someone says otherwise, I am willing to accept the proffer of the affidavit as the evidence supporting the underlying motions.  So if anyone wants to hear live testimony, sing out so we can deal with that.  But I will approve the motion.

Now, are we doing this on an interim basis or do you want a final approval of this one?  Are we going to revisit the issue later?

MS. ABEL: Your Honor, to the extent that there are functions relating to the inter-company services and reimbursement protocol that Mr. Rayburn discussed, those would be things that we would leave open for discussion at a future hearing but, as far as payment of the actual obligations, we would ask that the court authorize their payment because of the nature of the claims that are involved.

THE COURT: Do you envision doing that by a separate motion or are we going to simply continue this out for further discussion on some aspects of the –

MR. DURHAM: Your Honor, I think we are asking that essentially the payroll motion be approved.  Anything that will be caught up in the inter-company arrangement would be subject to the motion addressed by Mr. Rayburn and identified by counsel.  So we are basically asking you to approve this final today.

22

THE COURT: Asking for final approval of this one?

MS. ABEL: Yes, sir.

THE COURT: Okay.  All right. Again, any objection?

(No response.)

THE COURT: There being none, it is approved.

MS. ABEL: Thank you, Your Honor.

MR. DURHAM: Your Honor, one other issue that I would ask for my client's sake, we have six hundred employees. Actually we have six hundred and eleven or so employees.  We would ask, if we could download the order today, as early as Your Honor could consider it today, because the funds are actually drafted from the payroll this afternoon and, upon entry of this order and the DIP financing order and the cash management order, I believe our bank where the funds will be drafted on would be acceptable to having those funds moved and the people get paid tomorrow.

THE COURT: Okay.  If you will make sure when you download the order that you make a note to the clerk that this one needs expedited attention.

MR. DURHAM: I understand.

THE COURT: And we will try to do the same, and I will be looking for it this afternoon or whenever you can get it.

MR. DURHAM: Well, hopefully that one is essentially done so it will be this afternoon.

THE COURT: Okay.  Good.

23

MR. DURHAM: Your Honor, I am back up.  Your Honor, I think the next issue on our agenda is the DIP financing order. Just to give Your Honor a little bit of background and understanding the word "brief," Garlock was a borrower in Garrison, a guarantor under the existing prebankruptcy facility with Bank of America, Wells Fargo, Wachovia and SunTrust for seventy-five million dollars.

THE COURT: Okay.

MR. DURHAM: The collateral package that is essentially proposed under the DIP agreement for Garlock and Garrison is almost identical to the collateral package that they put forth or pledged, secured, borrowed against or were able to borrow against under the existing facility.

It is not totally exact but, to the extent possible, we are trying to unplug Garlock and Garrison from that prepetition facility and plug them into a post-petition facility upon the conditions, certain conditions precedent occurring.  And I think the essential ones, although they will be to the satisfaction of the bank, are the court's approval of the DIP loan agreement, the court's entry of the interim DIP financing order in the form attached to the interim DIP motion, which would continue the banking relationship of Garrison and Garlock to the DIP lender and its affiliates and, again, the collateral being the same type of property and provide for the roll-over of a letter of credit for approximately four point

24

seven million dollars, which is under the existing facility, would be rolled into the DIP facility.

Also, Your Honor, any banking – and the DIP motion and the bank relationship motion, which is the one – and the cash management motion which comes after this, Your Honor, are really very – are conjoined. Any banking product, any banking relationship obligations, any bank product obligations that exist before we filed would be secured under the prepetition facility, we believe. Those will move into the post-petition facility with Bank of America, continue to be secured and paid in the normal course of business.

Again, we are unplugging their obligation, their collateral and we are plugging it in to the DIP facility, carrying over any banking relation, any banking product liability, checks and float, whatever, and the letter of credit for four point seven million dollars will be carried under the DIP facility.

Your Honor, we would ask for purposes of this that Your Honor accept the findings stated in the DIP motion as a proffer also. They have been served on parties and set forth the general terms.

The DIP facility, Your Honor, is a ten million dollar facility. It would be based on a borrowing base of eligible accounts receivable and inventory. There would be reserves against that, including the letter of credit reserve and other

reserves. The interest rate is set forth in the – the interest rates are set forth in the document. The initial maturity would be December 7, 2011. There would be a right of renewal on certain terms and conditions as set forth in the document. And, again, the collateral granted would be the collateral that we have set forth. Essentially it is set forth specifically in the DIP motion, which, Your Honor, we attached a summary to the front of it but followed with the entire agreement and the order.

There is a potential for a springing lien on fixed assets, and fixed assets is defined in the DIP loan agreement. It would include all real property and equipment and any adjoining rights in those. That springing lien would only spring to the extent that the carve-out proposed in the DIP order would be required to be funded either by an advance by Bank of America or the use of proceeds of collateral of Bank of America and, at the time of that advance or just immediately following, Bank of America has not been paid in full its obligations.

So they could get additional collateral but they would only get that additional collateral if that carve-out had to be funded either by direct revolver advance or use proceeds of theirs.

Your Honor, there are liens – Bank of America is granted under this document a super priority under 364(c)(1).

26

They are granted a junior lien on their collateral as set forth in the – on the collateral as set forth in the order under 364(c)(2).   They are granted a, I am sorry, a lien on unencumbered under (c)(2), a junior lien under (c)(3).

They have a limited 364(d) lien, and that lien is only to the extent of the collateral of the prepetition lenders, and that lien will go – those liens will go away and expire or terminate upon what is defined as the release effective date in the plan – I am sorry – in the court order, in the interim DIP order.

The intent of the release effective date is that, upon the approval of the – I think, generally, Your Honor, upon the approval of the DIP loan agreement, entry of the interim financing order, and the entry of the cash management order, that those liens would then go away.

Now, there are other things.  We have to make a representation we are not in default at those times, but those are the essential terms.

Your Honor, the DIP does contain a standard requirement that we and the corporate counsel for the debtor have generally looked at and believe that the prepetition lenders have valid and binding liens; they have valid and binding obligations; that those liens and obligations aren't subject to equitable subordination or offset recoupment or recharacterization; that we don't know of any claim against the

27

prepetition lenders as a result of their lending; and that we essentially have signed off, the debtors have signed off on that.

The order also provides that any other party has a deadline of sixty days from the appointment of counsel to the committee or ninety days from the filing of the petition to review those facts and decide if they want to come to a separate conclusion.

Among the permitted uses of the proceeds of collateral of BofA, or advances under their revolver, the permitted uses do not include prosecuting claims against Bank of America.

Your Honor, there are also remedies and enforcement matters in there.  I believe the documents set forth in great detail, greater detail than I have gone into today, what the rights and remedies of the parties are.

But if Your Honor has any questions, Mr. Pomeroy is here and can offer testimony.  Mr. Dobbs can correct anything I have said if he disagrees with it, but I believe we would ask Your Honor to approve this on an interim basis and set it on for final hearing on June 30 at eleven o'clock.

THE COURT: Other parties?  Ms. Ramsey.

MS. RAMSEY: Thank you, Your Honor. Again, on an interim basis, we do not oppose this, Your Honor.  However, because the – particularly because of the roll-up provisions, we would like the opportunity to look at the lien rights and

28

also the papers with respect to this DIP loan are quite voluminous and we would like a greater opportunity to examine it in further detail before a final hearing.

THE COURT: Before the final hearing or before the time period runs on the blessing of the bank's liens?

MS. RAMSEY: The blessing on the bank's liens, as I understand it, Your Honor, does not run until ninety days after appointment or sixty days after the appointment of a committee. So I am sure that the committee is going to want the full opportunity to examine that, that's provided under the documents but, even with respect to approval of what has been requested here today, we would like a greater opportunity to examine.

There are provisions that appear from our initial review to limit the debtor's waiver to the debtor and provide the committee an opportunity for review, to limit the liens on assets that are not normally estate assets available to creditors, those types of provisions, but we have only been able to do what I would refer to as a rather superficial review at this point.

THE COURT: Sure. Okay. Others? Anyone else wanting to be heard on this?

MR. DURHAM: Your Honor, clearly this would only be an interim order but we would ask – we believe it is appropriate, and I think the deadline issue, it is clearly our intent that

29

anybody else who wants to review the prepetition obligations and the liens would have sixty days from counsel appointment or, at the very least, ninety days from the date of the petition.

Also, Your Honor, the only debts that are actually being pulled over would be the letter of credit, which is Garlock's letter of credit for four point seven million, which was secured prepetition and secured post-petition.  Then there are banking relationship debts of Garlock to BofA.  Under the prepetition facility, there is a bank card that they use to pay certain obligations.  That would be pulled in to the post-petition and paid and would continue under the post-petition facility.  Again, there is not a lot of debt being pulled over other than the debt that is purely Garlock's and it would be pulled in to the new facility.  But we are asking for interim relief today, Your Honor.

THE COURT: Right.  I take it that the bank is amenable to allowing inspection of its loan documents and the like, Mr. Dobbs?

MR. DOBBS: That is correct, Your Honor.

THE COURT: Okay.  Great.  And the other thing that I would mention, I have not been able to weed through every line and verse of these orders as yet.  I think the local lawyers understand this.  Judge Hodges and I, we try to follow the Bankruptcy Code as we can.  If there is something in the code

30

that's at variance with something in the order, the code wins. If we are waiving or restricting a right that exists by statute, then we may be waiving it to the extent of a particular party – for example, the debtor – but if someone else wants to object, then we don't have the authority to waive statutes.  Okay.

MR. DURHAM: Your Honor, I believe the extension time on deadline applies to any party-in-interest.

THE COURT: Right.

MR. DURHAM: Not just to the committee.

THE COURT: I understand.

MR. DURHAM: So we are not limiting that right.

THE COURT: My point is sometimes in these early cash collateral and loan motions, not yours particularly – I haven't had the occasion to get line and verse of this yet – but in some we see waivers of various statutes and remedies that exist under the Bankruptcy Code and statements that the court will not do this, that or the other when the statute says that we have that authority.  I can't waive legal provisions that Congress has mandated, and I think all of the local attorneys at least understand that.  I wanted to make sure that everyone else did, as well.

All right. On an interim basis, the financing is approved and we will set the final hearing over again for June 30th at eleven.

31

Okay.  What's next?

MR. DURHAM: Your Honor, next is the bank account cash management motion, which I, again, would say is joined at the hip with the DIP motion to some degree.

We had our prepetition accounts and banking relationship with Bank of America essentially.  We have thirteen accounts that we have identified.  Twelve accounts or eleven accounts with Bank of America.  One account with Bank of America Securities, LLC, and one account with Scotiabank in Canada, which is a Garlock account.  There is a flow chart which is Exhibit "A," Your Honor, that shows the various accounts, I believe.

Your Honor, we are asking today to maintain our existing bank accounts, to continue our cash management system and, to the degree we can, to waive any deposit requirements or investment guidelines.  It is our understanding from our client that the monies, any excess cash is invested in U.S. Government securities.

We believe those are backed by the full, faith and credit.  We are getting the prospective to give to Ms. Simpson today.  The order provides that Ms. Simpson has the right to bring this order back on or object to it prospectively if she finds – if she ever wants to challenge any part of it.  We can get her that information hopefully today.

This is another order, Your Honor, which is critical

32

for us to try to get entered today because it ties into our payroll function and the banking products of allowing bank – us to draft the money out of the account for payroll and to start business as usual to the degree we can after the filing of the cases.

We are also asking that if any inter-company claims between the debtors or affiliates would be granted administrative expense just to the extent that – so that everybody bears their own expense here. Those, of course, would be subordinate to the claims granted to the bank under the DIP order.

Your Honor, one issue, which is part of the DIP order but also part of this order, is the understanding that the bank is a secured creditor on the prepetition facility and a secured creditor under the DIP facility. If there were any banking charges, or fees, or costs or banking relationship debt owed Bank of America, that would flow through this order and continue the same as, again, in conjunction with the same as the DIP order.

Your Honor, there have been some red line changes to the proposed bank order and, if could approach, I have got one copy. I don't know if I have another. I had other copies, Your Honor, but – I do have another copy.

THE COURT: Okay.

MR. DURHAM: If I could approach, Your Honor?

33

THE COURT: Please.

(Pause)

MR. DURHAM: Your Honor, these are essentially clean-up orders and they are orders that – the changes are clean-up changes and they are essentially to clarify the bank's position.  We have attempted to put into place a mechanism to stop payment or block payment on any checks that were written prepetition that were not cleared as of Saturday morning or Friday evening, and we are getting this information to the bank and the bank is relying on the information that we are giving them.

THE COURT: Right,

MR. DURHAM: And the bank wants protection based on the information we are giving them.

THE COURT: All right. Other parties?  Ms. Simpson.

MS. SIMPSON: There are just a couple of things.  One account is a Canadian account?

MR. DURHAM: Yes.

MS. SIMPSON: And there is not that much information on it.  It sounds like you fund that just to meet the expenses and then there is very little in it?

MR. DURHAM: I think there is less than fifty thousand dollars on any basis at any time in that account, and it is just used to fund some expenses up there which are Garlock expenses.

34

MS. SIMPSON: The other question I had, it seems that the motion is asking that the debtor be excused from all provisions of 345 with respect to posting bonds. I don't have any problem with that but, to the extent we can get Bank of America to post collateral on these accounts if they exceed the FDIC limit, I don't see any reason to excuse that to have collateralized. That's just a book entry really. Does the bank have any problem with that?

MR. DOBBS: Your Honor, I am not sure whether the bank would have a problem with that at all. My understanding is that, as part of the U.S. Trustee and Bankruptcy Administrator provisions, there is a standing deposit the Bank of America has.

MS. SIMPSON: And we would roll that up and down depending on what the cases show.

MR. DOBBS: Right, but I am not in a position at this moment to say whether or not that would be problematical otherwise. We can certainly check if this could be granted on at least an interim basis and see if that's a problem or not.

MS. SIMPSON: Yeah. I just read the motion to excuse all compliance and maybe I was reading it over broadly.

THE COURT: Mr. Durham.

MR. DURHAM: Well, I am responsible for drafting it. I said strict performance. I am not sure that is all the requirements. We clearly are going to meet whatever the court

35

requires us to do, Your Honor, and work with the bank and with Ms. Simpson's office to do that.

I think the order provides that nothing in here shall be deemed to prejudice the right of the bankruptcy administrator to bring that, although we are asking that that be for forward thinking items when you bring it. So we would like, if we could, if Ms. Simpson is comfortable getting this order entered, we would continue our dialogue with her and for whatever reason – we are going to have to serve this order. If there is a problem that we cannot satisfy her office with, then I suspect she would bring this back on for a hearing at the next hearing date.

MS. SIMPSON: And the only thing I really need more information on, beyond just setting up the collateral like we do in other cases, is the investment account, and we have talked about that a little bit.

MR. DURHAM: Right. We have. And I requested that, Your Honor. As soon as I get that, I will give it to Ms. Simpson. It is my understanding that it is just in T-bills, which I think would be acceptable.

MS. SIMPSON: That's great.

MR. DURHAM: I understand it is not the greatest return but it's the safest, we hope.

THE COURT: Why don't we do an interim approval of the bank account motion, if you will, reserving that issue to talk

36

about collateralization or posting reserves and simply put that over so we don't have to file a new motion and re-notice it.

MS. SIMPSON: Yeah. I don't want to gum up the bank's loan and, if this is a requirement for the loan, I don't have any problem with going forward like it is because my rights are reserved with the understanding that we are still working on some of those things.

MR. DURHAM: Your Honor, we would ask that if you would consider entering the order as is without reservation and the understanding on the record that Ms. Simpson, if she is not satisfied, is going to bring this on for hearing.

THE COURT: Okay. I was just going to save you a little bit of paper work and noticing but, if you would rather do it the other way, we – do any other parties want to be heard on this one?

(No response.)

THE COURT: Okay. I will approve the motion.

MR. DURHAM: Your Honor, that's another order that we need to have entered that we need to flag for the clerk.

THE COURT: Okay.

MR. DURHAM: I am going to turn it back over to Ms. Abel, Your Honor.

THE COURT: All right.

MS. ABEL: Actually, Your Honor –

MR. DURHAM: Oh, no, it is Mr. Rayburn.

37

MS. ABEL: That's right.  That's okay.

MR. RAYBURN: This is a motion for an authorization to continue ordinary course sale and purchase transactions with affiliated entities.  I won't make you squint at a chart again but basically what happens in this international group of companies is that the debtors, Garlock primarily, not Garrison. Garrison is a litigation services company.

THE COURT: Right.

MR. RAYBURN: Garlock transacts business with foreign affiliates of its own and foreign affiliates of other members of the EnPro family.  Those transactions are done on a business to business basis, selling on open account among the affiliates on what amounts to net thirty-day terms.  Once a month Garlock inputs all of its invoices to all of these affiliates into the clearance system.  Once a month the affiliates do the same. There is a literally around-the-world computation of how much is owed to Garlock and how much is owed by Garlock and, once a month, that net debt, whichever way it runs, is settled in a single wire by Garlock, either to Garlock or from Garlock with all of these non-debtor entities.  The transactions are run through a bank account in BofA Dublin.  It is mostly because it is all foreign commerce.

And this motion is carefully crafted not to ask permission to cross the petition with respect to the settlement mechanism.  This motion is crafted so as to say we have frozen

38

the input of payables into the clearance scheme that we are talking about, and we won't input payables except to the extent those payables are authorized by some other motion today and to grant any such motion by some other motion to be paid.  In other words, prepetition payables are not going into this system unless they are expressly authorized under the twenty-day admin claim or a similar motion.

We would ask you to approve this motion.  This one is just to continue literally a prepetition practice and we frankly don't know any other way to do it.  We don't think it is very unique.  We think we did it the same way as other folks do it and, if we get a benefit, obviously get a benefit from it because we are able to buy on credit, albeit thirty-day credit, where we buy from our foreign affiliates and the foreign affiliates are being put on a thirty-day basis.  We are not having to give them 364(c)(1) protection or any other similar protection.  We are simply getting ordinary course extensions of credit.

THE COURT: Other parties?  Does anyone wish to be heard on this one?

(No response.)

THE COURT: Okay.  Again, without objection, we will approve the motion.

MR. DURHAM: Your Honor, that was on an interim basis also, by the way.

39

THE COURT: All right. We will revisit that on a final basis on June 30.

MS. ABEL: Thank you, Your Honor.  I am taking over at this point for a couple.  The next item on our agenda is a motion dealing with our customer practices.  These are pretty typical customer practices for a manufacturing operation.  We have warranties and allowances and return policies that allow us to stand by our products.  We also have certain rebates and incentive programs, and we would ask to continue those prepetition practices during the course of the cases in order to preserve our enterprise value.

THE COURT: Others wanting to be heard on this one?

(No response.)

THE COURT: Okay.  Again, without objection, approved.

MS. ABEL: Thank you, Your Honor.

The next item up relates to our common carriers.  We coordinate the deliveries of our products through – I am sorry, Your Honor.  It has escaped me – AFS Logistics, and we would ask to continue that post-petition.

At the time of the petition date, we are estimating that there is approximately a hundred two thousand dollars in outstanding invoices for common carriers that we would ask to be authorized to pay on a post-petition basis in order to keep those goods moving through the petition date for obvious reasons relating to their rights as a bailee.  So we would ask

40

Your Honor to enter an order approving this motion.

THE COURT: Ms. Simpson.

MS. SIMPSON: I just have a question.  AFS is not a related debtor?

MS. ABEL: No, Your Honor.  I am sorry.  No, Linda.

THE COURT: Any other parties wanting to be heard on this one?

(No response.)

THE COURT: Well, the disruption, I suspect, that would be caused if you didn't do this, even if you are paying a prepetition debt, the disruption would be greatly more harmful than the amount you are proposing to pay.  That's approved.

MS. ABEL: Thank you, Your Honor.  The liens, as well, so we thank you for that.

THE COURT: Uh-huh.

MS. ABEL: The next item up is a utility motion.  We have mirrored some previous orders that were entered in this jurisdiction relating to adequate assurance of payment.  As a manufacturing operation, our access to utilities is important as it is in any company but particularly for us.  We feel we have approximately – we have a run rate of approximately three hundred and forty thousand dollars a month on our utilities.  We are asking in the motion to be allowed to pay prepetition invoices in the ordinary course of business as part of our adequate assurance of payment.  We are also proposing to post

41

deposits with each of the providers that equals that average monthly cost, and we also have procedures set forth in the motion and the proposed order whereby utility providers can request additional adequate assurance payment and, if we have any requests, we hope we will be able to work that out but having this forum in order to resolve that issue, if need be.

THE COURT: With the debtor getting the first crack before the lender brings the matter to court, is that the way it works, that the request for additional assurance first goes to the debtor and then to –

MS. ABEL: Yes, Your Honor, and if we are not able to reach a consensual resolution of that issue, we would notice it with the court.

THE COURT: Okay.  Other parties?

(No response.)

THE COURT: It is fairly typical, so I will approve that, as well.

MS. ABEL: Thank you, Your Honor.  The next item up on our agenda is a request to pay some sales and use taxes.  We would submit that those would be a necessary payment at any time soon in the case, and we would like to go ahead and have the authority to pay that at the petition date if that is appropriate in this case.  We believe we have prepetition obligations totaling approximately twenty-nine – just shy of thirty thousand dollars, and we ask for authority to pay those

42

at this time.

THE COURT: Other parties?

(No response.)

THE COURT: There being none, the motion is approved.

MS. ABEL: Thank you, Your Honor.  We are now going to invite our co-counsel, special counsel to the debtor, Garland Cassada, to discuss noticing procedures relating to asbestos claimants.

THE COURT: Mr. Cassada.  Mr. Krisko.

MS. ABEL: I am sorry.  I misspoke.

MR. CASSADA: Actually Mr. Krisko will present our particular matter.  Thank you, Your Honor.

MR. KRISKO: Yes, Your Honor.  This is a motion for the court to approve notice procedures as they apply to the asbestos claimants in this case.  As you may know from reviewing the pleadings, there are over a hundred thousand asbestos claimants in this case.  They are represented by approximately seven hundred law firms.

The debtor's relationship with these claimants has been exclusively through their counsel and information related to these claimants is – all the information we have related to these claimants is really contact information for their counsel.

In this kind of cases, it is routine for the court to approve, pursuant to its authority under Rule 2002(m), to

43

notice these asbestos claimants through their counsel and, Your Honor, this motion requests authority to notice these asbestos claimants by addressing notices to counsel that appear on behalf of the asbestos claimants.

THE COURT: Okay.  Other parties?  Ms. Ramsey.

MS. RAMSEY: Yes, Your Honor.  It is not unusual in asbestos bankruptcy cases for notice procedures to permit notification through asbestos counsel and frequently, Your Honor, the law firms that represent the plaintiffs support noticing procedure like that because it is confusing and burdensome for the individual claimants, many of whom are quite ill, to receive the volume of paper work that comes across in these proceedings.

However, Your Honor, in this particular case, we would ask that the court approve this motion again on an interim basis and only with respect to the pleadings that are customary in a bankruptcy case.  And specifically the reason for this request, Your Honor, is that reviewing the debtor's informational brief and taking a look at the papers that have been filed to-date with respect to the adversary action for the TRO, it is clear that the debtors are planning a procedure that we believe comes very close to attempting to estimate or determine individual claims, and there are both jurisdictional issues with respect to that.  There are also very important substantive rights that are at issue, and it is not always the

44

case that a law firm that represents these claimants for purposes of pursuing their tort claims is the counsel that is retained for purposes of pursuing these kinds of bankruptcy rights or protecting those bankruptcy rights.

So what we would ask the court to do today, Your Honor, is to approve the motion for today's purposes but permit again an extension of time for an official committee to come in and for more members of the asbestos bar to have an opportunity to review the informational brief and to take a look at what the debtor is proposing by way of claims estimation and litigation with respect to these claims and come back and more completely argue this at a later time.

THE COURT: Okay.

MR. PHILLIPS: Just to echo Ms. Ramsey's comments, Your Honor, Robert Phillips, one of the asbestos law firms. Again, it is customary for purposes of 2002 notices and such to utilize the asbestos law firms rather than attempt to serving individual plaintiffs but, as Ms. Ramsey stated, we appear that we may be going down a track of an attempt to do individual claim allowance and disallowance. And given the fact that there are pending lawsuits that such a litigation strategy might require issues with regard to withdrawal of the reference, with removal of cases from state court to federal court and also we have seen in other litigation, not only in asbestos, there have become issues with regard to the federal

45

multi-district litigation panel and its jurisdiction over asbestos claims, as well as the jurisdiction of the bankruptcy court and it gets very complicated, Your Honor, and would require a lot more work and examination and discussion frankly between the committee, once appointed, and debtor's counsel as to what exactly the procedure is going to be.

We will concede the debtor has not filed their motion asking for the various things we are referencing, but the informational brief certainly foreshadows that something is coming down the pike with regard to this.  So if we could just have a reservation of rights, Your Honor.

THE COURT: All right. Anyone else?

MR. KRISKO: Your Honor, just to respond to those concerns.

THE COURT: Yes, sir.

MR. KRISKO: First, the order that is proposed does give any party twenty days to present specific objections to this and to set on for hearing any objection to this.  The order, as drafted, will allow the court to approve these notice procedures but will set a time for parties such as counsel that have appeared here to make specific objections to these procedures as we propose them.

THE COURT: Anyone else?

(No response.)

THE COURT: I hear you.  I guess the short answer is we

46

need to have some mechanism to do the noticing starting out of the gate. We may change that. Judge Hodges may have a different idea after you all have had a chance to weigh in on it. I realize the twenty-day objection period may not be sufficient for a full investigation of this or to fully formulate the notice procedures that apply all the way through the case but that, at least, will get some thought time and, if the objections are filed, assuming they are filed, further discussion can be had at the hearing on the 30th about that and then it may be even necessary to tweak or revise those procedures later in the case. But with the reservation of rights, let's go ahead and use this as the starting mechanism and see where we go from there. Okay.

All right. What's next?

MR. DURHAM: I believe I am up again, Your Honor. Your Honor, these are generic notice procedures in the case, which I believe is item thirteen on your agenda. Your Honor, what we have done initially is create a service list of the top twenty unsecured creditors for Garlock, top five unsecured creditors for Garrison, the top thirty Mesothelioma asbestos law firms that we could identify by number of claims, I believe. We anticipate that those – the twenty unsecureds will be replaced by an unsecured creditors committee. We anticipate, to the extent the court approves an asbestos committee, that they will replace the top thirty listing. We intend to continue to serve

47

those people until that event occurs – those events occur.  But we would also like to limit notice generally to the bankruptcy administrator, the debtors, the attorneys for the two prospective committees we just discussed, counsel for Bank of America, counsel for – if there is a personal representative appointed at any point in time, counsel for that representative, a representative of our union, any 2002 parties and the usual United States of America suspects, the SEC –

THE COURT: Suspects?

MR. DURHAM: The Department of the Treasury, the U.S. Attorney and the PBGC.

Your Honor, we believe that that notice will be fully sufficient on the generic bankruptcy or the general bankruptcy case filings in this case and hopefully that the court will approve that.  We understand that there were minor – we got corrected addresses over the weekend based on the FedEx packages we sent out.  The actual order we propose to download to Your Honor today may have three or four corrected addresses from the addresses that were on the initial filing.

Your Honor, on a related note, we would also hope that there will be other case management motions filed shortly in this case after discussion with the parties in interest and specifically the clerk of the Bankruptcy Court and Ms. Simpson's office just for management and docketing purposes and perhaps a Chapter 11 day for Garlock, Your Honor, if I should

48

be so bold.

Those matters will be coming shortly, but we just need to sit down with Ms. Simpson and the clerk's office to see what would work for them and what they want and what they need, if we can meet those needs.

But this order, I think initially would set forth the general service list, Your Honor, and we believe this list tracks other lists that this court has found acceptable in the past in cases of this nature.

THE COURT: All right. Does anyone want to weigh in on this motion?  As compared to the asbestos creditors, what are the debtors seeing in terms of trade debt and the like, non-tort claims?

MR. DURHAM: Your Honor, we think we have approximately six hundred employees at Garlock.  I think we have eleven employees at Garrison.  We have two hundred and fifty probably trade debt at Garlock.  We have less than ten trade debt at Garrison.

THE COURT: All right.

MR. DURHAM: We have, I think co-defendants, I am guessing, Your Honor, around six hundred, and plaintiff's law firms, I believe again maybe another five or six hundred, maybe seven hundred.  Mr. Krisko used that number.

THE COURT: I am more interested in, realizing that the current motion is addressed primarily to routine repeated cases

49

as case notices, I am more interested in the initial first meeting notices and making sure the world is well apprised and –

MR. DURHAM: I think I just did the first meeting notice, Your Honor.  It was  probably two thousand to twenty-five hundred as opposed to what I think would be actually in excess of a hundred thousand.

THE COURT: Right.  But the trade debt, if you will, the non-tort claimants are going to get a first meeting notice because they are identifiable; right?

MR. DURHAM: Right.

THE COURT: And then you are proposing as to the asbestos claimants the notice through the law firms?

MR. DURHAM: Right.  We believe the total of those notices, including co-defendants and current employees, would be somewhere between two thousand and twenty-five hundred.

THE COURT: Is there any prospect that there could be asbestos claimants out there that are not affiliated or represented by law firms at this juncture?  I am a little concerned about whether, if I am just sitting at home and feeling bad and I haven't done anything about it, how do I know if Garlock is in bankruptcy?

MR. DURHAM: Your Honor, it is my understanding, even though I am stealing Mr. Cassada's and Mr. Krisko's thunder to a degree, it is my understanding that we believe that Garrison

50

is set up to handle these claims and work with the plaintiffs and the plaintiffs' firms and the insurance companies in trying to resolve these claims, either consensually or through whatever litigation that would ensue, that they believe that most – I think most all the claimants are represented by counsel.  To the degree that they are not and we can identify them, then clearly those would receive notice if we have addresses for them.

THE COURT: I am just wondering out loud whether a publication notice of some sort of the first meeting might be in order.

MR. DURHAM: I think, Your Honor, that that was contemplated.  I will let Mr. –

THE COURT: Mr. Cassada.

MR. CASSADA: Yes, Your Honor, there certainly are conceivable asbestos claimants who are not represented by counsel and, for certain matters within the bankruptcy case that affects their interest, we will be proposing and asking the court's approval for publication notice designed to reach those creditors.

THE COURT: I am sure the attorneys have read the Fourth Circuit's ruling in *Tessler* of known claimants get notice and, if you don't give them actual notice, you can't bind them with the case or the plan.

MR. CASSADA: Yes, and I understand that's consistent

51

with what the Supreme Court said a long time ago in *Mullane*.

THE COURT: Okay.  Yes, sir.

MR. PHILLIPS: Your Honor has hit on a key problem in all these cases, which will come up down the line when we talk about notice, talk about bar dates and so forth.  You know, as the debtor points out in its informational brief, everyday dozens and dozens and dozens of persons are diagnosed with asbestos related diseases, with regard to Mesothelioma, lung cancer, other cancers.  We are talking about people going in to their actual treating doctors, clinics in their neighborhood and being diagnosed with this disease.  These are not, you know, recruited cases.  These are not the result of screenings.  These are people going to their primary care physicians and being diagnosed.  And everyday some percentage of those persons sign with law firms.  And so even since Saturday when the debtor filed bankruptcy, there have been hundreds and hundreds of people who have come forward with asbestos diseases, some of whom – I know my firm has signed people as clients over the weekend and beginning this week.  We do it every single day, and we may be the largest Mesothelioma law firm but I think that is echoed across the bar.  And so you may have heard debtor's counsel make a reference to a personal representative.  That's one reason why it is typical in these cases for a future claims representative to be appointed by the court to represent future claimants, holders of demand, which are the people who

52

aren't even sick yet or at least don't know they are sick.

THE COURT: Right.

MR. PHILLIPS: And between the committee, which represents the people current, and a futures representative to pick up everyone who hasn't yet come forward, there is the ability to perhaps comport with due process to make sure everyone has been properly notified, as well, as they spoke, in some sort of publication notice.

But the Supreme Court itself has addressed this problem.  Whether someone is sitting in Houston who worked at an oil refinery knows anything about whether they should come forward when they see a notice in the *USA Today* or, you know, *The Wall Street Journal*, of all places, saying that Garlock Sealing Technologies is in bankruptcy is a very problematic proposition.  So even a notice program that is typical in commercial bankruptcy cases is very questionable if it's sufficient.  But I think if we can get not only a committee but a future representative up and running in this case, it would really help to mollify those concerns.

THE COURT: Anyone else?  Mr. Cassada.

MR. CASSADA: Yes, sir.  Your Honor received a copy of our informational brief and undoubtedly noted there that we anticipated the prompt appointment of a committee for asbestos claimants only and also a future motion to appoint a futures representative to represent on those claims.

53

THE COURT: All right.    Anyone else on the current motion?

(No response.)

THE COURT: We will go ahead again and start with this. Again, if something arises that shows a need to tweak the notice procedures, we will deal with that going down the road, but let's go ahead and get these notice procedures in place so that we at least have something to use.

All right.

MS. ABEL: Thank you, Your Honor.  There are just two more matters on the agenda that are pretty procedural in nature.  One is to get an extension of time to file the schedules and statements.  Because of the nature of these cases and the breadth of the potential claimants, we are asking for an additional thirty days to file those reports, through and including July 20th.  The same for – I guess I should ask the court to approve that motion before I move on to the next.

THE COURT: Any objection?

MS. SIMPSON: The only issue with that is holding a first meeting which will have to be held long before that or at some point before that deadline passes, and handling that and creditors and making sure that the matrix is correct, and I don't know what you propose as far as getting a correct matrix in, if it is already in.

MS. ABEL: That is something that was being worked on

54

this morning.    We expect a full matrix to be – well, correction.    Not a full matrix including all of the asbestos claimants but –

MS. SIMPSON: With their attorney representatives –

MS. ABEL: All of the attorney representatives would be submitted sometime today, we expect, would be finalized.

MS. SIMPSON: First would be the notice for the first meeting and then making it meaningful by having schedules and statements, but I am not sure if that's –

THE COURT: Is there a way to back into these schedules even if we make an extension?    Can we stage the various filings and prioritize between particular schedules, some have a little more meaning at the first meeting than others?

MS. ABEL: What would be those that you would be most interested in seeing prior to –

MS. SIMPSON: I am looking more out for the creditors because I can always ask the questions later on.    Creditors want to see how their claims are listed.    Because this is a Chapter 11, if you list them properly, they don't have to do anything else.    That sort of thing.    They may decide their claim is listed properly and they aren't going to bother coming.    That sort of thing.

MS. ABEL: As far as the Schedule "F," which is what you are hinting at, I think trade creditors we could probably generate that in quick order.    The challenge is the asbestos

55

claimants.  And so if there would be an opportunity to submit a staggered Schedule "F," if that would be acceptable to the court and to Ms. Simpson, that is something that we would be willing to do.

THE COURT: I would assume things like the statement of financial affairs would be the last of importance or interest. Maybe the list of executory contracts, that sort of thing.

MS. SIMPSON: Yes.

MR. DURHAM: Your Honor, one issue on our schedules is we would hope that within the first sixty to ninety days of the case we could eliminate our employees from the schedules.  I think the trade schedules may not be an issue.  We are talking less than three hundred.  The asbestos claimants, if we believe we do have to schedule them by name, the only address we have is the law firms, and we need to come up with a format to do that because it will be several thousand pages.  And if we use, you know, a landscape program with forty to a page, we are talking three or four thousand pages.  If we did the typical bankruptcy schedule, seven to a page, the clerk would quit.

But we are willing to work with the asbestos counsel's committee to try to resolve that issue to make sure that – what we are trying to do is assimilate the information correct without having to amend it, amend it, amend it, if we can.  So that's why we believe it will take time.

THE COURT: What is typically done in this sort of case

56

with regard to scheduling?   You folks obviously have participated in other cases of a similar nature.

MR. PHILLIPS: One thing I was going to say, Your Honor, to add to that, is one issue that comes up that would be helpful, independent of listing the thousands and thousands with unliquidated claims, is what they would be listed as, is there should be, I am guessing – I don't know the debtor's books and records – some number of settled claims with the asbestos bar, and it would be helpful to have those quickly put out there.   I would think that that could be generated, maybe not as quickly as the trade debt because the debtor will have to consult the various law firms they utilize, but it would be very useful to have that put to the side because, as we talked about, there is going to be continuing issues we are going to keep coming back to with regard to notice to the unliquidated claims and the future claims and the future demands.  But if we could, I just wanted to say, if we could insert that the settled claims, especially if there happen to be any settled claims out there with collateral.  We have seen in some cases where there is random settlement agreements out there where there might be some sort of collateral securing the settlement. It seems odd but – it seems odd to me but it does happen from time to time.  So if there is anything like that, we would want that disclosed fairly quickly.  We can keep talking about the issue with regard to how we list the volume of unliquidated

57

tort claims.

THE COURT: I am just wondering out loud, is there a mechanism, separate and apart from CM/ECF, but is there a mechanism where we can use either an Internet connection to the debtor, if you are someone who is wondering, to post that information in electronic form that it could be viewed?

MS. SIMPSON: Mr. Durham and I were talking yesterday about the possibility of the asbestos-related claims being a spreadsheet linked attachment to the schedule so that – and work with the IT people at the court so that you could have an Excel file and someone could easily search it.  They could sort it any way they wanted, that sort of thing.  And also we need to work with the clerk on claims and how those would come in and that sort of thing, but that's further.

But as far as the schedules go, that was our first discussion on it, but I think that kind of a document may be helpful to the public.

THE COURT: Okay.  Ms. Ramsey.

MS. RAMSEY: We agree, Your Honor, and very often the counsel for the asbestos claimants committee will set up a web site available to the asbestos law firms that is readily accessible to have at least the most important pleadings and dates of interest.

THE COURT: Right.  So we don't have to have people trying to get Pacer accounts all over the world.

58

MR. PHILLIPS: And depending on the case, Your Honor, debtors have used claims and balloting agents, which themselves, Logan and Company, others, that maintain elaborate databases.  I remember with my prior practice, if you are a trade creditor, you can just go there and see how they have you listed as opposed to trying to wander through ECF which can be daunting to a non-lawyer.

THE COURT: Sure.

MR. PHILLIPS:  I don't know what the debtor's plans are, if it is necessary for them to go about hiring such a claims agent, but certainly it has also been done where the debtor can set up a web site consultation with the Bankruptcy Administrator to do what Ms. Ramsey echoed, which the debtor could run here so we have listed and so forth along with those dates, and that might help them with regard to other creditors they have that they need to keep informed, or the committee could do that.

THE COURT: Mr. Cassada.

MR. CASSADA: Your Honor, in addition to that, Rule 2019 requires lawyers who appear in cases to identify their clients when they represent multiple clients.  So we would anticipate that Mr. Phillips' firm and all of the others who appear will provide an accurate list of the clients for whom they are representing.

And I would note that Garlock, we believe, is on the

59

word processor for a lot of these plaintiff's firms and they simply named Garlock to the extent it looks like Garlock gets every single Mesothelioma client. We would certainly hope that the plaintiffs, when they file their 2019 statements, will name only those clients who actually have bona fide or can claim bona fide exposure to Garlock's products. We anticipate that will greatly aid the debtors in identifying who their true body of claimants are.

THE COURT: We are getting a little far afield here, but let's back into where we were. I think the first thing that we can garner out of this is we need to be thinking about ideas of how this information can be disseminated as quickly as possible to the world, if you will, the asbestos claimants particularly about the bankruptcy and in a more efficient and easier accessible fashion than a Pacer account.

But as to the current motion of extending the time to file schedules, did anyone have any other objections or concerns, comments about that?

(No response.)

THE COURT: I think what I am going to do is just approve it *en gros*, if you will, allow the thirty days to file those schedules but ask the debtor to prioritize and back in, particularly with a view to number of people affected on filing those schedules, maybe stage them in order of importance, if you will, and get as much information up as quickly as

60

possible.  Do you see what I am saying?

MS. ABEL: Yes, Your Honor.  Just to be clear to the court, I think that the relief is only through July 20th.  I don't believe that would be fourteen plus thirty; it is just through July 20th.

MR. DURHAM: Actually I believe it is, Your Honor.

MS. ABEL: Is it fourteen plus thirty?  I am sorry.  I can't do math –

MR. DURHAM: I am not good in math but I counted it on my fingers real quick.  I actually believe it's – July 20th may actually be thirty-one days, to be fair, Your Honor, but we understand the direction of Your Honor and we will endeavor to work with the asbestos committee –

THE COURT: I want best efforts to file as much information as quickly as possible.  I don't anticipate any attempt to sandbag information before the first meeting but get everything you can out as quickly as possible and in order, if you will, kind of universal importance to the creditor body.

MR. DURHAM: I think Mr. Phillips, is it –

MR. PHILLIPS: Yes

MR. DURHAM: Has identified a good point.  To the degree there is an amount that we know, then we need to circulate those and separate those the best we can.

THE COURT: And the other, I think, technical aspect of that, if any of you all are contemplating filing voluminous

61

documents that may tax the system, you might want to place a call to our clerk first and tell them what's coming if we are going to have something that has so much data. We don't want it to crash the system or create filing headaches.

MR. DURHAM: We can certainly have Ms. Robinson, my assistant, speak to anyone who has that issue because we have it regularly, Your Honor.

Your Honor, I think it's important that – we agree, I think, with everyone in this courtroom that notice is very critical in these cases and that it is essential that the notice be as thorough as we can get it.

THE COURT: Okay. All right. We all know where we are headed. You had one more motion, Ms. Abel?

MS. ABEL: One more, yes, sir. We also have filed a motion asking for an extension of time to comply with the requirements of Bankruptcy Rule 2015.3. The date that is suggested in the motion is the same, July 20th date, which is an enlargement of thirty to thirty-one days which Mr. Durham pointed out to me.

This is a newer reporting requirement. We are going to make sure we try to give as much information as we can, that is appropriate under the circumstances, and we just ask for additional time to prepare those documents because of the nature of these cases.

THE COURT: All right. Again, responses, concerns,

62

objections?  It is a new provision.  I am not sure any of us fully understand what's involved.

MS. ABEL: Yes, Your Honor.  We are going to figure that out.

THE COURT:  I can't even get a dispute over it.  That being the case, without objection, it is approved.

MS. ABEL: Thank you, Your Honor.

THE COURT: Other matters, concerns, things that we need to talk about before the next hearing?  Do you have anything else?

(No response.)

THE COURT: Well, you have done a tremendous amount of work.  I congratulate you for your organization for all concerned and your ability to work with one another on the start of the case.  I am sure there will be a lot more to talk about at the next hearing.

Just one parenthetical, if you looked at the proceedings memo yesterday, we incorrectly docketed – or not docketed – the proceedings memo indicated that I had recused myself in these cases.  I had not.  I reassigned them to Judge Hodges as a matter of trying to balance our caseloads out.  It was not a conflict or anything of that nature, but I didn't want anyone to be misled.

All right. If there is nothing else, we will recess. Thank you all.

63

MR. DURHAM: Thank you, Your Honor.

MS. ABEL: Thank you, Your Honor.

(Off the record at 10:54 a.m.)

64

C E R T I F I C A T E


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Patricia Basham

Patricia Basham, Transcriber

Date:  June 15, 2010