IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

In the matter of:                  )
                                   )
GARLOCK SEALING TECHNOLOGIES, LLC, ) No. 10-31607
et al.,                            ) Jointly Administered
                                   ) Charlotte, NC
      Debtors.                     ) June 15, 2010, 3:29 p.m.


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE J. CRAIG WHITLEY
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

Albert F. Durham
Rayburn, Cooper & Durham, P.A.
227 West Trade Street, Suite 1200
Charlotte NC, 28202-1672

Garland S. Cassada
Jonathan C. Krisko
Robinson, Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246


Electronic Recorder
Operator:                  Barbara Sifford

Transcriber:               Patricia Basham
                           6411 Quail Ridge Drive
                           Bartlett, TN  38135
                           9O1-372-O613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

APPEARANCES:

David Greenstone
Simon, Eddins & Greenstone, LLP
3232 McKinney Avenue, Suite 610
Dallas, TX 75204

Robert W. Phillips
The Simmons Firm
707 Berkshire Blvd.
P.O. Box 521
East Alton Illinois 62024

George Tankard
Waters & Kraus LLP
315 North Charles Street
Baltimore, MD 21201

A. Cotten Wright
Grier Furr & Crisp, P.A.
101 North Tryon Street, Suite 1240
Charlotte, NC  28246

Natalie D. Ramsey (Telephonically)
Montgomery, McCracken, Walker & Rhoads
123 South Broad Street
Philadelphia, Pennsylvania

Linda W. Simpson
Alex Kinney
Bankruptcy Administrator's Office
402 West Trade Street, Room 202
Charlotte, NC 28202

Joseph F. Rice
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC  29464

William M. Graham
Wallace and Graham
525 N. Main St.
Salisbury, NC 28144

Garrett J. Bradley (Telephonically)
Thornton & Naumes LLP
100 Summer Street, 30th Floor
Boston, MA 02110

John Cooney (Telephonically)
Cooney & Conway
120 North La Salle St., Suite 300
Chicago, IL 60602

3

APPEARANCES (Continued):

Alan Kellman (Telephonically)
The Jaques Admiralty Law Firm
1370 Penobscot Building, 645 Griswold Street
Detroit, Michigan  48226-4192

Peter A. Kraus (Telephonically)
Waters & Kraus, LLP
3219 McKinney Avenue
Dallas, Texas  75204

4

(CALL TO ORDER)

THE COURT: Be seated, please.  All right.  Garlock Sealing Technologies, LLC.  My name is Craig Whitley.  I am sitting in for Judge Hodges.  This is really supposed to be his case, but he is out-of-town this week, so we are going to do the best we can.

Let me ask for appearances from the courtroom first. I  know  we  have  got  a  number  of  parties  appearing telephonically, and we will try to get you all in order.  And as  the  hearing  proceeds,  I  would  ask  each  of  you,  when  you speak,  there  are  a  lot  of  you  here  that  are  new  to  us,  and  we would  ask  you  to  identify  yourselves  each  time  you  step  up  to say  something.   But  let's  get  the  appearances  from  the courtroom  first.   All  right.   Starting  over  here.

MR.  DURHAM:  Your  Honor,  I  am  Al  Durham.   I  am  the bankruptcy  counsel  for  Garlock,  Garrison  and  Anchor.

THE  COURT:  Okay.

MR.  CASSADA:  Good  afternoon,  Your  Honor.   Garland Cassada,  here  for  Garlock  and  the  other  debtors,  accompanied  by John  Krisko.   Don  Pomeroy,  the  chief  financial  officer  of Garlock,  is  also  here.

THE  COURT:  All  right.   Yes,  sir.

MR.  GREENSTONE:  Your  Honor,  good  morning.   I  guess  it is  still  morning.   This  is  David  Greenstone  with  Simon,  Eddins and  Greenstone,  on  behalf  of  the  creditors  represented  by

5

Simon, Eddins and Greenstone.

THE COURT: Okay.  I guess it depends on where you came from whether it is still morning.

MR. PHILLIPS: Robert Phillips, Your Honor, of the Simmons Browder firm on behalf of the Simmons Browder claimants and, like Mr. Greenstone, a proposed member of the asbestos committee.

THE COURT: Okay.

MR. TANKARD: Good afternoon, Your Honor.  George Tankard, Waters & Kraus, on behalf of the Waters & Kraus claimants and also Waters & Kraus is a member of the proposed committee of asbestos personal injury claimants.

THE COURT: Okay.  Ms. Wright.

MS. WRIGHT: Your Honor, Cotten Wright.  I am local counsel for Natalie Ramsey of the Montgomery McCracken firm. She is on the telephone, and our client is a proposed committee member, as well, the firm of Kazin McClain.

THE COURT: Okay.

MS. SIMPSON: Linda Simpson an Alex Kinney for the Bankruptcy Administrator's Office.

MR. RICE: Your Honor, I am Joe Rice for the Motley Rice firm out of Charleston, South Carolina.  I am here on behalf of claimants represented by Motley Rice, asbestos personal injury claimants, and I have also been asked to appear today on the motion we filed on behalf of Weitz & Luxenberg,

6

Cooney & Conway and Baron & Budd, all firms that are representing asbestos personal injury claimants, and we have a motion pending with the court.

THE COURT: Right.  Others in the courtroom needing to announce?  Yes, sir.

MR. GRAHAM: Your Honor, Bill Graham, the firm of Wallace & Graham in Salisbury.  Here on behalf of the firm of Paul, Reich & Myers in Philadelphia, making application for asbestos personal injury claimants committee.

THE COURT: Okay.

MR. GOAD: Your Honor, Chuck Goad, FTI Consulting, not engaged at the moment, financial advisors, here as observers.

THE COURT: All right.  Fine.  Yes, sir.

MR. HUNT: James Hunt, FTI Consulting.

THE COURT: Okay.  All I need are the attorneys announcing.  If there is anyone else in the courtroom?

(No response.)

THE COURT: Okay.  Let's get the telephonic appearances.  I know there are several of you appearing on the line.  I hope all of you are with us and I hope all of you can hear.  The list I have has the following individuals:

Garrett Bradley from Thornton and Naumes.  Is Mr. Bradley on the line?

(No response.)

THE COURT: He has not announced.  Okay.  John Cooney

7

of Cooney and Conway.

MR. COONEY: Yes, Your Honor, John Cooney from Chicago is on the line.

THE COURT: Great.  And you can hear, sir?

MR. COONEY: I can hear you fine, sir.

THE COURT: Okay.  Great.  Alan Kellman of the Jacques Admiralty Law Firm.

MR. KELLMAN: Yes, sir, Alan Kellman is on the line and I can also hear you well.

THE COURT: Okay.  Great.  Peter Kraus of Waters & Kraus.

MR. KRAUS: Yes, Your Honor, Waters & Kraus.  I am on the line and can hear fine.

THE COURT: Okay.  And Natalie Ramsey at the Montgomery McCracken firm.

MS. RAMSEY: Yes, Your Honor, I am on the phone and can also hear well.

THE COURT: Are there any parties appearing telephonically or attorneys actually appearing telephonically that are on the line but have not been called?  Do we have anyone that I don't have on my list?

(No response.)

THE COURT: Okay.  Good.

All right.  Ms. Simpson, it is your notice of proposed orders.  Why don't you set the stage and tell us what's afoot?

8

MS. SIMPSON: Thank you, Your Honor. Your Honor, I wanted to just give some background to the court about how this came about and where we are today.

The process was last Wednesday I sent out a notice of the formation of the committee.  It was sent to as many of the asbestos claimants' attorneys as we had information on.  We did receive information from other people that, if we liked it, we sent it to whoever contacted us or we knew about of the top – I think we got the top twenty-five from the debtor and we worked from that list.  It also was sent out to the twenty largest unsecured creditors in the Garlock case.

In the Anchor case, there is not a twenty largest list.  In the Garrison case, there are only five creditors listed.  None of the claims reach a thousand dollars.  So I did no solicitation there.

The notice, if I could approach, I have marked as Exhibit 1, Your Honor, so you would have that background.

That is the notice that went out.  It required for a response on the questionnaires by Friday, June the 11th, last Friday at Noon, and that a formation meeting would take place by a conference call at two o'clock.

My office arranged to have sixty open lines through the District Court. When we got into the call, it was apparent we had about twenty because, as people dropped off, other people came on. As a result, anyone that I had information on,

9

anyone that contacted me, anyone that called, I contacted them back after the conference call. We finished about three o'clock.

By 5:30 or so, I had finished the calling and sat down and proposed orders. They would have been filed sooner but unfortunately the court's web site went down about 5:45. So they were actually filed about nine. An employee in my office sent out the proposed orders for both committees, as well as a notice of this hearing to everyone she had e-mails for.

(Garrett Bradley has joined the conference.)

So that's the posture of it. I had set it for today rather than waiting until Thursday or later in the week, as I know there are a lot of first-day motions and things were moving on, on this case, and I didn't want the case to get away from the committee before they were formed and had an opportunity to participate.

THE COURT: Okay.

MS. SIMPSON: If we can turn first to the general unsecured creditors committee, the notice and the proposed order on that, we only received three positive responses. To be honest, I was surprised we received that many because there are not really that many big creditors in this case.

THE COURT: Right.

MS. SIMPSON: We have talked to some other general unsecured creditors, and we have had one that's just not really

10

interested in spending the time on it.  I would ask that the court consider appointing this committee with the caveat that, if we can dig up some other general unsecured creditors that might be willing to serve, we would have the option to amend that order.

THE COURT: Okay.

MS. SIMPSON: I don't believe there are any objections to that, Your Honor.

THE COURT: Anyone wanting to be heard with regard to the general unsecured committee?  How does the debtor feel about this?

MR. CASSADA: We are fine with the committee as proposed and with the order that Ms. Simpson proposed.

THE COURT: All right.  Any parties in the courtroom that want to talk about the unsecured committee, the general trade debt, if you will, the non-asbestos claim committee?

(No response.)

THE COURT:  Anyone on the telephone that wants to weigh in on that?

(No response.)

THE COURT: All right.  There being none, then we will go ahead and approve the three-member committee subject to further revision as circumstances may dictate.

MS. SIMPSON: And, Your Honor, I will submit a clean order.  That has "proposed" written on it, so I will submit

11

that to the court through the normal process.

THE COURT: Okay.  Thank you very much.

MS. SIMPSON: Your Honor, the next exhibit is Exhibit 2, and these are the questionnaires and information I have received back from the firms that were listed on the proposed order.  I did not include every submission I received as they were quite voluminous.  I can file those with the court.  But if you are willing, I would like to run through each of these rather quickly and maybe give you a flavor of why they were put on the proposed order.

THE COURT: Okay.

MS. SIMPSON: On the first one, Mr. Boyer – and let me preface it with this.  It has become apparent that the claimant is not so much the person active on the committee.  Typically it is my understanding, and the parties here can certainly correct me, that these are committees made up of the representatives of the claimants, and these representatives don't represent just this one claimant.  They have a wide variety of claimants and a large number of claimants.

So I am going to start talking about the attorneys first, and this is information I received from the questionnaires, from telephone calls.  So if I misstate it, I hope these parties will correct me, and this is just my information.

Mr. Kellman has represented in his submission that his

12

firm has over twenty-five thousand claimants.  They are Merchant Mariners with asbestos claims.  The committee work has included U.S. Gypsum and Armstrong World Industries.

Mr. Boyer's questionnaire asserts a claim, and I believe it is sixty thousand dollars.  It was difficult to read, and he lists some action pending in the Eastern District of Pennsylvania.  Mr. Boyer resides in Wilmington, North Carolina, and that would be the claimant.

THE COURT: Okay.

MS. SIMPSON:  The next is John and Diane Allen.  Mr. Kazin is their attorney.  Mr. Kazin has represented plaintiffs in asbestos disease cases, litigation, for over thirty-five years and has stated that he specializes in very serious asbestos disease cases, most of which are mesothelioma cases.

If you look at his attachments, he has substantial experience in this area.  I believe he has international speaking engagements, published, that sort of thing.  He has stated that he will personally take part in the committee and not delegate the work to another member of his firm.

His client, Mr. Allen, is a claimant diagnosed with mesothelioma and asserts asbestos exposure during his time in the Navy and he resides in California.

Mr. Warren, which Mr. Phillips, who is in the courtroom, represents.  Mr. Phillips has characterized himself as a bankruptcy lawyer turned asbestos lawyer.  He has

13

extensive experience in asbestos-related bankruptcy cases and has served on other committees in other cases.  His firm represents more mesothelioma cases than any other firm in the country.  He has represented that he has a good working relationship with the debtor.  The client, William Warren, is a claimant diagnosed with mesothelioma and lives in Utah.

Mr. Koeberle is represented by Mr. Kraus who has twenty years of experience with Garlock; stated that it was contentious until about 2005.  Since 2006, he has settled all of his cases with Garlock.  He stated that he has extensive litigation experience regarding scientific and technical issues related to the committee; and he has previously served on a number of committees.  Mr. Koeberle is a mesothelioma claimant living in Pennsylvania.

The next person, Ms. Guzzo, represented by Mr. Lipsitz.  Mr. Lipsitz is an attorney in Buffalo, located near the Palmyra, New York, plant of the debtor.  He has served on a committee in the past – he has not served on a committee in the past.  He would be new to this.  He has represented workers from the plant in New York, has a smaller practice in upstate New York, has a number of cases pending against Garlock and they are listed with his submission.  Ms. Guzzo is the administratrix of the estate of Mark Guzzo.

Robert Wirwicz is a client of Garrett Bradley with Thornton and Naumes.  Mr. Bradley is a partner in charge of the

14

bankruptcy practice at his firm and his firm also has a litigation practice that has several hundred asbestos claimants.

Mr. Bradley has experience in managing the trust following these bankruptcies and has experience with about twenty of those trusts. This was the first committee that Mr. Bradley had asked to be considered for on behalf of a claimant. Mr. Wirwicz is a mesothelioma claimant living in Massachusetts.

Charles and Loretta Willis, represented by David Greenstone. This firm has a practice primarily in Texas and California, and they have been around since 2006, so they are a relatively new firm. They have approximately a hundred active mesothelioma cases against Garlock and have been active on other committees. They have stated they have the largest individual claimant. And attached to their submission are a list of settlement values for their claimants.

The Willis claim is based on mesothelioma by asbestos exposure and they reside in Virginia.

Your Honor, when I went through coming up with a proposal for this committee, there were a number of factors. And since we had enough for a regular unsecured committee, it made sense to have two committees. I am not sure anyone here objects to two separate committees.

One of the reasons for limiting it to seven was cost and administrative convenience. I know how difficult it is to

15

get two or three lawyers together, much less more than seven. It also leaves the court an option to add a claimant here or there without making it too large, this committee.

I hope in what I gave you, you understood some of the rationale for some of these people. The first claim was from a firm that represents generally non-mesothelioma claimants based on maritime law, and they listed a large number of claimants.

Mr. Kazin and his firm have had extensive experience, and I don't know that he characterized himself this way but it appeared to me on paper he looked like the grandfather of the mesothelioma claimants.

UNIDENTIFIED PERSON: No objection to that.

MS. SIMPSON: No objection? I don't know the man but that's the way he looked on paper.

UNIDENTIFIED PERSON: He is not on the phone, though Natalie might instruct him of that.

THE COURT: That's one of those dubious distinctions like qualifying for the senior citizen discount at Arby's.

MS. SIMPSON: He may be younger than I am but he said he had thirty-five years of experience, so.

THE COURT: All right.

MS. SIMPSON: Mr. Phillips is here. I will let him speak for himself. He has a large number of claimants, especially the serious ones.

16

Mr. Kraus, I bought his pitch, so to speak, in terms of the technical expertise, the fact that he is fairly contentious with the debtor and worked out some settlement protocols.

Mr. Lipsitz was a local counsel where the debtor's plant is, and that was appealing. The fact that he was a smaller practice was also somewhat appealing, to give a balance.

Mr. Bradley, the idea that he has had experience managing these trust post-confirmation would, I think, lend a lot to the committee in that he could identify some of the pitfalls that they may run into, as well as some of the things to consider that perhaps someone that doesn't do that would not be aware of.

Mr. Greenstone's firm, I was impressed that they have only been around since 2006. They seem very aggressive. They have a number of cases, and I thought they could bring some new perspective to a committee such as this.

So that's the rationale for the choices that I put on the committee for your consideration. If there are any questions, I will be glad to answer those. I had narrowed it down to eleven and then it went down to seven. So there are other certainly well-qualified committee members within this group.

THE COURT: Okay. Well, I guess it is appropriate at

17

this point to ask how many other law firms are wishing or representatives, if you will through the law firms, are wishing to serve on the committee that were not originally proposed for inclusion?

I know we have gotten one such response, but it would be a help to me to know who is trying to get on that hasn't already been included on the list.  We had the filed written response, if I can lay my hands on it now, and that appeared to be that there were four law firms that were through one request for inclusion were attempting to join the rank.  Let me hear from them next as to – are all of those members trying to join individually, or are you trying to join as a group?

MR. RICE: Your Honor, individually.  Joe Rice on behalf of Motley Rice and speaking for that group.  We filed the one pleading for the convenience of the court.

THE COURT: All right.

MR. RICE: And Mr. Cooney is on the phone and can speak for himself if he needs to supplement anything that I say.

THE COURT: All right.  So each of the four that are in writing.  How about the other firms that have either announced appearances telephonically or in the courtroom?  First in the courtroom.  Are there other parties not previously announced that wish to join?

MR. GRAHAM: Your Honor, Bill Graham on behalf of Paul, Reich & Myers.  I think Robert Paul from Philadelphia, he is an

18

- actually he is in a Bondex hearing, as we speak, in Philadelphia, in that bankruptcy, and he wishes to make application for the committee, as well.

THE COURT: Okay. Others in the courtroom that wish to join?

(No response.)

THE COURT: Has that got it? And then telephonically, those who have not already joined in a written motion or announced in the courtroom, appearing telephonically who else is interested?

MS. RAMSEY: Your Honor, Natalie Ramsey. If the committee were to be expanded, on behalf of Mr. Kazin, our view is that, at this time, it's not appropriate to expand but, if it were to be expanded, Belluck & Fox was another applicant for the committee and they would be interested in being considered.

THE COURT: Okay. Others telephonically?

MR. COONEY: Judge, John Cooney from Chicago. I am on the telephone, but I believe I am included in the actual filing that you have before you.

THE COURT: Yes, I think that is correct. Any others? Anyone else telephonically that was not either on the proposed list or included in the motion in opposition?

(No response.)

THE COURT: So effectively we have five that would like to join and possibly six, depending on - I understood from Ms.

19

Ramsey that you didn't think the committee should be expanded but, if it was to be expanded, that you have the Belluck & Fox firm; is that correct?

MS. RAMSEY: That's correct, Your Honor.

THE COURT: Okay.  Well, I guess the first question, then, is whether it is appropriate to expand the committee and, if so, the reasons why the first seven wouldn't suffice and then, secondarily, we will talk about who should be added that has not already been added.

Did the debtor want to weigh in on this?  It is not normally a province for the debtor to be determining who your committee is, but obviously I guess in the end you are paying for the bill.  I would assume the debtor has some interest in how big the committee is constituted.

MR. CASSADA: Yes.  Your Honor, Garland Cassada here for the debtor. We have two concerns, Your Honor. One is with size.  It struck us that the committee was the correct size, at least from the debtor's point of view, and our interest is one purely of cost.  Now, we also have an interest in making sure that we allow credible law firms who represent claimants and who certainly have a history with the debtor of participating in the case, both in terms of representing their constituency and also in negotiating with the debtor. So on the one hand, we would welcome a larger committee for that.

We are concerned about the cost, though, and just, to

20

put it in perspective, if there is an out-of-town meeting and you have eleven or twelve committee members who attend that meeting, then we might be talking about out-of-pocket cost to the debtor of thirty to forty thousand, forty-five thousand dollars per meeting.  So the cost can add up really quickly, but perhaps that can be addressed through some understanding about out-of-pocket costs that will be reimbursed.

So otherwise we do have an interest in seeing that some of these firms who have – and I don't think we should have a twelve-person committee. That's really large.  So I think, at the end of the day, the court is going to have to make a decision.

One concern we have, Your Honor, and I am glad Mr. Kellman is on the line because he can address this, but with respect to the Jacques Admiralty firm, Your Honor, we don't believe that John Boyer, the putative committee member, nor the firm, hold or represent an interest to any valid claim or interest that justifies their service on that committee.

THE COURT: Well, let's not get off on who should and shouldn't be on the committee.  Let's start with the size issue.

MR. CASSADA: Okay.  That's all I have to say about the size.

THE COURT: From the debtor's vantage point, you would prefer to stick with seven; right, seven or as close thereto as

21

-

MR. CASSADA: Unless we can reach an agreement accommodating the cost control.

THE COURT: Right.  From the B.A.'s perspective, Ms. Simpson, you said you started with eleven and you backed down to seven.  Tell me why you –

MS. SIMPSON:  Cost and availability of members and getting together and that sort of thing, that was our biggest concern there.

THE COURT: Okay.  Are others in the courtroom interested in keeping this to a seven-person committee?  Now, mind you, I am not saying that the seven that are on the proposed order end up being the seven on that committee.  I am just trying to figure out about what is the logical size for a case of this magnitude and what's most workable if you are a member of the committee.  Were there any of the firms or representatives in the courtroom that believe that we should stick with the seven-member committee as opposed to a larger one?  Does anybody want to be heard in that regard?

MR. PHILLIPS: Your Honor, Robert Phillips. One thing I would say, and this was mentioned earlier, and my firm, in particular, has been in this position before on several cases. I do think it's important that, whatever size – I don't know if the cost going from seven to eleven is really that large an issue as far as that goes.  I mean, getting people on the phone

22

is always a problem even in groups of three. I have been on steering committees and committees getting two people to agree on a time is sometimes problematic. But there should be flexibility, whatever we do here today, whether it is seven, whether it is nine, whether it is thirteen, for the court to address an issue of adding members later on because we don't know where this case is going to go, we don't know how long it is going to take and, you know, given some of the twists and turns that these cases have taken in the past, I just think the court, whatever decision it makes, should keep in the back of its mind that it may be asked later to look at the constituency of the committee and make changes or additions.

THE COURT: All right. Especially since Judge Hodges will be the one having to be flexible. Others that wanted to weigh in that believe that we should stick with the proposed number, whoever may be on that?

(No response.)

THE COURT: Okay. Let's go the other way. I suspect we will get more interest this direction. If we can take it one at a time, those who wish to discuss reasons why we should go to a larger size.

Go ahead, Mr. Rice.

MR. RICE: Your Honor, Joe Rice. I will speak first with the court's permission. It is good to be back in Charlotte. I grew up in Gastonia, so I am close to home and I

23

can stay with family.

The group that I am speaking for has served as chairman or negotiating chairman for every major bankruptcy since *Johns Manville*, and I am not talking about some of the small ones like *JT Thorpe* or some of the regional ones, but if you are talking about *Owens Corning*, *USG*, *Armstrong*, those that resolve for a billion dollars or more, this group has been involved in every one of them. These firms have all been litigating cases since the 1970s.

The firms collectively represent, according to defendants, and Garlock can speak if this is accurate, but we know this from the work that we have done with *Manville* all through the years, over fifty percent of the pending cases in the country are represented by those four firms.

Each of those firms has established a willingness to do the work in the bankruptcies and to attend the meetings personally, and each has been selected by the bankruptcy court after the conclusion of the bankruptcy to serve as a trust advisor in those major bankruptcies.

So they have the experience and the continuity of understanding this litigation from the beginning to end. That is not to in any way speak negatively about Grandfather Kazin. He has certainly been there a long time, and Steve has offered a lot, and I am not criticizing him. He has a great point of view to bring.

24

The real problem we see here is that the committee, as currently constituted, is made up of smaller firms who principal interest is mesothelioma cases. Essentially the seven firms that are proposed are predominantly mesothelioma cases.

While my firm has over seven hundred and fifty mesothelioma cases with Garlock claims, we do represent over six or seven thousand non-malignant cases, as well.

Mr. Weitz has a large mesothelioma practice, but he also represents an additional fifteen or twenty thousand claimants. In the same process would be Baron & Budd, although I cannot represent the numbers for Baron & Budd, but historically Fred Baron has been in the litigation for years and, while he is no longer living, his firm has been a heavy member of the asbestos bar and practicing consistently.

So we are not in any way saying anything negative about those that have been selected, but they are a narrow focus of the asbestos litigation. For purposes of statistical data, mesothelioma usually are about five percent of the total volume of asbestos cases that this court will see or that the debtor will see, maybe seven percent, but it is going to be something in that nature.

Geographically there is no one proposed for the committee that represents any part of the southeast region of the United States. All of the committee members are generally

25

west of the Mississippi.  We have got one Massachusetts and one upstate New York.  So there is no regional diversification.

In addition, there is no large urban area.  New York City and Chicago, who have large asbestos practices, were both omitted from the committee, and we believe they bring a lot to the table.

While certainly Mr. Kazin has experience for a number of years in bankruptcy, and Mr. Phillips has served on some, generally speaking there is not a lot of bankruptcy experience in negotiating resolutions that has been proposed by the committee.  While I believe that between the four firms that I am speaking for, they have served as either chairman of negotiating committee or a member of the negotiating committee in all of the major bankruptcies, and have probably done as many settlements with Garlock over the years as any firms in the country but, again, Garlock can speak to that.

I mentioned the trust advisory counsel.  The current TDPs that are being used, the trust distribution processes that have been approved by the court from *Owens Corning/Fibreboard*, P.C. has not been approved but it's in confirmation hearing now, just finished, USG, BMW, they were designed to work together so that, at the end of the day, the cost to the claimants can be reduced in this process, and we would like to keep the continuity, if possible, to continue that process.

As far as costs, if the court chose not to reimburse

26

costs, that wouldn't change our position.  We would still want to be on this committee.  We are here to try to speak for the large volume of clients that we represent, to try to help the court bring this process through what could be a very complicated bankruptcy in as short of a period of time as possible, with the best possible outcome for everyone, and we believe that we offer a lot to the table to do that.

But, again, I want to make it perfectly clear.  We are not speaking negatively against any of the proposed seven members.

THE COURT: Understood.  But let's go back to the original question, the size of the committee.  You gentlemen and ladies have more experience in that than I do.

MR. RICE: The size of the committee, I think, needs to be more than seven.  There is a fair comment about the continuity of getting people together, but we have generally found, over the last fifteen years of doing this, that doesn't present a problem.  A lot of the work is done by telephone conferences.  Bylaws have been set up.  And by having eleven or more, you are clearly more likely to be able to get a quorum than you would if you have a smaller group, but we have not had any problem with the size of the committee.

Even the trust advisory councils that have come out after the bankruptcies have usually been five to seven.  The committees have generally been somewhere between nine and

27

fourteen or so.  So the size has not presented a big problem.

As far as the cost, I can assure the court from experience that the cost of the members of the asbestos creditors committee will be a gnat on the elephant before this bankruptcy is over compared to the cost of the process itself, with all of the professionals and financial advisors and various insurance counsel, et cetera, that the debtor will ultimately bring to the table and bring to the court for permission.  So I don't think cost is really an issue here.  I would point to the – well, there have been some recent decisions that have focused on that.

So I think it is more workable and more efficient to have more people.  You get more done.  You can break up into committees.  You get active committees, and you get the work done quicker because every one of these firms, including ours, is going to continue to have an active litigation practice both in the asbestos area and in some other areas.

We actually have what we call trust tests periodically where we have gotten the trust to coordinate.  They have their meetings in one city and it is set at a designated period of time so we can actually reduce costs and control the costs in that fashion, and that's been very helpful.

THE COURT: All right.  Let me ask if any other party wishes to weigh in on the size of the committee?  I am asking really on the ones who believe it should be expanded.  Again,

28

not specifically whether your firm should be added or not but more of the overall size of the committee.

Yes, sir.

MR. GRAHAM: Your Honor, Bill Graham. I have only had the dubious honor of being selected for one bankruptcy in the past, Porter-Hayden. I would say that the limited number that were chosen in that particular bankruptcy hampered efforts in the initial phase.

And I would echo what Mr. Rice has said, that sometimes more – there is plenty of experience to bring to the table but sometimes it is often difficult to herd cats, particularly with the firms that we are talking with, all of which are extraordinarily experienced.

I appear today not on behalf of myself or my firm, Wallace & Graham, but on behalf of Paul, Reich & Myers in Philadelphia.

THE COURT: Right.

MR. GRAHAM: Your Honor, they have a complexion of cases which mirrors more of Mr. Rice's type of practice, Motley-Rice, rather than a particular meso type of practice, which Mr. Kazin and some of the others do so well at. I know that the debtor is very familiar with the Philadelphia firm. They have been in active litigation –

THE COURT: We are back again into who the membership should be. I don't want to discuss that at the moment. I want

29

to talk about how big the committee is to function properly. Anything else on that?

MR. GRAHAM: No.  I just would argue that –

THE COURT: You believe larger is better?

MR. GRAHAM: Particularly at the initial phase.  Okay. Thank you, Your Honor.

THE COURT: Others wishing to be heard?  Yes, sir.  Who is this?

MR. BRADLEY: Your Honor, this is Garrett Bradley with the Thornton & Naumes firm.  I think that the committee going to eleven would probably be a reasonable approach.

THE COURT: Okay.  Anyone else?

MR. COONEY: Yes, Judge, this is John Cooney again from Chicago.  I would say, Your Honor, that most of the cases, the large cases where you have litigation in most of the states, have generally started out at eleven.  I think in *Owens Corning*, there were a couple added, including what we are glad to hear is the grandfather and a few others.  And in terms of costs, I can tell you I, for instance, have been on twenty of these, and I have never submitted a bill for anything.

THE COURT: Okay.  Anyone else on this particular issue, the size of the committee?

(No response.)

THE COURT: Well, recognizing the cost factor has to be separated out from the rest of this, I like the number eleven

30

myself because it's an odd number so that you can reach a decision rather than having even splits on votes and that sort of thing. I believe that we can go with a larger committee, given the circumstances, and deal with the cost issue as it arises.

We have got room for four additions, or substitutions, or whatever they may be. Now, that being the case, I think we had potentially as many as five additions that wanted to be added in on this. I would rather not go to an even number. So the question is, that being the case, is there anyone that wishes to consider declining the appointment or declining the request to add in, or are we going to have to bump someone out like we are playing musical chairs at the moment? Any thoughts?

(No response.)

THE COURT: Okay. Well, that being the case, Ms. Simpson has given us reasons why she thought the present constituency of the proposed committee should be the way it should be, and I have heard you being very gracious as not suggesting that these folks would not be as representative but others might be good additions, as well. I am going to have to leave someone out. I am sorry to do that, but I will be happy at this juncture to hear individual proposals as to who should and should – I would rather you not say who shouldn't. It seems like a little ungracious, but if you feel inclined. I

31

would be more interested in knowing what the individual firm's qualifications are, if you want to say anything on your own behalf, and why you believe that your inclusion in that group of eleven would be meritorious.

I would propose that we just start. I don't think anyone needs to be sworn or anything of that nature. Rather if each of the members that have already been suggested that are in attendance would like to tell me anything more on their behalf, let's take them one at a time and then we will go on to those in the motion and then those who have been suggested, and I will try to reach some sort of decision.

How about the Jacques Admiralty Law Firm, Joseph Boyer. Do we have anyone –

MR. KELLMAN: Your Honor, Alan Kellman on behalf of Mr. Boyer and Jacques Admiralty. I can add to what Ms. Simpson has already indicated. We have been involved in asbestos cases and bankruptcy cases going back for some twenty-five years. In addition to the couple of cases that I mentioned in my correspondence, we have sat on the committees in the *Celotex* case, the *H. K. Porter* case and a number of others. And it is also noteworthy that there have been a number of shipowner Chapter 11s where they haven't been national bankruptcies, but I have participated in bankruptcy cases on behalf of our clients in Tampa, St. Louis, in New York, dating back some twenty years.

32

We have a large practice, as has already been indicated, which includes thousands of malignancy cases, including some one hundred or more mesothelioma cases, a considerable number of non-malignancy cases.

Mr. Boyer has serious asbestosis. He worked in the engine room. And to Mr. Rice's remark that most of the committee are the smaller mesothelioma firms, obviously we are the exception to that and bring a great deal of experience to the table.

THE COURT: Okay. All right. How about John and Diane Allen, the Kazin McClain firm?

MS. RAMSEY: Your Honor, this is Natalie Ramsey representing Kazin McClain today. I think, as the bankruptcy administrator said, I think Mr. Kazin can fairly be described as a grandfather, at least, of the mesothelioma bar. He has been active in almost every major asbestos bankruptcy case that has been filed, along with many of the other applicants today that you have heard from. He does specialize in serious cases. He has a national presence in mesothelioma cases.

He has dealt with Garlock for a number of years, both as an adversary but also has a very good relationship with Garlock and can bring both his substantial experience and also his personal knowledge of Garlock and his relationship with them to the committee to facilitate a resolution here.

THE COURT: All right. The William Ames Warren, the

33

Simmons Browder firm, Mr. Phillips.

MR. PHILLIPS: If it please Your Honor, our firm is not an old firm, an older firm as some of the godfather, grandfather or Mr. Rice's firm. We were found in 1999. Since 2003, however, Your Honor, we have represented more mesothelioma claimants than any other law firm in the country. We annually resolve cases that are probably better measured in multiples of the next closest firm in terms of number of cases. We have the largest number of lawyers devoted to asbestos than any other law firm.

I, myself, who would be carrying the primary load, started out as a bankruptcy lawyer in a large mid-western law firm and ended up doing a lot of work with regard to representing other parties in mass tort bankruptcy cases. I represented insurers, lenders. I was involved in the *USG* bankruptcy referenced earlier on behalf of some of the lenders. That led me to move over to the plaintiff's side, seeing the need, went with the Simmons firm. I am a partner at that firm.

Another point I would make generally, however, characterization, the litigation generally has changed. I mean, since the first run of bankruptcy cases, asbestos litigation these days is mesothelioma and lung cancer cases. Anywhere from, depending on the defendant, eighty to ninety-five percent of the liability, the indemnity paid by the defendants is paid to mesothelioma and cancer claims.

34

Some of the recent bankruptcies, the numbers we have seen, public filings, those numbers are fairly typical.  Even the bankruptcy trusts themselves that are operating are paying in excess of two-thirds of their money to mesothelioma and lung cancer claimants, which is quite high when you consider the large backlog of non-malignant claims going back into the late nineties.

I know while I have said that our firm is very large, I know other members of the committee, I would not personally characterize as small litigation mesothelioma boutiques.  I think what you saw in Ms. Simpson's committee was a fairly heavy representation of mesothelioma practice in this country.  And I think that our firm especially, because of our size, the scope of our practice, which is national.  We represent clients in every single state, and pretty much every U.S. territory. I believe I have even seen a client in Guam.

And so we bring a depth and a breadth of practice to this which would significantly help the committee as it goes forward.

THE COURT: All right, Mr. Phillips.  The Waters & Kraus firm of Texas.

MR. TANKARD: Good afternoon –

MR. KRAUS: Yes, Your Honor.  I am sorry, this is Peter Kraus on the firm.  I think Mr. Tankard from my office is present in court but, if the court will permit me, I will speak

35

to our qualifications.

THE COURT: I think Mr. Tankard just gave ground.  So go ahead, Mr. Kraus.

MR. KRAUS: Thank you, Your Honor.  Waters & Kraus is a fifty-lawyer law firm with offices in Texas, Los Angeles and smaller offices in Baltimore and San Francisco.  Our practice is predominantly representing mesothelioma victims across the country.  We have, similar to the Simmons Firm but on a smaller scale in terms of the overall numbers, we probably have mesothelioma victims who come from every state and are filed in twenty to twenty-five different states in both state and federal court.

I have been litigating against Garlock for twenty years.  I started at the Baron & Budd firm and, in 1998, left and started my own firm.  And we immediately began litigating very intensively against the debtor and tried in the first half of the last decade more cases to verdict than any firm in the country against the debtor and had both plaintiff and defense verdicts.

Attendant with that, we had very intensive pretrial litigation with the debtor on many of the issues that they set forth in their informational briefs, their defenses, the causation defenses on medical issues, the technical defenses in terms of industrial hygiene and the dust that is produced in the ordinary course of using their product, the asbestos dust.

36

We litigated those issues in state and federal courts, you know, around the country.

And about 2006, we were able to mostly resolve our differences with the debtor and, since then, have been able to settle all of our cases that have come up for trial. We presently have pending about fifty-five open, unsettled claims against the debtor. I think all but two are mesothelioma cases. In addition, I think we have twenty-two cases that are settled for a liquidated number but unpaid by the debtor, all mesothelioma cases.

I think our settlement experience and our extensive litigation experience against the debtor would be valuable to the committee, and we would ask that the court retain us and follow the Bankruptcy Administrator's initial recommendation and retain us.

THE COURT: Let's see. That takes us down now to Madonna Guzzo, care of Lipsitz and Ponterio firm. Anyone wanting to speak there? Do we have anyone on the line for them?

(No response.)

THE COURT: All right. Then we will drop down to Robert Wirwicz, care of Mr. Bradley and the Thornton & Naumes firm. Anything there?

MR. BRADLEY: Yes, Your Honor, Garrett Bradley with Thornton & Naumes. The claimant before you is a mesothelioma

37

case.  This firm has been suing Garlock for over thirty years. They are one of our major defendants.  I personally negotiated the last settlement agreement.  Locally have had a good working relationship with the debtor.  We have three years of trial of cases coming up in which we have numerous claims against Garlock.  This particular claim had an outstanding demand prior to going into bankruptcy.  My personal experience is for the last seven or eight years is actually working and processing claims through the bankruptcy trust that have been established, and I think I bring a little bit of a unique and different background in that regard because I have actually gone out and had to work through the results of these bankruptcy processes, and I have seen what works and some of the things that doesn't work.  So I think I bring a different perspective to that.

We were proposed by the Bankruptcy Administrator.  I do wish to be retained on the committee and look forward to serving.  It would be my first particular committee, and I have quite frankly, Your Honor, just – because I know this is the first for North Carolina.  I know Mr. Rice is representing four firms today and, quite frankly, I have not seen a bankruptcy proceed without some of the representation that he is proposing, and I think him and Mr. Cooney have been involved in pretty much every major bankruptcy that has gone forward and, if you do retain me, I look forward to working with one or all of them, as well.

38

THE COURT: Okay.  All right.  We drop it down, then, to Charles and Loretta Willis, care of Mr. Greenstone at Simon, Eddins and Greenstone.

MR. GREENSTONE: Thank you, Your Honor.  This is David Greenstone with Simon, Eddins and Greenstone.  We would like to echo some of the statements made about the administrator's appointment.  My firm, Simon, Eddins and Greenstone, began in 2006.  We are a younger firm but, much to my chagrin, I don't believe that we can any longer be called the small firm.  We have thirty attorneys, offices in Texas and California, and we literally represent cases – we only represent mesothelioma cases, the most seriously injured victims, and we have cases in thirty different states right now, including states in the southeast, including the northeast, all over the country.

And in addition to that, we haven't just been in a settlement posture with Garlock and with other defendants, we have actually had some of the most extensive trial experience with this defendant of any firm in the country.  Myself and my partners included have tried numerous cases to a verdict against Garlock, and we currently have a hundred active mesothelioma claims currently pending against Garlock.  Some of them are settled with liquidated damage amounts and some of them are not.

But I would suspect that, when you break it down, we also couldn't be considered a small firm when you are looking

39

at the number of cases that we have or the amount that we would be a creditor against this particular defendant.

We know this defendant. We have extensive experience litigating cases against this defendant. My partners and my firm, we have participated in bankruptcy committees, including committees currently. I do believe, though, that we haven't had near the experience as some of these other folks, and I think maybe perhaps that's a good thing. We would offer a fresh perspective. I don't mean that in any pejorative manner at all. I have the utmost respect for the individuals who are on the committee and also for those who are asking to be included. But I think that, given our posture with this particular defendant, I think our inclusion is particularly appropriate and we would be very honored to serve.

THE COURT: Okay. And I think that takes us off the B.A.'s list and now we are dropping down to those firms that Mr. Rice has been kind enough to file a motion and speak on behalf of. The Baron & Budd firm. That is Charles Anderson. Anything else to be said in regard to them?

MR. RICE: Your Honor, I do not believe they were able to participate today, but I don't have anything to add. I think Mr. Kraus said – I think actually a couple of these fellows worked with Baron & Budd before they broke off into the firms that they have now. The firm has been around for years.

THE COURT: Where are they headquartered?

40

MR. RICE: Dallas, Texas.

THE COURT: Is there something about Texas and California that all these claims are there?

MR. RICE: Yeah, it's got a lot of industrial workers. Also, Baron & Budd has a large practice in the Louisiana area, as well, and they have an office in California, as well. In fairness to – Mr. Phillips is correct. The asbestos litigation, the current dockets, trial dockets, have been dominated by mesothelioma, and that has been driven, in large part, for the practice in California that the state courts have set up and southern Illinois, and most of these gentlemen, their practice arises out of southern Illinois and the rocket-docket that has been established there.

THE COURT: Right.

MR. RICE: I will let Mr. Cooney speak for himself since he is on the phone. I would like to add a couple supplemental comments about Motley Rice.

THE COURT: Go ahead, please.

MR. RICE: When the federal courts put the asbestos litigation from the federal courts into the MDL, it was after there had been several mass consolidated trials, which my firm was lead counsel in the trials in Texas, West Virginia, Maryland and Mississippi. And when the court established the MDL, I served as liaison counsel for the MDL. I am not going to say I am real proud of the length of time we have been in

41

that MDL, but I am very proud of the fact that we have gotten the judge now to give us a target date to end that MDL.  Mr. Kraus has worked hard on that.  Mr. Kazin has been involved, Mr. Cooney and Mr. Baron and Mr. Weitz.

In addition, as far as herding cats that was referenced, my personal experience in that regard is I served as counsel for the states in the tobacco litigation and was the chief negotiator for the states in the tobacco litigation.  And if you want to talk about herding cats, try getting all of the Attorney Generals to agree to one document that would affect their states and the structure.  So I think I have some experience in that regard.

I don't think anyone from Weitz and Luxenberg is on the phone but, as far as a firm that has established a litigation history.  New York, since they changed their statute of limitations about ten years ago, has become a very strong litigation area and Mr. Weitz has personally tried a number of cases.  He was picked by Judge Weinstein to be chief counsel in the large consolidation in New York a few years back.  He has been very active in the litigation and also in the resolution side.  And I don't think anyone here would challenge that he has been involved for twenty years.

As far as the grandfather is Mr. Kazin, vast amount of litigation.  Mr. Motley, Mr. Baron, Mr. Kazin, as far as people that are still practicing today – Mr. Baron passed away last

42

year – they have all been there thirty years.  There is no question about that.  When *Manville* filed for bankruptcy, there were sixteen thousand cases pending.  When I went up to do the docket review for their first-day motions, I only had to deal with sixteen thousand cases.  Now we are dealing with tens of thousands of cases.  So it has changed, but there are still a lot of claimants have to be represented and we need the diversification.

THE COURT: Okay.  Backing up a step, Mr. Cooney, do you wish to speak on behalf of your firm?

MR. COONEY: Thank you, Your Honor.  My grandmother used to tell me not to talk about myself, but I think in terms of roles we all play, I think on the rare occasions when anyone on some of these committees disagree about something, we always try to find some common ground, some way forward, something to stop the bickering and bring it together.

For better or worse, I have been asked by my – once these committees get formed, and I think I am on most of them, but I have also been asked to chair a lot of them, including ones that are well-known in the bankruptcy world.  In *Owens Corning*, in *W.R. Grace*, *USG* and *Armstrong World Industries*, in *Combustion Engineering*, in *Haliburton,* in each of those I think I have served as the chair or the co-chair.  Maybe that's just because I am the only wishy-washy one in the room, but at least my fellow lawyers have asked me to have that role.

43

As I say, I am very interested in this case. We started doing this largely with mesothelioma victims in 1974. I have yet to charge a nickel for any of my services or reimbursed for the air fare or hotels. I don't think I will add much to the cost of the process, and I will commit to Your Honor that I will be personally present and not send somebody else.

THE COURT: Okay. All right. Then I believe that's everyone on the list from the filed motion. I believe the next, Mr. Graham, you had, was it Paul Reich?

MR. GRAHAM: Paul, Reich & Myers, yes, sir.

THE COURT: Paul, Reich & Myers, okay. Thank you.

MR. GRAHAM: Your Honor, I just reiterate what I said earlier. Robert Paul and this firm has done quite a bit of work in this area, particularly against the debtors, have represented a large number of shipyard workers in the Philadelphia area, as well as the railroad workers and (inaudible) work, which has had their clients come into contact with the debtor's products. I know they have tried a number of cases with the debtor and also bring a non-mesothelioma concentration perspective to the committee. And I would reiterate what I said earlier, and would ask that they be added to the committee, if Your Honor would permit.

THE COURT: All right. And I believe, Ms. Ramsey, you had the Bellicon & Fox firm, was that your suggestion?

44

MS. RAMSEY: That's correct, Your Honor, Belluck & Fox.

THE COURT: Belluck, okay.

MS. RAMSEY: Yes.  Belluck & Fox, Your Honor, is a firm that's on the smaller side, also concentrates in mesothelioma and lung cancer claims.  It is located in New York.  It has four offices throughout New York and is among the top 25 firms that have pending cancer claims against Garlock.

I know also, Your Honor, in addition to that, I should also just mention that, although Belluck & Fox had asked us to represent them today and to convey their interest in participating on this committee, that there were a number of other law firms, Your Honor, who I believe felt that the committee was representative and have not appeared but might also be interested if they understood that the court was going to expand the committee, and I just wanted to make the court aware of that, as well.

THE COURT: It's a surprise to me that there is so much public service out there in the world that everyone is interested, but we may have to do what we do today and get some resolution.  Was there anyone else that didn't get a shot at this?

(No response.)

THE COURT: Let me ask the other question.  A few of you had announced that you were willing to serve without compensation on these committees.  Is that a standard in the

45

asbestos bankruptcy cases or is that something above and beyond?  You all know a lot more about each other than I know about you.

MR. RICE: Your Honor, I believe the general practice that I am familiar with has been that the committee members, the clients themselves, would be reimbursed when they come to meetings, and there will be meetings where they will come, probably once a quarter, once a year, or something like that depending on the speed of it.  But I am not aware of any of the attorneys ever asking for compensation, like hourly rate compensation.

There have been, on most occasions, that their out-of-pocket expenses have been covered for their travel and hotel rooms.

THE COURT: Right.

MR. RICE: And then, of course, they would ask to have counsel and, if necessary –

THE COURT: The committee counsel would be paid.

MR. RICE: The committee counsel, insurance counsel and maybe financial advisor depending on the status of the case and the coordination between the asbestos creditors committee and the unsecured creditors committee hopefully to be able to use some of the same advisors.

THE COURT: Okay.  Mr. Phillips.

MR. PHILLIPS: Your Honor, I would echo Mr. Rice's

46

comments that in every meeting I have ever attended, the number of professionals who are being paid, approved by the estate, paid by the debtor, dwarf even the attempt by the asbestos bar to charge for its time which it doesn't.

THE COURT: I can't say that I have had an asbestos case before, but I understand that last argument about professional fees dwarfing everything else.

MR. DURHAM: Your Honor, I just want to point out I don't think there is an issue that this court would be approving hourly rates for professionals attending committee meetings, but there would be obviously the coach air fare, the meals, the hotels, whatever.

THE COURT: Sure.  I understand.  Okay.

MR. RICE: It will be a lot cheaper in Charlotte than it has been in New York.

MR. DURHAM: We would welcome all meetings to be held in Charlotte.  Mr. Rice could visit his family and we could all get to know each other.

MR. RICE: I would put one plug in for South Carolina. Give me a break.  Let's go to Charleston.

THE COURT: Does anyone else wish to say anything?

MR. CASSADA: Your Honor, I might add some facts for the court to consider.

THE COURT: All right.

MR. CASSADA: With respect to the composition of claims

47

against Garlock, I believe that Your Honor knows there are approximately a hundred thousand claims pending. We believe that the vast majority of those claims are non-malignant claims that are on inactive dockets and that have no value. And Mr. Phillips is correct, the numbers he talked about, the eighty-five to ninety-five percent, the vast majority of the money that Garlock has paid to resolve claims has gone to resolve mesothelioma claims. I believe the correct number there is eighty-five percent of all monies and rising. And the counter to that, the non-malignant claims, are disappearing both in terms of number filed and certainly even more so in terms of claims that actually have settlement value. And I expect that that will be an issue in this case. That is, to what extent should Garlock, especially given the nature of its product, pay any claim other than a cancer claim.

With respect to the firms that are represented, I don't have anything ungracious to say about the abilities of any firm. I will point out, with respect to one firm, and that's the Jacques Maritime firm, and Mr. Kellman is here and he can clear up anything, but we don't believe that they represent any true claimants against the estate. Their putative committee member, that's John D. Boyer, filed a complaint against Garlock in the Northern District of Ohio in 1995, and that claim was transferred to the MDL litigation in Philadelphia and administratively dismissed. Our records show

48

that, at least as it relates to Garlock, that claim is inactive. It is not an active claim.

With respect to the firm itself, we have records of paying two claimants in the last five years an aggregate amount of five thousand dollars. I believe the correct number is two thousand, five hundred dollars each. And while I do believe that this firm, or its predecessor, has filed tens of thousands of cases, most of those cases are administratively dismissed and inactive. Our local counsel tells us that less than a thousand of those cases were recently reopened, but Garlock doesn't believe any of those cases have any value.

So with respect to the firms, we don't believe the Jacques Admiralty Firm holds or represents an interest that would justify the service of either Mr. Boyer or that firm on the committee.

The other firms that Your Honor has heard about, they are all firms that have brought claims against Garlock and that have a substantial history of resolutions of claims either through litigation, going to trial or settlement.

THE COURT: Anyone else?

MR. KELLMAN: Your Honor, Alan Kellman on behalf of Mr. Boyer and the Jacques Admiralty Firm.

THE COURT: Yes, sir.

MR. KELLMAN: Mr. Cassada's remarks, I think, speak exactly as to why we should be on the committee because we

obviously have some differences and he is in error with respect to the status of our cases. Yes, they were transferred to the multi-district court in the Eastern District of Pennsylvania. However, we have been through this issue in other bankruptcies and Judge Weiner, before he passed away, specifically addressed what was the meaning of a case that was administratively dismissed vis-a-vis bankruptcy claims. And I would be happy to provide a copy of that order to the court, but I can report to the court that our cases are considered to be alive and active for all bankruptcy purposes. We have been participating in every single bankruptcy that anyone has mentioned on the phone during the last hour. Our claims are being processed. Our claims are being paid. We represent better than three thousand malignancy claims and, while it is correct as one of my colleagues pointed out, about two-thirds of the money today is going to malignancy claims, one-third is going to non-malignancy claims. So we very definitely, definitely have an interest in this case.

It is correct that cases over the last ten years in the MDL have been held up, where we have experienced getting mesothelioma cases to our frustration into a trial posture but, contrary to what Mr. Cassada says, we absolutely belong in this case, and I think that his position, again, speaks as to why we should absolutely be on this committee.

THE COURT: All right. Anyone else want to say

50

anything?

(No response.)

THE COURT: You folks know one another well enough, I wonder whether I should have just allowed you all to vote for this as if it were an all-star balloting or something.

Let's take about a ten-minute recess and I will try to give you a decision in a moment.

(Recess from 4:33 p.m. until 4:47 p.m.)

THE COURT: Have a seat everyone.  Do we still have our telephonic appearances?  Okay.

I know what it's like judging a beauty contest now. This gets into the subjective, and the bottom line is we are gratified to have the interest from all of you and your qualifications are exemplary, and obviously it looks to me like all could do a good job in the current role, but the reality, though, is there is only so much room at the conference table, especially when you are having to pay for travel.

So I am going to stick to my first inclination to make the committee eleven persons or firm representatives, if you will, and I am going to basically refer to these not by the victim but more by the representative law firm.

To get down to eleven – I showed we had thirteen firms that wanted to sit at the table – I have decided to strike one from the Bankruptcy Administrator's list and strike one from the other parties that asked to be participants, and please

51

rest assured it has nothing to do with your firm's qualifications. It was more looking at it from a geographical perspective and looking at it in terms of wanting to have good representation from the places where the debtor operated, particularly the debtors operated, and also another concern about how many claims you have and how active your participation has been.

The short answer is I am adopting the Bankruptcy Administrator's list with the deletion of the Jacques Admiralty Law Firm. I normally wouldn't count the debtor's opinion. Having the debtor not want you, it seems to me to be a ringing endorsement if you are going to be on a creditors committee, but I was concerned about the amount of claims that have been paid out recently on that and how likely it was that there would be a large number of claims there, and also because I was trying to keep a geographic disbursal of the parties, and we more or less had a representation that was a little clearer from the Midwest.

Likewise, the Baron and Budd firm that also asked to get on by written motion, I am not going to include them but I am going to include the others. We had a little more representation from Texas than we needed, and I did want someone from the southeast, so I wanted the Motley Rice firm in there just to get someone from the Atlantic coast area to have some representation, as well.

52

So effectively, with the one deletion from the B.A.'s proposed order, but with the addition of Cooney & Company, Motley Rice, Weitz and Luxenberg – is that it – Paul Reich and Belluck & Fox, that would be the composition.

Ms. Simpson, if you could make those amendments.

MS. SIMPSON:   Your Honor, if I may, could those you have chosen send me again, to make sure I have it correct, their claimant, as well as their correct attorney, and they can send that by e-mail and we will get that in the morning.

THE COURT: And, of course, this is without binding Judge Hodges in any way if he wants to add to the composition of the committee later on as events develop.  We will do it that way.  I do appreciate the interest by all of you and it looks like it is going to be a fascinating case.  I am sorry that this is where I get off the merry-go-round, but I am sure you will have a great time, and the locals can get you a list of restaurants in Charlotte should you need them.

Anything else?

(No response.)

THE COURT: We will recess.  Thank you, folks.

(Off the record at 4:51 p.m.)

53

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Patricia Basham

Patricia Basham, Transcriber

Date:  July 9, 2010