FILED & JUDGMENT ENTERED
David E. Weich

Jul 15 2010

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

George R. Hodges
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| IN RE: | Case No. 10-31607 |
| GARLOCK SEALING TECHNOLOGIES LLC, et al., | Chapter 11 |
| | Jointly Administered |
| Debtors.[1] | |

### ORDER AFTER FINAL HEARING (1) AUTHORIZING DEBTORS-IN-POSSESSION TO OBTAIN FINANCING, GRANT SECURITY INTERESTS AND ACCORD PRIORITY STATUS PURSUANT TO 11 U.S.C. §§ 361, 364(c) AND 364(d); (2) MODIFYING AUTOMATIC STAY; AND (3) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 361 AND 363 (c)(2)

This matter is before the Court on the Motion (the "*Motion*") (Docket No. 20) of **Garlock Sealing Technologies LLC**, an entity organized under the laws of the State of North Carolina ("*Garlock Sealing*"), **Garrison Litigation Management Group, Ltd.**, a corporation organized under the laws of the State of North Carolina ("*Garrison*"), and **The Anchor Packing Company**, a corporation organized under the laws of the State of North Carolina ("*Anchor*"; Garlock Sealing, Garrison and Anchor are collectively referred to herein as "*Debtors*" and individually as a "*Debtor*"), as debtors and debtors-in-possession in the above-captioned Chapter 11 cases, requesting entry of an order (1) authorizing Debtors to obtain financing and other

---

1    The Debtors include Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd. and The Anchor Packing Company.

**Error! Unknown document property name.**

extensions of credit from **Bank of America, N.A.**, a national banking association ("*BofA*", and in its capacity as post-petition lender, the "*DIP Lender*"), grant security interests and liens and accord superpriority claim status in favor of DIP Lender pursuant to Sections 361, 364(c) and 364(d)(1) of Title 11 of the United States Code (the "*Bankruptcy Code*"); (2) modifying the automatic stay; and (3) authorizing Debtors' use of cash collateral.[2]

Based upon the Court's review of the Motion and all matters brought to the Court's attention at the interim hearing, which was held on June 8, 2010 (the "*Interim Hearing*"), and at the final hearing, which was held on June 30, 2010 (the "*Final Hearing*," and together with the Interim Hearing, the "*Hearings*"), in each case pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), and after due deliberation and consideration, the Court makes the following findings of fact and conclusions of law applicable to the financing sought by Debtors from DIP Lender (to the extent any findings of fact constitute conclusions of law, they are adopted as such, and *vice versa*):

THE COURT HEREBY FINDS AND DETERMINES:

A.    **Petition Date**.  On June 5, 2010 (the "*Petition Date*"), each Debtor filed with the Court its voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code and is continuing to manage its properties and to operate its business as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed herein. The Court has entered an order authorizing joint administration of these Chapter 11 cases.

B.    **Nature of Business**.  Garlock produces and sells high performance fluid-sealing products, including gaskets and compression packing used in internal piping and valve assemblies in numerous industries.  Garrison supervises a nationwide network of local defense law firms that represent Debtors in asbestos related litigation in various states; assists in

---

[2] Capitalized terms used but not defined in this Order shall have the meanings ascribed to them in the Post-Petition Loan and Security Agreement entered into by Debtors and DIP Lender in substantially the form attached to the Motion.

**Error! Unknown document property name.**

defending against asbestos related litigation before and during trial; settles asbestos related litigation; makes arrangements for payment of judgments, settlements and defense costs; and makes claims against, collects payments from, and facilitates audits as required by, insurers in connection with asbestos related litigation. Anchor is a non-operating subsidiary of Garrison and previously had distributed fluid sealing materials, including gaskets and packing.

C. **Pre-Petition Loan Agreement; Pre-Petition Debt**. Garlock Sealing and Garrison, together with certain of their affiliates (collectively, "*Pre-Petition Borrowers*"), are parties with BofA, Wachovia Bank, National Association and SunTrust Bank (collectively, "*Pre-Petition Lenders*") and BofA in its capacity as agent for Pre-Petition Lenders (in such capacity, the "*Pre-Petition Agent*"; together with Pre-Petition Lenders, "*Pre-Petition Credit Parties*") to a certain Amended and Restated Loan and Security Agreement dated April 26, 2006 (hereinafter, together with all amendments thereto and modifications thereof, the "*Pre-Petition Loan Agreement*"). As of the Petition Date, Pre-Petition Borrowers were jointly and severally liable to Pre-Petition Lenders pursuant to the Pre-Petition Loan Agreement for (i) any amount that may be drawn under a certain standby letter of credit for the account of Garlock Sealing in the face amount of $4,721,323.44 (the "*Garlock Pre-Petition LC*"), (ii) any amount that may be drawn under a certain standby letter of credit for the account of EnPro Industries Inc. in the face amount of $4,112,000, (iii) certain accrued fees, and (iv) certain Banking Relationship Debt (collectively, the "*Pre-Petition Debt*").

D. **Pre-Petition Liens**. Pursuant to the Pre-Petition Loan Agreement and related documents (collectively, the "*Pre-Petition Loan Documents*"), each Pre-Petition Borrower granted and collaterally assigned to Pre-Petition Agent, for the benefit of the Pre-Petition Credit Parties and as security for the payment of all Pre-Petition Debt, security interests in and liens upon (collectively, the "*Pre-Petition Liens*") all of each Pre-Petition Borrower's accounts,

-3-

inventory, general intangibles, chattel paper, documents, instruments, investment property, letter-of-credit rights, deposit accounts, Insurance Receivables Rights (as defined below), and books and records, but excluding general intangibles, chattel paper and documents exclusively related to Fixed Assets as that term is defined in the Pre-Petition Loan Agreement (all such non-excluded property, as the same existed on the Petition Date, together with all cash and non-cash proceeds thereof, being hereinafter referred to as the "*Pre-Petition Collateral*").  As used herein, (i) "*Insurance Receivables Rights*" means all rights and interests, now owned or hereafter acquired, in and to the insurance receivables with respect to the Asbestos Insurance Policies (as defined below), and any supplementary or other contracts issued in connection with such Asbestos Insurance Policies, any additional insurance proceeds of such insurance policies which are or may hereafter become payable, and all claims, options, privileges, rights and interests in and under such policies to collect and receive such accounts receivable and insurance proceeds, subject to all of the terms and conditions of such policies; and (ii) "*Asbestos Insurance Policies*" means insurance policies maintained by any of the Pre-Petition Borrowers or guarantors of the Pre-Petition Debt with respect to which any of such Pre-Petition Borrowers or guarantors is entitled to (or claims entitlement to) insurance coverage in connection with claims made against any of them (or their predecessors) for asbestos related injury or alleged injury.

E.  **Debtors' Stipulations**.  Debtors stipulated in the Motion and at the Hearings that (a) the Pre-Petition Loan Documents constitute valid and binding agreements and obligations of Garlock Sealing and Garrison; (b) the Pre-Petition Liens granted by Garlock Sealing and Garrison (i) constitute valid, binding, enforceable and perfected security interests and liens, are not subject to avoidance or subordination, and are subject only to certain security interests and liens that are expressly permitted under the Pre-Petition Loan Agreement to have priority over the Pre-Petition Liens, but only to the extent such permitted liens are valid, enforceable, non-

Error! Unknown document property name.

avoidable liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and senior in priority to the Pre-Petition Liens under applicable law after giving effect to any applicable subordination or intercreditor agreements, and (ii) are not subject to avoidance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Pre-Petition Debt constitutes legal, valid and binding obligations of Garlock Sealing, Garrison and the other Pre-Petition Borrowers and is not subject to equitable subordination, offset, recoupment or recharacterization; (d) all amounts paid on or before the Petition Date by Garlock Sealing and Garrison to Pre-Petition Credit Parties on account thereof are not subject to any objection, offset, defense or counterclaim of any kind or nature or reduction, disallowance, impairment, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (e) no claims in favor of any Debtor exist against any Pre-Petition Credit Parties under any contract or tort (including, without limitation, lender liability) theories of recovery or pursuant to Section 105 or chapter 5 (including, without limitation, Sections 510, 544, 547, 548, 549, 550 or 553) of the Bankruptcy Code.

F.    **Fifth Amendment to Pre-Petition Loan Agreement; Certain Pre-Petition Lien Release**.  Pursuant to a certain Fifth Amendment to Amended and Restated Loan and Security Agreement and Amendment to Other Loan Documents dated as of June 4, 2010 (the "*Fifth Amendment*"), among Pre-Petition Borrowers and Pre-Petition Credit Parties, on the Effective Date (as defined therein) (herein, the "*Release Effective Date*"), Garlock Sealing and Garrison ceased to be liable for all Pre-Petition Debt other than the Garlock Pre-Petition LC, which is deemed to be issued under the DIP Loan Agreement (defined below) as provided in

Error! Unknown document property name.

paragraph 2 of this Order, and the Banking Relationship Debt of Garlock Sealing and Garrison to DIP Lender or any of its affiliates, which constitute DIP Obligations (as defined below); and neither the Garlock Pre-Petition LC nor such Banking Relationship Debt remain as Obligations under (and as defined in) the Pre-Petition Loan Agreement. In addition, as of the Release Effective Date, Pre-Petition Agent released the Pre-Petition Liens granted by Garlock Sealing and Garrison in the Pre-Petition Collateral owned by them. As provided in the Fifth Amendment, the Release Effective Date occurred upon the satisfaction of the conditions set forth in Section 14 of the Fifth Amendment, all of which were satisfied as of June 8, 2010.

G. **Need for Financing**. An immediate and ongoing need exists for Debtors to obtain financing to continue the operation of their businesses as debtors-in-possession under Chapter 11 of the Bankruptcy Code and to minimize disruption of such businesses. Despite diligent efforts, Debtors have been unable to obtain financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a special administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code; and Debtors are unable to obtain financing in the form of credit secured by liens solely on unencumbered assets of Debtors or solely by liens that are junior to existing liens on property of the estate pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code on terms as favorable as those offered by DIP Lender pursuant to the DIP Loan Agreement (as defined below).

H. **Proposed DIP Facility**. Debtors requested DIP Lender to establish a secured revolving credit facility in their favor (the "*DIP Facility*") pursuant to which Debtors could from time to time obtain loans ("*DIP Loans*") and letters of credit ("*Letters of Credit*") in an aggregate amount up to $10,000,000 outstanding at any time (with a sublimit of $8,000,000 for Letters of Credit), secured by the Collateral (as defined below). DIP Lender established the DIP Facility,

**Error! Unknown document property name.**

upon the terms and conditions set forth in the Interim Financing Order, and in a certain

Post-Petition Loan and Security Agreement dated June 8, 2010, between Debtors and DIP

Lender (together with all schedules, exhibits and annexes thereto, and as at any time amended,

modified, supplemented or restated in accordance with this Order, the "*DIP Loan Agreement*").

I.    **Certain Conditions to DIP Facility**.  DIP Lender's willingness to continue to

maintain the DIP Facility is conditioned upon, among other things, (i) Debtors' obtaining Court

approval of ongoing extensions of credit under the DIP Loan Agreement; (ii) this Court

confirming Debtors' grant of, as security for the payment of the DIP Obligations (as defined

below), security interests in and liens upon the Collateral (as defined below); (iii) DIP Lender

receiving a continuing guaranty agreement with respect to the DIP Obligations (as defined

below) from each of Garlock International, Inc., a Delaware corporation, and Garlock Oversees

Corporation, a Delaware corporation (collectively, *"Guarantors,"* and individually, a

*"Guarantor"*) and the supporting documents related thereto; and (iv) Debtors' ongoing

satisfaction (or DIP Lender's waiver in writing in its sole discretion) of all conditions precedent

in the DIP Loan Agreement.

J.    **Interim and Final Hearings; Budget**.  Pursuant to Bankruptcy Rules 4001(b)(2)

and (c)(2), Debtors requested in the Motion that the Court hold the Interim Hearing to consider

authorizing Debtors, during the Interim Period (as defined in the Interim Financing Order), to use

cash collateral and to obtain DIP Loans, Letters of Credit and other credit extensions pursuant to

the DIP Loan Agreement (collectively, the "*Credit Extensions*") for purposes specified in the

budget presented at the Interim Hearing, and that the Court hold the Final Hearing to consider

authorizing Debtors to continue to obtain Credit Extensions after the Interim Period for purposes

authorized by the DIP Loan Agreement, all as approved by Order of this Court dated and entered

on June 8, 2010 (the "*Interim Financing Order*").

**Error! Unknown document property name.**

K.    **Service of Motion**.  Debtors have certified that copies of the Motion (together with copies of the DIP Loan Agreement) and notice of the Final Hearing were served by electronic mail, telecopy transmission, hand delivery, overnight courier or first class United States mail upon the United States Bankruptcy Administrator (the "*U.S. Bankruptcy Administrator*"), counsel for the Pre-Petition Agent, the top 30 law firms by number of asbestos claimants represented who have asserted mesothelioma claims against Debtors, the holders of the 20 largest non-asbestos general unsecured claims against Garlock Sealing, the holders of the five largest non-asbestos general unsecured claims against Garrison, all persons or entities (other than Pre-Petition Credit Parties) known by Debtors to have or assert any security interest in or lien upon any of the Pre-Petition Collateral, and all parties (if any) that have filed requests for notices under Rule 2002 of the Bankruptcy Rules, and that notice of the Final Hearing on the Motion was served in accordance with the terms of the Interim Financing Order.  The Court finds that notice of the Motion, as it relates to this Order, is sufficient for all purposes under the Bankruptcy Code and the Bankruptcy Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c).

L.    **Finding of Cause**.  Good cause has been shown for the entry of this Order and authorization for Debtors to continue to obtain the Credit Extensions pursuant to the DIP Loan Agreement.  Debtors' need for financing of the type afforded by the DIP Loan Agreement continues to be ongoing, immediate and critical.  Entry of this Order will minimize disruption of Debtors' businesses and operations, will preserve the assets of Debtors' estates and their value and is in the best interests of Debtors, their creditors and their respective estates.  The terms of the proposed financing appear fair and reasonable, reflect Debtors' exercise of business judgment and are supported by reasonably equivalent value and fair consideration.

**Error! Unknown document property name.**

M.    **Finding of Good Faith**.  Based upon the record presented at the Hearings, the Court finds that the DIP Loan Agreement and the other DIP Loan Documents (as defined below), as well as the terms of this Order and the Interim Financing Order, have been negotiated in good faith and at arm's length between Debtors, on the one hand, and DIP Lender, on the other. Therefore, all Credit Extensions heretofore and hereafter made to Debtors pursuant to the DIP Loan Documents shall be deemed to have been made in good faith within the meaning of Section 364(e) of the Bankruptcy Code.

N.    **Jurisdiction; Core Proceeding**.  This Court has jurisdiction to enter this Order pursuant to 28 U.S.C. §§ 157(b) and 1334.   Consideration of the Motion constitutes a core proceeding, as defined in 28 U.S.C. § 157(b)(2).

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, as follows:

1.    **Authorization of Ongoing Financing**.  The Motion is hereby GRANTED with respect to ongoing Credit Extensions after the Interim Period subject to the terms and conditions set forth herein.  Any and all objections to the relief requested in the Motion, to the extent not withdrawn with prejudice, waived or resolved by consent at or before the Final Hearing, are hereby OVERRULED and DENIED.

2.    **Authorization of Financing**.  Subject to the terms and conditions set forth herein, the Court hereby ratifies, reauthorizes and reapproves (i) the execution and delivery by each Debtor of the DIP Loan Agreement in substantially the form annexed to the Motion (with such changes as were addressed to the Court at the Hearings or are authorized to be made as amendments to the DIP Loan Agreement in accordance with this Order) and all other DIP Loan Documents (the DIP Loan Agreement and all other DIP Loan Documents, as at any time amended, modified, renewed, restated, extended or substituted, being collectively called the

Error! Unknown document property name.

"*DIP Loan Documents*"); (ii) Debtors' continuing to obtain DIP Loans, Letters of Credit and other Credit Extensions in accordance with the DIP Loan Agreement from time to time up to an aggregate principal amount outstanding at any time of $10,000,000, plus additional amounts (if any) that DIP Lender, in its sole discretion, elects to advance as DIP Loans to fund all or part of the Carve-Out (as defined below), plus interest, fees and other charges payable in connection with the foregoing; (iii) the Debtors' requiring the Guarantors to execute and deliver guarantees and the supporting documents related thereto; and (iv) Debtors' satisfying or continuing to satisfy all conditions precedent and performing all obligations hereunder and under the DIP Loan Documents in accordance with the terms hereof and thereof; provided, however, that the authorization to use proceeds of DIP Loans shall be limited solely to the purposes specified and authorized in this Order or the DIP Loan Documents, including, without limitation, the permitted uses of proceeds set forth in Section 2.1.3 of the DIP Loan Agreement (collectively, the "*Permitted Uses*").  DIP Lender shall not have any obligation or responsibility to monitor Debtors' use of any DIP Loans and may rely upon any Debtor's representations that the amount of the Credit Extensions requested at any time, and the use thereof, are in accordance with the requirements of this Order, the DIP Loan Documents and Bankruptcy Rule 4001(c)(2). Debtors' use of proceeds of the DIP Loans authorized under this Order or the Interim Financing Order shall not impair, release or alter the liability of any Guarantor with respect to the Pre-Petition Debt or DIP Obligations.  As provided in the DIP Loan Agreement and the Fifth Amendment, (i) the Garlock Pre-Petition LC shall continue to be treated as having been issued under the DIP Loan Agreement, shall continue to constitute part of the Credit Extensions thereunder, shall continue to be entitled to all of the benefits and security of the DIP Loan Documents and this Order, and shall not be regarded as part of the Pre-Petition Debt; and (ii) the Banking Relationship Debt of Garlock Sealing and Garrison to BofA and any of its

-10-

affiliates shall continue to constitute DIP Obligations owed to DIP Lender, shall continue to be entitled to all of the benefits and security of the DIP Loan Documents and this Order, and shall not be regarded as part of the Pre-Petition Debt.

3.    **Execution, Delivery and Performance of DIP Loan Documents**.   The DIP Loan Documents constitute valid and binding obligations of each Debtor, enforceable against such Debtor in accordance with their terms.   In furtherance of the provisions of paragraph 2 of this Order, each Debtor is authorized and directed, to the extent required by the DIP Loan Agreement or otherwise requested by DIP Lender in accordance with the terms of the DIP Loan Documents, (a) to do and perform all acts; (b) to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, financing statements and intellectual property filings); (c) to obtain from each Guarantor guaranties, pledge agreements and security agreements; and (d) to pay all filing and recording fees as may be necessary or, in the opinion of DIP Lender, desirable to give effect to any of the terms and conditions of the DIP Loan Documents, or as otherwise required or contemplated by the DIP Loan Documents.

4.    **Collateral and DIP Liens**.

(a)    **Working Capital Collateral**.    All Obligations under the DIP Loan Agreement, including, without limitation, all Credit Extensions and Banking Relationship Debt (all of the foregoing being collectively called the "*DIP Obligations*") shall continue to be, and hereby are, secured by security interests and liens in favor of DIP Lender with respect to all of the following property of each Debtor, whether now in existence or hereafter created, acquired or arising and wherever located: all of such Debtor's cash, accounts, inventory, general intangibles (except to the extent constituting Springing Lien Collateral (as defined below)), documents (except to the extent constituting Springing

**Error! Unknown document property name.**

Lien Collateral (as defined below)), instruments, chattel paper (except to the extent constituting Springing Lien Collateral (as defined below)), deposit accounts, letter-of-credit rights, commercial tort claims, investment property, Insurance Receivables Rights, and books and records (whether in tangible or electronic medium) relating to any assets of such Debtor and all cash and non-cash proceeds (including, without limitation, insurance proceeds) of the foregoing (all such property, including, without limitation, all Pre-Petition Collateral of Garlock Sealing and Garrison and the proceeds thereof, being collectively hereinafter referred to as the "*Working Capital Collateral*").

(b)    Springing Lien Collateral.  Subject to and immediately upon satisfaction of the Springing Lien Conditions (as defined below), DIP Lender shall be deemed automatically to have a perfected security interest in and lien upon all of the Springing Lien Collateral (as defined below) as security for the payment of the DIP Obligations, but not to exceed an amount of DIP Obligations equal to the Carve-Out Amount (as defined below) that is satisfied in whole or in part by DIP Loans or Cash Collateral (as defined below)).  As used herein, the term "*Springing Lien Collateral*" means Fixed Assets (as defined below), software and intellectual property embedded in Fixed Assets, and general intangibles, chattel paper and documents exclusively related to Fixed Assets; the term "*Fixed Assets*" means, with respect to each Debtor, all real property and equipment or other tangible personal property (except inventory, books and records and other tangible personal property included as Collateral pursuant to Section 7.1(a) of the DIP Loan Agreement) at any time owned or leased by such Debtor; the term "*Springing Lien Conditions*" means the following conditions, the satisfaction of which shall result in the automatic creation and attachment of duly perfected liens upon the Springing Lien Collateral, regardless of whether such conditions are satisfied on, before or after the

**Error! Unknown document property name.**

Commitment Termination Date: (i) the Carve-Out (as defined below) is funded by DIP

Loans or Cash Collateral (as defined below), in whole or in part, and (ii) at the time of or

after giving effect to such funding of all or part of the Carve-Out, any DIP Obligations

remain unpaid; and the term "*Carve-Out Amount*" means the amount of Cash Collateral

(as defined below) or DIP Loans, or both, that are used for the Carve-Out pursuant to

paragraph 9 hereof.  For purposes of this Order, the security interests and liens in favor of

DIP Lender that attach to and encumber the Working Capital Collateral and, if and when

applicable, the Springing Lien Collateral are hereinafter referred to, collectively, as the

"*DIP Liens*."

(c)    Priorities of DIP Liens.  The DIP Liens with respect to the Working

Capital Collateral and, if and when applicable, the Springing Lien Collateral (the

Working Capital Collateral and, upon satisfaction of the Springing Lien Conditions, the

Springing Lien Collateral are collectively called the "*Collateral*"), shall have the

following priorities:

(i)    Unencumbered Collateral. Pursuant to Section 364(c)(2) of the

Bankruptcy Code, perfected first priority senior security interests in and liens

upon (x) all Collateral that, as of the Petition Date, is not subject to valid,

perfected and unavoidable liens or to valid and unavoidable liens in existence on

the Petition Date that are perfected thereafter (with a priority that relates back to a

date prior to the Petition Date), as permitted by Section 546(b) of the Bankruptcy

Code, and (y) all Collateral that is created, acquired or arises after the Petition

Date (other than direct proceeds of pre-petition assets of a Debtor that are subject

to valid, perfected and unavoidable liens in existence on the Petition Date); and

Error! Unknown document property name.

(ii)     Encumbered Collateral.     Pursuant to Section 364(c)(3) of the
Bankruptcy Code, perfected junior security interests in and liens upon all
Collateral that was subject to valid, perfected and unavoidable liens on the
Petition Date or to valid and unavoidable liens in existence on the Petition Date
that are perfected thereafter (with a priority that relates back to a date prior to the
Petition Date), as permitted by Section 546(b) of the Bankruptcy Code; provided,
however, the DIP Liens shall not be subject to any security interest or other lien
that was in existence on the Petition Date but is thereafter terminated or released,
including, without limitation, the Pre-Petition Liens of the Pre-Petition Credit
Parties that were released on the Release Effective Date.

(d)     Avoidance Claims and Proceeds.     Notwithstanding the foregoing
provisions of this paragraph 4 or anything to the contrary in the DIP Loan Documents,
the DIP Liens shall not attach to any of the following property (unless Debtors shall grant
or consent to any lien or security interest therein in favor of any other party, in which
event all such property shall be subject to the DIP Liens): (i) any claims of a Debtor or its
Estate pursuant to Sections 502(d), 544, 545, 547, 548, 549, 550, 551 or 553 of the
Bankruptcy Code (the "*Avoidance Claims*") or (ii) any proceeds or property recovered in
connection with the successful prosecution or settlement of Avoidance Claims (the
"*Avoidance Proceeds*").     The DIP Liens shall not be subject or subordinate to any
security interest or other lien that is avoided and preserved for the benefit of Debtors and
their Estates under Section 551 of the Bankruptcy Code.

5.     **Superpriority Claim; Surcharge**.

(a)     Scope of Superpriority Claim.     All DIP Obligations shall constitute an
allowed administrative expense claim under Section 503(b) of the Bankruptcy Code and

**Error! Unknown document property name.**

shall constitute an allowed superpriority claim (the "*Superpriority Claim*") pursuant to,

Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses in

Debtors' cases of the kind specified in, or ordered pursuant to, Sections 105, 326, 328,

330, 331, 503(a), 503(b), 506(e), 507(a), 507(b), 546(c), 726 or 1114 of the Bankruptcy

Code.   Without limiting the generality of the foregoing, the DIP Liens and the

Superpriority Claim shall be superior to any and all administrative priority claims arising

out of transactions, if any, arising between, on the one hand, any Debtor, and, on the

other hand, any entity affiliate of such Debtor, any other Debtor, or any entity affiliate of

any other Debtor (collectively, the "*Intercompany Affiliate Transaction Claims*"), and all

Intercompany Affiliate Transaction Claims shall be subordinate to the DIP Liens and the

Superpriority Claim.

(b)      <u>No Surcharge</u>.  No costs or administrative expenses that have been or may

be incurred in these Chapter 11 cases, in any matters or proceedings related hereto or in

any superseding Chapter 7 case and no priority claims are or will be prior to or on a

parity with the Superpriority Claim of DIP Lender for the DIP Obligations.  In no event

shall any costs or expenses of administration be imposed upon DIP Lender or any of

the Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise without

the prior written consent of DIP Lender, and no such consent shall be implied from

any action, inaction or acquiescence by DIP Lender.

**6.      <u>Joint and Several Liability; Debtor Reimbursement Claims</u>.**

(a)      Debtors are and shall continue to be jointly and severally liable to repay

the DIP Obligations in accordance with the DIP Loan Documents.  The DIP Obligations shall be

due and payable, and shall be paid, as and when provided in the DIP Loan Documents and as

provided herein, without offset or counterclaim.  In no event shall Debtors be authorized to offset

-15-

or recoup any amounts owed, or alleged to be owed, by DIP Lender to Debtors or any of their

subsidiaries or affiliates against any of the DIP Obligations unless and to the extent expressly

otherwise agreed to in writing by DIP Lender.

(b)    No Debtor shall have any right of contribution, reimbursement or

subrogation from any other Debtor or any other Debtor's assets as a result of such other Debtor's

use of Cash Collateral or DIP Loans except for contribution rights set forth in the DIP Loan

Agreement, and any such right of contribution shall be an allowed claim under Section 364(c)(1)

of the Bankruptcy Code, _provided_ that all such contribution claims (and the Section 364(c)(1)

priority accorded them) shall be junior, subordinate and subject to the DIP Liens and the

Superpriority Claim and may not be paid unless and until Full Payment of the DIP Obligations

has occurred.

7.    **Cash Collateral**.  Debtors shall cause all proceeds of Collateral that are in any

Debtor's possession on the Petition Date or that are received by any Debtor on or after the

Petition Date (collectively, the "_Cash Collateral_") to be promptly deposited in one or more

accounts designated by DIP Lender (each a "_Dominion Account_").  Prior to the deposit of such

Cash Collateral to a Dominion Account, Debtors shall be deemed to hold all such proceeds in

trust for the benefit of DIP Lender.  For so long as no Event of Default under the DIP Loan

Agreement occurs or exists and Debtors' proposed use of Cash Collateral would not result in an

Out-of-Formula Condition, DIP Lender shall allow Debtors to have access to any Cash

Collateral in DIP Lender's possession that constitutes collected and available balances in any

Dominion Account, subject to DIP Lender's right first to apply any such balances to the

payment of any of the DIP Obligations (including, without limitation, any Banking Relationship

Debt) that are then due and payable to DIP Lender.  At any time that an Event of Default or an

Out-of-Formula Condition exists, (i) DIP Lender may apply (and reapply) any or all Cash

Collateral at any time or times in its possession or control to the payment of any of the DIP

Obligations, in such order of application as DIP Lender may designate or elect, and may use all

or part of the Cash Collateral to collateralize, in accordance with the DIP Loan Agreement, any

Letters of Credit, Banking Relationship Debt or other contingent Obligations and (ii) after

applying and using such Cash Collateral in accordance with clause (i) above, DIP Lender shall

allow Debtors to have access to any excess Cash Collateral in DIP Lender's possession that

constitutes collected and available balances in any Dominion Account until such time, if ever,

that any other DIP Obligations arise (whereupon such Cash Collateral shall be applied to the

payment or cash collateralization of such DIP Obligations), with any excess Cash Collateral

again available to Debtors as described in this sentence.  If after Full Payment of the DIP

Obligations any claims or cause or action are asserted against DIP Lender in respect of which

Debtors have provided an indemnity or hold harmless agreement, then, unless the Court

determines that such claim or cause or action is not covered by such indemnity or other hold

harmless agreement, DIP Lender shall be entitled to payment from the Debtors to the extent of

all costs, expenses, liabilities or damages incurred by it (including, without limitation,

reasonable attorneys' fees).  Prior to Full Payment of the DIP Obligations, if and for so long as

Debtors are authorized to use any Cash Collateral as provided herein, Debtors' use of such Cash

Collateral shall be solely for Permitted Uses.

    **8.**    **Fees and Expenses of Professionals**.  For so long as the Carve-Out Event has not

occurred, Debtors are authorized to continue to use proceeds of DIP Loans and, subject to the

limitations contained in paragraph 7 of this Order, Cash Collateral solely for Permitted Uses,

which shall include (a) payment of any fees required to be paid to the Clerk of the Court;

(b) payment of quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6);

(c) payment of such compensation and expense reimbursement (collectively,

-17-

"*Professional Expenses*") (i) of professionals (including, without limitation, attorneys, accountants, appraisers, consultants and investment bankers) retained by Debtors (the "*Debtor Professionals*"), (ii) of any legal representative appointed in the Chapter 11 Cases to represent the holders of unknown asbestos-related claims or demands (the "*Legal Representative*"), (iii) of professionals (including, without limitation, attorneys, accountants, appraisers, consultants and investment bankers) retained by such Legal Representative (the "*LR Professionals*") and (iv) of professionals (including, without limitation, attorneys, accountants, appraisers, consultants and investment bankers) retained by any official committee (each such official committee being referred to as a "*Committee*" and the professionals retained by such Committee referred to as the "*Committee Professionals*"), in each case to the extent that payment of such Professional Expenses is in accordance with compensation procedures approved by the Court; and (d) payment of such expense reimbursement of any member of a Committee (or any such member's attorney-agent as identified in any Order appointing the Committee member) solely for reasonable expenses incurred in performing duties as a member of the Committee and only to the extent that payment of such expense reimbursement is in accordance with any applicable expense reimbursement procedures as approved by the Court (for purposes of clarity, such expense reimbursements shall not include compensation for time or services provided by the member or any attorney or agent for a member); provided, however, that, except as provided in the next proviso below, no proceeds of DIP Loans or any Cash Collateral shall be used to pay Professional Expenses of any Debtor Professionals, LR Professionals or Committee Professionals (collectively, the "*Professionals*") in connection with (1) commencing or continuing any claims, causes of actions or adversary proceedings against any Pre-Petition Credit Party or DIP Lender, or any contested matter seeking to affect adversely the rights, privileges, powers, claims or remedies of such Pre-Petition Credit Party or DIP

**Error! Unknown document property name.**

Lender under the Pre-Petition Loan Agreement or the DIP Loan Documents, including, without limitation, discovery proceedings subsequent to the commencement of any such claims, causes of action, adversary proceedings or contested matters; (2) preventing, hindering or delaying performance or enforcement by DIP Lender of its rights or remedies under this Order or any of the DIP Loan Documents; (3) challenging the DIP Liens or the Superpriority Claim; or (4) any action of a Professional for which Professional Expenses are not reimbursable from proceeds of DIP Loans pursuant to Section 2.1.3 of the DIP Loan Agreement (collectively, the "*Prohibited Purposes*"); and provided, further, however, it shall be permissible to use the proceeds of DIP Loans and any Cash Collateral to pay Professional Expenses of any Committee Professionals (including any reasonable costs) incurred in connection with the investigation of whether a Challenge (as defined in Paragraph 19 below) exists and should be pursued, with such Professional Expenses to include any investigation, examination, or discovery undertaken prior to a Challenge to determine the validity or the merits of a possible or potential Challenge, regardless of whether or not a Challenge is ultimately filed or a Committee is granted standing to pursue a Challenge; and the term "Prohibited Purposes" shall not be construed to preclude the allowance and payment of such Professional Expenses. Nothing herein shall be deemed to waive the right of any party in interest to challenge the reasonableness or necessity for such Professional Expenses. Notwithstanding anything to the contrary contained in this Order or the DIP Loan Documents, in no event shall (i) any lien, secured status, superpriority administrative status (whether under Sections 364(c)(1) or 507(b) of the Bankruptcy Code), administrative status or any asserted priority in entitlement, including, without limitation, the DIP Liens or the Superpriority Claim, attach to or be payable from any pre-petition retainers held by any Debtor Professional or be used as a basis to object to the payment of Professional Expenses from such pre-petition retainers, (ii) any amounts paid to any Professional pursuant to and in compliance

-19-

with any order of the Court (including, without limitation, any order establishing procedures for interim compensation and reimbursement of expenses) and not used for payment of Professional Expenses incurred in connection with Prohibited Purposes be subject to any lien, secured status, superpriority administrative status whether under Sections 364(c)(1) or 507(b) of the Bankruptcy Code, administrative status or any asserted priority in entitlement, including, without limitation, DIP Liens or the Superpriority Claim or be used as a basis to object to the payment of Professional Expenses, and (iii) DIP Lender be entitled or authorized to seek disgorgement of or object to the final award of any Professional Expenses paid to Professionals pursuant to an order of the Court (including, without limitation any order establishing procedures for interim compensation and reimbursement of expenses) solely based upon the existence of any lien, secured status, superpriority administrative status whether under Sections 364(c)(1) or 507(b) of the Bankruptcy Code, administrative status or any asserted priority in entitlement, including, without limitation, DIP Liens or the Superpriority Claim.

9.   **Carve-Out**.

(a)   Notwithstanding anything to the contrary contained in this Order or the DIP Loan Documents, any lien, secured status, superpriority administrative status (whether under Sections 364(c)(1) or 507(b) of the Bankruptcy Code), administrative status or any asserted priority in entitlement including, without limitation, the DIP Liens and the Superpriority Claim, shall be subject and subordinate to the payment of the following (to the extent that there are insufficient, unencumbered funds in Debtors' estates to pay such amounts at the time that payment is required to be made): (i) accrued and unpaid Professional Expenses of Professionals, to the extent that such expenses are for services rendered or expenses incurred by such Professionals prior to the occurrence of the Carve-Out Event (as defined below), are approved for payment by final order of

the Court and do not exceed $850,000 in the aggregate, less the balance, if any, of any

retainers held by any Professional at the time of such Carve-Out Event; (ii) Professional

Expenses of Professionals, to the extent that such Professional Expenses are incurred

after the occurrence of the Carve-Out Event, are approved for payment by final order of

the Court and do not exceed $150,000 in the aggregate; and (iii) quarterly fees required to

be paid pursuant to Bankruptcy Rule 2015(a) and 28 U.S.C. § 1930(a)(6) that are accrued

and unpaid as of the Carve-Out Event (clauses (i) through (iii) being collectively, the

"*Carve-Out*"); provided, however, that no proceeds of DIP Loans or any Cash Collateral

received pursuant to the Carve-Out shall be used by any person or entity to pay or

reimburse any Professional for Professional Expenses incurred in connection with

Prohibited Purposes or for uses other than Permitted Uses.  The term "*Carve-Out Event*"

shall mean the termination of the Commitment on the Commitment Termination Date,

whether such termination results from any action of DIP Lender or any Debtor, expiration

of the DIP Term, the dismissal or conversion of any of these Chapter 11 Cases, or

otherwise.

      (b)     After the Carve-Out Event, DIP Lender may, in its discretion at any time

and without waiving any Event of Default, and irrespective of the occurrence of the

Commitment Termination Date, either fund one or more DIP Loans pursuant to the DIP

Loan Agreement to pay any Court-approved Professional Expenses that were incurred

prior to or after a Carve-Out Event and that are covered by the Carve-Out, or may fund

one or more DIP Loans in the aggregate amount of the Carve-Out; and in either such

event, such DIP Loans shall (together with any Cash Collateral used for the Carve-Out)

reduce the Carve-Out by the amount of such DIP Loans (and such Cash Collateral used

for the Carve-Out), and all such DIP Loans shall be entitled to all of the benefits and

Error! Unknown document property name.

security of the DIP Loan Documents and this Order.  All DIP Loans funded, and all Cash Collateral made available, for the Carve-Out shall be used by Debtors solely for purposes of paying Professional Expenses of Professionals and quarterly fees to be paid pursuant to Bankruptcy Rule 2015(a) and 28 U.S.C. § 1930(a)(6) to the extent covered by the Carve-Out; and, if after paying all amounts covered by the Carve-Out any surplus of proceeds of DIP Loans or Cash Collateral exists, such surplus shall be remitted to DIP Lender for application to the DIP Obligations.  Notwithstanding the Full Payment of the DIP Obligations, in no event shall Debtors be authorized to use any proceeds of DIP Loans or Cash Collateral to pay any claim of any creditor or other interested party until all Professional Expenses and other administrative claims have been paid in full to the extent provided by this or any subsequent order of the Court.

(c)     In no event shall the funding of DIP Loans or the use of Cash Collateral to satisfy the Carve-Out result in any reduction in the amount of the DIP Obligations or affect DIP Lender's entitlement to Full Payment thereof.

**10.     Preservation of Rights Granted Under this Order**.

(a)     Protection From Subsequent Financing Order.  There shall not be entered in these Chapter 11 cases or in any successor cases any order that authorizes the obtaining of credit or the incurrence of indebtedness by any Debtor (or any trustee or examiner) that (i) is secured by a security, mortgage, collateral interest or lien on all or any part of the Collateral that is equal or senior to the DIP Liens except as expressly authorized by the DIP Loan Agreement, or (ii) has priority administrative status that is equal or senior to the Superpriority Claim granted to DIP Lender herein; provided, however, that nothing herein shall prevent the entry of an order that specifically provides that, as a condition to the granting of the benefits of clauses (i) or (ii) above, all of

-22-

the DIP Obligations must be indefeasibly paid in full, in cash, from the proceeds of such credit or indebtedness and all contingent obligations owed to DIP Lender fully cash collateralized as provided in the DIP Loan Agreement and the other DIP Loan Documents.

(b)    Rights Upon Dismissal, Conversion or Consolidation.    If any of the Chapter 11 cases is dismissed, converted or substantively consolidated with another case, then neither the entry of this Order nor the dismissal, conversion or substantive consolidation of such Chapter 11 case shall affect the rights or remedies of DIP Lender under the DIP Loan Documents or the rights or remedies of DIP Lender under this Order, and all of the respective rights and remedies hereunder and thereunder of DIP Lender shall remain in full force and effect as if such Chapter 11 case had not been dismissed, converted, or substantively consolidated. It shall constitute an Event of Default if any Debtor seeks, or if there is entered, any order dismissing any of the Chapter 11 cases. If an order dismissing any of the Chapter 11 cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Liens and the Superpriority Claim granted to and conferred upon DIP Lender shall continue in full force and effect and shall maintain their priorities as provided in this Order (and that such liens and the Superpriority Claim shall, notwithstanding such dismissal, remain binding on all interested parties) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens and the Superpriority Claim.

(c)    Survival of Order. The provisions of this Order, and any actions taken pursuant hereto, shall survive the entry of and shall govern with respect to any conflict

Error! Unknown document property name.

with any order that may be entered confirming any plan of reorganization or converting

any of the Chapter 11 cases from Chapter 11 to Chapter 7.

(d)    <u>No Discharge; Credit Bid Rights</u>.  Unless and until Full Payment of the

DIP Obligations shall occur, the DIP Obligations shall not be discharged by the entry of

any order confirming a plan of reorganization in any of the Chapter 11 cases and,

pursuant to Section 1141(d)(4) of the Bankruptcy Code, Debtors have waived such

discharge.  No plan of reorganization or liquidation, nor any order entered in connection

with a sale of assets under Section 363 of the Bankruptcy Code, shall limit or otherwise

restrict the right of DIP Lender to submit a credit bid for all or any part of the Collateral.

(e)    <u>No Marshalling</u>.  In no event shall DIP Lender be subject to the

equitable doctrine of "marshaling" or any similar doctrine with respect to any Collateral

at any time securing any of the DIP Obligations; and in no event shall any DIP Liens be

subject to any pre-petition or post-petition lien or security interest that is avoided and

preserved for the benefit of any Debtor's estate pursuant to Section 551 of the Bankruptcy

Code.

(f)    <u>No Requirement to File Proof of Claim</u>.  Notwithstanding anything to the

contrary contained in any prior or subsequent order of the Court, including, without

limitation, any bar order establishing a deadline for the filing of proofs of claims entitled

to administrative expense treatment under Section  503(b) of the Bankruptcy Code, DIP

Lender shall not be required to file any proof of claim with respect to any of the DIP

Obligations, all of which shall be due and payable in accordance with the DIP Loan

Agreement and the other DIP Loan Documents without the necessity of filing any such

proof of claim; and the failure to file any such proof of claim shall not affect the validity

or enforceability of any of the DIP Loan Documents or prejudice or otherwise adversely

-24-

affect DIP Lender's rights, remedies, powers or privileges under the DIP Loan Documents or this Order.

11.   **Automatic Perfection of Liens**. The DIP Liens shall be deemed valid, binding, enforceable and perfected with respect to all of the Collateral upon entry of this Order. DIP Lender shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or any similar document or take any other action (including, without limitation, possession of any of the Collateral) in order to validate the perfection of any DIP Liens. If DIP Lender shall, in its discretion, choose to file or record any such mortgages, deeds of trust, security deeds, notices of lien or UCC-1 financing statements, or take any other action to validate the perfection of any part of the DIP Liens, Debtors and their respective officers are directed to execute any documents or instruments as DIP Lender shall reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Order, and Debtors shall pay or reimburse DIP Lender for the payment of any cost, fees or expenses (including, without limitation, recording taxes) payable in connection with the filing or recordation of any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or other instruments or agreements. DIP Lender may, in its discretion, file a certified copy of this Order in any filing office in any jurisdiction in which any Debtor is organized or has or maintains any Collateral or an office, and each filing office is directed to accept such certified copy of this Order for filing and recording. Notwithstanding the foregoing, Debtors shall not be obligated to reimburse DIP Lender for the costs of filing or recording any liens with respect to any Collateral that consists of Fixed Assets.

12.   **Reimbursement of Expenses**.  All reasonable costs and expenses incurred by DIP Lender in connection with the negotiation and drafting of this Order and the DIP Loan

**Error! Unknown document property name.**

Documents (or any amendments thereto), the preservation, perfection, protection and enforcement of DIP Lender's rights hereunder or under the DIP Loan Documents, the collection of the DIP Obligations, or the monitoring of these Chapter 11 cases, including, without limitation, all filing and recording fees (except as otherwise provided in paragraph 11 with respect to Fixed Assets) and reasonable fees and expenses of attorneys, accountants, appraisers and other professionals incurred by DIP Lender in connection with any of the foregoing, whether any of the foregoing were incurred prior to or after the Petition Date, shall form a part of the DIP Obligations and shall be paid by Debtors in accordance with the terms of the DIP Loan Documents but subject to the procedures hereinafter set forth. DIP Lender shall submit to Debtors, with copies also sent to counsel for each Committee and the Bankruptcy Administrator, a copy of each statement evidencing the fees and expenses incurred to professional persons retained by DIP Lender, each of which statements shall be in reasonable detail (but redacted to protect any attorney-client privileged matter or work product). The submission of any such statement (whether or not redacted) shall not operate to waive any attorney-client or other evidentiary privilege. The Debtors, each Committee and the Bankruptcy Administrator shall have 15 days after receipt of each such statement within which to object to any part of a statement, provided that any such objection shall be in writing, be served upon DIP Lender's counsel by email and regular U.S. Mail, and be specific as to the time entries and fee amount that the objecting party claims to be inappropriate or unreasonable. In the event that an objection is timely served upon DIP Lender with respect to any statement, the fees and expenses shown on such statement shall be paid by Debtors only to the extent of the portion thereof as to which no objection has been timely asserted and the portion of any such fees and expenses as to which a timely objection has been made shall be resolved by mutual agreement of DIP Lender and the objecting party or by the Court upon application of DIP Lender.

-26-

13.    **Amendments to DIP Loan Documents**. Debtors and DIP Lender are hereby authorized to execute, deliver and implement, in accordance with the terms of the DIP Loan Documents and without further order of the Court, any amendments to and modifications of any of the DIP Loan Documents on the following conditions: (i) the amendment or modification must not constitute a material change to the terms of the DIP Loan Documents, (ii) copies of the amendment or modification must be served upon counsel for each Committee (and, prior to the appointment of counsel for any Committee, upon the members of the such Committee), the U.S. Bankruptcy Administrator, and other interested parties specifically requesting such notice, and (iii) notice of the amendment is filed with the Court. Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court. For purposes hereof, a "material change" shall mean a change that operates to shorten the DIP Facility, increase the aggregate amount of the commitment for DIP Loans or Letters of Credit under the DIP Facility, increase the rate of interest other than as provided in or contemplated by the DIP Loan Documents, delete or modify the provisions of Section 14.18 of the DIP Loan Agreement, add specific events of default, or enlarge the nature and extent of default remedies available to DIP Lender following an Event of Default under (and as defined in) the DIP Loan Agreement.

14.    **Events of Default; Remedies**.

(a)    <u>Events of Default and Remedies</u>.  An Event of Default shall be deemed to have occurred and exist for purposes of this Order upon the occurrence of an "Event of Default" under (and as defined in) the DIP Loan Agreement, including, without limitation, an Event of Default resulting from any of the following: the failure of any Debtor to observe, perform or discharge any obligation or duty imposed upon such Debtor by this Order or any of the DIP Loan Documents; a trustee shall be appointed in the Chapter 11 Cases; an examiner shall be appointed in the Chapter 11 Cases with

-27-

enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the

Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; the Chapter 11 Cases

shall be dismissed or converted to cases under Chapter 7 or a motion for any such

dismissal or conversion shall be filed by any Debtor; any Debtor shall file any motion to

alter, amend, vacate, supplement, modify, or reconsider, in any respect, this Order or,

without DIP Lender's prior written consent, this Order is amended, vacated, stayed,

reversed or otherwise modified, whether on appeal or otherwise; or the Court shall enter

an order granting to any entity other than DIP Lender relief from the automatic stay to

foreclose upon a lien with respect to any Collateral of any Debtor, provided that (x) DIP

Lender has a first priority lien on such Collateral or (y) such relief of stay could

reasonably be expected to have a Material Adverse Effect on the ongoing business

operations or financial performance of Debtors.

      (b)   <u>Enforcement of Remedies</u>.  Upon or after the occurrence of any Event of

Default, DIP Lender shall be fully authorized, in its sole discretion, to terminate further

Credit Extensions under the DIP Facility, accelerate the maturity and demand payment of

all DIP Obligations, hold and apply to the payment of any of the DIP Obligations any

balances in any accounts of Debtors, cause to be cash collateralized (to the extent not

previously cash collateralized), whether from Cash Collateral or DIP Loans (which may

be funded irrespective of termination of the DIP Facility), any contingent obligations of

Debtors to DIP Lender, and upon at least five (5) business days prior written notice to

counsel for Debtors, counsel for each Committee (or, prior to the appointment of counsel

for any Committee, upon the members of the such Committee), and the U.S. Bankruptcy

Administrator (during which five-day notice period, Debtors will be entitled to seek an

emergency hearing with the Bankruptcy Court regarding such enforcement), repossess

**Error! Unknown document property name.**

and foreclose its DIP Liens with respect to any or all of the Collateral and take all other actions and exercise all other remedies under the DIP Loan Documents and applicable law that may be necessary or deemed appropriate by DIP Lender to collect any of the DIP Obligations and otherwise enforce this Order and the DIP Loan Documents as if these Chapter 11 cases or any superseding Chapter 7 case were not pending.

(c)    Enforcement of Remedies in the Bankruptcy Court.  In addition to the remedies set forth herein and in the DIP Loan Documents, upon the occurrence and during the continuation of an Event of Default, during any period that Full Payment of the DIP Obligations has not occurred and to provide for an orderly disposition of the Collateral, Debtors shall, if so requested in writing by DIP Lender (with a copy of such request concurrently delivered to counsel for each Committee), file (i) one or more motions seeking to sell, assume and assign, or otherwise dispose of any or all of the Collateral as DIP Lender may direct (and as the Court may approve) pursuant to Sections 363 and 365 of the Bankruptcy Code and (if necessary or appropriate) motions to establish reasonable and customary bid procedures, and (ii) any further motions necessary to maximize the value received from the sale or disposition of the Collateral, including, without limitation, motions to retain any additional professionals to assist Debtors in the sale of the Collateral.  Debtors shall file any such motions promptly (and in any event within 25 days) after DIP Lender's request therefor and shall diligently prosecute all such motions for so long as Full Payment of the DIP Obligations has not occurred.  In the event of any sale or disposition of the Collateral in accordance with this paragraph or otherwise, DIP Lender shall have the right to credit bid any or all of the DIP Obligations under Section 363(k) of the Bankruptcy Code.

Error! Unknown document property name.

(d)     <u>Application of Collateral Proceeds</u>. Notwithstanding any contrary provision contained in this Order, if DIP Lender shall proceed to enforce its DIP Liens in respect of any Collateral, then DIP Lender may, in its discretion, elect to apply all proceeds of the Collateral to the payment or cash collateralization of the DIP Obligations, in such order of application as DIP Lender may elect in its discretion.

(e)     <u>Rights Cumulative</u>.  The rights, remedies, powers and privileges conferred upon DIP Lender pursuant to this Order shall be in addition to and cumulative with those contained in the DIP Loan Documents.

**15.     <u>Monitoring, Inspection and Use of Collateral</u>.**

(a)     <u>Inspection Rights</u>.  Representatives of DIP Lender shall be authorized to visit the business premises of Debtors and its subsidiaries in accordance with Section 10.1.1 of the DIP Loan Agreement to (i) inspect any Collateral or other assets, (ii) inspect and make copies of any books and records of Debtors, and (iii) verify or to obtain supporting details concerning the financial information to be provided to DIP Lender hereunder or under any of the DIP Loan Documents.

(b)     <u>DIP Lender's Right to Retain Professionals</u>.  DIP Lender shall be authorized to retain attorneys, appraisers, consultants, auditors and financial advisors, at Debtors' expense (subject to Sections 3.2.4, 3.4.1, 8.2.4 and 8.3.1 of the DIP Loan Agreement), which attorneys, appraisers, consultants, auditors and advisors shall be afforded reasonable access to the Collateral and Debtors' business premises, during normal business hours, for purposes of monitoring the business of Debtors, verifying Debtors' compliance with the terms of the DIP Loan Documents and this Order, and appraising all or any part of the Collateral (subject to Sections 3.2.4, 3.4.1, 8.2.4 and 8.3.1 of the DIP Loan Agreement).

**Error! Unknown document property name.**

16.    **Use of Springing Lien Collateral.**    At any time that an Event of Default exists, DIP Lender shall be authorized to use any Springing Lien Collateral (whether or not constituting Collateral), including, without limitation, any furniture or equipment of Debtors, and any used or leased premises of a Debtor, in connection with DIP Lender's sale, collection or other disposition of any of the Working Capital Collateral.

17.    **Modification of Automatic Stay**.    The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby lifted and terminated as to DIP Lender to the extent necessary to implement the provisions of this Order and the DIP Loan Documents, thereby permitting DIP Lender, *inter alia*, to receive collections of Collateral for application to the DIP Obligations as provided herein, to file or record any UCC-1 financing statements, mortgages, deeds of trust, security deeds and other instruments and documents evidencing or validating the perfection of the DIP Liens, and to enforce the DIP Liens as and to the extent authorized by this Order.

18.    **Payment and Subordination of Intercompany Obligations.**    As and to the extent provided in the DIP Loan Agreement, each Debtor shall be authorized to pay to any other Debtor any obligations incurred by the paying Debtor to another Debtor in the ordinary course of business, including, without limitation, payments by any Debtor of any liability that it may have to another Debtor under any of the Intercompany Notes; provided, however, that from and after the occurrence and during the continuance of any Event of Default under the DIP Loan Agreement, any amounts that a Debtor is obligated to pay to any other Debtor shall (if so elected by DIP Lender in its discretion) instead be remitted to DIP Lender for application to the DIP Obligations, in such order of application as DIP Lender may elect, until Full Payment of all DIP Obligations.    In addition, as provided in the DIP Loan Agreement, each Debtor shall be authorized to pay to any non-Debtor affiliate any indebtedness of the paying Debtor that is

**Error! Unknown document property name.**

incurred to such non-Debtor affiliate in the ordinary course of the paying Debtor's business, or

is otherwise approved by order of the Court; provided, however, that from and after the

occurrence and during the continuance of an Event of Default under the DIP Loan Agreement,

the paying Debtor shall, upon written instructions to do so from DIP Lender, cease making

payments to all non-Debtor affiliates.

19.   **Deadline for Challenge to Pre-Petition Liens and Claims**.   Each Debtor has

voluntarily made the stipulations contained in paragraph E hereinabove (the "*Debtors'*

*Stipulations*").   In consideration of DIP Lender's agreement to continue to provide Credit

Extensions pursuant to the DIP Loan Documents, each Debtor has waived and shall be barred

(a) from challenging the amount, validity, extent, perfection or priority of or seeking to set

aside, avoid, offset, subordinate or recharacterize any of the Pre-Petition Debt of a Debtor or

any Pre-Petition Liens in any Pre-Petition Collateral of a Debtor and (b) from asserting against

any Pre-Petition Credit Party a claim under any contract or tort (including, without limitation,

lender liability) theories of recovery or pursuant to Section 105 or Chapter 5 (including, without

limitation, Sections 510, 544, 547, 548, 549 or 550) of the Bankruptcy Code.   The Debtors'

Stipulations shall be binding on the Debtors, but shall be subject to the right of any party in

interest, including, without limitation, a Committee, to the extent that such party has or is

otherwise granted standing to do so, to commence an appropriate adversary proceeding or

contested matter (a "*Challenge*") seeking avoidance and/or recovery of any Debtor's pre-

petition payment or other pre-petition transfer of any interest in its property to a Pre-Petition

Credit Party as a transfer voidable and/or recoverable under Sections 105, 510, 544, 547, 548,

550, 551 or 553 of the Bankruptcy Code, which adversary proceeding or contested matter must

be filed no later than the earlier to occur of (i) 60 days from the date of engagement of counsel

by a Committee or (ii) 90 days after the Petition Date. If a party in interest has not obtained an

**Error! Unknown document property name.**

order from the Court granting it standing to pursue any such Challenge, then such party in interest shall be required promptly to seek such an order as a condition to its further prosecution of such Challenge, subject to any objection by Debtors, Pre-Petition Credit Parties or any other interested party (provided that the Court may grant standing to a party in interest, including, without limitation, a Committee, over the objection of Debtors or any other interested party if it determines such objection to be without merit), and such party in interest's authority to prosecute such Challenge shall be contingent upon its obtaining such an order.  In no event shall the filing of any such Challenge affect any of the rights, privileges, powers or remedies of DIP Lender under this Order or the DIP Loan Documents pending a ruling on such Challenge. If such Challenge is not timely filed or if standing to a party in interest in connection with any such Challenge is not granted, all claims and other causes of action, if any, that could have been asserted against any Pre-Petition Credit Party pursuant to Section 105 or Chapter 5 of the Bankruptcy Code shall be forever waived and barred.

20.    **Service of Order**.  Promptly after the entry of this Order, Debtors shall mail, by first class mail, a copy of this Order to counsel for DIP Lender, the U.S. Bankruptcy Administrator, counsel for each Committee (or, prior to the appointment of counsel for any Committee, upon the members of the such Committee), each creditor known by Debtors to have or assert a lien upon any Working Capital Collateral, the Internal Revenue Service, and all parties (if any) who have filed requests for notices under Rule 2002 of the Bankruptcy Rules, and shall file a certificate of service regarding same with the Clerk of the Court.

21.    **No Deemed Control**.  By consenting to this Order, making Credit Extensions to Debtors and administering the financing relationship with Debtors pursuant to the DIP Loan Documents, DIP Lender shall not be deemed to be in control of any Debtor or any Debtor's operations or to be acting as a "responsible person," "managing agent" or "owner or operator"

-33-

(as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar state or federal statute) with respect to the operations or management of such Debtor.

22.    **Binding Effect; Successors and Assigns**. The provisions of this Order shall be binding upon all parties in interest in these Chapter 11 cases, including, without limitation, DIP Lender and Debtors and their respective successors and assigns (including, without limitation, any Chapter 11 trustee hereafter appointed or elected for the estate of any Debtor or any Chapter 7 trustee appointed in any superseding Chapter 7 case), and shall inure to the benefit of Debtor, DIP Lender and Pre-Petition Credit Parties and the respective successors and assigns of DIP Lender and Pre-Petition Credit Parties. In no event shall DIP Lender have any obligation to make Credit Extensions to any Chapter 7 or Chapter 11 trustee appointed or elected for the estate of any Debtor.

23.    **Effect of Appeal**. Consistent with Section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter modified, vacated or stayed on appeal:

(a)    such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, liability or DIP Liens granted or incurred by Debtors to DIP Lender prior to the effective date of such stay, modification or vacation, or the validity, enforceability or priority of any DIP Liens, priority or right authorized or created under the original provisions of this Order or pursuant to the DIP Loan Documents; and

(b)    any indebtedness, obligation or liability incurred by Debtors to DIP Lender under the DIP Loan Documents prior to the effective date of such stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and DIP Lender shall be entitled to all the rights, remedies, privileges and benefits, including, without limitation, the DIP Liens and priorities granted herein and

-34-

pursuant to the DIP Loan Documents, with respect to any such indebtedness, obligation or liability. All Credit Extensions under the DIP Loan Documents are made in reliance upon this Order, and, therefore, the indebtedness resulting from such Credit Extensions prior to the effective date of any stay, modification or vacation of this Order cannot (i) be subordinated, (ii) lose the priority of the DIP Liens or the Superpriority Claim status, or (iii) be deprived of the benefit of the status of the DIP Liens and the Superpriority Claim granted to DIP Lender under this Order or the DIP Loan Documents, as a result of any subsequent order in any one of these Chapter 11 cases, or any superseding cases, of Debtors.

24. **Effectiveness**.  This Order shall take effect and be enforceable immediately upon entry hereof notwithstanding any contrary Bankruptcy Rule or Rule of Civil Procedure and there shall be no stay of execution or effectiveness of this Order.

25. **Inconsistencies**.  To the extent that any provisions in the DIP Loan Agreement are inconsistent with any of the provisions of this Order, the provisions of this Order shall govern and control.

This Order has been signed electronically.                    United States Bankruptcy Court
The Judge's signature and court's seal
appear at the top of the Order.

**Error! Unknown document property name.**