**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| IN RE: | Case No. 10-BK-31607 |
| GARLOCK SEALING TECHNOLOGIES LLC, et al., | Chapter 11 |
| Debtors.[1] | Jointly Administered |

**DEBTORS' MOTION FOR (A) ESTABLISHMENT OF ASBESTOS CLAIMS BAR DATE, (B) APPROVAL OF ASBESTOS PROOF OF CLAIM FORM; (C) APPROVAL OF FORM AND MANNER OF NOTICE, (D) ESTIMATION OF ASBESTOS CLAIMS, AND (E) APPROVAL OF INITIAL CASE MANAGEMENT SCHEDULE**

The above-captioned debtors (collectively, the "Debtors" or "Garlock") move for entry of an order (a) fixing a bar date for Asbestos Claims, (b) approving an Asbestos Proof of Claim form, (c) approving the form and manner of notice of bar date, (d) ordering the estimation of Asbestos Claims against Garlock, and (e) approving an initial case management schedule to govern these and related matters.

**Jurisdiction**

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this motion is proper under 28 U.S.C. § 1408.

2.     The statutory predicates for this motion are 11 U.S.C. §§ 105(a) and 502(c) and Bankruptcy Rules 3003(c)(3) and 9009.

---

[1]     The debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

**Background**

*A. Garlock's Asbestos Litigation*

3.     The Debtors filed these cases in order to achieve a full, final, and fair resolution

of present and future claims against them by persons holding claims based on bodily injury and

wrongful death allegedly caused by asbestos-containing products formerly manufactured by

Garlock.  *See* Information Brief of Garlock Sealing Technologies LLC, Docket No. 24

("Information Br.") at 39 *et seq.*

4.     Garlock manufactures sealing products, including gaskets and packing, some of

which used to contain asbestos.  Prior to the 2000s, Garlock was a long-time but peripheral

defendant in asbestos litigation.  The scientific and medical evidence is overwhelming that

Garlock's asbestos-containing products did not create an increased risk of asbestos-related

disease.  In Garlock's asbestos-containing gaskets and packing, asbestos was encapsulated in

rubber or other binders, so the products could not release more than negligible, if any, asbestos

fibers during ordinary use.  Moreover, almost all of Garlock's products that contained asbestos

used chrysotile asbestos.  Garlock's products were never banned by any government agency, and

complied with all applicable government safety standards at all times.

5.     Until the 2000s, the principal defendants in asbestos litigation were companies

that had produced thermal insulation, construction, and other friable asbestos-containing

products that released huge volumes of asbestos fibers during ordinary use.  Many of these

products were used near or around Garlock's gaskets and packing.  So long as the thermal

insulation and building products companies were tort system defendants, they paid the majority

of money necessary to resolve asbestos claims.  Because Garlock was named on form complaints

of the major plaintiffs' firms it received larger numbers of claims, but Garlock settled claims for

3017457

small amounts, reflecting the plaintiffs' bar's acknowledgement that juries understood that other companies, not Garlock, caused plaintiffs' asbestos-related injuries.

6.     Beginning in 2000, however, Garlock's situation changed dramatically because virtually all of the surviving major asbestos defendants filed for bankruptcy protection.[2] *See generally* Lloyd Dixon, et al., *Asbestos Bankruptcy Trusts* at 1 - 3 (RAND Corporation 2010) (available at http://www.rand.org/pubs/technical_reports/2010/RAND_TR872.pdf) ("RAND 2010").  As the major asbestos defendants disappeared from the tort system, the asbestos plaintiffs' bar sought other sources of recovery for their clients and "targeted" peripheral defendants like Garlock. *See id.* 8.

7.     This Bankruptcy Wave caused a marked increase in Garlock's defense and settlement expenditures.  This was particularly true for claims by persons suffering from mesothelioma, which accounted for approximately 90% of Garlock's indemnity expenditures in the twelve months preceding the June 5, 2010 petition date (the "Petition Date").

8.     First, the Bankruptcy Wave almost doubled the number of mesothelioma claims asserted against Garlock each year.  Doctors diagnose fewer than 3,000 persons with mesothelioma annually. The incidence of mesothelioma is in decline, with less than 2,500 diagnoses estimated in 2009.  In recent years, approximately 70% of persons diagnosed with mesothelioma file suit in the tort system to recover damages for their diseases. In 2009, approximately 1,900 claims were filed to recover damages in civil courts and against bankruptcy trusts.

---

[2]     The major defendant bankruptcies included Babcock & Wilcox Co. (2000); Pittsburgh Corning Corporation (2000); Owens Corning Fiberglass (2000); Fibreboard (2000); Armstrong World Industries (2000); W.R. Grace & Co. (2001); USG Corp. (2001); Turner & Newell, PLC (2001); and Federal-Mogul Corp. (2001).  As the liability of these major defendants was transferred to surviving defendants, 34 additional bankruptcy cases followed. *See* Information Br.  46-9.

3

9.     Because the use of asbestos in American industry was ubiquitous, plaintiffs
diagnosed with mesothelioma had exposure to asbestos in numerous different industries and
occupations, only a fraction of which would plausibly have brought workers into environments
in which Garlock's gaskets and packing were used.  And only a handful of workers in such
environments could conceivably have been involved in the job of removing and replacing
packing and gaskets.  Between 1992 and 1999, about 800 mesothelioma claimants per year, on
average, sued Garlock, an inflated number of claims that already far exceeded realities of
workplaces where plaintiffs alleged asbestos exposure. The Bankruptcy Wave took the major
defendants out of the tort system, however, and doubled the number of mesothelioma complaints
filed annually against Garlock during the 2000s.

**Figure 1: Increase In Mesothelioma Claims Against Garlock[3]**



---

3     Based on Bates White, LLC estimates.

4

10.     The Bankruptcy Wave also caused an alarming increase in the average amount necessary to resolve individual mesothelioma claims.  In 1999, Garlock paid an average of approximately $9,000 per settled mesothelioma claim.  During the 2000s, Garlock's average settlement payment progressively multiplied to over $75,000 per claim by 2006, where it remained as of the Petition Date.



11.     The increase in Garlock's claim numbers and settlement values resulted from changes in practices of the plaintiffs' bar in response to disappearing sources of recovery for asbestos claimants.  Part of the increase in Garlock's average settlement payment to mesothelioma claimants resulted from joint and several liability—as the traditional defendants retreated from the tort system, the liability allocation rules of many states required surviving defendants ultimately found to be liable to pick up the liability shares of bankrupt defendants. This increased trial risk and in turn settlement values for surviving defendants.

12.     The principal driver of Garlock's increasing average mesothelioma settlement payment, however, was a disturbing trend in tort system discovery.  Many plaintiffs who targeted

5

Garlock refused to acknowledge in discovery that the friable asbestos products of the major

defendants that had filed for bankruptcy contributed to their injuries, instead insisting that

Garlock's non-friable gaskets and packing were a major cause of their diseases. The new story

was inconsistent with positions plaintiffs had taken for decades, with real work practices, with

everything shown by legitimate science, and with the positions these same plaintiffs

subsequently would take when they would file claims against asbestos trusts established by

bankruptcy defendants pursuant to Bankruptcy Code Section 524(g) ("Trusts" or "524(g)

Trusts").   Yet this new story was difficult for Garlock to rebut consistently and repeatedly

before state court juries. In the absence of any information regarding evidence of exposure to

friable products of bankrupt companies and regarding plaintiffs' recoveries from asbestos trusts,

courts became willing to permit plaintiffs to offer dubious medical evidence to support their

claims against Garlock and it became easier for plaintiffs' attorneys to convince juries that

Garlock had caused their clients' injuries.

13.     In sum, the Bankruptcy Wave that swept the major defendants (which in the

1990s paid most of the money necessary to resolve asbestos claims) from the tort system into

bankruptcy in the early 2000s caused a catastrophic increase in Garlock's settlement

expenditures for mesothelioma claims:

- Between 1992 and 1999, approximately 800 mesothelioma claimants per year, on average, sued Garlock; Garlock paid approximately 600 claims per year an average of approximately $6,400 per claim; and Garlock's annual mesothelioma settlement payments were approximately $3.7 million.

- In contrast, between 2000 and 2009, an average of 1,650 mesothelioma claimants per year sued Garlock (a more than two-fold increase); Garlock paid approximately 950 claims per year an average of approximately $52,000 per claim; and Garlock's annual average asbestos-related indemnity expenditures were almost $50 million.

- By 2009, the plaintiffs' bar named Garlock in more than 1,800 mesothelioma complaints, virtually all complaints filed in the tort system; Garlock paid 926 claims, on average

6

approximately $74,000 per claim; and Garlock's annual mesothelioma settlement payments totaled approximately $68.6 million.

14.     The inflation in Garlock's payments to resolve mesothelioma claims has been artificial and should be temporary.  Most of the asbestos-driven bankruptcies of major defendants that drove Garlock's claims numbers and settlement values up have concluded, resulting in the creation of 524(g) Trusts that have assumed the bankrupt defendants' asbestos liabilities and begun, or will begin in the near future, paying claims.  The wealth of recently-formed 524(g) Trusts is enormous.  *See* Charles E. Bates & Charles H. Mullin, *Having Your Tort and Eating it Too?,* 6 Mealey's Asbestos Bankruptcy Report at 4 (November 2006) ("**Bates & Mullin**") (copy annexed as **Exhibit A** hereto); RAND 2010 at 26-8.  Garlock's claims expert, Charles E. Bates, Ph.D., of Bates White, LLC, estimates that 524(g) Trusts confirmed during the years 2004 through 2009 have been funded with aggregate assets in excess of $30 billion, with Trusts holding an additional $9 billion in assets expected to be confirmed in the near future.[4]  Moreover, the funding of these Trusts may increase to more than $60 billion from future contributions for pending and future insurance receivables, the formation of additional trusts, and other sources. *See* Bates & Mullin at 4; Mark A. Behrens, *What's New in Asbestos Litigation?*, 28 Rev. of Litig. 501, 554 (Spring 2009) (citing Bates & Mullin at 4) (copy annexed as **Exhibit B** hereto).  To place the wealth of recently emerged 524(g) Trusts in context, the aggregate future liability of *all* asbestos defendants is estimated by some experts to total $30 billion on a net present value basis, significantly less than the projected aggregate funding of the trusts. *See* Bates & Mullin at 4.

---

[4]    Trusts pending confirmation include those of the following defendants currently going through reorganization: Pittsburg Corning Corporation, W.R. Grace, Quigley Company, Congoleum, Flintkote Co. and Flintkote Mines Limited, APG, NARCO, and Thorpe Insulation.  This estimate does not include estimates for the assets in eventual Trusts from companies that have recently declared bankruptcy such as Plant, General Motors, Bondex, and Durabla, among others.

7

15.     Almost all of the 524(g) Trusts in the enormously wealthy Trust system were funded based on evidence that such Trusts would receive and pay a majority of the mesothelioma claims that are expected to be filed in the tort system.  As a result, each of the plaintiffs who sue Garlock will bring claims against numerous 524(g) Trusts, just like plaintiffs brought claims against the major defendants before they filed for bankruptcy during the Bankruptcy Wave of the early 2000s.

16.     Garlock's asbestos expenditures during the 2000s reflect a separate, material phenomenon: the disappearance of the "elephantine mass" of non-malignant claims that had been filed for years against Garlock and other asbestos defendants.  Beginning in 2003 and 2004, states that attracted the majority of non-malignant cases (including Mississippi and Texas) enacted tort reform and began to relegate these unimpaired plaintiffs to inactive dockets until they manifested symptoms of disease.  Because most plaintiffs never develop symptoms, this removed the pressure for defendants to settle these cases, and made medical screenings that produced such claims an unprofitable business for plaintiffs' firms.  The number of filings dropped precipitously.  In addition, the business of mass non-malignant filing was further impacted by the discovery of widespread misconduct in the medical screening process in 2005. *See Judge Janis Jack opinion in* Order No. 29: Addressing Subject-Matter Jurisdiction, Expert Testimony and Sanctions at 149, In re Silica Prods. Liab. Litig., MDL Docket No. 1553 (S.D. Tex.) at 150 ("Judge Jack Opinion").

17.     Non-malignant claim filings against Garlock ebbed.  In 2002, more than 45,000 non-malignant claims were filed against Garlock; in 2006, only a few thousand (Figure 2). Garlock's aggregate expenditure on non-malignant claims was nearly $100 million in 2001; by 2008, it paid only $5 million; and by 2009, only $3.6 million.  The sharp, declining trend

continued in the first half of 2010.  By the Petition Date, it was clear that Garlock's future

expenditures to resolve non-malignant claims would be immaterial.



*B. Garlock's Pending Asbestos Claims*

18.     There are approximately 124,000 asbestos claims pending against Garlock in state

and federal courts across the country.[5]  These pending claims can be divided into four different

types of asbestos-related diseases or conditions: mesothelioma; lung cancer; other cancer; and

non-malignant conditions.

19.     The majority of pending asbestos actions against Garlock are stale and

dormant—almost 110,000 (88%) were filed more than four years ago and over 44,000 (35%)

were filed more than ten years ago (*see* **Exhibit C** – Pending Asbestos Complaints Against

Garlock By Year of Filing):

---

[5]     After accounting for duplicate claims, cases that have been administratively dismissed, and cases that
should have been dismissed under settlement agreements, Garlock estimates that it has approximately 100,000
pending claims.

3017457

| Filing period | Mesothelioma | Lung Cancer | Other Cancer | Non-malignant | Unknown disease | Total |
|---|---|---|---|---|---|---|
| Pre-2000 | 400 | 1,400 | 500 | 21,000 | 21,000 | 44,300 |
| 2000-2005 | 1,400 | 3,100 | 1,300 | 45,000 | 15,000 | 65,800 |
| 2006-2009 | 3,500 | 2,500 | 700 | 7,100 | 1,100 | 14,900 |
| Total | 5,300 | 7,000 | 2,500 | 73,100 | 37,100 | 125,000 |

20.     Historically, claims that will be settled and paid by Garlock are almost always resolved within four years of their filing date.  That is, the vast majority of claimants who have not offered evidence of an asbestos disease or that they used Garlock's gaskets and packing within four years of filing suit against Garlock, will never do so, and their claims against Garlock eventually will be dismissed without payment.  This statistic reflects, among other things, that plaintiffs' lawyers use form complaints that name Garlock among dozens of other defendants in every asbestos suit they file for their clients, even for clients who have not, and never will, attribute their alleged asbestos diseases to the products manufactured or sold by Garlock and many other defendants named in the form complaint.

21.     Moreover, the vast majority of Garlock's pending *non-malignant* claims were filed prior to tort and judicial reform in the mid-2000s that relegated non-malignant claims to inactive dockets.  For example, of the more than 70,000 pending non-malignant claims against Garlock, more than 60,000 (over 85%) were filed before January 1, 2006.  These claims would not have qualified for compensation under applicable state law and Garlock would never have paid them unless they subsequently developed a real disease.

3017457

22.    Finally, there are approximately 37,000 pending claims that do not allege any type of asbestos disease or condition, approximately 36,000 of which were filed before January 1, 2006.

### C. The Task of These Cases

23.    The principal task of these cases is to determine the amount of trust funding necessary to satisfy Garlock's true responsibility for present and future asbestos claims.  Doing so requires a two-stage process—claims allowance and claims estimation:

a.    In the allowance proceedings, Garlock will ask the Court to establish a bar date for asbestos claims followed by discovery seeking additional information concerning the validity of claims filed by claimants who file proofs of claim. Garlock will then object to timely filed asbestos claims for which there is insufficient scientific, medical, or exposure evidence to hold Garlock responsible.

b.    In the estimation proceedings, Garlock will ask the Court to estimate any liability that Garlock may have for present asbestos claims surviving the claims allowance proceedings, and for future claims similar to those present claims. As part of these proceedings, Debtors will ask the Court to grant discovery on the necessary information to accomplish such estimation.

24.    Through these two stages, an aggregate determination of Garlock's liability will be made, taking into account, among other things, the enormous impact on asbestos claims against Garlock of the availability of tens of billions of dollars in future payments from Trusts to pay the same claims.  The wealthy trust system was not available in the 2000s after the major asbestos defendants left the tort system to resolve their asbestos liabilities in Chapter 11, and Garlock was forced to pay significantly enhanced settlement values.  Now that the major

11

defendants, and others, have established these wealthy Trusts to pay the same asbestos claims

that Garlock receives, Garlock's true responsibility should be restored to the pre-Bankruptcy

Wave situation when (a) evidence that the top tier defendants, and not Garlock, caused the

plaintiffs' injuries kept Garlock's trial risk low, and (b) even in cases where Garlock may be

found liable with top tier defendants, Garlock was not forced to pay such defendants' liability

shares.

      25.    A principal issue will be whether mesothelioma claims against Garlock should be

valued at their pre-Bankruptcy Wave levels when the major bankrupt defendants were in the tort

system paying the lion's share of mesothelioma liability.  The funding by such defendants of

524(g) Trusts should eliminate pressure under applicable law for Garlock to pay the temporarily

missing shares of such defendants.  Garlock's responsibility should not be based on the

artificially inflated values of the 2000s which resulted from the apparently manipulated absence

of evidence against or payments from such bankrupt major producers of friable asbestos

products.  Plaintiffs will receive as much money in the aggregate through the trust system alone

than they did prior to 2000 from the major asbestos defendants that established such trusts.  In

fact, some of the emerging 524(g) Trusts make higher average settlement payments than the

average historical settlement amounts paid prior to the Bankruptcy Wave by the top tier

defendants that created them.  The pre-Bankruptcy Wave defendants were wealthy and willing

and able to make massive payments to Trusts in order to resolve asbestos litigation against them.

*See* Bates & Mullin at 4.

      26.    After an estimation order determines the amount of Garlock's aggregate liability,

if any, Garlock will seek confirmation of a Chapter 11 plan of reorganization pursuant to which

Garlock will create a post-confirmation trust to process and resolve all legitimate asbestos

3017457

claims.  Garlock will fund such Trust with assets equal in value to the amount estimated by the

Court.  In conjunction with the plan, Garlock will seek issuance of a channeling injunction by the

district court (a) channeling all asbestos claims to the post-confirmation trust for claims

resolution and remedies and (b) enjoining all asbestos claimants from pursuing remedies from

Garlock, its affiliates, and other protected persons.  This process will fully, fairly, and finally

resolve Garlock's responsibility for asbestos claims.  It will also provide a means by which

persons that may hold any legitimate asbestos claims against Garlock can receive full

compensation, promptly and without high transaction costs.

27.     Determination of the number and amount of claims is necessary for multiple

purposes.  First, it will determine how much Garlock must place into a Trust in order to fully

fund its share, if any, of damages owed to claimants with pending tort system claims against

Garlock and all potential future claimants.  This Trust will assume Garlock's liability for

asbestos claims; become responsible for paying all legitimate asbestos claims against Garlock;

and will be the sole recourse for those claimants, who will be enjoined from pursuing Garlock

after entry of a channeling injunction directing their claims to the Trust.

28.     Second, the number and amount of valid claims will determine whether the plan

of reorganization Garlock will propose is confirmable.  The true number and amount of asbestos

claims will be relevant for a number of reasons, including voting, cramdown, feasibility, and the

best interests of creditors test.  *See* 11 U.S.C. § 1126(c) (class vote); 11 U.S.C. §

524(g)(2)(B)(ii)(IV)(bb) (vote of current claimants); 11 U.S.C. § 1129(b)(1) (cramdown); 11

U.S.C. § 1129(a)(7) (feasibility); 1129(a)(11) (best interests of creditors).

29.     The specific relief Garlock requests in this motion is a necessary first step to

determining the amount and number of asbestos claims against Garlock.

3017457

## A Bar Date Is Necessary In These Cases

30.     A bar date is an integral part of any reorganization case because it enables the court to identify claimants, allow and disallow claims, and determine the value of claims. *First Fid. Bank, N.A. v. Hooker Invs., Inc. (In re Hooker Invs., Inc.)*, 937 F.2d 833, 840 (2d Cir. 1991); *see also In re Keene Corp.*, 188 B.R. 903, 907 (Bankr. S.D.N.Y. 1995) (bar date identifies claims and is not a "procedural gauntlet" but an "integral part of reorganization process").

31.     A bar date for asbestos claims is required in these Cases because of the nature of the claims.  All current and future asbestos claims have been scheduled as disputed, contingent, and unliquidated, so proofs of claim are not deemed filed.  11 U.S.C. § 1111(a).

32.     Bankruptcy Rule 3003(c)(2) requires creditors with claims scheduled as "disputed, contingent or unliquidated" to file proofs of claim "within the time prescribed by subdivision (c)(3) of this rule," and provides that any claimant who fails to file "shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution." Then, Rule 3003(c)(3) states, "The court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed."

33.     Under these circumstances, a bar date is mandatory. *See In re A.H. Robins Co.*, 862 F.2d 1092, 1095 (4th Cir. 1988) (where claims are unliquidated and possibly disputed, "it is necessary for the claimant to file a proof of claim" within the time fixed by the court); S. Elizabeth Gibson, Judicial Management of Mass Tort Bankruptcy Cases 72 (Federal Judicial Center 2005) ("[T]he imposition of a bar date is mandatory.").  Bar dates have been imposed in many asbestos and mass tort bankruptcy cases. *See, e.g.*, *Vancouver Women's Health Collective Soc'y v. A.H. Robins Co.*, 820 F.2d 1359, 1360 (4th Cir. 1987); *In re Babcock & Wilcox Co.*, No. 00-0558, slip op. at 7–8 (E.D. La. Oct. 30, 2000); *In re Dow Corning Corp.*, 211 B.R. 545, 554

14

(Bankr. E.D. Mich. 1997); *In re Celotex Corp.*, 204 B.R. 586, 593 (Bankr. M.D. Fla. 1996); *In re Eagle Picher Indus., Inc.*, 137 B.R. 679 (Bankr. S.D. Ohio 1992).

34.    In these Cases in particular, a bar date is an indispensable first step in estimating the number and amount of asbestos claims.  The bar date will force the current asbestos claimants to assess their claims against the Debtors and decide whether they wish to assert those claims in the bankruptcy.  Then, when they file the specialized Proof of Claim form (described below), they will provide information essential to determining the number and amount of the asbestos claims against the Debtors.  From that information, the Court will be able to conduct the allowance process and estimation process necessary to determine the Debtors' responsibility for asbestos claims.

35.    A bar date in these Cases is especially essential because it is far from clear that any significant portion (by number) of the approximately 124,000 pending claimants intends to, or even can, assert a claim in these Cases.  In the first place, an extraordinary number of pending claims against Garlock are stale, non-malignant claims that have been rendered not compensable by state tort reform.  Of approximately 70,000 pending claims against Garlock based on non-malignant conditions, approximately 60,000 (85%) were filed before January 1, 2006 and are not being actively litigated.  Most of these claims were produced by plaintiffs' firms through medical screening processes that the federal court in Corpus Christi, Texas discredited in 2005.  *See* Judge Jack Opinion at 150.

36.    Garlock believes these claims have not been prosecuted because of tort reform in certain states that raised the standards for non-malignant claims, and because of the discovery of misconduct in the medical screening process for such claims.  Information Br. 44-46.  But

3017457

regardless of the reason for the staleness, there is substantial doubt regarding whether these claimants will assert claims in these Cases.  A bar date is the only way to find out.

37.     In addition, among approximately 15,000 pending claims for mesothelioma, lung cancer and other cancer, 8,100 pending claims (approximately 55%) are over four years old.

38.     Without a bar date that will force holders of these stale claims to decide whether they are able to assert a valid claim in this bankruptcy case—followed by proceedings that will permit the Debtors to identify and eliminate claims not supported by evidence—the vote on any proposed plan of reorganization will be swamped by tens of thousands of utterly meritless claims.

39.     A bar date is also necessary to identify bankruptcy claimants because a suit in state court is no indication that a claimant is asserting a claim in these bankruptcy cases.  The bankruptcy rules contain protections not present in state court against filing claims with no evidence of disease or causation.  In state court, a defendant can be sued thousands of times simply by placing its name in the word processor caption of a form complaint.  That is in fact what happened to Garlock.  But the bankruptcy rules contain protections not present in state court against filing claims with no evidence of disease or causation.  The pleading burden required by a Proof of Claim is higher than in many state courts because the claimant must set out the "basis for claim."  *See In re A.H. Robins Co.*, 862 F.2d 1092, 1093 (4th Cir. 1988). Criminal penalties may attach to false statements on a Proof of Claim, which do not apply in state court.  Finally, different procedural and evidentiary rules (such as *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993)) apply in federal bankruptcy court, which means claims that are not supported by medical and scientific evidence that meets the *Daubert* standard can be summarily disallowed.  *See Dow Corning*, 211 B.R. at 586, 589.

16

40.     For all of these reasons, claimants who filed or would have filed spurious claims in state court absent the petition will not necessarily file such claims here.  A bar date is necessary to determine who will seek to participate in these Cases.  *See In re Hooker Inv.*, 937 F.2d at 838 (filing proof of claim is "not merely a means of providing information to the bankruptcy court, but is a means of invoking the bankruptcy court's equitable jurisdiction over the bankruptcy estate to establish the creditor's right to participate in the distribution of the estate").

41.     Finally, a bar date is necessary because many potential claims have arisen since the Petition Date.  A bar date is the only possible way to bring these claimants before the Court.

42.     A bar date is thus a necessary prerequisite to determining the number and value of current claims in these Cases, which is itself essential to a fair confirmation of the plan of reorganization Garlock will propose.  Without a bar date, the parties and Court have no way of understanding which asbestos claimants are asserting bankruptcy claims against Garlock.  Once claimants who intend to make claims are before the Court, the Court can determine their validity and amount, construct a fair vote, and apply the other standards for plan confirmation.

43.     Garlock proposes that the bar date be set on January 17, 2011 (the "Bar Date").  This will give most claimants nearly four months to file the Asbestos Proof of Claim Form, similar to or longer than the period allowed in most mass tort bankruptcies.  *See, e.g., Vancouver Women's Health Collective Soc'y v. A.H. Robins Co.*, 820 F.2d 1359, 1360 (4th Cir. 1987) (approximately 166 days); Bar Date Order, *In re W.R. Grace & Co.*, No. 01-01139 (Bankr. D. Del. Aug. 24, 2006) (83 days); *In re Dow Corning Corp.*, 211 B.R. 545, 554 (Bankr. E.D. Mich. 1997) (161 days); *In re The Celotex Corp.*, 204 B.R. 586, 593 (Bankr. M.D. Fla. 1996) (91 days).

3017457

44.    The Bar Date should apply to all persons who satisfy the definition of Asbestos

Claim contained in the Notice of Bar Date For Asbestos Claims attached hereto as **Exhibit D**,

and who have manifested asbestos-related injury as of the Bar Date.  This is the class of persons

who know or should know they have a claim.  Previous courts in asbestos bankruptcies have

adopted this definition of claimants subject to a Bar Date.  *See* Order re: Motion for Entry of an

Order Establishing a Bar Date, *In re The Babcock & Wilcox Co., et al.*, No. 00-0558 (Bankr.

E.D. La. Aug. 25, 2000).

### The Proposed Form and Manner of Notice of Bar Date Is Appropriate

45.    Garlock also requests approval of the form and manner of notice of the Bar Date.

To provide due process with respect to the Bar Date, there must be "notice reasonably calculated,

under all the circumstances, to apprise interested parties of the pendency of the action and afford

them an opportunity to present their claims."  *Mullane v. Central Hanover Bank & Trust Co.*,

339 U.S. 306, 314 (1950).  Whether a particular notice program is reasonably calculated to

apprise interested parties of the bar date depends upon the particular facts and circumstances.

*See Tulsa Prof'l Collection Servs. v. Pope*, 485 U.S. 478, 484 (1988).

46.    Garlock has developed a comprehensive set of notice procedures that are

reasonably calculated to provide notice to persons subject to the Bar Date ("Notice Plan,"

attached hereto as **Exhibit E**).

47.    Some of the persons subject to the Bar Date are known: the potential claimants

who sued Garlock in the tort system before the Petition Date.  Others are unknown: persons with

claims based on injury that manifested before the Petition Date but who had not sued, and

persons with claims based on injury that manifests between the Petition Date and the Bar Date.

18

It is not possible for Garlock to identify these individuals, since it has no way to determine who among the persons allegedly exposed to asbestos would have brought a claim absent the petition.

48.     To provide notice to these known claimants, Garlock will mail a Bar Date Notice Package (consisting of the Notice of Bar Date for Asbestos Claims (**Exhibit D**), Bar Date Order, Asbestos Proof of Claim Form (**Exhibit F**), and instructions) to the claimant's attorney of record. This actual notice satisfies due process with respect to the known claimants. *See Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*, 492 F.3d 242, 249 (4th Cir. 2007).

49.     Unknown claimants may receive constructive or publication notice of the Bar Date. *See id.* at 249-50.  Garlock has developed a comprehensive program to provide constructive or publication notice, with a total budget of approximately $1.10 million.

50.     In assessing proper notice for unknown claimants, it is important to understand that an entire industry exists to identify persons who may have asbestos claims against one or more defendants.  Advertisements by law firms seeking to represent persons diagnosed with asbestos-related conditions are ubiquitous on television, on the Internet, and in print media. Plaintiffs' firms have an intense financial interest in identifying persons with asbestos-related conditions because they receive substantial contingency fees (typically 40%) when these claimants receive settlements or judgments in the tort system or payments from Trusts.  The financial return to the plaintiffs' firms for identifying new claimants is particularly large in asbestos litigation because normal factors justifying contingency fee awards are missing.  There is little risk of non-recovery and little expense associated with asserting a claim.  This is particularly the case with the Trusts, which apply pre-negotiated criteria for claims payment, and have assets projected to exceed $30 billion in the near future.

19

51.    The most effective form of constructive notice therefore will be Bar Date Notice Packages mailed to all law firms known by Garlock to file asbestos cases.  These firms will be constantly identifying new claimants—the very claimants who would have sued Garlock—up until the Bar Date.  These firms will have the ability to inform claimants of the Bar Date and assist in filing Proofs of Claim.  Moreover, they will have an interest in doing so, in order to preserve the opportunity for the recruited claimants to receive a distribution from the estate.

52.    Indeed, because the plaintiffs' bar engages in heated competition to identify new claimants, sending notice of the Bar Date to them is the best means of notifying unknown asbestos claimants of any kind with potentially viable claims.  These firms are already spending millions of dollars each year to identify the very unknown claimants subject to the Garlock bar date.  Nothing Garlock could reasonably spend on notice would come close to matching the efforts these firms are already undertaking.

53.    Nevertheless, to account for the remote possibility that an unknown claimant subject to the Bar Date will not become associated with a law firm in time to make a claim, Garlock will provide a wide variety of additional constructive and publication notice.

54.    First, Garlock will provide Bar Date Notice Packages to unions known to contain workers and former workers who may have been exposed to asbestos; public health organizations that serve persons with cancer; and social media websites known to serve asbestos claimants.  This will further spread word among the relevant communities and ensure that persons interested in making a claim have the opportunity to do so.

55.    Second, Garlock will provide notice via the Internet in two ways.  The Debtors' claims agent will establish a web site that will contain the notice.  Garlock will also purchase Internet advertisements (in the form of **Exhibit 1** to the Notice Plan) to run for the entire length

3017457

of the notice period, which will display when individuals search for terms such as "asbestos" and "Garlock" on Google or Yahoo, and direct such persons to the bar date website. This kind of advertisement is targeted and effective—it is the very way plaintiffs' firms advertise to attract new clients. Internet advertisements are also cost-effective, because the estate pays for the ad only when someone clicks on it.

56.     Finally, Garlock will provide publication notice. First, it will send its Bar Date Notice Package along with a press release or letter to news organizations, with the goal of generating free publicity of the Bar Date. Certain publications focused on asbestos litigation and asbestos bankruptcies will be certain to publish at least one story regarding the Bar Date. Those publications are commonly read by attorneys involved in identifying new claimants.

57.     Second, to supplement the notice provided by all the other methods, Garlock will publish its Summary Bar Date Notice (attached as **Exhibit 3** to the Notice Plan) in *Parade* (a magazine inserted into hundreds of local and regional newspapers nationwide), *Time*, *Reader's Digest*, *American Legion*, *VFW Magazine*, and several newspapers in U.S. territories and possessions.

58.     This Notice Plan, costing approximately $1.1 million, is reasonably calculated to apprise unknown potential claimants of the Bar Date, satisfies due process, and should be approved. *See Tessler*, 492 F.3d at 250 n.6 ("[C]onstructive notice can be satisfied through publication because 'in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights'") (quoting *Mullane*, 339 U.S. at 317).

**The Proposed Proof of Claim Form Is Necessary, Reasonable, and Appropriate**

59.     Form 10 of the Bankruptcy Rules provides a standard Proof of Claim form for use in bankruptcy cases. Because that form does not suit every bankruptcy case, Bankruptcy Rule

21

9009 provides that this Court may alter the claim form where "appropriate." Fed. R. Bankr. P.

9009. In mass tort contexts, courts routinely evaluate the specific nature of claims that will be

made in particular cases, and approve "custom" forms tailored to the unique nature of tort claims

so that the claims process permits the Debtors to evaluate the nature and validity of claims made

in such cases. *See, e.g.*, *In re A.H. Robins Co.*, 862 F.2d at 1093; *In re USG Corp.*, 290 B.R.

223, 227-29 (Bankr. D. Del. 2003);  Order Regarding Debtors' Motion for Entry of an Order

Establishing a Bar Date, Approving the Proof of Claim Form, and Approving the Form and

Manner of Notice, *In re Babcock & Wilcox Co.*, No. 00-0558 (E.D. La. Oct. 30, 2000).

60.    The purpose of a specialized claim form is to give claimants a full opportunity to

assert the basis for their tort claim, given the specific context in which they arise, and to permit

debtors to evaluate each claim for purposes of the allowance, estimation, and plan confirmation.

61.    The Debtors propose the Asbestos Proof of Claim Form, attached hereto as

**Exhibit F**.  As proposed, the Asbestos Proof of Claim Form collects information essential for

accurate administration and identification of tort claims in these Cases.  For example, the Form

identifies the person alleged to have suffered injury caused by asbestos and, in cases where the

creditor is a person different from the one suffering injury (e.g., the creditor is the personal

representative of the injured party's estate), the form requires that distinction.  The Form also

identifies and/or confirms counsel of record for each Asbestos Claimant.

62.    In addition, Asbestos Claims are the subject of legal proceedings against the

Debtors as well as multiple other defendants and may be the subject of a purported settlement.

Accordingly, Part I of the Form requires information that will allow the Debtors to correlate

Asbestos Claims with any previous legal proceedings, demands, or purported settlements.

Likewise, because virtually every asbestos claimant alleges (although not necessarily in a single

22

action) claims against other defendants and trusts, the Form requires information to account for

an Asbestos Claimant's claims and actions against other asbestos tort system defendants or

asbestos trusts.

63.     Part II of the Form requires each claimant to provide basic information necessary

to support an asbestos claim against Garlock.  It requires each claimant to identify alleged

exposure to a product manufactured or sold by the Debtors, and to provide the location, duration,

and other details concerning such alleged exposure.  Claimants unable to provide this basic

information have no plausible claim against the Debtors.  In addition, given the nature of

Garlock's products, any assessment of any claim must account for any exposures to asbestos

products which were not manufactured or sold by the Debtors.  This information will be essential

to the Debtors' evaluation of their potential liability and any estimation of claims against them.

64.     Part III of the Form requires the fundamental medical evidence necessary to

sustain an asbestos claim.  Each claimant must identify his alleged injury and provide a reliable

medical diagnosis upon which his claim must stand.  Without this basic medical information, any

Asbestos Claim would be summarily dismissed.  Accordingly, this information must be a

requisite to make an Asbestos Claim in these Cases.

65.     The foregoing requirements track the substance of claims forms approved in other

cases.  *See, e.g.*, *In re USG Corp.*, 290 B.R. at 226-28 (ordering claim form that required medical

records supporting the diagnosis, detailed description of occupational exposure to USG products,

and history of asbestos litigation including verdicts, settlement money and amounts from other

defendants); *In re The Babcock & Wilcox Co., supra* (requiring medical information including

diagnostic reports, a history of exposure to Babcock & Wilcox products, and the total number of

years of exposure).  To the extent that the proposed Form seeks information additional to or

23

different from claims forms approved in previous cases, such additional information is required to account for the unique nature of Garlock's products, material developments in the asbestos litigation in the tort system, and changes in the assessment of claims asserting asbestos-related diseases since those cases.

66.    The proposed Form is designed to be completed using an online electronic filing interface developed and maintained by a court appointed Claims Agent.  This electronic filing system will be in form and function substantially similar to the federal court's CM/ECF system, other websites developed for mass tort bankruptcies and class actions for this purpose, and websites currently used by 524(g) Trusts to receive and manage claims for processing and payment.  In particular, Debtors plan to engage a claims processing company that currently manages claim filings for multiple trusts to receive the electronic Forms using very similar forms and processes that seek similar information.

67.    The Debtors request that, for purposes of judicial economy and the preservation of assets of the Debtors' estates, claimants represented by counsel be required to file Claim Forms using the electronic filing system.  Such a system will streamline the review of claims to permit allowance proceedings, permit the Debtors and other parties to analyze readily the Asbestos Claims for purposes of estimation, and ensure complete, accurate, and verifiable Asbestos Claims that will give high integrity to the proceedings in this case.

68.    Asbestos Claimants not represented by counsel would have a choice to utilize the electronic filing system or to submit their Form in paper format.

3017457

## The Court Should Enter An Order To Estimate Asbestos Claims Against Garlock

69.     The Court also should enter an order requiring estimation of the number and value of present and future asbestos claims against Garlock.  An estimation is how the Court (or the District Court) will ultimately determine the number and amount of the claims.

70.     Garlock believes that many of the claims that will be filed will be subject to summary disallowance pursuant to Bankruptcy Code section 502(b).  Information Br.  81-82 (specifying the kinds of claims that may be subject to summary disallowance).  Further, Garlock expects that, in many instances, this can occur expeditiously through consolidation under Federal Rule of Civil Procedure 42, followed by summary judgment proceedings applying Federal Rule of Civil Procedure 56 and the Federal Rules of Evidence, including *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), which applies in bankruptcy courts.  *Dow Corning*, 211 B.R. at 586, 589.  Garlock will pursue these summary disallowance proceedings after receiving, reviewing, and evaluating proofs of claim and prior to any trial estimating asbestos claims.

71.     Ultimately, however, it likely will not be possible to disallow all proofs of claim at the summary judgment stage.  Because the trial of whatever claims remain after summary judgment would require numerous jury trials, and because it would not be possible to liquidate future claims where alleged injury has not yet even manifested and may not manifest for many years, an estimation will be necessary.

72.     The Bankruptcy Code provides, "There shall be estimated for purpose of allowance under this section . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."  11 U.S.C. § 502(c).  Bankruptcy courts commonly use their authority to estimate contingent personal injury claims, and such an estimation should eventually occur in these cases as well.  *See, e.g., A.H.*

3017457

*Robins Co. v. Piccinin*, 788 F.2d 994, 1012 (4th Cir. 1986) (holding that bankruptcy court had jurisdiction to estimate contingent personal injury claims against the debtor).

73.    The Court need not at this stage determine precisely when estimation will take place, what method the Court will use to estimate claims, or what procedures should be followed leading up to an estimation trial.

74.    The Court should, however, enter an order requiring estimation of claims. Estimation will undoubtedly be necessary to determine the number and value of claims for all plan purposes described above.  Furthermore, by moving for estimation now, the Debtors' have initiated a contested matter that triggers parties' discovery rights.

75.    This discovery—including discovery regarding the Trust claiming process and regarding the process of generating exposure evidence in the tort system—could be protracted and contentious.  By entering the order to estimate and beginning discovery now, this discovery and related proceedings can occur while the bar date process, summary allowance/disallowance process, and other proceedings are ongoing.

76.    In this way, the Court can ensure that the eventual estimation trial will take place in the most expeditious and efficient manner.

### The Court Should Enter A Case Management Order

77.    Finally, the Court should enter an order fixing a bar date, approving the Asbestos Proof of Claim Form, approving the form and manner of notice, ordering estimation of Asbestos Claims, and setting an initial case management schedule ("Order").

78.    The Court has authority to enter this order under section 105(a) of the Bankruptcy Code.  Garlock has attached a proposed Order hereto as **Exhibit G,** and respectfully requests that it be entered.

3017457

**Conclusion**

For the foregoing reasons, the Court should grant the relief requested herein.

This 31st day of August, 2010.

Respectfully submitted,

/s/ Garland S. Cassada
Garland S. Cassada
N.C. Bar No. 12352
Jonathan C. Krisko
N.C. Bar No. 28625
Richard C. Worf, Jr.
N.C. Bar No. 37143
Ty E. Shaffer
N.C. Bar No. 38495

ROBINSON BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina  28246
Telephone:     (704) 377-2536
Facsimile:     (704) 378-4000

gcassada@rbh.com
jkrisko@rbh.com
rworf@rbh.com
tshaffer@rbh.com

*Special Corporate and Litigation Counsel to the
Debtors Garlock Sealing Technologies LLC,
Garrison Litigation Management Group, Ltd., and
The Anchor Packing Company*

C. Richard Rayburn, Jr.
N.C. Bar No. 6357
Albert F. Durham
N.C. Bar No. 6600
John R. Miller, Jr.
N.C. Bar No. 28689
Rayburn Cooper & Durham, P.A.
1200 Carillion, 227 West Trade Street
Charlotte, NC  28202
(704) 334-0891

3017457

*Counsel to the Debtors Garlock Sealing Technologies, LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company*

3017457