# EXHIBIT A

# MEALEY'S™
# Asbestos Bankruptcy Report

## Having Your Tort And Eating It Too?

by
Charles Bates, PhD
and
Charles Mullin, PhD

Bates White, LLC
Washington, D.C.

A commentary article reprinted from the November 2006 issue of Mealey's Asbestos Bankruptcy Report



MEALEY'S Asbestos Bankruptcy Report                                    Vol. 6, #4   November 2006

# Commentary

## Having Your Tort And Eating It Too?

By
Charles E. Bates
and
Charles H. Mullin

*[Editor's Note: Charles E. Bates, PhD is President and CEO of Bates White, LLC in Washington, DC. Dr. Bates has led the development of state-of-the-art asbestos forecasting methods since 1991. Most recently, he testified in front of the U.S. Senate Judiciary Committee on the FAIR Act. Charles Mullin, PhD heads Bates White Environmental & Product Liability practice. Their current research focuses on the evolution of the tort environment and its impact on claiming behavior and total recoveries. The views expressed here are not necessarily the views or positions of their clients. Copyright 2006 by authors. Replies are welcome.]*

### Introduction

A sea of change in asbestos litigation is taking place today. For the first time ever, trust recoveries may fully compensate asbestos claimants. In the late 1990s, an individual with mesothelioma collected $30,000 from the Manville Personal Injury Settlement Trust and then turned to the tort system with an average aggregate recovery of $900,000. Tomorrow, this same individual may collect more than $1 million from the emerging bankruptcy trusts.

The figure below illustrates this sea change. For 2000, RAND and Tillinghast-Towers Perrin estimated $150 billion in nominal future expenditures. This estimate equals about $60 billion in real dollars, meaning that $60 billion invested in treasury bills in 2000 would have funded the projected indemnity payments. At the same time, the assets of bankruptcy trusts totaled about $4 billion. Presumably, RAND and Tillinghast-Towers Perrin believed the $56 billion shortfall was to be covered by solvent defendants.

### A sea of change has occurred in the ability of bankruptcy trusts to pay claimants



In 2006, asbestos defendants face a more favorable litigation environment: forum shopping has been constrained, mass consolidations are less frequent, fewer states impose unrestricted joint and several liability, and the mass recruitment of non-malignant claims has ceased. Consequently, estimates of future asbestos expenditures have fallen to around $30 billion in real dollars. At the same time, the bankruptcy trusts have at least $35 billion in assets and potentially as much as $60 billion. This sea change raises a crucial question: will these assets serve as an offset to the payments that would otherwise be covered by

solvent defendants or are they a windfall for asbestos claimants?

The existing tort rules and trust procedures leave the answer to this critical question unclear. A claimant may be able to receive full compensation for his claim first in the tort system, and again from the trusts. Alternatively, trust payments may be viewed as an offset to the obligations of solvent defendants, just as settlement payments by the trusts' predecessor companies were viewed. Thus, now is the time for policymakers to reevaluate the claims resolution process to ensure that the outcome is in society's best interest.

### The Tort Value Of The Future Claims

Expenditure forecasts are lower today then they were in 2000. Two factors are the primary reasons expenditure forecasts have decreased: the billions paid over the last six years, and the collapse in unimpaired non-malignant claims. Two distinct approaches to estimating future expenditures both suggest post-2006 total expenditures of about $30 billion in real dollars. One approach is a top-down estimate that adjusts published forecasts of total future expenditures from the early 2000s to reflect recent changes in the litigation environment. The top-down estimate is $32 billion. The other approach is a ground-up estimate that combines projections of individual claim values and the number of future claimants to calculate total expenditures. The ground-up estimate is $29 billion.

In 2003, Jennifer Biggs of Tillinghast-Towers Perrin testified before the U.S. Senate that the eventual cost for asbestos litigation would come to $200 billion.[1] Stephen Carroll et al. at the RAND Corporation estimated $50 billion in costs through 2000.[2] Taking the difference leaves $150 billion in future expenditures as of 2000. RAND estimates that 20 percent of the $150 billion would be defense costs, leaving $120 billion for claimants. This estimate equals about $60 billion in real dollars, after accounting for the time value of money.[3]

This $60 billion estimate assumed the 2000 litigation environment would persist forever. It did not. Today, asbestos defendants face a more favorable litigation environment. For example, Texas now imposes medical criteria on non-malignant claimants, effectively employs several liability, and requires each claim to stand on its own merits (no consolidated trials). Mississippi bans mass trials, imposes venue constraints for each plaintiff on a county-by-county basis, caps punitive and non-economic damages, and limits joint and several liability to economic damages. In addition to these reforms, the activities of select members of the plaintiffs' bar have come under scrutiny. In particular, U.S. District Court Judge Janis Graham Jack described the mass recruitment and diagnosis of non-malignant claims as "driven neither by health nor justice . . . they were manufactured for money."[4] Subsequent to Judge Jack's ruling, numerous doctors have been banned from providing diagnoses, and medical evidence, in general, has come under greater scrutiny.

In aggregate, these and other related events caused the collapse of unimpaired non-malignant claims. The active recruitment of non-malignant claims appears to have ceased in 2003. Subsequently, non-malignant filings with the Manville Trust fell from a peak of 85,000 to about 10,000 per year in 2004 and 2005. Prior to 2000, non-malignant claims received more than 50 percent of all compensation paid. Today, non-malignant claims receive less than 10 percent.

The table below shows how the $60 billion 2000 forecast became a $32 billion 2006 forecast. Projected payments in the intervening years reduce the 2000 forecast by about $20 billion. The collapse of non-malignant claims reduces the 2000 forecast by about $17 billion more, which represents about 80 percent of the dollars that were forecast to go to non-malignant claimants. Accounting for the change in the time value of money between 2000 and 2006 adds about $10 billion, resulting in a top-down estimate of $32 billion.

**Top-down estimate of $35 billion**

| Steps | | Tort value |
|---|---|---|
| 2000 forecast of future expenditures | | $60 B |
| Payment made 2001 to 2005 | + | ($20 B) |
| Collapse of non-malignant claims | + | ($17 B) |
| Subtotal | | $23 B |
| Convert base year from 2000 to 2006 | * | 138% |
| Total | | $32 B |

The ground-up estimate provides validation of the top-down approach. For the past two years, tort defendants have spent about 80 percent of their settlement dollars on mesothelioma cases. Many companies document this shift in payments away from non-malignant claims in their 10-K filings. The epidemiological processes underlying asbestos-related diseases imply that the percentage of money paid to non-mesothelioma claimants will fall through time. These facts suggest that estimating total expenditures on mesothelioma claims and scaling up by 25 percent to account for non-mesothelioma payments will overstate total expenditures.

The 2005 RAND report estimates that in 2000 the cost of a mesothelioma claim averaged $1.14 million inclusive of defense expenditures or about $900,000 exclusive of defense expenditures.[5] This $900,000 estimate equals about $1.1 million in 2006, after accounting for inflation. This value is equivalent to the $1.1 million proposed by the FAIR Act. As with any average, individual awards vary with the characteristics of the claimant: age, jurisdiction, law firm, family situation, and economic status.

The National Cancer Institute reports about 3,000 new manifestations of mesothelioma per year from 1999 through 2003 in the United States. In each of those years, about 1,750 of those individuals eventually filed a tort claim (as recorded by the Manville Personal Injury Settlement Trust). In other words, about 60 percent of individuals with mesothelioma currently file tort claims. As with awards, the filing rate varies with individual characteristics. In particular, older individuals have been less likely to sue. If the historical age-specific claiming rates persist, then there will be about 30,000 pending and future mesothelioma claims.

The table below converts the number of future mesothelioma claimants into an estimate of total expenditures. Settling 30,000 claims at $1,100,000 per claim will cost $33 billion. This estimate equals about $23 billion in real dollars, after accounting for the aging population of individuals with mesothelioma and the time value of money.[6] Finally, scaling this estimate up by 25 percent to account for non-mesothelioma claims yields $29 billion.

**Ground-up estimate of $29 billion**

| Steps | | Tort value |
|---|---|---|
| Value of pending and future mesothelioma claims | | |
|    Number of mesothelioma claims | | 30,000 |
|    Average tort value | * | $1,100,000 |
| Subtotal | | $33 B |
|    Account for age-specific settlement values | * | 92% |
|    Deflate to 2006 dollars | * | 76% |
| Subtotal | | $23 B |
|    Inflate to account for all other diseases | * | 125% |
| Total | | $29 B |

Both the top-down and the ground-up approaches demonstrate that the passage of time and the collapse in unimpaired non-malignant claims lowered the 2000 forecast of $60 billion to about $30 billion in 2006. That said, both approaches should be viewed as suggestive, not demonstrative. The tort environment could change again; asbestos litigation has shown us time and time again that the future is difficult to predict.

### The Ability Of Trusts To Pay Future Claims

Prior to 2000, construction companies and their suppliers were the front line of asbestos defendants. Coming into 2000, the construction industry was in the middle of an economic downturn. That downturn produced short-term cash flow problems for many companies. Financing that cash flow problem was difficult for any company with a large asbestos overhang. Due to these factors, more than 40 companies filed for bankruptcy between 2000 and 2002.

Throughout the bankruptcy process, many of these companies maintained that they were solvent and simply faced a short-term cash flow problem. In particular, they asserted that as soon as business in the construction industry picked up, they would be fine. Business did pick up, and today many of these companies are emerging from bankruptcy as healthy, robust entities: paying 100 cents on the dollar to unsecured creditors, maintaining equity for shareholders, and funding large 524(g) trusts for asbestos claimants.

Unlike the old trusts, the new trusts have enough assets to entirely replace the likely tort obligations of their predecessor companies. For example, U.S.

Gypsum paid about $30,000 per mesothelioma claim prior to the 2000 to 2002 bankruptcy wave.[7] The USG trust has $4 billion in assets and will pay $101,250 per mesothelioma claim, more than three times its pre-bankruptcy value. Specifically, the USG trust specifies an average value of $225,000 per qualifying mesothelioma and pays 45 cents on the dollar. Our own calculations suggest the USG trust could pay $95,000 to $115,000 per mesothelioma claim.

The USG average value of $225,000 is built upon the assumption its bankrupt codefendants will have zero assets available for asbestos claimants. Its bankrupt codefendants made the same assumption about USG. As a result, the face value of a mesothelioma claim across all of the trusts is about $7 million or six times the tort value. Thus, despite the trusts nominally paying cents on the dollar, the aggregate payments will average $650,000 to $1.5 million per mesothelioma claim — a substantial amount relative to the $1.1 million average tort value.[8] As with tort awards, individual recoveries will vary with the characteristics of the claimant.

The trusts' payments will be funded by $35 billion to $60 billion. The table below lists the largest of these trusts and their associated $30 billion in known cash and equity assets. In addition, the trusts will have further resources: some reorganization plans have yet to specify trust contributions, third parties may contribute further resources to existing trusts in exchange for 524(g) protection ("bolt-ons"), and many trusts were assigned rights to insurance receivables. Inclusive of these resources, the trusts will hold at least $35 billion in assets and potentially as much as $60 billion.

**Known cash and equity assets for established and emerging bankruptcy trusts**

| Bankruptcy trust | Assets |
|---|---|
| Halliburton/DII Industries | $5.34 B |
| Owens Corning/Fibreboard | $4.99 B |
| US Gypsum | $3.95 B |
| Pittsburgh Corning | $3.50 B |
| Armstrong World Industries | $2.11 B |
| Western MacArthur | $2.00 B |
| Manville | $1.60 B |
| Babcock and Wilcox | $1.00 B |
| Others | $6.41 B |
| Total | $30.89 B |

The trusts also face more pending claims than their solvent codefendants. About 10,000 individuals with mesothelioma have resolved their claims with solvent defendants while the predecessor companies to the emerging 524(g) trusts sat in bankruptcy. Thus, although a straight comparison of trust assets to projected future tort values is informative, the claim-by-claim average recoveries provide a more accurate picture.

Furthermore, these 10,000 mesothelioma claimants highlight the potential for double collection. Due to joint and several liability, the solvent defendants supposedly covered the obligation of their "bankrupt" codefendants and provided full compensation to these mesothelioma claimants. Will those same mesothelioma claimants be allowed to collect a second time from the trusts or will the solvent defendants be reimbursed for the monies they covered? One way or another, this question will be answered within a few years.

**Conclusion**

As we stated earlier, a sea change in asbestos litigation is taking place today. The emerging 524(g) trusts have enough assets to entirely replace the likely tort obligations of their predecessor companies. In fact, these trusts may pay the average mesothelioma claim more than the $1.1 million proposed under the FAIR Act. However, how these affluent trusts affect solvent defendants and asbestos claimants is unresolved. Claimants may be able to double collect for their injuries: once from solvent defendants and again from trusts. Alternatively, trust payments may be viewed as an offset to the obligations of solvent defendants, just as settlement payments by the trusts' predecessor companies were viewed.

---

**Endnotes**

1. The Fairness in Asbestos Injury Resolution Act of 2003: Hearings on S.1125 Before The Senate Committee on the Judiciary (June 4, 2003) (statement of Jennifer Biggs, Tillinghast-Towers Perrin).

2. Stephen J. Carroll, D. R. Hensler, J. Gross, E. M. Sloss, M. Schonlau, A. Abrahamse, and J. S. Ash-

wood, Asbestos Litigation (Santa Monica: The Rand Corporation, 2005), page 93.

3. This calculation discounts money at 5.5 percent and assumes every claim would be paid two years after diagnosis.

4. In Re: Silica Products Liability Litigation, MDL Docket No. 1553 (S.D. Tex., June 30, 2005).

5. Personal communication, Stephen J. Carroll; RAND 2005 pp. 92-93.

6. The time value of money calculation assume a three percent real interest rate (nominal interest rate minus inflation rate).

7. Based on information contained in USG 10-K filings.

8. The aggregate payment estimates for trusts account for administrative costs, average values by disease, and trust-specific payment ratios between malignant and non-malignant claims. ∎

**MEALEY'S ASBESTOS BANKRUPTCY REPORT**
*edited by Lisa Schaeffer*
**The Report** is produced monthly by



1018 West Ninth Avenue, 3rd Floor, King of Prussia Pa 19406, USA
Telephone: (610) 768-7800 1-800-MEALEYS (1-800-632-5397)
Fax: (610) 962-4991
Email: mealeyinfo@lexisnexis.com   Web site: http://www.lexisnexis/mealeys
ISSN 1537-2065