# EXHIBIT B



LEXSEE 28 REV OF LITIGATION 501

Copyright (c) 2009 The University of Texas School of Law
The Review of Litigation

Spring, 2009

*28 Rev. Litig. 501*

**LENGTH:** 20004 words

ARTICLE: WHAT'S NEW IN ASBESTOS LITIGATION?

**NAME:** Mark A. Behrens*

**BIO:** * Mark A. Behrens is a partner in the Public Policy Group of Shook, Hardy & Bacon L.L.P. in Washington, D.C. He received his B.A. from the University of Wisconsin-Madison in 1987 and his J.D. from Vanderbilt University Law School in 1990, where he was a member of the Vanderbilt Law Review. The author wishes to thank Phil S. Goldberg for his research assistance. Mr. Goldberg is an associate in the Public Policy Group of Shook, Hardy & Bacon L.L.P. in Washington, D.C. He received his B.A. from Tufts University and his J.D. from The George Washington University School of Law, where he was a member of the Order of the Coif.

**SUMMARY:**
 ... "Remarkably, however, only twelve ... doctors diagnosed more than 9,000 plaintiffs with silicosis." ... After these depositions, Judge Jack "had enough," and ordered the diagnosing doctors and screening companies N&M and Respiratory Testing Services (RTS) to appear before her at a Daubert hearing from February 16-18, 2005. ... Ray Harron reportedly diagnosed disease in 51,048 Manville claims and supplied 88,258 reports in support of other claims. ... Frederick Dunbar, a senior vice president of NERA Economic Consulting, recently studied the Securities and Exchange Commission filings of eighteen large asbestos defendants and found that, "for all of them, 2004 asbestos claims had dropped from peak levels of the previous three years. ... The court said that it was not "a viable solution to indulge in a fiction that each and every exposure to asbestos, no matter how minimal in relation to other exposures, implicates a fact issue concerning substantial-factor causation in every "direct-evidence' case." ... There has been a migration of asbestos-related claims away from jurisdictions that have adopted reforms. ... In Simonetta, the court held that a manufacturer may not be held liable in common law negligence or strict liability actions for failure to warn of the dangers of asbestos exposure resulting from another manufacturer's insulation applied to its products after sale of the products to the Navy. ... The stated purposes of the ALEC model bill are: (1) to provide transparency of claims made against asbestos-related bankruptcy trusts and in the tort system; (2) to assure that courts and litigants have available to them information as to payments an asbestos claimant has or may receive from asbestos-related bankruptcy trusts; (3) to facilitate fair and appropriate compensation to claimants with a rational allocation of responsibility to all persons whether current defendants or not; 4 to preserve the resources of both defendants and asbestos-related bankruptcy trusts to help promote adequate recoveries for deserving claimants; and (5) to insure that liabilities properly borne by asbestos-related bankruptcy trusts are not imposed upon defendants in the tort system.

**TEXT:**
 [*501]

    I. Introduction

28 Rev. Litig. 501, *

Asbestos litigation is the "longest-running mass tort" in U.S. history. n1 Since asbestos litigation emerged over three decades ago, n2 [*502] lawyers who bring asbestos cases have kept the litigation going by adapting to changing conditions. Now, the litigation appears to be evolving once again.

In the earlier years of asbestos litigation, most cases were filed by people with cancer and other serious conditions. n3 From the late 1990s until recently, the vast majority of claimants were not sick. n4 The mass recruitment of non-malignant claims has ceased, n5 and the litigation is re-focused on people with mesothelioma (a type of cancer) and other serious conditions.

The target defendants have changed too. First, the litigation was focused on companies that made asbestos-containing products. n6 Then, when most of those companies went bankrupt, the litigation [*503] spread to premises owners in claims brought by independent contractors. n7 Now, new companies and industries are being targeted, and new theories are being raised. n8

New forums are also emerging. Plaintiffs' lawyers are actively seeking out new jurisdictions in which to file their claims, largely driven by the desire to avoid reforms adopted in states that were once favored jurisdictions, such as Texas. n9

This Article discusses these civil case trends and forecasts the types of claimants, places, and theories that are likely to dominate the civil court asbestos litigation landscape for the next several years. n10

[*504]

II. The Asbestos Litigation Environment Has Changed

A. Impacts Affecting Mass Screenings and Unimpaired Filings

The asbestos litigation environment has changed significantly in the past few years. n11 Until recently, a substantial majority of claims were brought on behalf of unimpaired claimants diagnosed largely through plaintiff-lawyer-arranged mass screenings. n12 It is estimated that over one million workers have undergone attorney-sponsored screenings. n13

[*505] The problem, as policy-makers, judges, and lawyers for the truly sick recognized, was that mass filings by unimpaired claimants were creating judicial backlogs and exhausting defendants' resources. n14 As discussed below, various legislative and judicial reforms have greatly diminished the economic incentive for plaintiffs' lawyers to conduct mass screenings and file claims on behalf of the non-sick.

1. Medical Criteria Laws

Beginning in 2004, state legislatures in some key jurisdictions began to enact "medical criteria" laws requiring asbestos (and silica) claimants to present credible and objective medical evidence of physical impairment in order to bring or proceed with a claim. n15 [*506] Medical criteria procedures for asbestos cases were enacted in Ohio in 2004, n16 Texas n17 and Florida n18 in 2005, Kansas n19 and South Carolina n20 in 2006, and Georgia n21 in 2007. n22 These laws "set forth rigid criteria for the claimant diagnoses." n23

[*507]

2. Courts Have Given Priority to Sick Claimants

Courts also have helped to curb filings by the non-sick. For instance, a number of courts have implemented inactive asbestos dockets (also called deferred dockets or pleural registries) to give trial priority to the sick. n24 Under these docket management plans, the claims of the non-sick are suspended and preserved; n25 they also are exempt from discovery. n26 Claimants may petition for removal to the trial docket when credible medical evidence of impairment is shown. n27

Since 2002, the list of jurisdictions with inactive asbestos dockets has grown to include: Cleveland, Ohio (March 2006); n28 [*508] Minnesota (June 2005) (coordinated litigation); n29 St. Clair County, Illinois (February 2005); n30 Portsmouth, Virginia (August 2004) (applicable to cases filed by the Law Offices of Peter T. Nicholl); n31 Madison County, Illinois (January 2004); n32 Syracuse, New York (January 2003); n33 New York City, New York (December 2002); n34 and Seattle, Washington (December 2002). n35 In 2005, the RAND Institute for Civil Justice called the "re-emergence" of inactive dockets one of "the most significant developments" in asbestos litigation. n36 Earlier courts that

28 Rev. Litig. 501, *

had adopted inactive dockets include Baltimore City, Maryland (December 1992); Cook County (Chicago), Illinois (March 1991); and Massachusetts (coordinated litigation) (September 1986). n37

[*509]  Other courts in several states - Arizona, n38 Delaware, n39 Maine, n40 Maryland, n41 and Pennsylvania n42 - and the federal courts for Hawaii n43 and Massachusetts, n44 have held that the unimpaired do not have legally compensable claims. As the Supreme Judicial Court of Maine explained, "there is generally no cause of action in tort until a plaintiff has suffered an identifiable, compensable injury." n45

3. Fewer Consolidations

There is now a better understanding by courts that, in addition to fundamental fairness and due process problems, consolidating cases to force defendants to settle is a bit like using a lawn mower to cut down weeds in a garden - the practice may provide a temporary fix to a clogged docket, but ultimately the  [*510]  approach is likely to fuel the filing of more claims. n46 As mass tort expert Francis McGovern of Duke University Law School has explained:

Judges who move large numbers of highly elastic mass torts through their litigation process at low transaction costs create the opportunity for new filings. They increase demand for new cases by their high resolution rates and low transaction costs. If you build a superhighway, there will be a traffic jam. n47

Recently, a number of significant jurisdictions have ended or substantially curbed the use of trial consolidations in asbestos cases. For instance, the Mississippi Supreme Court has severed several multi-plaintiff asbestos-related cases. From 2005 In July 2005, the Ohio  [*511]  Supreme Court amended the Ohio Rules of Civil Procedure to preclude the joinder of pending asbestos-related actions. n49 Similarly, in August 2006, the Michigan Supreme Court adopted an administrative order precluding the "bundling" of asbestos-related cases for trial. n50 In December 2007, the Delaware Superior Court amended Standing Order No. 1 to prohibit the joinder of asbestos plaintiffs with different claims. n51 Most recently, a San Francisco Superior Court judge entered an order vacating all sua sponte consolidation orders and further stating that any future consolidations would proceed only by formal motions. n52 This order should curb trial consolidations in the Bay Area.

State legislatures are also acting to require individualized trials, removing an economic incentive for plaintiffs to file claims  [*512]  that may have little or no value unless they are joined with other more serious cases. From 2005 through 2007, Texas, Kansas, and Georgia enacted laws that generally preclude the joinder of asbestos cases at trial. n53 As two commentators recently explained, "the Texas law is especially important, because that state has for many years relied upon modest-sized consolidations in trying asbestos cases, often with horrific results for defendants." n54

Even in the two states that formerly allowed extraordinarily large trial consolidations, Virginia n55 and West Virginia, n56 the practice appears to have subsided. The reason may be that judges in those states figured out that trial consolidations had the unintended effect of attracting more filings. n57 As West Virginia Judge Andrew  [*513]  MacQueen acknowledged while involved in the state's asbestos litigation:

I will admit that we thought that [a mass trial] was probably going to put an end to asbestos, or at least knock a big hole in it. What I didn't consider was that that was a form of advertising. That when we could whack that batch of cases down that well, it drew more cases. n58

4. Fallout from Judge Jack's Federal Court Silica MDL Findings

The landmark ruling in June 2005 by the manager of the federal silica multidistrict litigation, n59 U.S. District Judge Janis Graham Jack of the Southern District of Texas, also has had a substantial impact on lawyer-driven mass screenings and the filings they generate. n60

[*514]  The events that would lead to Judge Jack's ruling, discussed further below, were spurred by the review of fact sheets submitted by the plaintiffs. n61 The fact sheets required plaintiffs to list all of their physicians, not just those physicians who diagnosed them with silicosis. n62 More than 9,000 plaintiffs submitted fact sheets and listed approxi-

mately 8,000 different doctors. n63 "Remarkably, however, only twelve ... doctors diagnosed more than 9,000 plaintiffs with silicosis." n64

In virtually every case, these doctors were not the Plaintiffs' treating physicians, did not work in the same city or state as the Plaintiffs, and did not otherwise have any connection to the Plaintiffs. Rather than being connected to the Plaintiffs, these doctors instead were affiliated with a handful of law firms and mobile x-ray screening companies. n65

In October 2004, defendants began depositions of some of the diagnosing doctors.

On October 29, 2004, defendants deposed Dr. George Martindale, n66 "who had purportedly diagnosed 3,617 MDL plaintiffs with silicosis while retained by the screening company N&M." n67 "At his deposition, Dr. Martindale changed the course of the MDL. He testified that he had not intended to diagnose these individuals with silicosis and withdrew his diagnoses." n68

On December 20, 2004, defendants deposed Dr. Glyn Hilbun regarding his 471 silicosis diagnoses. n69 "His deposition added fuel [*515] to the fire" and "demonstrated that the abuses revealed at Dr. Martindale's deposition were not unique." n70 "Dr. Hilbun, who N&M paid $ 5,000 for each screening day, testified that he had "never in [his] life' diagnosed silicosis and that N&M had inserted diagnostic language into his reports without his knowledge." n71 Dr. Hilbun withdrew his silicosis diagnoses, followed by Dr. Kevin Cooper, who was deposed on January 4, 2005. n72

After these depositions, Judge Jack "had enough," n73 and ordered the diagnosing doctors and screening companies N&M and Respiratory Testing Services (RTS) to appear before her at a Daubert hearing from February 16-18, 2005. n74 In the February 2005 Daubert hearings, it was established that N&M "helped generate approximately 6,757 claims in the MDL, while RTS ... helped generate at least 1,444 claims." n75 N&M generated these 6,500-plus claims in just ninety-nine screening days. n76 "To place this accomplishment in perspective, in just over two years, N&M found 400 times more silicosis cases than the Mayo Clinic (which sees 250,000 patients a year) treated during the same period." n77 Furthermore, at least 4,031 N&M-generated plaintiffs had previously filed asbestosis claims with the Manville Personal Injury Settlement Trust, although "a golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to find a single case of both silicosis and asbestosis." n78

The most prolific MDL diagnosing physician, Dr. Ray Harron, was involved in the diagnosis of approximately 6,350 of the silica MDL plaintiffs and was listed as the diagnosing physician for approximately 2,600 plaintiffs. n79 His testimony at the first day of the Daubert hearings "abruptly ended when the Court granted his [*516] request for time to obtain counsel." n80 Dr. Ray Harron's son, Dr. Andrew Harron, diagnosed approximately 505 MDL plaintiffs for N&M. n81 "Like his father, he never saw or read any of the reports purportedly written and signed by him." n82

Another screening physician, Dr. James Ballard, performed 1,444 x-ray readings on plaintiffs in the MDL, in conjunction with RTS. n83 The defendants presented over a dozen examples where Dr. Ballard had previously diagnosed the same individuals with lung conditions consistent with asbestosis. n84 Similarly, Dr. Barry Levy diagnosed approximately 1,389 plaintiffs in the silica MDL, n85 including 800 MDL plaintiffs in seventy-two hours. n86 "It is clear that Dr. Levy had an agenda: diagnose silicosis and nothing else." n87 Dr. H. Todd Coulter diagnosed 237 MDL plaintiffs in eleven days, n88 as part of a contract with Occupational Diagnostics, a company that was run from a Century 21 realty office and held screenings from a "trailer in the parking lots of restaurants and hotels." n89 Finally, screening physician Dr. W. Allen Oaks diagnosed approximately 200 plaintiffs and performed x-ray reads on 447 plaintiffs. n90 Despite issuing 200 diagnoses, he declined to label himself as an expert in diagnosing silicosis. n91

In June 2005, Judge Jack issued a scathing, lengthy opinion stating, "the Court is confident ... that the "epidemic' of some 10,000 cases of silicosis "is largely the result of misdiagnosis.'" n92 "These diagnoses were driven by neither health nor justice," Judge Jack said in her opinion, "they were manufactured for money." n93 As Judge Jack noted:

[*517]

This explosion in the number of silicosis claims in Mississippi suggests ... perhaps the worst industrial disaster in recorded world history.

And yet, these claims do not look anything like what one would expect from an industrial disaster... . The claims do not involve a single worksite or area, but instead represent hundreds of worksites scattered throughout the state of Mississippi, a state whose silicosis mortality rate is among the lowest in the nation.

Moreover, given the sheer volume of claims - each supported by a silicosis diagnosis by a physician - one would expect the CDC or NIOSH to be involved ... . One would expect local health departments and physicians groups to be mobilized. One would expect a flurry of articles and attention from the media, such as what occurred in 2003 with SARS.

But none of these things have happened. There has been no response from OSHA, the CDC, NIOSH or the American Medical Association to this sudden, unprecedented onslaught of silicosis cases... . Likewise, Mississippi's silicosis epidemic has been greeted with silence by the media, the public, Congress and the scientific communities.

In short, this appears to be a phantom epidemic ... . n94

[*518] Judge Jack concluded that "the failure of the challenged doctors to observe the same standards for a "legal diagnosis' as they do for a "medical diagnosis' rendered their diagnoses ... inadmissible." n95 The broad media reporting of Judge Jack's findings sparked criminal and congressional inquiries at which the suspect doctors refused to testify, invoking their Fifth Amendment rights. n96

The X-ray interpreters (called B-readers) and screening firms referenced in Judge Jack's opinion have helped generate tens of [*519] thousands of asbestos claims. n97 For example, it has been reported that seventy-two percent of the silicosis claimants before Judge Jack had also filed asbestos-related claims, n98 even though it is "statistically speaking, nearly impossible" to suffer from both asbestosis and silicosis. n99 Dr. Ray Harron reportedly diagnosed disease in 51,048 Manville claims and supplied 88,258 reports in support of other claims. n100 In one day, Dr. Harron reportedly diagnosed 515 people, or the equivalent of more than one a minute in an eight-hour shift. n101 Dr. James Ballard provided 10,700 primary diagnoses and another 30,329 reports in support of asbestos claims. n102 According to the records of Claims Resolution Management Corporation, which manages the Manville Personal Injury Settlement Trust, Dr. Jay Segarra "participated in almost 40,000 positive diagnoses for asbestos-related illnesses over the last 13 years, or about eight per day, every day, including weekends and holidays. There were about 200 days on which Dr. Segarra rendered positive diagnoses for more than 20 people, and 14 days with more than 50." n103

Judge Jack's findings have impacted, and will continue to impact, asbestos litigation. n104 For instance, in the wake of Judge [*520] Jack's findings, "some trusts finally have begun their own crackdown on claims submitted on the strength of B-reads performed by the discredited doctors." n105 Claims Resolution Management Corporation announced in September 2005 that it would no longer accept medical reports prepared by the suspect doctors and screening companies. n106 Several other trusts, including the Eagle-Picher, Celotex, Halliburton (DII Industries), Owens Corning/Fibreboard, Babcock & Wilcox, United States Gypsum, Armstrong World Industries, Plibrico, and Keene Creditors Trusts, have followed Manville Trust's lead. n107

In March 2006, the Court of Common Pleas of Cuyahoga County in Cleveland, Ohio dismissed all asbestos cases supported solely by doctors who refused to testify before Congress, noting they [*521] "are currently unlikely to testify at any hearing or trial in these matters." n108

In response to the federal court silica litigation and its aftermath, several state medical licensing agencies also took action against Dr. Ray Harron. In California and Florida, Dr. Harron agreed to voluntarily surrender his medical license. n109 In Mississippi, New Mexico, and Texas, Dr. Harron entered into agreed orders not to practice medicine until his license expired and not to renew it thereafter. n110 North Carolina and New York permanently revoked Dr. Harron's medical license. n111 Two other doctors involved in the federal court silica litigation, Drs. H. Todd Coulter and Andrew Harron, were also reprimanded in Mississippi. n112

[*522] In February 2009, the manager of the federal asbestos multidistrict litigation, U.S. District Judge Eduardo Robreno of the Eastern District of Pennsylvania, granted defendants' motions to exclude Dr. Harron's testimony and dismiss cases where he was the diagnosing physician. n113 The court said that during a motion hearing held on January 29, 2009, "parties to the summary judgment motions agreed that medical diagnoses from Dr. Ray A. Harron should be excluded as unreliable. Since the captioned plaintiffs have submitted medical diagnosing reports or opinions which name Dr. Harron as the sole diagnosing physician, their cases will be dismissed without prejudice." n114

In addition, there is recent evidence that courts may be more willing to entertain motions aimed at curbing asbestos lawsuit abuse, just as Judge Jack did in the federal court silica litigation. For instance, in November 2008, Wayne County (Detroit) Circuit Court Judge Robert Colombo, Jr. granted a defense motion to exclude plaintiffs' expert testimony by Lansing-based Dr. R. Michael Kelly of Mid-Michigan Physicians in dozens of upcoming trials. n115 The motion argued that Dr. Kelly, who earned $ 500 per exam and had diagnosed more than 7,000 asbestos litigants, should be

28 Rev. Litig. 501, *

excluded as unreliable because Dr. Kelly was not a radiologist nor board certified in reading X-rays, and because independent radiologists that examined 1,875 of Dr. Kelly's cases found no evidence of disease in eighty-eight percent of the cases. Further, Dr. Kelly may have misused a breathing test machine called a spirometer to create false positives. n116 Judge Columbo agreed and disqualified Dr. Kelly from acting as an expert in asbestos cases:

[*523]

 The findings of Dr. Kelly are suspect ... . The same findings appear in almost every case. Although this Court concedes that many of the Plaintiffs have the same work history, it is hard to believe that they have the same physical conditions. It is also hard to understand how Dr. Kelly, who claims he conducted a complete exam, fails to refer Plaintiffs to doctors for their medical conditions... . If Dr. Kelly's opinions are medically supportable, why do the medical records of the Plaintiffs and the findings of the treating physicians fail to support Dr. Kelly's findings and diagnosis? The only conclusion in the face of such overwhelming medical evidence is that the opinions of Dr. Kelly are not reliable. n117

 Plaintiffs' lawyers in the lawsuits pending before Judge Colombo are now required to find new experts, putting thousands of other asbestos cases in Michigan in limbo. n118

   B. Filings Down in General - Especially the Unimpaired

 The result of the above-described developments has been a dramatic reduction in the number of filings by unimpaired claimants. n119 For example, Richard Schuster, chairman of the Columbus-based Vorys, Sater, Seymour and Pease's national toxic tort defense litigation practice, has said that Ohio's medical criteria law "dramatically cut the number of new case filings by more than 90%." n120 Bryan Blevins of Provost & Umphrey, a national [*524] plaintiffs' practice based in Beaumont, Texas, has said that since Texas enacted its asbestos medical criteria law, "the only cases getting filed now are cancer cases." n121 John Cooney, an asbestos plaintiffs' lawyer based in Chicago, has said, "I know whole firms that just don't do asbestos anymore." n122 New York Appellate Division Justice Helen Freedman, who adopted a Deferred Docket when she managed the New York City asbestos litigation as a trial court judge, has said that "[a] preliminary estimate indicates that the Deferred Docket reduced the number of cases actually pending in my court by 80 percent." n123

   "A lot of companies that were seeing 40,000 cases in 2002 and 2003 have dropped to the 15,000 level," according to Jennifer Biggs, who chairs the mass torts subcommittee of the American Academy of Actuaries. n124 Frederick Dunbar, a senior vice president of NERA Economic Consulting, recently studied the Securities and Exchange Commission filings of eighteen large asbestos defendants and found that, "for all of them, 2004 asbestos claims had dropped from peak levels of the previous three years. Ten companies saw claims fall by more than half between 2003 and 2004." n125

   The CEO of a large mutual insurer further highlighted the effects of recent asbestos reforms at the state level in testimony before Congress:

   [*525]

 The beneficial impact of these efforts cannot be overstated. Historically Texas, Ohio and Mississippi have been the leading states to generate claims filed against [our] policyholders, collectively accounting for approximately 80% of the asbestos claims filed against [our] insureds. Since the statutory and judicial reforms in those three key states, the decrease in the volume of claims has been truly remarkable. In Mississippi, the decrease has been 90%, in Texas nearly 65% and, in Ohio, approximately 35%. Across all states, from 2004 to 2005 we have seen over a 50% decrease in the number of new claims filed, a trend that has continued in 2006. These numbers are the best evidence that state-driven initiatives are working ... . n126

 These anecdotal reports are supported by available data. A 2007 scholarly article studied new filings for selected defendants from 2003 and 2004. n127 The authors put their findings in the following table:

   Table: New Filings for Selected Defendants 2003 and 2004. n128

| Company | 2003 | 2004 | Change |
|---|---|---|---|
| Dow Chemical | 122,586 | 58,240 | 52.5% |

28 Rev. Litig. 501, *

| | | | |
|---|---|---|---|
| Georgia Pacific | 39,000 | 26,500- | 32.1% |
| Honeywell | 25,765 | 10,504 | 59.2% |
| Owens Illinois | 26,000 | 15,000 | 42.3% |
| St. Gobain (Certain Teed) | 62,000 | 18,000 | 71.0% |

A more recent study of claims against four large asbestos-related bankruptcy trusts (Manville, Eagle-Picher, Celotex, and H.K. Porter) from 2002 to 2007 revealed "a drop in the number of trust filings that ranges from one-sixth as many claims filed for the Celotex trust to one-twelfth as many claims filed for the H.K. Porter trust." n129 The authors added: "At the beginning of this period, all of these trusts received several tens of thousands of claims per year. By 2007, filing rates had declined to a range of just over 6,000 for the H.K. Porter trust and to just over 12,000 for the Celotex trust." n130

    C. Change in Disease Mix: Mesothelioma Cases Are the Primary Focus

The data also reflect a change in the mix of diseases being alleged. Consider the following table summarizing the Manville Trust's filing history from 2003 through 2005:

    Table: Manville Trust Filings 2003-2005 (U.S. Claims Only) n131

| Year | 2003 | 2004 | 2005 |
|---|---|---|---|
| Lung Cancer | 4,944 | 1,071 | 1,825 |
| Mesothelioma | 2,809 | 1,816 | 2,036 |
| Non-Malignant | 79,372 | 9,556 | 10,971 |
| Other Cancer | 1,269 | 339 | 600 |
| Other | 5,370 | 562 | 1,175 |
| Total | 93,764 | 13,344 | 16,607 |

The Manville data provides further confirmation that unimpaired (and other non-malignant) filings are playing a substantially [*527] reduced role in the litigation compared to just a few years ago, and, as a consequence, the total number of claims filed has declined substantially as well. More modest reductions have occurred with respect to lung cancer and "other cancer" filings, perhaps because these cancers can be attributed to other factors, making causation difficult to establish. n132 Mesothelioma case filings have remained fairly consistent. The reason may be that mesothelioma is more readily associated with asbestos exposure, although there is wide agreement that a significant number (by some estimates, twenty to thirty percent) of mesotheliomas are not asbestos-induced. n133 The Manville data supports anecdotal reports we have received from defense counsel indicating that mesothelioma claims are now the primary focus of the litigation in most places around the country. n134

    III. Other Trends in Asbestos Litigation

As asbestos litigation has evolved, the connection to asbestos-containing products is increasingly remote and the liability connection more stretched. n135 Within this broad trend there are several specific movements underway.

    [*528]

    A. Rejection of Plaintiffs' Expert Causation Testimony in de minimis or Remote Exposure Cases

In the past, asbestos litigation typically involved plaintiffs who worked in professions involving high-dose exposures; they were insulators, asbestos factory workers, and textile workers. n136 Now, an increasing number of plaintiffs are bringing claims for de minimis or remote exposures, such as "shade tree" brake work on the family car or one remodeling job using asbestos-containing joint compound. n137

    The foundation for these types of cases is the "any exposure" theory, sometimes called the "any fiber" theory. n138 Rather than assess dose, the experts who support this theory simply opine that any occupational or product-related exposure to asbestos fibers is sufficient - there is no minimum. n139 The theory allows plaintiffs' counsel to sue thousands of defendants every year whose supposed [*529] "contribution" to plaintiffs' asbestos exposure is trivial and far below the doses actually known to cause or increase the risk of disease, while at the same time excluding from causation other background exposures to millions of fibers.

28 Rev. Litig. 501, *

In the last three years, however, more than a dozen courts in multiple jurisdictions have excluded or criticized "any exposure" causation testimony, either as unscientific under either a Daubert n140 or Frye n141 analysis, or as insufficient to support causation. For instance, in Borg-Warner Corp. v. Flores, an asbestos case brought by a retired brake mechanic, the Texas Supreme Court rejected the idea that mere proof of exposure is sufficient for causation. n142 The court held that in order to prove causation a plaintiff must show "defendant-specific evidence relating to the approximate dose to which the plaintiff was exposed, coupled with evidence that the dose was a substantial factor in causing the asbestos-related disease." n143

Similarly, in Gregg v. V-J Auto Parts, Inc., a mesothelioma case against an auto parts company, the "any exposure" position espoused by the plaintiff's experts was rejected by the Pennsylvania Supreme Court. n144 The court said that it was not "a viable solution to indulge in a fiction that each and every exposure to asbestos, no matter how minimal in relation to other exposures, implicates a fact  [*530]  issue concerning substantial-factor causation in every "direct-evidence' case." n145 The result, the court explained, would subject defendants to liability without any reasonably developed scientific foundation. n146 Numerous other courts have recently reached similar decisions, including:

. a Texas appellate court in a mesothelioma case, rejecting the testimony of Dr. Samuel Hammar that any dry wall exposures above 0.1 fibers/cc year would be a substantial contributing factor; n147

. the Texas Multidistrict Litigation (MDL) court, rejecting the testimony of Dr. Eugene Mark in a friction product case n148 and other experts in an electrician drywall exposure case; n149

. an Ohio federal district court, affirmed by the Sixth Circuit Court of Appeals, in a gasket and packings case, rejecting testimony by Drs. Arthur Frank and Yasunosuke Suzuki that every exposure to asbestos, no matter how small, is a substantial factor; n150

. three Pennsylvania state trial courts, rejecting the "any exposure" testimony of Drs. John Maddox, David Laman, Eugene Mark, William Longo, Jonathan Gelfand, and Arthur Frank in friction product cases and criticizing the theory's application in a pleural disease case; n151

[*531]  . a federal bankruptcy court in litigation involving asbestos in vermiculite insulation, rejecting Dr. Henry Anderson's "any exposure" approach; n152

. a Mississippi appellate court, rejecting a medical monitoring class for persons allegedly exposed to asbestos in a school building; n153 and

. two Washington State trial court decisions by different judges, rejecting the opinions of Drs. Samuel Hammar and Carl Brodkin in heavy equipment mechanic cases, that every asbestos exposure was a substantial factor in causing plaintiffs' mesothelioma. n154

 These are not insignificant courts. In addition, the breadth of alleged exposures and diseases covered by these cases demonstrates that the "any exposure" theory is failing across the spectrum of asbestos cases, regardless of disease and type of exposure. n155

[*532]  These decisions are consistent with the holdings of courts that have considered similar situations. For instance, in Parker v. Mobil Oil Corp., a gas station attendant alleged that he developed acute myeloid leukemia (AML) from low-level benzene exposures in gasoline. n156 Epidemiology studies have demonstrated that high exposures to pure benzene, typically in factory settings, can cause AML, but studies have not demonstrated the occurrence of disease from low-exposure gas station work. n157 In Parker, the plaintiff produced reports from two experts, Drs. Phil Landrigan and Bernard Goldstein. n158 Dr. Landrigan extrapolated down from high-dose, factory benzene exposure studies and conducted "extensive mathematical modeling" to opine that low-level exposures would likewise cause AML. n159 Dr. Goldstein cited to government regulations for benzyne levels in modern refineries and noted that the plaintiff's medical history of having received radiation treatment may have made him more susceptible to leukemia from exposure to benzene. n160 Drs. Landrigan and Goldstein did not quantify the plaintiff's exposure to benzene from gas station work and did not present evidence that the plaintiff's dose approached those shown to cause AML in epidemiology studies of high-dose workers. n161 Instead, they expressed their opinions in subjective terms, referring to the plaintiff's exposures as "substantial" or "significant." n162 The New York Court of Appeals rejected this approach:

The experts, although undoubtedly highly qualified in their respective fields, failed to demonstrate that exposure to benzene as a component of gasoline caused Parker's AML. Dr. Goldstein's general, subjective and conclusory assertion - based [*533] on Parker's deposition testimony - that Parker had "far more exposure to benzene than did the refinery workers in the epidemiological studies" is plainly insufficient to establish causation. It neither states the level of the refinery workers' exposure, nor specifies how Parker's exposure exceeded it, thus lacking in epidemiologic evidence to support the claim. n163

Parker has many antecedents which similarly reject assumed causation at low levels. These cases include the United States Supreme Court's General Electric Co. v. Joiner ruling, which rejected alleged PCB injury without a dose assessment, n164 and the Sixth Circuit's decision in Nelson v. Tennessee Gas Pipeline Co., which rejected alleged environmental harm from PCB exposure without an actual dose assessment. n165

B. Migration of Claims to New Venues

Civil justice reform legislation, n166 public and media attention on forums called "Judicial Hellholes" by the American Tort Reform Foundation, n167 and decisions such as the Texas Supreme Court's Flores decision, n168 are having an impact on where asbestos claims are being filed. There has been a migration of asbestos-related claims away from jurisdictions that have adopted reforms.

[*534] Consider, for example, the dramatic changes that have occurred in Mississippi. In December 2002, Mississippi Governor Ronnie Musgrove signed a civil justice reform package into law. n169 That law became effective on January 1, 2003, and applied to all cases filed on or after that date. n170 The 2002 law included an amendment to the state's venue law to require that lawyers file claims in counties with some relationship to the facts of the case, provided for modest "sliding caps" on punitive damages based on the net worth of the defendant, gave some relief to innocent sellers, abolished joint liability for noneconomic damages for any defendant found to be less than thirty percent at fault, and stopped duplicative recovery of "hedonic" or lost enjoyment of life damages. n171

In June 2004, Mississippi Governor Hailey Barbour signed another comprehensive civil justice reform bill into law. n172 That law generally went into effect on September 1, 2004, and applied to all cases filed on or after that date. n173 The 2004 law included "significant reforms that strengthen and go beyond the 2002 legislation." n174 The legislature revisited venue and joinder abuse, providing that a civil suit may be filed in the county where the corporation has its principal place of business or in the county where a "substantial alleged act or omission occurred or where a substantial event that caused the injury occurred." n175 If venue cannot be asserted against a nonresident defendant under the above [*535] criteria, then the plaintiff may file in the county where he or she lives. n176 Most notably, the new law eliminated the problematic "good for one, good for all" rule by requiring venue to be proper for each plaintiff. n177 The 2004 law also limited recovery of noneconomic damages against any civil defendant, other than a health care liability defendant, to $ 1 million. n178 In addition, the legislation placed tighter limits on punitive damages that may be awarded against medium and small businesses. n179 The 2004 law included other civil justice reforms, including the elimination of joint liability and a provision to give innocent product sellers greater protection against being pulled into lawsuits directed at manufacturers. n180

The Mississippi Supreme Court also has improved the state's legal climate through a number of changes to the Rules of Civil Procedure and through a series of judicial decisions that require venue to be independently established for each plaintiff; require the severance of improperly joined plaintiffs whose claims do not arise out of the same transaction or occurrence, and are not linked by a common litigable event; condemn the practice of shotgun style complaints; permit independent medical examinations of plaintiffs; and strengthen the rules regarding admissibility of expert testimony. n181 In addition, the court established more stringent requirements for proof of causation in toxic tort claims and rejected medical monitoring as a cause of action for plaintiffs with no present physical injury. n182 Together, the changes brought about by Mississippi [*536] lawmakers and the Mississippi Supreme Court have significantly improved the tort litigation climate for defendants. n183

Texas is another former asbestos "magnet" state that has experienced dramatic changes. In June 2003, Texas Governor Rick Perry signed comprehensive tort reform legislation into law. n184 The 2003 law addressed many issues affecting asbestos and other toxic tort litigation, including several provisions applicable to cases filed on or after July 1, 2003, n185 and other provisions applicable to cases filed on or after September 1, 2003. n186

28 Rev. Litig. 501, *

[*537] Soon after the 2003 law became effective, Brent Rosenthal, a plaintiffs' attorney with Dallas-based Baron & Budd, acknowledged that the reforms would "have a significant impact on the administration of toxic and mass tort cases." n187 More recently, Bryan Blevins of Texas-based Provost & Umphrey said, "After generic tort reform legislation on issues such as venue, joint and several liability, and third-party employer liability took effect in Texas in September 2003, asbestos and silica filings dropped dramatically from the thousands of cases to the hundreds." n188

Texas supplemented the 2003 comprehensive tort reform law with an asbestos (and silica) medical criteria reform law that Governor Perry signed into law in May 2005 and which took effect on September 1, 2005. n189 As explained earlier, that law defines the minimum level of diagnosis and impairment an asbestos claimant must present to proceed to trial in a Texas state court in an asbestos case pending on or filed after the effective date. n190 According to plaintiffs' attorney Bryan Blevins, the "comprehensive state tort reform later supplemented by medical-criteria legislation has affected filings in Texas "in capitals and bold letters and raised to the 10th degree.'" n191 The Flores decision by the Texas Supreme Court n192 is the most recent blow to asbestos personal injury lawyers in Texas.

Ohio also has adopted significant reforms. On the heels of the enactment of Ohio's asbestos medical criteria law, n193 Ohio lawmakers also approved a comprehensive tort reform package. The general tort reform law was signed by Governor Robert Taft in [*538] January 2005 and became effective on April 7, 2005. n194 Among other things, the 2005 law caps punitive damages at two times compensatory damages for larger employers, prohibits multiple punitive damages for the same act or course of conduct, caps noneconomic damages for non-catastrophic injuries at the greater of $ 250,000 or three times the amount of economic damages up to $ 350,000 per plaintiff and $ 500,000 per occurrence, and permits the introduction of collateral source evidence. n195

Other states that have recently improved their asbestos litigation climate, either through civil justice reform legislation or by judicial decision, include South Carolina n196 and Rhode Island. n197

[*539] In contrast to those states that have worked to improve the asbestos and toxic tort litigation climate, the asbestos litigation appears to be increasing in a few jurisdictions. California is perhaps the best example. n198 Judges in California have acknowledged the ever-increasing burden placed on the judicial system by the state's asbestos docket. For example, in 2004 one San Francisco Superior Court judge stated that asbestos cases take up twenty-five percent of the court's docket. n199 Another judge noted that asbestos cases were a [*540] "growing percentage" of the court's ever-increasing caseload and that they take up a large share of the court's scarce resources. n200

Many of these plaintiffs lack any meaningful connection to California, having lived most of their lives outside of the state and alleging asbestos exposure that ostensibly occurred elsewhere. In a 2006 sample of 1,047 asbestos plaintiffs for whom address information was available, over 300 - or an astonishing thirty percent - had addresses outside of the state. n201

Now, large plaintiffs' firms that manage these and other asbestos claims are moving to California, especially Los Angeles. n202 For example, Dallas-based Baron & Budd "opened up in Beverly Hills in 2007, while Southern Illinois' SimmonsCooper also has placed its only out-of-state office in nearby El Segundo." n203 "Another huge player, Dallas' Waters & Kraus, first opened a small Los Angeles office in 2001," then developed a "prominent presence" in 2006 when it "merged with the plaintiffs' firm Paul & Janofsky, becoming Waters, Kraus & Paul in Los Angeles. So far, the foray [*541] has proved successful." n204 As a result, "California is positioned to become a front in the ongoing asbestos litigation war." n205

Delaware is another state that has experienced an increase in asbestos filings. n206 Many of the new Delaware filings reportedly flow from SimmonsCooper, a firm based in East Alton, Illinois. n207 The Record, a weekly law journal covering civil courts in Madison County, where East Alton is located, observed in 2005 that the "deluge of filings [was] keeping clerks in a Delaware court working nights and weekends to keep up." n208 One SimmonsCooper lawyer acknowledged this practice, stating that "we are just filing [the asbestos cases] in different places." n209 Delaware may be attractive to plaintiffs' counsel because many companies are incorporated in the state, making it hard for defendants to obtain dismissal on forum grounds.

In addition, there appears to be a resurgence in asbestos filings in Madison County, Illinois. n210 Historically, the county has been a popular destination for asbestos cases. n211 The number of new asbestos filings reached an all-time high of 953 cases in 2003, then dropped to 473 cases in 2004, dropped further to 389 cases in 2005, and was down to 325 new cases in 2006. n212 Since then, the number [*542] of filings has risen, climbing to 455 cases in 2007. n213 In 2008, more than 500 new asbestos cases were filed in Madison County. n214

C. New Theories of Liability

28 Rev. Litig. 501, *

1. Component Supplier Liability

An emerging theory being promoted by some plaintiffs' counsel is that makers of nonhazardous component parts, such as pumps or valves, should be held liable for asbestos products made by others and attached to the components post-sale, such as by the Navy. n215 In essence, those advocating for this new duty rule seek to impose rescuer liability on the component supplier, which tort law is traditionally reluctant to do. n216 It is easy to see what is suddenly driving this novel theory: most major manufacturers of asbestos-containing products have filed bankruptcy and the Navy enjoys sovereign immunity. Component part makers are being targeted simply because they happen to be solvent and subject to suit.

The issue was addressed in Lindstrom v. A-C Product Liability Trust, n217 where a plaintiff with alleged asbestos-related mesothelioma sued several manufacturers of products used in conjunction with other manufacturers' asbestos products. The central issue in Lindstrom was causation as it related to component [*543] parts rather than the existence of a duty. The court found no causation, concluding that a manufacturer cannot be held responsible for asbestos contained in another product. n218 For example, the Lindstrom court affirmed summary judgment for pump manufacturer Coffin Turbo, which did not manufacture or supply the asbestos products used to insulate its pumps. The court found that Coffin Turbo could not be held responsible for the asbestos contained in another product, though the asbestos was attached to a Coffin Turbo product. n219 It was those asbestos products, not Coffin Turbo's pumps, that caused injury.

More recently, in two companion cases, Simonetta v. Viad Corp. n220 and Braaten v. Saberhagen Holdings, n221 an en banc panel of the Washington Supreme Court voted 6-3 to overturn an appellate court and reject component maker liability for failure to warn of asbestos-related hazards in products made by others. In Simonetta, the court held that a manufacturer may not be held liable in common law negligence or strict liability actions for failure to warn of the dangers of asbestos exposure resulting from another manufacturer's insulation applied to its products after sale of the products to the Navy. The court said that the defendant, an evaporator manufacturer, was only responsible for the "chain of distribution" of its product, and that the addition of asbestos-containing insulation manufactured by another company represented a separate chain of distribution. n222 In Braaten, the court rejected failure to warn claims against pump and valve manufacturers relating to replacement packing and replacement gaskets made by others. In both cases the court rejected plaintiffs' claims that the foreseeability of harm gave rise to a duty owed. As the Braaten court explained, "It makes no difference if the manufacturer knew its products would be used in conjunction with asbestos insulation." n223

Most recently, a California Court of Appeal found the rationale of the Supreme Court of Washington to be "convincing" and "sound" when the California court held that makers of components [*544] supplied to the Navy for use in a ship's propulsion system had no duty to warn of the dangers inherent in the asbestos-containing products supplied by other manufacturers. n224

The expansion of failure to warn liability to cover makers of nonhazardous component parts represents unsound public policy, as noted by numerous commentators. This new duty rule would lead to "legal and business chaos - every product supplier would be required to warn of the foreseeable dangers of numerous other manufacturers' products." n225 "For example, a syringe manufacturer would be required to warn of the dangers of any and all drugs it may be used to inject, and the manufacturer of bread would be required to warn of peanut allergies, as a peanut butter and jelly sandwich is a foreseeable use of bread." n226 "Can't you just see a smoker with lung cancer suing manufacturers of matches and lighters for failing to warn that smoking cigarettes is dangerous to their health?" n227 "Packaging companies might be held liable for hazards regarding contents made by others... . Consumer safety also could be undermined by the potential for over-warning (the "Boy Who Cried Wolf' problem) and through conflicting information on different components and finished products." n228

Plaintiffs' attorneys who promote this theory rely on cases in which manufacturers of nonhazardous products have been held liable [*545] when their products were used in combination with products made by others and created synergistic hazards. n229 These cases, however, are very different from the emerging component supplier asbestos cases, as the California Court of Appeal found in the recent decision mentioned above. n230

For example, in Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co., a California Court of Appeal held that a manufacturer of power grinding tools had a duty to warn about the release of respirable dust caused by the interaction of the defendant's power grinders with abrasive wheels or discs made by another. n231 The court observed that the defendant's grinding tools created the dust and that the other manufacturer's disks would not have been dangerous without the effect of the defendant's tools. n232 Another synergistic hazard case, Wright v. Stang Manufacturing Co., involved a plaintiff injured when a deck gun on a fire truck broke loose and failed under the intense pressure generated by the deck

gun and the inadequate capacity of the riser pipe attached to the deck gun. n233 In these two cases, products that were individually safe formed a hazard when combined with another product. The subject asbestos cases do not involve such independently safe products; the pump or valve may have been safe, but the asbestos put on it was potentially hazardous. The hazard, therefore, did not arise from two safe products being used in tandem; rather, it arose solely from the asbestos products made by someone other than the pump or valve maker. Liability should not attach to component suppliers in these situations.

### 2. Secondhand Exposure Claimants

In addition, plaintiffs' lawyers are now targeting property owners for alleged harms to secondarily exposed "peripheral plaintiffs." n234 These claims involve workers' family members who have been exposed to asbestos off-site, typically through contact  [*546]  with a directly exposed worker or that worker's soiled work clothes. n235

Since the beginning of 2005, a growing number of courts have decided whether premises owners owe a duty to "take home" exposure claimants. n236 These claims have been uniformly rejected by courts that define tort law duties by looking at the relationship between the parties and broad public policy issues, such as the highest courts of Georgia, n237 New York, n238 Michigan, n239 and Delaware. n240 Other courts that have rejected take home asbestos exposure claims include state appellate courts in Texas, n241 Iowa, n242 and Ohio; n243 a federal appellate court applying Kentucky law; n244 and  [*547]  a federal district court applying Pennsylvania law. n245 Earlier, a Maryland appellate court reached the same conclusion. n246 In Kansas and Ohio, claims against premises owners for off-site asbestos exposures are statutorily barred. n247

In contrast to the courts mentioned above, the New Jersey and Tennessee Supreme Courts applied a different duty analysis and ruled the other way. n248 In these cases, and nearly every other instance where courts have recognized a duty of care in a take home  [*548]  exposure case, the foreseeability of risk was the primary, if not only, consideration in the courts' duty analyses. n249

Courts that have rejected such claims have wisely appreciated that allowing a new cause of action against landowners by remote plaintiffs injured off-site would exacerbate the current asbestos litigation and augment other toxic tort claims. As one commentator has explained,

If the law becomes clear that premises-owners or employers owe a duty to the family members of their employees, the stage will be set for a major expansion in premises liability. The workers' compensation bar does not apply to the spouses or children of employees, and so allowing those family members to maintain an action against the employer would greatly increase the number of potential claimants. n250

Future potential plaintiffs might include anyone who came into contact with an exposed worker or his or her clothes. Such plaintiffs could include co-workers, children living in the house, "extended family members, renters, house guests, baby-sitters, carpool members, bus drivers, and workers at commercial enterprises  [*549]  visited by the worker when he or she was wearing dirty work clothes," as well as local laundry workers or others who handled the worker's clothes. n251 Moreover, potential defendants may not be limited to corporate property owners. Landlords and private homeowners also might be liable for secondhand exposures that originate from their premises. In an attempt to reach for homeowners' insurance policies, private individuals could be swept into the dragnet search for potentially responsible parties in asbestos cases. Courts must consider these impacts when deciding take home exposure cases.

### IV. Increased Transparency Between Bankruptcy and Tort Systems

Asbestos litigation has forced an estimated eighty-five companies into bankruptcy, n252 with devastating impacts on the companies' employees, retirees, shareholders, and surrounding communities. n253 Many of these bankruptcy filings have occurred  [*550]  since 2000. n254 Recent developments, discussed below, have led to increased awareness of the interplay between the bankruptcy and civil tort systems. n255 Courts are allowing greater transparency with respect to claims made and payments received by plaintiffs from asbestos trusts in order to promote honesty in litigation and prevent double recoveries. n256

### A. Bankruptcy Trust Claim Forms

28 Rev. Litig. 501, *

 In January 2007, Cleveland, Ohio Judge Harry Hanna barred a prominent California asbestos personal injury law firm from practicing before his court after he found that the firm and one of its partners failed to abide by the rules of the court proscribing dishonesty, fraud, deceit, and misrepresentation. n257 Judge Hanna [*551] concluded that the lawyers had "not conducted themselves with dignity" and had "not honestly discharged the duties of an attorney in this case." n258 An Ohio Court of Appeals and the Ohio Supreme Court let Judge Hanna's ruling stand. n259 Judge Hanna said later, "In my 45 years of practicing law, I never expected to see lawyers lie like this." n260 Judge Hanna added, "It was lies upon lies upon lies." n261

 Judge Hanna's ruling received national attention for exposing "one of the darker corners of tort abuse" in asbestos litigation: inconsistencies between allegations made in open court and those submitted to trusts set up by bankrupt companies to pay asbestos-related claims. n262 As the Cleveland Plain Dealer reported, Judge [*552] Hanna's decision ordering the plaintiff to produce proof of claim forms "effectively opened a Pandora's box of deceit ... . Documents from the six other compensation claims revealed that [plaintiff's lawyers] presented conflicting versions of how Kananian acquired his cancer." n263 Emails and other documents from the plaintiff's attorneys also showed that their client had accepted monies from entities to which he was not exposed, and one settlement trust form was "completely fabricated." n264 The Wall Street Journal editorialized that Judge Hanna's opinion should be "required reading for other judges" to assist in providing "more scrutiny of 'double dipping' and the rampant fraud inherent in asbestos trusts." n265

 Like Judge Hanna, a growing number of judges are recognizing defendants' legitimate interest in discovering information about plaintiffs' trust claims. n266 In Volkswagen of America, Inc. v. Superior Court, for example, a California appellate court issued a writ of mandamus, stating that it would be an unjustifiable denial of discovery for the trial court not to allow defendants to discover documents submitted to bankruptcy trusts by the plaintiff's attorney in support of the plaintiff's claims to those trusts for the alleged asbestos-related injuries. n267 In New York, a court ordered that claim submissions be produced to defendants remaining in the tort system:

While the proofs of claims are partially settlement documents, they are also presumably accurate statements of the facts concerning asbestos exposure of the plaintiffs. While they may be filed by the attorneys, the attorneys do stand in the shoes of the plaintiffs and an attorney's statement is an admission [*553] under New York law. Therefore, any factual statements made in the proofs of claim about alleged asbestos exposure of the plaintiff to one of the bankrupt's products should be made available to the defendants who are still in the case. n268

 "Likewise, Texas trial courts are granting motions to compel responses to interrogatories directed to asbestos claimants regarding claims and settlements made or expected to be made with any bankruptcy trust." n269 And "in New Jersey, a discovery master for the court overseeing that state's consolidated asbestos docket recommended that production of claim forms be directed, explaining that, whether or not ultimately admissible in evidence, such documents reveal discoverable factual information regarding plaintiffs' alleged exposure to asbestos-containing products." n270 Several jurisdictions also have established case management orders that require plaintiffs to disclose certain bankruptcy-related information as a matter of course. n271

 Most recently, a New York trial court required plaintiff's counsel to file all claim forms that they intended to file within ninety days before the start of trial and produce those forms to defendants. n272 The court warned that if plaintiff's counsel ignored the order and filed claim forms with bankruptcy trusts later, any verdict against the defendant would be vacated. n273

 B. Efforts to Address Potential "Double Dipping"

 As recent bankruptcy proceedings conclude, a mind-boggling amount of money will become available to pay claimants outside the [*554] tort system. According to one recent estimate, the trusts "have at least $ 35 billion in assets and potentially as much as $ 60 billion." n274 In fact, "for the first time ever, trust recoveries may fully compensate asbestos claimants." n275 Courts, therefore, should require greater transparency and allow defendants to learn if, and how much, plaintiffs have received or are eligible to receive from the trusts. Courts also should make appropriate setoffs to prevent "double dipping."

 The King County (Seattle, Washington) trial court recently embraced this approach in Coulter v. AstenJohnson, Inc. n276 In Coulter, the Washington Court of Appeals held defendant AstenJohnson (Asten) liable to asbestos plaintiffs in the amount of $ 237,650 plus costs, minus applicable setoffs. n277 The appellate court remanded the case to the

28 Rev. Litig. 501, *

superior court to consider the proper offset for plaintiffs' settlements with other defendants and bankruptcy trusts. n278 On remand, Superior Court Judge Sharon Armstrong held that, "at a minimum, Asten is entitled to setoffs for amounts received to date by Plaintiffs from settling defendants and bankruptcy trusts, for amounts agreed to and to be received from settling defendants and bankruptcy trusts, for amounts that can be obtained by application to existing bankruptcy trusts, and for amounts that can be obtained from bankruptcy trusts expected to soon become available." n279

Judge Armstrong's decision to permit setoffs for amounts that the plaintiffs could receive from the trusts - in addition to setoffs [*555] for payments actually received - shows that the judge fully grasped the gamesmanship plaintiffs were apparently trying to carry out. According to the court, "Plaintiffs' records show that they submitted claims to only a small number of available bankruptcy trusts," and they did not provide "any explanation as to their failure to apply to [other available] trusts." n280 It appears evident that the plaintiffs in Coulter were intending to delay filings with certain trusts in an attempt to maximize their recovery and "double dip" as much as possible. Judge Armstrong wisely saw right through this tactic; in doing so, she provided a beacon for other courts to follow.

State legislation also is likely to be introduced in this area and will most likely be based on the approach found in model legislation approved by the American Legislative Exchange Council (ALEC) in August 2007. n281 The stated purposes of the ALEC model bill are:

(1) to provide transparency of claims made against asbestos-related bankruptcy trusts and in the tort system; (2) to assure that courts and litigants have available to them information as to payments an asbestos claimant has or may receive from asbestos-related bankruptcy trusts; (3) to facilitate fair and appropriate compensation to claimants with a rational allocation of responsibility to all persons whether current defendants or not; [4] to preserve the resources of both defendants and asbestos-related bankruptcy trusts to help promote adequate recoveries for deserving claimants; and (5) to insure that liabilities properly borne by asbestos-related bankruptcy trusts are not imposed upon defendants in the tort system. n282

[*556] The model Act accomplishes these goals by providing for the discovery and admissibility of asbestos trust claim forms; staying any civil action in its entirety until the plaintiff certifies that all anticipated claims against asbestos trusts have been filed; and requiring setoffs for recoveries plaintiffs have received or are eligible to receive from asbestos trusts.

V. Conclusion

Asbestos litigation is now entering a new phase. Until recently, a substantial majority of claims were brought on behalf of unimpaired claimants diagnosed largely through mass screenings. Legislative and judicial reforms in a number of key states have largely removed the economic incentive for plaintiffs' attorneys to file such claims; the result has been a dramatic reduction in the number of filings by the non-sick. Consequently, asbestos litigation in most jurisdictions is now primarily focused on claimants alleging asbestos-related mesothelioma.

New developments are emerging with respect to claims alleging mesothelioma and other serious injuries. For instance, courts are now examining more closely the causation testimony presented by plaintiffs' experts in cases involving de minimis or remote exposures. An increasing number of courts are applying principles of sound science to find "any exposure" testimony to be unreliable and inadmissible. These courts are properly requiring plaintiffs to show defendant-specific evidence relating to the approximate dose to which the plaintiff was exposed, coupled with evidence that the dose was a substantial factor in causing the asbestos-related disease.

In addition, a migration of claims is occurring. Plaintiffs' lawyers are actively seeking out new jurisdictions in which to file their claims, largely driven by the desire to avoid reforms adopted in states that were once favored jurisdictions, such as Texas. Delaware and California are two examples of these new jurisdictions. California, in particular, seems positioned to attract significant attention from plaintiff and defense counsel going forward.

Moreover, plaintiffs' alleged connections to asbestos-containing products have grown increasingly remote, and the liability connection more stretched. For example, two emerging [*557] theories being raised by plaintiffs' attorneys seek to hold component suppliers liable for asbestos-containing products made by others and attached to the components post-sale; and to hold premises owners liable for alleged harms to workers' family members and others who may have been exposed to asbestos off-site, typically through contact with a directly exposed worker or that worker's soiled work clothes.

28 Rev. Litig. 501, *

Finally, there is a greater recognition by courts of the interplay between the bankruptcy and civil tort systems. Recently, a number of courts have taken action to ensure needed transparency between these systems by allowing discovery of claim forms filed with bankruptcy trusts. These reforms can safeguard individual trials by preventing plaintiffs' lawyers from trying to try to tell a bankruptcy trust one set of facts and a civil jury another set of facts. These reforms also create proper pressure on plaintiffs' lawyers to file more consistent and accurate bankruptcy trust claims. Courts also will be asked to order appropriate setoffs to prevent "double dipping" with respect to asbestos trusts and civil defendants. A recent decision by a Washington trial court provides a sound approach for other courts to follow to prevent double recoveries and gamesmanship in asbestos litigation. ALEC's model Asbestos Claims Transparency Act provides a model for state legislation to accomplish the same goals.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Civil ProcedureJudicial OfficersJudgesGeneral OverviewEnvironmental LawHazardous Wastes & Toxic SubstancesAsbestosGeneral OverviewTortsDamagesCosts & Attorney FeesGeneral Overview

**FOOTNOTES:**

n1. Helen Freedman, Selected Ethical Issues in Asbestos Litigation, *37 Sw. U. L. Rev. 511, 511 (2008).*

n2. See, e.g., *Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1083-85 (5th Cir. 1973)* (holding that asbestos product manufacturers could be held strictly liable for failure to warn of asbestos exposure risks).

n3. See James S. Kakalik et al., Variation in Asbestos Litigation Compensation and Expenses 30 (1984) (stating that only four percent of asbestos claims closed from 1980 to 1982 lacked a manifest asbestos-related injury).

n4. See James A. Henderson, Jr. & Aaron D. Twerski, Asbestos Litigation Gone Mad: Exposure-based Recovery for Increased Risk, Mental Distress, and Medical Monitoring, *53 S.C. L. Rev. 815, 823 (2002)* ("By all accounts, the overwhelming majority of claims filed in recent years have been on behalf of plaintiffs who ... are completely asymptomatic."); see also Christopher J. O'Malley, Note, Breaking Asbestos Litigation's Chokehold on the American Judiciary, *2008 U. Ill. L. Rev. 1101, 1105 (2008)* ("Most individuals with pleural plaques experience no lung impairment, no restrictions on movement, and usually do not experience any symptoms at all."); Alex Berenson, A Surge in Asbestos Suits, Many by Healthy Plaintiffs, N.Y. Times, Apr. 10, 2002, at A1 ("Very few new plaintiffs have serious injuries, even their lawyers acknowledge ... . "The overwhelming majority of these cases ... are brought by people who have no impairment whatsoever.'"); Roger Parloff, Welcome to the New Asbestos Scandal, Fortune, Sept. 6, 2004, at 186 ("According to estimates accepted by the most experienced federal judges in this area, two-thirds to 90% of the nonmalignants are "unimpaireds' - that is, they have slight or no physical symptoms.").

n5. Charles E. Bates & Charles H. Mullin, Having Your Tort and Eating it Too?, Mealey's Asbestos Bankr. Rep., Nov. 2006, at 21, 21.

n6. See Kakalik et al., supra note 3, at 5 ("Asbestos plaintiffs typically do not sue their employers ... but rather bring suits against the asbestos miners, manufacturers, suppliers, and processors who supplied the asbestos or asbestos products that were used or were present at the claimant's work site or other exposure location.").

n7. See Editorial, Lawyers Torch the Economy, Wall St. J., Apr. 6, 2001, at A14 ("The net has spread from the asbestos makers to companies far removed from the scene of any putative wrongdoing."); see also Richard B. Schmitt, Burning Issue: How Plaintiffs' Lawyers Have Turned Asbestos into a Court Perennial, Wall St. J., Mar. 5, 2001, at A1 (discussing one lawyer's attempt to "turn [asbestos] litigation away from its traditional targets," and noting that the volume of litigation has "prompted lawyers to sniff out new defendants to compensate

28 Rev. Litig. 501, *

their clients as former deep pockets ... head to bankruptcy court, swamped by unrelenting claims"); Susan Warren, Asbestos Quagmire: Plaintiffs Target Companies Whose Premises Contained Any Form of Deadly Material, Wall St. J., Jan. 27, 2003, at B1 (discussing the new wave of asbestos-related lawsuits targeting companies with little or no apparent connection to the material); Susan Warren, Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps, Wall St. J., Apr. 12, 2000, at B1 (discussing the "vast and growing fraternity of unlikely new targets of asbestos litigation" and noting that "as the coffers of asbestos makers and heavy asbestos users have been depleted by litigation expenses, plaintiffs' attorneys have cast their nets wider to find companies to blame").

n8. See discussion infra Part II.A and II.C.

n9. See discussion infra Part II.B.

n10. Asbestos litigation issues have also been active in the federal bankruptcy courts. E.g., *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.), 517 F.3d 52* (2d Cir.) (addressing jurisdiction of bankruptcy court to enjoin third-party non-debtor suits), cert. granted sub nom. *Travelers Indem. Co. v. Bailey, 129 S. Ct. 761,* and cert. granted sub nom. *Common Law Settlement Counsel v. Bailey, 129 S. Ct. 767 (2008); In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004)* (vacating order confirming plan of reorganization); *In re Congoleum Corp., No. 03-51524, 2009 WL 499262* (Bankr. D.N.J. Feb. 26, 2009) (dismissing plan of reorganization) (unpublished); *In re Federal-Mogul Global Inc., No. 01-10578, 2008 WL 4493519* (Bankr. D. Del. Sept. 30, 2008) (rejecting a settlement plan for an asbestos-related company). See generally Mark D. Plevin, Leslie A. Epley & Clifton S. Elgarten, The Future Claims Representative in Prepackaged Asbestos Bankruptcies: Conflicts of Interest, Strange Alliances, and Unfamiliar Duties for Burdened Bankruptcy Courts, *62 N.Y.U. Ann. Surv. Am. L. 271 (2006)* (discussing the consequences of *11 U.S.C. § 524*(g) (2006), a provision in the Bankruptcy Code that allows companies threatened by asbestos liabilities to channel current and future asbestos claims into a trust set up to pay claims). These developments are beyond the scope of this Article.

n11. See generally Mark Behrens & Phil Goldberg, The Asbestos Litigation Crisis: The Tide Appears to Be Turning, *12 Conn. Ins. L.J. 477 (2006)* (discussing how state courts and legislatures have acted to restore fairness and sound public policy to asbestos litigation); Deborah R. Hensler, Has the Fat Lady Sung? The Future of Mass Toxic Torts, *26 Rev. Litig. 883 (2007)* (explaining the current status and history of mass toxic tort litigation and the changing dynamics resulting from executive, legislative, and judicial policy efforts); James A. Henderson, Jr., Asbestos Litigation Madness: Have the States Turned a Corner?, Mealey's Tort Reform Update, Jan. 2006, at 12 ("A movement is afoot among state courts and legislatures that may prove to be the beginnings of a reversal in the disheartening trends of recent years, perhaps the turning of a corner in this hugely important and highly controversial area of tort litigation.").

n12. See *Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 723 (D. Del. 2005)* ("Labor unions, attorneys, and other persons with suspect motives [have] caused large numbers of people to undergo X-ray examinations (at no cost), thus triggering thousands of claims by persons who had never experienced adverse symptoms."); *Eagle-Picher Indus., Inc. v. Am. Employers' Ins. Co., 718 F. Supp. 1053, 1057 (D. Mass. 1989)* ("Many of these cases result from mass X-ray screenings at occupational locations conducted by unions and/or plaintiffs' attorneys, and many claimants are functionally asymptomatic when suit is filed.").

n13. Lester Brickman, On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality, *31 Pepp. L. Rev. 33, 68 (2003);* see also Robert J. Samuelson, Editorial, Asbestos Fraud, Wash. Post, Nov. 20, 2002, at A25 (criticizing trial lawyers who recruit plaintiffs through advertisements and mass X-ray screenings); Judyth Pendell, Regulating Attorney-Funded Mass Medical Screenings: A Public Health Imperative? (AEI-Brookings Joint Ctr. for Regulatory Studies, Related Pub. No. 05-22, 2005), http://aei-brookings.org/admin/pdffiles/phpZI.pdf (discussing the unreliability of medical evidence generated by attorney-funded mass medical screenings for asbestos and silica litigation, the associated financial and legal consequences for defendants and the courts, and the harmful effects on workers who are screened). See generally Les-

28 Rev. Litig. 501, *

ter Brickman, Ethical Issues in Asbestos Litigation, *33 Hofstra L. Rev. 833 (2005)* (commenting on attorney-sponsored screenings).

n14. See *In re Collins, 233 F.3d 809, 812 (3d Cir. 2000)* ("The resources available to persons injured by asbestos are steadily being depleted. The continuing filings of bankruptcy by asbestos defendants disclose that the process is accelerating."); *In re Asbestos Prods., Liab. Litig. (No. VI), No. MDL 875, 2002 WL 32151574, at 1* (E.D. Pa. Jan. 14, 2002) (Administrative Order No. 8) ("Oftentimes these suits are brought on behalf of individuals who are asymptomatic as to an asbestos-related illness and may not suffer any symptoms in the future. Filing fees are paid, service costs incurred, and defense files are opened and processed. Substantial transaction costs are expended and therefore unavailable for compensation to truly ascertained asbestos victims."); *In re Joint E. & S. Dist. Asbestos Litig., 129 B.R. 710, 751* (Bankr. S.D.N.Y., E. & S.D.N.Y. 1991) ("Overhanging this massive failure of the present system is the reality that there is not enough money available from traditional defendants to pay for current and future claims."), vacated, *982 F.2d 721 (2d Cir. 1992);* Mark A. Behrens, Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation, *54 Baylor L. Rev. 331, 333, 344-57 (2002)* (noting that the number of "traditional defendants" who have gone bankrupt creates pressure on "peripheral defendants"); Paul F. Rothstein, What Courts Can Do in the Face of the Never-Ending Asbestos Crisis, *71 Miss. L.J. 1, 4 (2001)* (describing asbestos litigation as "seriously flawed"); Susan Warren, Competing Claims: As Asbestos Mess Spreads, Sickest See Payouts Shrink, Wall St. J., Apr. 25, 2002, at A1 (discussing the wave of corporate bankruptcies resulting from asbestos litigation).

n15. E.g., *Ohio Rev. Code Ann. § 2307.92* (West Supp. 2008) ("No person shall bring or maintain a tort action alleging an asbestos claim based on a nonmalignant condition in the absence of a prima-facie showing ... that the exposed person has a physical impairment, that the physical impairment is a result of a medical condition, and that the person's exposure to asbestos is a substantial contributing factor to the medical condition."). See generally Joseph Sanders, Medical Criteria Acts: State Statutory Attempts to Control the Asbestos Litigation, *37 Sw. U. L. Rev. 671, 689 (2008)* (concluding that "medical criteria acts are a step in the right direction"); Philip Zimmerly, Comment, The Answer is Blowing in Procedure: States Turn to Medical Criteria and Inactive Dockets to Better Facilitate Asbestos Litigation, *59 Ala. L. Rev. 771 (2008)* (providing overview of state medical criteria laws and concluding that the laws help the truly sick access courts).

n16. Act of May 26, 2004, H.B. No. 292, 2004 Ohio Laws 3970 (codified as amended at *Ohio Rev. Code Ann.§§2307.91-.96* (West Supp. 2008)). See generally Kurtis A. Tunnell, Anne Marie Sferra Vorys & Miranda C. Motter, Commentary, New Ohio Asbestos Reform Law Protects Victims and State Economy, Andrews Asbestos Litig. Rep., Aug. 26, 2004, at 10 (discussing the details of Ohio's asbestos reform legislation). The Ohio law was upheld by the Ohio Supreme Court in Ackison v. Anchor Packing Co., 2008-*Ohio-5243, 897 N.E.2d 1118, P1* (finding asbestos medical criteria law did not violate prohibition against retroactive laws in the Ohio Constitution).

n17. Act of May 19, 2005, 79th Leg., R.S., ch. 97, 2005 Tex. Gen. Laws 171 (codified as amended at *Tex. Civ. Prac. & Rem. Code Ann. §§90.001-.012* (Vernon Supp. 2008)). See generally John G. George, Comment, Sandbagging Closed Texas Courtrooms With Senate Bill 15: The Texas Legislature's Attempt to Control Frivolous Silicosis Claims Without Restricting The Constitutional Rights of Silicosis Sufferers, *37 St. Mary's L.J. 849 (2006)* (providing background on Texas silica medical criteria law and predicting that the law would be declared constitutional); James S. Lloyd, Comment, Administering a Cure-All or Selling Snake Oil? Implementing an Inactive Docket for Asbestos Litigation in Texas, *43 Hous. L. Rev. 159 (2006)* (describing the Texas medical criteria law and suggesting it passes constitutional muster).

n18. Asbestos and Silica Compensation Fairness Act, ch. 274, 2005 Fla. Laws 2563 (codified as amended at *Fla. Stat. §§774.201-.209* (2008)).

n19. Silica and Asbestos Claims Act, ch. 196, 2006 Kan. Sess. Laws 1411 (codified as amended at *Kan. Stat. Ann.§§60-4901* to 60-4911 (Supp. 2007)).

28 Rev. Litig. 501, *

n20. Asbestos and Silica Claims Procedure Act of 2006, No. 303, 2006 S.C. Acts 2376 (codified as amended at *S.C. Code Ann.§§44-135-30* to 44-135-110 (Supp. 2007)).

n21. Act of Apr. 30, 2007, No. 9, 2007 Ga. Laws 4 (codified as amended at *Ga. Code Ann.§§51-14-1* to 51-14-13 (Supp. 2007)).

n22. State asbestos medical criteria laws find support in model legislation developed by the American Legislative Exchange Council and a February 2003 American Bar Association resolution calling for the enactment of federal legislation to require claimants to demonstrate impairment before proceeding with an asbestos claim. See Asbestos Litigation Crisis: Hearings Before the S. Comm. on the Judiciary, 108th Cong. 61-87 (2003) (statement of Dennis W. Archer, President-Elect, Am. Bar Ass'n), available at http://www.gpo.gov/congress/senate/pdf/108hrg/89326.pdf (presenting the views of the ABA regarding asbestos litigation); Comm'n on Asbestos Litig., Am. Bar Ass'n, Report to the House of Delegates 1 (2003), http://www.abanet.org/leadership/full_report.pdf (recommending "Standard for Non-Malignant Asbestos-Related Disease Claims").

n23. Matthew Mall, Note, Derailing the Gravy Train: A Three-Pronged Approach to End Fraud in Mass Tort Litigation, *48 Wm. & Mary L. Rev. 2043, 2060 (2007).*

n24. See Susan Warren, Swamped Courts Practice Plaintiff Triage, Wall St. J., Jan. 27, 2003, at B1 (discussing the use of an inactive docket in Baltimore City and noting attempts by courts in Cleveland and New York City to give priority to the sickest asbestos plaintiffs); see also Jeb Barnes, Rethinking the Landscape of Tort Reform: Legislative Inertia and Court-Based Tort Reform in the Case of Asbestos, 28 Just. Sys. J. 157 (2007) (documenting how judges have improved the asbestos litigation environment through "court-based tort reform").

n25. See *In re Report of the Advisory Group, 1993 WL 30497, at 51* (D. Me. Feb. 1, 1993) ("Plaintiffs need not engage in the expense of trial for what are still minimal damages, but are protected in their right to recover if their symptoms later worsen.").

n26. See, e.g., *In re Asbestos Personal Injury & Wrongful Death Asbestos Cases, No. 92344501, 1992 WL 12019620* (Md. Cir. Ct. Dec. 9, 1992) ("So long as a claim remains on the Inactive Docket, it is exempt from requirements for answer or motion by the Defendants and from requirements for discovery by either plaintiffs or defendants.").

n27. See generally John E. Parker, Understanding Asbestos-Related Medical Criteria, Mealey's Litig. Rep.: Asbestos, June 18, 2003, at 45 (explaining the medical criteria used by physicians to evaluate the presence and severity of asbestos disorders).

n28. Cuyahoga County Asbestos Cases, Special Docket No. 73958 (Ohio Ct. Com. Pl. Mar. 22, 2006) (order of the court regarding prioritization of non-malignant cases for trial).

n29. The Minnesota Supreme Court, recognizing the "unique challenges to the judicial system" presented by asbestos litigation, "assigned one judge of the district court to preside over all asbestos related claims brought in the Minnesota state courts" in an order dated December 14, 1987. *In re Minn. Personal Injury Asbestos Cases, 481 N.W.2d 24, 25-26 (Minn. 1992)* (explaining the basis for the court's decision to coordinate Minnesota's asbestos litigation). The Inactive Docket was adopted in 2005 after the trial judge managing the Minnesota litigation found that over 900 personal injury asbestos cases were pending before the court and many of the cases had

been pending for five or more years without any party requesting a trial date. See In re Minn. Personal Injury Asbestos Cases, No. C8-94-2875 (Minn. Dist. Ct. Ramsey County July 5, 2005).

n30. Mark A. Behrens & Manuel Lopez, Unimpaired Asbestos Dockets: They Are Constitutional, *24 Rev. Litig. 253, 264 (2005).*

n31. *Id. at 264 & n.52.*

n32. *Id. at 264.*

n33. Id.

n34. Id.

n35. Id. See generally Mark A. Behrens & Monica G. Parham, Stewardship for the Sick: Preserving Assets for Asbestos Victims Through Inactive Docket Programs, *33 Tex. Tech L. Rev. 1 (2001)* (proposing "a model inactive docket program" permitting "courts to manage the increasing burden of asbestos litigation"); Peter H. Schuck, The Worst Should Go First: Deferral Registries in Asbestos Litigation, *15 Harv. J.L. & Pub. Pol'y 541 (1992)* (recommending that Congress and state legislatures mandate deferral registries).

n36. Stephen J. Carroll et al., Asbestos Litigation, at xx (2005); see also *In re USG Corp., 290 B.R. 223, 226 n.3 (Bankr. D. Del. 2003)* ("The practical benefits of dealing with the sickest claimants ... have led to the adoption of deferred claims registries in many jurisdictions."); Freedman, supra note 1, at 513 ("Perhaps the most dramatic change since the dawn of the new century has been the restriction of the litigation to the functionally impaired.").

n37. Behrens & Lopez, supra note 30, at 264 n.50.

n38. *Burns v. Jaquays Mining Corp., 752 P.2d 28, 30 (Ariz. Ct. App. 1987)* (holding subclinical asbestos-related injury was insufficient to constitute the actual loss or damage required to support a cause of action).

n39. In re Asbestos Litig., No. 87*C-09-24, 1994 WL 721763, at 5* (Del. Super. Ct. New Castle County June 14, 1994) (requiring claimants to establish present physical injury in order to support mental anguish claim based on fear of cancer), rev'd on other grounds sub nom. *Mancari v. A.C. & S., Inc., 670 A.2d 1339, 1995 WL 567022 (Del. 1995)* (unpublished table decision).

n40. *Bernier v. Raymark Indus., Inc., 516 A.2d 534, 542 (Me. 1986)* (explaining that inhalation of asbestos dust does not constitute physical harm giving rise to a claim under state defective products statute).

n41. *Owens-Ill. v. Armstrong, 591 A.2d 544, 560-61 (Md. Ct. Spec. App. 1991)* (finding that workers with pleural plaques or pleural thickening without health significance did not have legally compensable claims), aff'd in part, rev'd in part on other grounds, *604 A.2d 47 (Md. 1992).*

n42. *Simmons v. Pacor, Inc., 674 A.2d 232, 237 (Pa. 1996)* (concluding that asymptomatic pleural thickening does not give rise to cause of action).

n43. *In re Haw. Fed. Asbestos Cases, 734 F. Supp. 1563, 1567 (D. Haw. 1990)* (finding no cause of action for claimants without functional impairment).

28 Rev. Litig. 501, *

n44. *In re Mass. Asbestos Cases, 639 F. Supp. 1, 3 (D. Mass. 1985)* (""The first appearance of symptoms attributable to [asbestos] constitutes the injury."" (quoting *Payton v. Abbott Labs, 551 F. Supp. 245, 246 (D. Mass. 1982)*) (second alteration in original)).

n45. *Bernier, 516 A.2d at 542.* See generally Victor E. Schwartz, Mark A. Behrens & Phil Goldberg, Defining the Edge of Tort Law in Asbestos Bankruptcies: Addressing Claims Filed by the Non-Sick, J. Bankr. L. & Prac., 2005 No. 1, at 61 (concluding that an asbestos claimant should have to demonstrate physical injury).

n46. Victor E. Schwartz & Rochelle M. Tedesco, The Law of Unintended Consequences in Asbestos Litigation: How Efforts to Streamline the Litigation Have Fueled More Claims, *71 Miss. L.J. 531, 536-38 (2001); see* also Victor E. Schwartz & Leah Lorber, A Letter to the Nation's Trial Judges: How the Focus on Efficiency Is Hurting You and Innocent Victims in Asbestos Liability Cases, *24 Am. J. Trial Advoc. 247, 249 (2000)* (arguing that the emphasis on efficiency has invited an increase in litigation).

n47. Francis E. McGovern, The Defensive Use of Federal Class Actions in Mass Torts, *39 Ariz. L. Rev. 595, 606 (1997); see* also Richard O. Faulk, Dispelling the Myths of Asbestos Litigation: Solutions for Common Law Courts, *44 S. Tex. L. Rev. 945, 954 (2003)* ("When plaintiffs learn that a particular forum will coerce settlement procedurally irrespective of the merits of their claims, one doubts whether that forum will remain unclogged for long."); Freedman, supra note 1, at 517-18 ("Unfortunately, the highway has ultimately led to the bankruptcy courts, that is, the filing of bankruptcy petitions by otherwise solvent companies."); Keith N. Hylton, Asbestos and Mass Torts With Fraudulent Victims, *37 Sw. U. L. Rev. 575, 586 (2008)* ("Aggregate litigation introduces some socially undesirable incentives. The most obvious is the incentive to include fraudulent claims."); James Stengel, The Asbestos End-Game, *62 N.Y.U. Ann. Surv. Am. L. 223, 232 (2006)* ("However well-intentioned, these experiments [with aggregation] failed, not only as mechanisms to clear dockets and to adjudicate the claims then pending, but also by facilitating the increasing rate of claim filings... .").

n48. E.g., Alexander v. AC & S, Inc., 2005-*CA-01031-SCT, 947 So. 2d 891 (Miss. 2007); Albert v. Allied* Glove Corp., 2005-*CA-01022-SCT, 944 So. 2d 1 (Miss. 2006); Amchem Prods., Inc. v. Rogers, 2003-IA-00237-SCT, 912 So. 2d 853 (Miss. 2005); Ill. Cent. R.R. v. Gregory, 2003-IA-01795-SCT, 912 So. 2d 829 (Miss. 2005); 3M Co. v. Johnson, 2002-CA-01651-SCT, 895 So. 2d 151 (Miss. 2005); Harold's Auto Parts, Inc. v. Mangialardi, 2004-IA-01308-SCT, 889 So. 2d 493 (Miss. 2004); see* also Mark A. Behrens & Cary Silverman, Now Open for Business: The Transformation of Mississippi's Legal Climate, *24 Miss. C. L. Rev. 393, 403-06 (2005)* (examining Mississippi's past reputation for a biased legal climate and how the various branches of government are working to improve the legal environment); David Maron & Walker W. Jones, Taming an Elephant: A Closer Look at Mass Tort Screening and the Impact of Mississippi Tort Reforms, *26 Miss. C. L. Rev. 253, 278-80 (2007)* (discussing the impact of recent Mississippi court cases and how judicial and legislative reforms are working to promote integrity and fairness in Mississippi civil litigation).

n49. Ohio R. Civ. P. 42(A)(2) ("In tort actions involving an asbestos claim, ... for purposes of trial, the court may consolidate pending actions only with the consent of all parties. Absent the consent of all parties, the court may consolidate, for purposes of trial, only those pending actions relating to the same exposed person and members of the exposed person's household.").

n50. Prohibition on "Bundling" Cases, Administrative Order No. 2006-6 (Mich. Aug. 9, 2006), available at http://courts.michigan.gov/SUPREMECOURT/Resources/Administrativ e/2003-47-080906.pdf; see also Matthew L. Cooper, Note, Too Far or Not Far Enough? Michigan Supreme Court Administrative Order 2006-6 and its Impact on Asbestos Litigation in Michigan, *85 U. Det. Mercy L. Rev. 407 (2008)* (discussing Michigan Supreme Court's Administrative Order and supporting adoption of inactive asbestos docket); Editorial, Unbundling Asbestos, Wall St. J., Aug. 21, 2006, at A10 (supporting the Michigan Supreme Court's administrative ban on "bundling").

28 Rev. Litig. 501, *

n51. In re Asbestos Litig., No. 77C-ASB-2 (Del. Super. Ct. New Castle County Dec. 21, 2007) (Standing Order No. 1).

n52. San Francisco Trial Judge Vacates His Own Consolidation Order, HarrisMartin's COLUMNS - Asbestos, May 2008, at 13, 13; see also James C. Parker & Edward R. Hugo, Fairness Over Efficiency: Why We Overturned San Francisco's Sua Sponte Asbestos Consolidation Program, HarrisMartin's COLUMNS - Asbestos, July 2008, at 4, 4 (explaining why the San Francisco Superior court overturned its consolidation program).

n53. Act of Apr. 30, 2007, No. 9, sec. 1, § 51-14-11, 2007 Ga. Laws 4, 5-6 (codified as amended at *Ga. Code Ann. § 51-14-11* (Supp. 2007)) ("A trial court may consolidate for trial any number and type of asbestos claims or silica claims with the consent of all the parties. In the absence of such consent, the trial court may consolidate for trial only asbestos claims or silica claims relating to the same exposed person and members of his or her household."); Silica and Asbestos Claims Act, ch. 196, § 2(j), 2006 Kan. Sess. Laws 1411, 1420 (codified as amended at *Kan. Stat. Ann. § 60-4902(j)* (Supp. 2007)) ("A court may consolidate for trial any number and type of silica or asbestos claims with the consent of all the parties. In the absence of such consent, the court may consolidate for trial only claims relating to the exposed person and members of such person's past or present household."); Act of May 11, 2005, 79th Leg., R.S., ch. 97, § 2, sec. 90.009, 2005 Tex. Gen. Laws 169, 177 (codified as amended at *Tex. Civ. Prac. & Rem. Code Ann. § 90.009* (Vernon Supp. 2008)) ("Unless all parties agree otherwise, claims relating to more than one exposed person may not be joined for a single trial.").

n54. Patrick M. Hanlon & Anne Smetak, Asbestos Changes, *62 N.Y.U. Ann. Surv. Am. L. 525, 574 (2007).*

n55. See *In re Hopeman Bros., Inc., 569 S.E.2d 409, 409 (Va. 2002)* (rejecting mandamus petition arising from consolidation of 1,300 asbestos claims against twenty-five defendants, even though the trial court found that "consolidation of all of the cases would adversely affect the rights of the parties to a fair trial").

n56. See *State ex rel. Mobil Corp. v. Gaughan, 565 S.E.2d 419, 428-29 (W. Va. 2002)* (Maynard, J., concurring) (approving mass consolidation involving more than 8,000 plaintiffs suing more than 250 defendants).

n57. See Victor E. Schwartz, Mark A. Behrens & Rochelle M. Tedesco, Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) and Case Management Plans that Defer Claims Filed by the Non-Sick, *31 Pepp. L. Rev. 271, 284 (2004)* ("As it turns out, bending procedural rules to put pressure on defendants to settle brings no lasting efficiency gains.").

n58. *Id. at 284-85;* see also Helen E. Freedman, Product Liability Issues in Mass Torts - View from the Bench, *15 Touro L. Rev. 685, 688 (1999)* (judge overseeing New York City asbestos litigation stating that "increased efficiency may encourage additional filings and provide an overly hospitable environment for weak cases").

n59. *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d 563 (S.D. Tex. 2005).* The federal court silica litigation began in September of 2003 when the federal Judicial Panel on Multidistrict Litigation centralized for pretrial purposes a large number of silicosis claims that primarily originated in Mississippi state court and were removed to federal court. *In re Silica Prods. Liab. Litig., 280 F. Supp. 2d 1381, 1382 (J.P.M.L. 2003).* The Panel assigned the cases to the Southern District of Texas before Judge Jack, "an experienced transferee judge for multidistrict litigation" and "a seasoned jurist." *Id. at 1383.* Cumulatively, over 10,000 individual plaintiffs' cases were transferred to *Judge Jack. In re Silica Prods. Liab. Litig., 398 F. Supp. 2d at 573.*

n60. See infra notes 104-12 and accompanying text (discussing the refusal of several asbestos settlement trusts to accept medical reports prepared by suspect doctors and screening companies identified in Judge Jack's opinion; an Ohio court's dismissal of all cases supported solely by suspect doctors; and an agreement reached between one doctor and the Texas Medical Board that he will never again practice medicine in Texas); discus-

28 Rev. Litig. 501, *

sion infra Part II.B. (discussing the resulting reduction in the number of filings by unimpaired claimants); discussion infra Part II.C. (discussing the resulting change in the mix of diseases being alleged and the shift to mesothelioma claims as the primary focus of litigation around the country).

n61. John P. Hooper et al., Undamaged: Federal Court Establishes Criteria for Mass Tort Screenings, Mass Torts Litig. (Am. Bar Ass'n Section of Litig., Chi., Ill.), Summer 2007, at 12, 12.

n62. Id.

n63. Id. at 12-13.

n64. Id. at 13.

n65. *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d 563, 580 (S.D. Tex. 2005).*

n66. *Id. at 581.*

n67. See David M. Setter & Andrew W. Kalish, Recent Screening Developments: The MDL Silica 1553 Daubert Hearing, Mealey's Litig. Rep.: Silica, May 2005, at 11 (arguing one of the problems in the screening process is "for-profit screening companies" like N&M); see also *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d at 582* ("These 3,617 diagnoses were issued on only 48 days, at an average rate of 75 diagnoses per day.").

n68. *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d at 581;* Setter & Kalish, supra note 67, at 39.

n69. *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d at 587.*

n70. Setter & Kalish, supra note 67, at 39.

n71. Id.

n72. See *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d at 588* ("Both doctors emphasized that they did not diagnose any of the Plaintiffs with silicosis. Indeed, both doctors testified that they had never diagnosed anyone with silicosis." (citations omitted)).

n73. Setter & Kalish, supra note 67, at 40.

n74. *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d at 585.*

n75. *Id. at 596.*

n76. Setter & Kalish, supra note 67, at 40.

n77. *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d at 603.*

n78. Id.

28 Rev. Litig. 501, *

n79. *Id. at 606.*

n80. *Id. at 608.*

n81. Id.

n82. *Id. at 609.*

n83. Id.

n84. Id.

n85. *Id. at 611.*

n86. *Id. at 616.*

n87. *Id. at 615.*

n88. Setter & Kalish, supra note 67, at 42.

n89. *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d at 616.*

n90. *Id. at 618.*

n91. Id.

n92. *Id. at 632.*

n93. *Id. at 635.*

n94. *Id. at 572;* see also Roger Parloff, Diagnosing for Dollars, Fortune, June 13, 2005, at 96 (noting that the federal court silica litigation raised "great red flags of fraud"); Editorial, Screening for Corruption, Wall St. J., Dec. 2, 2005, at A10 (arguing that Judge Jack's opinion has resulted in a heightened awareness in the legal community aimed at exposing the corruption that underpinned the silicosis litigation); Editorial, The Silicosis Sheriff, Wall St. J., July 14, 2005, at A10 (praising Judge Jack's opinion which dismissed "manufactured" silicosis claims); Mike Tolson, Attorneys Behind Silicosis Suits Draw U.S. Judge's Wrath, Hous. Chron., July 2, 2005, at A1 (discussing Judge Jack's opinion, which stated that the plaintiffs' diagnoses were "manufactured for money"); Mike Tolson, A Dozen Doctors, 20,000 Silicosis Cases, Hous. Chron., May 8, 2006, at A1 (reporting that plaintiffs' attorneys paid a dozen doctors who were paid to sign forms confirming a diagnosis of silicosis despite not having the requisite expertise); Mike Tolson, Exposing the Truth Behind Silicosis, Hous. Chron., May 7, 2006, at A1 (revealing that the massive silicosis litigation was the result of lawyers working with doctors and screening companies to manufacture diagnoses); Editorial, Trial Bar Cleanup, Wall St. J., Feb. 11, 2006, at A8 (applauding judges who exposed sham silicosis cases). See generally Lester Brickman, Disparities Between Asbestosis and Silicosis Claims Generated by Litigation Screening Companies and Clinical Studies, *29 Cardozo L. Rev. 513 (2007)* [hereinafter Brickman, Disparities] (noting that clinical studies support Judge Jack's conclusions); Lester Brickman, On the Applicability of the Silica MDL Proceeding to Asbestos Litigation, *12 Conn. Ins. L.J. 289* (2005-2006) [hereinafter Brickman, Silica MDL Proceeding] (describing Judge Jack's findings);

28 Rev. Litig. 501, *

Lester Brickman, The Use of Litigation Screening in Mass Torts: A Formula for Fraud?, *61 SMU L. Rev. 1221 (2008)* (describing problems with litigation screenings).

n95. *In re Silica Prods. Liab. Litig., 398 F. Supp. 2d at 634.*

n96. Grand juries in New York and Texas were convened to consider criminal charges arising out of the federal court silica litigation. See Peter Geier, Silica Cases Drawing Resistance; Fallout from Key Texas Case Continues with Grand Jury, Legislation, Nat'l L.J., Dec. 19, 2005, at 7; Jonathan D. Glater, Civil Suits over Silica in Texas Become a Criminal Matter in New York, N.Y. Times, May 18, 2005, at C5; Jonathan D. Glater, Lawyers Challenged on Asbestos, N.Y. Times, July 20, 2005, at C1. The United States House of Representatives Energy & Commerce Subcommittee on Oversight & Investigations also held hearings on the subject in 2006. See Julie Creswell, Testing for Silicosis Comes Under Scrutiny in Congress, N.Y. Times, Mar. 8, 2006, at C3. Several doctors and the owners of two screening companies refused to answer Congressional questions, invoking their Fifth Amendment rights. Editorial, Silicosis Clam-Up, Wall St. J., Mar. 13, 2006, at A18; Press Release, Joe Barton, Chairman, House Comm. on Energy & Commerce, Doctors Refuse to Testify at Silicosis Hearing; Others Recount Diagnoses "Manufactured for Money" (Mar. 9, 2006), available at 2006 WLNR 4049125; Press Release, Ed Whitfield, Chairman, Subcomm. on Oversight & Investigations, House Comm. on Energy & Commerce, Lawyers Questioned over Faulty Silicosis Claims (July 26, 2006), available at 2006 WLNR 13106184. More recently, Dr. Ray Harron invoked his Fifth Amendment privilege when deposed in an asbestos case previously pending in the United States District Court for the Northern District of West Virginia. See Ayers v. Cont'l Cas. Co., No. 5:05-*CV-95, 2007 WL 1960613, at 1* (N.D.W. Va. July 2, 2007) ("Defendant took the deposition of Dr. Harron. However, Dr. Harron refused to answer questions about his interpretations of x-rays, instead pleading his Fifth Amendment right against self-incrimination.").

n97. See Editorial, The Asbestos Waterloo, Wall St. J., June 10, 2006, at A12 ("According to the Manville Trust, perhaps the most complete database of asbestos claims, the six combined [screening doctors referenced in Judge Jack's opinion] have authored an astonishing 140,911 asbestos "diagnoses' - and the number is probably much higher.").

n98. Editorial, Trial Bar Cleanup, Wall St. J., Feb. 11, 2006, at A8; see also Asbestos: Mixed Dust and FELA Issues: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 11 (2005) (statement of Lester Brickman, Professor of Law, Benjamin N. Cardozo Law School of Yeshiva University), available at http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=109_senate_hearings&doc id=f:26796.pdf (stating that sixty percent of silica MDL claimants had filed asbestos claims with the Manville Trust).

n99. Carlyn Kolker, Spreading the Blame: The So-Called Phantom Epidemic of Silicosis Has Become a Hot Potato for the Plaintiffs Bar, Am. Law., Oct. 2005, at 24, 24.

n100. Editorial, supra note 96, at A18.

n101. Id.

n102. Id.

n103. Adam Liptak, Defendants See a Case of Diagnosing for Dollars, N.Y. Times, Oct. 1, 2007, at A14.

n104. See Barbara Rothstein, Perspectives on Asbestos Litigation: Keynote Address, *37 Sw. U. L. Rev. 733, 739 (2008)* ("One of the most important things is I think judges are now alert for is fraud, particularly since the silicosis case ... and the backward look we now have at the radiology in the asbestos case."); see also Brickman, Disparities, supra note 94, at 594 ("The evidence reviewed in this Article indicates that Judge Jack's findings

28 Rev. Litig. 501, *

with respect to silica litigation[,] apply with at least equal force to nonmalignant asbestos litigation: the diagnoses are mostly manufactured for money."); Brickman, Silica MDL Proceeding, supra note 94 (evaluating the practical implications of Judge Jack's opinion on the "entrepreneurial model" of asbestos litigation).

n105. William P. Shelley, Jacob C. Cohn & Joseph A. Arnold, The Need for Transparency Between the Tort System and Section 524(g) Asbestos Trusts, 17 Norton J. Bankr. L. & Prac. 257, 281 (2008).

n106. Id.

n107. Id. These trusts have banned medical reports by Drs. James Ballard, Kevin Cooper, Harold Todd Coulter, Andrew Harron, Ray Harron, Glynn Hilbun, Barry Levy, George Martindale, and W. Allen Oaks, as well as Netherland & Mason, Inc. (N & M) and Respiratory Testing Services (RTS) as testing facilities. See Memorandum from David Austern, President, Claims Resolution Mgmt. Corp., Suspension of Acceptance of Med. Reports (Sept. 12, 2005), http://www.claimsres.com/documents/9%2005%20Suspension%20Memo.p df (Manville trust) [hereinafter Manville memo]; Memorandum from William B. Nurre, Executive Director, Eagle-Picher Pers. Injury Settlement Trust to Claimants' Counsel (Oct. 19, 2005), http://www.cpf-inc.com/includes/content/PhysicianNotice.pdf (Eagle-Picher trust); Memorandum from John L. Mekus, Executive Director, Celotex Asbestos Settlement Trust on Notice of Trust Policy Regarding Acceptance of Med. Reports (Oct. 20, 2005), http://www.celotextrust.com/news_details.asp?nid=22 (Celotex trust) [hereinafter Celotex memo]. The Occupational Diagnostics testing facility has also been banned. Manville memo, supra; Celotex memo, supra. Additionally, Dr. Gregory Nayden, as well as the American Medical Testing and Healthscreen, Inc. testing facilities, have been banned. See Manville memo, supra (banning Healthscreen, Inc.); Memorandum from David Austern, President, Claims Resolution Mgmt. Corp. (Sept. 24, 2002), http://www.claimsres.com/documents/MEM-AMT.pdf (banning Dr. Nayden and the American Medical Testing facility).

n108. Peter Geier, Thousands of Asbestos Cases Dismissed; Ohio Court Tosses Cases that Rely on Questionable X-Ray Diagnoses, Nat'l L.J., Apr. 10, 2006, at 13 (quoting Cuyahoga County Asbestos Cases, Special Docket No. 73958 (Ohio Ct. Com. Pl. Mar. 22, 2006) (order of court regarding defense motions for evidentiary hearings)).

n109. Raymond A. Harron, M.D., File No. 16-2007-183197 (Cal. Med. Bd. June 18, 2008), http://publicdocs.medbd.ca.gov/pdl/mbc.aspx (search for license number "8415"); Ray A. Harron, M.D., No. 2007-36780 (Fla. Bd. of Med. June 23, 2008), http://ww2.doh.state.fl.us/FinalOrderNet/folistbrowse.aspx?LicI d=6879&ProCde=1501.

n110. Ray A. Harron, M.D. (Miss. State Bd. of Med. Licensure Nov. 8, 2007), http://www.msbml.state.ms.us/boardactionreportnarr2007.htm (table decision); Ray A. Harron, M.D., No. 2008-016 (N.M. Med. Bd. June 20, 2008), http://www.docboard.org/nm_orders/Harron,%20Ray.pdf; License of Raymond Anthony Harron, M.D., License No. C-9439 (Tex. Med. Bd. Apr. 13, 2007), http://marcus.tmb.state.tx.us/hostconnect/bcs_tiff_ view.asp?docid=004122367; see also Press Release, Tex. Med. Bd. (Apr. 18, 2007), http://www.tmb.state.tx.us/news/press/2007/041807a.php (noting execution of agreed order).

n111. Ray A. Harron, M.D., License No. 17826 (N.C. Med. Bd. Dec. 14, 2007), http://www.ncmedboard.org/ (follow "Look up a Licensee"; search for last name "Harron" and first name "Ray"); Ray A. Harron, M.D., BPMC #09-02 (N.Y. Dep't of Health Dec. 30, 2008), http://w3.health.state.ny.us/opmc/factions.nsf/physiciansearch? openform (search for last name "Harron" and first name "Ray").

28 Rev. Litig. 501, *

n112. Harold Todd Coulter, M.D. (Miss. State Bd. of Med. Licensure Nov. 8, 2007), http://www.msbml.state.ms.us/boardactionreportnarr2007.htm (table decision) (Consent Order by Dr. Coulter to have his license suspended for one year with the suspension stayed 90 days beginning January 1, 2008); Andrew W. Harron, D.O. (Miss. State Bd. of Med. Licensure Nov. 8, 2007), http://www.msbml.state.ms.us/boardactionreportnarr2007.htm (table decision) (Agreed Order by Dr. Andrew Harron not to renew or seek reinstatement of his license in Mississippi).

n113. In re Asbestos Prods. Liab. Litig. (No. VI), No. MDL 875 (E.D. Pa. Feb. 2, 2009) (order).

n114. Id. at 1 n.2.

n115. See Megha Satyanarayana, Asbestos Diagnoses Defended: Lansing Doctor's Credentials Questioned in Wayne Co. Cases, Det. Free Press, Nov. 18, 2008, at 12, available at 2008 WLNR 22005011.

n116. Id.; see Editorial, Michigan Malpractice, Wall St. J., Nov. 10, 2008, at A18 ("The medical records also showed that the vast majority of the lung-function tests Dr. Kelly performed failed to meet accepted standards."); Editorial, A Strange Find Up in Michigan: The Evidence for Asbestos Claims Needs to Be Examined Very Carefully, Charleston Gazette & Daily Mail (W. Va.), Nov. 14, 2008, at 4A, available at 2008 WLNR 21798130 ("Defendants also found from medical records that most of the lung-function tests Kelly performed didn't meet standards.").

n117. Tresa Baldas, Ruling Puts Mich. Asbestos Cases in Limbo, Legal Intelligencer (Phila.), Nov. 26, 2008, at 4 (quoting Judge Columbo's order); see also Editorial, Columbo the Asbestos Sleuth, Wall St. J., Dec. 23, 2008, at A12 ("In his ruling, Judge Colombo laid out the facts and found that "the only conclusion in the face of such overwhelming medical evidence is that the opinions of Dr. Kelly are not reliable.' He then disqualified him from the case.").

n118. See id.

n119. See Patti Waldmeir, Asbestos Litigation Declines in Face of US Legal Reforms, Fin. Times (London), July 24, 2006, at 2 ("Figures for 2005 show a decline of more than 75 per cent against some defendants. The primary fall has come in claims filed by plaintiffs who have been exposed to asbestos but are not ill ... .").

n120. Peter Geier, States Taking Up Medical Criteria: Move Is to Control Asbestos Caseload, Nat'l L.J., May 22, 2006, at 1.

n121. Id.; see also Joseph Nixon, Editorial, Why Doctors Are Heading to Texas, Wall St. J., May 17, 2008, at A9 ("The 2005 reform created minimum medical standards to prove an injury in asbestos and silica cases. Now plaintiffs must show diminished lung capacity in addition to an X-ray indicating disease... . There are about 85,000 asbestos plaintiffs in Texas. Under the old system, each would be advancing in the courts. But in the four years since the creation of MDLs, only 300 plaintiffs' cases have been certified ready for trial. And in each case the plaintiff is almost certainly sick with mesothelioma or cancer. No one else claiming "asbestosis' has yet filed a pulmonology report showing diminished lung capacity. This means that only one-third of 1% of all those people who have filed suit claiming they were sick with asbestosis have actually had a qualified and impartial doctor agree that they have an asbestos-caused illness.").

n122. Waldmeir, supra note 119, at 2.

n123. Freedman, supra note 1, at 514.

28 Rev. Litig. 501, *

n124. Alison Frankel, Asbestos Removal, Am. Law., July 2006, at 15, 16.

n125. Id.; Mark A. Behrens & Frank Cruz-Alvarez, State-Based Reforms: Making a Difference in Asbestos and Silica Cases 1-2 (Wash. Legal Found., Legal Opinion Letter Vol. 16 No. 21, 2006), http://www.wlf.org/upload/080406behrenslol.pdf.

n126. S. 3274: The Fairness in Asbestos Injury Resolution Act of 2006: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 93 (2006) (statement of Edmund F. Kelly, Chairman, Liberty Mutual Insurance Co.), available at http://bulk.resource.org/gpo.gov/hearings/109s/30086.pdf.

n127. Hanlon & Smetak, supra note 54.

n128. Id. at 594 (data compiled from The Dow Chem. Co., Annual Report (Form 10-K), at 14 (Feb. 17, 2006); Ga.-Pac. Corp., Annual Report (Form 10-K), at 99 (Feb. 28, 2005); Honeywell Int'l, Inc., Annual Report (Form 10-K), at 75 (Feb. 25, 2005); Owens-Ill. Group, Inc., Annual Report (Form 10-K), at 84 (Mar. 16, 2006); Saint-Gobain, Annual Report 2004, at 176 (2005), http://www.investis.com/reports/stgobain_ar_2004 _en/report.php?type=1&zoom=1&).

n129. Charles E. Bates & Charles H. Mullin, State of the Asbestos Litigation Environment - October 2008, Mealey's Litig. Rep.: Asbestos, Nov. 3, 2008, at 29.

n130. Id.

n131. Hanlon & Smetak, supra note 54, at 594 (filings data current as of December 31, 2005, provided to Hanlon & Smetek by the Manville Personal Injury Settlement Trust and on file with the New York University Annual Survey of American Law); see also Bates & Mullin, supra note 129, at 33.

n132. Bates & Mullin, supra note 129, at 33.

n133. See 3 Lawrence G. Cetrulo, Toxic Torts Litigation Guide § 33:3 (2008), available at TOXICTORTS s 33:3 (Westlaw) ("Asbestos exposure is the dominant cause of mesothelioma, and accounts for 70 to 80 percent of all mesothelioma cases."); Lester Brickman, On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality, *31 Pepp. L. Rev. 33, 44 n.19 (2003)* (stating that approximately twenty percent of malignant mesotheliomas have been attributed to causes other than exposure to asbestos).

n134. See generally Victor E. Schwartz, Paul W. Kalish & Phil Goldberg, A Letter to the Nation's Trial Judges: Serious Asbestos Cases - How to Protect Cancer Claimants and Wisely Manage Assets, *30 Am. J. Trial Advoc. 295 (2006)* (providing recommendations as to how courts should handle mesothelioma claims).

n135. See Sheila Jasanoff & Dogan Perese, Welfare State or Welfare Court: Asbestos Litigation in Comparative Perspective, *12 J.L. & Pol'y 619, 628 (2004)* ("Defendants' bankruptcies ... have not dissuaded further asbestos mass tort claims as might have been expected. Instead, plaintiffs' lawyers are filing even more claims ... against defendants whose involvement with asbestos production is increasingly tangential.").

n136. E.g., *Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1081 (5th Cir. 1973)* (noting that plaintiff was "an industrial insulation worker" suing "manufacturers of insulation materials containing asbestos"); *Nicolet, Inc. v. Nutt, 525 A.2d 146, 147 (Del. 1987)* (manufacturer's appeal arising from suit brought by asbestos

workers against various asbestos manufacturers for injuries caused by exposure to asbestos at plants); *Rosenthal v. Unarco Indus., Inc., 297 S.E.2d 638, 640 (S.C. 1982)* (stating that this case was one of many pending South Carolina asbestos cases involving plaintiffs who were "industrial insulators, shipyard workers, or factory workers").

n137. E.g., *In re Grossman's, Inc. 389 B.R. 384, 387 (Bankr. D. Del. 2008)* (plaintiff alleged that exposure to asbestos-containing products during 1977 remodeling projects of her home caused her injuries); *Chavers v. Gen. Motors Corp., 79 S.W.3d 361, 364 (Ark. 2002)* (involving the estate of a self-described "shade tree mechanic" who alleged that exposure to manufacturers' asbestos-containing products while working on his and relatives' vehicles caused his mesothelioma).

n138. Mark A. Behrens & William L. Anderson, The "Any Exposure" Theory: An Unsound Basis for Asbestos Causation and Expert Testimony, *37 Sw. U. L. Rev. 479, 480 (2008).*

n139. See *Lindstrom v. A-C Prod. Liab. Trust, 424 F.3d 488, 498 (6th Cir. 2005)* ("Plaintiffs-appellants fail to articulate a standard that they claim is more appropriate, saying only that "once the mesothelioma is diagnosed, it is impossible to rule out any of Mr. Lindstrom's exposures as being substantially contributory.'"); *Gregg v. V-J Auto Parts, Inc., 943 A.2d 216, 226 (Pa. 2007)* ("We recognize that it is common for plaintiffs to submit expert affidavits attesting that any exposure to asbestos, no matter how minimal, is a substantial contributing factor in asbestos disease."); *Ga.-Pac. Corp. v. Stephens, 239 S.W.3d 304, 308* (Tex. App. - Houston [1st Dist.] 2007, pet. denied) ("[Plaintiffs] relied on expert testimony that any exposure to asbestos contributes to cause mesothelioma").

n140. See *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993)* ("The trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

n141. See *Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923)* (to be admissible, scientific evidence must "have gained general acceptance in the particular field in which it belongs").

n142. *232 S.W.3d 765, 773-74 (Tex. 2007)* ("The court of appeals erred in holding that "in the context of asbestos-related claims, if there is sufficient evidence that the defendant supplied any of the asbestos to which the plaintiff was exposed, then the plaintiff has met the burden of proof.'").

n143. *Id. at 773.*

n144. *943 A.2d at 229* (noting that the expert affidavits of Drs. James Girard, Arthur Frank, and Richard Lemen "concluded that it is generally accepted that relatively small amounts of asbestos exposure can cause mesothelioma and that regular and frequent exposure need not occur to cause this form of cancer"); *id. at 226* ("We recognize that it is common for plaintiffs to submit expert affidavits attesting that any exposure to asbestos, no matter how minimal, is a substantial contributing factor in asbestos disease. However, we [believe] ... that such generalized opinions do not suffice to create a jury question in a case where exposure to the defendant's product is de minimis, particularly in the absence of evidence excluding other possible sources of exposure (or in the face of evidence of substantial exposure from other sources).").

n145. *Id. at 226-27.*

n146. *Id. at 227.*

28 Rev. Litig. 501, *

n147. *Ga.-Pac. Corp. v. Stephens, 239 S.W.3d 304, 320-21* (Tex. App. - Houston [1st Dist.] 2007, pet. denied).

n148. *In re Asbestos Litig., No. 2004-03964, 2004 WL 5183959* (11th Dist. Ct., Harris County, Tex. Jan. 20, 2004) (letter ruling).

n149. In re Asbestos, No. 2004-3964 (11th Dist. Ct., Harris County, Tex. July 18, 2007) (letter ruling).

n150. *Bartel v. John Crane, Inc., 316 F. Supp. 2d 603, 611 (N.D. Ohio 2004),* aff'd sub nom. *Lindstrom v. A-C Prod. Liab. Trust, 424 F.3d 488 (6th Cir. 2005).*

n151. See *Summers v. Certainteed Corp., 886 A.2d 240, 244 (Pa. Super. Ct. 2005)* (denying plaintiffs' use of Dr. Gelfand's testimony and criticizing Dr. Gelfand's attempt to bolster his report with legal "magic words" when the diagnosis was merely pleural thickening), appeal granted, *897 A.2d 460 (Pa. 2006); In re Asbestos Litig., No. 1986-0001, 2008 WL 4386012* (Pa. Ct. Com. Pl. Phila. County Sept. 24, 2008) (precluding the use of Drs. Mark, Longo, Gelfand, and Frank on defendants' motion for Frye hearing); Basile v. Am. Honda Motor Co., No. 11484 *CD 2005, 2007 WL 712049, at 1* (Pa. Ct. Com. Pl. Ind. County Feb. 22, 2007) (denying plaintiffs' use of Dr. Maddox's testimony on defendant's motion for Frye hearing); *In re Toxic Substance Cases, No. A.D. 03-319, 2006 WL 2404008, at 7-8* (Pa. Ct. Com. Pl. Allegheny County Aug. 17, 2006) (applying Frye standard and denying plaintiffs' use of "any exposure" testimony by Drs. Maddox and Laman).

n152. *In re W.R. Grace & Co., 355 B.R. 462, 474, 478 (Bankr. D. Del. 2006),* appeal denied, sub nom. Zonolite Insulation Property Damage Claimants v. W.R. Grace & Co. (In re W.R. Grace & Co.), Ch. 11 Case No. 01-1139, Adv. No. 07-MC-0005 RLB, 2007 WL 1074094 (D. Del. Mar. 26, 2007).

n153. Brooks v. Stone Architecture, P.A., 2004-*CA-00919-COA, 934 So. 2d 350 (Miss. Ct. App. 2006).*

n154. Free v. Ametek, No. 07-2-04091-9 SEA, 2008 WL 728387, at 4 (Wash. Super. Ct. King County Feb. 28, 2008) (order) (noting that there is no scientifically established safe level of exposure to asbestos, so doctors could not testify that "any exposure at the level of 0.1 fibers/cc yr or less is a substantial contributing factor to the development of mesothelioma"); Transcript at 144-45, Anderson v. Asbestos Corp., No. 05-2-04551-5SEA (Wash. Super. Ct. King County Oct. 31, 2006); see also Seattle Jury Delivers Verdict for Caterpillar, Andrews Asbestos Litig. Rep., Jan. 12, 2007, at 5 (stating that court granted Caterpillar's challenge to certain causation opinion of Dr. Hammar and precluded Dr. Hammar from testifying that every exposure to asbestos-containing products was a substantial contributing factor of plaintiff's mesothelioma).

n155. See David E. Bernstein, Getting to Causation in Toxic Tort Cases, *74 Brook. L. Rev. 51, 59 (2008)* ("The recent, increasingly strict exposure cases ... reflect a welcome realization by state courts that holding defendants liable for causing asbestos-related disease when their products were responsible for only de minimis exposure to asbestos, and other parties were responsible for far greater exposure, is not just, equitable, or consistent with the substantial factor requirements of the Restatement (*Second) and Lohrmann [v. Pittsburgh Corning Corp., 782 F.2d 1156 (4th Cir. 1986)].*").

n156. *857 N.E.2d 1114, 1116 (N.Y. 2006).*

n157. *Id. at 1117.*

n158. *Id. at 1118.*

28 Rev. Litig. 501, *

n159. Id.

n160. Id.

n161. *Id. at 1118-19.*

n162. *Id. at 1121-22.*

n163. Id.

n164. *522 U.S. 136, 144-47 (1997)* ("Because it was within the District Court's discretion to conclude that the studies upon which the experts relied were not sufficient ... to support their conclusions that Joiner's exposure to [PCBs] contributed to his cancer, the District Court did not abuse its discretion in excluding their testimony.").

n165. *243 F.3d 244, 252-54 (6th Cir. 2001)* ("With respect to the question of dose, plaintiffs cannot dispute that [their expert] made no attempt to determine what amount of PCB exposure the ... subjects had received and simply assumed that it was sufficient to make them ill.").

n166. E.g., Act of Dec. 3, 2002, ch. 4, 2003 Miss. Laws 1289 (codified as amended in scattered sections of Miss. Code Ann. tits. 11 & 85) (tort reform package passed by the Mississippi legislature in late 2002).

n167. See, e.g., Am. Tort Reform Found., Judicial Hellholes 2008-2009, at 3-17 (2008), available at http://www.atra.org/reports/hellholes/report.pdf (identifying jurisdictions perceived by civil defendants as the most unfair forums).

n168. *Borg-Warner Corp. v. Flores, 232 S.W.3d 765 (Tex. 2007).*

n169. See Behrens & Silverman, supra note 48, at 413 ("In late 2002, during a lengthy special session called by Governor Ronnie Musgrove, the Mississippi Legislature passed a civil justice reform package, H.B. 19." (citing Act of Dec. 3, 2002, 2003 Miss. Laws 1289)).

n170. Act of Dec. 3, 2002, § 16, 2003 Miss. Laws at 1298.

n171. Behrens & Silverman, supra note 48, at 413 (citing Act of Dec. 3, 2002,§§1, 3, 4, 6, 10, 2003 Miss. Laws at 1290-92, 1293-96).

n172. See id. at 415 ("In June 2004, the Mississippi legislature, prompted by the efforts of Governor Barbour and Lieutenant Governor Tuck, enacted a comprehensive civil justice reform bill, H.B. 13, in a special session." (citing Act of June 16, 2004, 1st Extraordinary Sess. ch. 1, 2004 Miss. Laws 1387 (codified as amended in scattered sections of Miss. Code Ann. tits. 11, 13, 25, 33, 73, 85))).

n173. See Act of June 16, 2004, § 20, 2004 Miss. Laws at 1400 ("Sections 8 through 15 of this act shall take effect and be in force from and after January 1, 2007; the remainder of this act shall take effect and be in force from and after September 1, 2004, and Sections 1 through 7 of this act shall apply to all causes of action filed on or after September 1, 2004.").

28 Rev. Litig. 501, *

n174. Behrens & Silverman, supra note 48, at 415.

n175. Id. (quoting Act of June 16, 2004, § 1, 2004 Miss. Laws at 1387) (emphasis added).

n176. Id. (citing § 1).

n177. Id. (citing § 1).

n178. Id. (citing § 2, 2004 Miss. Laws at 1388).

n179. Id. at 415. Punitive damages awards cannot exceed $ 20 million for a defendant with a net worth of more than $ 1 billion; $ 15 million for a defendant with a net worth between $ 750 million and $ 1 billion; $ 5 million for a defendant with a net worth of more than $ 500 million but not more than $ 750 million; $ 3.75 million for defendants between $ 100 million and $ 500 million; $ 2.5 million for defendants worth $ 50 million but not more than $ 100 million; or two percent of the defendant's net worth for a defendant with a net worth of $ 50 million or less. Id. at 415-16 (citing § 4, 2004 Miss. Laws at 1391).

n180. Id. at 416 (citing §§3, 6, 2004 Miss. Laws at 1389, 1393).

n181. Id. at 402-12.

n182. See Maron & Jones, supra note 48, at 292 ("[A] plaintiff in a case involving alleged workplace exposure to asbestos or other allegedly harmful products must show exposure to a particular product, with sufficient frequency and regularity, over an extended period of time, in proximity to where the plaintiff actually worked, such that it is probable that the exposure to defendant's products caused the injuries" (footnoted omitted)); id. at 293 ("Mississippi does not recognize a cause of action for medical monitoring either where a plaintiff, without a current physical injury, has merely been exposed to a harmful substance or "based on an increased risk of future disease."" (quoting Paz v. Brush Engineered Materials, Inc., 2006-*FC-00771-SCT, 949 So. 2d 1* (P1) (Miss. 2007))).

n183. See Lynn Lofton, Tort Reform: Insurance Rates Fall, Recruitment Up, Miss. Bus. J., Nov. 6, 2006, at B3 (discussing how tort reform has lowered malpractice insurance premiums); Lex Taylor, Editorial, Mississippi is Seeing the Benefits of Tort Reform, Sun Herald (Biloxi, Miss.), Sept. 29, 2006, at D2 (arguing that Mississippi's tort reform has led to increased business in the state); Press Release, Haley Barbour, Governor of Miss., Mississippi Moving up in Litigation Climate Rankings According to Directorship Magazine (July 10, 2007), available at 2007 WLNR 13089224 (reporting that Mississippi had moved from 49th to 33rd in the magazine's rankings). See generally John W. Christopher, Tort Reform by the Mississippi Supreme Court, 24 Miss. C. L. Rev. 427 (2005) (discussing the effect of rules adopted by the Mississippi Supreme Court).

n184. See Patrice Pujol & Marty Thompson, Texas Legislature Hammers Out Massive Tort Reform Bill, Hous. Law., July/Aug. 2003, at 10, 11 ("After pressure from Governor Rick Perry and lobbyists from the medical community, the 78th Texas Legislature passed a massive tort reform bill ... ." (citing Tex. H.B. 4, 78th Leg., R.S. (2003) (enacted version at ch. 204, 2003 Tex. Gen. Laws 847))).

n185. Id. at 13-14 (provisions include the designation of responsible third parties, including employers and bankrupt entities, and their inclusion on jury verdict forms without the need for joining them in the action; fault-based rules for retailer liability; and the elimination of the "toxic tort exception" to a joint liability reform law that abolished joint liability for defendants found to be fifty percent or less at fault (citing *Tex. Civ. Prac. &*

28 Rev. Litig. 501, *

*Rem. Code Ann.§§33.004*, 33.011, 82.003(a) (Vernon 2005); Tex. H.B. 4,§§4.10(3), 4.10(5), 23.02(c) (enacted version at 2003 Tex. Gen. Laws at 859, 899))).

n186. Id. at 12, 18 (provisions include venue and forum non conveniens reforms to reduce forum shopping, and a requirement that awards for punitive damages must be based on a unanimous verdict (citing *Tex. Civ. Prac. & Rem. Code Ann. §§15.003(a)*, 41.003, 71.051(b) (Vernon 2005); Tex. Prob. Code. Ann. § 5B(b) (Vernon Supp. 2008); Tex. H.B. 4,§§3.09, 23.02(a), 23.03 (enacted version at 2003 Tex. Gen. Laws 855, 898, 899))); see also Walter G. Watkins, Jr., Todd D. Ogden & Laura A. Frase, Key Jurisdictions: Texas, in Asbestos Litigation in the 21st Century (4th Annual Advanced ALI-ABA Course of Study, 2004), available at SK040 ALI-ABA 413, at 417-20 (Westlaw) (discussing Tex. H.B. 4 and its effects).

n187. Brent M. Rosenthal, Misty A. Farris & Carla M. Burke, Toxic Torts and Mass Torts, *57 SMU L. Rev. 1267, 1267 (2004).*

n188. Geier, supra note 120, at 1.

n189. Act of May 11, 2005, 79th Leg., R.S., ch. 97, 2005 Tex. Gen. Laws 169 (codified as amended at *Tex. Civ. Prac. & Rem. Code Ann. §§90.001-*.012 (Vernon Supp. 2008)).

n190. Kevin Risley, S.B. 15: A New Day for Asbestos and Silica Litigation in Texas, *68 Tex. B.J. 696, 696 (2005).*

n191. Geier, supra note 120, at 1.

n192. *Borg-Warner Corp. v. Flores, 232 S.W.3d 765 (Tex. 2007).*

n193. *Ohio Rev. Code Ann.§§2307.91-.96* (West Supp. 2008).

n194. See Kurtis A. Tunnell, Anne Marie Sferra Vorys & Miranda Creviston Motter, Once Again ... Ohio Legislators Approve Comprehensive Tort Reform, Legal Backgrounder (Wash. Legal Found., Wash., D.C.), May 20, 2005, at 1, 1, available at http://wlf.org/upload/052005LBTunnell.pdf ("Senate Bill 80, which was signed by Governor Bob Taft in January, becomes effective on April 7, 2005." (citing Act of Dec. 8, 2004, Amended Substitute S.B. No. 80, 2004 Ohio Laws 7915)). The act applies to causes of action accruing on or after its effective date, with one exception. See Act of Dec. 8, 2004, § 8, 2004 Ohio Laws at 8034 ("Section 2323.44 of the Revised Code, as enacted by this act, shall take effect January 1, 2006.").

n195. Tunnell et al., supra note 194, at 3 (citing Act of Dec. 8, 2004, § 1, secs. 2307.80, 2315.18-.21, 2004 Ohio Laws at 7957-59, 7964-73 (codified as amended at *Ohio Rev. Code Ann.§§2307.80*, 2315.18-.21 (West Supp. 2008))).

n196. Beginning in 2005, South Carolina adopted a civil justice reform law and a law establishing medical criteria requirements for asbestos-related claims. See Asbestos and Silica Claims Procedure Act of 2006, No. 303, 2006 S.C. Acts 2376 (codified as amended at *S.C. Code Ann.§§44-135-30* to 44-135-110 (Supp. 2007)) (asbestos medical criteria legislation); Act of Mar. 17, 2005, No. 27, 2005 S.C. Acts 107 (codified as amended in scattered sections of S.C. Code Ann. tits. 15, 34, 36, 39) (tort reform legislation). Forum shopping, particularly with respect to filings in Hampton County, had been a major focus of the legal reform community in South Carolina. See Steven B. McFarland, A One-Two Punch to Forum Shopping: Recent Judicial and Legislative Amendments to South Carolina's Corporate Venue Jurisprudence, *57 S.C. L. Rev. 465, 465 (2006)* ("Hampton County is notorious throughout South Carolina, and the nation, for its plaintiff-friendly jurors and excessive ver-

28 Rev. Litig. 501, *

dicts... . Consequently, Hampton County epitomizes the significant problems associated with forum shopping under South Carolina's pre-2005 venue jurisprudence."). In 2005, the South Carolina Supreme Court and lawmakers "delivered a one-two punch that effectively eliminates forum shopping within the state." Id. In February 2005, the South Carolina Supreme Court, in Whaley v. CSX Transportation, Inc., overturned several prior cases and held that "owning property and transacting business" within a county is insufficient to establish the residence of a corporate defendant for venue purposes. *609 S.E.2d 286, 295-96 (S.C. 2005).* In March 2005, South Carolina Governor Mark Sanford signed "sweeping tort reform legislation ... that included the first significant changes to the state's general venue statute in over a century." McFarland, supra, at 466 (quoting Daniel B. White, Ronald K. Wray II & John R. Bell, Jr., Where Do We Go from Here? Recent Changes in South Carolina's Venue Laws, S.C. Law., May 2005, at 27, 30). The 2005 tort reform law generally applies to causes of action arising on or after July 1, 2005. See Act of Mar. 17, 2005, § 16, 2005 S.C. Acts at 122-23 (specifying when each section of the Act takes effect). In addition to revising the state's venue statute, the 2005 law also abolished joint liability for any defendant found to be less than fifty percent at fault, § 6, sec. 15-38-15(A)(1), 2005 S.C. Acts at 117-18 (codified as amended at *S.C. Code Ann. § 15-38-15(A)(1)* (Supp. 2007)), and strengthened sanctions on the filing of frivolous lawsuits, see § 5, sec. 15-36-10, 2005 S.C. Acts at 114-17 (codified as amended at *S.C. Code Ann. § 15-36-10* (Supp. 2007)) (setting out sanctions for frivolous lawsuits). In May 2006, Governor Sanford signed additional legislation to provide medical criteria requirements for asbestos claims. Asbestos and Silica Claims Procedure Act of 2006, 2006 S.C. Acts 2376. That law became effective upon approval of the governor and applied to cases pending on or filed after the effective date. Id.

n197. The Rhode Island Supreme Court, in *Kedy v. A.W. Chesterton Co., 946 A.2d 1171, 1175 (R.I. 2008),* formally recognized the doctrine of forum non conveniens and dismissed asbestos personal injury and wrongful death claims filed by thirty-nine Canadian plaintiffs.

n198. See Alfred Chiantelli, Judicial Efficiency in Asbestos Litigation, *31 Pepp. L. Rev. 171, 171 (2003)* (Chiantelli, a former San Francisco Superior Court judge, stating that "lately, we have seen a lot more mesothelioma and other cancer cases than in the past"); Hanlon & Smetak, supra note 54, at 599 ("Plaintiffs' firms are steering cases to California, partly to the San Francisco-Oakland area, which is traditionally a tough venue for defendants, but also to Los Angeles, which was an important asbestos venue in the 1980s but is only recently seeing an upsurge in asbestos cases.").

n199. See Judges Roundtable: Where Is California Asbestos Litigation Heading?, HarrisMartin's COLUMNS - Asbestos, July 2004, at 3, (Judge Ernest Goldsmith speaking on a panel at a symposium hosted by the University of San Francisco School of Law).

n200. Id. (Judge Tomar Mason of the San Francisco Superior Court); see also Steven Weller et al., Policy Studies, Inc., Report on the California Three Track Civil Litigation Study 28 (2002), http://www.clrc.ca.gov/pub/BKST/BKST-3TrackCivJur.pdf ("The San Francisco Superior Court seems to be a magnet court for the filing of asbestos cases."); Dominica C. Anderson & Kathryn L. Martin, The Asbestos Litigation System in the San Francisco Bay Area: A Paradigm of the National Asbestos Litigation Crisis, *45 Santa Clara L. Rev. 1, 2 (2004)* ("The sheer number of cases pending at any given time results in a virtually unmanageable asbestos docket.").

n201. Victor E. Schwartz, Mark A. Behrens & Kevin Underhill, Litigation Tourism Hurts Californians, Mealey's Litig. Rep.: Asbestos, Nov. 2006, at 41, 41.

n202. See Alan Calnan & Byron G. Stier, Perspectives on Asbestos Litigation: Overview and Preview, *37 Sw. U. L. Rev. 459, 462 (2008)* ("There is a sense locally among the bar that Southern California may be in the midst of a surge."); Steven D. Wasserman et al., Asbestos Litigation in California: Can it Change for the Better?, *34 Pepp. L. Rev. 883, 885 (2007)* ("With plaintiff firms from Texas and elsewhere opening offices in California, there is no doubt that even more asbestos cases are on their way to the state."); Cortney Fielding, Plaintiffs'

28 Rev. Litig. 501, *

Lawyers Turn to L.A. Courts for Asbestos Litigation, Daily J. (L.A.), Feb. 27, 2009, (Verdicts & Settlements), at 1.

n203. Fielding, supra note 202, at 1.

n204. Id.

n205. Emily Bryson York, More Asbestos Cases Heading to Courthouses Across Region, L.A. Bus. J., Feb. 27, 2006, at 8.

n206. See, e.g., Steve Korris, Delaware Court Seeing Upsurge in Asbestos Filings, Record (Edwardsville, Ill.), July 1, 2005, at 1, available at http://madisonrecord.com/news/contentview.asp?c=162494 (noting an upsurge in asbestos cases filed in Wilmington, Del.).

n207. See id. (noting that SimmonsCooper had expanded to New York, Chicago, and Delaware).

n208. Id.

n209. Id. (quoting Mike Angelides of the SimmonsCooper firm).

n210. See Steve Gonzalez, Madison County's Asbestos Surge Defies National Trend, Record (Edwardsville, Ill.), May 8, 2008, at 1, available at http://www.madisonrecord.com/news/212109-madison-countys-asbestos-surge-defies-national-trend ("The number of asbestos cases being filed across the country may be declining, as reported in a study by Manhattan Institute this week, but an asbestos surge in Madison County defies the trend.").

n211. See Victor E. Schwartz, Mark A. Behrens & Kimberly D. Sandner, Asbestos Litigation in Madison County, Illinois: The Challenge Ahead, 16 Wash. U. J.L. & Pol'y 235, 243 (2004) ("From 1985 through 2002, about 8,000 asbestos suits were filed in Madison County.").

n212. Steve Gonzalez, Asbestos Suits on the Rise in Madison County and Nationwide, Record (Edwardsville, Ill.), Aug. 28, 2008, at 1, available at http://www.madisonrecord.com/news/214465-asbestos-suits-on-the-rise-in-madison-county-and-nationwide.

n213. Id.

n214. See Scott Sabatini, Asbestos Rise in Madison County Could Signal Return to "Old School' Tactics, Record (Edwardsville, Ill.), Dec. 12, 2008, at 1, available at http://madisonrecord.com/news/216380-asbestos-rise-in-madison-county-could-signal-return-to-old- school-tactics.

n215. E.g., Simonetta v. Viad Corp., 151 P.3d 1019, 1021 (Wash. Ct. App. 2007) (former Navy machinist sued manufacturer of evaporator used on Navy ship, alleging that manufacturer was liable for machinist's asbestos-related illness based on his exposure to asbestos-laden insulation manufactured by another corporation and used to encapsulate the evaporator on the ship), rev'd, 197 P.3d 127 (Wash. 2008).

n216. See James A. Henderson, Jr., Sellers of Safe Products Should Not Be Required to Rescue Users from Risks Presented by Other, More Dangerous Products, 37 Sw. U. L. Rev. 595, 602 (2008) ("Every student of

28 Rev. Litig. 501, *

American tort law knows that American courts will not impose a legal duty to rescue another merely because the would-be rescuer knows that the other requires help that the rescuer is in a position to render.").

n217. *424 F.3d 488 (6th Cir. 2005).*

n218. *Id. at 496.*

n219. Id.

n220. *197 P.3d 127 (Wash. 2008).*

n221. *198 P.3d 493 (Wash. 2008).*

n222. *Simonetta, 197 P.3d at 138.*

n223. *Braaten, 198 P.3d at 498; see also Simonetta, 197 P.3d at 136* ("Foreseeability has no bearing on the question of adequacy of warnings in these circumstances.").

n224. *Taylor v. Elliott Turbomachinery Co., 171 Cal. App. 4th 564, 2009 WL 458543, at 17 (1st Dist. 2009).* At the time of this writing, another appeal relating to the same duty issue was pending in California's Second District Court of Appeal. See Merrill v. Leslie Controls, Inc., No. B200006 (Cal. App. 2d Dist. filed July 14, 2007).

n225. John W. Petereit, The Duty Problem with Liability Claims Against One Manufacturer for Failing to Warn About Another Manufacturer's Product, HarrisMartin's COLUMNS - Asbestos, Aug. 2005, at 2, 5.

n226. Thomas W. Tardy, III & Laura A. Frase, Liability of Equipment Manufacturers for Products of Another, HarrisMartin's COLUMNS - Asbestos, May 2007, at 4, 6.

n227. Petereit, supra note 225, at 4.

n228. David C. Landin, Victor E. Schwartz & Phil Goldberg, Lessons Learned from the Front Lines: A Trial Court Checklist for Promoting Order and Sound Public Policy in Asbestos Litigation, *16 J.L. & Pol'y 589, 629-30 (2008);* see also *Restatement (Third) of Torts: Prods. Liab. § 5* cmt. a (explaining the consequences of applying liability to component manufacturers); Victor E. Schwartz & Russell W. Driver, Warnings in the Workplace: The Need for a Synthesis of Law and Communication Theory, *52 U. Cin. L. Rev. 38, 43 (1983)* ("The extension of workplace warnings liability unguided by practical considerations has the unreasonable potential to impose absolute liability ... .").

n229. Landin, Schwartz & Goldberg, supra note 228, at 642-43.

n230. *Taylor v. Elliott Turbomachinery Co., 171 Cal. App. 4th 564, 2009 WL 458543, at 12-15 (1st Dist. 2009).*

n231. *28 Cal. Rptr. 3d 744, 745-46 (Ct. App. 2004).*

n232. *Id. at 750-51.*

n233. *63 Cal. Rptr. 2d 422, 424 (Ct. App. 1997).*

n234. Mark A. Behrens & Frank Cruz-Alvarez, A Potential New Frontier in Asbestos Litigation: Premises Owner Liability for "Take Home" Exposure Claims, Mealey's Litig. Rep.: Asbestos, July 5, 2006, at 32.

n235. Id.

n236. Id.

n237. *CSX Transp., Inc. v. Williams, 608 S.E.2d 208, 210 (Ga. 2005)* ("An employer does not owe a duty of care to a third-party, non-employee, who comes into contact with its employee's asbestos-tainted work clothing at locations away from the workplace.").

n238. *Holdampf v. A.C. & S., Inc. (In re N.Y. City Asbestos Litig.), 840 N.E.2d 115, 116 (N.Y. 2005)* (holding that defendant-employer did not owe a duty of care to the plaintiff-husband's wife who was allegedly injured by exposure to asbestos dust while laundering her husband's clothes); *Rindfleisch v. Alliedsignal, Inc. (In re Eighth Judicial Dist. Asbestos Litig.), 815 N.Y.S.2d 815, 820-21 (Sup. Ct. 2006)* (holding that company owed no duty to wife of employee).

n239. *Miller v. Ford Motor Co. (In re Certified Question from the 14th Dist. Court of Appeals), 740 N.W.2d 206, 216 (Mich. 2007)* (holding that the relationship requirement of the duty test precluded liability for a distant third party).

n240. *Riedel v. ICI Ams. Inc., No. 156, 2008, 2009 WL 536540* (Del. Mar. 4, 2009) (affirming summary judgment in favor of defendant on a nonfeasance theory of negligence because of the lack of a relationship between plaintiff and her husband's employer).

n241. *Alcoa, Inc. v. Behringer, 235 S.W.3d 456, 462* (Tex. App. - Dallas 2007, pet. denied) ("We conclude that other factors relevant to establishing a duty ... cannot, as a matter of law, outweigh a complete lack of foreseeability ... .").

n242. *Van Fossen v. MidAmerican Energy Co., 746 N.W.2d 278, 2008 WL 141194, at 2* (Iowa Ct. App. Jan. 16, 2008) (unpublished table decision) (declining to extend company's duty of care to employee's spouse), review granted, No. 06-1691 (Iowa Apr. 3, 2008).

n243. Adams v. Goodyear Tire & Rubber Co., Cuyahoga App. No. 91404, 2009-Ohio-491, PP 18-24 (finding plaintiff's take home exposure claim statutorily barred and holding that her negligence claim failed as a matter of law because no duty of care was owed).

n244. *Martin v. Cincinnati Gas & Elec. Co., No. 07-6385, 2009 WL 188051, at 1* (6th Cir. Jan. 27, 2009) (affirming decision holding that injuries to members of employees' households were not foreseeable).

n245. *Jesensky v. A-Best Prods. Co., No. Civ. A. 96-680, 2003 WL 25518083* (W.D. Pa. Dec. 16, 2003) (Sensenich, Mag. J.) (recommending grant of summary judgment to Duquesne Light Co., finding that the company owed no duty to plaintiff), adopted, *2004 WL 5267498* (W.D. Pa. Feb. 17, 2004), aff'd on other grounds, *287 F. App'x 968 (3d Cir. 2008)* (unpublished), cert. denied, *2009 WL 735677* (U.S. Mar. 23, 2009).

28 Rev. Litig. 501, *

n246. *Adams v. Owens-Ill., Inc., 705 A.2d 58, 66 (Md. Ct. Spec. App. 1998)* ("If liability for exposure to asbestos could be premised on [decedent's] handling of her husband's clothing, presumably [the premises owner] would owe a duty to others who came into close contact with [decedent's husband], including other family members, automobile passengers, and co-workers. [The premises owner] owed no duty to strangers based upon providing a safe workplace for employees.").

n247. *Kan. Stat. Ann. § 60-4905(a)* (Supp. 2007) ("No premises owner shall be liable for any injury to any individual resulting from silica or asbestos exposure unless such individual's alleged exposure occurred while the individual was at or near the premises owner's property."); *Ohio Rev. Code Ann. § 2307.941(A)(1)* (West Supp. 2008) ("A premises owner is not liable for any injury to any individual resulting from asbestos exposure unless that individual's alleged exposure occurred while the individual was at the premises owner's property.").

n248. *Olivo v. Owens-Ill., Inc., 895 A.2d 1143, 1149 (N.J. 2006)* ("To the extent [defendant] owed a duty to workers on its premises for the foreseeable risk of exposure to friable asbestos and asbestos dust, similarly, [defendant] owed a duty to spouses handling the workers' unprotected work clothing ... ."); *Satterfield v. Breeding Insulation, Inc., 266 S.W.3d 347, 374 (Tenn. 2008)* ("It is foreseeable that the adverse effects of repeated, regular, and extended exposure to asbestos on an employee's work clothes could injure [other] persons... . Accordingly, the duty we recognize today extends to those who regularly and repeatedly come into close contact with an employee's contaminated work clothes over an extended period of time, regardless of whether they live in the employee's home or are a family member.").

n249. See *Honer v. Ford Motor Co., No. B189160, 2007 WL 2985271, at 4* (Cal. Ct. App. Oct. 15, 2007) (unpublished) (reversing a grant of summary judgment because husband's defendant-employer could be liable for wife's "household" exposure to asbestos); *Condon v. Union Oil Co. of Cal., No. A102069, 2004 WL 1932847, at 5* (Cal. Ct. App. Aug. 31, 2004) (unpublished) (holding that employee's wife's exposure was foreseeable); Chaisson v. Avondale Indus., Inc., 2005-1511, p. 14-15 (La. App. 4 Cir. 12/20/08); *947 So. 2d 171, 183-84* (holding that foreseeability and public policy justified finding of duty); Zimko v. Am. Cyanamid, 2003-0658, p. 23 (La. App. 4 Cir. 6/8/05); *905 So. 2d 465, 483* ("We find [defendant's] duty is the general duty to act reasonably in view of the foreseeable risks of danger to household members of its employees ... ."); *Rochon v. Saberhagen Holdings, Inc., 140 Wash. App. 1008, 2007 WL 2325214, at 3 (2007)* (unpublished table decision) ("[Defendant] had a duty to prevent injury from an unreasonable risk of harm it had itself created."). But see *Martin, 2009 WL 188051, at 1* (rejecting claim against premises owner on foreseeability grounds); *Van Fossen, 746 N.W.2d 278, 2008 WL 141194, at 2* (same); *Alcoa, Inc. v. Behringer, 235 S.W.3d 456, 462* (Tex. App. - Dallas 2007, pet. denied) (same).

n250. Patrick M. Hanlon, Developments in Premises Liability Law 2005, in Asbestos Litigation in the 21st Century (ALI-ABA Course of Study, 2005), available at SL041 ALI-ABA 665, at 694 (Westlaw).

n251. *Miller v. Ford Motor Co. (In re Certified Question from the 14th Dist. Court of Appeals), 740 N.W.2d 206, 219 (Mich. 2007)* (quoting Behrens & Cruz-Alvarez, supra note 234, at 5); see also In re Asbestos Litig., No. 04C-07-099-ASB, 2007 WL 4571196, at 12 (Del. Super. Ct. Dec. 21, 2007) ("There is no principled basis in the law upon which to distinguish the claim of a spouse or other household member ... from the claim of a house keeper or laundry mat operator who is exposed while laundering the clothing, or a co-worker/car pool passenger who is exposed during rides home from work, or the bus driver or passenger who is exposed during the daily commute home, or the neighbor who is exposed while visiting with the employee before he changes out of his work clothing at the end of the day."), aff'd sub nom. *Riedel v. ICI Ams. Inc., No. 156, 2008, 2009 WL 536540* (Del. Mar. 4, 2009); *Holdampf v. A.C. & S., Inc. (In re N.Y. City Asbestos Litig.), 840 N.E.2d 115, 122 (N.Y. 2005)* (fearing that to expand duty would raise the "specter of limitless liability," perhaps resulting in liability to family babysitter or employees of a neighborhood laundry).

n252. Martha Neil, Backing Away from the Abyss, A.B.A. J., Sept. 2006, at 26, 29.

28 Rev. Litig. 501, *

n253. See Joseph E. Stiglitz, Jonathan M. Orszag & Peter R. Orszag, The Impact of Asbestos Liabilities on Workers in Bankrupt Firms, 12 J. Bankr. L. & Prac. 51, 70-88 (2003) (exploring the effect of asbestos-related liabilities and bankruptcies on employment, retirement security, government finances, and other economic factors); see also Christopher Edley, Jr. & Paul C. Weiler, Asbestos: A Multi-Billion-Dollar Crisis, 30 Harv. J. on Legis. 383, 386 (1993) (noting that economic dislocation drives firms to bankruptcy with substantial burdens on the "shareholders, employees, pensioners, and communities of asbestos defendants"). Bankrupt companies and communities are not the only groups affected:

The uncertainty of how remaining claims may be resolved, how many more may ultimately be filed, what companies may be targeted, and at what cost, casts a pall over the finances of thousands and possibly tens of thousands of American businesses. The cost of this unbridled litigation diverts capital from productive purposes, cutting investment and jobs. Uncertainty about how future claims may impact their finances has made it more difficult for affected companies to raise capital and attract new investment, driving stock prices down and borrowing costs up.

George Scott Christian & Dale Craymer, Texas Asbestos Litigation Reform: A Model for the States, *44 S. Tex. L. Rev. 981, 998 (2003).*

n254. See Shelley et al., supra note 105, at 257 ("Since 2000, dozens of companies have sought to use the trust provisions of *§ 524(g) of the Bankruptcy Code* to globally resolve their asbestos liabilities."); see also Carroll et al., supra note 36, at xxvii ("Between 2000 and mid-2004, there were 36 bankruptcy filings, more than in either of the prior two decades.").

n255. See generally Francis E. McGovern, The Evolution of Asbestos Bankruptcy Trust Distribution Plans, *62 N.Y.U. Ann. Surv. Am. L. 163 (2006)* (explaining the evolution of asbestos litigation culminating in bankrupt defendants' plans to pay asbestos claimants).

n256. See Shelley et al., supra note 105, at 274 ("A growing number of courts are recognizing defendants' legitimate interest in discovering information about plaintiffs' trust claims.").

n257. See Ohio Judge Bars Calif. Firm from His Court, Nat'l L.J., Jan. 22, 2007, at 3 ("An Ohio state court judge has barred Novato, Calif.-based Brayton Purcell and one of its lawyers from appearing in that court due to their alleged dishonesty in litigating a mesothelioma case."); Thomas J. Sheeran, Ohio Judge Bans Calif. Lawyer in Asbestos Lawsuit, Cincinnati Post, Feb. 20, 2007, at A3 ("A low-key judge fed up with disrespectful behavior and alleged lies by an attorney created a stir with a courtroom ban on the lawyer from a nationally known San Francisco-area law firm that handles asbestos-related lawsuits coast-to-coast."); see also Editorial, Going Too Far, Columbus Dispatch, Feb. 7, 2007, at 8A (praising Judge Hanna for "drawing nationwide attention to such underhanded behavior").

n258. Kananian v. Lorillard Tobacco Co., No. CV 442750, slip op. at 19 (Ohio Ct. Com. Pl. Cuyahoga County Jan. 19, 2007), available at *2007 WL 4913164;* see also Paul Davies, Plaintiffs' Team Takes Hit on Asbestos, Wall St. J., Jan. 20, 2007, at A4 ("In a harshly worded opinion ... Judge Harry Hanna listed more than a dozen instances where attorneys ... either lied to the court, intentionally withheld key discovery materials, or distorted the degree of asbestos exposure alleged.").

n259. See Kananian v. Lorillard Tobacco Co., No. 89448 (Ohio Ct. App. Feb. 21, 2007) (dismissing appeal as moot, sua sponte), review denied, 2007-*Ohio-6803, 878 N.E.2d 34.*

28 Rev. Litig. 501, *

n260. James F. McCarty, Judge Becomes National Legal Star, Bars Firm from Court over Deceit, Clev. Plain Dealer, Jan. 25, 2007, at B1.

n261. Id.

n262. Editorial, Cuyahoga Comeuppance, Wall St. J., Jan. 22, 2007, at A14; see also Peter Geier, Allegations of Conflicting Claims in Tobacco Case - Tobacco Lawyers Allowed to Depose Opponents, Nat'l L.J., May 1, 2006, at 6 ("Lorillard claims that Brayton Purcell's "amendment' of its Johns-Manville asbestos claim conveniently strengthens its case against the cigarette maker, but contradicts earlier claims that [were] made - and upon which awards were paid - on Kananian's behalf."); Matthew Hirsch, Judge: Firm Submitted Fraudulent Claim Forms, Legal Intelligencer (Phila.), Jan. 22, 2007, at 4 ("When lawyers for Lorillard moved to disqualify the California firm and its partner in November, they contended that ... the Brayton firm had submitted inconsistent claims to asbestos trusts in order to hit up multiple defendants for Kananian's exposure, then lied in court to cover their tracks."); Kimberly A. Strassel, Opinion, Trusts Busted, Wall St. J., Dec. 5, 2006, at A18 ("[One] law firm filed a claim to one trust, saying Kananian had worked in a World War II shipyard and was exposed to insulation containing asbestos. It also filed a claim to another trust saying he had been a shipyard welder. A third claim, to another trust, said he'd unloaded asbestos off ships in Japan. And a fourth claim said that he'd worked with "tools of asbestos' before the war. Meanwhile, a second law firm, Brayton Purcell, submitted two more claims to two further trusts, with still different stories... . [Brayton Purcell then] sued Lorillard Tobacco, this time claiming its client had become sick from smoking Kent cigarettes, whose filters contained asbestos for several years in the 1950s.").

n263. McCarty, supra note 260, at B1.

n264. Daniel Fisher, Double-Dippers, Forbes, Sept. 4, 2006, at 136, 137.

n265. Editorial, supra note 262, at A14.

n266. Shelley et al., supra note 105, at 272-76.

n267. *43 Cal. Rptr. 3d 723, 725 (Ct. App. 2006).*

n268. Transcript of Proceedings at 3-4, Negrepont v. A.C. & S., Inc. (In re N.Y. City Asbestos Litig.), No. 120894/01 (N.Y. Sup. Ct. N.Y. County Dec. 11, 2003).

n269. Shelley et al., supra note 105, at 274.

n270. Id.

n271. Id. at 274-76 (citing orders from courts in West Virginia, Delaware, Ohio, Kentucky, Texas, and Massachusetts).

n272. See Transcript of Proceedings at 44, Cannella v. Abex, No. 1037729/07 (N.Y. Sup. Ct. N.Y. County Jan. 24, 2007) ("The CMO at Section 15 Sub E, Sub L, specifically says, "Plaintiffs must file all claims forms that they intend to file in the case within 90 days before trial begins.'").

n273. Id. at 46.