**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| GARLOCK SEALING TECHNOLOGIES | ) | Case No. 10-31607 |
| LLC, et al. | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |

**MEMORANDUM OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS: (1) IN OPPOSITION TO THE DEBTORS' MOTION FOR (A) ESTABLISHMENT OF ASBESTOS CLAIMS BAR DATE, (B) APPROVAL OF ASBESTOS PROOF OF CLAIM FORM, (C) APPROVAL OF FORM AND MANNER OF NOTICE, (D) ESTIMATION OF ASBESTOS CLAIMS, AND (E) APPROVAL OF INITIAL CASE MANAGEMENT SCHEDULE; AND (2) IN FURTHER SUPPORT OF ITS MOTION FOR ENTRY OF A SCHEDULING ORDER FOR PLAN FORMULATION PURPOSES**

**HAMILTON MOON STEPHENS STEELE & MARTIN, PLLC**

Travis W. Moon (Bar No. 3067)
201 South College Street
Charlotte Plaza, Suite 2020
Charlotte, NC 28244-2020
Telephone: (704) 344-1117

*Co-Counsel for the Official Committee of Asbestos Personal Injury Claimants*

**CAPLIN & DRYSDALE, CHARTERED**

Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125

Trevor W. Swett III
Leslie M. Kelleher
Jeanna Rickards Koski
One Thomas Circle, N.W.
Suite 1100
Washington, D.C. 20005
Telephone: (202) 862-5000

*Co-Counsel for the Official Committee of Asbestos Personal Injury Claimants*

#359104

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

I.     A BAR DATE/PROOF OF CLAIM PROCESS IS NEITHER REQUIRED BY LAW NOR USEFUL AND IF ADOPTED WOULD CONSIGN THE PARTIES AND THE COURT TO SEVERAL YEARS OF EXPENSIVE ACTIVITY TO NO PURPOSE ...................................................................................................... 5

     A.     Neither a Bar Date Nor a Proof of Claim Is Required by Law ............................. 5

     B.     Nothing Can Be Accomplished By a Bar Date/Proof of Claim Process ................ 8

              1.     *Asbestos Personal Injury Claims Cannot Be Decided* En Masse *or by Summary Judgment* ............................................................................. 8

              2.     *The Asbestos Claims Cannot Be Eliminated Through* Daubert *Challenges to Expert Testimony* ............................................................. 13

              3.     *The Bankruptcy Court Does Not Have Core Jurisdiction to Determine the Validity of Asbestos Personal Injury Claims by Summary Judgment* ................................................................................ 16

     C.     What Would Result from a Bar Date/Proof of Claim Process Would Be Many Years of Delay and Tens of Millions of Dollars Spent for No Purpose ......................................................................................................... 18

II.     BECAUSE THE DEBTORS ARE HOPELESSLY INSOLVENT THERE IS NO LEGITIMATE PURPOSE FOR A BAR DATE/PROOF OF CLAIM FORM AND ALLOWANCE PROCEEDINGS ........................................................................ 23

     A.     Garlock's Aggregate Liability for Pending and Future Mesothelioma Claims Exceeds $1.5 Billion ................................................................................ 26

     B.     Garlock's Liability for Mesothelioma Claims Alone Renders it Insolvent, Since the Debtors' Consolidated Equity Is, at Most, $882 Million ..................... 29

III.     CASE AFTER CASE HAS SHOWN THAT A DEBTOR'S HISTORICAL CLAIMS RESOLUTION HISTORY PROVIDES THE BEST FACTUAL BASIS UPON WHICH TO ESTIMATE THE ASBESTOS LIABILITY .................................. 32

     A.     The Best Source of Information for Measuring Garlock's Asbestos Liability Is Its Historical Claims Database ......................................................... 32

     B.     Discovery Related to Garlock's Solvency Should Commence Immediately ....... 40

IV.     AN ORDER FOR AN ESTIMATION PROCEEDING WOULD BE PREMATURE ......................................................................................................... 42

CONCLUSION ................................................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re A.H. Robins Co.*,
862 F.2d 1092 (4th Cir. 1988) ........................................................................... 7

*Agawal v. Mid Island Mortg. Corp.,*
555 F.3d 298 (2d Cir. 2009) ............................................................................. 21

*In re Allegheny Int'l, Inc.*,
954 F.2d 167 (3d Cir. 1992) ............................................................................. 20

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................................... 8

*In re Armstrong World Indus.*, Inc.,
348 B.R. 111 (Bankr. D. Del. 2006) ............................................................28, 37

*In re Babcock & Wilcox Corp.,*
No. Civ. A. 00-0558, 2000 WL 422372 (E.D. La. April 17, 2000) ............. 7, 9, 10, 17, 18, 22

*In re Babcock & Wilcox Corp.,*
No. 00-10992, 2004 WL 4945985 (E.D. La. Nov. 9, 2004) .................................................. 11

*Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)....................................................................................24, 25

*In re Bulldog Trucking, Inc.*,
66 F.3d 1390 (4th Cir. 1995)........................................................................25, 26

*Butner v. United States*,
440 U.S. 48 (1979) ........................................................................................... 33

*In re Celotex Corp.*,
204 B.R. 586 (Bankr. M.D. Fla. 1996) ........................................................... 7, 8

*In re Charter Co.*,
876 F.2d 861 (11th Cir. 1989)......................................................................... 24

*Cimino v. Raymark Indus., Inc.*,
151 F.3d 297 (5th Cir. 1998)............................................................................. 8

*Cortes-Irizarry v. Corporacion Insular de Seguros*,
111 F.3d 184 (1st Cir. 1997) ........................................................................... 16

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993)...................................................................... 13, 14, 15, 16

*In re Dow Corning Corp.*,
211 B.R. 545 (Bankr. E.D. Mich. 1997) ............................................. 7

*In re Dow Corning Corp.*,
215 B.R. 346 (Bankr. E.D. Mich. 1997) ............................................. 17

*In re Eagle Picher Indus., Inc.*,
137 B.R. 679 (Bankr. S.D. Ohio 1992)............................................... 7

*In re Eagle Picher Indus., Inc.*,
189 B.R. 681 (Bankr. S.D. Ohio 1995)............................................... 37

*In re Federal-Mogul Global, Inc.*,
330 B.R. 133 (Bankr. D. Del. 2005)..................................... 11, 27, 28, 32, 35, 37

*In re Fibreboard Corp.*,
893 F.2d 706 (5th Cir. 1990) .............................................................. 8

*Georgine v. Amchem Prods., Inc.*,
83 F.3d 610 (3d Cir. 1996)................................................................ 8

*In re Hemingway Transp., Inc.*,
993 F.2d 915 (1st Cir. 1993) ............................................................ 20

*In re Hooker Invs., Inc.*,
937 F.2d 833 (2d Cir. 1991) .............................................................. 7

*In re Johnson*,
84 B.R. 492 (Bankr. N.D. Ohio 1988)......................................... 24, 25

*In re Keene Corp.*,
188 B.R. 903 (Bankr. S.D.N.Y. 1995)................................................ 7

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999).......................................................................... 15

*Malcolm v. Nat'l Gypsum Co.*,
995 F.2d 346 (2d Cir. 1993) .............................................................. 8

*Nat. Hockey League v. Metro. Hockey Club, Inc.*,,
427 U.S. 639 (1976).......................................................................... 21

*In re Nwonwu.*,
362 B.R. 705 (Bankr. E.D. Va. 2007)................................................ 24

*Owens Corning v. Credit Suisse First Boston (In re Owens Corning),*
    322 B.R. 719 (D. Del. 2005) ....................................................................... 33, 35, 37, 39, 40

*Paoli R.R. Yard PCB Litig. v. Monsanto Co.,*
    916 F.2d 829 (3d Cir. 1990) .......................................................................... 15

*In re Paoli R.R. Yard PCB Litig.,*
    35 F.3d 717 (3d Cir. 1994) ...........................................................................15, 16

*Petrucelli v. Bohringer & Ratzinger,*
    46 F.3d 1298 (3d Cir. 1995) .......................................................................... 21

*In re Quigley Co.,*
    346 B.R. 647 (Bankr. S.D.N.Y. 2006) .......................................................... 6

*Raleigh v. Ill. Dep't of Revenue,*
    530 U.S. 15 (2000) ......................................................................................... 33

*In re Rubin,*
    769 F.2d 611 (9th Cir. 1985) ......................................................................... 20

*In re Schepps Food Stores, Inc.,*
    169 B.R. 374 (Bankr. S.D. Tex. 1994) .......................................................... 17

*In re Simmons,*
    765 F.2d 547 (5th Cir. 1985) ......................................................................... 7

*In re Skyport Global Commc'ns, Inc.,*
    480 B.R. 687 (Bankr. S.D. Tex. 2009) .......................................................... 20

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.,*
    549 U.S. 443 (2007)........................................................................................ 33

*In re UAL Corp.,*
    310 B.R. 373 (Bankr. N.D. Ill. 2004) ........................................................... 17

*In re Unisys Sav. Plan Litig.,*
    173 F.3d 145 (3d Cir. 1999) .......................................................................... 15

*United States v. Llera Plaza,*
    188 F. Supp. 2d 549 (E.D. Pa. 2002) ............................................................ 15

*United States v. Verdunn,*
    89 F.3d 799 (11th Cir.1996)........................................................................... 17

*In re UNR Indus., Inc.,*
    74 B.R. 146 (N.D. Ill. 1987) .......................................................................... 17

*In re USG Corp.*,
290 B.R. 223 (Bankr. D. Del. 2003) ............................................................ 9

*In re W.R. Grace & Co.*,
2009 WL 6388055 (Bankr. D. Del. Oct. 30, 2009) .............................. 9, 11, 18, 22

## DOCKETED CASES

*In re Anchor Packing Co.*,
No. 10-31606 (Bankr. W.D. N.C.) ............................................................24, 30

*In re Armstrong World Indus., Inc.*,
No. 00-4471 (D. Del.) ............................................................................ 6, 36

*In re Babcock & Wilcox Corp.*,
No. 01-30135 (Bankr. D.N.J.) ...................................................................... 37

*In re Combustion Eng'g, Inc.*,
No. 03-10495 (Bankr. D. Del.) ...................................................................... 6

*In re Congoleum Corp.*,
No. 03-51524 (Bankr. D.N.J.) ....................................................................... 6

*In re Federal-Mogul Global, Inc.*,
No. 01-10578 (Bankr. D. Del.) ...................................................................... 6

*In re Global Indus. Techs., Inc.*,
No. 02-21626 (Bankr. W.D. Pa.) .................................................................... 6

*In re JT Thorpe*,
No. 02-14216 (Bankr. C.D. Cal.) .................................................................... 6

*In re Kaiser Aluminum Corp*,
No. 02-10429 (Bankr. D. Del.) ...................................................................... 6

*In re Mid-Valley, Inc.*,
No. 03-35592 (Bankr. W.D. Pa.) .................................................................... 6

*In re N. Am. Refractories Co.*,
No. 02-20198 (Bankr. W.D. Pa.) .................................................................... 6

*In re Owens Corning*,
Nos. 00-3837-3854  (D. Del.) ............................................................6, 38, 39

*In re USG Corp.*,
No. 01-2094 (Bankr. D. Del.) ...................................................................... 10

*In re W.R. Grace & Co.*,
No. 01-01139 (Bankr. D. Del.) ............................................................11, 12, 37

**STATUTES**

11 U.S.C. § 101(5).............................................................................................................. 13

11 U.S.C. § 101(32)(A) ..................................................................................................... 26

11 U.S.C. § 502(b).........................................................................................................13, 34

11 U.S.C. § 524 (g).......................................................................................................1, passim

11 U.S.C. § 1141(d) ........................................................................................................... 19

28 U.S.C. § 157(b)..........................................................................................................16, 17

28 U.S.C. § 157(c)(1) ........................................................................................................ 17

28 U.S.C. § 1411(a) ........................................................................................................... 16

**OTHER AUTHORITIES**

*Collier on Bankruptcy* (15th ed. rev. 2008) ......................................................................... 7

Fed. R. Bankr. P. 3001(a) .................................................................................................. 18

Fed. R. Bankr. P. 3007........................................................................................................ 20

Fed. R. Bankr. P. 7037........................................................................................................ 20

Fed. R. Bankr. P. 9014........................................................................................................ 9, 20

Fed. R. Civ. P. 23 ................................................................................................................. 8

Fed. R. Civ. P. 33 ................................................................................................................ 22

Fed. R. Civ. P. 37 ................................................................................................................ 20

Fed. R. Civ. P. 42 ................................................................................................................ 9, 10

Fed. R. Civ. P. 56 ................................................................................................................ 17

H.R. Rep. No. 93-137, 93rd Cong., 1st Sess. (1973) ......................................................... 25

James R. Eck, et al., *Asset Valuation* (1st ed. 1991). ..................................................... 31

*Moore's Federal Practice* (3d ed. 2007)......................................................................20, 21

Jonathan E. Clarke, *Handbook of Modern Finance* (12th ed. 2010).............................. 31

*Norton Bankruptcy Law and Practice* (3d ed. 2010) ................................................... 24

The Official Committee of Asbestos Personal Injury Claimants (the "**Asbestos Claimants Committee**" or "**ACC**"), respectfully submits this memorandum in opposition to the Debtors' Motion for (A) Establishment of Asbestos Claims Bar Date, (B) Approval of Asbestos Proof of Claim Form, (C) Approval of Form and Manner of Notice, (D) Estimation of Asbestos Claims, and (E) Approval of Initial Case Management Schedule, dated August 31, 2010 [Dkt. No. 461] ("**Bar Date Motion**"), and in further support of the ACC's Motion for Entry of a Scheduling Order for Plan Formulation Purposes, dated August 30, 2010 [Dkt. No. 451] ("**ACC Scheduling Motion**").

## PRELIMINARY STATEMENT

In our Information Brief, submitted in support of the ACC Scheduling Motion, based on the Debtors' prior statements, we anticipated that the Debtors would file this Bar Date Motion. We provided preliminary arguments why following the Debtors' proposed path would prove a fool's errand at great cost and with years of delay. Now that the Bar Date Motion has been filed, we detail below why the Debtors' proposed Bar Date/Proof of Claim/Allowance process:

1.      is not, as they claim, required by law;

2.      will serve no useful purpose; and

3.      will cause years of delay at great cost to the parties and require years of wasted effort by the Court.

In a Section 524(g) bankruptcy, where the pertinent inquiry is the determination of the debtor's aggregate liability for asbestos claims, the best data on which to base that determination is the debtor's own claims verdict and settlement history, which reflects the debtor's own

assessment over time of the value of claims asserted against it in the tort system.[1]  The task of resolving and liquidating individual claims is left to the trust created by the Plan.  Thus, there is no need for the Bankruptcy Court to take on the Sisyphean task of individual claims determination in allowance proceedings, which would take many years to complete and would deplete the assets of the estate.  Indeed, of the nearly ninety Section 524(g) bankruptcy cases, undersigned counsel are aware of only two in which a bar date and proof of claim form process was even begun.  And in <u>no</u> case has there ever been allowance proceedings for asbestos personal injury claims.

Moreover, even to begin down the Debtors' ultimately futile path would be to derail this case at enormous costs in time and money to the parties and the Court.  First, the Court would have to consider and approve a notice plan and proof of claim form.  In doing this, the Court would have to review the Debtors' proposed eleven-page proof of claim form, an oppressively burdensome set of document requests and interrogatories directed to each individual claimant, and provide a schedule on which not only the ACC and the Future Claims Representative ("**<u>FCR</u>**"), but all potential respondents, could present for resolution the many legal and constitutional issues raised by the notice plan, and the myriad proof of claim form objections involving relevance, privilege, and burdensomeness.  In the only two cases where this process was even begun, it took two to three years for the courts to resolve these issues, in order to arrive at the stage when the form could be issued to claimants.

Second, claimants would require sufficient time to complete the proof of claim form as approved by the Court.  Even if we assume that only three hours would be required for asbestos

---

[1]  By "tort system," we refer to the complex of doctrines, rules, and practices under which asbestos claims are commonly litigated and resolved outside of bankruptcy.

claimants' representatives to complete the form, the effort would require 372,000 paralegal hours, as well as significant lawyer hours, and the cost to respondents to do so would be well upwards of $10 million at the very least.

Third, even after the Court and the parties have devoted two to three years to the effort, and claimants and their counsel have spent millions of dollars, and after more than 100,000 proof of claim forms have been filed, this Court and the District Court — which has sole jurisdiction to issue any final orders disallowing personal injury and wrongful death claims — would be mired in summary judgment hearings in allowance proceedings for years. Moreover, any such allowance proceedings would prove futile, because asbestos claims are highly fact-intensive and thus are not amenable to disposition by summary judgment. Garlock cannot escape its liabilities through bankruptcy. This Court and the District Court cannot act as forums for tort reform and disallow claims based on defenses that have been consistently rejected in the tort system. Once this became clear in the only two Section 524(g) cases where proofs of claims were ordered and filed, the allowance process was abandoned.

It is well-established that all forms of asbestos, including chrysotile asbestos, are inherently dangerous and therefore there can be no serious dispute that asbestos emitted from Garlock's products was a substantial contributing factor to the injuries suffered by thousands of workers exposed to the asbestos in those products. As we detail in our Information Brief, judges and juries in the tort system have regularly rejected Garlock's and other defendants' arguments to the contrary. Thus, typically, the only genuine issues in lawsuits against Garlock were whether the plaintiff had been exposed to Garlock's products, and whether the plaintiff's injuries were asbestos-related. For individuals who could demonstrate they had a disease caused by asbestos, and that they had been exposed to asbestos from Garlock's products, the only argument

was over the amount of money that Garlock should pay in damages. Faced with that reality, and having suffered (by its own account) "ruinous" verdicts in a significant percentage of the cases it chose to take to trial, Garlock, like most asbestos defendants, chose to settle, rather than litigate, most of the claims against it. Garlock's decisions to settle cases were in its own rational self-interest, in an effort to minimize its asbestos liabilities, and the settlement amounts reflect Garlock's best business judgment of the varying strengths of the claims and their values in the tort system.

There is no bankruptcy case in which the "allowance-then-estimation" course of proceedings that Garlock proposes has been carried out. To the best of the ACC's knowledge, in some ninety asbestos bankruptcies administered since the early 1980's, only two courts have attempted anything like it. In both cases, the process collapsed of its own weight and the debtors involved settled their asbestos liabilities by agreeing to contribute billions of dollars to Section 524(g) trusts. Indeed, the very notion of claim-by-claim allowance proceedings addressing tens of thousands of pending asbestos personal injury cases is antithetical to Section 524(g), which is designed to relieve the courts and the parties of the burdens of allowance proceedings by shifting responsibility for processing the claims to a trust created under judicial auspices as part of a confirmed plan of reorganization. Given the enormous burden that the Debtors' proposal would impose on the estates, the asbestos claimants, and this Court and the District Court — in time, money, and satellite litigation — Garlock's failure to demonstrate that its suggested program has any practical utility, and the utterly fanciful nature of its scheduling proposal, are reasons enough to deny its motion.

The Court can and should require the parties to frame their discovery to meet the factual issues that are truly material to valuing the Debtors' aggregate asbestos liabilities and the assets

of their estates. Garlock's ill-conceived program should be rejected and the ACC's proposed scheduling order adopted by the Court, so that these cases can be put on track towards a plan of reorganization that can be formulated and confirmed in a reasonable period of time. At the very least, the Bar Date Motion should be deferred until all the parties in interest receive the Debtors' historical claims data and have had an opportunity to analyze the data for use in responding fully to the factual premises of the Motion, including the purported claim form and notice program for which the Debtors seek the Court's imprimatur based on untested representations and hyperbolic rhetoric.

I. **A BAR DATE/PROOF OF CLAIM PROCESS IS NEITHER REQUIRED BY LAW NOR USEFUL AND IF ADOPTED WOULD CONSIGN THE PARTIES AND THE COURT TO SEVERAL YEARS OF EXPENSIVE ACTIVITY TO NO PURPOSE**

    A.    **Neither a Bar Date Nor a Proof of Claim Is Required by Law**

In large asbestos-driven bankruptcies such as these cases, pending asbestos claims at the petition date number in the hundreds of thousands — far too many to be dealt with in the bankruptcy without indefinitely delaying distribution to the creditors and resolution of the bankruptcy case. Moreover, thousands of additional claims arise continuously, as long-latent diseases become manifest, and new claims will continue to arise well beyond the petition filing date. The tens of thousands of demands of potential future claimants, whose claims will not even arise until after any bar date or even plan confirmation date, and who cannot be identified or given adequate notice, cannot be discharged. *See* Information Brief of the Official Committee of Asbestos Personal Injury Claimants dated August 30, 2010 [Dkt. No. 452] ("**ACC Info. Br.**") at 30.

In short, a bar date is impractical in these cases. As Southern District of New York Chief Bankruptcy Judge Bernstein put it:

> [T]he filing of a one page proof of claim, *see* Official Form no. 10, with minimal information and an exorbitant or unliquidated demand is not helpful. The alternative, designing a claim form that calls for more detailed medical information about the nature and the severity of the claimant's impairment, is cumbersome and best postponed for submission to the post-confirmation trust.

*In re Quigley Co.,* 346 B.R. 647, 653 (Bankr. S.D.N.Y. 2006). Accordingly, in virtually all asbestos bankruptcies, bar dates for asbestos personal injury claims have not been imposed, and asbestos claimants have not been required to file claims "because of the practical difficulties involved." *Id.* *See, e.g., In re Armstrong World Indus., Inc.*, No. 00-4471 (D. Del.); *In re Combustion Eng'g, Inc.*, No. 03-10495 (Bankr. D. Del.); *In re Congoleum Corp.,* No. 03-51524 (Bankr. D.N.J.); *In re Federal-Mogul Global, Inc.*, No. 01-10578 (Bankr. D. Del.); *In re Global Indus. Techs., Inc.*, No. 02-21626 (Bankr. W.D. Pa.); *In re N. Am. Refractories Co.*, No. 02-20198 (Bankr. W.D. Pa.); *Owens Corning v. Credit Suisse First Boston (In re Owens Corning)*, Nos. 00-3837-3854 (D. Del.); *In re Kaiser Aluminum Corp*, No. 02-10429 (Bankr. D. Del.); *In re Mid-Valley, Inc.*, No. 03-35592 (Bankr. W.D. Pa.); *In re JT Thorpe*, 02-14216 (Bankr. C.D. Cal.).

This well-established practice is clearly envisaged by Section 524(g), which Congress enacted specifically to deal with the practical difficulties of asbestos bankruptcies. Section 524(g) provides for all pending and future asbestos claims to be channeled to a trust. 11 U.S.C. Section 524(g)(2)(B). The estate's assets are used to fund the trust and, in exchange, the debtor is freed of liability. *Id*. The task of resolving and paying the claims is left to the trust, pursuant to procedures approved by the court. *Id*. Thus, the court is not saddled with allowance proceedings that would take years if not decades to complete, finality can be achieved without offending the due process and legal rights of the asbestos creditors, and the case can be resolved in an expeditious manner.

Garlock argues that a bar date is required in these bankruptcy cases because the claims are scheduled as disputed, contingent, and unliquidated. *See* Bar Date Motion at 14. But neither the Bankruptcy Code nor the Bankruptcy Rules require a proof of claim as a prerequisite for having creditors' claims considered. *See In re Simmons*, 765 F.2d 547, 551 (5th Cir. 1985) ("[N]o creditor is required to file a proof of claim."); *see also* 4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶501.01[1] at 501-4 (15th ed. rev. 2008) ("*Collier*") ("It should be noted that the filing of a proof of claim or interest is permissive, and no creditor or interest holder is ever required to file one."). Instead, proofs of claim are a tool to be used when they would serve some legitimate purpose in the proceeding. *See Simmons*, 765 F.2d at 551 ("A proof of claim or interest should be filed only when some purpose would be served."); 4 *Collier* ¶ 501.01[1], at 501-4 (quoting *Simmons*).[2] A bar date for asbestos personal injury claims serves

---

[2]  Garlock's own authorities do not support Garlock's argument that a bar date is mandatory. *See* Bar Date Motion at 14-15 (citing cases). Rather, they support the opposite proposition, that is, that the court has broad discretion to determine whether a bar date should be imposed. While the court in *Eagle-Picher*, a pre-Section 524(g) asbestos bankruptcy case, set a bar date, the court firmly rejected the argument Garlock makes here, and held that debtors do not "have an absolute right to have a bar date set by which time proofs of claim must be filed." *In re Eagle-Picher Indus., Inc.*, 137 B.R. 679, 680 (Bankr. S.D. Ohio 1992). "After careful consideration," the court held, "we have reached the conclusion that while such bar dates are commonly set in Chapter 11 cases, upon good cause shown *the court may dispense with one in a given case." Id.* (emphasis added). And in *Keene,* another pre-Section 524(g) asbestos bankruptcy case, the bar date did not apply to asbestos personal injury claims. *See In re Keene Corp.*, 188 B.R. 903, 913 (Bankr. S.D.N.Y. 1995). *Hooker*, *Robins* and *Dow Corning* did not involve asbestos claims. *See In re Hooker Invs., Inc.*, 937 F.2d 833 (2d Cir. 1991); *In re A.H. Robins Co.*, 862 F.2d 1092 (4th Cir. 1988); *In re Dow Corning Corp.*, 211 B.R. 545 (Bankr. E.D. Mich. 1997).

As discussed in Part I.B.1, below, the bar date and allowance procedures established by the court in *Babcock & Wilcox* proved futile and were abandoned. *Celotex* is, to the best of the ACC's knowledge, the only Section 524(g) case in which a bar date was imposed and acted upon. The petition in that case was filed in 1990, before Section 524(g) had been enacted. The bar date was imposed in 1996, some six years after the petition was filed, and shortly before an anticipated confirmation hearing. And, unlike in these cases, the bar date in *Celotex* was not sought or used in order to attack individual claims before estimation. *See In re Celotex Corp.*, (Footnote continued on next page.)

no purpose in a Section 524(g) bankruptcy, as those claims will not be liquidated by the court, but are left for resolution by the trust after confirmation and consummation of the plan.

B.    **Nothing Can Be Accomplished By a Bar Date/Proof of Claim Process**

1.    *Asbestos Personal Injury Claims Cannot Be Decided* **En Masse** *or by Summary Judgment*

Personal injury asbestos claims cannot be decided *en masse*; the pervasive factual disputes underlying asbestos claims are too individualized to be litigated in classes.   In the *Georgine* settlement litigation, for example, the Third Circuit concluded that the putative class of future asbestos claimants could not lawfully be certified for class action treatment under Rule 23 of the Federal Rules of Civil Procedure because the individual claims were so disparate on their facts:

> Class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods.  Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling asbestosis, or from mesothelioma — a disease which, despite a latency period of approximately fifteen to forty years, generally kills its victims within two years after they become symptomatic. Each has a different history of cigarette smoking, a factor that complicates the causation inquiry.

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).   Under substantive law, "causation of plaintiff's injury by defendant's product and plaintiff's resultant damages must be determined *as to 'individuals, not groups.*'"  *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 313 (5th Cir. 1998) (emphasis added) (quoting *In re Fibreboard Corp.*, 893 F.2d 706, 711 (5th Cir. 1990)); *see also Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350-54 (2d Cir. 1993) (disapproving consolidation

---

(Footnote continued from previous page.)
204 B.R. 586 (Bankr. M.D. Fla. 1996).  Nowhere in its confirmation decision does the court in *Celotex* even suggest that a bar date was mandatory.  *See In re Celotex Corp.*, 204 B.R. at 593.

for trial of forty-eight asbestos cases because too many different individual exposures, jobs, job sites, and diseases were involved).

Even if this Court were to consolidate huge tranches of claims for summary judgment motions under Rule 42, each claimant would have due process rights to notice and an opportunity to be heard in the allowance proceedings, contested matters to which discovery rules would apply.[3]  Thus, each of the tens of thousands of individual claimants would be entitled to his or her own discovery and response.

Nor would the claims be amenable to disposition by summary judgment.  Asbestos cases are highly fact-intensive.  Defendants in the tort system often question whether a plaintiff has been exposed to their specific product, whether his claimed illness is actually caused by asbestos exposure, and indeed whether the plaintiff is sick at all.  By their very nature, such defenses almost always turn on disputed facts, preventing summary dispositions.  Garlock simply will not be able to demonstrate that there are no genuine issues of material fact with respect to any material number of the claims against it.  Rather, there generally will be enough evidence of exposure and disease to go to the jury.  *See* ACC Info. Br. at 72-75.

In the two Section 524(g) cases in which courts ordered bar dates and allowance proceedings, *Babcock & Wilcox* and *W.R. Grace*, the process was ultimately abandoned.[4]  Faced

---

[3]  *See* Fed. R. Bankr. P. 9014 advisory committee's note ("the filing of an objection to a proof of claim * * * creates a dispute which is a contested matter").

[4]  In *USG*, a bar date order was entered with respect to cancer claims only, so that the debtor's solvency could be determined.  *See In re USG Corp.*, 290 B.R. 223, 227 (Bankr. D. Del. 2003). In an observation pertinent to the Bar Date Motion before the Court in these cases, the court in *USG* noted that if the debtor's aggregate liability for mesothelioma and other cancer claims rendered it insolvent, "small benefit will be gained for immense cost of litigating the entire universe of claims." *Id.* at 224.  The bar date was never imposed.  Rather, the asbestos claimants committee and the debtor filed a consensual plan, which was confirmed after an uncontested (Footnote continued on next page.)

with a proposal similar to Garlock's, the court in *Babcock and Wilcox* recognized these practical problems. In a hearing on a proposed case management order, District Judge Vance of the Eastern District of Louisiana was highly critical of the debtor's arguments that the completed forms could be used to eliminate entire categories of claims. For example, B&W argued that the exposure history on the forms showed that a large number of claimants alleged exposure at locations where there were no B&W boilers, the sole source of exposure at issue in that case. Judge Vance flatly rejected B&W's contention that these claims could be consolidated under Fed. R. Civ. P. 42 and summarily dismissed, stating:

> But the issues are still individual issues. If you are going to lump them all together and say, okay, these 160,000 may have an issue involving exposure — each one of those people has an issue as to exposure that has to be determined * * * Now, how can I do that except one at a time?

Hearing Transcript at 7-8, *In re Babcock & Wilcox.*, (E.D. La. Jan. 25, 2002) (No. 00-cv-558) ("Babcock & Wilcox Hr'g Tr.") (excerpt attached as Ex. 2). The debtor was unable to answer that question to the court's satisfaction. *See id.* at 8-11.

The court in *B&W* correctly recognized that the summary judgment motions would take decades of the court's time, if they could be done at all. "Suppose there's an issue of fact and you lose that summary judgment motion," Judge Vance told the debtor, "[t]hat's not the end of it because you have a backup summary judgment motion down the road because you have about 644,000 possible objections that could be made to these claims if I add all this stuff up." *Id.* at 11. In response to the debtor's remarkable contention that the court could dispose of 93,000 claims in three months, "depend[ing] on how fast you read the papers," Judge Vance pronounced

---

(Footnote continued from previous page.)

confirmation hearing. *See In re USG Corp.*, No. 01-2094 (Bankr. D. Del. June 15, 2006) (Findings of Fact and Conclusions of Law regarding Confirmation) [Dkt. No. 11687] (Ex. 1).

herself "awe-struck." *Id.* at 12-14. Again and again, Judge Vance returned to the basic point that objections to claims must be dealt with on a case-by-case basis.

Toward the end of this colloquy, Judge Vance declared:

> *I think you want to totally undo the bankruptcy process*, and I just don't agree with your interpretation of how that works, that you can't have an estimation process that considers past history of how claims were settled, [that] to make an estimation * * * you have to have an individualized determination of every single claim.

*Id.* at 32 (emphasis added). Faced with Judge Vance's incredulity about their proposed estimation methodology, and with the end of the exclusivity period looming, the debtors negotiated a consensual plan of reorganization with the asbestos claimants' committee.[5]

In *W.R. Grace*, the court imposed a bar date on asbestos personal injury claimants who had lawsuits pending as of the petition date. The debtors wanted the bar date and the submission of claim forms to follow on the heels of an onerous multi-page questionnaire — similar to the proposed proof of claim form here — which the debtors had been permitted to issue to all existing asbestos personal injury claimants for the ostensible purposes of estimating the debtor's liability.[6] Claimants submitted more than 100,000 responses to the questionnaire, with voluminous corroborating documentary evidence attached, all at enormous cost to that constituency. The questionnaire led to numerous and protracted discovery battles, and forced the

---

[5] The plan ultimately led to a confirmation hearing at which various insurance companies contested the debtors' overall asbestos liability. The valuation of the debtors' asbestos liability at the confirmation hearing was based entirely on expert estimation of that liability and the debtors' past claims history, not on the claim forms. B&W's total liability for present and future asbestos claims ranged from $7.1 billion to $ 9.0 billion. *See In re Babcock & Wilcox Corp.*, No. 00-10992, 2004 WL 4945985 (Bankr. E.D. La. Nov. 9, 2004); *see also In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 156 n.11 (D. Del. 2005) (discussing *B&W*).

[6] *See* Case Management Order for the Estimation of Asbestos Personal Injury Liabilities, *In re W.R. Grace & Co.*, No. 01-01139 (Bankr. D. Del. Aug. 29, 2005) [Dkt. No. 9301] (Ex. 3). The court granted the debtor's bar date request in August 2006. *See* Order, *In re W.R. Grace*, No. 01-01139 (Bankr. D. Del. August 24, 2006) [Dkt. No. 13061] (Ex. 4).

court to extend the discovery deadlines and the estimation hearing eleven different times.[7]  The process was so time-consuming for the court that Judge Fitzgerald declared that "she would never do this again," and that it had been a "nightmare."[8]  Then, almost three years into its individual claims discovery program, the debtor stated that simply *coding* the information into a database would take another *eight years.*[9]

The bankruptcy court never had to rule on the estimated value of Grace's aggregate asbestos-related liability.  Instead, after a total of seven years of litigation against the asbestos claimants committee and personal injury claimants in its bankruptcy case, Grace and its former affiliates agreed to fund a Section 524(g) trust.[10]  Ultimately, the bar date, which had generated the filing of tens of thousands of asbestos-related personal claims, did not play any material role in the *Grace* reorganization.  Under Grace's proposed reorganization plan, an asbestos personal injury claimant can receive a distribution from the Section 524(g) trust regardless of whether he or she timely filed a proof of claim.[11]  In sum, Grace's program combining a bar date and onerous claimant questionnaire was a huge waste of time and money.

---

[7]  *See* ACC Info. Br. at 12-13 & n.15.

[8]  Hearing Transcript at 200, *In re W.R. Grace & Co.*, (Bankr. D. Del. Sept. 25, 2006) (No. 01-01139) (excerpt attached as Ex. 5).

[9]  *See* W.R. Grace & Co.'s Response to Emergency Motion of the Official Committee of Asbestos Claimants and David T. Austern the Court Appointed Legal Representative for Future Asbestos Personal Injury Claimants to Compel Production of Complete Navigable Database at 9, *In re W.R. Grace & Co.*, No. 01-01139 (Bankr. D. Del. Mar. 26, 2007) [Dkt. No. 14973] (Ex. 6).

[10]  See ACC Info. Br. at 12-13 & n.15.

[11]  *See* First Am. Joint Plan of Reorganization Under Chapter 11 of the Bankr. Code of W.R. Grace & Co., et al., the Official Comm. of Asbestos Pers. Injury Creditors, the Asbestos PI Future Claimants' Representative, and the Official Comm. of Equity Sec. Holders at 47, *In re W.R. Grace & Co.*, No. 01-01139 (Bankr. D. Del. Feb. 27, 2009) [Dkt. No. 20872] (excerpt attached as Ex. 7).

2.      ***The Asbestos Claims Cannot Be Eliminated Through* Daubert *Challenges to Expert Testimony***

Just as asbestos claims do not lend themselves to collective dispositions on the facts under existing tort law, they are not amenable to disallowance under any special bankruptcy standards. Of course, any effort to disallow claims in bankruptcy would have to rest on statutory grounds recognized by the Bankruptcy Code itself. The statutory grounds for disallowance are detailed and specific. *See* 11 U.S.C. § 502(b). Only one of those grounds has even theoretical relevance here, *i.e.*, the objection that any "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). That ground simply incorporates the rule that claims are tested in bankruptcy by applicable non-bankruptcy law. A claim is not unenforceable under applicable non-bankruptcy law merely because the debtor disputes the merits of the claim or dislikes applicable state tort law. To the contrary, the Bankruptcy Code expressly defines "claim" to encompass a right to payment that is "disputed." 11 U.S.C. § 101(5).

Garlock contends that it will seek disallowance of claims by invoking *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). *See* Bar Date Motion at 25. According to Garlock, courts in the tort system have permitted "dubious medical evidence" (*id.* at 6) that Garlock's products cause asbestos disease, which Garlock apparently assumes would be excluded in this Court under *Daubert*. Apparently, Garlock intends to move to disallow any expert evidence introduced to demonstrate that the asbestos in Garlock's products caused or contributed to causing any asbestos-related diseases. *See* Bar Date Motion at 2, ¶ 4l; Garlock Info. Br. at 80-81.

Garlock's underlying premises are false and have been rejected by independent experts in the scientific and medical community. Contrary to Garlock's repeated assertions, the scientific

evidence is overwhelming that chrysotile asbestos causes all kinds of asbestos diseases.[12] Indeed, there is persuasive evidence that chrysotile asbestos "is by far the main contributor to pleural mesothelioma causation in the U.S."[13]  There is also conclusive evidence that Garlock's asbestos-containing gaskets and packing material emit large quantities of asbestos when installed or replaced; that the asbestos is encapsulated on manufacture does not prevent fibers from being emitted when the gaskets and valve packing are cut, scraped, abraded, or otherwise disturbed while routinely being installed or replaced.  *See* ACC Info. Br. at 45-48.[14]

In asserting that it will have claims disallowed by invoking *Daubert*, Garlock seems to be asserting that claimants cannot produce any expert who could testify that chrysotile asbestos causes disease, or that Garlock's products emit asbestos during normal use when disturbed, or that the asbestos emitted by Garlock's products contribute to causing disease.  But Garlock could not have expert testimony on these issues excluded under *Daubert* just because Garlock disagrees with the experts' conclusions.  *Daubert* provides that a particular expert's testimony is admissible in a particular proceeding so long as the process or technique the expert used in

---

[12]  *See* ACC Info. Br. at 50-55.  *See also* Collegium Ramazzini, *Commentary: Asbestos is Still with Us – Repeat Call for a Universal Ban,* 16 Int. J. Occup. Environ. Health 351, 351-55 (2010) ("All forms of asbestos cause asbestosis, a progressive, debilitating fibrotic disease of the lungs. All forms of asbestos cause human cancer [including] malignant mesothelioma, lung, laryngeal, and ovarian cancers.  * * *  Early suggestions that chrysotile might be less dangerous than other forms of asbestos have not been substantiated * * * numerous epidemiological studies, case reports, controlled animal experiments, and toxicological studies * * * show clearly and consistently that chrysotile is highly dangerous and that it is fully capable of causing cancer.").

[13]  *See* Allen H. Smith & Catherine C. Wright, *Chrysotile Asbestos Is the Main Cause of Pleural Mesothelioma,* 30 Am. J. Ind. Med. 252, 262-66 (2006) (concluding, after careful review of available data, that chrysotile asbestos "is by far the main contributor to pleural mesothelioma causation in the U.S.").  *See also* William J. Nicholson, *The Carcinogenicity of Chrysotile Asbestos - A Review*, 39 Indus. Health 57, 57-64 (2001) (chrysotile "dominates the risk [of mesothelioma] where it is the principal fiber used").

[14]  Further, as the ACC already has demonstrated, Garlock's alleged compliance with safety regulations is no defense to tort liability.  *See* ACC Info. Br at 56-57.

formulating the opinion is relevant and reliable. *Daubert*, 509 U.S. at 589. The reliability inquiry is intended to be a flexible one, designed merely to serve as a threshold query for admissible evidence. *See id.* at 594. As the Supreme Court explained in *Daubert* itself, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 n.15 (3d Cir. 1994) ("The methodology/conclusion distinction remains of some import * * * to the extent that there will be cases in which a party argues that an expert's testimony is unreliable because the conclusions of an expert's study are different from those of other experts. In such cases, there is no basis for holding the expert's testimony inadmissible."). And the court "must err on the side of admission rather than exclusion." *Paoli R.R. Yard PCB Litig. v. Monsanto Co.*, 916 F.2d 829, 857 (3d Cir. 1990). Indeed, Garlock's and other defendants' challenges to expert testimony on these issues under *Daubert* (or under correlative state law standards) in the tort system have repeatedly been rejected. *See* ACC Info. Br. at 67-75. There is no reason to expect a different result in this Court.

Moreover, *Daubert* issues are decided on a case-by-case basis. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court held that whether or not the factors identified in *Daubert* are pertinent for admitting expert testimony depends upon "the particular circumstances of the particular case at issue." *Kumho Tire*, 526 U.S. at 150; *see also id.* at 156 ("The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'") (citation omitted); *see In re Unisys Savings Plan Litig.*, 173 F.3d 145, 156 (3d Cir. 1999); *United States v. Llera Plaza,* 188 F. Supp. 2d 549, 564 (E.D. Pa. 2002). Of course, *Daubert* motions cannot be granted without permitting the proponent of the expert evidence an "adequate opportunity to defend its

admissibility." *Cortes-Irizarry v. Corporacion Insular de Seguros,* 111 F.3d 184, 188 (1st Cir. 1997). *See also In re Paoli R.R.*, 35 F.3d at 739.

Consequently, the only lawful way to implement Debtors' demand for *Daubert* scrutiny of individual claimants' evidence would be by holding tens of thousands of *Daubert* hearings — or even more, depending on the number of experts each claimant would proffer in support of his or her claim. As Judge Vance recognized in *B&W*, the proposed allowance proceedings are simply not feasible.

3. ***The Bankruptcy Court Does Not Have Core Jurisdiction to Determine the Validity of Asbestos Personal Injury Claims by Summary Judgment***

Furthermore, the Bankruptcy Court does not have core jurisdiction to make threshold determinations of the validity of asbestos personal injury claims by summary judgment, and any final orders in such proceedings would have to be issued by the District Court. Each individual asbestos personal injury claimant retains the constitutional right to a jury trial, which is preserved by statute notwithstanding Garlock's bankruptcy. *See* 28 U.S.C. § 1411(a) ("this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim"). Congress has also mandated that such trials be conducted in the district court that presides over the bankruptcy or, if that court so orders, in the district where the claim arose. 28 U.S.C. §§ 157(b)(5). *See* ACC Info. Br. at 10. In the same vein, Section 157(b)(2)(B) expressly excludes "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims" from the definition of core proceedings. 28 U.S.C. § 157(b)(2)(B). The grant of a summary judgment

motion to disallow such a claim results in valuing the claim at zero, effectively liquidating it, and thus is a non-core proceeding.[15]

Bankruptcy courts are thus limited to issuing recommended findings of fact and conclusions of law when presiding over such summary judgment proceedings. Whichever party disagreed with the Bankruptcy Court's recommendations could object, requiring *de novo* review by the District Court before it could issue a final order. *See* 28 U.S.C. § 157(c)(1). And even if the Bankruptcy Court did have core jurisdiction over threshold determinations of the merits of claims, any rulings on Rule 56 motions to disallow the claims, by either the Bankruptcy Court or the District Court, would predictably generate appeals by whichever side was dissatisfied with the outcome.[16]

---

[15] *See, e.g.*, *In re Schepps Food Stores, Inc.*, 169 B.R. 374, 377 (Bankr. S.D. Tex. 1994) (holding that, under Section 157(b)(2)(B), the bankruptcy court lacked core jurisdiction to disallow a personal injury claim based on a state statute of limitations defense, "because to do so would effectively liquidate the claim for purposes of distribution"). *See also In re UNR Indus., Inc.*, 74 B.R. 146, 148 (N.D. Ill. 1987) (holding that the bankruptcy court could not decide a summary judgment motion with respect to a personal injury claim against the bankruptcy estate because a resolution against the creditor could serve as a final adjudication of the creditor's claim on the merits for purposes of distribution).

Courts that have come to the opposite conclusion have reasoned that "liquidation or estimation" refers only to determinations as to the amount of a claim, and does not include determinations as to the validity of the claim. *See In re UAL Corp.*, 310 B.R. 373, 379 (Bankr. N.D. Ill. 2004). *See also In re Dow Corning Corp.*, 215 B.R. 346, 356 (Bankr. E.D. Mich. 1997) ("[A] liquidated debt is one that 'has been made certain as to amount due by agreement of the parties or by operation of law' and that 'the concept of a liquidated debt relates to the amount of liability, not the existence of liability.'") (quoting *United States v. Verdunn*, 89 F.3d 799, 802 (11th Cir.1996)). This rationale is not persuasive, and the courts in these cases make no attempt to explain why a determination that a claim is invalid, and thus worth "zero", does not effectively "liquidate" the claim. Nor do those courts adequately explain how a bankruptcy court can legitimately take upon itself the role of deciding whether a given case is amenable to summary judgment where an erroneous summary disposition would deprive the creditor of a statutory and indeed constitutional right to trial by jury in a district court.

[16] Indeed, for these and other reasons, in *In re Babcock & Wilcox Co.*, No. 00-0558, 2000 WL 422372, at *1 (E.D. La. Apr. 17, 2000), the district court, at the debtor's request, withdrew the reference to the bankruptcy court with respect to, *inter alia*, the bar date motion and the proposed (Footnote continued on next page.)

C.  **What Would Result from a Bar Date/Proof of Claim Process Would Be Many Years of Delay and Tens of Millions of Dollars Spent for No Purpose**

Garlock has proposed an eleven-page proof of claim form that would perform double-duty as a far-reaching — and improper — set of interrogatories and discovery requests concerning the merits of individual claims.[17]  If the form were adopted, it would be so burdensome, if not impossible, to complete within the time-frame contemplated by Garlock that it would operate to disqualify large numbers of claims for which Garlock clearly would be liable if it remained in the tort system.

In *B&W* and *Grace*, where similar (though less far-reaching) proof of claim forms or questionnaires were proposed, litigation over the form tied up the parties and the Court for two years or more.  Similarly time-consuming satellite litigation over the details of the form would certainly occur in Garlock's case, as its proposed form is objectionable in myriad ways.  If any version of the form were ultimately approved, it would be many more years before the forms could be completed and many more years still before Garlock would collate the information they

---

(Footnote continued from previous page.)

summary judgment motions (a proposal later abandoned, as already noted) regarding the validity of claims in that case.  The court held that "partial withdrawal is warranted because it will reduce the uncertainty and confusion that presently exists among a number of courts regarding the bankruptcy court's jurisdiction to make threshold determinations as to the validity of personal injury tort claims and because it will promote judicial economy by eliminating duplicative proceedings."  *Id.*

[17]  By contrast, Garlock's proposed proof of claim form for non-asbestos creditors is closely modeled on Official Form 10, mirroring the prevailing practice where proofs of claims are appropriate.  *See* Ex. A to Debtors' Motion an Order (I) Establishing Bar Dates for Filing Proofs of Claim for Non-Asbestos Claims, (II) Approving Bar Date Notices and Mailing Procedures and (III) Providing Certain Supplemental Relief Claims, dated Sept. 21, 2010 [Dkt. No. 528].  *See also* Fed. R. Bankr. P. 3001(a) ("A proof of claim is a written statement setting forth a creditor's claim" that "*shall conform substantially* to the appropriate Official Form [10]" – *i.e.*, Official Form 10) (emphasis added).

contain for any practical use in court.  And it would take decades for the courts to complete the allowance proceedings Garlock proposes and the appeals that would surely follow.

As a preliminary matter, the role of this Court in any such proceedings would have to be established.  For the reasons discussed in Section I.B.3 above, the Bankruptcy Court cannot be the decision-maker, as threshold determination of a personal injury claim by summary judgment does not fall within core bankruptcy jurisdiction.  Garlock acknowledged in its Information Brief that "there are * * * special jurisdictional rules for personal injury tort and wrongful death claims," and promised that in conjunction with its Bar Date Motion it would "propose an appropriate division of oversight of such issues between this Court and the district court, consistent with this Court's statutory jurisdiction."  Garlock Info. Br. at 83.  In its Bar Date Motion, however, Garlock has completely ignored this significant issue, which would have to be resolved, most likely on appeal, at the outset.

The function of the proof of claim form would also have to be litigated.  The form calls for a remarkable amount of information — well beyond what Garlock could compel plaintiffs to produce in the tort system — much of which most claimants would find difficult to provide.  If Garlock had its way, claimants to whom Garlock would clearly be liable under applicable non-bankruptcy law, but who failed to muster the resources to return their proof of claim forms within the ninety or so days allotted, would find their claims time-barred, disallowed, and "discharged" even before a discharge could be granted under Bankruptcy Code § 1141(d).  *See* Ex. G to Bar Date Motion (Proposed Order).  Additionally, even claimants who returned their proof of claim forms on time but failed to complete them "in [their] entirety" would see their claims "denied" — that is, disallowed and expunged.  *See* Ex. F to Bar Date Motion (Proposed

Asbestos Proof of Claim Form) at 1.  That result is not authorized under the Bankruptcy Code and Rules, and cannot be countenanced by this Court.

In a proper allowance procedure, if Garlock believed a proof of claim form was not adequate or did not present a viable claim, it would have to object to the claim by filing formal objections pursuant to Bankruptcy Rule 3007, and the burden of rebutting the *prima facie* validity of the claim would fall on Garlock.  *See In re Hemingway Transp., Inc.*, 993 F.2d 915, 925 (1st Cir. 1993); *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).  The claimants would be entitled to discovery under Bankruptcy Rule 9014.  Furthermore, the claimants would be entitled to have the Court determine the scope of discovery to which Garlock would be entitled — far narrower, the ACC contends, than what is sought in the proposed proof of claim forms.  Indeed, the scope and scheduling of that discovery would predictably be the subject of much contention, and would engender numerous issues that would have to be resolved by this Court.

There is no automatic dismissal sanction, such as Garlock would seek to apply for failure to fully complete its form.  Under Federal Rule of Civil Procedure 37, made applicable in bankruptcy by Bankruptcy Rule 7037,[18] the ultimate sanction of dismissal of a claim is rarely applied for failure to fully comply with discovery demands.  And dismissal is never granted until an order compelling compliance with the discovery demand has been obtained, there has been a showing of non-compliance, and the person charged with non-compliance has been afforded the opportunity to show cause why the failure should be excused.  7 James Wm. Moore et al., Moore's Federal Practice § 37.42[4] (3d ed. 2007) ("An order awarding sanctions for disobeying

---

[18]  *See In re Rubin*, 769 F.2d 611, 616 n. 6 (9th Cir.1985); *In re Skyport Global Commc'ns, Inc.*, 408 B.R. 687, 694 (Bankr. S.D. Tex. 2009).

a discovery order must be predicated upon a violation of a prior order compelling discovery.").[19]

Additionally, a showing of bad faith, willfulness, or substantial fault would have to be required before a dismissal or default sanction could ever be imposed. *See Nat. Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 640 (1976) (per curiam); *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009); *see also* 7 MOORE'S FEDERAL PRACTICE 3D § 37.05[2][b].

In addition, the Court would have to resolve the numerous objections to the proof of claim form that would be raised by the ACC, the FCR, and the individual claimants and their counsel, upon whom the burden of completing the forms would fall, and who would have to be given an opportunity to object before any version of the form could be approved.[20] Without purporting to be an exhaustive list of the numerous problems raised by the proposed form, the following issues are apparent from even the most cursory review:

---

[19] Indeed, the rules do not permit the Debtors even to seek such an order compelling discovery until they have issued their discovery and the claimants have been afforded a chance to object to the discovery. *See id.* § 37.05[1]; *see also Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1310 (3d Cir. 1995).

[20] In addition, Garlock's proposed Notice Plan is woefully inadequate, and seems designed to ensure that potential claimants do not learn of the potential impact on their rights. Garlock's plan depends heavily on unidentified "plaintiffs' firms" to notify claimants. *See* Bar Date Motion at 19-20; Ex. E to Bar Date Motion (Bar Date Notice Plan) at 6. Garlock does not even intend to publish notice in newspapers distributed in the United States, though it would send out a "press release" to newspapers, merely "directing them to the Bar Date website." *See* Bar Date Notice Plan at 12. Garlock plans to publish a small notice in only five territorial newspapers and four periodicals; no publication would be made via television or radio. *See* Bar Date Notice Plan at 12-13. Remarkably, the search terms "mesothelioma" and "asbestos" would not retrieve Garlock's internet notification, unless coupled with "Garlock" or other terms. *See* Bar Date Notice Plan at 10-12. Thus, a newly-diagnosed mesothelioma victim researching his disease online would not be likely to find Garlock's notice. Further, the form of the notices themselves are not in plain English, but rather legalese, and would be all but unintelligible to most potential claimants.

These and the numerous other issues raised by the Notice Plan and form of notice would also have to be resolved by the Court, after the ACC, the FCR, and the claimants and their counsel were afforded the necessary discovery to fully evaluate the proposal, and file their objections with the Court.

- There are no instructions accompanying the form, although it refers to instructions that must be followed to complete it.

- It appears that no electronic filing system for the claim form has been devised, although, under Garlock's proposal, counsel would somehow be required to file electronically (but outside the Court's ECF System).

- Many of the questions in the form are virtually impossible to answer. For example, claimants are asked to list every job they ever held, the name and address of every employer, specific dates of employment, regardless of whether the claimant was exposed to asbestos at those jobs. The claimant is also to identify every worksite at which he or she was exposed, with the specific names of the asbestos-containing products, tool used, and other details. It is simply unrealistic to expect that claimants will have all of that information available. Indeed, claimants often do not know the names of the products to which they were exposed on jobsites, but rely on third-party depositions, shipping manifests, and other sources to find out.

- The form demands the opinions of plaintiffs' counsel with respect to the relative culpability of each tortfeasor and would thus impermissibly invade the work product privilege.

- The form violates the presumptive limit of 25 interrogatories, including sub-parts, under Fed. R. Civ. P. 33.

- The form asks for irrelevant information, much of it confidential, such as settlements with other defendants and third-party trusts.

Thus, it can be anticipated that litigation on the numerous and significant issues raised by the form alone would take two years, as did the less ambitious forms proposed in *B&W* and *Grace*.

In addition, the burden that the forms would place on claimants and their counsel is unprecedented. Garlock's suggestion that the claims forms could be distributed and completed in less than four months is unrealistic on its face. The proof of claim form runs eleven pages, with approximately 687 individual entries to fill in, excluding continuation sheets. If we assume the Debtors' estimate of the number of claimants (124,000) is correct, and if we estimate that it would take about three hours to complete each form (obtaining the information for and filling in roughly four entries per minute on average), the total number of hours required to complete all the forms would be 372,000 hours (*i.e.*, 124,000 multiplied by 3) — which amounts to 186 years of work. Additionally, a significant amount of attorney time would be required, because of the types of information sought. This is far in excess of the time that would be available to complete the forms if the bar date were January 17, 2011, as the Debtors propose. And a close reading of the form makes clear that it is highly unlikely to take only three hours to complete.

The cost of the exercise would be enormous as well. Assuming that the claimants' law firms could enlist sufficient additional paralegals to complete the work and assuming, conservatively, a cost of $25 per hour for each paralegal, the total cost of the exercise would be $9,300,000 (*i.e.*, 372,000 multiplied by $25). That figure does not take into the account the significant amount of attorney time that will be required, at a higher hourly rate, the cost of recruiting and training paralegals to complete the forms, the cost of obtaining a physicians' diagnostic reports that fulfill all the requirements demanded by the Debtors, and other unforeseen expenses.

II.   **BECAUSE THE DEBTORS ARE HOPELESSLY INSOLVENT THERE IS NO LEGITIMATE PURPOSE FOR A BAR DATE/PROOF OF CLAIM FORM AND ALLOWANCE PROCEEDINGS**

The main purpose of a bar date and allowance proceedings in a bankruptcy case is to bring to light the claims against, and determine the total liabilities of, the estate, so that the assets

may be distributed to the creditors swiftly, and finality can be achieved.[21]  In these bankruptcy cases, Garlock's stated purpose for the proposed allowance procedings is not to determine and deal with its asbestos liabilities, but to reduce or even eliminate those liabilities, and salvage equity for its shareholder EnPro.  *See* Garlock Info. Br. at 85.  But Garlock's goal is improper and cannot be achieved.

The asbestos personal injury claims, which are Garlock's only significant liabilities,[22] have rendered Garlock deeply insolvent, and EnPro has no just claim to any share of the assets of the estates.  Faced with this reality, EnPro and Garlock are threatening the claimants with soaring costs and a protracted bankruptcy.  Their obvious goal is to gain undue negotiating leverage and extract an undeserved equity interest.  This is a clear abuse of the bankruptcy process.  If the Court were to adopt the Debtors' proposed course of proceeding, the costs in time and money to the estate, the claimants, and the Court, would be enormous and unconscionable.

This Court should be highly skeptical of the Debtors' proposal.  As the Supreme Court has noted, the absolute priority rule, and the requirement that a plan of reorganization be "fair

---

[21]  *See, e.g.*, 9 *Norton Bankruptcy Law and Practice* § 179:11 (3d ed. 2010) ("The purpose of a bar date is to provide 'a definitive cut-off date past which claims may not be filed' * * * so that the total number and amount of claims against the debtors' estate can be calculated, the estate divided, and the remainder of the debts discharged. The bar date advances the Code's goal of expeditious claim adjudication.").  *See also In re Johnson*, 84 B.R. 492, 494 (Bankr. N.D. Ohio 1988) ("the purpose of a claims bar date is to provide the debtor and its creditors with finality and to insure the swift distribution of the bankruptcy estate.") (internal citation omitted); *In re Charter Co*., 876 F.2d 861, 863 (11th Cir. 1989) (same); *In re Nwonwu*, 362 B.R. 705, 708 (Bankr. E.D. Va. 2007) (same).

[22]  Other unsecured liabilities total approximately $4.5 million, after excluding intra-company notes.  In addition, there may be as much as $18 million in secured liabilities.  *See* Declaration and Schedules A-H, *In re Garlock Sealing Techs.*, No. 10-31607 (Bankr. W.D.N.C. July 20, 2010).  *See* Declaration Statement of Financial Affairs, Official Form 6, Schedules A-H, *In re Garrison Litig.* No. 10-31608 (Bankr. W.D.N.C. July 13, 2010); *see* Official Form 6, Schedules A-D, *In re Anchor Packing Co*, No. 10-31606 (Bankr. W.D.N.C. July 13, 2010).  *See also* Ex. 12.

and equitable," reflect Congress' recognition of "the danger inherent in any reorganization plan proposed by a debtor, then and now, that the plan will simply turn out to be too good a deal for the debtor's owners." *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999). Congress, the Court noted, was concerned with "the ability of a few insiders, whether representatives of management or major creditors, to use the reorganization process to gain an unfair advantage". *Id.* (quoting H.R. Rep. No. 93-137, 93rd Cong., 1st Sess. at 255 (July 1973)). That concern is particularly applicable here. This Court should firmly decline to embark on a course of proceeding that would consume the assets of the estates and the creditors, as well as the Court's time, at the behest of obviously insolvent Debtors who are controlled by the shareholder for whose sole benefit the proceeding is proposed.

While the ACC requires access to Garlock's historical claims database to perform a thorough solvency analysis, a preliminary assessment, based on publicly-available information and statements by Garlock in these bankruptcy cases, demonstrates that Garlock's liability for mesothelioma claims alone renders it insolvent — before even taking into consideration claims involving lung cancer and other cancers, asbestosis, and pleural diseases. Thus, the vast bulk of the estates' assets (other than the relatively small amount to be paid to Garlock's non-asbestos creditors) must be contributed to fund the Section 524(g) trust, which will assume the task of resolving the asbestos claim. No portion of the estate will remain for Garlock's shareholder. The bar date and elaborate allowance-then-estimation proceedings that Garlock has proposed would serve no legitimate purpose. Rather than "insure the swift distribution of the assets of the estate[s]," *In re Johnson*, 84 B.R. at 494, the only result would be delay and waste.

A corporation is insolvent when "the sum of such entity's debts is greater than all of such entity's property, at fair valuation." *In re Bulldog Trucking, Inc.*, 66 F.3d 1390, 1398 n.11 (4th

Cir. 1995). *See also* 11 U.S.C. § 101(32)(A). The ACC does not have all of the Debtors'

financial information, and so cannot do a complete analysis of the assets and liabilities of the

estates at this time. However, based on public information and data provided by Garlock in these

cases and drawing reasonable inferences from other asbestos cases, it is clear that Garlock's

liability for mesothelioma claims alone renders it deeply insolvent. A conservative estimate of

Garlock's liability for present and future mesothelioma claims is more than $1.5 billion, while

the total equity of the consolidated Debtors is no more than $882 million.

**A.    Garlock's Aggregate Liability for Pending and Future Mesothelioma Claims
Exceeds $1.5 Billion**

Garlock has proffered only limited information on its asbestos claims history. While it

has disclosed the number of pending claims for all types of diseases (mesothelioma, lung cancer,

other cancers and nonmalignant diseases), it has disclosed average settlement values, the number

of claims filed, and the number of claims settled for mesothelioma claims only. *See Bar Date*

*Motion* at 4-7. That data is sufficient, however, to establish that Garlock's liability for

mesothelioma claims alone far exceeds what Garlock and its shareholder, EnPro, have put forth

in public filings as the worst case scenario for total asbestos liability.[23]

Briefly, total asbestos liability is calculated by multiplying the number of claims received

by the average settlement value and by the percentage of claims actually paid.[24] According to

Garlock, its average settlement value for a mesothelioma claim since 2006 has been over

---

[23] In its most recent Form 10-K, EnPro estimated Garlock's total asbestos liability as falling
within the range of $480 million to $602 million. *See* EnPro Indus., Form 10-K, Mar. 3, 2010, at
34 (excerpt attached as Ex. 8). EnPro indicated that its consultants also produced a broader range
of estimates, from $252 million to $698 million, and warned that "scenarios continue to exist that
could result in total future asbestos-related expenditures for Garlock in excess of $1 billion." *Id.*
at 35.

[24] *See In re Federal-Mogul Global, Inc.,* 330 B.R. 133, 144 (Bankr. D. Del. 2005).

$75,000.[25]  Based on numbers provided in Garlock's Information Brief and Bar Date Motion, and in public statements, Garlock paid 9,500 (or 82.2%) of the 11,558 mesothelioma claims that it resolved between 2000 and 2009.[26]  Thus, one can fairly assume that, had Garlock remained in the tort system, it would have paid 82.2% of the claims against it at the average settlement value of $75,000.  According to Garlock, the total number of pending mesothelioma claims against it is 5,372.[27]  Assuming that only 82.2%, or 4,416, of those claims would be paid, at an average payment of $75,000, the total liability for pending mesothelioma claims would be $331 million.

Garlock's liability for future mesothelioma claims (or, more accurately, "demands")[28] depends on the number of such claims that will be brought against it in the future.  The generally-accepted methodology used to predict future claims, which has been adopted by numerous courts conducting asbestos estimation proceedings,[29] is derived from the Nicholson

---

[25]  *See* Bar Date Motion ¶¶ 10 and 13, at 5, 6.  *See also* EnPro Indus., PowerPoint Presentation for EnPro Investor and Analyst Meeting, June 10, 2010, at 39 (excerpt attached as Ex. 9) (stating that the average settlement values for mesothelioma claims for the last four years were $78,700 (2006), $72,400 (2007), $75,600 (2008), and $74,100 (2009)).

[26]  Garlock received 16,500 mesothelioma claims between 2000 and 2009 and paid 9,500 such claims during the same period. *See* Bar Date Motion ¶13, at 6 ("[B]etween 2000 and 2009, an average of 1,650 mesothelioma claimants per year sued Garlock * * * [which] paid approximately 950 mesothelioma claims per year * * *.").  Only 4,492 of the claims filed during this period remain pending, which implies that the remaining 2,058 claims, or 17.8%, were "zero-pay" claims (*i.e.*, resolved with no payment).  Thus, 82.2% of claims were paid.

This percentage of claims paid is necessarily an estimate because, without discovery of Garlock's claims database, the ACC is unable to determine how many of the claims paid during the period 2000-2009 were actually filed prior to 2000.  The calculation in the text above assumes that claims paid during the period 2000-2009 were also filed during this period.

[27]  *See* Ex. C to Bar Date Motion (Pending Asbestos Complaints Against Garlock by Year of Filing) at 2.

[28]  "Demands" are rights against a debtor for payment for asbestos injuries that will not be asserted until after the bankruptcy case is over.  *See* 11 U.S.C. § 524(g)(5) (defining "demands").

[29]  *See, e.g.*, *In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 144 (Bankr. D. Del. 2005); *In re Armstrong World Indus.*, 348 B.R. 111, 113 (Bankr. D. Del. 2006).

Study,[30] an epidemiological study that has proven to be remarkably accurate in predicting the incidence of mesotheliomas that will arise each year. In previous asbestos bankruptcy cases, liability estimates accepted by the courts have assumed a number of anticipated future claims several times higher than the number of present claims. This is not surprising. As the Nicholson Study demonstrates, large numbers of workers are expected to fall ill from mesothelioma, the "signature" asbestos-related disease,[31]for decades to come.

Based on experiences in other cases and Garlock's known experience in the tort system, a conservative back-of-the-envelope estimate forecasts that approximately 21,500 additional mesothelioma claims will be asserted against Garlock in the future, a ratio of future claims to present claims of approximately 4:1.[32] Assuming that 82.2% of those claims will be settled, for

---

[30] William J. Nicholson et al., *Occupational Exposure to Asbestos: Population at Risk and Projected Mortality – 1980-2030*, 3 American Journal of Industrial Medicine 259, at 259 (1982) (forecasting the incidence of mesothelioma and asbestos-related lung cancer in the United States from 1980 through 2027). *See also* the discussion of the Nicholson Study in the ACC Information Brief, at 16-17.

[31] See ACC Info. Br. at 65-66.

[32] This ratio of future to pending mesothelioma claims is in keeping with that used in estimates in other asbestos cases. The court in *In re Armstrong World Indus.* adopted a liability estimate that included 3,134 pending mesothelioma claims against the debtor, and an additional 47,973 mesothelioma claims that would be asserted in the future, a ratio of future to pending claims of more than 15 to 1. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 134 (D. Del. 2006). *See also* Mark. A. Peterson, *Armstrong World Industries, Inc. Projected Liabilities for Asbestos Personal Injury Claims*, Table 12, at 22, and Appendix A, Table A-3, at A-3 (March 29, 2006) (excerpt attached as Ex. 10). The Nicholson Study shows that the incidence of mesothelioma will decline after it peaked during the 2000 – 2009 period. Because the *Armstrong* estimate included future claims from the period 2000- 2009, adjustments have to be made to remove future claims from that period in order to provide a proper basis for comparison to the estimate of Garlock's future claims. Subtracting the 18,526 claims that were anticipated to arise during the 2001-2009 period in *Armstrong* leaves a ratio of more than 9:1.

Similarly, in *In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 164 (Bankr. D. Del. 2005), the court adopted a total liability estimate that included 3,002 pending mesothelioma claims, and a range of 27,850 to 37,339 future claims, a ratio of future to pending claims of between 9 and 12 to 1. *See* Mark. A. Peterson, Turner and Newall, Inc., *Projected Liabilities for Asbestos* (Footnote continued on next page.)

an average of $75,000 per claim, and adjusting the average value for inflation, the present value of Garlock's liability for future mesothelioma claims is about $1.2 billion. When added to the $331 million liability for present claims, this produces an aggregate liability for present and future mesothelioma claims of approximately $1.5 billion. This estimate appears highly reasonable, in light of Garlock's own statement that it already has spent more than $1.3 billion resolving asbestos claims. *See* Garlock Info. Br. at 1.

The ACC's preliminary estimation of Garlock's liability, of course, is not precise, given that it is derived from numbers Garlock and EnPro have carefully selected to present in their filings in these cases and in EnPro's investor presentations. Nor does it account for claims for lung cancers, other cancers, and nonmalignant diseases caused by exposure to Garlock's products. The ACC therefore expects that Garlock's aggregate asbestos liabilities will prove to be much higher, once Garlock's claims, verdict and settlement database is made available and analyzed. The point now, however, is that Garlock's limited published data regarding its exposure for mesothelioma claims alone point to an overwhelming liability.

### B. Garlock's Liability for Mesothelioma Claims Alone Renders it Insolvent, Since the Debtors' Consolidated Equity is, at Most, $882 Million

One can derive a rough estimate of the Debtors' total equity from the Debtors' Statements of Financial Affairs (the "**Statements**")[33] filed with this Court, and other publicly

---

(Footnote continued from previous page.)
*Personal Injury Claims*, Table 17, at 23, and Appendix A, Table A-3, at A-3 (Nov. 29, 2004) (excerpt attached as Ex. 11). Subtracting the 13,501 claims estimated to arise during the 2001-2009 period from the lowest estimate of future claims leaves a ratio of more than 4.7:1, still significantly higher than the ratio we are using here to demonstrate Garlock's probable insolvency.

[33] *See* Declaration and Schedules A-H, *In re Garlock Sealing Techs.*, No. 10-31607 (Bankr. W.D.N.C. July 20, 2010). *See* Declaration and Schedules A-H*, In re Garlock Sealing Techs.*, No. 10-31607 (Bankr. W.D.N.C. July 20, 2010). *See* Declaration, Statement of Financial
(Footnote continued on next page.)

available information. Based on the Statements, as summarized in Exhibit 11, the consolidated equity value of the Debtors (excluding inter-company obligations among the Debtors) is approximately $550.9 million.[34] However, the assets and liabilities in the Statements are scheduled at book value (historical cost). Thus, the $550 million equity value does not take into account the going concern value of Garlock LLC (other than its subsidiaries), and so is likely understated.

For a better estimate of the equity value of the Debtors, we determined a "going-concern" enterprise value ("**EV**")[35] related to the operating assets and liabilities, which we used in place of the book value of the operating assets and liabilities. We then added non-operating assets and deducted non-operating liabilities (both at book value) from the enterprise value to arrive at an adjusted equity value for the Debtors.

---

(Footnote continued from previous page.)

Affairs, Official Form 6, Schedules A-H, *In re Garrison Litig.*, No. 10-31608 (Bankr. W.D.N.C. July 13, 2010); *see* Official Form 6, Schedules A-D, *In re Anchor Packing Co.*, No. 10-31606 (Bankr. W.D.N.C. July 13, 2010).

[34] The ACC has generated a consolidated balance sheet based on the Statements. *See* Ex. 12. Liabilities do not include any amount for asbestos claims, and, while current insurance receivables are included in assets, prospective insurance recoveries and tax benefits from the payment of future claims are not assigned any values in the Schedules. The notes to the Schedules also indicate that (with the exception of Garlock LLC's investments in subsidiaries, which were valued on a discounted cash flow basis) all assets and liabilities were based on book values as of the date of the bankruptcy filing.

[35] The term enterprise value is "generally used to represent some sort of aggregate value of the company…." Shannon P. Pratt and Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 37 (5th ed. 2008) ("**Pratt**"). Enterprise value here is calculated as the market equity capitalization for the company, plus preferred stock, plus the book value of debt, less cash and cash equivalents.

Analysts often derive enterprise value by a "market multiples" valuation.[36] Here, we identified guideline companies that have comparable operations to Garlock LLC — including EnPro, Garlock's parent company — and divided their current enterprise value by earnings before interest and taxes ("**EBIT**").[37] The resulting range of market multiples was 8.1 to 16.1.[38] Based on securities filings and public statements by EnPro, a conservative EV/EBIT multiple for EnPro is 8.1, the lowest of the market multiples.[39] Garlock's EBIT for the twelve months prior to June 2010 was roughly $29.2 million.[40] Applying EnPro's 8.1 multiple, Garlock LLC's operating EV is roughly $236.5 million.[41] Adding this figure to the Debtors' non-operating assets, and subtracting non-operating liabilities, produces an equity value for the Debtors of

---

[36] *See, e.g.*, http://www.investopedia.com/terms/e/ev-ebitda.asp (last visited Sept. 17, 2010); Richard Loth, *Investment Valuation Ratios: Enterprise Value Multiple*, http://www.investopedia.com/university/ratios/ investment-valuation/ratio8.asp (last visited Sept. 17, 2010).

[37] For more on ratio analysis, *see, e.g.*, James R. Eck et al., *Asset Valuation* §§ 29.01-29.07, 30.08, 30.11 (1st ed. 1991). *See also, e.g.*, Jonathan E. Clarke, *Handbook of Modern Finance* D6.05[4][d] at D6-32 (12 ed. 2010); Pratt at 313.

[38] *See* Exhibit 13. All of the guideline companies have substantially larger revenues than Garlock LLC. In general, all other factors being equal, larger companies have greater access to capital markets and lower perceived risk, which typically translates into higher trading multiples. For that reason, we consider it highly unlikely that Garlock LLC's EV to last-twelve-month EBIT would exceed the high end of the multiple range for the guideline companies.

[39] *See* EnPro *Indus.*, PowerPoint Presentation on Garlock Sealing Technologies LLC Asbestos Claims Resolution, June 7, 2010, at 27-32 (Ex. 14); EnPro Indus. Form 10-Q, June 30, 2010, at 1-7 (Ex. 15); EnPro Indus. Form 10-K, Mar. 3, 2010, at 55-59 (Ex. 8). The complete EnPro Indus. Form 10-Q, June 30, 2010 is available at http://www.sec.gov/Archives/edgar/ data/1164863/000095012310075077/g24294e10vq.htm. The complete EnPro Indus. Form 10-K, Mar. 3, 2010 is available at http://www.sec.gov/Archives/edgar/data/1164863/ 000095012310020653/g22340e10vk.htm.

[40] *See* EnPro Indus., PowerPoint Presentation for EnPro Investor and Analyst Meeting, June 10, 2010, at 127-128 (Ex. 9); EnPro Indus. Form 10-Q, June 30, 2010, at 6-7 (Ex. 15).

[41] Because Garrison has been a claims processing company for Garlock and Anchor, and Anchor had no operations (*see* ACC Info. Br. at 36 and 36 n.92), the operating enterprise value for Garlock LLC is the operating enterprise value for the Debtors collectively.

roughly $648.7 million.  *See* Exhibit 16.  Applying the highest market multiple of 16.1 produces

an estimate of $882.3 million in equity.  *See* Exhibit 17.

As with the liability estimates, these figures are not precise, since they are derived from

the carefully selected numbers that Garlock has chosen to provide in its filings in these cases,

and EnPro's investor presentations.  The ACC requires discovery concerning the size of the

estates to refine these calculations and to determine the extent of the assets available to Garlock's

creditors.   But with equity value in the range of $648.7 million to $882.3 million and

mesothelioma liabilities of roughly $1.5 billion there can be no serious question that Garlock is

deeply insolvent, and that the allowance proceedings it proposes are designed to "preserve"

equity that does not exist.  Such proceedings would serve no legitimate purpose.

III.   **CASE AFTER CASE HAS SHOWN THAT THE DEBTORS' HISTORICAL
       CLAIMS RESOLUTION HISTORY PROVIDES THE BEST FACTUAL BASIS
       UPON WHICH TO ESTIMATE THE ASBESTOS LIABILITY**

A.     **The Best Source of Information for Measuring Garlock's Asbestos Liability
       Is Its Historical Claims Database**

Garlock is indubitably insolvent; the only real question is the amount of the shortfall.

Garlock cannot refute its insolvency by *ipse dixit* assertions that the tort system is irrational and

unfair, or that the amounts Garlock willingly paid to settle mesothelioma claims do not

accurately reflect what Garlock now believes to be its "true responsibility" for the injuries to its

victims.  Bar Date Motion at 11-12.  Garlock's "true responsibility" is what it would have paid

its asbestos victims in the tort sytem in the absence of bankruptcy.[42]  Garlock's historical record

of claims resolution in the tort system, including results achieved by settlement and verdict, over

decades, provides the best available data for determining its aggregate liabilities for present and

---

[42]  *See Federal-Mogul*, 330 B.R. at 155 ("It is, after all, a general principle in bankruptcy law
that, for bankruptcy purposes, state law governs the validity and amount of a claim.").

future asbestos claims. When Garlock ignores or deprecates the values that emerged from that process, it essentially seeks to escape history and invent a world that does not exist. Such wishful thinking on the Debtors' part, and the desperate litigation maneuvers it engenders, should be met with a high degree of skepticism.

Fundamental principles of bankruptcy law and federalism prohibit the parties or this Court from ignoring or overriding the values placed on asbestos claims in the tort system. Asbestos personal injury tort and wrongful death claims are creatures of state law (or, in maritime cases, admiralty law). Accordingly, applicable non-bankruptcy law governs the validity and value of the claims. *See* ACC Info. Br. at 41-42. No federal doctrine, procedure, or practice can legitimately change the outcomes or supplant the values that would be arrived at in the tort system. As the Supreme Court has repeatedly emphasized, with specific reference to the claim allowance function, the "basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007) (citations and internal quotations omitted). *See also Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) (same); *Butner v. United States*, 440 U.S. 48, 54 (1979) (same); *Owens Corning v. Credit Suisse First Boston (In re Owens Corning)*, 322 B.R. 719, 721 (D. Del. 2005) (estimating aggregate asbestos liabilities, and noting that "[t]he claims being valued arise under state law, hence state law determines their validity and value."). Thus, claims in bankruptcy must be given the value they would have under applicable non-bankruptcy

law.  Nothing in the Bankruptcy Code would authorize this Court to promulgate its own tort law and disallow asbestos claims that would be recognized in the state courts.[43]

Garlock and its insurers had long experience litigating asbestos claims before resorting to bankruptcy, having resolved tens of thousands of claims.  That history generated a rich body of data that makes it possible to estimate the Debtor's remaining liability in an objective way. Indeed, that data — which reflect Garlock's and its insurers' own assessments of the claims values, *i.e.*, the amounts necessary to resolve those claims — provide the *only* realistic starting point for determining the settlement value of unresolved claims, and deriving a reasonable estimate of Garlock's aggregate liability for pending and future claims.  It is meaningless to speak of claim values or "true responsibility" outside of the context of actual litigation.

While Garlock was defending asbestos claims in the tort system, management no doubt exercised its business judgment in Garlock's best interest at every juncture, and made rational decisions in the enlightened self-interest of the company, with the overall objective of minimizing the outlays and the liability.  When negotiating settlements, Garlock and its insurers were constantly motivated to minimize Garlock's overall costs.  The Court should not look behind the business decisions that generated Garlock's claims resolution history as reflected in its own database.

There is no reason, for example, to go through a bar date and claims allowance procedure to determine how many of the pending claims against Garlock are likely to be resolved without payment.  *See* Bar Date Motion at 10.  Under well-established methods, the number of "no

---

[43] The Debtor has not even attempted to show any statutory basis for disallowing asbestos claims under Section 502(b) of the Bankruptcy Code.  Such claims would hardly be "unenforceable against the debtor and property of the debtor, under any agreement or applicable law," 11 U.S.C. § 502(b)(1), and no other subpart of Section 502(b) has any conceivable relevance.

pays" among pending and future claims will be reliably estimated based on statistical analysis of Garlock's claim history. As noted in Part II.A, above, history indicates that Garlock resolved 17.8% of the mesothelioma cases against it without payment. Those "zero-payment" cases will be factored into the parties' experts' estimates of Garlock's remaining liabilities. *See In re Federal-Mogul Global, Inc.*, 330 B.R. at 146 (noting that an estimate of liability will take into account the percentage of claims that are paid).

Nor are a bar date and allowance proceedings necessary to account for changes in the law regarding the treatment of claims for non-malignant diseases, or to determine the effect of the "Bankruptcy Wave" on Garlock's liability. *See* Bar Date Motion at 10. Rather, these are matters that the parties' experts can consider in valuing Garlock's pending and future claims. The impact of historical events already will be fully reflected in the claims database and, where appropriate, extrapolation from historical figures can be adjusted to reflect changed circumstances. *See In re Owens Corning,* 322 BR. at 725. However, it bears noting that Garlock's self-serving assertions that jury verdicts against it were wrong, that its settlement values are artificially inflated, and that has paid more than its share of liability in the tort system do not justify any such adjustments to the historical data as the appropriate yardstick for estimation. These unsubstantiated assertions certainly do not justify discarding that yardstick completely and miring this Court and the District Court in years-long discovery disputes and allowance proceedings.

There is no basis for the contention that Garlock paid any claims unnecessarily, much less that Garlock and its insurers paid more than a billion dollars for meritless claims. Rather, like other asbestos defendants, Garlock settled claims that were likely to survive motions for summary judgment, while contesting the rest. Indeed, Garlock managed to resolve almost 20%

of the mesothelioma claims against it without payment.  Nor is there any substance to Garlock's complaint that it paid more than its fair share of asbestos victims' damages in the tort system. *See* ACC Info Br. at 13-16.  All defendants' costs for asbestos claims have increased sharply since 2000.  A review of Mealey's Asbestos Litigation Reporters for the relevant years reveals that for the period 1993 through 1999, the average jury verdict in favor of a plaintiff in a mesothelioma case was $3.9 million (in 2009 dollars), and almost doubled, to $7.4 million (in 2009 dollars), during the period 2000 through 2009.  *See also* Hearing Transcript at 26, *In re Armstrong World Indus.*, (D. Del. May 23, 2006) (No. 00-CV-4471) (excerpt attached as Ex. 18) (Daniel Myer, who was an outside claims negotiator for Armstrong, USG, Union Carbide, Federal-Mogul, and GAF, among others, testifying that, in the 1999-2000 timeframe, "the estimated gross value of a mesothelioma case was between 2 and a half to 3 and a half million dollars," and that "the total gross value of a mesothelioma case [in 2006] is somewhere in the range of between [$]5 to $8 [million].").

At the same time that liability costs were growing for all defendants, Garlock was experiencing additional liability pressures as a natural consequence of bankruptcy filings by some of the larger asbestos defendants.  Garlock's contention that its liability costs should have reverted to pre-2000 levels as the debtors emerged from bankruptcy and established Section 524(g) trusts is fanciful and ignores economic realities.  *See* Bar Date Motion at 6-8.  One such reality is that, because those larger debtors were insolvent, the trusts that now stand in their shoes lack resources to pay more than a small percentage of the amounts that those debtors paid before bankruptcy.  *See* ACC Info. Br. at 86.  Garlock's desire to escape reality and minimize its liabilities in order to enrich its shareholder is no justification for the allowance proceedings it proposes.

All courts have found that the appropriate methodology for determining aggregate asbestos liability is estimation by reference to claims history. *See, e.g.*, *In re Eagle Picher Indus., Inc.,* 189 B.R. 681, 684-86 ("the only sound approach is to begin with what is known; namely the data in the [debtor's claims] database"); *In re Armstrong World Indus., Inc.*, 348 B.R. 111 (D. Del. 2006); Certification of No Objection, *In re Babcock and Wilcox*, No. 01-30135 (Bankr. D.N.J. December 19, 2003); *In re Owens Corning*, 322 B.R. at 725; *In re Federal-Mogul Global*, 330 B.R. at 157 (same).[44] No court has ever estimated a company's aggregate asbestos-related liability by reference to data obtained from responses to proof of claim forms or questionnaires issued to claimants. *See, e.g.*, Hearing Transcript at 284-285, *In re W.R. Grace & Co.* (Bankr. D.Del. Sept. 15, 2009) (No. 01-01139) (excerpt attached as Ex. 19) (testimony that a methodology proposed by W.R. Grace to estimate its aggregate asbestos-related liability, which would have used data collected from claimants' responses to proofs of claims forms and questionnaire, was "novel" and "unusual" and, to his knowledge, had never been approved or adopted by a court in the "history of estimation").

*Owens Corning* is instructive. In that case, District Judge John P. Fullam rejected a proposal made by Credit Suisse First Boston, an agent of holders of bank debt, to impose for estimation purposes a bar date and liability criteria, and to take discovery of asbestos claimants, based on many of the same arguments Garlock makes here. Instead, Judge Fullam scheduled an estimation hearing, ruling that "the data now available – the Debtor's claim history, the

---

[44] These estimation cases establish that the key considerations that should enter into a court's estimate of a debtor's aggregate asbestos liability are: (1) the past claims resolution history of the debtor company; and (2) *foreseeable* trends in the incidence of asbestos related diseases and in the real world litigation landscape in which the claims would have been resolved, but for the bankruptcy. *See Armstrong*, 348 B.R. at 123-24; *Owens Corning*, 322 B.R. at 721-25; *Federal-Mogul*, 330 B.R. at 155; *Eagle-Picher*, 189 B.R. at 690-92.

experience in other cases, etc. – viewed in light of the expert testimony at the scheduled hearing, should probably suffice for Claims Estimation purposes." *See* Order, *In re Owens Corning*, Nos. 00-3837-3854 (Bankr. D. Del. Aug. 19, 2004) [Dkt. No. 12520] (Ex. 20).

The court reiterated that position shortly thereafter. Credit Suisse filed a motion seeking discovery and valuation of a "sample" of individual claims on the grounds that such information was necessary to determine the debtors' aggregate asbestos liabilities. *Id.* The court once again found that the data from Owens Corning's claims history was sufficient, and that discovery of individual claimants' medical records was unwarranted and would simply result in unnecessary delay and expense. Memorandum and Order Denying Motion to Establish Procedures to Obtain a Sample of Medical Records at 1, *In re Owens Corning*, Nos. 00-3837-3854 (Bankr. D.Del. Nov. 22, 2004) (Ex. 21).

Credit Suisse contended that the discovery of individual claimants' medical files was necessary to allow it to show that most nonmalignant claims paid by the debtors should never have been paid. Thus, Credit Suisse argued (as does Garlock in these cases), that the historical claims resolution values were artificially inflated. Credit Suisse was constrained to inform the court that even its relatively narrow sample — exponentially smaller than the massive discovery Garlock seeks here — would require postponing the estimation hearing by "a period of six months to a year." *Id.*

Judge Fullam denied Credit Suisse's request and rejected the proposed discovery on the grounds that "no useful purpose would be served by further delaying matters, and running up additional legal bills, to prove what is already reasonably well known." *Id.* at 2. His reasoning was clear, succinct and persuasive, and is equally applicable in these cases:

> The record already contains substantial evidence to support the notion that Owens
> Corning's history of dealing with asbestos claims has included payments to large

numbers of claimants who actually sustained little or no harm from their exposure to Owens Corning's products. *The relevant data have been available for analysis for many years. The conclusions drawn by experts have long been debated, and will be fully aired at the January hearing.* In the unlikely event that the information now available proves insufficient to enable a reasonably correct estimate of future claims, that issue, too, will be considered at the hearing in January.

*Id.* at 1-2 (emphasis added).

Judge Fullam emphasized that the task was to estimate aggregate liability — "to determine what amount of money will be necessary, and sufficient, to cover Owens Corning's liability to claimants in the real world in which such claims will be resolved" — not to determine the legitimacy of individual claims. Rather, the task of testing individual claims was explicitly left for another day, to be dealt with by the trust. Only after the aggregate liability was estimated, Judge Fullam held, would it be "necessary to structure a program of payments which, to the extent possible, recognizes only legitimate claims." *Id.* at 2.

Rather than undertaking Credit Suisse's proposed sample of 1,000 individual claims, the parties engaged in a streamlined discovery process, limited to issues that truly pertained to Owens Corning's aggregate liabilities rather than the merits of individual claims, and lasting only a few months. As a result of this discipline, the estimation hearing ultimately held in *Owens Corning* lasted only six days, and, less than three months later, the court handed down a Memorandum and Order estimating Owens Corning's liability for present and future asbestos claims at $7 billion. *See Owens Corning*, 322 B.R. at 719. The court viewed its task as one of applying informed judgment to historical facts regarding the tort system, based on a review of Owens Corning's claims litigation and resolution history and the testimony of experts proffered by the several parties. *See id.* at 721-22. The court did not endeavor to infer what Owens Corning's liability would have been if the tort system had been different than it was, but grounded its analysis on the realities confronting Owens Corning at the time it filed for

bankruptcy, taking into account developments and trends in the tort system that were likely to influence the value of anticipated future claims. *Id.*

Estimation by reference to claims history is even supported by Frederick Dunbar, who is often a debtors' expert on estimating asbestos claims. Dr. Dunbar has specifically advocated the use of historical settlement information, including settlements and judgments obtained in state courts, in performing an estimation. In his 1996 treatise on estimating mass tort claims, Dr. Dunbar states that, "[w]here data is available on the indemnity payments that historically have been made on similar claims, an average of these may serve to estimate the payment on pending or future claims."[45] Later in the book, Dr. Dunbar describes how his firm and other experts used historical averages of settlement values to predict and value pending and future asbestos claims in the *National Gypsum* case. *See* Dunbar at 158-60. This estimation methodology has also been used by corporations, settlement trusts, risk managers, and insurance companies, as well as by courts in contexts outside of bankruptcy litigation. *Id.* at 1-5, 119-136.

B.    **Discovery Related to Garlock's Solvency Should Commence Immediately**

The ACC's preliminary estimates of Garlock's total assets and aggregate asbestos liabilities, discussed above, are based on information taken from the Debtors' filings in this Court and publicly available financial information. While even this limited information suffices to demonstrate that the Debtors are hopelessly insolvent, a complete analysis requires access to Garlock's claims database. The ACC and its experts has not been provided with sufficient information and a focused investigation of the Debtors' businesses. The scheduling priority should be to complete those inquiries so the parties' experts can develop their views of the key

---

[45] Frederick C. Dunbar, et al., *Estimating Future Claims: Case Studies from Mass Tort and Product Liability* 81 (Andrews Publications 1996) ("**Dunbar**") (excerpt attached as Ex. 22`).

issue of solvency. Until they can do so, the parties will not be in a position to negotiate a consensual plan.

Garlock should provide its claims, verdict and settlement database so that the ACC can more accurately estimate the number and value of present and future claims. In addition, the ACC should be afforded the opportunity to depose Garlock's employees and counsel regarding Garlock's claims history and the approaches it took to managing the claims in the tort system. The ACC should also be permitted discovery regarding the assets of the estate in order to obtain a complete picture of the Debtors' financial condition.

Indeed, Garlock itself argues in the Bar Date Motion that claims estimation discovery should commence. *See* Bar Date Motion, ¶¶ 23(b), 27-28. That discovery, however, must be appropriately focused on the Debtors' *aggregate* asbestos liability, not the details of individual pending claims. The discovery appropriate to aggregate estimation is far different than what would be appropriate in claim-by-claim litigation and should be limited in scope and in the time allowed for its completion.

Indeed, if the Court is not satisfied that the factual assertions put forth in this brief demonstrate *prima facie* insolvency, then it should hold the Bar Date Motion in abeyance while the ACC obtains the claims database and asset-related discovery needed to flesh out that showing more completely. Certainly, the consequences of the Bar Date Motion to the administration of these cases, in terms of the time and expense required, are much too great to entertain that motion on the basis of Garlock's glib, self-serving, and unsubstantiated rhetoric. We respectfully submit that the information and authorities marshaled in this brief demonstrate clearly that the Bar Date Motion must be denied as the ploy of insolvent Debtors bent on tying up the case indefinitely as a way of pressuring asbestos creditors to accept much less than they are due from

these estates.  If, however, the Court remains in doubt, it should fix a schedule for the discovery essential to a solvency analysis based on Garlock's claims history before taking any steps down the path the Debtors have sketched out in their Bar Date Motion.

IV.    **AN ORDER FOR AN ESTIMATION PROCEEDING IS PREMATURE**

Garlock's proposed allowance proceedings would serve no legitimate purpose in these bankruptcy cases, and would delay their resolution indefinitely, at enormous costs to the estates. The ACC respectfully submits that the more sensible course of proceeding would be that proposed in the ACC's Scheduling Motion.  That is, the parties should be given limited discovery into the two main issues in these bankruptcy cases:  the total value of Garlock's assets, and the amount of Garlock's aggregate liability for asbestos claims.  With that information, the parties and their experts can develop their respective views of the extent of the assets and liabilities, and will be positioned to negotiate a consensual plan before the end of Garlock's exclusivity period.  If the parties cannot agree, the Court will be presented with competing plans, and will need to structure a contested confirmation hearing.  Only at that point would it be necessary for the Court to schedule an estimation hearing.

Garlock's motion to commence a formal estimation proceeding is premature and should be denied.  *See* Bar Date Motion at 25.  After all, Garlock does not contemplate an estimation hearing in the near term.  Rather, as Garlock itself recognizes, if its allowance proceedings were to go forward, no such estimation would occur for many years.  Garlock's admitted intent is to "initiate[] a contested matter that triggers parties' discovery rights."  *Id.* at 26.  In addition to the massive discovery Garlock would seek from the individual claimants by its so-called proof of claim form, it proposes that it also be allowed discovery "regarding the Trust claiming process and regarding the process of generating exposure evidence in the tort system."  *Id.*  Presumably, that discovery would be directed to the Section 524(g) trusts and law firms representing asbestos

claimants, among other parties. Garlock admits that discovery of that nature and scope promises to engender disputes that could be "protracted and contentious." *Id.* There is nothing to be gained by these inevitable discovery disputes other than delaying the resolution of this bankruptcy case. Indeed, that seems to be Garlock's main goal — to draw out these bankruptcy cases in the hopes of wringing concessions from the asbestos claimants and extracting undue value for its shareholder, EnPro. This Court should be chary of embarking on such a course at the behest of insolvent Debtors who seek to benefit their parent company, which has no share in the estate, at enormous cost to creditors and inordinate burden on the interested parties and the Court.

**CONCLUSION**

The Court should deny the Debtors' Bar Date Motion in its entirety and grant the ACC

Motion for Scheduling Order.

Respectfully submitted,

Date: September 24, 2010

HAMILTON MOON STEPHENS STEELE & MARTIN, PLLC

By:  /s/ Travis W. Moon
Travis W. Moon (Bar No. 1067)
201 South College Street
Charlotte Plaza, Suite 2020
Charlotte, NC  28244-2020
Telephone:  (704) 344-1117

CAPLIN & DRYSDALE, CHARTERED

Elihu Inselbuch (EI-2843)
(ei@capdale.com)
375 Park Avenue, 35th Floor
New York, NY  10152-3500

Trevor W. Swett III
(tws@capdale.com)
Leslie M. Kelleher
(lmk@capdale.com)
Jeanna Rickards Koski
(jmr@capdale.com)
One Thomas Circle, N.W.
Washington, D.C.  20005
(202) 862-5000

*Attorneys for the Official Committee of Asbestos Personal Injury Claimants*