# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | **Chapter 11** |
| **USG CORPORATION,** | : | |
| a Delaware corporation, <u>et al.</u>,[1] | : | **Jointly Administered** |
| | : | **Case No. 01-2094 (JKF)** |
| Debtors. | : | |
| | : | **Related to Dkt. Nos. 11605, 11675, 10810** |
| | : | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF USG CORPORATION AND ITS DEBTOR SUBSIDIARIES, AS MODIFIED

---

[1]  The Debtors are the following 11 entities:  USG Corporation, United States Gypsum Company, USG Interiors, Inc., USG Interiors International, Inc., L&W Supply Corporation, Beadex Manufacturing, LLC, B-R Pipeline Company, La Mirada Products Co., Inc., USG Industries, Inc., USG Pipeline Company and Stocking Specialists, Inc.

# TABLE OF CONTENTS

**Page**

I.    FINDINGS OF FACT ................................................................................................ 5

    A.    HISTORY OF THE DEBTORS' ASBESTOS PERSONAL INJURY
        LIABILITIES, THE DECISION TO FILE THE REORGANIZATION
        CASES AND THE ASBESTOS AGREEMENT .................................................. 5

        1.    Background ............................................................................. 5

        2.    Overview of the Asbestos-Containing Materials Manufactured or
            Sold By the Debtors or Their Affiliates .................................... 5

        3.    Overview of Asbestos Personal Injury Litigation ...................... 9

        4.    Determination to File Reorganization Cases ........................... 11

        5.    The Asbestos Agreement ...................................................... 12

    B.    MODIFICATIONS TO THE PLAN .................................................. 14

    C.    COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF
        THE BANKRUPTCY CODE ............................................................ 14

        1.    Section 1129(a)(1) — Compliance of the Plan with Applicable
            Provisions of the Bankruptcy Code ........................................ 14

        2.    Section 1129(a)(2) — Compliance with Applicable Provisions of
            the Bankruptcy Code ............................................................ 21

        3.    Section 1129(a)(3) — Proposal of the Plan in Good Faith ...................... 21

        4.    Section 1129(a)(4) — Court Approval of Certain Payments as
            Reasonable ......................................................................... 22

        5.    Section 1129(a)(5) — Disclosure of Identity of Proposed
            Management, Compensation of Insiders and Consistency of
            Management Proposals with the Interests of Creditors and Public
            Policy ................................................................................ 23

        6.    Section 1129(a)(6) — Approval of Rate Changes ................................ 23

        7.    Section 1129(a)(7) — Best Interests of Holders of Claims and
            Interests ............................................................................. 23

        8.    Section 1129(a)(8) — Acceptance of the Plan by Each Impaired
            Class ................................................................................. 24

        9.    Section 1129(a)(9) — Treatment of Claims Entitled to Priority
            Pursuant to Section 507(a) of the Bankruptcy Code ................ 24

        10.   Section 1129(a)(10) — Acceptance By at Least One Impaired,
            Non-Insider Class ................................................................ 26

        11.   Section 1129(a)(11) — Feasibility of the Plan ....................... 26

## TABLE OF CONTENTS
(continued)

12. Section 1129(a)(12) — Payment of Bankruptcy Fees ............................ 26

13. Section 1129(a)(13) — Retiree Benefits.................................................. 27

14. Section 1129(d) — Purpose of Plan........................................................ 27

D. THE ASBESTOS PERSONAL INJURY TRUST AND THE ASBESTOS PERMANENT CHANNELING INJUNCTION COMPLY WITH SECTION 524(G) OF THE BANKRUPTCY CODE ........................................ 27

    1. The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code.................................... 27

    2. The Asbestos Personal Injury Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code................................... 29

    3. The Extension of the Asbestos Permanent Channeling Injunction to Third Parties Is Appropriate...................................................................... 32

    4. The Interests of Future Asbestos Claimants were Represented by the Asbestos Personal Injury Futures Representative............................... 35

    5. Entry of the Asbestos Permanent Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants .................... 35

E. THE ASBESTOS PERSONAL INJURY INSURANCE ASSET ENTITY INJUNCTION SATISFIES THE REQUIREMENTS OF SECTION 105(A) OF THE BANKRUPTCY CODE ........................................................... 35

F. COMPREHENSIVE SETTLEMENT OF CLAIMS AND CONTROVERSIES................................................................................... 37

G. SATISFACTION OF CONDITIONS TO CONFIRMATION .......................... 38

II. CONCLUSIONS OF LAW ....................................................................................... 42

A. JURISDICTION AND VENUE ................................................................... 42

B. MODIFICATIONS TO THE PLAN .................................................................. 43

C. EXEMPTIONS FROM TAXATION ................................................................ 43

D. COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE ...... 44

E. COMPLIANCE WITH SECTION 524(G) OF THE BANKRUPTCY CODE......................................................................................................................... 44

F. PROPRIETY OF THE ASBESTOS AGREEMENT ......................................... 44

G. OBJECTIONS TO THE PLAN ....................................................................... 44

H. TRANSFER OF BOOKS AND RECORDS TO THE ASBESTOS PERSONAL INJURY TRUST ......................................................................... 44

I. APPROVAL OF THE RELEASES PROVIDED UNDER THE PLAN ........... 45

## INTRODUCTION

WHEREAS, USG Corporation, United States Gypsum Company, USG Interiors,

Inc., USG Interiors International, Inc., L&W Supply Corporation, Beadex Manufacturing, LLC,

B-R Pipeline Company, La Mirada Products Co., Inc., USG Industries, Inc., USG Pipeline

Company and Stocking Specialists, Inc., the above-captioned debtors (collectively, the "Debtors"

and, as reorganized entities after emergence, the "Reorganized Debtors"), proposed the First

Amended Joint Plan of Reorganization of USG Corporation and Its Debtor Subsidiaries, dated

March 27, 2006, as modified (as it may be further modified, the "Plan");[2]

WHEREAS, the Bankruptcy Court, on April 7, 2006, entered its Order Approving

(A) Disclosure Statement, (B) Notice of Disclosure Statement Hearing, (C) Contents of Plan

Solicitation Packages, (D) Procedures for the Distribution of Solicitation Packages and the

Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Plan of Reorganization

and (E) Certain Related Relief (D.I. 10847) (the "Disclosure Statement Order"), by which the

Bankruptcy Court, among other things, approved the Debtors' proposed disclosure statement

(the "Disclosure Statement"), established procedures for the solicitation and tabulation of votes

to accept or reject the Plan and scheduled a hearing to consider Confirmation of the Plan for

June 15, 2006 at 9:00 a.m., to be continued on June 16, 2006 if necessary (the "Confirmation

Hearing");

---

[2]    Unless otherwise specified, capitalized terms and phrases used herein have the meanings given to them in the Plan.  The rules of interpretation set forth in Section I.B.1 of the Plan apply to these Findings of Fact and Conclusions of Law (the "Findings and Conclusions").  In addition, in accordance with Section I.A of the Plan, any term used in the Plan or these Findings and Conclusions that is not defined in the Plan or herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

A copy of the Plan (without the exhibits thereto) is attached to the Confirmation Order as Exhibit A and incorporated herein by reference.

WHEREAS, affidavits of service were executed by Kathleen M. Logan with respect to the mailing of notice of the Confirmation Hearing and solicitation materials in respect of the Plan in accordance with the Disclosure Statement Order (collectively, the "Affidavits of Service") and were filed with the Bankruptcy Court on May 31, 2006 (D.I. 11487), May 31, 2006 (D.I. 11488), May 31, 2006 (D.I. 11489), May 31, 2006 (D.I. 11490) and June 1, 2006 (D.I. 11523);

WHEREAS, the Affidavit of Katherine Kinsella Outlining Implementation of the Notice of (A) Deadline for Casting Votes to Accept or Reject Proposed Joint Plan of Reorganization, (B) Hearing to Consider Confirmation of Proposed Joint Plan of Reorganization and (C) Related Matters (D.I. 11338) (the "Publication Affidavit") was filed with the Bankruptcy Court on May 16, 2006, regarding the publication of the Notice of (A) Deadline for Casting Votes to Accept or Reject Proposed Joint Plan of Reorganization, (B) Hearing to Consider Confirmation of Proposed Joint Plan of Reorganization and (C) Related Matters and/or the other form of publication notice approved by the Bankruptcy Court in certain magazines and newspapers as set forth in the Disclosure Statement Order;

WHEREAS, Logan & Company, Inc., the Bankruptcy Court-appointed solicitation and tabulation agent in respect of the Plan, filed the Declaration of Kathleen M. Logan Certifying the Methodology for Tabulating Votes on, and the Results of Voting with Respect to, the First Amended Joint Plan of Reorganization of USG Corporation and Its Debtor Subsidiaries (D.I. 11650) (the "Voting Declaration") on June, 14, 2006, attesting to the results of the tabulation of the properly executed and timely received Ballots for the Plan as follows:

**Class 7 Claimants.**  The Debtors received 252,469 acceptances out of 253,136 votes from holders of Claims under Class 7 (Asbestos Personal Injury Claims), with Class 7

claimants who voted in favor of the Plan holding Claims in the amount of $3,002,987,928 for voting purposes, such acceptances being 99.74 percent in number and 99.68 percent in amount of all ballots received from holders of Class 7 Claims (Voting Declaration ¶¶ 18-19);

WHEREAS, objections to Confirmation of the Plan (collectively, the "Objections") were filed by:  the Nevada Department of Taxation (D.I. 11427); the New York State Department of Taxation and Finance (not listed on docket); New Jersey Self-Insurers Guaranty Association (D.I. 11447); Wilmington Trust Company (D.I. 11452); United States Trustee (D.I. 11455); and Wells Fargo Bank, N.A. (D.I. 11456);

WHEREAS, the Debtors filed modifications to the Plan (D.I. 11602) (the "Modifications");

WHEREAS, the Debtors filed a memorandum of law in support of Confirmation of the Plan and in response to certain of the Objections (D.I. 11603) (the "Memorandum of Law);

WHEREAS, the declarations of Matthew R. Rosenberg (D.I. 11599), Richard H. Fleming (D.I. 11600), Stanley L. Ferguson (D.I. 11601), Dean M. Trafelet (D.I. 11598) and Mark A. Peterson (D.I. 11597) were submitted in support of the Plan (collectively, the "Declarations");

WHEREAS the expert report of Mark A. Peterson, which was included as Exhibit 2 to the Peterson Declaration, was submitted in support of the Plan (the "Peterson Report") and was uncontradicted at the Confirmation Hearing;

WHEREAS, the Bankruptcy Court and the District Court have reviewed the Plan, the Disclosure Statement, the Disclosure Statement Order, the Voting Declaration, the Affidavits of Service, the Publication Affidavit, the Objections, the Memorandum of Law, the Declarations

and the other papers before the Bankruptcy Court and the District Court in connection with the

Confirmation of the Plan;

WHEREAS, the Bankruptcy Court and the District Court, sitting jointly together

for purposes of the Confirmation Hearing, (1) heard the statements of counsel and the testimony

of Stanley L. Ferguson in support of Confirmation and (2) considered the Declarations submitted

into evidence, all as reflected in the record made at the Confirmation Hearing;

WHEREAS, the Bankruptcy Court and the District Court have considered all

evidence presented at the Confirmation Hearing;

WHEREAS, the Bankruptcy Court and the District Court have taken judicial

notice of the papers and pleadings on file in these chapter 11 cases;

WHEREAS, the Bankruptcy Court, after due deliberation and for sufficient cause,

finds that the evidence admitted in support of the Plan at the Confirmation Hearing is persuasive

and credible;

NOW, THEREFORE, the Bankruptcy Court hereby enters the following Findings

of Fact and Conclusions of Law with respect to Confirmation of the Plan.[3]

---

[3]     These Findings and Conclusions constitute the Bankruptcy Court's findings of fact and conclusions of law
        under Fed. R. Civ. P. 52, as made applicable herein by Bankruptcy Rules 7052 and 9014.  Any finding of
        fact shall constitute a finding of fact even if it is referred to as a conclusion of law, and any conclusion of
        law shall constitute a conclusion of law even if it is referred to as a finding of fact.  Citations to the
        Bankruptcy Code and Rules are to the sections and rules as numbered and in effect prior to October 17,
        2005.

I.    **FINDINGS OF FACT.**

  A.    **HISTORY OF THE DEBTORS' ASBESTOS PERSONAL INJURY
        LIABILITIES, THE DECISION TO FILE THE REORGANIZATION
        CASES AND THE ASBESTOS AGREEMENT**

    1.    **Background**

        a.    U.S. Gypsum was incorporated in 1901.  USG was incorporated in

Delaware on October 22, 1984.  By a vote of stockholders on December 19, 1984, U.S. Gypsum

became a wholly owned subsidiary of USG, and the stockholders of U.S. Gypsum became the

stockholders of USG, all effective January 1, 1985.  (Ferguson Decl. ¶ 14.)

        b.    USG has approximately 70 domestic and foreign Debtor and

nondebtor subsidiaries (collectively, including USG, the "USG Companies"), which operate a

variety of businesses worldwide.  Together, the USG Companies are a leading manufacturer and

distributor of wallboard and other building materials, producing a wide range of products for use

in new residential, new nonresidential, and repair and remodel construction, as well as products

used in certain industrial processes.  USG's most recognizable product is Sheetrock® brand

drywall.  The USG Companies are headquartered in Chicago.  (Ferguson Decl. ¶ 15.)

        c.    During calendar year 2005, the USG Companies generated

consolidated revenue of approximately $5.14 billion.  As of December 31, 2005, the USG

Companies had approximately $6.14 billion in assets on a consolidated basis and approximately

14,280 full- and part-time employees.  (Ferguson Decl. ¶ 16.)

    2.    **Overview of the Asbestos-Containing Materials Manufactured or Sold
          By the Debtors or Their Affiliates**

        a.    U.S. Gypsum manufactures a wide range of construction materials.

In the past, certain of those materials contained asbestos.  The products U.S. Gypsum

manufactured that may have contained asbestos during different times included, among others,

drywall joint compounds, acoustical and fireproofing products and spray textures. U.S. Gypsum never mined, manufactured or sold asbestos, and its drywall never contained asbestos. (Ferguson Decl. ¶ 17.)

b.    U.S. Gypsum has been named as a defendant in more than 400,000 asbestos-related personal injury lawsuits, approximately 150,000 of which were pending as of the Petition Date. The products at issue in almost all of these suits were U.S. Gypsum's drywall joint compounds. Joint compound is a mud-like paste that is applied to the joint between sheets of wallboard to seal the joint and create the appearance of a single continuous wall. Joint compound products containing some level of asbestos were sold from the 1920s until 1976. (Ferguson Decl. ¶ 18.)

c.    USG Interiors, Inc. ("USG Interiors") is a subsidiary of USG and was formed in 1986. USG Interiors has manufactured mineral fiber ceiling tiles and ceiling tile suspension systems, mineral fiber insulation, access floors, and wall partition systems. USG Interiors was named as a defendant in several asbestos personal injury lawsuits pending as of the Petition Date. None of the products manufactured or sold by USG Interiors contained asbestos as part of the product formulation. (Ferguson Decl. ¶ 19.)

d.    L&W Supply Corporation ("L&W Supply") is a distributor of building materials manufactured by U.S. Gypsum and other companies. L&W Supply was created in 1971 as a subsidiary of U.S. Gypsum and became a subsidiary of USG in 1985. In the 1970s, some of the products distributed by L&W Supply, primarily joint compound and roofing materials, contained asbestos. Asbestos-containing products produced by manufacturers other than U.S. Gypsum may also have been distributed by L&W Supply. The Asbestos Personal Injury Committee, the Asbestos Personal Injury Futures Representative and the Asbestos

Property Damage Committee also have made claims in these reorganization proceedings that some of the constituent companies that were joined together to form L&W Supply may have distributed asbestos-containing products and that L&W Supply is liable for injuries arising out of their activities as well.  The Debtors' records indicate that L&W Supply has been named as a defendant in approximately 30 lawsuits.  At the Petition Date, L&W Supply was a defendant in approximately 20 pending asbestos personal injury lawsuits.  (Ferguson Decl. ¶ 20.)

   e. Beadex Manufacturing, LLC ("Beadex") is a subsidiary of U.S. Gypsum created in 2000 after U.S. Gypsum acquired the stock of Beadex Manufacturing Co. in 1999.  Beadex Manufacturing Co. is alleged to have manufactured and sold certain asbestos-containing products, including joint compounds, from 1963 through 1979.  Distribution of these products is believed to have been limited to certain states in the Northwest.  Beadex or its predecessor have been named as a defendant in about 120 asbestos personal injury lawsuits, and, as of the Petition Date, Beadex was a defendant in approximately 50 pending asbestos personal injury lawsuits.  (Ferguson Decl. ¶ 21.)

   f. The Asbestos Personal Injury Committee, the Asbestos Personal Injury Futures Representative and the Asbestos Property Damage Committee also allege in these Reorganization Cases that the Debtors are responsible for the asbestos personal injury liabilities of A.P. Green Refractories Co., a former subsidiary of U.S. Gypsum and USG.  A.P. Green Refractories Co. manufactured and sold refractory products for industrial companies such as steel manufacturers, shipbuilders and refineries.  Some of these products were asbestos-containing until the 1970s.  A.P. Green Refractories Co. was acquired by merger into U.S. Gypsum on December 29, 1967.  On the next business day after the merger, January 2, 1968, U.S. Gypsum conveyed A.P. Green Refractories Co.'s assets and liabilities to a newly formed

Delaware corporation and wholly owned subsidiary of U.S. Gypsum, also called A.P. Green

Refractories Co.  A.P. Green Refractories Co. was operated as a wholly owned subsidiary of

U.S. Gypsum until 1985, at which time A.P. Green Refractories Co. became a wholly owned

subsidiary of USG.  In 1988, A.P. Green Refractories Co. became a publicly traded company

when its shares were distributed to the stockholders of USG.  In February 2002, A.P. Green

Refractories Co. (n/k/a A.P. Green Industries, Inc.) as well as its parent company, Global

Industrial Technologies, Inc., and other affiliates filed voluntary petitions for reorganization

through which A.P. Green Refractories Co. and its affiliates seek to resolve their asbestos

liabilities through creation and funding of a section 524(g) trust.  According to the court filings

in the A.P. Green bankruptcy proceeding, as of A.P. Green's petition date, approximately

235,757 asbestos-related claims were pending against it and approximately 58,899 such claims

were pending against an affiliate.  Prior to its petition date, A.P. Green had resolved

approximately 203,000 asbestos-related claims for approximately $448 million in indemnity

costs.  In addition, A.P. Green had resolved approximately 49,500 asbestos-related claims in the

aggregate amount of $491 million, which were unpaid as of its petition date.  (These 49,500

claims are included in the 235,757 pending claims referenced above.)  (Ferguson Decl. ¶ 22.)

        g.     The Debtors also have had affiliations with other companies that

made or sold asbestos-containing products.  These companies include DAP, Inc., which was

acquired in 1987 by USG Industries, Inc, a subsidiary of USG.  DAP, Inc. operated as a

subsidiary of USG Industries, Inc., and then USG.  The assets of DAP, Inc. were sold in 1991.

Before the acquisition of DAP, Inc. by USG Industries, Inc., DAP, Inc. made some asbestos-

containing adhesive and sealant products.  (Ferguson Decl. ¶ 23.)

h.      Other former affiliates include Chicago Mastic Company and

Permalastic Products Company, both of which manufactured adhesive products, some of which

contained asbestos.  (Ferguson Decl. ¶ 24.)

i.      U.S. Gypsum also made a limited number of private label asbestos-

containing products that were sold by others.  From about 1965 through 1971, U.S. Gypsum

made an asbestos-containing mineral fiber fireproofing and thermal insulation product, called

SprayDon, for Sprayon Research Corp.  For a certain period during 1970 and 1971, U.S.

Gypsum also made an asbestos-containing insulation block product, called K-Fac 19, which was

sold to A.P. Green Refractories Co. in a limited geographic area. A.P. Green Refractories Co.

resold this product under the Insblok 19 label.  During this time, U.S. Gypsum also sold a very

limited amount of K-Fac 19.  (Ferguson Decl. ¶ 25.)

### 3.      Overview of Asbestos Personal Injury Litigation

a.      Because of the nature of U.S. Gypsum's products, it was a

peripheral defendant in asbestos personal injury cases until the late 1990s.  The primary targets

of asbestos personal injury lawsuits were companies such as Johns Manville and UNR that made

high-temperature asbestos-containing pipe and boiler insulation.  In the early 1980s, Johns

Manville and UNR filed for bankruptcy.  During this same period, more asbestos personal injury

lawsuits were being filed by claimants who were recruited through mass screenings.  (Ferguson

Decl. ¶ 26.)

b.      In response to this changing environment, in 1988 a group of

defendants, including U.S. Gypsum, organized the Center for Claims Resolution (the "CCR") for

the purpose of administering, managing and defending claims.  From 1988 to February 2001, the

CCR administered and arranged for the defense and settlement of asbestos personal injury claims

against its members.  During that period, costs of defense and settlement of asbestos personal

injury claims were shared among the members of the CCR pursuant to predetermined sharing formulas.  (Ferguson Decl. ¶ 27.)

        c.        Continuing in the 1980s and early 1990s, more companies involved in asbestos personal injury litigation, including Carey Canada, Celotex, Eagle-Picher and H.K. Porter, filed for bankruptcy protection.  By 1993, companies that reportedly had borne one-half to three-quarters of the original liability share in asbestos litigation had filed for bankruptcy protection.  (Ferguson Decl. ¶ 28.)

        d.        In 1993, after extensive negotiations with counsel for asbestos personal injury plaintiffs, the CCR members attempted to reach a global settlement of all current and future asbestos personal injury claims.  In January 1993, the CCR and counsel for various asbestos plaintiffs agreed to a comprehensive settlement, which was approved by the United States District Court for the Eastern District of Pennsylvania.  *See Georgine v. Amchem Prods. Inc.*, 878 F. Supp. 716 (E.D. Pa. 1994).  The United States Court of Appeals for the Third Circuit reversed the District Court's approval of the settlement, and the United States Supreme Court affirmed the Third Circuit.  *Georgine v. Amchem Prods. Inc.*, 83 F.3d 610 (3d Cir. 1996); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).  (Ferguson Decl. ¶ 29.)

        e.        After the Supreme Court's decision in *Amchem*, new asbestos filings reached record levels, with a dramatic surge in claims.  U.S. Gypsum, historically a peripheral defendant, became a larger target of the litigation as additional major defendants filed for bankruptcy.  Asbestos personal injury lawsuit filings against U.S. Gypsum increased from approximately 13,000 per year in 1990 to a peak of approximately 60,000 in 1998.  By 2001, U.S. Gypsum was named in over 90 percent of all claims brought against CCR members — up from less than 50 percent in the early days of the CCR.  Approximately ten percent of filed

claims were brought by claimants who alleged that they had an asbestos-related cancer.

Approximately 90 percent of filed claims were brought by claimants who alleged that they had a

non-malignant or unidentified condition.  (Ferguson Decl. ¶ 30.)

　　　　f.　　　As of the Petition Date, U.S. Gypsum had spent approximately

$675 million in indemnity and defense costs to resolve more than 270,000 asbestos personal

injury lawsuits.  Of this amount, approximately $520 million was reimbursed by insurance.  The

defense and indemnity costs relating to U.S. Gypsum's asbestos personal injury lawsuits had

increased significantly in years preceding the Petition Date.  From 1997 to 2000, U.S. Gypsum's

annual cost for indemnity and defense of asbestos personal injury claims, exclusive of insurance

reimbursements, had increased from approximately $32 million to approximately $162 million.

(Ferguson Decl. ¶ 31.)

　　　　g.　　　By 2001, virtually all of the Debtors' insurance coverage for

asbestos personal injury claims had been exhausted with limited exceptions.  (Ferguson Decl.

¶ 32.)

### 4.　　　Determination to File Reorganization Cases

　　　　a.　　　During 2000 and in 2001, a substantial number of companies that

were significant defendants in asbestos personal injury cases filed for bankruptcy.  These

included The Babcock & Wilcox Company, Pittsburgh Corning Corporation, Owens Corning,

Armstrong World Industries, Inc., W.R. Grace & Co. and G-I Holdings, Inc., a subsidiary of

GAF Corporation.  Following the bankruptcy filings of these defendant companies, plaintiffs

substantially increased their settlement demands to U.S. Gypsum.  In response to these increased

settlement demands, U.S. Gypsum attempted to manage its asbestos liability by contesting, rather

than settling, a greater number of cases that it believed to be non-meritorious.  (Ferguson Decl.

¶ 34.)

b.      As a result, in the first and second quarters of 2001, U.S. Gypsum agreed to settle fewer asbestos personal injury cases, but at a significantly higher cost per case. As of March 31, 2001, U.S. Gypsum had estimated that cash expenditures for asbestos personal injury cases in 2001 would total approximately $275 million before remaining insurance recoveries of approximately $37 million.  (Ferguson Decl. ¶ 35.)

c.      Under these circumstances, the Debtors determined that the filing of the Reorganization Cases, with the goal of achieving a global resolution of their present and future asbestos personal injury liabilities, would be the best alternative for the Debtors to protect the legitimate interests of asbestos claimants while preserving fundamentally strong businesses and protecting the interests of other creditors and existing shareholders.  (Ferguson Decl. ¶ 36.)

**5.      The Asbestos Agreement**

a.      Since the inception of the Reorganization Cases, the amount of the Debtors' present and future asbestos liabilities has been the subject of significant dispute.  This dispute has led to a protracted chapter 11 case, involving litigation in both the Bankruptcy Court and the District Court.  The issues in the litigation involve the estimation of the amount of the Debtors' asbestos personal injury liability and which Debtor or Debtors bear responsibility for that liability.  (Ferguson Decl. ¶ 9.)

b.      In December 2005 and January 2006, in the midst of years of bankruptcy litigation, the Debtors, the Asbestos Personal Injury Committee and the Asbestos Personal Injury Futures Representative met to determine whether they could reach a consensual resolution of the Reorganization Cases.  These discussions took place in the context of uncertainty as to whether Congress would pass legislation titled the Fairness in Asbestos Injury Resolution Act of 2005 (Senate Bill 852) (the "FAIR Act of 2005") and the parties' realization that, in the absence of legislation and even after four and one-half years in chapter 11, they faced

a contentious and uncertain litigation process with respect to the Debtors' asbestos personal

injury liability that might last several more years.  The parties had attempted to settle during

court-ordered mediation during the Fall of 2004 but had been unsuccessful.  (Ferguson Decl.

¶ 10.)

        c.      In late January 2006 the Debtors reached an agreement (the

"Asbestos Agreement") with the Asbestos Personal Injury Committee and the Asbestos Personal

Injury Futures Representative to resolve all Asbestos Personal Injury Claims against the Debtors

and to cooperate in the confirmation of the Plan.  The Asbestos Agreement will be implemented

through the Plan, which incorporates the terms of the agreement.  (Ferguson Decl. ¶ 11.)

        d.      In accordance with the Asbestos Agreement, the Plan provides for

the full payment or reinstatement of all Claims and Interests (other than Asbestos Personal Injury

Claims) and leaves such Claims and Interests unimpaired.  Pursuant to the Plan, the Debtors will

establish and fund a personal injury trust under section 524(g) of the Bankruptcy Code to pay all

Asbestos Personal Injury Claims, including all Asbestos Personal Injury Claims asserted against

the Debtors on account of or relating to A.P. Green.  All Asbestos Personal Injury Claims will be

determined and paid pursuant to the terms of the Asbestos Personal Injury Trust Agreement and

the Asbestos Personal Injury Trust Distribution Procedures, which are attached to the Plan as

Exhibits I.A.18 and I.A.19, respectively.  Pursuant to the Plan and section 524(g) of the

Bankruptcy Code, the sole recourse of the holder of an Asbestos Personal Injury Claim will be to

the Asbestos Personal Injury Trust, and such holder will have no right whatsoever at any time to

assert its Asbestos Personal Injury Claim against any Protected Party, including the Debtors.

The amount that the Debtors must pay into the Asbestos Personal Injury Trust depends upon

whether the FAIR Act of 2005 or substantially similar legislation is enacted and made law during

the current session of Congress.  As described in greater detail in Section IV.G.2 of the Plan, the

Debtors would be required to pay $900 million if the FAIR Act of 2005 or substantially similar

legislation is enacted and not successfully challenged or $3.95 billion if the FAIR Act of 2005 or

substantially similar legislation is not enacted or, if enacted, successfully challenged.

> **B.      MODIFICATIONS TO THE PLAN.**

The Debtors filed the Modifications.[4]  The Modifications do not materially or

adversely affect or change the treatment of any Claim against or Interest in any Debtor.

> **C.      COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF
> THE BANKRUPTCY CODE.**

>> **1.      Section 1129(a)(1) — Compliance of the Plan with Applicable
>> Provisions of the Bankruptcy Code.**

The Plan complies with all applicable provisions of the Bankruptcy Code, as

required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the

Bankruptcy Code.  The Plan fully complies with each requirement of section 1123(a) of the

Bankruptcy Code.  Article II of the Plan designates 12 classes of Claims and Interests.  (Plan

art. II.)  Section III.B of the Plan specifies that Claims and Interests in Classes 1-6 and 8-12 are

not impaired under the Plan.  (Plan § III.B.)  Section III.B.7 of the Plan specifies that Claims in

Class 7 are impaired and describes the treatment of such Class.  (Plan § III.B.7.)  Further, the

treatment of each Claim or Interest within a Class is the same as the treatment of each other

Claim or Interest in such Class, unless the holder of a Claim or Interest agrees to less favorable

treatment on account of its Claim or Interest.  (Plan § III.B.)

---

[4]      The Modifications are attached to the Confirmation Order as Exhibit B.

a.      **Sections 1122 and 1123(a)(1)-(4) — Classification and
Treatment of Claims and Interests.**

i.      The Plan constitutes a separate plan of reorganization for
each of the Debtors.  (Plan Intro.)  In accordance with section 1122(a) of the Bankruptcy Code,
Article II of the Plan classifies each Claim against and Interest in the Debtors into a Class
containing only substantially similar Claims or Interests.  (Plan art. II.)

ii.      In accordance with section 1123(a)(1) of the Bankruptcy
Code, Article II of the Plan properly classifies all Claims and Interests that require classification.
(Plan art. II.)  In particular, Article II of the Plan segregates into separate classes Unsecured
Priority Claims (Class 1), Secured Claims (Class 2), Credit Facilities Claims (Class 3), Senior
Note Claims (Class 4), Industrial Revenue Bond Claims (Class 5), General Unsecured Claims
(Class 6), Asbestos Personal Injury Claims (Class 7), Asbestos Property Damage Claims
(Class 8), Environmental Claims (Class 9), Intercompany Claims (Class 10), Subsidiary Debtor
Stock Interests (Class 11) and USG Stock Interests (Class 12).  (Id.)  The number of classes
reflects the diverse characteristics of those Claims and Interests, and the legal rights under the
Bankruptcy Code of each of the holders of Claims or Interests within a particular Class are
substantially similar to other holders of Claims or Interests within that Class.  (Ferguson Decl.
¶ 55.)

iii.      In accordance with section 1123(a)(2) of the Bankruptcy
Code, Article III of the Plan identifies and describes each Class of Claims or Interests that is not
impaired under the Plan.  In particular, Article III of the Plan indicates that Classes 1-6 and 8-12
are unimpaired.  (Plan art. III.)

iv.      In accordance with section 1123(a)(3) of the Bankruptcy
Code, Article III of the Plan identifies and describes any Class of Claims or Interests that is

impaired under the Plan.  In particular, Section III.B.7 of the Plan indicates that Asbestos

Personal Injury Claims (Class 7) are impaired.  (Plan § III.B.7.)

            v.      In accordance with section 1123(a)(4) of the Bankruptcy

Code, the Plan provides the same treatment for each Claim or Interest of a particular Class unless

the holder of such a Claim or Interest agrees to less favorable treatment.  (Plan art. III.)

            vi.      Due to their entitlement to priority status under section 507

of the Bankruptcy Code, Unsecured Priority Claims have been separately classified in Class 1.

(Plan § II.1.)  Based on their secured status, Secured Claims have been separately classified in

Class 2.  (Plan § II.2.)  Credit Facilities Claims, Senior Note Claims, Internal Revenue Bond

Claims, Asbestos Property Damage Claims and Environmental Claims have been separately

classified in, respectively, Classes 3, 4, 5, 8 and 9 due to the distinctive bases for such claims.

(Plan §§ II.3, II.4, II.5, II.8 and II.9.).  Asbestos Personal Injury Claims have been separately

classified in Class 7 due to the distinctive bases for such claims and the fact that, unlike all other

Classes of Claims, Asbestos Personal Injury Claims are impaired and will be channeled to the

Asbestos Personal Injury Trust.  (Plan § II.7.)  Moreover, due to their unique nature, Class 10

Intercompany Claims have been classified separately from Class 6 General Unsecured Claims.

(Plan §§ II.6 and II.10.)  Finally, the two Classes of Interests are segregated according to the

differing nature of such Interests and comprised of (A) the Interests on account of the stock of

any Subsidiary Debtor (Class 11) and (B) the Interests on account of the stock of USG

(Class 12).  (Plan §§ II.11 and II.12.)

        **b.**        **Section 1123(a)(5) — Adequate Means for Implementation of
the Plan.**

In accordance with section 1123(a)(5) of the Bankruptcy Code, the Plan,

including Article IV of the Plan, provides adequate means for its implementation, including:

(i) except as otherwise provided in the Plan and subject to the Restructuring Transactions, the continued corporate existence of the Debtors and the vesting of assets in the Reorganized Debtors under Section IV.A of the Plan; (ii) the consummation of any Restructuring Transactions in connection with Section IV.B of the Plan; (iii) the adoption of the corporate constituent documents that will govern the Reorganized Debtors and the identification of the initial boards of directors of the Reorganized Debtors as provided in Section IV.C of the Plan; (iv) obtaining cash for making all payments under the Plan, as detailed in Section IV.D of the Plan; (v) the creation of, and transfer of certain assets to, the Asbestos Personal Injury Trust and the appointment of the Asbestos Personal Injury Trustees, as detailed in Sections IV.E, IV.F and IV.G of the Plan; (vi) the preservation of rights of action by, and release of certain rights of action against, the Reorganized Debtors, as described in Section IV.H of the Plan; (vii) the continuation of certain employee, retiree and workers' compensation benefits, as described in Section IV.I of the Plan; and (viii) the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases to which any Debtor is a party, as stated in Article V of the Plan.

        **c.**        **Section 1123(a)(6) — Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.**

In accordance with section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors' charters, bylaws or similar constituent documents contain provisions prohibiting the issuance of nonvoting equity securities and provide for the appropriate distribution of voting power among all classes of equity securities authorized for issuance. In particular, Section IV.C.1 of the Plan provides that the Certificates of Incorporation of each of the Reorganized Debtors will, among other things, prohibit the issuance of nonvoting equity securities to the extent required under section 1123(a) of the Bankruptcy Code. (Plan § IV.C.1.)

This prohibition is stated in the forms of Certificates of Incorporation of Reorganized USG and

the Reorganized Subsidiary Debtors filed as Exhibit IV.C.1.a of the Plan.  (Plan Ex. IV.C.1.a.)

> **d.     Section 1123(a)(7) — Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders and Public Policy.**

In accordance with section 1123(a)(7) of the Bankruptcy Code, the provisions of

the Plan and the Reorganized Debtors' charters, bylaws or similar constituent documents

regarding the manner of selection of officers and directors of the Reorganized Debtors are

consistent with the interests of creditors and equity security holders and with public policy.  USG

is a publicly-traded company, and Section IV.C.2 of the Plan provides that the initial board of

directors and the officers of each of the Reorganized Debtors will consist of the directors and the

officers of such Debtor immediately before the Effective Date.  Such directors and officers were

elected, appointed and serve in accordance with the terms of the certificate of incorporation and

bylaws (or comparable constituent documents) of the respective Debtor and state law.  In light of

the foregoing, the manner of selection of the initial directors, managers, trustees and officers of

the Reorganized Debtors, as set forth in the certificates of incorporation and bylaws or similar

constituent documents of the applicable Reorganized Debtor and applicable state law, is

consistent with the interests of the holders of Claims and Interests and public policy.  (Plan

§ IV.C.2; Ferguson Decl. ¶ 56.)

> **e.     Section 1123(b)(1) — Impairment of Claims and Interests.**

As permitted by section 1123(b)(1) of the Bankruptcy Code, Article III of the

Plan provides for the impairment of certain classes of Claims and Interests, while leaving other

Classes unimpaired.  (Plan art. III.)  The Plan thus modifies the rights of the holders of certain

Claims and Interests and leaves the rights of others unaffected.

f. **Section 1123(b)(2) — Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases.**

In accordance with section 1123(b)(2) of the Bankruptcy Code, Article V and other provisions of the Plan provide for the assumption, assumption and assignment or rejection of the Executory Contracts and Unexpired Leases of the Debtors that have not been previously assumed, assumed and assigned or rejected pursuant to section 365 of the Bankruptcy Code and appropriate authorizing orders of the Bankruptcy Court; *provided*, *however*, that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit V.C of the Plan to: (i) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption pursuant hereto; or (ii) add any Executory Contract or Unexpired Lease to Exhibit V.C, thus providing for its rejection.  (Plan art. V.)

g. **Section 1123(b)(3) — Retention, Enforcement and Settlement of Claims Held by the Debtors.**

In accordance with section 1123(b)(3) of the Bankruptcy Code, Section IV.H.1 of the Plan provides for the retention and enforcement by the Reorganized Debtors of any claims, demands, rights and causes of action that any Debtor or Estate may hold against any Entity, except to the extent transferred to the Asbestos Personal Injury Trust pursuant to Sections IV.G.3 and IV.G.4 of the Plan.  (Plan §§ IV.H.1, IV.G.3 and IV.G.4.)

h. **Section 1123(b)(5) — Modification of the Rights of Holders of Claims.**

Article III of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of each class of Claims and Interests.  (Plan art. III.)  All Claims and Interests, other than Asbestos Personal Injury Claims, are unaffected.  The Plan modifies the rights of Asbestos Personal Injury Claims by channeling such Claims to the Asbestos Personal Injury Trust for

resolution as set forth in the in the Asbestos Personal Injury Trust Agreement and the related

Asbestos Personal Injury Trust Distribution Procedures.  (Plan § III.B.7.)

> **i.      Section 1123(b)(6) — Other Provisions Not Inconsistent with Applicable Provisions of the Bankruptcy Code.**

In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes

additional appropriate provisions that are not inconsistent with the applicable provisions of the

Bankruptcy Code, including:  (i) the provisions of Article VI of the Plan governing distributions

on account of Allowed Claims; (ii) the provisions of Article VII of the Plan establishing

procedures for resolving Disputed Claims and making distributions on account of such Disputed

Claims once resolved; (iii) the provisions of Article IX of the Plan regarding the release of

Claims and injunctions against certain actions, including the Asbestos Permanent Channeling

Injunction and the Asbestos Personal Injury Insurance Asset Entity Injunction; and (iv) the

provisions of Article X of the Plan regarding retention of jurisdiction by the Bankruptcy Court

and District Court over certain matters after the Effective Date.  (Plan art. VI, VII, IX and X.)

> **j.      Section 1123(d) — Cure of Defaults.**

In accordance with section 1123(d) of the Bankruptcy Code, Section V.B of the

Plan provides for the satisfaction of Cure Amount Claims associated with each Executory

Contract and Unexpired Lease to be assumed pursuant to the Plan in accordance with

section 365(b)(1) of the Bankruptcy Code.  Additionally, in accordance with Article III of the

Plan and the Confirmation Order, certain Claims will be Reinstated.  All Cure Amount Claims

and Reinstated Claims will be determined in accordance with the underlying agreements and

applicable nonbankruptcy law, and pursuant to the procedures established herein or, to extent

applicable, any separate orders of the Bankruptcy Court.  (Plan §§ III.B and V.B.)

2.    **Section 1129(a)(2) — Compliance with Applicable Provisions of the Bankruptcy Code.**

The Debtors have complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  The Disclosure Statement and the procedures by which the ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018 and the Disclosure Statement Order.  Votes with respect to the Plan were solicited in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order, including the inclusion of letters from the Debtors, the Asbestos Personal Injury Committee and the Asbestos Personal Injury Futures Representative, the Creditors' Committee and the Equity Committee recommending acceptance of the Plan in the solicitation packages.  The Debtors, the Reorganized Debtors, the Asbestos Personal Injury Committee, the Asbestos Personal Injury Futures Representative, the Creditors' Committee and the Equity Committee, their respective members and each of their respective directors, officers, employees, agents, members and professionals, acting in such capacity, have acted in "good faith," within the meaning of section 1125(e) of the Bankruptcy Code.

3.    **Section 1129(a)(3) — Proposal of the Plan in Good Faith.**

The Debtors proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the formulation of the Plan.  (See Ferguson Decl. ¶¶ 37-53, 57.)  Based on the evidence presented at the Confirmation Hearing, the Bankruptcy Court finds and concludes that the Plan has been proposed with the legitimate

purpose of reorganizing the affairs of each of the Debtors and maximizing the returns available

to creditors and other parties in interest.  (Ferguson Decl. ¶ 57)  Consistent with the overriding

purpose of chapter 11 of the Bankruptcy Code, the Plan is designed to allow the Debtors to

reorganize by resolving certain pending disputes and proceedings.  In particular, the Plan

achieves a global resolution of Asbestos Personal Injury Claims.  (See Ferguson Decl. ¶¶ 51, 57.)

Moreover, the Plan itself and the arms' length negotiations among the Debtors, the Creditors'

Committee, the Asbestos Personal Injury Committee, the Asbestos Personal Injury Futures

Representative and the Equity Committee leading to the Plan's formulation, as well as the

overwhelming support of creditors for the Plan, provide independent evidence of the Debtors'

good faith in proposing the Plan.  (See Ferguson Decl. ¶¶ 44-50, 57; Voting Decl. ¶¶ 18-19.)

**4.      Section 1129(a)(4) — Court Approval of Certain Payments as Reasonable.**

a.      In accordance with section 1129(a)(4) of the Bankruptcy Code, no

payment for services or costs and expenses in or in connection with the Reorganization Cases, or

in connection with the Plan and incident to the Reorganization Cases, including Professionals'

Fee Claims, has been or will be made by a Debtor other than payments that have been authorized

by order of the Bankruptcy Court.  (Ferguson Decl. ¶ 58.)  Section III.A.1 of the Plan provides

for the payment of various Administrative Claims, including Professionals' Fee Claims, which

are subject to Bankruptcy Court approval and the standards of the Bankruptcy Code.  (Plan

§ III.A.1.)  In addition, any fees and expenses incurred by the Credit Facilities Agent (with

respect to legal fees), the Senior Note Indenture Trustee or the Industrial Revenue Bond

Indenture Trustees and payable by the Debtors pursuant to Sections III.B.3, III.B.4 and III.B.5 of

the Plan, respectively, will be subject to a "reasonableness" standard and, upon any objection,

review by the Bankruptcy Court.  (Plan §§ III.A.1.e and III.B.c.)

b.       In connection with the foregoing, Article X of the Plan provides

that the Bankruptcy Court will retain jurisdiction after the Effective Date to hear and determine

all applications for allowance of compensation or reimbursement of expenses authorized

pursuant to the Bankruptcy Code or the Plan.  (Plan art. X.)

5.       **Section 1129(a)(5) — Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy.**

In the Disclosure Statement, the Plan and Exhibit IV.C.2 to the Plan, the Debtors

have disclosed all necessary information regarding the Debtors' and Reorganized Debtors'

officers and directors and, for the officers of Reorganized USG who may constitute insiders, the

compensation paid or to be paid.  The appointment or continuance of the proposed directors and

officers is consistent with the interests of the holders of Claims and Interests and with public

policy.  (Ferguson Decl. ¶ 59.)

6.       **Section 1129(a)(6) — Approval of Rate Changes.**

The Debtors' current businesses do not involve the establishment of rates over

which any regulatory commission has or will have jurisdiction after Confirmation.  (Ferguson

Decl. ¶ 60.)

7.       **Section 1129(a)(7) — Best Interests of Holders of Claims and Interests.**

Each holder of an impaired Claim that has not accepted the Plan will on account

of such Claim, as demonstrated by the liquidation analyses included as Exhibit II to the

Disclosure Statement, receive or retain property under the Plan having a value, as of the

Effective Date, that is not less than the amount that such holder would so receive or retain if the

Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

(Rosenberg Decl. ¶¶ 16-19.)

8.      **Section 1129(a)(8) — Acceptance of the Plan by Each Impaired Class.**

a.      Pursuant to section 1129(a)(8) of the Bankruptcy Code, all classes

of Claims and Interests have either accepted the Plan or are unimpaired.  Specifically, Class 7,

the only class entitled to vote on the Plan, overwhelmingly voted to accept the Plan.  (Voting

Decl. ¶¶ 18-19.)  Classes 1-6 and 8-12 are unimpaired under the Plan and, therefore, are deemed

to have accepted the Plan.  (Plan § III.2; Disclosure Statement Order ¶ J.)  Accordingly, section

1129(a)(8) of the Bankruptcy Code has been satisfied with respect to all Classes of Claims and

Interests.

9.      **Section 1129(a)(9) — Treatment of Claims Entitled to Priority
        Pursuant to Section 507(a) of the Bankruptcy Code.**

a.      The Plan also meets the requirements regarding the payment of

Administrative Claims, Priority Claims and Priority Tax Claims, as set forth in

section 1129(a)(9) of the Bankruptcy Code.

b.      Section III.A.1.a of the Plan provides that, subject to certain bar

date provisions in the Plan and unless otherwise agreed by the holder of an Administrative Claim

and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative

Claim shall receive, in full satisfaction of its Administrative Claim, cash equal to the allowed

amount of such Administrative Claim either (i) as soon as practicable after the Effective Date or

(ii) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on

which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of

Amount and Nature of Claim is executed by the applicable Reorganized Debtor and the holder of

the Administrative Claim.  (Plan § III.A.1.a.)  Pursuant to Section III.A.1.c of the Plan,

Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its

business, including Administrative Trade Claims, any Intercompany Claims that are

Administrative Claims, Administrative Claims of governmental units for Taxes (including Tax

audit Claims related to Tax years or portions thereof commencing after the Petition Date) and

Administrative Claims arising from those contracts and leases of the kind described in

Section V.F of the Plan, shall be satisfied by the applicable Reorganized Debtor pursuant to the

terms and conditions of the particular transaction giving rise to such Administrative Claims,

without any further action by the holders of such Administrative Claims or further approval of

the Bankruptcy Court.  (Plan § III.A.1.c.)  Section III.A.1.d of the Plan provides that, on the

Effective Date or such later time as agreed to by the applicable Debtor and the DIP Lender,

(i) any allowed Administrative Claims under or evidenced by the DIP Letter of Credit Facility

shall be paid in full by the applicable Debtor and (ii) the DIP Lender shall (A) receive

cancellation without draw of all outstanding letters of credit issued under the DIP Letter of

Credit Facility or (B) have such letters of credit extended, refinanced or replaced in the ordinary

course of business on or after the Effective Date.  The Debtors shall be authorized to take any

action necessary or appropriate to cancel, extend, refinance or replace the DIP Letter of Credit

Facility.  (Plan § III.A.1.d.)

     c.  Section III.A.2.a of the Plan provides that, unless otherwise agreed

by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each

holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax

Claim, payment in full of the allowed amount of the Priority Tax Claim plus Postpetition Interest

on the later of the Effective Date or 90 days after the date when such Claim becomes an Allowed

Claim.  (Plan § III.A.2.a.)

10.    **Section 1129(a)(10) — Acceptance By at Least One Impaired, Non-Insider Class.**

As indicated in the Voting Declaration and as reflected in the record of the Confirmation Hearing, at least one Class of Claims that is impaired under the Plan has voted to accept the Plan, determined without including the acceptance by any insider, with respect to all Reorganized Debtors under the Plan.  Class 7 Claims (Asbestos Personal Injury Claims), which is not an insider Class and is the only impaired Class under the Plan, has voted to accept the Plan.  (Voting Decl. ¶¶ 13, 18-19.)

11.    **Section 1129(a)(11) — Feasibility of the Plan.**

As demonstrated by the Debtors' financial projections contained in the Disclosure Statement and the evidence in the record, Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors, the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan.  (Fleming Decl. ¶ 22.) Upon the Effective Date, the Reorganized Debtors will have sufficient operating cash and liquidity to meet their financial obligations under the Plan and to fund ongoing business operations.  (Fleming Decl. ¶¶ 13-15, 17-20.)

12.    **Section 1129(a)(12) — Payment of Bankruptcy Fees.**

Section III.A.1.b of the Plan provides that Administrative Claims for fees payable pursuant to section 1930 of title 28 of the United States Code will be paid in cash equal to the amount of such Administrative Claim by the Debtors on or before the Effective Date.  After the Effective Date and until these Reorganization Cases are closed, the Plan provides for the payment of all such fees in accordance with section 1930 of title 28 of the United States Code and section 350(a) of the Bankruptcy Code.  (Plan § III.A.1.b.)

13.     **Section 1129(a)(13) — Retiree Benefits.**

The Plan provides that, from and after the Effective Date, the Reorganized

Debtors shall be obligated to pay retiree benefits (as defined in section 1114(a) of the

Bankruptcy Code) and any similar health, disability or death benefits in accordance with the

terms of the retiree benefit plans or other agreements governing the payment of such benefits,

subject to any rights to amend, modify or terminate such benefits under the terms of the

applicable retiree benefits plan, other agreement or applicable nonbankruptcy law.  (Plan

§ IV.I.2.)

14.     **Section 1129(d) — Purpose of Plan.**

The principal purpose of the Plan is not avoidance of taxes or avoidance of the

requirements of Section 5 of the Securities Act of 1933, and there has been no filing by any

governmental unit asserting such avoidance.

D.      **THE ASBESTOS PERSONAL INJURY TRUST AND THE ASBESTOS
        PERMANENT CHANNELING INJUNCTION COMPLY WITH
        SECTION 524(g) OF THE BANKRUPTCY CODE.**

The Plan comports with the Bankruptcy Code's requirements for issuance of an

injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in

respect of asbestos-related claims or demands against the Reorganized Debtors.

1.      **The Asbestos Personal Injury Trust Satisfies the Requirements
        of Section 524(g)(2)(B)(i) of the Bankruptcy Code.**

a.      The Asbestos Permanent Channeling Injunction is to be

implemented in connection with the Plan and the Asbestos Personal Injury Trust.

b.      Pursuant to Section IV.G.4 of the Plan and any other relevant

provisions of the Plan, the Asbestos Personal Injury Trust, as of the Effective Date, shall assume

the liabilities of each of the Protected Parties with respect to all Asbestos Personal Injury Claims,

and, upon such assumption, no Protected Party shall have any liability for any Asbestos Personal

Injury Claim.

         c.      The Asbestos Personal Injury Trust is to be funded in whole or in

part by securities of the Reorganized Debtors and by the obligation of the Reorganized Debtors

to make future payments.  Section IV.G.2 of the Plan provides that the Asbestos Personal Injury

Trust will be funded by securities issued by the Reorganized Debtors in the form of the Note and

the Contingent Payment Note.  (Plan § IV.G.2.)

         d.      The Asbestos Personal Injury Trust, by the exercise of rights

granted under the Plan would be entitled to own, if specified contingencies occur, a majority of

the voting shares of USG, the parent corporation of each such Reorganized Debtor.  As set forth

in Sections I.A.43 and I.A.94 of the Plan and Exhibits I.A.43 and I.A.94 of the Plan, the

Asbestos Personal Injury Trust shall have the right to obtain 51 percent of the voting stock of

Reorganized USG, under both the Note and Contingent Payment Note, exercisable upon the

occurrence of a payment default and certain other specified contingencies.  (Plan §§ I.A.43 and

I.A.94; Plan Ex. I.A.43 and I.A.94.)

         e.      The Asbestos Personal Injury Trust shall use its assets and income

to pay Asbestos Personal Injury Claims, including Demands.   In particular, Section IV.E of the

Plan provides that the purpose of the Asbestos Personal Injury Trust is to, among other things:

(i) direct the processing, liquidation and payment of all Asbestos Personal Injury Claims in

accordance with the Plan, the Asbestos Personal Injury Trust Distribution Procedures and the

Confirmation Order; (ii) preserve, hold, manage and maximize the assets of the Asbestos

Personal Injury Trust for use in paying and satisfying Asbestos Personal Injury Claims; and

(iii) qualify at all times as a qualified settlement fund.  Section III.B.7 of the Plan also provides

that all Asbestos Personal Injury Claims shall be determined and paid pursuant to the terms of

the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust

Distribution Procedures.  (Plan §§ IV.E and III.B.7.)

> **2.    The Asbestos Personal Injury Trust Satisfies the Requirements
> of Section 524(g)(2)(B)(ii) of the Bankruptcy Code.**

a.    As set forth in the Disclosure Statement and reflected in the record

of the Confirmation Hearing, the vast majority of asbestos personal injury lawsuits at issue in

these Reorganization Cases are lawsuits against U.S. Gypsum.  As of the Petition Date, U.S.

Gypsum had spent approximately $675 million in indemnity and defense costs to resolve more

than 270,000 asbestos personal injury lawsuits.  As of the Petition Date, U.S. Gypsum was a

defendant in more than 100,000 pending asbestos personal injury cases, as well as approximately

50,000 additional personal injury cases that may be the subject of settlement agreements.

(Disclosure Statement at 30-31; Ferguson Decl. ¶ 61.)  In addition to U.S. Gypsum, as of the

Petition Date, five other Debtors were named as defendants or had claims asserted against them

in pending asbestos personal injury lawsuits:  (i) Debtor USG Interiors, Inc. was a defendant in

several pending asbestos personal injury lawsuits, (ii) Debtor L&W Supply Corporation was a

defendant in approximately 20 pending asbestos personal injury lawsuits (iii) Debtor Beadex

Manufacturing, LLC was a defendant in approximately 50 pending asbestos personal injury

lawsuits; (iv) Debtor USG had approximately 286 asbestos personal injury claims pending

against it; and (v) Debtor USG Industries, Inc. had approximately 60 asbestos personal injury

claims pending against it.  (Disclosure Statement at 27-28; Ferguson Decl. ¶ 61.)

b.    The Asbestos Personal Injury Committee, the Asbestos Personal

Injury Futures Representative and the Asbestos Property Damage Committee have sought to hold

each of the Debtors in these Reorganization Cases liable for the asbestos liabilities of all of the

other Debtors.  (Ferguson Decl. ¶ 62.)  In the fourth quarter of 2004, the Debtors other than U.S.

Gypsum filed a complaint for declaratory relief (the "Declaratory Relief Action") in the

Bankruptcy Court requesting a ruling that the assets of the Debtors other than U.S. Gypsum are

not available to satisfy the asbestos liabilities of U.S. Gypsum.  In opposition, the Asbestos

Personal Injury Committee, the Asbestos Personal Injury Futures Representative and the

Asbestos Property Damage Committee each filed counterclaims asserting that all of the Debtors

are liable for, and all of their assets are available to satisfy, the asbestos liabilities of any of the

Debtors based on various legal theories, including successor liability, piercing the corporate veil

and substantive consolidation.  (Disclosure Statement at 47-48; Ferguson Decl. ¶ 62.)

        c.      The Asbestos Personal Injury Committee, the Asbestos Personal

Injury Futures Representative and the Asbestos Property Damage Committee also asserted

claims seeking a declaratory judgment that L&W Supply has direct liability for injuries caused

by the asbestos-containing products of non-debtor companies for which L&W Supply was a

distributor and for asbestos-containing products of distribution operations that were allegedly

assumed by L&W Supply upon its formation in 1971.  (Disclosure Statement at 48; Ferguson

Decl. ¶ 62.)

        d.      The Asbestos Personal Injury Committee, the Asbestos Personal

Injury Futures Representative and the Asbestos Property Damage Committee also have asserted

in a counterclaim in the Declaratory Relief Action that the Debtors are liable for claims arising

from the sale of asbestos-containing products by A.P. Green Refractories Co. and its successors.

As of February 2002, approximately 235,757 asbestos-related claims were pending against A.P.

Green and approximately 58,899 such claims were pending against an affiliate.  (Disclosure

Statement at 48; Ferguson Decl. ¶ 63.)

e.      Based on the long latency period of asbestos-related diseases and

the substantial number of asbestos-related personal injury lawsuits that had been asserted in the

past and that remained unresolved on the Petition Date, the Debtors, either directly or indirectly

(including through any substantive consolidation or related litigation), likely would be subject to

substantial future Demands for payment arising from the same or similar conduct or events that

gave rise to the Claims that are addressed by the Asbestos Permanent Channeling Injunction.

(Ferguson Decl. ¶ 64.)  Also the actual amounts, numbers and timing of future Demands cannot

be determined.  (Ferguson Decl. ¶ 64; Peterson Report at 21-44.)

f.      If the holders of asbestos-related Demands are able to pursue such

Demands outside of the Asbestos Personal Injury Trust Distribution Procedures, the holders of

such Demands would have to pursue their claims in the tort system on an individual basis, which,

because of the vagaries inherent in litigation, could produce inconsistent results.  (Ferguson Decl.

¶ 65; Trafelet Decl. ¶ 20.)  Further, the majority of asbestos liability relates to Demands, and

estimates of the predicted liability for such Demands encompasses an extraordinarily wide range

of values.  There is a risk that, at some point in the future, Demands would go unsatisfied.

(Ferguson Decl. ¶ 65; Peterson Report at 21-52.)  Accordingly, the pursuit of asbestos-related

Demands against the Debtors outside the Asbestos Personal Injury Trust Distribution Procedures

contemplated by the Plan would likely threaten the Plan's purpose to deal equitably with

Asbestos Personal Injury Claims, including future asbestos-related Demands.  (Ferguson Decl.

¶ 65; Trafelet Decl. ¶¶ 20-21.)

g.      The terms of the Asbestos Permanent Channeling Injunction,

including any provisions barring actions against third parties (i.e., certain of the Protected

Parties) pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and in the Disclosure Statement.  (Plan §§ I.A.8 and IX.B.2; Disclosure Statement at 80-81.)

   h. The Debtors designated a separate class, Class 7 under the Plan, for all Asbestos Personal Injury Claims, and, of the holders of Asbestos Personal Injury Claims in Class 7 that voted, 99.74 percent of such holders voted in favor of the Plan.  (Plan § II.7; Voting Decl. ¶ 19.)

   i. Also, as set forth in Section III.B.7 of the Plan, Exhibits I.A.18 of the Plan (Asbestos Personal Injury Trust Agreement) and Exhibit I.A.19 of the Plan (Asbestos Personal Injury Trust Distribution Procedures), all Asbestos Personal Injury Claims shall be determined and paid pursuant to the terms of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.  Accordingly, the Asbestos Personal Injury Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Asbestos Personal Injury Trust shall value and be in a financial position to pay Asbestos Personal Injury Claims, including Demands, that involve similar Claims in substantially the same manner. (Trafelet Decl. ¶¶ 14, 17; Plan § III.B.7; Plan Ex. I.A.18 and I.A.19.)

   **3.** **The Extension of the Asbestos Permanent Channeling Injunction to Third Parties Is Appropriate.**

   a. Sections I.A.8 and IX.B.2 of the Plan contemplates that the Asbestos Permanent Channeling Injunction will be extended to protect the following nondebtor-related parties and third parties:

    i. any nondebtor Affiliate of the Debtors (Plan § I.A.106.a.);

      ii.  any former or present director, officer or employee of any

Debtor, Reorganized Debtor or any Affiliate of the foregoing but only in their capacity as such

(Plan § I.A.106.b.);

      iii.  any stockholder of any Debtor but only in their capacity as

such (Plan § I.A.106.c.);

      iv.  any Entity that, pursuant to the Plan or on or after the

Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of any

Debtor, Reorganized Debtor or the Asbestos Personal Injury Trust (but only to the extent that

liability is asserted to exist by reason of it becoming such a transferee or successor) (Plan

§ I.A.106.d.); or

      v.  any Entity that, pursuant to the Plan or on or after the

Effective Date, makes a loan to any Debtor, Reorganized Debtor or the Asbestos Personal Injury

Trust or to a successor to, or transferee of, any assets of any Debtor, Reorganized Debtor or the

Asbestos Personal Injury Trust (but only to the extent that liability is asserted to exist by reason

of such Entity becoming such a lender or to the extent any pledge of assets made in connection

with such a loan is sought to be upset or impaired) (Plan § I.A.106.e.); or

      vi.  any Settling Insurer. (Plan § I.A.106.g.)

    b.  Each Protected Party is identifiable from the terms of the Asbestos

Permanent Channeling Injunction by name or as part of an identifiable group.  All of the

Protected Parties, other than those alleged to be directly liable for the Asbestos Personal Injury

Claims, are or may be alleged to be liable for the liabilities of the Debtors based upon conduct of,

Claims against or Demands on a Debtor to the extent that such alleged liability arises by reason

of one or more of the following:

i.      such Entity's ownership of a financial interest in any

Debtor, Reorganized Debtor, a Past Affiliate, a present Affiliate of any Debtor or Reorganized

Debtor, or Predecessor in Interest;

ii.      such Entity's involvement in the management of any

Debtor, any Reorganized Debtor or any Predecessor in Interest;

iii.      such Entity's service as an officer, director or employee of

any Debtor, any Reorganized Debtor, any Past Affiliate, any present Affiliate of any Debtor or

Reorganized Debtor, any Predecessor in Interest or any Entity that owns or at any time has

owned a financial interest in any Debtor, any Reorganized Debtor, any Past Affiliate, any present

Affiliate of any Debtor or Reorganized Debtor, or any Predecessor in Interest; or

iv.      such Entity's involvement in a transaction changing the

corporate structure, or in a loan or other financial transaction affecting the financial condition, of

any Debtor, any Reorganized Debtor or any Past Affiliate, any present Affiliate of any Debtor or

Reorganized Debtor, any Predecessor in Interest or any Entity that owns or at any time has

owned a financial interest in any Debtor, any Reorganized Debtor, any Past Affiliate, any present

Affiliate of any Debtor or Reorganized Debtor, or any Predecessor in Interest, including

(A) involvement in providing financing (debt or equity) or advice to an Entity involved in such a

transaction or (B) acquiring or selling a financial interest in any Entity as part of such

transaction.

(Plan § I.A.106.f.)

c.      The extension of the Asbestos Permanent Channeling Injunction to

third parties is consistent with section 524(g)(4)(A)(ii) of the Bankruptcy Code and bars actions

against third parties only where such parties meet the requirements of that section.

4.      **The Interests of Future Asbestos Claimants were Represented by the Asbestos Personal Injury Futures Representative.**

In accordance with section 524(g)(4)(B)(i) of the Bankruptcy Code, a legal representative, Honorable Dean M. Trafelet, was appointed on July 14, 2002, as the Asbestos Personal Injury Futures Representative for the purpose of protecting the rights of persons that might subsequently assert demands.  (D.I. 2538.)

5.      **Entry of the Asbestos Permanent Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants.**

The Reorganized Debtors, on behalf of the Protected Parties, are transferring $890 million in cash, the Note, the Contingent Payment Note and the Asbestos Personal Injury Insurance Asset to the Asbestos Personal Injury Trust.  (Plan §§ IV.G.2 and IV.G.3.)  In light of the substantial contributions to be made to the Asbestos Personal Injury Trust by or on behalf of the Protected Parties, entry of the Asbestos Permanent Channeling Injunction, and the naming of the Protected Parties therein, is fair and equitable with respect to persons that might subsequently assert future asbestos-related Demands.  (Trafelet Decl. ¶ 21.)

E.      **THE ASBESTOS PERSONAL INJURY INSURANCE ASSET ENTITY INJUNCTION SATISFIES THE REQUIREMENTS OF SECTION 105(a) OF THE BANKRUPTCY CODE.**

1.      In conjunction with the resolution of the Debtors' Asbestos Personal Injury Claims and the transfer of the Asbestos Personal Injury Insurance Asset, the Plan provides for an Asbestos Personal Injury Insurance Asset Entity Injunction.  (Plan § IX.B.3.)   The Asbestos Personal Injury Insurance Asset Entity Injunction enjoins all Entities (not including the Asbestos Personal Injury Trust or the Reorganized Debtors) that have held or asserted, that hold or assert or that may in the future hold or assert any Claim, Demand or cause of action (including any Asbestos Personal Injury Claim assumed by the Asbestos Personal Injury Trust) against any Asbestos Personal Injury Insurance Asset Entity based upon, relating to, arising out of or in any

way connected with any Asbestos Personal Injury Claim or Asbestos Personal Injury Insurance

Asset whenever and wherever arisen or asserted (including all Claims in the nature of or

sounding in tort, or under contract, warranty or any other theory of law, equity or admiralty)

from taking any action for the purpose of directly or indirectly collecting, recovering or receiving

payments, satisfaction or recovery with respect to any such Claim, Demand or cause of action.

(Plan § IX.B.3.)  The Asbestos Personal Injury Insurance Asset Entity Injunction is not issued for

the benefit of any Asbestos Personal Injury Insurance Asset Entity, and no Asbestos Personal

Injury Insurance Asset Entity is a third-party beneficiary of the Asbestos Personal Injury

Insurance Asset Entity Injunction.  (Plan § IX.B.3.)

       2.     The Asbestos Personal Injury Insurance Asset Entity Injunction is

necessary to preserve the Asbestos Personal Injury Insurance Asset and to protect the Asbestos

Personal Injury Trust so that it can participate in insurance coverage litigation and negotiate

settlements with insurers for the benefit of the Asbestos Personal Injury Trust and all holders of

Asbestos Personal  Injury Claims.  Absent the Asbestos Personal Injury Insurance Asset Entity

Injunction, individual claimants could separately assert claims against Asbestos Personal Injury

Insurance Asset Entities, thereby depleting the insurance available to the Asbestos Personal

Injury Trust and impeding the Asbestos Personal Injury Trust's ability to negotiate settlements.

Pursuit of claims and future demands against Asbestos Personal Injury Insurance Assets outside

the Asbestos Personal Injury Trust Distribution Procedures would threaten the Plan's purpose to

deal equitably with claims and future demands.  (Ferguson Decl. ¶ 66.)

       3.     Further, no creditor or holder of an Asbestos Personal Injury Claim has

objected to the Asbestos Personal Injury Insurance Asset Entity Injunction or the extension of

that injunction to the Asbestos Personal Injury Insurance Asset Entities.

4.      For all the foregoing reasons, the issuance of the Asbestos Personal Injury

Insurance Entity Injunction is appropriate under the Bankruptcy Code.

## F.      COMPREHENSIVE SETTLEMENT OF CLAIMS AND CONTROVERSIES

1.      Based upon the representations and arguments of counsel for the Debtors

and all other testimony either actually given or proffered at the Confirmation Hearing and the

full record of these Reorganization Cases, the findings and conclusions of which are hereby

incorporated by reference as if fully set forth herein, the Bankruptcy Court finds that, pursuant to

section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the

Distributions and other benefits provided under the Plan, the provisions of the Plan, including the

releases set forth in Section IV.H.3, constitute a good faith compromise and settlement of all

claims or controversies relating to the rights that a holder of a Claim or Interest may have with

respect to any Claim, Asbestos Personal Injury Claim or Interest or any Distribution to be made

pursuant to the Plan on account of any Allowed Claim, Asbestos Personal Injury Claim or

Interest.

2.      Moreover, based upon the Peterson Report, the Declarations and the

representations and arguments of counsel for the Debtors and all other testimony either actually

given or proffered at the Confirmation Hearing relating to the negotiations leading to the

Asbestos Agreement and the wide range of the potential amount of liability for Asbestos

Personal Injury Claims, the Asbestos Agreement, including both the Debtors' noncontingent

$900 million obligation if the Asbestos Legislation is enacted and found constitutional, and the

Debtors' contingent $3.05 billion obligations if the Asbestos Legislation is not enacted or, if

enacted, found unconstitutional, is a fair and reasonable, good faith settlement and compromise

of the Debtors' liability for Asbestos Personal Injury Claims.  (Peterson Report at 8-52; Ferguson Decl. ¶¶ 51-53; Trafelet Decl. ¶ 21.)

G.  **SATISFACTION OF CONDITIONS TO CONFIRMATION.**

1.  Section VIII.A of the Plan contains conditions precedent to Confirmation that must be satisfied or duly waived pursuant to Section VIII.C of the Plan.  Pursuant to these Findings and Conclusions and the Confirmation Order, the conditions precedent set forth in Sections VIII.A.1, VIII.A.2, VIII.A.3 and VIII.A.4 of the Plan have been satisfied or duly waived.

2.  Concerning the establishment of the Asbestos Personal Injury Trust and the issuance of the Asbestos Permanent Channeling Injunction, as described in greater detail above, the Bankruptcy Court specifically finds:

a.  The Asbestos Permanent Channeling Injunction is to be implemented in connection with the Plan and the Asbestos Personal Injury Trust.

b.  The Asbestos Personal Injury Trust, as of the Effective Date, shall assume the liabilities of each of the Protected Parties with respect to all Asbestos Personal Injury Claims, and, upon such assumption, no Protected Party shall have any liability for any Asbestos Personal Injury Claim.

c.  Each Debtor had been named as a defendant in a personal injury, wrongful death or property damage action seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

d.  The Asbestos Personal Injury Trust is to be funded in whole or in part by securities of one or more of the Reorganized Debtors and by the obligation of such Reorganized Debtor or Reorganized Debtors to make future payments, including dividends.

e.  The Asbestos Personal Injury Trust is to own, or by the exercise of rights granted under the Plan would be entitled to own if specified contingencies occur, a majority of the voting shares of each such Reorganized Debtor, the parent corporation of each such Reorganized Debtor or a subsidiary of each such Reorganized Debtor that is also a Reorganized Debtor.

f.  The Asbestos Personal Injury Trust shall use its assets or income to pay Asbestos Personal Injury Claims, including Demands.

g.  Each of the Debtors is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Claims that are addressed by the Asbestos Permanent Channeling Injunction.

h.  The actual amounts, numbers and timing of such future Demands cannot be determined.

i.  Pursuit of such Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands.

j.  The terms of the Asbestos Permanent Channeling Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and in the Disclosure Statement.

k.  The Plan establishes, in Class 7 (Asbestos Personal Injury Claims), a separate class of the claimants whose Claims are to be addressed by the Asbestos Personal Injury Trust.

l.  Class 7 (Asbestos Personal Injury Claims) has voted, by at least 75 percent of those voting, in favor of the Plan.

m.      Pursuant to court orders or otherwise, the Asbestos Personal Injury Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Asbestos Personal Injury Trust shall value and be in a financial position to pay, Asbestos Personal Injury Claims, including Demands, that involve similar Claims in substantially the same manner.

n.      Each Protected Party is identifiable from the terms of the Asbestos Permanent Channeling Injunction by name or as part of an identifiable group.  All of the Protected Parties, other than those alleged to be directly liable for Asbestos Personal Injury Claims, are or may be alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on a Debtor to the extent that such alleged liability arises by reason of one or more of the following:

i.      such Entity's ownership of a financial interest in any Debtor, Reorganized Debtor, a Past Affiliate, a present Affiliate of any Debtor or Reorganized Debtor, or Predecessor in Interest;

ii.      such Entity's involvement in the management of any Debtor, any Reorganized Debtor or any Predecessor in Interest;

iii.      such Entity's service as an officer, director or employee of any Debtor, any Reorganized Debtor, any Past Affiliate, any present Affiliate of any Debtor or Reorganized Debtor, any Predecessor in Interest or any Entity that owns or at any time has owned a financial interest in any Debtor, any Reorganized Debtor, any Past Affiliate, any present Affiliate of any Debtor or Reorganized Debtor, or any Predecessor in Interest; or

          iv.      such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Debtor, any Reorganized Debtor or any Past Affiliate, any present Affiliate of any Debtor or Reorganized Debtor, any Predecessor in Interest or any Entity that owns or at any time has owned a financial interest in any Debtor, any Reorganized Debtor, any Past Affiliate, any present Affiliate of any Debtor or Reorganized Debtor, or any Predecessor in Interest, including (A) involvement in providing financing (debt or equity) or advice to an Entity involved in such a transaction or (B) acquiring or selling a financial interest in any Entity as part of such transaction.

          o.      The Asbestos Personal Injury Futures Representative was appointed as part of the proceedings leading to issuance of the Asbestos Permanent Channeling Injunction for the purpose of protecting the rights of all persons, whether known or unknown, that might subsequently assert, directly or indirectly against any Debtor, an Asbestos Personal Injury Claim that is a Demand that is addressed in the Asbestos Permanent Channeling Injunction and transferred to the Asbestos Personal Injury Trust, regardless of the nature or theory of such Demand.

          p.      Identifying each Protected Party (by name or as part of identifiable group, as applicable) in the Asbestos Permanent Channeling Injunction is fair and equitable with respect to persons that might subsequently assert Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Asbestos Personal Injury Trust, on behalf of any such Protected Party.

          q.      The Plan and the Asbestos Personal Injury Trust (and related documents) comply with section 524(g) of the Bankruptcy Code.

r.      The Plan and its Exhibits are a fair, equitable and reasonable

resolution of the liabilities of the Debtors for the Asbestos Personal Injury Claims.

s.      The Asbestos Personal Injury Futures Representative has

adequately and completely fulfilled his duties, responsibilities and obligations as the

representative for the persons set forth in finding Section I.F.2.o above in accordance with

section 524(g) of the Bankruptcy Code.

t.      Adequate and sufficient notice of the Disclosure Statement, the

Plan and the Confirmation Hearing, along with all deadlines for voting on or objecting to the

Plan has been given to (i) all known creditors and holders of Interests, (ii) parties that requested

notice in accordance with Bankruptcy Rule 2002 (including the Asbestos Personal Injury

Committee, Asbestos Personal Injury Futures Representative, Asbestos Property Damage

Committee, the Equity Committee and the Creditors' Committee), (iii) all parties to Unexpired

Leases and Executory Contracts with the Debtors and (iv) all taxing authorities listed on the

Debtors' Schedules or in the Debtors' Claims database, in each case, (A) in accordance with the

solicitation procedures governing such service and (B) in substantial compliance with

Bankruptcy Rules 2002(b), 3017 and 3020(b).  Such transmittal and service were adequate and

sufficient to bind, among other parties, any holder of an Asbestos Personal Injury Claim, and no

other or further notice is or shall be required.

## II.      CONCLUSIONS OF LAW.

### A.      JURISDICTION AND VENUE.

The Bankruptcy Court and the District Court have jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334.  Confirmation of a plan is a core proceeding pursuant to

28 U.S.C. § 157(b)(2).  The Debtors were and are qualified to be debtors under section 109 of the

Bankruptcy Code.  Venue of the Reorganization Cases in the United States Court for the District

of Delaware was proper as of the Petition Date, pursuant to 28 U.S.C. § 1408, and continues to

be proper.  The Bankruptcy Court has jurisdiction to enter a final order with respect thereto,

except to the extent of the requirements of section 524(g) of the Bankruptcy Code for issuance or

affirmance of the Confirmation Order by the District Court.

### B.    MODIFICATIONS TO THE PLAN.

The Modifications do not materially or adversely affect or change the treatment of

any Claim against or Interest in any Debtor.  Pursuant to section 1127(b) of the Bankruptcy Code

and Bankruptcy Rule 3019, the Modifications do not require additional disclosure under

section 1125 of the Bankruptcy Code or the resolicitation of acceptances or rejections of the Plan

under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims against or

Interests in the Debtors be afforded an opportunity to change previously cast acceptances or

rejections of the Plan as Filed with the Bankruptcy Court.  Disclosure of the Modifications on the

record at the Confirmation Hearing constitutes due and sufficient notice thereof under the

circumstances of the Reorganization Cases.  Accordingly, the Plan (as modified) is properly

before the Bankruptcy Court and the District Court and all votes cast with respect to the Plan

prior to the Modifications shall be binding and shall be deemed to be cast with respect to the Plan

as modified.

### C.    EXEMPTIONS FROM TAXATION.

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or

exchange of any security contemplated by the Plan, or the making or delivery of any instrument

of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

D.      **COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.**

As set forth in Section I.C above, the Plan complies in all respects with the

applicable requirements of section 1129 of the Bankruptcy Code.

E.      **COMPLIANCE WITH SECTION 524(g) OF THE BANKRUPTCY CODE.**

As set forth in Section I.D above, the Plan complies in all respects with the

applicable requirements of section 524(g) of the Bankruptcy Code.

F.      **PROPRIETY OF THE ASBESTOS AGREEMENT**

In light of the extensive litigation relating to Asbestos Personal Injury Claims and

the consideration to be provided by the Debtors to the Asbestos Personal Injury Trust under the

Plan and based on the evidentiary record presented at the Confirmation Hearing and the Peterson

Report, the Asbestos Agreement, as incorporated in the Plan, is fair, reasonable and adequate, in

accordance with applicable United States Supreme Court and Third Circuit law.  See Protective

Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968);

Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d. Cir. 1996); Ferguson Decl. ¶¶ 37-53;

Peterson Report at 9-52; Trafelet Decl. ¶ 21.

G.      **OBJECTIONS TO THE PLAN.**

The Bankruptcy Court concludes that all other objections to the Plan not

otherwise withdrawn at or prior to the Confirmation Hearing should be overruled for the reasons

the Bankruptcy Court articulated on the record at the Confirmation Hearing and/or set forth in

the Debtors' Memorandum of Law in support of confirmation of the Plan.

H.      **TRANSFER OF BOOKS AND RECORDS TO THE ASBESTOS
PERSONAL INJURY TRUST.**

Section IV.G.1 of the Plan provides that the Reorganized Debtors will transfer

and assign, or cause to be transferred and assigned, to the Asbestos Personal Injury Trust copies

of those books and records agreed upon by the parties that pertain directly to Asbestos Personal Injury Claims that have been asserted against any Debtor.  The transfer of these materials is essential to implementation of the Asbestos Personal Injury Trust and the preservation of its assets.  Moreover, preservation of any privilege relating to materials transferred to the Asbestos Personal Injury Trust is necessary to ensure that the Reorganized Debtors are able to defend effectively against Asbestos Property Damage Claims.  (Ferguson Decl. ¶ 67.)  The transfer of books and records from the Reorganized Debtors to the Asbestos Personal Injury Trust shall not waive or destroy any applicable privilege pertaining to such books and records, and each of the Reorganized Debtors and the Asbestos Personal Injury Trust shall retain the right to assert any applicable privilege with respect to such books and records.

I.       **APPROVAL OF THE RELEASES PROVIDED UNDER THE PLAN.**

The releases set forth in Section IV.H.3 of the Plan, including the releases of nondebtor parties pursuant to the general releases in Section IV.H.3.c, are (1) integral to the terms, conditions and settlements contained in the Plan, (2) appropriate in connection with the Reorganization of the Debtors and (3) supported by reasonable consideration.  In light of all of the circumstances, the releases in Section IV.H.3 of the Plan are fair to the releasing parties.

Dated:  **Dated: 6/15/2006** , 2006          _Judith K. Fitgerald_
        **16:54:11**                        UNITED STATES BANKRUPTCY COURT JUDGE
                                            **rmab**