# EXHIBIT 18

```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF                  )
                                  ) 00-CV-4471
                                  )
ARMSTRONG WORLD INDUSTRIES,       ) Philadelphia, PA
                                  ) May 23, 2006
                                  ) 9:27 a.m.
                                  )

                       TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE EDUARDO C. ROBRENO
                    UNITED STATES DISTRICT JUDGE

   APPEARANCES:

   For the Debtors:              STEPHEN KAROTKIN, ESQUIRE
                                 DEBRA A. DANDENEAU, ESQUIRE
                                 Weil, Gotshal & Manges
                                 767 Fifth Avenue
                                 10th Floor
                                 New York, New York   10153

   For Unsecured Creditors       STEPHEN J. SHIMSHAK, ESQUIRE
   Committee:                    Paul, Weiss, Rifkind,
                                 Wharton & Garrison, LLP
                                 1285 Avenue of the Americas
                                 New York, New York   10019

   For the Creditors:            ELIHU INSELBUCH, ESQUIRE
                                 NATHAN D. FINCH, ESQUIRE
                                 Caplin & Drysdale Chartered
                                 375 Park Avenue
                                 35th Floor
                                 New York, New York   10152

   For Dean Trifolet:            JANE W. PARVER, ESQUIRE
                                 Kaye Scholer, LLP
                                 425 Park Avenue
                                 New York, New York   10022

   Audio Operator:               JOSEPH MATKOWSKI
   Transcribed by:               DIANA DOMAN TRANSCRIBING
                                 P. O. Box 129
                                 Gibbsboro, New Jersey   08026
                                 Off: (856) 435-7172
                                 Fax: (856) 435-7124
                                 E-mail: dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

3

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

FOR THE CREDITORS:

| Daniel Myer | 21(Fin) | 61 | 96 | 99 |
| Edward Houff | 101 | 137 | | |

| EXHIBITS: | | Iden. | Evid. |
|---|---|---|---|
| 19 | Mr. Myer's C.V. | | 21 |
| 20 | CCR Settlement Agreements | | 21 |
| 21 | CCR Settlement Agreements | | 21 |
| 22 | CCR Settlement Agreements | | 21 |
| 23 | CCR Settlement Agreements | | 21 |
| 24 | CCR Settlement Agreements | | 21 |
| 28 | Plan Supporter's Agreement | | 102 |
| 29 | Plan Supporter's Agreement | | 110 |
| 30 | Logo | | 111 |
| 31 | Document 9/26/80 | 118 | |
| 37 | Opening Statement | | 122 |
| 75 | Dyson Opinion | | 124 |
| 33 | Plan Supporter's Agreement | | 113 |
| 34 | Plan Supporter's Agreement | | 113 |
| 36 | Plan Supporter's Agreement | | 114 |
| 32 | Rebranding Agreement | | 115 |

OPENING:

By:  Mr. Inselbuch     6

By:  Mr. Shimshak    12

1    the witness and other counsel that have the exhibits just to be

2    used with this witness.  If you would prefer to use the exhibit

3    set you already have up there, it's up to you.  But, I have

4    collected in a notebook just the exhibits I'm going to use with

5    Mr. Myer.  They're identical to the ones in your book.

6           THE COURT:  Okay.  Well, that will be fine.  This

7    will be easier to handle.  Thank you.  Okay.  Let's proceed.

8    We'll use the courtroom clock here, which is 9:53.  And, we'll

9    begin now.  Swear the witness, please, when you have a chance,

10   Mr. Matkowski.

11              DANIEL MYER, CREDITORS' WITNESS, SWORN

12           CLERK:  Please state your full name.

13           MR. MYER:  Daniel Myer, M-Y-E-R.

14                        DIRECT EXAMINATION

15   BY MR. FINCH:

16   Q    Nathan Finch for the Asbestos Claimants Committee.  Mr.

17   Myer, could you turn in your exhibit binder to Exhibit 19?

18   A    Yes, sir.

19   Q    Does it accurately reflect your work and educational

20   history?

21   A    Yes, sir.

22           MR. FINCH:  Your Honor, we offer at this time Exhibit

23   19, and also 20, 21, 22, 23, and 24, as to which I understand

24   there's no objection.

25           THE COURT:  Okay.  Admitted without objection, is

1       that right?

2               MR. GORDON:  No objection.

3               THE COURT:  Okay.

4       BY MR. FINCH:

5       Q    Could you briefly describe your background in asbestos

6       litigation, what you've done, who your clients have been?

7       A    Well, I started back in 1982 with regards to managing --

8       handling asbestos related personal injury claims.  At that

9       time, I was with Continental Insurance Company.  In 1986, I

10      believe it was, I went to work in the capacity as a supervisor

11      in the claims department for the Asbestos Claim Facility.  In

12      that capacity, I was involved with middle management

13      responsibilities for the evaluation, disposition, settlement of

14      cases on behalf of a number of different asbestos defendants

15      who were members of the Asbestos Claim Facility.  I continued

16      in that position until 1988.

17              With the demise of the asbestos claim facility and

18      the creation of the Center for Claims Resolution, at which

19      point I was asked to stay aboard and become -- became the

20      director of claims for the Center for Claims Resolution.  At

21      the CCR, I was responsible for the overall management of

22      asbestos claims, personal injury claims on behalf of

23      approximately 20 different defendants for about 36 different

24      jurisdictions across the country.

25      Q    And, what -- would that include basically the entire

1   eastern part of the United States to the Mississippi River?
2   A    Yes, sir.
3   Q    You -- have you -- as part of your work, have you observed
4   trials of personal injury cases?
5   A    Oh, yes, sir.
6   Q    How many cases have you settled or overseen the resolution
7   of in your career in asbestos?
8   A    I would estimate somewhere between 4 to -- 4 to 500,000
9   cases.
10  Q    When you were with the CCR, Armstrong was one of the
11  members?
12  A    Yes, sir.
13  Q    And, did you attend settlement conferences on a regular
14  basis?
15  A    All the time.
16  Q    Could you describe for the Court who would be the parties
17  present at such settlement conferences?
18  A    The parties would typically include defendant
19  representatives, plaintiff counsel, special masters, mediators,
20  arbitrators, Judges.  Those parties would be involved in
21  settlement conferences typically.
22  Q    After the CCR fell apart in early -- in January of 2001,
23  could you describe what you did then?
24  A    Yes, sir.  I -- after the CCR dissolved, I started up my
25  own company with three other partners.  It's -- the name of the

1   company is called CMC, Claims Management Services.  And, we
2   provide essentially the same service that we provided in the
3   CCR.  That is to provide claim management, claims
4   administration on behalf of a number of different defendants
5   still involved actively in the tort system in the asbestos
6   personal injury litigation.
7   Q    Did you settle cases for any former members of the CCR
8   after January of 2001?
9   A    Yes, sir.
10  Q    Would that include United States Gypsum?
11  A    Yes, sir.
12  Q    And, Union Carbide?
13  A    Yes, sir.
14  Q    And, you continue to represent Union Carbide today?
15  A    Yes, sir, I do.
16  Q    You mentioned in your deposition something called the
17  total gross value of a case.
18  A    Yes, sir.
19  Q    Could you describe for the Court what that is and how you
20  -- how you use it in your day to day settlement discussions?
21  A    Sure.  The total gross value of a case is what would
22  typically be referred to as the total amount of the settlement
23  that all defendants collectively have put together for purposes
24  of resolving a claim or a case.  My responsibility insofar as
25  resolving cases on behalf of the defendants that I represent is

```
 1    to ensure that whatever amount that I'm paying on behalf -- on
 2    their behalf reflects their relative liability and, in turn,
 3    from a dollar standpoint, their relative dollar amount of that
 4    total gross value.
 5  Q    And, is that something you use every day in negotiations?
 6  A    Sure, yes.
 7  Q    Could you describe to the Court what is the total gross
 8    value of a mesothelioma case in the 1999 to 2000 time frame?
 9           MR. KRAVITZ:  Your Honor, I'd like to object.  I
10    don't think a proper foundation has been laid for his knowledge
11    of what the total gross value is, other than defendants are not
12    in the CCR.  I haven't heard that foundation laid yet.
13           MR. FINCH:  Your Honor, I think I established a
14    foundation.  He discusses --
15  BY MR. FINCH:
16  Q    Do you know the total gross value -- do you have an
17    understanding of the total gross value of the case?
18  A    Yes, I believe I do.
19  Q    And, that is based on your discussions with other
20    defendants?
21  A    Well, I've interacted over the course of the last 20 years
22    with virtually every plaintiff counsel in the country and every
23    significant plaintiff lawyer in the country who's involved in
24    the asbestos litigation.  I've interacted with numerous co-
25    defendants -- asbestos defendants in the context of managing
```

1   this litigation on behalf of, over the course of time,
2   approximately 40 to 50 different defendants.  So, in that
3   respect, I think I -- that's where I base the knowledge of that
4   -- that factor.
5   Q    And, would it also include discussions with Magistrates
6   and Judges and arb -- and mediators in settlement --
7   A    Yes, sir.
8   Q    -- conversations?
9            MR. FINCH:  Your Honor, I think it is a proper
10  foundation.
11           THE COURT:  Overruled.
12  BY MR. FINCH:
13  Q    Could you -- what is your understanding of the total gross
14  value of a mesothelioma case in 1999 or 2000?
15  A    In that time frame, the estimated total gross value of a
16  mesothelioma case was between 2 and a half to 3 and a half
17  million dollars.
18  Q    And, today, in 2006, what is the total gross value of a
19  mesothelioma case?
20  A    I believe the total gross value of a mesothelioma case
21  today is somewhere in the range of between 5 to $8M.
22  Q    You heard Mr. Shimshak describe all these elements of tort
23  reform that have occurred.  Have -- what, if any, impact has
24  that had on the total gross value of a mesothelioma case?
25  A    Very little.

```
 1    Q    It's gone up two or three times, right?
 2    A    Yes, sir.
 3    Q    In your work for the Center for Claims Resolution, did you
 4    come to an understanding as to the primary bases for
 5    Armstrong's asbestos liability?
 6    A    Yes, sir.
 7    Q    Could you describe to the Court what that is?
 8    A    The basis of their liability in the asbestos personal
 9    injury litigation was their involvement in the overall
10    insulation contracting business.
11    Q    And, could you describe what is the insulation contracting
12    business?  What do you mean by that?
13    A    They were involved in installing asbestos products,
14    primarily pipe and block insulation, asbestos containing
15    cements, those types of products over the course of a number of
16    years.
17    Q    Installing other people's products in other words?
18    A    Rebranded products, that's correct.
19    Q    Kaylo, for example -- Owens Corning Kaylo?
20    A    Kaylo, sure.
21    Q    Did you come to an understanding of the geographic scope
22    and size of Armstrong's asbestos insulation contracting
23    business?
24    A    I think most people, including myself, would have
25    considered Armstrong to be a national defendant.  In other
```