IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| GARLOCK SEALING TECHNOLOGIES, LLC, | ) No. 10-31607 |
| et al., | ) Jointly Administered |
| | ) Charlotte, NC |
| Debtors. | ) Oct. 14, 2010, 9:30 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GEORGE R. HODGES
UNITED STATES BANKRUPTCY JUDGE

Vol. I, Pages 1 to 245

APPEARANCES:

Garland S. Cassada
Jonathan C. Krisko
Richard C. Worf, Jr.
Robinson, Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246

John R. Miller, Jr.
C. Richard Rayburn, Jr.
Rayburn, Cooper & Durham, P.A.
227 West Trade Street, Suite 1200
Charlotte NC, 28202-1672

Electronic Recorder
Operator:                     Barbara J. Sifford

Transcriber:                  Patricia Basham
                              6411 Quail Ridge Drive
                              Bartlett, TN  38135
                              901-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

APPEARANCES:

Travis W. Moon
Hamilton Moon Stephens Steele Martin
2020 Charlotte Plaza
201 S. College Street
Charlotte, NC 28244-2020

Trevor W. Swett III
Leslie M. Kelleher
Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005

Daniel G. Clodfelter
Moore & Van Allen
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

Linda Simpson
U.S. Bankruptcy Administrator
402 W. Trade St., Suite 200
Charlotte, NC 28202

Jonathan P. Guy
Orrick, Herrington & Sutcliffe LLP
Columbia Center, 1152 15th Street, N.W.
Washington, DC

Michael P. Cascino (Telephonically)
Cascino Vaughan Law Offices Ltd.
220 S. Ashland Ave.
Chicago, IL 60607

Case 10-31607   Doc 633   Filed 10/26/10   Entered 10/26/10 14:17:03   Desc Main
Document      Page 3 of 245

3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Dr. Charles Bates | 77 | 165 | 239 | |

EXHIBITS

| NO. | DESCRIPTION | ID | ADM |
|---|---|---|---|
| ACC-1 | EnPro 10-K | 194 | 195 |
| ACC-2 | Myer Excerpt | 204 | -- |

4

(CALL TO ORDER)

THE COURT: Good morning.  Have a seat.

We have got a lot to do, so I guess let's get started. The first thing we want to do is announce you all's appearances so we get your voices on the recording machine.

Mr. Cassada has got the best-looking tie, so why don't we start with you.

MR. CASSADA: Thank you, Your Honor.  Good morning.  My name is Garland Cassada.  I am here as special counsel for the debtor.

THE COURT: Let's do the debtor's side there first.

MR. CASSADA: I am joined by my two partners, Rick Worf and Jon Krisko.

THE COURT: Okay.  Good. Anybody else on this side?

MR. MILLER: Good morning, Your Honor.  Jack Miller and Rick Rayburn on behalf of the debtors.

THE COURT: Okay.  Good.

MR. CLODFELTER: Dan Clodfelter, Moore and Van Allen. I represent Coltec Industries.  We are the parent company of the debtors.

MS. SIMPSON: Linda Simpson, Bankruptcy Administrator.

THE COURT: All right.  Anybody else?  Okay, Mr. Swett.

MR. SWETT: Good morning, Your Honor.  Trevor Swett for the Official Committee of Asbestos Claimants, along with my partner, Leslie Kelleher, that I would like to introduce to the

court.

MS. KELLEHER: Good morning.

THE COURT: Thank you.  Welcome.

MR. SWETT: Tom Moon, Hamilton Moon, is also with us for the committee.

MR. GUY: Good morning, Your Honor.  Jonathan Guy, Orrick, Herrington & Sutcliffe, for the future claimants representatives, and I am here with Mr. Grier.

THE COURT: All right.  Good.  Anybody else?

(No response.)

THE COURT: Okay.  We have got a lot to do and I guess, just logistically, let me say – well, we will do it however you all want to do it.  I would suggest that we start and go, you know, until regular quitting time today, between 5:00 and 5:30 or so, and then do what we can tomorrow.  I know a lot of you all are from out-of-town.  Whatever time you decide you would like to get out-of-town tomorrow, we can do that.  I don't want you to try to feel like you have to cram everything into just whatever, these two days.  If it is going to take more than that, I do have to have a term of court in Asheville through next Wednesday but next Thursday and Friday are open.  So if we need to lop over, we can just lop over until next Thursday and Friday, as far as my schedule is concerned, and not force you to try to eliminate things or cram something in that you otherwise wouldn't want to do.

6

I will tell you that I have read – I think I have read everything brief wise that has been filed.  I have not read every exhibit, although I have looked at a lot of exhibits. Whether I have understood any of that will be disclosed at the end of the hearing, I guess, or at least your opinion about whether I have understood any of it will be disclosed at the end.

So with that, why don't we get started and however you all want to proceed.

Mr. Miller, you were standing up.

MR. MILLER: Yes, Your Honor.  This morning we filed an amended notice of agenda that really just updated the notice that was filed on Monday, to try to capture all of the things that have been filed since Monday.  And, Your Honor, we do have two preliminary uncontested, very dull matters, that are on that I might suggest we go ahead and knock out.

THE COURT: All right.

MR. MILLER: Your Honor, the debtors did file a motion to set a non-asbestos bar date.  There hasn't been any objections to that.  What the proposal basically is, is it's basically a straight-up bar date proposal like you are used to seeing. We would propose to give non-asbestos claimants ninety days, after we send the notice out, to send their claims in. But the current proposal is to use Rust Consulting as the –

(Telephone interruption.)

7

THE COURT: Can you cut that off?

COURTROOM DEPUTY: I did have two.  Do you want me to go ahead and get them to announce themselves and see who is back on the conference?

THE COURT: I guess.

COURTROOM DEPUTY: Could you please announce yourself again, please?

MR. CASCINO: Michael Cascino.  I am sorry, I got cut off.

COURTROOM DEPUTY: Fine.  Thank you.  And Mr., I think it is Mr. Demmy.

THE COURT: Okay.  All right.

MR. MILLER: Your Honor, the proposal as it currently stands is for Rust Consulting to act as the claims agent and folks could file their claims electronically through the Rust website that would be set up.  Obviously if Rust isn't retained for some reason, then we would adjust accordingly.  And if it's only the financial non-asbestos claims that are going to be filed, then we would probably just have those done through the court, obviously subject to working with Mr. White.

Your Honor, the form of notice of the bar date set out on Exhibit "B" to the motion, we drafted it.  It is pretty typical.  We drafted it to try to make the instructions clear. The debtors propose to serve the bar date notice on the major parties-in-interest in the case, as well as all claimants who

8

are set forth on the debtors' schedules and also all counter-parties to executory contracts and all parties who have filed a request for notice in the case.  And the debtors further reserve all of their rights to serve the bar date notice on anybody else they think ought to get a copy of it but those are the folks that we presently would intend to serve it on.

It has got built into it an amended schedule bar date that would give folks, if we amend the schedules, give folks time, once they get the notice of an amendment to the schedules, to send a claim in if they disagree with what we have done.  It gives people additional time, thirty days after a contract rejection but the greater of not the original ninety day period or thirty days after they service the order on rejection to file claims and generally tries to protect the parties' interest.

The bar date form itself is attached to the motion as Exhibit "A."  It is essentially form ten, slightly modified just with the case names on the top, a check box, whichever debtor you are filing a claim against, and it has got some special instructions that deal with – that specify that these are for non-asbestos claims and talk about how to file a claim. Again, those would all have to be adjusted depending on who the claims agent is going to be, if any.

Your Honor, in the motion and the order, as filed, we had proposed to serve the bar date notice and the proof of

9

claim form within three days after entry of an order granting the motion.  As I understand it, and this gets into more of what you will hear later, Rust would need about thirty to sixty days probably to get their website set up and be in a position where they are able to take the proof of claim forms as they are submitted electronically or, if they are submitted in paper form, to transfer those over onto their system.

So what we would propose is that we just wait to see how things come out with Rust and, if Rust is appointed, that we modify the order to provide that we will send the bar date notice out after we have notice from Rust that they are prepared to start accepting claims, and send it out at that point and then the bar date would be ninety days after that time.

Again, Your Honor, no objections have been filed and so we would ask that the court approve the ninety-day bar date and the form of notice and form of bar date – I am sorry – the form of the proof of claim itself.

THE COURT: Okay.  Nobody is jumping up, so we will approve that.

MR. MILLER: Thank you, Your Honor.

Your Honor, the second matter that's on is a motion that the debtor has filed to pay an appeal bond.  The debtors have an invoice from one of their sureties on a bond that was issued to secure an appeal of a state court verdict that had

10

been entered against Garlock, but the invoice is a total of about thirty-seven hundred dollars.  It covers a very brief stub period, prepetition stub period.  It is from May 26, 2010, through May 26, 2011.

The prepetition period comes to ninety-three dollars and change but, just out of an abundance of caution, we wanted to make sure that the court was okay with us paying that prepetition claim because we didn't have any other – couldn't find any authority in any other orders that we have gotten so far to pay that invoice.  And so we would ask for authorization to go ahead and pay that.  No objections have been filed on that one either.

THE COURT: We will approve that, as well.

MR. MILLER: Your Honor, from there we go in the proposed agenda to the contested matters and as we have them set out in the agenda.

The first matter is the debtor's motion for an order requiring the Rule 2019 statements, and I am not sure exactly what the status of that is.  It looks like there may be one issue on that.

And then, from there, we have got the debtor's bar date motion, asbestos bar date motion and the committee's motion for a scheduling order and, with that, I think I will hand the ball off to Mr. Cassada.

THE COURT: Okay.

11

MR. CASSADA: Your Honor, I believe we can dispose of the 2019 motion fairly quickly. We have exchanged drafts of proposed orders on the motion, and it appears that we are in accord on all of the language of the orders except for one provision, and that is the provision that addresses what happens to the information once it's filed and the burden that any party-in-interest who wants to get the information included must meet and the burden that the law firm that made the filing must meet to avoid disclosure.

By way of background, Your Honor may recall when we argued about this issue a month and a half ago, you asked us to attempt to negotiate an order and you suggested that we reference orders filed in other cases. And I believe both the committee and the debtors focused on orders entered by Judge Fitzgerald and there were two of those orders. There was an order initially entered and then a later order supplementing that order. We have combined those two orders to create one order and, again, it appears that we have substantial agreement on that.

The only place where we are apart, I believe, has to do with the issue I just raised. Under the order, the lawyers who made appearances and who represent asbestos claimants filed a notice to that effect and they filed the information regarding the names of their clients and other information on a disk that will be provided to the clerk but won't be

12

available on the docket and won't be available for public inspection. However, they will give the disk to the debtor.

If a party-in-interest appears and asks to have access to the disk, then the order that we provided says that a party-in-interest would be entitled to have access unless the party who filed the 2019 statement appears and makes the required showing under section 107 of the Bankruptcy Code that there is a basis for protecting the information from disclosure.

And as the court knows, section 105 says that all documents, pleadings, papers, filed in a Bankruptcy Court are public records subject to public exceptions, and section 105 lists exceptions to that rule and permit parties who file papers to demonstrate that the papers they filed meet those exceptions.

So we believe that the order as we propose it complies with the law and we propose that the court enter the order as drafted by the debtor.

THE COURT: Mr. Swett.

MR. SWETT: Yes, Your Honor. Where this debate began was with the debtors propounding a request modeled on the *Congoleum* case under which all of the information acquired under its interpretation of 2019 would be spread on the public record from the outset.

We objected. We made our various arguments. We pointed you to a model devised by Judge Fitzgerald. We then

13

proceeded to use that model in several different asbestos bankruptcies which resulted in a couple of different district courts, and the Third Circuit in one instance, passing on it on appeal.

Now, the outcome of those appeals addressed the question raised by objecting insurance companies whether it was appropriate for Judge Fitzgerald to include in her order a provision that the clerk would hold the attachments in which the details, the information, the substance actually provided, would be held off the docket and out of public view pending motion on notice and a further ruling by the court. And both the District Court in Delaware and the District Court in the Western District of Pennsylvania found that that condition or that restriction on public access to that kind of information in that particular setting was appropriate.

The one court treated it as a regulation of public access, simply the judge reaching out to control the process and to require somebody who wanted to gain access to come in and state a good reason, hear objections and then rule, without prejudice to what the burdens would be in that eventual contest, if any came to pass. I am not aware that any did but I speak speculatively there. I am just not sure.

But in the other case, the District Court held that it was an appropriate balancing of the needs of public access and the practical administration of a large cumbersome asbestos

14

bankruptcy with novel issues pertaining to the extent of the information the claimants would be required to go forward with. Both courts upheld the restriction, and one of those cases went to the Third Circuit which also did not upset Judge Fitzgerald's ruling.

At the end of the last hearing, you suggested that, subject to further argument, you would be inclined to follow Judge Fitzgerald's model since it had been tested in the appellate courts. We therefore devised a form strictly conforming to what Judge Fitzgerald did. That would be acceptable to the committee. It is not where we wanted to end up but it is an outcome that will not, I think, stimulate a lot of controversy in the constituency that will have to comply, and it will put Your Honor in the posture of not anticipating disputes that may or may not arise.

If somebody comes forward and says we want access to the details of the 2019, you are entitled to inquire why; is it a matter of prurient interest; is it a co-defendant seeking advantage in another case; is it some expert in some other case who is doing in effect research and development for purposes having nothing to do with this particular bankruptcy; is it somehow collusive between the debtor and a third person. The debtor obviously, and this will be a through line in the various matters you will have to address in this stage of the case, the debtor wishes to impose burdens and inconveniences on

15

the creditor constituency while saving itself from all burdens and inconveniences.

This is an example of the debtor reaching out to impose burdens and inconveniences that are not necessary in the current posture of the case and asking you to, in effect, give an advisory view as to what the appropriate allocation of burden would be in the event of such a contest.

You need to hear from the law firm who has put the data forward about whether or not it ought to be protected and how the burdens should be distributed in that showing. You shouldn't be resting on the competing views of the debtor which will have the information, although subject to confidentiality, and the committee which represents the entire constituency, no particular individual or law firm.

So we submit that the prudent thing to do and the appropriate incremental decision-making process for the court is to order the form that Judge Fitzgerald propounded and to reserve all questions regarding what will happen if and when somebody comes forward to demand the data.

Thank you.

THE COURT: Let's hear from Mr. Guy.

MR. GUY: Thank you, Your Honor. In our papers, we didn't take a position on the 2019 motion other than to say the Rule is clear and it seems the parties have gone over what they are required to disclose. Now the question is just

16

confidentiality.

The only reason I rise is to say that I think, and the parties hopefully would agree, is the FCR would have access to that information and wouldn't have to go to the court to seek access and we would, of course, keep it confidential.

MR. SWETT: That's acceptable to the committee.

MR. CASSADA: Your Honor, I will be brief about this because there are a lot of other issues before the court. I mean, let's be clear what we are talking about here. Rule 2019 requires the filing of a notice with a Bankruptcy Court. Section 107 says that all papers filed with the court are public records. So if there is going to be an exception made to that, there is a requirement that a party come in and show that there should be an exception to Section 107.

Now, entering the order that's been proposed by the parties here automatically grants an exception to section 107, and the reason it does is because the document won't be on the public record.

In Judge Fitzgerald's case, it is important for you to know that she didn't enter the order until the law firms came in and they attempted to make some showing on why the language should be protected. In fact, the original order that she entered required that all of the information be on the public record. So law firms came in, they provided evidence, they made a showing. She entered an order based on that. That has

17

not happened in this case.  All you have here is a request to require compliance with 2019 and, in order for you to enter an order saying that there won't be public access to this, there has to be a showing that hasn't been made.

Now, let's examine some of the reasons.  Mr. Swett, he is afraid that the co-defendants who might come in here and they have a prurient interest in this information and they might use it to their advantage in litigation.  Let's be clear about what that means.  The debtor receives several hundred mesothelioma claims a year.  These same claims are filed against other co-defendants all within the tort system, and the question about how many defendants a claimant can claim a remedy against is very important to the value of a claim.

And what the plaintiff's bar wants to do is they want to be able to file claims in secret here, and they think it is somehow improper for co-defendants who, by the way, are parties-in-interest in this case.  They are – they fall within the definition of an asbestos claim.  They will be bound by the confirmation order that will be entered in this case.  That those co-defendants should not have access, automatic access to this information because they might improperly use it in their defense in state court.  So that the suggestion is that it would be improper for them to know that the people who have filed lawsuits on the public record, identifying their names and identifying their disease, against them can come here in

18

private and it would be unfair for co-defendants to have that information.  That is patently absurd.

So the debtor's position, Your Honor, is that once the order is entered requiring filings of the papers, before the court bypasses section 107, there has to be a showing, and our proposed language gives the court the basis for doing that by postponing the showing until someone comes and asks for the information.

But to-date, the showing hasn't been made.  It was made before Judge Fitzgerald.  Apparently, you know, there were appeals and appellate courts got to review her order in the context of the evidence that supported that relief.  None of that has happened here.

MR. SWETT: Your Honor, a couple of brief points. Recall that the debtor's position was that anybody who came in to oppose his 2019 motion would thereby subject itself to a 2019 file.  The debtor has actively deterred law firms from coming in to express their views on those issues at this stage by threatening them with the not inconsiderable burdens of preparing these 2019 statements.  Some of these law firms have thousands of claims.  That's number one.

Number two, whether a co-defendant wants to come in and gain access to information about claimants against Garlock is between that co-defendant and that claimant and, if they want to come here and do that, you can hear them and you can

19

decide then whose burden it is and what the right answer is. It is not for the debtor to be, in effect, an officious inter-meddler in that.

Third, the showing has been made.  We are talking about the identities and other particularized information about a very large number of individuals.  The statute itself recognizes that an individual is protectable under section 107 with regard to personally identifying detail.  That showing is implicit in the nature of the information that is elicited by the form and by the statute itself.  We would rest on that and urge you not to anticipate disputes that may or may not come down the pike.

Thank you.

THE COURT: Well, I think for that last reason and because it seems to be a pretty minimal restriction to ask somebody to let us know when they want to look at this information, that I ought to go with the form as Judge Fitzgerald had done it and as the committee has recommended. So that will be my ruling if you all can – if you have language that does that from her order, I suppose –

MR. SWETT: Your Honor, we submitted a proposed form of order with the statement we filed on the 12th of October.

THE COURT: All right.

MR. CASSADA: I believe that form order took our language.  We just changed the one provision.

20

MR. SWETT: That's correct.

MR. CASSADA: Well, that's agreeable, Your Honor, if that's Your Honor's ruling and we agree that that order properly reflects –

THE COURT: Okay.  Well, that's the order that I will – if you all will upload that, I will sign that order.  And we will just see.  We may revisit this if we have a flood of requests, but we will see where it goes.  We will at least have some idea of who wants to see what.  Okay.

MR. CASSADA: Your Honor, we are prepared to present our case on our motion for bar date and other relief.  We have four witnesses.  We have, as Your Honor knows, a number of affidavits that previously have been filed in support of the motion and then there is documentary evidence that we would propose to admit after our witnesses, and we would move for admission of that evidence with an explanation to the court as to its relevance as we do that.

So the way I would suggest we proceed is that I will make an opening statement.  Our first witness will be Dr. Charles Bates.  It would be important, if we could, to complete his testimony and allow him to travel today.  He learned yesterday that he has an ill father-in-law and his wife is attending to him in their home in San Diego, and he would like to get back to assist with that situation.

THE COURT: All right.  Well, we will try to

21

accommodate him.

MR. SWETT: A couple of comments, Your Honor.  First, I would like to make an opening statement after Mr. Cassada speaks but before the evidence is presented.

Second, subject to calling Dr. Bates back on another day, I am amenable to releasing him today in view of his personal circumstances.  I would like to hear what he has to say before deciding whether to engage in cross-examination and, if so, whether to do that on a subsequent day.

THE COURT: That's fine.  We will do what we can to accommodate his needs.  All right.

MR. CASSADA: Thank you, Your Honor.  Your Honor, I believe I am going to make history in this court.  We are going to use for the first time the court's technology.

Your Honor, I want to begin by explaining to the court the relief that the debtors have sought in their motion.  It's important because I think the court will need to focus on the issues that are at stake in our motion and not issues that are not yet ripe.

We have asked the court to set a bar date and, as we have argued, setting a bar date and requiring proofs of claim is a fundamental requirement of the Bankruptcy Code.  It is not only mandatory but obviously it's not a useless formality.  There is a purpose for it and the purpose is to aid in confirmation and the proof of claim forms will do that in this

22

case.

Secondly, Your Honor, we have asked you to approve an alternative proof of claim form.  The form has been submitted to the court.  The parties have reviewed it, and we will show you that that form is a reasonable form to request claimants to fill out.  In fact, that form is designed to mirror the claim forms that are filed by claimants against the post-confirmation trust that have been established in the second half of the last decade.

We have asked Your Honor also to approve the form of our notices of the bar date.  Those have been drafted, submitted to the parties for review and the court has had those since the end of August.

We have asked the court to approve the manner of notice.  We have submitted the court a detailed notice program. We have offered evidence on that, and we will ask the court at the end of the hearing to approve our program.

And finally to enter a case management order that will dictate what the parties can accomplish while we are awaiting the proofs of claim.

Your Honor, the relief request is completely consistent with what the Bankruptcy Code says about how disputed claims are resolved.  First, the first step is that Rule 3003, it requires a bar date and it requires proofs of claim for disputed claims.

23

Step two, code section 502(a) entitles the debtors to object to proofs of claim.  In fact, if we don't object, they are deemed allowed and, as the court and parties well understand, we intend to object in these cases.

There is a third step.  Section 502(b) requires the court to liquidate disputed claims to the extent such liquidation won't unduly delay administration of the estate.  That's a step for down the road.  Until we get the proofs of claim and the information that they will provide, we don't know whether it makes sense in all cases to skip liquidation and go to estimation.

And the fourth step under section 502(c) requires the court to estimate those disputed claims for liquidation of which would unduly delay administration of the estate.

So the statutory scheme provides a clear four-step process, and the debtor's bar date motion initiates that process.

Under the Bankruptcy Code, you don't get to step four unless you go through step one, two and three.  There is no way you can read the language of the Bankruptcy Rules or the Bankruptcy Code to get to section 502(c) until you have proofs of claim.

And under section 502, once you have the proof of claim and the information, then you decide how you value those proofs of claim, whether that valuation can be done through

24

liquidation or through estimation. Regardless of the route that the court decides to take, a bar date is required and proofs of claim are required because they provide the essential information. They provide the claims that have to be estimated. They provide information necessary to the valuation of the claim. Again, whether that be through liquidation or through estimation.

Once the debtors get the essential information that the proofs of claim provide, we will seek relief that we believe we are entitled to at that point. And that relief is likely to include focused objections to claims based on lack of evidence and common legal issues, but we are not asking you to decide whether we can do that today. We will have the information then. The committee can object to liquidation of any claims and argue that we go directly to estimation or the court may agree with us and decide that it can hear focused common issues.

But until proofs of claim are filed, we have no disputed claims to estimate. We lack evidence that would be essential for estimation, and there is no basis for the court to conclude today that estimation is better than liquidation. In fact, the cases say the liquidation is preferred to estimation. And before you get to estimation, skipping liquidation, there has to be a showing, a strong showing, that all of the claims have to be estimated.

25

Now, the reasons we have asked for the proof of claim bar date and claims to be filed in this case – and those reasons likewise are consistent with the Bankruptcy Code – first, filing proofs of claim will ascertain the identity and number of present claims.

Second, having the proofs of claim will assist in valuing present claims, and whether that valuation takes place through allowance or estimation.

Third, it will assist in estimating the number and nature of future claims and, in fact, as you will learn from the experts, the information gathered and the valuation taken for present claims often serves as the basis for valuing future claims.

And, fourth, it will assist in determining voting rights and ensuring a fair vote. Some of the evidence you are going to hear, Your Honor, is that within Garlock's database, there are somewhere around a hundred and eighteen thousand records that show open claim and that the vast majority of those claims are the legacy of medical screenings that have been discredited. They have been shown to have been based on medical reports that are unreliable from doctors that today, when you ask them about them, they plead the Fifth Amendment or they disavow that they ever intended to make a diagnosis. Those claims have to be identified. If they are not, and we don't have proofs of claim, they just show up and vote and

26

there is no way that the debtor can ensure that there is a fair vote or the court can be certain that persons with real claims are voting. They are so big in number that no matter what standard is used to determine whether to confirm a plan, they will block it, they will highjack the case. And the only way to deal with them is to agree to pay them, although they would never be paid in the tort system.

Now, the committee's approach, they would skip steps one, two and three and they would skip it on the basis of what we believe are specious arguments.

First they say proofs of claim are burdensome and a waste of time. It is a strange argument for them to make on the one hand that Garlock's pending mesothelioma claims have a value of three hundred and thirty million dollars and, on the other hand, it's burdensome for them to fill out a proof of claim form that they estimate will cost them two hundred and twenty-five dollars a claim to fill out. That is a beginning proposition. It makes no sense.

But it makes no sense for another reason, and that's that even they admit they are going to have to file a claim to be compensated. And we are using the same form and the same procedure as claims that are filed against post-confirmation trusts. So they will have to file these trusts anyway and they will have to incur the two hundred and twenty-five dollars per claim. And not only that but, when they file their claims

27

here, it will provide information to us essential to the confirmation of a plan of reorganization and they will also have their claims in the trust queue.  So the trust will be able to be established, open, operate and pay claims more quickly.

Not only that but trusts have FIFO queues, first claim in, first claim out, so there's an incentive for claimants to want to be the first to file their claims and have those in the queue before the trust is established.

Now, the committee also makes arguments that the court has no power and the debtor has no right to question the merit of any claim.  They are too big; there are too many of them; we are going to get lost in a morass of paper; they have rights to jury trials that can't be violated even in the most ridiculous claims that are based on the most ridiculous evidence.  But these are all wrong, but we don't need to prove that today and it's not even relevant for today.

What is relevant for today is that proofs of claim are required and necessary for estimation.  We can argue at a later date about whether you estimate or liquidate.

Your Honor, we submit that the arguments are a pretense.  What they want to do is they want to leave the court and the parties in the dark about facts supporting claims. They don't want a scientific estimation supported by evidence. They want to engage in sorcery as indicated by the preliminary

28

claims estimation that they have provided.  They want to estimate claims on the basis of a recent settlement history that's tainted by abuse in the system and by the bankruptcy wave.

Now, they point out that there are some courts and some cases that skip the first three steps and went directly to estimation. Courts in other cases have rejected the path.  But it is important for the court to know in every case where the debtor opened a case and asked for the court to follow the Bankruptcy Code and to require proofs of claim, proofs of claim were required.

So if there has been a skipping of these steps in other cases, it has been at the behest of the debtor, not based on an objection by the creditors committee at the beginning of a case to cut the legs from under the debtor and not let them have proofs of claim and review the merit of any claim.

There are good reasons that we shouldn't follow the path suggested by the committee.  We are in a new era of asbestos bankruptcy cases and, in a lot of ways, the case before this court, we should set new trends.  So why is Garlock different?  This is the first post-bankruptcy wave debtor case. Now, what I mean by that is that this is the first debtor who has filed who has suffered a transfer of liability from the top tier defendants.  Huge transfers, the court has seen from our papers, and as the evidence will show today.  You know, the

29

trust had been set up for those companies whose liability Garlock has been carrying for the last several years. Those trusts now are beginning to pay the liability.

So Garlock's database, it reflects a disruption by the bankruptcy wave, but it doesn't yet reflect the relief that Garlock is entitled to and will get from the payments made by the bankruptcy defendants.

Now, this wasn't an issue in any of the cases cited by the committee of the top tier defendants. Previous bankruptcies didn't drive their liabilities. They went in as the top tier, most prominent defendants. Well, there may have been some cases that drove their liabilities but the big bankruptcy wave occurred in early 2000.

But the point is that proofs of claim will get at that issue. They will provide information, among other information that we will see, to show the impact of the bankruptcy wave and to show how Garlock would be entitled in the court system to relief from the bankruptcy trust payments that would bring its settlement values back down toward pre-bankruptcy wave values.

This is also, Your Honor, the first post-silicagate. Now, what I mean by that, and the court has read in our papers, the significant events in the silica MDL in Texas when the same screening doctor engaged in the same screening practices for silica that they have been engaging for a decade in asbestos litigation. And the federal judge there scratched the surface

30

and quickly found that the screening process was abusive, that these weren't real diagnoses by doctors.  These were, as Judge Jack said, these were diagnoses for money.

So screened medical claims have been thoroughly discredited and they had a profound effect on asbestos litigation.  Those claims have ceased being made and the ones that were filed now that sit on Garlock's docket, we estimate in excess of a hundred thousand, those cases are stalled.  They were never be paid.  Plainly they are based on unreliable medical reports, medical reports that would not be allowed in a federal court or a state court.  The vast majority of records in Garlock's database reflect recruited claims.  You will hear that testimony and you saw the affidavit of Paul Grant.

These claims need to be identified and dealt with.  If not, then these claims, they will dominate the vote.  As indicated earlier, Garlock believes they represented ninety percent of the cases within its database.

And then finally, Your Honor, Garlock's case is the first post-trust compensation system debtor.  Now, what do we mean by that?  As you will hear from Dr. Bates, since the mid 2000s, numerous trusts have emerged with billions of dollars of assets, and there has been a need for claimants to make their claims in an efficient way against those trusts so they can receive payment.  So the trusts, working in cooperation with the plaintiff's bar, have developed a very sophisticated and

31

efficient way to present and pay claims. Those are electronic claims. And that changes everything in a bankruptcy case. All of the cases before where they said that it was unduly burdensome to allow debtors to gain information from paper proofs of claim, they don't apply anymore.

Today, debtors like Garlock can, and Garlock has in this case, take advantage of the trust compensation system. We have developed a proof of claim form that requires the exact same information and showing that claimants have to make if they file a trust claim. There is one exception which we will explain. We propose that those proofs of claim be submitted in the exact same manner that they are in the trust system. There is simply no basis whatsoever for anyone to come in here and argue to Your Honor that they shouldn't be required to present a claim that will aid the administration of this case and then serve as their proof of claim for any post-confirmation trust.

I want to summarize what our evidence will show. First, Your Honor, we will demonstrate that proofs of claim are required and necessary. We will demonstrate that our proposed proof of claim form is reasonable and necessary. That the proposed proof of claim form and process will not unduly burden the court, claimants or debtors. The debtor's bar date notices are reasonable and provide adequate notice. The debtor's bar date notice program provides reasonable notice to all affected parties.

32

In addition, Your Honor, we will show that, contrary to statements you have heard from the committee, debtors in other cases that have required proofs of claim have not abandoned the proofs of claim. They have been central to the resolution of bankruptcy cases where those proofs of claim were required.

Present and future asbestos claims do not render Garlock insolvent. And finally, Garlock's settlement history, the claims database, do not provide a sufficient foundation for estimation.

On this last point, Your Honor, I think I should address a case that the claimants committee talks about in their brief. The committee cites a 2003 verdict from the *Blandford* trial, a case in which Garlock was targeted by the Baron and Budd law firm and where a Cleveland, Ohio, jury returned a six point four million dollar verdict against Garlock. The committee says that this case supposedly demonstrates that Garlock's low dose defense has little traction with juries.

What the committee doesn't disclose is that that case was reversed based on the trial court's improper admission of the plaintiff's dose witness. It turns out that the plaintiff's firm improperly called that witness in rebuttal so that Garlock would not have a chance to answer the evidence offered.

33

The case eventually settled for a very small fraction of the verdict. But it is an instructive case for many reasons. It demonstrates well the way plaintiff's firms abuse the tort system to Garlock's disadvantage. Mr. Blandford worked at industrial sites with many asbestos products, including significant amounts of friable asbestos insulation. The lawyers targeted just three defendants though. Hart, a distributor of Owens-Corning's Kaylo product; Chesterton, a gasket manufacturer, and Garlock.

Mr. Blandford had died of mesothelioma and the plaintiff's key witness in the case was his son, also a co-worker and president of the local steelworkers union.

In his deposition, his son testified repeatedly that he remembered those three products, Garlock, Kaylo and Chesterton, but that he could not recall his father ever worked with or around any other asbestos products.

By trial, Hart and Chesterton had settled. It was clear that Garlock was the target and unable to settle the case, so the case proceeded to trial with Garlock left to defend on its own.

At trial, the son's testimony was now more refined. He recalled that most of the asbestos he was exposed to was Garlock, these gaskets, and that Chesterton and Kaylo were only minor contributors. He could not recall there being any other asbestos products on the site  A six point four million dollar

34

verdict resulted.

The Ohio appellate division reversed the trial court's decision and remanded the case for retrial, finding the court to have abused its discretion in an evidentiary rule.

Garlock worked the case up for trial again but guess what?  In the preparation for the trial, Garlock discovered that in the interim period between the verdict in 2003 and the 2006 reversal, that Blandford had taken their claims to the trust.  They filed claims against trusts who had paid claims on behalf of friable insulation defendants and all bankrupt co-defendants who had not – all of these were bankrupt defendants who had not been identified in deposition or at trial.

Now, needless to say, the case suddenly became easier to settle and did settle for a fraction of the plaintiff's last demand prior to the first trial.

To get this resolved, Garlock was forced to spend hundreds of thousands of dollars attending depositions, preparing for trial, engaging medical and industrial experts in trying the case, briefing, arguing on appeal and preparing to do it all over again, and that's not unusual.  The reality is that it cost Garlock more to win than settle and any analysis of settlement amounts will show that claims payments have much more to do with avoiding defense costs than merits of particular cases.

The committee suggests that the average settlement

35

value of a mesothelioma claim is five million to eight million dollars, more than it says the average verdict is.

Now, we are going to demonstrate to you that the settlement numbers are ridiculously inflated but, if they were true, obviously they defy logic and they demonstrate that something is very wrong with the tort system.

Now, the committee also asserts that the *Grace* case proves that proofs of claim and focus on the merits are a waste of time. They say that proofs of claim weren't even used in a case. They were abandoned. This simply is not true. Proofs of claim and the information they provided were fundamental to estimates of claims and a rational resolution of the *Grace* case.

Now, there were two dueling approaches in the case and this graph demonstrates that. The debtors came in and they argued for proofs of claim; they argued for a questionnaire process, both preceding and following proofs of claim, to get information about the nature and quality of claims before Garlock. And the information they got served as the fundamental evidentiary basis for their estimation approach, and there was an estimation trial in 2008 and the debtors put on their case and, under their case, the range of potential values for Grace's total asbestos liabilities were a low of three hundred and eighty-five million and a high of one point three billion.

36

Now, the committee took exactly the same position they are taking in this case, that we should base this valuation solely on their claims database and settlement history, that that's the only thing that mattered and, if we will use that, the debtors are hopelessly insolvent, the same language that we are hearing in this case.

In their expert's report, the same expert as in this case, said that the liability is five point four to six point two million.  Well, six point two billion, excuse me.  Five point four billion to six point two billion.  Well, the debtors put on their case at the estimation trial and the committee never put on its case.  The case settled for two point two billion, which I believe the court can take as a proxy for the real value of Grace's asbestos liability or, in fact, the settlement permitted Grace's shareholders to retain equity over two billion dollars.  They put less money in the settlement than they kept for their shareholders.

Now, what does this mean for Garlock?  Well, Grace, remember, was a top-tier defendant.  It was one of the major payers before the bankruptcy wave.  In 1999, Grace was paying about fifty thousand dollars a mesothelioma case.  By comparison, Garlock in the same year was paying about nine thousand, one hundred dollars.

The Grace settlement, again a settlement that permitted shareholders to keep equity, estimates a value to

37

mesothelioma claims in the range a low of fifty-six thousand and a high of seventy-nine thousand.

If Garlock's liabilities were resolved on the same basis, then the average value of a mesothelioma claim would be ten thousand dollars to fourteen thousand, five hundred dollars, far less than the numbers inflated by the bankruptcy wave on which the committee would base its estimation today.

So, Your Honor, here is the evidence that we have offered and that we plan to offer.  First, the court has the filed declarations of Paul Grant, the president of Garrison Litigation Management; Dr. Charles Bates, our claims expert; Marc Scarcella, also of Bates White, who is an expert on the trust compensation system; and Paul Verbinnen with a nationally-recognized public relations firm of Sard Verbinnen, in support of our asbestos bar date notice program.

The witnesses we will hear from, we will start with Dr. Bates who will talk about the asbestos claims litigation history that Garlock has confronted, the proof of claim and how that proof of claim is essential to the estimation of claims, and he will address the one point five billion dollar preliminary estimate of mesothelioma claims that the committee has offered.

Marc Scarcella will testify about the trust claiming process and how the process proposed by the debtors is completely consistent with the claiming process in the trust

38

system.

Two witnesses, Your Honor, from Rust Consulting, our proposed claims agent, Elizabeth Graham-King and Nathan Shuck. They will talk about how the proof of claim works, all the features of the proof of claim, and they will actually demonstrate to the court the process of completing an electronic proof of claim form.

With that, I will let Mr. Swett speak and then we will call Dr. Bates.

THE COURT: All right, Mr. Swett.

MR. SWETT: Thank you, Your Honor.

The task at hand is to reorganize a debtor whose fundamental problem is that for many decades it dealt in a poisonous product that was widely used in industrial settings where many, many workers unwittingly came into contact with a toxic substance that has been responsible for some three hundred thousand deaths in this country over a period of decades and is projected by knowledgeable epidemiologists whose predictions have been borne out by empirical data to continue to cause deaths in significant numbers for the next forty years.

This debtor dealt in that toxic product far longer than most, certainly longer than those they have termed the friable defendants and that they would style as the real bad guys. This debtor didn't stop selling those asbestos-

39

containing products until the middle of 2001.

The fundamental problem that it faces is the basic fact that its product, full of toxic substance, is out there in the world and many people have come into contact with it, many people have become ill and have been able to demonstrate, according to the standards applicable in the non-bankruptcy courts that have the principal responsibility for administering the tort laws, that they are entitled to compensation from Garlock, compelling Garlock to acknowledge its situation and come to terms with those plaintiffs in settlements over the course of thirty years.

Now, the diseases are diverse but there is one that in the present stage the parties seem to agree is the driver of the liability and that is mesothelioma. Mesothelioma is a malignant condition of the lining of the chest. Its effects are fairly rapid. Upon diagnosis, a mesothelioma victim is generally given less than two years to live. It is virtually invariably fatal. It is a very painful death. It is a scenario that juries don't like.

It involves blue-collar workers, often elderly, because the period of time necessary from first exposure to asbestos to the manifestation and diagnose-ability of the disease is very lengthy. So the folks are often elderly. They often have dependents. They are sympathetic plaintiffs in the eyes of the jury. That is Garlock's problem.

40

The laws that govern these complex – the scenario is extremely complicated by the fact that there were lots of manufacturers of asbestos-containing products that show up in the same places and by the fact that there are, in the nature of the disputes, there are some things that are really beyond dispute and there are some things that are intensively fact specific, often usually can be disputed.

What is not in dispute is what we call general causation.  Asbestos causes a variety of diseases, including mesothelioma.  There is indeed no other known cause for mesothelioma.  In general, the risk of contracting an asbestos-related disease is measured in terms of a relationship between the dose and the disease response.  How much asbestos is out there that the person comes into contact with.  The more asbestos he is exposed to, the likelier he will contract some asbestos-related disease.

Mesothelioma is unique among the asbestos-related diseases, not only as the one inflicting the most serious injury but also in terms of the disease process.  It is thought by widespread knowledgeable scientists to be capable of occurring with only minimal exposure.  Your likelihood of falling victim to that disease is greater if you have lots of exposure over an extended period of time, but that's not necessary to the contracting of the disease.  You can get it from exposures that the defendants would derive as *de minimis*.

41

Now, that's the debated matter in the tort system. There is a large body of respected science that asserts what I just said. There are others who disagree with it. It goes to juries when cases are tried. It is controverted; it is not amenable to summary disposition.

That kind of dispute happens at many different levels in the complex process of trying an asbestos case to verdict after preparing it through the elaborate pretrial process that prevails in the tort system.

And so the cases are costly, both for the plaintiff and for the defendant. It is a matter of considerable expense and effort to the plaintiff to prepare a case over a long period of time, gathering information from myriad sources.

The plaintiffs often are unaware of what manufacturer's products they have come in contact with. They may have some idea. They certainly don't know comprehensively.

Interestingly, Judge, it is accepted that people in the United States living in urban settings largely, almost ubiquitously have some asbestos in their lungs, so pervasive was the use of this stuff in our environment.

How many of us could say who was the manufacturer who put out the fiber that ends up in our lungs? I couldn't. Most plaintiffs can't. Now, some will say, well, they know that a Johns Manville product was present because Johns Manville accounted for something like sixty percent of the asbestos

42

products out there.  It is not surprising that people would tend to remember it.

On the other hand, Garlock says that its products were lodged in pipes that were surrounded with other people's asbestos-containing products.  They don't necessarily have the names branded on them in conspicuous detail.  And, remember, these exposures take a long time to produce the disease.  So the exposures were some decades in the past oftentimes.  It is not surprising that a plaintiff couldn't recite, when he walks into the lawyer's office to say I have just been diagnosed with mesothelioma, all of the products that might be the sources of his exposure.  And so the plaintiff must prepare a case.

The defendant confronted with such a claim must prepare a case.  Some of the defendants – Garlock seems to depict itself as such – wish to argue that no, no, their product didn't put out enough fiber to make the plaintiff sick, it must have been the other manufacturer's products and, if it has to go to trial, it wants to be able to lay off responsibility on the other defendants and then, if it wants to settle, it takes into account its ability to do that.

And as I will get to later, the tort system provides many tools and many avenues for the defendants to pursue those purposes if they so choose.  And those tools and those avenues and the prospect of going to trial, whether in an array of multiple defendants or isolated as a single defendant, is the

43

backdrop against which virtually all of the claims are resolved.  Less than one percent of the asbestos claims go to trial.  The rest, where resolutions are achieved, are achieved by the time-honored process of settlement negotiations, each side represented by counsel, each side seeking the best result against the counter-party to that negotiation for itself.  In its rational self-interest, Garlock settled the bulk of the claims over decades.

Now, despite the complexities, despite the myriad applicable law, and the Supreme Court has instructed that even in bankruptcy it is the state law or the non-bankruptcy law that would control outside of bankruptcy that determines the validity and value of a claim.  Despite all of those complexities, Garlock was able to resolve hundreds of thousands of cases over decades.

And this is one of the unique situations that actually narrows the issues and presents an opportunity when it comes time to reorganize a debtor like Garlock that concludes that it has no alternative but to enter bankruptcy in order to deal with a claim.  And that is that the fund of data available to value the asbestos claim, on average, is deep and wide. Unlike some other mass tort cases, such as the *Robins* case and the *Dow-Corning* case, this court will have available to it Garlock's own data concerning the claims and the claim resolution across hundreds of thousands of cases.   The

44

settlements it arrived at, it arrived at through using all of the tools available to it in the tort system to ferret out the facts, including the responsibility of other defendants.

That pool of data is sufficiently wide and deep and it can fairly be said to represent the full array of fact pattern, the full distribution of cases across a spectrum of weak evidence and strong evidence.

The full variety of cases in which the plaintiff had exposure virtually only to Garlock products and those in which it had exposure, the plaintiff had exposure to many different defendant's product, all of those details across very large numbers are baked into the settlement values that Garlock achieved.

Now, we would submit and we will be prepared to show that, if Garlock is held to the value that it negotiated with its army of lawyers at great expense in terms of defense costs, investment in the defense, preparing the case to the degree that it thought it needed to be prepared before it could value it, that those values are a fair, indeed the only reliable representation on average of the value of a mesothelioma claim against Garlock.

And what that is going to lead us to argue to Your Honor is what Judge Fullam found in the *Owens-Corning* case when asked to allow a whole bunch of discovery into the medical conditions of existing claimants for the purposes of allowing

45

the debtor to attack – I am sorry, in that case it was the financial creditor – to attack the merits of those claims in the bankruptcy court. And he said, no, that is not necessary; we will begin with what is known and that is Owens-Corning's database. We will attempt to estimate the total bogey, the overall liability for plan formulation purposes. We will not engage in drilling down into the details of particular cases. Those details in this setting will not differ materially from cases that are baked into the settlement data. We will begin with what is known and we will go to estimation and if at that time it emerges that some more data, or some development of some issue is necessary in order to complete the explanation, we will attend to it then.

In that case, in contrast to the *Grace* process which took many years and cost many, many millions of dollars, while the claimants went uncompensated and while the plaintiff's bar absorbed massive expense, while the debtor consumed inordinate amounts of the debtor's resources, instead of that, Owens-Corning produced an estimation trial that lasted a matter of days. It dealt with a manageable number of witnesses. It produced expert testimony across the spectrum of value. It allowed the judge to make reasoned determinations of the likely outlook that would affect the projection of future claims.

He was able to ascertain from then existing trends, based upon properly founded evidence, that the era of

46

screenings and massive numbers of non-malignant claims was on the wane. He made adjustments for that in regard to his findings with regard to the likely number of value of future claims. He nevertheless came in with an estimate that Owens-Corning's liability was seven billion dollars in the aggregate, and the plan was formulated on that basis and confirmed.

Contrast that to what Judge Fitzgerald ended up describing as the nightmare of the process that Grace had insisted upon where a debtor, not seeking as here allowance proceeding, which is an important distinction I will come back to, but an estimation, insisted on a massive discovery inquiry in the inappropriate form of a proof of claim and elaborated a process that went on for a great length at massive expense only to proceed to trial on a basis where it made little, if any, use of the details elicited through the proof of claim.

Now, some of the advantages available to the court here are the experience of the some-odd thirty asbestos bankruptcies that have been successfully concluded in plans of reorganization since Manville went into the chapters in 1982. The overwhelming learning from that mass of cases is bar dates are not useful in an asbestos-driven bankruptcy for the reason that the cases are constantly arising. The diseases are manifesting all the time and will for the next forty years. My partner likes to describe it as a carpet that is unrolling into the future. Whereas a bar date is an arbitrary line in the

47

sand.  Things are treated entirely differently depending upon whether they are on that side of the line or on this side of the line.  Whereas, in the asbestos cases, where so much of the liability is in the future but is in financial overhang that simply cannot be ignored, one of the essential goals is to treat the guy at the end of that long carpet similarly, as fairly, as the guy at the front-end of the carpet.  That's the mission of the asbestos trust, which we will get to.

The historical data and epidemiology that is commonly accepted allows the court to make a projection of how many people will in the future contract mesothelioma and how many of those people are likely to bring claims against Garlock.  And by reference to the average settlement values paid over a relevant period of time, which can be the subject of debate and the court can make findings, what the value will be going to those claimants who will achieve resolutions, what percentage of the claimants are likely to receive resolutions and how to structure that projection over time and discount it back to present value, to measure the present worth of the debtor's liabilities.

Now, since the parties agree that mesothelioma drives the liability, since there will be little debate over the incidence in the future of mesothelioma – there will be debates about how many of those victims are likely to sue Garlock, but here is where the rubber really hits the road in this case.  It

48

is what will the average settlement value be that should be projected into the future, that should be attributed to the present, and what fraction of those claimants are likely to receive settlements had the debtor remained outside of bankruptcy, and that's a key point.

What you will be measuring when we get to estimation in this case is what it would cost the debtor in total to resolve the liabilities were there no bankruptcy, and that brings to bear the non-bankruptcy law that controls the validity and the value of the claims.

And here is the rub: If the debtor is held to the settlement values that it negotiated and accepted during the last five or six years in the tort system, it will be beyond dispute that the debtor is profoundly insolvent. They say that on average in that period they paid something like seventy-five thousand dollars per meso claim that got paid, and we can figure out from the database what percentage of the mesothelioma victims who claim against Garlock received settlement. And we can analyze the factors that bore on that in order to make reasoned extrapolation.

And because of the availability of all of that data, the experts can direct their analyses to the issue that matters, which is are those historical mesothelioma settlement values going to stand up as a fair basis for projection, and they can bring to bear their opinions and analyses on why

49

seventy-five thousand dollars is or is not an appropriate amount to attribute on average to a positive mesothelioma settlement by Garlock, and that's where the action is in this case.

If the seventy-five thousand dollar number stands up, they are sunk and Coltec, their parent, has no interest in the assets of the estate, no entitlement to a distribution. Because, as we will show, their assets, the debtor's assets, the equity, I should say, the net asset value of the debtors, is not more than somewhere between six hundred and eight hundred million dollars, probably much closer to six hundred. Whereas on the assumption that the seventy-five thousand dollar settlement value is going to stand, the liability is on the order of one point five billion.

So preliminarily, based only on what Garlock has seen fit to put forth in its briefs and filings in its own self-interest, by bringing to bear an understanding of the basic dynamics of its litigation past, they are underwater by seven hundred million dollars, which is more than the total net asset value itself. So they are two hundred percent – I am sorry – a hundred percent more than the asset value is the liability. They are that sunk.

Now, they will disagree with us about that and they will have their chance, through a process that you will control, to develop what evidence appropriately goes to that

50

dispute, and you can fit that into the model of an aggregate estimation without undertaking to drill down to any particular claim to have, in effect, the surrogate for a tort trial in the bankruptcy court, to trigger the due process rights of the individual claimants who, if their claims come under individual attack in this case, will not stand idle but will be in front of you arguing their own rights, objecting to discovery that they consider inappropriate, unduly burdensome and not appropriately focused, and we will have a donnybrook that will take a very long time if the focus is on individual claims. But it need not be because you will be satisfied by expert testimony that you can derive appropriate averages from the settlement history, make whatever adjustments the evidence persuades you are appropriate in terms of the developments and trends in the tort system, and you need not trigger the individual due process rights of the claimants and you need not consume years in formulating an appropriate set of discovery requests of individual claimants whether by something called a proof of claim but substantively very different or through more conventional discovery devices. You will not have to suffer through those individualized discovery disputes. You will have a focused, contained, fair process in which the real issue of what is the appropriate average mesothelioma settlement value and how many of the claimants are going to get paid can be determined.

51

Now, another advantage that you have going – besides the salutary example of the *Owens-Corning* case which in turn followed upon the *EaglePicher* case, which in turn was followed by the *Federal-Mogul* case and the *Armstrong World Industry* case, all of which produced confirmed plans of reorganization based on aggregate liability estimates along the lines that I have described – is that the debtor has come in and said from the outset that its goal is a plan under 524(g) of the Bankruptcy Code. 524(g) of the Bankruptcy Code was created on the model of the *Manville* bankruptcy. The *Manville* bankruptcy created a trust, channeled the claims to the trust, relieved the court of any allowance process whatsoever, making section 502 irrelevant. Instead relying upon the trust under criteria approved as part of the plan to resolve the claims post-effective date.

So the idea that it is necessary to have allowance proceedings targeting a hundred thousand claimants is utterly beside the point when it comes to a 524(g) plan. That's what the trust is for.

The court does not become the equivalent of an insurance claim adjuster with massive claim processing facilities. The trust handles it under criteria that the court controls through the plan. Ineligible claims are thrown out by the trust. Eligible claims get paid within the limits of the trust's ability to pay them, while reserving sufficient assets

52

to pay the future claimants similarly.

So 524(g) is the statutory model embraced by Congress to address the unique difficulties of asbestos-related, mass tort bankruptcies. It doesn't apply in other kinds of mass tort cases. It doesn't apply – it didn't apply in the *Robins* case. It didn't apply in the *Dow-Corning* case and neither of which involved asbestos. But it is available to the court and the parties and is indeed the only proven way of reorganizing an asbestos defense. It has never happened otherwise.

And so it becomes section 524(g) of the Bankruptcy Code and the need to confirm a plan that becomes the focus of the estimation process. It is not something that happens in the abstract. It is tethered to a plan. That focuses the inquiries, that controls the appropriate scope of discovery. That allows the court to put the case on a track that can produce a confirmable plan in a year or so if the process is appropriately governed.

So there is a very strong need to draw on the lessons in history. Now, in this circuit there hasn't been an asbestos bankruptcy before, at least none that I am aware of. Certainly no major one. But there is the *Robins* case and the debtors cite one of the Fourth Circuit decisions in the *Robins* case for the idea that a bar date is mandatory. That decision is in fact beside the point, as I will come to, but first I would like to focus on another *Robins* decision. It is known by the

53

unpronounceable name of *Piccinin* or *Piccinin*.  I am not sure how you say it.

THE COURT: *Piccinin* is what I have always called it.

MR. SWETT: And that case determined that *Robins,* facing only some nine thousand prepetition claims, compared to the hundred thousand or so that's in the pipeline for this debtor, that that debtor must not attempt allowance proceedings, it must not cause the delays that a claim by claim attack on the unliquidated tort claims would entail.  That it must instead proceed to estimation.

Now, that was a case in the late eighties before most of the asbestos reorganizations that I have described to you.  It did focus on 502.  It did not have available section 524(g) which, in addition to being limited to asbestos cases, didn't exist yet.  But the court emphatically said you must not have allowance proceedings because you will consume too much time and waste the estate's resources.

So that is the legal answer to the debtor's proposition that they must have allowance proceedings in the roughly analogous situation, although ours involves many more claims and much more complexities.  Allowance proceedings were not feasible there and they are not feasible or lawful here.

Now, the bar date.  They say the bar date is mandatory under Rule 3003 which says "shall," but they overlook that the rule expressly gives the judge discretion as to when.  Of

54

course the creditors have to be identified before they get paid, before they vote, but recognizing the problem of the unfolding carpet that I mentioned, the asbestos bankruptcies have tended to postpone any procedure pursuant to the notion of a bar date, usually until the time of the vote. And many of those cases have treated the ballots as the proofs of claim.

I commend to Your Honor the *Quigley* decision which comments on the unusefulness of bar dates in the unique circumstance of asbestos bankruptcies and the expedient and lawful approach that defers the bar date until the vote and may even treat the vote itself, the ballots themselves, as the bar date.

Now, the debtor raises the specter of a vote highjacked by non-malignant claims that it considers illegitimate although I think the evidence will show it paid in recent memory, after the developments in the silica litigation that Mr. Cassada described, significant value for meritorious, non-malignant claims. But, anyway, they say those people in mass numbers will come in and highjack the vote and we won't be able to deal with them and they will be overbearing in plan formulation. Well, the vote can be weighted by disease category. It can be weighted according to the values that the court derives for purposes of plan formulation and trust distribution procedures. It can require the votes to take place in categories of claims so that it can later consider

55

whether a difference between the votes of the non-malignants and the votes of the mesothelioma claimants made any difference in the outcome.  The specter of a highjacked vote is a red herring and shouldn't detain you in the least.

Now, the proof of claim here and the bar date here present this sort of rhetorical happening.  It is easy to talk about this as, oh, a bar date motion.  Bankruptcy lawyers are used to bar dates.  Bankruptcy judges think instinctively about bar dates and don't think about that unfolding carpet, but this isn't a mere bar date that they are talking about.  This isn't a form ten which is the basis of the bar date, the claim form that they have now promulgated for the non-asbestos claimants.  This is in effect a demand that every one of the one hundred thousand asbestos claimants in the pipeline and any others arising until the bar date, including the day before the bar date, prepare their cases fully for trial within an inordinate short period of time and all at once.  So that a plaintiff's law firm that has a thousand, two thousand claims, is going to be required to, in effect, do all of the spade work necessary to go to trial against all conceivable defendants in four months time.  Now, that's not possible.  No court in a tort system would require that in a mesothelioma case with all of its complexities.  And if it is decreed here, it will prove to be not feasible.  It will break down.  Only one court, Judge, in all of the thirty-year history of asbestos bankruptcies, has

56

attempted allowance proceedings triggered by proofs of claim form, so-called, that are really massive trial preparation and discovery demands such as Garlock would impose here, and that was the *Babcock and Wilcox* case.

Now, the District Court in *Babcock and Wilcox* withdrew the reference, recognizing that it was controversial, as indeed it would be here, whether the bankruptcy court could exercise jurisdiction to be the decision-maker over merits decisions concerning individual personal injury tort or wrongful death claims because section 157(b)(2)(B) of the Bankruptcy Code says that's not a core matter. So rather than have the bankruptcy judge sit as a magistrate and make recommended findings and conclusions, the District Judge withdrew the reference. She allowed the debtor to proceed to attempt to set up a program of consolidated Rule 42 common issues, summary judgment motions. It has a familiar ring in light of what Garlock is attempting to do.

She put out the claim form. She required people to attempt to comply with that impossible document. And two hundred thousand people did what they could. And then the court had an argument and ascertained the futility of the debtor's program. And the dialogue went something like this: Mr. Debtor's counsel, you want to make summary judgment motions pertaining to two hundred thousand claims. Yes, ma'am. And you are going to cluster those motions into seven or eight

issues that you think will cut across a wide swathe of the claims. Yes, ma'am. And each of the two hundred thousand people you are trying to dispose of will have a due process right to appear with his or her own counsel, to take discovery, to make written submissions and to appear for argument and to appeal, right? Yes.

And then let's suppose that your defenses are so good and so non-fact sensitive that you prevail in ninety percent of the two hundred thousand claims. Okay. That's going to leave me with twenty thousand, fully ready, trial prepared cases on your view that have to now be dealt with. Mr. Debtor's counsel, we must find another way.

So the judge abandoned the effort that Garlock is proposing that you embrace here because it was neither fair nor feasible. And in this Circuit under *Robins*, it isn't lawful either.

So the closest precedent where an asbestos debtor wanted allowance proceedings is directly against this debtor's proposal and the lesson ultimately drawn by that court.

Now, there are other reasons why it would not be appropriate to entertain that program. I am going to focus for the moment on the allowance side of it, Judge, and we will talk later about the idea that they way to get around to Babcock and Wilcox process is not to bother to try those twenty thousand claims that survive but just estimate them at that point. Let

58

me mention first a key problem with that, and it is a problem going to fairness and rationality.  A claim that is settled a few weeks after it is asserted, before there has been discovery, before it has elicited a lot of effort by the plaintiff's law firm or by the defense, can be settled for a lot less than a case that has run the full gauntlet of several years of discovery and trial preparation, is on the trial queue and is ready to be presented to the jury.  Courthouse steps settlements are notoriously expensive.

Well, if a debtor is permitted to command its entire asbestos constituency to in effect prepare for trial through the medium of what they call this proof of claim form, then you are going to have a whole bunch of cases that have proceeded to more or less advance stages of preparation although not, I submit, because it wouldn't be possible to be fully prepared yet for trial, there will be an accretion in value because of the work that goes into them, because of the facts uncovered, because of the evidence developed and because of the strategies honed by the plaintiff.  And at that point it will no longer be fair or rational to exploit the great advantage that the court has in the averages that emerge from the claims data, all of those hundreds of thousands of claim resolutions, because those claims do not reflect – those resolution values do not reflect cases in advance stages of preparation by and large.

Remember, I mentioned that only one percent or less of

59

asbestos cases get tried.  Well, what that tells you is that the backlog of cases which arise are processed to some extent, settled at some stage in that process, are not fully matured, have not achieved their full value, are amenable to compromise at the values that the plaintiff and the defendant come together on.

If on the other hand you force all of those claimants through all those filters, make them do all of that preparation, hone their strategies and get ready for trial, in effect, you have enhanced the value and destroyed the utility of the average settlement values as a measure, and you are going to end up estimating more on the basis of verdicts than on settlements.  And while that estimate might throw out a larger number of claims because Garlock had a respectable record or better at trials, it still lost cases in considerable numbers and percentages and, when you apply those reduced percentages to trial averages, the liability is going to be a multiple of what it would be if measured realistically on the basis of a settlement.  And it is only the settlement values that are realistic as long as you don't goose the value of the claims through the way you handle them in the process because that's the way in the real world the cases get resolved, through settlement at various stages of preparation.

Now, Garlock's mission, as it has said for itself, is not to come in and reorganize in the traditional sense but

60

remember it wants to get out from under the seventy-five thousand dollar average mesothelioma verdict. That's what drives its case. And how is it going to do that? It is going to come in and argue to you that the tort system is broken, that all of the tools and machinery available in the tort system to ferret out the facts and make the defense and lay off liability on other responsible defendants and pursue contribution claims and all of that was not sufficient to allow Garlock to fairly measure its several share, the portion of its responsibilities in these claims. That you have got to fix that as the bankruptcy judge.

But, remember, the Supreme Court teaches that it is the law that would govern outside of bankruptcy that controls the validity and value of claims in bankruptcy. So Garlock's mission of continuing the tort wars but in its chosen forum, the bankruptcy court, amounts to little more than a massive effort at forum shopping, which is improper, and a search for litigation advantage. Even though it couldn't achieve Rule 42 mass dispositions in the tort system, it wants you to do that.

Well, that kind of search for litigation advantage as the driver of a bankruptcy filing is bad faith. The *SGL Carbon* case in the Third Circuit is one that bears reading on that subject. It is quite simply that you can't file a bankruptcy case and sustain that petition against a challenge to its good faith if you are driven by a search for litigation advantage as

61

opposed to a proper reorganization purpose. And I would submit that Garlock's entire strategy, its quest to supplant the resolutions achieved in the tort system by coming into a new chosen forum and hopefully getting that court to apply the law in a different way or, better yet, apply some kind of uniform law across cases arising in all fifty states, that's bad faith.

Now, moreover, when we come to arguing in a proper setting about the average mesothelioma values, we will take on their excuses for why those shouldn't stand up in the estimates that the bankruptcy court can fairly make.

I've averted to the  fact that plaintiffs are not the best source of information about all the products they came into contact with.  In the tort system, plaintiffs quite commonly prepare their cases by reference to testimony given elsewhere by co-workers who worked alongside them and were able to identify a particular product.  Invoices showing that a particular workplace, the asbestos products from Garlock or some other defendant were present.  Site lists developed as a form of institutional knowledge, over thirty years in the tort system. Oh, yes, that construction site, Owens-Corning product was used.  At that construction site, Grace product was used. At that oil refinery, Garlock gaskets were used.  That institutional knowledge is available both to the plaintiffs and the defendants.  And it is from sources like those that plaintiffs develop their side of the issue and the defendants

62

have access to the same kinds of tools and information.  They can depose the plaintiff.  They can elicit interrogatory responses. They can depose third parties.  They can depose co-debtors – I am sorry – co-tortfeasors.  They can bring to bear their own institutional knowledge.  They can consult such things as site lists that are public on trust websites.  Oh, yes, Babcock and Wilcox product was at these 32,000 sites.  Let's see if this individual worked there.  That's the complex process by which claims and defenses are worked up on the vast asbestos cases.

They would say they are at some considerable disadvantage that you ought to worry about because plaintiffs aren't forthcoming when they go to trial against Garlock and not against others.  In that setting, Garlock seems to suppose that the plaintiff's responsibility is to work up the case against a settled defendant or the bankrupt defendant, getting command of all of those facts for Garlock's benefit.  Well, that's not the way the tort system distributes the burdens of preparation.  If Garlock wants to try the empty chair, Garlock has every opportunity to develop that evidence through the tools available to all civil litigants.  If it wants to sue a solvent co-defendant, it can do that.  If it wants to wait until after trial, pay the whole judgment and go seek contribution from that solvent defendant, it can do that.  In most states, it can require the judge to put on the verdict

63

form that goes to the jury a long list of other parties absent from the courtroom, the empty chair, and argue to the jury that it is those manufacturer's products that caused the plaintiff's injuries.

But to do that, it needs to have evidence. And to generate that evidence, the way the tort system apportions the burdens of preparation, it has to engage in the costly process of developing that information. If it chooses not to do that, it can hardly fault the plaintiff. If it had a tactical reason why it's too dangerous to build up a case against the co-defendant because that just magnifies the peril to all of the defendants and it makes that tactical choice, it is not later entitled to come back and say, oh, I have now looked at the site list and I see that this plaintiff worked there, he must have come in contact with Owens-Corning product but he didn't tell me about that. That's not a fair interpretation of the situation.

What Garlock is really complaining about is the dynamics of the tort system that assign to the defendant who would lay off liability on others significant burdens, but you can't cure that. That is not your job. You are supposed to value the claims as they would be valued in the tort system. And when Garlock goes to settle cases in the tort system before its bankruptcy, it had all of those tools available. It had the backdrop of its opportunities to lay off liability on other

64

parties but it didn't avail themselves of it. Well, then, that was its choice. It can't visit that choice upon the plaintiff.

The verdict forms can also list in many places insolvent defendants. The debtor is entitled to argue to the jury if it has evidence that Johns Manville, Owens-Corning, Federal-Mogul, all now bankrupt, were the real culprits, it was their products, not ours, that caused the harm if they have developed the evidence. And in many states the jury is called upon to apportion responsibility by percentage among all of those absent players.

If it suffers the verdict, gets the judgment, pays it off, it can go to the trust of the insolvent defendants and make what are known as indirect trust claims, claims for contribution or indemnity, which are processed under standards created by the court when it sets up the trust in the plan of reorganization. And it can, if it meets those criteria, extract payment from the trust at the same discounted percentage that the asbestos claimants asserting direct claims against that insolvent defendant will get. They have the full array of equipment to ensure that, when they go to settle a case in the tort system, it is only their several share that they are compromising. It is not the share attributable to the insolvent defendants.

Now, they say that this bankruptcy wave commencing in 2001, where a lot of formerly prominent defendants took refuge

65

in 544(d) cases, changed all that and that this is the first time a court has been called upon to deal with that phenomenon. We will see, if we get into the estimation today at this level if this excuse of the trust manipulating the situation continues to be propounded, we will have an opportunity to appeal all of that, but a few things should be known from the outset.   The trust distribution procedures are public.   The trust distribution procedures set forth key information that will allow a debtor such as Garlock or a solvent tortfeasor still litigating in a tort system to know with a high degree of reliability what a claimant who qualifies against that trust will receive in payment.

Why is that?  Because the trusts schedule what are known as average values.  Average value for mesothelioma, "x" dollars.  What is the meaning of the average value?  That means that across all cases resolved by whatever alternative procedures the trust makes available as a choice to claimant, whether it be an expedited procedure that costs little and the claimant takes comparatively low value as a result or the liquidated amount or whether it be individual review which is a much more intensive and exacting process, costs more and produces, if the plaintiff succeeds, higher value.

Across all of those cases, the trust averages are the target that it sets to make sure that it doesn't agree to a liquidated value for claims on average that would impair its

66

ability to pay future claimants on the same basis.  It's a device for regulating the outflow of funds to claimants in the queue or across that unfolding carpet.

And that means that, when brought to bear against another piece of data that I will now mention, the defendants will know what a qualifying claimant against Owens-Corning, Fibreboard, Manville, GAF, any of those insolvents, is likely to receive for a successful mesothelioma claim.

And the other piece of data is the payment percentage. The payment percentage is that fraction expressed as a percentage of the liquidated average value or the liquidated claim determined in any individual case that the trust handles, that the plaintiff will actually receive in money.  These trusts are limited funds.  They are underfunded.  They don't have enough money to pay all the claims at their full liquidated value.  In order to ensure that the future claimants receive payments equivalent to what the present claimants will receive, the trust discounts the liquidated values before paying them.

The payment percentage of the major trusts ranges between cents on the dollar, two percent, up to about fifty percent at the maximum and most of them cluster around fifteen/twenty percent.  That is to say that, if you were able to show that you qualified under the trust distribution procedures of all the trusts in the world and few, if any,

67

claimants will be able to do that, you would not receive a hundred percent recovery.  And solvent defendants in the tort system would not be able to say that you are already fully compensated, they shouldn't have to pay you anything, which is what Garlock is asserting.

We have set forth in our reply brief on the scheduling motion, Your Honor, a chart that lists the trusts that we are most familiar with in our firm and shows the average values scheduled in the trust distribution procedures ranging from single digits to about fifty percent, and translates the average values, finds the payment percentage to dollar figures. Garlock has that information.  All of the defendants do.  It is public.  It is on websites.  Each of the trusts either has or is forming a website and the TDPs, if not available on the trust website, are available on the court docket of the bankruptcy court that reorganized that debtor.  That information is notorious and open.

Contrast that to the situation of the solvent defendant litigating in the tort system and wanting to know what another solvent defendant is paying when he settles out a case rather than proceed to trial.  Put Garlock back a few months before its petition litigating in the court system.  It couldn't tell what Union Carbide might pay to settle a case as another solvent defendant, or Georgia Pacific, but it could tell what the Owens-Corning trust would pay and it could tell

68

what the Armstrong, GAF, (inaudible), Dresser, Fibreboard, EaglePicher, Manville, all of those friable defendants, the real bad guys according to them, already reorganized, they know on average what they are going to pay and it is the averages that matter because of the mass tort phenomenon and the law of large numbers that we have already described.

So the idea that Garlock has been victimized by blinders as to who has got claims against the trust and what the trust will pay will not stand up under scrutiny when you direct focused discovery well-tailored to that particular issue to take place in an appropriate setting.  And that doesn't require that two hundred thousand people file proofs of claim with materials that in effect constitute, as close as they can feasibly make it, to a fully prepared case for trial.  It doesn't require that.  Those averages are published.

Now, the futility of the debtor's program in terms of the idea that they are going to dispose of lots of claims on summary judgment motions has already been averted to with regard to the Babcock case, but let's touch for a moment on the nature of its defenses.

Garlock's products do not emit sufficient amounts of asbestos fiber to cause mesothelioma because Garlock's products are encapsulated, plastic or teflon or some other encasing bonding material surrounding the poison.  So as it sits there, it is not emitting fibers into the atmosphere.  And they go to

69

juries and they make that argument, and juries and courts sometimes accept it, especially when there is some other plausible evidence of how this particular defendant or plaintiff got sick, and they sometimes, not infrequently, reject it because it is a fact-specific defense, and it depends upon how the product was used or abused *in situ*.

Now, we have displayed in our information brief depositions of witnesses in the tort system who talk about the conditions under which they came into contact with Garlock valves or Garlock gaskets or Garlock valve packing, and they testified to the dust created by the way those products were treated on site. You have got to replace gaskets, pull them out of the pipes, but they are compressed. They have been in there a long time under pressure. It is hard to get them out. The U.S. Navy told people they should apply air brushes or physical brushes, scrape them, chop them, hit them, bang them with a hammer, abrade them, and that creates dust, and there is admissible evidence that commonly gets in front of juries when these cases are tried that those dusty creations are created and Garlock's product is the source of the fibers that the plaintiff breathed in.

Now, that defense is not going to be amenable to summary judgment. If it were, then Garlock would not have a hundred thousand claims in the background, in its backlog. It is fact specific. Summary judgment won't work.

70

They say, ah, Garlock's products complied with permissible exposure limits set by OSHA, they should have no responsibility for this unfortunate plaintiff's mesothelioma. Well, there are legal and factual answers to that. The permissible exposure limits do not address cancer risk, and mesothelioma is a cancer. They are not intended to prevent cancer. When promulgating the permissible exposure limits, OSHA acknowledged in its statement in the Federal Register that, under these standards, there will be something like three and a half excess deaths per thousand workers due to cancer caused by the asbestos.

That's the legal context and it has a factual basis because there is often testimony that the Garlock product, according to admissible experts' opinions, is a substantial contributing factor or whatever else the test of causation in the tort system is, and that goes to the jury, it is not motionable.

Moreover, in many jurisdictions, compliance with the permissible exposure limits isn't even admissible evidence because it doesn't go to the issue of negligence in a cancer case.

The ability to lay off liability on other defendants is something we have already talked about. I will cut this short because I know it has dragged on somewhat, but my message, Judge, is allowance is not lawful under *Robins*. It is

71

not practical or judicially manageable under *Babcock and Wilcox*.  It is not necessary in order to value the claims in the aggregate, which is the key for plan formulation.  It is not appropriate because estimating in the aggregate for plan formulation purposes is what is required under 524(g).  It would sacrifice the huge advantages of that statute by requiring the court to preside over individualized disputes in which claimants would come forth, assert their own defenses, make their own objections, have their own arguments, and the whole bankruptcy would take a very long time and cost a very large amount of money.

The bar date need not be imposed now.  It can await plan formulation and voting and it can be structured in such a way as to address the debtor's professed concerns about the vote.

It is not fair to the claimant because it would inflict on that constituency tens of millions of dollars in expense if you were to authorize that form.  That information would end up not being useful or used to any considerable extent.  Moreover, as Judge Fullam thought, it is not necessary because so much is already known through the settlement data.

Now, Judge, I am not going to take time on the particulars of the form yet.  I think it would be most useful for the court to focus on the root issues of allowance proceedings or not, whether the idea of using a proof of claim

72

form to trigger a process that would stand as a massive demand for discovery and trial preparation is appropriate.  Those are the two keys, and they all go to the issue of whether the average mesothelioma value, negotiated at arms-length, in its own rational self-interest by Garlock in its recent history, are going to stand up under challenge.  And they can make all of those challenges in a rational, well-structured process.  We can be done.  We can have a plan by springtime when their exclusivity runs out and, if necessary, we can proceed to a contested estimation proceeding where the issue will be solvency or not.

Thank you, Judge.

THE COURT: Anybody else?  Mr. Guy.

MR. GUY: Your Honor, this issue is very important to us but, with the court's permission, we would like to reserve our comments until the close of the evidence.

THE COURT: All right.  Anybody else?

(No response.)

THE COURT: We will take a break, then, until about twenty-five til.  It almost 11:25 now.  So we will take a break until 11:35 and then we will come back and go until about 12:30 or so and break for lunch.

(Recess from 11:23 a.m. until 11:37 a.m.)

THE COURT: Have a seat.  I guess we are ready to get started.  We will do everything we can to get Dr. Bates done

73

today.  So we will go until when we have to, I guess, although I generally operate under the premise that the mind will absorb only what the butt will endure, so we will keep that in mind.

MR. CASSADA: Your Honor, Mr. Swett said a lot, and we have evidence that addresses just about every point he made. But before we proceed to that, there are a few things he said that I believe stand addressing up-front.

First of all, Mr. Swett has referred to things that happened in other bankruptcy cases, suggesting that courts following these paths suggested have regretted it and have abandoned and what-not.  We have a lot of respect for Mr. Swett but part of our evidence will be actual documents from those cases indicating that the committee's description of what happened is just not correct.  What we have are quotes from judges on single pages pulled out of context in transcripts, and we do not agree that orders were entered or anything happened like the committee says happened.  And there is a danger in relying on those kind of statements about cases because we are not relying on reported opinions or even any orders of any kind.  We are relying on reference to dialogues in transcripts taken, we believe, out of context.

Mr. Swett also suggested that the impact of a 524(g) trust has already been accounted for in tort system values. That is not correct.  These trusts are just coming on line. Some of them have paid for a couple of years but they were

74

addressing claims of the last decade.  So there really hasn't been a match-up with the tort system.  And then, of course, there has been the transparency problem that defendants are trying to address, both in the tort system and in bankruptcy courts and in the U.S. Congress.

Mr. Swett made a reference to 524(g) and he said that that's the only path to resolution and he said that 524(g) supersedes sections 501 and 502.  I assume that Mr. Swett is going to point to some language at some point to demonstrate that that's in fact what section 524(g) does but, if he tries to do that, he won't find any.

I mean, in the first place, it's not even clear that 524(g) applies to this case.  By its terms, 524(g) addresses the court's power to enter an injunction binding against demand holders and demand holders are defined to be people who do not have claims under the Bankruptcy Code.

We are not even asking for the court to impose a bar date on anyone who falls into that category and, indeed, the Fourth Circuit case law would indicate that there are no such people because, in the Fourth Circuit, a tort claimant who is injured by prepetition exposure holds a claim under the code.  So 524, it is highly debatable whether it even applies.

And if we are to look to 524, we are not going to find any guidance on the bar date question under requirement for proofs of claim.  That's dealt with elsewhere in the Bankruptcy

75

Code.  And even those bankruptcy courts that have addressed the issue of proofs of claim subsequent to 524(g), they don't point to 524(g) as a basis for their decision.  In fact, they pointed to section 303, which was the provision that the Fourth Circuit looked at in *A. H. Robins* when it said that proofs of claim are mandatory.

Mr. Swett also said that the procedure had never been done in any other asbestos case.  Well, that is not correct.  I mean, there are numerous cases that we will cite where the courts in asbestos cases followed the bar date request.

Now, Mr. Swett also refers to the *Robins* decision as somehow undercutting the relief that we have requested in the bar date motion.  He is suggesting that *Robins* undercut the idea of claims allowance. The fallacy of Mr. Swett's argument is he is assuming that, if proofs of claim are required, that the court will be forced to liquidate those proofs of claim, and *Robins* said that that doesn't happen.  We are not asking the court to do that.  We are not asking the court to do anything that *Robins* says you can't do.

Remember the four steps required by the Bankruptcy Code.  This is the path that *Robins* says you take.  In *Robins* – and, by the way, there weren't nine thousand claims.  There were hundreds of thousands of claims. In *Robins,* the court disallowed a hundred and thirty thousand claims, substantially more claims than exist in this case.  But in *Robins*, the

76

decision in the *Piccinin* case that he cites was stage three in our four-stage process.  Proofs of claim were filed.  The debtors had objected.  The question was to what extent will there be any kind of liquidation or allowance proceeding.  There were allowance proceedings.  The debtor moved for and obtained a dismissal of a hundred and thirty thousand claims that had been filed and didn't properly fill out the proof of claim.  But the court applied the standard in 502(c) to the proofs of claim that were before it and determined that liquidation of claims would unduly delay administration of the estate.  That's all we are asking the court to do here.

THE COURT: Okay.

MR. SWETT: Your Honor, just briefly.  I did not mean to say that by the time the questionnaire process, which was not the proof of claim but a subsequent exercise in *Robins*, was done, there weren't a whole lot of claims in front of the court, hundreds and thousands.  What I meant to say was that *Robins'* litigation history did not stretch back thirty years, as here, did not include hundreds and thousands of resolutions as here.  The backlog of cases in *Robins* was something on the order of five thousand suits pending.  I am citing to *Robins* against *Piccinin*, 788 F.2d 994 at 1013.

I also didn't mean to say that bar dates had never been used in asbestos bankruptcies.  I meant to say that the collective experience and lessons drawn from that experience

Bates - Direct                                77

has been that bar dates have proven not to be useful in such cases.

Thank you.

MR. CASSADA: I believe Mr. Swett said that courts had decided in the vast majority of cases to skip the proof of claim process, and that's not at all what happened.  The debtors decided to skip the proof of claim process and never requested proofs of claim because they had – and many of these cases were a prepackaged or prearranged case where they had already reached an agreement and they had already convinced the plaintiffs' lawyers who controlled the claims to vote in favor of a plan.

There are a number of other statements about law and fact, and we will save our response to those for after the evidence has been presented.

But with that, Your Honor, we call our first witness, Dr. Charles Bates.

THE COURT: If you will come up, Dr. Bates, and be sworn here and then have a seat.

(DR. CHARLES BATES, WITNESS, SWORN)

DIRECT EXAMINATION

BY MR. CASSADA:

Q.        Good morning, Dr. Bates.  Could you state your full name for the record?

A.        Yes.  My name is Charles Bates.

Bates - Direct                            78

Q.          And where do you reside?

A.          I reside in Washington, D.C., is my primary residence.

Q.          Did you prepare some slides to help describe and illustrate your testimony today?

A.          Yes, I did.

Q.          Is the document on the screen the slides that you prepared, Dr. Bates?

A.          It certainly looks like it so far.

Q.          Would you please describe your firm, Bates White, LLC, to the court and explain your relationship to the firm?

A.          I believe we have a slide that accompanies that. As Your Honor can see, it is on the slide, is I am currently the chairman and founder of Bates White, LLC. Bates White is a company that was founded eleven years ago. It has approximately a hundred and seventy employees, staff.

We have six major practice areas which are listed on the screen up there. The one which is entitled "Environmental and Product Liability" is the area which the work that I am currently doing here comes under, which is involved with asbestos liability, which at Bates White I have been conducting through the entire history of the firm, as well as on my professional work before that.

Q.          Could you describe briefly your educational background?

Bates - Direct                          79

A.          Would it be helpful if I had the clicker?

UNIDENTIFIED SPEAKER: We don't have that capability.

THE WITNESS: Oh, I thought that's what that little device was over there.

UNIDENTIFIED SPEAKER: Yeah.  It's not working.

THE WITNESS:  Okay.  On the screen here is a summary of my education, and primarily my background was a Ph.D. in economics from the University of Rochester, and a specialization in a field called econometrics, which is the application of mathematics and statistics to financial and economic data.

And before that, I have both a master's degree from the University of Rochester, as well as a bachelor's degree from the University of California, San Diego, with a double major in mathematics and economics.

I spent ten years as an academic researcher and teacher prior to joining with KPMG in 1991.  Seven of those years were teaching graduate econometrics at Johns Hopkins University, as well as consulting with the other individuals on the faculty in terms of providing specialization, advice on how to do various kinds of statistical analyses, econometric analyses.

Before that, I also taught first for several years at the University of California, San Diego, while I was completing my dissertation with my thesis advisor, who is Dr. Albert

Bates - Direct                                    80

White, who is also my partner in this business, and spent a year of my last year of graduate school at the University of Rochester – at Rochester Institute of Technology, teaching introductory economics.

Q.          Thank you.  Could you describe your professional experience?

A.          Well, currently I am the chairman and founder of Bates White, LLC.  Prior to that, I did a short stint at A. T. Kearney where I was a vice-president there where I was hired and attracted away from what was my prior position in partner at KPMG.  The purpose of that was to bring mathematics and statistical techniques to strategy and operational consulting, which they did at A. T. Kearney.

Prior to that, I spent seven years at KPMG, which was with the position I took subsequent to my academic position. I rose to the ranks of a partner there and became a partner in charge of my own group which I developed there called the Economic Analysis Group at KPMG.  And much of the work that I did on asbestos liability issues began during my tenure there with my initial work that I did coming out of Johns Hopkins University.

Q.          Would you please provide the court a concise history of your professional experience estimating asbestos personal injury claims, beginning with your work at KPMG?

A.          Well, in fact, when I was hired at KPMG, my first

Bates - Direct                                        81

assignment was as an expert in statistical methodology to figure out how to estimate asbestos liability.  The methods that had been used theretofore were rather undeveloped.  They had used some methods to estimate the liability in some of the bankruptcies that occurred earlier back to the times of when Manville first – Manville bankruptcy took place in the early eighties, as well as some other matters, but those methods were not developed to the point where people felt that they were reliable.

So that was my job and I spent much of the time period that I was there over the first couple of years developing those models.  These models have essentially – as part of that effort, I in fact consulted with the famous Dr. Bill Nicholson who was the lead researcher in a group that under a Department of Labor, EPA study with the Mt. Sinai School of Medicine, developed the epidemiological models of the types that Mr. Swett referred to earlier, which basically take the estimates of the population of people who were exposed to asbestos and then use epidemiological risk equations that have been developed over several decades of science, which then projected the risk of disease, much like the process which he described, which is hence the amount of time from exposure, how much exposure individuals had until they manifest the disease, perhaps as much as decades later.

Those models then give us a sound scientific basis for

Bates - Direct                                                    82

projecting the number of cases of mesothelioma that will occur into the future.  I have worked on those models and worked with Dr. Nicholson to improve those models at the time with him. Several adjustments were made to that model to reflect new information that we had received and, in consultation with him, those models were updated at that time and embodied in what was called the KPMG Asbestos Incidence Model.

We layered on top of that, then, estimates using claims data, estimates of the average claim values of the type that Mr. Swett referred, though it is much more complicated than he described it, as well as the fraction of claims that ensued, and that model basically became essentially the benchmark model that was used over the subsequent decade of the nineties to estimate the claims.

Since that time, I have maintained an ongoing program of research on the methodology of how you estimate claims and have updated it in several cases.  I think we are sitting here now at the precipice of a very significant change in the litigation environment which will require, for proper estimation and adaption, a modification and upgrade of that model to account for the impact of the kinds of things that we expect to see going forward here.

Q.        Have you published any commentary about asbestos litigation?

A.        The result of that research that I have been doing

Bates - Direct                                          83

over time is summarized in five papers that have been published over the last five years in commentaries and journals which specialize in publishing various kinds of news events, as well as commentaries on asbestos litigation environment.

In summary, these papers address the issues that we identified about the impact that the emerging trust would eventually have, the fact that there will be a tort system, that the litigation environment was significantly impacted by the bankruptcy wave that was referred to earlier, which was caused by a very significant number, hundreds of thousands of claims which we now know many to have very tenuous diagnosis behind them of the process that you heard described, as well, and then subsequently the value of claims at the aggregate level based on research we have done, and I think we will touch on a number of those points as we go through here today.

Q.        And have you been involved as an expert in asbestos litigation before?

A.        Yes, I have.  Certainly at this time over the last decade I have been probably, and even before that, involved at some level or not as – some involvement with virtually every significant asbestos matter.  Initially as a support manager, project manager, in the early days in developing of the methodologies and so on, then as a consulting expert and then, over the last decade, as my own – as the lead expert in testifying on these cases.

Bates - Direct                                                    84

I also provide – speak at conferences on a regular basis, invited to speak on my research, as well as I comment on the litigation environment, asbestos litigation environment in general.

Q.        Have you ever been called upon to render an expert report on the estimation of the number or value of asbestos claims?

A.        Yes, that has occurred many times, though these reports rarely see the light of day in public.  For the most part, the side of the case that I have worked on has settled out at some point and those reports and so on never make it into the courts themselves.

Q.        Have you been recognized before by any court as an expert relating to estimation of future asbestos claims?

A.        Yes.  One case where we did make it all the way through to the trial phase was in the *Babcock and Wilcox* case where I was working on behalf of a group of insurers who asked me to show up to present evidence about how many people could possibly have been exposed to a Babcock & Wilcox boiler at that point.  So that had to do with the number of potential claims that would be exposed.

Q.        Have you been recognized as an expert in matters outside of asbestos litigation?

A.        Yes, I have.  The bottom of the list here is a number of different cases where I have actually testified.

Bates - Direct                                    85

Several in the United States Tax Court, usually again an application of my statistical and econometric expertise for large tax matters where there is disputes, these things are relevant.

I also testified in front of the Senate Judiciary Committee on what was the proposed FAIR Act, which was the proposed national trust of all future asbestos claims.

Q.        Dr. Bates, are you currently or have you in the past been a consultant for any public company for purpose of estimating asbestos expenditures for financial statement or SEC disclosure purposes?

A.        Yes, I have been involved in that kind of work for business purposes over the last – over ten years now, beginning with my work with United States Gypsum Company as a person who estimated their liabilities for financial reporting purposes. There are several other companies here that are listed which we do this work.  Some of them on a current basis and some of them at a time in the past for specialized purposes.

Q.        Does slide eight of your presentation reflect companies in which you have served that capacity?

A.        Yes, it does.

Q.        Do you know whether any of those companies have used your estimate in their public filings?

A.        I believe most of them have.

Q.        Okay.  Have you served as a –

Bates - Direct                                    86

A.          I think actually all of them have.

Q.          Okay.  Have you served as an expert in litigation involving insurance coverage issues relating to asbestos claims in other mass tort cases?

A.          Yes, that's a regular part of my work, as well.

Q.          And you testified earlier that you were asked to appear and testify before the United States Congress on asbestos litigation or projections in connection with the FAIR Act?

A.          Yes.  I don't know if Your Honor is familiar with that proposal but it was an attempt to bring all of the asbestos litigation into a single national trust and then there were issues related to how much would that trust cost and how much money would the companies have to put in to do that.  So that it dealt with exactly the kind of issues we are dealing with here, which is how many claims of the various types would there be and how much would they cost.

Q.          Have you done consulting work for parties in asbestos bankruptcy cases and other asbestos-related litigation?

A.          Yes, I have.

Q.          Have you, in connection with this work, closely followed trends in asbestos litigation, both in the tort system and in bankruptcy courts?

A.          Well, both in terms of the work that I do and the

Bates - Direct                                                87

professional experience that I do and as well as the research that I do independently on my own, I have followed this quite closely over the last twenty years and has been a subject of study of mine.

Q.          And have you in the course of the asbestos litigation related engagements you have described researched factors that drive numbers and values of asbestos claims?

A.          Yes, that is in fact my specialty.  It is the subject of my research in many cases.

MR. CASSADA: Your Honor, at this time we would proffer Dr. Charles Bates as an expert in asbestos claims valuation which includes estimating the values of asbestos personal injury claims, the factors that drive those values, estimating future asbestos personal injury claims, estimating the cost to resolve pending and future asbestos personal injury claims and the types of information that facilitate the most precise possible estimation.

MR. SWETT: Your Honor, we have no objection to his qualifications for the limited purpose of this hearing.  We would reserve the opportunity to object if we are so advised in later proceedings if Dr. Bates is tendered as an expert in other settings.

THE COURT: That's fine.  We will accept him as tendered.

BY MR. CASSADA:

Bates - Direct                                              88

Q.      Dr. Bates, you have been retained by the debtors as the claims expert in this case?

A.      That's correct.

Q.      And at least one of the purposes of your engagement is to estimate the number and resolution cost of present and future asbestos injury claims against Garlock?

A.      Yes, it is.

Q.      Are you familiar with Garlock's historical claims database?

A.      Yes.  I have spent the last six years both in the process first initially of helping Garlock put that database together in a way that can be used for these purposes, as well as analyzing it and updating it over the last six years.

Q.      Are you familiar with Garlock's historical experience in defending and resolving asbestos claims?

A.      Yes, I am.

Q.      And there has been a lot of talk about mesothelioma claims.  Are claims for mesothelioma the predominant focus of asbestos litigation today?

A.      Yes, they are.

Q.      And you have a slide.  I believe it is slide ten in your presentation.  Does that indicate the relationship of Garlock's total expenditures for mesothelioma claims?

A.      Yes, it does.  Let me explain this slide briefly because I think it will help in understanding this.  On the

left-hand side, we have the column headings which show the year over which claims were resolved, and I presented this chart, if you will beg my indulgence, but I thought that would be helpful to actually show the long history of this to show in fact how some of these numbers and the significance of the various disease classes has changed, which is an example of the very dramatic changes that occurred in the asbestos litigation environment over the time period there.

The second column shows us the total dollar values in the database of resolutions of mesothelioma claims in one way or another, which is added up to the time to approximately five hundred and sixty-one million dollars.  Those numbers, as you will notice there, are in small numbers of millions up through the period of 1999 and then dramatically increase in 2000, 2001, '02, '03 and in through to the mid 2000's, for which point they actually tend to remain stable for a period of time and apparently show some drifting downward, although not significantly at this point.  The number for 2010 is a partial year.  So the reason it is as low as it is, is it is a reflection of claims that were filed in – resolved in 2010 prior to the petition date.

All other diseases and the sum of the resolutions of those are shown in the third column total there.  And as we notice there, that all other diseases dominate the expenditures up through the periods of – in fact, up through 2002 and 2003

Bates - Direct                                                    90

but reaching their peak in 2001 and then dropped dramatically from the time period there of a hundred and twenty million dollars down to, in the most recent period, just over ten million dollars, and that's a history which in fact will continue into the future for reasons we could go into.

The fourth column shows you the actual total dollars of expenditures and, as we can see it, the expenditures peaked at about a hundred and forty-five million dollars in 2001 and have dropped down to an amount that is not quite half of that at the present time.

The far, right-hand column shows us the percentage of the expenditures which are represented by the mesothelioma claims, which as you can see as the numbers of other cases which have been resolved and the amounts that have been attributed to other kinds of cases other than mesothelioma cases have declined and the value of cases settled, mesothelioma cases, has increased, that they have become the dominant factor in the future which is, I think, consistent with what Mr. Swett had said, as well.

So at the present time, we believe that number is – it is about eighty-five percent of the dollars are basically paid to mesothelioma claims and we expect over the future that number to increase for the reasons that we have described herein.

Q.      Approximately how many total mesothelioma claims are

Bates - Direct                              91

filed each year in the tort system against all defendants?

A.          Well, this graph can show you that. We have prepared a chart for that purpose.

Q.          You are referring to page eleven of your slide presentation?

A.          Correct. It's on the screen at the present time. Again, the left-hand axis of this chart shows you the number of cases of mesothelioma, the number of diagnoses we expect to get on a year-to-year basis.  The heights of the bars on the chart are the number of claims which are filed in the tort system and I have, in fact, divided those bars into two pieces.  The green part of the bars show you the number of claims that were filed against Garlock and, as you can see, that number was measured in the several hundreds in the beginning of this time period and then, at the period starting in 1999, rose dramatically up to the peak that they reached in 2003 at almost two thousand claims and have basically come down since that time to reach a period that is pretty close to around eighteen hundred, seventeen hundred cases per year at the present time.

The red line at the top is in fact a prediction of the incidence of mesothelioma that comes out of the epidemiology, which we described before.  It is reflected in an update of the models that were produced by Dr. Nicholson and the work that we currently do on that.  That incidence of disease that is referred to peaked in the mid-nineties at about three thousand

cases per year and has now started to come down. We are reaching a level here where that total number is about twenty-five hundred cases per year.

The epidemiology of this disease is that that number will continue to decline into the future. The reason why that occurs is, of course, is the population of people who are exposed to asbestos in any significant way essentially ended in the periods of the late 1970's, 1980, when the EPA banned most uses of friable asbestos. There were other types of asbestos which continued to be used after that time, though many of those products were at levels of emission of the products that the epidemiologists did not consider them and OSHA did not consider them to be a significant risk to populations in general.

What that means, then, is that the population of people that we see with the epidemiological risk equations tell us how these numbers of cases will develop and trend out into the long-distant future. It will continue over a period of several decades, albeit a much older population as we move that curve out through time.

What we can see from this chart is that the number of cases we see in the present time has started to decline approximately in the pattern indicated by the incidence of disease. That indicates that we have probably reached a saturation in the fraction of cases which will come to trial,

Bates - Direct                                                93

will be filed as cases.

There is a good reason why not all cases are brought to trial. First of all, there is some uncertainty about the actual height of the curve or the incidence of disease because it is based on a sample of cases around the country. It is not based on a comprehensive count.

Second of all, many of the people who get this disease are very, very old, and some of those people have no one – they either live in jurisdictions where it makes no sense for them to bring a case or they are so old there is really nobody actually to bring the case forward for them. Anybody who watches a lot of day-time T.V., or T.V. in general, sees many ads these days for mesothelioma. So the information about mesothelioma has been and the awareness if you have mesothelioma you can bring forward a case, I think is ubiquitous at this point, and the increase in the perfection of this curve that we see throughout the 1990's, I think is an indication of the increase in awareness of this disease and the possibility of bringing a tort case.

Q.        Approximately how many defendants receive mesothelioma claims in the tort system?

A.        Well, there are literally several thousand of them who actually bring cases, who are actually named in the cases. However, in the individual cases, there are generally between forty to fifty defendants who get named on individual cases.

Bates - Direct                                                    94

In some cases, it is many more and, in some cases, it is very many less.

The mixture of who is named on those cases has changed dramatically over the last – over the history of this litigation.  In the 1990's, they were dominated by several dozen of what we consider top-tier defendants who are named in almost all of the complaints. With the bankruptcy wave that we have talked about occurring, that shifted to many different defendants.  The ones who are now more peripheral defendants, some of those defendants tend to get named fairly regularly, like Garlock did.  Others of them only get named two or three times on the cases, so it is much more selective in who gets named, but literally thousands of companies out there that get named.

Q.        Do some persons who suffer from mesothelioma also assert claims against trusts set up to pay claims against companies that have filed for bankruptcy?

A.        Well, they almost assuredly all will because the bulk of the exposure that they received that is the cause of their disease was caused by most of the products made by those companies that have now been reorganized and gone through bankruptcy.

MR. SWETT: I would object to the competency of that testimony, Your Honor.  He is not an expert on causation.

THE COURT: All right.

Bates - Direct                                        95

MR. SWETT: And move to strike.

THE COURT: Well, we will allow it.  I understand where he is coming from.

BY MR. CASSADA:

Q.          Dr. Bates, what was Garlock's average cost per claim to resolve a mesothelioma claim in 1999?

A.          I prepared a chart to actually show that, as well. It is on the screen at the present time.

Q.          And this is page twelve of your presentation?

A.          Yes, that's correct.  Again, the left-hand column here shows the resolution year.  We provided five columns on this chart which provide some of the information that comes out of the historical database.  The second column that is there shows us the number of cases which were essentially dismissed without payment.  That is, cases for which there was no money paid for them.

The third column shows us the number of cases for which some dollars were paid to be resolved.  We call those settled cases.

The fourth column shows us the total number of payments made and, as you can see, it comports with the five hundred and sixty-one million dollars we showed you on the prior chart, which had the total dollars.  And then the next right-hand two columns show us two different numbers.  One of them called the average settlement amounts.  That's the average

Bates - Direct                                              96

amount that is paid per case that gets paid, which was the number that Mr. Swett was referring to earlier in his discussion. And as you can see, down in the time of 1999, that amount was approximately ninety-five hundred dollars. So less than ten thousand dollars which is what the settlement values were before that.

You can see in the final column over here something called the average resolution amount. That's what happens if you take account of the zeroes, as well. So you divide the total dollars spent by the total number of cases resolved. Now, we can see in the early history here, that number was approximately the same, but it diverges significantly as we move on through time.

Q.        If we fast-forward to 2009, a year before the bankruptcy petition, what was Garlock's average cost per claim to resolve a mesothelioma claim for that year?

A.        Approximately seventy-three thousand dollars of claims were paid. On the other hand, when you take account of cases, all cases that were resolved, you can see there that that number is about thirty-six thousand dollars.

I would point out under the settled column there, as well, you can see how the number of cases that were settled was measured in several hundreds throughout the period of the 1990's, rose to about a thousand in the period of 2000 to 2003/2004, and has subsequently come down to an amount that's

Bates - Direct                                    97

just over nine hundred cases.

So basically you can tell, just comparison, we saw on the prior chart where the number of cases filed against Garlock in the period of the recent history has been approximately eighteen hundred mesothelioma claims. You can see here that we pay on average about nine hundred or just over – so you expect that we in fact will pay just over – approximately half of the cases will eventually get paid that are filed against Garlock.

I think you can also see the dramatic increase in the number of cases which are dismissed approximately the time period of 2004 into 2005, and that's a trend which would continue on to the future. As more and more cases became filed against Garlock, Garlock actually adopted its defense posture to actually hold the line in terms of how many cases were being filed against it. Consequently, the number of cases they paid went down but the number of cases they dismissed went up. The settlement average which they paid also went up at the same time, which is not surprising. On the other hand, you can see that the average resolution cost was not impacted nearly as much.

Q.      Are you familiar with – you referred to it earlier – the bankruptcy wave? Could you describe what phenomenon you are referring to there?

A.      Well, beginning in the early part of the last decade, a series of companies went through bankruptcy, and what

Bates - Direct                                    98

happened during the time period was during the 1990's large numbers of – and I say large numbers, hundreds of thousands of cases of non-malignant cases or cases which asserted cases of exposure disease were generated through recruiting processes which had developed.

These cases, at their peak, probably were generated as many as sixty, seventy thousand cases by the time we reached the period of 2000.  This mass of cases that were there –

Q.         You mean sixty or seventy thousand per year?

A.         Per year.  This mass of cases put such a pressure – defending those cases put such pressure on the then front-line defendants that initially companies that handled and received most of these cases, Babcock & Wilcox, Pittsburgh Corning and particularly Owens-Corning, filed for bankruptcy protection in 2000.  This wave of cases, this ocean of non-malignant cases essentially caused these companies to go bankrupt at that time.

As they did so, demands were immediately placed on their co-defendants at the time.  Their cases were proceeding to trial.  They were the co-defendants.  They faced the prospect of either going to trial without – with the litigation stayed against their co-defendant or in fact paying higher settlement amounts. They, as a group, tended to be running out of insurance, as well.  And so in many cases, as the liability transfer went from one company to another in rapid succession, it caused essentially what we call the wave of bankruptcies.

Bates - Direct                                              99

In many cases, these companies – many of these cases were actually tied together in the form of a common defense organization called the Center for Claims Resolution.

And so the companies there, which tended to settle cases all at once, immediately became responsible through their sharing mechanism for those cases which led to the breakup of the Center for Claims Resolution and the bankruptcy of many of those same companies which were in that position.

Q.        Focusing on the non-defendants named on slide thirteen, we refer to those defendants sometimes as the top-tier defendants.  Would you describe the roles of these particular defendants in asbestos litigation in the late 1990s, just preceding the bankruptcy wave?

A.        Yeah.  These are the companies that received virtually every case within the system, as well as some of their co-defendants were also within the Center for Claims Resolution.  More generally so, those which were in the Center for Claims Resolution include the GAF, USG, Armstrong.  These companies essentially made construction products of the type that were used which had friable asbestos insulation.  These were the products that were essentially the known sources of asbestos exposure, the bulk of the exposure.  They were the populations that were studied by people like Irving Selikoff and were used by Dr. Nicholson and Irving Selikoff in their papers about the epidemiology and the future number of cases

Bates - Direct                           100

that were there.

They paid the bulk of the liability at the time period of the 1990's. Essentially the defendants that I think subsequently went bankrupt, I estimate probably would have paid somewhere in the neighborhood of perhaps ninety percent of the amounts that were spent in the 1990's.

Q.        Did bankruptcies of other defendants follow these top-tier defendants?

A.        Yes, they did. There is a slide again here that shows you by year the companies which subsequently went bankrupt. Again, essentially the process which I described for the top-tier defendants also started affecting these companies, as well. What happened is almost immediately upon the bankruptcy of these companies, asbestos plaintiff's law firms began looking for other companies to sue, and they were well-aware of other companies such as Garlock, as well as many others, so they continued to name them. The cases were stayed against the companies that filed for reorganization, so they no longer showed up on the complaints that were named.

So these companies one by one were essentially identified and brought into the complaints, and all of a sudden face the prospects of demands that were heretofore much, much higher than they had heretofore because of the lack of the co-defendants who paid the bulk of the expense.

Q.        Dr. Bates, do you have an opinion regarding whether

Bates - Direct                                          101

the bankruptcy wave substantially contributed to the increase in Garlock's settlement cost for mesothelioma claims?

A.          I think it's a high degree of economic certainty that that's the case.

Q.          And would you please describe the basis for that opinion?

A.          Well, we showed you the history of how the claim values went.  We also know that the number of co-defendants – I have studied the pattern of namings of defendants over time.  We know how that has changed and how the co-defendants that Garlock faced disappeared.  There were co-defendants of theirs in the nineties that disappeared from the complaints.  We saw how the values changed dramatically.  This pattern has persisted.  It is just the economics of the situation that drives claim settlements, the type that was described by Mr. Cassada earlier today in the case that he made a point of here.  It is the fact  that what drives the value of a settlement is the fact that you have the prospect of going to trial and, if you wind up being  held liable in that trial, you will have to share any verdict that is held against you with the other identified parties that are brought into the case.  With the litigation stayed against the co-defendants, the defendants at that time had not figured out how to bring those co-defendants into the cases in any kind of a reliable way.

          So the basic economics of the situation drive that

Bates - Direct                               102

outcome and it happened.  You know, talk with defense attorneys and interviews with defense attorneys, as I have done over the last decades, basically comport with that, and it is the same pattern that exists amongst all of the companies with which I have studied over the last twenty years.

Q.          Did the bankruptcy wave contribute to increases in settlement costs for other defendants who remain in the tort system?

A.          Yes.

Q.          Now, have some bankruptcy trusts arisen from the bankruptcy wave defendants?  And we have here slide fifteen.

A.          Yes.  So what we have here is a chart which shows you the assets which are in the currently active trusts that are up here.  As you can see, there are several trusts from the top-tier defendants I mentioned, as well as adding Haliburton into this because of the large dollars that were put in.  These numbers come from the year-end reports of these trusts.  These trusts are required to file with the bankruptcy courts that oversee them an annual report which says what the number of their – the amount of their assets are.  And as you can see here, the assets in the current trust represent approximately twenty billion dollars.

Q.          In some other bankruptcy cases are there trusts, the funding of which has been agreed to but have yet to emerge?

A.          Yes, there are additional trusts.  This chart shows

Bates - Direct                    103

that there are additional trusts whose assets we estimate are reported to be at this point another ten billion dollars, which would bring the total up to approximately thirty billion dollars between current and emerging trusts.

Q.        So you are referring now to the pending trust assets depicted on slide seventeen?

A.        Correct.

Q.        Let me invite your attention to slide sixteen.  Can you describe how trust money has flowed to compensate asbestos claimants since these trusts have been set up?

A.        Yes.  I have a slide here again.  This is a bar chart which I think is something that is very significant for the exercise, the estimation exercise that we anticipate here. The left-hand axis provides the total dollars of payments that are made in any particular year.  The horizontal axis tells us the year in which those payments have taken place.

Given the length of time that it took for these companies to go through bankruptcy to set up the trust and to begin paying trusts, there has been a very significant delay in those payments being made.  So what we can see here is that in 2007, 2008, 2009, we have had a significant increase in the amount of payments that have come out of those trusts.  In fact, updated information that we have on the 2009, there's a few reports that have come.  That bar is actually just a little bit higher, even probably just above four billion dollars.

What is significant about this is that this money is not being paid to the current claimants.  When the companies went into bankruptcy in the early 2000's, they had a stock, a backlog of pending claims for themselves.  And subsequent over the years from 2000 to whenever their trust finally got up to pay, these claims that were there basically built, the backlog of these claims built each year.  So by the time these claims processing facilities are up and running, they now are processing these claims in the order in which they came in, and they can only handle these cases so quickly and they begin processing them in a manner, referred to in many cases the rules of these trusts require the cases to be hired in a FIFO way.

So what we are seeing here is that, from the tort environment in the 2000 to 2010 period, there is very little impact that the trusts have had at this point on the current claimants because the current claimants themselves have no prospects of getting compensated for those trusts until the future at some point when their case finally comes up.

But as this backlog is worked through here over the next few years, very few years, now the claimants who are going to be processing in the claim, who are the current claimants in the tort system, have the prospect of getting their tort claim paid very rapidly because actually, once that backlog is worked through, you will be able to submit your claim and get paid in

Bates - Direct                    105

a matter of weeks, if not even sooner than that depending on which kind of a claim you wish to get.

So now a current tort claimant will have the prospect of getting large amounts of money, which we are about to talk about, or waiting until after they process their tort claim.

It is a fact, as well, that defendants are learning how to use that information about what the trusts are to help develop their causes of what Mr. Swett referred to as the information that it used, in effect, the jury trials. And I think the example that Garland Cassada just gave here earlier about how the trust money can impact the outcome of a trial is extremely, extremely significant. So I can't over emphasize the importance of how much this money means to what we expect to see on the tort system, what will happen. It is a big significant change over what we saw in the recent history and Garlock's and other company's history. The tort values will be significantly impacted by this money over the next few years and in the decades to come.

Q.        Dr. Bates, what is the range of the potential aggregate payment claimants will be able to receive from the trust system?

A.        Well, we have several charts to illustrate that here.

Q.        You are starting with slide eighteen?

A.        In fact, we have three of them – four of them in a

Bates - Direct                                              106

row that I want to direct your attention to.  The first one here is a list of the trusts that were identified in the memorandum that was submitted by the ACC a few nights ago. This chart here lists the trust and the amounts that they reported as being what would be paid and what could be paid to those trusts.  The total at the bottom is slightly different because our arithmetic worked out a little differently than theirs, but it is not a material difference.

MR. SWETT: Your Honor, it would appear that Dr. Bates didn't receive our corrected version, which I trust the court did receive.

THE COURT: All right.

THE WITNESS: Thank you.  I did not see that.  Thank you.

In any case, what you can see on this chart is the average payment amount that would be an individual who submitted a claim against a trust would receive from those trusts.  And the total of that from these trusts alone would be about five hundred and twenty-six thousand dollars if they filed against all of those trusts.

Now, it is likely that many claimants will file against many of these trusts, maybe not all of them but most of them, but for this purpose at this point, that column adds up to just over five hundred thousand dollars.

Q.        Are there other trusts to which claimants or from

Bates - Direct                     107

which claimants can seek recovery?

A.         Correct.  On page eight of nineteen here, we have a list of about eight other trusts which are paying or will be paying in the relatively near future.  This will add another two hundred and thirty thousand dollars to the potential recovery that a claimant could get, a mesothelioma claimant could get from the trust.

Q.         And are there any other trusts?

A.         Well, that chart and the last two charts primarily focused on what you would consider to be companies which have a national presence.  There is a couple on the first chart which are not a national presence, but those are companies which you would expect their products were widely distributed. The claims that they received came from around the country, very much like Garlock's claims come from across the country.

This particular chart shows you a list of trusts that are out there and there is over twenty of them which currently exist or will exist which we consider to be regional. By that, I mean, take for example the third one on the list, this Western McArthur and the Western Asbestos Companies that are combined in the same trust, this is a group of companies that basically was a distributor of the Manville products in the Bay area around San Francisco.  It is a trust which, in order for people to qualify, have to have been essentially on a ship that was essentially docked in and worked on the naval yards in that

Bates - Direct                                     108

area or one of the companies in the places where they worked. So given the business practices of that company, only individuals who worked and were in that area are likely to have a claim against it.  So there are regional ones which matter, as well, given the amount of money that's in them, but it will only apply to a selected group of a claim.

Q.          Are there additional trusts?

A.          Yes, there are significant different trusts.  If you added up all of the numbers in this chart, as well, you would add an additional one point four million dollars to that. Obviously we don't believe that somebody would qualify for all of these trusts.

Q.          Okay.  My first question was what is the aggregate potential payment.  Do you have an opinion regarding what the typical person bringing a mesothelioma claim would likely receive from the trust system?

A.          Yes, the combined total from all of these trusts adds up to about two point two million dollars.  I think that that is not the amount that an average claimant would get because an average claimant would not in fact be able to collect against all of these trusts.  If historical naming patterns prevail from, let's say, the 1990's, from dockets that we have been able to study where we can get complete information on that, it appears that the average recovery would be approximately one point two million dollars.  That's based

Bates - Direct                                                              109

on a study on a limited area.

That number comports quite well with the fact that we think, if you look at the total assets within these trusts, as well as the total number of claimants we expect to see over time, that comports with the fact that you have to allocate these dollars to those claims over the decades that these claims will emerge, and that works out to be an average which is consistent with the total assets that are in these trusts.

So the combination of the naming patterns, as well as the epidemiology, when these cases will occur and the amount of assets, I think all point to the same thing, which is out of the present or emerging trusts there will be at least one point two million dollars available for each mesothelioma claim that will occur in the future. I say at least in that because many of these trusts also have insurance assets which are under dispute and they will get, I think, additional monies out of those insurance assets as the litigation over those matters in coverage court are matured.

Q.      Does the amount a claimant receives from a trust depend on the circumstances of the claimant?

A.      Yes, they do, quite a bit.

Q.      And so would some claimants receive more than the one point two million dollars?

A.      Oh, quite a bit of difference will exist between the claimants. There are some claimants who, from these trusts,

Bates - Direct                     110

may get only a few hundred thousand dollars.  There may even be some claimants who don't qualify for any of them and their only recourse is the companies that are in the tort system.  Albeit that is a very small number of individuals out there.

On the other hand, there are other individuals who will get quite a bit more than this.  There are rules within the TDP, the Trust Distribution Procedures, which specify claims can be submitted for individual review, and individual circumstances of the claimants, such as what law firm filed their claims, the age of the claimant, what jurisdiction they are in, as well as some other special circumstances all can lead to differences in value.

We studied that directly using the kinds of procedures that Mr. Swett referred to, which is using the public information on the websites, as well as background history of some of the individuals that we have seen over the litigation history, and we have had some case studies on that and showed through the paper that we have there called "The Claiming Game," how several individuals could get anywhere from, on the one hand, five hundred thousand dollars, and in other cases one and a half million dollars or more based just simply on their work history and their individual circumstances.

Q.        Now, to put the trust recovery into a perspective, do you have an opinion regarding the average total value of a mesothelioma claim in the tort system prior to the bankruptcy

Bates - Direct                                    111

wave?

A.          Yeah, I believe that number was approximately nine hundred thousand dollars, just less than a million dollars.

Q.          And just to be clear what we are talking about, we are talking about the amount that a claimant could recover from all defendants?

A.          From all sources, the average recovery from all sources would have been approximately nine hundred thousand dollars in the late 1990s.

Q.          Would you describe for the court the basis for that opinion?

A.          Well, the basis for that opinion comes from several places.  One is that we have had discussions with a researcher who put together a lot of data from sources all over the country, a large number of defendants, large numbers of insurance companies, and to, in their case, to estimate the total expenditure that was made on mesothelioma cases at the time.

If you take the total expenditure of these cases and divide it by the number of cases that were filed, you get a number that is about nine hundred thousand dollars.  You get about one point one million.  When you include the defense expenses associated with them, you get about nine hundred thousand dollars as the amount.

So the total – I think that's the most important

Bates - Direct                                                  112

information we have got, is you can get an estimate of what the total expenditure was for that source and you know the number of cases that are filed and, hence, you know what the average had to have been on that basis.  It comports with the amount that was proposed in the FAIR Act as being the compensation for the national trust which they proposed an amount that was about one point one million dollars.  That was an amount that would be put in a trust that was years later than the amount that was from the 1990's.  So you would expect –

THE COURT: Does that really compare with your average recovery, expected average recovery from the trust?  Won't the point nine million figure, the nine hundred thousand figure, doesn't that include cases that were dismissed?

THE WITNESS: I am sorry?  Try it again.  I am sorry.

THE COURT: Wouldn't the information from which you reached the nine hundred thousand dollar figure include cases that were dismissed and where claimants got nothing?

THE WITNESS: Your Honor, there are very few places, if any, that don't get something in the tort system.  The issue there was having to do with an individual defendant.  So these cases, what happens is on average a typical plaintiff names forty to fifty companies, gets paid by twenty to thirty of them and gets dismissed on the others.  So the fact that there are, again, wide differences in how much individuals get, because we are talking about the average here and people who are very old

Bates - Direct                                113

in some jurisdictions will get maybe only a few hundred thousand dollars, whereas people in places like a particularly dangerous jurisdiction for defendants in places like New York City or Oakland courtroom, or in Los Angeles, or Madison County, will get more.

And the trust system tries to mimic that to some extent by the individual review process, but I think the fundamental point here is that the amount of money that has gone into these trusts is more than enough to pay what was the prior tort liability of those companies.

Q.        Does your estimate also comport with the public disclosures that prominent defendants were making prior to the bankruptcy wave?

A.        Yes, it does.

Q.        Dr. Bates, do you have an opinion regarding the average value, the average settlement value of mesothelioma claims in the tort system today, and I am excluding the trusts?

A.        No, from the tort system today, from the people that the plaintiffs sue and have received payments, I believe that number across the country is an average which is less than one and a half million dollars, probably about one point two, one point four.

Q.        Would you describe, then, the basis for that opinion?

A.        Well, that opinion comes about from a lot of, again,

Bates - Direct                                    114

indirect evidence.  I don't have direct measures of that.  That is, for the most part, the plaintiffs have been unwilling to give me that information, even though I have asked for it in public forums where they have talked about what that number is.  It arose out of a dispute that was first – a public dispute that occurred in a national conference where several prominent plaintiff's attorneys were describing what they believe the average settlement amount was for mesothelioma claim was somewhere between five to eight million dollars, the same figure that they have used here.

I stood up in the back of the room and asked those plaintiff's attorneys how they knew that.  They told me that that was based on their information about the data.  Now, it would not surprise me if those particular attorneys received amounts similar to that.  They are some of the most accomplished attorneys in some of the most dangerous jurisdictions in the country, but I think that's not the same as an average of all of the cases that are filed across the country.  Those attorneys represent a few dozen cases, not the eighteen hundred cases or two thousand cases we see across the country.

So I embarked on a study to figure out what that number must be because if in fact the total is in fact five to eight million dollars, that means somewhere in excess of twenty billion dollars a year is being spent on mesothelioma claims.

Bates - Direct                         115

That amount of money leaves a very big paper trail. Much of that money is being paid for and comes out of the coffers of public companies which have to disclose these amounts in their financial statements.

If there was that amount of money there, you would essentially have, say, a prominent defendant such as, say, Foster Wheeler, who is one of the largest payers in the country, pays about a hundred and fifty million dollars per year, you would have to have two hundred or so such companies, a hundred and fifty such companies like that to reach that number, you know. And it doesn't take you very long at all just adding up the totals of the companies that you get before you are well below that figure. A prominent defendant such as Garlock became pays as much money as almost anybody else, and someone paid eighty million dollars, sixty million dollars a year on mesothelioma cases. You can't find the money in that way. That's why I wrote the paper that's called "Show me the Money."

If you look at the settlement patterns, of which I have been aware – I have studied company's settlement patterns over the years, along with their naming patterns. You know that they are getting named on average of forty to fifty cases per year. You know that they pay on twenty to thirty of those. You know that the average resolution cost is about fifty thousand dollars per settlement. That leads you to a number

Bates - Direct                                          116

that comes pretty close to a million, somewhere between a million and a million and a half.  Again, a pattern across the averages suggests a number that is much, much lower but more on the order of the numbers that I have said.

I looked at the jury verdicts.  Jury verdicts, on average, are similar to what it is that the ACC said.  They come out to be somewhere around six million dollars as an average jury verdict, but there is only a couple dozen cases that go to trial.  These are a highly selected group of cases.  What does that mean about what the settlement average is?  Well, these tend to be individuals who are much younger.  Most of them tend to be individuals who are less than sixty; whereas the average claimant in the court system is seventy-five.  So they have much more significant claims for economic damages because of family members, loss of life, loss of earnings.  The economics of those cases are quite different than those of the average case.

When you take account of what those average verdicts are, take account of the differences in the age of the claimants and then take account of the risk they face in taking a case to trial because, after all, almost half of the cases that go to trial result in a defense verdict.  You comport all of those things together, it suggests a value which is, again, on an average settlement from an analysis of the verdicts, as well as the makeup of the cases, again somewhere between one

Bates - Direct                           117

and one point two million dollars.

So there are three sources of ways of looking at them. They all point to the same sort of number.

The final way I looked at it, which was there was a report that was made in the *American Lawyer* a few years back which reported the income of some of the top law firms in the country based on their analysis. And based on how many cases get filed by various plaintiff's attorneys, if the averages that they suggest prevail, the income of those law firms would have been multiples of what got reported.

So all of the information that's put together there, by indirect message suggests that it is one to one point five million dollars on average. I think that ideally you would have direct evidence on that information to resolve the issue once and for all but, absent that, I think you have to rely on these kind of indirect methods.

Q.        Is direct evidence available?

A.        It would be from the plaintiff's attorneys.

Q.        Do you have an opinion regarding whether payments on mesothelioma claims from the emerging trust system ultimately will have an impact on the value of a mesothelioma claim against Garlock?

A.        Oh, it definitely will. It will have a very significant impact for exactly the kinds of reasons that –

THE COURT: Before we start into that, why don't we go

Bates - Direct                        118

to lunch?

MR. CASSADA: Okay.  That's fine, Your Honor.

THE COURT: It sounds like – I mean, that is going to be a significant thing.  So let's go ahead and take a break. Can we come back at 1:30?  Will forty-five minutes give you enough time?

MR. CASSADA: That's fine with us, Your Honor.  1:30 will be fine.

THE COURT: Okay.  All right.  We will take a break until 1:30 then.

(Recess from 12:43 p.m. until 1:31 p.m.)

THE COURT: Have a seat.

MR. CASSADA: It looks like we are minus a witness and an adversary.

THE COURT: Yeah.  Okay.  Somebody called from Moon's office and said that Moon was running late. We told them that that's fine, we weren't going to wait on him anyhow.  But if he has got the witness and Mr. Swett with him, that means you have got two problems.  One is your witness is eating with the opposing counsel and the other is they haven't come back.

MR. CASSADA: I wondered where he went.

THE COURT: Why don't we stand down until they come. If the witness was here, we could just put him on the stand and let Mr. Swett wonder what had happened while he wasn't here.

(Recess from 1:32 p.m. until 1:48 p.m.)

Bates - Direct                          119

THE COURT: Have a seat.  All right, whenever you all are ready, we are ready.

MR. CASSADA: Thank you, Your Honor.  I believe, Your Honor, I had just asked Dr. Bates whether he had an opinion regarding whether the bankruptcy wave substantially contributed to the increase in Garlock's settlement costs for mesothelioma claims.

THE COURT: Yeah.

THE WITNESS: Are we ready?

MR. CASSADA: Yes.

THE WITNESS: Yes, it did.

BY MR. CASSADA:

Q.        Would you describe the basis for your opinion?

A.        I am sorry, this is regarding Garlock again, just to make sure?

Q.        Yes, regarding Garlock, whether the bankruptcy wave substantially increased the value of a mesothelioma case?

A.        I think we went through a fairly long answer on that.  Would you like me to repeat it or is that –

MR. CASSADA: We can't check the transcript?

ECRO OPERATOR: I will have to stop and go off the record and then –

THE COURT: I can read you my notes.  I think what you had just finished up on was the average recovery versus the – recovery in the tort system and the amount of money in the

Bates - Direct                                    120

trust system, but I don't think you had –

BY MR. CASSADA:

Q.          Okay.  We had discussed your opinion of the average value of a tort claim.

A.          Correct.

Q.           In the tort system in 1999, a year before the bankruptcy wave.

A.          Correct.

Q.          And currently.

A.          Yes.

Q.          And to be clear, when you were identifying those values, you were talking about claims in the court system against all defendants?

A.          Yes.  What I am saying is, just to be clear here, I will draw a distinction I am making, which is defendants who remained in the tort system had their values go up fairly dramatic.  The overall claim value did not go up in the same way because it is simply a shift of who paid that from the group that had been the ones, companies that had gone through bankruptcy to the ones who now were having to pick up the share of liability of the others.  So essentially the movement was a transfer from one to the other, at least on the temporary basis during the first decade of 2000 as distinct from an increase in the overall total which went up rather modestly.

Q.          And then I had asked you whether you had an opinion

Bates - Direct                               121

regarding whether payments on mesothelioma claims from emerging trusts ultimately would have an impact on the value of asbestos claims against Garlock?

A.          Most assuredly they would have to.

Q.          Would you describe the basis for that opinion?

A.          Well, I think we saw an example of that in the case that you described in your opening argument, whereas you were essentially proceeding to trial on a case which you disputed how much you should have to settle on it and you were left with the prospect of going to trial without the benefit of a significant number of co-defendants to share the payment, as well as the ability to actually point to the other sources of exposure for the individual.  In the intervening time period where the individual was required then subsequently after the appeal to reveal what the trust payments were and they then subsequently, the amount by which the case was able to be settled, was quite significant in terms of the impact that that would potentially have had on the potential jury outcome.

I think that process encapsulates what will go on in the future as trusts begin paying claims on a concurrent basis because it is that dynamic which the attorneys on both side back away from and handicap as they are deciding whether to settle the case and move forward or bear the additional cost of settling the case, that determines what the settlements were and what settlements are.

Bates - Direct                                    122

It will influence the decisions of the plaintiffs themselves because they will be in a position of, when trusts are paying contemporaneously and a large number of them are up and running, they face the prospect of essentially submitting their claim to the trust and acknowledging and developing their proof and their basis of proof against those trusts in order to submit their claims to the trust or delay that process and wait for a number of years while their case runs through the tort system. If they have to experience that delay anyway, then that adds little to their cost, to the burden of time.

On the other hand, if it actually delays when they can get an average of one point two million dollars, it has to have a significant impact.

Secondly, what is going on in the country, around the country right now in a number of jurisdictions is the defendants are developing, using methods very much along the lines of what Mr. Swett talked about, of bringing the information about the trust and the potential amounts that plaintiffs will get from the trusts into the courtroom through things like expert testimony, which takes the exposure history, the work history of the individuals, matches it up to the site list that Mr. Swett mentioned. Knows then through the websites what it is, from the trust, what it is that the individuals will get paid, and they can bring that in and say this individual worked in the Boeing plant in Seattle and we know in

Bates - Direct                                    123

that plant in Seattle Owens-Corning, was.  They will be able to bring a case to Owens-Corning.

We know that Pittsburgh Corning was at that site. They will be able to establish the basis of the exposure against the trust.  And that is something which over the last decade has not taken place because defendants had not figured out how to do that, and the information for them to do was not present.  That information is now being done.

Judges in some jurisdictions are ordering plaintiffs to reveal which trusts that they will be subsequently submitting claims.  That is, the trusts that they will be submitting claims.  That is going on, and these issues over procedure, these issues over what shows up in the courtroom are being addressed right now and, over the next few years, they will be worked through.  But it necessarily must have an impact on the values because the only way that you can continue to have a tort system operate, which does not account for those sources of exposure, is for the tort system to wind up with a completely different perception about what the sources of exposure which caused the disease than what epidemiology tells us and what the trust system will tell us.  And that necessarily, as the timing of these two systems and the payment of these systems becomes more coincident, that information must transfer.  It is untenable that it's – it's just unimaginable that that would actually remain separate.

Bates - Direct                                124

Q.          Will estimating the extent of the impact of trust payments on the number and resolution costs for Garlock's mesothelioma claims be addressed in your estimation opinion?

A.          Yes, it will.

Q.          Can you describe for the court the type of information that you will seek to assist in rendering an opinion estimating the value of claims?

A.          Well, I think we just, through what I just described, we are talking about some of that information.  It is part of what is being requested on the proof of claim form data is one source of it.  Knowing what the detailed work history is or what – is one very important component to that.  This is information that is not currently in Garlock's database.  It is information that the plaintiffs have and they can provide and, given how old many of these claims are, they could easily provide.  It has probably well been worked up over the years and it is the kind of information that they have to have anyway to submit their claims to the trust.

Claimant level information on total payments received from the tort system is clearly a valuable item, as is the money that they actually have gotten or will get from the trust for which they have submitted claims.  Their direct evidence of that, I think is very important information of this sort.

And then I think it is very key – and this is information out there – is they provide, you know, information

Bates - Direct                    125

on who else they have named on their complaints.  Often that information could be – it is just information that's not contained in Garlock's database.  It is public information that's part of – on their complaints, but the number of defendants that are out there, and who they name, and who they are alleging as the sources of potential exposure to is very important for knowing what Garlock's share of that liability ought to be down the future.

The heart of all of this is getting at what is the appropriate settlement value that we ought to apply to these claims.  I agree in this respect with regard to what Mr. Swett said about how the issue will be what that average value is.  But I think it is very important to know that there is not a single average value.  It is important for the estimation process that claims be segmented according to important characteristics which distinguishes what's the appropriate average value that's used.  The methods that I have been using for valuing Garlock's claims, as well as what I use for valuing all of the asbestos claims that I do, is identifying the data and then the information we have, what the important categories of information are, that it can be used to properly segment the data.

Here, we have a significant problem that we have a large number of records in the database which don't have the information on them that is needed to make that determination.

Bates - Direct                                          126

I believe and in the estimation of the past believe that those claims have very little value attached to them, but I know that there are some claims in there which probably do have some value and that's information that we need to discriminate.

Q.        So a lot of the information or at least some of the information that you will use will come through the proof of claim process?

A.        Correct.

Q.        Dr. Bates, approximately how many claims does the Garlock database indicate are pending?

A.        We prepared a slide on that.  It is slide twenty – twenty-three.  It's on the screen at this point.  I prepared this as a fairly extensive table because I think it revealed some very important features of the Garlock data.

          I think the first thing that I want to say about this is these are records within a database that are not listed as being resolved in some way.  It does not mean that there are open cases proceeding in a court somewhere.  In fact, there is good reason to believe that most of them, a vast majority of them are not, that their tort claims are resolved and they no longer would pursue a claim in a tort system against Garlock because Garlock's defenses in the tort system would be very strong and that's why they never brought the cases against them in the first place.

          So one feature of what we need to figure out is how

Bates - Direct                    127

many of these cases in this data actually are actually still cases that are being pursued and is it a matter of the cases are actually out there and the records just haven't been updated properly or not.  The information in the database just isn't there to tell you.

So as you can see from this table, we have a total records in the database of about a hundred and eighteen thousand, seven hundred and thirty-four is the number that's listed here.  That number is actually fewer than it was six months ago because Garrison has basically been going through the process of trying to identify to the best it can, with the information that it has, through the people who house and maintain the database and the information, how many of these cases that they have here actually should have already been listed as dismissed.

Their ability to do that is significantly limited by the kinds of information that they have at their disposal, information which is actually in the hands of the plaintiffs themselves for the most part.

You can see that there is a large, large number here of cases which are very old. That in fact these cases extend way back in time, four thousand cases which have non-malignant diseases or which no disease is specified from the 1980's. Tens of thousands of cases prior to the time period of 2000 itself, you know, even more cases in the recent periods of

Bates - Direct                    128

time.   In all disease categories, this is in fact the case where we have these large numbers of cases here.

How many of those cases are actually active tort cases which would ever receive value in the tort system?  How many of these cases are in fact cases that are the result of claims that were mass recruited by doctors who will no longer stand up and say that that's a diagnosis and support that claim?  That information is not in the database.  That information is sought in the proof of claim form and it was very, very important for identifying that a lot of these cases just simply do not have a tort basis for their claim and they would have zero value.

So I think that this chart shows you an important element of this data which is really not a feature of much of the data from the databases that existed at the time periods of the bankruptcies in the early 2000's where most of the cases that they got were all disposed, the number of abandoned and old claims that they had which were not part of the data was a small number of the cases relative to the active current tort claimants.

Here, these cases swamp the current tort cases which are likely to get valued in order of magnitude.  I think in fact that there is probably, you know, maybe ten thousand cases in here which actually are active tort cases as distinct from the situation here, ten times that many, which probably have no basis and would never receive any value in the tort system.

Bates - Direct                        129

Q.          Dr. Bates, are you aware that the Jacques Admiralty firm has announced that it represents approximately twenty-five thousand merchant mariners who may seek to assert claims against Garlock?

A.          Yes, I heard that the other day from you.

Q.          Are these claims reflected in Garlock's database as open claims?

A.          No, they aren't.  I mean, the Jacques Admiralty claims, there was approximately thirty-three thousand of them in the database which were filed over the decades of the 1990's and most of those claims were listed as being dismissed without any value attached to them, which is my experience with those claims for other defendants in their data, as well.

Q.          Does Garlock have information in its database for those claims with respect to the diseases that the plaintiffs allege?

A.          Well, I am not even sure if we know that those are the same claims.  They are the ones that are being dismissed. There is no way of knowing without getting information about those claims from something like a POC.

Q.          Now, you expressed an opinion that there are claims reflected as pending in the database which you believe would never receive payment in the tort system?

A.          That's correct.

Q.          And what is the basis for that opinion other than

Bates - Direct                           130

you talked about the mass recruitment and practices that drove a lot of those claims and age?  Is there any other basis for that opinion?

A.          Well, I think there are several bases.  I think, if we actually look at the next slide here, I think a very important feature of the data itself from the standpoint of simply doing a statistical estimate here, which I think indicates this is the case, is the fact that in the current regime, settlement regime the last number of years, Garlock, like a lot of other defendants – and this is not characteristic just of Garlock itself – but essentially pay the valuable claims, the claims that actually will get money from them within a very few number of years from the time that the claims are filed.

Most of that money is actually paid within a year or two.  The vast majority of it is paid within two years.  And, in fact, there are some cases which extend out a few years beyond that which wind up getting paid but, within four years of filing, you can count on about ninety-five percent of the dollars that will ever be paid to a group of claims that are filed has been paid.

The chart at the bottom of this table shows you the period in the last four-year period here how much money has been spent and how much of that has gone to claims that were more than four years old, which is essentially five percent of

Bates - Direct                              131

the data.

Now, using that feature, we can estimate that there are in fact or just count from the database almost a hundred and five thousand claims within this database which are more than four years old.

Some of those cases will eventually get paid some money. We don't know which ones of those they will be. We could do a statistical estimate over that, but I think, unless you know which ones of them will get paid, you have no basis of knowing which ones would be appropriately valued for, say, things like voting purposes or something like that.

Q.        Did Bates White assist the debtor's counsel in designing proof of claim forms?

A.        Yes, we did.

Q.        Does the proof of claim form provide a better means of identifying persons who actually have a claim and estimating persons who have a claim?

A.        Well, to know which claims from that basis to say these claims have a real – segment it between these claims actually have a likelihood of getting some money and these claims do not, it is  not possible within the database to do that with the information that's there. So, for example, you don't know which of the claims within the database filed the complaint but it was  really  done  after  the  statute  of limitations because they don't have diagnosis information like

Bates - Direct                                                    132

just even the date of which the case was diagnosed relative to when the case was filed.  You don't know the name of the doctor who did the diagnosis, all right, which is whether it is one of these doctors who basically, you know, did the screening diagnosis which are not – which they repudiate at this point as being the diagnosis.

Q.        How would the proof of claim process assist Garlock in addressing what you call abandoned claims?

A.        Well, first of all, if there are actually claims which have been abandoned in terms of their pursuit, they wouldn't actually file a proof of claim form.  So you would know, first of all, which ones actually intended to try and submit a claim to get a payment or at least whose attorneys intended to file a claim on their behalf to get a payment.

A number of these people, given the age of these claims, many of these people may be deceased.  We don't know whether or not their estates are still pursuing a claim or not or whether they were just simply a claim that they were filing themselves on a personal injury basis.

So that's the first issue right there, is you will be able to see who actually is going to assert a claim which you wouldn't otherwise do.  That's important because it will arise, I can predict with almost a fair degree of certainty, the way in which I will value those claims and which Dr. Peterson will value those claims based on historical precedent, is that he

Bates - Direct                                        133

will attach a value to them. I will attach no value to them.

And I will be able to make arguments but Your Honor won't

actually be able to discern from the information within the

data which one ought to be the one you ought to accept.

So I think that that information from the bar date is

very critical to allowing us to make that – for the court to

make that determination, for us to present the information

which will allow him to make that determination.

Q.        Would you explain to the court how the proof of

claim form and process would assist Garlock in addressing

recruited claims that purport to be supported by discredited

medical reports?

A.        I think that's the information needed.  The data in

the database itself does not tell us the name of the doctor who

did the diagnosing information or the name of the medical group

that did the diagnosing information.  The proof of claim form

would ask for that information and that would allow you to know

just by simply saying what is the name of the doctor who did

your diagnosis to allow you to determine whether it is one of

those doctors or not.

Q.        And what is the magnitude of the claims within

Garlock's database that you believe reflect recruited –

A.        Well, the vast majority of them do.  Again, the

information on individual claims is not there which will tell

you that information.  If we had information, say, from

Bates - Direct                                    134

submissions to Manville or other places, we could actually see numbers of claims that would actually have the same filing date or the same diagnosis date.  That information is not actually in the database that we have from any of these claims.

You know, it is important to understand that claims that get resolved are the cases which are the stronger cases that they have.  They are the cases which have some basis for their claim of exposure, whether or not they have – you know, it can go all the way from the extreme of there are just some cases which recommend some potential risk enhance, they get a payment to avoid the defense cost but they provide things like their Social Security number and an affidavit saying they were exposed to the product and what their diagnosis is.  And so the information is there in many cases for the claims that have actually been resolved.

For the cases that haven't been resolved, that information is not there because it is not provided except as part of the resolution process.  And so if somebody abandons their claim in some way, you don't have the information to distinguish them from the cases which actually are the valuable cases because the information is not there in the database.

Q.       Would the proof of claim process assist the court, the debtors and other parties-in-interest in identifying and evaluating the Jacques' claims?

A.       Well, yes.  We could find out, for one thing,

Bates - Direct                                          135

whether or not there are claims that were already in the database or not because they would be submitted and we could look at their names for one thing alone.  So we certainly can do that.

Q.        Will the proof of claim process, as opposed to only relying on Garlock's claims database, facilitate a more reliable determination of the population of persons who hold asbestos claims?

A.        Yes, yes.

Q.        And is that because they will actually file claims identifying themselves?

A.        They will file claims identifying themselves but they will also provide information for us to know which category of cases they fall into.  We have thirty-three thousand cases here on these (inaudible/2:11:31) cases which have not provided information on what their disease they allege is.  What average should we apply to those?  Now, we can use some statistical basis for doing that, all right, but again you won't know, if a dispute arises between Dr. Peterson, know how that procedure is done.  That's a dispute that doesn't have to be there if you basically just have to provide the information.

Q.        Will the proof of claim process make it easier for Garlock to identify and eliminate duplicate complaints?

A.        Yes.  That's the other thing about it, is sometimes the information on the claims within the database are actually

Bates - Direct                                136

claims of differences of spelling of the name, claims have been refiled but was filed with some different identifying information on them, claims that are actually part – in some states, they are two-injury states where you can get both a wrongful death and a personal injury case.  Those cases, when they do occur, are appropriately merged together from the standpoint of valuation of cases because that's the way they are settled.  Both cases are dismissed in one case.  And so for a number of reasons there are duplicate of claims in the database that you can't know for certain.

You know, when you have a John Smith, for example, and more than one John Smith within the database, you don't know if it is the same person.  If you have the Social Security number, you know.

Q.        You spoke earlier about the periodic updating of the database.  Are there dismissed claims in Garlock's database that erroneously have not been reflected as dismissed but are recorded as open claims?

A.        Well, I am confident that there are although I couldn't tell you how many.  Certainly over the time period that I have worked with Garlock, we have, in terms of getting their database as accurate as it can be, they have numerous times gone back through a process of getting information from underlying counsel to update that information.  And whenever we do that, they find that there are cases that were now

Bates - Direct                    137

dismissed.   They have gotten information on them from some counsel in some regional area that they had not previously gotten.

Q.        Now, is the proof of claim form also designed to provide information that you will use in the approach you intend to take in estimating the number and value of Garlock's asbestos claims?

A.        Yes.

Q.        And is the information within the proof of claim designed to do that?  Is that described in your declaration dated September 23, 2010?

A.        Yes, it is.

Q.        Is information from asbestos claimants identifying other manufacturers and co-defendants, in addition to Garlock who allegedly contributed to their injuries, relevant to determining values of claims against Garlock?

A.        It is key.

Q.        And you previously explained that in your testimony?

A.        Yes.

Q.        Is information from claimants regarding settlement payments they have received from other defendants relevant to determining the values of claims against Garlock?

A.        Yes, it is.  I think it is important to understand here that procedures which we developed back at KPMG in the 1990's were useful in predicting claim values in a stable

Bates - Direct                                     138

litigation environment where you knew that the future would be like it is at the present time. In an environment where you are sitting there where a big significant change is going to occur, you need to adapt the methods to account for the kind of change that would occur.

Mr. Swett mentioned Judge Fullam. Judge Fullam recognized that in his ruling where he said, look, we know we can use the historical data to estimate a starting point but then it needs to be adjusted for known future changes in the tort system. It is that adjustment that we need to know how to do here. How much will the trust impact the claims.

The importance of this is that, you know, you can't just go back and use the values from the 1990's. We have a benchmark about what we can refer but how much it will go back is a function of how much money out of these trusts will flow to the Garlock claimants in the future, and that will tell us how much of the revision of the claim values you will get. I suspect it would be a lot but I don't think we can do that accurately or precisely without having this kind of information about which other defendants are named, what is the source of the exposures they allege or the co-defendants they have and what is the industry and occupations that they have so we know which trusts they will make a claim against.

And then the basis of that, the kind of statistical model which we can create can then value categories of claims

Bates - Direct                     139

and come up with the correct, the proper average to use of the type that Mr. Swett mentioned.

So when it comes to valuing the claims, we will talk about a feature of that in a little bit as we move forward.

Q.      Will determining the population of persons who sued Garlock who have also pursued claims against the trusts be information that would be useful in a precise estimate of Garlock's asbestos claims?

A.      I think it's important information.  It's the best way to know what they will be getting from the trust.

Q.      Have you been engaged to determine the impact of the trust system on the asbestos liabilities of any other defendant?

A.      Yes, I have.

Q.      And in what case have you been engaged?

A.      Well, certainly that's an issue that we have pursued already in the matter of the General Motors matter in front of Judge Gerber in New York, the United States Bankruptcy Court in New York.

Q.      Are you pursuing information from trusts to help assess the liability in that case?

A.      Yes, that's precisely what we are trying to get the information for.

Q.      And has a court order been entered allowing you to get that information to assist your estimation?

Bates - Direct                                    140

A.          Yes.   Judge Gerber ruled that that was obviously meritorious claim information that we could use.   At the present time, they are still working out the issues of the confidentiality agreement.

Q.          Without a proof of claim process, how would the court and parties determine the population of claimants that must be estimated who will assert present claims against Garlock?

A.          Well, you can't actually segment the population between those who will or won't without the P.O., the proof of claim form data.   You could suggest what percentage of them would based on data, but I think that what you are likely to find out is, if we don't have the proofs of claim data, like I mentioned before, you are probably going to get a very large difference in the valuation of the pending claim stock based on the methods that Dr. Peterson has historically used versus what I have used in the case of Garlock here over the years.

Q.          But that dispute could be eliminated simply by filing – by a requirement –

A.          I think it could go a long way towards eliminating that dispute, at least allowing the court to make a determination.

Q.          Have you read language in the response by the asbestos committee in these cases to the motion for a bar date to the effect that it would be highly burdensome and take years

Bates - Direct                                       141

for the parties to analyze the information gathered through the proofs of claim?

A.          No, that's not correct.  I have read that language but that's not –

Q.          You have read that and you think –

A.          I have read that language but that's not a correct statement.

Q.          Based on the proof of claim form, would the data collected already be in an electronic form and organized in an analytical database?

A.          That's what the design is to do, yes.

Q.          How long would it take to process the claim and to analyze the proof of claim form data both for the allowance of pending claims and if you used this input for the future expenditures forecast?

A.          You could begin analyzing and processing that data almost immediately in the form that it's in, in a database. You know, exactly how long you would spend doing it depends on what particular analysis you want to do it, but this is a days or weeks long process, not a months or years long process.

Q.          Are there computer programs that are able to process and analyze large quantities of data in a few minutes?

A.          Yes, indeed.  I mean, all of the trusts have them, all of the advisors have them.  We all use them.

Q.          So Bates White has such programs for use in these

Bates - Direct                                             142

cases?

A.          Yes, we do.

Q.          Have you personally performed data and statistical analyses with millions of records making use of these programs?

A.          Yes. I have done it as recently as the last couple of days, yeah.

Q.          Related to asbestos claims?

A.          Correct.

Q.          Dr. Bates, have you read the asbestos committee's statement that Garlock's aggregate liability for pending and future mesothelioma claims alone exceeds one point five billion?

A.          Yes, I have read that statement.

Q.          Did you review the committee's calculation and key assumptions?

A.          I did.

Q.          Do you have an opinion regarding whether the committee's preliminary estimate is accurate?

A.          No, it is not.  It is way too high.  It is obviously way too high from some very – just a few mistakes that they have made in the data.

Q.          What has been Garlock's aggregate cost of resolving all mesothelioma claims during thirty plus years of asbestos litigation?

A.          Well, as we showed on the charts earlier today, it's

Bates - Direct                                    143

just over five hundred and sixty million dollars.

Q.         And that compares with the one point five billion that the committee posits will be Garlock's future liabiilty, pending future liability?

A.         Those are both from mesothelioma, yes.

Q.         Right.  Have you undertaken to determine how the committee made those calculations?

A.         Yes, I have.

Q.         Let me refer you to slide twenty-five.

A.         Correct.  Yes.  It is on the screen right now.

Q.         Okay.  Yes, it is.  What is the basis for your understanding of the method followed by the committee?

A.         Well, I reviewed their calculation as they described it in their paper, and they intend it to be, I think, a fairly high level summary statement to demonstrate the basic point with regard to the solvency.

The calculation they do is described by the illustration that's on the screen here.  First they break it into two pieces, estimating what they claim the value of the pending mesothelioma claims are and then they do a similar calculation with regard to the future claims which is different in only one respect, which is they put in a factor that you take account of the fact that over time there will be inflation and then we will want to discount that back to present value terms.

Bates - Direct                                                  144

Essentially you can see from the blocks here the way the calculation goes.  It is a rather simple calculation which we can run through.  You take the number of pending claims that they count.  We multiply it by a payment rate which they estimated.  We multiply it by an average value and then get that average together, put all of those claims together to come up with a value of the pending claims.

Now, I would dispute that this is the proper way to do this in general because, in fact, it involves more details than that.  But for the purpose of this demonstration, it gives us an order of magnitude calculation which we can address and, in particular, we are only going to address one of those numbers on that screen, and I think it is obvious that one of those numbers is so off that the value of their calculation is off by a multiple.

Future claims, we do exactly the same thing here.  Only in this case not only do you have the payment rate, the average value and the number of future claims but you also have to take account of the fact that in the future claim values will rise from monetary inflation and then, to bring them back to present value purposes, you have to discount those.

They have summarized that calculation into a single factor which represents some assumptions that they made about present value and about the inflation rate which will prevail.

I am not going to challenge those particular

Bates - Direct                                145

assumptions for this purpose but, again, I think that there is problems with each one of their numbers here to some extent but I think, if we just focus on a couple of them, we can, I think, illustrate just how far off the calculation actually is.

Q.        Okay.  Let me ask you to look at slide twenty-six. In this slide do you set forth the input values and calculations that the committee has made?

A.        Yeah, this is a summary of the calculation that they did in their memorandum.  I think the numbers are exactly the ones that they used within the degree of precision that's reflected on the screen here.  So it is essentially thirteen steps in this which are essentially what's represented from having done the calculations on the prior page.

Steps one to four above are exactly the steps that we did.  They had an estimate they took from a status of where the database was at some point in the past.  Fifty-three hundred and seventy-two claims, mesothelioma claims, which are unresolved.  Now, the current database has a slightly larger number than that.  We will take that number as given because the slightly larger number would be included in their number below of the number of future claims.  So let's just take that number as given.

Q.        Okay.

A.        They then multiply that by eighty-two percent.  They performed a calculation in which they said eighty-two percent

Bates - Direct                               146

of the cases that are pending will get resolved.  That number is way off.  The number of pending cases that will be resolved is much smaller and I am going to talk about that in the future.  So I take very significant exception to that.

The value of the pending cases here they will take as being seventy-five thousand dollars.  Mr. Swett has already identified that we will have controversy over what that number is.  For the purpose of this calculation, I am simply going to leave that number set the way they set it.  I don't agree that that's the proper number to use here but that's the number we will take for their calculation.

If you multiply those three numbers, you get three hundred and thirty million dollars.  That number is way too big for reasons that I will mention in a few moments.

The next set of calculations are done to calculate the number of pending claims, which replicate the calculation you just saw –

Q.        Excuse me.  The number of future?

A.        Future claims, excuse me.  The number of future claims in all respects except one.  First, they have an estimate of the number of future mesothelioma claims there that's twenty-one thousand, five hundred.  That's going to come out to be very close to a number that I would probably use, as well, although we will see how the calculations actually do when we actually estimate that number.

Bates - Direct                                          147

They again apply their payment rate of eighty-two percent to that.  Again, that number is incorrect.  We know that from the information I have shown you already today, that basically they only pay about half of the cases, mesothelioma cases that get presented, not eighty-two percent of them.  So this would essentially say that they are paying a very large, significant number of cases beyond what Garlock would have in the tort system and what history shows.  We will get to that in a moment.

Again, they have a future case value of seventy-five thousand dollars which, if you multiply those three numbers, it gives you one point three billion dollars.

Now, of course, the seventy-five thousand dollar number is one in which, if that was the right starting model number and, again, that's an area where we are going to have, I think, significant dispute in the future and part of what we need the information and discovery we are looking for is to address, which is how will that number get affected by the trust.  But we will take that number as given for this calculation.  But we do accept that that number would go up from inflation and then would have to be brought back to present value terms.

The combined summary of those, the impact of those in their calculation, as they laid out in their paper, results in a number for the future claims of one point two billion

Bates - Direct                                              148

dollars.  That's effectively a reduction of the one point three for the combination of inflating and then discounting back and, since the discount rate is slightly higher than the inflation rate, results in a reduction of the number to present value terms of one point two billion.

Add the number, the pending total of three hundred and thirty million to the one point two billion, you get one point five-three billion, which compares disfavorably to the number that they used of eight hundred and eighty-two million and even less favorably to the number that Mr. Swett talked about this morning of potentially six hundred and some million, leaving a remainder of something like six hundred and fifty million dollars.

Now, that's their calculation and how it was –

Q.        You point out that they assert or assume that Garlock's payment rate is eighty-two percent but you take exception to that assumption.  Based on your knowledge of Garlock's database and actual historical settlement rate, what is the correct settlement?

A.        Well, for the pending claims, the number is much lower and, in fact, I have prepared a chart on that that helps us assist on this.  The next chart essentially shows you the payment history based on the claims that have been filed over the time.  I think we have talked about this number somewhat in the past, earlier in the testimony, earlier today, but this is

Bates - Direct                              149

done by filing year, and what you can see again is, as we went through the bankruptcy wave starting in 2000, 2001, 2002, as you can see from the total column, the fifth column over there from the left, the number of claims filed against Garlock went up significantly during that time period.

What you can see from the column next to it, the settled column, is that in the early part of their history, they were paying a large fraction of those cases and, in fact, the percentage over on the far right is the payment rate which shows you what percentage of those cases actually wound up ever getting paid out of the ones that were filed.

Now, when the bankruptcy wave occurred and more cases were being brought against Garlock, the number of cases they pursued, given the defense strategy that they were using, went up, but nothing like it went up by the amount as the number of cases went up. The number of cases more than doubled whereas the number of cases they paid increased maybe forty to fifty percent.

As more cases were brought against Garlock, Garlock pushed back on those cases and you can see from the far left-hand column, as it did so, more and more a much larger number of the cases wound up getting dismissed.

It is also the case that more and more of the cases that were filed never got resolved in one way or the other. So if you look at the column that says "Not Affirmatively

Bates - Direct                                                150

Resolved," you can see that that number increases rather dramatically as we go from 2001, 2002, 2003.

Now, as you get to the recent period of time, some of those cases in that column will get settled. They will in fact move over into either the dismissed column or the settled column and some of them will stay where they are based on the history of what we have seen.

Now, recall what I have told you is that and the history of the data is that the worst cases from the standpoint of Garlock, the most valuable cases get settled first. What that means, then, is that of the cases here which are settled that were, say, filed in 2007, we have already resolved seven hundred and four of them. The number of valuable cases that are remaining out of the five hundred and eighty-three not affirmatively resolved is a small fraction of that total because we are only going to eventually settle about half of them. So we only need enough cases to bring that up to somewhere around nine hundred as I showed you the resolution data.

So the selection of which cases get resolved first, what order they get resolved and how many of them will get resolved indicates two important features, which I am going to show you on the next chart. We have a slide that shows you the calculation and a summary of that description, which is, one, there are a total of five hundred and seventeen – fifty-seven

Bates - Direct                             151

hundred and nineteen claims, mesothelioma claims, listed as being unresolved in the current database as we have it. Three hundred and forty-seven of those are claims that were filed after the time period where the data that was available to Mr. Swett was used. So those claims would be part of the twenty-one hundred and fifty future claims. So we can take them out of this pool because they are in that pool already.

That leaves us with the fifty-three hundred and seventy-two claims. Now, as we know from my earlier description, virtually all of the money gets paid to cases, ninety-five percent of the money gets paid to cases that are less than four years old. So the first thing we need to do is take those cases which are more than four years old and set them to the side. Most of those cases – there's very few cases there which will ever get any settlement dollars associated with them. That's the historical pattern that has existed and there is good reason for why that's the case.

That leaves us a total of thirty-four hundred and thirty cases to be resolved. Now, there has already been about twenty-five hundred cases resolved out of the pool of seven thousand cases that were filed over this four-year period. That means there is only about thirteen hundred and fifty cases left out of the original filings to be filed, to be settled. So of those thirty-four hundred cases that we get, a larger fraction of them are going to be dismissed than are going to

Bates - Direct                                    152

get paid.  When you do the arithmetic on that, there is really only twenty-five percent of the cases which are pending mesothelioma cases which will actually get any money associated with them.

So you can't take the eighty-two percent that they calculated – first of all, that calculation is incorrect but, even if you took the right number there, which is more like fifty, fifty-five percent, the fact is that the more serious cases, the ones that are valuable and get paid get resolved before the ones that get dismissed because the ones that get dismissed get dismissed later than the ones that get settled.

And, hence, when you look at a case, a pool of cases which are partially through the process of being resolved, the ones that are left are more likely to be dismissed cases than the ones as they are filed.  And so that number must necessarily be a lot lower and it works out through the calculation of the data to only be about twenty-five percent.

Now, we can see the impact of that on the next page, all right, in the next slide, which shows you the –

Q.        For the record, you are now at slide twenty-nine?

A.        Correct.  What this slide shows you then is repeats the calculation with what the ACC suggested value was in their calculation in the second column.  The steps that we listed here are the same steps that we had listed before.  Only the right-hand column is the ones that we are actually going to

Bates - Direct                          153

use.  But we are going to add an additional step here and actually we are going to add an additional two steps to this because, in fact, if I just simply carry out their calculation without doing an adjustment, I think it misrepresents the actual value for the pending claims.

So the first step is we start from the same number of pending claims.  Now we apply the payment rate that actually is applicable for the pending stock of cases out of that fifty-three hundred and seventy-two cases, and that's twenty-five percent.  It is not eighty-two percent.  We apply the same seventy-five thousand dollars per case.  Again, I dispute that that's the right number here.  These cases, the older ones, tend to be less valuable, but let's just leave that number in place for the moment.  And if we do that calculation, we would get a hundred and one million dollars, not three hundred and thirty million dollars.

Now, I assigned all the cases in this process more than four years old zero value.  That's not correct.  Some of those cases will actually have some value.  Approximately five percent additional value will be represented in those older cases.  So I am going to gross up that hundred and one million dollars by the fact that really only captures ninety-five percent of the value.  That factor gives me then an estimate of a hundred and one – a hundred and six million dollars, making that adjustment.

Bates - Direct                                              154

Now, the additional adjustment we are going to make here is the fact that, since we are talking about solvency, it wouldn't be appropriate in our case to ignore the other diseases because the calculation I am going to show you belies the fact that it is insolvent.  So I need to add back in the value of the other diseases, and that is reflected in the next line, line seven, which is, as you recall from the chart I showed you earlier this morning, eighty-five percent of the dollars go to mesothelioma claims over the last several years. So if we essentially do an adjustment to reflect the fact that an additional amount of money needs to be paid to other diseases, that takes the number up to about a hundred and twenty-five million dollars.

So, in summary, their calculation, just correcting the factor of the number of cases that will be resolved and then accounting for the fact that there are other diseases, as well, the number should be a hundred and twenty-five million, not three hundred and thirty million dollars.

Q.        Just to restate, this is not the approach that you would take to estimate any pending claim?

A.        No, it would be – I think you would need a more detailed breakdown of the cases to divide them up by categories of disease, what the appropriate values are, what venues they are in, as well as things like age of the claim.

Q.        Does Garlock's database reflect that the values of

Bates - Direct                                    155

claims changes based on the age of the person asserting a claim?

A.          Yes, they do.

Q.          What, if any, adjustments would the committee take to reflect the fact that Garlock's claims population is aging over time?

A.          Well, none, and I think in the case of a short-run forecast or a forecast of pending claims, I don't think that is a material factor; but when you are talking about a long-range forecast for the future claims, I think it would be quite significant.

So where this goes to is what's the appropriate inflation factor to use and present value factor to be used.

Q.          And you are referring now to slide thirty?

A.          I am referring now to slide thirty, right. So if we go back, if you will recall the multiple steps of the process were we took the number of future claims, multiplied it by a payment rate and then multiplied it by the seventy-five thousand dollars, and then we used this discount factor of ninety-one percent to bring it back down to a current term basis.

These claims are going to evolve over a period of many years. What that means is that the claimants are going to get older and older. They are already quite old and they will be actually moving into –

Bates - Direct                          156

THE COURT: Some of us are kind of sensitive about that.

THE WITNESS: I am myself, Your Honor.

THE COURT: I am saying that for Mr. Moon, by the way.

THE WITNESS: The economics of the situation, though, are ones that older claimants don't receive as much as younger claimants because of the issues of whether or not they have children who need to be supported, educate, college and so on.

The chart on page thirty shows you how the values in Garlock's database actually vary with the age of the claimant. The fact is that, when you have claimants which are under the age of sixty, sixty or younger, they get significantly more than the claimants do when they are in the ages of seventy-five to eighty years old.

The reality of that is that this is a population which is growing in age. There was a time period in the past where asbestos was essentially banned from use for most purposes, so that fixed the population. That population is aging, and the next slide shows you how that population is aging through time, and this is actually from Garlock's own data. It is true not just for Garlock but the population as a whole, which is back in the eighties the population of people who got mesothelioma was in fact sixty-five years old. Today, that is ten years older. It is about seventy-five years old. If we go out another ten years, it will go up again to a period of time

Bates - Direct                    157

where ten to twelve years from now it will be about eighty years old.

The most important part of that is the number of individuals we have who are under sixty, which are where the most valuable cases come from, will get to be a smaller and smaller percentage of the population.

If you do a statistical analysis on the database on that, it indicates a decline in the values at a rate of about one and a half, one point seven-five percent per year over time. When you account for that, it means that the inflation rate you should use relative to discount rate is lower and, hence, that number, instead of it being ninety-one percent, which is that seventy-five thousand, just goes up with inflation. It goes up with inflation but it comes down some from the fact that it is an older population. And the net effect of that is about a twenty percent reduction over the period of the entire forecast, which is a three to four decade out forecast of this population.

The summary of that information then is related on the next chart, which shows the adjustment and how that impacts the calculation.

Q.        And you are referring to slide thirty-two now?

A.        It is on slide thirty-two. And, again, here we have done an adjustment to reflect for these factors. On line one, it will still continue to use the number of future claims that

Bates - Direct                               158

they forecast, twenty-one thousand, five hundred. Only the payment rate here is fifty-five percent, not eighty-two. Now, these are freshly filed claims, so none of them have yet been resolved. So we don't need to do an adjustment of the type we did before. We can just look and see of the cases that get filed how many of them eventually get paid. The number over the last few years has been somewhere between fifty and fifty-five percent. So we will use a conservative number, use the fifty-five percent.

You multiply the resulting number then on line three by seventy-five thousand dollars and you get an adjusted total in current dollar basis of eight hundred and ninety million, not one point three billion dollars.

Now, when you take account of the age adjustment as well as the inflation and net present value, that would be a multiplication now of point seven-two. That is eighty percent of the ninety-one percent. What I described was the eighty percent – is what the adjustment factor does, about a twenty percent reduction.

Q.        Are you finished?

A.        Not quite because the next thing you do is, when you multiply it by the point seven-two, instead of getting one point two billion, you get six hundred and forty-five million. Now, if you take that number and adjust it for the fact again that only eighty-five percent of the dollars go to

Bates - Direct                    159

mesothelioma, when you gross it back up for the additional diseases, we wind up with a number that, for all diseases, not just mesothelioma, is approximately seven hundred and sixty million dollars.

Q.      Does the committee's analysis account for the fact that asbestos claims payments are tax deductible?

A.      No, it does not.

Q.      And what effect, if any, would that have on the calculation?

A.      Well, what it means is that, even though you pay a certain amount going out the door in the tort environment, you would actually get a deduction of a partial benefit from that from the tax return. So you don't get, off the equity value of the firm, you wouldn't get the full impact. You would essentially get essentially the result, you get a tax benefit, as well, of an amount. And for purposes of illustration here, I am going to use the number of thirty-five percent which is the federal corporate rate.

Q.      And have you undertaken to do a summary calculation of the total pro forma liability based on the committee's methodology, correcting those obvious errors?

A.      Yes, that's on page thirty-three. It shows you the summary which does a comparison of these amounts. When you compare – the calculation you originally described was listed on the middle column which says ACC's suggested value. The

Bates - Direct                                    160

column which says pro forma applies the adjustments which I described above to the pending and future claims and then uses the tax – there is a calculation of the tax benefit of thirty-five percent, which winds up then with a number in total impact of five hundred and seventy-five million dollars, which compares rather favorably with the number of eight hundred and eighty-two million dollars as a potential equity value, as well as the, say, six hundred million dollars that was also proposed.

Q.        Just to be clear, where did you get the equity value of Garlock?

A.         That's the number that was used in the ACC's memorandum.

Q.        So you took that as a given?

A.        I just took it as a given.

Q.        Okay.

A.        I haven't done any independent estimate of that.

Q.        And then finally, Dr. Bates, this is not the way that you would calculate Garlock's pending and future asbestos claims?

A.        No.  I would use a much more detailed process and, in particular, it ignores any potential impact that the trust will have on the future claim values, which is what we seek the information here today.

MR. CASSADA: Your Honor, I have no further questions.

Bates - Direct                    161

I will turn him over to Mr. Swett for cross-examination.

THE COURT: Do you know what you want to do, whether you want to do that now or –

MR. SWETT: Your Honor, I would like to start and see how it goes.  I don't know – we have covered a lot of ground and I am not at all certain how long this will take.  The witness has not been deposed, and we would like to do a thorough cross.  So my suggestion is that we go ahead and start.

I have another suggestion which I would like to make at an appropriate time regarding the focus of the hearing as it pertains to other witnesses because my suggestion to counsel and to the court is that we focus at the present time on the basic issue of are we going to have allowance proceedings, are we going to have an estimation and, if so, what kind of estimation, and that we defer for subsequent determination the issues that would flow from that.

Are we going to have a claim form at all?  If so, what kind of claim form?  If so, the vetting of details of what they propose in their claim form and their notice program.

Right now, we should be focusing on the fundamental issue of which way are we going to go in this case.

So I would submit that it is probably not a good idea to take testimony today or tomorrow concerning the particulars of the claim form or the notice program, that we focus the

Bates - Direct                                        162

examinations and the arguments on the more fundamental issues. Hopefully we can get through all of that by some decent hour tomorrow and you can then decide which direction we are heading, and the rest of the issues to be debated will flow from that.

MR. CASSADA: Your Honor, the issue of whether we liquidate or estimate is not currently ripe. It is not before this court. Right now the issue is what is the bar date; is the proof of claim form that we have proposed reasonable and proper; what's the form of notice and how do we give notice.

We cannot make a decision on whether we are going to engage in any kind of limited allowance proceedings or go directly to estimation until we get the proofs of claim form in and have the information gathered in that.

We have given notice now for over a month with respect to the content of our proof of claim form and the notice. We brought witnesses here at considerable expense to testify regarding that, and the committee has had a long time to provide input as it relates to what has been included in the proof of claim form. It would be improper to hold up that part of the case to decide an issue that is not before the court. I mean, in short, that's the tail wagging the dog.

THE COURT: Well, I think I ought to – you have made the motion, and I will let you proceed to argue it in the way that you want to do it and present the evidence that you want

Bates - Direct                               163

to present.  And we will just see – I mean, if it turns out to be surplus, it turns out to be surplus but –

MR. CASSADA: Your Honor, just to be fair, I mean, I think the committee has had a chance and they need to bring their evidence on whether the content of the proof of claim form, they need to bring it now so we can get that approved. It is going to take, as you will hear, it is going to take at least thirty days, once it's approved, for Rust to get the claim form up and operating, and that's how we get on with the case.  We get them onto the task of doing what they do, so we can give notice to claimants and have the proofs of claim filed.

Otherwise, I mean, I guess the committee said that we are going to spend two years litigating the proof of claim form which is ridiculous in that this form is based on trust forms that have already been approved in trust cases.

But, you know, this is not Delaware.  We don't need to spend two years litigating that issue.  The issue has been properly brought before the court and it is time to make that decision and get on with the case.

MR. SWETT: Your Honor, I understand what you have ruled.  I would like to point out that the first motion on these subjects filed is our motion.  It was a motion for entry of a scheduling order that would involve informal estimation for the purposes of plan negotiations, followed by contested

Bates - Direct                                    164

estimation proceeding if the parties can't formulate a consensual plan. That's the first issue that was placed in front of you.

The major disagreements have to do with whether we are going to have allowance proceedings and what the shape of the estimation process should be and whether now is the time to have the formal contest or whether we should instead be bearing down on plan formulation.

So those are the reasons for my suggestion. None of the witnesses have been deposed. None of them was noticed as coming before you today to give live testimony. We have kind of engaged, each of us, in an old-fashioned style of litigation here, which is going to involve laborious examination of witnesses on the stand. If we can focus today and tomorrow on the fundamental issues and come back in front of you, if you think it's necessary, to address issues of notice or the particulars of the claim form that have very significant implications, we can do that, having deposed those witnesses, and make much crisper presentation.

THE COURT: All right. Let me think about that and we will figure out what we do with that.

Do you say you want to – I am wondering if there is any point in starting with Dr. Bates at this point. He needs to leave today; right?

THE WITNESS: No, Your Honor. I spoke with my wife

Bates - Cross                              165

over the lunch break.  Her sister has returned from her trip and she is there to help her father.  She says she does not need my help.

THE COURT: Okay.  So if you want to, we will start and go with this and then meanwhile I will be stewing on what to do about the rest.

MR. SWETT: Okay.  Thank you, Judge.

CROSS EXAMINATION

BY MR. SWETT:

Q.       Good afternoon, Dr. Bates.

A.       Good morning, Mr. Swett – afternoon, I guess.

Q.       Dr. Bates, how long have you worked with Garlock?

A.       Since the end of 2004.

Q.       2004?

A.       Correct.

Q.       While you were at KPMG, did you have any contact with Garlock or Coltec?

A.       Not that I am aware of, not that I recall.

Q.       Have you had access to Garlock's claim databases since 2004?

A.       Approximately.

Q.       Are you aware, sir, that the committee was provided with a version of the database, the only version it has received, this Monday of this very week?

A.       I am not aware of the specific timing.

Bates - Cross                      166

Q.          Your database includes data going back to the early 1990's and beyond; is that right?

A.          That's correct.

Q.          I take it you are not aware that the database provided to the committee includes no data for that period?

A.          I am not aware of that.

Q.          Are you aware, sir, whether or not Garlock maintains the database of cases that have been trial listed?

A.          I am sorry, repeat the question, please.

Q.          Do you know whether or not Garlock maintains in any form a database that identifies cases that have been trial listed?

A.          I don't know if they maintain a separate database for that purpose.

Q.          Are you aware of data fields in the data that you used that indicates whether or not a mesothelioma case has been put on a trial queue?

A.          It is not a piece of information that I am familiar with.

Q.          Does the database or the databases that you work with for Garlock include verdict information?

A.          Yes, there is information somewhat, I think.  It is either in that form or in an abbreviated form in some other report we have but I believe it's in the database.

Q.          Is it correct, sir, that the vast majority of

Bates - Cross                                    167

resolutions reflected in the Garlock data that you are familiar with come from settlements?

A.          That's correct.

Q.          As opposed to verdict?

A.          That's correct.

Q.          Now, you have testified, have you not, that something upwards of eighty percent of the dollars paid out in indemnity by Garlock over the recent past goes to mesothelioma victims as opposed to victims of other diseases?

A.          About eighty-five percent, correct.

Q.          And you agree with me, do you not, that perhaps the central issue in estimating the aggregate liability, once all the data that is going to be used is available and both sides have had a chance to take their (inaudible/2:55:45) is going to be what average value to attribute to a mesothelioma claim that is assumed to be paid?

A.          And the percentage of them that get paid, yes.

Q.          The percentage of mesothelioma claimants against Garlock who will receive a monetary settlement?

A.          Yeah, I think there will be issues about how many will be filed because that will get impacted by how the litigation environment will unfold in the future as the trusts begin making payment, what percentage of the cases that will get filed will get paid and how much they will get paid.

Q.          And isn't it true, sir, that an aggregate estimation

Bates - Cross                                    168

methodology that attempts to value the overall liability of Garlock for indemnity payments to mesothelioma victims can encompass each of the variables that you just mentioned?

A.       If it has the appropriate information from which to work.

Q.       And assumptions and the reason debated on those subjects was had in the Owens-Corning case; correct?

A.       I am not sure what precisely happened in the case itself.  I was not in the courtroom in the Owens-Corning case. I read Fullam's rulings on it afterwards.

Q.       And you referred to it on direct as one where he acknowledged a need to anticipate developments in the tort system based upon trends already discernible based upon evidence that people knowledgeable about what's going on in the tort system; correct?

A.       Well, he indicated that you should take account of known predictable changes in his ruling, yes.

Q.       Are you also aware, sir, that he curtailed an effort by financial creditors to conduct individual claim-related discovery into the medical condition of claimants?

A.       I am not familiar with that part.

Q.       Now, the proof of claim process that Garlock has proposed would call upon each claimant who has a pending claim to muster information and submit the form with all the details; right?

Bates - Cross                    169

A.            To their counsel, yes.

Q.            There is an alternative, is there not, known as sampling?

A.            Yes.

Q.            Have you sometimes used sampling for the purposes of statistical analysis?

A.            Yes.

Q.            And that involves queries of less than the entire population of claimants?

A.            Yes.

Q.            On some basis that will allow the expert to extrapolate from statistical analysis; correct?

A.            Some pieces of the information, you could do that way, yes.

Q.            You have done some of that yourself in your preliminary analysis; haven't you?  You have made the assumption, for example, based upon your reading of an analysis of Garlock data that claims over four years old are unlikely to be paid?

A.            It is an equivalent kind of thing, yes.  I think I have talked about that.

Q.            And you can do that across each disease type that's reflected in the database; correct?

A.            You can apply that in general.  You can't know specifics and it does depend on you having the characteristics

Bates - Cross                                170

within the claim data to make the discrimination between ones which you should apply it to.

Q.        You can zero in on mesothelioma – I am sorry, did you have something else to say?

A.        No, I was just going to say there are claim characteristics which are important for that determination, and particularly a determination of whether a claim value is zero or not, that are not within the data itself.

Q.        But for the most part – strike it.  You could do an analysis of that issue, how many of the older claims were mesothelioma will get paid based upon the claims history and statistical extrapolation from what you find in the data; correct?

A.        Yeah, I believe that I have described that there is a number which I believe that is and have illustrated a method for doing something with that.  It does not, however, let you know that information on a claim by claim basis for things like determining whether somebody should be an appropriate vote and have an appropriate claim.

Q.        Now, if you focused your data recovery or data gathering efforts on the details of individual claims, is it your expectation – and you do so for the purposes of a program under which Garlock has declared its intention to seek summary disposition of large numbers of claims?  You understand that's Garlock's intention; correct?

Bates - Cross                         171

A.          I have heard that.

Q.          Now, is it your expectation that the claimants will sort of stand idly by and allow their claims to be attacked that way without mounting defenses of their own, not defending the merits of their claim?

A.          Well, I think the first situation is whether or not we actually have – the database is actually an accurate reflection of the claims that actually sit out there.  The first issue of the proof of claim form is to see whether or not all of those actually present a claim form.  Some of them are – many of them are very, very old, and at this point you do not have the information to know, any basis to know whether or not they would actually show up to get paid at all.  That's the first determination, which you could not do with any data in the database.

Q.          Even on your assumptions though, sir, isn't it correct that you could find that out with a whole lot less burdensome claim form than one that runs on for pages and requires all kinds of detail and attachment?

A.          Well, I don't agree with your characterization of the claim form.  The claim form that's filed, the electronic data is important not just for that purpose but also for doing a proper estimation of the claims, an environment for which the trust will be paying substantial amounts of money.

Q.          Do you know what a form ten is, sir?

Bates - Cross                                    172

A.          I don't know that form.

Q.          Okay.  Are you familiar with an official bankruptcy form that's commonly used as a proof of claim form in non-asbestos cases for commercial debt?

A.          I may have seen something like that.  I am not familiar with it.

Q.          You are aware that it is about two pages long?

A.          Like I said, I am not familiar with it.

Q.          And you could put out a form that basically called upon a claimant to give his name, state his disease and state whether or not he was asserting a claim against Garlock for compensation for that disease and  you would answer your first question regarding which claimants are gong to show up; right?

A.          That would be one piece of the information.

Q.          Now, I think you testified some on direct concerning the Manville bankruptcy?

A.          I made some references to it.

Q.          Did you have any role, sir, as a professional in connection with the Manville bankruptcy?

A.          Well, I have worked with Manville claims data in the past, but I have not worked on behalf of Manville.

Q.          Were you involved in a case on behalf of any party-in-interest?

A.          No, that case took place before I became involved with asbestos litigation.

Bates - Cross                          173

Q.          Are you aware from the work that you have done in the field that Manville was by far the major defendant in the tort system when it went into bankruptcy in the early 1980's?

A.          That's my understanding.

Q.          Are you aware, sir, that at that time a number of co-defendants banded together and moved the Manville bankruptcy court to extend the automatic stay to all co-defendants on asbestos personal injury cases throughout the United States?

A.          I am not familiar with that dynamic.

Q.          Are you aware that many co-defendants complained vigorously that it was not fair to require them to proceed to litigate asbestos claims in the tort system with Manville out of the game and protected by the automatic stay?

A.          Like I said, I am not familiar with that.

Q.          You are familiar, though, with the fact that there were other bankruptcies in the 1980's and early 1990's besides Manville; correct?

A.          That is correct.

Q.          There was EaglePicher?

A.          That is my understanding.

Q.          There was UNR, there were various other bankruptcies during that period; correct?

A.          That's my understanding.

Q.          And of course they were spearheaded by that of the major defendant, Manville; correct?

Bates - Cross                                       174

A.          I think that would be a fair assumption.

Q.          Do you know what happened to the value of the claims against the remaining solvent defendants when the Manville company took bankruptcy?

A.          It went up.

THE COURT: I am sorry.  What was the answer?

THE WITNESS: They went up.

Q.          Is it your contention, Dr. Bates, that the average mesothelioma settlement value to be ascribed to Garlock should return to the levels that obtained in the early 1980's?

A.          The early 1980's?

Q.          Yes, when Manville went into bankruptcy.

A.          I don't think that's what would happen in the tort system, no.

Q.          Is it your position that they should return to the levels that obtained in the early 1990's?

A.          I think I testified earlier today that that was an insufficient benchmark for that purpose, that we needed the data that we have to actually figure out the answer to that question.

Q.          Are you familiar with a phenomenon in tort litigation, sir, where attention is turned to a defendant that was not formerly prominent in the given tort litigation, a plaintiff's law firm's resources become concentrated on making the case against that particular party?  Have you observed that

Bates - Cross                         175

pattern in your study of these matters?

A.          Yes, I believe that occurs.

Q.          And when that happens –

THE COURT: I missed – what was it you were saying that happens?

MR. SWETT: I was asking Dr. Bates if he was familiar with a pattern in asbestos litigation where plaintiffs focus their attention at a certain point on a defendant who had not been prominent previously in the litigation.

THE COURT: Okay.  On the previously not prominent?

MR. SWETT: Right.

THE COURT: Okay.

MR. CASSADA: Are you asking him whether a plaintiff or a plaintiff law firm would?

MR. SWETT: Plaintiffs and their lawyers.

BY MR. SWETT:

Q.          And have you observed what happens to the claim values when that takes place?

A.          Yes.

Q.          What happens?

A.          Well, they tend to go up or, if it is not successful, they tend to go down.

Q.          And is it your understanding that throughout the 1990's Garlock was not a prominent party in the tort litigation?

Bates - Cross                         176

A.          Garlock was not a prominent payer.  It was a prominent party.  There is a long litigation history, which we saw that history as illustrated here.  They are named in hundreds of mesothelioma cases per year and, in some years, tens of thousands of non-malignant cases.  The distinguishing feature was the amounts of money that they paid.

Q.          Very few trials against Garlock for mesothelioma in the 1990's?

A.          That's probably correct.

Q.          Increasing numbers of trials for mesothelioma against Garlock throughout the 2000's?

A.          Probably.

Q.          Rising settlement values for mesothelioma for Garlock throughout the 2000's?

A.          Not surprisingly in the absence of the co-defendants and the litigation stayed against those co-defendants.

Q.          Now, are you aware of any doctrine generally prevailing, applied in a widespread fashion, in the tort system that requires a tort plaintiff to pursue his claim against insolvent potentially responsible parties before bringing suit against solvent defendants?

A.          No, I am not aware that that would be the case.  I wouldn't expect it to happen.

Q.          You agree with me, do you not, sir, that the trust distribution procedures of the asbestos defendants who are the

Bates - Cross                              177

subject of confirmed plans of reorganization are publicly available?

A.      That the plans are publicly available, yes.

Q.      The trust distribution procedures?

A.      Correct.

Q.      Including the average values that the trust estimates it will pay?

A.      Absolutely, yes, they are.

Q.      For mesothelioma?

A.      Sure.  Most of them are on the web.

Q.      And the payment percentages reflecting the discounts from liquidated value that the trust will pay across all disease types?

A.      Well, they are a discount from some value that gets specified.  I am not sure what you want to call that value that it's a discount off of but it certainly wasn't a tort value, so —

Q.      Are you familiar with the term "average values" as it appears commonly in trust distribution procedures?

A.      Yes.

Q.      A Section 524(g) trust?

A.      Yes.

Q.      What is your understanding of what that means?

A.      That's a specified average number that's put in the trust distribution procedures by the people who drafted the

Bates - Cross                    178

trust distribution procedures.

Q.          Do you know how those numbers are derived?

A.          Well, they can be derived in any number of ways but they have little bearing with the prior tort values.

Q.          Do you have any actual knowledge of how they are derived in fact?

A.          I have essentially some understanding of that but it's not direct knowledge of it.  It certainly has been the subject of discussions that I have had at times with attorneys who have questioned me in depositions.

Q.          What is your understanding?

A.          Well, in many cases – in some cases, they get specified by actually looking at the historical data and looking at something like the seventy-fifth percentile of what the payment amounts are as a starting point.

In other cases, they get specified according to testimony that Dr. Peterson has given about the way values would have changed in his opinion in the tort system.  In some cases, they are just made up.

Q.          Where?

A.          Well, I had a deposition that was taken of me by a gentleman in the case of Plibrico where he asked what did I care what the heck that value was, the payment percentage would just change reflected, and it was a case where we were dealing with a company that had paid an average of twenty thousand

Bates - Cross                         179

dollars per meso claim to resolve and they were putting in a trust distribution procedure value of four hundred and twenty-five thousand dollars, which had no connection.  The value that's in the United States Gypsum TDP is a reflection of the total amount the entire members of the CCR paid, not the amount that USG paid on average.  Similar with the GAF value or in the Armstrong value.

So these values are not – these values in some cases are simply changed by the action of the trust advisory committees within the trusts so as to get a lower percentage as revealed.  So, for example, in the Haliburton trust where they doubled the value of the face value of the claim so that the average payment percentage went, which was approaching a hundred percent, would once again be reflected as a fifty percent value.

Those numbers are just useful for some purpose of the asbestos trust but they have no connection with the former tort values of the companies involved.

Q.        Do you have an understanding of the function of the payment percentage in the trust distribution procedure?

A.        The payment percentage is essentially a calculation that is done which is the difference between what the value that's specified in the trust and what the given assets of the trust can afford to pay given actuarial calculations about how many claims they expect to see in the future.

Bates - Cross                              180

Q.          Do you have the understanding that futures claims representatives participate in the process that produces the decisions as to what the payment percentages of a trust should be?

A.          Well, I understand that there is a role for them. I am not privy to those conversations.

Q.          You testified about your work with Dr. Nicholson at KPMG in refining his epidemiology?

A.          That's correct.

Q.          Did you work with somebody named Baskes in that process?

A.          Yes.  He was my boss.

Q.          Now, do you, for purposes of forecasting, accept the reliability of the Nicholson epidemiology?

A.          I think the methodology that is employed by Nicholson is the right kind of methodology to use.  I think that there are some assumptions within his work that we have better information today which allow us to update it.  That was what I worked with him in terms of doing.  He provided me some of those updated assumptions himself in the work that we did. The adjustments and corrections I made were essentially in consultation with him and with his agreement.

Q.          I want to refer you to your chart.  My copy that was provided me today doesn't have page numbers.

A.          Well, they are there.  They are just underneath the

                          Bates - Cross                    181

binding in the right-hand corner.  I had trouble with that myself.  It is hard to see.

Q.        I can't tell.  I am going to ask you to look at the settlement history chart.  It is in two digits.  That's all I can tell you.

A.        Okay.

THE COURT: Resolution history?

MR. SWETT: Settlement history, Your Honor.  It comes right after the page headed "Dr. Bates' Selected Expert Experience."

THE WITNESS: This one right here, Your Honor.

THE COURT: Page ten.

BY MR. SWETT:

Q.        Page ten, settlement history, resolution year, then it gives mesothelioma resolutions and then all other and total; correct?

A.        Correct.

Q.        Are these in dollars of the day?

A.        Yes, they are.

Q.        So those have not been brought forward, to speak, in terms of 2009 dollars or 2010 dollars?

A.        That's correct.

Q.        Do you have an expectation of what the bottom line would roughly be if that adjustment were made for each of the years before 2010?

                            Bates - Cross                    182

A.           I could do a calculation and provide you that number.  I can't do it sitting here.

Q.           It would be quite a substantial increase; wouldn't it?

A.           Yes, probably.

Q.           Now, "all other" means all of the other diseases for which claims were resolved between the period before 1990 through 2010; is that right?

A.           That's correct.

Q.           Those diseases would include all varieties of non-malignant conditions?

A.           That's correct.

Q.           But they would also include all lung cancer cases resolved by settlement; would they not?

A.           That's correct.

Q.           Those would tend to be a lot more valuable than the non-malignant cases; wouldn't they?

A.           It depends.  Some cases they are and sometimes they aren't.

Q.           On average?

A.           On average of the average cases that are presented but the most serious asbestosis cases are more valuable than many of the lung cancer cases.

Q.           So serious asbestosis cases require very high levels of exposure to the fiber; correct?

Bates - Cross                                          183

A.          That's correct.

Q.          That's your understanding?

A.          That's right.

Q.          They also include all resolutions for gastrointestinal or other cancers besides lung cancer; correct?

A.          Those are in there.

Q.          And it would be possible to just aggregate the numbers you have under "all other" to isolate the cancers for lung and other cancers and give total resolutions in dollars, year by year, by Garlock for the period shown here; correct?

A.          Of course.

Q.          So you can do an analysis for the period of the 1990's and segmented for the period of the late 1990's and so on, showing the distribution of settlement dollars as between non-malignant and malignant claims, classing as malignancies mesothelioma, lung and all other cancers; correct?

A.          Certainly.

Q.          Okay.  Are you aware of forecasts of liability performed on behalf of Coltec in the mid 1990s?

A.          I am not.

Q.          I want to talk to you, sir, about your concept of a transfer of liability from insolvent to solvent defendants in the so-called bankruptcy wave.  You have used that term several times on direct; correct?

A.          Yes.

Bates - Cross                                    184

Q.          What do you mean by that?

A.          Well, what I mean by it is the following: That you have a case which, if it were to proceed to trial, it will have some likelihood of success depending on who the parties are that were named and the characteristics of the claimants themselves.  You know, what their age is, what their family situation is, how well they would present themselves, what the strength of their evidence is, a whole bunch of different kinds of factors which come into play on this which determine essentially what would be the expected value for a case.  And then each of the parties handicaps that based on where they think the outcome of the case would be, but each case essentially has an aggregate value that it could expect to get if that case was taken to trial and resolved, which translates through that process into an aggregate value of what the expected settlement value for that case is.

Now, a particular company such as Garlock – we will use them as an example – when it proceeds to trial, proceeds with a case or gets sued in a case where its co-defendants are the top-tier defendants, that we have mentioned there before, is going to be treated as a very small person of – company of responsibility within that.  It is going to receive essentially a small several share.  The number of times which it did not receive a small several share of the potential aggregate value of the case is very, very small.  It is a small number of cases

Bates - Cross                                              185

in which that occurred and, through the periods of the nineties and so on, the number of cases which they had which had settled for over, say fifty thousand dollars, was very small.  Which is a reflection of the fact that the products they made had very small contribution to the exposure that the individuals faced and it was acknowledged by the presence of their co-defendants in terms of what's there.

You remove those co-defendants who actually say they are manufacturers of the pipe asbestos coating that sits outside of the pipe which has the gasket inside of it, all right.  Remove them from the case and a case proceeds to trial without that person being in the courtroom with them, we face the prospect of going to trial without the co-defendants who are actually the sources of the exposure in the courtroom.

Now, is there some ability to bring that in?  Maybe. Is there some – you know, however it is but the reality of the situation is that, confronted with that prospect, Garlock or another company, similar situation, faces the prospect of paying a much larger share of the aggregate value of the case. That is what we refer to as the liability transfer.  It is not that they weren't there already or didn't get a share.  In many cases they weren't even named because the share that they would likely get, if they were named, is so small it doesn't warrant the expense from the plaintiffs.

But in the cases that proceed to trial, that's what I

Bates - Cross                              186

mean by the liability transfer.  That is, it is a joint liability.  It is a shared liability amongst a number of parties and, when some of those parties are no longer in the case, either because litigation is stayed against them or they aren't properly identified in some way or there is no way to identify them in some way, the aggregate value now has to get shared by the remaining parties.

Q.        Now you are speaking, if I may characterize it, and tell me whether you think this is fair, when you say "transfer of liability in that circumstance, you are really talking about an economic concept and not one that relates to a legal exchange or a bargained out exchange among the co-defendants?

A.        No, absolutely not.  This is an economic concept.  I am not talking about liability in a legal sense at all.  I mean, we occasionally get those words mixed up because there is an economic financial sense of what liability means and there is a legal sense, and we often run into periods of confusion with people with legal backgrounds on that issue.

Q.        In the legal sense, are you aware of any means of determining the total amount that a mesothelioma victim might receive, all in, for his or her damages other than taking the case to trial and getting a verdict on damages from the jury?

A.        I don't think I understand your question.  I am trying to parse it but I don't.

Q.        Okay. A typical mesothelioma case involves multiple

Bates - Cross                                                        187

defendants; correct?

A.          That's correct.

Q.           Some of them settle out on the way to the courthouse?

A.          That's correct.

Q.          And some proceed to trial sometimes?

A.          Sometimes.

Q.          But not very often?

A.          Not very often.

Q.          Most of the cases are resolved by a settlement which is a negotiation of parties that are seeking each the best outcome for themselves; correct?

A.          That's correct.

Q.          Okay.  Now, supposing in a tort system a plaintiff were intent upon finding out what the maximum he could recover for his damages would be, how would that plaintiff go about that?  What could he do?

A.          I assume that's what all of the plaintiffs do now. I don't believe any of them basically don't seek to try and get – maximize the return for their case.

Q.          Is there any means that a defendant has of knowing the maximum total recovery from all sources that a claimant could receive other than taking the case to verdict?

A.          Well, they might take the case to a verdict and find it was zero.  That doesn't necessarily maximize the value of

Bates - Cross                    188

the case to the plaintiff.

Q.        I wasn't speaking in terms of maximizing the value but ascertaining with certainty what the recovery would be. That would require a trial; wouldn't it?

A.        No.  No.  Most cases are resolved without a trial. There are very few cases that go to trial and it does not take cases going to trial.  Simply taking a case to trial does not reflect the appropriate risk that the party is taking for taking the case to trial.  Settlement averages and the aggregates of the settlement values is the appropriate value.

Q.        Are you aware of any legal source one could consult to find out whether a particular mesothelioma victim could receive more than "x" million dollars under the law?

A.        I have no idea what kind of a legal source that would be.

THE WITNESS:  Your Honor, I am about out of water.  Is there a refill we can get somewhere?

THE COURT: Why don't we take a break?  We will take a break until twenty until four.

(Recess from 3:25 p.m. until 3:41 p.m.)

THE COURT: All right.

MR. SWETT: May I resume?

THE COURT: Yes.

BY MR. SWETT:

Q.        I would like to talk to you a little bit more about

Bates - Cross                                    189

the resolution process that established that it's almost entirely not by verdict but by settlement. I would like to talk to you about your understanding of the settlement process.

First, is it your expectation that, when a mesothelioma victim is diagnosed and makes his first visit to the attorney's office, that he will have complete information about what asbestos products he was exposed to?

A.        No.

Q.        Do you have an understanding about how plaintiff's lawyers go about identifying potential sources of asbestos exposure?

A.        I haven't had any direct interaction with that. I could guess but I think that's what it would be.

Q.        You have no personal knowledge about how the plaintiff's lawyers put together the case?

A.        Not directly.

Q.        Do you have the understanding that discovery in an asbestos case that does proceed to trial can take a long period of time?

A.        Yes, I would assume that's the case.

Q.        You referred to work histories as one source available for investigating potential sources of asbestos exposure?

A.        Yes.

Q.        And site lists. What did you mean by site lists?

Bates - Cross                              190

A.          It's the same reference to the item that you were referring to which is on the trust who publish lists of the sites which there is presumption of exposure to the company's products if they file a claim and say they worked at a particular site.

Q.          In your experience, you saw the defendants compile site lists where their own products are known to have been present?

A.          Not generally, no.

Q.          They certainly could do that if they wanted to; couldn't they?

A.          Well, a number of defendants over time have done things where they have put together things like invoice records and so on that they use for the purposes of establishing where their products were.  Babcock & Wilcox had throughout its litigation history an entire record of where every boiler it made was.  So there are such things in many cases.  Simply sometimes it's invoice records; sometimes it's records for safety purposes, such as that, but I would not expect them to publish them on the website if that's what you are asking.

Q.          Solvent defendants, unlike the trusts, don't publish their site list?

A.          That's correct.

Q.          Do they publish their settlement agreement?

A.          No, they don't publish them.

Bates - Cross                                    191

Q.        Do you agree with me that, because the average values and payment percentages are available in the trust distribution procedures on the web or the court docket, that a solvent defendant has more information about what the section 524(g) trusts are likely to pay a qualified plaintiff than they have about what other solvent defendants are likely to pay?

A.        That's correct once they figure out if they are qualified, yes.

Q.        Do you agree with me that the defendant who wishes to explore the possibility of attributing responsibility for mesothelioma to other people's product have various devices available to them under the discovery rules that prevail in the tort system?

A.        I am sorry, was that a question?

Q.        Well, do you agree with that?

A.        Yes.

Q.        And they also have the option, do they not, of actually bringing claims against co-defendants if they wish to attribute liability to them for a given case?

A.        That's my understanding of the joint and several process.

Q.        You referred before the break – I am sorry, I can't be more specific than this but you gave kind of a long answer discussing the settlement process in which you rattled off some factors that people think about when they are settling cases.

Bates - Cross                                192

The only one that caught my ear was age.  Do you remember the other factors that you mentioned as being pertinent to an analysis that a claimant or lawyer would do in settling a case?

A.        Sure.  Life status, family status, you know, number of children, economic loss, what job they had before, what their economic damages were.  I mean, in a case that would proceed to trial, normally there would be somebody like an economist who would get up there and give testimony about what the expected earnings of the individual would be over their remaining working life.  People would get estimates of what their medical costs would be.  These are the kinds of things that would come into play.

Q.        And outside the courtroom in the settlement process seasoned lawyers bring to bear their own judgments about how those factors affect the appropriate value of settling the case to their client's benefit?

A.        Certainly.

Q.        Now, the settlement requires the defendant's agreement to write a check; correct?

A.        Yes.

Q.        And it's the defendant that decides whether and when to write the check; correct?

A.        Yes.

Q.        Are you aware of – have you read the litigation related footnotes of EnPro's 10-K for 2009?

Bates - Cross                          193

A.          If I did, it has been some time.  It is not on the top of my mind.

Q.          Are you aware that Garlock has a publicly disclosed system, not the details but the existence of an approach under which Garlock has developed an internal goal for asbestos liabilities?

A.          Yes, I am familiar with that.

Q.          What is that program?

A.          As far as I know, they have an internal budgeting program which they work with.  In part of my work with them, they would advise me of what that budget was.

Q.          That's a budget of the amount they are prepared to pay by way of indemnity during a given period?

A.          What they are planning on.  It is a planning purpose.

Q.          What resources they plan to devote to claim resolution during the budget period?

A.          That's my understanding.

Q.          Are you aware, sir, that that plan is used in setting targets for annual and long-term incentive compensation for executives?

A.          The plan related to the asbestos expenditures?

Q.          Yes.

A.          I am not familiar with that.

Q.          Are you aware that it is that plan that feeds into

Bates - Cross                                           194

Garlock's own estimates of its current and future liability?

A.          Certainly the numbers that they had of their plan were basically numbers that I tested against my forecast.

MR. SWETT: I think, Your Honor, we better mark the EnPro SEC form 10-K for 2009.  I am afraid I have no labels. I am not familiar with the way –

THE COURT: That's all right.  We have them.

MR. SWETT: Let's number it ACC-1 and we will put the date.  Your Honor, may I hand this to the witness?

THE COURT: Yes.

MR. SWETT: And I will provide one to Your Honor.

BY MR. SWETT:

Q.          Let me refer you, sir – do you have a copy in front of you?

A.          I do, right in front of me, yeah.

Q.          Let me refer you, please, to page thirty-four.

A.          There are two different page numbers here.  Which page thirty-four?

Q.          Thirty-nine of one hundred and seventeen is another number appearing on the lower left-hand side.

A.          Okay.  So page thirty-four.  So at the bottom of the page, it is listed as page twenty-nine.  It says in the bottom left-hand corner thirty-four of a hundred and seventeen.

Q.          Go forward, please, to thirty-nine of a hundred and seventeen.  Do you see the page above is numbered thirty-four,

Bates - Cross                                     195

just so we will be on the same page.

A.        Yes.

Q.        What I was referring to was the second to the last paragraph which reads –

MR. SWETT: I am sorry, Your Honor.  I would like to move this into evidence.

THE COURT: Okay.  We will accept it.

Q.        Let me read from that paragraph, toward the bottom of the page.

"We have independently developed internal goals for asbestos related liabilities.  We have used those goals for a variety of purposes, including guidance for settlement negotiations and trial strategy, in our strategic planning, budgeting and cash flow planning processes and setting targets for annual and long-term incentive compensation, and in producing our own estimate of the current and future liability."

Do you see that, sir?

A.        Yes, I do.

Q.        And it goes on to refer to their estimate being within the range estimates of Bates White.  That's your firm; correct?

A.        Correct.

Q.        And it goes on further to state at the very end of that paragraph:

"Accordingly our recorded liability is derived from

Bates - Cross                196

our internal estimate."

Do you see that, sir?

A.      Yes, with the intermediate sentence, I think is very important.

Q.      "As a result, Bates White and management believe that our internal estimate for the next ten years represents the most likely point within the range."

A.      It is important consideration that the numbers that they used for their budget fell within the range of what we consider to be most likely outcomes absent those budgets, as well.

Q.      It is also important to notice, isn't it, that the estimate only spans ten years?

A.      Yes, very much so.

Q.      You testified on direct, didn't you, that the Nicholson epidemiology points to the expectation that mesothelioma will continue to manifest itself in individual incidences for a great many years into the future?

A.      Certainly, but that's not what that ten years is in reference to.

Q.      What is the ten years in reference to?

A.      The ten years in reference is referring more to the number that you were talking about, which is the thing with the seventy-five thousand dollar average payment or the percentage of cases that get paid, and it's a reflection of the fact that

Bates - Cross                      197

there is considerable uncertainty about what those numbers would be and, the further you go out in time, the greater that uncertainty is.

Q.       So for financial reporting purposes, Garlock doesn't project out for more than ten years because of that uncertainty?

A.       Correct.

Q.       But in an asbestos bankruptcy, when making an estimate for plan formulation purposes, has it not been customary to make a projection over several decades into the future?

A.       As far out as you can see.  Two different contexts, two different purposes.

Q.       If we turn back to the settlement history page of your slide presentation – I guess it was page ten – we see that between 2007 and 2009, Garlock paid in dollars of the day as opposed to adjusted dollars, to speak on a consistent basis, somewhere between sixty-six and sixty-nine hundred – sixty-nine million dollars; correct?

A.       For mesothelioma claims.

Q.       For mesothelioma claims?

A.       Yeah.  Any adjustment to current dollars of the day there would be very small.

Q.       Very small there and it shows a fairly stable rate and amount of resources being devoted to resolving mesothelioma

Bates - Cross                                    198

claims; correct?

A.        Correct.

Q.        It sort of looks like it was driven by a plan on the defendant's part with regard to allocating resources for that purpose; doesn't it?

A.        Would you like me to explain?

Q.        I would like to know whether you accept that Garlock has significant influence over both the timing and the amount of money that it will devote to resolving a mesothelioma claim?

A.        It has some influence on both, but it certainly has more influence, particularly on an annual basis on the timing because of the way in which it could engage in multi-year settlement deals with particular attorneys as a way of expeditiously resolving large numbers of cases.  So they could in fact – suppose you were getting to the end of a particular year and the budget amount had not yet been used up, you would go ahead and go ahead and make payments and make a deal with some attorney to pay some cases that would otherwise get deferred to bring it into the current budget year.

          In fact, by specifying what the budgets are, and in particular the budgets are made and consistent with an expectation of the long-run filing patterns and the long-run settlement patterns, you can bring some financial stability to the process through such a budget process because you have the ability to move from one calendar year to the next over the

Bates - Cross                          199

period of, say, January to December of when you arrange a settlement.  So that's not surprising.

Q.          Going back to the subject of preparing and resolving claims, we talked about the lengthy discovery period and various means that parties have to develop their case.  In general, all other things being equal, do you agree with the proposition that a case that has been fully prepared for trial is a more valuable case than one that has not yet been developed?

A.          I think it depends.

Q.          On what?

A.          It depends on who it is being prepared against.  It depends on who – I mean, if you take a number of the cases which are prepared to trial, they would be a valuable case against a particular defendant and they would be not so valuable against other defendants depending on who it was – what were the actual sources of exposure for an individual.

Q.          But don't you agree that the risk of each party rises as the trial date approaches?

A.          It depends on the party.  For some parties, it goes away.  As you go through, you have a number of attorneys whose basic – law firms whose basic strategy is to name virtually all of the defendants they have on a boilerplate and then, as they go through discovery and prepare for trial, they remove numbers of them from the case because their preparation shows they have

                        Bates - Cross                        200

little risk associated with the case, not more significant

risk.

            So it depends on which one of the defendants –

Q.        Suppose it's a defendant that's still hanging in

there in the case as it approaches trial, all other things

being equal, that case will be a more valuable claim in the

hands of that plaintiff against that defendant than it would be

at the beginning of the process you just described; correct?

A.        In some cases, yes; in some cases, no.  It depends

again.

Q.        From the standpoint of a claim that is going to be

settled and not taken fully to trial, do you dispute the

general proposition that a defendant who can be taken to trial

is likely to make their best settlement offer before the

verdict comes back?

A.        For the most part, if you have a defendant who

recognizes that he has significant risk if he was to take a

case to trial is better off trying to settle that case earlier.

I do agree with that.

Q.        Are you aware, sir, that Garlock's strategy in

resolving claims has been to focus on trial-listed cases?

A.        Well, they certainly pay attention to their trial-

listed cases.

Q.        Well, let's turn to page forty-two of one hundred

and seventeen in ACC Exhibit 1.  Let me refer you to the last

Bates - Cross                            201

–

A.          I am sorry.  The page number again?

Q.          Page forty-two of a hundred and seventeen, also numbered, for reasons I don't understand, page thirty-seven. Are you with me?

A.          Yes.

Q.          Do you see the paragraph at the very bottom headed "Strategy and Outlook?"

A.          Yes, I do.

Q.          It says there:

"Garlock's asbestos claims management strategy is to focus on trial listed cases, pursue training initiatives and research projects to improve its defense at trial, aggressively negotiate, reduce settlement commitments and payments each year, carefully manage and maximize collections from a declining pool of available insurance coverage, and proactively support efforts to achieve meaningful asbestos reform."

Did I read that right?

A.          Yes.

Q.          Do you have any reason to doubt that Garlock's asbestos claims management strategy has been to focus on trial-listed cases?

A.          No, I think that was what their strategy was, that

Bates - Cross                                   202

they focused on trial-listed cases.  I think that's similar for all defendants.

Q.           You mentioned Babcock & Wilcox as having participated in litigation.  Are you aware that Babcock & Wilcox had a program under which it settled without litigation virtually all claims?

A.           Yes.  Most defendants do.  There are some who don't.

Q.           I mean without litigation, without having complaints filed against them.

A.           Oh, without complaints filed against it, yeah, a purely administrative process.  Yes, that's my understanding.

Q.           So some defendants take a different tact and settle cases without litigation; correct?

A.           The worst cases against Babcock still proceeded as if they were trial-listed cases.

Q.           By and large they settled without going to court?

A.           Most cases do.  That was my point.

Q.           By and large they settled without initiating a litigation process or disputing the claim in a structured civil litigation context?

A.           Lots of defendants do that.

Q.           You gave some testimony in one of your slides.  I can't tell the page number.  It looks like it might be twenty.  It deals with – you testified about and depicted on one of your charts some information about a proposed trust with regional

Bates - Cross                               203

presence?

A.          Yes.

Q.          I would like to explore a little bit what that means.  Would you expect that a trust like Swan would have relatively fewer claimants than a trust like Owens-Corning which is listed among your national presence trust?  I am sorry, it is not listed there.  Pittsburgh Corning which is listed in your national presence trust.

A.          Owens-Corning was there, too, isn't it?

Q.          Owens-Corning is on my list, replicated by you.

A.          No.

Q.          I am looking now at your proposed trust with national presence.  Let's compare Pittsburgh Corning to Swan. A lot more claimants against Pittsburgh Corning?

A.          That's what I would expect.

Q.          Because its products were nationally distributed?

A.          That's correct.

Q.          Garlock's products were nationally distributed?

A.          Yes.

Q.          Do you know of any direct evidence of what an asbestos mesothelioma claimant might expect to receive all in from all sources of responsible defendants in about 2006 from direct evidence?

A.          Well, I think I testified that I did not get access to direct evidence and so I proceeded to look at it by indirect

Bates - Cross                    204

evidence.

Q.          Do you know somebody named Daniel Myer?

A.          I have met him.

MR. SWETT: Your Honor, an excerpt of testimony given by Daniel Myer in the *Armstrong World Industries* bankruptcy is Exhibit 18 to our opposition to the bar date and proof of claim motion dated September 24, 2010.  I am going to go ahead and mark another copy so that we can use it with the witness, if that's agreeable to the court.

THE COURT: All right.

MR. CASSADA: You are not moving the admission of that?

MR. SWETT:  He is not here for you to cross-examine. I guess I can't.  I am exploring this man's knowledge.  I find myself with a shortage of copies.  I will do the best I can. This is ACC-2.

BY MR. SWETT:

Q.          You say you have met Mr. Myer.  Do you understand that he has functioned as a claim adjuster over a long period of time?

A.          That's my understanding of his background.  It is not the context under which I met him but –

Q.          Take a look at page twenty-two, please, of the testimony I just handed you.  Do you see his description of his professional background here?

A.          Yes.

Bates - Cross                                            205

Q.          Do you have any understanding that Mr. Myer was one of the claims adjusters for the Center for Claims Resolution?

A.          It is my understanding he was with one of the premier.

Q.          One of the premier adjusters for the CCR?

A.          Yes.

Q.          The CCR was a consortium of a large number of manufacturers that joined together for joint defense and resolution of claims?

A.          Yes.

Q.          Settled a great many cases over the years?

A.          Yes, that's right.

Q.          Do you have any understanding that the CCR fell apart in the early 2000's?

A.          Yes, it dissolved in 2001.

Q.          You see on page twenty-four that Mr. Myer proceeded to act for Union Carbide in the resolution of claims?

A.          It's my understanding.

Q.          Union Carbide remains a solvent defendant; correct?

A.          That's my – yes.

Q.          Let me refer you to testimony on pages twenty-four and twenty-five, beginning at line nineteen.  And my question to you, sir, is whether you are aware – before I showed you this, were you aware that this testimony was given under oath in the Armstrong bankruptcy?

Bates - Cross                         206

A.          Yes, I am.

Q.          Let me read it:

"Could you describe for the court what that is" – I am

sorry.

I am on line sixteen:

"You mentioned in your deposition something called the

total gross value of a case?"

"Yes, sir."

"Could you describe for the court what that is and how

you use it in your day-to-day settlement discussions?

Answer:

"Sure.  The total gross value of a case is what would

typically be referred to as the total amount of the

settlement that all defendants collectively have to

put together for purposes of resolving a claim or a

case.  My responsibility insofar as resolving cases on

behalf of the defendants that I represent is to ensure

that whatever amount that I am paying on their behalf

reflects their relative liability and, in turn, from

a dollar standpoint, the relative dollar amount of

that total gross value."

Question:

"And  is  that  something  you  use  everyday  in

negotiations?"

Answer:

Bates - Cross                           207

"Sure.  Yes."

Question:

"Could you describe to the court what is the total gross value of a mesothelioma case in the 1999 to 2000 time frame?"

There is an objection.  There is a resolution.  The question was again propounded.

"Do you know the total gross value?  Do you have an understanding of the total gross value of the case?"

"Yes, I believe I do."

"And that is based on your discussions with other defendants?"

"Well, I have interacted over the course of the last twenty years with virtually every plaintiff counsel in the country and every significant plaintiff lawyer in the country who is involved in the asbestos litigation.  I have interacted with numerous co-defendants, asbestos defendants, in the context of managing the litigation on behalf of, over the course of time, approximately forty to fifty different defendants.  So in that respect, I think that's where I base the knowledge of that factor."

Question:

"And would it include discussions with magistrates and judges and mediators and settlement?"

Bates - Cross                                    208

"Yes, sir."

Question:

"Conversations?"

Evidently there was an objection because there is colloquy.  It's overruled.

"Could you – what is your understanding of the total gross value of a mesothelioma case in 1999 or 2000?"

Answer:

"In that time frame, the estimated total gross value of a mesothelioma case was between two and a half to three and a half million dollars."

Question:

"And today, in 2006, what is the total gross value of a mesothelioma case?"

Answer:

"I believe the total gross value of a mesothelioma case today is somewhere in the range of between five to eight million dollars."

Do you see that, sir?

A.      Yes, I do.

Q.      Were you aware of that testimony before you took the stand today?

A.      Oh, absolutely, and I don't believe it.

Q.      But you have no direct evidence?

A.      Oh, we have very strong evidence to the contrary.

Bates - Cross                            209

Q.        But you characterized your evidence on direct as indirect evidence?

A.        That amount of money leaves a very large trail that is observable and that money is not there.

Q.        Let's don't argue. Let's answer this question. On direct, your testimony was that you lacked direct evidence of what the value of an "all in" on a mesothelioma claim is; correct?

A.        Without direct evidence, you can know that that number is incorrect.

Q.        I didn't ask you that. I asked whether you have direct evidence.

A.        I can know that it's incorrect.

Q.        I didn't ask if you could know. I asked if you have direct evidence? Are you willing to answer the question?

A.        Yeah. I have already told you I do not have the direct evidence, but you know that that number is incorrect.

Q.        Are you suggesting that Mr. Myer is misleading the court on purpose?

A.        I think he is uninformed.

Q.        Have you acted as a claims adjuster for forty to fifty defendants?

A.        He is not working on behalf of the plaintiffs. He is working on behalf of the defendants. He was their premier claims adjuster. He saw their worst cases. He settled cases

Bates - Cross                                         210

in places like New York, in places like Oakland where the claim values probably were that high, but he was not working on the average claim value.  He is not a statistician.  He does not know how to calculate the average properly and he doesn't have the information to do it.  He is basically talking about the cases in his experience.  That has to be the case.

If what he is saying is true, then a case which has an average, expected average trial value should the plaintiff succeed of six million dollars would have absolutely no settlement value at all for a defendant like Garlock because Garlock would get a complete, total offset given all the other settlements that are made.  And that's not what happens.  So something is amiss.  Both things cannot be correct.

Q.        Where is it written that an asbestos mesothelioma victim can never recover more than six to eight million dollars so that Garlock could get a credit no matter what?

A.        No, I didn't say that.  I said, if Garlock took a case to trial, and you used the number yourself of approximately six million dollars, if the average claimant, a mesothelioma claimant got six to eight million, five to eight million dollars, then Garlock would most assuredly get almost a hundred percent setoff in every case.  So, therefore, it's not – it can't possibly be right.  It applies to all defendants.

Q.        There is the small matter of a great number of

Bates - Cross                                  211

insolvent asbestos defendants out there; isn't there?

A.          I don't catch your point.

Q.          You don't catch my point.  Is Garlock's position that the debtors that took bankruptcy in the 2000's were the ones that bore most of the liability; isn't it?

A.          Right, but those companies were bankrupt during the time period which Mr. Myer is referring to.  During the time period of 2006, those companies were all bankrupt.  Those companies are not contributing to that six to eight – five to eight million money he is talking about.  He is talking about the aggregate settlement value in the tort system.

Q.          You said something about offset.  If Garlock was asked to participate in a settlement which, involving other defendants, came up to six million dollars and paid a share of that, is it your expectation that Garlock would then have a right to go pursue other parties for contribution?

A.          If Garlock took a case to trial of the kind that you mentioned in your statements here, took cases to trial and received an average verdict of six million dollars – five point nine million dollars is the number you used – and it was the case that settlements for those cases, on average across all of those other solvent defendants, was five to eight million dollars, then Garlock in its trial case would get set up for the entire amount, on average.  So the value of those cases would be zero, and that's exactly what's happened in cases of

Bates - Cross                                212

a number of defendants these days who basically get cases to trial, all right. While these cases are being settled, we find out what the settlement amounts are. Those are represented as offsets against the trial amount. The cases then go to – sometimes they are appealed. Mostly they are appealed and they get discounted values off of the trial values in the first phase. So the six point – six million dollars is not a reasonable number in light of the fact that the number of five to eight million dollars as settlement value makes absolutely no sense in the context of the published numbers we know about what the average plaintiff verdict is. It makes no sense. The defendants would not pay the settlements that they do if that was the average jury amount, the average claim amount. The economics of it don't work.

Q.        It's your position, isn't it, that the insolvency of the so-called friable defendants that Garlock talks about had a significant upward impetus on the settlement values of Garlock's claims for mesothelioma?

A.        That's correct. It increased its share of a much smaller amount. You can't double count the liability in multiple places and just add up the number. It makes no sense.

Q.        What is it that causes you to believe that the general increase in the overall settlement value of a mesothelioma case in the early 2000's is not rising as quickly as Garlock's rising share?

Bates - Cross                          213

A.          One, the cases themselves did not change.  The age of the claimant doesn't change.  The makeup of the – the characteristics of the claimants didn't change.  There was nothing that went on in the general litigation environment which makes those cases more valuable than cases that go to trial.

Quite the contrary actually because now they no longer have the easy targets about going after the cases.  In fact, you expect the case trial values to actually go up some now because they would be more selective about which cases they take to trial because the easy defendants who they previously have worked up the cases on are no longer in the system.

So the cases, there is nothing in the characteristics of the cases which would change, which would lead you to think that the values of the aggregate values of the cases, that trial risk has gone up.  You know, that piece alone makes no sense.

Q.          Are you familiar, sir, with Judge Weinstein's opinion in the decision by which the Manville trust was reformed, a very lengthy decision published in about 1991?

A.          I am not familiar with the actual decision.  I know who Judge Weinstein is.

Q.          Well, let me read you something and see if you agree with it.  The part I am reading from occurs on pages between seven forty-five and seven forty-seven.  I won't read the whole

Bates - Cross                                214

thing, but I want to isolate this statement:

"Typical of mass torts, during the early litigation stages plaintiffs had little success. But as they developed evidence, legal theories and expertise, there was a sudden explosion of asbestos litigation."

Have you ever heard that asserted?

A.      Yes. I remember the time periods back in the eighties when people were talking about the ocean of claims that were coming, clogging the courts.

Q.      Now, if Garlock became a more prominent defendant in the tort system after the bankruptcy of other previously prominent defendants, it would in turn become more prominent when Manville went in bankruptcy ten years before and plaintiffs and their lawyers concentrated their efforts more on Garlock than they had before. Would you expect the quality of the case preparation and lawyering on the plaintiff's side to improve over time?

A.      Certainly. It is part of why I expect that we need some of the information we need to, to figure out the actual impact of the trust data, trust funds will have on future Garlock settlements.

Q.      You spoke of some particularly accomplished plaintiff's attorneys in jurisdictions that you described as dangerous for defendants. Do you recall that?

A.      Yes, that's the way they think of it.

Bates - Cross                    215

Q.          Have you observed in your study of asbestos litigation any patterns by which claims tend to migrate towards the most accomplished attorneys?

A.          Yes.

Q.          And to the most dangerous jurisdictions for defendants?

A.          Yes.

Q.          Do you think that the revenue numbers for plaintiff's law firms published in the *American Lawyer* are a reliable source of the success rate at trial or in settlements of plaintiff's attorneys around the United States?

A.          I am sorry.  What was that?

Q.          You cited as one of your sources of indirect information about what mesothelioma claims must somehow be worth, in the absence of direct evidence, I thought you said that you consulted the *American Lawyer* magazine.

Q.          Well, I was aware of the article which said what their revenues were.  So given the other things that I looked at, I looked at that, too, to see if there was information there or evidence there that would indicate that the other sources I was looking at were off in some way but it did not.

Q.          But did you view any particular study of how the *American Lawyer* compiled its information?

A.          No, they won't tell you.  If that was the only thing alone, we wouldn't be sitting here talking about this.

                         Bates - Cross                    216

Q.          Dr. Bates, you have worked for a great number of asbestos defendants; correct?

A.          Yes.

Q.          And a great number of insurance companies?

A.          That's correct.

Q.          You gave an estimate of Babcock & Wilcox's liability at the confirmation trial?

A.          No.

Q.          Did you ever estimate Babcock & Wilcox's asbestos liability?

A.          I don't think we ever completed that, no.

Q.          Did you ever express an opinion in court or deposition as to an aggregate estimate of Babcock & Wilcox's liability?

A.          No.

Q.          Have you compiled over the years considerable data that you maintain today about various aspects of asbestos litigation?

A.          I have compiled data that is from publicly available sources that I maintain for that purpose but not from data that's been given to me from confidential sources.

Q.          What publicly available sources have provided you with data that you maintain concerning asbestos litigation?

A.          Well, I bought a license of the data from Manville through 2002, so I have that copy.  That was provided to me.

Bates - Cross                    217

I was given a copy of the Center for Claims Resolution data, the characteristics of the claimants and so on, for that purpose.  I have gone through websites and dockets in various places around the country collecting namings of complaints and namings of individuals on publicly filed complaints.  That kind of thing.

Q.        Have you linked those sources in your computer research?

A.        Of the public sources, yes.  That's part of the exercise that all of the claims experts do when they are doing their estimation, is to use the data in that way.

Q.        You built up a rather deep and broad fund of data from the sources you have described; haven't you?

A.        Yes.

Q.        Have you compiled, sir, on line or on computer, depositions of product identification witnesses who have testified in asbestos litigation over the years?

A.        I have some of those.

Q.        In your experience, do the defendants litigating in the system have some of those available to them from the thirty years of litigation that they have been involved in for asbestos?

A.        Some.

Q.        You mentioned on direct one of the things you want to gather are the complaints filed against Garlock by the

Bates - Cross                                              218

various claimants; isn't that right?

A.          That would be useful.

Q.          Isn't it true that, as a general matter, Garlock gets served with the complaints when it gets sued?

A.          Yes.

Q.          Have you asked Garlock's network of attorneys to pull together the complaints so that you can add them to your fund of data?

A.          I think they are working on it.

Q.          They are working on it?

A.          Maybe.  I am not sure how many of them they keep and maintain.  That's, I think, something that has to be found out.

Q.          But your idea is that the plaintiffs should have to provide their complaints again, even though Garlock has already been served?

A.          I don't recall that we asked plaintiffs to provide the complaints.

Q.          Oh, I am sorry.  I thought you said on direct that that's one of the things that you wanted the plaintiffs to provide.

A.          The name of the defendants who they have named in the cases, yes.

Q.          Garlock has that in its complaint; doesn't it?

A.          In some of them, yes, but not others.

Q.          How can Garlock have the complaint served upon it

Bates - Cross                                    219

along with co-defendants and not know who the co-defendants

are?

A.          They don't have copies of all of the complaints.

Q.          You spoke of duplicates, you spoke of the

probability that there are some claims reflected in the Garlock

databases as pending that are in fact resolved without payment

and things like that; correct?  You would expect that in a

database this large there will be a certain rate of error;

correct?

A.          Yes.

Q.          Would you expect that rate of error to extend to the

misclassification of claims as dismissed rather than paid?

A.          That has happened.

Q.          Now, have you debriefed or interviewed plaintiff's

lawyers concerning the data that they have on hand from

asbestos litigation generally?

A.          Generally they don't want to talk about it.  I have

had one statement from Messrs. Cooney and Weitz on that subject

but no formal interview.

Q.          Well, do you make the assumption that all of the

plaintiff lawyers who represent asbestos victims, hundreds of

thousands of people across the United States and the many law

firms involved in the litigation, all maintain sophisticated

databases and fully prepared data points concerning their

clients and all of the potential sources of their asbestos

Bates - Cross                        220

exposures on computer?

A.          That's my understanding is that most do and most file their claims electronically with the trusts through batch modes.

Q.          The trusts also made provision for receiving claims on hard copy, don't they?

A.          I believe they do but the trusts require that, if they are going to file multiple complaints, that they do it – multiple requests, that they do it by electronic.

Q.          We also established earlier, though, didn't we, that there is nothing in the law that requires as a general matter a claimant to proceed against the insolvent defendants in trust before pursuing the solvent defendants; isn't that right?

A.          Not so far as I know, there isn't.

Q.          So if that's the regime, wouldn't you expect that plaintiff's lawyers would work up their cases against solvent defendants who could pay hundred cent dollars before they would go after trusts that might pay them twenty-five cents on the dollar?

A.          You are saying they are hiding their exposures? What?  Did I misunderstand you?

Q.          No.  What I am saying is, if the plaintiff is not required to work up his case against insolvent defendants and their trusts before proceeding to litigate against a solvent defendant, tell me what incentive the plaintiff would have to

Bates - Cross                                221

do that, as opposed to pursuing the defendant who has the resources to pay top dollar?

A.        How do you do one against the other?  I mean, all that it requires is you know what their work history is and you know where the products are where they worked, right, and most of the cases we are talking about here are very old cases that are all done with their tort cases against all other defendants.  So they are as mature and worked up as they are going to be.  So I don't understand – your statement makes no sense to me.

Q.        That's an inference you are drawing from the age of the case?

A.        No.  I mixed two points together there.  All right.  One which is, you know, we talked about how you would work up the case against one group of defendants and not another.  The kind of information we are talking about here is information that is reflected about what their work history is and, on the basis of that, you know, what products they think they were exposed to.  The plaintiff law firms know that information based on the individuals and where they worked.  It is exactly the stuff that they worked up for years.  So it is not like there is any additional work that has to be done.  I don't understand what you are saying.

Q.        I am asking whether what you just said is based on personal knowledge or inference.  Have you actually debriefed

Bates - Cross                                222

plaintiff's lawyers to confirm whether or not that is true?

A.        The plaintiff lawyers say they have this information.  They have had books and books with all of the products in them about where the products are.  They know by the site list where the products were and which cases they could go after.  This is not a lot of work to do.  This is known.

Q.        If you are proceeding to trial as a plaintiff against three defendants and you have the possibility, not yet confirmed, that you can also assert claims against various insolvent defendants, what incentive do you have to concentrate your resources on developing a case against the insolvent defendants before you go to trial?

A.        It is not a matter of concentrating cases here.  If you tell me you know the work history of the individual, what you have done to work up the case against Garlock, you know whether or not that individual qualifies for a case against Owens-Corning.  I can tell you that.  Just give me their work history and I will tell you because Owens-Corning's database tells you that.  You said that yourself.

Q.        Would you be satisfied, sir, in your data gathering in this case to receive the Social Security earnings histories of the various claimants and rest all of your conclusions about which other parties were responsible for the injuries on the basis of that data?

Bates - Cross                                                    223

A.          How much money they earned?

Q.          No.  Their work histories.

A.          So when you are talking about their work history, you are talking about what plants they worked at, what kind of jobs they did?

Q.          The identification of their employers.

A.          The identification of their employers?  I have not tried to use that data for that purpose, but I don't think it's sufficient for what we are talking about to identify the kinds of information that tell what products they were exposed to and whether they qualify for sites of the trust, claims against the trust based on what sites they worked at.

So an individual who is an insulator, it doesn't tell you in his Social Security record that he worked, you know – it tells you he worked for this union hall.  It doesn't tell you he worked for Boeing Seattle.  When I read the complaints or the interrogatories which people have developed, they basically tell you that.  When you ask an individual, you go through an interview, where did you work, they tell you places where they worked.

Q.          And it is your expectation that the cases in the pipeline against Garlock reflected in its database are, for the most part, fully worked up in that way?

A.          There are many, many cases here which are.  There has to be.  These are old cases.  Just look at the age of them.

Bates - Cross                                   224

Q.        So that's the inference you are drawing?

A.        That's an inference, yes.

Q.        In your effort to, as you put it, correct the preliminary estimate put forth in our papers – let's see if we can find that – I am on page twenty-two, I believe it is.  "ACC represents the following input values and calculations" is the heading on the page.

THE COURT: What is your page?

MR. SWETT: I can't tell, Your Honor.  It looks to me like it must be about twenty-two.  Twenty-eight, I am sorry.

THE COURT: Yeah.  I knew it had to be after twenty-five.

THE WITNESS: Let me go backwards.  I think he is talking about this one right here, correct, twenty-six?

MR. SWETT: Twenty-six, I am sorry.

BY MR. SWETT:

Q.        I want to direct your attention to the equity value per ACC without asbestos.  It is towards the bottom, line twelve.  For purposes of your illustration, you chose the high end of the range that we gave in our papers; correct?

A.        It was the only number I had at the time.

Q.        And you are now aware that the valuation expert – I am sorry.  You are now aware that in the brief we put forth a range, the bottom end of which is closer to six hundred and fifty million dollars?

Bates - Cross                           225

A.          Yes, I think I mentioned that earlier.

Q.          Have you been provided with a copy of the affidavit that we filed earlier this week by (inaudible)?

A.          I haven't seen that, no.

Q.          Do you happen to know the value at which EnPro carries Garlock on its books?

A.          I do not.

Q.          Let's turn to the page that follows, a couple of pages forward in your presentation, that is headed "Only twenty-two percent of pending mesothelioma claims remain to be paid."

A.          Twenty-five.

Q.          Twenty-five percent.

A.          Yes.

Q.          Line six says, "Claims to be dismissed or abandoned."

A.          Yes.

Q.          What is that?

A.          That's the remaining claims that will not be paid out of the thirty-four hundred claims that are not resolved at the present time in the last four years.

Q.          That's a statistical inference that you draw from analysis of the claims history?

A.          Correct.

Q.          That's a material factor in your conclusion on that

Bates - Cross                    226

page, that the percentage of mesothelioma claims that will actually be paid is only twenty-five percent; correct?

A.        Of those cases, yes.

Q.        And turning back to the page, "Garlock pays about half of the mesothelioma claims it receives," do you see any year before 2009 where Garlock paid as few as twenty-five percent of the mesothelioma claims?

A.        That's not a relevant comparison.

Q.        Well, just answer the question.  Do you see any, sir?

A.        It is not a relevant comparison.

Q.        You are not going to answer the question, okay.

A.        That number is not there but it is not a relevant comparison.

Q.        We established earlier that Garlock has influence over the timing of resolutions; correct?

A.        To some extent.

Q.        Do you believe that Garlock slowed the pace of settlement of mesothelioma claims in the last year outside of bankruptcy?

A.        No, they actually accelerated it.

Q.        I beg your pardon.

A.        They accelerated.

Q.        How do you mean?

A.        Well, they had settlement deals, multi-year

Bates - Cross                              227

settlement deals with attorneys who were incentivized to bring their older cases that were viable cases forward and get them resolved for payment because of the nature of the way those deals worked.

Q.          In the several years preceding 2009, Garlock settled hundreds of mesothelioma claims – I am sorry.  I am looking at the wrong column.  I beg your pardon.  In 2009, your data reflects that Garlock settled three hundred and twenty-four cases?

A.          No.  Of the cases that were filed in 2009, already three hundred and twenty-four of them are resolved.

Q.          I see.

A.          We have to go to a different chart to show how many cases were actually resolved in 2009.  The point there is of that cadre of claims filed, that eighteen hundred and seventy-six claims, about nine hundred of those cases will file, which means, since we have already settled about three hundred and twenty-four, there is about another five hundred and seventy-five of them or about six hundred of them still to be resolved out of that fourteen hundred and eighty-seven, not eighty-two percent of them.

Q.          What is the fourteen hundred and eighty-seven?

A.          If you look on column, line 2009 under the "cases not affirmatively resolved" line.

Q.          What page?

Bates - Cross                    228

A.          That same page you were directing me at.

THE COURT: What's the number?

THE WITNESS: It's page twenty-seven.  But I think this is an important point here.  So in 2009, there were eighteen hundred and seventy-six mesothelioma cases filed.  Of those, three hundred and twenty-four were already settled.  We expect out of that eighteen hundred and seventy-six about nine hundred and twenty-five, nine hundred and fifty, maybe a thousand of them will be resolved based on a fifty to fifty-five percent settlement rate.  That means that we have six hundred to seven hundred of them left to resolve, six hundred to six hundred and fifty of them left to resolve.  Subtract that from the fourteen hundred and eighty-seven.  That means that essentially we have approximately eight hundred of those cases will get either dismissed or not be affirmatively – or they will remain unsolved, not eighty-two percent of them, which is your calculation, multiply that by eighty-two percent.  That's –

Q.          Well, what is the significance of the payment rate percentage given in the right-hand column?

A.          That's just a percentage which have been paid so far.

Q.          So far.  So I am reading it correctly if I say, as of 2008, forty-one percent of the mesothelioma claims filed to-date against Garlock have been paid?

A.          No.  In 2008, of the seventeen hundred and ninety-

Bates - Cross                              229

eight cases filed, seven hundred and thirty-one of them, or forty-one percent, have already been resolved.  We expect that number, instead of being forty-one percent, to come up to somewhere between fifty and fifty-five percent.  That tells you how many additional cases remain out of the, if you look over here on a different line, five hundred and eighty-three that are still not resolved, how many of those will be resolved.

So you don't take eighty-two percent of the five hundred and eighty-three claims that are remaining unresolved in 2007 because we have already settled seven hundred and four of the cases and we are only going to settle a total of about fifty to fifty-five percent of that.  So we have to bring that number of seven "o" four up to around eight hundred, eight hundred and fifty, and we have satisfied what are the expected settlement amounts.  It is because these cases were filed three years ago, four years ago, and all of the cases, which are valuable cases, have already been settled.  The remainder will not be settled.  So the number grossly overstates the number that will actually be settled when you multiply it by eighty-two percent.

Q.        And what is the basis for your assumption that fifty to fifty-five percent will be paid?

A.        You can see it directly in the numbers that we showed you before.  They are getting about eighteen hundred meso cases a year, and they resolve about nine hundred.

Bates - Cross                              230

Q.          The basis is in the data?

A.          That's correct.  That's the statistical pattern.

Q.          Let me turn your attention to the second to the last substantive page of your presentation.

THE COURT: Thirty-two?

MR. SWETT: Yes, Your Honor.

Q.          I call your attention to the number of six hundred and forty-five million dollars down in the right.

A.          Six hundred and forty-five, yes.

Q.          Six hundred and forty-five million dollars.

A.          Yes.

Q.          That represents your pro forma statement of the estimated value preliminarily of the future mesothelioma claims alone; correct?

A.          It is stated somewhat differently.

MR. CASSADA: I will object to that to the extent that you are attributing the estimate to Dr. Bates.  It is just an adjustment done by the committee.

MR. SWETT: Okay.  I understand.

MR. CASSADA: I just want it to be clear on the record.

Q.          For purposes of the analysis you presented to the court today, six hundred and forty-five million dollars represents the number you are putting forth within the confines of that analysis as the present value of total future

Bates - Cross                                    231

mesothelioma claims against Garlock; correct?

A.          With the caveats as stated, yes.  It is not the number that I am representing –

THE COURT: I think what he is saying is that taking your numbers and adjusting them the way he thinks they ought to be adjusted, that's the number you would come to.

THE WITNESS: Well, Your Honor, it's not even that.  It is only adjusting a couple of things because I think there are other things that are very important that remain to be changed. So I just want to make it clear we are not –

THE COURT: Right, but you made a couple of adjustments but what you started with was the ACC's numbers.

THE WITNESS: We started with their number and their methodology and made a couple of corrections and that's the impact of it, yes.

BY MR. SWETT:

Q.          And you understand that we didn't have the data that you have when we put forth that analysis; correct?

A.          I understand.

Q.          Okay.  And I am just trying to confirm that within the confines of the analysis you have put forth here today, the number you arrive at for the value of future mesothelioma claims against Garlock is six hundred and forty-five million dollars.  That's just the future claims; right?

A.          That's not what I said.

Bates - Cross                                    232

THE COURT: I don't think that's the number he arrived at.  That's the number that was arrived at that you started with.

MR. SWETT: Okay.  I take the point, Your Honor.  I am not trying to argue with him.

BY MR. SWETT:

Q.          I am trying to bring out that, under those assumptions, that is a present value number.  That speaks in terms of today's dollars; correct?

A.          That is a present value calculation.

Q.          That excludes all other diseases?

A.          It does.

Q.          But you make an adjustment later for that?

A.          That's correct.

Q.          It excludes the present mesothelioma backlog?

A.          No, it values it at, I think, an appropriate way.

Q.          I am talking about that particular number is isolating the futures; correct?

A.          Oh, yes, it excludes the claims from the database, yes.

Q.          Has anybody ever told you, sir, that the equity of Garlock is carried on the books of its parent company at six hundred and ten million dollars, excluding asbestos liability?

A.          No.

MR. SWETT: Your Honor, that concludes my examination

Bates - Cross                                    233

at this time.

THE COURT: Okay.  Mr. Guy.

MR. GUY: I have a couple of questions.

THE COURT: Okay.

CROSS EXAMINATION

BY MR. GUY:

Q.        Dr. Bates, my name is Jonathan Guy.  I represent the FCR in this case.

A.        Good afternoon.

Q.        Dr. Bates, you were retained in 2004, weren't you?

A.        The end of 2004, correct.

Q.        By Garlock?

A.        Yes.  Was retained by Garlock?  I think I was retained by EnPro on behalf of Garlock.  I am not sure of the contract terms.

Q.        One of the two, either the parent or the debtor?

A.        Well, actually I think it is the attorneys.  Garland Cassada is who retained me.

Q.        And you were provided information from that time frame on by the debtors?

A.        I have received information from the debtors since that time, yes.

Q.        And you relied upon that information in forming your opinion that you provided to the court today?

A.        Yes.

Bates - Cross                    234

Q.          Why were you retained originally in 2004?

A.          To estimate for financial reporting purposes the value of the present and future claims that they would get.

Q.          And you have done that; correct?

A.          I have.

Q.          How many times have you done that?

A.          Well, we did it initially on a quarterly basis and, more recently, it has been less frequently.

Q.          And in each instance did you provide a written report to the debtor and its parent?

A.          I wrote a letter which was a summary of my opinions.

Q.          And you still have copies of those; correct?

A.          I believe so.

Q.          And you still have all of the data that is being provided to you by the debtors during that time frame?

A.          I believe so.

Q.          Do you have all of the correspondence with debtor's counsel?

A.          I believe so.

Q.          And what conclusion, what is your most recent conclusions concerning the total asbestos liabilities of the debtor?

A.          I didn't refresh my memory on that.  It has been a while, so I would have to go back and look.

Q.          Is it the numbers that show up in the securities

Bates - Cross                    235

filing that Mr. Swett cross-examined you about?

A.        I believe.  I would have to – again, like I said, I didn't refresh my memory on that, so I would have to check.

Q.        As you sit here today, do you have any idea of what you think the accurate number for the extent of the debtor's asbestos liabilities to be?

A.        Accurate number, no.

Q.        Do you have any number?

A.        No.  I think it is less than what we have here. What we are trying to do here is obtain the information to allow us to get a more accurate number.

Q.        Dr. Bates, what I am trying to understand is what you think the number should be so the court can understand.  Do you have a number?

A.        I do not have a number.  I have a range of numbers. I produced – let me explain just briefly the methodology, all right.  Within the analysis that we did, we created a number of alternative scenarios of what the valuation could be, trying to estimate what the impact of – the likely impact of the trust and the timing of that would be.  There was considerable uncertainty about that, so we produced a range of estimates. That range was then compared with the budgeted amount that they had and, when the budgeted amount was consistent to that range, we determined that that was a more likely outcome simply because it was a budgeted amount, but it was first we did an

Bates - Cross                                236

analysis about what the likely outcomes would be, but there is a considerable range on that.

Q.          And what is that range?

A.          I don't have – again, we could look up the numbers, but I don't have them offhand.

Q.          Is it the four hundred and eighty to six hundred and two million dollar number that was in the security filing?

A.          That certainly sounds like a range we would have used.

Q.          And you used a ratio of one to four for present and futures; is that correct?

A.          No.

Q.          You testified earlier that you thought that the ACC's ratio of one to four was about right.  Do you agree with that?

A.          That's a different statement.  My statement here was that the total number of future meso cases, given recent filing rates, I just took it as a given.  I just take their number.

Q.          But you testified before that you thought that number was about right.  Would you agree with that?

A.          I figured at current filing rates, that would be about the right number, but I also said that I think that the impact of the trust on the filing rates could be significant.

Q.          Now, you have been involved in many asbestos cases; correct?

                          Bates - Cross                    237

A.          Yes, I have.

Q.          Approximately how many?

A.          Dozens.

Q.          Have you been involved in any asbestos cases where there was an asbestos proof of claim form required?

A.          No.

Q.          There are approximately a hundred and thirty thousand existing asbestos claims against the debtors; correct? A hundred and eighteen?  Do you know?

A.          No.  I think that is part of what we are trying to find out.

Q.          From your own data that you have, the database that you reviewed, how many claims are currently asserted here to-date?

A.          There are a hundred and eighteen thousand plus records in a database.  How many of those actually correspond to a claim that ought to get paid or would ever get paid is not a question we know the answer to.

Q.          And each one of those represents a complaint that was filed; correct?

A.          I don't know that.

Q.          So what is the database showing if it is not showing complaints that are being served?

A.          It is showing a record that was entered into a database of information that was provided to Garlock about how

Bates - Cross                    238

many, you know, some basis of a claim.  I don't know the background of whether it involved a complaint, a summons, a notice, service, something.  I don't know.

Q.        But most of them would be a formal complaint; correct?

A.        That's an assumption on my part.  It is not a knowledge.

Q.        Now, one of the things that you are trying to achieve by the bar date and the proof of claim is who is going to show up, correct, who are these people who have asserted complaints or claims, how many of those people are going to show up in the bankruptcy case; is that correct?

A.        How many of them – yes.

Q.        Can you achieve that goal by a simple proof of claim form that Mr. Swett talked about earlier?

A.        I don't know.  Maybe we could.  That's not the only purpose, though, so.

Q.        But you could achieve one goal in terms of how many people are going to show up with a simple proof of claim form; correct?

A.        Right, but it wouldn't allow me to identify whether those cases would presumptively have invalid claims because, for example, diagnosed with a doctor who really didn't do a diagnosis.

        MR. GUY: No further questions. Thank you.

Bates - Redirect                                    239

THE COURT: Mr. Cassada, do you have anything else?

REDIRECT EXAMINATION

BY MR. CASSADA:

Q.          Dr. Bates, Mr. Guy asked you if you have been involved in bankruptcy courts before where proofs of claim were used.

A.          Yes.

Q.          Do you know the answer to that question?

A.          I don't know of any case where they used a proof of claim form in a bankruptcy.

Q.          Were you involved with the Babcock & Wilcox case?

A.          Yes, I was, but only in a –

Q.          Were you aware that there were proofs of claim required in that case?

A.          No.  I worked for the insurer in that case and we didn't have privy to a lot of the same information.

Q.          And you were involved in the W. R. Grace case?

A.          No, I wasn't involved in the bankruptcy.  I was involved in the Sears Air matter, which was the fraudulent transfer matter that took place a couple of years before that.

Q.          All right.  Do you know, on the list of cases you were involved in on slide seven, do you know whether or not there were proofs of claims in those cases?

A.          Well, I certainly know there was in the Grace case. I was not informed on the Babcock case.

Bates - Redirect                    240

Q.        Okay.   What about the other cases; do you have knowledge with respect to those?

A.        I don't.

MR. CASSADA:  Okay.  Nothing further.

THE COURT: Was it a proof of claim in the Grace case or was it a PIQ?

MR. CASSADA: It was both.

THE COURT: It was both, okay.

MR. CASSADA: In fact, a proof of claim was solidified when the plaintiff's lawyers – you will hear this when Mr. Warford is presented.  They wouldn't cooperate on the personal injury questionnaire.  So the court determined the only way they were going to provide the information is if a bar date was set.

THE COURT: Okay.   Do you have anything else?   I believe I interrupted you.

MR. CASSADA: Not from Dr. Bates.

THE COURT: Do you have something else?

MR. SWETT: No, Your Honor.

THE COURT: Okay.  I think they are done with you.  You can step down.

THE WITNESS: Thank you.  Do I take these things or –

THE COURT: Just leave it there.  It is almost five. This is probably a good place to quit for today rather than getting started with somebody else.

241

Let me say about the point Mr. Swett raised earlier about how to proceed, we have got two motions, the claimants committee's motion for a scheduling order that goes fairly quickly to an estimation process and the debtor's motion which is for several items.  The first of which is to establish a claims bar date and then the other three or four items that come after that are all things that flow from that and wouldn't be necessary unless that first motion was granted.  So given that we have got mutually exclusive procedures that have been tendered and that – I think it is my first decision to make as to which procedure to go with.  So I think we ought to focus our presentation on that issue first.  That is, whether we ought to go with a bar date and all of the things that go with it or go in the process suggested by the committee.

But it seems to me also that, while that ought to be the primary focus, at least in terms of the first decision I have to make, the Garlock witnesses are here and their motion was noticed and that's all been teed up, all those issues have been teed up.  I think we ought to hear their testimony.  And my primary interest will be in how that impacts the decision on the first issue.

So I think that maybe a procedure that would help you out a bit, Mr. Swett, you mentioned that there hadn't been any depositions and such but perhaps we could reserve any cross-examination you are interested in on the details of those

242

forms, notices and such, to a later date until we decide whether we are going to go that route or not. So maybe you could focus your cross-examination on how that impacted. And I am not going to try to tell you how to do it. I couldn't presume to begin to practice law for you all, but I suggest that as perhaps a way. And we could reserve the right, if we get to the point, if the first part of Garlock's motion is granted, then I think we have probably got to have a detailed discussion about exactly what the papers would look like and what the process would be. So we can do that another day, I suppose.

Does that make sense to you all?

MR. CASSADA: Your Honor, yes, as long as we can put our witnesses on whose testimony is really the same testimony describing the claim form and –

THE COURT: That's fine. We will listen –

MR. CASSADA: That's related to the first decision.

THE COURT: Exactly. It seems to me that some of that may at least influence whether it's a wise procedure to go into it or not. So it would impact the first part of your motion. And, as I say, that will be my primary interest. And if we decide that that is the way to go, then I suspect we are going to have some discussions on exactly what's in the forms.

MR. SWETT: Your Honor, that approach makes perfect sense to me. We can approach it that way and I will try to

243

direct my questions tomorrow to whatever relation it may be to the forms and the basic question of which way we are going to jump.

THE COURT: All right.  Well, we will proceed as best we can tomorrow.  When do you want to start?  9:30?  That's when we usually start.

MR. CASSADA: 9:30 would be fine.

THE COURT: Okay.  Is that all right with you all?

MR. SWETT: That would be fine.

THE COURT: Okay.  I will see you all at 9:30 and we will continue with Garlock's presentation and then, when that's done, we will go into you all's and, if we can't do that all tomorrow, then we will flop over into next week.

MR. MOON: Your Honor, will the courtroom be locked this evening?  Can we leave boxes here?

THE COURT: Yeah, we will lock it just as soon as the last person leaves and it will be open again at 8:30 or so tomorrow morning.

MR. CASSADA: And which days was the court considering next week?

THE COURT: I think Thursday and Friday.  I will be in Asheville through Wednesday afternoon and I will be back Thursday and Friday.

MR. SWETT: Your Honor, I have a hearing in New York on Thursday.  Unless that cancels, I won't be able to be here on

244

Thursday.

THE COURT: We can go Friday and then next Monday is open after that, too.  We will just do the best we can with it. I think that's – we are not in a race, so I think there is no reason to try to force you all to go until Midnight or to dispose of things to short-shoot yourself.  We will proceed at a pace, you know, and you all offer whatever evidence you want and then, when we get to the end of it, I will try to make the decisions.  Okay.  Thank you and we will see you in the morning.

(Off the record at 4:59 p.m.)

245

C E R T I F I C A T E


        I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.



                                    /s/ Patricia Basham

                                    Patricia Basham, Transcriber

                                    Date:  October 19, 2010