```
                IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                        CHARLOTTE DIVISION
```

In the matter of:                    )
                                     )
GARLOCK SEALING TECHNOLOGIES, LLC,   ) No. 10-31607
et al.,                              ) Jointly Administered
                                     ) Charlotte, NC
     Debtors.                        ) Oct. 15, 2010, 9:32 a.m.


```
                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE GEORGE R. HODGES
                UNITED STATES BANKRUPTCY JUDGE

                 Vol. I, Pages 246 to 476
```

APPEARANCES:


Garland S. Cassada
Jonathan C. Krisko
Richard C. Worf, Jr.
Robinson, Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246

John R. Miller, Jr.
C. Richard Rayburn, Jr.
Rayburn, Cooper & Durham, P.A.
227 West Trade Street, Suite 1200
Charlotte NC, 28202-1672


Electronic Recorder
Operator:                    Barbara J. Sifford

Transcriber:                 Patricia Basham
                             6411 Quail Ridge Drive
                             Bartlett, TN  38135
                             9O1-372-O613


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

247

APPEARANCES:

Travis W. Moon
Hamilton Moon Stephens Steele Martin
2020 Charlotte Plaza
201 S. College Street
Charlotte, NC 28244-2020

Trevor W. Swett III
Leslie M. Kelleher
Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005

Daniel G. Clodfelter
Moore & Van Allen
100 North Tryon Street
Suite 4700
Charlotte, NC  28202-4003

Linda Simpson
U.S. Bankruptcy Administrator
402 W. Trade St., Suite 200
Charlotte, NC 28202

Jonathan P. Guy
Orrick, Herrington & Sutcliffe LLP
Columbia Center, 1152 15th Street, N.W.
Washington, DC

248

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Elizabeth Graham King | 255 | 273 | 295 | 298 |
| Nathan Shuck | 303 | 320 | 335 | -- |
| Mark A. Peterson | 337 | -- | -- | -- |

EXHIBITS

| NO. | DESCRIPTION | ID | ADM |
|-----|-------------|----|----|
| ACC-3 | Rust Consulting's Claim Service Agreement | 280 | 280 |
| ACC-4 | Dr. Peterson's curriculum vitae | 338 | 338 |
| ACC-5 | Slides prepared by Dr. Peterson | 361 | 361 |
| ACC-6 | Meso Timed to Payment | 398 | 398 |
| ACC-7 | Page 2 from easel | 409 | 409 |
| ACC-8 | Page 1 from easel | 409 | 409 |

249

(CALL TO ORDER)

THE COURT: Good morning.  Have a seat.

Barbara, do we need everybody to announce their appearances again or do you have that from yesterday?

(Inaudible)

THE COURT: Well, there is some change, so let's just start with Mr. Guy and go across this way and we will get your voices for the recording machine.

MR. GUY: Good morning, Your Honor.  Jonathan Guy for the FCR.

MR. SWETT: Good morning, Your Honor. Trevor Swett for the Official Committee of Asbestos Claimants.

MS. KELLEHER: Good morning, Your Honor.  It is Leslie Kelleher for the Official Committee of Asbestos Claimants.

MR. CASSADA: Good morning, Your Honor.  Garland Cassada, here for the debtors.  Accompanied with me today are Jon Krisko and Rick Worf.

MR. MILLER: Good morning, Your Honor.  Rick Rayburn and Jack Miller for the debtor.

MR. CLODFELTER: Good morning, Judge.  Dan Clodfelter for Coltec Industries.

MS. SIMPSON: Linda Simpson, Bankruptcy Administrator.

MR. SWETT: Your Honor, Tom Moon for the Official Committee is with us today, as well.

THE COURT: Okay.  Good.  All right.  We were with you,

250

Mr. Cassada, so I guess we will continue along.

MR. CASSADA: I think it might make sense, Your Honor, at this point to take care of some housekeeping matters.

THE COURT: Okay.

MR. CASSADA: Mr. Swett and I have been talking about the need for various witnesses to get flights out of there, and we have also been talking about the continued dates for this hearing.

THE COURT: Okay.

MR. CASSADA: I think it would make sense to spend a few minutes now talking about people's availability and see when this could get continued.

THE COURT: That sounds good to me.  I agree with you.

MR. CASSADA: As I understand it, next week you had Thursday and Friday.  Mr. Swett is – I think he was not available for Thursday, and Friday looked bad for him.  Is that correct?

MR. SWETT: Yes.

MR. CASSADA: And then Friday I had personal plans that can be changed to accommodate that but, if that doesn't suit other –

THE COURT: Well, we have got the week after that.  We have got Monday and –

MR. CASSADA: We have a scheduled hearing, I think, on Thursday, the 28th.

251

MR. SWETT: How is Friday, the 29th, in case the Thursday events roll over?

THE COURT: Friday, the 29th? That's what is bothering me is –

UNIDENTIFIED PERSON: It is currently scheduled for the motion for appointment of a trustee in an adversary case.

THE COURT: That's the 28th and 29th, isn't it?

MR. CASSADA: We are on for Thursday, the 28th, I think.

THE COURT: Are we? I thought that was a day when we weren't on.

COURTROOM DEPUTY: The 28th is a date in –

THE COURT: Is it a Garlock day?

MR. CASSADA: I am sorry. The 28th is a Garlock day?

THE COURT: Okay. So is Pacific on –

UNIDENTIFIED PERSON: Pacific is on the 29th.

THE COURT: The 29th, okay. All right. Well, that's good.

MR. CASSADA: I don't know if Mr. Clodfelter is available then. Is Wednesday, the 27th –

THE COURT: We probably have Wednesday afternoon, but we have got regular Chapter 11s on the –

MR. CASSADA: On Wednesday morning?

THE COURT: Yeah, in the morning. They generally don't lop over, and I could ask Judge Whitley if he could do the 13s, which would give us Tuesday, and Monday is open, which would

252

give us the whole week.  He is back there.  Right quick, could you go just check and see, if we had to, could he – that would be, what, about the 26th or something.

UNIDENTIFIED PERSON: The 26th is Tuesday.

(Pause)

MR. CASSADA: There are at least three witnesses I know of, two of mine and one of Mr. Swett, who have flight arrangements that they need to catch.  We also have a third witness, Mr. Scarcella, and I haven't spoken with him yet about his flexibility as far as his flight arrangements go.  So our thinking was that we would call two of our witnesses, the two Rust witnesses first, and then we would let Mr. Swett call his witness, Dr. Peterson, out of turn and cover his direct examination.  Dr. Peterson would then be able to make a 4:15 flight to California.

DR. PETERSON: No, I need to leave by 4:15.  It is a six o'clock flight.

MR. CASSADA: Oh, so you need to leave by 4:15?  So we will undertake his direct and then we will proceed with Mr. Scarcella and hopefully we can get finished with Mr. Scarcella today and then –

THE COURT: Okay.  Good.

LAW CLERK: Judge Hodges, Judge Whitley has several Chapter 11s scheduled to be heard on the 26th, but he could cover your Chapter 11s on the 27th so that the whole day could

253

be devoted to this.

THE COURT: Okay.  So it looks like we could go Monday, Wednesday and Thursday.

MR. SWETT: I would think, Your Honor, that Wednesday and Thursday, the combination of that would probably do just fine.

THE COURT: Okay.

MR. CASSADA: As opposed to what?

MR. SWETT: As opposed to Monday, Wednesday and Thursday.  Don't you think we can do this in two days?

MR. CASSADA: I am sorry.  Tuesday was out of the question?

THE COURT: I think Tuesday we have got a couple hundred thirteens.  I don't want to make you all sit through that.  I get paid to do it.

MR. CASSADA: Well, if we could complete Dr. Peterson out of turn on –

MR. SWETT: On Wednesday.

MR. CASSADA: Then I think that –

MR. SWETT: That's fine with me.

MR. GUY: That's fine with me.

THE COURT: Okay.  So we will do what we can today and then come back on Wednesday, the 27th at 9:30.

MR. CASSADA: Yes.

THE COURT: Okay.  Good.

254

MR. CASSADA: As I said, we have three witnesses we will offer today, and these witnesses will testify about the claim form that has been proposed, both the content – well, a little on the content of the form because I understand Your Honor wants to delay a sharp focus on what the content of the proof of claim form is for now.  At least that's the way I understood yesterday.

But what we would focus on today would be the claim form.  We will talk some about its content and its similarity to proofs of claim filed in trusts and the electronic submission and how that vastly eases the burden on the court, the claimants and the parties.  And we have three witnesses, two from Rust Consulting, Elizabeth Graham King who is the project manager and who we first dealt with and explained to her what we were trying to accomplish, and she oversaw the design of the engagement and how Rust Consulting would meet that.

And then we will have Nathan Shuck who will actually demonstrate how the on-line electronic claim filing would be, would work.

And then following that, we have Mark Scarcella of the Bates White firm who is an expert on trust procedures, and he will testify about the similarities between the process that we have designed and trust filing and also how the claim that we filed can be used as the trust claim.

Graham King - Direct                           255

And as far as burden goes, Your Honor, the intent of our proof of claim form and process is, to the greatest extent possible, to mirror the process the claimants are going to have to go through anyway at some point in this case to actually show that they have a basis for their claim and present the claim as against the trust.

So our claim form mirrors that.  It is a little bit broader, though, because, as Dr. Bates testified yesterday, there are matters that affect values of claims and there is discovery that needs to be taken in those and the claim form is designed to put things on the table, and those principal things are the other responsible defendants for a particular claimant's claim which, as you heard, vastly or dramatically affects the value of a claim against any tort system defendant.

So that is how we are proceeding today.  Mr. Krisko will conduct these examinations.

THE COURT: Okay.

MR. KRISKO: Yes, Your Honor.  I would like to call Elizabeth Graham King.

(ELIZABETH GRAHAM KING, WITNESS, SWORN)

DIRECT EXAMINATION

BY MR. KRISKO:

Q.      Good morning, Ms. Graham King.  Can you state your name for the court record, please?

A.      Elizabeth Graham King.

Graham King - Direct                    256

Q.           And can you describe your position at Rust Consulting?

A.           Yes.  I am the senior vice-president and I am in charge of mass tort practice.

Q.           Okay.  I am going to ask you in a moment, Ms. Graham King, about Rust's experience in the specific engagement in this case but, first, I was wondering if you could just summarize for the court the basic role of a claims handling agent in a case like this?

A.           Yes.  Essentially we function much like the clerk of the court would.  We receive claims.  We receive them, date them, acknowledge them, maintain a claims register.  In this case we would maintain the information that was required by the court to be submitted to us on a database, transmit the information to the court as required and to parties as allowed under the Bankruptcy Code.

Q.           Okay.  So if Rust is acting as a claims handling agent, essentially Rust will be taking the entire burden of receiving, docketing and maintaining a claims register of the clerk of court?

A.           Yes.

Q.           Okay.  Well, let's talk about Rust's experience and qualifications for this proposed engagement.  Can you give the court a brief description of Rust's corporate enterprise, I guess a little bit about its history and the core business that

Graham King - Direct                          257

Rust has?

A.        Yes.  Rust is a class-action claims administration handling firm.  We have been in business for about thirty years.  We have – if we are not the largest, we are one of the two largest claims administrators in the country.  We employ approximately 550 people full-time.  We have offices all over the country, and we are called upon by our clients to handle matters ranging in size from a few hundred people to millions of claimants on a very routine basis.

Q.        Okay.  Can you give the court a little bit more description of the kinds of cases that Rust handles?

A.        Yes.  We handle all types of cases in addition to mass tort and bankruptcy cases.  We have a labor and employment practice, healthcare, insurance.  We do government sector work which includes work for the SEC, the FTC, the Attorney Generals, all fifty states, the Secret Service, Department of Justice.  We do private securities work.  We do consumer fraud cases, consumer finance cases, pretty much all aspects of the law.  If there is a settlement, we cover it.

Q.        Okay.  And Rust has acted as claims handling agent in bankruptcy cases; is that correct?

A.        Yes, we have.

Q.        Can you give the court a sense for some of the cases that it has handled?

A.        Yes.  Particularly in the asbestos realm, we have

Graham King - Direct                          258

handled W.R. Grace, Babcock and Wilcox, Raytek.  There might be a couple of others.

Q.      Can you give the court a little bit more description of the kinds of services that Rust provides in these kinds of cases?

A.      Generally speaking or in the context of just bankruptcy?

Q.      Generally speaking.

A.      We handle on the front-end – we handle all aspects of claims filing, claims identification, claims processing and distribution.  On the front-end of cases we are consulted often by our clients, plaintiff's firms, defense firms, Fortune 500 companies, the government.  Depending on the scope of the engagement, often we are called upon to draft the notice, the distribution plan, allocation plan and sometimes policy.

We disseminate notice in large-scale cases.  We create websites for notification and processing claims.  We process all aspects of the claim according to allocation plans that are handed to us.  Distribute the money.  We provide tax accounting and sometimes legal services and, most recently, expert testimony and we do some lien resolution work, as well, in the context of handling the claims.

Q.      Okay.  I think you mentioned when you were describing Rust's basic lines of business that it sometimes is engaged by the federal government for claims processing

Graham King - Direct                    259

activities?

A.          Yes, we often are.

Q.          Can you provide a little bit more detail about that?

A.          Yes.  We are often engaged by the SEC in connection with what we call FAIR fund cases when there is a disgorgement or the SEC levies a fine against an entity.  We are called upon to help the SEC with distributing the funds to the appropriate parties.

We also work for the Treasury Department through the Secret Service in handling similar situations, remissions. When there has been any kind of violation of federal laws, the Treasury Department will be responsible for seizing the assets. We make sure that those funds are distributed.

We also work for the FTC in their consumer fraud cases.  We handle the distribution of funds that have been seized by the FTC.  And we have worked for, I think, all fifty Attorneys General in various capacities, whether it is consumer cases that they bring, antitrust cases they bring, things in that nature.

Q.          Okay.  Thank you.  Can you give the court some examples of some current projects that are analogous or relevant to the one that has been proposed here?

A.          Yes.  I think from a technical standpoint what the court will probably find most helpful is the projects that we are doing right now where we have a large volume of claimants

Graham King - Direct                          260

and we have an online claims filing process.

For example, we are handling a case right now where there is approximately three and a half million class members and I think ninety-five percent of the filings have been done online.  We processed a hundred and forty thousand claims in one day.

We have another case right now that we are doing for the Secret Service.  It is a large disgorgement case where the remission is going to be – we are still going through background checks but we anticipate that there is going to be hundreds of thousands of claimants that will be using our online system.

We have a similar matter for the FTC that we're handling where, again, I think the projection is that there is going to be three hundred and fifty thousand class members.

Q.        Okay.  In these cases, has Rust developed experience in designing claims forms and claims systems that are easy for claimants or their lawyers to use?

A.        Absolutely.  The prime directive at Rust is to distribute money and that is what we're in the business of doing, and so our goal is to make our systems and the entire process easily navigable by lay people because, in a good portion of the cases that we work on, lawyers are not always involved, and so our goal is to get the money out to the people who have been affected by whatever the settlement is

Graham King - Direct                         261

addressing.

Q.       Does Rust have experience handling sensitive or private information such as Social Security numbers or medical information?

A.       Absolutely.

Q.       Describe that experience to the court, please.

A.       Yeah, in virtually every case that we handle, there is some sensitive information that is being transmitted to us. In the financial cases, SEC and consumer finance cases, we routinely receive people's stock records, buy and sell orders, financial records, obviously Social Security numbers, bank statements, things of that nature, credit card information.

In our mass tort and our health and insurance practice, we routinely receive medical records; again people's Social Security numbers, insurance policies, things of that nature. Labor and employment, we handle people's employment history, wage issues. We often are called upon in cases to deal with garnishment issues, so we receive orders from various agencies if there is a lien against a case, child support, things like that.

I think in almost every case that we handle, there is some sensitive information that we need to guard against disclosure.

Q.       Okay. Does Rust have policies, procedures in place that maintain the confidentiality of that kind of information?

Graham King - Direct                                    262

A.        Absolutely.   We take our data security very seriously.  We self-audit.  We do seven-day audits.  We are audited routinely when we do the government work.  We are required to undergo audits in that capacity.

We have developed a proprietary system that I believe Mr. Shuck will talk about later.  The entire goal is to keep the information protected.

Q.        The particular engagement proposed in this case, has it at its center an electronic claims processing system?

A.        Yes.

Q.        Rather, claims submission system.  Can you describe Rust's experience and capability in electronic submission systems?

A.        Yes.  As I mentioned before, we are doing a number of cases where there is online filing.  We have been doing them more and more routinely in the past few years in response to our clients' needs, as well as the claimants' needs.  We did our first online filing case, large online filing case, probably about a decade ago.  And since that time, in cases where online filing is an issue, we have seen more and more the response rate has gotten higher and higher in terms of the people who want to use the system and so we have continued to develop that technology to keep ourselves kind of ahead of the curve in the industry.

Q.        Ms. Graham King, you are the senior person at Rust

Graham King - Direct                                   263

that is handling this particular project?

A.          I am.

Q.          Can you give the court a description of your educational and professional background?

A.          Yes.  I graduated from law school in 1989, and I was admitted to the bar in the same year and began practicing.

Initially I worked for a large defense firm in California in the product liability, mass tort, then class-action arena.  We handled all types of product cases, including asbestos work.  We did pharmaceutical work, some toxic tort work, medical device work.

In 1994, I switched sides and I went to a large plaintiff's firm to develop their mass tort and class-action business.  The firm that I joined was primarily a personal injury firm and they were interested in getting into class-action and mass torts, so I headed that practice.

And then in 1996, I started my own firm with some of the partners from the prior firm and continued practicing exclusively on behalf of plaintiffs since that time.

In approximately 1998, my firm settled a very large case against a company where the distribution and allocation plan was very complicated.  So we decided, after talking to various claims administrators, that the best way to handle the claims processing was to do it in-house.  So my partner and I started a company that handled claims administration, initially

Graham King - Direct                              264

just for other plaintiff's firms and then we expanded that.  We started a company called RG2 Claims Administration in approximately 2000, and I have been doing claims administration work since that time.

In 2008, my company was acquired by Rust Consulting.

Q.        Okay.  Can you also describe for the court the backgrounds of the other senior members of the team that would be engaged with this project?

A.        Yes.  Our project manager, our senior project administrator is a man named Kim Elam.  Mr. Elam comes to us with twenty-five years of asbestos trust experience.  He worked for the asbestos trusts in Naperville, Illinois, and then later in Wilmington, Delaware.  And during the course of his employment handled trusts for Keene, NR, Fibreboard, the whole panoply of asbestos defendants.  And I believe initially he started as a paralegal at a plaintiff's asbestos firm.

Mr. Shuck will be handling the technology end of the case, working with me to make sure that the systems are as we designed them and running efficiently and appropriately handling the case.

And then depending on the scope of the work, as the court decides, we will have various senior project people, all of whom have experience in the same realm.

Q.        Okay.  You mentioned Rust was engaged as the claims handling agent in the W. R. Grace matter?

Graham King - Direct                                    265

A.          Yes.

Q.          Can you describe for the court Rust's role in that case?

A.          Yes.   Initially we were working just as a claims agent, as I explained before, receiving claims, docketing claims, keeping a claims register, reporting to the court as required.

Subsequent to our initial engagement, we were asked to collect information from PIQs, which are personal injury questionnaires designed by the parties to gather information concerning the individual claimant's asbestos exposure and medical conditions.

Q.          Okay.  Do you know how the proofs of claim or the personal injury questionnaires were used in that case?

A.          My understanding is the information gathered was to inform the process for estimation of the exposure of the company based on asbestos personal injury claims.

Q.          Can you describe how the proposal Rust has made in this case would be different than its engagement in the W. R. Grace matter?

A.          Yes.  If we were to proceed in the manner which we recommended, the online claim filing, we believe that it would lend vast efficiencies to the process that we didn't experience in Grace.  There are some issues that came up in Grace that we believe could have been, you know, in hindsight, we could avoid

Graham King - Direct                                266

if we followed the claims protocol that we are proposing in this case with the online claim form.

Q.        Okay.  Can you be a little bit more specific about some of the differences in this proposal?

A.        Yes.  In the Grace case, we received the PIQs in a paper format.  So there were inefficiencies in the process in that, if somebody submits a large volume of paper, first you have security issues.  When you submit a claim online, we have the ability to map and track everybody who looks at the claim, touches the claim, is involved in the process.

In a paper case, basically data containment is locked file cabinets, locked rooms where we segregate employees, have cameras.  They have to sign in and out, things of that nature.

In Grace, we had initially proposed – we had sent out claim forms that were bar coded and each bar code on the claim form, on the cover sheet, corresponded to a Rust ID number for the claimant.  And what we found was people were sending back photocopies of the cover page with the same bar codes.  So that they would copy a bar code that was for claimant "A" a hundred and fifty times, and we would wind up having to go into the system to verify who the actual claimant was.  So there were inefficiencies there.  We received some duplicate claims and, again, because of the situation with the paper, we had to manually track those.

We had what we call deficiencies in several of the

Graham King - Direct                          267

claim forms, and it could be anything from, if you put in nine digits instead of ten in your Social Security number, it would require us to go in, find the claimant, find the claimant's counsel who was representing the claimant, correspond with them, wait for their response to come back, correct it and make sure that the form was as it was supposed to be.  And so obviously there is a latency period there.  There is a lag time if you are doing it manually as opposed to if you do it online.

In this case what we are proposing is an online filing system where the technology, the process, it will guide you through.  So if you enter the wrong Social Security number or if you enter your first name where your last name should be or try to put your name on one space instead of dividing it, the system will flag it.  Much like anybody that has used it, the credit card system online when you try to enter your credit card number and the website tells you it is not valid because you have missed the expiration date or something, our system will flag it for the claimant or the law firm entering the information and tell you exactly what the problem is.  So there won't be the lag time and there won't be the human intervention necessary for the receipt of claims in a consistent fashion.

Q.        Is the proposed engagement that has been put forth by Rust here consistent with the approach it takes in other cases?

A.        Yes, absolutely.  And, again, as I said before, in

Graham King - Direct                          268

all of our online filing cases, the goal is to make it as easy as possible for the user.  So it is a user-friendly system and we designed it so that people can enter data, review it and, in this particular case, the plaintiff's firms would be – we would capture all of the data in one place.  They would be able to sort it for all of their clients.  So they would have a record themselves of everything that they submitted on behalf of all of their clients.

Q.        Okay.  Well, let's talk a little bit more about the specific proposal in this case but, first, can you confirm that Rust developed the proposal based on guidance from the clerk of court office?

A.        Yes.  Prior to finalizing the proposal, we received the order from the court explaining what the duties would be in this case.  So we met as a team and made sure that all of those were achievable and that we could do it in accordance with what the court wanted.  And I believe I also spoke with Ms. Adams about how we would be handling the data retention and the transmission of the data to the court as appropriate.

Q.        Okay.  Can you summarize for the court, I guess the key features of this proposal in terms of the system and other duties that Rust will be undertaking?

A.        Yes.  As I said, I think the key feature is the online filing system that we have developed.  It will be customized to address what the parties and the court deem

Graham King - Direct                          269

appropriate in this case.  And so, as I said, we will make a

navigable system that's user-friendly and ultimately, we hope,

will be an aid to both the claimants and the court.

And then the other feature of our proposal is

essentially just taking the burden entirely off the court by

maintaining the register on line and transmitting reports as

required.

Q.         Okay.  Can you indicate what protections will be in

place for private information that's submitted by claimants in

connection with this process?

A.         Yes.  Again, because we have to undergo various

audits and conform to government regulations and we are HIPAA

compliant, we have set up a number of features internally

within the system to keep the data secure.  The law firms will

have access – let me back up.  On the public side, the only

information available will be what the court deems appropriate

in terms of claims register.  And then, in accordance with the

court's order, it will be the basic information and nothing

confidential will be available to the public.

The law firms, however, who are uploading the data,

the plaintiff's firms, will be able to access the system.  We

will give them security clearance and a password and they will

be able to see their files online.  They will need to upload

the standard medical authorization and release that they get

prior to collecting.  Usually they have it prior to collecting

Graham King - Direct                        270

personal records, so that we can ensure, then, in fact that they have the ability to review what they submit.

Q.      Okay.  Is Rust proposing to staff a call center?

A.      Yes.  We will set up a 1-800 number with a dedicated call personnel to answer claimant's questions.  We anticipate that there might be some individuals who are not represented, so we will have a script and staff the call center according to, again, the direction of the parties and the court.

We will also have a website where people will be able to download claim forms and receive the 1-800 number and information, and I assume that the notice that the debtor will send out will reflect all of that information, as well.

Q.      Okay.  Getting back to some of the features of the electronic submission system, will law firms who represent dozens or scores or hundreds of claimants be able to assign multiple staff members to upload claims into the system?

A.      Yes, absolutely.  Each law firm will be given their own ID and they will be able to have whoever they think is appropriate access to the system.

Q.      As proposed, will the claim system allow claimants – is it necessary for a claimant to put all of the information into the system in one sitting?

A.      No.  People will be able to access the system. People from the various law firms can access it simultaneously. They can upload as much information as they like and then they

Graham King - Direct                    271

can complete the form later.  It is not until they hit the "submit" key that it will be the final form.

Q.        So the form will essentially say what information has been put in to-date and then, once they identify other information, they can come back and complete the form?

A.        Yes.

Q.        Rust will also receive hard copy claims from asbestos claimants?

A.        Yes, it is my understanding that the proposal is designed to allow for claimants who are not represented by counsel to submit claims in a paper format.  In which case, Rust personnel would go in and enter the information into the same database as if it were being entered by one of the claimant's counsel.

Q.        But just to be clear, *pro se* claimants do not need to do hard copy claim forms; they can choose whether to do electronic or hard copy forms?

A.        Yes.  They will be able to upload the information electronically, just as we do in other cases.

Q.        Okay.  Can you describe the features of the database that will be created as a result of the claims submission process?

A.        Yes.  Essentially it mirrors the proof of claim form that is being designed in this case.  So all of the information on the proof of claim form will be captured in the database and

Graham King - Direct                              272

then the parties, and if the court wants to, the court will be able to access the information and sort it in a variety of ways.  So the claimant's counsel will be able to run reports for all mesothelioma cases if they want to look at it that way, or based on exposure sites, or based on dates of filing. Basically the system is designed so that it can be customized and individualized in a variety of ways.  So as we are directed to, we can create fields and capture that information and process it accordingly.

Q.          So would the parties-in-interest have the opportunity, for example, to identify all claimants who may have been diagnosed by a particular doctor?

A.        Yes.

Q.          And I guess another example might be would the parties-in-interest be able to identify when a claim was – I guess all of the claims that may have been diagnosed before a certain date?

A.          Yes.  Essentially the system will allow you, if we are instructed, we can search it and pretty much capture any field that a party would like to take a look at.

Q.          Rust will also receive proofs of claim from financial creditors; is that right?

A.          Yes, that is my understanding.

Q.          Once approved by the court, Ms. Graham-King, how long will it take Rust to be in a position to start receiving

Graham King - Cross                    273

claims?

A.          Assuming that the court allows the proposal that we set forth, in maybe thirty to sixty days, I would say.

MR. KRISKO: Thank you, Ms. Graham-King.

THE COURT: All right.  Ms. Kelleher.

CROSS EXAMINATION

BY MS. KELLEHER:

Q.          Good morning, Ms. Graham-King.  I am Leslie Kelleher with Caplin & Drysdale.  I just have a few questions for you.

My first question is what do you mean by – and this may be something that your colleague will get into more, but by filing electronically?  By that, do you just mean entry of the data into the computer?

A.          Yes, it is data entry.  The claim would be submitted but it would also be acknowledged, receipted, and dated by us and we would report the date of the filing to the court.

Q.          Have you looked at the proposed proof of claim in this case?

A.          Yes.

Q.          There is a lot of open-ended questions on the proof of claim form where the claimants won't just use codes but may have to type in information; is that correct?

A.          That is correct.

Q.          So how do you deal with that?

A.          It depends on which information we're talking about

Graham King - Cross                          274

but certain information we code.  So if it is a narrative that explains, for example, an injury, we would code it based on the injury.  But the ultimate goal is to capture the information in a format that the parties can use.  So we are not necessarily evaluating or categorizing the information; our function is really just to provide the information to the parties.

Q.        So you are not dealing with those kinds of things that are being entered?  If somebody is entering a description of how they used the particular product, what tools they used, what tasks they performed with the product and it goes on for a paragraph, how are you going to deal with that?

A.        I am not sure I understand what you mean by dealing with it.  We are going to provide the information on a proof of claim form.  Our goal is to capture the information and what the parties choose to do with it –

Q.        So you won't do anything other than have it entered and sitting there on your system?

A.        (No response.)

Q.        Have you been asked to create fields to do anything with that information?

A.        No.

Q.        What if people want to attach documents to the form?

A.        They would be able to upload them on our system.

Q.        And how will you deal with those documents; what will you do with them?

Graham King - Cross                                    275

A.          I am not –

Q.          If they upload the documents onto your system, what will Rust Consulting do with those documents?  Do you simply act as a repository for the information?

A.          Well, there are certain documents, for example, that I understand would be required, if it is something like a firm retainer agreement or a medical authorization, it triggers something in our system that we review it and the documents would go into a queue and say, okay, these people are now allowed to review medical records.  So those documents are one set.

The other documents, if it is medical, let's say an x-ray or a medical report, our job is really just to maintain that information and to provide it to the parties.  Again, we don't in any way evaluate it.  We just maintain it in the database.

Q.          What if someone attaches, for instance, a work history or excerpt from a deposition stating where Garlock's products were used, how will you deal with that information?

A.          If it is responsive to a particular question, it would just be captured as an element of that answer for the claimant and, again, we just maintain that information for the parties.

Q.          So one of the questions on the claim form, for instance, is to list all of the places where someone has

Graham King - Cross                          276

worked.   Can they just attach a document that lists those places?

A.          I don't see why not.  If that is what we are told to do, they could just attach a document.

Q.       As your proposal, under your proposal, is that going to be done?

A.          Under our proposal, it could be done.  We have also talked about whether it would be appropriate to enter what we call drop-down fields to make it easier on the claimants.  So instead of, for example, we have created, and you will see a demonstration later of not totally yet but we have got the list of the asbestos trusts that we know of at the moment.  So there will be a drop-down field so people could just click on the appropriate ones instead of having to go back every single time.

Similarly for work sites, if the parties know various work sites and they want to have information to make it easier on the claimants, we can do that on a drop-down –

Q.       That's up to the parties, correct?

A.       Yes.

Q.       And if people attach documents to the form of the type that I have described, it will just be deposited somewhere in your system and will not be in separate fields; is that correct?

A.          (No response.)

Graham King - Cross                          277

Q.          How will it get uploaded?

A.          Well, I assume that in order to upload, the law firms would have to scan it and submit it to the system the same way you would –

Q.          I think I was unclear.  Not how the particular document would be uploaded but the information in the document? It is just going to be in the document and stay there; is that correct, the attached document?

A.          As I understand, yes.

Q.          Now, you mentioned that Rust Consulting handled the processing of the personal injury discovery questionnaires in Grace?

A.          Yes.

Q.          And you were asked how the information on those forms were used.  You said something along the lines it was to inform the process for estimation.

A.          Uh-huh.

Q.          Do you know specifically what information in those forms were used?

A.          I do not.

Q.          Are you aware that, once the information from those questionnaires was gathered, debtor's counsel represented to the court in Grace that it would take an additional eight years to enter the information into the database?

A.          I am aware of that statement, yes.

Graham King - Cross                    278

Q.        Was that an estimate that you made?

A.        No, it was not.

Q.        Or Rust Consulting?

A.        No, it was not.

Q.        Let me just step back for a minute.  You mentioned that you had worked for a defense product liability firm. Could you give us the name of the firm?

A.        Brobeck Phleger and Harrison.

Q.        I am sorry?

A.        Brobeck Phleger and Harrison.

Q.        You may need to spell that?

A.        It is B-R-O-B-E-C-K.  Phleger is P-H-L-E-G-E-R, and Harrison.

Q.        Thank you.  And was that the only firm that you worked for as defense counsel?

A.        Yes.

Q.        And then in 1994 you went to do some plaintiff's work?

A.        Yes.

Q.        And what was that firm name?

A.        Initially it was called The Alexander Law Firm. After a few months, it became Alexander, Rapazzini, R-A-P-A-Z-Z-I-N-I, and Graham.

Q.        And where is that firm?

A.        It was in San Jose, California, and San Francisco,

Graham King - Cross                                              279

California.

Q.          Did you work with anyone else that's appearing in this court?

A.          Worked with them, no.

Q.          As an attorney?

A.          No.

Q.          One of the firms?

A.          No.  Mr. Clodfelter and I have worked against one another on occasion.

Q.          Okay.  I saw some – I was curious what that was.  So just to get back, in your proposal you have estimated or set out that there will be a hundred thousand proofs of claim that are expected?

A.          That was the assumption that we were given, which we keyed our proposal off of.

Q.          That's my question, where did you get the number.  That was given to you by debtor's counsel, correct?

A.          Yes.

Q.          And the five thousand manual was given to you by debtor's counsel; correct?

A.          I believe that is the case.  We might have actually estimated the five thousand on our own as a guideline.

Q.          Okay.  You also – in fact, let me give you a copy of your proposal rather than –

                MS. KELLEHER: Your Honor, can I mark this as, I

Graham King - Cross                    280

believe it is Exhibit 3 for the ACC.

THE COURT: Okay.

MS. KELLEHER: I have marked a copy of what is in our papers Exhibit "B" to our reply brief, and it is a copy of Rust Consulting's claim service agreement, proposed, and I will give that to the witness.

THE WITNESS: Thank you.

BY MS. KELLEHER:

Q.        This is just for ease of your reference, so  I don't make you remember every single thing you said in your proposal.

A.        I appreciate that.

Q.        So if I can just have you flip in your proposal to the – on this copy, at the top, we have numbered it.  These numbers were not originally in your proposal but, for ease of reference, it is page six of eleven.

A.        Yes.

Q.        So one of the numbers toward the bottom where you have got proofs of claims, receipting, review and reporting.

A.        Yes.

Q.        In the second section there, data review and deficiency processing.

A.        Yes.

Q.        You have got an entry for deficient proof of claim notification?

A.        Yes.

Graham King - Cross                    281

Q.          And you have got a footnote on the next page explaining that one hundred data submissions – you assume that one hundred data submissions will be sent back to counsel for review, correct?

A.          Correct.

Q.          Where did you get that number from?

A.          It is an estimate that we internally discussed.  It wasn't provided to us by anybody, but we assumed that there would be a certain number of claimants who were using the system who are not represented by counsel who might need to have their claims reviewed by us and, if there was information on it that was either incorrect or incomplete, we would notify them, work with them to make it a complete claim form.

Q.          So what kinds of deficiencies are you thinking of?

A.          Again, if somebody submits information that is in a paragraph or a narrative and it is maybe not responsive to a question or is in the wrong place or there is something in the system that we didn't catch, we would queue that as deficient which really it could just be incomplete.  It is not deficient in that context.  It is not a value judgment.  It is just something in the claim looks wrong, so we talk to the claimant and explain to them what it is they might have not completed.

Q.          And you anticipate you would only do that for claimants that are filing without counsel?

A.          I suppose there could be situations where our system

Graham King - Cross                        282

doesn't catch something that the claimant's counsel might enter incorrectly.  It is not completely infallible.  So we would, in that case, correspond or discuss that with the claimant's counsel if that were the case.  But, again, a hundred is a very small number because we assume that most of the people are going to get it right.

Q.          And you mentioned that a hundred is a very small number.  That is a question that I had.  Is that your experience that, when you're talking about a hundred and five thousand claims, you would only expect a hundred would have some kind of a deficiency?

A.          Generally speaking, if lawyers are entering the information in a case where they have been representing clients for a long period of time, it is very easy to use and a very user-friendly system.  So our experience is that the process, as lawyers and paralegals are guided through it, it is easily achievable to get a complete claim form.

Q.          This is a piece that you can help me with.  Right below it says, "Process deficient proof of claim responses."

A.          Yes.

Q.          And it has got a number of two thousand.  How does that number sync with the one hundred?

A.          So the two thousand is the volume of – that captures not only the data submissions but the paper submissions.  So, again, it is an outside limit of the number of claims that we

Graham King - Cross                                        283

may deem deficient and that need to be processed and sent back to the individuals that submit the claims.

Q.        So let me get it straight. The one hundred deficient proof of claim notifications, you expect that's just for the claims that are entered manual – excuse me – on the computer?

A.        The deficient proof of claim notification?

Q.        Yes, I am trying to understand the difference between the one hundred and the two thousand.

A.        Okay.  So the one hundred is – it's a deficiency pack and it's the notices that would go out, the proof of claim notification.  It would be a notice that your claim is deficient.  So they go, generally speaking, to individuals or to law firms.

So if, for example, Motley Rice sent us a thousand claims that were deficient, we would send them one notification and they would correct it.  We are allowing for two thousand individual proof of claim responses or corrections.

Q.        Okay.  And in your experience is two thousand deficient proof of claim responses, when we are looking at a hundred and five thousand, a small number, two percent?

A.        It's an assumption that we created based on our analysis and we think it's a reasonable number. And, again, it is an assumption that we made.  So if it is more, we will process more.  If it is less – it is really set out as a guideline so that the people looking at the proposal can

Graham King - Cross                                284

understand what we are basing our assumptions on.

Q.        And understand how much you are charging for it?

A.        Exactly.

Q.        If those numbers of deficiencies go up, the cost of the proposal, of course, will go up – the cost of the services will go up; is that correct?

A.        Yes.

Q.        The proposal is not – the budget for the proposal is not a ceiling; correct?

A.        Correct.

Q.        Just to go back to the deficient proof of claim, how much time will the persons who are notified of the deficiencies be allowed to fix proof of claims?

A.        That would not be my decision.  That would be the decision of the parties and the court.  Typically when we receive allocation plans or distribution plans, we receive direction from the parties and the court and they say, you know, allow for "x" number of days to pass before you deem it.

Q.        There is, on your proposal, there is an August 12th letter that is submitting the proposal to Mr. Cassada.

A.        Yes.

Q.        It's the first page after this cover page.

A.        Uh-huh.

Q.        And there is a reference to – it's the second sentence: "Based upon our conversations, we have prepared a

Graham King - Cross                                285

revised proposal for your consideration."

A.        Yes.

Q.        Did you retain copies of the original proposal?

A.        Yes, I am sure we have it somewhere.

Q.        And I assume you discussed it with Mr. Cassada if that's what you are referring to, "Based on your conversations." What revisions did you discuss?

A.        Initially when we were contacted, our duties were going to be as a co-claims agent. We would be the claims agent, but I believe that one of the co-debtors was going to be involved and we were going to audit their processes. And at some point the debtor's counsel advised me that they decided to go a different route and just retain Rust exclusively.

Q.        But did you make any changes to the assumptions about the number of proofs of claims that would be filed electronically, manually?

A.        I don't believe that the first proposal had any assumptions with regard to the volume of claims. It was just the volume of claims that we would be auditing. And I don't recall specifically if we had those assumptions in there, but there would have been a whole different set of assumptions because our duties would have been different.

Q.        In your declaration that was submitted earlier in this matter, you state that one of the duties that Rust would have would be to make the claims register available for review

Graham King - Cross                              286

by the public, other than the part that would be kept away from the public that would be kept secure.

A.        Yes.

Q.        And the information that would be kept secure, could you tell me what information would be kept secured?

A.        Any private information.  People's entire Social Security number would not be exposed.  Their medical information would not be subject to, as I understand it, subject to disclosure.

Q.        You mentioned earlier that in other cases you also keep employment history secure?

A.        Yes.

Q.        Would you keep that secure in this case?

A.        Again, if the parties tell me to, I will.  I would imagine that that would be something that, at the outset, we would strive to keep secure unless we were told to disclose it.

Q.        And who told you that it would be kept – to propose that it would be kept available to the public; other than the secure information, that the claims register would be available to the public?

A.        It was my understanding, based on the court's order or the proposed order that we reviewed, that certain information would need to be kept on a register and available to the public for examination.

Q.        I understand.  That's the proposed order that was

Graham King - Cross                    287

provided to you by Mr. Cassada; is that correct?

A.        Yes.

Q.        Not an order of this court?

A.        No.  I believe it was a directive from the clerk.

Q.        There was a directive from the clerk in this case; is that correct?

A.        I believe that that was the case, that it was a proposed order of this court.

Q.        Bear with me a moment here.  I am just looking for the proposed order.  Do you have a copy of the proposed order?

A.        Not with me.

Q.        So your understanding was that this order was already entered by the clerk; is that correct?

A.        My understanding was that there was a proposed order that established the guidelines for a claims agent in this case and that, if we were to be retained, we would have to, at minimum, adhere to those guidelines.

Q.        But not that the order had already been entered; correct?

A.        I don't believe I saw a signature on it but I could be incorrect.

Q.        We mentioned already, Ms. Graham-King, that the amount that you have on your proposal, the approximately four hundred and fifteen thousand dollars, is not a cap. One of the lines that is left free is the line for additional expense.

Graham King - Cross                    288

Other charges on page seven of eleven, you have got a line for other charges and out-of-pocket costs?

A.        Yes.

Q.        What types of additional expenses might you expect to be incurred?

A.        For example, my trip here.  Initially I wasn't contemplating spending three days in Charlotte.  Things of that nature.  Any kind of – if you look at footnote seven, if we were called upon to rent a P.O. box.  We have people ask – claimants ask us for FedEx delivery versus U.S. mail, just routine out-of-pocket expenses as incurred.

Q.        And if additional claims than the five thousand were filed manually, the expenses would go up; correct?

A.        Yes.

Q.        Or if there were –

A.        Potentially.

Q.        I am sorry.

A.        Potentially.  I mean, we assume it would or, if there were fewer than five thousand claims, it would go down.  It's just a guideline.

Q.        If there were separate documents attached to the claims, would the cost go up?

A.        No.

Q.        What if you had to input information that was on those documents?  If Rust Consulting were given the job of

Graham King - Cross                              289

taking information from such documents and coding it or inputting it into fields, would your cost go up or charges go up at that point?

A.        If we were to do it more than five thousand cases?

Q.        A hundred and five thousand.

A.        I don't –

Q.        One of the things on the proof of claim form, for instance, is a request for a list of sites where people worked?

A.        Yes.

Q.        If people were to attach a document, you have told me that, instead of inputting it somehow into your website, you told me that the document would be sitting there, it would be a pdf, correct?

A.        Yes.

Q.        That information to be accessible would somehow have to be inputted into some database; is that correct?

A.        No.  If it is uploaded, it is already in the database.  The database is just a container for information.

Q.        But if it is sitting there as a pdf, then you have got to create a situation where people could, say, search and find out how many people worked at a particular job site or for a particular employer.  In order to do that, that information would have to be somehow inputted.

A.        I see what you are saying.  Yes, if we were asked to either sort the information or in some way code it or put it

Graham King - Cross                          290

into a searchable engine, then, yes, there would be data processing costs that are probably not reflected in the proposal.

Q.          And, in Grace, they ran into that problem, correct, these documents were not input and that's why counsel in Grace said it was going to take eight years to input that information?

A.          I don't know why counsel in Grace said it was going to take eight years.  It would not in this case take eight years to upload information.  I mean, if we are talking about attachments to documents, we routinely receive claim forms in other cases that are paper claim forms and we have data processors entering the information.  It is a pretty efficient system.  It is just not as efficient as if you do it online.

Q.          If the materials were in the forms of depositions where the deponent stated what products had been used on work sites and you had to read through the depositions and then input the information, would that take a little bit more time?

A.          Well, of course, but again there's efficiencies in the process.  I am assuming, based on my knowledge of litigation, you are going to have a defined, a pretty-well defined set of workplaces.  So at some point, if you review the first batches, you can code them or enter them in a more efficient way than reading through every single deposition.

Q.          So you say that it would be more efficient.  What is

Graham King - Cross                         291

the basis for your saying at some point there will be a list of

sites?

A.          I think my opinion is that at some point you have a

well-defined set of depositions.  I can't imagine that every

claimant is going to submit a different deposition, but I could

be wrong.

Q.          If every claimant did submit a deposition, that

would take considerably more time, right?

A.          It would take more time.  I don't know if it would

be considerably more time.  I mean, it's a hypothetical.  I

just can't answer it, not having seen the deposition and

understanding what's being spoken about.

Q.          What were Rust's charges in the Grace case?

A.          I don't know the total charges, but I do know that

it was exponentially higher than the proposal in this case.

Q.          Will you give me your best guess?

A.          It was millions of dollars.

Q.          Do you think more than ten million?

A.          I don't think more than ten.  I think it was

probably – and, again, this is a guess.  I wasn't with Rust at

that time, but I think the total project for property damage,

personal injury, medical monitoring, acting as a claims agent,

reviewing the PIQs and the work that we did, the back-and-forth

and the problems that we had, I think it probably cost around

six or seven million dollars by the time the process was

Graham King - Cross                     292

complete.

MS. KELLEHER: That's everything.  Thank you very much.

THE WITNESS: You are welcome.

THE COURT: Mr. Krisko.

MR. GUY: Your Honor –

THE COURT: Oh, I am sorry, Mr. Guy, I almost forgot you.

MR. GUY: Thank you, Your Honor.

CROSS EXAMINATION

BY MR.  GUY:

Q.       Ms. Graham-King, you said you weren't with Rust at the time of the Grace case; correct?

A.       That is correct.

Q.       So you don't have any personal knowledge as to how the claim forms were used or not used in that case?

A.       How they were used by?

Q.       The debtors.

A.       No, I have no personal knowledge.

Q.       So you don't know whether they were efficiently used or inefficiently used, one way or the other, correct?

A.       By the debtors?

Q.       Correct.

A.       I have no idea how they used them.

Q.       To file a claim under the proposed claim form process that you have, someone is going to have to have a

Graham King - Cross                          293

computer; correct?

A.          Yes.

Q.          And you are assuming that most of these claims are going to be filed through lawyers?

A.          Law offices, yes.

Q.          Do you understand what claims the bar date the debtors propose it applying to, what type of claim?

A.          I would assume all of the claims in the bankruptcy.

Q.          But you understand that they want to impose the bar date on claims that haven't been asserted yet against the debtors?

A.          I actually don't have an understanding of that one way or the other.

Q.          Do you have an understanding as to the scope of the bar date order in the Grace case, as to whether that was imposed against existing claims or claims that could be asserted?

A.          I do not.

Q.          Do you have a position as to whether it is reasonable to impose a bar date on individuals who have not yet asserted a claim against Garlock?

A.          I do not.

Q.          You are not taking a position today on what the proof of claim form should include; correct?

A.          No, except that I would counsel along the line the

Graham King - Cross                        294

parties to try to make the claim form as efficient from a technological standpoint as possible.  In other words, to make the claim form so that the business logic that we employ could be utilized in an efficient way, guide the claimant through the process.

Q.        But you don't take a position one way or the other as to whether the claim form should be a simple claim form or a long claim form, that either way Rust Consulting can process it efficiently and electronically; correct?

A.        Yes.

Q.        I see that Rust was involved in the Babcock & Wilcox case.  Were you involved in that or does that predate you?

A.        That predated me.

Q.        So you don't have any knowledge as to Rust's experience in that case?

A.        The only knowledge I have about Rust's experience in the asbestos bankruptcies is what I have learned from my colleagues who are at Rust and from my review of the depositions taken of my former Rust colleagues who worked at Rust at that time.

Q.        Do you know what Judge Vance said about the use of the claim form in the Babcock & Wilcox case?

A.        I do not.

Q.        So you don't have any view one way or the other as to whether it was efficiently used in that case?

Graham King - Redirect                    295

A.          By the debtors, no, that's not really our job.

Q.          Do you have any knowledge one way or the other as to whether a claim form is being efficiently used by a debtor in any asbestos case?

A.          No.

MR. GUY: Nothing further, Your Honor.

THE COURT: Okay.  Now, Mr. Krisko.

REDIRECT EXAMINATION

BY MR. KRISKO:

A.          Ms. Graham-King, in discussing the estimates about the deficient proof of claim form notification and process the deficient proof of claim responses that you discussed with the committee's counsel, did the features of the electronic system that you propose in this case guide you in estimating the amounts of deficiencies that you put forth here?

A.          Yes.

Q.          Okay.  And how did that affect the estimate, the system that –

A.          As I said, our experience is if you build an easily navigable system, you see far less deficiencies than you would in a system where you are dealing with paper.

So in creating these estimates, we assumed that the majority of the claimants, particularly those represented by counsel, would be able to use the system and that we would not see a large number of deficiencies.

Graham King - Redirect                    296

Q.        Okay.  And isn't it a feature of this system that it prevents on the front-end a claimant, who is represented by counsel, from submitting an incomplete or incorrect proof of claim form?

A.        Yes.  In most of the fields, you will be cued if you try to, as I said, enter a name where there should be a number or enter a number that the system doesn't recognize as having the correct number of digits.  Things of that nature will all be caught.  As I said, in certain narrative situations, we could build something to catch it but that's not part of the proposal.

Q.        And so is it fair to say that one of the features of this particular system is that a claimant will get instant feedback as to whether or not his or her claim is complete or not?

A.        Yes.

Q.        There won't be any lag – will there be any lag time in between – how is that superior to a paper based system that's been used previously?

A.        It eliminates a lag time.  So on the front-end, you are notified instantly if you have tried to enter something incorrectly.  It's flagged.  And then, if there is something that – basically the system is designed to bring you to certain fields.  So if you answer on the front-end, for example, that you are not a personal injury claimant, you would jump to a

Graham King - Redirect                  297

different landing page.  So you don't need to review all of the additional information that might pertain to a personal injury claimant.  If you say, no, that you haven't worked at a certain place, it takes you to a different place in the system.

So it is, in our opinion, a much more efficient system in terms of guiding the process.

Q.        Committee counsel asked you about the charges in the W. R. Grace case.

A.        Yes.

Q.        Can you explain to the court the difference in the scope of the work that Rust did there compared to here?

A.        Well, again, I would say the primary difference is that we were dealing with large volumes of data submitted manually in a paper form.  So we received volumes of medical documents, actual x-rays, things of that nature that we processed individually one by one and oftentimes, as I said, there were situations where problems arose and we found duplicate claims.  We couldn't identify claimants because of the way the claim form or the personal injury questionnaire was altered or manipulated.

Q.        Now does the system that you propose in this case address a lot of those concerns?

A.        Yes.

Q.        Could you also explain to the court whether or not Rust had responsibilities in the Grace case that had nothing to

Graham King - Recross                    298

do with the particular personal injury questionnaires, things like property damage, I think you mentioned?

A.     Yes.  The scope of the work in Grace included not only personal injury claims but there was a large property damage component and there were also, I believe, claims for medical monitoring.

Q.     Okay.  Were the charges that were incurred by the estate in that case due to services other than just the asbestos, personal injury?

A.     Absolutely.  I mean, the property damage cases alone incurred – the debtors or the trust incurred a significant portion of the charges as a result of those.

MR. KRISKO: No further questions, Your Honor.

MS. SIMPSON: May I ask a couple, Your Honor?

THE COURT: Yes.

RECROSS EXAMINATION

BY MS. SIMPSON:

Q.     Has your security system ever been compromised?

A.     It is probably a question for Mr. Shuck, but I don't believe it has.

Q.     Are there instances where you used a web-based system in the past for claims that the system has been down for any reason, whether there is a natural disaster or an update, that sort of thing?

A.     None that I am aware of.

Graham King - Recross                    299

Q.        Do you have procedures in place in the event the main system goes down for the web base to be picked up somewhere else?

A.        Yes.

Q.        Does your engagement include working with claimant's attorneys to load their – potentially load data that they already have into your system to avoid manually entering claims?  For instance, if they have spreadsheets with the information on all of their claimants, does your engagement include working with them to load that data directly?

A.        You mean having them upload a spreadsheet and then capturing it?

Q.        Yes, or upload the data to map it essentially?

A.        The proposal does not anticipate that, no.

Q.        How many filings will the web base system accommodate in an hour, let's say?

A.        I think, again, that's a question for Mr. Shuck but we can process a large volume of filings hourly.

Q.        The reason for the question was, when you have a bar date, typically people tend to wait until that bar date.

A.        I've heard that.

Q.        And I wondered at the end how that would be handled.

A.        It would not be a problem.  If you are asking me if it would compromise the system, it would not.  We anticipate that that will be the case.

Graham King - Recross                    300

Q.          What happens to claims and claimants when a deficiency notice is sent to them that their claim was deficient in some way and they do not respond?  What happens to those claims?

A.          Generally speaking, we make multiple attempts to contact the party and then we would advise both sets of parties and the court of the situation and we would take our direction from whatever is agreed upon.

Q.          So if there was a law firm or a group of claimants that were resistant to this, it would ultimately come to the court to decide how to deal with those claims?

A.          I would assume so.  Our job would be to just notify the appropriate parties that we have made every attempt and received no response.

Q.          Will the data in the system be available other than reporting to the debtor or the committee counsel, for instance, data mining, or is it just to the attorneys that represent those claimants?

A.          My understanding is that the data will be accessible to everyone.

Q.          There is secure data that would not be accessible to everyone?

A.          Correct.

Q.          When you say everyone, who is that?

A.          So the plaintiff's firms would be able to access all

Graham King - Recross                    301

of their own data and, if we were ordered by the court or if the parties agree that other, for example, counsel for the futures, were to access that data, we can make it available. The presumption is that –

Q.        To the debtor or – you would not without order of the court?

A.        No.

Q.        Okay.

MS. SIMPSON: Thank you, Your Honor.

THE COURT: I have got one question.  I am always reluctant to ask questions because all it usually does is disclose my ignorance but, if somebody is trying to fill out the form on a computer and the computer tells them that such and such field hasn't been done, your example of leaving the expiration date off the credit card, something like that, would the person be able to submit that claim even though there were those deficiencies or would the system not allow them to submit something?

THE WITNESS: Well, the system can be built to do either, Your Honor.  If the parties –

THE COURT: It seems to me that there are only two possible populations, either you have got a system that allows deficient claims or you have got a system that disallows some claims.

THE WITNESS: Actually the system can be built so that

Graham King - Recross                          302

if, for example, you can't submit a claim without the minimum information saying name, Social Security number, we can build it so that, as long as that information is contained in the claim, then the claim can be submitted.  So if somebody leaves out, for example, work history, we could still accept the claim.

On the other hand, if the parties tell us that certain information is imperative to have and a claim can't be submitted without it, we can design the system so that it rejects the claim in its entirety.

THE COURT: All right.  Anything else?

(No response.)

THE COURT: Thank you.

MR. KRISKO: Your Honor, we would like to call Nathan Shuck to the stand next.  He has prepared a demonstration of the system that Rust has already kind of mocked up.  It will take just a minute to get his computer plugged into the screen.

THE COURT: Do you want to go ahead and take a break then?  Why don't we just take until eleven o'clock.

MR. KRISKO: Thank you, Your Honor.

(Recess from 10:47 a.m. until 11:01 a.m.)

THE COURT: Have a seat.

During the break, Ms. Beyer advised me that yesterday afternoon she received in the mail two checks from Rust Consulting, apparently for participation in a class-action she

Shuck - Direct                                          303

had forgotten about.  One was for twenty dollars and the other
was for ten.

MR. CASSADA: So they didn't forget about it.  They are
good.

THE COURT: No, they didn't forget about it.  That's
good for them.  Her check was twenty and her husband only got
ten.

Okay.  Are we ready to go?

MR. KRISKO: Your Honor, we are ready to call Nathan
Shuck to the stand.

THE COURT: Okay.  Good.

(NATHAN SHUCK, WITNESS, SWORN)

DIRECT EXAMINATION

BY MR. KRISKO:

Q.        Mr. Shuck, can you please state your name and your
position at Rust Consulting?

A.        Nathan Shuck, Director of Business Integration and
Compliance.

Q.        Can you give the court a description of your
professional background?

A.        I have been in the IT industry for approximately
seventeen years.  Over the course of my career, I have designed
and implemented large scale systems for federal government,
state government, Department of Defense, Fortune 100 industries
such as JP Morgan, Chase Manhattan, a variety of industries.

Shuck - Direct                                      304

Q.        Can you describe for the court your duties at Rust Consulting?

A.        My duties at Rust Consulting, I have several departments that I report to.  As such, I have responsibility for business requirements analysis, system design, data architecture, compliance and process improvement.

Q.        Okay.  Do you also oversee, and I guess it is implied in something that you said, but the Rust compliance with information security?

A.        Absolutely.

Q.        And can you give a fuller description of those duties at Rust?

A.        We investigate all – or we analyze all contracts that come through and make sure that we can comply with the requirements. We also provide the relevant requirements, which aren't usually specified in a contract – they are alluded to – for the federal government.  This would be several FISMA based requirements.  The federal government has a specific set of compliance regulations that they mandate, as well, and certain types of information are federal regulations that take precedence such as HIPAA, HITECH.

We also have state laws that apply for personal identifiable information, as well as industry standards such as PCIDSS, which is credit card information.  In addition, we also have several acts that govern the way we handle data, even

Shuck - Direct                                        305

though we are not subject to them, such as Gramm–Leach–Bliley,

which would be the security of financial information.

Q.         Okay.  In your job title, the word "compliance" is

in there.  Does that mean that you are the person that's really

in charge of compliance with these requirements at Rust?

A.         Absolutely.

Q.         Okay.  Can you describe the kinds of claims

administration matters that you are involved in?

A.         Through my roles and responsibilities at Rust,

virtually – well, pretty much every case I am indirectly

involved in.  Every case that goes before us has a business

analyst assigned to it, as well as compliance.  All of those

people report up through me.  I also get directly involved in

any large-scale cases or any large-scale cases that have any

kind of technology implications or onerous compliance

requirements.

Q.         Is the project that's been proposed in this case

consistent with the kinds of projects that Rust handles in

other situations?

A.         Absolutely.

Q.         We have heard some description of the claims

submission system that's been proposed here.  Can you provide

the court with a more detailed description?

A.         Yes.  We have a core system that stores all of the

data that we receive, everything that's submitted to us.  We

Shuck - Direct                                    306

also have several different ways of intaking data.  The one we have proposed here is an online filing system which will allow us to take the data on a web application over the Internet through a web form.  This will allow us to ensure the date is correct and complete prior to submission.  We will be able to give instant feedback.  We will eliminate any latency between submission and defect resolution by capturing it immediately.

We will be able to transmit this data securely through an encrypted fashion over SSL.  This prevents anyone from being able to do a "man in the middle" attack, being able to snoop the data, being able to intercept it on its way to us.

Q.        Okay.  Is the kind of system that's been proposed in this case been approved by other courts?

A.        Absolutely.

Q.        I guess, just to be clear, do the other matters that Rust handles involve sensitive information like Social Security numbers, medical information, and that sort of thing?

A.        Absolutely.

Q.        Can you describe for the court how you will approach developing a system for this case?

A.        Once the parties have agreed on the data elements that would be captured, such as the proof of claim form, we will take a look through there and we will analyze the data elements, we will group them appropriately, put like elements with like elements, so that it is more intuitive for the user.

Shuck - Direct                                    307

In something like this, what we are primarily going to focus on is usability, data security, data normalization.

And by data normalization, it is a technical term for saying that we are going to make sure that all of the data is entered in the same way.  An example of that would be, if you are entering a name in a field that says, "Please put your name in," you could do it Nathan Shuck.  You could do it Shuck, comma, Nathan.  You could do Shuck, comma, Nathan W.  So there's a variety of ways, and that makes matching very difficult without using sophisticated algorithms to determine who is actually submitting the data or how to identify that person in the case of duplicates or in the case of misspellings.

What we would do is we would separate that out.  We would ask you distinctly for your last name.  We would ask you distinctly for your first name.  With these discrete elements, it makes matching much more easier and it makes duplicate identification resolution much easier.

Q.        Okay. How does this approach, particularly with the technology process that's been proposed, compare with the methods that were available four or five years ago?

A.        Well, the technologies did exist in some fashion in the mid 2000's; however, they have improved.  But, more importantly, our techniques have improved.  We have gotten a lot better with the leveraging technology.  We have gotten a

Shuck - Direct                                        308

lot smarter about how people normally interact with systems. In the mid 2000's even, technologists were doing things that were cool but not necessarily usable. To the average layperson, they were difficult, they were complex. However, today we have gotten to the point where we know how people interact. We know how people visualize a system. We have a whole field of discipline for user interface design. So we focus primarily on ensuring that it is usable.

The techniques, the technologies that have evolved since the mid 2000's have greatly improved our efficiency in this matter.

Q.      Okay. Mr. Shuck, I understand you are prepared to give the court a brief demonstration as to how the electronic claims submission system would work in this case with, I guess, a basic mockup of the system; is that correct?

A.      That is correct.

MR. KRISKO: Your Honor, with the court's leave, I would like to allow Mr. Shuck to give a demonstration.

THE COURT: All right.

THE WITNESS: I apologize. This is going to be a little bit difficult to read. What we have done is we have taken the proposed proof of claim form that we received from debtor's counsel. We've –

THE COURT: Do you want to pull up a chair closer?

MS. KELLEHER: I am sorry but I can't see it at all.

Shuck - Direct                                    309

THE WITNESS: I was trying to magnify it earlier but it made the TV go a little wonky.  Okay.  So we started with the proposed proof of claim form that debtor's counsel gave us.  We then turned that into a web form.  There are distinct differences between what you can do with paper and what you can do with a web form.  So we have changed some of the order around.  We have grouped some of the other elements around.  We have expanded certain sections, and we have reduced certain sections.

The main approach that we are looking for here is something that's easy to navigate, something that's intuitive for people to use and something that is going to have a lot of usability features such as hiding elements that are not required.  There are going to be certain cases on a claim form where, if you answered "yes" to a question, you have to fill out a full section.  If you don't answer "yes" to that section, we are not even going to show it to you.  We don't want to confuse somebody by throwing a bunch of elements at them that they think that they have to come up with.

Also, though not in this prototype, we have the ability to constrain data elements, to tell you if you have entered a number where a letter should be, a letter where a number should be, a date that doesn't exist.  For example, February 31st would immediately result in an error.  We have turned those off for the sake of demonstration here.

Shuck - Direct                              310

In this example, obviously if we don't have your last name, we would not allow you to proceed. We would tell you, you must enter your last name. We would highlight that field for you, and then you would be able to go back and correct it.

So once you have entered all of this information, for example, you just use tab keys to move through. You can put in your mailing address, you can select your state. We will use drop-downs wherever we know what the data elements are. That way, we don't have you typing Georgia or GA, or any kind of abbreviation. We know what it is. We are going to give you that choice. We are going to make it very easy.

And once you get used to using the system, after a couple of run-throughs, for example, if I want to choose Minnesota when I tap this field, I don't have to actually open it up. I can just hit the "M" key five times and it will take me to Minnesota.

Our data entry people had some input into this. We have learned a lot of lessons from them. We know that using a keyboard is extremely quick. We know that you can quickly memorize certain elements. So we try and keep your hands off of the mouse and allow you just to tap through.

We have check boxes that we can validate or not. It is completely up to how the parties determine this form to be used. Once you hit next page, that previous page is saved. All of the data that you have entered is now saved. If you get

Shuck - Direct                              311

to this page and you realize, you know what, I don't have any of this information, you would be able to quit, go and get this information, come back and your first page is saved.  You would be able to resume right here.

This is why we pay a lot of attention to organizing common data elements.  We want to make sure that we are not asking you for work history at the same time we are asking you for your address.  That is not how a logical brain is going to process these things.

As we go through here, the other small issues are check boxes versus radio buttons.  A radio button allows me to pick one or the other.  This is one of those things that we know you are not going to pick both.  We are going to make you pick one, though.  More addresses.

As we go through here, here is an example of a dynamic element.  This is a dynamic form element which allows us to hide or produce data elements as necessary.  In this case, if the creditor is the injured party, you just answer yes and you move on.  However, if the creditor is not an injured party, we have some other information that we require from you.

For example, if you are the personal representative of the injured party's estate, we are saying that you must attach a copy of certificate of official capacity.  If you have checked this and you don't attach anything, it will bomb out as you try and go forward.  It will tell you we need you to upload

Shuck - Direct                                              312

an attachment.  You will do so here.

You click on this and this would open a window.  You would choose to add a file.  You would browse your system. Whether it is one file or multiple files, we allow you to do multiple at one time.  So if there are five documents you need to upload, we are not going to make you do that over and over again.  We are going to allow you to upload them all in one shot.

These are more examples of how we will do dynamic elements.  In this case, if you are an attorney and you have logged in, because you have logged in we know who you are, we know what firm you are associated with.  So this would default to "yes" and this would all be pre-populated with your information. This is something that isn't going to change.  As a static data element, we are going to populate this for you. Our goal is to make it usable.  Our goal is to make this as streamlined as possible.

This is a case where you could have multiple elements, whether it is mesothelioma, lung cancer, other cancer or other. If you do other, it is going to ask you what it is and this will give you the opportunity to put that information in.

This is another example of a dynamic element.  This is if you have filed a lawsuit or a civil action against one of the other debtors based on injury.  It will then ask you some of the case details.  It will ask you if a judgment has been

Shuck - Direct                                    313

entered.  If a judgment has been entered, it will ask you the date of the judgment, the amount of the judgment and whether or not the judgment has been satisfied.

It will also ask you on the next question that's related to the first, is whether or not the case lawyer is different from the represented lawyer.  If that answer is yes, it is going to ask you this information.  If the answer is no, that information is hidden.

This is more settlement information.  We are not going to go through the whole thing because it does get redundant and a lot of you have already seen the claim form.  Here is how we are going to deal with claims against other asbestos trusts. I believe this was table "A" in the proposed proof of claim form.  In this case, we know what the trusts are.  We can put a list of all of the trusts out there, and we will allow you to just select one from a drop-down list.  From a data integrity standpoint, it is easier for me to have you select one from a drop-down list, as well as quicker and easier for the people entering the data, rather than having someone type Armstrong World Industries Asbestos Personal Injury Settlement Trust. There is a lot of opportunity for error there.  We're going to remove that by making it a little bit easier on you.

Once you have gone through and added your information and, again, there are no edits on this right now.  Once you have gone through and added your information, you click to add

Shuck - Direct                              314

it.  This will create a table.  This allows you to add as many or as few as you want.  If you don't have anything, you can go immediately to the next page.  If you have got ten different settlements, it will start populating this grid down here.  If you erroneously add one, you can either choose to edit it or delete it, and that will take you back to this section here.

This is one of those open-ended questions where, if we don't know what the party's name could be, we give you the opportunity to answer it here.  This allows us to capture as much data without constraining it.

This is an example of where we know what the result was.  If there is going to be one of four possible results, we are not going to make you enter that.  And this, again, would be a grid.

This is another example of how we hide and produce elements as appropriate.

That's just a simple question, yes or no, and proceed.

Product exposure details, this is more of a questionnaire and this also is a grid.  Everywhere that you had a table, one of those long forms in the proof of claim, we have replaced it with a grid.  We don't need to show you all of that information if it is inappropriate of if it is unnecessary.  We do need to give you the ability to enter it.  We do need to have the ability to capture it.

One other thing that is important to point out is, as

Shuck - Direct                                    315

you look at this, we are having you enter discrete elements. Every data field is distinct so that we can do comparisons. Facility name, site owner and employer, rather than giving you a block to work with, we are going to capture these individually as different elements. They are all associated. They are all related. This allows us to do a search on facility name.

So if somebody actually enters a facility name that is slightly different, they mean the same thing but they are a little bit different, we will use what is called the Hamming algorithm, which is a scientific algorithm designed for determining the distance between data elements. It does so on mathematical comparisons of letters, spelling order, as well as correlation of other data. Logically humans can see that, if the site owner is the same, the facility name is off by one letter, they are probably the same thing. We do that with the Hamming distance algorithm.

Again, more grids. Occupational history, again, this is a grid.

Full Social Security names, or Social Security numbers or foreign tax IDs, we have got this currently in boxes. We would probably change that if we are expecting a large number of foreign tax identification numbers.

Medical history, and this is another open-ended question.  Has the injured party ever smoked cigarettes,

Shuck - Direct                                          316

cigars or pipes, yes or no.  If yes, identify the frequency and duration of use.  There are a couple of different ways we can do this.  It would be through an open-ended text box in here for now; however, we could break that out into separate data elements such as first frequency as one element and then duration of use as another element.

It really comes down to, once the parties have settled on a proof of claim form, we will go through, we will identify the elements and we will structure it in the best way so that you can search it later.

Supporting documentation, this is for diagnosis. This is for attaching a diagnostic report.  Again, it is upload, go ahead and browse, grab them, add them and upload them.

Once you have uploaded documents, they are automatically associated with this claim.  There is no ambiguity here.  Everything that is uploaded will be tagged and loaded into our system with the appropriate claim number, the Rust ID that we will uniquely generate internally.  It has no significance other than uniquely identifying documents within our system.

Again, more questionnaires. This is another question, "Has a certified B-reader interpreted any chest x-rays of the injured party?"  If yes, again upload the documents.  The reason they have upload documents on specific pages, one, we're going to know who this document is associated with by the fact

Shuck - Direct                          317

that it was uploaded during this process.  By putting it in different sections, we will also know what the significance of that document is.  If you upload a document here, we are not going to confuse it with a proof of representation.  Everything will be tagged by what we call metadata.  Metadata is the technical term for data that describes other data.  It is a description of the element that you are looking at.

A question about pulmonary function.  Again, it is going to ask you for uploading documentation, as well as is the injured party deceased.  Again, these are going to be certificates that we will be able to identify automatically once you have uploaded them.

And finally an electronic signature.  This essentially says that everything is fine, I have read everything, I have double checked, let's go ahead and submit it.  This would actually turn into a submit button.  Once you have reached the end of the process, once you have submitted it, it goes into our production systems.  It is permanently saved.

Prior to this, anything you do back in these sections is going to be a pending record that will be saved on a staging location.  That allows you to go back and work on it, make corrections as necessary.  Once it is submitted, now we have it in a production form; we have it stored in our main production database as a finalized record.

We would then send an acknowledgment to whoever we

Shuck - Direct                                                318

were told to acknowledge.  I believe it is – I think it is under the firm attorney.  I am sorry, I forget where it is, but there is a section in here that asks you where notification should go, whether it goes directly to the injured party or whether it goes to their representation.

Based on that, once we get to the end, once you hit submit, we will send that acknowledgment to whatever party was indicated.

That concludes the demonstration.

Q.       Thank you, Mr. Shuck.  Just a couple of further questions for you.  Well, two questions.   How would the sensitive information, the medical records and that sort of thing, be handled once it is input into the web application?

A.       Once it is put into the web application, it will be submitted to our databases.  Whether that is a staging database or a production database, we will have both of them physically secured, as well as electronically secured.  You need access to be able to get into them.

Under the HIPAA and the HITECH Act, we are also required to do foot printing, which means that least privileged access, if you are a processor, if you are a call center representative, we probably don't need to show you a full Social Security number, so we would obfuscate.  We would mask out the first five characters as mostly common and just show the last four.  Anybody who has ever called the bank before,

Shuck - Direct                                            319

they ask for your last four.  The person on the other end of that phone doesn't get to see your full Social Security number. They only see the four.

The basic principles of HIPAA compliance are least privileged access and auditing.  We will know everybody who looks at the data.  We will know how often they have looked at it.  We will know what they did with it, whether it has changed, whether they just viewed it.  So that is how we would secure this data.  Primarily what we are concerned about in this case is personally identifiable information and health information.  So those elements would be secured, those would be isolated in our database systems.

Q.       Does Rust have an auto process to ensure its continued compliance with those security requirements?

A.       We have several.  We have our SAS 70, type two, annual audit which is a statement on accounting standards. That it is a type two, means that we do it annually and we can produce that report from independent auditors.

We also undergo, for our work with the federal government, we undergo FISMA certification.  FISMA is the Federal Information Standards of Management Act of 2002, which dictates that all systems need to be secure to function for the United States government based on their appropriate level of sensitivity. As part of that process, it calls for a mandatory certification  and  accreditation  program  by  a  designated

Shuck - Cross                                        320

approval officer of that federal branch.

Q.        Okay.

MR. KRISKO: No further questions, Your Honor.

THE COURT: Okay.  Ms. Kelleher.

MS. KELLEHER: Your Honor, I have a few questions.

CROSS EXAMINATION

BY MS. KELLEHER:

Q.        Mr. Shuck, I am Leslie Kelleher and I am here for the Official Committee of Asbestos Creditors.

A.        All right.

Q.        At the end of your presentation, you said that once you hit the submit button, that it is permanently in your files, the claim form.  If a claimant has made an error, can he go back and correct it?

A.        Yes.  The reason why we move it from a staging database to a production database, generally once you have hit submit, in most cases that is going to be a finalized record. It is not going to be subject to change.  Therefore, we can store it with the rest of our records.

We also do it for the distinction of notifications. I am pretty sure you don't want a notification every time you enter a field or save a page.  So that is how we make a distinction between something that is pending or something that is permanent.

We do know that, if you have a pending claim, you are

Shuck - Cross                                                321

going to change it.  You have to change it for it to become a finalized proof of claim form.  So for the sake of performance, we have records that are highly transactional, meaning they are subject to change, and records that are not subject to change, so they are more analytical.

Q.        I'm sorry, maybe I missed it, but once it has been finalized and somebody realizes, oh, I missed three jobs, they can go back and submit a whole new claim because at the beginning of your presentation, the first page asks – one of the questions asked was if this is corrected.  So would it replace, then, the original claim?

A.        It would not replace.  We would ask you to update the elements that you had mistakes on.  We use date relational history for our data architecture, and what that means is that we never replace or delete data.  We just date stamp it so that we know what is current.

It is analogous to, if you go to a restaurant that has a chalkboard out front that says today's specials, that is permanent data.  Once they erase it and put the new special on, you don't have any record of what yesterday's special is.  This would be more like a whiteboard of paper where you just add a new piece of paper over the top of it.  You can go back at any time and view what the activity was, what the mistakes were.

This is important for several reasons.  One, we want to make sure that we have accurately captured everything that

Shuck - Cross                              322

was submitted.  We want to make sure that we never accidentally throw anything away, so we protect ourselves by never throwing anything away.

Two, it allows us to do usability analysis and assessment.  We can see that, if someone is having a specific problem, if we see a wide group of people are having a problem with a specific section, we will know that either we need to update instructions or we need to go modify that process and assist people in having a better usability experience.

Q.      What is the last date on which such a correction can be made by the claimant?

A.      That would be up to the parties.

Q.      And I take it you haven't been given any instructions on that point?

A.      Nope.  I'm just a tech guy.

Q.      Okay.  That's a good line.  You talked about normalization when you spoke about having your fields, the last name is written first and the first name is written second.  Is there any kind of normalization in that sense for questions such as – it is written differently on your presentation.  In the proof of claim form that is a paper form, there is a question that asks the claimant to describe how the injured party worked with product, including the tasks and tools involved and how many times, on average, an injured product or other exposed person worked with product each year.  Is there

Shuck - Cross                                  323

any normalization of the responses to those questions?

A.          There could be.  First of all, it seems like there are two questions.  That is more of a compound question block.  So we would break those answers out and we would allow you to answer each one of them individually.  That gives us a better target for searching.  If we are looking for specific locations, we would block that out into a field, discrete data elements, so we could search solely on those locations without having to weed through all of the other stuff.

            The other thing that we would do –

Q.          Could I just – I am sorry.  Could you just repeat what you just said?  Solely – I just didn't hear you.

A.          You can solely target specific data elements that you are looking for.  If you have got a location, how you have been exposed, if we have some pre-populated answers that we can give you, we can offer those to you.  If that needs to be a free form, that could be a free form.

            Normalization isn't always going to give you exact match, one-to-one, across all people but what you can do is you can constrain the boundaries of how many questions they are answering in a specific paragraph.

Q.          How do you decide when to seek to achieve greater normalization?

A.          We do usability studies.  We do data analysis.  We look at the reports that are expected.  Most of what we do for

Shuck - Cross                                      324

determining how we are going to store data, besides common sense and besides historical expertise, we will look at the reports that people are looking for. We're going to look at what the actual business case is, what the use cases are.

By telling us how you plan to use the data, we can better optimize the way we store the data for you.

Q.     So these decisions have not yet been made for this proof of claim form, I take it?

A.     I have not received any requirements.

Q.     You have got some – I don't remember how you phrased it but situations where if you answer yes, then you will get an additional drop-down menu; if you answer no, you don't. And we saw a few such menus. At this point, the ones that we saw, are those the only ones in which that occurs?

A.     Those are the ones that I saw on the proof of claim that was proposed. So those are the ones that we extracted and turned into those dynamic elements.

Q.     We also saw some spots in the electronic proof of claim form that allow you to upload a document. There is a blue box that says upload document.

A.     Yes.

Q.     Are those the only places in the proof of claim form where you can upload documents?

A.     We have a final document upload page that will allow you to upload something that is not specifically categorized.

Shuck - Cross                                     325

The reason that we have those on specific pages is because we can attach metadata to the documents you have uploaded so we will know what they are.  For example, proof of representation is on the representation page.  Therefore, if you upload a document through that page, we will automatically assign metadata to it that says this is a proof of representation document.

Q.          So, therefore, if someone who wishes to do so wants to upload deposition transcripts or other types of information, an affidavit, a list of places where he has worked rather than filling in your little boxes, they could upload it at the end?

A.          You could do that, but we would highly recommend against doing that because that completely sidesteps the concept of data normalization.  Essentially what that does is that puts the burden on a third-party that doesn't have direct contact or a relationship with the injured party.  One of the principles of data capture is trying to get as close to the data source as possible.  It is much more efficient for you, for example, to go onto a website to buy something when you know what your credit card information is, you know what your date of birth is, rather than have somebody who may not know all of that information.

The closer we get to that source, generally the better quality of data we are going to get.  So rather than having us go through and try and pull out that data from a deposition,

Shuck - Cross                          326

there would be inefficiencies there.  I wouldn't say that it would be inefficient.  We do have technology that we can use to get us eighty percent of the way.  It would be of improved efficiency if the person who was taking the deposition, or is familiar with the case, can separate that data element out appropriately and list them in a way that we could search on them much more efficiently,

Q.          If someone were to do as I just suggested and upload documents such as deposition excerpts or other documents that are normally used during discovery, is it your understanding that Rust Consulting would go through those documents to extract the pertinent information?

A.          It depends on how the court orders it or it depends on how the parties determine the best way to approach is.  There are a couple of different approaches.  We could have manual labor. We could have someone who reads the document and keys it in to the appropriate forms.  We could also use a process called OCR and ICR, which is optical character recognition and intelligent character recognition. We can map out some specific fields.  We can capture data elements that way.

However, again, our recommendation is that the discrete data fields are used.

Q.          Am I correct that OCR will not work unless the document is OCR searchable?

Shuck - Cross                                        327

A.          Not really, no.  It will work less effectively.  OCR can work with just about anything whether it is an image.  It just has to know what it is looking for.  It can be a Word document.  It can actually be a TIF file or JPEG or a picture file of any kind.

Q.          Well, you will have to excuse me.  You call yourself the tech guy.  I will call myself the non-tech gal.  But my experience has been sometimes that I look at a PDF and I am looking for a word and I know the word is in there, and I can't find it in the PDF when I try to search it.

A.          Okay.

Q.          That is not OCR, then, right?

A.          That is OCR-able.  The reason why you can't do a search on that is because the way the PDF was created was not through text; it was created with images.  OCR, by its very nature, is going to scan an image and determine what the characters are. Optical character recognition is exactly that.  It will take the image.  It will look at the general shapes, recognize them as characters and organize them in a fashion. So the search functionality in a PDF is completely unrelated to OCR.

Q.          So my understanding from your colleague's testimony is that, if these proofs of claim form are filed online in the way that you have just shown us, you can process many in a day. She expressed no concern at the system crashing if we have got

Shuck - Cross                                    328

tens of thousands of people putting them up; correct?

A.          If we know what to expect, we can provision a appropriately for it.  We have done a quite heavy volume in the past and this is on hardware that is slower than what we purchase today.  I believe we had a case where I think we did about eight hundred thousand in a week.

Q.          What does it mean when you say that you did them, you processed them?  Does that just mean they are being uploaded onto your system?

A.          Processing has a different meaning when we start talking about the technology.  In this case, what we will be doing is we will be basically doing data submission, data intake.  Our processing, we have not received any instructions on any processing.  All we are going to do is take it in, store it.  That is pretty much it.

Q.          So if you were to receive, in fact, tens of thousands or a hundred thousand claims with large volumes of documents attached, you would not process those other than to store them on your system; is that correct?

A.          Store them, apply the metadata.  A hundred thousand documents, without trying to sound cheeky, that's a bit of a rounding error to us.  We have done extremely high volumes.

Q.          If you were asked, however, to go through those documents – and, by documents, I should be clear.  I know that often people refer to documents as a page or something.  If you

Shuck - Cross                    329

were to be asked to go through a hundred thousand deposition transcripts that are a hundred and fifty pages long each, it would take you a bit more time; is that correct?

A.        It depends on the form of those documents.  If they are handwritten documents, if there are scribbles, if it is my handwriting, yes, that would take quite a bit of time.

Q.        So conceivably the charge from Rust Consulting could be considerably higher; is that correct?

A.        It could be.  There are various operational things that we can do to lower those charges, as well.  If you are going to be using highly skilled and educated people to go through and read these, obviously your charge goes up.  If you're using lower-skilled people and all you are looking for them to do is do some typing, the charge goes down.

However, there would be an up charge if you were going to rely on us to do transcriptions.

MS. KELLEHER: That's all of the questions I have. Thank you.

THE COURT: Mr. Guy.

CROSS EXAMINATION

BY MR. GUY:

Q.        Mr. Shuck, I know who to call the next time I am on Amazon trying to buy something.

A.        Just give me your credit card number.

(Laughter)

Shuck - Cross                                    330

Q.          It wouldn't help me, believe me.  My wife already has it.

Do you understand that the purpose of the proof of claim form that you have designed here is to determine who intends to file claims against the company?

A.          I assumed that was the case, yes.

Q.          And that is from the existing pool of people you have claims currently?

A.          I don't know who this is going to be targeted at.

Q.          Can you achieve that same goal of determining who is going to pursue claims with a simple claim form?

A.          I am sure that there is probably a scope here.  I don't think it is a complete black and white question.  Again, I am looking at the technology.  I am looking at the intake.  I am not looking at the overall purpose of it.  What I go by is somebody tells me what they are trying to accomplish, somebody gives me the data elements they are looking for.  We analyze those as business requirements and we implement leveraged technology, as necessary, to support it.

The furthering lines of the business reasons behind it are on the other side of a walled garden to me.  I merely serve in my niche.

Q.          But from a technical perspective, you could have a form that required name, address, Social Security number and disease, correct?

Shuck - Cross                              331

A.          Oh, absolutely.  We could have a form that requires something as little as what your name and address is.  We could expand it to what your shoe size is.  We can capture whatever data once you decide are appropriate.

Q.          Now the proposed cost here is four hundred and fifty thousand – four hundred and fifteen thousand dollars, correct?

A.          I believe so, yes.

Q.          Were you involved in the Grace case?

A.          I was not.  I was not directly involved with that case.

Q.          Have you been involved in any other asbestos cases where Rust Consulting was an advisor and consultant?

A.          All of those cases predated my time with Rust.  However, as part of my process improvement, management duties, we do have several initiatives in place within Rust.  We do SIGMA, process improvement exercises.  Part of this is analyzing everything that we have done in the past.  Every time something doesn't go swimmingly well, we find that there are improvements that we can make.  We test those improvements; we apply those improvements; and then we adopt them once they are proven.

The issue here – and even if something does go swimmingly well, we're going to use those lessons learned.  We are constantly evolving our process.  It is kind of funny to think that somebody would do something that was painful and

Shuck - Cross                            332

didn't work very well and continues to do the same thing over and over again.

So I do have some familiarity with the W.R. Grace case just because of the process improvements that we have analyzed as a result of some of the lessons learned there.

Q.        It didn't go swimmingly well in Grace, right?

A.        From what I gather, probably not.  We know that we can do a lot better by adjusting certain elements.  My understanding of that case is the primary difficulty was getting the asset, which is data, getting clean data, getting it in an organized, normalized form.  That is one of the things that we find that we can prevent a lot of the issues midway through the case if we deal with them up-front.  The further down the chain they get, the more difficult they are to resolve and the more expensive it is to resolve it.

Q.        And the more complex the claim form and the system behind it, the more expensive it is; correct?

A.        In certain cases, it could raise the cost of the system.  In other cases, it is a trade-off because, if you look at the amount that you spend on prevention, you severely reduce the amount of resolution.

Q.        If we were to have a very simple claim form in this case that is similar to the claim form that is submitted in most bankruptcy cases, effectively one page with maybe ten fields, that would be cheaper for the estate, correct?

Shuck - Cross                              333

A.          It depends on what you are looking at.  If you are looking at it from a very small microcosm of the overall process, it probably would be cheaper.  You could have a college graduate write something like that.  However, if you are looking at it in the overall process for the data that you need to capture, the data that you are going to need to determine the cases and all of the things that are going to be required to take you to the end, as we look at the whole picture, it would probably end up costing you much more by not investing up-front.

Q.          Mr. Shuck, when you were going through your explanation of the form, you had supporting documentation for a diagnosis; correct?

A.          Correct.

Q.          And certified B-readers; correct?

A.          Correct.

Q.          And pulmonary function tests, correct?

A.          Correct.

Q.          Now, as I understand the bar date proposed by the debtors, it would apply to anybody who manifest a disease at any time just before the bar date.  So if you manifest a disease on December 31, are you going to have that documentation?

A.          I wouldn't know.  Actually, to tell you the truth, I don't know what most of those things were.  Those were taken

Shuck - Cross                                    334

off of the proof of claim form.  So I don't know what the lead

time for producing those documents are.

However, in the terms of whatever terms that the

parties agree to, it could be that initially just filling out

your name is sufficient.  It could be that all of the documents

have to be completed.  That is not a determination that we can

make.

Q.          Thank you.

THE COURT: Anything else?

MS. SIMPSON: Let me just ask one.

CROSS EXAMINATION

BY MS. SIMPSON:

Q.          I had asked a question about it seems to assume that

there is going to be a lot of problems with people putting in

data or they don't want to put in data – I am sorry – or they

don't want to put in data or they want to stick it at the end

or whatever, and you don't have any control over that.  That

would be up to the court to take care of that.  But if you had

an attorney that had a database with all of this information in

it, how difficult would it be for you to assist them in mapping

the information so it could go right into your system, your

database?

A.          That's going to depend on the structure of the

database, whether it is third form, normalization, whether they

have actually structured it in a way that we can map that over

Shuck - Redirect                                                335

to our structures.  If they have just thrown a bunch of garbage in there, we're going to have to do a lot of data cleansing. This falls under the discipline of ETL, which stands for extract, transform and load.  So we would have to analyze the data within those databases.

If it is clean data, then we would have really not that much of a problem pulling it in.

Q.      And once that was pulled in, then they could go back and review the forms and add anything else to it that they needed to and sign off one by one?

A.      We could have absolutely structured it that way.

MS. SIMPSON: That's all I have, Your Honor.

THE COURT: Mr. Krisko.

MR. KRISKO: Just a couple of questions.

REDIRECT EXAMINATION

BY MR. KRISKO:

Q.      We discussed a little bit about the W. R. Grace case.  I wondered if Rust is now handling a current case that is comparable in size and scope in which it is applying the kinds of technologies that have been proposed here?

A.      We handle several cases that rely on data intake for electronic data submission.  Some of them are very, very large. One of them was a class size of eighty million members.  We knew that we were going to get a heavy volume there.  I believe that was right around six hundred thousand in the first week,

Shuck - Redirect                                   336

week and a half.  We have also had one in the past where I believe we did about eight hundred thousand in the first month – actually, I think in the first two weeks.  What happened with that was, once the settlement became public knowledge, it was picked up by a bunch of news outlets, MSNBC, in particular, that actually provided a link directly to our site.  That was one that we weren't really expecting.  So all of a sudden we were adding servers.  We did not have any problems with it but it was an exercise in taking a look and make sure that we know what volume to expect.

MR. KRISKO: No further questions, Your Honor.

THE COURT: Okay.  You can step down.  Thank you.

THE WITNESS: Thank you.

THE COURT: Now are we going to shift to Mr. Swett's witness?

MR. SWETT: We are at your disposal, Your Honor, whether we start now or have lunch and come back and start.

THE COURT: Well, I am for eating lunch if that's going to give you all time to do what you need to do.

MR. SWETT: We are ready to go now.  It is just a question of when you want to have lunch.

THE COURT: I have got enough candy up here.  I can last through the afternoon.  I said I have enough candy up here, I can take care of myself.  I don't know about you all.

MR. CASSADA: Your Honor, I have spoken with a couple

Peterson - Direct                                337

of counsel who have requested that, if it were agreeable to the parties and the court, to adjourn at 4:15 today, it would allow them to catch earlier flights.

MR. MOON: Your Honor, actually we have got folks that need to leave at 4:15, so if we could adjourn at 4:00, is that a problem?

MR. CASSADA: Which I am hopeful that we will get Mr. Scarcella on but, if not, I suppose we have flexibility there but four o'clock.

THE COURT: All right. Forty-five minutes didn't work yesterday. Can it work today?

MR. MOON: It will work. We have got lunch coming today.

THE COURT: Okay. All right. Let's just come back at 12:30 then. That is forty minutes.

MS. SIMPSON: Your Honor, if I can be excused now.

THE COURT: Sure. That's fine. All right. We will be back at 12:30.

(Recess from 11:48 a.m. until 12:32 p.m.)

THE COURT: Have a seat. If you are all ready, we will get Dr. Peterson on.

(MARK A. PETERSON, WITNESS, SWORN)

DIRECT EXAMINATION

BY MR. SWETT:

Q.       Good afternoon, Dr. Peterson.

Peterson - Direct                    338

A.        Good afternoon.

Q.        Would you please state your full name?

A.        Mark Alan Peterson.

Q.        Where do you reside?

A.        Thousand Oaks, California.

MR. SWETT: Your Honor, I would like to mark Dr. Peterson's curriculum vitae.

THE COURT: Okay.

MR. SWETT: This will be ACC-4.

Q.        Dr. Peterson, is this a copy of your most recent resume?

A.        Yes, it is.

Q.        Would you summarize briefly, please, your education and academic experience?

A.        I have an undergraduate degree from the University of Minnesota, a law degree from Harvard Law school, and I have a doctorate in experimental social psychology from the University of California, Los Angeles, which I received in 1976.

Since that time, for about twenty years, I worked at the RAND Corporation in Santa Monica as an empirical researcher, quantitative researcher, mostly dealing with issues of the legal system.  First, the criminal justice and, subsequently, the civil justice system.  And most of that work – during the course of time, I also taught both at RAND – RAND

Peterson - Direct                                    339

has a graduate school that gives Ph.D.'s.  I taught there and I have taught as a visiting professor at UCLA Law School.  In graduate school, I taught undergraduates at UCLA.

My work in civil justice primarily focused on mass-tort litigation and primarily on asbestos litigation.  I have published many papers, both in RAND and in journals, RAND publications and journals, on the subject of mass-tort litigation.

I really began the work in the early 1980's working on a project for Judge Tom Lambros, US District Court Judge at the time in Cleveland, working with Francis McGovern as a special master.  My job there was to interview plaintiff and defense lawyers in the Cleveland area about how they value asbestos claims.  The court in Cleveland was faced in the early eighties, as many courts were, with an influx of many asbestos claims and had to figure out how to deal with them.  So the trust was trying to work up efficient processes for litigating and trying to settle those claims.

The judge asked me to interview the plaintiff and defense lawyers about how those cases are processed by each side and how they value claims and, to do so, I conducted extended, with each interviewee, I conducted extended Socratic interviews where I would give them a hypothetical case, ask them how they valued it and why they valued it, and then I would change one fact at a time and ask them how does that

Peterson - Direct                    340

change the value.

Based on that, we developed a series of rules that we developed into a computer system, an artificial intelligence model, tried to get a computer to think like a lawyer. We were partially successful but unfortunately we used up so much computer capacity that RAND made me stop using the computers.

Q.        Was that your only engagement involving working for a court?

A.        No. Subsequently I worked for Judge Parker in the Eastern District of Texas on a large class-action involving the Center for Claims Resolution and others where again we interviewed plaintiff's and defense lawyers. In both of these engagements we collected data on past settlements to help analyze and use in resolving then pending claims. That was in the late to mid-eighties.

About that time I also began a project working for Judge Robert Merhige in Virginia. I was one of the court's experts in trying to help the court fashion a process for developing information about Dalkon Shield claims in order to value those claims.

Q.        Before we go further there, let me take you back to the Judge Parker matter. Was that an asbestos-related case?

A.        Yes, that was an asbestos – class-action involving somewhat over six hundred claims.

And after that, in 1990, I was engaged as a special

Peterson - Direct                          341

expert, I guess it was called, for Judge Jack Weinstein and Burton Lifland in New York to restructure the Manville Trust. The Manville Trust had come into existence about eighteen months earlier and had immediately become insolvent.  It couldn't pay the claims that it was facing.  So Judge Weinstein stayed payments and asked me to help the court restructure the trust by working with the parties to see if we could fashion a way that it could pay present and future claims similarly.  And I worked on that project actually off and on – well, I worked on it for seventeen years, although we did develop a solution at five, primarily because of the good graces of the parties. And that led to Manville's restructuring and the first of what is called the trust distribution procedures that set a model for how all other asbestos trusts have operated since that time.

Q.          Let's turn to your work on behalf of private parties.  What sorts of parties in asbestos-related matters have you been engaged by?

A.          I really have been engaged by a range of parties – claimants committees in bankruptcy, future representatives in bankruptcy cases, asbestos defendants, insurers of asbestos defendants, courts, asbestos trusts.  I have been engaged by most of the asbestos trusts to help on issues of claims handling and also to forecast liabilities or to review the forecasts of others.  And that's pretty much the engagements I

Peterson - Direct                         342

have had in that area.

Q.        Are you a trustee of any asbestos settlement trusts?

A.        Yes, I am.  I am a trustee of the Fuller Austin Asbestos Trust.  It is a small trust in Texas, and I became a trustee in 1998.  I have continued to be a trustee there.

I am a trustee of the Manville Trust.  After serving as the special expert for the court and the parties, all parties, including the trust, for seventeen years, I became a trustee in the year 2007 and I continue to be a trustee.

Q.        Dr. Peterson, on page four of your C.V., beginning a little below the midline of the page, there is a list headed "Expert on asbestos claims and liability forecast in forty-four bankruptcies."  Is that list complete and up-to-date?

A.        No.

Q.        What's missing?

A.        Well, it doesn't include the testimony in the W. R. Grace case a little over a year ago on issues of estimation. In particular, the estimation of cases arising in the state of Montana.  I participated in that hearing, but the actual estimation hearing got terminated with a settlement of the parties before I was called as a witness in the main part of the estimation.

There may be others.  That's the only one that comes to mind right now.

Q.        Have you been engaged in the recently filed

Peterson - Direct                    343

bankruptcy called Specialty Holdings, formerly known as Bondex?

A.        Yes.

Q.        Who is your client in that case?

A.        The asbestos claims committee.

Q.        And have you been engaged in the bankruptcy of Motors Liquidation Company, formerly known as General Motors Corporation?

A.        Yes, and I am engaged in this case.

Q.        Who is your client in the General Motors bankruptcy?

A.        The asbestos claimants committee.  I have also had some additional trust engagements that aren't on here, several trusts of either trusts or claimants committees in trusts. They were some for the trustee, some for the claimants committees, sometimes jointly for the claimants committees and the future representative.  They are not all listed here but there are several more.  As the trusts get created, they need expert help.

Q.        Have you had occasion in the past, Dr. Peterson, to testify to estimations of the aggregate asbestos liabilities of any particular debtors?

A.        Yes.

Q.        Roughly how many times have you appeared in court to give that testimony?

A.        I counted it a couple of years ago and I think it was around fifteen, give or take some.  Some cases I have

Peterson - Direct                    344

appeared multiple times.

Q.          Have the courts in those cases accepted your qualifications as an expert for the purposes of claims estimation hearings?

A.          Yes, in each case.

Q.          How do you characterize, Dr. Peterson, your areas of expertise?

A.          Well, my academic areas is the study of behavior of people that are participating in the litigation system and institutions such as courts and businesses and insurance companies, and that's what I have published in.  I am an expert on the processes of mass-tort litigation, including asbestos litigation, and the structure of trusts to pay mass-tort cases.

In my consulting work, I regard myself as an expert on estimation of liabilities in mass-tort cases.  Mass-tort litigation is a process.  On the asbestos and other forms of trusts set up in these cases to pay claims; the trust distribution procedures used to pay claims; matters such as that.

MR. SWETT: Your Honor, at ths time I would proffer Dr. Peterson as an expert in the fields he just described, which I would summarize as the behavior of the parties and institutions in mass-tort litigation; the estimation of liabilities in mass-tort situations; the creation and operation of trusts formed to deal with the aftermath of mass-tort resolutions.

Peterson - Direct                    345

THE COURT: Mr. Cassada.

MR. CASSADA: I will accept Dr. Peterson on the same basis that Dr. Bates was, certainly for purposes of this hearing.

THE COURT: Sure.  We will accept him as such on that basis.

MR. SWETT: Thank you, Your Honor.

THE WITNESS: Let me add one other thing.  That work is primarily empirical and quantitative.  That's the nature of the work I do in all those areas.

MR. SWETT: Okay.

MR. CASSADA: I just want to ask does that qualification, does that apply to any particular part of the expertise you described or is that –

THE WITNESS: To all of them.

MR. CASSADA: Okay.  Thank you.

BY MR. SWETT:

Q.        Let me bring you back, please, to the case you mentioned, the *Robins* case.  What was your role – I think you said you were engaged by the court in that case?

A.        Yes.

Q.        And what was your function?

A.        I was working under the direction of Professor Francis McGovern who is at Duke Law School, and the court asked three persons to be experts and they are my partners in Legal

Peterson - Direct                          346

Analysis Systems, my company – Dan Relles, a statistician who (inaudible) my work and Patricia Ebener, who is an expert on data collection and proofs of claim and matters such as that. And he asked us to work with the experts that were appointed for each of the parties in order to develop a process by which we could help the court understand what were the liabilities facing A. H. Robins for Dalkon Shield claims.

And in working with the experts and with Francis, we devised and designed the process that was used, the data collection process for claims in Dalkon Shield. I didn't do any analysis of that data. Francis didn't want the neutral experts to provide the answer; the individual parties did that. We helped them in that effort.

Q.       And what was Professor McGovern's official capacity in that case?

A.       He was the special master.

Q.       Do you have a recollection, Dr. Peterson, that there was a proof of claim form in the *Robins* case?

A.       In some sense there was a couple but there were different proofs of claim in that case.

Q.       Do you remember that, in addition to a short proof of claim form, at a different stage of the case an elaborate fifty-page questionnaire was employed for certain purposes?

A.       That was used for some purposes for a sample of claimants to collect data. It wasn't part of what's more

Peterson - Direct                      347

broadly understood as a proof of claim and it was given only to a small portion of the claimants who had registered basically by filing a more generic proof of claim form, a simpler claim, more like a form ten.

Q.          And how was that sample drawn?

A.          We randomly selected – I think it was a stratified random sample of claims who had registered with regard to a second proof of claim.  It was a sample, I believe, of seventy-five hundred.  It has been some time since I did this project.

Q.          Do you remember the approximate response rate that that questionnaire elicited?

A.          I think it was around five or six thousand.  It was fairly substantial.

Q.          Do you remember the amount of time that was devoted to that process?  That is, the devising, the issuing of the form and the collecting and inputting of the information?

A.          Well, that and there was a parallel process to collect data from resolved claims and they were kind of done parallel in conjunction with each other.  And that whole process well exceeded a year.  It was done – my recollection is about a year and a half, but I precisely can't say.

Q.          And was participation by respondents in the questionnaire process voluntary or compelled?

A.          I believe it was required that they do so, although I am not sure that people – in retrospect, I think people who

Peterson - Direct                          348

failed to comply still could pursue claims.

Q.        And as among the formal parties to the case, was it a voluntary or consensual process or a compelled process?  That is, did the debtor and the committees agree upon it or was it decreed by the court over objection?

A.        No, it was a process that came out of the parties. The parties developed it consensually with the assistance of Francis McGovern who is special master and wheedled it out of us, I guess.  So it was a totally voluntary process with regard to the decision in the first instance to undertake the project and, secondly, how it was carried out, all of the details were worked up consensually with the three of us as the court's experts in trying to direct, and manage and guide that consensus.

Q.        Do you remember, Dr. Peterson, to a rough order of magnitude the costs that were entailed in the questionnaire and information-gathering process in *Robins* that you have described?

A.        I don't think there was ever a definitive complete tally of it.  Francis McGovern at the time referred to the cost as around ten million dollars –

MR. CASSADA: I will object. That is hearsay.

THE COURT: I will accept it with that understanding.

THE WITNESS: The costs were around ten million dollars, of which about six million was in the data collection

Peterson - Direct                          349

and working on its development and so forth and about four million or so in a notice campaign that the court undertook.

BY MR. SWETT:

Q.          What was the perceived need in the *Robins* case that led the parties to the idea of using that questionnaire and incurring that expense?

MR. CASSADA: I will object to the form of the question, Your Honor, perceived need.  I don't know whose perceived need –

MR. SWETT: I will rephrase.

BY MR. SWETT:

Q.          Do you have an understanding of why the parties decided to go the route of that questionnaire?

A.          Yes.

MR. CASSADA: The same objection.

THE COURT: Overruled.

Q.          And what's your understanding?

A.          The parties and the judge and everyone involved with it recognized there was inadequate existing data about the past history of Dalkon Shield claims in order to be able to base a forecast on.  There were a wide range of injuries that were claimed to have been caused by the Dalkon Shield, which was an intra-uterine device, and many of those kinds of claims were never evaluated or paid through those tort processes.  Some were, some weren't.  But even for those that were paid, I

Peterson - Direct                    350

believe at the time there were maybe five thousand settlements, more or less.  There were not a trivial number of them but not a great many settlements.  There wasn't a big settlement history on those cases.  There were some trials but a relatively sparse number of settlements.

And so the parties concluded that – we were expecting we received a couple hundred thousand claims.

MR. CASSADA: Your Honor, can I have a standing objection to this testimony about what the parties concluded and –

THE COURT: Sure, that's fine.  I will overrule it and listen.

THE WITNESS: The experts working with them all assumed and discussed the likelihood of getting a couple hundred thousand claims, which we did, and the parties' experts needed a way to estimate the values for those claims and they didn't have it, so we developed this process as a means to fill in data that weren't available.

BY MR. SWETT:

Q.        Was the result of that process, in your opinion, a reasonable replication of a tort system resolution?

A.        Not really.

Q.        Why not?

A.        It's because it was based upon the parties' analyses of the closed claims.  They said, okay, there is a group of –

Peterson - Direct                    351

a small number of claims of a certain sort, certain consequence of a pelvic infection.  And the parties had to extrapolate from those results to what other kinds of diseases would get paid, without ever having any data for them.  And even for the cases that were resolved, they made their own inferences as to what they thought the real values of these claims, rather than what they got in the tort system.

And so there was a wide range of estimations from under a billion dollars, I believe, to up to three or four billion dollars.  And that wide range was based, to a great extent, on how the parties valued the claims because they had no guidance.  We didn't have what, first, just to undertake the project in the first place is we had no history to look at.  And so we were doing this on a theoretical analyses basically of the various experts as to how to value claims, which may or may not have proved to have been accurate.  So we couldn't test it.  There was never any litigation again.  So it was untested, but it was highly variant among the parties and without really any empirical basis for telling us – with any adequate empirical basis to tell us that one set of estimated values was better than the other.  We just had nothing to look at.  There was no history there.

Q.        Dr. Peterson, do you consider –

A.        It was inadequate history, excuse me.

Q.        I am sorry.  I didn't mean to –

Peterson - Direct                        352

A.          I needed to clarify that.

Q.          Do you consider that questionnaire process such as was undertaken in the *Robins* case would be reasonably necessary in the Garlock case?

A.          No.

Q.          Why not?

A.          Well, here, unlike *Robins*, we have an abundant history. Unlike *A. H. Robins*, which had been participating in litigation for only several years, Garlock has been a participant in asbestos litigation since 1975. They have thirty-five years of experience. During that course of time, they have settled hundreds of thousands of claims and dismissed almost as many. So there is a great deal of empirical information about how these claims had been valued in the tort system. And we can see how they were valued – the tort system has not been static – the asbestos litigation has not been static for thirty-five years. It has changed. And we can see how the level of claiming has changed in response to changes in the litigation system. We can see how the values have changed in response to litigation. We can see what the current values are, how they are valued by each of five diseases, each of which is amply represented in these data.

So the forecast, the objective of a forecast, whether I do it or Dr. Bates does it, is to try and estimate how these claims would be resolved if the asbestos litigation were to

Peterson - Direct                              353

continue against Garlock, what's the values of these claims, what's the obligations of the debtor to these group of creditors.

The way the value of those claims are determined in the American court system is how they are valued in the litigation system and the ancillary settlement process to the litigation.  And, here, we can see that.  That's what it obtained in the past.  That's what it would obtain in the future.  And that's the best way to do it, and we have ample data.  There is no need to invent some – and it's a method – the methods of using these data have been used thousands of times.  They have been used in litigation.  They have been used in estimation processes.  They have been used by defendants.  They have been used by Garlock.  They have been used by insurance companies.  They are the bases for all the trust estimates.  It's the universally applied method for estimating liability.

So we have a method that's been tested.  We have data that's been tested.  There is no need to invent a wholly new method that's going to have all of the problems of no ability to confirm the conclusions of that, like the process that was used in *Robins*.

Q.        Does the method that you just referred to, is it commonly referred to by any particular name?

A.        The standard method.

Peterson - Direct                              354

Q.        And can you give a thumbnail description of what it consists of or its essential elements?  We will go into detail later but, for now, just the essentials.

A.        Fundamentally the estimate of future claims is based upon the data, the prevalent claims data that's available for a defendant, usually abundant, about the past history of litigation.  So it's empirical forecasts based upon all the data about how that debtor or company, if it is not a debtor, if they are doing a financial forecast, what's been the past experience with regard to the asbestos litigation for this particular entity, combined with information about the epidemiology.

There is very well-confirmed epidemiological research – Dr. Bates made some reference to that – that tells us what's been the past level of asbestos-related cancers and what's likely to be the current level.  You combine those in order to forecast future claims, and you look to the past resolutions to let you know what fraction of claims historically have been paid, what fraction – how much money they have gotten, how that has changed over time in order to make inferences about how that is likely to be in the future.

Q.        Now, is the method that you just described so briefly one that aims for mathematical exactitude in the forecasting of claims and values and aggregate liabilities?

A.        No.  It's neither an aim or a possibility.  I mean,

Peterson - Direct                           355

these are forecasts.  All we can do is say, based on our best knowledge now and utilization of all of the data available to us and the methods that in the past have proven to be reasonably accurate, what is the future likely to be, but there are enormous numbers of uncertainties that can affect forecasting like this, particularly because the forecasts go out forty years.  And most of that uncertainty –

Q.          I am sorry, I didn't hear you.  How many years?

A.          Forty years.

Q.          Why is that?

A.          Because the incident – asbestos diseases are called latent diseases.  They typically manifest themselves decades after someone was first exposed to asbestos.  Asbestos fibers are insidious.  They have to get into the body and work the damage that they do over time.  So there is a time delay because of that.  There is also a time delay because asbestos exposures, significant asbestos exposures predated the 1940's and have continued in great quantity through the 1970's.  And with regard to Garland, they continued until the year 2000 or 2001.

So if you think of someone being exposed in the year 2000 with the risk of mesothelioma, which has been described before as kind of reaching its maximum in forty years after the first exposure, or beyond, you add forty years to 2000, you are at 240 – 2040.

Peterson - Direct                     356

So that's why the carpet you referred to earlier will continue to unroll for decades and, because of that, the need for compensation to victims in asbestos litigation and asbestos trusts will continue for that length of time.

Q.      Before you continue, I would like to make clear that it is not the position of the asbestos claimants committee that Garland Cassada is responsible for the asbestos mass tort.

A.      I am sorry, I didn't mean –

THE COURT: That's the risk you run when you have two last names.

MR. CASSADA: I have only been involved since about 1994.

THE WITNESS: And I have to explain that Mr. Cassada and I are old acquaintances.  He has had the fortune or misfortune of cross-examining me multiple times, and we have almost become friends over that period of time.  So if I sometimes mention his first name or confuse it with his closely-named client –

MR. CASSADA:  We are friends.

MR. SWETT: Very well.

BY MR. SWETT:

Q.      Let me ask this: If mathematical exactitude is not a feasible objective, what can you achieve through estimation of asbestos liability under the standard method that you have described?

Peterson - Direct                               357

A.              Well, several things.  I think you can make forecasts that I believe have reasonable certainty.  You know, the one thing I can guarantee that no forecast you are going to hear in these proceedings will be exactly right, but it could be more or less close to what the ultimate – well, what the liability would be.  In some sense, you can't even measure it because they are not returning to litigation.  They are going to presumably go to a trust, which is a slightly different process.

So you have – and you know that these are reasonably certain methods because they have been used in the past, and we can look at how good they have been in the past.  You can also identify areas of uncertainty, and you have seen some of that already.  Dr. Bates has taken the very preliminary and illustrative forecast that I provided, and we will be speaking to in a couple of minutes, and he has raised some criticisms, and those are criticisms that we haven't been able to deal with yet because we don't have the data from the debtor to really be able to analyze.  So we had to make a very superficial analysis based upon information that Garlock had provided us.

And in doing so, Dr. Bates said what's this issue about stale claims, for example, and we can quantify that.  We can look at, okay, if there are no stale claims, the liability is "x."  If there are stale claims or what the debtor describes as stale claims, and they get resolved never, you have a

Peterson - Direct                              358

different value or if some fraction of them get resolved.  So you can see how much is your ultimate forecast sensitive to uncertainty and disagreement about stale claims.  We can tell the court that.  We can say, okay, we disagree about stale claims, but it's a third decimal issue.  It is not going to be a billion dollar issue.  It is probably not going to be a hundred million dollar issue.  It is going to be tens of millions of dollars.

So the court can understand that, yes, there are areas of disagreement but we can quantify what is the likely range of effect upon forecast.  So the court can see for each of the experts, when you look at the data, what our forecasts are, how we differ and what's the significance of each difference.

Q.        Is it fair to say that sensitivity analyses are a strategy for dealing with the inherent uncertainties of forecasts in the future?

A.        It's a standard way for trying to understand and address uncertainty in this kind of effort, yes.

Q.        Now, you mentioned a source or sources that you used for the preliminary illustrative analysis you mentioned and contrasted that with something else.  I want to zero in on that for a moment.  Have you received at LAS a database from the debtor?

A.        Yes.

Q.        When did you receive it?

Peterson - Direct                              359

A.          Monday afternoon, this last Monday afternoon.

Q.          And to what extent has LAS been able to work with the data between then and now?

A.          Well, I had my partner, Dan Relles, chained to the computer in Santa Monica looking at it, and it is a complex database.  It involves, the debtor says, nine hundred thousand claims.  We have only been able to identify seven hundred thousand but, in either event, it is an enormous database and it involves not simply one database, it involves multiple databases.  One for claims, one for law firms, one for the complaint and information like that.  It is called a relational database because you can take each of these databases and link them together.  Each of those databases have lots of variables in them, and those variables, in turn, have codes.  The information is encoded and, in order to understand what the data mean, you need to be able to understand the structure as I have described it, superficially.  You need to know what the variables are.  They are not always well-labeled.  And you need to know what the whole specific number in that variable is, what's the meaning of it.  Is there a number in there that indicates a case was tried or not, for example.  And we didn't get very good information about all of that detail about the structure of the database, about what the variables mean and what the values of the variables mean.

            And that's not particularly surprising.  When you get

Peterson - Direct                    360

a database at first, I mean, it often is incompletely documented. I expect that, you know, we will be able to, with Dr. Bates and his associates, or the debtor and their people, they will help us understand it. We don't know whether we just are missing certain data. The fact we have fewer claimants is a bit odd, and maybe there is something that hasn't been sent to us yet, or maybe we just don't understand what we have. I expect that, over time, we will get that but, right now, we don't have it. It is useful in very limited ways, and I will draw on it a bit, but it is not sufficient for doing forecasts. In any event, as good as Dan Relles is, he is not good enough to do a forecast overnight.

Q.      Is there such a thing commonly referred to as a data dictionary?

A.      Yes.

Q.      What is that?

A.      The data dictionary basically identifies the variables and the values of those variables the way I have described.

Q.      Is that the missing piece that you were referring to a moment ago?

A.      That or its analog, something like it, yes.

Q.      When you are equipped with that information, do you expect to be able to use the Garlock database in the way that you have used other similar databases in the past to estimate

Peterson - Direct                    361

asbestos liability?

A.          Oh, certainly, yes.

MR. SWETT: Your Honor, I think what we will do now is walk through a series of slides that I will hand out to the parties and the court that Dr. Peterson has prepared.

THE COURT: Okay.

MR. SWETT: And we will mark this for identification as ACC-5.

Your Honor, if I may, I am going to acknowledge that Mr. Cassada sent us, after we requested it, some information prepared, I believe, by one of his partners to try and help us understand the database.  We are still anticipating further dialogue with opposing counsel to see if we can elicit the company's data code definitions, and that will be attended to in due course.

MR. CASSADA: I would like to point out now that the database was only requested, I believe, either the day before or after this hearing had originally been scheduled.

MR. SWETT: I am not making an issue of it.

MR. CASSADA: I didn't think you were but I didn't want that information to be out there without making that point.

MR. SWETT: Fair enough.

BY MR. SWETT:

Q.          I just wanted to elicit the following: Dr. Peterson, is the presentation that we are about to go through one that

Peterson - Direct                    362

you made on the basis of the database?

A.        No.

Q.        What was the information upon which you based, as far as the claims history goes, what was the source of information you used for this analysis?

A.        It's information primarily from the proof of claim motion that Garlock submitted in this case.  There are a number of references in tables to quantitative issues, and we have taken those – we don't know their validity but we are accepting them as the basis for the forecast for both reasons.  We don't have the database and we are relying upon the representations about data from Garlock.  These have got to be regarded as very preliminary and really only offered to illustrate how this method works.

Q.        Do you expect that a fully fleshed out analysis of the data would produce an estimate different from the preliminary way you are prepared to talk about today?

A.        Yes.  I don't know how different or how materially different but it is certainly going to be different.

Q.        Okay.  Well, let's just walk through this going through.  The first page of text, which is actually numbered page two in the hard copies, would you explain to the court the ideas that are set forth here?

A.        Actually Dr. Bates helped explain some of this before.  A forecast of liability for both either pending claims

Peterson - Direct                         363

or future claims is a function of three parameters: The number of claims, what fraction of them get paid, the percent paid and how much they would get paid on average.  So that is the simplest statement and version of this.

There are complications throughout but that's the simplest statement.

Q.        The data sources, we have already talked about.

A.        Yes.  Well, you want to rely upon the asbestos claims database and we will, and that's how the method operates.  Right now, we are operating on this limited set of data.  The other source is the epidemiological forecast that I mentioned.

Q.        You have noted here certain problems.  Would you explain those?

A.        Well, I have already referred to them.

Q.        Okay.  All right.  Let's turn to page three.  What is set forth here?

A.        Well, the third of the three parameters is the average payment.  Historically in the last half dozen years, or so, Garlock reports that it has paid seventy-five thousand dollars per claim on average to mesothelioma claimants when their claim is paid.  This does not include the zero payments. This includes only the people who received some money.  Of the data that Dr. Bates shared earlier in this hearing, it basically confirms.

Peterson - Direct                                    364

Q.            Let me bring out – does this preliminary analysis treat non-mesothelioma malignant disease claims in any fashion?

A.            Only as a forecast of mesothelioma claims.  Each of the different diseases have their own characteristics, their own values.  Of course, the numbers of claims differ, the fraction that get paid differ.  So this analysis has to be done separately for each of the diseases.

Mesothelioma is the most – it's a poor word to use, but it is the most valuable, is the highest value of any of the asbestos-related diseases.  Lung cancer is next.  Then, on average, other cancers will be less and non-malignants will be less than that.  Although there is great variation of payments for each of those diseases, particularly non-malignants, there are very serious non-malignant claims. It can even result in death.  So some non-malignant claims have values that approach lung cancer.  Most don't.

Q.            But we deal today in this preliminary analysis exclusively with mesothelioma claims; correct?

A.            Only mesothelioma claims, just for illustration.  It will be the largest share of the liability across the diseases, though.

Q.            What is the significance of the average mesothelioma payment in an asbestos estimate?

A.            Well, this is what they paid historically.  It is a not unusual starting point for forecasting in the future.  If

Peterson - Direct                                    365

the debtor has been paying roughly seventy-five thousand dollars a claim for the last five or six years, it's not unreasonable to assume that, in 2011, they would pay about the same amount of money, seventy-five thousand dollars.

Now, there may be reasons to think it will go up or down and Dr. Bates and I will both be engaged in efforts to see if there are such things that might explain if they go up and down, and we will explain it. He may come back and say, well, the real value of a mesothelioma claim in 2011 is going to be fifty thousand dollars, and I may say it is ninety thousand dollars, but this is a starting point.

Q.        And what sorts of analyses have you brought to bear on the question of what the appropriate average mesothelioma value for an estimation is?

A.        Well, I think the appropriate number is where you ended up, that's where you start. The things you want to look at to see if you want to adjust that, you look at trends. If they have been going up over the last five years, then it is appropriate to think they are going to continue to go up.

You can do univariate and multivariate analyses. You can see how factors in your database are associated with the amount of money people got in the past.

We know, for example, that the mesothelioma payments in California will be greater, on average, than they were in Nevada. And so that can be – you can do an analysis to say,

Peterson - Direct                           366

among pending claims, it takes into account these differences. In saying if you think the mix of claims is going to be different next year than they were last year, that perhaps that's going to affect the value.  There are a number of things you can do on that.

You can also make inferences that there is going to be some change in the asbestos litigation or there is some change going on now that's going to impact values.  Those kind of things are what you consider, and you can quantify a lot of these because, remember, we have thirty-five years of experience.  If you think that there is some event that's occurred that's changed the values in the past, we can look and see that.  And if that's the case, one or the other of us may present to the court an argument that, okay, this is the value today but the world is changing now in a way that's changed before.  When it changed before, we saw this happen and we think it is going to happen again. Those are the kinds of arguments, and they can all be made within these data. These issues are all best explored within this data.

Q.        Let's turn to the next page.  This one is headed, "Mesothelioma Percent Paid."  What are you talking about there?

A.        Not all claims get paid, and so – not in the past and not in the future.  So when you forecast the number of claims that come in to Garlock, you have to estimate what fraction of them will get paid and get the average value.  And

Peterson - Direct                         367

there again, you look at history.  You see how that's changed. As Dr. Bates has illustrated, there is some uncertainty about what's the appropriate historic payment rates because some claims haven't been paid yet.  So you have to figure out, okay, we know how – we can count the number of claims that we paid. We can count the numbers that haven't been paid, but some of them haven't and you have got to make inferences about what's going to happen for claims historically that are not yet paid, and that will lead to some differences between us with regard to how we forecast.

You can look at that in the data.  We will explain it to you.  You can see what's the consequence of making different inferences about it.

Here we actually do – we didn't have the data, so we couldn't ourselves calculate, but the percent paid is the number of paid claims by the number of resolved claims.  That's how you define it.

Here, we have taken Garlock's representation of the number of mesothelioma claims that have been paid in recent years, which is ninety-five hundred a year.  We don't know how many are resolved.  We just don't have – because you have got to add to these claims the numbers that were closed without payment, and so we have to make inferences about that.

MR. CASSADA: And you said ninety-five hundred a year, I believe?

Peterson - Direct                               368

THE WITNESS: It's on page six of the P.O.C. motion.

MR. SWETT: Let me ask a question and I will try to clear it up.

BY MR. SWETT:

Q.        The number paid, ninety-five hundred –

A.        I am sorry.  It is not a year.  I beg your pardon, yes.

Q.        Is that by year or in total?

A.        That's total.  I beg your pardon.  That was a mistake.  It was nine hundred and fifty a year for the decade of the 2000's and we are looking at the decade of the 2000's. Thank you for the correction and thank you for sending us the information off the database, too.

Q.        The next thing on your slide –

A.        Let me make one other point. We don't know how many of these claims will resolve without payment, and so we have two estimates, a high and low, which leads to different payment percentages which are shown, either eighty-two percent or sixty-four percent. That's a sensitivity analysis. That's one example of how you examine uncertainty.

Q.        Well, first of all, do you expect to be able to identify the number of resolved mesothelioma claims once you get into the database?

A.        Yes.  There will still be some uncertainties about what's the right number, but we will be able to do that by

Peterson - Direct                                  369

looking at the database.

Q.        And describe to the court how you arrived at the low estimate and high estimate given in your preliminary analysis?

A.        Well, it differs basically with regard to how many pending claims – how many claims were – we know that there were four or five thousand meso claims that weren't resolved at the end.  We know also that – we have a representation from Grace that there are over five thousand pendng meso claims.  We have their representation that there are about sixteen hundred and fifty claims filed per year.

So when you count up how many claims were filed during the 2000's according to the debtor and how many of them got paid but there was some left over, and so you have got to exclude them from the analysis because they weren't resolved and so they don't enter into the calculation of the payment rate.

Also there were some claims at the beginning.  They started not only with the claims that were filed during the year 2000's but there were claims that got carried over from the 1990's and that we don't know how many claims from the 1990's came over. We don't even have – Garlock did not provide a representation about that, and that's the difference between these two.  It is how many claims from the 1990's got carried over.

Q.        So how did you go about addressing that uncertainty

Peterson - Direct                                            370

for purposes of your preliminary analysis?

A.          Well, we looked at during the decade of the 2000's, we had an estimate of how many claims got resolved that were filed in that year, and we kind of applied what we see from the 2000's back to the 1990's and made the same inference about how many are going to be left over at the end.  At the end, there were over five thousand claims.  You can look at that in relationship to the number of mesotheliomas that got filed during the year.

So we assume that that similar percentage could be applied to data from the 1990's that, again, the debtor provided us, how many finds there were during the 1990's.  We assume a similar fraction of them carried over from one decade to another.

Q.          What accounts for the difference between your high estimate of the percent paid and your low estimate of the percent paid?

A.           It is just differences with regard to that carry-over number.

Q.          How did you derive the carry-over numbers to assume? What's the difference –

A.           One, I think we didn't have any carry-over number. That's the high estimate. That's unreasonable. It's too high. But we are trying to set a range here and it's for illustration.  The other was to assume the historic rate of

Peterson - Direct                                    371

carry-over from the debtor – from the data as I have described. That's the other one.

Q.        Let's pass to the next page, number of mesothelioma claims.  Is the number of five thousand, three hundred and seventy-two pending claims a figure you got from Garlock?

A.        Yes.  It was in the proof of claim form.

Q.        And how did you derive the number you have here, twenty-three thousand, nine hundred and seventy-seven for future claims?

A.        Well, we used – that number was derived from a forecasting method that's called the Nicholson method. Nicholson was a – in fact, Dr. Bates described him earlier.  He was a researcher at Mt. Sinai Hospital in New York, which is really the center of research on asbestos disease in this country and it's a forecast that he did in the early eighties. So we used that, coupled with the limited information that the debtor provided us about claim filings during the year 2000's, in a way that I have set out in the next several pages.

Q.        Let's take a run at explaining briefly the Nicholson epidemiology.  Can you describe in your own words the essential elements of that?

A.        The Nicholson epidemiology is based upon – Dr. Nicholson in 1982 published a report that forecast the number of people that were going to die annually from occupational exposures to asbestos, exposures that occurred between 1940 and

Peterson - Direct                                    372

1979, the peak years of exposure for all of the major asbestos using industries in the country, which really pretty much are close to the universe of all persons.  And for each year he forecast how many people were going to die from mesothelioma, asbestos-related mesothelioma.

Q.        Let me ask a question.  Is there any known cause of mesothelioma other than asbestos?

A.        No, no.

          MR. CASSADA: Your Honor, I will object.  I don't believe he has been qualified as a medical witness.

          THE COURT: All right.

Q.        Is it generally assumed by forecasters of asbestos-related liabilities that all mesothelioma cases are attributable to asbestos?

A.        There are differences of opinions amongst forecasters.  There's differences of opinion among doctors.  Dr. Nicholson has written that he doesn't believe there is anything other – well, certainly no one can identify a known cause of mesothelioma.  The question is are there unexplained causes of mesothelioma.  Dr. Nicholson said that he didn't believe that anything other than mesothelioma caused it, and the only problem is you couldn't – and he has written about this and he told me this personally, when I was working with him in my work with Judge Weinstein, that if you looked far enough, you could find the asbestos exposure.  So there is a

Peterson - Direct                        373

difference of opinion about that.  But his forecast is of mesothelioma which he regarded as all mesotheliomas.

More properly, the lung cancer forecast is only persons whose lung cancer was caused by asbestos disease. Asbestos is the second most frequent cause of lung cancer deaths in this country after tobacco, and they interact.  The combination is particularly lethal.

MR. CASSADA: The same objection, Your Honor, about lack of medical status.

THE COURT: Okay.  We will accept it.

BY MR. SWETT:

Q.        Let me ask you this: Did Nicholson forecast deaths from mesothelioma separately from deaths from lung cancer?

A.        Yes.  He did it separately for each disease.  He did separately for categories of occupations and he did it separately by year, and he also did it for other cancers which are the gastrointestinal cancers.

Q.        Let's move forward to the next slide.  Would you please explain this chart?

A.        This is a graphic representation of what the Nicholson method is.  The black line is the Nicholson forecast of the number of asbestos-related deaths, the number of deaths from mesothelioma –

Q.        That's the top line?

A.        The black line at the top, yes.  So roughly it's at

Peterson - Direct                                 374

around three thousand in recent years, and it will begin to go down slowly and then somewhat more quickly. He forecast out to 2030, but we extrapolated his curve out to 2040 because we do our forecasts to 2040. He didn't say there weren't going to be any more mesotheliomas after 2030, he just stopped his forecast.

The light blue line is the number of claims as reported by Garlock, sixteen hundred and fifty mesothelioma claims a year filed against them, on average, during the 2000's. In reality, it wouldn't be straight, but we can look at the data. It would go up and down, but we just have this average representation.

And so what we can do is we can divide the blue line, the number of Garlock mesothelioma claims, by the black line for the years when past claims have occurred, the decade of the 2000's, and that gives us what fraction of all mesotheliomas in the country ended up with a claim against Garlock. And on the next page, that calculation is shown for the top formula. It is the number of claims which are data from Garlock, divided by the incidents, the count of the number of mesothelioma deaths in the country. You divide the number of claims by incidents and that's the fraction. It is the claiming rate, the propensity to sue.

Q.      Explain that. What is that telling us?

A.      It basically says, among all the persons who might

Peterson - Direct                    375

have filed a claim against Garlock for mesothelioma, because they had mesothelioma, so potentially they could have filed a claim, what fraction of them actually made a claim against Garlock. That's their history of claim filing or claim rate, the probability that a mesothelioma will result in a claim against Garlock historically is that number.

We assume, as a starting point, that in 2011 and in the future, the number of claims filed against Garlock would be about the level that they were historically when you consider the propensity to sue.

So if fifty percent of the people with mesothelioma in the country file a claim against Garlock, the inference – one inference one could make is that, okay, in all future years fifty percent of the mesotheliomas that occur in the country will result in a Garlock claim.

You can vary that. You can say a fraction maybe going up or going down, but you have an empirical basis for forecasting what fraction of the forecasted mesothelioma incidents in the country will result in a Garlock claim. You have a basis for estimating how many mesothelioma claims will be filed against the debtor each year in the future.

And if you look back, that calculation is at the bottom but it is shown graphically again on the prior page, number seven. Because Nicholson forecast the number of mesotheliomas in future years, as well as past years, we have

Peterson - Direct                    376

got a standard to make a forecast against.  Assuming that his forecast continues to be as accurate in the future as it has in the past, we take the number of mesotheliomas that he forecasts in any future year and we multiply it by the propensity to sue. So if fifty percent of the mesotheliomas historically have resulted in a claim, we take whatever number of mesotheliomas he says will occur in a year.  He may say, for example, in the year 2020 he has got perhaps sixteen hundred mesotheliomas occurring in the year 2020 and, with a propensity to sue at fifty percent, that would suggest that there will be eight hundred mesotheliomas filed against Garlock, and that is the basis for the forecast.

Q.        Is the propensity to sue a static factor?

A.          It changes over time.  Historically it is empirically calculated. You can calculate it for each year, in that year how many claims were filed compared to the incidents for that year.  You can do it for groups of years.  And you find that that number varies from year to year, and it may also demonstrate trends.  Frequently I find, with asbestos defendants, that the propensity to sue has been going up because asbestos litigation, despite the fact it has been around for thirty-five years, continues to expand.  So kind of the common finding has been, you know, the number of claims are expanding.  The probability of filing a lawsuit is growing, you get more claimants.

Peterson - Direct                            377

But, again, that is an inference you make from looking at the historical data.  You need the historical data to make that judgment.

Q.      Have you explained to your own satisfaction the propensity to sue as it relates to forecasting future claims?

A.      Yes.  If it is unclear, I would be happy to try to again. I believe some.

Q.      Is the propensity to sue a factor that is amenable to sensitivity analysis?

A.      Yes.

Q.      How do you go about that?

A.      Well, you just say let's assume that, if it has been stable across the decade of the 2000's, say at fifty percent, what happens if the litigation expands.  So it is going to go up to sixty percent, and you just use sixty percent rather than fifty percent and you see how many more claims it creates.  And you can then run that through your estimated pay percentage and average values and say, okay, it adds liability of two hundred million dollars, for example, hypothetically.  So you can see when you change this variable, it has this result.  That's the sensitivity analysis.

Q.      Can the parties then bring evidence to the court to argue about which assumption is more reasonable?

A.      Yes, yes.  We will say, okay, we think it was this level in the past, but we think it is now going to be a higher

Peterson - Direct                    378

level or a lower level, and we think for these reasons and the reasons again can be drawn from the database, supported by knowledge about what's going on in the litigation world, of course.

Q.        Let's flip over to page ten, "Nicholson's Three Cancer Forecasts."  Can you explain these, this graph?

A.        I mentioned that Dr. Nicholson made this forecast basically from 1970 to – the early seventies all the way out to 1930, which we have extended to 1940.  This just shows his forecast for each of the three diseases – mesothelioma, which is red; lung cancer, blue; and other cancers in green.

All  of  them  are  –  the  forecasted  deaths  are decreasing.  We have reached a point where they are beginning to go down for each of those diseases.  They are going down more rapidly for lung cancer at this point in time than for mesothelioma.  But historically there were many more asbestos-related lung cancers than mesothelioma.  We are approaching a point where they are going to be about the same.

Q.        Has it been possible to confirm by empirical means the accuracy or reliability of the Nicholson epidemiology?

A.        Yes.

Q.        How has that been done?

A.        Well, that's the real strength of the method because the fundamental assumption about this is how many past and future mesotheliomas there are going to be, and the U.S.

Peterson - Direct                    379

Government collects data, several different forms of data about annual mesothelioma deaths.  One of them is called SEER, the "Surveillance of Epidemiology and End Results."  The other is the USCS cancer count.  Both of them rely upon going to medical facilities, comprehensively all of the medical facilities in a particular jurisdiction, and counting up – hospices, hospitals, nursing homes, so on, and finding out people who died and the cause of death, and they can get that for – they subdivide the cancers  into various  kinds  of cancers, one of which is fortunately mesotheliomas, its own category.

So  the  USCS  data  is  recent.   It  has  only  been undertaken for the last eight years or so.  The USCS data, they go to every state in the country other than Maryland.  For some reason, Maryland doesn't have reliable data.  And they count for every hospital and so on how many mesothelioma deaths.  And so that's a good measure.  That's the yellow dots – I mean, it's the black dots on this chart.  That's the best measure we have got right now.  And, again, it's hard to improve.  It is actually data – it's data for almost the entire country.

The blue bar is data – it's the counts for SEER-9. They used to have just nine sites around the country that they collected these data from.  The state of Iowa was a site.  Los Angeles, Long Beach, is a site. The state of Hawaii is another site.  So for places like that, they did a count and they used that to extrapolate the country as a whole.

Peterson - Direct                    380

The blue line jumps around a lot because it is a national estimate based upon only nine sites.  So it's quite variable.  Like any sampling study, there is variability attached to it.

So SEER went to seventeen sites, again talking to all of the hospitals, hospices, in seventeen different sites.  They have more data.  It's a more heavily sampled process, so that the black dots, which are the – I mean, the yellow dots, rather, not the black dots.  The black dots are USCS; the yellow dots are SEER.  That is more variable than the USCS because it isn't a census like the USCS is, but it's much better with regard to stability than just a sample from nine sites.

But the principal point of each of these is that all of them conform greatly to Nicholson's forecast.  Nicholson made his forecast in 1982.  It's a prediction.  It's a long-term prediction.  It is science.  The way you test science is to look at data.  You test your scientific forecast against subsequent data.

This is an extraordinarily strong confirmation of a forecast.  Not only particularly the best data, the USCS data, it is almost precisely what Nicholson forecast in 1982, but it is stable year after year.  And so this gives strong confirmation that the epidemiological component of this method is very solid.  It is better than you would hope to get.

Peterson - Direct                      381

Q.          Taken as a whole, what do you consider to be the advantages of the standard methodology for estimating asbestos liabilities as you have described it?

A.          There are several.  First of all, it is the best method because it deals with exactly what you are trying to forecast.  It is data on what happens in the tort system, using an extraordinarily well-confirmed scientific forecast.  So you are using what has actually happened in the past to forecast what will happen in the future, where you are using the same defendant, the same parties on both sides basically because the law firms are similar, doing the same things in a litigation system that's basically the same.  But when it changes, you know what those changes are.  So you can observe the data.  You can understand what the data mean.  You have got an extraordinarily rich set of data, a huge quantity of it.  So it's a good method because it's the only set of data that's so well tied to what you are trying to forecast.  It is fortunate that we have this.

It also is subject to a rich set of data.  The debtor's data has a lot of information about it, presumably when we finally figure it all out, that lets you test assumptions that Dr. Bates and I are going to throw at each other.  We are going to throw criticisms at each other, and we can have a dialogue perhaps between us to try and get some agreement or we can bring those disagreements to the court.

Peterson - Direct                          382

And the values in that are what this defendant actually paid within the tort litigation system that would obtain in the future under the theories of the analysis. So it's precisely what you want to do the forecast, and it has been tested and demonstrated to be a reasonably accurate forecast. There is no artificiality to it. There is nothing novel about it. We know how it performs. It is not an untried method. And finally it's the least-expensive way to do this because we already have this data. We don't have to collect it. We already have it. We have got experts here that know how to deal with this. Dr. Bates and I both use data like this to forecast all the time. So we don't have to get up-to-speed. We know what to do here. And the data is available now. So the forecasting can be done quickly. It has all of those advantages.

Q.        Now suppose that we go the route in this case of issuing the proposed proof of claim form requiring, as in a census, all claimants to respond fully to the form and we gather all of that data and we go through the inputting process that was described this morning, do you expect that the resulting fund of information would be more or less useful than what is already available in Garlock's database?

A.        Oh, it would be far less useful. I think it would have no utility at all but, whatever utility it would have, it would be trivial in comparison to the utility of what we

Peterson - Direct                                    383

already have.

Q.          Why do you say that?

A.          Several reasons.  One is it is artificial.  I mean, the debtor is proposing something that doesn't exist in tort litigation, the system that we are concerned about.  A bar date, a proof of claim, is a one-time event.  It hasn't occurred before.  We have no way of knowing what effect it has upon claimants.  It will not occur in the future under kind of the assumptions of the analysis.  There wouldn't be a bar date in litigation five years from now.  So you are introducing an extraordinarily disturbing event that is going to affect how many people file claims, who files claims.  The people that respond to the bar date are going to be different from the people who would file claims or pursue claims historically.  It depends on the form of the bar date – the proof of claim.  A daunting and demanding proof of claim form will discourage people from pursuing claims, whether or not they have got a good claim.

So if the claims go down, because people don't respond to the bar date, Dr. Bates and I are going to get into a disagreement.  He will say that this shows these were bad claims, that's why they didn't follow, so you can disregard them, and you can say in the future that all of those claims need to be ignored because these bad past claims shouldn't serve as a basis for forecasting the future.

Peterson - Direct                            384

I am likely to say that, well, we don't know that's true because this is such an awful process that there are people that just stop doing it but they wouldn't have stopped in litigation.  You would have had to deal with these claims. That's the kind of – it is going to introduce disputes and uncertainties that don't now exist.  That's one example of it.

Q.        Is the process of requiring claimants to work up the information called for by the form one that is going to change the status or character of the claims?

A.        Oh, absolutely.

Q.        How so?

A.        Well, both the need to compile this information and submit it under the debtor's proposed proof of claim form requires an extraordinarily amount of effort by the law firms. I have heard the representations but I am familiar with other proofs of claim processes in other cases and how long it takes. I have done pre-tests of forms like this in other cases.

Q.        What do you mean by pre-test?

A.        I have actually taken a proposed form and I have given it to a sample of law firms and said would you please fill this out for me and do two things.  Tell me whether or not you can answer the question – three things.  If you can't answer the question, what do you have to do in order to answer the question and, third, how long has it taken you to answer the questions you can and how much longer do you think it would

Peterson - Direct                                    385

take you to compile the rest of it.  That's a pre-test.

What the debtor is proposing is a very huge data collection effort.  As a social scientist, I regard this – it is like a big survey.  It is a complex, demanding survey of information from all claims.  It is a census really.  And that data collection effort, they don't know if that form is going to work.  They have no idea.  And, you know, we will get opinions one way or another about it, but the only way to know if it would work is to take the form and give it to a sample of claimants, claimants and law firms, and say, okay, can you actually answer these questions and what kinds of problems do you encounter and how long is it going to take you.

At RAND, when we conduct any kind of survey, we take it out and pre-test it because we don't want to field a big process that is going to cost many millions of dollars and find that our data collection document was poorly drawn.  But there has been no pre-test here; there is no assurance that this form can actually extract the information that the debtors think it can do.

Q.      Suppose it does and come back to the question I posed.  Will the process of gathering that data, the process the plaintiff's lawyers have to go through that result in terms of the fund of information available, will that change the character, nature or value of the claims in your opinion?

A.      Absolutely.

Peterson - Direct                                386

Q.          How so?

A.          The process of just having – you are going to get a selection effect, a social science term, scientific term.  You are not going to get all claims, you will get certain claims, and those that do it will have had to prepare their claims.  So you are not going to get a representative of all – it's only some people will submit this form.  Those that do it had to make a great effort and, in doing so, you are going to get a select and better quality group of claims that answer the form than you would expect to get if you just took a random sample of what they have settled historically or what they dismissed historically.  Historically they dismissed a lot of claims.

But you can't then take the results of that data and look at it and say, okay, historically we failed to pay twenty-five percent of the meso claims and now we assume we are going to fail to pay twenty-five percent of the claims that submit this form.  No, because these are a different group of people.  The meso claimants that submit this form are a different group of people than they dealt with historically, everyone who filed a claim.  These are people that have gone to the special effort of answering a very exhausting set of questions and providing documents.  That's a better group of claims.  So they are going to qualify at higher rates than you saw historically.  The values are going to be greater.  Then when you run them through whatever tests and challenges the debtor is going to be making

Peterson - Direct                             387

with regard to – they are going to say that some of these claims shouldn't be allowed.  You are going to end up with an even more elite set of claims.

So they are going to be more valuable for two reasons.  One is they have been worked up more and it is just like if you are approaching trial, in effect.  They prepare these cases – actually they prepare these cases in ways they probably wouldn't have to for trial, but they have done that level of effort.  And then what you are left with is the cream, the very best of these cases that then get filed and then get scrutinized by Grace – excuse me – by Garlock and that they say are qualified.

So you can't apply historic values to those times or the historic payment rates because you are dealing with an entirely different group of people.

Q.        And is there any empirical basis for knowing what a payment percent rate or what value to attribute to that surviving group of claims you just described?

A.        No, because this has never happened in the tort system.  These kinds of claims going through this process have never been valued in the tort system.  The closest analog to it is cases that go to trial and plaintiff's verdicts.  I mean, if you want to know the value of them, the only thing that approximates what these cases have been through and demonstrate is the claims that in litigation have survived summary judgment

Peterson - Direct                              388

motions and gone to trial and been determined by a jury to be claims that have value.  That value may be the closest to representation.  It's probably too high because juries are subject to all kinds of things going on.  So I wouldn't say that that's a good forecast.  I wouldn't want to set out this process and value them based on verdicts, but you've got nothing else.

I mean, that's the irony of this whole process.  You have gone through what will end up being tens of millions of dollars of work, years of effort.  I don't care how they characterize it, the time it is going to take to get this and fight over this stuff is going to take years of delay and, in the end, you won't be able to use it because you don't have any way to value claims.

That's precisely what happened in the *Dow-Corning* case. They went through all of that effort and then they ended up presenting a forecast to the court that was based on the values of twenty-eight claims, what twenty-eight claims got historically.

Q.        Did you mean, then, to refer to *Robins?*

A.        I mean the *W. R. Grace* case.  Excuse me, the *W. R. Grace* case.

Q.        Explain what you just said.

A.        *W. R. Grace* made people fill out forms, and they looked at those cases of a sample to see how many of them

Peterson - Direct                           389

complied with what *W. R. Grace* believed would be imposed by a court in order for them to be paid.  They have their own rules of qualification, not unlike whatever will be offered here. And they found that a small number of claims, they believed in this sample, would qualify as a mesothelioma claim.

They also collected data on a sample of resolved mesothelioma claims that they had resolved and paid, and they compiled whatever information they had available on those claims from the law firms and general counsel's office, and they applied these same rules to those claims.  They said, okay, if we are going to require that these pending claims meet these qualifications, we don't have any really good way to value them but the best thing we can do is look at, in the past, how much was paid to claims that met these qualifications.  And they found that, after going through their sample, they could only identify seven lung cancer claims that passed their scrutiny, and all of the lung cancers, all of the other cancers, all of the non-malignant claims were valued based upon seven claims.

They then went and looked at meso claims and found only twenty-one meso claims, mesothelioma claims, satisfied the requirements.  They said these twenty-one mesothelioma claims will be the basis for our valuing all of the thousands, hundreds of thousands of mesothelioma claims that are pending and will be applied in the future.

Well, I mean, we have already hundreds of thousands of resolutions as a basis for our forecasting.  This process ended up with a debtor who very single-mindedly pursued this similar kind of process with twenty-eight claims.  Not only that, I went and reviewed a bunch of these claims they had reviewed, and I found two more mesothelioma claims that met their qualification and that their expert agreed met their qualification for mesothelioma.  And if you added just two claims to the twenty-one mesothelioma claims, the overall value estimated for *W. R. Grace* increased from seven hundred million dollars to one point three billion dollars.

And the point of that is that you not only have such a small basis for forecasting a huge liability but that's an unreliable and highly variable number of claims.  When you have only got twenty-one, if you make a mistake or add another one or two, it can greatly change your results, and we showed that it changed the results.

And when their expert was questioned about this on cross-examination, the debtors settled within a couple of weeks, and the estimation was never used to set the values in that case.

Q.        Dr. Peterson, a point of clarification, the rules of eligibility that you referred to, were those rules that *W. R. Grace* prescribed for itself for purposes of the estimation exercise?

Peterson - Direct                          391

A.              Yes, these are rules that were identified and created by *W. R. Grace*.  They are not – often they were not legal rules that actually obtained.

Q.              Were they rules that had been prescribed by the court in the *Grace* case?

A.          No.

MR. SWETT: Your Honor, at this point I would like to ask counsel, if they would, please, to pull out their copies of the Bates White slide shot.

BY MR. SWETT:

Q.          Dr. Peterson, do you have a copy in front of you of the Bates White presentation that we went through on the screen yesterday?

A.              Yes, I do.  I made some notes on it.  I showed a couple of pages to Mr. Cassada and, if he wants to examine, he is free to.

MR. SWETT: Your Honor, do you have available to you the Bates White slide?

THE COURT: I have got it.

MR. SWETT: Very well.

Q.          I have numbered – I thought I had numbered.  Let me refer you, Dr. Peterson, to page number twenty-eight.  In my numerology, that's a page headed, "Only twenty-five percent of pending mesothelioma claims remain to be paid."  Are you on that same page with me?

Peterson - Direct                                     392

A.          I am.

Q.          Would you please give us your understanding of the information set forth on this page and adjustments you would make to it for purposes of today's presentation and explain those adjustments?

A.          Well, these are Dr. Bates' – some of Dr. Bates' criticisms of the preliminary forecast that we have just gone over.  And it is an example kind of academic criticism.  I mean, I have done an academic and scientific forecast.  Dr. Bates says, okay, but I think that there is this additional issue you didn't consider or these issues and, if you did, it changes the results.  That is pretty standard give and take among people like us.

It  is  odd  for  us  to  be  having  this  kind  of conversation in a courtroom in front of a judge.  I mean, this is something that, if we were collegial, we would be talking about it back-and-forth.  In litigation, we would be submitting rebuttal and reports and stuff like that, but this is real time.  And it is actually useful because it demonstrates the utility  of the database to address the kinds of concerns that Dr. Bates has raised and likely would raise.

And he basically takes – this is the forecast of the values of the pending mesothelioma claims, which we had made a forecast for, and we  start  with  the  five  thousand,  seven hundred and nineteen mesothelioma claims, and he makes a number

Peterson - Direct                                              393

of eliminations.  He eliminates three hundred and forty-seven claims because he says there is a certain double-counting by us, claims that we say are future claims, already pending claims.  That's number two.

Number four, he eliminates claims because he has this theory that, if a claim hasn't been paid within four years, it will never get paid or it will rarely get paid, get paid at a rate of five percent.  So he eliminates nineteen hundred claims for that.

Number six is his elimination of claims based upon what he believes is his calculation of the historic disallowance, rejection rate, by the debtor.  I believe that properly characterized it.

As a result, he thinks that this will result in only thirteen hundred and fifty of the mesothelioma claims being paid out of the original five thousand, seven hundred and nineteen or twenty-five percent of the claims.

I have gone through his analyses and the materials he has provided.  Again, it's a demonstration more than anything, of how I would respond to some of these criticisms and what implications it would have for the forecast.

The first is with regard to the claim of double-counting.  I have two points about that.  One, it's a pretty trivial number, two hundred and forty-seven claims.  Second is that I just don't believe that there is that double-counting.

Peterson - Direct                                 394

I will go back and work with Dan Relles to see kind of statistically whether there was such an issue.  There may be.  Right now, I am disregarding that criticism.  But if it is, it would take away three hundred and forty-seven claims from what I said, which in the end is a pretty – it is not a material number in even this hypothetical or demonstrative forecast.

The more important issues are the stale claims issue and the dismissal rates, and I am prepared to talk about both of those and say what changes I would make, and why, and how I draw upon the data to do so.

Q.        Proceed, please, to do so with regard to the fourth item on Dr. Bates' list, claims older than four years.

A.        All right.  As you will recall, Dr. Bates said that claims that have been pending more than four years have a very little – unlikely to get paid.  I have several comments on that and perhaps it is best if you look at the prior page number twenty-seven.  It shows that, among the five thousand, seven hundred and nineteen claims, how many of them had been around for four years or more.  And basically if the claims – the column that has five thousand, seven hundred and nineteen is the count of pending claims for mesothelioma.  And six sixty-one above it is the number of pending claims that were filed in the first half of 2010 and haven't yet been paid, and then fourteen eighty-seven and so on.

So those first four lines, six sixty-one, fourteen

Peterson - Direct                               395

eighty-seven, eight fifty and five eighty-three, and half of 2006 are basically within four years.  So those are the only mesothelioma claims in effect subject to his five percent that he believes would be paid.  And all of the rest above there are claims that he would toss out because they are stale claims.

A couple of observations.  The notion of stale claim, I have looked at this issue.  Dr. Bates raises this issue frequently when we are engaged in the same case.  And we have always been able to look historically at how many claims have been around for more than four years actually get paid.  That is an empirical question to be answered in the database, and that's what I am going to do, but I would also like to make a couple of other observations.

This issue of stale claims isn't – stale claims do not – the fact that a claim has been around for four years and hasn't been paid isn't indicative of the poor quality of the claim, as Dr. Bates asserts.

As we heard yesterday in testimony and saw in their financial statements, Garlock works under a process where they set a budget for a year and, if you look at the last two years, they appear to have set a budget at a hundred and ten million dollars of indemnity payments.  That's what they paid in each year.  The year before, they paid a hundred and fifteen.  And they seem to be very effective in reaching the same number every year, and they do it, as Dr. Bates agreed, by essentially

Peterson - Direct                    396

paying only the number of claims that will reach that total. And if they have more claims that could be paid but would drive that number up, they won't pay them and they will get kicked off to the next year.

So Dr. Bates again recognized the timing of payments is under the control of Garlock. They don't have to pay claims at a particular point in time. They pay them on their schedule. So the fact that a claim hasn't been paid within four years is more a function of Garlock's strategy than it is anything to do with the characteristics of claims.

So this notion of stale claims in the pejorative sense that Dr. Bates is using it is one I reject. But there is an issue that the probability of settling goes down over time. There is no question about that and, for whatever reason, that's true.

The next point I would make is that stale claims is not a very significant issue for mesotheliomas because two-thirds of the pending claims were filed within the last four years. So, at most, this analysis would apply to about a third of the mesothelioma claims. It is a more significant issue for the non-malignant claims and for the claims that have no disease. As in most asbestos claims database, there are a number of claims that have been filed and they are filed with a complaint that says it's an asbestos-related disease but doesn't identify with specificity what the disease is. Those

Peterson - Direct                         397

kinds of claims that never get identified historically have very low value. Few of them ever get resolved with payment, and I think we probably both agree with that.

So the kinds of cases that Dr. Bates is calling stale are primarily unresolved claims and non-malignant claims. Well, Dr. Bates has also discussed that non-malignant claims tend to be – there are some of them that earlier in time, at least, are old claims by now that would meet his stale claim definition, used doctors that have been – who have come to be disregarded.

Q.        Are you speaking now of mesothelioma claims?

A.        No, this is not mesothelioma. I am talking about the non-malignant claims. The non-malignant claims basically that are stale claims are also claims that tend to be claims that probably would be rejected either because they don't have a disease or because they have a doctor who is questionable, so the debtor wouldn't pay them.

Also they mentioned what are called MARDOC cases, maritime docket, the Jacques cases. Basically a lot of the Leonard Jacques' cases share all of these qualities. They haven't been paid. They are stale by his definition. A lot of them have poorly – doctors who don't have a very good record. A lot of them don't identify a disease. And so essentially they have raised about three or four objections and comments that pertain to the same set of cases. They are not going to

Peterson - Direct                    398

be – I mean, I would probably reject them for reasons other than the fact they are stale, but I would get rid of them anyway. And you can't reject them and then take that value off three or four times.

Having said that, let me describe what we did. This is the only use I am going to present of the data that actually was done by – given to us by Garlock.

Q.       Would it be helpful at this time to have in front of you the document that you entitled "Meso Timed to Payment?"

A.       Yes.

Q.       Let me mark that.

MR. SWETT: Your Honor, we have marked for identification a two-page document headed, "Meso Timed To Payment," which I will hand now to Dr. Peterson.

THE WITNESS: Thank you.

THE COURT: That's number six?

MR. SWETT: ACC-6, Your Honor.

Q.       Dr. Peterson, can you identify this document and tell the court what it is?

A.       Yes. I prepared this with the help of Dan Relles, my statistician and partner.

Q.       And what does it show?

A.       First of all, it's a little ugly and complex. It appears to be. It actually is fairly simple. Going down the rows, it has the – again, this is drawn from the Garlock data.

Peterson - Direct                               399

They have in there a couple of variables dealing with when claims first arose. This is the earliest of the dates within the Garlock database as we understand it of the year when a claim arose, from 1978 all the way to 2010. This is when a claim was first filed. I think served or whatever other variable they used to describe it.

Going across in each column is how many claims were paid. So among the – well, let's go up to the 2008 row. Those are claims filed, first filed in 2008. Of those claims, two hundred and thirty were filed – were paid within the first year. That's zero zero. Another four hundred and twenty-nine were paid within the second year. They were settled within the second year. Seventy-seven were settled within the third year or, here, the third year is the half year, 2006.

In total, so far, seven hundred and thirty-six, which is the total line at the end for the third row from the bottom, seven hundred and thirty-six claims filed in 2008 were settled – were resolved with payment by Garlock and they distribute in the years as I have just suggested.

Now, Dr. Bates says there should be no number after four years, which is the column beginning '04 and beyond. So it's the year when those claims would have been paid.

The problem with that is that claims that were filed in 2008 haven't gotten to four years. So you can't analyze what's the historic rate of later payment among those claims.

Peterson - Direct                          400

You can't do it for 2007 because they have just reached three and a half years.  And you can't do it for 2005 or '04 because, as you see by looking up this table, claims can settle – mesothelioma claims can settle many years after they are first filed.  There are mesothelioma claims that settle fifteen or more years after they were filed.  Not many but there is some possibility.

But the question is how many, what fraction of the resolved claims settle after the third year.  And if so, those are claims that Dr. Bates says basically shouldn't get paid, shouldn't be valued, but we find that they do get paid, they do have value.

The second page summarizes that information.  I am sorry, please stay on the first page.  In order to do this analysis, you have to have a number of years.  So we have said, okay, we will look out ten years from the date of filing.  So the four years that Dr. Bates thinks are the years when it is still good and the fifth years and beyond when he says this claim is no longer any good, it's stale.

So we go back to the year 2000 and say – we can only address this question of the likelihood, what's the fraction of claims that get settled after four years, by looking at claims that were first filed in 2000 or older.  The next page summarizes those results.

At the bottom of the table, year 2000, the quadrant

Peterson - Direct                      401

row, this describes the number of cases settled after the – it's in the upper right quadrant of this.  It's basically the number of claims that got paid more than four years after they were filed.  There were a hundred and twenty mesothelioma claims filed in 2000 that were paid more than four years after filed.

Altogether there were eight hundred and forty-three mesothelioma claims paid that had been filed in the year 2000. That's fourteen percent.  So rather than five percent of the claims filed in 2000, fourteen percent got paid. Among the mesothelioma claims filed in 1948, twenty percent of them got paid.

Now, as you go up this column of percent, the numbers tend to grow because these claims have been around for a longer time and have a bigger chance they have gotten settled in the out years.

On the right side, under reverse cumulative, what we have done is the first entry, fourteen years, this is the experience for one year, 2000.  1999 is the sum of the experience in the year 2000 and 1999. The entry for – which is seventeen percent.  So across both years 2000 and 1999, seventeen percent of mesothelioma claims filed in those years got paid after the fourth year.

In 1998, it's eighteen percent and so on, it goes up the table.

Peterson - Direct                    402

This says to us basically, if you look at that whole row, that roughly twenty percent of the mesothelioma claims that Garlock settled were settled after the fourth year.

Q.          As contrasted to Dr. Bates' assumption of what percent?

A.          Well, he starts with zero percent but he says, well, some of them will, so I will assume five percent.

MR. CASSADA: I would just point out that that's not what he testified to, but we will cover that on cross.

THE WITNESS: Well, the point – let me make a point. I don't think that we have this answered, the stale claims issue hasn't been answered. I mean, I would not – I likely would not present this analysis quoting an estimation here. We will do a stale claims analysis. It probably won't be this because we will find – first of all, Dr. Bates is about ready to tell me why I am wrong and, when he tells me why I am wrong, if I agree with him, I will fix it. And then when I present something to you, it is something that he can't challenge then, and I look forward to hearing why I am wrong.

But my point isn't that necessarily this is the right answer. The point is that you can answer these kinds of questions within the data and, over the course of the next several months, if the court decides to proceed along using historic data as the basis for the estimation, we will do things like this and, in the end, we will write a report and

Peterson - Direct                                    403

Dr. Bates will challenge it and we will write a rebuttal report responding to those challenges, and these issues will be brought to the court and, if there is an estimation hearing in this case, we will testify about these kinds of matters.

But these are questions that are amenable for examination, not necessarily resolution within the data, but we will each define our positions and the court can understand how we differ and what the significance of our difference is. The data allow us to do that, and that's how you proceed with all of these issues.

So what I have done here is I have used the analysis that Dr. Bates is going to tell me is wrong, but I have used it in re-estimating his liabilities, and I did one other thing.

Q.        What was that?

A.        The other thing is the percent of claims that get paid, the payment rate basically that he calculates on page twenty-seven.

Q.        Well, does that have to do with the line item on page twenty-eight, number six, claims to be dismissed or abandoned?

A.        Yes, it's the source of the claims to be dismissed as I understand it. The first point is that Dr. Bates, on page twenty-seven, calculates the payment rate as sixty-one percent across all years, and he calculates that number incorrectly.

Q.        How so?

Peterson - Direct                                        404

A.         The payment rate is, among resolved claims, what fraction closed with payment.  Dr. Bates said among all filed claims what fraction closed with payment.  Let me illustrate that.

There were twenty-six thousand, four hundred and thirteen, the bottom row, the total for – the total in total – all claims filed in the year and the total across the years, there are twenty-six thousand, four hundred and thirteen mesothelioma claims filed according to Dr. Bates.  These are his numbers again.  They are not our numbers.  Of those, sixteen thousand and twenty-two were paid.  Five thousand, seven hundred and nineteen have not yet been resolved one way or the other.  We don't know whether or not they will be paid.  They have value, and that's what page twenty-eight addresses.  Four thousand, six hundred and seventy-two were rejected.

Among the resolved claims, the way to calculate the payment rate is the number of settled claims, sixteen thousand twenty-two, divided by sixteen thousand and twenty-two, plus four thousand, six hundred and seventy-two.  I have actually put that up on the –

Q.         Let me bring the easel around.

MR. SWETT:   It is not going to be possible to position this easel, counsel, so that you and the court can both see it.  So you are welcome to come up and have a look if you would like, but I have to put it this way so that Dr.

Peterson - Direct                    405

Peterson and the judge can see it.

THE WITNESS:  I will be quick.  May I?

THE COURT: Yes.

THE WITNESS: This is the standard way of calculating the payment rates.  The number of paid claims divided by the number of resolved ones.  As we have seen, sixteen "o" two two is the number of paid claims.  The number of resolved claims is the number paid, plus the number not paid.  That's seventy-seven percent.

What Dr. Bates does is he adds to the bottom here the number of pending claims.  It doesn't go into the numerator, just the denominator.  In effect, he is assuming that none of the pending claims will ever be paid in making his calculation of sixty-one percent.  That's the first grid.

Q.        Are there any more calculations written on this easel?

A.        There's another page which –

Q.        Okay.

A.        The second point has to do with his list of the pending claims because this is all triggered by his discussion on page twenty-eight.  Now, how do you apply this information?  Basically Dr. Bates says that anything before the middle of 2006 doesn't get paid.  They are stale claims, according to him.  We have already seen that twenty percent of them get paid.  It's not seventy-seven percent.  There is no historic

Peterson - Direct                                406

basis for saying that the claims that are old are going to be paid at the same rates of all claims.  I agree with him that they are likely to be paid at a significantly lower rate.  The data suggests to me that it's likely to be twenty percent.

There are nineteen hundred and fifty-one – out of the total number of fifty-seven hundred pending claims, nineteen hundred of them are more than four years old at this point in time.  Looking at their history and the table that I went over, we assume twenty percent of them will be paid. That's three hundred and ninety claims that were excluded from the values of the pending claims that Dr. Bates said.  So we add that three hundred and ninety claims.

And what I am trying to reach here is the total number of claims, mesothelioma claims that will get paid and then find out how many left of this fifty-seven hundred will likely be paid.  So we start with the numbers that have already been paid.  We add what's going to happen among the stale claims. There are three thousand, seven hundred and sixty-eight claims that aren't stale that have not been paid.

Q.       And by stale, you mean just filed more than four years ago?

A.       They were filed, yes – let me say it positively. There are three thousand, seven hundred and sixty-eight claims that were filed within four years, the last four years.  They don't meet Dr. Bates' definition of claims that should be

Peterson - Direct                              407

disregarded.  The payment rate, we just calculate it at seventy-seven percent.  That yields two thousand, nine hundred and one claims.  We assume that two thousand, nine hundred and one of these claims will be paid.

When you add them all up, you get nineteen thousand, three hundred and thirteen claims.  Out of the original twenty-six thousand, we expect that nineteen thousand, three hundred and thirteen will get paid, but sixteen thousand have already been paid.  They have already been allowed.  So the difference suggests that, among the fifty-seven hundred pending meso claims, there will be another thirty-two hundred and ninety-one claims that get paid.  That thirty-two ninety-one is fifty-eight percent of all pending claims.  So it suggests that, among pending claims, roughly fifty-eight percent of the pending mesothelioma claims get paid.

In basic, all this does is it responds to Dr. – this is one way of responding to Dr. Bates' stale claim issue.  It is where I would say, yes, I agree that there is an issue that older claims don't have the same likelihood of getting paid.  They are not at the seventy-seven percent level.  But some of them, more than he said, will get paid.

And so looking empirically at the data, it suggests it is going to be twenty percent.  So rather than assuming these are all going to get paid at the same seventy-seven percent rate, I assume some lower fraction is it's twenty percent, and

Peterson - Direct                                    408

that produces this number, and that's the number I used – I haven't used it.  I haven't run a forecast on it.  I am just saying it is a way to address his issue which, in principle, I agree with, but I disagree with how he quantified it, but our disagreement and presumably our continuing disagreement is a matter that can be resolved in the – it can either be resolved within the database or we can each identify our positions and we could present them to the court and the court can understand why we disagree.  All of this is available because we have got this incredibly rich database.

THE COURT: Before you flip the page, understanding that this isn't for all times, but that fifty-eight percent number, that's what you are saying is, of the five thousand, seven hundred and nineteen pending claims, you are saying that fifty-eight percent of them would be paid?

THE WITNESS: That's the result of this analysis.  Based, of course, on –

THE COURT: I want to be sure I understand what the fifty-eight percent meant.

THE WITNESS: In fact, if you go to the next page, it's overall – Dr. Bates said on page twenty-eight of the five thousand, seven hundred and nineteen claims, thirteen hundred and fifty would be paid.  We believe that it is more likely to be two thousand more claims than that.  And he calculated that twenty-five percent of the pending claims will be paid.  We

Peterson - Direct                                      409

calculate that fifty-eight percent of them.

It's a middling level difference between us.  If we end up being that close together on the overall forecast, everyone will be happy.  Knowing me and Dr. Bates, we probably won't get that close.  So it's not going to be – it is not a difference that is going to change the case but it is a difference.  And when you add this difference with other differences, they begin to mount up, but it is subject to analysis.

Q.        Are you done with the easel?

A.        Yes.

MR. CASSADA: Are you going to mark these as exhibits?

MR. SWETT: Would you like me to?

MR. CASSADA: Sure.

MR. SWETT: Okay.  We will mark the easel.

THE WITNESS: Given that, let me just reiterate that this is not an analysis I am likely to endorse later.  It is demonstrative evidence to illustrate the utility of the database.

MR. SWETT: Your Honor, as Mr. Cassada has requested, we have marked the second page of this writing on the easel as ACC-7 and I guess we ought to mark the first page out of order as ACC-8.

THE COURT: That's all right, as long as it has got a number.

Peterson - Direct                    410

THE WITNESS: It's no fair, you are going to have a week to prepare.

THE COURT: Somebody take a picture of that with their cell phone and e-mail it around so we will have an exhibit we can handle.

MR. CASSADA: You will get a chance.

THE WITNESS: Oh, yeah.

MR. CASSADA: You will get a chance to think about this, too.

THE WITNESS: Yes, a week at least.  That's why I anticipate I am going to hear why it's wrong.

BY MR. SWETT:

Q.        Let's go back to the beginning of Dr. Bates' slides, Dr. Peterson.

A.        Yes.

Q.        Let's go back to the beginning and we will just go quickly through this and allow you to comment on whatever it is you want to comment on.

Turn to page five.  Is that the page headed "Dr. Bates' Experience in Estimating the Number and Values of Future Asbestos Personal Injury Claims?"

A.        Yes.

Q.        Do you see the reference there to Dr. Nicholson?

A.        Yes.

Q.        Does Dr. Bates, as you understand it, rely on Dr.

Peterson - Direct                    411

Nicholson's epidemiology as modified by KPMG?

A.        I think he has done some subsequent modifications to it, but it is basically he builds upon – he starts with the modifications KPMG did in 1982 and makes some subsequent ones that I think he believes are consistent with that, the spirit of those changes.

Q.        Do you have an opinion as to whether Dr. Nicholson's original projections are more or less reliable than the alterations or modifications of that epidemiology performed by KPMG?

A.        Yes, I do.

Q.        What is your opinion?

A.        Dr. Nicholson's forecasts are consistent with the data and Dr. Bates' forecast, as he presented on a graphic in here –

Q.        Turn to page eleven.

A.        Yes, page eleven, it's this graphic.

Q.        Page eleven is headed, "Claim Filings and Incidents" and is a –

A.        Yes.

Q.        – bar chart coupled with a line graph?

A.        Yes.  As I understand, the red line on this chart is Dr. Bates' epidemiological – his modification of Nicholson.

Q.        And how does it differ in material respect from Dr. Nicholson's?

Peterson - Direct                    412

A.        Well, primarily if you look at the last years, 2008 and 2009, Dr. Bates said there are about twenty-five hundred – he has testified to this fact.  There are about twenty-five hundred mesotheliomas a year in this country.  In fact, USCS and SEER both agree that – I mean, the data, the actual empirical data that the federal government collects – those are both federal programs – perhaps that's no longer an endorsement today – but their data, federal government data, says that there is three thousand.  That's what Nicholson forecast, three thousand.  So there are three thousand mesotheliomas a year, not twenty-five hundred.  Nicholson correctly forecast it.  Dr. Bates didn't.

And the trend line there is different, too.  Dr. Bates has this peaking in the year – the number of mesotheliomas basically peaking in 1998. The SEER and USCS data that I had in my presentation that we just went over, my preliminary estimate, shows that mesothelioma incidents appear to have peaked in the last couple of years.  You know, in the mid 2000's.  So there is almost a decade difference.

So the trend lines differ and the absolute value differ now, and they differ in a way that's considerable, five hundred mesotheliomas a year, and Nicholson got it right in '82. Dr. Bates' current work isn't correct, and his conclusion that there are twenty-five and testimony there's twenty-five hundred mesotheliomas a year is not correct.

Peterson - Direct                    413

Q.        Is there anything else on that chart you would like to comment on?

A.        Yes.

Q.        What is that?

A.        The total height of the bars on page eleven are the number of claims filed annually, Dr. Bates' estimate of the number of claims filed annually for mesothelioma in the United States, and I have two comments.  One, that's an incalculable number.  I know Dr. Bates collects lots of data and he's very adept at that, but I don't believe that there is anyone that can identify every claim against every defendant and total the number up.  That's an impossible task to do.  There is no central repository of filings.  If you collect data from lots of different defendants and insurance companies, you still are not going to exhaust all of the claims that have been made because there are some claims that get filed against kind of small defendants or they escape it.

So, in principle, I don't agree that that's a calculable number.  But more importantly, it's not consistent with recent experience for the Manville trust, which has been getting claims at the level of about three thousand a year, which is very close to the incidents.

Q.        Incidents meaning the number of people diagnosed with mesothelioma in a given year?

A.        Yes.  Well, number died but yes.  And it is greater

Peterson - Direct                              414

than the number of mesotheliomas that Dr. Bates forecasts occur in the country.  So both of these numbers are too low on this chart.

The number of filings, I believe, are greater than this, but I don't believe anyone can ascertain precisely what that amount is, nor do I think it is a relevant number.  It is not a number that will prove to be useful in forecasting, and I believe his epidemiology is not as good as Nicholson's.

Q.          Let's turn to a different subject.  As a prelude to finishing up with Dr. Bates' slides, let me ask you a few things about asbestos settlement trusts.

I want to refer you to what the opposing counsel has described as the bankruptcy wave of the 2000's and, following that, the trust payment onset of the 2000's.  Of the bankruptcies that occurred in 2000 and after, which was the first that produced a trust that was up and operating and paying claims?

A.          I think it was Owens-Corning.

Q.          Wasn't it Babcock?

A.          It was one or the other.  Those are the two first up.

Q.          Owens-Corning and Babcock & Wilcox were the first two?

A.          Yes.

Q.          Do you know approximately when the Babcock & Wilcox

Peterson - Direct                          415

trust began to make them?

A.          I think it was approximately 2005.  It might have been slightly earlier.

Q.          Do you remember roughly when the Babcock & Wilcox company went into bankruptcy?

A.          I believe it was 2000.

Q.          Now, I would like to call your attention to the period immediately following the date when the trust began to pay claims, and I would like you to tell the judge – I would like you to describe the situation facing a trust created after that lengthy a bankruptcy when the time comes to begin to pay claims.  What is the situation then presented?

A.          They are overwhelmed, overwhelmed with claims.  We call it a glut of claims that begin with any trust.  It will happen with this trust.  But if it gets out of bankruptcy, within a year or two, it won't be as bad because that glut of claims results from two sources.  One, the pending claims that were left unresolved, fully unresolved prior to the bankruptcy, either those that were settled and had liquidated values but weren't paid or the claims that were pending and didn't have any resolution, weren't settled prepetition.  In this case, that may be around a hundred thousand.  In Babcock & Wilcox, it was greater.  So that's one source.

          The other source is the claims that accrued during the period of the bankruptcy.  The bankruptcy stay stops litigation

Peterson - Direct                            416

against Babcock & Wilcox or against Garlock but it doesn't stop the arising of claims. People are developing diseases. They are identifying BMW on the one hand or Garlock on another as a potentially liable defendant, and those would ordinarily have been filed against Babcock & Wilcox in 2001, 2003 and so forth. And those claims all accrue and arise and get brought to the trust soon after they begin. Now, they don't all get filed in the first year. It may take several years for them to come in but, once the trust opens its doors, it has got this big backlog of claims, plus it gets the claims that then arise in 2005. So it gets all of the new ones, plus a bunch of pent-up claims that are waiting to get paid and haven't gotten paid. That is true of every trust. And the significance of it is that the trust's heaviest obligations occur immediately. Some trusts have paid half of their corpus in the first year or a third of their corpus. It's really disturbing to a trustee of a several hundred million dollar trust or a billion dollar trust to have half of the money go out in the first year or two. They don't like it. But those of us that deal in this area know that that is going to happen. You get warned on that but, when you see it, it really unnerves you.

Q.        Is that level of payment by that trust in those circumstances likely to continue on into the future?

A.        No, it can't, it won't. It's not forecast to do. It will go down. The initial payments for a trust are the

Peterson - Direct                         417

greatest. They pay more out in the first couple of years than they do – than they will over the lifetime annually for trusts.

Q.        Turn, please, to page sixteen in Dr. Bates' charts. It is headed "Trust Payments Over Time."

A.        Yes.

Q.        Let me call your attention to the bar graphs pertaining to the years 2008 and 2009.

A.        Yes.

Q.        Given the phenomenon that you just described, if you were to –

THE COURT: What page are you on?

MR. SWETT: This is page sixteen, Your Honor.  It is "Trust Payments Over Time."  It's the bar graph.

Q.        Explain what you see here in relation to the phenomenon you just described.

A.        Well, it's indicative of new trusts coming online. They are getting into their initial glut of payments they have to make.

I would say, even though a trust is going to face this huge number of claims initially, they don't pay them all the first year.  The trusts are pretty efficient these days.  They can process claims pretty quickly, but plaintiff's lawyers aren't.  Even when they are going to get paid for it, they often file deficiencies.  I mean, the issue of deficiencies was brought up earlier.  A high percentage of claims filed with the

Peterson - Direct                                          418

trust are deficient.

Q.          In what sense?

A.          That they don't have the information necessary to be able to evaluate a claim.  They haven't been able to complete the proof of claim form.  Even the much simpler proof of claim forms that obtain with these trusts is far simpler than the proof of claim form that's been proposed here.  The plaintiff's lawyers have difficulty getting all of that information even though they are going to get paid as soon as it is approved.  As a result, it takes often three or four years to get all of those deficiencies cured and paid, if they get cured.  Some don't ever get cured.

And so, as a result, you get this big initial glut but it is spread out over time.  So I would expect that, even though the BMW trust got started around 2005, they didn't start paying claims in the first year.  Those claims got spread out and they contributed to the size of the bar we get in 2007, '08 and '09.  Those are payments of old claims by new trusts.

Q.          What does that imply for Garlock?

A.          Garlock is not going to get – probably isn't – even under their theory isn't going to get any credit for those payments because they have already settled those claims.  A claim that was a bankruptcy era or pre-bankruptcy era claim against BMW, Dr. Bates says it has no value.  If it hasn't been settled by now, he gives it zero value.  We don't think that a

Peterson - Direct                                              419

whole lot of them are going to get paid.

So Garlock has already resolved those claims. If they should have been given a credit, which, you know, if they can wheedle out – well, they can receive some credit on their settlements in the future with plaintiff's lawyers for the fact that BMW had some liability in that case. They can't do it with these cases because it has already been resolved.

Q.          Turn to page eighteen, please.  This is the page headed "Trust Identified by the ACC."  I just want to ask you a few more questions about trust structure.  Can you explain, please, what the term "average values" means in the context of a trust distribution procedure?

A.          Average value, which is different from average payment, average value – the trust distribution procedures, I think has been described, have categories of diseases that the trust is supposed to compensate and that's typically seven or eight categories.  Mesotheliomas in one category, lung cancer is broken down into two categories based primarily on different issues of causation, a stronger and weaker causation.

For each of those categories, there is a matrix of values.  There is what is called the scheduled value, which that has been described before.  The scheduled value represents typically about what the average payment was to claimants.  If they qualify for the criteria and requirements that are stated in the trust distribution procedures, the claimant can receive

Peterson - Direct                                    420

the scheduled value.  It is a fixed amount.  There is no need to negotiate it.

Some claimants believe they have more valuable claims, and so they negotiate.  They ask to go into a different process, not the expedited review that results in a scheduled payment but an individual review.  They ask to negotiate their claim, and they can get more or less than the scheduled value.  Usually they get more.  They can get paid – they can get a claim valued at the amount up to what's the maximum.  This matrix also has a maximum payment for each category.  They can't get paid more than that except for certain exceptional circumstances there is – you can go past it and that's defined in these plans.

But the trust has an average value because the concern was that, if you gave people this option of going into individual review, you are going to drive up the values. People who have good claims are going to – or even mediocre claims – are going to try and get an IR.  It is going to throw off all the calculations.  It is going to raise how much the trust has to pay if they can get really high values routinely under individual review, which would disadvantage future claimants.

So for purposes of planning, for purposes of fairness, the plan has an average value, and that's the target.  And the target value is a number that usually my colleague, Dan Relles,

Peterson - Direct                                421

and I calculate.  Not always but often calculate.  We just look at the history of the defendant and saw how many people historically got paid more than the scheduled value, the average, and among them how much did they get and, based upon that, we can calculate and estimate what we expect the average would be.

The trusts are very good at meeting the average payment, the average values.  That's the value they place on a claim, the settlement does.  It's not what they pay because the payment is reduced for whatever the prevailing payment percentage is for the trust.

Q.        Is it fair to call that the average liquidated amount?

A.        Yes, it is the average liquidated value, average liquidated settlement.

Q.        Going back to the scheduled values applicable under expedited review, what relation do the, as a matter of – in general, what relation do scheduled values promulgated by a trust have to its historical settlement values for claims of the same disease?

A.        It's meant to reflect the average value that you expect the trust would have been paid – it would be paying if it continued litigation.  It is meant to reflect the average value.  If the payment history has been stable, then it is the historic average.  If the values have been going up, then the

Peterson - Direct                          422

trust would actually – you would expect they would pay somewhat more in the years, you know, when the bankruptcy is resolved and so the scheduled value may be somewhat higher.  But, in either event, it is meant to represent basically the average payment.  We usually use the seventieth or the seventy-fifth percentile which is among – the seventieth percentile is that seventy percent of the people got a payment equal to or less than that amount of money; thirty percent got paid more.

The reason we use that is that is typically very close to the historic average.  It is the nature of the skewness of historic payments, but it is not as – the trouble with a historic average is, if one or two people get very large judgments, payments, it skews the average in a way that isn't at all representative of what you expect will happen in the future.  That is a specific and overly technical description.

Q.        Okay.  But to bring it into simpler terms, if we assume that Babcock and Wilcox went into bankruptcy in 2000 and emerged in 2005, would you expect that the scheduled values in the TDP for the Babcock and Wilcox trust would be precisely equal to the average for that disease category for some relevant period of time preceding the bankruptcy?

A.        Not necessarily.

Q.        What is the effect of the five-year interval in bankruptcy?

A.        That was a period of time when asbestos values

Peterson - Direct                                423

everywhere were going up.  And so if BMW had continued in litigation, it would have been paying more in 2005 than it paid in 2000 when it went into bankruptcy.  So the scheduled value – I don't recall specifically how those values were set or even if I participated in setting them but, under that set of circumstances, I would expect the scheduled value would be somewhat greater than the historic average value from an earlier period of time that is no longer applicable to what was going on.

Q.        Now explain, please, the function of a payment percentage in a trust distribution procedure?

A.        That is the *pari passu* amount.  I mean, the reason that Manville got into a problem, it was paying a hundred cents on the dollar initially.

Q.        You are speaking now of the Manville trust?

A.        The Manville trust.  It had several problems.  That was among them.  The money needed to pay future claims was going out the door.  So what we did in restructuring the Manville trust is we said, okay, we are going to calculate – we are going to look at what the assets of the trust are.  We are going to look at what its liabilities are and we are going to figure out how much money can you pay to claimants today and in '24, so they all get the same percentage of value of their claim, and that's the payment percentage.  And basically the calculation, you typically run it off of a complicated cash

Peterson - Direct                                          424

flow analysis but simplistically it is looking at – you divide the assets of the company, minus the anticipated expenses. That is your numerator. You divide it by the liability and it is a calculated number. Every trust has it. There is no trust that – some of them start out at a hundred percent but none of them last at a hundred percent. It always goes down. So basically every trust is impaired and the payment percentage is less than a hundred.

Q.        Turning back to page eighteen of Dr. Bates' slides, there is a list of trusts and a column is headed "Average Payment." Do you expect that the average payment there is the product of multiplying that average value by the payment percentage within the ambit of a trust distribution procedure?

A.        Yeah. I had no part in preparing this table but that looks to me as if that is probably what those numbers are.

Q.        And knowing what you know about the status of trusts and their ability to pay claims, do you expect that the payment percentages will remain stable or will change?

A.        The payment percentages are likely to change. They do tend to change. And in recent years they have gone down, both because claims, filings and liabilities are greater than anticipated and also because assets have not performed as well as people expected. I mean, there are a number of reasons why I don't think the numbers on this table, or particularly the total at the bottom, is meaningful and that is one of them.

Peterson - Direct                    425

Q.        Turn to page twenty which is headed "Additional Active or Proposed Trust with Regional Presence."

A.        Yes.

Q.        Do you have any comments to make on this chart?

A.        Well, like the prior page, I would say that certainly this total isn't meaningful and a number of these entries are, again, questionable because of the payment percentage issue, but perhaps I can illustrate with a couple of these.

Swan is a trust that applies only to one site, a pipe plant in Tyler, Texas.  It is the only people that can be compensated by the Swan trust.  It has a number of toxic products that have injured workers.  As far as I know, only one, or two, or at most a half a dozen – it isn't even a half a dozen – only one or two people have made a mesothelioma claim with the Swan trust, and that is as you would expect.  It is one site and not a lot of people have worked there.  So it has a very high level of compensation for mesothelioma, but it has a very narrow application.  It has no impact on the general compensation of people.  There is one person that got roughly a quarter of a million dollars because they had a Swan claim, but it shouldn't be added into this total because it doesn't represent anything other than what one person got.

T.H.A.N., the next one on the list, T.H.A.N. started off as a hundred percent trust.  T.H.A.N. is now proposing that

Peterson - Direct                          426

it will become a twenty-two percent trust.  Two hundred and thirty-eight thousand dollars is based on a hundred percent. Applying twenty-two percent, it is fifty-two thousand dollars. So the value is vastly overstated as to what is likely to happen now and in the future.

Also there are few people that are going to qualify for payments from the T.H.A.N. trust because T.H.A.N. is a fiber defendant.  The breadth of exposure of defendants differ. Fiber defendants contribute to asbestos diseases among a lot of people.  They are the ones that sold the product that – that sold the component asbestos fibers that made all of these products dangerous and, in turn, injured lots of people.  The problem is to be able to show that chain of evidence, that T.H.A.N. made the particular products that a specific claimant was exposed to in the particular years that he was exposed. That chain is very difficult.  Some claimants have been able to meet that standard.  Most can't.  And as a result, even though theoretically there are lots of people that should be paid by T.H.A.N., probably relatively few of them can make a claim that would stand up in litigation and, if they can't stand up in litigation, they shouldn't be paid by the trust because the trust only pays creditors.  If you can't qualify as a creditor, you shouldn't be paid.

And so T.H.A.N., again, I think is going to apply to a relatively narrow number of people and the dollar value is

Peterson - Direct                    427

too high.

Western MacArthur is a trust whose liability is almost exclusively in the Bay Area.  That was already mentioned, the Bay Area of California.  California typically constitutes about maybe five percent of asbestos claims.  Even though we are the biggest state, we are not the biggest with regard to the numbers of filings.  The Bay Area has perhaps half of the claims from California.  So MacArthur applies to maybe two and a half percent of the claims.  You can't consider that two hundred and fifty-three thousand as a number that affects everyone.  It affects a very small number of people.

I think the Unarco value at this time is speculative. We don't know what they are going to be paying.  Minnesota is – API is a Minnesota defendant.  Their liability is to Minnesota claimants and North Dakota. No one from North Dakota has ever made a claim.  Minnesota is a less than one percent player.  I mean, not only is it a modest size state, it doesn't have terribly great asbestos litigation.  They are good quality but not a lot of claims.  So that hundred and seventy-three thousand dollars would affect less than one percent of the people nationwide.

Thorpe, like MacArthur, J. T. Thorpe California, is a California entity, perhaps two and a half percent.  J. T. Thorpe Texas is only a Texas entity, maybe five percent of the claims.  Shook & Fletcher has only a few states where it is

Peterson - Direct                              428

liable in the gulf coast.

So to total this set of numbers is a meaningless calculation.

Q.        Why is that?

A.        Well, you are adding numbers that don't apply.  What does it represent?  One person is going to get – at Swan – is going to get two hundred and forty thousand dollars.  He is not going to get paid by anyone else on this list probably.  Someone from Western MacArthur won't get a Swan payment, probably won't get a T.H.A.N. payment, may not get paid by anyone else.

Q.        Do you think it's realistic to assume that there is anyone in the real world who will collect from each of these trusts?

A.        The probability is – his Delta Approach is zero, which is a calculus notion.  It is next to nothing.

Q.        Turn to the next page.  This is page twenty-one headed "Summary of Trust Payments to Mesothelioma Claimants." It puts to a number described as expected average recovery based on historical tort naming patterns.  Are there adjustments that you would make to this chart to give effect to the criticisms that you just articulated?

A.        Well, that's a different matter.  The criticisms I have just articulated apply to the row above it, the two point two million.  I think that is a meaningless number because I

Peterson - Direct                                    429

think basically you have just got to knock out that whole one point – one billion, four hundred and forty-eight – one million, four hundred and forty-eight thousand.

The other numbers are too high.  You can't add across defendants.  Manville trust – we actually did an empirical study of this when we were working on the FAIR Act.  I testified three times before the U.S. Senate when it was considering the FAIR Act.  One of the things we did is we looked at how many cases Manville got of all of the cases filed, even though we – you know, what we did is we took data for twelve different defendants, we linked it together, and we identified unique individuals across those twelve defendants. So it's someone who filed a claim against one or more of those trusts, and of all of those people, only seventy percent of them have made a claim against Manville.  Manville is sometimes stated to represent the universe of all claims.  It isn't.  It only gets seventy percent of claims, and that's the biggest trust there is with regard to the receipt of claims.  At most, other trusts get maybe fifty percent of all of the claims.

Now, you can't calculate the total.  It is an approximation.  But it's indicative of the fact that most trusts only get a fraction of the claims, and that means that these payments, on average, for the first line, the five hundred and twenty-five million, you have got to cut it in half perhaps.

Peterson - Direct                    430

Q.          Five hundred and twenty-five thousand?

A.          Five hundred and twenty-five thousand.  You have to cut it in half because people are getting paid basically, on average, from only half of those.

Q.          By the way, do you understand that that number came out of a reply brief filed by the committee?

A.          Yes, and it's not the number that's actually in your brief, as I understand.

Q.          You understand that we corrected the brief to add one of the Federal Mogul trusts?

A.          Yes.

Q.          And what was the result of the figure?  Have you written it down there?

A.          Yeah, I wrote it down.  Five hundred and forty thousand, eight hundred and eighty-six.  It doesn't make a difference though.  So, at most, if you add this stuff together, figuring out you take half of the five twenty-five and half of the two thirty-three, ball park, you get, you know, four hundred thousand dollars, not two point two million.

Q.          Let's turn to the one point two million dollar figure at the bottom of the page there.  Do you have an understanding based upon having listened to Dr. Bates what that figure is supposed to represent in the analysis?

A.          He said that it was his estimate of both the total amount of money on average received by a mesothelioma claimant

Peterson - Direct                    431

for their injuries.

Q.        And do you have a comment to make upon his assumption there?

A.        I have several.

Q.        Go ahead.

A.        First of all, he gave no support for that, no credible support for it.  A conversation with an unidentified researcher based upon confidential data that that researcher then destroyed is not a reliable set of information that a scientist or anyone else would rely upon.  You have got to be able to support what you say.  That's not support.

Secondly, that number was out-of-date, is out-of-date. That was a number he said of 1999 values.  We have got ample data showing the asbestos values for mesothelioma had increased greatly since 1999.

If you compare the 1999 averages to the actual payments in recent years for Garlock, it has gone up nine-fold. For Grace, between 1999 and – for Grace between 1999 and 2001, they went up eight-fold.  For USG, they went up seven-fold. For Quigley, they went up nine-fold between 1999 and 2004. Turner & Newall, they went up three-fold.  And that's only the early nineties except for Garlock, which is current number.

Q.        What are the sources of the information you just conveyed?

A.        These are the claims databases that have been in my

Peterson - Direct                            432

reports and public in each of those cases.  Danny Meyer, his testimony in Armstrong, said that the values of claims increased from about around two million dollars in the early 2000's to the number we have talked about, five to eight.  He suggests whether or not those absolute numbers are correct, he suggests there is a two to three-fold increase.  I mean, all of those sources suggest that the 1999 number needs to be more than doubled.  It probably should be raised three or four times to reflect current values.

So it's an unreliable number to begin with.  It is out-of-date and needs to be increased greatly and in a manner we can't really say.  And, in any event, it's a number – again, it's impossible to calculate this number.  The researcher didn't obtain data from every defendant and didn't obtain data from every insurance company, couldn't get any source.  And as a result of that, that number was understated.  And I think that that has been acknowledged in the report that subsequently followed.

And so the number is meaningless.  We don't have a number.  That number, in particular, is blatantly too low.

Q.      Okay.  Page twenty-two is headed, "Information to be used in estimation of asbestos indemnity."  There are several bullet points here.  I would like you to walk through them and tell us whether or not you believe that the information described there would be useful in an aggregate estimation of

Peterson - Direct                        433

Garlock's liability for mesothelioma.

A.          First of all –

Q.          Let me amend that.  For asbestos related diseases in general.

A.          Would you restate what it is you want me to –

Q.          Please walk through the bullet points and tell us, for each of them, whether you believe that the information described there would or would not be useful for the purposes of an aggregate estimation of Garlock's liability for asbestos-related disease claims?

A.          All right.  Well, the first is not – it's irrelevant what the total payment across all defendants were.  It's undiscoverable.  You can't determine it.  The effort would be extraordinarily difficult and expensive and you don't need it at the claim level anyway.  If you want to calculate an average and you think you have some way to do it, that's one thing, but you don't need this on a case by case basis.  Estimation is not a case by case project.  It is an attempt to forecast the aggregate liability.  When you have got hundreds of thousands of claims that have been resolved already and you have got a hundred thousand pending claims and you have got multiples of that in the future, you need to know what the average is, and it is such a big number, the average is a meaningful number more than individuals.  So that's unavailable; it's not useful; and it is not necessary at a claim level.

Peterson - Direct                                    434

The second item is basically the same thing. The claimant level on the total payment received in the trust system. That's across trusts. Again, that's just not relevant to what people have. I mean, it might be relevant if there was some indication that the exit of trusts – entry into the tort system significantly affected settlements. This is a question that we have looked at. We can look at historically. The Manville trust exited – entered the tort system twice. It entered it in 1998, paying a hundred cents on the dollar. If there was ever a time when people should have gotten a setoff, it was the biggest trust coming in paying a hundred cents on the dollar in '98. They went into their own insolvency when Judge Weinstein seized them, and they came out again in 1995. Other trusts have come online regularly since then.

If you look at the settlement values obtained during the period of years when these trusts were not participating and later, what happened when Manville was not paying, the values basically stayed stable. In 1990 to 1995, the values were stable across almost every defendant. There wasn't much action with regard to values. When Manville left, the values went up sharply.

Q.      When you say they left, what do you mean?

A.      When they left the litigation and entered into paying claims. When Manville began to pay claims at ten percent, although it's not a big percentage but their values of

Peterson - Direct                         435

claims – it was fifteen thousand dollars per meso.  There is no indication that that increased values.  They went up.  I don't know if that –

Q.        Increased values against other parties?

A.        Other parties, yes.  I mean, we looked at the data across a number of defendants, the same data source you asked me about earlier, the data we have from the various asbestos trusts.  Jury verdicts went up, too, of course, during this era.

          And similarly there is no indication that the entry, when looking at the available data, that at any point in time when EaglePicher or National Gypsum and some other trusts came on, you don't see a blip.

Q.        Are you referring now to the 1990's?

A.        Those are all 1990's.  I mean, there were a large number – there were a number of significant trusts that came on board in the 1990's.  Manville was the biggest but all of these companies – EaglePicher was among the biggest.  Celotex was among the biggest that came on, Celotex in Carey, Canada.  All of these people came out, set up trusts in the 1990's and began paying claims.  It had no effect.  It certainly didn't reduce the settlement averages.  It had no discernible effect.

Q.        On other defendants?

A.        On the settlements by other defendants because they went up.  They didn't go down.  I mean, now one could argue and

Peterson - Direct                                         436

say they would have gone up even more if you didn't have it but there is no evidence of that.  That's speculation.

So I don't think that this is a – I understand – one other thing, when the co-defendants, their reaction to the Manville Trust when it started paying a hundred cents on the dollar, and I know this because they told me this when I was working as a special master, special expert with Judge Weinstein and Judge Lifland, I was negotiating with co-defendants as parties to that class-action, and I had many conversations with representatives of asbestos defendants and distributors of Manville.  They said they expected, when Manville came out and paid –

MR. CASSADA: Your Honor, just for the record, this is hearsay.  If he is relying on it for his opinion and not for the truth of the assertions, that's fine.

THE COURT: We will accept it as such.

THE WITNESS: When they came out of bankruptcy and started paying claims, the representatives of these companies said they expected to get a reduction in what they had to pay. They didn't get it.  They were angry.  They were trying to get me and my world to try and help them in some way get some credit for it.  There really wasn't any vehicle that we could do that.  That was between them and the lawyers they were negotiating with.

So that's a vivid example that I have seen that caused

Peterson - Direct                              437

me to believe there is no – what the debtor here is hoping for has never happened in the past.

Q.        What about the third bullet point, is that information likely to be significantly useful in an aggregate estimation?

A.        The most useful thing about it is the year when the claim was filed, the date of the complaint, but the debtor already has that.  The debtor has most – the debtor has the complaints for all of its own cases.  I mean, if it is a lawsuit against Garlock, I would assume that Garlock somewhere has the complaint, so it has this information.  It presumably has used and can use whatever it has got, but generally it is not very important.

Q.        How about the last bullet point, those items of information?  Do you think those items of information would justify a major data-gathering exercise in this case?

A.        No.

Q.        Why not?

A.        You don't need it to do a forecast.  You can forecast based upon averages across people under the assumption that the exposures are going to be roughly the same going forward as they were in the past. If you want to look at that question in a more detailed level, you can take Nicholson and break them out into the different occupations and look at forecasts separately than occupations.

Peterson - Direct                          438

The trouble is that you are not going to have any of this information for future claimants.  You may have it for pending claimants and it might marginally adjust your forecast for any of this stuff for present claims, but four times as much liability is going to come out of the future claimants as the pending.  You will never get that.  The reduction of uncertainty in the forecast, even if any of these will be valuable – I don't believe any of them would be valuable.  Even if you had that, it is not going to be a significant impact on the forecast.

Q.          We have one more set of slides to work through, which are those that Mr. Cassada put on the board.  Do you have those in front of you?

A.          I do.

MR. SWETT: Your Honor, this is –

THE COURT: I don't.  I didn't get that first bunch. I was just looking at the screen.  Okay.  I have got them now. It is beginning to look like we are not going to get to your last witness.  I am just wondering whether you all want to take a short break or you want to keep trying to plow on?

MR. CASSADA: How much longer do you anticipate?

MR. SWETT: A half an hour perhaps.

MR. GUY: I probably have about five minutes.

MR. CASSADA: It looks unlikely then.

THE COURT: Why don't we take a ten-minute break then.

Peterson - Direct                            439

I apologize to your last witness, but I just don't think it is going to be possible, and we might as well do the last half hour without our eyes yellowing over.  So we will take a ten-minute break.

(Recess from 3:06 p.m. until 3:17 p.m.)

THE COURT: Have a seat.

MR. SWETT: Your Honor, we are going to turn to Mr. Cassada's slides, the first page of which is headed "Relief Debtors Seek."

THE COURT: Okay.

BY MR. SWETT:

Q.        Dr. Peterson, please turn to page four.  And the way I have numbered the pages, the cover page is page one.  So page four is headed "Purposes of P.O.C. Process."

A.        Yes, I see that.

Q.        Please go through these and tell us whether or not you believe the purposes articulated here would be useful and valuable for the purposes of an aggregate estimation of asbestos liability?

A.        I don't think any of these purported purposes would advance the estimation in this case.

Q.        I should have said the purposes of issuing the proof of claim form with its detailed inquiry.

A.        Yes.  Let me just quickly go through them. Ascertaining the identity and number of present claims, like a

Peterson - Direct                                    440

number of these have mixed effects.  There is some good and some bad.  In principle, the particular proof of claim form here is so arduous and impossible that there is no value to it in any event, but a form ten would have some value but not this.

I believe that, if you have the kind of process that's been proposed by the debtors, you would actually add uncertainty to the issue of how many present claims and you would add disputes because, as I said before, you are going to get a different number of claims.  You are going to get some people who are in the database that will not file a form.  You are going to get some people who weren't in the database, hadn't filed a claim and will file it again, will file a claim in the future, but you don't know what to do with either of those things really because, as I said, the people that are eliminated may be eliminated for reasons other than to do with the quality of their claim or their compensability; it just is the process itself discourages them, and that would be disputed.

If there are more claims, which is a real probability and happens in most proofs of claim processes, that it generates more claims than were filed, and that is simply because any time you give a law firm a deadline, they tend to act protectively and they file claims in order to make sure that no one is going to get barred by the bar date.  And so you

Peterson - Direct                                    441

are going to get a bunch of claims.  Now, the debtor has not been in bankruptcy a long time, so that isn't as much of a problem.  Well, by the time you get this process going, if you did, they will have been probably a year or so in.  And, you know, what do you do with those extra claims?  I mean, are they real claims that should be used as a basis for forecasting the future claims?  Are they real claims that should be valued here?  Are they claims that just were brought out simply by the artificial process?  This whole proof of claim and the bar date are artificial.  It doesn't happen in litigation.  It is presenting a unique event.  It is like an earthquake in L.A.  You weren't anticipating it.  It destructs your life, and here it destructs the forecast.

The information it adds is that you do get rid of some claims but, again, you don't know why you got rid of them and, in any event, the kinds of claims that the debtor thinks they need to get rid of are claims you can estimate.  You can estimate some fraction of stale claims that should be eliminated.  You can make an assumption about whether the MARDOC claims should be in or out or partially.  You can address the issue of the questionable doctors.  All of those things can be addressed and typically are.  I mean, most of my forecasts deal with those sets of issues based on historic matters.  So it doesn't really add much useful information and it complicates things.

Peterson - Direct                    442

It doesn't help in valuing present claims for the same reasons.  It really doesn't add any information about the values of the claims primarily because you don't have a metric to set it against.  You get data about – you now know something more about a claim, but you don't know how to value that incremental knowledge because you are now dealing with data and kinds of issues that never occurred in litigation.  You just don't know what implications it has.

Whatever value there is in counting claims, one, there is no incremental value in this information and the utility in valuing present claims.

The number of future claims, again it complicates.  It is a process that makes forecasting harder, not easier, because what do you do with these higher number of claims.

We all base our forecast in some measure upon the recent claim filing experience of the defendant.  How many claims did they get in the last three, four, five, however many years.  And the assumption is that that level of claim filing, there is a mantra, past is prologue.  I mean, that is a starting hypothesis.  You change it, of course, because you try to be realistic about what's going on in the world but the past is no longer prologue here because you have introduced not only the claims you have seen filed with this debtor but you have now got some extra number of claims coming in or some fewer number of claims.  And how does that affect your forecast?  Do

Peterson - Direct                                    443

you think that over the long-term, if you see twenty percent more claims than you had in your database, prepetition database for people filing in response to the bar date, should you increase your future forecast by twenty percent?  That implies those twenty percent of claims that only respond to the bar date are equivalent to the claims you got prepetition.  It's a whole new – it's the kind of problem the debtor is talking about but you are introducing a new one.

Q.          Now, let me ask you are you familiar with the procedures for voting rights that have been adopted in any of the recent asbestos bankruptcy cases?

A.          I haven't followed them as closely in the cases that I have been involved in recently because I move on to other things by the time we get past estimation in a case typically, but over the last twenty something years working on estimation issues, the issues of voting, how to conduct voting has been a matter that I have dealt with.

Q.          Do you have a view as to whether or not the data –

MR. CASSADA: Excuse me, did you proffer Dr. Peterson as an expert on voting in a Chapter 11?

MR. SWETT: I didn't refer to that specifically.

MR. CASSADA: Okay.  I don't think you have established that he is competent to testify –

THE COURT: We will hear what he has got to say.

BY MR. SWETT:

Peterson - Direct                    444

Q.          Do you feel you have a basis for commenting, sir, on whether or not the data gathering exercise proposed by the debtor would be of assistance in ensuring a fair vote on the plan?

A.          Yes, I have opinions about that.

Q.          What is your opinion?

A.          And the opinions are based upon my expert work in this area, experience in this area.  One, you don't need to have it.  You can have people basically file a proof of claim when they vote.  That has been done before and it is perfectly appropriate.  There is no reason to have a two-stage process. In the state of Minnesota, you get to register to vote and vote on the same day.  It is basically that kind of thing.  If it's good enough for voters in Minnesota, it's good enough for this process.  I say that as a former Minnesotan.

Other issues have to do with values.  I mean, how do you value claims?  Some courts give one dollar to each claimant for purposes of voting.  They are all treated equivalently. Others give higher values.  You can look at the historic relationship between what a mesothelioma claimant gets and what a non-malignant claimant gets and give that relative number of votes to mesothelioma claimants, which prevents the possibility of the case somehow being railroaded by claimants that have the least valuable but still most numerous claims.

In my experience, none of that makes any difference

Peterson - Direct                                       445

because, if the claimants committee and its members and the plaintiff's bar support a plan, it will pass and you will get a high vote across every constituency.  If they don't support a plan, it won't pass and it doesn't make any difference if some sub-group of claimants vote for it, it won't pass.  I mean, the vote is usually something that's pretty easy to predict in these cases, and it depends upon whether or not there is support within the claims group and the claims lawyers' group.  And these worries about how that pending claimants are going to vote differently from cancer claims, I have never seen that happen and I don't expect it.  It theoretically could happen but, in the real world, it doesn't.

Q.        Let me ask you to skip forward to page eight which is headed, "In W. R. Grace estimation trial, committee settled after Grace rested its case based on POCs."  Do you see that page?

A.        I have that.

Q.        And the bar chart there.

A.        Yes.

Q.        Do you have any comment on the information set out there?

A.        Well, again, I haven't gone back to see if the estimation that Dr. Florence testified about and my report, but I will assume they are correct.  But the last column is a problem, the two point two –

Peterson - Direct                                   446

Q.          Why is that?

A.          Well, first of all, no one knows what the settlement is, the value of the settlement, because it is dependent upon the values of the stock.  I have seen it more recently at two point four.  I have seen other numbers.  I have heard it at three million.  So that number is not a set number.  It is not a reliable number.

Q.          You are referring to the number set forth on the page, two billion, two hundred and fourteen million?

A.          Yes.

Q.          Under the heading "settled?"

A.          Yes.  Now, in the spirit of estimation, it's an estimation of the value and, you know, it may or may not be a good one but it is certainly not a definitive number, but that's not the real problem.  The real problem is that the two point two-one-four is the amount of money, assuming that's the correct number, is the amount of money that the plan would give to the trust.  That's not the liability.  The plan also says that the payment percentage in this case is anticipated – that the parties expect the payment percentage for the W. R. Grace trust will be between twenty-five percent and thirty-five percent.  It's a heavily impaired plan.  It's not a hundred percent plan.

The two point two-one-four would imply the values of the claims are two point two-one-four only for a hundred

Peterson - Direct                                    447

percent plan.  But since it's a range between twenty-five percent and thirty-five percent, if the payment percentage is set at twenty-five percent, that means that the two point two-one-four is based upon an assumption that the liabilities of the trust will be eight point nine billion dollars, which is greater than I forecast.

Q.         Is that the difference between the liquidated amount of the liability and the payment amount after applying the payment percentage?

A.         Yes.  The problem is that this chart and Mr. Cassada's discussion of it totally ignores the difference between the liabilities of a trust and what the trust pays, and that's a fundamental mistake.  If the trust sets a thirty-five percent payment percentage, the two point two-one-four implies that the total liability is six point three billion dollars, which is still more than I forecast.  So rather than disconfirming my forecast, this value confirms my forecast.

Q.         Do you have a comment, sir, on the next page, page nine?

A.         I am sorry, Mr. Cassada, but this page is an example of a number of very bad mistakes.  The first is it uses a method that just has no utility, no value. What they have done is they have taken a point in time in both of these cases and say, okay, we are going to take the value of W. R. Grace's settlement in 1999 and Garlock's payment in 1999 and we are

Peterson - Direct                                        448

going to kind of look at how the plan supposedly grosses up the average value of forty-nine, and that's how they get to the fifty-six to seventy-nine. That's my understanding.

There are two problems with that. The first is, again, it ignores the payment percentage. The fifty-six to seventy-nine isn't the value of a claim, it is the amount of money that's expected to be received. So you have got to divide by the expected payment percentage and, in fact, the average value under the W. R. Grace trust is two hundred and twenty-five thousand dollars. So if you wanted to do the comparison, you have got to compare the forty-nine point – forty-nine thousand, five hundred and eighty-six million dollar average in 1999 to two hundred and twenty-five thousand dollars, not to the numbers on these tables. It's a meaningless comparison. You are comparing an apple and an orange.

Q.        Two hundred and twenty-five thousand dollars is your understanding of the average mesothelioma value as prescribed by the trust distribution processes at the proposed Grace plant?

A.        That's correct. But I regard that as – I mean, that's a bad enough problem, but the worst problem is that it's the years you select. It is arbitrary as to what year to select. Looking at the data that Dr. Bates has provided us about the average settlements for 1999, if they had taken the

Peterson - Direct                                        449

value in 1998, you would have started at twenty-seven thousand, four eighty-four.  So you would basically double the rate of increase.  So it goes from twenty-seven thousand to two hundred and twenty-five thousand.  That's a ten-fold increase.

They have given us 1999, which is fifty thousand dollars.  So that's a two and a half – four and a half fold increase.

If you had taken 2001, it was a different number for Grace, ninety-seven thousand dollars.  You would have gotten a different number already.  It's arbitrary.  You get very different inferences and results depending on which of these years you take, and the choice of the years is arbitrary.  There is no reason to take one year rather than another.  You get completely different conclusions.

And the same thing with regard to the selection of the Garlock year.  If you had taken the year 2000, you would have gotten nine thousand, one hundred dollars.  Instead of that, you would have gotten twenty-four thousand, six hundred and forty-eight.  You would have started almost three times higher.

So this table doesn't really reflect any kind of useful comparison or analysis.

Q.       Come back, please, to page five.  This will be the conclusion of the examination, I think.  This is the page headed "New era in asbestos bankruptcy cases.  Why is Garlock different?"

Peterson - Direct                      450

Taking the first of the bullet points there, the first post-bankruptcy wave debtor, do you think that that is a realistic way to characterize Garlock and the setting of this case?

A.          No, it is clearly wrong.

Q.          Why?

A.          Well, the first bankruptcy wave was Manville. Manville filed for bankruptcy in 1982. It came out in 1988, went back in, in 1990 – well, it didn't go into bankruptcy but had the stay in 1990, came out in 1995. There are two waves with regard to Manville because the class-action was kind of a mini-bankruptcy.

Q.          Why do you describe those events as waves?

A.          They are very disruptive.

Q.          How do you mean that?

A.          Manville was paying between twenty and forty percent of the full values. That was the word of mouth, the expectation at that time. And whether it was twenty or forty percent probably depended upon the part of the country and the kind of industry and so forth. But Manville was by far and away the largest payer of asbestos claims. It dominated the asbestos litigation while it was still in litigation. The lawyers that represented Manville were the lead counsels in almost every state and locality in the country. They dominated this litigation in every way. They dominated the public

Peterson - Direct                    451

relations.  And so when they left, it threw the whole litigation into a loop.

Q.      By left, you mean stopped paying claims?

A.      When they left the active litigation by the bankruptcy stay in August of 1982.  And most concern for both the plaintiff's lawyers and defendants is they cut off paying claims.  The biggest source of money was now gone.  And as a result, the defendants pursued litigation in which they tried to get the stay extended to them, the co-defendants.  They were unsuccessful.

Q.      What happened to their settlement values, those of the co-defendants?

A.      They went up because Manville was gone.  Under the principles of joint and several liability and the basic principle of the tort law of this country, that when you have got multiple tortfeasors and one becomes insolvent or unavailable, that shortfall needs to be born by the joint tortfeasors, not the victim.  That's the principle that underlies all of this.  That happened.  So that effect is real.

And the problem for the asbestos defendants is that those values never went down and, in fact, they continued to go up and, when Manville then started paying a hundred cents on the dollar – I already said this – that the co-defendant settlements didn't go down.

Q.      That's when Manville emerged from bankruptcy through

Peterson - Direct                          452

the trust?

A.         Yes.  It paid, I think, a billion three in payments. That number may not be right.  It may be a billion, but they paid an enormous amount of money in the period of time when they were paying a hundred cents on the dollar between 1998 when they came out and July of 2000 when Judge Weinstein entered a stay on payments by the trust.  But the co-defendants didn't get any benefit from that, and there is no evidence – and there were subsequent waves, as I have indicated.  There were other significant trusts.  Celotex had the next biggest, perhaps the next biggest amount of ever being paid. EaglePicher was very significant. Keene.  All of those companies went into bankruptcy in the 2000's and removed people that were paying significant amounts of money.

Q.         The 2000's or the 1990's?

A.         The 1990's, excuse me, 1990's.  They removed people that were paying significant amounts of money, and it's hard to identify the same kind of striking effects that we saw with Manville's bankruptcy, but they added to the pressure on the remaining defendants to pay claims more.

Q.         Let me call your attention to a settlement class-action known as the Georgine case.  Are you familiar generally with that case?

A.         Yes.

Q.         Do you perceive in the historical data any waves

Peterson - Direct                                          453

associated with the Georgine?

A.          Georgine was filed in '93, and it had a number of effects.  Actually that is an important point.  A lot of the – litigation is changing all the time.  That is one of the things that makes it interesting.  I mean, it's an academic because all these events happening and disturbing the litigation.  It's a system.  Litigation is a system but it's a system that's constantly disturbed and those perturbations are fascinating.

The CCR did a number of things.  It took –

Q.          What was CCR?

A.          The Center for Claims Resolution was a consortium of twenty asbestos defendants that joined together in order to settle claims together and to defend them together.  And it gave them a significant settlement advantage because the amount of money they were now paying to a particular claimant was much greater than any one of them individually.  So they had leverage to get more favorable settlements.  So all of their members benefitted from the fact that they were paying jointly at one time and they could cut better deals.

The biggest problem with the CCR is that internally they were arguing about who should pay what share, and that ended up destroying CCR in the end.  Well, that and a whole bunch of their members became bankrupt or became insolvent.

Q.          What happened – let me just fast-forward just a bit.  Was there a proposed global class-action settlement of future

Peterson - Direct                                    454

asbestos claims against CCR members?

A.          Yes.

Q.          And that's called the Georgine settlement?

A.          That's the Georgine.  It was filed in the Eastern District of Pennsylvania.

Q.          Was there a stay of litigation imposed by the District Court entertaining that class-action settlement?

A.          Yes, it did.  You could only – if anyone who brought a claim against any member of the CCR, because if you sued one, you got them all.  Anyone that wanted to file a claim could only file a claim through the process that was spelled out in the Georgine.  They had to follow the Georgine process, which imposed certain restrictions on who would qualify for payments and the flow of claimants by year and a number of other matters like that.  So if you followed that, you could make a claim, but you couldn't file a claim in the ordinary litigation during the Georgine era.  Georgine was turned down by the Circuit Court and the Supreme Court overthrew the plan in 1997.

So what happened is, when Georgine was in place, claimants lost now the biggest source of money.  They lost Manville and now they lost this.  And so as a result, they had to pay – it is really the same thing as a bankruptcy in that respect.  They wanted the co-defendants to pay more and values went up, particularly in the period '95 and '96.

Q.          And what happened when the stay came off after the

Peterson - Direct                    455

Supreme Court affirmed the rejection of the proposed settlement?

A.        The settlements among other co-defendants moderated some but it wasn't because they were getting credit, it is basically – and then they jumped back up.  It was just a hiatus when claims weren't being settled against other defendants because everyone was now bringing in their claims and pursuing them against Georgine to get paid by them.

Q.        Against CCR?

A.        CCR.  And then the values kicked up again.  So there was kind of a period of claim filings – well, I don't know if that so much.  I don't know if that's a general pattern. Claims filings against co-defendants went way down.  I don't know if there was a general effect on settlements.  I will have to correct that answer.  But it did affect claim filings because now Georgine was active and everyone was concentrating getting paid by them.

        One of the important things is the notice campaign in Georgine.

Q.        How is that?

A.        There was a nationwide campaign, I think five to ten million dollars – ten million dollars, as I recall – in which they advertised pervasively about the class-action being filed and that you had to participate in it this way and so on, and that publicized, just like a big advertising campaign.  It

Peterson - Direct                    456

brought forth a lot of claims though that otherwise wouldn't have come.

And shortly after, there was a similar kind of notice campaign involving Fibreboard and its Ortiz class-action that was filed about a year later. And so you had these two big notice campaigns and that brought out more claimants. It was kind of like the advertising we see now.

Q.          Now, after the Georgine settlement was thrown out, what happened to the CCR?

A.          The CCR tried a different strategy. They entered into global settlements, and they made kind of private – the deal is somewhat like Georgine but a law firm at a time. They would settle all of the pending claims that a law firm would have in Georgine and then they would – all future claims would be subject to conditions and restrictions that were not dissimilar to Georgine. And they operated under that process kind of until 2000 it began to fall apart. Some of the members withdrew.

Q.          What happened then?

A.          And then, in 2001, January 2001, they disband.

Q.          Was there an impact on settlement values among the individual members of CCR from the dissolution of that organization?

A.          It was a huge impact.

Q.          Why was that?

Peterson - Direct                                                457

A.            It meant that the asbestos defendants who were members of Georgine had benefitted from that.  The leverage they had from the group membership was now gone and they had to go out on litigation on their own.  And so a number of them went into bankruptcy within a year of disbandment of CCR.  But in the meantime, the amounts they had to pay in cases just went up enormously.

Q.            Let me refer you to the second bullet point on page five, first post silica-gate debtor.  Do you regard that as an appropriate way to characterize Garlock in the context of this bankruptcy case?

A.            Not at all.

Q.            Why not?

A.            Well, a couple of reasons.  One is that there have been other intervening – the silica opinion was in the mid 2000.  I think it was 2005.  But, first of all, that opinion by itself wasn't a signal event.  It really just kind of summarized and codified what was already going on.  Even prior to 2005, non-malignant claims were dropping off rapidly and sharply, and they were dropping off for a number of reasons.  One is that there were other avenues for criticism of these doctors.  The CCR – well, several – there were several asbestos defendants who brought lawsuits or otherwise challenged the veracity of some of these doctors.  There were some published audits where the B-reads – B-read is an x-ray.  A chest x-ray

Peterson - Direct                                    458

is read by a B-reader. It's a specialized pulmonologist who is qualified in reading an x-ray to see if the x-ray is indicative of the patient having a pneumoconiosis, a lung disease. And you can distinguish asbestosis from other lung diseases. So a B-reader is supposed to be able to identify that.

Q.        Does that have any direct relevance to mesothelioma?

A.        No.   None of this – there was really no – mesothelioma doesn't arise from screenings.   This was a criticism of the screening process.   Probably most, a large number of the non-malignant claims in the 1990's and early 2000's were the result of some entrepreneur setting up a screening van in some location outside of a plant where people were exposed to asbestos and bringing them in and having a chest x-ray and then having a doctor read it.   And those practices were questionable, and that generated a lot of claims.

Screening itself is a medically sound thing to do.  It is beneficial, but it was abused here.   And then those facilities would have basically peddled those claims to plaintiff's lawyers who filed them and that produced, you know, tens of thousands, approaching a hundred thousand claims in 2001 or so.  And the plaintiff's bar – well, the defense bar and the defense community, needless to say, got very irate about this and brought a bunch of challenges to it, the last of which – really, it's the last was Judge Jack's, the effort in

Peterson - Direct                                459

Judge Jack's which was not an asbestos case at all. It was a silica case. But these same entrepreneurs had the same process for diagnosing silica claims. Even though the – and they found that lots of people had both asbestosis and silica, even though the likelihood of getting both of those diseases is very remote. So the practice was something that was unsavory and it contributed to a distortion of the compensation.

From my viewpoint, in addition to being unfair to defendants, it meant the money was being directed to people who weren't sick or only minimally sick, as opposed to mesothelioma lung cancer claims who were in dire circumstances. It distorted the fairness of the process.

And Judge Jack's opinion in 2005 kind of recounted some of this, described what would happen in the asbestos litigation and she acted harshly within the silica litigation, but it tarred all of these doctors. So as a trustee of the Manville trust and the Fuller Austin trust, we refused to take claims from these doctors anymore.

So that really further dampened the number of non-malignant claims which had already, as I said, that had started dropping off in 2002 before this. So people who filed bankruptcy in that era got fewer claims. This had happened. That was well before this bankruptcy proceeding. It is eight years before, seven years before, and the effect of that was to reduce the number of non-malignant claims that they were

Peterson - Direct                                    460

receiving.  From the estimation standpoint, it reduced the number of non-malignant claims we forecast for the futures.  It did leave people with some residual bad claims in-house, some of which got perfected.  All you had to do is go to get a good doctor to read your x-ray and you had a good claim.  It didn't mean the claim was bad because even this process identified some quality claims.  It is just that you couldn't tell the good from the bad.

Q.        Were there other developments involving the non-malignant claims over the course of the mid 2000's having to do with legislative action?

A.        Several states.  Probably most prominently Texas.  Texas, Ohio, Mississippi, Georgia.  I think Florida had two.  Had all passed some legislation at the behest of the defense community, the asbestos defense community, to make it more difficult to bring asbestos claims, focusing mostly on non-malignant claims but they also set up hurdles that non-malignant – that some cancers would have to face.  Mississippi redid its venue process by statute because the courts had allowed anyone to file a claim in Mississippi, and that generated, again, a lot of claims that weren't of much quality.  So that happened, and they were intended by the defense community to save them from its problems but the perverse effect of it is, is that it probably made it worse.

Q.        Before you go, then, let me ask this question: Have

Peterson - Direct                              461

you heard the term "inactive dockets" as it pertains to non-malignant claims before?

A.          Yes.

Q.          What's an inactive docket?

A.          An inactive docket, I think probably Los Angeles County was either the first or one of the first to do it.  It is if a claim is a low-level non-malignant claim, you have got a diagnosis you have got pleural disease, which is a disease – scarring of the tissue around the lung or asbestos, but there is no evidence that you are suffering any impairment from it.  The court will say, okay, you have filed a claim and we will keep the claim.  You have beat the statute of limitations.  So you qualify there, but we are going to hold that case as inactive until you either get a different disease or your disease progresses because non-malignant claims often are progressive.  You get it and it gets worse over time.  And so some of these people who don't have much wrong with them ten years ago may now have a compensable disease.  And those inactive dockets have spread to a number of places around the country.  It is another way of dealing with the same problem.

Q.          Okay.  Now you were about to speak of an effect of these changes in the handling of non-malignant claims upon other claims.

A.          And this affects every defendant, is that, as a general point, an asbestos injury claim really has value only

Peterson - Direct                              462

if the claimant can get to trial.  It is like any litigation. The defendant doesn't want to pay.  Garlock doesn't want to pay these claims.  The only reason they pay them is because they are being forced to by the threat of the legal process, and that means, to enforce the legal process, you have got to have a trial.  They wait until these cases are trial-ready, they say.  It's a sensible position, a strategic position to take. So if and when you get a trial date, then they value them, and the value of the claim goes up because, if you have got a case that's ready for trial, you have got a real threat to hold over – as a plaintiff, you have a real threat to hold over a defendant, and you can try and force a good settlement.

If you filed a claim but your trial date is five years out, you are unfortunately in Los Angeles, some other crowded jurisdiction, it's very difficult to force a very good settlement with the defendant because they are under no threat. I mean, if they don't pay, what are you going to do?  You can't get a trial judgment against them.  You have got to wait for years, and years and years.

The defendants benefitted greatly from the large number of non-malignant claims because it so tied up the trial courts they couldn't get around to dealing with the serious claims and, as a result, mesothelioma claims often had to settle for modest values because they couldn't get a trial date.

Peterson - Direct                                      463

Now you have gotten rid of the vast – a large number of the non-malignant claims, you have lessened the burden on the trial courts and so they can advance the calendar for the good cases, the serious cases, which means that a mesothelioma claimant has a better prospect of getting a trial and a more valuable claim.  That's one of the things that contributed to the increase in the non-malignant values in the – in the meso values in the 2000's because now it's easier to get to trial.

So oddly a reform, that basically in many respects was a good reform and a reform meant to benefit defendants, was perverse in that it came back and created even worse liability for the defendants in the meso cases and drove up the meso settlement value.

Q.        When you say perverse, were you making a pejorative adjective?

A.        I am speaking as a RAND researcher there.  I am sorry.  It's an unexpected event.  You think you are – you engage in an act for a purpose but the purpose is contrary to what you think, the opposite of what you would expect.  It's like a perverse incentive.  It's a perverse effect, and it's not meant to be pejorative.  You can think increasing the value of mesothelioma claimants, defendants don't like it, plaintiffs do.

Q.        And does the phenomenon that you have just described imply that, had there not been such vast numbers of non-

Peterson - Direct                                     464

malignant claims in the late 1990's, early 2000's, mesothelioma settlement values by and large in that era would have been higher?

A.          Yes.

Q.          Let's proceed to the last bullet point.  It says, "First post-trust compensation system debtor."  Do you believe that's an appropriate characterization of Garlock in the context of this bankruptcy?

A.          Well, clearly not.  It's historically ignorant.

Q.          What do you mean by that?

A.          I mean, there has been – the first trust in asbestos claims was Manville.  Well, the first one out.  They weren't the first in but they were the first out, in 1998.  And, as I said, they paid more than any trust coming out now is going to pay. They probably paid as much as, in aggregate – well, they paid a huge amount of money.  In that day, in particular, it was very large overall, part of the overall asbestos liability. And so whatever effects that was going to have began to become apparent in 1998 – 1988 – when Manville came out, and then they became in effect again in 1995 when they came out of the class-action.  Plus you have got other trusts being set up during this entire picture.

Q.          Can you name a few from that era?

A.          EaglePicher came out, I believe in 1996.  National Gypsum, I believe 1993, the trust was set up and they began

Peterson - Direct                                    465

paying claims.  Mr. Cassada would know that better than me.

Q.        What about UNR, are you familiar with that name?

A.        UNR came out in – I think they were perhaps the second one out.  They were in about 1990 or 1991.  UNR pays nothing now, very little, but at the time they were paying significant amounts of money.  Celotex was a major one.  Celotex in Carey, Canada, were both in the same bankruptcy proceeding and they paid – their scheduled value was half as much as Manville.  When they started paying, their payment rate was higher than Manville.  So they were paying numbers that approached Manville numbers.

But, in any event, none of these matters, none of these issues in my mind, even if this were the first debtor that responded to these, which it isn't, any of them, none of that makes the debtor's proposal for a proof of claim process necessary or useful.

Q.        For the reasons you have already given in this examination?

A.        Yes.  It won't work.  It is going to be extraordinarily expensive to the estate.  It is going to accomplish nothing other than to pay the professionals in this room and other professionals tens of millions of dollars.  It needn't be paid because you have got a database here that's better.

MR. SWETT: Your Honor, I believe that concludes my

Peterson - Direct                      466

examination.

THE COURT: Mr. Guy, do you want – do you have time?

THE WITNESS: I certainly have time.  I don't think he is going to be terribly long.

THE COURT: Go ahead.

MR. GUY: Thank you, Your Honor.

THE WITNESS: I have fifteen minutes, Your Honor.

MR. GUY: Your Honor, so the court knows, the FCR will be seeking to retain its own future claims expert.  So we will get to that another time.

CROSS EXAMINATION

BY MR. GUY:

Q.        Dr. Peterson, I want to focus my questions on the issue that's in front of the court, which is whether there should be a bar date and, if so, the scope of that bar date.  And in addressing that, if you could turn back to your slides to page thirteen.

UNIDENTIFIED PERSON: Do you want it on the board?

MR. GUY: It may help the court.

Q.        Do you have that Dr. Peterson?

A.        I am sorry, I do.

Q.        There you – and I understand that this is all preliminary but do you identify the total claims in the case for mesothelioma as being approximately twenty-nine thousand, correct?

Peterson - Direct                    467

A.          Yes.

Q.          And of those twenty-nine thousand, twenty-four thousand –

THE COURT: What page are you on?

THE WITNESS: It's page thirteen.

THE COURT: All right.

MR. GUY: I am sorry, Your Honor.

Q.          Of the twenty-nine thousand of total claims, twenty-four thousand of those are future claims; correct?

A.          Yes.

Q.          And that's what, about eighty percent of all of the claims?

A.          Roughly.

Q.          And those are ratios of one to four, one to five that Dr. Bates agreed with; correct?

A.          It's in that order.

Q.          And you calculate, using those ratios, a total amount of liability of one point four billion; correct?

A.          Yes, that's my estimate, yes.

Q.          Just the lowest number?

A.          Yes.

Q.          And of the lowest number, one point one-four of that are the future claims?

A.          That's correct.  That's what this is.

Q.          And that's again about eighty percent in number;

Peterson - Direct                                        468

correct?

A.          Yes.

Q.          And those are the SCR's clients; correct, his constituency?

A.          They are today, yes.

Q.          None of them will file a claim in this case?

A.          A few of them might.  Those who statistically are future claimants and included in this count, in these values, whose claims arise prior to the bar date will be obligated to file a claim and, if they don't file it, they will have their claim barred.

Q.          And in terms of a bar date being set on January 1, 2011, those individuals who have claims won't be filing a proof of claim?

A.          If we start this on January 1, 2011, none of them will virtually and if it's – very few will.

Q.          So the results that would come out of that proof of claim form process wouldn't be helpful in analyzing eighty percent of the number of claims and eighty percent of the value of the claims?

A.          It will give you no information about those claims, no.

Q.          If you could turn to Dr. Bates' slides, and I think it is number 27 but it's the one that we focused on.  It's the one that's entitled, "Garlock pays about half of the

Peterson - Direct                        469

mesothelioma claims it receives."

A.          Yes, I have this.

Q.          Dr. Bates, I think had estimated and I understand it was a first – and it was only a response to what the ACC had put in there papers and he wasn't ultimately adopting it, but he had used the number of a fifty-five percent future case net payment rate.

Now, you have done your analysis before and you wrote it on the board there to describe how you got to your numbers but, as a non-statistician, when I look at this chart from before 2000, the payment rate is always in excess of eighty percent; correct?

A.          Yes.

Q.          And that's Garlock's own data; correct?

A.          Yes.

Q.          So if you were to do this chart in 2020, would you expect that all of the data between '99 and 2010 would have a similar payment rate of in excess of eighty percent?

A.          Probably not.

Q.          Why not?

A.          Well, one, this is a different era and these differences in the overall value, the payment rates change from time to paying in part on the settlement strategies of the debtor, but for the – well, first of all, I don't – what Dr. Bates shows as his payment rate isn't what I mean by a payment

Peterson - Direct                                    470

rate or how I use it in my analysis.  He may have a different way of describing and dealing with it, using the term, but it's different.  I disagree with that whole column.  I mean, it isn't appropriate for the analyses that I do.  And it's likely that the process is a bit different.

For these to get raised up to the level of the other, you would have to resolve a lot of – from 2000 to 2005, you would have to resolve a lot of claims that are beginning to get somewhat old.  And I would agree with Dr. Bates that probably the probability of payment for those claims is less than the overall and also, as a group, these claims are – they are not necessarily representative of all filed claims.  There's a bunch of complications in this and things that we are going to have to deal with as we go forward.

Q.        But you believe the number is in excess of fifty-five percent, correct?

A.        Well, I calculated it at fifty-eight percent.  So, I mean, yes, but not very much different.

Q.        And you were involved in Babcock –

A.        But I know this calculation on the next page starts with thirty-four thousand, three hundred – thirty-four – three thousand, four hundred and thirty claims and he eliminates two thousand, one hundred and eighty, and that's sixty-one percent.

Q.        Okay.  And you were involved in Babcock & Wilcox; correct?

Peterson - Direct                471

A.        Pardon me?

Q.        You were involved in the Babcock & Wilcox case?

A.        I was.

Q.        And was there a complex claim form in that case?

A.        There was.

Q.        Was it helpful?

A.        Not at all.

Q.        Not at all?

A.        Not at all.

Q.        Why not?

A.        For a lot of the reasons I have said here.  It was burdensome and time-consuming and it ended up not being used in the estimation.

Q.        Was Dr. Bates involved in the Grace bankruptcy?

A.        He was.

Q.        Was Ms. Graham-King involved in the Grace bankruptcy?

A.        I don't recall.

Q.        If the debtors were to pursue their proposed advertising program, notice program, to the world, do you think that would result in an avalanche of claims against the debtors?

A.        It's hard to know.

Q.        Could it?

A.        If they have the advertising program that they are

Peterson - Direct                    472

- I don't think the - what I have looked at and I have discussed this with Patricia Ebener, who kind of specializes in this area, suggests to me that it isn't a very competent notice program.  So I don't know what kind of impact it is going to have at all.  It is one of the problems with this proposal.  But if it were enhanced, it would draw more attention and probably create more claims but, in part, that depends upon the form.  The form is discouraging, the current form.  If it is a form ten, yeah, a campaign for advertising and a form ten would generate more claims, and those claims would be very hard to estimate.  It would be much harder to estimate than the problems we have now.

Q.      Are you familiar with the scope of the bar date in the Grace case?

A.      In which case?

Q.      The Grace case.

A.      I was familiar with it at the time.  I haven't gone back and looked at it much.

Q.      Do you recall whether or not it applied to individuals who had filed complaints or individuals who had filed complaints and just manifested an injury prior to the bar date, i.e., a bigger group?

A.      Sitting here right now, I don't recall.  It's whatever it is. It's a document.

Q.      Do you have an opinion one way or the other as to

Peterson - Direct                          473

whether it would be appropriate to set a bar date that applies to individuals who have not yet asserted a claim but may have manifested an injury such as ten days before the bar date?

MR. CASSADA: I will object.  Are you asking him for a legal opinion?

MR. GUY: No.

MR. CASSADA: Appropriate in what sense?

MR. GUY: In determining, assisting the court and the parties to determine the amount of claims outstanding.

THE COURT: Well, go ahead and answer it if you can.

THE WITNESS: Well, I think it is inappropriate from the standpoint of fairness.  It could trap some people who have a disease but don't know they have got a claim.  Whether or not – if that were applied, it would seem to me it would run afoul of kind of the idea that you have to have – you really have to know you have got a cause of action against this defendant, which is inconsistent with at least some statutes of limitation.  I don't know if the court would enter the court orders.  And it would add some more claims but it would deny payments for an arbitrary reason to some people and it wouldn't really affect the forecast much.

Q.      Would form ten, the simple claim form, the one that we are used to, would that assist the debtors, the parties and the court in determining which of the non-malignant class would pursue claims against the debtors?

Peterson - Direct                                    474

A.            I don't think it would materially improve those kinds of decisions.  It would have – it might have some value but, on the other hand, even a form ten is going to distort the filing practices, the filing behavior of claimants when they come in, and that's going to be a bigger problem, I think, than any change in count of pending claims.  And the difference in the forecast that would come with and without a form ten, I think is immaterial.

So I think that certainly it wouldn't be worth the expense, and I don't think it would likely prove very beneficial, if at all, and it would create its own problems, but it would certainly be an improvement over the proposal.

Q.            When you say expense, are you referring to the advertising expense?

A.            The advertising and the process of you have to still hire Rust to process those claims.  So there is that expense.  It would require some work on the part of the professionals in this case, not as much as the debtor's proposal.  So all of that would mount up.  I think it isn't likely to be the tens of millions of dollars I would expect from the debtor's proposal but it would be millions of dollars of unnecessary expense and a debtor that, you know, may very well be insolvent.

MR. GUY: No further questions, Your Honor.

THE COURT: I guess it is time to quit, and we are going to be back on the 27th, Wednesday, the 27th at 9:30.

475

Mr. Rayburn, you had something?

MR. RAYBURN: My notes from this morning were not clear. You have the 27th, 28th and 29th?

THE COURT: No, not the 29th.

MR. RAYBURN: Just the 27th and 28th.

THE COURT: All right. We will see you at 9:30 on the 27th. Thank you all.

(Off the record at 4:10 p.m.)

476

C E R T I F I C A T E


        I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.




                                /s/ Patricia Basham

                                Patricia Basham, Transcriber

                                Date:  October 25, 2010