**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | | |
|---|---|---|
| | ) | |
| In Re: | ) | Chapter 11 |
| | ) | |
| GARLOCK SEALING TECHNOLOGIES LLC, et al. | ) ) | Case No. 10-31607 |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

**SUPPLEMENTAL MEMORANDUM OF THE OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY CLAIMANTS (A) IN OPPOSITION TO THE
DEBTORS' SECOND MOTION FOR ORDER UNDER 11 U.S.C. § 1121(d)
EXTENDING EXCLUSIVE PERIODS TO FILE A PLAN OF
REORGANIZATION AND SOLICIT ACCEPTANCES THEREOF, AND
(B) IN SUPPORT OF THE OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS FOR ENTRY OF A SCHEDULING
<u>ORDER FOR PLAN FORMULATION PURPOSES</u>**

The Official Committee of Asbestos Personal Injury Claimants (the "**ACC**") respectfully submits this paper to supplement its opposition to the Debtors' pending request for a further extension of the exclusive periods.[2]  This paper also serves to supplement the ACC's motion for entry of a scheduling order for plan formulation and confirmation proceedings.[3]

---

[1]  The Debtors in these jointly administered cases are Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and the Anchor Packing Company (collectively, the "**Debtors**" or "**Garlock**").

[2]  Debtors' Second Motion for Order Under 11 U.S.C. § 1121(d) Extending Exclusive Periods to File Plan of Reorganization and Solicit Acceptances Thereof, dated January 27, 2011 [Dkt. No. 1117] (the "**Second Exclusivity Motion**").

[3]  Motion of the Official Committee of Asbestos Personal Injury Claimants for Entry of a Scheduling Order for Plan Formulation Purposes, dated August 30, 2010 [Dkt. No. 451] (the "**Scheduling Order Motion**").

476963

## PRELIMINARY STATEMENT

By Order of December 9, 2010, this Court scheduled for May 12 a conference at which "the Court will further consider the Scheduling Order Motion, the Bar Date/Proofs of Claim Motion,[4], the results of the parties' discovery, and negotiations pursuant to this Order, and matters related to those topics."[5]  These and other directives in the same Order implemented the Court's earlier bench ruling denying the Debtors' Bar Date/Proofs of Claim Motion without prejudice, granting in part the ACC's Scheduling Order Motion, and providing a six-month period for the parties to engage in plan negotiations and to develop their respective theories of aggregate estimation of asbestos liabilities through preliminary discovery.

At the May 12 conference, the Court is also due to revisit the Debtors' Second Exclusivity Motion and the ACC's objection thereto.  That motion urges the Court to extend the exclusive filing period to November 28, 2011, just a few weeks shy of the maximum extension that could be allowed under any circumstances,[6] and the exclusive solicitation period to February 6, 2012.  The Court granted partial relief by extending the exclusive filing period until May 31

---

[4]  Debtors' First Amended Motion for (a) Establishment of Asbestos Claims Bar Date, (B) Approval of Asbestos Proof of Claim Form, (c) Approval of Form and Manner of Notice, (D) Estimation of Asbestos Claims, and (E) Approval of Initial Case Management Schedule, dated August 31, 2010 [Dkt. No. 461].  The Debtors recently renewed and amended the foregoing motion.  *See* Renewal of and Second Amendment to Debtors' Motion for (a) Establishment of Asbestos Claims Bar Date, (B) Approval of Asbestos Proof of Claim Form, (c) Approval of Form and Manner of Notice, (D) Estimation of Asbestos Claims, and (E) Approval of Initial Case Management Schedule, dated May 3, 2011 [Dkt. No. 1310].  The ACC's opposition thereto is being filed at or about the same time as this supplemental memorandum.

[5]  Order on Motion of the Official Committee of Asbestos Personal Injury claimants for Entry of a Scheduling Order and Debtors' Motion for Establishment of Asbestos Claims Bar Date, etc., dated December 9, 2010 [Dkt. No. 853] ("**December 9 Order**").

[6]  *See* 11 U.S.C. §§ 1121(d)(2)(A) ("The 120-day  period specified in paragraph (1) [exclusive plan filing period] may not be extended beyond a date that is 18 months after the date of the order for relief under this chapter.")

and the exclusive solicitation period until August 1, 2011, without prejudice to the rights of all

persons to seek or oppose either a further extension or the termination of exclusive rights, and

subject to the Court's further deliberations at the upcoming conference.[7]

The ACC now supplements its objection to the Second Exclusivity Motion[8] and urges the

entry of a scheduling order for confirmation proceedings, including aggregate estimation of the

Debtors' asbestos liabilities.  The ACC respectfully submits that, upon taking full account of the

status of these Chapter 11 cases, the Court should pursue the following course of action:

    a.  The Court should deny any further extension of exclusivity.  It should allow

        the ACC and the Future Claimants Representative (the "**FCR**") to file a plan

        of reorganization (the "**Creditors' Plan**") and disclosure statement promptly

        after May 31, when the present extension expires.

    b.  The Court should fix dates for disclosure statement hearings and confirmation

        hearings on the Creditors' Plan and any competing plan the Debtors may

        choose to file.

    c.  The Court should set down the aggregate estimation of present and future

        asbestos claims against the Debtors for trial as a phase of the confirmation

        hearings, fix cutoff dates for fact discovery and expert discovery, and set

        deadlines for any discovery motions, motions *in limine* and other steps

        integral to a contested estimation.

The discussion below explains the rationale for this course of action.

---

[7] *See* Order Extending Exclusive Periods to File a Plan of Reorganization and Solicit Acceptances Thereof, dated February 28, 2011 [Dkt. No. 1191].

[8] Limited Objection of the Official Committee of Asbestos Personal Injury Claimants to the Debtors' Second Motion for Extension of Exclusivity, dated February 14, 2011, at 5-7 [Dkt. No. 1154] ("**ACC Objection**").

## ARGUMENT

**I.    The Debtors Cannot Meet Their Burden of Showing Cause for a Further Extension of Exclusivity.**

Section 1121(d) of the Bankruptcy Code, both in its original form as enacted in 1978 and as amended in 2005, expresses Congress's recognition that prolonged exclusivity favors debtors over creditors in the reorganization process, leaving creditors vulnerable to the coercive effect of delaying tactics.[9]    Courts, therefore, must not grant extension requests "cavalierly" or even "routinely." *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) (citation omitted).    Rather, an extension of exclusivity may only be granted for "cause."    11 U.S.C. § 1121(d)(1).  "Cause" must be shown through evidence, not unsupported assertions (*see In re Parker St. Florist & Garden Ctr., Inc.*, 31 B.R. 206, 207 (Bankr. D. Mass. 1983)), and the burden rests squarely on the Debtors. *See, e.g.*, *In re Fountain Powerboat Indus., Inc.*, No. 09-07132-8-RDD, 2009 WL 4738202, *2 (Bankr. E.D.N.C. Dec. 4, 2009); *In re Mid-State Raceway, Inc.*, 323 B.R. 63, 68 (Bankr. N.D.N.Y. 2005).  Indeed, Garlock's "burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts." *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997).

In the cases at bar, the Debtors cannot show that allowing them to retain exclusive control over plan formulation any longer would foster prospects for the confirmation of a plan of reorganization within a reasonable period of time.  Accordingly, the Second Exclusivity Motion should be denied.  The Court should allow the exclusive proposal period to lapse on May 31, terminate the exclusive solicitation period, and allow the ACC and the FCR to file and pursue a

---

[9]    *See* ACC Objection at 5-7.

Creditors' Plan. Under this approach, the Debtors will remain free to propose their own plan if they so desire.

In the Second Exclusivity Motion, the Debtors' argument in favor of a lengthy extension boiled down to the assertions that these cases are "large and complex," (page 4) and that they had "demonstrated good faith progress toward reorganization," (page 9), especially through "progress in negotiations" with creditors (page 14). These assertions were incorrect when made; after four months, they ring even more hollow.

"Size and complexity" are not talismans for eliciting extensions without any serious assessment of the particular needs and dynamics of the cases at hand. *In re Public Serv. Co.*, 88 B.R. 521, 537 (Bankr. D.N.H. 1988) (observing that size and complexity "cannot suffice as 'cause' for a continuation of a debtor's plan exclusivity right in a chapter 11 reorganization"). In a certain sense, moreover, the Debtors' cases are not unusually complicated: they do not involve a wide variety of unsecured claims. Indeed, the only unsecured claims of significance in number and value are asbestos tort claims. The competing stakeholders are the parent companies on the one hand and holders of present and future asbestos claims on the other hand. The only real complexities have to do with applying the reorganization provisions of the Bankruptcy Code to a mass tort context in which all but a few of the tort claims are unliquidated and many more of them will predictably arise in the future.

Since *Johns-Manville* filed bankruptcy in 1982, bankruptcy courts have accrued a generation's worth of experience in reorganizing asbestos defendants overwhelmed by their tort liabilities. Congress has enacted a special statute for that purpose, 11 U.S.C. § 524(g), and scores of debtors have emerged from Chapter 11 cases pursuant to confirmed plans of reorganization, having made provision for their asbestos victims by funding settlement trusts

5

approved by the courts.   The process for achieving such outcomes is not simple, and it

necessarily varies with the circumstances, but after almost thirty years of grappling with the

problem, bankruptcy courts have a substantial body of precedent to guide their way through

reorganization issues in asbestos bankruptcies, such as those at bar.

More to the point, such complexities as exist in these cases all pertain to the asbestos

issues.  The way to come to grips with the asbestos issues is to focus on the aggregate estimation

of the Debtors' tort liability as an essential step in formulating any viable plan of

reorganization.[10]  That is precisely the approach this Court has taken.  It is not an approach that

implies any need to keep creditors from proposing a plan — quite to the contrary.  Estimation in

aid of the plan process is an integral part of confirmation proceedings.  Given the positions of the

interested parties as they have taken shape during the 11 months since the Debtors filed their

Chapter 11 petitions, it is not only appropriate but necessary to permit the filing of a Creditors'

Plan in order to frame and resolve the key issues that stand between the Debtors and their exit

from Chapter 11.

The Debtors have asserted that their "progress in negotiations" warrants an extension of

exclusivity.  Second Exclusivity Motion at 14, ¶ 43.  At last report, they informed the Court that

the Debtors had made a proposal and that "certain ACC representatives, and the ACC's financial

advisor have engaged in further discussions and informal exchanges to permit the ACC to

formulate a response."  *Id.* at 10.  Courts have observed that extensions of exclusivity often

---

[10]  *See In re Federal Mogul Global, Inc.*, 330 B.R. 133, 154 (D. Del. 2005) (noting that "[t]he
object of [estimation] is to establish the estimated value of a creditor's claim for purposes of
formulating a reorganization plan." ) *See also In re A.H. Robbins Co.*, 880 F.2d 694, 697-98
(4th Cir. 1989) (instructing that, to foster reorganization,  the lower court must estimate the
debtor's mass tort liability, rather than inflicting on the estates the costs and delays of
thousands of allowance proceedings).

magnify costs and retard, rather than advance, a negotiated resolution. *See, e.g.*, *In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. 444, 452 (B.A.P. 9th Cir. 2002). Leaving aside any broad generalizations about the impact of exclusivity on plan formulation, the simple fact is that settlement negotiations in the Debtors' cases have foundered. Any further extension of exclusivity in these cases would thus do nothing to promote a consensual plan and indeed would disserve that goal by encouraging intransigence.

Although the "discussions and informal exchanges" of this past winter were constructive to a point,[11] they were useful mainly in clarifying the breadth and depth of the gulf that continues to divide the parties, in demonstrating that each side is committed to pursuing the outcome it considers warranted. The participants were a Co-Chair of the ACC and attorneys and executives of the Debtors and their parent companies. To inform the discussions, the Debtors and the affiliates provided the ACC's financial advisor with certain financial information, subject to an agreement that these data not be shared with the ACC itself, or anyone else. The ACC's Co-Chair and the representatives of the Debtors and their parent companies then outlined, from their opposing vantage points, the appropriate structural and financial parameters for a global settlement. But the parlay did not bring the parties to any shared conception of how to bridge

---

[11] By contrast, the Debtors distort reality by describing a meeting they convened with plaintiffs' law firms in June 2010 as "initiat[ing] settlement negotiations." Second Exclusivity Motion at 9, ¶ 29. There was no bargaining at the June 2010 meeting and no agreement to treat the Debtors' presentation as confidential settlement communications. Instead, the Debtors used the occasion to declare, in much the same confrontational terms as their Information Brief, their intention to ratchet down asbestos claimants' recoveries drastically through the bankruptcy process. This was not a negotiation; it was the Debtors throwing down the gauntlet. And the Debtors' stated goal of escaping the tort system to compel lower settlements does not constitute a valid reorganization purpose. *See In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999); I*n re Premier Auto. Servs., Inc.*, 492 F.3d 274, 280 (4th Cir. 2007); *Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir. 1989); *In re 15375 Mem'l Corp.*, 589 F.3d 605, 609 (3d Cir. 2009).

their differences or forge a deal.  On the contrary, it revealed that their respective views of the

appropriate resolution differ too widely to create any reasonable prospect for a consensual

resolution, absent further developments in court.

Each side has rejected the proposal put forth by the other.  The discussions are not

ongoing.  Regrettably, the ground in these cases is not prepared for a consensual plan.  An

agreement will not become a realistic possibility unless events force a shift in the parties'

evaluations of the merits and hazards of their positions. [12]

More discussions at this juncture will not bring about such a shift.  What is required,

instead, is for these cases to progress down a litigation path so that the parties can frame and

argue the key disputes, elicit the rulings of the Court, and reevaluate their positions in light of

developments as they occur.  Because litigation is necessary and inevitable, fairness and the best

interests of the estate lie in putting the key issues for plan formulation on a track that leads to

prompt resolution.  In the end, the parties' evolving assessments of these cases under the

pressure of events will determine whether the outcome is a consensual plan or a litigated

conclusion.

## II.     The Debtors' Solvency or Insolvency Should Be Determined in the Context of Confirmation Hearings.

The most fundamental issue obstructing progress toward a consensual plan is solvency.

The Debtors are committed to the idea that they are solvent, notwithstanding their mass tort

liability.  They say that "these Chapter 11 Cases were filed for the purpose of resolving their

asbestos liability in a single forum with the ultimate goal of paying all creditors, asbestos and

---

[12]  We are informed that, after their dialogue with the ACC's Co-Chair ran its course, the Debtors
and the parent companies commenced a similar discussion with the FCR.  We, of course, do
not purport to speak for the FCR.

non-asbestos, the full amount of their allowed claim." Second Exclusivity Motion at 9, ¶ 28.

Their announced goal in the bankruptcy cases is somehow to cap their asbestos liability at a level

that will preserve equity in the hands of the existing stockholders, and then to emerge from

bankruptcy free of the overhang of pending and future claims and with their parents protected

from any derivative liability. *See* Information Brief of Garlock Sealing Technologies LLC, dated

June 7, 2010 at 95 ("**Garlock Info. Br.**") [Dkt. No. 24]. The ACC, on the other hand, believes

that the burden of pending and future asbestos claims renders the Debtors insolvent by many

hundreds of millions of dollars. It envisages a Creditors' Plan that will extinguish the stock

interests of the Debtors' parent companies and transfer ownership of the Debtors — along with

responsibility for present and future asbestos claims — to a trust pursuant to section 524(g) of

the Bankruptcy Code. The plan will not protect the Debtors' parent companies from any

liabilities derived from the Debtors, and will "pass through" to the trust any potential causes of

action against the parents for fraudulent transfer, piercing the corporate veil, or the like.[13] Proof

of insolvency will be a condition precedent to such a Creditors' Plan.

In other words, solvency is a *confirmation* issue. The plan the Debtors hope for and the

one the ACC has in mind, though radically different, have this much in common: Both depend

on resolving the disputed question of whether the asbestos liability has wiped out the

shareholders' equity interests. The Debtors must establish that their assets exceed their liability

if the parent companies are to retain equity over the creditors' objection; conversely, the

predicate for transferring ownership of the Debtors to a trust would be a finding that the

---

[13] The plan will be sufficiently flexible to bring the parent companies within the protections of
the section 524(g) injunction at some future time, if they contribute to the trust in an amount
that proves acceptable to the asbestos creditor constituency and is deemed fair and reasonable
by the Court.

liabilities of the estates exceed their assets, so that no economic interest of the shareholders subsists.

Thus, solvency *vel non* is a key issue for the confirmability of a plan of reorganization, whether it be the plan envisioned by the Debtors or the very different one sketched out by the ACC. It follows that confirmation proceedings are the appropriate context in which to adjudicate the issue. Solvency should be litigated with a plan on the table.

Indispensable for the liability side of the solvency equation is the aggregate estimation of the Debtors' asbestos liability. This Court has already recognized that the estimation is to be undertaken "for purposes of formulating a plan of reorganization." December 9 Order ¶ 3. The plan formulation purpose of the aggregate estimation will be a key factor in shaping the course of proceedings. Estimating the aggregate asbestos liability as foundation for a plan need not, and should not, be the same thing as estimating individual claims, in lieu of allowing or disallowing them, for purposes of determining what ultimate distribution a given claimant should receive from the estate.

Rooting the estimation in confirmation proceedings is therefore the procedurally correct thing to do, and will serve to keep the issue in proper focus as the matter unfolds. For example, decisions on the admissibility of evidence are often affected significantly by the context in which the issue arises. The Debtors have announced that they mean to challenge the admissibility of their historical claims settlement data for the estimation. They contend that using settlement data for the aggregate estimation would violate Rule 408 of the Federal Rules of Evidence. The argument implicitly equates the use of settlement data for aggregate estimation to admitting a settlement offer into evidence to prove liability or the amount of the damages in an individual tort suit. The ACC expects to show that this idea misconstrues Rule 408 and clashes with

10

apposite precedent.[14]  That debate lies ahead, and the plan confirmation context will and should

have an important bearing on it.  When the parties join issue on this or other evidentiary or

procedural questions, a plan of reorganization conditioned on proof of solvency or insolvency

will serve, in effect, as the operative pleading, much like the complaint in a conventional lawsuit.

That context will frame the issues, determine the contours of relevance, and inform the discretion

that the Court will necessarily bring to bear in applying the rules.  The goal will be to illuminate

and resolve disputes as to the confirmability of the plan.  Attempting to do that without having a

particular plan in view would lessen the concreteness and specificity of the issues, at some cost

to the quality of adjudication.

The financial impact of asbestos claims upon the Debtors is the *raison d'etre* of these

bankruptcy cases.  Estimation of that burden in the aggregate should be tethered overtly to plan

confirmation, because resolution of that issue will be essential to the architecture of a plan.  Far

from being an "unresolved contingency" that justifies continued exclusivity (Second Exclusivity

---

[14] *See In re Babcock & Wilcox Company,* 274 B.R. 230 (E.D. La. 2002).  The court in *Babcock* rejected the very same interpretation of Rule 408 that the Debtors are embracing here.  There, a statutory committee of asbestos claimants sued for avoidance of a corporate transfer on the ground that Babcock & Wilcox, the transferor, was insolvent when the transfer was made.  To prove insolvency, the committee presented an aggregate estimate of B&W's asbestos liability at the transfer date, through Dr. Mark Peterson, who is also the ACC's expert in the instant cases.  Dr. Peterson used the standard method for estimating the aggregate asbestos liability, essentially the same method he will use here, which, as this Court has heard, involves statistical extrapolation from the asbestos defendant's historical settlements. B&W challenged the admissibility of the settlement data under Rule 408, but the bankruptcy court overruled the objection.  *See id.* at 255-56.  It held that Rule 408 does not require the court "to pretend for purposes of determining insolvency that the very obligations that bring B&W before the court were not obligations at all in 1998."  *Id*. at 256.

Not only does this decision reject the misinterpretation of Rule 408 that the Debtors have pinned their hopes on.  It also shows that the Debtors have been mistaken in telling this Court that the standard methodology for aggregate estimation of asbestos liability has been used only in cases where the debtor consented to it.  So far as the ACC is aware, no court has ever held that Rule 408 bars the use of settlement data for purposes of estimating an asbestos defendant's aggregate asbestos liability.

Motion at 17, ¶ 54), aggregate estimation gives strong reason to open up the process by allowing

the creditor representatives to file a plan and litigate its disputed premises.  Indeed, if the Court

were to prevent the filing of a Creditors' Plan, it would run the risk of permitting a serious abuse

of the bankruptcy process.

**III.    The Debtors' Approach to These Cases Threatens Abuse That Can Best Be Prevented by Allowing Exclusivity to End and Providing a Schedule for Confirmation Proceedings.**

In the hearings on the Debtors' demand for a bar date, specialized proof of claim form,

and allowance proceedings, the Court received substantial evidence showing that, if the

settlement values the Debtors accepted during their last five years before bankruptcy are

accepted as the starting point for aggregate estimation, the Debtors will prove to be deeply

insolvent.  That is why the Debtors are on a mission to escape their claims history and establish

some other, as-yet untried way of valuing the claims.  Yet, the Debtors take the position that they

have come into the Bankruptcy Court not because of financial distress, but rather to use the

Bankruptcy Court as a "single forum" for resolving all present and future asbestos claims, pay or

provide for 100% of the value of each claim, and emerge from Chapter 11 discharged from any

further responsibility to asbestos claimants and with its existing owners similarly protected and

retaining control.  Second Exclusivity Motion at 9, ¶ 28.  *See also* Garlock Info. Br. at 75-85.

The Debtors' conception of these bankruptcy cases raises troubling questions about the

proper functions and limits of bankruptcy jurisdiction.  If a defendant reacts to a significant

antitrust suit by filing bankruptcy as an exercise in forum shopping and a search for a tactical

"edge," its petition will be dismissed for bad faith.  *See In re SGL Carbon Corp.,* 200 F.3d 154,

165 (3d Cir. 1999) ("[F]iling a Chapter 11 petition merely to obtain tactical litigation advantages

is not within the 'legitimate scope of the bankruptcy laws.'") (citation omitted).  Courts do not

recognize jockeying for litigation advantage as a valid reorganization purpose.  *See In re Premier*

*Auto. Servs., Inc.,* 492 F.3d 274, 280 (4th Cir. 2007) ("Subjective bad faith is shown where a petition is filed 'to abuse the reorganization process,' or 'to cause hardship or to delay creditors'") (citation omitted); *Carolin Corp. v. Miller,* 886 F.2d 693, 702 (4th Cir. 1989) (same); s*ee also In re 15375 Mem'l Corp.*, 589 F.3d 605, 609 (3d Cir. 2009) (finding bad faith where purpose of bankruptcy filings was to serve "as a litigation tactic to protect the Debtors and [related entities] from liability in [various] pending litigations").  The approach Garlock and its co-Debtors are taking in these Chapter 11 cases is not meaningfully different from that classic abuse, for by their own account the Debtors have fled into bankruptcy in search of gaining litigation advantages over asbestos claimants that they could not achieve in nonbankruptcy courts.  From the outset, Garlock has fairly boasted that its goal is to obtain through bankruptcy proceedings (allowance contests and estimation) better outcomes in its tort disputes than it could win in the "tort system." *See* Garlock Info. Br. at 2, 69, 71, 75, 81-82.  This is not legitimate.  It taints these bankruptcy cases as massive exercises in forum shopping.  And it is especially offensive because the gambit is designed to relegate asbestos claims and demands, without their holders' consent, to a trust that would be substantially underfunded in relation to the Debtors' historical liabilities.

It is only because of Garlock's evident insolvency when measured by the standards of its own relevant history that the company belongs in bankruptcy in the first place.  This circumstance, juxtaposed against the Debtors' avowed goals, has profound implications for the way in which these cases should be administered.  There is the inherent risk that the Debtors' grand scheme is designed, not with any real faith in their prospects for success on the merits, but to confront asbestos claimants with the Hobson's choice of either knuckling under to unfair terms or else enduring a war of attrition lasting many years, a scenario that would depreciate

13

their claims as a function both of the time value of money and the depletion of the estate by litigation expenses. Compounding the abuse inherent in that scenario is the fact that the parent companies are enjoying the protections of a preliminary injunction that has stayed not only derivative claims against them based on the Debtors' asbestos liabilities, but also asbestos claims against Coltec arising from product lines it acquired from entities unrelated to the Debtors and for which the Debtors themselves bear no responsibility. The Court should view in this light the recent statement made to securities analysts by EnPro's chief executive, in which he said essentially that it does not matter to EnPro how long the Debtors remain in bankruptcy because EnPro's "leverage" grows stronger as time passes and as the Debtors attempt to use the bankruptcy cases to further their quest of uncovering alleged abuses in asbestos litigation.[15] Tort "reform" is not a proper reorganization purpose or legitimate use of estate resources, but oppressing creditors through delay and a scorched-earth approach to litigation in the Bankruptcy Court are textbook examples of abuse.

There is good reason, then, to suspect that the Debtors' strategy will prove improper. Without prejudging the merits, the best way for the Court to prevent the threatened abuses is to put the key issues on a litigation schedule that marches deliberately and with reasonable dispatch toward a conclusion. The first step should be allowing exclusivity to terminate on May 31 so that the ACC and the FCR may propose a Creditors' Plan. In the meantime, the Court should direct the parties to meet and confer on a schedule that would set deadlines for confirmation

---

[15] EnPro Industries, Inc., Earnings Call Transcript, at 11 (Feb. 16, 2011) (attached as **Ex. A**) (Steve Macadam, President and CEO of EnPro) ("[T]he simple fact of the matter is as time rolls forward, I believe, our leverage in the case increases because the discovery that we are trying to do in the currently already formed asbestos trust from all the other companies is going to reveal the double dipping behavior that we have continued to allege, and are virtually certain it is going on. And the more of that that comes to light, I believe the more leverage that we get in the case. So we're really in no hurry.")

14

proceedings, including hearings on disclosure statements and aggregate estimation.  The schedule for estimation should include deadlines for fact discovery, expert discovery, and any motions practice that may be contemplated.

## CONCLUSION

For the foregoing reasons, the Debtors' Second Exclusivity Motion should be denied. The Court should enter an order scheduling confirmation proceedings, including, as an essential step, estimation hearings on the Debtors' aggregate asbestos liabilities.

Date:  May 9, 2011

Respectfully submitted,

CAPLIN & DRYSDALE, CHARTERED

By:  /s/ Trevor W. Swett III
Trevor W. Swett III
(tswett@capdale.com)
One Thomas Circle, N.W.
Washington, D.C.  20005
(202) 862-5000

Elihu Inselbuch
(einselbuch@capdale.com)
375 Park Avenue, 35th Floor
New York, NY  10152-3500

*Co-Counsel for the Official Committee of Asbestos Personal Injury Claimants*

MOON WRIGHT & HOUSTON, PLLC

Travis W. Moon (Bar No. 1067)
(tmoon@mwhattorneys.com)
227 West Trade Street
Suite 1800
Charlotte, NC 28202
Telephone:  (704) 944-6560

*Co-Counsel for the Official Committee of Asbestos Personal Injury Claimants*