IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

---

In the matter of:                    )
                                     )
GARLOCK SEALING TECHNOLOGIES, LLC,)  No. 10-31607
et al.,                              )  Jointly Administered
                                     )  Charlotte, NC
     Debtors.                        )  May 12, 2011, 9:31 a.m.

---

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GEORGE R. HODGES
UNITED STATES BANKRUPTCY JUDGE

---

APPEARANCES:

Garland S. Cassada
Jonathan C. Krisko
Richard C. Worf, Jr.
Robinson, Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246

John R. Miller, Jr.
Richard Rayburn
Rayburn, Cooper & Durham, P.A.
227 West Trade Street, Suite 1200
Charlotte NC, 28202-1672

---

Electronic Recorder
Operator:                  Cecelia Burr

Transcriber:               Patricia Basham
                           6411 Quail Ridge Drive
                           Bartlett, TN  38135
                           9O1-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

APPEARANCES:


Jonathan P. Guy
Orrick, Herrington & Sutcliffe LLP
Columbia Center, 1152 15th Street, N.W.
Washington, DC

Joseph W. Grier, III
Grier, Furr & Crisp, P.A.
101 N. Tryon St., Suite 1240
Charlotte, NC 28246

Travis W. Moon
Hamilton Moon Stephens Steele Martin
2020 Charlotte Plaza
201 S. College Street
Charlotte, NC 28244-2020

Trevor W. Swett III
Leslie Kelleher
Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005

Daniel Clodfelter
Hillary B. Crabtree
Moore & Van Allen PLLC
100 N. Tryon Street, Suite 4700
Charlotte, NC 28202-4003

Deborah L. Fletcher
Fisher Broyles LLP
6000 Fairview Rd
Suite 1200
Charlotte, NC 28210

Garlock/5-12-11

3

EXHIBITS

| NO. | DESCRIPTION | ID | ADM |
|---|---|---|---|
| GST 154 | Presentation by Mr. Worf | 91 | 184 |
| GST 155 | Garlock Sealing Technologies LLC Mesothelioma Claim Questionnaire | 91 | 184 |
| ACC 103 | Asbestos Committee's Questionnaire | 118 | 184 |

Garlock/5-12-11

4

1          (CALL TO ORDER)

2          THE COURT: Good morning.

3          COUNSEL: Good morning.

4          THE COURT: Have a seat.  We are here for Garlock, and

5    why don't we get everybody's voices on the machine.  So why

6    don't we start with Mr. Guy and work across the room.

7          MR. GUY: Good morning, Your Honor.  Jonathan Guy for

8    the FCR and Mr. Grier is here in the courtroom.

9          THE COURT: All right.

10         MR. SWETT: Good morning, Your Honor.  Ted Swett and

11   Leslie Kelleher, along with Tom Moon, for the Official

12   Committee of Asbestos Personal Injury Claimants.

13         MR. CASSADA: Good morning, Your Honor.  Garland

14   Cassada.  I am here today with Jon Krisko and Rich Worf.  We

15   represent the debtors.

16         MR. CLODFELTER: Good morning, Your Honor.  Dan

17   Clodfelter and Hillary Crabtree, Moore & Van Allen, for Coltec

18   Industries.

19         MR. MILLER: Good morning, Your Honor.  Jack Miller and

20   Rick Rayburn of Rayburn, Cooper & Durham on behalf of the

21   debtors.

22         MS. FLETCHER: Deborah Fletcher for the unsecured

23   creditors committee.

24         THE COURT: Okay.  We have a number of items on the

25   agenda, so we will proceed however you all want to go.

Garlock/5-12-11

5

1          MR. CASSADA: Thank you, Your Honor.  Let me sort of

2     summarize what's before the court today.  I think we have a

3     very ambitious agenda, given that we only have today.  We have

4     agreed that the hearing can adjourn – I think there is a time

5     period by which Mr. Swett has to make a flight, 4:30 or so.

6          MR. SWETT: Yes.  Thank you very much.

7          MR. CASSADA: Yes.  I am not confident that we will get

8     through everything on the agenda, but we have a proposed method

9     of proceeding that we think will cover things that we view as

10    being more on the critical path.

11          First, Your Honor, we have a status conference that

12    the court scheduled over six months ago on the status of the

13    case today at the end of the preliminary six-month period.  In

14    connection with that status conference, Your Honor, we propose

15    to – I will make a brief statement.  We will report on the

16    status of the discovery.  We will report, if the court is

17    interested, on the status of settlement discussions, but we

18    suggest that any such report should be off the record in

19    chambers.  And then we will talk about our ideas for a

20    scheduling order to proceed from this point on and

21    understanding that the court may want to defer actually ruling

22    on a scheduling order until it hears other matters that are

23    before the court today.

24          Your Honor, in connection with the status conference,

25    the order entered on December 9 stated that the court would

Garlock/5-12-11

6

1   further consider certain aspects of the debtors' bar date

2   motion and the committee's motion for management or scheduling

3   order and, in connection with that, the committee may have

4   specific things that we want the court to consider.

5          We do think it would be appropriate at this point for

6   the court to consider and enter an order on the debtors'

7   request to approve Rust Consulting as claims agent, both for

8   asbestos claims and then we would also move to appoint Rust

9   Consulting as agent for proofs of claim, non-asbestos proofs of

10  claim.

11         Inasmuch as we are closing in on finalizing the

12  personal injury questionnaire, we need to be able to serve that

13  and get responses in, and we believe, if we can get Rust

14  promptly appointed, that we will be able to serve that

15  questionnaire most expeditiously.

16         COURTROOM DEPUTY: We forgot to call in the conference.

17         THE COURT: We have to call in the conference.

18         MR. CASSADA: Okay.  I will pause.

19         (Connecting telephonically to the conference.)

20         THE COURT: Okay.  We will proceed.

21         MR. CASSADA: Yes, sir.  On the point of further

22  consideration of certain aspects of the case administration

23  motions that were before the court last fall, we have asked the

24  court to proceed with the appointment of Rust Consulting, and

25  we have also filed an amendment to our bar date motion, which

Garlock/5-12-11

7

1    gives the court an alternative for a very simple proof of claim

2    requirement, and we will talk about that.  We won't belabor the

3    bases for that.  We understand that the court has heard a lot

4    about that, but we will ask the court to consider that and to

5    enter a ruling on that motion.

6          The debtors have moved to extend the exclusive periods

7    to propose and solicit acceptance of a plan, and the committee

8    has opposed that and wants the exclusive periods to be

9    terminated, and we will ask the court to hear that after we

10    consider these issues respecting the status conference.

11          Finally, Your Honor, we have the matter of completing

12    the personal injury questionnaire.   We have a brief

13    presentation on that.   And then we have on the table the

14    claimants motion for past claimants' discovery, which has been

15    fully briefed and is ready for presentation.

16          Like I said, that's a very ambitious agenda.  I doubt

17    we get through all of it but I hope we can at least get through

18    the completion of the personal injury questionnaire and, if

19    not, perhaps we can pick a date in the next week or two to get

20    that done so that we can have that served within the next

21    thirty days or so.

22          Your Honor, just briefly I will talk about the status

23    of the case and then we will proceed to give reports on the

24    various tasks that the court directed the parties to engage in

25    during the six-month period.

Garlock/5-12-11

8

1      The six-month preliminary discovery period has ended.

2 The purpose was to obtain discovery regarding claims and

3 estimation for plan formulation purposes and, in part, to

4 permit meaningful negotiations about a consensual plan.

5      As you will learn, the debtors and their affiliates

6 have produced a wealth of information at great effort and

7 expense.  The debtors so far have received nothing that they

8 have requested, and we understand that the court has been very

9 patient in hearing the parties' respective positions on that

10 discovery, but we also understand that it is the court's plan

11 to extend the discovery period to permit reasonable discovery

12 to continue and thereafter to permit meaningful negotiations to

13 occur once the parties have better information in hand.

14      For that reason, the court said that it was not overly

15 concerned about the pace of discovery in February, and we

16 accordingly haven't been at that point – or since that point,

17 at least, haven't been overly concerned about that.

18      The court also had indicated in February that, to

19 avoid prejudice to the debtors, that it anticipated a further

20 extension of the exclusive period to coincide with the further

21 discovery, the extension of the discovery period.  And given

22 that our exclusive periods have been consumed by the initial

23 six-month discovery period and that we have been proceeding as

24 directed by the court there, we believe this is a fair approach

25 and we support it.

Garlock/5-12-11

9

1          The committee wants to terminate exclusivity, and we

2    are going to argue about that.  We will move to present our

3    motion to extend.  They will get a chance to present their

4    view, but we believe that, if the court adopts the committee's

5    view, it will change the course of the case and be unfair to

6    the debtors.  Again, whose exclusive period has been devoted to

7    the preliminary discovery period and the matters the court

8    asked us to focus on.  We believe that the committee sold its

9    approach to this case, which we argued departed from the

10   Bankruptcy Code, as a means of reaching an expedited

11   settlement.

12          The court put off a decision on a bar date for filing

13   proofs of claim and now, before the debtor obtains any

14   information about the identity and bases for mesothelioma

15   claims against the estate, the committee wants to abort the

16   process it suggested and initiate a confirmation battle.

17          We support sticking with the court's plan as announced

18   in late February, but the committee has announced it is not

19   apparently in the mood for negotiating and wants to pursue

20   creditors' rights under the plan.

21          It appears more likely that, even if we proceed

22   pursuant to the court's plan as outlined in the December 9

23   order, that we may have a contested confirmation battle.  We

24   believe strongly, Your Honor, that that cannot happen without

25   requiring asbestos claimants to comply with the requirements of

10

1   the code, too, and to assert their claims against the estate if

2   they are going to do so, and that's why we have renewed our

3   request to set a bar date.

4        I will make a brief presentation on that motion, and

5   we will ask the court to either set a bar date, which we don't

6   think would be as much of an issue now as it was before because

7   the court is already requiring mesothelioma claimants to submit

8   personal injury questionnaires.  So we will ask the court to

9   either enter the bar date or enter a final order on disposition

10  of our motion, at least clarifying whether there will be a bar

11  date for filing claims before the exclusive periods expire

12  and/or before any estimation trial is held.

13       I want to briefly, Your Honor, go over a schedule that

14  we believe would be workable between now and the end of an

15  extended discovery period.  We filed a status conference

16  statement late yesterday, and I don't know if the court –

17       THE COURT: I didn't see that.

18       MR. CASSADA:  – has had a chance to read it, but we

19  filed it.  It's docket number 1330.

20       THE COURT: Have you got an extra copy?  Oh, here we

21  go.  Okay.

22       MR. CASSADA: And on page six, Your Honor, we outline

23  there our proposal for scheduling of matters from now until the

24  end of the extension that we asked for with respect to the

25  exclusive periods.

Garlock/5-12-11

11

1           First, Your Honor, we would request that the court

2    immediately appoint Rust Consulting as claims agent and then

3    enter the following scheduling order:

4           First, on or before Thursday, June 12, the personal

5    injury questionnaire shall be served on counsel of record for

6    all plaintiffs in personal injury actions pending against the

7    debtor by mesothelioma claimants as of June 5, 2010, which is

8    the petition date.  There is a typo in our motion.  We say

9    2011.  With directions that completed personal injury

10   questionnaires must be filed with the claims agent no later

11   than Monday, September 12, 2011.  That would be a three-month

12   period.

13          We have not had a chance to discuss that with the

14   committee and we are certainly interested in its views about

15   what a fair response time should be, but that struck us as a

16   reasonable amount of time.

17          If the court agrees that it should set a bar date for

18   proofs of claim, then we ask that the court have that bar date

19   coincide with the personal injury questionnaire dates and that

20   notice of a bar date shall be served on or before Thursday,

21   June 12, 2011, requiring holders of asbestos claims to file the

22   official form ten proof of claim with the claims agent no later

23   than Monday, September 12, 2011, provided, however, that

24   completed personal injury questionnaires shall qualify as

25   proofs of claim for persons alleging mesothelioma.

Garlock/5-12-11

12

1        Under our renewed bar date, we have simplified it

2   greatly, Your Honor, by requiring form ten and also limiting it

3   to persons who have cases pending as of the petition date or

4   who have actually had lawyers identify them in Rule 2019

5   statements as clients they represent who purport or allege to

6   have claims against the estate.  So that simplifies greatly –

7   we have simplified greatly both the content of the proof of

8   claim form and the means of service.  It can simply be served

9   on the law firms who have appeared in cases against Garlock as

10  representing these persons.

11       Your Honor, we would also request that on or before

12  Friday, July 29, 2011, requests for estimation of asbestos

13  claims must be filed, and these requests would state the bases

14  and purposes for any requested estimation.  And then on or

15  before Wednesday, August 31, objections to timely motions for

16  estimation of claims must be filed.

17       So that way, Your Honor, we believe that we would

18  initiate a process that would be very useful to the parties in

19  understanding exactly what is going to be estimated and what

20  the purposes for that estimation will be under the Bankruptcy

21  Code.  And those are certainly points that would benefit the

22  debtor today as we have embarked on the discovery but with no

23  clear purpose in mind other than the language formulation that

24  is for purposes of formulating a plan.

25       On September 15, Your Honor, we would hold a hearing,

Garlock/5-12-11

13

1    and I picked that date because that's a Thursday and the

2    practice has been to have hearings on every other Thursday

3    during the month, and I believe that falls within the sequence.

4    The court would choose a mediator to facilitate negotiations

5    regarding a consensual Chapter 11 plan and order that mediation

6    statements be provided to such mediator within ten days of

7    appointment and mediation commenced no later than Monday,

8    October 10.

9         And then, Your Honor, we would propose that the debtor

10   would file its proposed plan and disclosure statement on or

11   before Monday, October 31.  And, finally, discovery would

12   continue until the court would have a second status conference

13   on Thursday, November 17, on which date the court would conduct

14   a status conference, hearing motions and objections related to

15   estimation, enter an order with respect to the request for

16   estimation and schedule that.  And also enter any appropriate

17   scheduling order as it relates to the plan and the disclosure

18   statement filed by the debtor.

19        And finally, Your Honor, pursuant to the debtors'

20   request, we would ask the court to extend the exclusive

21   proposal period through and including November 28, which would

22   run just after the status conference and the end of the

23   preliminary discovery period and the solicitation period

24   through and including January 26th, 2012.

25        So, Your Honor, that is our view of a sensible way for

Garlock/5-12-11

14

1    the case to proceed.

2            Now, Your Honor, I want to shift and provide

3    information to the court regarding the status of settlement

4    discussions and discovery.  I don't know whether the court is

5    interested in hearing about settlement discussions. We view it

6    as improper, both with the rules and with our agreements with

7    parties regarding what would be said about what happened in

8    settlement discussions to go on the record on that.  We are

9    happy at this point, if the court wants to know more about

10   what's happened in settlement discussions, to go off the record

11   and in chambers and discuss that.

12           On the other hand, if the court doesn't believe that's

13   necessary or there are objections, then we are fine with

14   focusing on other matters.

15           THE COURT: It is probably not necessary right now.

16   Maybe we can do that at some point later in the day or whenever

17   if you all want to.  I don't plan to get involved in

18   negotiations or know much about what's going on.

19           MR. SWETT: Your Honor, I think we can report in open

20   court just the objective facts of what has taken place without

21   getting into the contents of the communications.  If we were to

22   get into the contents of the communications, I would be at some

23   disadvantage because I was not a participant.  The only person

24   for the committee who was a participant is one of the co-chairs

25   and he, of course, is not here.

15

1          THE COURT: I mean, I don't want to know the content

2    anyhow.  I don't think that would be appropriate.

3          MR. CASSADA: I will have to say, to be fair to Mr.

4    Swett, that we don't agree, based on our knowledge of

5    settlement discussions, with the statements and his papers

6    regarding what the status is, but I am happy not to get into

7    that.

8          So we should focus now, I believe, on discovery, and

9    I think the court knows well what the status of the debtors'

10   request for discovery is.  In fact, we have focused so far on

11   getting fundamental information in two areas, and one has been

12   focusing on present claimants who might assert claims against

13   the estate.  I think these are people who might file proofs of

14   claim if they were required to do so.

15         We have asked for the personal injury questionnaire to

16   gather information about those claimants.  The court is

17   obviously well-informed about the status of the personal injury

18   questionnaire.

19         We have also focused our discovery on past claimants

20   and particulars of cases that have been settled by the debtor

21   during the last decade.  The reason we have done that is

22   because of the proposition in this case that those settlements

23   should be used to determine and value the judge's liability –

24   the court's – the debtors' liability for the present claims and

25   also for future claims.  And obviously it's our right under the

Garlock/5-12-11

16

1    code and under the rules to object to that and to demonstrate

2    to the court that those settlements have no relevance to the

3    debtors' liability and, in fact, that those settlements – if

4    settlements are to be a measure, that those settlements are not

5    a fair measure because they were temporarily inflated by a

6    transfer of liability that happened when the insulation

7    defendants and other defendants with high-dose asbestos

8    products filed for bankruptcy and were removed from the

9    compensation system and now are coming back.

10        So we have diligently sought discovery in that area,

11   as well.  We have motions pending on that.  Those motions

12   include the motion that's scheduled today, a limited motion for

13   past claimants' discovery, and the motion for trust discovery

14   which we will schedule in turn as soon as the court has ruled

15   on our attempts to get information from other sources.

16        As far as discovery that has been served on the

17   debtors, Your Honor, and this is discovery that has actually

18   been served on both the debtors and their affiliates, there

19   have been three different sets of discovery.  There has been

20   estimation related discovery; there has been insurance related

21   discovery; and then there has been discovery regarding

22   prepetition transactions between the debtors and their

23   affiliates.  And this is discovery that was served both by the

24   committee and by the futures rep, although the futures rep may

25   have been, I believe, the only party that served discovery

Garlock/5-12-11

17

1    asking about insurance information.

2         I will ask Mr. Krisko to report about estimation

3    discovery.  He has taken charge of that.  I believe that the

4    insurance discovery has been responded to and the prepetition

5    transaction discovery, as well, has been responded to.  Much of

6    that response for the prepetition transactions comes from the

7    debtors' affiliates, and Mr. Clodfelter will report to the

8    court on that discovery.

9         So at this point I will turn it over to Mr. Krisko.

10        MR. KRISKO: Yes, Your Honor.  As Mr. Cassada

11   summarized, the debtors have received requests in three

12   different categories, and principally I will talk about

13   estimation discovery and what the debtors have done and where

14   we stand on the production of documents in response to that

15   discovery.

16        To-date, the debtors have gathered, reviewed and

17   produced more than a hundred thousand documents responsive to

18   the estimation discovery request propounded by the committee

19   and the future claims representative.  As part of an agreement

20   on the timing of discovery, the debtors agreed to commit to

21   substantially complete the production of documents by May 23,

22   a week from Monday, and to at this hearing come and report to

23   the court and to the other parties whether the debtors would be

24   unable to produce any documents by that deadline.

25        During this process, the debtors have produced

Garlock/5-12-11

18

1    documents using document production software to try to make it

2    easier on the parties to review the documents.  They have been

3    produced in electronic format.  They have been produced in text

4    searchable format to try to permit their review in a fashion

5    that is most efficient for the parties.

6          Additionally, the debtors have provided information

7    that they may object to the admission of, namely the use of

8    settlement agreements and that sort of thing, settlement

9    amounts, but nonetheless the debtors have provided, in order to

10   avoid discovery disruptions and to try to encourage the process

11   to go along.

12         The discovery effort, as it pertains to estimation,

13   has been virtually the focus of almost my entire time for the

14   past couple of months.  They have also been the focus of

15   personnel at Garrison Litigation Management, one of the

16   debtors.  They have been searching for, identifying and

17   providing documents to our offices for our review.

18         In addition, some of the documents that the committee

19   and the future claims representative have requested have only

20   been available through lawyers that may have represented

21   Garlock in the past and so, where it was not unduly burdensome

22   to do so, the debtors went out to those lawyers and asked them

23   to collect documents, send them in for our review and

24   production to the committee and the FCR.

25         I guess the main point of that is to underscore that,

Garlock/5-12-11

19

1    with this number of people involved in this discovery process,

2    it does take time, and I do believe that the debtors have

3    worked very energetically to try to get this process complete.

4           But returning to the agreement that the debtors made

5    with the committee and the FCR concerning the time of

6    discovery, the debtors report that they do expect to

7    substantially complete the production of documents by May 23.

8    Then there are a couple of exceptions to that, which I will

9    briefly detail.  The first of which is the fact that the final

10   production of the debtors is expected to be substantial.  And

11   in my experience in this case and others, to gather, organize

12   and produce in the electronic format that I described with text

13   searchable documents that make it ready to review, occasionally

14   when that production is finally prepared, there might be some

15   technical defects because the software writes it to a DVD and

16   it takes several hours and could sometimes require a day or two

17   delay.  If that circumstance arises, and I don't expect it to

18   arise, I will contact the committee.  I will contact the future

19   claims representative and advise them of that event but the

20   point being that all of the documents will have been gathered,

21   reviewed and ready for production.  If any delay occurs, it

22   will only be because of some sort of technical detail that we

23   cannot control.

24          There is one other exception to that and that is that

25   the debtors have attempted to locate and identify documents

Garlock/5-12-11

20

1   that may have been in the custody of former employees, and we

2   have not fully completed that process of seeing whether their

3   former employees had documents, whether those documents are

4   responsive and reviewing those documents.  We don't expect

5   that, if we do identify those documents, they will be many in

6   number, but that process is going to continue and, if any

7   further documents are identified from former employees that may

8   exist within the possession of the debtors, we will promptly

9   provide them to the committee and the FCR.

10          That completes my report unless the court has any

11   questions.

12          THE COURT: Thank you.

13          MR. CASSADA: Your Honor, that completes our report on

14   the status conference.  We set forth our proposed schedule and,

15   again, believe that it would be appropriate for the court to

16   consider that after it has considered other issues before it

17   today.

18          One thing we would like to get on the table and

19   resolved, unless there is some objection to it, is we would

20   like to ask the court and we would like the committee and the

21   futures rep to identify whether they have any objections to us

22   going ahead and entering an order appointing Rust Consulting as

23   asbestos claims agent and as general claims agent.

24          Rust Consulting would, if appointed today or within

25   the week, would be able to undertake immediate work on getting

Garlock/5-12-11

21

1    the personal injury questionnaire in a form that would permit

2    claimants to respond electronically or to prepare to send that

3    form out to claimants.

4        We don't think that is a very complicated request.

5    You heard from Rust Consulting here, I believe it was during

6    October when we started the case administration hearings.  So

7    it might be helpful to know whether there is any objection to

8    the debtors going ahead and beginning that process and getting

9    Rust Consulting to the task of preparing to work with the

10   questionnaire and to send out notice of the bar date for

11   unsecured, non-asbestos proofs of claim.

12       THE COURT: Okay.

13       MR. GUY: Your Honor, the court has indicated before

14   that you will not second-guess the debtors' request on

15   professionals.  So I am assuming the same position would apply

16   here.

17       With regard to Rust Consulting, our concern with Rust

18   Consulting is the same concern we had before.  In the *Grace*

19   case, the costs incurred were very significant, and we had

20   asked previously for a budget.  I think the court had said no

21   on another professional.

22       So on this issue, we would just reiterate that we

23   would like the debtors to keep track of the costs and we will

24   be getting to the cost overall in the case later.

25       Thank you, Your Honor.

Garlock/5-12-11

22

1          MR. SWETT: Your Honor, the ruling on the questionnaire

2    contemplates that, as an option, claimants may submit their

3    responses on a Rust-devised system.  So there is good reason to

4    allow them to be engaged at this point.  And as Mr. Cassada has

5    also pointed out, there is a need for a non-asbestos bar date

6    and I suppose they plan to make that motion and they will need

7    Rust to handle whatever responses there are to that.  So we

8    have no objections to that scope.

9          THE COURT: Okay.

10         MR. KRISKO: Your Honor, if I can just address Mr.

11   Swett's point.  We actually have already had a motion with

12   hearing on the non-asbestos bar date.  I think that Your Honor

13   ordered that there should be one.

14         I believe what we were contemplating was – there was

15   a technical question, sort of a chicken and egg question with

16   the court's clerk who said we can only have one claims

17   register.  And so what the debtors have been doing is we have

18   not sent out the notice of a bar date because we didn't know –

19   we were questioning whether that claims register would be with

20   the court or whether it would be with Rust.

21         At this point, the debtors have determined that,

22   notwithstanding the results of the asbestos bar date, we need

23   to go ahead and get and set the non-asbestos bar date and, even

24   though Rust would presumably be slightly more expensive to hold

25   that, we need to move forward and that's the best path that we

Garlock/5-12-11

23

1    could see to just move forward on that issue and put it to bed.

2            THE COURT: All right.  Well, we will approve Rust for

3    those purposes and whatever else we assign them to do.

4            MR. CASSADA: Your Honor, we would propose at this

5    point to move to the issue of the exclusive periods because we

6    think, again, that's on a critical path and that will inform

7    what the court does on the scheduling order, and then we will

8    talk briefly about the bar date after the court hopefully could

9    indicate where it believes we are on the exclusive periods

10   since you have heard the parties' presentations on that.

11           THE COURT: All right.  Is that all right with the rest

12   of you?

13           (No response.)

14           THE COURT: Okay.  We will proceed that way then.

15           MR. MILLER: Thank you, Your Honor.  Your Honor, Jack

16   Miller on behalf of the debtors.

17           Your Honor may have noticed that you have heard very

18   little from me, or Mr. Rayburn, or any of our cohorts over the

19   last six months.  That's particularly unusual when Mr. Rayburn

20   is in the courtroom.  He usually has at least something to say.

21           You know, the reason for that is the last six or eight

22   months I have been listening to a lot of information from Mr.

23   Cassada and Mr. Swett that is on a subject that I know very

24   little about.  I told Mr. Cassada he has forgotten more about

25   asbestos litigation than I will ever know, and the same is true

Garlock/5-12-11

24

1   with Mr. Swett and Mr. Guy clearly.

2         But, you know, the reason is what this case has been

3   about during the last six to eight months is the various

4   parties staking out their positions on what information the

5   debtors ought to be entitled to in order to make their case on

6   what the debtors' asbestos liability is.

7         Mr. Cassada has argued that we think that the

8   liability is going to be less – we will be able to show that

9   the liability is less than what the ACC and the FCR – we think

10  the ACC and the FCR's experts will say that it is and we need

11  certain information in order to make that case and Mr. Swett,

12  and to a lesser extent Mr. Guy, have fervently disagreed with

13  that and the court has heard us out on those issues.

14        But all of that, we think, has been with the eye

15  towards both parties becoming fully informed about whatever

16  information the debtors can get, the debtors making their case

17  to the other side and both parties engaging in negotiations to

18  try to get to a consensual plan if we can.

19        Unfortunately where we sit today is the debtors have

20  none of the information that we have asked for so far after six

21  months of discovery disputes.  When we were before Your Honor

22  on February 17 on the first hearing on the debtors' second

23  motion to extend the exclusive periods, I am assuming that the

24  court was operating under two assumptions.  First, that the

25  debtors will get discovery responses in time to analyze those

Garlock/5-12-11

25

1    responses, have the debtors' expert prepare some sort of draft

2    report, present that to the ACC and the FCR, negotiate over

3    plan treatment based on all parties' full knowledge of their

4    estimation trial risk, for lack of a better term, agree or

5    don't agree and move towards either contested or consensual

6    confirmation within the debtors' exclusive periods.  That has

7    been the debtors' aim and the debtors have acted with as much

8    speed as they can in getting our discovery requests teed up and

9    heard before Your Honor, trying to meet that time line.

10        The second assumption was that the ACC would remain

11   open to continuing negotiations and it appears now, based on

12   the papers that the ACC filed on Monday night, that they have

13   determined that they don't want to negotiate, and they are sort

14   of ratcheting up the pressure of the debtors by actually moving

15   to terminate exclusivity and not just deny extension but they

16   have asked to terminate the debtors' solicitation period in

17   order for the ACC, and presumably then the FCR, to move forward

18   with their own plan.

19        Now, the debtors certainly remain hopeful that

20   estimation discovery disputes will get put to rest in the near-

21   term and we will have a realistic opportunity to negotiate a

22   consensual plan that can be achieved in the next six months,

23   but the debtors at this point have to recognize, based on where

24   we are in the discovery process, first that it is unlikely

25   really to get to an estimation trial within the debtors'

26

1    exclusive periods, and that is an assumption that we were not

2    operating under two months ago.

3         And, secondly, the debtors have to realize the

4    practical reality that the ACC said that they are not

5    interested in negotiating at this point.

6         And so the debtors at this point have to sort of take

7    a step back and assess their options for formulating a plan

8    that they can potentially get confirmed over the ACC's

9    constituency's objection, if necessary, since at this point it

10   appears that we are.  And which, secondly, doesn't require an

11   estimation trial before confirmation because that appears to be

12   where we may be, as well, and to do all of that within the

13   debtors' exclusive periods which, at the latest, only run six

14   months from now in terms of filing.

15        Now, the debtors are not without options here, we

16   believe.  We have indicated from the beginning of the case that

17   the debtors may very well not file and pursue a 524(g) plan if

18   we can't get to an agreement with the committee and the FCR.

19        So we think that – and the debtors have some ideas

20   that we are now developing, given sort of where we are in the

21   case, on what such a plan might look like.  But at this point

22   we have spent the last six months working on discovery issues,

23   estimation discovery and trying to proceed down the path that

24   the court and the ACC and the FCR sort of advocated.

25        With that, Your Honor, you know, the Code clearly

Garlock/5-12-11

27

1    contemplates that the debtor have an unqualified – and the case

2    law states that the debtor have an unqualified opportunity to

3    present and confirm a plan.  And as we sit here today, the

4    debtors have really had no realistic opportunity to file and

5    proceed with a plan of its own in the exclusive periods because

6    the exclusive periods have really been consumed with going down

7    a different track in hopes and effort to get to a consensual

8    plan.

9        Cause, we believe, for an extension of the exclusivity

10   exists under these circumstances to permit the debtor to first

11   continue its efforts towards finishing up with discovery and

12   potentially in hopes that the information that's learned

13   through that discovery will lead the parties back to the

14   negotiating table but, secondly, giving the debtors an

15   opportunity to formulate a confirmable plan and try to get that

16   confirmed before the expiration of its exclusive periods in the

17   event that negotiations end up failing.

18       And as we are here today, we are in the very unusual

19   situation, for me at least, of not having any bar dates

20   established and there are some practical hurdles the debtor is

21   going to have to overcome if they are going to be able to

22   present a plan that meets the 1129 requirements.  For example,

23   at the hearing on November 19, the court heard Mr. Clodfelter

24   make an argument that, without proofs of claim, there is no way

25   to determine whether the best interest of creditors test is met

Garlock/5-12-11

28

1       under 1129(a)(7) such that the debtors could ever cram a plan

2       down over equity's objection, and the debtors are going to have

3       to take that argument and walk a line between equity's argument

4       and the practical reality that at this point we don't have a

5       bar date for asbestos or non-asbestos claims and try to address

6       that point creatively if the court is inclined not to set a bar

7       date for asbestos claims.

8               Your Honor, we talked a little bit earlier about the

9       fact that we don't have a non-asbestos claims bar date set yet,

10      although we are going to do that with all due speed and

11      hopefully in the next three months or so we will be able to get

12      all of those claims in but, while we have a pretty good idea of

13      what is out there in terms of unsecured claims, we need to have

14      those claims in so that we know, for classification purposes,

15      where claims need to be classified and, secondly, so that we

16      don't have any surprises that impact the feasibility analysis.

17              Finally, the debtors haven't yet retained a financial

18      advisor to provide the feasibility and liquidation analyses

19      that we are going to have to have in connection with the

20      disclosure statement, and the reason for that has just been to

21      try to keep the cases as streamlined and efficient as possible

22      and not go off on two different tracks unless and until it

23      absolutely became necessary.

24              Your Honor, these are the very sort of complexities

25      that the debtors would submit would argue in favor of an

29

1    extension and meet the large and complex case test under the

2    case law.

3              I would just like to make a side note, Your Honor.  I

4    am not going to spend any time walking today through the

5    various different factors under the case law.  I think our

6    previous brief set those out.  We talked about them in the last

7    hearing, and what I am trying to do today is just focus on sort

8    of bringing the court up from where we were on the 17th to where

9    we are today, although I will be happy to talk about those if

10   the court wants to hear any more on those.

11             Your Honor, really what the debtors are asking for

12   here is just a fair shot to use the code's contemplated

13   exclusivity opportunity, and what the ACC appears to argue is

14   that this stalemate apparently in negotiations is cause to

15   actually terminate exclusivity.

16             First off, Your Honor, I want to note that it is the

17   ACC's burden to show that cause exists for termination of

18   exclusivity, and we don't believe that the ACC has shown that.

19   The debtors are certainly disappointed to know that the ACC is

20   not interested at this point in negotiating, but the ACC's

21   unilateral determination not to negotiate is not cause to

22   terminate exclusivity.

23             The *Fountain Power Boat* case, which I believe I cited

24   in our paper that we filed yesterday, which hopefully Your

25   Honor saw, pretty clearly states that stalemated negotiations

Garlock/5-12-11

30

1    with one creditor constituency does not meet the test for cause

2    to terminate exclusivity.  And, in fact, that case says that to

3    hold otherwise would permit litigious creditors to manufacture

4    cause to justify shortening the exclusive period.

5         Likewise, none of the major obstacles to successful

6    negotiation – that's a quote that appears in several of the

7    cases that talk about where there is cause to terminate the

8    debtor's current exclusive periods – none of those exist here.

9    The primary ones that the case law talks about is gross

10   mismanagement of the debtors.  There is no evidence of that

11   here.  And also acrimonious feuding between the debtor's

12   principals.  That's the debtor's management itself, and we

13   don't have any evidence of that here either.

14        The Fountain Power Boat case is one in which the court

15   talks about those major obstacles to successful reorganization.

16        Your Honor, the bottom line, I think, is that these

17   cases have enough complexity as they currently stand without

18   terminating exclusivity at this point or denying the debtors'

19   request for an extension to open the case up to competing plan

20   proposals.

21        Your Honor, we think that the debtors have laid out a

22   realistic time line for trying to bring these cases to a

23   conclusion, and we think that that time line fits well within

24   the debtors' requested exclusivity extension.

25        We simply believe that it is premature at this point,

Garlock/5-12-11

1   until the debtors are able to file a plan, for the creditor

2   constituencies to have an opportunity to file a competing plan.

3   We need to wait and see what that plan says and reserve

4   everyone's rights to move to terminate exclusivity based on

5   where we are down the road a little bit in the cases.

6        Your Honor, for the reasons stated both in our papers

7   and today and at the February 17th hearing, we would ask the

8   court to extend the debtors' exclusive periods for filing,

9   first off, through November 28th and for solicitation through

10  January 26, 2012.

11       Thank you, Your Honor.

12       THE COURT: All right.

13       MR. SWETT: Good morning, Your Honor.  Trevor Swett for

14  the committee.

15       Your Honor, our request to the court is to allow the

16  current extension of the exclusive proposal period to lapse on

17  May 31st.  It is apparent and has been for some time that the

18  debtors do not intend to file a plan within this existing

19  extension.   That, in turn, makes the extended solicitation

20  period, which presently runs through August 1st, a dead letter.

21  It means nothing if the plan proposal period expires on May 31st

22  and is not further extended.

23       So we think that events should take their course to

24  May 31st.  The debtor will have enjoyed two extensions and will

25  have made no attempt to show, let alone indeed show, that they

Garlock/5-12-11

32

1   can present the plan within that period and, instead, they have

2   contrived a schedule that takes them to the very end of what is

3   virtually the maximum extension, not quite but almost, and they

4   would propose the plan only at that very end which would, of

5   course, imply a very substantial period going forward from

6   there to a confirmation proceeding.

7        To us, that is an unacceptable pace given the clarity

8   that has emerged in what the issues, the real issues in the

9   case are in these last many months of debate.  First about how

10  to administer the case and then about the scope of discovery

11  appropriate for aggregate estimation.

12       I should say at the outset that the debtors

13  misconstrue the committee's position with respect to

14  negotiations.  They characterize the position in a fashion that

15  may lend traction to their argument for an extension but

16  happens to be incorrect.

17       We have not said we would refuse to negotiate. We have

18  acknowledged the fact that, on the present state of play, the

19  distance between the parties, as elucidated by useful,

20  constructive and informative negotiations, is simply too great

21  to expect anything to emerge from it by way of a consensual

22  plan until events force the issues and force the parties to

23  narrow the issues and to narrow the gap between them and their

24  respective evaluations of what is the appropriate outcome.

25  This is just a statement of reality.

Garlock/5-12-11

33

1          In fact, it's surprising in a sense to hear the

2     debtors say they are disappointed that the committee has

3     unilaterally decided not to negotiate when their own

4     exclusivity papers say they are not in a position to have

5     meaningful negotiations until they get their discovery.

6          So they are sort of putting us in a Catch-22 position.

7     The fact of the matter is on both sides of this case we have

8     very senior people, very, very accomplished negotiators out

9     front in what has been a candid and constructive exchange and,

10    if there is reason for one side or the other to pick up the

11    phone and renew that discussion, I can assure you that the

12    presence or absence of a further extension of exclusivity will

13    not stand in the way.

14         Our goal from the beginning of the case has been to

15    get to confirmation with a consensual plan as soon as

16    reasonably possible, and that remains our goal.  Our judgment,

17    based upon a lot of experience and an evaluation at the most

18    senior level on our committee of the respective positions

19    staked out by the debtors and the committee's delegate, the co-

20    chair who has been in direct dialogue with Mr. Magee for EnPro

21    and with other senior representatives of Garlock, is that now

22    the parties need to work on narrowing the issue.  There needs

23    to be confrontation and rulings on the key issues in the case

24    and that means that much as in normal civil litigation where

25    nothing concentrates the mind so much as a firm trial date,

Garlock/5-12-11

34

1   here, the way to accelerate the negotiation process or allow it

2   to proceed as quickly as it reasonably can, is to put the case

3   on a track that promises a litigated conclusion, if such is

4   necessary, within the horizon and we don't have that yet, and

5   extensions of the exclusive periods will forestall rather than

6   accelerate the date when we will have that.

7        And so we are just speaking from a perspective of

8   realism.   The parties disagree drastically on what is the

9   appropriate outcome.  The issues have been usefully framed and

10  aired in the debates concerning what aggregate estimation

11  should be and what the scope of that discovery should be and we

12  are nearing the end of those debates and thankfully moving into

13  the next stage where whatever discovery is allowed takes place.

14  We will have some depositions.   We will have the normal

15  pretrial process for a hearing on estimation, and the parties

16  will be in a better position to evaluate their respective cases

17  and what might be an acceptable compromise to produce a plan.

18       And I remind the court that every asbestos Chapter 11

19  reorganization to-date that has concluded has concluded in a

20  consensual plan.  The odds are overwhelming that we will get

21  there in this case if we keep working, but the needful work now

22  is to work on the asbestos issues that feed directly into the

23  fundamental plan formulation building block of a solvency

24  determination.

25       That's where the rubber hits the road in this case.

Garlock/5-12-11

1   The debtors, from the beginning, have wanted to assure the

2   court that they have a way of dealing with the asbestos claims,

3   paying them a hundred cents on the dollar and emerging with

4   their equity intact.

5        We doubt that profoundly because, from where we sit

6   and our evaluation of the historical evidence, the financial

7   burden of the asbestos claims which drove the debtors into

8   bankruptcy to begin with exceeds, is likely to be demonstrated

9   by proof to exceed the asset value, which fundamentally alters

10  the debtors' options with respect to what kind of plan can be

11  confirmed.

12       And they have their goal, which depends upon proof of

13  solvency, and we have our view of the likely outcome of those

14  disputed issues, and we believe that the debtor will prove to

15  be insolvent by many hundreds of millions of dollars, which

16  will extinguish equity and call for a plan of a certain shape.

17       Now, estimation in itself in this case has always been

18  about plan formulation.  When we came before you last fall,

19  late summer or early fall with our motion for a scheduling

20  order, we said that there should be a period, fairly brief but

21  reasonable period in which the parties could evaluate the

22  prospects for a consensual plan and begin to obtain the

23  information needed to inform their respective views of

24  estimation but that, failing that, within the extension that

25  expired on April 1, under the then existing state of affairs in

Garlock/5-12-11

36

1    the case, we would want the right to come forth and propose our

2    own plan, that termination of exclusivity would be warranted if

3    the  initial  soundings  of  the  parties  indicated  that  there

4    wasn't a reasonable prospect at least yet of a consensual plan,

5    and that's the state of affairs.

6         There  has  been  no  change  in  position  on  the

7    committee's part.  That has been our idea of how to bring the

8    case to fruition within an acceptable period of time from the

9    beginning.

10        So now we have – we agreed to an extension from April

11   1 to May 31 of the proposal period.  That time is now lapsing.

12   There is no plan.  We would be ready to propose a plan very

13   promptly after May 31.  We are working with Mr. Guy and his

14   team  in  tandem  on  formulating  a  plan,  the  fundamental

15   assumption of which would be that the debtors are insolvent.

16   We would have to prove that in order to confirm that plan.

17        So insolvency, or to say it the other way from their

18   point of view, solvency is a plan confirmation issue.  There

19   needs to be a plan on the table when you consider that issue.

20   I liken it to the initial pleading in a lawsuit that says what

21   the cause of action is that the court then uses to delineate

22   the appropriate scope of discovery and identify what the key

23   disputed issues are.  That has to happen and should happen.  It

24   will happen with most efficiency and the greatest clarity if a

25   plan is on the table when the issues that feed into insolvency

Garlock/5-12-11

37

1    or solvency are being litigated.  We are prepared to frame

2    those issues through a plan promptly after May 31.

3           The debtors, of course, will remain free to propose

4    their own plan.  Presumably they will.  We understand from the

5    paper that we received last night that they are actively

6    thinking about some way in which to confirm a plan that

7    wouldn't involve agreement with the committee or the legal

8    representative.  Fine.  Let's see what it is.  We need to know

9    what those issues are as we evaluate our position going

10   forward.  There is no utility, there is no fairness, in hanging

11   back from it.

12          The issue of solvency has been well framed already.

13   We are in a contested proceeding for estimation for plan

14   formulation purposes and it will help to clarify the

15   appropriate lines of dispute and guide the court's procedural

16   rulings, including the amount of time that ought to be

17   permitted for fact discovery and the amount of time that ought

18   to be permitted for expert discovery under each party's

19   drastically different way of going about the aggregate

20   estimation as has been clarified by recent events in the

21   discovery motions practice.

22          You will be in a better position to arbitrate the

23   implementation of discovery as it goes forward if you know what

24   the goal is, what plan provisions turn on whether or not the

25   debtor is insolvent.

Garlock/5-12-11

38

1          It is also useful, as parties cite case law and

2     advocate points of view about the disputed issues, for the

3     court to keep clearly in mind that the purpose of this

4     estimation, unlike others that are conceivable under the Code,

5     is the formulation of a plan.  We are not here estimating

6     individual claims for allowance purposes.  We are estimating

7     the overall liability for the purpose of determining how the

8     estate's assets ought to be allocated, *en gros*, among several

9     constituencies, one of which under our plan would be a

10    settlement trust to be confirmed pursuant to section 524(g).

11         If they have a different plan structure that doesn't

12    involve 524(g) or anything like it and that they think that

13    they can confirm over objection, then it would be healthy and

14    useful for our constituency to understand what that threat is

15    so that we can evaluate whether it is really viable, whether it

16    is a serious downside or whether it is posturing.  We need to

17    know these things and so does the court.

18         So we have an ongoing willingness to negotiate.  Mr.

19    Magee has Mr. Rice's phone number.  He has Mr. Grier's phone

20    number.   Those people get along fine.   They just have

21    significantly different views of the outcome.  If that changes

22    and discussions become fruitful, they can always have them.

23         What we would propose – now, let me address first the

24    legal predicates for the idea that an extension isn't

25    warranted.  Two main themes have been sounded in the debtors'

Garlock/5-12-11

39

1    bid for further exclusivity, one of which is progress in the

2    negotiations and we have said enough about that.  Progress in

3    negotiations will be stimulated, not retarded, by allowing the

4    exclusive period to lapse.

5          The other is that the case is large and complex.  That

6    is true in a sense and not in another.  It is a rather simple

7    case when it comes to the debtors' capital structure, to the

8    minimal presence of non-asbestos, unsecured claimants, who will

9    be identified pursuant to a bar date and who can, by our likes,

10    expect a hundred cent dollars.  If those claims are within the

11    dimensions that we anticipate in terms of their number and

12    value, the unsecured creditors are likely to emerge unimpaired.

13          So the real complexities lie in how do you apply the

14    Bankruptcy Code provisions to a mass-tort bankruptcy where

15    substantially all of the claims are unliquidated and there's a

16    whole lot of them in the future, and that was the subject of

17    all of the evidence and argument that you heard last fall in

18    the case administration motions, and that situation hasn't

19    changed.

20          What you decided to do is focus the parties in the

21    case on aggregate estimation for plan formulation purposes.

22    The logical next step in that process is to bring forth the

23    plan, either a creditors' plan or a creditors' plan and a

24    debtors' plan and let us join issue on the ultimate questions

25    of how this case can get from here to exit from Chapter 11.

Garlock/5-12-11

40

1      So the complexity of the case is intimately bound up

2   with the asbestos issues, and you already have us heading in

3   the right direction with respect to aggregate estimation.  It

4   is time to formalize that through the filing of the plans.

5      Now, the argument is made that the exclusive period

6   has been consumed in debate about what scope of discovery is

7   appropriate for aggregate estimation, and in a sense that's

8   true, but that results from the debtors' aggressive agenda,

9   which they were very clear about announcing at the beginning in

10   their information brief.  Their idea was that they could come

11   into Bankruptcy Court in order to do better in their disputes

12   with the individual asbestos claimants through bankruptcy

13   processes and win lower resolutions of those claims than they

14   could achieve in the tort system.

15      We have a fundamental objection to that objective as

16   a proper restructuring goal.  We don't think that's a proper

17   reorganization purpose under the code, but we are not at a

18   point yet where we can ask you to rule on that.  We hope to get

19   there.

20      But the point is they have chosen to push the envelope

21   in terms of their attack on the claimants, in terms of the

22   discovery that they would seek for the purposes of that

23   litigation agenda, and their entire approach to the case called

24   for litigation, not planning.  They make some gestures to

25   planning on the side.  That's fine.  I am not disparaging their

Garlock/5-12-11

41

1   right to litigate at this point.  I am just pointing out that

2   they have chosen a path, and the path that they have chosen is

3   one where each discovery motion sort of pushes the envelope

4   further in terms of virtually unprecedented discovery for

5   purposes of aggregate estimation that they want to perform in

6   a manner that no one has ever succeeded in doing and that their

7   own expert has never found it necessary to do.

8        So I won't belabor those points.  You have heard an

9   awful lot about them over the past few months.  My present

10  point is simply that it's true there has been a lot of debate

11  about the scope of discovery.  I hope the court has found it

12  useful.  It has sharpened the parties' respective ideas about

13  what the appropriate estimation ought to be.  We are on the

14  verge of joining issue on those matters, and let's go forward

15  with it.  The way to do that is to allow exclusivity to lapse

16  and bring on the plans.

17       The debtors' discovery can be administered in the

18  context of confirmation proceedings, which is what estimation

19  is all about here.  Since estimation here is for plan

20  formulation purposes, it's a confirmation issue.  It's properly

21  conceived of as a phase in a confirmation hearing of several

22  phases.  We have to value the assets. We have to value the

23  liability as the committee's expert would do it.  They seek the

24  right to value it in a different way.  And each of these may

25  imply a separate hearing or separate stage of what is a

Garlock/5-12-11

42

1    confirmation hearing leading to an up or down judgment with

2    respect to a proposed plan.  We need to get moving down that

3    path.  It's the best way to bring the case to a head.  It will

4    stimulate and not retard the opportunities for a consensual

5    resolution.

6          So, Judge, what we are asking for is exactly what we

7    suggested we would be asking for last August if the initial

8    extensions didn't produce promise of a consensual plan within

9    a reasonable period of time.  We want to bring forth a plan.

10   We are happy to receive a plan from the other side.  We want

11   discovery cutoffs after meeting and conferring with the debtors

12   and we get through the rulings on their outstanding discovery

13   motions.  We think that their idea that there should be some

14   kind of exchange of pleadings or briefs on the estimation

15   methodology – that's how I am understanding what they have

16   suggested in this paper last night.  It is not exactly how they

17   put it but they wanted some paper filed setting forth the

18   parties' affirmative estimation method and the purposes of it.

19   Presumably there would then be time to respond to that.  We

20   think that exercise was a good way to bring to a head what has

21   been learned over these last few months of debate about the

22   nature of estimation and the scope of the necessary discovery,

23   but there is no reason to wait until August for it.  We can

24   file a brief on our affirmative way of estimating liability by

25   the end of this month, and we would like to respond to theirs

Garlock/5-12-11

43

1    in time for the June hearing, which is late in June.  We think

2    that the court would be well-served by such an exchange of

3    briefs.

4          For example, the debtors' persistence is suggesting

5    that the settlement database is not even going to be

6    admissible, much less an appropriate basis for an aggregate

7    estimation, notwithstanding that every court that has concluded

8    an estimate to-date has used that same method.

9          Well, okay, let's bring that issue on.  We need to

10   know if Your Honor is going to rule that the settlement

11   database is not admissible because of Rule 408.  We need to

12   know so that we can come up with an alternative.  We think that

13   issue is clear-cut and that you are going to readily conclude

14   that the debtor is mistaken, but they are entitled to take

15   their shot at that.  What they are not entitled to do is hold

16   that over our heads indefinitely until we get to the end of the

17   exclusive period when they will produce a plan that they will

18   view as obviating our approach to estimation, and so this Rule

19   408 issue just hangs there in the clouds over our heads until

20   the very end of the process, and their game would seem to be

21   not resolution of that issue but simply having it in play, but

22   we want to bring it to a head and we would like a ruling.

23   There is no reason to wait on that.

24          That's an example of what can be expected by way of

25   constructive developments that will influence each side's

Garlock/5-12-11

44

1    evaluation of their situation in this case and what the chances

2    of achieving what they believe to be the appropriate outcomes

3    may be.   There are other issues like that, that will also

4    benefit from being joined and argued along the way.

5        So we need a track.  The track should be one that ends

6    in a final confirmation hearing with previous stages for the

7    issues that go into the plan formulation.  And left to our own

8    devices, because ours is not a discovery intensive methodology,

9    we think we could be ready for an expedited evidentiary hearing

10   on our way of doing the estimation in the early fall, fairly

11   promptly after Labor Day.  The debtor is not in that situation

12   because their discovery is more ambitious.  There is no reason

13   why we can't proceed on those two tracks.

14       The two methods are in effect ships passing in the

15   night.  Both need to be progressing.  Neither one needs to be

16   retarded by an extension of exclusivity.  So let's get on with

17   it.

18       So we are asking for the opportunity to meet and

19   confer with the debtor over the overall schedule for discovery,

20   fact discovery, expert discovery, whatever motions practice the

21   parties may contemplate with respect to the estimation

22   methodology or other confirmation issues and firm hearing dates

23   for the different stages of the confirmation process in this

24   case.

25       That's our request now, as we promised it would be

Garlock/5-12-11

45

1    back in August if the interim developments didn't point us to

2    a confirmable plan, and regrettably they have not.

3         There is no present opportunity for a consensual

4    resolution.   So we need to be deciding the issues and

5    litigating them in the normal course on a reasonably

6    expeditious track.

7         Thank you, Your Honor.

8         THE COURT: Mr. Guy.

9         MR. GUY: Your Honor, I can proceed now or if the court

10   would like to take a break.

11        THE COURT: Do you all want to take a break?  Let's do.

12   Let's take ten minutes and come back about ten until eleven.

13        (Recess from 10:40 a.m. until 10:53 a.m.)

14        THE COURT: Okay.  Mr. Guy, I believe you have the

15   ball.

16        MR. GUY: I will try not to drop it.

17        Your Honor, Jonathan Guy for the FCR.  Before I start,

18   I have a couple of documents and I am not trying to get them in

19   as exhibits because they are already in the record, but they

20   may be helpful for the court.  I have already distributed them

21   to the parties.

22        THE COURT: All right.

23        MR. GUY: May I approach?

24        THE COURT: Yes.

25        (Pause)

Garlock/5-12-11

46

1          MR. GUY: Your Honor, the issue is whether extending

2     exclusivity will facilitate moving the case forward.  And on

3     that issue, we agree it will.  We disagree with the length of

4     time.  We believe that a short extension of one month is

5     appropriate and this is the reason why:

6          Your Honor, there is no doubt that the debtors find

7     delay in the case to be helpful.  I do not question their good

8     faith to move forward but delay is helpful.  We know that from

9     just the reality that it's cheaper for them to be in bankruptcy

10    than it is to be in the tort system.  We also know that because

11    Mr. Macadam, the CEO and president, and I have referred to this

12    analyst call before and it's attached to the ACC's last filing

13    on exclusivity, and this is in response to a question about

14    what's happening in the bankruptcy case.  He said:

15          "The thing is the thing moves very, very slow, and we

16          actually think, although in my remarks obviously we

17          would love to be done with it" – and I am sure they

18          would – "and put it behind us, but the simple fact of

19          the matter is, as time rolls forward, I believe our

20          leverage in the case increases because the discovery

21          that we are trying to do in the currently already

22          formed asbestos trusts from the other companies is

23          going to reveal the double-dipping behavior that we

24          have continued to allege and are virtually certain is

25          going on.  And the more of that that comes to light,

Garlock/5-12-11

47

1          I believe the more leverage that we get in the case.

2          So really we are in no hurry."

3     And then towards the end he says:

4          "So, anyway, the thing is moving very very slow.  It

5          is a costly thing to litigate, but it is far less

6          costly than staying in the tort system."

7          Your Honor, that is what is going on in the case.  The

8     debtors would like to get discovery to gain leverage.  That's

9     their prerogative and they are getting discovery in this case.

10    The court has allowed them to proceed with their questionnaire,

11    but there is no doubt that delay helps them.

12         The second thing I want to allude to, Your Honor, is

13    the chart that I handed up, and this is straight from the

14    record and I circulated copies to the other parties, and I

15    believe it's all accurate but, if we made some mathematical

16    errors, I would be happy to change it.  And I am not

17    highlighting any professional or any entity, Your Honor.  It

18    just speaks for itself.  The bottom line is the total

19    professional fees in –

20         MR. CASSADA: Mr. Guy, do you have another copy?

21         MR. GUY: Yeah.

22         MR. CASSADA: Thank you.

23         MR. GUY: The total professional fees are approximately

24    ten point eight million, Your Honor, and expenses are about

25    five hundred and sixty-five thousand.  However you slice that,

Garlock/5-12-11

1   that is money that would be better served either paying

2   creditors or allowing the debtors to run their company.  And

3   one thing that my experience in the bankruptcy cases has taught

4   me, even though it shouldn't be the case, is that meter that's

5   running at about a million dollars a month will continue to run

6   for as long as we are in the bankruptcy case.  So you have

7   heard from us before, Your Honor, and I know that Your Honor

8   wants to do the same thing, we want to get to reorganization as

9   quickly as possible.

10        The next thing I want to refer to before getting to

11   why I think a one-month extension is appropriate is something

12   that Mr. Miller talked about, and those are Mr. Clodfelter's

13   remarks at the November 19th hearing.  We have a lot of respect

14   for Mr. Clodfelter.  I am not arguing with what he was saying.

15   That's for another day.  But I have marked it in the transcript

16   that I handed up to you, and what Mr. Clodfelter was arguing

17   was – and I have highlighted the relevant pages but they are

18   all there for everybody to see if they need it.  On 1191 he

19   says:

20        "Because the dissenting equity interest can't be

21        extinguished or dispossessed without an 1129(a)(7) and

22        section 726 analysis, then liquidation of these

23        debtors actually becomes a real alternative for

24        consideration.  Because in a true Chapter 7

25        liquidation, the assets are going to be distributed

Garlock/5-12-11

49

1          only to those claimants whose claims can be liquidated

2          for distribution when the trustee files a report and

3          closes the case.  And that means that future claimants

4          don't exist in that world.  They disappear."

5     Your Honor, I don't necessarily agree with that but

6     the purpose I am raising it is just to talk about the

7     intentions of the parent, EnPro, of the debtor that is before

8     you, Garlock.

9          And then on 1193, Mr. Clodfelter continues:

10          "So looking at the alternative of a liquidation

11          scenario, I have to look at my client and say you

12          should consider, before you accept any plan that

13          extinguishes equity, you should consider the

14          liquidation alternative."

15     I will explain in a minute, Your Honor, why that's

16     very relevant.

17          Now let's turn to the debtors' filing on this very

18     issue.  They are very straightforward, Your Honor.  They say

19     that they want to extend exclusivity and they hope this will

20     permit discovery to produce sufficient evidence for the

21     parties' experts to develop their claims estimates and opinions

22     regarding the values of the debtors' assets in a way that will

23     aid negotiations for a consensual plan, perhaps with the

24     assistance of a mediator.

25          Your Honor, I think the true purpose for the discovery

Garlock/5-12-11

50

1    is for leverage.  I don't believe that the true purpose for

2    discovery, even though it's relevant to their arguments, is

3    that they need it to estimate their asbestos liability.  Why do

4    I believe that, Your Honor?  Because Dr. Bates, who is their

5    expert and has been their expert on this issue for a number of

6    years, has already estimated their asbestos liability.  He has

7    done it in securities filings that are being made public, and

8    he has estimated that liability by reference to the information

9    that is available to him by the data that he has about the

10   claims, by the data he has about the history of the debtor, by

11   the data he has about the asbestos that was contained in their

12   products.  He has estimated that in the region of four hundred

13   and eighty to six hundred million dollars.

14        So we know that Dr. Bates can testify on that issue

15   today.  Now, he may want more but we know he can.

16        Then I would like to refer to what I believe is the

17   legitimate reason for extension for exclusivity which is also

18   in their filing, and this is on page three.  There they talk

19   about the unanticipated change in circumstances with regard to

20   their characterization of the ACC's current disengagement from

21   further negotiations, and they say:

22        "The debtor should be permitted an opportunity to

23        formulate and file a plan that could be confirmed over

24        the ACC's constituency's objection in the event the

25        debtors are unable to successfully negotiate a

Garlock/5-12-11

51

1        consensual plan."

2        Your Honor, the debtors have been preparing for this

3   case for a very long time.  They are not my documents.  They

4   have been preparing for this case for a very long time, but I

5   am going to take at good faith that this has been a change that

6   they didn't expect, a position that they didn't expect.  And if

7   they need to come up with a plan that's very different from a

8   plan they had in mind before, which I assume was a standard

9   524(g) plan, then they should have some time to do that.  I am

10  sure they have been thinking about it.  I am sure they have in

11  mind exactly what they want to do.  I don't know what that is,

12  Your Honor.  I want to know and the court should want to know

13  in short order how they can address the issue of confirming a

14  plan, how they can address absolute priority issues, how can

15  they address best interest issues, how can they address

16  affirmative voting issues.  The court should know and the FCR

17  is entitled to know in short order how they can do that.

18       If they need two weeks to do that, if they need three

19  weeks to do that, if they need a month to do that, that's fine.

20  A month should be more that sufficient, Your Honor.  There are

21  a lot of very capable professionals on the debtors' side.  That

22  should give them more than enough time to file a plan.

23       Your Honor, when we talk about the plan and creditor

24  plans, debtor plans, in my mind that is somewhat of a – I don't

25  want to say it's a red herring but it is not really getting to

Garlock/5-12-11

52

1    the core of the issue because the truth is reasonable parties

2    today could file a plan that says creditors get what they get

3    in terms of the extent of their liability.  The debtors have

4    said they are solvent.  We are not sure whether they are

5    solvent.  The ACC has said for sure they are insolvent.  But

6    that's the issue.  So the plan could be written right now and

7    filed right now, tomorrow.  It would simply say, if they

8    convince the court in an aggregate estimation hearing, which

9    the court has given very clear instructions that that is the

10   path that we are going down, if they convince the court that

11   the value of the company is greater than their liabilities,

12   then Mr. Clodfelter, his company has equity.

13        If they don't, they don't, and the value of the

14   company goes to pay the creditors.  That's the way bankruptcy

15   works, and that's the way it works in this context where it is

16   unrealistic, unviable and not within this court's jurisdiction,

17   which creates a whole host of problems and the court has

18   already alerted them, to adjudicate individual claims.

19        So why do I refer back to the remarks about

20   liquidation?  It's because we are entitled to know what the

21   debtors' intent, sooner rather than later.  Do they intend to

22   accept the court's ruling on the size of the liability?  That

23   presumably will be in their plan.  Or do they intend to go

24   forward with an estimation hearing and then subsequently argue,

25   well, no, no, we now would like to have a claims allowance

Garlock/5-12-11

53

1   proceeding, or we would now like to have a hearing about

2   whether the debtors' products are hazardous or not.  We should

3   know that, and that will be in their plan.  There will be a

4   clear path for us in their plan.

5        Your Honor, in terms of estimation theories – the

6   debtors have proposed that, the ACC have agreed – we are

7   absolutely on board, Your Honor, because that's what we need to

8   get before the court.  We need to have an estimation hearing as

9   soon as possible.  The sooner we do that, the sooner we can

10  stop the hemorrhaging on legal fees, the sooner we can find out

11  whether we are going to have a situation where the debtors will

12  honor the results of that hearing or whether they will say,

13  well, in that instance, we are going to liquidate because then

14  we have another fight on our hands.

15       I don't want to go through the time, expense and

16  trouble, and I am sure the court doesn't either, of all of this

17  questionnaire fight and estimation hearing, expert testimony,

18  hours and hours and hours, tens and tens of millions of

19  dollars, if at the end of the day EnPro says, well, we don't

20  like that result, so now we are going to move to convert, which

21  is what we have right here.

22       So how do we get to find out?  They are not going to

23  foreclose that opportunity today, Your Honor, I am sure.  How

24  do we find out?  Well, let's get a plan on the table.  I know

25  the debtors can do it.  They have the ability to do it.  A

Garlock/5-12-11

54

1    month gives them sufficient time to do it.  It's not going to

2    change anything.  What's going to change - the filing of a plan

3    isn't going to change the solvency point.  We need to get to

4    the solvency point and then we will know where we are.

5              Thank you.

6              THE COURT: All right.  Mr. Clodfelter.

7              MR. CLODFELTER: Your Honor, thank you.  I have one

8    principal point I want to make.  Obviously we endorse Mr.

9    Miller's presentation to the court, and I want to elaborate

10   really on one point in addition to what he said, but just a

11   couple of brief responses to clear away a couple of red

12   herrings.

13             I greatly appreciate Mr. Guy's solicitousness for

14   position of equity on professional fees in this case.  We are

15   watching those quite closely because it is our money that's

16   being spent first in this case.  So I appreciate his concern

17   for that, and I am sure that he in his own professional

18   practice is mindful of the position of equity on that point,

19   but I don't think exclusivity is the proper way to address that

20   issue.  The court has full control over professional fees and

21   the rulings on interim fee applications, and we have confidence

22   that the court will police professional fees appropriately in

23   the case.  That is not a ground for denying extension of

24   exclusivity or terminating exclusivity.

25             I also will not, as we have agreed this morning, go

Garlock/5-12-11

55

1    into any of the details about the parties' negotiations today

2    except to say, to the extent Mr. Swett characterized the

3    current state of those negotiations as being a realization that

4    the positions of the parties were too distant for them to be

5    bridged, my client does not agree to that characterization from

6    the state of discussions, and we will leave it at that unless

7    the court wishes to discuss privately with the parties further

8    on the subject.  I don't want to leave that, however, standing

9    unrebutted.  Our view of the matter is somewhat different.

10        The principal point I want to make is this:  It is

11   very concrete and it's very tangible.  It has nothing to do

12   with generalities about the overall position of the case.  It

13   is very specific to the personal information questionnaire.

14        We started this process, as directed by the court, and

15   the debtors have in good faith and proceeded to try to develop

16   the evidence necessary for their theory of the case.  We have

17   come now to the point where the court has permitted them to

18   proceed with a personal information questionnaire.  That

19   questionnaire will develop material evidence material for all

20   parties who may be propounding claims, whether they be the

21   debtors, or whether they be any of the creditor constituencies,

22   or whether they may be the parent entity.  That evidence will

23   be highly material for the purposes of formulating a plan.  We

24   can today, as could anyone in this court, go back to the office

25   and generate a piece of paper called a Chapter 11 Plan of

Garlock/5-12-11

56

1    Reorganization and file it this afternoon, but would we be able

2    to say to you that we have made any reasonable determinations

3    about whether we properly classified claims or whether we know

4    that that plan has any realistic chance of being feasible in

5    terms of consummation, whether we know whether it can or cannot

6    meet the best interest of creditors test or whether, if

7    necessary, it could meet the absolute priority rule if that

8    comes into play.

9         And I think again the personal information

10   questionnaire is highly material to the determination of all of

11   those questions.  Any party who wants to responsibly proceed

12   today with a plan, be it the debtor, creditor constituencies,

13   or my clients, needs that information in order to do a job of

14   classification, analysis of feasibility, analysis of best

15   interest, and analysis of absolute priority.

16        If we proceed in the absence of that, I think we have

17   been wasting our time over the last six months, all of us have

18   been wasting our time over the last six months.  We would hate

19   to see those professional fees have been wasted certainly for

20   that purpose.

21        We think the responsible thing for all parties at this

22   point is to proceed with the personal information questionnaire

23   to get the results back and then allow all parties who wish to

24   do so, to consider those in light of what plans they might wish

25   to propose, formulate, negotiate consensual or proceed with on

Garlock/5-12-11

57

1    a litigating basis.

2         Very tangibly why it makes a difference is this: It's

3    significant when we were in court last November, at that point,

4    based upon the parties' available information at that time, the

5    estimate was that the debtors had currently about fifty-seven

6    hundred active mesothelioma claims.  As a result of the

7    evidence that has been developed since that date and the review

8    of the documents and available information since that date, we

9    can say today that we think the number of active mesothelioma

10   claims against this debtor is less than four thousand.  That is

11   not an insignificant difference in terms of formulation of a

12   plan or the judgment of feasibility of that plan or any of the

13   other criteria that have to be considered for confirmation.  It

14   is material not only for us, as I say, but for every

15   constituency in the case.

16        A personal information questionnaire is designed and

17   intended by the parties, intended by the court, to further

18   flesh out that information so that we can know what is the

19   universe of claimants with which we are dealing.  It is an

20   absolutely fundamental question.  Fundamental for insolvency

21   determination, fundamental for any plan confirmation.

22        With that, Your Honor, I think for that reason alone

23   the court needs to let this take its course, not terminate

24   exclusivity or deny the debtor its opportunity to react to that

25   information, prepare within the exclusive period a plan of

Garlock/5-12-11

58

1   reorganization.

2        So with that, I will stop and rest on the arguments of

3   Mr. Miller.

4        THE COURT: All right.

5        MS. FLETCHER: Your Honor, may I be heard for the trade

6   creditors committee?

7        THE COURT: Yes.

8        MS. FLETCHER: There is one issue that I think is maybe

9   obvious to everyone but I think has not been stated, and that

10  is that, while the prepetition trade creditors may be a

11  relatively small constituency here, they are a constituency and

12  many of those trade creditors are extending credit to the

13  debtor on an operating basis and as a result of the

14  understanding that the debtor will come out of this, will

15  reorganize, will file a plan, will resolve its issues with the

16  asbestos claimants and that there will be a plan proposed.

17       The termination of the debtors' exclusivity period

18  where the debtor can propose such a plan will have a

19  tremendously negative effect on the trade creditors, not only

20  the prepetition creditors and their confidence in the debtors

21  getting through this but also if there are other creditors who

22  are not – parties who are not prepetition creditors who are

23  extending credit, the debtor is doing business with, those

24  parties in dealing with the debtor if they learn that the

25  debtor has lost the exclusive right to file their plan of

Garlock/5-12-11

59

1    reorganization.

2         This is an operating debtor with, I understand,

3    approximately six hundred employees and it is trying to do

4    business in a way that has nothing to do at the present time in

5    terms of its operation other than this bankruptcy case with the

6    allowance of the asbestos claimants.

7         I agree with everything that Mr. Swett and Mr. Guy

8    have said in terms of things need to be brought to a head, but

9    I do disagree that the termination of the exclusive period for

10   the debtor to file a plan is really going to advance that ball,

11   and I think it will have a tremendously negative effect on the

12   creditor constituency that I represent and also the best

13   interest of the estate, and I think there are other ways to

14   force the issues, if there is going to be a consensual plan, to

15   bring that forward with what the debtor has proposed, and I ask

16   the court to keep that in mind in terms of its decision on

17   exclusivity.

18        THE COURT: Well, I think I ought to grant the debtors'

19   request and, to the extent there is any motion to terminate,

20   decline to terminate the exclusivity and grant the debtors'

21   request.

22        I guess the temptation is there to put a short string

23   on it and keep a little more control over it, but the basis for

24   extending it is largely to allow the discovery to take place

25   and that has already been authorized.   And I think any

Garlock/5-12-11

60

1    realistic guess of when that might happen would push us out

2    towards what the debtor is requesting already.  So there is

3    probably no reason to play games and have this exercise again

4    in August or September or sometime.

5            So let's just go ahead and I will grant the debtors'

6    request and, as I say, I think the debtor is entitled to get

7    the benefits out of the discovery that's been authorized.  I

8    know the debtors wanted more.  Our ideas on what the debtor

9    needs have been a little different and may continue to be so

10   and may not.  But at least with what has been authorized with

11   the questionnaire and such, I think we ought to give that time

12   to play out and just see what happens, see what the response

13   is, see what information is produced, if any.

14           So I will grant your motion if you will do such an

15   order.

16           MR. MILLER: Thank you, Your Honor.

17           MR. SWETT: Your Honor.

18           THE COURT: Yes.

19           MR. SWETT: The debtor did move for the extension.  I

20   understand that's been granted.  And last night they filed a

21   paper laying out a bunch of interim deadlines.  I take it that

22   is not part of what has been granted.  For example, mediation

23   —

24           THE COURT: No.  No, right, because I haven't really

25   looked at that either, but I think it is probably best if you

Garlock/5-12-11

61

1    all talk about that before I consider a schedule, but I think

2    at this point we will extend the exclusivity period as they

3    asked.  And to the extent they have presented this, as I say,

4    I didn't look at it last night either.  I think what I ought to

5    do is not set any kind of schedule today based on what you all

6    have suggested but allow you all to talk about that and see

7    where we go.

8              MR. GUY: Your Honor, can I have a clarification?

9              THE COURT: Yes.

10             MR. GUY: I believe they asked that it be extended

11   through November 28, 2011, but I don't think that is the final

12   period of the statutory exclusive period.  Are we done now or

13   are we going to be revisiting this at the end of November?

14             MR. MILLER: Your Honor, the way that we calculated

15   that was just to take – I think to take eighteen months instead

16   of trying to count up how many days are in the total number,

17   the total period from – so there may be a couple of weeks stub

18   period on the end there, but the debtors view the November 28th

19   period as the full extension of their exclusivity period.  We

20   just tried to calculate it conservatively.

21             THE COURT: All right.  Okay.  Where do you want to go

22   to next?

23             MR. CASSADA: Your Honor, I would like to briefly

24   address the bar date.  As the court may recall, we requested a

25   bar date and Your Honor announced a bench ruling, I believe on

Garlock/5-12-11

62

1    November 18 of last year, and then entered an order on December

2    9.  And in that ruling the court said that the bar date motion

3    was denied without prejudice and would be further considered on

4    May 12.

5          Now, we, Your Honor, interpreted that to be that you

6    would determine whether a bar date was necessary as we got

7    through the preliminary discovery period, and our understanding

8    was that the court was motivated by promoting the possibility

9    for a consensual plan that might obviate the need for bar dates

10   and proofs of claim.

11         There have been additional hearings, one where we

12   brought up the bar date and indicated that we would be asking

13   the court to further consider that today, and I heard the court

14   say at that hearing that the court was not going to revisit the

15   bar date.

16         In any event, Your Honor, we need clarity on that

17   point.  So I am going to briefly talk about the bar date.  I am

18   not going to rehash all of the arguments that we have made

19   before under the code, but I will briefly state why we think a

20   bar date is required and then ask the court to enter a ruling

21   there to give us certainty on that issue.

22         Your Honor, as we have pointed out, the debtors

23   dispute the asbestos claims against them and we think we have

24   shown the court for good reason.  The debtor is not like the

25   insulation defendants and other high-dose, manufacturers of

Garlock/5-12-11

63

1    high-dose asbestos products.  Garlock tried hundreds of cases

2    during the time that it has been in asbestos litigation, and we

3    believe that we offered evidence to Your Honor that, when the

4    evidence that plaintiffs were exposed to insulation products

5    and the products of other high-dose defendants who filed for

6    bankruptcy in 2000's, when that was on the table, Garlock

7    almost never lost a case.  In fact, in the few cases that

8    Garlock did lose by virtue of the joint and several rules and

9    setoffs, Garlock's responsibility in those cases tended to be

10   very small.

11        And, as a result, when we are looking at Garlock's

12   potential legal liability for a claim when the responsibility

13   of all defendants is on the table, Garlock's liability, we

14   believe that Garlock had no liability and that the settlements

15   that Garlock reached were settlements in lieu of defense costs

16   because defending claims is very expensive.

17        And, of course, we offered Your Honor evidence that in

18   the 2000's evidence disappeared and Garlock's results changed.

19   Now Garlock still won more cases than it lost and Garlock still

20   got credit and sometimes didn't have to pay a judgment because

21   setoffs from settlements produced what we have identified as

22   take nothing judgments.  So Garlock still had defenses, very

23   viable defenses, but the litigation risk changed because the

24   most culpable target defendants filed for bankruptcy and they

25   hadn't yet set up their trusts.  So we explained that.

Garlock/5-12-11

64

1          But what we believe the settlement history shows is

2     the substantial bases for objections to Garlock's claims and

3     the substantial need for evidence to support those claims.

4          Now, as we have shown and argued, proofs of claim are

5     mandatory.  A contested Chapter 11 case cannot proceed without

6     proofs of claim and indeed, under Rule 3003, claimants who hold

7     disputed claims cannot be treated as creditors in a bankruptcy

8     case for purposes of voting or distribution unless they file

9     proofs of claim.

10          And as the court knows, the Fourth Circuit has told us

11     that proofs of claim are mandatory even in a mass tort case,

12     even in a mass tort case where claimants have filed lawsuits

13     and have complaints pending in federal court, federal and state

14     courts around the country, as they did in that case.

15          And finally, Your Honor, Professor Gibson, who has

16     produced a noteworthy manual on the management of mass tort

17     bankruptcy cases, has written that proofs of claim are

18     mandatory.  Without proofs of claim, the potential creditors

19     are not parties to the case and indeed now we are serving

20     personal injury questionnaires on them which really has to be

21     regarded as third-party discovery.

22          So importantly for the debtors, Your Honor, proofs of

23     claim are integral to protecting the debtors' rights to contest

24     the validity and amount of claims.  In fact, if we look at the

25     bankruptcy code, literally all of the key provisions that

Garlock/5-12-11

65

1    adjust the rights between the debtor and creditors and equity,

2    they all are based on proofs of claim and the court's

3    determinations as they relate to proofs of claim.

4         Now, it appears increasingly likely or possible that

5    we are going to be heading down a contested confirmation path

6    and just to cite a few issues where proofs of claim will come

7    up, we have voting.  Under 1126(a), only holders of allowed

8    claims or interest can vote and, therefore, in order to vote,

9    a claim has to be filed and there has to either be no objection

10   to it or that objection has to be resolved or the Bankruptcy

11   Code says that the court can temporarily allow a claim and

12   value it for purposes of voting, but there has to be a proof of

13   claim before that can happen.

14        For estimation, Your Honor, estimation occurs under

15   section 502.  502(c), to be precise.  You don't get to that

16   section unless proofs of claim are filed, and the court heard

17   the progression and is quite familiar with it, when the debtor

18   lists claims as disputed which is a debtor's right, and then

19   claimants have to file proofs of claim.  The debtors can object

20   and, once they object, the court has to allow that claim or

21   either liquidate or estimate the claim for allowance purposes.

22        And indeed that process defines creditors' rights

23   under other provisions of the code.  If we get to a

24   confirmation hearing, then there will have to be a

25   determination of whether a plan meets the best interest test.

Garlock/5-12-11

66

1    You have heard a lot from Mr. Clodfelter and from Mr. Miller

2    here today that that test, you can't even begin to make that

3    test unless there are proofs of claim.

4            And finally, Your Honor, before any plan can be

5    crammed down on a party-in-interest under 1129(b)(2),(B) and

6    (C), the court is going to have to determine that the holders

7    of allowed claims – that's a defined term that goes back to 502

8    – will be receiving an amount equal to the amount of their

9    allowed claim.  So the court doesn't know what the amount of

10   allowed claims are unless proofs of claim are filed because

11   allowed claims don't exist unless they exist under section 502.

12           So it's clear that a contested bankruptcy case, a case

13   where the debtor disputes liability, cannot go forward and

14   cannot be resolved without proofs of claim.

15           Now, we have heard a lot from Mr. Swett today and at

16   other times about how the debtor is proceeding in uncharted

17   waters and wants to do something that's never been done before

18   and that there has never been an estimation in any case that

19   has ever used anything except for the so-called standard method

20   and settlements.  But we disagree with that.  If the court

21   looks at the cases that have proceeded, there are four of them

22   where the debtors disputed liability for asbestos claims, and

23   in all four of those cases the court concluded that it had no

24   choice but to enter a bar date and require proofs of claim.

25           We talked about the USG case when we were here last

Garlock/5-12-11

67

1    before you and we talked about how in that case the court ruled

2    about the information the debtors were entitled to from

3    creditors, but that case is particularly instructive because

4    it's a district court and that district court was looking at

5    the very same issues that this court is grappling with.  In

6    that district court, Judge Wolin, he determined that once USG

7    exercised its right to dispute that its asbestos claims

8    rendered it insolvent, that the Bankruptcy Court had no

9    discretion.

10        Again, in that case the committee was appearing and

11   saying that proofs of claim would be contentious, be

12   unmanageable or take too long, or be too expensive, and they

13   are unnecessary because this debtor is obviously insolvent if

14   you look at the claims database.  And the court concluded in

15   very compelling language that, if the debtor contends, disputes

16   the claims, then the curt has an obligation to let the debtor

17   present its case.

18        And the court set a bar date for mesothelioma claims

19   and ruled that the court were to hold an estimation hearing

20   under section 502(c) – again, you don't get to 502(c) without

21   proofs of claim – at which the debtor would be permitted to

22   present their defenses.  And then the court said, without

23   deciding precise procedural devices, about how those defenses

24   would be brought.  The court observed that the debtors may wish

25   to attack certain medical evidence under *Daubert* and the

Garlock/5-12-11

68

1    Federal Rules of Evidence and also that the debtors would have

2    the right or may wish to move for summary judgment on certain

3    issues on a claims-wide consolidated basis pursuant to Federal

4    Rule of Civil Procedure 42.

5        Now those issues aren't before the court today, but

6    the instruction from that case is that debtors in a bankruptcy

7    case have rights, as do claimants, to dispute claims and to

8    present their defenses.

9        There have been three other cases where debtors

10   disputed liability and in every single one of those cases the

11   court eventually ordered bar dates and provided discovery that

12   allowed the debtors to present their defenses either in an

13   estimation context or through a limited allowance proceeding.

14   And I am referring to the *Babcock & Wilcox* case, the *W.R. Grace*

15   case and the *G-I Holdings* case.

16       Now we have seen engaging language from cases cited

17   frequently by the committee in the *Owens Corning, Armstrong,*

18   *Federal-Mogul, EaglePicher* and other cases, but all of those

19   cases, Your Honor, were cases in which the debtor didn't

20   dispute the claims, didn't dispute liability and supported

21   eventually plans that the result of which wiped out equity.

22       Mr. Swett says, well, no court has ever gone down this

23   path.  The reality is in every single one of these cases, when

24   the proofs of claim are on the table and the process for

25   allowing the debtor to present its legal defenses was to begin,

Garlock/5-12-11

69

1    there was a settlement.  And then once there was a settlement,

2    that settlement determined the funding of the trust and then

3    the case was turned over to let the committee and the future

4    rep present evidence under the so-called standard method with

5    regard to settlement payments and how money should be

6    distributed from the trust.

7         But I think that it is wrong to say that there is no

8    precedent for our position.  In fact, we think that the

9    opposite is obviously true.  There is no precedent for the

10   committee's position.  We are not aware of any case where a

11   debtor has not been able to exercise its right to have proofs

12   of claim filed, have not been able to exercise its rights to

13   have claims determined based on legal liability and not

14   settlements.

15        We saw some discussion in the committee's brief about

16   the exclusive period, taking on the debtors' statement that

17   settlement payments can't be used to determine the debtors'

18   liability, and the case they cite is *Babcock & Wilcox*.  Now

19   what's important to understand about that case is that the case

20   cited was a fraudulent transfer case.  It was a case under

21   Louisiana's revocatory statute and the issue was different.

22   The issue was whether the debtor and the shareholder had a

23   reasonable basis for believing their estimate of claims

24   prepetition that supported a huge dividend from Babcock &

25   Wilcox to its parent.  And eventually the court ruled that they

Garlock/5-12-11

70

1    did but considered what settlement results they were achieving

2    in determining how that factored in to their good-faith basis

3    for believing their projection.  And the court said at the end

4    of that opinion I am going to be doing – there might be other

5    estimates in this case, including an estimate for purposes of

6    any  plan  of  reorganization  for  determining  the  debtors'

7    liability and this opinion has no effect whatsoever on that.

8         And,  in  fact,  as  we  learned  in  that  court,  a

9    determination was made that the debtors had a right to present

10   their  legal  defenses  and  hearing  on  those  defenses  would  be

11   scheduled up when settlement was achieved.

12        I am not aware of any case where the court went to a

13   contested confirmation hearing where there weren't proofs of

14   claim  and  used  the  debtor's  settlement  history  to  impose

15   liability and to determine what the debtor's responsibility was

16   for claims.

17        Now, we have also heard from the committee that the

18   debtor is trying to, quote, do better than it could do in the

19   tort system and they are pushing the envelope, and we disagree

20   with  that,  Your  Honor.   We  are  doing  nothing  more  than

21   exercising  our  rights  under  the  Bankruptcy  Code  to  dispute

22   claims and to have claims determined in bankruptcy based on the

23   same legal principles they would be determined under state law.

24   That's what the district court, Judge Wolin, decided that the

25   court was bound to give the right to the debtor to do in USG.

Garlock/5-12-11

71

1          Again, it's a little misleading to say that no debtor

2     has ever been successful in pulling that off because in all of

3     these cases an agreement was reached preserving equity on a

4     plan about funding a trust before the issues were ever joined

5     in the actual courtroom.

6          In any event, Your Honor, we have heard from the court

7     that it doesn't plan to revisit this issue.  Obviously that's

8     a big disappointment to the debtors, but at this point we would

9     ask the court to either enter the bar date or to enter a final

10    ruling on the debtors' request for a bar date.

11    MR. SWETT: Your Honor, from the beginning of the case,

12    the debtors have signaled that their intentions for the

13    bankruptcy case were in effect to reprise or redo the issues

14    they have been litigating for a generation in the tort system,

15    and now it appears that, with similar rigidity, the debtors are

16    not taking the learning from the rulings made along the way in

17    this case so far and that we are going to have perpetual

18    debates about the bar date.

19         Suffice it to say, though, that what is clear in the

20    code and in the rule is that you have discretion with respect

21    to when a bar date is imposed, and last fall we showed you at

22    great length with a lot of evidence from the other bankruptcy

23    cases that the voting issue, that all of the other kinds of

24    things that the debtor has argued about today, have been

25    handled without imposing bar dates in midstream, and I refer

Garlock/5-12-11

72

1    you back to those transcripts and that evidence as the fullest

2    answer to the points that Mr. Cassada has made in summary

3    fashion today, but I will respond in similar summary fashion,

4    trusting that the court is aware of the record already made on

5    this issue, which of course supported the ruling it made in

6    December that we are not going to allowance proceedings.  That

7    would be the only conceivable purpose for imposing a bar date

8    now.  Since we are not going there, it would serve no purpose.

9         Since we are going to an aggregate estimation, one of

10   the virtues of which is that the individual claimants are not

11   parties and so cannot assert their due process rights in a

12   fashion that makes it more difficult to get the estimation

13   done, that makes it necessary for the court to focus on

14   individual disputes, we are circumventing that at this stage

15   for the purposes of plan formulation.  There is absolutely no

16   reason to impose a bar date now for plan formulation purposes.

17        You know, it is interesting the debtor says that it

18   believed it had no liability in the tort system but, of course,

19   if you read the EnPro 10-Ks, when it comes to the litigation

20   disclosures, you find Dr. Bates' estimate of what that non-

21   liability would be in terms of dollars.  It is hard for me to

22   understand that position in light of the admissions made yearly

23   by the debtor over a great many years.

24        There is oblique reference in Mr. Cassada's argument

25   to *Robins* as somehow instructing that bar dates are mandatory.

Garlock/5-12-11

73

1    There is no such decision in *Robins*.  The bar date decision or

2    the decision having to do with a bar date in *Robins* in the

3    Fourth Circuit was one simply enforcing a bar date that had

4    been imposed against some claimants who, under the peculiar

5    circumstances of that case, failed to submit some required

6    statement in a timely fashion, argued that that wasn't part of

7    the bar date.  The Fourth Circuit held to the contrary and

8    simply enforced the bar date that no one had appealed from in

9    the first instance.

10         There is no learning in the *Robins* case that you must

11   impose a bar date midstream in a mass tort bankruptcy.  In

12   fact, the opposite ruling by the *Robins* court in another appeal

13   was that, rather than go the route of allowance proceedings,

14   the debtor, who only faced five thousand claims total at that

15   time, as I recall it, must go the way of estimation because

16   otherwise they would consume the estate's resources

17   inordinately in individual disputes.  So that authority does

18   not support the debtors' position.

19         We showed you how in case after case bankruptcy courts

20   have exercised their power to allow asbestos claims temporarily

21   for voting purposes, and we also showed you that in many cases

22   the ballots themselves had been deemed to be the proofs of

23   claim and not required until the very end of the case,

24   certainly not as the parties are moving into an aggregate

25   estimation that doesn't have anything to do with allowance.

Garlock/5-12-11

74

1    So these are inapposite arguments, we submit, that the

2    debtor is making and, moreover, more to the present point,

3    there is nothing new in the arguments.  You have already heard

4    these.  Nothing has changed in the evolution of the case to

5    suggest that now is a sensible time in which to impose a bar

6    date that you weren't willing to impose last fall.

7    This estimation proceeding that we are embarking on,

8    as I said from last December forward, is for plan formulation

9    purposes, not for allowance.  Section 502 issues are thus

10   beside the point.  Section 502 is part of the scheme that the

11   code provides for allowance.  We continue to believe that the

12   only reasonable and feasible outcome to this case is a 524(g)

13   plan where the trust, not the court, will evaluate the

14   individual claims and pay or deny them.  In effect, there will

15   be no allowance process in this case if it goes in that

16   direction.  Since that remains, even under the debtors' papers,

17   the principal goal, the preferred route, if we can overcome the

18   obstacles to getting there, there is simply no point in setting

19   up such an obstacle by calling in all these tens of thousands

20   of claims now at a time when we are focused on aggregate

21   estimation.

22   We disagree profoundly with the debtors' recitation of

23   authorities and the meaning of the *G-1, USG, Babcock* and *Grace*

24   cases.  You heard all about the Babcock allowance process and

25   how it collapsed last fall.  You have heard about the very,

Garlock/5-12-11

1    very difficult process, in the guise of estimation but with

2    sort of *sub rosa* allowance aspects to it, that the *Grace* case

3    found itself embroiled in and the magnificent expenses and huge

4    costs in terms of time and money that that entailed.  Hopefully

5    we can avoid that here.   It is not a very affirmative

6    authority.

7        *G-I Holdings*, Mr. Cassada is simply mistaken.   The

8    debtors moved for a bar date in that case.  We opposed it.   The

9    debate went forward from one approach to estimation that they

10   proposed that the court rejected to another approach to

11   estimation in connection with which the debtor withdrew without

12   prejudice its bar date application and that application was

13   never renewed.  In the end, there was a consensual plan.  There

14   was temporary allowance for voting much as I have described the

15   process in the other cases, but the simple fact is there was no

16   bar date.

17       But it's true that the debtor advocated for a personal

18   injury questionnaire which was granted and they hoped to have

19   an estimation process that somehow spilled over into the

20   substance of their defenses to the tort claims and the court

21   allowed the questionnaire.   It was never issued and that

22   process never actually went forth.  There was a plan.

23       The relevance of the Babcock fraudulent transfer

24   decision is simply that it shows that the debtor has somewhat

25   overstated the idea that, in any contested setting where the

Garlock/5-12-11

76

1    debtor wasn't consenting to the use of its settlement

2    information, that information wasn't admissible.  That's not

3    true.  It was a fraudulent transfer case.  The debtor was the

4    committee's party opponent. The committee proceeded through Dr.

5    Peterson to put on an estimate based upon the historical

6    settlement information.  They objected and argued that it

7    wasn't admissible under Rule 408.  The court held to the

8    contrary.

9        The holding that Mr. Cassada recited today was simply

10   that in the end, under the peculiarities of Louisiana law,

11   which is a unique statute in force nowhere else in the United

12   States, the court accepted that the historical estimates made

13   along the way by management were reasonable and under that

14   statute that defeated the fraudulent transfer claim.  That's

15   beside the present point.  The point now is the settlement

16   information was admitted.

17       I guess this is all a little bit tangential to the bar

18   date issue but it responds to a point that the debtor keeps

19   trying to reinforce and mistakenly argue.  Hopefully we get

20   that cleared up in the process going forward of the aggregate

21   estimation.

22       We have set forth in conclusory fashion, with record

23   citations in our response to the renewed bar date, the record

24   basis that supports your December 9th ruling that no bar date

25   should be imposed at that stage.  We submit, Your Honor, with

Garlock/5-12-11

77

1    respect that the same considerations, when brought to bear on

2    the situation now existing in the case, compel the same

3    conclusion.  The bar date motion should therefore be denied.

4              Thank you, Judge.

5              THE COURT: Mr. Guy.

6              MR. GUY: Your Honor, we had six days on this issue

7    before.  The court properly denied it without prejudice, gave

8    the parties an opportunity to conduct discovery for the

9    purposes of getting to aggregate estimation.  The court also

10   encouraged the parties to negotiate and develop a protocol for

11   identifying pending asbestos related claims that may be

12   considered to have been abandoned or otherwise no longer viable

13   claims.  I am not aware that those discussions have taken place

14   at all, Your Honor.  This is premature.  The court set a clear

15   framework for discovery for aggregate estimation.  The parties

16   should negotiate as encouraged by the court on this issue of

17   the abandoned claims or non-viable claims.

18             And, Your Honor, we now only need look back to their

19   information brief to see where this is going if the court

20   grants a bar date now.  They say in their information brief

21   that was filed way back on June 7:

22             "After proof of claims have been filed, Garlock will

23             move to consolidate, under Federal Rule of Civil

24             Procedure 42, claims that have a common question of

25             law or fact and then move to disallow claims that are

Garlock/5-12-11

78

1          not supported by evidence.  The proofs of claim and

2          questionnaires will provide the medical and exposure

3          evidence necessary to test the claims.  During this

4          process, Garlock will move to exclude any scientific

5          or expert evidence offered to support these claims

6          that does not meet the standards of *Daubert*.  Evidence

7          proper to show that a product caused a disease will

8          not be admissible unless there is an established

9          scientific connection between the exposure and the

10          illness.”

11     And then they go on to explain, which is the perilous

12     path that the FCR has been concerned about, and I know the

13     court is concerned about:

14          “Both allowance and disallowance of claims against the

15          estate and estimation of claims generally constitute

16          core proceedings.  There are, however, special

17          jurisdictional rules of personal injury, tort and

18          wrongful death claims.  Early in the case Garlock

19          will, in conjunction with its motion to establish a

20          bar date, which it’s renewing, and case management

21          order propose an appropriate division of oversight of

22          such issues between this court and the district

23          court.”

24     Your Honor, you will never reorganize this case if

25     they go down this path.  I request that the court deny their

Garlock/5-12-11

79

1    renewed motion without prejudice.  They can come back to the

2    court again after we have gone through all of these issues that

3    the court has set.

4            Thank you.

5            MR. CLODFELTER: Your Honor, may I be heard briefly?

6            THE COURT: Yes.

7            MR. CLODFELTER: Thank you, Your Honor.  I am going to

8    stay away from the merits of whether the motion should be

9    allowed or denied.  I want to talk about the "without

10   prejudice" part of the ruling, and say that what we really are

11   here about today is to get a final disposition of the motion,

12   be it denied or allowed, and I want to talk very specifically

13   about why that disposition is material not for purposes of

14   allowance or disallowance, or estimation, but why it's material

15   to the task ahead of the parties in the next few months about

16   preparing and formulating the plans of reorganization.  Again,

17   I want to try to speak as much as I can not in generality but

18   concretely.

19           The court will recall that in November we learned that

20   in the debtors' database there are approximately a hundred

21   thousand records, and I am going to be very precise about that.

22   Those are records in the database that may or may not indicate

23   that there is an asbestos claim out there alive in the world.

24   Those are records in the database.  Over a hundred thousand of

25   those the debtor had no evidence in the database of any

Garlock/5-12-11

80

1   activity with respect to that possible claim for over five

2   years.  In some cases, decades.  So we now have the database,

3   which is what we had then.  Now it's work to clean it up and,

4   as I said in my earlier remarks on the exclusivity motion, we

5   have already learned, in trying to go back out and do some

6   research on that, that already substantially the number of

7   believed to be active mesothelioma claims, not the hundred

8   thousand but what we thought were active mesothelioma claims,

9   has already been substantially reduced because we have learned

10  they are no longer alive.

11       Now I am at the task of formulating a plan, and so I

12  have to answer a number of very specific questions.  When, for

13  example, I prepare my classification of claims, I might

14  possibly be able to consider plan structures in which claims

15  are classified differently based upon whether there are

16  malignancies or non-malignancies.  I need to know are they or

17  are they not malignancies or non-malignancies.  I have a

18  hundred thousand records in my database.  I am not sure how I

19  am supposed to classify them because I don't even know enough

20  about the accuracy of my information at this point to say that

21  I should put them all in one class or I might be able to put

22  them in two classes or in three classes.  It's a plan

23  formulation issue, and a bar date and a proof of claim will

24  give me that necessary information even on a form ten, which is

25  what the debtor has scaled back the current request to.

Garlock/5-12-11

1    Apologies.  I am drifting into the merits.  I will stay away

2    from that.  But with the minimal information of a proof of

3    claim and a bar date, I might make a more informed decision

4    about classification of claims.

5         And then I move to preparing my plan for a

6    confirmation hearing and I have to think about plan

7    feasibility.  What am I supposed to do about those hundred

8    thousand records in the database?  Do I have to run them

9    through my feasibility analysis or not? Are they alive or not?

10   It's a highly material issue in terms of how I formulate the

11   plan and knowing whether or not I can come into court and say

12   to you this plan is feasible, we have financial resources and

13   can perform.  I don't know the universe of who I am dealing

14   with.  It's as simple and fundamental as that.

15        There has been a tendency to confuse a record in a

16   database with a claim and that is an error we cannot make.  It

17   is why we are at a point in the case now where we really just

18   need to get closure on that issue.  We need to know whether we

19   are going to get closure on that issue, with respect.  We need

20   to know whether we are going to get closure on that issue

21   because it will inform how we go forward and think about some

22   of the tasks in preparing the plan.

23        If I am going to do my best interest analysis – we

24   have had a lot of discussion about that this morning under

25   (a)(7) – we need to know, again, what do I do about that

82

1  hundred thousand.   Do I have to consider them in a best

2  interest analysis or not?  I just need to know.

3       And if I am going to be told that I won't have proofs

4  of claim in order to help me inform that decision, then that

5  leads to very different tasks ahead of us in putting that plan

6  of reorganization together.

7       Again, that's all I want to say.  It's material to the

8  task at hand and for the parties in this case who all face the

9  same task, whether they be creditor plans, parent plans or

10  debtor plans, as I said earlier, and I am not arguing the

11  merits of the motion.  I am arguing that the court remove the

12  "without prejudice" and give a dispositive ruling at this point

13  so we know what is the shape of the task ahead.

14       MR. SWETT: Your Honor, if I may.

15       THE COURT: Go ahead.

16       MR. SWETT: We suggest that the correct approach is to

17  deny this without prejudice following Judge Fullam's lead on

18  how to proceed in stages.  The debtor has illustrated to you

19  today the extent to which they can use their available data in

20  order to make inferences and present what they believe to be

21  facts concerning the scope of their liability. They have, by

22  using their available resources without one iota of discovery,

23  they have decided that twenty-five percent of the mesothelioma

24  claims aren't really mesothelioma claims, but we can dispute

25  that and debate that based upon the available data, but the

Garlock/5-12-11

1   point is they are at no disadvantage in terms of plan

2   formulation, given the extent of the information they have both

3   in their database and in their litigation databases and in the

4   files they have accumulated over the years in all of that

5   process.

6        What Judge Fullam said on a similar issue, the issue

7   there was are we going to have medical discovery of a hundred

8   thousand non-malignant cases in the mid 2000's, and he said let

9   us begin with what is known and with the information that we

10  already have, and we will proceed to hear an estimation on that

11  basis and, if it turns out that there are issues that would

12  benefit from more factual development at that point, we can

13  always commission those inquiries then.  There is absolutely no

14  need for plan formulation purposes to call down upon the heads

15  of the parties at this stage all of the individual disputes,

16  and doing so will tend to make the estimation irrelevant.

17       We will be embroiled in a world of individual asbestos

18  disputes which, as we have argued in the past, have no

19  acceptable way of being concluded in bankruptcy proceedings.

20  Ultimately there are jury trials held in the district court.

21  That's just not a viable approach.  There is no need to stir up

22  that wasp nest at this stage.  Nor is there any need to decide

23  today that you will never do that for any purpose.  You may

24  well decide in the end that there should be temporary allowance

25  process and that the ballots can be proofs of claim.  You might

Garlock/5-12-11

84

1    decide that for some particular purpose it would be useful to

2    have a proof of claim at a later stage in the case.

3         Judge Wolin's provisional or I should say preliminary

4    ruling about estimation in the USG case shows the wisdom of

5    this approach.  He said, "Look, if the cancer claims alone are

6    enough to extinguish equity, then the debtor-in-possession has

7    no interest in the question of what the non-malignants are

8    entitled to.  So let's focus on a cancers only estimation and

9    we will make progress on that issue that will clarify whether

10   or not we have any fact-finding that we need to do concerning

11   the non-malignants."

12        Here a similar issue is arising in a slightly

13   different posture.  We should take this at stages lest we

14   overwhelm the case with too many disputes and too many fights

15   going on at the same time to bog the case down and to prevent

16   progress.

17        I can tell you that, as far as the non-malignant

18   claims are concerned – that's the hundred thousand that Mr.

19   Clodfelter referred to – a statistical analysis of the debtors'

20   database would indicate that, consistent with their history in

21   the last five years before bankruptcy, those claims account for

22   a relatively modest slice of the overall liability, somewhere

23   between nine and twelve percent.  It shouldn't be a driver of

24   the action at this point.  It is going to, in the end, be a

25   secondary or even a tertiary issue and, depending upon what the

Garlock/5-12-11

85

1    estimation shows, it may not even be necessary to get to it.

2    So there is no need to anticipate it.

3            But at the same time, you should not be mouse-trapped

4    by the bid to lock in a ruling, bar date, yes or no, for all

5    time and all purposes at this stage of the case.  There is no

6    need to do that.  It would not be sound or wise judicial

7    administration.  What you should do is deny the bar date, again

8    without prejudice and we can revisit that in the fall after

9    they present their plan.

10           Thank you, Judge.

11           MR. CLODFELTER: Your Honor, would you indulge us very

12   briefly again?  I want to say again the point here for a proof

13   of claim at this stage of the case is independent questions of

14   valuation for estimation.

15           I just want to talk again about plan mechanics.  We

16   will need to know – the debtors need to know, excuse me.  I

17   have gotten a little invested in this.  I think we are

18   investors. I think it's right.  We are the investors.  The

19   debtors need to know, in preparing that plan and formulating

20   that plan, do they have to get fifty-one thousand "yes" votes

21   in order to have an accepting class; do they need thirty-three

22   thousand, eight hundred and seventy-eight to have an accepting

23   class; do they need fourteen thousand, three hundred and

24   twenty-one to have an accepting class, what is that target.  It

25   has nothing to do with value.  I am not talking value now. I am

Garlock/5-12-11

86

1   just talking the raw numbers in order to meet the class

2   acceptance and, you know, that may determine how they put the

3   classes together in the first instance.  It may be highly

4   material to know do I think I can sustain a classification here

5   and can I get an accepting vote.  You can't know that if you

6   don't know who the claimants are.  It has nothing to do with

7   value.

8        Now, value questions enter in.  I am not saying they

9   don't enter in, but I am talking that there are issues here

10  that cannot be obscured by constantly talking about aggregate

11  estimation.  They are fundamental mechanics of the code, and we

12  simply need to know are we going to be able to rely upon the

13  fundamental mechanics of the code as we prepare plans of

14  reorganization and try to solicit acceptances or will we be

15  using a very different mechanic.

16       MR. MILLER: Just to follow along very quickly with

17  what Mr. Clodfelter said, perhaps a different way that we could

18  frame up the ruling that we are asking for is whether there

19  will be a bar date that will permit proofs of claim to be filed

20  prior to the end of the debtors' exclusivity period.  That

21  might be another way to get at it.  That's all I have to say.

22       MR. SWETT: That doesn't change anything.  I am sorry,

23  Jonathan.  Please.

24       MR. GUY: Your Honor, the practical problem I have with

25  all of this is the debtors filed a pleading with you last night

Garlock/5-12-11

1    that said on or before Monday, October 31, 2001, the debtor

2    shall file a proposed plan and disclosure statement and then

3    they say – they ask that the court set an estimation trial in

4    the future, presumably at some point in 2012.  This is all

5    reversed.  They are saying they want to file a plan and then

6    have an estimation hearing and then at the result of that

7    estimation hearing they can decide whether to convert the case

8    or not.  It doesn't make sense.  Creating all of these

9    additional hurdles and expenses and delays, they are not going

10   to move us towards reorganization.

11        If the results of the estimation hearing determine

12   that the debtors are insolvent, then the TDP should be the

13   document that determines who gets paid and how.  It's as simple

14   as that.  They don't need this information to classify

15   unsecured creditors, asbestos creditors.

16        Thank you, Your Honor.

17        MR. CASSADA: Your Honor, I need to just make a couple

18   of points and that is, if what we are about here is just

19   estimating mesothelioma claims, then we need not only to know

20   whether there are proofs of claim for plan – actually the

21   formulation and drafting of that plan but also what we are

22   going to need estimating when you have an estimation trial.

23   And the question is are we going to do an aggregate estimation

24   of mesothelioma claims without proofs of claim and which we are

25   going to be estimating who might file a proof of claim and then

Garlock/5-12-11

88

1   what those values might be or are we going to be doing an

2   estimation of the allowed amounts of claims which the code

3   requires which require proofs of claim.

4          And to reiterate, aggregate estimation without proofs

5   of claim is what has been done in connection with consensual

6   plans when the debtor and the asbestos committee and the FCR

7   have reached an agreement and that's also – I mean, they say,

8   well, we will have a proof of claim just for voting purposes.

9   It may be that you agree with that and there is not going to be

10  proofs of claim for any purpose except that but we need to know

11  that today.  We are progressing toward an estimation trial.  We

12  need to know whether the court is going to be estimating claims

13  of claimants without proofs of claim or whether the court is

14  going to be estimating records in the claimant's database that

15  might be proofs of claim or might not be or whether the court

16  is going to be estimating some other kind of liability.

17         MR. SWETT: Your Honor, those records in the database

18  have been good enough for Charles Bates to make estimates for

19  financial reporting purposes for a long time.  This is all

20  window dressing.  They are just scheming to try and get closer

21  to the allowance proceedings that they wanted from day one.

22  You said they shouldn't have those, at least not yet.  There is

23  no reason in these new arguments to change the ruling, that now

24  is not the time for any bar date and without being boxed into

25  a position for a future administration of the case.

Garlock/5-12-11

89

1          THE COURT: I am going to stick with the existing

2     ruling, with the "without prejudice" part of it, because I

3     don't think, other than the fact it's May 12th, there is any

4     reason to go forth with that now.  I don't think it's

5     appropriate for me to decide it one way or the other at this

6     point.

7          Where I think we ought to head to is an estimation of

8     the debtors' liability, primarily the mesothelioma liability,

9     and that ought to be the next step we get to and hopefully we

10    will be able to get there sooner rather than later and that

11    will depend on the discovery and what kind of responses we get

12    to that and on what time table, but hopefully we are going to

13    get to that and then we will know better where to go after

14    that.

15         That will be my ruling.

16         MR. CASSADA: May I ask for a clarification?

17         THE COURT: Yes.  Go ahead.

18         MR. CASSADA: Would I take that to be that we are going

19    to get to a determination of that without proofs of claim?

20         THE COURT: Yes.

21         MR. CASSADA: Okay.  Thank you.

22         THE COURT: At least that's my feeling today.  Now, I

23    may change my mind on that but, you know, in terms of where we

24    are headed, I think that's where we are headed.  We will just

25    have to see about that.  I mean, if we get absolutely no

90

1    responses to the questionnaires, then we may have a different

2    scenario than if you get, you know, a good response to the

3    questionnaire.  We just don't know that today and I am not

4    prepared to make those judgments today.

5            Why don't we go to lunch, or do you all want to just

6    keep going?

7            MR. SWETT: It's a fine time for a lunch break.

8            THE COURT: It is a little after noon.  Do you want to

9    just come back at 1:15?

10           MR. CASSADA: That would be fine with us, Your Honor.

11           MR. SWETT: Perfect.  Thank you, Judge.

12           (Recess from 12:04 p.m. until 1:16 p.m.)

13           (CALL TO ORDER)

14           THE COURT: Have a seat.  All right.  Where do we want

15   to go next?

16           MR. CASSADA: Your Honor, I believe there are two

17   additional matters on the record today.  One is the completion

18   of the personal injury questionnaire and follow-up on the e-

19   mail from the court regarding the posture on two issues, and

20   then our motion for past claims discovery.

21           THE COURT: All right.

22           MR. CASSADA: Mr. Worf will be making both of those

23   presentations.

24           THE COURT: Okay.  Good.

25           MR. CASSADA: Thank you.

Garlock/5-12-11

91

1          MR. WORF: Good afternoon, Your Honor.  I have passed

2     out a few documents, a presentation that I am going to be

3     speaking from, as well as an exhibit book.  We are only going

4     to introduce two new exhibits, one of which is the presentation

5     I am going to make, and then we also have a revised version of

6     the questionnaire which is going to be GST 155 that we have

7     drafted in an attempt to meet some of the court's concerns as

8     expressed in the e-mail a week and a half ago.

9          I think that, after numerous hearings, we are getting

10    very close on the form of the questionnaire.  We circulated

11    yesterday a copy of the questionnaire that embodies what we

12    viewed as the court's rulings on everything except the two

13    issues that we are discussing today.  We circulated that

14    yesterday and of course did not expect a response from the

15    committee or future claims representative before today, but

16    that process is underway and I don't think that those areas are

17    going to be controversial at all.

18         We appreciate the opportunity today to address the two

19    areas that were the subject of the court's e-mail of a week and

20    a half ago and I think those are two fairly narrow areas and

21    they are the questions regarding the Garlock exposure and the

22    questions regarding the claimant's exposure to other asbestos

23    products.

24         And the way I want to approach those is, first of all,

25    to explain the debtors' need for those items and how they fit

Garlock/5-12-11

92

1    into the debtors' estimation case and, like I said, I am not

2    going to introduce any new exhibits.  I might refer to some of

3    the past ones, and I also want to refer to some of the

4    testimony from Mr. Glaspy and Mr. Simon to help to explain the

5    debtors' need.

6         And then for each of those topics, I am going to

7    discuss the court's concern regarding coding, and we have

8    drafted new questions in both of those areas in an attempt to

9    meet that concern and bring some standardization to the

10    responses to those questions.

11         So hopefully we can show the court that the debtors

12    can get that information while still getting it in a somewhat

13    standardized form.

14         Just to recap what we think the scope of discovery is,

15    we presented at the last hearing debtors' rubric for their

16    legal liability estimation case, and the court expressed a

17    willingness to hear the debtors on that case and to allow

18    reasonable discovery that is relevant to that case.  And the

19    basic approach is, as the court heard, the estimated liability

20    for a group of asbestos claims is a function of just a few

21    factors and, starting on the right side at the bottom, it

22    starts with what the expected value of a judgment is and the

23    judgment in that jurisdiction for that kind of injury, and then

24    you have to determine what the allocation to co-defendants

25    would be to determine what the potential exposure for Garlock

Garlock/5-12-11

93

1    at a hypothetical trial would be and then multiply that by the

2    probability that Garlock would be found liable and by the

3    number of claimants who are in that group.

4         So that's the rubric.  And the information we are

5    discussing today is mainly relevant to the second listed factor

6    there, which is the probability of Garlock liability.  The

7    other exposures are also relevant to the allocation of co-

8    defendants as I will discuss.

9         Now, the court's e-mail, one of the reasons for the

10   court's decision regarding Garlock exposure and the other

11   exposures was the court's impression, and Mr. Glaspy had

12   testified he did not need that information in order to settle

13   a case.  So I wanted to remind the court of the link between

14   what Mr. Glaspy testified regarding trial risk and the

15   likelihood that Garlock would be found liable at a trial and

16   settlement values.

17        As the court is well aware, the debtors don't think

18   the standard at estimation is what Garlock would have had to

19   pay to settle the cases, and they also think, for reasons that

20   have been well aired, that the settlements from 2000 to 2010 do

21   not fairly characterize either what Garlock would have paid in

22   the future to settle cases or Garlock's legal liability for

23   claims, and I won't get into the details of that.  I think the

24   court is well aware of our positions on that.  But I do want to

25   point out that Mr. Glaspy in his testimony about what

Garlock/5-12-11

94

1    settlement – how he would value the settlement value of a case,

2    and I apologize for the writing here being so small so that

3    spectators cannot see, but I might read part of it here.   He

4    testified that there is a link between trial risk, the risk at

5    a hypothetical trial, what our legal liability approach is

6    trying to model, and what the settlement value of the case is.

7    I think that's important to understand.   And in this testimony

8    he testified that all of the factors in our equation have

9    something to do with the settlement value of the case.   And

10   just to quote some selections:

11             "Yes, my job was" – well, Mr. Cassada asked him:

12             "Would you agree with Mr. Simon's statement on page 67

13             of his transcript that, quote, the risk of trial is

14             what drives settlement, end quote?"

15        And Mr. Glaspy said, "Absolutely."   And then he went

16   on to explain that, when he is evaluating the risk that Garlock

17   faced in a particular case, it depended on the expected jury

18   verdict in that jurisdiction; the allocation that would be made

19   to co-defendants which depended on settlements and also the

20   allocation scheme of that jurisdiction; and then finally at the

21   end of the page there, the likelihood that Garlock would be

22   found liable.

23        Now he testified also that settlements are motivated

24   by other concerns, which we have gone into, the cost of

25   litigation and also he testified extensively about why the 2000

Garlock/5-12-11

95

1    to 2010 settlements, due to the temporary absence of the

2    culpable bankrupts, did not fairly adjudicate Garlock's

3    liability when it was settling cases.  So that's an important

4    caveat, but this is just to point out that there is a link

5    there and, if the court wants to limit the questionnaire in the

6    way that the e-mail suggested, it still has to keep in mind

7    what Mr. Glaspy testified about the trial risk.

8        So going on to the particular questions that we are

9    concerned about here, the first deal with the particulars of

10    the Garlock exposure and, just to recap where the questionnaire

11    stands, if the court sticks to the e-mail from last week, it

12    would require the claimant to identify the products, the

13    Garlock products that he or she was exposed to, and then would

14    require the claimants to fill out the check boxes saying

15    whether he or she personally cut gaskets, personally cut

16    packing, personally removed gaskets, personally removed

17    packing, was at a site where Garlock or Anchor asbestos

18    containing products were cut or removed by others, or worked in

19    or around areas where Garlock or Anchor asbestos containing

20    products were cut or removed by others.

21        Those are important questions to us and we are

22    obviously glad they are in the questionnaire.  We don't think

23    they go quite far enough, and I want to describe why by

24    reference to Mr. Simon's testimony.

25        The basic contour of any asbestos case is that the

Garlock/5-12-11

1     plaintiff is trying to prove that he or she inhaled asbestos

2     from a Garlock product that was a substantial contributing

3     factor in causing his or her mesothelioma.  And what happens in

4     these trials is that experts for the plaintiff and the

5     defendant come in and they testify about two things.  First of

6     all, about how much asbestos from the products the plaintiff

7     could have been exposed to, given what the plaintiff did with

8     the product and then, secondly, whether that exposure was a

9     substantial factor in causing a dose sufficient to lead to the

10    disease, in this case mesothelioma.

11         Now, plaintiffs have encountered the Garlock product

12    in a lot of different ways and there were some plaintiffs, as

13    the questions might suggest, who were out there alleging that

14    they were cutting gaskets or removing gaskets and there were

15    some plaintiffs out there who were alleging, no, I didn't do

16    much of that, I was just in a site or in an area where other

17    people were doing those activities.  Some people were even more

18    remote than that.  They were just in a factory or a big

19    shipyard or somewhere like that where they know the Garlock

20    product was present but they didn't have any particular

21    association with the product.

22         And then even among those groups are differences.  So

23    there might be people who cut one gasket in their career.

24    There might be people who that's all they did for many years.

25    There's just differences among those groups and that matters in

Garlock/5-12-11

97

1    determining what the likelihood that Garlock would be found

2    liable in a particular case.    I think Mr. Simon's testimony

3    illustrates that pretty well.

4         Now, the debtors would no doubt disagree with Mr.

5    Simon about where the line is between a strong Garlock case and

6    a weak Garlock case from the perspective of a plaintiff, but it

7    is clearly an issue and is part of the terms of the debate

8    between plaintiffs and defendants and it has an impact on what

9    the value of the case is.    So he testified – the question was:

10              "Now, in a case where you are proceeding to trial

11         against Garlock in a gasket packing exposure and

12         against some array of other defendants on those other

13         kind of products you described, what disadvantages, if

14         any, did the plaintiff's case against Garlock have by

15         virtue of the combination."

16   And he testified:

17              "Well, the quality of the gasket case, for example,

18         depended significantly on what did the claimant do

19         with the gaskets.    That is to say that, if you are

20         talking about gaskets in a setting, you know, like a

21         heat transfer setting where the gasket would degrade

22         and become stuck to both ends of a pipe flange so that

23         the gasket residue had to be removed through heavy

24         action, then there were no particular disadvantages in

25         a gasket case except for the fact that Garlock was

1        represented by very skilled trial lawyers who knew

2        their business.  If on the other hand you didn't have

3        that kind of case, your case was" – and I emphasize

4        this – "just primarily installing precut gaskets or

5        very little removal or if the case was where the

6        gasket was in an ambient air setting so that the

7        gasket wouldn't really stick to the flange and

8        therefore it wasn't really necessary to put real

9        exertion in getting the gasket off, then that is, you

10       know, a lower exposure gasket case and a disadvantage

11       not just because those particular facts are not

12       compelling from the standpoint of exposure but because

13       the Garlock lawyers were very skilled at pointing out

14       those deficiencies and comparing them to other

15       exposures that they would argue were more prolific."

16            So here you have a very experienced plaintiff's lawyer

17       admitting that there were Garlock gasket cases that were not

18       very compelling because of the circumstances of the exposure,

19       and that is what we are trying to get at with the questionnaire

20       and the questions that follow the checkboxes about how the

21       claimant was exposed to the product.

22            For instance, as the question stands right now with

23       the checkboxes, someone who just cut a single gasket in their

24       career would be able to check that he or she personally cut

25       asbestos containing gaskets, and that wouldn't tell us very

Garlock/5-12-11

99

1    much about what that claimant's exposure to the product was.

2    That's why we had the follow-up questions about how they

3    removed the gaskets and some estimate of how many times they

4    did it.

5         Going on to the next slide, I won't read all of these

6    but Mr. Simon went on and said that's our case, that if a

7    person is using this heavy mechanical action on the gasket of

8    a hand wire brush, a power wire brush, a disk grinder, and he

9    went on to say that's the kind of case that he liked to see.

10   So with the questionnaire, we are trying to figure out how many

11   of those cases are out there.

12        The next slide, he went on, in bold there, he says

13   that – here he is talking about his account of what settlement

14   negotiations with Garlock were like.  And at least according to

15   him Garlock was interested in, in other words, did he work with

16   a lot of gaskets or not; did he remove the gaskets this way or

17   not.  Again, Mr. Simon admitting that that was a factor when

18   Garlock was settling cases.

19        The next one, he says:

20        "In what I would call a good Garlock exposure case,

21        which Garlock's lawyers disputed ever existed, where

22        somebody was removing gaskets from an adhered flange

23        with heavy action and did that a lot in their

24        professional career..."

25   So they did that a lot.  Again, the numerical element of it.

Garlock/5-12-11

100

1          And then the next one:

2          "What they did is important."

3          This is Mr. Glaspy.  I apologize.  He was talking

4    about how he went through and valued cases, and he said:

5          "What they did is important.  Did he actually use

6          gaskets throughout his working career; or was he

7          working in insulation and somebody else was using a

8          gasket down the way? So there are a lot of plaintiff-

9          oriented criteria that would enter into a case and

10         each case is different."

11         I should have said earlier this is all a function

12   ultimately of state law and the fact that state law recognizes

13   that – at least many states do – that the duration, the

14   frequency and proximity of exposure to an alleged asbestos

15   defendant's product matters.  And in our summary response to

16   the committee's information brief, we cited some of these cases

17   last year, and I will just read from one of them where the

18   Supreme Court of Pennsylvania said:

19         "We recognize that it is common for plaintiffs to

20         submit expert affidavits attesting that any exposure

21         to asbestos, no matter how minimal, is a substantial

22         contributing factor in asbestos disease.  Such

23         generalized opinions do not suffice to create a jury

24         question in a case where exposure to the defendant's

25         product is *de minimis,* particularly in the absence of

Garlock/5-12-11

1          evidence excluding other possible sources of exposure

2          or in the face of evidence of substantial exposure

3          from other sources."

4          And that citation is *Gregg v. V-J Auto Parts Company*,

5    596 B.A. 274.

6          So the nature of the exposure really matters and

7    that's why Garlock put it in the questionnaire and why it's

8    important for debtors as they craft their expert's opinions on

9    estimation.

10         So let me go to what we propose to put in the

11   questionnaire to replace the question we had before, and I have

12   got a summary of this on the next slide.  This draft is

13   attached as GST-155.  The open-ended questions about the

14   cutting and removal of gaskets, we have eliminated entirely.

15   We have taken those out, and we have replaced those with fairly

16   discrete questions about how often they encountered the Garlock

17   or Anchor product and what they did with the product.  So after

18   the checkbox question, we have the claimant respond to the

19   approximate number of Garlock gaskets or quantity of Anchor

20   packing cut during employment at this site, including cutting

21   while installing gaskets and packing.  That should be an

22   approximate number, easy to code, and it goes on to ask the

23   person completing the questionnaire how the injured party or

24   occupation of the exposed person cut Garlock gaskets or Anchor

25   packing at this site, and it has them list the method.  They

Garlock/5-12-11

1   can do that as Mr. Simon's testimony shows.  They can say what

2   kind of tool they used to cut the gaskets and this question

3   asks them to quantify the approximate quantity of gaskets and

4   packing that they used that method on.

5           So if they cut gaskets, that's the only thing they

6   have to answer.  Then if they also removed gaskets or packing,

7   it asks them the approximate number of Garlock gaskets or

8   quantity of Anchor packing that they removed during employment

9   at that site, and then it goes on to ask them how they did it

10  and, if they used more than one method, to quantify or make an

11  approximate quantification of how much they did it.

12          And then finally we have checked the bystander

13  exposure question which was already quantified:  If the injured

14  party or occupation exposed person worked in or around areas

15  where Garlock or Anchor asbestos containing products were cut

16  or removed by others, describe such person's regular proximity

17  to such areas in terms of hours per day and days per year.

18          So those questions will give us a rough idea of what

19  group this claimant fell in, and it will be a substantial

20  improvement over just the checkboxes.  And with these discrete

21  questions, we think it will be easy for the experts to code and

22  to process.

23          Now we showed the court the last time these kinds of

24  questions have been approved in previous questionnaires in

25  asbestos bankruptcies, these sorts of quantification questions,

Garlock/5-12-11

1    and one was the W.R. Grace questionnaire and also Judge Wolin

2    at USG expressed an intention to approve questions like that,

3    including the description of how the USG product was used at

4    the site, as well as the nature of exposure and the name of the

5    product, and also in what we have been calling the *G-I Holdings*

6    questionnaire.  I understand from Mr. Swett it might be the *G-I*

7    *Holdings*.  It must be a Roman Numeral, I guess, but they also

8    asked specific questions about the quantity of exposure.

9         So we think that shows it is a legitimate topic of

10    estimation related discovery, as well, and in this case it

11    strikes us as even more legitimate because, as the court heard

12    from Mr. Glaspy, Garlock's record at trial before 2000, when

13    these debtors, *G-I Holdings, W.R. Grace and USG* were also in

14    the tort system, Garlock's record was exemplary and Mr. Glaspy

15    testified that he was nineteen and one before 1998 in cases

16    where he could show that the worker had been exposed in a

17    certain way to a Garlock product and showed the alternative

18    exposures to the other products.

19         These debtors, their products were far less defensible

20    than Garlock's products.  That's why they were, in part, in

21    bankruptcy more than a decade before Garlock was.  And they

22    asked these questions and were entitled to receive the

23    information, and I just think, in Garlock's case, Garlock with

24    a product that was just objectively more defensible than their

25    products is entitled to ask those questions, too.  And for the

Garlock/5-12-11

1    reasons I described, it's important to Garlock's estimation

2    case.

3              Again, we are not seeking all the details about how

4    they were exposed to the Garlock products.  Mr. Simon went into

5    a lot more detail about what the kind of pipe was, what the

6    level of adherence of the gasket to the pipe was.  We are not

7    asking any of that.  We are just asking the very basic

8    questions about the quantity of exposure, again to group the

9    claimants into the rough categories that we need to put them in

10   to conduct aggregate estimation.

11             So we would respectfully ask the court to approve our

12   revised form of questionnaire with those discrete questions in

13   there.

14             The next topic that we wanted to discuss today are the

15   exposures to other asbestos products and just to remind the

16   court where it stands right now, if the court holds to its e-

17   mail from a week and a half ago, the claimant would list the

18   work sites where he or she was exposed to other products and

19   would list sort of the general circumstances of how he or she

20   was exposed to asbestos, which would, I presume – well, it is

21   somewhat vague what that means but that's what the committee's

22   version of the questionnaire says.  But it would not give the

23   names of the particular other asbestos products that the

24   claimant was exposed to.  And we think that is a significant

25   omission for a few reasons.

Garlock/5-12-11

105

1        The court heard from Mr. Glaspy that the identity of

2    the other asbestos exposures that the claimant had experienced

3    was crucial in determining how much trial risk Garlock had and

4    what its likelihood of success was if it went to trial.  And I

5    will just recap some of Mr. Glaspy's testimony on this, and I

6    will do it in a little more detail than I did Mr. Simon's

7    because it is also relevant to the motion that will be heard

8    later today if we get to it.

9        Mr. Glaspy began by describing what his job was as a

10   Garlock defense attorney and he said very pithily what his task

11   was and he was asked:

12           "Can you describe what the environment in the presence

13            of asbestos insulating material meant to Garlock in

14            terms of its defenses at trial?"

15   And he said:

16           "Trying cases for Garlock over thirty years and

17            talking to the juries, it became very obvious that we

18            were almost always facing a plaintiff who was dying,

19            or his widow, and the jury wanted to know why.  So my

20            job was to get up and point at the insulation, the

21            amphibole asbestos, the huge exposures, a proven cause

22            of meso, and give the jury the answer to that

23            question.  Then we could explain how gaskets couldn't

24            have caused it."

25           He went on to describe, at pages 11 to 14 – these

Garlock/5-12-11

106

1    excerpts are all tabbed in the copies of the testimony that I

2    have handed to the court – he describes how the insulation and

3    the other dusty products were fundamentally different from

4    Garlock's.  The court may recall that he had an example of a

5    Garlock gasket up there.  It was hard.  It wasn't an asbestos

6    containing gasket.  It was, I believe, contained Kevlar or some

7    other fiber but he said it was identical in appearance to a

8    Garlock asbestos-containing gasket and it was hard and couldn't

9    be crumbled to the touch, and he described that the insulation

10   was very different and how it was dusty just when you touched

11   it.

12        He went on to describe how successful Garlock was when

13   it could point to the insulation and the plaintiff's exposure

14   to the dusty products and how Garlock was less successful when

15   it couldn't.

16        He was asked:

17        "Was, then, Garlock's trial risk in a given case

18        influenced in large part by the number of co-

19        defendants whose products were identified in a case?"

20   He answered:

21        "Absolutely."

22        "And was Garlock's trial risk profoundly affected by

23        identification of the asbestos insulation products

24        that you have described before?"

25        "Yes, and for two reasons.  One, like I said, the way

Garlock/5-12-11

107

1            to defend a case was to tell the jury what caused the

2            injury and, if you couldn't point at that friable

3            asbestos insulation, you had a real problem.   And,

4            secondly, offsets.  If those people are with you, they

5            are going to take a big share of the hit and your

6            client's share is reduced."

7            "In those cases when you were able to point to and

8            identify the amphibole insulation products, how would

9            you assess the third stage of your settlement process,

10           the risk that Garlock would be held liable at trial?"

11   He answered again:

12           "My experience in talking to jurors afterwards is we

13           won because they were convinced that the insulation is

14           what caused the disease.  So if we couldn't point at

15           that stuff, we would have been, I think, very

16           unsuccessful.

17           Q.  But if you could point to it?

18           A.  We were fairly successful.

19           Q.  Okay.  When the plaintiffs admitted they were

20           exposed to asbestos insulation, when a plaintiff

21           itself admits that, what effect would that have on

22           Garlock's trial risk?

23           A.  Well, it made my case, my job, very easy because,

24           if a plaintiff admits that all of that material was

25           present and he was exposed to it, I had met my burden

Garlock/5-12-11

108

1       of proof."

2       And then he went on to describe how he personally was

3    nineteen and one defending Garlock before 1998 and how in the

4    one case the share of liability assessed was between two and

5    five percent.

6       He went on to describe, at pages 23 to 29, how other

7    exposures matter because other exposures mean other settlements

8    and other settlements mean that Garlock is protected from the

9    plaintiff's damages if it went to trial.   He described two

10    cases, the *Duncan* case and the *Firth* case that were handled by

11    Mr. Simon's firm.   In the *Duncan* case when it became clear that

12    the settlements exceeded the possible verdict, the plaintiff's

13    attorney packed his bags and went home.

14       And in the *Firth* case, the jury assessed liability

15    against Garlock but it was a take nothing verdict because the

16    settlements exceeded the jury's verdict.   So the other

17    exposures were relevant for that reason, as well.

18       At pages 33 to 34, he testified again that before 2000

19    there was a low level of risk for Garlock because the plaintiff

20    would identify the insulation exposures and it, quote, made the

21    case a whole lot easier.

22       At page 36 to 37, he said that bankrupts were

23    routinely – the future bankrupts were routinely identified in

24    Garlock cases before 2000.

25       Pages 39 to 43, after the bankruptcies started in

Garlock/5-12-11

109

1    2000, the plaintiff's identification of those products

2    increased dramatically, and he testified that there was no

3    practical way for a defendant to prove the exposure when the

4    plaintiff didn't admit it.  According to him, the plaintiffs

5    controlled the product ID evidence.  And when asked whether

6    from the work sites alone it would be possible to prove that

7    the plaintiff was exposed to a particular insulation or other

8    high dose product, Mr. Glaspy testified that that was not

9    practical for various reasons.

10        He went on to describe the impact that trusts could

11   have on the situation.  At page 52 he described how plaintiffs

12   identifying trust exposures in order to get trust payments

13   would have the potential of increased trial risk because you

14   would be back in a situation like Mr. Glaspy was in before 2000

15   when plaintiffs were admitting the evidence and had developed

16   it and Garlock, if it went to trial, would be able to point to

17   that evidence.

18        At 52 to 55, he described how offsets from trust

19   payments would increase trial risk and, if the aggregate amount

20   of those payments were one point two million dollars, it would,

21   quote, be like the old days where others were picking up most

22   of the plaintiff's expected damages.

23        Page 57 to 60, he described again how the lack of

24   identification of other products contributed to a worse record

25   at trial after 1998, and he described how that played out in

Garlock/5-12-11

110

1     the *Treggett* case that he handled, which was Garlock's - the

2     largest verdict that anyone obtained against Garlock.

3          And then finally at page 97 he described how, without

4     the plaintiff's help in identifying the exposures, it is not

5     possible for a defendant to link a product, a particular

6     product, to the plaintiff and to their breathing zone because

7     it is, quote, like a needle in a haystack.

8          MR. SWETT: What page is that, please?

9          MR. WORF: That is page 97.

10         Mr. Simon also testified about the importance of other

11    exposures in assessing trial risk.  He was asked:

12         "Can you describe for the court your experience and

13         how it is that an asbestos defendant goes about trying

14         to make the case at trial that its product is less

15         responsible and should avoid damages or should be

16         lower damages than another defendant's or non-party's

17         asbestos product?"

18    And he answered:

19         "In two ways.  One through trying to establish that

20         their product is not a substantial factor in causing

21         the disease claimed but rather other products are.

22         The notion that other products were more prolific in

23         this claimant's asbestos exposure.  Other products

24         contained forms of asbestos that, you know, Garlock

25         would characterize as more potent and more significant

Garlock/5-12-11

1          in how this person got mesothelioma and how people in

2          general, when they develop asbestos related

3          mesothelioma, get it."

4          And that was at page 66 of Mr. Simon's testimony.

5          Then on cross-examination, at page 152, Mr. Simon was

6     asked:

7          "Q.  Let me take you back to the same fact pattern

8          that we were talking about a moment ago where we have

9          a number of defendants against whom all we have

10         compelling evidence of exposure for all of the

11         defendants.  The more of those kinds of defendants

12         there are, the lower any single defendant's risk in a

13         joint and several state, correct?

14         A.  Same exposures?  Do you see what I am saying?  You

15         know, thirty-nine proven, fairly attenuated exposures,

16         two significant product exposures, you know, it is

17         sort of fact specific.  It is hard to answer

18         generally.

19         Q.  So it depends on the level of exposure to each of

20         the alternative defendants, to each of the co-

21         defendants?

22         A.  That's certainly a determinative factor which

23         would affect trial risk, for sure."

24         So back to the questionnaire and the debtors' need for

25    identification of other products, as the questionnaire would

Garlock/5-12-11

112

1    stand under the court's e-mail from last week, we would get the

2    work sites but we would not get the names of the other products

3    that the plaintiff was was exposed to.   And for all of the

4    reasons I have described, the names of those products are

5    really quite important.   They will tell us whether the

6    plaintiffs  today are admitting their exposures to the kinds of

7    products  that Garlock used to defend itself at trial before

8    2000. And Mr. Glaspy testified extensively regarding the

9    importance of that and his ability to point to those products

10   and how trial risk after 2000 went up significantly because

11   those products were no longer identified.

12        So in assessing whether today's claims are more like

13   the pre 2000 claims or more like the 2000 to 2010 claims, it's

14   important to know are those exposures being identified.  And we

15   have reason to believe they are.  Plaintiffs are making trust

16   claims.  They are having to identify exposures, and they can

17   tell us whether they have identified those exposures, and

18   that's an important fact to know.

19        Are the work sites enough? Well, Mr. Glaspy testified

20   no.  He knew the work sites between 2000 and 2010, and that

21   wasn't enough because, as he testified, he has to have the

22   plaintiff identifying the exposures for it to matter, and

23   that's what the debtors' question on the questionnaire is

24   directed to, are the plaintiffs doing that now, are they

25   admitting their exposures to the other products.

Garlock/5-12-11

113

1      For the same reason, you know, under the questionnaire

2   as it stands, we will have the identity of the defendants that

3   the plaintiffs have claimed against, as well as whether they

4   settled with the defendants or not and the same for the trusts.

5   But that is not enough either because those facts don't show

6   that the plaintiff was admitting that he or she was exposed to

7   the product.  And, again, it is important to know that for all

8   of the reasons that Mr. Glaspy and, indeed, Mr. Simon admitted.

9      So in light of the court's concern, we asked ourselves

10   is there a way for us to take away some of the indeterminacy as

11   they stood before and make it so it is more easily coded and

12   more standardized, and we have tried to do that and here is

13   what we did.

14      First of all, at the last hearing, the court said that

15   it preferred the committee's separation of part five into parts

16   5(a) and 5(b).  5(a) for Garlock exposure and  5(b) for the

17   other products' exposure.  So we have done that.

18      Part 5(b) per the committee's proposal requires the

19   claimant to identify the work sites where he or she was exposed

20   to the other products and also, per the committee's proposal,

21   includes the question about the circumstances of exposure.  The

22   questions in part five that we had before about the name of the

23   products, the name of the other products, the name of any

24   contractors who installed other products on the site and the

25   name of any equipment manufacturers who installed – any

Garlock/5-12-11

114

1    manufacturers of equipment that was on the site, and we have

2    eliminated those, as well.

3          We have replaced it with, in tables (a), (b) and (c)

4    where the plaintiff identifies the defendants and trusts

5    against which the claimant has asserted claims, as well as the

6    status of such claims, we have added a single question, "Have

7    you ever admitted exposure to a product for which this

8    defendant is responsible?" And the claimant would answer yes

9    or no.

10          THE COURT: Do you have that in the –

11          MR. KRISKO: Your Honor, there should be an exhibit

12   book to your left that is tabbed to – is it 155?

13          MR. WORF: That is right. It is GST 155 and it is

14   table (a) and it is also in (b) and (c). I see some of my

15   lines have disappeared in table (a) but we can replace those.

16   But it asks, "Have you ever admitted exposure to a product for

17   which this defendant is responsible?" And the claimant just

18   has to answer yes or no, and that is something the claimant

19   knows. We are not asking about exposures that have not yet

20   been investigated. We are just asking simply whether that

21   claimant has already admitted exposure to a product for which

22   that defendant is responsible.

23          How might a plaintiff do that? Well, it's common for

24   plaintiffs to have been deposed. It is common for plaintiffs

25   to execute affidavits of exposure when they are settling claims

Garlock/5-12-11

115

1   with other defendants, and these are all facts that the

2   claimant knows about whether or not he or she has done that.

3   And it goes directly to the facts that Mr. Glaspy and Mr. Simon

4   testified were important about whether those other exposures

5   were admitted.

6          And then finally simply answering yes or no about that

7   particular defendant doesn't quite get us all of the way there

8   because, for instance, some defendants manufacture multiple

9   products and we won't know just from that yes or no whether,

10  for instance, if a claimant settled – if the claimant had a

11  claim against the Johns-Manville trust and had admitted

12  exposure, we wouldn't know what kind of Johns-Manville product

13  he or she had admitted exposure to, and that is important again

14  as Mr. Glaspy testified.

15         Now this doesn't ask the claimant to answer that

16  question or provide the answer to that question in the

17  questionnaire but, in order to fill that gap, if it becomes

18  necessary and important to the experts, we have asked the

19  plaintiff to attach to the questionnaire, first of all, the

20  plaintiff's deposition; second, any affidavits of exposure that

21  the plaintiff has executed admitting exposure to any product;

22  and finally the trust claim forms that that plaintiff has

23  submitted which would contain any admissions of exposure to

24  that trust's product, as well as in the case of many or most of

25  the trust claim forms, the identity of the product the

Garlock/5-12-11

116

1      plaintiff was exposed to.

2          So we relieved the plaintiff – the claimant of the

3      burden of putting that information in the questionnaire but we

4      asked for those attachments which the claimant obviously has to

5      fill that gap if it becomes important to the expert's analysis.

6          So that is our new approach tracted to make some

7      attempt to address the court's concerns.

8          Again, at the last hearing we talked about how this

9      was a topic of discovery in previous estimations in asbestos

10     bankruptcy cases.  We showed the court the *W.R. Grace*

11     questionnaire and the *G-I Holdings* questionnaire and they all

12     had far more extensive questions about exposures to other

13     products, including requirement in both of those that the

14     claimant quantify the extent of the exposure to the other

15     products, some quantification of the dose of exposure.  We

16     don't have that.  We have less than those questionnaires have.

17     We just want to know the names of the products that the

18     claimant has admitted exposure to and then get copies of

19     documents that may go into more detail.

20         So we think the request is quite reasonable and

21     especially given the issue of other exposures and other

22     defendants and the impact that had on Garlock's claim history

23     between 2000 and 2010 is one of the central issues in these

24     cases and, to my knowledge, it was not nearly as central in

25     these previous cases where issues such as the validity of

117

1    medical evidence supporting nonmalignant claims was, to my mind

2    and what I know of these cases, the more pressing issue, yet

3    these debtors got to ask more extensive questions than the

4    debtors are even asking for.

5         So we think it is reasonable and we think that the new

6    proposal provides a way to reduce subjectivity and any coding

7    that may take place.  The claimant will provide, right here in

8    the charts, whether or not he or she admitted exposure to those

9    products, and it is important for all of the reasons that I

10   have discussed.

11        Finally just one point that I skipped over is that Mr.

12   Simon testified extensively about how this evidence is

13   discoverable and how it is his obligation to provide what he

14   knows in tort system discovery about what the other exposures

15   are and the references there are pages 133 to 134, pages 135

16   and 136 and pages 158 to 159.

17        On page 136 he said, "I have a responsibility to

18   answer discovery according to the understandings that I have

19   about the alternative exposures."  So we think it is proper

20   discovery.  We think that the new proposal provides an

21   efficient way to get the information, and we would respectfully

22   ask that the court accept our attempts to meet the court's

23   concerns regarding both the Garlock exposure and the other

24   products exposure.  Thank you.

25        THE COURT:  Okay.  Mr. Swett.

Garlock/5-12-11

1        MR. SWETT:  Your Honor, we are confronted with a

2    drastically new approach.  I am going to urge that you stick

3    with the rulings you have made so that we can move forward and

4    not have to continually reargue things.

5        We have a form of questionnaire that we have marked as

6    ACC Exhibit 103 that Ms. Kelleher will now distribute which

7    reflects the court's rulings as we understand them and would

8    represent the state of play in light of the modification of

9    your ruling by e-mail the other evening, if we have understood

10   you correctly.

11       So that, for example, in 5(a), and we have 5(a) and

12   5(b) as you suggested, the claimant would be called upon to

13   check boxes characterizing in that limited fashion the kind of

14   contacts they had with Garlock products and, if it doesn't fit

15   within those boxes, they would be called upon to make an

16   explanation.  All of this would be subject to the option the

17   plaintiff would have of supplying the documents that represent

18   the plaintiff's knowledge or information concerning these

19   circumstances.

20       As you see at the beginning of 5(a), there is a check

21   the box if you are responding by attaching documents in lieu of

22   filling out part 5(a) of the form.  This is structurally

23   borrowed from the Bondex form.

24       So we believe that  5(a) as set forth here reflects

25   your thinking as you expressed it in the e-mail the other day

Garlock/5-12-11

119

1    and likewise, with regard to  5(b), the other exposures, the

2    non-Garlock exposures, I believe your ruling was that the

3    committee's proposed approach to that would be accepted and

4    this was that.

5          This differs from what the Garlock folks are now

6    proposing in very important ways.  The significant impact of

7    each of the changes that the debtors are proposing would be to

8    magnify the plaintiff's burdens, which have to be evaluated in

9    the context that a relatively small number of law firms are

10   going to need to be working on five thousand, five hundred of

11   these at the same time and what will be, by any measure, a

12   fairly truncated period of time, while at the same time

13   responding to the Bondex form, which is another five thousand

14   or so claimants. The idea that in the tort system at any time

15   any particular law firm would be called upon to develop the

16   product identification information out of its files for

17   purposes of written discovery at the same time is unthinkable.

18   It just wouldn't happen.  It will create significant strains on

19   the law firms as I am sure, if the form goes out in the manner

20   that they suggest, you will hear from folks who have much more

21   direct experience in that than I.

22         But you shouldn't minimize the goal that you

23   articulated in the e-mail of balancing reasonable need on the

24   debtors' side against the difficulties of response and all that

25   that means on the claimants' side.  The debtors, I submit,

Garlock/5-12-11

1    don't really know the meaning of balance.  Every time they

2    modify their form, it gets more onerous, not less.  Every time

3    we come back, they have some other detail that they want to

4    elicit.

5         What has been missing from any of their presentations

6    is any assertion, much less any demonstration, that in the tort

7    system in the average case they did anything like this level of

8    detailed discovery of a particular claimant's information,

9    whether it be to exposure or otherwise.  They didn't.

10        The evidence that you have in front of you is that

11   very few cases proceeded to trial.  Admittedly where they did

12   go to trial or on a situation where they were headed to trial

13   and on the brink of it, before they settled, their discovery

14   was indeed aggressive.  Those are relatively few cases as we

15   understand it.

16        You have seen that, in the case of The Simon Firm,

17   which was a trial oriented firm, after a decade of crossing

18   swords with The Simon Firm in mesothelioma cases, finally the

19   suggestion that they make a general understanding about how to

20   resolve cases in broad categories finally made sense to Garlock

21   and, in the last several years before the bankruptcy petition,

22   that's how they were dealing with The Simon Firm's clients.

23        You also saw the Simmons Firm, which had, instead of

24   a litigation track to settlements, it had what we would call an

25   administrative or a processing track where Garlock essentially

Garlock/5-12-11

1    set a budget.  It knew roughly how many mesothelioma claims the

2    Simmons Firm would present every year.  It knew how those

3    cases, roughly speaking on average – and I emphasize again it

4    is the average that drives the estimate.  It is not the

5    particulars of an individual case.  And they knew what the

6    average case would look like and they made a budget.  They knew

7    they would have to resolve those cases and they figured out

8    that the most effective, most cost-effective way to do so would

9    be to arrive at a general understanding with the firm about a

10   framework for settlement without litigation, and they did no

11   discovery, much less any discovery on this order of detail.

12          So the first thing I have by way of a substantive

13   objection to this is that on the record what they are asking

14   for now far exceeds, far exceeds the level of discovery that

15   they usually took in the tort system when they were actually

16   litigating the claims.  Ironically, aggregate estimation, if

17   they had their way on these details, will have become a vehicle

18   for more intensive claim by claim discovery of mesothelioma

19   claimants than allowance proceedings if they followed the model

20   of the tort system would.  It doesn't make any sense, nor is it

21   necessary.

22          The evidence from last fall and through both of the

23   lawyer witnesses who testified is that this is a mature tort.

24   This was litigated for thirty years.  Not only was it a mature

25   tort system-wide, across all defendants, but it was a mature

122

1    tort as far as Garlock went, as far as Garlock dealt with the

2    cases and the lawyers, and it did not require Garlock to make

3    the unreasonable, non-cost-effective decision to engage in

4    intensive claim by claim discovery in every case.  It simply

5    didn't do it, so why should they do it now?

6         The reason now is because they are playing with house

7    money, as Mr. Guy has pointed out.  They are less interested in

8    the incremental dollar.  They would rather devote the money to

9    an aggressive approach in estimation than coming to terms with

10   the claimants.

11        Well, that is something we just have to deal with, but

12   it is a factor when you consider the appropriate balance which,

13   as I will argue more extensively later today, is your function

14   under Rule 26.  This is gilding the lily.  It is not necessary.

15   It will impose inordinate burdens and it shouldn't be required.

16        It also subverts the proper interplay of the

17   bankruptcy system and the tort system in this sense, and here

18   I rely on Mr. Glaspy's testimony.  Mr. Glaspy's testimony was

19   when the plaintiff was an active suit against a large group of

20   defendants or the burden of making product identification

21   against everybody who was in the case by the time of trial and

22   Garlock could sit back and, in a sense, piggyback on the

23   plaintiff's efforts in that regard.  But then when the other

24   defendants went into bankruptcy, the array of defendants

25   heading into trial changed.  Garlock became more prominent in

Garlock/5-12-11

123

1    that array and the burden, in effect, shifted.  Mr. Glaspy

2    flatly admitted in that circumstance now it was his burden to

3    find the other exposures.  He called it, "Live by the sword,

4    die by the sword."  He called it, "The shoe is on the other

5    foot," because the same burdens that the plaintiffs used to

6    have to bear to make their case against the insulation

7    defendants at the same time as against Garlock were now burdens

8    that he had to bear.  He called it, "The search for the needle

9    in the haystack."  That is what it was for the plaintiff, too.

10    That is the sense of his testimony.  That is what he was

11    telling you.

12        Now, through the magic of bankruptcy procedure,

13    Garlock is hoping to shift that balance back, shift that burden

14    back onto the plaintiffs.  That is not a fair use of bankruptcy

15    procedure.

16        They have not laid a proper foundation for this

17    discovery in terms of what they generally and reasonably sought

18    in the tort system.  Instead they are trying to ratchet up the

19    aggressiveness of discovery and inflict the cost of that and

20    the burdens of that on the plaintiffs or, as Mr. Guy pointed

21    out this morning, purposes of leverage, and that is not

22    appropriate.

23        Now, a couple times Mr. Worf referred to an effort to

24    standardize so that the experts could code better, and this

25    underscores the irony of what they are trying to do in the

Garlock/5-12-11

124

1    guise of estimation.  They want it to be intensively about the

2    individual claims.

3           Well, they also acknowledge, as did their witness,

4    that all claims are in some sense different.  Now, the

5    intensity of the differences or the minuteness of the

6    differences, or the variety of the differences in the wholesale

7    system of resolving the claims in the tort system turned out to

8    not be of primary importance.  They could categorize the case

9    broadly according to a few basic categories and price it on

10   that basis.  That is the evidence as to what they did, by and

11   large, with the exception of those few cases that they did

12   press to trial.

13          Here, they want minute detail and they want it in a

14   format that then their expert can code, which is like asking

15   the plaintiff to characterize facts for the benefit of the

16   other side's expert.  It is an inappropriate allocation of

17   those burdens.

18          If they now want to define more minute categories,

19   then they should bear the burden of extracting the information

20   from the raw materials in order to check their boxes or fill

21   out their fields in the way their expert finds more convenient,

22   but it won't give you a clear picture of the tort suit.  A fair

23   picture of the tort suit comes from watching the plaintiff

24   testify on the stand to the circumstances of his life, how he

25   came into contact with these products, what it meant in his

Garlock/5-12-11

125

1    daily routine and what the consequences were, and that is not

2    going to come through in checking the box, no matter how many

3    boxes they proliferate.

4            So they are on, in effect, a quixotic mission to turn

5    fact-intensive, case-by-case, highly individualized disputes

6    into check the box.  And yet because, precisely because that is

7    not a feasible cost-effective undertaking in the tort system

8    when they were actually buying these claims, they didn't go

9    about it that way.  So their discovery approach here is out of

10   whack.   It doesn't fit the needs of the case, and it would

11   impose inordinate burdens.

12           Now, we know that their expert, Dr. Bates, doesn't

13   need anything like this.  We know that because he is the expert

14   in Bondex, and the Bondex case is different and its theories

15   may be different but he is the expert.  He will be the guy who

16   makes the estimate.  And we know, both from his own history of

17   making estimates and his approach in the Bondex case, that he

18   doesn't require this inordinate level of detail.  And frankly

19   speaking, they probably have no sensible way of using it.

20           If they do, though, they can extract it from the

21   materials that most claimants will opt to produce instead of

22   completing the form.  I am not clear on whether their new and

23   improved version of their questionnaire form preserves that

24   option in the same way.  It is an essential component of the

25   resolution that where matters stood after your e-mail ruling

Garlock/5-12-11

126

1    the other day was an essential component in getting the parties

2    to agreement in Bondex.  It makes a world of difference to the

3    claimants and it should be preserved.

4         With regard to the third-party exposures, the form

5    that we suggested and, as matters stood after the e-mail, you

6    had accepted, simply calls upon the claimant to identify the

7    work sites where he was exposed to asbestos of other than

8    Garlock or Anchor and to describe, in general, the activity

9    that led to the exposures.  This, again, is the approach taken

10   in on Bondex and it is the one that the plaintiffs – I'm sorry

11   – the defendants themselves, through the likes of the Bates

12   White firm, have taken to using when they assess the

13   probability that a given claimant will have a claim against a

14   given trust.  As you have seen multiple times, they review the

15   work history that you get from the Social Security

16   Administration.  They review the information in their database

17   that they have already accumulated through thirty years of

18   litigation about that work site and what other products were

19   known to be there and they make inferences accordingly, and

20   they can do that here.  Mr. Scarcella has testified that takes

21   a few hours.  That costs a modest amount of money.  Instead

22   they would inflict these burdens and expenses on the plaintiffs

23   through this overly elaborate questionnaire process.

24        Now, one thing you can be sure of, they are not going

25   to take the plaintiff's word for it.  We know that because of

Garlock/5-12-11

127

1   the jaundiced view they take of the plaintiffs generally.  And

2   we know that, when they get the questionnaires and the

3   plaintiff, if they fill out the boxes or check the boxes and

4   write out the short narrative descriptions, they then intend to

5   scrutinize that and they are hoping to be able to depict those

6   responses as somehow misrepresentative, and so they are going

7   to do another analysis themselves anyway.  They're going to

8   look at the discovery records and the work site lists and all

9   of that material that has accumulated and draw their own

10  inferences.  And since you know as a practical matter that they

11  are going to do that, why bother to have the plaintiffs do it

12  for them?  It doesn't make any sense.

13       When I spoke, Your Honor, of their database of work

14  sites and exposure information, I was referring to testimony

15  given by a lawyer named Turlick who is out of Pittsburgh.  He

16  was a Garlock defense attorney, which is quoted at length in

17  one of our submissions about the questionnaire.

18       This new question, which they sort of slide in here

19  subtly in a form that we don't see until the night before the

20  hearing and ask you to accept on the spur the moment, in

21  effect, "Do you admit to exposure to a given person's product?"

22  If that were a request for admission in the civil litigation

23  system, it would probably be objectionable as vague and

24  ambiguous, and they don't define what they mean by admit.  They

25  take some things as admissions that the plaintiffs might not

Garlock/5-12-11

128

1  take as admissions, and they are asking the plaintiff to

2  characterize the state of play in a way that is for their

3  convenience but will not resolve the issue because of its

4  inherent ambiguity.

5       If the plaintiff discloses that they made a claim

6  against a certain entity or a certain trust, whether or not

7  that claim has been settled, then they will, as they would

8  anyway, make their own inferences about that. They will

9  interpret that the way that they think best suits their

10  estimation case. They don't need to be calling upon the

11  plaintiff to express legal conclusions about the state of play

12  on his claim against somebody else other than whether it is

13  pending or has been settled, and that is where matters stood

14  after your e-mail of the other night, Judge, and we submit to

15  you the better part of wisdom here would be to let it sit there

16  and have the parties meet and confer one last time to conform

17  the document to your rulings so that the debtors can then give

18  it to Rust and have it out on the street in a reasonable period

19  of time.

20       There is one other issue which I'm going to point to.

21  I believe it has been resolved. They evidently take a

22  different point of view. They have requested that as part of

23  the questionnaire claimants be required to complete an

24  authorization that would authorize Garlock to go to all of the

25  trusts and get all of their claim forms even though they are

Garlock/5-12-11

129

1    asking the claimant to identify the claims and the status, and

2    one way the claimant has of doing that is to produce the

3    documents, which could well include the claim form.  It is a

4    redundant request.  It is an offensive one in this regard:

5          As you have seen, and as the TDPs that have been put

6    into evidence confirm, the trusts have confidentiality

7    obligations in their organic documents, in the document that

8    controls who they pay and how they pay, the claim submissions

9    and other information are subject to a confidentiality

10   obligation.

11         Now that doesn't mean that the trust in a tort suit

12   might not respond to discovery of a proper subpoena for a given

13   claim, here in, what, five thousand, five hundred of them,

14   multiplied by however many trusts are involved, but they are

15   asking the claimant the same thing.

16         The claimants don't have to waive whatever rights they

17   have under the TDPs.  The claimants can respond directly to

18   that discovery, and that's the appropriate way for them to get

19   at that information without gilding the lily and going into all

20   kinds of redundant discovery in hopes that somehow they may be

21   able to impeach somebody.  If they get the identification of

22   the claim and its status through the questionnaire or through

23   the production by the claimant of trust claim forms, that

24   should suffice for any reasonable need.

25         We object to the notion of a compelled waiver of

Garlock/5-12-11

1    rights under the TDPs in response to a mere discovery request

2    from Garlock.

3          Judge, I think I have said everything I meant to.  We

4    urge you to adhere to the existing rulings and for this process

5    to go forward.

6          THE COURT:  Mr. Worf.

7          MR. WORF:  I will respond briefly, Your Honor.

8          The committee says that the revised form would require

9    the claimants to undertake the burden of working up information

10    about Garlock exposure that they did not be required to do in

11    the tort system.  The newest claim that is subject to this

12    questionnaire is almost a year old.  The petition date was June

13    5 of last year.  This questionnaire will be issued, it appears,

14    about the same time.

15          So if the claimant doesn't know how he or she was

16    exposed to the Garlock product, now is the time to find out,

17    and it is something that someone with a Garlock claim should

18    know and if, as the committee says, the claims are worth what

19    the committee thinks they are, which I believe they are going

20    to say is seventy-five thousand dollars a claim or more, that

21    is not an undue burden to require the claimant to answer some

22    very simple questions.

23          Like I said, these questions are far simpler than what

24    they would have to answer in the tort system where they would

25    have to describe much more regarding the details of their

Garlock/5-12-11

131

1    exposure.

2         The committee says that there is no evidence that

3    Garlock took discovery like this in the tort system.  Well,

4    there is no evidence in the record that Garlock didn't and it

5    is my understanding that Garlock did take discovery just like

6    this about the mesothelioma claims in the tort system.  I think

7    the committee is rehearsing an argument they made in many

8    previous cases that pertain to the hundreds of thousands of

9    nonmalignant claims that honestly were not worked up by

10   defendants because they weren't worth very much individually.

11   These mesothelioma claims, that is just not my understanding.

12        These claims were serious claims in the tort system

13   and discovery was taken in order to determine what the other

14   exposures were and what the basic Garlock exposure was.  It is

15   certainly not something that Garlock wasn't doing.  As the

16   court is aware, they employed many lawyers to work on these

17   cases and they were out there doing basic written discovery.

18        The cases certainly did not all go to trial but

19   Garlock was not, by and large, settling these cases not knowing

20   what they were about.  As Mr. Simon testified, there were,

21   according to him, good Garlock cases and  bad Garlock cases.

22   And these simple questions are designed to figure out which

23   ones are which among the pending claims.

24        A point that I am sure we will air later today is

25   whether the questions about the other exposures somehow shifts

Garlock/5-12-11

132

1      the burden from Garlock to the claimants, and I think the

2      committee is confusing a burden of proof, which is what Mr.

3      Glaspy testified about, with a discovery obligation.   Mr.

4      Glaspy did testify that, when the bankruptcies happened, yes,

5      it was now the burden of proof of the defendants to produce

6      evidence sufficient to survive a motion for summary judgment

7      with respect to the alternative exposures.   Because now they

8      were trying to lay off liability on others, the plaintiff was

9      no longer trying to prove up liability against the bankrupt,

10     but they shouldn't confuse a burden of proof with a discovery

11     burden.   Mr. Simon testified quite plainly that it's a

12     discovery obligation for plaintiffs to tell defendants what

13     they know about the other exposures.   He said on page 133, he

14     was asked:

15             "Are there some cases where you might be aware of

16             evidence of your client's exposure to products of

17             bankrupt companies and your client might not be aware

18             of those?

19             A.   Yes, sir.

20             Q.   Okay.   And in those cases, is that evidence of

21             exposure, is that discoverable readily by defendants

22             through simple discovery?

23             A.   Yes."

24             It's a discovery obligation and it is not

25     controversial.   It is plainly discoverable.   And, like I said,

Garlock/5-12-11

133

1    we are not requiring them to work up the other exposures; we

2    are just asking what they are.  The work sites aren't

3    sufficient because they don't answer that question of are the

4    plaintiffs admitting the exposure to the products, and that is

5    why the continued reference to some of the work that Bates

6    White does for certain tort system clients where Bates White

7    tries to estimate what the trust recoveries are, is a red

8    herring.  Bates White does that work, can give those defendants

9    some idea of what the offsets are going to be, of what the

10   trust claims are, and Bates White is not assessing the ability

11   of those defendants to have the plaintiff admit the exposures

12   at trial, which is the question we are talking about here and

13   the question that Mr. Glaspy said was so significant.

14           Those reports and estimates are talking about the

15   offsets; they are not talking about the exposures, and it is a

16   distinct issue that bears on Garlock's legal liability for

17   these cases.

18           Another Bates White point, we have heard several times

19   today that Bates White, well, they didn't require this

20   information to do their analyses for the financial reporting

21   that the parent company did before the petition date.  I mean,

22   I think the court probably sees that that is just a

23   fundamentally different task from what Dr. Bates is being asked

24   to do in this court, which is opine on an estimate that is

25   going to be a legal determination.  Whatever form it takes, it

Garlock/5-12-11

134

1   will be a legal determination, and the court through its order

2   authorizing the questionnaire has seen that it is legitimate

3   for debtors to take discovery when there is going to be

4   something weighty like that happen.

5          Not to say that putting something in a financial

6   disclosure is not weighty, but it is a fundamentally different

7   activity.  And, in fact, it is a good way to explain the

8   difference between the estimation approach the debtors are

9   pursuing and the court said the debtors could present evidence

10  on and the one that the committee seems to be pursuing.  The

11  estimate that Dr. Bates was doing when Garlock was in the tort

12  system was estimates of future expenditures, what is it going

13  to take to resolve these cases, settle these cases.  In other

14  words, what the committee is talking about.

15         We have told the court that is not what this court

16  should be doing here.  Here, the court, when it is estimating

17  claims, has to be estimating legal liability and it is a

18  fundamentally different activity from what someone who is doing

19  something for financial reporting would do.  So that example is

20  just inapposite.

21         We heard the argument again that these questions are

22  not appropriate for an aggregate estimation.  I think the

23  committee would say that about every question in the form.  I

24  think they did say that about every question in the form.  So

25  I don't think that really speaks to these particular questions

Garlock/5-12-11

1    and it is also debtor discovery.  So the committee's statements

2    about what the debtors and their experts do or don't need, I

3    don't think should receive much weight from the court.

4         As a comparison to the previous questionnaires I

5    believe shows, the debtors have been quite reasonable in what

6    they have asked with respect to these topics and, for both of

7    them, we are asking for less than previous debtors got where

8    the issues to which those issues pertained were of less moment

9    to those debtors, it mattered less because they had high-dose

10   products and they also did not have the bankruptcy wave related

11   issues that these debtors have and that will be aired at the

12   estimation.

13        Just to clear up sort of a mechanical issue about the

14   trust claim forms, in the last version of the questionnaire we

15   did request that the claimants execute an authorization.  One

16   reason for that, as opposed to asking a claimant to attach the

17   trust claim forms, was because in that version of the

18   questionnaire we asked about claims that will be filed, and the

19   debtors wanted the ability to go to trusts that haven't been

20   established yet, such as some of the pending bankruptcy cases,

21   and if those were established, have that authorization to be

22   able to go and figure out what the trust claims that the

23   claimants filed in between the time they answered the

24   questionnaire and the time when a hypothetical estimation trial

25   occurs.

Garlock/5-12-11

136

1          The court cut out the claims that will be filed

2     question. So we think it now makes sense just for the claimant

3     to attach the trust claim forms to the questionnaire and we

4     still have the option in there, if they would prefer, to

5     execute the authorization. We are happy to take that

6     authorization to the trusts and relieve the claimants of that

7     burden of attaching claim forms.

8          Trusts respond to those authorizations all the time.

9     They are not controversial. They don't waive any privacy

10    rights. In fact, many state courts, as we showed the court at

11    the last hearing, as a matter of their master discovery

12    required the plaintiff to execute an authorization like that

13    and then defendants can take it to the trusts and get the claim

14    forms. It is utterly uncontroversial.

15         Again, we have taken out that option from this one

16    and, as part of our modified proposal for the other exposures,

17    have asked that they be required to attach the trust claim

18    forms that they have submitted as of the time of the

19    questionnaire, and we will leave it at that. That's

20    appropriate.

21         As we went into the last time and as we will discuss

22    further today, the trust claim forms are held to be

23    discoverable by every court, and I don't think the committee

24    has disputed that and they are legitimate discovery. As the

25    California court said, a trust claim form isn't a settlement

Garlock/5-12-11

137

1    discussion; it's in the nature of a complaint and it contains,

2    as many courts have held, including explicitly Judge Davidson

3    in the Texas MDL, Judge Friedman in the New York City asbestos

4    MDL and many other important jurisdictions, they all hold that

5    the trust claim forms contain admissions of other exposures

6    that are relevant to things that defendants like Garlock are

7    concerned about.  So they are discoverable.

8         With respect to the "have you admitted" question, I

9    actually didn't have that even in the version I sent to the

10   committee yesterday.  That's something that we drafted in

11   preparation for this hearing but I am, of course, open to

12   wording changes.  One potential change would be just to say

13   were you exposed to a product for which this defendant is

14   responsible and then the claimant would check yes or no

15   depending on whether they had admitted that or not.  That would

16   take away any ambiguity.

17        And then the documents that we have requested that

18   they be attached would provide any additional detail with

19   respect to what the plaintiffs have – what the claimants have

20   admitted with respect to the other exposures.

21        Finally – well, the committee makes another point

22   about how it should be the debtors' burden to extract this

23   information from the attached documents.  The attachment option

24   is preserved.  They can attach documents to answer any of these

25   questions, including the new Garlock questions, the questions

Garlock/5-12-11

138

1    about Garlock exposure.  So that, I think, is a non-issue.

2    That document attachment option is still preserved.  And that's

3    fine with us.  We just had to make clear in the questionnaire

4    what the questions are so that the claimants know what

5    documents to attach and what they have to make sure is

6    responsive and true and complete when they respond to the

7    questionnaire.  So the questions are still important but they

8    still have the option to answer with documents.

9         Unless the court has any other concerns, which I will

10   be happy to address, we would respectfully ask that the court

11   approve these modifications.

12        THE COURT: Well, on 5(a) and (b), I think we ought to

13   stick with what I had suggested in the e-mail.  I think I lost

14   sight for a minute of the fact that we are dealing with

15   estimation here and not with discovery in an individual

16   lawsuit.  And it appears to me, from all that Mr. Glaspy and

17   others have said, that 5(a) and (b) is, I guess, as are

18   contained in what Mr. Swett handed me, get the information that

19   was – get that information or maybe more than what was

20   regularly used in the normal course of making a determination

21   of potential risk and exposure prior to bankruptcy.  So that,

22   and especially with the other tables that are attached, I think

23   as to the other exposure evidence, gives ample information from

24   which to make an estimation.  So we will go with that.

25        And then, as I understand, it sound to me like there

Garlock/5-12-11

1    was not a dispute about the claim form or about the

2    authorization, that I understand Garlock is not proposing to

3    include the authorization at this point?

4         MR. WORF: Well, we asked that they attach their trust

5    claim forms.

6         THE COURT: Or sign this.

7         MR. WORF: Or sign that, that's right, Your Honor.

8         MR. SWETT: That represents a shift because in the

9    previous edition the claimant had the option of completing the

10   boxes and other information required by the body of the form or

11   supplying documents and now, while conceding that the

12   authorization to go to trusts to get trust claim forms ought to

13   be an option, and I have no objection to that, I don't think

14   that should morph into an affirmative obligation on the

15   plaintiff's part to produce the trust claim form if they prefer

16   to execute the narrative parts of the questionnaire which is

17   where matters stood when we last presented this.

18        THE COURT: I think we ought to include the claim forms

19   as to claims that have existed.  So if that's a morphing, let's

20   morph that way.  That seems to me easy enough to do.

21        MR. SWETT: But with the authorization to go to trust

22   being the option to direct production?

23        THE COURT: Yes.

24        MR. SWETT: Yes, sir.

25        THE COURT: Okay.  With that being said, do you all

Garlock/5-12-11

140

1  think you have what you need to try to come to some final

2  document?

3          MR. SWETT: Yes, sir.

4          MR. WORF: Yes, Your Honor, I think we do.  I don't

5  know if Your Honor wants to wait until the next hearing for us

6  to bring it or we would be happy – I think I would be able to

7  submit it –

8          THE COURT: I think as soon as you all get it agreed

9  on, we can enter an order that it be sent out.

10         MR. SWETT: We submitted a proposed order that included

11 confidentiality and use restrictions that you accepted.  So

12 what I suggest is that we sit down together, go over the state

13 of the rulings and pick and choose from the different forms to

14 conform to the rulings, present a conformed copy with the order

15 for Your Honor's consideration.

16         THE COURT: Okay.  The next question is whether you all

17 want to do that now with the time we have left today or whether

18 you want to go on to other things today and come back to that?

19         MR. SWETT: My preference would be to argue the other

20 motion and get it over with and to then have a day or two to

21 work with Mr. Worf to conform the questionnaire.  I will be

22 available Monday.

23         THE COURT: Okay.  Is that all right with you all?

24         MR. WORF: I think that makes perfect sense.  We can

25 take today –

Garlock/5-12-11

141

1          THE COURT: Okay.  All right.  Well, then, let's take

2     a break for about – come back about five minutes of three and

3     we will go forward.

4          (Recess from 2:42 p.m. until 2:57 p.m.)

5          MR. WORF: Your Honor, I think the next thing on the

6     agenda is the debtors' – the amended motion of debtors for

7     order pursuant to Bankruptcy Rule 2004 directing production of

8     documents from specified past asbestos claimants and their law

9     firms, and I am going to speak to this, as well.

10         We have some themes that are similar to what I already

11    discussed  today,  so  hopefully  that  will  expedite  the

12    presentation.

13         This motion is a motion to obtain four categories of

14    non-privileged documents that are in the custody of law firms

15    that  we  believe  represent  persons  who  either  settled  with

16    Garlock  in  the  past  or  obtained  a  verdict  against  Garlock.

17    These persons are listed on the exhibit to our motion and they

18    are approximately five hundred in number from thirty-three law

19    firms.

20         I am going to proceed in three parts.  First of all,

21    explaining  the  relevance  of  the  documents  to  aggregate

22    estimation and then addressing whether the documents are not

23    discoverable because they are privileged or for some other

24    reason, and then finally I will address whether the documents

25    are available from some other source.

        Garlock/5-12-11

142

1       The basic reason for the debtors seeking discovery of

2  these documents from past claimants is that the committee has

3  put settlements with past claimants at issue with the

4  estimation methodology they have forecasted they will present

5  at the aggregate estimation trial.

6       You have heard from Dr. Peterson at the case

7  administration hearings, and you saw examples of reports that

8  Dr. Peterson has submitted in previous asbestos bankruptcy

9  cases.  Dr. Peterson uses the average settlement value for

10  cases from some period before the petition date to inform his

11  projection of what debtors would have paid to settle cases had

12  they remained in the tort system.

13       Then he often actually inflates that number or at

14  least he did in the past decade, but the past settlement

15  history was the starting point, and then he often justified his

16  upward adjustments by reference to settlement histories of

17  other defendants who had remained in the tort system and had

18  later declared bankruptcy.

19       But that is a starting point, is the past settlements,

20  and you saw in the preliminary estimation that Dr. Peterson had

21  prepared that he used a figure of seventy-five thousand as the

22  average settlement value for current and future mesothelioma

23  claims against the debtors.  And the reason he did that was

24  that was the average settlement value in a case in one of the

25  years before the petition.  I think it was lower than that

Garlock/5-12-11

143

1    directly before the petition, but that was the average value,

2    I believe, a couple of years before the petition.

3          So the committee has shown that what they are going to

4    do is use the past settlements in order to value debtors'

5    liability for current and future asbestos claims.  And it is

6    our  contention  that  the  debtors  are  entitled  to  simple

7    discovery that is directed at rebutting the notion that past

8    settlement values are an accurate proxy either for debtors'

9    legal liability or current and future asbestos claims, what we

10   say is important, or for what the committee says is important,

11   which is the future cost of settling the current and future

12   asbestos claims.

13         And let me explain why.  First of all, we cited in our

14   brief, and this is my slide two.  I put a presentation up there

15   for Your Honor.  It is thankfully shorter than the last one,

16   and I have also got a binder of exhibits, all of which we have

17   introduced before and that I will refer to, which I have also

18   provided to Your Honor.

19         As we cited in our reply brief, Professor Gibson at

20   Chapel Hill who wrote this "Judicial Management of Mass Tort

21   Bankruptcy Cases" for the Federal Judicial Center says:

22         "Frankly a debtor should have the opportunity prior to

23         a judicial estimation to establish the invalidity of

24         past settlement values as a basis for valuing present

25         and future claims."

Garlock/5-12-11

144

1        And that is what the debtors are trying to do through

2    this motion, is to test their central contention regarding why

3    the 2000 to 2010 settlement values do not accurately reflect

4    debtors' liability for current and future asbestos claims.

5        Now, the committee says that those settlements are the

6    right yardstick for the current and future claims and, as the

7    court knows, debtors object to the use of settlements of any

8    kind for the purpose of fixing their liability for asbestos

9    claims, but the committee has said that's what they are going

10   to do and, as we discussed this morning, there is no ruling yet

11   on whether they will be permitted to do so.

12       So in the interim, it is legitimate discovery to take

13   discovery relevant to any party's claim or contention.  That's

14   just the standard Rule 26, incorporated in the Bankruptcy

15   Rules.  And so we are taking discovery that Professor Gibson

16   endorses relevant to the past settlement values.

17       Now, why are these particular documents relevant?

18   Well, they are directed to one of the central issues in the

19   case, which is why Garlock's settlement values increased

20   abruptly and suddenly after 2000.  The debtors' contention,

21   which Your Honor heard from – didn't hear the contention but

22   heard the evidence from Mr. Glaspy that supports debtors'

23   contention, which is that was a product of two factors.  First

24   of all, the exit of the bankrupts meant that the primary source

25   of compensation for mesothelioma claimants, including the ones

     Garlock/5-12-11

145

1    who asserted claims against Garlock, disappeared and Garlock,

2    along with the other remaining defendants, were exposed to the

3    risk, if they were held liable, of bearing portions of

4    liability that the bankrupts had previously born, and that was

5    a material effect on Garlock's settlement values.

6         The second reason for the increase, Mr. Glaspy also

7    testified about, was the disappearance of plaintiffs'

8    identification of the bankrupt exposures, their identification

9    of the insulation products and other dusty, high-exposure

10   products, that they had previously identified freely and now,

11   according to Mr. Glaspy, were no longer identifying.

12        Now, as far as why that happened, why the

13   identification ceased, for purposes of this motion, that's not

14   really important.  The debtors have said things about that and

15   the committee has said things about that.  The committee says

16   the plaintiffs no longer had an incentive to investigate those

17   exposures.  The debtors think that probably had something to do

18   with it but also, based on some evidence we have seen, suspect

19   that some evidence may have been obscured or concealed.  But

20   who is right on that doesn't really matter for purposes of this

21   motion.

22        In this motion, we are simply attempting to determine

23   whether, for what are many of the most significant cases that

24   Garlock settled over the past decade, Mr. Glaspy is correct.

25   Mr. Glaspy testified he has his experience, but we need to do

Garlock/5-12-11

146

1    it somewhat systematically and figure out whether, in the most

2    significant cases, many of the most significant cases that

3    Garlock had, he's correct, that the identification of the

4    exposures was postponed until after the tort system case had

5    resolved and whether the trust claims that those claimants had

6    available to them eventually were pursued after Garlock had

7    settled their cases.

8         If we can show that, debtors will have shown that the

9    past claims are significantly different from what the court can

10   expect the current and future claims to be because now the

11   trusts are operating.  They are paying current claims.

12   Plaintiffs are coming up with evidence to sustain claims

13   against those trusts, and the questionnaire is going to help us

14   show that, but this motion is important, too, in addition to

15   the questionnaire, because it will let us show that the past

16   claims are different from those current claims that are subject

17   to the questionnaire, and that is something that the court is

18   going to want to know when it is valuing the current and future

19   claims.

20        I won't go through all of Mr. Glaspy's testimony again

21   concerning what happened in terms of the case against Garlock

22   over the past decade.  I went over that in the previous

23   argument and the gist of it was that the insulation exposures,

24   the identification of those exposures, as well as other friable

25   asbestos products, decreased dramatically.  The defendants

Garlock/5-12-11

147

1    couldn't make up the gap because, without the plaintiff's help,

2    it is extremely difficult, if not impossible, to tie a product

3    to the plaintiff's breathing zone, which is what is important

4    for establishing that that product and not Garlock's product

5    caused the mesothelioma.

6            So it wasn't enough for Mr. Glaspy to have the work

7    site or some basic knowledge about the occupation and industry

8    of the claimant.

9            Now, Mr. Simon testified to the contrary.  He said,

10   no, co-defendants or defendants were able to identify those

11   exposures and prove them at trial just on the basis of cross-

12   examining a witness and doing things like that.  So according

13   to Mr. Simon, he disagreed with Mr. Glaspy about the ability to

14   still demonstrate those exposures.  That's a conflict in the

15   evidence.  Something to be resolved at the aggregate estimation

16   trial.

17           In the meantime, though, the court has Mr. Glaspy's

18   testimony and that should determine the scope of discovery.

19   His testimony was that the decrease in the plaintiff's rate of

20   identification was significant and was an important factor.

21   This discovery will help show that it actually happened.  It's

22   important to know whether Mr. Glaspy was correct on that.

23           Now, the committee disputes that that was the reason

24   or that those were the reasons behind the increase in Garlock's

25   settlement values over the past decade and, by those, I mean

Garlock/5-12-11

148

1    the   two   reasons   the   debtors   rely   on,   which   was   the

2    disappearance of the evidence and the unavailability of the

3    offsets and credits.

4         We have heard various things from the committee.  We

5    haven't heard anything systematic yet.  There are no expert

6    reports yet, but we have heard, first of all, that the increase

7    can be explained by the increase in the value of mesothelioma

8    claims.  Mr. Glaspy disputed that at pages 48 to 49 of his

9    testimony where he testified it wasn't about the change in the

10   total value of claims, which has remained fairly constant

11   across his career, but it was rather the lack of evidence and

12   the lack of offsets.

13        So the committee disputes that the factors the debtors

14   rely on are the explanation and the debtors need the ability to

15   demonstrate that, no, that was going on and it's a reasonable

16   explanation for what was occurring.  And as I said, Mr. Simon

17   even disputes that that's what was going on.  He doesn't think

18   that the evidence disappeared, and this discovery is aimed at

19   showing that it did.

20        The committee also says that the trusts are not going

21   to   have   an   impact   on   Garlock's   settlement   values   because

22   certain trusts began paying claims in 2007 or thereabouts and

23   allegedly Garlock's settlement values didn't decrease when that

24   happened.

25        Now, in the portion of Dr. Peterson's testimony that

Garlock/5-12-11

149

1    we cited in our brief, Dr. Peterson testified that, after he

2    had testified to that fact, testified that it's important to

3    know whether the claimants that Garlock was settling with

4    between 2007 and 2010 were the ones who were making and

5    receiving payments on the trust claims because otherwise you

6    wouldn't necessarily expect an impact.

7         And Dr. Bates testified about how there is good reason

8    to believe that wasn't occurring during 2007 and 2010.  It had

9    taken seven years for some of those debtors to reorganize and

10   they had built up large backlogs, both prepetition and post-

11   petition, pre-effective date claims, that those trusts had a

12   process in many cases first, and Dr. Bates testified that

13   that's a reasonable explanation for what was going on and that

14   the claims were not the same between Garlock and the trusts.

15        This discovery will also address that issue by showing

16   whether the Garlock claimants between 2007 and 2010 that

17   Garlock was settling claims with were the ones who were making

18   claims against the trusts and resolving their claims with the

19   trusts with the resulting impact on the settlement value of the

20   Garlock claim.

21        So the discovery that the debtors are seeking is

22   directly targeted at demonstrating the discontinuity between

23   the tort and the trust systems, and here's what they are.  It

24   is ballots that the thirty-three firms cast in previous

25   bankruptcy cases on behalf of claimants; other discovery that

Garlock/5-12-11

1   the named claimants submitted in previous bankruptcy cases;

2   trust claim forms that those claimants, the past claimants

3   submitted to trusts; and finally documents sufficient to show

4   the status of those trust claims.  In other words, whether they

5   have been paid or not, although not the amount of the payment.

6        All of those documents provide evidence of identified

7   exposures to products for which bankrupts were responsible, and

8   I will refer to exhibits that we previously introduced to

9   demonstrate this fact and move for their admission with respect

10   to this motion.

11        First of all, GST 112 is one of the master ballots for

12   accepting or rejecting the Pittsburgh Corning's third amended

13   plan of reorganization, and it shows there, in submitting those

14   ballots, the law firm certified under penalty of perjury the

15   identified claimants' exposure to Pittsburgh Corning asbestos.

16   So that's an admission in a court relevant to exposure.

17        Then we also have the personal injury questionnaire in

18   the *W.R. Grace* case, which is an example of the other discovery

19   that would be covered by this order and by this discovery and

20   there, as we showed the court earlier, the *W.R. Grace*

21   questionnaire asked about exposure to W.R. Grace asbestos, as

22   well as other products.  So that's also directly relevant, to

23   the extent the claimants answered it, to when they identified

24   the exposures to those companies.  Those questionnaires, I

25   believe, were submitted between 2005 and 2007.  So many of

Garlock/5-12-11

151

1   those claimants had resolved Garlock cases much earlier and

2   that would show what they learned in the interim between

3   settling the Garlock case and submitting that questionnaire in

4   the *W.R. Grace* case.

5         We, of course, are not asking for all of the

6   questionnaires in the *W.R. Grace* case, just the ones that the

7   five hundred claimants may or may not have submitted.

8         Next, the trust claim forms, and we have introduced

9   examples of those at the last hearing, at GST 137 to GST 144,

10  and I should note that I have provided Mr. Swett with a list of

11  the portions of those that were treated as confidential.  So

12  those exhibits are with us, as well as in these binders, but we

13  now know what parts we are treating confidential, and I would

14  propose to treat them the same way here.

15        And those show, as well, that trust claim forms

16  contain admissions of exposure to products for which those

17  trusts, and previously those bankrupts, were responsible.

18        I am taking a look at GST 138 just as an example, and

19  it lists here a claimant's exposure to products for which

20  Celotex was responsible, and it has a fair amount of detail

21  about that.  It says even the names of the products to which

22  the injured party was exposed.  Celotex, of course, was not one

23  of the bankrupts in the bankruptcy wave but we just offer that

24  as an example of what is contained in the trust claim forms

25  that's relevant to the issues that we are discussing.

Garlock/5-12-11

152

1        And then finally documents sufficient to show the

2    status of the trust claim.  Very simply whether a claim has

3    been resolved or not, and that would tell debtors when the

4    claim was resolved and, thus, whether it was resolved in a time

5    period different from when Garlock was resolving the case

6    during the past decade.

7        We have stayed away from settlement payments.  We are

8    not asking for those and just limiting this to the categories

9    that I discussed.

10       We think that this discovery is very focused.  It is

11   trained on exactly the issue that is really the major one in

12   this case of explaining what happened over the past decade or

13   what meaning that has for Garlock's current and future

14   liabilities, and it's really a limited and discrete set of

15   documents that's implicated by it.

16       What we did in constructing the sample was to take no

17   more than thirty past claimants from any one law firm to

18   minimize any burden on the law firm.  In general, as the

19   committee pointed out in its brief, these were the higher value

20   claims that debtors resolved at that law firm, and that's for

21   two reasons.  First of all, those higher value settlements are

22   the ones that are likely to be pushing the average up over the

23   past decade.  So if you know something about those, you know a

24   lot about how characteristic that average is for the current

25   and future claimants.  And then, second, these are all claims

Garlock/5-12-11

153

1     that, because they were relatively high-value settlements, were

2     the subject of discovery and a discovery that will show what

3     the products identified when Garlock was resolving the case

4     were, they can be compared against what later happened to show

5     whether debtors' explanation for what was going on is correct.

6          For some law firms, it is far less than thirty. I

7     think for some it's just a handful of claims, so that the total

8     is about five hundred.

9          So that's what we are seeking.   That's why it's

10    relevant and that's how the sample was crafted.   The next

11    question when deciding whether discovery is legitimate is

12    whether it's privileged or otherwise not subject to discovery,

13    and I think most of these documents are self-evident that they

14    are not privileged.   The ballots and the discovery in previous

15    bankruptcy cases are either public documents in the case of the

16    ballots or, in the case of the discovery, were submitted to an

17    adversary of the claimant, so they are not privileged.

18          And we have put on a lot of evidence also about how

19    the trust claims are not privileged, and I have repeated that

20    evidence in the exhibit list here.   I will just briefly, for

21    the sake of the record, go through all of that.   It is GST 146,

22    which is the standard interrogatories in the New York City

23    asbestos MDL; GST 148, which is a particular order holding that

24    trust claims are discoverable in the New York City asbestos

25    MDL; GST 149, the case management order in the Texas MDL; GST

Garlock/5-12-11

154

1    150, which is a ruling from the Texas MDL on the

2    discoverability of trust claims; GST 151, which is the similar

3    language from the Cleveland asbestos docket; and GST 152, which

4    is the one from Los Angeles; GST 146, which is the one from

5    Philadelphia; and then GST 51, which is the West Virginia case

6    management order.

7         So those are most of the important asbestos

8    jurisdictions in the country and it shows that they are

9    discoverable.

10        Now, the committee in their response makes the

11   argument that, well, yes, they are discoverable when you have

12   a current claim but Garlock settled all of these claims, so it

13   can't rely on these case management orders or anything else to

14   say that it's entitled to discovery here.  But I think the

15   committee misses the point of those case management orders.

16   It's not that these claims are still open.  Obviously they are

17   not.  They are either verdicts against Garlock or settlements.

18   What the case management order shows is that, when the trust

19   claims are relevant to pending litigation, such as the

20   aggregate estimation trial, they are discoverable and they are

21   not privileged.  Privileges don't spring up just for particular

22   kinds of litigation.  Something is either privileged or it's

23   not.  The fact that these are discoverable in some cases,

24   namely asbestos products liability cases, means that they are

25   discoverable whenever they are relevant in litigation, as for

Garlock/5-12-11

1    the reasons I have discussed, they are relevant here to the

2    aggregate estimation.

3         And it is especially ironic because it's the committee

4    that has made these past cases relevant by deciding to base

5    their estimation methodology and their estimation standard on

6    the past settlements and using them as the yardstick for

7    Garlock's current and future liability.

8         If the committee would stipulate that that was not

9    their intention, I think we could very well most likely

10   withdraw this motion, but they haven't stipulated that and they

11   obviously won't, and that's why the documents we seek are

12   relevant and are legitimate to test the committee's

13   contentions. And, in fact, as we set out in our reply brief,

14   the committee has conducted its own discovery with respect to

15   these very claimants in the form of documents that are in the

16   possession of Garlock. Just to mention a few, the settlement

17   terms and payments, as well as the other information in the

18   database with respect to these claimants. The verdicts that

19   certain of these claimants, these past claimants obtained

20   against Garlock, certain trust claim forms that Garlock has

21   obtained from certain of these past claimants were covered by

22   the committee's discovery requests and will be produced to the

23   committee. And the ballots that were cast in the *Pittsburgh*

24   *Corning* case, which debtors obtained in early 2010 and that the

25   committee requested and either has or will soon receive, those

Garlock/5-12-11

1    ballots contain the names of many of these claimants.

2          So it's especially odd that the committee says these

3    claimants are out of bounds because they put them at issue and

4    they have also done discovery with respect to the claims.

5          Now, the debtors are seeking discovery from another

6    source.  The committee has no documents relevant to these

7    claimants.  The committee didn't exist before June 2010.  So we

8    can't get them from the committee the way the committee can get

9    them from us.  So we have to get them from the law firms or

10   somewhere else, as I will discuss later on.  That's where you

11   get the documents, and the debtors are entitled to get these

12   documents that are relevant to meeting the committee on fair

13   ground at the aggregate estimation trial.

14         I want to say a little something about the source.  We

15   have directed this to the law firms and also to the claimants.

16   Insofar as the court decides we can't obtain them from the law

17   firms except as agents for the claimants, for the past

18   claimants, another source for much of the same information,

19   namely the trust claims and their statuses, are the trusts, and

20   the debtors filed their trust motion on October 13, 2010.  That

21   motion hasn't been heard yet.  It has been put off for various

22   reasons.  But it's important to note that the trust, when they

23   responded to that motion, said you shouldn't be getting it from

24   us, we are strangers to this litigation.  You need to go to the

25   law firms who are the ones that handled the case against

Garlock/5-12-11

157

1    Garlock and obtain it from the law firms.  And we cited all of

2    those responses from the trusts in our reply brief.

3          So here we are, we have made the motion to get it from

4    the law firms, and it's frankly a more constricted set of

5    documents because we know a little something about the trusts

6    and their information and document processing capabilities and

7    the fact that it should be easy for them to produce this data

8    for essentially all of the past claims against Garlock.

9          The law firms were not quite so sure, so we wanted to

10   make sure that we limited it to a manageable number, and that's

11   why we limited it to thirty-four law firms, and we think that

12   would be sufficient.

13         But that's what we have done.  We have gone to the law

14   firms and are trying to get it from there.  And what does the

15   committee say about that?  They say, well, no, you can't get it

16   from the law firms either for various reasons, but you can't

17   get it from the trusts; you can't get it from the law firms.

18   I imagine they don't - well, actually they also say that we

19   can't get it from the claimants, the past claimants.

20         So that just can't be true that there are documents

21   relevant to litigation that are not privileged and that are in

22   some no man's land where they can't be gotten.  That can't be

23   true.

24         We cited in our reply brief the famous line from -

25   well, it's been quoted in many cases but I think most recently

Garlock/5-12-11

158

1    in the *Jaffe* case that the public is entitled to every man's

2    evidence, and that's a fundamental principle of litigation and

3    discovery, that relevant and non-privileged documents are

4    discoverable and should be discovered, and litigation should be

5    a search for truth, and that was said in the context of

6    rejecting a privilege, a certain kind of privilege.

7         Here, we don't even deal with an issue of privilege.

8    The documents are admittedly not privileged but yet the

9    committee wants to say that you can't get them from anywhere

10   and that's just not fair because the committee is wanting to

11   rely on those settlements to fix the debtors' liability for the

12   current and future claims, and it just doesn't make sense.

13        The debtors, like I said, have put off the trust

14   motion and are still, of course, willing to get this

15   information from the trusts if the court thinks that would be

16   more efficient and economical.  It very well might be, and we

17   intend to have that motion on for hearing as soon as it is

18   feasible, but we think that this motion is also feasible and

19   would be a most efficient way to get the documents.  It covers

20   less claims but we can live with that and obtain it from these

21   law firms.

22        Now, one reason why the committee says that you can't

23   get this from the law firm is that you can't subpoena a law

24   firm.  It's improper and you can't get documents from them, and

25   it's just not done, it's not possible.  Well, we cited, I don't

Garlock/5-12-11

1    know, more than a half a dozen of cases.  I think certainly

2    more in our reply brief showing that's just not true.

3    Litigants obtain relevant and non-privileged documents from law

4    firms all the time.  I certainly know that in my firm's

5    practice we respond to subpoenas for relevant and non-

6    privileged documents.  I think that's the practice in many law

7    firms and it's no different for these law firms, and I think

8    the *Ratliff v. Davis, Polk & Wardwell* case is quite

9    instructive.  In that case, there was not even jurisdiction in

10   the United States over the law firm's client.  It was a Dutch

11   client that was abroad and was not amenable to process in the

12   United States, couldn't even be compelled to come and show up

13   in a U.S. court.  Its law firm was in New York City and

14   documents relevant to litigation in Georgia were subpoenaed

15   from the law firm, and the law firm comes to the Second Circuit

16   and says, well, you know, we got these documents from our

17   client and you can't get them because that inherently makes

18   them privileged, the fact that the documents came from the

19   client to us, and we are asserting that privilege and we are

20   here and the documents shouldn't be produced.

21          The Second Circuit said, no, that's not true,

22   documents that are privileged – not privileged and relevant are

23   subject to subpoena when they are in the hands of a law firm

24   subject to process in a United States court, and these

25   documents were not privileged because they had all been shared

Garlock/5-12-11

1    with the litigation adversary of the Dutch company, which was

2    the SEC.

3          So the Second Circuit had no trouble concluding, a

4    panel upon which now Justice Sotomayor served, had no trouble

5    concluding that Davis Polk had to turn over those documents,

6    and so they did.

7          Obviously the client – the law firm doesn't have to be

8    served or do anything.  The law firm might have an obligation

9    to the client, very likely does.  I mean, you have a

10   professional obligation if you are a law firm and, even if you

11   have no association with the client anymore, to protect

12   privileged documents that are in your possession and any lawyer

13   would do so.  So the law firm would have a professional

14   obligation to oppose production of privileged documents, but it

15   is no defense to having to produce non-privileged documents to

16   say I am a law firm, I am in no man's land.  That's just not

17   true.

18         We have a lot of other cases.  We have a couple of

19   criminal cases are cited, you know, subpoenaing law firms for

20   records.  That is something the federal prosecutors have to do

21   all the time.  It's not – I guess, more precisely, Grand Juries

22   do all the time.  It's not something unusual.

23         We even cited a case, the *SEC v. Lewis* case from, I

24   believe it's the Eleventh Circuit, where the law firm – the

25   documents, the purpose of the documents was to identify the

Garlock/5-12-11

161

1    client, and that's why they were relevant to litigation between

2    the SEC and Lewis.  And the client – I mean, the purpose of the

3    documents was to identify the client and the client wasn't

4    known to the person subpoenaing the documents.  They obviously

5    couldn't be notified or brought into court to be heard.

6         In fact, there's authority to support the notion that,

7    when non-privileged documents are subpoenaed from a law firm,

8    the client doesn't even have standing to object to the

9    subpoena, that it has to be the law firm that objects.  Of

10   course, the law firm would if the documents are privileged but,

11   if the documents are not privileged and the law firm for some

12   reason didn't object, then there are cases that state the

13   principle that a client doesn't have standing to object to the

14   subpoena unless the documents are privileged.

15        So there is that, but we don't have to go that far

16   here.  If any claimants wanted to show up and object to the

17   subpoena, they certainly can do so, but the point is that we

18   don't have an obligation to serve the client and figure out

19   where they are and have the client and the law firms use our

20   inability to find out where the client is as a defense to not

21   producing not privileged and relevant documents.

22        But if we have to serve the client, we have asked for

23   the law firm to provide the address and we are happy to serve

24   the client, as well.  The committee says, well, maybe the law

25   firms don't know the address of the clients.  Well, we don't

Garlock/5-12-11

162

1    have the law firms here to say that.  It's unclear to us how

2    the committee would know that before the law firms have been

3    asked to provide the information but, in any event, the law

4    firm could provide that address and say whether or not they

5    have a reason to believe that that is the current address.

6    Again, like we said, we don't think that's necessary but we

7    have included that as part of the relief we request in case the

8    court is inclined to make us do that.

9         There is also this specter which comes up from time to

10   time of difficulties enforcing the discovery and collateral

11   litigation.  We think that there are easy ways for the court to

12   manage this that would prevent collateral litigation.  Like we

13   said, we think Rule 2004 is applicable.  The court in Garlock

14   could easily notice a hearing where the law firms, the thirty-

15   three law firms, would be instructed to come and object, if

16   they have objections, to the production of the documents that

17   the debtor requests.  That decision would bind those law firms

18   and then, when Garlock issued the subpoenas, that would

19   collaterally estop them from starting litigation in all the

20   different forums where the subpoenas would issue, which is

21   something that you obviously want to avoid.

22        That would be a perfectly fair way to do it.  That's

23   the way that Judge Gerber was going to handle the trust

24   discovery and he said in his order about that, that it would be

25   inappropriate for the trusts in that case – here, the law firms

Garlock/5-12-11

1      – have a second bite at the apple after being served with and

2      had the opportunity to object to the Rule 2004 request.  So

3      that's an easy way to do it.  Rule 2004 is available for the

4      reasons that we have discussed.  It's an appropriate tool to be

5      used even in anticipation of litigation when there is not yet

6      a pending contested matter because there is no pleading here

7      that asks for aggregate estimation yet.  There is not a pending

8      contested  matter,  and  that  is  an  easy  and  judicially

9      administrable way to do it.

10          The committee says that it is unprecedented to take

11     discovery  like  this.   Well,  no,  it's  not.   It's  not

12     unprecedented to take third-party discovery relevant to pending

13     litigation.  It happens everyday in every federal court in the

14     country and, you know, I am not as familiar, although I am

15     increasingly so with the previous asbestos bankruptcy cases, I

16     have a feeling it has probably been done there before.  I can't

17     substantiate that but, even if it hasn't and the committee can

18     prove that, it doesn't tell us anything.  It's relevant here.

19     The  issues  here  are  different  than  were  involved  in  the

20     previous  cases,  and  I  think  we  have  demonstrated  the  clear

21     relevance of these documents.

22          And, again, Professor Gibson supports this sort of

23     effort  and  giving  debtors  the  opportunity,  before  their

24     liability is fixed, using past settlements to demonstrate that

25     they inflated the liability.

164

1          Now, the committee claims that the discovery is not

2     within the spirit of the court's December 9th order.  We think

3     it is.  It's directed to aggregate estimation.  We think that

4     it incorporates many of the rulings that the court has made

5     along the way about efforts to find a sample, and we have taken

6     great care to construct a sample here that will not impose a

7     burden on law firms and will be easily administered.

8          Finally,  the  committee  argues  that  taking  this

9     discovery will violate the debtors' settlement agreements with

10    the settled past claimants.  I think we have dealt with this

11    well in our brief but I will just reiterate the point.  That's

12    just not true.  Settlement agreements are not a bar to taking

13    third-party discovery from parties you have settled with even

14    when you gave a general release to that party.  We cited

15    numerous cases holding that where the party seeking to obtain

16    documents through subpoena had settled with the target of the

17    subpoena and had executed a general release and the subpoenaed

18    party argued, well, you executed a general release, you gave up

19    all your rights against us, and those courts said, no, we are

20    not  construing  even  a  general  release  to  eliminate  those

21    rights, those subpoena rights in subsequent litigation.

22          Obviously someone who has executed a release like that

23    cannot resume litigation against that party covered by the

24    release unless there is good reason to obtain the release from

25    it but, even in the case of those releases, there's no bar to

          Garlock/5-12-11

165

1   third-party discovery.

2           As we represented in our brief, to our knowledge

3   Garlock didn't execute any kind of release for these settlement

4   claimants.  The standard agreement was that the plaintiff who

5   had sued Garlock executed the release and Garlock promised to

6   pay money and did pay money, and there was no release going the

7   other way.

8           So if you can execute a general release and not lose

9   your third-party discovery rights against the released party,

10  Garlock, who didn't execute any release at all, didn't lose

11  those rights and it's frankly a frivolous argument to say that

12  Garlock is in a worse position than parties in these cases who

13  executed a general release.

14          There is no prospect of that or of administrative

15  claims in contract or tort that are going to arise as a result

16  of this discovery.

17          So just to sum up, this evidence is in the core of

18  relevance and the debtors' rebuttal of the committee's

19  projected estimation case.  The documents sought are not

20  privileged.  The motion has been carefully drafted to impose

21  little burden on the law firms and to obtain the evidence that

22  is most relevant to debtors' rebuttal.  The motion could be

23  administered through devices that this court has in its

24  disposal and the motion is otherwise proper.

25          So for all of these reasons, the debtors request that

Garlock/5-12-11

1    the motion be granted.  Thank you.

2           THE COURT: Mr. Swett.

3           MR. SWETT: May it please the court, we just heard that

4    discovery of people who were but are no longer claimants

5    against Garlock would be relevant somehow to show what Garlock

6    should pay to future claimants and others.  How remains a

7    mystery.  We contest the fundamental issue of relevancy with

8    respect to this information, and I will get to that in more

9    depth.

10          We have heard that these documents are not privileged.

11   That is true.  We are not asserting that they are privileged.

12   What we are asserting is that, as a matter of the court's

13   discretion to shape the estimation process and as a matter of

14   its discretion under Rule 26, which notwithstanding Garlock's

15   protestations to the contrary, is the governing regime here,

16   not Rule 2004, you ought not to let them go there because the

17   benefits of doing so will be far outweighed by the detriments

18   to the process that will result predictively and inevitably

19   from that misguided effort.

20          We have heard that the requests are crafted to be

21   minimally burdensome but, by virtue of going back to an

22   extinguished claim in the hands of a lawyer who used to

23   represent the client, who was a claimant against Garlock but is

24   no longer, no burden is justified.  There is nothing that has

25   been said in the affirmative effort to support this discovery

Garlock/5-12-11

1    that gives any good cause, much less a compelling reason, for

2    this unusual, indeed extraordinary step.  To our knowledge, it

3    has   never   been   done   in   any   of   the   asbestos   bankruptcy

4    reorganizations where the standard methodology has been used.

5    Not even in those few abortive attempts to conduct estimations,

6    something  similar  to  what  the  debtor  has  in  mind  here.   It

7    simply  hasn't  been  done  because  no  one  ever  thought  it  was

8    appropriate or useful to go disturb past claimants in search of

9    some evidence whether or not it was directly potent, whether or

10   not it had significant implications for the estimation or the

11   forecast, whether or not it would burden the estimation process

12   in a particular case in a uniquely contentious and disputatious

13   way, all of which is true here.

14          Now, let me begin with the legal framework.  We are

15   offered the siren song of a Rule 2004 hearing in the Western

16   District of North Carolina to call in lawyers from all around

17   the   United   States,   who   are   outside   of   the   territorial

18   jurisdiction of the court, to make a once and for all ruling on

19   the  appropriateness  of  this  discovery  request  against  other

20   people,  third-party  former  claimants  who  wouldn't  be  in  the

21   courtroom, and that that would somehow bind the world once and

22   for  all  without  the  unfortunately  messy  process  of  going

23   through Rule 45 subpoenas in the courts where the subpoena

24   targets are found and having enforcement proceedings commenced

25   in  those  courts  and  carrying  on  in  the  normal  way  under  the

168

1      federal rules.

2           Rule 45, I should point out, doesn't depend on whether

3      the discovery request purports to be brought under Rule 2004

4      or, instead, under Rule 26.  A Rule 2004 subpoena has to be

5      served out under Rule 45.  The same protections apply under

6      Rule 45 whether or not the paper says Rule 2004 in the heading

7      instead of Rule 26.  That is a (inaudible).  It will solve none

8      of the procedural problems that will predictively result from

9      this misguided discovery.

10          But Rule 26 is in fact the governing regime.  We know

11     this because we are in a contested proceeding, as the debtor

12     has admitted previously when it suited its purposes to do so.

13     For example, at the March 3rd hearing transcript, page 173,

14     lines 25, to 174, line two, this is Mr. Cassada speaking:

15               "We are in an estimation but we are in a contested

16               estimation, and we are seeking discovery in a

17               contested estimation."

18          In the Rule 2004 motion seeking production of data

19     from trusts filed on October 13, at page five, paragraph

20     fifteen, this is docket number 601, if I am reading this note

21     correctly, quote:

22               "Both the debtors and the committee have moved for the

23               initiation of a contested matter in the form of the

24               estimation of asbestos claims."

25     And the amended motion for discovery from past claimants itself

Garlock/5-12-11

169

1    refers to Rules 9014 and 9016 of the Bankruptcy Rules which

2    incorporate Rule 26 and Rule 45; in the case of Rule 26,

3    subject to the court's discretion to rule otherwise.  There has

4    been no such ruling here.

5         But one thing is clear from the case law, and has

6    never been controverted by the debtors, when you are in a

7    contested proceeding, discovery proceeds under the Federal

8    Rules of Civil Procedure, not Rule 2004, and the case law is

9    equally clear that Rule 26 and Rule 2004 do not operate

10   simultaneously.  It's one regime or the other and the onset of

11   a contested proceeding such as we have here ousts Rule 2004,

12   brings in Rule 26, as frankly the argumentation of the debtors

13   in their recent briefing on the questionnaire itself implicitly

14   acknowledges, they have been making their arguments under Rule

15   26.

16        Rule 2004 is not a *deus ex machina* to solve the

17   problem of proliferating satellite litigation that this motion

18   seems calculated to produce.

19        Now, Rule 26(c) – I don't think that's the right cite.

20   (Pause) Rule 26(b)(2)(C), on motion or on its own, the court

21   must limit the frequency or extent of discovery otherwise

22   allowed by these rules or by local rule if it determines, and

23   then there are several alternatives.  One is that the discovery

24   sought is unreasonably cumulative or duplicative, could be

25   obtained more readily from another source.  Another is that the

Garlock/5-12-11

170

1    party seeking discovery has already had ample opportunity to

2    obtain the information by discovery in the action.  The third,

3    which is the one I have focused on for the most part, the

4    burden or expense of the proposed discovery outweighs its

5    likely benefit, considering the needs of the case, the amount

6    in controversy, the party's resources, the importance of the

7    issues at stake in the action and the importance of the

8    discovery in resolving the issues.

9         As a matter of law, when the debtors say evidence

10   conceivably relevant and not privileged, case closed, the

11   discovery must go forward, is not correct because the court has

12   to exercise the discretion inherent in 26(b)(2)(C), giving

13   attention to such factors as I just described and others of

14   similar character.

15        Here, that discretion is reinforced by the nature of

16   the proceeding itself.  This is an aggregate estimation.  The

17   case law on estimation, which the debtors themselves have cited

18   in attempting to justify their novel approach, emphasizes that

19   the judge has substantial discretion to craft the proceeding to

20   serve the intended purpose.  And here that discretion dovetails

21   with the discretion, indeed the duty under Rule 26(b)(2)(C) to

22   keep the discovery focused on what really matters or that can

23   be obtained without undue disruption of the proceeding so that

24   the matter can go forward and serve the purposes of aggregate

25   estimation, which are not mathematical precision but efficiency

Garlock/5-12-11

171

1   and, in effect, rough justice, so that we can have a plan while

2   we are still all middle-aged.

3        Now, when we consider these factors, it seems to me

4   they point clearly to the answer that this discovery is ill-

5   considered and should not be allowed.

6        Needs of the case.  This case, as I have mentioned, is

7   the estimation proceeding.  If the court allows the discovery

8   to become inordinately focused on individual claims, past or

9   present, it will destroy the utility of the procedure in the

10  manner that I just described, the intended goals of efficiency,

11  the focus on the aggregate, the need to get through the process

12  expeditiously.  All of those benefits will go by the wayside if

13  we focus inordinately on individual claims.  In this respect,

14  Your Honor's rulings on the questionnaire implicitly apply the

15  discretion that you were compelled to apply under Rule

16  26(d)(2)(C) and that decision provides a useful model here.

17  The same factors that caused you to say that certain queries

18  provided enough information for estimation purposes and others

19  would be excessive in that context, that same kind of judgment

20  call needs to be made here.

21       So that's the needs of the case.  You can require the

22  defendants to make out their theory that, if settlements in the

23  past decade were somehow inflated in a way that ought to be

24  adjusted before you forecast and estimate the future or

25  determine, as they would have it, the legal liability, we are

Garlock/5-12-11

172

1    not saying they can't make those arguments by appropriate means

2    of proof.    We are saying that to go to people who are not

3    Garlock claimants any longer, who specifically either bought

4    peace or won verdicts against Garlock, would be an abuse of

5    discretion and the wrong thing to do.

6          The parties' resources is another factor under Rule

7    26(b)(2)(C).    These are bankrupts.    They are not entitled to

8    the sort of no-holds barred, lavish discovery menu, that a

9    civil litigant using only what were incontestably its own

10    resources might be entitled to do.    You don't have the same

11    degree of deference towards a debtor in this kind of discovery

12    process that you would have outside of bankruptcy to an

13    independently funded, solvent litigant who chose to devote a

14    certain level of resources to the case.

15          The debtors are not entitled, simply put, to consume

16    inordinate resources re-fighting the tort wars that brought

17    them into the bankruptcy court for shelter in the first place.

18          The importance of the issue.    They pitch this

19    discovery now purely as rebuttal to Dr. Peterson's use of the

20    settlement database pursuant to the standard methodology.

21    Their main point there has been so far it's not admissible

22    under Rule 408.    That's wrong.    We will have to find an

23    opportunity going forward to tee up that issue and get it ruled

24    upon expeditiously so that we can know where we are.

25          But the issue of whether or not a given number that

Garlock/5-12-11

173

1    emerges from the data is the right number to attribute to an

2    average mesothelioma claim going forward is one that can be

3    attacked in a number of different ways and doesn't reasonably

4    require you to go disturb settled cases or cases that have been

5    resolved by judgment.

6          So the issue, although not unimportant, is amenable of

7    being tested by other fair means that don't require this

8    extraordinary step.  There is a logical disconnect in this idea

9    which is at the heart of the motion although somewhat obscured.

10   We are going to go to past claimants to get their documents

11   bearing on claims against insolvent defendants in order to show

12   what the circumstances Garlock would face in settling claims

13   with other mesothelioma victims in the future would be, and one

14   doesn't respond to the other.   It is sort of piling an

15   inference upon a speculation.  There are much more direct ways

16   to skin the cat, if there is a cat there to be skinned.  They

17   haven't adequately explained why going back to past claimants

18   in derogation of finality, which is what was achieved by those

19   settlements or by those judgments, can possibly be worth the

20   candle in terms of its probative force.  And they are not

21   entitled, I think, to experiment with that kind of thing.  They

22   are asking for discovery from five hundred people, not a

23   trivial matter at all.

24         The discovery will be cumulative of discovery that

25   they took in the tort system.  Here it is indeed relevant that,

Garlock/5-12-11

174

1    rather than a random sample to identify in effect the run of

2    the mill mesothelioma claims, they have targeted people who got

3    more than average compensation from Garlock to resolve their

4    claims or who won verdicts, an even rarer subset because the

5    trials were so few.

6         So far from a random sample that one could extrapolate

7    from in a statistical way, they have targeted what they call

8    the high value cases, and they have acknowledged in their own

9    argument that those are precisely the cases where Garlock had

10   the most incentive and exercised the most energy in pursuing

11   discovery.

12        That is also, by the way, not simply Mr. Worf's

13   arguments from the counsel table today but in note two their

14   reply in support of the amended motion that we are now arguing.

15   It says that these cases that they have targeted are, quote,

16   also generally the cases where Garlock conducted the most

17   discovery.  So they are in the best position with respect to

18   these past claimants to draw inferences based upon the

19   discovery material already in hand.  There is no indication

20   that they have attempted to do that or that the attempt has

21   shown that that information would be inadequate.

22        If, for example, they want to delve into their

23   litigation files concerning these high-value claims and

24   organize all of that material to demonstrate that, when Garlock

25   settled those claims, it was not of record whether or not the

Garlock/5-12-11

175

1    plaintiff had a claim against Johns-Manville, or Owens Corning

2    or something like that, they can do that.  They can do that

3    without disturbing settled claimants or judgment holders out of

4    the materials that they got in the tort system and of the kind

5    that they routinely use for drawing inferences of that nature

6    now through the Bates firm.

7         These claims are precisely the ones where the Turlick

8    testimony about the data resources already available to Garlock

9    is most significant.  The need here is minimal, if at all,

10   because of the way that they have targeted the particular

11   claimants they want to – past claimants that they want to go

12   after for more discovery.

13        Now, I spoke earlier of the un-wisdom of allowing the

14   discovery process to focus inordinately on individual claims,

15   and this is the textbook example because consider what would

16   happen if they got this discovery and now predictively they

17   would say, aha, this discovery proves that we are right, these

18   people didn't make trust claims before we settled.  By the way,

19   where is it written that Garlock is entitled to wait until

20   everyone else settles before it does or goes to trial?  It

21   isn't.  It's an intellectual construct that they have set up

22   that has no foundation in reality.

23        But they say, aha, these materials make our case.  We

24   will dispute it.  The question will become, okay, what were the

25   circumstances in which these five hundred cases were settled?

Garlock/5-12-11

176

1    Who will be the witnesses to that?  Presumably the lawyers who

2    settled the cases and the Garrison people who were in the loop

3    on settlement matters.

4         So they will have to bring in the settlement lawyer,

5    the Mr. Glaspy of the particular case, and we will examine him

6    about what was the situation existing right before they

7    settled, what he knew and didn't know, how he knew it, to what

8    extent he exercised diligence in trying to find out things

9    about the claimant's other exposures or other defendants, and

10   we will remind him of David Glaspy's testimony that, yes,

11   indeed – and this was elicited by Mr. Cassada on direct – yes,

12   indeed, when Garlock settled cases or went to trial, it had a

13   very good educated guess – I think was the terminology he used

14   – as to what the other settlements were because he had the

15   institutional knowledge of the work sites; he had his savvy as

16   a trial lawyer.  He has his relationships with other members of

17   the defense bar, and he had a pretty good working hypothesis of

18   what those other settlements were.

19        And the lawyer who is being examined now notionally

20   about why he settled a given case at a given level will be

21   confronted with all of that and will give his story, and then

22   we might have to bring in the plaintiff's lawyer to give the

23   plaintiff's perspective on what the situation was existing at

24   trial.

25        Your Honor, the Glaspy testimony I just referred to is

Garlock/5-12-11

177

1      at page 33 at lines 11 through 15.  It has to do in this

2      instance with tried cases that he says before finishing the

3      trial – I am sorry.  The question was, at line eight:

4            "Q.  And did you have an idea in cases about the

5            amount of settlements that the plaintiff was receiving

6            from other defendants?

7            A.  Before finishing a trial, the answer to that

8            question is, yeah, we had an idea or a very good

9            educated estimate and we would obtain that by prior

10           dealings, historical numbers and just talking with

11           defense attorneys but it was a ballpark estimate."

12           I remind the court that we are here about an estimate,

13     mathematical precision as the court in *Owens Corning* and the

14     court in *Federal-Mogul* acknowledged, not the kind of estimate

15     that Mr. Glaspy had when he sat down to settle cases is what –

16     is, I think, the appropriate basis under which to assess the

17     reasonableness of the historical settlements for the purposes

18     of forecasting an estimation.

19           But in any event, the point now is, if we allow the

20     estimation discovery to focus inordinately on individual

21     settlements, we will have five hundred mini trials about the

22     circumstances under which highly individualized past claims

23     were resolved.  It doesn't make any sense.  It will consume

24     inordinate amounts of time.  It isn't worth the candle.  But we

25     will be forced to go there if Garlock is allowed to go to past

Garlock/5-12-11

178

1    claimants in order to build a one-sided argument about the

2    meaning of the past settlement data.

3         Again, Mr. Glaspy was clear in testifying that Garlock

4    settled to avoid trial risk.  He also had to – I am sorry –

5    Garlock must acknowledge that the trust distribution procedures

6    of the existing trusts, which are all public, show what those

7    trusts are paying on average.  So putting that together with

8    information that is now going to get from the present

9    claimants, who have a lot of controversies with Garlock, will

10   provide pursuant to the questionnaire and that, coupled with

11   Garlock's preexisting resources, which are formidable, should

12   suffice.

13        Now, I want to be clear it is not our position that

14   there are no circumstances under which a law firm can be

15   subpoenaed for documents.  We never said that.  What we say is

16   that, as a matter of the court's discretion under Rule 26 and

17   for the purposes of shaping the estimation proceeding, it would

18   not be a wise thing to do to open up past claimants in these

19   numbers to this kind of discovery.  There are good prudential

20   reasons to avoid that can of worms.  Those lawyers who formerly

21   represented claimants who won substantial settlements from

22   Garlock will predictively and undeniably regard efforts to take

23   discovery of the very same claim, for the very same

24   circumstances, as Garlock had the opportunity to take in the

25   tort system before it settled, is at the very least in

Garlock/5-12-11

179

1     derogation of the settlement and in effect a diminution of the

2     value of the settlement to the claimant.  And they will do what

3     strong lawyers are supposed to do in defending their client's

4     interest, and that is they will litigate the appropriateness of

5     it.  And while we are struggling to get traction in an

6     aggregate estimation that could finish up sometime before the

7     end of this year, all of a sudden we will have a proliferation

8     of enforcement disputes.  This isn't a threat.  Whenever I say

9     this, they tend to say that I am somehow threatening them.  I

10    am just trying to predict the course of events in a way that

11    can inform the judicial management of this case.

12        This discovery isn't worth that price and yet it will

13    put these thirty law firms that they have chosen to target with

14    this discovery in the position of almost having to do that,

15    almost being compelled to put up a stout defense of this

16    discovery in their own courts and haggle through all of those

17    Rule 45 issues while the parties in this case are trying to get

18    to the aggregate estimate.

19        I can't control that process.  I can only give the

20    court my best forecast of what disputes will flow from this

21    ill-considered effort by the debtors to disturb claimants whom

22    they voluntarily settled with under circumstances where either

23    they did get the discovery that they are now after so it's

24    redundant or they found it not to be to their advantage to seek

25    it.  In which case, now they are trying to retread.  Neither

Garlock/5-12-11

180

1 scenario is an attractive one from the standpoint of trying to

2 justify this unusual discovery.

3   A couple of hypotheticals.  These are not intended to

4 answer comprehensively but to point out aspects of what makes

5 this discovery troublesome.

6   Suppose in the tort system Garlock is defending a

7 mesothelioma suit brought by plaintiff "A."  Now Garlock

8 subpoenas former plaintiff "B," a settled claimant, demanding

9 discovery of that former claimant's claims against not Garlock

10 but other defendants and the status of those cases and there is

11 an objection and Garlock argues I need that information from

12 the settling claimant concerning his claims against others and

13 those resolutions, third-party against third-party, to

14 determine whether to settle with plaintiff "A" and, if so, at

15 what amount.  That would not be a viable justification for that

16 unusual discovery in the tort system.

17   That doesn't necessarily dictate the answer here but

18 it is informative.  There is a radical disconnect between the

19 stated purpose and what that discovery could actually show and

20 there are good, solid reasons in the meaning of settlements, in

21 the importance of finality in the litigation system and in the

22 sound judicial administration of Garlock's own case not to go

23 there.

24   Now suppose in a variation of the hypothetical, the

25 same facts but the co-defendants about whose claims Garlock

Garlock/5-12-11

1    would inquire of the former claimant have put on the Internet

2    their average payments to mesothelioma claimants.  That is

3    precisely the situation of the trusts who, after all, are

4    nothing but in effect the liability divisions or run-off

5    divisions of reorganized former co-defendants.

6         What in the world could justify the foray into this

7    unusual discovery against resolved claims when the average that

8    the targeted co-defendant or former co-defendant pays to

9    claimants of that type is already known?

10        It reminds me again of Judge Fullam's admonition, "Let

11   us begin with what is known."  Let's not go chasing after

12   mathematical precision.  Let's not make the aggregate

13   estimation inordinately focused on highly individual claim by

14   claim inquiries.

15        Now, after the same hypothetical that plaintiff "A,"

16   the active litigant against Garlock in the tort suit, will have

17   disclosed the fact and status of his claims against the co-

18   defendants, which is what claimant "A" will have to do under

19   the questionnaire.  It becomes more and more marginal.  It is

20   ultimately reduced to abject absurdity.

21        We have said some things in our papers about ulterior

22   purposes that the plaintiffs bar will certainly suspect, given

23   Garlock's public posture, and that will intensify the onset of

24   satellite litigation if these matters go forward, and that is

25   Garlock's declared purpose of sometime in the fullness of time

Garlock/5-12-11

182

1    bringing lawsuits against lawyers who settled cases in a way

2    that Garlock now regrets were against their clients.  We know

3    that when a lift stay applicant came to court this last fall

4    and Garlock responded by a blunderbuss of discovery, even

5    though that lift stay applicant held a judgment against

6    Garlock, you found no connection between the lift stay and the

7    discovery.  Garlock said in parting, "Oh, well, we will get

8    that discovery when we bring our past claimants motion."  They

9    were suggesting in that situation that that claimant had

10   somehow wronged them by coming out on the winning side of that

11   case in the way that claimant did, and they were eager to

12   develop a factual basis for some kind of striking back.

13         Well, that is an avowed purpose, not even a disguised

14   ulterior purpose of some of this discovery.  Those purposes, at

15   the very least, coexist with the arguments that Mr. Worf has

16   made.  They suggest a very troublesome tendency here and one

17   that won't be lost on the people who receive these subpoenas.

18   They are all well aware of Garlock's aggressive posture. And so

19   that adds to the discretionary factors that we hope you will

20   take into consideration in weighing the balance here because it

21   makes it highly probable that this discovery will be seen as a

22   provocation that will produce a lot of litigation that will get

23   the estimation off track, which is something I am hoping to

24   prevent.

25         And so, Your Honor, for all of these reasons, all of

Garlock/5-12-11

183

1    which are inherent in Rule 26(b)(2)(C), we hope you will

2    exercise your discretion and deny this motion.

3         Thank you, Judge.

4         THE COURT: I think I have to deny this motion for the

5    law firms for the same reasons that I have done before, but

6    also I think that largely on relevance grounds that it seems to

7    me unlikely that, if this evidence was produced, that it would

8    really go very far towards doing what the defendants/debtor

9    suggests that it would and, that being the case, it is an

10   unwarranted expense and an undue burden to proceed in this way

11   to try to get that evidence, given the fact that these are

12   settled claims that are anywhere from almost a year to ten

13   years old, you know, claims that have been put to rest and I

14   think ought to stay at rest.

15        So, Mr. Swett, if you all will just draw an order

16   denying that motion, we will go from there.  Okay.

17        Does that do then what we had set to do for today or

18   is there anything else?

19        MR. CASSADA: That completes the agenda today.

20        THE COURT: Okay.

21        COURTROOM DEPUTY: The motion of the asbestos personnel

22   injury claimants is still pending, motion of the official

23   committee, number three on the agenda.

24        MR. SWETT: The judge dealt with that in the status

25   conference.

Garlock/5-12-11

184

1          THE COURT: Yeah, in the status matters, yeah.  Okay.

2     Well, thank you all for your efforts and we will – when is our

3     next hearing?

4          MR. MILLER: The 26th.

5          THE COURT: All right.  We will see you all then.  If

6     you need, on the questionnaire, if you need to get up with me

7     or if you need to have a status conference or something to work

8     out any final details of that, just call and I will be around

9     and about, one place or another, and we can get together by

10    conference call or otherwise.

11         MR. KRISKO: Thank you, Your Honor.  We will try to get

12    that to you quickly.

13         COURTROOM DEPUTY: And the exhibits from today's

14    hearing?

15         THE COURT: We will admit all the exhibits.  Anything

16    that was new, I will admit.

17         Thank you.

18         (Off the record at 4:19 p.m.)

Garlock/5-12-11

# C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

 /s/ Patricia Basham

Patricia Basham, Transcriber

Date:   May 21, 2011

Garlock/5-12-11