IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

In the matter of:                    )
                                     )
GARLOCK SEALING TECHNOLOGIES, LLC,)  No. 10-31607
et al.,                              )  Jointly Administered
                                     )  Charlotte, NC
    Debtors.                         )  May 26, 2011, 9:31 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GEORGE R. HODGES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

Garland S. Cassada
Jonathan C. Krisko
Richard C. Worf, Jr.
Robinson, Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246

John R. Miller, Jr.
Rayburn, Cooper & Durham, P.A.
227 West Trade Street, Suite 1200
Charlotte NC, 28202-1672

Electronic Recorder
Operator:                    Cecelia Burr

Transcriber:                 Patricia Basham
                             6411 Quail Ridge Drive
                             Bartlett, TN  38135
                             901-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

Garlock/5-26-11

2

APPEARANCES:


Jonathan P. Guy (Telephonically)
Orrick, Herrington & Sutcliffe LLP
Columbia Center, 1152 15th Street, N.W.
Washington, DC

A. Cotten Wright
Grier, Furr & Crisp, P.A.
101 N. Tryon St., Suite 1240
Charlotte, NC 28246

Travis W. Moon
Moon Wright & Houston, PLLC
227 West Trade Street
Suite 1800
Charlotte, NC 28202

Trevor W. Swett III
Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005

Hillary B. Crabtree
Moore & Van Allen PLLC
100 N. Tryon Street, Suite 4700
Charlotte, NC 28202-4003

Deborah L. Fletcher
Fisher Broyles LLP
6000 Fairview Rd
Suite 1200
Charlotte, NC 28210

3

EXHIBITS

| NO. | DESCRIPTION | ID | ADM |
|-----|-------------|-----|-----|
| GST 156 | Rust Consulting, Inc. Proposed Questionnaire Form | 18 | 107 |
| GST 157 | Garlock's Proposed Stipulated Protective Order | 107 | 107 |
| GST 158 | Garlock's Proposed Order as to Claim Questionnaire | 12 | 107 |
| GST 159 | Garlock's Proposed Mesothelioma Claim Questionnaire | 6 | 107 |
| ACC 104 | Combustion Engineering 524(g) Asbestos Pl Trust Proof of Claim Form | 40 | 105 |
| ACC 105 | Red lined copy of last version of the Garlock proposed questionnaire form | 46 | 105 |
| ACC 106 | Committee's updated version of proposed order to issue questionnaire and governing of the confidentiality of information | 47 | 105 |
| ACC 107 | Red lined copy by the committee of the debtor's last version of the proposed order authorizing the debtors to issue questionnaire and governing of the confidentiality of information | 47 | 105 |
| ACC 108 | Summary of Debtor's Fees and Applications | 88 | 105 |

Garlock/5-26-11

4

1       (CALL TO ORDER)

2       THE COURT: Good morning.  Have a seat.

3       COUNSEL: Good morning.

4       THE COURT: We will, I guess, get you all's voices on

5  the machine.  Why don't we start with Mr. Krisko over here and

6  just go across.

7       MR. CASSADA: Good morning Your Honor.  This is Garland

8  Cassada from Robinson, Bradshaw & Hinson.  I am here with

9  Jonathan Krisko and Richard Worf.

10      THE COURT: Okay.

11      MR. MILLER: Good morning, Your Honor.  Jack Miller,

12  Rayburn, Cooper & Durham on behalf of the debtors.

13      MS. CRABTREE: Good morning, Your Honor.  Hillary

14  Crabtree from Moore & Van Allen on behalf of Coltec Industries.

15      MS. FLETCHER: Your Honor, Deborah Fletcher for the

16  trade creditors committee.

17      MR. SWETT: Good morning, Your Honor.  Trevor Swett for

18  the Official Committee of Asbestos Personal Injury Claimants,

19  along with Tom Moon.

20      MS. WRIGHT: Good morning, Your Honor.  Cotten Wright,

21  here on behalf of the FCR, and I believe that Mr. Guy will be

22  on the telephone.

23      THE COURT: Okay.

24      MR. GUY: Good morning, Your Honor.  I am on the phone.

25  Thank you for letting me appear.

Garlock/5-26-11

5

1        THE COURT: Good.  Well, we will proceed, then.  Mr.

2   Miller, do you want to take us through?

3        MR. MILLER: Sure.  I will grab M.C. duties.  We only

4   have two items on the agenda for hearing today, and one of them

5   is a continuation of the personal injury questionnaire matters

6   that you have heard a number of times.  I believe Mr. Cassada

7   or Mr. Worf are going to handle sort of giving you an update

8   about where we are on that and any issues that remain

9   outstanding.

10        And then the only other item that's on is the Caplin

11   and Drysdale's second interim fee application.

12        THE COURT: All right.  Do you want to do the

13   questionnaire first?

14        MR. CASSADA: Yes, Your Honor.  Hopefully today we can

15   complete the personal injury questionnaire.  There is also an

16   order approving the questionnaire and it will provide for

17   certain logistics with respect to service and what-not, and

18   hopefully we can complete that or at least establish a schedule

19   for getting that completed, probably presenting competing

20   orders that Your Honor can choose from.

21        But as a matter of update, we have undertaken to agree

22   on the form of the questionnaire consistent with our

23   understanding of the court's rulings.  We have been successful

24   in reducing disagreements to a very short list.

25        So as the court knows, the questionnaire in the

Garlock/5-26-11

6

1    debtor's view falls far short of what we requested and it fails

2    to require that claimants provide information necessary to

3    determine the enforceability and value of claims under

4    applicable law, as we believe code section 502 requires.  But

5    we do believe that, by the end of the day, you can consider two

6    points and we will have a questionnaire consistent with Your

7    Honor's ruling.

8            The questionnaire order, on the other hand, has been

9    very difficult to reach agreement on.  There are a number of

10   issues that separate us, most of which the court has not had an

11   opportunity to consider.  They are the type of things that

12   parties do try to agree on without the assistance of the court,

13   and I believe there are important logistics that we have agreed

14   on but there are other things that will require the court's

15   assistance.

16           So Mr. Worf will explain the differences that separate

17   us on both the questionnaire and the questionnaire order and he

18   will present our arguments.

19           THE COURT: Okay.

20           MR. WORF: Good morning, Your Honor.  I would like to

21   begin by passing out the debtor's current version of the

22   questionnaire, if I may approach.

23           THE COURT: All right.

24           (Pause)

25           MR. WORF:   And this is marked GST 159.  The areas of

Garlock/5-26-11

7

1   disagreement, as Mr. Cassada said, boil down to two now, and

2   they both relate to the court's ruling on May 12 that claimants

3   they should attach their trust claim forms to their completed

4   questionnaire.

5       As the court may recall, that's what the court ordered

6   and claimants also have the opportunity, in lieu of attaching

7   those claim forms, to execute an authorization to obtain the

8   trust claim forms from the trusts themselves, which would

9   relieve the claimants of the burden of having to attach them if

10  that's what they prefer.

11      Those versions, the committee's version and the

12  debtors' version, now contain the requirement that trust claim

13  forms be attached and they also contain the authorization which

14  the committee had substantial input on the form of that

15  authorization and the debtors accepted virtually all of those

16  suggestions except for one that I will get to in a second.

17      When the debtors wrote their requirement to attach

18  trust claim forms, here is how we put it.  It's in part eight

19  of the current questionnaire.  It is page fourteen.  And we

20  wrote it this way:

21          "Attach copies of all trust claim forms submitted by

22          or on behalf of the claimant or injured party to

23          trusts listed in table-B (including all evidence

24          submitted to meet the exposure requirements of the

25          trust but excluding, if you wish, medical information

Garlock/5-26-11

8

1        submitted to the trust)."

2        We put that in there to clarify that we don't need the

3   medical part of the attachments to the trust claim form.

4   That's not something that we are interested in or that our

5   experts need and just wanted to make clear that the claimants

6   don't have to provide those pages which can sometimes be

7   lengthy, although if they want to, that's fine, too.

8        The attachment of the exposure evidence that the

9   claimant submitted with their trust claim form is the current

10  area of dispute.  It is our belief that the exposure evidence

11  is an integral part of the trust claim form that the claimants

12  submit.  Most trusts, as the court has heard, have both

13  exposure and medical requirements, and sometimes those exposure

14  requirements are satisfied by the claimant signing something in

15  the body of the actual form or stating something in the body of

16  the actual form, but other times they say "See Exhibit-A," and

17  Exhibit-A is an affidavit of exposure of some kind that

18  describes how they were exposed to the product for which the

19  trust is responsible.  So I have an example of what that looks

20  like that I will pass out, if I may approach.

21        (Pause)

22        MR. WORF:  This is an excerpt from GST 137, which we

23  previously marked, and this was a claim form submitted to the

24  National Gypsum Trust by an individual named Mr. Puller, and

25  this is the two-page certified statement of exposure that he

Garlock/5-26-11

9

1    had attached to his trust claim form.  As the court can see, it

2    is relatively short but it contains material facts.  He says in

3    paragraph two, admits that the decedent was exposed to asbestos

4    containing materials and breathed air containing particles of

5    dust arising from such materials from the years 1973 to 1978.

6    It then says the locations where the person worked where

7    National Gypsum products were located and then certifies that.

8        So facts like that in this particular instance would

9    not be in the body of the claim form, they would be in the

10    short attachment, and those facts are material to us and to our

11    experts because that's an area of dispute, is what are the

12    claimants admitting when they submit these claims to the

13    trusts.  Sometimes we hear here and elsewhere that, to recover

14    from a trust, the claimant only has to say that they were at a

15    site where the product was.  The Babcock & Wilcox trust claim

16    form is often held up as an example of that.  And exposure

17    affidavits like these show that the claimants sometimes in

18    making their trust claims make admissions that would have been

19    valuable to Garlock had it remained in the tort system and are

20    also relevant to its legal liability.

21        We think that these attachments are part of the trust

22    claim form.  They are clearly discoverable.  Mr. Simon

23    testified that affidavits of exposure like this have to be

24    disclosed in discovery as a matter of course.  The location of

25    this testimony was the February 17, 2011, transcript at pages

10

1    144 to 146.

2         He was asked:

3         "And that would be discoverable pretrial?" Referring

4    to the affidavits of exposure.  And Mr. Simon said, "Sure,

5    because it is part of that set of exposures that the plaintiff

6    apparently knew about and needs to have disclosed through

7    discovery."

8         So we think the clarification that the trust claim

9    form includes materials like this is a clarification that is

10   included within the court's ruling on May 12 and should be part

11   of the questionnaire.  Although, like I said, we are not

12   interested in obtaining the medical information.

13        The second area of dispute on the questionnaire is the

14   authorization and, like I said, we had substantial input from

15   the committee on this and, again, this is not something that

16   claimants are required to execute.  It is something that, if

17   they want to avoid the burden of attaching the trust claim

18   forms, they execute this and the debtors can obtain them from

19   the trust.

20        We accepted detailed language providing that this

21   authorization is limited and only permits Garlock and no one

22   else to obtain these materials.  Those are all additions that

23   the committee made.

24        The one area of dispute is the expiration date of the

25   authorization, and the last version of the committee's

Garlock/5-26-11

1    questionnaire that we saw said that the authorization would

2    expire on October 24, 2011.  Now, that is problematic because

3    October 24 is, as I will discuss in more detail, the expected

4    return date of the questionnaire.  So what the committee wanted

5    was essentially an authorization that is going to expire the

6    moment the debtors get it.  They wouldn't have the opportunity

7    to actually use it to obtain the materials.  So that is not a

8    very helpful suggestion.

9         What the debtors had in our version was that the

10   authorization would expire on the effective date of any plan of

11   reorganization in the bankruptcy cases.  Now, you could say

12   another option would be to say it would expire at the end of

13   any estimation trial that occurs in these cases.  That's

14   another potential way to do it because that would give the

15   debtors enough time obviously to go and get the trust claims

16   from the trust.

17        We think the effective date is a little better because

18   it's not completely predictable what is going to happen in the

19   cases and what litigation will occur, and we think it makes

20   sense that once the claimant has executed the authorization

21   that it remains good for the entire period of the case and that

22   there is no reason, if things take a different course, for

23   debtors or anyone else to have to resolicit the authorization.

24   The authorizations obviously would only be used for the limited

25   purpose contained in the authorization, which prevents any sort

Garlock/5-26-11

12

1    of use of it for any purpose not related to these cases.  And

2    the court would, of course, remain cognizant and aware of what

3    purposes these authorizations are being used for.  So we think

4    that is the appropriate expiration date, if there is one.  And,

5    like I said, the October 24 date is just a nonstarter because

6    that would nullify the effect of the authorization.

7         I think that wraps up the areas of the questionnaire.

8    We, as Mr. Cassada said, worked hard to try to minimize the

9    disputes that we would bring to the court and that is what we

10   have been able to do.

11        The next matter is the form of the order issuing the

12   questionnaire, and I will pass out the debtor's current version

13   of that order, GST 158.  I guess I will just describe sort of

14   the mechanics of it and how the debtors' version goes and I can

15   hit on the points of disagreement as I go through it.

16        I don't think there is any dispute on the preamble,

17   which just recites what has happened in the case related to the

18   questionnaire.  Then our version has a brief statement of

19   jurisdiction.

20        The committee's version wants to say that the

21   questionnaire is being authorized under Rule 9014.  Our version

22   does not have that and let me explain why.

23        9014, of course, is the rule applying the various

24   rules of civil procedure to contested matters, and the debtor's

25   original motion was under Rule 2004, as the court knows.  Now

Garlock/5-26-11

13

1    the rule 9014, we don't think that there is any rule in there

2    that really describes what we are doing with the questionnaire.

3    The  questionnaire  is  not,  you  know,  a  standard  method  of

4    discovery that is covered by the federal rules, and that's why

5    the debtors originally sought to issue the Rule 2004.

6          The conceivable rule that might apply is the subpoena

7    rule that is also incorporated by the Bankruptcy Rules.  As the

8    committee  said  many  times,  the  mesothelioma  claimants  are

9    currently third parties to the cases and that would seem to be

10   the natural rule but, of course, we are not proceeding under

11   that rule either because that presents potential procedural

12   obstacles that I don't think the court wants to get involved

13   with.

14         So the way we view the questionnaire is that it is

15   something that the court is either issuing under Rule 2004 or

16   under its inherent powers to administer the case and that there

17   is not anything in Rule 9014 that applies and describes exactly

18   what the court is doing.  So that is why that is not in our

19   order.

20         We next provided the questionnaire which, of course,

21   will be the final form of it.  It is attached as Exhibit "A"

22   and is incorporated and approved.

23         Then I see my paragraph numbers are incorrect but, in

24   what appears on this as paragraph three, this is the definition

25   of who is required to answer the questionnaire.  And what we

Garlock/5-26-11

14

1    did here is we just drew out from the version of the

2    questionnaire that everyone has been working with the

3    definition of who has to answer it and that definition is every

4    person who has a pending lawsuit against Garlock or Anchor.  In

5    other words, if they sued on or before June 5, 2010, and

6    alleges that such person or another individual contracted

7    mesothelioma as a result of use of and/or exposure to an

8    asbestos containing product manufactured and/or sold and/or

9    placed into the stream of commerce by Garlock or Anchor.

10         Again, that is just drawn directly from the version of

11   the questionnaire that the court and the parties have been

12   working with over the past few months, and I don't think anyone

13   has objected to that definition, at least not in the recent

14   past.

15         Now the disagreement that leads to is that that

16   definition includes anyone who had a pending lawsuit on June 5

17   and who alleges in that lawsuit that they have mesothelioma and

18   that one of the debtors caused it.  As the court may recall

19   from the fall testimony, there are certain people who fall in

20   that category who are known to Garlock.  Their complaint said

21   I have mesothelioma, Garlock or Anchor caused it, and I am

22   suing you, and people like that got entered into the Garlock

23   database as mesothelioma claims, and so Garlock knows that

24   those individuals have alleged mesothelioma and can easily

25   serve copies of the questionnaires on those people and tell

15

1    them that they are required to answer it.

2          There is another group of claimants which the court

3    may recall.  There are approximately 30,000 in number who sued

4    Garlock or Anchor, had pending cases as of June 5 and are

5    unknown.  Their complaints or whatever they used to initiate

6    the suit didn't contain what their alleged disease is.

7          Now, it is likely that most of those are nonmalignant

8    claimants but, as the experts testified back in the fall, there

9    is likely some number who are cancer claimants and some smaller

10   number of those who are mesothelioma claimants, and those would

11   fall within the definition.

12         The experts will be making, in the absence of knowing

13   who those people are, the experts can extrapolate who they are

14   and say, well, you know, there is a certain number of unknowns

15   either for this debtor or for the Manville trust or for someone

16   else who, if they are unknown, turn into mesothelioma claimants

17   once you find out what their disease is.  But the problem is,

18   even though you can extrapolate that, if you don't have

19   questionnaires from them, you don't know what the

20   characteristics of those individuals are, nor do you have

21   certainty regarding what the actual numbers are.  And we think

22   that there is an easy way to require those individuals to

23   answer the questionnaire and to come forward and say, yes, I am

24   a mesothelioma claimant and also here are the characteristics

25   of my claim.  And here is what we propose:

Garlock/5-26-11

16

1          First of all, the easy part in what appears as 4(a) in

2     our order provides that on or before June 24, 2011 – that is a

3     number that we got with the help of Rust.  They tell us that,

4     whenever the court enters an order, within about three weeks

5     from then, they can have the paper, service packages and the

6     electronic system up and running.  So that is where we got that

7     number.

8          4(a) provides that the debtors will serve the

9     questionnaire on counsel of record for all plaintiffs, party to

10    complaints containing allegations that such plaintiffs are

11    mesothelioma claimants.  Those are the known and that is, like

12    I said, easy to do from the database.  We have already done

13    that and determined who those individuals are.

14         Then part 4(b) deals with the unknown, and what we

15    have proposed is that the debtors would serve a notice on

16    counsel for the thirty thousand and it wouldn't be anything

17    extensive.  It would be a notice enclosing a copy of this order

18    and a single copy of the questionnaire, as well as probably a

19    cover letter, and would tell those counsel that, if you have

20    any mesothelioma claimants among the individuals listed in this

21    letter, and we will list the unknowns that in the Garlock

22    database are associated with that counsel, if any of those are

23    mesothelioma claimants, here is the questionnaire, they need to

24    answer it.

25         That process would not be very difficult.  There are,

Garlock/5-26-11

17

1    I believe, around seven hundred counsel, total, who are

2    recorded in the Garlock database, and it could be even fewer

3    than that depending on what firms brought the unknown claims.

4    It is likely fewer than that, but it would be a short package

5    to those seven hundred, or fewer, counsel telling them here is

6    a questionnaire, any mesothelioma claimants need to answer it.

7        THE COURT:  And you know the names of the claimants;

8    you just don't know their disease?

9        MR. WORF:  That's correct, and we would attach to that

10   letter to counsel a list of the claimants that we have.

11       THE COURT:  So you will identify who you are talking

12   about?

13       MR. WORF:  That's right, and we would say here is your

14   list, here are our records and just take a look.  No one

15   counsel would have thirty thousand.  It would be fewer than

16   that for each counsel.

17       So that, we would do, and we think that is a

18   cost-effective and simple way to figure out who among the

19   unknowns are mesothelioma claimants and then figure out what

20   their characteristics are, and we think that's a cost-effective

21   and helpful exercise and also falls within the definition of

22   mesothelioma claimants that everyone has been working with.

23       Another feature that we have incorporated and we

24   haven't had a real chance to discuss with the committee, but

25   was absent from their latest draft that I wanted to explain to

Garlock/5-26-11

18

1    the court, is that we have discussed with Rust the process of

2    answering the questionnaire in paper and what would make it

3    easiest on them and on the debtors and the estate to process

4    the paper forms without increasing any burden on the

5    plaintiffs, and here is what we came up with, and I will pass

6    this out.  It is GST 156.

7           (Pause)

8           This is an older – the substance of this is an older

9    version of the questionnaire.  We are not introducing this for

10   the text but rather for the format.  And what Rust says is that

11   it really makes it easy on us if the claimants who answer in

12   paper do so on a form that has a bar code linked to them.  So

13   that when it comes in, we scan it in, we know it is associated

14   with that claimant and there we go.  That prevents having to do

15   a manual review and a manual linkup of claimants with their

16   paper forms.

17          And so you will see that there is a bar code on the

18   first page and also on the subsequent pages that is unique to

19   that claimant and links it up to that claimant.

20          They have also done some formatting things, spacing it

21   out so that there is plenty of space to answer the questions in

22   the paper form for any claimants that you need to do that,

23   which I don't think anyone would have any problem with.

24          And so what we would do is that, for the known

25   claimants, Rust would mail to their counsel an individual copy

Garlock/5-26-11

19

1    of this claim form with a unique bar code for everyone in our

2    records that have a known mesothelioma claim, and this order

3    provides that they will be required to answer it on this form

4    so that we have that time and cost savings.  It would be no

5    problem for the claimant because Rust would provide this copy

6    to them.

7          We think that makes a lot of sense and it is just

8    easier for everyone concerned and it would save the estate some

9    money.

10          For the unknowns, what we would do is we would not

11    send an individual one for all of the thirty thousand or so

12    unknowns because that just wouldn't make sense because most are

13    not mesothelioma claimants.  Instead we would send just a

14    sample form to their counsel and request, if they want to

15    answer in paper, just give Rust a call or send them an e-mail

16    and they will send the form to them.  Or if for some reason

17    they chose not to do that, the number of those would be

18    relatively small compared to the knowns and would not be a real

19    burden to manually link up.

20          Moving on, 4(d), we have a return date of October 24,

21    2011.  That's keyed off the June 24 service date, and that's a

22    number we got from the committee.  According to them, a hundred

23    and twenty days is about what the claimants need to answer the

24    form.  So that's what we put.

25          We have the option to answer in paper or

Garlock/5-26-11

20

1    electronically.  Rust has started on the electronic system and,

2    as soon as the final questionnaire is done, they can finish it

3    in a relatively short period of time.

4         Then we provided that Rust will make the questionnaire

5    responses and attachments available to the parties who have

6    been in here, the debtors, the official committee of asbestos

7    personal injury claimants, the FCR, the equity holder, and the

8    bankruptcy administrator.  I am sure we could add the trade

9    creditors if they want to be added, and we also provide that,

10   in the event there is some other person who needs access, they

11   can move the court for access after providing notice to the

12   affected mesothelioma claimants by their counsel and also the

13   various other parties.

14        We have a requirement that Rust create a database of

15   the information.  We thought that one way to save cost would be

16   to have the debtors, namely Garrison, doing the manual

17   inputting of the paper forms.  That is a mechanical process and

18   we didn't think anyone would have an objection to that and

19   thought it would be a good use of Garrison.  So we have that in

20   there, too.

21        Then we have an objections procedure.  Of course,

22   Exhibit 2 to the questionnaire is the form for making

23   objections and the order provides that claimants have to make

24   their objections there and cannot do so by attachments which

25   would be ambiguous.

Garlock/5-26-11

21

1        And then it provides that the consequences for failure

2    to complete and timely submit the questionnaire and any

3    required attachments remain to be determined, which I believe

4    is a correct statement of where things stand and what we have

5    heard the court's thinking on that issue, and that leaves it

6    open for everyone to argue what those consequences should be if

7    and when anyone fails to return the questionnaire.

8        The rest of the order – the rest of the substantive

9    parts of the order deal with confidentiality, and this is the

10   other large area of disagreement between the committee and

11   debtors.

12       What we heard the court say on, I believe April 28 at

13   page 188 to 189, was that the debtors' objections to

14   confidentiality were overruled and the committee's suggestion

15   that the questionnaires and their responses should be subject

16   to the stipulated protective order among all of the existing

17   parties and that they would be automatically subject to that

18   and that they would be used for the purposes of estimation but

19   that someone could make a motion to the court if it became

20   necessary to use them for some other purpose in the cases.  So

21   that is what we tried to capture in the order starting in what

22   is labeled as paragraph six.

23       It provides that the responses to the questionnaire,

24   both the information and the documents, are treated as having

25   been designated confidential information within the meaning of

Garlock/5-26-11

22

1    the stipulated protective order already entered in the

2    bankruptcy cases.  I have a copy of that order that I can pass

3    around.

4           So what that means is, if you look at paragraph –

5    actually it is section four of the stipulated protective order,

6    this governs the designation of confidential information and it

7    provides that the parties to the stipulation may designate as

8    confidential information material produced in discovery by

9    stamping confidential on each page.

10          Under our order, the mesothelioma claimants are

11   getting better treatment than this because we are going to

12   treat everything as automatically designated confidential

13   information within the meaning of this stipulated protective

14   order. So they wouldn't have to stamp anything.  It would just

15   be treated as that automatically.  So they won't have to go

16   through the obligation that parties to this order have of

17   determining whether in good faith the material actually is

18   confidential.  It would just be treated as that and we would go

19   from there.

20          Now the consequences of that treatment and that

21   designation are not that it is automatically confidential

22   forever and all time because, in the stipulated protective

23   order, there is, in section five, a provision that allows for

24   any party to challenge, if they want, the designation as

25   confidential.   And even with the questionnaire responses

Garlock/5-26-11

23

1   designated as confidential, someone could come and do that for

2   a particular part of the questionnaire that they didn't think

3   was confidential and needed to disclose to somebody for some

4   purpose.

5        The committee's version of the order doesn't have that

6   out.  It treats everything as confidential forever and all

7   time.  It essentially puts it in a box and says confidential

8   forever, and we don't think that is appropriate and we think

9   that really hurts or potentially hurts the debtors who have an

10  interest in potentially sharing certain parts of the

11  questionnaire responses with other parties who can provide

12  information and that certain parts of the questionnaire are

13  virtually indisputably not confidential.

14       Just to reference a few, the information on the

15  claimant's occupation and industry, the information on their

16  exposure to a Garlock product, those are not even arguably

17  confidential and, like I said, they would be designated as

18  confidential under our order but there would be the opportunity

19  for argument and findings from the court regarding whether

20  those parts actually are confidential.  We don't think they

21  are.  The committee may argue otherwise, but there hasn't been

22  any findings on that or an extended debate on it, and we think

23  that, at least putting that off, is the best approach for now

24  so that we can get the questionnaire issued and not be held up

25  by a dispute like that.

Garlock/5-26-11

24

1          Now why would the debtors want to tell someone else

2     that this claimant is saying that they were exposed to Garlock

3     at this site?  Well, these claimants have all sued many other

4     defendants and those defendants are finding out things about

5     what the claimants are saying about Garlock and about other

6     products  and  the  debtors  have  an  interest  in  potentially

7     comparing what is said in this questionnaire to what is said

8     out in the tort system.  That is not an illegitimate goal.

9     That is ensuring the consistency in the best sense of the word,

10    and that is just an example of the kind of thing that would not

11    be  possible  under  the  committee's  black  box  approach  where

12    these questionnaires are put in a black box and sealed for all

13    time.

14          Again, we think that this approach is consistent with

15    the court's ruling on April 28 where the Court indicated that

16    this information should be subject to the stipulated protective

17    order.

18          This stipulated protective order, of course, is what

19    has governed the debtors' discovery and the sensitive documents

20    that they have produced to the committee and the FCR and, you

21    know,  we  think  it's  really  only  fair  that  the  debtors'

22    discovery  that  they  are  obtaining  from  the  mesothelioma

23    claimants is subject to the same rules, which is all that the

24    debtors' order does, and there is no reason to have different

25    rules for different parties.

       Garlock/5-26-11

25

1          Alternatively another way for the court to proceed

2     would be to issue the questionnaire under the stipulated

3     protective order and then, before the questionnaire responses

4     come in, have a hearing on what parts of the questionnaire

5     should be confidential and what parts should not for all time.

6     And then the parties could put on evidence about what parts are

7     confidential and what parts are not, and the court can get that

8     squared away even before the responses come in, but we don't

9     think the issuance of the questionnaire should be delayed by

10    those disputes.

11         The other part of the court's ruling on the 28th was

12    the uses of the information and the court ruled that it should

13    be used for estimation, and we embodied that in what is listed

14    as paragraph twelve of the debtors' exhibit.

15         Section six of the stipulated protective order has a

16    fairly broad use restriction.  It basically allows the parties

17    to the stipulated protective order to use the confidential

18    information for any purpose they want in the cases.  That is a

19    simplification of it but that is basically what it says, and

20    those are the terms under which the debtors' sensitive

21    documents have been produced to the committee and the FCR.

22         We are giving the claimants better treatment under

23    paragraph twelve here than the debtors got under the stipulated

24    protective order because we limited it to section six and

25    limited the use of the confidential questionnaire information

Garlock/5-26-11

26

1   to the purposes of formulating a plan of reorganization in

2   these bankruptcy cases and for the purpose of any estimation of

3   asbestos claims that occurs in these bankruptcy cases.

4   Estimation was part of the court's ruling.  We put in

5   the purposes of formulating a plan of reorganization because we

6   view the questionnaires as directed to that, as well as helping

7   the debtors with formulating a plan of reorganization and

8   proposing an appropriate plan.  So we put that in there, too,

9   but that can be struck if the court would like.

10   And then it provides that a party may use the

11   confidential questionnaire information for any other purpose

12   only pursuant to a court order after motion and notice to

13   counsel for mesothelioma claimants affected.  That's another

14   part of the court's April 28 ruling where the court said that,

15   if some other use became necessary, a party could make a motion

16   and get an order to that effect.

17   The committee's version of the order doesn't contain

18   that and so we thought it was inconsistent with the court's

19   ruling.  It provides that the information is strictly only to

20   be used for estimation for all time, again putting it in a

21   black box that has estimation on the cover of it, and we don't

22   think that is either appropriate or consistent with the court's

23   order.

24   So those are basically the differences as they stand

25   now.  There may be some details that are different, but I think

Garlock/5-26-11

27

1    those are the material ones, and we think the debtors' order

2    embodies the court's rulings, it provides a workable and

3    efficient way to get the information that the debtors need.

4    And for those reasons, we respectfully ask that it be entered.

5         Thank you.

6         THE COURT: Mr. Swett.

7         MR. SWETT: Good morning, Your Honor. I have a lot of

8    materials to work with and it may take some shuffling but,

9    first, I would like to try and encapsulate the areas that I

10   think we need to focus in on.

11        First, Your Honor, though, I have to voice a

12   complaint. We provided a form of order for authorizing the

13   questionnaire and blessing the form of it subject, of course,

14   to the eventual individual objection process, on April 22, six

15   days before the April 28 hearing. We got no response to that

16   until two days ago while we were busily preparing the

17   questionnaire and trying to narrow the issues in terms of the

18   scope and contents of the questionnaire form itself and with

19   little time to deal with what are perhaps subtle but absolutely

20   drastic changes, not only in the form of order but in the

21   concept of the questionnaire exercise.

22        They, in fact, cast into question the viability of the

23   questionnaire project if they are allowed to be glommed onto

24   the process as it existed as we emerged from the last hearing

25   for reasons that I will explain.

Garlock/5-26-11

28

1          So I think the court really has two alternatives.  One

2     is to invite briefing on the order before commissioning the

3     debtors to go ahead and serve out their questionnaire and take

4     evidence on the disputed points.  And the other is to recognize

5     today that what the debtor has done is at the last minute

6     substituted some cards into the deck that fundamentally changed

7     the hand and to rule that that is really not appropriate and

8     that, if they want to bring issues pertaining to, for example,

9     the unknown claims, unknown disease claims, we will have to

10    address that in a different process because it fundamentally

11    subverts the efficiency and the ability of the court and the

12    parties to march forward now with the questionnaire within the

13    scope previously contemplated.

14          And there are two such issues subtly embodied in the

15    order.  They are perhaps the two most important things to talk

16    about today, although there are some others that are not

17    unimportant.

18          One is the scope of the mesothelioma claimants to whom

19    the debtors would send the form.  As we will see in a moment

20    when we turn to the details, the debtor has engaged in a

21    unilateral, self-help process of throwing claims out of its

22    database without a basis in the judicial system or in the

23    claimant's consent, and now it proposes to send the form only

24    to those that survive that unilateral self-help, winnowing out

25    of claims.  At the very least, that threatens a significant

Garlock/5-26-11

29

1    manipulation of the estimation process.  We don't get, no, we

2    haven't had discovery of it, we haven't had detailed discussion

3    of exactly what they have done to the database, but we know

4    that they have materially reduced the number of claims that

5    they recognize as pending for mesothelioma.  Mr. Clodfelter at

6    the last hearing said something about how this winnowing

7    process had caused him to believe now that, instead of fifty-

8    five hundred prepetition mesothelioma claims they were talking

9    about last fall in the bar date hearing, now they think it's

10   less than four thousand, a very material discount, if you will,

11   by their own say-so of the base, the cohort from which the

12   estimation will proceed.

13        That is an unheard of manipulation of the data and

14   really can't be tolerated.  Certainly I am going to urge you

15   most vigorously that you can't permit them not to notice people

16   who, when the bell sounded on their bankruptcy case, they had

17   recognized as claimants for mesothelioma prepetition.  That

18   would be a big thumb on the scale, and it is grossly

19   inappropriate for them to slip in that procedure at the

20   eleventh hour in a purported response to an order that

21   contemplated the same process and the same scope of

22   distribution that they had been talking about from the

23   beginning.  And I think it is worth parsing through their

24   papers, which I will in a minute, to demonstrate that that

25   represents a significant and unacceptable shift on their part

Garlock/5-26-11

30

1       with regard to the concept behind this questionnaire project.

2               And the second has to do with this notion that they

3       are going to kind of canvas the claims in their database that

4       are not reflected in their database with an identified disease

5       through a process that they characterize as easy on themselves

6       without much regard for the burdens on the constituency and

7       which represents a drastic increase in the scope of the data

8       gathering exercise.  Again, one that at this late hour it seems

9       to me is intolerable in this process and will cause delay that

10      I am frankly not able to measure precisely but I know it would

11      be material.

12              And here is the point there and the gist that we will

13      come back to in more detail on later.  There are thirty-three

14      thousand claims in the database that are reflected without an

15      identified disease.   That doesn't mean they don't have

16      information pointing to the disease.  They may or they may not.

17      It is not uncommon in these databases, as previous estimations

18      have shown, for there to be a significant number of claims in

19      the debtor's data that for legitimate reasons they can't

20      associate with a specific disease allegation.  But there are

21      also factors of inertia, a desire to save money for themselves

22      and inflict the cost on the outside world and things like that

23      that cause them not to mine their existing resources to

24      identify the diseases within the resources that they have.

25              For example, they may have received a complaint that

Garlock/5-26-11

31

1    simply alleges asbestos related disease.  That is quite common.

2    Most courts do not require identification of disease in the

3    complaint.  But then they maybe serve interrogatories and they

4    get responses but they don't update the database to reflect

5    them or they take a deposition and elicit the disease diagnosis

6    or they engage in discussions with the plaintiff's firms and

7    those things somehow don't get reflected in their data.

8            It's impossible to know in the abstract how many of

9    the thirty-three thousand claims in their database not

10   associated with a disease are in fact known to them to have a

11   disease.  But it is ironic to me that in their form they have

12   an instruction that says, well, the claimants may respond to

13   this.  If they respond through documents, they must ensure that

14   the documents speak currently as of the submission date.

15   That's part of the certification.  And they have to take

16   account, according to them, of whatever information about that

17   claimant the lawyer has obtained since the documents that he is

18   providing as the substance of the response were created, and

19   they would put that burden in effect of supplementation on the

20   claimant's back, but they undertake no exercise themselves to

21   mine their existing resources to identify diseases where that

22   information is within their reach.  Instead, they would send a

23   letter to thirty-three thousand people.  Oh, this is Garlock.

24   The court has ordered mesothelioma claimants can be canvassed

25   with this questionnaire.  You better check all of your clients

Garlock/5-26-11

32

1    to make sure whether or not they have claims against Garlock

2    and, if so, whether they have mesothelioma on pain of some sort

3    of ominous sounding but not spelled out threat of preclusion or

4    other prejudice.   Thirty-three thousand claims in their

5    database.

6          This is not a new problem.  This problem has existed

7    in every estimation of asbestos liability that's ever been

8    done, and Charles Bates is fully versed in it, and it has never

9    given rise to a data-gathering project like this as an incident

10   of where it kind of bolted onto a questionnaire to identify

11   claimants.

12         Instead,   the   experts   engage   in   statistical

13   extrapolation.  Mesothelioma is a rare disease, devastating but

14   rare.  That means that the experts using data, public data from

15   past cases and interpretation of the changes over time of the

16   claims in the debtor's own database that may start out as

17   unidentified but progress through a litigation process to the

18   point   where   they   do   update   their   database   and   now   it's

19   reflected   as   mesothelioma,   those   things   can   be   analyzed

20   statistically   and   you   can   extrapolate   with   reasonable

21   reliability   what   fraction,   what   small   percentage   of   those

22   thirty-three thousand are going to be reliably extrapolated to

23   be mesothelioma claimants.

24         It is efficient.  It is a procedure that all of the

25   experts understand and apply all the time, and it does not

Garlock/5-26-11

33

1    involve disturbing thirty-three thousand cases out there in the

2    world that are stayed by the bankruptcy stay for the debtor's

3    convenience at the last moment of this elaborate questionnaire

4    process.

5              As I am going to emphasize further, allowing that

6    subtle but drastic change to be glommed onto this questionnaire

7    at this process will imperil the exercise from the standpoint

8    of being able to bring it home and allow the experts to use the

9    data and get on with an estimation within any reasonable period

10   of time.

11             You heard, and it is true, that after canvassing the

12   people on our committee, we believe that a hundred and twenty

13   days would be required for the identified mesothelioma

14   claimants to respond in robust fashion to the questionnaire.

15   That's longer than we would like because it will take Rust a

16   month to get the form up and, when you add four months to that,

17   you are in late October before you even have the responses.

18   That means, as a practical matter, there is no way that we are

19   going to reach an estimation trial until sometime of like now

20   or later next year, and this is supposed to be an efficient

21   direct and relatively inexpensive process.  That is part of the

22   whole virtue of estimating rather than having individual claims

23   litigation, but their endless appetite for more and more data

24   demands upon the constituency makes that unachievable if it is

25   indulged.

Garlock/5-26-11

34

1          So we have got to find some practical expedient.  The

2    claims of unknown disease are a problem that's been staring

3    them and every other defendant in the face for years and, for

4    them to slip this in at the last minute, is really quite beyond

5    the pale.

6          Mission creep is what all of the changes and disputed

7    points we will be talking about today is all about.  Garlock is

8    unhappy to be in an estimation rather than allowance mode.  It

9    is unhappy with the court's rulings on various of its discovery

10   overreaching forays, and it expresses that frustration through

11   continual efforts to push the envelope in a process that should

12   now be a simple matter of identifying our narrow disagreements

13   over fully vetted issues already fleshed out and getting on

14   with it because, Lord knows, it is going to take enough time

15   already.

16         So the unknown claims is a big, big, big issue, and I

17   am going to urge that either you cut that out of this and just

18   not deal with it now and send the parties off to figure out

19   what to do, separate and apart from the questionnaire going out

20   to identified mesothelioma claimants, or that you simply scotch

21   it as inconsistent with the whole idea of aggregate estimation,

22   which necessarily involves a degree of statistical extrapola-

23   tion.  No matter how merits oriented they want to make it, the

24   experts are going to have to apply their statistical expertise

25   to  draw  inferences,  and  this  is  an  area  where  they  can

Garlock/5-26-11

35

1    certainly do that without any prejudice to the debtors.

2         The use restrictions and confidentiality requirements

3    are drastically different in their order than the one we

4    presented more than a month ago.  As we explained at that time,

5    those use restrictions and confidentiality restrictions grew

6    out of a stipulated order in the *Motors Liquidation* case where

7    Charles Bates, his firm was also the expert and where they had

8    no problem agreeing to those provisions.  They were suggested

9    precisely because evidence had emerged, as we have detailed to

10   the court on another occasion, that the Bates White firm has

11   commercial interests in the exploitation of data that it would

12   love to get its hands on for reasons unrelated to the case.  To

13   make that policeable, you have to have a fairly detailed

14   regimen regarding how it manages the electronic data and what

15   it is and isn't entitled to do by way of preserving weight,

16   data sets that merge in effect the data gathered here with data

17   gathered in other cases, and less regulated by the court, would

18   be available to Bates White or others in some other case or

19   context not contemplated here and that is a very, very

20   significant issue for the reasons that I have explained

21   previously in elaborating on Bates White's association with the

22   Litigation Resolution Group.

23        And Your Honor, upon first considering the provisions

24   that we borrowed from the MLC order, commented that they seemed

25   reasonable.  Although in fairness, I must acknowledge the

Garlock/5-26-11

36

1   debtors hadn't at that point responded in substance to those.

2   So I am not suggesting that this ought to be treated as a

3   closed issue.  I am suggesting that the difference between the

4   orders is significant, that there are material issues involving

5   the legitimate rights of the claimants and the administrability

6   of this process that counsel adopting the protective provisions

7   from the MLC order, which will bear a close reading.

8        There are other issues pertaining to the order which

9   I will get to, Judge, when we go over a red line that compares

10  their version to ours but first to touch on the questionnaire

11  form.

12       The issues are indeed narrow.  I am not sure that I

13  have caught up with – I think I know I have not caught up with

14  whatever changes in the debtors' form have been made since

15  yesterday, but a cursory review suggests that we are down to

16  some fairly short strokes with one huge exception.

17       Before going to the huge exception, I would like to

18  point out an issue that requires clarification in one of the

19  details of their form.

20       Your Honor, if you will turn to 5(a) of GST 159, the

21  instructions.

22       THE COURT: Do you have a page number?

23       MR. SWETT: Page six, at the very top.

24       THE COURT: All right.  I am there now.

25       MR. SWETT: The instructions say, "Complete for every

Garlock/5-26-11

37

1  site" – this is the place to identify exposure information

2  pertaining to Garlock products.  It says, "Complete for every

3  site where claimant alleges exposure to Garlock or Anchor

4  product.  In the case of secondary exposure, list information

5  for the site where primary exposure occurred and the

6  occupationally exposed person's exposure."

7       That doesn't strike me as understandable.  The basic

8  distinction between secondary and primary exposure is well

9  understood in asbestos litigation and is not the problem.  The

10  problem is the tag line, "and the occupationally exposed

11  person's exposure."

12       A bystander in the workplace has occupational exposure

13  to asbestos fibers released in the air by operations carried

14  out by other workers on the scene.  If I am such a person – or

15  another kind of secondary exposure is a family member is

16  exposed to asbestos fibers on the work clothes of the worker

17  who brings them home, and there are not an inconsiderable

18  number of household exposure mesothelioma cases.

19       So what causes the confusion, presumably the person

20  with secondary exposure is being asked here to identify where

21  the primary exposure took place because that's where Garlock's

22  product might be, but the way this is written, as we tried to

23  point out in the exchange of drafts, is confusing and will

24  introduce questions and ambiguities that will trouble

25  responses.

Garlock/5-26-11

38

1          So I am urging the debtor to clean that up and, if I

2     have misunderstood their intention, well, I am sure that people

3     out   there   in   the   world   who   get   the   form   would   also

4     misunderstand.   So it bears clarification.

5          MR. WORF:   Do you want me to respond to that real

6     quick?

7          MR. SWETT: Sure.

8          MR. WORF:   We don't have strong feelings about this,

9     and we can certainly make it clearer.   The point is that's not

10    intended to capture bystanders.   If you look at the boxes down

11    below, there is bystander, which would be a person who was at

12    a site and Garlock products were allegedly around it and then

13    secondary, which our understanding of the traditional meaning

14    of that was the take-home exposure where a person's husband is

15    exposed to asbestos at the work site and then brings it home.

16          So these questions about the occupational exposure in

17    that scenario would only apply to the husband or wife who was

18    in   the   workplace,   and   that's   where   the   question   would   be

19    directed to, to determine how they encountered the Garlock

20    product because the only way for the secondary person who

21    encountered a Garlock product is through the primary person.

22    So the primary person's exposure is what you need to know

23    about.

24          MR. SWETT: Let's just agree that we will sharpen that.

25          MR. WORF:   We can sharpen that.

Garlock/5-26-11

39

1           MR. SWETT: Fix that problem.

2           THE COURT: Okay.  It looks to me like it needs some

3     work.

4           MR. SWETT: Okay.  Now, the big issue involving the

5     questionnaire form flows out of your openness at the last

6     hearing to the idea that the claimant should attach their trust

7     claim forms to their response and the mission creep in the

8     debtors' form of order that purports to implement that ruling

9     but in fact imports a very, very significant loss on it that

10    will have very material and practical consequences for the

11    response process.

12          Let's go back to the first premises.  The 5(b) and

13    6(b) portions of the form respectively call for plaintiffs to

14    identify – have to do with third-party – other defendants,

15    trusts or stand-ins for a subset of other defendants, the

16    insolvent ones, and the concept behind the form as it has taken

17    shape is that the claimant will identify sites where claimant

18    believes he or she was exposed to asbestos other than Garlock's

19    and describe the activities that caused that person to come

20    into contact with that asbestos and the debtor will then go to

21    work on that with its experts to make whatever inferences it

22    wants regarding the offsets it would be entitled to or the

23    recoveries the claimant would receive from other sources so

24    that it can make arguments about what impacts that those other

25    recoveries would be on its future settlement values.  That's

Garlock/5-26-11

40

1    what that is all about.  And that roughly replicates the

2    process that in fact, as a practical matter, defendants follow

3    in the tort system when they are gauging their exposure to

4    damages and their chances of coming out of a scrape with an

5    asbestos litigant unscathed or what the chances a very large

6    judgment might be.

7         Now, coming into the last hearing, they basically

8    said, well, gee, give us the trust forms, too.  There wasn't a

9    strong rationale, at least one that sticks in my mind, for

10   making that departure from the fundamental premise of the form

11   as it had thus evolved, which treats the trusts unaccountably

12   as drafted completely different than the solvent defendants.

13   Whereas, in fact, the trusts are just defendants who went bust.

14        What is the debtor going to get from the trust claim

15   forms?  Well, you said what you said about that and we go on.

16   We go on to a revised form from the debtor that says, oh, not

17   just the trust claim forms but all of the submissions made to

18   the trusts to make out the exposure requirements in the trust

19   TDP, and we are given an example today of a two-page form

20   affidavit as though that were illustrative of the general run

21   of the mill of trust submissions without evidence in fact that

22   it is.

23        But we know from the trust forms themselves, some of

24   which are in the record, and one of which I will hand up now as

25   ACC Exhibit 104.

Garlock/5-26-11

1          (Pause)

2          We know from these forms that there are a variety of

3     means by which plaintiffs can meet the exposure requirements of

4     trusts, and we know from our previous discussion and evidence

5     of what the TDPs call for, that in the case of mesothelioma

6     what is required is a showing satisfactory to the trust that

7     the claimant had meaningful exposure to the trust predecessor's

8     asbestos products, a standard that is in some respects

9     different than the proof that the plaintiff would be required

10    to put on in a tort suit.

11         But we know, as we can see from the trust materials,

12    for instance on page seven of ACC 104, that there are a variety

13    of means acceptable to trusts for making out that showing such

14    as it is.  They are not all one-page affidavits, the details of

15    which I will get to, but they also include, for example, such

16    bulky documents as depositions, affidavits, invoices, answers

17    to interrogatories which in the tort system tend to be quite

18    lengthy, deposition transcripts and other.  Verified listings

19    of job sites, which is one that is relevant to the affidavit

20    that the debtor has put in as GST 137(a).

21         Turning to that affidavit, what we see is that this

22    claimant, David Puller, affirms that he worked as a boiler

23    technician.  In the questionnaire form, presumably a person in

24    this position, when describing the activities that brought him

25    into contact with third-party asbestos would say boiler

Garlock/5-26-11

42

1    technician.  That as part of such work the decedent was exposed

2    to asbestos containing materials and breathed air-containing

3    particles of dust arising from such materials, and then giving

4    the years, which is information elicited by the questionnaire.

5    And then that the decedent worked at the following locations

6    where this particular trust predecessor products were on the

7    scene.

8         Now, in those instances where this kind of evidence is

9    what is elicited if the claimants are required to attach their

10   evidentiary submissions to trusts, what is the debtor going to

11   get out of this?  The guy was a boiler technician.  He was

12   exposed to asbestos in a certain span of years and he was

13   present at a site where there was National Gypsum product.

14   Exactly what they are going to get out of the form, the

15   questionnaire form itself.  It adds nothing.

16        But consider the situation of the law firm that

17   represents Mr. Puller.  Supposing it is one of the law firms

18   that has hundreds and hundreds of mesothelioma claimants.

19   Supposing that each of those mesothelioma  – that on average

20   those mesothelioma claimants have claims against multiple

21   trusts.  Suddenly you have magnified the burden on the law firm

22   of responding to the questionnaire quite materially.

23        I mentioned earlier the hundred and twenty day period

24   that we believe is going to be required for identified

25   mesothelioma claimants to complete the form reliably.  I have

Garlock/5-26-11

43

1    it from one of the firms that has a very large volume of

2    mesothelioma claimants that, if they are required to attach

3    trust claim forms, too, let alone the evidentiary submissions

4    on top of them, they won't be able to do it in that period of

5    time because there are too many and because, as I should have

6    mentioned earlier, these firms will be required to respond to

7    the Bondex form more or less at the same time as the Garlock

8    form, so the burden is roughly double except that the Garlock

9    form as it emerges is the more burdensome one.  So what is the

10   point of this mission creep?

11        Supposing further that Mr. Puller is not typical, that

12   the one-page affidavit is not the usual way of meeting the

13   trust exposure requirements.  I don't know.  All I know is that

14   there are other means and that the materials of doing so are

15   often, according to the trust claim form, can be voluminous

16   materials.  What is the debtor going to do?  Put itself in the

17   position of being the administrator of every trust out there

18   and make merits determinations about whether or not this

19   particular claim gets paid?  That is a fool's errand.  It will

20   not add significant value to the estimation even under their

21   theory.

22        And the fact that they are not satisfied just with the

23   form but they want the evidentiary submissions, when no

24   evidentiary submissions are to be made with respect to Garlock

25   or third party defendants who are not bankrupt, it doesn't make

44

1    any sense.  It is at war with the other concepts behind the

2    form and it imperils the efficiency of the process.

3         So at the very least, it seems to me the court ought

4    to excise the debtor's efforts to glom onto the evidentiary

5    submissions of the trusts.  I do believe it is worth re-

6    thinking the opening that you gave them at the last hearing to

7    elicit the trust claim forms themselves unless a particular

8    claimant chooses to include such forms in the document set if

9    he is responding through documents instead of providing

10   narrative responses to the questions.  I have no problem with

11   that being an option, but the expansive request as it emerges

12   from the debtor's revision is very troublesome and it calls

13   into question, I think, the wisdom of the idea of opening the

14   door on trust claims as a mandatory feature of the response at

15   all.

16        And no matter how this comes out today, Your Honor, I

17   would implore the court to – if it goes forward in anything

18   like what the debtor has proposed, you must anticipate

19   objections from the field and those objections need to be heard

20   with an open mind and an empathetic perspective on the problems

21   and burdens of the respondents, as I am sure Your Honor would

22   accord them.

23        But the better part of wisdom, it seems to me, would

24   be to deal with this today and to cut it back appropriately.

25   Again, largely for the reason of trying to preserve the ability

Garlock/5-26-11

45

1    of this process to come to fruition in responses within an

2    acceptable period of time.

3            On that subject, the authorization form, which of

4    course should conform to however you come out on the underlying

5    question of what trust material, if any, is to be required,

6    highlights a very significant practical problem because it's

7    true, we had put in – we don't like the idea of an open-ended

8    authorization.  We don't think claimants would accept that.  We

9    don't like the idea of an authorization that lives as long as

10   the case because who knows how long that's going to be and how

11   would a trust know when Garlock shows up with the authorization

12   without exerting affirmative efforts on its own part whether

13   that cut-off had become operative, and so it would put the

14   trust in a peculiar position.

15           So we said, well, let's make it the response time.

16   That was, in fact, an ill-considered suggestion.  Mr. Worf is

17   right.  It doesn't work.  We retract it.  But there has to be

18   a cut-off if there are going to be those authorizations, and

19   the sensible one in the alternative would be the discovery cut-

20   off, whatever Your Honor ultimately rules when we get together

21   on a scheduling order and present one or two competing ones to

22   the court for ruling.

23           But if the court agrees with me that the detour into

24   trust claim forms let alone the supporting exposure evidence is

25   imprudent, improvident and that we should walk back from that,

Garlock/5-26-11

46

1    then the authorization form falls out, becomes of no relevance

2    and presumably can be taken away.  So it would be simplified.

3        So my basic pitch is to treat the trusts like the

4    other solvent defendants and let's get on with it.

5        Now, I would like to come back to the question of who

6    is to receive this form but, first, I will hand up two

7    documents.  Excuse me just a minute.  First is a red line of

8    the form against what we have as the debtors' last version,

9    Exhibit 105.  I would like to point out that the highlighted

10   and bracketed language on page two at part eight and the

11   editing in the authorization and the editing in the part eight

12   instructions on page fourteen.  Again, they are highlighted and

13   bracketed.  The highlighting and bracketing means we were

14   flagging this issue for debate today.  The inclusion of that

15   language in the brackets and highlighting is not, of course, a

16   sign that we agree with it.  In fact, as I have just argued, we

17   certainly do not.  So I just wanted to clarify that for the

18   record.

19       So this represents the state of the discussion with

20   the debtors as it existed on yesterday's forms and they have

21   accepted a couple of the points that are reflected in here, for

22   which we thank them, and the main issue as reflected is the one

23   about the evidentiary submissions and trust forms that I have

24   just been through.

25       Now I would like to hand up Exhibit 106, which is an

Garlock/5-26-11

47

1    update of the committee's version of the order that we put in

2    on April 22nd to take account of some suggestions reflected in

3    the debtors' version, and I am also going to hand up as 107 a

4    red line against the debtors' last version of the order.

5         I apologize for the awkward format of this red line.

6    I couldn't get the machine, when I was working on this last

7    night, to give me a simple red line.  Instead it insisted on

8    having this field on the right-hand side and all of these

9    arrows and things.  It makes it a little bit harder to deal

10   with, but I did the best I could.  So that is 107.

11        Now, I would like to first go back to the issue of who

12   is going to be sent the questionnaire by the debtors and their

13   form has an anomaly which is the tip of an iceberg.  GST 158

14   says in its paragraph number three:

15            "Every person who has a pending lawsuit against

16            Garlock or Anchor and alleges that such person or

17            another individual contracted mesothelioma as a result

18            of," and it goes on to describe exposure to Garlock

19            product, "is required to complete the questionnaire."

20        A more appropriate decree at the outset is that the

21   debtors are authorized to issue the questionnaire.  Their

22   application was for authority to issue the questionnaire and

23   you ruled that, while you would issue an order on the form, it

24   would be subject to the right of remote parties once served

25   with it to come in and propound particular objections.  So, in

Garlock/5-26-11

48

1    fact, it's a misstatement to say that you are requiring them to

2    make a complete response.    That is in derogation of the

3    objection rights.    That's a technical point.    But here is the

4    main point:

5         Whereas this paragraph says every mesothelioma

6    claimant must respond, paragraph 4(a) says that the debtors are

7    going to provide the questionnaire to significantly fewer than

8    all persons who have alleged mesothelioma and pending lawsuits.

9    Instead they are going to send it to people whose complaints

10   flag mesothelioma before the petition date, not only limiting

11   that source of – limiting it to that source of information but

12   further limiting it to as reflected in the version of the

13   debtors' claim database produced in discovery on May 18, 2011.

14   What is that?

15        Well, that is the vulgarized, expurgated, revised,

16   updated, litigation oriented version of the database that has

17   been created now for the special purposes of the estimation

18   context, not the prepetition database that Dr. Bates used in

19   reporting to the financial markets on Garlock's behalf or

20   rather advising him with regard to the disclosures that it must

21   make to the financial markets, not what the claims managers at

22   Garrison used to manage the mass tort problem before they fled

23   into bankruptcy but something new and different which, as I

24   mentioned earlier, has some materially fewer mesothelioma

25   claimants reflected in it because, as Mr. Clodfelter put it the

Garlock/5-26-11

49

1  last time, the debtor has decided in its wisdom that some of

2  those are merely records in the database rather than claims.

3       Well, that is a – it's a naked manipulation of the

4  estimation process as I explained before and it shouldn't be

5  permitted.  The questionnaire should go to everyone who before

6  the petition date had alleged mesothelioma, be it in the

7  complaint or in the other information provided to the debtors.

8  And certainly it must be not inconsistent in terms of

9  inclusiveness with the prepetition database.  It can't be an

10 edited expurgated version.

11      Now, I would like to demonstrate briefly that this

12 subtle idea worked into 4(a) represents in fact a drastic

13 departure from the concept that we have all been discussing

14 since January when this motion was made.

15      First of all, as recently as May 11th, the day before

16 the last hearing, the debtors filed their statement regarding

17 that conference, which is document 1330 on the docket.  And in

18 that document, they expressed the following intention and I am

19 quoting:

20           "The personal injury questionnaire shall be served on

21           counsel of record for all plaintiffs in personal

22           injury actions pending against any debtor by

23           mesothelioma claimants as of the June 5, 2011,

24           petition date."

25 All mesothelioma claimants.

Garlock/5-26-11

1          Your Honor, if you go back and read the Rule 2004

2    questionnaire application, which is document 1006 filed last

3    January, it says on page three:

4               "Through the motion, the debtors seek an order

5               requiring persons known to have asserted as of the

6               petition date an asbestos personal injury claim

7               against the debtors based on an alleged diagnosis of

8               mesothelioma to provide information sought by the

9               questionnaire.  There are approximately five thousand,

10              five hundred such claims."

11         MR. CASSADA: Your Honor, can I make a point here

12   because I don't think we really have a dispute and, if I could

13   clarify it, then maybe we can move on to things that are really

14   disputed.

15         THE COURT: All right.

16         MR. CASSADA: What the debtors have done is they have

17   gathered further information from local counsel regarding which

18   mesothelioma cases are open and local counsel have discovered

19   that there were many, many cases that were dismissed of record

20   that had not been reflected in the database.  And so it was

21   updated and the effect of that was to reduce the number of

22   pending claims known to the debtors from about fifty-five

23   hundred to about five thousand.  I explained that to the court

24   at our last hearing.

25         The number that Mr. Clodfelter referred to eliminated

Garlock/5-26-11

51

1    claims that were six or seven years old and older.  Now, we

2    have not changed our plan.  We plan to send the questionnaire

3    to everyone known to the debtors to have pending mesothelioma

4    claims.  If the committee does not trust the process that we

5    went   through,   we   have   got   no   problem   in   sending   the

6    questionnaire to the people, to the five thousand, five hundred

7    the records indicated as of the petition date.  In fact, we

8    know that five hundred of those claimants have claims that are

9    actually dismissed and therefore wouldn't complete and return

10   the questionnaire but, if it makes the committee feel more

11   comfortable, we are certainly willing to send it to all of

12   those persons.  We are not trying to engage in mission creed or

13   do anything else to limit the number of claims.

14          And the only other issue is that there are – we know

15   who all of the law firms are, and they may have other lawsuits

16   where   they   haven't   identified   their   clients   as   having

17   mesothelioma   claims,   and   we   have   been   just   looking   for   a

18   practical, commonsense way to capture those claims.

19          So really there is no dispute on this issue at all and

20   I don't – unless Mr. Swett, after hearing that, believes there

21   is.  So I don't think it's really worth the –

22          THE COURT:  As long as we can define broadly who it

23   goes to, I think it's best.  The information that comes back

24   will help winnow it down, and that will be known to everybody

25   and we won't have a dispute about – I would hope that we could

Garlock/5-26-11

52

1    eliminate a dispute about the basic facts.

2           MR. CASSADA: Absolutely, Your Honor.

3           THE COURT: So that we can –

4           MR. SWETT: I think that would bear discussion between

5    us.  I understand what Mr. Cassada just said.  It comes as news

6    to me because our initial analysis through our own claims

7    consultant of the impact of the changes in the database goes

8    beyond ones that have now been reflected as dismissed without

9    payment, a category that is not self-defining anyway, but also

10   other changes in status including closing cases without any

11   reference to judicial action or a withdrawal by the claimants.

12   So we can discuss that, and I am happy to hear the debtor's

13   willingness to do that.

14          The point now is that this order expresses a different

15   conception and ought not to be issued in this form.  But I will

16   cut that short, then, on the assumptions that Mr. Cassada and

17   I can work out something on that and submit it to the court.

18          MR. CASSADA: I guess the open issue, though, is still

19   the –

20          MR. SWETT: I have got a huge issue regarding the

21   unknown disease claims, and I would like to turn to that now.

22          MR. CASSADA: Correct.

23          MR. SWETT: This is an aspect of the problem that the

24   debtors talked about at the bar date hearing.

25          THE COURT: Well, let's – I don't want to cut you off

Garlock/5-26-11

53

1      but I think I probably should.

2            MR. SWETT: Okay.

3            THE COURT: Because I don't think we ought to deal with

4      the unknowns now.  I haven't been – nothing I have ordered to-

5      date has been with them in mind and I think that is a new

6      subject that ought to be dealt with separately.  I don't have

7      – you know, I don't have any strong feeling about it one way or

8      the other, I just haven't ever dealt with it before, and I

9      think now is probably not the time and that it is not necessary

10     to do that with this questionnaire, that we can get this in the

11     works and going and deal with the rest of the people in some

12     other fashion and let you all have a chance to hash that out

13     and see where that goes.

14           MR. SWETT: Thank you, Judge.

15           THE COURT: I mean, I can tell you I wouldn't have

16     embarked on a questionnaire procedure if I thought it was going

17     to go to thirty thousand people.  It's only the limited, that

18     we were dealing with the limited, that kind of encouraged me to

19     think along the lines of doing this.  So I think maybe that

20     there is some other way to deal with that.  It may be that we

21     just shouldn't touch that can of worms.  But I think that

22     that's a separate issue that we don't have to deal with in this

23     questionnaire, so let's put that off.

24           MR. WORF:  Can we reserve our rights, Your Honor, to

25     file a motion and –

Garlock/5-26-11

54

1          THE COURT: Sure, we will reserve all of your rights.

2     I mean, just bring it up as a separate matter and we will deal

3     with it as a separate matter, and it may be that, you know –

4     because it is entirely a separate thing.

5          MR. WORF:   I would want to just – I don't want to let

6     the accusation that we were pushing this in at the last minute

7     go unanswered, and I will just say very briefly we, all along,

8     thought that was within the definition that everyone was

9     working with on the questionnaire, and it is perfectly

10    understandable that the court wants to delay that now, but that

11    is not something that we were trying to push in at the last

12    minute.

13         MR. SWETT: I think probably – thank you, Judge, for

14    cutting me off.  That advances the ball a lot, which is perhaps

15    a telling comment, but I would like to march through the

16    highlighted – the red line version of the committee's form of

17    a proposed order just to highlight the thinking behind the

18    changes.

19         On page two, we have inserted in the first partial

20    paragraph the reference to the court's determination on March

21    31 that asbestos claimants wouldn't be served with a motion

22    that required or invited comment and argument about the motion,

23    and that their objections would be preserved for later.  That's

24    simply a housekeeping provision that more accurately reflects

25    the process we have gone through.

Garlock/5-26-11

55

1        The underscored language at the bottom of that

2    paragraph simply calls attention to the fact that the personal

3    injury questionnaire has been sought in the debtors' papers

4    from the beginning, argued by the committee and ruled upon by

5    the court as a proposed procedure for estimation and the

6    estimation proceedings.

7        The reference to Rule 9014(c), we have argued to you

8    repeatedly that the motion is misstated under Rule 2004 because

9    we have been for some time now in a contest over estimation and

10   what that process should be like and what the scope of the

11   facts that need to be developed would be and what the discovery

12   should be.  And in that context, the rules are clear – the case

13   law is clear Rule 2004 doesn't operate, Rule 26 does.

14       We acknowledge that this is kind of a hybrid discovery

15   device.  The court has ample discretion in Rule 9014 to apply

16   the part seven rules of discovery with full rigor or otherwise

17   and, if need be, one can always link those rules and the plan

18   formulation provisions of the code to 105 and decree that this

19   hybrid information gathering exercise is going out as a

20   function of the court's powers to authorize it under those

21   provisions of the rules and the code but it isn't 2004.

22       Paragraph four was our effort to address the scope of

23   the distribution of the questionnaire, which is now going to be

24   subject to further discussion among us.

25       Paragraph five is modeled on the debtor's form that

Garlock/5-26-11

1       they put in today but with significant changes.  We contemplate

2       that there will be a scheduling order that we will discuss with

3       one another and opposing counsel will hopefully agree upon or

4       come as close as we can and then tender to the court for entry

5       to govern the case development of the estimation proceeding so

6       that there would be a cutoff date for fact discovery, a cutoff

7       date for expert discovery after the rendering of reports and

8       taking of depositions and other interim deadlines as the

9       parties may agree would serve the purposes of that proceeding

10      order that the court might require.

11              But we are not in a position to do that now because we

12      just have gotten jammed up here.  Mr. Cassada is about to go

13      away on vacation.  My hope is to have significant discussions

14      before he leaves for a couple of weeks and get as far as we

15      can, perhaps to conclusion, but that shouldn't hold this up was

16      my thought.  But, on the other hand, they have appropriately

17      wanted a time table in this order so it would be plain to the

18      claimants who receive the questionnaire with this order

19      attached, and so what we said is a further order to be made by

20      the court for scheduling all aspects of the estimation

21      proceedings shall incorporate the following provisions.  And

22      then, based on discussion with the debtors, we wrote in June 24

23      as the date for issuance and, further down, October 24, a

24      hundred and twenty days for response, borrowing some of these

25      other language from the debtor's version.

Garlock/5-26-11

57

1          We would urge in sub-part (d) that the cutoff for

2     written responses, mailed responses, be the post-mark date of

3     October 24, not mailing in time for Rust to receive it by

4     October 24 because that would just generate disputes and

5     because, if my own experience is at all typical, the timing of

6     mail delivery has become quite variable.

7          We contemplate in subpart (d) as it continues on the

8     next page, page five of the red line, that the claims agent

9     here is not just serving the debtors, it is an honest

10    intermediary, a clearinghouse for this information that's being

11    gathered.  And so our thought is that they will create a

12    database that incorporates all of the responses, including

13    whatever attachments are submitted or required, in some agreed

14    turnaround time.  We said here by a date to be fixed in the

15    scheduling order.  And then each of the participants in the

16    proceeding would then receive a duplicate of that database.

17         A word about the parties to the proceeding.  The

18    active parties thus far have been, of course, the debtors, the

19    committee and the FCR, occasional appearances on other motions

20    by the debtors' parents.

21         We recognize that, you know, this is a bankruptcy

22    contested matter.  There are broad rights of participation.  We

23    think the orderliness of the process would be well-served if

24    there was a cutoff date by which people who want to participate

25    would have to come in and move to intervene and, if such a

Garlock/5-26-11

58

1    motion were granted, they would then be bound by this order and

2    the stipulated protective order as though they were parties to

3    the latter as set forth in the underlining on page six at the

4    top of the page.

5         Paragraph six, the redlining restores the statement

6    about future process to the form it was, I believe, in our

7    original submission of this order.  The point we were trying to

8    make is to make clear to the claimants that they are supposed

9    to record their objections as per the instructions in the form

10   but there is no defined process as yet for addressing them.

11        The next page, the changes appear to be simply

12   conforming changes to the points I have already made.   In

13   paragraph ten and following, we have the very significant

14   differences in the use restrictions and confidentiality

15   requirements that would pertain to the estimation responses.

16        I am not going to try to go back through from square

17   one the arguments that we made to you when first propounding

18   these suggestions other than to say this: To the degree that

19   the claimants here are facing a manifestly hostile aggressive

20   debtor whose has made no secret of its intention to engage in

21   other litigations besides the estimation, and those people who

22   receive the questionnaire necessarily have to be on their guard

23   about that and, on the other hand, it is necessary for the plan

24   formulation process, if the questionnaire is going forward at

25   all, that the responses be robust.

Garlock/5-26-11

59

1        So people need to be assured in strong terms that the

2    responses will not be permitted to be abused for purposes other

3    than those intended in the order allowing the questionnaire to

4    go forth in the first place.

5        The court will have ample process and the ability to

6    authorize,  or  limit,  or  control  or  not  authorize  other

7    litigations having something to do with the claims, but this

8    process is for the questionnaire, is for the claims estimation

9    proceeding as a function of plan formulation, and it shouldn't

10    be tainted by the suggestion that, when you fill this out, you

11    are giving ammunition to a hostile debtor who fully intends to

12    make use of this information some day and in some, as yet

13    unknown, context to attack your interest.  If they want to do

14    that, they can tee up that proceeding and we can have it out

15    over whether or not it's appropriate and the discovery can go

16    forth in that proceeding or those proceedings as you deem

17    appropriate but it ought not to creep from this hybrid

18    discovery process for the estimation and plan formulation

19    purposes.

20        So the underscoring here compares this, of course, to

21    the debtor's version but, if you compare it to the original

22    that we put in on April 22nd, you will see we are just adhering

23    to the basic idea that this information ought to be confined to

24    the uses of the estimation proceeding, and we are building in

25    the protections that the parties and the court in the MLC case,

Garlock/5-26-11

60

1    where the Bates White firm was the opposing expert, found

2    useful and appropriate to encourage the robust response and to

3    provide adequate assurance against abuse, including very

4    significantly the control over the digitalization or the uses

5    of digitalized information emerging from this data set.  I

6    explained at an earlier appearance that in that debate about

7    discovery in the *General Motors* contested estimation

8    proceeding, I learned in dialogue with lawyers who were

9    speaking for Bates White, that they have other data sets that

10   they have created from other cases, some of which they believe

11   are available for unrestricted use, and that they are zealous

12   about linking these data sets to maximize the information that

13   they have in any given context about a particular claimant who

14   shows up in the Garlock questionnaire responses.

15          So they want to associate this data set with some

16   other data sets that they believe are generally useable without

17   constraint, and the risk is that the merged set will bleed over

18   in Bates White's administration of this complicated logistical

19   problem into the sets that they regard as freely usable.  They

20   will lose sight of the restrictions and suddenly the use

21   restrictions and confidentiality provisions of this order will

22   be functionally inoperative and impossible to police.

23          So that accounts for the detail of which those

24   provisions are written and they were written with a very close

25   dialogue with the lawyers for the Bates White clients in the

Garlock/5-26-11

61

1    *General Motors* case.

2         Your Honor, that completes my comments in response to

3    Mr. Worf's.

4         THE COURT: Anything else, Mr. Worf?

5         MR. WORF:   Thank you, Your Honor.  I guess I will

6    start with confidentiality.  That's essentially where Mr. Swett

7    left off.

8         We are, of course, willing to talk with the committee

9    about the precise form the confidentiality restrictions take,

10   but the reason why we didn't make much progress in coming to

11   terms on it is because we hold true to two principles.  First

12   of all, the debtors have to have an opportunity to challenge

13   the confidentiality of some of the questionnaire information.

14   And, second, as the court said on April 28, the debtors or

15   other parties should have the opportunity to move to use it for

16   purposes other than estimation.  Not that they should have the

17   right from the outset but that the court would reserve judgment

18   on that and that there could be a motion permitting other uses.

19   That's all we are talking about.

20        First of all, to make clear the GM analogy.  My

21   understanding of that case is the confidentiality provisions

22   where this was drawn from were from the trust discovery that

23   Judge Gerber was ordering and that, of course, was not just the

24   current claimants, that was many, many past claimants against

25   GM.  I believe it was all the past mesothelioma claimants

Garlock/5-26-11

62

1    against GM were included.   That was a different kind of

2    information than what we are talking about here, and it would

3    be a mistake to bring this over wholesale from that context

4    when it was a completely different context.

5         Now, let me explain why we think it's important for

6    the debtors to have an opportunity to show that certain limited

7    information, such as the Garlock exposure allegation, are not

8    confidential.  It would be a distortion of what the committee

9    says it is trying to simulate, which is what would have

10   happened in the tort system for this to be a black box and for

11   it to be a black box around those allegations, in particular,

12   because when Garlock was a defendant for thirty years, there

13   was no restriction on Garlock's sharing with other defendants

14   allegations the plaintiffs had made that they were exposed to

15   a Garlock product.  That is not confidential information.  It

16   is just not.

17        Now, we have been willing to say, look, we will treat

18   that as confidential from the start but, if there comes a need

19   to share it with someone else, we should be able to come to the

20   court and make a motion.  That's all we are saying, is that it

21   shouldn't be put in a black box right now.  Not just the

22   prejudice to the debtor but imagine the poor incentives it

23   gives to claimants who are answering this questionnaire.

24        With the knowledge that this is going to be a black

25   box, it's possible that the results that we get back from the

Garlock/5-26-11

63

1    questionnaire are not going to be as reliable as they would be

2    when the claimants know there is some possibility down the line

3    that someone might check up on it.  Not to cast any aspersions

4    on any claimants or any particular claimants but that's just a

5    natural human impulse.  We think that presents bad incentives.

6    That's a reason why that information is not private in courts

7    in general and, again, we are not saying that right now it

8    should be deemed public but just the court should have a

9    hearing on that at some point and allow us to come in and show

10   that those particular allegations should be shared.  And,

11   again, anything that is truly confidential would be protected

12   and the court would have a firm hand over that.  That's a

13   reason why we couldn't agree on these confidentiality

14   provisions.

15         Again, as far as the Bates White allegations about the

16   commercial interests, there is no possible commercial interest

17   that Bates White could have in the Garlock exposure

18   allegations, to take one example.  Again, those allegations are

19   what Garlock knew and was able to share with the world for

20   thirty years, and it's not - you know, we could have a

21   discussion over particular parts of the questionnaire, whether

22   that allegation touches on any of them, but that's one area

23   where it's obvious there is no problem.  And, again, we are

24   saying protect it now, give us the opportunity to challenge it

25   later under the terms of the same stipulated protective order

Garlock/5-26-11

64

1       that the debtors have been subject to.

2               As far as the use of the information, it's a similar

3       thing.  The debtor's order says, as the court said on April

4       28th, that it is only going to be used for estimation unless

5       someone makes a motion.  The difference in the committee's

6       order is that they don't have that opportunity to make a

7       motion.  So, again, the black box concept, which we think is

8       inappropriate and there haven't been findings made to support

9       such a treatment.

10              So that's our views on confidentiality.  We are

11      willing to go back to the drawing table if the court makes

12      those principles clear, and I think that we can settle on

13      something pretty easily if those two opportunities are

14      preserved.  Otherwise, I think there is a potential for delay

15      in getting this out.  We are as anxious as anyone to get it out

16      and start this process moving.

17              The other big issue is the exposure attachments to the

18      trust claim forms.  I won't go into my entire presentation from

19      the last hearing, but the court heard how important those trust

20      claim forms are to us and, in particular, how important the

21      allegations of exposure are.  Mr. Glaspy testified that that

22      evidence of exposure against the trusts and the products for

23      which they are responsible disappeared over the last decade.

24      The question now is, is it coming back, and there is a dispute

25      over if it is coming back, what form is it coming back in?

Garlock/5-26-11

65

1          We heard Mr. Swett say, and he claimed again today

2     that there is a difference between the trust meaningful and

3     credible exposure evidence and the quantum of evidence that

4     would benefit a defendant like Garlock in the tort system.

5          Well, that's a dispute.  Is that true?  What are the

6     claimants providing to the trust?  That is important in

7     modeling Garlock's future liability, and we could, you know,

8     bring an expert in to testify to that but we thought that was

9     pretty clear from the experts that we have put on already.  So

10    that's the importance of it.

11         The example affidavit that I put into evidence from

12    Mr. David Puller, who I believe is a relative of Reginald

13    Puller, who is the claimant, but it does contain information in

14    there that won't be in the questionnaire.  It says that he

15    worked at a site where National Gypsum products were present,

16    a trust product.  That is not in the current version of the

17    questionnaire and is something that is important to us.  We

18    viewed the requirement to attach the exposure evidence as a

19    targeted way to get at a very big issue – is the evidence

20    specifically against the trust coming back and in what form.

21         We are not covering all of the defendants because this

22    isn't, as Mr. Swett pointed out, applicable to the tort system.

23    But as the court is well aware, the trusts are the big issue in

24    this case.  So it is a targeted way to get it.  They are

25    documents that are already created, and I would urge the court

Garlock/5-26-11

66

1      not to take the allegations of burden as gospel truth because

2      the firms that have the largest number of claims are the ones

3      who are most likely to have sophisticated databases where this

4      information is easily obtained and filed away.  And again, if

5      they want, they can just execute the authorization and we can

6      get it from the trusts who we know have that capability.

7      That's where we got Mr. Puller's affidavit.  We got that from

8      a trust and prepetition, response to a prepetition subpoena.

9      We have had it for some time, but we got it from a trust.

10             Some of the more minor issues:  The committee says

11     that the order should give debtors authority to issue the

12     questionnaire instead of requiring the claimants to complete

13     it.  The requirement to complete it is from the version of the

14     questionnaire that everyone has been working with.  That's

15     where we got it from.  We thought that's where the court was

16     going.  We think that an order that just says authority to

17     issue without any requirement that it be completed could be

18     disregarded by claimants, would be treated potentially as a

19     nullity, which would just delay the case and prevent this

20     process from moving forward.

21             The language about how the timing will be incorporated

22     in a scheduling order, we don't see any reason to wait for

23     that.  We don't know how long it is going to take us to get

24     that scheduling order done.  People are going on vacation, and

25     we think that the timing should be in this order so that we can

Garlock/5-26-11

67

1    go ahead and know what our schedule is.

2         We don't think there should be a date for Rust to

3    complete the database.  It's too early to know that, to know

4    how long it is going to take.  We don't know what the responses

5    are yet.   There is this specter, this constant specter of

6    objections.  So we don't know exactly what we are going to get

7    back and how soon Rust will be able to put that database

8    together.

9         We have in our order the requirement that Rust

10   provides the – make the forms available to the parties and

11   create a database but we have it open-ended.   They are

12   certainly not going to drag their feet.

13        Our order also has Garrison involved in inputting the

14   paper forms.  We think that's a mechanical task and one that we

15   should not pay Rust to do.  Again, Rust will make the actual

16   forms available to all the parties so, if they have any doubts

17   about what Garrison did in inputting the forms, they can audit

18   Garrison and raise those issues, but it is a mechanical

19   process.

20        We think equity should be in the order as one of the

21   parties that has access.  They have been a participant in these

22   hearings and will obviously likely be a continued presence.

23   The financial creditors, as well, if they would like, should be

24   part of the order.  I just did not have a chance to confer with

25   them before this.

Garlock/5-26-11

68

1          That's all I have.  Thank you, Your Honor.

2          MR. GUY: Your Honor, it's Jonathan Guy for the FCR.

3      May I be heard briefly?

4          THE COURT: Yes.

5          MR. GUY: Thank you, Your Honor.  The court has made it

6      clear that the debtors are entitled to appropriate discovery to

7      assist their experts in presenting their theory that tort

8      values are not applicable in determining aggregate liability at

9      the estimation hearing on aggregate liability that is going to

10     take place, and we hope that takes place sooner rather than

11     later, but that discovery shouldn't swallow the goal, and I

12     think the court has made this clear also, of getting to that

13     hearing quickly, inexpensively, or at least as inexpensively as

14     possible and without a burden to respondents or invading any of

15     the applicable privileges while at the same time protecting

16     confidentiality, and that the court has gone to some pains to

17     balance those needs of the debtors against the concerns of the

18     respondents and the burden.  And we just urge that the court

19     continue to do so.

20          And in terms of specifics, the only thing that we

21     would add is the more straightforward this form is, the quicker

22     it can go out and the quicker we can get responses.

23          On confidentiality, one of the concerns that was

24     raised there was that, well, this is a way to keep people

25     honest.  I believe that the form requires some verification

Garlock/5-26-11

69

1    from either the claimant or the counsel.  That should be

2    sufficient in that regard.

3         And from our perspective, Your Honor, we just need

4    this to go out.  As Your Honor said, this needs to get in the

5    works and get going.  We have taken a long time on this.  It

6    has been very expensive.  I think, at the end of the day, it is

7    not going to have a huge difference to what the experts are

8    going to say to us.  Dr. Bates has already presented his theory

9    to the court.  The debtors have presented that theory over and

10   over, and there will be data there that they can rely upon, but

11   we have got to get it back from the claimants so we can get to

12   estimation.

13        So I would just urge the court that we get the form

14   out.  There will be a firm date.  We don't go back to the

15   drawing board on any issue because this will be, what, the

16   third go-around now, and we set a firm date, reasonable date

17   for getting those forms back and then we can get to estimation.

18        Thank you, Your Honor.

19        THE COURT: Mr. Swett.

20        MR. SWETT: Your Honor, in reverse order, I would like

21   to discuss with counsel for the equity and counsel for the

22   trade creditors before taking a position on whether their

23   participation should be assumed and built into this order.  I

24   am open to that possibility but I would like to discuss it with

25   them.

Garlock/5-26-11

70

1          With regard to the idea of including the transmission

2     date for the questionnaire and the response date in the order,

3     we agree.   That's what ours says.    It's just that we also

4     contemplate, and the court should contemplate, that there will

5     be a scheduling order governing the whole estimation proceeding

6     in which those deadlines will be incorporated.   That was the

7     structure that we adopted to address the problem of not

8     allowing the larger scheduling order to hold up the show on the

9     questionnaire but reconciling the questionnaire deadlines

10    ultimately to the overall schedule.

11          The idea that the questionnaire will be a nullity

12    unless the order says that claimants are required to respond,

13    which in some sense is in derogation of the objection right

14    elsewhere preserved, is misplaced.    What this is, is a

15    discovery request.   Because it's an unusual hybrid for a

16    specific proceeding in which the court exercises a large

17    discretion, it's been subject to all of this preliminary

18    process, but it's a discovery request.

19          When they put out a discovery request, they don't

20    typically say the court has ordered you to do this.   They say

21    we direct you to do this and, if you have a problem with it,

22    you take it to the court, and that's the model that we are

23    suggesting is appropriate even for this hybrid.

24          Mr. Worf sowed some confusion in his last comments

25    about the interplay of the tort standards with the trust

Garlock/5-26-11

71

1   standards.  The trusts are settlement vehicles.  They exist not

2   to contest claims but to identify the legitimate ones and pay

3   them quickly with a minimum of process.  So their standards do

4   necessarily differ from those in the tort system and that's an

5   inescapable fact.  The trust distribution procedures themselves

6   make that abundantly clear.

7         Now, it doesn't matter here, though, because their

8   issue, as they articulated it from the beginning, is how much

9   relief in terms of ultimate liability or payment is Garlock

10   going to experience from the fact that payments are flowing

11   from the trusts and, for that matter, from other sources.

12         Well, they will get that, the basis for drawing their

13   inferences on that, out of the questionnaire because the

14   questionnaire will require the claimant to identify the trusts

15   against which it has filed claims and state whether or not a

16   claim has been paid and what the amounts that the trusts pay on

17   average are public information published in the trust

18   distribution procedures approved by the courts creating those

19   trusts.

20         So there is absolutely no need for them to dig into

21   the particulars of whether a given claimant is just checking -

22   telling the trust that he was on a site that's on the trust

23   official site list as a place where their predecessor's product

24   was or whether instead he has got, you know, nitty-gritty

25   deposition, co-worker affidavit and invoice type evidence to

Garlock/5-26-11

72

1    establish that the trust predecessor's product was at a given

2    site and that he came to be personally exposed to it there.  It

3    doesn't matter for their issue.  This is a macro, not a micro

4    exercise, and that's one of the keys to the efficiency and

5    utility of the estimation process, which is not buried by the

6    rival theory that they have articulated about exactly what it

7    is we are supposed to be estimating.

8          Now, precisely because the questionnaire pulls into

9    one place information which in the tort system was rarely, if

10   ever, routinely discovered, it is of potential commercial

11   interest to an outfit like Bates White who wants to be in the

12   catbird seat when it comes to brokering a deal – I am sorry,

13   they are an affiliate of Litigation Resources Group – who wants

14   to be in the catbird seat when it comes to advising clients in

15   risk transfer deals such as we described in a previous

16   appearance.

17         So I just take exception to the glib assertion that

18   the risk identified and responded to in our use restrictions

19   and confidentiality provisions, crafted with the same firm that

20   now acts for them as the expert, is just misplaced.

21         Now, I heard him say that they are willing to discuss

22   that aspect of the order, and I welcome that discussion but I

23   just wanted to flag that I don't agree with Mr. Worf's facile

24   dismissal of that concern.

25         Here is the most disturbing thing of all about the

Garlock/5-26-11

73

1   position that has emerged in this last exchange of drafts and

2   the comments today: The debtor seems to have in mind some

3   exercise where it is going to amalgamate litigation force

4   against the tort claimants by going to other parties and say

5   show me your exposure information and I will show you mine, and

6   we will gang up on these claimants.  And what that is, is a

7   prescription for the mother of all tort suits.  It is not what

8   we are about here.

9        We have here a defendant that needs to be reorganized,

10  and we are driving towards a plan of reorganization, and the

11  estimation is for the purposes of plan formulation.  It is not

12  for the purposes of equipping Garlock to intensify and magnify

13  the tort litigation that it waged for thirty years to the end

14  where it was unable to do so out there in the courts that

15  normally handle those things and so came into the bankruptcy

16  court.  It is a misplaced ambition for the discovery that is

17  appropriate for estimation, and it is very disturbing as a sign

18  of the debtor's future intentions which should not be

19  encouraged by the provisions of this order.

20       Thank you, Judge.

21       MR. WORF:   Your Honor, may I make three quick

22  clarifications?

23       THE COURT: All right.

24       MR. WORF:   First of all, we keep hearing this

25  statement that the questionnaire seeks information that was

Garlock/5-26-11

74

1    rarely, if ever, sought in the tort system.  That is –

2            MR. SWETT: That is not what I said.  I said in one

3    place, not routinely.

4            MR. WORF:   I don't know what you mean by one place

5    but Garlock asked these same questions hundreds of times per

6    year in cases that I have personally seen where they did

7    discovery about these very issues, including Garlock exposure.

8    So that's just not correct.

9            Second, the debtors' position is not just that relief

10   will come from the trust payment but also that the restoration

11   of evidence, when claimants are developing evidence of exposure

12   against the trusts will also decrease Garlock's trial risk and

13   result in lower legal liability and settlement values.  That's

14   why the evidence is important and what the nature of that

15   evidence is, and the court heard Mr. Glaspy about that.

16   Nineteen and one in trials when that evidence was on the table.

17   The record got a little worse over the past decade.  What's

18   going to happen in the future?  That's why it's relevant.

19           Finally, as far as requiring claimants to answer this,

20   there is a form of discovery that amounts to a court order

21   requiring documents and information to be produced.  It's a

22   subpoena.  And this is closest in nature probably to that, and

23   we think it's appropriate that the order, just like a subpoena

24   does, require the claimants to answer it.  They can have their

25   objections, they can bring them forward, but they should know

Garlock/5-26-11

1    that this is something that has taken a lot of time and effort

2    in these cases and should have some force behind it.

3            Thank you, Your Honor.

4            MS. CRABTREE: Your Honor, one quick statement.

5            THE COURT: Yes.

6            MS. CRABTREE: This is the first time we have heard

7    today that the parent may not be involved or able to be given

8    access to discover it.  I just want to reserve my rights to

9    bring that argument before you and make certain we are not

10   foreclosed by the events today to seek that discovery.

11           THE COURT: Sure.  Okay.

12           All right.  Well, let's do this and I will try to have

13   some  semblance  of  order  here  but,  first,  on  the

14   confidentiality, I think that the responses should be treated

15   as fully confidential and that they should be used only in the

16   estimation process.  Although as I said before, I think that

17   that  designation  and  such  should  be  without  prejudice  to

18   parties by motion and notice to everybody involved if they want

19   to raise that issue at a later date.  I think I can foreclose

20   it forever, but I think that the only purpose about which we

21   are about here is the estimation process and that that should

22   be the limit of the use of the data at this point.

23           The exposure information, I will order that the claim

24   form alone be sufficient and that the language about additional

25   exposure information not be included.  It seems to me that that

Garlock/5-26-11

76

1    is consistent with the rest of the questionnaire.  It's

2    particular details that obviously would be of interest to

3    Garlock but I think they are not necessary for the estimation

4    process and therefore I don't think I should require those to

5    be included.

6         As to the requirement or the statement of requiring

7    completion, I think we should include this.  I agree with Mr.

8    Worf, it is really like any other discovery, an interrogatory

9    or subpoena goes out commanding a response.  Implicit in that

10   is the right to object and, of course, those rights are

11   included in this form.  So I don't think anybody will be

12   intimidated into thinking they have lost their right to object.

13        I think we ought to include a date to send it out and

14   a date to respond to it and we can deal with the other matters

15   later.  I think it would be good to have the scheduling order

16   that Mr. Swett has raised.  I don't know that we need to

17   include a statement about this in this document.  I don't think

18   that's necessary, but I hope that you all can talk about that

19   and, if not, maybe I will bring it up.

20        I think it's probably a good idea to have in this

21   order that the data that's the result of this will be shared by

22   the parties, and I think that we ought to limit it at this

23   point to the parties who are involved in the process, which

24   would – directly – which would exclude the equity and trade and

25   financial creditors, but we will let you all – let that be

Garlock/5-26-11

1   without prejudice to you all raising that issue at some point

2   down the line if you want to, and there may be a real

3   difference between looking at the data versus the results of

4   the data. So we will see about that. But at this point let's

5   leave it at the parties to this litigation.

6        I think we ought to either leave out the reference to

7   9014 or include everything else including the kitchen sink with

8   it because I have got no earthly idea what authority I am doing

9   this under other than it seems to me to be necessary and

10   helpful to the process. It's probably best just to remain

11   silent on that. When pushed, I always instinctively blurt out

12   105. So this is a process that – well, I think this will be

13   helpful to people and to the parties and whether it is

14   discovery under 9014, or a subpoena, or whatever it is,

15   hopefully it will advance the ball. And I don't think it's

16   meaningful to anybody to what statute we cite right there, that

17   that's necessary.

18        Let's see what else we have here. We talked about the

19   unknowns. We won't deal with them here. I believe you all

20   were going to talk about who to send the thing to. I think the

21   definition of the known parties at this point ought to be as

22   inclusive as possible or as broad as possible.

23        That's about all of the notes I had. Are there other

24   items that I have missed?

25        MR. WORF:   Ted, you don't have any objection to the

78

1    requirement that the paper forms be unique?

2           MR. SWETT: No.

3           MR. WORF:   Okay.

4           THE COURT: No, I think that's a good idea, yeah.

5           MR. SWETT: I have no problem with that procedure.

6           MR. GUY: Your Honor, it is Jonathan Guy.  I apologize

7    if I missed this, but do we have a fixed date for when this

8    will go out and when the response will come back?  I am worried

9    that, if we refer that back, then we are going to have more

10   delay in terms of trying to reach agreement between the

11   parties.

12          THE COURT: I kind of like the dates you had in there.

13          MR. GUY: Thank you, Your Honor.

14          MR. WORF:   I think, given today's rulings, we can put

15   together a final order in short order and give it to Your Honor

16   early next week.

17          THE COURT: Okay.

18          MR. WORF:   And hopefully get it entered, so these

19   dates –

20          MR. GUY: That was my only concern, Your Honor.  Thank

21   you.

22          MR. SWETT: The dates are the same in our rival order,

23   so we are agreed on when it goes out and when it gets responded

24   to.

25          THE COURT: Okay.

Garlock/5-26-11

79

1          MR. WORF:   I think the only other issue is the
2     expiration date for the authorization.  Maybe that is something
3     we can talk about.
4          THE COURT: I mean, I was leaning towards the date of
5     the estimation trial.  It would seem to me that it might be
6     helpful to the trusts to have a date in a document and, if
7     that's the case, maybe if you all would just kind of pick your
8     best guess at when something like that might happen because, I
9     guess, a trust is going to get this form and you don't want the
10    recipient of the form to have to go do research to find out
11    whether it is still valid or not; if it had a date in it, that
12    might be useful.
13         MR. WORF:   We also don't want to have to put pressure
14    on the trusts to answer it quickly before an authorization runs
15    out which –
16         MR. SWETT:  The impact of that is to delay the
17    discovery cutoff, but that seems to me, Your Honor, to be the
18    logical date because it is discovery and so, when we structure
19    a calendar, we will have to take account of the fact that the
20    authorization form survives and it's going to come in as late
21    as October 24th and that, for those claimants who use it,
22    Garlock will have to go to the trusts.  That will build in some
23    interval before the discovery cutoff.
24         THE COURT: Okay.  I suspect that's going to have to be
25    – you all try to talk about that and, if you can't, early next

Garlock/5-26-11

80

1    week I will pick a date.

2          I will be here through Wednesday of next week, then in

3    Asheville, but around, and then back Monday or Tuesday of June

4    6th and 7th, but leaving and gone June 7th from midday as a

5    practical matter.  Okay.

6          Let's take a break for about ten minutes and then we

7    will come back or do you want to break for lunch and come back

8    early or do you want to keep going and try to finish it up

9    before lunch?

10          MR. SWETT: Your Honor, we are at your disposal.

11          THE COURT: I am easy.  I mean, you all –

12          MR. MILLER: Your Honor, I would expect that my

13    argument is going to be very brief, fifteen minutes top.

14          THE COURT: Well, let's take a ten-minute break and

15    come back and then we will finish up before we go to lunch.

16          (Recess from 11:53 a.m. until 12:05 p.m.)

17          THE COURT: Have a seat.

18          Okay.  We have, I believe, the debtors' objection.

19          MR. MILLER: Yes, Your Honor, and I don't know whether

20    Mr. Swett wants to go first or how we want to handle this.  It

21    is their application.  I wasn't sure if you had a preliminary

22    statement.

23          MR. SWETT: I do.  I was tempted to just rest on my

24    brief, Judge, but then we didn't file a reply because we were

25    trying to economize in this process.  So to really join issue,

Garlock/5-26-11

81

1    I think that Mr. Miller and the court ought to hear at least my

2    brief account of response to the issues raised in their written

3    objection, which of course flows out of a series of monthly

4    objections and responses which are collected in our brief in

5    support of the fee application and represent the main source of

6    information on these issues, and I hope is illuminating to the

7    judge, to the court, about what's going on in the interplay

8    between the parties on these fee issues.

9          The long and the short of it is that the debtors are

10   consistently objecting to a very significant percentage of our

11   fees and, by the time it gets winnowed down through the

12   responses to the monthly objections and concessions and comes

13   up to the briefing, they are still hanging in there for

14   something like twenty percent of the fees charged over the

15   interim period.  This has been consistent from the beginning of

16   the case when they objected to our rate structure and our

17   retention application as representing some sort of twenty to

18   thirty percent premium over what they thought it ought to be.

19   And so from my perspective, one of the things that's going on

20   here is the debtors are just bound and determined to object and

21   are casting about for rationales because they just don't like

22   the numbers.  That's not an appropriate basis for a fee

23   objection but it certainly has implications for the merits of

24   their arguments.

25         Here, they are saying that the issues have to do with

Garlock/5-26-11

82

1  insufficient descriptions, alleged duplicative effort or

2  overstaffing, tasks that they think took too long in relation

3  to the product and services that they say were without benefit

4  but far and away the largest issue has to do with their efforts

5  to attack the amount of fees incurred in what they characterize

6  as resisting their discovery but, in fact, when you look at the

7  time charges that they collect under that description also

8  includes affirmative discovery and strategy considerations

9  going beyond response to any particular one of their many

10  discovery motions.

11         Now, it seems to me quite obvious from their paper

12  that they are attempting to force their present issues into the

13  framework of ruling on the first interim application and, in

14  particular, on the court's view that the fees incurred in

15  connection with the information brief were larger than ought to

16  be paid.  And I would like to begin by drawing a fundamental

17  distinction between that unique project and the ongoing work in

18  the case.

19         The information brief was unique in our experience as

20  a firm.  We had never done that before.  We were responding, as

21  you noted last January, to a particularly aggressive opening

22  gambit by the debtors and thought it was necessary and useful

23  to try and pull together our experience of the issues in a

24  whole lot of different context into some coherent presentation

25  to set the table for what has followed and will continue to

Garlock/5-26-11

83

1    follow.  But that was a unique task.  It was uniquely important

2    to  the  constituency.   So  it  was  actively  monitored  by  the

3    members of our committee and did involve active participation

4    by a large group of professionals in our firm, and Your Honor

5    seemed to believe that that was more people than ought to be

6    charging for that, and so you nicked us for that, and I am not

7    here  complaining  about  that.   I  am  explaining  that  the

8    objections  with  respect  to  the  second  interim  are  very

9    different because the work involved is very different and does

10   not lend itself to facile analogy to the issue presented by the

11   information brief.

12       The  main  thrust  of  the  debtors' effort  to  find  some

13   basis  for  objecting  to  the  some  three  hundred  and  forty

14   thousand dollars in fees that they attribute but not strictly

15   directly to resisting their discovery is that the descriptions

16   are  insufficient  to  tie  the  work  to  any  particular  piece  of

17   output.   Indeed, and the entries were so numerous that they

18   couldn't  be  troubled  to  analyze  them  with  particularity  to

19   separate the ones that they thought were insufficient from the

20   ones that they would concede to be sufficient, which tells you

21   something.   It  tells  you  that  their  real  objection  is  not

22   insufficient description; it is they just don't like the amount

23   of  fees  incurred  in  that.   But  that, of  course, is  directly

24   related  to  the  amount  of  effort.   And  the  amount  of  effort,

25   which  you  have  a  window  on  from  the  bench  as  you  have  seen

Garlock/5-26-11

84

1     these matters argued out in front of you, has been very great.

2     Hopefully it has also been very useful for the court for the

3     parties to join issue on these matters, have them well-prepared

4     and vigorously advocated both in the written submissions and in

5     the hearings and in the evidence presented and, of course, all

6     of that flows from significant work in assessing the other

7     sides's strategy and coming up with a strategy and adapting

8     from time to time according to developments for our

9     constituents.

10         You know, we hear a lot in the bankruptcy fee

11     application world about the evils of clumping time entries.

12     You shouldn't have an entry that says, you know, did legal

13     research, wrote memorandum and attended to correspondence.

14     Well, we don't do that. We are very much aware of the need not

15     to clump, but what about clumping objections? In effect they

16     are clumping objections to the time entries that they say have

17     something to do with discovery without doing the court the

18     service of descending to particulars and pointing to actual

19     specific problems other than, you know, the occasional, quote,

20     example that they find it convenient to put in a footnote.

21         But if you turn to tab (a) of their objection, you see

22     their restatement here of the time entries that they have

23     clumped under the notion of responding to or resisting their

24     discovery. And I submit, and I won't take any more time on

25     this, when you do that, I just don't think their

Garlock/5-26-11

85

1   characterization of overly vague, generalized, undifferentiated

2   time entries as between projects or tasks sticks.  It just

3   doesn't fit the facts.  Those issues are replete with

4   references to the different aspects of the discovery program

5   that have been fought out.  As you will recall, they include

6   the Rule 2004 application addressed to trusts, which is the

7   subject of a significant number of entries here, to a subpoena

8   issued to them or rather a notice of deposition issued to the

9   trusts over the Christmas holidays, which gave rise to briefing

10  about the interplay of Rule 2004 and Rule 26.  The

11  questionnaire application; the application to take discovery of

12  law firm's settlement information; the application to take

13  discovery of past claimants; and I may be forgetting one but it

14  has been a complex, multi-part discovery program driven by a

15  particular strategy.

16      Now, some of our work, as reflected in the entries, is

17  particular to the given pieces of that program.  Others of it

18  are strategic analysis and trying to figure out where we want

19  to go with all of this and how we want to counter what they are

20  trying to do, and some of the entries reflect that.

21      There was a time, for example, they object to some

22  time entries of Jeanna Rickards Koski on the basis that they

23  can't figure out which of the pieces of the discovery program

24  she was working on.  In fact, at that stage, she was working on

25  all of them because we had in mind the possibility of an

Garlock/5-26-11

86

1     omnibus response and, while we didn't ultimately file it that

2     way, that work, including research and drafting, fed into the

3     particular brief that we submitted on the particular pieces of

4     their discovery program.  So it was in no sense wasted.  It was

5     highly beneficial and necessary work.

6          But my main point, Judge, is an examination of the

7     entries that they clump under this objection of generalized

8     time entries that they can't really tell but it's too much

9     money just doesn't bear it out.  And on the subject of whether

10    it's too much money, from our perspective it's a pittance

11    compared to the cost that they have attempted to inflict on our

12    constituents, and it's a pittance in comparison to the costs

13    that the estates would incur if they were given their head in

14    that discovery program.  And I hope the court believes that the

15    joining of issue on those matters has been helpful to the court

16    and to the process.  My perspective has been most assuredly

17    necessary and not overdone.  It's hard work because it involves

18    taking overarching concepts of discovery and the applicable

19    rule, bringing them to bear on a highly specific and somewhat

20    unusual context, and trying to make the real world consequences

21    of these discovery demands, which are easy to write and hard to

22    comply with, real to the court.  That's a hard job and we

23    didn't overdo it and we don't overstaff it.  People have

24    discrete assignments.

25          Mr. Wehner, for example, has had an active role in,

Garlock/5-26-11

87

1   along with me, crafting our affirmative discovery.  He has had

2   an active role in responding to the past claimants as I recall,

3   on certainly the questionnaire motion.

4        On the other hand, Mr. Liesemer had a significant role

5   in the briefing towards the end of last fall into December and

6   January over trust discovery issues.

7        Ms. Kelleher, as you know, has assisted me in

8   presenting these matters to the court in hearings and in

9   writing important briefs or portions of briefs involving, for

10  example, the past claimants.  There hasn't been any piling on,

11  on these projects.

12       So we fall back on the objection that, well, there are

13  just too many professionals involved, there are too many hands

14  on this work product.  Well, Judge, that doesn't really tell

15  you anything.  In fact, I am going to hand up an exhibit that

16  underscores this and a related point.  It doesn't tell you

17  anything that is worth noting.  That Mr. Inselbuch, my senior

18  partner, reads a paper before it goes in, so that counts as a

19  professional logging time to that particular brief.  So they

20  get to add that to the paralegals who do the cite checking and

21  there are two or three lawyers who had the laboring oar in

22  crafting it and suddenly they come up with eight or nine

23  timekeepers and, oh, my gosh, that must be redundant.  It

24  doesn't support that inference.  You have to look at the time

25  and you have to look at the entries which they have disdained

Garlock/5-26-11

88

1    to do.

2           Now, in terms of the sheer numbers of professionals,

3    I have ACC Exhibit 108 to hand up.  ACC 108 is a summary that

4    we have done on the basis of examining the debtors'

5    professional fees application, when confronted with the

6    suggestion that we have too many timekeepers in the matter, and

7    we looked to see, well, how many timekeepers does the debtor

8    have across all the firms and all the functions, and the

9    numbers are quite impressive.

10          It is, after all, a large case.  So I am not

11   suggesting that this exhibit should give you necessarily pause

12   about their fee applications because you can't tell what's

13   behind the aggregate number of the professionals keeping time

14   in the matter.  You can see that it's quite an impressive

15   number and you can compare it to ours and see that they do in

16   fact outgun us in terms of the sheer number of professionals

17   devoting time and energy to this, and it is an understatement

18   because we don't know what Forman Perry does.  It hasn't filed

19   regular fee applications, and we don't know what the fifty-four

20   law firms who were engaged as ordinary course professionals are

21   doing by way of lending their efforts affirmatively to the

22   debtors' discovery program, much less whether they

23   differentiate that time by the particular grief that they

24   happen to be supporting.

25          So the points are two-fold.  Sheer numbers of

Garlock/5-26-11

89

1    timekeepers don't tell you anything.  This is not like the

2    information brief where you had that concern.  And the second

3    thing is, when it comes to the balance of forces, we are at a

4    disadvantage.  We are not overdoing it.

5         So let me pass to some of the other points.  They

6    object to the time spent in response to the fee objections and

7    they point out that some of that time showed up in the first

8    interim but some of it flows from the months following the

9    closing of that period.  They object to seventy-two thousand

10   dollars on that account, which is additive to the time already

11   water under the bridge in the past period, an additive in the

12   sense that they are not objecting to a hundred percent.  They

13   are just trying to cut us by some substantial percentage.

14        Well, this calls attention to the sort of what I would

15   call asymmetrical nature of the battle that they have chosen to

16   wage with us on our fees because what they do is they, with

17   little investment of time, and even less of thought, they cast

18   off these monthly objections, and we are forced either to

19   ignore them and take our chances at the interim stage or

20   respond to them.  Because we were in the midst of a six-week

21   long – a hearing that stretched out over six weeks or two

22   months last fall – we weren't able to muster the monthly

23   responses.  This time we decided to try and do it differently

24   in the hopes that it would make it a more illuminating process

25   for the court and perhaps even obviate some issues.  So we did

Garlock/5-26-11

90

1    respond monthly, and an example is in January they said, oh, my

2    goodness, all these entries regarding discovery, we object.  We

3    said, okay, tell us which entries you object to.  What they

4    sent us back was a list of every single entry they could

5    identify in the fee request that had anything to do with

6    discovery whether affirmative or oppositional. Well, that was

7    not very helpful.   It certainly didn't particularize the

8    objections.  And the next month is the same, only that time

9    they didn't provide the response.  Not that it would have been

10   that helpful to respond with another complete list of the

11   entries pertaining in any fashion to discovery.

12        But, in other words, they put us to a lot of trouble

13   and cast at issue large amounts of fees with minimal care on

14   their part and yet we have to respond, and then they complain

15   about the time we spend responding.  It's not as though we have

16   attempted to overdo this.   We decided that timely monthly

17   responses would be helpful, that we would then accumulate those

18   responses and make them essentially the substance of the brief

19   in support and we, you know, forewent the opportunity to put in

20   a reply brief and chose instead to rely on the oral argument.

21   We are not overdoing it.  They are bringing this problem on

22   themselves by being overly aggressive in their fee objections.

23   We are used to and fully appreciate the importance of a

24   constructive fee application and objection process, and we

25   have, in fact, tried to respond to their criticisms even when

Garlock/5-26-11

91

1    we haven't thought they were well-founded as long as it

2    wouldn't distort our process or chill our efforts on the part

3    of the committee.

4         But beyond that, we are not willing to go.  We just

5    have to do our work and, when they put at issue a total of more

6    than a million dollars in fees for the two interim periods, we

7    are going to respond in an appropriate fashion to defend our

8    position on that work and to try to beat back that ill-

9    considered attack.

10        We hope that with the court's guidance on this

11   occasion or some subsequent one involving these issues, that

12   their appetite for this process, which we consider wasteful and

13   an imposition on the court, will wane but so far it hasn't.

14   Their appetite is unabated and we have to go through this

15   process.

16        Forman Perry.  We put in a supplemental brief in

17   opposition to the retention of Forman Perry which would have

18   been, I think, the fifty-sixth law firm they were retaining.

19   We did so because of two reasons.  One was that the bar date

20   ruling intervened and perhaps changed the setting of the table

21   as it pertained to the reasonable need for that law firm to be

22   engaged.  And also because, in attempting to justify that

23   retention, they made very broad assertions alleging, you know,

24   fraud and the like on the part of our constituents.  So we did

25   an analysis and spread it on the record in the form of our

Garlock/5-26-11

92

1    supplementation or supplemental brief of exactly what it was

2    they were complaining about as fraud.  And in our view, it was

3    very (inaudible) indeed and certainly didn't justify that

4    overheated rhetoric, and that was a worthy project for

5    defending the interest of our constituency whether or not you

6    were going to appoint Forman and Perry.

7         So we consider that work to be amply justified by the

8    output and by the challenge to our constituent's interest that

9    we were responding to.

10        They complain that at the bar date hearing we spent

11   five thousand, six hundred dollars, or that's the objected to

12   amount, I guess, putting together an analysis of the costs

13   incurred by the debtor upon whose program they were modeling

14   their own, which is great.  That wasn't easy to do because the

15   Grace costs and fees were not reported in a way that made it

16   easily translated, but we didn't want to overstate it because

17   that would be misleading the court and it would also be

18   ineffective advocacy.  So we had to do an analysis and then we

19   had to decide where to cut off the analysis for the sake of

20   conservatism and for not gilding the lily rather than trying to

21   reconcile it down to the last penny.  And then we had to cast

22   that in the form of admissible summary with appropriate backup.

23   And then we had to fit that into our case about why the bar

24   date and associated relief that they were seeking wasn't a good

25   idea, wasn't the appropriate way to administer the case.

Garlock/5-26-11

93

1          That time, from the standpoint of arguments I made at

2     the end of the day at that hearing in opposition to their

3     program, was cheap at the price.  In my way of thinking, it was

4     effective and important for the court to know.

5          The preparation of hearing exhibits for the February

6     hearing, they object to some ten thousand, nine hundred dollars

7     of that.  The same thing.  We are not casual about the evidence

8     that we put in front of the court, particularly when it

9     involves summary of more detailed evidence that is not

10    convenient or feasible to dump in front of the court as an

11    undifferentiated mass, and that takes time.  And also the

12    selection process.  What are the issues that would benefit from

13    that kind of evidence?  Where do you go to find it?  What do

14    you do with the raw material when you find it?  How do you

15    present it to make your point most effectively?  Those are the

16    kinds of things that feed into that process of preparing a

17    hearing exhibit.  It is painstaking but that is a necessary

18    element of the quality of the evidence presented.

19         They object to what they call docket management and

20    calendar.    We  have  briefed  this  under  a  different

21    characterization which I think is more appropriate, which is

22    essentially communications with the client.  We put out every

23    week an update of what's coming up on the docket, what the

24    deadlines are, what positions have been taken so far, what the

25    advice to the committee is and what developments there have

Garlock/5-26-11

94

1    been in the case.  We call this, for shorthand, the calendar,

2    but it is in fact a medium of communication with clients who

3    insist upon real time updates about what's going on in the

4    case.  It is carried out by relatively junior lawyers and

5    paralegals with minimum oversight from me, since I am

6    responsible for the advice.  So it's a routine task.  It has to

7    be done.  We have tried to make it more and more efficient.  We

8    experimented early on with having it done at Tom Moon's office

9    but this is Tom's first involvement with an asbestos committee.

10   They are large and demanding constituents, as I have told you

11   before, and the phrase "herding cats" is fully applicable.  And

12   so in the end we decided we could probably do it quicker and

13   cheaper by modeling the process on ones we follow at Caplin &

14   Drysdale in other cases, so we took the task back.

15          In that month, there was inordinate paralegal time –

16   this was January – spent on it because we had to train up a

17   paralegal to do it, and we cut her time in half, which means

18   that satisfied the debtors with respect to that month.  That

19   month is unlike all of the other months when it comes to this

20   issue of the routine communications to the committee because

21   there was no similar learning curve time in the other months.

22   So we think we have fairly addressed their concern there.  We

23   certainly strive to make the process efficient while fulfilling

24   its necessary purposes, and the amount involved is not large

25   considering the importance of the task and the magnitude of the

Garlock/5-26-11

95

1    case.

2           The final objection – no, I am not there yet.  They

3    object to some time spent by Kevin Maclay and some time spent

4    by Bernie Bailor.  Mr. Maclay's entries have been limited in

5    this period to a period when he was, and I think he still is,

6    reading the memos that go to the committee.  Now, that is

7    necessary because Mr. Maclay has the responsibility, among

8    other things, for the debtors' efforts to gather information in

9    other bankruptcy cases, and he needs to have an ongoing

10   understanding of what the discovery forays are, what positions

11   the committee is taking, what the advice to our clients are,

12   and it's very little time.  There's fifteen hundred dollars

13   under that category.  It is necessary, appropriate and not

14   disproportionate to the need.

15          Mr. Bailor – let me make an analogy. We have noticed

16   in the fee applications of the debtor's two principal firms

17   considerable either cross-fertilization or overlap depending

18   upon how you view it, and I don't take a position on that.  I

19   am not now intending to criticize them for this.  But the

20   Durham firm records typically a not insubstantial amount of

21   time reading the Robinson firm's work product or participating

22   in a meet-and-confer on the questionnaire even though the

23   Robinson firm are cast as special asbestos litigation counsel

24   principally charged with, you know, those responsibilities.

25          Well, it's important for Mr. Miller and his colleagues

Garlock/5-26-11

96

1    to be up-to-speed with what Mr. Cassada and his forces are

2    doing in the case on the asbestos issues and the strategy that

3    they are articulating for their clients and co-counsel for the

4    way forward.  We understand that.

5         If the standard is, oh, no, no, two lawyers can't be

6    doing the same thing, that's going to be treated as redundant

7    effort or overstaffing no matter what, then I suppose we would

8    have to change our view of their fee apps, but that's not what

9    occurs to us as the appropriate standard and I would not like

10   to do that.

11        Mr. Maclay is in much the same position as a Durham

12   lawyer looking down upon Robinson work product for the needs of

13   their  own  focus  task  in  the  case.   It's  necessary  and

14   appropriate  and  it  benefits  the  client  and  ultimately  the

15   estates.

16        Mr. Bailor's time.  Mr. Bailor had gone away on

17   vacation.  He logged three hours one day, catching up on what

18   had been going on in the case.  Here, Judge, I am going to tell

19   you that, if you see fit to cut that by fifty percent, I can't

20   cry very hard because it is a lot like the time that you cut

21   for  fifty  percent  in  the  first  interim  application.    Mr.

22   Bailor's responsibilities focused on the affiliate's document

23   production, the analysis of the restructuring transactions that

24   took place before bankruptcy and the asset valuation side of

25   things.  So there will be significant charges for Mr. Bailor in

Garlock/5-26-11

97

1    the case but the particular entry that they singled out, the

2    three hours of catching up when he came back from vacation, is

3    somewhat attenuated from the specific responsibilities, and I

4    have to acknowledge it would be consistent with your first

5    ruling to allow that two thousand dollars in fees only to the

6    extent of fifty percent.

7            They lump under another heading, which they called new

8    filing system, some three thousand, nine hundred and fifty-six

9    dollars in fees.  This is a wrong characterization.  It is not

10   as though we created new software or electronic filing or

11   completely revamped our system firm wide as opposed to for the

12   needs of this case.  Instead during the second interim period,

13   the case by now had been going on for many months, the filings

14   were voluminous, the correspondence is considerable and the

15   need, which always arises in a case like this to be able to

16   retrieve matters specifically, reliably, quickly and

17   inexpensively is very real.  It happens everyday.  If the files

18   are not set up, categorized, organized, labeled and made

19   retrievable in an appropriate way, the estate is going to bear

20   very large expenses for rooting around in the file trying to

21   get, you know, the right piece of paper under time pressure

22   because you are trying to link it to or relate it to a new

23   submission that you have to make.  Four thousand dollars over

24   the period of four months for that task is not out of line.

25           Now, I acknowledge this is additive to other similar

Garlock/5-26-11

98

1    administrative tasks that they are not objecting to.  I am not

2    suggesting otherwise.   But  this  increment  that  they  are

3    suggesting to on the basis that, well, they were setting up a

4    new  filing  system  and  that  sounds  like  overhead  is  not

5    appropriate.  It was specific to the needs of this case.  It

6    will result in lower charges, not higher ones over time.  It's

7    a  fully  appropriate  administrative  measure  and  fully

8    compensable.

9          Finally, they object to, under the category of a new

10   filing system, to entries that don't have anything even to do

11   with that project as I have described it but rather with the

12   ordinary, humble task that lawyers have to follow of keeping

13   their own papers in order so that the next time, you know, they

14   get  called  to  take  steps  within  the  areas  of  their

15   responsibility, they are not caught out and they don't have a

16   lot of ramping up time for that.  That was a total, Judge, of

17   one point six – one point eight hours across two lawyers over

18   a four-month period.  It wasn't worth an objection.  It's not

19   worth more comment on my part.

20         The only other thing I would say, Judge, is that the

21   cases cited in the brief to try to turn a sow's ear into a silk

22   purse  are  very  inapposite.   Most  of  them  have  to  do  with

23   converting  or  with  fee  applications  in  elevens  that  were

24   converted to sevens or that otherwise were taking place under

25   circumstances where the judge had very powerful reasons to

Garlock/5-26-11

99

1   believe that the file had been overworked or the efforts had

2   been unproductive, and I trust that that is not the court's

3   view of the efforts of either side in the present case.

4        Thank you.

5        MR. MILLER: Thank you, Your Honor.

6        Your Honor noted in the last hearing on Caplin's first

7   fee application that this is a distasteful task for you.  I can

8   tel you that I don't like being here doing it either, just as

9   much as I think Mr. Swett doesn't like having to defend his fee

10  application.

11       This is a process that I think puts some strain on the

12  parties' relationships and is inconsistent with what I have

13  found to be a very collegial atmosphere here in Charlotte which

14  we typically extend to our out-of-town brethren, you know, with

15  great fervor.

16       However, this is not a typical case, these are not

17  typical fee applications.  Caplin's requested fees through the

18  first request, the second request, March and April of this year

19  tally a grand total of four point three million dollars.  These

20  are very significant fees and the debtors take it as part of

21  their job to keep an eye on fees and to raise issues and

22  objections when they feel it is necessary as part of their

23  fiduciary responsibility to the estate as a whole.

24       Your Honor, as Mr. Swett noted, the debtors did object

25  through the monthly process to approximately four hundred and

Garlock/5-26-11

1    fifty thousand dollars of the one point four-seven million

2    dollars in fees that are covered by Caplin's second fee

3    application, and the debtors continued through their analysis

4    as they received responses from Caplin to those monthly

5    objections and, in addition, for example, the November

6    objection was sent to Caplin before Your Honor ruled on the

7    first application, and so the debtors took into account the

8    responses that they received and the guidance that Your Honor

9    provided in the first hearing on this and have tried to narrow

10   the issues in the objection and actually reduced the objections

11   that were covered by the monthly applications by about a

12   hundred and seventy thousand dollars.

13       And the debtors, I think freely admitted in the papers

14   and will freely admit here in open court that we believe the

15   first objection had a lot of the desired and intended effect.

16   Caplin has changed some of their billing practices

17   significantly we think for the better and we think that the

18   case overall is better for it.

19       However, there are a few issues that we raised that

20   are still of concern to the debtors and those are primarily

21   rooted back to three code sections.  One is section

22   330(a)(4)(A) which says that firms are not entitled to

23   compensation for unnecessary duplication of services.  The

24   second is section 330(a)(3)(D) which indicates that services

25   that aren't performed within a reasonable amount of time

1    commensurate with the complexity, importance and nature of the

2    task  are  also  not  compensable.   And  finally,  section

3    330(a)(3)(C), in conjunction with 330(a)(4)(A) which states

4    that services not necessary to the administration of the case

5    are likewise not compensable.

6         The  debtors'  largest  grouping  of  objections  does

7    relate to the ongoing discovery efforts and the Caplin firm's

8    responses  and  objections  to  the  debtors'  discovery efforts.

9    Mr. Swett stated that some of the items on Exhibit "A" may not

10   relate  to  those  particular  efforts,  may  relate  to  their

11   affirmative discovery.   If that's the case, Your Honor, I

12   apologize.  It's difficult sometimes to tell exactly what task

13   is at hand, but there was no intention – any mistakes there

14   were purely unintentional.

15        However, as a whole, Caplin's efforts in response to

16   the debtor's discovery request are very much like their work on

17   the  information  brief  in  that  they  have  had  many,  many

18   professionals  incurring  hundreds  and  hundreds  of  hours,

19   eighteen different professionals with over seven hundred and

20   sixty-six  hours  in  a  two-month  period  working  on  these

21   responses  to  the  trust  discovery,  the  personal  injury

22   questionnaire and discovery directed at the plaintiff's law

23   firms.

24        Your  Honor,  I  do  take  issue  with  Mr.  Swett's

25   characterization of the time entries being crystal-clear in

Garlock/5-26-11

1    terms of where the efforts were going.  I don't want to spend

2    a lot of time on it but I will highlight a few examples on

3    Exhibit "A."  On the first page, there is an entry on the 3rd

4    of July, AJS, for four point three hours, simply legal research

5    regarding Rule 2004.

6         Two pages over, there is an entry by JMR on 1-11-2011,

7    four point two hours, research for further response regarding

8    discovery sought by debtors.  Again, not clear exactly what we

9    are talking about there.

10        And, Your Honor, that's important because what we

11   would have liked to have been able to do, but simply couldn't,

12   was try to parse through what work was related to what project,

13   what work was related to another project and see sort of how

14   things split out but, even assuming that it is sort of all

15   split out evenly, Your Honor, we would submit that the time

16   incurred was so substantial and the number of billers so

17   substantial that there had to be some duplication of efforts on

18   those matters.

19        The debtors certainly don't contend that the ACC

20   shouldn't have expended efforts on those issues, simply that

21   the issues appear to be overworked and inefficiently staffed

22   and that's the reason for the objection to a hundred and

23   seventy thousand dollars of the three hundred and thirty

24   thousand dollars or so in fees that the debtors believed were

25   related to those responses to the debtors' discovery.

103

1        Your Honor, the next item, and I will sort of try to

2   take them in the order that Mr. Swett took them, is the fees

3   incurred in responding to the debtors' objections to their fee

4   request, and it's really a similar situation here.  A hundred

5   and forty-six thousand dollars total in the interim period.

6   Again, three hundred and twenty-three hours of work with twelve

7   different professionals working on it.   It really is

8   essentially the same objection as we have with the response to

9   the discovery efforts, and I think I can just leave it at that.

10       With respect to the Forman Perry application, the

11   debtors viewed that.  That response is essentially rehashing

12   issues that had already been presented.  We didn't think it was

13   particularly helpful in the issues that were at stake with

14   respect to that Forman Perry application, and so the debtors

15   had objected to about half of those fees or twelve thousand

16   dollars.

17       The efforts to put together the information about the

18   fees in the *W.R. Grace* case, the debtors, that was sort of – it

19   appeared to be just a summary example of a statement that I

20   think was fairly easy to make, that the fees incurred in the

21   *Grace* case were extensive.  The debtors didn't see the need to

22   incur some twelve thousand dollars in putting that together and

23   that was the basis for that objection.

24       Your Honor, the February 17th hearing exhibits, twenty-

25   one thousand dollars or almost twenty-two thousand dollars over

Garlock/5-26-11

104

1    ninety-two hours with ten different professionals, and this was

2    just for the preparation of the exhibits for that hearing, not

3    the – or what we tried to exclude was the preparation of the

4    argument or anything related to that.  Mr. Swett and Caplin, in

5    its response, stated that there were a number of different

6    issues presented at that hearing. However, it appeared to me,

7    based on a review of the transcript, that really the only

8    exhibits that were presented were in conjunction with Mr.

9    Simon's testimony, and it seemed to us that those sort of

10   limited exhibits that were illustrative of the way that a

11   plaintiff's lawyer might prove a case against Garlock were

12   probably at the ready and readily available and that time in

13   preparing those exhibits simply seemed excessive to us.

14          With respect to the items with Mr. Maclay and Mr.

15   Bailor, Your Honor, frankly Mr. Swett's explanation of Mr.

16   Maclay's time, I believe, was new information to me and it may

17   have been included in their response.  If it was, I missed it,

18   and that explanation frankly makes a lot of sense to me and I

19   would just withdraw that objection here on the record, and I

20   believe that the concession with respect to Mr. Bailor would be

21   fine with the debtors, as well, so I think we can dispose of

22   that issue.

23          And then the last issue with the filing system, Your

24   Honor, that's simply good housekeeping and really frankly just

25   appears to be overhead that would be associated with any good

Garlock/5-26-11

1    file maintenance in a case.  I can say that I don't believe our

2    firm charges for those types of rejiggering of the filing

3    system or setting the filing system up, and I think that, if

4    Ms. Simpson were here, she would probably say that that was

5    overhead, too, or if she saw it in our fee application, she

6    would probably tell us it was overhead and ask us to remove it.

7         So with that, Your Honor, the total objections that

8    the debtors had raised were two hundred and eighty-two

9    thousand, three hundred sixty-two dollars and fifty cents, and

10   there would be obviously some adjustment for Mr. Maclay's time

11   which I certainly concede today, but I am not sure exactly how

12   much that would be.  We could certainly figure that out.

13        But, Your Honor, for the reasons stated primarily in

14   the papers and here today, we would ask that the fee objection

15   be sustained.

16        MR. SWETT: Your Honor, first I would like to move into

17   evidence the exhibits tendered in the previous motion this

18   morning.

19        THE COURT: We will admit all exhibits.

20        MR. SWETT: And the single exhibit tendered for this

21   one.  Other than that, I have only this to say.  The examples

22   that Mr. Miller pulled out of Exhibit "A" to the application

23   for supposedly inadequate entries, research concerning Rule

24   2004, at the opening states of a large discovery program being

25   initiated ostensibly under Rule 2004, with very significant

Garlock/5-26-11

1   technical issues about how that interplays or doesn't with Rule

2   26, with the ability to serve notices instead of subpoenas on

3   Rule 2004 targets and all of those things, and why should we

4   have to particularize in the time entry which particular issue

5   under Rule 2004 we are addressing when that would only invade

6   our work product and give the other side an undue advantage.

7         Second, Jeanna Rickards' time on January 11, research

8   for further response to Rule 2004 applications, that was part

9   of the omnibus effort I described where we were trying to take

10   the overview and pull together the themes that would be common

11   to the different pieces of the debtors' emerging program.

12         I think that the time entries speak for themselves

13   and, taken as a whole, are more than adequate.

14         Thank you.

15         THE COURT: Well, I think I should overrule the

16   objection and approve the fee application with the exception of

17   the minor concession by Mr. Bailor, the fifty percent of that,

18   but it is a lot of money and it does involve a lot of people.

19   Those are always good reasons to take a good look at it, but it

20   seems to me that the descriptions of the time are adequate, the

21   work that was done appears to be necessary and to the progress

22   of the case.   I didn't see unnecessary duplication.   I guess

23   you can always quibble about something should have been done

24   quicker but I can't see from my review of the time entries in

25   the papers that things were out-of-line.   I think they were

107

1    done within a reasonable amount of time, and it appears the

2    work is necessary to the administration of the case and dealing

3    with the issues that have been presented.

4          So we will overrule the present objection, with the

5    understanding we have, I guess, a final catchup at the end, at

6    which time the goal is to approve a reasonable fee and there

7    are factors involved in that that we don't know now, so we will

8    deal with those matters later.

9          Okay.  Thank you.

10         MR. SWETT: Thank you, Judge.  We will consult with Mr.

11   Miller over a form of order and submit it promptly.

12         THE COURT: Do we have anything else to do today?

13         MR. MILLER: No, Your Honor.  One minor housekeeping –

14   oh, I am sorry.

15         MR. WORF:  Your Honor, I would move the exhibits that

16   I introduced into evidence, as well.

17         THE COURT: We will admit all of those.

18         MR. WORF:  And also introduce or identify GST 157 on

19   the record.  That was the stipulation.

20         THE COURT: Yeah, we will admit all of those exhibits.

21         MR. MILLER: Your Honor, there was one other minor

22   housekeeping issue that was reflected as a continued matter on

23   the agenda that we filed, which is that holdover Rochester

24   lease issue.  We still have not heard confirmation back from

25   the landlord on the form of order that we proposed, and we just

Garlock/5-26-11

108

1     ask that that stay on the docket or on the agenda until the

2     next hearing in the hopes that we can get that wrapped up and

3     get an order.

4              THE COURT: Okay.  Well, thank you all.

5              MR. SWETT: Thank you, Judge.

6              MR. CASSADA: Thank you, Judge.

7              THE COURT: When is our next hearing date?

8              MR. SWETT: June 30, I believe.

9              THE COURT: All right.  Good.  Well, enjoy June.

10             MR. SWETT: We are probably not going to let you alone

11    that long, though, Judge.

12             THE COURT: I am going to be hard to find for a while

13    but, otherwise, I will be around.  Thank you all.

14             (Off the record at 12:54 p.m.)

Garlock/5-26-11

109

C E R T I F I C A T E

       I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings in the
above-entitled matter.




                                    /s/ Patricia Basham
                                    Patricia Basham, Transcriber
                                    Date:  June 2, 2011