**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC, et al.,<br><br>               Debtors.[1] | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered |

**<u>DEBTORS' BRIEF IN SUPPORT OF MOTIONS FOR ESTIMATION AND BAR DATE</u>**

---

[1] The debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company (hereinafter "Garlock" or "Debtors").

## **TABLE OF CONTENTS**

I.    BACKGROUND ................................................................................................ 4

    A.    The Plan of Reorganization ................................................................. 4

    B.    Debtors' Need for Estimation ............................................................. 5

    C.    Proceedings to Date ........................................................................... 7

II.    ARGUMENT .................................................................................................. 11

    A.    The Court Should Estimate Mesothelioma Claims for the Purpose of
        Determining the Feasibility of the Plan ............................................. 11

    B.    The Court Has Core Jurisdiction Over the Estimation of Mesothelioma
        Claims for the Purpose of Determining Plan Feasibility ..................... 13

    C.    The Court Should Set a Bar Date for Questionnaire Claimants for the
        Purpose of Enforcing the Questionnaire and for Other Purposes Relevant
        to Aggregate Estimation ................................................................... 14

    D.    Debtors' Proposed Bar Date, Proof of Claim Form, and Notice of Bar Date
        Are Appropriate ................................................................................ 16

    E.    Prior to Estimation, Debtors Should Have the Opportunity to Propound
        Additional Discovery to a Sample of Questionnaire Claimants .......... 18

        1.    Facts Relevant to Number of Allowed Mesothelioma Claims ............... 19

        2.    Debtors Should Have the Opportunity to Collect Further
            Information Pertaining to Mesothelioma Claimants' Contact with
            GST Products and Exposures to Other Products ..................................... 22

        3.    Debtors Should Also Have the Opportunity to Collect Further
            Information That Is Highly Relevant to the Amount of Allowed
            Claims ................................................................................ 25

    F.    The Estimation CMO Provides an Efficient Schedule for Arriving at
        Aggregate Estimation of Mesothelioma Claims ................................. 27

III.    CONCLUSION .............................................................................................. 28

# TABLE OF AUTHORITIES

**Cases**

*A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1985) ................................................ 10, 12, 13

*Bd. of Educ. v. Zanda, Martin & Milstead, Inc.*, 390 S.E.2d 796 (W. Va. 1990) ....................... 25

*Bittner v. Borne Chem. Co.*, 691 F.2d 134 (3d Cir. 1982) ........................................................ 11

*Borg-Warner Corp. v. Flores*, 232 S.W.3d 765 (Tex. 2007) ................................................ 18, 19

*Georgia-Pacific Corp. v. Stephens*, 239 S.W.3d 304 (Tex. App. Houston 1st Dist. 2007) .......... 19

*Gregg v. V-J Auto Parts Co.*, 596 Pa. 274 (Pa. 2007) ...................................................... 18, 19, 20

*In re A.H. Robins Co., Inc.*, 862 F.2d 1092 (4th Cir. 1988) ................................................ 14, 15

*In re A.H. Robins Co., Inc.*, 880 F.2d 694 (4th Cir. 1989) ........................................................ 12

*In re USG Corp.*, 290 B.R. 223 (D. Del. 2003) ................................................................ passim

*Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488 (6th Cir. 2005) ........................................ 4, 18

*Maressa v. A.H. Robins Co., Inc.*, 839 F.2d 220 (4th Cir. 1988) ............................................ 15

*Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439 (6th Cir. 2009) .................................... 18, 20

*Moeller v. Garlock Sealing Technologies LLC*, __ F.3d ____, 2011 U.S. App. LEXIS
    19987 (6th Cir. Sept. 28, 2011) ........................................................................ passim

*Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684 (W.D.N.C. 2003) .................................. 23

*Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*, 492 F.3d 242 (4th Cir. 2007) ................. 17

**Statutes**

11 U.S.C. § 1129(a)(11) ........................................................................................................ 4

11 U.S.C. § 502(b)(1) ........................................................................................................ 11

11 U.S.C. § 502(c)(1) ........................................................................................................ 10

740 ILCS 100/2(a) .............................................................................................................. 24

Cal. Civ. Proc. Code § 877 .................................................................................................. 24

N.Y. Gen. Oblig. Law § 15-108(a) ...................................................................................... 24

Tex. Civ. Prac. & Rem. Code § 33.013 ........................................................................ 25

Tex. Civ. Prac. & Rem. Code Ann. § 33.012(b) *et seq.*........................................... 5, 24

**Other Authorities**

I. Selikoff & D. Lee, *Asbestos and Disease* 467 (1978) ................................................ 4

P.G. Harries, *Asbestos Dust Concentrations in Ship Repairing: A Practical Approach to Improving Asbestos Hygiene in Naval Dockyards*, 14 Ann. Occup. Hyg. 241 (1971).............. 4

**Rules**

Fed. R. Bankr. P. 7037........................................................................................... 14

Fed. R. Evid. 702 Advisory Committee Note (2000) ................................................. 23

**Treatises**

Collier on Bankruptcy (16th ed.), ¶ 502.04[2]........................................................ 11

Restatement (Second) of Torts § 433B ..................................................................... 18

Restatement (Second) of Torts §§ 431, 433............................................................... 18

The above-captioned Debtors submit this brief in support of their Motion for Estimation of Asbestos Claims Under Section 502(c) and for Entry of Case Management Order for Estimation of Mesothelioma Claims (Docket No. ___) (the "Estimation Motion") and their Motion for Questionnaire Claimant Bar Date (Docket No. ___) (the "Bar Date Motion").

## I.    **Background**

**A.    The Plan of Reorganization**

1.      On November 28, 2011, Debtors filed their Joint Plan of Reorganization (the "Plan") (Docket No. 1664). The Plan contemplates that Debtors will fund in full all allowed GST Asbestos Claims. Reorganized GST will pay Current GST Asbestos Claimants, and the GST Asbestos Trust will pay Future GST Asbestos Claimants.

2.      Under the Plan, individual allowance of GST Asbestos Claims will occur after confirmation. The Plan gives GST Asbestos Claimants the opportunity to elect the Settlement Option or the Litigation Option. Under the Settlement Option (governed by the Claim Resolution Procedures or "CRP"), GST Asbestos Claimants who satisfy objective medical and contact criteria will have the opportunity to receive quick, generous, and certain payments without any litigation. The offers can range up to a maximum of $2.5 million, depending on the objective factors concerning the claim.

3.      Claimants also may elect the Litigation Option. The Litigation Option will preserve each GST Asbestos Claimant's right to a jury trial and individual litigation of his or her claim, with pretrial allowance litigation in this Court for the purpose of controlling litigation costs, and any trials in the district where the claim arose. The Settlement Option has been designed to minimize the amount of allowance litigation following confirmation.

B.    **Debtors' Need for Estimation**

4.      In order to confirm the Plan, Debtors must show that "[c]onfirmation of the plan

is not likely to be followed by the liquidation, or the need for further financial reorganization, of

the debtor or any successor to the debtor under the plan . . ." 11 U.S.C. § 1129(a)(11). Debtors

have committed to paying the full allowed amount of GST Asbestos Claims through the

Settlement Option and Litigation Option. Therefore, to demonstrate the feasibility of the Plan,

Debtors must show that they can fund the full allowed amount of GST Asbestos Claims.

5.      Debtors request estimation as the way for the Court to determine whether Debtors

can meet this funding obligation, and request that the Court begin by estimating GST Asbestos

Claims based on alleged mesothelioma ("Mesothelioma Claims") in the aggregate. At

estimation, Debtors will put on evidence concerning the aggregate number and amount of

allowed Mesothelioma Claims.

6.      Debtors will first ask the Court to estimate the aggregate number of colorable

Mesothelioma Claims—i.e., those groups of claims that are not subject to disallowance as a

matter of law. Many groups of Mesothelioma Claims are not colorable and should be estimated

at zero because they would be disallowed as a matter of law following confirmation of the Plan.

GST formerly manufactured gaskets that contained encapsulated asbestos fibers. Because the

asbestos was encapsulated, fibers could not become airborne in more than trace amounts during

normal use and posed "no health hazard" according to leading researchers.[2] Thus, the vast

majority of putative GST Asbestos Claimants cannot demonstrate exposure to asbestos from a

GST product sufficient to raise a colorable claim. *See Lindstrom v. A-C Prod. Liab. Trust*, 424

--------

[2]  I. Selikoff & D. Lee, *Asbestos and Disease* 467 (1978); P.G. Harries, *Asbestos Dust Concentrations in Ship Repairing: A Practical Approach to Improving Asbestos Hygiene in Naval Dockyards*, 14 Ann. Occup. Hyg. 241, 249 (1971).

F.3d 488, 492-93 (6th Cir. 2005) (mere exposure to asbestos from product is not sufficient, rather

plaintiff must show "a high enough level of exposure that an inference that the asbestos was a

substantial factor in the injury is more than conjectural.").

7.      In addition, because GST products were used in the vicinity of friable amphibole

insulation and other dangerous products that released large amounts of asbestos into the air, the

vast majority of GST Asbestos Claimants experienced massive exposures to other products,

many containing amphibole asbestos, which were thousands or tens of thousands of times greater

than any amount that GST's products could have released. These exposures rendered any GST

exposure insignificant as a matter of law. *See Moeller v. Garlock Sealing Technologies LLC*, __

F.3d ____, 2011 U.S. App. LEXIS 19987 at *12-13 (6th Cir. Sept. 28, 2011) (granting GST

judgment as a matter of law because pipefitter who removed GST gaskets for eight years "failed

to quantify [his] exposure to asbestos from Garlock gaskets and . . . sustained massive exposure

to asbestos from non-Garlock sources").[3]

8.      After the Court estimates the aggregate number of colorable Mesothelioma

Claims, Debtors will ask the Court to estimate their aggregate *amount*. This analysis should take

into account the fact that, under applicable substantive law, Debtors are protected against bearing

shares of liability for which others are responsible or that others have already paid. *See, e.g.*, Tex.

Civ. Prac. & Rem. Code Ann. § 33.012(b) *et seq.* Thus, in this part of the estimation trial,

Debtors will ask the Court to weigh (i) the total potential verdict values of estimated colorable

Mesothelioma Claims; (ii) the estimated portion of verdict values that the law could assign to

---

[3] Though claimants who experienced those massive exposures to the products of others cannot prove a claim against
Garlock, they have the opportunity to recover from many other sources, including Trusts currently holding over $35
billion in assets for payment of claims.

GST after allocating fault to co-defendants and making adjustments based on settlements with

co-defendants; and (iii) the probability that GST might (or might not) be found liable.

9.      Debtors' estimation case in chief will not rely in any respect upon their past

settlements. Most of these settlements were entered into to avoid defense costs, and are thus not

relevant to the merits of claims or the aggregate allowed amount of Mesothelioma Claims. Past

settlements are, in any event, inadmissible under Federal Rule of Evidence 408. Likewise,

Debtors in their case in chief will not ask the Court to determine facts concerning the history of

asbestos litigation in the United States, or what Debtors would have paid to settle claims had

they not filed for bankruptcy protection. Those facts too are irrelevant to aggregate estimation of

Mesothelioma Claims.

10.      Information that Debtors have begun to collect pursuant to the Order Authorizing

the Debtors to Issue Questionnaire to Holders of Pending Mesothelioma Claims and Governing

the Confidentiality of Information Provided in Responses (Docket No. 1390) (the "Questionnaire

Order") is vitally relevant to estimation. Information pertaining to claimants' industry,

occupation, contact with GST products, exposure to Trust products, and sources of other

recoveries are all relevant to the aggregate number and amount of allowed Mesothelioma Claims.

As described more fully below, however, Debtors should have the opportunity to obtain certain

additional basic information not included in the Questionnaire from a much smaller sample of

current claimants concerning extent of contact with GST products, exposure to other products,

and sources of payment from other parties.

**C.      Proceedings to Date**

11.      On August 31, 2010, in an effort to establish the allowed amount of claims against

the Debtors, Debtors moved for a bar date, to be followed by limited liquidation proceedings and

then estimation of the aggregate liability. *See* Debtors' Motion for (A) Establishment of Asbestos

Claims Bar Date, (B) Approval of Asbestos Proof of Claim Form, (C) Approval of Form and

Manner of Notice, (D) Estimation of Asbestos Claims, and (E) Approval of Initial Case

Management Schedule (Docket No. 461).

12.    The Court denied Debtors' motion without prejudice. The Court instead entered

an order opening six months for "preliminary discovery related to estimation, for purposes of

formulating a plan of reorganization, of the Debtors' liability for pending and future asbestos-

related claims for personal injury and wrongful death." Order on Motion of the Official

Committee of Asbestos Personal Injury Claimants for Entry of a Scheduling Order and Debtors'

Motion for Establishment of Asbestos Claims Bar Date, Etc. (Docket No. 853).

13.    In the ensuing months, Debtors responded to estimation-related discovery

propounded by the Committee. Debtors also filed motions seeking to obtain preliminary

discovery relevant to estimation.

14.    In the Questionnaire Order, the Court granted in part and denied in part Debtors'

motion for discovery through the form of a questionnaire issued to all persons with pending

mesothelioma claims against Debtors, according to Debtors' databases as of June 5, 2010 or June

7, 2011 ("Questionnaire Claimants"). The questionnaire was served on July 1, 2011 and the due

date was November 1, 2011.

15.    At least a majority of the Questionnaire Claimants did not comply with the

Court's Order, and many of the rest lodged objections to material portions of the Questionnaire.[4]

---

[4] Debtors' analysis of the Questionnaire response is ongoing, and is slowed by the fact that most claimants who did respond attached many documents, making it difficult and time-consuming to determine whether they complied with the Order. These figures regarding non-compliance are thus best read as minimums, not maximums. Debtors also reserve the right to revise or update these numbers as analysis continues.

- Approximately 2,500 of the 5,800 Questionnaire Claimants (43%) returned no Questionnaire.

- Many law firms refused to provide responses for *any* of their clients. Over 140 of the approximately 320 law firms on the service list returned no Questionnaires for their clients, and also apparently lodged no objections. This group includes two law firms that represent claimants on the Committee. Another 28 law firms failed to return Questionnaires for at least half of their clients.

- A significant number of Questionnaire Claimants who submitted responses failed to provide any information at all in their responses, on the ground that they allegedly have settlements with the Debtors. But Debtors have no record of many of these settlements. For example, one law firm that represents a Committee claimant asserted that 48 Questionnaire Claimants have settled claims, but Debtors have records of settlements with only eight of those claimants.

- Many Questionnaire Claimants who submitted responses declined to answer material portions of the Questionnaire, often without objection. For example, the Court required Questionnaire Claimants to attach copies of claim forms they had submitted to Trusts, or else execute authorizations for Debtors to obtain such records from Trusts directly. Some Questionnaire Claimants appear to have complied. But large numbers of claimants refused to do so. For example, of the 1,010 claimants who submitted Questionnaires electronically (a subset that is more easily analyzed than the paper submissions), over 300 failed to provide either Trust claim forms or an authorization. At least three law firms that represent Committee claimants and answered in paper (associated with a total of 502 Questionnaire Claimants on the service list) failed to provide either Trust claim forms or

authorizations for their clients. This is in addition to the two Committee law firms that
provided no responses whatsoever for their clients.

- Finally, a large number of Questionnaire Claimants lodged objections to material portions
  of the Questionnaire. Though analysis of the extent of objections is still ongoing, it is
  clear that many claimants objected to Part 5A (concerning contact with GST products),
  Part 5B (work sites where claimant was exposed to other products), Table A (statuses of
  claims against tort system defendants), Table B (claims against Trusts and statuses), and
  Table C (claims against other parties).

- Many of these objections are frivolous. For example, one law firm that represents a
  claimant on the Committee, and over 150 Questionnaire Claimants, refused to provide
  any information concerning contact with GST products, as required in Part 5A, because
  Debtors allegedly did not require that information when they settled cases with that law
  firm in the past.

- Another law firm representing a claimant on the Committee (and 64 Questionnaire
  Claimants) refused to provide Trust claim forms or authorizations on the ground that
  Trust claim forms are not discoverable because they are "created by the entities with
  whom the Client filed claims." This, despite the fact that the principal in that firm, Mr.
  Jeffrey Simon, testified before this Court that Trust claim forms are discoverable. 2/17/11
  Tr. 159:18-21 (Simon).

16.      Despite the problematic response to the Questionnaire, in compliance with the
Court's Order, Debtors are coding the paper responses (such as they are) into a form usable by
the parties' experts. Questionnaire Order ¶ 5. In addition, Rust has made the Questionnaire
responses available to all parties entitled to access and their experts.

17.     Debtors incorporate herein the requests for relief made in the Estimation Motion

and Bar Date Motion, and offer the following in support.

## II.    Argument

**A.    The Court Should Estimate Mesothelioma Claims for the Purpose of Determining the Feasibility of the Plan**

18.     The Court should estimate the aggregate number and amount of current and future

Mesothelioma Claims for the purpose of determining feasibility and confirming Debtors' Joint

Plan of Reorganization. Debtors propose to pay in full all allowed GST Asbestos Claims through

the Plan. To determine that the Plan is feasible, the Court should estimate the aggregate allowed

amount of GST Asbestos Claims, beginning with Mesothelioma Claims.

19.     Bankruptcy Code section 502(c) authorizes the Court to "estimate[] for purpose of

allowance . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the

case may be, would unduly delay the administration of the case." Section 502(c) also authorizes

the Court to estimate a collection of personal injury claims for purposes of determining the

feasibility of a Plan. *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1012 (4th Cir. 1985)

(bankruptcy court has authority "to 'estimate' the contingent 'personal injury' claims for

purposes of determining the feasibility of a reorganization").

20.     Pre-confirmation liquidation of Mesothelioma Claims for the purpose of

determining the feasibility of Debtors' Plan would "unduly delay the administration of the case."

11 U.S.C. § 502(c)(1). Under the Plan, GST Asbestos Claims will be individually liquidated

post-confirmation, pursuant to the Settlement Option and the Litigation Option, through means

that will minimize litigation and litigation costs. Pre-confirmation liquidation for purposes of

determining feasibility of this Plan would therefore be unnecessary and would cause delay. To

determine feasibility, the Court need only estimate the aggregate number and amount of allowed GST Asbestos Claims, which it is authorized to do under section 502(c). *See A.H. Robins*, 788 F.2d at 1012.

21.    At estimation, just as in liquidation, the Court will be "bound by the legal rules which may govern the ultimate value of the claim." *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982); Collier on Bankruptcy (16th ed.), ¶ 502.04[2] (same, and elaborating that "e.g., the court should estimate the worth of a claim based on an alleged breach of contract in accordance with accepted contract law"). Groups of claims that have no merit under applicable law must be estimated at zero for feasibility purposes because they will never be allowed after confirmation, and groups of claims with a low probability of success should be discounted accordingly or estimated at zero. *See* 11 U.S.C. § 502(b)(1) (unenforceable claims shall not be allowed); *Bittner*, 691 F.2d at 139 (no abuse of discretion for bankruptcy court to estimate at zero claims that likely would not succeed).

22.    For all these reasons, in an asbestos bankruptcy case, a debtor's defenses apply fully in estimation, as the United States District Court for the District of Delaware recognized in *In re USG Corp.*, 290 B.R. 223 (D. Del. 2003). There, the asbestos debtor contended that the vast majority of the claims against it lacked any merit under applicable tort law, including the law of causation. The court held:

> [I]f the debtor maintains that its creditors are not legitimate and that, properly analyzed, claims against it do not exceed its assets, the Court must assist . . . . In an asbestos bankruptcy, the Court will, within the constraints of the law, reject unsubstantiated claims, bogus medical evidence, and fanciful theories of causation. . . . In [the area of claims administration] the Court has some limited discretion. As to the application of federal or state substantive law to the merits of the claims themselves, **the Court has no discretion**.

*Id.* at 225 (emphasis added). The court held that at the estimation trial, "debtors will be permitted to present their defenses," including causation-based defenses, and ordered discovery relevant to

those defenses. *Id.* at 227. It also held that "[d]ebtors may wish to attack certain medical evidence under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals* . . . They may wish to move for summary judgment on certain issues on a claims-wide consolidated basis pursuant to Federal Rule of Civil Procedure 42." *Id.*

23.     Similarly, and also in the mass tort bankruptcy context, in *In re A.H. Robins*, the Fourth Circuit upheld an aggregate estimation of tort claims that accounted for "a considerable reduction from disallowance of claims." *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 700 (4th Cir. 1989) (emphasis added). This clearly indicates that the goal of estimation is to determine, efficiently and fairly, the aggregate number and amount of allowed claims against the debtor. The Court should estimate Mesothelioma Claims to determine whether Debtors can fund the allowed claims in full, as the Plan contemplates.

**B.     The Court Has Core Jurisdiction Over the Estimation of Mesothelioma Claims for the Purpose of Determining Plan Feasibility**

24.     This Court also has core jurisdiction to estimate Mesothelioma Claims for the purpose of determining Plan feasibility.

25.     In *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1985), the Fourth Circuit acknowledged that special jurisdictional provisions apply to personal injury claims in bankruptcy cases, noting that "[t]he bankruptcy court . . . is without authority . . . over 'the liquidation or estimation of contingent or unliquidated personal injury or wrongful death claims against the estate for purposes of *distribution* under Title 11' 28 U.S.C. § 157(b)(2)(B)." *Id.* at 1012 (emphasis in original).

26.     The Fourth Circuit held that this provision only makes an estimation for purposes of *distribution* non-core. But estimation of a personal injury claim for purposes of determining the feasibility of a plan of reorganization remains core:

- 10 -

It will be observed, however, that the statute denies authority to the bankruptcy court to 'estimate' contingent claims only if the purpose is to make a 'distribution' of the assets of the debtor; the statute does not in express terms deny to the bankruptcy court the authority, or relieve it of the duty, to 'estimate' the contingent 'personal injury' claims for purposes of determining the feasibility of a reorganization.

*Id.* The court cited two seminal asbestos cases in support of this proposition: *In re Johns Manville Corp.* and *In re UNR Industries, Inc.*, which both had held "that estimations of the debtors' potential personal injury tort liabilities as an incident of the development of a plan of reorganization are core proceedings within the bankruptcy court's jurisdiction and that such estimations are not foreclosed by Section 157(b)(5) of the Act." *Id.*

27.    Thus, the Court has core jurisdiction to estimate Mesothelioma Claims for the purpose of determining whether the Plan is feasible.

**C.    The Court Should Set a Bar Date for Questionnaire Claimants for the Purpose of Enforcing the Questionnaire and for Other Purposes Relevant to Aggregate Estimation**

28.    As requested in the Bar Date Motion, the Court should set a bar date for the purpose of enforcing the Questionnaire Order and other purposes relevant to aggregate estimation of Mesothelioma Claims.

29.    First, Debtors believe a bar date is necessary to bring the Questionnaire Claimants before the Court where it can compel claimants to respond to the Questionnaire and respond fully to the Questionnaire, as well as rule on objections to the Questionnaire. As described above, at least a majority of Questionnaire Claimants did not comply with the Court's Order, and many of the rest declined to answer all or material portions of the Questionnaire, or raised objections, including many frivolous ones.

30.    The purpose of the bar date will not be to commence individual liquidation of the Questionnaire Claims. Under the Plan, that will occur after confirmation.

- 11 -

31.     Rather, the purpose of the bar date will be to make Questionnaire Claimants

parties to the case so that Debtors can move to compel responses to the Questionnaire, claimants

can be heard on any objections, the Court can order discovery as appropriate, and Debtors can

move for sanctions as appropriate, including adverse inferences for the aggregate estimation. *See*

Fed. R. Bankr. P. 7037. Debtors' proposed schedule for these proceedings is outlined in the

Estimation Motion and in the proposed Estimation CMO.

32.     A bar date is the correct tool for enforcing compliance with discovery related to

aggregate estimation. For example, a bar date was employed to enforce discovery in the *A.H.*

*Robins* case even though the court did not liquidate claims pre-confirmation and instead

conducted an aggregate estimation. *See In re A.H. Robins Co., Inc.*, 862 F.2d 1092, 1093-94 (4th

Cir. 1988).

33.     In the *USG* case, the Delaware District Court intended to use a bar date to enforce

discovery pertaining to aggregate estimation, in fact instructing the parties to include in the Proof

of Claim form many of the items that are in Debtors' Questionnaire:

> Upon the passing of a cancer-only bar date and processing of the claims
> submitted, the Court will hold an estimation hearing under 11 U.S.C. § 502(c). At
> this time, debtors will be permitted to present their defenses. . . . The debtors will,
> within thirty days of the date of this Memorandum Opinion and Order, submit to
> the Court a proposed Order creating a claims bar date for all persons with a claim
> against USG . . .

*In re USG Corp.*, 290 B.R. 223, 227 (D. Del. 2003)

34.     Finally, a bar date was used for the same purpose in the W.R. Grace case—the

only recent case where (to Debtors' knowledge) a court had to enforce a questionnaire process.

There the court was enforcing a questionnaire issued to more than 100,000 claimants, as opposed

to the approximately 5,800 Questionnaire Claimants here. *See* Order as to All pre-Petition

Asbestos PI Litigation Claims, Including Settled Claims, (I) Establishing Bar Dates; (II)

- 12 -

Approving Proof of Claim Form; and (III) Approving Notice of Pre-Petition Asbestos Personal-Injury Claims Bar Date, *In re W.R. Grace & Co.*, No. 01-1139 (Bankr. D. Del. Aug. 24, 2006) (attached as **Ex. A**).[5]

35.    The bar date will have several other benefits in addition to permitting enforcement of the Questionnaire Order. First, it will remove all dispute concerning the number of current and future Questionnaire Claimants who assert that they have Mesothelioma Claims, and will thus lay the groundwork for a more accurate aggregate estimation. The natural inference from the fact that 2,500 Questionnaire Claimants did not return a Questionnaire is that they are not asserting or do not have Mesothelioma Claims. But unless the Committee and FCR are willing to so stipulate, a bar date is necessary to remove all doubt. A dispute regarding over 43% of the Questionnaire Claims could obviously be material at aggregate estimation.

36.    Finally, once the Questionnaire Claimants are parties, Debtors will have the opportunity to take additional limited discovery relevant to aggregate estimation of the Mesothelioma Claims (as described more fully below). This discovery will be propounded to a limited sample of Questionnaire Claimants. *See* Fed. R. Bankr. P. 7033. This discovery will proceed simultaneously with enforcement of the Questionnaire. It will not materially delay Mesothelioma Claim estimation and confirmation.

37.    For all of these reasons, the Estimation CMO should accommodate a bar date for Questionnaire Claimants.

---

[5] Debtors also expressly preserve and reassert the argument they have previously made that a bar date is necessary before the Court estimates claims for any purpose. *See Maressa v. A.H. Robins Co., Inc.*, 839 F.2d 220, 221 (4th Cir. 1988); *In re A.H. Robins Co., Inc.*, 862 F.2d at 1093-94; *see also In re USG Corp.*, 290 B.R. 223, 227 (D. Del. 2003) (recognizing the need to set a bar date prior to judicial estimation).

**D.**      **Debtors' Proposed Bar Date, Proof of Claim Form, and Notice of Bar Date Are Appropriate**

38.      In the Bar Date Motion, Debtors propose a bar date, Proof of Claim form, and notice of bar date.

39.      First, Debtors propose that the bar date occur approximately 45 days after entry of the proposed order establishing a bar date for Questionnaire Claimants. Given the simplicity of the proposed Proof of Claim form, this is an appropriate length of time, and will permit the expeditious commencement of the steps in the Estimation CMO that need to take place after the bar date passes. The bar date will extend only to Questionnaire Claimants, consistent with its purposes of enforcing the Questionnaire Order, determining how many Questionnaire Claimants in fact assert claims, and permitting additional limited discovery relevant to aggregate estimation. This limited scope for the bar date will also minimize notice costs, as described below.

40.      Debtors propose a Proof of Claim form that is substantially in the form of Official Form 10, and substantively identical to the form that W.R. Grace used to enforce its Questionnaire. The Proof of Claim form removes fields from Official Form 10 that are not relevant to the specific claims at issue (claims for personal injury and wrongful death). It then departs from Form 10 in these targeted respects:

- First, the Proof of Claim form requires Questionnaire Claimants who did not submit a Questionnaire and assert they have a non-settled claim to provide basic information concerning their lawsuit naming a Debtor. This is for the purpose of identifying the Questionnaire Claimant and matching him or her against Debtors' records.

- Second, the Proof of Claim form permits Questionnaire Claimants who submitted a Questionnaire to check a box incorporating their Questionnaire into the Proof of Claim, excusing them from providing the basic information concerning their lawsuit.

- Third, the Proof of Claim form requires Questionnaire Claimants who assert they have a settled claim to indicate why they believe they have a settled claim, and to attach documentary proof of the settlement. The Court will need this evidence when it rules upon refusal to answer the Questionnaire based upon an alleged settlement of which Debtors have no record.

41.     Debtors propose sending notice of the bar date to counsel of record for Questionnaire Claimants (taking into account any changes in counsel that Debtors have learned through the Questionnaire process). This was the form of notice approved in the W.R. Grace case for the purpose of enforcing the debtor's questionnaire, and is appropriate and consistent with due process because these claimants are known. *See Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*, 492 F.3d 242, 249 (4th Cir. 2007); Ex. A (W.R. Grace bar date order).

42.     Debtors also attach a proposed form of notice to the Bar Date Motion, virtually identical to the one used in the W.R. Grace case, which Debtors submit is also consistent with due process.

**E.     Prior to Estimation, Debtors Should Have the Opportunity to Propound Additional Discovery to a Sample of Questionnaire Claimants**

43.     Debtors request that the Estimation CMO accommodate a limited amount of time following enforcement of the Questionnaire for Debtors to finish propounding additional limited discovery relevant to aggregate estimation of Mesothelioma Claims. This discovery will run concurrently with enforcement of the Questionnaire, but Debtors need two additional months

after the enforcement process, so that they can propound the discovery to sample members who are late to identify themselves, in response to Debtors' motion to compel responses to the Questionnaire.

44.    As described above, the task at estimation will be to estimate the aggregate number and amount of allowed Mesothelioma Claims. *See In re USG Corp.*, 290 B.R. at 225. Experts can make a reasoned projection of the number and amount of such claims on the basis of a sufficient factual record.

### 1.    Facts Relevant to Number of Allowed Mesothelioma Claims

45.    Among other things, at estimation, Debtors will ask the Court to estimate the total number of allowed current and future Mesothelioma Claims. Groups of claims that cannot survive judgment as a matter of law should be estimated at zero for feasibility purposes, because they can never have allowed GST Asbestos Claims. Claims that are unlikely to succeed should be discounted accordingly.

46.    Every state where GST faces a significant number of claims has adopted the "substantial factor" test for proximate causation from the Restatement (Second) of Torts, which requires the plaintiff to show that a GST product was a substantial factor in bringing about the alleged disease. *See, e.g.*, Restatement (Second) of Torts §§ 431, 433; *Gregg v. V-J Auto Parts Co.*, 596 Pa. 274, 291 (Pa. 2007); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770 (Tex. 2007). The plaintiff always has the burden of proving substantial factor causation. *See* Restatement (Second) of Torts § 433B; *Borg-Warner*, 232 S.W.3d at 773.

47.    To reach a jury on the issue of substantial factor causation, the plaintiff must demonstrate "a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *Lindstrom v. A-C Prod. Liab. Trust*, 424

F.3d 488, 492-93 (6th Cir. 2005). The plaintiff may not reach a jury by simply asserting that any exposure to asbestos from a GST product is a substantial contributing factor, because that would render the substantial factor test "meaningless." *See Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443-34 (6th Cir. 2009); *see also Lindstrom*, 424 F.3d at 493; *Gregg v. V-J Auto Parts Co.*, 596 Pa. 274, 291 (2007) (no jury question where "exposure to the defendant's product is de minimis"); *Borg-Warner*, 232 S.W.3d at 771 (no jury issue on substantial factor causation because, despite exposure to defendant's product, plaintiff failed to show enough exposure to cause disease); *Georgia-Pacific Corp. v. Stephens*, 239 S.W.3d 304, 318-19 (Tex. App. Houston 1st Dist. 2007) (same).

48.     Exposures to other sources of asbestos are also highly relevant to whether a Mesothelioma Claimant has a colorable claim, or instead is subject to adverse judgment as a matter of law. A recent decision from the United States Court of Appeals for the Sixth Circuit provides a good illustration of this principle. *Moeller v. Garlock Sealing Technologies LLC*, __ F.3d ____, 2011 U.S. App. LEXIS 19987 (6th Cir. Sept. 28, 2011). Robert Moeller "worked with asbestos-containing gaskets made by Garlock from about 1962 until 1970," but also "sustained significant exposure to asbestos insulation." *Moeller*, 2011 U.S. App. LEXIS 19987 at *2. Mr. Moeller's estate put on evidence that he had spent "many years . . . scraping and grinding asbestos gaskets." *Id.* at *4.

49.     After being diagnosed with mesothelioma, Mr. Moeller sued GST and others. GST "[did] not dispute that asbestos-containing products likely caused Robert's mesothelioma. Rather, GST argue[d] that the mesothelioma was caused by Robert's exposure to asbestos insulation, and that its own gaskets were not a substantial factor in causing the mesothelioma." *Id.* at *2.

50.    The jury rendered a verdict against GST, but the United States Court of Appeals

for the Sixth Circuit reversed, finding that the plaintiff had failed to prove substantial factor

causation as a matter of law. Chief Judge Batchelder, recognizing the fundamental importance of

plaintiffs' other exposures to asbestos, held that "[t]he question whether defendant's acts

probably caused plaintiff's mesothelioma must be viewed in the context of plaintiff's other

substantial exposure to asbestos." *Id.* at *8-9 (punctuation and citation omitted).

51.    The Sixth Circuit then found that the plaintiff had failed to raise a jury issue on

substantial factor causation, despite the evidence that Mr. Moeller had spent years scraping and

removing gaskets:

> [T]he plaintiff here presented no evidence quantifying Robert's exposure to
> asbestos from Garlock gaskets. There is testimony that Robert removed gaskets
> for several years, and that some of those gaskets were Garlock's. Robert testified
> that he worked with Garlock gaskets "every day," but the Plaintiff failed to
> establish how many Garlock gaskets he removed, or how frequently he
> removed—as opposed to installed—them. The record also shows that Robert
> regularly tore out asbestos insulation during the relevant years, and that his
> exposure to asbestos from insulation would have been thousands of times greater
> than his exposure from removing gaskets.
>
> . . .
>
> While Robert's exposure to Garlock gaskets may have contributed to his
> mesothelioma, the record simply does not support an inference that it was a
> *substantial* cause of his mesothelioma. Given that the Plaintiff failed to quantify
> Robert's exposure to asbestos from Garlock gaskets and that the Plaintiff
> concedes that Robert sustained massive exposure to asbestos from non-Garlock
> sources, there is simply insufficient evidence to infer that Garlock gaskets
> probably, as opposed to possibly, were a substantial cause of Robert's
> mesothelioma. . . . On the basis of this record, saying that exposure to Garlock
> gaskets was a substantial cause of Robert's mesothelioma would be akin to saying
> that one who pours a bucket of water into the ocean has substantially contributed
> to the ocean's volume.

*Id.* at *12-13 (emphasis in original). *See also Martin*, 561 F.3d at 443-44 (in asbestos case,

holding that "one measure of whether an action is a substantial factor is 'the number of other

factors which contribute in producing the harm and the extent of the effect which they have in

- 18 -

producing it'") (quoting Restatement (Second) of Torts § 433(a)); *Gregg*, 596 Pa. at 291 (holding

that "evidence of substantial exposure from other sources" is relevant to proximate causation in a

mesothelioma case).

52.      The extent of Mesothelioma Claimants' contact with GST products, as well as the

extent of their exposures to other asbestos products, are thus highly relevant to the merits of their

claims under applicable law—and indeed, to whether those claims are colorable or instead will

be subject to disallowance as a matter of law.

> **2.      Debtors Should Have the Opportunity to Collect Further Information Pertaining to Mesothelioma Claimants' Contact with GST Products and Exposures to Other Products**

53.      At estimation, Debtors will ask the Court to estimate the total number of GST

Asbestos Claimants who, unlike Mr. Moeller, can properly reach a jury on the issue of

substantial factor causation. As the *Moeller* case makes clear, the nature, frequency, duration,

and proximity of contact with GST's products and other asbestos products are highly relevant to

this question. *See Moeller*, 2011 U.S. App. LEXIS 19987 at *12-13. In general, GST's defenses

are highly relevant to aggregate estimation. *See In re USG Corp.*, 290 B.R. at 225

("unsubstantiated claims" based on "fanciful theories of causation" must be rejected in aggregate

estimation). Groups of claims like Mr. Moeller's lacking sufficient evidence that GST products

were a substantial cause of disease should be estimated at zero. Claims with little likelihood of

success should be discounted.

54.      The Questionnaire provides useful information pertaining to contact with GST

products and exposure to other products, in the form of questions about industry and occupation,

start date and end date, and Trust exposures contained in Trust claim forms. But Debtors should

have an opportunity to gather limited additional information from a limited number of

Questionnaire Claimants (the "Dose Sample" described below).

55.     First, Debtors should have the opportunity to collect information concerning the

frequency and proximity of Questionnaire Claimants' contact with GST products. These facts are

crucially relevant to the total number of colorable claims, and to merit generally. For example,

GST obtained judgment as a matter of law in *Moeller* even though the claimant alleged regular

work with GST gaskets for eight years. *Moeller*, 2011 U.S. App. LEXIS 19987 at *12-13. The

Questionnaire does not, however, require claimants to indicate how often they worked with GST

products.

56.     To rectify this gap, Debtors seek to propound simple discovery to a limited

sample of Questionnaire Claimants concerning, for example, how long claimants performed the

various activities in the Questionnaire with respect to GST products (i.e. personally cut,

personally removed, etc.); the approximate number of GST gaskets they worked with; and the

method they used to cut or remove GST gaskets and packing.

57.     This is exactly the information that previous asbestos debtors have been permitted

to collect prior to aggregate estimation of asbestos claims, from far more claimants, despite

having manufactured products that caused massive asbestos fiber exposures during normal use.

For example, in the W.R. Grace bankruptcy case, the debtor was permitted to collect from over

100,000 claimants the dates and frequency of exposure and, if exposure was due to working in or

around areas where the product was being installed, mixed, removed, or cut, their regular

proximity to such areas. *See* Personal Injury Questionnaire in *In re W.R. Grace & Co.*, No. 01-

1139 (Bankr. D. Del.) (attached hereto as **Exhibit B**); *see also* Fourth Amended Order

Implementing G-I's Claimant Questionnaire and Sampling Protocol, *In re G-I Holdings Inc., et*

- 20 -

*al.*, No. 01-30135 (Bankr. D.N.J. July 7, 2008) (attached hereto as **Exhibit C**). This is

information Debtors have not yet had the opportunity to collect.

58.     Second, Debtors should have the opportunity to propound discovery concerning

the exposures to other products experienced by a sample of Questionnaire Claimants. These

other exposures are also of core relevance to the merits of claims—one of the key factors the

Sixth Circuit relied upon in granting judgment as a matter of law in *Moeller* was Mr. Moeller's

"massive exposure to asbestos from non-Garlock sources." *Moeller*, 2011 U.S. App. LEXIS

19987 at *12-13. The other exposures are also relevant to the admissibility of expert testimony

on substantial factor causation. *See* Fed. R. Evid. 702 Advisory Committee Note (2000) (factor

bearing on reliability is "[w]hether the expert has adequately accounted for obvious alternative

explanations"); *Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 694 (W.D.N.C. 2003).

59.     This too is exactly the kind of information that previous asbestos debtors have

been permitted to collect before aggregate estimation of asbestos claims, from far greater

numbers of claimants. For example, in the W.R. Grace case, the debtor had the opportunity

before aggregate estimation to propound discovery concerning all Non-Grace asbestos-

containing products to which all of the more than 100,000 claimants were exposed, the dates and

frequency of exposures, how the claimants were exposed, and the natures of the exposures. *See*

Ex. B (W.R. Grace); *see also* Ex. C (G-I Holdings).

60.     Debtors propose to collect this information from far fewer claimants than were at

issue in the W.R. Grace case—and indeed, many fewer than received the Questionnaire. Debtors

will use the response to the Questionnaire to construct a sample (the "Dose Sample") of

claimants in occupations and industries that are most pertinent to Debtors' estimation case: that

is, the claimants who would be expected to have the most contact with gaskets in the course of

their occupations. Debtors expect this sample to include only a small portion of the 5,800

Questionnaire Claimants. Debtors also intend to seek the discovery through standard forms of

discovery under the Bankruptcy Rules, which will not require preapproval from the Court.

61.     Debtors do not need the Court's assistance in propounding this discovery, except

in two respects: the ordering of a bar date so that the limited discovery may occur pursuant to the

Rules governing party discovery, and enough time so that any late-answering Questionnaire

Claimants (pursuant to Debtors' motion to compel) who are in the Dose Sample can be included.

Much of the discovery from the Dose Sample can run concurrently with enforcement of the

Questionnaire, to the extent claimants have already identified industry/occupation combinations

that place them in the Dose Sample. Thus, Debtors expect to require only an additional two

months in the schedule set out in the Estimation CMO to propound the discovery to the late-

identified members of the Dose Sample. The additional discovery will not materially delay the

estimation trial, and any delay that does occur will not be due to the Debtors, but to the failure of

many Questionnaire Claimants to comply with the Court's Questionnaire Order.

### 3.     Debtors Should Also Have the Opportunity to Collect Further Information That Is Highly Relevant to the Amount of Allowed Claims

62.     After making a reasoned estimate of the number of current and future

Mesothelioma Claims that have potential merit, the Court should estimate the aggregate amount

of those claims.

63.     The amount that a claimant with a colorable claim might be able to collect from

GST depends upon applicable law, but in all states GST is protected from bearing shares of

damages for which other parties are responsible or that have already been paid through

settlements. Some states apply proportional liability (also known as several liability), under

which each joint tort-feasor is responsible only for its proportional share of the plaintiff's

- 22 -

damages. *See, e.g.*, Tex. Civ. Prac. & Rem. Code Ann. § 33.012(b) *et seq.*; Cal. Civ. Proc. Code

§ 877; N.Y. Gen. Oblig. Law § 15-108(a). In these states, GST is insulated from shares of

liability for which other parties are responsible.

64.    In joint and several liability jurisdictions, the plaintiff can seek his entire damages

from any single defendant. But each defendant typically has the opportunity to receive credit for

settlement payments plaintiffs have received from others (and the opportunity to seek

contribution from responsible parties that have not yet paid). The credit for these payments is

automatic in many states. *See, e.g.*, 740 ILCS 100/2(a); Tex. Civ. Prac. & Rem. Code Ann. §

33.012(b) (if defendant faces joint and several liability); *Bd. of Educ. v. Zanda, Martin &*

*Milstead, Inc.*, 390 S.E.2d 796 (W. Va. 1990). Other jurisdictions apply a hybrid version of the

several-only and joint and several regimes. *See, e.g.*, Tex. Civ. Prac. & Rem. Code § 33.013.

65.    The information pertaining to other exposures that Debtors intend to seek through

the sample described above is also relevant to apportionment, because it is relevant to the

existence of liability shares from which GST is protected in several-only and hybrid

jurisdictions.

66.    As the final item of additional discovery, Debtors should have the opportunity to

propound discovery concerning payments received from all others by Questionnaire Claimants in

the Dose Sample. Again, this is information that debtors have invariably had the opportunity to

receive in previous mass tort bankruptcies prior to judicial estimation of personal injury claims.

The Delaware District Court in *USG* ordered all cancer claimants subject to estimation to

disclose the amounts of settlement money or verdict payments received from defendants. *See In*

*re USG Corp.*, 290 B.R. at 228. The same occurred in the A.H. Robins, G-I Holdings, and W.R.

Grace cases (the latter with respect to more than 100,000 claimants). *See* Ex. D (questionnaire in

A.H. Robins); B (W.R. Grace); C (G-I Holdings). That is because settlements and verdict

payments are directly relevant to the amount of claims against the Debtors and the extent to

which they can be enforced against the Debtors under applicable law (see above).

67.      Debtors intend to collect this information only from Questionnaire Claimants in

the restricted Dose Sample. As described above, this discovery will run concurrently with the

process of enforcing the Questionnaire, with an additional two months to accommodate addition

of claimants who comply with an order compelling them to respond to the Questionnaire.

**F.      The Estimation CMO Provides an Efficient Schedule for Arriving at Aggregate Estimation of Mesothelioma Claims**

68.      Finally, the Estimation CMO that Debtors propose is a proper and efficient

schedule for arriving as expeditiously as possible to a Mesothelioma Claim estimation trial. The

key dates are in Table 1 below.

**Table 1: Key Dates in Estimation CMO**

| Event | Date |
|---|---|
| Bar Date | February 28, 2012 |
| Hearing on Motion to Compel Response to Questionnaire | March 2012 |
| Deadline for Designating Experts | May 15, 2012 |
| Fact Discovery Ends | July 15, 2012 |
| Pre-Trial Conference | August 23, 2012 |
| Expert Discovery | July 2012-November 2012 |
| Estimation Trial | December 2012 |

69.      The bar date is the first key event in the Estimation CMO. To permit the most

efficient enforcement of the Questionnaire, Debtors propose to serve, no later than the notice of

bar date, motions to compel responses to the Questionnaire and a notice of hearing. This will

allow Questionnaire Claimants' response period to run concurrently with the bar date, instead of

consecutively. The hearing on the motion to compel can then be held shortly after the bar date

- 24 -

passes on February 28, 2012. After that hearing, Questionnaire Claimants who are compelled to respond would have an additional period in which to do so.

70.    During that period, Debtors will serve the discovery outlined above on those members of the Dose Sample who are already identifiable (that is, who have an industry/occupation combination that places them within the Dose Sample). This discovery will thus run concurrently with the additional response period for the Questionnaire.

71.    Fact discovery will extend to July 15, 2012 (with the exception of motions to compel and depositions) for the purpose of allowing Debtors to propound discovery to members of the Dose Sample identified as a result of Questionnaires submitted in response to the order on Debtors' motion to compel.

72.    Meanwhile, expert discovery will begin even before fact discovery ends, with designation of experts in May 2012. The expert discovery period has to run somewhat beyond the fact discovery period, to permit expert reports and depositions on the basis of the evidence identified during fact discovery.

73.    Finally, the Estimation CMO contemplates an initial pretrial conference in August 2012 where, among other things, pre-trial briefing schedules can be set. An estimation trial could occur as early as December 2012.

74.    Debtors believe this is the most efficient schedule for arriving at aggregate estimation of Mesothelioma Claims that is consistent with the rights and obligations of all parties, and request that it be entered.

### III.    Conclusion

75.    For the foregoing reasons, Debtors respectfully request that the Court enter the relief requested in the Bar Date Motion and Estimation Motion.

This 2nd day of December, 2011.

Respectfully submitted,

/s/ Garland S. Cassada
Garland S. Cassada
N.C. Bar No. 12352
Jonathan C. Krisko
N.C. Bar No. 28625
Richard C. Worf, Jr.
N.C. Bar No. 37143

ROBINSON BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile:  (704) 378-4000

gcassada@rbh.com
jkrisko@rbh.com
rworf@rbh.com

*Special Corporate and Litigation Counsel to the
Debtors Garlock Sealing Technologies LLC,
Garrison Litigation Management Group, Ltd., and
The Anchor Packing Company*