**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | | |
|---|---|---|
| In re: | : | Case No. 10-BK-31607 |
| | : | |
| GARLOCK SEALING | : | Chapter 11 |
| TECHNOLOGIES, LLC, *et al.*, | : | |
| | : | Jointly Administered |
| Debtors.[1] | : | |
| | : | |

**MEMORANDUM OF LAW SETTING FORTH THE**
**OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY**
**CLAIMANTS' (A) LIMITED OBJECTION TO DEBTORS' MOTION FOR**
**ESTIMATION, AND (B) OBJECTION TO DEBTORS' MOTION FOR A BAR DATE**

**CAPLIN & DRYSDALE, CHARTERED**

Trevor W. Swett III
(tswett@capdale.com)
James P. Wehner
(jwehner@capdale.com)
Jeanna Rickards Koski
(jkoski@capdale.com)
One Thomas Circle, N.W.
Washington, DC  20005
Telephone:  (202) 862-5000

Elihu Inselbuch
(einselbuch@capdale.com)
375 Park Avenue, 35th Floor
New York, NY  10152-3500
Telephone: (212) 319-7125

*Co-Counsel for the Official Committee of*
*Asbestos Personal Injury Claimants*

**MOON WRIGHT & HOUSTON, PLLC**

Travis W. Moon
(tmoon@mwhattorneys.com)
227 West Trade Street
Suite 1800
Charlotte, NC  28202
Telephone:  (704) 944-6560

*Co-Counsel for the Official Committee of*
*Asbestos Personal Injury Claimants*

---

[1]   The Debtors are Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ......................................................................................1

ARGUMENT ..................................................................................................................3

I.      THE DEBTORS' ESTIMATION APPROACH IS ILLEGITIMATE AND
        IMPRACTICAL ..................................................................................................3

        A.      Aggregate estimation cannot be a "virtual" trial of asbestos
                personal injury claims .............................................................................4

                1.      Courts have repeatedly rejected group or class-wide
                        litigation of asbestos claims ..........................................................5

                2.      The Debtors cannot trump state law with their preferred
                        causation standards  ..........................................................7

                3.      The Debtors' suggestion that this Court can conduct a
                        "science trial" and conclusively resolve issues that remain
                        subject to legitimate dispute in the tort system is not viable ..............17

        B.      The Debtors' estimation process presupposes unlawful and
                unmanageable post-confirmation proceedings ................................................21

                1.      The Debtors' post-confirmation process would deny
                        claimants due process guaranteed by the Constitution and
                        the Bankruptcy Rules.......................................................21

                2.      The post-confirmation process envisioned by the Debtors is
                        unrealistic.............................................................23

                3.      If post-confirmation allowance proceedings were
                        conducted with due process protections, the results would
                        not differ from historical averages ........................................25

        C.      The Debtors' authorities do not support its approach to estimation ................26

II.     THE DEBTORS' AGGREGATE LIABILITY CAN BE ESTIMATED
        FAIRLY AND EFFICIENTLY ..............................................................................28

        A.      The resolutions achieved during the Debtors' long history of
                litigating asbestos cases provide the proper foundation for the
                estimate ..............................................................................29

B.      Using the Debtors' own claims resolution history is appropriate
        and consistent with Rule 408 ............................................................30

C.      Trends in the tort system can be taken into account ........................................36

D.      Estimation under this standard methodology can be accomplished
        with just six months of discovery and preparation ...........................................37

III.    A BAR DATE FOR MESOTHELIOMA VICTIMS IS UNNECESSARY
        AND WOULD CLASH WITH THE PURPOSES OF AGGREGATE
        ESTIMATION ..........................................................................................................38

A.      The Debtors do not need a bar date to enforce the Questionnaire or to
        take more claimant discovery ........................................................................40

B.      There is no other justification for a bar date in estimation .............................41

CONCLUSION ..................................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACandS, Inc. v. Abate*,
710 A.2d 944 (Md. Ct. Spec. App. 1998) ...............................................................11

*ACandS, Inc. v. Asner*,
686 A.2d 250 (Md. 1996) ........................................................................................15

*Ada Liss Group (2003) v. Sara Lee Corp.*,
No. 1:06CV610, 2009 WL 3241821 (M.D.N.C. Sept. 30, 2009) ............................30

*Arnold v. Garlock, Inc.*,
278 F.3d 426 (5th Cir. 2001) ...................................................................................6

*Bailey v. NARCO*,
95 S.W.3d 868 (Ky. Ct. App. 2003) ..................................................................14, 16

*Berger v. Amchem Prods.*,
818 N.Y.S.2d 754 (N.Y. Super. Ct. 2006) .........................................................16, 17

*Betz v. Pneumo Abex LLC*,
998 A.2d 962 (Pa. Super. Ct. 2010) ........................................................................12

*Bittner v. Borne Chem. Co.*,
691 F.2d 134 (3d Cir. 1982)..................................................................................3, 7

*Blancha v. Keene Corp.*,
Civ. A. No. 87-6443, 1991 WL 224573 (E.D. Pa. Oct. 24, 1991)............................9

*Borg-Warner Corp. v. Flores*,
232 S.W.3d 765 (Tex. 2007)......................................................................................8

*Broadcourt Capital Corp. v. Summa Med. Corp.*,
972 F.2d 1183 (10th Cir. 1992) ..............................................................................32

*Cardinal Indus. Insulation, Co. v. Norris*,
Nos. 2004-CA-000525-MR *et al.*, 2009 WL 562614 (Ky. Ct. App. Mar. 6, 2009) ..........13, 14

*CertainTeed Corp. v. Dexter*,
330 S.W.3d 64 (Ky. 2011) .................................................................................12, 13

*Cimino v. Raymark Indus., Inc.*,
151 F.3d 297 (5th Cir. 1998) ...............................................................................5, 7

*Clayton v. Ameriquest Mortg. Co.*,
No. 1:02CV415, 2004 WL 734978 (M.D.N.C. Apr. 5, 2004).................................30

*Cohn v. Petsmart, Inc.*,
   281 F.3d 837 (9th Cir. 2002) ..................................................................................32

*Cortes-Irizarry v. Corporacion Insular de Seguros*,
   111 F.3d 184 (1st Cir. 1997) ..................................................................................20

*Dalton v. 3M Co.*,
   MDL 875, E.D. Pa. Civ. A. No. 2:10-64604, 2011 WL 5881011 (E.D. Pa. Aug. 2,
   2011) ........................................................................................................................16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .............................................................................17, 19, 20, 26

*Eagle-Picher Indus., Inc. v. Balbos*,
   604 A.2d 445 (Md. 1992) ...............................................................................10, 14

*Eckenrod v. GAF Corp.*,
   544 A.2d 50 (Pa. Super. Ct. 1988) ........................................................................12

*Estate of Hicks v. Dana Cos., LLC.*,
   984 A.2d 943 (Pa. Super. Ct. 2009) ......................................................................11

*Fiberglass Insulators, Inc. v. Dupuy*,
   856 F.2d 652 (4th Cir. 1988) ................................................................................32

*Georgia-Pacific Corp. v. Stephens*,
   239 S.W.3d 304 (Tex. App. 2007) ..........................................................................8

*Georgine v. Amchem Prods., Inc*,
   83 F.3d 610 (3d Cir. 1996) ......................................................................................5

*Gregg v. V-J. Auto Parts Co.*,
   943 A.2d 216 (Pa. 2007) ...................................................................................8, 11

*Hoffeditz v. AM Gen., LLC*,
   MDL 875, E.D. Pa. Civ. A. No. 2:09-70103, 2011 WL 5881003 (E.D. Pa. July 29,
   2011) ........................................................................................................................16

*Howard v. A.W. Chesterton Co.*,
   31 A.3d 974 (Pa. Super. Ct. 2011) ........................................................................12

*In re A.H. Robins*,
   880 F.2d 694 (4th Cir. 1989) ...........................................................................27, 28

*In re A.H. Robins Co.*,
   197 B.R. 568 (E.D. Va. 1994) ...............................................................................32

*In re A.H. Robins Co.*,
    59 B.R. 99 (Bankr. E.D. Va. 1986) ........................................................................22

*In re A.H. Robins, Co.*,
    88 B.R. 742 (E.D. Va. 1988) ...........................................................................27, 28

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) ....................................................29, 31, 33, 34, 37

*In re Babcock & Wilcox*,
    274 B.R. 230 (Bankr. E.D. La. 2002) .....................................31, 33, 34, 35

*In re Caribbean Petroleum Corp.*,
    443 B.R. 560 (Bankr. D.P.R. 2010) ....................................................................25

*In re Eagle-Picher Indus., Inc.*,
    189 B.R. 681 (Bankr. S.D. Ohio 1995) ............................................29, 31, 33, 35

*In re Federal-Mogul Global, Inc.*,
    330 B.R. 133 (D. Del. 2005) ........................................................... *passim*

*In re Fibreboard Corp.*,
    893 F.2d 706 (5th Cir. 1990) ...............................................................................5

*In re Harford Sands Inc.*,
    372 F.3d 637 (4th Cir. 2004) .............................................................................21

*In re Nat'l Gypsum*,
    257 B.R. 184 (Bankr. N.D. Tex. 2000) ........................................................31, 35

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ..........................................................................19, 20

*In re Pinnacle Brands, Inc.*,
    259 B.R. 46 (Bankr. D. Del. 2001) ....................................................................22

*In re Quigley Co.*,
    346 B.R. 647 (Bankr. S.D.N.Y. 2006) ...............................................................42

*In re Smith*,
    419 B.R. 622 (Bankr. E.D. Va. 2008) ..........................................................21, 22

*In re Taylor*,
    132 F.3d 256 (5th Cir. 1998) .............................................................................22

*In re Unisys Sav. Plan Litig.*,
    173 F.3d 145 (3d Cir. 1999) ..............................................................................20

*In re USG Corp.*,
    290 B.R. 223 (Bankr. D. Del. 2003) .......................................................................26, 27, 42

*John Crane, Inc. v. Linkus*,
    988 A.2d 511 (Md. Ct. Spec. App. 2010) .........................................................................10, 15

*John Crane, Inc. v. Scribner*,
    800 A.2d 727 (Md. 2002) .................................................................................................11

*Johnson v. Owens-Corning Fiberglas Corp.*,
    729 N.E.2d 883 (Ill. App. Ct. 2000) ................................................................................11

*KCH Servs. Inc. v. Nordam Grp, Inc.*,
    345 B.R. 542 (W.D.N.C. 2006) .........................................................................................21

*Kemnitz v. Trans World Airlines, Inc.*,
    131 F.3d 131 (2d Cir. 1997).............................................................................................30

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999).........................................................................................................20

*Lindstrom v. A-C Prod. Liab. Trust*,
    424 F.3d 488 (6th Cir. 2005) ..........................................................................................8

*Linster v. Allied Signal, Inc.*,
    21 A.3d 220 (Pa. Super. Ct. 2011)...................................................................................12

*Lundell v. Anchor Constr. Specialists, Inc.*,
    223 F.3d 1035 (9th Cir. 2000) .........................................................................................22

*Malcolm v. Nat'l Gypsum Co.*,
    995 F.2d 346 (2d Cir. 1993).............................................................................................5

*Martin v. Cincinnati Gas & Elec. Co.*,
    561 F.3d 439 (6th Cir. 2009) .......................................................................................8, 13

*Mavroudis v. Pittsburgh-Corning Corp.*,
    935 P.2d 684 (Wash. Ct. App. 1997)...............................................................................14

*Moeller v. Garlock Sealing Techs. LLC*,
    660 F.3d 950 (6th Cir. 2011) .............................................................................8, 12, 13, 14

*Nelson v. A.W. Chesterton Co.*,
    MDL No. 875, E.D. Pa. Civ. A. No. 2:10-cv-69365, 2011 WL 6016986 (E.D. Pa. Oct.
    27, 2011) .......................................................................................................................9

*Owens Corning v. Credit Suisse Boston*,
    322 B.R. 719 (D. Del. 2005).........................................................28, 29, 31, 33, 34, 37

*Paoli R.R. Yard PCB Litig. v. Monsanto Co.*,
916 F.2d 829 (3d Cir. 1990)...........................................................................19

*Perry v. Novartis Pharms. Corp.*,
564 F. Supp. 2d 452 (E.D. Pa. 2008) ...............................................................15

*Raleigh v. Ill. Dep't of Revenue*,
530 U.S. 15 (2000).............................................................................................7

*Rutherford v. Owens-Illinois, Inc.*,
941 P.2d 1203 (Cal. 1997) ....................................................................9, 10, 15

*S. Cent. Petroleum, Inc. v. Long Bros. Oil Co.*,
974 F.2d 1015 (8th Cir. 1992) ........................................................................34

*Scapa Dryer Fabrics, Inc. v. Saville*,
16 A.3d 159 (Md. 2011) ..................................................................................10

*Simontacchi v. Invensys, Inc.*,
Civil No. 3:05CV283, 2009 WL 426466 (W.D.N.C. Feb. 19, 2009)....................30

*Thacker v. UNR Indus., Inc.*,
603 N.E.2d 449 (Ill. 1992) ..............................................................................11

*Tragarz v. Keene Corp.*,
980 F.2d 411 (7th Cir. 1992) .....................................................................11, 15

*United States v. Llera Plaza*,
188 F. Supp. 2d 549 (E.D. Pa. 2002) ...............................................................20

*Vermande v. Hyundai Motor Am., Inc.*,
352 F. Supp. 2d 195 (D. Conn. 2004) ..............................................................33

*Walker v. Owens-Illinois Glass Corp.*,
MDL No. 875, E.D. Pa. Civ. A. No. 2:07-62843, 2011 WL 4790626 (E.D. Pa. Jan.
28, 2011) ....................................................................................................10, 16

*Weakley v. Burnham Corp.*,
871 A.2d 1167 (D.C. 2005) .............................................................................17

*Weber v. John Crane, Inc.*,
50 Cal. Rptr. 3d 71 (Ct. App. 2006) ................................................................10

*Whitney v. Dresser*,
200 U.S. 532 (1906).........................................................................................22

*Wyatt v. Security Inn Food & Beverage, Inc.*,
819 F.2d 69 (4th Cir. 1987) ............................................................................32

*Zickuhr v. Ericsson, Inc.*,
No. 1-10-3430, 2011 WL 5578910 (Ill. App. Ct. Sept. 30, 2011) ..........................................11

STATUTES

11 U.S.C. § 502(a) ...............................................................................................................21

11 U.S.C. § 502(c) .................................................................................................................4

11 U.S.C. § 524(g) .................................................................................................................4

28 U.S.C. § 157(b) ............................................................................................................4, 23

28 U.S.C. § 1334(c) .............................................................................................................25

28 U.S.C. § 1411(a) ...............................................................................................................4

OTHER AUTHORITIES

Collier on Bankruptcy .........................................................................................................22

Fed. R. Bankr. P. 3001(a) ....................................................................................................21

Fed. R. Bankr. P. 3001(f) .....................................................................................................21

Fed. R. Bankr. P. 3007 ...................................................................................................21, 23

Fed. R. Bankr. P. 3007(a) ....................................................................................................22

Fed. R. Bankr. P. 3007(c) ..............................................................................................22, 23

Fed. R. Bankr. P. 3007(d) ..............................................................................................22, 23

Fed. R. Bankr. P. 7026 .........................................................................................................22

Fed. R. Bankr. P. 9014 .........................................................................................................22

Fed. R. Civ. P. 23 ...................................................................................................................5

Fed. R. Civ. P. 26 .................................................................................................................22

Fed. R. Civ. P. 42 .................................................................................................................26

Fed. R. Evid. 408 .............................................................................................31, 32, 33, 34

Fed. R. Evid. 702 ...........................................................................................................17, 26

Fed. R. Evid. 703 .................................................................................................................34

Prosser & Keeton Torts § 41 (5th ed. 1984) .................................................................14

Restatement (Second) of Torts § 434(1)(a) (1965) .......................................................15

Richard B. Sobol, *Bending the Law* (1991) ...........................................................27, 28

Weinstein's Federal Evidence § 408 ...........................................................................33

The Official Committee of Asbestos Personal Injury Claimants (the "**ACC**"), by and through its undersigned counsel, submits this memorandum in opposition to the Debtors' Motions for Estimation and Questionnaire Claimant Bar Date ("**Estimation Motion**" and "**Bar Date Motion**," respectively) [Dkt. Nos. 1683 and 1684], and the Debtors' Brief in Support of Motions for Estimation and Bar Date ("**Estimation Brief**") [Dkt. No. 1685].

## PRELIMINARY STATEMENT

The ACC agrees that the Court should proceed to aggregate estimation. But estimation must be directed towards the proper end, and conducted by an appropriate method. The Debtors' proposal to focus estimation on the feasibility of the Debtors' plan is misplaced. As the ACC and FCR will show in other papers to be filed next week, the Debtors' plan is patently unconfirmable. Among other fatal flaws, the Debtors' plan impairs asbestos claims but would deprive them of a right to vote on the plan, and invokes the form of section 524(g) while gutting the protections that statute mandates. Rather than reorganizing, the Debtors' plan demonstrates that they are using bankruptcy to attempt to gain tactical advantage in litigation of the underlying asbestos tort claims, forcing claimants who do not concede to a meager and illusory "Settlement Option" into a "Litigation Option" in which the protections and precedents of the tort system are stripped away and a process favoring the Debtors is imposed. This is not a valid reorganization purpose and, indeed, amounts to bad faith. The feasibility of the Debtors' plan is, therefore, a moot point.

The Debtors' method — the unprecedented estimation procedure the Debtors propose — is likewise deeply flawed. In an effort to avoid the tort system, in which for more than thirty years courts and juries around the country found the Debtors' asbestos products caused death and injury, the Debtors would have this Court conduct a "virtual" trial of asbestos claims, make

wholesale judgments that entire classes of claims are valueless, and rule once and for all that defenses that often failed the Debtors in the tort system will never fail them again.  Along the way, the Debtors' procedures would violate due process protections and Rules of Bankruptcy Procedure.  Finally, the procedures would create an unworkable and wildly impractical situation in which thousands of lawsuits around the country would be siphoned into this Court.

This Court should instead conduct an estimation based on the methodology that has been used in numerous successful asbestos bankruptcies to test whether the Debtors' aggregate liability for pending and future asbestos-related personal injury claims has rendered them insolvent.  Soon after the expiration of the Debtors' exclusive solicitation period on January 26, 2012, the ACC and the FCR will file a creditors' plan based on the assumption that the Debtors are insolvent.  Estimation will determine whether or not that assumption is correct.  If the Debtors prove solvent, this bankruptcy should be dismissed and the asbestos claims against the Debtors returned to the tort system.  If insolvent, ownership of the Debtors' stock will pass to a section 524(g) trust under a creditors' plan.  In that event, nonbankrupt affiliates may obtain the protections of a channeling injunction only by negotiating a satisfactory contribution to the trust.

The estimation should follow the model of other asbestos bankruptcies in which aggregate estimation has been litigated to conclusion.  A solvency determination will not require the Court to determine the precise amount of the Debtors' liability, but simply whether the total liability, according to the preponderance of the evidence, exceeds the value of the business and assets of the estates.  Nor will it require this Court to determine the value of any particular claim.  Such an approach conforms to bankruptcy law, respects the rights of individual asbestos claimants, and offers considerable efficiencies.  So focused, the pretrial process would lead to an evidentiary hearing of a week's duration or less, to take place no later than August 2012.

We address in this brief the deficiencies of the Debtors' proposed approach compared to a proper aggregate estimation. We also show that Debtors' bar date motion is unnecessary and counterproductive for the purposes of aggregate estimation, and, more fundamentally, amounts to an attempt to circumvent this Court's previous rulings on a bar date and the proper scope of estimation.

## ARGUMENT

### I.    THE DEBTORS' ESTIMATION APPROACH IS ILLEGITIMATE AND IMPRACTICAL

The Court has the discretion to shape estimation to fit the needs of the case and the subject matter to be estimated. Subject to the constraints of due process, the Court may use "whatever method is best suited to the particular contingencies at issue." *Bittner v. Borne Chem. Co.,* 691 F.2d 134, 135 (3d Cir. 1982). In choosing the approach, the Court's "principal consideration must be an accommodation to the underlying purposes of the Code," including the goal of accomplishing reorganization "quickly and efficiently." *Id*. at 135, 137. In short, estimation should facilitate the confirmation of a plan within a reasonable period of time. The Debtors' estimation approach fails this first test. The Debtors propose to spend a year estimating their mesothelioma liability (it would almost certainly take much longer) and imply that estimates of other asbestos-related claims would take place thereafter. Their timetable itself shows that the "estimation" Garlock has in mind would defeat the efficiency a well-designed aggregate estimation process should achieve.

Beyond its extreme inefficiency, the Debtors' proposed estimation process violates fundamental rights of claimants in an attempt to create an "alternate universe" in which, unlike the tort system, the Debtors' can avoid liability. As we explain below, this fantasy is both illegitimate and impractical.

- 3 -

A.    **Aggregate estimation cannot be a "virtual" trial of asbestos personal injury claims**

This Court has already concluded, correctly, that it should not adjudicate the merits of any claim, on the Debtors' theories or any other, but will instead estimate aggregate liability. Hr'g Tr. 185:24-186:1, Apr. 28, 2011 ("But I do intend to proceed to an estimation and not to any individual determination - determination of individual cases, through this or any other theory.") (Ex. 1); *see also* Order on Motion of the Official Committee of Asbestos Personal Injury Claimants for Entry of a Scheduling Order and Debtors' Motion for Establishment of Asbestos Claims Bar Date, Etc., dated Dec. 9, 2010, ¶ 3 [Dkt. No. 853].

The Debtors have deliberately ignored the Court's decision for months, and continue to do so in this motion. While adopting the phrase "aggregate estimation," they propose a process to bring thousands of claimants into this Court as parties to the estimation and litigate their individual claims by having them "estimated" at zero.[2]  Correctly conceived, however, aggregate estimation of asbestos claims is not a matter of valuing individual claims and adding up those values to arrive at a grand total. Rather, it proceeds by extrapolation from statistical information and informed judgments about the dynamics and trends at work in the tort system, pointing to the overall value of present and future claims in their entirety. For this fundamental reason, the

---

[2]    The Debtors contend that this estimation should be conducted by this Court under 11 U.S.C. § 502(c) for the purpose of determining "feasibility." Estimation Br. at 8. Although some courts have pointed to this provision in aggregate estimations, it is not strictly apposite. Section 502(c) is part of the allowance provisions of the Code. But allowance is not the purpose of the Debtors' estimation proposal or ours. Estimation Br. at 8-9. Rather, the issues are solvency *vel non* and the requirements imposed by section 524(g) for a channeling injunction. Strictly speaking, therefore, the correct statutory bases of the estimation here are section 1129(a) of the Code insofar as it incorporates the absolute priority rule and section 524(g). To the extent that the Debtors would have this Court determine that certain claims will not be allowed post-confirmation, the Court lacks jurisdiction under 28 U.S.C. § 157(b)(2)(B) and (b)(5), and such a procedure jeopardizes claimants' rights to a jury trial expressly preserved by 28 U.S.C. § 1411(a).

Debtors' proposal to join 5,800 recipients of its mesothelioma claim questionnaire as parties to the estimation is unwarranted and fundamentally at odds with aggregate estimation.

> **1.      *Courts have repeatedly rejected group or class-wide litigation of asbestos claims***

The Debtors' proposed estimation process is an exercise in class-wide litigation of asbestos claims. They contend that, "[m]any groups of Mesothelioma Claims are not colorable and should be estimated at zero because they would be disallowed as a matter of law following confirmation of the Plan." Estimation Br. at 2.

Courts have repeatedly recognized that the factual disputes underlying asbestos claims are too individualized to be litigated in classes or groups. In *Georgine v. Amchem Products, Inc.*, for example, the Third Circuit concluded that a putative class of future asbestos claimants could not lawfully be certified for class action treatment under Rule 23 of the Federal Rules of Civil Procedure because the individual claims were so disparate on their facts:

> Class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods. Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling asbestosis, or from mesothelioma — a disease which, despite a latency period of approximately fifteen to forty years, generally kills its victims within two years after they become symptomatic.

83 F.3d 610, 626 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). Similarly, the Fifth Circuit concluded that "causation of plaintiff's injury by defendant's product and plaintiff's resultant damages must be determined ***as to 'individuals, not groups*.'"** *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 313 (5th Cir. 1998) (emphasis added) (quoting *In re Fibreboard Corp.*, 893 F.2d 706, 711 (5th Cir. 1990)). *See also Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350-54 (2d Cir. 1993) (disapproving consolidation for trial of forty-eight asbestos cases because different individual exposures, occupations, job sites, and diseases were

involved). This principal has informed estimation proceedings in asbestos bankruptcies. In the estimation in the Federal-Mogul bankruptcy, the court observed that the estimation of aggregate liability must focus on "aggregate personal injury liability for the creation of a trust, not the merits of individual or class of individuals claims." *In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 154 (D. Del. 2005). As the court further observed, "[t]o do the latter, would require that each claimant be afforded the procedural protections of the due process clause of the Fifth Amendment, thereby requiring cases that presented disputed issues of fact a trial by jury." *Id.*

Garlock has attempted such a mass-resolution strategy before, and been rebuffed by the courts. In 2001, Garlock attempted to remove large numbers of cases from state courts to federal district court as purportedly "related to" the bankruptcy of a Federal-Mogul subsidiary, claiming that removing the cases would result in a "a centralized, efficient, cost effective application of a uniform, fair system for assessing and compensating asbestos-related claimants." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 442 (5th Cir. 2001) (quotations removed). In a description of that strategy equally applicable to the Debtors' current proposal, the Fifth Circuit observed that "Garlock appears to be contemplating the availability of coordinated federal court judgments for their preclusive effect in future actions." *Id.* The Fifth Circuit then warned Garlock specifically against attempting to engineer mass litigation of cases:

> [N]o matter how creative the procedural avenue, and in spite of the fact that this litigation would benefit from a uniform approach, at almost every turn this circuit has rejected attempts at aggregation and issue preclusion in asbestos cases. Our adversity toward group resolution sounds in our concern that no one be deprived the right to a full and fair opportunity to litigate their claims.

*Id.* at 443. The Fifth Circuit accordingly upheld remand of the individual cases back to the state courts from which they came.

Here, the Debtors' proposed estimation process, an attempt to engineer what amounts to class-wide disallowance of claims, violates these same principles. Individual claimants' job and exposure histories, their medical evidence and damages are simply too varied to adjudicate ─ actually or virtually through "estimation at zero" ─ their claims in groups. The Court should, for that reason alone, decline to engage in the exercise. In fact, the Debtors' proposed estimation procedure takes group litigation to extreme lengths. The Debtors propose to take discovery of a sample of mesothelioma claimants to determine the "dose" of Garlock asbestos to which the sample claimants were exposed and then, apparently, argue that large numbers of other, unsampled claims should be "estimated at zero" on the ground that the sampled claimants' evidence proves the unsampled claimants have no viable case. Estimation Br. at 19-20. The Debtors likewise propose to take discovery of a sample of mesothelioma claimants to determine what "exposures to other products" those claimants had, and what payments they received from other sources. *Id.* at 21. It is, of course, inconceivable that the Debtors would expect this Court to determine that a California pipefitter's claim was valueless on the grounds that a shipyard mechanic in Brooklyn was exposed to too few Garlock gaskets, too much of another asbestos-containing product, or that he made a claim to a trust. *See Federal-Mogul*, 330 B.R. at 154; *see also Cimino*, 151 F.3d at 313.

### 2.    *The Debtors cannot trump state law with their preferred causation standards*

The Debtors acknowledge that, in estimation, the Court should apply the legal rules that govern the ultimate value of the claims. Estimation Br. at 9. As the Supreme Court has explained, "[t]he 'basic federal rule' in bankruptcy is that state law governs the substance of claims," *Raleigh v. Ill. Dep't of Revenue,* 530 U.S. 15, 20 (2000). State law governs their value in bankruptcy. *Bittner*, 691 F.2d at 135. While rhetorically acknowledging the rule, the Debtors'

proposed estimation procedure would thoroughly subvert it. Specifically, the Debtors would cherry-pick and apply to all claimants everywhere a causation standard far more onerous to claimants than the standards that actually apply in most jurisdictions.

The Debtors contend that the vast majority of claims will not be able to survive summary judgment as a matter of law, and thus "should be estimated at zero for feasibility purposes." Estimation Br. at 16. According to the Debtors, in order to defeat a motion for summary judgment on the issue of whether exposure to asbestos from Garlock's products was a substantial factor in causing his disease, a mesothelioma claimant must demonstrate "a high enough level of exposure" from Garlock products to cause disease, and that the vast majority of claimants will not be able to do so. Estimation Br. at 16-17, citing *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492-93 (6th Cir. 2005*)*; *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443-44 (6th Cir. 2009); *Gregg v. V-J. Auto Parts Co.*, 943 A.2d 216, 226 (Pa. 2007); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 771 (Tex. 2007); *Georgia-Pacific Corp. v. Stephens*, 239 S.W.3d 304, 318-19 (Tex. App. 2007). Garlock also contends that the vast majority of claimants were exposed to significant amounts of asbestos from other products, which "rendered any GST exposure insignificant as a matter of law." Estimation Br. at 3, citing *Moeller v. Garlock Sealing Techs. LLC,* 660 F.3d 950 (6th Cir. 2011); *Martin*, 561 F.3d at 443-44; *Gregg*, 943 A.2d at 226.

There is no uniform standard of causation in asbestos cases, however, and the Debtors' cases are not representative of the law applied in the 50 states.[3] In their hope to federalize the

---

[3]   As also shown below and in the accompanying State Law Appendix, Texas law, as set out in *Borg-Warner* and *Georgia-Pacific*, is an outlier. Moreover, Garlock overreads the other cases on which it relies. In *Martin*, the Sixth Circuit found that plaintiff had no evidence of exposure to the defendant's products. *Martin*, 561 F.3d at 443. The *Lindstrom* decision, in which the Sixth Circuit was applying maritime law, has been cited by Judge Robreno, who presides over the asbestos multi-district litigation docket, as articulating a much less stringent causation standard *(Footnote continued on next page.)*

causation standard, they have distorted state law.  As demonstrated more fully in the State Law

Appendix accompanying this memorandum, state courts outside of Texas do not require that a

plaintiff demonstrate that he or she inhaled a sufficient amount of asbestos from the defendant's

products to cause asbestos-related disease independently.  Rather, courts regularly recognize that

mesothelioma can be caused by a small amount of asbestos, and that every exposure to asbestos

above a background level contributes to the cumulative exposure that causes the disease, and

thus is a substantial contributing factor.[4]

In California, for example, where a significant number of claims against Garlock are

pending, the Supreme Court has held that a plaintiff can prove causation by showing to a

"reasonable medical probability" that exposure to defendant's asbestos-containing products "was

a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff or decedent

inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer."  *Rutherford v.*

*Owens-Illinois, Inc.,* 941 P.2d 1203, 1219 (Cal. 1997).  In determining whether the defendant's

---

*(Footnote continued from previous page.)*
than that advocated by Garlock here.  *See, e.g., Nelson v. A.W. Chesterton Co.,* MDL No. 875,
E.D. Pa. Civ. A. No. 2:10-cv-69365, 2011 WL 6016986 (E.D. Pa. Oct. 27, 2011) (citing
*Lindstrom*, and denying summary judgment where plaintiff presented evidence that he worked
with the defendant's gaskets, that the gaskets produced dust, giving rise to material issues of fact
regarding exposure and causation existed).  As discussed below, the decision in *Moeller* is a
dubious application of Kentucky law.  And, as shown below, courts in Pennsylvania consistently
read the decision of the Pennsylvania Supreme Court in the *Gregg* case as permitting claims to
get to the jury based on expert evidence that every exposure to asbestos can be a substantial
factor in causing asbestos disease.

[4]    As the court stated in *Blancha v. Keene Corp.,* applying Pennsylvania law:

> [I]t is not essential to establish with any precision the quantity, duration, or
> percentage of the occupational exposure to asbestos for which any or each
> particular manufacturer or supplier is responsible in order to establish proximate
> cause and, therefore, liability.  *Every* such exposure is a substantial factor in
> bringing about mesothelioma, and may be so found when the latency period is
> consistent.

Civ. A. No. 87-6443, 1991 WL 224573, at *6 (E.D. Pa. Oct. 24, 1991) (emphasis added).

asbestos was a substantial factor, many courts consider the frequency and regularity of exposure, and the proximity of the asbestos products to the plaintiff. *See Weber v. John Crane, Inc.,* 50 Cal. Rptr. 3d 71, 75 (Ct. App. 2006). However, the plaintiff need not "demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that actually produced the malignant growth," and "a defendant cannot escape liability simply because it cannot be determined with medical exactitude the precise contribution that exposure to fibers from defendant's products made to plaintiff's ultimate contraction of asbestos-related disease." *Rutherford,* 941 P.2d at 1207, 1219. Rather, the plaintiffs can establish the defendant's liability by presenting evidence of exposures along with expert testimony that the "particular asbestos disease is cumulative in nature, with many separate exposures each having constituted a 'substantial factor' that contributed to his injury." *Id.* at 1207.

In Maryland, another forum in which a significant number of Garlock claims are pending, courts also use a "frequency, regularity, and proximity" test to establish substantial factor causation. *See Scapa Dryer Fabrics, Inc. v. Saville*, 16 A.3d 159, 163 (Md. 2011), citing *Eagle-Picher Indus., Inc. v. Balbos*, 604 A.2d 445, 460 (Md. 1992). The test is "liberally applied" and plaintiffs can survive summary judgment with only circumstantial evidence of exposure. *See Walker v. Owens-Illinois Glass Corp.,* MDL No. 875, E.D. Pa. Civ. A. No. 2:07-62843, 2011 WL 4790626 (E.D. Pa. Jan. 28, 2011) (applying Maryland law). The Court of Appeals has held that "lay testimony describing the amount of dust created by handling the products in question, coupled with expert testimony describing the dose response relationship and the lack of a safe threshold of exposure (above ambient air levels), was sufficient to create a jury question" as to whether asbestos from the defendant's products was a substantial contributing factor to the plaintiff's mesothelioma. *John Crane, Inc. v. Linkus*, 988 A.2d 511, 523 (Md. Ct. Spec. App.

- 10 -

2010). *See also ACandS, Inc. v. Abate,* 710 A.2d 944, 989 (Md. Ct. Spec. App. 1998), *abrogated on other grounds*, *John Crane, Inc. v. Scribner*, 800 A.2d 727 (Md. 2002) (considering expert testimony that "each and every" asbestos exposure was a "substantial contributing factor" to the causation of the plaintiff's illness).

Like Maryland, Illinois courts require the plaintiff to show that he "was exposed to the defendant's asbestos through proof that he regularly worked in an area where the defendant's asbestos was frequently used and the injured party worked in sufficient proximity to this area so as to come into contact with the defendant's product." *Johnson v. Owens-Corning Fiberglas Corp.*, 729 N.E.2d 883, 887 (Ill. App. Ct. 2000) (quoting *Thacker v. UNR Indus., Inc.,* 603 N.E.2d 449, 457 (Ill. 1992)). Illinois courts do not require a finding of the quantity of fibers to which plaintiff was exposed, (*see Zickuhr v. Ericsson, Inc.*, No. 1-10-3430, 2011 WL 5578910 (Ill. App. Ct. Sept. 30, 2011)), because causation "is not concerned with the quantity of asbestos but its legal significance." *Johnson*, 729 N.E.2d at 889. Thus, in a mesothelioma case, a single fiber or slight exposure can be sufficient to show substantial-factor causation if there is "competent evidence that one or a *de minimis* number of asbestos fibers can cause injury * * *." *Id.*; *see also Tragarz v. Keene Corp.*, 980 F.2d 411, 421 (7th Cir. 1992) (applying Illinois law).

Pennsylvania law is similar. The Debtors cite *Gregg* as establishing a rule that proof of more than *de minimis* exposure is required before the question of causation can go the jury. Estimation Br. at 17. But the court in *Gregg* recognized that the frequency, regularity and proximity test should be tailored to the facts and circumstances of the case. *Gregg*, 943 A.2d at 225. Lower courts in Pennsylvania consistently read the holding in *Gregg* as permitting claims to reach the jury where there is expert testimony that "each and every breath" contributes cumulatively to the risk of contracting mesothelioma. *See Estate of Hicks v. Dana Cos., LLC.*,

- 11 -

984 A.2d 943, 957 (Pa. Super. Ct. 2009) (*en banc*); *Betz v. Pneumo Abex LLC*, 998 A.2d 962

(Pa. Super. Ct. 2010); *Howard v. A.W. Chesterton Co.*, 31 A.3d 974, 982-83 (Pa. Super. Ct.

2011). Pennsylvania courts emphasize that the frequency, regularity, and proximity test is "not a

rigid test with an absolute threshold necessary to support liability," and the plaintiff does not

need to "quantify the specific level or duration of his asbestos exposure." *Id.* at 979. Instead, the

test is tailored to each case, with the standard becoming less cumbersome "when dealing with

cases involving diseases, like mesothelioma, which can develop after only minor exposures to

asbestos fibers." *Id.* (citing *Linster v. Allied Signal, Inc.,* 21 A.3d 220, 223–24 (Pa. Super. Ct.

2011)). Thus, a plaintiff need only "present evidence that he inhaled some asbestos fibers shed

by the specific manufacturer's product." *Howard*, 31 A.3d at 979; *Eckenrod v. GAF Corp.,* 544

A.2d 50 (Pa. Super. Ct. 1988).

Nor can a defendant escape liability because the plaintiff was exposed to asbestos from

other manufacturers' products as well. The Debtors rely on the Sixth Circuit's decision in

*Moeller* for the contrary proposition. In *Moeller*, the court rejected the plaintiff's argument that

her experts "provided [the] causal link" between Garlock products and the plaintiff's

mesothelioma, on the ground that plaintiff's experts "never testified that Robert's exposure to

Garlock gaskets was a substantial factor in causing Robert's cancer." 660 F.3d at 954. Rather,

plaintiff's expert, Dr. Arthur Frank, had testified only that "all types of asbestos can cause

mesothelioma and that any asbestos exposure counts as a 'contributing factor.'" *Id.*

Significantly, the Kentucky Supreme Court recently held that testimony by the same expert, Dr.

Frank, that "each and every exposure to asbestos was a substantial contributing factor" to the

plaintiff's asbestos-related lung cancer, coupled with evidence of exposure to the defendant's

- 12 -

products, was sufficient to establish causation. *CertainTeed Corp. v. Dexter,* 330 S.W.3d 64, 78 (Ky. 2011).

In *Moeller*, after finding that the expert testimony did not establish substantial factor causation, and purporting to apply Kentucky law, the court found that there was insufficient evidence from which the jury could infer that exposure to Garlock gaskets "probably, as opposed to possibly, were a substantial cause" of the plaintiff's mesothelioma. *Moeller*, 660 F.3d at 955. The court found that, while there was testimony that the plaintiff had removed at least some Garlock gaskets, it did not establish how many gaskets the plaintiff removed, or how often, and there was evidence of "massive exposure" to other asbestos. *Id*. The Sixth Circuit cited the decision of the Kentucky Court of Appeals in *Cardinal Indus. Insulation, Co. v. Norris*, Nos. 2004-CA-000525-MR *et al.*, 2009 WL 562614 (Ky. Ct. App. Mar. 6, 2009), for the proposition that, under Kentucky law, a defendant's liability must be evaluated in the context of other exposures.[5]  *See Moeller,* 660 F.3d at 954.  But in *Cardinal* there was no evidence of exposure to asbestos from the defendant's products; rather, the evidence placed the plaintiff far from the site where the defendant performed asbestos abatement work.  The court in that case held that it was unreasonable to infer that the plaintiff, who worked in "an asbestos-filled environment * * * probably contracted mesothelioma by inhaling asbestos fibers released by work [the defendant] performed about one-and-a-half city blocks away." *Cardinal*, 2009 WL 562614 at *8.[6]

---

[5]  The court also cited its own previous decision in *Martin*.  But the plaintiff in *Martin* had failed to adduce any evidence of exposure to asbestos from the defendant's products, and had not even established that the defendant's products contained asbestos. *Martin*, 561 F.3d at 443.

[6]  The court noted that there was no evidence presented in that case regarding how far asbestos fibers may drift, and thus no evidence from which it could be inferred that the plaintiff had inhaled fibers released by defendant's abatement work. *Cardinal,* 2009 WL 562614, at *6.

In *Moeller*, by contrast, there was evidence of exposure to Garlock's products, and the Sixth Circuit's finding that the evidence was not sufficient for a jury to infer substantial causation was a doubtful application of Kentucky law. Under Kentucky law, "[g]enerally, the existence of legal cause is a question of fact for the jury," and it is "well-recognized" that legal causation may be established by circumstantial evidence. *Bailey v. NARCO,* 95 S.W.3d 868, 872-73 (Ky. Ct. App. 2003).[7] In *Bailey*, for example, the court held that the defendant was not entitled to summary judgment where the evidence showed that asbestos from defendant's products was released into the air in the factory where the plaintiff worked, and plaintiff's expert testified that the fibers would have drifted to the plaintiff's work area, that there was no safe level of asbestos exposure, and thus exposure to defendant's asbestos was a substantial contributing factor to the plaintiff's illness. *Id.*

Thus, the decision in *Moeller* is based on a misreading of Kentucky law. In any event, that case does not establish a uniform, national rule that exposure to asbestos from other manufacturers' products will exonerate Garlock from liability for exposures to Garlock's products. It is hornbook law that if a defendant's conduct was a substantial factor in causing plaintiff's injury, "he will not be absolved from liability merely because other causes have contributed to the result." Prosser & Keeton on Torts § 41 (5th ed. 1984). As the court said in *Eagle-Picher Indus., Inc.*, 604 A.2d at 459, "no supplier enjoys a causation defense solely on the ground that the plaintiff would probably have suffered the same disease from inhaling fibers originating from the products of other suppliers." *See also Mavroudis v. Pittsburgh-Corning*

---

[7] Indeed, Kentucky has an even less stringent causation standard than states such as California, Maryland and Illinois, as Kentucky courts have refused to adopt the frequency-regularity-proximity test on the ground that it "would infringe upon the mandate of the jury to determine causation." *Bailey,* 95 S.W.3d at 872. *See also Cardinal*, 2009 WL 562614, at *5.

*Corp.*, 935 P.2d 684, 689 (Wash. Ct. App. 1997) (same).   That is because substantial-factor

causation does not turn on comparative fault, but looks at "whether each contributing cause,

standing alone, is a substantial factor." *John Crane, Inc. v. Linkus*, 988 A.2d at 521 (citing

*ACandS, Inc. v. Asner,* 686 A.2d 250 (Md. 1996)).   *See also Tragarz*, 980 F.2d at 425 (Under

Illinois law, "the plaintiff's exposure to each defendant's product should be independently

evaluated when determining if such an exposure was a substantial factor in causing the plaintiff's

injury — meaning that evidence of an exposure to other manufacturer's products is not relevant

to such an inquiry.").   Indeed, in asbestos cases, it is impossible to establish which asbestos

fibers caused plaintiff's injury.   Thus, as the California Supreme Court has stated, "[a]sbestos

plaintiffs * * * are *not* required to identify the manufacturer of specific fibers that caused the

cancer" and do not need to demonstrate "that fibers from the defendant's particular product were

the ones, or among the ones, that *actually* produced the malignant growth." *Rutherford*, 941

P.2d at 1219.

Questions of causation are highly fact-intensive, and generally are not subject to

determination by summary judgment.   *See, e.g., Perry v. Novartis Pharms. Corp*., 564 F. Supp.

2d 452, 463-64 (E.D. Pa. 2008) (noting that in toxic tort cases, the issue of specific causation is

ultimately for the jury).   Rather, when a plaintiff in a mesothelioma case has presented evidence

of exposure to the defendant's asbestos-containing product, whether that exposure was a

substantial factor contributing to causing the disease usually presents a question of fact for the

jury.[8]   Thus, for example, Judge Robreno, who ran the federal asbestos multi-district litigation,

---

[8]   *See also* Restatement (Second) of Torts § 434(1)(a) (1965) ("It is the function of the court to
determine (a) whether the evidence as to the facts makes an issue upon which the jury may
reasonably differ as to whether the conduct of the defendant has been a substantial factor in
causing the harm to the plaintiff.").

regularly denied defendants' motions for summary judgment on causation issues where the plaintiff presented any evidence of exposure to asbestos from the defendant's products. *See, e.g.*, *Walker*, 2011 WL 4790626 (applying Maryland law, summary judgment denied where the plaintiff produced evidence through co-worker that he worked with defendant's products, that he was thereby exposed to asbestos, and that these products released asbestos fibers); *Dalton v. 3M Co.*, MDL 875, E.D. Pa. Civ. A. No. 2:10-64604, 2011 WL 5881011 (E.D. Pa. Aug. 2, 2011) (applying Mississippi law, denying summary judgment where plaintiff identified defendant's products as those he worked with and testified that he was exposed and breathed asbestos from these products on many occasions); *Hoffeditz v. AM Gen., LLC*, MDL 875, E.D. Pa. Civ. A. No. 2:09-70103, 2011 WL 5881003 (E.D. Pa. July 29, 2011) (applying Pennsylvania law, denying summary judgment where plaintiff testified that he worked with defendant's engines, and that when he removed gaskets from such engines dust was released, and that plaintiff also presented evidence that the defendant manufactured asbestos-containing engines during the period at issue).

State courts also regularly deny asbestos defendants' summary judgment motions on causation issues. For example, the Kentucky Court of Appeals in *Bailey v. NARCO* denied the defendant's motion for summary judgment, as there was evidence that the defendant's products were used at the plant where plaintiff worked, and plaintiff's expert opined that the plaintiff would have been exposed to the asbestos because it drifts and that such exposure was a substantial factor contributing to the plaintiff's illness. 95 S.W.3d 868. In *Berger v. Amchem Products,* Justice Freedman, who at the time oversaw the asbestos docket for New York, denied the defendant's motion for summary judgment where the plaintiffs had adduced expert testimony that chrysotile asbestos causes mesothelioma, that the defendant's products contained chrysotile,

and that the plaintiff was exposed to those products, finding that "there is sufficient empiric evidence to allow the jury to consider causation."  818 N.Y.S.2d 754, 761-62 (N.Y. Sup. Ct. 2006).  *See also, e.g.*, *Weakley v. Burnham Corp.,* 871 A.2d 1167, 1173 (D.C. 2005) (summary judgment on substantial-factor causation denied where plaintiff provided expert testimony that every exposure from boilers containing or covered with asbestos was a significant causative factor in development of asbestosis).

> 3.    *The Debtors' suggestion that this Court can conduct a "science trial" and conclusively resolve issues that remain subject to legitimate dispute in the tort system is not viable*

As part of their reorganization plan, the Debtors propose a "science-based estimation trial" at which they would demonstrate the level of asbestos exposure necessary to cause mesothelioma and the levels of "conceivable asbestos exposure" by workers in different occupations.  Estimation Mot. at 3-4.  The Debtors promise to demonstrate that "any conceivable asbestos fiber release through use of GST products was minuscule, and was dwarfed by asbestos fiber release thousands or tens of thousands of times greater from insulation and other dangerous friable products * * *."  *Id.* at 3.  The Debtors further suggest that they would attack certain contrary medical evidence under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See* Estimation Br. at 10.  The Debtors would have this Court rule in the estimation proceeding—for all claimants, for all jurisdictions, for all times—that its various defenses will always prevail, and that the claimants' positions are never meritorious.  It is the Debtors' stated position that chrysotile asbestos is not a potent carcinogen and that their products cannot emit dangerous amounts of asbestos.  These are not new contentions. The Debtors have asserted them throughout their decades in the tort system, and have paid $1.4 billion in indemnity to resolve plaintiffs' contentions to the contrary.  *See*

- 17 -

Information Brief of Garlock Sealing Technologies, LLC at 1-2, filed June 7, 2010 [Dkt. No. 24]. *See*, *e.g.*, EnPro 2002 10-K Form (March 18, 2003) at 16 ("We believe that Garlock and Anchor are in a favorable position compared to many other asbestos defendants because, among other things, the asbestos-containing products formerly sold by Garlock and Anchor were encapsulated") (Ex. 2).

For example, the defenses that Garlock products are encapsulated while other companies' products are friable and that chrysotile asbestos is less harmful than other forms of asbestos have long been central to the Debtors' tort defenses.  Sometimes these defenses convinced a court or jury.  Other times they did not.  For example, in a 1998 Maryland case, *Scribner v. AcandS*, No. 95284501 (Md. Cir. Ct. Nov. 25, 1998), Garlock both raised the "chrysotile defense" and argued that its products did not release enough fibers to cause disease.  The jury disagreed and rendered a substantial verdict against Garlock.  20 No. 21 Asbestos Litig. Rep. 3 (Dec. 4, 1998) (Ex. 3). Similarly, in the 2003 *Blanford* case in Ohio, Garlock raised the chrysotile and encapsulation defenses, but the jury nevertheless returned a large verdict against Garlock.  26 No. 2 Andrews Asbestos Litig. Rep. 3 (Dec. 4, 2003) (Ex. 4).  In short, these defenses are not magic bullets in the tort system.  This Court need not and cannot determine now the merits of these defenses for all time.

Far more often than concluding in success or failure at trial, however, claims were settled with these defenses in the mix of information available to the Debtors and plaintiffs when evaluating the value of the claims.  These defenses, therefore, are already reflected in the Debtors' claims resolution history.  Consequently, they will be embedded in any properly-conducted aggregate estimate based on that history.

In suggesting that they will have claims disallowed by invoking *Daubert*, the Debtors seem to be asserting that claimants could not produce any expert who would be permitted to testify that chrysotile asbestos causes disease, or that Garlock's products emit asbestos, or that the asbestos emitted by Garlock's products can contribute to causing disease. But the Debtors could not have expert testimony excluded under *Daubert* just because they disagree with the experts' conclusions. *Daubert* provides that a particular expert's testimony is admissible in a particular proceeding so long as the process or technique the expert used in formulating the opinion is relevant and reliable. *Daubert*, 509 U.S. at 589. The reliability inquiry is intended to be a flexible one, designed merely to serve as a threshold query for admissible evidence. *See id.* at 594. As the Supreme Court explained in *Daubert* itself, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 n.15 (3d Cir. 1994) ("The methodology/conclusion distinction remains of some import * * * to the extent that there will be cases in which a party argues that an expert's testimony is unreliable because the conclusions of an expert's study are different from those of other experts. In such cases, there is no basis for holding the expert's testimony inadmissible."). And the court "must err on the side of admission rather than exclusion." *Paoli R.R. Yard PCB Litig. v. Monsanto Co.*, 916 F.2d 829, 857 (3d Cir. 1990).

Garlock's and other defendants' challenges to expert testimony on these issues under *Daubert* (or under correlative state law standards) in the tort system have repeatedly been rejected. For example, in the recently concluded MDL proceedings, Judge Robreno denied a defendant's motion to preclude a plaintiff's expert from testifying about the level of exposure to asbestos needed to cause mesothelioma, stating "there is a bona fide debate within the scientific

community regarding what the threshold level is, and indeed, whether a numeric threshold can be ascertained at all. Simply, Dr. Maddox takes one position and Defendants' experts take another." Order Denying Defendants' Motion in Limine to Preclude Expert Testimony and Argument, *Schumacher v. Amtico*, No. 2:10-1627 (consol. in MDL No. 875) (E.D. Pa. Nov. 2, 2010) [Dkt. No. 143] (Ex. 5). *See also* Memorandum, *Larson v. Bondex Int'l*, No. 09-69123 (consol. in MDL No. 875) (E.D. Pa. Nov. 22, 2010) [Dkt. No. 85] (denying defendant's motions to exclude expert testimony that chrysotile asbestos causes mesothelioma) (Ex. 6); Information Brief of the Official Committee of Asbestos Personal Injury Claimants at 67-75 filed Aug. 30, 2010 [Dkt. No. 452] ("**ACC Info. Br.**"). There is no reason to expect that this Court could properly reach a different result in estimation. Like Debtors' other defenses, their position on the admissibility of medical evidence is "baked into" their claim resolution history and cannot be evaluated apart from that history on the estimation context.

Moreover, *Daubert* issues are decided on a case-by-case basis, not once and for all in some kind of mass proceeding. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court held that whether or not the factors identified in *Daubert* are pertinent for admitting expert testimony depends upon "the particular circumstances of the particular case at issue." *Kumho Tire*, 526 U.S. at 150; *see also id.* at 156 ("The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'") (citation omitted); *see In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 156 (3d Cir. 1999); *United States v. Llera Plaza*, 188 F. Supp. 2d 549, 564 (E.D. Pa. 2002). Of course, *Daubert* motions cannot be granted without permitting the proponent of the expert evidence an "adequate opportunity to defend its admissibility." *Cortes-Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997). *See also In re Paoli R.R.*, 35 F.3d at 739.

**B.**    **The Debtors' estimation process presupposes unlawful and unmanageable post-confirmation proceedings**

The Debtors assert that large numbers of claims would be dismissed on summary judgment in the mass allowance proceedings it would have this Court conduct post-confirmation. Lifting themselves up by their own bootstraps, Debtors would, before those proceedings occur, value those claims at zero in estimation and impose a low estimate as a "cap" on the funding available for claims channeled to a trust.  *See* Estimation Mot. at 1-2.  But the allowance procedures that the Debtors imagine producing mass dismissals would violate applicable rules and flout the due process rights of claimants.  They would also create a logjam of asbestos cases in this or other courts.

**1.**    ***The Debtors' post-confirmation process would deny claimants due process guaranteed by the Constitution and the Bankruptcy Rules***

The Bankruptcy Code and Rules of Bankruptcy Procedure provide asbestos personal injury claimants substantial rights and due process protections in any allowance process, whether before or (as the Debtors now propose) after confirmation.  A proof of claim filed in accordance with the Bankruptcy Rules is *prima facie* evidence of the claim's validity and amount, and a claim must be allowed unless the debtor files an objection under Rule 3007 that meets its burden of producing sufficient contrary evidence.  *See* 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f); *In re Harford Sands Inc.*, 372 F.3d 637, 640-41 (4th Cir. 2004); *KCH Servs. Inc. v. Nordam Grp, Inc.*, 345 B.R. 542, 548-49 (W.D.N.C. 2006).  The Bankruptcy Rules require that a proof of claim be no more than "a written statement setting forth a creditor's claim" that "conform[s] substantially to the appropriate Official Form." Fed. R. Bankr. P. 3001(a).  To negate the *prima facie* validity of a proof of claim, a debtor must produce "sufficient evidence" and the "mere filing of an objection does not satisfy this requirement."  *In re Smith*, 419 B.R. 622, 627-28

- 21 -

(Bankr. E.D. Va. 2008). If a debtor fails to meet this burden, "the debt is considered allowed." *In re Taylor*, 132 F.3d 256, 261 (5th Cir. 1998); *see also In re Pinnacle Brands, Inc.*, 259 B.R. 46, 50 (Bankr. D. Del. 2001). The Supreme Court made clear a century ago that debtors cannot defeat proofs of claim — or even require claimants to produce additional evidence — by unvarnished objection. *Whitney v. Dresser*, 200 U.S. 532, 535 (1906). Following *Whitney*, courts have repeatedly overruled objections and allowed claims based on proofs alone where debtors produced no specific evidence in rebuttal. *See, e.g.*, *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1040-41 (9th Cir. 2000).

If a debtor's objection meets its burden of controverting the proof of claim, a "contested matter" governed by Bankruptcy Rule 9014 begins. *In re Smith*, 419 B.R. at 627-28; 9 Allan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 3007.01[1], at 3007-3 (16th ed. 2009) ("**Collier**"). Although the burden of proof then shifts to the claimant to prove claim validity by a preponderance of the evidence, "a claim objection under Rule 3007(a) assumes a contest and the concomitant requirements of due process." 9 Collier ¶ 3007.01[2], at 3007-4. Rule 9014 mandates that "reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought," stating that various provisions of the Bankruptcy Rules "shall apply," including full discovery under Rule 7026 (the equivalent of Fed. R. Civ. P. 26), and Rules 7028-7037. *See* 10 Collier ¶ 9014. Thus, courts facing multiple tort claims in Chapter 11 bankruptcies routinely permit discovery before resolving any claim in allowance proceedings. *E.g.*, *In re. A.H. Robins Co.*, 59 B.R. 99, 105 (Bankr. E.D. Va. 1986).

The Bankruptcy Rules also strictly limit the use of "omnibus" objections. Rule 3007(c) provides that unless otherwise ordered by the Court or permitted by Rule 3007(d), objections to

more than one claim shall not be joined in a single objection.  Fed. R. Bankr. P. 3007(c).[9]  As the

Advisory Committee Notes explain, the rule's restrictions are designed "to ensure the protection

of the due process rights of the claimants."  Fed. R. Bankr. P. 3007 advisory committee's note,

2007 amendments.  Any discretion to permit omnibus objections left by the Rule is bounded by

these due process considerations.

Debtors' proposed post-confirmation procedures would violate these rights, and, indeed,

would turn the Bankruptcy Code on its head.  Without benefit of individual discovery, claimants

would have to present evidence of disease, occupation, industry, and exposure "sufficient to

withstand a motion for summary judgment."  Proposed Order Establishing Protocols for Post-

confirmation Allowance of Disputed GST Asbestos Claims at 2, filed Dec. 16, 2011 [Dkt. No.

1722-1] ("**Proposed Post-confirmation CMO**").  This evidence would be subjected to an

omnibus summary judgment motion.  *Id*. at 3.[10]  Only then would discovery be permitted — "if

any."  *Id*.  Claims that survived this gauntlet would then be subjected to mandatory mediation.

The entire process conceived by the Debtors is contrived to magnify the claimants' burdens and

costs and delay any recovery indefinitely, thus ratcheting down their values.  Bankruptcy is not

meant to be a litigation process skewed in favor of the defendants.

### 2.    *The post-confirmation process envisioned by the Debtors is unrealistic*

In addition to abridging claimants' rights, the post-confirmation procedures imagined by

the Debtors are simply unrealistic.  They would channel thousands of claims into this Court for

---

[9]    The exceptions listed in Rule 3007(d), such as disallowance for duplicate or incorrectly-filed
claims, do not apply here.

[10] The Proposed CMO is vague with respect to which court would adjudicate these summary
judgment motions. *E.g.*, Proposed Post-confirmation CMO at 3.  To the extent the Debtors
contemplate this Court disallowing claims, 28 U.S.C. § 157(b)(2)(B) would limit this Court to
issuing recommended decisions for *de novo* review in the District Court.

summary judgment proceedings.   Faced with a proposal similar to Garlock's, the court in
*Babcock and Wilcox* recognized the massive burdens of adjudicating thousands of summary
judgment motions and trials.  In a hearing on a proposed case management order, District Judge
Vance of the Eastern District of Louisiana flatly rejected B&W's contention that these claims
could somehow be consolidated and summarily dismissed, stating:

> But the issues are still individual issues.  If you are going to lump them all
> together and say, okay, these 160,000 may have an issue involving exposure —
> each one of those people has an issue as to exposure that has to be determined
> * * * Now, how can I do that except one at a time?

Hearing Transcript at 7-8, *In re Babcock & Wilcox.*, No. 00-558 (E.D. La. Jan. 25, 2002) [Dkt.
No. 122] (Ex. 7).

Judge Vance correctly recognized that the summary judgment motions would take
decades of the court's time, if they could be done at all.  "Suppose there's an issue of fact and
you lose that summary judgment motion," Judge Vance told the debtor, "[t]hat's not the end of it
because you have a backup summary judgment motion down the road because you have about
644,000 possible objections that could be made to these claims if I add all this stuff up."  *Id.* at
11.  In response to the debtor's remarkable contention that the court could dispose of 93,000
claims in three months, "depend[ing] on how fast you read the papers," Judge Vance pronounced
herself "awe-struck."  *Id.* at 12-14.  Toward the end of this colloquy, Judge Vance declared:

> *I think you want to totally undo the bankruptcy process*, and I just don't agree
> with your interpretation of how that works, that you can't have an estimation
> process that considers past history of how claims were settled, [that] to make an
> estimation * * * you have to have an individualized determination of every single
> claim.

*Id.* at 32 (emphasis added).

The Debtors' proposal of having this Bankruptcy Court preside over "omnibus" summary
judgment proceedings is, for the same reasons, entirely impractical.  Sending surviving claims to

trial in District Courts around the country would not materially diminish the burden.[11]  If Debtors

really wish to litigate all asbestos claims that would not be settled under their onerous

"Settlement Option," their legitimate course is to dismiss their Chapter 11 cases.

### 3.    If post-confirmation allowance proceedings were conducted with due process protections, the results would not differ from historical averages

As the Debtors' own history makes clear, the substantive issues they assume the

Bankruptcy Court would decide on summary judgment in post-confirmation allowance

proceedings entail triable questions of fact.  It follows that, unless the allowance proceedings the

Debtors propose were played out on a table tilted unfairly to Debtors' advantage, the Debtors

would wind up settling most claims on terms satisfactory to the claimants, rather than on the one-

sided basis of the plan's "Settlement Option" — just as they would have done had there been no

bankruptcy.

There is no reason to suppose that Debtors would enjoy greater success in challenges to

supposed "unreliable" scientific evidence of injury or causation under a proper post-petition

allowance process than it had in pre-petition litigation in the tort system.  Under the applicable

nonbankruptcy law of causation, a proper allowance process would not materially reduce

Debtors' liability by way of dismissals for lack of "necessary exposure" evidence or "reliable

evidence that Debtors' products or conduct caused the claimed disease."  Either the number of

dismissals on such grounds would not appreciably exceed those achieved in the tort system, or

else the costs of resolving the claims that withstood these tests would rise as prevailing plaintiffs

---

[11]    The Bankruptcy Court and District Court would have ample basis for abstaining as a matter of discretion from adjudicating the asbestos personal injury claims, the vast majority of which originate in state court and are governed by state law.  28 U.S.C. § 1334(c)(1).  *See, e.g., In re Caribbean Petroleum Corp.*, 443 B.R. 560, 569 (Bankr. D.P.R. 2010) (personal injury claims remanded to state court where "Defendants' desire to have the case tried in federal court is motivated, at least in part, by forum shopping.").

demanded higher compensation to take account of the higher litigation costs inflicted.   The resulting increase in settlement values would offset or exceed any gains from the higher dismissal rate.   Moreover, the rate at which pending and future claims would be dismissed on the basis of other defenses such as statutes of limitations cannot be assumed to exceed historical levels.

In short, to the extent that the Debtors' estimation approach assumes that the allowance process would produce results departing radically from historical trends, it could not produce legitimate or reliable results.   Their approach is not calculated to approximate the Debtors' aggregate liability, but to drive down that liability by misuse of the bankruptcy process.

**C.     The Debtors' authorities do not support its approach to estimation**

None of the Debtors' cited authorities support the estimation program that they seek to impose on the asbestos creditors, present and future.   They cite *In re USG Corp.*, 290 B.R. 223 (Bankr. D. Del. 2003), an asbestos bankruptcy case, to support their vision of an estimation trial where a debtor will be permitted to present its defenses, which "apply fully in estimation."   *See* Estimation Br. at 9-10.   But *USG* never actually reached the point of an estimation— that case was settled before such a proceeding got seriously underway, and therefore has little to say about how estimation should be conducted.

The Debtors also quote selectively from Judge Wolin's opinion.   For example, the Debtors assert that *USG* "held that '[d]ebtors may wish to attack certain medical evidence under Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharmaceuticals * * *.   They may wish to move for summary judgment on certain issues on a claims-wide consolidated basis pursuant to Federal Rule of Civil Procedure 42.'"   Estimation Br. at 10 (quoting *USG*, 290 B.R. at 227).   The Debtors leave out that portion of the opinion that states the *USG* court "will not

decide now the precise procedural device with which these defenses will be brought before the Court," and that "[t]he parties may be assured that the Court will entertain such applications [summary judgment] *only to the extent they do not interfere with the claimants' constitutional and legal rights as prescribed by law*." *USG*, 290 B.R. at 227 (emphasis added).

The Debtors' reliance on *In re A.H. Robins*, 880 F.2d 694 (4th Cir. 1989), is misplaced. The Debtors tell the Court that in *A.H. Robins*, "the Fourth Circuit upheld an aggregate estimation of tort claims that accounted for a 'considerable reduction from disallowance of claims,'" which "clearly indicates that the goal of estimation is to determine, efficiently and fairly, the aggregate number and amount of allowed claims against the debtor." Estimation Br. at 10.

But the Debtors fail to reveal an important difference between the *A.H. Robins* estimation and its own estimation program.  In *A.H. Robins*, the judge did not make a formal finding of A.H. Robins' liability for Dalkon Shield personal injury liability at the conclusion of the estimation hearing. Rather, in the manner of a mediator, the judge "announced" an aggregate liability number without explanation, a number that was subsequently voted on and approved by the majority of Dalkon Shield personal injury claimants with the support of the Claimants' Committee. *In re A.H. Robins, Co.*, 88 B.R. 742, 747 (E.D. Va. 1988), *aff'd*, 800 F.2d 694 (4th Cir. 1989); *see also* Richard B. Sobol, *Bending the Law* 197 (1991) ("Later, the Judge explained that his purpose had been to avoid the delay of an appeal and to focus the attention of the parties on reaching an agreement."). The disclosure statement with the aggregate liability number was sent with related materials (including a letter in support of the plan by the Claimants Committee) to the 195,000 Dalkon Shield claimants.  The judge specifically instructed the debtors to remove from the disclosure statement any reference to the court having "decided" the amount of the

aggregate liability and to substitute instead that the court had "stated" that $2.475 billion would be sufficient to pay the claims in full. *Id.* at 231. Over 140,000 votes were cast by the Dalkon Shield Personal Injury Claimants, of which 94.38% voted to accept the plan. *A.H. Robins*, 88 B.R. at 750. Notably, the Claimants Committee argued *in favor* of the plan at the confirmation hearing. *Bending the Law* at 245. Only after the favorable vote did the court "reconfirm its finding" that $2.475 billion would be sufficient to pay the claims in full. *A.H. Robins*, 88 B.R. at 750.

Here, the Debtors are not proposing that this Court operate as a kind of mediator to suggest an aggregate liability number that might be acceptable to all parties and survive a vote of the affected creditors. The Debtors instead seek to estimate large numbers of asbestos claims at zero, devaluing such claims completely and denying them even the opportunity to vote. *A.H. Robins* offers no support for such a program.

## II.   THE DEBTORS' AGGREGATE LIABILITY CAN BE ESTIMATED FAIRLY AND EFFICIENTLY

The proper goal of aggregate estimation is to determine what it would cost the Debtors to resolve present and future asbestos claims if they were not in bankruptcy. *See Owens Corning v. Credit Suisse Boston*, 322 B.R. 719, 722 (D. Del. 2005) ("claims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy"); *Federal-Mogul*, 330 B.R. at 158 (object is to determine "what a claim would have been worth but for the bankruptcy").

The only realistic assumption is that, outside of bankruptcy, the Debtors would continue to settle most asbestos claims brought against them, under conditions more or less resembling those that existed in the recent past. While there is legitimate room for debate as to whether or how foreseeable changes in those conditions would affect overall liability, the Debtors are not

entitled to escape their claims resolution history by imagining that in the future they will settle only those few (if any) mesothelioma claims that they admit to be meritorious. History leaves no doubt that such an assumption would be fanciful.

**A.**     **The resolutions achieved during the Debtors' long history of litigating asbestos cases provide the proper foundation for the estimate**

The Debtors' bankruptcy is the outgrowth of their several decades of asbestos litigation, which have generated a unique fund of statistical information covering resolutions across the full spectrum of claims, strong and weak. Precisely for that reason, the court in *Federal-Mogul* concluded, as have numerous other courts, that estimation should, therefore, focus on the debtor's historical "claims-handling practices, and expert testimony on trends and developments in the asbestos tort system." *Federal-Mogul*, 330 B.R. at 155-56. *See also, e.g., In re Armstrong World Indus., Inc.,* 348 B.R. 111, 123-26 (D. Del. 2006), *Owens Corning*, 322 B.R. at 721-25, *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 690-92 (Bankr. S.D. Ohio 1995). As the *Federal-Mogul* court observed:

> [A]ttempt[ing] an estimation without utilizing information known about these debtors and their history in the handling of claims which have been asserted against them in the past, and their disposition, is to ignore a valuable resource. From the database it is possible to associate with each claim characteristics such as occupation of the claimant, nature of the disease, the amount which was paid to the claimant, as well as a number of other factors. Because much of the same information is known about the unpaid, pre-petition claims (pending claims), though, or course, not the settlement amount, it is possible to ascertain with some degree of accuracy what the settlement figures for those claims would be had they been resolved pre-petition.

*Federal-Mogul*, 330 B.R. at 157, citing *Eagle-Picher*, 189 B.R. at 686. This Court should, for the same reasons, rely on the Debtors' claims resolution history as the starting point for estimation.

**B.** **Using the Debtors' own claims resolution history is appropriate and consistent with Rule 408**

Like other asbestos defendants, the Debtors resolved the bulk of the claims against them before trial. Evidence confirms that the Debtors settled asbestos claims only when they considered the settlement demands reasonable. David Glaspy, one of the Debtors' lead defense attorneys, testified to that effect last March:

> Q.    As a seasoned defense attorney, you recognized, didn't you, that Garlock had good and sufficient reason to settle its cases?
>
> A.    Yes, the risk of trial.

Hr'g Tr. 88:6-9, March 3, 2011 (Ex. 8). *See also* EnPro 2002 10-K at 17 ("When a settlement demand is not reasonable given the totality of circumstances, Garlock generally will try the case") (Ex. 2).

When the Debtors settled a claim, they incurred a legal liability, enforceable under applicable state law, to pay the settlement amount.[12] Had they not sought bankruptcy protection, it must reasonably be assumed that the Debtors would have continued to settle claims, converting disputed tort claims into contract claims to pay money. For aggregate estimation to be based on a different assumption would be unrealistic, and it is therefore perfectly appropriate to use

---

[12]    *See, e.g.*, *Clayton v. Ameriquest Mortg. Co.*, No. 1:02CV415, 2004 WL 734978, at *3 (M.D.N.C. Apr. 5, 2004), *aff'd*, 117 F. App'x 301 (4th Cir. 2004) ("A settlement agreement is a contract, and therefore exists once offer, acceptance, and consideration are exchanged between the parties * * *.]"); *Kemnitz v. Trans World Airlines, Inc.*, 131 F.3d 131, at *1 (2d Cir. 1997) (table) ("A settlement is a contract, and once entered into is binding and conclusive.") (quotation omitted); *Simontacchi v. Invensys, Inc.*, Civil No. 3:05CV283, 2009 WL 426466, at *8 (W.D.N.C. Feb. 19, 2009) (citation and quotations omitted) ("Whether denominated accord and satisfaction or compromise and settlement, the executed agreement terminating or purporting to terminate a controversy is a contract, to be interpreted and tested by established rules relating to contracts."); *Ada Liss Group (2003) v. Sara Lee Corp.*, No. 1:06CV610, 2009 WL 3241821, at *14 (M.D.N.C. Sept. 30, 2009) ("It is further well settled that a release or a settlement agreement is a contract, to be interpreted according to established rules governing contracts.").

historical settlement values for claims resolved close to the bankruptcy filing date as the starting

point for estimating the amounts that the Debtors would have paid on pending and future claims.

All courts that have completed aggregate estimation in asbestos bankruptcies have proceeded in

this way. *See, e.g., Armstrong,* 348 B.R. at 123-24; *Owens Corning,* 322 B.R. at 721-25;

*Federal-Mogul,* 330 B.R. at 155-57; *In re Babcock & Wilcox,* 274 B.R. 230, 256-57 (Bankr. E.D.

La. 2002); *In re Nat'l Gypsum,* 257 B.R. 184, 197-99 (Bankr. N.D. Tex. 2000); *Eagle-Picher,*

189 B.R. at 686-92.[13]

The Debtors contend that Federal Rule of Evidence 408 would preclude introduction of

Garlock's settlement data at estimation.  Estimation Mot. at 4-5.  This argument is frivolous.

Rule 408 provides:

> (a) **Prohibited Uses**.  Evidence of the following is not admissible – on
> behalf of any party – either ***to prove or disprove the validity or
> amount*** of a disputed claim or to impeach by a prior inconsistent
> statement or a contradiction:
>
>> (1) Furnishing, promising, or offering– or accepting, promising to
>> accept, or offering to accept – a valuable consideration in
>> compromising or attempting to compromise the claim; and
>
>> (2) conduct or statement made during compromise negotiations
>> about the claim – [inapplicable examples omitted]
>
> (b) **Exceptions**.  The court may admit this evidence for another purpose,
> [inapplicable examples omitted], such as proving a witness's bias or
> prejudice, negating a contention of undue delay, or proving an effort to
> obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408 (examples omitted, emphasis added).

---

[13] Debtors' argument that estimation should determine their "legal liability," as distinct from
the aggregate cost of resolutions, is unavailing.  A court cannot determine "legal liability" for a
disputed unliquidated tort claim without actually adjudicating the claim in a manner dispositive
of the claimants' rights.  A tortfeasor, however, can determine its own "legal liability" by
entering into settlements, thus converting disputed unliquidated tort claims into liquidated
financial obligations by contract.

As Judge Mehrige observed in *A.H. Robins*, "Rule 408 aims to foster settlement discussions in an *individual lawsuit*, and therefore insulates the *particular parties* to a settlement discussion from possible adverse consequences of their frank and open statement." *In re A.H. Robins Co.,* 197 B.R. 568, 572 (E.D. Va. 1994) (emphasis added). The Rule is intended to "foster frank discussions," *Fiberglass Insulators, Inc. v. Dupuy,* 856 F.2d 652, 654 (4th Cir. 1988), by preventing litigants from introducing settlement negotiations to prove the liability or value of the very claim that was the subject of the settlement negotiations. The Fourth Circuit has instructed, however, that Rule 408 does not prevent a litigant from offering evidence regarding prior settlements "when he does not seek to show the validity or invalidity of the compromised claim." *Wyatt v. Security Inn Food & Beverage, Inc*., 819 F.2d 69, 71 (4th Cir. 1987). In *Wyatt*, the Fourth Circuit held that Rule 408 did not preclude the defendant in a discrimination suit from offering evidence of the existence and amount of a settlement in a previous discrimination suit.[14]  *See also Broadcourt Capital Corp. v. Summa Med. Corp.,* 972 F.2d 1183, 1194 (10th Cir. 1992) (finding evidence from prior settlement discussions admissible because it related to an entirely different claims from the claim that was the subject of the negotiations).

Courts can admit evidence of compromise negotiations even when the attempted settlement was made in the case at bar, if the evidence is offered for a purpose other than establishing liability or validity of the claim at issue. For example, in *Cohn v. Petsmart, Inc.,* 281 F.3d 837, 840 & n.3 (9th Cir. 2002), the court found that Rule 408 did not bar evidence of

---

[14]  The lower court in *Wyatt* had excluded the settlement evidence. The Fourth Circuit held that, although the evidence was not precluded by Rule 408, the defendant was not prejudiced by its exclusion. *Wyatt,* 819 F.2d at 71. Here, by contrast, prior settlement history is unquestionably the most probative evidence of the costs Garlock would incur to resolve similar claims in the future.

settlement negotiations "because this evidence was not offered to establish the amount of Petsmart's liability, but merely to indicate Cohn's assessment of the value of the trademark." And in *Vermande v. Hyundai Motor Am., Inc.,* 352 F. Supp. 2d 195, 202 (D. Conn. 2004), the court held that previous settlement offers in the case were admissible for the purposes of assessing the amount in controversy to determine jurisdiction. *See also* 2 Weinstein's, Federal Evidence § 408.08[1] ("Rule 408 does not require exclusion if the evidence is offered for some purpose other than proving liability for, the invalidity of, or the amount of a disputed claim.").

In the Debtors' chapter 11 cases, nothing in Rule 408 prohibits the admission of evidence concerning Garlock's settlement history of past asbestos claims for the purpose of this Court's better understanding of Garlock's liability on a different but similar set of claims — the unresolved pending and future claims. Indeed, such evidence has been admitted for precisely that purpose in all previous asbestos bankruptcy cases and bankruptcy adversary proceedings where the question arose. *See Armstrong,* 348 B.R. at 123-24; *Federal-Mogul,* 330 B.R. at 157; *Owens Corning,* 322 B.R. at 721-25; *Babcock & Wilcox,* 274 B.R. at 256-57; *Eagle-Picher*, 189 B.R. at 686. As the court in *Eagle-Picher* emphasized, the debtor's pre-petition settlement record is "a valuable experiential resource" for estimating the value of pending and future claims. *Eagle-Picher,* 189 B.R. at 686.[15]

In *Babcock & Wilcox,* the court flatly rejected the debtor's argument that Rule 408 prohibited admission of such evidence in a fraudulent transfer action arising in an asbestos bankruptcy, noting that Rule 408 prohibits evidence of settlements only when offered to "prove

---

[15] The Debtors' suggestion that these precedents were somehow inapplicable because the estimations were uncontested is incorrect. Each of these estimations was contested by parties able to raise the argument that Rule 408 prevented the use of settlement information for estimation purposes.

the validity or invalidity of the claim that is the subject of the compromise." *Babcock & Wilcox,* 274 B.R. at 256.  The court explained that, when "settlement negotiation and terms explain and are part of another dispute, however, they are often admitted to allow the trier of fact to understand the case" *Id.* (quotation omitted).  Thus, the court held, "in determining whether B&W's future estimation of tort liabilities was reasonable, [the court] can consider both settlement by B&W and other case histories against other asbestos defendants as part of the grounds for its decision." *Id.* at 256.  Refusing to admit the debtor's settlement history, the court noted, would be tantamount to closing "one's eyes to the realities that existed [prior to the bankruptcy filing]." *Id.*

Even if Rule 408 rendered settlement data inadmissible—which it plainly does not—the Federal Rules of Evidence would permit an expert to rely on that data to render an opinion.  Rule 703 provides that expert testimony based on facts or data that are not independently admissible may be introduced if the information relied upon is "of a type reasonably relied upon by experts in the particular field."  Fed. R. Evid. 703.  This rule "permit[s] experts to rely on inadmissible information in forming their opinions as long as the underlying information" is regularly and reasonably accepted or relied upon in the expert's field.  *S. Cent. Petroleum, Inc. v. Long Bros. Oil Co.,* 974 F.2d 1015, 1019 (8th Cir. 1992).

It is indisputable that evidence concerning Garlock's settlement criteria and settlement history is information of a type regularly and reasonably relied upon by experts in estimation of aggregate asbestos liability.  The testifying expert witnesses in every contested asbestos liability estimation case to date have relied heavily on the debtor's past claims resolution and settlement history and the company's settlement criteria as a basis for their estimates.  *See, e.g.*, *Armstrong*, 348 B.R. at 123-26; *Federal-Mogul*, 330 B.R. at 155-156; *Owens Corning*, 322 B.R. at 721-25;

*Babcock & Wilcox*, 274 B.R. at 256-57, 261-63; *Nat'l Gypsum*, 257 B.R. at 197-99; *Eagle-Picher*, 189 B.R. at 690-92.

This history-based estimation methodology is the standard in non-litigation contexts as well.  It has been used by corporations, asbestos bankruptcy trusts, risk managers, and insurance companies, as well as by courts.  It is widely employed by experts for financial reporting purposes by companies that face asbestos liabilities.  *See*, *e.g.*, Union Carbide Corp. 10-K form (Feb. 19, 2011) at 10 (asbestos liability estimate based on "historical asbestos claims and resolution activity") (Ex. 9); Meritor, Inc. 2011 10-K Form (Nov. 22, 2011) at 53 (forecast of cost of pending and future asbestos claims "based on historical data and certain assumption with respect to events that occur in the future") (Ex. 10).  The Debtors and their expert, Bates White, have themselves used the standard estimation method for purposes of financial reporting.  According to EnPro's 2004 10-K Form (March 14, 2005) at 28, Bates White was retained to "review Garlock's product history, historical claims information and settlement experience and to assist and advise in connection with the management of Garlock asbestos claims and our estimation of Garlock's liability for pending and reasonably estimable unasserted future asbestos claims." (Ex. 11).  Indeed, Charles Bates has admitted that he has for many years provided asbestos liability estimations for clients in a number of contexts, including for purposes of financial reporting, for insurance purposes and for bankruptcy purposes, by extrapolation from the particular entity's settlement history and without resorting to analysis of the merits of individual claims.[16]  Indisputably, experts may rely on the Debtors' resolution history when formulating their opinions in the aggregate estimation proceeding.

---

[16]  *See* Hr'g Tr. 775-76, Oct. 28, 2010 (Ex. 12).

### C.     Trends in the tort system can be taken into account

The standard methodology for aggregate estimation is not static, but a flexible method that can accommodate trends in the tort system.  It specifically permits "expert testimony on trends and developments in the asbestos tort system." *Federal-Mogul*, 330 B.R. at 155.  In that case, for example, the parties' experts made varying assumptions about the mathematical relationship –expressed in a "multiplier"– between the number of mesothelioma claims and the number of non-malignant claims that would exist in the future. *Id.* at 157.  The court was able, on the basis of expert testimony, to decide which it found most convincing. *Id.* at 159.  Here, likewise, the Debtors' and the claimant constituencies' experts have ample room for bringing to bear their perspective on any salient developments in the tort system.  For example, the claimant constituencies might point to the relatively late end to Garlock's production of asbestos-containing products compared with other defendants and assert that, in later years of the projection, a higher percentage of cases would be attributable to Garlock exposure.  For their part, the Debtors might seek to make adjustments to the mix of non-malignant versus mesothelioma cases that would be expected in future years.  Such adjustments, although requiring adequate foundation, can be accommodated in the standard aggregate estimation methodology.

As explained above, however, Debtors' idea that this estimation must entail a "science trial" is nonsensical.  The Court cannot properly accept or reject Garlock's defenses to asbestos claims in an estimation mode.  The Debtors have maintained the same defenses throughout most of their asbestos litigation history.  *See* section I.A.3, *supra*.  Those defenses have always been disputed in the tort system, and their strengths and weaknesses are built into the Debtors' settlement history.  While the Debtors can attempt to make the "science" issues and tort defenses

relevant to aggregate estimation through the expert testimony, the ultimate admissibility of those matters will depend on whether the opinions have a sound foundation and properly fit the issues relevant to aggregate estimation.

> **D.    Estimation under this standard methodology can be accomplished with just six months of discovery and preparation**

The focus and efficiency of the evidentiary hearing for aggregate estimation will benefit from limitations on the number of witnesses and the amount of trial time allotted to the two sides, namely, the Debtors and their parent on the one hand and the ACC and the FCR on the other hand. Previous estimation proceedings provide some guidance regarding the appropriate duration and scope of this proceeding. The estimation hearing in *Armstrong* took three days and involved eight live witnesses, principally experts. *Armstrong*, 348 B.R. at 114, 125. The estimation trial in *Federal-Mogul* took five days and involved approximately seven witnesses, and mostly experts. *Federal-Mogul*, 330 B.R. at 135. The estimation hearing in *Owens Corning* lasted six days and saw sixteen witnesses testify, twelve of whom were experts. *Id.* at 155-156. Here, an estimation hearing of similar duration and scope is appropriate. An overall limit of five days of testimony should suffice, dividing trial time equally between the two sides (Debtors and their parents on one hand and the ACC and FCR on the other) and permitting a maximum of five witnesses per side.

Considering the amount of information already on hand, fact discovery for aggregate estimation can and should be concluded within three months, especially if the Court adopts expedited procedures for resolving discovery disputes. During the period of fact discovery, the parties should endeavor to stipulate to the reasonable range of value to be ascribed to the businesses and assets of the estates. Opening reports by testifying experts should be filed one month after the fact discovery cut-off, with another six weeks allotted for reply reports.

- 37 -

(Whereas Drs. Bates, Peterson and Rabinovitz have presumably made substantial progress in

formulating their opinions in chief already, they will not be able to turn to reply reports until they

have one another's opening reports in hand).  To facilitate the joining of issue by the experts, an

early date should be set for preliminary identification of experts witnesses and anticipated

subject matters of their testimony.  Allowing two weeks for expert depositions, the parties should

be ready for trial after six months.

   Thus, a reasonably expeditious schedule for discovery and trial preparation would be

along the following lines:

| | |
|---|---|
| April 2 | Preliminary identification of expert witnesses in addition to Drs. Bates, Peterson and Rabinovitz and subject matters of such additional experts' testimony |
| April 30 | Fact discovery cutoff |
| May 3 | Opening reports by experts due |
| July 16 | Reply reports by experts due |
| August | Trial to commence on date convenient to the Court, concluding after a maximum of five trial days. |

## III.   A BAR DATE FOR MESOTHELIOMA VICTIMS IS UNNECESSARY AND WOULD CLASH WITH THE PURPOSES OF AGGREGATE ESTIMATION

   This Court has already ruled that it will not adjudicate the merits of any claim but will

instead estimate aggregate liability.  With that ruling, the Debtors' initial plan to disallow

asbestos claims and then estimate the remaining claims was off the table.  And with that ruling,

the rationale for a bar date as part of the estimation also went by the boards.  The Debtors,

however, still desired to disallow claims *en masse* and reap the benefit of disallowance in

estimation.  To accomplish this, they simply flipped estimation and allowance.  Instead of

disallowing first and then estimating the remaining claims, under the Debtors' new plan, this

Court would anticipate in estimation the post-confirmation mass disallowance of claims and indeed make rulings on some of the Debtors' key defenses. Allowance, however, would not actually take place until after confirmation of the plan.

Under the Debtors' new plan, one would think that, with allowance postponed, a bar date would not be necessary. But, curiously, the Debtors have not abandoned their quest for a bar date as part of estimation. Instead, they have articulated a new justification for a bar date, namely to "enforce" the Questionnaire order and seek additional discovery. These justifications are meritless, and, ultimately, pretextual. The Debtors' real purpose for joining all 5,800 Questionnaire recipients as parties to the estimation is to facilitate the mass disallowance of claims through the application of issue preclusion. By making all the claimants parties, the rulings on the Debtors' defenses that they would have this Court make in estimation would preclude those same claimants from relitigating those defenses in post-confirmation allowance proceedings. And –*voilà*– what this Court has already determined would not be an allowance proceeding becomes, effectively, precisely that. While this purpose for the bar date does not appear in the Debtors' latest moving papers—which instead allude only to mysterious and unnamed "other purposes," *e.g.*, Estimation Br. at 11— counsel for the Debtors briefly let this justification slip at a hearing in August. Hr'g Tr. 54:10-14, Aug. 25, 2011 ("[T]here is no such thing as an estimation trial where the creditors whose claims are being estimated are not a party. Indeed they wouldn't be bound by any such result and there would be no point in doing it.") (Ex. 13). The Court should not countenance this shifty end-run around its decision. The bar date should be denied.

A.    **The Debtors do not need a bar date to enforce the Questionnaire or to take more claimant discovery**

The Debtors' stated justification for imposing a bar date is their allegation of non-compliance with the Questionnaire.    *See* Bar Date Mot. at 2, Estimation Br. at 11.    This justification is meritless.    Seeking to justify a bar date, the Debtors have exaggerated non-compliance, making broad claims that they have subsequently had to retract.    For example, in their brief, the Debtors assert that "2500 of the 5,800 Questionnaire Claimants (43%) returned no Questionnaire."  Estimation Br. at 6.  Shortly thereafter, at a status conference before the Court, counsel for the Debtors admitted those figures were in fact wrong, and that their count was incomplete.  Hr'g Tr. 7:8-12, 8:13-17, Dec. 15, 2011 (Ex. 14).[17]  In reality, compliance with the Questionnaire has been substantial, generating far more information than Garlock can realistically use.  Perfect compliance is unnecessary since an adequate population has responded, creating a fund of information that the Debtors' experts can use for analysis and extrapolation, experts who have already conceded they can proceed with estimation with a sample.  Hr'g Tr. 169:2-170:19, Oct. 14, 2010 (Ex. 15).  The Debtors have also suggested that a bar date will permit them to issue additional discovery to still more groups of claimants, such as the "Dose Sample" discovery discussed above, without the need to trouble the Court.  Estimation Br. at 22. For the reasons reviewed above, such discovery serves no legitimate purpose in aggregate estimation.  *See* section I.A.1, *supra*.  *See also* Memorandum and Order, *In re Owens Corning*, No. 00-3837 (Bankr. D. Del. Nov. 22, 2004) (Ex. 16) (denying estimation discovery of medical records from non-malignant asbestos claimants where there was substantial evidence about

---

[17]  The mismatch between the scope of the proposed bar date, which encompasses all 5,800 recipients of the Questionnaire, and the stated rationale for the bar date — to enforce the Questionnaire against 43% of those individuals  — reveals its pretextual nature.

- 40 -

Owens Corning's history of dealing with non-malignant asbestos claims and the "conclusions drawn by experts have long been debated").  *Id.* at 1.

In fact, the Debtors' call for a bar date, blunderbuss enforcement proceedings, and further discovery are consistent with their overall strategy of protracting these cases to inflict costs on the asbestos constituency and to delay claimants' recoveries indefinitely.  Debtors have made no showing that they have used their own information resources with diligence.  Further investment of time and estate resources chasing the Questionnaire discovery would not be cost-effective for the purposes of aggregate estimation.  It is time to shift the focus from open-ended information-gathering to the preparation of expert opinions based on the information already known.

### B.    There is no other justification for a bar date in estimation

The Court has twice before rejected Garlock's bid for a bar date applicable to asbestos claims, and the same flaws that led the Court to reject those earlier efforts exist here.  As the Committee has previously asserted, there are numerous reasons why a bar date is inappropriate.[18]  Significantly, a bar date is neither required by law nor useful.  In large asbestos-driven bankruptcies such as these cases, pending asbestos claims at the petition date number in the thousands and upwards — too many to be dealt with together by one court at one time.  Moreover, thousands of additional claims arise continuously, and new claims will continue to arise well beyond the petition filing date.  In short, a bar date is impractical.  As Southern District of New York Chief Bankruptcy Judge Bernstein put it:

---

[18] *See* Memorandum of the Official Committee of Asbestos Personal Injury Claimants: (1) in Opposition to the Debtors' Motion for (A) Establishment of Asbestos Claims Bar Date, (B) Approval of Asbestos Proof of Claim Form, (C) Approval of Form and Manner of Notice, (D) Estimation of Asbestos Claims, and (E) Approval of Initial Case Management Schedule; and (2) In Further Support of Its Motion for Entry of a Scheduling Order for Plan Formulation Purposes filed Sept. 24, 2010 [Dkt. No. 548] (the "**Bar Date Opposition**").

> [T]he filing of a one page proof of claim, *see* Official Form no. 10, with minimal
> information and an exorbitant or unliquidated demand is not helpful.   The
> alternative, designing a claim form that calls for more detailed medical
> information about the nature and the severity of the claimant's impairment, is
> cumbersome and best postponed for submission to the post-confirmation trust.

*In re Quigley Co.,* 346 B.R. 647, 653 (Bankr. S.D.N.Y. 2006).

Accordingly, in virtually all asbestos bankruptcies, bar dates for asbestos personal injury claims have not been imposed, and asbestos claimants have not been required to file claims "because of the practical difficulties involved." *Id. See, e.g., In re Armstrong World Indus., Inc.*, No. 00-4471 (Bankr. D. Del.); *In re Combustion Eng'g, Inc.*, No. 03-10495 (Bankr. D. Del.); *In re Congoleum Corp.,* No. 03-51524 (Bankr. D.N.J.); *In re Federal-Mogul Global, Inc.*, No. 01-10578 (Bankr. D. Del.); *In re Global Indus. Techs., Inc.*, No. 02-21626 (Bankr. W.D. Pa.); *In re N. Am. Refractories Co.*, No. 02-20198 (Bankr. W.D. Pa.); *Owens Corning v. Credit Suisse First Boston (In re Owens Corning)*, Nos. 00-3837-3854 (Bankr. D. Del.); *In re Kaiser Aluminum Corp*, No. 02-10429 (Bankr. D. Del.); *In re Mid-Valley, Inc.*, No. 03-35592 (Bankr. W.D. Pa.); *In re JT Thorpe*, 02-14216 (Bankr. C.D. Cal.).   There is similarly no reason for a bar date in these cases.   Indeed, a bar date would seriously disserve the purposes of **aggregate** estimation by focusing the process too closely on the particulars of **individual** claims and claims-specific disputes. *Federal-Mogul*, 330 B.R. at 154

The authorities cited by the Debtors in support of a bar date are, for reasons explained in previous briefs and hearings, unpersuasive here.   In *USG*, a cancer-only bar date was ordered, *USG*, 290 B.R. at 227, but never actually imposed.   Rather, the asbestos claimants' committee and the debtors filed a consensual plan, which was subsequently confirmed.   *See* Findings of Fact and Conclusions of Law regarding Confirmation, *In re USG Corp.*, No. 01-2094 (Bankr. D. Del. June 15, 2006) [Dkt. No. 11687] (Ex. 17).   For the reasons discussed at length in the prior briefs and hearings, *In re W.R. Grace* provides an instructive **negative** example of why a bar date

- 42 -

should be avoided as cumbersome, counterproductive and, as Judge Fitzgerald came to recognize, "a nightmare."[19] *A.H. Robins*, a case in which estimation was at its core a mediated and ultimately consensual process, did have a bar date.  But as Dr. Mark Peterson explained during the Court's case administration hearings in October and November 2010, the information gathering process in that case was necessary because there was inadequate claims history for Dalkon Shield cases.  The Robins reorganization involved a diverse mix of claims, many of a sort that had never been evaluated or paid in the tort system.  Hr'g Tr. 349:18-350:5, Oct. 15, 2010 (Ex. 18).   In the present case, the Debtors have more than thirty years of experience litigating and resolving asbestos personal injury claims in the tort system, an entirely adequate claims history.  The parties and the Court should focus on that claims history and use it to conduct a prompt, efficient estimation.

---

[19]   Bar Date Opposition at 12 (quotations omitted).

## CONCLUSION

For the forgoing reasons, the Court should deny in part Debtors' motions for Estimation and deny outright their motion for a Bar Date.  Estimation of the Debtors' aggregate asbestos liability, with a view to determining whether the Debtors are solvent, should proceed according to the well-established methodology used in myriad other asbestos bankruptcies.

Dated:  January 12, 2012

**CAPLIN & DRYSDALE, CHARTERED**

By:  */s/ Trevor W. Swett III*
Trevor W. Swett III
(tswett@capdale.com)
James P. Wehner
(jwehner@capdale.com)
Jeanna Rickards Koski
(jkoski@capdale.com)
One Thomas Circle, N.W.
Washington, DC  20005
Telephone:  (202) 862-5000

Elihu Inselbuch
(einselbuch@capdale.com)
375 Park Avenue, 35th Floor
New York, NY  10152-3500

**MOON WRIGHT & HOUSTON, PLLC**

Travis W. Moon
(tmoon@mwhattorneys.com)
227 West Trade Street, Suite 1800
Charlotte, NC  28202
Telephone: (704) 944-6560

*Attorneys for the Official Committee of Asbestos
Personal Injury Claimants*