IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

---

In the matter of:                )
                                 )
GARLOCK SEALING TECHNOLOGIES, LLC,) No. 10-31607
et al.,                          ) Jointly Administered
                                 ) Charlotte, NC
     Debtors.                    ) Jan. 9, 2012, 11:00 a.m.

---

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GEORGE R. HODGES
UNITED STATES BANKRUPTCY JUDGE

---

APPEARANCES:

Garland S. Cassada
Jonathan C. Krisko
Richard C. Worf, Jr.
Robinson, Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246

John R. Miller, Jr.
Rayburn, Cooper & Durham, P.A.
227 West Trade Street, Suite 1200
Charlotte NC, 28202-1672

---

Electronic Recorder
Operator:                    Julia Adams

Transcriber:                 Patricia Basham
                             6411 Quail Ridge Drive
                             Bartlett, TN  38135
                             9O1-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

APPEARANCES:


Jonathan P. Guy (Telephonically)
Orrick, Herrington & Sutcliffe LLP
Columbia Center, 1152 15th Street, N.W.
Washington, DC

Travis W. Moon
Moon Wright & Houston, PLLC
227 West Trade Street
Suite 1800
Charlotte, NC 28202

Trevor W. Swett III
Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005

Joseph W. Grier, III
Grier Furr & Crisp, P.A.
101 North Tryon, Suite 1240
Charlotte, NC 28246

Daniel Clodfelter
Moore Van Allen PLLC
100 N. Tryon Street, Suite 4700
Charlotte, NC 28202-4003

3

1       (CALL TO ORDER)

2       THE COURT: Good morning.

3       COUNSEL: Good morning.

4       THE COURT: Have a seat.  I guess we ought to get

5   everybody's voices on the machine.  Why don't we start with Mr.

6   Grier and go across that way?

7       MR. GRIER: Your Honor, Joe Grier, FCR.  I think Mr.

8   Guy's on the phone, although I am not sure.

9       MR. GUY: I am, Your Honor.  Good morning.

10      THE COURT: Okay.  Good.

11      MR. SWETT: Good morning, Your Honor.  Ted Swett,

12  Caplin & Drysdale, with Tom Moon of Moon Wright and Houston,

13  for the committee of asbestos personal injury claimants.

14      MR. CASSADA: Good morning, Your Honor.  I am Garland

15  Cassada with the law firm of Robinson, Bradshaw & Hinson.  I

16  represent the debtors, and I am here today with Rich Worf and

17  Jon Krisko of our firm.  Thank you.

18      MR. MILLER: Good morning, Your Honor.  Jack Miller of

19  Rayburn, Cooper & Durham, on behalf of the debtors.

20      MR. CLODFELTER: Dan Clodfelter, Moore and Van Allen,

21  for Coltec Industries.

22      THE COURT: Okay.  So we have on the hearing about the

23  hearing.

24      MR. SWETT: May it please the court, we are here on the

25  committee's motion to adjust the schedule laid down by the

Garlock/1-9-12

4

1   debtors on the motion to compel further questionnaire

2   compliance that they have filed and noticed for hearing on

3   January 26th, with briefs due on January 23.

4        The committee proposes to meet those deadlines for

5   itself.  In order to address that motion as a matter of sound

6   case administration, we think it is ill-advised for reasons we

7   will fully brief on the 23rd.  But in the meantime, we think the

8   court would be prudent to lift the briefing deadline and limit

9   the scope of the hearing so as to obviate participation by

10  individual claimants and their lawyers, who are targeted by the

11  motion to compel, for reasons that I will develop in this

12  argument.

13       In short, we think that the constituents should have

14  no obligation to respond to the motion to compel unless and

15  until you decide that, as a matter of sound case

16  administration, it is necessary and appropriate to take the

17  rather sweeping action that Garlock is proposing to take

18  through its motion to compel; and it won't surprise you to

19  learn that we think that doesn't make sense and we hope to

20  persuade you on the 26th not to go there.

21       The debtors support their motions by some schedules,

22  some lists of people they say failed to comply adequately with

23  the questionnaire in one way or the other.  I am going to talk

24  a little bit about two categories, the category of persons that

25  they say didn't return any questionnaires and the category of

Garlock/1-9-12

5

1    persons that they say did not certify them.  We believe their

2    count on both scores is deeply flawed resulting in, without

3    consideration of any of the other issues that we will brief on

4    the 23rd, a very overbroad blunderbuss approach to what should

5    be narrow and tailored, if any, compliance measures with regard

6    to the questionnaire.

7         To us, this is a symptom that the debtors are

8    overeager to pick fights with the law firms who are the

9    mesothelioma claimants.  As we will sketch out on other

10   occasions and in other papers, the debtors seem intent on

11   turning the exercise of measuring or estimating the aggregate

12   asbestos liability for mesothelioma into an occasion to attack

13   the merits of the individual claims on an individual basis in

14   a way that we believe would destroy the purpose and efficiency

15   of the aggregate estimation and the way that we use that term

16   and that it is generally used in the asbestos bankruptcy case

17   law.

18        And the consequences of allowing or giving debtors

19   their discretion to go around the countryside chasing the

20   asbestos claimants' mesothelioma claimant questionnaire

21   respondents is to compound the expense and burden of what has

22   already been, as we will see, a very cumbersome exercise, the

23   costs of which are uncounted but which are undoubtedly vast.

24        Now, I would like to call attention to the fact that

25   the hearing date that the debtors noticed for their motion to

Garlock/1-9-12

1   compel is already chocked full with important matters for the

2   court to hear argument on as among the estate parties.  It is,

3   we think, a very bad idea to bring into that hearing the

4   hundreds of law firms or, at the very least, the scores of law

5   firms – I haven't counted them – implicated by the issues the

6   debtors have raised in their motion to compel.

7        We have important business to get to that day,

8   including the debtors' motion for estimation and its theory of

9   how that estimation should be focused and how it should

10  proceed.  When we brief that motion, you will see that we

11  certainly agree there must be an aggregate estimation but we

12  have profound differences that are going to bear the court's

13  careful consideration about the nature of that process and the

14  appropriate timetable.

15       The debtors have also noticed for hearing on the 26th

16  their third effort to obtain a bar date vis-a-vis mesothelioma

17  claimants.  In this case, targeted at persons who were served

18  with the questionnaire.  Their theory there is that the court

19  would have to impose such a bar date in order to be positioned

20  to take enforcement measures vis-a-vis the questionnaire,

21  making that motion somewhat at odds with the motion to compel

22  which in effect treats the questionnaire recipients as though

23  they were already parties and dispenses with what evidently the

24  debtors would treat as a minor procedural impediment the fact

25  that those people are not parties to the case, in hopes that

Garlock/1-9-12

7

1   Your Honor will then be persuaded to give the back of the hand

2   to some very substantial objections raised by the constituents,

3   many of whom responded to the questionnaires subject to

4   objections, pretty much the way the debtor has responded to

5   each and every set of discovery that we have issued in this

6   entire case.

7        And finally there is the disclosure statement hearing.

8   I wrote to Mr. Cassada, copying the court, to advise him that

9   we withdrew our suggestion that that not be heard that day and

10  that it be postponed indefinitely.  The legal representative

11  wisely prevailed upon us to go forward with that, and so we are

12  busily briefing the disclosure statement objections that are

13  due on the 19th of January for hearing on the 26th.

14       All of those are very important building blocks to the

15  administration of this case with respect to the central issue.

16  They need the court's full attention and we don't need to have

17  the courtroom full of individual counsel clamoring to be heard

18  on their problems with the questionnaire or the debtor

19  clamoring to be heard on why their feet should be held to the

20  fire.

21       So our suggestion is that you let the estate parties

22  argue threshold matters regarding the motion to compel on the

23  same date, the January 26, or if, as well may be the case, that

24  calendar is already overfull and time is not available that

25  day, then we have another hearing set for February 2nd and we

Garlock/1-9-12

8

1   can come back to do that.

2        But there are very good reasons to restrain the debtor

3   from the path that it says it wants to go down in the motion to

4   compel.  The stated premises and its sense of the extent and

5   significance of the compliance questions it raises are, we

6   think, overblown and not well-founded, and their counts

7   attempting to justify this motion are very far from accurate.

8        We were tipped to this matter by one of the committee

9   firms called our attention to the fact that they were listed in

10  connection with three claims on Exhibit 2 to the motion to

11  compel and two on Exhibit 4.  The ones on Exhibit 2 are those

12  who assertedly did not respond to the questionnaire .  Those on

13  Exhibit 4 are those who assertedly did not certify their

14  responses.  All five of these allegations turned out to be

15  wrong.  This is the Simon Eddins firm as it was formerly known,

16  now known as Simon-Greenstone.  Jeffrey Simon, you will recall

17  from last February when he took the stand and testified at one

18  of our hearings.

19       According to the debtors' Exhibit 2, the Simon-

20  Greenstone firm failed to submit questionnaires for somebody

21  named Hall, somebody named Kundra, K-U-N-D-R-A, and somebody

22  named Conut or Cenut.  I can't read my own writing.  In fact,

23  the firm did submit a response for Mr. Hall.  It forwarded Mr.

24  Kundra's questionnaire to a law firm by the name of Early that

25  submitted it and returned to Rust the questionnaire for Mr.

Garlock/1-9-12

9

1    Conut because the firm did not represent that person, and

2    called attention to these latter two matters in the letter

3    addressed to Rust of August 11, 2011, which we will come to.

4         So then turning to Exhibit 4 with regard to the

5    supposed non-certification of submitted questionnaires, we

6    learned that the debtor was asserting that that was the case

7    for a Mr. Dodgen and a Mr. Robovsky, again with respect to the

8    Simon Eddins firm, as it was then known.  In fact, the firm has

9    never heard of Mr. Dodgen and so advised Rust that it was

10   unable to complete the questionnaire for that individual and

11   did in fact certify a questionnaire submitted by the Simon Firm

12   for Mr. Robovsky.

13        The error rate with regard to that firm, in the

14   debtors' details, was a hundred percent.  This gave us some

15   concern and caused us to dig a little deeper.

16        So we focused first on the certification issue, and it

17   turned out that there were three hundred and six claimants

18   listed on Exhibit 4 as having uncertified questionnaire

19   responses.  Two hundred and forty-seven of those had to do, it

20   turned out, with paper submissions and the balance, on-line

21   submissions.

22        We were able to cull by computer through the paper

23   submissions which numbered two hundred and forty-seven and we

24   learned that, of that number, a hundred and sixty-six had in

25   fact certified the questionnaire, and I have copies of those

10

1    pages to demonstrate.  I'm going to mark this as ACC 110, if I

2    may hand it up to the court.

3          This represents the fruits of a computerized search of

4    the two hundred and forty-seven paper submissions that are

5    listed on Debtors' Exhibit 4 as uncertified and, as you will

6    see, we have just included the certification pages which are

7    uniformly signed, usually by the lawyers and on at least one

8    occasion by the client.

9          That degree of false positives in the debtors'

10   computation is, of course, of significant concern because it

11   suggests that they don't yet know what they have got.  And I am

12   not faulting them for that because it turns out that working

13   with these materials is very cumbersome, and it was only by

14   virtue of a rather sophisticated computer program that our

15   consultant has that we were able to do this work in the time

16   allowed.

17         We were advised that, for the two hundred and forty-

18   seven paper submissions wrongly listed in total on Debtors'

19   Exhibit 4, there were literally tens of thousands of pages of

20   attachments.  So grasping what is in there and what it means

21   and assessing the degree of compliance and the reasons for any

22   gaps is a significant undertaking and the debtors have chosen

23   to file this blunderbuss motion to compel before having

24   reasonable command over those details.

25         Now the overall response rate, as we will see in a

Garlock/1-9-12

11

1    minute, based upon current assessment which, as the last time,

2    I must caution is an analysis liable to evolve, is by, I think

3    their computations and ours, about sixty-eight percent if you

4    include some five hundred and sixty responses that the debtors

5    weren't aware of when it first raised issues concerning the

6    degree of compliance.  And that compares very favorably to the

7    extent to which the debtors were able to dismiss claims without

8    payment in the last five years before they came into the

9    bankruptcy court.

10           We have a higher response rate from the questionnaire

11   recipients with open mesothelioma claims than we would have

12   expected if the prepetition zero pay rate, as I will call it,

13   had held steady for that population that is sampled by the

14   questionnaire.

15           So by our likes, that appears to be a pretty robust

16   response but, whatever may ultimately be said about that, the

17   fact now is that the debtors do not have a good handle on the

18   materials that they have.  They have engaged, as far as we are

19   aware, in none of the informal consultation with their

20   discovery targets that courts these days expect and that we go

21   through every time we have any discovery of the debtors,

22   sometimes at great length.  And the result is a motion that, if

23   it goes unfettered, will bestir hundreds of law firms involving

24   thousands of claimants, many of whom it will turn out in the

25   end have complied adequately with the questionnaire, and that

Garlock/1-9-12

12

1    is ascertainable from the existing information.  It doesn't

2    require further queries.

3         Now, on stuff like certification, another point worth

4    mentioning is that, of the online submissions that the debtors

5    flag as uncertified, there are forty-six as they count them.

6    The law firms for those particular claimants submitted, in

7    total, four hundred and twenty-five online questionnaire

8    responses.  So that is just a little over ten percent that the

9    debtors say aren't signed, and they appear to be correct about

10   that but that implies nothing like a systematic ignoring of or

11   flouting of the certification requirement.

12        You have got firms on the list who submitted fifty-

13   four questionnaires, one of which isn't electronically signed;

14   another thirty-four questionnaires electronically submitted,

15   one not signed.  The pattern varies but nothing emerges that

16   suggests that the law firms are just thumbing their nose at the

17   certification requirements.  So some phone calls might well

18   clear up that problem to the extent it is a problem but, as far

19   as we are aware, that process hasn't gotten underway.

20        Now, another problem is that it turns out that the

21   population receiving the questionnaire is overbroad by a

22   certain light for the stated purpose of the exercise and, by

23   that, I mean it includes a lot of people who, according to the

24   debtors' own data, don't have mesothelioma or don't have open

25   claims as of the petition date and, therefore, quite arguably

Garlock/1-9-12

13

1    don't meet the criteria for needing to respond to the

2    questionnaire.

3         I am handing what I have marked as ACC Exhibit 111,

4    which is a composite of correspondence submitted by law firms

5    who have received questionnaires for people to Rust.  A glance

6    through it will give you an idea of some of the reasons why

7    some of the people for whom questionnaires were issued didn't

8    return them.

9         Cooney and Conway - by the way, these are all firms

10   associated with the committee in this composite exhibit.

11   Exhibit 111.1 is a letter from Cooney and Conway of October 26

12   advising Rust that a couple of people for whom that firm had

13   received questionnaires had closed cases and no pending claim

14   against Garlock.

15        The Kazan McClain firm, Exhibit 111.2 listed the

16   people for whom they were submitting completed questionnaires

17   and supporting documentation on disks; submitted another list

18   of people whom they were acknowledging, on the existing state

19   of their file, lack of product identification evidence vis-à-

20   vis Garlock; and two people for whom, in addition, they weren't

21   submitting responses because, in the one case, the claim was

22   resolved by Garlock in February '08 and then another resolved

23   by Anchor back in 1995.

24        And we have got the Simon Firm.  Here, we see by

25   letter of August 11 in Exhibit 111.3, the Simon Firm returning

Garlock/1-9-12

14

1  uncompleted questionnaires for Donald Conut and Ralph Dodgen

2  because they were not counsel for those persons.

3       111.4 is another Simon communication - all of these

4  are by Bradley Smith, the fellow there in charge of bankruptcy

5  cases - noting that for Mr. Paul, Richard Paul, Rust had sent

6  two questionnaires, each uniquely identified by a separate

7  number, and that the firm would only be completing one of

8  those, of course.  That communication went in on October 21,

9  2011, and similarly, on October 24, Mr. Smith advised Rust that

10  two claimants for whom his firm had received questionnaires

11  were not represented in the bankruptcy by his firm and that,

12  instead, they had forwarded those forms to the Early Lucarelli

13  firm for submission.

14       We have confirmed, and I have seen and can show

15  opposing counsel if they would like to see them, completed

16  questionnaires with attachments for those two individuals

17  submitted by the Early firm.

18       Exhibit 111.6 to eight are captioned "objections" that

19  the Simmons firm, Simmons Browder Gianaris Angelides & Barnerd,

20  submitted as part of their questionnaire responses.  These are

21  enclosures to the many, many questionnaires that they completed

22  and submitted, and these objections raise such matters as the

23  firm didn't want to be responding for people it does not

24  represent, in Exhibit 111.6; for people who have settled their

25  mesothelioma claims already with Garlock, as in exhibit 111.7.

Garlock/1-9-12

15

1    And, after all, freedom from the burdens of discovery is one of

2    the points of settlement, so it is easy to understand that

3    objection.  And, finally, they didn't want to be responding for

4    another list of persons not represented by that firm.

5         Let me make sure I don't have it duplicated, that

6    exhibit six and seven are different – I mean exhibit six and

7    eight.   Excuse me, Your Honor.   (Pause)   Yes, they are

8    different.

9         So that gives you a flavor – now, we are aware that

10   there was correspondence like this from law firms that are not

11   associated with the committee.   It does not appear that the

12   debtors have taken account of any of these.   We would call

13   these, in some sense, responses.   They alert Rust and the

14   debtors to reasons why completed questionnaires would not be

15   submitted for particular individuals, including some who are

16   acknowledging that they presently lack product identification

17   evidence against Garlock; some whose claims are no longer open

18   personal injury tort or wrongful death claims but settled,

19   contractual obligations to pay on the debtors' part, at least

20   according to the plaintiffs, and so on.

21        And in connection with the settled claims, or asserted

22   to be settled claims, the debtor has complained that they

23   didn't submit evidence of the settlement and it has no record

24   of it but what is lacking, at least as far as I am able to

25   discern, is any effort by the debtors to go to their local

Garlock/1-9-12

16

1    counsel and make serious inquiry as to whether any of the

2    people it was called to Rust's attention as being settled

3    claims, some of which presumably were already paid, some

4    perhaps not.  That hasn't happened.  And before they go

5    stirring the world to respond further to the questionnaire, it

6    seems that further particulars ought to be developed on that

7    score.  If it turns out that there is some issue about whether

8    or not claims are settled or whether or not the debtor will try

9    to  repudiate  or  reject  executory  settlements,  that's  a

10   subsidiary  set  of  issues  against  a  targeted  group  of

11   individuals who will have necessarily a process of its own and

12   shouldn't be folded into a blunderbuss motion to compel.

13        I  would  like  to  finally  show  an  exhibit  which  is

14   something we put together by way of a summary to illustrate

15   parts of moving counts of the overall response rate.  I have

16   marked this, Your Honor, as ACC 112.

17        This reflects that a total of five thousand, eight

18   hundred and thirteen questionnaires were sent out to law firms.

19   There seem to have been some duplicates, reducing the relevant

20   total by ten.  Some thirty-three seventy-nine by our count were

21   returned in the process.  The debtor may differ a little bit

22   with us on that.  I haven't attempted in connection with this

23   emergency motion to reconcile these figures to theirs, but I do

24   highlight  in  here  some  five  hundred  and  sixty-eight

25   questionnaires that evidently were submitted on disks have

Garlock/1-9-12

17

1    still not been processed and posted to the website, as I

2    understand it, that the experts are working with.  In any

3    event, that information doesn't appear to have been digested as

4    the debtors' motion itself seems to acknowledge in a footnote.

5    Leading to the conclusion that, based on this raw account,

6    sixty-eight percent of those requested to respond have done so,

7    and that compares to the payment rate by which, I mean, what

8    percentage of cases resolved in 2006 to 2010 were resolved by

9    payment as opposed to dismissal without payment in the relevant

10   period before bankruptcy, and that turns out to have been about

11   sixty-three point five percent according to the debtors'

12   database.

13       Now, when we come to argue the motion to compel on the

14   26th, we will endeavor to show that that is a very healthy

15   response rate that adequately serves any sensible purpose in

16   connection with aggregate estimation.  But passing that

17   question, I would like to note that the actual response rate is

18   likely to prove even higher once one takes account of the fact

19   that many of the people requested to respond, according to the

20   debtors' own database, don't have open claims or don't have

21   mesothelioma claims.

22       Here again, I am not faulting the debtors for this

23   count because they were permitted to serve the questionnaire

24   seeking open mesothelioma claims as of two different dates.

25   Their old prepetition database from June 2010 and their

Garlock/1-9-12

18

1    updated, rolled forward database took into account additional

2    information in May 2011.  But the result was a lot of false

3    positives and, when we talk about the goals of the

4    questionnaire in eliciting the discovery requested from persons

5    who in fact hold open mesothelioma claims against the debtor

6    for personal injury, tort or wrongful death, the response rate

7    will be somewhat higher than sixty-eight percent and therefore

8    in our submission will prove to be even more adequate for the

9    legitimate purposes of aggregate estimation.

10          I have not taken the trouble, Your Honor, in this

11   posture to go through these problems by way of underscoring

12   that there are very significant issues concerning the

13   reasonableness of an effort to corral all of the questionnaire

14   recipients into a compulsory questionnaire compliance process

15   at this stage, given the cumbersomeness of the information, the

16   difficulties that both sides are having in getting their arms

17   squarely around the information at hand, and the apparent

18   robust nature of the responses from our point of view and the

19   vast amount of evidence in the form of attachments that the

20   questionnaire has already called for.  We would like to be

21   fully heard on those issues on the 26th before and we hope

22   instead of allowing the word to go out to the world to come in

23   and argue their specific questionnaire issues in front of you

24   on the 26th, or ever, and for that purpose we have submitted a

25   proposed order that would call upon the debtor to promptly

Garlock/1-9-12

19

1    notice the same people served with the motion to compel that

2    their response deadline is suspended pending further order and

3    limiting the scope of the January 26th hearing accordingly.

4            Thank you, Judge.

5            THE COURT: Before you start, Mr. Cassada, let me run

6    out and cancel something right quick.  I will be back in about

7    two or three minutes.

8            (Recess from 11:30 a.m. until 11:32 a.m.)

9            THE  COURT:  Have  a  seat.    I  am  sorry  for  that

10   interruption.

11           Mr. Cassada.

12           MR. CASSADA: Thank you, Your Honor.

13           Your  Honor,  I  want  to  begin  by  commenting  on  the

14   illustrative exhibit that Mr. Swett handed up, and I want to

15   point out that the exhibit is not really a fair representation

16   of the responses.

17           First,  Your  Honor,  of  the  total  responses,  as  you

18   heard from Mr. Swett, the three thousand, nine hundred and

19   forty-seven, a substantial number of those include the eight

20   hundred and fifty-four persons that he talked about who the

21   debtors have concluded did not have open mesothelioma claims.

22   So those who responded, a substantial number did so by saying

23   they don't have claims.

24           And just to remind the court about how that happened,

25   we had moved the court to require that questionnaires only go

Garlock/1-9-12

20

1    to five thousand or so claimants who the debtors believed had

2    open claims because the debtors post-petition had amended their

3    database and it was the committee that insisted that we serve

4    those eight hundred and fifty-four persons, perhaps disputing

5    whether they had claims at all.

6           So when we look at the total response rate, we see

7    three thousand, nine hundred and forty-seven.  A substantial

8    portion, as we understand, of eight hundred and fifty-four are

9    included in that number and then also included in that number

10   are forty percent of those claimants who properly objected, who

11   filed their objections in the proper way required by the court

12   and did not provide information required.

13          In addition to that, we have a substantial number of

14   claimants  as  of  yet,  the  number  not  yet  identified  but

15   substantial as shown by a review of the committee's personal

16   injury questionnaires, who raised no objections but did not

17   provide information required.  So the suggestion that there has

18   been a robust response we believe is completely wrong.

19          Your Honor, the committee essentially wants the court

20   to excuse objecting and noncomplying questionnaire claimants

21   from  having  to  respond  to  the  debtors'  motion  to  compel

22   compliance so the committee can first argue that objecting

23   claimants should not have to answer the questionnaire in the

24   first instance.

25          Now this is precisely the litigation that took several

Garlock/1-9-12

21

1   months last fall when the committee argued that the court

2   should hear objections to the questionnaire in two stages.

3   First the committee and the futures representative should have

4   a chance to review the questionnaire and object to it and to be

5   heard on that and that the court should enter an order on those

6   questionnaires.  And the committee asked the court to excuse

7   claimants and claimants' law firms from objecting to the

8   questionnaires and require them to raise their objections in

9   the questionnaires when they responded, and the court agreed

10  with that procedure and we did so.

11       So the committee has already raised its objections to

12  whether the information required in the questionnaire should be

13  required and whether it should be required of the entire class

14  of open mesothelioma claims.  The court has heard and ruled on

15  those issues.

16       The emergency motion violates the March 31 bench

17  ruling where you adopted the two-stage procedure set forth by

18  the committee and the futures representative.

19       So Your Honor, we are going today to urge the court to

20  deny the motion because it accomplishes nothing more than

21  delay, and we believe the time has come to enforce the

22  questionnaires so we can move forward expeditiously with the

23  case.

24       First of all, Your Honor, I want to talk about the

25  relief we seek because we seek modest relief at this stage.

Garlock/1-9-12

22

1    First, we want an order compelling claimants who did not return

2    a questionnaire to do so, and we have identified those

3    claimants by claim name and law firm.  We have attached them to

4    the motion and we have given notice.

5         In fact, the motion has in a sense worked the way that

6    you would expect a motion to compel discovery to work.  Some

7    law firms have contacted the debtors, and we have removed them

8    from the list because they have demonstrated that they – some

9    of them have demonstrated that they did file a questionnaire

10   and some of them have stated that they did not file a

11   questionnaire because their claimants do not have claims.  So

12   that is the way the process is supposed to work and, by filing

13   the motion, we have started that process.

14        But, in any event, it is going to be necessary for

15   this court to enter an order requiring that one-third or so of

16   the claimants who did not return any questionnaire at all to do

17   so.

18        Second, Your Honor, we have asked the court to rule on

19   the objections that have been properly raised in the

20   questionnaire.  We have likewise identified each of the

21   claimants who properly objected and have given each claimant

22   notice.  Now the court ordered in the questionnaire order and

23   in the questionnaire form itself that all objections be set

24   forth on Exhibit 2 to the questionnaire.  It specifically said

25   don't attach your objections to the questionnaire.  So we have

Garlock/1-9-12

23

1      given notice to all of the claimants who have properly

2      objected, and there may be some objections that are attached

3      and we will certainly deal with those objections, as well, but

4      those objections are identical, in our observation, to the

5      objections that appear on Exhibit 2, and we have served notice

6      of the opportunity for all claimants to come in and to sustain

7      their objection.

8           Now, third, and finally, Your Honor, we have asked the

9      court to set forth procedures that contain appropriate

10     sanctions that ensure compliance.  Now, Mr. Swett calls this

11     sweeping action that is unprecedented and unnecessary, but this

12     is precisely the type of relief that Your Honor held that we

13     should seek in your March 31, 2011, bench ruling and, in doing

14     so, the court adopted the procedure suggested by the committee.

15     Your Honor, we are not picking fights; we are moving forward in

16     the case so that we can get to a resolution.

17          Mr. Swett talked about how some of the claimants had

18     objected on the basis that they had settlements.  Now, there

19     are some claims who said they have settlements.  We have no

20     record of the settlement, and these are not claimants who are

21     saying we don't have a claim because we settled with you and

22     resolved our claim a while ago.  These are claimants who are

23     saying we have a settlement and you owe us money on the

24     settlement, and we have no record of that.  And we have checked

25     our files, we have checked with local counsel.  There is no

Garlock/1-9-12

24

1    record of these settlements and, in our motion, we will ask the

2    court to require any claimant in the database who asserts they

3    have a settlement to produce a copy of the basis, to describe

4    the basis for the settlement and produce a copy of a settlement

5    agreement.

6        Your Honor, in considering the committee's motion

7    today, we believe a short history of the questionnaire order is

8    in order and it will put the committee's motion in the proper

9    perspective.

10       Your Honor may recall that the questionnaire itself

11   was the product of months of litigation.  The committee and the

12   FCR participated in the formulation of the questionnaire and

13   the questionnaire process.

14       There was one point early on, Your Honor, when the

15   court had indicated that it would follow a different two-stage

16   process and that is to first hear objections from the committee

17   and the futures representative and then, before issuing the

18   questionnaire, it will hear individual objections.  So we had

19   individual law firms who were participating.

20       Now, the committee, in particular, raised numerous

21   objections to the form and content of the questionnaire.  In

22   the first place, the committee opposed the questionnaire

23   altogether and the committee argued that the information sought

24   was unnecessary and exceeded the appropriate scope of the

25   committee's vision of a proper aggregate estimation proceeding,

Garlock/1-9-12

25

1    precisely the argument that you heard Mr. Swett say he wants to

2    make later this month.

3          Now, on June 21, the court approved the questionnaire.

4    The court disagreed and overruled the committee's objections,

5    at least as they related to the final information required in

6    the questionnaire.  The court granted some of the committee's

7    objections  and  denied  our  request  to  require  claimants  to

8    provide certain other information.  But the questionnaire that

9    was  approved  reflects  the  court's  rulings  on  the  committee's

10   objections.

11         Now prior to the June 21 approval, there was a dispute

12   over  when  claimants  would  have  to  lodge  their  objections.

13   Remember that the debtors served a questionnaire motion on all

14   fifty-eight hundred persons with open claims and argued all of

15   their objections should be heard up-front.  We argued that this

16   process would allow the process of gathering information to be

17   completed  most  expeditiously,  and  this  was  precisely  the

18   procedure followed in the *Bondex* case and, as the court knows,

19   the *Bondex* questionnaire was approved after Judge Fitzgerald

20   heard and ruled on claimants' objections.  And it turned out

21   there was not chaos.  There were several law firms who appeared

22   to raise objections for the class of creditors.

23         The committee and the FCR urged the court to follow a

24   different two-stage process.  They wanted the court to excuse

25   individual claimants from participating in the formulation of

Garlock/1-9-12

26

1    the questionnaire and the PIQ process and they moved to order

2    that individual claim objections would be preserved and that

3    claimants would be allowed to raise objections when they

4    returned their questionnaire responses.   And the committee

5    argued that the court should hear claimants' objections in,

6    quote, omnibus proceedings after the response deadline.

7          Now, again, the debtors objected.  We argued that the

8    process proposed by the committee would be cumbersome, time-

9    consuming and could lead to litigation chaos.

10         The committee responded insisting that omnibus

11   procedures after responses was the proper way to proceed and

12   even mentioned that it would cooperate in omnibus proceedings.

13   A quote from the committee's argument:

14         "When you seek discovery from five thousand, five

15         hundred people at the level that the debtor is

16         seeking, there are going to be problems of compliance

17         and we are just going to have to deal with them, but

18         there should be no fear about that.  Courts are, by

19         now, quite used to omnibus procedures or orchestrating

20         concerted resolutions of sets of objections like that,

21         and we can certainly cooperate in some process like

22         that here."

23         And the committee accused the debtors of fear

24   mongering by suggesting that the committee's proposed procedure

25   of delaying consideration of objections to subsequent omnibus

Garlock/1-9-12

27

1    procedures could leave to chaos and delay.  And, in particular,

2    the committee said we can deal in due course with whatever

3    problems turn out to be and I think it is a little bit of

4    crying wolf to suggest that it is going to be a meltdown.

5         Now, that is a familiar word because the last time we

6    were here, the committee suggested that Garlock seeking to

7    compel compliance was going to lead to a, quote, litigation

8    meltdown.

9         Now, the court at the end of the day was convinced by

10    the committee's argument to postpone consideration of

11    claimants' objections until after they responded to the

12    questionnaire, and the court recognized that objections were

13    inevitable but you ruled, as proposed by the committee and the

14    FCR, that you were going to follow the two-part process and

15    that it was appropriate.  First, you would resolve the

16    questionnaire among the debtors, the committee and the FCR,

17    ruling on any objections that the committee and FCR had to the

18    form and content of the questionnaire proposed by the debtor.

19         Second, you ruled that claimants could object later in

20    their responses and that you would rule on such objections at

21    that time after giving claimants an opportunity to be heard.

22         Your Honor may recall that you opined that you had the

23    power to fashion remedies to ensure compliance.  Specifically

24    you stated:

25         "It may be as simple as just valuing those claims at

Garlock/1-9-12

28

1          zero or maybe some aggressive type of orders

2          contemplated by something like Rule 37 in order to try

3          to get compliance and, if we have absolute anarchy

4          break out, then we will deal with that as best we can

5          but I think we will not try to anticipate anarchy at

6          this point and hope for the best."

7          Thereafter, Your Honor, the court entertained and

8    ruled on the first stage objections raised by the committee and

9    FCR and approved the questionnaire in its current form.

10          Now, those objections included, we suspect, although

11   the committee hasn't actually given its reasons why the court

12   shouldn't hold the omnibus objection proceedings that it

13   suggested last spring, we believe, based on hints in a more

14   recent motion that they filed and what they said before, they

15   are going to raise the same arguments that they did, that it is

16   going to be time-consuming, it is going to be expensive, it is

17   going to lead to a meltdown, it is going to be disputatious.

18   I think that's another word we have heard. So we are going to

19   rehash everything that we have already been through.

20          Your Honor, as it turned out, the Garlock

21   questionnaire looked almost identical to the *Bondex*

22   questionnaire where the same law firms appeared and where

23   claimants objected up-front and where the court heard and ruled

24   on those objections.

25          So the current situation is that the questionnaire

Garlock/1-9-12

29

1    response date has now passed and, as everyone predicted, we

2    have numerous objections and, by our motion, we request that

3    the court, under procedures proposed by the committee and

4    contemplated by your previous order, proceed to the second

5    stage of the committee's two-stage process and hear and rule on

6    claimants' objections and set forth a procedure for enforcing

7    compliance.  Nothing has changed.

8         But now the committee objects to its own two-stage

9    procedure and it wishes to introduce a third stage.  It wants

10   to delay the second stage while it argues for a second time

11   that objecting creditors should not have to respond to the

12   approved questionnaire in the first instance.  Again, we have

13   already heard those arguments.

14        This emergency relief, it will accomplish nothing but

15   delay, to give the committee a second bite at the apple, and

16   none of the reasons that we have heard it offer – we really

17   haven't heard much – has any merit.  Again, most of it has

18   already been heard.

19        First, the argument that the questionnaire seeks

20   information that exceeds the appropriate scope of aggregate

21   estimation proceeding, the court already ruled on this point

22   and required every questionnaire claimant, not a sample,

23   particularly not a sample chosen by the law firms, to complete

24   and return the approved questionnaire.

25        Second, the committee argues that compelling

Garlock/1-9-12

30

1    compliance by claimants who object is unnecessary because the

2    information the debtors receive from claimants who did not

3    object provides more than sufficient information to estimate

4    the allowed amounts of all disputed claims.  This is wrong for

5    at least two reasons.

6         First, it is inconceivable that a representative

7    sample can be created by permitting plaintiffs' law firms to

8    decide which claimants opt into the questionnaire process and

9    which opt out.  If the questionnaire claimants and the

10   committee have the right to control the evidence upon which

11   estimation is based, the whole process will lack legitimacy.

12   Compliance with your questionnaire order provides the only way

13   to generate a fair body of data for estimating the allowed

14   amounts of claims.

15        To try to project the facts from the claimants who

16   responded onto those who did not cannot be done.  Indeed, the

17   only proper inference is that those claimants who did not

18   respond or refused to provide information lack allowed claims.

19   Mr. Swett has as much as admitted that today, suggesting that

20   we should just assume that people who didn't return

21   questionnaires don't have claims that would be paid.  And

22   enforcing the questionnaire, our way at least gives these

23   claimants a second chance to provide information before that

24   inference is drawn.

25        Second, for the committee to prove that the debtors

Garlock/1-9-12

31

1   have enough information, there would have to be an analysis of

2   the questionnaires, expert testimony and satellite litigation

3   to determine that the body of information is representative.

4   Particularly in the face of the commonsense conclusion that

5   it's not, that makes no sense at all.  Such a determination

6   would take months, if not a year or more, to complete.

7        The court has already ordered all questionnaire

8   claimants to complete the questionnaire and the fact that some

9   law firms, including most of the committee, chose to object has

10  no basis – it's no basis to start a new litigation to determine

11  whether to amend the questionnaire order to excuse objecting

12  claimants from compliance.  That's exactly what the committee

13  wants to do.

14       The committee complains that the debtors have not

15  identified which claimants raise objections but that's not

16  true.  We have been very specific in the exhibits.  Now the

17  committee points to examples where there may be inaccuracy in

18  those exhibits and the process that we have begun will work, we

19  think, efficiently and reliably to identify which claimants

20  have actually returned questionnaires contrary to what we have

21  said and which ones have certified.  And certainly at the end

22  of the day, Your Honor, we are not going to ask the court to

23  disallow any claimant who has actually complied with the

24  court's previous orders.

25       Exhibit 2 lists each claimant who didn't return a

Garlock/1-9-12

32

1    questionnaire.  Exhibit 3 lists each claimant who objected and

2    identifies the portion of the questionnaire to which each

3    claimant objected.  And, as the court said earlier, there will

4    be omnibus proceedings to rule on objections.  That has to take

5    place and it should take place now.

6           Finally, the committee has hinted that the omnibus

7    procedures it proposed last year will result in a litigation

8    meltdown.  That's what we heard the last time.  This is just

9    the opposite of what the committee argued when they argued that

10   the court should adopt a two-stage process.  Again, the

11   committee acknowledged that, quote:

12          "There will be problems of compliance and we are just

13          going to have to deal with them but there should be no

14          fear about that.  The courts are by now used to

15          omnibus procedures or orchestrating concerted

16          resolutions."

17           And the court says and we certainly – and we can

18   certainly cooperate in some process like that here.

19           So, Your Honor, the emergency motion should be denied.

20   The fact that there might be some claimants who are listed on

21   these schedules who are amended later is no reason to delay the

22   process of ruling on objections and completing the

23   questionnaire process.

24           The court has already heard the committee's objections

25   to the questionnaire.  The motion that we filed is not even

33

1    directed to the committee.  The committee has no ability to

2    bind the claimants.  It is time for the committee to do what it

3    said   it   would   do   and   to   recommend   compliance   with   the

4    constituents   and   for   this   court   to   hear   the   claimants'

5    objections so we can advance the case toward resolution.

6          MR.   SWETT:   If   I   may   briefly,   Your   Honor.   The

7    committee   is   playing   out   its   statutory   role,   which   is   a

8    constructive   one   in   the   case.   We   haven't,   in   fact,

9    proselytized among the constituents.  We have done our best to

10   make this questionnaire process, although our objections to it

11   were overruled, a constructive one.  And now we are attempting

12   to play the same role with respect to the issue of what, if

13   any,   compliance   procedures   should   be   undertaken,   what   the

14   timing of that should be and what the scope is.

15          No   one   is   surprised   by   the   fact   that   there   are

16   objections.   Of course the debtor has objected to virtually

17   every discovery request we have made of them throughout this

18   entire   case,   but   we   have   not   moved   on   anything   like

19   substantially all of those objections because that's not the

20   way constructive litigators work.

21          We have engaged in elaborate meet-and-confer processes

22   with them to try and narrow issues and, even where they have

23   stuck to their guns and not seen things our way, we haven't

24   brought   you   every   dispute.   We   tried   to   work   around   them

25   because otherwise we would spend all of our time haggling over

Garlock/1-9-12

34

1    discovery motions and you would be bogged down, too, and we

2    just don't think that's the way to go about it, and we are just

3    bringing that same philosophy to bear now from our committee

4    perspective on what makes sense from the standpoint of

5    administering this case.

6         Now, we are not saying now there should never be any

7    compliance measures taken with regard to the questionnaire.  We

8    don't know.  What we do know is that it is inappropriate to

9    send out a blunderbuss to the entire set of people listed on

10   the debtors' attachments, which we have already demonstrated

11   include a very high error rate, to inflict costs and time

12   burdens on those law firms whose main job in life is

13   representing sick and dying people to recover funds from

14   solvent defendants.  It is highly disruptive of their practices

15   and it doesn't serve the legitimate purposes of this case to

16   fire off a blunderbuss like that.

17        They now acknowledge that a process of informal

18   consultation with law firms has been constructive, but they

19   seem to think the onus is on the recipients of the

20   questionnaire to come to them and reach out to them and explain

21   their position and why they shouldn't be on the debtors' list.

22   They can as easily pick up the telephone.  They are used to

23   that.  They require us to do that, and they shouldn't move

24   under the local procedures until they have the meet-and-confers

25   and have narrowed the issues and gleaned as much as they can by

Garlock/1-9-12

35

1   way of satisfactory responses from that informal process

2   without burdening the court or the estate with litigation.

3        They say that individual claimants participated in or

4   through their counsel in the design of the questionnaire.

5   That's misleading.  Law firms associated with the committee,

6   not all but some, in their capacity as fiduciaries consulted

7   about that matter.  That's different than what happened in

8   *Bondex* when law firms appeared because the case took a

9   different direction, and I would argue that this one has been

10  a lot more efficient and a lot more productive than the *Bondex*

11  process, as witness the fact they got started a whole lot

12  sooner than we and we got our questionnaire responses in at

13  about the same time, and we are a lot further along toward

14  aggregate estimation by my likes than they are.

15       So there have been benefits to this process although

16  it involves the committee and the debtors disagreeing and

17  bumping heads.  Hopefully the results are a more productive,

18  efficient process, helpful to the court's task of estimating

19  the aggregate.

20       Our main point now is this motion is ill-designed for

21  the purposes of the questionnaire and of the aggregate

22  estimation.  We have profound differences with them.  You may

23  rule for them; you may rule for us; but there are things you

24  ought to consider here and rule on before you allow that motion

25  to compel to go out and cause a lot of Sturm und Drang among

Garlock/1-9-12

36

1     the constituency.

2          I am sorry the debtor regards our efforts as somehow

3     inconsistent with our past arguments.  I don't think they are.

4     We are continuing to try to play the role that we have played

5     from the outset, trying to bring to bear our perspective of

6     what makes sense.  We don't think their motion to compel makes

7     sense.

8          I should add that I don't think there's a chance in

9     the world that, if we had two hundred individual law firms in

10    this courtroom on the 26th, that any of them would actually be

11    heard that day because we have all of those other important

12    case administration motions to get through and because the

13    debtor isn't receiving under their own schedule the written

14    submissions of those law firms until the 23rd.  It hasn't

15    particularized its attack on any of their objections.  It has

16    just said you all come in here and submit a brief on your

17    objections and we will answer later.  It has given itself three

18    days.  There is no way it will brief those matters in any

19    sensible fashion in that period of time.

20         I think what happened is they lamented, regretted the

21    tact they took in the bar date motion and tried to see if they

22    could somehow leapfrog over that.  It won't work.  It's not a

23    sensible approach, and we hope that you will enter the order we

24    have submitted.

25         MR. GUY: Your Honor, it's Jonathan Guy for the FCR.

Garlock/1-9-12

37

1      May I be heard quickly if Mr. Swett is finished?

2            THE COURT: Yes.

3            MR. GUY: Your Honor, I will be very brief.  The issue

4      is not whether the motion to compel should be granted.  It's

5      simply whether the individuals have to respond first or whether

6      the ACC can respond and the court can hear those arguments.  We

7      believe that the motion should be granted.

8            The debtor has sought discovery of what is now

9      thousands of meso claimants.  It is efficient to have the

10     committee respond.  It is going to be incredibly cumbersome to

11     have hundreds of claimants in court.  I don't think the debtors

12     are even ready to respond to those individuals if they do.

13           To the extent the court hears these issues when they

14     are teed up by the debtors and by the ACC, it is going to

15     narrow issues.  It is going to save costs for everybody.  There

16     is evidence with regard to the questionnaire in the first

17     instance, the court ordered relief that the debtors sought

18     without the individuals having to appear, and I think the same

19     thing will happen this time around.

20           And in light of the various missteps that we have seen

21     with regard to the analysis of the questionnaire data, it seems

22     premature to require the individuals to respond.  And I agree

23     with Mr. Swett, it is practically impossible to consider

24     individual objections given that everything is set for the

25     calendar on the 26th.

Garlock/1-9-12

38

1            Thank you, Your Honor.

2            THE COURT: All right.  Well, I think we ought to have

3       a third-stage, if you want to call it that.  So I think what we

4       will do on the 26th is hear the motion, along with the

5       committee's objections, and I will determine what issues I can

6       based on that.

7            I will not overrule any individual's objections

8       without giving them a chance to be specifically heard, but

9       there may be some or all the relief that can be dealt with and

10      perhaps narrow the impact and narrow the scope of where we go

11      after that, and that we can do that with a separate setting if

12      that is necessary for that.

13           I think the order that the committee attached that I

14      read seemed to do that without going any further.  So I would

15      suggest that we just enter that order, and I think that

16      requires – I guess the debtor has the mailing list but to

17      notify people that they won't need to be here on the 26th.  You

18      will need to do that, I think.

19           We can, on that date, if there are further hearings

20      necessary, can set a date and time for those hearings to take

21      place.  Okay.

22           MR. SWETT: Thank you, Your Honor.

23           MR. CASSADA: Your Honor, could I have an opportunity

24      to look at the order?

25           THE COURT: Yes.  Look at that and, if you have serious

Garlock/1-9-12

39

1   problems with it, let me know and we can deal with that on the

2   telephone.  Okay.

3          Thank you all, and we will see you Thursday.

4          MR. SWETT: Thank you, Judge.  Should I collect the

5   exhibits?

6          MR. GUY: Thank you, Your Honor.

7          THE COURT: Do you need the exhibits?

8          COURTROOM DEPUTY: No, because they were not admitted.

9   They were just identified.

10          THE COURT: Well, I will admit them if you want.  They

11   ought to just be part of the record.

12          Thank you all.

13          (Off the record at 12:02 p.m.)

Garlock/1-9-12

40

C E R T I F I C A T E

      I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


       /s/ Patricia Basham
      Patricia Basham, Transcriber
      Date:  January 12, 2012

Garlock/1-9-12