**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC,[1] et al.<br><br><br>　　　　　　　　　Debtors. | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered |
| GARLOCK SEALING TECHNOLOGIES LLC and GARRISON LITIGATION MANAGEMENT GROUP, LTD.,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>TROY D. CHANDLER, CHARLES D. FINLEY, SAMANTHA FLORES, AND WILLIAMS KHERKHER HART BOUNDAS, LLP,<br><br>　　　　　　　　　Defendants. | Adversary Proceeding No. 11-AP- |

Garlock Sealing Technologies LLC and Garrison Litigation Management Group, Ltd. (collectively, "Garlock"), debtors in bankruptcy proceedings in the United States Bankruptcy Court for the Western District of North Carolina, allege:

**I.
NATURE OF THE ACTION**

1.　　Garlock brings this action against Williams Kherkher Hart Boundas, LLP (the "Firm") and three of its lawyers, Troy D. Chandler, Charles D. Finley and Samantha Flores

---

[1] The three debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

- 1 -

(collectively, the "Lawyers," and collectively with the Firm, "Defendants") because they committed fraud.

2. The Defendants committed fraud by knowingly and willfully concealing evidence that they were obligated to disclose in discovery. They had sued Garlock in state court claiming that their client's mesothelioma had been caused by a rare type of asbestos and this asbestos came solely from working with Garlock's products. But at the same time they were suing Garlock, the Defendants also were pursuing claims for the same client in a bankruptcy case against a manufacturer of products containing the same rare type of asbestos. By casting ballots in the bankruptcy case, the Defendants verified that their client indeed had been exposed to that manufacturer's products.

3. Garlock requested in discovery that the Defendants disclose other exposures, and the Defendants were legally obligated to disclose them, including the exposure that was the basis of their bankruptcy claim for the same client. But making the required disclosure would have greatly reduced the value of their case against Garlock because the bankrupt company's products are notorious for their potential to cause mesothelioma, while Garlock's products are demonstrably safe in their foreseeable use. Accordingly, the Defendants repeatedly signed discovery responses concealing the exposures that were the foundation of the claims they were making in bankruptcy. The Defendants perpetrated the fraud to increase the amount of the contingency fee that they would bring in from this personal injury case. The Defendants' fraud did not come to light until April 2012, when Garlock obtained the bankruptcy ballots as a result of a court order.

4. Defendants' fraud was highly effective, inducing Garlock to pay far more in settlement than it otherwise would have paid in *John A. Phillips and Cynthia Phillips v. Garlock*

*Sealing Technologies, LLC, et al.,* (Harris County, Texas District Court No. 2008-41366) ("*Phillips*"). That settlement, and the fraudulent means by which it was obtained, is the subject of this lawsuit.

## II.
## PARTIES AND JURISDICTION

5. Garlock Sealing Technologies, LLC ("GST") is a North Carolina limited liability company whose sole member is Coltec Industries Inc, which is a Pennsylvania corporation with its principal place of business in Charlotte, North Carolina.

6. Garrison Litigation Management Group, Ltd. ("Garrison") is a North Carolina corporation with its principal place of business in Rochester, New York.

7. The Firm is a limited liability partnership organized under the laws of the State of Texas whose partners, upon information and belief, are citizens and residents of Texas.

8. Defendant Troy D. Chandler is a lawyer currently employed by the Firm and also was employed by the Firm during all the events relevant to this Complaint. Upon information and belief, he is a citizen and resident of Texas.

9. Defendant Charles D. Finley is a lawyer currently employed by the Firm and also was employed by the Firm during all the events relevant to this Complaint. Upon information and belief, he is a citizen and resident of Texas.

10. Defendant Samantha Flores is a lawyer currently employed by the Firm and also was employed by the Firm during all the events relevant to this Complaint. Upon information and belief, she is a citizen and resident of Texas.

11. Upon information and belief, the Firm derives income from the fees charged by the Firm for legal services provided by its lawyers, generally upon a contingency fee basis.

12. The Firm acts through the lawyers it employs. The Lawyers conduct or participate in, directly or indirectly, the conduct of the Firm's affairs.

13. The district court has subject matter jurisdiction over the claims herein for relief under 28 U.S.C. §§ 1332 (diversity of citizenship) and 1334 (bankruptcy). The causes of action alleged herein relate to a case under the Bankruptcy Code. This is a non-core proceeding under 28 U.S.C. § 157 in which Garlock requests trial by jury before the district court.

14. Venue is predicated upon 28 U.S.C. § 1409(a), which provides for venue for a proceeding related to a case under the Bankruptcy Code in the district court where such case is pending.

15. Venue is further predicated upon 28 U.S.C. § 1391, which provides for proper venue in any district in which a substantial part of the events giving rise to the claim occurred.

16. This Court has personal jurisdiction over Defendants under the nationwide service provisions of Fed. R. Bankr. P. 7004(d) because Defendants reside within the United States.

### III.
### BACKGROUND

17. The Lawyers represented John A. Phillips ("Phillips"), who was diagnosed with mesothelioma, a disease that is almost always fatal. Phillips was comparatively young for a person with mesothelioma. Unlike many mesothelioma patients, he was still in his peak earning years and could document substantial economic losses. Although mesothelioma cases can be extremely lucrative for plaintiff's lawyers, who are virtually always compensated by receiving a percentage of the amount the plaintiff recovers, Phillips' case was potentially more lucrative than most. The Lawyers' problem, however, was finding a solvent defendant to sue for their client's injuries.

18.  Documents filed by the Lawyers under penalty of perjury establish that they believed their client had a claim against ASARCO, LLC ("ASARCO") and two of its subsidiaries, CAPCO and Lake Asbestos of Quebec.  See ballots attached as **Exhibit A**, which are incorporated by reference (the exhibits to the ballots have been redacted to delete the names of other claimants and Phillips' social security number).  CAPCO manufactured asbestos cement pipe, a notoriously dangerous product that is a well-established cause of mesothelioma.

19.  Moreover CAPCO pipe was made from a rarely-used type of asbestos, crocidolite, the form of asbestos that is most potent in causing mesothelioma.  The Lawyers knew that pathological studies demonstrated that their client had elevated levels of crocidolite in his lungs, which meant that he must have had exposure to a crocidolite product known to release high levels of asbestos.  CAPCO cement pipe was precisely such a product.

20.  But the Lawyers wanted more money than could be recovered solely by pursuing a claim in bankruptcy against CAPCO.  They intended to get whatever money they could out of the bankruptcy, but they also searched for a solvent company to sue in the tort system.

21.  In his high school years, 1966-68, Phillips had worked summers and part time at a company called Triplex, Inc. ("Triplex"), which had a history of selling a number of industrial products, including asbestos pipe.  But virtually no records were available about Triplex's inventory from more than 40 years ago.  In determining when various products were sold – and who supplied them – the jury would be guided primarily by the testimony of interested witnesses who worked for Triplex, including a client of the Lawyers.  The Lawyers could work with those witnesses to "implant memories," which was the process used by the plaintiff's bar to develop cases as famously described by leading plaintiff's lawyer Fred Baron, the senior partner of the

firm where Defendant Chandler received his early training in asbestos litigation: "Do we implant memories? Yeah, probably we do. Is that something that is wrong? I don't believe it is."[2]

22. As the Lawyers planned their lawsuit they eventually focused on another asbestos product category historically sold by Phillips' employer in 1966-68: gaskets. Asbestos gaskets are "non-friable," meaning that the asbestos fibers within the gaskets are not released in response to hand pressure. Gaskets were historically regarded as encapsulated products that posed no health hazards. Asbestos gaskets do not begin to compare with asbestos pipe in notoriety, danger, and fiber release. Moreover, most asbestos gaskets are made from chrysotile. Crocidolite gaskets were more expensive, and were only used in limited specialty applications.

23. Nevertheless, if no other source of the crocidolite in Phillips' lungs was known, a jury might believe it came from gaskets with which he worked. Accordingly, the Lawyers sought to identify a manufacturer of crocidolite gaskets that they could sue.

24. Triplex, where Phillips worked with gaskets, was a distributor for Johns-Manville Corporation ("J-M"), the global leader in the manufacture of asbestos-containing products. J-M was a major manufacturer and marketer of gaskets, including crocidolite gaskets.

25. Yet J-M was also a bankrupt company at the time the Lawyers were planning their lawsuit. Asserting that J-M gaskets were the source of the crocidolite in Phillips' lungs would therefore not create a case with the value the Lawyers sought. Moreover, the Lawyers could get the maximum recovery allowed by the J-M trust simply by asserting that their client worked with chrysotile gaskets from J-M. Although reputable scientists hold the view that chrysotile fibers are not a real world cause of mesothelioma, the J-M trust distribution procedures permit recovery for claimants asserting exposure to J-M chrysotile products. The

---

[2] Christine Biederman, Thomas Korosec, Julie Lyons & Patrick Williams, Toxic Justice, Dallas Observer, August 13, 1998.

Lawyers thus could rationalize a claim against the J-M trust, as based solely on the chrysotile gaskets, and blame another company for crocidolite gaskets.

26.     Garlock was an ideal target.  Although most of its gaskets were made from chrysotile, it sold a limited number of crocidolite gaskets for specialty applications. It was not in bankruptcy at the time the Lawyers were planning their case.  Also, Garlock defended mesothelioma cases by asserting, among other defenses, that chrysotile gaskets do not cause mesothelioma, making it hard for Garlock to argue that J-M chrysotile gaskets contributed to Phillips' mesothelioma.

27.     Accordingly, the theory of the Lawyers' case against Garlock was that all the crocidolite gaskets their client worked with while he was in high school came from Garlock, not from J-M, the distributor with which his employer was associated.

28.     The Lawyers had solved the problem of disclosing the bankruptcy trust claim they were pursuing to get money from the J-M trust.  They could comply with their duty to disclose that claim without diminishing their total recovery.  Yet, they still faced a problem if they were to get money from both Garlock and the CAPCO trust.  If their client's claim against the manufacturer of cement pipe were known, the claim against Garlock would have far less value, and the Lawyers would receive far less money.

29.     The Lawyers solved this problem by telling one story in the CAPCO bankruptcy case and another story in their lawsuit against Garlock. Even after they had voted in the ASARCO bankruptcy, they repeatedly signed responses to requests for information about their client's claim against Garlock by describing a history of exposure to asbestos products that did not include exposure to the products of the cement pipe company.  The Lawyers had reason to believe that telling two different stories would succeed because their ballots would not be readily

- 7 -

available to the public and their bankruptcy trust claims, when made, would be kept confidential. The plaintiff's bar has made extraordinary efforts to maintain the confidentiality of these claims, both within bankruptcy cases and when claims are asserted against trusts, which creates a two track system that is rife with potential for abuse.

30. Moreover, upon information and belief, the Lawyers asserted additional claims for their client based on evidence of their client's exposure to asbestos-containing products of others bankrupt producers, evidence which the Lawyers failed to disclose to Garlock and which Garlock has not been able to uncover on its own.

31. Because the Lawyers concealed the information they were duty-bound to disclose, Garlock paid in settlement an amount far in excess of the settlement value of the case if the information about the claim against the cement pipe company (and any other claims that existed) had been revealed.

### IV.
### PARTICULAR INSTANCES OF FRAUDULENT ACTIVITY

32. On or about July 8, 2008, Phillips and his wife Cynthia sued Garlock in Texas state court alleging that Garlock was liable for causing Phillips' mesothelioma.

33. On or about September 8, 2008, Defendant Flores, on behalf of the Firm, served upon Garlock, via certified mail, Plaintiffs' Responses to Master Interrogatories, Request for Production and Requests for Disclosure.

34. Defendants had a duty to make a complete response to the interrogatories, based upon all information reasonably available to them at the time the answers were provided. This duty extended to all information known by or reasonably available to them, even if such information was not known to the clients.

35. Interrogatory 6 required Defendants and their clients to list each asbestos product to which Phillips was exposed, including the name of the manufacturer, the brand name of the asbestos product, and a specific description of each alleged exposure. Interrogatory 6 therefore required identification of all asbestos products to which Phillips had been exposed. The undersigned attorneys did not object to the interrogatory, and gave only the following response:

> Mr. Phillips' occupational exposure to asbestos occurred in the summers from 1966 to 1968 when he worked for Triplex in Houston, Texas. Mr. Phillips' work required him to cut asbestos sheet gaskets, exposing him to the asbestos in the gasket materials. He remembers working with and cutting Garlock and Johns-Manville gaskets.

36. As required by Texas law, Defendants supplemented their interrogatory responses, in this case no less than thirteen times. The responses, the last of which were served on February 19, 2009, never varied with respect to the exposures disclosed. The original and amended interrogatory answers are attached as **Exhibit B** and incorporated by reference.

37. Defendant Flores signed the interrogatory responses. Defendant Chandler accompanied Defendant Flores on the signature line, with both names above the Firm's. Under the Texas Rules of Civil Procedure, the Lawyers had a duty to make a complete response based on all information reasonably available to them, and their signature constituted a certification and a representation that to the best of their knowledge, information, and belief, formed after a reasonable inquiry, the interrogatory answers had a good faith factual basis.

38. Defendants therefore certified and represented that to the best of their knowledge, the answers had a good faith factual basis in light of all information reasonably available to them, the Firm and their clients. Further, the response to Interrogatory 47 states that "Plaintiffs and Plaintiffs' attorneys" participated in the preparation of the responses or furnished information used in the preparation of the responses.

39. Despite diligent inquiries by counsel for Garlock, no witness in any deposition provided any evidence of exposures to other crocidolite-containing products.

40. Evidence of Phillips' exposures to other crocidolite products was material to Garlock for at least two reasons under Texas law. First, such evidence improved Garlock's defenses to liability. To recover under Texas law, Phillips was required to prove that exposure to Garlock's products was a substantial factor in bringing about Phillips' mesothelioma. Exposures from other sources weakened the claim that any purported Garlock exposure was a substantial cause of Phillips' mesothelioma.

41. Phillips' exposures to other crocidolite products were especially relevant to Garlock's defense because other products such as asbestos pipe released large numbers of crocidolite fibers during routine operations such as cutting, compared to which any potential trace release of asbestos from Garlock's products was insignificant. Absent truthful evidence of alternative exposures, it became much more difficult to explain to a jury how any alleged release from Garlock products, which even if it occurred, was at trivial, scientifically insignificant levels.

42. Second, Phillips' exposures to other products were important for allocating fault among defendants held liable. In Texas, where the Defendants filed *Phillips,* unless the plaintiff can show that a particular defendant's percentage of responsibility is greater than 50%, the defendant is liable only for the percentage of damages found by the jury equal to that defendant's percentage of responsibility with respect to the harm for which damages are allowed. Texas law permitted defendants to place other companies, including bankrupt companies, on the verdict form as responsible third parties ("RTPs"), and instructed juries to allocate percentages of responsibility to them based on evidence regarding the extent to which exposure to such products

contributed to plaintiffs' diseases. Thus, if Phillips was exposed to non-Garlock products, such exposures decreased the chance that Garlock would face a significant percentage of responsibility or be held responsible for more than 50% of the injury, and thus decreased the value of a potential award against Garlock and the settlement value of the claims against Garlock.

43. Evidence of crocidolite exposure from sources other than Garlock would have been powerful evidence in *Phillips*. Thus, truthful evidence of Phillips' exposures to other crocidolite products would have materially decreased Garlock's potential liability, and thereby decreased the settlement value of Phillips' claims.

44. At no point, however, did the amendments to the interrogatories or any of Phillips' witnesses identify Phillips' exposure to any non-Garlock products other than J-M, or any crocidolite-containing non-Garlock products whatsoever.

45. On or about February 20, 2009, the Lawyers continued their concealment efforts by filing an extensive Motion in Limine. Among other things, the Lawyers asked the court to make the following rulings:

> a) That Defendants' witnesses not be allowed to reference any type of asbestos-containing products other than gaskets (paragraph 90).
>
> b) That Defendants' witnesses not be allowed to reference exposures to asbestos other than those that occurred at the Triplex facility (paragraph 95).
>
> c) That Defendants not be allowed to testify or offer evidence regarding distributor agreements between Triplex and Johns-Manville as a limiting factor of Triplex' purchase of Garlock gaskets (paragraph 108).
>
> d) That Defendants not be allowed to testify or offer evidence regarding any crocidolite-containing product other than Garlock gaskets, as there is no valid evidence of John Phillips' exposure to any crocidolite-containing products (paragraph 114).

The Motion in Limine is attached as **Exhibit C** and incorporated by reference. In this manner the Lawyers attempted to isolate the exposure to crocidolite to Garlock products.

46. On or about March 31, 2009, without knowledge of Defendants' concealment of material evidence, Garlock paid to settle Phillips' claims against Garlock. Upon information and belief, the Firm received a contingency fee as a result of Garlock's payment.

47. The principal reason that Garlock paid the amount of the settlement was because the Lawyers had not identified exposure to any other crocidolite-containing products, other than the J-M exposures, which they directed away from crocidolite. The concealment of this evidence prevented Garlock from explaining the cause of Phillips' mesothelioma, and exposed Garlock to bearing more of the damages in the event it were held liable because Garlock lacked sufficient evidence to allocate liability to others. All of this greatly increased the value of Phillips's claims against Garlock and increased Garlock's willingness to pay more to settle the claims.

## V.
## THE FRAUD IS EXPOSED

48. Garlock learned in April 2012 that the Lawyers had concealed evidence of exposure to at least one other crocidolite-containing product, CAPCO.

49. To be specific, in April of 2012, Garlock obtained copies of the ballots cast on plans of reorganization in certain bankruptcy cases of other former producers of asbestos-containing products (pursuant to 11 U.S.C. § 1126). Ballots in asbestos bankruptcy cases are typically filed by claimants' counsel who vote, on behalf of their clients who have claims against a debtor, to either accept or reject proposed plans of reorganization. The ballots are customarily not filed on the public docket, but are submitted to the custody of court-appointed balloting agents.

50. The ballots that Garlock obtained show that, on October 20, 2008, while *Phillips* was pending, Defendant Finley, on behalf of the Firm cast a ballot in the reorganization case of ASARCO for a group of Firm clients who authorized the Firm to certify that they held claims against ASARCO, and vote such claims. Phillips was one of those clients, and his name and social security number appeared in the ballot. More specifically, by signing the ballots the Firm certified under penalty of perjury that:

   a. Phillips was the holder of Channeled Asbestos PI Trust Claims in Class 5 of the Plan (*i.e.*, holders of asbestos personal injury claims against ASARCO);

   b. Phillips was represented by the Firm;

   c. Phillips had authorized the Firm to vote on the Plan on his or her behalf;

   d. Each disease category indicated with respect to Phillips was based on medical records or similar documentation in such holder's file;

   e. The signing attorney was authorized by Phillips, as the holder of an asbestos claim to represent the disease category for him; and

   f. The signing attorney was authorized by Phillips, as the holder of an asbestos claim, to represent the required exposure to products for which ASARCO was responsible.

51. On July 21, 2009, shortly after *Phillips* had settled, Defendant Finley on behalf of the Firm cast a second ballot in the reorganization proceedings of ASARCO, in which he repeated his certifications under penalty of perjury. This ballot confirmed that Phillips and other Firm clients had claims against not only ASARCO, but also against CAPCO.

52. In the ballots the Firm listed Phillips' disease level as Level VIII: Mesothelioma. To qualify for this disease level, the Firm represented that Phillips had meaningful and credible

evidence of exposure to products mined, manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by CAPCO or ASARCO.  The ballots cast on Phillips' behalf were previously referenced as **Exhibit A**.  The Firm cast ballots in other bankruptcies after Phillips' diagnosis but did not list him in at least some of these ballots, implying that the Firm made conscious decisions about the bankruptcies in which it would make the certifications described above.

53.    Defendant Finley on behalf of the Firm therefore certified under penalty of perjury that Phillips had an asbestos personal injury claim against CAPCO, a company that manufactured crocidolite-containing cement products, and that Phillips had authorized the firm to represent that he had meaningful and credible exposure to a CAPCO product.

54.    The Firm and the Lawyers never disclosed Phillips' CAPCO exposure to Garlock in the interrogatory answers or in the depositions before Garlock settled *Phillips*.

55.    At the time the Firm, through the attorneys named above, served the interrogatory answers on Garlock (or failed to supplement the interrogatories as required by law), the Firm and such attorneys knew or should have known that Phillips had been exposed to a CAPCO product. The ballots were cast and *Phillips* was pending during the same time period.

56.    Moreover, the Firm had an obligation to discover (and an interest in discovering) that evidence in 2008-09 because the Firm was representing its clients' interests in the CAPCO bankruptcy case at the same time.

57.     Garlock is informed and believes that the Firm knew about Phillips's exposure to CAPCO products during 2008-09 when it responded to or supplemented Garlock's discovery, and failed to disclose such exposure to Garlock because it would decrease the value of the claims against Garlock.

58. Phillips' exposure to CAPCO crocidolite-containing products—known to the Firm and its attorneys—was a material fact that the Firm and the attorneys signing the interrogatory answers had a duty to disclose under Texas law, but failed to disclose.

59. The materiality of this evidence was, upon information and belief, the motivation for the Defendants to conceal it.

60. Garlock relied on the absence of identification of CAPCO exposure in agreeing to pay the amount it paid to settle the Phillips case. If the interrogatory answers had identified Phillips' exposure to CAPCO (or other crocidolite-containing products), the value of the claims against Garlock would have decreased materially for numerous reasons. Garlock's low-dose defense would have improved (due to the greater magnitude of Phillips' exposure to non-Garlock products), and Garlock's expected share of damages would have decreased (due to Garlock's added ability to allocate liability to CAPCO, and the lower likelihood that Garlock would be held more than 50% responsible and face joint and several liability). Furthermore, the identification of CAPCO exposure would have assisted Garlock in cross-examining the Phillips' witnesses and probing their credibility.

61. In short, if the CAPCO exposure had been identified, Garlock would not have paid the amount it paid to settle the claims.

62. Garlock reasonably relied on the omission of CAPCO exposure in the interrogatory answers, as well as the representations by the Firm and attorneys that the answers had a good faith factual basis. Garlock reasonably believed that the attorneys would identify exposures known to them, in response to the interrogatory asking for such exposures, as required by law, and reasonably relied on this fact. Garlock also reasonably relied on the omissions and

representations because it was unable to identify Phillips' non-Garlock crocidolite exposures through independent means.

63. Garlock is informed and believes that the Firm and signing attorneys intended for Garlock to rely on the omission of the CAPCO exposure, and intended for Garlock to pay more to settle the Phillips claims as a result of the omission, resulting in a larger fee for the Firm.

64. Garlock had no factual basis or ability to discover the fraudulent concealment of the CAPCO exposure until it obtained the ballots in the ASARCO bankruptcy case in April 2012 during discovery in Garlock's bankruptcy case.  The court in ASARCO suspended the balloting procedures on October 20, 2008, the 2008 ballots were never tabulated, and there was no public record of the ballots the Firm had submitted at that time. The only court filing related to the ballots was a certification by the balloting agent that reported the aggregate number of ballots cast in the 2009 solicitation.  This filing occurred after the *Phillips* settlement and did not indicate that Phillips had voted through his attorneys in the ASARCO case.

65. These ballots were not available to Garlock until the Bankruptcy Court for the Western District of North Carolina recently ordered that it should have access to them.  Indeed, information similar to the evidence concealed in *Phillips* is routinely kept secret in asbestos bankruptcy cases.  The asbestos plaintiff's bar is actively involved in drafting trust distribution procedures which provide this secrecy and also provide an incentive to conceal evidence, as occurred in *Phillips.*

66. Garlock suffered damages from the fraudulent omission of the CAPCO exposure because Garlock paid much more to settle the Phillips claims than it would have paid if the fraud had not occurred.  Further, because it is the practice of the plaintiff's bar to file multiple bankruptcy claims on behalf of their clients, Garlock is informed and believes that discovery will

- 16 -

result in uncovering instances of concealment of additional evidence that Phillips suffered exposure to asbestos-containing products of other former manufacturers and asserted claims based on such exposure.

## VI.
## FIRST CLAIM FOR RELIEF

*Claim against all Defendants for Common Law Fraud*

67. Garlock here realleges and incorporates by reference the allegations of paragraphs 1–66.

68. Defendants had a duty to answer the discovery responses truthfully and to make truthful disclosures as more particularly described above, including without limitation, their response to Interrogatory 6.

69. Defendants' representations and nondisclosures were material when made.

70. Defendants' representations and nondisclosures were false.

71. When Defendants made the misrepresentations and nondisclosures, they knew they were false or made them recklessly without any knowledge of the truth and as a positive assertion.

72. Defendants made the misrepresentations and nondisclosures with the intent that Garlock should rely and act upon them.

73. Garlock acted in reliance upon the misrepresentations and nondisclosures.

74. As a proximate result of Defendants' misrepresentations and nondisclosures, Garlock suffered compensatory and punitive damages in an amount to be proven at trial, which exceeds $75,000, exclusive of interest and costs.

## VII.
## SECOND CLAIM FOR RELIEF

*Claim against all Defendants for Negligent Misrepresentation*

75. Garlock here realleges and incorporates by reference the allegations of paragraphs 1–66.

76. Defendants' discovery responses and nondisclosures more particularly described above, including without limitation, their response to Interrogatory 6, constituted representations and nondisclosures made in the course of their business or in a transaction in which it had a pecuniary interest.

77. Defendants supplied false information and concealed truthful information for the guidance of Garlock in its business.

78. Defendants did not exercise reasonable care or competence in obtaining, communicating and concealing the false information.

79. Defendants justifiably relied upon the false information.

80. As a proximate result of Defendants' negligent supplying of false information and concealing truthful information, and Garlock's justifiable reliance, Garlock suffered damages in an amount to be proven at trial, which exceeds $75,000, exclusive of interest and costs.

## VIII.
## THIRD CLAIM FOR RELIEF

*Claim against All Defendants for Civil Conspiracy*

81. Garlock here realleges and incorporates by reference the allegations of paragraphs 1–66.

82. As more particularly described above, Defendants had a meeting of the minds on a common object to be accomplished, *i.e.,* recovery of a contingency fee artificially inflated by a fraudulently induced settlement in *Phillips*.

83. Defendants committed various unlawful acts as described above in pursuit of that object.

84. As a proximate result of Defendants' civil conspiracy, Garlock suffered compensatory and punitive damages in an amount to be proven at trial, which exceeds $75,000, exclusive of interest and costs.

## IX.
## PRAYER FOR RELIEF

Wherefore Garlock prays that:

1. Plaintiffs have and recover compensatory and punitive damages as proven at trial from each of the Defendants, jointly and severally;

2. Plaintiffs have and recover all interest and costs allowed by law;

3. Plaintiffs have and recover such other and further relief as the Court deems just and proper.

4. All issues in this action that are triable by a jury be tried before and decided by a jury.

This 4th day of June, 2012.

                        /s/ Garland S. Cassada
                        Garland S. Cassada
                        N.C. Bar No. 12352
                        D. Blaine Sanders
                        N.C. Bar No. 12541
                        Jonathan C. Krisko
                        N.C. Bar No. 28625
                        Richard C. Worf, Jr.
                        N.C. Bar No. 37143

                        ROBINSON BRADSHAW & HINSON, P.A.
                        101 North Tryon Street, Suite 1900
                        Charlotte, North Carolina 28246
                        Telephone: (704) 377-2536
                        Facsimile: (704) 378-4000

                        gcassada@rbh.com
                        bsanders@rbh.com
                        jkrisko@rbh.com
                        rworf@rbh.com

                        *Counsel to Garlock Sealing Technologies LLC and Garrison Litigation Management Group, Ltd.*