IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

In the matter of:                )
                                 )
GARLOCK SEALING TECHNOLOGIES, LLC,) No. 10-31607
et al.,                          ) Jointly Administered
                                 ) Charlotte, NC
     Debtors.                    ) July 26, 2012, 9:32 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GEORGE R. HODGES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

Garland S. Cassada
Jonathan C. Krisko
Richard C. Worf, Jr.
Robinson, Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246

Shelley K. Abel
Rayburn, Cooper & Durham, P.A.
227 West Trade Street, Suite 1200
Charlotte NC, 28202-1672

Electronic Recorder
Operator:                   Tara Salmons

Transcriber:                Patricia Basham
                            6411 Quail Ridge Drive
                            Bartlett, TN  38135
                            901-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

Garlock/7-26-12

2

APPEARANCES (Continued):

Stephen M. Juris
Morvillo, Abramowitz, Grand, Iason
  Anello & Bohrer, P.C.
565 Fifth Avenue
New York, NY  10017

Sam McGee
Jackson & McGee, LLP
225 E. Worthington Avenue, Suite 200
Charlotte, NC 28203

Kathleen A. Orr
Orrick, Herrington & Sutcliffe LLP
Columbia Center, 1152 15th Street, N.W.
Washington, DC

Travis W. Moon
Moon Wright & Houston, PLLC
227 West Trade Street
Suite 1800
Charlotte, NC 28202

Trevor W. Swett III
James P. Wehner
Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005

Ashley Edwards
Parker Poe Adams Bernstein LLP
401 South Tryon Street Suite 3000
Charlotte, NC 28202

Garlock/7-26-12

3

(CALL TO ORDER)

THE COURT: Good morning.  Have a seat.

COUNSEL: Good morning.

THE COURT: All right.  We have got a number of things on the agenda.  So I guess the first thing would be to get everybody's voices on the recording machine.  So why don't we start here and go across that way?

MR. CASSADA: Good morning, Your Honor.  Garland Cassada, here for the debtors, accompanied by Rich Worf and Jon Krisko.

MR. JURIS: Good morning, Your Honor. Stephen Juris. I am here today for the moving trusts and with me is local counsel, Sam McGee.

MR. WEHNER: Good morning, Your Honor.  Jim Wehner for the committee, along with Ted Swett from my firm and Tom Moon from Moon, Wright and Houston.

THE COURT: Good.

MS. ORR: Good morning, Your Honor.  Kate Orr on behalf of the FCR.

THE COURT: All right.  Good.

MS. EDWARDS: Ashley Edwards on behalf of Delaware Claims Processing Facility.

MS. ABEL: Your Honor, just for purposes of the record, Shelley Abel on behalf of the debtors as ordinary counsel.

THE COURT: All right.  We will proceed, then, however

Garlock/7-26-12

4

you all want to go.

MR. CASSADA: Your Honor, the first item on the agenda is the matters related to the subpoena duces tecum that you authorized Garlock to serve on the Delaware Claims Processing Facility and the six trusts for which it administers claims.

There were objections by Delaware Claims Processing Facility and the trusts to the subpoena. There was a motion to compel filed in Delaware. There was a motion filed in this court by the trusts. I will refer to the Delaware Claims Processing Facility and the trusts, just for ease of reference, as the trusts. But the trusts have objected to the subpoena in this court and asked the court to impose an anonymity protocol. So that issue is here, as well.

I would propose that we argue our motion to compel first and then let the other parties respond and then we will get a reply to that.

THE COURT: Is that all right with you all?

MR. JURIS: That's certainly acceptable, Your Honor.

THE COURT: Good. Let's do it that way, then.

MR. CASSADA: As the court may recall, on May 17, you recognized that Garlock sought evidence relevant to estimation when it sought authority to issue subpoenas in Delaware and serve those on the trusts, and you authorized Garlock to do just that, to have the subpoenas issued and to serve the trusts.

Garlock/7-26-12

5

The subpoenas are narrowly drawn.  They don't seek any production of any claims submission materials or any documents that have to be reviewed.  They seek just four pieces of data for approximately eleven thousand settled claims in Garlock's database.  Eleven thousand.  It's slightly less than eleven thousand.

But for each claim, the subpoenas seek information about the date that any claim was filed against any of the six DCPF trusts, the date any such claim was approved, the date any such claim was paid, and the status of the claim if it has not been approved or paid.

Now, the trusts have raised three objections.  First, they want to be reimbursed for reasonable expenses of compliance.  Secondly, they want confidentiality protection.  And, third, they have asked that the court blind the identities of the claimants and, in fact, under an anonymity protocol which would blind the claimants to Garlock and its experts so Garlock would not be able to match the data that it receives with Garlock's claims files and databases.

Now, we have agreed up-front that the same confidentiality provisions contained in the personal injury questionnaire shall apply to the data produced pursuant to the subpoena.  In fact, this is what was requested and we have readily agreed to that.

We have also agreed up-front to the full reimbursement

Garlock/7-26-12

6

of the trust reasonable cost associated with compliance with the subpoena. Again, the subpoena is narrowly drawn and requires the production of data in only four data fields for each settled claimant, and we believe the burden and cost are minimal but, whatever they are, we agree to bear those costs.

We object to a request that the data be provided under the anonymity protocol requested by the trusts. We need the names of claimants associated with the data so we can use it. Garlock and its experts need to match data associated with settlement claims to information in Garlock's claims files.

As we have argued throughout this case, the data here and this type of data is relevant to show that past settlements are not a fair reflection of either liability for present and future claims and they are also not a predictor of what Garlock would be expected to settle claims for in the future, if that's really an issue in this case.

We intend to prove that throughout the 2000s, up to the date of our petition, our bankruptcy petition, settlements continued to be inflated by the bankruptcies of top-tier defendants. Trust claims and payments are, as the committee argues, not priced into past settlements and therefore the settled claims are not representative of pending and future claims.

And as we have argued in our motion throughout the case, we expect the data to show that settled claims were still

Garlock/7-26-12

7

inflated because trust claims either weren't being filed or paid at the same time as the holders of such claims asserted them against Garlock or that such holders were not disclosing to Garlock that they had exposures, that they had the trust claims or that they had exposures giving rise to the trust claims when they settled with Garlock.  They could only have been priced in settlements if Garlock had that information, and we expect the trust data – by matching the trust data, we expect to be able to prove that.

So only by matching settled claimants' trust claims with settled claimants' files can Garlock prove its defense to the committee's settlement theory.

Now, the trust data rationale for anonymity, we believe, is wrong in every respect.  First, and their argument really is a relevance argument.  Their assertion that Garlock does not need the names of the claimants because all it seeks is to show the timing of trust claims and payment involved, in addition to the problem with the lag, Garlock could not have taken into account that plaintiffs had evidence supporting claims unless it had knowledge that the settled claimants had such evidence.  We were clear in our motion that we needed the data for this purpose, and this is a completely legitimate purpose, to show that Garlock did not have this information because claimants, for whatever reason, weren't divulging it. This has been a theme and a principal theory of our case from

Garlock/7-26-12

8

the very beginning.

Second, the anonymity protocol, it's not necessary. The settled claimants' privacy interests are already protected because the debtors have agreed to application of confidentiality provisions drafted by the committee to protect the members of their constituency. Those provisions restrict access to the information to a limited number of people, the parties and their experts. They require parties to take extraordinary steps to protect the information. The use of the information is strictly limited to the estimation proceeding, which is the sole purpose for which Garlock seeks the information, to use it in the estimation proceeding.

The provisions restrict the ability of any party to introduce any individual claimant's name into the estimation proceeding, and it requires the destruction of data when the case is closed. This is ample protection for whatever privacy interest these claimants have.

And, third, the trusts' proposed anonymity protocol, it is not supported by the case law. No court has ever bought into this type of request, despite their reliance on cases cited in their papers. You simply have to read those cases to understand this.

Three decisions that all the parties have cited are the decisions in *Porter Hayden*, the most recent one in February of this year; *Congoleum;* and *Federal-Mogul*. All three support

Garlock/7-26-12

our position that this would be an improper protocol.

THE COURT: There are several people trying to call in and cannot connect.  We better take a second and let her redial.

MR. CASSADA: Sure.

(Connecting parties telephonically.)

MR. CASSADA: Your Honor, the point I was on before we took the brief recess is that the requested protocol is not supported by the cases that the trusts rely on.  Specifically the *Porter Hayden* case, *Congoleum* and *Federal-Mogul* all support our position.  And they also argue that their protocol is just like the protocol in *GM* and one that the debtors in *Bondex* and their expert, Bates White, proposed in their case but that's not true at all.  As we will demonstrate, those protocols did not blind the data and undercut the debtor's right to match trust claim information in its database, just the opposite.

So, Your Honor, we are concerned that these trusts are not raising a legitimate privacy interest but they are simply attempting to prejudice Garlock's defense of the committee's estimation.  To put it lightly, the trusts are very good friends with the committee, both its members and its law firm. We are concerned that what they really want to do is to blind Garlock and limit Garlock's use of data.

I am not going to harp long on this point, but I do want the court to understand the relationship between the

Garlock/7-26-12

10

committee members and the trusts and the Caplin and Drysdale firm.  So I have provided these demonstratives that show the following:

These are all of the committee members on page one, Your Honor, and this shows that, of the settled claimants – and this is the claimants for whom we are getting this data – thirty-three percent of these claimants were represented by members of the committee.  Now, these are the same members of the committee that are taking the position in this case that Garlock's liability for pending and future claims should be determined on what Garlock paid their past claimants.  So these committee members are putting forth this theory that their past claimants' settlements should be used to gauge Garlock's liability.

Now, we have heard from the committee that these claimants settled their claims and they have an expectation of privacy.  They have put it all behind them and an expectation of finality.  That's a very ironic argument, Your Honor.  We say the same thing.  These settlements are behind us, and we have got a right not to have them revisited on us in this bankruptcy case as the supposed measure of our liability.  But once the committee puts these settled claims into play, then discovery on these claims is completely fair game.

Now, I am going to briefly run through this.  There are six trusts and, among these six trusts, you will see that

Garlock/7-26-12

11

our committee members in this case dominate the trust advisory committees for each of the trusts.

On the Armstrong World Industries trust, four of the five TAC members are members of the committee in this case.

The next page, the Babcock & Wilcox trust, four of seven of the trust advisory committee members in that case are committee firms in this case.

The DII trust, four of eight TAC members of the DII trust are committee firms in this case. And Caplin and Drysdale is counsel for the trust advisory committee for the DII trust.

The Federal-Mogul trust, four of five TAC members are committee members and, again, TAC counsel in that case is Caplin and Drysdale.

The Owens Corning Fibreboard trust, four of nine TAC members are committee firms. Caplin and Drysdale is counsel for those TAC members.

And finally, the USG trust, three of five TAC members are committee firms in our case and, again, Caplin and Drysdale is TAC counsel. So these Delaware Claims Processing trusts are closely intertwined with the committee in this case. And I might add, if the committee wanted to expedite compliance in this case, the committee has the complete power to do that because they have got committee counsel and they have committee members who could make that happen.

Garlock/7-26-12

12

So our concern here is that this anonymity protocol, which is unlike any protocol in the cases that they rely on, is not made to protect any legitimate interest. It is simply made to assist the committee and give the committee a leg-up in the estimation case against Garlock.

Now, I have got a couple of other pages here, Your Honor, that show how closely the TAC members are involved with the administration activities of the trusts. I have an excerpt here from the Federal-Mogul form of asbestos personal injury agreement, and then the next page shows a portion of the caption on the complaint. You will recall that the last time that Delaware Claims Processing was in this court, it was to seek an injunction or relief from stay to be able to sue Garlock to prevent it from getting trust information in the Delaware court, and the TAC members for the USG and Owens Corning trusts were co-plaintiffs in that suit and Caplin and Drysdale represented them. So we had what, in my experience, was unprecedented. We had committee counsel here suing a debtor to prevent it from getting information in another court.

So these parties are very closely aligned, and I think that any position they take has to be viewed with that in mind. So I want to talk about relevance because I think the trust argument is really a relevance argument. Essentially they are saying you don't need the names of the claimants because all you are interested in is the timing, it's the issue of lag, the

Garlock/7-26-12

lag between when the trusts settled and paid claims versus when you paid claims; were the settled claims being settled against Garlock and the trusts at the same time. And their point is we will just give you that data based on what the settled – the timing, and we will blind that so you won't be able to tell which claims are asserted by which parties.

Well, this is wrong for two reasons. First, we need the information because we need to match it to show the lack of Garlock's knowledge of the disclosure of these claims when it was settling claims. Again, that's what this is about. The argument that these settlement claims already take into account Garlock's defenses and its rights against these trusts, Garlock didn't know about them. The trust claimants weren't providing that information. It is not possible that it could have been priced in or reflected in settlements.

It is not even – an anonymity protocol wouldn't even be sufficient for purposes of assessing any timing issue because it wouldn't show the significance of the claims that were submitted contemporaneously. What claims are they? Are they high value claims or are they low value claims? Which firms are they? Which jurisdiction? All of that is information that our expert would need to know to be able to assess the relevance and meaning of the trust data.

The trusts in this case, they simply assume that Garlock doesn't need that information and so they are in here

14

pounding on relevance.

Now, there seems to be a suggestion by the trusts and committee that Garlock somehow obtained authorization of the subpoena under false premises, that all we were trying to do was to do the timing issue and that's all you had in mind, but that's not even close to being correct.

In the motion that we set out for authorization, we made it crystal-clear what we expected the data to show and why we were proceeding it, and those are the last three pages, Your Honor, of the demonstratives that I have provided for you. And, by the way, we provided the copy of that motion to the trusts in this case twice. We sent it to them when it was filed to give them an opportunity to object to it in this court and then later, after Your Honor entered the order, we sent it back up to them and said here is the motion, the court has granted this, let's talk about resolving it, let's talk about the idea that you will submit to the jurisdiction of the bankruptcy court here to reach a prompt resolution. So we provided this to them twice.

And in their papers, there is a statement in there to the effect that our motion and our argument made clear that we were only seeking this information on the timing issue, but here is what the motion said:

First, in the prefatory comments of the motion, on page two, it says:

Garlock/7-26-12

15

"The requested data will show that, to the contrary, even though settled claimants, like current and future claimants, had many claims against trusts at the time Garlock settled the settled claims, (a), settled claimants had not filed trust claims; (b), settled claims had not identified in tort system discovery exposure underlying the trust claims; and, (c), the trusts had not paid the settled claims."

It is crystal-clear that we needed the information to show not only timing but to be able to match with our database to show that Garlock didn't have the information because settled claimants didn't provide it.

In the introduction of the motion, the next page, in paragraph five of our motion, we made it clear again, quote:

"The data debtors seek to subpoena from DCPF will show that the trust payments were not and could not have been priced into the settled claims. Debtors expect the data to show that, even though the settled claimants would eventually have many claims against these trusts when Garlock settled their claims, (a), settled claimants had not filed their trust claims; (b), settled claimants had not identified in tort system discovery the exposures underlying the eventual trust claims; and (c), the trusts had not paid the settled claimants' trust claims."

Garlock/7-26-12

16

Again, Your Honor, we made clear that the data was for us to be able to show that the settled claimants had not identified exposures underlying it and Garlock did not have that information and it could not have been reflected in the settlements, and the inflation of the bankruptcy wave continued.

And then finally in the argument section, we again made it clear. We said, quote:

"The data concerning claims filed against the six targeted trusts by settled claimants are directly relevant to rebutting the committee FCR case. The data will show whether settled claimants had filed their trust claims, identified their trust exposures or been paid by trusts when Garlock settled their claims. The data thus bear on whether it is improper to infer, as the committee and FCR urged, that Garlock's settlements somehow priced down the impact of thirty-seven billion dollars in new trust assets."

It just could not be more clearer that we are seeking the data for that purpose. That is a legitimate purpose as we will discuss in a moment, and the position, it seems that the sole position offered by the committee and the trust, is that we did not obtain authority to issue those subpoenas for that purpose. It is completely wrong.

Now, at the hearing, the committee never argued that

Garlock/7-26-12

our access and use of data should be limited by anonymity. Nobody ever raised that point. The issue didn't come up. And we made it clear in our motion that the testimony and the position taken by Peterson was just one indication of the relevance of the material, and we laid that out for the court but we certainly didn't limit it and no one suggested that it should be anonymous and, in fact, the court recognized that the subpoenas were drawn narrowly and that they were relevant and approved the subpoenas as they were drawn.

Now, I want to talk about the cases because I believe that assessing the merit of the trust position requires a good understanding about the cases cited by the parties, including the trusts. There are three of them that they cite.

One is *National Union Fire Insurance Company v. Porter Hayden*. That's a Delaware – or, excuse me, a Maryland District Court opinion written just a few months ago where she compelled trusts, including the trust in this case, to provide claim form information.

The second is the *Congoleum Corp v. Ace American Insurance Company* case, a case from 2009 by a special master in the Delaware Superior Court, and finally *Federal-Mogul,* which is the case that the committee seems to place most of its reliance.

First, the *National Union v. Porter Hayden* case. In that case, insurers were sued for indemnity for claims filed

Garlock/7-26-12

18

against the Porter Hayden trust.  So these were claims that were already filed and the insurers issued and served a subpoena on fifteen trusts and these fifteen trusts had sought claim forms and attachments of eventually six thousand, five hundred settled claimants, and these were settled claimants or claimants who had asserted and settled claims against the insurer.  So these were claims that the insurance company was to be held responsible for in the complaint.

The opinion is clear that the insurers wanted to compare the information in the trust claim forms.  In other words, they wanted to look at all of the trust claim forms that the Porter Hayden claimants had filed in others with information the same claimants provided in their claims against Porter Hayden's trust.  Their theory, they wanted to prove that the claimants provided inconsistent information.  They thought that they would obtain evidence showing inconsistent facts which might reveal that claims in question are invalid or even fraudulent.  So they laid their theory out and they showed that they needed the information and they needed to match it.

Now, the trust in that case raised – or, excuse me, we will talk about the trust in a moment.  The claimants raised a host of objections to it, and the court would eventually reject every one, but the court held that the claim forms were clearly relevant and that there is no special privilege or right that applies.  The same discovery rules that apply to any evidence

Garlock/7-26-12

19

from third parties apply here and specifically mention that the Fourth Circuit has held that there is no settlement privilege like the one that we see asserted by claimants and trusts every time.

And the court required production of the claim forms with the settled claimants' names so insurers could match trust claim forms with claims made against Porter Hayden for which the insurers are allegedly liable.

So that's essentially the same situation as we have here, past settled claimants and the court – there was no – as we pointed out, this wasn't like the formula to Coke, these are just the names of people who asserted claims against you and have also asserted claims against other trusts and what they were saying in those claims.

Now, interestingly, the Delaware Claims Processing Facility was in that case and, at the very commencement of the case, DCPF and the trusts there entered into a confidentiality agreement, and that confidentiality agreement, I don't believe it's any different or any more robust than the one that the committee actually wrote here.  They did not argue for a blinding protocol in that case.  They didn't say that that was necessary or that there was any kind of privacy interest that suggested that, and they left it to the claimants to come in and raise whatever objections they raised, which happened and which the court eventually rejected.

Garlock/7-26-12

20

In the *Congoleum Corp* case, insurers again were sued for reimbursement of claims filed against the Congoleum trust. The insurers in that case sought submission of approximately a hundred and twenty-two thousand Congoleum claims against seven trusts, and they explained that the purpose of the subpoena was to test the validity of the claims against Congoleum. They sought documents related to other claims filed by the same hundred and twenty-two thousand with the trust, alleging injuries caused by other asbestos exposure, and they argued that it was relevant because submissions to other trusts might reveal inaccuracies or even fraud in the Congoleum claims.

Now, eventually they narrowed the hundred and twenty-two thousand to seventy thousand claims. The special master found that the relevance of the claim forms and supporting material is, quote, beyond dispute. The court ordered production of seventy thousand claimants' claim submissions, including supporting documents and the information on the resolution of the claims and the amounts awarded, far more information than we seek here, and electronic data conveying that information. And of course, there, the names weren't redacted from the claim forms because the insurers were going to match them with the Congoleum data. So there was no anonymity protocol in that case and that case also demonstrated that this is not incredibly sensitive information. This is information about claimants who asserted claims against both –

Garlock/7-26-12

21

in this case, against both Garlock and these trusts and, in the Congoleum case, against Congoleum and these were claims that were asserted and paid by Congoleum and were filed against the seven trusts.  It is exactly the situation here.  No one in that case suggested that any anonymity protocol was necessary.

And finally I want to talk about the *Federal-Mogul* case.  That case involved an insurance coverage action by Federal-Mogul against its insurers for claims related to products of a subsidiary, Wagner Electric.  Now, in that case, the Wagner claims had not yet been filed but, under the Federal-Mogul plan, they would be filed against the Federal-Mogul claims.  So these were not claims that had been filed and that had provided any information to Federal-Mogul that the insurers had access to.  They were going to be filed in the future.

The claimants were identified because they had voted and so they had identified themselves as creditors, as Wagner creditors, but they didn't provide information about their claims there except for their disease type.  They certified that they had claims and they provided the disease type.

The insurers in that case sought trust submissions for eleven thousand claimants.  At the beginning of the case – it was a little less than eleven thousand, just like in this.  At the beginning of the case, it was a hundred and ten thousand.  They narrowed it to eleven thousand claimants, the same number

Garlock/7-26-12

22

we want, and the point was to demonstrate whether the Federal-Mogul trust distribution procedures were reasonable and negotiated in good faith.  So they weren't attacking anything that the claimants had done or any settlements the claimants had reached in this case.  They were saying that these trust distribution procedures that you are going to settle, they are unreasonable and we shouldn't be liable for any claims that are resolved on them.

Now, their theory was that, if they could take the Wagner claimants and they could show the claims they filed against other trusts, and these were the Verus trusts, and they could link those claims and show that the trusts were making inconsistent – taking inconsistent positions among those and that the trusts were paying claims that were patently invalid and maybe even fraudulent.  And if they could show that, then they could show that the Federal-Mogul trust distribution procedures were unreasonable.

Now, I will repeat, a significant difference between Porter Hayden and the Congoleum case and the Federal-Mogul case is the Wagner claimants had not yet filed any claims against the Federal-Mogul trust.  They had simply voted on the plan of reorganization.  There was no allegation by the insurers, no theory that the claimants had taken inconsistent positions against Federal-Mogul versus positions they had taken against the Verus trusts.  As a result, there was nothing to compare.

Garlock/7-26-12

23

There was no need for matching trust claims with the claims against Federal-Mogul.

So the special master in that case eventually made the following recommendation: First, the special master approved the production of printable claim forms from each Verus trust with the work history, exposure history, medical condition, claim status.  And claim status, whether the claim was paid, deferred, withdrawn, pending, rejected and dates of the same. So those were provided.  And then a grid showing, for each of the approximately eleven thousand Wagner claimants, each Verus trust against which such claimants had submitted a claim and the status of each claim.  Basically the same information that would be provided in the trust claim form.

In that case, the court redacted the names and Social Security numbers of the claimants because of the following, and I quote:

"Since there are presently no submissions by Wagner claimants to the FM trust, from a practical perspective, Hartford will not be able to cross-examine claimants on the basis of proving inconsistent statements made to the other trusts.  This militates in favor of not disclosing the individual names and addresses at this time."

So the court there was clearly saying that we are not going to disclose the names here because you don't need the

Garlock/7-26-12

24

names.  If they haven't filed claims, you have got nothing to compare them to.

The court did require – the special master required that Verus, which had all of the information about claims against all of the trusts, place identifiers in there so that the insurers could match the claims, the same claimants who were filing against each trust.

Now, obviously, if claims had been filed against Federal-Mogul and there was a need to match claims in that case, Verus wouldn't have been able to provide that kind of matching data because Verus doesn't have access to the information in the Federal-Mogul database.  So that's a key distinction in that case that's not present here.

In this case, as in the Congoleum and the Porter Hayden cases, the claimants have filed claims, they have had those claims settled.  The committee says that those settlements are a reflection of liability and that they reflect the trust claim.  We need to be able to match the claims, see if they truly do, to see if the claims we settled were claims about which we knew about, the trust claims and the underlying evidence.

Now, we have heard statements from the trusts that they are seeking a protocol and it's just like General Motors. It is just like that.  So this has happened before and this is what General Motors approved.  That's not correct.  In General

Garlock/7-26-12

25

Motors, Judge Gerber's order, it required that claims information, including names and Social Security numbers of the claimants, be produced to parties' experts so they could match the data with GM's data and claims filed and create an anonymous database.  In other words, they had to provide that so that the matching could be done.  And then, once the matching was done, then the experts – and the experts had to negotiate with each other and assure each other that they had all done correctly and agreed on the matching.

So in that case, they came up with a database that identified claimants by something other than their name and Social Security number, and they provided that each of the parties' experts could keep the matching information.  In other words, they would keep a key showing the links to the actual name but that that information would be kept in a separate electronic document.  It would be taken off of the expert's computer files and it would just be held and it could only be used for any additional matching purposes in the future.

Now, the purpose of that was not to blind information to the parties.  The parties understood that the parties needed the information to do the matching, but the purpose of it was to give an additional layer of protection that this information could never be disclosed to third parties.  So that even if there was an inadvertent disclosure of materials, no third party would ever be able to link the database that the court

Garlock/7-26-12

26

and the parties would rely on with specific claims. So that's the purpose. The purpose isn't to blind or limit a party's use of the data.

Now, they talk about the *Bondex* case and, in *Bondex*, they say that Bates White and the debtor in that case said that they were agreeable to an anonymity protocol just like the one they propose but that's not true, and I cite the papers that the trust cited in their submissions to the court, and this is the debtor's counsel in *Bondex*, and he said we discussed with our estimation expert, Bates White, and after that discussion we determined that the anonymity protocol that was negotiated by the unsecured creditors committee, the asbestos claimants committee and the future committee in the *Motors* case – that's the one we just talked about, and ultimately approved by Judge Gerber in that case, would work in this case, and I don't know if Your Honor is familiar with that, but that's what they were saying. They were saying we will be agreeable to do this pursuant to the *Motors* or *GM* protocol.

THE COURT: And didn't I read in your papers that you all are willing to go by that?

MR. CASSADA: Yes.

THE COURT: The *Motors* protocol?

MR. CASSADA: Yeah. We don't think it's necessary and, as long as it doesn't – that there is nothing added to it that limits our ability to match but, yes, we will do that. We

Garlock/7-26-12

27

think it's unnecessary.  It's expensive and it is going to be time-consuming because it takes several weeks for the parties' experts to exchange and agree on an anonymous database but, yes, we  can work with that and we believe that it would serve our purposes in this case.

Now, we didn't hear a lot from the trust about burden, and we are confident that our request imposes very little burden of cost.  We considered these other cases before we made it, and particularly the *Congoleum* case talks about how easy it is for trusts to produce this kind of data because it's all electronically stored and basically requires two things. First, matching.  They have got to match the claims we send them with their database.  Now, we know they have already done that because they gave notice to the claimants' lawyers.  We don't think it was very expensive to do that either.

And then they just have got to extract for each of those claims four pieces of data.  We assume that they know how to do this but a very simple computer program can be written in short order to extract that data, and it's not very expensive. So we haven't heard them complain about it, but our request was designed specifically so it wouldn't impose a burden and it wouldn't be real expensive for the debtors to obtain this information.  But in any event, we will pay the reasonable cost of the burden.

The last thing I hesitate to get into and I won't get

Garlock/7-26-12

28

into it in detail unless I have to but the trusts, to our surprise and dismay, they spend a big portion of the paper that they submitted complaining that we were discourteous to them, and we just don't believe that's the case.  We were very patient, we were friendly, we were accommodating.

THE COURT: We don't need to get into that.

MR. CASSADA: All right.  Well, I won't get into that.

THE COURT: You all are lawyers.

MR. CASSADA: Thank you, Your Honor.

THE COURT: I expect a certain amount of discourtesy.

MR. CASSADA: Okay.  Well, that's all I have.  I will sit down and you can hear a response from the trusts and the committee and then take an opportunity to reply to that.

THE COURT: Okay.

MR. JURIS: Thank you, Your Honor.  Stephen Juris for the trusts.  We are all here in front of you and we are happy to be here and have our day in court.  It has been about a year and a half since I was here.  I haven't minded not being part of this fight but here we are.

The parties put in extensive papers.  Mr. Cassada made a comprehensive statement for his position.  I want to focus on some key thoughts and to frame them around the following concepts.  Context, content and common ground because one thing that I think I have observed in the course of briefing here, unfortunately we came to it late, is that there is probably

Garlock/7-26-12

29

more common ground here than there initially appeared. Mr. Cassada, as Your Honor has noted, acknowledged in his papers that some kind of anonymity protocol would be acceptable to Garlock and so the question then becomes what kind, how is it structured, is it the GM protocol or is it something else, and I will touch on that in a moment.

For context, I want to talk briefly about where this case fits in with other cases and with this case previously because it shapes how we have approached this issue. Frankly if I were a betting man, I would have wagered incorrectly that we wouldn't be here arguing this issue. I thought from my standpoint this was not a fight we wanted to be having. We thought there was a reasonable way to accommodate both Garlock's interests, stated interests, stated reason for this discovery and the reality that the trusts are governed by TDPs that say they have got to do various things and fight various things, but also balance against the practical reality that Your Honor has already spent time with the parties to this action addressing relevancy issues and the like, and we didn't want to revisit those.

So context, where are we? Mr. Cassada said that he thinks this will all be simple and we have heard that before. The larger context here is that, in any case involving asbestos liabilities, and particularly big, contested, hard-fought cases like this, the debtors or whoever is seeking information

Garlock/7-26-12

30

initiate a march to the sea, asking for the trusts to produce lots of information and we get lots and lots of these requests. Some of them, we fight because we feel we have to fight them, and we have fought them and the *Bondex* case is a good example, and sometimes when we fight, we win and sometimes when we fight, we get half a loaf and we move on.

In this case, we just got finished with a fairly sizeable production to Garlock that took a lot of time, a lot of energy and Mr. Cassada is right in his papers that the substance of that doesn't relate to this, but I represent a client that has a very particular purpose and a very particular mission, and it has not been created as the Library of Congress for these requests. So what we are trying to do here is to balance their mission, their TDPs, their obligations, case law but also the practical realities of understanding that Your Honor has a case to move forward.

Let me talk about the content of this current dispute because I think – I had thought that we had found a way around this and that it should have been acceptable to Garlock. Obviously we have serious problems with the basic premise of the request but I am not going to address that. I think that ship has sailed from our standpoint.

What we did when we got the subpoena is to take a hard look at how Garlock – what Garlock said, what it said it needed, why it said it needed it, what it emphasized during

Garlock/7-26-12

31

oral argument before Your Honor, with the goal and the purpose of trying to figure out whether there was a way for us, the trusts, to commit to do something that would get Mr. Cassada every item that he ticked off – the date the claim was filed, the date the claim was approved, the date the claim was paid, the status of the claim, all of those things, on the one hand and also to avoid, you know, us getting sued for turning over information that claimants view to be inappropriate, and so we are trying to balance those two things.  And the idea we came up with was an anonymity protocol.

Mr. Cassada, when he argued before Your Honor, I thought passionately made the case for his side that he believed he needed trust information to be able to show that in fact there was a lag, that the claims that Garlock was settling back prior to bankruptcy weren't the same claims that Garlock – you know, that the trust were paying and that therefore this information, the trust payments, had not been, quote/unquote, priced into Garlock's settlements.

As I said, I think that ignores the reality that our TDPs are fairly clear and litigants know to a fair-the-well what the trusts are going to pay if they can establish liability but that's beside the point.

When I went back to my clients, I said we think we can do this anonymously.  We think we can get Mr. Cassada what he wants in a way that will either show or not show what he wants

Garlock/7-26-12

32

to establish, which is, by the way, by rebuttal, and that I think, as a practical matter, we obviously don't represent claimants, we don't know what positions they will take, but my sense is that it would dampen the ardor on the part of the claimants and certainly reduce some of the concern that we are going to be producing information to Garlock and to its experts, Bates White, regarding claimants, their Social Security numbers and that, when we give that information to Garlock and Bates White, that information is going to go off into the ether and, while protected by the confidentiality provisions here, Bates White can't unlearn the things it learns.

In any event, we also asked a couple of other things, which it sound to me like the debtor here has acknowledged are reasonable confidentiality protections.   That we get compensated for both out-of-pocket cost and the time spent by DCPF doing this and that there would be some sort of orderly procedure for claimants to come in and object, so that we are not put in a position where we are being asked to produce things and claimants are saying don't you dare produce it, we haven't had a chance to be heard.

And I thought that that was going to work. Apparently it didn't, and I guess my question is why.  We know that in some context anonymity protocols are acceptable.   GM was obviously a different case, a different time. The debtor in GM

Garlock/7-26-12

33

or the UCC, rather, in GM wanted the information for a much larger purpose than is being expressed here. But when Garlock made the pitch to Your Honor that it wanted this information, the point that they were making to Your Honor is that they needed the information to be able to show that it is not conceivable that the trust could have been resolving the same claims that Garlock was resolving at the same time, and that was how it was presented. Our proposal does that.

They said it's not possible that the trusts, that they, we, could have been paying the Garlock claims, the claims that Garlock was getting in the latter half of the decade at the same time as Garlock. So we contend there is no overlap or there is not enough overlap to demonstrate whether Garlock and other defendants will get relief from the trusts if the court considers this information.

Well, I think the information we proposed to provide does that. It will either show it or it won't and, if it is necessary to identify each individual claimant with a unique identifier so they can compare across the information provided by our trusts and that will solve their concern, that's certainly something we could do.

Let me touch on *Federal-Mogul* and *Porter Hayden* because I think there is a fair amount of emphasis there. So *Porter Hayden*, identified as a case that supports the proposition that this doesn't need to be anonymized. Well, we

Garlock/7-26-12

34

took a look at *Porter Hayden*.   I am familiar with *Porter Hayden*.  And the most noteworthy thing from my perspective from that case is that the exact information that is being requested here was excluded from that production.  Excluded.  No claim status information, no settlement information whatsoever.  That was a consideration that was relied upon by the judge in that case for approving that production.  So from our perspective, the cases are inapposite.  The information that's being sought here is settlement information.  It is exactly the information that was not included in *Porter Hayden.*  And I would just refer Your Honor to Exhibit "I" to Garlock's papers where the judge made a point in that case of saying that, here, there has been a limitation to exclude settlement-related information, including information about claim status.  So that's *Porter Hayden*.

*Federal-Mogul*, I want to be clear, there was a statement made earlier on the record that in that case claim form information was provided with claimant names and Social Security numbers.  I think that was not correct and I think, towards the end of the presentation, that was made clear but let me emphasize that.  In *Federal-Mogul*, albeit an insurance case, these same kinds of debates were happening.  The papers, if Your Honor were to look at the underlying briefing in that case, it would be eerily reminiscent of the briefing in this case, albeit an insurance case.  Ultimately there was a fight

Garlock/7-26-12

35

and there was a ruling by a special master in that case but, on the things that matter to us today, in that case the production was anonymous. There was fighting about whether it ought to be anonymous or not, and it was anonymized. Names were removed. No Social Security numbers, no information. And the way in which it was produced did not allow the insurers to go back to their experts and link the information that they were receiving from the trusts to the information that they already had.

And so from our standpoint, it is not a case that supports Garlock's position; it is a case that supports our position and frankly gave me comfort, when I was thinking about ways to resolve this problem and move on, that Garlock might just well take that deal, but they didn't.

So that brings me to common ground. I don't think there is a debate here that anonymity as a principle, as a goal, is something that is achievable and that is achievable in a way that is not going to do violence to what Garlock wants to do here. We don't have a stake in that fight. The trusts have TACs and that's how they were created by courts, and I can't change that, but we don't want to be here fighting, we don't want to be a player in this litigation. We want to be left alone and, where we can't successfully be left alone, we want to do things in a way that is not going to result in someone screaming and yelling at us or maybe suing us for producing information that they believe to be protected and confidential.

Garlock/7-26-12

36

So the real question here is, given what Garlock said it needed this information for, is the proposal that we have identified sufficient to the task at hand, and I think it is, and it also has some other virtues.  It is simple; it is easy.  It doesn't require us to do much more than we have already done.  It avoids concerns, and I think they are real concerns, that may well motivate the plaintiffs' bar and, which we heard in *GM* and ultimately resulted in the plug being pulled on that discovery in that case.

I think there is concern among certain quarters that, if information is provided to Bates White in a non-blinded way, that claimants are going to object and find it objectionable, and I think that, if we do it this way, you are less likely to have that response.  And critically I think it does allow them to do what they told Your Honor they wanted to do.  They will either be able to see that people are claiming against trusts at the same time that they are claiming against Garlock or it won't, and I think that's sufficient to the task at hand.

Now, I was involved in GM.  I have an opinion about that case.  I think by the end of that case everybody involved, including the judge, decided that it was – and not just the anonymity protocol but every aspect of that case was not something to be emulated.  The judge ultimately pulled the plug on discovery and there was an order entered vacating his prior orders.

Garlock/7-26-12

37

I will just say that the anonymity protocol in that case strikes me and it struck me at the time as complicated and fairly unwieldy and information was sent into a black box and then, you know, once it was combined, it was launched into outer space.

The bottom line is, you know, it strikes me that our suggestion is a reasonable one, and I think it is one that would have allowed us to avoid this and, as I said, I think it may well be a way to move this forward.

I guess my last thought is there is an argument made in the briefing that was not made here today, or it was only alluded to, that if costs of this exercise are paid for by Garlock, that the cost of notice not be covered, and I would just like to say, you know, we strenuously object to that. The reality here is that, to the extent we are here and we are sending out notice at all, it's because someone, here, Garlock, wants information that we have. And given how the circumstances have aligned, whether it's under the TDPs or under considerations of due process or Your Honor's prior order, notice has to be given to the folks whose information is in play here, and there is no way for that notice to get to them without us sending out a notice, which we did, and I think it is only reasonable, if we are going to be forced to do this, that Garlock accept the responsibility of paying for the time and energy it takes to do it and do it right.

Garlock/7-26-12

Thank you, Your Honor.

MR. WEHNER: Good morning, Your Honor. Jim Wehner for the committee. May I bring up an exhibit before I get started?

THE COURT: Yes.

MR. WEHNER: Your Honor, on May 17th, the debtors told you they needed specific items of trust data, largely dates for a specific purpose, to address the so-called overlap issue. They pointed to testimony from the committee's expert from back in 2010, Dr. Peterson, regarding whether trust payments were reflected in Garlock's settlement history.

As the debtors explained it that day, the issue is were the trusts paying the same claims as Garlock at the same time, and they had a PowerPoint that talked all about overlap and Dr. Peterson's 2010 testimony, and that is what I have handed up as ACC 132.

If you just page through it, you can see that the focus of their presentation on May 17th was that question, were the trusts paying the same claims at the same time, and it was all about rebutting this one statement from Dr. Peterson.

The debtors also told you on that day that they did not want to address the merits of individual claims; and it seemed to us that, as they framed it that day, that narrow overlap issue – you called it narrowly drawn in your ruling – was the basis on which you granted their motion for permission to issue the subpoenas.

39

But since the trusts suggested anonymity, the debtors have changed their tune.  They now say they want this information to determine whether individuals had revealed exposures in tort system discovery.  In other words, this is all part of their apparently endless quest for fraud and nondisclosure on the part of individual claimants.

This is an about face from what they said on May 17th.  It is a bait and switch.  We believe the confidentiality concerns of the settled claimants can be addressed by holding the debtors to their word, that is, to the purpose that they articulated at the May 17th hearing.  The only way realistically to do that is to adopt the anonymity proposal that the trusts have put forward.

As Mr. Juris explained and is laid out in the papers, under that proposal, the dates of settlement with Garlock for these eleven thousand claimants will be matched to the dates of trust payments and other trust events and that lag issue can be examined.

Of course, stepping back, the committee believes that this data is unnecessary.  Garlock was well aware about what was available, potential recoveries from the trusts and the idea that they were sitting around unaware of trust recoveries is, we submit, pretty silly, but the debtors said they wanted this data for that reason and Your Honor permitted it, and we are not here to reopen that issue.

Garlock/7-26-12

40

But settled claimants have legitimate confidentiality concerns, as Mr. Juris touched on, and they have yet to have their day in court. The court-approved distribution procedures for these trusts say this material is confidential. Claimants approach and settle with the trusts on that basis.

And, as we have talked about before, settlement information is generally not provided or available in the tort system except after a verdict. Garlock could not go out here and subpoena solvent defendants in the tort system and say, hey, Union Carbide, what did you settle all of these claims for. They couldn't do it or they couldn't do it without an epic battle.

And, in addition to that, we have to keep in mind that these are not current claimants who are seeking money from the debtor right now. They are settled claimants. Sometimes they settled years ago and, by settling, they bought peace with the debtors, they bought peace from intrusive discovery requests and the debtors got the same thing. They got peace from the plaintiff's discovery requests.

And it is certainly true that current claimants are, in some instances, represented by the same counsel as settled claimants and, when they see Bates White in case after case seeking this information, seeking to create large databases. Bates White was involved in *Federal-Mogul*. Bates White was involved in *Porter Hayden*. Bates White was involved in

Garlock/7-26-12

41

*Congoleum*.  They are legitimately concerned that this data is being sucked into some kind of  Bates White's creation and that they will see it again and again.

Together with a protective order like the one that protects the questionnaire data, and which the debtors have agreed is appropriate, the trust anonymity protocol goes a long way to assuaging these concerns on the part of settled claimants, while still giving the debtors what they said they needed, at least at the May 17 hearing.

So we urge the court to adopt the trusts' anonymity proposal.

The debtors have suggested that the anonymity protocol from GM might work and we don't think it is going to.  Like Mr. Juris, Mr. Swett and I were involved in the *General Motors* case and that was a much different case.  Specifically – Bates White was involved in that case, too, of course.  In that case, the UCC was not making this sort of case-by-case nondisclosure arguments that the debtor wants to here.  It was an aggregate estimate that was going to be fought at a high level with numbers essentially.

Judge Gerber did not want to get bogged down in what he called the asbestos wars, and the entire estimation case was scheduled to be completed in about two and a half months, a month for fact discovery, including depositions, a month for expert discovery including depositions and then the hearing.

Garlock/7-26-12

42

In that case, the anonymity protocol, which was alluded to here, was one where the data that the UCC was seeking from the trusts was going to be merged with the debtor's database and certain other databases into a single database, and then all of the identifying information was going to be stripped out and locked in a box.  And it never came to pass, of course.  It might have worked in General Motors.  It is not going to work here.  The reason is what the debtors want to do here is link this trust data with claims files, depositions, interrogatories, entire claims files.  It is simply impractical to think that somehow that kind of massive combined database could be anonymized like they did it in GM. You can't go through a two hundred page deposition and black out names for eleven thousand claimants.  It would take a million years.

So if we are going to go down that path, if we're going to be looking at claim after claim and trying to determine whether this person really did not disclose certain information, then that kind of GM style anonymity protocol is not going to work.  If we are going to use this trust data for that purpose, the GM proposal won't work.

Instead, we believe the trust anonymity protocol is workable and gives the debtors what they said they needed. With trust payment dates linked to the date of settlement with Garlock, the overlap question, at least as Garlock claimed it,

Garlock/7-26-12

43

can be addressed.  They can hardly complain that they are getting what they asked for, and that production strikes the right balance between the concerns of settled claimants and the needs of the debtors.  We believe it will substantially lessen claimants' concerns about the discovery and reduce the prospect of objections and litigation and help us move promptly towards estimation.

So we would urge the court to adopt the trusts' anonymity proposal.

THE COURT: Anybody else?

MR. SWETT: Yes, Your Honor.  I rise to supplement Mr. Wehner's and Mr. Juris' remarks with respect to the important question of the impact of anonymizing this data on the progress of this case.  It strikes me that there are four distinct interests that you have to take into account in trying to strike a reasonable balance here.  The first is the interest that Garlock expressed in this information that led you to authorize the subpoena in the first place.  Counsel have already covered that.  It is fairly plain from the transcripts and the PowerPoint where their emphasis lay and, when you said you think we have a factual issue here and this is narrowly drawn, the only reasonable interpretation I can place on it is that you were persuaded why the overlap issue was a narrow factual dispute that would be resolved by this information. And, as counsel have pointed out, that need can be addressed in

Garlock/7-26-12

44

spades without getting into the claimants' names.

There is the interest of the settled claimants, the people who already made peace with Garlock.  One of their interests is in just maintaining that peace.  One is not finding their adverse expert in the tort system, which is Bates White, equipped with a whole lot of data and information in its head to their disadvantage when Bates White, or their solvent defendant clients or their insurance company clients negotiate with plaintiff's counsel for the resolution of those settled Garlock claimants' claims against still solvent entities.  That is a negotiating imbalance.  It would be a unilateral advantage on the part of the solvent defendant against the plaintiff.  It is not fair and it shouldn't be permitted.  That's an interest of the settled Garlock claimants here.

Another, however, is reliance on the TDPs, which are court-ordered documents integral to the reorganization of former tort defendants, blessed by the courts, creating legitimate reliance interest on the part of the settled claimants that Garlock is now pursuing information about.  It is not that the TDPs create a black box.  In the tort system, the trusts respond to one-off subpoenas in individual tort suits where that information is deemed available under the rules of the presiding court, but this is altogether different.  This is wholesale discovery essentially of a co-defendant's settlement information.

Garlock/7-26-12

45

Remember, the trusts, Your Honor, are essentially the liability division of reorganized tort defendants and, as Mr. Wehner pointed out, if Garlock were to say to you either in this bankruptcy context or even in the tort system, we wish to subpoena the settlement data information from all solvent defendants, they would never get it.  No court would enforce that demand, and that's essentially what they are trying to do here.  There is no difference between a trust and a solvent defendant when it comes to this issue.

What about the trusts' interest?  Their interest is in executing the TDPs.  Their interest is avoiding getting caught in the cross-fire between plaintiffs and defendants and Bates White in what Judge Gerber called the asbestos wars.  That's a legitimate interest.

The TAC members that counsel gave you this hand-up about, trust advisory committee members, fiduciaries to the constituency of trust beneficiaries, they have a legitimate interest in enforcing the TDPs.  They are not the maligning influences that Mr. Cassada would suppose.

And then, and this really is where the rubber hits the road as far as I am concerned, there is the interest of the reasonably prompt progress of this case. When you authorized that subpoena on narrow grounds, it was on the supposition that the issue was narrow and could be addressed narrowly.  Now, in a massive bait and switch, they have pulled out a few subtle

Garlock/7-26-12

46

references from their brief, completely ignored in their oral argument and their PowerPoint, to suggest a much broader agenda of linking this information to all the other stuff they are getting in their quest to make something of the supposed minutes of plaintiffs' disclosures in the tort system about third-party exposures.

They are getting more of that kind of information from other sources than they can possibly use. They are already crying to you that they cannot get their work done in time for the September 21 fact discovery cutoff that they previously agreed to. They are suffering from what I would indelicately call discovery indigestion, and I would submit that it is up to them to scale their case to the needs of the calendar that you have laid out. You, of course, have the discretion to modify that calendar in accordance with the real needs of the case, but that kind of decision should be made advisedly. It shouldn't be there for the asking; it should go to real need. This is not one because their stated purpose, as emphasized at the May 17th hearing, can be accommodated by anonymized data.

So here is where I come down, Judge: I am frank to say we think the authority to issue the subpoena was improvidently granted but it's done and we are not asking you to withdraw it. We are, with a view to balancing all the interests and our own keen interest in getting to trial soon and therefore not proliferating satellite litigation and discovery fights and

Garlock/7-26-12

47

third-party objections, having regard to all of that, the ACC has authorized me to represent that, if the court sees fit to anonymize this data, we will provide a written statement which Garlock can include in its notice package when it sends out notice of the inevitable required opportunity for these settled trust claimants to object, that on behalf of the ACC, it recommends that they refrain from doing so on the basis that the anonymization of the data, balancing all of the other interests, adequately protects them for the narrow purposes of this case.

That authority is not lightly granted.  I do not make that representation casually.  I also can't promise that all of the constituents would abide by it.  They are not controlled by us.  But I hope we have influence as the ACC.  We are willing, because we want to get to trial soon and to avoid this kind of swamp, to affirmatively advocate to the constituency that they acquiesce in the trust anonymized production of this data. That's our contribution to try to push this case forward and pass this particular sticky wicket.  We hope, all things considered, you will balance the interests and find that the trust position is satisfactory.

Thank you.

THE COURT: Anybody else?  Ms. Edwards.

MS. EDWARDS: Your Honor, the Delaware Claims Processing Facility would just like to join in the arguments of

Garlock/7-26-12

48

the trusts by Mr. Juris.

THE COURT: Okay.  Mr. Cassada, do you have anything else?

MR. CASSADA: Thank you, Your Honor.

First of all, this idea that there has been a bait and switch is completely wrong.  That is language that we continue to hear from the trusts.  We have been clear throughout this case why we need the trust information and, in the motion, we made it crystal-clear.  There are no subtle references here. We summarized three different times precisely why we needed the information and included that we needed the information to show that the settled claimants had not identified in the tort system discovery the exposure to underlying potential claims. We said that over and over, and we also said in our motion that the lag issue, and this is in paragraph seven, was just one example of the relevance.  So we made that crystal clear there and, when we sent to the DCPF and the trusts the subpoena, we sent a copy of a motion which explained why we needed that.  We didn't send them a transcript of an argument or anything.  We sent the motion.

We didn't limit in our argument, we didn't limit ourselves in any way, and that would be a decision unlike any I have ever seen, where we would go to and win an argument on discovery and then have someone come back later and said that we agreed during the argument to limit the request that we had

Garlock/7-26-12

49

made to the court.  That's completely inappropriate.

This is nothing more than an attempt to cripple our case.  This information is plainly relevant.  It has been ordered to be produced in many other cases without anonymity, including in *Porter Hayden* and the *Congoleum* case, and all the time without anonymity and the courts have rejected wholesale – and you can read those cases – they tick off these arguments about the TDP and reject them one by one.  The confidentiality provisions are agreements between the claimants and the trusts.  They don't apply to third parties.  They are subject to discovery just like anyone else.  There is no settlement privilege, particularly in the Fourth Circuit.

Now, Mr. Juris says, well, in *Porter Hayden* they didn't even get claim status.  Well, they didn't ask for it there.  It wasn't relevant to what they were doing.  They asked for all of this other information that the claimants claimed was confidential and subject to the same privacy interest.  The court found that it was relevant and ordered that it be produced. No anonymity protocol.  And Bates White was involved in that case.  No concern at all about that.  The same in *Congoleum*.

And when they say they are providing the information for what we say we need it for, they are ignoring our motion.  They are ignoring the positions we have taken throughout the case.  They have got this argument that claimants will find it

Garlock/7-26-12

50

objectionable.  Well, we need to give notice to the claimants and we have agreed to do that.  We are going to give notice to the claimants and have them appear and raise any objections they have, but they came and they raised all the same objections you have heard here today in these other cases and they were rejected.  This is relevant data that we are entitled to.

And now they start heaping scorn on the GM anonymity protocol, but go back and look at their motion.  They said in there that that is what they had offered, that they were offering that protocol, and that supported their position.  So we didn't make that up.  That's what they said.

But you can understand now why we were not able to settle this, and that is that they are unwavering in their requirement that any information they give to us, we can't use it in any way except for the single way that they say we can.

Let's consider that for a moment.  Suppose we get the information and the information shows that thirty-five percent of the claimants had filed claims before they settled with Garlock.  So suppose the lag issue is the only issue?  Well, then, the committee says, aha, that shows all these claims, if you were going to get any relief, you would have gotten it then, but we are unable to match the claims where that actually happened, where there was a settlement before our settlement to show which claims they were, what significance that lag really

Garlock/7-26-12

51

does have on claims value and what happened in discovery in that case, did we have knowledge of the trust claim. We would have to have that before you could reasonably argue that it was priced into the settlements. Clearly relevant information. And anonymity protocol, it achieves no legitimate purpose other than the purpose of handcuffing us and preventing us from proving our case.

Mr. Swett, when he was arguing in a discovery motion here where they were trying to get information, he said this is the oldest trick in the book. First you block the discovery and then, when they get to the case, you argue that they haven't been able to prove their position and therefore the court should reject it. So that's exactly what's going to happen in this case. We are going to come in and we are going to make our arguments and they are going to say you don't have the evidence.

Remember the information we have, we have the ballots. Well, he has already come in and said ballots don't mean anything. That's not evidence of a claim, that's a hunch. Remember that? And he said if you really want to know whether they have a claim, you have got to see the trust claim. Well, that's what these are. These are the trust claims, and that's what we are seeking.

Now, Mr. Wehner said this was unlike GM in that we are proposing to compare these data that we received with actual

Garlock/7-26-12

52

claim files and that wasn't going to happen and there was some kind of high-level thing, you couldn't possibly do the database. But I refer you to paragraph eleven of the GM protocol which expressly contemplates that the committees in that case are going to be able to compare the data with claims file materials. Claims file materials include transcripts of depositions of approximately six hundred and fifty mesothelioma claimants identified on a list. So the GM protocol specifically recognized that – I am sorry. It is not the protocol. It is the order that ordered the discovery. But in that case, it was specifically understood that the data was going to be used for that purpose and I am referring now to paragraph eleven of the August 24 order.

I mean, this is really all about the committee not wanting us to put on our argument that's been central to our theory about why settlements don't fairly reflect our liability from the beginning of the case, and that is that the settlements were inflated by the bankruptcy and, when the trusts began to emerge, the claimants were not identifying the evidence that they had that supported claims against the trusts and therefore we weren't getting credit for the trust payments. They say we were getting credit, and they want to completely block our ability to get at that issue. It is clearly relevant. They haven't given any good reason to impose – to essentially blind the debtor from being able to use this data,

Garlock/7-26-12

53

other than to raise this frivolous argument that we engaged in a bait and switch, we didn't say that we wanted it for that purpose when we clearly did.

So, Your Honor, I would urge you to enforce the subpoena in accordance with its terms.  If there is going to be an anonymity protocol, then it should be a protocol like GM, which again, you talk about a bait and switch, read their papers.  That's the one they held up as providing a model for what they had requested for us, but let's do it pursuant to that protocol so that the debtor can use this data in a way that supports its case at the hearing.

Also, Your Honor, we have already gotten from the trusts the information necessary to serve the claimants and we would propose getting that notice out within the next twenty-four hours, however long it takes for Your Honor to enter an order and to have those claimants have an opportunity to appear and object on August 16, which is a date when other claimants can appear and object, as well.

MR. SWETT: Your Honor, if I may, first to correct Mr. Cassada's characterization of our position.  It's not our position that they were getting credit for other payments.  It is our position that they never paid anything but their own share, that this issue of credit is a false issue.  So I just want the record to be clear on our view of that.

With regard to GM, don't go there.  We would rather

Garlock/7-26-12

54

not have any protocol than the GM protocol and here is why: The UCC in that case may have started out on this kind of jihad but Judge Gerber wasn't letting them do it.  The anonymity protocol supervened and distinctly limited the information that was going to be usable in the case and then he put it on the two-month tract that Mr. Wehner described to you.  No possible way were they going to engage in the intensive focus on individual claims that unfortunately Garlock is insisting on doing.

And in that posture, should they take that intense focus on individual claims, should they tell stories about such and such a claimant didn't make these disclosures or that disclosures, we have to be able to get behind that and test the veracity and accuracy of their representations based upon basically revisiting all of the tort discovery, a very tedious and time-consuming job which we can't do if they get the information non-anonymized, then get to strip it out after linking it to all of their stuff and then the parties are relegated to the anonymized version, we could never get behind their stories on that basis.

So that's completely inapposite to this case and we disclaim any suggestion that the GM protocol would serve the purposes of this case.  Instead, the far simpler and cleaner protocol suggested by the trusts is the one to embrace here.

THE COURT: Okay.  Then here is what I will do: I will order that this subpoena be enforced on the condition that the

Garlock/7-26-12

55

reasonable expenses be paid by Garlock, including the expenses of notice, and that the confidentiality provisions in this case be applied to that, that the claimants have an opportunity to object individually and to do that on August 16th, but otherwise will not blind or anonymize the data, and we will just leave it with the confidentiality provisions of this case to apply and protect that.

If you will do that order, Mr. Cassada, and get that notice out, we will have a circus on the 16th.

MR. CASSADA: We will have the order to you this afternoon.

THE COURT: All right.  Let's take a break until about ten minutes after eleven.  If possible, I would like to break for lunch at 12:15 and come back at 1:30.  Will that work for you all?  Okay.  With that in mind, let's take a break.

(Recess from 10:58 a.m. until 11:13 a.m.)

THE COURT: All right.  What do you want to do next?

MR. SWETT: May it please the court, I think the next up is the committee's motion for determination of the insufficiency of certain responses to request to admit and for an order directing further responses to related interrogatories and document requests.  This has been colloquially referred to as the third request, although it was the first set of requests for admissions.

We have submitted a proposed order.  I have a refined

Garlock/7-26-12

56

one to suggest today.  It grows out of dialogue with Mr. Cassada where we haven't agreed but perhaps have narrowed the issues, and he is aware of the contents, although we haven't had a whole lot of time to think about it.

THE COURT: Are you talking about this order here?

MR. SWETT: Yeah, which I am going to hand up later. It's possible we can make a little further progress in narrowing the issues but I can't promise that at this point. So I do believe we are going to need to come away from this hearing with an order that makes clear Your Honor's view of the debtors' discovery obligations in the matters in question here.

Looming in the background is the issue of the schedule.  It is a repeated point of tension between the parties whether there should be a structured schedule with firm deadlines, with a bright line, as you have previously felt there ought to be between fact discovery and expert discovery and  a reasonably early trial date.  It started out December 2012.  Because of discussions having to do with the scope of expert discovery, the next suggestion was February.  That didn't work because I think the issue then was one of the defense attorneys couldn't come to trial then, so it became March 4th. We had substantial discussions, all premised on that as the trial date.

In effect, we had agreed the essential elements of a schedule but not buttoned it down as to the last jot and tittle

Garlock/7-26-12

57

and then we had the (inaudible/11:16:10) over the significance of the June 28th hearing as it regards individual claimant's right to object to the supplemental questionnaires. The debtors take the view that that had a substantial impact on the schedule and so walked away from what had previously been assumed. And their perspective is they can't be assured of obtaining, much less using, all of the, I would characterize it as massive information that Your Honor has authorized them to go seek, while committing to make disclosure of their contentions and the facts underlying those contentions as regards supposed claimant non-disclosures in the tort system within the fact discovery period.

And so we are faced with, from our point of view, what are continual suggestions that, as to that, the court affirmative discovery by them, the dates previously suggested shouldn't apply and, if they do apply, there should be an escape hatch for this kind of discovery and inevitably it would seep well into the expert discovery phase and we would not, in that scenario, have a fair opportunity to get behind their contentions and test the factual basis, and which is our essential problem.

But our foremost interest, and it seems to me the foremost interest and what is in the best interest of the case is to have an early trial. It is an estimation. It is not the trial in absentia of a whole bunch of asbestos claimants, even

Garlock/7-26-12

58

though in many ways the debtors' approach tends to make it seem like that.

Mathematical exactitude, as the courts that have already successfully completed estimations, is a chimera, it is not achievable, and the case shouldn't be managed with the impossible goal of achieving mathematical exactitude.

It is an estimate and, in that context, and given the importance to the interests of the estates and creditors in getting this over with in the reasonably near future, it seems to me all parties have a very important obligation to scale their efforts in accordance with that goal of expedition.

Query whether, given the authorized discovery for the debtors on these issues of supposed claimant misconduct or nondisclosure, whether or not amounting to misconduct, query whether that balance is achievable at all, but we have got to do the best we can.

And while I understand and appreciate the debtors' concern that, having won the right to get this information, it ought to have a fair opportunity to use it before having to make disclosures of its underlying – of the facts underlying its contentions, that can't be the sole driver of the train. The countervailing interests in expedition of the trial, of making this a triable case, and not one where the committee is put in the possible posture of having to test nitty-gritty factual assertions about whether or not, you know, JQ claimant

Garlock/7-26-12

59

did or did not own up to known exposures to some other third party's products in the tort system.  If the debate is going there, as I have explained before, the work to join issue fairly is extremely painstaking and time consuming, but it is inevitable.  Otherwise you have what I have characterized in the brief as their data coming forth, in effect an unexamined status.  It would be like allowing them to put witnesses on the stand without cross-examination.  It would be guaranteed to skew the record, so it must be avoided.

Those are the tensions as far as the important question and the overarching question of time is concerned.

Let me now switch my focus to the substance.  We have two motions on the calendar today.  The issues are different and it is important to keep them separate in your thinking for clarity of understanding and, failure to do that, I think, sows some confusion that has in fact, I think, compromised unduly the debtors' response to the request for admission and the related interrogatories and document requests in a way that I will point out later.

The first motion is that one seeking further responses and further productions, going to contentions by the debtor as to whether or not, given individual claimants failed to disclose, whether it be because they were falsely denying on purpose or in ignorance or concealing, actively or passively, or simply failing to disclose exposures in fact, reasonably

Garlock/7-26-12

60

knowable to them, and those are the key contentions that give rise to this discovery.

And we have said, and the way that I will explain, give us the documents germane to those contentions. Of course, we have particularized the requests and defined them much more carefully than that but that's the gist of it. It is material that is undoubtedly relevant, and nobody suggests otherwise, if we are going into this claim by claim debate about tort system disclosures.

Now, for the clarity of the record, let me emphasize again we think this is all a gigantic and wasteful frolic. Garlock does not pretend to have paid for a release in the tort system that benefitted anybody but Garlock and its affiliates. It was not buying claims against other persons. It was never paying anything other than its own tort liability.

So this notion that somehow this foray into a replication of a decade worth of tort system discovery is going to be significant in this case. When all is said and done and you stand back and consider the significance of all of this work, we are fully expecting you to conclude, I hope you will conclude – we will certainly advocate – it is meaningless. But, right now, we have to deal with it and that's the first motion.

The second is similar but different. It has to do with the enforcement of an order you entered in May focused on

Garlock/7-26-12

61

claimants who voted in the *Pittsburgh Corning* case and who the debtors allege intentionally failed to disclose Pittsburgh Corning exposures, that is, exposures to asbestos-containing products for which Pittsburgh Corning was responsible. We won that fight. That, in itself, was the continuation of a fight we had last August where they said what are we fighting about, we are happy to give you that material. Many, many months later, stipulation efforts having abjectly failed to bring forth that production, we brought the renewed motion in April; you ruled in May; and we won. And you directed them to immediately produce what they had as to claimants who they say intentionally concealed Pittsburgh Corning exposures.

Weeks went by, we got nothing. That led to our motion for sanctions, which I am going to put second in the queue here for discussion today. And the reason it's important to keep in mind the difference between those two motions is the one focused on Pittsburgh, the one focused on intentional concealment. The other, we learned some lessons in that little debate, focused on claimants who they say they paid settlements in reliance on nondisclosures, whether by false denial, by concealment or simple failure to disclose.

We stripped out any suggestion that the scope of the responsive information would be limited to claims that they think were advanced by fraudulent claimants or intentionally misbehaving claimants. They don't seem to have accepted that

Garlock/7-26-12

62

in their response, in the belated production and response that they gave us last Friday under a shadow of these two motions, and I will explain that in more detail because the details are very important.

But for now the key point is the motion to require further responses to the request for admission and related interrogatories and document productions doesn't key off of intentional misconduct or allegations thereof by the debtors.

We have two related problems as to this motion to compel further responses. First, the response to the request to admit are transparently evasive and disingenuous, did not in fact place on the record in any fair or straightforward way the debtors' contentions on the subject matter. I think that's essentially – that's clear from both sides' briefs we are sort of beyond that because, in their letter of last Friday, they came forth with a much more expository, explanatory statement of their contentions, but their of record admissions, or rather denials, coupled with a lot of legal mumbo-jumbo, do not fairly set forth their position and need to be amended of record so that we can rely.

You have two options under the law and, by the way, they don't cite any law, we do, for dealing with evasive responses to requests to admit. You can deem them admitted or you can give them the opportunity to cure. We would be satisfied here with an opportunity to cure and it would

Garlock/7-26-12

63

probably be the better remedy for the purposes of this record because they could formalize the contentions that they have now given informally in their letter and the record would be clear.

The consequence, however, of the position they have taken is that the interrogatories and a request for production that were part of this integrated set are triggered, as they seem to acknowledge. They profess now to have complied within the limits of what they characterize as an agreement. I am here to tell you there was no agreement despite strenuous efforts, and what they have produced is, in significant ways, not responsive and therefore not complete and, by our rights, continues a pattern of maneuvering and evading to avoid the straightforward discovery that we are entitled to, but I will explain that in further detail as we go through the argument.

So to remind you of the structure, we asked them to admit or deny that in the decade of the 2000s they had paid settlements in reliance on nondisclosure, whether it be by false denial, by concealment or by a simple failure to disclose third-party exposures, and also we asked them to admit or deny that they had paid judgments won by claimants who, in their contention, falsely denied, concealed or failed to disclose third-party exposures.

They, despite the overheated rhetoric on these subjects that has characterized their papers since the information brief, they deny it, they weren't making those

Garlock/7-26-12

64

contentions and the hook that they seized on to deny was the preliminary way in which it said admit that, in connection with the estimation of your aggregate liability, you are making these contentions.    They read that tendentiously and unreasonably in my view to mean, oh, no, that means you are asking us to admit it's part of our affirmative case, that settlements are a part of the estimation at all and, of course, it's our fundamental position, they say, that that's not correct, although you have now ruled that evidence on that subject of settlements will be received, but they have seized on that introductory phase to say therefore we do not and therefore we don't have to answer the interrogatories and document requests because the RFAs were written such that, if you gave an unequivocal denial, as we put it, that would take the issue of all of this supposed nondisclosure out of the estimation proceeding and render the interrogatories and RSPs moot.    But of course this was now abundantly clear they didn't intend to take the issue off the table for the estimation proceeding, they were just bobbing and weaving and avoiding or delaying the discovery.

That's not a good-faith response to a request to admit. It requires a cure.

So let's proceed to the triggered document requests and interrogatories.    They appear on page seventeen of our opening papers and on eighteen.    The banging of heads in the

Garlock/7-26-12

65

meet-and-confer led us to narrow these requests in some important ways. You, in the meantime, had rejected our position that the debtors have waived privilege, so we explicitly excised privileged documents from this demand, whereas formerly we had requested that they provide their entire litigation file with regard to claimants as to whom they were making these contentions. We narrowed that to a specific list of documents and information, which appear on page twenty of our opening brief, and they include the documents setting forth the settlement, the release, the amount paid in settlement or, where applicable, the judgment and the amount paid in judgment, ballots, trust claim information or forms, similar materials forming part of the factual basis for the debtor's contention as to the supposed nondisclosure and a set of materials essentially consisting of tort system discovery papers that the parties have come to call product exposure information. All manifestly relevant if we are going to have to go and join issue with them on whether a given claimant didn't disclose what they were supposed to disclose about some other exposure, and there doesn't seem to be any debate about the significance of the information requested if that's where the debate is going.

Now, given their July 20 letter and production, why do we press this motion? Well, the answer is in a way simple and in a way it requires an appreciation of the details of the

Garlock/7-26-12

66

previous correspondence that they display with their papers, but must be hoping the court will not read very closely, because the account they give of that set of communications leads to a fundamentally mistaken view that we agreed in the end to narrow our request to what they have now provided or said they will provide in the future.  We have not, and it does not meet the need and it cannot be accepted as a limitation on their discovery obligation.

For this purpose, Judge, the thing to focus on is section two of the letter of July 20th which is attached to their opposing paper as Exhibit B-1 – I am sorry – Exhibit "B."

THE COURT: I don't have that up here with me.

MR. SWETT: Your Honor, let me hand up the letter of July 20 from Mr. Krisko to Mr. Wehner and Ms. Orr.

Section two of that letter is the one that addresses the motion I am now speaking to as distinct from the other motion for sanctions and it begins with the heading "Documents concerning omitted disclosures of exposure to products other than Garlock."  And it begins by the assertion that the debtors, referred to here as "we."

"We provide documents related to asbestos claimants, (a), with whom debtors reached a settlement or to whom the debtors paid a judgment and, (b), with respect to those who the debtors have evidence that such claimants or their lawyers falsely denied, concealed

Garlock/7-26-12

67

or failed to disclose that they, or the person whose injuries form the basis for their claims, have been exposed to asbestos-containing products of entities other than the debtors."

Now, the phraseology there embraces ours. A reasonable understanding, when you come to this letter cold, is that, okay, they were accepting an obligation to produce the responsive documents within that category. But as I will come to, they placed a gloss on it, a gloss of intentional misconduct as I came to find out only yesterday in discussion with Mr. Cassada, and that places a significant limitation on their response. We have taken pains to excise the element of intent from the scope of our request and thus of the responses. They have read that back in apparently.

MR. CASSADA: Excuse me, just to be clear, our discussion last night didn't in any way modify this letter that you are talking about.

MR. SWETT: Okay. Well, I am hopeful that that was a miscommunication and that we are not going off the rails on that point. But to emphasize the significance of getting that right, I would like to hand up the enclosure to the July 20th letter.  I am not going to put this in the record because it transmits confidential information but I would like the court to see it.

The first part of this enclosure corresponds to the

Garlock/7-26-12

68

other motion, the Pittsburgh Corning voters said to have intentionally concealed.  The second part appears on page three.  I should say there is some ninety-nine, I think, Pittsburgh Corning claimants referred to here. That's a lot but it is a considerable reduction in the number of claimants previously suggested to have engaged in such intentional misconduct.  So it does represent progress and a narrowing of the issues.

But the second part, that corresponding to section two of the letter on page three, lists all of five claimants. Several, we are already familiar with.  The *Blandford* case was bandied about in the opening of this case.  The *Robertson* case was the subject of lift stay litigation several months ago where they suggested misconduct and a need to go investigate and therefore wanted a stay of a state court judgment and that was not allowed.

And then Mr. Phillips is the claimant whose claim has given rise to their much brooded lawsuit recently against the Williams Kherkher firm.  As far as I know, nothing yet is happening in that case but, in any event, we will deal with that in due course.

These are not new.  So basically you have a net disclosure of new information of two claimants.  Not very impressive but, in any event, I am concerned that they have limited their response there by having read back into their

Garlock/7-26-12

69

production and their statement of contentions this notion of intent. And if my concern is misplaced based on a misunderstanding that Mr. Cassada had last night or that I misinterpreted what he was saying, then Mr. Krisko can correct me when it is his turn to speak. But, if true, that is a very significant problem because it leaves us in ignorance of what else is out there with regard to non PC claimants and supposed nondisclosures regarding a very large set of pending claims in a situation where we, like they, are under time pressure to get this over with.

Now, they also have couched their responses in such a way as to elegantly evade an integral component of the request for admissions as to settled claims, which is the notion that they paid in reliance on the nondisclosure, the absence of information provided by the claimants. That's critical. If they didn't rely on supposed nondisclosure when they paid the amounts, then this whole exercise is an absurd waste of time.

They are telling you in their arguments this morning and elsewhere that their theory is indeed that the numbers that they paid were skewed because of those nondisclosures. It sounds like reliance to me, but they most assiduously do not include, in their description in their July letter of what it is they are undertaking to produce, anything about reliance, and it matters. Here is an example:

Clyde Blandford, somehow that case became a subject of

Garlock/7-26-12

70

discussion way back in the fall of 2010.  They said, oh, my goodness, that claimant – those witnesses changed their story from discovery to trial.  By the time of trial, Garlock was the sole responsible person in their sights and they weren't identifying anybody else and they falsely denied in their depositions and they won a big judgment.

And we appealed it and we overturned the judgment.  It happened to be on some point of the order of expert discovery, not something unrelated, and then we came back down on remand and we extracted from them trust claim forms that they had filed, and that proved these other disclosures and so the case went away.  We settled it for a fraction of the verdict.

Well, we rounded out that story by getting a hold of the complaint, by getting a hold of the interrogatory responses, by reading the depositions and we showed you that the complaint itself said this guy is a pipefitter in Ohio, had a whole lot of exposures to a whole lot of people and products and he would be suing Manville, Owens Corning, AWI, EaglePicher, Celotex and so on and so forth, but for the fact that they are bankrupt and protected by the stay.

And we showed that, in the written discovery, he had served multiple times responses that said, in effect, this guy, given his occupation, given where he worked, we believe had exposure, significant exposures to the whole panoply of asbestos-containing products that one would associate with that

Garlock/7-26-12

71

kind of work in that industry and listed them, and they included the products of all of the bankrupts who would be expected to have supplied product, including insulation, to places where pipefitters would be working with gaskets.

And we showed you that, in the depositions, they did not falsely deny. The product ID witnesses, the victim having deceased already at the time, talked about the products they could identify. I can't remember now which ones they were but there were several other than Garlock, and then they also said there was a lot of joint compound around and we don't know who made it; there were lots of insulation products that didn't have their names on it and we don't know who made it. The suggestion, as we argued to you, then, that they had been pulling their punches or distorting their testimony to evade appropriate disclosures of these exposures seemed to us to be a complete distortion of that record.

So my point now is we were fortunate to be able to get a hold of those materials because they weren't producing them. Had you drawn inferences based upon their version of *Blandford*, it would have been a very different story than the one that you have in front of you after the record had been rounded out.

So that's my object lesson in the importance of getting behind, claim by claim, if that is how they are going to do this, each story they tell about a claimant who supposedly misled them or failed to disclose for whatever

Garlock/7-26-12

72

reason in the tort system.

It's a very important aspect of the case if – and I consider this an unfortunate turn for the case to take – but if that is where it is going, we have to have the opportunity to get behind those stories.  And my reason for thinking it unfortunate is not any lack of confidence whatsoever that we will dispel the suggestion that somehow their settlement history was skewed by nondisclosures.  It is instead regret at the amount of time, effort and money this is going to take and its impact on a trial date but be that as it may.

They evade the reliance component of the RFA as it pertains to settled claims.  And the final point about *Blandford*, the emergence of the trust claim forms was not due to renewed sleuthing by Garlock.  It had to do with the change of Ohio law pending the appeal, and the plaintiff duly complied with the change of law and produced their claim forms and then Garlock settled the case.  They cannot possibly have relied on the previous nondisclosure of those trust claims when they settled.  So reliance is an important part of their story.  If you don't hold them to it, if you don't make them say, okay, which of all of these claimants of supposed nondisclosure did you rely on the nondisclosures for when settling the case and allow us to get behind that and examine the timing and the material available at the time of settlement and whether or not Garlock made appropriate efforts to elicit the facts and so on

Garlock/7-26-12

73

and so forth, you are going to end up with a skewed record just like witnesses testifying without cross-examination.

And the list of claimants, one may reasonably expect from whom they can colorably arguably, plausibly suggest that a settlement was skewed by reliance on nondisclosure will be a lot shorter than the list of claimants for whom they say there was nondisclosure.

Now, there is another aspect of the noncompliance in the guise of supposed compliance and it relates to the original problem with their production last year, which is they cherry-picked and they gave us what they thought supported their contentions.  I have some concern that they may be up to that here, too, under the guise of this intent issue because look at page one of their brief in opposition.

"As detailed below, the debtors have and will continue to produce further documents and information supporting their view."

Well, the whole point is not to get the information that supports their view; it is to get the whole information.  But the unhappy experience of this whole train of events, going back all the way to January 2011, and they make me hypersensitive to this and I am not supposing that the representations made in the letter, although very carefully couched and in some ways evasive, I am not suggesting that, where a document falls within the category they describe as

Garlock/7-26-12

74

populating their production, that they are withholding it on a cherry-picked basis.  I am suggesting that they are reading this thing in a very cagey and defensive fashion in order to limit their production.

Another area of implicit noncompliance has to do with the period during which they would undertake to complete this discovery, and that relates to the problem of time that I mentioned before.  It is critical that we get the discovery while there is still time before trial to do the painstaking work we have to do.  And they, on the other hand, are straining like crazy to avoid a firm cutoff.  It is possible that, when you decree finally what the schedule is, you have in front of you the submissions of the parties on that and then expect the parties to live up to it.  Whips will be cracked, things will get done and it will be brought in, in time, but it is going to take an order because they see their interest as compelling them to continually argue one way or the other for open-endedness in this process.  Not until they are satisfied that they have got what they are entitled to in the discovery you have authorized should they be required to respond as to their contentions or the underlying facts, although they do profess a willingness to proceed on a rolling basis.

What is to prevent them from coming in on the last day of discovery and dumping a whole lot of information on us because their version of rolling does not include an important

Garlock/7-26-12

75

element that we have insisted upon, which is that at each of the intermediate dates that we stipulate to, the production shall include all of the then available information not previously produced. So it's a true roll and not a deferral until the end of the line.

But passing that, they insist that there be basically implicit extension of the fact discovery cutoff, at least as it pertains to this important information, if they are not satisfied that they have what they are supposed to be getting from the trusts, and the claimants, and the ballots, and the 2019s if they are permitted by the appellate courts to go there, and so on and so forth.

But we can't live with an open-ended schedule. The case will not progress. It will become a bog and a swamp. It is not the way to run the train. Some kind of appropriate balance is going to have to be struck here, and they are going to have to commit or you are going to have to impose, for the sake of sound case management, a cutoff by which time this discovery will be out and that should be in time for us to do our work. And after that, we should hear no more about supposed evasions or non-disclosures by claimants for whom the contentions have not been advanced during the discovery period and for whom the underlying facts have not been produced during the fact discovery period.

That's the model you enforced in your May 17th order.

Garlock/7-26-12

76

You told them give them what you have got on PC voters and do it on a rolling basis and, after the cutoff, the court will not countenance any further contentions of misrepresentations or omissions on the part of PC voters.

And the proposed order that we have – we will tender the amended version – will speak to that. If Mr. Cassada has a big issue with that, I am willing to discuss it with him to see whether there can be an agreement. So far there hasn't been. He has suggested one means of accomplishing this. I have suggested another. I am not sure where that is coming out, if it is left to the parties' agreement or to some future agreement. My supposition today is that we are going to need an order.

You will recall, however, that way back when we had to renew our motion to compel from last August, comes April 2012 now, we renew that motion and their position is, well, gee, we are happy to give this information but not until the reply reports for the experts are due and that, of course, would put us in a box. That's weeks from trial. We couldn't possibly use the information then, and you rejected that as their brief in opposition to the motion for sanctions squarely admits. You ruled against that and you required them to go forth with that discovery now and to end it within the cutoff, and they continually resist and come back in one way or the other to reargue that.

Garlock/7-26-12

77

And, in effect, what the debtors are arguing for now, it seems to me, if their argument today is consistent with their recent pitch to me on how to get past this problem, is a mission creed, is a complete leading into the expert discovery period of this important predicate fact information, which is not acceptable and ought not to be acceptable to the court.

So those are the reasons why we pressed this motion and we need an order, unless we can get an agreement within the next day, but what are the defenses; why do they say the July 20th response should basically make this a nonissue and make this motion go away?  Here are their defenses:

They say we agreed to a limited production along the lines that they now offer.  If you actually read with attention to detail the correspondence they have fixed as their Exhibits A-1, 2 and 3, you will see quite plainly that that is not a reasonable interpretation of the events. Faced with our third request, they said, no, we don't want to comply with that but we will give you claim file materials for those claims that we may specifically identify as part of our evidence in the estimation hearing or upon which our experts may rely.

Notice how different that is from what we asked for. We asked for the facts concerning people you alleged nondisclosed and you relied in payment of settlement or you paid a judgment.  Instead they want to say, well, we will give you the facts on the people we may specifically identify come

Garlock/7-26-12

78

the hearing or that our experts may rely upon. This is a very important point. We are not asking for anticipatory expert discovery. As you will see later, they are, and we are declining to give it to them, but we were not asking them for expert disclosures and we do not accept the transformation of our request by subtle interpretation or anything of the kind. This is fact discovery, pure and simple.

Once again, in their letter –

THE COURT: Let me interrupt you. Do you think it would do you all any good to talk about this, give you a little more time during lunch and let you talk a little bit?

MR. CASSADA: I think it would, Your Honor. Yes, we don't disagree that the information that has been requested should be provided and we have been working on providing that and I think it would help.

THE COURT: Why don't we break for lunch now and let you all hopefully have some time to talk about where you are and at least we will know –

MR. SWETT: I would like to make an alternative suggestion we could ponder over lunch.

THE COURT: Okay.

MR. SWETT: If Your Honor will issue a case management order with the trial date and the discovery cut-offs, then the practical problems will be clarified and it may be –

THE COURT: And I apologize. I thought you all were

Garlock/7-26-12

79

still talking about that and I may have gotten confused by –

MR. SWETT: We submitted competing orders and responded to one another, probably when you were out in Montana, so it is not surprising –

THE COURT: Well, but I got – there was a request for a delay, an order kind of extending the deadline and I assumed it was to that and it may not have been to that.

MR. CASSADA: Yeah, that was to extend the deadline for us to submit –

THE COURT: That was for something else, yeah.  Okay.  Well, that's my fault.  So I will do that and why don't we just reconvene about 1:30, okay.

MR. SWETT: Thank you, Judge.

THE COURT: Do you all have handy your various proposals or I can go and get them off of the computer?  If you don't have them handy, I can just –

MR. CASSADA: We can bring it to you, have it delivered to you.

THE COURT: I can just print it.

MR. SWETT: Judge, I have a set here that I can hand up.

THE COURT: Well, I will just print them off.  I will see you at 1:30.

(Recess from 11:59 a.m. until 1:48 p.m.)

THE COURT: Have a seat.

Garlock/7-26-12

80

There was a street preacher up on the square.  I almost invited him down.  He probably could have done a better job with this thing than I am doing.

MR. CASSADA: That sounded like the beginning of a good joke.

THE COURT: All right.  Where are we?  You all have been talking.

MR. SWETT: Yes, Your Honor, and it seems to have been productive.  Let me see if I can summarize it and Mr. Cassada can correct me if I go astray.

We received your e-mail, being general guidance as to the nature of the scheduling order and adjustment in the dates, and the parties on both sides are amenable to that approach.  We would like a little time to work out the extent of the roll, as I will call it, and the actual trial date to make sure that the right people can be here.  It is likely to be a little longer than a month but that's the general time frame.  The concept is that the intervals would simply roll by the same amount of time by which the trial is extended and, from the standpoint of the dates, it's likely to look a lot like the debtors' proposed order in terms of the dates and intervals.  So the discovery cutoff is going to be something like five or six weeks beyond what was originally contemplated and likewise through the sequence.

The reason why a single month's extension didn't seem

Garlock/7-26-12

81

to work is because it would make the expert reply reports due on January 3rd and that is just not a good time to be expecting a bunch of experts to get their work in.

THE COURT: That's fine.  Anything that's agreeable to you all is going to be agreeable to me.

MR. SWETT: We will endeavor to provide jointly an updated scheduling order today or tomorrow.  It could take as long as Monday but I am hoping not.  I am here this afternoon and we have agreed to work together to try to accomplish that quickly.

With regard to the motion to compel further responses that we were discussing when we broke for lunch, we have an agreed resolution.  I think it is fair to say it is essentially along the lines of the order I was going to hand up but –

THE COURT: Good, because I was going to enter that.

MR. SWETT: With some modifications.  It does require a little tweaking.  The debtors have made clear – we have eliminated, I think, a misunderstanding.  The debtors' intention as to what I will call the populations of claimants as to which it is going to contend some nondisclosure of tort discovery is really two different populations.  They will identify in the fact period, discovery period, and produce the documents requested those claimants who they allege they settled with in reliance on nondisclosure or paid judgments in the circumstance of material nondisclosures.

Garlock/7-26-12

82

Separately they will also identify individual cases and produce the requested documents for claims that were resolved not on the basis of any such reliance but simply in the presence of alleged nondisclosure so that they want the right to make contentions that cases in which they say there wasn't adequate disclosure are significant for aggregate estimation purposes without importing the notion of reliance. We will join issue with them on that conceptually and legally and factually, as well. The point now is they have agreed to identify that set of cases, as well as and in addition to those in which they assert there was reliance that affected the settlement numbers.

And as long as those facts and documents come out on a periodic rolling basis that supplements to the extent material has newly become available by the agreed intermediate dates, so that it is not all coming at the end, that approach is satisfactory to us. It is going to involve just some minor wordsmithing of a draft order that already exists.

With regard to the motion for sanctions, we have discussed the concept of rolling production and similar terms in the same terms as under the motion for further responses, the other motion. It is mutually agreeable. I propose that we set that forth in a stipulation but we will, subject to that, withdraw the motion for sanctions on the basis that we now have a clear expression of intention to comply and an understanding

Garlock/7-26-12

83

about what the rolling production would entail.

That's the extent of the issues that have already been adverted to this morning, so let me just pause to ask Mr. Cassada to address anything if he thinks I have gotten it somehow wrong.

MR. CASSADA: Just two things. First of all, on the case management order, I have explained to Mr. Swett, and I will to the court, as well, that we will be seeking relief if we don't feel like we have gotten the discovery that we need completed in time for our experts to rely on it under the case management order. I think that's the intent of the –

THE COURT: Well, I think that's implicit on anything.

MR. SWETT: There's language in the draft order that contemplates for good cause extensions with the right –

MR. CASSADA: I just felt like it was worth mentioning that –

THE COURT: And I understand.

MR. CASSADA: The second point is, on the discovery and the claims that we are offering, the second category of claims we are offering, we are offering aggregate information about the information that was available to Garlock when it settled claims, and we did not intend to offer evidence to prove reliance on each and every claim but the experts would draw inferences about how those claims impacted Garlock's settlements, and experts can draw whatever inferences there

Garlock/7-26-12

84

are.  We are not stipulating or saying that we didn't rely on those.  We are just saying that we are not going to – this is an aggregate estimation and we are not coming to the court to look at individual cases and prove that each specific settlement, at least under their approach, didn't have merit or that there was or wasn't reliance on specific missing data. The data, we will contend the information was not present and, in the aggregate, it affected the settlements.  That's our point on that.

I think that Mr. Swett understood that but I was a little bit confused about the way he separated the two categories.  Yeah, those are the only comments I have.

MR. SWETT: What matters to me about that second point is that the identification of the claims and the population that the experts draw inferences from, based upon supposed nondisclosure, those claims and the related documents that we have requested are going to come forth in the fact discovery period if I understood the –

MR. CASSADA: Yes, we are going to produce the claim files for those documents.

THE COURT: Let me give you all back – I think these papers came from you but especially the on that has got "confidential" on it that ought not be floating around here.

MR. SWETT: There is one other thing on the agenda having to do with the setting of the August 16th hearing date.

Garlock/7-26-12

85

I think, as moved by the debtors, it was for the supplemental questionnaire objections hearing.  I think the purpose of that now, if I understand your position correctly, expanded to include individual objections to the trust subpoena.  Also on August 16th, is that –

MR. CASSADA: A different hearing.

MR. SWETT: A different hearing, same date, and my concerns about that are the same as the ones that I expressed in our response to the motion as filed, which are basically that the claimants need fair notice of Garlock's position.  I think Mr. Cassada has agreed that they would serve out for overnight delivery the debtors' papers on that subject on the 10th of August; is that right?

MR. CASSADA: Yes.

MR. SWETT: What day of the week?

MR. WORF: I believe it's a Friday.

MR. SWETT: So the claimants would get it Monday, which would be the 13th, and the hearing would be three days later. Could you make that the 9th?  That way they would get it Friday.

MR. WORF: We will do our best.  Our only worry is they can be postmarked on July 31st and so we might not get some of them until pretty close to that deadline.

MR. SWETT: Would you agree to put out on the 9th those that you could and, on the 10th, those that you have been able to handle in the meantime?

Garlock/7-26-12

86

MR. WORF: Yes.

THE COURT: That sounds like a reasonable way to do it.

MR. SWETT: The other concern was that committee counsel somehow be afforded access to the submissions by the claimants in time to understand them and take a position. There are obvious logistical problems with things coming in with a July 31 date, you know, mail stamp. They have to receive them. They are interested in putting them in usable form, and I gather we have their agreement that, whatever the scanning and duplication process is going to be, we will get the stuff at the earliest possible time.

MR. WORF: We intend to set up a website, a secure FTP site so that everyone, all of the parties have everything as soon as we do. So there is going to be no delay as far as getting it. There are obvious logistical difficulties but we are going to go as fast as we can.

MR. SWETT: We do have concerns. We have exchanged proposed orders. Each has some concern about some details of the others. I would suggest that the court so order the transcript, so that they can go ahead and give notice tomorrow, by expedited means of both of those August 16 hearings and we will follow-up with an order reflecting the disposition of their motion.

THE COURT: Yeah, that sounds good. You all are prepared to do that, I think you said?

Garlock/7-26-12

87

MR. CASSADA: Yes.   We are on standby, ready to do that.

THE COURT: Well let's do that.

MR. SWETT: I believe that's it, Your Honor.

THE COURT: I had one thing I wanted to add to the agenda.  I was a little distressed when I sent some of you all an e-mail with a picture of Mr. Moon with a remarkably small fish but it was only the representatives of the FCR who recognized that that was a very small fish.  Some of you may need some remedial outdoor education.

MR. SWETT: I wasn't sure whether it was a minnow or just the bait.

THE COURT: But some people weren't sure whether that was me or Mr. Moon, and I am just going to attribute that to the fact they must have been looking on their BlackBerrys in the sunshine or something.

But I was gratified that all of the North Carolinians, at least, even including the Rhodes scholars from North Carolina, recognized that the fishing guide looked remarkably like the king, Richard Petty.

At any rate, thank you all and I appreciate your efforts.  We will see you on the 16th, I guess.

(Off the record at 2:01 p.m.)

Garlock/7-26-12

88

C E R T I F I C A T E


        I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.




                            /s/ Patricia Basham

                            Patricia Basham, Transcriber

                            Date:  July 30, 2012

Garlock/7-26-12