```
              IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                        CHARLOTTE DIVISION
```

```
In the matter of:                )
                                 )
GARLOCK SEALING TECHNOLOGIES, LLC,) No. 10-31607
et al.,                          ) Jointly Administered
                                 ) Charlotte, NC
       Debtors.                  ) August 16, 2012,9:31 a.m.
```

```
                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE GEORGE R. HODGES
                UNITED STATES BANKRUPTCY JUDGE
```

APPEARANCES:

Garland S. Cassada
Jonathan C. Krisko
Richard C. Worf, Jr.
Robinson, Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246

Trevor W. Swett III
James P. Wehner
Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005

Travis W. Moon
Moon Wright & Houston, PLLC
227 West Trade Street
Suite 1800
Charlotte, NC 28202

Electronic Recorder
Operator:                       Chelsea Sanders

Transcriber:                    Patricia Basham
                                6411 Quail Ridge Drive
                                Bartlett, TN  38135
                                9O1-372-O613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

Garlock/8-16-12

2

APPEARANCES (Continued):

Gary Kendall
Michie Hamlett Lowry Rasmussen & Tweel
500 Court Square, Ste 300
Charlottesville, VA 22902

Nathan Finch
Motley Rice
1000 Potomac St, NW, Ste 150
Washington DC 20007

Jeffrey Simon
Simon Greenstone Panatier Bartlett
3232 McKinney Ave, Ste 610
Dallas, TX 75204

Justin Rawlins
Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA

Angela C. Bullock
The Lanier Law Firm
6810 FM 1960 West
Houston, Texas 77069

Kathy Byrne
Cooney Conway
120 N. La Salle St, Ste 3000
Chicago, IL 60602

Charles McLeigh
Goldberg Persky & White
1030 Fifth Avenue
Pittsburgh, PA 15219-6295

Deirdre Woulfe Pacheco
Wilentz, Goldman & Spitzer P.A.
90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, New Jersey 07095-0958

Paul M. Matheny
Law Offices of Peter Angelos
100 N. Charles Street
Baltimore, MD 21201-3804

Garlock/8-16-12

APPEARANCES (Continued):

Peter A. Kraus
Leslie MacLean
Waters & Kraus
3219 McKinney Avenue
Dallas, Texas 75204

Telephonic Appearances:

Michael Shepard
The Shepard Law Firm
10 High Street
Boston, MA 02110

Audrey Perlman Raphael
Robert Komitor
Levy Phillips & Konigsberg LLP
800 Third Avenue, 11th Floor
New York, New York 10022

Robert Phillips
Simmons Browder, Gianaris Angelides and Barnerd LLC
707 Berkshire Blvd. East
Alton, IL 62024

Kathleen A. Orr
Orrick, Herrington & Sutcliffe LLP
Columbia Center, 1152 15th Street, N.W.
Washington, DC

David Butler
Richardson, Patrick, Westbrook, Brickman, LLC
PO Box 1368
Barnwell, SC 29812

Bronwyn Irene Rinehart
James F. Humphreys & Associates, L.C.
500 Virginia Street East, Suite 800
Charleston, West Virginia 25301

Allen Hossley
Hossley Embry
320 South Broadway Ave, Ste 100
Tyler, TX 75702

Garlock/8-16-12

4

Telephonic Appearances (Continued):

Jennifer Stevens
Patten, Wornom, Hatten, & Diamonstein, L.C.
12350 Jefferson Ave, Ste 300
Newport News, VA 23602

Peter D'Angelo
Elizabeth Heller
Goldenberg Heller Antognoli & Rowland, P.C.
2227 S. State Route 157
Edwardsville, Illinois 62025

David Austin
Morvillo, Abramowitz, Grand, Iason et al.
565 Fifth Avenue
New York, NY 10017

Lori Slocum
Frank Watson
Brent Coon & Associates
Weslayan Tower
24 East Greenway Plaza, Suite 725
Houston, Texas 77046

Marc C. Greco
Glasser & Glasser
Crown Center
580 East Main Street, Suite 600
Norfolk, VA 23510

Garlock/8-16-12

5

(CALL TO ORDER)

THE COURT: Good morning.

COUNSEL: Good morning, Your Honor.

THE COURT: Have a seat.  Let's get everybody's voice on the recording machine.  Why don't we start over on this side since there are fewer of you today.

MR. CASSADA: Good morning, Your Honor.  I am Garland Cassada with Robinson, Bradshaw and Hinson.  We are counsel for the debtors.  With me this morning are Rich Worf and Jon Krisko.

THE COURT: Okay.

MR. SWETT: Good morning, Your Honor.  Trevor Swett and Jim Wehner for the official committee of asbestos personal injury claimants, along with Tom Moon.  I am very happy to say, Your Honor, that we have a full house on the bride's side of the aisle this morning and there are a great number of people, including some behind the bar, who will need to enter appearances.

THE COURT: Okay.

MR. KENDALL: My name is Gary Kendall.  I am from Charlottesville, Virginia, the law firm of Michie Hamlett Lowry Rasmussen & Tweel.

THE COURT: All right.

MR. FINCH: Good morning, Your Honor.  My name is Nathan Finch.  I am from the Motley Rice law firm.  I am based

Garlock/8-16-12

6

in Washington, D.C.

THE COURT: Okay.

MR. SIMON: Good morning, Your Honor.  I am Jeffrey Simon, Dallas, Texas, the law firm of Simon Greenstone Panatier Bartlett.

MR. KRAUS: Good morning, Your Honor.  Peter Kraus, also from Dallas, Texas, the law firm of Waters & Kraus.

THE COURT: Okay.

MR. RAWLINS: Good morning, Your Honor. Justin Rawlins of Winston & Strawn, on behalf of The Lanier Law Firm and Angela Bullock from The Lanier Firm is here with me, as well.

MS. BULLOCK: Good morning, Your Honor.

THE COURT: Good morning.

MS. BYRNE: Good morning, Your Honor.  Kathy Byrne from Chicago, Illinois and the law firm of Cooney and Conway.

MR. McLEIGH: Good morning, Your Honor.  Charles McLeigh from the law firm of Goldberg Persky and White, Pittsburgh, Pennsylvania.

MS. PACHECO: Good morning, Your Honor.  Deirdre Pacheco, Wilentz, Goldman & Spitzer from Woodbridge and New York City.  Woodbridge, New Jersey.

THE COURT: Okay.

MR. MATHENY: Your Honor, I am Paul Matheny from the Law Office of Peter Angelos, Baltimore, Maryland.

MS. MACLEAN: Your Honor, Leslie MacLean from Waters &

Garlock/8-16-12

Kraus, Dallas.

THE COURT: All right.  I think that's it.

MR. SWETT: Your Honor, we also have some folks on the phone who I believe are going to want to speak at some point, so perhaps we could take their appearances, too.

THE COURT: All right.  If you are on the phone, how about identifying yourself, please.

MR. SHEPARD: Your Honor, this is Michael Shepard from The Shepard Law Firm in Boston, Massachusetts.

MS. RAPHAEL: Audrey Raphael from Levy Phillips & Konigsberg in New York.

MR. KOMITOR: Robert Komitor from Levy Phillips & Konigsberg in New York.

MR. PHILLIPS: Robert Phillips from the Simmons Browder Firm in Alton, Illinois.

MR. BUTLER: David Butler from the Richardson, Patrick, Westbrook and Brickman firm in South Carolina.

MS. RINEHART:  Bronwyn Rinehart from James Humphreys & Associates, Charleston, West Virginia.

MR. HOSSLEY: Allen Hossley from Hossley Embry, Tyler, Texas.

MS. STEVENS: Jennifer Stevens from Patten, Wornom, Hatten, & Diamonstein in Newport News, Virginia.

MR. D'ANGELO: Peter D'Angelo and Elizabeth Heller for Goldenberg Heller Antognoli & Rowland.

Garlock/8-16-12

8

MS. ORR: Good morning, Your Honor.  This is Kate Orr from Orrick, Herrington & Sutcliffe on behalf of the FCR.

MR. AUSTIN: David Austin from Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer on behalf of the trusts, although I don't expect we will be participating.

MR. SWETT: Your Honor, to clarify, I don't have the expectation that everybody on the phone is going to want to talk but I believe there are a couple.

THE COURT: All right.

MS. SLOCUM: Good morning, Your Honor.  Lori Slocum with Brent Coon & Associates, Houston, Texas.

MR. WATSON: Good morning. Frank Watson, also with Brent Coon & Associates, Houston, Texas.

MR. GRECO: Good morning.  Marc Greco with Glasser & Glasser.

THE COURT: Okay.  It sounds like it has died off. What I had hoped we can do – I don't know how long this is going to take but if we go to like 12:15 or so and break for lunch and come back.  If that doesn't work out, we will do something else.

MR. CASSADA: Your Honor, I have an indulgence to ask the court.  I actually was able, late yesterday, to get an appointment with a back doctor at 10:45 today, which is very bad timing, I realize, but it has been difficult to schedule that.

Garlock/8-16-12

9

THE COURT: I understand.

MR. CASSADA: My hope is – there are two matters before the court today.  The first is the continuation of the DCPF trust subpoena matter.  Today was the opportunity for the individual settled claimants to object to the relief that you granted provisionally on July 26.  My hope was that that would not take too long.  There are four written objections that were filed to that.  And then at approximately 10:20 or so I would depart from the proceedings and it looks like, from the parties in the court here today, that you may still be entertaining that hearing by the time that I get finished.  So then I would return when I could.

THE COURT: All right.  Good.

MR. SWETT: Do I understand correctly that we would proceed with Mr. Krisko and Mr. Worf –

MR. CASSADA: That was our plan.  I didn't want my personal health problem to interfere with the proceedings before the court.

THE COURT: All right.  Good.  We will start with that, then, I guess.

MR. CASSADA: Yes, that is the first matter on the agenda and just to bring the court up-to-date, on May 17 Your Honor authorized the issuance of a subpoena to the Delaware Claims Processing Facility and the six trusts for which DCPF is processing agent, and those are six top-tier defendant trusts.

Garlock/8-16-12

10

They include US Gypsum, Federal-Mogul, Owens Corning Fibreboard, Armstrong and Babcock and Wilcox.

The subpoena requested that the trust, each trust, provide four pieces of data regarding approximately eleven thousand settled claims, and that is the date that any of the settled claimants filed a trust claim, the date such trust claim was approved, the date such claim was paid and, if not approved or paid, the status of such claim.

Now, on May 17, the order off of the bench that was subsequently entered was subject to any objection by DCPF and the individual claimants, and the subpoenas were subsequently issued in the Delaware court and served on the seven parties in Delaware.

Subsequently, by agreement of the parties, the trust, DCPF, and Garlock agreed that this court would hear the trust objections to the subpoena and Garlock's motion to compel compliance.

That hearing took place on July 26, at which time the court ordered enforcement of the subpoenas and ruled on the DCPF party's objections, and those objections and those rulings were that the court ruled that the debtors must reimburse DCPF and the trusts for their reasonable expenses of compliance. The court approved confidentiality protection of the information that was produced. That would be akin to the protection that the court had previously provided in the

Garlock/8-16-12

11

personal injury questionnaire order entered last year.

And finally the court denied a request by DCPF and the trusts to blind the identities of settled claimants for which the subpoenaed data existed and was produced. So that ruling was subject to objections by individual claimants which would be heard today.

Now subsequently, Your Honor, on August 7, the court entered an order embodying the rulings that were made at the hearing and that order is self-executing. So that all the court would need to do today is to rule on the objections that any individual claimants might raise because the order itself requires the trusts to produce the required information within fifteen days of your entry of order on any individual claimants' objections and, of course, subject to your rulings of those objections.

Ample notice has been sent to individual claimants. In fact, they received several notices of the subpoena. On or before July 17, DCPF and the trusts gave electronic notice of the subpoena and the trusts' written objections to the subpoena and Garlock's motion to compel to each matching trust claimant whose claim data was subject to the subpoena in accordance with the trust's respective trust distribution procedures; and they did so by sending electronic notice to each such claimant's lawyer as identified in the records of DCPF and the trusts, and DCPF agreed to share that list with us. They didn't identify

Garlock/8-16-12

12

the claimants for which there were matches but they did share the list with us.

On July 27, one day after Your Honor's bench ruling, the debtor sent the lawyers notice by priority, overnight carrier, and this is notice of the August 16 hearing, notice of their opportunity to object and to be heard at the hearing.

And three days later, on July 30, DCPF also sent electronic notice of the hearing to the same parties and in that electronic notice providing a copy of the written notice that the debtors had served on July 27.

There have been three written objection that have been served on us, Your Honor, that have been filed and served by three groups of settled claimants, and these are settled claimants represented by the Hoffman Law Firm and the Matthew E., I believe it is Kiely firm.  These are two firms.  I believe they split off and so they represent, together, the same body of claimants and these are Dallas and Baltimore firms.

The Law Offices of Peter G. Angelos also objected on behalf of their settled claimants, and Wilentz, Goldman & Spitzer  objected on behalf of their settled claimants.

We also received an objection by Jacobs and Crumplar, and our best interpretation of that objection is that they are objecting for their current pending claimants, not for settled claimants.

Garlock/8-16-12

13

In any event, Your Honor, we believe none raised any objection that has not already been raised, briefed and argued at length in two prior hearings and subject to the evidentiary record that the court considered.

In addition, none raised any issue that is specific to their individual claimants.  Two of the three written objections by settled claimants state no specific objection at all.  They simply register their objection and adopt and incorporate objections raised by others, and those are the objections filed by the Hoffman, Matthew Kiely firm, and the Law Offices of Peter G. Angelos.  They don't say anything specific other than they object and they incorporate objections by others.

Wilentz Goldman raises three discrete objections.  We believe all of these have been raised and addressed by the court.  They start by stating that the data sought is not relevant to estimation.  Now, Your Honor may recall we have argued that at length and Wilentz Goldman fails to explain its position.  It just raises the objection.  And apparently those objectors are not aware of the evidence, the briefing and the argument that this court has already considered on this point.  I am not sure they are really knowledgeable regarding the issues that will be joined in the estimation trial.

They also argue that the Delaware Claims Processing Facility's trust distribution procedures designate all

Garlock/8-16-12

14

information of claimant treatment as confidential information. This, too, has been raised and rejected. The same TDP also state that the information is subject to and will be produced pursuant to subpoena. And the courts that have considered this, I believe including this court, have recognized the confidentiality provisions in these documents are a private agreement between the trust and claimants and do not affect the rights of third parties to obtain evidence that is relevant to a litigation elsewhere.

And finally they argue that the settlement claimants sought, and obtained, bargained for finality. You may recall that this was an argument raised and briefed by the committee. We don't believe the subpoenas threaten the finality of the settlements and, as I indicated, the argument provides no basis for quashing the subpoenas.

So we don't believe any of the settled claimants have raised an objection that should alter any ruling this court has already raised.

The Jacobs and Crumplar objection, as I indicated, is different in that it appears to be raised on behalf of its pending claimants. It protests that enforcing the subpoena will be too costly to the estate, but a review of their written objection demonstrates that it misconstrues the trust information that's requested. First it objects to the subpoena of any trust proofs of claim or files of the trusts. And it

Garlock/8-16-12

15

argues that it has already provided that information for its claimants in the PIQs that it returned on November – by November 1 of last year.

So apparently Jacobs & Crumplar claimants don't understand that this subpoena applies to settled claimants and doesn't seek information that has already been provided and does not seek any written files from the trusts but seeks the four discrete pieces of data. So we believe that the Jacobs and Crumplar objections simply are not pertinent.

So, in sum, no basis has been provided that would alter the court's rulings, and we believe that the court should stick with the order that it entered on August 7th.

I might add that we were successful in the few days after that order in negotiating with the committee and with the DCPF parties, their lawyers, the precise language of the protection that would be akin to the protection of the PIQ order, and that precise language which has been approved is in the order that the court entered on August 7.

So, again, we think all the court need do today is enter a simple order on the objection of the claimants and that order will be self-executing and, for the reasons indicated, we believe the court should deny the objection.

Thank you.

MR. SWETT: Your Honor, the committee has nothing further to say on this point. We argued it before. That's

Garlock/8-16-12

16

without prejudice to the rights of any individual claimants who care to speak but, you know, we rest on the position as previously expounded to the court and make no concessions with regard to the admissibility or significance of this information from the trusts when it comes to the trial on estimation.

THE COURT: Anybody else that's present have anything they want to say?

MR. MATHENY: Your Honor, I am Paul Matheny from the Law Office of Peter Angelos. We waive argument and just submit it on the briefs.

THE COURT: Okay.

MS. PACHECO: Your Honor, Deirdre Pacheco, Wilentz, Goldman & Spitzer and the same thing. We have submitted our papers. Thank you.

THE COURT: Well, I agree with Mr. Cassada that most of these or that these objections were previously argued and overruled and I guess, if I have made a mistake on that ruling, I will be consistent and overrule these objections.

If you will do an order, Mr. Cassada, overruling these objections, then I guess, as you say, the other order will become self-effectuating.

MR. CASSADA: Yes, Your Honor, that is correct. We will get that to you. Thank you.

THE COURT: All right. We will go from there. Thank you.

Garlock/8-16-12

17

MR. WORF: Good morning, Your Honor.  Richard Worf for the debtors.

I had the pleasure of reviewing each of the supplemental exposure questionnaires and most of the settlement ones, so I am happy to step in for Mr. Cassada today and deliver our presentation on this.

I first want to address the supplemental exposure questionnaire, which is where most of the objections that were filed focus their attention and, then later, I will address the settlement payment questionnaire.

First of all, just about why we addressed what we did in our notice of challenges and objections.  As the court is aware, we focused on what we have called question 2(d).  It is really the first part of question 2(d) which asks about the brands, the products, the manufacturers and sellers of the products that claimants were exposed to.  We think this is the simplest and most important question, and we have been able to analyze in some detail deficiencies in providing this information and objections that claimants have raised.

I will get into the importance of this question in a moment but, as an initial matter, the committee objects to our focus on this question and our sort of tabling of the other parts of the questionnaire.

They argue we should have brought before the court every objection that claimants raised to each part of the

Garlock/8-16-12

18

questionnaire and litigated them today.  There are probably hundreds of these different objections and they run the gamut.

As they always do, the committee accuses us of wanting to delay the estimation trial.  We were surprised by this position.  Normally once a party has responded to discovery, the propounding party doesn't bring a blunderbuss challenge to all objections that may have been raised.  You look at the responses, try to determine whether they are fair and bring before the court objections that actually need to be litigated. We have done that analysis for question 2(d), and I will discuss that in detail shortly.

With respect to the other questions, it was not possible for us to decide right now whether the objections need to be litigated or not.  We appreciate that, for many of the questions, there may be no better information than what is contained in depositions and interrogatory answers, and we received a lot of those.  Questions about what a claimant did with the products, how frequently he used them and so on are matters typically within the knowledge of the injured party. And, as claimants point out, many of the injured parties in the population of pending cases are now unfortunately deceased.

As I will describe later, we don't have the same view about the attachments with respect to the companies and products responsible for the claimant's injury.  That evidence is often developed by the lawyers.  They take the fact that

Garlock/8-16-12

19

someone worked at a site doing particular things, combine it with records about the site and decide a particular company is responsible.   It is often not reflected in the discovery documents the committee wants us to rely on.

Many of those discovery documents were created years ago.   As the court will recall, many of the pending cases against the debtors are older than four years.   Some were first filed against the debtors, I believe, in the late 1980s. Discovery documents from these cases are not current.

Since that time and the time those documents were created, lawyers have identified more exposures to allow them to file trust claims and cast ballots in other bankruptcy cases. At least in those cases, the companies are known to the lawyers and can easily be disclosed to us.  I will get to this in a moment.

So for the other parts of the questionnaire, we are making a good faith effort to look at the documents we have got and determine if they are the best information that can be obtained on this.  We appreciate that point.

Now, because the committee brought it up in their paper, I need to mention that we utterly reject their position that questions about frequency and proximity of exposure to the various products are somehow not relevant to Garlock's liability for mesothelioma claims.  As we will show the court at the estimation trial, science shows that the dose makes the

Garlock/8-16-12

20

poison.  Paracelsus, the famous scientist, said it centuries ago and scientists still believe it today.

Determining whether any product substantially contributes to a claimant's mesothelioma depends crucially on the fiber released from that product, how often claimants used it and how close they were when it was being used.  All of the questions in the questionnaire are relevant.

The committee's paper denigrates the discipline of exposure science, but estimating exposure is a regular and essential part of the causation inquiry in any toxic tort case for any product, not just asbestos.

The reference manual on scientific evidence, the federal reference manual, contains an entire guide on exposure science.  The committee misleadingly cites some statements from the reference manual about the challenges of exposure science, as if that undermines the discipline.  It doesn't.  The discipline exists to deal with those challenges and we will show that at the estimation trial.

If anything, then, because the questions in the questionnaire seek relevant and non-privileged information, objections to the other questions should be overruled and claimants permitted to answer with documents, contrary to the committee's order, which sustains objections to the questionnaire.

Now, we haven't even gone that far in our notice.  We

Garlock/8-16-12

21

are looking at the documents and we hope and expect that we are not going to have to bring any challenges as long as all of the documents have been produced, and I will get to that in a moment.

In conjunction with our experts, we are reviewing right now those documents and trying to determine whether we have got the best information reasonably available.  In the meantime, we reserve the right to bring challenges to the court.  We hope that won't be necessary.

Now, this review that we are currently undertaking with experts of the voluminous documents we received, it obviously wouldn't have been possible to do that before we filed our paper on August 10.

It may help here just to go through the process we went through to generate our filing.  We received four hundred and thirty-one total exposure questionnaires and six hundred and seventy-seven settlement payment questionnaires, for over one thousand total submission.  We have received a few since then that are not reflected in those numbers, and we are handling those in the ordinary course.

Most of these submissions were received in paper form.  Some were received on disk.  The first task was to get the submissions into a usable and transmittable form.  We had each of the questionnaires and all of their attachments scanned and, as required by the court's order, marked the questionnaires

Garlock/8-16-12

22

confidential.  As we were doing this, we created separate PDFs for each document type and labeled them clearly. Interrogatories were labeled interrogatories.  Depositions were labeled depositions, and so on.  This was a time-consuming task but ultimately resulted in a clear and usable set of documents.

The documents were made available to the committee and FCR on a daily basis.  Everyday, once we started the scanning, we sent them to the committee and the FCR.  They essentially had the documents as soon as we did.

While this was going on, nine lawyers spent all of their free time reviewing the submissions.  Not all worked full-time on it but it probably amounted to at least five or six lawyers working full-time.

I personally looked at every exposure questionnaire and many of the settlement payment questionnaires.  The purpose of this review was to generate the information about question 2(d), what we view as the simplest question, and the other matters summarized in our August 10 filing and it occupied us until the moment we filed the paper.

So it was clearly not possible to review the voluminous documents to see whether fair answers were given to other questions in the questionnaire.  It was impossible.

Now, contrary to the committee's allegation, we are not sitting on our hands while waiting to get the responses we think we need to question 2(d).  We are looking at the

Garlock/8-16-12

23

documents now and we will continue to do so.  And, like I said, we hope and expect not to have to bring any more challenges as long as documents are produced.

Finally, the committee argues that the order setting this hearing impliedly required us to bring any and all objections before the court or lose that ability for all time, but there is nothing in the order that says that.  That is not how normal discovery works and this hearing was never intended for that purpose.  It was intended to resolve, as soon as possible, what could possibly be resolved.

The court will recall we wanted to litigate objections before the questionnaire issue.  Then, without any responses on the table, it may have been possible to litigate everything at once, and that is how it has been done in some cases where questionnaires were issued.  Objections are litigated up-front. There is not a lot of documents to go through to find out whether fair answers have been made, but that is not what happened here.  And now that there are documents, we have to go through them, and we were able to complete our analysis for question 2(d), the simplest question, but not for the others.

If claimants had answered in the questionnaire, rather than with documents, it may have been possible to litigate all objections today but that was generally not what happened.  In general, claimants attached many documents and provided, although this varied, provided not particularly fulsome answers

Garlock/8-16-12

24

in the questionnaire itself.

There is no prejudice to claimants in proceeding this way. We were trying to minimize disputes and determine whether claimants had made a fair response. And like our challenges based on question 2(d), any further challenges will be targeted and well supported.

What we do need the court to do today is what we requested in our paper, which is to overrule objections to providing documents. These may contain responsive information to the other questions and, if we are going to be relying on documents, we need the documents. We don't have all of the documents yet. Although many claimants provided documents, some made objections to producing clearly relevant material that apparently they possess, such as expert reports prepared by defense experts. There is no reason for claimants not to produce documents like those. They are not privileged, nor burdensome to produce. Other claimants did produce those documents, and they contain relevant exposure related information.

Other claimants raised general objections, as we summarized in the exhibits to our notice, that could be construed to cover part three of the questionnaire which is the one that requires attachment of certain documents.

So we have asked the court to overrule objections to part three, which is the one that deals with documents, and

Garlock/8-16-12

25

order claimants to produce all documents requested in that part.

The committee's proposed order is insufficient for this reason alone. It does not overrule objections to providing part three documents and does not direct claimants to provide them, even though there is no legitimate objection to that.

The committee's order should be rejected for this reason and many others that I will discuss in connection with question 2(d).

So with that out of the way, I would like to turn to question 2(d). It asked claimants, if known, what was the product name, manufacturer and seller of each product constituting a portion of that type of asbestos source – asbestos source is a defined term in the questionnaire – and the relative percentage that each product constituted of the injured party's total exposure to products of that type, i.e., Johns Manville, thirty percent; Pittsburgh Corning, seventy percent.

The committee says this question is ambiguous but that is not true. It clearly requires claimants to provide two separate pieces of information: If known, the product names or manufacturer or seller and the percentages of total exposure. Claimants did understand it that way, as I will show when we get into specific examples of responses to this question, which

Garlock/8-16-12

26

I will come to in a moment.

Contrary to the committee, this question does not require a burdensome investigation.  It asks about what is known, consistent with the court's prior rulings on questionnaire questions and what can be expected to be provided.

No party has disputed the debtors are entitled to find out known product names and manufacturers.  This information is not privileged.  It is part of the standard discovery in every jurisdiction in the country.  It is at the core of these cases.  It was ordered produced in the *W. R. Grace* bankruptcy case, as the exhibit to our notice shows, and it is highly relevant to estimation here.

As we have explained to the court, it is important to know not only the type of asbestos products claimants were exposed to – insulation, joint compound, other kinds of products like that – but also the product and manufacturers because, in many states, knowing the product names and manufacturers allows Garlock to allocate liability to that manufacturer and protect itself from bearing claimant's damages.

So even if a claimant was exposed to the general category of insulation, there were a lot of different companies that made insulation and each one of them is potentially responsible if the claimant was exposed to their product.  It

Garlock/8-16-12

27

is important to know the companies and the products can help you, if the products are known, identify the companies.

States with large numbers of pending claims where this is the law include New York, Texas and California.  In these states, if you prove – and some of their regimes only apply to certain categories of damages, but if you proved that, say, Owens Corning was twenty percent responsible, Garlock is protected from twenty percent of the damages.

This questionnaire is the first opportunity debtors have had to get this information from claimants.  The original questionnaire approved by the court asked only for work sites where claimants were exposed to other products, the names of refineries, factories and so on.  It did not ask about the products or manufacturers of the products.

Moreover, the current questionnaire went to a sample, four hundred and seventy-one claimants.  The debtors' experts will use this sampling to, among other things, help predict the number of other responsible parties and mesothelioma claims against the debtors.  That will impact the maximum damages claimants might be able to collect from the debtors and will, thus, affect estimation.  It is hard to think of information that would be more relevant or useful at estimation.

And because this is a sample, deficiencies have an even greater importance. We are going to be extrapolating from the sample.  Inaccuracies in the sample will create larger

Garlock/8-16-12

28

errors at estimation because they will be extended to the entire population of, first, current claims and then the much larger population of potential future claims. So it matters. It is very important to have a clear and fair response to the question.

As I said before, neither the committee nor claimants appear to dispute the debtors are entitled to the information, rather the debate is over the form. The committee says that, as long as claimants have provided interrogatories, transcripts of testimony and trust claim forms, they should be judged compliant with the question.

As I will describe in more detail, we think attachments can be part of a proper response to the questionnaire but not in the way the committee says. For example, the committee's order would allow claimants to comply by attaching documents that may not even answer the question. Many interrogatories we saw in our review themselves did not identify the products or answer the question. They said, "to be provided later," or sometimes objected to providing information in response to that question. I will provide some concrete examples of those later on. But under the committee's order, the claimants would get credit for complying by attaching those misleading interrogatories. Even a case where that is the only discovery, by attaching that, claimants would be complying. Meanwhile information known to the lawyers, that

Garlock/8-16-12

29

may be easily accessible, would go unproduced.

What we need is an order like ours that overrules objections to the question and directs claimants to comply. And if they attach documents, the "see attached" needs to be in the questionnaire so it will be subject to the certification at the end of the questionnaire, which is akin to a Rule 9011 certification. It adopts that rule as a standard by which the questionnaire is certified. That would ensure that the firm is certifying that the documents do answer the question. We would go through the documents and find the answer but we would ensure that they can't slide by, by giving us documents that don't answer it.

This insistence on the certification is not a quibble, as the committee says. It is our way to ensure that we are getting the best answer that exists, and it is not burdensome to claimants. They shouldn't be allowed to be complying by attaching documents that don't answer the question.

Now another problem, and we talked about this in some detail in our paper, is that many claimants didn't say "see attached." They said "unknown" in a way that we think is misleading and contradicts the documentary record. These claimants answered "unknown" even though they have cast ballots in other bankruptcy cases, filed trust claims and been paid by trusts, all of which are not reflected in their exposure questionnaire.

Garlock/8-16-12

30

I should briefly remind the court of the significance of ballots and trust claims.  Ballots are typically cast by lawyers who certify under penalty of perjury that the claimant has a claim against the debtor and exposure to products for which the debtor is responsible.  They are generally lawyer prepared documents.  Although in some cases claimants vote individually, mostly they are master ballots that law firms cast.

Under bankruptcy law, only claimants with allowed claims are permitted to cast a vote.  So, for example, in the cases that Judge Fitzgerald oversaw, she was clear that she was not going to permit lawyers to cast votes for clients unless they gave her assurance that those clients had real claims against the debtor.

At this point, I would like to pass out some exhibits.  May I approach, Your Honor?

THE COURT: Yes.

MR. WORF: Oh, you already have one.

THE COURT: I have got one, yes.

MR. WORF: What appears as Exhibit 1 in this book, we have marked GST 228, and these are excerpts from a hearing that we had in front of Judge Fitzgerald where she talked about the meaning of ballots.  She said, "It's the vote in the case that substantiates whether the creditor thinks it has a claim."

And she also said, with respect to the ballots, "Those

Garlock/8-16-12

31

people have voted and asserted a claim." And claims require exposure.

What we have marked as GST 229 is an excerpt from the TDP, the most current TDP of the Armstrong trust. The distribution procedures of trusts uniformly require claimants to provide meaningful and credible evidence of exposure to products for which the trust is responsible. So like a ballot, a trust claim is an assertion by a claimant that the trusts or its predecessor, the former debtor, is responsible for his injury. A payment on a trust claim is also such evidence because trusts are not supposed to pay except upon proof of meaningful and credible evidence.

Exhibit 229 is exemplary. I am very familiar with the various TDP and most of them look like this. Page one says:

"The purpose of the trust is to resolve claims caused by exposure to asbestos containing products for which Armstrong is responsible."

Then later on, when it talks about the criteria for paying claims, it says that, for a mesothelioma claim, it requires credible evidence of AWI exposure, Armstrong World Industries. AWI exposure is defined as meaningful and credible exposure that must be substantiated by meaningful and credible exposure evidence. So that's ballots and trust claims.

When we performed our review, we put someone on Exhibit "C" only if they said "unknown" to one or more

Garlock/8-16-12

32

questions, questions 2(d), and had filed a ballot or filed and been paid on a trust claim that didn't show up in the questionnaire.

Most of the individuals on Exhibit "C" said "unknown" to virtually every question despite numerous ballots or trust claims.  If we didn't find an inconsistency like this, we did not put the claimants on Exhibit "C."

At this point I would like to go through a few examples of what we saw to give the court a perspective on the nature of this problem and then I will talk about what may be behind it and why it concerns us and needs to be fixed.

What I have done, before I pass out the books, we have a lot of people in the courtroom and I knew this would be the case, who are not parties to the protective order governing the questionnaires.  Each law firm obviously can see its own claims but it is not supposed to see the claims and questionnaires that were filed by other parties.  So what I have done, I have compiled copies of the questionnaire materials that we intend to use today.  I propose to pass the books out to persons permitted to have them and who executed joinders to the protective order, have those documents admitted under seal and, in my presentation, I will not reference individual claimants except by the number that I have assigned to the tabs, which reveals no information about the claimants.

We chose to do it this way instead of redacting the

Garlock/8-16-12

33

questionnaires because we are linking certain questionnaire submissions in response to the current questionnaire to previous questionnaire submissions, and we wanted the proof of the match to be in the copies that we handed to you.

So if that is acceptable to the court, I would propose to pass out the exhibits to the people I have described.

THE COURT:  Is that all right with the committee?

MR. SWETT: You are going to pass them out to estate parties who have signed off on the confidentiality?

MR. WORF:  Yes.

MR. SWETT:  That is fine with me.

THE COURT:  All right.  We will approve that.

MR. SWETT: I think it should also be available, however, to counsel for the claimants whose submissions you are focusing on, if they happen to be here.

MR. WORF:  Sure.

(Pause)

MR. SWETT:  Do you happen to know which firms are associated with which claims, so I can know how I can find it?

MR. WORF:  I do, yes.  Do you want me to tell you that right now?

MR. FINCH:  Do it on the record.

MR. WORF:  I was not going to say the firm name on the record.  If you want me to, I will say it.

MR. FINCH:  I think the fact that the firm represents

Garlock/8-16-12

34

a particular person is not confidential and you can say that on the record.

MR. WORF:  Okay.  This is for the record and then I will go through these in detail once I have said this for the record.  Claimants one through three are from the Brent Coon firm.  Claimants four through six are from the Early Ludwick firm.  Claimants seven through nine are from the Wilentz firm.

MS. PACHECO: I didn't hear the question.

MR. SWETT: Seven through nine are from the Wilentz firm.  I will show you the list.

MS. PACHECO: Okay.

MR. WORF: Claimant ten is from the Motley Rice firm.  Claimant eleven is from Robert Pierce and Associates.  And claimants twelve and thirteen are from the Goldberg Persky firm.

MR. SWETT: Thank you.

MR. WORF:  And, Your Honor, these claimants were disclosed to the committee yesterday and the FCR, and we provided copies of our other exhibits, as well, pursuant to our recent practice.

Claimants one through three are from the same law firm.  They answered question 2(d) identically.  They said – and we have marked these answers.  Tab (a) is their supplemental exposure questionnaire, and we have marked each of these answers with a blue tab.  They answered every question,

Garlock/8-16-12

"All product names, manufacturers, sellers and relative percentages are not known."

Now, they obviously understood the question and that it asked for product names and not just the percentages. So it wasn't ambiguous to them. Now, we compared this answer to their trust claims and ballots and part (b) for each of these claimants is the first page of their original questionnaire and then the table (b) from their original questionnaire, which deals with the trust claims.

Claimant one had twenty-three trust claims, each requiring meaningful and credible evidence of exposure. Now, we also compared these claimants to the ballots that we received. The court sometime ago denied a motion to prevent us from getting the ballots the claimants had cast in other bankruptcies, and we got those from the balloting agents. We got a lot of them, all of which had been provided to the committee and FCR. I haven't brought the documentary evidence. It's voluminous. Many of them were produced in the form of very large spreadsheets, and it is impractical without an expert here to actually put forward the evidence, but I will make a representation about what we found, which hopefully will suffice for purposes of today's discovery hearing.

Claimant one had ballots in seven cases, each requiring his lawyer to certify that he had a claim under penalty of perjury. AC&S, Asarco, Congoleum, Flintkote, G-I

36

Holdings, Pittsburgh Corning and Quigley.

Claimant two, the same firm, same answer, all marked by blue tabs, "All product names, manufacturers, sellers and relative percentages are not known." This claimant had thirteen trust claims, as part (b) shows. Cast ballots supported by certifications in five cases – AC&S, Asarco, Flintkote, Pittsburgh Corning and Quigley.

Claimant three, the same answer. The first answer appears on – well, it is marked as page eight. Sometimes these page numbers in the questionnaire are unreliable because additional copies of the exhibit and the tables were replicated for the various work sites, but it is the first appearance of that answer on the first page eight and then the others are marked by blue tabs.

This claimant had a ballot in the Asarco case and, as part (b) shows, on what is marked as page fifteen of the original questionnaire, as well as page sixteen, claims against twenty-four trusts.

Now, we could have gone on and on with this firm. They had a lot of claims, but I think that shows the point.

The next firm, claimants four through six, they are also from a single law firm, different from the last one. They answered "unknown" to every question 2(d) except when they mentioned Garlock gaskets and packing. So they understood the question. They listed Garlock but "unknown" for everything

else.

So, for example, claimant four, the first question 2(d) on the first page eight, talking about pipe covering, block insulation, various other products.  Question 2(d), unknown.

This claimant's lawyers voted for him in the Leslie Controls bankruptcy and, as shown by part (b), again pages fifteen through sixteen of the original questionnaire, fourteen trust claims.

There is also an affidavit attached to his original questionnaire that we provided that was from the claimant and attested to Owens Corning, Kaylo and Johns Manville products.

Claimant five, the same approach.  The first blue tab, it is marked page eight, "unknown" by the product name.  Part (b) shows nineteen trust claims and claimant five's lawyers voted his claim in the Leslie Controls bankruptcy.

Claimant six, the same story, unknown, unknown.  But then look on the second page eight.  This is not marked with a blue tab.  Question 2(d), Garlock gaskets.  This claimant has made seventeen trust claims, as part (b) shows, and that is marked pages fifteen through sixteen of that original questionnaire.

I know this is getting tiresome but I think it is an important point, so I will do three more claimants.  Claimants seven through nine, this is a different firm.  Question 2(d),

Garlock/8-16-12

38

if you look, this one is marked with blue tabs.  Actually it does not have page numbers because it is sort of a free form response to the questionnaire which we obviously don't object to but it just doesn't have page numbers.  The question 2(d)'s are all "unknown."  But the last blue tab, if you look on that page, job site one of one, job site one of one, asbestos source thirteen and fourteen, question 2(d), Garlock.

Claimant seven had ballots in six cases, Asarco, Flintkote, G-I Holdings, GIT, NARCO and Quigley; and claimant seven, as part (b) shows, pages fifteen through sixteen – actually for this one, it is the pages after fifteen and sixteen.  It is a self-created table (b) which again is fine but it just doesn't have page numbers.  Claimant seven had twenty-four trust claims.

Claimant eight, the same firm, same story.  "Unknown" to everything.  Ballots in six cases, Asarco, Flintkote, GIT, Kaiser, NARCO and Quigley.  As part (b) shows, again it is the pages without page numbers after page fifteen and sixteen of the original questionnaire, twenty-four trust claims.

Claimant nine voted in four bankruptcies, Flintkote, GIT, NARCO and Quigley.  The same approach to the exposure questionnaire.  Again, marked with blue tabs without page numbers on those pages.  Twenty-three trust claims.  Voted in Flintkote, GIT, NARCO and Quigley, if I didn't mention that.

And then finally, for this stage of the presentation,

Garlock/8-16-12

39

the claimant ten – this is from a committee firm – answered "unknown" to each question 2(d).  That starts on the first marked page eight and then – actually I think for all of these where I have said page numbers from where the answer to 2(d) is, it is always page eight because that's where the number is in the original questionnaire, so it is all page eights.

This claimant cast ballots in nine cases, AC&S, Babcock and Wilcox, Congoleum, Federal-Mogul, Flintkote, Owens Corning, Pittsburgh Corning, USG and W.R. Grace and, as part (b) shows, he has filed eight trust claims, and that is pages fifteen to sixteen of the original questionnaire.

We could go on and on.  Each of these firms that are represented here had many responses to the questionnaire.  It's a pervasive problem and these are the kinds of responses that are marked on Exhibit "C" to our paper, what we call evasive unknown.

Now, why have firms done this?  We don't know for sure.  One reason could be the obvious one, to help the committee's case.  These firms obviously knew how to answer the question.  It listed Garlock and Anchor in many cases, but they didn't list any of the products or manufacturers underlying the trust claims and ballots.

It is possible that some firms are standing on objections that we have summarized in our paper.  None of those objections are meritorious.  They need to be overruled, so if

Garlock/8-16-12

40

that's the reason why the information wasn't provided, we can get an answer.

Other firms appear to have misunderstood the questionnaire as only reaching the claimant's knowledge as reflected in depositions and the like and not facts that are known to the lawyer. That's a problem because we believe trust claims and the evidence that is used to make trust claims, and probably to file ballots, too, is often developed by the lawyer. The claimant knows I worked with insulation from 1960 to '65 at this plant, and the lawyer has the documents and other information that makes the link to the particular product that would have been there during that time.

The marketing materials from Weitz and Luxenberg that we attached to our notice showed how this works. The title says it all. Quote, "Asbestos cancer victims think suing possible only if they can recall all details of long past exposure. Weitz & Luxenberg aims to correct that mistaken notion."

Now, here is the key: Facts known to a lawyer have to be disclosed in discovery. We cited the famous *Hickman v. Taylor* case, as well as *Wright* and *Miller* for this hornbook rule. Now, documents prepared by a lawyer in anticipation of litigation don't have to be produced under the work product doctrine, but facts that are known to the lawyer have to be disclosed in response to proper discovery, even if the claimant doesn't know it, as our quotes from *Hickman* and *Wright* and

Garlock/8-16-12

41

*Miller* showed.  A law firm is not a black box for facts that are relevant to litigation.

We believe this may have been a major reason for all of the unknowns.  We hope it is because at least that wouldn't be intentional; it would be mistaken but it wouldn't be intentional.  We hope that's the case.

And an example from the past few days shows this. Claimant eleven – this is actually a happy example.  We placed this claimant on the "unknown" list, Exhibit "C," and then we got a call on Monday asking why we had done that.  We pointed out that this claimant had answered "unknown" to question 2(d), and that's reflected – here it is a little bit different.  Tab (a) is their original, unamended supplemental exposure questionnaire, and where the tabs are, you can see they have said not known in response to, I believe, everything.

So we pointed that out and we pointed out, well, you cast all of these ballots and filed all of these trust claims. And the attorney explained that she had answered the questionnaire only by reference to the claimant's deposition. And when I pointed out the trust claims and ballots, she agreed to amend.

The number of other companies identified in question 2(d) – and the amended questionnaire is part (b) under tab eleven – the number of other companies identified went from zero to twenty-one.  Now the questionnaire says, in the various

Garlock/8-16-12

42

parts, Armstrong, Celotex, EaglePicher, W.R. Grace, Owens Corning, Fibreboard, Allied, Anixter, National Gypsum, Plibrico, Harbison-Walker, Owens Illinois, Pittsburgh Corning, AW Chesterton, F. B. Wright, Viacom, Flexitallic, A-Best, USG, Pfizer Quigley, Turner and Newall.  The case now looks completely different.

Several of these were added only after I pointed out the ballots in a separate communication.  The exposures attested to in those ballots were evidenced by no other documents.  The claimant hadn't attached any other documents.  And those were exposures to Grace, Pittsburgh Corning, Flexitallic and Turner and Newall.

Others in the questionnaire that were added are not even bankrupt; they are solvent defendants that were added after we made clear that it reaches knowledge of the lawyer and those got added.

So we go from a case where from the questionnaire alone it looks like Garlock is the only potentially responsible part, we go up to twenty-one – twenty-two if you count Garlock. So that small process had enormous benefit in terms of getting reliable data in this process.

Yesterday this occurred with respect to two more claimants. One happened to be the claimant whose questionnaire was attached as Exhibit "A" to the committee's memorandum and who the committee held up as someone who had made a full

Garlock/8-16-12

43

response.

I haven't reproduced this questionnaire.  He had a large number of work sites, so it's very large.  So I will just summarize what happened.  Counsel reached out to us and we pointed out we marked his client deficient because certain trusts against which he had made claims were not reflected in question 2(d), and he promptly added those trusts to his questionnaire and we agreed to withdraw our objection.  This resulted in the addition of five additional companies to his questionnaire.  And it happened with respect to another claimant, too. It was not the committee's Exhibit "A," but that was to the committee's Exhibit "A."

We need this process to take place with these hundred and twenty-nine claimants.  Otherwise we are not going to know what would have been produced.  We need an order clarifying their obligation, overruling objections and stating the knowledge of the lawyer is to be included.

Now, for all of these claimants, whatever the reason for their answer, we could, when we get to estimation, point to the trust claims and ballots, and we are going to, but our worry is that the committee is going to dispute those as evidence of exposure.  They have already done that for the ballots.

In hearings before this court, the committee has said that some of the ballot certifications by lawyers may mean what

Garlock/8-16-12

44

they say, that the clients had injury causing exposure giving rise to claims, but they said that other ballots may not and they would be based on a hunch. And we know we are going to hear that again at estimation. They may make that same argument about the trust claims before this is over, say that the claim isn't evidence of meaningful and credible exposure. I don't know exactly how they will do that, but they may do it. They may stand up today and prove me wrong. They may say, no, we will stipulate that the trust claims are evidence of exposure. But if they don't, we are going to have a dispute about that, too, and the committee is going to brand its responses like these, with all of these what we view as misleading "unknowns" and what we think doesn't even state the record as known to these lawyers, and they are going to base an alternative estimation on it.

They may even say the questionnaire responses, because they are from the claimants, are the best evidence of the other exposures. At the very least, it will be a source of confusion and unnecessary disputes.

And as claimant eleven shows and the Exhibit "A" claimant showed, we can resolve this now. We can diminish the uncertainty about this issue. The firms can tell us that, yes, the trust claims and ballots do evidence exposure. Now it's possible they may say no. They may say, no, we filed those things without knowing about the exposures, and I think that

Garlock/8-16-12

45

would be significant, too, and I think that would be very illuminating for the court and I think it would be important to know that because I think it would have implications for this case.  But as claimant eleven and the Exhibit "A" claimants show, a process like that has significant potential to generate a better foundation for the extrapolations that the various experts are going to do.

How to implement this, we haven't proposed anything onerous.  We have asked the court to overrule objections to provide any information about products names and manufacturers. We have asked that the court order the information to be produced, make clear that it includes knowledge of the lawyers, and give us the opportunity to meet and confer with the claimants about that, exactly what we did with respect to claimant eleven and the Exhibit "A" claimant.

We have every expectation that this will be a productive process that will ultimately result in much better data.

The committee's order, by contrast, would paper over these hundred and twenty-nine, what we call evasive unknowns. We think that would generate down the line unnecessary and unproductive disputes that we can nip in the bud right now.  If we don't go through the process we propose, the parties and court won't know for sure what the answer is, and we think on this simple question we are entitled to a straight answer.

Garlock/8-16-12

46

The second major category of responses that we marked deficient are the ones that said "see attached."  Now, we expect a number of claimants who just left the questionnaire answer 2(d) blank were probably doing this to – sometimes in their objections they would say that they were relying on the documents but we put someone on Exhibit "A" if they had at least one blank to the answer.  So, this is an aside.  The committee claims we were over zealous in Exhibit "A" because some of the people had identified products but they didn't understand our criteria.   If they had one blank 2(d) answer, and there could be multiple 2(d)'s because there is one for each work site asbestos source, so often there would be several of the 2(d)'s.  So if one of those was blank, they are on Exhibit "A."  A very large number on that list didn't have any answers.   They didn't provide any product names in the questionnaire.

Like I said before, we are not categorically opposed to answers by attachment.  We proposed in our paper that claimants be permitted to answer by referring to discrete and updated interrogatory answers, and the committee includes that as a feature of their proposal.  So we are agreed on that.  That's a sufficient response, you point to those and, if they appear to be updated with all of the information – sometimes they won't be because, like I said their discovery documents are old, a lot of these cases are old. The youngest of these

Garlock/8-16-12

47

cases are now over two years old, and so often that won't be acceptable but, if they do exist, we will take them.

Now, we think that we shouldn't have to rely on attachments for exposures that are known to the lawyers that underlie trust claims and ballots. As I mentioned before, those are exposures that the lawyers should know about. They prepared the trust claims and most often they prepared the ballots. And I will get into why we think we are entitled to know a straight answer for those in a second.

With respect to the document attachment option, we still need an order overruling objections and requiring claimants to answer and, when they attach documents, they need to say "see attached" in the questionnaire so that their answer is subject to the certifications in the questionnaire that they have provided in good faith a complete response. This isn't quibbling. It ensures we will get an answer to the question somewhere.

And if a firm knows, as we wouldn't know until we review the documents, that they object to this question in their interrogatories, they shouldn't get a pass because they attached that interrogatory. They would under the committee's order.

Another issue is when there aren't any interrogatories, there are just depositions, and I will go into this in more detail later but depositions are inherently

Garlock/8-16-12

48

problematic because, as the cases cited in our paper state, they don't include knowledge of the lawyer. They are meant to probe the knowledge of that witness and therefore don't provide a complete picture, even if it is the claimant's deposition, to what is known to the claimant and his agents.

So the committee's order, if there were an all deposition case and those were attached, under the committee's order that would be a compliant answer, and we think that would be clearly improper.

Now, the trust claims and the ballots, here our issue is that we believe claimants or their lawyers could easily verify whether or not these are based on exposure, and the effort will be minimal and, further, that that would go a long way toward resolving the dispute that we are likely to have with the committee over the meaning of those documents.

It is not proper to answer with attachments, for example, under Rule 33(b) when the answer is easily known to the responding party. And we think that is the case for the ballots and the trust claims. The lawyer should know whether there was exposure. The example of claimant eleven is, again, illustrative. When counsel approached us and we pointed out the ballots and trust claims, she corrected the error within a day. It would have taken us much longer than that to go through the documents and determine whether they were evidence of exposure and, for some of the documents, the ballots, on

Garlock/8-16-12

49

review of them, never would have settled this question because the committee doubts whether those are evidence of exposure. The exposures I mentioned were only evidenced by the ballots, and we could have gone through those ballots until the end of time and the committee still wouldn't have agreed that they were evidence of exposure.

The claimant fixed that and said, yeah, these are based on exposure, and counsel amended that questionnaire more or less instantly.

It shows how easy it is for claimants to at least provide us that, and that would have numerous benefits. It will save the estate our having to search through those documents to substantiate that, at minimal cost to claimants and their lawyer. Again, in many cases, a review would not generate the answer. It wouldn't result in a definitive conclusion. So we will also eliminate disputes between us and the committee that could never be resolved through looking at the documents.

We think that this question with respect to the exposures supported by trust claims and ballots is more like the questions in the original questionnaire that could not be answered with attachments, such as the table. And a perfect analogy is table "B" in the original questionnaire which is check boxes. If you added a box to the right of it that said was this based on exposure, you would have exactly what we are

Garlock/8-16-12

50

asking for.

So we asked the court, even if claimants are going to use attachments, to direct the parties to meet and confer about the trust claims and ballots and whether the lawyers can verify that those were in fact based on exposure. This has a strong potential to resolve disputes about what the ballots and trust claim forms mean and thus narrow by a large amount the ground between us and the committee and FCR.

I would like to go through a couple of examples, just two, I believe, on the problems we are facing with the attachments, and these are claimants twelve and thirteen.

Claimant twelve, question 2(d) was left blank. Again, I believe this claimant likely ended up on either Exhibit "A" or the "see attached" question. They have a "see attached" in part three. So we may have counted this as a "see attached" rather than a no answer. It doesn't make a difference. No answer to 2(d).

This claimant has voted in six cases by our reckoning, Flintkote, Pittsburgh Corning, Grace, Quigley, AC&S and Asarco and has made, according to here it is part (c), the original questionnaire, and it's pages fifteen through sixteen of the original questionnaire, nineteen trust claims. Documents were attached but they provided no information to resolve the dispute about the meaning of the trust claims and the ballots.

In the interrogatory answer, which we have supplied as

Garlock/8-16-12

51

part (b) for this claimant, the answer to this question says only "to be supplemented," so presumably the case is going on and they served these interrogatories and didn't provide an answer to that question.  So that's the problem we mentioned about the interrogatories, and they are not always providing an updated or reliable answer.

But for this claimant, we would obviously benefit and the case would benefit from learning whether the attorneys can easily verify that the ballots and trust claims were based on exposure or maybe they won't, and I think that would be significant, too.

Claimant thirteen is from the same firm, again left question 2(d) blank, perhaps relying on attachments.  We have marked that with a blue tab and, like all these answers, it appears as page number eight.  By our reckoning, voted in four bankruptcies – Asarco, Flintkote, Pittsburgh Corning and Grace.  And then as part (c) shows, which is the table (b) from the original questionnaire, marked pages fifteen and sixteen, twenty-one trust claims.

The interrogatories provide no product names or manufacturers.  These are subpart (b) and there is no answer.  There were depositions that were also attached but we reviewed those and they don't shed any light on this question either.  So the attachments didn't do the job, and we would benefit greatly from clarification over what the ballots and the trust

Garlock/8-16-12

52

claims meant.

We can provide many more examples of all of these categories.  All of the firms I have discussed today have multiple claimants in the population, but I think the point is clear, we are entitled to a straight answer from the law firms through a combination of documents and we believe conferences over the meaning of the trust claims and ballots.

We believe Rule 33(b) doesn't apply to the exposures evidenced by the trust claims and ballots because the documents don't necessarily resolve the issue between us and the committee whether there was exposure and, at any rate, the burden is far less on claimants and their counsel than it is on us.  Again, claimant eleven went from zero to twenty-one in a day.

Just to mention briefly, other problems with the documents, some of which I have alluded to, were rampant and the committee's approach would paper over them.  The parties who didn't attach any interrogatories and therefore have no documents, they were directed to the knowledge of the lawyer.  Depositions, which only probe the knowledge of the witness, and the committee would let someone who just produced depositions pass muster.  Other interrogatories have objections to this question.  Under the committee's order, that would count.

So the relief we are asking for, we think, is simple.  We ask the court to direct firms to confer with us on the trust

Garlock/8-16-12

53

claims and ballots.  For the products and manufacturers other than trusts and ballots, we would be willing to accept production of all documents that might bear on exposure.

Another problem with the committee's order, it mentions three discrete sets of documents that are not all the ones the debtors requested.  It doesn't contain all discovery prepared by counsel.  It doesn't contain expert reports which often contain information that we requested.  So we need those produced in order to have all of the evidence.

And if claimants want to answer question 2(d) with documents, they shouldn't be compliant unless the documents do answer the question and they make a certification.

And finally, the order the court enters, unlike the committee order, should make clear that the knowledge of the lawyer is relevant, discoverable and should be provided. Otherwise debtors are going to be deprived of a great deal of relevant and nonprivileged information.

So that is our take on the supplemental exposure questionnaire.  I would like to address briefly the supplemental settlement payment questionnaire. I don't believe we received any new objections to this since we filed our paper.  Here, we simply ask that the court overrule objections and direct claimants, who withheld information on the basis of objections, to provide the information and direct claimants who provided no information in their response, or who provided no

Garlock/8-16-12

54

response at all, to respond.

The committee may argue, as they did with respect to the original questionnaire, although their objection was overruled, that we got enough of a response. But, here, we are already talking about a sample. This was one thousand claimants who were randomly selected from the population of still pending claims, mesothelioma claims against the debtor, and you can't get a representative sample through self-selection.

Entire law firms opted out of this process. The Baron and Budd firm has yet to return a questionnaire at all in this case, no original questionnaires, no settlement payment questionnaires. They weren't on the exposure questionnaire list because that only touched people who had submitted an original questionnaire, but they haven't returned any here either. And then for claimants who objected, we won't know that full answers were provided until objections are overruled and claimants are ordered to answer.

We think that our papers support why we are entitled to this discovery. As we set out many times, payments are relevant to the damages claimants can collect against Garlock. The amounts are not privileged. It is not burdensome to provide these afore numbers. Many claimants did provide them, including many that we marked compliant. And we have taken steps to protect the confidentiality of confidential

Garlock/8-16-12

55

settlements.  The information is being produced in the aggregate, and the questionnaire protective order applies to the information.

So for all of these reasons, with respect to both questionnaires, we ask the court to enter the relief we have requested and permit us to get the relevant and non-privileged discovery that the court has held we are entitled to.

MR. SWETT:  Your Honor, first of all, I would like to ask for five minutes and, second, I would like to know whether Michael Shepard is still on the line.

MR. SHEPARD:  I am, Ted.  Thanks.

MR. SWETT: Your Honor, I have some comments to make after the break, but Mr. Shepard has interrupted a deposition in order to participate by phone.  So if he would like to go before me, I will accede my place in the queue to him and then, after my remarks, I am going to turn it over to the people in the courtroom who have the greatest stake in these issues because they represent the people about whom the questionnaires are supposed to be turned over and, of course, Mr. Shepard is in that same category, but I will have some remarks to make first after Mr. Shepard.

THE COURT:  Let's take about ten minutes and come back at five after eleven.

(Recess from 10:56 a.m. until 11:08 a.m.)

MR. SWETT:  Your Honor, Mr. Shepard has suggested that

Garlock/8-16-12

56

I go ahead first, so I will make my remarks and then –

THE COURT:  Just so you know, I canceled my lunch date, so we can go as long as you all want.  If it looks like we can get done and get you all on to something productive, we will just keep plowing.  If starvation is going to set in, then we will take a break.

MR. SWETT: Okay.  Well, I hope this is productive.  It is certainly an important session for the purposes of our estimation proceeding, and it is a special opportunity for the court for this reason:  We have frequent gatherings in this case.  We have lots of debates between the debtors and the committee and sometimes the FCR, and most of it has to do with the interest of remote persons and the court has little opportunity to focus on those interests, to weigh them appropriately in the balance.  In the natural sense, the people out of view are harder to take account of when you are trying to do the right thing in a dispute.

Today you have the advantage of having a goodly number of the representatives of the claimants whose fates are ultimately at stake, not in the estimation but in the bankruptcy itself, and I hope that the court will benefit from that by getting a window on what it is like to be on the receiving end of these questionnaire forms, what it is like to turn your practice around on a dime to try to respond to them in the exacting and comprehensive manner that the debtors seem

Garlock/8-16-12

57

to feel that they are entitled to, in the context of a case that is, after all, not individual claim litigation but only estimation, and in a situation where these folks have to represent, against solvent defendants and others, the ongoing interest of their sick and dying clients. So this is a special opportunity for the court.

The committee has filed a brief. It focuses on the supplemental exposure questionnaire, as will my remarks. This is not a concession that the payment questionnaire is appropriate. Your Honor knows our position on that, and I am not going to spend any time on it today, as long as it is understood that we are not waiving the positions previously articulated to the court on the payment questionnaire.

THE COURT: That's understood.

MR. SWETT: Thank you, Judge. We're dealing here with a serious instance of discovery overkill, and a telling example of that or telling sign is part three of the questionnaire, which Mr. Worf referred to in part of his argument and it asked all claimants within the four hundred and sixty-seven person sample to make certain production of documents. They request attach copies of the following documents from any litigation seeking compensation as a result of the mesothelioma of the alleged injured party: (a), all depositions taken; (b), all discovery you or your attorney have answered on your behalf; (c) all expert reports produced by any party, including you.

58

What I would observe, to underscore the point about overkill, is those demands are not limited to evidence that goes to product identification and exposure, the supposed subject of this questionnaire which is, itself, merely supplemental of a very burdensome exercise that these firms went through last year in the original questionnaire.

They are basically saying you have got to give us all of the discovery from your underlying tort suits no matter whether it relates to product identification or exposure, or not, and then they are complaining when people have provided the evidence that they have accumulated in the underlying tort suits, that somehow that production is not certified, even though it is response to this overbroad request.

So this is an example of an out-of-focus, overreaching discovery demand and it would be all too easy to say, well, what the heck, let's just let that pass if the claimants aren't here to protest, and today they are here.  So hopefully their interest will be appropriately weighed in the balance.

The ACC's position is that Garlock is entitled to no relief with respect to the objections unless it shows, with regard to a particular claim, or in situations where law firms took a uniform approach for their multiple claimants in the sample, firm by firm, that the responses in substance are inadequate.  That is the basic proposition.

They have chosen to take this battle to the level of

Garlock/8-16-12

59

intensive individual claimant discovery, as though we were going to try these hundreds of claims. We are not. You know well that the committee believes that focus is inappropriate. We are not arguing that today. But if they are going to do that, they have no business treating the claimants, the individual persons whose rights are at stake here, as some kind of homogenized unit that they can get compulsory process on by making glib generalizations and showing a few examples.

It is their burden to demonstrate case-by-case that they have not been provided with sufficient information and, when that judgment is made, I submit you ought not to let the good be disparaged because it is not perfect or, as one of my partners likes to say, do not let the perfect be the enemy of the good. We are involved in a process of approximation here and, of course, within reasonable limits, they are entitled to refine their estimate. I am not suggesting that they should just be, you know, tossing up unsubstantiated numbers, but there are reasonable limits that flow from the nature of the proceeding. And I believe that, when you hear from these folks and you are exposed a little bit more to the actual responses and the abundant information provided in response to this supplemental exercise, and weigh that against what was already accumulated under the original questionnaire, you will, in most instances, be satisfied that enough is enough.

With regard to the scope of today's argument, these

Garlock/8-16-12

60

folks are here to argue all of their objections.  If the debtors want to take a dive on some of them, okay, but they put out a notice, as we pointed out in our paper, that required on an expedited basis – that gave these folks essentially no opportunity to respond in writing – the obligation to assert their objections and defend them, if challenged, and they are here to do that.  And it is not fair game, I submit, for the debtor to cry off that the expedition that it called down upon their heads is somehow too much.  Today is the day to consider the objections.

Now, whether your rulings imply that there is some further process with regard to some discrete problems, I am not suggesting that everything is over after today's hearing, but I am suggesting that you need to deal with all of the objections raised and it is not just a matter of question 2(d), although it is very helpful and I think meaningful to your analysis of the objections that they are now admitting that the nub of the matter is the identification of other products and manufacturers.

We have suggested a practical way at which to get at the mother lode of that information.  Whether or not it goes to the last iota of responsive information is not the question.  The question is, is it adequate for purposes of the estimation, and I submit that you should weigh carefully the extent and robustness of the responses if they challenged on an individual

Garlock/8-16-12

61

basis the adequacy of the same before overruling the objection. They are entitled to full and fair consideration in the context, and the context is the question 2(d) does not exist in isolation.  It was part of a form, unlike any other I have ever seen in any of these cases that proliferates the questions. You will have occasion to hear about some respondents who had peripatetic careers and many sites and a very, very impressive number of tables generated in response to the debtors' request for information in tabular form, where others, and I think quite justifiably, have declined the honor of doing the debtors' work by distilling and interpreting the information to put it in tabular form for the benefit of their IH experts. That is not the function of discovery.

The point is that the appropriateness of the form and the sufficiency of the information provided need to be considered as a whole, and the debtor should not be permitted to cherry pick, nor should it be permitted to have an open-ended invitation to compel meet-and-confers and impose on the time of opposing counsel.  We need to bring this to a head.

So whatever happens today, I am hoping you will entertain with consideration the various objections that the claimants are here to articulate and defend and, however you end up ruling, I am certain the court will be duly mindful of the burdensome demands on these folks who have already provided a lot of effort in response to Garlock's requests and need to

62

have some finality on their discovery obligations here.

Ultimately the relief that we have suggested, the outcome that we think would be appropriate on this motion, is for the court to rule that claimants who have provided their up-to-date tort suit discovery on product exposure and identification matters, including, in particular, interrogatories where they speak to that issue and depositions which, by the way, are always about product exposures and that is almost usually the only focus of them. If they have given the interrogatories up-to-date, if they have given their depositions on PID issues, product identification issues, and if they have complied with the original questionnaire by turning over their trust claim forms or authorizing Garlock to get them from the trusts directly, that should suffice.

I suppose there might be individual variations where, for some peculiar reason, you would want to hear the debtor on some further demand but it is hard for me to envision why anything further than that would be required for the purpose. So that's a suggestion for a crisp and clean resolution of this motion.

A couple of points in response to Mr. Worf's argument. They have the ballots. They have the trust claims. They don't need to compel a lawyer to sit down and prepare a list. What has all of this other discovery that you have authorized been about other than gathering those facts? They say, well, we

Garlock/8-16-12

63

need it because we want to establish that these other assertions, these ballots and these trust claims are based on actual exposure but how about this:  Their position is that mere exposure to an asbestos-containing product does not spell liability.

Now what does that tell you about the significance of what he characterized as issue resolving, issue simplifying, dispute avoiding procedures for following up on questionnaire – I'm sorry – on ballots or trust claims?  It tells you that it is illusory.  It is an illusion to suppose that, if you authorize them to spend another couple of months on this and to impose more and more hours on the claimants' counsel, that they are going to get someplace useful with it.  They are not.

Their obligation under state law, in most jurisdictions where they want to lay off liability on another party, is to prove the other party was a tortfeasor.  And their own theory is you don't prove a tort by mere exposure.

Now you should know, I think I have mentioned this in the past, ballots do not equal the assertion of a demand for payment from a trust.  That is a debate for another day, but I want to be very blunt and clear in the legal position because every time they say the ballots are claims, I am going to have to remind you that they are something else, that the voting procedures orders quite commonly provide that they are for purposes of the vote only and ultimately we are going to join

Garlock/8-16-12

64

issue on whether they have the significance as a legal matter that the other side insists on ascribing to them. That is not for today but, nevertheless, I have bookmarked the point.

The basic point for today is they have the ballots. So whatever significance they are going to ascribe to them, they are going to ascribe to them, and they are not going to avoid disputes about Owens Corning's responsibility because of an Owens Corning ballot when their obligation under state law, if they want to take some kind of credit for Owens Corning's participation in the tort, is to prove that Owens Corning was a tortfeasor, which they can't do through a ballot.

So the idea that they are going to simplify these issues and get a whole lot of traction out of further discovery process regarding ballots is an illusion. It is a recipe for a lot more disputes, third-party by third-party. Are we really going to try an estimation, the extent to which these other parties were tortfeasors, in cases where Garlock was a defendant? I submit that is impossible.

Whatever inferences they want to draw from the ballots, they are going to draw. They have the ballots. Enough is enough.

What about the trust claims? I believe I have noted before, and this is not an issue for resolution today but you should know that the standards under the TDPs for collecting from a trust are not the same as they are in the tort system.

Garlock/8-16-12

65

So, again, if they want to make a facile equation, they can go ahead and make that equation and we will join issue with them on the law. But just like the exposure issue is an illusory one, if what they are hoping to do is simplify and avoid disputes, so, too, is this one. But, again, a fundamental point is they have the trust claims. You let them get them.

When they fault a particular supplemental exposure questionnaire for not having listed various trusts among their claims, they already know, so why pester the claimant's counsel anymore? It is make work. It is burden. It is using discovery as an economic weapon against the interest of the claimants and it is not necessary.

Your Honor, my basic position here is that they have got a huge amount of information. It responds to the product identification and exposure issues, as well as any. Their experts – I think they began the supplemental questionnaire exercise by saying their industrial hygiene experts want to create these occupation groups and lump people in these categories and so they need these tables of identifying information regarding other exposures and other products. Well, it is not the claimant's job to do the work of the debtors' IH experts. They can certainly do that for themselves and no one is standing in their way. They have the evidence. Let them take the claims as they find them and how they find them is what is the discovery that has been accumulated in the

Garlock/8-16-12

66

tort system with regard to exposure, what are the interrogatory answers given by the claimant's counsel with respect to that issue if they have been required to respond. Those are the cases. That is the stuff of the cases. They are not entitled to force the claimant to box up the stuff of those cases in any particular way for their own convenience. Let them use the evidence they have and let's get on with the estimation.

Now, Your Honor, I am going to get out of the way now and I am going to ask Mr. Shepard, who is on the phone, to make his remarks and then the group that is in the courtroom have organized themselves and have an order of presentation that will follow. Mr. Kendall will be the first of those in the courtroom to speak. Thank you, Judge.

THE COURT:   We are going to hear from Mr. Shepard first, you say?

MR. SWETT:  Yes, sir.

THE COURT:  Mr. Shepard.

MR. SHEPARD:  Thank you, Your Honor. Are you hearing me okay over the phone?

THE COURT:  Yes, sir.

MR. SHEPARD:  I apologize for not being there in person, Your Honor.

I would like to start with some background on me and my firm so that you will have some context in which to consider my comments, Your Honor.  The Shepard Law Firm is a small

Garlock/8-16-12

67

litigation firm.  We are based in Boston, Massachusetts, and our focus is on the representation of victims of asbestos disease, primarily mesothelioma.  We have four attorneys.  We have a support staff of between three and six paralegals depending on our trial schedule at any given time.

I have been litigating mesothelioma cases since February 1995.  I tried my first case against Garlock in 1996. I started this firm in 1998.

Your Honor, my firm has submitted responses to Garlock's initial bankruptcy discovery request on behalf of twenty-eight claimants that we represent.  We were served with SEQs for three of those claimants and we timely responded to those SEQs.

In conjunction with those SEQ responses, we served a statement of objections on behalf of the claimants we represent.  In order to streamline things today, I am only going to argue those objections that I think require a particular explanation or highlighting but I am not waiving any other objections raised in my firm's submissions.

My first comment involves the effort expended in responding to the debtors' many discovery requests and the burden involved.  My firm is small but we handle a substantial workload.  In a typical year, we handle between twelve and twenty-five asbestos cases, the majority of those are mesothelioma.  Not every case is prepared for trial and I will

Garlock/8-16-12

68

explain that in more detail shortly, but the few cases that are nominated as lead trial cases require a tremendous amount of work.  Given the similarity of many asbestos cases, there are economies of scale in the work that we do, and I think that is common across the board.  Motions, exhibit lists, other pleadings can be borrowed from prior cases and, given those economies of scale and with the efficiencies that come with experience, we can manage to put together a complicated case with a relatively small staff compared to our brethren on the defense side.

However, with respect to Garlock's discovery request, there is no benefit of economy of scale whatsoever.  In order to respond to these, I had to pull people off of trial work to put the requested discovery information together and to complete these lengthy claim forms.  It is not simply a matter of printing out some documents or merging database information. There is no cutting and pasting involved.  I had to have paralegals and attorneys go through the discovery, question by question, search for the information requested and answer that information manually by either writing it out or typing it from scratch.  It took us many hours to complete and all of that time was taken away from getting our cases ready for trial, our existing trial cases.

Thus far, we have had to stop what we were doing to respond to Garlock's original discovery request for

Garlock/8-16-12

69

twenty-eight claimants, then we had thirteen deficiency supplements that we had to address, then three supplemental exposure questionnaires and four supplemental settlement questionnaires.  It has been an incredibly time-consuming and burdensome task for my firm and my active trial cases have suffered as a result of having to pull people off of other work to respond to Garlock's seemingly endless request for information.

I am not suggesting that Garlock is not entitled to some amount of discovery, but what I am saying is that we abided by the orders of the court, we understood the orders of the court, we answered the initial discovery and the SEQs and the supplemental settlement discovery in good faith.

What I wanted to bring to the court's attention today is to speak on behalf of not just my firm but other firms like mine to make the court aware of the amount of work that has gone into complying with those discovery orders and how that work takes us away from other tasks.

As Mr. Swett said, the reason I am not there in person is because I am in the middle of a deposition of a client in Massachusetts who is dying of mesothelioma.  There are real costs to be borne in dealing with Garlock's discovery requests. My firm has over eighty-six hours already spent on Garlock's several discovery request.  If we were a defense firm charging three hundred dollars an hour, it would have already cost us

Garlock/8-16-12

70

over twenty-five thousand dollars just to respond to this stuff.

Now we heard debtors' counsel earlier today say, repeatedly say, that the burden is far less on claimants than on debtors' counsel. I think the debtor has completely lost sight of how burdensome this whole discovery process has been for claimants and claimants' counsel. We are not all big firms with hundreds of people who can pump out discovery at will.

I also submit to the court that the burden of answering the SEQs was and is unreasonable because the utter futility of the exercise, and I don't mean to be glib by that. What I mean by the futility of the exercise is that the SEQ questions are either unreasonably broad, impossible to answer, or totally irrelevant to the claimants' underlying tort cases and, in order to understand why the SEQ questions are objectionable on these grounds, I would like to explain how the asbestos docket operates in my jurisdiction in Massachusetts.

In Massachusetts, all of the asbestos cases in the state are handled by one Superior Court Judge, Charles Healy. The asbestos docket is governed by a pretrial order which is extensive and covers all aspects of case filing, discovery, motion practice, trial, etc. It is essentially our own individualized rules of civil procedure. This asbestos docket is overseen by a court-appointed special master, and it is her task to handle any and all discovery and any and all case

Garlock/8-16-12

71

specific disputes before they can be presented to the court, so as not to have the court expend time dealing with stuff, ministerial things that can be worked out by the special master.

This system has been in place for decades and the lawyers who practice in Massachusetts, both plaintiff and defense, are well-versed in it. Not every asbestos case in Massachusetts is placed in a pretrial discovery work-up queue. Only certain cases are designated for trial and are worked up with full discovery.

According to our pretrial order, about ten percent of the cases on our docket each year are designated as lead trial cases. What that means is parties are expected to resolve all of the remaining cases on the docket that year, which we call down listed cases. We are expected to resolve those with the lead trial cases or at least attempt to do so. Those down listed cases are only given a trial setting and a resulting discovery work-up if the case is not resolved with the lead trial case.

The system is designed to save transaction costs for the asbestos defendants while still giving the plaintiffs the ability to secure a trial date if all settlement efforts have failed.

As a result, for the vast majority of asbestos cases in Massachusetts, there is no extensive discovery work-up.

Garlock/8-16-12

72

None of my firm's claimants who have been served with an SEQ had cases that were designated for trial, which means that no discovery work-up was conducted on those cases.  As a result, no depositions were taken; no product identification or exposure discovery was conducted; no expert statements or depositions were conducted.  The cases were settled with the lead trial cases in their respective trial lists to everyone's satisfaction, plaintiff and defendant alike, and the claimants are now all deceased.

Given that the claimants who are subject to debtors' SEQ are deceased and did not have a prior discovery work-up, there is limited information that is available to give to the debtor.  However, in the spirit of good faith, and with the hope and understanding that this burdensome request was the end of the debtors' discovery request to claimant's counsel and was not a precursor to some further and additional request for information, my firm provided in its response to the SEQs all of the responsive information that was available in the files, given the limited discovery conducted in the underlying cases, and I want to be very clear on that.  We did everything we could to respond in good faith to this.

With that being said, the information as to Garlock in many of these cases is less than even what was available as to other defendants in the underlying tort cases because any discovery as to Garlock was halted by the bankruptcy stay.  So

Garlock/8-16-12

73

even where discovery was conducted, none was conducted as to Garlock post-bankruptcy.

To the extent that the debtor here is asking for information from claimants that it presumably intends to show that exposure or wants to show that exposure to asbestos-containing products, manufactured and sold by Garlock, are insubstantial when compared to exposures to asbestos-containing products manufactured by other companies, it is something of a self-fulfilling prophecy because the claimants were stayed from pursuing Garlock in their lawsuits and were left to pursue other defendants.  So as a result, any discovery that exists with respect to Garlock is likely going to be less than what exists against companies who did not have the benefit or the protections of a bankruptcy stay.

Even in cases where Garlock was an active litigant in the underlying tort case, claimants object to the SEQ and the claimants I represent, and I am sure others, object to the SEQ because Garlock had an equal, if not greater, motive and opportunity to conduct this discovery prior to declaring bankruptcy and it chose not to do so.  Garlock never once, in the eighteen years that I have been doing this, has asked for this information that it is now seeking in the SEQ.

And there are three reasons that I can identify that this information was never requested by Garlock before in Massachusetts.  The first of those reasons is that the SEQs are

Garlock/8-16-12

74

far more extensive than the Massachusetts standard interrogatories and request for production of documents.  Those are dictated by our pretrial order and, even a case that gets a lead discovery work-up in Massachusetts, is not going to have the information the SEQs are seeking because it is not part of our standard discovery set, and I have provided a copy of that standard interrogatory set as part of my written objections, which I believe the court has in a pile of what I imagine is probably a couple feet tall at this point.

Your Honor, the SEQ requires answers to a set of vague and poorly worded questions for each job site, and each job duty that the claimant had at that job site, and each type of product on that job site while in that job duty.

The SEQ by itself requires far more answers than the entire set of standard discovery requires in Massachusetts asbestos cases, and this is on top of the original discovery set and the supplemental settlement discovery set served by Garlock.  By the way this is set up, these SEQs potentially require hundreds of answers.  No asbestos defendant in Massachusetts would ever be entitled to such an enormous and onerous amount of interrogatories.

The second reason, Your Honor, that Garlock never sought this SEQ information in Massachusetts is because, in this jurisdiction, we do not require or endorse a calculation of exposure to a particular defendant's product.  The so-called

Garlock/8-16-12

75

dose reconstructions are just simply not typically done in Massachusetts. As a result, no discovery evidence is gathered on that subject and it is not going to be in these clients' files.

I am not aware of a single instance in which Garlock has requested discovery on or in any way conducted a dose calculation for reconstruction in an asbestos case in Massachusetts, ever.

I tried a case against Garlock in federal court in Massachusetts in 1996. Garlock neither sought discovery on this, nor presented any evidence or argument on dose calculation, and there is good reasons for this that I would submit. Massachusetts is a joint and several liability state. As long as the defendant's asbestos product was a substantial contributing cause of the plaintiff's disease, they are liable for the full amount of damages. So there is no need to try to apportion fault among co-defendants.

But the most compelling reason not undertaking a dose reconstruction in Massachusetts is because it is complete and utter guesswork and speculation. There is no way, Your Honor, that any expert, no matter how credentialed, can state with any degree of scientific certainty how many asbestos fibers from products "A" through "Z" a particular person inhaled during their career. Even if you had a time machine and you went back in time and you placed an air sampler on the shoulder of the

Garlock/8-16-12

76

plaintiff and you kept it there for his entire working career, taking daily samples, you still couldn't get an accurate measurement because most exposures on most job sites involved many asbestos products being used at the same time. There is simply no way to differentiate which asbestos fibers flowing into the plaintiff's lungs on any given day are from which products.

It is incredible to me, Your Honor, that any court in the country would allow such inherently unreliable testimony to be introduced at trial. To my knowledge, that type of expert testimony has never gotten past the Daubert/Lanigan challenge here in Massachusetts, and I would be surprised if it ever did.

Counsel for the debtor this morning said that the so-called exposure science exists and is well-established. Well, yes, it does exist but it doesn't exist for the purpose that the debtor is attempting to use it. Industrial hygiene's goal is the protection of workers from workplace health hazards. Their tools and their techniques are used to try to make recommendations regarding health and safety measures to implement in the workplace to reduce the risk of injury.

They were never intended to be used to determine causation in a court of law or to say definitively that a certain product did or did not cause disease in a specific individual, particularly when that individual was exposed to the product upwards of fifty years ago.

Garlock/8-16-12

77

Dose reconstruction exposure science has been hijacked by the asbestos manufacturers, Your Honor, as part of a recent tactic to try to avoid liability for the harms they have caused.  It is not admissible here in Massachusetts.  I am surprised it is admissible anywhere and, as a result, I think that – I submit that the information that the debtor is seeking, not only being overly broad and virtually impossible to answer, is essentially useless because there is no expert that can take that information and synergize it in a way that should be admissible in any court of law.

The third reason, Your Honor, why the SEQ information was never sought by Garlock in Massachusetts is because Garlock settled with claimants in Massachusetts –

MR. WORF:  I object, Your Honor, to him speculating about Garlock's motives in Massachusetts.  I don't think it is relevant and he has no knowledge of –

THE COURT:  We will hear him out.

MR. SHEPARD:  Your Honor, after the 1996 federal court trial, Garlock ceased being in a litigation stance, and I will try to keep my comments regarding settlement benign, and entered into a stance in which they sought to encourage plaintiff's counsel to reduce the amount of transaction cost that Garlock had to incur and get together to talk about cases at an early stage and settle them in an early manner that had predictable results for both Garlock and the plaintiffs.  The

Garlock/8-16-12

78

upshot of which is that Garlock, by virtue of implementing this process, ensured that it would not be hauled into depositions, they wouldn't have to appear in depositions, they wouldn't have to respond to written discovery, they wouldn't have to participate.  They essentially kept their head down and tried to stay under the radar in terms of depositions, product identification and cases that were being actively litigated. And it would be patently unfair to now let the debtor assemble discovery and argue that the lack of exposure evidence in these files means that claimants weren't exposed to Garlock products or that those exposures were insubstantial when compared to other products.

I think the very nature of Garlock's litigation and settlement posture supports just the opposite conclusion. Garlock settled cases because it knew its products were widely used; it knew that they contained extremely high percentages of asbestos; that they released dust when they were installed and when they were removed and they caused lung disease, including mesothelioma.

In sum, Your Honor, my firm has cooperated in good faith to provide Garlock with the discovery information that it is seeking to the extent that we can do so from the existing state of information in the claimant's underlying tort case file.  I submit that it is unreasonable and unfair to allow the debtor any further attempts to re-create an exposure history

Garlock/8-16-12

79

from my firm's claimants when it took no steps to do so prior to declaring bankruptcy and while subsequently benefitting from the lack of discovery as to Garlock due to the bankruptcy stay and to their long-standing settlement practice here.

And I want to reiterate, Your Honor, that my presentation today was limited to highlighting how the SEQs are a particular burden on my firm and firms like mine, but I have raised other objections in my written submissions, including objections regarding the fact that the SEQ objections are vague, that they are poorly drafted, they are overly broad and, in many cases, they are impossible to answer. I am not waiving those objections; I just want to defer to the other arguments I'm sure you are going to hear today from my brothers and sisters who went out of their way to be there in person.

I would also like to note, Your Honor, my objections to the debtors' attempt to defer objections to any SEQ responses other than 2(d). As I have already stated, my firm has already expended a tremendous amount of time responding to the debtors' multiple discovery requests. I have taken the time from the deposition of the client to participate. This process should not be allowed to turn into a death by a thousand cuts by Garlock.

It is my sincere hope that Your Honor will consider the work expended by my firm, my comments regarding the nature of the information sought in the SEQs and weigh that with the

Garlock/8-16-12

80

need to move expeditiously toward an estimation, and that you will deny the debtors' SEQ challenges and prohibit any further challenges with regard to my firm's SEQ responses.

And, Your Honor, I would like to finish by saying that in all of this arguing about Garlock needs this information, Garlock needs that information, Garlock needs to subpoena trusts, or Garlock is in bankruptcy court because of all of these burdensome asbestos claims, in queuing all of that, let's not lose sight of the real victims here. The real victims are the good, hardworking men and women of this country who suffered and died from cancer caused by asbestos. Garlock made millions of dollars year after year for decades selling products that contained as much as ninety percent asbestos, a lethal carcinogen, but it is our clients who paid the ultimate price, Your Honor, and there is no amount of money that can give them back their health or their lives, and there is no amount of money, no matter what Garlock says about what claimants are getting in the tort system versus the bankruptcy system, there is no amount of money that can give them back their health, give them back their lives, or put them where they should be absent their asbestos exposures. So let's not forget who the real victims are here.

Your Honor, thank you for your time and for the opportunity to be heard.

THE COURT:  Thank you. Okay, Mr. Kendall.

Garlock/8-16-12

81

MR. KENDALL:  May it please the court,  counsel, my name is Gary Kendall.  I am from Charlottesville, Virginia and, for the last thirty-six years, I have had the privilege of practicing law in the law firm of Michie Hamlet in that town.

I look around the room and it is pretty clear that I am the old guy in the room.  I got my first asbestos case in 1980, and have been doing cases and it has probably been seventy to seventy-five percent of my practice since 1980.

I am presently a member of two trust advisory committees in two bankruptcies, the Celotex bankruptcy and US Mineral bankruptcy.

I come from a firm that has about fourteen lawyers in it.  Of the fourteen lawyers, only about three or four work on asbestos cases.  And you have heard Mr. Shepard's comment about the burdensome nature of this supplemental questionnaire, and I would echo everything that he says.  And I'm going to go through with the court a little bit about what this questionnaire entails, the burdens that it places upon us and why the information that is being requested is unnecessary information and, in many cases, outside of the scope of anything that anybody in this room has developed or collected over the years.

In terms of myself, there are two things I want you to know about me.  First, as an example of my judgment, I hired a young lawyer out of the University of Virginia's law school who

Garlock/8-16-12

82

started his legal career.  His name is Bobby Conrad.  He later became known in this building as Judge Conrad.  He worked for me for four years, and I like to take credit for everything that has happened to him.

The other thing I want you to know about me is that throughout most of my career I have served on the ethics committee as a judge appointed by the state bar to hear claims against lawyers who were being disciplined for ethical violations, and I think that means the bar doesn't think I am a crook.  Maybe it means it takes one to know one.

But there has been a lot of information tossed around in courtrooms, and I am getting really sick of hearing it, about the unethical conduct of plaintiff's lawyers.  And I can tell you that I have worked with most of the people in this room, most of the firms in this room, and they are nothing, nothing but committed, honest, hard-working lawyers, and they are coming into this proceeding to raise an objection, not because they don't want to do the work – I don't know of anybody that works harder than these people – they are coming in because they have a legitimate beef with Garlock about a questionnaire that is so overly broad, so vague and so impossible to answer that it makes it difficult for us to continue to practice in this proceeding.

Now, I also want the court to know that prior to today, as best I know, I am in compliance with everything that

Garlock/8-16-12

83

Garlock has requested. I have answered the original questionnaire. I have provided information about the settlements. If there is something that I have not done, they haven't told me about it, and I filed answers to five supplemental questionnaires that were sent to me, but I am being told that my answers are not responsive, and I want to go over that and I want to put it into the context of the overall questionnaire process that has been put on the plaintiffs in this case by Garlock.

Now the things that Mr. Shepard said were absolutely correct about Garlock in terms of their statements that they don't understand the exposures and they don't understand how each of these plaintiffs in these cases have a claim against Garlock. I want to talk about that in a minute, as well, but I want to explain the real basis for my objections and, in order to do that, I want to start with three basic propositions that affect me personally in my case. I understand from hearing from Mr. Shepard just now that he has the same problems.

Number one, all five of my clients are deceased. So if you look at the questionnaire – I want to go back through it in a minute line by line but, if you look at the information the questionnaire is requiring, that information can only come from the plaintiff or the decedent, and I can't go to him now to get information.

Garlock/8-16-12

84

He has divided his categories of deficiencies into people who put down "unknown," people who put down – just attach documents – and people who didn't do anything. Mr. Finch is going to talk about the "unknown" part. But, as a practical matter, if your client is deceased and you can't go back to him to ask questions, an "unknown" response is a proper response because the answer to that question would only come from the defendant – I mean, the plaintiff.

The second thing I want to point out, and I have an exhibit I would like to hand up to the court. Mr. Shepard touched on this. This is a motion and a corresponding order in a case that I handled last year in Newport News. In my state, dose reconstruction testimony is not only not favored, the court has consistently ruled in case, after case, after case, it is not admissible in evidence. It is pure speculation. It is a charlatan's attempt to create what somebody worked in forty, fifty years ago and what the dust level might have been. And in my court, with the orders I have presented you and the motions, there are string cites to the cases that say you cannot use dose reconstruction evidence as a basis to prove that a person did or did not have exposure to asbestos.

The questions that the defendants have steered their supplemental questionnaire to are essentially dose reconstruction questions, and the dose reconstruction question 2(d), if you look at question 2(d), it's a compound question and they

Garlock/8-16-12

85

say, well, people aren't answering this question properly. The compound question is, one, name all of the products that you worked with and who manufactured them and what percentage of those products were you exposed to.

In other words, asking the plaintiff to go back on a dose basis and reconstruct how much Johns Manville, how much Pittsburgh Corning, how much Garlock, how much any other asbestos defendant. That is exactly the kind of evidence the courts in Massachusetts and in my state, Virginia, they have said it is not even admissible, you can't put it on.

Now, I understand that this is a discovery stage for an estimation hearing and they may try to do that, but I think the court needs to weigh the burden on the plaintiffs in terms of responding to this with the nature of the defense they are trying to assert and, in this case, we believe that this defense is a false defense, a defense that is leading the court down a path, and I think everybody in this room is going to say the same thing, it is down a path that goes nowhere.

Now, the second and third point I want to make, in addition to my clients being dead and dose reconstruction testimony not being permitted into evidence, the third point I want to make is that we are a pure joint and several liability state, just like Mr. Shepard. The old expression is, if you are in for a dime, you are in for a dollar. It doesn't matter what percentage of Garlock, or Owens Corning, or Johns

Garlock/8-16-12

86

Manville, the law has been in my state, and we have two big shipyards, the Naval shipyard and the Newport News shipyard and in the western half of the state we have an army ammunition arsenal that has produced literally thousands of these cases over the last thirty-five or forty years and, in every one of those cases, there are always multiple products that are included in the exposure history of an individual, multiple products, and it does not matter because the courts have consistently ruled that each and every exposure to asbestos that is a substantial contributing cause to the disease creates liability for that defendant.

So it is not necessary for me to prove how much Garlock exposure I have or how it relates to anybody else's liability. All I have to show is that that exposure was a substantial contributing cause to the plaintiff's disease. That has been the law in my state for forty years and it has served the Commonwealth of Virginia very well. We are a conservative state but, in our conservative state, we recognize that there can be multiple causes to create an injury and it doesn't absolve somebody because somebody else – they had more exposure to somebody else's product as opposed to Garlock's product.

Now, everybody in this room knows and it is my experience that Garlock was to gaskets what Coca-Cola is to soft drinks. Everybody knew Garlock. Everybody worked with

Garlock/8-16-12

87

Garlock.  Their name was all over the product.  And what Mr. Shepard said a minute ago really hit head-on and that is Garlock came in to my firm – I have never tried a case against Garlock, not one in thirty-two years, because Garlock came into my firm and Mr. Shepard's firm, and a lot of these firms out here, and in every instance Garlock said, "Look, we want to offer a settlement plan that will pay so much per plaintiff depending on what disease he has.  If it is an asbestosis case, a lung cancer case or a mesothelioma case, we want to compensate" –

MR. WORF: If I may just interrupt a moment?  Judge, may I just have a standing Rule 408 objection just for the record.

THE COURT: Yeah.  I am going to overrule it.

MR. WORF: Thank you.

THE COURT: Yeah, I understand.

MR. KENDALL:   It was a standing and the client had the option – the client had the option of accepting that settlement and taking Garlock out of the case, and most clients did.  Most clients that I represented, because I never had to litigate one of these cases, opted into the plan that Garlock had created to provide compensation, and they did this for multiple years.  They were a defendant in my cases for more than twenty years.  They offered the settlement; the clients took it and they took it – Garlock offered it, (a), to keep its

Garlock/8-16-12

88

defense cost and transaction cost down and, (b), because in other places other than Virginia, and we have some lawyers here who have actually litigated against Garlock, they got their clock cleaned in court when they went to court, and so they understood that the benefit of fixing their liability and fixing their exposure and not being – in addition to getting hit in the courtroom, having unlimited defense cost, as well.

That has been the history of Garlock.  So in my joint and several liability state, when they came in, they understood that, if we could establish their presence in the case, which we almost always could – they were Coca-Cola after all – that they needed to do something about it, and they came in and they resolved these cases, which means there was not a lot of discovery done against Garlock, there were not a lot of attorney's fees, and there is not a lot of information to be provided.

Now I want to walk you through a case because I am one of the guys who did the "See Exhibit 1."  I am not the guy who said "unknown" and frankly I should have because, for example – I want the court to take a look at the questionnaire.  Do you have a copy of it, Your Honor?

THE COURT:  Yeah, somewhere.

MR. KENDALL:  Let me see if I have an extra one here. If I can hand up, this is another client, I am going to use the case of Billy Carter as my example.  He is one of my five.  If

Garlock/8-16-12

89

you will look at Billy Carter, the first question that they talk about is question 2(d) and it says, "What was the product name, manufacturer and seller of each product constituting a portion of the type of asbestos sort and – and – the relative percentage that each product constituted of the injured party's total exposure?"

I wasn't there.  I'm a lawyer.  Mr. Carter did his job forty years ago.  The only person who can testify as to the percentage, relative percentage that each product constituted of his total exposure is Billy Carter.  The correct answer would have been for me to say "unknown."  I didn't say "unknown" and, as I'm going to explain to the court, I took, at great expense and great time, my firm went in and got all of the liability exposure documents we could find on each one of these cases and we put it on a disk and we provided it to the defendants.

They got answers to interrogatories.  They got answers to requests for admissions.  They got depositions.  Not only depositions of the plaintiff but depositions of coworkers.  They got everything that I had relative to Mr. Carter's exposure that was in my office at the time they served this questionnaire.

Now, I want to point out some things, though, to the court.  When you get down to the last question in the questionnaire where they say, "Produce all depositions you or

Garlock/8-16-12

90

your attorneys have answered" – "all discovery and all depositions taken." There is an ammunition plant in western Virginia that is run by the Army. Well, it is run by a private contractor. It is owned by the Army. During the Vietnam War, they had seventeen thousand people working in that plant, and each day they brought asbestos products into that plant by the tractor-trailer load because, if anything gets hot in Radford, Virginia, the whole town blows up.

The arsenal was a place that was an asbestos-rich environment and, because of that, over thirty-two years, as you might imagine, I have had a lot of cases, a lot of depositions, a lot of discovery that I have done in the Radford Arsenal. If I am to take this questionnaire literally and produce all depositions taken, I could fill this room or come pretty darn close to it, at an expense that would be astronomical but that's what it says. It says all depositions taken. I used depositions in other cases as a basis to prove liability of a defendant in the case of Billy Carter. I don't just use Billy Carter's deposition. I don't just use depositions of people who said they worked with Billy Carter. I also used the depositions of other plaintiffs who have been in that environment, who have worked with products who have created dust, and the general theory is that they were all breathing the same air. And there is a lot of industrial hygiene literature about that, that once asbestos gets into the air of

Garlock/8-16-12

91

a plant or any kind of facility, it will stay for a long time and people will breathe it even though they had no direct contact with that product.

In those cases, there is a ton of it.  So I can't give him all depositions.  It would take me six months to go through and find them all and then thousands of dollars to copy them and send them to him.

But I want to make this point.  For Garlock to say they don't understand their liability or where they fit into the puzzle in the asbestos world, that's a little misleading because, for a lot of these depositions, Garlock was there.

I want to bring it to the court's attention.  Can I get somebody – I have dog-eared, Your Honor, the pages on this. This is one of the five cases that Garlock, the debtor, wanted me to produce information on, and what I have handed you as Michie Exhibit No. 2 is a very small sliver of the kinds of things that they were given.  I have a banker's box somewhere, I believe two banker's boxes.  FedEx sent one of them to Indiana by mistake.  So there is one here and somewhere in Indiana they have got a box of stuff that they have no idea what it means.

THE COURT:   It might be a good solution to the discovery problem.

MR. KENDALL: In those answers to interrogatories, it identifies every trust that I have filed a claim against.  It

Garlock/8-16-12

92

identifies – there is attached to it a work history affidavit that identifies every product that Mr. Carter can identify.  It is depositions of Mr. Carter, and I want to talk about that. The deposition of Mr. Carter, these cases are tried one at a time.  There is a lot of notion that somehow these are mass class cases.  These meso cases in my state are tried one at a time.  I have a mesothelioma case set for trial every other month between now and 2015, and I am getting ready to do ten more, which if my calculations are right, they are going to run me until 2017 or 2018 I am going to have mesothelioma cases, Your Honor, to try.

Now, in each one of those cases, there are multiple defendants and, in the Billy Carter case, if you turn to the tab that is the deposition, I believe it is tab number five, in the back – I have earmarked the page – dog-eared the pages for you, Judge.  I want to set the stage for how this works because Garlock was there.  They were a defendant.  They were there. They participated.  There were twenty-five law firms there. There were seven lawyers who asked Mr. Carter questions for two days.  He was dying of cancer, barely able to sit up in the chair, and I will tell you and I will proffer this, the reason it took two days was that Garlock's lawyer was so abusive with Mr. Carter that I felt Mr. Carter was going to come across the table and knock his teeth out, and that man said, "I am not talking to him anymore," and walked out of the deposition,

Garlock/8-16-12

93

which meant we had to come back and do a second deposition. But my point is this: Garlock was not only there but Garlock participated in the whole process. And if you look on page 113, starting about the middle of the page – I can put this up if it will help – well, it doesn't help much, does it? Garlock asked him some questions about how he got exposed to asbestos dust from Garlock, from gaskets, and they asked him would it be fair that working with gaskets was a small percentage and he said:

"That would be a tough one to answer because, there again, you have to be in an environment of a place that I worked. At one area I worked, that is all you do. Go to work, to the work area, and you rebuild cylinders, pumps and different things. That's all you did for three months. And then in another place I worked, all we did was change out pumps for a whole overhaul period of pasteurizers. I don't know if you know what one of those are but it is what you pasteurize beer in, and that is all we did. We changed pumps and you changed gaskets for however long the overhaul went on."

Now, it goes on, on the next page, and this page I want to read to the court because it goes directly to the "unknown" answer that so many people in this room have used in their supplemental questionnaires. The lawyer for Garlock

Garlock/8-16-12

94

continues to press him and he says – I will get down towards the middle of the page – he says:

"I do know that I work on asbestos gaskets that they told me later had asbestos in it that I breathed and caused my condition. Now I do know that. The time frame, I don't know. What little I have read on computers, I don't really take a whole lot of time if that's what you are getting at. Well, from what I understand, you could do it a couple of times, you know."

"Mr. Carter, all I am asking is what you know. If your answer is I don't know, that is a fair answer."

When these questionnaires say, "unknown," that's a fair answer because people like Billy Carter, who worked in the trade his whole life, and worked around these products his whole life, has no way of being able to specify that and, if you look at these questions, there is a whole pile of them that said how many times in a typical day – now, Mr. Carter was never asked these questions by Garlock's lawyer when he was being deposed for the two days that he was there.

He did say on the next page, if you go to page 115:

"What I was asking was not whether you breathed my product. What I asked you is was working with gaskets a small percentage of what you did over your entire working career?"

Garlock/8-16-12

95

The answer was:

"It was not a small percentage, no."

Now we come to these questions, how many days a year did he work with or around an asbestos source.  No one has asked him.  He is dead now.  How am I to find out that information?

How many times a typical day?  I didn't work with Mr. Carter.  I am a lawyer.  I am not a coworker.  Is there a typical day?  He did construction work and it varied from day to day as to what he was exposed to, whose products he was exposed to and what was going on around him.

They asked him what was the typical duration of a task or a job.  Again, nobody asked – Garlock's lawyer and nobody else asked him these questions in a two-day deposition but now they want us to go back and try to reconstruct this, and the only person who could tell us that is Billy Carter and he is dead.

They want to know percentages between percentage of time of each contact in subsection (g).  They want to know a number of questions that only Billy Carter could answer and, because of that, the answer to the question "unknown" is a fair answer.

I could have made that answer but I chose to do something different.  I gave the defendants everything I had in my file on exposure for this man, everything I have.  I didn't

Garlock/8-16-12

96

go back and give them twenty years or thirty years worth of depositions from the Martinsville DuPont plant and, by the way, I will say this, as well, Judge.  I think every trust that I have participated in and every trust that I have filed a claim for treats this plant where Billy Carter worked as an approved job site.  They don't want you to prove any product ID information.  They know they are all over this plant, and Garlock has never denied a case for anybody arising out of that plant in my experience, or the DuPont plant in Martinsville or the DuPont plant in Richmond.  So they already know that everybody knows this site is an asbestos-rich environment and it's not some secret that is sneaking up on somebody and it is not something that their experts have to go back and reconstruct the entire asbestos exposure history for this plant.  It is there, they have known it, they have always known it and requiring this kind of information is just not fair.

Now I want to talk a little bit about how these cases progress because another problem with producing all of this information at this time is that it is extremely misleading. As I said earlier, I have cases set today through 2015.  I promise you, Judge, I am not doing my case preparation on a case that is set for trial in 2015 right now.  I am worried about the case that is coming up in October, and I have got to find some witnesses and I have got to do some work.  2015 is an eternity away, and most everybody in this room who has been

Garlock/8-16-12

97

doing asbestos cases for a long time, and that is true of everybody in this room, knows what is necessary to prepare a case. And when you prepare a case, you focus on that one case and you have got to get a lot of things pulled together, experts, coworkers, medical people. You don't have time to be going out here and doing product ID information on cases that aren't anywhere near fruition. It is like landing airplanes. They are circling. You worry about the one that is going to land right now and that is what you spend your time on.

So when you ask people to produce information concerning product ID, there could be a tremendous amount of information that would be produced down the road but you don't have it in your file now.

Likewise, as Mr. Shepard said, you may have settled with these companies in what is called an administrative settlement where you have very little or no product ID information, but that doesn't mean to say that Garlock, for purposes of estimation, that Garlock is not an active player for that person's asbestos case.

Now, because this is an issue over estimation, we are not here to prove a liability case. We are not here to estimate the debtors' liability. I submit to the court, and I am going to let some other people talk because I have talked a lot longer than I was supposed to, I am going to let some other people present some information of their own experience and

Garlock/8-16-12

98

some other issues that I no doubt have missed but, in terms of estimation, Garlock has all of the information it could ever need and Garlock has, through its own lawyers, all the information it could ever need, and any further information is a tremendous burden and a tremendous expense on the claimants, and we would ask that the court deny any further requirement by these folks here, the claimants and their attorneys, to produce any more information because they already have it.

Thank you.

THE COURT:  Okay.

MR. FINCH:  Is it okay if I stand here, Your Honor?

THE COURT:  Sure.

MR. FINCH:  May it please the court, my name is Nathan Finch.  I have personally been involved in working up and trying mesothelioma cases for about three years now.  For many years prior to that, I was a partner and colleague of Mr. Swett at Caplin and Drysdale, and he is my neighbor and friend and we are fellow University of Virginia Law School graduates.

I take very seriously my firm's obligations under the discovery rules.  I'm going to ask that the court deny Garlock's challenges to the Motley Rice responses to the questionnaire and particularly the allegations that we have been evasive or misleading in the responses of "unknown."  We were categorized for all six of the supplemental questionnaires evasive unknown.

Garlock/8-16-12

99

I think it is useful for the court – I'm going to describe a little bit about my firm's litigation history. Motley Rice and its predecessor, Ness Motley, have been litigating and trying asbestos cases since the mid 1970s when Ron Motley got one of the very first verdicts for a plaintiff in an asbestos case against Johns Manville.

Over the years my partners and colleagues have tried, in terms of one at a time trials, hundreds of asbestos cases and some cases where there have been mass consolidation where you had a group of six and then the results could be applied to other people. I mean, Mr. Motley tried several thousand cases at once and got verdicts.

We have a long history of litigation in states all over the country. I had the privilege of being Mr. Kendall's co-counsel in many cases. I have been co-counsel with Mr. Kraus' firm in cases. My firm and the partners have been co-counsel with half of the people in the room, maybe most.

We have at any given time a couple hundred mesothelioma cases that are working towards a trial date. They are in, as Mr. Kendall described, various stages of preparation. Some of them, they are ready to go, you know, to trial in a month. We usually have a standing docket of eight to ten cases up for trial in West Virginia every three or four months. Other cases are on a docket where they might not get a court time for years.

Garlock/8-16-12

100

Sometimes we will get involved in cases, you know, two weeks before the case is scheduled to go to trial, I will get a call from somebody, "Hey, can you come help me try a case?"

The questionnaire responses that Motley Rice provided, I think it is important to understand what we did and what we went through in responding. Motley Rice received approximately a hundred and twenty questionnaires from mesothelioma victims. There were some that, in addition to that, that might be co-counsel responsible cases. Like Mr. Carter's case was a case that Motley Rice and Mr. Kendall's firm was counsel in, and so Mr. Kendall responded to that questionnaire.

There were others that we thought, well, this case was settled and we didn't have to respond to the questionnaire. There were others still that we received questionnaires for and we didn't represent the person at all. And there were others still that we know that we have cases against Garlock where, for whatever reason, we didn't get a mesothelioma questionnaire. So we only responded to the discovery we got.

We take our discovery obligations very seriously. I have a senior associate who has about twenty years experience. She spent between two hundred and fifty and three hundred hours working on this. Two senior paralegals spent somewhere between two hundred and fifty and three hundred hours on this. We had fourteen staff members, junior paralegals, who spent anywhere from eight to ten hours each. We had six lawyers, including

Garlock/8-16-12

101

me, in addition to the senior associate, most of them are partners who are responsible for the cases, some of which I am going to talk about, who spent anywhere from five to ten hours on this.

Unlike Mr. Shepard's firm or Mr. Kendall's firm, I am not complaining about the burden of this. Although if you were to charge by the hour for what we did, it would be a substantial amount of money. You know, we had our IT staff involved; we had our accounting staff involved; and we submitted questionnaire responses on behalf ultimately of about a hundred and twenty people. And, as far as I am aware, there were some meet-and-confers that Ms. Gilbert, my associate, had with people from the debtors' counsel. As far as I am aware, until today, there wasn't any allegation or suggestion that we had been unfair, or improper, or hadn't provided whatever information is called for by the questionnaire.

I take very seriously allegations that somehow I, or my firm, is being dishonest. I mean, I am a product of the University of Virginia and the University of Virginia Law School. I don't know if Your Honor knows that at the University of Virginia there is something called the honor code that you have to sign that, any time you take a test, that you are a straight shooter, you didn't lie, cheat or steal.

THE COURT: I went there.

MR. FINCH: And, beyond that, I think anybody that has

Garlock/8-16-12

102

ever had a case with me on the other side of the courtroom would say I am a straight shooter. And so I don't think the evasive unknown is a proper characterization of our responses, and I'm going to walk you through two different supplemental questionnaire files. We had six supplemental questionnaires. I am going to show you sort of the whole history of what we provided to the debtor. One of them is a case that got fairly well worked up. There were many depositions taken. There was a trial deposition taken of the client while he was still alive. Garlock was involved in the case during the discovery stage.

The other case was almost identical to the one that they used in the example, I think it is their Exhibit 10. I am going to talk about a guy who is similar to that. There is no real functional difference. It is a guy who died before he could ever get deposed. All there was, was some interview notes in a file and maybe some product ID affidavits and I will explain how this sort of process works.

May I approach the bench, Your Honor?

THE COURT: Yes.

MR. FINCH: I have a couple of exhibits, and I have one copy for Your Honor and I have one copy for the debtors' counsel and I will work off of my copy.

Your Honor, you can't just – the debtor likes to, and in a trial, I would call it trial by sound byte. They like to

Garlock/8-16-12

103

pick out little pieces of things and say, oh, this firm, you know, did something bad here, this firm did something bad. They aren't showing you the whole picture.

When I was a little kid, I used to listen to a radio show called "The Paul Harvey Show." I still do until – you know, he is not on the air as much anymore. I guess his son has taken over. But Paul Harvey used to have this segment called "The rest of the story," which he would tell you part of a story and then you would hear the rest of the story. And so I am going to tell you the rest of the story on how we answered these questionnaires.

You have what has been marked as Motley Rice Exhibit 1, which is not just the supplemental questionnaire response but it is basically the entire set of file relating to exposure for a case of a man named Mr. Raynor. And Mr. Raynor is not a case that I worked on personally; this was worked on by my partner in Rhode Island, Vincent Green, but Robert Raynor, he is dead like the rest of our clients.

If you turn to tab one, which is the original questionnaire, there was questions about alleged exposure to Garlock or Anchor products and where it was. If you see, it is part 5(a), alleged exposure, and it lists DAR Industrial Products, Inc. He was there for ten years and he personally cut asbestos-containing gaskets, personally cut asbestos-containing packing, worked at a site where Garlock or Anchor

Garlock/8-16-12

104

asbestos-containing products were cut or removed, and then also he was involved in the manufacturing of gaskets.

The next tab, tab two in this questionnaire, is alleged exposure to products other than Garlock and Anchor products. And, there, it is a list of various asbestos-containing products. Do you have the page, Your Honor?

THE COURT: Yes.

MR. FINCH: I could use the Elmo, but I can probably go faster without it. But, you know, it lists everything from A. W. Chesterton; Green Tweed; Scapa; John Crane, which is another gasket manufacturer; Crown Cork and Seal, which is insulation; HK Porter which is an insulation contractor; Owens Corning, which made both asbestos-containing insulation and other asbestos-containing products; JT Thorp, insulation contractor; Raybestos made asbestos-containing brakes but also other types of asbestos; and Johns Manville, which made every kind of asbestos product known to man. And it just says, "Exposed to products while manufacturing asbestos gaskets."

So then, back in February of this year, if you remember, Your Honor, there was a hearing that was scheduled to be held in February and Your Honor was unable to preside over the hearing, and so basically people dealt with that on the papers. But, in advance of that hearing, if you will look at tab three – are you with me, tab three, Your Honor?

THE COURT: Yes.

Garlock/8-16-12

105

MR. FINCH:  That's a letter from Ms. Gilbert to Rust Consulting which is the debtors' claims consultant, and Garland Cassada, which the last line of the letter says, "The remaining hundred and twenty-three cases have been supplemented on the CD.  Please note that we have included the Rust claim number in our enclosure, as well as in the CD for each matter."  And then there is a list of the people.  And what we put on that CD was the exposure information that we had in the file for whatever person, and it wasn't just for the supplemental questionnaires; it was for all of them.  If we had depositions taken of the client, in that case we gave them a deposition.  If there were coworker depositions taken in that client's case, we gave that to Garlock as well.  If there were product ID affidavits, we gave that to Garlock.  This is at the time of the submission of the regular questionnaire.  Maybe the regular questionnaire called for all of that stuff and maybe it didn't.  I didn't want there to be any dispute that we hadn't, you know, given Garlock everything they needed to know if they wanted to try to figure out some person's individual exposure.

I'm going to come back briefly to tab six, seven and eight, but six is Mr. Raynor's trial deposition; seven is the deposition of a guy who was, I think, the purchasing officer of the DAR plant where they talked about the various asbestos products he bought.  Eight, there were three or four days of discovery depositions of Mr. Raynor, including one day – do you

Garlock/8-16-12

106

have a red tab, Judge Hodges, where Mr. Raynor was asked questions about other asbestos products that he remembered or was being exposed to, just on page 165 of the deposition.

For example, Crown Cork and seal, yes.  Dresser Industries, yes.  EaglePicher, don't recall.  EJ Bartells, no, I don't know.  Fibreboard Corporation, yes.  Flintkote, don't recall.  They go through – what they did is they took a laundry list of all of the companies that have gone into bankruptcy as a result of asbestos-containing – asbestos liabilities, and they just asked poor Mr. Raynor, "Do you remember this?  Do you remember this?"  And if he said, "Yes," they came back and had follow-up questions.

I don't think this was counsel for Garlock who was asking these questions, but counsel for Garlock was there at that deposition.  And so they developed the information about the man's exposure in these depositions.  We gave that to Garlock.

So then we get to the supplemental questionnaire response and, if you get to tab four – do you have tab four, Your Honor?

THE COURT:  Yes.

MR. FINCH:  This says "General Objections to Supplemental Exposure Questionnaire."  Are you with me?

THE COURT:  Yes.

MR. FINCH:  What we said in here is that claimant, by

Garlock/8-16-12

107

counsel, because our clients are dead, has attempted to respond to all of the – I guess we left out the word "questions" – in the Garlock supplemental exposure questionnaire to the best of his or her ability.  No information has been withheld on the basis of an objection.  However, the responses are subject to the following objections and, first of all, discovery has been stayed as to Garlock.  And all we did was give them the information we had available to us at the time, not what we might be able to work up if the case progressed.  You know, no court has set a trial date for a case to go to trial against Garlock since it went into bankruptcy over two years ago.

We also objected to the extent the information that's requested here, you know, the exposure information requested here is either information that we don't have or the claimant doesn't have or is – it equally is available for the debtors as it is the claimant.

There are, as Mr. Shepard touched on and Mr. Kendall touched on, there are all kinds of reasons why individual dose reconstruction is not admissible in a lot of places.  It is kind of like – let me explain what I mean by that.  It is absolutely valid science to say if you change a gasket one time, this is a level of exposure that is associated with doing that one time or doing it over the course of even a few hours.  There are both historical documents where people like the United States Navy or some other asbestos defendants and even

Garlock/8-16-12

108

some companies who aren't typically asbestos defendants, like Shell Oil, where they had a situation where they happened to be measuring what happened if you fabricate a gasket or removed one from a flange.  There are also work practice simulations done by experts for litigation purposes, some of which are published in the (inaudible) literature, some of which aren't, and the dose show, you know, if you take a gasket and remove it from an adhered – the gasket is adhered to a flange and use a power tool to get it off, what kind of fiber exposure are you talking about, and there is a range of exposures there.  And there is a dispute in almost every gasket case that gets tried as to whether you believe the defense side of the industrial hygiene material science on that or the plaintiff's side.

I think the better view of the evidence and the historical assessments are on the plaintiff's side of the evidence, but we are not trying a gasket case here today.

But, you know, one time, sure, that information is science.  But what they are talking about and the questions, and you can't just isolate one question, they are talking about taking somebody's entire exposure history and saying what is the total amount of asbestos he was exposed to from Garlock as compared to everything else. And Mr. Kendall explained, under Virginia law, and that is the law in a lot of places where I have handled cases and tried cases, it doesn't really matter what it is for other companies' exposure.  In some places, it

Garlock/8-16-12

109

does.  In some jurisdictions, you put a lot of companies on the verdict form and the jury is asked to assign relative percentages of fault.

At the end of the day, you know, the typical person that has mesothelioma is exposed to asbestos from multiple different sources.  The expert testimony is that mesothelioma is a cumulative dose disease, meaning every occupational exposure to asbestos contributes to the total dose that causes a disease.

Just like if you came into the doctor's office and you had lung cancer and you smoked cigarettes for twenty years and ten of it was Phillip Morris, and five of it was Pall Mall and five of it was Joe Campbell.  You know, you ask your doctor, "What caused my lung cancer?" And he would say, "All your cigarette smoking."  If you said, "Well, was it the Phillip Morris versus the Joe Campbell?", the doctor would say, "No, it is all of them."  That is the real world and that is the testimony that generally comes in evidence.

So you have that sort of situation.  The question ultimately at trial is, for the defendant that is on trial or defendants – sometimes you start trial with four, five, six defendants – was that set of exposures a substantial factor in causing this man's mesothelioma.  And that is sort of the whole dispute and the arguments of whether there is enough evidence to get to a jury on that, sometimes it comes up in a *Daubert*

Garlock/8-16-12

110

context.  Mr. Kraus and I have argued that in federal court in front of Judge Robreno.  We have argued it in state court. Most places it comes in.  It comes down to the individual facts and circumstances of each case.

So now we get to the supplemental questionnaire, which is number four.  If you skip past the four, go to tab five. Are you with me, Your Honor?

THE COURT:  Yes.

MR. FINCH:  This is asking about gaskets.  This client had several job sites and, for each job site, we went through generally what he did, and then question – you can't just read question (d) in a vacuum.  You have got to read (d), (e), (f), (g), which goes into things like Mr. Kendall was talking about. How many days per year; how much, etc.  Question (d) is:

"If known, what was the product name, manufacturer and seller of each product constituting a portion of that type of asbestos source and the relative percentage that each product constituted of the injured party's total exposure to products of that type, i.e., Johns Manville, thirty percent; Pittsburgh Corning, seventy percent?"

And the answer there is "unknown."  And if the question had been what was the product name, manufacturer and seller of each product to which you believe your client was exposed, full stop, then they might have gotten a list of

Garlock/8-16-12

111

products; but I certainly didn't read that question that way. You know, it was a compound question. If I had been at trial, I might have objected, compound question. I might have just let it slide because it is trial and who really cares. But the point is, a lot of lawyers around the country and everybody who looked at it in my office viewed that as asking a question, not this question, not this question that Nate Finch edited but the question as posed in the supplemental questionnaire, which is percentages.

And there, Your Honor, that is where you really get to unknown, and it is unfair to call that evasive unknown when we have given them the man's deposition, if we had it, and product affidavits if we had it.

And let me just give you sort of a real-world example that doesn't have anything to do with asbestos. Do you remember the earthquake in Japan about a year and a half ago when the nuclear plant got damaged,, and they would send people in to try to repair it and they would say, well, these people have exceeded the safe limits for how much radiation they were exposed to. Some of them had, some of them hadn't.

Well, anybody that works, at least in the first world, anybody that works around nuclear power plants wears little badges that, on a contemporaneous basis, collect information about how much radiation you are exposed to. There is nothing like that in the industrial hygiene literature for asbestos.

Garlock/8-16-12

112

There are occasionally some measurements taken at some plants for some activities at certain periods of time, but no client had somebody following him around with a dust monitor and measuring how much asbestos he was breathing. And even if they did, as Mr. Kendall said, or maybe it was Mr. Shepard, you don't know how much of it came from this and how much of it came from that. All you know is total dose. But you don't even have that. There is nothing like that in asbestos, and it is unfair and unknowable really to expect people to know that information and to put it sort of in real concrete terms that a lawyer can understand.

Lawyers, at least, if I had to go back and tell you what I was doing in 1995 when I was at Caplin and Drysdale on a particular day, you know, I could call Ted and say, "Hey, do you have the time records going back that far?" I could at least come up with I worked four hours on this case and two hours on that one, maybe did legal research.

Most of my clients, they don't have jobs like that. They don't keep track of their time. They might be at a union hall and go to work at fifty different places in the course of a year. Now, there might be a journeyman pipefitter or just a basic construction laborer that goes to many different places, and they don't know how much time they spent at what place versus how much time they spent at another place.

And then to put a more defined point on it, instead of

Garlock/8-16-12

113

the question "What were you doing fifteen years ago?", if the question was how much time did you spend with F.Supp. versus how much time did you spend with North Carolina Code Annotated, versus how much time did you spend looking at US Code Annotated, versus how much time did you spend with Wright and Miller's, versus how much time did you spend with, I don't know, Mickey's, which is a black letter law treatise in Virginia, versus how much time did you spend with the US Code Annotated.  Nobody can remember that level of detail and that specificity, how much time they were doing with each thing.  You could certainly testify, or at least I could, and anybody who has spent any time in a law library, you could testify, yes, I spent a lot of time when I was a young associate looking at the F.Supp. 2d – or F.Supp. 2d didn't exist –  F.Supp. or the Shepard's books or looking at Wright and Miller's or Weinstein's on Evidence, Wigmore on Evidence.  I spent a lot of time, many many times, hundreds of times.  Could I say how much, how long, how many hours, how many minutes, how many days?  Was I in the same room when other people were doing that?  Sure I was.  How much?  Who knows.  And the answer is unknown.  They didn't ask just list the products you think your guy was exposed to.  They asked for what percentages of times, and all of their questions carry on in that vein.

I want to hand up a second exhibit which is more like the Motley Rice questionnaire that counsel for the debtor

Garlock/8-16-12

114

provided to you.  May I approach the bench, Your Honor?

THE COURT:  Yes.

MR.  FINCH:   This has been marked as Motley Rice Exhibit No. 2.  This one is a case of Mr. Andreoli  This is another case handled in our Rhode Island office.  If you turn to tab one, that is the initial questionnaire where we talked about he did commercial and residential renovation, construction renovation work.  Do you see that, page 9 of 24? And then the next page over, worked at General Dynamics in Quincy, Massachusetts, for about two years where he worked on ships and in shipyards repairing and installing piping, its components, etc.

Mr. Andreoli died before we could get him deposed and the case has not been worked up to any substantial degree.  You know, the way the trial docket works in Rhode Island is similar to the way it works in other places.  You know, there is sort of a line and people decide which cases they want to push forward and which cases they don't.  Many times unfortunately a client will die before you can get them deposed or they will decide, you know, they don't want to fool with the lawsuit because they would rather spend the last six months of their life with their family and their kids and their spouse and not have to deal with lawyers in the courtroom, and then they die and the widow or the children say, yeah, we would like to pursue a lawsuit.

Garlock/8-16-12

115

And so this is a man, and I think this is the same situation – I am sure it is the same situation for the case they showed you, you know, quote, the evasive unknown. This is a guy who died before we could get him deposed.

We sent the same sort of supplemental information back in February. Whatever we had in the file related to this man, which I will get to in a minute, which is some product ID affidavits he executed before his death, we gave them. But in responding to the supplemental questionnaire, we said, "See attached job description," and this is based on what Mr. Green or his staff could remember about their interviews and the product ID affidavits that we had. If you will look at tab two – do you have tab two, Your Honor?

THE COURT:  Yes.

MR. FINCH:    Mr. Andreoli was a self-employed carpenter contractor from approximately 1969 until 2002. During this time he worked at various residential and commercial sites throughout the state of Rhode Island. He worked on both new construction and repair and renovation projects. He had significant exposure to asbestos covered boilers and piping at these sites and these are often ripped out and replaced as part of the project. He specifically recalled working with various types of asbestos-containing products depending upon what the product sign consisted of, included but not limited to gaskets, joint compound, spackling,

Garlock/8-16-12

116

roofing products, shingles, floor tiles and ceiling tiles.  He recalls removing existing products and oftentimes early in his career installing them as part of his regular work.

And then, if you look at tab three, that is some of the affidavits he was able to execute from stuff he recalled personally before he died.

So the other part, Your Honor, is in the questionnaire itself, the first questionnaire, we identified – I think for all of our clients we identified the trust claims they had filed and what the status was.  There is no secret.  We weren't hiding the ball from the debtors.  I believe there is a tab four –  is there a tab four, Your Honor?  Is that a table (b), page (b)?  That lists the trust claims, I think.  I don't have my copy.  For whatever reason, it doesn't have that page.

So for them to say that it is misleading or it is evasive unknown for us to answer a question when they are not asking give us a list of the products, they are asking give us a list of the products and the percentage of time you used each, which is unknown.  To say that that is evasive when they got the information about the trust claims forms that are filed.  We provided them with access to the trust claim forms.  You know, the argument that he made about the lawyer's knowledge, here, you know, whoever worked up this file gave them the best of their knowledge about that case.

Now what we didn't do, Your Honor, we didn't respond

Garlock/8-16-12

117

to these questionnaires as if they were a motion for summary judgment or a trial.  You know, as Mr. Kendall says, there is a lot of work that goes into preparing a case for trial from the time where it might be early on in the case, like this one, and the time you try your case.  I mean, as you saw from the questionnaire, the guy who was working in the Quincy shipyards at General Dynamics doing things on ships, we didn't go out and try to find coworkers who could remember our guy and talk about what he was doing with and around gaskets or anything else.  We didn't do that to respond to the questionnaire.  I don't think that is required by the Federal Rules of Civil Procedure to go out and work up your case in response to what is effectively interrogatory answers where you are not even a party to the case.

I mean, there are many times when there are coworkers identified and the defendants never bother to take their depositions in that particular case because they have been deposed in other cases or they just don't get around to doing it, and then a summary judgment motion comes in and you can go and get affidavits from those people and respond to it and defeat summary judgment.

I routinely argue summary judgment motions in federal court in Philadelphia in front of Judge Robreno on that type of situation.  Sometime – actually, I don't think I have lost one on product ID or exposure issue in front of him.

Garlock/8-16-12

118

So, a long story short, the information in the file, we gave Garlock what we had.  We think there is clearly enough information for them to tell what products there was a potential for exposure for, at least.

And remember, as Mr. Swett said, a lot of bankruptcy trusts will have what is called an approved work site, and Mr. Kendall talked about that.  You know, it is on some level – the level of evidence required to submit to a trust is different than the level of evidence you would have to submit to get to a jury or get past summary judgment in a lot of different states.  And maybe other people will talk about this, and maybe this isn't the day to deal with it but, long story short, we gave Garlock the information we had; we thought we responded to the questionnaires favorably.  We didn't withhold any information on the basis of objection.  The objections are really just to qualify what we were doing so they could understand what we did and what we didn't do.

And so I respectfully would request, Your Honor, to deny Garlock's challenges to Motley Rice's supplemental questionnaires, both as to question 2(d) and 2(e), (f), (g), (h) and (i) where they ask more questions that are effectively unknowable.  You know, they have the depositions of the people if they are alive.  If they are not alive, they have the best we have in the file.  And so I would request that you deny the relief they seek against the Motley Rice clients and anybody

Garlock/8-16-12

119

else who did basically what we did.

Thank you, Your Honor.

THE COURT: Yes, sir.

MR. KRAUS: Good afternoon, Your Honor.  I am Peter Kraus from Waters & Kraus.  Is it the court's preference to continue on and continue soldiering through?

THE COURT: How much more do we have?  I guess I ought to ask that.  How many more people want to speak?

MR. SWETT: Your Honor, according to my notes, after Mr. Kraus, there are six in the courtroom and one on the phone.

THE COURT: We probably better take a break.  It is almost one.  Why don't we just come back at two.  We will take a break for lunch and come back at two o'clock.

(Recess from 12:49 p.m. until 1:59 p.m.)

THE COURT: Have a seat.  I don't know whether it is good news or bad news that Mr. Cassada is not back.  Maybe he is getting cut on this afternoon.

MR. WORF: I think it is a little bit of both, Your Honor.  I mean, it is good and bad but I don't believe he will be back today.

THE COURT: Hopefully they can get him some relief.  I have been in his shoes.

MR. SWETT: Your Honor, may I ask if Jennifer Stevens is on the phone?

MS. STEVENS: I am.

Garlock/8-16-12

120

MR. SWETT: Ms. Stevens has a situation that requires her to depart pretty soon, so we propose to allow her to go now and then Mr. Kraus will take up the baton.

THE COURT: Let's let her go and then I may intervene for a second and then we will see where you all want to go. Okay.  Go ahead, Ms. Stevens.

MS. STEVENS: Thank you.  I appreciate it.  I am from the law firm of Patten, Wornom, Hatten, & Diamonstein, in Newport News, Virginia.  We also filed responses like everyone else who has spoken today, and we received the challenge that our answers to 2(d) were patently evasive and non-responsive. We kind of were left scratching our heads on that, to be honest.  We wondered if our answers had actually been read.

In our case, we had five questionnaires.  We completed them.  We turned them in on time.  None of the lawsuits, except one, none had even gone through the discovery process, only the Burris case had of our five.

We, like everyone else, have spent considerable amount of time working on the responses.  Myself and Donald Patton, both attorneys here, personally worked on the responses.  We did all of the work on it.  We didn't turn it over to the staff.  Conservatively, you know, we spent the largest majority of a two-week period doing nothing but this and of course, then, we also had paralegal time and law clerk time just trying to dig up some information for us from our files.

Garlock/8-16-12

121

We did make objections in the objection chart, but I think what is missing for the debtors is that we actually objected and then answered every question.  We did file a response yesterday and in the attachment we included an example on the Pilon case.  We actually did include the names of products.  And just quickly, as an example to show that I really don't think these were read at all, in the Pilon answers we identified products from Owens Corning, Pittsburgh Corning, Fibreboard, Mannville, Carey, GAF, Unarco, EaglePicher, Armstrong, Keene, National Gypsum, US Gypsum, US Minerals, HK Porter, (inaudible), Raybestos Manhattan, Babcock & Wilcox, Combustion Engineering, Foster Wheeler, Dresser, Harbison Walker, Kaiser, Dietrich, Rockwell, Rutland, Garlock, John Crane, Flexitallic, G.E., General Cable, Anaconda, (inaudible) and (inaudible), and plus suppliers' names, and we still got a response that we are being evasive and nonresponsive.

Your Honor, if anything, we were being over inclusive. We included any exposures that were alleged in complaints, as well as any that were bankrupt claims that were filed.  And as Mr. Finch spoke about before – I won't rehash it – but our clients worked at what trusts call presumed sites during times that the trust agrees to settlement, whether or not the client or his co-workers could identify their product, and we included all of those in our response.

The only unknown answer that we provided was as to the

Garlock/8-16-12

122

percentage of exposure to each product and that's specifically the reason that Mr. Kendall and Mr. Finch already addressed. All of our clients also are deceased.  Their exposures occurred fifty years ago or more and many of the exposures were indirect and they have no idea or would have no idea the percentages of products that other people were using.  And the best evidence of this is in the Burris case, which we attached the depositions – as I said, that is the only case that went through discovery.  And just quickly, for example, one of the co-worker depositions, Mr. Sisson was asked in that case:

"As you sit here sixty years later, you don't have any way of telling how many times that happened?"

"I have no idea how often that would have happened."

"I assume you would not be able to tell us how many times Mr. Burris made a gasket on that ship?"

"There is no way I could put a number on it."

A similar question:

"There is no way you could tell us how frequently it happened?"

"Whenever it need be, we did, but I can't quantify it."

And so on, and that goes through his deposition.  There is a co-worker, a man who was 85 years old who worked on a ship in 1960 to 1962 with Mr. Burris, and he was similarly asked the same kinds of questions.

Garlock/8-16-12

123

"Can you tell me how many times you saw Mr. Burris doing this specific task?"

And he would say, "No." So it's not just that we are saying that it's impossible to tell, the witnesses are actually backing this up with sworn testimony. As Mr. Finch and Mr. Kendall said, anyone who does this work knows that you will never get an answer to those questions because it's impossible. In fact, in one of the depositions when Mr. Sisson – the question was actually:

"You were asked earlier how many times Mr. Burris made a gasket, and I believe you were asked and, when you did ask, you chuckled because it's obvious from these cases that that can't be done."

But still with that, we did provide all of the information that we had in our files. We are not a firm that just wrote "unknown," if there are any such firms as the debtor says in its challenge. We identified many products. We did a very thorough review of the files, and we take exception to the debtors' challenge that we were evasive and, had they read our responses, they would have seen that we made a good-faith effort, and we would ask the court to deem our responses to have been provided in good faith and be removed from the challenges and, if any other law firms are ordered to provide supplements, we ask that we be exempted from it. We just don't have any more information than what we have already provided.

Garlock/8-16-12

124

That is all I have.

THE COURT: All right.  Thank you.

Let me say – I don't know if this will help you all or not, and I am going to say first I am prepared to listen to anything any of you have to offer but, having read all of the papers and listened to what has been said this morning, let me kind of tell you where I am and then we will take a short break and let you all see how you want to proceed from there.

But my thought was on the supplemental exposure questionnaire that I should probably order the – overrule the objection and order responses to those people – to those firms that are listed on Exhibit "C," with the exception of people that have filed written responses because the written responses, I think, either answered those questions or satisfied that they shouldn't be on the list, and that would be that, and overruling the objections and directing responses to the supplemental settlement questionnaire.  That was where I was leaning.

I think, just generally, I do appreciate the effort that people have had to put into this.  It has been a while but I did answer interrogatories before and know the burden of responding to things like this and have not ordered this discovery without some appreciation for what I was putting you all through.  And I appreciate the efforts that have been made

Garlock/8-16-12

125

actually by everybody.  It appears to me, though, that the attachments that have been made are an appropriate answer –

UNIDENTIFIED PERSON: I am sorry, Your Honor.  Are appropriate or inappropriate?

THE COURT: Are an appropriate answer and that I shouldn't order anything further about that.  The "unknown" thing, I think "unknown" is an appropriate answer.  It does appear though that, on Exhibit "C," that it was used in some cases where it needs another look at it, and that's why I would order that the people listed on Exhibit "C," with the exceptions of the ones who have responded, be kind of re-sent that part of the questionnaire.

And I will say, too, I think we are at or near the end of this, at least as far as I am concerned.  I don't foresee going any further with discovery unless it is just absolutely necessary.  I won't foreclose anybody from raising anything else they want to raise, but I think we have collected a vast amount of information and that we have probably tested the reasonable limits of what we ought to get.  And there has been not a perfect response but there has been some response and that is the response and the data that we will go forward with, and we will just let each of you argue what you can from what we have got, but I think at this point we have gotten about all we can reasonably expect to get.

So having said all of that, let me take about a ten-

Garlock/8-16-12

126

minute break and see if –

MR. WORF: Judge, would you mind if I ask a few clarifying questions?

THE COURT: Yes.

MR. WORF: First of all, the people who didn't respond to the exposure questionnaire, will you order them to respond?

THE COURT: Yes, to respond.

MR. SWETT: If Your Honor please, I take it this is clarifying remarks, not making a ruling. We are going to have a break and we are going to come back –

THE COURT: We will come back. This is not a ruling. I mean, this is where – you are right, I was focusing on Exhibit "C." If somebody just has not responded at all, they ought to be directed to respond.

MR. WORF: And then two more points. When you say the people from Exhibit "C" who provided a written submission, does that mean claimant eleven and the other claimants I referenced or –

THE COURT: Yes.

MR. WORF: Okay. And then –

THE COURT: Yeah, there are a couple of Motley Rice's on there, and I think he has adequately explained those.

MR. WORF: Okay. And then what about the documents we requested in part three?

THE COURT: I think that we shouldn't go any further

Garlock/8-16-12

127

with that.

MR. WORF: Okay. Thank you, Your Honor.

THE COURT: That's where I am leaning and we will –
let's take a break until, let's say, twenty-five after and see
where we are.

(Recess from 2:12 p.m. until 2:28 p.m.)

THE COURT: Where do we stand?

MR. SWETT: Well, I think we should have a discussion
here in open court.

THE COURT: Okay.

MR. SWETT: And I am prepared to listen if Mr. Worf has
something he wants to say now because it may affect whether it
is worth discussing.  I don't know.  But we do have a
perspective that we would like to share.  It would be helpful
to know where the debtors are.

MR. WORF: I think we are generally fine with that.  I
think it solves our major concern.  I have a couple of
clarifying questions but I think that it basically sounds fine
to us.

MR. SWETT: In order that we not be ships passing in
the night, I would like to sort of recite what I think you said
with a gloss of how I would suggest that you operationalize it.

I understand your concern, Your Honor, was that some
firms may have disclaimed knowledge in a way that a more
considered response wouldn't have done; that you are referring

Garlock/8-16-12

128

therefore to Exhibit "C," which is the list of people that claims and law firms that the debtor has lumped under the category of evasive unknown.

Am I right so far?

THE COURT: Yes.

MR. SWETT: Addressing that concern but within the framework of the argument I previously made, I do not think it would be appropriate to simply accept the debtors' account as gospel. That will affect the remedy and I will get to that in just a minute. But we are provisionally accepting of the notion that, where there has been a showing that calls into question, for lack of a better term, the appropriateness of the "unknown" in that circumstance, subject to all of the qualifications that you stated on the record, they should have the opportunity to run that firm down in a meet-and-confer, and then if that – there is good reason to expect that that process will result in resolution. We know that because there were lots of meet-and-confers with respect to the original questionnaire and there wasn't a single motion to compel following the meet-and-confers. So that process seems to work.

But we are concerned by the extent of the list and, as I mentioned, we don't accept and don't believe it would be appropriate for the court to accept the debtors' account as controlling the scope of the meet-and-confers.

Indeed you stated, if I understood you correctly, that

Garlock/8-16-12

129

the list, which is Exhibit "C," would first be reduced by those who filed responses. I think, in context, I understood that to mean those who filed in effect briefs for today's hearing.

THE COURT: Yes.

MR. SWETT: Okay. Some filed substantive objections but attached the documents, saying that they were attaching what they had that was responsive and I take it, from your remarks, that you deem that to be satisfactory, so this list would be reduced by those terms.

An example of a firm that briefed the matter, and so would fall off of Exhibit "C," although they are listed there now with several claims, is the Patton firm, Ms. Stevens having just spoken. An example of a firm that would fall off this list because of its attachments is Motley Rice, as Mr. Finch walked you through the attachments and the nature of their response through documents.

If I am right so far, then we are going to be able to stand down and accept this resolution on the assumption that you would need to rule that the relief at this stage, with respect to firms remaining on the list after those reductions, would be the opportunity to meet and confer and then to come back if the debtor had issues with the outcome of the meet-and-confer. And if that is what you had in mind, the group assembled in court would be accepting of that. I haven't had a chance to talk to the folks on the phone.

Garlock/8-16-12

130

THE COURT: What I had in mind was to do an order requiring them to respond but it may be that the meet-and-confer would satisfy that more quickly because I don't want to just push it off.  You know, I think – and what some of the written responses, for instance, Ms. Stevens from the Patton firm, was essentially that we have given everything that we have got, we can't do any more, and I think that is a sufficient answer and, if that is the answer for somebody that's on this list that gets a requirement that they respond, then they just need to make that clear.

MR. SWETT: So a statement to that effect on top of the submission previously made would satisfy the response?

THE COURT: Yeah.  But as to the people – as to Exhibit "C," there has at least been a demonstration that there was at least some disconnect here between the "unknown" and then some other information in the record indicating that perhaps it wasn't exactly unknown.  Just what caused that could be anything and maybe that can be explained.  It may be that some more information needs to come forward, but we will see.

MR. WORF: I think that's a good approach.  I think Exhibit "C" is a good starting place with the exclusions that we talked about.  Obviously we have been conferring in good faith with some of the people already who are on that list, and we are going to do that with everyone on the list, but I think that is a good starting place.  And I do want to make sure that

Garlock/8-16-12

131

I have the exclusions, the people who are going to be struck off the list clear.

So Patton, Motley and then the –

MR. MATHENY: Angelos.

MR. WORF: Angelos.

THE COURT: Waters & Kraus, Simmons Browder, Weitz and Luxenberg, Belluck and Fox and Glasser and Glasser is who I had.

MR. WORF: I guess our concern with – I think this is more extensive than I thought it was. Our concern would be is I know they said that in their response and they said they have given us everything, but we are worried that there is this knowledge of the lawyer issue that we think is discoverable and may have resulted in some of the information not being disclosed. We think we would benefit from having that overruled and still confer with these firms.

Like I said, with every one of these, we didn't put them on the list unless we compared their response to the trust claims and ballots and we found something there. I think, if we conferred, obviously there is an explanation and, if they have given us a complete response and they are saying that those things are not backed by exposure and that's their answer, we will accept that. We are not going to demand, you know, what they can't provide.

THE COURT: Well, as I read those responses that I have

Garlock/8-16-12

132

on my list that I brought in here this morning, I was satisfied that they had explained their answers and that that was a sufficient answer.  So I am prepared to leave them off the list.

Now, that certainly wouldn't stop you all from talking with one another but, in terms of ordering any further written response, I don't think I ought to order them to do anything more.

MR. WORF: Could we have them subject to the meet-and-confer and then we only bring it to the court if – I mean, because we are not going to bring anything to the court that we don't think is well-founded.

THE COURT: That's fine.

MR. SWETT: I have to object because his concept of what the lawyer's discoverable knowledge is, is highly controversial and unacceptable and I am prepared to argue why.

THE COURT: Well, now, I am not prepared to order lawyers to turn over their knowledge, and I think that – anyway, I am just not going to get into that.  I am not going to order lawyers to, because I think their knowledge is largely the product of their work and, whether it is a written product or whether it is in their head, or just where it is, I think even if it is facts that they developed as the course of their work, I don't think that is something that we can turn the lawyers into witnesses about.  But I think where there is

Garlock/8-16-12

133

information in the files, then –

MR. WORF: We don't know it's a lawyer knowledge.  It might be something else.  I just think, if we had them subject to the meet-and-confer, we can suss that out and figure out what's going on.  We just need to talk to these firms and –

THE COURT: Well, I will say this: I will take those firms that I listed off of the list and, as far as I am concerned, that just puts the burden on you all to contact them and confer if you talk further with them.  The others, I think –

MR. SWETT: I take it, though, they are under no further obligation?

THE COURT: Pardon?

MR. SWETT: They would be under no further obligation if they fall into the categories that led you to –

THE COURT: I agree.  I agree with that, that there is no further obligation to supplement the supplemental questionnaire.

MR. RAWLINS: There are a couple of individual firms that would like to address the court.

MR. FINCH: I just want to make sure Motley Rice is off the list.

THE COURT: Yes.

MR. FINCH: Thank you.

MR. RAWLINS: Your Honor, there are a few other firms

Garlock/8-16-12

134

or at least the Lanier Firm is one of them, who didn't file a formal response but we are here to argue and we would like to be off the list.  Out of fifty-four responses, I think the debtors identified one on Exhibit "C," and so – and we attached all of the documents, so –

THE COURT: Okay.  Well, what I would suggest is that you all simply go through the meet-and-confer process on that rather than argue it out here.  It is probably quicker to do it that way but, if you have answered, then you have answered.  If you have given the information, there is nothing more you can do and there is nothing more we are going to expect of you to do.

So I think in the situation that you just outlined, the answer would be that we have given you everything we have got and there is nothing more that can be required of you.  Okay.

MR. WORF: Your Honor, with respect to the other parts of the questionnaire, I don't know if what the court wants to do there is sustain the objections or do what we suggested and sort of not rule on the objections and, if anything comes up –

THE COURT: It would be my intention to not rule on things at this time.  I have given you a hint on how I would rule on them if you raise them but, if you all have some specific thing, I don't want to foreclose you from – because I don't know all of the facts, but I won't foreclose you from

Garlock/8-16-12

135

raising any issue that you want to raise, but I will tell you that you will be swimming upstream because I think it is time to wrap this up.

MR. WORF: Understood.  I just wanted to make that clear.

THE COURT: Now, does that do us?  Do you all want to talk further and –

MR. SWETT: I suppose we should ask whether anybody on the phone wants to weigh in on this, but I am not hearing anybody.

MR. PHILLIPS: This is Robert Phillips of the Simmons Browder firm and, not to change the course of this, but I just want to say I am more than happy to meet with Mr. Worf, meet-and-confer at any time.  I would have liked to had the chance to speak with debtors' counsel prior to the notice being filed, given that on the other questionnaire, the payment question-naire, the debtors said that we didn't file anything, and our response pointed out that we filed all of our questionnaires and attached delivery receipts.  So some of this may be just mistakes in filing and so forth, and so I am more than happy to speak with debtors' counsel on this or any of the issues.

MR. SWETT: Robert, you are not on the list.

MR. PHILLIPS: I don't have the updated list.  So thank you.  But that's my position.  I don't intend to stand on – with all due respect, Your Honor, I am more than happy – I

Garlock/8-16-12

136

understand Your Honor's point about not being obligated to start the conversation, but I am more than willing to talk to debtors' counsel about our responses any time.

THE COURT: Okay.

MR. WORF: And, Ted, to be clear, I think he was talking about the settlement data questionnaire, not Exhibit "C." We obviously are willing to talk to anyone about anything. It was not possible to meet-and-confer with firms before making a filing four days after we got most of the responses.

THE COURT: Okay. Can somebody put this in the form of an order that makes some sense?

MR. SWETT: Yes, sir.

UNIDENTIFIED PERSON: We will do that, Your Honor.

THE COURT: Does anybody else have anything they want to say or do you want to take a break and see or what?

MR. SWETT: Does anybody want to talk? I think we are done.

THE COURT: Okay. Well, thank you all for your participation and for you all's work.

(Off the record at 2:42 p.m.)

Garlock/8-16-12

137

C E R T I F I C A T E


        I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.




                          /s/ Patricia Basham

                          Patricia Basham, Transcriber

                          Date:  August 20, 2012




Garlock/8-16-12