IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

In the matter of:                    )
                                     )
GARLOCK SEALING TECHNOLOGIES, LLC,)  No. 10-31607
et al.,                              )  Jointly Administered
                                     )  Charlotte, NC
     Debtors.                        )  Dec. 6, 2012, 9:30 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GEORGE R. HODGES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

Garland S. Cassada
Richard Worf
Robinson, Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC 28246

John R. Miller, Jr.
Rayburn, Cooper & Durham, P.A.
227 West Trade Street, Suite 1200
Charlotte NC, 28202-1672

Cary Schachter
Schachter Harris, LLP
220 Canal Centre
400 E. Las Colinas Blvd.
Irving, TX 75039

Electronic Recorder
Operator:                    Kim Towery

Transcriber:                 Patricia Basham
                             6411 Quail Ridge Drive
                             Bartlett, TN  38135
                             901-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

Garlock/12-6-12

2

APPEARANCES (Continued):

Trevor W. Swett III
Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005

Travis W. Moon
Moon Wright & Houston, PLLC
227 West Trade Street, Suite 1800
Charlotte, NC 28202

John Herrick
Nathan D. Finch (Telephonically)
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Jonathan P. Guy
Orrick, Herrington & Sutcliffe LLP
Columbia Center, 1152 15th Street, N.W.
Washington, DC

Sally Higgins
Hillary Harper
Higgins & Owens, PLLC
5925 Carnegie Blvd.,Suite 530
Charlotte, NC 28209

George F. Sanderson, III
Ellis & Winters LLP
P.O. Box 33550
Raleigh, NC 27636

David A. Klingler
Stutzman, Bromberg, Esserman & Plifka
2323 Bryan Street, Suite 2200
Dallas, Texas 75201-2689

Joseph Grier
Grier Furr & Crisp, P.A.
101 North Tryon, Suite 1240
Charlotte, NC 28246

James E. McCambridge, III (Telephonically)
State of Wisconsin, Office of the Attorney General
PO Box 7857
114 East State Capitol
Madison, WI 53707-7857

Garlock/12-6-12

3

(CALL TO ORDER)

THE COURT: Good morning.

COUNSEL: Good morning, Your Honor.

THE COURT: Have a seat.  Let's get you all's voices on the recording machine and why don't we start over here and go across that way?

MR. CASSADA: Good morning, Your Honor.  I am Garland Cassada, here for the debtors and accompanying me today are Mr. Richard Worf from Robinson Bradshaw and Hinson and Cary Schachter who is with the Schachter Harris firm.  Both of our firms are special asbestos counsel for the debtors.

THE COURT: Okay.

MR. MILLER: Your Honor, Jack Miller, Rayburn Cooper and Durham, also for the debtors.

MR. SWETT: Good morning, Your Honor.  Ted Swett, Caplin and Drysdale for the official committee of asbestos personal injury claimants, along with Tom Moon of Moon, Wright and Houston, and special counsel who will introduce themselves.

MR. HERRICK: Good morning, Your Honor.  My name is John Herrick.  I am with the Motley Rice law firm in Charleston, South Carolina.

THE COURT: Okay.

MR. KLINGLER: Your Honor, my name is David Klingler. I am with Stutzman, Bromberg, Esserman and Plifka in Dallas, Texas, and I am here on behalf of four of the law firms,

Garlock/12-6-12

4

Belluck & Fox, LLP, Shein Law Center, Simon Greenstone and Waters and Kraus.

MR. GUY: Good morning, Your Honor.  Jonathan Guy on behalf of the FCR and Mr. Grier is here in the courtroom.

MS. HIGGINS: Your Honor, I am Sally Higgins, here for Williams Kherkher Hart and Boundas.  With me is Hillary Harper and we also represent Troy Chandler.

THE COURT: Okay.

MR. SANDERSON: Your Honor, good morning.  George Sanderson from Ellis and Winters, representing Dr. John Dement.

THE COURT: All right.  We have a couple of things. Why don't you all –

MR. SWETT: Your Honor, there may be some interested people on the telephone.

THE COURT: Oh, thank you for reminding me of that. Does anybody on the phone want to identify themselves?

MR. McCAMBRIDGE: Good morning, Your Honor.  This is the Wisconsin Assistant Attorney General, James McCambridge, appearing on behalf of Professor Marty Kanarek of the University Of Wisconsin School of Medicine.

THE COURT: All right.

MR. FINCH: Good morning, Your Honor.  This is Nate Finch from the Motley Rice law firm, as well.

THE COURT: Okay.

MR. SWETT: Your Honor, I have a preliminary matter.

Garlock/12-6-12

5

First, in view of the fact that the folks on the phone and some in the courtroom are here only with regard to the motion of the committee and the motion of Dr. Dement with respect to the subpoenas on unretained experts, my suggestion is that we take that set of matters first and then proceed to the motion regarding the debtors' subpoenas for documents to various law firms.  If that would be acceptable to the court, I think it would be appropriate because it would allow some folks in the room to depart.

MR. CASSADA: Your Honor, we don't object to that.  In fact, we will offer exhibits and presentation that will disclose information that has been designated as confidential and we would have been, at that point, compelled to ask the court to decide whether there were people who could remain in the courtroom who are not subject to the protective order.  So we are happy to proceed with that and then we will have a brief discussion about how to proceed with our presentation on the second motion for a protective order.

MR. SWETT: With regard to the exhibits, Your Honor, I have a preliminary issue, as well.  I went to sleep last night at about 11:30.  When I woke up this morning, I had an email from Mr. Worf saying this is the first of three emails and the attachments are too bulky to send in one.  We might use these in tomorrow's hearing.

Of course, it took me a while to get to Mr. Moon's

Garlock/12-6-12

6

office this morning in order to get those things printed out. I have not had an appropriate opportunity to review them, neither has Mr. Guy.

This is not like the initial hearings that Your Honor held where the parties were feeling their way and would come to court on a day with unannounced evidence because, in that situation, you were prepared to keep that hearing open for six weeks and everybody had a chance to respond and to put in their own responsive exhibits.  And you will remember that that practice of rounding out and completing and responding to the other side's exhibits had a significant bearing on the shape of the record and on the facts and the truth to emerge from those materials.

Here, we are in the midst of day-to-day depositions on a calendar under which we are to complete fact discovery by January 16.  We can't have this hearing continue day-to-day, let alone for weeks.  We have to get decisions today.

So it is not the same thing and Your Honor, at the sensible suggestion of Mr. Guy, laid it down at one point that the parties were to disclose exhibits they intended to offer at a hearing the day before the hearing, and I submit to Your Honor an electronic transmission after 11 o'clock at night on the eve of the hearing is not good-faith compliance with that.

So I have two requests.  My first request is that you direct the debtors to make their arguments today without

Garlock/12-6-12

7

reference to those exhibits.  In other words, that you exclude them from the record for purposes of today's hearing.

In the alternative, we suggest that you make them, at the appropriate time after we argue the unretained expert's subpoena, proffer them one by one, explain what they are and how they propose to use them and let us respond.

You will then be in a better position, document by document, to decide whether these materials are at all relevant, whether they are going to help you make the decisions that you have to make today or whether they are gilding the lily, as I submit they are likely to be.

But, either way, we need a fair opportunity to join issue with them on the evidence and the evidence should be limited to the exhibits they put in with their papers.  If Your Honor for some reason is inclined to give them more leeway, then I would suggest the proper procedure that I described so that document by document you can consider what they are saying and what our response is and whether that document should come into the record at all.

THE COURT: Does that apply to the – the exhibits are for the law firm part of the –

MR. CASSADA: This is for the law firm part of the motion.

THE COURT: Okay.  Well, let's go ahead and deal with the experts first, then.

Garlock/12-6-12

8

MR. WORF: I think there were three or four brief exhibits on the expert witness thing, some studies and things that I don't think are going to be as controversial but maybe they will be.

MR. CASSADA: I will point out, Your Honor, that the committee has offered scores of documents and never, not even once, provided those to the debtors before the hearings; and the agreement that we reached was that the day before we would provide documents.  The committee asked for this hearing on an expedited basis, expedited the briefing and filed a reply that wasn't even provided for under the scheduling order late yesterday.

So this is the committee's motion before the court on an expedited basis.  They have never, not once, produced documents before a hearing –

THE COURT: Let's go ahead and deal with the experts first.

MR. SWETT: I take exception to those comments.  They are untrue.

Turning to the motion, Your Honor, we are here on the committee's motion for a protective order to prevent the enforcement of subpoenas served by the debtors on four unretained experts.

These people are scientists who have, in their professional endeavors, as independent experts, addressed

Garlock/12-6-12

9

various asbestos issues in various contexts.

Now, I am quick to add that at least one of these experts has upon occasion in the past appeared as a retained expert in underlying tort suits for the plaintiff.  I don't have the impression, although others will know better than I, that this was extensive activity; but the real point is none of these scientists are retained in this case.

Now, there is a rule on this.  It is a subpart of Rule 45 governing subpoenas and here is what it says.  It says, if a party subpoenas an expert because of work they have done not at the behest of a party and the expert isn't a fact witness, doesn't have knowledge of the particulars of the case, then that subpoena must be quashed absent a showing of substantial need.

I may have misspoken.  I am not sure it says must be quashed.  The presumption is it will be quashed unless there is a showing by the subpoenaing party of a need, not only a need but a substantial need.

The presumption is, if you are an expert, you have a right to decline to offer your services in a given case.  You also have the right to be paid but that is neither here nor there.  If you don't want to take the engagement and accept the payment, you are not in the case and nobody has a right to subpoena you because of your expertise and your professional work unless you consent to the engagement or unless there is a

Garlock/12-6-12

10

proof of a substantial need, and the cases tell us what that means.

What it means is the party issuing the subpoena has an issue in the case that they cannot meet without the unique expertise of the only available expert. That is essentially what the cases teach. You don't get it just because you want it. You don't get it just because it might help you. The presumption is litigants have access to their own experts, retained, who are prepared to join issue with the opposing experts in the case. And unless that access for some reason doesn't exist and there is an issue that a particular expert out there in the world who hasn't consented to be retained is the unique source of information on, you can't get him because his work was undertaken not at the behest of the parties and you have no substantial need.

Now, the debtors told us in advance why they were seeking to subpoena these gentlemen, Dr. DeMent, Dr. Kanarek, Dr. Weiss and Dr. Infante. And I quoted in our opening brief Mr. Cassada's representations to me about why he felt entitled to take these depositions and it was in the context of an email that appeared to be straightforward and that said to me the committee has announced that it intends to rely on studies made by these gentlemen and, therefore, we want to take their depositions to demonstrate that they are unreliable and biased. So I would characterize that broadly speaking as anticipatory

Garlock/12-6-12

11

rebuttal.

Now, I responded with an email.  I said, "I don't believe the rules provide for that.  The expert stage in this case hasn't arrived.  The reports aren't due until February 1.  If you have got authority, please share it with me.  And, by the way, point out to me where you think we have made this announcement of reliance."  Silence.  No response.

Something other than an offer at dialogue seems to have been the point of the original email from Mr. Cassada but, in any event, his message was clear.  I will read it.

"Debtors intend to seek depositions of authors of recent publications that the committee has announced it will rely upon or that it likely will rely upon at the estimation trial.  The particular witnesses are identified below.  We are entitled to take these depositions in order to probe methodological flaws and biases in the materials for which these authors are responsible."

So what they are proposing to do is reach out to unretained experts, force them to the deposition table and attack them for supposed bias and methodological flaws in their work.

Well, none of these people have consented to testify.  Dr. Dement has made a motion.  Dr. Kanarek moved to quash in Wisconsin and then, by agreement, withdrew that motion so that

Garlock/12-6-12

12

this hearing could go forward and has put in a paper staking out his position under Rule 45, and I believe that Mr. Schachter will confirm that he has a letter from Dr. Infante objecting to the idea that he should be subjected to deposition.

You have got unwilling, unretained experts and what is the field?  The field has to do with the various issues surrounding chrysotile.

Now, this debtor has been litigating those issues for thirty years.  This debtor has no dearth of experts available to it to address its own affirmative issues and to take exception to whatever reliance materials the committee's experts may end up relying upon.

By the way, as for this announcement of an intention to rely, I make no representations today about that but I do cite historical facts.  Having received Mr. Cassada's email, I looked back at word searches done of our various submissions and all I found was a single citation to a study Dr. Dement had been involved in.  It was in our information brief and we repeated the same citation in our brief on the scope and purposes of estimation, and that was all that I could find pertaining to any of these people.

So I think the notion that we have announced an intention to rely is somewhat disingenuous but I don't want to make overmuch about that because our experts will have a free

Garlock/12-6-12

13

hand, as experts do, to rely on whatever materials they think are appropriately relied upon, and their experts will have a free hand to come back and rebut them and try to demonstrate to you why those reliance materials shouldn't be relied on.  That is what experts do.

If we open the door to anticipatory rebuttal of expert reports that aren't even here yet, we will have  – we will be going down a lot of rabbit holes on a calendar where we are supposed to be marching efficiently and expeditiously to an estimation trial.  It is utterly collateral and attenuated.  It is precisely the situation that Rule 45 contemplates and establishes the presumption that those witnesses are not to be deposed because this debtor has ample resources of expertise available to it for any issue.

I did a look back at Cary Schachter and his firm's fee applications because that's where the costs pertaining to the science-related experts show up.  Over a course of four monthly fee requests, July through November, the total amount expended for fees and expenses of experts, as revealed on the Schachter Harris monthly request, one point seven million dollars plus. So any notion that there is a substantial need here on account of unavailability of experts is obviously specious.

So what do they do instead?  They fall back on the idea that somehow these folks are fact witnesses, but look at the cases cited in our reply.  This is an old ploy.  Whenever

Garlock/12-6-12

14

somebody bumps up against the problem of Rule 45 with regard to unretained experts, they fall back on the idea that, well, in this context they are fact witnesses. Nonsense. Mr. Cassada's email to me demonstrates that they want these people because of their work undertaken not at the behest of a party.

Others can give you a better feel for the context in which these folks work. Dr. Dement is affiliated with Duke University. Dr. Weiss with a medical school in New Jersey. Dr. Infante participated in a collaborative group project, I believe, of the IARC. Dr. Kanarek is a professor at the University of Wisconsin. These are academics.

Now that brings me to the second point, and it is at least as important as the structure and requirements of Rule 45. The independence, the autonomy, the freedom of the academy and a scientific endeavor unconnected to litigation is a very important value in society. A great deal depends upon it. Imagine a world in which any aggressive tort defendant was free to reach out and attack by deposition subpoena, haul to deposition conference rooms, disparage and attack the work of scientists working for, say, the National Health Institute, or NASA, or any university, where that expert had not taken on a role in the case. Imagine that the tobacco industry had seen fit to subpoena scientists working on the 1964 Surgeon General's report about the hazards of smoking. Would we have the same knowledge today about those hazards? Probably not.

Garlock/12-6-12

15

Now, litigation is a process of societal value, as well, but it is not the only one.  It does not trump the other realms of activity and, to allow it to do that, would be to chill, in a very palpable and destructive fashion, the progress of science and academic freedom in non-litigation institutions.

So there is every good reason to hold them to the structure of Rule 45.  It would be a big mistake to open this door.  It would set a very bad precedent, and the rule forbids it anyway.

Your Honor, I submit that there is no showing of substantial need here.  These are unretained experts.  The work is sought that was work performed not at the behest of the party and these are not fact witnesses.

I don't believe the court has any significant discretion in this matter.  I think that the court must put a stop to these subpoenas and prevent these depositions from taking place.

Your Honor, with that, I will sit down and let others address the issues.

THE COURT: All right.

MR. SANDERSON: Good morning, Your Honor. We represent Dr. Dement and I will try not to plow the same ground that Mr. Swett did but to put it in more specific context with respect to Dr. Dement.

Dr. Dement is on the faculty of Duke University at

Garlock/12-6-12

16

Duke University Medical Center.  A simple review of the debtors' response to our motion to quash and the committee's motion for a protective order, I think belies the notion that this is  – that the debtors' level of inquiry is strictly focused as a factual inquiry. All of the background and all of the representations that they make in that response, they indicate that this is going to be a full-on, direct attack on the conclusion that was made in Dr. Dement's article and that he couldn't rule out that chrysotile asbestos was either safe or did not cause mesothelioma.

Besides the obvious attack on the factual underpinnings of his study, which was that at this particular plant only chrysotile asbestos was used, the debtors would go on to say, full-on, that they intend to take discovery concerning Dr. Dement's ties with the plaintiffs and ties to, I guess, plaintiffs who are now represented by the committee and also want to inquire about the sources of funding with respect to the study itself.

This is an attempt to discredit an expert's opinion in a case where the expert is unretained and, as Mr. Swett said, Rule 45, the 1991 amendments to Rule 45 I think were specifically enacted in order to prevent this inquiry when the expert is not retained.

With respect to the cases, especially the cases after the amendment was enacted in 1991, the case law is clear that

Garlock/12-6-12

17

there has to be some level or some allegation of some preeminent expertise by the unretained expert in order for the expert to be subject to subpoena.

We cited in our briefs, Your Honor, the *Rosa* decision out of California which, post the 1991 amendments, only found one situation where a witness was found to have expertise so unique that no other expert in the field would be available to provide the information such that disclosure was merited.

The *Rosa* court also points out what is in the committee notes to the 1991 amendment that the amendment was specifically enacted because of the policy concern that this type of behavior dissuades research and dissuades scientists to pursue their scholarly work. Specifically, the committee note says out of fear that they will not have an opportunity to bargain for their expertise, but the case law pre 1991 also suggests there is a policy concern that this sort of behavior in the Seventh Circuit in the *Allen* decision would inevitably check the ardor and fearlessness of scholars to conduct research.

Absent this key finding that Dr. Dement is the preeminent authority as to whether or not chrysotile asbestos causes mesothelioma or not, we would submit that even the level of discovery that the debtor proposes is not permitted under this Rule 45 amendment.

Furthermore, Your Honor, notwithstanding that the

Garlock/12-6-12

18

debtors have said they need this factual information about the chrysotile – about whether or not it was solely chrysotile that was used in the plant, the debtors in their own papers already say they have a good-faith basis to rebut that presumption. And we would submit, Your Honor, and again this goes back to the *Rosa* decision, that in that circumstance where there is a factual basis that is clearly available separate and apart from what is in the possession of the unretained expert, that, quoting *Rosa*, "It is for the parties to discuss and debate the significance, validity and relevance of the study."  They clearly have somebody lined up who is already prepared to say why they don't think Dr. Dement's study is valid.

And under those circumstances, Your Honor, this, again, reverts back to a battle of the experts and, again, under Rule 45 where the experts are unretained, we don't have a dog in that fight and we shouldn't be dragged into it.

Your Honor, the debtors, subsequent to our filing a motion to quash, purported to narrow the scope of their request to Dr. Dement and specifically  – we have read the very broad request of their subpoena to require Dr. Dement to not only turn over documents that were in his possession or custody but also control, which theoretically would mean that Dr. Dement would have to go back to the original repositories where the information was retained and go through that exercise.

Now, the plaintiffs have now come back and said, no,

Garlock/12-6-12

19

we only want records within Dr. Dement's possession and control.  And while that eliminates one potential avenue of objection, it still doesn't eliminate another logistical, substantial logistical burden and that is, Your Honor, that the records that are in Dr. Dement's control and custody are not – he does not own them.  They are records that he obtained or copies of records that he obtained from the state through their dusty trades program and the United States Public Health Service.  And those records, Your Honor, not only contain the names of employees at the plant but, in certain instances, they contain the medical conditions of these workers.

And so, Your Honor, if we were compelled to turn over documents, even if it were limited to the documents that were within our possession, we would submit, first, that the state and the United States Public Health Service ought to be put on notice that their records are about to be disclosed and further, Your Honor, the production is going to require substantial redactions.

The other logistical issue that may not be facially apparent, Your Honor, is that the study covered four different plants in North Carolina, only one of which is at issue.  The records aren't kept in a way that it was just – that we can just reach out and get one specific slice for this plant.  We are actually going to have to undertake a significant review to actually pull out and identify the records that are specific to

Garlock/12-6-12

20

this plant.

Combined, Your Honor, with the fact that the debtors' records don't disclose any apparent effort to go to the United States Public Health Service or the state to request these hygiene studies, and that's what was disclosed in the article that we obtained, were hygiene studies from these two sources. Again, there is no showing of the requisite burden that they would need to show, comparative burden in order to permit Dr. Dement to have his deposition or this document production, this subpoena go forward.

Thank you, Your Honor.

THE COURT: Thank you.  Anybody else from that side?

(No response.)

THE COURT: Okay.  Mr. Schachter.

MR. SCHACHTER: Thank you, Your Honor.

MR. McCAMBRIDGE: Excuse me, Your Honor.  James McCambridge, Assistant Attorney General, appearing on behalf of Dr. Kanarek.  I simply wish to join the arguments of Mr. Swett and counsel for Dr. Dement and to thank them for their clear articulation of the law in this area.  Rule 45(b) is designed to protect exactly this abuse of discovery by the debtor.

Thank you.

THE COURT: All right.  Thank you.  Okay, Mr. Schachter.

MR. SCHACHTER: Your Honor, if I may, we have a few

Garlock/12-6-12

21

slides that we want to project during our discussion.  May I hand them up?  I understand you prefer to have copies.

THE COURT: Okay.

MR. SCHACHTER: we also have five exhibits that we will tender during –

MR. SWETT: I would like to see them, Your Honor, before they are tendered.

THE COURT: All right.  Why don't you look at those?

(Pause)

MR. SWETT:  Your Honor, these are among the materials that were included in the voluminous email transmissions of last night.  I think that you either need to exclude them or require a one by one proffer without going into the contents too deeply so that we can respond and you can figure out whether these have anything to do with anything.

MR. SCHACHTER: I will get to those documents as I speak, Your Honor, if there is a problem.

THE COURT: Let's do these that way.

MR. SANDERSON:  Your Honor, for the record, we were not provided with copies of these at all.

MR. SWETT: Your Honor, if we proceed in that way, I am going to have to interrupt at each point when he turns to one of these documents.

THE COURT: With respect to these five, let's do it that way.  We will deal with the others later.

Garlock/12-6-12

22

MR. SCHACHTER: Your Honor, I would like to start with where everyone agrees in this case. It is beyond dispute that, for estimation, you are going to have to do a fair review of Garlock's defenses in this case, and basically this is one of the efforts of the committee to sort of say "King's X," important material that we rely upon, some of it produced by people with whom we have long associations, is beyond the pale of fact discovery because of Rule 45. We disagree strenuously.

The relevance of this material is important first for two reasons. The defense related to the fact that almost all of our products were chrysotile was a key defense in our case. In case after case we received defense verdicts and Garlock, unlike a lot of other defendants, put a lot of money into developing facts, educating its attorneys and presenting the science to juries so that they would truly understand that these products were not dangerous and one of the reasons they were not dangerous is because they were made of chrysotile.

Not to testify but, in case after case, that was important to us, and the court will have no way to understand this case unless you truly understand that defense.

It goes not only, however, to our estimation theory, which is based on true legal liability, the committee does not deny that its experts will seek to inflate the numbers they present for estimation by claiming that advances in science have weakened Garlock's case and therefore they are entitled to

Garlock/12-6-12

23

justify some large number.

So we are talking about discovery important to a theory they have already said that they are going to put before the court and naturally they want to limit the discovery on that as much as possible.

We know, because it is already in their papers, that they will rely upon Dement's study.  They cited it in their information brief and we know that they will rely upon a study by IARC 2012 that relies heavily on Dement's new work because, in their preliminary disclosures of what their experts would say, they said they will establish the generally accepted causes of mesothelioma in humans according to IARC 2012.  They are making that IARC 2012 the paradigm that they say should guide the court, and a lot of this discovery to these witnesses relates specifically to that document that they have already said is important.

The other document is a joint policy statement that just came out in 2012 by something called the Societies on Epidemiology.  Not a lot is known about that process yet, but they don't deny that they are going to be citing that document, too, for this court.

There is a third independent reason why this discovery into facts is important.  These documents that either they will rely upon or their experts will rely upon as learned treatises under the Federal Rules of Evidence, and the case law that we

Garlock/12-6-12

24

cited to the court makes it clear that the reason learned treatises are admitted into evidence is because there is a presumption that they are produced by people who have no biases.

Accordingly, to determine funding and biases related to a learned treatise may lead to the exclusion of that learned treatise, as our cases show; and somewhat related, the court will have to consider preliminary *Daubert* issues, and those *Daubert* issues make the sufficiency of the underlying facts or data one of the key inquiries for the court and, especially as to the Dement article, that's all we want to know, is about the underlying facts or data and his bias, but we already really know about his bias.  It's mainly about his facts and data there.

Now, through the course of the litigation the plaintiffs always have something, they say, that is going to defeat the chrysotile arguments, and we would do our discovery and get ready and prepare and find out what the real facts were and we would be able to present the case effectively with that.

We have been in bankruptcy for two years and these are two new articles, 2012 and 2012, for both of them, and we are entitled to do what we would do in a litigation, which is discover what's really behind these and to discover facts.

So let's turn to the foundation of these claims.  Mr. Swett has argued that the purpose of Rule 45 is this lofty goal

Garlock/12-6-12

25

of protecting intellectual freedom, that 45(c)(3)(B)(iii) is all about that.  No, it is all about protecting the expert's right to bargain to get paid if you are trying to use him to support your case, and the advisory committee notes make that completely clear.

If the court would like, I can hand up a copy of the full advisory committee notes for your perusal but these are sections taken from them.  May I approach?

THE COURT: Okay.

MR. SCHACHTER: And where they talk about clause (c)(3)(B)(ii), it is about four pages from the bottom.  It's the fourth from the last page where there is this discussion of it and there is a long paragraph and it is all about the party having a right to bargain for their services.  It really doesn't talk about intellectual freedom in the academic community, anything like that.  It is, if you are going to hire a witness, if you are trying to avoid hiring a witness to support your case, we are not going to allow that.  That was the change that was made in 1991. And that's why, in the cases they cite, we see that that is what is on the mind of the court: Is that what the plaintiff is trying to do, trying to get – or is that what the subpoenaing party is trying to do, trying to get favorable testimony?  They cite the statutory committee case, a recent case and, if you read from that, the core of what the court is dealing with is these experts had

Garlock/12-6-12

26

prepared a private report that cost six hundred thousand dollars. They charged the client six hundred thousand dollars to prepare this private report, not a published article anywhere, a private report in a commercial setting, and the subpoenaing party was trying to get that for free. The responding party said, "We will do it for you for two hundred and fifty thousand dollars," but the party with the subpoena said, "No. We have this right to it." Well, no, you don't. You don't have a right to get favorable testimony for free.

We are not looking for favorable testimony. We are probing testimony that is going to be used against us. They cite repeatedly the *MedImmune* case and it is a brief order and, when you read the case, you see exactly what we are talking about, protecting the witness' right to get paid is the core issue of this portion of Rule 45. The court:

"The court is unpersuaded that MedImmune seeks Dr. Wilson's testimony as a precipitant witness, rather it seems that Dr. Wilson's real value to MedImmune is his expert opinion. Although MedImmune argues that it is a fact that Dr. Wilson's opinion agrees with those of MedImmune's experts, it is Dr. Wilson's opinion that MedImmune really wants to put before the jury."

We vigorously disagree with Dr. Dement's opinion and the opinions in his articles. We are not trying to put their opinion before the court and get their testimony for free.

Garlock/12-6-12

27

These cases – this rule is not focused on the problem that they say it is creating, nor is there any kind of First Amendment issue that is really involved here.  The analysis in all of the case deals with burden and a weighing of burden, not First Amendment.  The *Wright/Jeep* case is important because it states that fact, and the *Wright/Jeep* case helps us understand why because it is cited in the advisory committee notes to Rule 45(c)(3)(B)(ii).

Similarly, there is not an academic privilege.  This was dealt with in the *Anchor* case that is in our briefs.  It is very clear that there is no federal statutory case law or common law privilege just because somebody is in academic.  And North Carolina, in particular, just doesn't recognize such a privilege.

And then it is clear and even before 1991, where the point of paying an expert was the key, it was clear that a party can't do what they are trying to do, can't put witnesses beyond the power of cross-examination, especially as to facts.  And it is also very clear that a legitimate purpose of discovery is to determine the possible biases of a witness, his financial incentives.

The advisory committee notes gives the court a rubric to deciding this objection, a rubric that was not cited in the initial response of the committee.  It is called the *Kaufman* factors and there are five of them.

Garlock/12-6-12

28

Does the discovery seek fact or opinion?  And that is basically the issue is the subpoenaing party trying to get a favorable opinion for themselves without paying for it or are they into facts.

Will the witness have to form a new opinion?  Are you subpoenaing him and they are going to have to do a bunch of analysis and do a lot of work or something new?

An important factor under *Kaufman*: Does a witness have unique knowledge?  Really is there something that is out there that you are trying to get at, some issue you are trying to get at that he is the guy that knows?  And, related to that, is there another willing witness out there to these facts and has the witness shown, and it is the burden of the witness to show, previous oppressive testimony?  In other words, the guy is going to be called in for deposition after deposition.  He has already been called in for a deposition on this.  Well, that would weigh, militate, on these nonexclusive factors.

No showing like that has been made.  For these articles, I don't think any of these witnesses have been deposed on these new materials, which is what – you know, for the old things in the literature against us, we had plenty of chance to do depositions before we were in bankruptcy.  This is new stuff and this is the first time.

Also that features prominently, a paradigm case for them is this *Dow* case, and you will see in that *Dow* case there

29

was this broad subpoena by Dow to try to get – this was a case of true interference with ongoing research.  In *Dow*, there was a research project going on, it hadn't been published, nothing was disclosed yet and Dow said we want to know every piece of paper that you have got for that ongoing research and you are going to have to, as you generate new stuff, send it to us; and the court said, no, we are not going to go that far; in weighing the burdens, we're not going to do that.

Why is this case different than *Dow* in that situation? Because, first of all, we haven't sought every scrap of paper from every one of these studies, and in a minute I will go through witness by witness and you will see how narrow our request has been.

Importantly, this is completed and published material, published in the scientific literature and people are relying on it in the scientific literature and it is not something where the opinions are being formed.

And, secondly, and most critically, in *Dow* the court said, look, the party seeking this, *Dow*, is not going to be confronted with these studies.

Here, we know that we are going to be confronted with these studies when we reach the expert phase because they have already announced it and they don't deny that, and that is why we want fact discovery now, so that our experts can prepare their reports on it and so that we will be prepared to

Garlock/12-6-12

30

adequately cross-examine the witnesses these parties do provide reports from about their reliance on these materials.  Now is the time.

With that said, I would like to briefly go through the four witnesses from whom we seek discovery.

Dr. Dement.  It is undisputed that he is a long time witness for the plaintiff in the litigation, and I don't think anybody seriously contests that he is not on the witness list, possible witnesses against Garlock or cases among even people who are current claimants.  He is not a stranger to the litigation.

Tab one is the plaintiff's statement concerning testimony of expert witnesses, which I think is sort of a standard statement that the Motley Rice firm and their affiliated lawyers present.  Dement is always on the list for them.  He has a long relationship with Motley Rice.  I don't think anyone seriously disputes that.

I would offer tab one, Exhibit GST 234, for that limited, noncontroversial really, reason.  We can talk about the admission later.  That is why I wanted it in there.  If Mr. Swett wants to argue now, that is fine, but I will finish my argument.

So there is also a history with Dr. Dement.  It is rare in the literature, in the scientific literature, to find anybody saying there is a chrysotile cohort here that we have

Garlock/12-6-12

31

a clear indication chrysotile was the cause of mesothelioma. Dr. Dement basically wrote that in the eighties, and he said I found a cohort – and that means a group, a factory group in South Carolina, the Charleston, South Carolina, factory, and it looks like it is a chrysotile factory and these are chrysotile cases, and over the years he published on that group several published articles that were influential in scientific literature raising concerns about chrysotile.  It took about twenty years, but a series of studies ultimately determined –

(Microphone interference noise)

THE COURT: Go ahead.

MR. SCHACHTER: It took about twenty years, Judge, but a series of studies ultimately determined that workers at that plant had elevated levels of amphiboles, the stuff in insulation, the stuff that is agreed to cause mesothelioma, in their lungs.

So we had the evidence.  It took twenty years to get the evidence.  So he has got a history.

And now we come to what we're studying.  This is the article.  It is Loomis and Dement.  They were companion articles.  Dement was the lead author on the industrial hygiene companion article written about this cohort and Loomis was the lead author on this, and it doesn't deal with the South Carolina plant, it is the North Carolina plant, a North Carolina plant.

Garlock/12-6-12

32

So, in 2009, Dr. Dement publishes a study that says, aha, I have a new one of these rare cohorts, a chrysotile cohort, a chrysotile study from North Carolina.  This appears in a publication without any disclosure at all that Dr. Dement is a long-time expert for the plaintiffs, a very important fact, increasingly in published literature.  That's, as you will hear, a very important fact.

So that is one reason right there that draws concern. And then this study is cited in 2012 by IARC, the International Agency on Research for Cancer.  They convened a working group and they published what is called IARC 2012, and we know it will be used against us in the expert phase of this case because the committee's preliminary disclosure say that's their paradigm for deciding what causes mesothelioma.  Their experts are going to be relying on it.

And the key study that this group cites is  – there were two studies that they cite as the new literature and they cite Dement's article.  That is why we are concerned about Dement's study.  That's why we want to know what are the facts, and what facts are we looking at?  Okay.  Here is where our request goes.

He talked about four plants, as was explained to the court, and he focused on one, the Marshville plant, Marshville, North Carolina, and the statement attributed to that plant is, "According to available records, only chrysotile was used,"

Garlock/12-6-12

33

which would make it a chrysotile plant and, if you had four cases of mesothelioma there, the scientific community, wow, this may change some of our thoughts on potency.  It has been cited a number of times, not knowing, not in the literature, at least, of his associations with the plaintiffs bar according to available – and that is all we want.

They cited the email exchange from Mr. Swett and Mr. Cassada about a month or two ago.  We sent out a notice.  There was no further discussion after the notice.  There was no attempt to resolve this before we got a motion to compel.  None of the witnesses did that.  We are willing to talk about it, as you saw.  We sent letters to these witnesses before they were served, come on, let's talk about this stuff if they had any concerns.  Rather, they wait as late as they could to delay it out to increase the chance that this is a time pressure issue.

All I represent to the court is that the focus of our inquiry is what are your available records.  If you have them, fine.  If you don't have them, fine.  If you have notes that identify this – and it's not all available records, not the medical records on these people.  It is not the records of the fiber burden studies on these people because that doesn't tell you the fiber type.

If he is saying, according to their full records, he is referring to something, that this was a chrysotile only plant and it is important.  Over the years eventually it will

Garlock/12-6-12

34

be turned up.  If we were in the litigation, we would get Dement's deposition eventually and figure this out, but everything is on a controlled, compressed cycle here, and that will be the sole focus.  We're not trying to deal with his methodology.  I represent to the court that, if we gave that impression before, if this is based on that, we are not after that.  That is the limited purpose.  Give us as much information as you can, either give us the records or help us identify it.

So let's go to the *Kaufman* factors.  Based upon the representation we want, do we want his opinion?  No, we know his opinion.  His opinion has been against Garlock, if you look at the disclosures, very clearly for years.  No.  All we want to know are what records are there so that our experts can find the exact records and confirm or deny.  You know, we can launch into an extensive effort to try to find out whether there are other records on this and then all that comes back is Dr. Dement found some other records and it's in his article apparently and no one knows what they are.  Why should we have that uncertainty?

Will he have to form new opinions?  No, nothing at all.  Just tell us what the records were.

Does he have unique knowledge?  Yeah, he is the one who said, "According to available records."  And is there another willing witness to this?  That is where the argument is

Garlock/12-6-12

35

made by Dr. Dement.  These are records from North Carolina's public health service.  We didn't know that he was limiting it to that until we got that response.  We had assumed he had actually gone to other places where there are records on what was produced there, and maybe he did.  We don't know.  We need to know where he looked for records and what records he found, and they say, in the words of their responses, voluminous records.  Okay, yeah, this is a case that has cost a lot of money already and they want it to cost even more.  We have to hire experts to go through the haystack to try to find the needle when somebody, who is a scientist, should have notes saying what records he relies on for that point. We are trying to save money by this, not waste money.

And, of course, the last factor, has he been previously deposed on this issue?  No.  Is it an oppressive repetitive thing?  No.

I don't think the deposition would take two hours.  I think this one – I could commit to that and probably much less unless he starts arguing about the records or unless they start trying to make him a witness.  Sometimes in these depositions the plaintiffs will then do a cross and they will try to get his expert opinion, and then we would have to attack his opinion.  But if it is just limited to what we want, what records, it might be over in less time than this hearing will take.

Garlock/12-6-12

36

Dr. Infante is the second of our witnesses.  Dr. Infante is also being asked  – let me tell you a little bit about him first.  Dr. Infante has – I know we have said it and it hasn't been disputed – that he has served as an expert for plaintiffs in the asbestos litigation on the chrysotile issue.  We know that, and I believe that he has served as a plaintiff's expert on all kinds of toxic tort substances and probably, although that's why we have to explore his relationships, probably has relationships with many firms that handle plaintiff's asbestos cases.  But basically that is going to be our focus.

Why is he important?  Well, I told you that Dement's article relates to what they are going to use against us, IARC 2012.  Well, this was put together by a working committee and the working committee included a relatively small group and one of them was Dr. Infante, a witness who we know has opinions, has been paid for – on information and belief, I assume he was paid when he was an expert witness.  Has been paid for his view on chrysotile, and this working group was described in a 2009 article that was actually cited, I think, in the information brief of the plaintiffs when the case was first filed, before the 2012 article came out, and it is attached in the exhibits, and this article has no disclosure of Infante's conflicts.  It lists conflicts for some of the working group members but none for Infante.

Garlock/12-6-12

37

So naturally, since this document is going to be used against us, we have a very important need to fully understand the conflicts of Dr. Infante and whether there was disclosure to the group and the other issues.

I will point out Dr. Infante wrote us a letter and he said, "I don't want to be a witness. I object," and we have attached that, but two important things were said in that letter. One is, "I have no documents." Why is that important? Well, it means it is not going to be very hard for him and the deposition won't be very long if he really does have no documents. There will be an oral deposition that talks about, you know, what these conflicts were and what his possible biases and sources of funding are, that's it, and the process of disclosure of that for this working group and various other process issues.

It will not be an attack on Dr. Infante's – I represent to the court – I am the one in charge of this. Mr. Cassada was not primarily in charge of this discovery. I represent to the court we are not going to be taking on his opinions in an effort to cross him on his opinions unless the plaintiffs try to make him – the plaintiffs bar tries to make him their witness during the deposition.

Okay. So the *Kaufman* factors, do we seek facts or opinions? We seek facts, related bias. We don't seek his opinion. We don't agree with his opinion. We're not trying to

Garlock/12-6-12

38

get it for free.

Will he have to form a new opinion?  No, definitely no.

Does he have unique knowledge?  Yes, he has unique knowledge about the nature of the disclosures he made and the nature of the associations he had with these entities.

Is there another witness willing to testify to these facts?  No.  And he hasn't been previously deposed on this. All of the *Kaufman* factors militate for us on this discovery.

The next witness is Dr. Weiss.  Dr. Weiss is someone who I am not very familiar with, which is one of the reasons, since I know that his publication is going to be used, one of the reasons that we want to discover it, to discover the source of his biases, and fundings, and other issues.

What does it relate to?  It relates to this policy statement that came out in the summer.  It was purported to be a physician's statement on asbestos from the Joint Policy Committee of the Societies of Epidemiology.  It was the first policy statement ever put out by this group.  It is a new group and we have tried to figure out what is going on here, and our experts will try to figure out what's going on here.  And our experts need facts about what was going on here related to this document.

But the press materials, and I call them press materials because they have a website where they put out sort

Garlock/12-6-12

39

of information talking about how great this is that we're doing this, and they have solicited others to endorse this policy statement.

So this is something that has been produced and put out to the world seeking endorsers, not some kind of confidential document or confidential research. But the press material says that we thank Colin Soskolne and Kathleen Ruff who volunteered to do this research. Basically it looks like these two people, Soskolne and Ruff, it wouldn't have happened had they not volunteered to make this a project.

We tried to find out about these people. Colin Soskolne is indeed an epidemiologist. He is a professor in Canada, and we know that he has come to the United States and served as an expert witness for plaintiffs in asbestos cases. There is no disclosure anywhere in this position statement on asbestos that one of the principal authors was a plaintiff's expert.

The other person is Kathleen Ruff, and we tried to figure out who she is. The promotional information says she is an asbestos advocate. She doesn't appear to be a scientist. Certainly doesn't appear to be an epidemiologist of any kind. What she is doing, doing research on an epidemiology statement, is something we want to find out. How did these two people get disclosed and, for this policy statement, did they disclose the people who put it together, their associations with the

Garlock/12-6-12

40

asbestos advocacy community, with the plaintiffs bar and was that disclosed to the endorsers before they signed on this, because you know that the plaintiffs are going to come in here and tell the court this represents the view of every epidemiology society in the world and, when you read it, if it just talked about banning chrysotile or asbestos, no problem. Chrysotile asbestos, at high doses, causes disease. If a government – not mesothelioma necessarily but other diseases. If a government wants to ban it for policy reasons, fine, but this is – that is not the issue in any of our cases, as we explain to juries. The issue is has it been a proven cause of mesothelioma, especially at the low doses where our products might have released some fibers, and there is no good science on that and we are able to convince juries of that.

But there are lots of statements in this that look like they are written for the plaintiffs bar. So it looks like it was written to bolster the testimony of Colin Soskolne when he comes to testify in court, and we want to discover why that happened.

So do we ask – am I going to cross-examine him on the science? No, we just want these facts.

Will he have to form new opinions? I am not asking for him to form any opinion.

Does he have unique knowledge? Yeah, he is the chairman. He is the guy that put this whole thing together and

Garlock/12-6-12

41

he is the guy to whom the inquiries are supposed to be directed.

Is there somebody else who could testify?  We really don't know who else to ask about all of the stuff.  How did you get people who had these associations to be the authors of this document, and is this something that he is going to be testifying on time after time?  No.

The last witness is a person named Professor Kanarek, and Professor Kanarek is someone who – I have been out of the mainstream asbestos litigation in the field there for the last two years.  I don't know anything about him, but we know he is important because we go back to the joint policy statement, and they have a section on epidemiology where they discuss the evidence, and this is the gut section where the case would be presented to the jury who hears the epidemiology evidence that this society has put together, and it starts with the heading, "Epidemiological Evidence," and then the very first citation is the 2012 paper by Dr. Kanarek.

Well, as the cases I talked about at the beginning of our presentation show, one of the issues, if that is going to be the learned treatise that they are relying on or that they rely upon independently, we are entitled to discover issues related to bias and funding.

We are not going to, unless they try to make him an expert witness, conduct, you know, fight with him over his

Garlock/12-6-12

42

opinions.  If we gave that impression in any of our earlier paper, I represent to the court that is not it.  This, too, if it is focused on those narrow issues, will be a narrow, short deposition.

Your Honor, the other issues with Kanarek relate to what is in his paper and the paper itself is in evidence.  I have three documents – the other four documents I have relate to the citations that Kanarek made.  I want to show the court why just reading the paper, there is something really strange going on, and I think that it is fair to talk about documents that the Kanarek paper, which is in evidence, and the citations that Dr. Kanarek has put into his paper.  So I will proceed and these are Exhibits 235, 236, 237 and 238.

THE COURT: Let's just stay away from those?

MR. SCHACHTER: Huh?

THE COURT: I will exclude that part of it.

MR. SCHACHTER: Okay.  Then I won't talk about it.  On its face, the Kanarek article adopts the methodology of not looking at all of the evidence but saying where can I find any case that has ever been attributed to chrysotile exposure or where there has been a question of chrysotile exposure.  And, for example, on brakes, the case he cites is a 1982 document, a 1982 document by Dr. Lang, a case report.  As the court knows on science, case reports raise questions.  They do not answer the questions.

Garlock/12-6-12

43

As the court will hear at the estimation trial, if not before, there have been study after study on brake maintenance workers showing no statistically significant increased risk of mesothelioma, so people that have an exposure to chrysotile that's higher than gaskets, and those studies are not even alluded to in Dr. Kanarek's paper.  He relies on his update in a 1982 case report.  That, in addition, raises questions.

Rule 43 is meant to prevent a party from getting favorable testimony, not this situation where we are dealing with important, vast number of cases, where everybody agrees the court has to fully understand the factual defenses of Garlock and where new material has been presented, especially in Dr. Dement's case, purporting to rely on facts, and Rule 45 cannot be used to deny that important discovery.

Therefore, we urgently request that we be permitted to take this limited discovery.

THE COURT: Anything else?

MR. SWETT: May it please the court, as you are well aware by now, it is Garlock's religious premise that chrysotile does not cause mesothelioma.  No court in the land has ever held as a matter of law that that is so.  Thirty years of asbestos litigation has not produced such a holding.  There are jury verdicts.  The jury generally doesn't tell you why they reached their conclusion, and the Constitution prevents anybody from looking behind the jury verdict.  So generally jury

Garlock/12-6-12

44

verdicts say nothing.  He can say they won a lot of cases. They also lost a significant amount of cases, and they paid one point four billion dollars in compensation to victims before bankruptcy.

Jury after jury hears these defenses and passes on the specific facts and makes the kinds of decisions juries are supposed to make, and this will not be a jury trial and it will not be a trial on any individual case, and those are the cases that are the appropriate forum for merits determinations with regard to Garlock's tort defenses.

The estimation is something altogether different, and you have recognized as much when you commented that one of the beauties of estimation is you don't have to decide whether or not chrysotile causes mesothelioma.  That is not the significance of the statement he quoted from the committee at the beginning of his presentation, that in estimation you will need a fair review of Garlock's defenses for the limited purposes of estimation.  That is something other than merits determination.

You are going to understand the quality of the cases. You are going to understand what the debates are.  You are going to understand, in general, what the kinds of evidence offered by the plaintiffs and the defenses are as to what the debates between the scientists are.

But, Your Honor, if what they have in mind is an

Garlock/12-6-12

45

estimation where you will set yourself up as the judge for all time on whether or not chrysotile causes mesothelioma, I submit, and I certainly hope, that they are in for a big surprise because that is not what estimation is about.

So they begin from an erroneous premise and it leads them into the wilderness. They begin with the assumption that somehow this estimation is a gigantic tort suit, writ large, with lots of individual case components to that; and that's a flaw with their position on the motion you will hear later today, as well. It is wrong, but let's pass that and get into the particulars of this situation.

The notion that Rule 45 exists only to protect the pocketbooks of academics and scientists is refuted by all of the cases that we cited to you in our papers. The notion that Rule 45 exists to prevent a party from getting favorable testimony and no other purpose is wrong, as demonstrated by the cases.

We have cited to you a line of cases where a party attempted, just as here, to reach out, to drag in unretained experts in order to box with them about their bias or their unreliability, and they were thwarted under Rule 45 as the rule requires.

The *Rosa* case cited on page twelve of our motion, *Anchor* cited thereabouts as well, *Solarex* cited in the First Amendment discussion of our paper, all of these prevented

Garlock/12-6-12

46

overly aggressive litigants from going out and picking gratuitous fights with unretained experts. Why do I say gratuitous? He kept referring to these people as witnesses. They are only witnesses if he makes them witnesses. They are not on our fact witness list.

He admits that what they want them for is basically to undermine their work so that, if and when ACC experts cite their papers, they can have something to say in opposition. They already have a lot to say in opposition, as Mr. Schachter's presentation eloquently demonstrates to you. They are already in a good position to join issue at the level required for estimation on any scientific topic that you consider relevant to this debate. They have no need, let alone a substantial need, and that is what Rule 45 is all about.

They make a big deal of funding and bias. There are cases that we cited to you where the target of the subpoena was an expert in some other case. That doesn't matter under Rule 45; the question is if you retain an expert in your case. The question is was his work undertaken at the behest of a party in your case.

As demonstrated in the cases cited throughout our papers, the very premises that the debtor is bringing to bear here are refuted in case after case. That is not what Rule 45 is about. The expert has the freedom to stand aloof from the litigation whether or not you offer to pay him, whether or not

Garlock/12-6-12

47

you are only after his documents.

Notice that the rationale among the different witnesses differed in a way that leaves the debtors' true aspirations or objectives for these things in significant question.  It shouldn't be overlooked what they said at the outset when attempting to justify this, and he confirms it in various ways in his presentation.  They want to attack on bias and on grounds of methodological unreliability the published works of these people.

They want to say, oh, well, Mr. Weiss knows about these two other people and those two other people aren't witnesses in this case either.  They want Dr. Dement because he studied at a plant in North Carolina, a plant in South Carolina, reached conclusions that they don't agree with, that they have been disagreeing with over the course of twenty years, and they say they have the evidence.  They don't need him and they don't need his documents.

And contrary to Mr. Schachter's predilections, this case is not going to turn on whether or not workers at a given plant in South Carolina had elevated levels of an amphibole.

By the way, a big difference between a retained expert and any other witness is that the retained expert has a right under the rules of evidence to rely on hearsay.  That is what experts do.  And the other side can meet hearsay with hearsay, fight fire with fire, as they undoubtedly will.  Their expert

Garlock/12-6-12

48

reports will be replete with citations to articles and learned treatises, etc., etc., that but for the fact that they are reliance materials for an expert are excluded as hearsay.

Dr. Dement wasn't present when those exposures took place in that plant in South Carolina or that plant in North Carolina. Most of those exposures took place before he was born. It is hearsay. If they treat him as a fact witness, his testimony is inadmissible. It is a big red herring.

They say, well, this won't be reiterative, redundant; we won't be pestered again and again. Nonsense. Garlock never did this, as far as I know, in the tort system. They never reached out for unretained experts in order to beat up on them. If they got the right to do so here, what do you suppose would happen with that precedent? How often would these people face deposition by equally overly aggressive debtors? How often would scientific institutions be invaded by tort defendants eager to make their case in litigation where the institution has not stepped in to take a part?

There is a real floodgates problem here. Don't suppose otherwise.

Dr. Infante, he says he doesn't have any documents. They only want Dement's supposedly now, in contradiction to the articulated statement they gave of their purposes before issuing the subpoenas. Dr. Infante doesn't have any documents.

Dr. Weiss does not speak for the entire joint policy,

Garlock/12-6-12

49

committee, or whatever it was that he named. Dr. Infante does not speak for the whole working group of IARC. His testimony would be hearsay.

He says he wants to explore his conflicts. Well, here is an example of why that is overkill for estimation. Nothing is going to turn on whether or not that report is right but, to the extent that the ACC's experts when they report in February of this year cite it, or rely upon it, they can point to the absence of disclosure. They can have an expert come in and make a point of what that means for the reliability of a report. If they have any evidence that there is any actual conflict, they can say so.

But it is an utterly collateral sideshow and, if we go down this path, it is just going to be the first of many. The estimation will be consumed in battles over irrelevant and collateral matters, stuff that, even if they are in some sense relevant to a given party's theory, are so attenuated as to not merit attention in a two-week trial on a discrete issue which is something other than the merits of any individual claim.

He says, "Oh, we are not going to cross-examine Dr. Infante," but he wants to bring out bias and conflicts. What is that but cross-examination, the gratuitous cross-examination of a non-witness?

Dr. Weiss, he is not familiar with him. He wants to explore his bias and his funding. What kind of fishing

Garlock/12-6-12

50

expedition is that?  It certainly doesn't rise to the level of substantial need.  It is not a need at all.

If you can't use Rule 45 to go get favorable testimony, why in the world can you use it to go reach out and pick a fight with somebody who hasn't entered into the case?

Here is an analogy.  Dr. Dement, suppose Dr. Dement or one of these other folks was a consulting expert to the ACC. They are not but suppose they were.  Discovery would be barred under the rule on work product as it pertains to experts, absent again a substantial need.  They wouldn't clear that hurdle.  Why should they have any greater right with regard to someone who had no existing relationship with the parties to the case with reference to that case?

It is exactly the situation that Rule 45 presumes will not be allowed absent substantial need.  Far from showing any substantial need, Mr. Schachter has demonstrated to you quite clearly that they are already in a position, through their counsel and through their own experts, to meet any issue that matters pertaining to chrysotile and for the limited purposes of the estimation.  Our motion should be granted; these subpoenas should not be enforced.

Thank you, Judge.

THE COURT: Mr. Guy.

MR. GUY: Your Honor, I will be very brief because we have been going for a while.  I want to talk about Coltec's

Garlock/12-6-12

51

prejudice and timing.

Coltec's fact discovery is going to close January 16. The FCR has been constantly asking that we move this process forward. This seems to me to be another vehicle for delay. It is going to be very difficult to do this in the time frame that we have left to us.

The other context is that this is not a jury trial. If it was a jury trial, Mr. Schachter might have a point, but it is not. The court said:

"One of the beauties of estimation is that you don't have to decide specifically individual cases or the scientific evidence. For example, you don't have to decide or make a determination that chrysotile asbestos is not a cause of mesothelioma."

Your Honor, we have relied on that in preparing for the estimation trial. We have no expectation that the estimation trial will ask the court to make a determination that chrysotile asbestos has caused mesothelioma. Your Honor, if these experts are brought in, we will have to engage them as experts because otherwise you will only be seeing the part that they want you to see.

I am sure that the experts will have a lot to say about all of the issues that Mr. Schachter has raised. We can't leave it with just that one small part. There is more expense, more delay and not needed.

Garlock/12-6-12

52

In terms of prejudice, Your Honor, I think this is really controlling. A lot of what I heard is bias, bias, these experts act for the plaintiffs on occasion. Well, they have that information, Your Honor, and they can argue it to you. We have a two-week trial. We spent longer this morning than we could possibly spend in the trial on these issues. They can certainly argue that.

And they have all of the information – Mr. Schachter said we have study, after study, after study. I don't know how that is going to be presented to you in an efficient manner, but they will have an opportunity to do that.

They have information from their own plants where they used chrysotile. They can present that to the court.

In terms of timing, Your Honor, the last point is the parties haven't exchanged expert reports yet. This is all incredibly premature. They don't know. They make the representation that absolutely these reports are going to be front and center in the expert reports that they receive from the FCR and the ACC. They don't know that. To the extent they are, maybe they can come back to the well on this issue, but it is all premature, it is all unnecessary and it is all too late.

Mr. Schachter talked about a 2009 report. It is now 2012. They have had opportunities to pursue this. They had opportunities to pursue this before they even filed for the bankruptcy.

Garlock/12-6-12

53

Thank you, Your Honor.

THE COURT: Okay.  Mr. Sanderson.

MR. SANDERSON: Your Honor, thank you.  Very briefly, I believe, just to clear up the record, I believe Mr. Schachter said one of the reasons that this discovery was so important is because these articles were new and came out in 2012.  I think the record shows that, with respect to Dr. Dement's article, that was a 2009 article, and so there has been plenty of time for the literature to develop if there are any opinions to the contrary.

Your Honor, I think the biggest difficulty I have with the debtor's argument, and especially trying to fit this into the *Kaufman* factors, is that what the debtor has told you is that they aren't really seeking discovery from Dr. Dement on the issue of whether or not it was chrysotile only that was used at this plant or not.  What they are really looking to get this discovery from Dr. Dement for is in order to undermine his conclusion about an ultimate opinion about whether chrysotile may or may not cause mesothelioma.  There was nothing within their presentation about either an inability to get testimony about whether or not there was only chrysotile used at the plant or not, nor have they made any representation about their efforts to go to the same sources that Dr. Dement went to, these public records registry, to get this discovery that they now claim is so vital for them to get.

Garlock/12-6-12

54

The *Kaufman* factors, the way Mr. Schachter cited them, are not actually the way they appear in the rule.  Most importantly, Your Honor, the first *Kaufman* factor is not whether or not fact or opinion discovery is being sought; it is the degree to which the expert is being called because of his knowledge of facts relevant to the case, rather than in order to give opinion testimony.  They are not seeking discovery from Dr. Dement, Your Honor, in order to discover whether or not chrysotile was used at the plant or not.  What they are asking to do is they are asking for discovery to undermine Dr. Dement's ultimate opinion.

With respect – and frankly the debtors admit that. The debtors admitted that the scope of their discovery goes beyond factual representations and that they are actually going to ask questions of Dr. Dement that go to his alleged bias. They allege that he is not going to be called on to form a new opinion.  I guess what that means is that, after beating up on him about whether or not his factual methodology was sound or not, they aren't going to ask him the ultimate question about whether or not, based on the probing questions that they issued, is Dr. Dement now going to change his mind about the ultimate conclusion that he sought.

With respect to the underlying policies that drive Rule 45, Mr. Schachter conflates the principle that underlies the enactment of Rule 45, which was essentially to protect an

Garlock/12-6-12

55

unretained expert's ability to profit from his expertise, with how this works in the enactment and conduct of Rule 45.  And what I mean specifically, Your Honor, is the issue is not whether or not the calling of Dr. Dement in this particular case is going to harm his pecuniary interest about whether or not he is going to get an expert fee in this case or not; it is about his long-term viability in terms of being able to conduct his research relatively unmolested in liable cases and in order to do that on a going-forward basis.  If Dr. Dement is called as an expert in all asbestos cases in which he is not actually retained as an expert, we would submit to you that is the very policy that Rule 45's enactment was sought to prevent.

So the fact that he may or may not be financially burdened in this particular case is wholly a red herring.

Your Honor, with respect to the burden issue, Mr. Schachter gave no evidence to the court about the comparative burdens placed on Dr. Dement again versus them getting the information themselves, for themselves.  Mr. Schachter said that Garlock has been litigating these issues for years.  I would be very surprised that they wouldn't have an expert ready to go, regardless of whether or not Dr. Dement is called to a deposition or not, that's going to testify about whether or not chrysotile asbestos was the only asbestos used in that plant.  They have made no representation that Dr. Dement is the sole source of that information.

Garlock/12-6-12

56

And for those reasons, Your Honor, we would submit that the policies behind the amendment to Rule 45 that protects unretained experts is directly on point here and would strongly counsel against the discovery sought in this case.

Thank you.

THE COURT:  All right.  Well, I will tell you what I think I ought to do.  I will allow the deposition and I guess document production, if there are any, of Dr. Dement and Dr. Infante and not Weiss and Kanarek.

With respect to Dr. Dement, I will allow examination as to the records that he referred to or that were referred to in the quote that was on Mr. Schachter's sheet; also to the process of his study, bias, funding and conflict.

With Dr. Infante, I will allow examination as to the process of the working group and any bias, funding and conflict issues.

Other than that, I will enter a protective order against document production or examination, but I will also condition that, with respect to Weiss and Kanarek, that I will also not permit any reference by any expert to the policy statement that was referred to unless and until the examination of Weiss and Kanarek are permitted.

So the method in my madness is that the whole thing is a bit premature, I suppose, but time is important.  So rather than prevent it at all, it seems to me that this study by Dr.

Garlock/12-6-12

57

Dement referred to in the 2012 IARC report and the IARC report are probably more likely to be part of the committee's case, and so we will permit the examination as to those matters.

The policy statement seems to be a little bit more obscure and less likely to be part of things and so we will eliminate that for the time being.  If it is going to be part of the experts' opinions or offered as a treatise of some sort, then we will allow the examination prior to its being used in such fashion.

Now, Mr. Schachter, can you draw an order along those lines?

MR. SCHACHTER: I can try, Your Honor.  Thank you.

THE COURT: Why don't you try and –

MR. SCHACHTER: I will do it, Your Honor.

THE COURT: Basically it looks like, to me, that the debtor will be confronted with IARC and the Dement studies and that we ought to go ahead and let you get into those things.  Okay.

Let's take a break and then we will come back.  Let's come back at a quarter after eleven.

(Recess from 11:05 a.m. until 11:16 a.m.)

THE COURT: Have a seat.  Okay.  Do you want to proceed on, then?

MR. SWETT: May it please the court, Ted Swett for the official committee.  Your Honor, the next matter is the

Garlock/12-6-12

58

committee's motion for a protective order with respect to document demands included in Garlock's subpoena duces tecum to five law firms that it has subpoenaed for depositions. The depositions are going forward. The issue is whether any further document discovery along the lines requested in the Rule 30(b)(6) subpoenas, to law firms who have already been subjected to an awful lot of that stuff over the course of many months, is warranted at all or whether there are grounds to call a halt to that process and let the debtor use all the materials that it already has in examining those law firms.

The status of discovery, as you know, is that we are supposed to be done with fact discovery on June 16. There have been many motions over a course of two years, lots of battles fought –

MR. GUY: January 16.

MR. SWETT: January 16, I thought that was what I said. An awful lot of paper discovery have been visited upon the lawyers and their clients, so much so that back in August, when there was a showdown over whether the debtor was entitled to still further enforcement or responses of some of its questionnaires, you allowed as to how Garlock had already tested the reasonable limits of document discovery, had a vast amount of information and it did not appear that anything more would be necessary and a very high hurdle, you put it, as absolute necessity would be applied to any further document

Garlock/12-6-12

59

demands.

Now they have subpoenaed five law firms.  Three are affiliated with the committee; two are not.  And they have included in these subpoenas a voluminous set of document demands.

These, of course, are law firms who were subjected to the discovery that you allowed Garlock over the course of many months.  Many many hours of their practices have been devoted to responding to these requests.  They are prepared to testify.  They will not willingly produce these documents in view of the inordinate demands and the narrow purposes of estimation.

Now counsel for law firms is present and he will speak for them.  My perspective is going to be coming from the direction of appropriate case administration for the estimation.  You already are well aware of our philosophical differences with the debtors over what an appropriate conception of estimation is.  This motion does not turn on which way you eventually go on that.  It is a nitty-gritty motion having to do with detailed particulars and whether or not there is any good reason to subject these firms to still more paper discovery; and that has to be measured, the burden and the necessity, or lack thereof, not against a sample the committee has taken in order to prepare to meet the debtors' allegation that, taken as a whole, the case resolution history will show some sort of pattern and practice that it will say

Garlock/12-6-12

60

distorted the values of the resolved cases.

To meet that, we said, okay, well, let's see your claim materials from your litigation files concerning a bunch of cases.  They objected.   You enforced another (inaudible).  They tried to set that up as a basis of comparison to the burdens and necessity of what they are asking for here, and that's misplaced.

The burden and necessity of what they are asking for here needs to be measured against all that they have already received, which is what you recognized when you made the pronouncements back in August that a very high standard of necessity would be applied to any further requests.

Just because these requests come in the form of a deposition subpoena rather than a request for production of a party should be of no moment.  It is the same issue, the same standard that you articulated back in August should apply for the good of the progress of the case and for the imposition of some reasonable sense of balance over what this process should be and what these law firms should and shouldn't have to do.

Fundamentally I am appealing to an evenhandedness and a balance in the court's administration of the discovery process of this case, which up to this point has involved a virtually unprecedented scope of discovery on the part of this aggressive debtor into the documents of these lawyers and their clients.  I submit that it is time to draw a line.  In fact,

Garlock/12-6-12

61

you already drew one back in August and they have nothing that can clear that standard of absolute necessity in this context.

Now, we are on a compressed schedule for fact depositions. We must finish by January 16 because, if we don't finish by January 16, we cleared this trial date of July 22, which has already been delayed for many months due to problems of which the committee and the FCR are not the makers. That date matters because time is money, because the debtor has an announced strategy of exerting leverage by delay and because this reorganization cries out to move forward to a plan, whether it be consensual or imposed in light of whatever the estimate turns out to be.

So the timeliness is important, and they have had an awful lot of time, two and a half years, to take the discovery that they thought truly mattered and now they are gilding the lily, and that's not just my supposition. I represent to you that, back on September 30th, Mr. Cassada sent me, I believe it was eight subpoenas for eight different law firms. Some of which are now the subject of the subpoenas we are arguing about; others were affiliated with the committee but are not now the targets.

The point I want to make about those subpoenas is that they didn't include any document demands. That, of course, was close in time to your pronouncement about the standard that would apply to any further document requests.

Garlock/12-6-12

62

Evidently, recognizing the import of that statement, the debtor exercised some restraint for once, and those subpoenas had no document demands, but they were never served. They were replaced, instead, a month and a half or so after by the subpoenas we are now arguing about that have a sweeping set of demands, cabined only by a reference to certain designated plaintiffs.  There are plaintiffs designated for each of the would-be deponents.  In all, they number seventeen.

The composition is very interesting.  Fifteen settled cases.  One paid judgment – I'm sorry – one additional paid case that was paid by way of settlement after a judgment and one open case.

There is also an open judgment in there, the *Torres* case.  It was the subject of a lift stay motion by the debtors who came to you and said they wanted to continue to litigate this case and you said there was no reason to lift the stay, that case should ride through with the plan and the parties should focus on estimation.

Now, let's remind ourselves briefly of all of the discovery by way of documents that the debtors have been permitted, almost uniquely in this case, almost unprecedented fashion to gather.  They won the right, over our objection, to subpoena all of the ballot agents in all of the asbestos bankrupcties and therefore to call forth literally millions of ballots.  They say a ballot in an asbestos plan of

Garlock/12-6-12

63

reorganization is the equivalent of a claim and therefore must rest on an admission that the person voting had actual contact with a debtor's products. We, of course, dispute that. We had a debate about the meaning of ballots. Nothing to-date turns on how that comes out because they already have the ballots, and yet they want these law firms to go back and gather up their ballots from fifty asbestos reorganizations to present at these depositions, as though they would have time to examine on all of those particulars in a one-day deposition.

It is utterly gratuitous. It is the very epitome of redundancy. Matched only by another one of their requests that I will come to in a minute. But the point is there is no need, they are already adequately equipped.

Next, trust claim forms for these designated claimants. Well, pursuant to the questionnaire, the original questionnaire, they got claim forms from all of the open mesothelioma cases. They got them either from the law firms or pursuant to authorizations issued by those firms and clients to the fifty trusts in the world. They have those claim forms. That would include Mr. Grabowski, the only open case on their list of designated claimants for which a judgment is not in place. He was a questionnaire respondent. The law firm has already produced what they can produce. There is no occasion to visit them again with that request.

The supplemental exposure questionnaire, not only have

Garlock/12-6-12

64

they identified their known Garlock exposures in the original questionnaire, they were called upon in the supplemental exposure questionnaire to identify all other exposures they may ever have had to anybody else's asbestos products. They made their responses. We litigated out whether those responses were sufficient. You said they were and that a very heightened standard of necessity would apply to any further document requests by the debtor. And these new requests essentially defy that guidance.

The supplemental payment questionnaire, why do they want trust claim forms? Because they want to know where the designated claimants applied to trusts for compensation. Most of the designated claimants are settled cases.

What do they have already on the subject of trust recoveries by settled claimants? They have the results of their subpoena, which you allowed over objection, to the Delaware trusts. They quibbled with me about whether there are six or seven trusts. I was treating the Owens Corning and Fibreboard trust, which is a unitary entity with two sub-trusts, as two. It doesn't matter but, come to think of it, if you count the debtors, the number of producers and the different products encompassed by their history that are embraced by the Delaware trusts, you have got a lot more than six or seven. You have, for example, the Federal-Mogul entity, including a gasket maker, Flexitallic. You have

Garlock/12-6-12

65

probably five or six Federal-Mogul entities that have sub-funds. You have Owens Corning and Fibreboard, as I mentioned, and there may be other trusts that respond for more than one affiliated debtor to the tort claims. It is a lot of information.

Moreover, the Delaware trusts are the ones that were created over the decade of the 2000s, the major ones. They are among the largest trusts, too. The issuance of information by the Delaware trusts, pursuant to the debtors' request, is a lot of information.

And what was the information? Ten thousand settled Garlock claimants. The Delaware trusts, tell us for each of these people did they ever proceed against any of these trusts; if so, which trust? If so, was the claim paid? If so, when? If not, what is the status? Rejected, deficient, or deferred.

It is a huge amount of information with regard to settled claims. So the notion that they come to you, hat in hand, and say our discovery has been focused on pending claimants, it is not true; and it is information much more than the nitty-gritty particulars of some individual case that the experts can sensibly use in an estimation. There will be debates about its significance. There will be debates about its reliability. But at least it is statistical information that the likes of Charles Bates and Dr. Peterson are used to dealing with and extrapolating from, and you can hear whatever

Garlock/12-6-12

66

the appropriate debates are about that particular information and be in a good position to referee those disputes without calling upon any settled claimants now, at this late date, while we are busily trying to finish depositions over the Christmas holidays, to go back and have these lawyers search their dead files and produce all of the trust claim forms in the world for given clients.

It is an inordinate burden.  It comes at a very inopportune time, in the face of very strong guidance by the court to the contrary, and it is needless.  They have enough to examine on the subjects that are framed by their 30(b)(6) notices.  In truth, it is far more than enough but, in any event, they are well equipped.

Now, it is important that fifteen of the seventeen designated claimants hold settled claims because, as you have recognized in previous decisions, to open up discovery as to a settled claim is not the same thing as pursuing discovery of an open claim, even in the wholesale level, as I call it, of estimation.

Settlements are bargains where each side negotiates for benefits.  Each side gets freedom from discovery with respect to that individual dispute as part of the benefit bought and paid for.  The plaintiff pays for it by giving up his claim.  The debtor pays for it by money.  Both get peace. Garlock has chosen to breach that peace with these subpoenas.

Garlock/12-6-12

67

It is not fair.  It is in derogation of the settlements.  There are strong policies of finality that resist these demands and there is precious little, if any, need for it because they have gotten comprehensive discovery out of the questionnaires with regard to the open cases, and they have got the trust data with regard to the closed cases.

One of these designated claimants, as I mentioned, is a judgment holder whose judgment was paid.  Are we going to look behind the verdict?  Are we going to reopen discovery over a case that a verdict has been issued in by a jury and Garlock has paid?  They say, "Well, we have to because the committee's methodology relies on the settled cases," but we don't rely on any merits examinations.  That is not the point.  What we rely on is the fact that there are many, many thousands of resolutions, across all manner of cases weak and strong, that produce averages with respect to how many cases are paid and how many are thrown out and also produce averages with regard to what the successful plaintiff who gets a settlement will receive or has received in the past.  And the experts can argue about whether or not that base is appropriate for extrapolation and you can referee those disputes without going back in and reopening any number of past claims with regard to their detailed merits.

The entire thrust of these subpoenas, their focus on these seventeen individuals, suggests that what the debtors

Garlock/12-6-12

68

have in mind is somehow turning the estimation into an aggregation of mini trials. Well, that is not fair to the settled claimants. It is in gross derogation of their settlements. It does trigger their due process rights. And you may recall – I am sure you do – that when you embarked on the estimation path, rather than the allowance path, one of the salient considerations was your recognition that to do otherwise would invoke the due process rights of a whole bunch of non-parties. It is no excuse that now they only want to do that to seventeen. We don't have time in a two-week trial to have seventeen mini trials over the merits of these concluded cases.

If we embarked on that effort, it would behoove the lawyers for those resolved claimants to come in and defend those cases, just like it was a trial, and the whole thing would degenerate into a nonsensical exercise because in two weeks – do you know how long it takes to try a mesothelioma case? Probably about two weeks, one case. Are we going to do that all over again for seventeen?

And if that is not the purpose, what is the purpose? How can an expert, any sensible rational person, come in front of you and say, "Well, we are going to extrapolate from these seventeen cases." There are fifteen thousand. Fifteen thousand people have sued Garlock over mesothelioma. Four or five thousand of those have open cases and the rest are

Garlock/12-6-12

69

settled.  No meaningful pattern or practice can possibly emerge from seventeen cases, and they have all of the information that their experts may need to discern whatever patterns and practices they wish in the data, and they have plenty of material to confront these lawyers and ask them about in these depositions without putting them through more hoops for document discovery.

Are there more designated plaintiffs to come?  If we do this, are we going to get another wave of lawyer subpoenas, with more designated plaintiffs, more poster children, more threatened mini trials?  The whole thing will degenerate and it is grossly unnecessary, considering that one thing at least is clear: You have said, not just in colloquy but in an order, you don't intend to pass on the merits of any individual claim.

So now they want the trust claim forms.  They already have the trust claim forms.  They already have the data with regard to the settled cases.  They already have the ballots.

2019 statements.  The debtor, as it typically does, adheres to the same position regardless of developments.  The 2019 statements, they say, must be had because the 2019 statement is the equivalent of a claim and therefore must rest on an admission that the client had actual contact with that debtor's product.  That is nonsense.

Judge Fitzgerald has recognized that it is nonsense. They went to her and sought access to the 2019 statements,

Garlock/12-6-12

70

which are submitted by law firms in reliance on orders to keep them off the docket and keep them confidential unless need is shown by application to the court that has them. They made that application. They lost. Judge Fitzgerald happens to have presided at most of the Delaware bankruptcies and some in Pittsburgh. So she sits in two different courts and this has generated two different appeals, one to the Western District of Pennsylvania and one to the District of Delaware. Those appeals pend. Garlock's supposed entitlement and need for those materials is at issue before those district courts.

Now, in the tail-end of fact discovery here, having gotten access to all of the ballots, which Judge Fitzgerald said they were entitled to, they want you to come and interfere with the progress of those appeals, prejudice the rights of parties that have expended effort and resources defending their positions in that appeal, which do include some of the law firms who are now subpoenaed here.

It is a transparently circumventing maneuver. I suppose perhaps they think they are maintaining a position that for some reason is important to them. Be that as it may, you should swiftly overrule that.

Then they want any exposure documents concerning these designated – any document that tends to show what products these folks were exposed to. Now, when we asked for documents from Garlock and we say please produce any documents pertaining

Garlock/12-6-12

71

to such and such topic, we immediately, as if by clockwork, get an objection back that says, oh, any, that is way over broad; how can we do any?  That would require us to search every which way, every possible where and would make us responsible if we didn't find or overlook something.

Well, to ask these lawyers, under the pressure of a deposition subpoena, where testimony is requested within a matter of weeks, to produce any exposure documents is ridiculous; and there are a couple of different scenarios.  One scenario would be Garlock settled the case without discovery. We had a deposition of a fellow this week who testified that, after a particular resolution brought things to a head with his firm, Garlock entered into a protocol with him, encouraged him to settle his cases without suit, and the whole premise of the deal was there would be no discovery.

So if they didn't take discovery then when they were joining issue on the merits, as they are not here, why in the world would it be germane to have the lawyers produce that material here?

Now, these subpoenas, it appears, are directed at firms that, more than most, tried cases.  Okay.  In the tried cases, they had all of the discovery they wanted; and now, if they think that some exposure went undisclosed that should have been disclosed there, they have got the ballots and they say that would be revealing of that, and we dispute that as a

Garlock/12-6-12

72

matter of principle, but they have the means of making their case.  They have the trust claim forms.

For reasons that we will engage with at the appropriate time in the estimation trial, the trust claim form is not necessarily evidence of actual exposure in the sense that many of the trusts have site lists.  The site list, if you can establish that your client worked at that site, it is taken as meaningful credible exposure to the debtor's product.  That is not the same as trial type evidence of actual contact with a given product.  Suspicion to establish tort against that debtor, it is not the same thing but, in any case, they have the trust claim forms for a whole lot of people, and they can discern whatever patterns and practice they want and they can confront these law firms with a whole bunch of material about their clients, that it's not these designated plaintiffs perhaps that each and every document that they have in their categories will be available for is of no moment.

When we challenged them and said, "Why do you want the ballots?  You have already got all of the ballots?"  They said, "Oh, we wish to assure ourselves that we have all of them."  Well, that is a quixotic and unrealistic aspiration in this setting and it is needless.  Enough is enough.

And here we have the pièce de résistance, the ultimate epitome of redundancy and gratuitous burden in discovery.  Produce to us, again, all of the exposure documents that you

Garlock/12-6-12

73

produced to us in the tort suit.  Really, Judge, that doesn't even require our argument.

So then they say give us all documents pertaining to closed meetings of the plaintiffs bar where there was discussion of trust claims that were or might be litigated – pertaining to claims that might also be litigated in the tort system.  And we say supposing, indulging what I expect will prove to be the unrealistic supposition that such documents exist, if they do, the description in the demand makes it obvious that they are protected work product.  They are documents generated because of litigation.  They are only asking about trust claims pertaining to tort claims that are litigated in the tort system.  It is work product on the face of it.

So they say, well, but it is past cases, but the case law, which we cited to you in our reply, makes it perfectly clear the work product privilege applies even if the work had to do with a closed case.  The work product protects both the client and the lawyer.  These law firms have a protected interest in their work product. Adversaries, like Garlock, are not permitted to come in and piggyback on that work product. They can do their own work.

So they say, well, you have asked a couple of our witnesses about conferences, the same thing.  Far from it.  The conferences we have asked about go by the name of Neeley's,

Garlock/12-6-12

74

Perrin, The Defense Research Institute.  These are entities who sponsor meetings of the plaintiffs and defense bar.  I'm sure Mr. Schachter and Mr. Cassada have been to many of them, along with some of the very people they are now wanting to depose at these law firms, in mixed meetings.  It is a very different kettle of fish.  Their demand goes only to closed meetings of the plaintiffs bar where lawyers who are in the profession to prosecute the rights of mesothelioma victims get together and talk about the prosecution of those claims and the evolving developments in the tort litigation, core protected stuff.

So they finally say, well, that is a misplaced objection for the committee to make, it should be a document by document inquiry of the law firms and, implicit in that, is that the law firm should not have to go conduct a comprehensive search to find whether any such documents exist, bring them to the deposition and answer questions about them without reviewing their contents; but we have been through that before, Judge.  Remember when we sought to compel the production of written communications between Garlock and insurers who were on the other side of coverage in place deals with them, and we said the relevance, Judge, is it is going to show Garlock advocating the reasonableness of the very settlements that they are now going to turn around and tell you were grossly inflated and somehow distorted and unfair.

You thought two things.  Number one, you thought that

Garlock/12-6-12

75

was attenuated, it didn't really go to the heart of the issue here and, number two, you thought that it was tinged with the work product interest even though they were on other sides of the table with the insurance companies, that there was a common interest vis-a-vis the plaintiffs bar on the part of the insurers and the tortfeasor.  And so you declined to require them to search for the documents, let alone bring them to a deposition to answer questions, and they didn't have to log them because it was plain to you that the category of documents sought was protected, so why waste the time and money allowing that inquiry to go any further.  And those documents were a whole lot more potentially significant.  For one thing, we know they exist and, for another thing, the relevance of them, while you considered it to be attenuated, is a lot less attenuated than just a fishing expedition for communications reduced to writing concerning a closed meeting with the plaintiffs bar.

So that is what they are after.  What I ask  the court to do is to soberly consider those demands in light of all of the discovery that has come before and in light of the crying need to finish the fact discovery by January 16, and to issue a protective order denying enforcement of those document demands; let the plaintiffs go forward – I am sorry  – let the debtors go forward with all of the materials within their vast cache of written discovery already taken to conduct those depositions and let's get on with it.

Garlock/12-6-12

76

Thank you, Judge.

THE COURT: Okay.

MR. KLINGLER: Your Honor, David Klingler for four of the five law firms that were on the receiving end of these subpoenas duces tecum with the six document categories requested.

I concur, without qualification, in Mr. Swett's remarks; so I will endeavor to keep my own remarks brief and to tread as little as possible on ground that he has already well covered.

I would point out to the court that my four clients did file a joinder with respect to the committee's motion and we made some additional comments in the context of that joinder, which is filed at docket number 2628.

We think the court was spot on in August when it foresaw little more in the way of discovery than was absolutely necessary. We believe that the six document categories being sought now don't come close to meeting the threshold of necessity that the court appeared to envision in August. But the reason for that is peculiar. They are significantly cumulative of discovery that has already been taken or they seek materials that Garlock has requested but been denied.

In the committee's motion, they refer to the first five of the document requests, the five except for the documents from meetings confined to the plaintiffs bar, is deja

Garlock/12-6-12

vu all over again.  Indeed they are.  I had that phrase in mine as I was reading through Garlock's response to the motion again last evening, and I have heard it all before and I recalled where, at least where I heard it the first time, and that was in document item 24 in this case, which was Garlock's informational brief filed just two days after the Chapter 11 petition, the first business day after Garlock's Saturday bankruptcy filing.  That paper was filed thirty months ago tomorrow and that paper is about twenty-six hundred docket items ago, and it lays out the same grandiose theory that has most recently been belabored in Garlock's response to the committee's motion.

So thirty months into the case, while perched upon a literal mountain of documents it has obtained – the zeroes are extraordinary, millions of ballots, thousands of trust claim forms – Garlock was playing the same familiar refrain in going back to my clients for the same old stuff.

The court denied them a lot of what they are seeking now in May 2011, more than a year and a half ago.  That was where the court noted, in respect to past claimants, their claims have been put to rest and ought to stay at rest and remarked that discovery in closed cases is largely irrelevant to aggregate estimation and that the burden would be an unwarranted expense and undue.  That is doubly true now.

Garlock has more in the way of document discovery than

Garlock/12-6-12

78

it could possibly marshal or need for aggregate estimation, and documents regarding discrete asbestos claimants fixed long ago by settlements or verdicts have little to no relevance to an aggregate estimation.

With Garlock trying to subject the firms I represent to the considerable burden of gathering up these documents now, in many cases again, that's perhaps just patent to discovery abuse as there can be.

More than seventy years ago a federal district court in Washington, DC, sensibly observed that, and I am quoting here:

"An adverse party should not be required to perform burdensome labor or to execute difficult and expensive tasks in searching for facts or compiling data."

The cite to that case is 8 FRD 635 and it was decided in 1940.

In that case, discovery was being sought by one party from another. That's not the case here. Mr. Swett said that the burden today needs to be measured against all Garlock has received and they have received a lot, but it also needs to be evaluated against the reality that the firms from whom this discovery is now being sought are strangers to the estimation, and retrieving the documents that Garlock is requesting, to a significant degree, would entail going through archival documents, you know, stuff that has been sitting around in

Garlock/12-6-12

79

bankers boxes for perhaps a decade.

The 2019 statements, Judge Fitzgerald heard their arguments and said no, talking about the confidential exhibits. They told Judge Fitzgerald they needed that stuff for their bankruptcy. They didn't get any traction with her. Then they appealed. They appealed to the district courts sitting in Delaware and Western Pennsylvania.

They told the district judge sitting in Delaware that they would appreciate it if he would rule fast because they needed that stuff, and they committed a significant quantum of estate resources to prosecute their request in front of Judge Fitzgerald and in front of those district courts.

If they could have always just asked for it in discovery in this case, don't you think they would have done it before 11:59 on the discovery clock? It is just – it is a brazen attempt to bypass and subvert an appellate process that is underway and we respectfully urge the court not to allow them to do that.

Now, the most remarkable of their document categories, Mr. Swett mentioned. I have to mention it again because of its egregiousness. They asked for documents through which the firms disclosed to debtors, disclosed to them, evidence of any designated plaintiff's exposure to any asbestos-containing product.

Translation: Give us again what you gave us before

Garlock/12-6-12

80

maybe years ago and you find it and you bear the burden of finding it.

This is an astounding request. Asking my clients to incur costs and burdens to review archival case files and reproduce documents is shocking when Garlock has, at its disposal, legions of its former defense lawyers who should forage for such documents in Garlock's own files if they are really thought to be needed.

I will talk briefly about the designated plaintiffs. Mr. Swett, I think, more than adequately covered the largest category of the designated plaintiffs. Twelve of the fourteen among the four firms that I represent are people that have settled cases many years ago. Settlement comes with closure and finality and the notion that they need no longer have to respond to discovery inquiries. Garlock executed settlements putting these to bed.

We respectfully assert to the court, and we agree very earnestly with Mr. Swett, that forcing firms to troll through archival files relating to documents of claims settled long ago serves very little in the way of the forthcoming aggregate estimation.

Now, the two other subgroups of claimants are subgroups of one. One former plaintiff was represented by Waters and Kraus, one of the firms I represent, and he is the one that tried the case to verdict, prevailed against Garlock

Garlock/12-6-12

81

after a long and hard-fought trial.  This gentleman's name is Robert Treggett.  He was diagnosed with mesothelioma in 2003. He sued Garlock in a California court.  He was a Navy veteran. He was exposed to Garlock's gaskets while a submariner in the service.  After robust pretrial discovery and a hotly contested trial, a verdict was entered in Mr. Treggett's favor.  The jury awarded him thirty-six point seven million and assessed Garlock with forty percent of the fault.  The judgment is long since final and, as is invariably the case with those stricken with mesothelioma, Mr. Treggett is no longer with us.  He passed away almost two years before Garlock filed its Chapter 11 petition.

And so now Garlock wants document discovery related to the late Mr. Treggett.  It had its day in court.  It had the opportunity to take discovery.  The jury rendered its verdict in 2004, which is verging on a decade ago.  Documents related to Mr. Treggett's fully litigated claim, like Mr. Treggett himself, should be left to rest in peace.

The other subgroup of one is a designated plaintiff represented by another of my clients, the Shein Law Center. John Grabowski is a current plaintiff.  He contracted mesothelioma in June of 2009.  He sued Garlock that November, and seven months later Garlock forestalled that litigation by filing for bankruptcy.

In the fall of 2010, Mr. Grabowski sought to lift the

Garlock/12-6-12

82

automatic stay so that he could proceed with the lawsuit because Garlock was the only source of his exposure to asbestos.  Further, he is a seriously ill plaintiff and Mr. Grabowski wanted to get to trial quickly, and he had a setting of his case for May 2011.

Garlock responded to Mr. Grabowski's lift stay motion with a box barrage of discovery targeting his claim.  Faced with this onslaught, Mr. Grabowski withdrew his lift stay motion to await the resolution of this bankruptcy case and died shortly thereafter.  His claim is now among the property of his estate.

Garlock's personal injury questionnaire, the original one and the supplemental exposure questionnaire, were submitted with respect to Mr. Grabowski and they were answered and, in the papers Garlock filed where it challenged the sufficiency of some of the answers to its questionnaire, there was not so much as a peep about insufficiency concerning the disclosure that was given with respect to Mr. Grabowski.

The crux of the answer to the supplemental questionnaire on exposure, not incidentally, was that Garlock gaskets were virtually the sole source of asbestos to which Mr. Grabowski was exposed.

Now they propose to seek documents from the Shein Law Center to get information about, guess what?  The documents evidencing disclosure or evidencing exposure by Mr. Grabowski

Garlock/12-6-12

83

to asbestos, information that has already been given to them in the context of the proceedings in this case.

We believe that none of the discovery that is being sought with respect to these four firms, document discovery, is remotely necessary.  I would add, however, that all four of my clients are willing and committed to having representatives here and offer testimony.  So we are not challenging the depositions themselves, only the duces tecum aspect of it.

We would urge the court to grant the committee's motion for a protective order in which we join, and end the harassment of lawyers whose now deceased clients, or their survivors, want peace vis-a-vis Garlock either by settlement, victory at trial or, in Mr. Grabowski's case, through steadfast compliance with prior discovery orders of this court through his executories.

It wasn't even four months ago that the court commented that the vast amount of information that Garlock had amassed amounted to about all they can reasonably expect to get.  We urge the court to hold that line and grant the committee's motion in all respects.

THE COURT: Ms. Higgins.

MS. HIGGINS: Your Honor, I will be very brief.  I represent the Williams Kherkher firm, which is one of the five firms and Troy Chandler who is an individual lawyer at Williams Kherkher.  And we join in the argument that Mr. Swett and Mr.

Garlock/12-6-12

84

Klingler have already made, so I won't repeat any of that; but as the court knows, Williams Kherkher and Mr. Chandler are in a very different situation because they have been sued by Garlock for fraud in connection with a settled case, the Phillips case, which was settled in 2009.  Yesterday we filed dispositive motions that we believe demonstrate that there is no basis in law or fact for the claims that have been made against Williams Kherkher and Mr. Chandler but, back in October, the court anticipated that we would be filing those motions and stayed discovery pending the motions.

Garlock is free to come in and demonstrate to the court why they need discovery and on what subjects and Your Honor will consider that at that point but, as of now, discovery is stayed in that case.  And with that backdrop, to allow Garlock to subpoena Williams Kherkher and Mr. Chandler for depositions is inappropriate and should not be allowed.

There are three claimants that are mentioned in the subpoenas to Williams Kherkher and Mr. Chandler. Mr. Phillips, whose claim is the subject of the adversary proceeding; Mr. Torres who I understand, before we were ever involved in the case, there was some litigation about Garlock's ability to go back and get documents and lift the stay.  I don't even know everything that that involved but there was some effort to continue litigating that claim, and it is my understanding that the court denied Garlock's effort to do that.

Garlock/12-6-12

85

There is a third claimant who is mentioned in the subpoenas who was not in fact a client of Williams Kherkher.

This reminds me of the rule of statutory construction that the general controls over – excuse me – the specific controls over the general. Williams Kherkher and Mr. Chandler aren't parties to the estimation. We don't pretend to be familiar with all of the issues and all of the history that has been there, but we do understand that the matters in the adversary proceeding, which are particular to our clients, go to specific actions and representations and processes related to the representation of these lawyers in a particular case and you have stayed discovery in that case. And we ask that Garlock not be allowed to get an end run around that discovery stay until, in the specific case that deals with these parties and that claim, you have had an opportunity to rule about whether any discovery is proper and, if it is proper, to what extent.

We, unlike the other motions that are made, we do challenge the deposition. We are not just objecting to the document production because we think both the depositions and the document productions are in contravention of the stay.

Thank you.

MR. SWETT: Your Honor, I would just like to note the committee does join in the Williams Kherkher application and does oppose the going forward of that law firm's deposition and

Garlock/12-6-12

86

the deposition of Troy Chandler and suggests that you adhere to the stay in the adversary proceeding, consider whatever application Garlock may make there about what discovery, if any, it needs to meet those motions and allow that process to go forward.

They say in their papers, oh, the committee jumped into the Williams Kherkher case saying that there was interplay with the estimation. That's right. It is an interplay that they create by focusing inordinately on the merits of individual cases in the estimation. But, that said, they chose to sue these people and they are subject to the rules in the adversary proceeding and those defendants are entitled to the protection of those rulings. And no sooner had you issued that stay, then they turned around and issued this subpoena (inaudible) and it is deeply prejudicial to the defendants and to the committee as intervenor in the Phillips case and we ask that it not be permitted.

THE COURT: Mr. Cassada.

MR. CASSADA: Thank you, Your Honor. Your Honor, these motions should be denied. They are nothing more than an attempt to suppress Garlock's access to relevant evidence and this is evidence that we have not had a chance to have access to.

The PIQ process, which the committee and the movants argue that the court shut down, that involved pending claims

Garlock/12-6-12

87

which are relevant to our case in chief.  These documents relate to their case.  They claim that we should be bound by our settlements.  They claim that our settlements are proxies for our liability and should be used to measure the validity and value of present and future claims.  We have had very little discovery on settled claims, and we have had no discovery at all from settled claimants or their law firms, at least as they relate to the settled claimants.

We do have trust data and I will tell the court, and you will see during the presentation, that we didn't have that trust data until very recently.  We moved to get that back in the spring.  The committee and the FCR vigorously opposed it. The trusts opposed it, and it wasn't until long after I got back from my medical leave that we were able to get the data that was requested, after, by the way, the notices of deposition that Mr. Swett described earlier that didn't subpoena specific documents.

Through the trust data that was supplied by the DCPF and, as Mr. Swett testified, this is approximately ten trusts, we have identified scores of examples where claimants appear to have suppressed evidence of exposure to bankrupt insulation products against GST and then they filed contradictory 524(g) claims against those trusts.

Through the ballots  – and Mr. Swett said, look, you got those ballots, you got to subpoena those.  Those were

Garlock/12-6-12

88

judicial records.  That was not discovery, and he also says that the committee opposed that.  Well, the committee opposed it in this case after the Caplin firm and the same law firms who opposed it here stipulated that we were entitled to it up in Delaware.  But those ballots, likewise, show substantial contradiction.

Now, for each of these cases, we claim that they demonstrate a pattern and practice that inflated Garlock's settlement.  They demonstrate why settlements are not an appropriate proxy to measure liability.  We are entitled to offer that proof at trial.

Now, in connection with the case, we have identified every single one of these cases for the committee and the FCR. We have packaged them up.  We have given them every document we have on them.  We have given them every document from our counsel's file.  They have them and we are giving them periodically as we find them.  So they have all of those documents.  And you might recall Your Honor required that because they said they needed those documents to be able to rebut our rebuttal.  They needed those documents to show that double dipping wasn't going on.

So they have those documents and they are preparing a defense on those documents.  Now, if we are not allowed to take these depositions with documents, here is what is going to happen.  When we come to trial, they are going to come up with

Garlock/12-6-12

89

documents of their own, selected documents from these law firms who claim it is such a burden to have to provide these documents to show that they didn't really suppress evidence and to show that the trust claim forms are not inconsistent with the positions they took in evidence.  That is what is going to happen, and we are not going to have a chance to have tested any of that.

We have picked seventeen cases, four for each firm, and we have asked the firms to produce a discrete set of documents with respect to those particular cases and then we will be able to tell whether the stories they tell about the ballots and the positions they took outside of the tort system, after they have represented to Garlock that they did not have exposure to the insulation products of the bankrupt, we will be able to judge whether their story is true.

Now, Mr. Swett has already said it.  He said that you can't rely on trust claim forms and he has told us what their position is going to be.  Their position is going to be that these trust claim forms aren't based on any evidence of actual exposure.  They are going to say we were able to file them and we were able to get money from the trusts without them.  How are we going to know unless we get copies of the trust claim forms?

Mr. Swett talked about all of the trust claim forms we have for the pending claimants.  Well, that is good and fine,

Garlock/12-6-12

90

we have got them for the pending claimants but these are the settled claims.  These claimants are the basis for their case in chief that we have liability that is going – that is somehow going to be measured by these claims.  How are we going to know whether in fact their story is correct when they talk about the significance of trust claims?

He says we are going to litigate about the meaning of trust claims.  Your Honor, if we don't get this evidence and if they don't produce documents to us that support their version of what ballots mean and their version of what it means when a claimant against Garlock said that it was only Garlock or it was only Garlock and a few other low-dose defendants and we didn't have any exposure to those insulation products or we can't remember any of those insulation products, when they say that and we offer our case, we're going to get documents back from them that we are never going to have a chance to have deposed their witnesses on those documents and we are never going to have had a chance to test the veracity of their position.

So at the very least, Your Honor, if we are not going to be entitled to probe into that with these law firms, then the court should rule that they can't rely on any document or rely on any argument where we have not had a chance to actually take a deposition and probe into the veracity of their witnesses.

Garlock/12-6-12

Now, they say that settlements – that Garlock is somehow breaching the peace on settlements, that these settlements were negotiated with the plaintiffs, they bought peace and they shouldn't have to come and answer any discovery on settlements.  Well, that is our argument, Your Honor.  Garlock settled all of these cases and, in each one, Garlock had the claimant acknowledge that these settlements are not an admission of liability by Garlock and they will not be used for that purpose.  So their use of the settlements, their putting them in the record violates our right to finality and our right not to have the settlements used against us.  But once they put them in issue, we are entitled to take discovery to show what the settlements mean, and we are specifically entitled to take discovery to show that these settlements don't reflect the true value of claims against Garlock.

So it is an absurd argument for them to come in and say that we are not entitled to take discovery on these settlements when they are the ones who are putting them in evidence.

These documents, Your Honor, I will go over the category of documents but they are relevant, they are not burdensome.  We have specified a small number of claimants, four for each firm, and they are necessary.  They are necessary for us to ensure that we can effectively examine these law firms on, as Mr. Swett put it, the meaning of the claim form,

Garlock/12-6-12

92

the meaning of 2019 statements, the meaning of ballots.

And, secondly, they are necessary to ensure the full development of an evidentiary record for estimation, so that you are permitted to see our case, see why we say these settlements don't reflect liability.

And the same applies for Williams Kherkher, Your Honor. The discovery stay in the adversary proceeding has no effect on discovery here. As Mr. Swett and Williams Kherkher itself has argued, it is related to the estimation. They have possession of documents in evidence that is relevant to estimation.

And, by the way, all of the claims that we have cited have been specified or designated by the committee as documents that are relevant to their rebuttal – to our rebuttal of their case in chief. They have said we want documents from your law firms with respect to five hundred claims that were settled and about thirty claims that were verdicts. All of our claims are on their list, and Your Honor said they could go to our law firms and they could compel them to produce documents relating to the negotiations of every single one of those claims.

Now, there was no dispute that there was an immense burden for that, and this came late in the discovery, right at the eve of depositions and we argued for it, but the court found that the stakes of the litigation and the interest of developing a full evidentiary record justified the burden.

Garlock/12-6-12

93

So we have been doing it.  We have been gathering these documents and we have been getting them to the committee before they take the depositions of our lawyers, and that is why they said they needed it.  They said we can't effectively take the deposition of your lawyers without these documents.  They are just going to read your briefs and come and testify about your talking points but, with the stubborn facts in the documents, we will be able to tell and take a deposition that provides us with the real evidence, and that's the only way we can take a fair deposition, if we have the documents.

Now the shoe is on the other foot and we have asked for documents related to the same cases that they have specified but a smaller number, only seventeen.  And let me talk, Your Honor, about the specific documents.

First, we have asked for claim forms submitted by the designated plaintiffs, the seventeen plaintiffs, and accompanying documents containing evidence of the designated plaintiffs' exposures to the bankrupt products.  Those documents are relevant, Your Honor, because we don't have them.  We have the trust data.  We know that they filed the claims.  We need to know what the meaning of the claims are.  We need to be able to rebut their argument that you can't rely on claim forms because claim forms don't necessarily mean that there was actually exposure.

Again, we have asked for this for no more than four

Garlock/12-6-12

94

designated plaintiffs for each firm.  It is not possibly burdensome for the firms to be able to get the claim forms and the attachments, which are key, because the attachments are what are included in the claim form to show the exposure allegation.

And, by the way, there is no dispute but that this is discoverable information when it is relevant.  These claim forms are not entitled to any kind of privilege or secrecy.  Courts all over the country during our bankruptcy case have ruled over and over that this is discoverable and this is evidence of exposure to the products of the bankrupt debtors.  So there is no reason, given the core relevance of this information, there is no reason that it shouldn't be produced in this case.

We have asked for ballots cast by or on behalf of each of the designated plaintiffs.  We have a lot of ballots and we would narrow that request, Your Honor, to include only the ballots that we don't have and we have actually specified each of those ballots.  We have provided them all to the committee and to the designated plaintiffs.  They have all had access to that.

Rule 2019 statements containing the name of each of the designated plaintiffs.  Well, the committee and the law firms' argument seems to be that has already been litigated in Pennsylvania and Delaware and the judge ruled against that, but

Garlock/12-6-12

95

that is not true and one has to wonder whether they have actually read Judge Fitzgerald's opinions on this matter. Judge Fitzgerald ruled on this twice. May I approach the bench to hand you her decision?

THE COURT: Yes.

MR. SWETT: Your Honor, I believe this is among the materials that were sent to me late last night. I am not going to object to this one, though, because we have seen it before in this case.

MR. CASSADA: Your Honor, they have seen all of the documents before.

MR. SWETT: That is not true.

MR. CASSADA: Yes, it is.

THE COURT: I think we ought to do it without documents but we will do it with these. There has been – and I have read your briefs, but there has been ample argument without mention of documents before, so we will accept these but let's otherwise do it without getting into documents.

MR. CASSADA: Your Honor, in the first order – and this one was entered in the *Pittsburgh Corning* case in December – it was either December of 2009 or early 2010, Garlock made a request for all 2019 statements filed in the case. The court denied that without prejudice and said you can come back and you can ask for documents on a case-by-case basis, and then we will judge the need for those documents on a case-by-case

Garlock/12-6-12

96

basis.  So the first order was entered without prejudice.

The second order, Your Honor, was an order entered that the court knows well about.  It was entered in March of 2010.  It was an order denying – I'm sorry – that is when the first order was entered.  The second order was entered in the fall of 2011, and that order denied Garlock's blanket request for 2019 statements in several cases pending before Judge Fitzgerald in the Western District of Pennsylvania and the District of Delaware, and her objection to Garlock's request was that it sought blanket – it sought a blanket production of all of the 2019 statements.

We argued that we were entitled to those because they were judicial records and we had a public right to them.  But Judge Fitzgerald observed on page nine of her opinion, she said:

"If Garlock has grounds with respect to a specific creditor or their law firm, and it is in the bankruptcy case, it can file a new motion setting forth the facts.  To-date, it has not identified a creditor's case who is also a creditor in these bankruptcy cases and whose exposure evidence was allegedly concealed."

So the orders that they cite do not prevent Garlock from getting that information from the court's files in Delaware and Pennsylvania, but that is not the issue before

Garlock/12-6-12

97

this court.   The issue here is whether we are entitled to discovery of relevant information from the files of these law firms and the files are, again, they are clearly relevant.  The 2019 statements filed by the law firms themselves state, under penalty of perjury, that the persons listed on the 2019 list, that they are people who were exposed to the products of the debtor and that they have claims based on injury caused by those exposures.

So  this  is  clearly  relevant  information.   It  is information that was filed effectively under seal in bankruptcy cases while claimants, as we have demonstrated in our cases, they were taking contradictory positions.

So,  Your  Honor,  we  are  entitled  to  the  2019 statements.  We are not asking for blanket 2019 statements on all of the claims.  We are just asking for documents reflecting a 2019 statement filed in a particular case by one of the designated plaintiffs.

Now, Mr. Klingler said that we didn't ask for this until the eleventh hour.  Well, yes, we did ask for this.  We asked for this back in the spring of 2011 when we asked for all of  the  same  information  with  respect  to  a  sample  of  five hundred claims.  This is compared to the five hundred claimants that the committee was recently permitted to get discovery on. We asked for it in the case and at the time the court denied it, and the court made observations at the time that led us to

Garlock/12-6-12

98

believe that the court at that point was not fully informed of how the case would proceed and how the committee, exactly how they planned to use settlements and Garlock's right to put on evidence to undercut the relevance and the meaning of those settlements.

So we asked for it for five hundred claims and the committee seems to fault us today for only asking for it for seventeen claims. They are saying, well, you can't – you are engaged in some kind of claim-by-claim attack here and that is not a proper means of going forward on an aggregate estimation. Well, they are attacking five hundred and thirty claims, five hundred settled claims, thirty verdicts, and all we are asking for is for seventeen.

So under their argument, we should have asked for more, which we did before but we were denied. We did that a long time before. Your Honor, that evidence was available. It is available today. It is relevant and it would clearly have assisted us in our defense of their settlement based case. And it may be difficult to go forward without it because we already know now that they are going to have witnesses testify that the documents in this case aren't really evidence of exposure to other products.

Your Honor, I have prepared a presentation so that I can describe to the court a few of the designated plaintiffs and demonstrate the need for this evidence in those claims.

Garlock/12-6-12

99

THE COURT: Go ahead.

MR. SWETT: Do these refer to the documents that the judge just excluded?

MR. CASSADA: I think we need to go on it page by page to see exactly what is excluded. There is nothing in here that has not been produced to the committee, nothing to my knowledge. If they can point out anything, fine, but let me explain the process here, Your Honor.

We provided them with a package of documents relating to every claim for which we claimed there were omissions and that we would use to rebut their defense. When we noticed the depositions, we specified the seventeen claimants for which we had already sent documents. When we responded to their motion for a protective order in a timely manner, we specified the specific claimants on whom we would rely on documents that had already been given in connection with defending their motion for a protective order.

So most of these documents have either already been introduced in the case before or they are references to orders in other cases, in matters that are public record. So we are entitled to rely on those documents.

We are entitled, Your Honor, also, I think, to refer to documents that we have already produced to the committee and the FCR. I will tell you we are not asking the court to admit any of these documents. We are just demonstrating – we are

Garlock/12-6-12

100

using the documents to demonstrate our basis for this discovery and our need for the discovery, which is clearly a proper purpose. There is no prejudice here. They have seen all of these documents. We have given them advance notice of them. In fact, we have given them all of these documents so that they can be prepared to defend and answer our rebuttal to their defense.

MR. SWETT: And on the eve of today's hearing, they send me a redwell full of documents electronically that I can't see until ten minutes before the hearing. This is just not the way –

THE COURT: As I said, we will do it without the documents. I think I have heard enough and I am ready to rule and I don't think we need to go through this any further.

I will allow the discovery and order the documents produced with respect to all of the law firms except Williams and Kherkher with respect to Mr. Phillips and will allow you to examine Williams Kherkher about Mr. Torres, and I think they said the other one is not a client, so I will presume that is going to fall away, but not with respect to Phillips. But as to them and the other law firms, we will allow the production of the trust claim forms, ballots, rule twenty nines and the other documents evidencing exposure that's contained in that designated plaintiff's file. I don't think they need to search beyond the particular file for that designated plaintiff. And

Garlock/12-6-12

101

then also from that file, if they have records of the disclosures made to the debtors, we will include that as well but will sustain the objection as to the information from seminars or whatever, plaintiffs-only meetings. I think that's of minimal relevance and probably even less admissibility and perhaps work product. So I think we just ought to stay away from there.

But with those tweaks, we will allow the deposition to go forward with those documents, and I am doing that only because it appears to be a relatively small number of people and I think the burden of retrieval of their files for the Kherkher firm should not be too much. If this is just a toe in the door, we will stop it later but, for now, we will that this go forward.

Let me ask you, if you would, Mr. Cassada, to draw that order and of course share it.

MR. GUY: Your Honor, I have one housekeeping item which might help us moving forward. One of the things Mr. Cassada said, I did agree with, which is if a party is going to rely on a document, they should have produced it in discovery. Maybe this isn't the place for the order on that issue but I would like it understood by all of the parties, and perhaps the court could reinforce it, that all the parties to the estimation hearing should be producing documents that they intend to rely upon because what I envisage is that there will

Garlock/12-6-12

102

be an exchange of exhibits in advance of the estimation hearing and we can look at those exhibits and understand them because, if we are going to be done in two weeks, we can't have a fight about thousands and thousands of documents.

THE COURT: Well, let me ask you all to see if you can come to some agreement about that and, if not, I will enter some sort of pretrial order or whatever.

MR. GUY: Thank you, Your Honor.

MR. CASSADA: That may have been addressed in our case management order.

MR. SWETT: There is an exhibit list requirement.

THE COURT: It is in our standard pretrial order, so I suspect –

MS. HIGGINS: May I ask for one additional clarification on the motion for a protective order?

THE COURT: Yes.

MS. HIGGINS: And that is whether the deposition of Troy Chandler, who is an individual defendant in the adversary proceeding –

THE COURT: Has he been noticed?

MS. HIGGINS: He was subpoenaed along with the firm in a 30(b)(6).

THE COURT: Well, let's just do the firm unless he is the one who should be the designee.  I mean, if he is the appropriate designee, then –

Garlock/12-6-12

103

MR. SWETT: The firms control the designation, Judge, under the rule.

MR. CASSADA: That's fine.  We will take that – that's fine.

THE COURT:   Okay.  Thank you.

(Off the record at 12:30 p.m.)

Garlock/12-6-12

104

C E R T I F I C A T E


        I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.


                                /s/ Patricia Basham

                                Patricia Basham, Transcriber

                                Date:  December 10, 2012


Garlock/12-6-12