IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
10-31607


C O P Y


In the matter of:                   )
                                    )
GARLOCK SEALING TECHNOLOGIES,       )
LLC, et al.                         )          TRANSCRIPT OF HEARING
                     Debtors.       )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _     )


_____

Committee's Motion for a Ruling in Limine or,
In the Alternative, for Expedited Discovery
_____


Thursday, June 6, 2013
9:30 o'clock a.m.


Honorable George R. Hodges Presiding


_____

Atlantic Professional Reporters
Winston-Salem, NC  27116-1672

2

APPEARANCES OF COUNSEL


Jonathan P. Guy, Esq.
ORRICK HERRINTON & SUTCLIFFE LLP
Columbia Center, 1152 15th Street, N.W.
Washington, DC   20005

Trevor W. Swett, III, Esq., and
Catherine Drysdale, Esq.
CAPLIN & DRYSDALE, Chartered
One Thomas Circle, N.W, Suite 1100

Washington, DC   20005


Garland S. Cassada, Esq.

ROBINSON BRADSHAW & HINSON

101 North Tryon Street, Suite 1900

Charlotte, North Carolina   28246


Mark A. Nebrig, Esq., and

Hillary B. Crabtree, Esq.

MOORE & VAN ALLEN

100 North Tryon Street, Suite 4700

Charlotte, North Carolina   28202


C. Richard Rayburn, Jr., Esq., and

John R. Miller, Jr., Esq.

RAYBURN COOPER & DURHAM, P.A.

227 West Trade Street, Suite 1200

Charlotte, North Carolina   28202-1672

I N D E X

PROCEEDING                                                4

EXAMINATION

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| (None) | | | | |

_____

ADJOURNMENT                                              167

REPORTER CERTIFICATE                                      168

E X H I B I T S

| Name | Offered By | Identified | Admitted |
|------|-----------|-----------|----------|
| Exhibit 133 | ACC | 32 | 164 |
| Exhibit 134 | ACC | 32 | 164 |

P R O C E E D I N G

(9:30 o'clock a.m.)

THE CLERK:  This bankruptcy court for the Western District of North Carolina is now in session.

The Honorable George R. Hodges presiding.

THE COURT:  Good morning.

MR. SWETT:  Good morning, Your Honor.

MR. GUY:  Good morning.

THE COURT:  Have a seat.

We're, I guess, here for the committee's motion, so I guess I'll let you all go first.

MR. SWETT:  Yes, sir.  I guess we should make our appearances.

THE COURT:  Yeah, you're right. Yeah.  I forgot.  I've been gone too long.

Why don't ---

MR. SWETT:  --- That's what a vacation will do, Your Honor.

THE COURT:  Why don't we start with Mr. Guy and go across the room that way.

MR. GUY:  Good morning, Your Honor. Jonathan Guy for the FCR.  And Mr. Greer is here in the courtroom with me.

MR. SWETT:  Good morning, Your Honor.

Ted Swett and Catherine Drysdale for the official committee of asbestos personal injury claimants, along with Tom Moon.

MR. CASSADA:  Good morning, Your Honor.

Garland Cassada here for the debtors. Accompanying me today are John Krisko and Rich Worf, both with Robinson Bradsaw & Hinson.

MR. NEBRIG:  Good morning, Judge. Mark Nebrig and Hillary Crabtree with Moore & Van Allen for Coltec Industries.

THE COURT:  Okay.

MR. RAYBURN:  Good morning, Your Honor.  Rick Rayburn, Jack Miller, debtor's counsel for the bankruptcy.

THE COURT:  Okay, good.

And how about on the phone?  Do we have people on the phone that want to make their appearances known?

I guess not, so we'll proceed.

MR. SWETT:  May it please the Court, we're here today on the com -- on the committee's motion for a ruling in limine or, in the alternative,

for expedited discovery of certain matters.

The motion flows from the doctrine of at-issue waiver, with which Your Honor is familiar, among other reasons because of a previous motion at a much earlier stage and on a less developed record.

The situation now, of course, is that we are what, six weeks from trial. The -- each side's case is spread on the record. The -- we have gone through extensive document discovery, we have gone through fact depositions, we have gone through the process of expert reports and rebuttal reports, and we are now in the midst of finishing up expert depositions on our way to final trial preparations.

And that long-awaited appearance before Your Honor on July 22nd for the trial of the essential issues are the aggregate value of mesothelioma claims pending in the future against this debtor, Garlock Sealing Technologies.

What we ask for in this motion is a ruling that in the -- in the -- in the case at trial that the -- the debtors may not put on evidence going to their reasons, their settlement decision-making process, their alleged reliance in the settlement decision-making process with respect to specific identified cases, as distinct from the generalities,

the testimony at a highly general level that you received at a much earlier phase of the case before it even -- the estimation proceeding had been formally begun at which Jeffrey Simon and David Glasby came before you and gave their perspectives for the most part at a high level on how mesothelioma claims against Garlock were brought, what the issues were and how they were resolved in the tort system pre-petition.

We thought, for a couple of reasons, that Mr. Glasby's testimony coupled with an affidavit from Paul Grant crossed the line, placed at issue attorney-client communications and work product and resulted in an at-issue waiver.  And we brought that question to you about a year ago and you ultimately ruled that on the record in front of you there had been no waiver.

But as we will see, you also issued a cautionary note expressing your recognition that the case was on a progression, and that heading in a certain direction, if the debtors indulged in certain tactics, there would be a cross over the line and there would be a waiver that you would deal with appropriately before closing the record.

We are today in a very different situation

because we have descended from those generalizations to highly particularized contentions and testimony and expert reports placing squarely at issue Garlock's contentions that its settlement decision-making process rested on reliance on information provided by the plaintiffs and resulted as a cause-and-effect matter in their settling cases at a level and on a basis that otherwise they would not have entertained.

And the witnesses to this are the in -- in-house attorneys who handled the cases and the case resolutions, such as Mr. Hennessee and Mr. Grant. They are also the outside settling attorneys, the lead defense attorneys on the west and east coast, respectively, David Glasby and John Turlett, speaking now not in generalities, but in the context of the debtor's specific undertaking of record to offer evidence of their reliance on supposed misrepresentations or omissions in the tort system discovery and the causal link between that evidence and the settlement amounts and resolutions that they achieved and why, therefore, you should disregard those settlements and those settlement amounts when you come to estimate their aggregate liability.

And that's the situation we now face, and

the issue is ripe.  I will address in a moment contentions that it's either premature or too late, or that somehow this whole issue which has been staring the parties and the Court in the face as we watch the case unfold is ripe for decision now.

The Court is in the best position to decide it now while there's still time left to make whatever adjustments need to be made in order to make this trial fair and to avoid or prevent what I would describe as the massive whipsaw that the debtors are attempting to pull off in their desperation to escape from their own settlement history.

It is a bold ploy for them to, on the one hand, say settlements -- the basis of every decided asbestos estimation case ever, including most recently the Bondex decision issued by Judge Fitzgerald just a few weeks ago, where she pronounced on the estimation of Bondex's asbestos liabilities for mesothelioma claims, accepted the methodology that is illustrated by the Owens-Corning decision that we have cited to you often, credited the testimony of the asbestos claims expert and the STR's expert, Drs. Peterson and Bascus, respectively, pronounced an estimate of something like -- I think it was $1.1 billion in liabilities, based on that

method, and rejected, after consideration, that debtor's claim that oh, my goodness, all these settlements were nothing but the avoidance of higher defense costs, a central theme of the debtors here.

And the ploy, while bold, becomes brazen when you consider that the operative facts placed at issue by this contention of massive fraud in the tort system and the resulting shaky basis, or disreputable basis as they put it, of the -- of -- of the widespread settlements that they engaged in, when you consider that the natural repositories of the information that would allow for a fair testing of that contention are the lawyers.

Why is that?  Because it was the outside lawyers who defended the cases, who evaluated the cases and who made recommendations to Garrison, and because the Garrison personnel who received those recommendations, who worked with those outside defense attorneys were themselves attorneys who passed the recommendations and their own observations up the chain to Paul Grant, who, in addition to being the president of Garrison, is a lawyer and a defense attorney, who, in turn, passed the recommendations up to Richard McGee, who's present in the courtroom today, general counsel of Inpro.  He received these

recommendations if the settlements were over a certain amount.  That's the chain of command for settlement.

Only rarely did it go through that chain of command all the way up to the chairman of Inpro -- or the president -- I'm sorry -- president and CEO, Mr. McCattem, and before him another gentleman in the relevant period whose -- whose name was Ernie Schall.

So it's lawyers every which way.  It's lawyers receiving the discovery, it's lawyers evaluating the cases, it's lawyers bringing to bare their institutional knowledge based upon 30 years in this -- in this tort litigation.  It's the lawyers relying on their own investigations and their independent information resources, and the whole mix of information, informed assumptions and the like that a lawyer brings to bear in evaluating a case and formulating recommendations to his client.

And that's where they say the system misfired, because they say those people were looking at a discovery record that was misshapened by plaintiff concealments and misrepresentations.  But by making that contention they placed inevitably in question what -- the full panoply of information available to that lawyer, not just what the plaintiff

said or what the interrogatory answers were, but the full panoply of information.  And not only this -- our information, but also the institutional knowledge of where these cases arose and what kind of trades tended to produce the claims, because the workers had contact with the asbestos-containing products, and at given types of trades and workplaces and industries what kinds of asbestos-containing products were present -- as well as information in the public realm, such as the scheduled settlement values of the various trusts that stand in now for the defunct asbestos insulation makers.

That whole panoply of information, of assumptions, of -- of -- of experience is what is in question, not simply as the plain -- as -- as the debtors would have it, what the disclosures made by the plaintiff in the case happen to be.  Because these people are convinced that their products never hurt anybody, they did not credit, I would submit -- it's a reasonable inference -- they did not credit the representations of the plaintiffs to the contrary.

They maintained doggedly throughout that their products were innocent and hurt no one.  And yet they claim they -- they settled these claims at

high numbers not because there was any real risk of liability, but because of the defense costs, or above a certain level, yes, there was some risk of liability because juries could misfire, according to Garlock's lights, but that was distorted by the -- the -- the plaintiff's failures, allegedly, to be forthcoming, about their exposures to other people's products that Garlock regards as more culpable.

That's the whole panoply of facts and circumstances and events as evaluated by the lawyers who were settling the cases and pricing the cases and telling Garlock what it should pay in its own best interest to get out of the cases.  And what they're attempting to do is to place at issue the bases of those resolutions while shrouding in secrecy and privilege those facts made operative facts by the position they take.

Now, they say, well, gee, it's the committee that -- that wants to use the settlements pursuant to the now well -- very well established methodology in asbestos cases, and so they're placing it at issue and we're just questioning the -- the integrity of that foundation for information, and that that's only fair.

But -- but here's the analogy.  Suppose

the claim is settled and the defense is prod in the inducement, and the witnesses with knowledge of the bases of the settlement are the layers.  The assertion of that defense implicitly places at issue the knowledge and reliance of the lawyers, and that's the implied waiver.

And the only difference here is that it is written large across thousands of cases.  There is no difference in principle, and when we get to discussing the case law, which I will do briefly towards the end, because I know you're already abundantly familiar with it, I will reemphasize that doctrine and why it operates here in the context of, in effect, a wholesale claim of fraud in the inducement where the natural precipitant witnesses are the lawyers.

And the case law is overwhelmingly on the committee's side of that issue in terms of the implied waiver of privilege, which is as it must be, because the debtors have undertaken, as we will see quite specifically -- they have undertaken -- well, let -- let -- let me back up.

Their problem is they made thousands of these settlements.  Their contention is implausible in that context, but to try and make it plausible

they have segmented the population of the settlements.  And I would say there are three groups -- actually four.

The lynch pin to their efforts to show a cause and effect between supposed plaintiff misconduct and inflated settlement amounts has come to rest on 26 claims out of the tens of thousands that they resolved.  I should be more precise -- out of the 11,000 that they resolved in the decade of the 2000's, ignoring the prior decade.

And those 26 cases, of those some 17 were made the focus of -- of their depositions of plaintiff's lawyers, and have now, along with several other cases numbering in total 26, wound up on a list that they were compelled by order and stipulations to provide us of those cases as to which they intend to put in specific evidence of reliance on the discovery record presented by the plaintiff, and of the causal link, supposed causal link, between that alleged discovery misconduct and the allegedly grossly inflated amounts of those settlements.  So that's 26 out of 11,000.

But they go beyond that and have another list of 210, which includes the 26, and those are cases where they're reserving the right specifically

to argue this causal link that they would set up

between the posture of the plaintiff in discovery and

their overpayment, supposedly, of the claims.

And so they want to draw -- make a leap of

inference from the 26 to the 210, and from the 210

they would make the leap to the 11,000.  But there

they have another problem, because the record is

completely clear that, by and large, they settled

mesothelioma claims without intensive litigation.

After all, they've been doing it for a long time.

They knew the cases well.  They knew the context,

they knew the values, they knew, roughly speaking,

what other defendants were paying.  They were no

amateurs at this.

And so they did what every other defendant

in this mass tort litigation has done.  They adopted

sensible economical cost beneficial ways of resolving

the cases outside of intensive litigation.  And the

evidence at trial will be that, by and large, that's

how they handled these cases, that these 26 cases

that they singled out are unusual in the respect that

they were the subject of intensive litigation, that

the 210 that they then proposed to -- to -- to -- to

build up upon the 26 were likewise unusual.

And they themselves underscore something

unusual about those 210 cases, which is that they settled for more than $250,000.  And they have segmented, as you will see in Dr. Base's report, the universe of their resolutions of mesothelioma claims between those that settled for more than 250,000 and those that settled for less.

And if it settled for less, their contention is, well, over that spectrum, up to 250,000, the overwhelming driver of the case resolutions were mere defense costs, and all we were doing was avoiding further costs of defense, and that's not liability, so you shouldn't extrapolate from it.

There's a whole lot wrong with that theory which we will get to at trial and in briefs.  But right now I'm just trying to focus in on the context of the at-issue waiver issue, so I'll leave the -- the -- the various disputes unrelated to that aside.

So now they have 210 cases settled for 250,000 and a whole bunch more cases settled for less than that where their contention is less than 250, not real liability, more than 250, not real liability but for a different reason, because the plaintiff snookered us.

So they would extrapolate from the 26 to

the 210, to the above 250 to the below 250, to the

contention which is -- to call it bold is an

understatement.  Brazen is more like it, especially

when coupled with their abuse of the privilege -- to

the contention that the whole system was rife with

fraud.  And therefore, unlike every other Court that

has ever decided an estimation question in an

asbestos case, you should disregard the actual

history of their case resolutions.

The problem is the whole house of cards

crumbles, falls to the ground, without the link of

supposed reliance, of alleged lack of fair

perspective on the case, of -- of -- of supposed

constraints of information, traceable complainant

misconduct, as they would have it.

If they don't prove that, their theory is

out the window, and that's why they produced the --

what is described as the request for admissions list,

or the RFA lists, singling out the 26 cases, saying

we're going to offer proof of reliance of -- of the

specific causal link in these cases and we're going

to draw inferences from those cases to the rest.

And yet, are they willing to drop the veil

to allow us to examine the settlement liberation

process that actually produced those resolutions?

No, they're not willing to have us examine it.

They're not willing to have you see it.  They draw

the veil of -- of privilege around it and assiduously

and systematically shut down the inquiries when they

come to match the level of specificity that they have

gone to when they single out those cases.

And the choice confronting the Court is

whether to allow them to put on evidence of the

reasons why they settled particular cases, of their

supposed reliance on the discovery record in a

particular case on the alleged causal link between

that and their grandiose theory of pervasive fraud,

and allow them to put on evidence of that without

calling forth the witnesses with knowledge, the

attorneys who actually settled the cases, to explore

what they did and didn't know, what they did and did

not assume, what information sources they did and did

not consult, what recommendations they did or did not

make with respect to whether the case presented a

real risk of liability or not.

That's what is the operative set of

questions presented by this position that they have

taken out -- taken -- taken upon them to make.  And

it's not just the taking of the position, in our

submission, that results in the implied waiver.  It

is the way that they have proposed to go about doing it.  It is the undertaking to offer specific evidence of reliance with regard to those 26 cases to support the inferences as to all the others.

Now, let's contrast this to the prior motion.  We saw this coming.  We saw this coming, because they put Mr. Glasby on the stand to say why his settlement recommendations went up during the 2000's, and we thought that well -- went well belong the -- well beyond the general -- the general testimony I provided through Simon, implicitly placed it as to Mr. Glasby's thought processes, his attorney impressions, his attorney-client communications and constituted a waiver, especially when coupled with the Grant affidavit which spoke of reports received from attorneys in the field, but did not deign to identify those attorneys or provide particulars.

But you ruled on the basis of a distinction between the specific and the general. And after all, we were at a pre-evidentiary stage of the proceeding.  We hadn't brought an issue.  No specific cases were under examination.  And the basis of your ruling was as follows.

You acknowledged the doctrine of at-issue waiver by referring to Roan and Hearn, the two

leading cases that expressed subtly different conceptions of the at-issue waiver.

You said, it just doesn't seem to me there has been a putting at issue of attorney-client communications.  There has been generalized assertions about things, but I don't think that either Mr. Grant or Mr. Glasby or anybody else has gone so far as to actually put attorney-client communications at issue at this point.  So I don't believe there has, either, expressly or impliedly been a waiver.

You went on to emphasize that broad assertions that have been made, especially in the context of the testimony of Mr. Glasby and the Grant affidavit in earlier proceedings, did not rise to the level of a waiver -- the broad assertions.  And then you said, however -- you issued a cautionary note.

I will say, though, that I will not permit the use of evidence of an attorney-client privilege without the box being opened.  So if we come to the hearing and evidence is offered, I will either not permit the evidence to be offered or will give an opportunity for the full discovery to be made so that there can be a meaningful cross-examination about it, and just leave it to you all to decide if and when we

are going to come to that point.  At this point I

don't think I ought to allow discovery of

attorney-client privilege things.

We were then seeking documents on the

basis of the distinction between general testimony

educating the Court to the general nature of the

underlying disputes in the tort system, on the one

hand, and by necessary implication, increase specific

assertions about identifying cases in an evidentiary

context where specific cases are called into

question.  That's the dichotomy, I take it, that your

earlier decision set up.

And while we didn't think it was correct,

we bowed to it and proceeded, confident in the

expectation that these defendants were so intent on

their strategy, already signaled as they point out by

the information brief, that they would push the

envelope and that there would come a point where, by

any reasonable assessment of the record, they would

have crossed an -- that line and engaged in a waiver.

And that's the point where we are now.

Now, they place a strange construction on

that last cautionary note that you sounded in your

ruling.  Instead of a caution, they took it as a

license.  They were emboldened in their strategy of

abusing the attorney-client privilege and the work

product doctrine by placing matters at issue and then

depriving us of the facts that allow for reasonable

litigation of those facts.

Their implausible reading was that what

you said was, well, if you come to trial and you put

on evidence of a privileged communication or of

protected work product, I will either exclude the

evidence or I will give discovery.  I can see why, in

focusing on the literal words, how they might seize

upon it for their tactical purposes in that way.

But in the context, Judge, it makes

nonsense of what you ruled.  In the context it -- it

would mean I am not going to recognize the doctrine

of implied waiver in this case.  Only an explicit use

in evidence of an otherwise privileged communication

will trigger a waiver.  That is very, very far from

what you actually said.  If that was your ruling, you

would have -- you would have said, if you mentioned

Roan and Hearn at all, that I don't agree with those

cases and I'm not following them.  I don't accept the

doctrine of implied waiver.

But instead, what you said is I see no

waiver here, expressed or implied.  So the gloss that

they would put on your ruling to justify the tactics

that they have so brazenly pursued simply won't stand up.  It is not a reasonable construction of the opinion.  It says nothing about the issue before you today.

We still disagree with that ruling, but we're not here to re-litigate it, because we are now on a -- at a very different posture with the developed record, and you can see clearly what they're up to.

I suppose that when they got emboldened by turning the caution into a license, they -- they must have thought that we would somehow fail to make clear to you the giant whipsaw that is at the heart of this tactic.  But in any event, we're here to try to make it clear and to enforce the at-issue waiver doctrine in a way that can guarantee the fairness of the trial.

Now, a little anticipatory rebuttal of arguments they make in their brief.  Oh, the committee agreed, the FCR agreed generalities would not trigger waiver.  We've relied on that agreement, we've gone forward, and now they're repudiating it.

We're not here to argue about generalities.  We're here to point out that they can't prove their case without specifics, that they

have in the RFA stipulations specifically undertaken to provide specifics about 26 particular cases and another 210 of them.  That's different.  And what they -- what they quote in their effort to ucorrupt an agreement in fact refutes it.

They quote at length at page 14 -- 13 and 14, I guess, from the Belkin Fox deposition.  The -- the context is they're now questioning plaintiff's lawyers.

Plaintiff's lawyers have attorney-client and work product rights, too.  But the depositions occurring -- is occurring in a context where there has been a ruling in the case, a rule -- a -- a -- a law of the case has been at least preliminarily established with respect to waiver.  And the defense attorney, the -- the attorney defending the plaintiff's dep -- lawyer's deposition was concerned when -- when questioning straight into what the plaintiff's lawyers do in their cases and how they act with respect to tactics and discovery and so forth in the cases.

And so Mr. Esserman, sitting as the lawyer for the plaintiff's attorney, called into question whether this was straying into privileged matters.  And Mr. Cassada says this -- this in on page 14 of

the brief.  I would have to hear the answer first, but if -- but if what you're saying is that the witness testifies about a general practice without reference to any specific claim, that your position is he can do that and that that would not be a waiver of the attorney-client privilege.  It says product, but that's a misprint.

Mr. Esserman, that would be my position, but I would also want a stipulation from you that it would not constitute such a waiver.

Question of Mr. Cassada addressed to me.

Is that what the position -- is that the position the committee is taking.

Answer.  I believe that is the position that emerges from the judge's rulings on the various privilege disputes that we have had in the case so far.

All we were doing was referring to your distinction between generalities and specifics, and we were abiding by that distinction so as not to obstruct the examination of the plaintiff's attorney.

So we explained our understanding of that ruling, which Mr. Cassada seemed to share, to the plaintiff's lawyer and his attorney and we did that on more than one deposition so as -- so that the

questioning could continue and the record could be made.

And now they seize upon that mere acknowledgment of what you had ruled as though we had agreed to it. It was a ruling emerging from a -- a motion we lost, and just because we were not recalcitrant in continuing to fight the same issue in the same posture does not mean we agreed.

What we agreed with Mr. Cassada about was the sense of your ruling, not its merits, and certainly not the implication that they could never achieve a waiver by going further down the path they were on.

There was no agreement. Mr. Esser -- Insobuck sat in for me because I was indisposed at some depositions, and they quote his statement on page 15 of their brief, which is an acknowledgment that Mr. Cassada had recited the practice that had emerged in the case shaped by your ruling of treating one another's witnesses not as waiving if they adhere to your distinction between generalities and specifics when talking about their cases or their approach to the litigation. And that's all he agreed. It is the same -- it is the same as what I did.

And then again in Exhibit L of their brief, at the deposition of Mr. Simon, Sandy Esserman was, again, the attorney defending the deposition. He makes a work product objection to a particular question by Mr. Cassada.  And I said, the record in this case, based upon the ruling made by the judge in a privilege-piercing motion brought by the committee, is that the testimony at a general level as opposed to case-specific or as opposed to high detail will not constitute a waiver.  And do you agree with that? Is that a fair statement?  Mr. Cassada.  Yes.  There is no agreement that in any sense, either in letter or in spirit, forecloses today's motion.

So the argument is made that, well, there has been unreasonable delay.  That's an interesting argument to make in the context where just in opposing the request to shorten time so we could fit this hearing in among the expert depositions, the other side said, well, it's too early.  You should wait for trial.

So it's hard for me to understand what was the right moment by their lines to bring this issue before the -- before you, especially since the parties, by their conduct and their communications throughout the discovery period, under -- well

understood that the issue of -- the question of

at-issue waiver was very much alive today.

And so what we did was wait for them to

spread their case on the record.  We were also, like

them, very busy.  We had the fact depositions, we had

the expert reports, we had the reply reports.  As

soon as we got a reasonable pause from that activity

we addressed this motion and brought it to you as

quickly as we could.  And there is still six weeks to

go before trial, so rulings can be made and

implemented, parties can adjust, the trial can

proceed without delay.

This is an opportune time for you to

entertain this motion precisely because, unlike the

first motion we brought, we're now dealing with a

concrete record with very well elaborated contentions

and testimony.

It would be a mistake to wait until trial,

though, because if we're right, the result would be

the utter disruption of a very, very elaborate,

complex event involving many, many people.  We are

literally taking 30 rooms at the Marriott Hotel for

the duration of the trial.  There are scores of

people descending on Charlotte for this long-awaited

event.

To get into the trial and say, ah, blow the whistle, there was the waiver, it's a waiver along the lines the committee has been crying about for a year and a half now, but now I see it and I'm going to blow the whistle and stop the trial and have the discovery would be absurdly disruptive at huge cost to these estates, and unnecessary, because the issue is clearly framed now.

Equally unfair and unreasonable and costly would be a decision to postpone the trial whether it be now or in the midst of the trial.  We're trying to get this company reorganized.  We have to have the estimation.  We've been pressing for it for several years.  The time has come.  The tactics that they have knowingly adopted in the face of your cautionary ruling should not engage in any delay whatsoever.

And so the remedies that we propose -- propose to you are simply surgical excision of a certain subset of the evidence that they have proposed to put on.  We are not asking you to categorically exclude any witness, we are not asking you to -- to -- to do radical surgery on the heart of their case.

What we are asking is that you hold them to the tactic that -- that failed to disclose the

operative facts with respect to their reasons for settling cases, their reliance, their knowledge when settling cases and how they priced the cases.  They should not be able to talk about that at the trial, whether through witnesses or documents, because they have not permitted discovery on that subject.  And that is the appropriate remedy at this stage of the proceedings.

Failing that, or as the -- in -- in the alternative, we have set forth in Exhibit A to our brief discovery that we would seek on an expedited basis in an effort -- and I'm not sure that it could be successful, but we would certainly try, to cure the prejudice inherent in the present situation.  And I'll talk about what that discovery would be as we get further into the merits.

So now let me talk about what I will -- will call the descent to particulars in the plaintiff's -- in the -- the debtor's case, the going beyond generalities that makes this a very different situation than you confronted before.

And here, if you indulge me, I'm going to kind of walk through some of the material highlighted in our brief so that I can comment on its significance, but first I'd like to hand up two

exhibits.

I have to check what the last number was. The last number was 132, so I'm going to mark this as ACC Exhibit 133, June 5 (sic), 2013.

(* Exhibit 133 was marked *)

MR. SWETT:  ACC Exhibit 134.

(* Exhibit 134 was marked *)

MR. SWETT:  May I approach?

THE COURT:  Yes.

MR. SWETT:  Okay, let me tell you what these exhibits are.

These are reports generated from the debtor's historical database.  They are, quite simply, two lists of claims.  The first is the list of the 26 claimants on the RFA list that the debtors intend to produce evidence of reliance about.

And the second is the broader list of 210 cases settled for $250,000 or more.  And the list includes the identification of the def -- of the plaintiff's firm and the defense firm.  I'll get to the significance of that in a moment.

On page seven of our brief you see in block quotation the representations lying behind these lists.  The shorter list is that of the claimants who are the subject of the -- the -- the

following undertaking by -- by the debtors, each mesothelioma claimant who the debtors contend misrepresented or omitted third-party exposures -- there's a reference to a definition -- personally or by an attorney as to whom the debtors intend to offer evidence of the nature of the alleged misrepresentations or omissions and -- and here is the rub -- any connection between such misrepresentations or omissions in Garlock's settlement or payment of that claimant's claim, or any reliance debtors otherwise placed on the alleged misrepresentation or omissions with respect to Garlock's settlement or payment of that claimant's claim.  These are the 26 cases on which their grand theory of fraud in the inducement rests.

And the second list is from -- it -- it replicates the other RFA list, which is that set of cases about which they intend to raise the inference of distortion of the settlement amounts by reliance on the plaintiff's supposed discovery failures.  So this is the heart of their -- of their fraud theory, these two lists.

Now, on top of the representations about what they intend to do with these RFA lists of claimants, they have Mr. Hennessee testifying.  He

was the 30(b)(6) witness who -- who was put up to respond to questions about all this.  They have then on a -- as an overlay on top of that they have the experts, and they give a little sketch of those -- just a brief one on pages six and seven of their brief.

They have Professor Priest who's going to talk about the economics of settlement and why the resolution should be regarded, massive cost avoidance rather than any approximation of liability.

Dr. Bates, who, as they say, has concocted a new model for how to tell you if you were to try each and every pending and future mesothelioma case, how that would come out and what the ultimate dollar burden on Garlock would be, something that no one in history has ever undertaken to do before, a methodology that remains completely untested, and to the extent it was approximated in Bondex, rejected by that Court.

But Dr. Bates justifies his approach and his inferences regarding whether or not to attribute serious liability risk to any given claim -- and we're talking now specific claims.

He purports to construct an estimate by the intensive analysis of specific claimants and by

predicting case by case what pending and future claims would resolve for if they were tried. It's well beyond generalities.

But he says at paragraph 179 of his report, which is on page 91, in order to justify the debunking of the settlement history, the most important change from the 1990's to the early 2000 was the disappearance of the information in only some mesothelioma cases regarding plaintiff's actual exposure.

As summarized in his February 8, 2013, memorandum, the law firm of Robinson Bradshaw & Hinson details 10 cases of blatant misrepresentation of plaintiff's actual asbestos exposures that it uncovered during discovery in these bankruptcy proceedings.

In all of those cases the plaintiffs denied or failed to identify exposures to numerous amosite asbestos products of many of the reorganized former asbestos tort defendants. This clearly was information that similarly situated mesothelioma plaintiffs would have willingly provided just a few years before.

The value of the withheld information is also clear. The value of the withheld information is

also clear.  It's an implicit embracing of the assumption which also pervades the memorandum that debtor's counsel gave to Bates why -- of reliance of the discovery record as they interpret it as having been the basis of the settlements.  And on that basis and a characterization of -- of -- what did he call it -- blatant misrepresentation, Dr. Bates justifies his economic inferences that these cases -- these resolutions weren't really about liability at all.

Now, let me talk a little bit about the RBH memorandum -- that is, the memorandum that debtor's special litigation counsel have provided to a number of their experts.  It's at exhibit D -- exhibit E to the opinion of Lester Brickman, who is -- which itself is replicated at Exhibit D to the other side's brief.

It is a lengthy memorandum in which RBH, the Robinson firm, explains how they zeroed in on these cases and what they think they've found and what it all means, and the pervasive assumption in there that this is what caused the settlements to be aberrant.  It doesn't matter whether they used those words.  We're talking about implied waiver.  Now, let me be quick to draw a distinction.

It seems to me perfectly clear that the

tendering of this memorandum by litigation counsel, two experts, expounding an advocate's point of view as to what the fruits of discovery in this case mean, is a -- is a clear waiver, but I'm not going to go there.  I am not asking for Robinson Bradshaw & Hinson's attorney-client communications about this subject matter.  I am not asking for their work product compiled in this very case.

I am insisting that by selling their experts this memorandum as an objective account of what has happened, which it is far from being, including the implicit but necessary assumption of reliance and of causation with respect to distorted settlements, that I am entitled and Mr. Guy is entitled to explore the actual bases of those settlements.

They have tendered this memorandum and these experts have uncritically embraced it as gospel.  None of them has exercised any independence with respect to evaluating these advocates' contentions.  And they've used that to justify their various drastic inferences about the pattern of conduct that characterized the tort resolutions before bankruptcy.

And just to particularize my contention

about the non-objective, the advocacy nature of this piece, I want to refer you to the discussion on page eight of -- of John Phillips, Williams Kherkher, Texas.  That, of course, is the same case that has given rise to the adversary proceeding you are presiding over involving Williams Kherkher.

And here, without any suggestion to these experts that the issue is fairly debated in the adversary proceeding, these people assert in this memorandum that this claimant, John Phillips, spoke falsely when he claimed his only exposure to gaskets was as a young man during three summers working as a gasket cutter where he only cut Garlock chrysotillic gaskets as well as John Manville gaskets.

They go on to say that his ASARCO ballot indicated, among other things, that he had exposure for which Capgo, an asbestos-cement pipe manufacturer, was responsible.  You have already heard on a fairly developed record and you will hear it again at the upcoming summary judgment hearing that that is simply false.  That there is no evidence whatsoever that Mr. Phillips had the contact that they recite as a fact of their experts with Capgo chrysotillic containing that.

It's not a recitation of facts.  It is an

advocate's piece.  It implicitly invites the experts

to -- to assume, as they have, reliance by Garlock on

a certain set of discovery without reference to what

other information and sources of facts it may have

had to come -- come -- come to the conclusion that

the settlements were not to be respected in the

estimation claim.

So without proposing to explore Robinson

Bradshaw's file, it seems to me this memorandum is

powerful evidence of the underlying at-issue waiver

that goes to the settlement decision-making process

in the underlying cases that they are setting up as

the lynch pin of their broad theory.

Continuing with my, I hope not overlong,

exposition of the record, I'm going to call your

attention to the testimony set forth -- the exchanges

set forth on pages 10 and 11.  We are now in Mr.

Hennessee's deposition.  He is the 30(b)(6) witness

put up to testify about these subjects.  We are

asking him about one of these RFA cases, Tommy

Williams, one of the ones where they're going to

prove fraud on.

Why did Garlock settle the Tommy Williams

case for $475,000?  Mr. Harris.  I'll instruct the

witness not to answer.  That's attorney-client

communications, attorney work product and attorney mental impressions.  He's not answering that question.  So would they want to tell you why the settlements were made and are not to be respected for estimation?

Now, we turn around and say, okay, why were they made.  The answer is a shutting of the door.  We're not going to tell you that.  You're not entitled to explore that.  That's privileged.

And just to make sure there was no room for doubt about that, Mr. Wainer said -- pressed the question.  Okay, so if I ask why Garlock settled these claims that are listed here, that's in the RFA list, for the amounts that they did settle them for -- Mr. Harris, yes -- Mr. Wainer, you would instruct Garlock's 30(b)(6) witness not to answer.  Mr. Harris.  Yes.

Exploring the information underlying the settlements, what did your outside counsel tell you -- this is again addressed to Mr. Hennessee -- about what claims Mr. Williams might have to asbestos trusts.  After all, what -- what they're saying was hidden was the exposures underlying entitlements for recovery from various trusts.  So what did your outside counsel tell you about that.

Mr. Harris.  Objection.  The question calls for attorney-client communications, confidential attorney-client communications, and I instruct the witness not to answer.

Did counsel advise Garlock that Mr. Williams may in the future be able to obtain payments from asbestos bankruptcy trusts.  After all, they're saying that he mis-priced the cases because they didn't know what the recoveries would be from -- from trusts where there were undisclosed trust claims.  A fair question.

Mr. Harris.  I'll object to the question, that it calls for attorney-client communications, confidential attorney-client communications.  I instruct the witness not to answer.

Likewise, we were not permitted to ask the 30(b)(6) witness what information Garlock received from counsel regarding any plaintiff's trust claims, and that's set forth on -- on page 11.

Now, what I have described as the brazen tactic of whipsaw that's going on here becomes crystal clear when you consider that among the experts that they are going to overlay on top of whatever factual presentation they proposed to make about this RFA list of cases, they are bringing

settlement attorneys, but now dressed as experts. Mr. Turlick, their leading defense attorney on the east coast, Mr. Glasby, their leading defense attorney on the west coast and other jurisdictions. They settled enumerable cases. They tried a few, they settled many. They are the repository for Garlock's knowledge and information on the basis of which the settlements were made including settlements on these very lists of the specific cases that they are proposing to impugn.

ACC 133, the favored 26, look at the list -- Segal McCambridge. Segal McCambridge is Mr. Turlick's firm, one of the defense attorneys here, settling these very cases where the legitimacy of the settlement is now called into question.

What jurisdictions was Mr. Turlick responsible for for Segal McCambridge? New York, Ohio, Pennsylvania, Maryland. There may be others, but that's enough to make my point.

You see here how many of these cases that they're attacking specifically are in those jurisdictions and, thus, subject to Mr. Turlick's jurisdiction and that of his firm with respect to resolution and settlement.

And they're going to bring him to come and

testify to you that, oh, things would have been real different if only we had had certain knowledge and information, but without allowing us to explore what information and facts and sources of intelligence about these cases they actually in fact had.

Now, Judge, the same is true of Mr. Glasby. You can see that his firm is identified by name here with regard to a subset of these 26 singled-out cases. There could be no clearer case of implied waiver of privilege with respect to the knowledge and information and advice given by those attorneys in the pricing of these cases, but laid alongside of their undertaking to prove fraud and, therefore, by necessity to prove reliance and, therefore, by necessity to prove causation and the alleged distortion of the settlement amounts. There's no way around it. And they've done it with their eyes open. This is not a foot fault. This is a tactic, and it's a tactic fairly described as a whipsaw.

ACC 134 need not detain us very long. I merely point out, again, the prevalence of Segal McCambridge and the prevalence of jurisdictions where Mr. -- Mr. Turlick was the responsible attorney, and also Mr. Glasby. It's just a broadening of the

impact of the unfairness of the tactic, of bringing these people as experts but refusing to -- to permit an exploration of the true foundation and basis of their opinions.

So here we have a convergence of two bodies of law.  We have the at-issue waiver doctrine and we have the commonsensical universally acknowledged doctrine that an expert's opinion is only as good as its foundation and, therefore, you get a -- a -- to closely scrutinize -- you must closely scrutinize the basis.  And it's the basis not as they would themselves conveniently define it to limit that examination.  It is the full basis of their knowledge, their information, their experience, their files, their advice on the subject matter, because where there is a waiver at issue just as whether it's an expressed waiver.

The -- the -- the result is not, well, okay, you get the document he happens to have been talking about in this particular passage of the transcript.  You get the documents and evidence surrounding that subject matter to the full extent needed to make that debate fair.  And that's enshrined in the Federal Rules of Evidence.

So Mr. Turlick on page 13 of our brief, my

colleague and -- and page 12 as well -- my colleague was deposing Mr. Turlick, and he presented him with a list of settlements and with a particular law firm, Levy Phillips in New York, which is one of Mr. Turlick's jurisdictions.  And the question was, on page 12 -- it's towards the bottom, Judge -- how did you arrive in your negotiations with Levy Phillips at these different numbers, what was the process?

Mr. Harris, the defense attorney, oh, hang on a second.  We're going to object.  That information is confidential and protected by the attorney-client privilege and attorney work product, and instruct the witness not to answer.

Now, observe.  The question was how did you arrive in your negotiations with this given law firm at these numbers?  What was the process? Instruction not to answer -- when what their contention is is that the process was corrupted in a way that should cause you to disregard it.  It goes on to be instructed not to -- not to even reveal the extent of his actual information.

Question.  Do you, as an attorney in a firm that dealt with New York asbestos personal injury cases, have access to many depositions regarding exposure to asbestos-containing products at

the Brooklyn Naval Yard?  Is that correct?  Yes.

Parenthesis, Judge.  There is a repository of all of the cases ever litigated for asbestos that came out of the Brooklyn Naval Yard, one of the prime sites of asbestos generating claims in the United States.  And it goes back decades and it is a massive repository of information.  And the defendants have equal access as the plaintiffs to that information.

So here the question is did you use it. He acknowledges that he had access.

Question.  Now, we descend to particulars. We're going from the generalization to the specifics about a given case.

When you were determining what type of non-Garlock exposures Mr. Homer was exposed to, did you consult, for example, depositions of individuals that work at the Brooklyn Naval Yard?

Another parenthesis.  One typical classic way of proving exposure to a given product -- and this is true of plaintiffs when they make their cases and of defendants when they try to prove alternative exposures -- is to look at the depositions of others who were there in the same trades at the same time -- from the previous cases litigated again and again to see what products were there and what were the

working conditions that gave rise to the fiber releases.

So that's the -- that's the question. Did you consult those depositions?

Objection. Calls for attorney work product.

Are you telling him not to -- yes. That would be something in connection with his work as a Garlock lawyer and so we would instruct him not to answer.

Now, just a minute. When you look at the Turlick opinion and the Glasby opinion, you will see that it has only one subject matter, which is indisputably in connection with his work as a Garlock lawyer. And yet, that is the basis under which this instruction not to answer is given.

The only appropriate way to look at the Glasby opinions and the Turlick opinions, Your Honor, are the fully developed record that you now have -- is as a selective revelation of attorney impressions and work product shaped to the tactical interest of Garlock in this particular estimation scene. That's all it is. It's the attorney coming forth voluntarily at the instance of his client to reveal his impressions and his theories of the case. That's

an affirmative use of work product.  That's a waiver.

And that would be so even -- even without the well-established doctrine that an expert's foundation for his opinion and his knowledge and experience of the subject matter is open to -- completely open to examination.

I want to talk a little bit very briefly about the Hennessee deposition again.  This, again, is the 30(b)(6) witness.  This is on page 104, line 21, of the deposition of January 24th, 2013.

Question.  Why did Garlock settle the Tommy Williams case for 475?

I'll instruct the witness not to answer.  We've already gone over that.  But there follows a colloquy.

We had made clear our view that that subject matter was fairly open to examination, because we persisted in ask -- asking the questions despite the instructions.

Mr. Guy chimed in at this point to say, well, wait a second.  This doesn't make any sense.  You're making these contentions.  You're not allowing us to explore the facts.  It's too long to read, Judge.  It goes on till page 110, the back-and-forth with Mr. Harris and Mr. Guy.  But it goes to the

subject of this argument by the other side that there was some sort of agreement here.

Mr. Guy and his client are co-movants with the committee on this matter, and the committee's position that these subjects were not legitimately privileged as -- as spread on the record throughout, and Mr. Guy, the -- the careful lawyer he is, simply pointing out that there was a reservation of rights to pursue this issue of waiver as we now do.

I'm going to turn briefly to the debtor's brief, at page 18.  They set forth some testimony from Mr. Glasby's deposition of January 22nd of this year.  It has to do with the Treggett case, and the Treggett case, as you see, is on the short list of 26.  And as you see from the memorandum that they gave to Charles -- to Lester Brickman, substantially like the memorandum they gave to the other experts, it's one that figures importantly in the debtor's strategy for the estimation, as well it might, because it produced not a mere settlement, but the largest verdict that Garlock ever took.  Speaking from memory, it was $35 million or thereabouts with the significant punitive components.  It settled pending appeal on a basis that dissolved that claim for the full award of puni -- of compensatory damages

plus interest, some $9 million, the settlement at the same time of other cases represented by the same firm.

And the memorandum that the -- the Robinson Bradshaw firm gave to Lester Brickman underscores the significance of Treggett in the first couple of pages of its discussion there, and in a specific discussion of the Treggett case in the body of the memorandum.  So they make -- they make much of this case and they have Mr. Glasby as the deponent.

Question.  We touched a little today on the case of Robert Treggett.  In that case did Mr. Treggett or his counsel misrepresent or omit exposure information to non-Garlock products during the course of the litigation?

Answer.  Yes.

Question.  And how did they do that, what -- how did that happen?

Answer.  As you well know, I tried the case to conclusion and the only asbestos product that we talked about were two or three, and then I had come to find out he submitted 15 or 20 claims against various products alleging exposure.

If I had had that information at trial, that would have been a defense verdict.

Well, let's see what information in fact he had at trial.  Let's see whether this boast by the defeated defense attorney stands up.  There's reason to believe it won't.

For one thing, the argument is grossly oversimplified.  He couldn't have gotten a defense verdict simply by showing exposure to other products, which was his burden in the posture of a defendant trying to lay off liability on others.  He would have to prove tort against all those third parties, which means causation, which means by Garlock's light, sufficient exposure to fibers in a quantity that can account for the disease.  Not an easy thing to do.

And the inadequacy of a showing of mere exposure is made explicit on the record of that case where Mr. Treggett freely acknowledged, identified flexitallic gaskets, asbestos-containing, when the judge wouldn't even let flexitallic on the verdict sheet, because there was in -- in -- insufficient evidence regarding the nature and extent of those exposures to create a plausible claim by the debtor -- by Garlock of liability over against flexitallic.

So mere assertions by Mr. Glasby that if he had only had the information he would have had a defense verdict are suspect and call for an

examination of the extent of the information he in fact had when Garlock is attempting to prove that the verdict and settlement achieved in the Treggett case were induced by fraud.  And he was the guy who recommended the settlement.

I'm going to talk briefly about the law and the remedy we seek and then I'll sit down.

Your Honor, for a -- a thorough discussion of all -- of the leading authorities on our point of view, I would refer you to the brief we filed in -- in the first motion which is appended to the -- to our motion here and to the extensive discussion of the cases.  But I'm not going to take your time on a -- on a complete exposition of that today, of course. I am, however, going to touch on some highlights.

One of the rife areas for at-issue waiver is disputed settlements, agreements of some kind where they arise in a dispute in some posture and the -- and some party or the other say, well, that's nice, it was an agreement, but it was a flawed agreement, because it was fraudulent inducement or because it wasn't voluntary or because I was misinformed or whatever the because may be.

And examples of that cited in our papers are the Livingston case decided under Roan Pouloff,

the Cincinnati Insurance case cited in our older brief at page 18, and the Charlotte Speedway case cited in our older brief at page 24.  All of these cases, one way or the other, involve settlement.

All were held to implicitly place at issue attorney-client communications and work product surrounding the settlement.  So that's one body of pages you can look for guidance where settlement is -- the legitimacy of settlement is in dispute and the natural repository of the facts are the lawyers who settled the case and other percipient witnesses, and they're going to come forth in the case and their knowledge and information is fully available to the other side regardless of privilege or work product.

Second, cases where the lawyer is put up as an expert.  We've just talked for a minute about cases where the lawyers are percipient witnesses. The doctrine is just as clear when they are experts. And I'm going to cite to two cases I haven't cited to you before, but I did call attention with the other side to them last night.

One is called Peggy Dix Dion -- Peggy Dion against Nationwide Mutual Insurance.  It's at 185 FRD 288.  It was decided by the District Court in Montana.

And the other is Multiform Dessicants --

that's D-e -- D-e-s-s-i-c-a-n-t-s -- Inc., v.

Stanhope Products Company.  That was decided by the

Western District of New York, 930 Fed. Supp. 45.

In different context, but in both cases,

lawyers were put up as experts and that was deemed to

constitute an implied waiver.

For example, in the Dion case the Court

observed -- the lawyer was Missenberg.  The Dion's

case will, of course, place at issue Missenberg's

handling of the underlying claim.

The Vaughan Furniture case, we have -- we

read that case very differently than the other side

does, so I'm only going to comment at it -- on it in

relation to what they say in their brief and call

your attention to pages 128 and 29.

The question arises as to what constitutes

documents considered by the attorney expert.  This is

after the Court had found waiver on the basis that

the plaintiff intends to use his attorney as an

expert witness and to use the attorney's opinions as

a sword -- or shield to protect the fact-finding

process.

Therefore, the Court finds the instant

situation to be one implicitly recognized by the

Fourth Circuit as being an exception to the theory -- viability of opinion work product.  And it goes on to elaborate in terms of the scope of the waiver.

The waiver applies to those documents which the expert reviewed at any time, not just in the preparation of his opinion, and would be relevant to the formulation of his expert opinion.  The scope extends to the full relevant experience of the expert lawyer witness.

And that is true even if the particular documents were rejected as the basis for the opinions affirmatively by the Court.  Only those documents pertaining to unrelated subject matters -- that is, subject matters unrelated to his opinion -- and dealing with trial strategy escape the scope of the waiver.

The statement more particularly is, on the other hand, documents the attorney reviews in order to provide help in answering discovery requests or to talk about matters of trial strategy which are completely unrelated to the subject matter of his opinion are not included.  Subject -- such documents do not fall into the limited waiver of opinion work product because they do not relate to the subject matter of the expert's opinion.

But again, the subject matter as construed by the Court was not the particular documents on which the lawyer would carefully construct his opinion for the tactical purposes of the given case. It was information he had at any time, documents he reviewed at any time going to that subject matter.

And I want to call your attention lastly to the Nobles case, because it's -- it's decided by the Supreme Court.  It puts the question particularly starkly.  It is in miniature what we were deal -- what we are dealing with on a grand scale, because in that case a defendant wanted to testify out of a memorandum, but he wanted to prevent the other side from getting the whole memorandum for use in cross-examination.

And the Supreme Court said the respondent can no more advance the work product doctrine to sustain a unilateral testimonial use of work product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in the direct examination.

Now, that's a microcosm, but the prin -- principle there doesn't turn on the fact that it

wasn't documented or that it happened on the stand.

The operative principle is, look, if you are going to make affirmative use of otherwise protected or privileged matters, you are going to have to open up the subject matter.  You cannot rely on privilege to cabin the inquiries of the other side within the fair scope of the subject matter that you are addressing.

That is the fundamental principle that we are calling to your attention on this motion.  We think it undeniable that the tactic that they have advisedly chosen to pursue in the face of the caution that you uttered when you saw the general direction this was headed is a -- is a unmistakable waiver under the at-issue doctrine and has to be cured if this trial is going to be fair.  So how do we cure it?

Well, the alternative of expedited discovery is one that we address in Exhibit A because we wanted to give you a clear idea of the discovery that would be required if curing this thing at this posture is -- is possible.  We ask for that alternative remedy, expedited discovery of all documents concerning RFA list one that discuss trial risks for predicted outcome, exposure to

asbestos-containing products, bankruptcy ballots,

actual or potential asbestos trust claims,

evaluations concerning the resolution of the case,

including settlement recommendations or trial

strategies, and reports of settlement discussions

with opposing counsel.

Now, it happens that we know from previous discussions there are two kinds of -- of -- of routine standard documents prepared in the course of their internal settlement deliberations, and one is called the trial evaluation form and one is the major expense authorization.  I -- we explained in footnote in our -- our -- our Exhibit A that those forms were filled out for settlements in excess of certain thresholds and contained a summary of the covered settlements, the reasons for the settlements, codes and approval level -- levels -- and that the trial evaluation forms contain information for each trial listed case so that the matter can be evaluated.  So that's the heart of it.

But consistent with the rule that if the -- if there is a waiver that extends to the full scope of the subject matter so as to make the debate fair, we ask that we not, in respect of these 26 key cases, be limited to those standardized documents,

but that we obtain production on an expedited basis of all of the documents addressing the topics that I just rattled off.

And then we turn to the broader list, and these, remember, are the cases settled for more than $250,000 that the defendants intend to make the subject of inferences about distorted settlements through plaintiff misconduct.  And for that we ask for the TEA's, the MEA's and any other standard memorandum relating to the same subjects that I ticked off a minute ago.

And -- and in both instances we would like a 30(b)(6) witness to come and testify to what we see in those documents.  We would in the -- in the normal course of litigation have recourse to all of the witnesses with knowledge.  But under the circumstances, where we're six weeks from trial, we're going to have to rely on a 30(b)(6) witness. But it's going to have to be a witness who is well prepared, who steps up to the plate, who has the corporate knowledge and answers the questions.

And then there is a appended list of a hundred cases.  This is a sample that we drew from the whole universe of cases settled for less than 250,000.  Because we wanted to approach it from both

angles, we have to counter both the ultimate position that they take that the cases above 250 were rank with fraud and the cases under 250 had nothing to do with liability.  And by forcing out these documents and bringing a witness to testify to the facts, we have some chance of getting to the -- a fair position in evaluating their contentions in time for trial. Otherwise, it would, quite frankly, impose herculean burdens on them and on us.

But unless there is to be surgical preclusion of testimony going to their reasons, going to their settlement deliberations, going to their pricing of the cases, it's hard to see how we're going to do without discovery of this scope.

And because of the importance that we place on holding the trial date, we are frank in urging you to prefer the remedy of surgical preclusion and in limine ruling rather than turning the case upside down for expedited discovery of these matters that they have deliberately, stubbornly, systemically protected as a deliberate tactical choice in the case.

Your Honor, our motion should be granted.

We are at the Court's disposal for the appropriate remedy within the constraints that we've

described.

Thank you, Judge.

THE COURT:  Okay.

Mr. Guy?

MR. GUY:  Is this a good time to take a break, Your Honor, or you -- would you like to sail forth?

THE COURT:  How much are you going to -- how long are you going to talk?

MR. GUY:  Probably five minutes, Your Honor.

THE COURT:  Let's -- let's do that and then we'll take a break.

MR. GUY:  Your Honor, the question for us today is whether Garlock, by its own choice, has put at issue its understanding of specific cases -- the facts concerning specific cases.  If it has, it's gone beyond what you ruled before, which was they were just making generalized assertions.

If it has put at issue its understanding of the facts of specific cases, that's a waiver.  There -- there's no other way around it.  And it was a voluntary waiver.  It was their choice.  They knew what you ruled, Your Honor.  They then went the next step thinking that they could perhaps get away with

it.

How do we know for sure, without any doubt, that they have put at issue their current understanding of the facts of specific cases?  Right here, Your Honor, this is their memorandum.  I don't know whether you have it.  It's Exhibit D.  I'll just read it to you.  It's from Robinson Bradshaw, and it says this memorandum reflects Garlock's best understanding of the facts of these cases.  And then it lists the cases -- these cases.

Garlock reserves the right to continue refining its understanding of the facts until the time of trial and will apprise you of any material changes in its understanding of the facts of these cases.

The point that they crossed the line and told their experts what they knew or what they want the experts to believe they knew about specific cases, with the intention of bringing those experts and putting them in that chair and having those experts attempt to convince you that that understanding resulted in them being defrauded in every instance where they paid above a certain level -- every instance.  Once they did that, they crossed the line.  There's no other way around it.  That's

the issue.

Now, Your Honor, I want to put this in perspective in the -- we look at the whole case, and when we look at this case in the pantheon of what happens in the asbestos arena, if a company is facing asbestos liabilities and it cannot afford to pay them either at verdict or in settlement, it has one choice, bankruptcy and 524(g).  There was supposed to be another choice, the Fair Act, but that never happened.  And perhaps that would have been a better choice for everybody.  But right now there's only one choice.

Garlock has exercised that choice because in the tort system it couldn't pay its liabilities.  It vigorously disputes it, but in the tort system it was insolvent.  Otherwise, we wouldn't be here.

How do we know that, Your Honor?  Mr. Palelroy's first-day affidavit, he says we can't stand the heat in the kitchen anymore.  We need relief.  So they're here.  They want a 524(g) injunction for themselves and for their parent.  That's what they want.

Now, they know full well, just like every other debtor before them, dozens and dozens and dozens of debtors before them that have asbestos

liabilities, that the best measure of what their future liabilities are -- Mr. Greer's clients -- the best measure is what they paid in the past.  Why?  Because that's the actual liability that they paid.  It's not a hypothetical, it's not an imaginary.  It's really.

Now, they know that that measure shows that they're woefully insolvent.  And they know that you're going to look at that measure and find it reliable in the first instance.  Why?  Because it's what they paid, and it's because what everybody has done in every case to determine what the future liabilities are.

So Garlock is an unusual case because it has a really extensive history of payments dating back decades.  It had an organization within Garlock -- Garrison Litigation.  All they did, their business was resolving claims, thousands and thousands and thousands of claims.  We've had a lot of discussion here about attorney work product, mental impressions.  That's their business.

And they entered into contracts, Your Honor, thousands and thousands and thousands of contracts.  I think it's even more than 11,000 contracts just in that short window, in the five-year

window before their bankruptcy that we're relying upon to determine what the future liability is.

So what do you do when you knowingly enter into contracts where you pay a certain amount of money, where you don't put that in that contract I'm relying on the representations of the other guy? That's not in their settlements, Your Honor.

Where you don't put in that contract, by the way, if you ever recover money from anybody else, you need to tell me about it and you need to give it to me.  They didn't put in any of their settlements, Your Honor.

What they put in their settlements was we are resolving our liability for this amount of money. And they had representing them the best lawyers. They had the best advice.  And they have very competent people running that claim resolution shop. So they know that they're stuck with that reality and they know that you're going to look at it.

So the only solution to them is the solution that every contracting party looks to, or at least the ones who want to avoid their obligations when they just don't like the price they pay.  They say, well, we were defrauded 11,000 times -- 11,000 times, Your Honor, they were defrauded.  Their

competent top-notch lawyers, their competent business -- business people, their competent in-house counsel were defrauded 11,000 times.  That's not credible, Your Honor.

To make it credible they want to highlight 27 cases and then let you only see this side of the page.  And they want to turn out their defense lawyers, the same people who resolved these cases, the same people who made recommendations as to what to pay to resolve those cases, which payments were accepted, and say we were defrauded, and they want you to find that credible and then extrapolate it.

It is improper and unsupported by the law that a party who's claiming reliance on representations in specific contracts, that they shouldn't -- that they should keep behind them, behind their backs, what they actually knew.

If you had a case in this Court, Your Honor, and it was a single contract case, and the party came in, and Mr. Cassada said to you, Your Honor, I don't want to honor this contract anymore, I'm sorry, it -- it's too rich, I was defrauded.  And by the way, my lawyer is going to tell you I was defrauded.  You would say, well, wait, let's test that.  Let's test what your lawyer knew, let's test

what your lawyer told you, let's test what investigations you did, let's test what facts you had.

It's the facts.  There it is in their memorandum, their understanding of the facts.

What facts did they have?  They don't want you to know the facts they had, because they know that if you know the facts they had, you would say, well, it's not credible that you were defrauded, because you knew exactly the exposure of these individuals.  You knew what occupations they were in, you knew where they worked, you knew what products were there.  So stop it already.

That's why they've played this little shell game.  They first relied on your natural inclination, Your Honor, and the law, which is very protective of the attorney's meddling questions, and appropriately so.

They relied on you saying, no, no, look. As long as you're just keeping it general, I'm not going to let the other side go there.

But you -- we knew where it was going, Your Honor.  Back in February when we were talking about Mr. McGee, I said this is where it's going. And lo and behold, here we have it.  And in their

depositions they're going to say it and at trial they're going to say it.  We should be allowed to test that assertion.

More appropriately, though, given the juncture in this case, the better result is to say, look, you contractually entered into these settlements.  That's the price.  That's what you paid.  Stop it already.

Is it reasonable for the FCR and the ACC, their experts to predict the future liabilities and the current liabilities by reference to that?  Yes, it is.  Are they entitled to make their argument about the merits of the cases?  Yes, they are.  And you've ruled that already.

But this notion that they can say we were defrauded, therefore these settlement numbers that we contractually entered into, these contracts, should be thrown out wholesale.  Because that's what they want you to do.  They want you to completely disregard their contracts and engage in this hypothetical analysis of what they would have paid.

We don't think that's proper, Your Honor. We think that the surgical approach that Mr. Swett has set forth and we have set forth in our paper and the proposed order should be adopted.

Thank you, Your Honor.

THE COURT:  Okay, let's -- let's take a break till 20 minutes after 11 by that clock and then we'll come back in here for Mr. Garland's....

(11:09-11:26 a.m. - recess)

THE COURT:  Have -- have a seat. Okay, we'll proceed.

Mr. Cassada, it's you all's turn.

MR. CASSADA:  Thank you, Your Honor.

Before I begin my presentation, I'd like to point out that I'm going to be talking about specific cases involving some serious -- very serious allegations of fraud, abuse and suppression of evidence, and -- and those allegations relate to specific lawyers.  And -- and these lawyers admitted that these practices that we've uncovered were general systematic practices that were followed in other cases, and that these practices were followed for the express purpose of maximizing the value of their claims against Garlock and other non-bankrupt defendants.

These lawyers have designated all of this evidence as confidential and we're in a dispute over that.  But for now there are some questions about

whether we can discuss this in public and who might be in the -- in the room while we discuss it.  I know there are some people in the courtroom.  I don't know if they're subject to the stipulated protective order.

THE COURT:  They're, I think, law clerks that are here, interns this summer, so ---

MR. CASSADA:  --- Okay.

THE COURT:  So they're -- I think they probably are -- are ---

MR. CASSADA:  --- They're part of that order.

THE COURT:  Well, they're interns working for the District Court, so you all decide what you want to do.

MR. CASSADA:  I would be happy to go forward and discuss it.

The other -- the lawyers who represent these law firms and who have asserted that any information about these practices are subject to confidentiality, they're not here.

MR. SWETT:  They're not here, and they're reliant on the protective order.

THE COURT:  I think we ---

MR. SWETT:  --- We really don't have

any alternative but to exclude persons who are not signatory ---

THE COURT:  --- Okay, we had better ask them to leave, then.  So -- okay, thank you.

MR. CASSADA:  I apologize, Your Honor.  I just ---

THE COURT:  --- That's all right.

MR. CASSADA:  --- I would be happy to ---

THE COURT:  --- No, I understand.

MR. CASSADA:  I want to -- I want to talk just about some housekeeping matters before we begin.  I want the Court to understand what our schedule looks like from now until we start our trial on July 22.

As Your Honor can see, it starts on -- on this past Monday, June 3rd.

MR. SWETT:  Perhaps we should see whether any non-signatories are on the phone.

THE COURT:  All right.

Is there anybody left on the telephone?

(No response)

THE COURT:  Why don't we cut it off.

THE CLERK:  Just cut it off?

THE COURT:  Yeah.

MR. CASSADA:  This, Your Honor, is what our calendar looks like from now until the trial.

We negotiated these depositions of experts with Mr. Swett and Mr. Guy just two and a half weeks ago.  I might add there was no mention during these negotiations that there was going to be any need to file a motion with the Court to seek to have the Court exclude any of our expert or fact evidence.

In fact, we negotiated specific dates for the depositions of -- of -- of our experts, and this -- these negotiations took place some two weeks or so after the rebuttal reports had been filed.

As -- as you'll see, there are depositions just literally every day from now until Friday, June 21.

And there was a deposition scheduled for yesterday of a -- of a lawyer who the committee has designated as -- as an expert yesterday.  That's had to be continued, so we're moving that one till next Tuesday.  And then we had to move a deposition from Tuesday, the deposition of McGraw, to the following Friday.  So we're going to be double and triple tracking depositions literally for every day for the next several weeks.

We're in Washington, D.C. this week.  That session, of course, has been interrupted by the -- for us to respond to this expedited emergency motion that the committee and FCR felt like they had to file.

Next week we're going to be in New York City taking expert depositions.  And then after that, on the 17th, Your Honor, we have arguments in the Third Circuit in the W.R. Grace bankruptcy case where we're asking the Third Circuit not to approve a plan that includes trust distribution procedures that allow plaintiff's lawyers to conceal evidence of their claims against -- against the trust.  That's going to be heard on Monday, the 17th.

The next day we go to California, Los Angeles, and we begin a series of depositions in Los Angeles of the estimator experts.  And of course, because of this motion, now, we've had to move the deposition of Horea Yardin Garcia from today until the 19th, which in fact -- which was reserved for Dr. Bate's deposition, along with a -- with another deposition of a -- of a -- of a science witness.

Now, so Dr. Bates is going to be deposed in Washington currently scheduled for Tuesday, the 25th, and -- and Mr. Glasby for Wednesday, the 26th.

And as you'll see, right after those depositions end, the case management order provides for several deadlines that are going to have to be met in order for us to be prepared for trial and for Your Honor to be prepared for trial that begins on July 22.  A very, very busy schedule.

There's no time at this point, the committee and the FCR -- FCR acknowledge this, for this gargantuan discovery enterprise that they -- that they say they're entitled to.

And so they're asking you to simply exclude Garlock from putting on its evidence, exclude Garlock from rebutting their argument that Garlock's settlements were admissions of liability and that Garlock cannot deny its -- Mr. Guy calls it a contract claim as if there's some contract that we were party to when we entered the bankruptcy case that required us to -- to continue paying claims in the same amount and at the same rates as we were.

In any event, Your Honor, there's simply not time to indulge in -- in the enterprise that the committee and the FCR have put us on.  And it appears that they have intentionally delayed for several months after they received the fact memo, the depositions, the reports that they now claim have

created this urgent need.  They've -- they've waited four months, Your Honor, four months to -- to bring this issue before you.  And now they're saying that Garlock cannot put on its case rebutting their theory of what the Garlock settlements mean.

Your Honor, the -- the -- the fact is that the motion in limine is the very same motion the committee filed one year ago.  They used the same whipsaw metaphor right in there, it was a whipsaw, and then in the very same argument -- and in fact, they -- Mr. Glasby had taken the stand and they -- and he expressed opinions, the same opinions he's expressed in his -- in his expert reports.  And they said that by expressing those opinions he -- we waived the privilege and we waived the work product and, therefore, they're entitled to get the very same type of information that they're seeking here today. Nothing has changed.

I might add that they offered Jeffrey Solomon as a witness, who testified some two weeks or so before Mr. Glasby, and he made the same points as Mr. Glasby did only from the plaintiff's -- the plaintiff's side.

So there is -- there's -- nothing has changed.  Your -- you -- you ruled on their motion

back on May 31 of last year.  There was a bench ruling there.  Garlock, as well as the committee and the FCR, have complied with that order.

We have permitted our witnesses to provide generalized testimony and information about the settlement decision and how they approached the claims.

We have not permitted lawyers and witnesses to talk about settlement decisions in specific cases, because Your Honor made it clear that that might constitute a waiver of the attorney work product or the attorney-client privilege -- communication privilege.  And the committee and the FCR made it clear that if we went there, they were going to take that position.

So here's where we are.  I think we -- we can distill the current situation to the following.

The committee and the FCR will offer evidence of Garlock's settlements over Garlock's objection as evidence of Garlock's liability, because they say the settlements supposedly reveal how Garlock itself -- what was in Garlock's mind and how it priced these claims.

They found expert reports that say that. Dr. Peterson says, quote, Garlock settled claims

because it recognized the risks of those claims --

some probability that they would be found liable.

Yet talk about cause and effect.  You've got Dr. Peterson, who's pointing to Garlock's supposed recognition of liability and tying it to the settlements.

Now, that's where they say it brings us today.  They say Garlock is engaged in this unfair enterprise.  It's denying its contract -- contract liability.  It bears the burden of proving that its settlements did not reflect -- reflect liability.

So they've flipped the burden.  It's our burden to prove that we weren't admitting liability when we entered into settlements.  Now they're saying but they can't even take that position or offer any evidence without waiving their privilege.  That's where they are.  That's exactly where they were a year ago.  Your Honor rejected that.

Now, we ought to pause here because, remember, when we briefed the estimation trial and the different approaches that would be offered, we moved to exclude the committee and the FCR from offering Garlock's settlements as admissions of Garlock's liability, the validity of claims, and the amount of claims, because, we pointed out, that

Garlock, when it entered bankruptcy, it came into bankruptcy with all the rights and defenses it had before it was in bankruptcy, and one of those rights was to defend claims on the merits.

And Your Honor might recall we asked for parte, which is what happens in bankruptcy cases.  We asked for us to -- to have the right to look at and actually examine the merits of claims, which happens in bankruptcy cases just like it does under state law.  And they said, no, we're -- we're not going to go there.  We're going to offer settlement.

Now, Your Honor rejected our argument that the settlements were not being used in an impermissible way under Rule 408.  In fact, the Court, recognizing the Fourth Circuit authority, said it would be improper if they were using the settlements to prove liability for the claims that were actually compromised.

But that's not what they're doing. They're offering the settlements to prove liability for additional set of claims.  So now we know.

If you read their expert reports, they're using the settlements to prove that Garlock was admitting liability for the claims that were settled, and that Garlock was actually pricing its liability

for the claims that were settled.  This is blatantly improper, and certainly Garlock has the right to defend itself without being deemed to have waived its -- its privileges.

But, Your Honor, we've renewed our motion, which we'll ask the Court to hear, excluding their expert reports and their reliance on settlement.  And it's clearly a violation of our right.

It's interesting, in Mr. Guy's argument where he tried to put -- he's -- he's going to put the case in context.  And he -- and basically he misstated the facts, he misstated the law and he misstated what the bankruptcy case and estimation is all about.

He said first look at the contracts Garlock signed before it came into bankruptcy.  He said those contracts didn't say that -- that we were only paying our share and we were going to be able to go against other companies that might be liable.  He said, quote, this is what the contract said, quote, we, Garlock, are resolving our liability for this amount of money.

Now, if you actually read the contracts, the releases, every single one of them say the same thing.  And the personal injury claimants who

executed those contracts acknowledged that Garlock

was settling the case without any admission

whatsoever of liability.  That's what they said.  So

Garlock settled the claims without admitting --

admitting liability.  It was not contracting or

acknowledging its liability.

Now, Mr. Guy would want to say it's -- it

-- in his pained outrage that Garlock was doing

something improper under the law.  Well, let's talk

about the law.

The law is that we're not bound by our

past settlements.  They can't even be used against

us.  That's the law.  That's the position we took

when we came into the case.

And then they said we're disregarding --

he says we're disregarding a contract.  What contract

is he talking about?  It can only be the contract

when he puts Dr. Rabinovitch up there, or the

committee puts Dr. Peterson up there, and they say

that, you know, we've studied the situation.  Garlock

was admitting liability in these cases.  This is the

way Garlock was pricing its liabilities.  Your Honor,

we are in the -- in improper territory to begin with.

Now, they talk about all the cases up in

Delaware where settlements were used.  And in every

single one of those cases, Your Honor, every single one -- except for the recent Bondex case, which we'll talk about in a minute -- the debtors had resolved their liability. They had picked a number. They agreed with the settle -- that settlements reflected their liability. That's not the case here.

In a couple of those cases the Courts weren't letting the case -- letting the case actually proceed on a settlement-based approach, because the debtors came into the cases contesting their liability. And in those cases a settlement was eventually reached where the -- the debtors capped their liability, and then they told the committee, have at it. Put Dr. Peterson on there. Let him say the liability is whatever he wants to say it is. Let him do whatever he wants with settlements. We don't care, because we capped our liability. That's what those cases are about.

You can't translate that case into a case where a debtor, who is undeniably entitled to defend itself on the merits of claims, is suddenly going to be bound by its settlement agreements, and suddenly it's very, very inequitable for a debtor to come in and to -- to contest settlements and to say that the circumstances, the environment in which their

settlements were -- were negotiated shows that the

settlements don't reflect liability.

So the -- Mr. Guy and Mr. Swett, they've

misstated the context of the debtor.  And the Court's

order said we are here to determine Garlock's

aggregate liability for allowed claims.  That's a

defined term.  Those are claims based on injury that

Garlock caused, and only a share for taking into

account the contributions of others.

Now, I -- the -- let's go back to -- to

May of -- May 31 for the Court's last ruling,

because, as I've indicated, nothing would change --

has changed.  None of the arguments have changed,

none of the evidence have changed, none of the

positions of the parties have changed.

Here's Your Honor's ruling.  Your Honor

ruled, I don't believe there has been a waiver.  I

think Roan is probably controlling -- other -- either

Roan or Hearn.  It doesn't seem to me there has been

a putting at issue of attorney-client communication.

So it's one thing to say that our

settlements don't reflect liability, that they were

motivated by other things, and another to say, as our

-- the -- the -- these -- our communications with our

lawyer proved that.  Those are two different things.

And -- and a -- a party has a right to contest liability or take a position without putting at issue its communications with its lawyer.

And you specifically talked about the generalized assertions that were made by Mr. Grant and Mr. Glasby, because that was the basis of their waiver argument.  You said there's been -- there have -- there has been generalized assertions about things, but I don't think either Mr. Grant or Mr. Glasby or anyone else -- referring there to Mr. Sion, their witness -- has gone so far as to actually put attorney-client communications at issue at this point.  So I don't believe there has, either expressedly or impliedly, been a waiver.

And then you went on to state as follows.

Now, this is actually the quote on which the committee and the FCR build their argument today.  But they omit the first part of the quote and they -- and they -- and it changes the meaning of what Your Honor ruled completely.

You said, I will say, though, that I will not permit the use in evidence of an attorney-client privilege without the box being opened.  So if we come to the hearing and the evidence is offered, I will either not permit the evidence to be offered or

will give an opportunity for the full discovery -- for full discovery to be made, so that there can be a meaningful cross-examination about it and just leave it to you all to decide if and when we are going to come to that point.

Your Honor, there is no dispute -- in fact, they're complaining about just the opposite. That Garlock has not offered or permitted the use of an attorney-client privilege in evidence.  We have not done that.  We've -- we've only exercised our right to defend ourselves.  And it -- it completely changes Your Honor's ruling to take that first sentence out of the paragraph.

I want to -- before I actually talk about the merits of their position, I want to summarize from you the -- the way the case has proceeded and the evidence that has been developed in the case.

Garlock has developed and fully disclosed to the committee and the futures rep non-privileged -- non-privileged evidence supporting Garlock's position that its settlement costs and settlements were inflated by the suppression of evidence of alternative exposures.

We've been clear from the start -- our defense is that settlements don't mean liability.

And they were driven up by lawyer's trust-planning practices that increased defense costs and improperly inflated trial work.  We've produced thousands of pages of documents.  We've -- we've offered dozens -- many days of -- of testimony by our witnesses bearing and proving this very fact.

We've offered consistent testimony by our fact witnesses, including Paul Grant, Chris Gray, Brian Hensel, Rick McGee, David Glasby and John Turlick, whose depositions they noticed, who testified on general matters.  And they testified, providing testimony consistent with Mr. -- with what Mr. Glasby provided here in May of 2011, that claimants ceased to identify any exposures to bankrupt company's product, particularly the highly-friable, ampliable insulation products, after the bankruptcy wave.  When those companies left the tort litigation, the evidence left with it.

They provided that this evidence was very important to Garlock's defense and it would have disappeared.  It drove up Garlock's defense costs, trial risk and settlement value.  They have been enabled to go into and probe that to their hearts' delight.  And the only restriction we've put on that is that we have not permitted either our client or

our lawyers to provide specifics of why they settled specific cases.

And you'll see the questions they asked, you know, what did your lawyer advise you on this, or did your lawyer tell you this.  Well, those were questions that were specifically designed to call for attorney-client privilege waiver and to trigger a waiver.  That's what they were trying to do, and we instructed our witnesses not to answer those questions.

Now, we've also offered evidence from my -- from these same witnesses that the firms that demand the highest settlements from Garlock targeted Garlock with clients who would not admit to any exposures to the bankrupt company's products.

In fact, we -- it -- it was curious. There are certain law firms, and they seem to specialize in representing clients who don't ever recall any bankrupt's exposure.  You get their interrogatories, they're not in there.  You go to their deposition and you ask them and they don't recall a thing about it.  And somehow they were -- they were removing gaskets or products like gaskets during their whole career and they were avoiding all this highly-friable, dangerous insulation products

that are used in the same environments with gaskets.

We know now that these same firms' practice was to file just as many trust claims as -- as firms that don't engage in this practice.  We've seen these -- these clients -- going through the case and resolving it with Garlock, they -- they file 15, 20, more than 20 trust clients based on allegations of exposure directly contrary to what they were telling Garlock in its bankruptcy case.

And they engage in a practice -- they wait and they file their trust claims after the tort case. Now, sometimes they file before the tort case is over and they just wouldn't disclose it.  But most of them, they just hold onto them and they'd file them after the tort case was over.

And then they don't admit to the exposures on which the trust claims were based.  And these trust claims are against -- are against the top-tier defendant.  I mean, these were the defendants who created the product that medical researchers said in the 1960's was the cause of mesothelioma, the highly friable, ampliable insulation product.  The medical experts say that they are -- that the toxicity level is -- even for non-asbestos mesothelioma claims, a hundred times greater, 50 times, hundred times

greater than -- than chrysotillic exposure, which was used in asbestos which was used in most Garlock gaskets.

So they are withholding the evidence of their claimant's exposures to those claims, but then they are appearing in the trust later and under the cloak -- the veil of secrecy -- in the trust provision that they negotiated when they negotiated the agreements with this firm.  They're hiding those claims.

And by the way, they're all -- they're also voting now in -- in the bankruptcy cases.  And when they vote, the Bankruptcy Court made them provide a certification.  You can't let just anyone vote.  You got to certify you were actually exposed to and injured by the product, and so they sign these certifications.  And those are outside of public availability.  We don't have those.  But they're sign -- they're voting before and after the case is resolved.

Now, we know that the disclosure of this evidence is quite material in an asbestos personal injury case.  And in fact, there have been a number of highly publicized cases where the Court has discovered and the defendant has discovered on the

eve of trial, sometimes during the trial, that the plaintiff has a bunch of trust claims and they haven't disclosed them.  We cite some of those incidences.  We describe the details of those incidences in -- in the memo that are the opinion that Professor Brickman has -- has submitted.  You'll see the details there.

But the courts in those cases -- and they -- and when they are discovered, the plaintiff's lawyers are there, and they offer the same excuses you're going to hear here from Mr. Swett and Mr. Guy and the plaintiff's attorneys.  And that's, oh, those trust claims don't really mean exposure.  We have the -- that was a deferral claim.  We were just filing that to save the client.  Or this was based on a presumed work site.  The client wasn't actually saying he was exposed.  My goodness.  They -- they offer all those same excuses here.

And the Court said based on -- are you kidding me.  This is material information.  And -- and they go at length in explaining the obvious, why it's important in a personal injury case against a tortfeasor to provide evidence of the wrongdoing of other tortfeasors.  And invariably in these cases they have given some kind of relief to the defendant

based on extreme prejudice.  In some cases they've continued the trial, in some cases they've dismissed the complaint.

But the evidence is clear that this is material information and that it affects the trial risk of a defendant.  And when defendants don't have it, and it goes through, it -- there's a miscarriage of justice.

You'll -- you'll see also in Professor Brickman's report his reference to the testimony of Judge Abel, who until very recently was the MDL judge for asbestos cases in Delaware.  And she testified about the practice in Delaware courts.  She said that it happened a lot, that it was dishonest, that it was prejudicial to defendants, and she -- she told congress they needed to enact legislation that created transparency, that made trusts more transparent.

This is what Garlock is complaining about. This is the environment that Garlock's cases were settled in.  And these are the practices that drove up Garlock's defense costs and its -- and its trial risk.

Now, Your Honor knows well that we -- from the very commencement of the -- that we came into the

case explaining that this was our problem.  It was in our information brief.  It was -- it was -- it's been in just about every significant paper that we've filed.

We asked the Court for -- that -- to allow us discovery so we could prove that this -- these trust claiming practices were going on and that the plaintiffs really were withholding trust claims and filing them later.  Because it just didn't make sense that in case after case that Garlock could really have the kind of responsibility that plaintiffs were -- Waters & Kraus were saying that Garlock had.

We asked for a broad sample of information from a broad sample of settled claims.  We -- we brought that motion to Your Honor a couple of different times.  Both times it was denied.  But we wanted the settled claims.  We wanted to get the trust claims that were eventually filed by the settled claimant, Rule 2019 statements that were filed, ballots that were cast, and -- and information in discovery about what they actually disclosed in the underlying case.  That information we were not allowed to get.  We asked for information from trusts.  We weren't successful.

But eventually we did get a right to take

some discovery, and it started a little over a year ago when Your Honor said that we could get data from settlement trusts for 11,000 settled claims.  In fact, these are claimants that settled from January 1, 1999, to the date of the bankruptcy case.  And we got the data from the Delaware claims processing facility.  And that's a facility that processes claims for the -- for 10 very large trusts.  And these trusts are all part of the bankruptcy wave. They were either one of the top-tier defendants that filed or they were swept up after the wave.

And -- and once we got the data, the data consisted of, I think, four things, the date any claimant filed a claim with the trust for each of the 11,000, the date of the approval of the claim, if it was approved, the date of payment if paid, and if it was not approved or paid, the status of the claim.

This data -- first of all, it showed the stark impact on the filing of trust claims on the amount of Garlock's settlement.  During the period after these trusts started paying claims, claimants who filed at least one claim with the DCPF trust before settling with Garlock received about half of what claimants who did not file at least one claim before settling did with -- with Garlock.

So this information was taken by Bates White, who put it in its database and it compared the impact of claim filing and the timing of claim filing on Garlock's settlements, and it found a remarkable substantial impact.  When claimants waited, they got more.

The DCPF -- from Validata -- and we also -- as Your Honor knows, we were able to get ballots that were cast by claimants in numerous cases.  It also showed the sharp decline in the identification of bankrupt's asbestos products in the highest value of Garlock cases after 2000.  It was in response to discovery requests that we had produced, a list of cases with identified known exposure.

And what we did when we got the DCPF from Validata, we picked a sample of claims, high-value claims.  We compared the data with a -- a detailed meticulous case file review, where we looked at what the claimants were saying in their pre-trial discovery in the cases against Garlock with the trust claims that -- that they actually found, and -- and we provided that list in discovery.

And so the list has 210 cases.  This is the -- the RFA, one list that you've heard discussed where debtors -- where we identified omission.

And just for the record, we've heard about the $250,000 demarcation point.  Most of these cases, most of them -- of these cases are part of cases that settled for over 250,000.  In fact, subsequent to 1999 Garlock only paid 263 claimants more than that amount.  And the RFA list includes 126 of those, so it's -- it -- it shows what was happening in Garlock's high-value cases.

So Bates White analyzed ballots and trust claims filed by the claimants and determined how many of those companies had been identified in discovery. They found, that between 2000 and 2003, 62 percent of those claimants' companies were omitted.  Between 2004 and 2010, the time period that the experts for the committee and FCR want to use to measure Garlock's supposed liability, 74 percent were omitted.  And companies that manufactured friable insulation were especially likely to be omitted. That's what the macrodata showed.

Now, in addition to this evidence, Your Honor, when -- when it came time to take discovery depositions, we sought approval to do case studies to determine what was behind this broader set of data, what's actually happening in cases that were part of the data.  We looked at the evidence of six prominent

law firms and their clients in -- in 15 specific exemplar cases, and we found that those cases demonstrate systematic practice of suppression of evidence of alternative bankruptcy (sic) exposure.

Now, as Mr. Swett and Mr. Guy have pointed out, we produced -- Robinson Bradshaw & Hinson produced a memorandum, and that memorandum has the facts in it.  Now, Mr. Guy seems to think that when you disclose the facts, he said, that you waive the privilege.  Well, that's just -- that's just completely wrong.

We researched the facts of these specific cases.  We -- and if you -- you can read the memorandum.  It's not an advocate piece at all.  It does nothing but give information.  And for every single fact we cite the record -- we cite deposition testimony, we cite trust claim data, we cite ballots, we cite interrogatory answers to demonstrate the difference in the case between -- between what these law firms were saying in the cases against Garlock and what they were eventually saying when they filed -- when they filed trust claims.

So what we found, in the 15 resolved cases, plaintiffs filed an average of 19 trust claims, ballots and Rule 2019 statements based on

exposures never disclosed during tort system
discovery -- 19 of -- of other companies.  And most
of these companies, again, are companies that
produced the products that actually caused the
problem.

We found that they -- on average they
disclosed only two of the -- of the exposures, on
average, underlying their trust claims, ballots and
2019 statements.

In 11 of the 15 cases some trust claims,
ballots or statements based on nondisclosures were
filed before Garlock resolved the case, but never
disclosed, so -- so most of them, they were
withholding and filing later, and not disclosing the
evidence supporting those claims.  Some of them they
went ahead and filed them.  They just didn't --
didn't disclose.

Again, we talk about specific cases, and
I'll -- I'll start with the -- the Shein firm, the
Shein Law Center, a law firm in Philadelphia, tries
cases in Philadelphia, a firm that's very successful
in settling cases for a lot of money.  We looked at a
number of their cases.

One case we'll call the Galeny case.  It
settled for several hundred thousand dollars just

within the year of the petition.  Mr. Galeny, the first thing he did when he got to the Shein firm, he sat down, they interviewed him.  He signed 14 affidavits, and these affidavits attested to exposure.  It was frequent, proximate and regular with products -- of 14 asbestos products.

So the first thing they asked him was to identify all of his exposures and they identified all his trust claims.  They took the trust claims and apparently they put them in a drawer, and one month later they filed the lawsuit against Garlock and other defendants.  They answered discovery.  And in Philadelphia, just like other states, the interrogatories require plaintiffs to disclose all the products that they know they were exposed to.  How many of the 14 claims did Mr. Galeny and the Shein firm identify?  Zero.  Not one.  In fact, they didn't identify exposure to any bankrupt product.

One month later they present Mr. Galeny for his deposition.  Mr. Galeny is asked during his deposition about other exposures.  He doesn't identify any of these.  In fact, he's asked about some of these specific products in his affidavits, and he professes not to know anything about any of those products.

Eventually his case goes to trial and the trial starts, then the case is settled.  And we asked Mr. Shein in his deposition about a number of things. But what is going on here, why didn't you disclose this?  And he said, well, I guess I should have disclosed them in the interrogatories.

And then we found out that there was one lawyer who interviewed Mr. Galeny and got all of these affidavits of this regular, frequent and proximate exposure to bankrupt asbestos products which he said created dust that he breathed.  There was one lawyer who got that.  And then another lawyer prepared him for his deposition, and -- and it was in his deposition where he was asked about specific products.

Did -- did these lawyers talk with each other?  We asked Mr. Shein.  And he says our goal -- and excuse me -- he said he would not have expected the sworn statements to be shared with the attorney who prepared the plaintiff for his deposition and questioning, because, quote, our goal is to maximize a client's recovery, and in order to do that, what we focus on for the deposition is the buyout non-bankrupt company.  That's our job.  Okay?  Our goal is to do our job on behalf of our clients, okay,

not to do the defendant's job for them.

So there's this view -- and -- and you'll hear it from the committee and Mr. Guy from time to time -- that if a plaintiff somehow admits he was exposed to products of the bankrupt companies and the defendants don't figure that out on their own, that the plaintiff is, quote, doing the defendants' job for them. That's not the way discovery works, not in Philadelphia, not in this Court and not in any other court.

There's another claim that -- that the Shein Law Center represented, the claim of Mr. Massinger that actually went to trial against Garlock and was settled during trial for $1,700 -- right -- $700,000. And this plaintiff maintained his only exposure to asbestos, including Garlock products, came from being exposed to his father's work clothes as a child.

He explicitly denied that he was ever directly exposed to asbestos on any job, and specifically he was in the Armed Forces and -- and a lot of exposures come out of the -- the Armed Forces. He was in the Air Force. So naturally, he was asked about those, and he said he didn't have any exposures from those. In fact, he said they had really great

hygiene practice -- industrial hygiene practices there, so he didn't -- he didn't have any exposure.

Now, when the -- before the case went to trial, another law firm representing Mr. Massinger filed a couple of trust claims for him.  One of them -- or two of the trust claims were based on exposures that he claimed he suffered while he was in the Air Force at three different bases, each of which he was asked about and all of which in each case he said he wasn't exposed to.

In his affidavit he says that he was -- that he worked around and was exposed to asbestos in the workplace while he was at those work sites, and based on that exposure to asbestos, he filed claims against -- against two different trusts that -- that were eventually paid.  These claims were never disclosed to Garlock.  Garlock eventually settled the case.  And by the way, he filed other claims after that that were inconsistent with -- with discovery and never disclosed.

Interestingly, he filed -- two of the claims he filed before his trial, we found that some way they were withdrawn right before trial -- trial -- and then they were paid -- they were refiled two months later after the trial.  One of the claims was

against the USG Trust and the trust had approved the claim and was ready to pay it, and he withdrew it. Then he filed it later and picked up a payment. Never disclosed to Garlock.  He filed numerous trust claims, none of them disclosed.

The Treggett case -- and Mr. Swett -- we talked about this case.  They brought it up first. We -- it -- it was the largest adverse verdict in Garlock's history.

In this case the Waters & Kraus lawyers filed a ballot, attesting under penalty of perjury, that Mr. Treggett was exposed to Pittsburgh Corning asbestos in February of 2004, an -- an exposure never disclosed to Garlock.  It was later confirmed that this claim was filed based on exposure to Unibestos, a notoriously bad product.

If Garlock has information that a claimant is exposed to Unibestos -- it's a highly friable, ubiquitous, ampliable asbestos product.  And, of course, when that evidence of that exposure is made, not only in the plaintiff's case, it -- it will actually diminish the value of the case against other defendants.

Well, Garlock tried, through circumstantial evidence, to show the exposure to

Unibestos, but Mr. Treggett's lawyers denied that he was exposed to Unibestos.  This is four months after he certified under penalty of perjury that he was exposed to Unibestos.  He stated in closing argument there isn't Unibestos on the jury form because they didn't bring proof that there was Unibestos on that ship.  They couldn't.  It's not proof, he told the jury.  They thought, we'll try to prove this amosite thing.  That's what Garlock always did.  Try to prove that the plaintiff had amosite exposure.  That was Garlock's ticket to being absolved and exculpated in trial, because if you can show amosite exposure, juries understand that a gasket didn't cause the plaintiff's disease.

But he said, I think I will try to prove this amosite thing and say it's all amosite.  And they didn't do it, and they couldn't, because it's not true, so -- so specifically contradictory the -- the certification under penalty of perjury filed just four months earlier.

And then, of course, Mr. Treggett started filing trust claims shortly after the trial, eventually filing 14 different trust claims all based on undisclosed exposure, with a total of 22 total undisclosed claims.  That's the Waters & Kraus firm.

And there -- and we have a number of -- of cases that show a similar pattern in pre-trial discovery.

Now, you remember Mr. Simon with the Simon Evans & Greenspan firm.  That was the name of the firm.

Now, he testified about his settlement procedures with Garlock.  And we talked -- talked about the factors that drive settlement.  And so I asked him -- he was right there.  I asked him whether his firm had a practice of delaying trust claims until after they resolved claims.  He said, no, no, we don't do that.  We don't -- we file them when we know about them.

And I said, well, as a practical matter does it just seem to sort of work out that you don't discover them until after a case is filed.  He said he couldn't conceive of that happening.  He couldn't conceive that a plaintiff would go all the way to the point of trial and then file -- find claims after the trial.

Well, we got discovery from -- which you ordered from the Simon Evans firm on a number of cases.  All of the cases fit the same pattern, interrogatory answers that require them to identify all of their exposures, no bankrupt exposures

identified.

Once the case with Garlock was resolved and they were free and clear of the court system, they filed numerous, numerous trust claims. We found over 20 trust claims in -- in one case and almost 20 in another.

These trust claims that they filed, what -- what was interesting about them was that they were supported by affidavits from their clients. And these are clients who answered interrogatories and appeared in deposition and testified that they didn't have exposure to specific products, they weren't exposed to specific places, and yet they filed trust claims based on affidavits. And the affidavits said that plaintiff name, I'm -- I'm providing this based on my personal knowledge. I have knowledge of this. I was at this work site. I worked frequently around this product and I breathed and was exposed to this product.

So these claims that the Simon Evans firm, after their clients take one position in the tort claim against Garlock, they take an entirely different position based on affidavits signed by their own clients.

So one case, the Owenstein case, Mr. --

Garlock settled for 400,000, again, no -- the firm disclosed no bankrupt product to which Mr. Owenstein was exposed in response to a standard interrogatory. After the settlement, the -- the firm filed 11 claims based on unidentified exposure, seven of which were based on declarations executed by the plaintiff himself, under penalty of perjury, attesting to his personal knowledge of exposures to specific product.

Another case that Simon Evans firm represented was the White case, a case that Garlock eventually settled for several hundred thousand dollars.

Mr. White would eventually, after the dust settled on his tort claim, filed 22 trust claims based on -- again, based on exposures never disclosed in pre-trial discovery in his tort case.  Again, standard interrogatories called for all of these to be identified.  None were.  Four of the trust claims were supported by sworn statements from the plaintiff himself attesting to personal knowledge of exposures to specific asbestos-containing products.

Now, even more surprising -- and this -- and this fits a pattern -- when Simon Evans presented this man for his -- his deposition, he testified that he was pretty much cabined in a machine shop and that

-- that he was exposed to asbestos when other workers would bring in valves and pipes and other things that had gaskets on them.  And he remove the gasket and -- and breathe that -- that and that -- that that's how he would -- attributed his illness to.  In fact, he -- he talked about his little world where he was exposed to Garlock gaskets and other things.

He specifically testified that he was never on board a ship and he was never exposed on board a ship.  Said he never went aboard ships when he worked at a shipyard, but instead, removed gaskets from valves on equipment brought to him in the machine shop.  But in support of two trust claims, his wife signed sworn statements attesting that the plaintiff had worked on ships at the shipyard and was -- was exposed to ampliable pipe insulation.

According to her, the plaintiff, after he was diagnosed with mesothelioma, indicated that he believed his exposure to pipe insulation while on the USS Montreal while he was at the Norfolk Naval Shipyard was contributory to his mesothelioma.  So this is what he told her after he was diagnosed.  This directly contradicted his -- his deposition testimony and the story he told in the case against Garlock.

Now, the -- the Belluck & Fox firm -- and Simon & Evans and Waters & Kraus, as Your Honor know, they're members of our committee.  We're negotiating with them, or litigating with them, to try to resolve this case.  Belluck & Fox, also a committee law firm, we took discovery on several cases with Belluck & Fox.

One case in particular that we think is an example of the way -- of the practices that Belluck & Fox engages in to maximize the claims of its clients -- Belluck & Fox took Garlock to trial in the Homer case, and the case tried for 18 days.  And the -- the issue in that case was what caused Mr. Homer's exposure.

He denied and minimized any exposure to pipe insulation or ampliable product.  He couldn't recall the names of any.  He -- he attacked Garlock's experts when their experts took the stand to try to say he must have been exposed to these products, because we can show they were on the ships.  His lawyer said, well, the ship records don't necessarily prove that, and you weren't there and you can't prove it.  They -- they attacked it.

Now, there's a rule in -- in New York in the -- the case management order in the Supreme Court

of New York City, and that case management order

requires all claimants to disclose all trust claims

at least 90 days before trial.  But you're not

supposed to disclose just the trust claims that

you've filed.  You're supposed to disclose trust

claims that you plan to file.  And in fact, you're

supposed to actually file those claims and then

you're supposed to disclose them to the other side at

least 90 days before trial.  And if you don't, then

you don't get a trial.

Of course, the 90 days came, and in this

case the lawyer was consulted, no trust filed, so no

trust claims filed, none that planned to be filed.

Now, the case settled after all the

evidence was put in and before the jury -- jury

deliberations.  And within 24 hours -- or less than

24 hours of the announcement of the settlement and

the discontinuance of the trial, Mr. Homer's lawyers

started filing trust claims for him.  They filed

eight trust claims 24 hours after the settlement was

made.  And they would go on to file 22 trust claims,

all of them based on allegations of exposure to

products that were never identified during the tort

case.

Now, when we took the deposition of Joe

Belluck, he testified about this case.  He said, well, the -- we had a referral firm, and the referral firm filed all those claims.  And we said did you talk to the referral firm.  I didn't remember.  I don't remember any conversation we had with the referral firm.  Well, we took the deposition of the referral firm, and here's what we learned.

In this particular case they referred the firm to Belluck & Fox to try the case.  Before they referred the case, they interviewed Mr. Homer and they identified all the trust claims he was going to file.  They referred the case and they were instructed by Belluck & Fox not to file the trust claims.  Don't file the trust claims, because it's in the best interest of our clients not to file the trust claims.  So they didn't file the trust claims.  And then they did file the trust claims the day after the trial was entered, because Belluck & Fox called them, the coast is clear.  The file -- the case is settled, file the trust claims, so they filed the trust claims.

And I -- as I indicated, they would eventually file over 20 trust claims all based on undisclosed exposures and under a practice that blatantly violated the case management order in New

York that required that those claims be disclosed and filed 90 days before the trial.

Now, these cases are all on RFA list 1A. And these are just some of the cases.  I could tell you more stories about the evidence we've uncovered. It's all -- it's all the same pattern.  It's all delay filing the trust claims, conceal the exposure supporting the trust claims, file the trust claims when the case is cleared.  That's the pattern.

Now, they're saying under the RFA requirement we agreed to identify certain claims that -- where -- where we allege that there were these patterns of trial risk and settlement practice, because we're rebutting their settlements case. Remember, we're putting on our own case where we don't allow it to settle.  We're only doing this to defend our -- ourselves against their, we believe, specious argument that these settlements were somehow a fair reflection of liability that's -- that should be perpetrated into the future.

Well, under the RFA we identified all 210 of the cases where we got the data and compared the data to the tort system discovery.  Now, we asked for but didn't get information regarding the -- directly from the claimants so we could find out exactly what

-- what was going on behind the data.  We did not get that.

So what we have in that case is we have the data which discov -- which shows the inconsistency between the trust claim filing and the position taken in tort discovery.

Now, for RFA list 1A we've provided a list of specific cases which is the only discovery that Your Honor allowed.  And by the way, every time we pulled the curtain of secret -- of -- the veil of secrecy back and take a look, in every single case it confirms abuse, discovery abuse.  It confirms that plaintiffs' lawyers engage in these practices.

So they like to say, oh, 26 of 11,000 cases.  It's the only 26 we've seen and we're batting a thousand.  The only reason we didn't get more is because they wouldn't let us have more.  They wouldn't let us have the discovery.  So now I -- I guess they're going to argue that this is unrepresented and -- and we can't rely on just -- just 26 cases.

But the RFA requires us to identify it. It says each mesothelioma claimant that the debtors contend misrepresented or omitted third-party exposure, as the final paragraph four in the

stipulation and order, personally or by an attorney as to whom the debtors intend to offer evidence of the nature of the alleged misrepresentations or omissions.  And -- and there are two alternatives here.  One, any connection between such misrepresentations or omissions in Garlock's settlement or payment of that claimant's claim or, two, any reliance debtor has otherwise placed on the alleged misrepresentations or omissions with respect to Garlock's settlement or payment of that claimant's claim.

We have produced every bit of -- of discovery, documents and testimony that we're required to produce under this, and we have the right at trial to offer evidence on either one of those points.

We have not offered evidence of specific reliance on cases, but we do have evidence, and they're fully aware of -- of what it is, of the connection between the misrepresentations and our settlement or payment of the claimant's claim.  We have evidence overflowing that these practices that they engaged in and the practices specifically in these cases inflated Garlock's settlement payments.

In fact, the plaintiffs' lawyers

themselves say that that's why they engaged in these practices. Peter Kraus said that, as a matter of practice, they wait and file the trust claim. Why do they do that? Because they don't want the defendant to have the ability to put the bankrupt co-defendant on the verdict sheet and argue that it should get -- that the -- the bankrupt defendant should get a share of liability. Because if they did that, then as a matter of law, their claim could be less. And if we -- if Garlock's in a case and there's Garlock and 10 trust claims, 10 culpable bankrupt parties, then Garlock's liability is a lot less than if it's just Garlock.

So Peter Kraus admitted that he engaged -- his firm engaged in this delay practice specifically to increase the amount of the client's claim -- his client's claims against the viable non-bankrupt defendants.

Ben Shein admitted the same thing. He said if you -- that he delays the trust claims because he doesn't want Garlock to be able to get the bankrupt company on the verdict sheet.

He also in his testimony about his practice -- why do you -- why do you sequester knowledge about a bankrupt -- about a client's

bankruptcy claims -- why do you sequester that knowledge from your trial lawyer.  He said because my job is to maximize the claims of my client.  And to do that, I have to focus on a viable non-bankrupt defendant.  I can't focus on the bankrupt defendants because once I -- once you get them in the courtroom, then my claim against the viable defendants is less.

And he also pointed out, by the way, Garlock's defense -- when Garlock is able to get those companies -- the evidence of exposure to those companies' products, then Garlock's defense to liability that its product was not a substantial contributing cause is much enhanced.  And -- and you'll hear evidence, Your Honor, from my experts that when Garlock had all of this evidence at trial, it rarely, rarely lost a case.

And not only that, but if it did lose a case, and there was a case -- there were -- in the last six years or so before -- in cases tried after 2005, Garlock won just about every single one.  We lost two.  One of them was to the Williams Kherkher firm, Torres case also on the 1A list, where we discovered that they concealed a trust claim.

The other was a case in New York where we got the trust claim and Garlock was assigned a two

percent share of liability.

So this is -- evidence is highly credible and has a remarkable impact on trial risk and settlement factors, and the plaintiffs' lawyers themselves admit that. And that's what the data firm admitted, too, Your Honor.

I talked about that earlier when the data lawyer said that sometimes the trial firm tell us to delay filing the claims because it's in the best interest of the client. Why do they do it? They're increasing trial risk of the claims against the viable defendants and they're forcing higher settlements. That's the name of the game.

We have -- and we have testimony that we'll offer and that our experts will rely on that will show that these practices increased Garlock's trial risk and increased settlement value. And we've got the testimony that -- that I've already described of our witnesses that these -- in general, that influence -- the factors that influence settlement. We have examples of cases where judges talk about the importance of this information and how defendants were prejudiced without it.

We have ample evidence, without having to offer our work product and our attorney-client

communications -- we have ample evidence that Garlock was hurt by these practices and that these practices created an atmosphere in which Your Honor cannot rely on Garlock's settlement history.  It -- it can't be done.  It won't happen under our bankruptcy plan, it won't happen in this Bankruptcy Court.  We don't believe that Your Honor will say that claimants can engage in these kinds of practices to inflate claims against Garlock.

So with that, Your Honor, I want to address the arguments that the committee and the future claimants were able to make.  And I also -- when I'm finished, Your Honor, I'll have Mr. Krisko talk about the -- the case law that Mr. Swett talked about.  A couple of the cases were -- were not relied on in their brief and, again, we were sent copies very late last night.  So we've done the best we can to understand what their arguments are and how to address them here.

But the committee and the futures rep, they seem to argue three things constitute a -- a waiver.

First, they repeat their, quote, putting at issue way -- they say that -- that Garlock has put in it here.

Second, they say that the expert opinions from our outside lawyers have created the waiver.

Then finally, they say -- and this a curious argument -- that the refusal to let witnesses testify about subjects that might constitute a waiver in -- in itself somehow creates a waiver.

Before I address those three points, I want to talk about this -- this -- the delay of and lack of and how I believe that their motion should be denied just based on their unreasonable delay in bringing -- in bringing them.  In fact, we think it would be unfair to prejudice Garlock at this late point in the case.

We've been careful, as -- as we'll discuss, to stay within the boundaries of your May 2012 ruling, and we entered into a stipulation with the other side agreeing what those boundaries were. And both sides followed them.  I mean, they -- they instructed witnesses not -- not to answer the questions.

We have -- as Your Honor knows, we have spent millions of dollars preparing this case for trial, and the committee is now saying that Garlock should not be able to offer -- to be completely precluded from offering as facts and expert evidence

rebutting their settlement approach and taking the position that the settlements don't reflect liability.

So you have to ask yourself what new things happened to justify the relief and when did they have notice of these reasons.

Now, keep in mind their motion in limine was filed on May 24th, the day before Memorial Day weekend.  Well, Your Honor may recall that when you entered the estimation order on April 13 of 2012, the order itself acknowledged that Garlock -- and emphasized what Garlock had emphasized in its brief, and that's that Garlock would rebut their settlement approach with evidence proving that the defense costs and discovery abuse following the bankruptcy wave inflated settlement.  That has been an issue on the table the whole time.  In fact, it was in our information brief.

Now, we disclosed -- on June 22 of 2012 we disclosed that one subject of expert testimony would be the impact of omissions and concealment of exposure elements on Garlock's settlements after the bankruptcy wave, so -- so that -- the committee and the FCR knew, and they knew before June 22, but they certainly knew on June 22 that that would be a

subject of expert testimony.

And one month later we filed a list of fact witnesses, which included lawyers including John Turlick and David Glasby, who would provide testimony within the boundaries of Your Honor's June -- May 31, 2012, bench rule.  They would provide general information about factors that influenced the settlement decision and -- or -- excuse me -- that influenced trial risk, and -- and they would not provide testimony about the decision process in any individual claim.

So on Oct -- October 11, 2012, you may recall that the committee had filed a motion to compel discovery, and in that motion they sought to compel Garlock to produce reams and reams of settlement negotiations with law firms.  And we argued that this is late in the game and this is going to place an undue burden.  But Mr. Swett said, look, I -- I really need this.  And he -- and he acknowledged then that he knew exactly where Garlock was going with this case.  He said they are promising -- and that has been reconfirmed in recent correspondence -- to pursue this theme in two different ways.  One is by introducing evidence as to specific claims and claimants that would, in their

view, establish the nondisclosures, conditional or otherwise, and connect those with nondisclosures to inflate itself.

And second, they're going to do something at a higher level by statistical means, presumably drawing upon whatever data they get from the trust, to try and show broader patterns and have experts come in and tell you that those patterns must have had a distorted effect on settlement values.

So Mr. Swett knew in October of last year that that's the way we were going to proceed.  He acknowledged it.  In fact, during the same hearing he acknowledged that -- that the law of the case was that he wasn't going to get attorney work product and communications.  He said you've already ruled, rejecting our privilege waiver argument, that the internal settlement deliberations are not available to us in, I guess, this backdrop where they're going to offer these experts.

And so we move on and we turn to the non-privileged communications exchanged with the plaintiff's counsel and the co-defendants regarding the evolution, negotiation, the bumping heads over settlement terms.

And he ordered the debtor to provide all

the discovery that he sought so that he could be prepared to defend the case that we were going to offer, including the -- the expert case.  So the committee and FCR knew that this was the approach that Garlock would be taking.

Now, they are pointing to three expert reports, as far as I can tell, and saying that these expert reports changed the game and this is -- and this is what created the expert report -- reports filed by David Glasby and John Turlick on February 8th.  Four months ago they got those expert reports. They got the Bates White expert report, that they're complaining about, one week later, on February 15th.

And -- and now, he did file a rebuttal report, and that rebuttal report would bust their settlements theory, but it doesn't say anything new about the analysis and the data and the evidence that -- that Bates White is relying on.  Bates White lays out the evidence.  It's not relying on any privileged communication.

And by the way, neither are Turlick or Glasby.  They're not relying on attorney work product, they're not putting into evidence attorney work product or attorney-client communications.

They are providing generalized opinions

about how the lack of evidence resulting from the bankruptcy wave drove up settlement value and risk and how the restoration of that evidence will drive trial risk and settlement values back down.

That's what they're -- that's the extent of their opinion.  That's exactly what Mr. Glasby testified about on March -- in March of 2011, exactly the testimony that you said was generalized and did not constitute a waiver.  That's the opinion they're offering, and the -- the -- for the same reasons that applied then apply today.

There has been no waiver of privilege.  That just -- just hasn't happened.  The committee has gotten all the discovery they said they needed to rebut that.  But likewise, Bates White does not rely on any privileged matter, doesn't offer any support.  It relies upon a -- on an economic analysis.  We'll talk about that shortly.

So they cite -- they cite those reports, reports that they've had for months.  And they're citing that they were, quote, waiting for the record to develop.

And Mr. Guy said something about how he waited for us to provide facts in the cases that we were relying on.  Well, during the deposition of Ken

Hennessee, Mr. Hennessee brought a -- a -- a long memo into the courtroom with him, providing details of all of the facts that we were relying on to support these claims that there was suppression of evidence that affected -- that unfairly affected Garlock.  They've had all of that evidence since January.

But they talk about -- they cite passages from four different depositions.  The first one occurred on November 7, the second one on January 9, the third one on January 22 and the fourth one on January 24.  So these were the depositions where they probed the knowledge and facts supporting our case, and they -- and they asked our clients questions about what they -- what evidence they had to support the notion that settlements were negotiated in an environment of fraud.  And they got answers.

And they cited -- they misleadingly cited several excerpts there where they asked the witnesses directly for attorney-client advice, attorney-client communications, and the witnesses were instructed not to answer those questions.

But in any event, there's no justification for waiting until May 24, months after they've had all these reports and they took the depositions that

they now use as the basis for seeking this emergency relief.

But if their motion had merit, and it certainly doesn't, it should -- it -- it should be denied, because it's too late to allow them to try to have such a profound fact -- effect on our case at trial.

So let's talk about the putting-at-issue argument. That should be denied, based on all -- the case and the parties' stipulations.

And by the way, I've got a -- a time line here that actually shows when different events happened relative to when they filed their -- their motion, and you can see -- you can see exactly how things unfolded.

On May 31 you entered your no-waiver motion. On June 22 we disclosed the subjects that experts would be testifying on, including the very subject of this hearing.

On October 11 they came in acknowledging that they weren't entitled to work product and the papers and the lawyers' files about deliberations for settlements, but asked for correspondence which the Court ordered.

On December 14 we had the exchange that

Mr. Swett talked about earlier where we acknowledged that the law of the case was that witnesses could testify about generalized matters without waiving privilege, and all witnesses conducted themselves accordingly.

On January 24 you have the last of the depositions, the deposition of Tim Hennessee.  And then, of course, you have the expert reports that were -- that were filed on February -- February 15. The rebuttal reports were filed on April 24 also, a full month before the motion was filed with the Court.

So this shows the motion is a complete afterthought.  We think it disingenuous.  It's -- it was meant -- well, I -- I'm not going to speculate on motives, but it's just -- it's just too late for the futures rep and the committee to bring -- be bringing this matter to the Court today.

So I want to talk about the -- the stipulation that the parties reached.  I've already talked about the May 31 order and how we've complied with that.

But during one of the early depositions we had this exchange, and the gist of the exchange was that we were going to let witnesses testify about

generalized matters, including factors that influence the defense of a case, trial risks, settlement deliberations and settlement values.  We were going to allow our witnesses to testify about that.  And we each agreed that we would not take the position that if a witness testified about that that it would be a waiver.

And by the way, all the witnesses, both the witnesses on their side and ours, are lawyers. And so we were in a -- a strange new world when we were taking these depositions.  When we -- when we were on a subject, we were on a playing field that we preferred not to be on.  And that's their theory that our settlements -- the Garlock settlements reflect -- reflect liability.  We had objected to that.

But we agreed to proceed in this way, and -- and Mr. Swett acknowledged that that's the position that emerges from the judge's rulings on various privilege disputes that have been had in this case so far.  So the stipulation was that witnesses -- we can ask questions and the witnesses would provide generalized testimony, but they wouldn't have any safe harbor if it came to testimony about the decision to settle -- enter into specific settlements or the decision to settle specific cases.

This stipulation is recited at the beginning of just about every deposition we had. It was recited with all the law firm depositions. It was recited in the depositions of Garlock's witnesses. And everyone agreed to it. So this is the way that we conducted ourselves.

So certainly they can't point to -- to the fact that we're taking the position that our settlements were based on -- were inflated by defense costs and discovery abuse, that simply taking that position is a waiver. That what they're -- that's really what they're arguing. What we've agreed is that you can't take that witnesses -- in fact -- or that position. In fact, our witnesses can testify about that.

So Garlock relied on the Court's bench ruling and the stipulation, and Garlock -- and -- and the committee and FCR simply -- they -- now they simply can't argue that our witnesses' testimony about factors that influenced -- as a -- in general settlement discussions created a waiver.

So then they come to the expert reports that Garlock has filed, and those reports themselves don't create a waiver. If you go back to your ruling, your ruling said that -- that if a party

actually introduced into evidence privileged

communications or work product, then that might open

the door and might either require production or not

let the witness testify.  None of these expert

reports do that.

Dr. Bates, he created an economic model --

model relationship between the settlements and the

trial risks.  It includes variables for plaintiff and

defendants' costs.  In other -- other words, his

model is intended to measure the relationships

between settlements and trial risk and defense costs.

And his report, which is -- goes into detail about

his knowledge and what he relied on it, none of it

attorney-client communications, shows that when you

populate his model with actual data from Garlock's

database, it proves that Garlock settled most cases

without any significant expectation of an adverse

verdict.  And in fact, it proves that plaintiffs did

that as well.  They were bringing claims against

Garlock to extract low settlements based on defense

costs to avoid it.  That's what the economic

perspective on the -- on the case is.

Dr. Bates, his case-in-chief in rebuttal

reports -- they're attached as exhibits -- and you'll

notice in that that there's no reliance or mention of

privileged material.  It doesn't exist in there.  And -- and there are dozens of pages.

There's incredible detail in there about what he is relying on, what position he's taking, and the committee has had that since February 15, and they've chosen not to do anything since then.

John Turlick and David Glasby who offered their expert reports -- you have copies of them. They'll offer testimony identical in scope and content to what Mr. Glasby and Jeffrey Simon offered in the -- in the discovery here.  And when -- when Mr. Glasby offered this testimony, you ruled it didn't constitute a waiver.  It was general testimony about the asbestos litigation.

Now, we have expert reports from Professor George Priest and from Lester Brickman, and also from Mark Ferron.  I haven't heard the committee or the FCR argue that there's a waiver there.

Certainly they can't argue that there's any surprise, because those expert reports -- they were filed a month before the motion was filed, and they don't say anything or offer anything that wasn't already offered in the previous expert reports and that the committee and the FCR don't already have and they've received in discovery in the case.

But if you look at the Glasby and Turlick report, their expert opinions can basically be distilled to this.  That -- that if Garlock had had information and exposure evidence that was previously available in the court system, if that had remained available for opening and transferring claim procedures or through plaintiffs providing the same information, then there would have been little change from the 1999's to the 2000's in Garlock's likelihood of success for trial and defense costs.  That's directly out of Mr. Glasby's opinion, and that's what they cite to the claim the waiver.

Now, Mr. Turlick had -- has similar opinions.  He said the bankruptcy waiver and departure of thermal insulation defendants caused the loss of testimony regarding exposures to products which increased trial risks and settlement values.

Now, compare this to what Mr. Glasby testified about in 2011.  He testified that Garlock's trial risks and settlements went up after the bankruptcy wave when plaintiffs stopped admitting to exposure to the bankrupt's product.  This is on page 40 through 50 of the March 2011 transcript.  So he provided that opinion then.

He also opined that access to trust claims

provides evidence that would lower Garlock's trial risks.  Page 52.  And he testified that the trust would further lower Garlock's trial risks because trust money serves as an offset and that offset would lower trial risks.

He also testified that -- that if Garlock had evidence in the Treggett case, in particular that Mr. Treggett was exposed to products of the bankrupt insulation defendants, it would have reduced Garlock's trial risk dramatically.  Now, this was before we learned that Mr. Treggett had filed 14 such claims.

Again, the Court ruled that this generalized testimony and these opinions, which were of the same subject offered by Mr. Simon, it didn't disclose any privileged communication and work product and, therefore, it wouldn't cause a waiver.

So these opinions have been modeled after the testimony that Mr. Glasby offered in this Court that the Court has already said didn't constitute a waiver.  So there's nothing in any of the expert reports which -- which waives the privilege.  There's nothing they can point to.

Their final argument seems to be that instructing witnesses not to answer questions that

might divulge privilege does not cause -- causes a

waiver of privilege, and that's completely wrong.

They -- as I indicated, they've cherry

picked portions of the transcript in which they were

trying to induce a waiver.  This is very misleading.

These depositions -- they had hours upon

hours of deposition time with these witnesses.  They

asked them about the specific -- specifics --

specifics -- excuse me -- in cases.  They asked them

about the factors that influenced settlement division

-- decisions.  They asked about the factors that

existed in these very cases where these very

practices took place.  They had full opportunity,

unfettered opportunity, to do -- do that.

The only time an instruction was given not

to answer is when they blatantly asked questions that

were obviously designed to trigger a waiver.  They

asked questions about what advice was -- was given or

what the -- what the lawyer told them or specifically

what factors they considered in a settlement of a

particular case.

So there is -- there is ample opportunity

they -- they had to discover all of the bases we're

going to offer to support our case, and -- and simply

by instructing witnesses not to answer questions that

were blatantly designed to trigger a waiver, that's not a waiver in and of itself.

And Garlock has a right to support its case with non-privileged information.  Their argument seems to be, well, you're taking this position and you can only take that position if you waive the privilege.  But no, we have other evidence.  We have plenty of evidence to support our position, and we have a right to offer that evidence.  You can consider the evidence then and decide whether we've proven our case.  Our experts have a right to rely on it, and our experts will explain why reliance on that evidence is reasonable.

So this -- the idea that, again, it just comes down to we've put at issue in our defense to their argument that settlements are admissions of liability, that that necessarily creates a waiver or you can't rebut their argument is nonsense.

Now, if -- in these cases, if it was improper for Garlock to instruct Mr. Hennessee not to answer a question that says what did your lawyer tell you about this, maybe -- if Garlock was being overprotective and improperly asserting a work product protection, then they could have -- during the deposition they could have stipulated, look, he

can answer the question.  We won't argue it's a waiver.  They didn't do that.

They could have then -- if -- if -- at that point, if they were somehow prejudiced by that, they could have filed a motion to compel, and they could have come to you and said, look, you know, we've asked them these questions, they've put this at issue and they instructed the witness not to answer. And we think that instruction is improper, because my questions didn't require them to waive attorney work product -- product or attorney-client communication.

But in fact, that was the exact opposite of the game they were playing.  They wanted to create a waiver.  They didn't want to hear the witness' answer to that question.  They wanted the witness to answer so that we could suddenly be on -- in a world where all of Garlock's wall -- world of files were open.  And that's not necessary, and Garlock's not required to do that in order to rebut their case.

I'd also like to point out that the committee and the FCR are relying on a few lawyers of their own, and they're offering these lawyers as experts.  The committee has on its list several expert witnesses and they're offering them in fact testimony.

In fact, if you look at the reports that have been filed by Dr. Peterson and Dr. Rabinovitch, those are reports that expressly rely on testimony from lawyers who represented personal injury claimants who are talking about why they settled claims, and they go much farther than Garlock.

For example, Dr. Peterson relies on testimony by Mark Iola.  And Mark Iola identifies specific claims.  He -- he settled with Garlock all the Waters & Kraus claims, and he's testifying that every single one of those claims where the plaintiff's decision to settle was affected by arguments that Garlock was making to us about its financial situation, its diminishing insurance.  We took that information and we processed it and we settled for lower amounts.

So their experts are relying on the kind of information that they say would create a waiver we're not relying on.  And they're going much further and relying on testimony by lawyers about why they settled a specific case.

Dr. Rabinovitch relies on testimony by a lawyer named Michael Shepherd, and she's making the same argument.  She's making an argument that, based on Mr. Shepherd's testimony, that Garlock was able to

keep down or push down its settlement values by

suppressing evidence, so -- so his -- the FCR is

arguing the fraud and the inducement point from the

other direction, and they're offering a lawyer to do

that.

Has -- now, has Mr. Iola opened up all his

attorney-client files in all those Waters & Kraus

cases?  Well, certainly if we have, he has.  In fact,

they -- he has gone much, much further than we did.

And their expert actually relied on it.  He cites it

in -- in his order.  And what about Mr. Shepherd and

his files and what Rabinovitch relies on?  It doesn't

end there.

The committee is offering a fellow named

John Patton.  Mr. Patton represents the futures rep

-- futures reps and the asbestos committees in

various bankruptcy cases.  And they're offering him

to testify on the meaning of trust fund and on the

meaning of value.  And he says, look, I represented

people who negotiated -- I'm a negotiator.  I know

what they mean and I know what concerns that the

claimants had when we negotiated these provisions for

them.  And I'm telling you, based on all that, this

is what they mean.

And it just -- it just so happens that he

testifies that they mean exactly opposite of what they say, which is a theme in this case.  Everything -- every -- nothing means what it says to a committee.  When someone certifies to exposure, they're not really certifying exposure.  But -- but that's a different argument.

The point is that they have offered a lawyer who's going to testify about why they -- they entered into an agreement, the negotiation process, and the -- the concerns that drove the meaning of these agreements.

That's Mr. Patton.  He's waived the attorney-client privilege.  We have a right to look into their files and to see the drafts of the agreements to see what really drove those agreements, see if what he's saying is true, if those agreements don't really reflect true liability or the claimants don't really have to allege exposure to assert a claim against a trust.

So if we go down this path, there's no -- there's no end to it, because every lawyer -- or every witness you're going to hear testify in this case is going to be a lawyer.

There are, Your Honor, some other lawyers they're relying on.  I'll -- I'll save that for

another day if necessary.  At this point I'm going to sit down and I'm going to let Mr. Kris -- Krisko address arguments that the committee and FCR have made on the actual cases that Mr. Swett argues support their position of waiver.

THE COURT:  Okay.  Thank you.

MR. KRISKO:  Thank you, Your Honor.

The -- the legal position that the committee and FCR kind of put forward in their brief seemed to be focused on the notion that if you put up a lawyer to testify, you automatically waive work product, you waive attorney-client privilege, and that was the focus of their brief.

The presentation today went -- went back to a lot of the things that we talked about before, back in May of last year, and I wanted to -- I think -- and -- and that was the notion that if you're going to take the position that material was not disclosed in connection with the making of an agreement, that's a waiver as well, and the argument essentially that there's an issue waiver anytime.

As it applies to our case, we dispute the meaning of the settlement agreements anytime that fact circumstance arises.  As I think counsel to the FCR put it, he said it's indisputable law that if

you're going to -- even if you going to go so far as to make a fraudulent inducement claim, that you automatically waive -- waive the privilege.

So -- and finally, the -- the committee also mentioned in argument today the Nobles case, which is not cited in -- in its brief, but was cited previously.  So I'm going to address those three points, but I want to start with, I think, the second one, the one that the -- the FCR brought up and -- and I believe that counsel talked about at length, which is this notion that it's indisputable if -- if you're going to put specific claims at issue, if you're going to talk about the facts that were disclosed to you in the context of a contract negotiation, that in and of itself, is an implied waiver.

And we talked about this in May of last year.  And Your Honor's ruling here, I think, is instructive just to perhaps bring the Court back so it understands kind of the distinctions in the case law that I think have been overlooked by the committee.

The Court may remember that there are two separate and distinct lines of authority on implied issue waiver.  One is the Roan case, which is a Third

Circuit case that holds essentially, Your Honor, that there's no implied issue waiver unless there is a putting of issue of what an attorney-client communication was in the actual element of a legal claim.

And the Third Circuit case in Roan goes on to cite examples. It talks about cases where a -- a client sues its lawyer, cases in the intellectual property context where a patent attorney may be taking the position -- or testifying that what he did in investigating and prosecuting that -- that -- that patent was above board and was not essentially a fraud on -- on the patent issuing authority.

It talks about cases in the insurance context where in -- in -- in -- attorneys may have been involved in negotiating settlement agreements and they're now one of the ones that testify to say the insurer was acting in bad faith or denying coverage or denying coverage under a certain limit or whatever. And it -- it -- it -- the Roan line of authority is very careful to say that when you put it as an element of your legal claim, that's when there's an implied issue waiver.

Apparently Roan, it's -- it's -- it's worth saying, expressly rejects Hearn. And the

committee counsel in its argument earlier tried to equate those two at times to say that they're two -- two stripes on the on the same road, but -- but they're not.  Roan expressly rejects Hearn.

Hearn would -- if there's a showing that information cannot be obtained, and it's relevant, it -- it would -- it would permit the -- a waiver of certain attorney-client communications, but it doesn't apply to work product.

But in any event, that should not be too much of a -- a dilemma for this Court, because when we argued this motion in May of last year, we talked about the differences and we talked about the fact that the Western District of North Carolina in multiple cases has adopted Roan.  And Your Honor ruled that he -- that you believed that Roan is probably controlling.  And so that is the -- the fork that we should go down and we should consider those things.  So that's one thing I want to point out.

The secondly thing I want to point out is at the end of this excerpt from your ruling, which is a -- a discussion about -- the -- the last sentence there the Court says, so I don't believe there was either expressly or impliedly been a waiver.  And I believe the Court was addressing the notion that

there's this implied waiver doctrine under Roan, where, if you put attorney-client communications as an element of your claim or your affirmative defense, there's a waiver.  But then, if you actually disclose attorney-client communications or work product, there also could be a waiver.  That's -- that was described to you before, Your Honor, as sort of -- as a testimonial waiver.  If you're going to bring it -- if you're actually going to put it out there, then there is a -- a -- a -- a -- a waiver of a limited scope that applies to materials that might apply to things that have actually been disclosed.

And the committee before made arguments under both bases.  They -- first they said that our position that we are challenging settlement agreements and that we're contending that facts were not disclosed to us is an implied issue waiver.  And then they pointed to the testimony of Mr. Glasby and Mr. Grant, and they said, well, that's express waiver.  And -- and the Court rejected both of those arguments.

And as Mr. -- Mr. Cassada pointed out, the premise of the motion was exactly the same.  We even quoted -- this -- this is part of their brief.  They -- from last May.  This is the -- they say in the --

the brief they filed in -- on April 19th of last year

that the debtors contend that their past settlements

were based on inadequate information as to the

claimants' exposures.  And then also there at the

bottom they also assert that they settled claims only

to avoid defense costs.

So as we can see from their brief, nothing

about the -- the debtor's position has changed and it

really is the same issue.

But to -- to address this first notion

that indisputable law, as the FCR's counsel put it,

that when you are making allegations akin or similar

to fraud, that you automatically waive the privilege,

he's wrong about it.  Not only is it in -- it is

indisputable, but it's indisputable that -- that he's

not correct in -- in making that argument.

We talked about a case from the North

Carolina Business Court last May, the case of Bank of

America Securities versus Evergreen International

Aviation.  It's found at North Carolina Business

Court 2006, case number two.  It's an opinion by

Judge Diaz, who, as we know, is now a Fourth Circuit

judge.

And in that case Evergreen was suing Bank

of America Securities on a fraud theory that -- that

the investment engagement that they had contracted Bank of America to undertake was fraudulently induced.  There were claims of fraud, fraudulent inducement and negligent misrepresentation in that case.

And Bank of America said the same thing the committee and the FCR are saying now.  If you're going to sue us for fraud, we need to look behind that.  We need to look at the privileged information.  Your attorneys were involved.  We need to have access to that to see if there -- the -- the reliance was -- was reasonable.  And Judge Diaz rejected that.

He pointed out that -- that while it is always possible that the client's motive or conduct was influenced by something his attorney told him, compelling the production cannot be justified solely as a mean -- as a means to check the client's statements.  He denied the discovery and pointed out that what really is -- is at issue in these fraud and negligent misrepresentation cases is what facts were at issue.

And as Mr. Cassada detailed, the debtors have been forthcoming completely with the facts that were at issue in these cases.  We produced voluminous discovery records.

On Friday Mr. Swett asked us, for his convenience, even to provide a -- a -- a disk that -- that -- that tied all the cite -- cited instances of -- related to the cases that -- that Mr. Cassada discussed that we had disclosed so that his attorneys would not need to -- to go and -- and verify or -- or -- or line up the documents with what we had detailed.  And -- and -- and we fully provided that to him.

But the long and short of that, Your Honor, is presuming that -- is that the Business Court applied Roan to reach that result.  The Western District is controlled by Roan here, in our view. And if you apply the theory, that just because there's fraud, negligent misrepresentation, etcetera, at issue in the case, the -- the -- the -- the privilege is waived, that's just not correct.  And this Court should follow that result as it did before, last May.

Secondly, turning to the Nobles case, the Court might -- might remember that that was a -- a criminal case where a -- a criminal investigator had -- had done some -- some pre-trial work investigating facts related to the claim and -- or re -- related to the case.  And I think the defendant wanted to put

that person on the stand to talk about what he learned, but didn't want to produce the report that he had given the lawyer in making that factual investigation.

As -- as Mr. Swett said, the Court -- the Supreme Court did hold that there was a -- a -- a waiver in that -- that instance, but that was on the lines of the express waiver, because essentially, even though the investigator was a -- a -- a feature of work product -- a creature of work product, he couldn't disclose some of what was in his report without dis -- disclosing the rest.  The Court ordered production.  But that's distinguishable from our case.

Finally, Your Honor, I want to talk about the -- the -- the cases that were cited in the -- in the -- the committee's brief and the other two that it sent to us later last night.

The first is -- has to do with these lawyers-as-witness cases.  Essentially the premise that the -- the committee and the FCR put forward is that when the lawyer is testifying these courts have held that you waive the privilege.

Well, we talked about these cases before. The Cincinnati case was one that we discussed at

length in -- in May's hearing last -- last year. That is a case -- an insurance coverage case where an attorney that was involved in the negotiations of coverage ultimately ended up testifying.  It's equivalent to the Dion case that -- from Montana that the committee now cites.

That's a species of the -- the Roan cases that have been identified as, well, if you're going to be in a coverage dispute and you're going to make allegations specifically about what went on and what was known by the attorneys, there is a limited waiver in in that instance, but that -- again, that's an element of the claim under -- under Roan, but it's a -- it's a -- it's a specific kind of case.

The other two cases the committee cites, one is the Vaughan Furniture case from the Middle District of North Carolina.  The other is the -- make sure I get this name right, Your Honor -- Multifoam case.  Those are two patent cases.  Those are circumstances, again, the narrow exceptions that were identified by Roan.

In our brief we -- we speculated whether Vaughan was actually a patent case, 'cause the magistrate's decision in that case was unclear as to what was at issue.  The Multifoam case actually cites

it and says, yeah, this is a patent case.  This is where the pat -- the -- it says that the patent prosecuting attorney who actually developed the patent is now going to testify and he's going to have to reveal -- and -- and he -- and he doesn't want to reveal the considerations that he had in -- in developing the patent.  Those are now fair game.

In those -- those -- those intellectual property disputes, as Your Honor may know, some of the things at issue are whether the -- the -- the patent holder committed a fraud on the patent office by not disclosing art -- state-of-the-art or known -- know patents in other -- other places and trying to obtain a patent.

And so obviously his -- if he's going to testify, he needs to say what -- what was considered in -- in that instance and whether his conduct was equitable, because an inequitable conduct defense, patent infringement is -- is also put at issue. That's -- the -- the -- the lawyer for the patent holder would be the only person that would be implicated in that claim, so it's, again, a -- another narrow circumstance that was recognized by Roan.

It does not apply to this case, Your

Honor, where we're talking about an aggregate estimation. We've made full disclosure of facts. And just because the -- the debtors have challenged the propriety of their settlements and identified circumstances where the factual record that was disclosed in discovery is different from the one that has been developed here, it does not constitute a waiver.

Thank you, Your Honor.

THE COURT: Okay.

MR. SWETT: Your Honor?

THE COURT: Yeah. Mr. Swett.

MR. SWETT: Well, Your Honor, I didn't mean to interrupt.

THE COURT: I was going to say I'm ready to either rule or take a break, one of the two.

MR. SWETT: I would suggest, if you don't mind, is that we break for lunch and come back. If you are inclined to entertain rebuttal argument, I would like to be heard briefly.

I can well understand if you are exhausted by ---

THE COURT: --- Let's -- let's take about a five-minute break and we'll come back and hear a short rebuttal and then I'll -- and then I'll

rule and then we'll go to lunch after that.  So --
okay.

(1:13-1:21 p.m. - recess)

THE COURT:  All right.  Okay, Mr. Guy, you're standing.

MR. GUY:  Your Honor, I want to respond to -- even though I only spoke for a couple of minutes, apparently I got a lot of references in the discussion, so I want to respond to some of them.

In terms of the law, I'm going to happily rely upon the Supreme Court.  And we stick to the proposition that if a plaintiff is relying on the lawyer who negotiated a settlement and interacted with the other party and made the recommendation as to the settlement and is privy to all the facts concerning the case, if you're using that lawyer to testify that the settlement was fraudulent, then you've opened the door.  You've put the knowledge of that lawyer at issue.  There's no debate.  You have put the knowledge of the lawyer at issue.

They say we're not putting in evidence of mental impressions of lawyers.  We're only having them testify about facts that we've given them that's -- that are available in the record.  They are putting in evidence mental impressions of the

lawyers, because the lawyers are going to say I was defrauded.  You cannot evaluate whether that lawyer was defrauded unless you know what that lawyer knew and unless you know what the lawyer relied upon.

Your Honor, Mr. Cassada said this motion is a complete afterthought, quote.

When we deposed Mr. Hennessee, this initial draft of this memo made its appearance in the middle of the deposition, and I said to counsel for Garlock, really, you're saying that these settlements are inflated and you just handed to us for the first time a very lengthy document concerning why you believe the settlements were inflated, but we can't ask why the debtors paid what they've paid.

I just want to be clear about this, because if it's your position -- remember, Mr. Cassada said it was an afterthought -- if it's your position that Mr. Hennessee can't testify as to why Garlock paid what it paid, he also can't testify that the settlements were inflated, either.  And there was further colloquy on that.

The end of it was -- and this is my statement -- so the record is clear, we reserve -- the FCR reserves the right to argue that, one, what we have here is selective waiver, and two, that the

debtor would be precluded from testifying as to these issues to the extent that it now and has in the path -- past -- asserted that privilege.  Counsel for the debtor said, I'm not agreeing or disagreeing.  I just don't think it's an appropriate forum for us to have this discussion.  And I agreed.

Your Honor, back in February when we were here before you for Mr. McGee, I said the following. Your Honor, we're going to have an estimation trial in July, and what you haven't seen yet, that we have seen, but you will see, are a whole series of expert reports, and included in those expert reports are two expert reports from the debtor's lawyers.

When those individuals were deposed, Your Honor, we had repeated objections and we have had repeated objections throughout these depositions of, well, no, no, no, you can't ask that because it's a mental impression.  They are picking and choosing who gets to talk, who gets to testify, what documents are being produced, depending on how they perceive it helps them or hurts them.  That is wrong, Your Honor. Even if it is opinion work product, which I don't think it is, that is selective disclosure.  This is not an afterthought, Your Honor.

Your Honor, they say we asked these

questions to induce the waiver.  I asked the

questions to build the record to show that they were

being selective in what they were choosing to

disclose.  We all understood that they were going to

assert that privilege.  But the point of asking the

question is to get on the record that they're

continuing to assert the privilege and that we asked

the question.

Your Honor, the last thing is Mr. Cassada

says I misunderstand the law about how estimation

trials work and 524(g) and every -- I just refer the

Court to the recent Bondex case.  I don't know

whether the Court's had an opportunity to read it.

That's the law, Your Honor.  I'm not making this up.

I'm not misstating it.  That's the law.

Thank you, Your Honor.

MR. SWETT:  Your Honor, thank you

for hearing me in brief rebuttal.

This is not the time which I will choose

to cut out the responses to the elaborate

presentation Mr. Cassada made about what the debtor

thinks it found in the discovery on the part of the

plaintiffs.  Suffice it to say, there are a lot of

disputes in there.  There's a lot of differences over

what the facts were and what the facts mean, what the

various bankruptcy submissions, like ballots and 2019 statements mean, and so on and so forth.  But it is -- it was a detailed presentation and we will respond in detail in due course, but that's for another day.

Today the point is that presentation demonstrates to you the flavor that pervades the memorandum that had been provided to the experts, including Jason Brickman, to get them to take as an assumption that Garlock's settlements were distorted by its reliance upon a certain state of the record in the plaintiffs' cases.  And that's the connection that we are entitled to attack to rebut this assault on the settlement history.  And it happens that they offered -- the witnesses to those matters are their lawyers because they're the people who acted as Garlock's agents in evaluating and settling the cases.  And it's as simple as that.

Now, I don't want to be understood as agreeing that the Hearn line of authority is irrelevant here.  But you did indicate, and Mr. Krisko pointed out, that you thought Roan was probably controlling, so without prejudice to that issue I address my case to Roan.

They say, oh, the committee's position is that since we are taking the position that the

settlements were fraudulent we have thereby waived.

That is not my position.

My position is it depends on how they do it. And if they do it in such a way as to make operative facts out of their lawyers' impressions and attorney-client communications, that's the waiver, and that's exactly what they've done. And that's what they have done going forward from your earlier ruling.

My position today is completely consistent with the distinction that you drew between general -- general statements about trends and so forth versus wading into the specifics of particular facts.

Once you ruled, the parties muddled through the depositions on the basis of that ruling. I'm not arguing that anything they said by way of generalities was a waiver. You already told them that you didn't consider that to be waiver. I'm arguing that they descended to particulars and changed the flavor of the case.

When they couple the RFA list, they're undertaking to produce evidence of reliance and connection. He said or I think it's in -- I think it's that -- that the -- the -- the obligation on that is to come forth with both.

But be that as it may, even if you read the order and the disjuncture, when they go to make the connection between the alleged misconduct and the settlement values, they are implicitly placing at issue their settlement decision-making process, and the only people who have knowledge of that are the lawyers.  But they have made that an issue.  There are other ways, if they wanted to, that they could challenge the committee's methodology and the FCR's methodology.

In all of the decided estimation cases so far, they were all disputed.  It may be that the debtor was on the same side as the plaintiff proponent as the committee at that point, but there were -- they were opponents who were challenging the method, who were contesting Dr. Peterson's and Dr. Rabinovitch's conclusions.  And they were not left without arguments, and we are not saying that these people should be without argu -- left without arguments.  We are saying they should argue within proper bounds, and that does not include implied assertion about their internal settlement deliberations, processes, when they refuse to make those facts open and available to the Court and to the adverse parties.

Now, Mr. Krisko interprets Roan as elaborated in -- in relevant cases involving lawyer experts or lawyer witnesses in Vaughan and Dion, is if you're going to make allegations that put what your attorneys knew at issue as an element of your case, that's the waiver under Roan, and that's exactly what they're doing here.  It is precisely what they are doing here, and that's why even under the -- the relatively narrow document of Roan there has been a waiver when they descend to particulars and abandon the safe harbor of your ruling with respect to generalities.

Now, to give you a -- one more example -- this is in the Hennessee deposition at page 103 and 104.  The questioning had to do with a certain case, that of Michael Steckler, and -- and in -- in -- in pertinent part it -- it unfolded this way.

How much did Garlock resolve the Michael Steckler case for?  I don't have that information in front of me, but it was a substantial amount of money.  There was a conference between the witness and the attorney, then he comes back to testify.

Is your recollection refreshed?  I -- I'm not -- my recollection is we paid, I believe, $850,000 on that claim.  Why did Garlock pay $850,000

for the Michael Steckler claim?  Here's where the rubber hits the road.

Mr. Harris.  Well, I'll object.  It -- it -- that it calls for speculation.

The witness.  I would just say that it was on advice of counsel.

So the position is the Steckler settlement for $850,000 was induced by fraud, but the immediate basis of it was the advice of counsel which was infected by the fraud.

Well, in that posture, under Roan, we are fully entitled to explore the full basis of the advice given that was the -- the stated basis for the settlement including all of the information and knowledge and experience surrounding it.  And that's our position under Roan today -- the connection between Mr. Turlick and the Shein firm.

This was -- they -- they -- they were not just dealing with the few cases that Mr. Cassada mentioned.  There was a course of dealing and a modus operandi, that what was it and what -- what priorities and goals and information did Garlock bring to bear on that modus operandi of which those particular cases that he chooses to cherry pick were written -- but apart.

Same thing with Mr. Turlick -- I'm sorry -- Mr. Glasby and Waters & Kraus and Mr. Glasby and the Simon Evans firm.  They're placing these matters squarely in the shoes of the privileges clause -- of work product and attorney-client that the -- the decision-making processes with respect to pricing of the cases has been placed at issue by the position that they have advisedly taken when they have all kinds of other ways of making their defense to the committee's methodology.  That tactic, of course, has consequences and the consequence is waiver.

Thank you, Judge.

THE COURT:  Okay.  Well, I -- here's what I think I ought to do.

First off, I don't think there's any -- that I should deny the motion on the basis of laches or unreasonable delay.  I don't think there has been any of that.

I also don't believe that there's been a wholesale waiver of the privilege.  But it -- it does appear that with respect to the 26 people on RFA, the one that has the 26 on it, that there is a specificity which would -- would require further examination into privilege -- otherwise privileged matters.  So I will allow discovery on an expedited

basis as to those 26 claims.

And I guess I would include in that examination of Mr. Glasby and Mr. Turlick, who's the people that are going to be witnesses, and production of the -- these MEA and TEF forms with respect to those claims -- and I -- and -- and I guess a 30(b)(6) witness, if you want to go at it that way as well.

I don't think I ought to order any discovery as to the 210 or the hundred cases that are also on other RFA boards.

I will also say, though, that -- and will make as a matter of this order that I will not consider -- at the estimation trial, will not admit any evidence with respect to matters on which there has been a claim of privilege made previously. That I will not allow any evidence of specific decision making as to specific cases, reasons for settlement or reliance on things as to any specific cases that have not been previously disclosed in discovery, and will not permit any evidence to be offered on which there was an inquiry at previous depositions that was cut off by an instruction not to answer.

And I think that's it. Can you all put that in an order in some form?

MR. SWETT:  Yes, sir.

THE COURT:  And I ---

MR. CASSADA:   --- Yes, sir.

THE COURT:   --- I guess -- let me ask you to try to work out the timing, if you can, and I'll try to referee that here.  It's a matter of operating a shoehorn, it looks like, but I'll just wish you luck with it.

MR. SWETT:  Your Honor, in that regard, more generally to matters of trial procedure, I have put forward for the other side's consideration some questions of issues about the -- the mechanics and the order of how we're going to run this trial. They haven't yet had a chance to respond, and I would anticipate that they will and may have points of their own.

I think it would be very healthy for the whole process if we could have a conference with Your Honor after we've had a full discussion of those issues so that we can all know what we're dealing with when we come down on the 22nd.

There is a hearing date on June 27 which might be suitable for that purpose.  I'm not certain.

THE COURT:  That -- that would be good for me and good with -- yeah, I think that would

be helpful to all of us.  It -- the thought had kind of occurred to me as well that -- that I ought to at least have a little bit of a truth-telling session with you to let you know I don't really expect there -- this to -- will be done in two weeks.  I wish. But having seen and heard something about your list of witnesses, it doesn't sound like that's possible. But....

MR. SWETT:  I'm not sure, Your Honor, that it's the right time to be telling us that ---

THE COURT:  --- Well ---

MR. SWETT:  --- Because right now we should be under pressure to condense our cases.

THE COURT:  Well, but I -- I don't want you to -- my -- my goal here is to do this only once.

I understand I'm not -- likely not the last word on this thing, and whatever we do, I don't -- don't want you all to -- I don't want to screw it up so bad you got to do it again.

So we'll -- we'll -- I won't try to twist arms to the point that you have to leave out stuff that's important to you, but I'll also say, when I was practicing law there was a lawyer who had the

reputation locally that if you could keep it in Court long enough, you could always beat him, so be -- beware that you don't become that lawyer by the -- going to ---

MR. SWETT:  --- Your Honor, I have some implicit limitations, because part of our team has to go off and try another case the week following the scheduled conclusion of this trial.

THE COURT:  Yeah.

MR. SWETT:  So -- so there's a little bit of margin there.  There are some days -- but it's not a whole lot, so I certainly want to ---

THE COURT:  --- Well, we -- we will have these two weeks, and then we'll have to stop. You know, if we're not done, we'll have to come back some other time.  And I -- I think it will -- I mean, and supposedly we still have the District Court courtroom upstairs.  We are regularly entertaining in -- entertaining inquiries from them about them using our courtrooms, so I think it's probably not likely that we'll get theirs back anytime in the near future, but we'll -- we'll have to figure out times to the -- whatever we do the first two weeks, if there's stuff left over, we're going to have to find times and places to do that.

MR. GUY:  Your Honor, in the Bondex case the judge -- and we can talk about this later -- but the judge -- similar issues, but the parties had to condense it because she only had a week available, and it was done.

THE COURT:  Yeah.

MR. GUY:  She used -- it's kind of hokie, but it worked -- a chess clock.  And people had their time, and if you went over their time, then that was it.  And it worked.  It worked well in holding people to the amount of time the Court allocated for trial.

THE COURT:  Yeah.

MR. GUY:  But that's something for us to talk about.

THE COURT:  Okay.  We can borrow one of those -- those things with the lights that the Fourth Circuit has.

THE CLERK:  And, Judge Hodges, there are two exhibits of Mr. Swett's.

Do you want to have admitted?

THE COURT:  I'll -- I'll admit those.

MR. SWETT:  Yes, I want those admitted.

THE COURT:  And I will -- and I will give them back to you.

MR. CASSADA:  Your Honor, just to -- to be clear on the ruling, will Mr. Glasby and Mr. Turlick show up in their -- to testify about why they settled cases, what factors were considered, and the -- and the extent of reliance on the nondisclosure of evidence.

MR. SWETT:  Your Honor ---

THE COURT:  --- Can they show up to testify?

MR. CASSADA:  Well, what -- what are their instructions?

Are they supposed to disclose attorney work product and attorney-client privilege?

THE COURT:  Umm ---

MR. CASSADA:  --- I mean, your -- if -- if they do that, can we be assured that the waiver is limited to those particular cases?

THE COURT:  Umm, you mean test -- when they show up to testify at their ---

MR. CASSADA:  --- At their depositions and at ---

THE COURT:  --- Depositions?  Yeah, they -- that ---

166

MR. CASSADA:  --- And at trial.

THE COURT:  Well, yeah.

What -- what they do at their depositions and at trial won't unlock the door to -- to anything else.

MR. CASSADA:  Other cases?

THE COURT:  To other cases.

MR. CASSADA:  So they can talk freely about what happened in those cases.

THE COURT:  Freely about these cases without fear that -- that that's going to lead -- that, of itself, will lead to further examinations.

MR. CASSADA:  Okay.

MR. SWETT:  Well, if they're going to put in evidence of other cases, under the ruling you articulated a few minutes ago, they've got to be prepared to open up on those, too.

THE COURT:  Right.  If there's other than the 26.

MR. SWETT:  Right.

THE COURT:  But -- but -- but if they're not going to do that, then ---

MR. SWETT:  --- Right.

THE COURT:  --- Then the fact that he's talked about these 26 won't open that up.

MR. CASSADA:  Okay.

THE COURT:  Okay.

MR. CASSADA:  Very good.

THE COURT:  I hope I haven't just

---

MR. SWETT:  --- Thank you, Judge.

THE COURT:  I hope I haven't just make it more confusing.

MR. CASSADA:  I -- I think it's clear what the ruling is.

THE COURT:  I'll rely on you all to straighten it out.

Thank you.

MR. CASSADA:  Thank you.

MR. GUY:  Thank you, Your Honor.

WHEREUPON,

at 1:42 o'clock p.m. the hearing was adjourned.

CERTIFICATION

I, Cassandra J. Stiles, CVR, Certified Court Reporter and Notary Public in and for the County of Forsyth, State of North Carolina at Large, do hereby certify;

That the foregoing record was reduced to typewriting in the normal course and manner of the transcription of electronic files as provided, and that the electronic file from which the record was produced was retrieved from the official records of the Court hereon indicated, and that the foregoing pages are a complete and accurate written record of said file;

That the undersigned is not of kin nor in anywise associated with any of the parties touched by the subject matter contained herein, nor any counsel thereto, and that I am not interested in any event(s) thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this the 9th day of June, 2013.

                              Cassandra J. Stiles, CVR

                              Certified Court Reporter

                              Atlantic Professional Reporters

                              Post Office Box 11672

                              Winston-Salem, NC 27116-1672