IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
10-31607 11


C O P Y


| | |
|---|---|
| IN RE: ) | |
| ) | |
| GARLOCK SEALING TECHNOLOGIES, ) | |
| ET AL, ) | TRANSCRIPT OF HEARING |
| ) | |
| Debtors. ) | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _) | |

---

Hearing on Debtor's Motion for Authorization
to remove Michael Bazley from Service List
And Disregard document filed relating to
Rule 2019 Statements

Hearing on Debtors' Renewed Motion to Exclude
Evidence of Debtors' Settlements Under
Federal Rules of Evidence 408

Hearing on Debtors' Motion for Order Authorizing the
Debtors to Enter into the Proposed Amendment and
Restated Affiliate Tolling Agreement and Proposed
Amended and Restated Managers Tolling Agreement

---


Thursday, June 27, 2013
9:31 o'clock a.m.


Honorable George R. Hodges Presiding

---

Atlantic Professional Reporters
Winston-Salem, NC  27116-1672

APPEARANCES OF COUNSEL

Garland Cassada, Esq.

John Krisko, Esq.

Ray Harris, Esq.

Jack Miller, Esq.

Dan Clodfelter, Esq., and

Hillary Craptree, Esq.

Ted Swett, Esq.

Travis W. Moon, Esq.

Ann Weber, Esq., and

Scott Frost, Esq.

Jonathan Guy, Esq.

OTHER APPEARANCES

Julian DuRant

3

I N D E X

PROCEEDING                                              4

EXAMINATION

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| (None)  |        |       |          |         |

_____

ADJOURNMENT                                             93

TRANSCRIPT CERTIFICATE                                  94

E X H I B I T S

| Name | Offered By | Identified | Admitted |
|------|-----------|------------|----------|

(None offered)

4

P R O C E E D I N G

(9:31 o'clock a.m.)

THE COURT:  We have a number of items on, so I'll go with whatever order you all want to go with it.  So....

MR. CASSADA:  Okay.  Your Honor, Garland Cassada.

THE COURT:  Well, I guess the first thing we need to do is get appearances.

MR. CASSADA:  Yes, sir.

THE COURT:  So....

MR. CASSADA:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. CASSADA:  I'm Garland Cassada. I'm here representing the debtors.  I'm joined today by John Krisko of my firm.

And also we have Ray Harris, who is with the Schachter firm.

THE COURT:  Okay.

MR. CASSADA:  Which, as you know, has been appointed

THE COURT:  --- Yeah.

MR. CASSADA:  --- As special counsel for the estimation trial.

THE COURT: Good. How about we finish up on this side of the courtroom and then....

MR. MILLER: Sure. Good morning, Your Honor. Jack Miller, Rayburn Cooper in Durham, counsel for the debtors.

Your Honor, I've got with me today Julian DuRant. He's a rising third-year law student at Wake Forest.

THE COURT: Okay, good.

MR. MILLER: He's with us for half the summer.

THE COURT: All right, good. Well, welcome.

MR. CLODFELTER: Good morning, Judge. Dan Clodfelter and Hillary Crabtree for Coltec Industries.

THE COURT: Okay, good.

MR. SWETT: Good morning, Your Honor. Ted Swett, along with Tom Moon, for the official committee of asbestos personal injury claimants.

And I have a couple of people I need to introduce to the Court today.

THE COURT: All right.

MR. SWETT: To my right is Scott

Frost.

MR. FROST:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. SWETT:  One of our special litigation counsel.

THE COURT:  Okay.

MR. SWETT:  He's with the firm of Waters & Kraus.  And my colleague, Ann Weber, and of course Jim ---

MS. WEBER:  --- Good morning, Your Honor.

THE COURT:  Yeah.

MR. SWETT:  And of course, Jim Wehner ---

THE COURT:  --- Yeah.

MR. SWETT:  --- Are here with us today.

THE COURT:  Okay, good.

MR. BECK:  Good morning, Your Honor. Jonathan Guy with the FCR.

THE COURT:  All right, good.

Okay, so now we'll proceed.

MR. CASSADA:  There are a number of matters on for hearing.

I think that we have two uncontested matters, one to remove a plaintiff from the service list, and another to extend the tolling agreement in the adversary proceeding.  I suggest that we -- we take those up first.

Then we have the -- the debtors' motion to exclude evidence of settlement.  As -- as -- as -- as I'll explain to Your Honor, this is a pretrial motion and we'll ask for -- for modest relief as it relates to that motion.

We've also got a motion by the committee to enforce your June 18 order compelling discovery.  So -- and I -- I would suggest that we take those in that order.

And then, finally, we're here on a status conference regarding the estimation trial.

THE COURT:  Okay.  Is that all right with you all?

MR. SWETT:  Yes, sir.

THE COURT:  Okay.

MR. CASSADA:  Yes, Your Honor.  We -- we should leave significant time for the status conference, though.

THE COURT:  All right.  Okay, good.

MR. MILLER:  Your Honor, I'll be

quick with my two matters.

The first one we'll take up is -- is item number one on the agenda, which is the debtors' motion to remove a -- a gentleman named Mike Bazley who filed at 2002 request for notice early on in the case.  He appears to be a prisoner at Folsom State Prison in California who filed a request for notice. We sent -- sent all the pleadings to him.  I hope he enjoyed reading them.

We -- we received a call from -- reportedly a call from an employee of -- of the California prison system saying that Mr. Bazley had been transferred and he gave us a new address for Mr. Bazley.

We amended the 2002 master service list and started sending items to him there.  They have all been returned.  We've had 80 items of mail sent and returned.  And so it appears that Mr. Bazley maybe hasn't actually been transferred but we're not sure at this point.

We filed a motion to ask that he just be removed from the service list unless or until he gives us a new address and we try it there and -- and things are going through to him.  He does not appear to be a claimant in this case.  He wasn't listed as

one of the asbestos claimants that were pending at the -- at the beginning of the case nor is he listed on our sort of regular schedule as -- as a claimant in any of the matters in any of the three cases.  And -- and so we -- we think that there will be no prejudice to him not receiving these notices as far -- at least as far as the debtors can tell.

Mr. Bazley also, I -- I suppose, received a copy of -- of the debtors' motion for a protective order with respect to the 2019 statements that the debtors have got an access to through -- through their discovery process that they've engaged in during the case.

Attached to that motion was a authorization form that certain parties-in-interest were supposed to fill out in order to get access to the 2019 statements that the debtors had received through this process.

The order that was entered granting the debtors' motion after hearing limited the parties who could actually receive those 2019 statements to the parties that are here in front of you in the -- in the courtroom today.

Mr. Bazley decided that he would make -- I think make up a -- a law firm name and -- and filled

out one of those 2019 access statements and sent it in. I think it was actually the file on the docket.

The other relief that we're requesting in this motion is that we be permitted to just ignore that 2019 request and do nothing in response to it.

We -- we attempted to serve Mr. Bazley at all of his previous addresses, all potentially known addresses for both -- both where he was at the beginning of the case and where the -- the -- the officer called and told us that he had been transferred to but we've gotten no response from Mr. Bazley in response to our -- to our motion.

THE COURT: All right. Well, we'll -- we'll grant your motion.

MR. MILLER: Thank you. Thank you, Your Honor.

THE COURT: I don't know what it says about Folsom Prison, that somebody would actively try to review 2019 statements ---

MR. MILLER: --- A lot of time on their hands.

THE COURT: --- As a way to entertain themselves. So....

MR. MILLER: A lot of time on their hands I think.

Your Honor, the other matter that I was going to handle today is actually item number three on the docket.

The debtors filed a motion seeking to extend the tolling agreements that they entered into with certain former managers of the debtor, and also certain affiliates, Coltec and other affiliates.

Your Honor will recall we had a hearing on this about this time last year in response to dualing motions for authorization to enter into a tolling agreement and the ACC and the FCR's motion for authorization to bring certain claims filed -- filed in the adversary proceeding against the former managers and -- and the affiliates.

That tolling agreement that was entered into last year is set to expire on July 1st.  We filed a motion seeking to extend that out to July 1st of next year -- or I -- I -- I believe it was the -- the earlier of July 1st of next year or 180 days after Your Honor's disposition of the estimation trial.

In response the ACC reached out -- in response to that motion the ACC reached out and -- and proposed a -- a shorter term extension that they would agree to.

We worked through the details on that and have reached an agreed order that would -- that would stay discovery that wasn't already -- that wasn't already pending and authorized by the Court during this shortened tolling extension and would extend the tolling period -- and basically extend the tolling agreements until the later of September 25th, 2013 or 30 days after the end of post-trial briefing for the estimation trial.

And the -- the ACC, the FCR, the debtors, the affiliate Coltec, and the affiliates, and also the managers have all agreed and signed off on -- on a stipulated order that provides that relief.  And we'd be -- we're prepared to upload that after Court ---

THE COURT:   --- Okay.

MR. SWETT:   --- Your Honor.

MR. MILLER:   --- If Your Honor will approve it.

THE COURT:   That sounds good to me.  Go ahead.

MR. SWETT:  Our -- our agreement is predicated on the assumption that -- that -- that the post-trial briefing won't go on forever and there will be a defined and limited period for that.

There is also a carve-out of the agreed, for lack of a better term, stay of new 2004 requests. In case of change of circumstances where it's necessary to preserve evidence, we still have the right to come forward on notice to seek leave.  So those protections are afforded to us.

But the main point is that we are bowing to the reality that the estimation trial looms large on the calendar, that there will be a post-trial briefing process that won't go on for an unreasonable length, and that at -- then at the appropriate time the parties will turn their attention to the other important business in the case.

Very high on the list of that from our point -- standpoint is the question of derivative liability for the asbestos problem.

THE COURT:  Okay.  We will -- I will sign that order when it comes.

MR. MILLER:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. CASSADA:  Your Honor, next on the agenda is a contested matter and it's the debtors' renewed Rule 408 motion.

Before I jump into that, Your Honor, I -- it -- it would be in order I think to give the Court

an update and -- since we were last before you on June 6th.  Since that time, Your Honor, we were in -- the following week we were in New York for the week for depositions of experts.

And then the next week, which was last week, we were in California.  We're taking depositions this week, three depositions this week and the one next week largely as a result of having interrupted depositions to hear the motion to compel filed by the ACC.

But everything is scheduled and -- and it appears that these depositions can be done in a timely manner and not interfere with the preparation for that estimation case.

We had depositions this week of the two lawyers that you heard about on June 6th, David Glaskey, who was Garlock's defense counsel in California, and John Turlick, who was defense counsel on the east coast.  Those depositions took place on Tuesday and Wednesday of this week.

Tomorrow we're presenting the Rule 30(b)(6) witness that Your Honor ordered us to produce in the order following the committee's and the FCR's motion to compel.

And then next week we have the deposition

of Charles -- Charles Bates, who's the debtors' claims estimation expert.

Your Honor, the -- our goals for our 408 motion are two -- are twofold.  One, we would like to obtain a ruling from the Court under Rule of Evidence 1(3)(b) recognizing Garlock's standing objection to the admissibility of settlements or settlement history based on both Rule 408 and the lack of relevance.

And, two, in light of confusion that has developed since Your Honor entered an order on estimation on April 13 of last year, confusion has developed over precisely what the committee and the FCR and their experts are offering settlements for.

We would like a ruling from the Court that settlements will not be offered for purposes that I think both the committee and the FCR today and in connection with this ruling have said they would not be offering settlements for, and that is for the purpose of proving -- or estimating the validity for the allowed amount of the claims that were actually settled, the disputed claims compromise.  Those are the two things we seek.

Your Honor may recall when you entered your order in April of last year you recognized that

the Fourth Circuit had held that Rule 408 does seek to preclude evidence -- or does preclude evidence to show the validity or invalidity of compromised claims.

The Court observed that the committee and FCR have stated that they were not going to be offering settlements for that purpose.  And -- and for that reason Your Honor denied our motion to exclude the use of settlements under their so-called settlements approach.

As the case has progressed, Your Honor, it has become clear that it's not clear at all whether the ACC and FCR's and their experts rely on settlements for this improper purpose.  We believe this provides a need for the Court to consider Garlock's motion in light of the position ACC, the FCR, and their experts appear to be taking that we believe is in contradiction of your order.

As the Court knows, Rule 502(c) provides for the estimation of allowed claims.  And the Court has properly ruled that the aggregate amount of allowed claims is the subject of the estimation trial that we will hold in July.  That's in paragraph nine of your estimation order, Your Honor.

In turn, 502 bakes -- makes clear that the

validity in allowing amount of claims is governed by

state law.  And that's true, the case law says.  And

502 makes it clear, we believe, whether claims are

subject to allowance or estimation, because

estimation is a -- is a shortcut to allowance.  Under

-- under either approach the Court must consider

whether claims are valid and what the amount of those

claims are under state law.

Now, it's our contention, we believe it

can't really be disputed, that only claims held by

persons who can prove that Garlock caused or

contributed to their injuries have allowed claims.

And the allowed amounts of their claims are based on

application of state law that allocates damages to

Garlock based on the fault of others.  And it gives

Garlock setoffs based on compensation the claimants

have received from other sources.  And, indeed, our

estimation approach is true to state law and -- and

follows that form.

But then the question arises what do the

ACC and the FCR offer to estimate the aggregate

number of valid claims and the allowed amount of

those claims past settlements.  The theory of their

experts has now become clear in their expert reports.

Garlock is bound by its past settlements.

They begin with the premise that Garlock is obligated to pay future claims based on what it was paying past claims before the bankruptcy date. They use various variables related to settlement history including propensity to sue, payment rate, the payment rate of claims that will -- that have been filed and what we file against Garlock in the future, and a term called average settlement value.

They apply average settlement values to future claims and they call this liability. And then they assert that properties should change hands by virtue of a formula that projects future settlements based on past settlements.

We believe the only way settlements of past claims can measure Garlock's liability for future claims is that past settlements were a measure of liability for the claims compromised. Otherwise the settlements would not be relevant.

The ACC and the FCR and the experts, they appear to understand that but they've denied before and they have not denied in response to this motion that they're offering settlements to show liability, or that they're offering settlements to prove the validity of claims settled. But at other times they make no bones about their primary premise that future

projected settlements are a liability precisely because past settlements were a liability.

I refer the Court to statements made by parties at the hearing before this Court on June 6th.

I'm sorry, Your Honor, for taking just a moment.

Mr. Guy was arguing on behalf of the futures representative and he was explaining how Garlock had raised -- waived its privilege. And in the course of that he explained the relevance of Garlock's past settlements. And I quote from page 63 of the transcript of that hearing. And I have copies of the transcript here if the Court and parties would like that.

But he says now they know full well, just like every other debtor before them, dozens and dozens of debtors before them that have asbestos liabilities, that the best measure of what their future liabilities are -- and Mr. Greer's client -- the best measure is what they've paid in the past. Why, because that's the actual liability that they've paid. It's not hypothetical. It's not unimaginary. It's reality.

And then he went on to -- to explain that when they put in their -- what they put in their

settlements was we are resolving our liability for this amount of money.  And they had representing them the best lawyers.  They had the best advice.  And they had every competent people running that claims resolutions shop.  So they -- now that we're stuck with that reality, and they know it, they're going -- that you're going to look at them.

So it -- it -- Mr. Guy made it crystal clear that the future rep -- representatives rely upon settlements which is very improper approach that this Court recognized in your order on estimation.

Now, we had the occasion last Friday to take the deposition of the future rep's claims expert.  And based on her testimony, it's not at all clear why she's -- why she's relying on settlements to prove Garlock's liability for future claims.  She really made two contradictory statements.

I asked her, okay, when you use the term liability in your reports, how are you defining that term.  Answer, I probably shouldn't be using that term, the term liability, because I don't define it as the lawyers do in this case clearly.  I'm simply saying that the process has produced responsibility in the company or not for paying a particular claim. For me that -- they're liable for it.

I realize that there has been a whole discussion about whether that means they are really responsible, but I guess my experience from the beginning is that in each of these various circumstances where people settle claims, they've signed certain things which say, yes, they have the disease, yes, the company caused it.  And the insurers enforce that.  The insuring -- the insurance requires the company to say this is my claim.  I'm paying it because my product caused this particular injury.  So -- so the futures rep's expert appears to be relying on settlements because she is assuming or interpreting the settlement as liability for the claims settled.

Now, later, after I finished asking questions, Mr. Guy asked her one question saying, well, are you equating past settlements with liability.  And she said no, in flat contradiction to what she -- her testimony when we were asking her questions.  She said no without any explanation.

In any event, there is -- at the very least there's a lack of clarity on -- on this issue.  And at the last hearing you heard the ACC argue that it was entitled to privileged materials and testimony to prove that Garlock settled the claims based on

liability concerns.  So -- so by offering the settlements to begin with, now we've -- now we're into satellite litigation about the settlements and satellite litigation about whether Garlock has to produce the privileged advice of its counsel and privileged work product in order to be able to meet its burden to prove that its past settlements were not based on liability.

Now, we've also heard over and over again from the committee and the futures rep that they're not relying on settlement for this purpose, that they're just projecting future contracts and they're projecting future settlement contracts based on Garlock's past settlement contracts.  And they some -- somehow they say that if we dress it up this way, we're not really relying on settlements to prove the liability for settled claims.

And we submit that that's no distinction at all.  And obviously we think the Court has probably considered that when we filed our motion before and -- and believes otherwise, believes that -- that that's a proper purpose and that -- that that's not relying on the premise that -- that settlements are a reflection of liability for the settled claims.

They cite a litany of cases for which they explain that all Courts that have completed estimation have admitted settlements. And they cite the Owens Corning case, Armstrong, Federal Medical, Eagle Picture, UNR, Babcock and Wilcox, and the National Business Act.

Now, we've explained to the Court in each of those cases where the estimation was completed, it was because there had been an agreement with the debtor that capped the debtor's liability. And the confirmation hearing and the estimate was for the purpose of confirming the debtor's liability as agreed. And settlements were admitted for the -- for that purpose by -- by all parties, both those that were advancing a -- a -a theory about estimation on the -- to sort -- support the plan that was being offered on the table and estimation seeking to deny -- deny confirmation of plans in the agreements that had been reached.

So those cases are very different from this case where liability is disputed. And I think we've explained to the Court this case is more like the USG case before they settled, when USG argued that it disputed liability and the Court ordered proof of claim and ruled that in any proceeding it

would consider USG's defenses and actual liability for claims in any estimation proceedings.

Now, Bondex appears to be an exception to the rule.  They cite the Bondex case and Judge Fitzgerald's recent ruling there.  I think what the Court needs to understand about Bondex is that the debtors in that case did not object to admissibility of the settlements.  In fact, they offered the settlements themselves to prove their case about what their true legal liability was.  And they said that the Court should let them settle.  So that's a different case altogether.

And, finally, the Babcock and Wilcock -- cox opinion that they have cited repeatedly, it has not application to our case.  That was not an estimation case.  That was a fraudulent transfer case.  And there would be good reason for settlements to be admissible there based -- depending on what standard is being applied under the fraudulent transfer law, if the Court has one of those standards, is whether it was reasonable for the -- the debtor and the transferee to believe at the time of the transaction that a company was -- was solvent. And in Babcock and Wilcox, my understanding is that the parties there had relied on settlements to

determine solvency to support the transaction.

And so it was completely appropriate for the Court in a fraudulent transfer action to consider that.  And the Court ruled that this -- that it was not ruling that settlement should be admitted in an estimation trial.  So that's a fraudulent transfer action.  This is an estimation trial, where you're actually estimating the allowed amount of claim.

Finally, I want to speak briefly about an -- one other case that the committee and the FCR have relied on repeatedly and that's a -- a decision out of the A.H. Robbins case from the Fourth Circuit. And they cited this case as authority that the Rule 408 does not apply in mass tort cases but only in individual cases.  But we don't think that's a fair interpretation of that opinion.  We think that in that case the Fourth Circuit was commenting on Rule 408 in dicta, saying that the protections of Rule 408 only applied to the parties to the settlement.

So if you were a party to a settlement, you had a right under Rule 408 to exclude the evidence of the settlement for any offer to compromise to prove the validity or invalidity of the claim or to prove the amount.  That's what that case says.  It was contrasting that to the claims

resolution procedures in the A.H. Robbins case, which had provision that the claim forms and different materials that the trust sent to the claimant would not be admitted into evidence.

In that case the claimant was trying to get those claim forms admitted in -- into evidence at a jury trial to show that the trust recognized liability and argued that the trust had waived the protections of those provisions.  And the Court was only saying in that case that -- that the claims resolution procedures and these provisions are different than Rule 408, because these provisions protect more than just the parties to the negotiations.  They protect the whole process and other parties.

So the -- so the rationale for Rule 408 doesn't apply here.  In -- in rule -- under Rule 408 the parties to the settlement discussions can keep those discussions out of evidence.  So that case doesn't really apply here.  It doesn't -- it -- it -- it -- it certainly doesn't stand for the proposition that -- that Rule 408 has no application simply because we're in a mass tort case.

This case is unique.  There's no settlement agreement.  In fact it -- it appears that

the committee and the futures rep are not interested

in a compromise because they believe 408 has no

application, making -- to force Garlock to swallow

its settlement history as a measure of liability.

So, Your Honor, we're -- we're asking for

-- for an order providing two forms of relief.

First, we would like the order to state that

Garlock's settlement cannot be admitted to estimite

-- mate the validity or value of the claims settled.

Now, this should not meet with objection since both

the committee and the futures rep has denied

vehemently that they're offering settlement for that

purpose.

Second, to facilitate an efficient

estimation trial, we would like the Court to

recognize, pursuant to Rule 103(b), a standing timely

objection and motion to strike by the debtor to the

admissibility of any evidence of any debtor's

pre-petition settlement of claims and rule that the

debtors are not required by Rule 103 to state any

objection and move to strike any evidence of

settlements and settlement history, state any

specific grounds for any such objections, or take any

further action at the estimation trial to preserve

its rights.

Now, we're -- now, our objection here is broad.  We're not only talking about an objection pursuant to Rule 408.  We're also raising an objection to admissibility of the settlement, because certainly we think that if settlements don't reflect liability, then they're -- they're not relevant and they shouldn't be used.

Thank you, Your Honor.

MR. SWETT:  Good morning, Your Honor.

This, of course, is an issue that you heard and decided in rendering your order on estimation of mesothelioma claims.  Nothing has changed.  The motion is in effect an untimely application for reconsideration which under the standards that govern that procedure must be denied.

As a prelude to what's going to happen at trial, however, it -- it is useful perhaps to refresh our -- our -- our respective recognition of what the issue is and what the positions of the parties are.

Mr. Cassada is correct.  You've ordered an aggregate estimation of present and future mesothelioma claims and you've put that in the context of allowance but in -- in the sense of we are to approximate the value of claims that may

ultimately be allowed under one plan or the other.

So this is not to be confused with a surrogate for

allowance proceedings in the sense that any given

claim will be allowed or not in the estimated amount.

That's the difference between an

individual merits contest and an aggregate

estimation.  If we are decidedly in the aggregate

estimation realm, you have made perfectly clear that

no claim and no defense will be decided on the merits

in the estimation context.  No claimant, none of whom

are here, need fear disallowance of his or her claim

as a result of the estimation.  Garlock need not fear

that whatever defense it has on a particular claim

will be decided exclusively against it in this

setting.  That's not what we're about.

This is a valuation exercise.  And the

Rule 408 issue must be viewed in the context of an

aggregate estimation exercise and the case law that

teaches how that exercise should be carried out.  And

as is well known to the Court, it is the position of

the ACC that the proper measure for estimation is

what would it cost the debtor to resolve the

unliquidated, disputed tort claims pending and future

for mesothelioma if it were not in bankruptcy

expressed as a present value.

Judge Pullen in the Owens Corning case put it a little differently but getting at the same thing.  And Judge Fitzgerald in Bondex took a leaf out of his book in saying that the issue is what would be a fair resolution of these disputed, unliquidated claims if the debtor were not in bankruptcy considered in -- in the aggregate.  So that's what we're about.  And that delineates, that defines the scope of the issues and the fair debates that are to be had at trial.

Now, in the tort system, which is the paradigm that we're -- we're supposed to follow in approximating the aggregate value, there are two ways to resolve a disputed, unliquidated mesothelioma claim.  One is by trial and judgment.  It is beyond peradventure.  No one can dispute that over its 30 years in the tort system, going all the way back to the landmark case of Perell, this debtor tried relatively few mesothelioma claims, a minuscule proportion in relation to the overall population of those claims.  As a matter of fact, as will be made abundantly clear, and appropriately so based upon the evidence at trial, Garlock did not use the trial method of valuing the claims very often at all.

What is the second method that per -- that

per -- that -- that -- that -- that such a claim can be resolved in the tort system? It is by consensual need. It is either by paying money to settle the claim or persuading the plaintiff and his counsel to withdraw the claim for lack of evidence. This in fact is the inescapable reality of how Garlock resolved the mesothelioma claims overwhelmingly. It was able in many instances after discovery or not to persuade the plaintiff's counsel to withdraw the claim on the basis that the claimant had no evidence of working with or around Garlock's asbestos-containing products.

As a condition of paying money to settle mesothelioma claims, Garlock required a medical diagnosis of meto -- mesothelioma acceptable to Garlock and evidence satisfactory to Garlock that the claimant worked with or around Garlock's asbestos-containing product, product identification. And where the claimant could supply both of those conditions, could meet both of those conditions, diagnosis and proof of product identification, by and large Garlock settled the claims rather than taking them to trial.

And in the estimation, given that so much of the problem lies in the future of proving claims

based upon the dissemination of asbestos products before the petition, the inevitable inference from the facts will be that in the tort system, were it still defending there, Garlock would continue to resolve the mesothelioma claims by similar means. There are admissions in the record that any other approach would be economic suicide.

Now, bankruptcy reorganization is an intensely financial and realistic matter, a -- a -- a -- it -- it is concerned with practical realities, not metaphysics.  The practical reality is that the tort system by and large is not a trial system for resolving mesothelioma claims.  And given that that is so, there is no occasion whatsoever to transform the bankruptcy system into such a evaluation approach, to suppose, contrary to all reality, that each and every mesothelioma claim would be valued by style, which, by the way, is the fundamentally unrealistic assumption of Dr. Bates' estimation opinion.

Now, if we were to join in earnest in in limine proceedings to -- to narrow the scope of the trial and focus the issues in accordance with the law, you would be hearing a motion in limine to exclude Dr. Bates' report as incompetent because

founded on manifestly unrealistic assumptions.  No

expert can do that.  Estimation cannot be

speculative.  It has to be rooted in reality.

But we are not doing that.  We are heading

into a judge trial.  We are getting there as quickly

as we can.  And we trust to the Court to -- to -- to

sort through the issues and make its findings and its

judgments accordingly without a whole lot of baggage

in advance in -- in -- in -- in the sense of in

limine practice.  But let there be no mistake that --

that our position is that Dr. Bates' estimate is

fundamentally unfounded and therefore inadmissible.

Now let's talk about allowance.

THE COURT:  You're attempting to

grant both motions in limine and take ---

MR. SWETT:  --- No doubt.

THE COURT:  --- Take the last couple

of weeks of July off.

MR. SWETT:  A sentiment I'm sure we

all share.

But let's talk, since we must, about the

-- the -- the context that you placed this estimation

in under rule -- or I'm sorry -- section 502(c) of

the Bankruptcy Code.  We have argued to you that

really the proper locus of this is 524(g).  But in

your order of mesothelioma estimation you embraced the idea that it -- it is a 502(c) matter in some sense and that we are about the business of estimating the overall value of claims that will ultimately be allowed under one plan or the other.

And let's bring it back, then, to the man -- manner in which mesothelioma claims are in fact resolved in the tort system, will in -- in -- without a doubt be resolved in the future in the tort system. And that is by taking disputed, unliquidated tort claims and turning them into consensual settlement obligation. There is absolutely no basis in law to suppose that settlements, being contractual obligations, are not allowable. No one could argue that with a straight face. Most claims allowed in bankruptcy are contractual. These are no different.

So the grand distinction that the debtors would set up with respect to legal liability -- capital L, capital L -- and what it would cost them to resolve the claims in the tort system is a specious distinction that will not fly. In truth and in fact the liabilities that the debtors incurred in the tort system were to pay settlement obligations. And that's the sense of Mr. Guy's comment quoted by Mr. Cassada, not that there were, and we do not take

the view that Garlock admitted fault, or admitted

causation, or anything at all of the sort.

What Garlock did is confront a huge financial problem replete with risk, the risk that if it forced too many cases to trial, it would too often suffer catastrophic judgments and simply be unable to go on.  And so they hedged.  In their own enlightened economic self-interest they exchanged the unlimited downside of a disputed, unlimited unliquidated tort claim for a capped, fixed, certain obligation in the form of an agreement to pay a certain sum of money to a claimant who had the requisite evidence to satisfy their criteria.

And claims transformed in that way, from unliquidated tort claims to fixed, liquidated contractual obligations are undoubtedly allowable. And that's why in the end, Judge, it doesn't really matter whether you take the view that we're under 502(c) or 524(g) for the estimation purposes, because the notion that you have to pretend to try in defiance of all reality every penny in future mesothelioma claims in order to determine the legal liability is simply false.

The excuses that the debtor offers to get out from under the uniform case law on the

appropriate measure to apply in the estimation in the pending and future asbestos claims don't fly either. In Eagle Picture, in Owens Corning, in Armstrong, in Federal Mobile, in Babcock and Wilcox, in Bondex, and in innumerable unreported  estimation outcomes there was a contest.  Somebody was opposing somebody else's estimate.  The asbestos claimants' constituency in those cases put forth realistic estimates based upon the claimant's -- I mean, the debtor's actual claims resolu -- claims history and resolution history which meant, as a practical matter, by and large they're not exclusively settled.

I say not exclusively because in a estimation method that takes account of the debtor's actual claims resolution history, such verdicts as it -- as it took both for and against are in effect factored in.  But they are statistically meaningless given the overwhelming preponderance of consensual resolutions, both dismissals and settlements.

In Owens Corning I believe it was the unsecured creditors' committee, a well-financed, determined constituency of financial players, banks and bond holders who were opposed to the ACC's estimate.  Likewise in -- in Armstrong I believe it was the property damage committee.  In Federal Mobile

it may have been the property damage committee, or it may have been the unsecured creditors.  I can't -- I can't remember.  But it was a determined, well-financed adversary with a significant interest in knocking down the as -- the asbestos con -- claimants' constituencies' estimates.

In Babcock and Wilcox it is true the first time an estimation was offered was in a -- a fraudulent conveyance case.  But the issue was what is the aggregate value of the -- of the present and future claims.  And the debtor said you can't use the settlement history because of Rule 408.  And the bankruptcy judge, Judge Brown, held, as you noted in your estimation ruling, that's not true.  Rule 408 does not stand in the way of this use of settlement data for aggregate valuation purposes.

And now most recently in Bondex it is not true that these -- that the Bondex debtors made no issue concerning the admissibility of prob -- probativeness of the settlement information.  They argued squarely that they should -- that the settlement should not be taken as any -- as any measure of the value of the claims in an aggregate estimation, presenting precisely this same issue.

And as you know from reading the Bondex

opinion, Judge Fitzgerald was unpersuaded and em --

and embraced the methodology applied by Dr. Peterson

and the variation of that methodology essentially was

put forth by Dr. Vasquez.

The notion that if Rule 408 applies to only the debtors can interpose an objection is simply not true.  And the reason way these -- this case law uniformly looks to the settlement and resolution in the claim history, the res -- the resolution history, and the -- and the settlement values achieved in the past is not to mechanically impose them on the future but to make realistic, informed judgments about what's going to go on if -- if -- if the bankruptcy plan craters or if the debtor were to return to the tort system or in the hypothetical valuation scenario of the continued defense of the -- of the matters in the tort system.

THE COURT:  I mean, I -- I don't want to -- I hate to cut you off but I -- I -- I don't think I ought to grant the motion to -- on the 408 ruling.  I -- I will give a standing objection. I think that would probably save everybody a lot of exercise.  And I think that we will -- that with -- with that limitation I'll otherwise deny the motion for the reasons that -- same reasons that I stated in

the prior order.

But, Mr. Cassada, if you want to write up a -- a -- I'm not sure exactly how to say it -- but, you know, write up something that protects you all's objection, we'll preserve that objection without you having to state it every time and -- and -- you know, pursuant to rule -- to 103(b).  And -- but other than that, I'll deny the motion and we will listen to that evidence along with you all's evidence and see where we come out.

MR. CASSADA:  Okay.  Thank you, Your Honor.

I'll draft an order and present it later today.

MR. SWETT:  Thank you, Judge.  And thank you for cutting me off.

THE COURT:  I hate to do that because I always learn something when you all talk. Sometimes it's useful and sometimes it's confusing. But I always learn something.

Okay, and then we have one other contested motion I think.

MR. SWETT:  Yes, Your Honor.

Your Honor, this is the committee's motion pursuant to the June 18 order, finding waiver and

compelling certain discovery.  We raised two issues in our further motion having to do with our dissatisfaction with the completeness of the debtors' response.  One of them, I'm happy to report, we've been able to resolve by agreement and I'll describe that first.

The issue was redaction.  The June 18 order specifically said that trial evaluation forms and major expense authorization forms for the 26 designated claims were to be produced without redaction.  And what we received was a set of documents from which material had been removed, as the debtor expressly to acknowledged that their explanation was one having to do with the characterization of pieces of those documents as separate trial evaluation forms pertaining to different cases.

But the fact is they were set forth in the original format on single documents and our position was those documents were required to be produced. And the debtor in the end was willing to do that as long as it was clear that doing so would not expand the scope of the waiver or in any -- in any sense constitute in itself a waiver of any applicable privilege or discovery protection.

And we were amenable to that.  We rely on the June 18 order as having fixed the parties' rights and obligations in regard to the production.  And so we have a consent order that we shared and that the other side has agreed.  And we will be uploading that later today.

So that leaves us with the second issue. And the second issue has to do with the absence of trial evaluation forms for half of the designated claimants.  And we're speaking now only of those forms and not the so-called major expense authorizations or major expense approvals, but the trial evaluation forms.

I can report that both of these forms are -- these documents are short.  They are a summary. They are very revealing in some respects and ways that we believe to be important and useful.  The -- we have had the opportunity to depose Mr. Glaskey and Mr. Turlick just this week and asked them about them. And while Mr. Glaskey essentially affirmed the accuracy of the major expense authorizations, as I understand it, he disclaimed recollection of advice or evaluations given to the clients with respect to any of the designated claims.  I was not present at these depositions so I'm -- I'm -- I'm not going to

purport to put too fine a point on it.

Suffice it to say that the order compelling disclosure of the evaluations and recommendations made by counsel in the TEA's pursuant to a scope of waiver that is described in paragraph two of the June 18 order, which I'll get to, has proved to be a limited utility given the lawyers disclaiming recollection of any such advice or evaluations in this 26 prominently featured cases, and -- and now to come full circle also due to the unavailability of the trial evaluation forms in half of those cases.

Mr. Turlick, it is my understanding, said that all these forms were prepared by paralegals with little supervision.  He was -- essentially declined to comment on them and we didn't get much from Mr. Turlick regarding his evaluations and recommendations to the clients on any of these cases of which he and his firm were responsible for a great number.

So I would characterize that as kind of taking a dive.  I believe that we are faced with the strategy of passive resistance to the waiver ruling. I believe under the circumstances that carrying out the intention of your order, and making real the scope of the waiver that you found, and making real

the objective of leveling the field and avoiding a

tilting of the table against the ACC and the FCR when

it comes to the debtors' contentions about the

information available to it when it settled these

cases or otherwise disposed of them requires a

further order.

And the further order that we seek is one

that would require the debtors to make a diligent

search for other documents in whatever form,

including e-mails, would set forth written

evaluations or recommendations as to whether to try

or settle any of the given designated claims, as to

potential trial outcomes of terms of settlement for

the same, and as to the facts, factors, and

considerations forming the basis for such evaluations

and recommendations.

We do not believe that carrying out that

search would be a great burden because the number of

law firms involved is -- is very small.  Mostly it's

Glaskey and Turlick.  I think there are perhaps three

not accounted for by their firms out of those 26.

The fact that Mr. Glaskey and Mr. Turlick are

purporting to take the stand as experts and to opine

to you about the nature of the claims and defenses

and why the resolution should not be respected for

valuation purposes makes it very important to carry out with a certain degree of rigor the waiver ruling that you made and memorialized in your June 18 order.

We would also like the opportunity once that search is made and those documents produced to depose if -- if it -- if we deem it appropriate witnesses with knowledge about the subjects that I've just mentioned.

I would like now to turn to paragraph two of the June 18 order, which is really the heart of the matter and which at the present state of play is -- is subject to a -- a determined effort by the debtors to turn it into kind of a dead letter.  And that's why we're here before you again.  We don't think it should be a dead letter.  It should be enforced in accordance with its intention.

You said in paragraph two of the June 18 order as follows.  To the extent set forth in this order under the doctrine of at-issue waiver, the debtors have waived privileges including the attorney-client privilege and work production protection with respect to the 26 mesothelioma claims, the designated claims listed on the ACC's Exhibit 133 introduced into evidence at the hearing.

The subject matter in the waiver consists

of the debtors' investigation, settlement, or other

disposition of the designated claims including the

debtors' reasons for settling or refusing to settle

any designated claim, their evaluation of the

strengths and weaknesses of any designated claim, and

of potential outcomes of the same, in the formulation

of settlement offers and weighing of claimants'

settlement demands with respect to any designated

claim, their alleged reliance on alleged

misrepresentation and concealments of claimants or

their counsel with respect to any designated claim,

and any alleged connection between any such alleged

misrepresentations and concealments and the amount of

any settlement payments made to resolve any

designated claim.  That's the scope of the waiver.

You then implemented that by calling forth

the trust evaluation -- I mean, the -- the trial

evaluation forms and the major expense

authorizations, rejecting our request for a somewhat

broad -- broader document production.  And I'm not

re-arguing those other requests.  I'm focusing now on

how to make substantive the translation of the scope

of waiver into a document production that is

feasible, that can be carried out quickly, that is

not unreasonably burdensome, and yet has the real

potential to perfect, carry another step forward in what is ultimately an imperfect process. We're not going to get perfect discovery. We understand that. We're not tilting at windmills.

But we do think that that scope of waiver needs to be enforced in a meaningful way. And Your Honor's assumption that the trust evaluation forms and the major expense authorization forms would suffice to give meaningful insight into the circumstances surrounding the resolutions of the 26 claims proves to be a -- a little misplaced in the sense that we don't have trial evaluation forms for half of those claims. It seems that it was not the practice routinely necessarily to prepare those documents. It was not the practice routinely to save them.

Undoubtedly it was the practice to receive recommendations of counsel. And in these high-value cases that the debtor regards as so important to its overall claims resolution history, it defies creduly to suggest that there were not written communications from counsel to their clients telling them what counsel thought they ought to be doing and why and based on what information. And that's the scope of the waiver.

So we ask that the debtors be required to undertake the search for other evaluative documents at the few offerings involved in that garrison.  We limit the scope of the search by defiant -- by -- by -- by saying that they need not search as to outside counsel beyond the files of the lead outside counsel, meaning the law firm and lawyer who had the principal responsibility for handling and resolving the claim.

We're only talking about 13 claims.  We're talking about a small handful of law firms, perhaps as few as three or four, two of whom are putting forth expert witnesses who the foundation of whose opinions is going to be necessarily the subject of a spirited contest at the trial.  And in order to referee those contests Your Honor needs a fair exposition of the foundation in terms of the information available and the views taken by those very lawyers when they were pronouncing on the resolution of those claims.  So that's the scope of the search.

I've mentioned that we would like the opportunity if we deem it appropriate to depose witnesses with -- with knowledge when those documents come forth.  Presumably it would be a garrison witness and one or two of the outside counsel.  The

timing is, of course, sensitive. We've been at this now since early June. The trial approaches. We are all very busy. We acknowledge that. We do not wish to proliferate the burdens on the other side unnecessarily. There's a lot of important work to be done.

But this is important to our ability to meet their case. And the burdens are modest in the overall scheme of things. And we will be flexible in working with the other side to schedule these things at the least inconvenient times.

I think I can report, without much fear of contradiction, that when it comes to the daily business of figuring out how to get the work done and cooperating among the parties for that purpose, the case has proceeded and will continue to proceed as smoothly as can be expected. And I offer my compliments to the other side on that subject, and I undertake to continue to relate to them in that fashion.

So as far as the timing of the depositions is concerned, once you've ruled and we prevail, we will sit down and discuss with the other side what they can do with the least con -- inconvenience in terms of providing us with that opportunity.

But as of now the -- the June 18 order has sort of been half fulfilled.  And by modest additional status it can be fulfilled within the practical limits that you envisioned when you granted the relief, and that's all we seek.

Thank you, Judge.

THE COURT:  All right.

Yes, sir?

MR. CASSADA:  May I approach the bench, Your Honor?

THE COURT:  Yeah.

MR. CASSADA:  I have a -- one page ---

THE COURT:  --- Yeah.

MR. CASSADA:  --- I'd like to give you.

I would like to -- first I'd like to thank Mr. Swett for acknowledging  that this is not a matter of noncompliance with your previous order as seemed to have been suggested by the motion to enforce.  We have fully complied with the order.  We have produced all documents in the debtors' possession that the -- that the Court required with respect to all points in this case.  And at this point the committee has core work product and

attorney-client advice on every single one of these

26 cases.  We have over our objection and -- and at

great dis -- discomfort we have bared our soul giving

them this information.

            And Your -- in addition, Your Honor,

they've had access to witnesses where they have been

-- had unfettered ability to ask them questions

without the fear of us interposing an objection and

instructing them not to answer based on a privilege.

They're have the ability to do that.  And they've

done that in two cases.  And Mr. Swett said that he

wasn't going to put a fine point on the depositions.

But they got an earful from Mr. Glaskey about why

these cases were settled for the values they were

settled.

            Now, for -- for each of the cases, Your

Honor, they requested -- or -- or Your Honor required

us to produce the major expense approvals and trial

evaluation forms.  Now, we said from the very

beginning when they first asked for them that there

were not trial evaluation forms for every settlement,

because this is a form that is filled out the month

before the case goes to trial and it -- it's

circulated then.  So we were -- we were clear from

the start that there were -- there were not forms

prepared for every case.  And we were also clear that -- that they were not always retained in every case.

Now, they are largely duplicative of the other documents that the committees received, and those are the major expense approvals which provide the rationale for paying for settling the claim.  So they -- they had all of those.  And for every single settlement, for every single settled case they have that.  And that's what they purport to be interested in, why the debtor settled cases.  So they have that.

They have unfettered access to our witnesses.  We're going to pre -- present a witness tomorrow.  They're going to ask him those questions that we don't have the ability to interpose an objection.  And we've very uncomfortable with that but that's what Your Honor ruled.

Now, with respect to -- there are 13 cases for which we were unable to locate a trial evaluation form.  In eight of those cases the reason we didn't have one is because they were never prepared.  In five of those cases we believe they should have been prepared.  But they're not in the -- they're not in our files or our lawyer's files.  We've asked for them.  And as we -- and as we said from the beginning, it is -- it was not Garlock's practice to

retain those forms.  They re -- did retain the -- the major expense approval forms.  So we -- on a timely basis we provide -- provided all of that information.

And by -- and -- and by the way, let me back up to the other dispute that has been settled, and that has to do with the -- with the trial evaluation forms.  We produced the complete trial evaluation form for every single one of these cases. Some of those forms were part of documents that included other trial evaluations and other unrelated cases that are not subject to Your Honor's ruling. So those were forms that provided core work product with respect to numerous other cases.  And we didn't believe Your Honor had ordered us -- or had ordered that we would waive any privilege with relations to those cases.  And the committee took exception to that.  And so -- so we've given in on that.

So they've got all of these other cases with core work product on it but have agreed that there's no privilege waived for that.  So they -- they have it.  I don't know how they think they can use it.  I'm not sure why they'd want it.  But -- but we've acquiesced to that.

What we -- what we can't acquiesce to is to doing what Your Honor ruled that we didn't have to

do before.  They want us to go make a search for more documents.  And Your Honor said we didn't have to do that for them.  You said that given the limited trial ability -- of -- of the limited time before the trial -- excuse me -- and the -- the nature of -- the sensitive nature of these documents you weren't going to require us to do that.

But they're saying for some reason the major expense approvals are not good enough and they want you to do what you said you weren't going to require us to do.  And they may want us to produce these witnesses that we've -- that we've agreed on, that we've already agreed to produce and make them available a -- a second time.  So the -- the net result of their motion is -- is two rounds of depositions, two rounds of -- of document searches.

They have enough, Your Honor.  They don't need -- they don't need any more.  And they have in the -- in the major expense approval form they have documents that are -- by and large they're more complete.  They provide much more information than the trial evaluation form does.

So this is not a matter of compliance.  This is a new -- a new motion for new discovery.  And it's not going to end.  I mean, they're not going to

be happy with what they get.  They're going to keep coming back.  It's like they've got a knife in the debtor and in their counsel and they're just twisting it.  We're -- we're presenting the witnesses.  We're providing information exactly like the Court told us to do.

Now, they report cooperation.  And that's true.  We've cooperated.  We've extended the deposition period because Your -- Your Honor ordered us to do that.  We didn't resist it.  We've agreed to that.  They even suggested that there's some kind of passive resistance going on here.  That's not true. We've completely complied with Your Honor's order.

And let -- let's look down the road.  We are approximately three weeks, a little over three weeks from the commencement of the trial.  We have document and witness lists due on next -- next Wednesday.  In addition to that we have designations of testimony from all of the depositions that have been taken in this case, numerous depositions.  Those have to be designated.

And then by next Monday we have a trial brief to file.  And then we have -- and we have to prepare for trial.  We have to prepare a large number of witnesses to come in here and testify and to

present evidence in your Court in a -- in a major trial, in a trial where there's a billion dollars at stake.

And five months after we gave them this list of 26, they started this new fact discovery period.  And Your Honor let them venture down that path, we've complied, and it has got to be -- it's got to be cut off.  We simply don't have time and it will -- it will prejudice us.  It will prejudice our ability to prepare for trial to have a new round of document searches.

I mean, as Your Honor said before, you were requiring us to produce well-defined documents so we didn't have to go in and interpret whether a document fits -- fits their needs or not.  So -- so we've done that.

So, Your Honor, they've had a fair opportunity to take the discovery.  They continue to have a fair opportunity to take depositions.  They haven't shown any need for any further documents other than that they don't like the information that they've received.

And, then, there's simply -- there's simply no time.  We -- we need to move forward with preparing for the trial.

So, Your Honor, we ask you to deny their motion.  We'll go forward with the deposition tomorrow.  And they will at that point have been given fair access to privileged information regarding why we settled that -- that they seek.

Thank you.

MR. SWETT:  First of all, Your Honor, we have no intention of seeking documents beyond the scope of the order that we request today. If it suits the other side's purposes, we will continue tomorrow's deposition and only take it after whatever relief you grant, if any, today has been carried out.  And we will, as I said, fully cooperate with regard to carving out modest time for no more than a day's deposition of -- of -- of whichever witnesses with knowledge in a -- it's not more than three.  And we'd get by with one if we could, which would step forward for that purpose.

There is no -- I -- I agree emphatically with one thing that Mr. Cassada said, which is that there are practical limits involving the shortness of time . That's why we circumscribed the scope so much. We are not requiring or asking you to require open-ended searches.  We're talking about a couple of firms with a limited subject matter involving 13

claims that are very prominent in the debtors' history.

I'm going to come back to the -- to the -- the virtue of the limits of time when we get to the status conference on how to conduct the trial. Now, I -- I -- I bow to those limits. I understand them. What we're asking for now is feasible within reasonable burden and expense of time.

Now, you assumed, I believe it's fair to say, that these formal-sounding documents, trial evaluation forms, would be routinely retained. They haven't been. That creates a gap in fulfilling the intentions of your order. It's that gap that we seek to fill.

If -- if not, I ask you to contemplate this scenario. I have John Turlick on the stand. He is the lawyer responsible for resolving virtually half or more of the 26 designated cases. He has strong views which he is not shy at expressing as purported facts about the value of these claims. It is his express view that the true value of any claim against Garlock is zero.

Now, we all know how easy it is for a -- for a savvy witness -- and you have to assume that a 30-year trial lawyer is going to be a savvy witness

-- to shade, to exaggerate, to engage in hyperbole when not controlled by documents.  So all we're asking is that if there were written evaluations and recommendations discussing the matters that I outlined that don't happen to have found their way into a trial evaluation form that has been retained, a fair opportunity to cross that witness requires that those documents be produced.  It's nothing more than that.

And in the absence of that relief, it seems to me, Your Honor, the fair thing to do would be to wall those cases off where there is no such evaluative document, we have not been made privy to the full circumstances surrounding the resolution contemporaneous information that reliably reflects insights and state of mind and not the hardened positions that people fall into in the -- in the crucible of trial.  And it's a better way of getting at the truth and of holding witnesses to the truth. And it will produce a more reliable fact-finding process for the Court.

And absent that relief you ought to wall those cases off.  Where there is no trial evaluation form, you should rule in limine that you will not receive evidence concerning the reasons why Garlock

settled a case or why the value as is established by the settlement agreement, if there was one, shouldn't be respected for valuation.  You should just take it off the table by ruling in limine.

I -- I -- if I understand Your Honor's approach after these three years with any degree of accuracy, I would assume that you would prefer the modest discovery to a ruling in limine.  But if I'm wrong, I don't believe the Court should hesitate there on the issues by preventing these lawyer witnesses from taking the stand and talking freely about matters that certainly were the subject of communications with the clients that ought to be produced.

Thank you, Judge.

THE COURT:  I -- I think I should deny the motion because I -- I think Garlock has done everything that I ordered them to do and that -- that -- that the -- there has been apparently something produced to NEA at least in each of the cases and that we just allow that to suffice.  That's what I ordered and that's what they've done.  So we'll stick with that.  So I'll -- I'll just deny that -- any further discovery on that issue.  So....

MR. CASSADA:  Thank you, Your Honor.

THE COURT:  Let's take a break, I guess, to 11 o'clock and then come back and talk about the scheduling -- I think is the last thing.

MR. CASSADA:  Okay.

(10:46-11:02 a.m. - recess)

THE COURT:  Okay, have -- have a seat.  I'm sorry.

She's checking about whether you can get a jury view of the courtroom.  I -- I wouldn't think it'd be a problem since everybody but me is at the Greenbrier.  There's nobody using it.  That's -- I'm not sad about that, mind you.

Okay, we need to talk about procedures?

MR. SWETT:  Yes, Your Honor.  We've had some preliminary discussion.  There's -- there's a lot of detail.  There are also some broader important points that will determine the shape of the trial -- we're at your service in terms of how you'd like to proceed.  I can rattle off what I think are issues that need to be talked about today, and Mr. Cassada can do the same, and then see where we go.

THE COURT:  That -- that -- that's fine with me.

MR. SWETT:  So to me the most important thing to address today in the broadest

terms is the amount of time that's going to be

devoted to the trial, whether you should be

contemplating a significant spill-over, if so, why

and when the spill-over would take place.  That's a

huge issue for reasons that I'll explain.

It is driven largely in terms of whether

or not the 40 hours that you originally allocated

with a modest escape hatch if -- if you were

persuaded that the time had been used effectively.

That's what you said in your estimation order.

What's driving the risk that we won't be

able to -- to finish in that amount of time is the

scale of the case that the debtor wants to put on

with respect to its science -- and I'll put that in

quotes -- defenses and the role, the proper role,

which I contend is limited, that those issues should

play in the valuation exercise that we're about here.

That's the main issue.

Then there are some sort of ways and means

-- ways and means questions having to do with trial

management, if there are time limits, how are they to

be administered.  I'm going to argue to you that you

should adopt the good practice followed by Judge

Regraino in the AWI case and Judge Fitzgerald among

others in the Bondex case, which is to actually use a

clock and to charge each side with the time they use either in direct or on cross.  You can always have the prerogative of stopping the clock if something's going on that you don't believe is fairly chargeable to either side.  That seemed to have worked pretty well.

The question of managing the flow of work during the trial so everybody knows what's going to happen the next day, you're going to see when the witness lists are submitted very long lists.  You're going to see remarkably long exhibit lists.  As a practical matter, and as a seasoned trial lawyer would tell you, those are going to shrink when they -- and -- and -- and they should not be used as a -- a -- a -- a -- as a tactical subterfuge or camouflage.  There should be as trial approaches a time when each side says, okay, we're -- we're -- we are -- we are going to call these witnesses and not those who are on our list.

When those dates would make sense to fall depends upon how you decide the flow of presentation, the order of presentation at trial is going to be. Our suggestion is that they take the first week and we take the second.  Of course, that includes the cross of each side's case as it -- as that case goes

in.   They have a different notion and I'm sure we'll discuss it.

But whatever -- what -- whatever way it -- it -- it -- it ends up being, fair notice, say, a week in advance of the onset of the party's case as to which of the witnesses are falling off their list, is an important aspect of -- of effective trial management and -- and the avoidance of waste of time, needless effort.

For example, if they've got four experts on the same subject, and I believe they do on -- in -- in some of these science issues, but they're only going to call two of them, they should tell us that reasonably in advance so our lawyers don't spend their wheel preparing crosses of the witnesses who aren't going to show up.  And we're, of course, prepared to do the same.

Likewise, in order to manage the daily flow of the presentation, notice the evening before of who's going to take the stand the next day and what aids to examination in the form of demonstrative exhibits that are not going to be used in evidence but are simply tools for the examination should be provided.  That's important because demonstrative and summaries of voluminous documents and the like, you

know, can be marred by errors that can be picked up on a brief review and corrected and it'll tend to streamline the work if we have that brief advanced notice of who's coming up the next day.

We need to talk about the treatment of expert reports.  Strictly speaking, expert reports and agreement are hearsay.  The expert presents himself for testimony and the -- and the -- and the evidence is the testimony.  We would propose to follow the same expedient that was followed in Bondex which is that the expert reports get marked as demonstrative exhibits, can be used in aid of examination and of cross, but are not themselves admitted into evidence.  That's a technical point but a not unimportant one.

We have the treatment of depositions in the trial.  We -- the parties have taken a lot of depositions, fact and expert, and they've videoed them.  And I doubt very much that Your Honor is going to want to sit through a bunch of video depositions. Perhaps the parties can have the prerogative of selecting short excerpts that they particularly want to highlight.  By and large it seems to me the depositions should be received or excluded based upon the transcripts.  And we should not be expected to

read out in open court lengthy passages of deposition testimony or to show unedited videos more than -- more than very succinct excerpts.

This is -- that is not a point actually that we've succeeded in discussing yet with the other side.  I have no idea what their views are.  I'm happy to hear what they are.  And I am confident that we'll come up with some exped -- some practical way of dealing with transcript and the building of -- deposition transcripts and the building of the record here.

Post-trial, we're -- we've sort of both acknowledged in the tolling agreement that was accepted for earlier application today that for the nature of the decision, and given the size of the record that you're going to have here, it would be helpful to the parties and to the Court to have a possess of post-trial briefing.  And we would need to schedule that.

Simultaneous opening briefs and simultaneous replies seemed efficient for the purpose.  And it seems to me we ought to be -- if we are -- succeed in concluding the trial in early August, we should be looking to complete the post-trial briefs by the end of September.  There

again, that's not something we've specifically discussed.  I don't know what Garlock's views are. But -- but having in mind the post-trial process for pulling all this together and -- and walking Your Honor through it would seem to be helpful.

I would like to -- to talk at -- at -- at some point in this discussion about why I think Your Honor should direct us back to the estimation order in terms of the expectations for how long is going to be devoted to this exercise reserving the discretion for that little escape hatch that I mentioned before. And I'd like to talk about why that would be the wiser course.

But if I lose on that point and you want to say now that you don't think we're going to finish in two weeks, it seems to me you should be defining another period and we should be setting it down on the calendar.  And the reasons for that are exquisitely practical.  We have a whole bunch of people who need to come in and out of Charlotte for the trial.  We have a block of 30 rooms at the hotel. We're renting office space for a limited term.  And those arrangements need to conform, of course, to the needs of the Court in terms of when it's available to hear, when it has a courtroom to use, and so forth.

There are some imperatives that we simply can't do anything about.  We have our own fairly short list of science witnesses.  It may grow shorter as trial approaches.  But those people get committed many months in advance.  Under their current -- we've had them on hold now for six months for the period of the -- the -- the -- the second week of trial.  And we're going to need to get those people on and off the stand on July 29 and July 30 and July 31 at the most.

And if -- if it happens that the order of presentation is such that that has to interrupt something else that's going on, we really don't have an ability to -- to solve that.  Those people have to go.  And they -- and -- and we can't be telling them, well, you fall into any spill-over period, because that would mean the spill-over period would be six months to a year in the future, and that's just, I think Your Honor will agree, beyond any reasonable expectation about when this exercise is going to conclude.

So I just have to bookmark, and I have made opposing counsel aware of the fact, that we have some witnesses who need to be gone by July 31st and won't be here until July 29th.  That's the window for

our response to their science.

Now, this brings me back to the -- to the overall issue of time limits and why it is, by my lights, really essential that there be some here. The exercise, as we know, is valuation.  It is not a merits determination.  You have already said to the other side you are not going to decide whether Chrysotile hurts you, you are not going to pass on the merits of any individual claim or the defenses to that claim.

Properly speaking, the science issues that are being objected by the other side here are background and context for their expert's report and that's it.  And it would be a -- a gross disproportionate use of time to -- to allow the -- the background and context presentation to swell up to take the whole two weeks.  But we perceive looming up from the other side of the courtroom a -- a -- a -- a -- a parade of scientists that is unreasonably long and that -- and -- and -- and an attack on our response that if given its full head will take up the whole two weeks.

We figure we can put on our response to their science case in two days maximum assuming we have cross-examination that is proportionate to the

direct.  But we can't make that assumption.  People on our team have litigated against Mr. Harris' firm in other contexts that are well aware of their extremely exacting approach on cross.  And we have to anticipate that they're going to want to take cross well beyond the limits of time that we devote to the direct.

And this underscores the utility, indeed the imperativeness of time limits chargeable to each side, because if you -- if you don't have time limits, the other side has no reason to -- to hue to reasonable limits in its direct or its cross.  If I put up a guy for an hour of testimony on industrial hygiene subjects and the other side wants to cross him for five hours, that's going to greatly distort the use of time for trial.

Now, the way to make it contrary to anybody's interest to run on that way is to impose an overall limit on the hours to be devoted to their case and their cross and charge them for the time.  And that has the very salutary effect of making them think hard about what's important to their case and what is less important and can be whittled down.

So my pitch to Your Honor is go back to the 40 hours a side.  Judge -- Judge Fitzgerald tried

Bondex in 30 -- giving each side half of 35 hours.

They had science -- science issues, too.  They --

they not only got it done within 35 hours, they had

some time left over.  She also had post-trial and --

and oral argument, which we agree would be a good --

a good thing here.

The Federal Mobile case involved a $9

billion liability, a -- an asbestos manufacturer that

was perhaps the largest in the world including

Manville, with a whole variety of asbestos-containing

products, not the limited product line we deal with

here.  They tried that case in six or seven days.

The Armstrong case, the judge gave them nine hours a

side plus argument.

It is very possible to do what's needed to

do in -- in these valuation disputes within

reasonable limits of time.  And the Court's

discretion to impose those limits without fear of

interference by a -- a -- a reviewing Court is great.

You have the reasonable discretion to focus the

issues to limit the amount of time.

We have in this case a -- a -- a

particularly real expression of the fact that the

public's -- the extent to which the public can be

expected to devote resources to these disputes is

limited.  We have a courtroom for two weeks.  After that, you have to go in search of a courtroom.  That underscores that there are indeed practical limits to any party's right to assume the consumption of public resources for the resolution of their disputes.  And history shows that it is very possible to shape this dispute into a -- a -- contours that fit within a two-week period.  And that's what I would urge.

THE COURT:  Okay.  Mr. Cassada?

MR. CASSADA:  Thank you, Your Honor.

First let me being by saying that we are not offering any evidence that we don't believe is important.  This is a trial.  And once you see the expert's report, you'll see that there's a billion dollars, a billion dollars at stake.

Mr. Swett refers to the estimation trials in Federal Mobile, Armstrong World Industries, etcetera.  There's no dispute about the liability in that case.  Settlement had been reached and everyone was offering the committee a settlement approach, their own version of that.  And it would be natural for the committee to want to cut off and limit the evidence that we can offer at trial, because they follow an approach, a settlements approach in which they say that everything is baked into the

settlements so you don't have to consider merit.  So -- so we take exception to the idea that this -- that you should put some type of artificial time limit.

I will commit to the Court that we have worked hard and will work hard to be able to present our case efficiently before the Court.  We have doubt -- we have serious doubts.  In fact, we think it's probably not possible to complete this trial in two weeks.  We don't think it's possible for the committee and the futures representative to present their case in one week.  So it -- it's simply -- it's simply unrealistic to believe that would happen.

The Court has the ability to -- to understand as the case progresses -- progresses whether lawyers are using the Court's time wisely and efficiently.  And there's no exception here.  I also add, we don't have any experts who are offering cumulative or duplicative opinions.

We think that the idea of a -- of a clock would be -- is distracting and unnecessary.  We will commit to the Court that we will proceed efficiently.

I want to comment on -- on their idea that we take a period of time and then they take a period of time.  As the Court knows, we're presenting two very different cases.  We are presenting a

merits-based estimation case and they're presenting a settlements approach. And we can't rebut their settlements approach until they put it on. Otherwise that would require us to explain what their approach is, and certainly in a fashion that they probably wouldn't agree to, and then to rebut it. That's not possible. That's not wise. That's not a good use of the Court's time.

So what we propose is that we put on our case-in-chief, our merits-based estimation. They rebut it. They put on their settlements-based approach. We rebut that. That's orderly. That allows the Court to best understand the issues and evidence in each approach.

As -- as far as the notice of witnesses go and -- and providing fair notice of demonstratives to be used by the witnesses, we don't have any objection to that. I'm not certain that the time periods they suggest are appropriate. But we would -- we could certainly, we think, reach agreement with them on -- on that.

Treatment of experts' reports, it's curious to us that they don't want to admit expert reports into evidence and at the same time they purport to -- to be interested in cutting the trial

short.   There might be some reports that we would like to admit into evidence.  They've had an opportunity to examine the -- those experts by deposition.  But if they're going to limit us in -- in that way, we're not sure that we could honor that.  That's -- that's certainly not going facilitate the most efficient use of the Court's time.

We don't have any objection to Your Honor's identifying when any spill-over would take place to facilitate our getting witnesses here.  We don't -- we -- we -- we don't see any problem with accommodating their science and medical witnesses during the first three-week phase of the second week, which I think is when they said they needed to have them there.  We certainly -- certainly can and should accommodate that.  So we don't -- we don't see a problem with that at all.

I have the -- the week following the two-week period I'm on a family vacation.  But I've advised Mr. Swett that if that is a week that works for the Court, I'm certainly willing to -- to change our vacation plans.

Now, we share a desire to complete the trial as efficiently as possible and as -- as -- as soon as possible.  We've worked hard to be prepared

to put on our case and -- and will be prepared to do so when July 22 comes around, and we'll be prepared to finish up then.

So I think I've addressed all of the issues.  I think our witnesses, I believe, are -- they're on standby and we can -- and we believe we can -- we can get them here in a flexible manner to accommodate the schedule.  They know when the -- the two-week period has been set aside.  We believe they're available after that for any spill-over time period.  So we don't -- we don't anticipate any particular problem with when witnesses can be here. But we trust that we'll be able to work with the committee and the futures rep in accommodating the schedules of witnesses.

So -- so that's it, Your Honor.  There is -- there are a couple of other housekeeping matters that -- that Mr. Swett and Mr. Guy and I discussed. One was exhibits.  We've agreed to exchange exhibit lists next Wednesday and then on the following Monday -- Monday exchange copies of exhibits, not in hard copy form, but on -- on a hard drive.  And then we would propose that -- that when we're in Court that the Court -- Your Honor could actually work with -- with electronic copies.  We might have hard copies of

documents that are being used for a witness on a particular day.

My understanding of the system in the courtroom you're using is that we could -- could pull up and observe documents in electronic form.  And when they're admitted, I think that -- that Your Honor has the technology to download them to a -- to a library or -- or a hard drive with admitted exhibits.  And that -- that's -- I believe that's the way they'll be received.  I don't know if that's the way Your Honor ---

THE COURT:  --- I ---

MR. CASSADA:  --- Contemplates it.

THE COURT:  That's fine with me. I've not used that upstairs before but....

MR. CASSADA:  Well, that's -- that -- that's something we're exploring ---

THE COURT:  --- But we'll -- I'm ---

MR. CASSADA:  --- And that to ---

THE COURT:  --- I'm happy to use whatever they have available, yeah.

MR. CASSADA:  --- Avoid the -- avoid the paperwork.

THE COURT:  Yeah.

MR. CASSADA:  So I believe that

covers everything.

I think it would be helpful for -- for you to consider issues like the order of -- of presentation.  We think it makes -- it makes good sense to proceed where -- with -- with our case first, our case-in-chief, and their rebuttal, and then their case, and -- and their rebuttal.  And -- and that would certainly help both of us for -- for planning purposes.

THE COURT:  Mr. Clodfelter, do you have....

MR. CLODFELTER:  I defer to Mr. Guy.

THE COURT:  All right.

MR. GUY:  Good morning, Your Honor.

There was a lot of discussion a long time ago about how long we needed for the estimation trial.  And there was a very detailed presentation from both sides about what they were going to say at the estimation trial.  And all the parties have experience with how long is needed.  And the FCR for his part has prepared his case on the understanding and relying upon the fact that we had a week with the creditors' committee.

I don't think the debtors prepared their case expecting to comply with the Court's order on

the two weeks.  And that's evident from how many experts they have, how many witnesses they have.  But it's completely within the Court's discretion to say and the Court did say we are scheduling two weeks, present your case in that time.

This is a very unusual case, Your Honor. You've had the benefit of extremely detailed presentations from the very beginning of the case about the debtors' theory, right from the very beginning with their information brief.  And you've heard it over and over and over.  And Mr. Cassada's theme, his theory has remained the same.  There is absolutely no reason with rigor applied that the debtors cannot present their case in one week.

Now, we've all been in this courtroom and we've all seen the enthusiasm for -- what should I say -- the debtor's presentation.  The only way we can keep the parties to their week is what's -- with some sort of vehicle like a clock.  I know it sounds a little hokey.  But it's the only way it can work and the only fair way it can work.  If each party knows it has X number of hours to present its case, it's going to look long and hard about what it wants to put on.  So when you have four experts talking about the same issue, you're going to pick one.  And

that's appropriate.

So I would urge Your Honor that you stick with the order that you had, that you make it clear to the parties -- and they've each said that they are prepared and expect that they can present their cases in the time frame allowed.  And we stick them to it, including the FCR.

Your Honor, the issues of admission of expert reports, I don't think we need to decide that today.  We should have to brief that issue for you, Your Honor.

I think on the order, obviously that is -- has got to go first.  But they have their 40 hours. So however they want to divvy it up, that -- that's their discretion.

Thank you, Your Honor.

MR. SWETT:  Your Honor.

THE COURT:  Mr. -- Mr. Clod -- let's see ---

MR. SWETT:  --- Oh, I'm sorry.  I beg your pardon.

MR. CLODFELTER:  I'll be brief.  I don't intend to speak about the total amount of trial time that will be consumed.  But I do have an interest in the sequence of the proof and -- and

thereby some interest in the actual schedule updates

on which different elements will be presented.  And I

think it's not unfair to say in several respects

we're probably the -- the tail on this dog.  We

certainly are in terms of the quantity of evidence we

will offer.

We will have one and only one witness.

The witness list will not get longer or shorter for

us.  It will remain at one.  That will be an expert

witness who will be offered in rebuttal of the case,

offered by the committee and the FCR.  And that leads

me to the question, of course, for us, which is the

sequence of proof.  Quite obviously that witness is

very useful and productive to the parties and to the

Court if -- if forced to -- to testify before the

plaintiff -- the committee and the FCR cases to be

presented.

That's especially so since -- being an

expert witness, since that witness will largely be

responding to the expert testimony of the experts

offered by the committee and by the FCR.  If expert

reports themselves will not be offered into evidence,

then quite obviously the rebuttal expert can't

testify competently.

So we do join in with the debtor in terms

of the proper sequence of proof.  I think that's a -- a logical and -- and -- and proper order for it.  And that really depends on the schedule, because it -- it does suggest that the rebuttal experts would be available, probably likely the rebuttal experts for both the -- both sides, both the committee, FCR, and in our case, both for us during the second week of trial.

We've learned that -- and -- and respect the scheduling issues that the committee and the FCR have for their experts.  We -- we respect that and don't quibble with it.  We're prepared to honor that. If the -- it's unfortunate that expert availabilities during various times of may conflict and -- and we -- we also likewise have limited days in the second week of trial when we could present our expert.

I think the -- the solution to that -- and, again, I'm not commenting on the total amount of time for trial.  That's an issue that the debtor has addressed and the committee -- the committee and I have addressed, and we'll reserve that and leave that to the Court.

But in terms of the sequence of proof, if there is to be any testimony by rebuttal parties -- rebuttal witnesses for either side, essentially, that

probably does need to be sliced off from the main case presentation and offered a day after both the main cases have concluded both for the debtor, the FCR and the -- and the ACC, and then perhaps a separate time can be reserved, a short time, within the total time allowed by the Court for presentation of rebuttal witnesses.  That will allow better scheduling, I think, and avoid scheduling conflicts during the times currently.

With that, Your Honor, we -- we come today prepared to offer alternative dates when we could offer our rebuttal expert witness and a number of other people who are offered.

MR. SWETT:  Your Honor, I'm going to need to reserve a certain amount if the sequence is going to be case, case, rebuttal.  And we can discuss that further or we can take items from Your Honor.

But we will have answers to Coltec's expert and we will have answers to the criticisms leveled by the debtors' experts.

It seems to me that the key here is if -- if I were in your shoes, Your Honor, I would ask the debtors to explain how much time they intend to devote to the science issue.  And if that time threatens to consume the whole trial, then I would

suggest that you take a brief proffer -- I'm talking five or 10 minutes -- from Mr. Harris and Mr. Scott as to what those issues are and what the positions of the parties are and the nature of the evidence, not a complete exposition of it, but just so that you can have clearly in view today before you decide these -- these trial management issues what the appropriate scope of -- of time be devoted to those -- those questions in this valuation context would be.  And we're prepared to do that.

If it's your judgment that we -- that we should schedule spill-over time, I would certainly urge that if the courtroom facilities can be found, that we just continue into the third week and wrap this up.  We will have galvanized the forces.  We will have our office space.  We will have the witnesses on non-science topics who are generally on notice of the period of the trial.  It would be far more convenient from the standpoint of concluding this matter to forge ahead.

And I appreciate Mr. Cassada's willingness to reschedule his -- his vacation if that is a period that the Court can make available.  But if it's not, we should define a period.  It shouldn't be very far into the future.  I don't know what the situation

here in -- in early August is -- I would be very sad to see this spill over before that because -- after that because it gets hard to get the witnesses in August.  So we would be to some extent playing with fire.

To me, the expedient thing is to hold us to the 40 hours.  We will certainly con -- conform our case to one week.  Experience shows us that we can -- we can do that.  We think it's fair to expect the other side to do that.  And that would have a salutary effect on the presentations.  But, of course, that is all within your sound discretion.

THE COURT:  Well, let me say it's my general intention to let the lawyers try their own cases.  And that will apply to you all as well.  I don't think I ought to use a clock, at least not yet, without -- and -- and I -- I -- I mean, just from what I recall of trying cases myself, that often the -- the -- the -- it -- it -- the evidence required and the time required is not often equal just because there happens to be two parties, one party on each side, or however many parties there are.  It's just -- there's no way to -- to make it equal.  It's just different things involved.  And I -- I really am reluctant to put artificial constraints on you other

than what -- the -- the general constraint of you all doing a good job.

I suspect probably the best thing to do would be to extend the thing out one more week and -- and -- and plan on running three weeks rather than two.  I mean, I'll -- I'll say again I don't believe it is necessary to prove the -- the science issue. It's not something that I believe is necessary or -- or that I have any intention of resolving.  But I understand you all have evidence you want to offer in that regard and -- and that it's important to you. And if -- if it's important to you, it's important to me.  The -- hopefully that can go smoothly and quickly.

So I -- I think we ought to set about probably trying to get the -- what would be the first week of August.  And I will -- that will require us rescheduling some stuff.  I had scheduled for in Asheville but we -- we can -- we'll -- we'll do something with that.  And the -- and -- and we'll just push forward as -- as hard as we can.

I think it -- we should plan on having the ACC's witnesses on the 29th through the 31st and reserve those dates for them even if it's out of order.

Generally I would say that I -- I -- I mean, most trials go with the plaintiff goes first and then the defendant goes and then the plaintiff has another shot at rebuttal.  And I -- I'd say that's kind of how we ought to go here.  We'll let Garlock -- Garlock put on its case, and then we turn the floor over to the ACC for whatever it has to offer in terms of rebuttal and case-in-chief, and then turn the floor back to Garlock for rebuttal of the case-in-chief, I suppose.

Does that make sense or have I tried to ---

MR. SWETT:   --- Well, Your -- Your Honor, here's the thing.  They're going to be shooting at Dr. Peterson and Dr. Rabinowitz.  And they're going to need to be able to come back and answer those criticisms, because as we've just heard, they don't -- Mr. Clodfelter doesn't want to have to attack Dr. Peterson until he has heard what Dr. Peterson says.  Likewise, we can't answer ---

THE COURT:   --- I understand.

And we'll -- we'll give you a fair shot at doing that.  I -- I think we shouldn't leave anybody without the -- the opportunity to -- to do that.  So....

MR. CLODFELTER:  Your Honor, again

---

THE COURT:  --- Yeah.

MR. CLODFELTER:  --- Not to bark too loudly, we may be one of the last, as I say, presenters in the case subject to the response from Dr. Peterson and Dr. Rabinowitz as -- we agree with Mr. Swett.  They're certainly entitled to have an opportunity to respond to the criticisms that our expert will make of his witnesses.  I -- we -- we fully agree with that.

That -- at -- at -- at the risk of complicating life, that does create some issues, again, because of the difficulty of managing dates. And -- and we understand now the 29th through the 31st are -- are lodged for your witnesses.  And I -- I -- I'm not quibbling with that.  But that creates complications from my side in -- in two respects.

If we go immediately into the following week, I am scheduled for a -- a -- a -- a matter in Wake County Superior Court during that week.  And, unfortunately, my witness, Dr. Hechtman, is during that week only available on Friday, August the 9th. I -- I don't know what we'd do to occupy ourselves for the remainder of that week before Friday.  But I

-- I only have access to my witness during one day during that week.

THE COURT:  Yeah.

MR. CLODFELTER:  I have considerable availability of -- of the witness later in the month and in the following -- I mean, in the following weeks considerable for that witness.  But I think because of the parties' planning and the witnesses' planning around the current two-week block of time, a lot of folks moved things to that following week.

I -- I -- I'd be glad to -- to work with Mr. Swett on an appropriate time when he can bring his witnesses back for rebuttal and we can have Dr. Hechtman here.  I don't think the testimony on rebuttal -- I don't want to speak for you, Ted.  But I -- I don't know that we would require more than a day or -- or perhaps slightly more for all of the party witnesses.

MR. SWETT:  I -- I doubt very much it would be a full day.  As -- as far as Dr. Hechtman is concerned, the issue seems to be a narrow one and a -- a -- a methodological one.

MR. CLODFELTER:  Indeed.

MR. SWETT:  I don't know.  I think it's much more nitty-gritty when it comes to Dr.

Bates and -- and his -- his colleagues criticisms.

And I'm not making any predictions on how long that

would take.  But we can certainly accommodate Dr.

Hechtman on August 9th even if we have to cool our

heels for a couple of days during that week.  Somehow

my sneaking suspicion is that that time will be used.

But we can certainly accommodate that -- that

witness' schedule.

THE COURT:  Okay.

MR. SWETT:  And hopefully we can

work around Mr. Clodfelter's other commitment.

MR. GUY:  Your Honor.

THE COURT:  Okay.

MR. GUY:  I understand what you said

about the additional week.  All I would urge is that

the Court urge the parties to plan their cases to be

completed in that window.  Everybody in this

courtroom knew we had a two-week window.  That's what

happens.  Courts schedule trials.  You have dates to

do it.  And we don't want to be in a situation where

we get to the end of the third week and we're still

nowhere close to being done.

The debtors -- we have two witnesses, Your

Honor.  We're going to get done in the time that you

allotted to us.  I don't think the debtors are

committing to you today that they'll be done and

they're going to make the choices and the decisions

in the presentation of their case to be done, because

they have literally dozens of witnesses, dozens.  And

that has been their choice.

THE COURT:  Well, and I -- I'll -- I'll let them try their case like they want to try it.  I guess I'm partly influenced by having tried cases before Judge McMillan and -- as a defendant, and where the plaintiff and I would agree that each side needed two days, and so Judge McMillan would say this is a four-day trial, then the plaintiff would take three days, and he'd look at me and say I had a day and that I had agreed to it.

MR. SWETT:  That's going to be us, Your Honor.

THE COURT:  So we'll do the best we can with it in terms of the general thing.  I -- I don't think I can -- that -- that I -- I don't believe that I should put too many constraints on it right now.  But I'll tell you that I will push you as we go along and -- and -- and hopefully see that we move along smoothly and quickly.

With respect to the expert reports, it would be my intention to do whatever the rules of

evidence say to do with them.  Unless you all agree, I wouldn't admit them unless they are admissible. And -- and I'll -- I mean, I can tell you that un -- that un -- unless directed to I'm -- you know, I'm not going to go outside researching this thing other than what you all tell me in court.  So if you want something considered, you'd better say it or have -- have somebody say it.

I'm -- if the -- I mean, if you all want to do it differently, we'll -- I'll do it differently.  But normally I would just rely on the things that are ad -- that are admitted and -- and those parts that are highlighted in the things that are admitted.

You know, by the time that -- by the time you get to the Fourth Circuit, they'll fine you for doing that stuff.  So I'll just ignore it.  I won't fine you.

I'll let you all talk about video depositions and stuff.  I -- I mean, I -- it sounds like you haven't talked about that yet.  And whatever you all work out about that is fine.  But that does take a long time, to kind of shift gears into that. And whatever -- whatever you need to do, we'll do.

The -- and -- and I'll ask you to see if

you can't have some sort of agreement about the advance notice of what to expect in the next five days and then the next day.  That sounds like a logical way to proceed and beneficial for everybody, to have some kind of notice on -- on -- on what's getting ready to happen next.

The -- and I guess the post-trial briefing schedule, whatever you all want to -- want to do is fine with me.  But I -- I think probably the simultan -- simultaneous filing of briefs and rebuttals probably is -- makes some sense.  Your positions won't be any secret by then.  So....

MR. SWETT:  Yeah.

THE COURT:  Is there any -- does that deal with what -- I don't know.  To the extent I can help, I....

MR. SWETT:  I think so.  Can we ---

THE COURT:  --- And -- and ---

MR. SWETT:  --- Expect a confirmation on that -- that there will be a courtroom for the third week?

THE COURT:  We'll find you one.

MR. SWETT:  Thank you, Judge.

THE COURT:  It -- it may be here.

But we'll get one.  And I'll try to get the one

upstairs.  As -- as -- as I say ---

MR.  CASSADA:   --- Yeah, because the one upstairs ---

THE COURT:  --- We'll -- we'll go find out.

Can she tell us?

THE CLERK:  It is open, if we just go ahead and go upstairs.  They won't be able to look at all the -- the technology because they're working on it upstairs.

THE COURT:  Okay.

THE CLERK:  But you can go up there and view the courtroom.

MR. SWETT:  Thank you.

WHEREUPON,

at 11:46 o'clock a.m. the hearing was adjourned.s

94

CERTIFICATION

I, Cassandra J. Stiles, CVR-M, Certified Court Reporter and Notary Public in and for the County of Forsyth, State of North Carolina at Large, do hereby certify;

That the foregoing record was reduced to typewriting in the normal course and manner of the transcription of electronic files as provided, and that the electronic file from which the record was produced was retrieved from the official records of the Court hereon indicated, and that the foregoing pages are a complete and accurate written record of said file;

That the undersigned is not of kin nor in anywise associated with any of the parties touched by the subject matter contained herein, nor any counsel thereto, and that I am not interested in any event(s) thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this the 7th day of July, 2013.

                    Cassandra J. Stiles, CVR-M

                    Certified Court Reporter

                    Atlantic Professional Reporters

                    Post Office Box 11672

                    Winston-Salem, NC 27116-1672