**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC, et al.,<br><br>Debtors.[1] | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered |

**DEBTORS' TRIAL BRIEF AND
<u>SUMMARY OF EVIDENCE TO BE PRESENTED AT TRIAL</u>**

---

[1] The debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company (hereinafter "Garlock" or "Debtors").

## TABLE OF CONTENTS

**Page**

TABLE OF CASES AND AUTHORITIES ................................................................................. ii

INTRODUCTION ........................................................................................................................ 1

I.    THE ALLOWED AMOUNT OF CURRENT AND FUTURE
      MESOTHELIOMA CLAIMS AGAINST GARLOCK IS NO MORE THAN $125
      MILLION.......................................................................................................................... 6

      A.    Estimating the Aggregate Allowed Amount of Mesothelioma Claims
            Requires an Examination of the Validity of the Claims Under State Law
            and a Forecast of Any Liability Under Judgments If Litigated to
            Conclusion ............................................................................................................ 7

      B.    The Evidence Will Show That Few If Any Claimants Can Carry Their
            Burden of Proving That a Garlock Product Caused Their Disease ....................... 9

      C.    The Evidence Will Also Show That Even if Claimants Can Reach a Jury
            on the Issue of Causation, Garlock's Responsibility is No More Than $125
            Million................................................................................................................ 12

II.   PLAN FUNDING OF MORE THAN $270 MILLION WILL BE SUFFICIENT
      TO RESOLVE CURRENT AND FUTURE MESOTHELIOMA CLAIMS
      AGAINST GARLOCK.................................................................................................... 15

III.  THE ESTIMATES OFFERED BY THE COMMITTEE AND FCR ARE
      IRRELEVANT TO THE QUESTIONS BEFORE THE COURT .................................. 18

      A.    Garlock's Settlements Do Not Represent Its Liability for Current and
            Future Mesothelioma Claims.............................................................................. 20

      B.    Garlock's Settlements Outside of Bankruptcy Do Not Reflect The Cost of
            Resolving Claims In Bankruptcy ........................................................................ 22

      C.    The Committee and FCR Estimates Do Not Even Reliably Characterize
            the Future Cost of Settlements If Garlock Had Not Filed for Bankruptcy .......... 24

# TABLE OF CASES AND AUTHORITIES

Page

**Cases**

*A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) ........................................................... 23

*Betz v. Pneumo Abex, LLC*, 44 A.3d 27 (Pa. 2012) ........................................................................ 2

*Bittner v. Borne*, 691 F.2d 134 (3d Cir. 1982) ............................................................................... 8

*Bryte v. Am. Household, Inc.*, 429 F.3d 469, 445 (4th Cir. 2005) ................................................. 2

*Gregg v. V-J Auto Parts, Inc.*, 943 A.2d 216 (Pa. 2007) ............................................................... 2

*In re Armstrong World Indus., Inc.*, 348 B.R. 111 (D. Del. 2006) .............................................. 19

*In re Dow Corning Corp.*, 211 B.R. 545 n.13 (Bankr. E.D. Mich. 1997) ............................... 8, 23

*In re Dow Corning Corp.*, 215 B.R. 346 (Bankr. E.D. Mich. 1997) ............................................. 8

*In re Farley, Inc.*, 146 B.R. 748, 753 (Bankr. N.D. Ill. 1992) ...................................................... 8

*In re Federal-Mogul Global, Inc.*, 330 B.R. 133 (D. Del. 2005) ................................................ 19

*In re FRG, Inc.*, 121 B.R. 451 (Bankr. E.D. Pa. 1990) ................................................................. 1

*In re James Wilson Assocs.*, 965 F.2d 160 (7th Cir. 1992) ......................................................... 22

*In re Ralph Lauren Womenswear*, 197 B.R. 771 (Bankr. S.D.N.Y. 1996) .................................. 8

*In re Sanford*, 979 F.2d 1511 (11th Cir. 1992) ............................................................................. 7

*In re USG Corp.*, 290 B.R. 223 (D. Del. 2003) ........................................................................ 2, 7

*Moeller v. Garlock Sealing Techs., LLC*, 660 F.3d 950 (6th Cir. 2011) ............................. 1, 3, 12

*Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719 (D. Del. 2005) ............................ 19

*Robertson v. Allied Signal, Inc.*, 914 F.2d 360 (3d Cir. 1990) ..................................................... 1

**Statutes**

11 U.S.C. § 502(b)(1) ............................................................................................................... 7, 22

**Other Authorities**

Federal Judicial Center Reference Manual on Scientific Evidence 651 (3d ed. 2010) ................. 2

**INTRODUCTION**

At the estimation trial, Debtors will present the Court with evidence demonstrating the truth about Garlock's responsibility for mesothelioma claims: that it has little or no responsibility for the claims that have been and will be asserted against it, and that even under claimant-friendly assumptions that are contrary to fact and law, its aggregate liability for current and future mesothelioma claims is certainly no more than $125 million.

Unlike the products at issue in past "asbestos" bankruptcy cases, the products at issue here (asbestos-containing gaskets and packing) did not contribute to causing anyone's mesothelioma.[2] Because Debtors have disputed their liability for all mesothelioma claims that may be filed against them in this bankruptcy case, to recover on their claims, claimants would have the burden of proving that exposure to asbestos from a Garlock product made a significant contribution to causing their mesothelioma.[3]

Debtors will show that the vast majority of current and future claimants are unlikely to be able to meet their burden to produce evidence satisfying the standards required to reach a jury on the issue of causation under applicable state law. *See, e.g., Moeller v. Garlock Sealing Techs., LLC*, 660 F.3d 950, 954-55 (6th Cir. 2011) (holding that longtime pipefitter testifying to extensive contact with Garlock gaskets could not reach jury because saying that Garlock contact "was a substantial cause of his mesothelioma would be akin to saying that one who pours a bucket of water into the ocean has substantially contributed to the ocean's volume").

---

[2] Whereas previous "asbestos" bankruptcy cases have involved highly dangerous asbestos products that disappeared from the marketplace decades ago, this case is about a low-dose product that is still sold by companies other than Garlock. "Different manufacturers' asbestos products differ in degrees of harmfulness." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 379-80 (3d Cir. 1990).

[3] *See In re FRG, Inc.*, 121 B.R. 451 (Bankr. E.D. Pa. 1990) (holding that "[t]he estimation process is merely a microcosm of the ordinary claims determination process" and "the allocation of the burdens of proofs . . . is the same as in deciding objections to proofs of claim").

Debtors' experts have evaluated the evidence from the Mesothelioma Claim

Questionnaire ordered by this Court, grouped claimants by the similarity of their contact with

Garlock products, and estimated the portion of total lifetime asbestos exposure that would come

from Garlock products. Doing so with highly pro-claimant assumptions shows that typical

cases—even in the group expected to have the most contact with Garlock gaskets and packing—

could not pass through the *Moeller* filter" for proving "specific causation."[4] Medical witnesses

for the Official Committee of Asbestos Personal Injury Claimants (the "Committee") do not

come to grips with the massive evidence about claimants developed in this case. Rather, they

advance causation theories under which virtually any exposure to asbestos from Garlock

products would be enough to get a case to a jury. These theories are "fictions" rejected by courts

throughout the country in an ever-increasing consensus that low-dose cases fail as a matter of

state substantive law.[5]

Moreover, *Daubert* and Federal Rule of Evidence 702 apply to the evidence in this

estimation trial.[6] The medical and industrial hygiene opinions the Court would have to accept to

reach an estimation substantially above zero fail to pass muster under *Daubert* for a host of

---

[4] The idea that the "dose makes the poison" is a central tenet of toxicology. Federal Judicial Center Reference Manual on Scientific Evidence 651 (3d ed. 2010). Thus, in a toxic tort case, "specific causation" focuses on the plaintiff's dose. Is the dose in question a proven cause of the disease?

[5] "[W]e do not believe that it is a viable solution to indulge in a fiction that each and every exposure to asbestos, no matter how minimal in relation to other exposures, implicates a fact issue concerning substantial-factor causation in every 'direct-evidence' case." *Betz v. Pneumo Abex, LLC*, 44 A.3d 27, 56-57 (Pa. 2012) (quoting *Gregg v. V-J Auto Parts, Inc.*, 943 A.2d 216, 226-27 (Pa. 2007)).

[6] *See In re USG Corp.*, 290 B.R. 223, 227 (D. Del. 2003); *see also Bryte v. Am. Household, Inc.*, 429 F.3d 469, 445-74 (4th Cir. 2005) (Federal Rules of Evidence apply in diversity cases in which state substantive law governs).

2

reasons detailed in the briefs supporting Debtors' motions to strike or exclude these opinions.[7] In

other words, few, if any, claims are likely to pass through a "*Daubert* filter."

Nevertheless, Debtors have proposed a generous fund to pay claims that should, under

the facts and law, be estimated at or near zero. Thus, in addition to the liability evidence, Debtors

will also present evidence to provide a conservative upper bound that the Court can safely accept

as more than adequate compensation for current and future mesothelioma claimants. Debtors'

economic evidence will show what Garlock's responsibility would be, assuming (contrary to fact

and law) that (a) *every* current and future mesothelioma claimant who identifies contact with a

Garlock product will have the chance to proceed to trial and potential judgment, and (b) *no*

claimant's causation evidence will be excluded under *Daubert*. In fact, these assumptions are

extremely likely *not* to be true. *See Moeller*, 660 F.3d at 954-55. Yet even under these highly

claimant-friendly assumptions, Garlock's responsibility for current and future mesothelioma

claims under state law is no more than $125 million.

Garlock is in bankruptcy not because it has significant liability for mesothelioma claims,

but instead because it could not obtain a fair and efficient adjudication of its liability in the tort

system after 2000. That is when Garlock's longtime co-defendants—who actually caused

plaintiffs' mesotheliomas and thus paid most of the money that asbestos plaintiffs received

before 2000—temporarily stopped paying claims while they entered bankruptcy and established

Trusts. This Bankruptcy Wave did *not* change Garlock's fundamental responsibility to

mesothelioma claimants. After all, Garlock had been showing it had no liability for these claims

---

[7] Debtors' Brief in Support of Motion to Exclude or Strike Committee Industrial Hygiene
Witness Opinions (Docket No. 2986); Debtors' Brief in Support of Their Motion to Exclude or
Strike Committee Medical Expert Witness Opinions (Docket No. 2982).

for decades before 2000, never paying more than *de minimis* average settlements to mesothelioma plaintiffs, and winning 92% of the dozens of mesothelioma cases taken to verdict.

Rather, Garlock's average settlement in mesothelioma cases increased from approximately $5,000 in in the five-year period from 1995 to 1999 to more than $70,000 by 2010 because its *cost of defense* increased enormously after its co-defendants entered bankruptcy. With the bankrupts temporarily not paying claims while they worked to establish Trusts, the rate at which plaintiffs identified bankrupts' products drastically decreased. If Garlock was going to demonstrate it had no liability at trial, it had to develop the evidence itself, at great expense, which greatly increased Garlock's defense costs and allowed plaintiffs to extract more in settlement. It was cheaper for Garlock to pay higher settlements than to spend the money necessary to demonstrate it had no liability. Indeed, no sums expended on defense could ultimately substitute for plaintiffs' own admissions that they were exposed to the friable products manufactured by the bankrupts—as they regularly did before 2000, and regularly would admit again once Trusts began paying claims.

Discovery in this case has shown that in the cases where Garlock paid the most money, certain plaintiffs' firms *actively suppressed* evidence of their clients' exposures to asbestos-containing products for which bankrupts were responsible. These firms engaged in a regular practice of failing to disclose Trust claims, in violation of court orders; delaying the filing of Trust claims, also often in violation of court orders; failing to produce sworn statements by plaintiffs and others identifying exposure to bankrupts' asbestos products; and allowing plaintiffs to deny exposure to bankrupts' products during deposition and trial testimony, contrary to the sworn statements of the plaintiff. These practices were intended to deny Garlock access to plaintiffs' alternative exposure evidence and admissions, and they artificially inflated Garlock's

4

cost of defense and its trial risk in the cases that presented the greatest financial burden over the past decade.

Debtors' plan of reorganization fixes the problem of a system distorted by the bankruptcies of Garlock's major co-defendants. The Plan requires any claimant choosing to litigate the validity of his claim to disclose *all* his known exposures, including exposures underlying Trust claims. By enforcing this simple disclosure obligation, the Plan will decrease the cost to Garlock of demonstrating the truth: that mesothelioma claimants against Garlock were exposed—and admit exposure—to the products of dozens of companies, including highly friable amphibole asbestos products.

To induce settlement, the Plan will pay a large premium over Garlock's actual responsibility, resulting in Plan funding of approximately $270 million, more than double the less than $125 million for which Garlock could actually be responsible under highly conservative assumptions. Plaintiffs will be better off accepting settlements under the Debtors' Plan than if they litigated, and will accept those settlements, for the benefit of all parties, as well as the Court, which will likely not have to try many of the mesothelioma claims against the Debtors.[8]

In contrast, the Court will hear nothing from the Committee and FCR about Garlock's actual responsibility for mesothelioma claims. None of their experts have determined the number of claimants whose mesothelioma may have been caused by a Garlock product, nor have they estimated the number of other potentially responsible parties or Garlock's share of any claimant's damages.

The Committee and FCR experts have merely projected Garlock's settlements immediately before the petition forty years into the future, and called that Garlock's "liability."

---

[8] In addition, under the Plan, any trials would occur in the district court where the plaintiff resides or the injury occurred, not in the Western District of North Carolina.

They fail to recognize that (a) Garlock's settlements had nothing to do with its responsibility under state law, but rather reflected the cost of defense and the failure of plaintiffs and law firms to identify admissions of exposure to bankrupts' products, and (b) Garlock's settlements have nothing to do with the cost of resolving claims *within* bankruptcy, where transaction costs that motivated settlements in the past will be minimized, leading to lower resolution costs. Finally, the Committee and FCR experts have even failed to reliably project what Garlock's settlements would have been outside bankruptcy because they (a) fail to apply a reliable methodology for predicting future settlements, (b) fail to take account of known changes to the tort environment, and (c) use virtually none of the discovery the Court has ordered in this case and have made basic data errors in applying their own methodologies.

This estimation trial will be a search for truth. And in truth, Garlock bears little if any responsibility for claimants' mesotheliomas. The $270 million in proposed Plan funding will result in claimants being paid much more than the full expected value of their claims if litigated under state law. The proposed Plan funding is an eminently fair resolution of Garlock's mesothelioma liability.[9]

## I.      THE ALLOWED AMOUNT OF CURRENT AND FUTURE MESOTHELIOMA CLAIMS AGAINST GARLOCK IS NO MORE THAN $125 MILLION

Debtors have organized their proof around the questions posed by the Court in its April 12, 2012 Order for the Estimation of Mesothelioma Claims ("Estimation Order") (Docket No.

---

[9] For the sake of clarity, Debtors have preserved and have not waived their rights to object to all asbestos personal injury claims that may be filed against them, and to have a bar date before any such claims are allowed or estimated, as set forth in the Debtors' Motion for (A) Establishment of Asbestos Claims Bar Date, (B) Approval of Asbestos Proof of Claim Form, (C) Approval of Form and Manner of Notice, (D) Estimation of Asbestos Claims, and (E) Approval of Initial Case Management Schedule (Docket No. 461). Debtors have also objected to the use of their past settlements to establish their liability for, or the amount of, any asbestos claims that may be filed against them. Nothing in this trial brief, or in the presentations to be made at the estimation trial, waives Debtors' rights with respect to these matters.

2102). In the Estimation Order, the Court after substantial briefing ordered this estimation trial,

granting Debtors' motion for estimation made in connection with their proposed plan of

reorganization. The Court concluded that the objective and purpose of the estimation trial would

be to "estimate the total amount of allowed mesothelioma claims in order to determine plan

feasibility." Estimation Order at 2; *see also id.* ¶ 9 (concluding that it is "proper here to estimate

Garlock's mesothelioma asbestos liability for allowance purposes pursuant to section 502(c).").

> **A.     Estimating the Aggregate Allowed Amount of Mesothelioma Claims
> Requires an Examination of the Validity of the Claims Under State Law and
> a Forecast of Any Liability Under Judgments If Litigated to Conclusion**

When the Court ordered the estimation of the allowed amount of these creditors' claims,

it followed the substantial precedent concerning the estimation of disputed, contingent, and

unliquidated claims under section 502(c) of the Bankruptcy Code. Those cases hold that

estimation of contingent claims is an estimate of the "allowed amount" of a claim—that is, an

estimate of the amount of enforceable liability for the claim under state substantive law if it were

allowed. *See In re USG Corp.*, 290 B.R. 223, 225 (Bankr. D. Del. 2003) ("It is basic that federal

bankruptcy jurisdiction does not oust state law governing claims on a debtor's estate. . . . An

unbroken line of authority holds that state law claims remain governed by state law, even after

the debtor invokes federal bankruptcy protection."); *see also* 11 U.S.C. § 502(b)(1) (directing

that claims "unenforceable against the debtor and property of the debtor, under . . . applicable

law" shall not be allowed in bankruptcy); *In re Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992)

("[A] claim against the bankruptcy estate will not be allowed in a bankruptcy proceeding if the

same claim would not be enforceable against the debtor outside of bankruptcy.").

The cases on estimation for allowance under section 502(c) provide that estimation,

although an abbreviated process compared to liquidation, remains governed by substantive state

law and must determine the number and amount of claims that *have validity* under state law. *See*

7

*In re Dow Corning Corp.*, 211 B.R. 545, 560 n.13 (Bankr. E.D. Mich. 1997); *see also id.* at 566

("While estimation may be a somewhat abbreviated form of liquidation, they are still generally

duplicative processes."); *In re Farley, Inc.*, 146 B.R. 748, 753 (Bankr. N.D. Ill. 1992) ("In

determining the claims' value, the Court 'is bound by the legal rules which may govern the

ultimate value of the claim.'"). Estimation of the allowed amount of claims thus "includes the

determination of whether the debtor is liable on the claim—that is, whether the claim is valid." *In

re Dow Corning Corp.*, 215 B.R. 346, 354 (Bankr. E.D. Mich. 1997); *see also Bittner v. Borne*,

691 F.2d 134, 135 (3d Cir. 1982) (estimation is "bound by the legal rules which may govern the

ultimate value of the claim.").[10]

The estimation process called for under section 502(c) thus compels the determination of

which claims are valid and their amount, a process that inevitably requires the Court to consider

the number of claims with potential merit, the likelihood of Garlock being found liable for any

such claims, and Garlock's share of damages in any cases that have potential merit. For example,

in *In re Farley, Inc.*, 146 B.R. 748 (Bankr. N.D. Ill. 1992), the court estimated a group of tort

claims. The court "appl[ied] the relevant laws of Illinois to the issues presented in their claims,"

then estimated the claims by determining the claimants' likelihood of success on the disputed

factual issue, and the probability of damages. *Id.* at 750-52, 754-56; *see also In re Ralph Lauren

Womenswear*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) (holding that "[t]he estimated value of

a claim is . . . the amount of the claim diminished by [the] probability that it may be sustainable

only in part or not at all" and that any claims that would be disallowed as a matter of law should

---

[10] *See generally* Appendix of Estimation Cases, Debtors' Brief Concerning Scope and Purpose of
Estimation of Mesothelioma Claims Pursuant to Bankruptcy Code Section 502(c) (Docket No.
2009) (describing fifteen cases recognizing that estimation for allowance under section 502(c), as
the Court has ordered here, requires consideration of the merit of claims).

be estimated at zero because at estimation the court "is bound by the legal rules which may

govern the ultimate value of the claim").

Debtors have structured their case on the allowed amount of claims in accordance with

this precedent and other applicable law. They will show the Court that (a) few if any current or

future mesothelioma claims have potential merit under substantive state law, and (b) even if

claimants could, contrary to expectation, reach a jury, the expected value of their judgments

would be no more than $125 million.

**B.      The Evidence Will Show That Few If Any Claimants Can Carry Their
Burden of Proving That a Garlock Product Caused Their Disease**

Debtors will present reliable scientific evidence permitting the Court to assess the

evidence of causation that various scientifically defined groups of mesothelioma claimants

against Garlock could offer. This evidence will allow the Court to determine, in the aggregate,

which kinds of claimants against Garlock could even reach a jury on the issue of causation. This

causation evidence consists of two broad categories: exposure assessment and opinions on

medical causation.

First, Debtors will offer evidence permitting the Court to assess, by groups, the exposures

to asbestos that current and future claimants against Garlock experienced from gaskets and

packing as well as from other products, including insulation.

Mr. John Henshaw (a certified industrial hygienist and the former head of OSHA)

grouped the current and projected future claimants based on their industries and occupations, as

defined in the Mesothelioma Claim Questionnaire ordered by this Court (which collected this

information for the current claimants). Using the descriptions of work practices contained in the

depositions of current and former plaintiffs in those industries and occupations, as well as other

data about work practices in those industries and occupations, Mr. Henshaw estimated how

frequently claimants in those industries and occupations would have encountered gaskets, as well as the insulation found around asbestos-containing gaskets, and grouped the industries and occupations accordingly. Then, using reliable science on the exposures produced by work activities involving gaskets and insulation, Mr. Henshaw derived estimates for each group of industries and occupations of the maximum exposure they would have experienced from gaskets, as well as the exposure they would have received from insulation around the gaskets.

Mr. Henshaw's exposure assessments indicated that the lifetime maximum potential exposures from gaskets and packing that claimants experienced were miniscule, well below the OSHA permissible exposure limit ("PEL"):



Mr. Henshaw also concluded that any exposure from gaskets and packing was dwarfed by the exposures such claimants experienced from insulation associated with gasket and packing work:



Debtors will next offer evidence demonstrating the medical insignificance of the potential

exposures from gaskets and packing experienced by these groups of claimants. Dr. David

Garabrant (Emeritus Professor of Occupational Medicine and Epidemiology at the University of

Michigan) and Dr. David Weill (Professor of Medicine at Stanford University Medical Center

and director of the Center for Advanced Lung Disease) will establish that exposures to low doses

of chrysotile asbestos (like those from gaskets and packing) are not associated with

mesothelioma, but that high exposures to amphibole insulation (which claimants with any

significant contact with gaskets also experienced) are a proven cause of mesothelioma. In

addition, Dr. Thomas Sporn (a Duke University pathologist whose third edition of an influential

book on asbestos disease is about to be published) will present the results of published studies

showing that physical evidence from lungs of mesothelioma patients with occupational histories

11

similar to those of the groups before the Court explains why virtually all likely claimants developed mesothelioma from amphibole-containing insulation products.

For all these reasons, any gasket exposure did not contribute to any of these claimants' mesotheliomas, which were instead caused by their exposures to insulation and other friable products often found around gaskets. The exposures claimants in each group experienced from gaskets were no more than a bucket in the ocean, meaning they cannot prove causation as a matter of law. *Moeller*, 660 F.3d at 954-55.

Debtors will likely offer witnesses supporting the primary exposure, epidemiology, and medical causation opinions described above, including witnesses on the environments in which claimants would have come into contact with Garlock's products; the nature of the products' use; why causality determinations cannot rest on regulatory materials that the Committee will rely upon; and methodological issues relating to epidemiology and the assessment of medical causation.

**C.      The Evidence Will Also Show That Even if Claimants Can Reach a Jury on the Issue of Causation, Garlock's Responsibility is No More Than $125 Million**

To provide an upper bound on Garlock's responsibility for mesothelioma claims, Debtors asked Dr. Charles Bates (PhD in economics and founder of economic consulting firm Bates White LLC) to estimate the expected value of final judgments that current and future mesothelioma claimants would receive on the claimant-friendly assumptions that:

- A trial court does *not* apply *Daubert* or a similar precedent to exclude unreliable testimony on behalf of plaintiffs concerning asbestos release levels and medical causation (even though such testimony has been and should be excluded under these standards), and

- The trial court permits the claim of any claimant who alleges contact with a Garlock product to reach the jury, despite precedents such as *Moeller* providing that a claimant who was exposed but cannot demonstrate that his exposure from gaskets was more than a "bucket in the ocean" *cannot* reach a jury.

Debtors also asked Dr. Bates to assume that plaintiffs do not hide evidence of their exposure to other products, but instead disclose to Debtors all exposures known or reasonably known to them or their attorneys—the situation that would obtain under Debtors' Plan and that is supposed to exist in the tort system.

Dr. Bates, applying reliable and conservative econometric methods and using information collected in discovery in this case (including from the Mesothelioma Claim Questionnaire), then estimated under these assumptions (a) the number of current and future claimants who will allege Garlock exposure, (b) the total verdicts such claimants would receive if successful, (c) the number of other products that such plaintiffs would admit exposure to, (d) Garlock's share of any damages given the liability sharing rules of each jurisdiction in the United States, and (e) the likelihood that the plaintiff would succeed in obtaining a verdict. These steps are displayed schematically below:



This analysis resulted in a figure of $125 million. If instead, as Debtors will show, large numbers of claimants will *not* be able to reach a jury on the issue of causation or present admissible evidence of causation, the number would be much lower.

Dr. Bates's testimony will be supplemented by testimony from (a) Dr. Jorge Gallardo-Garcia, who supervised the creation of an analytical database incorporating all discovery gathered concerning claimants in this case, as well as extensive additional data, and (b) from witnesses to Garlock's experience in asbestos litigation, including Garlock's defense attorneys.

## II.    PLAN FUNDING OF MORE THAN $270 MILLION WILL BE SUFFICIENT TO RESOLVE CURRENT AND FUTURE MESOTHELIOMA CLAIMS AGAINST GARLOCK

In its Estimation Order, the Court also stated that the estimation trial would be "for the purpose of making a reliable and reasonable estimate of the aggregate amount of money that Garlock will require to satisfy present and future mesothelioma claims." Estimation Order ¶ 10. The Court did not purport to determine how the claims would be resolved, but clearly indicated that they will be resolved within the context of bankruptcy law. *See id.* ("Whether those claims are satisfied through Garlock's Plan or that anticipated by the ACC and FCR; whether they are satisfied through litigation, settlement or a 524(g) Trust; or whether some as yet unanticipated process is necessary . . .").

Debtors accordingly will also present evidence concerning the cost of resolving mesothelioma claims in this bankruptcy case. Debtors have proposed plan funding of approximately $270 million, more than twice Garlock's estimated liability to current and future claimants. Such a premium should be sufficient, under any circumstances, to induce claimants to settle rather than litigate against the Trust.

More specifically, Debtors have proposed a Plan that fixes the problem that led to Garlock's bankruptcy. Garlock's cost of resolving mesothelioma claims increased after 2000 not because its *responsibility* for those claims under state law increased, but rather because the *cost* of demonstrating it was not responsible became prohibitively expensive. When plaintiffs largely ceased identifying exposure to the bankrupts' products, to prove it had little responsibility for claimants' injuries, Garlock had to bear the cost of developing this evidence independently, at great expense. Even that expense could never substitute completely for the plaintiff's own admission that he was exposed to the friable products manufactured by bankrupts. It became economically more attractive for Garlock to settle for increased amounts rather than spend

15

greater sums demonstrating it had little or no liability for plaintiffs' mesotheliomas. Garlock's

underlying liability, however, fundamentally remained unchanged.

Discovery in this bankruptcy case has revealed that at the extreme upper end of Garlock's

settlement range, plaintiffs' firms actively worked to prevent Garlock from discovering their

clients' admissions of exposure to the products of bankrupts, which greatly increased Garlock's

defense costs and trial risk. These firms' conduct followed, in large part, the practices of the

Baron & Budd law firm disclosed in its "Preparing for Your Deposition" memorandum, a

document that mentioned Garlock by name and instructed the firm's clients to avoid admitting

exposures to products of manufacturers who were not sued in their tort case. Many of the firms

implicated in this practice by discovery in this case were founded by attorneys trained at Baron

& Budd.

Discovery in this case has yielded admissions and evidence that:

- Plaintiffs' counsel engaged in a regular practice of delaying the filing of Trust claims to
  deny Garlock access to plaintiffs' exposure evidence and admissions, often in violation of
  court orders requiring pretrial filing and disclosure of Trust claims.

- Trial attorneys instructed referring counsel responsible for filing Trust claims to delay
  filing those claims in order to deny Garlock access to plaintiffs' admissions of exposure,
  also often in violation of court orders requiring claimants to file their Trust claims before
  trial and disclose them to defendants.

- Plaintiffs' counsel failed to disclose Trust claims containing admissions of exposure that
  had already been filed, again often in violation of court orders.

- Plaintiffs' counsel failed to produce sworn statements by plaintiffs identifying on the
  basis of their personal knowledge exposures to asbestos products manufactured by

bankrupts, and then never identified such exposures in tort discovery, in violation of

discovery rules and court orders.

- Plaintiffs' counsel allowed plaintiffs to deny exposure or deny knowledge of exposure to

  products during deposition and trial testimony contrary to such sworn statements.

- Plaintiff firms had a practice of not sharing evidence about their clients' exposures to

  asbestos-containing products manufactured by bankrupts within their own firms, in order

  to "maximize" the value of their tort suits against Garlock and other defendants, despite

  discovery rules and court orders requiring disclosure.

These tactics made it effectively impossible for Garlock to ever present plaintiffs' true exposure

history to juries. This was how plaintiff firms obtained the very highest settlements against

Garlock.

Debtors are in bankruptcy to fix this problem. Debtors' plan of reorganization requires

claimants to disclose their known exposures, including those admitted in Trust claims and

evidence supporting Trust claims, before litigating against the reorganized debtor or Garlock

Trust. This requirement will be centrally enforced and effectively monitored, ensuring that all the

exposures claimants know about are on the table before litigation can occur. Settlements in this

environment will be far closer to what Garlock paid in the 1990s, reflecting its minimal liability

for mesothelioma claims.

Debtors will offer Dr. Bates to establish that the $270 million of plan funding Debtors

have proposed is sufficient to resolve all current and future mesothelioma claims against Garlock

in a regime—much like how the tort system is supposed to operate—in which claimants are

compelled to provide all their admissions of exposure. Dr. Bates has modeled the relationship

between Garlock's settlements and its liability, and tested his model's accuracy with data from

Garlock's history. He will testify that, under the assumption that claimants have to provide their admissions of exposure to other products before litigating, it will be in claimants' best interest to accept the settlements offered in Debtors' Plan.

## III.    THE ESTIMATES OFFERED BY THE COMMITTEE AND FCR ARE IRRELEVANT TO THE QUESTIONS BEFORE THE COURT

Unlike Debtors, neither the Committee nor the FCR will offer evidence concerning the number of claimants whose mesotheliomas may have been caused by a Garlock product, nor an estimate of the number of other potentially responsible parties or Garlock's share of any claimant's damages. Instead, they have clung stubbornly to estimation approaches developed for cases in other contexts, where debtors manufactured dangerous friable products, did not dispute liability, and joined claimant committees and FCRs in presenting a settlement-based approach. Those approaches are entirely unsuitable for this case, where Debtors *do* dispute their liability for mesothelioma claims.

As the Court may recall, in briefing before the Court's entry of the Estimation Order, both the Committee and the FCR objected to the kind of estimation that the Court has ordered. Specifically, the Committee and FCR pleaded for, and the Court rejected, an estimation proceeding that did not seek to determine the "allowed amount" of claims.[11] Instead, the Committee and FCR sought the kind of estimation applied in cases where the debtor, the committee, and the FCR had agreed on a consensual plan, and the debtor had produced highly friable, dusty, amphibole products for which those debtors did not dispute liability. *See generally* Comm. Est. Br. at 8-12.

---

[11] *See* Brief of the Official Committee Of Asbestos Personal Injury Claimants and the Future Claimants' Representative as to the Nature and Scope of the Estimation Proceeding (Docket No. 2008) ("Comm. Est. Br.") at 12 (arguing that court should require a settlement approach that avoids any scrutiny of the merits of claims).

18

As the Court recognized in its Estimation Order, those estimations were not for purposes of allowance, and did not call on the court to determine which claims were valid and their amount. *See* Estimation Order ¶ 6 (explaining that estimations in *In re Armstrong World Indus., Inc.*, 348 B.R. 111 (D. Del. 2006), *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719 (D. Del. 2005), and *In re Federal-Mogul Global, Inc.*, 330 B.R. 133 (D. Del. 2005) were for purposes other than allowance). In contrast to the cases that the Committee and FCR argued should be the model for estimation here, the Court ordered that estimation in this case *would be* for "allowance purposes," and thus would necessarily entail inquiry into the validity of claims. Estimation Order ¶ 9 ("[I]t appears proper here to estimate Garlock's mesothelioma asbestos liability for allowance purposes pursuant to section 502(c).").

Notwithstanding the ruling reflected in the Estimation Order—which overruled the Committee's and FCR's pleas for a theory that avoided any inquiry into the merits of claims—the Committee and FCR have not adjusted their approach. They have instead persisted in offering a decidedly *non-merits* approach to determining the "allowed amount" of Debtors' liability for claims. It is the same approach they used for the "dusty" bankrupt defendants in support of a consensual plan. Their experts calculate Garlock's liability simply by predicting what Garlock would have paid to *settle* cases if it had never filed for bankruptcy. They implicitly assume that Garlock was *liable* or *admitting liability* in every case that it settled. The "settlement approach," in other words, tries to equate Garlock's past agreements to settle cases to *findings* by juries based on all relevant evidence that Garlock's products were a substantial cause of plaintiffs' mesothelioma.

Debtors will show, in rebuttal to the Committee and FCR's cases, that (a) Garlock's settlements outside bankruptcy do not represent its liability under state law, (b) Garlock's

19

settlements outside bankruptcy have nothing to do with what it will cost Debtors to resolve

claims in bankruptcy, and (c) the Committee and FCR have not even forecast reliably or

correctly what settlements would have been outside of bankruptcy.

**A.    Garlock's Settlements Do Not Represent Its Liability for Current and Future Mesothelioma Claims**

Debtors will show that Garlock's settlements during the past decade exceeded its liability

for claims under state law for a number of reasons. First, Garlock's settlements were not an

admission of liability, but rather a financial decision primarily motivated by a desire to avoid

defense costs. Simply put, it was cheaper for Garlock to settle claims than to pay lawyers and

experts to demonstrate Garlock had no liability. Debtors will establish this through testimony

from (a) individuals who settled the claims on Garlock's behalf (or approved such settlements),

and (b) Dr. Bates, who (as discussed above) has modeled the economic relationship between

settlements and liability in mesothelioma litigation and found that the vast majority of Garlock's

settlements are too low to be associated with any measurable trial risk. The Committee and FCR

experts, by contrast, have not modeled the relationship between Garlock's settlements and its

liability, and did not even attempt to draw a link between Garlock's settlements and its liability

under state law.[12]

Second, Debtors will show that Garlock's settlements do not reflect its liability under

state law because those settlements were not based on a full evidentiary record. The Committee

and FCR have characterized Debtors' settlements as "bargained-out resolutions reflect[ing] the

strengths and weaknesses of Garlock's purported science defenses, just as they **reflected the**

---

[12] Debtors have filed their Motion to Exclude or Strike Committee and FCR Estimation Expert Witness Opinions (Docket No. 2989) and supporting brief (Docket No. 2990), which set out in detail why the opinions of Dr. Rabinovitz and Dr. Peterson are not admissible under Federal Rule of Evidence 702 and *Daubert*, for lack of (a) fit, (b) reliable methods, and (c) reliable application of methods to the facts of this case.

**spectrum of evidence, from strongest to weakest**, across the entire population of claims

resolved by dismissal, settlement, or trial." ACC Est. Resp. Br. at 62 (emphasis added).[13]

      The evidentiary record developed in discovery, however, demonstrates that this is not

true. Garlock's settlement history in the several years before the Petition Date was *not*

established based on the full "spectrum of evidence" concerning claimants' exposure to asbestos,

but in an environment where claimants represented by some of the most prominent

mesothelioma trial firms presented a materially distorted picture of claimants' exposure profiles.

These firms withheld evidence of their clients' exposures to increase Garlock's defense costs,

artificially inflate Garlock's trial risk, and prevent juries from assigning responsibility to

bankrupt companies. This record completely undermines the Committee and FCR's notion that

Garlock's settlement history is a proxy for liability because those resolutions were based on a

full "spectrum of evidence."

      At trial, Debtors will establish these facts through deposition testimony of plaintiff law

firms that obtained some of the highest settlements from Garlock over the past decade, and

through documentary evidence produced by those firms. Debtors will also introduce expert

testimony from Professor Lester Brickman—a leading authority on asbestos litigation who has

testified before Congress and in previous bankruptcy cases—regarding the practices of plaintiff

firms in asbestos litigation, including the ways plaintiff firms control and manipulate evidence

for their own financial benefit, as reflected in such documents as the Baron & Budd "Preparing

for Your Deposition" memorandum pertaining to manipulation of exposure evidence.

---

[13] The Response Of The Official Committee Of Asbestos Personal Injury Claimants To The
Debtors' Brief Concerning Scope And Purpose Of Estimation Of Mesothelioma Claims (Docket
No. 2052) is referred herein to as the "ACC Est. Resp. Br."

**B.     Garlock's Settlements Outside of Bankruptcy Do Not Reflect The Cost of Resolving Claims In Bankruptcy**

Additionally, the Committee and FCR fail to link their estimates of what Garlock "would have settled for outside of bankruptcy" to what it will cost Debtors to resolve claims *within* bankruptcy. They overlook the purpose of this bankruptcy case, which is not to replicate a flawed tort system that could not provide Garlock an efficient and fair adjudication of its responsibility, but instead to decrease transaction costs and ensure that all persons with legitimate interests in the Debtors' estates are paid in full.

The only support the Committee and FCR seem to muster for refusing to consider anything other than costs outside of bankruptcy is a notion that claimants cannot legitimately receive anything less than they would have received had Garlock not filed for bankruptcy and continued to settle claims. But they cite no law for this proposition, and it is clearly wrong. Claimants have no entitlement to receive settlements they would have obtained if Garlock had not filed for bankruptcy—i.e., claims on contracts that do not yet exist. They are only entitled to recover the value of their claim under *applicable tort law*: i.e., the allowed amount of their claims under state tort law, with its requirement of proving causation. *See* 11 U.S.C. § 502(b)(1).

In addition, there is nothing about the bankruptcy process that suggests a debtor cannot end up in an improved position, so long as the debtor reaches that position as a result of application of the provisions of the Bankruptcy Code. Indeed, if the Committee and FCR's position were the law, no debtor would ever file for bankruptcy. *See In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992) (Posner, J.) ("It is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it? . . . [T]he Bankruptcy Code permits an individual or firm that has debts to declare bankruptcy even though he (or it) is not insolvent.").

Debtors' purpose here is consistent with the Code. Debtors filed these cases in order to implement a plan under which all claimants are paid the full allowed amount of their claims, with a minimum of transaction costs, for the benefit of all parties with interests in Debtors' estates. This is a legitimate purpose, as the Fourth Circuit recognized in words equally applicable to these cases:

> If the bankruptcy court could arrive at a fair estimation of the value of all the claims and submit a fair plan of reorganization based on such estimation, with some mechanism for dispute resolution and acceptable to all interested parties, great benefit to all the claimants could be achieved and the excessive expense of innumerable trials, stretching over an interminable time, could be avoided.

*A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1012 (4th Cir. 1986). The plan in *A.H. Robins* fulfilled this hope. It distributed substantial property to the debtor's shareholders, while funding a trust that ended up having *more* money than it needed to pay personal injury claims.

The eventual plan of reorganization here *will* have some transaction costs: the cost of operating the trust and defending any claims that are litigated. But through the Trust, the centralization of any pretrial litigation, and enforcement of the requirement that plaintiffs identify all their admissions of exposure to the products of other companies, the Plan will minimize those costs and permit allowed claims to be paid in full. The Plan, in fact, should give both Debtors and holders of *allowed* claims based on their merits a better result than they could have achieved litigating thousands of claims in fifty states. *See Piccinin*, 788 F.2d at 1012; *Dow Corning*, 211 B.R. at 597 (noting fundamental difficulties with individual litigation of claims in mass tort cases).

23

**C.    The Committee and FCR Estimates Do Not Even Reliably Characterize the Future Cost of Settlements If Garlock Had Not Filed for Bankruptcy**

Finally, not only are the Committee and FCR estimates of the "cost of settling claims outside of bankruptcy" completely irrelevant to estimation, they are themselves unreliable. In the first place, as set out more fully in Debtors' *Daubert* motion to strike or exclude the Committee and FCR estimation experts, neither Dr. Peterson nor Dr. Rabinovitz has a reliable methodology for predicting what Garlock's settlements would have been outside of bankruptcy. Rather, they blindly assume that the future would look like the immediate past, without establishing that the same factors that affected Garlock's settlements in the past would have existed in the future. Indeed, they could not even explain why Garlock's settlements varied over the past decade.

For example, Dr. Rabinovitz did not even examine and has no opinion on why Garlock's settlements increased after 2000—much less whether the factors that contributed would persist. Before issuing her reports, she did not evaluate the impact that $30 billion in future asbestos Trust payments would have on Garlock's future settlements.  She failed to do this, even though she concluded in an opinion she offered in a separate case in 2007 that future Trust payments would exert "considerable downward pressure on indemnity values" for that asbestos debtor in the tort system.  In blindly assuming that Garlock's future would resemble the immediate past, Dr. Rabinovitz neglected even to analyze this issue. As set forth in Debtors' *Daubert* brief, Dr. Peterson's analysis was no better.

The Committee and FCR also ignore legal developments during this decade and in the three years since the Petition Date that have already brought about drastic changes that would have exerted downward pressure on the settlement amounts of a low-dose, chrysotile defendant such as Garlock. Garlock will call Mr. Mark Behrens, a recognized authority on trends in asbestos litigation who has testified before Congress and numerous state legislatures. Mr.

Behrens will describe for the Court the case management orders entered in asbestos jurisdictions, decisions by state courts of last resort and federal courts on scientific evidence and causation issues that have made plaintiffs' cases even weaker than before, as well as state and federal legislation that have begun to bring transparency to the Trust claiming process, mitigating the problem that forced Garlock to file for bankruptcy and that Debtors' Plan is intended to address. Mr. Behrens will explain to the Court how these substantial reforms have impacted asbestos litigation generally and how they can be expected to impact Garlock in resolutions achieved under the Plan. These developments also show that Dr. Peterson and Dr. Rabinovitz have failed to take into account changes that have already occurred in the tort system that would have decreased Garlock's settlements if it had remained outside of bankruptcy.

Finally, Dr. Peterson and Dr. Rabinovitz have made basic analytical errors in applying *their own methods* that have led to highly inflated estimates. Debtors and their experts examined the projections of each of Dr. Rabinovitz and Dr. Peterson. That study revealed errors on several fronts, among them:

- Including in the figure projected payments to Garlock's defense lawyers based on the counter-factual notion that the bankruptcy had not occurred, ignoring the fact that defense lawyers have no claim in bankruptcy for future fees;

- Improperly accounting for cases settled before the Petition Date and how they influence projections under the Committee and FCR methodology;

- Ignoring explicit statements in Mesothelioma Claim Questionnaires returned pursuant to this Court's orders saying that the claimants in question do not have pending mesothelioma claims;

- Incorrectly assigning payment years to several large past payments, inflating Dr. Peterson and Dr. Rabinovitz's forecasts;

- Assuming claims would settle too quickly, given the history of how Garlock settled claims, resulting in payments being made in earlier years and not being discounted enough, inflating Dr. Peterson and Dr. Rabinovitz's forecasts;

- Incorrectly valuing pending claims, applying Garlock's average settlement value even though the pending claims have been pending longer than the average settled claim, and claims pending for longer settle for less;

- Applying Garlock's average settlement value to pending claims even though the pending claims on average come from jurisdictions where Garlock paid settlements that were lower than average;

- Applying inconsistent discount and inflation rates;

- Artificially inflating the number of claimants who would sue Garlock, without any sound statistical basis; and

- Failing to consider the impact that Trusts would have on future settlements outside of bankruptcies, an effect shown by data received from the Delaware Claims Processing Facility in this case.

These errors and their impact under the Committee and FCR estimates are summarized below:

26



This 8th day of July, 2013.

Respectfully submitted,

/s/ Garland S. Cassada
Garland S. Cassada
N.C. Bar No. 12352
Jonathan C. Krisko
N.C. Bar No. 28625
Richard C. Worf, Jr.
N.C. Bar No. 37143

ROBINSON BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000

gcassada@rbh.com
jkrisko@rbh.com
rworf@rbh.com

*Special Corporate and Litigation Counsel to the
Debtors Garlock Sealing Technologies LLC,
Garrison Litigation Management Group, Ltd., and
The Anchor Packing Company*

Cary Schachter
Raymond P. Harris, Jr.

SCHACHTER HARRIS, LLP
600 North Pearl, Suite 2300
Dallas, TX 75201
Telephone: (214) 999-5700
Facsimile: (214) 999-5747

cschachter@schachterharris.com
rharris@schachterharris.com

*Special Litigation Counsel to the Debtors Garlock
Sealing Technologies LLC, Garrison Litigation
Management Group, Ltd., and The Anchor Packing
Company*

28