**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>GARLOCK SEALING TECHNOLOGIES LLC, *et. al.*,<br><br>Debtors. | Case No. 10-BK 31607<br><br>Chapter 11<br><br>Jointly Administered |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION BY *LEGAL NEWSLINE* TO UNSEAL THE TRIAL
TESTIMONY AND EXHIBITS ON WHICH THE COURT BASED ITS
JANUARY 10, 2014, ORDER ESTIMATING AGGREGATE LIABILITY**

**I.     INTRODUCTION**

This motion asserts fundamental First Amendment rights with respect to public access to evidence on which this Court based a landmark ruling in a case of national importance. *Legal Newsline* moves to unseal the trial testimony and exhibits underpinning the Court's January 10, 2014, Order estimating that the liability of Garlock Sealing Technologies, LLC ("Garlock") for present and future mesothelioma claims is $125 million. (Order Estimating Aggregate Liability ("Estimation Order"), Dckt. 3296 at 1.) In rejecting the $1 to 1.3 billion estimate extrapolated by representatives of existing and future asbestos disease claimants (collectively, "Claimants") from previous verdicts and settlements involving Garlock, the Court found that the "evidence at the present hearing demonstrated that the last ten years of [Garlock's] participation in the tort system was infected by the manipulation of exposure evidence by plaintiffs and their lawyers." (*Id.* at 26.)  The Court's 65-page ruling summarized voluminous evidence—much of which was submitted under seal in portions of the hearing that were closed to the public—in support of its conclusion that such manipulation "had a profound impact on a number of Garlock's trials and many of its settlements such that the amounts recovered were inflated." (*Id.*)

There is always a compelling First Amendment interest in public access to court proceedings and, in particular, to evidence on which court decisions are based. That interest is even stronger here, where the subject of the ruling—misconduct by asbestos plaintiffs and their lawyers—is the focus of a national debate regarding the avalanche of asbestos litigation that has driven Garlock and more than 100 other companies into bankruptcy. The plaintiffs and their lawyers have no legitimate interest—much less the compelling governmental interest that constitutes part of the showing required to maintain evidence under seal—in preserving the confidentiality of what the Court found to be their "startling pattern of misrepresentation" and "suppression of evidence" regarding the plaintiffs' exposure to asbestos. (*Id*., ¶¶ 66, 69.) Particularly when prominent members of the plaintiffs' bar have criticized the Court's interpretation of the evidence, the only way for the public to be able to evaluate the merits of the Court's ruling is by granting access to the evidence on which it is based.

## II.    FACTS AND PROCEDURAL HISTORY

### A.    *Legal Newsline*'s Focused Request for Access to Evidence on Which the Estimation Order Is Based

*Legal Newsline* is an Internet-based publication featuring national coverage of noteworthy litigation affecting businesses. *Legal Newsline* has been reporting on the Garlock bankruptcy since February 2011. On July 30, 2013, *Legal Newsline* filed a motion requesting that the evidentiary hearing that ultimately gave rise to the Estimation Order (the "Estimation Trial") be kept open to the public. This Court denied *Legal Newsline's* motion on July 31, 2013, concluding that certain confidentiality considerations outweighed the public's interest in access to the trial. (July 30, 2013 Order, Dckt. 3069, p. 2.)

While the first motion by *Legal Newsline* sought to keep the entire Estimation Trial open to the public, the current motion is limited to access to the evidence on which the Court based the

Estimation Order.[1] As will be shown, the First Amendment's protection of the public's right of access to court proceedings applies with special force to evidence on which court decisions are based. In addition, when the Court decided to close portions of the Estimation Trial, it relied on representations by Claimants' counsel concerning the nature of the supposedly confidential information that would be introduced at trial. Now that the trial has been completed and the Court has heard the evidence and rendered its decision, the Court is not dependent on the representations of Claimants' counsel to evaluate the continued confidentiality of the specific testimony and exhibits that *Legal Newsline* seeks to have unsealed. The following summary of the key findings in the Estimation Order reveals that the evidence relating to those findings involves "the manipulation of exposure evidence by plaintiffs and their lawyers" as to which they have no legitimate confidentiality interests that could overcome the public interest in access to that evidence. (Estimation Order, ¶ 50.)

### B.    Context and Content of the Estimation Order

This Court conducted a three-week evidentiary hearing in July and August of 2013 to estimate Garlock's financial liability for mesothelioma claims. In light of the prior resolution of mesothelioma claims against Garlock by way of trial and settlement, a central inquiry in the

---

[1] Because the issue whether the entire Estimation Trial should have been kept open to the public is different than the issue whether the evidence upon which the Court based the Estimation Order should be unsealed, the pending appeal from the Order denying *Legal Newsline*'s motion to keep the Estimation Trial open does not prevent the Court from deciding whether to unseal the evidence relating to the Estimation Order. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (pending appeal merely "divests the district court of its control over those aspects of the case involved in the appeal"); *Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A.*, 527 F.2d 966, 973 (2d Cir. 1975) (filing of notice of appeal "only divested the district court of jurisdiction with respect to questions raised and decided in the order appealed from"). *See also In re Lichtin/Wade, L.L.C.*, 486 B.R. 665, 671 (E.D.N.C Bankr. 2013) ("a pending appeal of a bankruptcy decision does not deprive the bankruptcy court of jurisdiction over issues not involved in the appeal").

3

Estimation Trial was whether past was prologue—in other words, whether the prior verdicts and settlements provide an accurate yardstick for estimating future verdicts and settlements.

The Court's answer was a resounding "no." It found that the amounts previously recovered against Garlock had been inflated due to concealment by asbestos plaintiffs and their lawyers of evidence of the plaintiffs' exposure to asbestos from sources other than Garlock's products. (Estimation Order, ¶¶ 50, 71.) The Court's findings supporting this conclusion appear to have been derived in large measure from testimony and exhibits introduced when the courtroom was closed to the public. *Legal Newsline* respectfully requests that evidence bearing on the following findings be unsealed:

- After observing that evidence of exposure of particular plaintiffs to asbestos is often under control of the plaintiff's lawyer rather than the plaintiff, and that the plaintiff may not even have evidence of exposure for some of the defendants named in a typical asbestos lawsuit, the Court noted that evidence "disappeared" regarding exposure to the products that created the largest exposure to asbestos. "This occurrence was a result of the effort by some plaintiffs and their lawyers to withhold evidence of exposure to other asbestos products and to delay filing claims against bankrupt defendants' asbestos trusts until after obtaining recoveries from Garlock (and other viable defendants)." (Estimation Order, ¶¶ 51(c), 51(d), 58.)

- The Court found that "[i]t was a regular practice by many plaintiffs' firms to delay filing Trust claims for their clients so that remaining tort system defendants would not have that information," noting that one (unnamed) plaintiffs' lawyer

4

rationalized that practice "as seemingly some perverted ethical duty…." (*Id.*, ¶ 58(b).)

- The Court then summarized evidence that revealed a consistent pattern and practice of plaintiffs withholding from Garlock evidence of exposure to asbestos from non-Garlock sources—only to proceed, after settling with Garlock, to assert claims against other asbestos defendants:

  > "In 15 settled cases, the court permitted Garlock to have full discovery. Garlock demonstrated that exposure evidence was withheld in *each and every one* of them. These were cases that Garlock had settled for large sums. The discovery in this proceeding showed what had been withheld in the tort cases – on average plaintiffs disclosed only about 2 exposures to bankruptcy companies' products, but after settling with Garlock made claims against about 19 such companies' Trusts." (*Id.*, ¶ 58(c) (emphasis in original).)

- The Court provided example after example of situations in which, following verdicts against or settlements with Garlock, plaintiffs and their attorneys who had denied exposure to asbestos from sources other than Garlock proceeded to assert claims against other manufacturers of asbestos products. One such example involved a California case that resulted in a $9 million jury verdict against Garlock after the plaintiff had denied being exposed to asbestos from sources other than gaskets and, in particular, from a specific form of insulation. The Court found that

  > "[D]iscovery in this case disclosed that after that verdict, the plaintiff's lawyers filed 14 Trust claims, including several against amphibole insulation manufacturers. And most important, the same lawyers who represented to the jury that that there was no Unibestos insulation exposure had, seven months *earlier*, filed a ballot in the Pittsburgh Corning bankruptcy that certified 'under penalty of perjury' that the plaintiff had been exposed to Unibestos

5

> insulation. In total, these lawyers failed to disclose exposure to 22 other asbestos products." (*Id.*, ¶ 60 (emphasis in original).)

- Another example involved a Philadelphia case in which the plaintiff settled his claim against Garlock for $250,000 after his attorneys had provided answers to interrogatories swearing that the plaintiff had no personal knowledge of exposure to any bankrupt companies' asbestos products. Discovery revealed that the plaintiff and his attorneys made asbestos trust claims based on exposure to 20 different asbestos products. At least one of those trust claims was made six weeks before Garlock's interrogatories were answered. (*Id.*, ¶ 61.)

- The Court cited a New York case, settled by Garlock for $250,000, in which the plaintiff had denied any exposure to insulation products. After settling with Garlock, the plaintiff's lawyers filed 23 asbestos trust claims on his behalf—eight of them within 24 hours of the settlement. (*Id.*, ¶ 62.)

- Garlock settled a California case for $450,000 after the plaintiff, a former Navy electronics technician, denied that he ever saw anyone installing or removing pipe insulation on his ship. After the settlement, the plaintiff's lawyers filed eleven asbestos trust claims on his behalf, including seven based on declarations that he personally removed and replaced insulation products manufactured by companies that he was able to identify by name. (*Id.*, ¶ 63.)

- Garlock was hit with a $1.35 million verdict in a Texas case where the plaintiff swore that he was not exposed to asbestos from any products other than a Garlock gasket. As recounted by the Court:

> "The plaintiff specifically denied any knowledge of the name 'Babcock & Wilcox' and his attorneys represented to the jury that there was no evidence that his injury was caused by exposure to

6

> Owens Corning insulation. Garlock's discovery in this case demonstrated that the day before the plaintiff's denial of any knowledge of Babcock & Wilcox, his lawyers had filed a Trust claim against it on his behalf. Also, after the verdict, his lawyers filed a claim with the Owens Corning Trust. Both claims were paid – upon the representation that the plaintiff had handled raw asbestos fibers and fabricated asbestos products from raw asbestos on a regular basis." (*Id.*, ¶ 64.)[2]

- Garlock was permitted to conduct full discovery in 15 closed cases. The Court concluded that exposure evidence was withheld in each and every one of those cases, and that this pattern of non-disclosure applied to plaintiffs represented by five major law firms. (*Id.*, ¶ 65.) Although the 15 cases are just a minute portion of the thousands resolved by Garlock in the tort system, the Court noted that "the fact that *each and every one of them* contains such demonstrable misrepresentation is surprising and persuasive." (*Id.*, ¶ 66 (emphasis in original).)

- The Court also pointed to other evidence indicating that the 15 cases were merely the tip of the iceberg:

> "Garlock identified 205 additional cases where the plaintiff's discovery responses conflicted with one of the Trust claim processing facilities or balloting in bankruptcy cases. Garlock's corporate parent's general counsel identified 161 cases during the relevant period where Garlock paid recoveries of $250,000 or more. The limited discovery allowed by the court demonstrated that almost *half* of those cases involved misrepresentation of exposure evidence. It appears certain that more extensive discovery would show more extensive abuse. But that is not necessary because the startling pattern of misrepresentation that has been shown is sufficiently persuasive. (*Id.* (emphasis in original).)

---

[2] Peter Kraus, whose law firm represented that plaintiff, has termed the Estimation Order an "outlier decision." (Exhibit A hereto at 30.) Disputing the accuracy of the Court's findings, Mr. Kraus insists that "the judge's description of what happened is simply not correct" and is "very, very different from the rulings and findings by judges with a good deal more experience in this area." (*Id.* at 25.)

7

- The Court found that this "pattern of misrepresentation" resulted in the suppression of evidence: "[W]hile it is not suppression of evidence for a plaintiff to be unable to identify exposures, it *is* suppression of evidence for a plaintiff to be unable to identify exposure in the tort case, but then later (and in some cases previously) to be able to identify it in Trust claims." (*Id.*, ¶ 69 (emphasis in original).)

C. **Public Reaction to the Estimation Order**

The Estimation Order has attracted national attention. Articles, op-eds, and editorials discussing the decision have appeared in *The New York Times*, *Forbes*, *The Wall Street Journal*, and *Bloomberg Businessweek*, among other publications. (Copies of some of the items evidencing national interest in the Court's ruling are included in group Exhibit A.)

Although most commentators addressed the broader implications of the ruling for asbestos litigation or its relevance to passage of the Furthering Asbestos Claim Transparency Act (H.R. 982) pending before Congress, not everyone accepted the accuracy of the Court's findings. Jeffrey Simon echoed the criticism of fellow asbestos claimants' lawyer, Peter Kraus, in terming the Court's decision an "outlier." (Exh. A at 12.) Mr. Simon added:

> "It departs radically from the opinions of many other bankruptcy judges, as well as trial court judges and juries who reviewed the same subject matter and reached conclusions that *much more closely reflect the evidence*." (*Id.* (emphasis added).)

*See also id.* at 30 (asbestos claimants' lawyer, Natalie Ramsey, termed the Court's opinion "extraordinary and extreme" and "well outside the long history of asbestos bankruptcy jurisprudence").

The criticism of the Estimation Order underscores the need for unsealing the testimony and exhibits on which the Court's ruling was based. As explained below, the right of public

8

access to the courts protected by the First Amendment applies with particular force to evidence on which judges base their rulings. Unsealing the portions of the record underpinning the Court's decision will enable the media and the public at large to evaluate the extent to which the Estimation Order does, indeed, "reflect the evidence."

### III. ARGUMENT

#### A. Strict Scrutiny Standard Governing Restrictions on the First Amendment Right of Access to the Courts

Because "[w]hat happens in the halls of government is presumptively public business," courts "issue public decisions after public arguments based on public records." *Union Oil Co. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000). That presumption is derived from a First Amendment (as well as common law) right of access to judicial proceedings that includes the right to review court records. *See, e.g., Press Enter. Co. v. Superior Court*, 464 U.S. 501, 508 (1984) (First Amendment violated by closing of voir dire proceeding and refusal to release trial transcript); *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 575-78 (4th Cir. 2004), *cert. denied,* 544 U.S. 949 (2005) (First Amendment right of access required unsealing of documents filed in civil lawsuit).

The First Amendment right of access to the courts applies to bankruptcy proceedings. *See, e.g., In re Astri Invest., Mgmt. & Sec. Corp.*, 88 B.R. 730, 736-42 (D. Md. 1988) (public has right to attend creditors' meeting); *In re Symington,* 209 B.R. 678, 690 (Bankr. D. Md. 1997) (news media has standing to intervene for the purpose of dissolving protective orders issued in the context of Rule 2004 examinations). Indeed, the policy interest favoring public access to the courts "is at its zenith where issues concerning the integrity and transparency of bankruptcy proceedings are involved." *In re Food Mgmt. Group, LLC*, 359 B.R. 543, 553 (S.D.N.Y. 2007). "This policy of open inspection, established in the Bankruptcy Code itself, is fundamental to the

9

operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised." *In re Bell & Beckwith*, 44 B.R. 661, 664 (Bankr. N.D. Ohio 1984).

Restrictions on the First Amendment right of access to the courts are subject to strict scrutiny. Those opposing access must demonstrate that: (i) the limits on access are necessary to serve a compelling governmental interest; and (ii) there are no less restrictive alternatives. *See Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606-07 (1982); *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989). As with other applications of this strict scrutiny standard, limits on public access to the courts rarely pass constitutional muster. The Fourth Circuit has emphasized that the public's right of access should be denied "only in unusual circumstances" and that the decision to deny access "should not be made lightly." *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 178, 182 (4th Cir. 1988). The following discussion demonstrates that far from presenting unusual circumstances warranting limitations on access, this case in its current posture, after the Court has entered the Estimation Order, provides especially strong grounds for disclosure because *Legal Newsline* is seeking access to evidence on which a court decision was based.[3]

---

[3] "[T]here is a common law as well as a constitutional right to have court records made public." *Columbus-Am. Discovery Group*, 203 F.3d at 303. *Legal Newsline*'s motion is based on both sources of this right of access. Although both the First Amendment and the common law create a presumption of public access that is not rebutted with respect to the evidence that *Legal Newsline* seeks to be made public, this brief focuses on the First Amendment because its strict scrutiny standard is more stringent than the balancing test that applies to efforts to seal evidence subject to the common law right alone. *See Virginia Dep't of State Police*, 386 F.3d at 575 (explaining different scope and legal standards pertaining to First Amendment and common law rights of access to judicial records and documents).

### B. The First Amendment Requires Disclosure of the Evidence on Which the Estimation Order Was Based

Disclosure of the evidence on which the Court based the Estimation Order will effectuate the public oversight of the courts—both their processes and the outcomes they produce—that the presumption of public access is intended to protect. *See Columbus-Am. Discovery Group v. Atl. Mut. Ins. Co.*, 203 F.3d 291, 303 (4th Cir. 2000) ("Publicity of such records, of course, is necessary in the long run so that the public can judge the product of the courts in a given case"); *Goesel v. Boley Int'l (H.K.) Ltd.*, No. 13-2818, 2013 U.S. App. LEXIS 25764, at *3-4 (7th Cir. Dec. 26, 2013) (Posner, J.) ("The reason for this right of public access to the judicial record is to enable interested members of the public, including lawyers, journalists, and government officials, to know who's using the courts, to understand judicial decisions, and to monitor the judiciary's performance of its duties."). As Justice Oliver Wendell Holmes stated over a century ago, "[i]t is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed." *Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884).

Citizens' ability to understand and evaluate judicial decisions requires access to the evidence on which those decisions are based. The Fourth Circuit has observed that "[i]t is hardly possible to come to a reasonable conclusion [about a judicial opinion] without knowing the facts of the case." *Columbus-Am. Discovery Group*, 203 F.3d at 303. Other circuit courts agree. The Second Circuit has declared that "[a]n adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny." *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982), *cert. denied* 460 U.S. 1051 (1983) (reversing sealing of special

litigation committee report on which district court based its grant of summary judgment). Similarly, the D.C. Circuit has noted that the presumption of public access is "especially strong" with respect to a "court's decrees, its judgments, its orders, [that] are the quintessential business of the public's institutions." *EEOC v. National Children's Ctr.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) (reversing order sealing consent decree, emphasizing that "there is a 'need for public access' in those instances where 'the documents at issue [are] ... specifically referred to in the trial judge's public decision'" (citation omitted)). *See also FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 408-09 & n.5 (1st Cir. 1987) (favoring public access to documents submitted in connection with a consent decree that were "material and important" to the district court's decision to approve the settlement); *In re Specht,* 622 F.3d 697, 701 (7th Cir. 2010) (denying motion to seal documents pertaining to motion to recuse district judge, explaining that "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view").

Pitted against this fundamental First Amendment interest in public access to the basis of the Court's Estimation Order is, at most, the interest of certain Claimants and lawyers in maintaining the secrecy surrounding what the Court termed the "manipulation of exposure evidence." (Estimation Order, ¶ 50.) However, the "startling pattern of misrepresentation" detailed in the Estimation Order precludes any suggestion that a compelling governmental interest might trump the presumptive right of public access. (*Id*., ¶ 66.) The evidence summarized in the Estimation Order focuses on the actions by asbestos plaintiffs and their lawyers in, first, representing in litigation against Garlock that the plaintiffs were not exposed to other sources of asbestos and, second, contrary to those representations, asserting claims against other manufacturers of asbestos products. Claimants and their lawyers have no legitimate

12

interest, much less the requisite compelling governmental interest, in keeping evidence of the "misrepresentation[s]" and "suppression of evidence" under seal.

To be sure, disclosure of that evidence may well prove embarrassing to those whose behavior is discussed in the Estimation Order. They likely would prefer if the media did not report on the specifics of what transpired and who was involved. That self-interest falls far short of overcoming the importance of keeping the judicial process in public view. As Seventh Circuit Judge Frank Easterbrook has explained:

> "Many a litigant would prefer that the subject of the case … be kept from the curious …, but the tradition that litigation is open to the public is of very long standing. People who want secrecy should opt for arbitration. When they call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials. Judicial proceedings are public rather than private property, and the third-party effects that justify the subsidy of the judicial system also justify making records and decisions as open as possible. What happens in the halls of government is presumptively public business. Judges deliberate in private but issue public decisions after public arguments based on public records. The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat, which requires compelling justification." *Union Oil Co. v. Leavell*, 220 F.3d 562, 567-68 (7th Cir. 2000).

### C. <u>Identification of the Evidence to Be Disclosed</u>

Determination of precisely what testimony and exhibits underlie the Estimation Order will be facilitated by the Court's meticulous findings. Accordingly, if the Court grants *Legal Newsline*'s motion, the Court may decide to take it upon itself to identify the evidence to be disclosed. Alternatively, the Court may wish to consider requiring the parties that participated in the Estimation Trial to present the Court, by a date certain, with two lists of testimony and exhibits currently under seal. The first list would identify evidence that the parties agree relates

to the findings in the Estimation Order identified at pages 4 to 8, above.  The second list would identify evidence that some, but not all, of the parties believe relates to the findings in question.  If the Court were to choose the second alternative, it would ultimately order disclosure of all of the evidence identified in the first list, as well as such evidence in the second list that the Court determines relates to the relevant findings.

## IV.    CONCLUSION

The abuses detailed in the Estimation Order were made possible by the secret operations of asbestos trusts.  It would be unfortunate and ironic if the Court's landmark decision exposing those abuses was undermined by keeping the evidence underlying that decision from public view.  Accordingly, *Legal Newsline* respectfully requests that the Court unseal the evidence on which its Estimation Order is based.

Date:  March 3, 2014

Respectfully submitted,

MADISON COUNTY RECORD, INC.,
d/b/a LEGAL NEWSLINE

By: /s/ Stephen M. Russell, Jr.
    Stephen M. Russell, Jr.

| | |
|---|---|
| Steven F. Pflaum (*Of Counsel*) | Alan W. Duncan (N.C. Bar No. 8736) |
| Andrew G. May (*Of Counsel*) | Stephen M. Russell, Jr. (N.C. Bar No. 35552) |
| NEAL, GERBER & EISENBERG LLP | Van Laningham Duncan PLLC |
| Two North LaSalle Street, Suite 1700 | 300 N. Greene St., Suite 850 |
| Chicago, Illinois 60602-3801 | Greensboro, NC 27401 |
| 312.269.8000 | 336.645.3320 |
| spflaum@ngelaw.com | aduncan@vldlitigation.com |
| amay@ngelaw.com | srussell@vldlitigation.com |

## **CERTIFICATE OF SERVICE**

I, Stephen M. Russell, Jr., hereby certify that I caused a copy of the foregoing *Memorandum of Law in Support of Motion by Legal Newsline to Unseal the Trial Testimony and Exhibits on Which the Court Based Its January 10, 2014, Order Estimating Aggregate Liability* to be served on all counsel of record by electronic notification pursuant to the CM/ECF system on March 3, 2014.

/s/ Stephen M. Russell, Jr.
Stephen M. Russell, Jr.