UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


IN RE:                          )
                                )
GARLOCK SEALING TECHNOLOGIES )
LLC, et al,                     )    No. 10-BK-31607
                                )
      Debtors.                  )    VOLUME IV-A
_____)    MORNING SESSION


TRANSCRIPT OF ESTIMATION TRIAL
BEFORE THE HONORABLE GEORGE R. HODGES
UNITED STATES BANKRUPTCY JUDGE
JULY 25, 2013



<u>APPEARANCES</u>:

On Behalf of Debtors:

        GARLAND S. CASSADA, ESQ.
        Robinson Bradshaw & Hinson, PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

        JONATHAN C. KRISKO, ESQ.
        Robinson Bradshaw & Hinson PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

        LOUIS ADAM BLEDSOE, III, ESQ.
        Robinson Bradshaw & Hinson PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

        RICHARD C. WORF, ESQ.
        Robinson Bradshaw & Hinson, PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

<u>APPEARANCES (Continued)</u>:

On Behalf of the Debtors:

     RAY HARRIS, ESQ.
     Schachter Harris, LLP
     400 East Las Colinas Blvd.
     Irving, Texas 75039

     CARY SCHACHTER, ESQ.
     Schachter Harris, LLP
     400 East Las Colinas Blvd.
     Irving, Texas 75039

     C. RICHARD RAYBURN, JR., ESQ.
     Rayburn Cooper & Durham, PA
     227 West Trade Street, Suite 1200
     Charlotte, North Carolina 28202

     SHELLEY KOON ABEL, ESQ.
     Rayburn Cooper & Durham, PA
     227 West Trade Street, Suite 1200
     Charlotte, North Carolina 28202

     ALBERT F. DURHAM, ESQ.
     Rayburn Cooper & Durham, PA
     227 West Trade Street, Suite 1200
     Charlotte, North Carolina 28202

     ROSS ROBERT FULTON, ESQ.
     Rayburn Cooper & Durham, PA
     227 West Trade Street, Suite 1200
     Charlotte, North Carolina 28202

     JOHN R. MILLER, JR., ESQ.
     Rayburn Cooper & Durham, PA
     227 West Trade Street, Suite 1200
     Charlotte, North Carolina 28202

     ASHLEY K. NEAL, ESQ.
     Rayburn Cooper & Durham, PA
     227 West Trade Street, Suite 1200
     Charlotte, North Carolina 28202

     WILLIAM SAMUEL SMOAK, JR., ESQ.
     Rayburn Cooper & Durham, PA
     227 West Trade Street, Suite 1200
     Charlotte, North Carolina 28202

APPEARANCES (Continued.):

On Behalf of Interested Parties:

Carson Protwall LP:

> JULIE BARKER PAPE, ESQ.
> Womble Carlyle Sandridge & Rice, PLLC
> P.O. Drawer 84
> Winston-Salem, North Carolina 27102

Coltec Industries Inc.:

> DANIEL GRAY CLODFELTER, ESQ.
> Moore & Van Allen, PLLC
> 100 North Tryon Street, Suite 4700
> Charlotte, North Carolina 28202-4003

> HILLARY B. CRABTREE, ESQ.
> Moore & Van Allen, PLLC
> 100 North Tryon Street, Suite 4700
> Charlotte, North Carolina 28202-4003

> MARK A. NEBRIG, ESQ.
> Moore & Van Allen, PLLC
> 100 North Tryon Street, Suite 4700
> Charlotte, North Carolina 28202-4003

> EDWARD TAYLOR STUKES, ESQ.
> Moore & Van Allen, PLLC
> 100 North Tryon Street, Suite 4700
> Charlotte, North Carolina 28202-4003

Creditor Committees:

Official Committee of Asbestos Personal Injury Claimants:

> LESLIE M. KELLEHER, ESQ.
> Caplin & Drysdale, Chartered
> One Thomas Circle NW, Suite 1100
> Washington, DC 20005

> JEANNA RICKARDS KOSKI, ESQ.
> Caplin & Drysdale, Chartered
> One Thomas Circle NW, Suite 1100
> Washington, DC 20005

APPEARANCES (Continued.):

Official Committee of Asbestos Personal Injury Claimaints:

    JEFFREY A. LIESEMER, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

    KEVIN C. MACLAY, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

    TODD E. PHILLIPS, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

    TREVOR W. SWETT, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

    JAMES P. WEHNER, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

    ELIHU INSELBUCH, ESQ.
    Caplin & Drysdale, Chartered
    600 Lexington Avenue, 21st Floor
    New York, New York 10022

    NATHAN D. FINCH, ESQ.
    Motley Rice, LLC
    1000 Potomac Street, NW, Suite 150
    Washington, DC 20007

    GLENN C. THOMPSON, ESQ.
    Hamilton Stephens Steele & Martin
    201 South College Street, Suite 2020
    Charlotte, North Carolina 28244-2020

    TRAVIS W. MOON, ESQ.
    Moon Wright & Houston, PLLC
    227 West Trade Street, Suite 1800
    Charlotte, North Carolina 28202

APPEARANCES (Continued.):

Official Committee of Asbestos Personal Injury Claimaints:

        RICHARD S. WRIGHT, ESQ.
        Moon Wright & Houston, PLLC
        226 West Trade Street, Suite 1800
        Charlotte, North Carolina 28202

        ANDREW T. HOUSTON, ESQ.
        Moon Wright & Houston, PLLC
        227 West Trade Street, Suite 1800
        Charlotte, North Carolina 28202

        SCOTT L. FROST, ESQ.
        Waters Kraus, LLP
        222 North Sepulveda Boulevard, Suite 1900
        El Segundo, California 90245

        JONATHAN A. GEORGE, ESQ.
        Waters Kraus, LLP
        3219 McKinney Avenue
        Dallas, Texas 75204

Future Asbestos Claimaints:

        KATHLEEN A. ORR, ESQ.
        Orrick, Herrington & Sutcliffe, LLP
        1152 15th Street, N.W., Columbia Center
        Washington, DC 20005-1706

        JONATHAN P. GUY, ESQ.
        Orrick, Herrington & Sutcliffe, LLP
        1152 15th Street, N.W., Columbia Center
        Washington, DC 20005-1706

Official Committee of Unsecured Creditors:

        DEBORAH L. FLETCHER, ESQ.
        FSB Fisher Broyles, LLP
        6000 Fairview Road, Suite 1200
        Charlotte, North Carolina 28210

1

I N D E X

DEBTOR WITNESSES:                                           PAGE

2

JOHN L. HENSHAW

3

   Continued Direct Examination By Mr. Harris        832
4  Cross Examination By Mr. Finch                     874
   Cross Examination By Mr. Guy                       940
5  Redirect Examination By Mr. Harris                 945
   Recross Examination By Mr. Finch                   950
6  Redirect Examination By Mr. Harris                 951

7                       *  *  *  *  *  *

8                     E X H I B I T S

9  DEBTOR'S EXHIBITS:
   NO.                                              ADMITTED
10
   GST-15158C .........................................872
11 GST-15158A .........................................872
   GST-15158CD ........................................873
12

13                     *  *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

832

1                      P R O C E E D I N G S

2    JULY 25, 2013, COURT CALLED TO ORDER 9:30 A.M.:

3    MORNING SESSION:

4             THE COURT:  Good morning.

5             ALL COUNSEL:  Good morning.

6             THE COURT:  We'll go back to where we were, I guess.

7             MR. HARRIS:  Mr. Henshaw.

8                      JOHN L. HENSHAW,

9                 CONTINUED DIRECT EXAMINATION

10   BY MR. HARRIS:

11   Q.    Good morning.

12   A.    Good morning.

13   Q.    We left off yesterday we were just getting into the

14   exposure assessment that you conducted in connection with your

15   work on this case.  I think you briefly had explained what the

16   overview process was; is that right?

17   A.    That's right.  This is an overview.  Three basic steps.

18   One is to develop the similar exposure groups, which is the

19   guideline stipulation you need to do that.  Determine the

20   exposure profile, and then estimate the annual cumulative

21   exposure.

22   Q.    Okay.  Now how did you go about doing step one,

23   developing the similar exposure groups?

24   A.    Had to examine the data with the claimants, understand

25   what they did.  And the literature -- and basically this slide

                Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1   shows or represents the universe of data that I used to make

2   the determination as to which individuals fall into which

3   similar exposure groups.

4   Q.   What type of literature did you consult?

5   A.   Certainly the literature with respect to doing the

6   assessment.  Doing the exposure assessment as I talked about

7   yesterday.  The literature that deals with anything around

8   frequency and duration of handling gaskets or insulation.  The

9   questionnaires, of course, from the claimants.  I reviewed all

10  the supplemental questionnaires from the claimants.  The

11  testimony from the claimants.  They're the ones that are

12  describing what they did and how they did it.  Then certainly

13  my professional experience in my involvement in work places,

14  such as those described by the claimants.  And then various

15  textbooks which help inform industrial hygienists on how to do

16  exposure assessments.

17  Q.   Now the questionnaires identified occupations and

18  industries for the claimants to select for themselves based

19  upon what their experience was; is that correct?

20  A.   That's basically correct.  Although there wasn't -- they

21  weren't terribly informative.  But that was the intent behind

22  the supplemental questionnaire.

23  Q.   Did you get information about their occupations and

24  industries, either from the questionnaire responses or the

25  information they submitted in connection with that?

DIRECT - HENSHAW

1   A.   Yes, sir, I did.   From the deponent's testimony as well

2   as the questionnaires, yes.

3   Q.   Now there were a lot of occupations that were identified

4   on the questionnaires and industries, how did you know what

5   those were -- what each of those trades did?   Is this just off

6   the top of your head or is there information you consulted?

7   A.   No, there's specific information.   The questionnaire had

8   a total of 794, I think, various combinations of industries

9   and occupations, which really boil down to when you take the

10  blank spaces out or the unknowns, they really boiled down to

11  1,480 combinations of occupations and industries, which

12  represent 74 occupations and 20 industries.

13        So the notion of what I attempted to do is boil that down

14  into similar exposure groups.   And I used the definitions from

15  the National Academy of Science, which is the dictionary of

16  occupational titles.   Also used the Navel bureau -- Personnel

17  Bureau of Information published in 1943, which dealt with

18  military -- Navy occupations and any other source I could

19  find, as well as certainly the deponent's description of their

20  work activity.

21  Q.   And then you broke them down into similar exposure

22  groups; is that correct?

23  A.   That's correct.   Basically, I took those 1,480 and boiled

24  it down into -- may I sort of approach and --

25        MR. HARRIS:   Your Honor, may he step down --

Laura Andersen, RMR 704-350-7493

835

DIRECT - HENSHAW

1         THE COURT:  Sure.

2         MR. HARRIS:  -- to explain the slide to us?

3         THE WITNESS:  It's a lot of words on that slide.

4         Basically taking those 1,400 occupations and
5    industries, and boil them down into four, what I call gasket
6    and packing, similar exposure groups.

7         And the first group, which is the most likely to be
8    exposed to gasket and packing, their primary jobs involved the
9    greatest opportunity of routine in-field fabrication of
10   gaskets and packings, and the removal of gaskets and packing.

11        So group number one which are industrial
12   pipefitters, steamfitters, plumbers, Navy machinist's mates,
13   those are the ones that have the greatest opportunity for
14   handling gaskets and packings.

15        The next group is boilmakers and workers, shipyard
16   workers, Navy firemen, and there's an assortment of other
17   occupations, I couldn't list them all here.  But those involve
18   routine work with gaskets and packing, fabrication,
19   replacement and removal of gaskets and packing, frequently in
20   this job, but it's expected to be less than group number one.

21        And also means they're also closely as bystanders to
22   other people who are handling gaskets and packing.

23        Group number three is the next tier down.  These are
24   gasket and packing again, fabrication replacement and removal.
25   But it's not their routine part of their job.  The potential

DIRECT - HENSHAW

1   for bystander is still there, because they're in proximity to

2   others who may be handling gasket and packing.  Those would be

3   electricians, machinists and laborers, again a whole host of

4   occupations there.

5            And group four is the last group which include

6   painters, insulators, because they don't handle gasket and

7   packing, but they certainly handle insulation.  Clerical

8   office workers and there's a number of people in group number

9   four.  They're not directly associated with gasket and

10  packing, but they may be a bystander to somebody who may be

11  handling gaskets and packing.

12  Q.   Was there a fifth group of combinations?

13  A.   There was a fifth group that didn't make any sense.  The

14  combination of industry like a autoworker in an asbestos

15  manufacturing site.  Well, you don't have those two

16  combinations.

17       So there's a number of combinations that fall into group

18  number five that just didn't make any sense.  Either they

19  didn't make any sense, or the exposure is so negligible, much

20  less than group number four that it didn't make any sense to

21  make any calculations.

22  Q.   Again, the combinations are the combinations of the

23  occupation and the industries that were on the questionnaire?

24  A.   That's correct.  It's 74 occupations and the 20

25  industries.  That's taking all of that 7,480 -- or 1,480

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1  combinations and distilling it down into these five groups.

2  Four represent calculations that I made.  The fifth one I

3  didn't make calculations because it was so miniscule and you

4  couldn't calculate them.

5  Q.   All right.  What about for their work with other asbestos

6  products that -- or the potential exposures they might have

7  from other asbestos products when they're doing a task that

8  requires contact with gaskets and packing?

9  A.   Well, my primary mission was -- or objective was to

10 determine what other kinds of exposures they may have had

11 while they're doing gasket and packing, and it's principally

12 asbestos-containing insulation.  So it's associated with the

13 work.

14     If somebody's handling asbestos-containing gaskets at the

15 frequency that I estimated here, they're more than likely --

16 or truly will be exposed to other sources of insulation,

17 because that's where the work is being done.

18     And that's broken up into groups number one, two and

19 three, again, order of exposure.  The asbestos-containing

20 insulation group one, pipefitters, are working alongside of

21 insulation.  They're in the environment where insulation is

22 being used.  That's why they're there.  That's why the gaskets

23 and packings may be there.

24     Steamfitters, plumbers, Navy machinists, they're in group

25 one.  They have the highest potential to be exposed to

DIRECT - HENSHAW

1   asbestos-containing insulation.  And in this case the

2   pipefitters are also in group one for gasket and packing.

3       The ACI group number two, these are carpenters, glass

4   workers, machinists.  They're going to have some opportunity

5   for asbestos-containing insulation, but not as much as number

6   one.

7       Then the last one, group number three, these are like the

8   floor installers, heavy equipment operators, painters.  The

9   likelihood of them being exposed to asbestos-containing

10  insulation is less than groups one and two.

11  Q.   You described, generally, the information that you

12  reviewed, but for specific exposure information, can you

13  identify those documents that you would have reviewed for your

14  opinions?

15  A.   In respect to the insulation, it's going to be

16  professional judgment.  It's going to be a whole host of

17  things, including what the deponent's specified.

18  Q.   Tell us about what the claimants -- or the information

19  you garnered from the information submitted by the claimants

20  and other sources.

21  A.   Well the key bit of information here was examining what

22  the deponents said about their work activity, which includes

23  gasket and packing and insulation.

24      I reviewed -- we had -- we requested 471 questionnaires

25  and we got 429 supplemental questionnaires back.

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1   Q.   You requested --

2   A.   471.

3   Q.   Supplemental questionnaires?

4   A.   That's correct.

5   Q.   Right.   Okay.

6   A.   And we've got -- I got 429 supplemental questionnaires

7   back.   Reviewed every one of those, again, to determine

8   whether in fact we had good information in respect to

9   frequency, duration, and proximity to gasket packing and

10  insulation.

11      I reviewed the 542 depositions related to 306 claimants,

12  and these depositions varied as far as how useful they were,

13  but there were decisions in some cases about how they handled

14  various products.

15  Q.   You say 542 depositions related to 306 claimants.   Why

16  would there be more depositions than claimants?

17  A.   Some of the depositions from co-workers or from spouses.

18  So it's not all claimants.   It was whatever I had in respect

19  to those claimants, and it came out to be 542.

20  Q.   Okay.

21  A.   Now to start with, I asked for when I first started this

22  project, to give me a relative feel for how much information

23  there may be available, and how I can make this assessment.

24      So I used the 27 depositions from, I think it was 24

25  historical cases.   I requested that.   I received that, and

DIRECT - HENSHAW

1   that helped sort of develop, at least some idea of what kind

2   of information may be available in the depositions.

3   Q.   The historical cases were not current claims?

4   A.   Not to my knowledge.

5   Q.   They were past claimants against Garlock, correct?

6   A.   That's what I understand, yes.

7   Q.   You received those or you asked for those before the

8   supplemental -- the responses were available to the

9   supplemental questionnaires?

10   A.   That's correct.

11   Q.   Or the questionnaire process?

12   A.   Yes.  I had that first, then I got 249 depositions.  Then

13   I added another 51, and then we basically got to 306 claimants

14   covered.  That was in addition to the 27 depositions that

15   represent 24 claimants which I got earlier.

16   Q.   Okay.  Now what did you do with this information?

17   A.   The whole basis is to understand what activities were

18   being done in a given day, what they did, how -- what their

19   proximity was to gaskets and packings, the frequency of

20   handling gaskets and packing, as well as what the other

21   environment looked like.

22       This is an example of a typical day.  From the outset,

23   from the study design, what I did was build the day.  Because

24   work is made up of lots of activity, movement around proximity

25   here, doing this.  A worker's working eight hours a day,

DIRECT - HENSHAW

1   typically.

2        So the notion here is to try to identify all those

3   sources of asbestos, to the extent I could, during that given

4   day.  This is an example.

5        The focus was on gasket and packing, and the environment

6   they work in, which typically is handling insulation or having

7   a significant amount of insulation, depending on the

8   environment.

9        And recognizing the first 30 minutes of the day is

10  background.  There's an exposure to background, but it's very

11  small, but there's an exposure in background.  I wanted to add

12  that.

13       I wanted to identify what bystander kind of exposure a

14  person handling gasket and packing may have.  And that's what

15  a good portion of the day is represented here.  They're in the

16  environment.

17       This represents three gasket and packing events of the

18  day.  Which means three times a day they're going to be taking

19  a gasket and packing off or installing a gasket.

20       This also represents -- to get at a gasket you have to

21  remove insulation.  Now this represents only one time you have

22  to remove the insulation, not every time.  That was part of my

23  assesment in estimating.  I'm not going to say every time you

24  have to remove insulation to get to a gasket, so I basically

25  said one and a half -- basically -- on average one and a half

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1  a day to remove insulation when you have three gasket and

2  packing events a day.

3      Then also the last column represents the bystander

4  exposure.  If somebody is removing a gasket or packing,

5  somebody else may be alongside of them doing the same thing.

6  I wanted to be able to estimate what the contribution of

7  asbestos is from that as a bystander, not only the direct, but

8  also if they're working 10 feet away, what contribution may be

9  coming from that source.

10  Q.   So these will be the components of your analysis; is that

11  correct?

12  A.   That's correct.

13  Q.   All right.  And what does this slide tell us about those

14  components?

15  A.   This is how I added them up, basically.  I took the

16  direct exposure for gasket and packing and the bystander, and

17  from that I calculated the fiber cc year, for one year that's

18  associated with that work in each one of these groups.

19  Q.   What's a fiber per cc year?

20  A.   It's basically the exposure on average that a person

21  receives throughout the year, and that calculated as to one

22  fiber cc year.  Then you multiply that by the number of years

23  that person worked in that industry or worked in that

24  position, and that gives you the cumulative lifetime

25  exposure --

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1   Q.   Okay.

2   A.   -- to asbestos.  And I did the same thing for insulation.

3   We have direct access, again, knocking off the insulation to

4   get to the flange and gasket.  There's bystanders working in

5   the environment, may be doing other things, but working in the

6   environment.  Then there's a background contribution.  So I

7   added those contributions up and came up with the same.  A

8   contribution of asbestos fiber from insulation exposure and

9   that came up to a cumulative view.

10  Q.   All right.  In order to estimate their exposure, what is

11  the information that you need to extract from the data that

12  was provided?

13  A.   Basically the frequency, duration and concentration.  Had

14  to understand how often people do that task.  What is the

15  duration of that task.  That tells you how much exposure

16  they've had.  Then identify what is the typical exposure for

17  that kind of activity, and basically add all up into exposure

18  profile.

19  Q.   All right.  Let's go through the first component in some

20  detail.  This is the direct gasket and packing work?

21  A.   Yes.

22  Q.   All right.  So what is -- the first part of that is

23  frequency of gasket and packing work?

24  A.   The exposure depends to some extent on how often somebody

25  does that job.  They do it 10 times, 50 times, 100 times,

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1  everybody -- it depends on how many times people do that task.

2      So my objective here was to determine how many times on

3  average for 250 days a year that somebody handled a gasket or

4  packing.

5      In the published literature, Carl Mangold in 2000, had

6  typically two gaskets or packing replaced on a single day.

7  That was Carl's testimony -- or I think it was his paper.

8      The key piece here is what the claimant said.  This is

9  just some example.  I took out the names here, but these are

10  examples of -- for example, the first pipefitter, two or three

11  gaskets per day.

12      Now this person also said it took between two and three

13  minutes or 10 minutes, I think, per gasket.  So it was short

14  in duration.  So it was a very quick job.

15      Another pipefitter said 10 gaskets per week.  Another

16  pipefitter said every day.  Like I said, a lot of times

17  there's not a lot of specificity in the testimony.

18      Probably every day.  A millwright said packing replaced

19  once per month, sometimes once every two or three months.  And

20  then a nonunion electrician said maybe 2 or 3 percent of their

21  job may be doing gasket and packing.

22      But from the outset I wanted to -- to the extent I could,

23  overestimate what the exposure or contribution may be from

24  gaskets and packing.

25      So the plausible upper bound for my assessment was three

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1   events a day for group number one.  Now group number two,

2   group number three will be less than that.  But group number

3   one were three events.

4   Q.   Mr. Henshaw, you took out the names because those would

5   be confidential; is that correct?

6   A.   That's correct.

7   Q.   You just left the initials?

8   A.   Yes, that's correct.

9   Q.   Okay.  So for group number one, the upper -- the

10   plausible upper boundary frequency was three events per day.

11   How many does that work out to a year?

12   A.   For each group, this is the way it works out.  For say a

13   pipefitter in group number one, that's 750 tasks per day.

14        Now -- I also am estimating that every gasket they

15   handle, these 750 are asbestos-containing.  Now I know from

16   the testimony, I know from my personal experience they handle

17   a lot of other gaskets.  But for this purpose I'm saying all

18   750 are asbestos-containing gaskets.

19        Group number two, 300.  Group number three, 35.  And then

20   19 for group four.  That's on an annual basis.  Again, that's

21   average.  Some days may be more, some days may be less, on

22   average for a pipefitter 750.

23   Q.   Let's look at group four for a painter for example.  You

24   say 19 tasks per year?

25   A.   Per year.

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1  Q.   Now is that going to be -- you're assuming a painter is

2  actually -- you're assuming they're actually going to change

3  19 gaskets per year?

4  A.   That -- yes.  That's what I'm assuming.  Not all painters

5  are going to do that, some painters might, maybe do one or

6  two.  The testimony with respect to painters is basically no

7  description with respect to handling gaskets.

8  Q.   Right.  Okay.  So the committee has engaged an expert

9  named James Shoemaker who worked as a superindependent of

10 pipefitters during the 1980s at the Norfolk Naval shipyard.

11 He had other positions as well, but for some period of time in

12 the '80s to early '90s, he was the superindependent of

13 pipefitters at the Norfolk Naval Shipyard.  Do you understand

14 that?

15 A.   Yes, I do.

16 Q.   Have you had a chance to see his deposition?

17 A.   I have, yes.

18 Q.   We asked him at his deposition, what was the frequency --

19 how many gaskets would a pipefitter remove in a year.  This is

20 what he said.

21     Is there a number you would think for an individual

22 pipefitter?

23     I would think it would be less than 750.  A lot depends

24 on what systems and what ship he was working on.  750 is a lot

25 of gaskets to remove in a year.

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1       All right, would it be 500 or less?

2       I would guess one individual pipefitter, it would be more
3   like 250 or 300.

4       So this is what he estimated based on his experience in
5   his shipyard.  This obviously is lower than what you've
6   estimated for pipefitters; is that correct?

7   A.   That's correct.  And from the outset I was going to try
8   to overestimate to the extent I could, the handling of gaskets
9   and packing, and also assuming all are asbestos-containing.  I
10  don't know if he commented -- I forgot whether he did
11  comment --

12  Q.   Well, in fact he did comment.  That's all the gaskets,
13  rubbers, spiral wound, compressed sheet.  But you're assuming
14  these are all compressed sheet gaskets in your 750 a year?

15  A.   Yes.

16  Q.   That's why you say it's a plausible upper bound?

17  A.   That's correct.

18  Q.   Now what's the next step after frequency in your
19  analysis?

20  A.   Well, it's all depending on how much time it took.
21  Because remember one pipefitter said a couple seconds or
22  minutes to remove a gasket, and some said longer.  So the idea
23  was, what is a reasonable estimate in respect to the duration
24  of handling the gasket.  Because the duration is key in
25  determining how much exposure you get from the gasket and

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1   packing material.

2       In the published literature, I broke up gasket and packing

3   task into three basic groups or four basic groups, gasket

4   fabrication, gasket removal, gasket replacement and packing

5   gasket replacement.  This represents just three of those.

6       In the literature, Madl 2007 said a fabricated gasket may

7   take one to 10 minutes.  The gasket removal, two to 10

8   minutes.  Williams in their paper had five to 10.  Boelter,

9   one to 24 minutes.

10      In the packing side, two to 26 minutes, Boelter.

11  Anderson in '82 said 10 to 30 minutes.  And then McKinnery and

12  Moore, 46 minutes.

13      The evidence based on the deponents that I reviewed in

14  fabrication, it was anywhere between half a minute and 90

15  minutes.  In the removal side, half a minute to 360 minutes.

16  And -- but the median was 20 in that case.  The median for

17  packing was 30.  And it ranged from .5 to 180 minutes.

18  Q.   What did you conclude?

19  A.   For this estimate I estimate 30 minutes on average.  So

20  I'm taking the two or three minutes, and I'm taking the larger

21  on average saying 30 minutes for this estimate.

22  Q.   All right.  We looked at frequency, duration, and then

23  what's the next component?

24  A.   Well the next component is determining what the exposure

25  levels are in respect to this assessment.

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1   Q.   And so what did you rely upon for the exposure levels?

2   Because you didn't have direct monitoring data for any of

3   these current claimants?

4   A.   Exactly.  There was no data in respect to any of the

5   deponents which described any estimates of what exposures

6   were.  There were descriptions, but they weren't estimates.

7        From the outset I wanted to gather the universe of data

8   to understand what does the data tell us in respect to

9   exposure, all the data that's available.

10       And the first, this represents really the decision

11   logically as to what to do with the data that I've reviewed.

12  Q.   When you refer to data, what are you actually talking

13  about?

14  A.   Well the datapoints, exposure results.

15  Q.   Okay.

16  A.   All the exposure results.  Put them into this process and

17  determine whether in fact they meet tier number one, which is

18  the best data and the data I would choose to use.  Tier number

19  two is data I would use to compare, to see whether we're in

20  the ballpark.  And tier number three are data that's just not

21  useful for this exercise.

22  Q.   How large of a data set were you looking at?  Were you

23  looking at just the peer-reviewed literature?

24  A.   No.  If you look at going from left to right, everything

25  in the U.S.  I excluded everything outside the U.S.  I wanted

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1  everything in the U.S., I wanted to determine whether it was

2  a study or not.  There's a lot of data points out there, there

3  was not studies.  And then if it did -- if it was a study,

4  then determine whether it was peer-reviewed or was it

5  unpublished.  And then both of them go through a data quality

6  criteria WHO speaks about, in respect to what data you take in

7  and how you evaluate those data, based on whether it's

8  representative of what you're trying to estimate.  Whether the

9  sampling analytical technique is the right technique or is

10  there quality assurance, quality control issues, or is it task

11  data.  I'm not looking for eight-hour data.  I'm looking at

12  tasks.  That's what I'm building, are the tasks during the

13  day.  Then make a determination does it fall into tier one,

14  two and three.

15  Q.  Can you tell us the studies that you selected for your

16  assessment?

17  A.  In respect to the gasket activity, that's the fabrication

18  and installation removal and replacement.  These are the data

19  for tier one that I selected for this exercise.

20  Q.  Mr. Liukonen testified earlier this week about his study

21  for the United States Navy.  Is that one of the studies --

22  A.  The Liukonen in '78 is the data from his report, not all

23  of it, only the data that's relevant for this exercise.

24  Q.  It looks like you considered his data for fabrication,

25  installation, removal and replacement; is that correct?

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1  A.   That's correct.  That's correct.

2  Q.   So it was an important study in your assessment?

3  A.   It very much was.

4  Q.   On all phases of gasket work?

5  A.   It was.

6  Q.   Also I see Cheng and McDermott.  Can you tell us about

7  that paper?

8  A.   Cheng and McDermott did a similar thing where -- and I

9  think you -- it's probably already been introduced, that paper

10 published in '91.

11 Q.   We talked about it with Mr. Boelter yesterday and with

12 Mr. Liukonen.  So is it a peer-reviewed paper?

13 A.    It is a peer-reviewed literature.  It was done by

14 Chevron's IH folks, and it was a good paper.  And they -- we

15 used -- I used the data in there to make the determinations as

16 far as what would be removal.  And that's where I came up with

17 0.114.

18 Q.   All right.  I see at the bottom, packing replacement

19 Boelter 2011.  Can you tell us about that paper?

20 A.   That's the only data that met tier two that represent

21 packing -- packing removal and installation.  It's average

22 data, but it was still useful and there was 52 results there

23 that I used.

24 Q.   All right.  So we talked about the frequency, duration

25 and concentration of direct gasket and packing work.  The next

DIRECT - HENSHAW

1    component is what?

2    A.    Well the next component is what about bystander, people

3    are standing by or working around somebody else removing a

4    gasket or packing material.

5    Q.    How did you estimate that exposure?

6    A.    Well, the -- because we didn't have exposure data, what I

7    used was, Donovan in 2012 came up with -- it's a paper on

8    modeling to determine at what level away from the source would

9    somebody be exposed or might be exposed.

10   A.    And based on this model, the model was -- used original

11   data, but it came up with this model that basically said

12   between 1 and 5 feet from the source of the generated source

13   of asbestos, it would be 50 percent of whatever that

14   concentration was; 5 to 10 feet be 35; 10 to 30 feet -- 5 to

15   10 feet be 35 percent; 10 to 30 be 10 percent.  And anything

16   greater than 30 feet away from that source, it would be

17   basically 1 percent of that source.

18        And so I came up with an adjusted factor, assuming that

19   25 percent of the time somebody's working within 5 feet of

20   somebody who is handling the gasket and packing.

21        Another 25 percent which is the column on this side --

22   another 25 percent of the time, 5 to 10 feet away, and another

23   25 percent, 10 to 30; another 25 percent, greater than 30 feet

24   away.

25        It's an estimate, we don't have that kind of detail in

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1   depositions.  But it's an estimate, it's a reasonable

2   estimate, a proximity to somebody else working with gaskets

3   and packing.

4   Q.   So you multiplied your adjustment factor by their

5   direct -- by the direct gasket and packing exposure that you

6   calculated previously, and added that to the gasket and

7   packing?

8   A.   That's correct.  So now I have a total of contributions

9   from direct activity and contributions from bystander

10   activity.

11   Q.   Okay.  Can you tell us what this slide then depicts?

12   A.   This is the result for group one, two, three and four.

13   Equivalent to a eight-hour TWA, which would be used for the

14   one-hour cumulative exposure -- or one-year cumulative

15   exposure.

16       For group number one, that's the one highest exposed,

17   highest potential exposed, 0.02 -- 0.020.  The second group is

18   .0081.  The second (sic.) one is .0009, and the fourth one is

19   0.0005.

20       Now this also shows the OSHA PEL which is a .1.  That's

21   our current OSHA standard today.  That's an eight-hour time

22   weighted average.

23   Q.   Okay.  So for group one occupations like pipefitters and

24   machinist mates whose plausible upper bound is three gaskets a

25   day, average -- eight-hour time weight average is 0.02 fibers

DIRECT - HENSHAW

1   per cc?

2   A.   That's correct.

3   Q.   How does that compare with the OSHA permissible exposure

4   limit?

5   A.   Well, you can see from the bar, the OSHA limit is 0.1

6   fibers per cc.  So it's significantly low, 20 percent.

7   Q.   All right.  You mentioned the OSHA permissible exposure

8   limit.  This is a chart similar to what I believe Mr. Liukonen

9   or Mr. Boelter presented yesterday.  Can you tell us what this

10  represents, just very briefly?

11  A.   Yes.  This represents basically the change in the TLV or

12  OSHA standard over time.  It was at 30 fibers per cc -- or

13  really was 5 million particles as the note down below

14  indicates.  It was 5 million particles, that's equivalent to

15  30 fibers per cc.

16  Q.   Where do you get that conversion factor?

17  A.   This conversion factor is in the ACGIH TLV document --

18  it's in the literature.  And that conversion factor is a

19  common conversion factor that's applied to the million

20  particles per cubic foot readings.

21  Q.   Well, at one time OSHA had both a million particle per

22  cubic foot standard and a fiber per cc standard for asbestos,

23  correct?

24  A.   That's correct.  When they adopted the Walsh Healey Act

25  in 1969.

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1  Q.    OSHA adopted in 1971?

2  A.    Well, '69 OSHA -- or Walsh Healey adopted the ACGIH

3  values, and then under 6a rule making, which means adopting

4  consensus standards, OSHA adopted that in '71, and then

5  developed their own standard in '72.

6  Q.    Okay.  And what was the relationship -- what was the

7  million particle per cubic foot standard in fibers per cc?

8  A.    Equivalent 1 million particles equivalent to six fibers

9  per cc.

10 Q.    The OSHA standard in '71?

11 A.    Oh, '71 it was 12.  Then it went to 5.  And then in '76

12 it went to 2.  In '86 it went to .2.  And then '94 it went

13 to .1.

14 Q.    And today it's .1?

15 A.    That's correct.

16 Q.    Okay.  Then you compared -- did you calculate a career at

17 those exposure levels that you estimated?

18 A.    Well, at the current exposures or OSHA standard, that

19 standard's written based on a 45-year career at that exposure.

20 And that gives you the 45 fibers per cc calculation, basically

21 0.1 times 45.  That gives you the cumulative exposure.  It's

22 allowable --

23          THE COURT:  You said 45, you mean 4.5.

24          THE WITNESS:  I'm sorry.  4.5, yes.

25          That gives you the 4.5 cumulative allowable exposure

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1   under the OSHA standard.

2        If you took that same 45-year component -- now I'm

3   not saying all components were in these positions for 45

4   years.  But if they were, this is the calculated value for

5   group number one.  It would be .91.  And group two, group

6   three, group four.

7        The slide also shows -- this comes out in the Finley

8   paper, that exposure for career auto mechanics is generally

9   estimated to be between 1.96 and 2.79.  So considerably higher

10  than where we are with gaskets and packing.

11  Q.   All right.  Are these fiber years?  I see the slide

12  actually says fiber per cc -- but we're talking about fiber --

13  A.   These are fiber cc years, yes.

14  Q.   Or 45 career, that's what's indicated?

15  A.   Based on 45-year career in that position, yes.

16  Q.   Mr. Henshaw, we heard something about the exposure

17  information during the cross of Dr. Garabrant earlier this

18  week.  He was crossed about whether the asbestos in friction

19  materials converts to fosterite, which is something different

20  than asbestos, during brake wear -- in that brake wear dust.

21  But is fosterite, first of all, fibrous?

22  A.   No.  Fosterite is not a fiber, no.

23  Q.   And so when we look at industrial hygiene studies, or you

24  look at industrial hygiene studies that are describing

25  exposures from brake mechanics that are indicated there, does

DIRECT - HENSHAW

1  fosterite impact those numbers at all?

2  A.   No.  This is not measured fosterite, this is measuring

3  asbestos fibers.  So regardless of how much fosterite is in

4  whatever the material is, it's the fibers that we're counting

5  in the air, that's what we're counting.

6  Q.   Based on the industrial hygiene literature that you've

7  reviewed with respect to the vehicle mechanics and you cite in

8  your report, how does the brake mechanic's exposures compare

9  with gasket exposures --

10  A.   Well --

11  Q.   -- or gasket and packing exposures?

12  A.   Well they're significantly higher.  If you take this

13  overall career estimate here for auto mechanics, then compare

14  it to any one of the four groups of gaskets and packing, the

15  auto mechanics are considerably higher.

16  Q.   Okay.  Mr. Liukonen projected this slide referred to

17  Dr. Irving Selikoff's book in 1978.  You're familiar with that

18  quote?

19  A.   Yes, I am.

20  Q.   Does that still stand based upon your analysis of the

21  gasket and packing literature, and with respect to the

22  descriptions provided by the claimants in this case?

23  A.   Yes.  In my view, yes.

24  Q.   Now he's talking about shipyard applications.  In your

25  experience, is there a significant difference between the way

DIRECT - HENSHAW

1    gaskets and packing are used in shipyards, versus the way

2    they're used in industry or commercial applications?

3    A.    Not the way gaskets and packings are handled.  There's

4    only one way to take it off.  You may run into issues, but

5    there's only one way.  And the environment's going to be

6    different, of course.  The surrounding environment will be

7    different.  But the way you handle a gasket and packing is

8    going to be the same.

9    Q.    Okay.  Now let's move on to the next component in your

10   analysis, that's the insulation exposure; is that correct?

11   A.    Yes.

12   Q.    Now is this -- what does this insulation exposure

13   represent?

14   A.    Well, what I attempted to do is, what are the -- just

15   like gaskets and packing -- what are the direct activities

16   that these folks who handle gaskets and packing would do that

17   would create exposures, and then what their bystander's

18   exposure.

19        So this is insulation for direct removal to access the

20   gasket and packing material.  And I went through the same

21   process as we went through with gasket --

22   Q.    You looked at the published literature?

23   A.    Published literature, Mangold, remove pipe insulation,

24   bolts prior to any gasket replacement.  He describes that.

25   Certainly the evidence the pipefitters described working with

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1    or removing insulation to get at the gaskets and packing.

2        Mr. T, a millwright, reported 9 out of 10 times he had to

3    remove insulation to get to the valve.

4        Mr. W, a plumber, personally removed insulation to access

5    lines, and then tying new lines into old lines, tying new

6    lines, which means you have to replace the gasket when you do

7    that.

8    Q.   They talk about how they would remove the insulation in

9    order to get to the lines?

10   A.   With whatever tool they had, wrenches and hammers,

11   typical way to get at it.

12   Q.   The insulation that we've heard about, sometimes in the

13   Navy they use portable pads, and sometimes in the Navy they

14   use hard insulation.  Historically are you familiar with how

15   the lines were insulated in industry commercial applications?

16   A.    Historically it was hard insulation.  You had insulators

17   who insulated afterwards.  Pipe mechanics or pipefitters for

18   example, would come in, knock the insulation off, and then

19   have the insulators come back and reinsulate.  But it's hard

20   insulation, typically.

21   Q.   What about portable pads?

22   A.   I didn't see any portable pads.  Certainly historical,

23   portable pads in my environments that I've been in or ships

24   that I've been in.

25   Q.   Do you have an understanding as to whether the shipyards

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1   actually had shops that would make portable pads for the

2   fittings and valves on ships?

3   A.   I know that the shops are making all different sorts of

4   asbestos-containing material, insulation material, and some

5   made pads, yes, I know that.

6   Q.   Okay.  So what was your conclusions with respect to the

7   review of the literature and evidence on the frequency of

8   insulation removal to access the gaskets and packing?

9   A.   Well, from the outset I didn't want to overestimate this

10  component of it.  And so I assumed, based on -- because there

11  were some people said not all the time, 9 out of 10, and some

12  people said not all the time I removed insulation.

13       So from my estimate, I estimated that 50 percent of the

14  time somebody has to access or remove insulation to get at

15  that gasket or packing.

16  Q.   All right.  What about the duration?

17  A.   Duration, the same thing.  Looking at the literature, the

18  Nicholson -- Boelter and Nicholson were two sources.  Boelter

19  estimated 15 minutes to remove pipe insulation.  The

20  pipefitters Nicholson in '79 said pipefitters spent 10 percent

21  of their day removing insulation.  My estimate is less than

22  that.  But the evidence, again, talking about how often they

23  did that to the extent they're definitive, Mr. L, machinist,

24  estimated 30 minutes to remove insulation from a flange.

25       Mr. C estimated that it took between 10 to 30 minutes to

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

861

1   remove insulation.

2        H, Mr. H, millwright, estimated 10 to 15 minutes.

3        Mr. F, a pipefitter, estimated 5 to 10 percent of his

4   work involved removing pipe insulation.

5   Q.   All right.

6   A.   So my estimate was it would take about 15 minutes to

7   remove insulation to access the flange.

8   Q.   What about concentration?  Did you go through a similar

9   analysis in reviewing the insulation data to determine what to

10  select and use for this study?

11  A.   Using the same decision, logic and criteria, I did the

12  same thing, looked at everything that I could find, all the

13  studies, whether it was a study or not, peer-reviewed or not.

14  But ultimately deciding whether the data fits in tier one,

15  tier two or tier three.

16  Q.   All right.  So you considered published and unpublished.

17  For the unpublished, could that still make it through your

18  analysis to end up in tier one?

19  A.   Sure.  Yeah, as well as in the previous for gaskets and

20  packing.  If the unpublished met the criteria, representative

21  standard methods were used, accurate methods, good quality,

22  quality assurance, quality control, and it was a task data, it

23  wasn't group data, it was a task data, then it could have

24  fallen into tier one.

25  Q.   All right.  And so what data did you end up selecting?

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1   A.   In this case the only task data I had as we look at the

2   universe of data out there, was the Boelter study.  We had

3   no -- no representation or no data in the literature that

4   dealt with just the task of accessing the gasket and packing.

5   And the Boelter study was the only data that I had that met

6   the ultimate tier one criteria.

7   Q.   But aren't there lots of studies in the literature with

8   respect to insulation exposures?

9   A.   There's lots of studies out there that talk about rip

10  out.  They talk about lots of other activities, but not

11  specifically the removing insulation to access a gasket or

12  packing.

13  Q.   All right.

14  A.   That's what I needed to do this task analysis.

15  Q.   And how did Mr. Boelter's data compare with what else was

16  in the literature?

17  A.   His is around the ballpark.  There's lots of data much

18  higher than that during rip out.  His data is reasonable,

19  within -- within the activity.  If you spread the data out,

20  his is right in there where everybody else is.  It's not the

21  extreme by no means.  The extreme is very high.

22       But this, in my estimation, is the best estimate, the

23  best representation of what it takes, how much exposure one

24  would have to access the flange or packing.

25       Now in this case I only took the first 15 minutes of his

DIRECT - HENSHAW

1   study, not the entire day.  I didn't want any cumulation over

2   time, so I took the first 15 minutes of the study, and that's

3   what is shown here for the 83 fibers per cc.

4   Q.    Okay.  The next component of your analysis was the

5   bystander exposure to asbestos-containing insulation?

6   A.    Yes.

7   Q.    Did you go through a similar analysis?

8   A.    Similar analysis, talking -- looking at what the

9   testimony indicated.  And there were several people that

10  plumbers and pipefitters talked about in the vicinity of

11  insulation.  The removal work.  Mr. L said the shipyard looked

12  like a snowstorm.  Now these aren't very helpful as far as

13  a -- amount they're exposed to.  But it does tell me there's

14  some significant exposure.

15       Lots of insulation falling on people when they're working

16  below them.

17       Mr. B described that when insulation was removed, the

18  atmosphere looked like a snowstorm out there.

19       So I basically did the same thing.  I calculated a

20  bystander factor based on -- based on the data, and this is

21  the data.

22       From the selection of what the environment looked like,

23  and I'm trying to estimate what somebody in that environment

24  may be exposed to.  This is not direct activity.  This is

25  activity because they're in the proximity in that environment.

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1    I used the application mixing prefab and removal and

2    spraying, which are typical activities during the '60s, for

3    example.

4    I broke out industrial and shipyard, because they're two

5    distinct industries.  Shipyards historically have a lot more

6    asbestos exposure than industrial facilities.

7    And the average numbers I used came out of Cooper and

8    Balzer, NIOSH, Balzer and Cooper with 68.  A shipyard, Balzer,

9    Cooper, Ferris, NIOSH, Mangold, Nicholson, and Murray.  Those

10   are the data sources for those averages --

11   Q.   Now --

12   A.   -- 4.4 and 41.

13   Q.   I know the Mangold 1970, that's his -- the Asbestos

14   Exposure and Control at Puget Sound Naval Shipyard?

15   A.   Yes, sir.

16   Q.   And the committee's expert Roger Beckett was a co-author

17   of that paper?

18   A.   Yes, that's correct.

19   Q.   So did you do a similar analysis on the bystander

20   exposure to a calculated adjustment factor?

21   A.   Similar analysis, recognizing that ACI group one they're

22   going to be closer to the sources.  ACI two less so.  And ACI

23   three -- in fact 100 percent ACI three is greater than 30 feet

24   away.  Using the same modeling that Donovan modeled estimating

25   what the factor would be for bystander exposure in those

DIRECT - HENSHAW

1   environments.

2   Q.   Okay.   Then you had background exposure that you

3   considered.   Did you go through the same type of analysis on

4   frequency, duration and concentration?

5   A.   Yes, to some extent.   The literature or the depositions

6   didn't tell me much about how much break time they had, how

7   much time before the morning and after.   I assumed 30 minutes

8   in the morning, 30 minutes at lunch time, and 30 minutes in

9   the evening.   So that was an assumption that I make, because

10  there's not much description about how much break time or how

11  much time away there was.

12      So I assumed 90 minutes for that.   And I used, basically,

13  the OSHA clearance factor, or clearance number, which is 0.01

14  fibers per cc.   Becasue we're talking about in the '60s and

15  early '70s, used that as background exposure for the shipyard.

16  And I cut that in half for industrial applications.   That's --

17  that's what added up the total insulation number, which is

18  this value.

19      Now this happens to be industrial, not shipyards.   And

20  this is another eight-hour equivalent for the contributions

21  from asbestos insulation.   Asbestos coming -- fibers coming

22  from asbestos insulation.

23      In group one, because their proximity is right there with

24  that environment of that exposure at 5.5 fibers per cc.   Group

25  number two, they're less involved, 3.2.   Group number 3, 1.8.

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1  Group number 4, 1.7.

2  Q.   You've indicated, again, the OSHA PEL at 0.1 fibers per

3  cc there.   That's the current level that's been in place since

4  1994?

5  A.   That's correct.

6  Q.   OSHA hasn't lowered it?

7  A.   No, sir.

8  Q.   Has it been under consideration for lowering?

9  A.   Not that I'm aware.   Certainly not during my time.

10  Q.   All right.   From your perspective and from industrial

11  hygiene perspective, is this regarded as a safe level of

12  exposure to asbestos?

13  A.   No.   This -- certainly in the '70s this would have been a

14  lower exposure.   In early '70s of five fibers per cc, all

15  except group number one, would have been below the OSHA

16  standard at that time.   Now the OSHA standard is .1 and all

17  these are above that.

18  Q.   I'm asking about the OSHA permissible exposure limit

19  here.   Is that from a industrial hygiene perspective regarded

20  as a safe level?

21  A.   Yes, sir, it is.

22  Q.   Let me ask it this way:   Is this an opinion about this

23  level being a safe level something just expressed to Garlock

24  or have you actually testified before Congress about?

25  A.   I have testified before Congress on that point.

867

DIRECT - HENSHAW

1   Q.   Mr. Henshaw, this looks like the example workday of the

2   pipefitter; is that correct?

3   A.   That's correct.  Now this is the day of a pipefitter.

4   The only exception is, because remember I said 50 percent of

5   the time you have to remove insulation.  And we've got three

6   gasket events.  So basically on an average it's one and a half

7   a day.  This is an example of one day.  The next day there

8   will be two access gaskets and packing which is this

9   indication here.

10       So we've got background, we've got bystander exposure for

11  period of the day, we got three events, gasket and packing

12  events.  We've got one insulation for this day.  But as this

13  note implies, on average it's one and a half.  The next day

14  there will be two of these accessing events.  I estimate only

15  50 percent of the time one would have to remove insulation.

16       But this would be a typical day of a pipefitter.

17  Q.   Have you prepared a slide that illustrates the comparison

18  of certain example occupations based upon their insulation

19  exposure versus their gasket and packing?

20  A.   Yes, I have.

21  Q.   Is that what this represents?

22  A.   This is a representation or comparative exposure of

23  fibers coming from insulation as I calculated here, versus

24  exposure from gaskets and packing as I've calculated here.

25       Which includes the bystander and direct, and bystander

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1  and direct for both activities.

2      And for -- these are examples of just four occupations

3  out of the many combinations that I have.

4      The pipefitter, the contribution of asbestos coming from

5  insulation, 5.5 fibers per cc.  In respect to the gaskets it's

6  0.02.

7      And you can go down the line showing the representation

8  of a gasket from insulation which is a large bubble, and the

9  blue dot for gaskets and packing.

10 Q.   All right.  So the pipefitter's an example occupation in

11 group one, and there's only one alternative insulation group

12 associated with group one; is that correct?

13 A.   That's correct.  In group one there's only one and one,

14 which is gasket and packing and insulation.  Group two there

15 is one and two.  So there's -- in group two there's close

16 proximity to insulation and then there's less exposure to

17 insulation.

18 Q.   And the boiler workers in one of those groups, and the

19 electrician is -- how many alternative exposure groups are

20 there in group three?

21 A.   In group three there are three exposures.

22 Q.   Okay.  And the electrician's one of those groups?

23 A.   Same way with -- there's three alternative variations,

24 yes.

25 Q.   And the electrician's in one of those alternative

Laura Andersen, RMR 704-350-7493

DIRECT - HENSHAW

1   exposure groups?

2   A.   They're in 3/1, which means gasket and packing group

3   number three, and alternative asbestos-containing insulation

4   group one.

5   Q.   Okay.  And similar with the painter, or your alternative

6   exposure groups in group four?

7   A.   Painter chose that because it's a common occupation.  In

8   this case it's four, which is gasket and packing group four,

9   and alternative or asbestos-containing insulation group two.

10  Q.   Okay.  And this is just for industry.  There will be

11  different estimates for shipyard work?

12  A.   Shipyard would be different, that's correct.

13  Q.   Okay.  I mentioned in our opening statement that you made

14  certain proclaimant or conservative assumptions with respect

15  to insulation exposure.  Are there insulation exposures that

16  the claimants would likely have had that were not factored

17  into your analysis?

18  A.   Yes, there would be many.  I can only estimate the

19  exposure that's associated with gasket and packing work, not

20  other direct exposure.  For example, electrician.  That

21  electrician doesn't typically work around insulation.  That's

22  why they're in group -- in group number three.  And however,

23  this group is group number one.  Some environments they're not

24  around insulation.  There might -- however, they're hanging

25  hangars knocking off fireproofing to put in a control box,

DIRECT - HENSHAW

1    electrical control box.  So they have other sources of direct

2    asbestos exposure that I did not account for.

3    Q.   What about pipefitters?

4    A.   Pipefitters the same way.  I'm only looking at the

5    environment in which gasket and packings were handled.  If

6    pipefitters are doing other activity, direct exposure -- I'm

7    only counting one direct exposure activity, and that's

8    accessing the gasket and packing.  There may be other -- more

9    likely there are in industry, other direct sources of

10   asbestos.

11   Q.   Now the blue dots represent an assumption of working with

12   compressed sheet gaskets every time they were working --

13   asbestos compressed sheet gaskets every time they were working

14   with gaskets; is that correct?

15   A.   That's correct.  The 750, for example, the pipefitter,

16   all of those I'm estimating were asbestos-containing sheet

17   gaskets.

18   Q.   Did you understand there are fiber wound gaskets, rubber

19   gaskets, other nonasbestos gaskets they work with?

20   A.   Yes.  And the deponents testified there were a number of

21   gasket materials available and used.

22   Q.   And you also understand Garlock didn't manufacture all

23   the compressed asbestos sheet gaskets?

24   A.   I know there's many other manufacturers, that's correct.

25   Q.   Mr. Henshaw, at this time I think just to wrap up, I want

DIRECT - HENSHAW

1   to introduce a couple of documents.

2        First like to offer appendix one to your report, it is

3   labeled GST-15158A.  And can you tell us what appendix one to

4   your report is?

5            MR. FINCH:  Objection; hearsay, Your Honor.

6            THE COURT:  Overruled.

7            MR. HARRIS:  I was going to offer it.

8            MR. FINCH:  I object to the offering of the document

9   because it's hearsay.  It's not a summary of voluminous

10  documents.  He can talk about it, but if he tries to put the

11  document into evidence, I object on a hearsay basis.

12           THE COURT:  I'll overrule your objection.  Go ahead.

13  BY MR. HARRIS:

14  Q.   Can you tell us what Appendix 1 is?

15  A.   Yeah.  Appendix 1 of my report, this is the assignment

16  of all 708 -- excuse me, 1,480 combinations.  This is the

17  assignment of where all those occupations in industries fit

18  into these groups.  The first one, the first title is Gasket

19  and Packings.  So remember I said there's five groups.  The

20  fifth one there was no calculation.  But one through four

21  they're identified here which occupation.  For example the

22  second page, custodian in residential buildings.  I've got

23  them as mostly five, except in construction I have them in

24  four.  So in construction I've estimated that those

25  individuals may have fallen into group number four for gasket

DIRECT - HENSHAW

1   and packing.

2   Q.   All right.

3   A.   Just an example.

4   Q.   There's also a table in your report that summarizes the

5   results of your analysis in terms of the exposure; is that

6   correct?

7   A.   Yes.

8   Q.   This is Table 8 in your report; is that correct?

9   A.   This is a summary -- yes -- that's from my report, Table

10  8.  Basically it's a summary of describing the ranges of

11  exposures in these four groups.

12          MR. HARRIS:  All right.  We've marked this as

13  GST-15158C.

14          Your Honor, we offer this table into evidence.

15          MR. FINCH:  No objection to that.

16          THE COURT:  All right.  We'll admit that.

17          (Plaintiff's Exhibit No. GST-15158C was received

18  into evidence.)

19          THE COURT:  Not sure whether 15158A was offered, but

20  I'll treat it as offered and objected to and the objection was

21  overruled.

22          MR. HARRIS:  I'm sorry, Your Honor.  Thank you.

23          (Debtor's Exhibit No. GST-15158A was received into

24  evidence.)

25  BY MR. HARRIS:

Laura Andersen, RMR 704-350-7493

873

DIRECT - HENSHAW

1   Q.   Mr. Henshaw, I would like to hand you GST-15158D as in

2   David.  Can you tell us what this document represents?

3   A.   Yes.  This is a summary of the actual results for these

4   occupations and industries.

5        So if you follow this, you'll see exactly, does it fall

6   into group three, gasket and packing or ACI group three, and

7   actually what the computation was in respect to their

8   exposure.

9   Q.   So you have a big notebook that's on your witness stand

10  over there that has all the data itself.  This is a summary of

11  that data?

12  A.   Yes, sir.

13           MR. HARRIS:  Your Honor, at this time Garlock offers

14  GST-15158D as in David.

15           MR. FINCH:  Objection; hearsay; cumulative of the

16  testimony.

17           THE COURT:  Overruled that and accept it.

18           (Debtor's Exhibit No. GST-15158D was received into

19  evidence.)

20  BY MR. HARRIS:

21  Q.   One final question, Mr. Henshaw.  This is industry

22  exposure, correct?

23  A.   That's correct.

24  Q.   Not Navy, right?

25  A.   That's correct.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   Q.   If we were looking at Navy or shipyard exposure for the

2   pipefitters, that exposure, the red ball, would that be

3   larger?

4   A.   It would be much larger, yes.

5   Q.   And would the blue dots still stay the same?

6   A.   The blue dots stay the same.  There's a gasket and

7   packing activity is that activity.  But the

8   asbestos-containing insulation does vary, obviously shipyards

9   are much more.

10         MR. HARRIS:  Thank you, Mr. Henshaw.

11         Pass the witness.

12         THE COURT:  Okay.  Step down -- or you can sit down.

13         MR. FINCH:  Give us a second to get set up, Your

14   Honor.

15         THE COURT:  All right.

16                    CROSS EXAMINATION

17   BY MR. FINCH:

18   Q.   Good afternoon, Mr. Henshaw.

19   A.   Good morning.

20   Q.   Good morning.  When you've been here a little while, you

21   tend to forget what time of day it is.

22       Mr. Henshaw, you don't have a degree in engineering,

23   correct?

24   A.   That's correct.

25   Q.   And you are not a material scientist, correct?

CROSS - HENSHAW

1   A.   I'm not sure what that is, but no, I'm not.

2   Q.   You don't have a degree in epidemiology, correct?

3   A.   No, sir, I do not.

4   Q.   You also are not a medical doctor, correct?

5   A.   That's correct.

6   Q.   You haven't published any peer-reviewed publications on

7   asbestos and disease, correct?

8   A.   Not specifically, no, sir.

9   Q.   You never published an epidemiology study of

10  asbestos-exposed workers, correct?

11  A.   That is correct.

12  Q.   It is correct you have never published such a study?  I'm

13  right, you've never published such a study, correct?

14  A.   Such a study --

15  Q.   Epidemiology study of asbestos-exposed workers?

16  A.   That is correct.

17  Q.   You've never gotten a grant from the National Institute

18  of Health to study how asbestos fibers cause disease?

19  A.   No, sir, I have not.

20  Q.   And you never received any federal funding at all to

21  study asbestos and disease while you've been in ChemRisk,

22  correct?

23  A.   That is correct.

24  Q.   You've never published anything in the peer-review

25  literature concerning asbestos gaskets, correct?

CROSS - HENSHAW

1   A.   Yes, sir, that's correct.

2   Q.   You've never written any articles in the literature about

3   the practices for removing asbestos gaskets, correct?

4   A.   Yes, sir, that is correct.

5   Q.   As of 2012, you had only done air monitoring or sampling

6   during a gasket removal operation one time, correct?

7   A.   No, sir, that's not correct.  Precisely -- what I've --

8   what I did was, I had the opportunity for that one task.  Now

9   I've sampled many times during the activity where gaskets and

10  packings were removed.  But I had one opportunity that I could

11  just sample that particular task.

12  Q.   So you had one opportunity where you were just sampling

13  gasket removal, correct?

14  A.   The contribution from just that one source, that's

15  correct.

16  Q.   You've never published anything in the peer-reviewed

17  literature concerning testing products for asbestos fiber

18  content, correct?

19  A.   No, sir, I have not, that's correct.

20  Q.   You've never published anything in peer-reviewed

21  literature concerning testing the fiber release from any kind

22  of asbestos product, correct?

23  A.   That is correct.

24  Q.   You never published a peer-reviewed article, the focus of

25  which was air sampling for asbestos exposures for different

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    occupational groups, correct?

2    A.    That is correct.

3    Q.    While at OSHA you personally had nothing to do with

4    evaluating asbestos exposure from gaskets and packing,

5    correct?

6    A.    As an administrator, that is correct.  I did not have the

7    personal contact in that way.

8    Q.    In 2005 you went from OSHA to a company called ChemRisk,

9    correct?

10   A.    No, sir.

11   Q.    You went from -- when did you leave OSHA to go to

12   ChemRisk?

13   A.    There's two questions there, let me answer.  I left OSHA

14   in December, the end of December 2004.  I started my own

15   consulting firm in 2005.  Then I went to ChemRisk in 2011.

16   Q.    So between 2005 and 2011 you had your own consulting

17   business, correct?

18   A.    That's correct.

19   Q.    And that business was folded to ChemRisk in 2011,

20   correct?

21   A.    That is correct.

22   Q.    And 2005 is when you first started gathering lots of

23   detailed information about asbestos and gaskets, correct?

24   A.    Well, I had certainly -- when you say lots of detail.  I

25   certainly had my own files.  But after 2005 -- or in 2005 I

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    began to accumulate more data, records, whatever I can find

2    dealing with various compounds, including asbestos and silica

3    and a number of other.

4    Q.    All right.  Eighty percent of your time now is spent on

5    litigation consulting; is that correct?

6    A.    That's approximately correct.  I've never estimated it

7    and never counted it up, but that's an approximation.

8    Q.    And 70 percent of that is on asbestos litigation,

9    correct?

10   A.    I think that may be a little high, maybe 60 to 70, but in

11   that range probably.

12   Q.    You worked for Garlock multiple times before it went into

13   bankruptcy, correct?

14   A.    I've been retained on a number of cases with Garlock.  I

15   don't know the exact number.

16   Q.    You have worked for John Crane, which is a company that

17   made asbestos-containing gaskets and packing, correct?

18   A.    I have been retained by John Crane on a number of cases

19   as well.

20   Q.    You testified at trial for John Crane at least on one or

21   two occasions, correct?

22   A.    I have testified in John Crane cases.  I don't know

23   exactly how many, maybe one or two, yes.

24   Q.    Including some in Newport News, Virginia, right?

25   A.    Yes, sir, that's correct.

CROSS - HENSHAW

1   Q.   You've worked for Yarway, which is a company that made

2   equipment that had asbestos-containing gaskets as components?

3   A.   I was retained by Yarway on a few cases.  I don't know

4   exactly how many.  But they made pumps and valves.

5   Q.   You've worked for Honeywell, which made

6   asbestos-containing brakes through the Bendix line, correct?

7   A.   Again, I had a few cases with Honeywell.  I don't know

8   exactly how many.

9   Q.   You've done work for Georgia-Pacific, correct?

10  A.   I have been retained by Georgia-Pacific.

11  Q.   Georgia-Pacific makes an asbestos-containing -- used to

12  make an asbestos-containing joint compound, right?

13  A.   That is correct.

14  Q.   That was a chrysotile product, correct?

15  A.   That is correct.

16  Q.   That was not an encapsulated product, that was a friable

17  product, it was joint compound?

18  A.   It was joint compound.  It contained a small percentage

19  of asbestos in a joint compound.

20  Q.   And when it was sanded or mixed, it gave rise to asbestos

21  fiber concentrations in the air in -- it ranges in the

22  literature from 2 to 5 fiber per cc's on a time weighted

23  average basis, right?

24  A.   It depends on the applications, it depends on the

25  activity being done.  But it does generate fiber when you sand

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    the material.

2    Q.    It generates a lot of fiber, right?  There are

3    measurements of asbestos fiber from joint compound, 50, 60, 70

4    comparable insulation, right?

5    A.    No, sir.

6    Q.    They're in the triple -- in the double digits in terms of

7    fibers per cc for joint compound.  You've seen literature like

8    that?

9    A.    Well, I've seen lots of literature on asbestos-containing

10   joint compounds.  And some operations such as mixing dry

11   material, those concentrations could be in double digits,

12   that's correct.

13   Q.    And you would agree with me that the level of fiber

14   release from asbestos joint compound you would say would be

15   higher than from gaskets, right?

16   A.    The exposure from joint compound during the sanding

17   applications, or mixing applications, would be higher than

18   joint compound.  I mean, excuse me, then gasket and packing,

19   sure.

20   Q.    And it's been your testimony that mixing and sanding

21   asbestos-containing joint compound does not increase anyone's

22   risk of mesothelioma, right?

23   A.    Based on the evidence in respect to dry wallers, people

24   who actually do that on a routine basis, they have not shown

25   an increased risk of developing mesothelioma.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   Q.   You've never testified for a plaintiff in an asbestos

2   personal injury case?

3   A.   No, sir, I have not been asked to do so.

4   Q.   Since you joined ChemRisk, you never -- let me just back

5   it up.

6        Since you formed your consulting company after you left

7   OSHA, you've never testified for a plaintiff in any kind of

8   lawsuit involving personal injury or death from a product or

9   substance; isn't that true?

10  A.   Since joining ChemRisk, that is true.

11  Q.   Let's talk a little bit about what's ChemRisk.  ChemRisk

12  is something called -- you're a managing director of what is

13  now called Cardno ChemRisk, right?

14  A.   Yes, sir.

15  Q.   Cardno is a big company that bought ChemRisk, which was a

16  fairly good-sized company itself?

17  A.   That is correct.

18  Q.   And ChemRisk has office locations in San Francisco,

19  Orange County, Boulder, Colorado, Sanibel, Florida where you

20  live, Chicago and in Pittsburgh, right?

21  A.   That's correct, yes, sir.

22  Q.   Has 60 scientists on staff, published more than 1,000

23  papers at scientific conferences, 400 papers published by

24  ChemRisk scientists are relied upon in litigation proceedings.

25  Do you know that?

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   A.   I know there's more than 60 scientists.  I don't know how

2   many papers have been published, nor how many papers have been

3   referenced in litigation.

4   Q.   The president of ChemRisk is Dennis Paustenbach, right?

5   A.   Yes, sir, that's correct.

6   Q.   And you've actually published a paper with

7   Mr. Paustenbach, correct, that's the title of it?

8   A.   Yes, sir.  He was one of the co-authors, that's correct.

9   Q.   And this is a letter from Dennis Paustenbach on ChemRisk

10  letterhead to its valued clients.

11       "Over the past 25 years, our firm has been dedicated to

12  contributing to the peer-reviewed scientific literature.

13  Sharing our knowledge in this manner is what we consider to be

14  our duty as scientists.  Hopefully it has enhanced our

15  reputation within the scientific government and environmental

16  health communities, as well as in the courtroom.  Enclosed

17  please find abstracts for our recent publications, citations

18  below, related to asbestos and benzene.  Please pay particular

19  attention to the asbestos take home paper.  It represents a

20  major commitment by our firm."

21       You've seen letters like that from ChemRisk out to

22  corporate clients, correct?

23  A.   I've seen this letter.  I don't know if I've seen one

24  before, but I've seen this letter.

25  Q.   And the paper they're talking about is that Donovan paper

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    that you've cited to the court this morning, correct?

2    A.   Yes, sir, that's correct.

3    Q.   Another publication you've cited the court in your report

4    is something called an "Asbestos Study of Bystanders and

5    Workers During Installation or Removal of Gaskets and

6    Packing."  And you know that was funded by Garlock, correct?

7    A.   I know -- I don't know how exactly how much was funded by

8    Garlock.  But I see the acknowledgment, yes.

9    Q.   And it was written by people who you know to be at

10   ChemRisk, right?  Carl Mangold -- Amy Madl and Dennis

11   Paustenbach are definitely at ChemRisk, correct?

12   A.   Yes.  Carl Mangold is the only one that's not at

13   ChemRisk.

14   Q.   And then another paper you cited, "Exposure to Airborne

15   Asbestos During the Removal and Installation of Gaskets and

16   Packing, a Review of Published and Unpublished Studies."

17   Written by ChemRisk, right?  Amy Madl at ChemRisk and Dennis

18   Paustenbach?

19   A.   It's written by those three authors, they work at

20   ChemRisk.

21   Q.   Yes.  And what they conclude is the same thing you said

22   today, the weight of the evidence indicates the use of hand

23   tools and hand-operated power tools to remove or install

24   gaskets or packing as performed by pipefitters or other

25   tradesmen in nearly all plausible situations would not have

CROSS - HENSHAW

1  produced airborne concentrations in excess of contemporaneous

2  regulatory levels.  That's what they conclude in their paper,

3  right?

4  A.   That's one of their conclusions.

5  Q.   And although -- then they acknowledge that the financial

6  support for the underlying reserve was provided by a pump

7  manufacturer involved in asbestos-related litigation regarding

8  gaskets and packing.  That's who funded that paper, right?

9  A.   I'm not going to quibble over -- if that's a quote from

10 the paper, then that's an accurate quote.

11 Q.   Now you've also cited this paper in some brake cases, and

12 I believe it's in your list of reliance here.  That's got a

13 group of people, some of them are from ChemRisk and others are

14 from a company call Exponent, right?

15 A.   Exponent University of South Florida, and then Tetra Tech

16 Company out of San Francisco.

17 Q.   Okay.  And that -- you know that paper was funded by the

18 car companies who have been involved in litigation involving

19 brake dust, right?

20 A.   Again, I'm not going to quibble over your statement

21 there.  It acknowledges -- that's a proper acknowledgment.

22 Q.   Okay.  Now Exponent, this is a letter to the RJ Reynolds

23 tobacco company on Exponent letterhead.  You know that

24 Exponent was a consulting firm similar to ChemRisk, correct?

25 A.   Yes, sir, that's correct.

CROSS - HENSHAW

1    Q.   And this is Exponent, Dennis Paustenbach and Brent Finley

2    and Patrick Sheehan were all at Exponent in 1999 and they were

3    pitching RJ Reynolds on some kind of project, right?

4    A.   I've not seen that letter, so I can't say what that

5    letter describes.

6    Q.   So you don't know that Dr. Paustenbach has worked for the

7    tobacco companies?

8    A.   I know he's been retained by Ford and a couple other

9    companies.   I don't know the extent to which he was retained.

10   Q.   By -- RJ Reynolds is a tobacco company, right?

11   A.   I don't know what all the products they make.   I know RJ

12   Reynolds does produce tobacco products.   Like I said, I

13   haven't seen this letter, so I don't know what this is about.

14   Q.   Okay.   But you have seen this study.   This is a study by

15   people at Exponent and ChemRisk where they're collaborating on

16   paper -- this is a paper that Dr. Garabrant talked about,

17   correct?

18   A.   I have no idea what Dr. Garabrant talked about.

19   Q.   Okay.   You're familiar with this paper though,

20   "Mesothelioma and Lung Cancer Among Motor Vehicle Mechanics, a

21   meta-analysis."   You've relied on it in the past and even

22   cited it in your report here, right?

23   A.   Yes.   I'm aware of that paper.

24   Q.   Okay.   And it's written by people at Exponent and

25   ChemRisk, right?   Well, excuse me.   It's written by people --

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1  some of the people that wrote that were at Exponent, right?

2  A.   Yes.  Give me a minute and I'll go through all that.  I

3  don't see ChemRisk on there, but Exponent certainly University

4  of Michigan.

5  Q.   Okay.  And again, you know that research was funded by

6  the car companies, correct, for that paper?

7  A.   Again, I'm not going to quibble over that

8  acknowledgement.  That's a proper statement in a peer-reviewed

9  paper.

10  Q.   And you've cited this paper before, in your brake work

11  paper by Hessel, who is at Exponent.  "Mesothelioma Among

12  Brake Mechanics and Expanded Analysis of a Case Controlled

13  Study."  Familiar with that, right?

14  A.   I am familiar.  Not everyone's from Exponent, but I'm

15  familiar with that.

16  Q.   And Dr. Hessel at Exponent has published on a

17  case-controlled study of prostate cancer and atrazine exposure

18  where he concluded that there wasn't a -- there was no

19  evidence for an association between atrazine and prostate

20  cancer, right?  You're aware of that?

21  A.   Sir, I haven't seen this publication.

22  Q.   Are you aware that ChemRisk has written papers concluding

23  that there was no evidence between the -- between exposure to

24  pesticides and Parkinson disease which was funded by Crop Life

25  America?

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   A.    I'm not aware of that publication.

2   Q.    Were you aware, sir, that Exponent actually wrote a paper

3   where they concluded that there was no risk of obesity from

4   putting soft drinks in high schools, funded by the American

5   Beverage Association?

6   A.    Sir, I'm not aware of that publication.

7   Q.    But you cite to Exponent, even though they write papers

8   saying kids drinking soft drinks doesn't increase their

9   chances of getting fat?

10  A.    Sir, these are scientific papers based on scientific

11  evidence.  The scientists are the ones that know that data

12  more than you or I.

13  Q.    Now your past consulting work for Garlock related to

14  asbestos personal injury cases, right?

15  A.    As I said, I've been retained by Garlock in a number of

16  cases.

17  Q.    Okay.  And you've never, in any case, have you concluded

18  that asbestos exposure to gaskets and packing increase

19  someone's risk for mesothelioma, right?

20  A.    That's correct.

21  Q.    Okay.  And Garlock certainly knew of your opinions about

22  asbestos and gaskets before it hired you in this case, right?

23  Before it hired you in this bankruptcy case?

24  A.    Well, certainly the cases I've been involved in they knew

25  what my opinions were.

Laura Andersen, RMR 704-350-7493

1   Q.    And they knew what your general opinions were about

2   chrysotile asbestos before they hired you in this bankruptcy

3   case, right?

4   A.    Certainly they would have also known my general opinions

5   about chrysotile.

6   Q.    And you designed the study which is the report that you

7   authored in this case, right?

8   A.    Yes, sir.

9   Q.    And you picked the literature to rely on, right?

10  A.    I first selected the universe of data, and then selected

11  from that the data would be used in the assessment.

12  Q.    Okay.  And let's talk a little bit about this asbestos

13  exposure assessment.  You've never authored an asbestos

14  exposure assessment that involved this many different

15  occupations; that's fair, isn't it sir?

16  A.    This is a large group, that is correct.

17  Q.    And involving this many people there are approximately

18  4,000 pending claimants, give or take.  You haven't done

19  assessments with that many people in that many different

20  occupations?

21  A.    Well, with that many people, probably yes.

22  Q.    But not spread across so many --

23  A.    Not in the complexity, as far as the number of

24  occupations, that's correct.

25  Q.    Okay.  Am I correct that you've never authored a

CROSS - HENSHAW

1  peer-reviewed article about asbestos exposure assessment?

2  A.   That is correct.  Specifically on exposure assessment,

3  that's correct.

4  Q.   Okay.  You would agree with me that the two biggest

5  topics, the focus of your report are asbestos gaskets and

6  asbestos thermal insulation, right?

7  A.   Yes, sir, that's correct.

8  Q.   Okay.  I'll talk first with you about gaskets, then I'm

9  going to talk with you about thermal insulation and then we'll

10 be done, okay?

11 A.   Yes, sir.

12 Q.   All right.  Garlock sheet gaskets, you would agree that

13 they had 60 to 80 percent asbestos, generally speaking?

14 A.   I can't say all, but that's a reasonable range, from 60

15 to 80 percent.

16 Q.   Garlock made chrysotile sheet gaskets, most of the

17 gaskets -- in fact, the majority of the gaskets they made were

18 chrysotile sheet gaskets, right?

19 A.   From my understanding, that's correct.

20 Q.   And they also made -- you also know they made gaskets

21 with crocidolite in it too, correct?

22 A.   Yes, sir.

23 Q.   And the chrysotile that Garlock got came from Canada,

24 right?

25 A.   I don't know all the sources, but I know some of the

Laura Andersen, RMR 704-350-7493

1    sources came from Canada.   I don't know all.

2    Q.    Okay.   Now, you know that Garlock has put out an MSDS for

3    the 900 gasket, which is a fairly typical chrysotile gasket,

4    right, you've seen that before?

5    A.    I have seen that, yes.

6    Q.    And when Garlock -- that's a chrysotile sheet gasket.

7    And when Garlock wasn't in the courtroom and said, "chronic --

8    if breathing amounts of asbestos fibers can cause lung

9    disorders such as asbestosis, pleural plaque, lung cancer and

10   mesothelioma."  You know Garlock said that in its MSDS over --

11   almost 30 years ago, right?

12   A.    I don't see the date of that, but --

13   Q.    It looks like it's 1989, so 25 years ago it said that?

14   A.    I have no reason to quibble over -- if you're pulling

15   that directly from the MSDS.

16   Q.    I say assure you I am.   And then what they also say is

17   that the "dust from the sheet should be treated as free

18   asbestos.   Secure the area and clean up using HEPA filter,

19   vacuum or wet sweep.   Do not clean up in a method that creates

20   dust."  That's what Garlock said outside of court 25 years ago

21   in this MSDS, right?

22   A.    Again, I don't have that in front of me, but I assume

23   you've taken that directly out of that MSDS.

24          MR. FINCH:  And Your Honor, this one is already in

25   evidence as ACC Exhibit 3 or 4, one or the other.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1              Now let's talk a little bit about friability.

2    Friability is an asbestos-containing material that can be

3    crumbled, pulverized or reduced to powder by hand pressure.

4    And you agree with me this is the definition of nonfriable

5    asbestos from the EPA regulations, correct?

6    A.    It looks like that's my recollection of what the

7    regulations specify.

8    Q.    Okay.  So what nonfriable is, it's something that when

9    dry cannot be crumbled, pulverized, or reduced to powder by

10   hand pressure, right?

11   A.    That's correct.

12   Q.    Okay.  Then there's a definition further on in the

13   regulations that says, "category one, nonfriable

14   asbestos-containing material, means asbestos-containing

15   packings, gaskets, resilient floor covering, and asphalt

16   roofing products containing more than 1 percent asbestos",

17   right?  You know that's what the regs say, right?

18   A.    I haven't looked at that for some time.  Again, if you

19   pulled that out of the reg -- if I could see that copy to see

20   what it's referencing?

21   Q.    Sure.

22              THE COURT:  Why don't we take a break?

23              MR. FINCH:  I apologize, Your Honor.

24              THE COURT:  About that time anyhow.  Come back at 10

25   minutes after 11.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1        MR. FINCH:  Okay.

2    (Recess at 10:54 a.m.  Court resumes at 11:11 a.m.)

3        MR. FINCH:  Your Honor, ready to proceed?

4        THE COURT:  Yes.

5    Q.   Mr. Henshaw?

6    A.   Yes.

7    Q.   When we broke, we were discussing the environmental

8    protection agency regulations and the definition of

9    friability.  And there is a definition, "category one,

10   nonfriable asbestos-containing material, means

11   asbestos-containing packets, gaskets, resilient floor covering

12   and asphalt roofing products containing more than 1 percent

13   asbestos."

14       You've had an opportunity -- you have the regulations in

15   front of you, and you would agree that that is correct, right?

16   A.   That is correct.

17   Q.   Okay.  And you would agree that Garlock gaskets and

18   packings would fall into the definition of category one

19   nonfriable asbestos-containing material, correct?

20   A.   I believe that's correct, yes.

21   Q.   Okay.  And you also agree that if asbestos gaskets are

22   sanded, grinded, cut, or abraded, they are to be treated the

23   same as friable asbestos material under the EPA regulations,

24   correct?

25   A.   Well, I know that you can generate fibers, certainly,

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    when you do it that way.  And you're referring -- do you have

2    that piece of regulation?

3    Q.   It's in that same piece of paper that I just handed you.

4    If you turn to Section 61-141, which is -- it's got page 93 at

5    the bottom of mine.  You see there's a definition for

6    regulated asbestos-containing material, see that?

7    A.   Yes, sir, I do.

8    Q.   Okay.  By regulated that means when you have to take

9    precautionary measures.  That's what the regulations are

10   about, right?

11   A.   There are certain precautionary measures, that's correct.

12   Q.   Right.  And it means friable asbestos material, category

13   one, nonfriable asbestos-containing material that has become

14   friable.  And we just established that category one nonfriable

15   asbestos-containing material would include a Garlock gasket,

16   right?

17   A.   Category one nonfriable would include a Garlock gasket.

18   Q.   And so category one nonfriable asbestos-containing

19   material, which means you see a little red dot there, that's

20   where I'm at.

21   A.   I do.

22   Q.   So we can -- replace category one nonfriable

23   asbestos-containing material would include Garlock gaskets,

24   right?

25   A.   That's -- most part that's correct, yes.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   Q.   So if a Garlock gasket that will be or has been subjected

2   to sanding, grinding, cutting or abrading, it will be treated

3   as a regulated asbestos-containing material, correct?

4   A.   Certainly it is a asbestos-containing material.  I'm not

5   sure what you're getting at, however.

6   Q.   Well, if a -- you have -- you testified in the past that

7   if asbestos gaskets are sanded, grinded, cut or abraded, they

8   are to be treated the same as friable asbestos material.

9   That's what this regulation says, right, sir?

10  A.   What this regulation basically says is, if you grind,

11  sand, and cut and abrade, you can generate asbestos fiber.

12  Q.   And that therefore it has to be treated the same as

13  friable asbestos material under the definition of regulated

14  asbestos-containing material, correct?

15  A.   Well, there is rules on friable material, and then there

16  are rules that deal with category one, Nonfriable, if you

17  sand, grind and cut and abrade, that is correct.

18  Q.   And if you sand, cut, grind or abrade a Garlock gasket,

19  it will be treated just the same as friable asbestos material

20  under this regulation?

21  A.   Well --

22  Q.   Under this definition of this regulation?

23  A.   We're talking about definitions, not the treatment of

24  various products.  Talking about definitions.

25  Q.   Under this definition, if a Garlock gasket is sanded,

CROSS - HENSHAW

1  grinded, cut, or abraded, it gets treated as a regulated

2  asbestos-containing material, just like a friable

3  asbestos-containing material?

4  A.   No, it's not just like a friable asbestos material.   Does

5  it fall under that definition?   Yes.   If you sand, grade,

6  grind, you can generate asbestos fiber, therefore EPA has some

7  rules to follow if you do that.

8  Q.   All right.   That was my point.

9           THE COURT:   Before you go on, we're talking about

10 EPA or OSHA?

11           MR. FINCH:   This is EPA.

12           THE COURT:   This is EPA regulation.

13           MR. FINCH:   This is EPA.

14           For the record, the EPA regulation is 29-CFR-61 --

15 Section 61.141.

16           THE WITNESS:   No, sir.   It's not 29-CFR.

17           MR. FINCH:   Excuse me.   It's in Code of Federal

18 Regulations 61 --

19           THE WITNESS:   I believe it's 41.

20           MR. FINCH:   Forty-one.

21 Q.   All right.   In your exposure assessment you rely on

22 deposition testimony in determining frequency of gasket work,

23 duration of gasket work, frequency of insulation removal,

24 duration of insulation removal, and the proximity of bystander

25 to insulation, right?

CROSS - HENSHAW

1   A.   That is correct, yes, sir.

2   Q.   Most of the depositions that you had access to or got

3   from Garlock, were taken in the 2005 to 2010 timeframe, is

4   that when the bulk of them were?

5   A.   I don't recall exactly.  Certainly the historical cases

6   may be older.  I remember maybe in the 1990's timeframe.  But

7   I can't say all of them were in that timeframe, but generally

8   that's probably true.

9   Q.   Generally of the depositions you reviewed of the -- you

10  had the 20-plus -- let's clear this up.  You had 27 historical

11  depositions that cases -- they were over before Garlock went

12  into bankruptcy.  Either they had settled, or they were

13  dismissed, or they had gone to verdict or whatever.  Those

14  cases are done.  They weren't part of the pending claimants'

15  universe, right?

16  A.   Yes, sir.  That's my understanding.

17  Q.   Okay.  So those are the first 27 depositions you got, and

18  they were provided to you by Garlock's lawyers, right?

19  A.   Yes, sir.  That's correct.

20  Q.   Okay.  And you don't know what the criteria was that

21  Garlock applied to find those first 27 depositions, correct?

22  A.   No.  What I specified was -- I want the most informative

23  testimony that I can find in respect to frequency and duration

24  of gaskets and other sources of asbestos.

25  Q.   Okay.  That's what you told Garlock's lawyers you wanted.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1  You don't know how many depositions historically they had
2  access to pull those 27, correct?
3  A.   No, sir.  I just told you my criteria.  I don't know what
4  the universe was from their side.
5  Q.   Okay.  So Garlock's lawyers -- you said, get me the most
6  representative testimony.  And Garlock's lawyers pulled 27
7  historical cases for you to look at, right?
8  A.   That's correct.  I was specific about it.  I wanted
9  frequency of duration and conditions, workplace conditions to
10  the extent I can get that.
11  Q.   Okay.  So you don't know if Garlock has thousands or even
12  10,000 depositions and historical cases that has access to.
13  You don't know what that number is, correct?
14  A.   I don't know what the universe is, no.
15  Q.   Would it surprise you to learn that Garlock has been sued
16  several hundred thousand times in asbestos cases?
17  A.   I have no idea, sir.
18  Q.   So you don't know of those several hundred thousand
19  asbestos cases, how many of them were depositions where there
20  was some testimony about gasket work?
21  A.   Sir, I don't know what the universe is like.
22  Q.   Okay.  So in any event, Garlock selected the 27
23  depositions, and you relied on the testimony of the people in
24  those, the workers in those 27 depositions, at least in part
25  in forming your opinions here, is that fair to say?

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1  A.   Well, as I stated earlier, it was for -- to get a

2  representation of the data that I could get from the

3  depositions.  Because we didn't have the depositions.  So I

4  only had the 27.  So the depositions came later, the 249

5  depositions came later.

6  Q.   Okay.  The "we" in that sentence was we at ChemRisk

7  didn't have the depositions.  Garlock's lawyers had some

8  number of depositions which you don't know, correct?

9  A.   As I said, I don't know what the universe was like.

10  Q.   Okay.  So you got the 27 historical depositions, and then

11  you got, I think your slide said something around 300

12  additional depositions that came in through the questionnaire

13  litigation process, right?

14  A.   No, sir.  It was about 547 I believe, which represented

15  306 of the claimants.

16  Q.   I misspoke.  There was 300 people, and you got about 500

17  depositions.  So on average, one or two depositions per 300 --

18  per case, right?

19  A.   Well, that -- if you just take the raw numbers, that's

20  about correct, yes.

21  Q.   Okay.  Some cases might not have had a deposition, other

22  cases might have had five depositions.  But if you average it

23  out, you got 500 depositions?

24  A.   Well, all -- all the 306 had depositions.  Some had

25  multiple depositions.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1  Q.   Okay.  That's all I was getting at.  And that universe of

2  depositions, that's -- it's your understanding that those

3  depositions came from people who had responded to

4  questionnaires as part of the discovery in this bankruptcy

5  case; is that right?

6  A.   They're part of the claimants in this bankruptcy case.  I

7  got 400 or 249 of all the depositions that were available,

8  initially, after the 27 historical cases.  Then I asked for

9  some more.  And that's when the supplemental questionnaire was

10 sent out to, I think, 471, of which I got about 400-plus back.

11 Q.   Okay.

12 A.   And some of those contained depositions.

13 Q.   Okay.  And ballpark it, you had about 500 depositions in

14 addition to the 27 historical depositions; is that right?

15 A.   Little more, obviously, 547 I believe.

16 Q.   Okay.  And of the 520 -- 547 minus 27 -- the 520

17 depositions, the great majority of those were depositions

18 taken in the 2005 to 2010 timeframe, right?

19 A.   Again, I don't recall the precise years.  I did not focus

20 on that.  I was focusing on the detail in the depositions in

21 respect to frequency of handling gaskets and packings and

22 other sources.  So I can't say what the exact dates were.

23 Q.   Well you know that a lot of them were in the 2005 to 2010

24 timeframe, right?

25 A.   Yes, sir.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1  Q.   You cite to -- in your report, some of the depositions

2  you cite to are dated in 2002, like on page 39 -- 2010, like

3  on page 39 of your report.  That's one of the ones you cite

4  to, right?

5  A.   Yes.

6  Q.   So -- and you rely on those depositions for two purposes,

7  you also got six ACC depositions, right?

8  A.   That's part of 306 claimants, yes, sir.

9  Q.   Okay.  And you don't know -- you've heard of the ACC, the

10  Atlantic Coast Conference Basketball Conference before this

11  case, right?

12  A.   Yes, sir.

13  Q.   Have you ever heard of the ACC that -- I represent the

14  ACC, the Asbestos Claimants Committee and Mr. Inselbuch and

15  others do in this case.  You ever heard of that before this

16  case?

17  A.   No, sir.

18  Q.   Okay.  So you didn't know what it was, or how Garlock

19  selected -- why -- how or why it selected those six ACC

20  depositions, right?

21  A.   No, sir, I don't, except they are part of the committee,

22  they're representative of the committee.  I don't know the

23  precise language.

24  Q.   Okay.  And then you primarily focused on depositions in

25  your assessment.  You didn't read every affidavit or

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    interrogatory that might have been submitted with the

2    claimant's information that you got in response to

3    supplemental questionnaires, right?

4    A.    No, sir.  I read every affidavit, as well, that was

5    submitted.

6    Q.    Okay.  You didn't read all the interrogatory answers,

7    correct?

8    A.    No, sir.

9    Q.    And then let's -- focusing just on the universe of the

10   500 depositions.  You relied on that for two purposes.  One,

11   to assess gasket exposure.  And two, to assess exposure to

12   thermal insulation; is that right?

13   A.    To the extent I could.  I wanted descriptions in respect

14   to frequency and duration and proximity to gasket and packing

15   activity, as well as insulation activity.

16   Q.    Okay.  And in many of those depositions, the claimants or

17   other people testified about people doing gasket work where

18   they were also being exposed to thermal insulation, correct?

19   A.    That's correct.

20   Q.    Okay.  The duration of gasket work, you showed some

21   slides to the court where you estimated the duration and

22   removal was estimated at 30 minutes; is that right?

23   A.    That's correct, yes.

24   Q.    And you cited papers offered by Amy Madl as part of your

25   estimation of gasket work, correct?

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   A.   That's correct, yes.

2   Q.   She works for ChemRisk, and you know she's an expert for

3   defendants in -- for gasket defendants in asbestos litigation,

4   correct?

5   A.   Yes, sir.

6   Q.   You cited papers to Mister -- by Mr. Boelter, correct?

7   A.   Yes, sir.

8   Q.   And Mr. Mangold, who you know Garlock has funded his

9   research, correct?

10  A.   Yes, sir.

11  Q.   In your duration of gasket work section of your report,

12  you cite to only one deposition of Mr. Dagle who was one of

13  the 27 depositions selected by Garlock; is that correct?

14  A.   I believe that's correct.

15  Q.   You didn't include any time for cleanup, correct, in your

16  estimates?

17  A.   No, I did not include time for cleanup.

18  Q.   Okay.   Even under your assessment, a substantial

19  percentage of occupational groups did have at least some

20  opportunity for exposure to asbestos from gaskets, correct?

21  A.   Yes.   From one to four, I estimated what that exposure

22  would be for gaskets and packing.

23  Q.   Right.

24  A.   Either direct or bystander.

25  Q.   Right.   And one was obviously higher than four, but there

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   were lots and lots and lots of different occupations under

2   one, two, three and four, correct?

3   A.   All four, there were lots of occupations and industry

4   combinations in one through four, that's correct.

5   Q.   Okay.  Now you said when you put people in -- you put --

6   there was also a category five where you would put people if

7   their occupation and industry didn't make any sense.  And I

8   believe the example you cited the court is if somebody said

9   they did brake work at an asbestos manufacturing facility; is

10  that right?

11  A.   No, sir.  That's not correct.  I said doing automotive

12  work, not necessarily brake work in asbestos manufacturing.

13  Q.   Okay.  Doing automotive work in an asbestos manufacturing

14  facility?

15  A.   Industry --

16  Q.   Industry.

17  A.   Yes, sir.

18  Q.   And asbestos manufacturing industry would be something

19  like a company that makes asbestos-containing thermal

20  insulation, that would be the asbestos-manufacturing industry?

21  A.   I believe that's -- yes, that would be the manufacturing

22  industry, that's correct.

23  Q.   So a company like Owens Corning would be an example of a

24  company in the asbestos-manufacturing industry, right?

25  A.   At one time, that's correct, yes.

CROSS - HENSHAW

1   Q.    And people who do automotive work can be exposed to

2   gaskets, correct?

3   A.    To some extent, but I did not incorporate the automotive

4   industry into my assessment.

5   Q.    Okay.  You would recognize that Owens Corning could have

6   had people that were its employees that were automotive

7   workers, right?

8   A.    I suspect there are motor pools and there may be people

9   working in the machine shop.

10  Q.    Okay.  Now you would agree with me that all of these

11  organizations have stated that there is no safe level of

12  exposure to any type asbestos, right?

13  A.    I am aware of many of those policy statements, yes.

14  Q.    Okay.  And you just testified on direct that in your

15  view, the OSHA regulations provide a safe level of exposure to

16  asbestos, even for cancer; is that correct?

17  A.    Yes, sir.

18  Q.    All right.  The OSHA regulations -- you're familiar with

19  the OSHA regulations.  You were the head of OSHA, right?

20  A.    I am familiar, and I was the head of OSHA, yes.

21  Q.    In June of 1986 they published regulations.  And they

22  stated in June 1972, "OSHA promulgated a new final standard

23  that established an eight-hour time weighted average PEL of 5

24  fibers per cubic centimeter, and a ceiling limit of 10 fibers

25  per cubic centimeter.  These limits were intended primarily to

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1  protect employees against asbestosis, and it was hoped they

2  would provide some incidental degree of protection against

3  asbestos-induced forms of cancer."  That's what OSHA said in

4  1986, correct?

5  A.    That's the information OSHA had in 1972.

6  Q.    All right.  And then in 1994 it published the current

7  regulations for asbestos, correct?

8  A.    Yes, sir.

9  Q.    That's a page out of the Federal Registry August 10,

10  1994.  The day before my birthday.  And it says, "A

11  significant risk remains at the PEL of 0.1 fibers per cc, and

12  it is feasible to attain lower levels for some workers exposed

13  to asbestos."

14      That's -- OSHA said that there is still significant risk

15  remaining at the level they were setting the exposure limit

16  at, right?  That's what they said?

17  A.    This comes out of the preamble of the standard which

18  justifies the rule making.  And it's based on the linear no

19  threshold extrapolation of data that was used in late '70s

20  that Nicholson put together in the early '80s.

21      So it's based on high-level exposure primarily to mixed

22  fibers and amphibole.  That's the mathematical extrapolation.

23  That's where that came from.

24  Q.    OSHA goes on, these regulations are about 50 pages thick.

25  And is says, "after a comprehensive review of the evidence

Laura Andersen, RMR 704-350-7493

1  submitted concerning the validity of the 1984 risk assessment,

2  OSHA has determined that it will continue to rely on the

3  earlier analysis.  The agency believes that the studies used

4  to derive risk assessments remain valid and reliable, and that

5  OSHA's decision to not separate fiber types for purposes of

6  risk analysis, is neither scientifically nor regulatory

7  incorrect."  That's what OSHA wrote in 1994 in connection with

8  these regs, correct?

9  A.   That is correct.  The '84 risk assessment, and from a

10  regulatory standpoint, that's the position the agency took.

11  Q.   And you know that there was a public comment procedure --

12  period before these regulations were published, right?

13  A.   That's part of the rule-making process, yes.

14  Q.   People could submit whatever information they wanted to

15  OSHA, correct?

16  A.   Well, not whatever they wanted, but yes.  Good

17  information, that's what the agency needs to properly rule --

18  rule make.

19  Q.   Second, the regulations go on to state, the Federal

20  Register says, "As stated in the 1986 asbestos standard, even

21  if OSHA were to accept the premise, which it does not, a

22  chrysotile may present a lower cancer risk than other asbestos

23  fiber types, occupational exposure to chrysotile asbestos

24  still presents a significant risk of disease at the revised

25  PEL."  That's what OSHA wrote, right?

CROSS - HENSHAW

1   A.   That's in the '86 standard.  Yes, that's correct.  Again,

2   based on that linear no threshold extrapolation.

3   Q.   But OSHA -- and before it published this reg in 1994, got

4   new evidence -- "Some new evidence on the issue of

5   differential risk of asbestos fiber types was submitted by

6   both supporters and detractors of that theory.  Among the

7   studies submitted in support of the lowered risk of chrysotile

8   asbestos, are those of Churg and others showing that the lung

9   burden of mesothelioma victims is predominantly amphiboles,

10  even though high chrysotile exposure levels were reported.  As

11  noted above, this line of argument was presented in the

12  earlier asbestos rule making, and OSHA had concluded that lung

13  burden studies are inconclusive."

14       That's what OSHA wrote in 1994, correct, sir?

15  A.   Based on the earlier rule making that's correct.

16  Q.   And they got new submissions from organizations including

17  the Asbestos Information Association in the 1990 -- in --

18  reaching the 1994 regs, right?

19  A.   I don't know all the sources of information during that

20  process.

21  Q.   "OSHA believes that its conclusion to treat all asbestos

22  fibers as having similar potency in the occupational setting

23  remains valid."

24       Are you aware that the -- can I have the '94 regs?

25            MR. FINCH:  May I approach, Your Honor?

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1           THE COURT:  Yes, sir.

2    Q.   Mr. Henshaw, I'm showing you the first copy of the regs.

3    It says that, "several major participants in the rule-making

4    proceeding included the AFL-CIO, the building and construction

5    trades, Department of AFL-CIO --

6           COURT REPORTER:  I'm sorry, can you slow down,

7    please.

8           MR. FINCH:  -- the building and construction trades,

9    Department of AFL-CIO and the Asbestos Information

10   Association."  Do you see that?

11          THE WITNESS:  I see the statement saying

12   "including".  They're not all inclusive.  They haven't

13   identified everyone who is participating.

14   BY MR. FINCH:

15   Q.   Are you aware that Garlock, at one time, was part of the

16   Asbestos Information Association?

17   A.   I vaguely recall, but I don't know.  I just don't -- I

18   don't recall that.

19   Q.   You wouldn't dispute it, would you?

20   A.   I'm not going to dispute it, no.

21   Q.   You know that NIOSH is the research arm for OSHA, right?

22   A.   It's the research arm for Occupational Safety and Health,

23   and OSHA and NIOSH work together, yes.

24   Q.   Okay.  And NIOSH put out a road map in 2011, correct,

25   sir?

CROSS - HENSHAW

1   A.   Yes, sir.

2   Q.   And in the road map they continue to say, do they not,

3   that the permissible exposure limit now does not protect

4   against the risk of cancer, right?

5   A.   Again, because of that quantitative risk assessment, no

6   threshold model.  That's correct.

7   Q.   You know that in 1976 the revised recommended asbestos

8   standard -- the standard was recommended with the stated

9   belief that "it would prevent asbestosis, and with the open

10  recognition that it would not prevent asbestos-induced

11  neoplasm."

12      Do you know that's what the Department of Health,

13  Education and Welfare for NIOSH stated in 1976, right?

14  A.   That's NIOSH criteria document published in 1976.  That's

15  correct.

16  Q.   And in that criteria document they listed studies of

17  human populations carcinogenicity, and they had for mixed type

18  of fibers, they list six or seven different studies, and the

19  finding is evidence of association between mesotheliomas and

20  past exposure to asbestos, and for the group and exposure --

21  occupational exposures in some cases as brief as one day.

22  That's what NIOSH -- those studies are what NIOSH is relying

23  on in 1976, correct?

24  A.   They were some of the studies that they cited in their

25  criteria document.

CROSS - HENSHAW

1   Q.   And then the British Thoracic Society is not a regulatory

2   body, is it, sir?

3   A.   Not that I know of.

4   Q.   It's a medical society in -- I guess it's still a

5   kingdom, the Kingdom of Great Britain, right?

6   A.   Yes, sir.

7   Q.   And the British Thoracic Society has stated there is no

8   evidence for a threshold dose of asbestos below which there is

9   no risk, correct?

10   A.   I haven't seen the study or seen the evidence here, but I

11   have no reason to quibble with that.

12   Q.   Now let's talk about the types of asbestos that have been

13   used in the world.  That is a picture that Captain Wasson, who

14   was an expert for Garlock on piping systems, showed the judge

15   on Monday.  And this is hard thermal insulation.  And this is

16   one of these portable pads.  Is that consistent with your

17   understanding of what this would be?

18   A.   It appears to be pads that have been sewn in.

19   Q.   You can't tell from looking at that whether -- who made

20   that insulation, right?

21   A.   No, sir, I can't.

22   Q.   And you agree with me when you were reviewing the

23   testimony of the current claimants, I'm talking about the 27,

24   and I'm not talking about -- excuse me.  I am not talking

25   about the 27, but for the 500-some, they freely admitted that

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1  oftentimes they would have been exposed to asbestos from

2  thermal insulation during either their own activities or other

3  people doing stuff around them, right?

4  A.    Yes, sir.

5  Q.    Okay.  And sometimes they might know if they were there

6  when somebody was putting insulation in and they happened to

7  see a box and it said Kaylo, some of the times the people

8  would say, yes, I know the name of the insulation.  But for a

9  lot of the removal activities, many of the times the claimant

10 or whatever co-worker was testifying, would have no idea who

11 made the insulation, but would say yeah, I know it was thermal

12 insulation, I just don't know who made it.  You recall

13 testimony like that when you reviewed your 500 depositions,

14 right?

15 A.    I recall testimony of identifying various products.  I

16 don't know how they recalled that.  But they identified

17 numerous asbestos-containing insulation products.

18 Q.    So even in the current claimant depositions, a lot of the

19 claimants would say, oh yeah, I remember that there was

20 unibestos there.  I remember there was Johns-Manville

21 thermabestos (phonetic) there.  Some of them did freely say

22 what they could recall about the name brand of the insulation,

23 right?

24 A.    That's correct, yes.

25 Q.    Some of them didn't know the name brand of the

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   insulation, but they said, yeah, I'm sure it was thermal

2   insulation, I just don't know who made it, right?

3   A.    There were some obviously couldn't recall brands, but

4   there were many who recalled the brands.

5   Q.    And this was for the depositions in the 500-claimant

6   universe in which -- of people who have claims pending right

7   now against Garlock?

8   A.    Yes, sir.

9   Q.    Okay.  Now this asbestos thermal insulation comes in

10  different types, you would agree with that, right?

11  A.    It does come in different types.  When you say types, I

12  think you mean by shapes and forms.

13  Q.    Shape, sizes --

14  A.    -- concentrations.

15  Q.    And concentrations of asbestos, right?

16  A.    Yes, sir.

17  Q.    And there is what's called half rounds which are defined

18  as friable asbestos that you can crumble, right?

19  A.    That's correct.

20  Q.    And half rounds can have differing concentrations of

21  asbestos.  Can have chrysotile with a little bit of amosite,

22  or chrysotile with a lot of amosite, or just chrysotile,

23  right?

24  A.    Depending on the year.  Obviously there was a switch out

25  in various fiber types over the years.  But it could vary in

CROSS - HENSHAW

1  the mixture of asbestos fibers.

2  Q.   And in the cement, the insulating cement that goes over

3  top of the pipe, that's almost usually always chrysotile,

4  right?

5  A.   Not entirely, but a majority would be chrysotile.

6  Q.   Then there would be cloth wrap around the pipe, and that

7  could be oftentimes -- most of the time that was -- if it was

8  a wrapped cloth around a half round, it was usually chrysotile

9  cloth, right?

10  A.   That's correct.

11  Q.   And the -- you haven't done any testing of various types

12  of asbestos insulation to find out whether even in what's

13  called amosite thermal insulation, whether it was a majority

14  chrysotile, and some amosite, or vice versa, right?   You

15  haven't done that kind of testing in your life?

16  A.   I certainly have reviewed the literature in respect to

17  what's reported in the various types.   But I have not

18  specifically done that analysis myself.

19  Q.   Okay.   Now you have cited literature about -- in your

20  report, you cited to a paper by Virta in 2005 that's about --

21  I'll get you references here.   Let's see.   Do you have your

22  report up there?

23  A.   Yes, sir, I do.

24  Q.   Virta 2005, Mineral Commodity Profiles-Asbestos, USGS

25  Circular 1255-KK.   You cite to that on page 55 of your report,

CROSS - HENSHAW

1  correct?

2  A.    Yes, I do.

3  Q.    You're familiar with that document?

4  A.    Yes, I am.

5  Q.    And this graphic that I have shown up on the screen here

6  comes right out of that Virta document, correct?

7  A.    It does.

8  Q.    And that shows the world's use of asbestos -- world

9  production of asbestos by type from 1900 to 2003.  And the

10 purple color there is chrysotile.  Do you see that?

11 A.    Yes, sir, I do.

12 Q.    So, just eyeballing this, you would agree with me the

13 overwhelming amount -- the overwhelming production of asbestos

14 by fiber type in the world for the past 100 years has been

15 chrysotile, right?

16 A.    This is volume.  This is based on volume sold.  With

17 thousands of products that contained asbestos, majority of

18 them contained chrysotile.

19 Q.    And so this is the page before on Virta where the talk

20 about U.S. apparent consumption of asbestos from 1900 to 2003.

21 About 25.6 million metric tons of chrysotile, about 282,000

22 metric tons of amosite were used in the United States, right?

23 A.    Again, that's total for all products.  If you look at

24 specifically what products had, you'll notice that amosite is

25 a predominant product or fiber in insulation.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    Q.   In some types of insulation, correct, sir?

2    A.   Well certainly not a cloth, because you can't weave

3    amosite.  A cloth is a wrapping around it.  That's correct.

4    Q.   All right.  You're familiar with this document.  This was

5    published by AIHA in conjunction with an alliance with -- it's

6    an OSHA-cooperative program, correct?

7    A.   Yes, sir.  I'm aware of that.

8    Q.   Okay.  And this was published and became available on the

9    AIHA web site and the OSHA web site at the time that you were

10   the director of OSHA, correct?

11   A.   I don't know when -- certainly when I was director of

12   OSHA, we created the alliance program.  I don't know when this

13   was written.

14   Q.   Okay.  And this is talking about asbestos-containing

15   floor tiles, right?

16   A.   Yes, sir.

17   Q.   And asbestos-containing floor tiles, I think you would

18   certainly agree, are made of encapsulated chrysotile asbestos,

19   if they have any asbestos in them at all, correct?

20   A.   That's correct.  As far as I know, yes.

21   Q.   And what this OSHA alliance AIHA document says is, when

22   asbestos floor tiles are abraded, minute asbestos fibers are

23   released into the air and get trapped in the lungs.  Asbestos

24   is a known human carcinogen, and no known safe threshold --

25   with no known safe threshold of exposure."

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1      That's what was written in the document, which is

2   intended for the lay public to read and rely upon, right?

3   A.   It is intended for the lay people to rely upon.  But the

4   alliance program was all about -- associations like AIHA help

5   OSHA get their message out, and that's what the purpose of

6   alliance program is all about.

7   Q.   And it says in this document, does it not, sir, "that

8   inhaling asbestos fibers can also lead to cancer of the lining

9   of the lungs or the abdomen, which is always fatal."

10      And by that, "cancer of the lining of the lungs or

11   abdomen", they're referring to mesothelioma there, right?

12   A.   Yes, sir, they are.  And this is basically the OSHA

13   language.  And AIHA is helping get the message out to the

14   community.

15   Q.   All right.  I want to talk with you briefly about what

16   some other corporations have said about the potential

17   exposures or hazards from gasket works.

18      You are familiar with this document from Johns-Manville,

19   it's a series of memos that we obtained from the Manville

20   Trust.  You've seen this document before, have you not,

21   Mr. Henshaw?

22   A.   I can't say for sure.  I've seen a number of

23   Johns-Manville memos.  But I can't -- I would have to look at

24   the entire document.

25          MR. FINCH:  Your Honor, may I approach the witness?

CROSS - HENSHAW

1          THE COURT:  Yes.

2          MR. FINCH:  I will mark this as ACC Exhibit No. 5

3    and I'm going to offer it.

4          MR. HARRIS:  He's offering it now, Your Honor, but

5    we would object to the admission of this document on the

6    grounds of relevance and authentication.

7          THE COURT:  Overruled.  He may examine him about it.

8          MR. FINCH:  Your Honor, the authentication and the

9    fact that it's a business record is established by the

10   certification of the administrator of the Manville Trust on

11   the first two pages of the document.

12         And I think under the Federal Rules of Evidence it

13   meets the authenticity requirement based on that

14   certification, as well as the exception under hearsay of the

15   business rule.  It's also an ancient document.  And the

16   authentication rule requires -- complies with Rule 901 and 902

17   under the Federal Rules of Evidence.  So I'm offering this

18   substantively.

19         MR. HARRIS:  Is this on your exhibit list?

20         MR. FINCH:  Yes, it is.

21         MR. HARRIS:  What's the exhibit?

22         MR. FINCH:  I don't have the exhibit number.  It is

23   on our exhibit list.  I don't know the exact --

24         THE COURT:  Go ahead and we'll allow an examination.

25         MR. FINCH:  Okay.


                    Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   Q.   So, this is a document that you were shown in the Newport

2   News trial, isn't it so Mr. Henshaw?

3   A.   I don't recall.

4   Q.   What the document is, it's a document on Johns-Manville

5   from people within -- you recognize Johns-Manville as the

6   major maker and miner and seller of asbestos products in the

7   world, right?

8   A.   I don't know world, but I know it's a major producer --

9   it was a major producer, yes, sir.

10  Q.   Okay.  What they're saying is, they're trying to figure

11  out what products have to be labeled under new OSHA asbestos

12  regulations.  And it says, "this will confirm our conversions

13  regarding which JM products shall be labeled under new OSHA

14  regulations."

15       And they write, "We further recommend that all divisions

16  carefully scrutinize each product on a so-called locked-in

17  list to determine which, if any, are capable of producing

18  asbestos fiber levels in excess of the published limits when

19  they are cut, sawed, grilled, fitted, ground, machined or

20  otherwise handled in normal uses by our customers.  Some

21  examples of products that should be viewed closely are number

22  four, certain gasket material that is shipped to a customer,

23  subsequently cut material using a band saw."

24       You see that on the second page of the document, correct,

25  sir?

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   A.   I see that language, yes.

2   Q.   Okay.  And then that memorandum was written June --

3   July 12, 1972, right?

4   A.   Yes, sir.  Yes.

5   Q.   And then about a year later on June 14th, 1973, other

6   people within Manville write that, "we are receiving requests

7   from customers of my products asking if using the JM products

8   in their plants presents health hazards or breaks the law as

9   far as OSHA requirements are concerned.  As you know, the part

10  of my product line that contains asbestos is compressed sheet

11  packing."

12      The Manville employee writes, "The asbestos fiber's

13  entirely encapsulated in sheet packings and coated fabric, and

14  I believe should create no health problems.

15      "However, I would like all five of the above product

16  lines tested for compliance to OSHA requirements when they are

17  normally used in my customers' plants.

18      "I will need a documented research report of your

19  findings to submit to customers to protect JM business.  Our

20  customers may do all or some of the following things with our

21  products:

22      "Receive, reship, unpack, store, cut, shear or band saw.

23  Slit, die cut gaskets, punch gaskets, drill, laminate and

24  fold."

25      So he's asking that there be tests done on the products

CROSS - HENSHAW

1    which include the gasket products, correct?

2         MR. HARRIS:  Objection, Your Honor, it's misleading.

3    He didn't show the other five products -- or the other four

4    products in the list, all of which are actually used as gasket

5    material.  So compressed sheet gaskets is just one, but the

6    others, the asbestos felt, or paper, millboard and felt and

7    coated asbestos fabrics are used to cut gaskets.  And so it's

8    misleading unless the entire list is read.

9    BY MR. FINCH:

10   Q.   Let me rephrase the question.  You would agree with me

11   that the letter says, "we are receiving requests from

12   customers for the products," right?

13   A.   Yes, I see that.

14   Q.   And then it goes on, "the part of my product line that

15   contains asbestos is compressed sheet packing, asbestos paper

16   and roll board, asbestos millboard, asbestos felt, and coated

17   asbestos fabrics."  He's asking that those things be tested,

18   right?

19   A.   Well, I think what he's saying here is, that's part of

20   his product line.  He covers all of those five items.

21   Q.   Okay.  And in the next letter, June 22nd, 1973, people at

22   Manville write:  "There is no question in our minds that any

23   fabrication of asbestos paper, roll board, millboard, and

24   probably asbestos felt, result in levels far above OSHA

25   requirements.  This certainly would cover cutting, sawing,

CROSS - HENSHAW

1   band sawing, slitting, drilling and probable die cutting and

2   punching of gaskets."

3       That's what Manville wrote in 1973, right?

4   A.   I see that language, and that's sort of a pejorative

5   discussion but -- where they're talking about it could

6   generate levels above the OSHA standard.  And no doubt using a

7   band saw and millboard that will do it.

8   Q.   They also say probable die cutting and punching of

9   gaskets in that sentence too, don't they, sir?

10  A.   They talk about probable.  I don't know what testing was

11  done in that case.

12  Q.   This is the Dow Chemical Corporation.  You're familiar

13  with this study -- you've seen this report, correct?

14  A.   Yes, sir, I have.

15  Q.   And Dow -- this is a report dated April 1973, and Dow

16  states that "concentrations of asbestos in the general

17  atmosphere during the cutting of gaskets was found to be

18  borderline when compared to the federal regulation, but may be

19  significant when considering possible carcinogenesis."

20      That's what Dow wrote in 1973, right?

21  A.   This came out of that report.  I wouldn't call it a

22  study, but it's a report of a survey that was done at the

23  time.

24  Q.   Right.  And the fiber levels they found at Dow for

25  cutting gaskets ranged from the 2 to 5 fibers per cc, right?

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    A.   I recall they had numbers in that range, but those aren't

2    the precise numbers, I don't believe.

3    Q.   They were in that order of magnitude, right?  They

4    weren't .002 or anything like that?

5    A.   It depends on what activity was monitored in that survey.

6              MR. FINCH:  May I approach, Your Honor?

7              THE COURT:  Yes.

8              MR. FINCH:  (Handing paper writing to the witness.)

9         I don't have slides for this.  I'll just ask the

10   witness about it.

11   Q.   The activities monitored are described on page 2 of the

12   report, correct, Mr. Henshaw?

13   A.   It's not a Dow Corning, it's Dow Chemical.

14   Q.   It's a Dow Chemical -- I misspoke.  It's Dow Chemical.

15   And what they say in the conclusion section on page 2 is that

16   "asbestos fibers are liberated by the gasket cutting operation

17   in significant quantities, and found in the atmosphere

18   throughout the building."

19        Then they go on to list the concentration of asbestos

20   fibers that they found, correct?

21   A.   I see the results.  This didn't make my cut because it

22   doesn't talk about the methodology or -- I don't know whether

23   there's any background exposure in this -- where the study was

24   done, or where the --

25   Q.   Okay.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   A.   -- samples were taken.

2   Q.   You would agree that Dow Chemical Corporation is not an

3   organization that works for plaintiff lawyers in asbestos

4   litigation, correct?

5   A.   Dow Chemical and the folks who did this would be just

6   exactly what I did when I was with my company as an industrial

7   hygienist.

8   Q.   And if this was a document that was done not -- was

9   created not for purposes of use in litigation.  Dow was trying

10  to figure out what to do.  And what they concluded was, that

11  the cutting of gaskets was found to be borderline when

12  compared to the current OSHA -- current federal regulations,

13  but may be significant when considering the possible cancer

14  effects," correct?

15       That's what Dow was worried about?

16  A.   What they were worried about is the extent to which those

17  operations exceeded the OSHA standard.  They did not study

18  whether -- what the contributions -- where the contributions

19  were coming from.  This is exactly what I did.  I'm looking

20  at, is this work environment exceeding the OSHA standard

21  regardless of where the fibers are coming from.

22       So this is not a gasket study.  It's a study that's

23  associated with gaskets, but it does not give me enough

24  information here to say that's where the fibers came from.

25  Q.   Well, there's nothing in this that says there was any --

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    this was in 1973, correct?

2    A.    Yes, sir.

3    Q.    And this was cutting gaskets, it wasn't removing gaskets

4    from flanges, correct?

5    A.    That's some of the breathing zone samples were taken

6    while operators were doing that kind of work.

7    Q.    And there's nothing in the document suggests there was

8    any thermal insulation in the area, correct?

9    A.    Sir, that's not -- that's not relevant.  They're

10   determining whether in fact it exceeded the OSHA standard, not

11   concern about where the source of the asbestos was coming

12   from.  Just as I said, that's what I did.

13   Q.    All right.  You're familiar --

14   A.    And whatever it took, our job was to keep it below the

15   OSHA standard.

16   Q.    But Dow also noted that even if it's borderline when

17   compared to the federal regulations, it would be significant

18   when considering the cancer effects.

19       Are you telling me that Dow didn't understand that

20   carcinogens can -- well -- strike the question.

21       You're familiar with General Electric Corporation, right?

22   A.    Yes, sir, I am.

23   Q.    This is Material Safety Data Sheet from GE, relating to

24   asbestos rubber sheet gaskets compressed made out of

25   chrysotile, see that?

CROSS - HENSHAW

1    A.   I see that, yes.

2    Q.   That's the same type of gasket, same composition of

3    gaskets that Garlock made, correct?

4    A.   I can't say it's the same composition.  Certainly the

5    neoprene, nitrile, rubber, that's part of the some of the

6    products at Garlock.  I can't say it's the exact composition.

7    Q.   Very similar in terms of asbestos content?

8    A.   Oh, asbestos content, yeah, 90, 60, 90 percent, that's

9    probably in the general range.

10   Q.   And it's chrysotile, right?

11   A.   Yes, sir.

12   Q.   And General Electric says, "the health hazards of these

13   materials results from the release of chrysotile asbestos

14   fibers from the composite mechanical release from cutting,

15   machining, grinding, sawing, drilling, et cetera, release from

16   deterioration of the bonding agent.  Excessive inhalation

17   exposure to such airborne fibers can have the usual effects of

18   chrysotile -- it's misspelled -- chrysotile asbestos.

19   Asbestosis, lung cancer and mesothelioma have resulted from

20   the exposure to asbestos fibers."

21        That's what GE concluded in 1982, right?

22   A.   Speaking of excessive exposures, that's correct.  That's

23   what they put in their MSDS.

24   Q.   Let's talk a little about thermal insulation and then you

25   and I will be done.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1      Am I correct that your assessment presumes exposure

2  levels only for pre-1972 exposures?

3  A.    That is correct.   Primarily because of the belief,

4  although it's not an accurate one, I know.   But after 1972 the

5  awareness level raised in a lot of our workplaces in respect

6  to exposure, because of OSHA standards.   And most of our

7  data -- most of the data that we've seen in the literature,

8  most of the data that I used are relevant to pre-1972

9  activities.

10 Q.    Somebody has three important messages but why don't we

11 disregard that.

12     Garlock sold asbestos-containing gaskets well into the

13 1990s, right?

14 A.    That's my understanding.

15 Q.    And there was testimony earlier in the week that the

16 median latency period for mesothelioma is about 35 years.

17 Which means half the cases will be exposed prior to 35 years

18 ago, and half would have had their first exposure less than 35

19 years ago?

20 A.    That's -- it's a range, but that's a generally

21 accepted -- there is the middle point and there's above and

22 below that, yes.

23 Q.    Okay.   And the gentleman seated beside Jonathan Guy is

24 Joseph Grier who represents the interest of future claimants.

25 Do you understand that?

CROSS - HENSHAW

1    A.   Now, I do, yes.  Thank you.

2    Q.   Okay.  And the future claimants have the biggest interest

3    in this case in the sense that this judge is going to be doing

4    an estimate of what the liabilities would be for mesothelioma

5    cases arising all the way out to the year 2040 or 2050.  Do

6    you understand that?

7    A.   Yes, sir, I do.

8    Q.   Okay.  Would you agree with me that by -- as we get

9    further out in time, more and more of the people who would

10   have -- could have been exposed to Garlock gaskets in the

11   '80s, are much less likely to have been exposed to insulation,

12   correct?

13   A.   Not necessarily.  The same level of awareness of

14   asbestos, whether it's in a compressed sheet gasket or

15   insulation.  But generally insulation was the focus in the

16   '70s, in respect to reducing exposures, and not gaskets and

17   packing.  But as we've already stated, the regulations

18   stipulated of handling all asbestos-containing products in a

19   certain way.

20   Q.   Right.  But my point is that the regulations in the '72

21   to '86 timeframe, people were much more aware about putting in

22   place controls for insulation, versus controls for gaskets,

23   right?

24   A.   Certainly the regulatory agencies were, because that's

25   where the exposure occurred.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1  Q.   And --

2  A.   And so that was an emphasis certainly in the '70s.

3  Q.   In your analysis you're assuming that there's not going

4  to be these types of high exposure levels to thermal

5  insulation after controls start coming into place, right?

6  A.   It depends on the industry, but certainly some industries

7  took greater effort to reduce exposures to insulation and all

8  forms of asbestos.

9  Q.   Right.  And so if in 1982 a pipefitter was going to go

10 and change a gasket and he knew that there was

11 asbestos-containing thermal insulation there, it's likely that

12 there would have been some kind of controls to protect him

13 from the thermal insulation and not likely there have been

14 anything to deal with the gasket, correct?

15 A.   Well, I'm not sure I could make that leap.  Certainly

16 there were controls for asbestos-containing insulation.  Some

17 companies put more in the late '70s and '80s.  As we know, as

18 I know, there were companies that didn't put any controls in,

19 and that's where OSHA focuses its enforcement action as well

20 as EPA.

21 Q.   Okay.  Let me just talk about the frequency of the

22 asbestos insulation removal task.  You assume that workers

23 accessing gaskets would have to remove and disturb the

24 asbestos insulation half the time, right?

25 A.   That's correct.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1  Q.   And there's no basis in the published literature for the

2  50 percent conclusion.  You got that based on your review of

3  depositions, right?

4  A.   There's some literature that talks about removing

5  asbestos-containing insulation to get at the gasket.  And it's

6  all dependent on that system and what kind of insulation's on

7  that system and that flange.

8  Q.   You didn't have any asbestos bulk sampling for any

9  claimant's job site or air sampling from any claimant's job

10  site, correct?

11  A.   No, sir, I did not.

12  Q.   And your reliance on materials for insulation exposures

13  was included in Mr. Mangold's 2006 paper, correct?

14  A.   Well, the insulation exposure included Mangold's included

15  several others.

16  Q.   Right.  Included several --

17          MR. HARRIS:  Excuse me.  I object to the extent

18  you're referring to his gasket paper for insulation exposure.

19          MR. FINCH:  No.  I'm referring to --

20          MR. HARRIS:  The insulation paper was with

21  Mr. Beckett in 1970.

22  BY MR. FINCH:

23  Q.   You are relying on, for the insulation exposures, you're

24  relying on Mr. Boelter's study done in this case, correct, in

25  part.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    A.    For the accessing to gaskets, that's correct, yes.

2    Q.    All right.  And it's -- that paper was not published in

3    the peer-reviewed journal, correct?

4    A.    No, sir, not to my knowledge.

5    Q.    And it was measurements related to using a hammer to

6    knock the insulation off a pipe, right?

7    A.    That's correct.

8    Q.    You're aware there are other ways to remove thermal

9    insulation from a pipe, correct?

10   A.    There are other ways.  Most common would be the most

11   expeditious, and that would be the hammer.

12   Q.    You know that while you were at OSHA, Mr. Boelter sent a

13   letter to OSHA asking if it was -- if gaskets were exempt from

14   labeling requirements, correct?

15   A.    I am familiar with the letter, yes.

16   Q.    Okay.  And I don't want to get into debate with you about

17   what his letter said, or what OSHA said.  But while you were

18   at OSHA, he wrote the letter to OSHA and he sent them his 2002

19   paper.  We can agree on that, right?

20   A.    Yes, sir.

21   Q.    And he asked OSHA, OSHA's opinion as to whether gaskets

22   and packing require labeling under the OSHA regulations,

23   right?

24   A.    That was the basic opinion he was looking for, yes.

25   Q.    And ultimately -- you would agree with me that OSHA

1    said -- the first part of his reply said, no, your findings

2    cannot be used to exempt the mentioned gaskets.

3        Regardless of the reasons, you agree that OSHA did not

4    change the labeling requirements for gaskets based on

5    Mr. Boelter's letter, correct?

6    A.    There's no way the agency would do that.  That's correct.

7    That's not within Rich Fairfax's purview.

8    Q.    Okay.  Now, bystander insulation assumptions, I think I

9    heard this correctly.  You would assume that there were six

10   and a half hours of bystander insulation exposure, regardless

11   of occupational group; is that right?

12   A.    No, sir.  Well, the environments in which somebody may be

13   in proximity to the insulation, that's correct.  The distance

14   from the various sources of that is going to vary depending on

15   the exposure group.

16   Q.    Okay.  I just -- leaving aside the distance.  For

17   distance you're relying on the 2012 -- the distance is the

18   paper you were talking about the farther you get away from the

19   source, the less exposure to asbestos, right?

20   A.    Yes, sir.

21   Q.    And your source for that data was the Donovan paper that

22   was written with the ChemRisk people, correct?

23   A.    It was written by a number of authors.  The lead author

24   was from ChemRisk, that's correct.

25   Q.    And but leaving aside the distance factor, am I correct

CROSS - HENSHAW

1    that for all of the bystander insulation exposure people would

2    have, you're assuming that they are exposed as bystander

3    insulation for six and a half hours of every workday?

4    A.    Again, depends on the distance.  Some are people more

5    than 30 feet away, so they're exposed to 1 percent of that.

6    So it depends on the group, and the distance from the source.

7          No doubt we're exposed to insulation fibers that may be

8    in this room, so it just depends on the proximity.

9    Q.    There is no published paper that concludes every

10   occupation experience six and a half hours of bystander

11   exposure to insulation, correct?

12   A.    I do not know of any specific data to that extent, except

13   the testimony speaks about they're working in those

14   environments all day.  Now I didn't consider all day.

15   Q.    Okay.  Well, there would only be insulation exposure as a

16   bystander if people were either putting insulation in place or

17   removing it, right?

18   A.    They would be handling it in some way, could be removing,

19   installing.  It could be somebody nearby who's accessing a

20   gasket and removing insulation.  And if somebody's 30 feet

21   away, they would get 1 percent of that exposure.

22   Q.    Okay.  You're aware of this paper by William Marr,

23   correct?

24   A.    Yes, sir, I am.

25   Q.    And this is a paper about the exposure that insulators

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   have to pipe insulation in a shipyard, and how much -- what

2   percentage of their time the insulators spend doing various

3   tasks, right?

4   A.   Yes, sir.  There's several other issues identified in

5   that paper, but that's one of them.

6   Q.   Okay.  And this was published in 1964, right?

7   A.   Yes, sir.

8   Q.   You cite in your reliance list, right?

9   A.   Yes, sir.

10   Q.   And what they say is, "during ship overhaul repair and

11   remodernization, pipecoverers and insulators remove all the

12   various types of insulation they have applied", right?

13   A.   That's from the paper, that's correct.

14   Q.   Right.  And then they say, "as shown in Table 1, this

15   small portion of time spent in removing excessively dry

16   insulation gives a high exposure to asbestos dust."

17       This is talking about the insulator's exposure during the

18   rip out, right?

19   A.   That's what he's referring to for the most part.  Not

20   entirely, but during the rip outs, that's the highest

21   exposure.

22   Q.   And you would agree with me that an insulator would have

23   a lot more contact with insulation and ripping it out than any

24   other type of trade might have, correct?

25   A.   No, sir, I don't agree with that.  Insulators more often

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1  install insulation as opposed to removing it.  As some of the

2  deponents spoke about, they removed insulation on a regular

3  basis.  Nicholson said 10 percent pipefitters spend 10 percent

4  of their time removing insulation.

5  Q.   Okay.  But if the insulation was being put in or removed,

6  certainly wasn't being put in and removed six and a half hours

7  every day, right?

8  A.   Depends on what the operations are.  But it doesn't

9  necessarily mean they're removing or installing.  They're

10 still tampering with asbestos insulation.

11 Q.   All right.  But here in the Marr paper, the percentage of

12 time removing insulation that insulators spent was 2 percent

13 of their time, 3 percent of their time, .5 percent of their

14 time, right?

15 A.   Those are product specific times, 100 percent amosite

16 3 percent of the time, calcium silicate is 2 percent of the

17 time.  So they're being very specific.

18 Q.   Right.  If you add it all up it's less than 10 percent of

19 their time, right?

20 A.   I think in this analysis -- I don't know the exact total

21 but somewhere in that neighborhood.

22 Q.   Okay.  Now you're familiar with this paper by Amy Madl at

23 ChemRisk, "Airborne Concentrations of Asbestos Onboard

24 Maritime Shipping Vessels, 1978 to 1992"?

25 A.   I'm aware of that paper, yes.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   Q.   And it was funded by the various owners and operators of

2   merchant marine ships, right?

3   A.   Yes, sir.

4   Q.   What they conclude is that from the 1978 to 1992

5   timeframe, unless somebody is put in or ripping out

6   insulation, the exposures to insulation handling activities

7   onboard merchant marine ships, were nearly always below the

8   OSHA current permissible exposure limit, correct?

9   A.   They were using data that was available starting in '78

10  and running through '92 and that this was their conclusion.

11  Q.   And so for Mr. Grier's clients were people who were going

12  to be exposed in the '70s and '80s and not before, this would

13  be a reliable measure of insulation exposure to those type of

14  people, right?

15  A.   Well, depend on the kind of operation we're talking about

16  there, what kind of vessel.

17  Q.   But generally speaking you would rely on that, right?

18  A.   Again, it depends on the vessel.  If I'm specifying that

19  particular -- this is -- I think this is not Navy.  I think

20  this is just Merchant Marine.  But depends on if that's part

21  of my analysis, and I would probably rely on it, yes.

22  Q.   Okay.  Mr. Harris mentioned in opening statement, and you

23  talked about it on direct exam, Joseph Rodricks.  You know who

24  Mr. Rodricks is, correct?

25  A.   Yes, sir, I do.

CROSS - HENSHAW

1   Q.   You don't mean to suggest to the court that Mr. Rodricks

2   did anything other than a cursory review of your report in

3   this case, right?  That's all he did?

4   A.   I have no idea, sir.

5   Q.   Well, to the extent there was any suggestion, let's just

6   clear it up.

7        May I approach the witness, Your Honor?

8            THE COURT:  Yes.

9            MR. FINCH:  Could I have the ELMO, please?

10  Q.   Do you see the testimony begins on page 83, Mr. Henshaw?

11  A.   Yes, sir, I do.

12  Q.   Okay.  What I asked Mr. Rodricks was:

13            "You said you spent 20 to 30 hours total in the

14        Garlock matter, correct, Dr. Rodricks?

15            A.    I guess.  I think that might be a little more,

16        I don't know, but not a lot more.

17            Q.    Would you agree with me that by far the

18        majority of your time was spent on reviewing the

19        Boelter/Rodricks report?

20            A.    Yes."

21  Q.   I read all that correctly, right, sir?

22  A.   Yes, sir.

23  Q.   And you know the Boelter/Rodricks report is the guy

24  hammering on the pipe insulation report, right?

25  A.   That's the Boelter paper that I relied upon, yes.

CROSS - HENSHAW

1    Q.    And then I asked him:

2            Q.    "And so you may have spent at most an hour or

3        two on the Henshaw report, correct?

4            A.    I read Henshaw last week about 10 days ago.  I

5        spent more than an hour but not -- that's ballpark.  I

6        looked at it again for 15, 20 minutes, just sections."

7            Then I ask him -- I read that right, correct?

8            THE WITNESS:  Yes, sir.

9    Q.    Then I ask him:

10        "The chapter you wrote for the Federal Judicial Center

11    Reference Manual on scientific evidence you said was something

12    that would pass the peer-review process at the National

13    Academy of Sciences?

14            A.    It did.

15            Q.    It did.  You spent substantially longer than an

16        hour or two on that, correct?

17            A.    Several months.

18            Q.    Okay.  And you haven't analyzed the Henshaw

19        report in this matter to -- you haven't given it the same

20        review that the National Academy of Sciences would give

21        something if it was peer reviewing, correct?

22            A.    Well, I was looking for something different.

23        It wasn't intended to be a full peer-review detail.  I

24        was just looking at it for its general approaches,

25        general conclusions.

CROSS - HENSHAW

1        Q.     But you certainly weren't applying the same

2     level of rigor and peer review to the Henshaw report,

3     that the National Academy of Sciences applied to your

4     chapter for the Federal Judiciary Center Reference Manual

5     on scientific evidence, correct?

6        A.     No, sir.  I didn't say I had done that.

7        Q.     You're aware that the National Academy of

8     Sciences has done risk assessments on health hazards of

9     exposure to asbestos?

10       A.     Yes, sir.

11       Q.     You are not involved in those?

12       A.     No.

13       Q.     But you would expect him to be reliable sources

14     of information, correct?

15       A.     Should be, yes."

16  Q.   Do you see that I read that?  I read that correctly?

17  A.   As far as I could follow, that's correct.

18  Q.   Okay.  I have here the 1984 National Academy of Sciences

19  Risk Assessment for -- it's called "Risk Assessment

20  Asbestiform Fibers:  Nonoccupational Health Risks."

21       You're familiar with this document, right, sir?

22  A.   I've seen that, yes.

23  Q.   And it went through the National Academy of Sciences Peer

24  Review process, which is one of the highest levels of

25  intellectual scrutiny something can survive, correct?

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   A.   As far as I know, that's correct.

2   Q.   And in this document they looked at the world's

3   literature available at that time epidemiology, animal

4   studies, cell tissue studies, right, correct?

5   A.   I don't recall everything they looked at, but it was

6   supposed to be an exhaustive review.

7   Q.   And they concluded, did they not, that -- can I have

8   the -- I do have the ELMO.

9        They concluded, first of all, to treat all asbestos fiber

10  types the same, correct?  They all were the same?

11  A.   That was the approach in that timeframe, that's right.

12  Q.   And what they put there was that for mesothelioma, the

13  estimated lifetime risk of exposure, they said -- if somebody

14  had a lifetime exposure of .0004 fibers per cubic centimeter,

15  they had an estimated lifetime risk of mesothelioma of 9 times

16  10 to the 6.  That's 9 per million, correct?

17  A.   That's what 9 times 10 to the 6 stands for, yes.

18  Q.   That's a substantially elevated risk of mesothelioma,

19  even at that tiny level of exposure, right?  What the National

20  Academy of Sciences has concluded in 1984?

21  A.   As you said, that's in '84.  I can't vouch for all the

22  evidence that they used in that assessment.

23  Q.   Now you know since 1984 there had been a fair number of

24  cohorts exposed to chrysotile that had been followed over

25  time, correct?

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   A.   Yes, sir.  That's correct.

2   Q.   Okay.  Nobody's been -- has been able to get in a time

3   machine and go back into the '40s and '50s and '60s and '70s

4   and collect air sampling measurements of what the dust people

5   were exposed to so that they can update the data for that,

6   have they, sir?

7   A.   Not a time machine.  Certainly data has become available

8   over time.  Some of it represents past exposures.

9   Q.   But there -- whatever the data exists, the

10  epidemiological studies that exist, there's only -- there are

11  only a handful that have been added every year.  It's not like

12  you can go back and redo the science in 1984.  Strike the

13  question.

14       The National Academy of Sciences concluded that there was

15  still a substantial risk of mesothelioma even at the levels of

16  exposure shown in that table, correct?

17  A.   Well, that was the conclusion -- 1984, that was an

18  excerpt from that very large document, that's correct.

19  Q.   And they have never withdrawn that conclusion, correct?

20  A.   I don't know.

21            MR. FINCH:  That's all I have, Your Honor.

22            THE COURT:  Mr. Guy.

23                    CROSS EXAMINATION

24  BY MR. GUY:

25  Q.   Good morning, Mr. Henshaw.

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1   A.   It's good afternoon now.

2   Q.   It is good afternoon now, you're right.

3   A.   I can see the clock from here.

4   Q.   I can't keep track of time either.  I represent Joseph

5   Grier, III.  You heard from Mr. Finch that Mr. Grier's been

6   appointed by the court to represent people who have claims in

7   the future.

8   A.   Yes, sir.

9   Q.   Do you know, sir, when the U.S. Navy prohibited the use

10  of asbestos-containing insulation?

11  A.   There was a period when they quit purchasing

12  asbestos-containing insulation.  But it was still in use for

13  sometime on into the '70s and '80s.

14  Q.   For new ships post-1973, for example, would those new

15  ships have contained asbestos-containing insulation?

16  A.   I believe not, new construction that's -- I believe

17  that's correct.

18  Q.   And do you know when exactly Garlock stopped making and

19  selling asbestos-containing gaskets?

20  A.   No, sir, I don't.

21  Q.   If I was to represent to you it was either 2000 or 2001,

22  would you have any reason to dispute that?

23  A.   No, sir.

24  Q.   When were you first retained by Garlock?  When I say you,

25  I mean you in any capacity with any of the companies that

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    you've worked with?

2    A.    In this case or in this matter or --

3    Q.    In the beginning, very first time.

4    A.    I don't recall precisely, but in the neighborhood of

5    maybe 2008 maybe.  I don't recall precisely.

6    Q.    And the opinions that you testified to today to the

7    court, have you held those opinions for a long time?

8    A.    Well, I expressed a number of opinions.  Certainly the

9    opinion in respect to this exposure assessment, that's

10   relatively recent after the analysis I did and issued the

11   report.  I had the opinions that exposures were always quite

12   low, not zero, but quite low, approaching the numbers that

13   estimated here in the assessment.

14   Q.    So to put a fine point in it, you're right, it was an

15   inartful question.

16        Your opinion that exposure to asbestos fibers from

17   insulation is a lot higher than exposure to asbestos fibers in

18   working around asbestos-containing gaskets.  You've held that

19   opinion for a long time?

20   A.    I've experienced that for a long time, that's correct.

21   That's -- I've been in that -- been in this business awhile

22   and that's correct, yes.

23   Q.    In fact, I think you said in your deposition you've held

24   that opinion since studying in this area of industrial

25   hygiene, would that be fair?

CROSS - HENSHAW

1   A.   Yes, sir.  And in the mid-'70s insulation was the number

2   one issue of concern.

3   Q.   And do you have any reason to believe that Garlock didn't

4   have access to that knowledge, that opinion, either from you

5   or from other individuals in this field, in the 2005 to 2010

6   timeframe?

7   A.   I don't know what Garlock -- and I'm not sure who in

8   Garlock you're speaking of, or who -- is it a representative

9   of Garlock.  So I don't know if I can answer that question.  I

10  don't know what their opinions were.

11  Q.   All right.  Well let's focus on when you were working for

12  Garlock in asbestos trials.  You did that, correct?

13  A.   I've been retained by Garlock in asbestos trials in a

14  number of cases.

15  Q.   And you worked directly with Garlock's lawyers, correct?

16  A.   I have -- I have worked with the attorneys involved in

17  those cases, that's correct.

18  Q.   And they were aware of your opinions in the 2008

19  timeframe on, weren't they?

20  A.   I suspect so.

21  Q.   And they were able to evaluate the strengths and/or

22  weaknesses of those opinions when litigating their cases,

23  correct?

24  A.   I suspect that's correct.

25  Q.   You wouldn't dispute that when settling cases they were

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1  able to evaluate the strength and weaknesses of those

2  opinions, correct?

3  A.   I don't know the settlement process.  Suffice to say I

4  suspect they know my opinions, but I don't know the process of

5  settlement.

6  Q.   You have no reason to believe that when they were

7  evaluating settlements, that they weren't able to also

8  consider in that process the opinions that you held?

9  A.   Well, we've already established they more than likely

10  knew my opinions or they wouldn't be talking.  But like I

11  said, I don't know what the process is for settlement.

12  Q.   We'll have to ask Garlock's lawyers about that?

13  A.   Yes, sir.

14  Q.   Now you have submitted invoices in this case, correct?

15  A.   Yes, sir, I have.

16  Q.   And are you familiar with those invoices?

17  A.   I'm familiar with a number of them, yes.

18  Q.   When were you first retained to work in this particular

19  case?  By that, I mean the bankruptcy case.

20  A.   I believe it was at least a year and a half, maybe two

21  years.  I don't know precisely.

22  Q.   You've obviously put in a fair amount of work, correct?

23  A.   Yes, sir.

24  Q.   Do you know the total amount that you billed in this case

25  to Garlock?

Laura Andersen, RMR 704-350-7493

CROSS - HENSHAW

1    A.   I don't know the precise number, but I probably put in

2    around 700 hours probably in this matter.

3    Q.   And do you know the total dollar amount that you've

4    invoiced to Garlock in this case?

5    A.   No, sir, I don't.

6    Q.   If I was to represent to you that the amount was

7    $1.8 million as of the time of your deposition, would you have

8    any reason to dispute that?

9    A.   No, sir, I would not.

10        MR. GUY:  No further questions, Your Honor.

11        THE COURT:  Thank you.

12                REDIRECT EXAMINATION

13   BY MR. HARRIS:

14   Q.   Just a few questions on redirect.

15        Mr. Henshaw, you spoke briefly about the amphibole

16   content or the asbestos content in asbestos insulation; is

17   that correct?

18   A.   Yes, sir.

19   Q.   Have you researched that in the course of your work, what

20   types of asbestos fibers were used in pipe covering and block

21   insulation and cements?

22   A.   Yes, sir, I have.

23   Q.   What types, historically, of asbestos fibers were used in

24   pipe coverings, insulation blocks and insulating cements?

25   A.   The majority would be amosite.

REDIRECT - HENSHAW

1    Q.   I'm going to ask you a couple of questions about some

2    documents that Mr. Finch showed you.  The first one had to do

3    with the exchange of correspondence within, internally,

4    Johns-Manville.  Do you recall that document?

5    A.   Yes, I do.  I have it, yes.

6    Q.   I've highlighted a phrase or one of the things that they

7    were seeking to evaluate, and this is I believe what Mr. Finch

8    focused on.

9         "Certain gasket material that is shipped to a customer

10   who subsequently cuts material using a band saw."

11        Is that a common operation?

12   A.   No, not -- that's secondary manufacturing, typically,

13   where they're cutting a gasket with a band saw.

14   Q.   Okay.  That's secondary manufacturing.  That's not what

15   end users would be doing like pipefitters or machinist mates

16   or the people that are typically in group one; is that

17   correct?

18   A.   That's correct.  Typically group one.

19            MR. FINCH:  Objection.  Calls for speculation to the

20   extent that he's asking what the author of the document

21   intended.

22            THE COURT:  Sustained to that extent.  Go ahead.

23   BY MR. HARRIS:

24   Q.   Okay.  But the reference here to gaskets that Mr. Finch

25   directed the court to, references cutting gaskets with a band

REDIRECT - HENSHAW

1   saw, right?

2   A.   Yes, sir.

3   Q.   And that's a secondary manufacturing operation?

4   A.   For the most part that's correct.

5   Q.   Mr. Finch also showed the court a document from Dow

6   Chemical that you discussed with him; is that correct?

7   A.   Yes, sir.

8   Q.   He read parts of the document, but did not show the

9   actual results of the testing that was done.  I think he read

10  the first sentence, but then this is -- the second paragraph

11  is actually the concentrations that were reported, correct?

12  A.   Yes.

13  Q.   And they reported some concentrations that were close to

14  the OSHA permissible exposure limit back in the early '70s

15  when this report was written, correct?

16  A.   Yes, sir.

17  Q.   And they reported four fibers, two fibers, three, 5.4

18  fibers, 3.08 fibers; is that correct?

19  A.   Yes.

20  Q.   I think he just handwrote those on a sheet of paper, but

21  they're actually printed right in the report, correct?

22  A.   That's correct.

23  Q.   And then what it says is, "Note that samples A through D

24  were taken when the area had not been cleaned for several

25  days."  Correct?

Laura Andersen, RMR 704-350-7493

REDIRECT - HENSHAW

1   A.   Yes.

2   Q.   That's a housekeeping issue, right?

3   A.   That's correct.  That was my point.  I don't know where

4   the source of those fibers that were -- where they were coming

5   from.

6   Q.   This was in a shop where secondary manufacturing of

7   gaskets was going on, correct?

8   A.   Yes.

9   Q.   Then they cleaned up the area and the results were

10  like .78 fibers per cc and .12 and .9 fibers per cc, correct?

11  A.   At a cutting table; that's correct.

12  Q.   Those short term samples?

13  A.   They're relatively short term, yes.

14  Q.   And those would actually be below today's current

15  short-term exposure limit?

16  A.   When calculated time weighted average, could be yes.

17  Q.   Well as the short term exposure limit thought.  The

18  short-term exposure limit is one, right?

19  A.   Today it's one, that's correct.

20  Q.   Mr. Finch also showed you an excerpt from an MSDS and

21  we've heard about MSDSs.  Can you tell us what an MSDS is?

22  A.   It stands for Material Safety Data Sheet.  And it's

23  required under the Haz/Com standard, which is the OSHA

24  standard promulgated in 1983.  And it really lays out all the

25  information relevant to various products, and has its

Laura Andersen, RMR 704-350-7493

REDIRECT - HENSHAW

1   ingredients in these products, and it's to cover all

2   possibilities.

3   Q.   Why would you know about Material Safety Data Sheets?

4   A.   I wrote many of them.  And in the companies I've been

5   associated with, industrial hygienists get involved in writing

6   them, and when I was director of environmental safety and

7   health I was responsible for those MSDSs.  So I wrote many of

8   them.

9   Q.   Are findings by OSHA, the National Toxicology Program,

10  and IARC binding, or are they conclusive under the hazard

11  communication standard?

12  A.   Conclusive, I don't know what you mean by that.  But

13  you're required to report those specifics in respect to the

14  OSHA standard or ACGIH TLV.  You're required to put them on

15  your MSDSs if you have a certain percentage in your product.

16  Q.   All right.  And so if you prepare an MSDS, you're

17  required to report the information provided by those

18  organizations about the material if it's a carcinogen?

19  A.   Yes, sir, that's correct.

20          MR. HARRIS:  Your Honor, may I approach?

21          THE COURT:  Yes.

22          MR. HARRIS:  (Handing paper writing to the witness.)

23  Q.   Mr. Henshaw, I've handed you a document that is an MSDS

24  for play sand; is that correct?

25  A.   Yes, sir.  It's from that Quikrete.  Yes.

Laura Andersen, RMR 704-350-7493

REDIRECT - HENSHAW

1  Q.   It's Quikrete.  And Quikrete comes in a line of products,

2  and one of those is play sand, and that's product number 1113,

3  right?

4  A.   That's one of the products they list in this listing,

5  that's correct.

6  Q.   And then on the second page we see under the different

7  products that this MSDS covers play sand, code 1113, correct?

8  A.   Yes.

9  Q.   And under health hazards it says, "contains silica that

10  can cause severe and permanent lung damage and other diseases.

11  Breathing silica dust can cause silicosis, a lung disease that

12  can cause serious breathing difficulties and death.  Breathing

13  silica may cause cancer."

14      Did I read that correctly?

15  A.   That's the language in the MSDS, that's correct.

16  Q.   And so these companies are companies that prepare MSDSs

17  as required by OSHA, are reporting information about the

18  ingredients of their products that's required under the hazard

19  communication program?

20  A.   Yes, sir.

21      MR. HARRIS:  Thank you, Mr. Henshaw.  I'll pass the

22  witness.

23      THE COURT:  Anybody bought a chainsaw?  You have to

24  go through about 20 pages about how it's going to kill you

25  before you learn how to start it.

Laura Andersen, RMR 704-350-7493

RECROSS - HENSHAW

1          Yes, Mr. Finch.

2                    RECROSS EXAMINATION

3   BY MR. FINCH:

4   Q.   At the time that Garlock put out its MSDS on the 900

5   gasket, the government didn't specify the exact language that

6   Garlock had to use in that document; isn't that true?

7   A.   There were section -- there were topics that had to be

8   covered, but the precise language, that's correct.

9   Q.   So Garlock could have added any qualification it wanted

10  to, to the discussion of mesothelioma in the statement in

11  MSDS, correct?

12  A.   Well I think there's limitations, but in general they

13  have -- this is a performance standard.  So you can put your

14  language.  But there are specific areas that need to be

15  addressed in the MSDS.

16          MR. FINCH:  That's all I have, Your Honor.

17          THE COURT:  All right.

18          MR. HARRIS:  One question.

19          THE COURT:  All right.

20                    REDIRECT EXAMINATION

21  BY MR. HARRIS:

22  Q.   Is the MSDS a place for scientific debate?

23  A.   No, sir.  It's general communication.

24          MR. HARRIS:  Thank you.

25          THE COURT:  All right.  Why don't we break for

                    Laura Andersen, RMR 704-350-7493

1   lunch.  You got another witness I guess to call after lunch?

2           MR. SCHACHTER:  Yes, Your Honor.  Dr. Weill.

3           THE COURT:  Have you exchanged your lineup cards?

4           MR. FINCH:  They told us the lineup card was

5   Dr. Weill and then Mr. Brickman; is that right?

6           MR. HARRIS:  That's right.

7           MR. FINCH:  I think that would take us through the

8   rest of the day I would expect.

9           THE COURT:  All right.  Let's come back at quarter

10  to 2.

11          (Lunch recess at 12:35 p.m.)

12                  (End of Proceedings.)

13                  *  *  *  *  *  *
    UNITED STATES DISTRICT COURT
14  WESTERN DISTRICT OF NORTH CAROLINA
    CERTIFICATE OF REPORTER
15

16          I, Laura Andersen, Official Court Reporter, certify
    that the foregoing transcript is a true and correct transcript
17  of the proceedings taken and transcribed by me to the best of
    my ability.
18
            Dated this the 25th day of July, 2013.
19

20
                            s/Laura Andersen
21                          Laura Andersen, RMR
                            Official Court Reporter
22

23

24

25


                    Laura Andersen, RMR 704-350-7493