UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


IN RE:                          )
                                )
GARLOCK SEALING TECHNOLOGIES    )
LLC, et al,                     )        No. 10-BK-31607
                                )
        Debtors.                )        VOLUME I-A
_____ )        MORNING SESSION


TRANSCRIPT OF ESTIMATION TRIAL
BEFORE THE HONORABLE GEORGE R. HODGES
UNITED STATES BANKRUPTCY JUDGE
JULY 22, 2013



APPEARANCES:

On Behalf of Debtors:

        GARLAND S. CASSADA, ESQ.
        Robinson Bradshaw & Hinson, PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

        JONATHAN C. KRISKO, ESQ.
        Robinson Bradshaw & Hinson PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

        LOUIS ADAM BLEDSOE, III, ESQ.
        Robinson Bradshaw & Hinson PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

        RICHARD C. WORF, ESQ.
        Robinson Bradshaw & Hinson, PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

APPEARANCES (Continued):

On Behalf of the Debtors:

      RAY HARRIS, ESQ.
      Schachter Harris, LLP
      400 East Las Colinas Blvd.
      Irving, Texas 75039

      CARY SCHACHTER, ESQ.
      Schachter Harris, LLP
      400 East Las Colinas Blvd.
      Irving, Texas 75039

      C. RICHARD RAYBURN, JR., ESQ.
      Rayburn Cooper & Durham, PA
      227 West Trade Street, Suite 1200
      Charlotte, North Carolina 28202

      SHELLEY KOON ABEL, ESQ.
      Rayburn Cooper & Durham, PA
      227 West Trade Street, Suite 1200
      Charlotte, North Carolina 28202

      ALBERT F. DURHAM, ESQ.
      Rayburn Cooper & Durham, PA
      227 West Trade Street, Suite 1200
      Charlotte, North Carolina 28202

      ROSS ROBERT FULTON, ESQ.
      Rayburn Cooper & Durham, PA
      227 West Trade Street, Suite 1200
      Charlotte, North Carolina 28202

      JOHN R. MILLER, JR., ESQ.
      Rayburn Cooper & Durham, PA
      227 West Trade Street, Suite 1200
      Charlotte, North Carolina 28202

      ASHLEY K. NEAL, ESQ.
      Rayburn Cooper & Durham, PA
      227 West Trade Street, Suite 1200
      Charlotte, North Carolina 28202

      WILLIAM SAMUEL SMOAK, JR., ESQ.
      Rayburn Cooper & Durham, PA
      227 West Trade Street, Suite 1200
      Charlotte, North Carolina 28202

APPEARANCES (Continued.):

On Behalf of Interested Parties:

Carson Protwall LP:

    JULIE BARKER PAPE, ESQ.
    Womble Carlyle Sandridge & Rice, PLLC
    P.O. Drawer 84
    Winston-Salem, North Carolina 27102

Coltec Industries Inc.:

    DANIEL GRAY CLODFELTER, ESQ.
    Moore & Van Allen, PLLC
    100 North Tryon Street, Suite 4700
    Charlotte, North Carolina 28202-4003

    HILLARY B. CRABTREE, ESQ.
    Moore & Van Allen, PLLC
    100 North Tryon Street, Suite 4700
    Charlotte, North Carolina 28202-4003

    MARK A. NEBRIG, ESQ.
    Moore & Van Allen, PLLC
    100 North Tryon Street, Suite 4700
    Charlotte, North Carolina 28202-4003

    EDWARD TAYLOR STUKES, ESQ.
    Moore & Van Allen, PLLC
    100 North Tryon Street, Suite 4700
    Charlotte, North Carolina 28202-4003

Creditor Committees:

Official Committee of Asbestos Personal Injury Claimants:

    LESLIE M. KELLEHER, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

    JEANNA RICKARDS KOSKI, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

APPEARANCES (Continued.):

Official Committee of Asbestos Personal Injury Claimaints:

        JEFFREY A. LIESEMER, ESQ.
        Caplin & Drysdale, Chartered
        One Thomas Circle NW, Suite 1100
        Washington, DC 20005

        KEVIN C. MACLAY, ESQ.
        Caplin & Drysdale, Chartered
        One Thomas Circle NW, Suite 1100
        Washington, DC 20005

        TODD E. PHILLIPS, ESQ.
        Caplin & Drysdale, Chartered
        One Thomas Circle NW, Suite 1100
        Washington, DC 20005

        TREVOR W. SWETT, ESQ.
        Caplin & Drysdale, Chartered
        One Thomas Circle NW, Suite 1100
        Washington, DC 20005

        JAMES P. WEHNER, ESQ.
        Caplin & Drysdale, Chartered
        One Thomas Circle NW, Suite 1100
        Washington, DC 20005

        ELIHU INSELBUCH, ESQ.
        Caplin & Drysdale, Chartered
        600 Lexington Avenue, 21st Floor
        New York, New York 10022

        NATHAN D. FINCH, ESQ.
        Motley Rice, LLC
        1000 Potomac Street, NW, Suite 150
        Washington, DC 20007

        GLENN C. THOMPSON, ESQ.
        Hamilton Stephens Steele & Martin
        201 South College Street, Suite 2020
        Charlotte, North Carolina 28244-2020

        TRAVIS W. MOON, ESQ.
        Moon Wright & Houston, PLLC
        227 West Trade Street, Suite 1800
        Charlotte, North Carolina 28202

APPEARANCES (Continued.):

Official Committee of Asbestos Personal Injury Claimants:

      RICHARD S. WRIGHT, ESQ.
      Moon Wright & Houston, PLLC
      226 West Trade Street, Suite 1800
      Charlotte, North Carolina 28202

      ANDREW T. HOUSTON, ESQ.
      Moon Wright & Houston, PLLC
      227 West Trade Street, Suite 1800
      Charlotte, North Carolina 28202

      SCOTT L. FROST, ESQ.
      Waters Kraus, LLP
      222 North Sepulveda Boulevard, Suite 1900
      El Segundo, California 90245

      JONATHAN A. GEORGE, ESQ.
      Waters Kraus, LLP
      3219 McKinney Avenue
      Dallas, Texas 75204

Future Asbestos Claimaints:

      KATHLEEN A. ORR, ESQ.
      Orrick, Herrington & Sutcliffe, LLP
      1152 15th Street, N.W., Columbia Center
      Washington, DC 20005-1706

      JONATHAN P. GUY, ESQ.
      Orrick, Herrington & Sutcliffe, LLP
      1152 15th Street, N.W., Columbia Center
      Washington, DC 20005-1706

Official Committee of Unsecured Creditors:

      DEBORAH L. FLETCHER, ESQ.
      FSB Fisher Broyles, LLP
      6000 Fairview Road, Suite 1200
      Charlotte, North Carolina 28210

1                          I  N  D  E  X

2    OPENING STATEMENTS BY THE DEBTORS:

3    Mr. Cassada                                    10/43
     Mr. Harris                                     15

4

5                       *  *  *  *  *  *

6    OPENING STATEMENTS BY COLTEC INDUSTRIES:

7    Mr. Clodfelter                                 75

8                       *  *  *  *  *  *

9    OPENING STATEMENTS BY FUTURE CLAIMANTS COMMITTEE:

10   Mr. Guy                                        86

11                      *  *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2 JULY 22, 2013, COURT CALLED TO ORDER 9:30 A.M.:

3 MORNING SESSION:

4         THE COURT:  Good morning, have a seat.

5         We're here for the beginning of the estimation

6 hearing.  Let me ask you all to, I guess, first to announce

7 your appearances so that the court reporter will have your

8 names.  And I will warn you that during the course of the

9 hearing if she does not recognize your name, she will

10 interrupt and remind you so that she has it properly in the

11 transcription.

12         So why don't we start over here and go around that

13 way.

14         MR. GUY:  Good morning, Your Honor.

15         Jonathan Guy for the FCR.  I'm here with my

16 colleague Kate Orr and Richard Wyron.

17         MR. SWETT:  Good morning, Your Honor.

18         Trevor Swett along with Elihu Inselbuch and James

19 Wehner for the Official Committee of Asbestos Personal Injury

20 Claimants.  Tom Moon, our Charlotte counsel, is also with us.

21         THE COURT:  Okay.

22         MR. CASSADA:  Good morning, Your Honor.

23         I'm Garland Cassada with the law firm Robinson,

24 Bradshaw and Hinson, appearing today for the debtors.  I'm

25 accompanied by two of my partners Jonathan Krisko and Rich

1    Worf.  There are several other members of my firm in the

2    gallery, but I won't introduce them separately.

3              MR. HARRIS:  Good morning, Your Honor.

4              I'm Ray Harris for the debtors.  I'm joined by my

5    partner Cary Schachter, Lori Fay and my associate Edward

6    Taylor.

7              MR. CLODFELTER:  Good morning, Your Honor.  Dan

8    Clodfelter from Moore and Van Allen.  We represent Coltec

9    Industries.  I'm accompanied this morning by my partner Mark

10   Nebrig and Hillary Crabtree.

11             MR. RAYBURN:  Good morning, Your Honor.

12             Rick Rayburn, Jack Miller; Rayburn, Cooper, debtor's

13   counsel.

14             THE COURT:  Okay.  Well good.  All right.

15             We will begin however you all want to start.  Do you

16   want to make opening statements?

17             MR. CASSADA:  Yes, Your Honor.  I've conferred with

18   Mr. Swett.  I believe for both -- each side will make an

19   opening statement.  On our side, the debtors and Coltec will

20   spend about an hour and a half previewing the evidence that

21   you will hear over the next three weeks.  I understand the

22   committee and the futures representative will do the same.

23             THE COURT:  All right.

24             MR. CASSADA:  Before we begin, Your Honor, I might

25   bring up a housekeeping matter, and that is that we have filed

1   a motion to de-designate certain items that have been

2   designated as confidential, that's not confidential.  I

3   understand that Your Honor's going to hear that motion

4   tomorrow.

5            We will be disclosing and displaying in this public

6   court, items that have been designated, and testimony that has

7   been designated as confidential.

8            Under the stipulated protective order, as we

9   understand it, the court will have to close the courtroom to

10  the public when we do that.  That will happen in our opening

11  statement, some time toward the latter part of our opening

12  statement.

13           I suppose the first order of business will be to

14  determine whether the court, the judge, you should actually

15  close the courtroom during opening statements.

16           I will say that there are a number of folks here who

17  are from EnPro Industries and the debtor.  These are folks who

18  are parties and interested in the case.  They have each signed

19  a joinder to the confidentiality order, so I believe they can

20  remain in the courtroom.

21           There are a number of other people here who I don't

22  know.  I don't know if they are party to the protective order

23  or not.

24           MR. SWETT:  Your Honor, I had understood from some

25  correspondence from the court before this morning that you

1    would prefer to hear the confidentiality motion tomorrow.   And

2    if that's the case, then I suggest that we proceed as

3    Mr. Cassada described, and clear the courtroom where matters

4    that have been designated as confidential by parties in

5    interest or others, third parties included, who are not

6    present and not able here to assert their own rights, in

7    deference to the obligations that the debtors incurred in a

8    series of confidentiality stipulations, we really have no

9    alternative but to abide by that procedure and clear the

10   courtroom at the necessary times, unless and until you take up

11   that motion and decide on some other course.

12          But it is a serious problem, because there are lots

13   of people implicated by those confidentiality rights who are

14   not here and do not have notice of the motion.

15          THE COURT:  Why don't we take up that motion

16   tomorrow morning at 8:30 here.  And then for now, when you

17   get -- let's leave things open as long as we can.  When you

18   get ready to get into things that would be governed by the

19   confidentiality agreement, just tell us and we will ask those

20   who haven't signed an agreement to leave for that period of

21   time.  Okay?

22          MR. CASSADA:  That works.

23          THE COURT:  I think we're obliged to do it as

24   narrowly as we can, as long as we have to do it.  Okay?

25          MR. CASSADA:  Your Honor, I should start by telling

                   Laura Andersen, RMR 704-350-7493

1   you how we hope the day proceeds today.  We will make an

2   opening statement, we expect to be in the neighborhood of an

3   hour and a half.  You'll hear from me, obviously.

4           In addition, Mr. Harris will address part of the

5   evidence that you'll hear during the trial.  Mr. Clodfelter

6   will make a statement as well.  We are hoping that after the

7   committee and the futures representative make opening

8   statements, that we will be at that point at the lunch break,

9   and that we will be able to return after lunch and put two

10  witnesses on the stand and get them completed today.  That is

11  our hope.  We've given notice of those witnesses to the

12  committee and the futures representative.

13          Your Honor, Garlock is in bankruptcy, not because

14  large numbers of claimants have meritorious claims against it,

15  but because of the financial burden of defending itself -- but

16  because of the mass burden of defending itself in mass

17  asbestos litigation.

18          You will hear that Garlock spent approximately $1

19  billion to resolve hundreds of thousands of non-malignant

20  claims, produced by recruiting practices that everyone now

21  concedes were rife with abuse.  This abuse bankrupted the

22  large thermal insulation producers whose products are

23  responsible for causing disease, and workers who now make

24  claims against Garlock.

25          There is no dispute today that non-malignant claims

Laura Andersen, RMR 704-350-7493

1   have no material value, and that Garlock's liability turns on

2   mesothelioma claims.

3          Accordingly, we're here today to estimate Garlock's

4   aggregate mesothelioma liability for allowance purposes under

5   Code Section 502(c).  The core dispute is whether we look at

6   legal liability head on by assessing the number and amount of

7   valid claims under state law, or that we look indirectly for

8   liability that is allegedly baked into Garlock's past

9   settlements.

10         Your Honor, we offer the first approach, which we

11  believe is the correct approach under the bankruptcy code.

12         Our initial evidence, of course, will address our

13  approach, based on evidence gathered through the questionnaire

14  process and other discovery ordered by the court.  Our first

15  witnesses will address the merits of cases that claimants can

16  present against Garlock.

17         The evidence shows that even the best cases

18  claimants can muster, would fail to produce evidence

19  satisfying the standards required to reach a jury on the issue

20  of causation under applicable law.

21         The *Moeller* case against Garlock exemplifies the

22  application of law.  The plaintiff was a pipefitter who

23  routinely installed and removed gaskets.  Like all

24  pipefitters -- gasket -- he worked around asbestos insulation.

25  That pipefitter's gasket exposure was in the words of Judge

1   Alice M. Batchelder, who was the chief judge of the Sixth

2   Circuit Court of Appeals, "a bucket in the ocean compared to

3   exposures of asbestos thermal insulation."  Accordingly, as a

4   matter of law, the case did not merit a jury trial.  And Judge

5   Batchelder ruled that the *Moeller* case never should have gone

6   to jury.

7         In the second phase of our case, Dr. Bates will

8   provide a conservative upper bound that the court can safely

9   accept as more than adequate compensation for current

10  mesothelioma claims.

11        Our economic evidence will show that -- will show

12  what Garlock's legal responsibility would be, assuming

13  contrary to both fact and law that first, every claimant,

14  every current and future mesothelioma claimant was able to

15  identify contact with a Garlock product, will be permitted to

16  proceed to trial and potential judgment.

17        And second, that no claimant's causation evidence

18  will be excluded under *Daubert*, making these highly claimant

19  friendly assumptions, Garlock's estimated liability for

20  current and future mesothelioma claims under state law is no

21  more than $125 million.

22        Because our plan provides $270 million to resolve

23  claims, Dr. Bates will explain how the plan provides

24  sufficient compensation to fully satisfy all claims.

25        Of course this is consistent with what medical

Laura Andersen, RMR 704-350-7493

1   research has discovered long ago, that workers' exposure to

2   friable amphibole insulation, not gaskets, caused

3   mesothelioma.

4          Now, in addition to presenting evidence on our case

5   based on legal liability, we'll present evidence about why the

6   settlement history approach advocated by the committee and the

7   futures representative is inappropriate in Garlock's case.

8          That approach of course has been used in past cases

9   by agreement of the parties, and usually when liability was

10  not contested by the debtor.  Most recently a version of that

11  approach was used in the *Bondex* case.  But this case is not

12  *Bondex* or any other asbestos case.

13         First, the parties agreed to use settlement data in

14  the estimation trial in that case.  Second, the joint compound

15  produced by *Bondex* was friable, and banned by the consumer

16  product safety commission in 1970s.  Leading medical

17  researchers pronounced decades ago that asbestos-containing

18  gaskets and packing posed no health risk.  But what caused

19  disease was the ubiquitous asbestos-containing insulation

20  present in environments where gaskets were used.

21         Gaskets and packing have never been banned.  Not

22  only are the record and Garlock's positions different, but

23  critical facts are different as well.

24         The evidence will show that Garlock settled the vast

25  majority of cases because it was cheaper to settle than to pay

Laura Andersen, RMR 704-350-7493

1   lawyers to try cases.

2          In a relatively small number of cases controlled by

3   a relatively small number of law firms, Garlock paid larger

4   settlements based on incomplete factual records.

5          The evidence will show that firms securing these

6   settlements often resorted to suppression of evidence to

7   enhance the trial risk against Garlock, precisely because

8   Garlock's having an extraordinarily good chance of securing a

9   defense verdict when all evidence relevant to the cause of

10  plaintiffs' diseases was available.

11         I will yield to Mr. Harris.  He will address the

12  evidence that we will present addressing the merits of claims

13  against Garlock.

14         I'll follow and describe evidence that will support

15  Dr. Bates' econometric estimation of legal liability, and then

16  I'll conclude by forecasting our evidence that proves that the

17  settlement approaches offered by the committee and the FCR

18  lack merit.  And then Mr. Clodfelter will summarize evidence

19  that Coltec will offer.

20         MR. HARRIS:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22         MR. HARRIS:  We firmly believe that no estimation of

23  Garlock's liability, no matter what method the court chooses

24  to use can be fair unless the court fully understands the

25  nature of two very different types of products.

Laura Andersen, RMR 704-350-7493

1          The first is asbestos thermal system insulation that

2     insulates pipes and fittings where gaskets can be used.

3          Exposures from working with asbestos insulation,

4     removing insulation, installing insulation, fabricating

5     insulation, are well above all current and historic exposure

6     standards.

7          Mesothelioma is a rare disease that afflicts maybe

8     only three -- two to three to four people per million, who

9     don't have exposure to friable asbestos products like

10    insulation.

11         You'll hear in this case about Dr. Irving Selikoff

12    who was a pioneer in alerting the world to the potential

13    dangers of working with asbestos products.  He, in particular,

14    studied asbestos insulators.  He ultimately demonstrated that

15    9 percent of the insulators who worked with asbestos

16    insulation, died of mesothelioma; 9 percent, versus three to

17    4 million without exposure to friable asbestos products.

18         The insulation was so dangerous that it was

19    banned -- spray on insulation banned in 1973, and the pipe

20    covering that you see here was banned in 1975.

21         Johns-Manville, UNARCO, Owens Corning Fiberglass,

22    Pittsburgh Corning, Armstrong, AC&S, the list goes on, of

23    insulation manufacturers or distributors that were defendants

24    in the asbestos litigation.

25         Garlock never made asbestos thermal insulation.

Laura Andersen, RMR 704-350-7493

1   Garlock made gaskets where the asbestos was mixed with rubber

2   and pressed into sheets.

3           In contrast to insulation, this shows Fred

4   Boelter -- who is an expert witness for Garlock that you'll

5   see here either tomorrow or the next day -- working with

6   gaskets is very, very -- are very, very different than working

7   with insulation.

8           Every reliable study that's been done with respect

9   to asbestos gaskets, shows that the exposures are well below

10  not only the historic standards, but also the current

11  standards, including a very comprehensive systematic study by

12  the United States Navy back in 1978.

13          This is a list of studies that are published in the

14  literature.  On the far right-hand side is the short-term

15  exposure limit that OSHA adopted in 1972.  And then the

16  current OSHA short-term exposure limit that was adopted in

17  1988.  Studies by the United States Navy, the first

18  peer-reviewed paper with respect to asbestos gaskets that

19  appeared in the literature was in 1991.  Industrial hygiene

20  community just wasn't focused on gaskets.  So that's the first

21  paper, one of the few papers that were published that had

22  nothing to do with defendants or plaintiffs in asbestos

23  litigation.

24          The later studies are by Fred Boelter and Larry

25  Liukonen.  Both of them will testify in this case.

Laura Andersen, RMR 704-350-7493

1   Mr. Liukonen published in 2004, but he's also the lead author

2   of the Navy study.

3            In contrast, these are the insulation studies, or a

4   number of the insulation studies.  There's the 10 fiber cc

5   limit from 72 from the prior slide.  As you can see the

6   insulation studies far exceed that, and the exposures are tens

7   to hundreds to thousands of times higher than the current

8   exposure limit.

9            And Dr. Selikoff, who was the leader of alerting the

10  world to the hazards of asbestos, his work, particularly with

11  insulators, led to the creation of OSHA, said in 1978 in a

12  book that he wrote for the purpose of summarizing the

13  literature for lay people and specialists alike, says, high

14  temperature jointing and packing materials, no health hazards

15  in forms used in shipyard applications.

16           These gaskets that were used in shipyard

17  applications are the same types of gaskets that Garlock sold

18  for use in industry.

19           Nearly every claimant who worked with a Garlock

20  asbestos gasket or packing, would have had exposure to the

21  friable insulation, because they're working in the same spaces

22  where it is and the pipes and fittings are covered with the

23  insulation where the gaskets and packing are.  That insulation

24  exposure explains their disease.

25           We're not asking the court to decide the merits of

1    any individual claim, or decide any scientific issues here.

2    We ask only that the court estimate our legal liability.  This

3    will involve estimating how many cases would reach a jury

4    under the federal rules of evidence, and for those that do,

5    what is the likelihood of its success.

6         In an asbestos trial, the plaintiff has the burden

7    of proof and the burden of persuasion on many issues.  They

8    have to prove that the product is defective.  And in some

9    states they have to prove that the manufacturer knew or should

10   have known about the potential dangers associated with the

11   product.

12        For this trial we're focused only on one issue, and

13   that's specific causation.  That requirement is universal

14   among all states.  The plaintiffs must be able to prove, with

15   admissible evidence, that Garlock's products were a

16   substantial cause of the claimant's disease.

17        Claims should not reach a jury on this issue because

18   the claimants cannot show that the exposure from Garlock's

19   gaskets and packing was significant, compared to the

20   claimant's other exposures.

21        In the *Moeller* case that Mr. Cassada mentioned a

22   moment ago illustrates this issue.  As he quoted the Sixth

23   Circuit.  The Court -- as he quoted the Sixth Circuit, the

24   Sixth Circuit said -- this was a case we tried in federal

25   court in Kentucky.  Garlock lost at trial but appealed, and

Laura Andersen, RMR 704-350-7493

1   the Sixth Circuit said the case should not have gone to the

2   jury.  This is a case -- this was a very typical case,

3   pipefitter case, the type of occupation that has the most

4   contact with asbestos gaskets and packing.

5          We call the cases and the claims as they are -- as

6   they shouldn't make typical claims like this, they shouldn't

7   make it to the jury, the *Moeller* Filter.

8          To show you what the typical claims look like

9   against Garlock for estimation purposes, we used the

10  information from the questionnaire process.  They yielded a

11  vast amount of information about the evidence the claimants

12  will be able to present about themselves when they ultimately

13  have to prove their claims.

14         Our experts have done what science does in making

15  determinations about disease causation and predictions about

16  groups of people.  They analyze the data, group the population

17  by the relevant characteristics, and then applied the tools of

18  exposure science and industrial hygiene to understand the

19  nature of the exposures -- conducted in exposure assessment,

20  and then applied medical science to evaluate the information.

21         We've asked John Henshaw, an industrial hygienist to

22  review the data submitted by the current claimants.

23  Mr. Henshaw is a long time leader in the industrial hygiene

24  community, past president of the American Industrial Hygiene

25  Association, and the former head of OSHA.

1          Mr. Henshaw grouped the likely claimants by the

2   similarity of their contact with gaskets and packing.  He

3   divided them into five groups.  I've illustrated four groups

4   here.

5          Group one are those claimants that would have had

6   occupations that had the most contact with gaskets and

7   packing.  Those are the pipefitters, the steamfitters, the

8   plumbers, the Navy machinist mate.  Those are the primary

9   occupations.

10          In group two, they don't have quite as much contact

11   with gaskets and packing but it's still part of the regular

12   work they do on a regular basis, boiler workers, shipyard

13   workers, Navy firemen.

14          Group three has very little contact with gaskets and

15   packing, electricians, machinists, laborers, but they are

16   around the people in the trades that are doing that type of

17   work.

18          And then group four is more remote, painters,

19   insulators, clerical workers, office workers.

20          Group five, which is not depicted, are people that

21   wouldn't have any contact at all with gaskets or packing,

22   wouldn't be around people that would do any work with gaskets

23   and packing.

24          The court may recall from the questionnaire process

25   that the claimants were asked to categorize themselves by

1    their industry and their occupation.  So that led to more than

2    1,000 combination of industry and occupations.

3            Group five also includes those individuals where the

4    combinations don't make any sense, like a bricklayer in the

5    Navy.

6            Mr. Henshaw's grouping of the claimants is

7    definitive.  The claimants or the ACC has identified one

8    certified industrial hygienist may testify in this case, his

9    name is John Templin.  We asked him specifically about

10   Mr. Henshaw's grouping of the occupations, based upon their

11   contact with gaskets and packing.  He said, nothing being left

12   out of them as being nothing wrong.

13           Mr. Henshaw next evaluated the exposures expected in

14   each group using the principles of industrial hygiene, relying

15   on the information supplied from the questionnaire process,

16   and what the literature reports about the exposures that these

17   individuals would have.

18           Now the committee's response initially has been that

19   this process is illegitimate, that it isn't science.  But as

20   the court is aware, the Federal Judicial's Center manual on

21   scientific evidence has a chapter on Exposure Science.  It's

22   written by Dr. Joseph Rodricks, a well-known toxicologist.

23   We've engaged Mr. Rodricks, he reviewed Mr. Henshaw's

24   analysis, and said this is precisely the kind of exposure

25   science and methodology that's contemplated by the guide.

Laura Andersen, RMR 704-350-7493

1            Mr. Henshaw's evaluation of the exposures by group,

2     provides the following data that ties into the *Moeller* issues,

3     the bucket in the ocean.   These are example occupations from

4     within each group, the pipefitters from group one, the boiler

5     worker from group two, the electrician from group three, and

6     the painter from group four.   The red circles represent an

7     estimate of insulation exposure.   The blue dots represent

8     estimates of gaskets and packing exposure.

9            The standard measure for estimating cumulative

10    exposure is fiber per cc years.   You'll hear that when they

11    collect measurements -- when industrial hygienists collect

12    measurements in the workplace of exposure, it's measured in

13    fibers per cc.   That's converted -- an eight hour average is

14    determined by an eight hour or long term sample, and that

15    average exposure during the day is regarded as one fiber per

16    cc year.   So if someone was exposed to two fibers per cc, as

17    an eight hour time rate average, at the end of one year, 250

18    workdays, they would have two fiber cc years of cumulative

19    exposure.

20           Throughout his analysis, Mr. Henshaw made very

21    conservative assumptions or proclaimant assumptions.   For

22    example, for the insulation exposure, we know that pipefitters

23    and we know that boiler workers have exposure to insulation

24    that's not related to the work that also involves gaskets and

25    packing.   They're bystanders to insulators removing

Laura Andersen, RMR 704-350-7493

1   insulation.  They testified about it extensively.

2          You'll hear about testimony or you'll see testimony

3   where people described how it's a snowstorm when they're

4   around the insulators, and the insulators work right above

5   them and the insulation rains down on top of them.  You could

6   see how easily it would be if someone's removing insulation

7   next to you while you're trying to do your work, that you

8   would also be exposed to insulation.

9          Mr. Henshaw did not include that insulation exposure

10  in his estimates.  This is only for the work that goes along

11  with removing and when replacing asbestos gaskets.

12         For the gasket assumptions, his assumptions are

13  equally conservative.  The blue dot represent all the gasket

14  and packing exposure, not just Garlock exposure.  There was no

15  effort to try to determine Garlock's market share.  But as

16  you'll hear in the Navy, there are many, many manufacturers of

17  asbestos gaskets and packing that were on the qualified

18  products list that could sell.  Plaintiffs typically identify

19  two, three, four, five different types of gaskets and packing.

20  Garlock did not control or did not have majority of the market

21  share.  In fact, the largest market share belonged to

22  Johns-Manville during the '40s, '50s and '60s.  Johns-Manville

23  made basically 60 percent of just about every asbestos

24  product, particularly insulation, but also gaskets and

25  packing.  As you can see there's an orders of magnitude

1   difference.  So it's clear -- or it appears obvious that the

2   insulation exposure would explain the claimant's disease.

3          We then asked Dr. David Weill to review Mr.

4   Henshaw's analysis and explain its medical significance in

5   terms of substantial cause.  Dr. Weill is the director of the

6   Center of Advanced Lung Disease at Stanford University Medical

7   Center.

8          Even in the group one claimants with the most

9   contact with gaskets and packing, Dr. Weill explains that the

10  gasket and packing exposure would not be a significant cause

11  of disease, or would not be a substantial cause of disease.

12         For the claims in groups two, three and four and

13  five, the claims become even weaker.

14         None of the claims should make it through the

15  *Moeller* Filter, the bucket in the ocean filter.

16         And this assumes that each of the fiber types are

17  equally potent and they're not.  You've heard about the so

18  called chrysotile defense, or whether chrysotile is a cause of

19  mesothelioma.  The vast majority of the gaskets Garlock made

20  were made with chrysotile asbestos.  A very small percentage

21  were made with an amphibole asbestos known as crocidolite.

22         Our doctors will explain the differences between

23  these fiber types.  They come from two different families.

24  The serpentine -- asbestos is basically -- is actually a

25  commercial term, it's not necessarily a mineralogical term.

Laura Andersen, RMR 704-350-7493

1    It's a commercial term to describe fibrous minerals rocks that

2    you break them open and there are fibrous minerals inside,

3    that are resistant to fire, heat, acid.

4         Chrysotile's in the serpentine family.  The

5    amphibole family has several members, some were used

6    commercially, some were not.  The important commercial ones

7    were amosite and crocidolite.  Amosite was frequently used in

8    insulation crocidolite was too.

9         The vast majority of Garlock's gaskets were made

10   with chrysotile, and that's where the claims against Garlock

11   typically arise.

12        There's been studies over the years on different

13   cohorts, different factors, different groups of people studied

14   to determine whether they have an increased risk of disease.

15   And in particular, they report the increased risk of disease

16   from mesothelioma.

17        As you can see, the highest and greatest potential

18   for disease is cigarette factory workers, gas mask factory

19   workers where they were using crocidolite.

20        Insulators, though, also have a very high risk of

21   mesothelioma.  It's identified 10 percent -- or, I'm sorry,

22   9.4 percent.  I believe that's from Dr. Selikoff's study.

23        But as you move your way down and you start looking

24   at just the chrysotile only studies, there are more than a

25   dozen cohorts of large-scale studies of individuals who worked

1  factories, in mines, and mills, who had massive exposure to

2  chrysotile, and no increased risk of mesothelioma.

3         This doesn't include the case controlled studies --

4  some of the case controlled studies that involve people that

5  work with chrysotile products that would have made this list

6  even longer.

7         Over the last 10 to 15 years, there's been two major

8  quantitative risk assessments done to try to determine the

9  relative potency of the fiber types.

10         In 2000, Hodgson and Darnton who worked for the

11  Health and Safety Executive in Great Britain, Great Britain's

12  version of OSHA, estimated that the relative potency of the

13  fiber types was 500 for chrysotile, amosite 100, chrysotile 1.

14         Berman and Crump working in connection with the EPA,

15  estimated that the exposure was much -- the relative exposure

16  was in the hundreds to even over a thousand times more potent

17  for the amphiboles versus the chrysotile.

18         Even Dr. Brody, one of the experts that the

19  committee will call in 2006, estimated that the relative

20  potency between amosite and chrysotile was 500 to 1.

21         As the court has said, we're not asking the court to

22  determine whether chrysotile is a cause of mesothelioma.  But

23  relative potency is important, if chrysotile is potent at all.

24         So Dr. Weill in estimating or analyzing the medical

25  significance of the information that Mr. Henshaw prepared,

1    factored in potency.  And taking in the potency factor for one

2    of the examples of the pipefitter assuming that -- factoring

3    in the amosite components of the insulation, the ocean gets

4    even bigger.

5           We find it telling that the committee and the FCR

6    have not focused on the actual evidence in this case.  The

7    evidence that was submitted by the current claimants.

8           Their expert, Dr. Brodken, acknowledges that this

9    approach is scientifically valid and can be helpful.  We asked

10   him in scientific research in asbestos disease, researchers

11   have looked at various groups of workers and considered them

12   collectively for making decisions, correct?

13          Certainly.

14          And in that context, especially, retrospective dose

15   reconstruction is quite helpful; is that correct?

16          I would agree with that.

17          But the committee doctors did not use this approach.

18   Instead they've advanced various versions of the

19   every-exposure-contributes theory.  For a long time doctors

20   testifying for plaintiffs' lawyers would say that asbestos is

21   a cumulative disease -- a cumulative exposure disease, which

22   is true.  But that every exposure contributes to cause it.  So

23   any exposure from any product contributes to cause someone's

24   disease, and is therefore a substantial cause.

25          As courts started rejecting that, that theory got

1    modified a little bit and a new version emerged, that it was

2    every exposure above background exposure was a contributing

3    cause.

4         Courts have not rejected that as well.  It's

5    rejected in many states.  And in those states where they had

6    previously accepted that type of testimony, the courts are

7    starting to reject it; Pennsylvania is one.

8         Recently the highest court in Pennsylvania said, we

9    do not believe that it is a viable solution to indulge in a

10    fiction that each and every exposure to asbestos, no matter

11    how minimal, in relation to other exposures, implicates a fact

12    issue concerning substantial-factor causation.

13        That brings us to the second major point of emphasis

14    on our merits case, and that's whether the committee's

15    evidence passes through the *Daubert* filter.

16        Our focus is on the methodology that the committee's

17    expert followed, not just on their conclusions, and that's the

18    focus of *Daubert*.

19        Case law has rejected much of the methodology used

20    by the committee's experts, and our experts will explain the

21    science underlying the case law.

22        For example, the committee's expert's opinions on

23    specific causation rests largely on case reports.  Dr. Welch,

24    in fact, uses a single case report of someone who likely

25    worked with an amphibole product as a foundation for a gasket

1    opinions.

2         Case reports are not studies with control groups.

3    There's no statistical significance to case reports, they're

4    anecdotes.  They're a basis for a hypothesis, but they're not

5    evidence of causation.  They raise questions for further

6    study.  They don't answer the questions.  And the law is

7    clear, that reliance on case reports are not permissible.

8         This is from a recent decision -- or from a decision

9    in this district.  "Case reports are not scientific proof of

10   causation.  Case reports fail to test a causal hypothesis, and

11   therefore cannot support a causation opinion."

12        The committee's experts repeatedly used public

13   health agency findings as evidence of causation as well.

14   They'll cite public health agency statements to support their

15   opinions that chrysotile causation of mesothelioma -- or for

16   chrysotile causation mesothelioma and low dose causation.

17        But public health agency's policies are based on

18   conservative assumptions, as the Supreme Court said, "risking

19   error on the side of overprotection."

20        Courts that have looked into this issue have

21   consistently rejected such statements as proof of causation.

22   A regulator's purpose is to suggest or make prophylactic rules

23   governing human exposure, from the preventive perspective,

24   that agencies adopt in order to reduce public exposure to

25   harmful substances.  In doing so, the agency's threshold of

1    proof is reasonably lower than that in tort law.

2          The committee's experts will also and the

3    committee's lawyers will also speak about how public health

4    agencies have said that there's no safe level of exposure to

5    asbestos.  But saying that there's no safe level of exposure

6    to asbestos is based upon risk assessments, extrapolations

7    from high dose studies to low dose exposures, in calculating a

8    risk.  Those two have been rejected.  That's not -- risk --

9    estimates of risk are not proof of causation.  No safe level

10   addresses risk not cause, and there's a significant

11   distinction between those two concepts.

12         By offering -- this opinion is just from this year.

13   By offering opinions about risk, none of the plaintiff's other

14   experts have offered an opinion about what level of exposure

15   is sufficient to cause mesothelioma.

16         As I said earlier, the reliable studies on gaskets

17   and packing show that the exposures are well below, not only

18   the historic exposure limits, but also the current exposure

19   limits.

20         The committee's case on the fiber release for

21   gaskets is based on and built on the work of Dr. Longo.  He's

22   on the right.  He's a long-time witness for the plaintiff's

23   bar in asbestos cases.  He has -- his results are far higher

24   than anything that's published in the literature.

25         But because his studies are done solely for the

1    purpose of litigation, his review of his studies requires --

2    or -- the law is clear that the courts may impose greater

3    rigor in the analysis of such studies.  If a proposed expert

4    is a quintessential expert for hire, then it is well within

5    the trial judge's discretion to apply the *Daubert* factors with

6    greater rigor.

7            You can see the Navy study's on the left.  The Chain

8    (phonetic) paper from 1991 in the middle.  There's another

9    paper that appeared in peer-reviewed literature -- but peer

10   reviewed -- by McHenry and Moore (phonetic).  The

11   Liukonen/Boelter papers, and then here comes Dr. Longo.

12           In his earlier studies he was glueing gaskets to a

13   metal plate and calling that a workplace simulation.  Glueing

14   it to a metal plate and then scraping and wire brushing and

15   grinding away at the gasket.  He drew a lot of criticism for

16   those types of studies saying they're not real workplace

17   simulations.  Gaskets go on flanges of one type or another.

18   They're not glued down to a metal plate.  And so he found old

19   flanges with old gaskets that have been out of service for

20   many, many years.  And most recently in flanges that have been

21   out of service for 19 years, where the gaskets were dry,

22   brittle.  It's not even clear that they were compressed,

23   asbestos sheet gaskets, which is what Garlock made and what

24   the claims are against Garlock are based on.

25           We'll identify for you, Your Honor, many, many

Laura Andersen, RMR 704-350-7493

1   errors that Dr. Longo has followed.  We took his deposition in

2   this case.  Never before have we had the time to prepare for a

3   deposition with the full seven hours.  And we identified on

4   just the full seven hours were about errors in the different

5   studies that he cited to the court that he had conducted.

6           We won't go through, obviously, all of those

7   studies when he takes -- all those problems when he takes the

8   stand.

9           But from a big picture standpoint, the first major

10  problem with Dr. Longo's studies are that they're not

11  realistic work practices.  The glued gaskets is a good

12  example.

13          Then when you watch the studies, remember the

14  earlier video when Mr. Boelter was trying to get up underneath

15  the gasket to remove it.

16          Dr. Longo, and I think this is a video from where he

17  actually supposedly hired a steamfitter to remove these

18  gaskets.  For whatever reason this person is chopping away at

19  gaskets.  That's not the way the work is done.

20          Dr. Longo also employees these high speed grinders

21  in his studies, 11,000 RPM grinders.  He has no evidence, no

22  record, he admits he has not done any research to determine

23  whether these high speed electric grinders were even available

24  in '40s '50s and '60s.  Our research shows that they weren't.

25  But he's using these very high speed grinders and very

1    aggressive tools to generate the highest exposures.

2         Remember from his -- the charts of his gasket

3    studies, most recent gasket study bystander exposure was over

4    70 fibers per cc, almost 80 fibers per cc.  That's almost

5    higher than knocking off the insulation that we saw at the

6    very beginning of my opening, knocking off the insulation.  It

7    makes no sense.

8         This is a picture of Dr. Longo.  He uses different

9    tools on his grinder.  This is one of a brass wire brush.  He

10    didn't realize it until we brought it out at his deposition

11    that the maximum safety rating for the very brass wire brush

12    that he used there was 7,000 RPM.  He was using it at 11,000.

13    I asked him, well, is that a safety hazard.  He said, well,

14    evidently not because no one got hurt.  Well, that's not the

15    standard.  That's not how you evaluate safety.

16         But it's an unrealistic work practice to think that

17    workers were using tools like this outside their maximum

18    safety rating.

19         He had an early problem -- we'll see about this in a

20    second -- about a grinder burning out.  He said the problem

21    with the grinder burning out was that the wire brush was too

22    big for the guard, and it kept hitting the guard.  And so in

23    the studies he takes the guard off the grinder.  That doesn't

24    sound realistic.

25         You see sparks flying in his videos as if this is

Laura Andersen, RMR 704-350-7493

1    some sort of typical work practice.  Certainly those people

2    that worked in chemical plants, refineries, many industrial

3    facilities are not allowed to use electric grinders like this

4    and create this potential explosion or fire hazard.

5           This is the video, you'll see -- using these

6    aggressive techniques with the steel wire brush.  These flange

7    faces typically have phonographic finishes where they have

8    little grooves that grip the gasket when they're tied

9    together.  You wouldn't want to use these aggressive tools in

10   order to try to remove gasket material, because you risk

11   damaging the flange face.  But of course he's not using these

12   flanges again.  He's just trying to using them for his gasket

13   study.

14          You'll hear about how Dr. Longo did publish a paper

15   in the peer-reviewed literature in 2002.  That's true it drew

16   criticism in industrial hygiene literature.  We've taken his

17   deposition and we took his colleague's deposition.  Dr. Longo

18   testifies regularly.  He has a colleague, Mr. Hatfield, who

19   until the past year has testified for 10, 15 years for

20   Dr. Longo's company.  He's got other colleagues that testify

21   as well.

22          But we took Mr. Hatfield's deposition.  We

23   identified a number of problems in the quality control

24   procedures for the studies that were published in the

25   industrial hygiene literature.  So we asked Mr. Hatfield about

this.

We said, do you have any plans to do another study involving gaskets?

Yes.

Is this to fix the quality control problems with your accounts?

Well, it's for a number of reasons.

Is that one of the reasons?

That is one of the reasons.

So when you hear the committee's lawyers or the experts talk about Dr. Longo's published paper, understand that they had to redo the study, redo the studies, do subsequent studies to fix the quality control problems.

Ultimately what they -- of course every time they drew criticisms and they did another study, the numbers go up.

Reproducibility is an important part of reviewing any part of scientific experiment. Not only does Dr. Longo's studies does not reproduce what's in the scientific literature, but he can't reproduce his own work. They just keep going up.

We're talking about gasket studies and the packing studies where the exposures are measured in 10ths of a fiber per cc, and his are ranging 10, 15, 25, 36, 77 fibers per cc.

Dr. Longo tries to normalize his data or make it look normal by identifying or citing to sampling sheets.

1   These are actually handwritten sampling sheets that

2   plaintiffs' lawyers have collected over the years and sent

3   him.  There's four, five, six of them that he cites to, just

4   basically notes.  Not reports where the industrial hygienist

5   says, hey, I've done something important.

6          What's really telling about that is one of the first

7   ones that he always cites, relates to a sample that was

8   collected at Shell, a Shell refinery, where the purpose of the

9   study says they were trying to simulate the worst case

10  situation, and Dr. Longo's results are higher.  Not a lot

11  higher, but they are significantly higher.  So he says, well,

12  I have the same thing -- I got the same thing that Shell

13  reported.  When Shell was trying to create something that was

14  not a typical work practice, a worst case situation.

15         But all of the flaws that we identified can't

16  explain this.  Before we file for bankruptcy, this was the

17  highest sample that Dr. Longo ever got.  You see that the

18  workers are wearing pumps.  And those pumps are connected to

19  filters that are in the breathing zone of the worker.  That's

20  how the industrial hygienist -- or that's how air samples are

21  collected.  They forgot to turn the pumps on when they first

22  started the study and did the work.  They're just realizing

23  this now.

24         The person on the right is Mr. Hatfield.  He's going

25  to turn the pumps back on, and then they're going to go on a

1    rest period for 15 minutes.  They're going to stand in the

2    corner and they're going to report 36 fibers per cc, much,

3    much, higher.  Remember the standard -- the current standard

4    is one fiber per cc for short-term samples.  The historic

5    sample was 10 fibers per cc.  They're going to find 36 fibers

6    per cc for standing in the corner of a chamber.  We can't

7    explain that.

8           Dr. Longo also used -- the numbers may not even be

9    that important to him.  Well, it's been the feature of the

10   plaintiff's case against Garlock since the late 1990s and

11   throughout the 2000s are Tyndall lighting demonstrations.

12          This is Dr. Longo on the left removing a gasket

13   having scraped it and now using a wire brush, and they

14   generate what appears to be dust particles in the air.  What's

15   happened is, they've turned the lights off in their chamber

16   and they shine a bright light through the breathing zone of

17   the worker.  This creates what he calls the Tyndall effect.

18   And it looks scary.

19          Garlock cites to these studies that shows the

20   exposures from working with gaskets is very low, and then

21   Dr. Longo shows these videotapes and the plaintiffs' lawyer

22   says that Garlock says that this is a safe activity.

23          We'll show you evidence that you cannot tell whether

24   there's respirable asbestos fibers in the air during this

25   activity.  But what's important here, is the person on the

Laura Andersen, RMR 704-350-7493

1  right is wire brushing a flange without a gasket.  Just the

2  activity of wire brushing creates dust under the Tyndall

3  light.  In ambient light you can't see it, it's not like

4  insulation is pouring out.  You can't see it under ambient

5  lights.  But under the Tyndall lights everything looks dusty.

6  You set in a movie theater and seen the projector, the ribbon

7  of light that hits the screen, you see the dust in the air,

8  that's the Tyndall effect.

9          So when they talk about Tyndall lighting, if they

10 show you Tyndall lighting videos, understand that everything

11 looks dusty and dangerous under Tyndall lights.

12         I would like to wrap up by introducing you to the

13 witnesses that we're going to call.

14         Dr. Wasson is on the left, he's the first witness.

15 He started out in the boiler rooms of an aircraft carrier in

16 1961 as a young boiler officer.  He progressed through the

17 ranks, ultimately became a captain.  But he spent a lot of

18 time in boilers and firerooms on ships.  He knows how asbestos

19 gaskets and packing were used in the real world, and he knows

20 how insulation was used.  And he'll be our first witness that

21 we call after lunch.

22         Dr. Garabrant is our first witness, scientific

23 witness that we'll call.  He's an epidemiologist, Professor

24 Emeritus from the University of Michigan, School of Public

25 Health.  He'll explain based upon -- explain what epidemiology

Laura Andersen, RMR 704-350-7493

1    is.  Why it's important.  Why it's a necessary component to

2    understanding disease causation and making predictions about

3    increased risk of disease.  And he'll identify for us and walk

4    through the different occupations that are at increased risk,

5    and what is the nature of that work.

6           And we'll find, ultimately, I believe, that those

7    occupations that are at risk for disease from mesothelioma,

8    all have significant asbestos insulation exposures.

9           Our industrial hygiene experts consist of Larry

10   Liukonen and Dr. Still.  They were two of the three authors of

11   the Navy study back in 1978.  Mr. Liukonen went on to work for

12   the railroad and in private consulting, and is published in

13   the peer-reviewed literature on asbestos gaskets.

14          Fred Boelter is another -- Dr. Still went on to have

15   a very distinguished career in the Navy.  He became a captain,

16   was in command of the Navy's toxicology laboratory.

17          Fred Boelter started out working for OSHA, as a OSHA

18   inspector.  Went into private consulting.  He's done a number

19   of gasket studies that have been published in the

20   peer-reviewed literature, at least two articles.  But we also

21   asked him to do the assessment that you'll hear about on

22   insulations exposures.

23          What you'll find or what you'll hear, is that there

24   was not -- the insulation exposures that were in the

25   literature, involved -- typically involved work practices

1   involving lots of insulation.  At one particular time there

2   wasn't specific data in the literature on what is the exposure

3   someone has when they remove just enough insulation to replace

4   a gasket.  That's what Mr. Boelter studied.  That was the

5   video that you saw at the beginning of our opening, and he'll

6   come and testify about that.

7           And John Henshaw was the former head of OSHA.  He

8   did the analysis of the questionnaires.

9           Dr. Sporn is a Duke professor of pathology,

10   associate professor of pathology at Duke.  His laboratory has

11   been a pioneer in looking at the lung tissues of individuals

12   with mesothelioma.  And he'll be able to share with you what

13   they found in looking at those lung tissues, in particular,

14   what is the fiber type of asbestos that they found.

15           Dr. David Weill, reviewed and determined the medical

16   significance of the information that Mr. Henshaw analyzed.

17           We'll also call three witnesses that are very

18   specific to *Daubert* issues.  Dr. Hesselink will testify about

19   the work he's done to look at this issue of what Dr. Longo

20   says you can see when you're looking at work activities under

21   Tyndall lighting.

22           I should say that Tyndall lighting is an important

23   issue.  Evidently it was very -- it was persuasive to Judge

24   Fitzgerald in the *Bondex* decision.  She cited it in her order.

25   But she cited it saying that just from looking at the video,

1    it looks like there's a large quantity of asbestos that even

2    bystanders would be exposed to.

3          In fact, Dr. Longo says, but it's hard to not to

4    believe your eyes. Dr. Longo says, well, you can't quantify

5    the exposure to asbestos from watching Tyndall lighting. You.

6    Absolutely can't.  Because what Dr. Hesselink has demonstrated

7    and will share with the court, is that you cannot see respirable

8    asbestos fibers under the Tyndall light.  They're microscopic

9    and you need a microscope to see microscopic particles.

10         Dr. Anderson was the founder, and I believe the

11   first director of the EPA's assessment group.  The risk

12   assessment group at EPA that did the first risk assessment on

13   asbestos.  She'll explain the proper use of public health

14   agency statements that underlie the decisions that say you

15   can't use public health agency's statements for causation.

16         Dr. Weed, former chief of preventive oncology at the

17   National Cancer Institute.  He's an epidemiologist who's

18   published widely on the methods of determining causation.

19   He'll talk about the committee's experts' methodology as to

20   whether they've followed proper scientific methodology in

21   reaching their conclusions about either chrysotile or low-dose

22   causation.

23         Your Honor, we look forward to bringing our case to

24   you.  Thank you.

25         THE COURT:  Thank you.

               Laura Andersen, RMR 704-350-7493

1          MR. CASSADA:  Your Honor, I'm back to forecast for

2    you the evidence that you'll hear on our economic approach

3    estimating liability.

4          Your Honor, our approach to estimating the number

5    and the amount of valid claims follows the approach that

6    courts take in adjudicating disputed claims pursuant to our

7    adversary system for resolution of disputes.  This is

8    precisely what the code requires.

9          Applying state law and taking into account relative

10   evidence, we estimate the amount of probable damages that

11   would be assessed against Garlock, discounted by the

12   likelihood of success.  Our merits-based approach thus has two

13   variabilities.

14          First, we estimate the compensatory award share that

15   Garlock might face in cases against it -- in the typical case

16   against it.  And we estimate the liability of plaintiff's

17   success.  We use those two numbers to estimate what liability

18   Garlock might face.

19          Now we should note, this is not a novel approach,

20   just the opposite.  It focuses on the core legal elements of

21   liability, plus relevant evidence.

22          What is novel is what the committee and the futures

23   representative propose to do, which is depart from the rule of

24   law and equate liability with settlement.  They urge this

25   approach based on their theory that merit is somehow baked

1    into settlements.  I'll show later that this is simply not

2    true.  But in any event, their approach would never happen in

3    state or federal court or any court of law.

4          Now from court ordered discovery, we have had access

5    to extensive evidence.  In fact, you'll hear that Bates White

6    has constructed the most extensive database in the history of

7    asbestos litigation.  Bates White has used all of the data

8    it's collected.  In the database and all the evidence gathered

9    therein, it reveals the truth about Garlock's responsibility.

10   And that truth is completely consistent with what you've heard

11   from Mr. Harris about the science.

12         Garlock's claimants had massive exposures to other

13   asbestos products, even though those exposures didn't always

14   appear in the cases against Garlock.

15         In fact, those exposures included exposures to many

16   different products by companies that made amphibole asbestos

17   insulation.

18         The data says that typical claimant against Garlock

19   has exposures -- identified exposures to at least 36 other

20   products produced by other companies.

21         In the science that you heard Mr. Harris describe,

22   shows what this means in comparative terms, that Garlock

23   really is a bucket in the ocean in virtually every case when

24   you consider the number and sources of other exposures.

25         Now this affects both variables in the estimation

Laura Andersen, RMR 704-350-7493

1    process.   It affects compensatory award share, because in

2    asbestos litigation, the verdicts that plaintiffs get, will be

3    shared among all responsible parties.   It also affects the

4    likelihood of plaintiff's success.

5          You'll hear about Garlock's defense in asbestos

6    cases, and that defense focused on showing that under science

7    Garlock's products simply did not release enough asbestos to

8    cause disease, and comparing that with the exposures that

9    folks -- workers who actually came into contact with Garlock's

10   gaskets, what the exposure they suffered from asbestos

11   insulation.   That was a very effective defense.

12         And we'll show you that when all of the evidence was

13   in the courtroom, that Garlock won virtually every case.   In

14   fact, Garlock won 92 percent of the cases that went to

15   verdict.   So the -- when all of the evidence is available, the

16   plaintiff's likelihood of success is no greater than

17   8 percent.

18         Now in applying our merits-based approach, we asked

19   Dr. Bates to make three simple assumptions.   First, we asked

20   him to assume that all claimants who allege contact with

21   Garlock's asbestos-containing products, proceed to trial in

22   final judgment.

23         And second, that courts do not exclude claimant's

24   causation evidence under *Daubert* or other rules of evidence.

25         Now you just heard the science, and you know those

1   two assumptions are completely appropriate, because they're

2   actually against Garlock's interest.  We think that when the

3   proper rules are applied, very few cases would ever actually

4   make it to a jury against Garlock.

5           The last assumption we asked Dr. Bates to make, is

6   that courts and juries have access to all of the information

7   that plaintiffs or their counsel either have or can reasonably

8   obtain regarding plaintiff's exposures.

9           Now this too is an eminently reasonable assumption.

10  It simply mirrors the discovery obligations imposed on parties

11  and their lawyers on the rules of procedure.

12          Now it also happens to reflect the situation in this

13  estimation case.  We've gathered actual evidence in our case

14  about what claimants and their lawyers will eventually say

15  about what caused claimant's diseases.  From that evidence we

16  know that claimants will eventually identify 36 separate

17  causes for their diseases; 22 of these will be products that

18  are now part of the trust compensation system; 14 will be

19  defendants in the court system.

20          That's not surprising at all, because the companies

21  that produced the most dangerous products and who really

22  produced all the insulation products, they filed for

23  bankruptcy in the early 2000s, and they've established trusts

24  to assume their liability.

25          Now our estimation approach is a merits-based

1   approach.  So as a starting point, Dr. Bates had to consider

2   how juries or how courts would allocate -- that is to

3   Garlock -- under the different state apportionment regimes.

4        So we surveyed every state in the country.  We

5   divided the different allocation rules into three different

6   categories.  First, pure joint and several liability states.

7   Second, pure several liability states.  And finally, there are

8   several states that adopt hybrid rules.  You'll see on the map

9   we have here that we divided those up into three categories.

10  Most of them are pure several liability states.  In actuality,

11  some of those states do apply hybrid rule.  But we think for

12  all effective purposes in our case, those rules don't apply.

13       For example, Texas.  The rule in Texas is that

14  parties are only liable for their several share of a

15  plaintiff's damages as determined by jury.  But if a jury's

16  determined that a party's at least 50 percent liable, then

17  that party may have joint and several liability of the whole

18  thing.

19       Given that Garlock in a typical case would be one of

20  36 separate causes, those rules have never applied.

21       Dr. Bates then divided the different claimant

22  groups, both pending claims and future claims between the

23  three different liability regimes.

24       The next step was to estimate what the typical

25  plaintiff would receive in terms of a verdict.  And to

1    estimate verdicts, Dr. Bates looked at databases that have all

2    the reported verdicts, at least in the literature, and

3    mesothelioma cases.  He also looked at verdicts from other

4    databases and other tort context, other wrongful death and

5    personal injury verdicts.  He considered all of those.  And he

6    will tell you about what conclusions he reached about

7    estimating the verdict.

8         Under Dr. Bates' estimation model, verdict amount

9    can vary by state and claimant personal characteristics.

10   Dr. Bates in his approach takes those into account.

11        So we first focus on the analysis and pure joint and

12   several liability states.

13        Now as the court knows, the liability of reorganized

14   companies and companies in tort, are treated -- in the tort

15   system are treated differently under pure joint and several

16   liability.  Trust payments come off of the top of the verdict.

17   Once the trust payments come of the top of the verdict, the

18   remainder would be allocated among 14 different tort

19   defendants.

20        So Dr. Bates estimated what Garlock's share would be

21   of the remainder of verdicts in joint and several states after

22   application of trust payment.

23        Now note here that there's a very -- there's another

24   very claimant friendly assumption in Dr. Bates' approach, and

25   that is that the remaining share of a verdict after

Laura Andersen, RMR 704-350-7493

 1    application of trust payments, would be allocated to Garlock

 2    on a pro rata basis.

 3         So the way that the allocations are actually made in

 4    many states, is that a jury determines defendant's various

 5    shares and will allocate them in accordance with what the jury

 6    determines is the fault of each defendant.

 7         Our assumption is that everyone gets treated the

 8    same, which again is a very friendly assumption, given the

 9    low -- we think -- medically insignificant dose that

10    plaintiffs can get from a Garlock gasket.

11         Dr. Bates then focused on pure several law states.

12    Of course in those states the estimated verdict would be

13    sliced 36 different ways.  The trust and the tort defendants

14    are treated the same.  So Garlock would bear 1/36th of a

15    verdict in these states.

16         And finally there's several states that follow

17    hybrid rules, and Dr. Bates treated those states differently.

18    Now in these states, California, Texas to name a couple,

19    Courts -- the state law treats economic damages and

20    non-economic damages different.

21         Economic damages are often apportioned in accordance

22    with pure joint and several liability rules.  Non-economic

23    damages, pursuant to several liability rules.

24         So in these states, Dr. Bates first had to estimate

25    how damages would be allocated between the economic and

1   non-economic for each verdict.

2          Then for the economic damages, he applied the

3   approach I described earlier.  For pure joint and several

4   liability states, deducting the trust settlements first, at

5   least the trust settlements that would be allocated to

6   economic damages, and allocating the remainder 14 different

7   ways.  Then of course for non-economic damages, Dr. Bates

8   allocated 1/36th of those damages to Garlock.

9          Having determined or estimated Garlock's potential

10  share of damages and claims, Dr. Bates then discounted those

11  by the plaintiff's likelihood of success.  And for this,

12  Dr. Bates determined the likelihood of success was no greater

13  than 8 percent.  In fact, he concluded the likelihood of

14  success was less than 8 percent.

15         And there are a number -- you'll hear there are a

16  number of basis for this conclusion.  You've heard the

17  science -- you'll hear the science evidence that supports that

18  conclusion.  You'll also learn that Garlock, more than most

19  defendants, tried its share of cases, tried its share of

20  mesothelioma and other cases.

21         And during the time period when Garlock had all of

22  the evidence on the table -- as I said earlier, Garlock was

23  extraordinarily successful and won most of the cases that it

24  took all the way to trial.  So 8 percent is an appropriate

25  estimate for likelihood of success.

1           And Dr. Bates used econometric principles to

2    actually test that likelihood of success, and determined that

3    if you applied likelihood of success to all claims, that it

4    would actually be much lower than 8 percent.

5           So having discounted the estimated share of

6    judgments, Dr. Bates multiplied those by the number pending

7    claimants who actually alleged contact with Garlock products.

8    And the result was that Dr. Bates estimates that Garlock's

9    actual legal liability for clients would be -- for pending

10   claims, would be less than $25 million.

11          For future claims Dr. Bates followed the same

12   procedure, only he estimated that the future claims by

13   reference to an incidence model which predicted disease for

14   workers who would have worked with Garlock's gaskets.  And he

15   estimated based on Mr. Henshaw's different exposure groups

16   that you heard about from Mr. Harris.  The number of claimants

17   within those occupations who would actually come into contact

18   with a Garlock gasket.

19          And applying a formula to the projected future

20   claims, Dr. Bates estimates that Garlock's actual legal

21   liability would be no greater than $100 million, and therefore

22   the total liability that Garlock, under the Bates analysis,

23   would be that Garlock's liability for claims would be no

24   greater than $125 million.

25          As the court knows, Garlock has proposed a plan that

Laura Andersen, RMR 704-350-7493

1    would provide funding -- total funding of $270 million on a

2    net present value basis.  You'll hear from Dr. Bates about

3    that plan, and how based on Garlock's actual legal liability

4    and the provisions of the plan, that $270 million is more than

5    sufficient to pay all claims.

6             So that's the approach.  It's based on a reliable

7    scientific method.  It's based on merit.  Based on evidence.

8    And the result is actually what you would expect for a company

9    that produced products that were used in environments where

10   plaintiffs would have experienced massive other exposures and

11   particularly gaskets.

12            So I now turn to the evidence that we'll offer in

13   rebuttal to the settlement approaches that you'll hear from

14   the experts for the committee and futures representative.

15            Now the first noteworthy thing is, they are not

16   estimating the same thing as Dr. Bates.  They're estimating

17   what Garlock's future settlements would be.  In fact, to be

18   more precise, they're ignoring that the bankruptcy case was

19   ever filed, and they're forecasting settlements in a

20   counter-factual world in which Garlock had never filed for

21   bankruptcy.

22            Dr. Peterson opines that Garlock's future

23   settlements would be approximately $1.3 billion.

24   Dr. Rabinovitz estimates that Garlock's future settlements

25   would be $960 million.  Now these are astonishing numbers when

1   you consider Garlock's actual history of settling claims.   As

2   we'll hear, they both use the same so called calibration

3   period.

4          We'll offer a lot of evidence about the many things

5   that are wrong with their opinions.   They do not use a

6   reliable methodology.   We filed a motion to exclude their

7   opinions based on *Daubert*.   We understand the court will take

8   those under advisement.   They make many fundamental data

9   mistakes.   In fact they ignore actual data that we collected

10  during the course of the case.

11         For purposes of the next few minutes that I'll be

12  talking about this, I'm only going to focus on two

13  foundational problems that you'll learn about.

14         First, Dr. Peterson and Dr. Rabinovitz, they assume

15  that settlements reflect liability.   This contradicts the

16  fundamental tenants of economics that explain why Garlock's

17  settlements in fact were several times higher than its legal

18  liability.

19         Second, they ignore that settlements during their

20  calibration period are particularly inappropriate in its

21  proxy's for liability, because they're inflated by a desire to

22  avoid escalating high cost of trying cases and incomplete

23  factual records, in many cases resulting from evidence

24  suppression.

25         I should begin, Your Honor, by explaining that there

1   is a difference recognized in the law and economics literature

2   between liability and settlements.

3          In fact, this is a formula that first appeared in a

4   famous article, at least famous in some circles, by Richard

5   Posner, where he highlights the difference between settlements

6   and liability.  Judge Posner said -- is saying, basically,

7   parties settle cases for reasons other than liability.  And

8   you'll see under the formula you'll recognize the first part

9   of it, and that's a debtor's expected liability.  That's

10  precisely the formula that we're using in our direct approach

11  to estimating liability.  But defense cost and other cost

12  affect settlements greatly.

13         In fact, Dr. Posner or Judge Posner concluded in his

14  article that under the economics of settlement, a defendant

15  will rationally pay or offer as its maximum offer, its

16  expected liability, plus the defense costs that it can avoid

17  by going to trial.

18         Now this does not sound like a very profound

19  conclusion to any lawyer that's ever settled a case.  We all

20  know that when we settle cases, we consider the cost of going

21  to trial.

22         In fact, this formula and the intuitive judgment

23  they reflect, is precisely why we have rules that say

24  settlements are not admissible in a court of law to establish

25  the validity or amount of claims.  It is one of the reasons we

Laura Andersen, RMR 704-350-7493

1  have this rule.  Because implicit in the rule is what everyone

2  knows, and that's settlements do not reflect liability.

3       Now this chart depicts or actually shows the

4  information about the average amount that Garlock paid to

5  resolve mesothelioma claims during the 20 years preceding its

6  bankruptcy case.

7       Now I should add the amount you see here is the

8  average amount that Garlock paid to settle cases where it

9  actually made payments.  There were a number of cases, a large

10  number of cases were dismissed or resolved without any payment

11  at all.

12       Now what Doctors Rabinovitz and Peterson say, is

13  that in order to estimate Garlock's liability, we got to look

14  at these years, these four or five years right before

15  Garlock's bankruptcy case.

16       And why are we looking at those years?  Simply

17  because those are the years closest to the bankruptcy case.  I

18  haven't heard any other reason they do that.

19       No analysis regarding why these settlements were the

20  amount that they were, or why it would be reasonable to

21  conclude that those settlements reflect the world that Garlock

22  would be resolving claims in into the future.

23       Now there is a science that predicts human future

24  economic behavior; that science is econometrics.  That's the

25  science that Dr. Bates is applying in our merits-based

1     approach.  But it can also be applied to predict future

2     settlements.  And in fact, Dr. Bates did apply that type of

3     approach when he was estimating Garlock's liability for

4     financial statement purposes.

5             But as I said, you're measuring two different

6     things.  And you would naturally expect an estimation of

7     liability in a mass tort case where defendants face very large

8     cost of defense and management of the litigation that they

9     hope to avoid.  The cost of settlement is going to exceed the

10    cost of liability.

11            Now, an econometrician before picking a so called

12    calibration period, will look at the entire history of

13    Garlock's settlements.  And the first thing you would note is

14    that there's a huge difference between Garlock -- what Garlock

15    was paying in the 1990s, and what Garlock paid in the 2000s.

16            So the first we should ask is, what are the factors

17    that drive those differences?  What are the influences that

18    people -- that drove settlements in 1990s?  What are they in

19    the 2000s?  What changed?  Can we expect that change to be a

20    permanent change, or was that a temporary change?

21            That's the analysis that Doctors Peterson and

22    Rabinovitz should have followed in rendering their opinions,

23    and the evidence will show that they did not.  And that's one

24    of the things we will focus on during our rebuttal of our

25    case.

1          So what you'll hear and what you've already heard is

2     that beginning in 2000, and extending through 2001, there was

3     a bankruptcy wave.  We didn't create the term "bankruptcy

4     wave".  In fact, the first place I saw it was from an expert

5     report provided by the committee's expert, Dr. Peterson.  That

6     that bankruptcy wave took the nine top tier defendants that

7     you see listed here out of the tort system into bankruptcy.

8     Of course these were the biggest companies out there, and they

9     were paying most of the liability.

10          They were -- just about all were thermal insulation

11    companies.  These are the companies described by Mr. Harris

12    when he was showing you the video.  These are companies that

13    made highly friable amphibole insulation products.  Now there

14    are a couple that didn't, USG produced, principally, a joint

15    compound that was used in filling seams in wallboard.  But

16    that was a highly friable product, and they became a popular

17    target for plaintiffs.

18          But most of these cases -- most of these companies

19    produced the really dangerous amphibole insulation products

20    that Dr. Selikoff opined were the causes of mesothelioma.

21    These companies that were paying the most money, they were

22    paying the most clients, they went into bankruptcy.

23          You'll see that when they went into bankruptcy, a

24    whole host of companies were swept up with them.

25          Now their bankruptcies were caused by an avalanche

Laura Andersen, RMR 704-350-7493

1    of non-malignant claims brought by people who were not sick.

2    We know now that the vast majority of non-malignant claims

3    were manufactured by plaintiffs' firms and complicit doctors

4    that everyone now understands were fraudulent.

5              In the words of Judge Janice Jack, the diagnosis for

6    these claims were "driven by neither health nor justice, but

7    were manufactured by money".

8              So it was that phenomenon that took most of the

9    compensation for asbestos claims out of the tort system.  As

10   you've heard, Garlock itself is victimized by the fraudulent

11   medical screens.  Garlock paid almost $1 billion to resolve

12   several hundred thousands of these claims, a few hundred

13   dollars at a time, several hundred thousand dollars, little

14   cuts at a time that eventually amounted to almost $1 billion.

15   That's where a lot of Garlock's compensation -- or a lot of

16   the money that Garlock paid in compensation claims went before

17   this bankruptcy case.

18             Now this bankruptcy wave, it describes -- or it

19   provides the reason that Garlock's settlements went up during

20   the 2000s.  In fact, there's no serious dispute about the root

21   cause of Garlock's products, the disappearance of the thermal

22   insulation companies.  Without these companies, as you've

23   heard, plaintiffs' firms targeted Garlock and other low-dose

24   producers for trial.  They demanded that they, "pick up the

25   share of payments lost to the bankruptcy wave."

1              Now the immediate impact of this is that it
2     increased Garlock's overall cost to defend cases.  Garlock was
3     forced to either try more cases or pay higher settlements.
4     Now Garlock rationally paid more to settle claims, because the
5     escalating defense cost which could be avoided, increased the
6     benefits of settlement, even at the higher values.

7              Now, there was also an increase in the actual costs
8     of trying individual claims.  As you'll see here, this is data
9     from selected claims that were tried during the earlier
10    period, the 1990s and the later period.  And you'll see the
11    gargantuan increase in the amount to actually try a case.
12    This makes clear that these incentives that Garlock had for
13    paying more to settle claims.

14             Now the evidence will show that there was an
15    additional impact of bankruptcy wave, a very disturbing
16    consequence of the wave.  That as evidence of thermal
17    insulation exposure decreased, and even disappeared in some
18    cases, many of the plaintiffs' lawyers say now that they
19    "improved their cases against Garlock".  But they did so
20    because their clients no longer acknowledged exposures to
21    thermal insulation made by companies that went into
22    bankruptcy.

23             Now the Baron and Budd memo from 1998 shows that
24    plaintiffs recognized early on how they could increase or
25    maximize their claim values, simply by not admitting to

Laura Andersen, RMR 704-350-7493

1   evidence of alternative exposures.  And you'll see here, this

2   is the Baron and Budd memo.  This was a memo that was

3   uncovered in the late 1990s, just before the bankruptcy wave

4   that I described.

5          The memo is quite illuminating and actually

6   confirmed what many defendants expected, because there was a

7   bankruptcy effect before that, it was even before the

8   bankruptcy wave, when some defendants, very prominent

9   defendants introduced products that most plaintiffs would have

10  been exposed to when they disappeared, there was the

11  bankruptcy effect, the evidence disappeared in the tort

12  system.  This memo explains why.  This is a witness

13  preparation memo.

14         First, it's noteworthy here that in the late '90s,

15  that the Baron and Budd firm identified Garlock as someone

16  that plaintiffs could remember.  Garlock made gaskets.  And

17  the plaintiffs are admonished to be sure you know the names of

18  all the products listed on the worksheet.  Garlock made

19  gaskets.

20         But the memo also instructed witnesses what

21  testimony would maximize the value of their claims.  Do not

22  mention product names that are not listed on your work-product

23  sheet.  Defense attorneys will jump at the chance to claim

24  asbestos exposure on companies that were not sued in your

25  case.  So it's important that you name the right companies and

1    you don't name the other companies, because that would affect

2    your claim and you would be unable to "maximize the value of

3    your claim".

4         Now we'll offer the Baron and Budd memo into

5    evidence, and you'll hear testimony about that.  But there's

6    another part of it that's interesting and noteworthy there,

7    and that is that the memo itself shows that plaintiff's

8    lawyers appreciated that they controlled the evidence of

9    exposure.  They say at one point that you're going to be

10   sitting across the table from a defense lawyer, but don't

11   worry, they are very young.  There's not a thing they can do

12   to refute what you say about what your exposures were in your

13   deposition.  In fact, they say, they weren't there.  There's

14   not a thing they can do about it.  So don't worry about being

15   contradicted.

16        Now let's go back to the -- Judge Posner's formula.

17   With increasing defense costs that Garlock faced, you would

18   expect that the value of a settlement to Garlock would be

19   greater, and so that the cost of settling claims would

20   increase, purely from an increase in Garlock's defense costs

21   that could be avoided by going to trial.

22        Judge Posner's formula, in fact, explains why a

23   company that expects its liability to be zero, might still pay

24   a lot of money to avoid having to take a case to trial.

25        But suppression of evidence has an entirely

Laura Andersen, RMR 704-350-7493

1  different and more impactful effect.  In fact, when you

2  suppress evidence, it affects all three variables;

3  compensatory award share.

4         Remember how we divided up liability under the

5  different states.  If you can make culpable parties disappear,

6  that means that the companies that you're targeting will pay

7  more, and therefore you drive up their expected liability.

8         Likelihood of plaintiff's success.  Now remember

9  that Garlock's defenses were very powerful when they could

10  point to the amphibole insulation.  And when they could point

11  to the amphibole insulation, juries understood.  That's why

12  Garlock had a high success rate.  Juries understood that any

13  exposure to Garlock gasket was a bucket in the ocean.

14         But, if Garlock doesn't have the evidence, the ocean

15  becomes a bathtub.  So now Garlock is a bucket in a bathtub.

16  And Garlock, although it still won the majority of cases its

17  cases, its defense became marginally less effective.

18         And defense costs, the slide that I showed you

19  earlier of those huge defense cases, those were in cases where

20  Garlock faced the disappearing evidence phenomenon.  Because

21  when the plaintiffs weren't admitting that they were exposed

22  to these products, then Garlock had to hire experts and try to

23  take advantage of other rules of discovery to fill in the

24  missing evidence.

25         And you'll hear during the course of the trial that

1   Garlock would hire someone who would be an expert on products

2   used in the Navy, and put those on and the plaintiff's lawyers

3   attacked them saying, well, maybe the products were there, but

4   you can't show that my client actually was exposed -- used or

5   worked around those products.  Those experts obviously weren't

6   there and they have to admit that.

7           So in any event, when evidence is suppressed, all

8   three of the factors increased, and the maximum offer that a

9   defendant will rationally make will increase along with it.

10          Now we submit that the evidence will show that these

11  are the factors that drove Garlock's settlements on

12  mesothelioma claims from a few thousand dollars a claim in

13  1990s, to tens of thousands of dollars later during the 2000s.

14          Now Garlock rationally believed that the

15  reorganization of the thermal insulation companies, and the

16  creation of the wealth and trust system to pay claims would

17  provide at least some relief from the disappearing evidence.

18          It was rational to conclude that once the money was

19  put in the trust and became available, the evidence would

20  follow the money.

21          If you look at the bankruptcy cases and the trust

22  distribution procedures in order to collect from a trust, the

23  plaintiff has to show meaningful and credible exposure to the

24  trust product.  And surely one would expect that that evidence

25  would be available to defendants in tort system.

Laura Andersen, RMR 704-350-7493

1       We see this in Garlock's financial reporting,

2   beginning in -- in EnPro's financial reporting beginning in

3   2004.   That this was an expectation of EnPro and it was an

4   expectation of other defendants.   And even Dr. Rabinovitz, the

5   claims expert that Mr. Grier has hired to put on evidence in

6   this trial.

7       She opined in an opinion she offered in the ASARCO

8   case, that the recent availability of $30 billion in new

9   asbestos trust assets, would now place considerable downward

10  pressure on indemnity values.   Judge Posner's model shows

11  exactly why that statement is true.   This was an opinion that

12  Dr. Rabinovitz gave when hired by attorneys who represented

13  the debtor.   This was her opinion in that case.

14      Now what we know now what Dr. Bates will tell you is

15  Garlock did get some relief from the trust.   However, in many

16  cases, plaintiffs' lawyers and plaintiffs continued to press

17  Garlock, target Garlock in implausible ways, continued to

18  insist that they had no evidence of exposure to products for

19  which trust would be responsible.

20      Now these stories were implausible, but for reasons

21  I've explained, they were difficult or impossible for Garlock

22  to completely and effectively address, until Garlock could get

23  the actual evidence, which in many cases is controlled by the

24  plaintiff.   These practices continue to impose trial risk on

25  Garlock and continue to impose increasing defense cost.

Laura Andersen, RMR 704-350-7493

1          Now during the course of this case, actually --

2     this, Your Honor, might be the point where we should close the

3     courtroom, because I'm going to talk about evidence that

4     parties have deemed to be confidential.

5          THE COURT:  It seems to me I've seen and heard a lot

6     of this already.  Since this is just the opening, why don't we

7     just skip this now.  I think I know where you're going with

8     it.  I'm going to hear it later, but as evidence.  And we're

9     already running a little late.  Why don't we just do it that

10    way?

11         MR. CASSADA:  Okay.  May I confer, Your Honor, for a

12    moment?

13         THE COURT:  Yes.

14    (Pause.)

15         MR. CASSADA:  Your Honor, I'll proceed however the

16    court wants me to.  There was some video testimony that I was

17    going to offer that Your Honor has not seen before, that

18    doesn't go just to the facts of the case, but it shows that

19    these practices that we're complaining about are indeed -- or

20    the conduct we are complaining about, are indeed practices

21    that Garlock would have faced in a systematic way.  So we can

22    show that --

23         THE COURT:  All right.  I'll let you try the case

24    the way you want to.

25         So we'll ask that at this time, ask those who have

Laura Andersen, RMR 704-350-7493

1   not signed a confidentiality agreement to leave the courtroom.

2           MR. SWETT:  Your Honor, is this an appropriate time

3   for a morning break?

4           THE COURT:  I'll ask the staff, are you all ready

5   for a break?

6           Let's -- why don't we take a 10-minute break until

7   11:15.  Come back at 11:15 a.m.

8           (A brief recess was taken in the proceedings.)

9           MR. SWETT:  Your Honor, there may be people in the

10  courtroom who were not present when you gave the instruction

11  for what is coming so I would ask you to repeat the

12  instruction.

13          THE COURT:  Anybody here who has not signed a

14  confidentiality agreement should leave now for the rest of

15  this presentation.  And then when we get through this part of

16  it, you all will be welcomed back.  Okay.

16          MR. CLODFELTER:  Good morning, Your Honor.  It's, I
17  think, still morning, and I'm going to be brief, I hope.  I
18  have only one point I want to elaborate, and it's a point that
19  Mr. Cassada made, but I think it warrants some expansion.
20  It's perhaps somewhat obvious, but sometimes the obvious is
21  what really needs to be said.  And it goes to what we think is
22  the fundamental difference between the approaches that are
23  being taken in this proceeding, and in fact in the whole
24  Chapter 11 case by the debtors and by the committee and by the
25  FCR.  And I can boil it down into one sentence.  We are in

1   this court for a reason.

2          Very simply, in the non-bankruptcy processes that we

3   experience with resolving the asbestos tort claims, those

4   processes were unsustainable.  They just could not continue.

5   We're here today because the continuation of those

6   unsustainable processes would have benefited no constituency

7   in this case.  And the unsustainability of those processes is

8   of importance not just to Garlock and to its other unsecured

9   creditors and to its equity owner whom I represent, but also

10  to those individuals whose asbestos claims have not yet

11  arisen, have not yet been presented, and that will not be the

12  case for many years to come.

13         And so we are here to use the bankruptcy processes

14  and the bankruptcy rules to establish a sustainable process

15  going forward from this point.

16         A sustainable process for resolving claims in the

17  future that will benefit not just Garlock and its owners and

18  other creditors, but also asbestos claimants against Garlock.

19         Coltec is only going to offer one witness in this

20  proceeding, Dr. James Heckman, University of Chicago,

21  econometrician and a recipient of the Nobel prize in

22  economics.

23         Among other things that Dr. Heckman -- commenting on

24  the counter-factual world presented to you by the committee

25  and the FCR, will make the very common sense point that it is

1   absolutely absurd to project that any company would ever

2   continue to pay an ongoing stream of liabilities that are

3   projected to exceed the present value of its assets, expresses

4   a function of its future operating income.  There is simply no

5   economic incentive to continue a losing proposition.

6            We're here in July and we're over three years into

7   the Chapter 11 case.  But even now, three years later, the

8   committee and the FCR are still in denial about the

9   proposition that I just stated.  They're in denial about the

10  fact that we're here in this courtroom, and not still in the

11  pre-bankruptcy tort process.

12           And the case they will present to you in this

13  estimation proceeding demonstrates their continuing denial of

14  that fundamental fact.

15           Their justification that they will offer for the

16  case that they're going to present and their denial of our

17  being here has shifted somewhat of the course over the last

18  three years.

19           At first the very beginning of the case they were

20  heard to say, well, this is the way you do it, Judge, because

21  this is the way everyone has always done it, and therefore you

22  must do it that way.  This is the so called standard

23  methodology for doing claims estimation.

24           That myth was long ago exploited by the briefing of

25  the parties, setting out exactly what actually happened in

1  other Chapter 11 asbestos cases, and how and why estimations

2  were done in those cases, and exactly the way they were done

3  at the time they were done.

4      I won't repeat that here, except to say that all of

5  those cases differ in important ways from the estimation task

6  that you confront.

7      You are not being called upon to do an estimation

8  for the purpose of providing a general validation or cross

9  check for a consensual plan or an agreement already reached

10 among the parties to the case.

11     The task in this proceeding is not being conducted

12 for a discrete or a single purpose, such as to apply as in

13 *Armstrong*, the antidiscrimination rule with respect to the

14 treatment of different classes of creditors.

15     The estimation task that this court confronts will

16 require a more nuanced analysis.  It will require findings,

17 and judgments about multiple discrete issues that the parties

18 then take away from this proceeding, formulate their plans for

19 reorganization, to decide the classifications issues and the

20 voting issues, to structure a post-reorganization trust and

21 perhaps to conduct negotiations about all of those topics.

22     A somewhat more refined, but still the same

23 variation of basic theme of the committee and the FCR's

24 contention that you must do what they say because everyone

25 else has done it, then emerged in the following form:

Laura Andersen, RMR 704-350-7493

1          You are required to follow applicable non-bankruptcy

2     tort law in estimating, or for that matter, in actually

3     adjudicating or allowing claims, and therefore you must

4     estimate those claims by replaying in this court, the outcomes

5     that would have been realized in the non-bankruptcy tort

6     system.

7          This version of the case that they will present to

8     you as we have previously argued in our briefing is simply a

9     plain old garden variety *non sequitur*.

10         The substantive principles of state tort law drive

11    the court's estimation, and guide the decision as to whether

12    or not an asserted claim or group of claims, is or is not

13    valid against these debtors.  And if they may be valid, in

14    what amount they should be estimated.  But that is a very far

15    cry from the proposition that you should use and repeat in

16    this court, the results of the unbalanced processes that

17    occurred in the litigation and resolution of claims in the

18    non-bankruptcy system.

19         It is the point we argued in our brief a year ago,

20    and I won't belabor here.

21         Later on a new and interesting rationale for the

22    committee and the FCR's position emerged.  It was articulated

23    by Mr. Swett in the June 27 argument against the debtor's

24    renewed motion under Rule 408 to exclude evidence of

25    prerequisite settlements.  It was also repeated by the FCR's

1    expert witness in her deposition and we will likely explore

2    that point further when she testifies.  And the thesis goes

3    something like this:

4         In this proceeding, Your Honor really isn't

5    estimating tort liabilities at all.  What you are estimating

6    is a set of contract liabilities based on negotiations between

7    Garlock and asbestos claimants.  And that's why Garlock's

8    pre-bankruptcy's settlements are determinative of this

9    estimation proceeding.

10        You might, in other words, under this kind of

11   reasoning you might think of the asbestos claimants as sellers

12   of releases, and Garlock as a buyer of releases.  That's a

13   very clever theory, Your Honor, but it still rests on the

14   fundamental thesis, the purpose of this proceeding is to

15   replicate the results that would have been realized, had

16   bankruptcy never occur.

17        The analogy though that has emerged in this is

18   actually quite apt, but not for the reason that the committee

19   and the FCR have contended.  If you think about markets,

20   economists speak of efficient markets as being ones in which

21   the relative prices at which different products change hands

22   between buyers and sellers, are a reliable measure of their

23   real worth or value to the market participants.

24        Efficient markets are marked by transparency,

25   information about the characteristics of the products being

1    offered, information about the identities of the buyers and

2    sellers, information about the prices at which the products

3    change hands, is known to or known by all participants in real

4    time in the marketplace.

5           Efficient markets exhibit consistently applied rules

6    of operation that do not favor one group of sellers over

7    another, or one group of buyers over another, or buyers that

8    were sellers or vice versa.

9           Most, if not all efficient markets have a traffic

10   cop or a regulator to ensure that transparency and consistent

11   application of trading rules in the market are observed by all

12   participants, and exclude or discipline any variations or

13   departures from those rules.

14          In a highly efficient market, buying and selling

15   asbestos claim releases, the question of whether the price of

16   the thing and its true value that are negotiated in the

17   marketplace does not rise.  Whether those are different does

18   not rise.

19          But the asbestos claiming and claims resolution

20   markets, to use the ACC's analogy and the expert's analogy

21   that existed outside bankruptcy, are as the debtors have

22   demonstrated throughout the case and will demonstrate further

23   in this proceeding, notoriously inefficient markets that have

24   historically been characterized by wide and shifting

25   disparities in the availability of information among the

1    market participants, large inequities in bargaining power

2    among the participants based upon control of that information

3    and those disparities, inconsistently applied rules of conduct

4    that vary from jurisdiction to jurisdiction, and historical

5    disruptions that have caused wide price swings in the prices

6    offered and paid for those asbestos releases.

7         Most notable examples that you're well familiar with

8    are the early flood of mass screen non-malignant claims that

9    flooded the market and later were withdrawn from the market.

10        In such inefficient claim buying and selling

11   markets, one cannot have confidence that the prices negotiated

12   between buyers and sellers are reliable indicator of the true

13   value participants could place on the products being traded.

14        The whole point of this Chapter 11 case is to return

15   to a more efficient, and as I said at the beginning,

16   sustainable market that fairly treats debtors and creditors

17   alike.

18        One in which information is freely available, and is

19   exchanged among the release buyers and the release sellers in

20   which there are no information distortions; in which

21   transaction costs for buying and selling are minimized; and in

22   which there are clearly stated and equitably applied rules for

23   how the market will function, backed up by the force of the

24   court.  That's the whole goal of a plan of reorganization.

25   And it is why the future market for the resolution of asbestos

1    claims against Garlock cannot and will not simply be a

2    repetition of the past.

3           So if then Garlock's pre-bankruptcy settlements are

4    not dispositive in this estimation proceeding, what exactly do

5    they mean?  And here Your Honor is going to be called upon to

6    unbake the cake.

7           On the question of what they do mean, the

8    settlements, pre-bankruptcy, the parties will debate for the

9    next three weeks on the relative extent to which the

10   pre-bankruptcy settlements were an amalgam of Garlock's legal

11   liability if it had taken cases to trial with complete

12   information, and applying proper rules of substantive tort

13   law, versus the extent to which those settlements were

14   reflective of Garlock's avoided costs of litigation trial.

15          The committee and the FCR have contended throughout

16   this case that these two ingredients, the evidence concerning

17   the actual liability, and the cost of defense are baked into,

18   that's their phrase, and you've heard it before from

19   Mr. Cassada, are baked into the settlements so you don't

20   really need to worry about it any further yourself.

21          They may be baked in, but the heart of the case that

22   you have in the next three weeks is the relative weight to be

23   assigned to those two major ingredients that were baked into

24   the settlements, actual liability and avoided litigation

25   costs.

Laura Andersen, RMR 704-350-7493

1          That matters greatly to the outcome of this

2     proceeding, because the avoided litigation cost element of

3     that baked cake is necessarily going to be very different in

4     the future in this case, and under a plan of reorganization,

5     than it was before bankruptcy was filed.

6          It will not be possible for Your Honor to estimate

7     the way in which those differences should affect your

8     estimation ruling, unless the court first understands how, and

9     in what ways, and in what measure those two elements, legal

10    liability and avoided litigation costs were baked into the

11    settlement cake in the first place.

12         Garlock's evidence will show, as Mr. Cassada has

13    said, that when properly modeled by valid econometric

14    methodology, over 90 percent of Garlock's pre-bankruptcy

15    settlement payments reflected a value of zero on the liability

16    side, under applicable state substantive tort law.

17         And for that reason, over 90 percent of the present

18    anticipated future claims against Garlock should likewise be

19    estimated to have a zero value, for purposes of determining

20    whether they are valid claims that would be allowable if

21    adjudicated to conclusion in those cases.

22         To demonstrate the correctness of this proposition

23    under controlling non-bankruptcy law, Garlock's evidence will

24    demonstrate the scientific and legal basis for the proposition

25    the merits case Mr. Harris described to you and that you will

1   hear further about, that case will support and serve to

2   validate the conclusions of Garlock's econometric experts be

3   demonstrating that Garlock's econometric estimation of its

4   present and future liabilities is fully consistent with and

5   supported by applicable non-bankruptcy tort law governing the

6   validity of claims.

7            So to recap my one and only point this morning,

8   Garlock is here in this court because the goal of this Chapter

9   11 case is to strip away the extraneous factors that go into

10  negotiating settlements in the tort system, and to obtain an

11  estimation of its actual liabilities under applicable

12  substantive law.

13           With that estimation in hand, the parties can then

14  craft a reorganization proposal that is equitable among

15  claimants holding different types of claims against the

16  debtors, equitable as between present claimants and future

17  claimants, and equitable as between asbestos claimants and all

18  other constituencies holding claims against Garlock.  That is

19  the sole purpose and goal of this proceeding and these cases.

20           If instead the goal is to reproduce in this

21  proceeding and in this case what would have happened to

22  Garlock outside bankruptcy, then this proceeding and the

23  entire Chapter 11 case is pointless.

24           Thank you, Your Honor.

25           THE COURT:  Mr. Guy, are you going to go first --

1           MR. GUY:  I am, Your Honor.

2           THE COURT:  Are you going to go first for your side?

3    Okay.  Good.

4           MR. GUY:  It's now good afternoon, Your Honor, at

5    least by my watch.

6           What was supposed to be an hour and a half became

7    two hours and 20 minutes.  I fear that we're going to have a

8    repeat of that.  But for our purposes, the FCR's purposes --

9           THE COURT:  You'll only have eight days of it.

10          MR. GUY:  That's right, Your Honor.  It all adds up.

11   We'll keep track.

12          Your Honor, Jonathan Guy for the Future Claimants

13   Representative, Joseph Grier, III.

14          Your Honor, I know what we're here today to do,

15   because Your Honor told me.  It's in your order.  We're here

16   today to start a process so we can calculate the aggregate

17   amount of money that Garlock will require to satisfy present

18   and future mesothelioma claims, not non-malignant claims.  We

19   heard from Mr. Cassada about all the perils of non-malignant

20   claims.

21          But we're here today to calculate the aggregate

22   amount for the future mesothelioma claims.  And we're here to

23   do that in the real world, not an idealized world.  How do I

24   know that we're here to do that, because it's in your order,

25   Your Honor.  That's what we have tried to do in preparing for

1    this case.

2              Why do we need that estimate?  We need that estimate

3    to determine the feasibility of the debtor's plan, and the

4    anticipated plan of the ACC or the FCR.

5              For our part, Your Honor, we have delayed in filing

6    our plan for the simple reason that we want the results of

7    this hearing to be incorporated in that plan.

8              Your Honor, we're not here to allow any individual

9    claim or group of claims.  Your Honor knows and recognizes in

10   your order that we can't do that as a practical matter.

11   There's something like 4,300 pending claims.  There's too many

12   of them, and the estates of the claimants have their rights,

13   their jury trial rights under 28 U.S.C. 1441, to pursue their

14   wrongful death claims.

15             Your Honor, I don't say wrongful death claims

16   lightly.  Because anyone who had a mesothelioma claim at the

17   beginning of this case against Garlock is now dead.

18             Mr. Grier's constituency are the 20,000 plus

19   claimants that will arise in the future.  There appears to be

20   an agreement amongst the parties, because of their reliance

21   upon the Nicholson model and various variations of that.  But

22   there will be tens of thousands of claims against Garlock.

23   Garlock of course disputes the merits of the claims, but they

24   don't really dispute there will be tens of thousands of them.

25             Your Honor, the Court and parties are going to look

Laura Andersen, RMR 704-350-7493

1   to the estimate that comes out of this hearing to determine

2   whether their plans are feasible or not, but also whether

3   they're fair and equitable, whether they satisfy the absolute

4   priority rule, and whether critically from EnPro's

5   prospective, whether the plans will garner at least 75 percent

6   of the votes of asbestos claims, to obtain the special

7   injunctive relief under 524(g).

8           In other words, everyone is looking at this estimate

9   to determine whether a party's plan can be confirmed or not.

10  That's the end game Your Honor, confirmation.  That's our

11  focus.

12          Your Honor, as part of that confirmation process,

13  the debtors chose Mr. Grier.  The ACC didn't choose Mr. Grier.

14  The debtors chose Mr. Grier.  And they chose him to be an

15  independent fiduciary for future claims, one who's

16  unaffiliated with any group.  An individual known to the court

17  and this community.  Those that knew that Mr. Grier would

18  fulfill his duties to future claimants with integrity and

19  fairness.

20          Our firm which was recommended to Mr. Grier, is not

21  affiliated with any particular group.  I was counsel for

22  Shook and Fletcher a debtor just like Garlock, that

23  reorganized.  I also acted as counsel for Cooper Industries, a

24  co-defendant of Garlock's.  The same is true of

25  Dr. Rabinovitz, Your Honor.  For 40 years of her professional

 1   career she has acted as an expert in numerous cases, going

 2   back to A.H. Robins and before.  She's acted for courts, she's

 3   represented debtors, you saw that from Mr. Cassada's

 4   presentation, insurer's solvent companies and fiduciaries like

 5   the FCR.

 6           Why do I raise that in the opening, Your Honor?  For

 7   the very simple reason that we do not come to this case with

 8   any particular ideology, any particular prejudice, or any

 9   vested interest.  We certainly don't come to this case with

10   any view of what the right number should be.  We're not

11   picking a number and then trying to justify it.

12           Your Honor, in asking what is fair and equitable to

13   future claimants, we have to ask, in fact we have no choice

14   but to ask, what present claimants were paid when the merits

15   of their cases were analyzed and weighed by both parties, by

16   both adversaries.  What were they paid in that situation?

17           And in Garlock's case, that happened in two

18   different situations; trial, settlement; 99.7 percent of their

19   cases they settled.  That was their choice, Your Honor.  That

20   was their protocol.

21           We do not ask what present claimants were paid in an

22   idealized world that can never be tested.  Whether it be one

23   posited by Garlock or one posited by the plaintiffs.  We asked

24   how did the real world value the claims of mesothelioma

25   victims when they were presented in state courts under state

Laura Andersen, RMR 704-350-7493

1   law across the country.  How were they resolved, and at what

2   value.

3         Your Honor, over the next three weeks you're going

4   to hear a great deal of testimony as to the merit and

5   otherwise of Garlock's defenses to mesothelioma claims.

6         You have heard from Mr. Harris, Garlock's very

7   capable defense counsel, that it's impossible to contract

8   mesothelioma from Garlock's products.  And in every instance,

9   anybody who has mesothelioma, who may have worked around

10   Garlock products, got it from someone else's product.  You

11   will hear from Mr. Harris why those defenses were successful

12   at trial.  You will also hear from the ACC and Mr. Finch as to

13   why they were not.

14         But the reality is, regardless of the strength or

15   weaknesses of those defenses, Garlock faced significant trial

16   risk.  We can even see that from the demonstratives that were

17   shown earlier.  Eight percent of the time when they had all

18   the information available to them, they lost.  That's a

19   significant trial risk.  You only have no trial risk when you

20   never lose.

21         And they knew that trial risk, Your Honor, increased

22   substantially when co-defendants filed for bankruptcy.  That's

23   a reality that's obvious to everyone in this courtroom.  If

24   there are fewer people in the courtroom, your trial risk

25   increases.

1           Your Honor, they assessed that risk in the period

2      before their bankruptcy.  They considered the strength and

3      weaknesses of their defenses, and they settled their potential

4      liability at trial in nearly every instance.

5           In a five year timeframe, 12,000 claims, Your Honor,

6      going back to the beginning of their mesothelioma cases, we're

7      talking about 26,000 claims.  That's the data that we rely

8      upon, Your Honor.  We have to rely upon that data because

9      that's real world data.  That is a very robust database.

10          Your Honor, and in those settlements, critically,

11     Garlock asked for exposure evidence.  They didn't just write a

12     check to anybody who turned up.  They wanted to know that

13     there was exposure to their products.

14          And when they settled, Your Honor, equally

15     critically, they never paid any other company's share.  They

16     settled their share.  And critically in those settlements,

17     Your Honor, they never said, despite all you've heard about

18     those 15 settlements, in the thousands of settlements they

19     never said, represent whose products you were exposed to.

20     They had the ability to do that.  They didn't do it, Your

21     Honor, because they didn't attach importance to it, because

22     they were settling their responsibility fully understanding

23     that in every instance there would be exposure to other

24     companies' products, because it was the nature of the location

25     of Garlock's products.  They're in industrial settings.  There

Laura Andersen, RMR 704-350-7493

1   will be other products, always, around anyone who's working on

2   a Garlock gasket in an industrial setting.

3           In the end, Your Honor, what they've paid to resolve

4   claims, Mr. Clodfelter is right, they paid a market price.

5   Where he's wrong is that the information was available to

6   them.  They knew about the science.  They knew about the state

7   of the law.  They knew about exposures to other companies'

8   products.  That's the real world, not an idealized world.

9           Your Honor, from that real world we can reasonably

10  and reliably project an aggregate number that Garlock would

11  need to satisfy present and future mesothelioma claims.

12  That's what Dr. Rabinovitz did here.

13          We have two witnesses, Your Honor, you will be

14  pleased to know, Dr. Rabinovitz and Mr. Radecki who assisted

15  her in discount rate calculations.

16          Your Honor, Dr. Rabinovitz uses an accepted and

17  established methodology that relies upon observable data,

18  Garlock's data.  She asked for and was given Garlock's

19  database.  Garlock updated that database in May 2011, Your

20  Honor, in the middle of the bankruptcy case.  She relied upon

21  that updated database.  They never subsequently updated it.

22  That's what she used, and she used that database from 12,000

23  claims that Garlock either dismissed, tried to jury, or

24  settled.  From that data she calculated a forecast of the

25  range of approximately $1.3 billion, including defense costs,

1    Your Honor.

2              How do we know from that database, that that

3    database represented thousands and thousands of individual

4    occasions where the debtors considered the merits of claims

5    and valued them?  How do we know that, Your Honor?  We know

6    that because they said so.

7              In 2006 in their 10-K, which was issued December of

8    2006, this is what they said about their settlements.  I don't

9    know whether you can read that easily, Your Honor, but we'll

10   certainly get you a copy.  I believe copies have been

11   previously submitted as attachments to our papers.  But this

12   is what they say.

13             Settlements are made without any admission of

14   liability.

15             Yes, of course.  That's standard.  But that doesn't

16   mean the settlement doesn't resolve their potential liability,

17   otherwise why would you settle?

18             Now, what do they take into account when they

19   settle?

20             Settlement amounts vary depending upon a number of

21   factors, including the jurisdiction where the action was

22   brought, the nature and extent of the disease alleged, and the

23   associated medical evidence, the age and occupation of the

24   plaintiff, the presence or absence of other possible causes of

25   the plaintiff's alleged illness.  Note, the presence or

1    absence of other possible causes of the plaintiff's alleged

2    illness.  Alternative sources of payment available to the

3    plaintiff.

4            That would be bankrupt defendants and solvent

5    defendants.  The availability of legal defenses.  Those are

6    the defenses you're going to hear about ad nauseam, Your

7    Honor.  They know how strong their defenses are, Your Honor.

8    They believe passionately in their defenses.  They weighed the

9    strength of those defenses when they settled, and whether the

10   action is an individual one or part of a group.

11           Your Honor, if their defenses were weaker, they

12   would have paid more.

13           Now, this is key, and these are not the words of any

14   expert, Your Honor.  These are the words from EnPro's 10-K.

15           "Before any payment on a settled claim is made, the

16   claimant is required to submit a medical report acceptable to

17   Garlock" -- acceptable to Garlock -- "substantiating the

18   asbestos-related illness, and meeting specific criteria of

19   disability.  In addition, sworn testimony or other testimony that

20   the claimant worked with or around Garlock asbestos-containing

21   products is required.  The claimant is also required to sign a

22   full and unconditional release of Garlock and its affiliates."

23           No one else, just Garlock.  Your Honor -- I

24   apologize, it's difficult to read.

25           Your Honor, Dr. Bates uses those numbers to forecast

Laura Andersen, RMR 704-350-7493

1    what would be paid in the future.  The very thing that you

2    asked us to do, make a reasonable and reliable estimate of the

3    aggregate amount of money that Garlock will require to satisfy

4    present and future mesothelioma claims.

5              Dr. Bates, the debtor's expert did just that.

6    Using, as Mr. Cassada said, econometrics and reliable

7    principles.

8              Critically, Your Honor, when EnPro did that for

9    Garlock, they say, "we focus on future cash flows to prepare

10   our estimate.  We make assumptions about declining future

11   asbestos spending based on past trends, publicly available

12   epidemiological data, current agreements with plaintiff firms,

13   and our judgment about the current and future litigation

14   department; the availability of claims of other payment

15   sources; both co-defendants and 524(g) trusts."

16             Your Honor, in 2006, they're doing exactly what we

17   should do.  They're doing it.  They've done it.  The input and

18   insight provided to us by Bates White.  And then they say, we

19   adjust our estimate when current and future cash flow results

20   and long trends suggest that the targets cannot be met or will

21   be significantly exceeded.

22             As a result, we have a process that we believe

23   produces the best, their words, Your Honor, the best estimate

24   of future liability for the 10-year time period within the

25   Bates range.

Laura Andersen, RMR 704-350-7493

1        Just 10 years, Your Honor, not to 2053 which is what
2   we're doing here, just 10 years.

3        What was that number, Your Honor?  Remember this is
4   their number, and you know that they're going to be not
5   rushing to the biggest number -- $561 million, not including
6   defense costs.  At the bottom there it says, conceding that
7   this is not a perfect estimate, no one can make a perfect
8   estimate in the world of asbestos.  Scenarios continue to
9   exist that could result in a total estimated liability for
10  Garlock in excess of 1 billion.

11       Your Honor, Mr. Cassada said that Dr. Rabinovitz's
12  number of 960 million, not including defense costs, was
13  astonishing; astonishing.  This is EnPro's estimate, 1
14  billion.  I don't think it's so astonishing when the other
15  party in the case was almost at the same number.

16       Your Honor, these are not the only times they
17  estimated their asbestos liabilities.  In 2004 they did
18  internal estimates.  Mr. Magee, who we have the greatest
19  respect for, signed off on those estimates.  He estimated the
20  number to be in the range of 1.14 billion under certain
21  scenarios.  That's the liability for other open claims, and
22  just five years of probable future claims.

23       Your Honor, lest you think that the number changed
24  dramatically in their 10-K from March 2010, again, they
25  reiterate the number could be $1 billion.

Laura Andersen, RMR 704-350-7493

1            "Scenarios continue to exist that could result in

2    total future asbestos related expenditures for Garlock of

3    $1 billion."

4            And Your Honor, when they internally calculated the

5    number for the timeframe that is relevant for us, which is

6    when everybody thinks there will be no more mesothelioma

7    claims because of Garlock's products, using fairly respected

8    incidence models out through the 2050 range.  Your Honor, when

9    they calculated that number internally, and they came up with

10   different scenarios, I freely concede that.  They came up with

11   a number of $1.27 billion.

12           Those are the estimates that Mr. Magee prepared that

13   we had the big fight about earlier, Your Honor.

14           Your Honor, these were merit based estimates,

15   because they were based upon claims that were paid when they

16   considered the merits of those claims.  And they priced them

17   accordingly in their discussions with the other party.  They

18   were estimates that were done internally, when there was no

19   need for advocacy.  They were estimates that were done in

20   securities filings where there was every need to have strict

21   disclosures grounded in reality.

22           Now, we're in bankruptcy.  In bankruptcy we depart

23   to an idealized world.  Garlock says, and Coltec says, well,

24   on the merits we have no liability; zero.  No one could ever

25   get sick from our products.  We have zero liability to the

1    26,000 potential claims against us.

2            What they really should be saying in this courtroom,

3    if they were true to that, Your Honor, please estimate our

4    liability at nothing.  But they're not comfortable with that

5    number.  Because it's such a radical departure from reality.

6            So it says, while Dr. Bates has come up with this

7    model, where every claim -- every claimant, all 26,000

8    claimants go to verdict at no cost to Garlock, and only a tiny

9    percentage win, and those that win, by the way, they share

10   with 36 other co-defendants.  It's a perfect world, Your

11   Honor.  If you were to take 26,000 claims to verdict, it would

12   cost billions and billions and billions of dollars.

13           But after that process Dr. Bates says, he thinks the

14   number is 125 million.  But the debtors aren't really

15   comfortable with that number either.  They say, well, we

16   actually think 270 is the right number.  We put 270 in our

17   plan, and you, Your Honor, and Mr. Grier my client, we can be

18   comfortable that that's enough.  Don't worry, it's enough.

19   Please believe that this number makes our plan feasible.

20   Please believe this number makes our plan fair and equitable

21   to future claimants.

22           Remember, Your Honor, we don't come to this case

23   with a number.  All we care about is future claimants are

24   treated fairly and equitably looking at what was paid in the

25   past.

Laura Andersen, RMR 704-350-7493

1          Claimants, Your Honor, will not accept values

2     post-petition that radically depart from the numbers they

3     accepted when the merits were considered between the parties

4     prepetition.

5          And how can it be that on June 4th, the day before

6     Garlock filed for bankruptcy, by its own calculations, their

7     asbestos liabilities were potentially in excess of $1 billion.

8     The day after June 5th, suddenly the number's $125 million.

9          Your Honor, in the end, Garlock's post-petition

10    idealized numbers are just-in plug numbers that preserve

11    equity.  Your Honor, I represented debtors.  I fully

12    understand the desire to preserve equity.  But if they truly

13    believe the number is zero, they shouldn't be here.  If they

14    truly believe the number is $125 million they shouldn't be

15    here.  And if they truly believe the number is $270 million,

16    they shouldn't be here.

17         Now, put aside all this about, well now we want you,

18    Your Honor, to rewrite state laws, rewrite the tort system,

19    come up with a better model, come up with a new model for

20    resolving asbestos claims.

21         The reality is, the debtors know under the model

22    that we all have to live with, flawed or not, they're

23    insolvent.  They know that, Your Honor.  That's why they're

24    here.

25         Your Honor, how do I say that with confidence?

Laura Andersen, RMR 704-350-7493

1    Because I've read the affidavit of Mr. Pomeroy, the

2    first day affidavit.  He was very careful to not say that the

3    company was insolvent.  But the words that he uses tell a

4    different picture.  This is from June 5th, 2010, 3 years ago.

5    Mr. Pomeroy says the debtors are not in business distress, but

6    overwhelmed by the financial institutional costs of defending

7    and resolving tens of thousands of asbestos claims in state

8    and federal courts across the country.

9         Continuing on he says, Garlock believed until

10   recently it would survive the bankruptcy wave, because most of

11   the major asbestos manufacturers had emerged from bankruptcy

12   by funding post-confirmation trusts.

13        Your Honor, Mr. Cassada highlighted a statement from

14   our expert, Dr. Rabinovitz, who I'm confident you're going to

15   find is a truly independent expert.  She did believe that

16   those monies would make a difference.  Nothing speaks to her

17   independence more than the fact that she was articulating that

18   belief in 2007.  But it didn't happen.

19        Your Honor, paragraph 19 they say, Mr. Pomeroy says,

20   the cash flows necessary to defend and resolve asbestos claims

21   in this tort system threaten to deplete rapidly, both

22   remaining insurance available to Garlock for such claims and

23   Garlock's cash flow from operations.  Without Chapter 11

24   protection, the value of the debtors' core businesses and the

25   debtors' ability to compete effectively in the marketplace

1    will be irrevocably damaged.

2         So that's the reality, Your Honor.  The reality we

3    have is, the debtors settled thousands and thousands of

4    mesothelioma claims.  They settled those claims asking for

5    exposure evidence, understanding the merits and strengths and

6    weaknesses of their defenses.  Understanding the reality of

7    the tort system.  Understanding what disclosure was required

8    in the state courts where these claims were being brought.

9    Understanding what claims could be brought against the trusts

10   and against solvent defendants.  They understood all of that,

11   Your Honor.  Because the plaintiffs didn't change, 1995

12   pipefitter; 2005 pipefitter.  That pipefitter has the same

13   exposure to the same types of products.  No one in this

14   courtroom would disavow that statement, Your Honor.

15        Your Honor, EnPro only has equity value in an

16   idealized world that doesn't exist and could never exist.

17        It doesn't believe its own numbers.  Because if it

18   did, it wouldn't be here.  It is here because it knows if it

19   dismisses this case, it won't survive.  But the path urged by

20   Garlock takes us nowhere.  A $270 million plan will not be

21   accepted by current claimants.  They will not get the 524(g)

22   protection they want.  And to the extent Garlock wants to fund

23   a plan under its theory that every case goes to trial, it

24   hasn't put enough money on the table, and it doesn't have that

25   kind of money.

Laura Andersen, RMR 704-350-7493

 1           Your Honor, when you hear all the testimony over the

 2     next three weeks, fact testimony, the expert testimony, I

 3     would ask that you ask yourself, if I appointed an expert,

 4     which you have the right to do under Rule 706, if you had

 5     appointed your own independent expert to answer your question,

 6     the aggregate amount of money that Garlock will require to

 7     satisfy present and future mesothelioma claims.  Would you

 8     find it credible if that expert said the number was

 9     $125 million, when the day before its bankruptcy that expert's

10     client was estimating the number in excess of $1 billion,

11     using that same expert's methodology?

12           Your Honor, in conclusion, we urge the court to

13     estimate the amount after you've heard all the evidence, to

14     satisfy present and future mesothelioma claims by the

15     reference to the amount that Garlock itself paid to satisfy

16     such claims, and put Garlock on a path to confirmation.

17           Thank you, Your Honor.

18           THE COURT:  It's 12:30, why don't we break for

19     lunch.

20           MR. SWETT:  That's fine, Your Honor.

21           THE COURT:  How long do you want to take?  I realize

22     that there's a lot goes on during the trial besides the eating

23     of lunch.  We'll take an hour and a half or an hour?

24           MR. CASSADA:  Well, I'll speak for our side, Your

25     Honor.  We are prepared to move forward quickly.  We're having

1    box lunches brought in.  We're going to eat here.  We'll be

2    ready to go, a half hour or at the earliest time that the

3    court is available.

4         MR. SWETT:  Your Honor, we would suggest a one hour

5    lunch break.

6         THE COURT:  Okay.  Let's just come back at 1:30.

7         (Lunch recess.)

8                        *  *  *  *  *  *

     UNITED STATES DISTRICT COURT

9    WESTERN DISTRICT OF NORTH CAROLINA

     CERTIFICATE OF REPORTER

10

11         I, Laura Andersen, Official Court Reporter, certify
     that the foregoing transcript is a true and correct transcript

12   of the proceedings taken and transcribed by me to the best of
     my ability.

13
          Dated this the 22nd day of July, 2013.

14

15

                              s/Laura Andersen

16                            Laura Andersen, RMR
                              Official Court Reporter

17

18

19

20

21

22

23

24

25

                    Laura Andersen, RMR 704-350-7493