UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GARLOCK SEALING TECHNOLOGIES | ) | |
| LLC, et al, | ) | No. 10-BK-31607 |
| | ) | |
| Debtors. | ) | VOLUME XVII |
| _____ | ) | |


TRANSCRIPT OF ESTIMATION TRIAL
BEFORE THE HONORABLE GEORGE R. HODGES
UNITED STATES BANKRUPTCY JUDGE
AUGUST 22, 2013




<u>APPEARANCES</u>:

On Behalf of Debtors:

        GARLAND S. CASSADA, ESQ.
        Robinson Bradshaw & Hinson, PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

        JONATHAN C. KRISKO, ESQ.
        Robinson Bradshaw & Hinson PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

        LOUIS ADAM BLEDSOE, III, ESQ.
        Robinson Bradshaw & Hinson PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

        RICHARD C. WORF, ESQ.
        Robinson Bradshaw & Hinson, PA
        101 North Tryon Street, Suite 1900
        Charlotte, North Carolina 28246

<u>APPEARANCES (Continued)</u>:

On Behalf of the Debtors:

        RAY HARRIS, ESQ.
        Schachter Harris, LLP
        400 East Las Colinas Blvd.
        Irving, Texas 75039

        CARY SCHACHTER, ESQ.
        Schachter Harris, LLP
        400 East Las Colinas Blvd.
        Irving, Texas 75039

        C. RICHARD RAYBURN, JR., ESQ.
        Rayburn Cooper & Durham, PA
        227 West Trade Street, Suite 1200
        Charlotte, North Carolina 28202

        SHELLEY KOON ABEL, ESQ.
        Rayburn Cooper & Durham, PA
        227 West Trade Street, Suite 1200
        Charlotte, North Carolina 28202

        ALBERT F. DURHAM, ESQ.
        Rayburn Cooper & Durham, PA
        227 West Trade Street, Suite 1200
        Charlotte, North Carolina 28202

        ROSS ROBERT FULTON, ESQ.
        Rayburn Cooper & Durham, PA
        227 West Trade Street, Suite 1200
        Charlotte, North Carolina 28202

        JOHN R. MILLER, JR., ESQ.
        Rayburn Cooper & Durham, PA
        227 West Trade Street, Suite 1200
        Charlotte, North Carolina 28202

        ASHLEY K. NEAL, ESQ.
        Rayburn Cooper & Durham, PA
        227 West Trade Street, Suite 1200
        Charlotte, North Carolina 28202

        WILLIAM SAMUEL SMOAK, JR., ESQ.
        Rayburn Cooper & Durham, PA
        227 West Trade Street, Suite 1200
        Charlotte, North Carolina 28202

APPEARANCES (Continued.):

On Behalf of Interested Parties:

Carson Protwall LP:

     JULIE BARKER PAPE, ESQ.
     Womble Carlyle Sandridge & Rice, PLLC
     P.O. Drawer 84
     Winston-Salem, North Carolina 27102

Coltec Industries Inc.:

     DANIEL GRAY CLODFELTER, ESQ.
     Moore & Van Allen, PLLC
     100 North Tryon Street, Suite 4700
     Charlotte, North Carolina 28202-4003

     HILLARY B. CRABTREE, ESQ.
     Moore & Van Allen, PLLC
     100 North Tryon Street, Suite 4700
     Charlotte, North Carolina 28202-4003

     MARK A. NEBRIG, ESQ.
     Moore & Van Allen, PLLC
     100 North Tryon Street, Suite 4700
     Charlotte, North Carolina 28202-4003

     EDWARD TAYLOR STUKES, ESQ.
     Moore & Van Allen, PLLC
     100 North Tryon Street, Suite 4700
     Charlotte, North Carolina 28202-4003

Creditor Committees:

Official Committee of Asbestos Personal Injury Claimants:

     LESLIE M. KELLEHER, ESQ.
     Caplin & Drysdale, Chartered
     One Thomas Circle NW, Suite 1100
     Washington, DC 20005

     JEANNA RICKARDS KOSKI, ESQ.
     Caplin & Drysdale, Chartered
     One Thomas Circle NW, Suite 1100
     Washington, DC 20005

APPEARANCES (Continued.):

Official Committee of Asbestos Personal Injury Claimaints:

    JEFFREY A. LIESEMER, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

    KEVIN C. MACLAY, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

    TODD E. PHILLIPS, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

    TREVOR W. SWETT, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

    JAMES P. WEHNER, ESQ.
    Caplin & Drysdale, Chartered
    One Thomas Circle NW, Suite 1100
    Washington, DC 20005

    ELIHU INSELBUCH, ESQ.
    Caplin & Drysdale, Chartered
    600 Lexington Avenue, 21st Floor
    New York, New York 10022

    NATHAN D. FINCH, ESQ.
    Motley Rice, LLC
    1000 Potomac Street, NW, Suite 150
    Washington, DC 20007

    GLENN C. THOMPSON, ESQ.
    Hamilton Stephens Steele & Martin
    201 South College Street, Suite 2020
    Charlotte, North Carolina 28244-2020

    TRAVIS W. MOON, ESQ.
    Moon Wright & Houston, PLLC
    227 West Trade Street, Suite 1800
    Charlotte, North Carolina 28202

APPEARANCES (Continued.):

Official Committee of Asbestos Personal Injury Claimaints:

    RICHARD S. WRIGHT, ESQ.
    Moon Wright & Houston, PLLC
    226 West Trade Street, Suite 1800
    Charlotte, North Carolina 28202

    ANDREW T. HOUSTON, ESQ.
    Moon Wright & Houston, PLLC
    227 West Trade Street, Suite 1800
    Charlotte, North Carolina 28202

    SCOTT L. FROST, ESQ.
    Waters Kraus, LLP
    222 North Sepulveda Boulevard, Suite 1900
    El Segundo, California 90245

    JONATHAN A. GEORGE, ESQ.
    Waters Kraus, LLP
    3219 McKinney Avenue
    Dallas, Texas 75204

Future Asbestos Claimaints:

    KATHLEEN A. ORR, ESQ.
    Orrick, Herrington & Sutcliffe, LLP
    1152 15th Street, N.W., Columbia Center
    Washington, DC 20005-1706

    JONATHAN P. GUY, ESQ.
    Orrick, Herrington & Sutcliffe, LLP
    1152 15th Street, N.W., Columbia Center
    Washington, DC 20005-1706

Official Committee of Unsecured Creditors:

    DEBORAH L. FLETCHER, ESQ.
    FSB Fisher Broyles, LLP
    6000 Fairview Road, Suite 1200
    Charlotte, North Carolina 28210

1                              I N D E X

2  DEBTORS' REBUTTAL WITNESSES                          PAGE

3  DAVID MICHAEL GLASPY
       Direct Examination By Mr. Krisko               4572
4      Cross Examination By Mr. Swett                 4589
       Cross Examination By Mr. Guy                   4661
5      Redirect Examination By Mr. Krisko             4672

6  JORGE GALLARDO-GARCIA
       Direct Examination By Mr. Worf                 4679
7      Cross Examination By Mr. Swett                 4702
       Cross Examination By Mr. Guy                   4745
8      Redirect Examination By Mr. Worf               4752

9  CHARLES BATES
       Direct Examination By Mr. Cassada              4754
10     Cross Examination By Mr. Guy                   4828
       Cross Examination By Mr. Swett                 4844

11

12                          E X H I B I T S

13 DEBTORS' EXHIBITS

14 NUMBER                                          ADMITTED

15 1002  .........................................4701
   6596  .........................................4701
16 7237  .........................................4701
   7238  .........................................4701
17 7243  .........................................4701
   7244  .........................................4701
18 8025  .........................................4701
   997  ..........................................4755
19

20

21

22

23

24

25

DAVID GLASPY - DIRECT

1   THURSDAY MORNING, AUGUST 22, 2013

2           (Court called to order at 9:00 a.m.)

3           THE COURT:  I guess we'll get started.

4           MR. KRISKO:  Thank you, Your Honor.  Mr. Glaspy was

5   on the stand when we last recessed and we'll call him again to

6   continue his direct examination.

7           I know, Your Honor, we only have a short portion of

8   direct examination with him planned, but it is going to touch

9   upon some confidential information.

10          THE COURT:  All right.  Well, I guess we'll have to

11  ask everybody who hadn't signed the confidentiality agreement

12  to leave.  I'm sorry.  We'll get you back in as quick as we

13  can.

14          (Sealed proceedings.)

JORGE GALLARDO-GARCIA - DIRECT

1      MR. WORF:  Good morning, Your Honor.  Richard Worf

2  for the debtors.

3      The debtors call Dr. Jorge Gallardo-Garcia.

4      And Dr. Gallardo-Garcia would not testify to any

5  confidential matters so we can reopen the courtroom if the

6  court wishes.

7      THE COURT:  Okay.  Would somebody invite the folks

8  in the hallway back in, please.

9                    JORGE GALLARDO-GARCIA,

10  being first duly sworn, was examined and testified as follows:

11                      DIRECT EXAMINATION

12  BY MR. WORF:

13  Q.   Good morning, Dr. Gallardo-Garcia.

14  A.   Good morning.

15  Q.   Have you reviewed the analytical databases that

16  Dr. Peterson and Dr. Rabinovitz used in performing their

17  estimation work in this case?

18  A.   Yes, I have.

19  Q.   How did they appear to have constructed their analytical

20  databases?

21  A.   Well, based on my review of their codes and the outputs

22  of their computer codes, I think that what they did is took

23  the Garrison Database as -- the May 2011 version of the

24  Garrison Database and then processed it to identify some

25  duplicates and to make some other modifications to how the

JORGE GALLARDO-GARCIA - DIRECT

1    data was presented.

2    Q.    When you reviewed their analytical databases, did you

3    find any errors?

4    A.    Yes, there were several of them.   The errors were mostly

5    due to the lack of use of available information in that case,

6    information that was provided by the debtors and through the

7    the PIQ process.   And also, there were coding errors that they

8    had in their computer code.

9    Q.    Have you prepared some slides to illustrate your

10   testimony today?

11   A.    Yes, I have.

12   Q.    Could you explain the nature of the first set of errors

13   that you identified.

14   A.    Well, the first error that I identified on my report was

15   that they overestimated the number of pending mesothelioma

16   claims that are in the database.

17   Q.    And does this slide entitled Classification Errors for

18   Pending Mesothelioma Claims by Drs. Rabinovitz and Peterson

19   summarize your analysis of their counts of the pending

20   mesothelioma claims?

21   A.    Yes, that's correct.   The blue bars denote the correct

22   number of the -- of pending mesothelioma claims that can be

23   calculated based on the available information in this case.

24   And the other colored portions of the bar are the errors or

25   the over or under counts that both Drs. Rabinovitz and

4681

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 10 of 199
JORGE GALLARDO-GARCIA - DIRECT

1  Peterson have in their own analytical databases.

2  Q.   Were you able to determine why Dr. Rabinovitz and

3  Dr. Peterson's databases contain these errors regarding the

4  number of pending mesothelioma claims?

5  A.   Yes.  As I said, for the most part it was because they

6  did not use the information from the questionnaire.  There

7  were some other errors that came through based on the computer

8  code they used to process the original Garrison Database to

9  convert it into their analytical databases.  But the main

10 source of their errors was not using the questionnaires.

11 Q.   When you say they didn't use the information from the

12 questionnaires, what information are you talking about?

13 A.   Well, in this case, for the most part claimants and the

14 representatives indicated through communications, through

15 letters and through their own PIQs, they communicated that

16 they did not have a pending mesothelioma claim anymore or that

17 they never had a pending mesothelioma claim.

18 Q.   So with this correction to Dr. Rabinovitz and

19 Dr. Peterson's databases, you are not talking about

20 individuals who did not return a PIQ.  You're talking about

21 individuals who returned one and said they did not have an

22 open mesothelioma claim.

23 A.   That's correct.  If we did -- if there is no information

24 regarding the status of a claim and the claim appeared in the

25 Garrison Database of May 2011 as an open mesothelioma claim,

4682

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 11 of 199
JORGE GALLARDO-GARCIA - DIRECT

1   it will be part of the blue box.

2        Now, if we have information directly to the contrary,

3   either because it was part of the -- well, basically, because

4   it was part of the information available in the case, then

5   that will have been reclassified and potentially will be in

6   one of the colored parts for Drs. Rabinovitz and Peterson.

7   Q.   Did Dr. Rabinovitz and Dr. Peterson also err in

8   categorizing some claims that are, in fact, open mesothelioma

9   claims as closed mesothelioma claims?

10  A.   Yes, there were errors in the other direction too.  Most

11  of them came -- were due to the computer code they used to

12  process the Garrison Database.

13       So when they were, for example, trying to identify and

14  eliminate duplicates, they had -- the code that they used to

15  identify duplicates might have identified too many duplicates

16  that were not so.

17  Q.   So the yellow bar that's under the zero line in

18  Dr. Peterson's column --

19  A.   Yes.

20  Q.   -- is that because he identified too many duplicates and

21  therefore should have classified some of the ones he

22  identified as duplicates as open mesothelioma claims?

23  A.   That's correct.

24  Q.   What was the net effect of the errors we've discussed

25  about the number of pending mesothelioma claims?

1   A.   Well, the net effect is reducing the total number of

2   pending mesothelioma claims Drs. Rabinovitz and Peterson had

3   in their analytical databases to the blue bars that we see

4   here.  It was in the range of 750 mesothelioma pending claims

5   that they had in their databases that were not to be

6   classified as such.

7   Q.   Let's talk about the questionnaires a moment.

8   Dr. Rabinovitz testified that she did not use responses to the

9   questionnaire in her work because in her view they were too

10  ambiguous to be useful.

11       Focusing for the moment on responses stating that

12  individuals did not have a mesothelioma claim or had resolved

13  their mesothelioma claim against Garlock, is Dr. Rabinovitz's

14  opinion correct?

15  A.   I don't think it is.  I myself reviewed a large number of

16  those -- of the documents that we used to reclassify --

17  reclassify records in the Garrison Database and that was part

18  of the Garlock analytical database later.  And to me at least,

19  the assertions from the claimants themselves were -- or their

20  representatives were very clear.

21  Q.   Have you prepared some examples for the court today

22  showing the nature of the responses that resulted in Bates

23  White classifying mesothelioma claims as not being open

24  mesothelioma claims?

25  A.   Yes, we have some examples on the slides.

JORGE GALLARDO-GARCIA - DIRECT

1    Q.    And you have redacted any individual claimant information

2    from these slides in order to protect the confidentiality?

3    A.    That's correct.  The gray boxes are -- behind the gray

4    boxes we can see that we will be able to see the names of the

5    actual claimants.

6    Q.    Can you briefly describe what -- what you summarized for

7    the court here.

8    A.    Yes.  For example, this is an example of a letter from

9    the Peter Angelos law firm where he was listing that these

10   individuals do not have pending mesothelioma claims against

11   the debtors as of the petition date.  And then he tells us

12   what were the -- what are the status of those cases with

13   respect to Garlock and Anchor Packing.  You can see many of

14   them are dismissed and some of them are settled.

15   Q.    Is this another example?

16   A.    Yes, this is another law firm letter where they

17   identified what were the -- what was the status of their

18   claims and why they were withdrawing the claims.

19   Q.    And this here?

20   A.    These are specific examples of questionnaires where the

21   claimants or the representatives objected to the questionnaire

22   itself because -- alleging that the questionnaire didn't apply

23   to them because they didn't -- did not have an open

24   mesothelioma claim anymore.

25         This is the same situation.  These were dismissed cases.

1       In these examples it's -- again, the top part is specific

2    PIQ and the second part is a letter from a law firm that is

3    withdrawing or saying that they will not pursue their claims

4    against Garlock.

5       This example is just a list of -- from the Peter Angelos

6    letter that says how many -- which of their clients do not

7    have -- have not been diagnosed with mesothelioma.

8       And this is a similar -- similar outcome, but this is for

9    a specific PIQ.

10              MR. WORF:  Your Honor, may I approach the witness?

11              THE COURT:  Yes.

12   Q.   I've handed you what has been marked as GST7224.  Is this

13   a collection of the questionnaire responses that you used in

14   constructing the slides that we just went over?

15   A.   Yes.  These are just the ones we showed on the slides,

16   but obviously -- I mean, what we showed on the slides is the

17   typical response that we will have seen for a claimant out of

18   the -- of all the claimants that were classified as not being

19   open mesothelioma claims.

20   Q.   Now, Dr. Peterson testified that he thought one should

21   not take into account people who responded by saying they did

22   not have mesothelioma because that would introduce a bias in

23   the analysis.  I believe Dr. Bates is going to address that

24   point.

25       What I wanted to ask you is are people who said they did

4686

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 15 of 199
JORGE GALLARDO-GARCIA - DIRECT

1   not have mesothelioma the main source of the criticisms that

2   you have of the pending claim counts of Drs. Rabinovitz and

3   Peterson?

4   A.   No.  If we go one slide back.

5        As you can -- the number of cases that were classified as

6   mesotheliomas in Dr. Rabinovitz's databases are the purple --

7   and that are not mesothelioma cases are the purple bars at the

8   top.  So as you can see, the main source of the

9   misidentification was not recognizing that there were cases

10  that actually had -- that were related to mesothelioma

11  diagnosis but were already resolved against them.

12  Q.   And the green bar are the ones where, by looking at the

13  available information, Bates White determined that the

14  mesothelioma claim had been resolved?

15  A.   Yes, for the most part dismissed.  Some of them settled,

16  but for the most part dismissed.

17  Q.   Does taking into account information indicating that the

18  claim was dismissed or otherwise resolved introduce any

19  potential bias?

20  A.   I don't think so.  These cases were -- that's the status

21  of the case.  They are not -- these are cases that are not

22  going to -- that do not exist against Garlock now and they

23  will not exist in the future because they have been already

24  dismissed.

25  Q.   As a general matter, in social science research is it

JORGE GALLARDO-GARCIA - DIRECT

1  proper to ignore available data?

2  A.   Well, I think that is not appropriate of social science,

3  is appropriate of any serious research.  If there is important

4  available data that you can review and assess and use, that's

5  the common practice for -- in any kind of setting that I've

6  been involved with.

7  Q.   Did Bates White share information with all parties early

8  on in the questionnaire process about how the questionnaire

9  responses affected the number of open mesothelioma claims?

10  A.   Yes.  On January and February of 2012 there were two

11  hearings about the progress of the information that made it

12  through the questionnaires.  And for that Bates White prepared

13  some lists of claimants that had been based on the information

14  provided by -- through the PIQ have been reclassified from

15  being pending mesothelioma claims to not being pending

16  mesothelioma claims.  I prepared a declaration for the court

17  and that declaration was presented in those -- in one of those

18  hearings.

19  Q.   I've handed you what is marked as Trial Exhibit GST6596.

20  Is this one of the declarations that you prepared and that was

21  submitted to the court?

22  A.   Yes.  And as an attachment of that, one of the exhibits

23  at the back is the list of the claimants, the list of PIQ

24  claimants and what was the new classification that we had

25  found in the documents submitted.

4688

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 17 of 199
JORGE GALLARDO-GARCIA - DIRECT

1   Q.   I think the only part of this slide we haven't talked

2   about is the red box in Dr. Rabinovitz's column.

3   A.   Right.

4   Q.   Can you please explain what that means.

5   A.   Well, in her estimate she included -- she used a response

6   from the debtors to interrogatories regarding what were the

7   cases that had been settled before petition but have not yet

8   been paid and other cases in which the claimants or the

9   plaintiff law firms say that those cases have been settled but

10  Garlock has not accepted those settlements.  So those are

11  what's been called the contested settlements.

12  Q.   And does the red box represent the errors that

13  Dr. Rabinovitz had in interpreting the interrogatories?

14  A.   Yes.  So what -- we have a couple of slides about that.

15  But basically, what happened is that on these responses to

16  interrogatories, there were four tables that listed claims

17  with different statuses.

18       For example, the C1 table had claims that had been

19  already resolved with Garlock.  Some of them were already paid

20  or were dismissed without payment.  So those were not pending

21  at all.  And some of them were settled before petition but

22  haven't been paid yet.

23       Then a similar situation was -- or a similar status was

24  for the claims on Exhibit E which it was a number of claims

25  that had been settled before petition but hadn't been paid

1   before petition.

2        And then there were two other lists, C1 and D, that were

3   cases in which the plaintiffs or their representatives say

4   that they already had a settlement with Garlock but Garlock

5   hadn't accepted those settlements.

6        So the problem with Dr. Rabinovitz's count in terms of

7   the -- of how many pending claims there were is that she used

8   Exhibit C both to count the number of cases that were pending

9   payments, let's say, and the cases that were contested

10  settlements.

11       What I think she meant to use was Exhibit C2, but there

12  was, I think, an error in her code and she introduced

13  duplicates by doing so.

14       This is basically the outcome of her -- of her code.  So

15  in the end, if we count the number of pending payments and

16  disputed settlements that -- or contested settlements that she

17  had on her report, there were 427.  If you apply -- if you use

18  the exhibits correctly, you will get 299.  And as you can see,

19  the larger difference is the difference between the contested

20  settlements and the -- the contested settlements.  She got

21  greater than 181 and there were actually 92 cases.

22  Q.   So the result of that is for that reason she had too few

23  pending mesothelioma claims?

24  A.   Yeah.  Well, there are two errors actually.  So on the

25  one hand, because she overcounted the number of contested

4690

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 19 of 199
JORGE GALLARDO-GARCIA - DIRECT

1   settlements and pending payments, when she subtracted that

2   number from the pending -- the number of pending claims to --

3   she had -- she subtracted too many cases.

4        But on the other hand, because she -- she overcounted the

5   number of contested settlements and she valued those

6   settlements at higher amounts than all the other cases she

7   valued, then she creates the -- she basically overestimated

8   the forecast.

9   Q.   So the net effect of all of her errors with respect to

10  the pending claims means that like Dr. Peterson, she had too

11  many pending mesothelioma claims?

12  A.   In both cases, both Dr. Rabinovitz and Dr. Peterson have

13  about 750 too many open mesothelioma cases in their databases.

14  Q.   How did the -- all the errors with respect to the number

15  of pending mesothelioma claims affect Dr. Rabinovitz and

16  Dr. Peterson's forecast?

17  A.   Well, the first effect is they valued too many pending

18  cases.  That's the first defect.

19       Then because most of the cases were dismissed as we can

20  see with the green portions of the bars because many of

21  them -- most of them were dismissed, those were cases that

22  will have entered into the calculation of the dismissal rate

23  and therefore the computation of the settlement rate.  And

24  that will have reduced the percentage of payment -- of cases

25  to be paid that they had.

JORGE GALLARDO-GARCIA - DIRECT

1  Q.    Now, for that reason and for others, did you identify

2  database errors that led to Dr. Peterson and Dr. Rabinovitz

3  having incorrect settlement rates?

4  A.    Yeah.  Well, this -- I think that there is -- this is the

5  settlement amounts, but we can -- it's one of the charts.

6  Q.    Sorry about that.  There it is.

7  A.    Yeah.  So based on -- given that they didn't take into

8  account these additional dismissals, and also they had some

9  issues with the timing of the cases they used in their codes,

10 they basically overestimated the percentage of cases that will

11 be paid for their calibration periods.

12     On this table what we can see is that we calculated --

13 well, we saw what was the rate that they used, that

14 Dr. Peterson and Dr. Rabinovitz used in their reports and we

15 see what will have been the -- using those same calibration

16 periods and the same -- the same way which they calculated

17 the -- the rates, we will have gotten different lower rates of

18 settlement.

19 Q.    So this is taking how they did the calculations and

20 corrected the database errors?

21 A.    Yes.  This represents their calculations.  This just

22 changes the data that underlies.

23 Q.    Did you also identify database errors that resulted in

24 Dr. Rabinovitz and Dr. Peterson having incorrect average

25 settlement amounts?

1   A.   Yes.

2   Q.   Does this slide 15 describe your conclusions with respect

3   to that?

4   A.   Yes.   So basically, I mean, there were a couple of

5   different errors that they have in their database.   One of the

6   errors, and that's, I believe, something that was mentioned in

7   testimony by Dr. Rabinovitz, was the misplacement of three

8   cases.   While these three cases were three verdicts that

9   actually occurred in the early 2000s -- I think that one of

10  them occurred in 2002, one of them in 2004, and the other one

11  in early 2005.   But these three cases had a contribution

12  payment from a trust paid to Garlock in 2010.

13       So what both Drs. Rabinovitz and Peterson did was take

14  the very last date in the database and they put the whole

15  amount of the verdict on that date.   So the problem with that

16  is that from the cases being outside the window or outside the

17  calibration period that they used for their estimates, they

18  included those three verdicts in the calibration window and

19  that increased their amounts.

20       This is not shown in this -- on this table, but this is

21  on my report.   And the effect of those three cases -- that

22  those three cases had on the 2010 average settlement amount

23  was about 25 percent.

24       There were other errors that had to do with not

25  considering about a hundred settlements that were reported on

JORGE GALLARDO-GARCIA - DIRECT

1   this list that I was talking about before, the responses to

2   interrogatories.  Those cases were not considered either.

3       So the total -- the total effect of the -- of not

4   considering all the information available was basically for

5   2010 specifically.  Instead of calculating a settlement

6   amount -- average settlement amount that was about $60,000,

7   they calculated an amount that was more than $90,000.  And

8   that's what they've shown on their tables.

9       Now, in terms of their calibration period and the numbers

10  that they actually used for their estimates, they

11  overestimated their amounts by 9 and 7 percent respectively.

12  Q.   Now, has Dr. Bates calculated the effect the database

13  errors you've identified had on Dr. Rabinovitz and

14  Dr. Peterson's forecast?

15  A.   Yes, he did.  One thing to know is that although these --

16  the changes -- the errors in the settlement rate and the

17  errors in the -- on the averages seem to be relatively low

18  when they actually compound.  So when you put them together,

19  the total effect on, for example, Dr. Rabinovitz's average

20  resolution amount would be 10 percent of her estimate.

21  Q.   Did your report contain further detail on your criticisms

22  of Dr. Peterson and Dr. Rabinovitz's database errors?

23  A.   Yes, it does.  It has all the explanations of how we are

24  concerned with these numbers.  What were the comparisons.  It

25  has more detail about what were the errors.  And the

JORGE GALLARDO-GARCIA - DIRECT

1    underlying computer code and the databases that we provided as

2    part of the production after we submitted a report has all the

3    details about these issues.

4    Q.   Before we finish, I'd like to briefly cover two more

5    issues that have arisen during the trial.

6        First of all, when Mr. Rice testified and he was showed

7    his firm's settlement average against Garlock and mesothelioma

8    cases, he explained it as a result of the allegedly large

9    number of railroad cases where he asserted Garlock was a more

10   minor player.  Have you put that testimony on a slide here?

11   A.   Yes.

12   Q.   Have you looked into the issue of --

13       MR. SWETT:  Your Honor, objection.  This is not in

14   his rebuttal report or any other report received from this

15   expert.

16       MR. WORF:  Your Honor, this is an issue that

17   Mr. Rice raised during the trial and could not have been

18   anticipated.

19       THE COURT:  We'll let him -- we'll let him go ahead.

20   Q.   Have you looked into the issue of the mix of railroad

21   cases versus other cases in the Motley Rice mesothelioma

22   settlements with Garlock?

23   A.   Yes.  Yes, we did.  We actually prepared a couple of

24   slides about that.  So what we -- the exercise that we

25   conducted was --

1           MR. SWETT:  Excuse me, shouldn't the settlement

2    distribution be confidential?  Can you do this without showing

3    it on the screen?

4           MR. WORF:  I don't think it was made confidential in

5    Mr. Rice's testimony, was it?

6           MR. SWETT:  I don't think there were numbers like

7    that.

8           MR. WORF:  We're happy to make it confidential if

9    you think it should be.

10          MR. SWETT:  Yes.

11          MR. WORF:  But we do need to show it on the screen.

12          MR. GUY:  Do you need to show it on that screen?  As

13   long as the witness and the judge sees it.

14          THE COURT:  Why don't you hand me the exhibit.

15          MR. WORF:  Sure, we can do it that way.

16          (Documents were tendered to the court, counsel, and

17   the witness.)

18   Q.   Dr. Gallardo-Garcia, so the results of your analysis of

19   this issue are on slide 17 that we've now handed out to the

20   court and the other parties.

21   A.   Right.

22   Q.   Could you explain the results of your analysis without

23   getting into specific settlement amounts.

24   A.   Well, so what we basically did was we tried to

25   identify -- to identify all the cases that have settled with

1    this law firm that were associated to railroad cases -- or to

2    railroad.

3        Basically, we had information from Garrison where they

4    identified which cases have been part of railroad settlement

5    agreement and we also used all the information that we had

6    on -- in the Garlock analytical database in terms of

7    occupations and industries to identify who have been

8    associated to a railroad in the -- from the claimants that

9    were represented by this law firm and that settled with

10    Garlock.

11        So we also separated the settlements by errors.  One is

12    the -- at the bottom of the table is the pre-2000 time.  And

13    then the -- at the top of the table is the 2000s, starting in

14    2000 through petition.

15        And I believe the idea of the -- or Mr. Rice's testimony

16    was that his amounts have increased in the 2000s on average

17    and also that the averages and the medians that were shown in

18    court that day were very low or were relatively low because

19    they had railroad cases.

20        So as we can see on these tables, the averages, it's --

21    when you compare the railroad cases in the 2000s to the

22    non-railroad cases, the other category, the average amounts

23    are relatively similar, very similar.  And when we look at the

24    medians, they are the same.

25        Now, another question was whether we had included

4697

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 26 of 199
JORGE GALLARDO-GARCIA - DIRECT

1   affiliate law firms.  And we did the same exercise with the

2   known affiliated law firms that we had in the database, and we

3   recalculated the same table.  And although the other average

4   is slightly higher for the -- in the 2000s for the

5   non-railroad, the averages are relatively close and the median

6   is again the same.

7   Q.   And then on slides 18 and 19 which I also will not

8   display publicly but which the court and the parties have, did

9   you look at the occupation mix among the non-railroad cases?

10  A.   Yes, to verify that there was no -- that there were no

11  railroad cases in the -- in what we classified as other, we

12  went on to the information available and we looked at what

13  were the occupations.  And as we can see, even when we split

14  by occupation, we have claimants that will have been in the

15  groups that, for example, Mr. Henshaw classified as having the

16  most likely -- the highest likelihood of contact with gaskets

17  like pipefitters and machinists and insulators.

18       And we see that the averages are again very similar and

19  the medians are the same both when we looked at these law

20  firm's settlements by itself and when we look at the -- when

21  we include the associates on the table which is the slide 19,

22  the last slide.

23  Q.   The final issue I wanted to address with you today is the

24  testimony by Dr. Peterson that his company had to spend six

25  weeks reverse engineering to determine how Bates White

JORGE GALLARDO-GARCIA - DIRECT

1    calculated its estimate.  You were here and heard that

2    testimony?

3    A.   Yes, I was.

4    Q.   I've handed you two email strings marked GST7238 and

5    GST7237 which were discussed.  But as a general matter, does

6    Dr. Peterson's testimony about having to reverse engineer the

7    calculations match with your understanding of the facts?

8    A.   Well, my understanding is that we were available to

9    answer any questions they might have had at any point in time,

10   and these two emails basically record communications that we

11   had about that topic.  And there were no -- no communications

12   to us that indicated that they were not able to understand the

13   materials that we had provided them.

14   Q.   To get the timing correct, sometime after the report

15   deadline on February 15, did Bates White send voluminous

16   backup materials supporting the analysis in the report to

17   Dr. Peterson and Dr. Rabinovitz?

18   A.   Yes.  The reports were due February 15th.  We -- Bates

19   White took probably between six and ten days to put together

20   the background materials.  And we provided those on hard

21   drives that we sent via parcel, parcel service.

22        And then the email that you have -- the first email on

23   these -- on this exhibit is basically an email that we

24   received -- or that Mr. Cassada received on March 1st, is

25   basically two weeks after we submitted the expert reports.

JORGE GALLARDO-GARCIA - DIRECT

1   Q.   I think you're referring to the March 1st, 2013 email at

2   4:05 p.m.   Looks like it was actually to me.   Did you get

3   forwarded a copy of this email?

4   A.   Yes.   Mr. Cassada contacted me after receiving this email

5   asking me to provide the requested information.

6   Q.   The next email in the string is from Mr. Cassada to

7   Mr. Swett.   It looks like it's less than an hour and a half

8   later on a Friday afternoon.   Did you provide the content of

9   the email that Mr. Cassada sent to Mr. Swett and Mr. Guy?

10  A.   Yes.   For the -- yeah, for the most part all the sections

11  were -- it's described where the data is to make the -- to

12  reach the calculations.   Where the code is.   What are the --

13  what are the sections where the intermediate steps were saved,

14  the intermediate files that we can review all the

15  calculations.   All of those things were listed here.

16  Q.   Would someone with a basic understanding of statistics

17  and statistics computer programs have been able to use those

18  instructions to find the calculations?

19  A.   I think that that will be definite.   The instructions --

20  the instructions that we show here give the exact location of

21  the files.   Now, within the files that I'm referring to on

22  these instructions, there are notes and there are -- they are

23  numbered.   They are organized in a way that shows what are the

24  order of the calculations.   Within the scripts or the computer

25  code there are notes that indicate what is the step that is

JORGE GALLARDO-GARCIA - DIRECT

1    occurring.  And you can also see what are the databases or the

2    database that is being used and what are the fields in the

3    database that are being used.  All those instructions are easy

4    to see in this -- in those materials.

5    Q.   Mr. Swett in his email response to Mr. Cassada thanks you

6    and Dr. Bates.  Did you hear anything else from Mr. Swett or

7    Dr. Peterson after March 1?

8    A.   Well, we didn't -- we didn't that weekend.  Apparently

9    there were no additional questions on that weekend.  But the

10   second email that you gave me asked for one additional

11   clarification.

12   Q.   And this is an email on March 13, 2013, from Mr. Wehner

13   to me.  Did you receive a copy of this email?

14   A.   Yes.  You forwarded to me the -- that email.

15   Q.   And this is also talking about the calculation.  And did

16   you provide the content of the email that I sent a few hours

17   later to Mr. Wehner, Mr. Swett, and Mr. Guy?

18   A.   Yes, I did.

19   Q.   Could the instructions in that email have been used to

20   find the calculations?

21   A.   Yeah.  Well, that was the exact location of the -- of the

22   file that they were looking for and the file was an Excel file

23   that was easy to open by anyone.  And the numbers that I think

24   they were asking for on the email were the numbers that were

25   in the first half of the file.

JORGE GALLARDO-GARCIA - DIRECT

1    Q.    Thank you.   I handed you -- when I handed you the slide

2    show, I handed you exhibits marked GST Trial Exhibit 1002 and

3    Trial Exhibit GST7243.   Could you please identify those

4    documents.

5    A.    Yes.   The 1002 is my rebuttal report.   And the 7243 is an

6    errata to my rebuttal report.   It's actually to both of my

7    reports, the affirmative and the rebuttal reports.

8    Q.    And then I handed you a copy of the slide show.   Could

9    you identify that by GST number for the record.

10   A.    Yes.   It's 8025.   That's -- those are the slides that we

11   saw today.

12            MR. WORF:   Your Honor, we would move to admit the

13   declaration that I showed Dr. Gallardo-Garcia which is

14   numbered GST6596, also the sample questionnaires that are

15   marked as GST7244, the two emails that I identified on the

16   record, his slide show for demonstrative purposes, and then

17   his rebuttal report and the errata page to his report, the

18   latter two for Rule 104 purposes.

19            MR. SWETT:   Subject to those limitations, no

20   objection.

21            THE COURT:   All right.   Admit all that.

22            (Debtors' Exhibits Nos. 1002, 6596, 7237, 7238,

23   7243, 7244, and 8025 were received into evidence.)

24            MR. WORF:   Thank you, Dr. Gallardo-Garcia.   No

25   further questions.

4702

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 31 of 199
JORGE GALLARDO-GARCIA - CROSS

1            THE WITNESS:  Thank you.

2                    CROSS EXAMINATION

3  BY MR. SWETT:

4  Q.   Good morning, Dr. Gallardo-Garcia.

5  A.   Good morning.

6  Q.   Your assertion is that -- among others, is that

7  Dr. Peterson overestimates the percentage of mesothelioma

8  claims that were paid by Garlock historically, correct?

9  A.   That's correct, given his calibration window.

10  Q.   And you say that that overstatement results principally

11  because Dr. Peterson didn't use the questionnaire responses to

12  identify mesothelioma claims that had been dismissed in the

13  tort system or otherwise resolved but not recorded as such in

14  Garrison's database, correct?

15  A.   That's correct.

16  Q.   Now, the questionnaire did nothing to identify

17  mesothelioma claims filed prepetition but not recorded in

18  Garlock's -- in Garrison's database, did it?

19  A.   Say that again.  Can you repeat the question, please.

20  Q.   The questionnaire didn't concern itself with identifying

21  claims for mesothelioma that had been filed before the

22  bankruptcy but had not found their way into Garrison's records

23  as such.  The questionnaire didn't try to ferret out those

24  claims, did it?

25  A.   Well, I think that -- that's correct.  I think that

4703

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 32 of 199
JORGE GALLARDO-GARCIA - CROSS

1   initially the first questionnaire was going to be submitted to

2   law firms and to us to provide questionnaires for all their

3   mesothelioma cases that they had against Garlock, but then it

4   was restricted only to the ones that were in the database.

5   Q.   Well, actually, it was restricted to mesothelioma claims

6   reflected as such in Garrison's records.   And that doesn't

7   necessarily mean just the database, does it?

8   A.   I don't know what you mean by that.

9   Q.   Okay.   Well, at any rate, Bates White itself undertook no

10  effort to ascertain how many unrecorded mesothelioma claims

11  might exist at the petition date, did it?

12  A.   No, we did not.

13  Q.   And to your knowledge, the debtors made no such effort in

14  the questionnaire process or related inquiries, correct?

15  A.   Well, I actually think they did.   When they were updating

16  the Garrison Database, I think that they did look for which of

17  the records that were in the Garrison Database were not

18  mesotheliomas but -- were not classified as mesotheliomas but

19  in fact were.

20  Q.   You're speaking of the roll forward of the database from

21  September 2010 to May 2011?

22  A.   Yes, I think that's --

23  Q.   After that -- strike that.

24       Now, at the beginning of the case, Garlock obtained an

25  order requiring law firms in certain circumstances to submit

4704

Case 10-31607    Doc 3488    Filed 04/02/14    Entered 04/02/14 16:04:49    Desc Main
Document    Page 33 of 199
JORGE GALLARDO-GARCIA - CROSS

1  Rule 2019 statements, correct?

2  A.    That's correct.

3  Q.    And you're aware that the form of the required 2019

4  statements included the listing of clients and the

5  identification of the diseases from which they suffered,

6  correct?

7  A.    I believe that's correct.

8  Q.    But Bates White did not look at the 2019 statements filed

9  in this very case to ascertain how many claimants they might

10 identify with mesothelioma who wouldn't be listed at that

11 point in the Garrison Database as such, correct?

12 A.    Well, we did some analysis about that, actually, and it

13 was not a significant amount of cases.  And many of the cases

14 that were listed on the 2019s were actually already settled or

15 dismissed in the Garrison database.

16 Q.    That analysis is not in either of your reports, is it?

17 A.    No, it's not.

18 Q.    You are familiar with a procedure that data analysts

19 sometimes use of comparing a late version of a database to an

20 earlier version of the same claims database in order to

21 observe changes?

22 A.    Yes.  We do -- we do those things to ensure that the --

23 that we understand what is the data that we have at hand and

24 what is the better version of the data to use.

25 Q.    So for example, the September 2010 Garrison Database

4705

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 34 of 199
JORGE GALLARDO-GARCIA - CROSS

1    could have been compared to previous editions of the database

2    that Bates White had received in its prepetition services to

3    EnPro, correct?

4    A.   Yes.

5    Q.   And it would not have been unusual, would it, to observe

6    in that comparison cases being reclassified from one disease

7    category to another over time?

8    A.   Well, I mean, it wasn't typical.  I mean, that was

9    observed, but it wasn't typical.

10   Q.   You're familiar with a procedure that some data analysts

11   use in this context called a transition matrix?

12   A.   Yeah.  I mean, as a general concept I know what a

13   transition matrix is.

14        One thing that is very important is to understand what is

15   the transition and why the transition is happening and

16   that's -- I don't think that that's -- the manner in which

17   Dr. Peterson used those transition matrixes were appropriate.

18   Q.   Well, oftentimes it is the case that an asbestos

19   defendant will take in a case, record information in the

20   database, but not yet at that time have disease information to

21   record, correct?

22   A.   Yes, it happens.

23   Q.   And sometimes -- and so those often are put into a

24   category of unknown disease, correct?

25   A.   Correct.

4706

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 35 of 199
JORGE GALLARDO-GARCIA - CROSS

1  Q.    And over time, as the information grows and the defendant

2  becomes better informed, those cases are often recategorized

3  and assigned to particular disease categories, correct?

4  A.    Correct.

5  Q.    Among those disease categories being mesothelioma,

6  correct?

7  A.    That's correct.

8  Q.    And sometimes the initial recordation of a case with a

9  disease categorization turns out over time to have been

10  incorrect in the first instance, right?

11  A.    That's unusual.

12  Q.    But it does happen.

13  A.    That's happened, yes.  It's -- usually asbestos-related

14  databases have hundreds of thousands of records.  In the case

15  of Garlock, we have -- we have a database that has already

16  900,000 records and always, as I described in my prior

17  testimony, mistakes on those databases are always possible.

18  Q.    And so an analysis can be done to observe historically

19  the error rate and the rate at which cases originally recorded

20  in one disease category migrate over time into other disease

21  categories, including mesothelioma, correct?

22  A.    That's correct.  The -- but also an analysis could be

23  done about trying to understand how that error rate might

24  change because one -- one thing that we know about cases --

25  about asbestos cases is that if a claimant has mesothelioma,

4707

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 36 of 199
JORGE GALLARDO-GARCIA - CROSS

1   the claimant is going to -- is likely going to let the -- let

2   the defendant know that it's a -- this is a mesothelioma claim

3   as soon as possible.

4        So there is a different timing for becoming -- for

5   updating an unknown disease case from -- into a mesothelioma

6   than there is to -- from updating an unknown disease case to

7   non-malignancy, for example.

8   Q.   Neither of your reports in this case reports on any

9   comparison of the Garrison May 2011 database to prior editions

10  of the database for the purpose of identifying mesothelioma

11  claims that may have been misclassified in the past.

12  A.   No, my reports don't have that subject.   Although,

13  Dr. Bates did some analysis about that.

14  Q.   Now, the Garrison Database does reflect, doesn't it, that

15  in 2009 Garlock dismissed an unusually high number of cases?

16  Are you aware of that?

17  A.   I don't know what you mean by unusually high.

18  Q.   Let's take a look at ACC927.

19       I'm looking at the bars in 2009.  This is a -- I should

20  explain first this is a chart based upon the Garrison Database

21  that classifies dismissals according to the age of the case or

22  how much lag there was between the filing of the case and its

23  dismissal.  And as you'll see, the purple part or parts of the

24  bars are cases that lagged by five years or more.  Do you see

25  that, sir?

4708

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 37 of 199
JORGE GALLARDO-GARCIA - CROSS

1    A.    Yes, I do.

2    Q.    So this chart would indicate, for example, that in 2009

3    there was a very high level of the dismissal of such cases in

4    that lag category compared to the three years prior and even

5    the fourth year before that, correct?

6    A.    Yes.   Are these mesothelioma claims only or...

7    Q.    Yes.

8    A.    Yes.   I mean, that's what I see on the table, but I -- I

9    mean, on this chart, yes.

10   Q.    Is that a pattern that you had observed for yourself

11   before seeing the chart?

12   A.    I don't recall this pattern.

13   Q.    Are you aware of any change in Garlock's claims

14   management practices at or about 2009 that would explain this

15   pattern if it accurately reflects the Garrison Database?

16   A.    I'm not aware of any.

17   Q.    And as you'll see the level of dismissals of older cases,

18   five years and older, is also comparatively high in 2010,

19   correct?

20   A.    That's -- yeah, that's what the chart shows.

21   Q.    Do you have any reason to believe that commencing in

22   2009, Garrison undertook any sort of project to clean up its

23   database in anticipation of bankruptcy?

24   A.    I don't know about that.   But these are clearly dismissed

25   cases.   So, I mean, they should have been recorded on the

1  database at some point or another.  I don't know when they --

2  I mean, I don't know about the timing, but these are

3  dismissals.

4  Q.   Now, if we focus on 2005 and again on that purple part of

5  the bar, and then we compare it to the three years following,

6  if we were standing in 2005 and projecting and we were focused

7  on the extent of the dismissals of cases five years and older

8  and we were to project just on the basis of that 2005

9  experience, that would be somewhat misleading with respect to

10 the three following years, wouldn't it?  In a forecasting

11 mode.

12 A.   (No response.)

13 Q.   Because of the spike.

14 A.   Well, I don't know -- I'm -- I cannot answer that

15 question.  I don't know why you would only use 2005.

16 Q.   No, no.  I'm just asking you to bear with me on this

17 hypothetical.  If the analyst were to project standing in 2005

18 based upon the rate at which older cases were dismissed in

19 that year, it would sort of miss the target in terms of

20 forecasting for the next several years, wouldn't it?

21 A.   Yes.  If you just took that number and blindly used it to

22 extrapolate something.  The point is that if you saw that

23 there was that difference in the dismissal rates or in the

24 number of dismissals from one year to the next, you'll try to

25 understand why that was the case and what will be the

4710

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 39 of 199
JORGE GALLARDO-GARCIA - CROSS

1   appropriate portion of the data to use.

2   Q.   And one thing that a reasonable data analyst might do is

3   construct an assumption based upon observed experience for a

4   broader period of time, correct?

5   A.   That's one thing that one could do.

6   Q.   To sort of smooth the curve and normalize the experience

7   rather than depend upon the experience of a single year that

8   might not be recurring.

9   A.   Well, I mean, to have a better estimate, I don't know

10  what you mean by smoothing the curve.

11  Q.   I mean avoiding the distorting influences of a particular

12  spike or -- an anonymous period.  Data analysts commonly

13  engage in exercises to construct calibration periods, correct?

14  A.   Yeah.  You -- yeah, you -- that's something you can do,

15  yes, of course.

16  Q.   So that would observe -- for the particular metric that

17  you happened to be interested in as it existed in several

18  different years over a selected period to construct a

19  normalized assumption with respect to that particular metric

20  for forecasting purposes, right?

21  A.   I don't know what you mean by normalized.  I mean, there

22  is a specific definition of normalizing in statistics.   I

23  don't think that you're using it that way.

24  Q.   Well, I'm not a statistics maven so you're appropriately

25  cautious in that.

1          All I mean to say is that as a common procedure, when

2     faced with this kind of data analysis problem, to construct a

3     calibration period, to observe the data over that period, and

4     on the basis of that observation of a wider period of time, to

5     construct a rationally based assumption for use in forecasting

6     the future.  That's all I'm talking about.

7     A.    Yeah, I mean --

8     Q.    That's a calibration --

9     A.    You might -- there might be different -- different

10    periods of time that you use to calculate statistic that then

11    you apply to -- for an extrapolation, yes.  I mean, but I

12    think that the most important thing will be to understand what

13    it is that you're including in your calibration period.

14    That's the -- I think that's the most important thing.

15    Q.    Okay.  Now, switching gears.  Bates White used the

16    questionnaire responses to determine that some significant

17    number of claims recorded in Garrison's database as open

18    mesothelioma claims were not, in fact, open mesothelioma

19    claims at the petition date, either because they were

20    previously paid or they were previously dismissed, right?

21    A.    Correct.

22    Q.    Or because they belong to individuals who do not contend

23    that they have mesothelioma; that they were mischaracterized

24    in the database itself.

25    A.    That's correct.

JORGE GALLARDO-GARCIA - CROSS

1  Q.   Correct?

2       Now, in the ordinary course of Garrison's claims

3  management outside of bankruptcy, that kind of information

4  would have come to the fore over a period of time, wouldn't

5  it?

6  A.   Yes.  I guess, yes.

7  Q.   So that the claim that was mischaracterized as a

8  mesothelioma claim in the ordinary course of events outside of

9  bankruptcy would have come to the fore, would have been

10 settled or dismissed, would have made itself known to Garrison

11 as not a mesothelioma claim, right?

12 A.   I don't think that in every single instance.  I mean, we

13 see in the database that there were cases that have been

14 pending or open for years, for tens of years.

15 Q.   Nothing is perfect.  We can stipulate to that.

16 A.   Yes.

17 Q.   But by and large, over the course of time, a

18 misclassified mesothelioma claim would reveal itself as such

19 to Garrison and Garrison would update its database

20 accordingly, correct?

21 A.   Yes, I think that would be --

22 Q.   Okay.

23 A.   That's correct.

24 Q.   Rather than giving effect to that process over time as it

25 would have unfolded outside of bankruptcy, however, Bates

1   White adjusted the Garrison Database in its analytical

2   database by counting the dismissed mesothelioma claims that

3   were -- that emerged as such from the questionnaire process,

4   correct?

5   A.   Well, we are talking now about dismissed cases.   These

6   cases are dismissed.   So there is no -- I mean, this is --

7   this is just a matter of data recording.

8   Q.   We're talking about data claims management.

9   A.   Yeah, we are talking about the fact that these cases are

10  dismissed so if they are dismissed, they should be reflected

11  as such in the database.

12  Q.   And so rather than construct an assumption and project

13  over time the rate at which cases are dismissed making

14  whatever statistical adjustments it thought appropriate based

15  on experience, Bates White relied on the questionnaire process

16  to trump the Garrison database and override the ordinary

17  course procedures by which that database had been constructed

18  in order to take account of the questionnaire responses,

19  correct?

20  A.   Well, as a matter of any scientific process, if you can

21  observe the actual event, you don't try to forecast it.

22       So in this case we observed the fact that these cases are

23  actually dismissed.   So there is no reason for making any

24  assumption about those.   If they are dismissed they are

25  dismissed.

1  Q.   If we were to use the historically based -- a dismissal

2  rate for forecasting that was constructed on the basis of

3  Garrison's data as it stood in May 2011 but bring it to bear

4  on the Garlock analytical database constructed by Bates White,

5  we would, in effect, double count dismissals, wouldn't we?

6  That wouldn't fit, would it?

7  A.   Can you repeat that question.  I got lost there.

8  Q.   Suppose I were to take the Garrison 2011, May 2011

9  database.  Construct the calibration period.  Derive a

10  dismissal rate from that experience as recorded in Garrison's

11  books in the ordinary course of events.  And I were to take

12  that dismissal rate and use it with the Bates White analytical

13  database underlying data to make my forecast, that would be

14  apples and oranges, wouldn't it?  It wouldn't fit.

15  A.   Yes, I...

16  Q.   It would result in double counting some dismissals,

17  wouldn't it?  Because the dismissals that would be inherent in

18  my dismissal rate constructed on the May 2011 database would

19  be -- would appear in the questionnaire responses too, right?

20  A.   Yes, but I don't understand why will anyone do something

21  like that.  I mean, if you had the -- if you had a database

22  that has that right -- the correct dismissal rates, you will

23  also have the database that has the correct, for example,

24  number of pending cases.  And then you will apply that correct

25  dismissal rate to the correct number of pending cases to, for

1   example, get the right number of potentially dismissed cases

2   from those --

3   Q.   And if you take an historical database and you apply

4   selectively trumping or overriding procedures derived from

5   exercises like the questionnaire for some purposes but you use

6   the unadjusted historical information for other purposes, you

7   are introducing significant distortions into your analysis,

8   aren't you?

9   A.   I don't think that's correct.  It all depends on what are

10  the -- what are the factors that you are -- that you are

11  referring to and what is the effect on the analysis.  I mean,

12  all of those things certainly have to be reviewed and have to

13  be considered.  But it's not -- as a matter of principle, I

14  don't think that's correct.

15  Q.   Did Garlock -- strike that.

16       Did Bates White classify as dismissed claims that were

17  reported in the questionnaire process under any other

18  description?  For example, if the claimant reported that he

19  didn't have mesothelioma, would Bates White treat that as a

20  dismissed claim?

21  A.   No, of course not.  Well, I mean, not -- not as a

22  dismissed mesothelioma claim for that matter, obviously.  I

23  mean, if -- so let me be clear about the process because

24  there's probably some misunderstanding here.

25       So if we had information about the status of the claim

1   but the claimant did not say that he did not have

2   mesothelioma, then he will be -- he will remain a mesothelioma

3   claim in the Garlock analytical database and will have a

4   different status.  For example, dismissed.

5        Now, if the claimant said these -- I never had

6   mesothelioma or I had lung cancer, then what will have

7   happened is that regardless of whether that case was dismissed

8   or pending, that will have been reclassified as lung cancer

9   and will not be part of the mesothelioma claims calculations

10  any longer.

11  Q.   Now, some of the -- I remember from your slide concerning

12  the mesothelioma claim questionnaire responses correspondence

13  from the Angelos firm.  In some instances they said Garlock

14  was never joined as a defendant in this case, right?  Do you

15  remember that?

16  A.   Yeah.  Well, I think that there was one or two entries

17  that said Garlock was not named.

18  Q.   How did you treat those?  Did you dismiss them?

19  A.   Those were dismissals, yes.

20  Q.   You treated them as dismissals?

21  A.   Yes.

22  Q.   In fact, they weren't dismissed; they were never brought

23  in the first place, right?

24  A.   Well, so they are not -- there are no claims against

25  Garlock.

1  Q.   Now, Bates White also did an analysis, did it not, of

2  particular claimed files to derive assumptions as to the

3  extent to which the pending -- population of pending claimants

4  asserted contact with a Garlock product?

5  A.   Correct.

6  Q.   And Bates White made judgments about what did and didn't

7  qualify as such an assertion, correct?

8  A.   I don't think that's correct.  Well, there are two things

9  that I need to say about that.

10      The first thing is that we reviewed all the pending

11  claims that had submitted questionnaires for that matter.

12  It's not a sample.  It was basically a census of all the

13  mesothelioma claims that had submitted information through the

14  PIQ.

15      The second -- the second point that I want to make is

16  that the -- we reviewed -- for most of the cases there was

17  just the answer that claimants themselves provided on question

18  9 of Section 5A of the questionnaire, and that wasn't -- there

19  was no interpretation about that.

20      For some individuals who did not respond on the face of

21  the questionnaire but, rather, submitted the documents to

22  supplement their questions, what we did is -- what Bates White

23  did is basically go through those documents, identify any

24  instance in which they had mentioned Garlock gaskets as a

25  potential source of exposure, and then record whether they

1  had -- what was the way in which they had been in contact with

2  gaskets.

3  Q.   Now, you're aware LAS did that as well.  Conducted an

4  exercise to examine actual files to observe the rate at which

5  claimants in their claim materials, their PIQs and so forth,

6  actually asserted contact with a Garlock product.  You're

7  aware of that?

8  A.   Are you referring to the analysis that Dr. Peterson

9  reported on in his report?

10  Q.   Yes.

11  A.   Yes, I am.  But I don't think that we are talking about

12  the same thing.

13  Q.   My point is both experts undertook an analysis to make

14  observations about the extent of the identification of Garlock

15  products in their questionnaire materials.

16  A.   That's correct.

17  Q.   Okay.  Now --

18  A.   On my rebuttal report I covered that subject.  We didn't

19  present it today, but I can point to you what are the issues

20  with the analysis that Dr. Peterson performed.

21  Q.   And they disagree, correct?  You say they counted too

22  many.  They say you counted too few.  Right?

23  A.   Yeah.  We can show in the data why it is that we think

24  that --

25  Q.   Now, let's suppose you're right.  This is just for the

4719

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 48 of 199
JORGE GALLARDO-GARCIA - CROSS

1   sake of discussion.  Let's suppose your analysis of that is

2   right.  You observed the extent to which claimants didn't

3   identify in their questionnaire materials or supporting

4   documents contact with Garlock products.  How did you treat

5   those claims?

6   A.   Which claims, excuse me?

7   Q.   The claims that you determined in Bates White's analysis

8   lacked an assertion of contact with Garlock products.

9   A.   Well, how do I treat them?

10  Q.   How did you treat them in the database?

11  A.   Well, they are identified as such, as not identifying

12  source of Garlock --

13  Q.   And you gave them zero value, correct?

14  A.   Well, now you're talking about the forecast then.  In

15  that case I think that you are talking about Dr. Bates'

16  analysis.  And yes, my understanding is that he valued them at

17  zero.

18  Q.   Now, we're talking about stayed claims.  You know what

19  that means, correct?  Claims that are subject to a stay of the

20  bankruptcy automatically flowing from the pendency of the

21  bankruptcy.  Meaning those claims cannot go forward unless and

22  until the bankrupt court deals with them or lifts the stay

23  order, correct?  Or the automatic stay.

24  A.   Yeah, by -- yeah.

25  Q.   You're generally aware that these cases have been, in

1  effect, in suspended animation since Garlock filed bankruptcy.

2  A.   I don't know about that.  I wouldn't know about that.

3  But, yeah, I think -- I know what you are talking about.

4  Q.   You know they haven't been actively litigated or

5  processed since then.

6  A.   I don't know -- I don't know that.  I mean, I don't know

7  if they had continued against other defendants.

8  Q.   I'm sorry, I couldn't understand you.

9  A.   If they have continued their case against other

10 defendants.  I just don't know.

11 Q.   I'm talking about against Garlock.

12 A.   Oh, yeah, they are still pending, yes.

13 Q.   They're still pending and they're sitting there awaiting

14 action.  They haven't been active as to Garlock since the

15 bankruptcy was filed three years ago, right?

16 A.   That is correct.

17 Q.   Okay.  Now, you know from your experience in working

18 around these asbestos matters that it can be very difficult to

19 identify all of a given person's asbestos exposures, correct?

20 A.   I don't know what you -- what you mean by that.  I mean,

21 I don't have firsthand experience on that.  But my

22 understanding is that the main source of the exposure,

23 exposure information is either the -- is the claimant himself.

24    So, I mean, I will expect that he will know what were the

25 occupations and industries where he worked at, what were the

4721

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document    Page 50 of 199
JORGE GALLARDO-GARCIA - CROSS

1  locations where he worked and that will be something that his

2  representative will be able to figure out with no -- with no

3  trouble.  But I don't know firsthand.

4  Q.   Did you listen to Mr. Glaspy testify earlier today?

5  A.   I was not in the room.

6  Q.   Have you read his testimony given in this court in March

7  of 2011?

8  A.   No.

9  Q.   He described the search for exposure evidence is

10 oftentimes a search for a needle in a haystack.

11 A.   You are talking about the defense -- the defense

12 attorney.  I thought that you were talking about the plaintiff

13 attorney.

14 Q.   I'm talking about whoever is doing the searching.  It's

15 not necessarily an easy thing to identify all the myriad

16 sources of asbestos exposure that a given worker might have

17 suffered.

18 A.   I wouldn't know about that.  I told you that I don't have

19 firsthand knowledge of that.

20 Q.   But you do have the understanding, don't you, that these

21 cases don't come fully developed when the claimant walks into

22 the lawyer's office?

23 A.   I don't know about that either.

24 Q.   They're built over time, aren't they?  You know that.

25 A.   I really don't.

4722

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 51 of 199
JORGE GALLARDO-GARCIA - CROSS

1   Q.   You've seen the interrogatory answers.  You've seen the

2   complaints.  You've seen the depositions.  You've seen the

3   trial testimony in various cases.  You see how the cases

4   evolve and are built over time.

5   A.   Yeah, I've seen that there are -- for example, in some

6   cases there are multiple interrogatories and multiple

7   depositions.  And I've also seen that the additional

8   information that is provided in later interrogatories and

9   depositions is many times not significantly different from

10  what was provided the first time.

11  Q.   And it is also true, isn't it, that plaintiffs and

12  defendants commonly postpone their efforts at trial

13  preparation until very close to the time of trial?

14  A.   I don't know about that.

15  Q.   You're not aware of that.  You didn't hear Mr. Glaspy

16  testify to that this morning?

17  A.   I wasn't -- I wasn't in the room.  I mean, if he

18  testified to that.

19  Q.   Now, the record will reflect that in the course of

20  presiding over disputes concerning the questionnaire process,

21  this court made clear that respondents need provide only

22  information already available in the file, correct?

23  A.   Yes, I think that's correct.

24  Q.   They did not have to engage in further investigation,

25  right?

4723

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 52 of 199
JORGE GALLARDO-GARCIA - CROSS

1   A.   Correct.

2   Q.   And they did not have to engage in trial preparation,

3   correct?

4   A.   I think that's correct.

5   Q.   The court also made it clear that the questionnaire

6   process would not involve in any way any sanction of dismissal

7   of any claim.  Are you aware of that?

8   A.   No, I am not.  I am not.

9   Q.   The record will so reflect.

10       Now, assigning zero value to a pending claim in a state

11   of suspended animation under the automatic stay is not very

12   different from treating it as dismissed, is it?

13   A.   Well, we are talking about -- now we are talking back

14   about the forecast because --

15   Q.   Yes.

16   A.   -- first you were talking about specific claimants.

17   Q.   I'm talking now about the forecast.

18   A.   So that's --

19            MR. WORF:  Your Honor, objection.  This is outside

20   the scope of today's direct.  He should have asked

21   Dr. Gallardo-Garcia about this last time if he wanted to --

22            THE COURT:  Well, hopefully he'll wind it up pretty

23   quickly.  Go ahead.

24   Q.   Both the dismissal and the treating of a claim as having

25   zero value had the effect of tamping down the estimate, didn't

4724

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 53 of 199
JORGE GALLARDO-GARCIA - CROSS

1   it?  They produce a lower estimate than another assumption

2   would.

3   A.   Yeah, but I don't think that that's an assumption.  We

4   are talking about facts that were reflected in the

5   questionnaires.

6   Q.   Now, you're aware that most of the claimants had died by

7   the time of the questionnaire responses?

8   A.   Yes.  And even a good number of the -- of the claimants

9   that were reported as deceased actually were able to provide

10  the way in which they were in contact with asbestos.

11  Q.   The fact of the matter is that most of them were dead by

12  then, isn't that so?

13  A.   I will have to look at the data.  I'm not sure that all

14  of them -- most of them were dead, but I will have to look at

15  the data.

16  Q.   You understand that the expected life expectancy of a

17  mesothelioma victim upon diagnosis is something on the order

18  of 18 months?

19  A.   Yes, I've heard that before.

20  Q.   You understand that the questionnaire process took more

21  than 18 months from the beginning of the case to come to

22  fruition in the questionnaire responses?

23  A.   Yes, I know that for a fact because I was part of the

24  process.

25  Q.   Now, in the ordinary course of litigation outside of

4725

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 54 of 199
JORGE GALLARDO-GARCIA - CROSS

1   bankruptcy, you know, do you not, that some of those cases

2   that you are treating as of no value because the file does not

3   reflect in your estimation contact with a Garrison product --

4   Garlock product at this particular moment would ripen in

5   litigation into viable claims.

6   A.   I do not -- I do not know that and that's not -- you are

7   still talking about an analysis that I did not perform.   That

8   was an analysis that Dr. Bates performed.

9   Q.   Now, others, I would grant you, would sort of die on the

10   vine and eventually be dismissed.   That would happen at the

11   pace of the underlying litigation in the nonbankruptcy

12   processes, correct?

13   A.   Yeah.   But here we are talking about cases that were

14   dismissed before and that were just not reflected in the data.

15   Q.   And both of the --

16   A.   We are talking about two different things now.

17   Q.   Both of the patterns that I'm talking about, the pattern

18   where an undeveloped case becomes developed, finds evidence,

19   becomes viable, evades dismissal and is either settled or

20   tried; and the pattern, on the other hand, where it comes up

21   empty.   Where, like that Belluck and Fox response you put up

22   on the board, the claimant says I'm done.   I can't find

23   Garlock ID.   I'm withdrawing my claim.

24        Both of those patterns would be detectable in the

25   historical data over time, correct?

4726

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 55 of 199
JORGE GALLARDO-GARCIA - CROSS

1   A.   It's possible, but it will -- it will be necessary to

2   analyze that.

3        Now, that -- again, what we are talking about here is

4   facts.  The fact that those claims were dismissed as we saw on

5   the examples and as we can see in all the other documents that

6   were submitted through the PIQ, that's just a fact.  That was

7   not reflected in the Garrison Database.

8   Q.   No, no, no.  You're talking about the unilateral

9   recognition of dismissals from the questionnaire process

10  without a correlative, on-the-other-hand effort to find out

11  falsely mischaracterized or omitted mesothelioma claims.  I'm

12  talking about something else now.  I'm talking about the

13  treatment of claims as of zero value in the forecast.

14       My contention, Dr. Gallardo-Garcia, is that to some

15  material extent, claims that Bates White is treating as of no

16  value for its forecast would, if processed in the normal

17  course of litigation outside of bankruptcy, ripen into viable

18  claims.

19  A.   I don't think that's true.

20  Q.   History teaches us that, doesn't it?

21  A.   I don't think that's true.  The experience that I have

22  with asbestos databases is that most of the settlements -- if

23  a claim is going to be settled, that settlement is going to

24  occur just a couple of years after filing.

25  Q.   Well, that may be the predominant pattern.  But you are

1   also aware of some very old claims getting paid at the end,

2   aren't you?

3   A.   Some of them, but those are rare.

4   Q.   Now, contrasted to the natural processes of the

5   nonbankruptcy litigation, what would have happened if Garlock

6   hadn't sought refuge in the bankruptcy court; contrasted to

7   that, the marking down of claims to zero for lack of evidence

8   at an arbitrary moment selected by the debtor who has an

9   interest in minimizing its estimated liability is not, I

10   submit to you, a fair reflection of how claims are handled in

11   the nonbankruptcy world.  Do you accept that?

12   A.   I don't think -- I do not.  The -- at the time of the --

13   of submitting the questionnaire responses, the youngest claim

14   will have been at least a year and a half old.  So I will

15   have -- I will assume that if there was going to be any

16   information that they could gather, they will have had enough

17   time.

18        Now, we are talking about the -- when we are talking --

19   Q.   That's your assumption.  What's the basis?

20   A.   As I told you --

21   Q.   Just the age?

22   A.   Yeah, because I've seen -- because I've seen in the data,

23   as I said before, that cases that eventually settle are

24   typically settled just a couple of years after filing.

25   Q.   And in your estimation, it makes no difference that the

JORGE GALLARDO-GARCIA - CROSS

1  plaintiff has been legally barred from proceeding for three

2  years?

3  A.   You are talking about -- again, about Dr. Bates'

4  estimation.   You can ask that to Dr. Bates because he actually

5  did an analysis regarding the timing of the claims and to

6  payment and all these things that you are asking about.

7  Q.   Okay.   Let's switch gears.   Let's talk about your

8  criticism of Dr. Peterson for failing to include more than a

9  hundred settlements that occurred in 2010.   I take it that's

10  based upon the debtors' February 2013 response to long pending

11  requests from the FCR for information about settled claims,

12  right?

13  A.   Some of -- some of those might have come from there.

14  Q.   That's the information provided about a week before the

15  expert reports were due, correct?

16  A.   That's correct.

17  Q.   Okay.   Now, you included -- Bates White included those

18  settlements as such in 2010 in its analytical database.

19  A.   So many of those settlements actually had -- I believe

20  they had dates.   For many of them we had actual dates.

21  Q.   Many of them you didn't, right?

22  A.   For the -- for a small number of them.   If we are talking

23  about the hundred specific cases that you're referring to, I

24  will know how many of those had dates or not, but I will think

25  that a number -- a significant number of them actually had

JORGE GALLARDO-GARCIA - CROSS

1    dates.

2    Q.   But none of those claims were recorded as settled in the

3    May 2011 Garrison Database, was it?

4    A.   Some of them were.

5    Q.   How many?

6    A.   I don't know.  I will have to go back and --

7    Q.   Most of them weren't?

8    A.   I don't know.  I will have to look at that.

9    Q.   Well, why would it be newsworthy of an interrogatory

10   response to report a hundred claims as settled if they were

11   already in the database as settled?

12   A.   Well, actually, that's what we found in the database.

13   When we did the analysis on a claim-by-claim basis as opposed

14   to just summing all the cases in one single number as

15   Dr. Rabinovitz did, the -- what we found is that there were

16   actual cases that were already reflected as settled and paid

17   or actually dismissed in the May 2011 database that were

18   listed on those -- on those interrogatory responses that you

19   are referring to.

20   Q.   We're talking now about the hundred settlements that

21   you're criticizing Dr. Peterson for not taking account of.

22   But if you relied on the May 2011 database, he would

23   implicitly have taken account of those that had been recorded

24   as settled by that time, wouldn't he?

25   A.   Yeah, that's correct.  That's correct.

1   Q.   So when you criticize him for omitting the hundred

2   settlements, you didn't do that analysis to figure out more

3   precisely which ones had and hadn't been recorded already as

4   of the May 2011 database?

5   A.   Yeah.  Well, we basically found those claimants in the

6   database and we identified -- identified them as such.

7   Q.   But you criticized him for omitting them, but he used the

8   May 2011 database.

9   A.   Yeah, and we used both the -- the May 2011 database and

10  those responses to interrogatories.

11  Q.   Okay.  And those unrecorded settlements, if that's what

12  they were, had relatively low values, averaging about $22,000

13  a claim, right?

14  A.   Yeah, there were some -- some relatively low value cases.

15  There were some that were relatively high.

16  Q.   That's just about a third of the average settlement value

17  that you compute after you make adjustments that we'll get to

18  to the late stage settlement values; isn't that right?

19  A.   Yes, those are the settlements.  I mean, that's -- that's

20  what the data -- that the data shows.

21  Q.   Now, there were also a number of settlements that were

22  reported on the questionnaires that were significantly higher

23  than the average, correct?

24  A.   Settlements that were reported in the questionnaires?

25  Q.   Settlements -- well, let's -- let's don't muddle the

4731

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 60 of 199
JORGE GALLARDO-GARCIA - CROSS

1    question.  That were reported in those interrogatory responses

2    on Exhibit D:  52 settlements averaging 162,000.

3    A.   Right.

4    Q.   Those --

5    A.   I don't -- I don't know that that's the right average

6    amount, but Exhibit D had the settlements.

7    Q.   We'll look at that.  But they were comparatively high,

8    correct?

9    A.   Well, they were -- yeah.

10   Q.   But because Robinson Bradshaw told you that it -- that

11   Garlock wasn't accepting those as settled, you didn't treat

12   them as settled in the database, in your analytical database

13   or even forecast.

14   A.   That's not right.  You said Exhibit D?

15   Q.   D.

16   A.   Exhibit D is on unpaid settlements, I think, and those

17   were reflected as such in the database.

18         MR. SWETT:  Mr. Walker, can we call up ACC687.  Then

19   go to the second to the last page.

20         THE WITNESS:  Oh, no, you are right.  You are right.

21   Now I remember.

22   Q.   Okay.  Let's just -- let's just get clear on the record.

23   Exhibit D, the second to last page -- I'm sorry, this is

24   confidential so we won't show it.  I'll show it to you,

25   though.

4732

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 61 of 199
JORGE GALLARDO-GARCIA - CROSS

1       If I may approach?

2           MR. WORF:  We have no objection to you displaying

3   it.

4           MR. SWETT:  I have to be consistent.

5           If I may?

6   Q.   This is Exhibit D.

7   A.   Yes.

8   Q.   So Exhibit D listed 52 settlements of a certain status

9   that Garlock disputed.

10      I'm now looking at page 2 of the discovery response where

11  at the bottom the debtors say this.  "Plaintiff's counsel also

12  contended that claims listed on Exhibit D are subject to a

13  prepetition settlement agreement.  Although debtors did not

14  bring motions against the claimants listed on Exhibit D to

15  compel them to provide a questionnaire, debtors dispute that

16  such claims are subject to a settlement agreement.  And, if

17  such claims were presented to the court through the filing of

18  (unintelligible) claim, reserve their rights to fully contest

19  these claims."

20      How did you treat in your database and your forecast the

21  claims -- the 52 relatively high value claims listed on

22  Exhibit D?

23  A.   Those will be classified as pending, pending mesothelioma

24  claims.

25  Q.   Not as settled but not paid?

4733

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 62 of 199
JORGE GALLARDO-GARCIA - CROSS

1  A.   Correct.  Because they are not -- they are contested by

2  the debtors.

3  Q.   And what did the debtors tell you as to the basis for

4  that supposed contest?

5  A.   I don't -- they didn't say anything.

6  Q.   Did you make any inquiry on your own independent of

7  Robinson Bradshaw or of Garrison to find out what it was about

8  those asserted settlements that caused Garlock to dispute

9  them?

10  A.   Well, I did not, but my understanding is that it's just

11  that the debtors have no record about those settlements ever

12  having...

13  Q.   How did you get that understanding?

14  A.   Through Robinson Bradshaw.

15  Q.   Now, those settlements all pertain to clients of Belluck

16  and Fox, Simon Eddins, and Waters and Kraus, right?

17  A.   Yeah, that's what I saw in the...

18  Q.   You're aware that the debtors have been particularly

19  critical of those firms in this estimation trial.

20  A.   Yes, I've seen that.

21  Q.   Have you ever seen -- well, let's look first at Belluck

22  and Fox.

23         MR. SWETT:  Your Honor, I'm afraid that this is

24  going to be very awkward unless we clear the courtroom.

25         THE COURT:  Why don't we take a break for lunch and

 1   come back at 2:00, and then we'll do it with the courtroom

 2   closed.  I'll ask you to try to wind this up as quickly as

 3   possible.  We're going to quit today at 5:30.

 4           MR. CASSADA:  I'm sorry, Your Honor, I didn't hear

 5   that last statement.

 6           THE COURT:  I said we'll be back at 2:00.  We're

 7   going to quit today at 5:30.

 8           MR. CASSADA:  Okay.  Thank you.

 9           (Lunch recess at 1:15 p.m.)

10   THURSDAY AFTERNOON, AUGUST 22, 2013

11           (Court called to order at 2:00 p.m.)

12           MR. SWETT:  Your Honor, by way of shortcutting this,

13   I figured out a way to do it without displaying documents so

14   we don't need to clear the courtroom.

15           THE COURT:  All right.  Good.  So if anybody is

16   outside, invite them back in.

17           MR. SWETT:  Yes, sir.  Instead, what I'm going to do

18   is cite forth to the record some documents, lay down an

19   assumption, and then proceed on the basis of the assumption to

20   ask Dr. Gallardo-Garcia a question or two on this subject of

21   the 52 settlements that the debtors listed on Exhibit D as

22   disputed.

23           And the documents I want to refer to with reference

24   to the Belluck and Fox claims on that list, there's ACC720.

25   We have created an excerpt that we will separately tender into

4735

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 64 of 199
JORGE GALLARDO-GARCIA - CROSS

1  evidence as ACC720A.  It's an email from Bernadette Catalana

2  of the Osborn Reed firm representing Garlock.  That includes a

3  list that embodies the cases that Belluck and she had agreed

4  to resolve under the matrix agreement of 2010.  And I'm going

5  to represent that that list includes each of the claims that

6  shows up on Exhibit D.

7       Then I'm going to refer to certain correspondence in

8  the questionnaire meet and confer process pertaining to those

9  matters, ACC720B, which is a compilation of emails addressing

10  those matters in the questionnaire process.

11       With regard to Simon Eddins, I will refer to ACC237

12  and separately marked portions of ACC721 which we have --

13  which consist of a compilation of emails and letters which we

14  have broken out separately for identification as 721P, as in

15  Peter, 721Q, 721R, 721S, as in Sam.  And we'll represent that

16  these include a settlement letter addressing three of the

17  claims listed on Exhibit D, another email addressing a fourth

18  claim that's on Exhibit D, another letter addressing a fifth

19  claim on Exhibit D, another letter addressing at least eight

20  of the Simon Eddins cases listed on Exhibit D.

21       And I'm going to refer to ACC721 which we have also

22  broken out into its constituent parts.  It too is a composite

23  exhibit.  These consist of releases submitted to Garlock by

24  the Simon Eddins firm for claimants listed on Exhibit D.  And

25  the parts I will refer to are 721A, B, C, D, E, F, G, H, I, J,

4736

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 65 of 199
JORGE GALLARDO-GARCIA - CROSS

1   K, and L.

2           I will also refer with respect to the Simon Eddins

3   firm to ACC921 which is a summary of meet and confer

4   correspondence that is separately identified as ACC721M, 721N,

5   721O.

6           Finally, with respect to Waters and Kraus, I will

7   refer to ACC228 which is a 2006 settlement agreement in letter

8   form, and ACC235 which is another letter agreement, this one

9   extending the existing Waters and Kraus settlement agreement

10  with Garlock into a future period.  And will note that Exhibit

11  D to that letter lists cases covered by the settlement

12  agreement and it includes each of the Waters and Kraus

13  claimants who are listed on Exhibit D.

14          I will also refer to correspondence from the meet

15  and confer process in the questionnaire matter, ACC722, and

16  Exhibit A.  They are two reflecting Water and Kraus's

17  confirmation that the settlements were agreed to be treated as

18  settled but not paid in the questionnaire process.

19  Q.   Now, having regard to those representations -- and I

20  understand I've not shown you the documents.  I'm not asking

21  you to take them for granted except for purposes of this --

22  concluding this part of the examination.

23          Would it have made any difference to you in your

24  treatment of the Garrison -- I'm sorry, of the Bates White

25  analytical database or in your forecast to know that there was

4737

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 66 of 199
JORGE GALLARDO-GARCIA - CROSS

1   substantial documentation available to Garlock that pointed to

2   the conclusion that, yes, indeed, Garlock had agreed to settle

3   each and every one of the cases listed on Exhibit D?

4   A.   Well, it will have -- certainly have an effect on the

5   data because that -- if that was really the case that those

6   cases were actually settled and Garlock had accepted those

7   cases as settled cases, then they will have appeared as such

8   in the database with any amount that will have agreed -- been

9   agreed between Garlock and the plaintiffs, yes.

10  Q.   But you were given no understanding from Robinson

11  Bradshaw or Garrison as to why Garlock was now taking the

12  position that these settlements shouldn't be accepted as such,

13  correct?

14  A.   Yes, I don't -- I don't have information about that.

15  Q.   Okay.

16  A.   Now, about the forecast.  And again, this is a topic for

17  Dr. Bates, but it will have made -- it will have made a

18  difference in the forecast.

19  Q.   Now, you understand, sir, don't you, that LAS,

20  Dr. Peterson's firm, accepted neither the 100 settlements that

21  Bates White accepted as settled claims based upon the

22  supplemental information provided in Garlock's discovery

23  response nor did it accept as settled the 52 cases that

24  Garlock treated as disputed settlements except to the extent,

25  if any, that they were reflected in the database as such.  Do

1  you have that understanding?

2  A.   Yeah, I think that they didn't reflect any of those

3  settlements in their database.

4  Q.   Let's talk about the three verdicts.  I believe this is

5  our last subject.  You assert that Dr. Peterson erred in

6  treating three verdicts, Puller, Snyder and Wilson, as having

7  been -- as recognizing them in the year 2010 rather than in

8  some prior period, correct?

9  A.   Correct.

10  Q.   These verdicts were on behalf of the plaintiffs and were

11  returned by juries in 2002, 2004, and 2005, correct?

12  A.   Correct.

13  Q.   And Bates White accounts for them in the year of the

14  verdict.

15  A.   Yes, that's right.

16  Q.   But they weren't actually paid in those years, were they?

17  A.   No, they were paid a couple of years after.

18  Q.   They were paid at various points, all of which fell

19  within the 2006 to 2010 calibration period used by LAS,

20  correct?

21  A.   I will have to look at my report, but I don't believe

22  that's true for the three of them.

23  Q.   Well, let's look at ACC925.

24      ACC925 is a summary of these verdicts as to information

25  in the database with respect to payment and recoupment

JORGE GALLARDO-GARCIA - CROSS

1   amounts.

2       And as you'll see, the Puller case, the verdict in that

3   case is reflected as paid on October 10 of 2006.  Do you have

4   any reason to doubt that?

5   A.   No.  I mean, that's -- that point's on the table.

6   Q.   That's the amount that Garlock paid to the plaintiff

7   pursuant to the verdict, correct?

8   A.   Correct.

9   Q.   And then below that we have a listing of a series of

10  smaller transactions with negative numbers, and those are each

11  an entry to reflect a payment received by Garlock from a trust

12  by way of offset against the amount paid on the verdict,

13  right?

14  A.   I don't know about every single entry of those, but,

15  yeah, that's my understanding.  It will be adjustments to the

16  initial amount.

17  Q.   And the last of those offsets that came in was collected

18  on June 29, 2010, correct?

19  A.   Correct.

20  Q.   Now, you understand that Garlock recorded -- or Garrison

21  recorded each of those transactions in the payment field of

22  the Garrison Database.

23  A.   Yes, I think that -- yeah, this is what -- what seems to

24  be the case that this looks like, an excerpt of the Garrison

25  Database, yes.

JORGE GALLARDO-GARCIA - CROSS

1   Q.   And likewise with Herman Wilson, the summary indicates

2   that it was -- the verdict of a million eight and change was

3   paid on January 24, 2006, correct?

4   A.   Yes.

5   Q.   You have no reason to doubt the accuracy of that?

6   A.   No.   I mean, that's part of the table.

7   Q.   Then we have the offsetting collections putting to a net

8   total, correct?

9   A.   Correct.

10   Q.   So that the impact of recording these transactions in

11   this way was to allow Garrison to track the net cost of that

12   verdict to Garlock, all things considered, right?

13   A.   Correct.

14   Q.   And then Snyder likewise, it indicates here the plaintiff

15   received payment of the verdict on April 5th of 2007, correct?

16   A.   Yeah.   Yes.

17   Q.   And offsets came in up to June 29, 2010, correct?

18   A.   Correct.

19   Q.   Were applied against the payment amount of the verdict,

20   producing net sums reflecting what Garlock paid out net

21   pursuant to that verdict, correct?

22   A.   Correct.

23   Q.   Each of the main transactions, the payments to the

24   plaintiffs, took place in 2006 or later, correct?

25   A.   The actual payments, yes, but not the verdicts.

JORGE GALLARDO-GARCIA - CROSS

1    Q.   And 2006 is the beginning of the calibration period used

2    by LAS.

3    A.   Yes, but that's incorrect.  Dr. Bates explained that in

4    his procedure when you asked these same questions.  And the

5    point here is not whether -- not when the verdict was paid,

6    but whether -- when was the event that occurred.

7    Q.   You're skipping ahead.  Stick with me for a minute.

8    A.   Okay.

9    Q.   The calibration period used by LAS began in 2006 and went

10   through 2010, right?

11   A.   Correct.

12   Q.   And both the first and last transactions recorded by

13   Garrison in the payment field for each of these three verdicts

14   took place within that span of time, correct?

15   A.   Correct.

16   Q.   So you are aware, are you not, that a verdict rarely if

17   ever constitutes the last event before payment of a claim.

18   A.   Well, sometimes I know that it's a bill, but the -- but

19   the amounts -- if the bill is not received, the amounts are

20   usually very close to what was the amount of the verdict.

21   Q.   Well, the verdict is when the jury comes back and gives

22   its award, right?

23   A.   Yes.

24   Q.   And then there follows a molding of the judgment where

25   any settlement credits are applied or interest added or

4742

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 71 of 199
JORGE GALLARDO-GARCIA - CROSS

1  whatever other arithmetic adjustments the court deems

2  appropriate to the verdict award, correct?

3  A.    Yes.   That's my understanding, yes.

4  Q.    And there is a time for noting an appeal, correct?

5  A.    Yes.

6  Q.    And Garlock always appealed, didn't they?

7  A.    I don't know about that.

8  Q.    You are certainly aware that Garlock's usual practice

9  when faced with an adverse verdict was to pursue an appeal.

10 It says that in the 10Ks.   You're aware of that?

11 A.    Well, I've seen the 10Ks, but I don't have recollection

12 of that.

13 Q.    And you're also aware that oftentimes settlement

14 negotiations followed the rendering of a verdict, correct?

15 A.    That's correct, yeah.   I know -- I know about those.

16 Q.    And when any of those things is going on, the amount that

17 the defendant will pay pursuant to the verdict remains

18 undetermined, correct?

19 A.    Well, it's not completely undetermined because there is

20 an award that's been already -- there is an amount that's been

21 already awarded, so there is the -- the amount is usually

22 similar to those -- to the initial verdict amounts.

23 Q.    But there is no payment when the jury comes back and

24 announces its verdict.

25 A.    No.

4743

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 72 of 199
JORGE GALLARDO-GARCIA - CROSS

1   Q.   That requires a passage of time and many events

2   intervening, correct?

3   A.   Yeah, that's correct.

4   Q.   Okay.   Now, you understand that LAS is projecting what

5   the debtor -- forecasting what Garlock would pay to resolve

6   asbestos claims if it were not in bankruptcy, correct?

7   A.   Yeah.

8   Q.   You call that an expenditure forecast.

9   A.   That's correct.

10  Q.   Because it's keyed to payments, right?

11  A.   (No response.)

12  Q.   Now, given that that is so, it's eminently reasonable,

13  isn't it, to take account of a verdict at some date related to

14  payment.

15  A.   I don't think it is.   And as Dr. Bates explained in

16  his -- in his deposition, if you include the verdict in a

17  period of time where the payment occurred, the impact of

18  the -- the behavioral impact on other settlements is already

19  reflected on the other settlements.   So you're basically

20  double counting the effect of that verdict.   But he can

21  explain it better than I.

22  Q.   We could either -- we could accept LAS's approach of

23  recognizing the net payment where it actually appears date

24  wise in Garrison's database or we could say, well, the largest

25  transaction and the first transaction are the ones that we

4744

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 73 of 199
JORGE GALLARDO-GARCIA - CROSS

 1  could reasonably relate the verdict to payment in and that

 2  would still be within the calibration period.

 3      So whichever of those two choices we make, and I

 4  appreciate that Dr. Bates doesn't agree with either of them,

 5  but when we make either of those choices, we do not affect the

 6  settlement averages produced by using that calibration period,

 7  correct?

 8  A.   Well, no, it will not affect them.  But again, that will

 9  be wrong.

10  Q.   Okay.  Now, from time to time Bates White had to make a

11  choice as to a settlement that was paid out in installments.

12  And the choice had to do with when to recognize the settlement

13  in the data, correct?

14  A.   Correct.

15  Q.   And in those instances, it was Bates White's practice,

16  was it not, to recognize the settlement as of the date of the

17  largest installment?

18  A.   That's correct.

19  Q.   Now, the LAS forecast speaks as of June 2010, the

20  petition date, correct?

21  A.   Yes.

22  Q.   So if LAS had chosen not the last payment in the series

23  but the first payment in the series for each of those verdicts

24  back in 2006, 2007, it would have to have rolled those numbers

25  forward by way of an inflation adjustment so that they would

4745

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 74 of 199
JORGE GALLARDO-GARCIA - CROSS

1   speak as of June 2010 in its forecast, correct?

2   A.   I don't know how they done their analysis.

3   Q.   But if they did make such an inflation adjustment, there

4   would be a small increase in the numbers, right?

5   A.   If they have assigned those amounts to the -- to prior

6   years and the inflation adjustment was positive, yes.

7   Q.   But they didn't do that, did they?

8   A.   No, it doesn't appear.

9   Q.   They just took the numbers straight out of the Garrison

10  Database, correct?

11  A.   Well, not straight out of the Garrison Database.  As you

12  showed here, they basically made this assumption of putting

13  all the payments or the balance of the payments on the last

14  date.

15  Q.   Well, we've already established that it wouldn't have

16  made any significant difference if they had taken the first

17  date from the standpoint of calculating their settlement

18  averages resulting from their calibration period, correct?

19  A.   Yeah, if you are just taking into account those dates as

20  opposed to the verdict date, yes.

21           MR. SWETT:  Okay.  Thank you, doctor.

22           THE WITNESS:  You're welcome.

23           THE COURT:  Mr. Guy.

24                        CROSS EXAMINATION

25  BY MR. GUY:

4746

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 75 of 199
JORGE GALLARDO-GARCIA - CROSS

1   Q.   Dr. Gallardo-Garcia, my name is Jonathan Guy.  I

2   represent the future claimants representative, Mr. Grier.

3        The answers to the questions Mr. Swett posed to you

4   concerning the assignment of those three claims and the

5   calibration period, understanding that Dr. Rabinovitz's

6   calibration period was 2005 to 2010, your answers would be the

7   same, correct?

8   A.   Yes.  If they had correctly assigned those amounts to the

9   payment dates, yes.

10  Q.   Now, Dr. Gallardo-Garcia, you're not taking any issue

11  with the first step in Dr. Rabinovitz's process of the

12  first -- of the six steps, correct?  The one where she

13  estimated the size of the population exposed to asbestos.

14  A.   You're going to have to give me more details.  I don't

15  know what you are referring to, I'm sorry.

16  Q.   Do you remember reading Dr. Rabinovitz's report?

17  A.   Yes.

18  Q.   Do you remember the six steps?  We can maybe put them up

19  on the screen.

20       You were here for her testimony in court, correct?

21  A.   Yes.

22  Q.   And I just want to be clear for the record what it is

23  that you're disagreeing with as to Dr. Rabinovitz.

24       You're not disagreeing with the first step, are you?

25  A.   To be honest, I will have to look at the -- I'd

1  actually -- what she actually did.  I don't -- by looking at

2  this slide, I cannot tell you.

3  Q.   Okay.

4  A.   If you are talking about the incidence model perhaps.

5  Q.   Yes.

6  A.   Well, I do know that the incidence model she used is

7  wrong because we've estimated that incidence model.  Dr. Bates

8  has done that, and he has --

9  Q.   Dr. Gallardo-Garcia --

10  A.   -- different estimates.

11  Q.   -- I'm sure Dr. Bates has lots to say about that.  I'm

12  focusing on what you are taking at issue with Dr. Rabinovitz's

13  report.

14      The one that you're focused on is number four, isn't it?

15  The value of the pending claims, right?

16  A.   No.  It's the number -- let's see.

17  Q.   Let's eliminate them.  You're not --

18  A.   Well, actually, yeah -- well, I'm -- I mean, you could

19  say that the mistakes she has in her data will affect several

20  of them, two, three, and four.

21  Q.   All right.  Let's break it down.

22      You can take that down.

23      The impact of the errors that relates to the settled but

24  disputed claims is $10 million, isn't it?

25  A.   Yes.  It's very small.

JORGE GALLARDO-GARCIA - CROSS

1   Q.   How much has Bates White spent on this case?

2   A.   On the whole case?

3   Q.   Yes.

4   A.   I guess -- I don't have an exact number.  But probably

5   $13 million.

6   Q.   And counting.

7        Now, the impact of this issue, the PIQ data not being

8   incorporated in the May 2011 database, is $80 million, right?

9   By your calculation.

10  A.   Well, that's by Dr. Bates' calculation.  I don't have his

11  report in front of me, but...

12  Q.   You're not saying that he's wrong, are you?

13  A.   No.  No.

14  Q.   Okay.  So let's take the $80 million.

15       You understand that Dr. Rabinovitz's report relies upon

16  the historical data, right?

17  A.   The Garrison Database.

18  Q.   Yeah.  And you're not -- you're not taking at issue with

19  the fact that the historical database showed claims that were

20  paid and the amounts that were paid on those claims, right?

21  A.   Correct.  What -- you're talking about the settlements?

22  Q.   Yes.

23  A.   Correct.

24  Q.   And you're not -- you're not taking at issue with the

25  Garrison Database the fact that it showed a propensity to sue

4749

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 78 of 199
JORGE GALLARDO-GARCIA - CROSS

1   too, correct?

2   A.   Correct.  Although, if I -- I mean, if we are going to

3   talk about mistakes, when Dr. Rabinovitz doesn't recognize

4   that there are -- there is a number of cases that are not

5   mesothelioma in the Garrison Database when she calculates the

6   propensity to sue, that will have --

7   Q.   No, no, no.

8   A.   -- an increasing effect on her estimates.

9   Q.   I'm talking about cases that were paid where there's a

10  settlement.  We saw it from Mr. Glaspy.  There's a

11  mesothelioma claim.  There's an acknowledgment of exposure.

12  The database shows all of that, doesn't it?

13  A.   Right.  But you asked about propensity to sue.

14  Q.   Right.  I'm just trying to break it down for the court,

15  the $80 million.  We've dealt with the $10 million, and the

16  other issue you raised is an $80 million issue.

17        Now, you would agree with me, sir, would you not, that

18  Dr. Rabinovitz's model recognizes that cases that were

19  dismissed against Garlock necessarily reflects that of the

20  pending claims, a number of those claims, something in excess

21  of 40 percent would be dismissed, correct?

22  A.   Yeah, but there are --

23  Q.   Yes.

24  A.   -- dismissals -- yes.

25  Q.   Right.  So her model recognizes that there will be a

1  dismissal of a large number, 40 percent or so, of the pending

2  claims, right?

3  A.    Yeah, that's what she calculated.

4  Q.    So by saying, well, now in 2013 we have this new data and

5  we are going to then apply it to the database from 2011, and

6  say, well, this one was actually dismissed.  Her model,

7  because it reflects an historical dismissal rate, already

8  incorporates that, doesn't it?

9  A.    No, that's not correct.

10  Q.    All right.

11  A.    In that case the problem is that she's basically double

12  counting because there is a dismissal rate that is the actual

13  dismissal rate based on the actual data that exists and then

14  the number of dismissals that you will have in the -- that

15  existed before 2010.

16      So this is not new data.  We are talking about the data

17  that was provided by the plaintiffs or their representatives

18  through the PIQ, right?  These cases were, as far as I

19  understand, dismissed previously and they are just not

20  reflected in the data.

21      So now, if you use those cases to -- if you update the

22  data, understand what you are going to have is a correct

23  dismissal rate rather than accounting for -- the model

24  accounting for those dismissals in the future.

25  Q.    Dr. Gallardo-Garcia, if the data that the debtors have

 1  recognizes over an extended period of time a dismissal rate,

 2  and then that is applied to the 3,000 plus pending claims,

 3  claims that are likely to be subject to dismissal would then

 4  be kicked out, wouldn't they?

 5  A.    Yes, but --

 6  Q.    Thank you.

 7  A.    -- a portion of the ones that will be classified using

 8  this calculation that you're talking about as settled will

 9  have been dismissed anyway because we know from the actual

10  data that they were actually dismissed.

11  Q.    Yeah, I think everybody understands it.

12        Dr. Gallardo-Garcia, do you remember the total number of

13  future claims that Dr. Rabinovitz forecast?

14  A.    No, I don't.

15  Q.    I represent to you I believe it was 21,389.

16        Do you know the total number of claims, future claims

17  that your colleague, Dr. Bates, forecast?

18  A.    On the order of 20 something thousand.

19  Q.    I think it's 28,402.  And then he applies this, well, I

20  think a lot of them aren't going to be good claims so I'm

21  going to unilaterally kick them out.  But in terms of the

22  total claims, his number is about 20 percent -- 25 percent

23  higher than Dr. Rabinovitz's, isn't it?

24  A.    Yeah, based on the numbers you just gave me.

25  Q.    So if Dr. Rabinovitz were actually to use your forecast

1  for future claims, her forecast would be significantly higher,

2  wouldn't it?

3  A.   Well, I wouldn't know how she would use the -- you are

4  talking about using the Bates White incidence model --

5  Q.   Yes.

6  A.   -- in this case?

7  Q.   Yes.

8  A.   Well, if she did -- if she used the same data that has

9  too many -- that doesn't account for the dismissals that we

10  know are dismissed and she counts all the other mathematical

11  errors that she has, she will probably come up with a higher

12  number.

13  Q.   Yeah, and it would be hundreds of millions of dollars

14  more, wouldn't it?

15  A.   I wouldn't know about that.  I would have to do the

16  calculation.

17             MR. GUY:  I have no further questions, Your Honor.

18             THE COURT:  Okay.  Mr. Worf, anything else?

19             MR. WORF:  Very brief, Your Honor.

20                     REDIRECT EXAMINATION

21  BY MR. WORF:

22  Q.   Dr. Gallardo-Garcia, Mr. Swett was talking with you about

23  the analysis that Bates White did of claimants' responses to

24  question 5A in the questionnaire about contact with Garlock's

25  asbestos-containing products.  Do you remember him asking you

4753

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 82 of 199
JORGE GALLARDO-GARCIA - REDIRECT

1  about that?

2  A.   Yes, I do.

3  Q.   That analysis did not enter into your critique of

4  Dr. Peterson and Dr. Rabinovitz that you presented today,

5  correct?

6  A.   No, that's -- that's a different -- a different topic.

7  What this slide shows is just the -- the number of pending

8  mesothelioma cases that exist in the database after

9  reclassifying the cases where the claimants said that their

10  claim had been dismissed.  This chart does not have

11  relationship with whether claimants were exposed or not.

12         MR. WORF:  Thank you, Your Honor.  No further

13  questions.

14         THE COURT:  You can step down.  Thank you.

15         THE WITNESS:  Thank you.

16         (Witness stepped down.)

17         MR. CASSADA:  Your Honor, Garlock calls Dr. Charles

18  Bates.

19         Your Honor, we've -- by our calculation, we have an

20  hour and 50 minutes for Dr. Bates and we will move with

21  efficiency and due speed to accomplish that.

22         THE COURT:  All right.

23         MR. CASSADA:  And we will accomplish that.  An hour

24  and 50 minutes will certainly handle it.

25                    CHARLES BATES,

1   being first duly sworn, was examined and testified as follows:

2                          DIRECT EXAMINATION

3   BY MR. CASSADA:

4   Q.    God afternoon, Dr. Bates.  I believe you previously

5   introduced yourself to the court so we'll jump right into

6   things.

7   A.    Good afternoon.

8   Q.    You were present in the courtroom when Drs. Peterson and

9   Rabinovitz testified?

10  A.    Yes, I was.

11  Q.    And when they presented their estimation opinions?

12  A.    Yes, I was.

13  Q.    Have you considered their testimony?

14  A.    Yes, I have.

15  Q.    Have you studied and considered their written materials?

16  A.    Very much so.

17  Q.    Is there anything in their testimony or presentations

18  that affects your -- the opinions that you previously offered

19  the court?

20  A.    I've looked at what they had to say.  I've considered the

21  lot.  A number of them are issues which I had considered in

22  the work that I had been doing.  So I considered them very

23  carefully.  And there is nothing that they said which

24  basically leads me to change any of the opinions to which I

25  have reached.

4755

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 84 of 199
CHARLES BATES - DIRECT

1   Q.   And you have actually reviewed and critiqued their

2   opinions, their estimation opinions; is that correct?

3   A.   I have.

4   Q.   And you've prepared a written report explaining your

5   criticisms and errors you found in their reporting?

6   A.   Yes, I have.

7   Q.   And you have before you a document that is marked as GST

8   Exhibit 997.

9   A.   Yes, I do.

10   Q.   And this is a copy of your rebuttal report.

11   A.   Yes, it is.

12           MR. CASSADA:  Your Honor, we move to admit

13   Dr. Bates' rebuttal report on the same basis as previous

14   reports for Rule 104 purposes.

15           THE COURT:  We will admit those.

16           MR. SWETT:  No objection on that basis.

17           THE COURT:  Thank you.

18           (Debtors' Exhibit No. 997 was received into

19   evidence.)

20   Q.   Dr. Bates, would you please describe the differences in

21   what you did and what Drs. Rabinovitz and Peterson did, both

22   in terms of the object of your estimation and your

23   methodology.

24   A.   Sure.  Would it be all right if I step down so I can

25   point?

4756

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document    Page 85 of 199
CHARLES BATES - DIRECT

1          THE COURT:  Yes.

2          (Witness stepped down.)

3          THE WITNESS:  So I think, Your Honor, I think the

4   diagram that we used for the law and economics model that we

5   developed I think helps mostly.

6          I think the -- essentially the estimates before the

7   court are starkly different.  And in particular, which the

8   model which we developed which related how liability is

9   related to the elements that make up the defendant's highest

10  offer, settlement offer, as well as the lowest amount that the

11  plaintiff would be willing to exceed -- accept essentially

12  shows the relationship between where the liability is which we

13  believe, according do the debtors' hypothesis about how the --

14  what is payable under -- what they owe under the bankruptcy

15  code is one thing which is distinctly different from the

16  amount that we paid as an expenditure.  The difference between

17  those is accounting for both the defendant's and the

18  plaintiff's costs and the structure of that.

19  Q.   And in addition to actually estimating different things,

20  did you employ different methodology?

21  A.   We did.  I think that it is clear from the presentation

22  that's gone on here, certainly is clear to me and certainly is

23  clear from the presentation of Dr. Heckman, that we presented

24  a coherent integrated model; that we basically used a

25  scientific method in what we were doing and how we did it.

1          And as near as I can tell, neither Dr. Rabinovitz nor

2     Dr. Peterson have any coherent model, theoretical,

3     quantitative or otherwise, that relates settlements to

4     liabilities and costs.  I think that's one of, I think, my

5     most significant criticisms of what it is that they have done

6     is they raised a number of issues, a number of them are very

7     important issues, but there is very little in the way of

8     quantitative analyses, real serious hypotheses testing, using

9     a statistical analysis to test what it is that they assert.

10    We've seen several examples of that in the court today.

11    Q.    Okay.  And you were here during the testimony of

12    Professor Heckman.

13    A.    I was.

14    Q.    Did you use reliable and established statistical and

15    economic -- econometric methods in your work?

16    A.    I did.  And throughout my presentation today, Your Honor,

17    I have put in some of the empirical -- the results that come

18    out of the actual statistical software that we used on this.

19    I don't intend to spend any time with this unless you have an

20    interest in me going into any details of them.  But I want to

21    just illustrate the kinds of things that we used that are

22    reflective of the kinds of critiques that Dr. Heckman referred

23    to as the kinds of statistical procedures that should be used

24    in proper statistical analysis, proper quantitative analysis.

25    And so I've put those in those and they will be in the

4758

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 87 of 199
CHARLES BATES - DIRECT

1    reports.

2         If at any time in my presentation today I tend to go over

3    things rather quickly because of the limited time, if there is

4    something that needs more clarification, please, Your Honor,

5    stop me and I'll answer your question and address that point.

6    Q.   Accepting that Drs. Peterson and Rabinovitz measured a

7    different thing, expenditures, have you considered whether

8    they've done that reliably?

9    A.   Yes, I have.

10   Q.   And have you identified and quantified errors in their

11   analysis and opinion?

12   A.   I have.  I have laid out in the table that's in front of

13   us on the screen right here as essentially a form of which was

14   used by Mr. Guy in his cross examination with Dr. Rabinovitz.

15   These lay out the errors that we've identified and the impact

16   that they have on their estimates.

17        And I think between the relationship in considering the

18   way in which they handled these items and then relationship to

19   these issues, between them you can basically reconcile

20   essentially between the estimates that they gave as well as

21   the financial forecasting estimates that we did for Garlock

22   which were expenditure estimates as well, including the

23   liability estimate that we did in our direct work here.

24   Q.   So for purposes of the record, we're referring to slide

25   number 5 and we have -- on that slide you set forth nine

4759

Case 10-31607    Doc 3488    Filed 04/02/14    Entered 04/02/14 16:04:49    Desc Main
Document    Page 88 of 199
CHARLES BATES - DIRECT

1   discrete errors.

2   A.    Correct.  We've identified the errors in terms of

3   categories, nine categories which lay them out.  The first

4   eight of them essentially are direct applications of the

5   methods they did.

6        The last, what I would consider to be methodological

7   errors in even what they were trying to do, the last one is a

8   difference in interpretation about how you should account for

9   the information that is becoming available and what I think is

10  happening in the tort system out there more broadly.

11       The kind of things that I tried to account for in the

12  financial reporting estimate that we did as well with the

13  available -- the expected upcoming trust that would be --

14  which, frankly, were delayed beyond what we thought would

15  occur and showed up -- only began paying claims on a

16  contemporaneous basis only late in the decade of the 2000s.

17  Q.    Okay.  Well, we'll review each error.

18       Turning to the first error.  Would you please describe

19  what that error is and what impact it had on the estimate.

20  A.    Well, this was -- within Dr. Rabinovitz's estimates she

21  includes payments to defense lawyers.  I am not sure why she

22  did that.  I listened to her explanation of that.

23       The one error -- one element of that would potentially

24  add some basis -- if we switch to the next slide, you can see.

25  Was she referred to it as being in some sense a proxy for what

4760

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 89 of 199
CHARLES BATES - DIRECT

1   would be costs if you operated Garlock's payments in a trust

2   instead of in the tort expenditures -- in the tort system.

3        For that purpose, first of all, I don't -- my

4   understanding is it's not an appropriate consideration for

5   this forum about the estimation of the liability or even if

6   you considered the expenditure to mesothelioma claimants.

7        On the other hand, if you want to consider what the

8   expense should be in operating a trust, we did that in terms

9   of our analysis of Garlock's -- their plan of reorganization

10  Garlock put forward.  We included trust expenditures in there.

11  It's much, much less.  She considered an amount that's an

12  amount almost 35 percent of what would be the total amount of

13  her forecast for that purpose.

14       In fact, if we just simply go out just as a point of

15  reference and look at the bankruptcy trusts that are currently

16  operated out there and the 524(g) trusts that are operating

17  out there right now, their operating expense level is closer

18  to 7 -- 6, 7 percent of their total expenditures, not 35 -- of

19  the assets, not 35 percent.

20  Q.   Okay.  So we're referring now to slide 7.  And this

21  demonstrates that a debtor's prepetition defense costs are not

22  a proxy for the costs of a trust.

23  A.   They would not be.  There's considerable less expenses

24  associated with operating that.  The burden of you no longer

25  trying to obtain a lot of information through the tort system,

1    through discovery.  Rather, it's incumbent upon the plaintiff

2    to present that information, which had a lot to do with why we

3    valued the trust the way we did with regard to the plan of

4    reorganization.

5    Q.   Okay.

6    A.   On the basis of that, you would have reduced her

7    expenditure, which she said was very nearly the same as

8    Dr. Peterson's, by $320 million.

9         And on that basis, when you compare the two, as you can

10   see on the next slide, they still would be -- there would be

11   considerable difference between the two.  One would be about

12   75 percent of the other.

13   Q.   Okay.  And your next error, turning to slide 8, is value

14   contested settlements as pending.  I believe we heard a little

15   bit about this.

16   A.   We've heard quite a bit about that so let's just do that

17   very briefly.  Just flash to the next slide.

18        I think that it's just the issue of how you treated them

19   and whether you treated them as pending claims or whether you

20   find them at the value that they had.

21        I think one point that I would make about the valuation

22   of these claims is if you're going to take a pool of the

23   pending claims, however they are, and extract from them a

24   group of particularly high valued claims out of them and

25   assign them in separate values, that's a procedure you can do.

4762

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 91 of 199
CHARLES BATES - DIRECT

1      And you can certainly, and I've done this in my forecasts

2    a lot, which is to segment claims into appropriate buckets and

3    assign the valuation characteristics to them that are

4    appropriate for them.  And we're going to talk about some

5    cases where that should have been done in more detail here by

6    Dr. Peterson and Dr. Rabinovitz.

7      But if you do that, you better reflect the fact that the

8    claims that you have left over are of lower quality and would

9    have been paid on average less.  And so you would at least

10   need to adjust the other side of those claims down.

11     So it's not the fact that you valued one group of claims

12   different than another because they might be of different

13   value characteristics to them, but you can't apply the blended

14   outreaches if they were all in there to one group after

15   already having taken out the high value claims.  Otherwise,

16   you're double counting the value of those claims.  You need to

17   account for that, which she didn't do.

18     Here we simply treat the entire group of them in the same

19   way as pending claims.  Then the net effect of that, the

20   combination of the various things here, first including SBND

21   claims which are valued and are accepted by the debtor.

22   That's simply set aside and treated in a different class of

23   claims and outside the scope of this forecast.

24     Once you account for those, it's a $10 million effect.

25   Q.   And this is an issue that pertains to Dr. Rabinovitz's --

4763

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 92 of 199
CHARLES BATES - DIRECT

1   A.    Yes.

2   Q.    -- testimony?

3        The third error is eliminate spurious trend.   Is

4   spurious -- is the term "spurious" a term that has meaning to

5   an econometrician?

6   A.    Yes, absolutely.  I mean, trends and spurious trends, the

7   distinction between a real trend and a spurious trend is

8   something that's well understood and studied by

9   econometricians and has been for a long time.

10       There's lots of literature relating to using sort of

11  numerical procedures to simply extrapolate what are apparently

12  numerical trends and data going forward, and it's something

13  that the amateur stock pickers try to do all the time.   They

14  just simply look at a time series of data and say, oh, that

15  means the data is going to go this way.   That's -- that's a

16  fallacious procedure.   It's well-known that that leads to

17  spurious results as Dr. -- Professor Heckman mentioned in his

18  testimony here.

19       It's really -- when you're going to examine something --

20  data of that sort, you really have to look at the underlying

21  mechanism which caused the data to change, that caused the

22  observations to change the way they are.   It just is not

23  appropriate.

24       In particular, in this case, when Dr. Peterson justified

25  adding a 4-1/2 year trend that he saw in the period of the

4764

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 93 of 199
CHARLES BATES - DIRECT

1   data on the basis, and the only explanation that he gave for

2   it was that he found the results implausibly low.

3       Well, if he had the number that he thinks he needs to

4   reach, then what's the purpose of the model?  I mean, the

5   model is what is to tell you the number.  You don't look at

6   the model and say, well, I don't like that result so let's do

7   something to make the number bigger, which is what he said in

8   his report he did.

9       He has provided no theory on why that trend is there.

10  And I think that in particular, it's not as if each one of

11  these time series of variables is an independent variable.

12  It's related to the other parts and parameters of the model

13  that he's estimating as well and the interrelationship between

14  them matters.

15      Whereas, he's treating them in this way -- and, frankly,

16  Dr. Rabinovitz does this too -- is treat the parameters in the

17  models as if they were independent factors to be estimated

18  separately instead of taking account of the relationship

19  between the variables that's -- that a well defined, coherent

20  model would give you.

21      In this particular case, if we go to the next slide, this

22  just is a chart out of my report using the propensity to sue

23  numbers that Dr. Peterson had in his report.  In particular,

24  there's a couple things I want to point out about this.

25      The trend that he winds up using to extend the values is

4765

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 94 of 199
CHARLES BATES - DIRECT

1    the red line.  Doesn't actually just extend it in this way.

2    What he did was he actually took the average from the period

3    of 2006 to 2010.  Which, by the way, this is an average.

4    These percentages over here are percentage of the incidence of

5    disease.  So we call that concept propensity to sue as we've

6    talked about here.  So the fraction of the incidence of

7    disease that brings a claim against Garlock, whether it's to

8    be paid or not, it's just bringing a claim.

9        He's measured that ratio based on the number of claims

10   filed to the number of claims diagnosed in that year.  Those

11   are not quite the same thing.  They can be different depending

12   on the time.  But he's taking an average across this period.

13       And then he takes the trend line that he gets from the

14   slope from going from 2006 to 2010 and then extends it upward.

15   So essentially, starts from about the point where the black

16   line is there and extends it upward according to this line.

17   And I'll show you that picture in a moment.

18       The point with this slide is that he's picked a

19   particular period of time from 2006 to 2010.  There's no five

20   year period in this period where the trend continues beyond

21   that point much at all.  If you had just simply taken the

22   period going back just a few years, it would have been flat.

23   If you had gone before that, the five year trend would have

24   looked like it had gone down.

25       None of those are appropriate things to do on the basis

1  of just looking at these ten numbers or five of those ten

2  numbers and just saying there's a pattern there you should

3  use.

4  Q.   So just to be clear, this propensity to sue and what

5  Dr. Peterson was forecasting here was an increasing percentage

6  of people every year diagnosed with mesothelioma who would

7  bring a claim.

8  A.   Certainly.

9  Q.   And you talked about the interrelationship between

10  variables.   What does slide 13 show?

11  A.   Well, this is another trend.  This is taking a graph -- a

12  set of numbers, it's a table of numbers that's on his report

13  as well, and just simply putting them on a bar chart to see

14  it.

15      I mean, this showed a very clearly distinctly downward

16  pattern.  I'm not suggesting this is a trend that one ought to

17  extrapolate at all.  What I'm just saying with this, if you

18  just looked at the numbers on this basis and say, oh, here's a

19  trend, this would be a downward slope.

20      Now, we've seen from the slide that Mr. Swett used in

21  cross examination of Dr. Gallardo-Garcia here that, you know,

22  it's probably the result of some activity that took place with

23  regard to Garrison's activities in cleaning up the database

24  and getting old mesothelioma claims put as dismissals which

25  has brought these rates down.  It's also had the impact of why

1   this particular bar is particularly low.

2        So looking just one level below the surface, it leads you

3   to say, well, I don't think I should necessarily believe this

4   trend as being something that I should continue.  That's the

5   kind of thing you need to do in doing this kind of analysis.

6   You have to look below the surface and find out what is

7   causing the pattern to change if you wanted to do anything

8   with that pattern.  It's just not simply a matter of just

9   extrapolating the pattern.

10  Q.   Does 14 show a relationship between propensity to sue

11  and --

12  A.   Right.  And this reveals the effect of having the

13  combination of the two.

14       This is a graph of the number of claims that are resolved

15  in each year.  Down at the bottom is resolution here.  The red

16  bars are the number of claims that are paid.  The blue bars

17  are the numbers of dismissals on the data.

18       And as you can see here that a couple of things come out

19  from the charts that Mr. Swett showed.  You can see the

20  relatively larger bars in blue in 2010, 2009, and 2005.  But I

21  think what's important for the chart for the purpose that

22  we're talking about is Dr. Peterson has extended a trend

23  upward of the propensity to sue.  He says there's going to be

24  more claims and we're going to project that forward.  He's

25  kept the payment rate constant.

1    But in doing that, what he's saying is that I'm going to

2   project an increasing number of claims to be paid, or at least

3   a nondeclining number of cases to be paid depending on how

4   steep of a slope he set going up.

5    In fact, what we can see from the data historically,

6   there's actually -- the most claims that were paid by Garlock

7   were, in fact, in the past prior to the time period where that

8   propensity to sue increased the way Dr. Peterson talked about.

9   In fact, the number of pending claims has been gone when

10   that's the pattern we would actually expect to see more

11   generally with the change in the incidence of disease and the

12   change in the composition in line with the number of people

13   who would have -- be able to make product ID with Garlock

14   products because of the beginning to decline number of people

15   with mesothelioma from occupational sources in the population.

16   Q.   How did Dr. Peterson respond to this criticism which you

17   pointed out in your rebuttal report?

18   A.   Right.  Well -- okay.  We can -- we can talk about it

19   first a little bit.  But this was a chart that he presented

20   here in court.  And this is what I was talking about here.

21   This black line starts here and moves up.  It's the one that

22   how he increases the propensity to sue.  So where I had the

23   bars, he has this kind of wire line here.  The percentages are

24   the same.

25    And what he's showing you is the procedure that he used

4769

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 98 of 199
CHARLES BATES - DIRECT

1  which was take the average from this period, start it from

2  here and move upward.

3      He then presented this graph and said, well, you know,

4  there's nothing wrong with that trend because that trend

5  doesn't go up anymore.  If I did all of these other things, I

6  would get a higher trend.  Well, that's caused not by looking

7  at the trend he picked.  This is not a test of the trend.

8  It's a test of where he started out the -- started out the

9  forecast.

10      So in all of these, he hasn't just put a different trend

11  in.  For all of these, he basically changed the starting spot.

12      So the fact is, of course you're going to get higher

13  numbers.  If you had just done all of these same trend slopes

14  and put them at the same point, every other one of them would

15  have been less, not higher.  So it's not a true test of what

16  it was he said it was.

17  Q.   Now, he had a propensity to sue projected for 2010.  Was

18  that based on real data?

19  A.   Yes.  It's based on -- it's his measured data -- oh, for

20  2010 itself.  Well, that's a different factor.  If you go back

21  to the two charts for just a second.

22  Q.   This?

23  A.   This one right here.

24      One of the things you'll notice about this is 2010, it

25  has the highest propensity to sue of any time period here.  It

1    gets the most weight in establishing this trend because it's

2    the highest point.  Well, it gets the same weight literally,

3    but it is the highest amount.

4         This is only based on a partial year data, so he's kind

5    of annualized it.  Said I've got filings for the first few

6    months of 2010.  I'll say so I've got five months.  Then I'll

7    take essentially twelve-fifths of that and say that's the

8    number of claims I would get.

9         There's a high degree of uncertainty in that number and I

10   think that's not the best way to do that.  Just leave it at

11   that.

12   Q.   Now, slide 16 summarizes your response to his -- to his

13   response to your rebuttal.  Have you covered these points

14   already?

15   A.   I think I have.  I think it's -- just in the end I would

16   say that it's not that I'm advocating use of any of these

17   trends.  I'm thinking that -- I'm saying what you really need

18   to have is an underlying model which explains the

19   inter-temporal dynamics and not just simply take the numerical

20   trend and extrapolate it forward on the basis of the fact that

21   the estimate without it is, quote, implausibly low.

22   Q.   What impact, quantitative impact did the spurious trend

23   have on Dr. Peterson's forecast?

24   A.   Well, essentially just raised it $130 million, net

25   present value.

4771

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 100 of 199
CHARLES BATES - DIRECT

1  Q.   Okay.   The next error you point out is correcting data

2  processing errors.

3  A.   Correct.

4  Q.   Would you explain what that refers to.

5  A.   Well, these are mostly what Dr. Gallardo-Garcia was

6  talking about in his description which is by not properly

7  accounting for the information in the data, you're going to

8  over estimate first the number of pending claims.   Over

9  estimate as a result of it the settlement rate because, in

10 fact, many of the claims that you find out the information on

11 are in fact dismissed mesothelioma claims that should be

12 treated that way within the data.   Otherwise, you're not going

13 to treat the data as -- properly with regard to the settlement

14 rates.   It affected the average settlement amount.

15     And in particular, the issue came up here about the fact

16 where the three verdicts should be placed and how -- the

17 impact of those.   And Dr. Gallardo-Garcia was tested on that

18 by Mr. Swett.

19     I think a simple example illustrates the fundamental

20 point that he was trying to make on that.   Consider a

21 situation which is not uncommon in the situation that Garlock

22 faced when it had a large verdict where the plaintiff and the

23 plaintiff's law firm that is basically negotiating with

24 Garlock expects to get higher settlements, having once

25 demonstrated that they can bring a case against Garlock and

 1   establish the credibility of taking cases to trial if Garlock

 2   does not pay them more.  This was something that occurred in

 3   the first half of the decade of the 2000s a number of times to

 4   Garlock.

 5       They did not believe that the plaintiffs could actually

 6   prove the case against them.  They resisted.  The plaintiff

 7   said, well, we can.  The plaintiff's law firm said we can.

 8   And they -- Garlock -- they needed to establish for Garlock's

 9   purposes if they wanted to get higher that they had a credible

10   threat of taking cases to trial.

11       So suppose -- it's a simple numerical example.  Suppose

12   that you have a case here that went to trial and Garlock lost

13   and as a result of it paid a million dollars.  It had a

14   million dollar verdict that it's going to have to pay at some

15   point.

16       And suppose as a result of that, prior to that time

17   period it had been settling cases with the law firm for

18   $10,000 each.  But now, subsequent to that time, it negotiates

19   a settlement agreement where it's going to pay them $50,000

20   each.

21       And so suppose they get ten of those cases each year in

22   the subsequent year.  As a result of the verdict, and probably

23   in many cases as a result of negotiating subsequent to the

24   verdict, the payment of that, they also negotiate a settlement

25   amount for the future cases of that law firm.  So they agree

CHARLES BATES - DIRECT

 1    to $50,000 a case and that's going to be the amount that

 2    they're going to pay going forward.

 3        If you're trying to do a forecast from this point going

 4    forward of those cases from that law firm, you should be using

 5    $50,000 because as we move forward in time, as a new case

 6    comes up, that's the amount that we're going to pay on it, not

 7    $10,000.

 8        If you do the analysis the way that Mr. Swett suggested

 9    you do, that Dr. Peterson and Dr. Rabinovitz did, and if that

10    payment, that million dollars was paid in the period two years

11    later, say, or a year later after the negotiations, so it's in

12    the calibration period.

13        So if you have, just for the numerical example, ten cases

14    at $50,000 each for those five years, and we're going to stop

15    and do the calibration at that point, you would have,

16    essentially, you know, ten cases at $50,000 each and get

17    $500,000 per year.  You'd get $250,000 (sic) for the 5 years

18    across the 10 -- the 25 cases that you get.

19        You put a million dollars into that average.  Now you're

20    going to get 26 cases.  And instead of having $5 million --

21    five times -- two and a half million dollars, you're going to

22    have three and a half million dollars.  And now you're going

23    to divide it by 25 and you're going to wind up with a number

24    here that's more like $70,000 a case.

25        Well, the new cases that come up, as they really come up

1  in the underlying process, really only cost $50,000 per case

2  but the numerical average that they will have calculated is 20

3  to 30 to 40 percent too high because they've thrown the

4  verdict payment amount into the calculation after the impact

5  on the settlement amount has already happened.

6      So it double counts the impact of the verdict.  And

7  verdicts are special in that way in that the role that they

8  played was establishing the value, the credibility of that law

9  firm of being able to take a case to trial.  So even if it's

10  cases that they wouldn't have any liability, they've

11  established the credibility that they're willing to take a

12  case to trial and then Garlock has to pay more to settle those

13  cases, at least to avoid the trial costs if nothing else.

14  Q.   Okay.  Turning to slide 19, can you describe the impact

15  that placing the verdicts in the wrong year has on an

16  estimate.

17  A.   Well, this chart shows you an amount that is the average

18  resolution amount.  This chart comes out of Exhibit, I think

19  it's 22 in my rebuttal report.  The size and the heights of

20  the bars in dark blue are -- the amount you get is an average

21  resolution rate including settled claims and the zeros.

22      The light blue bars on top -- unfortunately on the screen

23  here they don't show up.  Things that are light tend not to

24  show on this screen very well.  But they show where the

25  verdicts are and how much they would have added to those

4775

Case 10-31607    Doc 3488    Filed 04/02/14    Entered 04/02/14 16:04:49    Desc Main
Document    Page 104 of 199
CHARLES BATES - DIRECT

1    values.

2        So it shows you essentially what the average resolution

3    amounts are for the years.  Here's where the verdicts took

4    place are in this year, this year, this year, and this year.

5    And this is where we had the higher settlement values in this

6    time period here.  Thus that process that I was just

7    describing.

8        If I take the amount that are in those light blue bars

9    and put them into these years, in particular, if I put them

10    into this year and this year, even though these are somewhat

11    down for a number of reasons, perhaps the increased number of

12    dismissed claims, but also perhaps the impact of trusts

13    finally has an effect.  In any case, those values would be

14    much higher.

15        And as a result of having done that, Dr. Peterson and

16    Dr. Rabinovitz calculate resolution averages which are about

17    where the dotted red line and the solid red line are there

18    which would be unrepresentatively high relative to what's

19    taking place in the settlement subsequent to when those

20    verdicts took place.

21    Q.    Okay.  Changing subjects, Dr. Bates.  We heard a little

22    bit of testimony from Dr. Gallardo-Garcia about the errors and

23    the suggestion by Dr. Peterson that when you correct errors in

24    a database, it distorts the database because those errors are

25    offsetting other errors.  And he talked about the transition

 1  matrix.  Can you please respond to that issue.

 2  A.   Yes.   This is an issue that Dr. Peterson and I have

 3  discussed back and forth over a number of times in terms of

 4  the way you should properly do this.  Obviously, real data is

 5  better than essentially imputing what the disease would be if

 6  you could possibly know it.

 7     But he discusses what I think is theoretically a

 8  reasonable procedure to use.  We have several issues, however,

 9  that we have to take with that procedure.

10     One of them is, first, the time period in which he used

11  to start his transition matrix is the number -- the size of

12  the percentages that he gets when he does that computation of

13  that transmission -- that transition matrix is very much

14  impacted by the fact that he's starting the data with a

15  database in 2005 going into subsequent periods.

16     I think that if you actually went back and saw --

17  remember the chart that Dr. Swett put up there when he was

18  talking with Dr. Garcia about the number of cases in 2005 that

19  were old dismissed cases that were in that year.

20     That's the result of the fact of in 2004, late 2004 when

21  I was retained by EnPro to do the work with Garlock in the

22  first place, one of the first things I did in my initial

23  examination of the database was ask them about their record

24  keeping capabilities -- their record keeping practices.  And I

25  insisted that they do an effort to go back and clean up their

1   database and establish and put into their records and find

2   from their local counsel records of dismissed mesothelioma

3   claims, dismissed all claims because their practice was

4   generally to not really follow up on that because once the

5   claim was dismissed, they didn't have to worry about it.  They

6   didn't want to spend any money on it, and it just didn't get

7   changed in the database.

8        So for my purposes and for purposes of being able to work

9   with the data, I asked them to make an effort to clean up that

10  record.  So that's what that was a result of 2005.

11       What we saw in the chart that we did here is apparently

12  they let that practice lapse a little bit through part of the

13  2000s and then reinitiated that effort at some point in the

14  2009 period.

15       So that's one issue which is by starting off in the

16  period from 2005, they're using a database which had a number

17  of old claims in it which were not recorded with active

18  disease but were updated as dismissed mesothelioma claims.

19       And by the way, when most of these claims do transition,

20  they transition at a time period where the claim is resolved

21  in some way.  And by and large, the vast majority of these are

22  transitioned to dismissed claims, not to well paid claims.

23       The second thing about it is even if we take

24  Dr. Peterson's transition amounts, which these are the

25  percentages that he used for the disease categories of amounts

CHARLES BATES - DIRECT

1    of claims within each disease category that would transition

2    to mesothelioma, he's applied these numbers in some way to all

3    of the old unknown claims in the database which the vast

4    majority of which -- I mean, almost all will never be

5    transitioned.  They certainly are not mesothelioma claims.

6    They've been the result of two exhaustive searches to bring

7    all the mesothelioma claims out.  That's why we have the spike

8    in 2005; we have the spike in 2009.

9         Second of all, if we look at then the claims that have

10   been filed since 2005, we really only have 1334 claims with

11   unknown disease.  This is after the time period when large

12   numbers of unknown claims, which were by and large mostly --

13   the vast majority of which were non-malignant claims of some

14   sort.

15        So even if you apply these transition percentages, which

16   are most certainly too high, relative because of the reason I

17   first said, to these amounts which are the diseases that we've

18   got since this time period, 2006, the most you can get is 85

19   of them, not 850.  And I have no idea how we can get 850 out

20   of this small number of relative claims without the

21   mesotheliomas coming forth.

22        The last point here is that within the PIQ process

23   itself, plaintiff lawyers have come forward with approximately

24   58 -- I think it's 58 claims that were listed in these

25   categories and said they are mesotheliomas.  So I believe in

CHARLES BATES - DIRECT

1  applying these procedures the plaintiff lawyers themselves

2  have already brought forward 70 percent of what would be those

3  85 claims.  So this can't be a material issue in any way.

4  Q.   So what impact would correcting data processing errors

5  have?

6  A.   Well, the data processing errors, as we discussed before,

7  was approximately an $80 million issue, even more so for

8  Dr. Peterson.

9  Q.   Okay.  The next error you have listed is account for

10  jurisdiction of claims.  Would you please describe that error.

11  A.   Sure.  This is a variant of something that we had talked

12  about earlier about, you know, if you had a group of claims

13  which you thought were relatively higher value, and then other

14  claims, it's appropriate to treat them as two distinct pools

15  and have them separately valued and they'll have a distinct

16  average.  The average between them when you blend them should

17  be the overall average.

18      And if you have a group of claims which is from where you

19  took the sample and got your average, computed your average

20  settlement value, if it's -- if the distribution of claims

21  within that pool is the same as the distribution of claims

22  across those value --  those jurisdictions in the claims which

23  you're trying to estimate, then you can use the overall

24  average reliably.

25      On the other hand, in this particular case, that's not

1    what you have.  In particular, we know that the claims in

2    California and New York -- this is just an example because

3    there are a couple of other states that we could have included

4    in this too, but to make the fundamental point here, which is

5    two states, which are California and New York, which have a

6    settlement resolution average that includes the zeros of

7    almost $70,000, as compared with the overall average is

8    somewhere around 38, $39,000, is distinct from all the others

9    which have an average about just under $30,000.

10        In fact, there's a couple of other states I could have

11    put in there, Pennsylvania and Virginia, would have made that

12    average higher and the other states even lower, but I think

13    this strongly made the point.

14        And so these two jurisdictions have distinctly different

15    settlement averages.

16        If we look at the next slide on this.

17    Q.    Twenty-three?

18    A.    Slide 23.  These blue bars and the yellow bars tell you

19    the percentage of claims both -- the blue bars are the

20    percentage claims that -- on the resolved claims where we

21    calculate the average.  That is, the settlement average we

22    took is made up of nearly 23 percent of cases, 22 percent of

23    cases from California and New York, and 80 -- 78 percent from

24    other states.  Whereas, the pending claims are only

25    represented by about 15 percent of claims coming from New York

1   and California, whereas 85 percent.

2       So if we apply the average that we would get by taking

3   these two pieces together and applying it to the pending stock

4   here, we're going to be applying more -- a weighted average of

5   higher values to the overall claims than is warranted given

6   the distribution of the claims.

7   Q.   Now, did you hear Dr. Peterson's response to this

8   criticism?

9   A.   Yes.  He said we needed to do a breakdown by more states,

10  which I was rather pleased to hear that we should do more

11  segmentation rather than less because over the years that's

12  been one of my primary criticisms of his which is that he's

13  not done a sufficient segmentation.

14      So I was a little bit interested to find based on the

15  analysis that I did that he came up with a settlement average

16  when he did it by all of the states individually, they got him

17  a higher settlement average given the predominant role that

18  California and New York played in that.  Well, the difference

19  was that he left out the zeros.

20      If you actually do it by state as he suggested, but not

21  only account for the payment -- the settlement average but the

22  payment rate as well, which is what you get when you do the

23  average resolution value, of course, it turns out, of course,

24  it went in the same direction that I said.  That the weighted

25  average of the resolved claims is $36,000, but for the cases

4782

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 111 of 199
CHARLES BATES - DIRECT

1  that were in the pending pool that we're going to apply, if

2  you took the same averages by state and apply this to, you

3  would have gotten a number less than $35,000.

4      This isn't the proper way -- fully proper way to value

5  these claims, but it does show you that the distribution, the

6  jurisdictional mix issue does matter and it essentially goes

7  in the direction that I indicated by the analysis that I

8  expected.

9  Q.   So next you have two errors grouped together here.  Would

10  you describe those for the court.

11  A.   These have to do with timing of the claims.  They're

12  related to each other.  Essentially, these two categories --

13  this is where I said the other things that didn't take account

14  of just the jurisdiction.

15      But the claims in the pending pool are made up of claims

16  of different vintages, and claims that are of different

17  vintages get paid different amounts.  As Dr. Gallardo-Garcia

18  mentioned in response to one of Mr. Swett's questions, it's

19  well established and patterned in this data that many of the

20  claims, particularly the higher value claims get paid up front

21  within a year or two after they are filed with the company,

22  and that claims that tend to lag in getting settled over a

23  period of time drop in value.

24      This is going to matter because the way Dr. Peterson and

25  Dr. Rabinovitz treat the claims is they take all -- in their

1  extrapolation model, they take all the pending claims and, for

2  Dr. Rabinovitz, treats them as if they were resolved all at

3  once in 2010.  And Dr. Peterson treats them as if they were

4  all resolved in 2011.

5     So the entire stock of pending claims out there, 3900

6  about, more than two years to literally three years worth of

7  mesothelioma claims are all paid in just one or two years,

8  which is much more rapidly than they would have been paid in

9  the tort system had these progressed in the normal progression

10 of events.  This significantly front loads the forecast.

11    It also means that when they -- where they place claims,

12 by doing this simple procedure of where they place the claims,

13 it has the net effect of front loading the forecast in a

14 number of different ways.  You wind up by putting them in the

15 wrong years.  You apply the wrong inflation.  And then you

16 apply the wrong discount rate to them both.

17    There's a second issue which is, just to go back one

18 here, that comes out of the way and it's -- Mr. Radecki does

19 his discount rate calculation.  And I know Your Honor is going

20 to get the reports on the discount rates from the experts at

21 another time.  But this particular issue here is one that is

22 not a factor of what should the discount rate be but, rather,

23 an artifice of the calculation.

24    If you recall, Mr. Radecki calculated discount rate by

25 taking a weighted average depending on what the distribution

4784

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 113 of 199
CHARLES BATES - DIRECT

1  of claims were that Dr. Rabinovitz gave him.  So she gave him

2  a huge spike of claims in 2010 and then a small number in

3  2011, '12, and '13.  He used a term structure of interest

4  rates that basically says as claims get farther in time, that

5  interest rate gets higher.

6      But he first calculates a weighted average of the

7  duration of time to say what should be the interest rate that

8  I should use.  Well, included in that calculation was all the

9  pending claims which aren't going to get discounted.

10      So the artifact of this is the more claims you put into

11  pending claims pool and the higher and the sooner you have

12  them paid, the lower is your discount rate and hence the

13  higher is your future claims estimate.  That is, the more

14  pending claims you have and the sooner they're paid, the

15  higher is your future claims estimate just through the

16  discount rate you choose.

17      That's a nonsense calculation.  Why in the heck should

18  your number of pending claims affect the discount rate about

19  your future claims?  That's what his calculation did.

20  Q.  So what does slide 27 show?

21  A.  Well, it shows -- this shows you the lag -- the measure

22  on the bottom is the length of time in years from diagnosis to

23  settlement.  And the vertical, it shows you the percentage of

24  claims.

25      So within the first year after the diagnosis, claims are

1  both filed and settled about 15 percent of the time.  And this

2  is diagnosis, not filing here.  So this is -- and so we have

3  here, again, within one year you've now got an additional 33

4  claims -- percentage claims are both diagnosed and settled.

5      And then as you can see, there are claims that get

6  settled and these are settled claims that get paid extending

7  way out in time, but the percentage of them is very, very low.

8  Q.   And slide 28.

9  A.   This actually shows you the way in which the values,

10 settlement values themselves are affected by the timing.  So

11 whereas, the overall settlement average is, you calculated, we

12 saw, was somewhere in the range of $60,000.  We know that from

13 this graph -- and this is a fairly -- a fairly strong result

14 correlation wise.  That if you look at claims that are paid

15 within the first year since diagnosis, they get on an average

16 about $90,000 in recent years, the same period as the

17 resolution period.  And that drops about 16 percent a year in

18 a very steady pattern going out through time.

19     So taking account of the fact, as we do on the next

20 slide, that the distribution through time of when claims are

21 settled as we first showed you, the blue bars.  The red bars

22 show you the age at the time of the -- at the time of the

23 petition date.  What was the age of the pending claims?  That

24 is, what's the amount of time they've had from diagnosis date

25 to petition date?

1      You can see that there's a -- these claims are on average

2   much older.  In fact, they're about two and a half years older

3   on average than the claims that are -- that were settled in

4   calculating the settlement average.  That means we're using --

5   because of the prior graph, we're using the wrong settlement

6   amounts in valuing the claims.  They're actually lower value

7   claims because they're older and hence with two years, two and

8   a half years, they're going to be about 30 percent less,

9   40 percent less in value than they would have been otherwise.

10      That reduces the estimates, again, about $80 million.

11  Q.   And then you have on your list of errors apply consistent

12  inflation and risk free discount rates.  Would you explain

13  what that means.

14  A.   Right.  That is the issue, then, of what is the inflation

15  rate you should apply to the -- and what is the discount rate

16  you should do in calculating the value of the estimate in

17  total.  There are reports on this coming from the financial

18  experts.  Historically, if we -- slide through to the next

19  slide.  Dr. Snow will provide his report on that.

20      Historically, based on my understanding of the economics

21  and the finance, which is not deep which is why I have the

22  finance experts.  They've always advised me to use for a

23  long-term forecast approximately a 3 percent real -- long-term

24  real discount rate when you're talking about such a long-term

25  forecast.  It's what the CBO uses in its analysis.  That is

CHARLES BATES - DIRECT

1  the difference between the inflation rate which is forecast by

2  the CBO to be about 2-1/2 percent, and then with a 3 percent

3  premium on that compounding to, that calculates out to a 5.575

4  discount rate.  And that is, contrary to what Dr. Peterson

5  said, that is a risk free rate from the Congressional Budget

6  Office long-term forecast.

7  Q.   Are you familiar with the practices of Drs. Rabinovitz

8  and Peterson themselves in prior cases with regard to the

9  discount rates they use?

10  A.   Yeah.  For the most part, most of the time period over

11  the last decade that we've been doing these analysis, they've

12  used discount and inflation rates that are very similar to

13  what I've used here.

14  Q.   And that's addressed at length in Dr. --

15  A.   Dr. Snow's report.

16  Q.   -- Snow's report?

17  A.   Yes.

18  Q.   So you've corrected a number of errors there.  Can you

19  explain where that brings us.

20  A.   Well, that brings us down to a point which is essentially

21  about at the upper end as we had in the chart that I had for

22  the other -- the last time we were here.  We've added two

23  other lines on this which I mentioned before.  But where we

24  had in our direct report the amount of the liabilities down

25  below, as I explained to Your Honor before in several of the

4788

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 117 of 199
CHARLES BATES - DIRECT

1   estimates.

2       The estimates that I got from taking the financial

3   reporting model that we did at the end of the period of 2009,

4   the last financial forecast we did, if I limited that to be

5   mesothelioma claims, extended it out for 50 years, and then

6   used the present value number instead of the nominal face

7   value of the claims, I got numbers that were right in the

8   range of just over 600 million.

9       For Dr. Peterson and Dr. Rabinovitz, when I do these

10   kinds of adjustments to correct their, what I believe are

11   methodological errors in what they do, I get numbers which I

12   would find is not materially different from them within the

13   range of the uncertainties of these forecasts.  And that's

14   where the little green bar is up in the range there that's

15   just a little bit above 600 and below 700 million.

16       So that's -- what I've labeled that was payment

17   extrapolation with trust disclosures as the mid-2000s.  That's

18   essentially the experience that Garlock was facing at that

19   time with the -- with whatever information was being revealed

20   about the exposures by the individuals and given the different

21   law firm practices and their practices as we've heard a lot

22   about in here.

23       Many of the law firms filed the trust claims and

24   disclosed their trust claims, but there's others who don't and

25   that had a lot to do with our thinking in terms of when we

4789

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 118 of 199
CHARLES BATES - DIRECT

1   were doing the financial reporting forecast.  We had several

2   of them, but that was the upper end of the forecast which we

3   made.

4   Q.   And you testified earlier in the case about the work you

5   were doing when you were doing the financial reporting

6   forecasts, and you said when you were doing that work, you

7   were estimating expenditures.

8   A.   Correct.

9   Q.   Okay.

10  A.   That's this part over here.

11  Q.   Okay.  Now, you focused on the upper end of what you

12  called the range.  Your financial reporting forecast actually

13  predicted or estimated a range of outcomes?

14  A.   It did.  We did that -- a wide range of forecasts based

15  on scenarios in which we tried to evaluate what the impact of

16  the trust disclosures would be when they finally came on line.

17       At the beginning of the time period when we were doing

18  that work, it was just at the time period where Garlock was

19  first struggling with the transition from the period of the

20  1990s where the information on the exposures of the insulation

21  products was being willingly allowed by the plaintiffs to a

22  period where they were not finding that in their testimony

23  anymore.  And they were having to figure out stagies and

24  tactics for dealing with and obtaining this information.

25       I mean, we've heard a lot about it in the courtroom over

1    the last several weeks and we talked about this, about how

2    it's shifted the burden of finding what the true exposures

3    were had shifted.  Mr. Swett was talking about what Garlock

4    could do to get those.

5         Well, every one of those things they talk about shifted

6    the burden, shifted the cost of doing that from the plaintiff

7    who willingly espoused it where it was not an expensive thing

8    to do to Garlock which was a very expensive thing to do.

9    Hiring experts and doing investigations, doing a lot of work.

10   And that greatly exceeded its costs.

11        So within the time -- the way we were thinking about this

12   in terms of the 2000s while we were doing the financial

13   forecasts was that at some point in the future when the trust

14   came on line, that information would begin to come back into

15   the settlement process and into the tort system and it would

16   have its impact on lowering the amounts that Garlock would

17   have to pay because its expenditures would be lower, its risk

18   at trial would be lower.

19        And through this proceeding, we've been able to develop

20   the more coherent sophisticated model with the information to

21   be able to estimate those impacts more fully.  That's

22   described in the range that we have there.

23   Q.   Okay.  So let's turn to the last error on your -- in your

24   rebuttal report and that has to do with accounting for trust

25   money.

1   A.   Right.  So essentially, the simplified model that

2   Dr. Peterson and Dr. Rabinovitz used to extrapolate just

3   simply does not have the structure necessary to account for

4   the changes in the historical litigation environment.  There's

5   no basis to study it.  There's no basis to quantify it.  They

6   simply look at the time period and say here's a quantification

7   and the only dynamic element to their model is what is given

8   to them by the incidence curve that was calculated either by

9   Dr. Nicholson in the case of Dr. Peterson or by the work that

10  we did at KPMG in the case of Dr. Rabinovitz.

11       Certainly there is nothing that can account for the

12  dynamics of current litigation environment.  There is

13  certainly not the impact of the costs and the difference in

14  the costs or the changes in the risk that they face and how

15  that would have affected settlement.

16       So it's just a numerical extrapolation which, if you were

17  coming from a fairly stable environment that didn't change

18  over time, can give you through that process, as long as

19  nothing else changes, a numerical answer that can be reliable

20  in that context.

21       But if you have any expected changes that occur or if

22  you're trying to account for changes that occurred in the

23  past, it has no ability, it's completely vague about that

24  because the model simply doesn't have that capability.  It

25  requires a dynamic model with more elements associated with

1    it.

2       In particular, in their forecast that they've done, the

3    extrapolation from this period that we've seen where the

4    resolution period -- resolution amounts are the highest,

5    Dr. Peterson certainly can't account for in their model any of

6    the past distortions that we saw here through the suppression

7    of evidence kinds of things that we saw that take place.  In

8    particular, the stategies that were developed in the early

9    parts of the 2000s, the decade which persisted throughout the

10   2000s, essentially withholding evidence regarding the

11   exposures to the trusts that became a common practice of some

12   law firms as we saw discussed here.

13      And they certainly can't account for the future changes

14   as there are -- both, there are certainly -- partly as a

15   result of the practices that we've seen take place and the

16   recognition that those practices are not fair and not

17   appropriate for the tort system.  There are -- there are

18   reform efforts going on at both the state and federal level

19   with regard to gaining some fairness in that process.

20      More importantly as well, under the plan of

21   reorganization, certainly plaintiffs can be required to

22   provide all that exposure information similar to what they do

23   currently now in trusts where they file claims, where they

24   have to give their work history and tell the basis of why

25   they're exposed to this product.  In some of the trusts they

1   require more demographic information, plan of reorganization.

2   But we hope that they'll appear and rely more on what's done

3   in the Western McArthur trust where it accounts for age and

4   accounts for dependents and accounts for life status of, you

5   know, living spouse and so on.

6       So you can through a plan of reorganization, you know,

7   essentially have the plaintiffs provide that information

8   instead of having the defendant have to basically extract that

9   information through costly discovery process.  And that

10  affects, as we've seen here, that affects the -- what the

11  settlements should be -- will be.

12  Q.   Have you analyzed the financial impact of -- on Garlock

13  of different law firm stagies in terms of providing trust

14  claim exposures and not providing exposures?

15  A.   Yes, I've done it in two different ways here.  We did

16  this recently based on what we saw unfold here in the court

17  system.  So this is not in our -- not in our rebuttal report

18  or not in our affirmative report because we just watched this

19  unfold as we were here.

20      But we took the -- all the law firms that were on the RFA

21  list, there's about 25 of them, and we calculated their

22  settlement average in the period of 2006 through the petition

23  date.

24      For those law firms we got, when you can account for all

25  of them, their settlement -- their settlement average here is

1   about just over $80,000.  It's about $85,000.

2       If we limit our attention to the seven or so law firms

3   for which they took actually the discovery on, those law

4   firms, for the claims that we saw, those claims were --

5   themselves were very high.  But those law firms, if we look at

6   the settlement average for those law firms is almost $160,000,

7   over $150,000 on those law firms.

8       In contrast, with all of the other law firms, for all of

9   the other firms, the settlement average is right around just

10  under $50,000.  Somewhere in the neighborhood of $46,000.

11      So that the difference in the practice of where these

12  were the firms that were essentially identified as being ones

13  that potentially withheld trust information and through the

14  discovery here on these, on 15 out of 15 cases we saw that

15  there were very significant withholding of -- suppression of

16  exposure evidence.  Those are the RFA-1A law firms, is the

17  title underneath there.

18      We saw that that has a very significant impact on the

19  settlement average here because these are the cases -- these

20  are the firms which basically through these practices both

21  increase the cost to Garlock in trying to obtain the

22  discovery, increase the credibility of a threat of taking a

23  case to trial, and increase the trial risk itself in the face

24  of not having sufficient evidence, not having all the evidence

25  that should otherwise be there.

CHARLES BATES - DIRECT

1   Q.   Yes.  And just to be clear here, when you're calculating

2   average settlement values for each of these firms, for the

3   RFA-1A law firms, for example, you're including more than just

4   the claims for which Garlock obtained discovery.

5   A.   Oh, yes.  Those claims would be a lot higher actually

6   averages.  These are all of the claims for those law firms

7   from 2006 to the present time.

8   Q.   And do you recall -- let's see where I am here.

9   A.   The next slide, this is the second way we talked about.

10  Q.   Yes.

11  A.   This is the thing that was addressed somewhat in his

12  rebuttal to me by Dr. Peterson, so we'll talk about this a

13  little bit.

14       This was -- this is the result of the data that we got --

15  the analysis we did using the data that we got from the DCPF

16  trust.  Those were ten trusts from one trust facility who we

17  provided, Garlock provided -- that Bates White would help

18  produce the list that Garlock submitted to the trust to the

19  names of all the settled mesothelioma claims.

20       So we got back a record from them about whether or not

21  they had filed a claim with those trusts with the date at

22  which it was filed and whether or not they had been paid.

23       And an interesting observation occurred where if we look

24  at the time period subsequent to when the trust started paying

25  claims, at about the time period where there was a significant

CHARLES BATES - DIRECT

1   increase in the amount of funds available to pay claims in

2   late 2007 and into 2008, then we find that there's a

3   distinctly different settlement average between the claims

4   that had settled their claim after they had done the trust

5   filing versus settling the claim before they had done the

6   trust filing.  Probably stating that actually backwards.

7       It's really, in fact, that, you know, what happened here

8   is we had claims that are filed with trusts and they

9   subsequently settled with Garlock because they had a tendency

10  in terms of the practice of the law firms that do these kinds

11  of things -- and as we now know a little bit more, it's really

12  a law firm practice issue.  Many of them file their trust

13  claims before and then they go ahead and pursue their tort

14  claim.

15      Whereas these, the practices we saw described here, they

16  either routinely withhold the trust forms or it's held by a

17  separate law firm which governs when the trust funds are paid

18  as we saw in some of that description.

19      So in this, this shows a distinctly different average

20  that you would get based on the simple observed difference

21  between the -- whether you would file the trust filing -- at

22  least one trust filing or not.

23  Q.   We're turning now to slide 39.

24  A.   Yes.  This is in response to what Dr. Peterson said, and

25  spent some more time thinking about it because I think the

1    chart that he put on the screen is very informative for what's

2    going on.  I mean, he shows data -- he provided it to

3    basically show that I was mixing claims that really came from

4    two different law firms together in different proportions and

5    hence I was getting a difference in that settlement average

6    because you were mixing law firms that had -- they -- even

7    though before -- whether they had before or after settled

8    their -- filed their trust claims, they had settlement

9    averages that were very similar between those two.  The

10   different mix between them gave the appearance as if there was

11   a big difference in the average and it really wasn't.  It was

12   just a mix issue.

13        It's deeper than that.  The practice of whether or not

14   they settled the -- filed their trust claims before and when

15   they filed them vis-a-vis when they settled the trust claim is

16   a matter of a business practice for the firm.  The practice

17   has developed where some law firms strategically withhold as

18   their practice, as was stated here, filing the trust claim

19   until after they resolve their tort claims.

20        All right.  If we go to the next slide to show this.

21   This is Dr. Peterson's slide.  This is what he put on the

22   screen.  Blow this up.

23        The numbers on these slides really help.  So he had two

24   law firms.  And what he said was here you have firm one and

25   firm two.  And in this case this firm had an average of about

4798

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 127 of 199
CHARLES BATES - DIRECT

1   $30,000.  And here's another firm and it had an average that

2   was somewhere in the neighborhood of $220,000.  And it made no

3   difference whether they had filed their claim before or after

4   on an individual basis.

5       But the fact of the matter is because there a lot of

6   these -- this is 101 of these and only 24 of these.  That is,

7   for the most part, you know, they only settled about

8   20 percent of theirs.  80 percent of their claims get filed

9   early.  Whereas, in this case you only have 4 here and 12

10  here.  80 percent over here gets filed after instead of

11  before.

12      Since you blend these averages together, you get a lower

13  number here than you would have gotten when you were putting

14  two of them together.

15      It's not the fact on whether or not these individuals

16  within these firms filed their cases before or after.  It's

17  the business practice of the law firm that matters.  The

18  reason both of these claims get about the same is that this

19  practice of this law firm is to essentially file its claims on

20  a contemporaneous basis.  It doesn't withhold the trust

21  claims.  It files them.  It provides the information about

22  them.

23      And there's a lot of the law firms in the data that do

24  that and their settlement averages are all similar to what

25  they were.  They're somewhat higher than they were in the

1   1990s.  But not nearly to the extent they are with these law

2   firms which systematically withhold them.  As a result of

3   that, they basically are the firms that basically can

4   establish credible risk of going to trial against Garlock.

5   They basically develop a pattern of settlement with Garlock.

6   And the fact that they have a few cases for which they've

7   actually filed the settlements or not is immaterial because

8   these are essentially trial avoidance costs for many of these

9   cases and they're essentially getting the benefit of the group

10  kind of deal that this law firm has done.

11       So it's the law firm practice.  This slide is very

12  telling.

13       This slide shows you that this is what is -- that there

14  is an increasing practice amongst the plaintiffs and an

15  increasing practice amongst the law firms to file claims

16  essentially with the trust before Garlock settlement.  Now,

17  this is only with the DCPF trust.

18       This basically means that as the trusts have come on

19  line -- and remember, the trusts have really only started

20  coming on line here in a big way here and really paying claims

21  out and most of them pending claims in this frame and really

22  starting to pay claims on a contemporaneous basis over here

23  from the payment graph that we have which is in the rebuttal

24  report.

25       You can see that the percentage of individuals who have

1    filed their claims with one of the DCPF trusts, and that's

2    only ten of the total number of trusts that are out there, has

3    grown dramatically over the recent years.

4        There's a lot of economic incentive to try and get your

5    claim in with these trusts sooner.  We've heard the

6    description about how the plaintiffs, when they come to the

7    plaintiff law firms, how they're in need of money.  They have

8    expenses.  They -- and so getting the money from these trusts,

9    which can be a sizable amount of money, is something that they

10   really don't want to delay if they don't have to.

11       So the economic incentive to do that is strong and it's

12   getting even stronger as more trusts -- there's another

13   $10 billion that is going to go into these trusts over the

14   next few years as WR Grace and Pittsburgh-Corning and so on

15   get up and running.

16       Next slide.

17   Q.    Yeah, slide 42 talks about trust claims among the PIQ

18   claimants.

19   A.    Right.  So within the PIQ we've seen that essentially

20   95 percent of the claimants with pending claims who responded

21   to PIQ had already filed a significant number of claims with

22   the trust.  Remember the other graph was just for the settled

23   data with the DCPF trust.  This is from the PIQ data.  This is

24   from the pending claims.

25       And in total what we see was the median number of trusts

4801

Case 10-31607    Doc 3488    Filed 04/02/14    Entered 04/02/14 16:04:49    Desc Main
Document    Page 130 of 199
CHARLES BATES - DIRECT

1    that was filed was -- so far is 18.  And so far they have

2    already received payments from eight of them.  The average

3    receipts at this point is somewhere between 250 and $300,000

4    at this point already for pending claims from the trust.

5    Q.    And that was as of the date of the PIQ responses?

6    A.    Correct.

7    Q.    So what is the -- your -- how have you quantified the

8    impact of --

9    A.    So what I did was two things on this.  I first used the

10    DCPF trust data, and this is what I reported in my rebuttal

11    report.

12          In terms of using what Peterson and Dr. Rabinovitz did

13    with their forecasts is I added what the impact would be if

14    you assumed that the -- all of the claimants actually filed

15    their claims with the trust on a contemporaneous basis with

16    their tort claims.  So I removed the practice of withholding.

17          So I treated all the claimants as if they were the

18    claimant -- the same as the law firms which filed their claims

19    and their trust and tort claims on a contemporaneous basis.

20          And I -- in addition to that, I adjusted down the trial

21    risk values to take account of the fact that when you

22    basically file your trust claims, it lowers the trial risk and

23    lowers the discovery costs on the higher value claims as well.

24          The impact of that is to give you a number that is in the

25    range, then, of around 300, 320 million dollars which is at

4802

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 131 of 199
CHARLES BATES - DIRECT

1   the low end of the financial reporting range.  Which again, as

2   I described before, if I take -- which was what I was doing

3   with financial reporting and trying to take account of what

4   the trust would be, my last forecast is in the neighborhood of

5   the bottom end of that range as well.

6       The additional thing that I did was simply take -- and

7   that's a more complicated calculation which involved both

8   accounting for the change in the costs as well as the change

9   in the trial risk.

10      In addition, what I did was I took the raw -- the RFA

11  list settlement average and simply assumed that the average of

12  the RFA-1 claims were simply the same as the RFA group more

13  generally and did an analysis of what that settlement average

14  would be for the overall.  And then also assumed what would

15  happen if all of the RFA firms simply had the same practice

16  and got the same amount as all of the firms that were not on

17  the RFA list.

18      And the calculations there, depending on which one of

19  those I did, give you a range that ranged essentially between

20  500 -- 400 and 500 million dollars, just below the middle of

21  where the financial reporting range.

22      So essentially, if you remove the impact of the practices

23  that we saw here of withholding of the evidence in a way that

24  was described by the RF -- the RFA firms, that's the kind of

25  number you would get as a financial forecast and extrapolation

1   of the settlements.

2       Again, these are all expenditure estimates using what you

3   get on the right-hand side of the model over there which is

4   with the settlements, with the impact of the defense costs and

5   the costs.

6   Q.   Okay.  We have about 45 minutes left.

7   A.   Okay.

8   Q.   We're going to shift subjects here.  I want you to

9   address the criticisms that you heard from Drs. Rabinovitz and

10  Peterson to your case in chief estimate.

11  A.   All right.  So again, this is just -- we -- I think we've

12  got that up on the screen up there.  This is just a repeat

13  showing the basic model again.  There's no changes.  So we can

14  just go forward here.

15      What I've gone through here is I've just listed a number

16  of the criticisms they made at various times and what my

17  response is.  There's a lot of words on the screen because we

18  may not get to some of these and I wanted to leave you behind

19  with something to understand my responses to them.

20      On her last slide, Dr. Rabinovitz basically described the

21  methodology as unaccepted and untested.  Basic point here is

22  methodologically this is using well tested, accepted

23  scientific estimation methods that have been developed over

24  decades and decades.

25      It applies the standard law and economics model relating

1    legal liability to settlement.  Well studied for a decade.

2    Professor Heckman talked about it.

3        Uses the long-established statistical econometric

4    methods.

5        And in particular, to estimate the model's parameters, we

6    quantified the parameter variation as described by Professor

7    Heckman.  I'm going to show you some of that.

8        So we've basically applied the scientific method

9    throughout to do this.

10       This model represents a very significant improvement over

11   prior empirical evaluation models.  It's made possible through

12   the enhanced data available through the discovery in this

13   case.  And importantly, it allows the quantification of the

14   actual relationships between asbestos liability to settlements

15   and the parties' cost of litigation.

16       Many of the criticisms that have been described in terms

17   of what we do and the challenges we did, this kind of a model

18   is the kind of model that you use.  It's standard in

19   econometric analysis.  It's standard in social science

20   analysis of using a model to essentially test the results of a

21   hypotheses, test the result of a question about how

22   something -- one thing relates to another.  And that's what

23   we've done.

24   Q.   Now, the next criticism, I believe you've already

25   addressed this by referring to the model, and that is that you

1  have reconciled Garlock's actual liabilities.

2  A.   Right.  Essentially, what I've described here is a

3  reconciliation between the liability estimates and the

4  settlement, and they reconcile, I think, very well given the

5  costs and our understanding of the costs of the parties.

6       There's been several questions raised about that here so

7  I wanted to do some testing of that.

8  Q.   So let's go directly to the components of your estimation

9  approach.

10  A.   All right.  So essentially, what we have essentially over

11  on the far left-hand side over here, as you recall, the way we

12  estimated the model, we estimated the various components of

13  the model starting with the compensatory award.  Figuring out

14  how many shares there would be for that as a typical claimant.

15  Estimating what we believed the likelihood of success would

16  be.  Accounting for the defendants's costs.  Accounting for

17  the plaintiff's costs on these as well.  Getting our estimate

18  over here of what the liability was.  And then using Garlock's

19  settlements and our understanding of the costs and the

20  plaintiff's costs to test whether or not that made any sense

21  and whether this was a coherent model.

22       And so we went back and forth between those but focusing

23  on the liability estimation.  That's -- and using the data as

24  a test.

25       So the first set of criticisms they leveled at us is that

1   we didn't do the compensatory damage estimation properly.

2   Challenges have been that there's not enough data to do this.

3   In particular, it's been claimed that we -- there were only 24

4   Garlock verdicts which added unreliability and uncertainty to

5   the model.

6       There are data, public available data on 367 verdicts out

7   there.  They are not representative as we've talked about.

8   The ways in which they're -- go back for just -- go -- they're

9   not representative.

10      So we took account of that in what we did.  We used --

11  had a model built of the economic damages from Dr. Brown and

12  we estimated what the noneconomic damages are.

13      The critiques were that there was not enough data.  And

14  in particular, it didn't capture -- from Dr. Peterson, that it

15  didn't capture important trends; in particular, an increasing

16  trend in the verdict amounts.

17  Q.   And Dr. Rabinovitz found significant that there were only

18  24 verdicts.

19  A.   She did.

20      All right.  So --

21  Q.   Slide 50.

22  A.   The regression we used and the reason why we had to use a

23  regression is because we have several different -- we can just

24  get at settlement an average of the verdicts, but that average

25  is not an appropriate average because, again, the

1   representative group of claimants that we have, for plaintiffs

2   for which we have -- for which we have verdicts doesn't match

3   the pool of plaintiffs we have.  They tend to be younger.

4   They tend to be from higher value jurisdictions.  They're more

5   likely to be alive.  All things which affect the verdict

6   values typically within the data.  So regression method is a

7   way of actually controlling for that bias that gets created.

8        As far as it goes, regression uses well -- sound

9   established econometric procedures.  There are standard

10  model -- standard output from the model provide the

11  statistical variation measures of uncertainly that judge the

12  formulation.  The kinds of things like competence intervals

13  that Dr. Heckman -- Professor Heckman talked about.

14       The criticism that regression only is 24 Garlock verdicts

15  is just specious.  The potential compensatory damages are

16  determined by the plaintiff characteristics, not by the

17  identity of the defendant.  So it's the claimant's

18  characteristics that determine the characters.  So they don't

19  have to be Garlock verdicts because there's nothing special

20  about damages against Garlock relative.  It's the plaintiff

21  who -- damages.  So the additional pool of verdicts matters

22  there.

23       I don't think there's any other data that helps.

24       And I'm going to show you that Dr. Peterson's verdict

25  trend is just, again, another spurious trend.

1      Dr. Rabinovitz's criticism that the use of the verdicts

2   adds unreliability and uncertainty.  I don't think that's

3   right at all.

4      The model -- the output from the regression provides us

5   the measure of the uncertainty and leads me to conclude that

6   it is a reliable regression analysis to use.

7      And in particular, we've also gone and tested it against

8   1200 other wrongful death cases that come from WestLaw that

9   are non-mesothelioma cases, basically to be able to extend the

10   analysis to other states.  And the wrongful death verdicts

11   that we get are, for the most part, very similar to what you

12   get for wrongful death cases and personal injury cases from

13   mesothelioma cases.

14   Q.   What does slide 52 show?

15   A.   This is just a picture of the output that came from a

16   regression run that we did.  It's actually a combination of

17   two of the ones that would be in our background material, but

18   it's essentially -- it shows you essentially what comes out of

19   the measure.

20      And on this chart in particular, I just want to point out

21   to you, here's the confidence interval.  They give you the

22   range of uncertainty.  We get the variable names that we use.

23   We get the slopes.  And just to focus on one of them, here's

24   the age parameter coefficient we get from it.  Up there it

25   says minus 4.3.  Minus 4.3 per year.  By the significance test

1  we get here, it's highly significant.  It's confidence

2  interval is very tight.  It's a very good estimate of that

3  parameter.

4      Some of the other parameters that we get, they have

5  different degrees of level of reliability and significance to

6  them.  The analysis is all there of them.  But it's really

7  important that the age one is so well estimated.  And whether

8  it was my regression that I did or whether it was

9  Dr. Peterson's reestimation of it, that parameter comes out in

10  that range as reliably estimated.

11  Q.   Do you recall this slide from Dr. Peterson's

12  presentation?

13  A.   Yeah.  This is the way he pictured the trend, his trend

14  analysis.  And he shows you -- essentially, what he's done is

15  he's taken all the three hundred and some verdicts and

16  essentially taken the average in each year and created this

17  wire plot.  So a point like this would be what he estimated as

18  being the average in that year.  The point there would be the

19  average of the fifth year and so on.

20      The way I look at it is the following.  These are the

21  actual verdict amounts.  And so what he's done is you can see

22  now each of the individual data points.  And again, the scale

23  over here is done by logarithm because it makes the analysis

24  easy and it's standard in these cases.

25      But what he has done is he has taken the scatter plot and

4810

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document    Page 139 of 199
CHARLES BATES - DIRECT

 1  estimated this blue dotted line as a trend which he says

 2  increases in nominal dollar terms of 7 percent a year.

 3       Well, the question is is there really a trend in this

 4  data by the verdicts?  In fact, an alternative hypothesis

 5  which basically goes with the fact that there were significant

 6  changes that went on in this time period in the history of the

 7  asbestos litigation and as reported in -- outside the

 8  literature, that's about the time when the *Daubert* revolution

 9  was essentially sweeping across the country in courts and they

10  were basically imposing higher standards.

11       So an alternative hypothesis is that not only -- not that

12  there's a trend, but, rather, that there is just simply a step

13  up in verdict amounts from this period to this period.

14       So how do you test against those alternative hypothesis?

15  Well, one way to do that is simply to break the period up into

16  several periods.  Here we have the period where we have the

17  data here from '97 to 2000.  Another period 2001 to 2005,

18  2007.  Each of these periods has significant amounts of data

19  in them and they allow us to get an average within each one of

20  them.  And now let's just do a simple test of whether or not

21  the average from one is different from the average in the

22  other in each of these periods.  If it's a trend, you would

23  expect to see just a step up of the averages and you should be

24  able to test that.

25       This is the result of the statistical test of that.  And

1   what it says is on the top one is that if I test at the 2005,

2   if this was in 2010, it says that the average between those

3   two time periods is virtually identical.  It's one of the

4   strongest statistical tests I've ever seen the result of

5   across these tests.  It's got a T test that says that these

6   results are -- the difference between them is none at all.

7   Whereas, there is a very striking difference between the

8   period from the 1990s to the period of 2010.  And the impact

9   is measured through -- the statistical measures is quite

10  strong.

11      So the statistics reject there being any kind of temporal

12  trend.  It's a single, one time shift.  And of course, if you

13  try and fit a straight line to a one-time shift, it will

14  create an upward slope.  That's what happened.  That's what

15  Dr. Peterson did.

16  Q.   Now, you had also estimated or opined in your initial

17  report that there would be 36 liability shares in a Garlock

18  case.  That Garlock would share liability with 35 other

19  defendants.  And this part of your report also drew fire from

20  Dr. Peterson and Dr. Rabinovitz.

21  A.   Yes.  In particular, their critique here was that if you

22  looked at the Garlock's verdict history, it should be -- you

23  know, Garlock could be one of two shares.  Well, that's --

24  that's a remarkable statement in light of Garlock's position

25  within the litigation environment; that we should take all of

4812

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 141 of 199
CHARLES BATES - DIRECT

1   the claims that are filed against Garlock and in estimating

2   its liability come to conclude that Garlock should be half of

3   the liability associated with those claims, on claims for

4   which -- even for just a limited number of claims for which it

5   would win.

6       This is a quantification.  It's done in such a way that I

7   believe that it is, in fact, lower than the actual number of

8   shares that would be if we basically could somehow know what

9   exposures, in fact, were.

10      I think that it is -- we used -- because of the

11  significant issues we have in collecting the data on shares,

12  it has potential for nonreporting bias and other kinds of

13  reporting bias.  So a median statistic is what I used as

14  opposed to a mean because the median is less sensitive to

15  extremes on the outside that can be the subject of the kind of

16  nonreporting bias which in my investigation is prevalent here

17  in the sample.

18      By that I mean, is if you look at some of the claim files

19  where we only get one or two claims of exposure in them and

20  then you actually look at the claims files themselves, they

21  name 50, 60 parties.  They've collected from multiples of

22  these parties.  But the deposition and records and

23  interrogatory records which was the discipline that we imposed

24  to collect this data doesn't have the names of any of those.

25  And it is extremely unlikely in light of that history that

1   they don't actually have more exposures on it given there

2   is -- given their industries and occupations and their

3   discovery of their work histories.

4       We didn't go to the next step of trying to fill those

5   things in from what they said.  That would have been far too

6   much work.  But it is as a matter of the sample that we have,

7   it is very likely that the low -- extreme low numbers here

8   have a lot of nonreporting blanks associated with them.  For

9   that reason it's not really appropriate to use the mean

10   statistic because -- as I'll describe in a moment so we used

11   the median.

12       But it is based on review of hundreds of deposition

13   interrogatories and PIQs.  It is the result of a significant

14   amount of work.  I believe it gives us a reasonable

15   quantification, albeit somewhat conservative and counter to

16   interest.

17       Particularly, we also assume that all the shares we would

18   get would be equal.  Given the science that we've seen

19   presented here and the relative comparisons between the

20   exposures of Garlock's products versus other products, that's

21   a very conservative assumption, vis-a-vis Garlock to assume

22   that its share would be the same as others.  There's no -- it

23   would be hard to come up with a basis of coming up with shares

24   in an alternative way that's a disciplined way, so we adopted

25   that assumption for this purpose.

1  Q.   Okay.  And I believe you already tested the fact that

2  Dr. Rabinovitz said the correct share should be 2.78 percent

3  and Dr. Peterson --

4  A.   No, she said it should not be.

5  Q.   Oh, it should be higher.  Yeah, it should be 41 percent.

6  A.   2.78 is 1/36.

7  Q.   And Dr. Peterson one half.

8      And I believe you've already -- you've already talked

9  about this.

10 A.   We'll talk about this very quickly.  I think the first

11 thing to say is that Garlock's true liability here is most

12 assuredly lower than 1/36 if you consider the product use, how

13 it's used, where it's used, and the other products in the

14 presence of it.

15     You consider the epidemiology of the product.  That is,

16 we've done some calculations here as a result of listening to

17 science here and if we adopt the plaintiff's science case,

18 but -- and take the exposures of Garlock gaskets all the way

19 up to 2000, we only get 75 additional cases of mesothelioma

20 for all time out of -- less than .2 percent of the

21 contribution.

22     So if you try to think about it, epidemiological share,

23 gaskets and Garlock is only one of many, it's much too high.

24     And historical lawsuits.  Garlock has been sued with a

25 lot of other ones.

4815

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 144 of 199
CHARLES BATES - DIRECT

1    So I think what Dr. Peterson and what Dr. Rabinovitz did

2  was take the 20 adverse verdicts that Garlock received, and

3  where it was the subject of strategic targeting by the

4  plaintiffs to focus its case on Garlock, the kind of thing we

5  saw going on here from a science case to the exclusion of

6  everyone else.  And that is an important component to how

7  plaintiffs will run their case.  But they don't do that

8  against every defendant at the same time.  They have to do it

9  one at a time, but they can't do it for Garlock against

10  everyone.

11    So you either have to consider Garlock being put on an

12  equal stead with all of the potential plaintiffs -- defendants

13  who could be targeted on each case or you have to consider the

14  fact that only a very small number of the cases will Garlock

15  be targeted in.  But either way, you would come to the same

16  conclusion about what the relative liability is.  But we've

17  seen the description here of how that strategic marketing

18  works.

19    It's an effective practice.  If you -- the plaintiffs, I

20  understand, give seminars on how to essentially maximize the

21  likelihood of success against a particular defendant.

22  Websites by -- articles by particular law firms for their

23  marketing purposes talk about how you can use -- focusing your

24  case on an individual plaintiff to get around, say, California

25  Proposition 51 which has to do with the sharing of economic --

1  the fact that they have offsets that they did when they went

2  for economic damages, so how you should just go after

3  noneconomic damages.

4      So it allows you to basically target your case; and for

5  the plaintiff's side, minimize their costs and increase their

6  cost of win without violating their ethical duties of not

7  getting the maximum value for their case.

8  Q.   How many other defendants who we've heard the committee

9  and the futures rep call viable defendants, how many other

10 viable defendants are there?

11 A.   Well, this is from a plaintiff's --

12          MR. SWETT:   Objection.   This is not in any report.

13 This is utterly new.

14          MR. CASSADA:   This is off of a website.   It's a

15 site --

16          THE COURT:   Overruled.   Go ahead.

17 A.   This is just downloaded from a website of a plaintiff's

18 law firm that recruits for mesothelioma claims.   They assert

19 that there are 600 viable defendants.   Our own database shows

20 thousands of names.   Many of those are duplicates because of

21 their related corporate entities.   But there's -- from the

22 standpoint of litigation, there's -- there must be many, many

23 co-defendants.

24 Q.   Referring to slide 59, does it seem plausible that

25 Dr. Peterson could really believe that Garlock has 50 percent

4817

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 146 of 199
CHARLES BATES - DIRECT

 1   of the liability --

 2               MR. SWETT:  Objection.

 3   Q.   -- in cases against it?

 4               THE COURT:  Overruled.

 5   A.   Dr. Peterson has estimated that dozens of companies had

 6   liability from the same group of claims over and over and over

 7   again, as has Dr. Peterson.

 8   Q.   And with respect to Dr. Rabinovitz, she's done the same

 9   thing?

10   A.   I find it lacks credibility to say that Garlock would be

11   one of two shares in a liability calculation given all of the

12   estimation and given the commonality between the claimants.

13   Q.   And we're referring now to slide 60.

14               MR. GUY:  Your Honor, I would just object that

15   Dr. Rabinovitz's CV talked about the work that she's done and

16   didn't talk specifically about gasket claims.

17               THE COURT:  Overruled.

18               MR. GUY:  Except as to Garlock.

19               THE COURT:  Overrule the objection.  Go ahead.

20   Q.   Now, Dr. Peterson also had some specific criticism during

21   his testimony about your calculation of the 1/36 share.

22   A.   Yeah.  I mean, this is -- I don't know this is worth

23   spending a lot of time on by any means.  But he had a slide

24   where he essentially said that if you're even going to do the

25   calculation I did, you shouldn't do 1/36.  The number should

1   be 1/23.  And he said -- and he showed a calculation that he

2   did.

3       First of all, the only reason he does get the calculation

4   that he does is because he uses a mean when I actually used a

5   median.

6       He said one of the statistics I calculated for the trust,

7   he had the trust and the tort backward, I used the median but

8   for the other one I used the mean.  In fact, as is very clear

9   from my description of it in my report as well as my backup

10  material, I used the median for the reason that I described

11  earlier.

12      This -- he asserts that this property described is both

13  the property of both the mean and the median.  It's not.  It's

14  the property only of the mean.  The median does not have that

15  property.  You can use -- let's just use his particular --

16  let's go to the next slide for a second.  I'll just use his

17  example that he had on the screen.

18      What he said was, look, if you had three different cases

19  where they had one, two and three defendants on each one, each

20  one had a hundred dollar share.  You'd have $100 for defendant

21  here, $50 for Garlock here, 33 here.  That the average would

22  have given you something that was essentially 60 something

23  dollars a share instead of 50.  And he said, well, that shows

24  you that, you know, where the bias is.

25      Well, if you used the median in both cases, right, the

CHARLES BATES - DIRECT

1   median number of shares is two.  The median share is 50.  So

2   it does not have that bias associated with it.  That's one

3   thing here, that I didn't use that statistic with that

4   property.

5       The second thing about it is if we go back to the slide,

6   back to the slide, is that as I described, it's a median

7   statistic.  But more importantly, within the range in which

8   the shares matter, right, whether you use 30, 36, 42, if you

9   use the mean or a median in that case, the average -- the

10  difference between it is only 2 percent.  Not this.

11      Now, what's the result of that?  Well, I don't have the

12  easel here to show you, but if I'm just going to draw a

13  picture in the area for you here.  On the vertical access I'm

14  going to have percent share that he's had there.  And on the

15  bottom here we're going to have number of defendants.  If this

16  is one party's share, then the top point up here is a hundred

17  percent.  If it's two, it's 50 percent.  If it's three, it's a

18  third.  If it's four, it's a quarter.  If it's five, it's

19  20 percent.  If it's six, and so on.

20      And what you can see is this is coming down steep, but

21  then it's getting very flat.  And as I get out here beyond six

22  and seven, this curve which came down here becomes very, very

23  flat.

24      Well, the difference why you get between the mean and the

25  mean is this property of, if you were going to take an average

4820

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document    Page 149 of 199
CHARLES BATES - DIRECT

1   of two values here, right, the average is given by -- on the

2   middle of it in a straight line here, it would be above the

3   curve.  As you get out here, the average is virtually the

4   same.  The line is almost straight as you get down here.

5       So it's very important for his analysis and the impact of

6   his analysis that it take place -- that we're only talking

7   about one, two, and three.  I can have these numbers separated

8   by a lot more, but they're out here on the part where the

9   difference between the mean and the mean -- the mean and the

10  median is very little.

11      So it's not the statistic I used.  It's not used on

12  purpose because of the issues of the bias.  But even if it

13  was, the difference within the range that is, if any relevance

14  at all, makes almost no difference at all.  So it's not a

15  criticism that I think makes any difference.

16  Q.   Okay.  Let's move to slide 63 talking about another

17  variable within your model and that's liability likelihood.

18  A.   Right.  This was the criticism that we took the time

19  period.  And this was the thing that we had -- so we've now

20  covered the compensatory award part over there plus the share

21  amount.  So now we're on to the part about the liability

22  likelihood.

23      And as you recall, we had a series of 83 verdicts here.

24  We said no, it's a selected group.  So the question is --

25              THE COURT:  Before we get into this, why don't we

1   take a break until 4:15.

2             THE WITNESS:   Okay.

3             (Brief recess at 4:05 p.m.)

4                    CHARLES BATES

5             DIRECT EXAMINATION (Cont'd.)

6   BY MR. CASSADA:

7   Q.    Okay.  Dr. Bates, we were talking about liability

8   likelihood, and you were addressing criticisms from

9   Drs. Peterson and Rabitovitz with respect to your liability

10  likelihood.

11  A.    Correct.  So as Your Honor recalls is we looked at

12  Garlock's trial record, over 83 mesothelioma trials.  A number

13  of them being in the 1990s.  Many of them being in the 1990s,

14  and then in the 2000s as well.  And we saw a distinctly

15  different -- different success ratio.  Even though it's only

16  83 trials we had a -- that Garlock had a very high success

17  rate in the 1990s when plaintiffs were willingly espousing the

18  exposures to the amphibole insulation products.

19        Through the bankruptcy wave and through the early part of

20  the 2000s, Garlock was confronted with and took some fairly

21  large adverse verdicts during that time period.  And in

22  response to that, did several different things.

23        It developed -- it learned how to -- it learned that it

24  needed to basically work on developing the exposure evidence.

25  It developed experts who could help it with that.  It wound up

4822

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 151 of 199
CHARLES BATES - DIRECT

1   spending lots more money on the cases in defending the cases.

2      And consequently, in the second half of the 2000s, its

3   verdict rate on the cases that the plaintiffs decided to take

4   to trial went back down.  It also paid for a few more cases at

5   a higher rate than it had in the past as I described in my

6   original report.

7      On the basis of that experience, looking at the

8   commonality between the 1990s and the period post-2005, I

9   concluded that the period of time for calculating Garlock's

10  liability, which would basically not be -- not allow for

11  the -- account for the suppression of evidence that took place

12  particularly in the early parts of the 2000s and so on, that

13  the period in the 1990s would be more representative of an

14  appropriate trial share amount.

15     Dr. Peterson and Dr. Rabinovitz both argued that if I was

16  going to do that calculation, I needed to use the entire

17  verdict history of about 24 which came out to be about 24.1 or

18  40 -- 20 over 83 percent as being the right amount or

19  potentially just using the full period of the 2000s only,

20  which is 36. something or other.

21     Dr. Peterson also asserted that the period of -- that the

22  claims -- all claims -- you know, most claims represent a

23  probability of an adverse verdict for Garlock is greater than

24  0.

25     So first of all, the criticism was that the liability

 1   likelihood should be 2.1 to 2.4 -- 24.1.  8.3 is the rate that

 2   was there.

 3       More importantly, I've done the tests both to show that

 4   it is quite -- statistically a quite different period,

 5   significantly different in the first five years of the 2000s

 6   than either the period before or the period after.  And that

 7   if you test the difference between those two periods, they,

 8   from a statistical sense, show no apparent difference.

 9       More importantly, I think, is the test that I did with

10   the settlement data where I used the whole liability model,

11   the law on economics model with the costs that Garlock showed

12   and the tests that we talked about in some detail on my direct

13   which basically indicated here that we actually had, in fact,

14   an average liability likelihood rate that was less than

15   1 percent.  And it would be constructive for that, a

16   confidence interval about that which would basically say that

17   it ran from about .3 percent to 1 percent.  So using this type

18   of statistical procedures that Dr. Heckman talked about, we

19   used that.

20       This is a description of the tests that we ran to test

21   whether or not the period from the period of 2001 to 2005 were

22   the same or different from the periods from the 1990s to the

23   2000s or past 2006.  And it says it distinctly is.  So we'll

24   just slip on past this for a moment.

25       I think the criticism that Dr. Peterson leveled here was

 1   that the $200,000 liability threshold is arbitrary and said

 2   it's not supported by the data.  And then he stated that the

 3   $10,000 is equally plausible.

 4       Well, this is a pretty specious analysis.  If you got an

 5   amount that's above 200,000, it's certainly above 10,000.  So

 6   when you do the test for 10,000, all the amounts above 200,000

 7   are there.  So all you've really demonstrated by doing that is

 8   that showing how good the test is at detecting the presence of

 9   cases which have liability likelihood in them.  In fact, his

10   demonstration of this shows this, as we'll show in the graphs.

11   In fact, let's just get to the graph in the next one.

12       This is the graph that he showed where he had basically

13   fit the age effect as he analyzed it in logarithms for the

14   amounts over 200,000.  And then he did it again for the age

15   effect for the over $100,000.  And then he shifted the curve

16   so that they lined up so that you could see --

17           THE COURT:  Over a hundred or over ten?

18           THE WITNESS:  Ten, excuse me.  $10,000.

19           Well, as you can see that the one over $10,000 is

20   flatter than the one over $200,000.

21           Well, if you take a bunch of things where you have

22   an effect and you mix it in with a bunch of things where you

23   don't, where you have a slope with a bunch of things that have

24   zeros, then the line that you get is going to get flatter.

25   That doesn't mean that that's the right threshold.  It just

4825

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 154 of 199
CHARLES BATES - DIRECT

1   means that you've mitigated, attenuated the situation some.

2            So going back to the last slide for a second.

3   Q.   We're back to slide 66.

4   A.   Back to slide 66.

5        Essentially, the analysis that I described in my rebuttal

6   report showed how sensitive the age settlement test was at

7   detecting liability.  In fact, I put in where I tested, adding

8   essentially a liability likelihood to all the settlements

9   below a certain level to see how sensitive the statistics were

10  at finding it.  And if I put as little as .035 percent of

11  liability likelihood in there, I could detect it.

12       So if you recall when I had my chart where I showed what

13  the change was and I had the groups of claims and I had one

14  that had 17 percent and the other one said nil, the nil is

15  basically -- this is the quantification of nil.  It is below

16  0.035 percent on this.

17       The relevant test is not whether or not the amount less

18  than -- the relevant test is not whether amounts above $10,000

19  can you find the effect.  The relevant test is whether or not

20  there's a threshold below which you cannot find the test --

21  find the amount.  And that is a very strong result as

22  Dr. Peterson had shown on my results on the screen where you

23  got the coefficient below there of .00033 per year which is,

24  again, an extremely strong result of saying there is

25  statistically no difference from zero in the estimates.

1        Just so we don't get it confused that it's the low dollar

2    amount that matters, when you apply this test to the 1990s,

3    you find that the threshold was at $11,000 not at $200,000.

4    Back in the period where they had, you know, many more cases,

5    the small number of cases that they were paying settlements on

6    for which there was a liability risk associated with them, the

7    amounts they were paying were much less because the other

8    co-defendants were in the courtroom, or at least their

9    exposure evidence was in the courtroom and they were paying a

10   much lower share and their costs of doing that were much lower

11   and they -- their liability type settlements were at much

12   lower values.  So it's not a factor of that.

13               (Counsel and the witness conferred.)

14               THE WITNESS:  To make sure that you do -- the

15   threshold was -- I had several slides here that talk about the

16   threshold is not -- of 200,000 is not arbitrary.  It was based

17   on an economic analysis of the costs to Garlock.  The slides I

18   was going to show is statistical tests which also showed that,

19   but in the -- given the time that we have, I'm going to slip

20   over that and go to an overall test of their criticisms.

21               If we go to a prior slide for just one moment.

22               What I'm going to do to test the opinions -- the

23   rebuttal opinions regarding the law and economics model is I'm

24   essentially going to use the opinions that they described in

25   their rebuttal reports, Dr. Peterson and Dr. Rabinovitz, about

1   what the amounts should be and run it through the model for an

2   example case to show you just how -- how off it is.

3         And so I'm going to -- the opinions to be tested are

4   from the rebuttal reports on here.  I've shown you the page in

5   the rebuttal reports where they express those opinions about

6   what those numbers should be if I was going to do them.  And

7   essentially, they attach to each one of the boxes here.

8         Ideally, I would have taken you through this slide

9   by slide but --

10         MR. SWETT:  Objection, Your Honor.  None of this is

11   in any report.  It's not going to be possible to extemporize a

12   response to this on cross examination.  It should be excluded

13   as beyond the scope of the opinions previously expressed.

14         MR. CASSADA:  This responds specifically to

15   testimony that --

16         MR. SWETT:  That's what rebuttal reports are for.

17         MR. CASSADA:  It responds to testimony we heard for

18   the first time.

19         MR. GUY:  It responds to the rebuttal reports.

20         THE COURT:  Well, let's eliminate this.  I don't

21   think this is necessary, counsel.

22         THE WITNESS:  Okay.

23         (Counsel and the witness conferred.)

24         MR. CASSADA:  Thank you, Your Honor.  We have no

25   further questions.

1    THE COURT:  All right.  We'll go -- are you going to

2    go first, Mr. Guy?

3    MR. GUY:  Yes, sir.

4    Your Honor, as Dr. Rabinovitz is not here because

5    she had a medical issue she had to deal with, so I'll try and

6    do my best in her stead.

7    (Witness resumed the witness stand.)

8    CROSS EXAMINATION

9    BY MR. GUY:

10   Q.   Dr. Bates, my name is Jonathan Guy.  I represent the FCR.

11   Now, you criticized Dr. Rabinovitz for including defense

12   costs in her estimate, correct?

13   A.   For her estimates of the amounts of money that should be

14   paid to the asbestos plaintiffs, yes.

15   Q.   And you know that she derived those defense costs from

16   the monies that the debtors spend defending cases in the tort

17   system.

18   A.   That's my understanding.

19   Q.   Have you read the debtors' proposed trust?

20   A.   Yes.

21   Q.   Do you understand that the debtors plan in part on being

22   able to litigate cases to the extent plaintiffs want to take

23   their claims to the tort system?

24   A.   That's my understanding.

25   Q.   And the amount that the debtors are proposing to fund the

CHARLES BATES - CROSS

1   trust with is $270 million, correct?

2   A.   Correct.

3   Q.   And if plaintiffs decide that they would rather have

4   their claims litigated in the tort system, then the debtors

5   would have to defend those claims, correct?

6   A.   If that were to happen, but I don't believe it will.

7   Q.   Let's say it did.  Would Dr. Rabinovitz's estimate of

8   defense costs be out of whack?

9   A.   Yes.

10  Q.   Even if you litigated all the claims?

11  A.   They weren't going to litigate all the claims.

12  Q.   Well, they never litigated all the claims before, did

13  they?

14  A.   That's -- and they wouldn't in the trust as proposed.

15  Q.   Do you have any reason to believe other than rank

16  speculation, sir, that to the extent the debtors were to

17  litigate claims in the future, it would litigate claims in the

18  same percentage that it did before?

19  A.   Yes.

20  Q.   And what --

21  A.   I do have a reason to believe that.  They would not.

22  Q.   That's your personal opinion.

23  A.   No, it's not just a personal opinion.  It's a

24  professional opinion.  For example, we have many, many trusts

25  which pay amounts of money that are very similar to the

4830

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document    Page 159 of 199
CHARLES BATES - CROSS

1    amounts of money that were paid here.  And virtually no

2    claims, given the rules of those trusts, are litigated against

3    those trusts.

4        I don't see any reason why given the amounts by which

5    these amounts exceed the liability that Garlock would pay and

6    given the rules of the evidence, the rules of information that

7    they would need to provide, and given the experience of the

8    other trusts who pay very similar amounts to this trust, why

9    there would be any reason to expect that there would be

10   litigation here against Garlock when there's not against all

11   those other trusts and these amounts by the principles of law

12   and economics are above the liability amounts by significant

13   amounts.

14   Q.   Dr. Bates, we only have a small window as always.

15   A.   Sorry, Mr. Guy, I was responding to your question.

16   Q.   Those other trusts have trust distribution procedures

17   that were accepted by the plaintiffs, correct?

18   A.   Not the individual plaintiffs who are filing and settling

19   those claims.

20   Q.   By the class of plaintiffs they accepted those trusts,

21   didn't they?

22   A.   The individual plaintiffs who were filing those claims,

23   many of them were essentially -- essentially represented by

24   future claimants, by a future claimant representative and they

25   have their own independent decisions to make about whether or

4831

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 160 of 199
CHARLES BATES - CROSS

1   not they file those claims against the trust, and very few of

2   them litigate.

3   Q.   Now, you don't take issue with Dr. Rabinovitz on the

4   propensity to sue issue because she doesn't have an upward

5   sloping curve for that, correct?

6   A.   Well, I think the -- the cases where we have the issue,

7   there were some minor issues there, but that's not the --

8   that's not the main issue that I would take with her, no.

9   Q.   Now, on the settled but not paid dispute, that's, what, a

10  $10 million issue, correct?

11  A.   Yes.

12  Q.   Now, turning to the issue --

13  A.   The settled but not paid?  I don't think that's a dispute

14  at all.  That's just a question of whether or not it's an

15  amount --

16  Q.   Whether the plaintiff settled or not.

17  A.   Oh, the contested claim issue?

18  Q.   Yes.

19  A.   That's a different issue.  There was a group of claims

20  that are settled but not paid that are not in dispute.  Those

21  are just simply going to be paid, the amounts that were agreed

22  upon, presumably, under whatever the bankruptcy does.

23       And then there's the contested settlements --

24  Q.   Dr. Bates --

25  A.   -- and the issue there --

1    Q.    Dr. Bates, the issue of Dr. Rabinovitz not knowing for
2    sure which claims are settled because the debtor said they
3    settled some and the plaintiffs said, no, we didn't, that
4    issue is a $10 million issue in your chart, isn't it?
5    A.    That in combination with the double counting, yes.
6    Q.    Right.  Now, you said, well, all these claims aren't
7    going to get paid in the first year because the debtors'
8    historical experience was it would take longer for claims to
9    be paid, right?
10   A.    Claims historically have been paid, distributed over a
11   number of years after filing.
12   Q.    Now, that's in the tort system, right?
13   A.    That's what Dr. Peterson -- Dr. Rabinovitz was
14   estimating.
15   Q.    Okay.  But you're saying that we should use the trust
16   system for the purposes of defense costs, right?
17   A.    No, I'm saying that the defense costs are not
18   appropriately estimated in this context.
19   Q.    For the purposes of a trust.
20   A.    If you want to estimate the amount of a trust, you should
21   not be using defense costs associated with tort discovery.
22   Those are two different systems.
23   Q.    But for the purpose of determining when claims are going
24   to be paid, you're jumping back into the tort system.
25   A.    No.  Dr. Rabinovitz was the one who said that those

1  amounts should be a proxy for the payment in a trust and

2  that's why she estimated them.

3  Q.   Now, you said that it may take a little bit longer.  It

4  may take a year, may take two years, right?

5  A.   For what?

6  Q.   For those claims to be processed.

7  A.   I showed a -- in what?  In the tort system we're talking

8  now?

9  Q.   You said -- I believe you said on direct examination

10  that, well, it might take a couple of years longer.  It's not

11  all going to happen overnight.

12  A.   Sorry, your pronouns are confusing me in light of this

13  discussion.  Are you talking about how the claims would

14  normally be -- would have been settled had there been --

15  Q.   Correct.

16  A.   -- they remained in the tort system?

17  Q.   Correct.

18  A.   That would occur according to a lag of distribution

19  that --

20  Q.   Couple of years.

21  A.   -- can be estimated.

22       No, it's not that simple.  It's distribution.  Certain

23  percentage of them, different years, based on their vintage.

24  And it's a more complicated calculation.

25  Q.   And Dr. Bates, you said, well, that was a problem because

4834

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document    Page 163 of 199
CHARLES BATES - CROSS

1  Mr. Radecki assumed a discount rate that was for an eight-year

2  window, right?

3  A.    That's a different problem.

4  Q.    Okay.  Now, if he had used a ten-year window, do you have

5  any idea how different the discount rate would have been given

6  what we know about discount rates?

7  A.    I don't think that's the same point.

8  Q.    Do you know?

9  A.    Do I know?  No, sitting here I don't carry around a yield

10  chart and the expected yields on ten-year bonds for the next

11  three or four years.

12  Q.    Mr. Radecki does that.

13        Now, Dr. Bates --

14  A.    Apparently not well.

15  Q.    Really?  Well, let's look into that.  Your colleague

16  Dr. Snow, who is not here, suggests that the court should use

17  the weighted average cost of capital, right?

18  A.    If that --

19  Q.    Correct?

20  A.    That's Dr. Snow's opinion, yes.

21  Q.    That's his --

22  A.    Should -- I don't -- in this context I'll let him -- I

23  think you'll have to ask him that question.

24  Q.    Well, I'm asking you because he's not here and you just

25  referred to his opinion.  He used the weighted average cost of

1   capital, right, to discount?

2   A.   I think that's one of the things that he calculated.

3   Q.   Okay.  Now, that's a risk rate, right?  It's not a risk

4   free rate.

5   A.   That would be my understanding.

6   Q.   Now, he's your colleague, right?

7   A.   Yes.

8   Q.   You used the risk free rate, didn't you?

9   A.   Yes, I did.

10   Q.   Is there anything Bates White wouldn't do to push that

11   number down?

12             MR. CASSADA:  I'm going to object because I think

13   Mr. Guy is misrepresenting the report in the context of

14   Mr. Snow's opinion.  He offered alternatives and he provided a

15   context for those alternatives.

16             THE COURT:  Sustained.  Go on and ask him some

17   questions.

18             THE WITNESS:  Is that a question?

19             THE COURT:  No, that was an argument.

20             THE WITNESS:  Thank you.

21   BY MR. GUY:

22   Q.   Now, Dr. Bates, you rely upon the Congressional Budget

23   Office, right, to determine what the discount rate should be?

24   A.   I have used the discount rate as published by the

25   Congressional Budget Office in accordance with their long-term

 1  inflation estimate, yes.

 2  Q.   Now, you're an economist, right?

 3  A.   By training.

 4  Q.   You understand what U.S. Treasury yields are, right?

 5  A.   Generally.

 6  Q.   And you understand that they're actually driven by the

 7  market, right?

 8  A.   Generally.

 9  Q.   As an economist would you think the market view of

10  discount rates -- of interest rates is actually a more

11  reliable indicator than a forecast?

12  A.   Not for a long-term forecast necessarily.  Depends on

13  what interest rates you're talking about and under what

14  circumstance.

15  Q.   Let's just say eight years.

16  A.   As I said, depends on what interest rate and what

17  circumstance.

18  Q.   Now, Professor Heckman testified, correct?

19  A.   I heard his testimony, yes.

20  Q.   He's the witness who wasn't God.

21      Now, Professor Heckman analyzed Dr. Peterson's report,

22  correct?

23  A.   That's my understanding.

24  Q.   And he analyzed Dr. Rabinovitz's report.

25  A.   That's my understanding.

1   Q.   And he's coming into this courtroom as an independent

2   expert to tell the court, well, this is what I would do as a

3   Nobel winning laureate if I was to do this and I don't think

4   Dr. Peterson did it right and I don't think Dr. Rabinovitz did

5   it right, correct?

6   A.   That's my understanding.

7   Q.   But he didn't analyze your report, did he?

8   A.   Yes, he did.

9   Q.   He didn't write a report on it, did he, Dr. Bates?

10  A.   No.  You could have asked him.

11  Q.   We don't have that, do we, Dr. Bates?

12  A.   You could have asked him.

13  Q.   Well, the debtors could have asked him, but they didn't.

14  A.   That's correct, they didn't.

15  Q.   I wonder why.

16       Now, you have said, and tell me if I have this wrong, if

17  the debtors settle a case for $200,000 or less, it's only

18  because they want to avoid defense costs in every instance.

19  Is that your opinion?

20  A.   That's a mischaracterization of what I said.

21  Q.   Do you believe that the debtors have trial risks when

22  they settle cases at $200,000 or less?

23  A.   Depends on the particular case.  That's not what I said.

24  That's not what I described in my report.  It's a

25  misrepresentation.

1   Q.   Well, I've got you here.  You're captive.

2   A.   All right.

3   Q.   So let me ask you.  In every instance where the debtors

4   settled for less than $200,000, mesothelioma cases where there

5   was an exposure to Garlock's product, is it your position that

6   the debtors had no trial risk?

7   A.   No, that's not what I said.

8   Q.   Okay.  Now, your model assumes a 36 share, 1/36 share,

9   correct?

10  A.   That's the modeling of the share numbers, the allocation

11  of shares, yes.

12  Q.   And it assumes a verdict rate from the 1990s of .0833,

13  correct?  8 percent.

14  A.   Yeah, my opinion is that the appropriate rate to use is

15  less than 8 percent.

16  Q.   And your model projects before you take them away

17  potentially 28,000 future claims; is that right?

18  A.   I don't know what you're referring to, 28,000 claims.  I

19  don't know what you're talking about.

20  Q.   Well, you projected the number of future claims in your

21  report, didn't you?

22  A.   No.

23  Q.   You don't know the total number of future claims?

24  A.   I didn't estimate a number of future claims.

25  Q.   An absolute number.  You didn't say that you thought

4839

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 168 of 199
CHARLES BATES - CROSS

1   there would be after reduction 16,000 claims or so?

2   A.   No.  I didn't estimate claims at all in my original

3   report.  I estimated number of people with mesothelioma for

4   which Garlock would have a liability.  Essentially what I

5   estimated was Garlock's liability using a calculation of the

6   percentage of the people with the incidence who could

7   establish contact with Garlock's product, recognizing that not

8   all of them would necessarily bring a claim against Garlock or

9   even in the tort system.  So you're confusing two concepts.

10  Q.   Now, do you remember Mr. Inselbuch when he was

11  questioning you about what you really did and the three-step

12  process and the two charts he put up showing the total number

13  of claims times the verdicts and then with your reduction and

14  then the division by 36 and then the multiplication by 8

15  percent.  Do you remember that?

16  A.   Your representation of it.

17  Q.   Well, do you remember it, sir?

18  A.   I remember how you represented it, but you characterized

19  it as my characterization of it which is not correct.

20        MR. GUY:  Okay.  Now, let's pull up one of them

21  which is the -- not that one.

22  Q.   Let me put them on the screen so you can refresh your

23  recollection.  You remember that, right?

24  A.   I have no problem with my recollection.  It was your

25  characterization.

4840

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 169 of 199
CHARLES BATES - CROSS

1    Q.   Now, that number there is from your model of future

2    claims total.  28,402 future claims, do you see that?

3    A.   You're missing my point.  That's future incidence.

4    Q.   I'm just asking you -- I'm just going to ask you a

5    hypothetical using your numbers and then you can tell me if

6    you agree or disagree.  I understand --

7         MR. CASSADA:  I'm going to object.  Let him answer

8    the question.

9         MR. GUY:  Well, if we had the amount of time that

10   the debtors have spent on their case, I would be able to do

11   that, Your Honor.  But we have 45 minutes and Mr. Swett, I'm

12   sure, has questions.

13   Q.   Dr. Bates, 28,402 future claims.

14   A.   No --

15   Q.   Do you --

16   A.   -- they are not claims.

17   Q.   All right.  What would you like to call them?

18   A.   Those are an estimate of the incidence of disease.

19   Q.   All right.  And you have a calculation that then reduces

20   the incidence of disease to 16,807, right?

21   A.   No, that's the number of cases for which -- out of the

22   incidence of disease for which we estimate the number of

23   people would have contact with Garlock gaskets.

24   Q.   Right.

25   A.   Assert contact with Garlock gaskets or packing material.

CHARLES BATES - CROSS

1   Q.   But at least we agree that then you divide that by 36 and

2   you multiply it by .08.  At least we agree on that.

3   A.   Again, that's your characterization of how the

4   calculation that I described in some length -- I'm sorry, if

5   you don't want me to finish, I'll let you go ahead.

6   Q.   Dr. Bates, I know your report is a lot longer.  It's

7   hundreds of pages total.  But in the end it gets to a number

8   close to that, doesn't it?  $97 million.

9   A.   As I described, what you've got through this process for

10  this particular calculation which was the several share

11  calculation --

12  Q.   Right.

13  A.   -- resulted in that --

14  Q.   Right.  I'll pull up a chart --

15  A.   I don't want to talk over you, but I wish that I could --

16  Q.   -- that shows you the various parameters and then you can

17  tell me.

18       Let's pull up the one that shows the reduced number.

19       All I'm trying to do here, Dr. Bates, is to show that

20  when you change your assumptions, what impact that has.

21       So this has the number of liable parties on the top and

22  at the very top it's using your reduced claims or incidence,

23  whatever you would like to call it, 2,177, and then 16,807

24  future claims.

25       Now, when you plug that in, if you get the 8 percent

4842

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 171 of 199
CHARLES BATES - CROSS

1    number on the bottom with the 36 share, that's $119 million.

2    That's very close to your number of 125, right?

3    A.    Pretty close.

4    Q.    Now, if you were to change -- just to use one example.

5    If you were to actually use a liability share of 24 percent

6    and a number of liable parties of 15, your number is going to

7    change, isn't it?

8    A.    (No response.)

9    Q.    If you change your assumptions, the resulting number is

10   going to change.

11   A.    If you change a number, another calculation, another

12   number changes, yes.

13   Q.    And you picked 36.  You could have picked ten.

14   A.    I didn't pick.  I estimated.

15   Q.    Got it.  You could have estimated ten.

16   A.    That would have been unlikely.

17   Q.    Right.  You could have estimated an actual verdict rate

18   from the history of the debtors, couldn't you?

19   A.    Mr. Guy, you can just make up numbers, it's fine.  But

20   that's --

21   Q.    I'm not making up numbers.

22   A.    This is a result of a serious study.

23   Q.    I'm using your model which made up numbers.

24   A.    No.

25   Q.    So I'm plugging in different numbers so we see what

4843

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document    Page 172 of 199
CHARLES BATES - CROSS

1   impact that has.

2           MR. CASSADA:  Judge, I would object to the question.

3   It's argumentative and --

4           THE COURT:  Go ahead and ask your question.

5   Q.   Dr. Bates, I have one last question for you and I need to

6   pull up your deposition from July the 1st, 2013.

7           MR. GUY:  If you would go to page 350.  Highlight

8   the last paragraph.  So the analysis.

9   Q.   Did you remember that I asked you if you could figure out

10  for us and for the court how you can distinguish between the

11  impact on claim values from the fact that defendants are

12  accessing to bankruptcy and you have fewer solvent defendants

13  in the courtroom and this issue that the debtors have, which

14  they acknowledge now is not widespread but occurs, they say,

15  with nondisclosure, if you could isolate the impact so we

16  could actually figure out what that is.

17      And do you remember you said -- you gave a very long

18  answer.  "So I think that answers your question as to about

19  how much of it was attributable to an increase in the risk

20  that's associated with the other defendants not being in the

21  courtroom, though it's impossible here to really separate that

22  out from the part of it which is attributable to the fact that

23  some of the information is withheld, because it appears that

24  when the information is there and the plaintiff acknowledges

25  the information, the liability risk doesn't change that much."

4844

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 173 of 199
CHARLES BATES - CROSS

1      Do you remember that?

2           MR. CASSADA:  Object to the question -- or the --

3  this question because it doesn't show him the question in the

4  actual deposition.  It doesn't even show him a complete

5  answer.

6  Q.   Well, do you remember Mr. Glaspy testifying earlier today

7  about the Kazan settlements, Dr. Bates?

8  A.   The Kazan settlements?

9  Q.   Yes, sir.

10  A.   Vaguely.  Go ahead.

11  Q.   And do you remember --

12  A.   I'm trying to figure out what you were asking here.

13  Q.   Do you remember we showed the Kazan settlements and it

14  was a large number of settlements that were entered into with

15  the Kazan firm, 2005 time frame, and there were multiple

16  values for those settlements, correct?

17  A.   Yes, I remember that.

18  Q.   And no one is alleging the Kazan firm didn't disclose

19  trust information.  And those settlement values are in the

20  hundreds of thousands of dollars, aren't they?

21  A.   There are wide ranges of values there.

22           MR. GUY:  I have no further questions, Your Honor.

23           THE COURT:  Okay.  Mr. Swett.

24                     CROSS EXAMINATION

25  BY MR. SWETT:

4845

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document     Page 174 of 199
CHARLES BATES - CROSS

1  Q.   Dr. Bates, good afternoon.

2  A.   Good morning -- afternoon.

3  Q.   I'm interested in the phrase in this chart on the right,

4  "alternative information regimes."  That's a phrase that you

5  invented to describe scenarios in which different levels of

6  disclosure regarding trust claims would be prevalent in the

7  tort system?

8  A.   Trust claim exposure information.  It's essentially

9  shorthand for whether or not the way in which the exposure --

10  the amount and way in which the exposure information is

11  revealed.

12  Q.   And what really matters is the exposure information, not

13  the claim against some trust; isn't that right?

14  A.   Well, how it's -- how it's described and how it's

15  represented.

16  Q.   But your notion of information regimes implies some

17  alternative to the way things are, isn't that so?

18  A.   These are alternatives to -- that -- alternative ways of

19  thinking about what the information -- how the information

20  could be presented and what information was presented over

21  what -- over different time periods, yes.  They're

22  alternatives.

23  Q.   The term "regime" implies some kind of standard set of

24  rules or practices, doesn't it?

25  A.   Well, it implies a consistent application of the set of

1  standards with regard to how the exposure information is

2  described.

3  Q.   And implicit in your notion of the idea of alternative

4  information regimes is your dissatisfaction on behalf of

5  Garlock with the way the actual existing trust system

6  allocates the benefits and burdens of information finding and

7  disclosure; isn't that true?

8  A.   Nothing to do with my own personal view.

9  Q.   I didn't mean your personal.  Your professional.

10 A.   Sorry, I thought what you asked was what I --

11 Q.   You were positing alternative information regimes because

12 Garlock is dissatisfied with the way the tort system actually

13 allocated burdens and benefits with regard to information.

14 A.   That's not my motive.

15 Q.   Unlike Mr. Cassada, I wasn't trying to attribute motive

16 to you, but I am trying to get at the fact that your entire

17 analysis is predicated on the idea that somehow the bankruptcy

18 court by way of estimation should substitute some alternative

19 information regime for what actually obtains in the tort

20 system even though Garlock had all the tools available to any

21 litigant to enforce what it regarded as its information and

22 disclosure rights in the tort system.

23 A.   Right.  My point is the way which Garlock does that based

24 on what information is available will affect the costs, and

25 the costs affect the outcome.  It's not an issue of me

1   advocating any particular outcome.  I'm just describing what I

2   believe as a result of my science would tell me what the

3   different levels of the estimation would be based on how the

4   information was revealed and what kind of rules prevailed in

5   that circumstance.

6   Q.   And among those prevailing rules would be the burdens of

7   proof and persuasion assigned by the legal system to the given

8   party, correct?

9   A.   Burden in a cost sense, I think, is an important

10  consideration.

11  Q.   And in a legal sense.

12  A.   Who has --

13  Q.   You're purporting to estimate legal liability.  Is that

14  simply an economic concept to you?

15  A.   The definition that I used of Garlock's asbestos

16  liability was provided in my report.

17  Q.   And it's one that assumes a different information regime

18  than actually obtains in the tort system, isn't it?

19  A.   Correct.

20  Q.   Okay.  Now, when Manville went into bankruptcy because of

21  the forecast that it made in 1982 of billions of dollars of

22  liability looming over it in the future, it did not have the

23  benefit, did it, of an idealized legal liability, with capital

24  L, regime where some alternative information regime to that

25  actually existing in the tort system would determine how much

4848

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document    Page 177 of 199
CHARLES BATES - CROSS

1   it owed?  It didn't have that benefit, did it?

2         MR. CASSADA:  Your Honor, object to the question.

3   It mischaracterizes Dr. Bates' and the company's position.

4         THE COURT:  We'll let him answer the question if he

5   can.

6   A.   I have no idea how to answer that question.

7   Q.   Well, this notion is really rather simple, isn't it?  The

8   notion that Garlock has given you of what its legal liability

9   should be for purposes of this estimation is something all

10  together different from the rules and practices that would

11  determine what, in fact, it would pay on claims in the tort

12  system outside of bankruptcy.

13        MR. CASSADA:  Your Honor, object again.  Garlock's

14  position is a complaint about the conduct of individuals not

15  the content of --

16        MR. SWETT:  I'm going to the definition of legal

17  liability that begins Dr. Bates' report.

18        THE COURT:  Let's go ahead and answer the question

19  if you can.

20  A.   I'm sorry, is there a question on the table?

21  Q.   Yes, there is.  Can you read it back.

22        (The following question was read back:)

23        "Well, this notion is really rather simple, isn't

24  it?  The notion that Garlock has given you of what its legal

25  liability should be for purposes of this estimation is

4849

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 178 of 199
CHARLES BATES - CROSS

1  something all together different from the rules and practices

2  that would determine what, in fact, it would pay on claims in

3  the tort system outside of bankruptcy."

4         THE WITNESS:  I think I've made that very clear.

5  Q.   Okay.  Now, one of the things you've told me in the past

6  when we discussed these matters in deposition is that the

7  assumption of the defined legal liability term that Garlock

8  gave you with which you begin your report assumes full

9  disclosure of the relevant facts pertaining to product

10  exposures not only from the plaintiffs but also from the

11  defendants, right?

12  A.   I said -- described, basically, what would be the

13  information that would be available as what was known or

14  reasonably knowable by the parties, yes.

15  Q.   But you made no quantitative -- strike that.

16         But you assumed, did you not, that Garlock historically

17  has made those full disclosures.  That was your assumption,

18  was it not?

19  A.   I'm not sure that -- if there was a specific assumption

20  made one way or the other.  My assumption is that that

21  information is known about Garlock's products and so is

22  available.

23  Q.   You don't remember telling me that, yes, you made that

24  assumption because you relied on Richard Magee's

25  representation to you to that effect, that Garlock's

1  disclosures had been full and complete?

2  A.   That's -- that's consistent with what I think, yes.

3  Q.   And you made no quantitative adjustments in your forecast

4  for any alternative assumptions concerning whether or not

5  Garlock's historical disclosures had been fully complete.

6  A.   I'm not aware that there should be any or what they would

7  need to be.

8  Q.   Did you read the deposition of Michael Shepard in this

9  case?

10 A.   Not the full deposition.  I think I know to what you're

11 referring.

12 Q.   Are you aware of his testimony that Garlock settled the

13 case with him at a notably high figure in the 1980s or 19 --

14 early 1990s, conditioned on his shutting down the deposition

15 at which he was about to elicit the fact that Garlock was a

16 major supplier of impregnated asbestos yarn to a competitor,

17 Chesterton, for use in Chesterton gaskets?

18 A.   My understanding was that was part of standard

19 interrogatory responses.  I don't think there was anything new

20 or special about that.

21 Q.   Did you read that testimony?

22 A.   As I said, I was aware of that, but I'm -- my

23 understanding is that -- is what I just described.

24 Q.   Did you read the deposition of a former Garlock employee

25 taken in a tort suit prosecuted by what was then the Ness

4851

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 180 of 199
CHARLES BATES - CROSS

1   Motley firm, the deposition of Roy Whittaker?

2   A.   No.

3   Q.   So you're not aware, then, that in the late 1990s, it

4   came to the attention of Ness Motley, a leading plaintiff's

5   firm, that Garlock had given interrogatory responses over the

6   course of several years that failed to disclose that Garlock

7   had conducted or had had someone else conduct product tests of

8   its gaskets with results as to fiber emissions that were

9   unfavorable to Garlock.  Are you aware of that?

10  A.   I may have heard, but I don't -- as I'm sitting here, I

11  don't have a ready recollection of it.

12  Q.   I don't suppose we should be going back and repricing

13  settlements from the 1990s for estimation purposes on the

14  basis of that allegation.

15          MR. CASSADA:  Your Honor, object to all these

16  questions.  They're making assumptions about facts that are

17  not in evidence.  Nothing has been offered on this.

18          THE COURT:  I'll overrule the objection.  I think

19  he -- he didn't know anything about it, so that's all the

20  evidence we have.

21          MR. SWETT:  Well, we're going to offer in evidence

22  the depositions of Michael Shepard and Roy Whittaker.

23          THE COURT:  That's fine, but if this witness doesn't

24  know anything about it, then that's the end of the inquiry as

25  far as I'm concerned.

4852

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document    Page 181 of 199
CHARLES BATES - CROSS

1          MR. SWETT:  So we move on.

2   Q.   Now, you had something on the board about the RFA-1 firms

3   and their settlement values in comparison to those of other

4   firms.  Do you remember that?

5   A.   Yes.

6   Q.   And you drew the inference that the explanation must lie

7   in what you called the business practices of these RFA-1A

8   firms with respect to disclosure of product exposures in the

9   tort system.

10  A.   That was -- that was a hypothesis, yes.

11  Q.   And your hypothesis is based upon the handful of cases

12  that Garlock has explored in this estimation proceeding.

13  A.   And, you know, my understanding of the history, how it

14  evolved, yes.

15  Q.   And you know that the law firms that show up on RFA list

16  1A have a greater propensity than most of the other firms to

17  take cases to trial, don't you?

18  A.   Yes.

19  Q.   And that could account, could it not, for a significant

20  difference in settlement value?

21  A.   Yeah, which way the -- which way the causality go there I

22  don't think is obvious.

23  Q.   Now, you recognize that in the tort system of the 2000s

24  after the widespread bankruptcies of insulation makers, gasket

25  makers became more prominent in the tort litigation, isn't

1   that so?

2   A.   Well, they became -- we saw that for Garlock they became

3   named more often.  I think that's true from my experience of

4   others.  They had greater costs at defending.  Had -- became

5   more often targeted in the litigation than before, if that's

6   what you mean, yes.

7   Q.   Do you remember the brief that you signed and submitted

8   to the California Supreme Court in the O'Neil case?

9   A.   Yes.

10  Q.   You made the assertion there, didn't you, that a feature

11  of the tort system in the 2000s was the greater prominence of

12  defendants like Garlock who had been in the system for a long

13  time but came more to the fore in the 2000s.

14  A.   I think that's what I just said.

15  Q.   And you also said that entities that had not previously

16  been sued very often, pump makers and valve makers, had also

17  become more prominent in the 2000s.

18  A.   That's my understanding.

19  Q.   And pumps and valves involve gaskets, right?

20  A.   Among other things, yes.

21  Q.   And you also said that brake manufacturers, automobile

22  makers had become more prominent in the 2000s as far as being

23  targets in the tort system, correct?

24  A.   That's my understanding.

25  Q.   And there are gasket cases involving automobiles, aren't

4854

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 183 of 199
CHARLES BATES - CROSS

1   there?

2   A.   I'm not aware of use -- much use of asbestos gaskets in

3   automobiles, but I'll take your word for it if that's the

4   case.

5   Q.   Now, let me call your attention to that step in your

6   chart depreciating the estimates of Dr. Peterson and

7   Dr. Rabinovitz based upon your various criticisms and call

8   your attention in particular to the very large adjustment that

9   you would make based upon your assumptions about, quote, trust

10   transparency.

11   A.   Movement from there to there, yes, I get it.   I

12   understand what you're talking about.

13   Q.   So you're suggesting that the future will be different

14   than the 2000s in the degree to which the fact of trust claims

15   or of the underlying exposures involved in trust claims will

16   be more readily available to solvent defendants.

17   A.   I believe that's happening as -- and has happened over

18   the last couple years, yes.

19   Q.   Now, let me ask you this.   Do you expect solvent

20   defendants to become open with regard to their settlement

21   information in the next phase of the tort system?

22   A.   I don't believe that they'll change their practices in

23   that regard.

24   Q.   You were referring to such developments hoped for by the

25   Garlocks of the world as passage of the so-called Fair Act,

1  right?

2  A.   No.

3  Q.   I'm sorry, of the Fact Act.   Trust transparency

4  legislation which is under consideration but not passed

5  anywhere except Ohio and Oklahoma, right?

6  A.   I'm sorry, what was the question?

7  Q.   The question is when you're saying to the judge that he

8  should assume that the future will be different than the 2000s

9  in some respect that you describe as trust transparency,

10  you're suggesting that such things as the Ohio statute passed

11  just this year and replicated only in one other state,

12  Oklahoma, which requires trust claims to be brought before the

13  tort suit can proceed to trial at the option of the defendant,

14  you're suggesting that somehow that will become the governing

15  alternative information regime?

16  A.   No, I think there are transitions, there are reform

17  efforts along those kinds in the tort laws of the country.

18  There's also the economic benefit to the plaintiffs of being

19  able to get trust funds sooner; that basically as the trust

20  funds begin -- have begun to pay claims on a more

21  contemporaneous basis, we have a greater number, greater

22  percentage of plaintiffs of interest to get that trust claims

23  into the trust sooner.

24  Q.   And that was --

25  A.   So there's an economic incentive as well as basically a

4856

Case 10-31607    Doc 3488    Filed 04/02/14    Entered 04/02/14 16:04:49    Desc Main
Document    Page 185 of 199
CHARLES BATES - CROSS

 1  reform effort.

 2  Q.    And as far as the economic incentive is concerned, that

 3  was true as soon as trusts formed in the early 2000s began to

 4  pay significant dollars on claims, right?

 5  A.    No.

 6  Q.    That goes back to 2005 or 2006, doesn't it?

 7  A.    The real money started coming in much later, as you're

 8  aware.

 9  Q.    The real money started to flow around 2006, didn't it?

10  A.    The real trust payments really started in late 2007 and

11  into 2008.   Much of that is a backlog of other -- of claimants

12  who have been waiting for payments.

13       So the issue is whether or not an individual who files a

14  trust claim can get their trust claim paid on a

15  contemporaneous basis.

16  Q.    And based upon the current and anticipated level of

17  funding, you don't really expect, do you, that the level of

18  payments coming out of asbestos trusts collectively will ever

19  again approach the levels that it obtained in 2007, 2008,

20  2009?

21  A.    What, you're talking about aggregated?

22  Q.    Aggregate dollars out of trusts.

23  A.    You're confusing two things.

24  Q.    No, I'm not.   I'm asking you that question.

25  A.    The aggregate level of expenditures?   No, you had a

4857

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 186 of 199
CHARLES BATES - CROSS

1  backlog of claimants.  So you had multiple years of claimants

2  being paid off in very short periods of time, most of whom had

3  already resolved their tort claim by the time these payments

4  are being made.

5      So the aggregate number of expenditures, you'll probably

6  see those kinds of spikes when the Grace trust comes on line,

7  when the Pittsburgh-Corning trust comes on line, et cetera.

8  They will have a big backlog that will be paid out.

9  Q.   There won't be as many trusts making payments in the

10 early stages of their operational life after this year than

11 there were in 2007, 2008, 2009, will there?

12 A.   I'm missing the point of your question, I'm sorry.  I

13 don't know what the --

14 Q.   It's very simple.  You would call it basic economics.

15 There was a huge amount of money coming out of trusts in 2007,

16 2008, and 2009, wasn't there?

17 A.   You're confusing two things.

18 Q.   No, I'm not.  I'm asking you that question and you're not

19 giving me an answer.  It's a simple question, yes or no.

20      THE COURT:  Just answer that question.

21 A.   The money that came out of the trusts in the period --

22 time period that -- the large flow of funds that came out of

23 the time period that you said were payments to tort claimants

24 from the past who have basically been waiting for those trusts

25 to come up and to begin operating.

CHARLES BATES - CROSS

1      The economic incentive that I'm talking about only really

2   comes into play when a current tort claimant can basically

3   file with a trust and get paid in a reasonable period of time

4   relative to their -- to their tort claim.  They can get their

5   trust claim paid off on a contemporaneous basis.

6      So the incentive that I'm talking about is not -- has

7   nothing to do with a large amount of money being paid to a

8   group of claimants who resolved their tort claims in the past,

9   but the regular flow of tort claimants who will be able to get

10  their trust claims paid on a contemporaneous basis when trusts

11  are up and operating on a basis and have worked through their

12  backlogs.

13  Q.   So you've changed the question on me and answered the one

14  that you preferred to answer so I'll just move on and ask you

15  this.  Are you aware of the estimation that took place in the

16  first effort to confirm a plan in the Armstrong World

17  Industries bankruptcy?

18  A.   I'd have to go back and refresh my memory.  That's been a

19  number of years.

20  Q.   Do you remember that Logistic Chambers was an estimator

21  in that case for the debtor and the equity?

22  A.   I don't remember that.

23  Q.   Do you remember that she proposed to Judge Newsome that

24  he should make the assumption that the Fair Act, and now I do

25  mean the Fair Act, the one that was bandied about in Congress

1   in the middle of the 2000s, would pass and should be the basis

2   of the estimate adopted by the court?  Do you remember that?

3   A.   No.  I don't.

4   Q.   Well, I can tell you, as it will be of record in this

5   case, that Judge Newsome soundly rejected that proposition on

6   the basis that it's not appropriate for a debtor that's

7   seeking a discharge in injunction for the benefit of its

8   equity and at the expense of its creditors to make

9   self-serving assumptions about future changes in the law.

10       Does that strike you as a reasonable thing for Garlock to

11   do in the present circumstances?

12             MR. CASSADA:  I'll object to the question, Your

13   Honor.  He's already --

14             THE COURT:  Sustain the objection.  That's an

15   argument, not a question.

16   Q.   Now, you acknowledge, do you not, that the bulk of

17   Garlock's claims resolved by settlement were settled in

18   groups?

19   A.   Correct.  Well, a lot of them were.  I don't know -- it's

20   hard to quantify from the data because there's no flag that

21   reliably tells you that.

22   Q.   Let me show you a slide Dr. Peterson used in his direct

23   examination, slide 17, the heading of which says, "As Garlock

24   became more a focus of the plaintiffs' cases, Garlock's

25   settlement practices changed:  More group settlements than in

1   the 1990s."

2        And he has some data there, which the way he classified

3   it anyway, the groups in the period 2006 to 2010 predominated

4   among settlements by 90 percent.  Do you see that?

5   A.   There's no way you can reliably know these numbers.  They

6   aren't flagged.

7   Q.   Do you think the -- do you think the overall picture

8   presented by that information is close to correct?

9   A.   We can't know.  There's no reliable way of flagging

10  groups within the data.  This is a made up analysis.

11  Q.   You know -- you know that Garlock had a group deal with

12  the most active asbestos firm in New York City.

13  A.   Weitz?

14  Q.   Weitz and Luxenberg.

15  A.   Yes, I do.  I'm very familiar with that.

16  Q.   You know that it had a group deal with the most active

17  asbestos/personal injury law firm in Chicago, Cooney and

18  Conway?

19  A.   Yes.

20  Q.   You know that it had a group deal with the most active

21  asbestos/personal injury law firm in Madison County, Illinois,

22  Simmons --

23  A.   I understand that was their practice.

24  Q.   You know that in the middle of the decade, Garlock made a

25  group wide deal with Baron and Budd?

```
 1  A.   That's my understanding.

 2  Q.   You know that they made a group deal of sorts with Waters

 3  and Kraus?

 4  A.   That's my understanding as well.

 5  Q.   By the way, do you know when the three-year deal with

 6  Waters and Kraus that followed the Treggett verdict was made?

 7  A.   Not as I sit here.

 8  Q.   June 2006.  Does that surprise you?

 9  A.   No.

10  Q.   The Treggett verdict was in 2004.

11  A.   (No response.)

12  Q.   Is that right?

13  A.   I believe that's correct.

14  Q.   Now, in group deals risk is priced in the aggregate with

15  respect to the group as a whole, isn't it?

16  A.   No.

17  Q.   You dispute that?

18  A.   I do.

19  Q.   On what basis?

20  A.   The group deals are basically deals which allow for an

21  efficient resolution of a lot of claims to avoid the costs of

22  doing -- of resolving the claims.  They always have opt out

23  provisions in them such that plaintiffs will opt out the cases

24  which provide any real trial risk associated with them.

25  Q.   One of the benefits to Garlock is that as a practical
```

1   matter, the group deals discourage trial, isn't that so?

2   A.   No.

3   Q.   Well, how many cases did --

4   A.   Garlock can't -- Garlock cannot bind -- Garlock and the

5   plaintiffs' attorneys cannot bind the individual plaintiffs

6   who have a great case against Garlock from bringing that case

7   against Garlock.

8   Q.   How many cases did Garlock try against Weitz and

9   Luxenberg after 1993?

10   A.   There were numerous claimants that opted out of the Weitz

11   and Luxenberg --

12   Q.   How many went to trial?

13   A.   If they properly settled, very few --

14   Q.   How many Waters and Kraus --

15   A.   -- if any.

16   Q.   -- clients went to trial against Garlock after June 2006?

17   A.   We can find out.

18   Q.   You don't know?

19   A.   They each have settlements which would be not what would

20   be the amounts would be the group deals but rather would be

21   reflective of trial risk.  Each one of those lawyers has

22   individual settlements which indicate, by my analysis, trial

23   risk, whether it's Weitz and Luxenberg, whether it was Cooney,

24   whether it was Waters and Kraus that are opted out of the

25   group deals.

4863

Case 10-31607   Doc 3488   Filed 04/02/14   Entered 04/02/14 16:04:49   Desc Main
Document   Page 192 of 199
CHARLES BATES - CROSS

1      That's -- the group deals basically serve as an efficient

2   way to handle the avoid -- the cost avoidance payments to a

3   large number of claimants.  That's how they operate.  They

4   confirm this analysis; they don't belie it.

5   Q.   You take the same position with regard to the periodic

6   group settlements that Garlock made with the Kazan law firm?

7   A.   Yes, I do.

8   Q.   Now, in the context of group deals or otherwise, the

9   making of a settlement extinguishes a disputed tort claim and

10  replaces it with a contractual obligation, isn't that so?

11  A.   I mean, I'm not that familiar with the details of those

12  contracts, but that seems reasonable.

13  Q.   A payment obligation on behalf of the settling defendant,

14  correct?

15  A.   Sounds -- that's what settlements would be, yes.

16  Q.   Your notion of the true share of liability that Garlock

17  bears seemed to me when I heard it while we were sitting here

18  a little while ago to depend upon the extent of the emissions

19  of fiber from Garlock's product that would be ingested by the

20  mesothelioma victim.  Is that your concept?

21  A.   Well, no, that's one way of getting a handle on how you

22  might think about allocating it as I described.

23  Q.   But that's a way that is rather foreign to the laws as we

24  have them in this country, isn't it?

25  A.   Not really.

1            MR. SWETT:  We'll leave that for briefing.

2            Thank you, Dr. Bates.

3            Thank you, Your Honor.

4            THE COURT:  Thank you.  Anything else?

5            MR. CASSADA:  Thank you, Your Honor.  We have no

6    questions for Dr. Bates.

7            THE COURT:  I believe that --

8            MR. CASSADA:  We do have --

9            THE COURT:  I believe that will wind us up.

10           MR. CASSADA:  We do have some housekeeping matters

11   to discuss --

12           THE COURT:  All right.

13           MR. CASSADA:  -- in relation to exhibits.  But we

14   can excuse Dr. Bates.

15           THE COURT:  You can step down.

16           THE WITNESS:  Thank you, Your Honor.

17           (Witness stepped down.)

18           (Counsel conferred.)

19           MR. CASSADA:  Your Honor, there's been a lot of

20   exhibits flying around in the course of the last four weeks.

21   We've conferred with the counsel for the committee and the

22   FCR, and what we propose to do is to exchange our witness

23   lists, both admitted and those that we had identified and

24   intend to ask the court to admit.  And then we also have a lot

25   of exhibits that are associated with deposition designations.

1    Those will be offered as well.  And then I think there must be

2    some other exhibits we've heard about that we'll want to talk

3    about and be able to at least refer to and use in the briefing

4    process.

5              THE COURT:  Okay.

6              MR. CASSADA:  The agreement, the arrangement that

7    we've talked about is exchanging those lists.  We're prepared

8    to provide ours today.  And then meeting and conferring within

9    the next couple of weeks.  And then presenting the court with

10   a unified list.  If there's any -- if there are any objections

11   to documents on the list, then we would note those.  And if

12   they're referred to in the briefing, then Your Honor can

13   decide whether they would be admitted and how you would treat

14   such exhibits.

15             THE COURT:  That sounds fine to me.

16             MR. SWETT:  That's acceptable to the committee, Your

17   Honor.

18             THE COURT:  And -- well, in some way we'll need to

19   have access to those exhibits as well.

20             MR. CASSADA:  Yes, we would deliver them -- we're

21   thinking that we would deliver them electronically.  There's

22   going to be a large number, particularly with respect to the

23   RFA case that you've heard about.

24             THE COURT:  That will be fine.

25             MR. CASSADA:  Okay.  It might make sense to --

1           THE COURT:  If you can teach me how to get to them

2    like your automation people do, I'll be greatly obliged.

3           MR. CASSADA:  We might as well talk about briefing,

4    Your Honor.  I believe when I left the courtroom early last

5    week you had raised that issue.

6           THE COURT:  Right.  And I don't know if you all had

7    a chance to talk about what kind of schedule you want to have

8    for --

9           MR. SWETT:  We haven't, Your Honor.  And we haven't

10   had a single conversation about it.  I would like to do that.

11   I think we both would like to have a reasonably prompt

12   schedule, but there's a lot of material to cover.

13          So let us have the opportunity to see if we can

14   agree, the three of us -- the four of us, and present you with

15   a proposal.

16          THE COURT:  I'm happy to live with whatever you all

17   can agree on.  And if you can't agree on something, then I'll

18   try to referee it, I guess.

19          MR. CASSADA:  One issue that we would seek to

20   resolve, and we'll do this through conference as well, is the

21   timing of the objections to our witnesses based on *Daubert*.

22   You might recall that you agreed to --

23          THE COURT:  Right.

24          MR. CASSADA:  -- extend that deadline and then offer

25   us an opportunity to --

1              THE COURT:  Yeah.

2              MR. CASSADA:  -- present evidence in the form of

3    affidavits to respond to those.

4              Seems like that has to happen before the briefs can

5    actually be written, so we need to take into account in our

6    schedule the *Daubert* motions and responses and the --

7              THE COURT:  Okay.

8              MR. CASSADA:  -- trial briefs.

9              THE COURT:  If y'all can work out a schedule for

10   that, I'll be happy to go by that.

11             The only thing I would ask that -- one thing that

12   might -- that I think would be helpful to me is in your -- in

13   your post-trial briefs, if you can try to be pretty specific

14   about what you think you showed with each of your witnesses

15   and what you think you showed on cross examination of your

16   adverse witnesses, that would be helpful.  Not necessarily a

17   quote by quote, but with some specificity.

18             MR. SWETT:  Yes, Your Honor.

19             MR. CASSADA:  We certainly can do that, Your Honor.

20             THE COURT:  Okay.  Anything else?

21             (No response.)

22             THE COURT:  I will be around.  Just -- whatever you

23   all come up with, just email me that, if you would, in terms

24   of schedule.  And then we'll -- I'll just do like a short

25   order and enter that order and then the world will know what

1   that schedule is.

2          MR. CASSADA:  Okay.

3          MR. SWETT:  Your Honor, that's likely to be early

4   September because Mr. Cassada and I both have vacations next

5   week.

6          THE COURT:  That's fine.

7          And let me congratulate you all and thank you all

8   for a wonderful job of presenting your cases.  You've got

9   serious differences.  That's obvious.  I mean, you're only a

10  billion dollars apart.  But you -- from the -- from the most

11  junior to the most senior person involved, it has been a joy

12  to watch you all work.  And you've done an excellent job and I

13  think ought to be congratulated for that, both the lawyers and

14  the witnesses.  I guess in a lot of cases, the witnesses have

15  a lot more experience than the lawyers do.

16         But it has been -- as somebody who, I guess, has had

17  the good fortune not to have to try a case in 25 years, it's

18  been fun for me to watch you all at work.  And it's always fun

19  to watch good lawyers work and, as I say, you all ought to be

20  congratulated.

21         Thank you for the effort you've put into this.  And

22  we -- I hope now that you've all beat each other to a bloody

23  pulp, maybe you can talk about settlement.  If you can't, then

24  I'll do a decision and -- but, you know, I won't -- I'm not

25  one to try to beat people into settlement.  The fear of what I

1   might do is probably the greatest motivator you may have

2   anyhow.  But you can do a lot better job of it than I do, and

3   I know that you all know that and hopefully you'll be able to

4   do that.  If not, then I'll do what I do and you all can go

5   from there.

6            So thank you, though, for all your efforts.

7            MR. SWETT:  Thank you, Your Honor.

8            MR. CASSADA:  Thank you, Your Honor.

9            ALL COUNSEL:  Thank you, Your Honor.

10           (End of proceedings at 5:21 p.m.)

11                          *****

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF NORTH CAROLINA

3    CERTIFICATE OF REPORTER

4

5            I certify that the foregoing transcript is a true

6    and correct transcript from the record of proceedings in the

7    above-entitled matter.

8

9            Dated this 24th day of August 2013.

10

11

12                            s/Cheryl A. Nuccio
                              Cheryl A. Nuccio, RMR-CRR
13                            Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25