**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

|  |  |  |
|---|---|---|
| In re: | : | Case No. 10-BK-31607 |
|  | : |  |
| GARLOCK SEALING | : | Chapter 11 |
| TECHNOLOGIES, LLC, *et al.*, | : |  |
|  | : | Jointly Administered |
| Debtors.[1] | : |  |
|  | : |  |

**MEMORANDUM IN SUPPORT OF MOTION OF THE OFFICIAL
COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS
<u>TO REOPEN THE RECORD OF THE ESTIMATION PROCEEDING</u>**

**TGFCEVGF'XGTUKQP**

| **CAPLIN & DRYSDALE, CHARTERED** | **MOON WRIGHT & HOUSTON, PLLC** |
|---|---|
| Trevor W. Swett III | Travis W. Moon |
| Leslie M. Kelleher | 227 West Trade Street |
| James P. Wehner | Suite 1800 |
| One Thomas Circle, N.W. | Charlotte, NC  28202 |
| Washington, DC  20005 | Telephone:  (704) 944-6560 |
| Telephone:  (202) 862-5000 |  |
|  |  |
| Elihu Inselbuch |  |
| 600 Lexington Avenue, 21st Floor |  |
| New York, NY  10022 |  |
| Telephone:  (212) 379-0005 |  |

*Co-Counsel for the Official Committee of Asbestos Personal Injury Claimants*

---

[1]   The Debtors are Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company.  As used herein, "**Garlock**" refers to Garlock Sealing Technologies LLC and Garrison Litigation Management Group, Ltd.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

EXECUTIVE SUMMARY ........................................................................................ 1

INTRODUCTION ..................................................................................................... 3

ARGUMENT ............................................................................................................. 5

I.      THE COURT HAS DISCRETION TO REOPEN THE RECORD ................................. 5

II.     GARLOCK ENGAGED IN NON-DISCLOSURE AND CONCEALMENT
        OF EVIDENCE THAT CONTRADICTS ITS STORY THAT IT WAS A
        HAPLESS VICTIM OF THE PLAINTIFFS BAR ...................................................... 7

        A.      Garlock misled the Court into accepting the false contention that
                plaintiffs' counsel controlled exposure evidence ..................................... 7

                1.      Garlock failed to disclose that it had proof of Unibestos on the
                        USS John Marshall when it tried and resolved ▇▇▇▇ ........................ 8

                        a.      Garlock had detailed testimony and documentation in
                                its possession for more than 25 years establishing the
                                presence of Unibestos on the USS John Marshall ................ 10

                        b.      Representing Garlock, Cary Schachter's firm deposed
                                the man who delivered Unibestos to the USS John
                                Marshall ......................................................................... 18

                        c.      Garlock tried a case involving evidence about the USS
                                John Marshall weeks before the ▇▇▇▇ trial ........................ 18

                        d.      Garlock was obliged to produce this information to the
                                Committee but did not .................................................... 21

                2.      Garlock had ample information from prior cases about non-
                        Garlock exposures when it tried ▇▇▇▇ but hid that information
                        from the Committee and the Court .................................................... 23

                        a.      Garlock failed to produce a key report that discloses
                                Garlock's extensive knowledge of non-Garlock
                                exposures in ▇▇▇▇ ........................................................ 23

i

b.      Other failures of disclosure facilitated Garlock's
misrepresentations about ███████....................................................28

3.      Garlock's suggestion that exposure evidence comes only from
the plaintiff clashes with actual practice in the tort system ......................31

B.      New evidence shows Garlock's own experts contradict its contention
that every trust claim constitutes an admission of exposure..................................33

C.      Garlock and David Glaspy misled the Court in their account of the
settlement process by withholding key emails from the Committee in
the estimation discovery ......................................................................................38

1.      Emails found on the recently retrieved laptop of Ron Eddins, a
deceased plaintiffs attorney, contradict Mr. Glaspy's account of
the ███████ settlement .............................................................40

2.      The unproduced emails illustrate the reality of Mr. Glaspy's
approach to settling cases on Garlock's behalf .........................................44

3.      The Debtors and David Glaspy had a clear obligation to
produce these settlement communications but failed to do so..................50

III.    THE COURT SHOULD PERMIT FOCUSED ADDITIONAL
DISCOVERY AND REOPEN THE ESTIMATION HEARING TO
TAKE SUPPLEMENTAL EVIDENCE................................................................55

CONCLUSION...................................................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Akbari-Shahmirzadi*,
    2013 WL 1099794 (D.N.M. Mar. 15, 2013)..............................................................5

*In re Allen*,
    106 F.3d 582 (4th Cir. 1997) .................................................................................37

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
    326 F.3d 505 (4th Cir. 2003) ...................................................................................5

*Bassett v. Perrett*,
    2004 WL 1386298 (Cal. Ct. App. June 22, 2004) ..................................................21

*Baytree Assocs., Inc. v. Dantzler, Inc.*,
    2008 WL 2182202 (W.D.N.C. May 22, 2008) ..........................................................6

*In re Brooklyn Navy Yard Asbestos Litig.*,
    971 F.2d 831 (2d Cir. 1992)....................................................................................32

*Carver & Assocs. v. Anjani Invs., Inc.*,
    2005 WL 2338680 (Cal. Ct. App. Sept. 26, 2005) ..................................................21

*Depree v. BASF Catalysts LLC*,
    2013 WL 8103864 (Cal. Super. Ct. Oct. 4, 2013) ..................................................21

*Engle v. Air & Liquid Sys. Corp.*,
    2012 WL 6630141 (N.Y. Sup. Ct. Dec. 10, 2012) ..................................................32

*Exclusive Florists, Inc. v. Kahn*,
    95 Cal. Rptr. 325 (Ct. App. 1971)...........................................................................21

*Fayetteville Invs. v. Commercial Builders, Inc.*,
    936 F.2d 1462 (4th Cir. 1991) .................................................................................5

*Foreman v. Five Star Food Serv., Inc.*,
    2013 WL 5675899 (M.D. Tenn. Oct. 18, 2013) ...................................................5, 6

*Heisch v. Allied Packing & Supply Inc.*,
    2013 WL 8103844 (Cal. Super. Ct. Aug. 30, 2013) ...............................................21

*In re Kreider*,
    2006 WL 3068834 (Bankr. E.D. Pa. Sept. 27, 2006) ..............................................7

*Jazayeri v. Mao*,
    94 Cal. Rptr. 3d 198 (Ct. App. 2009) ...................................................................21

*Lineaweaver v. Plant Insulation Co.*,
    31 Cal. App. 4th 1409 (Ct. App. 1995) .................................................................32

*Luros v. Amcord, Inc.*,
    2013 WL 7943324 (Cal. Super. Ct. Jan. 11, 2013) ..............................................21

*In re Meyers*,
    483 B.R. 89 (Bankr. W.D.N.C. 2012) ................................................................6, 7

*In re Orlan*,
    138 B.R. 374 (E.D.N.Y. 1992) ...............................................................................6

*Rodriguez v. Tenn. Laborers Health & Welfare Fund*,
    89 F. App'x 949 (6th Cir. 2004) .............................................................................5

*Roehling v. Nat'l Gypsum Co. Gold Bond Bldg. Prods.*,
    786 F.2d 1225 (4th Cir. 1986) ..............................................................................33

*Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*,
    197 F. Supp. 2d 298 (D. Md. 2000) ....................................................................5, 6

*Weyerhaeuser Corp. v. Koppers Co.*,
    771 F. Supp. 1406 (D. Md. 1991) ...........................................................................6

## STATUTES AND RULES

Cal. Evid. Code § 1271 ................................................................................................21

Cal. Evid. Code § 1292 ................................................................................................21

Cal. Evid. Code § 1331 ................................................................................................21

Fed. R. Bankr. P. 9014 ..................................................................................................5

Fed. R. Civ. P. 54(b) .....................................................................................................5

Fed. R. Civ. P. 60(b) .....................................................................................................6

Fed. R. Evid. 502(a) ....................................................................................................57

Tex. R. Evid. 804 ........................................................................................................30

The Official Committee of Asbestos Personal Injury Claimants (the "**Committee**") hereby submits this memorandum in support of its motion, pursuant to Federal Rules of Bankruptcy Procedure 9014(c), 7037 and 7054 and Federal Rules of Civil Procedure 37 and 54(b), to reopen the record of the estimation proceeding to permit the presentation of supplemental evidence after certain additional discovery, as more fully set forth below.

## EXECUTIVE SUMMARY

Garlock has committed a fraud upon the Court.  The Committee has discovered through its own outside efforts that Garlock has violated this Court's orders to produce documents to the Committee, and that these violations permitted Garlock to present false testimony to the Court at the estimation hearing—false testimony the Court incorporated into its findings.  For example, in violation of the Court's August and October 2012 orders, Garlock failed to produce depositions and documents that would demonstrate that for years Garlock had ample evidence that ███████ ███████ was exposed to Unibestos on the USS John Marshall, even as Richard Magee, Garlock's general counsel, testified at the estimation hearing that "███████████████████ ████████████████████████████" And while Garlock was concealing its own knowledge from the Court, Garlock was accusing Mr. ████████ and his counsel of failing to disclose evidence.

Garlock's false testimony about ████████ alone casts serious doubt on the integrity of the estimation process and the reliability of any decision based on evidence Garlock presented at the hearing.  ████████ was the largest verdict ever suffered by Garlock, formed the centerpiece of Garlock's presentation last summer, and is recounted in the Court's estimation order as the lead example of supposed suppression of evidence by plaintiffs in the tort system.  The Court

conceived of the estimation as a contest between two different approaches:   the Committee's standard estimation methodology based on actual claims resolution history (the approach taken in every asbestos estimation ever litigated to conclusion) and Garlock's novel, highly theoretical, and assumption-laden economic "model."   Garlock attacked the reliability of its resolution history as a basis for estimation by telling a story of how a few plaintiffs' law firms managed to drive up settlement values by withholding evidence of their clients' exposures to asbestos from insulation products made by bankrupt manufacturers.   Garlock featured just fifteen resolved cases (out of more than 10,000 from the decade of the 2000s) as illustrations of this supposed phenomenon, plus a tabulation of trust claims and bankruptcy ballots filed on behalf of approximately 190 additional resolved claims on the premise that each trust claim and ballot constituted the plaintiffs' "admission" of a product exposure not disclosed in the tort system.   On the basis of this presentation, Garlock persuaded the Court to depart from precedent and draw the drastic conclusion that Garlock's real claims resolution experience was "useless" for estimation.[2]

It turns out, however, that Garlock failed to produce evidence that would not fit this revisionist account of its history in the tort system.   In addition to the trove of evidence bearing on ████████ that Garlock failed to produce in the estimation proceeding, the Committee has been able to uncover other instances in which evidence that Garlock was obligated to produce but withheld contradicts its contention that settlement values were inflated by suppression of evidence on the part of plaintiffs in the tort system.   The evidence Garlock failed to disclose includes expert reports detailing Garlock's knowledge of third-party exposures and emails undercutting the testimony of Garlock's witnesses about how and why it settled cases.   These are

---

[2]   Order Estimating Aggregate Liability at 58, dated Jan. 10, 2014 [Dkt. No. 3296] ("**Estimation Order**").

discussed below. To cure Garlock's grave lapses, the Court should compel Garlock to supplement its estimation discovery, including material covered by Garlock's prior privilege claims, and reopen the record of the estimation to take additional evidence. Without such corrective actions, the estimation order will remain tainted and will provide no reliable basis for reorganization.

## **INTRODUCTION**

Garlock has misled this Court. It has invited this Court to conclude, based on incomplete disclosures, misstatements and gross generalizations, that, in every case that mattered, it was the victim of improper withholding of evidence by plaintiffs' lawyers, and that if only they had been honest, Garlock could not have been found liable for killing people with its asbestos-containing products and would have settled virtually all cases for nuisance value.

Of course, this Court could not, and did not, examine all the relevant details of even the handful of cases Garlock chose to feature at the estimation hearing. Instead, Garlock presented, and the Court relied upon, generalized testimony from a senior executive and well-paid lawyers and experts. Through these witnesses, Garlock claimed, in a conclusory fashion, that it had been unable in the 2000s to prove that plaintiffs were exposed to non-Garlock products; that it would have prevailed had trust claims and bankruptcy ballots been disclosed; and finally that an exhaustive account of non-Garlock exposures was critical to the process of negotiating fair settlements.

Newly discovered evidence reveals that Garlock failed to produce relevant materials the Committee sought in estimation discovery—materials that would show Garlock's professed helplessness to be contrived. The Committee has obtained key information from other sources on the first few cases Garlock featured as examples of "fraud." Ironically, the new information

reveals Garlock itself manipulating the evidence in the estimation proceeding in much the way that it claims plaintiffs' lawyers did in the tort system.  Contrary to its position in the estimation, Garlock had copious, specific and probative evidence of plaintiffs' exposures to insulation and other non-Garlock asbestos products.  Garlock had this information when it resolved cases before its bankruptcy and when it elicited testimony to the contrary before this Court.  The estimate this Court produced on the basis of Garlock's false contentions—contentions made plausible, if at all, only by Garlock's own discovery evasions—threatens manifest injustice.

As the Committee cautioned from the outset, Garlock's claim that it was deceived in hundreds of cases cannot fairly be litigated in the context of aggregate estimation, because that task would require an examination of the particulars of each case, would include examination of witnesses who are not parties to the estimation and who in most instances have died, and would require scrutiny of the complete record of the cases, which have not been presented and are difficult to reconstruct years later.  It would essentially require the relitigation of scores of lawsuits, a massive undertaking that, even if possible, would strain the resources of this Court.

Nevertheless, it is possible to correct the incomplete picture Garlock offered at the estimation hearing.  To do so, the Court should permit additional focused discovery so that both the Committee and the Court can reevaluate Garlock's proof.  The Committee believes that, if the Court permits such additional discovery, it will come to a fairer, more nuanced and realistic estimate than one founded on Garlock's illusions.[3]

---

[3]   This motion is limited to the request for corrective action described herein and does not constitute a complete statement of errors in the Court's estimation findings.  The Committee fully reserves the right to appeal any such errors at the appropriate time.

## <u>ARGUMENT</u>

### I.    THE COURT HAS DISCRETION TO REOPEN THE RECORD

There is no question that the Court can apply these corrective measures in this estimation proceeding. Courts retain authority both under the common law and Federal Rule of Civil Procedure 54(b) to reconsider interlocutory orders, reopen any part of a case, and afford such relief as justice requires any time before entry of a final judgment. *Am. Canoe Ass'n. v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003); *Fayetteville Invs. v. Commercial Builders, Inc.,* 936 F.2d 1462, 1469-70 (4th Cir. 1991); *Foreman v. Five Star Food Serv., Inc.*, 2013 WL 5675899, at *2 (M.D. Tenn. Oct. 18, 2013) (citing *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004)). Rule 54(b), made applicable to bankruptcy cases pursuant to Fed. R. Bankr. P. 9014, states that until a trial court enters final judgment, any order that resolves fewer than all of the claims among all of the parties "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). This power of reconsideration and revision is committed to the sound discretion of the court. *Am. Canoe Ass'n.*, 326 F.3d at 515.

As this Court has previously recognized, the estimation is interlocutory.[4] Unlike final orders, interlocutory orders are not subject to the restrictive standards of Rules 59 and 60, *Am. Canoe Ass'n.*, 326 F.3d at 514; *Fayetteville Invs.*, 936 F.2d at 1472; *In re Akbari-Shahmirzadi*, 2013 WL 1099794 (D.N.M. Mar. 15, 2013), although the general principles of Rules 59 and 60 provide guidance. *Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F. Supp. 2d 298, 331-32 (D. Md. 2000). Thus, under Rule 59's guidelines, courts may review interlocutory orders

---

[4]    Order Denying Motion of Legal Newsline to Open Proceedings to the Public, dated July 31, 2013 [Dkt. No. 3069] ("This hearing is not a dispositive proceeding. While it is an important one, it is merely a preliminary step in the process of formulating a reorganization plan.").

when: (1) there has been an intervening change in controlling law; (2) evidence not previously available has become available; or (3) there is a need to correct a clear error of law or prevent manifest injustice.  *Id.* at 332 n.2 (citing *Weyerhaeuser Corp. v. Koppers Co.*, 771 F. Supp. 1406, 1419 (D. Md. 1991)); *Baytree Assocs., Inc. v. Dantzler, Inc.*, 2008 WL 2182202, at *3 (W.D.N.C. May 22, 2008) (citation omitted).  Courts may also afford relief from an interlocutory order pursuant to Rule 60, which addresses such circumstances as newly discovered evidence and misrepresentation. Fed. R. Civ. P. 60(b); *Superior Bank*, 197 F. Supp. 2d. at 332 n.2.

Within its discretion, a court may also reopen an evidentiary hearing and permit additional discovery.  *See, e.g.*, *Foreman*, 2013 WL 5675899, at *4 (vacating a previous interlocutory order and reopening discovery); *In re Orlan*, 138 B.R. 374, 377 (E.D.N.Y. 1992) ("whether to reopen the record of an evidentiary hearing is a question committed to the sound discretion of the bankruptcy court").  Because the estimation is interlocutory in nature, this Court has plenary authority to reopen the record and reconsider matters pertaining to the estimation hearing.

Bankruptcy courts have frequently exercised this discretion to reopen matters, including allowing additional discovery, to supplement and complete the record.  *See, e.g.*, Order Reopening Record on Confirmation and Setting Deadlines Related Thereto, *In re Flintkote Co.*, No. 04-11300 (Bankr. D. Del. Jan. 7, 2011) [Dkt. No. 5602] (granting a motion to reopen the record on confirmation to introduce additional evidence and allowing additional discovery related thereto); Memorandum Opinion, *In re Pittsburgh Corning Corp.*, No. 00-22876 (Bankr. W.D. Pa. Nov. 12, 2013) [Dkt. No. 9693] (denying a motion for reconsideration of the confirmation order, which argued in part that the bankruptcy court erred in reopening the record to allow the admission of affidavits to support plan confirmation); *In re Meyers*, 483 B.R. 89, 94-

- 6 -

95 (Bankr. W.D.N.C. 2012) (granting request to reopen and supplement the summary judgment record in an adversary proceeding); *In re Kreider*, 2006 WL 3068834, at *8 (Bankr. E.D. Pa. Sept. 27, 2006) (reopening the confirmation hearing and scheduling a supplemental hearing at which the parties could provide additional evidence).

As is discussed fully below, the new evidence unearthed by the Committee raises significant questions about the integrity of the estimation proceeding, and Garlock's misrepresentations to the Court threaten manifest injustice. It is, therefore, necessary to reopen the record of the estimation proceeding and receive additional evidence on specific issues after limited additional discovery. Fairness demands it.

## II. GARLOCK ENGAGED IN NON-DISCLOSURE AND CONCEALMENT OF EVIDENCE THAT CONTRADICTS ITS STORY THAT IT WAS A HAPLESS VICTIM OF THE PLAINTIFFS BAR

### A. Garlock misled the Court into accepting the false contention that plaintiffs' counsel controlled exposure evidence

One of Garlock's central themes in the estimation hearing, sounded first by Mr. Cassada in his opening statement, was that plaintiffs' lawyers "controlled the evidence of exposure" to put Garlock at a disadvantage.[5] That is, Garlock claimed that plaintiffs had the evidence and Garlock did not. This Court specifically accepted Garlock's claim on this key point, finding that "exposure evidence is under the control of the plaintiffs' lawyer."[6] But the picture Garlock painted is false and misleading, as Garlock knew when it made the claim to this Court. In fact, when Garlock settled or tried cases, it had ample evidence of plaintiffs' non-Garlock exposures, in some cases far more evidence than the plaintiffs had themselves. In the course of the

---

[5]    Hr'g Tr. 61:5-9, July 22, 2013 (Cassada); *id*. at 64:20-24.

[6]    Estimation Order at 27.

estimation proceeding, Garlock has concealed evidence that puts the lie to its claims of ignorance.  It has thereby misled the Court.

> **1.    Garlock failed to disclose that it had proof of Unibestos on the USS John Marshall when it tried and resolved** ███████

The ███████ case was the largest verdict Garlock ever suffered.  Garlock featured ███████ prominently in its presentation at the estimation hearing.  Richard Magee called it the "███████████████████"[7]  Garlock stated in its brief that ███████ ███████ ███████ ██████████████████████████████"[8]  And Garlock's claims about ███████ made a distinct impression on the Court:  In the Estimation Order, the discussion leading to the Court's conclusions that Garlock suffered material prejudice by "suppression of evidence" begins with ███████

███████ ███████ contracted mesothelioma in 2003 and brought a lawsuit against Garlock and others later that year.  Mr. ███████ most extensive exposures to asbestos-containing products occurred during his service in the Navy as a machinist's mate on a nuclear submarine.  In particular, Mr. ███████ was exposed during an overhaul of the submarine he served aboard, the USS John Marshall.  That overhaul—a long process of tearing out and replacing pipes, equipment, and insulation—took place between late 1966 and mid-1968 at the Newport News Shipbuilding and Dry Dock Company.  Mr. ███████ disclosed that he had been exposed to asbestos from insulation on steam lines during the course of his work on the USS John Marshall.  At a jury trial in Los Angeles held in September 2004, Mr. ███████ testified that he had heard about Pittsburgh Corning Unibestos insulation during training, but could not say whether or not

---

[7]    Hr'g Tr. 3090:11-13, Aug. 5, 2013 (Magee).

[8]    Debtors' Post-Trial Brief and Summary of Evidence Presented at Trial at 41, filed Nov. 1, 2013 [Dkt. No. 3205].

it was used on the John Marshall.[9]  Even though the plaintiff's own expert acknowledged that Unibestos was probably on that ship,[10] the trial judge refused Garlock's request, in the absence of specific evidence, to put Pittsburgh Corning on the verdict form for a potential allocation of fault by the jury.[11]

    Garlock claimed that it suffered a devastating verdict in ███████ because, with Mr. ███████ refusing to admit to Unibestos exposure, Garlock had no other means of proving it. Indeed, responding to the Committee's contention that Garlock had ample resources to prove third-party exposures, Mr. Cassada took pains to elicit from Mr. Magee ██ ████



---

[9]    GST-5444 (██████ Trial Tr.) at 1237:14-1238:5.  There is no reason to doubt the veracity of this testimony.  This Court has acknowledged that workers like Mr. ██████ often lack knowledge of the specific brands of asbestos products to which they were exposed.  Estimation Order at 26-27.

[10]    ACC-795 (Garlock Appeal Brief, ██████ at 26, 29.

[11]    GST-5452 (██████ Judgment) at GST-EST-0494812.

[12]    Hr'g Tr. 3070:21-3071:14, Aug. 5, 2013 (Magee) (emphasis added).

Garlock's claim was false.  At the time of the ███ trial, Garlock had extensive documentary and testimonial proof, not only that Unibestos pipecovering was onboard the USS John Marshall when Mr. ███ served on that ship, but also that Unibestos was used in the very overhaul he worked on in 1967-1968.  Garlock had this proof when it suffered the verdict against it and when it settled ███ on appeal.  Despite the Committee's numerous discovery requests, Garlock failed to disclose this proof to the Committee or to the Court.  Garlock's failure to disclose permitted it to make claims about ███ calculated to deceive the Court.

> **a.  Garlock had detailed testimony and documentation in its possession for more than 25 years establishing the presence of Unibestos on the USS John Marshall**

When the ███ case went to trial in September 2004, Garlock had long possessed detailed evidence that Pittsburgh Corning's Unibestos was used on the USS John Marshall when Mr. ███ served on that submarine.  Garlock obtained this evidence in the course of litigating asbestos personal injury cases in Norfolk and Newport News, Virginia, beginning in the 1970s.  That same evidence was used in Garlock's cases for over a quarter century before the ███ trial.  Over the years, Garlock's lawyers deposed workers from the Newport News Shipbuilding and Dry Dock Company who worked on or supervised work on vessels built or overhauled there, including the USS John Marshall.  Through this litigation, Garlock also had access to extensive documentary evidence about products purchased for use on the USS John Marshall.

As early as 1978, for example, Garlock deposed the foreman who supervised pipecoverers (*i.e.*, insulators) who worked on submarines, including the USS John Marshall.[13]

---

[13]  Pipecoverers were among the most knowledgeable witnesses for identifying insulation products and their manufacturers because they actually handled and installed the materials, unlike pipefitters, for example, who installed and removed gaskets.

The foreman, James T. Oman, testified that *the only* sectional asbestos pipecovering used on nuclear submarines like the USS John Marshall when that submarine was overhauled in 1967 and 1968 was Unibestos.

Q.      All right. Now, since you are aware of which areas we're talking about, name me those other areas where Unibestos pipe sections were used in the construction of the early nuclear submarines, and for what purposes?

A.      *Used Unibestos sections to cover the diesel exhaust. We used Unibestos sections to cover the hot water, in the crew's living—crews and officer's living spaces.* We used the Amosite blanket to cover valves in the diese1 exhaust system. Used amosite sections to cover the portion of the diesel fresh water which is hot. That's about as far as I can go in that area of the ship [without triggering a national security objection from the US government representative at the deposition].

Q.      *Mr. Oman, did you use any other asbestos-containing pipe sections in work performed upon nuclear submarines, not identifying any specific section?*

A.      Not identified as what?

Q.      Don't mention any specific section of a submarine in answer to this question. Did you use any other asbestos-containing pipe sections in work performed on a nuclear submarine?
. . .

Q.      Between '62 and '72 .
. . .

A.      *No, sir.*
        *No other sectional material, no, sir.*

Q.      *No other sectional material was used on a nuclear submarine between '62 and '72?*

A.      *Not to my knowledge.*

Q.      Can you tell me when they stopped using asbestos-containing sectional materials for use on nuclear submarines?

A.      Unibestos and Amosite felt blanket we used on all submarines from the time I started working until I went to the LOS ANGELES class.[14]

Garlock was represented at this deposition by attorney James Shannon, who along with Carl Schwertz served for decades as Garlock's counsel in Virginia.

Garlock's evidence of Pittsburgh Corning Unibestos on the USS John Marshall also encompassed documents.  These included purchase orders for Unibestos issued by the Newport News Shipbuilding and Dry Dock Company specifically for use on the USS John Marshall and receipts from the shipyard showing exactly what Pittsburgh Corning Unibestos pipecovering products were actually delivered for use on the USS John Marshall.  Copies of these documents are submitted as Exhibit 2 (purchase order) and as Exhibit 3 (receipt).

The purchase orders for the USS John Marshall (identified by its hull number SSBN 611) show the actual Pittsburgh Corning Unibestos pipecovering products being purchased in late 1966 for the very overhaul that Mr. ███████ worked on.  The seller was C.E. Thurston & Sons, Inc., a Unibestos distributor and the major supplier of insulation products to the Newport News Shipbuilding and Dry Dock Company.

---

[14]   Deposition of James T. Oman, dated Feb. 23, 1978, at 322:25-324:22 (objections omitted), attached as Ex. 1.

Here is a sample page of the purchase order:



The receipts, a representative page of which is reproduced below, show delivery of pipecovering from Pittsburgh Corning to the warehouse at the shipyard.



These purchase orders and receipts were produced by the Newport News Shipbuilding and Dry Dock Company pursuant to subpoena in the early 1980s. The records were then incorporated into a master set of Plaintiffs Exhibits, which were used repeatedly in cases against Garlock in Newport News, Norfolk, and elsewhere well into the 1990s. The master exhibit list corresponding to that set of materials describes these documents clearly, tying them explicitly to Pittsburgh Corning, the USS John Marshall, and the dates of the John Marshall's overhaul.



A copy of the relevant portion of the list is attached as Exhibit 4. The master exhibit list was incorporated into pretrial orders for many cases in that era.[15] The documents themselves were available at the Newport News courthouse and were also maintained by defendants' liaison counsel.

---

[15] For example, the master exhibit list, called in this case the "Plaintiffs Joint Pre-trial Exhibits," was incorporated into the Final Pretrial Order of a group of cases being tried against Garlock, among others, in the United States District Court in the Eastern District of Virginia in 1988. The Pittsburgh Corning Unibestos purchase orders were specifically referenced in that order. *See* Final Pretrial Order, *Bass v. H.K. Porter Co.*, No. 83-203-NN (E.D. Va. 1988), excerpts attached as Ex. 5.

In response to the explosive growth of the asbestos caseload in coastal Virginia in the 1970s, the state and federal courts there set up a consolidated proceeding known as C/P 77-1 and adopted a joint initial pre-trial order that appointed liaison counsel for both defendants and plaintiffs.[16]  Liaison counsel was responsible, *inter alia*, for "production and examination of documents."[17]   Importantly, the order specifically permitted interrogatories rendered and depositions taken under the master caption of C/P 77-1 to be used by or against anyone who was party to any case on that docket, who was present or had notice, or was represented or noticed through liaison counsel.[18]  Standing orders incorporated the same approach for more than thirty years.[19]

As a result of its long participation in asbestos litigation in Norfolk and Newport News, Garlock had access when ███████ was tried—and also when this Court conducted the estimation hearing—to many depositions of individuals who worked at Newport News Shipbuilding and Dry Dock Company and whose testimony proves the use of Pittsburgh Corning Unibestos on the USS John Marshall when Mr. ██████ worked on that ship.  These included, for example, another deposition of James Oman, the pipecoverer foreman mentioned above, who worked on submarines including the USS John Marshall.  Mr. Oman again identified Pittsburgh Corning Unibestos as having been used in the 1966-1968 overhaul of the John Marshall (the overhaul in

---

[16] *See* Initial Pretrial Order, *Thornton v. Johns-Manville Corp.*, No. 76-590 (E.D. Va. Aug. 25, 1977), attached as Ex. 6.

[17]  *Id*. at 4.

[18]  *Id*. at 11.

[19]  *See, e.g.*, Standing Order Applicable to Asbestos Litigation, *In re All Asbestos Cases*, Nos. CL92-10000W-01 & CL92-10000C-03 (Va. Cir. Ct. Newport News, July 28, 2004), attached as Ex. 7.

which Mr. ████ participated).[20]  Garlock also had access to the deposition of Henderson

Roberts, a "materials man" who took pipecovering orders from the foremen working on

submarines and then delivered the requested pipecovering to the submarines.  Mr. Roberts

worked on the USS John Marshall overhaul of 1966-1968 and testified that the pipecovering

used in that overhaul was Pittsburgh Corning Unibestos.[21]  Likewise, Garlock had access to the

deposition of Shirley Garris, a pipecoverer who also worked on the USS John Marshall overhaul

and likewise identified Pittsburgh Corning Unibestos.[22]  As an active defendant in the underlying

cases in Norfolk and Newport News in the 1980s, Garlock routinely received notices of the

depositions in those proceedings and liaison counsel made the depositions available to all

defendants in the Norfolk/Newport News litigation.  The Oman, Roberts, and Garris depositions,

and others like them were taken in the mid-1980s of witnesses closely associated with the

Newport News Shipbuilding and Dry Dock Company, on the understanding, recited in the

transcripts, that the depositions would be available for use in a large group of cases brought by

certain Virginia counsel.[23]  Garlock was a defendant in many of those cases and knew these

depositions were useable against Garlock whether or not it chose to attend them.  Plaintiffs listed

these witnesses' depositions again and again in pretrial orders in numerous cases where Garlock

was a defendant.[24]

---

[20]  Deposition of James T. Oman, dated Oct. 15, 1985, at 36:9-40:7, 42:16-44:21, attached as
Ex. 8.

[21]  Deposition of Henderson W. Roberts, dated Oct. 15, 1985, at 17:23-20:6, 40:12-42:12,
attached as Ex. 9.

[22]  Deposition of Shirley Garris, dated Oct. 16, 1985 at 6:4-16, 17:1-27:4, attached as Ex. 10.

[23]  *E.g.*, Deposition of James T. Oman, dated Oct. 15, 1985, at 3:14-24.

[24]  *E.g.*, Final Pre-trial Order, *Smith v. H.K. Porter, Inc.*, No. 81-95-NN (E.D. Va. Feb. 4, 1989),
excerpts attached as Ex. 11.

          **b.**      **Representing Garlock, Cary Schachter's firm deposed the man who delivered Unibestos to the USS John Marshall**

Garlock's active and extensive access to evidence about the USS John Marshall continued for decades. In 2000, the defense firm Whittenburg, Whittenburg & Schachter, P.C., representing Garlock, deposed Henderson Roberts, the man who delivered Pittsburgh Corning Unibestos to the USS John Marshall for its 1966-1968 overhaul. Cary Schachter, one of the attorneys who represented Garlock in the estimation hearing, was a name partner in that firm. As in the earlier deposition described above, Mr. Roberts testified in the presence of Garlock's counsel that he was, until 1968, a "materials man" who took pipecovering orders from the foremen working on submarines and then delivered the pipecovering to those ships.[25] He confirmed that he worked on the USS John Marshall.[26] At this deposition, as in the one fifteen years earlier, Mr. Roberts testified that Pittsburgh Corning Unibestos was the only pipecovering he delivered for use on submarines at the Newport News Shipbuilding and Dry Dock Company from 1962 to 1968, dates that span the period when Mr. ███ worked on the overhaul of the USS John Marshall.[27] As Mr. Roberts explained, Unibestos was the only pipecovering that had a chemical composition that did not affect stainless steel pipes.[28]

          **c.**      **Garlock tried a case involving evidence about the USS John Marshall weeks before the ███ trial**

Garlock and its co-defendants drew upon this cache of evidence just weeks before the ███ case in 2004, in a case called *Little*. The *Little* case involved exposure to Unibestos on the USS John Marshall and other submarines at the Newport News Shipbuilding and Dry Dock

---

[25]   Deposition of Henderson Roberts, dated Oct. 17, 2000, at 29:7-30:25, attached as Ex. 12.

[26]   *Id.* at 21:23-25.

[27]   *Id.* at 179:7-16.

[28]   *Id.*

Company.  Zebulon A. Little, Jr. worked as a machinist at the Newport News shipyard, from 1961 to 1963, and again in 1968.  He contracted mesothelioma and filed a complaint in 2003 in the Circuit Court of the City of Newport News, against ten asbestos product manufacturers and suppliers, including Garlock.  On October 15, 2003, Mr. Little served answers to interrogatories identifying Unibestos.[29]  Mr. Little also filed a ship list with his answers to interrogatories identifying six submarines and a submarine tender as the ships on which he worked, including on the USS John Marshall overhaul.[30]

Dana Corporation, a co-defendant in the *Little* case, filed its list of factual and expert witnesses on July 7, 2004.[31]  On page 3 of that witness list, Dana listed witnesses by deposition. The specified depositions included those of Newport News pipecoverers who, in the mid-1980s, had identified the trade names and manufacturers of the asbestos products used on ships at the Newport News Shipbuilding and Dry Dock Company:

1.      Browning, Walter – Deposition dated 1/28/82
2.      Burris, Arthur – Deposition dated 10/18/85
3.      Cutler, Dallas – Deposition dated 10/14/85
4.      Furr, H.L. – Deposition dated 10/17/85
5.      Garris, Shirley – Deposition dated 10/16/85
6.      Henderson, Thomas – Deposition dated 10/14/85
7.      Oman, J.T.  – Deposition dated 10/15/85
8.      Peele, David – Deposition dated 10/15/85
9.      Roberts, Henderson – Deposition dated 10/15/85
10.     Scruggs, John C. – Deposition dated 10/16/85
11.     Turner, Richard – Deposition dated 10/16/85

---

[29]  First Amended Answers to Interrogatories, *Little v. Owens Illinois, Inc.*, No. 37073V-04, (Va. Cir. Ct. Newport News, Feb. 23, 2004), attached as Ex. 13.

[30]  Ship List of Zebulon A. Little, Jr., Newport News Shipbuilding, dated July 10, 2003, attached as Ex. 14.

[31]  Defendant Dana Corporation's List of Factual and Expert Witnesses Who Will or May be Called to Testify at Trial, *Little v. Dana Corp.*, No. 700CL0337073V-04 (Va. Cir. Ct. Newport News, July 7, 2004), attached as Ex. 15.

Notably, the list includes the October 1985 depositions of James T. Oman, Henderson Roberts and Shirley Garris, discussed above, which establish the use of Unibestos on the USS John Marshall when Mr. ███ served on that ship.  On July 8, 2004—just weeks before the ███ trial opened in September 2004—Garlock itself filed in *Little* a witness list that identified all witnesses named by other parties.[32]

Before the *Little* trial, Dana filed specific page and line designations for the Oman, Roberts, and Garris depositions, among others.[33]  Dana certified with respect to each designation of each deposition that a copy of the page and line designations had been served on Garlock. These designations pointed to testimony in which witnesses identified Pittsburgh Corning Unibestos as having been used on, among other vessels, the USS John Marshall.[34]  On the brink of the ███ trial, then, Garlock was specifically directed to the particular Unibestos exposure testimony relating to the John Marshall contained in these depositions already well-known to Garlock.

In short, for years Garlock possessed extensive evidence that Pittsburgh Corning Unibestos was used on the USS John Marshall during the very period when Mr. ███ was working on the ship.  Garlock encountered this evidence again and again over decades of litigating cases emerging from the Virginia shipyards, including the *Little* trial held just before Garlock tried ███ Garlock had that evidence when it opened to the jury in the ███ trial

---

[32]   Garlock Sealing Technologies LLC's Fact and Expert Witness Disclosure, *Little v. Garlock Sealing Technologies, LLC*, No. 37073v-04 (Va. Cir. Ct. Newport News, July 8, 2004), attached as Ex. 16.

[33]   Defendant Dana Corporation's Designations to the October 15, 1985 Deposition of James Thomas Oman, the October 15, 1985, Deposition of Henderson Roberts, and the October 16, 1985 Deposition of Shirley Garris, *Little v. Owens-Illinois*, No. 700CL0337073V-04 (Va. Cir. Ct. Newport News, Aug. 27, 2004), attached as Ex. 17.

[34]   *See, e.g.*, *id.*

and when it settled that case after appealing from the resulting judgment. Why Garlock did not

use these resources in ████████ is a matter best known to Garlock itself and to its lawyers. Its

failure to do so may reflect strategy, resource allocation, complacency, or inadequate trial

preparation. But Garlock's claim that it could not prove Mr. ████████ exposure to Unibestos is

simply false.[35] Mr. Magee's statement at the estimation hearing, "████████████████████████

████████████████████████" was false. Garlock knew it was false.

### d.    Garlock was obliged to produce this information to the Committee but did not

Beyond dispute, Garlock's long-time knowledge of information evidencing Mr.

████████ exposure to Unibestos is highly relevant to its claims that he and his counsel

---

[35]    The purchase orders and receipts are admissible business records under California's
evidentiary rules. Cal. Evid. Code § 1271. *See, e.g.*, *Jazayeri v. Mao*, 94 Cal. Rptr. 3d 198 (Ct.
App. 2009) (finding dead-on-arrival chicken counts written on purchase orders were admissible
as business records under section 1271); *Bassett v. Perrett*, 2004 WL 1386298 (Cal. Ct. App.
June 22, 2004) (finding invoices properly admitted under the business records exception in
section 1271); *Carver & Assocs. v. Anjani Invs., Inc.*, 2005 WL 2338680 (Cal. Ct. App. Sept. 26,
2005) (finding that invoices prepared in the ordinary course of business satisfied section 1271);
*Exclusive Florists, Inc. v. Kahn*, 95 Cal. Rptr. 325 (Ct. App. 1971) (noting that purchase orders
were business records under section 1271). Because at the time of ████████ the documents were
more than 30 years old, they would also have qualified for admission into evidence as "ancient
writings." Cal. Evid. Code § 1331.

The depositions would also likely be admissible. *See* Cal. Evid. Code § 1292 (evidence of
former testimony is admissible if the declarant is unavailable, the former testimony is offered in
a civil action, and "[t]he issue is such that the party to the action or proceeding in which the
former testimony was given had the right and opportunity to cross-examine the declarant with an
interest and motive similar to that which the party against whom the testimony is offered has at
the hearing"). *See also Heisch v. Allied Packing & Supply Inc.*, 2013 WL 8103844 (Cal. Super.
Ct. Aug. 30, 2013) (finding that defendant established deposition was admissible because the
deponent was unavailable and that the plaintiffs in the prior case had an opportunity to cross-
examine him with a motive and interest similar to the plaintiffs in the present action); *Luros v.
Amcord, Inc.*, 2013 WL 7943324 (Cal. Super. Ct. Jan. 11, 2013) (same); *Depree v. BASF
Catalysts LLC*, 2013 WL 8103864 (Cal. Super. Ct. Oct. 4, 2013) (admitting deposition testimony
over plaintiff's objection because "[t]he plaintiffs in the Texas action would have had the same
incentive to show that UCC was the supplier of asbestos to Kelly Moore as the plaintiffs in this
action"). At a minimum, the documents and depositions taken together would provide a basis for
specific and credible expert testimony.

prevented Garlock from defending itself effectively in the trial of his lawsuit.  In the estimation

proceeding, the Committee served on Garlock a series of discovery requests designed to elicit

just this kind of information.  With specific respect to Mr. █████ who was one of the so-called

"RFA 1.A" claimants identified by Garlock, the Committee pressed for complete disclosure of

exposure evidence available to Garlock.[36]   Garlock objected and the matter was contested.

Ultimately, the Committee and Garlock negotiated a resolution that was embodied in an

amendment to an earlier Stipulated Order.  The amended order required that:

> Debtors shall produce the following documents as to each claimant
> identified in RFA List 1.A, associating such documents physically
> or electronically with the claimant to which the documents pertain:
>
> a.  the documents described in subparagraphs a. through h. of
> paragraph 5 of the Stipulation and Order.[37]

The referenced items described in 5(a)-(h) of the Stipulation and Order included:

> f.  any documents produced to the Debtors or obtained by the
> Debtors *from any other source* concerning the claimant's or
> injured person's exposures to asbestos-containing products or
> the identification of any products involved in such exposures
> (all information concerning such exposures being referred to
> below as "**Product Exposure Information**");
>
> g.  transcripts of any deposition testimony and trial testimony
> given by the claimant, the injured person, and *any other
> witnesses* with respect to Product Exposure Information, and
> all attachments and exhibits thereto; and

---

[36]   The "RFA 1.A" claimants made up the small group as to which Garlock reserved the right to
present in the estimation hearing evidence of discovery omissions and misrepresentations.  For
its more extensive "RFA 1" list, encompassing about 200 cases, Garlock restricted its evidence
to more statistical information and extrapolation.

[37]   Amendment to Stipulation and Order Resolving Motion of the Official Committee of
Asbestos Personal Injury Claimants to Determine Insufficiency of the Debtors' Answers to the
Committee's First Requests for Admission and to Compel Debtors to Respond to Certain
Discovery Requests ¶ 2(a), filed October 30, 2012 [Dkt. No. 2585].

      h.   any other materials that provide or evidence Product Exposure
Information or which are attached to any of the foregoing
documents.[38]

The purchase orders and depositions described above are precisely the type of
information that Garlock agreed to produce, was ordered to produce, and should have produced.
Garlock's claim that it was put in an untenable position because plaintiffs' lawyers "controlled
the exposure evidence" cannot be meaningfully evaluated without that discovery. The fact that
Garlock decided not to use its evidence in ████████ makes it more, not less, important for the
Court to know about such information when considering Garlock's contention that "suppression
of evidence" by plaintiffs' lawyers left Garlock unable to prove victims' exposures to insulation
products.

        **2.**      **Garlock had ample information from prior cases about non-Garlock
exposures when it tried ████████ but hid that information from the
Committee and the Court**

               **a.**      **Garlock failed to produce a key report that discloses Garlock's
extensive knowledge of non-Garlock exposures in ████████**

It turns out that Garlock also withheld evidence of its knowledge of non-Garlock
exposures in another one of the cases it featured in the estimation hearing, the ████████ case. Like
████████ the ████████ case was tried to verdict, and Garlock suffered a judgment for $1.35 million.
Unlike ████████ the Garlock gaskets that Mr. ████████ worked with were made of crocidolite
asbestos—a fiber that even Garlock admits is lethal.  In the estimation proceeding, however,
Garlock complained that it was unable to prove that Mr. ████████ mesothelioma was caused by

---

[38]   Stipulation and Order Resolving Motion of the Official Committee of Asbestos Personal
Injury Claimants to Determine Insufficiency of the Debtors' Answers to the Committee's First
Requests for Admission and to Compel Debtors to Respond to Certain Discovery Requests ¶ 5(f-
h), filed August 1, 2012 [Dkt. No. 2415] (emphasis added).

exposure to non-Garlock products at the Brownsville Union Carbide plant.[39]   Relying on

Garlock's representations, the Court found that Mr. ████ and his attorneys "withheld" evidence

of exposures, including Kaylo insulation made by Owens Corning and Babcock & Wilcox

boilers.[40]  But, as shown below, Garlock misled the Court.  Garlock already had the proof it says

it needed in ████.

The Committee has discovered that in ████ Mr. Fredrick Boelter, one of Garlock's

industrial hygiene experts, marshaled evidence that Kaylo insulation and Babcock & Wilcox

boilers were present at the Union Carbide plant in Brownsville, Texas, where Mr.████ worked

as a pipefitter.[41]  Mr. Boelter issued a report dated January 14, 2010.  There, he summarized

evidence—provided to him by Garlock itself—regarding asbestos-containing products at the

Union Carbide plant and Mr. ████ exposures to those products.  Mr. Boelter considered

evidence gathered not only in the ████ case, but also additional evidence from previous cases

Garlock had defended involving the same Union Carbide plant.  His report is a summary of what

Garlock knew about other exposures, but Garlock failed to produce it to the Committee.

Garlock's withholding of Mr. Boelter's report was a serious omission.  The report

contains "Product Exposure Information" concerning Mr. ████ encompassed by the amended

---

[39]   *See* GST-8011 at 9-10.

[40]   Estimation Order at 34, ¶¶ 64 and 65 (chart, case 15).  The Owens Corning trust bears
responsibility for Kaylo and the Babcock & Wilcox trust for its predecessor's insulated boilers.
Garlock mislead the Court into concluding that ████ involved two other "undisclosed" product
exposures for which trusts were responsible: the Dresser Industries (or "DII") Trust and
something called AMF.  But the DII trust is relevant to ████ only because it is responsible for
Brown & Root, which was a contractor, not a manufacturer.  AMF is not a trust at all, but
another contractor that was liquidated.

[41]   Environ, *Records and Deposition Summary of* ████████ *in* ████████ *and spouse,*
████████ *vs. Union Carbide et al.,* dated January 14, 2010 ("**Boelter ████ Report**"),
attached as Ex. 18.

order and stipulation entered in the estimation proceeding, which thus obligated Garlock to produce it to the Committee.[42]   While Garlock produced the transcript of Mr. Boelter's █████ deposition, Mr. Boelter did not discuss in that testimony the evidence related to Kaylo and Babcock & Wilcox.

In his undisclosed report, Mr. Boelter laid out a wealth of evidence putting Kaylo at the Union Carbide plant.   He discussed, for example, the September 28, 1996 deposition of Willie Joe Gibson in that witness's own tort suit against Garlock and several other defendants.   Mr. Gibson, who worked at Union Carbide's warehouse in Texas City from 1963 to 1975, testified that numerous asbestos-containing materials, including Kaylo insulation, were regularly sent from the warehouse to Union Carbide's plants in Texas.[43]   Mr. Boelter also discussed the 1996 deposition given by Kerry Weikel in an action commenced by his father, Grover Weikel, with whom he had worked at the Union Carbide Brownsville plant.[44]   Garlock was a named defendant in the *Weikel* case, and was represented at Mr. Weikel's deposition by Schachter Harris, LLP, Garlock's special counsel for estimation.[45]   Mr. Weikel, who was a maintenance systems coordinator at Union Carbide's Brownsville plant when Mr. ██████ worked there, testified that Kaylo insulation had been used throughout the plant until the early 1970s.   Mr. Boelter's report noted Mr. Weikel's testimony that "all distillation columns were insulated and distillation columns in the recovery unit were wrapped with Kaylo block insulation"; that "Weikel estimated 70% of pipes in the facility were insulated"; and that "[t]wo brands of pipe insulation used at

---

[42]   *See* notes 37-38, *supra*, and accompanying text.

[43]   Boelter ██████ Report at 4, 28.

[44]   *Id.* at 5-6.

[45]   *See* Deposition of Richard Kerry Weikel, dated Nov. 2, 2006, at 1, 4:7-10, attached as Ex. 19.

Union Carbide Brownsville were Kaylo and Celotex."[46]   Mr. Boelter explained that, although

Mr. Weikel's interrogatory responses in his father's case stated that, after 1972 or 1973, new

insulation in the plant was asbestos-free, Kaylo installed before then was still present throughout

the plant, and pipefitters and other workers were exposed to the dust produced when the Kaylo

was removed.[47]

The undisclosed Boelter report in ███ also shows Garlock's possession of extensive

evidence of the presence of Babcock & Wilcox boilers at the Union Carbide plant, and of Mr.

███ work with them.   Mr. Boelter wrote that, in the *Weikel* case, Kerry Weikel had testified

that "the 6 or 7 boilers at . . . the plant were made by Babcock and Wilcox and Combustion

Engineering, were insulated, and had refractory products inside."[48]   Mr. Boelter also noted Mr.

Weikel's testimony that the boilers were enormous—two stories tall and wide, or even larger[49]—

and that the boilers were insulated with Kaylo: "the 6 or 7 boilers were insulated or covered in

the same block insulation as 'columns' in the recovery unit which was Kaylo."[50]   Mr. Boelter

also pointed out that Mr. Rodriguez, one of Mr. ███ co-workers, "said there were times

---

[46]    Boelter ███ Report at 29, 36.

[47]    *See, e.g.*, Deposition of Richard Kerry Weikel Nov. 2, 2006, at 55:9-56:1 ("Distillation
columns are anywhere from 75 feet to 150 feet tall . . . .   They are wrapped with block insulation
and then chicken wire and then mastic . . . .   The block insulation, depending on the year it was
put on there, has asbestos in it . . . .   After an annual turnaround, many of the distillation columns
had insulation on them from the '60s era.   Insulators went into the units and removed that
insulation in the unit while everybody else is working around it, doing pipefitting, tubing fitting,
electrical work, scaffold building . . . .   [T]hat dust was created during the re-insulation of those
columns . . . and the removal.").

[48]    Boelter ███ Report at 29.

[49]    *Id.*

[50]    *Id.*

during shutdowns when he & ███ worked on boilers."[51]    In short, its protestations to the

contrary notwithstanding, Garlock had evidence that in working at the Union Carbide plant, Mr.

███ was exposed to asbestos from Kaylo and Babcock & Wilcox products.

Mr. Boelter's unproduced report also contrasts starkly with Garlock's insinuation at the

estimation hearing that Mr. ███ was untruthful, a suggestion the Court seems to have accepted

in the Estimation Order.[52]    In contrast to Mr. Magee's assertion at the estimation hearing that ███

███████████████████████████████████████████████████,[53] Mr. Boelter

candidly recounted that Mr. ███ disclosed extensive exposures.    His report noted that Mr.

███ "recalled being next to insulators removing pipe insulation during shutdowns,"[54] that he

worked near insulators who were "cutting insulation for pipes with a saw 'all day' for 8 hr [*sic*]

shifts 2 to 3 days per week over the 3 years he worked" at the Union Carbide plant, and that he

"saw insulation work on pipes 'practically everyday because insulation was everywhere.'"[55]    Mr.

Boelter also pointed out that several co-workers, offered as witnesses by the plaintiff, described

Mr. ███ massive exposures to insulation.    For example, Mr. Boelter wrote that Mr.

Valenzuela testified that when they worked around insulators, the "[c]lothes of the whole crew

including ███ got covered with dust,"[56] and that "his group including ███ . . . waited within

2 ft to 3 ft of insulators removing laminate and cutting pieces of insulation with a saw to remove

---

[51]   *Id.* at 20.

[52]   Estimation Order at 33 ¶ 64.    That Garlock invited the Court to draw inferences about the truthfulness of persons who were not before it is a particularly offensive aspect of Garlock's tactics in the estimation hearing.

[53]   Hr'g Tr. 3359:2-3360:16, Aug. 6, 2013 (Magee).

[54]   Boelter ███ Report at 20.

[55]   *Id.* at 17, 35.

[56]   *Id.* at 22.

it.  Insulation fell and broke into pieces."[57]  Similarly, Mr. Rodriguez testified, as noted in Mr.

Boelter's report, that when pipefitters cut open pipe insulation, "[d]ust and fibers that 'itched' got

onto their clothes and hair . . . ."[58]  Mr. Boelter also recounted that Mr. Robledo testified that

"workers around and/or above him and ████ . . . built scaffolding used while covering pipe and

when they were finished debris and white dust sitting on top of the boards of scaffolding was

dumped while they dismantled them," and "estimated he and ████ were exposed to the

insulation for 1 wk to 3 wks [sic] at a time depending on the work they were doing."[59]

Mr. Boelter's ████ report contradicts Garlock's assertion that it had no evidence

demonstrating exposures to Owens Corning Kaylo and Babcock & Wilcox boilers in that case.

By withholding Mr. Boelter's ████ report, Garlock prejudiced the Committee's ability to

counter Garlock's skewed account of the ████ trial and thereby misled the Court.

> **b.    Other failures of disclosure facilitated Garlock's misrepresentations about ████**

Mr. Boelter's ████ report is not the only key document Garlock failed to disclose.  Two

years before the ████ trial, Mr. Boelter provided Garlock with a similar report in connection

with the *Weikel* case.[60]  As did his ████ report, Mr. Boelter's *Weikel* report summarized

information regarding asbestos products at the Brownsville Union Carbide plant culled from

depositions and other discovery materials provided by Garlock.  And, like his ████ report, Mr.

---

[57] *Id.* at 34.

[58] *Id.* at 14.

[59] *Id.* at 35.

[60] Environ, *Richard Kerry Weikel, Ind. As Representative of the Estate of Grover (Benny) Weikel, Deceased and Jeanne Weikel, vs. Garlock Sealing Technologies et. al.,* dated February 11, 2008 ("**Boelter *Weikel* Report**"), attached as Ex. 20.

Boelter's *Weikel* report went undisclosed in the discovery Garlock rendered to the Committee in the estimation proceeding.

In his *Weikel* report, Mr. Boelter discussed the testimony of William Ketchum, who (like Mr. █████ worked for Brown & Root at the Brownsville Union Carbide plant from 1961-1984, and gave a deposition in his own case in September 1998.  Mr. Ketchum testified that Kaylo was used as pipecovering in the Union Carbide facility, and that Babcock & Wilcox boilers were present in the plant.[61]  Mr. Boelter's *Weikel* Report also referred to testimony by Robert Terry and Louis Ara, co-workers at the Union Carbide plant whom Garlock deposed in the *Weikel* case.[62]  Both men worked at the plant as pipefitters during the period when Mr. █████ worked there, and both testified to the presence of Kaylo in the plant.[63]  Garlock had this evidence when it went to trial in █████ but chose not to use it.  Moreover, Garlock withheld its own expert's catalog of this evidence from the Committee in the estimation proceeding, all the while complaining that the plaintiff and his lawyers were not forthcoming in █████

At the estimation hearing, Garlock attempted to explain away its failure to use deposition testimony in trials by claiming that it was not admissible.  Mr. Turlik told the Court that Garlock was generally unable to introduce deposition transcripts from other cases into evidence at trial.[64]  This testimony was not an accurate statement of Texas law, and misrepresented Garlock's own

---

[61]   Boelter *Weikel* Report at 31, 53.

[62]   *See id*. at 3-4.

[63]   *See* Deposition of Robert Terry, dated April 4, 2007, at 16:3-17:1, 87:12-88:14 (attached as Ex. 21) (stating that he recognized Kaylo as pipe insulation and block insulation used at the plant, and that "they used a lot of that when they were redoing those heads on those calandrias [*i.e.* boilers]"); Deposition of Louis Ara, dated May 23, 2007, at 15:1-16:6, 97:14-25  (attached as Ex. 22) ("I know we—we had Kaylo.").

[64]   *See* Hr'g Tr. 2253:14-2254:21, July 31, 2013 (Turlik); █████████
█████

experience.  The Committee has learned that in Texas, where ████ was tried, Garlock had

succeeded in introducing deposition transcripts from prior cases in support of its efforts to have

the jury apportion liability to other asbestos manufacturers.  For example, at the pre-trial

conference in the *Weikel* case, which settled before trial, Garlock announced its intention to

introduce at trial the transcript of Melvin Ketchum's September 1998 deposition (which Mr.

Boelter discussed in his *Weikel* report).  When the plaintiffs' attorney objected on the ground that

the *Weikel* plaintiff had not participated in that deposition from a prior case, Judge Davidson,

who presided over the state multi-district litigation in Texas, noted that "[t]he rules are a

deposition from a prior case can be given even if you weren't there if there was somebody there

at the time with a motive similar to yours."[65]  The plaintiff withdrew the objection, and the

deposition transcript was ruled available for Garlock's use at trial.[66]

Objections to the admission of depositions from prior cases are regularly overruled in

Texas courts in similar circumstances.  For example, in *Walker v. RPM International, Inc.*, the

plaintiff objected to the defendants' proffer of the prior deposition of Marshall Norman, who was

beyond subpoena range and therefore unavailable.  Having worked at a site where the plaintiff

had also worked, in the same year, the deponent identified amphibole pipe insulation and other

products used at the site.  The plaintiff argued that the deposition did not fall within the hearsay

---

[65]   Pretrial Hearing at 10:21-25, *Weikel v. Garlock Sealing Techs., LLC*, No. 2004-55629 (Tex. Dist. Ct. Harris Cnty. Feb. 26, 2008), ("**Weikel Pretrial**") attached as Ex. 23. The Texas rules of evidence provide that transcripts of prior depositions of persons unavailable to testify are admissible if "the party against whom the testimony is now offered, or a person with a similar interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Tex. R. Evid. 804.

[66]   The court sustained plaintiff's objection to the transcript of another deposition of Mr. Ketchum in a different case in which Garlock was not a defendant, on the ground that the plaintiff there had no motive to develop gasket-related testimony.  Weikel Pretrial at 44:18-45:16.

exception because the deponent testified only about his own exposure and thus did not have the same motive and opportunity to defend as the plaintiff would have.  The plaintiff also contended that the deponent did not know the plaintiff and had not worked with him.[67]  Judge Davidson overruled the objections and admitted the deposition testimony, holding that "[i]f the deposition is focused upon working conditions at the same work site, I think there is similar motive by somebody to . . . have presented both sides of the case."[68]

Thus, had Garlock wished to do so in ███ it could have offered the Ketchum deposition and depositions of other workers from the Union Carbide plant as evidence of Mr. ███ exposures to Kaylo insulation and Babcock & Wilcox boilers.  It chose not to do so.  Yet, Garlock did not even need to fear a hearsay objection to the use of Mr. Weikel's testimony in ███ since Mr. Weikel was available and testified in ███ that Kaylo was present at the Union Carbide plant.  Garlock's attorneys could easily have used Mr. Weikel's earlier deposition from his father's case to refresh his recollection that boilers at that plant were made by Babcock & Wilcox.  Again, Garlock chose not to do so.  Whether Garlock's failure to use available evidence in ███ proceeded from a tactical choice or mere inadvertence, it has become obvious that Garlock did not lack third-party exposure evidence in ███  The plaintiff and his lawyers had no unique access to proof.  In pretending otherwise, Garlock misled the Court.

### 3.   Garlock's suggestion that exposure evidence comes only from the plaintiff clashes with actual practice in the tort system

Garlock's arguments about the evidence it supposedly lacked are based on the fundamental misconception that Garlock was powerless to prove exposures the plaintiff did not

---

[67]   *See* Pretrial Motions at 35:19-37:6, *Walker v. RPM Int'l Inc.*, No 2009-52642 (Tex. Dist. Ct. Harris Cnty. Mar. 3, 2010), attached as Ex. 24.

[68]   *Id.* at 38:4-10.

admit.  But exposure evidence is not limited to a plaintiff rattling off the products to which he or

she was exposed.  As the Court has recognized, the plaintiffs themselves usually lack complete

knowledge of their exposures, the products that caused them, and the names of the manufacturers

who made the products.[69]   Rather, courts have for decades recognized that exposure is often

proven with circumstantial evidence, evidence that, as discussed above, was readily available to

Garlock.  *E.g.*, *Lineaweaver v. Plant Insulation Co.*, 31 Cal. App. 4th 1409, 1420 (Ct. App.

1995) (circumstantial evidence of product at refinery sufficient to support reasonable inference

of exposure).  For example, in cases addressing exposure at the Brooklyn Navy Yard, Judge Jack

Weinstein upheld verdicts "based on the circumstantial evidence that the defendants' asbestos-

containing products were present on particular ships and that asbestos fibers were '[a]ll over the

deck.'"  *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 837 (2d Cir. 1992).  As Judge

Weinstein explained, "[b]ecause the events happened years ago, and many of those exposed to

the asbestos are deceased, to require precision of proof would impose an insurmountable

burden."  *Id.  See also Engle v. Air & Liquid Sys. Corp.*, 2012 WL 6630141 (N.Y. Sup. Ct. Dec.

10, 2012) (denying defendant's summary judgment motion where ship blueprints called out

defendant's products).  The Fourth Circuit came to a similar conclusion in overturning a grant of

summary judgment dismissing the asbestos personal injury claim of an individual who worked at

a power station.

> Although Roehling [the plaintiff] could not himself remember
> what asbestos products were used in this work area, the witnesses,
> who handled the materials, have distinct memories: Owens-Illinois
> and National Gypsum . . . . ***Roehling should not be required to
> remember product names some thirty years later when he had
> been a pipefitter, breathing the dust, not handling the products.
> Such requirement would, in essence, destroy an injured***

---

[69]   Estimation Order at 27.

> ***bystander's cause of action for asbestos exposure.*** Rarely would
> bystanders take note of names of materials used by others.
> Moreover, the witnesses should not be required to know Roehling.
> They were employees of different companies, with different
> responsibilities in the work area. Bystanders often go
> unrecognized, but still receive injuries.
>
> The evidence, circumstantial as it may be, need only establish that
> Roehling was in the same vicinity as witnesses who can identify
> the products causing the asbestos dust that all people in that area,
> not just the product handlers, inhaled. This case includes such
> evidence and a jury can reasonably infer therefrom that plaintiff
> was injured by defendants' products.

*Roehling v. Nat'l Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d 1225, 1228 (4th Cir. 1986)

(emphasis added). Developing such circumstantial evidence represents a burden that falls on the

plaintiff when attempting to prove the defendant's tort, but it is the ***defendant's*** burden when that

party undertakes to prove the liability of a co-defendant or a potentially responsible person

absent from the trial.[70] Garlock cannot cry "fraud," since it could not reasonably expect any

plaintiff to recite the brand and manufacturer of every product to which he or she was exposed.

Nor was it entitled to put plaintiff's counsel to work ferreting out evidence unknown to the

plaintiff to prove other exposures at trial. That was Garlock's job. As a repeat player defending

multiple cases from the same sites—like we see in ███████ and ███████—Garlock had a

comparative advantage, as it could deploy evidence previously developed against a later plaintiff.

### B.    New evidence shows Garlock's own experts contradict its contention that every trust claim constitutes an admission of exposure

Garlock has contended that every trust claim constitutes the claimant's admission of

product exposure even if the claim is based on an approved site list or another presumption

established by the trust, as distinct from independent evidence from the plaintiff or his counsel.

---

[70]   Hr'g Tr. 4652:6-4656:9, Aug. 22, 2013 (Glaspy); ████████████████████
███

Thus, Garlock has argued flatly that '███████████████████████████████

████████████'"[71]  In support, Garlock has pointed to the testimony of Lester Brickman, its

expert, who testified that ████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

'████████



Hr'g Tr. 1320:10-19, July 26, 2013.

In fact, Garlock's own principal estimation experts, Bates White,[72] knew perfectly well

that this is not how trust claims work.  They have said so in other cases.

The Committee has obtained a very recent report from another case, *Burns v. Hajoca*

*Corp.*, in which Bates White analyzed what trusts a plaintiff could likely recover from.  The

Bates White report explains the operation of site-list, occupation, and industry presumptions in a

manner diametrically opposed to Mr. Brickman's account and Garlock's contentions:

---

[71]  Debtors' Response to Post-Trial Briefs of Committee and FCR at 36, filed under seal Nov.
26, 2013 [Dkt. No. 3249] ("**Debtors' Response to Post-Trial Briefs of ACC and FCR**").

[72]  Bates White was not only Garlock's principal expert for estimation, it also worked hand in
glove with Garlock's counsel before and after the bankruptcy to develop Garlock's strategy for
the asbestos issues at the heart of these Chapter 11 cases.  *See, e.g.*, ACC-150 (EnPro 2009 10-K)
at 36 ("Garlock and Bates White are working on a variety of strategies to expose the unfairness
of trust distribution procedures and bring fairness to the trust payment system"); ACC-132 (2005
Bates White retention letter).

As an alternative to sworn statements of product or operations exposure allegations, some trusts will accept evidence of presumed exposures at a qualifying Approved Site. Each such trust will compile a list of Approved Sites based on credible information that the former defendant's products or operations were present at a given location for a specified period of time. These Approved Site lists are often compiled through historical corporate records and prior plaintiff testimony, to which *the trust has determined, establishes enough evidence to presume that any individual in the direct proximity was likely exposed to the former defendant's products or operations* . . . . In addition to Approved Site Lists, certain Trusts also provide an Approved Industry/Occupation list of approved occupations and/or industries where the formerly bankrupt defendant's products or operations were presumed to be present.[73]

Of the methods for meeting trusts' exposure requirements, correctly delineated by Bates White, the site-list method requires nothing from the claimant but a showing that he worked at a certain place in a certain time and job that the *trust presumes* entailed exposure. Bates White clearly knows and readily admits that Approved Site Lists are based on presumptions, and that *it is the trust not the claimant that is doing the presuming*. Garlock's conclusion that everyone who files a claim based on a site-list presumption without admitting personal knowledge of exposure in discovery is committing fraud represents an unjustified leap. Worse, with knowledge that this leap is unjustified, Garlock counted as "undisclosed exposures" many trust claims that rested on approved site lists.[74] Garlock persuaded the Court to accept uncritically its tabulation of "suppression of evidence" regarding the 15 "Designated Plaintiffs" Garlock

---

[73] Report of Marc C. Scarcella at 3-4 & n.9, *Burns v. Hajoca Corp.*, No. 004317 (Ct. Com. Pl. Phila. Cnty. May 19, 2014) (emphasis added), attached as Ex. 25.

[74] *E.g.*, GST-4927 (████ B&W Claim); GST-4928 (████ DII [Haliburton] Claim); GST-4929 (████ Owens Corning Claim); GST-3692 (████ USG Claim); GST-2778 (████ AWI Claim); GST-3609 (████ Raymark Claim); GST-6045 (████ AC&S Claim); GST-4470 (████ Fibreboard Claim).

featured at the estimation hearing.[75]  And the same false equation between site-list claims and

hidden "exposure evidence" is the sole basis for Garlock's contention that another 72 cases were

settled on an inflated basis due to disclosure failures by plaintiffs or their counsel.  The Court

accepted these representations at Garlock's urging.  But they were false, as Bates White's reports

reveal.

This issue of site lists and occupation/industry presumptions goes to the heart of the

Estimation Order.  A close examination would show that more than half of the Designated

Plaintiffs' 204 exposures alleged by Garlock as "not disclosed" based solely on trust claims—

allegations included by the Court in the table on page 34 of the Estimation Order—qualify for at

least one of those presumptions.  Garlock does not even pretend that claimants' work histories or

the industries and occupations in which they labored were withheld.  Thus, a proper

understanding of the claims and of trusts' claim eligibility criteria sharply reduces the number of

supposed "nondisclosures."

That number dwindles further when one realizes that much of the rest of Garlock's

tabulation consists simply of adding up bankruptcy ballots and Rule 2019 statements.  At

Garlock's urging, the Court treated those instruments as evidence of product exposures "not

disclosed."  In fact, however, ballots required nothing more than the attorney signing them

having a reasonable belief that his or her client would probably have grounds to proceed against

a trust eventually formed in the reorganization case in which those instruments were submitted.[76]

The claimant's work history, always disclosed, provides the basis for such a reasonable belief in

most instances.  And counsel's belief is generally *not* a discoverable fact in the tort system;

---

[75]    *See* Estimation Order at 36.

[76]    Hr'g Tr. 3694:4-7, Aug. 7, 2013 (Patton).

unlike, for example, a document in the client's possession, custody, or control, or the identity of a known witness, counsel's belief is not evidence, but opinion work product enjoying the strongest immunity from discovery.[77]   Rule 2019 statements, designed simply to inform a bankruptcy court of the identity of clients of an attorney representing multiple clients, likewise do not constitute exposure evidence.[78]

Finally, Garlock's false account of "nondisclosures" depends to a considerable degree on ignoring or misstating the facts.  Many of what Garlock depicted as trust claims evidencing undisclosed product exposures were based only on evidence Garlock already had from tort discovery.

For example, ███████ one of the "Designated Plaintiffs," filed 15 trust claims. Garlock claims 14 of these trust claims represented undisclosed exposures.[79]  But of those trust claims, nine were covered by site-list or similar presumptions arising from Mr. ███████ work history, which history was fully known to Garlock.  The remaining claims were based only on exposure information already disclosed or known to Garlock.  Three claims attached no evidence other than ███████'s deposition, which Garlock attended.  One attached nothing.  One claim attached a deposition Garlock attended from another case.[80]  The last attached a deposition from

---

[77]   *E.g.*, *In re Allen*, 106 F.3d 582, 607 (4th Cir. 1997) (opinion work product enjoys nearly absolute immunity).

[78]   Hr'g Tr. 3788:5-18, Aug. 8, 2013 (Patton).

[79]   GST-6604 (Brickman Memo to RBH, Apr. 12, 2013) at 23; GST-8011 (Debtors' Summary of Evidence Regarding Certain RFA List 1.A Cases) at 42.

[80]   Mr. ████ attached excerpts of an April 14, 2000 deposition of James Clayton to his Porter Hayden trust claim.  Garlock was present at the Clayton deposition in 2000. Ironically, although the deposition would, under Garlock's theory, amount to significant exposure information, Garlock did not produce the Clayton deposition to the Committee as it was obligated to do under the Amended Stipulation and Order in the estimation proceeding.  *See* nn. 37-38, *supra* and accompanying test.

a third case that Garlock also attended, as well as interrogatory answers Garlock had been served

before in two other cases.[81]   For Garlock to have used claims like Mr. ███ to demonstrate

"suppression of evidence," explain away its actual resolution history, and rationalize a minimal

estimate of mesothelioma claims was a travesty.   For Garlock to have prevailed upon the Court

to accept these contentions has resulted in manifest injustice.

   **C.**  **Garlock and David Glaspy misled the Court in their account of the settlement process by withholding key emails from the Committee in the estimation discovery**

   David Glaspy was one of Garlock's key witnesses regarding how Garlock evaluated and

settled cases.   Over the course of three decades, for almost his entire legal career, Mr. Glaspy

defended Garlock and served as one of Garlock's national trial counsel and then regional counsel

for western states.[82]   Unlike Mr. Magee, who served as a corporate advocate at the estimation

hearing, presenting Garlock's theories and interpretation of the facts rather than the operative

facts themselves, Mr. Glaspy was offered at the hearing as a principal actor in the settlement

process by which Garlock's attorneys and defense counsel actually valued and resolved cases.

And so he was, having participated on Garlock's behalf in many trials and settlement

negotiations with plaintiffs' counsel over the course of his long career.   Indeed, Mr. Glaspy

claimed to have settled over 25,000 cases for Garlock.[83]   He testified as a fact witness to his role

in the settlement process and also offered opinions as an expert regarding the assessment of

asbestos claims, including trial risk, the impact of evidence on trial risk, costs and settlement

---

[81] Mr. ███ attached excerpts of a January 18, 2000 deposition of Donald James Coy to his Kaiser trust claim.   Garlock was present at the Coy deposition in 2000. Thus, when Garlock settled ███ in 2006, it already had the information it claims was hidden from it.   But Garlock failed to produce that information to the Committee.

[82] *See* Hr'g Tr. 4521:11-4523:1, Aug. 12, 2013 (Glaspy).

[83] *Id.* at 4524:11-20.

values, and the impact of laws and procedures on the defense and value of asbestos claims.[84]  He

opined about the impact of exposure evidence in asbestos cases and gave his views on how that

information affects trial risk, settlement values and costs.[85]

The central theme of Mr. Glaspy's testimony was that, after the "Bankruptcy Wave,"

evidence of insulation exposures disappeared, and that without this information he had to settle

Garlock's cases at far higher values.[86]  He claimed that his settlement recommendations would

have been much lower had plaintiffs disclosed trust claims and bankruptcy ballots that Garlock

obtained in discovery in the estimation proceeding, which he assumed (incorrectly) amount to

plaintiffs' admissions of alternative sources of asbestos exposure.



[88]

Recently discovered emails reveal a strikingly different reality.  These emails—which

Garlock and Mr. Glaspy were obligated to turn over to the Committee in the estimation

---

[84]   *Id.* at 4526:19-24.

[85]   *Id*. at 4528:4-16.

[86]   *Id.* at 4528:4-16.

[87]   *Id.* at 4534-4537; GST-8024 (Demonstrative).  *See also* Debtors' Post-Trial Brief and Summary of Evidence Presented at Trial at 19, dated Nov. 1, 2013 [Dkt. No. 3205] ("**Debtors' Post Tr. Br.**").

[88]   Hr'g Tr. 4536:18-4537:9. ██████████████████████████████
███████████████████████████████████████████████████ ACC-319
(████ TEF) at GST-EST-0556252; ACC-236 (Glaspy Jan. 18, 2008 email) at GST-EST-0337668.  ██████████████████████ Hr'g Tr. 4617:12-14, Aug. 22, 2013 (Glaspy).

discovery but did not—provide a clear window on the interplay between Messrs. Glaspy and Eddins.

Ron Eddins had served as the plaintiff's trial attorney in the ███████ case, while a member of Waters & Kraus. He and others formed SEG in 2006. He left that firm in the fall of 2011 and in January 2012 was killed in an automobile accident. As a result of the lawsuit Garlock filed in January 2014 against Simon Greenstone Panatier Bartlett, the successor to SEG, the firm set out to determine whether a laptop that had been used by Mr. Eddins was extant. Mr. Eddins' widow provided the laptop. Among the materials recovered was a series of emails between Mr. Eddins and David Glaspy regarding Garlock's settlement of cases brought by SEG's clients. The emails trace Mr. Glaspy's negotiation of group settlements for Garlock with SEG in 2007 and 2008. They show plaintiffs and defense counsel engaging in a candid, cordial, and highly personal process of give-and-take in discussing the values of cases and negotiating resolutions. They underscore the broad factual and legal considerations that shaped each side's view of the claim values. They show precisely how ███████ was settled. *And they do not touch at all on the subject of exposures to non-Garlock products*. That subject simply does not enter into the dialogue.

Whether examined for their particulars or taken as a whole, Mr. Glaspy's communications with Mr. Eddins are patently *not* those of a lawyer who supposed his counter-party was defrauding him or Garlock or withholding critical information.

> **1. Emails found on the recently retrieved laptop of Ron Eddins, a deceased plaintiffs attorney, contradict Mr. Glaspy's account of the ███████ settlement**

The new emails provide a clear window on the ███████ settlement, revealing a reality that was nothing like the picture Mr. Glaspy painted at the estimation hearing. Mr. Glaspy

touted ██████ as the quintessential illustration of how Garlock settlements were inflated by plaintiff counsel's withholding of evidence of their clients' exposures to insulation products.  He testified that the ████████████████████████████████ " Hr'g Tr. 4617:13-14, Aug. 22, 2013.  And Mr. Glaspy insisted that ████████████████



Hr'g Tr. 4537:7-9, Aug. 12, 2013.

*Id.* at 4562:7-8.

*Id.* at 4562:16-18.

Hr'g Tr. 4576:6-7, Aug. 22, 2013.

The recently discovered emails lay bare the falsity of this account.  It was Mr. Glaspy, not Ron Eddins, who started the settlement dialogue about the ██████ case.  Mr. Glaspy, on his own initiative, bundled ██████ in with a group settlement—he was not "forced" to do anything.  The negotiation was opened and shut via a brief exchange of emails.  There was no discussion whatsoever about non-Garlock exposures in ██████ or any other case.

Mr. Glaspy injected ███████ into the negotiation on August 2, 2008, a Saturday, when reporting on his progress in obtaining higher settlement authority for a group of cases that were under active negotiation.  He suggested adding ████████ to the group and increasing the overall price:

>From: David Glaspy
>To: reddins@seglaw.com
>Sent: Aug 2, 2008 2:11 PM
>Subject: Re: SEG group
>
>I was rather busy and had not reached your number so I kept trying.  I really had nothing new to report.  As of last night I had them up from ████ o ████  I have one phone call with them today and will probably be talking with some one again tomorrow.
>
>*Any chance of adding that new trial set case you mentioned, ████████ If so I know I can get them to ████████.*  I have not passed on your ultimatum yet as their usual response to such demands is to end the discussion.  It actually helps them.  If trial goes bad they say they had no choice.[89]

Ron Eddins responded about twenty minutes later:

>From: Ron Eddins <reddins@seglaw.com>
>To: David Glaspy
>Sent: Sat Aug 02 12:33:15 2008
>Subject: Re: SEG group
>
>I can wrap the 19 cases, including ████████ for ███ M.  Let me know.
>
>Ron[90]

Mr. Glaspy replied:  "Thanks.  I believe this is doable.  I will confirm tomorrow."[91]

---

[89]   Aug. 2, 2008 2:11 PM Email (emphasis added), attached as Ex. 26 (SGPB 0000027). Emails cited hereafter are located in Ex. 26 and referenced by internal bates number.

[90]   Aug. 2, 2008 12:33 PM Email (SGPB 0000027) in Ex. 26.

[91]   Aug. 2, 2008 14:53 PM Email (SGPB 0000027) in Ex. 26.

That was it, clean and simple.  The idea that Garlock settled ████ under duress because the plaintiff suppressed evidence is very far from the truth.  Mr. Glaspy knew it was untrue when he testified, but he fell compliantly in line with Garlock's corporate fiction.

Thus, the undisclosed emails confirm what the Committee has said all along—that third-party exposures were not a material consideration in Garlock's settlement of ████  After passing up the opportunity to press for details about such exposures at Mr. ████ deposition,[92] Mr. Glaspy proceeded to settle the case in August 2008 without even waiting to elicit the opinions of the plaintiff's experts.  When deposed in September 2008 by nonsettling defendants, plaintiff's medical and industrial hygiene experts readily conceded that Mr. ████ had sustained significant exposures to amphibole insulation during his Navy service.[93]  Plainly, neither Mr. Glaspy nor his client cared enough about third-party exposures to develop the issue before folding ████ into a group settlement and buying the plaintiff's release for a substantial addition to the aggregate price of the deal.  These facts are impossible to reconcile with the thrust of Mr. Glaspy's testimony, shaped as it was by Garlock's revisionist story-telling.

---

[92]  Mr. Glaspy had a colleague patch into the deposition by telephone and ask but two questions, neither of which followed up on Mr. ████ admission of significant exposures to asbestos insulation:

> Q.    [Mr. Chaefer]  Mr. ████ first of all, can you hear me?
>
> A.    Yes.
>
> Q.    Okay.  I want to take you back to the Duval County very briefly.  While on board the Duval County, did you ever see anyone replace any flange gaskets?  I know you talked about work on a valve, but other than this work on a valve, did you see anybody replace any flange gaskets?
>
> A.    No.
>
> Mr. Chaefer:  That is all I have.  Thank you very much.

████ Dep. 950:8-20, June 6, 2008, attached as Ex. 27.

[93]  E. Holstein Dep. 50:12-51:4, Sept. 23, 2008, attached as Ex. 28; S. Paskal Dep. 93:11-16, Sept. 19, 2008, attached as Ex. 29.

### 2.    The unproduced emails illustrate the reality of Mr. Glaspy's approach to settling cases on Garlock's behalf

The Glaspy/Eddins emails that Garlock and Mr. Glaspy failed to produce in the estimation proceeding go well beyond the ███ settlement, and so does their significance for the present motion.  They did produce some correspondence between Mr. Glaspy and SEG; that production consisted mostly of formal letters confirming settlements but also included some emails.  Omitted from their production, however, were a variety of emails that undercut Garlock's contentions in the estimation hearing and place Mr. Glaspy's credibility in an unfavorable light.  A complete production would have revealed just how drastically the testimony Garlock elicited from him departed from the truth.

Painfully familiar with Mr. Eddins' trial skills from the ███ case, Mr. Glaspy undertook in 2007 to shift Garlock's dealings with the SEG away from a trial-oriented mode and to forge a businesslike relationship with the firm.  He told Mr. Eddins that other Garlock lawyers thought the only way to deal with SEG was through "brute force, i.e. expensive trials."[94]  But Mr. Glaspy made clear from the outset that he, himself, was settlement-minded.  Mr. Glaspy explained that he hoped to persuade Garlock that it would be better off spending more money on compensating SEG clients and less on lawyers and experts to defend against their claims.  He admitted that Garlock's other defense counsel were undervaluing SEG's cases.  And he was candid to the point of bluntness in admitting to his own aspiration of displacing others as the outside lawyer in charge of Garlock's relationship with SEG.

These admissions came in early 2007, in the context of discussions concerning the possibility of settling certain SEG cases as a group.  Mr. Eddins made specific demands for four

---

[94]    Jan. 25, 2007 6:32 PM Email (SGPB 0000003) in Ex. 26.

cases, pointing out that "Garlock recently resolved a couple of our cases of similar or lesser

quality for" higher values.[95]   Mr. Glaspy voiced surprise, responding that, "[i]f they did then

there must have been some other cases resolved to get it within their parameters."[96] He claimed

to have already "put my neck on the line by extending my clients' maximum authority" for the

eight cases under discussion, but even so offered "a compromise suggestion" while admonishing

Mr. Eddins to consider "the bigger picture":

> You not only get the money you want in the 3 cases but you get
> money for the 2 cases where your client recently died and will not
> get a Court room until next year at the soonest.  I get to say I told
> you so to my client and all the defense attorney naysayers that are
> arguing that the only way to "DEAL" with you is through brute
> force, i.e., expensive trials.  Here is where the bigger picture comes
> in.  I can then take over the negotiations for all the jurisdictions
> that your office is involved with and we can get even more cases
> resolved.  Is it really worth a few extra dollars for this group?[97]

In response to this pitch, Mr. Eddins raised questions about the timing of payment and

"PCA" or "per case average" implied by Garlock's offer and its relation to the averages being

paid to another leading plaintiffs firm.[98]   Mr. Glaspy assured him that "this is equal to or better

than any deal I or my client has cut" with the competitor.[99]   He then proposed adding another

case, *White*, to the group and increasing the total price accordingly:

> From: Ron Eddins <reddins@seglaw.com>
> To: David Glaspy <dglaspy@glaspy.com>
> Sent: Thu Jan 25 18:00:45 2007
> Subject: Re: Garlock

---

[95]   Jan. 25, 2007 4:04 PM Email (SGPB 0000004) in Ex. 26.

[96]   Jan. 25, 2007 6:32 PM Email (SGPB 0000003) in Ex. 26.

[97]   *Id*.

[98]   Jan. 25, 2007 5:01 PM Email (SGPB 0000002); Jan. 25, 2007 6:54 PM Email (SGPB 0000003) in Ex. 26.

[99]   Jan. 25, 2007 17:21:45 Email (SGPB 0000002) in Ex. 26.

- 45 -

> Can you include White for a 9 case deal at ███████? White will
> be more later.
>
> Let me know.
>
> Ron[100]

Mr. Glaspy declined that bid but strategized openly about how to convince Garlock's Texas

defense attorneys that they were undervaluing SEG cases:

> From: "David Glaspy" <dglaspy@glaspy.com>
> Date: Thu, 25 Jan 2007 18:16:36
> To: <reddins@seglaw.com>
> Subject: Re: Garlock
>
> Ron: I can not at this time. If we do this deal then you have my
> word that I will force my way into the negotiations on the other
> cases and deal with white as if we had done it now.
>  One must walk before he can run. ***The local Garlock defense
> attorneys in Texas are my strongest opposition.  I will have to
> convince my client that their evaluations are a bit optimistic.***
> This will take more than a few days.[101]

Mr. Eddins then agreed to the earlier proposal, with a view to cementing a new working

relationship with Garlock:

> From: Ron Eddins <reddins@seglaw.com>
> To: David Glaspy <dglaspy@glaspy.com>
> Sent: Thu Jan 25 18:33:41 2007
> Subject: Re: Garlock
>
> David,
>
> That's fine. I will follow your advice and do the 8 case deal for █
> ███████ despite the fact this is ███K below my take number for the
> group. I do this to help establish a future working relationship with
> you and Garlock, and to avoid having to deal with TX counsel. For
> better or worse, I will handle Garlock nationally from this point
> forward.  If you are the guy, then here's to our future dealings. If

---

[100] *Id.* at 18:00:45 (SGPB 0000002) in Ex. 26.

[101] Jan. 25, 2007 18:16:36 Email (emphasis added) (SGPB 0000001) in Ex. 26.

not, please let Garlock know that I will handle this account going
forward.

I will forward a confirming settlement letter to you for signature
tomorrow.

We will discuss White next time.

Thanks,

Ron[102]

Mr. Glaspy in turn explained that the settlement would help him cut out Garlock's other leading

defense firm, Segal McCambridge.  And he invited Mr. Eddins to make a start on negotiating

with him SEG's trial-listed cases for the next stage, all with a view to "win win" resolutions in

which the claimants and Garlock—and Mr. Glaspy himself—would benefit.  Mr. Glaspy

concluded:  "I owe you one."

| | |
|---|---|
| From: | David Glaspy |
| To: | reddins@seglaw.com |
| Subject: | Re:  Garlock |
| Date: | Thursday, January 25, 2007 9:49:35 PM |

Dear Ron: on behalf of my client, thank you. ***They do not yet
realize that this is a win win, but with time they will. I actually do
not like the Segal, Mahoney empire and this will help me under
mine their influence. They, at my urging, went on record saying
that you could not be dealt with in a rational manner. Now I get
to shove that up their collective . . . .***
  When you have the time, it would help if I could get a list of the
trial cases from around the country that you want to negotiate.
Either annually, quarterly, or whatever time frame you desire and ***I
can then go take the general counsel out golfing and explain how
we can cut millions from their legal and expert budget.***
  ***That would be a win win for me.***  Golf and vindication, all paid
for. ***I owe you one.***[103]

---

[102]  *Id.*

[103]  *Id.* (emphasis added).

Nothing in this series of emails even hints that Mr. Glaspy believed the appropriate settlement values would depend on the extent of the claimants' disclosures of their contacts with third-parties' asbestos products. They contain no suggestion that Mr. Glaspy was dissatisfied with the discovery or other information SEG had provided about the cases being negotiated, still less that he thought SEG was deliberately suppressing evidence to inflate the settlements. (Mr. Glaspy would hardly have brought up his jaundiced view of Segal McCambridge and his personal ambition to displace them if he had considered Mr. Eddins untrustworthy.) Contrary to the melodramatic story Garlock presented through Mr. Glaspy's testimony at trial, this was not a situation in which Garlock caved in to excessive demands because it despaired of finding the evidence to prove up its side of the cases. Far from it. These were negotiations between sophisticated, experienced, and well-informed asbestos personal injury counsel who understood the nature of the cases and the risks presented, the efficiency and value of resolving them early, in groups, and the mutual benefits of minimizing litigation processes. It would be a mistake to disparage the resulting settlements as driven merely by the avoidance of defense costs. Rather, Mr. Glaspy was pursuing a sophisticated approach to risk management, chastened by past trials and cognizant of the impossibility of predicting with certainty which of the many cases brought by SEG might result in the next disastrous verdict for Garlock.

In their telling details, the emails discussed above point to the factors that influenced the lawyers' calculations of case values. Significant considerations included the victim's age,[104] whether or not the claimant was living (given the preference living plaintiffs received on the trial

---

[104]   Oct. 1, 2007 7:15 Email (SGPB 0000011) in Ex. 26.

calendar),[105] the claimant's occupation as an indication of his or her likely ability to prove

exposure to Garlock products,[106] the "PCA" or per-case average that Garlock was willing to pay

for SEG's cases and how that compared to what it was paying a competing firm,[107] and the time

value of money.[108]  Emails exchanged by Messrs. Glaspy and Eddins in negotiating later group

deals elaborate on other significant factors affecting values:  disease type;[109] jurisdiction;[110] lost

wages or other economic harms;[111] and, most important, the nature and extent of the victim's

contacts with **Garlock's** asbestos-containing products,[112] including the recognition that new

evidence identifying Garlock products can emerge as the case develops.[113]  Behind all of these

considerations, and influenced by each of them, is the calculus of trial risk.[114]  Always in the

---

[105]  Jan. 25, 2007 6:32 PM Email (SGPB 0000003) ("your client recently died and will not get a Court room until next year at the soonest") in Ex. 26.

[106]  *See, e.g.*, *id.* ("laundryman" cited by Mr. Glaspy to justify a low offer); *compare* n.112 *infra*.

[107]  *See, e.g.*, Jan. 25, 2007 5:01 PM Email (SGPB 0000002, 3) in Ex. 26.

[108]  *See* Jan. 25, 2007 6:54 PM Email (SGPB 0000003) (Eddins: "How quickly would you be able to get it paid?") in Ex. 26.

[109]  Oct. 1, 2007 7:15 PM Email (SGPB 00000011) (Glaspy: "Walton is a smoking lung cancer.") in Ex. 26.

[110]  *See* June 9, 2008 1:00:34 PM Email (SGPB 0000018) (Glaspy: "Juries in Seattle award substantially lower numbers than do Los Angeles juries.") in Ex. 26.

[111]  Jan. 18, 2008 12:59 PM Email (SGPB 0000015) (Eddins:  "I disagree with your analysis that wrongful death cases have a lower value because of the reduced economic component.  I think recent jury verdicts demonstrate this myth.") in Ex. 26.

[112]  July 23, 2008 4:45 PM Email (SGPB 0000024) (Eddins:  increasing total demand for group resolution "because of the addition of a number of strong CA Navy MM and BT cases," that is, California Navy machinist mate and boiler tender cases) in Ex. 26; Jan. 18, 2008 1:16 PM Email, in Ex. 26.

[113]  Oct. 2, 2007 11:16 AM Email (SGPB 0000010) (Glaspy: "[R]egarding the lack of Garlock i.d., are there any other co workers that will be forthcoming to take care of that issue?") in Ex. 26.

[114]  June 9, 2008 10:44 AM Email (SGPB 0000018) (Eddins: threatening to try more California cases if Garlock refuses to pay SEG its historical per-case averages "based on the quality of the cases as opposed to where the case happens to be venued") in Ex. 26.

background, but occasionally made explicit, is the reality of Garlock's waning insurance and

limited cash flow, and the threat that it will file bankruptcy if SEG's demands are

unrestrained.[115]

The new emails discuss all of these factors.  By striking contrast, **_nowhere do they even_**

**_touch on exposures to non-Garlock products._**   If Mr. Glaspy's valuation of cases really was

driven by that consideration, as claimed, surely he would have pressed Mr. Eddins on the point

in settlement negotiations.  If the testimony he gave in this Court were true, one would expect in

the emails to see Mr. Glaspy prodding his counterpart for more information about insulation

exposures, insisting upon the impact of other exposures as lowering the value of claims against

Garlock, and postponing settlements pending full investigations of the claimants' encounters

with third-party products.   But the emails contain none of this.   Given the directness and

frankness of the dialogue that Messrs. Glaspy and Eddins conducted over an extended period of

time, the emails strongly contradict the story Mr. Glaspy offered up for Garlock at the estimation

hearing.  And the omission of these emails from Garlock and Mr. Glaspy's productions points to

deliberate obfuscation of the truth.

### 3.    The Debtors and David Glaspy had a clear obligation to produce these settlement communications but failed to do so

Garlock and Mr. Glaspy were required to produce settlement communications like these

recently uncovered emails.  Many times during the estimation proceeding, the Committee sought

discovery from the Debtors about the course of dealing between the Debtors and plaintiffs'

lawyers when resolving mesothelioma cases in order to test Garlock's claim that denial of access

---

[115]  June 9, 2008 10:35:54 Email (SGPB 0000018) (Glaspy: ("[I]f they start paying Calif [*sic*]
numbers in all these other States then they might as well just file now.") in Ex. 26;  Nov. 24,
2008 4:06:22 PM Email (SGPB 0000029) (Glaspy: "This is a lot of money on the other cases for
a company with no cash and severely dwindling insurance proceeds.") in Ex. 26.

to exposure information drove up settlement values.  In particular, the Committee sought discovery of documents regarding the settlement and resolution of cases appearing on various of Debtors' lists of featured cases, such as the "RFA" claims or those the Debtors called "Designated Plaintiffs."  These discovery requests specifically encompassed settlement communications that Garlock's outside counsel such as David Glaspy had with plaintiffs' counsel.

For example, on July 18, 2012, the Committee served its Second Set of Requests for Admission and Fourth Set of Interrogatories and Requests for Production of Documents on Aggregate Estimation Subjects.[116]  Request 2 of that discovery sought communications between the Debtors (and the Debtors' counsel) and a sample of 31 plaintiffs' law firms and lawyers regarding the negotiation or settlement of asbestos claims.  The sample contained plaintiff law firms that fell within Mr. Glaspy's responsibilities as regional counsel and with which he certainly had settlement communications.  SEG was included by name.[117]

Similarly, on August 6, 2012 the Committee served a Fifth Set of Interrogatories and Requests for Production of Documents Directed to the Debtors on Aggregate Estimation Subjects.[118]  The Committee's August 6 discovery sought settlement communications relating to a subset of approximately 500 settled mesothelioma claims selected from the more than 10,000 claimants the Debtors had identified in their subpoena to the Delaware Claims Processing

---

[116] Official Committee of Asbestos Claimants' Second Set of Requests for Admission and Fourth Set of Interrogatories and Requests for Production of Documents on Aggregate Estimation Subjects, dated July 18, 2012, attached as Ex. 30.

[117] *Id*. at Ex. 2.

[118] Official Committee of Asbestos Claimants' Fifth Set of Interrogatories and Requests for Production of Documents Directed to the Debtors on Aggregate Estimation Subjects, dated Aug. 6, 2012.

Facility seeking trust claim data.  The list of 500 includes Mr. ███████ and implicates claimants' firms with whom Mr. Glaspy had settlement communications, including SEG.

The Debtors objected to these discovery requests and either refused to produce documents in response or heavily qualified their responses and their search for responsive documents.  Debtors' lack of cooperation led to the Motion of the Official Committee of Asbestos Personal Injury Claimants to Compel Debtors to Respond to Certain Discovery Requests, filed September 21, 2012 [Dkt. No. 2521], and related briefing.[119]  A hearing on that motion was held on October 11, 2012, at which the Court granted the discovery and left it to the parties to work out an order.[120]  Following the hearing, the Committee and the Debtors agreed on a revised scope of production to satisfy the requests that were the subject of the Motion.

On October 26, 2012, the Court entered the Stipulation and Order Resolving Motion of the Official Committee of Asbestos Personal Injury Claimants to Compel Debtors to Respond to Certain Discovery Requests [Dkt. No. 2579] (the "**October 26 Stipulation and Order**").  It required Debtors to "promptly produce," *inter alia*, settlement communications including communications by Mr. Glaspy and his firm:

> 1. The Debtors shall promptly produce all Documents constituting or setting forth any communications between the Debtors or the Debtors' representatives listed in paragraph 5, below on one hand, and up to 250 claimants to be selected by the ACC from the approximately 800 claimant sample the Debtors and the Committee have agreed upon (in lieu of the sample set forth in Exhibit 1 to the August 6 Discovery) or their representatives on the other hand, concerning the negotiation of terms of settlement (including but not limited to payment amount) of those claimants' Mesothelioma Claims against Garlock.

---

[119] *See* Debtors' Response to the Motion of the Official Committee of Asbestos Personal Injury Claimants to Compel Debtors to Respond to Certain Discovery Requests, dated Oct. 9, 2012 [Dkt. No. 2555].

[120] *See* Hr'g Tr. 32:1-9, Oct. 11, 2012.

- 52 -

* * *

3.    In addition to the production called for by paragraph 1, the Debtors shall promptly produce all Documents constituting or setting forth any communications between the Debtors or the Debtors' representatives listed in paragraph 5, below on one hand, and any claimants now or subsequently listed on RFA List #1, RFA List #1.A, or RFA List #2, or their representatives on the other hand, concerning the negotiation of terms of settlement (including but not limited to payment amount) of those claimants' Mesothelioma Claims against Garlock.

* * *

5.    The Debtors' representatives referenced in paragraphs 1 and 3 shall consist of (i) Garrison, (ii) any outside law firm representing the Debtors who was identified as a "regional counsel" by the Debtors during 2004, 2006 and 2008 (including but not limited to Segal McCambridge Singer & Mahoney, **Glaspy & Glaspy**, and Swetman Baxter Massenburg LLC), and (iii) Schachter Harris, Rumberger Kirk & Caldwell, McGivney & Kluger, Miles Stockbridge, P.C., and Sutter, O'Connell, Mannion and Farchinone.

October 26 Stipulation and Order ¶¶ 1, 3 & 5 (emphasis added).

Other discovery requests covered the Glaspy-Eddins emails as well.  On December 17, 2012, the Committee served its Third Set of Requests for Admission and Sixth Set of Interrogatories and Requests for Production of Documents Directed to the Debtors on Aggregate Estimation Subjects.[121]  Request Number 2 thereof asked Debtors to "Produce all non-privileged documents created prior to June 5, 2010, not previously produced, relating to any of the following Asbestos Claimants" and listed ██████████████████████████

---

[121]  Official Committee of Asbestos Claimants' Third Set of Requests for Admission and Sixth Set of Interrogatories and Requests for Production of Documents Directed to the Debtors on Aggregate Estimation Subjects, dated Dec. 17, 2012, attached as Ex. 31 ("**December 17 Discovery**").

███████

██████.[122]  Debtors said they would comply.[123]

In addition, Request Number 3 of the Committee's December 17 discovery asked Debtors to "Produce all Documents not previously produced evidencing Communications with any of the Law Firms with respect to the negotiation or agreement of settlement arrangements involving the claims of any of the Designated Plaintiffs."[124]  "Law Firms" referred to any law firm subpoenaed for deposition by Debtors, which included firms that Mr. Glaspy interacted with in the settlement context.[125]  "Designated Plaintiffs" referred to any asbestos claimant whom Garlock specified as the subject of a deposition or document discovery in any subpoena issued in the estimation proceeding to a "Law Firm" or counsel for an asbestos claimant.[126]  Such Designated Plaintiffs included fifteen claimants listed on RFA 1.A and featured in Garlock's presentation at the estimation hearing.  Debtors agreed to comply with Request Number 3: "To the extent not already produced, and subject to Debtors' General Responses and Objections to the Sixth Requests, Debtors will produce documents responsive to this request."[127]

███████████

███████████

---

[122]  *Id*. at 9-10.

[123]  Debtors' Responses and Objections to Official Committee of Asbestos Personal Injury Claimants' Third Set of Requests for Admission and Sixth Set of Interrogatories and Requests for Production of Documents on Aggregate Estimation Subjects at 2-3, dated Jan. 30, 2013 ("**January 30 Discovery Responses**").

[124]  December 17 Discovery at 10.

[125]  *Id.* at 8.

[126]  *Id.* at 6.

[127]  January 30 Discovery Responses at 3.



[130] As set out above, it is now clear that Garlock and Mr. Glaspy did not fulfill their obligation to make a complete production of his settlement correspondence, and what was not produced is patently at odds with the story they presented at the estimation hearing. The result has been serious distortion of the record on which this Court based its estimation ruling.

## III. THE COURT SHOULD PERMIT FOCUSED ADDITIONAL DISCOVERY AND REOPEN THE ESTIMATION HEARING TO TAKE SUPPLEMENTAL EVIDENCE

The new evidence and Garlock's repeated failures to provide disclosure discussed above reveal that the estimation proceeding so far rests on a shaky foundation. Given the Committee's limited ability to discern the extent of Garlock's non-compliance with discovery obligations and the scope of its misrepresentations, the few examples presented above should be regarded as the tip of the iceberg. Further discovery may uncover more examples where Garlock knew and could prove exactly what it now says it did not know and could not prove. Garlock has a wealth of information about the cases it chose to emphasize at the estimation hearing, but it has become obvious that it did not disgorge all relevant information called for when answering the

---

[128]  Glaspy Dep. 96:2-25, Jan. 22, 2013.

[129]  Glaspy Dep. 210:10-212:21, June 25, 2013.

[130]  Hr'g Tr. 4621:7-4622:4, Aug. 22, 2013 (Glaspy).

- 55 -

Committee's discovery.[131]  As a result, the Court was subjected to a false account of Garlock's litigation and settlement history, one that recasts its savvy negotiators as bumbling dupes.

This can be cured.  The medicine required is additional discovery focused on Garlock's settlement communications, its internal case evaluations, and its knowledge of non-Garlock exposures in key cases and at critical sites.  Specifically, the Court should order Garlock to:

- produce any and all communications between (i) Garlock, Garrison Litigation Management Group or their counsel and (ii) any representative of any asbestos claimant in any case that Debtors identified during the Estimation Hearing as having been, or likely to be, affected by omissions or misrepresentations of exposure evidence, including but not limited to, those cases noted on Debtors' list entitled "Omissions in RFA-1 Cases Based on DCPF and Ballot Data Only," GST-8001; and

- produce any and all documents, whether or not privileged, reflecting, concerning, discussing, relating to, or referring to sites and ships at issue in any case that Debtors identified during the Estimation Hearing as having been, or likely to be, affected by omissions or misrepresentations of exposure evidence, including but not limited to, those cases noted on Debtors' list entitled "Omissions in RFA-1 Cases Based on DCPF and Ballot Data Only," GST-8001.

The Court should also revisit its prior rulings on the Committee's attempts to obtain, over Garlock's claims of privilege, Garlock's internal evaluations of and communications regarding, the "RFA 1" claims.  As noted above, Garlock has presented a glib and self-serving version of its settlement history.  This Court cannot properly evaluate such claims without contemporaneous evidence, evidence which Garlock has not yet been compelled to provide.  Instead it has stood

---

[131]  While denying the Committee full access to these resources, Garlock has been continuing to use them during the estimation proceeding.  Garlock's fee applications disclose that as recently as last June, for example, Garlock's own counsel accessed Segal McCambridge's "library of depositions."  *See, e.g.*, Motion for Authority to Compensate Segal McCambridge Singer & Mahoney, Ltd. for Professional Services Rendered to the Debtors in the Ordinary Course of Business Ex. A at 4, filed Mar. 10, 2014 [Dkt. No. 3368].

behind privilege and created convenient stories.  But, as this Court ruled during the estimation

hearing, Garlock has impliedly waived its privileges.[132]  The Court should now enforce that

waiver to the full extent required by Rule 502(a) of the Federal Rules of Evidence by directing

Garlock to:

- produce the documents that were the subject of the Motion of the Official Committee of Asbestos Personal Injury Claimants to Compel on Grounds of Waiver the Production of Certain Documents the Debtors Have Withheld as Privileged, filed April 19, 2012 [Dkt. No. 2117] and designated on Exhibit 3 to the Memorandum of Law in Support of that Motion; and

- produce any and all documents, whether or not privileged, constituting, reflecting, concerning, discussing, relating to, or referring to any internal evaluative materials and communications about any case, including any discussions about sites or ships involved in the case, that Debtors asserted during the Estimation Hearing as having been, or likely to be, affected by omissions or misrepresentations of exposure evidence, including but not limited to those cases noted on Debtors' list entitled "Omissions in RFA-1 Cases Based on DCPF and Ballot Data Only," GST-8001.

The foregoing documents ought in fairness to be considered together with the self-serving

testimony and materials that Garlock offered at the Estimation Hearing though its lawyer-

witnesses.[133]  Failure to enforce Garlock's waiver within the full scope contemplated by the rule

would leave the record skewed and distorted to Garlock's unfair advantage.

The Committee has set forth the necessary supplemental document discovery in the

proposed order submitted herewith.  If granted such discovery, the Committee will report back to

the Court on the results of the production and suggest at that time what further steps the Court

---

[132]  Hr'g Tr. 1418:2-5 (July 26, 2013).

[133]  Fed. R. Evid. 502(a)(3).

should take to receive additional evidence into the record for estimation.  Those steps are likely

to include a limited program of depositions to follow the supplemental document discovery.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the Motion to Reopen so as to prevent

manifest injustice.

Dated:  June 4, 2014

Respectfully submitted,

**CAPLIN & DRYSDALE, CHARTERED**

By: */s/ Trevor W. Swett*
Trevor W. Swett III
(tswett@capdale.com)
Leslie M. Kelleher
(lkelleher@capdale.com)
James P. Wehner
(jwehner@capdale.com)
One Thomas Circle, N.W.
Washington, DC  20005
Telephone:  (202) 862-5000

Elihu Inselbuch
(einselbuch@capdale.com)
600 Lexington Avenue, 21st Floor
New York, NY  10022
Telephone:  (212) 379-0005

**MOON WRIGHT & HOUSTON, PLLC**

By: */s/ Travis W. Moon*
Travis W. Moon
(tmoon@mwhattorneys.com)
227 West Trade Street
Suite 1800
Charlotte, NC  28202
Telephone:  (704) 944-6560

*Co-Counsel for the Official Committee of
Asbestos Personal Injury Claimants*
