UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

| | | |
|---|---|---|
| In re: | : | Case No. 10-31607 |
| | : | |
| GARLOCK SEALING | : | Chapter 11 |
| TECHNOLOGIES LLC, *et al.*, | : | |
| | : | Jointly Administered |
| Debtors.[1] | : | |
| | : | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY
CLAIMANTS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
SOLICITATION AND CONFIRMATION PROCEDURES AND SCHEDULE**

**CAPLIN & DRYSDALE, CHARTERED**

Trevor W. Swett III
Peter Van N. Lockwood
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, DC  20005
Telephone:  (202) 862-5000

Elihu Inselbuch
600 Lexington Avenue, 21st Floor
New York, NY  10022
Telephone:  (212) 379-0005

**MOON WRIGHT & HOUSTON, PLLC**

Travis W. Moon
227 West Trade Street
Suite 1800
Charlotte, NC  28202
Telephone:  (704) 944-6560

*Co-Counsel for the Official Committee of Asbestos Personal Injury Claimants*

Dated:  August 14, 2014

---

[1]   The Debtors are Garlock Sealing Technologies LLC ("**GST**"), Garrison Litigation
Management Group, Ltd. ("**Garrison,**" and together with GST, "**Garlock**"), and The Anchor
Packing Company.

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES .................................................................................................. iii

OVERVIEW AND ISSUES PRESENTED ................................................................................. 1

ARGUMENT ...................................................................................................................... 6

I.    The Criteria for Temporary Allowance of Asbestos Claims for Voting
      Purposes Are Unfair, and the Proposed Hearings for Temporary
      Allowance Are Unprecedented, Unnecessary, and Unrealistic ........................... 6

      A.    The Proposed Voting Procedures for Class 4 Would Result in
            Unnecessary Litigation That Would Be Prudent to Avoid, as Other
            Bankruptcy Courts Have Done ............................................................... 7

      B.    The Proposed Procedures for Class 4 Would Impose Rules
            Unfairly Skewed in the Debtors' Favor, Thereby Enabling the
            Debtors to Target and Disqualify Ballots Rejecting the Plan ................ 11

            1.    The requirement to attach specific forms of exposure
                  evidence would be unfair and burdensome to claimants .......... 12

            2.    The requirement that specific forms of exposure evidence
                  be attached is heavily tilted in the Debtors' favor insofar as
                  it would require claimants to meet an evidentiary standard
                  higher than what courts apply in the tort system ..................... 14

            3.    The Voting Procedures would impose no deadline on the
                  Debtors to object to ballots and thus would open the door to
                  mischief ................................................................................. 18

      C.    The Proposed Class 4 "Temporary Allowance" Procedures and
            Requirements of Specific Types of Exposure Evidence Are Wholly
            Unnecessary ........................................................................................ 20

      D.    By Limiting Class 4 Voting Eligibility to Claims Based on
            Specified Diseases, the Proposed Voting Procedures Would
            Disenfranchise Untold Numbers of Asbestos Victims with Other
            Diseases or Injuries .............................................................................. 23

      E.    If the Court Sustains the Committee's Objections to the Exposure
            Evidence Requirement and the Objection Process, It Should
            Authorize the Use of Master Ballots in Classes 3 and 4 ..................... 26

II.     The Procedures Proposed for Class 8 Suffer from the Same Infirmities as
Those Proposed for Class 4.................................................................................27

III.    The Proposed Procedures for Class 3 Fail to Provide for Temporary
Allowance of Such Claims and Would Disqualify the Ballots of Many
Class 3 Claimants, Thus Depriving Them of a Vote on the Plan ......................28

IV.    The Proposed Ballot Certifications Would Risk Waiver of the Claimants'
Attorney-Client Privilege, Are Unnecessary, and Do Not Comport with
the Official Bankruptcy Forms .........................................................................30

V.    The Proposed Voting Procedures Would Require Claimants Represented
by Counsel to Disclose Their Personal Contact Information on Ballots
That Would Be Accessible on the Internet, Which Is Not Appropriate ...........31

VI.    The Debtors' Request to File an "Omnibus Objection" Is Not Relevant to
a Motion Seeking Approval of Voting Procedures, and the Omnibus
Objection Contemplated by the Debtors Would Violate Bankruptcy Rule
3007....................................................................................................................33

CONCLUSION..................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Amarex, Inc.,*
61 B.R. 301 (Bankr. W.D. Okla. 1985) ...............................................................25

*In re Armstrong,*
294 B.R. 344 (10th Cir. B.A.P. 2003)..................................................................20

*In re Asbestos Litig.,*
509 A.2d 1116 (Del. Super Ct. 1986) ..................................................................24

*In re Brooklyn Navy Yard Asbestos Litig.,*
971 F.2d 831 (2d Cir. 1992)..................................................................................13

*Berkowitz v. A.C.&.S., Inc.,*
733 N.Y.S.2d 410 (App. Div. 2001) ....................................................................17

*Cimino v. Raymark Indus., Inc.,*
151 F.3d 297 (5th Cir. 1998) ...............................................................................10

*In re DRW Prop. Co.,*
54 B.R. 489 (Bankr. N.D. Tex. 1985)..................................................................25

*In re E. & S. Dists. Asbestos Litig.,*
772 F. Supp. 1380 (E.D.N.Y. & S.D.N.Y. 1991) ...............................................13

*In re Fibreboard Corp.,*
893 F.2d 706 (5th Cir. 1990) ...............................................................................10

*Flanders v. Garlock, Inc.,*
2003 WL 22697241 (S.D. Ga. Aug. 11, 2003) ...................................................24

*In re Gardinier,*
55 B.R. 601 (Bankr. M.D. Fla. 1985) ..................................................................20

*Jacksonville Airport, Inc. v. Michkeldel, Inc.,*
434 F.3d 729 (4th Cir. 2006) ............................................................................9, 29

*Johnson v. Celotex Corp.,*
899 F.2d 1286 (2d Cir. 1990)...............................................................................17

*Lineaweaver v. Plant Insulation Co.,*
37 Cal. Rptr. 2d 902 (Ct. App. 1995) ..................................................................17

*In re Lloyd E. Mitchell, Inc.*,
373 B.R. 416 (Bankr. D. Md. 2007) .........................................................22, 23, 26

*Malcolm v. Nat'l Gypsum Co.*,
995 F.2d 346 (2d Cir. 1993)........................................................................10

*In re Mangia Pizza Invs., LP*,
480 B.R. 669 (Bankr. W.D. Tex 2012) ........................................................20

*In re Mother Hubbard, Inc.*,
152 B.R. 189 (Bankr. W.D. Mich. 1993)......................................................25

*O'Brien v. Nat'l Gypsum Co.*,
944 F.2d 69 (2d Cir. 1991)..........................................................................17

*Owens-Corning Fiberglas Corp. v. Watson*,
413 S.E.2d 630 (Va. 1992).........................................................................15

*Raleigh v. Ill. Dep't of Revenue*,
530 U.S. 15 (2000)......................................................................................14

*Roehling v. Nat'l Gypsum Co. Gold Bond Bldg. Prods.*,
786 F.2d 1225 (4th Cir. 1986) .......................................................13, 15, 16

*Salerno v. Garlock Inc.*,
622 N.Y.S.2d 946 (App. Div. 1995) ............................................................17

*In re Stone Hedge Props.*,
191 B.R. 59 (Bankr. M.D. Pa. 1995) .............................................................9

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*,
549 U.S. 443 (2007)....................................................................................14

STATUTES AND RULES

11 U.S.C. § 101(5) ............................................................................................23

11 U.S.C. § 502 .................................................................................................29

11 U.S.C. § 524(g) ....................................................................................1, 21, 22

11 U.S.C. § 1126 ...............................................................................................29

28 U.S.C. § 1411(a) .............................................................................................2

Fed. R. Bankr. P. 3007 ...............................................................................33, 34

Fed. R. Bankr. P. 3018 .........................................................9, 10, 19, 20, 29

Fed. R. Bankr. P. 9014 ............................................................................................................14

**OTHER AUTHORITIES**

Barry I. Castleman, *Asbestos: Medical and Legal Aspects* (5th ed. 2005) ...................................24

The Official Committee of Asbestos Personal Injury Claimants ("**Committee**" or "**ACC**"), by and through undersigned counsel, hereby objects to the Debtors' Motion for Entry of an Order Approving Solicitation and Confirmation Procedures and Schedule, filed on June 24, 2014 [Dkt. No. 3802] ("**Motion**").  The grounds supporting this objection are as follows.

## OVERVIEW AND ISSUES PRESENTED

The Debtors have proposed a first amended plan of reorganization[2] that is unfair to asbestos creditors because, among other things, those creditors would not be paid in full, while the Debtors' parent, Coltec Industries, Inc. ("**Coltec**"), would retain a significant equity interest. The proposed Plan would also grant non-consensual, third-party releases and extraordinary injunctive protection to Coltec and other non-debtor affiliates, in exchange for no real consideration and without complying with the requirements of § 524(g) of the Bankruptcy Code. In addition, the proposed Plan would violate other aspects of the Bankruptcy Code and principles of equity, and will prove to be unconfirmable on a number of grounds, including that the Plan would channel both current and future asbestos claims to a capped fund, without adhering to the protections spelled out by Congress in § 524(g).  Concurrently with this objection to the Motion, the Committee has filed an objection to the Debtors' proposed disclosure statement, in which the Committee asks this Court to require the Debtors to include with their disclosure statement a statement by the ACC to the asbestos creditor constituency, recommending that they vote to reject the Plan.

Like the proposed Plan, the procedures for solicitation and voting on the Plan that are proposed in the Debtors' Motion ("**Voting Procedures**") are unfair, unprecedented, unrealistic,

---

[2]   *See* Debtors' First Amended Plan of Reorganization, filed May 29, 2014 [Dkt. No. 3708] (hereinafter, "**Plan**").

- 1 -

and contrived to disqualify legitimate claims.  For these reasons, the proposed Voting Procedures should be rejected even if this Court approves the Debtors' disclosure statement and authorizes the Plan and disclosure statement to be distributed for a vote.[3]

Asbestos-driven bankruptcies typically involve hundreds of thousands of personal injury and wrongful death claims, and this case is no exception:  before the petition date there were more than 100,000 unresolved asbestos claims against the Debtors, and hundreds more have accrued each month since then.  As Judge Hodges recognized earlier in this case, there are far too many claims to be dealt with in allowance proceedings in the Bankruptcy Court without indefinitely delaying distribution to creditors and resolution of the Debtors' bankruptcy cases. Personal injury claims involve individualized factual disputes, and cannot be decided *en masse* or by summary judgment.  Moreover, each claimant would be entitled to due process rights to adequate notice and an opportunity to be heard in any allowance proceedings, and many would be entitled to a jury trial.  *See* 28 U.S.C. § 1411(a) (providing that the Bankruptcy Code "do[es] not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim").  To avoid triggering the due process and jury-trial rights of individual claimants and overburdening the Bankruptcy Court and the District Court, Judge Hodges thrice denied the Debtors' motions to impose a bar date and initiate allowance proceedings for asbestos claims.[4]

---

[3]    The ACC has certain technical objections to the Debtors' proposed Notice Program, set out in Exhibit C to the Motion.  The ACC believes these will be uncontroversial and easily resolved by minor amendments to the Notice Program.  The ACC reserves its right to present any such objections to the Court if they are not resolved by the parties prior to the hearing on the Motion.

[4]    *See* Hr'g Tr. 1295:16-18, Nov. 19, 2010 ("[T]he proof of claim process . . . runs the risk of creating due process rights that we might wish we had never created."); Order on Motion of the Official Committee of Asbestos Personal Injury Claimants for Entry of a Scheduling Order and Debtors' Motion for Establishment of Asbestos Claims Bar Date, Etc., entered Dec. 9, 2010 *(Footnote continued on the next page.)*

Through their proposed Voting Procedures, the Debtors are seeking to introduce, once again, the functional equivalent of the proof-of-claim and allowance process for asbestos claims that Judge Hodges previously rejected.  Except for the settled claims in Class 3, the Debtors are proposing that ballots cast by asbestos claimants function as proofs of claims, to which the Debtors would have the right to object in order to exclude the ballots from tabulation.  The Voting Procedures would then require this Court to resolve the Debtors' objections by determining the validity of the claims voted in the objected-to ballots, in litigation that would resemble full-blown allowance proceedings for those claims.  And these full-blown proceedings would be ushered in simply to determine whether the objected-to ballots should be counted.  This makes no sense.  Indeed, the proceedings under the Voting Procedures would be *in addition to* the allowance process that the Debtors are proposing under their Plan for ultimately resolving and liquidating asbestos claims – a process that might force claimants to revisit and re-litigate the same issues and objections that were raised and decided in connection with voting on the Plan. Thus, the allowance proceedings contemplated under the proposed Voting Procedures are duplicative and unnecessary.

In addition, the proposed Voting Procedures would require Class 4 asbestos claimants, and certain asbestos claimants in Class 8, to attach to their ballots documentary evidence going

---

*(Footnote continued from previous page.)*
[Dkt. No. 853] (denying Debtors' motion to impose bar date and initiate allowance proceedings for asbestos claims); Order Denying the Second Amendment to Debtors' Motion for (A) Establishment of Asbestos Claims Bar Date, (B) Approval of Asbestos Proof of Claim Form, (C) Approval of Form and Manner of Notice, (D) Estimation of Asbestos Claims, and (E) Approval of Initial Case Management Schedule, entered May 19, 2011 [Dkt. No. 1348] (same); Order for Estimation of Mesothelioma Claims, entered April 13, 2012 [Dkt. No. 2102] (same).  Ultimately, Judge Hodges imposed a bar date for settled claims only, which constitute a small fraction of the total claims.  *See* Order on Debtors' Motion to Establish Bar Date for Settled Asbestos Claims and Related Relief ¶ 4, at 2, filed July 9, 2014 [Dkt. No. 3854].

to the merits of their claims – namely, documents evidencing "personal knowledge" of exposure to Garlock's asbestos-containing products.  The Debtors try to characterize this as requiring only "a minimal showing that their claims have potential merit,"[5] but that is not true.   This documentation requirement far exceeds what is generally required in the tort system, where plaintiffs regularly proceed to trial before a jury on circumstantial evidence that the injured person was exposed to asbestos-laden dust from the defendant's product.   Moreover, the proposed Voting Procedures would require asbestos claimants to provide this documentary evidence, even though, in most cases, the claimants have not been afforded discovery from Garlock.  The Court would have to review each ballot objection individually, and only if the Court were to find that the claimants have complied with the evidentiary requirements arbitrarily set by the Debtors would the claims be temporarily allowed for voting purposes only.

It is difficult to imagine voting procedures more unfair to asbestos claimants, or more wasteful of the Court's time and the estates' resources.  Nor could the Debtors have devised voting procedures that are more unrealistic.  Just as full-fledged allowance proceedings are not feasible before confirmation in an asbestos-related bankruptcy, hearings on whether the hundreds or thousands of ballots to which the Debtors may object could not be completed without delaying confirmation indefinitely.

There is no good reason for this Court to be required to hold temporary allowance proceedings in order to determine which claimants are entitled to vote.  Indeed, the Bankruptcy Rules permit temporary allowance for voting purposes in order to prevent debtors from interposing last-minute objections to manipulate the outcome of the vote on a plan, and to promote expedited and efficient administration of the debtors' estates by avoiding disputes over

---

[5]    Motion ¶ 20, at 9.

the merits of claims.  Thus, courts in previous asbestos-related reorganizations, including *Metex Mfg. Corp.*, *Federal-Mogul Global*, and *W.R. Grace & Co.*, have granted, either expressly or impliedly, temporary allowance to all asbestos claims for voting purposes, with no requirement that the claimants provide documentary evidence of the merits of their claims.  In addition, courts routinely permit law firms representing asbestos claimants to cast master ballots on behalf of their clients.  Any voting procedures approved by this Court should do the same.

The proposed Voting Procedures are objectionable in other respects as well, as set out below.  The procedures would disenfranchise holders of numerous asbestos-related claims that would be discharged or extinguished if the Plan were confirmed, such as claims for asbestos-induced pleural plaques or effusions, or claims alleging conspiracy among asbestos defendants. In addition, the certification requirements that the Debtors would impose are unnecessary, do not comport with the Official Bankruptcy Forms, and would risk waiver of the claimants' attorney-client privilege.  Furthermore, claimants who are represented by counsel should not be required to disclose their personal contact information on the ballots, and no personal contact information of any claimant should be made publicly available.  Finally, the Debtors' request for leave to file omnibus objections to asbestos claims should be denied, as it is not properly before the Court at this time.  Moreover, the Debtors have not explained the purpose or nature of any such objections, or demonstrated that they would not violate the Bankruptcy Rules.  For the reasons noted herein, the Court should deny the Motion.

**ARGUMENT**

I.      **The Criteria for Temporary Allowance of Asbestos Claims for Voting Purposes Are Unfair, and the Proposed Hearings for Temporary Allowance Are Unprecedented, Unnecessary, and Unrealistic.**

Under the Debtors' proposed Voting Procedures, attached as Exhibit B to the Motion, ballots cast for classes 4, 5, 6, and 8 would also serve as proofs of claim.  Holders of Class 4 "Current GST Asbestos Claims," which encompass, essentially, all current and unliquidated asbestos claims against Garlock,[6] would be required to satisfy the Debtors' self-invented and overly stringent criteria in order to be temporarily allowed for voting purposes, including a requirement that claimants attach to their ballots specific kinds of documents, such as sworn statements or deposition testimony, to satisfy Garlock that the claimant had sufficient "exposure" to its asbestos-containing products.[7]  As demonstrated below, these evidentiary requirements for casting a vote have no basis in law or in the official bankruptcy forms, are unprecedented in asbestos bankruptcies, and go beyond what courts in the tort system require to establish product exposure.  Under Garlock's approach, after the ballots were cast, the Debtors would be free to object to any and all of the Class 4 ballots as not meeting the requirements set out in the Voting Procedures.  These objections would usher in contested temporary allowance proceedings at which the Court would be asked to decide potentially hundreds, perhaps thousands, of objections lodged by the Debtors, each essentially going to the merits of the claim that was voted (an issue that, outside of bankruptcy, would usually require a full-blown jury trial), all to determine whether the objected-to ballots would be counted.  Rulings on those objections would have no bearing whatsoever on whether the corresponding claim would ultimately receive a distribution

---

[6]     *See* Plan § 1.1.71, at 9.

[7]     Motion, Ex. B, ¶ 6(b)(i), at 6-7.  Citations to Exhibit B page numbers refer to the CM/ECF page numbers in the exhibit's header.

under the Plan.  Indeed, claimants choosing the so-called "Settlement Option" under the Plan would have to resubmit their exposure evidence to the Settlement Facility, and those choosing to litigate their claims under the Plan's so-called "Litigation Option" would have to litigate the sufficiency of their exposure evidence a second time.  Additionally, because the Voting Procedures would impose no deadline on the Debtors for objecting to ballots, but would permit no hearings on those objections to be heard within 45 days of the confirmation hearing, the Debtors would be able lodge their objections close to the 45-day cutoff, thereby depriving claimants of adequate time to respond to those objections.  For the reasons explained below, the procedures proposed for Class 4 are decidedly unfair to claimants, unnecessary, unprecedented, unrealistic, and contrived to enable Garlock to manipulate the counting of votes.  The Debtors' proposed Voting Procedures should be rejected, and any voting procedures approved in the *Garlock* case should follow established methods.

> **A.**     **The Proposed Voting Procedures for Class 4 Would Result in Unnecessary Litigation That Would Be Prudent to Avoid, as Other Bankruptcy Courts Have Done.**

At the heart of the proposed Voting Procedures is the notion of allowing asbestos claims temporarily for voting.  But closer scrutiny of the Voting Procedures reveals that the Debtors are proposing a distorted version of temporary allowance, one that would pervert the root purpose of that procedure, generate unnecessary litigation over whether ballots rejecting the Plan should be tabulated, and impede efficient resolution of this case.  The Debtors' proposed order approving the Solicitation and Confirmation Procedures provides that "the Court shall temporarily allow Claims . . . for voting purposes *provided they meet the criteria for acceptance of their ballot or*

*master ballot*."[8]  Once the ballots were cast, the Debtors would have the right to file objections

to the ballots for failure to meet the "criteria" and would refuse to count those ballots.  The

Debtors are thus setting up a process that potentially would enable them to disregard ballots

wholesale and manipulate the voting in order to obtain an accepting class of impaired claims.

These Voting Procedures not only would be unfair to claimants; they are wholly

unnecessary and would fly in the face of how bankruptcy courts have historically handled voting

on Chapter 11 plans in asbestos-driven bankruptcy cases.  In numerous cases, bankruptcy courts

have, either expressly or impliedly, granted temporary allowance to virtually all holders of

asbestos personal-injury claims, without conditions attached.[9]  Most recently, in the Chapter 11

reorganization of Metex Mfg. Corporation, pending in the Southern District of New York, the

court's order approving the voting procedures provided in relevant part:  "All Asbestos PI

Claims in Class 4 of the Plan *are temporarily allowed solely for purposes of voting* to accept/in

favor of or reject/against the Plan, each in the amount specified in the Voting Procedures and

designated for such Asbestos PI Claim on the applicable ballot or master ballot."[10]  Unlike the

Voting Procedures proposed here, there were no conditions attached to temporary allowance in

*Metex.*  There were no "criteria" that gave Metex the option of effectively revoking temporary

allowance and not counting the ballot.  Unlike the Voting Procedures here, the Metex voting

procedures did not contemplate a litigation process by which the debtor could object to ballots

---

[8]     Motion, Ex. A, ¶ 17 (emphasis added) (hereinafter, "**Proposed Order**").

[9]     *See* attached **Exhibit 1**, ¶ 14, at ACC-SOL-PRO-007 (*Congoleum Corp.* voting procedures);
**Exhibit 2**, ¶ 5, at ACC-SOL-PRO-061 (*Federal-Mogul Global, Inc.* voting procedures); **Exhibit
3**, ¶ 9, at ACC-SOL-PRO-158 (*Flintkote Co.* voting procedures); **Exhibit 4**, at ACC-SOL-PRO-
173 (*G-I Holdings* Voting Procedures); **Exhibit 5**, ¶ 12, at ACC-SOL-PRO-185 (*Metex Mfg. Co.*
voting procedures); **Exhibit 6**, ¶¶ 3-4, at ACC-SOL-PRO-205 (*Quigley Co.* voting procedures);
**Exhibit 7**, at ACC-SOL-PRO-279 to 281 (*W.R. Grace & Co.* voting procedures).

[10]    Attached Ex. 5, ¶ 12, at ACC-SOL-PRO-185 (emphasis added).

that did not meet its hand-crafted standards or "criteria," and thereby require the court's intervention to resolve the objection.  Nor did the voting procedures approved in the other asbestos bankruptcy cases cited above so contemplate.

There are good reasons why this Court should adopt this historical and time-tested approach to voting that has been approved in most asbestos-related Chapter 11 cases, rather than the unprecedented, self-serving, and litigation-laden approach proposed by the Debtors.  Chief among those reasons is that the principal purpose of temporary allowance under Federal Rule of Bankruptcy Procedure 3018(a) is to **avoid** time-consuming litigation going to the merits of claims.  "*Since claims litigation is often drawn out*, thereby defeating one of the essential purposes of the Code, i.e. expedited and efficient administration of the bankruptcy estate, [Bankruptcy Rule 3018] provide[s] that, for voting purposes only, the court can temporarily allow a claim in such an amount as the 'court deems proper.'" *In re Stone Hedge Props.*, 191 B.R. 59, 63 (Bankr. M.D. Pa. 1995) (quoting Fed. R. Bankr. P. 3018(a)) (emphasis added).  As contemplated by Rule 3018, temporary allowance is a device to permit the holders of contingent and disputed claims to cast their votes and to have those votes counted, while avoiding drawn-out disputes over the merits of those claims.[11]  Here, the Debtors would reserve for themselves the right to object to, and potentially disregard, any Class 4 ballots cast.  To have those ballots counted, the claimants would have to litigate against the Debtors over the sufficiency of the

---

[11]   Indeed, in *Jacksonville Airport* (which the Debtors cite at page 7 of their Motion for the proposition that a holder of a claim to which a party has objected may not vote), the Fourth Circuit recognized temporary allowance for voting purposes as the alternative to a full adjudication on the merits.  *See Jacksonville Airport, Inc. v. Michkeldel, Inc.*, 434 F.3d 729, 732 (4th Cir. 2006) ("Of course, the court upon motion could have temporarily allowed the claim for voting purposes or fully adjudicated [the] objection prior to the vote.").  The Debtors carefully avoid mentioning that aspect of the decision.

exposure evidence attached to their ballots or any other "criteria" the Debtors found deficient. The objection process proposed by the Debtors would thus turn Rule 3018(a) on its head.

Second, in large asbestos-driven bankruptcy cases, such as the Debtors' cases, pending asbestos claims at the petition date number in the hundreds of thousands – far too many to be dealt with in the bankruptcy without indefinitely delaying resolution of the Chapter 11 case and distributions to creditors.  Even Garlock concedes that the total number of asbestos personal-injury claims pending against it when it filed Chapter 11 exceeded 100,000.[12]  Epidemiology tells us that thousands of additional claims have accrued since the petition date, as long-latent diseases have become manifest, and that tens of thousands of new claims will continue to accrue over the course of decades to come.  Personal-injury asbestos claims cannot be decided *en masse*; the pervasive factual disputes underlying asbestos claims are too individualized to be litigated in classes.[13]  Nor are many of these claims amenable to summary disposition, because asbestos cases are highly fact-intensive, turning on disputed issues of fact, which are often the subject of circumstantial evidence and expert testimony, such as whether a plaintiff has been exposed to a particular product, whether his claimed illness is actually caused by asbestos exposure, and indeed whether the plaintiff is sick at all.  Moreover, by requiring Class 4 claimants to attach specific forms of evidence proving "GST Product Contact," the Debtors are injecting what is probably, aside from damages, *the* most litigated and factually contentious issue

---

[12]   *See* Disclosure Statement for Debtors' First Amended Plan of Reorganization § 2.4.4, at 32-33, filed May 29, 2014 [Dkt. No. 3710] (hereinafter, **"Disclosure Statement"**).

[13]   Under substantive law, "causation of plaintiff's injury by defendant's product and plaintiff's resultant damages must be determined *as to 'individuals, not groups.'"  Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 313 (5th Cir. 1998) (emphasis added) (quoting *In re Fibreboard Corp.*, 893 F.2d 706, 711 (5th Cir. 1990)); *see also Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350-54 (2d Cir. 1993) (disapproving consolidation for trial of forty-eight asbestos cases because too many different individual exposures, jobs, jobsites, and diseases were involved).

in the tort system – *viz.*, whether the plaintiff was exposed to the defendant's asbestos-containing products. In short, what the Debtors are proposing here are full-fledged allowance proceedings in all but name, just to determine whether ballots should be counted. When that is overlaid with the vast numbers of claims at issue and the inability to resolve these claims summarily and *en masse*, the Court, if it were to approve the Voting Procedures, would be injecting itself into protracted proceedings involving contentious factual and evidentiary issues. Many bankruptcy judges have prudently avoided that mare's nest of litigation simply by temporarily allowing asbestos personal-injury claims for voting, without attaching evidentiary conditions. This Court should deny the Motion and do the same.

> **B.    The Proposed Procedures for Class 4 Would Impose Rules Unfairly Skewed in the Debtors' Favor, Thereby Enabling the Debtors to Target and Disqualify Ballots Rejecting the Plan.**

Not only would the proposed Voting Procedures open the door to *de facto* allowance proceedings over the merits of claims, but they also would impose evidentiary requirements that are unfairly weighted in the Debtors' favor, so as to substantially increase the likelihood that their ballot objections would be sustained and thus disenfranchise holders of legitimate claims. First and foremost, as noted above, the Voting Procedures would require claimants and their counsel to attach to each Class 4 ballot documents evidencing "personal knowledge" of "GST Product Contact," including documents identifying:

> (i)    the residences, plants, or commercial sites (by name, address, or other description), and the city and state where exposure to asbestos from a Garlock asbestos-containing product allegedly occurred;

> (ii)   the Garlock asbestos-containing product with which the injured party had contact; and

(iii)     the manner in which the injured party experienced exposure to asbestos from the Garlock asbestos-containing product.[14]

In addition, at least one of the attachments demonstrating "GST Product Contact" must be:

(i)     an affidavit or other sworn statement on personal knowledge of the injured party;

(ii)     an affidavit or other sworn statement on personal knowledge of the injured party's co-worker or other competent witness; or

(iii)     deposition or trial testimony by the injured party or other competent witness with personal knowledge of the injured party's exposure to asbestos from a Garlock product.[15]

Furthermore, the sworn statements and testimony must be in the form of direct evidence satisfying the Debtors' self-invented standard for specificity; circumstantial evidence in the form of "[t]estimony or sworn statements that Garlock asbestos-containing products were used at the plant, facility, or other worksite *is not sufficient to identify exposure* to asbestos from a Garlock asbestos-containing product."[16]

### 1.     The requirement to attach specific forms of exposure evidence would be unfair and burdensome to claimants.

With disease latencies spanning 30 to 40 years, and perhaps longer, from the time of exposure, it is unrealistic to expect many claimants, especially those whose illnesses manifested after the petition date, to have either committed to memory or available at their fingertips the specific names and addresses of the places where they were exposed to asbestos. Moreover, given the decades-long latency period and how ubiquitous asbestos and asbestos-containing products were in American industry during the time period in which many of these claimants

---

[14]   Motion, Ex. B, at 6-7.

[15]   Motion, Ex. B, at 21.

[16]   Motion, Ex. B, at 22 (emphasis added).

were exposed, it is unrealistic to expect that claimants will have "personal knowledge" of the

particular "Garlock asbestos-containing product" to which they were exposed.  *See Roehling v.*

*Nat'l Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d 1225, 1228 (4th Cir. 1986) (observing that

an asbestos personal-injury claimant "should not be required to remember product names some

[many] years later when he had been . . . breathing the dust, not handling the products.  Such

requirement would, in essence, destroy an injured bystander's cause of action for asbestos

exposure.  Rarely would bystanders take note of names of materials used by others").

Claimants often do not know the names of the products to which they were exposed on

jobsites, but rely on third-party depositions, shipping manifests, purchase orders, and other

sources to find out.  Indeed, claimants also rely on discovery from asbestos defendants to find

out where their products were used and, hence, where the exposures occurred.  Asbestos

defendants in the tort system often are "repeat players" in asbestos tort litigation, and, during

their time in the tort system, have developed a wealth of data and knowledge, as the Debtors

have, of the worksites where their products were used.  The Brooklyn Navy Yard, for example,

was notorious for pervasive asbestos exposures,[17] and Garlock defended numerous suits

involving exposures to its products at that site.  Asbestos defendants, including the Debtors, are

thus essential sources of information for plaintiffs to prove up their claims.  Yet, for more than

four years, the automatic stay has shielded the Debtors from discovery in the tort system.  And it

---

[17]   Exposures at the Brooklyn Naval Yard have spurred thousands of asbestos cases.  *See, e.g.*,
*In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 835 (2d Cir. 1992) ("From the 1930's
through 1966, thousands of workers at the New York Naval Shipyard, commonly known as the
Brooklyn Navy Yard (BNY), breathed air laden with carcinogenic asbestos fibers."); *In re E. &
S. Dists. Asbestos Litig.*, 772 F. Supp. 1380, 1385 (E.D.N.Y. & S.D.N.Y. 1991), *aff'd in part and
reversed in part*, 971 F.2d 831 (2d Cir. 1992) (explaining that the consolidation of several
hundred cases involving factual issues arising in cases of workers exposed to asbestos while
working in the Brooklyn Navy Yard).

stands to reason that, during those same four years, records have been destroyed, memories have

faded, and injured parties, coworkers, and other witnesses have passed away.  It is in this setting

that the Debtors, after more than four years of being protected by the automatic stay, are

expecting claimants to come forward with the kind of "trial-ready" evidence in hand that they

might have garnered if they had been permitted discovery in the tort system.  The Debtors should

not be permitted to exploit this state of affairs by refusing to count ballots that fail to prove their

claims at the voting stage.

In a proper allowance proceeding, the Class 4 claimants would be permitted to pursue

discovery from the Debtors, and inquire into the Debtors' past litigation files, databases, and

records of jobsites and other locations where Garlock asbestos-containing products were used or

installed.  *See* Fed. R. Bankr. P. 9014(c) (making federal discovery rules applicable in contested

matters).  But the scope and scheduling of that discovery would predictably be the subject of

much contention, and would engender numerous issues that would have to be resolved by this

Court.  Given that the stakes pertain only to voting and that full-fledged proceedings to allow

compensable claims would occur later if the Plan were confirmed, this Court should reject the

Debtors' invitation to hold contested proceedings over product exposure and causation.

> **2.     The requirement that specific forms of exposure evidence be
> attached is heavily tilted in the Debtors' favor insofar as it
> would require claimants to meet an evidentiary standard
> higher than what courts apply in the tort system.**

The "basic federal rule in bankruptcy is that state law governs the substance of claims,

Congress having generally left the determination of property rights in the assets of a bankrupt's

estate to state law."  *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-51

(2007) (citations and internal quotation marks omitted); *see also Raleigh v. Ill. Dep't of Revenue*,

530 U.S. 15, 20 (2000) (holding that bankruptcy law does not alter the burden of proof dictated

- 14 -

by the substantive law that creates the claim).   If approved, the proposed Voting Procedures would violate this bedrock principle of bankruptcy by introducing Garlock's own custom-tailored, defendant-friendly evidentiary rules that are designed to facilitate the disqualification of ballots.   For instance, the proposed Voting Procedures provide that "[t]estimony or sworn statements that Garlock asbestos-containing products were used at the plant, facility, or other worksite *is not sufficient to identify exposure* to asbestos from a Garlock asbestos-containing product."[18]   The proposed procedures would also require that documents attached to each Class 4 ballot identify "the manner in which the injured party experienced exposure to asbestos from the Garlock asbestos-containing product."[19]   In other words, the procedures would require the claimant's personal knowledge or eyewitness testimony from a coworker or other percipient witness, placing the injured party at the precise location where the Garlock asbestos-containing product was used or installed and attesting to the injured party's actual exposure to asbestos fibers from that product.

These procedures would impose a standard of proof far more stringent than the standard applied by courts in the tort system.   For example, in *Owens-Corning Fiberglas Corp. v. Watson*,[20] the Virginia Supreme Court held that circumstantial evidence that the defendant had sold its asbestos-containing products to the shipyard while the plaintiff was working there was sufficient to support the verdict in the plaintiff's favor.[21]   And in *Roehling v. National Gypsum Co. Gold Bond Building Products*,[22] the plaintiff, who worked as a pipefitter in a power station,

---

[18]   Motion, Ex. B, at 22 (emphasis added).

[19]   *See supra* note 14 and accompanying text.

[20]   413 S.E.2d 630 (Va. 1992).

[21]   *Id*. at 639.

[22]   786 F.2d 1225 (4th Cir. 1986).

- 15 -

testified that asbestos material was "all over the place" where he worked, but he could not identify the products to which he had been exposed.[23]  Other witnesses who worked within the vicinity, and around the same time as the plaintiff, identified the defendants' asbestos-containing products, but did not recognize the plaintiff as being on the jobsite.[24]  On this evidence, the district court in *Roehling* granted summary judgment for the defendants.  The Fourth Circuit, however, reversed, explaining that "[w]e disagree with the district court that direct evidence is needed showing that [the plaintiff] identified the asbestos products or that the witnesses knew, had contact with, or recognized [the plaintiff] as being on the jobsite.  Such burden is unreasonable."[25]  "The evidence, circumstantial as it may be," explained the court, "need only establish that [the plaintiff] was in the same vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled."  Thus, under *Roehling*, circumstantial evidence may be used to identify the asbestos-containing products used at the jobsite, and circumstantial evidence from a separate source may be used to place the plaintiff within the vicinity of the work generating the asbestos dust; a plaintiff need not introduce eyewitness testimony establishing the "manner" in which the injured person "experienced exposure" to the defendant's asbestos-containing product.  In this respect, the Debtors' procedures are contrary to the Fourth Circuit's decision in *Roehling*.  Had the Fourth Circuit in *Roehling* applied Garlock's customized and stringent evidentiary standard, it would have affirmed the district court's grant of summary judgment rather than reversing it.

---

[23]  *Id*. at 1227.

[24]  *Id*. at 1227-28.

[25]  *Id*. at 1228.

In another case, *Berkowitz v. A.C.&.S., Inc.*,[26] the New York Appellate Division stated that the "inability of certain of plaintiffs to identify defendant Worthington as the manufacturer of the pumps containing the asbestos to which they were allegedly exposed does not require dismissal of their actions."[27]  This was because the "*defendants' own witness* conceded that Worthington pumps were on a very high percentage of Navy ships during the relevant time period."[28]  Moreover, "workers in the Brooklyn Navy Yard testified at their depositions that the pumps they saw on ships in the Navy Yard were manufactured by Worthington."[29]  The *Berkowitz* court thus affirmed the trial court's denial of the defendants' summary judgment motion.  Thus, under *Berkowitz*, circumstantial evidence of product exposure may come from different sources, including the defendant's own witnesses.[30]  In this case, the Debtors have been shielded from discovery in the tort system for more than four years, but they are nonetheless asking this Court to approve procedures that would require claimants to comply with an

---

[26]  733 N.Y.S.2d 410 (App. Div. 2001).

[27]  *Id*. at 411.

[28]  *Id*. (emphasis added).

[29]  *Id*. (citing *Salerno v. Garlock Inc.*, 622 N.Y.S.2d 946 (App. Div. 1995)).

[30]  Numerous other courts have recognized that circumstantial evidence can be used to establish exposure.  *See, e.g., O'Brien v. Nat'l Gypsum Co.*, 944 F.2d 69, 73 (2d Cir. 1991) (upholding the jury's causation finding against Celotex based on evidence that the decedent died from an asbestos-related disease and "testimony that asbestos products were used interchangeably on virtually all of the warships under construction in the Navy Yard"); *Johnson v. Celotex Corp.*, 899 F.2d 1286 (2d Cir. 1990) (upholding jury's finding of causation based on circumstantial evidence that the defendants' asbestos-containing products were present on particular ships and that asbestos fibers were "[a]ll over the deck"); *see also Lineaweaver v. Plant Insulation Co.*, 37 Cal. Rptr. 2d 902, 908-09 (Ct. App. 1995) ("While there was no direct evidence that [the plaintiff] was exposed to [products supplied by the defendant], the circumstantial evidence was sufficient to support a reasonable inference of exposure" when the plaintiff had produced evidence showing, *inter alia*, that the defendant was the exclusive distributor of the product in the area where the plaintiff was exposed).

evidentiary standard more stringent than what other courts require, just to have their ballots counted.  For this reason, the Voting Procedures would impose an unfair burden on claimants.

It bears mention that the requirement to attach specific forms of exposure evidence to each Class 4 ballot is inconsistent with the argument espoused by the Debtors previously for years that the ballots cast by asbestos claimants in other Chapter 11 cases are, in and of themselves, evidence of exposure to non-Garlock asbestos products.  Indeed, Garlock has initiated litigation against plaintiffs' counsel in this bankruptcy case and against the widow of a mesothelioma victim in Kentucky state court, alleging claims of fraud premised on Garlock's erroneous assertion that ballots cast in other bankruptcy cases constitute evidence of non-Garlock exposures.  But, now, when it comes to solicitation and voting in Garlock's *own* bankruptcy case, Garlock insists that a ballot completed and signed by the claimant or his or her authorized representative will not suffice; the Voting Procedures would require claimants to adorn their ballots with sworn statements and other documentation that may or may not satisfy the Debtors' rigid standard for demonstrating exposure to Garlock asbestos-containing products.  The Debtors' continual efforts to burden claimants, increase their costs, and deter the assertion of rights as holders of claims, albeit disputed claims, are unconscionable and should not be indulged by this Court.

> **3.**   **The Voting Procedures would impose no deadline on the Debtors to object to ballots and thus would open the door to mischief.**

The Debtors are requesting that the voting deadline be 150 days after entry of the order approving the disclosure statement.[31]  The hearing on approval of the disclosure statement is

---

[31]   Motion ¶ 60, at 21.

currently scheduled to commence on October 7, 2014.[32]  The Committee has filed, concurrently

herewith, objections to the Debtors' proposed disclosure statement.  Supposing, for the sake of

argument, that on October 14, 2014, the Court enters an order approving the disclosure statement

over the Committee's objections (which it should not), the 150-day voting deadline would be

Friday, March 15, 2015.  The proposed Voting Procedures would impose no deadline on the

Debtors to object to ballots; rather the Debtors are asking that the hearings on those objections be

no later than 45 days before the confirmation hearing, which means no later than Friday, May 29,

2015, if the confirmation hearing is set for July 15, 2015, as the Debtors request.[33]  Because the

Voting Procedures would permit objections to ballots *after* the voting deadline, the Debtors

would be able to target and object to ballots rejecting the Plan, after all the ballots had been cast.

(Indeed, because the Voting Procedures make it explicitly clear that temporary allowance for

voting would have no bearing whatsoever on allowance for distribution purposes,[34] it is hard to

imagine why the Debtors would object to *any* ballot accepting the Plan.)  This would put the

Debtors in a position to shape the overall voting outcome in Class 4, in order to obtain an

accepting class of impaired claims and thus pave the way for an attempted cramdown.

In addition, because the Debtors would not be subject to a deadline for making

objections, they could object to Class 4 ballots shortly before the 45-day cutoff for hearings on

those objections, thereby depriving claimants and their counsel of adequate time to respond.  The

drafters of Bankruptcy Rule 3018(a) authorized temporary allowance of claims for voting in part

---

[32]  Order Adjourning Hearings and Extending Deadlines for Objections to the Debtors' Proposed Disclosure Statement and Solicitation and Confirmation Procedures ¶ 1, at 2, filed July 30, 2014 [Dkt. No. 3912].

[33]  Motion ¶¶ 61 & 63, at 21-22.

[34]  *See infra* note 37 and accompanying text.

to curb the potentially abusive practice of plan proponents filing objections to claims at the last

minute, thereby disqualifying votes and manipulating voting outcomes.  *See, e.g., In re Mangia*

*Pizza Invs., LP*, 480 B.R. 669, 679 (Bankr. W.D. Tex 2012) (stating that the "policy behind

temporarily allowing claims is to prevent possible abuse by plan proponents who might ensure

acceptance of a plan by filing last minute objections to the claims of dissenting creditors")

(quoting *In re Armstrong*, 294 B.R. 344, 354 (10th Cir. B.A.P. 2003), *aff'd*, 97 F. App'x 285

(10th Cir. 2004)).[35]  By allowing the Debtors to interpose objections to Class 4 ballots at the

eleventh hour before the 45-day cutoff for holding hearings, the Voting Procedures would

undercut one of the principal purposes of temporary allowance under Rule 3018(a) and introduce

the same abuses that Rule 3018(a) was intended to thwart.

###### C.    The Proposed Class 4 "Temporary Allowance" Procedures and Requirements of Specific Types of Exposure Evidence Are Wholly Unnecessary.

Through the objection and "temporary allowance" process described above, the Debtors

are essentially seeking to hold "mini-trials" on the merits of individual Current GST Asbestos

Claims, just to determine whether Class 4 ballots will be counted.  Aside from taxing the time

and resources of the parties and this Court, such an exercise would be pointless and unnecessary.

The temporary allowance process is designed to fix an amount solely for voting purposes.  *See*

Fed. R. Bankr. P. 3018(a) (providing that "the court after notice and hearing may temporarily

allow the claim . . . in *an amount which the court deems proper* for the purpose of accepting or

---

[35]  *See also In re Gardinier*, 55 B.R. 601, 604 (Bankr. M.D. Fla. 1985) ("[O]ne can easily visualize a situation where it would be grossly unfair and unjust to disenfranchise any claim or interest just because the debtor interposed an objection to the allowance of the claim or interest. This is true especially in situations when the objection appears to be frivolous and without basis, and, because of time restraints, the court is not in the position to consider the objection on its merits prior to the confirmation hearing.").

rejecting a plan") (emphasis added).  Here, the Debtors have already determined what the voting amounts in Class 4 should be:  all Current GST Asbestos Claims based on pleural mesothelioma would be voted in the amount of $10,000; all Current GST Asbestos Claims based on the other diseases specified in the Voting Procedures would be voted in the amount of $1.[36]  It is therefore unnecessary to have litigation over whether a particular Current GST Asbestos Claim should be temporarily allowed.

Moreover, even if a ballot casting a Current GST Asbestos Claim survived the Debtors' objection gauntlet and was "temporarily allowed," that would have no bearing whatsoever on whether the Current GST Asbestos Claim ultimately would be allowed to receive a distribution from the Debtors' estates under the Plan.  The proposed form of Class 4 ballot makes it abundantly clear that "temporary allowance of any Class 4 Claim for voting purposes does not in any way constitute an admission of liability by the Debtors, or an admission of the value of any Class 4 Claim," thus reinforcing the point that what is at issue here is voting and not distributions from the estate.[37]  In a typical asbestos-driven reorganization, the task of resolving and liquidating individual claims for purposes of distribution is left to an asbestos settlement trust created by a plan of reorganization pursuant to 11 U.S.C. § 524(g).  In a 524(g) reorganization, claims are channeled to the trust for processing and, if eligible, paid, so there is no need for the bankruptcy court to take on the Sisyphean task of individual claims determinations in allowance

---

[36]  The Committee believes these voting amounts are arbitrary; indeed, these amounts are substantially lower than, and thus not reflective of, the liquidated claim amounts entered against Garlock in the tort system during the 1990s, the decade that predated the supposed withholding and suppression of exposure evidence alleged by Garlock.  The Committee has nonetheless decided not to dispute the arbitrary voting amounts fashioned by the Debtors since, at the end of the day, these amounts are for voting on the Plan, and not for determining distributions from the estates.

[37]  Motion, Ex. B, at 20.

proceedings, which would take many years to complete and would deplete the assets of the estate.   Although the Debtors have not proposed a plan comporting with § 524(g) of the Bankruptcy Code, their Plan does set forth procedures for resolving and liquidating asbestos personal-injury claims on two separate tracks – the "Litigation Option" or the "Settlement Option."   In other words, even the Debtors' Plan would leave the ultimate resolution and liquidation of asbestos claims for a later day.   But because the Debtors are proposing, in essence, to litigate the merits of Class 4 claims during the solicitation phase, they are setting up a process whereby Class 4 claimants and their counsel may be forced to litigate exposure and causation issues in order to have their ballots counted, and then forced to revisit or re-litigate those same issues under the auspices of the Plan in order to receive a distribution.   Such duplicative litigation makes no sense.   As one court stated in an asbestos-related bankruptcy case:   "There is no need to adjudicate claims once in the bankruptcy court for voting purposes and to adjudicate the same claims again . . . for allowance purposes."   *In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 425 (Bankr. D. Md. 2007).

For all of these reasons, this Court should reject the provisions in the Voting Procedures that would require Class 4 claimants to attach specific forms of exposure evidence to their ballot and would authorize a process for objecting to ballots.   In lieu of those provisions, any voting procedures approved by this Court should simply require each claimant or authorized agent to certify on the ballot that there is a good-faith basis for believing that the claimant has a "Current GST Asbestos Claim," as defined in the Plan, or that the claimant probably will have grounds to proceed against a trust or other limited fund formed in accordance with a confirmed plan of reorganization.   Because the term "GST Asbestos Claim" is broadly defined, such an approach would sweep in claimants who believe in good faith that they have a "disputed" claim against

Garlock and would make those claimants eligible to vote.[38]  It is perfectly proper to grant voting

eligibility to holders of "disputed" claims, and other types of "Current GST Asbestos Claims,"

given that the Plan would discharge all of these claims on its effective date.[39]  The approach

proposed by the Committee here is consistent with the decision in the asbestos bankruptcy case

of *Lloyd E. Mitchell, Inc.*, which permitted asbestos claimants "to self-determine that they have a

claim (*i.e.*, essentially to allow the claim themselves for voting purposes) and, based on that

determination, [made them eligible] to vote."[40]

**D.      By Limiting Class 4 Voting Eligibility to Claims Based on Specified Diseases, the Proposed Voting Procedures Would Disenfranchise Untold Numbers of Asbestos Victims with Other Diseases or Injuries.**

The term "GST Asbestos Claims" is broadly defined in the Plan, as it encompasses all

asbestos-related claims against Garlock, whether or not such claims are "reduced to judgment,

liquidated, unliquidated, fixed, settled, contingent, matured, unmatured, disputed, [or]

---

[38]   *See* Plan § 1.1.71, at 9 (defining "GST Asbestos Claim" as "a Claim against any of GST or Garrison, whether or not such Claim is . . . *disputed*, [or] undisputed") (emphasis added). Indeed, a claim is not unenforceable in bankruptcy merely because the debtor disputes the merits of the claim or dislikes the applicable state tort law.  To the contrary, the Bankruptcy Code expressly defines "claim" to encompass a right to payment that is "disputed."  11 U.S.C. § 101(5).

[39]   *See id.* § 8.1.1, at 50.

[40]   *Lloyd E. Mitchell, Inc.*, 373 B.R. at 423.  The Committee's approach is also in line with the testimony of James L. Patton, one of the Committee's experts in the *Garlock* estimation hearing. Mr. Patton has a long track record in asbestos mass-tort bankruptcy cases.  Hr'g Tr. 3676:22-24, Aug. 7, 2013 (attached hereto as **Exhibit 8**).  He has served as counsel to the future claimants' representative in many of those bankruptcy cases and in conjunction with the § 524(g) trust emerging from those bankruptcy cases.  Hr'g Tr. 3676:5-14, Aug. 7, 2013.  He has also served as the future claimants' representative himself, and in one asbestos mass-tort bankruptcy as debtor's counsel.  Hr'g Tr. 3676:17-24; 3677:9-15, Aug. 7, 2013.  At the *Garlock* estimation hearing, Mr. Patton opined that an asbestos claim "can be voted" if there is "some good faith basis to believe that there either is a claim or could be a claim once the [asbestos settlement] trust opens its doors such that that claim may be addressed by that trust."  Hr'g Tr. 3701:12-17, Aug. 7, 2013.

- 23 -

undisputed."[41]   The definition also sweeps in asbestos-related claims based on or arising from

"death . . . , disease, medical monitoring for increased risk . . . , loss of consortium, lost wages or

other opportunities, survivorship, or other personal injuries (whether physical, emotional, or

otherwise)."[42]   If confirmed, the Plan would discharge all "GST Asbestos Claims," including all

"Current GST Asbestos Claims" against Garlock.   Despite the breadth of the Plan's defined

terms, the proposed Voting Procedures would permit only a *subset* of Class 4 claimants –

namely, holders of Current GST Asbestos Claims that are based on pleural or peritoneal

mesothelioma, lung or laryngeal cancer, or asbestosis – to vote on the Plan.[43]   Garlock asbestos

victims who, for example, suffer from asbestos-induced pleural plaques or pleural effusions, or

those asserting conspiracy claims against Garlock based on, for example, Garlock's participation

as a member of the Asbestos Textile Institute,[44] would not be entitled to vote, even though their

claims would be discharged on the effective date of the Plan.   The Debtors' narrowing of the

asbestos creditor franchise is contrary to the procedures approved in other asbestos-driven

---

[41]   Plan § 1.1.71, at 9.

[42]   *Id*. at 10.

[43]   Motion, Ex. B, at 8-9.

[44]   *See In re Asbestos Litig.*, 509 A.2d 1116, 1119-21 (Del. Super Ct. 1986) (concluding that plaintiffs could pursue a conspiracy claim against asbestos manufacturers based on the allegation that "members of the referenced trade associations [including the Asbestos Textile Institute] suppress[ed] publication as well as general dissemination of medical and scientific data concerning the health hazards associated with inhalation of asbestos fibers" (internal citation and quotation marks omitted)), *aff'd sub nom. Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del. 1987); *see also* Barry I. Castleman, *Asbestos: Medical and Legal Aspects* 592-94 (5th ed. 2005) (describing Garlock's membership and involvement in the Asbestos Textile Institute and its historical knowledge of the hazards of asbestos exposure).   Not every court has followed the *Nicolet* decision, cited above.   *See, e.g.*, *Flanders v. Garlock, Inc.*, 2003 WL 22697241 (S.D. Ga. Aug. 11, 2003).   Nevertheless, the point is that even holders of asbestos-related claims against Garlock that are contingent, unmatured, or disputed qualify as holders of "GST Asbestos Claims," and therefore should be given the opportunity to vote on a plan that purports to affect their claims.

bankruptcy cases. For example, the voting procedures in *Pittsburgh Corning* provided that "[i]n the event more than one disease level is selected by or on behalf of a holder of a Channeled Asbestos PI Trust Claim, the Voting Agent shall designate Disease Level I [the disease level with the lowest voting amount] for voting purposes only."[45] This rule in *Pittsburgh Corning* enabled claimants to cast a ballot without having to select or certify a disease category.[46] Similar language appears in the voting procedures approved in other asbestos-related bankruptcies.[47] There is no equivalent language in the Voting Procedures proposed here.

The policy of the Bankruptcy Code encourages the full spectrum of claimholders to vote on Chapter 11 plans as a way of promoting creditor participation in reorganizations. *See In re Amarex, Inc.*, 61 B.R. 301, 303 (Bankr. W.D. Okla. 1985) (stating that "the spirit of Chapter 11 … encourages creditor vote and participation in the reorganization process"); *see also In re Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993) (noting the "chapter 11 policy of 'creditor democracy'") (footnote omitted); *In re DRW Prop. Co.*, 54 B.R. 489, 497 (Bankr. N.D. Tex. 1985) ("Subchapter II of Chapter 11 [which includes § 1126] . . . delineates the basic machinery which Congress has provided for creditor democracy within the debtor reorganization process."). By limiting voting eligibility to only claims with specified diseases, the proposed Voting Procedures cut against that policy. If all manner of "Current GST Asbestos Claims" are to be discharged, then all holders of such claims should be permitted to vote on the

---

[45]   *Pittsburgh Corning Corp.* Voting Procedures at 5 (attached hereto as **Exhibit 9**). During the *Garlock* estimation hearing, this document was marked for identification as ACC-480 and admitted into evidence on August 8, 2013. *See* Hr'g Tr. 3790:2-4, Aug. 8, 2013 (attached hereto as **Exhibit 10**).

[46]   Hr'g Tr. 3705:21-3706:1, Aug. 7, 2013 (testimony of James L. Patton) (attached hereto as Ex. 8).

[47]   *See* attached Ex. 1, ¶ 3, at ACC-SOL-PRO-018; Ex. 2, at ACC-SOL-PRO-079; Ex. 3, at ACC-SOL-PRO-127; Ex. 5, at ACC-SOL-PRO-197; Ex. 7, at ACC-SOL-PRO-281.

Plan.  By disenfranchising potentially thousands of claims falling within the definition of

"Current GST Asbestos Claim," the Voting Procedures would winnow the eligible voters and

thus the votes actually cast, thereby enabling the Debtors to attack fewer ballots more easily.

> ### E.    If the Court Sustains the Committee's Objections to the Exposure Evidence Requirement and the Objection Process, It Should Authorize the Use of Master Ballots in Classes 3 and 4.

For the reasons set forth above, this Court should sustain the Committee's objections with

regard to the proposed Class 4 procedures and deny the Motion.  If the Court, however, is

inclined to grant the Motion subject to these objections, it should authorize Class 4 claimants'

counsel to cast "master ballots" – that is, ballots enabling plaintiffs' firms to cast the votes of

many clients on a single form.  "The use of master ballots in mass tort cases is a long-standing

procedural mechanism that has been employed almost as a matter of course."  *Lloyd E. Mitchell,*

*Inc.*, 373 B.R. at 426.[48]  The Debtors clearly have no philosophical objection to the use of master

ballots, as they are allowing such ballots to be cast in the Convenience Claims Class (Class 8).

Garlock admits that it had more than 100,000 claims pending against it when it filed for

bankruptcy.[49]  Epidemiology and Garlock's own claims experience indicate that thousands of

asbestos victims have developed symptoms of asbestos-induced disease during the four years in

which Garlock has been in Chapter 11.  Many plaintiffs' law firms will have hundreds, if not

---

[48]   In addition, during last year's estimation hearing, Mr. Patton testified as follows: "[M]ost of the time ballots are cast by law firms using a Master Ballot structure that we borrowed from the bond holder cases.  And we allow law firms to collect information from their clients and cast a single ballot that reflects the vote of many or all of their clients.  Often, these Master Ballots will be ballots cast for thousands of claimants at a time."  Hr'g Tr. 3692:12-18, Aug. 7, 2013 (attached hereto as Ex. 8); *see also* attached Ex. 2, at ACC-SOL-PRO-105 (proposed master ballot); Ex. 3, at ACC-SOL-PRO-143 (same); Ex. 5, at ACC-SOL-PRO-198 (provision for master ballots); Ex. 6, at ACC-SOL-PRO-237 (proposed master ballot); Ex. 7, at ACC-SOL-PRO-305 (same).

[49]   *See* Disclosure Statement § 2.4.4, at 32-33.

thousands, of clients holding claims that fit the broad definition of "Current GST Asbestos Claim" in Class 4. Requiring those firms to complete separate ballots for each and every one of those clients would impose an undue administrative burden and thus discourage them from voting in Class 4. For the same reasons, this Court should also permit counsel representing the holders of Class 3 Settled GST Asbestos Claims to cast master ballots as well.

## II.   The Procedures Proposed for Class 8 Suffer from the Same Infirmities as Those Proposed for Class 4.

Under the Plan, all creditors, including asbestos personal-injury claimants, may elect to have their claims allowed and treated in the "Convenience Class" (Class 8), in which case they would receive $100 from reorganized Garlock in full satisfaction and extinguishment of their claims. If claimants want their claims treated as a Convenience Class Claim, they would have to complete a Class 8 ballot. The Debtors are representing that they will not object to the allowance of a Convenience Class Claim if the claim is listed as "pending" in the May 2011 version of the Garrison asbestos claims database.[50]  Holders of claims that are *not* listed in that database, however, would face virtually identical voting procedures as the claimants casting ballots in Class 4:[51]  they would have to attach to their Class 8 ballots the same types of documents demonstrating exposure to Garlock asbestos products; the Debtors would have the right to object to those ballots, but would not be subject to any deadline to do so; and litigation would then ensue over the Debtors' objections, which would have to be decided by this Court. None of these Class 8 procedures is necessary or makes sense, especially for claimants who could only

---

[50]   Motion ¶ 45, at 15-16.

[51]   *Id.* ¶ 46, at 16.

hope to receive $100 for their claims if the Debtors' Plan were confirmed.[52]  This Court should

reject the procedures proposed for Class 8.

### III.    The Proposed Procedures for Class 3 Fail to Provide for Temporary Allowance of Such Claims and Would Disqualify the Ballots of Many Class 3 Claimants, Thus Depriving Them of a Vote on the Plan.

Class 3 is comprised of "Settled GST Asbestos Claims."  The Plan defines such a claim

as an unpaid "GST Asbestos Claim that, as of the Petition Date, was subject to a settlement

agreement enforceable under applicable law between [Garlock] and the Holder of such GST

Asbestos Claim."[53]  By order of July 9, 2014, this Court set a bar date of September 30, 2014, for

holders of Settled GST Asbestos Claims to file proofs of claim.[54]  On July 7, 2014, the Debtors

filed amended bankruptcy schedules listing a total of 390 Settled GST Asbestos Claims, 316 of

which (almost 90%) were identified as disputed,[55] thus foreshadowing numerous contested

allowance proceedings over whether, among other issues, these unpaid settlements are

"enforceable under applicable law."  To date, approximately 541 proofs of claim have been filed

in support of Settled GST Asbestos Claims.  The Debtors have not yet filed objections to them.

According to the proposed form of Class 3 ballot, the Settled GST Asbestos Claims

would be "temporarily allowed for voting purposes in the amount claimed in the Holder's proof

of claim, *unless such Claim is subject to an objection*."[56]  Thus, with at least hundreds, if not

thousands, of proofs of claim expected to be on file by the bar date, the Debtors would be able to

---

[52]  *Id*. ¶ 45, at 15.

[53]  Plan § 1.1.116, at 15.

[54]  Order on Debtors' Motion to Establish Bar Date for Settled Asbestos Claims and Related Relief  ¶ 4, at 2, filed July 9, 2014 [Dkt. No. 3854].

[55]  *See* Notice of Second Amendment to Schedules of Assets and Liabilities for the Above-Captioned Debtors, filed July 7, 2014 [Dkt. No. 3846].

[56]  Motion, Ex. B, at 14 (emphasis added).

target and disqualify large numbers of rejecting votes, simply by interposing objections to the corresponding proofs of claim.   The Debtors suggest that this is perfectly permissible under Fourth Circuit decisional law, and they quote the portion of the *Jacksonville Airport* opinion stating that Bankruptcy Code §§ 502 and 1126 "allow only holders of claims to which no party has objected to vote on Chapter 11 plans."[57]   What the Debtors neglect to mention, however, is that the Fourth Circuit in *Jacksonville Airport* also stated that, in the face of a proof-of-claim objection, "the court upon motion [may] temporarily allow[ ] the claim for voting purposes or fully adjudicate[ ] [the] objection prior to the vote."[58]   Under the Voting Procedures, neither of these alternatives would be available to Class 3 claimants.   The Debtors have neither imposed a deadline on themselves to file objections to the proofs of claims nor reserved any time that would enable this Court to "fully adjudicate" such objections "prior to the vote."   As for temporary allowance, the Class 3 claimants would be in the same disadvantaged position as their Class 4 counterparts insofar as the Debtors could withhold their objections until shortly before the 45-day cutoff for hearings on temporary allowance, thereby depriving Class 3 claimants of adequate time to respond and perhaps even depriving them of a hearing altogether.   Again, such a procedure is contrary to the purpose of temporary allowance under Bankruptcy Rule 3018(a), which is intended to curtail such abuses and gamesmanship by plan proponents.[59]

The proposed form of Class 3 ballot makes it abundantly clear that "temporary allowance of any Class 3 Claim for voting purposes does not in any way constitute an admission of liability

---

[57]   Motion ¶ 15, at 7 (quoting *Jacksonville Airport, Inc. v. Michkeldel, Inc.*, 434 F.3d 729, 731 (4th Cir. 2006)).

[58]   *Jacksonville Airport, Inc.*, 434 F.3d at 732 (citing Fed. R. Bankr. P. 3018(a)).

[59]   *See supra* note 35 and accompanying text.

by the Debtors, or an admission of the value of any Class 3 Claim."[60]  Accordingly, there is no useful purpose in taxing the time and resources of this Court, and those of the parties, through litigation over whether a Class 3 settled claim should be temporarily allowed for voting purposes.  This Court should order that the Class 3 claims be allowed temporarily for voting purposes in the amounts set forth in the respective proofs of claim (or in the scheduled amounts, if the claims are listed in the schedules as liquidated, non-contingent, and undisputed), regardless of whether there are pending objections to the proofs of claims filed by Class 3 claimants, and leave for another day issues concerning whether holders of objected-to Class 3 claims are entitled to a distribution from the Debtors' estates.

## IV.  The Proposed Ballot Certifications Would Risk Waiver of the Claimants' Attorney-Client Privilege, Are Unnecessary, and Do Not Comport with the Official Bankruptcy Forms.

The proposed forms of ballots for Classes 3, 4, 6, and 8 would require any authorized agent, including an attorney, signing the ballot on behalf of a claimant to certify "under penalty of perjury" that the claimant "has *instructed me* [the authorized agent] *to cast the vote on the Plan* [as] *indicated*" on the ballot.[61]  It is unclear what sort of "instruction" would be necessary to fulfill this certification.  Indeed, it would be impracticable for claimants' law firms to seek and obtain written instructions from each of their clients on how to vote on the Plan.  Even more problematic is that the certification purports to disclose a communication from a client to his or her attorney – *i.e.*, disclosing the client's instruction on how to vote – and therefore could be deemed to waive the claimant's attorney-client privilege.  In addition, this certification of what a client "instructed" is unnecessary; the proposed forms of ballots already require authorized

---

[60]  Motion, Ex. B, at 15 ("Item 2" of ballot instructions).

[61]  Motion, Ex. B, at 17, 25, 36, & 51 (emphasis added).

agents to certify "under penalty of perjury" that they "have the full power and authority to vote to accept or reject this plan on behalf of the [claimant] identified . . . above."[62]  Any authorized agent with "the full power and authority to vote" on a plan does not need instructions from a claimant on how to vote; hence, the "instructed me" certification is overkill.  It should be stricken.

It bears mention that Official Bankruptcy Form 14 (the form of ballot) requires a simple signature by the creditor or authorized agent, and has no requirement to certify "under penalty of perjury."  To the extent that the ballots for Classes 4, 6, and 8 are intended to function as proofs of claim, it is worth noting that Official Bankruptcy Form 10 (the proof-of-claim form) requires a signed declaration that the "information provided in this claim is true and correct *to the best of my knowledge, information, and reasonable belief*" (emphasis added).  The words "knowledge, information, and reasonable belief" appear nowhere in the ballots proposed by the Debtors.  Indeed, there is nothing in Official Bankruptcy Form 10 that even approaches the sworn certifications called for in the proposed ballots.  For these reasons, the words "to the best of my knowledge, information, and reasonable belief" should be included in any ballot certifications for Classes 3, 4, 6, and 8.

**V.     The Proposed Voting Procedures Would Require Claimants Represented by Counsel to Disclose Their Personal Contact Information on Ballots That Would Be Accessible on the Internet, Which Is Not Appropriate.**

Virtually all the claimants involved in the Debtors' proposed solicitation are represented by counsel.  Indeed, the Debtors are proposing that notice to known claimants of the solicitation and proposed confirmation of the Plan be accomplished by sending notice to plaintiffs' firms.[63]

---

[62]   *See id.*

[63]   Motion ¶¶ 52-53, at 18-19.

Nevertheless, even when a claimant's attorney would be completing and signing a ballot for a client, the proposed Voting Procedures would still require the attorney to fill in the client's personal contact information.[64]   The Debtors suggest that this information is necessary to identify claimants, but that is not true.[65]   Experts, including those retained by the Debtors, typically rely on the claimants' names, the last four digits of their Social Security numbers, and the names of their respective counsel, in order to identify claimants and distinguish them from one another.  Experts do not typically rely on the claimants' home addresses and phone numbers because that information can quickly become stale, as individuals move to a new home.  It is simply unnecessary to require the claimants' personal contact information to be included on the ballots when the claimants are represented by counsel.  The name and address of the attorneys representing them will suffice.  Moreover, as the Debtors are proposing to make all completed ballots, including the personal contact information included therein, publicly accessible on the Internet,[66] the claimants would be vulnerable to direct contact by the Debtors, the balloting agent, other tort defendants, or anyone else, outside the presence of claimants' tort counsel. There is no good reason for this.  Claimants should not be required to provide personal contact information on their ballots if they are represented by counsel.  As for any claimants not represented by counsel, their personal contact information should be redacted before their ballot is made publicly available.

---

[64]   Motion, Ex. B, at 16, 23, 35, 41 & 48.

[65]   *See id.*

[66]   Motion, Ex. B, ¶ 7(c), at 8.

**VI.  The Debtors' Request to File an "Omnibus Objection" Is Not Relevant to a Motion Seeking Approval of Voting Procedures, and the Omnibus Objection Contemplated by the Debtors Would Violate Bankruptcy Rule 3007.**

The Debtors request leave to file an "omnibus objection" to the allowance of asbestos claims, without providing specifics on what form their "omnibus objection" would take.[67] Nevertheless, if experience and historical practice are any guide, their omnibus objection would likely be a "short-form" objection accompanied by a spreadsheet listing hundreds, if not thousands, of asbestos claims objected to, and would provide scant explanation of the grounds for those objections.  Under the proposed order, resolution of any omnibus objection would be "stayed until after confirmation."[68]

This Court should deny the Debtors' "omnibus objection" request for two reasons.  First, the proposed order provides that the omnibus objection would be filed "for purposes other than temporary allowance."  As such the provision authorizing the Debtors to lodge one or more omnibus objections has no place in an order setting forth "Solicitation and Confirmation Procedures," as the order purports to address.  Second, a 2007 amendment to Bankruptcy Rule 3007 sought to curb the abusive practices engendered by omnibus objections, by limiting their use to only procedural defects that are readily verifiable, such as duplicate claims or claims filed in the wrong case or after the bar date.  *See* Fed. R. Bankr. P. 3007(d).  The same amendment to Rule 3007 imposed other restrictions on omnibus objections, such as limiting an omnibus objection to no more than 100 claims.  Fed. R. Bankr. P. 3007(e).  The Debtors have not explained how the omnibus objection contemplated by them could comply with the restrictions

---

[67]  Proposed Order, *supra* note 8, ¶ 21, at 8.

[68]  *Id.*

- 33 -

and limitations set forth in Rule 3007, nor can they do so.  Accordingly, the Court should deny

the Debtors' request for leave to file one or more omnibus objections.

## CONCLUSION

For the reasons set forth above, the Committee requests that the Court sustain the

foregoing objections, deny the Motion, and grant to the Committee such other and further relief

as this Court deems just and appropriate.

Dated:  August 14, 2014                          Respectfully submitted,

                                                 CAPLIN & DRYSDALE, CHARTERED


                                                 By: */s/ Trevor W. Swett III*
                                                 Trevor W. Swett III
                                                 (tswett@capdale.com)
                                                 Peter Van N. Lockwood
                                                 (plockwood@capdale.com)
                                                 Jeffrey A. Liesemer
                                                 (jliesemer@capdale.com)
                                                 One Thomas Circle, N.W.
                                                 Washington, D.C.  20005
                                                 Telephone:  (202) 862-5000

                                                 Elihu Inselbuch
                                                 (einselbuch@capdale.com)
                                                 600 Lexington Avenue, 21st Floor
                                                 New York, New York  10022
                                                 Telephone:  (212) 379-6000

                                                 MOON WRIGHT & HOUSTON, PLLC

                                                 By: */s/ Travis W. Moon*
                                                 Travis W. Moon
                                                 (tmoon@mwhattorneys.com)
                                                 227 West Trade Street, Suite 1800
                                                 Charlotte, North Carolina  28202
                                                 Telephone:  (704) 944-6560

                                                 *Co-Counsel for the Official Committee
                                                 of Asbestos Personal Injury Claimants*

- 34 -