**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | | |
|---|---|---|
| In re: | : | Case No. 10-BK-31607 |
| | : | |
| GARLOCK SEALING TECHNOLOGIES, LLC, *et al.*, | : | Chapter 11 |
| | : | Jointly Administered |
| Debtors.[1] | : | |

**OBJECTION OF THE OFFICIAL
COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS
TO THE PROPOSED DISCLOSURE STATEMENT FOR
<u>DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION</u>**

The Official Committee of Asbestos Personal Injury Claimants (the "**ACC**"), by and through its undersigned counsel, hereby objects to the proposed Disclosure Statement for Debtors' First Amended Plan of Reorganization, filed on May 29, 2014 [Dkt. No. 3710] (the "**Disclosure Statement**") by the Debtors Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company (collectively, the "**Debtors**").

<u>**OBJECTION**</u>

A disclosure statement must provide information that will "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what

---

[1] The Debtors are Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company. As used herein, "**Garlock**" refers to Garlock Sealing Technologies LLC and Garrison Litigation Management Group, Ltd.

1108037

contingencies there are to getting its distribution." *In re Williams*, 1992 WL 521537, at *2 (D. Md. Sept. 1, 1992), *aff'd*, 998 F.2d 1012 (4th Cir. 1993) (internal citations and quotations omitted); *In re RADCO Props., Inc.*, 402 B.R. 666, 683 (Bankr. E.D.N.C. 2009) (same). "[F]ull and honest disclosure" is required, as "creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996); *RADCO*, 402 B.R. at 682 (same).

The ACC was appointed by the Bankruptcy Court to represent the interests of persons who have claims against the Debtors for asbestos-related personal injury and wrongful death.[2] The ACC's opinion that the Plan is unfair to Asbestos Claimants and its recommendation that Asbestos Claimants vote to reject the Plan constitute material information that Asbestos Claimants should consider in determining whether to approve the Plan.

The ACC believes that the Bankruptcy Court's estimate of Garlock's aggregate liability for mesothelioma claims, which underlies the Plan, is unrealistic and far too low; that Asbestos Claimants are not assured of full payment for their claims under the Plan and, for this and other reasons, are impaired by the Plan and entitled to vote to accept or reject it; that the proposed Claims Resolution Procedures and Case Management Order are skewed in favor of Garlock and unfair to Asbestos Claimants, in that they would impose stringent requirements not based on applicable law but designed to insulate Garlock from legitimate claims; and that the Parent Settlement and non-debtor third party releases and the related injunction, which were not

---

[2] *See* Order Appointing Official Committee of Asbestos Personal Injury Claimants, dated June 16, 2010 [Dkt. No. 101]; *see also* Amended Order Appointing Official Committee of Asbestos Personal Injury Claimants, dated July 20, 2010 [Dkt. No. 260].

negotiated at arm's length, are unfair to Asbestos Claimants and impermissible under the Bankruptcy Code.

The ACC also believes that the Plan will prove unconfirmable. Among its other flaws, the Plan would channel both current and future asbestos claims to a capped fund, and would provide extraordinary injunctive relief and third-party releases without complying with the requirements of Section 524(g) of the Bankruptcy Code, and in violation of other aspects of the bankruptcy laws and principles of equity. The ACC reserves the right to raise these and any other objections if the Debtors seek confirmation of the Plan.

The ACC submits that, if the Disclosure Statement is distributed, it should include a statement setting out the views and recommendation of the ACC, as set forth below.[3]

---

[3] The ACC submits also that the discussion of Insurance in paragraph 2.3.3 of the Disclosure Statement is incomplete and inadequate. The ACC is seeking additional information and clarification from the Debtors, and reserves the right to supplement this Objection.

**STATEMENT OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS IN OPPOSITION TO THE DEBTORS' FIRST AMENDED PLAN AND RECOMMENDING THAT ASBESTOS CLAIMANTS VOTE TO REJECT THE PLAN**

THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS ("**ACC**") WAS APPOINTED BY THE BANKRUPTCY COURT TO REPRESENT THE INTERESTS OF PERSONS WHO HAVE CLAIMS AGAINST THE DEBTORS FOR ASBESTOS-RELATED PERSONAL INJURY AND WRONGFUL DEATH ("**ASBESTOS CLAIMANTS**").

## THE ACC RECOMMENDS THAT ASBESTOS CLAIMANTS VOTE *TO REJECT* THE DEBTORS' PLAN.

THE ACC BELIEVES THAT *THE DEBTORS' PROPOSED PLAN IS UNFAIR TO ASBESTOS CLAIMANTS*.

THE ACC BELIEVES THAT THE AMOUNT THAT WOULD BE SET ASIDE TO COMPENSATE ASBESTOS CLAIMANTS UNDER THE PLAN IS INADEQUATE, THAT THE STANDARDS FOR PAYMENT UNDER THE PLAN ARE UNFAIR, CONTRARY TO LAW, AND DESIGNED FOR THE DEBTORS' UNDUE ADVANTAGE, AND THAT *ASBESTOS CLAIMANTS WOULD NOT BE PAID IN FULL UNDER THE PLAN.*

THE ACC BELIEVES THAT *THE PLAN IS UNFAIR AND INEQUITABLE BECAUSE IT WOULD PERMIT DEBTORS' EQUITY HOLDER TO RETAIN A SIGNIFICANT INTEREST EVEN THOUGH ASBESTOS CREDITORS WOULD NOT BE PAID IN FULL.*

THE ACC BELIEVES THAT *THE PLAN IS UNFAIR TO ASBESTOS CLAIMANTS BECAUSE IT WOULD RELEASE NON-DEBTOR AFFILIATES*, INCLUDING DEBTORS' PARENT COMPANY COLTEC, COLTEC'S PARENT COMPANY ENPRO, CENTRAL MALONEY, FAIRBANKS MORSE PUMP, FAIRBANKS MORSE ENGINE, AND QUINCY COMPRESSOR, FROM LIABILITY TO ASBESTOS CLAIMANTS *WITHOUT ADEQUATE COMPENSATION* AND IN VIOLATION OF THE BANKRUPTCY LAWS.

THE ACC ALSO BELIEVES THAT *THE PLAN CANNOT BE CONFIRMED* BECAUSE, AMONG OTHER THINGS, THE PLAN'S PROPOSAL TO CHANNEL BOTH CURRENT AND FUTURE ASBESTOS CLAIMS TO A CAPPED FUND AND TO RELEASE GARLOCK'S NON-DEBTOR AFFILIATES FROM ASBESTOS LIABILITIES WITHOUT AFFORDING CLAIMANTS THE PROTECTIONS OF SECTION 524(g) OF THE BANKRUPTCY CODE WOULD BE UNLAWFUL AND INEQUITABLE. THE ACC WILL OPPOSE ON ALL APPROPRIATE GROUNDS ANY MOTION BY THE DEBTORS SEEKING CONFIRMATION OF THE PLAN.

## THE ACC RECOMMENDS THAT ASBESTOS CLAIMANTS VOTE "*NO*" ON THE PLAN.

**DISCUSSION**

The ACC recommends that Asbestos Claimants vote to reject the Debtors' proposed Plan. The Debtors' assertions that Asbestos Claimants' rights are unimpaired by the Plan, and that such claimants may thus be deemed to accept the Plan, are incorrect. To the contrary, the ACC contends that Asbestos Claimants' rights would be impaired by the Plan in that, among other things, they are not assured of payment in full for their allowed claims, and therefore that they are entitled to vote to accept or reject the Plan. For the reasons set out below, the ACC believes that the Plan is grossly unfair to Asbestos Claimants. Thus, the ACC recommends unequivocally and without reservation that Asbestos Claimants vote "**NO**" and reject the Plan.

The $275 million that would be set aside under the Plan to compensate Asbestos Claimants is far less than Garlock's available assets, and would be far less than the aggregate value of their claims if estimated realistically in line with Garlock's actual experience in the tort system. The ACC believes that the Debtors have presented a highly inaccurate description of that experience in the tort system. The ACC will not attempt to respond here to every inaccurate statement by the Debtors regarding their asbestos litigation history, but the ACC disagrees vehemently with the Debtors' one-sided, distorted and revisionist story. In particular, the ACC disputes the Debtors' allegations that plaintiffs and their counsel in the tort system regularly suppressed evidence of plaintiffs' exposures to non-Garlock products, and that Garlock was thereby induced to settle cases for more than it would have if it were aware of and able to prove those other exposures. As set out in papers filed with the Bankruptcy Court by the ACC after the estimation hearings, and on the ACC's motion to reopen those hearings, Garlock, which was a repeat-player in asbestos litigation, was in possession of, or had access to, as much or more evidence of plaintiffs' non-Garlock exposures as plaintiffs and their counsel had, and its claims

of evidence suppression are unfounded and false. The ACC also vehemently disagrees with Debtors' assertions regarding the impact of co-defendant bankruptcies and the emergence of bankruptcy trusts on asbestos litigation against Garlock, as set out in the ACC papers mentioned above.

While the Plan is designed to limit artificially the number and amount of allowed claims, the cap on funding deprives Asbestos Claimants of assurance that allowed claims will be paid in full even on that artificially depressed basis. Yet, Garlock's parent company, Coltec Industries, Inc. ("**Coltec**"), would retain a significant equity interest under the Plan regardless of the inadequacy of funding for the claims of Asbestos Claimants, contrary to fundamental bankruptcy principles and basic notions of fairness and equity. Moreover, Garlock's non-debtor affiliates, including Coltec, Coltec's parent EnPro Industries, Inc. ("**EnPro**"), Central Maloney, Fairbanks Morse Pump, Fairbanks Morse Engine, and Quincy Compressor, would be released from all asbestos liabilities, without providing any compensation to Asbestos Claimants that Garlock itself could not provide. The ACC believes that these non-debtor releases and the related injunction called for by the Plan would be unfair to Asbestos Claimants and impermissible under the Bankruptcy Code.

### A. Asbestos Claimants Would not be Paid in Full Under the Plan and are Impaired.

The ACC disagrees with Garlock's assertion that Asbestos Claimants would be paid in full and are unimpaired, and thus should be deemed to have voted to accept the plan. The Asbestos Claimants are impaired because the total amount that would be contributed to the Settlement Facility and Litigation Fund is capped at $275 million in total—an unrealistically low amount that is far from sufficient to pay current and future Asbestos Claimants in full. Debtors' assertion that claimants will be paid "in full" is premised on the assumption that Asbestos

Claimants will be required to comply with onerous procedures and substantive standards devised by Garlock that are heavily skewed against the claimants and would never be imposed in the tort system, the whole purpose of which is to minimize unduly any recoveries by Garlock's asbestos victims. Yet, the Plan provides no assurance that the proposed funding would be sufficient to pay in full even the artificially depressed number and amount of Asbestos Claims that would be allowed under the Plan.

The amount that would be set aside to compensate Asbestos Claimants under the Debtors' proposed Plan is based on the Bankruptcy Court's estimation of the Debtors' aggregate liability for mesothelioma claims. *See* Disclosure Statement ¶ 2.4.2, citing Estimation Order. It is the ACC's position that the estimation is unrealistic, and far too low, in comparison to the liabilities Garlock would face in the tort system in the absence of bankruptcy. Prior to its bankruptcy, Garlock paid $1.38 billion in indemnity payments to asbestos victims, and, in addition, paid hundreds of millions for defense costs. *See* Disclosure Statement at 27-28. Asbestos claims in substantial numbers will predictably continue to arise against Garlock in the decades to come. Under the Plan, though, Garlock and its parent Coltec would contribute at most $275 million to a Settlement Facility and a Litigation Fund for indemnity and defense costs of all current and future Asbestos Claims: the Settlement Facility would receive a total of $245 million in cash, and the Litigation Fund would consist of $5 million in cash and a $25 million note. The Debtors and their affiliates would have no obligation to provide any additional funds beyond the $275 million contribution. The ACC disagrees, as a matter of law, with the premise that the estimation can be used to cap distributions to or for the benefit of Asbestos Claimants, individually or in the aggregate, and believes that $275 million would be far from sufficient to pay current and future Asbestos Claims in full. There is a material risk that the capped funding

would not be enough to pay the full amount of Asbestos Claims allowable under the Plan's skewed criteria, and Asbestos Claimants would certainly have received far more in the aggregate if Garlock had remained in the tort system than they would receive under the Plan.

Moreover, not all of the money contributed to the Settlement Facility would be used to pay Asbestos Claimants. In addition to paying for Asbestos Claims as provided in the Claims Resolution Procedures ("**CRP**"), costs of administration, and certain defense costs of Reorganized Garrison, the Settlement Facility would be required to "defend, indemnify, and hold harmless" the Reorganized Debtors and the "Released Parties," including EnPro and Coltec, from "any and all losses arising out of, related to, or associated with any GST Asbestos Claims asserted, commenced, or continued" against those parties after the Plan's effective date. Plan, Ex. A (Proposed Trust and Settlement Facility Agreement) § 3.4(a) at 86 [Dkt. No. 3711].[4] Moreover, those parties would be granted a security interest in the Settlement Facility's assets for any payments due to them under the indemnification provision, *see id.* § 3.5 at 87, which would give their claims priority over those of the Asbestos Claimants, who would be the putative beneficiaries of the trust.

    **B.**    **The Standards for Payment of Asbestos Claimants Under the Plan are Unfair and Overly Stringent, and Differ From the Standards for Payment in the Tort System.**

The standards for payment under both the Litigation Option and the Settlement Option are unfair to Asbestos Claimants. Those standards would be far more onerous for Asbestos Claimants than rules applicable in the tort system and have been designed for Garlock's unilateral and undue advantage.

---

[4] Citations to the Plan [Dkt. No. 3711] page numbers refer to CM/ECF page numbers in the document's header.

Under the Plan's Litigation Option, the Bankruptcy Court and the federal District Court in the Western District of North Carolina would preside over pretrial matters regardless of where the claimant lives or where the injured party was exposed to asbestos. The litigation would be conducted under a proposed Case Management Order ("**CMO**") heavily skewed in Garlock's favor. Claims would remain in the Bankruptcy Court throughout discovery and, after the filing of dispositive motions and *Daubert* motions, would be sent to the District Court for disposition or trial. The District Court would determine the venue for any trial. In addition to being required to fulfill onerous discovery requirements within 90 days of filing a proof of claim, regardless of the position on the trial queue, a claimant who elected the Litigation Option would be required, within 90 days, to file any available claims against bankruptcy trusts—a requirement that is not imposed by law in the vast majority of states. Claimants who elected the Litigation Option would be able to rescind that election at any time before deposition discovery commenced on their claims, and elect the Settlement Option instead, but Reorganized Garrison's litigation expenses would be deducted from any amount paid to the Claimant by the Settlement Facility as determined under the CRP. After deposition discovery commenced, the Litigation Option would be irrevocable, and Reorganized Garrison's settlement authority would be limited to the amount set by the CRP, less Reorganized Garrison's total litigation expenses.

The Settlement Facility would be administered by a single Trustee who would be required to consult with the Future Claimants' Representative ("**FCR**") and Reorganized Garrison on certain matters. The Plan, however, does not provide any role for representatives of current claimants in the administration or oversight of the Settlement Facility. The ACC believes that any plan in this case should provide for the appointment of a trust advisory committee to represent the interests of current claimants, and that any trust agreement creating a

trust to resolve Asbestos Claims after confirmation should provide that the trustees thereof would be required to consult with, and obtain the approval of, such committee on matters of significance to the current claimants, including amendments to the trust agreement or distribution procedures, and the appointment of successor trustees.

Those Asbestos Claimants who chose the Settlement Option and submitted their claims to the Settlement Facility would be subject under the CRP to evidentiary requirements for settlement that would be unreasonable and far more stringent than what Garlock required in the tort system. For example, circumstantial evidence of exposure to Garlock's products would not be sufficient under the CRP. Rather, the CRP would require that a claimant demonstrate that a person whose testimony would be admissible at trial can testify to the injured person's contact with Garlock products, and that the product in fact did contain asbestos; it would not be enough to demonstrate that Garlock products were used at the worksite under circumstances likely to have exposed workers in the injured person's occupation during the period when he or she worked at the site. Moreover, the claimant would be required to certify that the exposure to Garlock products was a "substantial and significant" part of the injured person's lifetime asbestos exposure. These requirements have no legal basis; to impose them by means of the Plan would be to allow Garlock, in effect, to rewrite the tort laws to suit itself.

The CRP set out a complicated formula for calculating settlement values for claims, which, the ACC believes, would result in the vast majority of mesothelioma claimants being given settlement offers far lower than the average $75,000 Garlock paid to settle claims by its mesothelioma victims in the tort system. A large number of pleural mesothelioma claimants would be given a settlement offer of $1,000, based on their occupation and industry. While the CRP state that the maximum settlement offers for a pleural mesothelioma claims under expedited

Case 10-31607    Doc 3961    Filed 08/14/14    Entered 08/14/14 20:04:58    Desc Main
                    Document      Page 11 of 14

review is $200,000, the criteria used to calculate the settlement offer would result in a significantly lower settlement offer for virtually all claims. For example, if the injured party spent five years as a Navy pipefitter and could demonstrate direct contact with Garlock products, as discussed above, had pleural mesothelioma, had died at age 75 while married, had not filed a claim against Garlock in the tort system, and had total documented economic losses of $200,000, the claimant would be offered a settlement of $3,200.[5]

Only Asbestos Claimants with pleural mesothelioma claims would be permitted to seek Individual Review of their claims, and, if they did so, they would be required to submit detailed information regarding all of their asbestos exposures and would effectively be required to assert all available claims against all other potentially responsible parties before filing a claim with the Settlement Facility. Moreover, the settlement criteria for individual review are such that Asbestos Claimants electing that option would likely be given even lower settlement offers than they would receive under expedited review.

In addition, Asbestos Claimants who have non-pleural (peritoneal) mesothelioma, asbestosis, or asbestos-related lung or laryngeal cancer—who, like all claimants, would be required to pay a $250 fee to file a claim, and who would be required to meet the unreasonable evidentiary requirements discussed above—would be given a settlement offer of only $500. The inequity of the settlement offers that would be made under the CRP is starkly demonstrated by the August 1, 2014 decision of the Kentucky Court of Appeals in *Garlock Sealing Technologies, LLC v. Dexter*, 2014 WL 3795407 (Ky. Ct. App. Aug. 1, 2014), in which the court upheld the denial of Garlock's motion for a directed verdict. The court affirmed the judgment of the lower

---

[5] *See* Plan, Annex A (Proposed Claims Resolution Procedures) Appendix I, § I.B.8, at 135. (1.0 (Medical Information Factor) x 1.0 (Life Status Factor) x 1.0 (Dependents Factor) x. 1.0 (Age Factor) x 1.0 (Economic Loss Factor) x 0.4 (Duration of GST Product Contact Factor) x 0.22 (Jurisdiction Factor) = 0.088. 0.088 divided by 5.46 = 0.016. 0.016 x $200,000 = $3,200.)

court awarding the plaintiffs almost $875,000 in compensatory and punitive damages against Garlock in a case in which the deceased injured party was a pipefitter who was exposed to Garlock gaskets and had developed asbestos-related lung cancer. *Dexter*, 2014 WL 3795407 at *1. A similarly situated Asbestos Claimant would be offered a $500 settlement under the CRP.

The ACC believes that the proposed CRP standards for settlement under the Settlement Option, and the procedures set out in the proposed Case Management Order that would govern the Litigation Option, are skewed in favor of Garlock, are calculated to disallow legitimate claims and minimize payments to Asbestos Claimants, and are grossly unfair to the Asbestos Claimants.

### C. The Parent Settlement Agreement and Non-Debtor Affiliate Releases and Injunction are Unlawful and Unfair to Asbestos Claimants.

The Plan provides that Coltec will contribute $30 million to fund the Settlement Facility, and that claims by Asbestos Claimants against Debtors' affiliates, including the Debtors' parent, Coltec, Coltec's parent EnPro, Central Maloney, Fairbanks Morse Pump, Fairbanks Morse Engine, and Quincy Compressor, as well as any claims by the Debtors' estates against Coltec, EnPro and any other non-debtor affiliates, including claims for fraudulent transfers and claims based on successor liability, alter-ego, or other theories of derivative liability, will be released and enjoined. *See* Plan § 7.12 at 56 and § 8.2 at 59-60. The ACC believes that this inside deal with Garlock's parent and affiliates would be grossly unfair to the Asbestos Claimants. It was not negotiated at arm's length but, rather, was negotiated between commonly controlled corporations with no participation by Asbestos Claimants or the ACC. Absent the third-party releases and injunction, the Asbestos Claimants would be free to pursue asbestos claims for liability that is derivative of Debtors' liability, such as successor liability and alter-ego claims, against Coltec, EnPro, and Debtors' other affiliates after confirmation. The ACC believes that

such derivative-liability claims, if successful, would have significant value because, as discussed above, the Asbestos Claimants would not have been paid in full for their claims against Debtors under the Plan. Moreover, the Plan, by its terms, would release more than derivative claims against Debtors' affiliates, but would also release the affiliates from their independent asbestos liabilities, unconnected to Debtors' products or actions. *See* Plan § 7.12 at 56. In addition, the record regarding potential fraudulent conveyance claims against Coltec, EnPro, and another non-debtor affiliate has not yet been fully developed, because the Bankruptcy Court denied, without prejudice, a motion by ACC and the FCR for leave to pursue those claims. Thus, the Debtors and their affiliates have no objective basis for suggesting, and have not demonstrated, that the $30 million Coltec would contribute to the Settlement Facility under the Plan would amount to fair consideration for the Individual Claimants' claims against the Debtors and the intercompany claims that would be extinguished under the Plan.

In any event, Coltec's contribution to the Settlement Facility would be illusory. Garlock itself has more than sufficient assets to contribute an additional $30 million to the Settlement Facility. It would make no difference to Coltec's financial condition if Garlock were to make the additional $30 million contribution itself. The only reason for Coltec to make the contribution directly rather than indirectly through Garlock is to create a pretext for releasing Coltec and Garlock's other affiliates from liability to the individual Asbestos Claimants and to the estates. The Asbestos Claimants would be given no net incremental benefit for relinquishing their claims against Garlock's affiliates. Moreover, the ACC believes that the non-debtor releases and the related injunction would be unlawful, both because the Plan does not conform to Section 524(g) and because the extraordinary relief Garlock proposes to confer upon its affiliates would violate other principles and provisions of the Bankruptcy Code, rendering the Plan unconfirmable.

\*\*\*\*\*

**FOR THE REASONS DISCUSSED ABOVE, THE ACC BELIEVES THAT *THE PLAN IS UNFAIR TO THE ASBESTOS CLAIMANTS, AND RECOMMENDS THAT ASBESTOS CLAIMANTS VOTE TO REJECT THE PLAN.***

## CONCLUSION

The ACC respectfully submits that, if the Disclosure Statement is distributed, it must include the foregoing statement and recommendation of the ACC.

Dated: August 14, 2014

Respectfully submitted,

**CAPLIN & DRYSDALE, CHARTERED**

By: */s/ Trevor W. Swett III*
Trevor W. Swett III
(tswett@capdale.com)
Peter Van N. Lockwood
(plockwood@capdale.com)
Leslie M. Kelleher
(lkelleher@capdale.com)
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000

Elihu Inselbuch
(einselbuch@capdale.com)
600 Lexington Avenue, 21st Floor
New York, NY 10022
Telephone: (212) 379-0005

**MOON WRIGHT & HOUSTON, PLLC**

By: */s/ Travis W. Moon*
Travis W. Moon
(tmoon@mwhattorneys.com)
227 West Trade Street, Suite 1800
Charlotte, NC 28202
Telephone: (704) 944-6560

*Co-Counsel for the Official Committee of Asbestos Personal Injury Claimants*