UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

| | | |
|---|---|---|
| In re: | : | Case No. 10-BK-31607 |
| | : | |
| GARLOCK SEALING | : | Chapter 11 |
| TECHNOLOGIES LLC, *et al.*, | : | |
| | : | Jointly Administered |
| Debtors.[1] | : | |
| | : | |

**OMNIBUS SURREPLY OF THE OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY CLAIMANTS IN SUPPORT OF
ITS OBJECTIONS TO THE DEBTORS' PROPOSED DISCLOSURE
STATEMENT AND PROPOSED VOTING PROCEDURES**

**CAPLIN & DRYSDALE, CHARTERED**

Trevor W. Swett III
Peter Van N. Lockwood
Leslie M. Kelleher
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, DC  20005
Telephone:  (202) 862-5000

Elihu Inselbuch
600 Lexington Avenue, 21st Floor
New York, NY  10022
Telephone:  (212) 379-0005

**MOON WRIGHT & HOUSTON, PLLC**

Travis W. Moon
Richard S. Wright
227 West Trade Street
Suite 1800
Charlotte, NC  28202
Telephone:  (704) 944-6560

---

[1]    The Debtors are Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company.  As used herein, "**Garlock**" refers to Garlock Sealing Technologies LLC and Garrison Litigation Management Group, Ltd.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

SURREPLY REGARDING OBJECTION TO PROPOSED
DISCLOSURE STATEMENT ..............................................................................9

1.    The ACC Has Revised Its Statement to Avoid Unnecessary
      Disputes.........................................................................................................10

2.    Section 7.12 of the Plan Remains Problematic ................................................11

3.    The ACC's Statement Regarding the Indemnification Provision is
      Accurate .........................................................................................................12

4.    Debtors' Suggestion of Conflict of Interest Is Frivolous....................................12

SURREPLY REGARDING OBJECTION TO PROPOSED VOTING
PROCEDURES....................................................................................................13

1.    The Court Should Promptly Sustain the Objections of the Committee That
      Have Gone Unanswered ................................................................................13

2.    Garlock and Coltec Contrive and Inflate the Risks Posed to Them if This
      Court Sustains the ACC's Objections and Adopts the Established
      Approach to Voting That Has Been Approved in Other Asbestos-Related
      Bankruptcy Cases...........................................................................................13

3.    The Proposed Voting Procedures Would Disenfranchise Countless
      Claimants Who Hold Legitimate Asbestos Claims Against Garlock But
      Who, at this Time, Cannot Meet the Debtors' Stringent Evidentiary
      Requirements to Vote .....................................................................................15

4.    The Voting Amounts That Would Be Assigned to Unliquidated Asbestos
      Claims Already Reflect Garlock's Opinion That the Holders of These
      Claims Are Unlikely to Successfully Prove Up Their Claims...........................19

5.    Garlock Concedes That Its Evidentiary Requirements Are Unprecedented
      in Asbestos-Related Bankruptcy Cases ..........................................................20

6.    The Balloting Agent Is Not Qualified to Evaluate the Sufficiency of
      Exposure Evidence, and Would Not Spare the Court from Unnecessary
      Litigation Over Temporary Allowance to Vote................................................22

7.      Garlock's Responses to the Objections Pertaining to Class 3 (Settled GST
        Asbestos Claims) Are Unavailing........................................................................................23

8.      There Are Problems in the Proposed Schedule for Confirmation
        Proceedings That Should Not Carry Over to Any Order Approving the
        Disclosure Statement or Solicitation..................................................................................24


CONCLUSION..............................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amarex, Inc.*,
  61 B.R. 301 (Bankr. W.D. Okla. 1985) ...............................................................15, 19

*In re DRW Prop. Co.*,
  54 B.R. 489 (Bankr. N.D. Tex. 1985).........................................................15, 16, 19

*In re Garlock Sealing Techs.*,
  504 B.R. 71 (Bankr. W.D.N.C. 2014) ....................................................................5

*Jacksonville Airport, Inc. v. Michkeldel, Inc.*,
  434 F.3d 729 (4th Cir. 2006) ...............................................................................22

*In re Lloyd E. Mitchell, Inc.*,
  373 B.R. 416 (Bankr. D. Md. 2007) ......................................................................14

*In re Mother Hubbard, Inc.*,
  152 B.R. 189 (Bankr. W.D. Mich. 1993)....................................................15, 19, 20

*Owens-Corning Fiberglas Corp. v. Watson*,
  413 S.E.2d 630 (Va. 1992)....................................................................................17

*In re Quigley Co.*,
  346 B.R. 647 (Bankr. S.D.N.Y. 2006) ...................................................................3

*Roehling v. Nat'l Gypsum Co. Gold Bond Bldg. Prods.*,
  786 F.2d 1225 (4th Cir. 1986) .................................................................16, 17, 18

*In re Stone Hedge Props.*,
  191 B.R. 59 (Bankr. M.D. Pa. 1995) ....................................................................22

*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009) ............................................................................................11

*In re Windsor Plumbing Supply Co., Inc.*,
  170 B.R. 503 (Bankr. E.D.N.Y. 1994) ..................................................................20

**Statutes and Rules**

11 U.S.C. § 524(g) ....................................................................................................3, 7

11 U.S.C. § 1129 .........................................................................................................25

Fed. R. Bankr. P. 3007 ................................................................................................14

Fed. R. Bankr. P. 3020(b)(1) ...................................................................................................25

Fed. R. Bankr. P. 9014 ...........................................................................................................26

The Official Committee of Asbestos Personal Injury Claimants (the "**ACC**"), by and through its undersigned counsel, hereby responds to the reply memoranda filed by the Debtors and their parent, Coltec Industries Inc. ("**Coltec**"), in connection with the Debtors' proposed disclosure statement and proposed procedures for soliciting acceptances and rejections of their First Amended Plan of Reorganization and related scheduling matters ("**Voting Procedures**").[2]

## PRELIMINARY STATEMENT

For a clear view of the issues arising from the Debtors' proposed Disclosure Statement and their Voting Procedures designed to ease confirmation of a controversial plan,[3] it is useful to retrace briefly the course of proceedings that has brought the estate parties to the present stage and to review the current posture of these jointly administered bankruptcy cases (together, the "**Case**").

When the Debtors filed their petitions for reorganization on June 5, 2010 (the "**Petition Date**"), tens of thousands of claims seeking damages for personal injury and wrongful death were pending against the Debtors in nonbankruptcy courts, as is typical of large asbestos-related

---

[2]   *See* Informational Response by Coltec Industries, Inc. to the Objection of the Official Committee of Asbestos Personal Injury Claimants to the Proposed Disclosure Statement, Sept. 23, 2014 [Dkt. No. 4082] (hereinafter "**Coltec Informational Response**"); Debtors' Reply in Support of Motion to Approve Solicitation and Confirmation Procedures and Schedule, Sept. 24, 2014 [Dkt. No. 4090] (hereinafter, "**Debtors' Voting Procedures Reply**"); Coltec Industries Inc.'s Reply to the Objection by the Official Committee of Asbestos Personal Injury Claimants to the Debtors' Motion for Entry of an Order Approving Solicitation and Confirmation Procedures and Schedule, Sept. 24, 2014 [Dkt. No. 4091]; Debtors' Reply to Objection of Official Committee of Asbestos Personal Injury Claimants to Proposed Disclosure Statement for Debtors' First Amended Plan of Reorganization, Sept. 24, 2014 [Dkt. No. 4094] (hereinafter, "**Disclosure Statement Reply**").

[3]   Nothing in this Surreply or in the ACC's original objections to the Disclosure Statement or the Voting Procedures is meant to waive any objections to the Plan or to its confirmation. Any and all such objections are expressly reserved.

bankruptcies. During the more than four years the automatic stay has protected the Debtors from additional filings, thousands more workers have manifested asbestos-related illnesses that will ultimately result in the assertion of additional claims. Still more tens of thousands of such claims will arise over the course of several decades after the Case winds down. These expectations arise from generally accepted epidemiology and historical claiming patterns; on the general outlook emerging from those sources, the retained claims consultants of the Debtors and the ACC broadly agree, even while they disagree fundamentally about the overall value of the forecasted claims.

At the outset of the Case, the Debtors moved the Court to impose a bar date on all asbestos claimants and to initiate allowance proceedings.[4] The ACC opposed that motion.[5] It argued that, because of the numerosity of the claims, the bankruptcy issues posed by a steady stream of newly arising claims, and the individual and fact-specific nature of each claim, it would be impracticable to conduct allowance proceedings during the bankruptcies, and that attempting to do so would trigger thorny issues of due process and burden the Court with an unmanageable number of disputes.

---

[4]    Debtors' Motion for (A) Establishment of Asbestos Claims Bar Date, (B) Approval of Asbestos Proof of Claim Form; (C) Approval of Form and Manner of Notice, (D) Estimation of Asbestos Claims, and (E) Approval of Initial Case Management Schedule, Aug. 31, 2010 [Dkt. No. 461].

[5]    Memorandum of the Official Committee of Asbestos Personal Injury Claimants: (1) In Opposition to the Debtors' Motion for (A) Establishment of Asbestos Claims Bar Date, (B) Approval of Asbestos Proof of Claim Form, (C) Approval of Form and Manner of Notice, (D) Estimation of Asbestos Claims, and (E) Approval of Initial Case Management Schedule; and (2) In Further Support of Its Motion for Entry of a Scheduling Order for Plan Formulation Purposes, Sept. 24, 2010 [Dkt. No. 548].

In view of the daunting legal and "practical difficulties involved,"[6] the ACC urged that a consensual resolution under § 524(g) of the Bankruptcy Code would serve the best interests of all concerned, since that section provides the statutory means of reorganizing the Debtors while shifting to a funded trust the problem of processing and resolving claims over a long period of time. The ACC therefore argued that the Court should charge the estate parties with negotiating an aggregate estimate of the Debtors' asbestos liability to inform the creation and funding of a trust. Failing a prompt agreement, the ACC contended, the Case should proceed to a contested estimation for plan formulation purposes, where the issue would be, not the merit of particular claims, but the value of all pending and anticipated future claims in the aggregate.[7] No agreement was forthcoming.

Judge Hodges refused to order a general bar date for asbestos claims, and has adhered to that decision in the face of the Debtors' repeated renewal of their request.[8] (The sole exception

---

[6]    *In re Quigley Co.,* 346 B.R. 647, 653 (Bankr. S.D.N.Y. 2006).

[7]    The approach recommended by the ACC was the one that had led to the successful reorganization of many asbestos tortfeasors, in such cases as *In re Armstrong World Indus., Inc.,* No. 00-4471 (Bankr. D. Del.); *In re Combustion Eng'g, Inc.,* No. 03-10495 (Bankr. D. Del.); *In re Congoleum Corp.,* No. 03-51524 (Bankr. D.N.J.); *In re Federal-Mogul Global, Inc.,* No. 01-10578 (Bankr. D. Del.); *In re Global Indus. Techs., Inc.,* No. 02-21626 (Bankr. W.D. Pa.); *In re N. Am. Refractories Co.,* No. 02-20198 (Bankr. W.D. Pa.); *Owens Corning v. Credit Suisse First Boston (In re Owens Corning),* Nos. 00-3837-3854 (Bankr. D. Del.); *In re Kaiser Aluminum Corp,* No. 02-10429 (Bankr. D. Del.); *In re Mid-Valley, Inc.,* No. 03-35592 (Bankr. W.D. Pa.); *In re JT Thorpe,* No. 02-14216 (Bankr. C.D. Cal.).

[8]    *See* Hr'g Tr. 1295:16-18, Nov. 19, 2010 ("[T]he proof of claim process . . . runs the risk of creating due process rights that we might wish we had never created."); Order on Motion of the Official Committee of Asbestos Personal Injury Claimants for Entry of a Scheduling Order and Debtors' Motion for Establishment of Asbestos Claims Bar Date, Etc., Dec. 9, 2010 [Dkt. No. 853] (denying Debtors' motion to impose bar date and initiate allowance proceedings for asbestos claims); Order Denying the Second Amendment to Debtors' Motion for (A) Establishment of Asbestos Claims Bar Date, (B) Approval of Asbestos Proof of Claim Form, (C) Approval of Form and Manner of Notice, (D) Estimation of Asbestos Claims, and (E) Approval of Initial Case Management Schedule, May 19, 2011 [Dkt. No. 1348] (same); Order for Estimation of Mesothelioma Claims, April 13, 2012 [Dkt. No. 2102] (same).

has been the September 30, 2014 bar date for the relatively small subset of claims that asbestos claimants allege were settled but not paid by the Petition Date.)[9]  Instead, Judge Hodges steered the Case away from individual claim litigation, and undertook an aggregate estimation of the most valuable subcategory of the asbestos claims against Garlock, namely, claims based on the disease of mesothelioma.[10]

It soon became clear that the Debtors, on the one hand, and the ACC joined by the Future Claimants Representative on the other hand, were proposing to follow drastically different estimation methodologies.  The creditor representatives sponsored a methodology applied in many previous cases, one that would extrapolate the aggregate of the pending and forecasted claims from Garlock's actual claims resolution history covering a period of years leading up to the bankruptcy (during which Garlock tried few cases, dismissing a substantial number without payment but settling and paying an even greater number).  The Debtors, however, rejected Garlock's recent pre-petition experience as not reflecting "Legal Liability" and proposed instead a novel economic model based among other things on the results of trials conducted in the 1980s. Judge Hodges conceived of the estimation proceeding as a contest between those approaches and determined to hear evidence supporting each side's methodology and to make an estimate based on which approach he found more persuasive.[11]

At the estimation hearing, the Debtors attacked the reliability of their resolution history as a basis for estimation, claiming that certain plaintiffs' law firms drove up claim values by withholding evidence of their clients' exposures to asbestos from the insulation products of

---

[9]    *See* Order on Debtors' Motion to Establish Bar Date for Settled Asbestos Claims and Related Relief at 2, ¶ 4, July 9, 2014 [Dkt. No. 3854].

[10]   *See* Order for Estimation of Mesothelioma Claims, April 13, 2012 [Dkt. No. 2102].

[11]   *See id.* at 8, ¶ 20.

manufacturers who, having gone bankrupt, were no longer defendants in the tort suits for roughly a decade before the Petition Date. The Debtors featured a handful of resolved cases as illustrations of this supposed phenomenon. Largely on the basis of this presentation, the Debtors persuaded the Court to depart from precedent and draw the drastic conclusion that Garlock's real claims resolution experience was useless for estimation. The Court embraced instead the estimate put forward by the Debtors and, on January 10, 2014, issued an order estimating the Debtors' aggregate liability for current and future mesothelioma claims at just $125 million. *See In re Garlock Sealing Techs.*, 504 B.R. 71, 97 (Bankr. W.D.N.C. 2014) (the "**Estimation Order**").

The Estimation Order is an interlocutory decision that remains subject to revision and appeal. Its departure from the Debtors' historical experience outside of bankruptcy is indeed stark: the Debtors acknowledge that, over the course of their thirty-year history in tort litigation, they paid approximately $1.4 billion as indemnity to asbestos victims.[12] In any event, the Estimation Order does not determine the merit of any as-yet unresolved claims, nor of course does it purport to adjudicate any future claims.[13]

On June 4, 2014, the ACC filed its Motion to Reopen the Record of the Estimation Proceeding [Dkt. No. 3725] (the "**Motion to Reopen**"). The Motion to Reopen contends that key representations the Debtors made to the Court in the estimation proceeding were false, as revealed by new evidence the Debtors failed to produce, in violation of the Court's discovery rulings. The new evidence marshaled with that motion shows that, with respect to the tort suits that the Debtors made the centerpiece of their attack at the estimation hearing, the Debtors

---

[12]    EnPro Industries, Inc., Annual Report for Fiscal Year Ended December 31, 2010 (SEC Form 10-K) at 3 (2011).

[13]    *See* Estimation Order at 74, 94.

possessed but failed to produce evidence of the claimants' insulation exposures that they said they lacked and had no means of obtaining, expert reports detailing their knowledge of those exposures, and emails undercutting the testimony of the Debtors' witnesses about how and why they settled cases.[14]  On the basis of this showing, the ACC has asked the Court to reopen the estimation record and authorize certain additional discovery.

The Motion to Reopen has not yet been set down for a hearing.  The Court has determined that, before proceeding to that hearing, it should resolve disputes concerning the sealing of evidence in the estimation proceeding.[15]  This Court is due to hear motions to seal on October 16, 2014.

The Debtors filed their First Amended Plan of Reorganization (the "**Plan**") and Disclosure Statement on May 29, 2014, just a few days before the filing of the ACC's Motion to Reopen.  The Plan rests on the assumption that the estimate embraced by the Court in the Estimation Order is not only reasonable and accurate, but may validly serve to "cap" distributions to asbestos claimants as a group through a trust.  The Plan would channel current and future asbestos claims to a limited fund.  It would allow the Debtors' parent, Coltec, to retain its equity interest.  In addition, it would provide Coltec and other non-bankrupt subsidiaries of the Debtors with the equivalent of a bankruptcy discharge through extraordinary injunctions, insulating them from open-ended exposure to potential derivative liability for the Debtors' asbestos torts.  The Debtors and Coltec seek to do this all without the consent of creditors and

---

[14]   *See* Memorandum in Support of Motion of the Official Committee of Asbestos Personal Injury Claimants to Reopen the Record of the Estimation Proceeding (filed under seal), June 4, 2014 [Dkt. No. 3726]; *see also* Reply in Support of Motion of the Official Committee of Asbestos Personal Injury Claimants to Reopen the Record of the Estimation Proceeding, July 28, 2014 [Dkt. No. 3901].

[15]   Order Postponing Hearing of Motion to Reopen, July 28, 2014 [Dkt. No. 3900].

without submitting to § 524(g) of the Bankruptcy Code, the only established legal framework for channeling present and future asbestos claims and insulating the affiliates of asbestos defendants.

Whether the Debtors' and Coltec's goals are equitable or their chosen means lawful are matters certain to be contested if the Plan reaches a confirmation hearing. The ACC disputes both the factual and legal premises of the Plan and has gone on record with its view that the Plan is unfair to asbestos claimants and will prove unconfirmable due to fundamental legal flaws in its essential structure. Not the least of those flaws is the Plan's reliance on an estimation the ACC believes will not stand, one the Debtors are using to preserve Coltec's equity interest without providing funding for Garlock's asbestos victims that would amount to full compensation if the claims were measured realistically. Confirmation issues, however, are not ripe for decision, and the ACC reserves the right to raise those issues at the appropriate time. The matters now presented to the Court are limited instead to the Debtors' requests for approval of their proposed Disclosure Statement and their proposed order laying down procedures for solicitation and confirmation.[16]

The ACC has not asked the Court to dictate changes in the Disclosure Statement. Rather, it has requested that a communication from the ACC be distributed as part of the Disclosure Statement or along with it, a communication recommending that creditors vote to reject the Plan and summarizing certain of the ACC's criticisms of the Plan. In response, the Debtors and Coltec have accepted the idea of including a statement by the ACC as a separate enclosure in the same package by which the Disclosure Statement and other solicitation materials are to be disseminated. The Debtors, however, (and, to a lesser extent, Coltec) have also urged the Court

---

[16]   *See* Debtors' Motion for Entry of an Order Approving Solicitation and Confirmation Procedures and Schedule, June 24, 2014 [Dkt. No. 3802] (hereinafter, "**Voting Procedures Motion**").

to regulate closely the contents of any such enclosed communication from the ACC under the legal standards that apply to disclosure statements, and they have sought to script language more to their liking for the ACC's statement, ostensibly in the interest of correcting alleged inaccuracies and replacing "arguments" with "facts" and "opinions."

The ACC agrees that its statement would best be presented as a separate enclosure for distribution in the Disclosure Statement package, rather than being folded into the body of the Disclosure Statement itself.  It is neither necessary nor appropriate, however, for the Debtors to edit the ACC's statement or to involve the Court in doing so.  Doing so would mistake the intended nature and purpose of the statement.  It is not meant to serve as a competing disclosure statement or as a legal argument against the Plan.  Instead, the ACC wishes to communicate to its constituents its recommendation that the Plan be voted down as contrary to the interests of asbestos claimants, who collectively comprise the only substantial body of creditors in the Case, and to summarize certain of the ideas and observations that have led the ACC to that recommendation.  With a view to that limited scope and for the sake of avoiding unnecessary disputes, the ACC has revised its draft statement so as to (i) make it even clearer that the statement is an expression of the ACC's recommendation and opinion, (ii) accommodate the Debtors' critique where this can be done without blurring or diluting the ACC's message, and (iii) strip out legal arguments and other material collateral to the essential purpose of the document.  The product of these revisions is submitted with this Omnibus Surreply as Exhibit 1, and a redline displaying the changes from the prior version is submitted as Exhibit 2.

With respect to the Voting Procedures, the ACC's fundamental objection is that the procedures crafted by the Debtors would, for no good reason, inevitably disenfranchise a substantial number of asbestos victims who possess allowable claims. The argument below

explains why this is so, while also rebutting the Debtors' answers to other aspects of the objections.

Finally, the ACC notes below certain problems with the schedule for confirmation proceedings set out in the Debtors' proposed order, as well as a few other aspects of that draft, respectfully reserving the ACC's rights with respect to those additional matters. The ACC suggests that, once the Court has resolved the main issues raised with respect to the Disclosure Statement and the Voting Procedures, the estate parties should meet and confer over the form and contents of the order and the schedule. Such a meet-and-confer process is already underway with respect to the Debtors' proposed notice program.

## SURREPLY REGARDING OBJECTION
## TO PROPOSED DISCLOSURE STATEMENT

The ACC's statement as revised ("**Statement**") sets out the ACC's opinion that the Plan is unfair to asbestos claimants, summarizes the basis for that opinion, and recommends that the asbestos claimants vote to reject the Plan. It also sets out the ACC's opinion that the estimation on which the Plan is based is inaccurate and unreliable, and that, contrary to the Debtors' assertions, the asbestos creditors will not be paid in full under the Plan. Moreover, the Statement informs creditors that the ACC has moved to reopen the estimation proceeding and summarizes the grounds for that motion, which are matters not mentioned in the Debtors' Disclosure Statement.[17]

---

[17]  The Disclosure Statement was filed a few days before the Motion to Reopen. The Debtors, however, have given no indication that they intend to amend their Disclosure Statement to inform the creditors about that Motion.

1.      **The ACC Has Revised Its Statement to Avoid Unnecessary Disputes**

In their Disclosure Statement Reply, the Debtors do not dispute that the ACC's opinions of the Plan and recommendations to the asbestos claimants constitute material information that asbestos claimants should consider in determining whether or not to approve the Debtors' proposed Plan.  They assert, however, that the ACC's Statement is "argumentative rather than factual," and is "inaccurate, misleading, and incomplete in numerous respects."[18]  The ACC disagrees with the Debtors' characterization of the Statement, which does not purport to be either a disclosure statement summarizing the Plan or a legal argument, but rather an expression of the ACC's opinion that the Plan should be voted down as unfair to asbestos victims.

To avoid unnecessary debate, the ACC has revised its draft to make even clearer that the Statement is the opinion of the ACC, eliminate any legal arguments, and address concerns expressed by the Debtors in points 1, 3, 5, 7, 9, 12, and 13 of their Disclosure Statement Reply.  Furthermore, the ACC has no objection in principle to including the Debtors' response to that Statement in the same package.[19]  To avoid confusion, however, the Debtors' response should be amended to reflect changes the ACC has made to its Statement.

The ACC has not amended the Statement in response to the arguments set forth in points 2, 3, 4, and 6 of the Disclosure Statement Reply because the Debtors are free to include those arguments in their response to the ACC's Statement, and have done so.  For example, in points 2, 4, and 6 of the Disclosure Statement Reply, the Debtors complain that the ACC has not summarized the Estimation Order.  But it is not necessary for the ACC to do so, considering that

---

[18]    Disclosure Statement Reply at 1.

[19]    *See* Disclosure Statement Reply, Ex. A.

the Estimation Order is published in the *Bankruptcy Reporter* and the Debtors have already

provided their own summary of it.[20]

## 2.    Section 7.12 of the Plan Remains Problematic

For the reasons set forth below, the ACC has not revised its Statement in response to

points 8, 10, and 11 of the Disclosure Statement Reply.

In paragraph 10 of the Disclosure Statement Reply, the Debtors state that they do not

intend for Section 7.12 of the Plan to release non-debtor affiliates from independent asbestos

liabilities.[21]   The ACC disagrees that the amendment to Section 7.12 of the Plan suggested by

Coltec,[22] and apparently accepted by the Debtors, "removes any possible ambiguity,"[23] or makes

that provision any more valid or acceptable.   The revised Section 7.12 would release the

Debtors' affiliates from, *inter alia*, liabilities or obligations that "may relate to" the operations or

assets of the Debtors.   In *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137 (2009), the Supreme

Court held that similar "relating to" language was "expansive," and that even if the parties

originally understood it to bar only derivative claims against an insurance company for the

wrong-doing of its policyholder, it also applied to non-derivative claims for the insurer's own

alleged violations of state consumer-protection statutes or common law duties.   *See id*. at 143,

148-50.   The ACC believes that the proposed language of Section 7.12 remains vague and

overbroad, and could be interpreted to extend to independent, non-derivative liabilities of non-

Debtor affiliates.   Asbestos claimants should be informed of this risk if Section 7.12 as drafted

and revised is included in the Plan.

---

[20]   Disclosure Statement at 41-43.

[21]   Disclosure Statement Reply at 11.

[22]   *See* Coltec Informational Response at 2-3.

[23]   Disclosure Statement Reply at 11.

3.      **The ACC's Statement Regarding the Indemnification Provision Is Accurate**

In point 8 of the Disclosure Statement Reply, the Debtors state that the provision in

Section 3.5 of the proposed Trust and Facility Settlement Agreement for indemnification

obligations in favor of the Debtors' affiliates to be secured by trust property is not in the Plan and

should not have been included in the Trust and Facility Settlement Agreement.[24]  If the Debtors

amend the Trust Agreement accordingly, the ACC will, of course, delete the reference to that

provision from its Statement.   The ACC, however, disagrees that its Statement would be

incomplete in respect of the indemnification without stating that the Parent Settlement

Enforcement Injunction would prevent the assertion of claims against Released Parties.   Indeed,

if Debtors believed that were true, the indemnification provision would be unnecessary.

Moreover, this is an argument that the Debtors are free to make themselves, and do make, in

their response to the ACC's Statement.[25]

4.      **The Debtors' Suggestion of Conflict of Interest Is Frivolous**

The Debtors argue, in point 11 of their Disclosure Statement Reply, that because the

Debtors have sued three law firms who represent members of the ACC, the ACC has "interests

that may conflict with the interests of most Asbestos Claimants," and that the ACC should

disclose this alleged conflict of interests.[26]  This eleventh-hour allegation of a conflict of interest,

raised for the first time in their Disclosure Statement Reply, is very puzzling.   The Debtors have

exhibited hostility throughout these cases not just to the law firms they have sued but to the

asbestos claimant constituency as a whole:   their strategy throughout the Case has been to tamp

---

[24]   *See* Disclosure Statement Reply at 10.

[25]   Disclosure Statement Reply, Ex. A, at 9.

[26]   Disclosure Statement Reply at 12.

down the value ascribed to asbestos claims in the aggregate by arguing that their entire resolution history should be disregarded.  Moreover, there are twelve members on the ACC, and only three are represented by law firms sued by the Debtors.  The Debtors cannot manufacture a conflict of interest on the part of the ACC by singling out those law firms.  Indeed, if a conflict of interest is present, it is one under which the Debtors themselves labor.  As debtors-in-possession, they owe a fiduciary duty to creditors; but they are controlled by Coltec and have made it their mission in the Case to preserve Coltec's equity interest at all costs.

### SURREPLY REGARDING OBJECTION TO PROPOSED VOTING PROCEDURES

**1.    The Court Should Promptly Sustain the Objections of the Committee That Have Gone Unanswered**

Before turning to the Debtors' and Coltec's responses in support of the Voting Procedures, we should point out the specific objections of the ACC that have *not* been answered and should be deemed conceded.  First, the Debtors have not responded at all to the ACC's points about their request for leave to lodge one or more "omnibus objections" to the allowance of asbestos claims, even though such objections could never satisfy the limitations set forth in Bankruptcy Rule 3007.  Second, the Debtors do not address the ACC's objections to the provision that (1) would require the personal contact information of claimants to be included on the ballots even if the claimants are represented by counsel and (2) would make such information available on the Internet, without redaction.  The Court should sustain the ACC's objections to these aspects of the proposed Voting Procedures without further ado.

**2.    Garlock and Coltec Contrive and Inflate the Risks Posed to Them if This Court Sustains the ACC's Objections and Adopts the Established Approach to Voting That Has Been Approved in Other Asbestos-Related Bankruptcy Cases**

As for the arguments actually made by Garlock and Coltec, it is important to consider that what is really at stake here is temporary allowance to vote a claim, *not* full-fledged

allowance to have a claim paid. Coltec's heated rhetoric about its "fundamental due process" rights and "economic stakes" being violated if the ACC's objections to the Voting Procedures are sustained seem calculated to distract from this simple point. It is also muddled. Coltec is not a Class 4 (asbestos claimant) creditor. Hence, there is no risk of dilution to any vote Coltec might cast if Class 4 ballots voting disputed (or what Coltec calls "hypothetical") claims are counted. More important, temporary allowance to vote will have no influence on whether a given claim should be permanently allowed and paid. The proposed form of Class 4 ballot makes that crystal clear.[27] The Debtors and Coltec have neither identified nor articulated the particular harm that would befall them if this Court sustains the ACC's objections and approves voting procedures permitting claimants to "self-determine"[28] that they have allowable claims for voting purposes, nor can they. On the other hand, if this Court were to overrule the ACC's objections and approve the Voting Procedures, thousands of asbestos claimants would stand to be disenfranchised and the Court would face potentially large burdens for no good reason.

As Judge Hodges recognized earlier in this case, there are far too many claims to be dealt with in allowance proceedings in the Bankruptcy Court without indefinitely delaying any distribution to creditors and resolution of the Case. To avoid triggering the due process and jury-trial rights of individual claimants and overburdening the Bankruptcy Court and District Court, Judge Hodges thrice denied the Debtors' motions to impose a bar date and initiate allowance proceedings for asbestos claims. There are thus tens of thousands of unliquidated asbestos claims that have been neither allowed nor disallowed at this stage of the Case. The Debtors dispute many, if not all, of these claims. And, all "Current GST Asbestos Claims," which is

---

[27]  Voting Procedures Motion, Ex. B, at 20. Citations to Exhibit B page numbers refer to the CM/ECF page numbers in the exhibit's header.

[28]  *In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 423 (Bankr. D. Md. 2007).

broadly defined to include all contingent, unliquidated, and disputed asbestos claims, [29] would be treated and discharged under the proposed Plan. The "spirit of Chapter 11 . . . encourages creditor vote and participation in the reorganization process,"[30] a policy that other courts have termed "creditor democracy."[31] Given that policy and the failure of the Debtors and Coltec to articulate any plausible harm that would flow from following the ACC's suggested approach, this Court should give all holders of Class 4 claims (and Class 8 claims) a voice in this reorganization – even if their claims are disputed or if they do not have the documentation at this time to meet the Debtors' stringent evidentiary requirements. Asbestos claims should be granted temporary allowance to vote without strings attached.

**3.     The Proposed Voting Procedures Would Disenfranchise Countless Claimants Who Hold Legitimate Asbestos Claims Against Garlock But Who, at This Time, Cannot Meet the Debtors' Stringent Evidentiary Requirements to Vote**

The claimants holding valid asbestos claims but who, at this time, cannot muster the necessary evidence to vote essentially fall into two categories. The first category is composed of claimants who lack exposure evidence because they have never had the opportunity to obtain discovery from Garlock, in large measure due to the automatic stay. This category includes claimants whose asbestos-induced diseases became manifest after the Debtors filed for bankruptcy. This is not an insignificant category: the ACC's claims expert has calculated, based on epidemiology and historical claiming trends, that between 6,684 and 7,127 persons have been

---

[29]   Debtors' First Am. Plan of Reorganization § 1.1.71, at 9, May 29, 2014 [Dkt. No. 3708] (defining "GST Asbestos Claim").

[30]   *In re Amarex, Inc.*, 61 B.R. 301, 303 (Bankr. W.D. Okla. 1985).

[31]   *See In re Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993) (noting the "chapter 11 policy of 'creditor democracy'") (footnote omitted); *In re DRW Prop. Co.*, 54 B.R. 489, 497 (Bankr. N.D. Tex. 1985) ("Subchapter II of Chapter 11 [which includes § 1126] . . . delineates the basic machinery which Congress has provided for creditor democracy within the debtor reorganization process.").

diagnosed with mesothelioma since the Petition Date and would have filed claims against Garlock but for the automatic stay.[32]   According to backup materials accompanying his own estimation report, the Debtors' own claims consultant recognizes that more than 7,000 mesotheliomas have been diagnosed since the Petition Date that are likely to give rise to claims against the Debtors.   Garlock is *not* proposing to make its records of where its asbestos-containing products were used publicly available so as to facilitate the claimants' ability to meet its evidentiary requirements and vote.   The unfairness is palpable.   The Debtors are setting up an obstacle while withholding information claimants could use to overcome that obstacle if Garlock were not bankrupt.

The second category is composed of claimants whose evidence of exposures to Garlock products would support a verdict favorable to them in the tort system, or would at least enable them to reach a jury, but would not satisfy the stringent evidentiary standard that Garlock has crafted for them in the Voting Procedures.   Through its discussion of the *Roehling*[33] decision and similar cases in its opposition brief, the ACC has shown how the evidentiary requirements in the Voting Procedures surpass what is necessary under state law to support a verdict or reach a jury.[34]   The Debtors try to reconcile these cases by saying that the courts there recognized that exposure evidence can come from multiple sources, just as the Voting Procedures do.   But that misses the point:  the Voting Procedures require a level and specificity of evidence that *exceed*

---

[32]   The same analysis indicates that, but for the automatic stay, as many as 47,000 other persons would have sued Garlock for other diseases, such as lung cancer and asbestosis, based on post-petition diagnoses.

[33]   *Roehling v. Nat'l Gypsum Co. Gold Bond Building Prods.*, 786 F.2d 1225 (4th Cir. 1986).

[34]   Objection of the Official Committee of Asbestos Personal Injury Claimants to Debtors' Motion for Entry of an Order Approving  Solicitation and Confirmation Procedures and Schedule at 14-18, Aug. 14, 2014 [Dkt. No. 3960] (hereinafter "**ACC Voting Procedures Obj.**").

what the courts in those cases found to be sufficient.  For instance, the proposed Voting Procedures provide that "[t]estimony or sworn statements that Garlock asbestos-containing products were used at the plant, facility, or other worksite *is not sufficient to identify exposure* to asbestos from a Garlock asbestos-containing product."[35]  Yet, in *Owens-Corning Fiberglas Corp. v. Watson*, 413 S.E.2d 630, 639 (Va. 1992), the Virginia Supreme Court held that circumstantial evidence that the defendant had sold its asbestos-containing products to the shipyard while the plaintiff was working there was sufficient to support the verdict in the plaintiff's favor.

Additionally, the proposed Voting Procedures would require that documents attached to each Class 4 ballot identify "the *manner* in which the injured party *experienced exposure* to asbestos from the Garlock asbestos-containing product."[36]  It is not at all clear what the words "manner in which the injured party experienced exposure" are supposed to convey in terms of an evidentiary standard.  If positions previously taken by the Debtors in this Case are credited, this provision could conceivably require personal knowledge of the claimant or eyewitness testimony from a coworker or other percipient witness, placing Garlock's gaskets in the injured party's "breathing zone" and establishing through such direct evidence that the gaskets contained asbestos.  But that is not how asbestos claims are typically proven.  In *Roehling*, an asbestos personal-injury case, the district court granted summary judgment in favor of the defendants after determining there was insufficient evidence of exposure to their asbestos-containing products. The Fourth Circuit reversed, explaining that the "evidence, circumstantial as it may be, need only establish that [the plaintiff] *was in the same vicinity as witnesses* who can identify the products

---

[35]   Motion, Ex. B, at 22 (emphasis added).

[36]   Motion, Ex. B, at 6-7 (emphasis added).

causing the asbestos dust that all people in that area, not just the product handlers, inhaled."[37]
The Fourth Circuit in *Roehling* cited no particular evidence showing the "manner" in which the plaintiff himself "experienced exposure" to the defendants' asbestos-containing products, other than the plaintiff's testimony that asbestos material in general (without reference to the defendants' specific products) was "all over the place"[38] where he worked.  In this respect, the Debtors' procedures are contrary to the Fourth Circuit's decision in *Roehling*.[39]

Even if the Debtors' criteria are not interpreted to be as stringent as they might be, their vagueness is problematic in and of itself, and in all probability would lead to disputes and litigation in this Court down the road.  Suppose a claimant were to attach to his ballot sworn statements, deposition transcripts, and other evidence showing that he worked around pipefitters who periodically removed and replaced asbestos-containing gaskets.  Would that demonstrate the "manner" in which the claimant "experienced exposure" to Garlock products?  Suppose the evidence submitted by a claimant showed that he sometimes passed through the workspace where pipefitters were occasionally removing gaskets.  Would that evidence be enough to have the claimant's ballot counted under Garlock's handcrafted evidentiary standard?  As noted below, Garlock would leave these questions for its balloting agent to resolve, even though the balloting agent is not qualified to do so and the standard the agent would be applying is vague.  This Court would then be tasked with adjudicating appeals from the balloting agent's evidentiary rulings.  There is no sensible or logical reason for this Court and the parties to proceed down that path.

---

[37] *Roehling*, 786 F.2d at 1228 (emphasis added).

[38] *Id*. at 1227.

[39] *See also* ACC Voting Procedures Obj. at 17 n.30 (citing cases).

The Debtors' assertion that Garlock demanded a high standard of proof in order to settle cases prepetition is ironic, given their disparagement of the settlements in the estimation proceeding, but is also beside the present point. Such a standard would disserve the Bankruptcy Code's policy of encouraging creditor participation in reorganizations and would unfairly disenfranchise claim holders.[40] The Voting Procedures would violate that fundamental policy and disenfranchise untold numbers of claimants.

4.      **The Voting Amounts That Would Be Assigned to Unliquidated Asbestos Claims Already Reflect Garlock's Opinion That the Holders of These Claims Are Unlikely to Successfully Prove Up Their Claims**

Garlock asserts that temporary allowance must take into account both the value and merits of claims. But the Voting Procedures *already* take into account Garlock's jaundiced view of the value and merits of these claims *by assigning low-dollar voting amounts to them*. In this respect, the differences between the voting amounts assigned under the Voting Procedures and the distribution amounts proposed under the Plan are instructive. Under the Plan, pleural mesothelioma claimants who opt for the Settlement Option and Expedited Review and who satisfy the disease and exposure criteria under the Claims Resolution Procedures ("**CRP**") would be eligible to receive a distribution of up to $200,000.[41] By contrast, under the Voting Procedures, pleural mesothelioma claimants would have an assigned voting amount of $10,000, which reflects a **95% discount** from the potential distribution of $200,000.[42] Under the Plan, claimants who alleged peritoneal mesothelioma, asbestos-related lung cancer, asbestos-related laryngeal cancer, or asbestosis, and who elected the Settlement Option would be eligible for a

---

[40]   *In re Amarex*, 61 B.R. at 303; *In re Mother Hubbard, Inc.*, 152 B.R. at 195; *In re DRW Prop. Co.*, 54 B.R. at 497.

[41]   Disclosure Statement § 1.2.4, at 6.

[42]   Voting Procedures Motion, Ex. B, at 9.

distribution of $500, provided they satisfied the disease and exposure criteria under the CRP.[43]

Under the Voting Procedures, by contrast, these claimants would have an assigned voting

amount of $1,[44] which reflects a **99.8% discount** from the distribution amount.[45]  In other words,

substantial discounts reflecting Garlock's view that claimants have a very low probability of

substantiating their claims are already baked into the voting amounts.[46]   Garlock, however,

would add insult to injury by throwing out ballots altogether that fail to meet its stringent

evidentiary requirements.

5.     **Garlock Concedes That Its Evidentiary Requirements Are Unprecedented in Asbestos-Related Bankruptcy Cases**

Garlock contends that bankruptcy courts in asbestos-driven cases have "routinely"

imposed conditions or requirements for voting.[47]  But the only thing that Garlock points to in this

regard is the certifications appearing near the signature lines on the ballots.  What Garlock is

demanding involves something more than claimants or their representatives signing a

_____

[43]   Disclosure Statement § 1.2.4, at 6.

[44]   Voting Procedures Motion, Ex. B, at 9.

[45]   The ACC is using the distribution amounts proposed under Garlock's Plan to illustrate the point that, even when the distribution amounts and proposed voting amounts are juxtaposed, the voting amounts still reflect a substantial discount.  The ACC, however, does not agree that the distribution amounts proposed under the Plan are in any way reflective of the recoveries obtained against Garlock prepetition in the tort system, and reserves the right to challenge these proposed distribution amounts as inadequate, unfair, and inequitable at the confirmation hearing.  As for the proposed voting amounts, the ACC also believes that they are not reflective of the liquidated claim amounts entered against Garlock in the tort system during the 1990s, but has decided not to dispute those amounts since, at the end of the day, these amounts are for voting on the Plan, and not for determining distributions from the estates.

[46]   *See, e.g.*, *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994) ("The estimated value of a claim is . . . the amount of the claim diminished by [the] probability that it may be sustainable only in part or not at all."), *quoted in* Garlock Voting Procedures Reply at 4.

[47]   Garlock Voting Procedures Reply at 4.

certification in order to cast a ballot; Garlock insists that claimants attach to their ballots documentation proving exposures under a process that would disqualify their votes in the event the documentation is deemed insufficient. Garlock talks out of both sides of its mouth: it claims to be "carry[ing] forward" the procedures used in previous cases,[48] but then acknowledges that its Voting Procedures would "*additionally* require documentation,"[49] thus conceding, as it should, that its Voting Procedures are not routine but unprecedented.

Garlock tries to justify the unprecedented nature of its Voting Procedures by arguing that the other asbestos-driven bankruptcies cited by the ACC are inapposite because they were uncontested reorganizations and this Case remains contested. This distinction misses the mark. In the other asbestos-driven bankruptcies, temporary allowance of asbestos claims without substantive conditions or evidentiary requirements was done *not* as a result of there being no disputes between the debtors and the asbestos creditors' committee, but rather because of the problems of administering asbestos claims in bankruptcy that exist regardless whether the case is contested. As the ACC explained in its objection to the Voting Procedures, asbestos-driven bankruptcies typically involve tens if not hundreds of thousands of unliquidated asbestos claims, involving pervasive factual disputes that are too individualized to be litigated in classes or *en masse.* In addition, there is the problem of the thousands of claims that have accrued since the Petition Date, as long latent diseases became manifest, and the holders of these claims will not have had the opportunity to take discovery of the Debtors and "work up" their cases against them. Thus, any procedures that require asbestos claimants to "prove" their claims, even *prima facie,* in order to vote, or which contemplate a contested process to determine temporary

---

[48]  *Id*. at 6.

[49]  *Id*. (emphasis added).

allowance for voting, would open up a mare's nest of fairness issues, due process concerns, and merits litigation that would only prolong the reorganization process.  Many bankruptcy judges have avoided that outcome simply by temporarily allowing asbestos personal-injury claims for voting, without attaching evidentiary conditions.  This Court should reject the Voting Procedures and do the same.

**6.    The Balloting Agent Is Not Qualified to Evaluate the Sufficiency of Exposure Evidence, and Would Not Spare the Court from Unnecessary Litigation Over Temporary Allowance to Vote**

Garlock tries to assure the Court that its Voting Procedures would not usher in litigation over the merits of asbestos claims because the person disqualifying the ballots would not be Garlock but the balloting agent instead.  This would not solve the problem:  instead of having to hear and decide ballot objections by Garlock – objections that Garlock is still reserving the right to make[50] – the Court would have to hear and decide appeals from decisions of the balloting agent.  The principal purpose of temporary allowance under Bankruptcy Rule 3018(a) is to *avoid* litigation going to the merits of claims since "claims litigation is often drawn out, thereby defeating one of the essential purposes of the Code, i.e. expedited and efficient administration of the bankruptcy estate. . . ."[51]  Indeed, in *Jacksonville Airport*,[52] the Fourth Circuit expressly recognized temporary allowance for voting purposes as the alternative to full-fledged litigation on the merits.[53]  Relying on the balloting agent to disqualify ballots would not cure the drawn-out claims litigation that would result under the Voting Procedures.

---

[50]   Garlock Voting Procedures Reply at 13-14.

[51]   *In re Stone Hedge Props.*, 191 B.R. 59, 63 (Bankr. M.D. Pa. 1995).

[52]   *Jacksonville Airport, Inc. v. Michkeldel, Inc.*, 434 F.3d 729 (4th Cir. 2006).

[53]   *Id*. at 732.

Even worse, the balloting agent is not qualified to evaluate whether the evidence accompanying the ballots sufficiently demonstrates "GST Product Contact." What Garlock has in mind for the balloting agent is not simply a ministerial inspection of the ballots to determine whether they meet straight-forward, objective, and easily verifiable requirements, such as whether a given ballot has been signed, whether a vote to accept or reject the Plan has been indicated, or whether a disease-level has been check-marked. Instead, Garlock would have the balloting agent scrutinize the affidavits, deposition transcripts, trial transcripts, and other documentary evidence accompanying the ballots, and make a judgment as to whether these materials sufficiently prove "GST Product Contact," which is by no means a cut-and-dried concept. Determining the sufficiency of evidence is ordinarily the province of judges and juries, not ballot counters. And, far from lessening the Court's workload, the Court would potentially have to wade through all of these materials every time the balloting agent disqualified a ballot for allegedly insufficient evidence. This dubious procedure has no precedent in asbestos-related bankruptcies, and would do little, if anything, to lessen the burdens of merits litigation that would invariably flow from it. The Court should therefore reject it.

7.     **Garlock's Responses to the Objections Pertaining to Class 3 (Settled GST Asbestos Claims) Are Unavailing**

Garlock dismisses the Committee's objections to the Class 3 voting procedures, asserting that, because Class 3 is allegedly unimpaired, "a scenario under which solicitation of this class would be necessary is only theoretical at best."[54]   This is nonsensical. Although the Debtors are proposing to "reserve[ ] for the Confirmation Hearing any decision whether these Classes of

---

[54]   Debtors' Voting Procedures Reply at 17.

Claimants is impaired,"[55] they are nonetheless soliciting votes in Class 3, so there is nothing

"theoretical" about the problems posed by their procedures with respect to Class 3.  Garlock also

asserts that, if Garlock objects to the proofs of claims of settled claimants, those claimants could

move to have their claims temporarily allowed to vote.  That would not solve the problem noted

in the Committee's objection.  Almost 90% of the settled asbestos claims listed in the Debtors'

schedules are identified as disputed.[56]  To date, more than 2,400 proofs of claim have been filed

in support of Settled GST Asbestos Claims.  Although the Debtors have not yet filed objections

to them, the Court potentially would be faced with thousands of claims objections and thousands

of motions for temporary allowance to resolve.  The solution is to order temporary allowance of

all Class 3 claims for voting purposes in the amount of their respective proofs of claim,

regardless of whether there are pending objections.  This will save the Court from having to

adjudicate disputes over temporary allowance, and will ultimately have no bearing whatsoever

on whether the Class 3 claims are eligible for full-fledged allowance and payment under a

Chapter 11 plan.

8.    **There Are Problems in the Proposed Schedule for Confirmation Proceedings That Should Not Carry Over to Any Order Approving the Disclosure Statement or Solicitation**

The Court should deny the Voting Procedures Motion *in toto*.  Nevertheless, if and when

the Court enters an order approving a disclosure statement or procedures governing solicitation,

there are certain problems with the confirmation schedule set out in the Debtors' current

proposed order, as well as a few other aspects of that draft, that should not be allowed to flow

through to the order ultimately entered by this Court.  For example, the current proposed order

---

[55]   Voting Procedures Motion, Ex. A, ¶ 8, at 4 (proposed order).

[56]   *See* Notice of Second Amendment to Schedules of Assets and Liabilities for the Above-Captioned Debtors, July 7, 2014 [Dkt. No. 3846].

would schedule the deadlines for submitting ballots and for filing Plan objections on the same date.[57]   The problem is that there are potential Plan objections that the ACC may raise – such as whether the Debtors have obtained the acceptance of an impaired, non-insider class under Bankruptcy Code § 1129(a)(10) or whether the Debtors have satisfied the cramdown standard under § 1129(b) – that depend on knowing the outcome of the vote on the Plan.   Thus, the deadline for filing Plan objections should occur *after* the Debtors file a ballot report tallying the number and amount of acceptances and rejections in each class.   Another problem is that the Debtors are proposing a status conference to be scheduled on a date in 2015 "to consider a schedule for discovery and other matters relating to the Confirmation Hearing."[58]   Instead of waiting until next year to confer on a discovery schedule, confirmation-related discovery should start immediately upon approval of a disclosure statement.   The Committee is already on record that it opposes the Plan and has outlined the reasons why it believes the Plan is not confirmable. Thus, for all intents and purposes, a contested matter under Bankruptcy Rules 3020(b)(1) and 9014 already exists, and the Committee should not be forced to wait months for discovery to begin and then be given only a compressed period of time for discovery before the confirmation hearing.   At the very least, the status conference to discuss discovery and pre-confirmation-hearing scheduling should be held promptly, rather than being arbitrarily postponed.   These are obvious problems pertaining to the proposed schedule; the Committee respectfully reserves its rights to raise any other objections going to scheduling and related matters.   The Committee suggests that the estate parties meet and confer over the form and contents of the order and the

---

[57]   Voting Procedures Motion, Ex. A, ¶ 4 (proposed order).

[58]   *Id.* ¶ 31.

schedule after the Court resolves the main issues raised with respect to the Disclosure Statement and the Voting Procedures.

## CONCLUSION

For the foregoing reasons, this Court should sustain the Committee's objections with respect to the proposed Disclosure Statement, the proposed Voting Procedures, and related matters, and should grant the Committee such other and further relief as the Court deems just and appropriate.

Dated:  October 1, 2014                    Respectfully submitted,

**CAPLIN & DRYSDALE, CHARTERED**

By:  */s/ Trevor W. Swett III*
Trevor W. Swett III
(tswett@capdale.com)
Peter Van N. Lockwood
(plockwood@capdale.com)
Leslie M. Kelleher
(lkelleher@capdale.com)
Jeffrey A. Liesemer
(jliesemer@capdale.com)
One Thomas Circle, N.W.
Washington, DC  20005
Telephone:  (202) 862-5000

Elihu Inselbuch
(einselbuch@capdale.com)
600 Lexington Avenue, 21st Floor
New York, NY  10022
Telephone:  (212) 379-0005

**MOON WRIGHT & HOUSTON, PLLC**

By: */s/ Travis W. Moon*
Travis W. Moon
(tmoon@mwhattorneys.com)
227 West Trade Street, Suite 1800
Charlotte, NC  28202
Telephone:  (704) 944-6560

*Co-Counsel for the Official Committee of Asbestos Personal Injury Claimants*