# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC, et al.,<br><br>Debtors.[1] | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered |

## DEBTORS' OPPOSITION TO THE MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO REOPEN THE RECORD OF THE ESTIMATION PROCEEDING

Garland S. Cassada
N.C. Bar No. 12352
Jonathan C. Krisko
N.C. Bar No. 28625
Richard C. Worf, Jr.
N.C. Bar No. 37143

Robinson Bradshaw & Hinson, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246

gcassada@rbh.com
jkrisko@rbh.com
rworf@rbh.com

*Special Corporate and Litigation Counsel to the Debtors Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company*

---

[1] The debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

I.    THE COMMITTEE MUST SHOW THAT ITS "NEW EVIDENCE" IS MATERIAL AND WAS NOT AVAILABLE DURING THE ESTIMATION TRIAL THROUGH DUE DILIGENCE ........................................................... 7

II.   THE COMMITTEE'S *TREGGETT* ARGUMENT SUPPORTS RATHER THAN UNDERMINES THE COURT'S FINDINGS, AND RELIES ON INFORMATION THAT WAS IN THE COMMITTEE'S CONTROL THROUGHOUT THE ESTIMATION TRIAL ........................................................ 9

A.    The new evidence supports the Court's finding that Garlock was prejudiced by plaintiff firms' failure to disclose exposure evidence .................. 10

    1.    The Committee misrepresents the prejudice Debtors suffered from the concealment of evidence in *Treggett* ................................. 11

    2.    The new evidence the Committee relies on would not have cured the prejudice caused by concealing the Unibestos evidence .................. 14

    3.    The transcripts and purchase orders only further prove Mr. Eddins misled the *Treggett* jury ...................................................... 17

    4.    Garlock did not know about the transcripts during *Treggett* or the estimation trial ...................................................................... 18

    5.    The Committee does not attack the Court's other findings about *Treggett* ............................................................................. 20

B.    The Committee had the same opportunity to obtain this evidence and failed to produce it despite being subject to the same discovery obligations as Debtors ............................................................................................ 21

    1.    The Committee's expert as well as its trial counsel Waters & Kraus had these documents ............................................................... 22

    2.    The Committee and Waters & Kraus had the same discovery obligation as Debtors, yet failed to produce these documents ................. 23

III.  THE COMMITTEE'S *TORRES* ARGUMENT DOES NOT IMPACT THE COURT'S *TORRES* FINDINGS, IS AN ATTEMPT TO REARGUE AN ISSUE ALREADY TRIED, AND CONCERNS SECOND-HAND INFORMATION THAT WAS NEITHER HIDDEN NOR DISPUTED ............................................ 25

A.    The Committee does not dispute the Court's finding of evidence suppression in *Torres* ......................................................................... 26

B.    The Court has already rejected the argument that Garlock could have removed the prejudice from suppression of evidence by developing the evidence on its own ............................................................................... 28

C.    Mr. Boelter's summaries add nothing to the Committee's proof and were not hidden from the Committee ............................................................. 29

# TABLE OF CONTENTS
## (continued)

Page

IV.   THE REPORT OF MARC SCARCELLA—AN EXPERT FOR A DIFFERENT
PARTY IN A DIFFERENT CASE, AND NOT AN EXPERT FOR DEBTORS
AT THE ESTIMATION TRIAL—IS CONSISTENT WITH THE VIEW OF
TRUST CLAIMS ADVANCED BY DEBTORS AND ACCEPTED BY THE
COURT ........................................................................................................................ 33

    A.   The Scarcella report does not contradict Garlock's contentions or the
Court's findings regarding site list claims .......................................................... 35

    B.   Debtors did not advance a false account of how Trust claims work .................. 40

    C.   The Committee's remaining arguments regarding the meaning of Trust
claims, ballots and Rule 2019 Statements improperly rehash positions the
Committee took at trial or make inaccurate statements about the evidence ....... 46

V.   THE SIMON GREENSTONE EMAILS PROVIDE NO BASIS TO REOPEN
THE ESTIMATION TRIAL .......................................................................................... 49

    A.   The Simon Greenstone emails would not produce a new outcome, nor
would they require the judgment to be amended .................................................. 51

        1.   The Designated Plaintiff cases discussed in the SEG emails reflect
instances of suppression of evidence that support the Court's
findings in its Estimation Opinion ........................................................... 52

        2.   The Simon Greenstone emails do not overcome the evidence at
trial that third-party exposure evidence was material to Garlock in
tort cases .................................................................................................. 57

        3.   The Committee's arguments have no merit; they raise cumulative
information already in the record and revisit arguments already
tried by the Committee ............................................................................ 61

        4.   The Committee cross-examined Mr. Glaspy about other
communications with Simon Greenstone, similar in content to the
ones discussed in the Committee's Brief ................................................. 65

        5.   The emails are cumulative of the substantial number of settlement
communications available to the Committee and immaterial in the
context of the massive trial record .......................................................... 67

        6.   The Committee could have, through diligence, obtained the Simon
Greenstone emails and presented them at trial but declined to do so ...... 68

        7.   The Committee declined to call witnesses that negotiated opposite
Mr. Glaspy ............................................................................................... 70

CONCLUSION ..................................................................................................................... 71

CERTIFICATE OF SERVICE .............................................................................................. 72

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505 (4th Cir. 2003)........................................ 8

*Armstrong v. Rushton* (*In re Armstrong*), 294 B.R. 344 (B.A.P. 10th Cir. 2003) ......................... 7

*Boryan v. United States*, 884 F.2d 767 (4th Cir. 1989) ......................................................... passim

*Foster v. Granite Broadcasting Corp.* (*In re Granite Broadcasting Corp.*), 385 B.R. 41
    (S.D.N.Y. 2008)........................................................................................................... 7

*Gatton v. A.P. Green Services, Inc.*, 64 Cal. App. 4th 688 (Cal. Ct. App. 1st Dist. 1998) .......... 15

*In re Garlock Sealing Techs. LLC, et al.*, 504 B.R. 71 (Bankr. W.D.N.C. 2014) ................ passim

*Konop v. Hawaiian Airlines, Inc.* (*In re Hawaiian Airlines*), 355 B.R. 225 (D. Haw.
    2006) ........................................................................................................................... 7

*Korsak v. Atlas Hotels, Inc.*, 2 Cal. App. 4th 1524-25 (Cal. Ct. App. 4th Dist. 1992)................ 16

*Moeller v. Garlock Sealing Technologies LLC*, 660 F.3d 950 (6th Cir. 2011) ........................... 59

*Robinson v. Wix Filtration Corp., LLC*, 599 F.2d 403 (4th Cir. 2010) ........................................ 8

*Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F. Supp. 2d 298 (D. Md. 2000)............ 8

**Statutes**

11 U.S.C. § 502(c) ........................................................................................................... 7

11 U.S.C. § 524(g)(2)(B)(i)(I) ......................................................................................... 36

Cal. Evid. Code § 1271 .................................................................................................... 16

Cal. Evid. Code § 1331 .................................................................................................... 16

**Rules**

Fed. R. Civ. Proc. 59(e) .................................................................................................... 8

Fed. R. Civ. Proc. 60(b) ................................................................................................... 8

On January 10, 2014, the Court issued its Order Estimating Aggregate Liability (the "Estimation Opinion"), finding that $125 million is a "reasonable and reliable estimate of Garlock's aggregate liability" to pending and future mesothelioma claimants. *In re Garlock Sealing Techs. LLC, et al.*, 504 B.R. 71, 96-97 (Bankr. W.D.N.C. 2014).[2] The Court based its decision on a massive evidentiary record that was the product of over two years of discovery. Debtors obtained discovery from thousands of asbestos claimants, from which their experts assembled "the most extensive database about asbestos claims and claimants that has been produced to date." *Id.* at 95. Debtors in turn produced over 550,000 pages of documents to the Official Committee of Asbestos Personal Injury Claimants (the "Committee") and FCR. The parties deposed dozens of fact and expert witnesses. The Committee and FCR had the opportunity to depose all of Debtors' principal officers involved in defending asbestos claims, as well as the outside counsel responsible for defending the cases—many of those witnesses multiple times. On the eve of trial and then again during trial, Debtors (after their objections were overruled) produced to the Committee and FCR more than 110 privileged internal documents discussing cases where Debtors had alleged plaintiffs and their counsel had failed to disclose exposure evidence, inflating Debtors' settlements. At trial, the Court heard from 29 witnesses, *id.* at 74, including many experts who are internationally recognized leaders in their fields. Ultimately, the Court's Estimation Opinion was based on the most extensive record about asbestos litigation and asbestos disease ever assembled.

In the months after the Estimation Opinion, Debtors have worked diligently to formulate a plan of reorganization based on the Court's ruling, including engaging in negotiations with the FCR and the Committee. Debtors filed their First Amended Plan of Reorganization (the "First Amended Plan") on May 29, 2014. The First Amended Plan provides more than $275 million for

---

[2] Debtors' page citations to the Estimation Opinion are to this published version.

asbestos claimants, more than double the Court's estimate. At the confirmation hearing, Debtors

will prove that this plan will ensure all claimants are paid in full.

The Committee did not file a motion for reconsideration of the Estimation Opinion or a

notice of appeal. Instead, six days after Debtors filed the First Amended Plan, the Committee

filed its Motion to Reopen the Record of the Estimation Proceeding (the "Motion"), claiming in

the first line of the supporting brief that the Estimation Opinion was the result of a "fraud upon

the Court" committed by the Debtors. Committee Br. at 1. The Committee seeks to reopen the

record and conduct still more discovery.

The Committee's Motion makes an inflammatory claim, but its substance is remarkably

thin. The Motion does not even mention, much less attack, the fundamental bases of the Court's

Estimation Opinion. There the Court found, on the basis of the scientific and social science

evidence presented at the estimation trial, that "[i]t is clear that Garlock's products resulted in a

relatively low exposure to asbestos to a limited population and that its legal responsibility for

causing mesothelioma is relatively de minimus." Estimation Opinion at 73. This was because

"predominantly, Garlock's products exposed people to only a low-dose of a relatively less potent

chrysotile asbestos and almost always in the context where they were exposed to much higher

doses of more potent amphibole asbestos. So, across all potential claims, Garlock's liability for

mesothelioma should be relatively small." *Id.* at 75; *see also id.* at 82 (same). As a result, the

Court found that "[t]he best evidence of Garlock's aggregate responsibility is the projection of its

legal liability that takes into consideration causation, limited exposure and the contribution of

exposures to other products." *Id.* at 73. It then found that Debtors' expert had reliably accounted

for these elements in an econometric model that estimated Garlock's liability at $125 million. *Id.*

at 95-97. The Committee's Motion challenges none of these findings.

2

The Committee's Motion does challenge the Court's decision to reject reliance on

Garlock's settlements as a proxy for its liability for mesothelioma claims. It was, of course, the

Committee's burden at trial to prove that those settlements were a reliable proxy, and the Court

found the Committee had not met that burden. The Committee provides no new evidence

showing that settlements do measure Garlock's liability. Indeed, the Motion does not even

mention several reasons why the Court rejected the settlement-based approach. The Motion does

not address the Court's finding that settlements reflected the high cost of defense, such that

valuing Garlock's liability on that basis "would be like valuing a trade creditor's claim by the

cost of collection rather than the amount of the debt." *Id.* at 94; *see also id.* at 73, 87. Nor does

the Motion address the Court's finding that the Committee and FCR experts failed to use fresh

data generated during the bankruptcy case. *Id.* at 94-95.

The Committee's Motion concerns only the other reason the Court rejected the use of

settlements: that "the last ten years of [Garlock's] participation in the tort system was infected by

the manipulation of exposure evidence by plaintiffs and their lawyers." *Id.* at 82. Even here, the

Motion addresses only a small part of the "substantial evidence" upon which the Court based that

finding. *Id.* at 84. It discusses at length only two of the fifteen Designated Plaintiff cases where

Debtors received full discovery (*Treggett* and *Torres*). It does not discuss or challenge other

evidence the Court relied on, including:

- The Baron & Budd memo instructing plaintiffs how to testify, *id.* at 84;

- The admitted "regular" practice of some plaintiff firms of delaying filing Trust claims "so
  that remaining tort system defendants would not have that information," *id.*;

- The thirteen other cases where Debtors received full discovery and showed non-disclosure of evidence, including cases where evidence contained in affidavits executed upon personal knowledge of the plaintiff was not disclosed, *id.* at 84-85;

- The hundreds of other cases where limited discovery revealed non-disclosure of exposure evidence, *id.* at 85-86;

- The credible testimony of Mr. Magee, Mr. Turlik, and Mr. Glaspy about this phenomenon, *id.* at 86;

- The Court's inference that "more extensive discovery would show more extensive abuse. But that is not necessary because the startling pattern of misrepresentation that has been shown is sufficiently persuasive," *id.*; and

- The success Garlock had at trial when it obtained Trust claim evidence, *id.*

The Motion does not even deny that plaintiff firms failed to disclose exposure evidence in its featured cases, *Treggett* and *Torres*. To the contrary, as discussed in detail below, in a stunning reversal from its position during the estimation trial, the Committee now admits that Unibestos *was* on board the USS John Marshall when Mr. Treggett served on it, proving beyond any doubt that Mr. Eddins of Waters & Kraus misled the *Treggett* jury when he said in closing argument that it was "not true" Unibestos was on that ship. The Motion reinforces the Court's conclusion that Garlock's historical settlements and verdicts were not based on a full evidentiary record and therefore do not provide a reliable guide to its liability for mesothelioma claims.

The Committee's Motion in fact does nothing more than present what it claims is "new evidence" allegedly showing that Garlock in *Treggett* and *Torres* had independent means to prove exposures that plaintiff firms had failed to disclose. This is just a rehash of an argument the Court has heard from the Committee many times before, and rejected in the Estimation

4

Opinion. Indeed, Debtors' witnesses *testified at trial* that they made independent efforts, but those efforts did not make it less important for plaintiffs to be truthful about their exposures. When plaintiffs continued to dispute facts they had already stipulated to (or would soon stipulate to) in Trust claims and ballots, they exposed Garlock to unwarranted trial risk and massively increased its costs. The Court has heard and rejected this routine Committee argument already, and it provides no basis for reopening the estimation record.

Moreover, the "new evidence" the Committee's Motion relies on with respect to *Treggett* and *Torres* was not hidden. The evidence the Committee relies on with respect to *Treggett* was in the possession of the Committee's consulting expert (Mr. Robert Hatten at the Patten Wornom firm in Virginia) as well as the Committee's retained estimation trial counsel, Waters & Kraus, which also serves on the Committee. Waters & Kraus, obligated to produce evidence of Mr. Treggett's exposures in response to Debtors' subpoena, did not produce these documents, even though it took the most recent of the depositions.

In *Torres*, the Committee relies on a summary of evidence that does nothing more than summarize third-party depositions that Debtors did produce to the Committee in connection with the *Torres* case. That summary was an exhibit to a deposition that was produced by Debtors to the Committee, was referenced therein, and was in the possession of Williams Kherkher, the Committee's co-party in the fraud action—who did not produce it to Debtors in response to Debtors' subpoena asking for such documents, and from whom the Committee obtained it. In short, all of the documents upon which the Committee bases its bombastic arguments regarding *Treggett* and *Torres* were fully accessible to the Committee during the estimation trial. It did not avail itself of them because they do not in fact help the Committee's case (and in the case of *Treggett*, affirmatively hurt the case the Committee tried to present at the estimation).

The Committee also repeats its argument that Trust claims do not contain exposure allegations, this time alleging that a report by Mr. Scarcella, a Bates White employee, submitted approximately one month ago contradicts the position Debtors took at trial. Not only was Mr. Scarcella not an expert witness for the Debtors at trial, but the report the Committee relies on merely states what this Court has already found: that some Trusts presume exposure at certain work sites. Estimation Opinion at 86. It does nothing to undermine the Court's finding that Trust claims matter, and that the Committee's attempt "to minimize the significance of Trust claims as being somehow disconnected from exposure evidence" is "belied by examples of cases where exposure evidence was withheld." *Id.* at 84.

The Committee also tries to contend that a handful of emails it obtained from Committee member Simon Greenstone reflect "new evidence" that justifies reopening discovery and re-litigating the estimation trial. Like the other "new evidence" the Committee cites, the emails do not, in any respect, impact the bases of the Court's ruling. They are nothing more than documents cumulative to the thousands of pages of settlement communications available to the Committee at trial and duplicative in substance to documents used by the Committee at depositions and at trial. The argument the Committee tries to mount based on these emails, that the disclosure of exposure evidence was not important to Garlock, is facially frivolous. If the Committee had any faith in that position at all, it could have tried to advance it based on the record available at trial but did not.

The Committee's arguments therefore do nothing to call into question the extensive record upon which the Court based its Estimation Opinion, and provide no justification for permitting any further discovery or supplementation of that record. Equally important, accepting the Committee's invitation to backtrack would be enormously detrimental to the orderly progress

of these bankruptcy cases. The estimation process occupied most of the first three and a half years of these cases. As the Court found, "This estimation is necessary to consideration of [Debtors' first plan] or any subsequent modification to it or a competing Plan filed by another party." Estimation Opinion at 74. Reopening the estimation record would halt the plan confirmation process that Debtors began by filing their Plan, after over five months of negotiation and deliberation. Such a step would also disserve the entire purpose of estimation, which is to prevent undue delay in administration of the bankruptcy case. 11 U.S.C. § 502(c).

None of this is warranted by a Motion that does not bother to mention the fundamental foundations of the Court's opinion and casts no doubt on the few findings it does challenge. These cases have now been pending for over four years. The estimation record was the most extensive ever generated in asbestos litigation. It provided a sound basis for the Court's decision. The Committee has suffered no prejudice, and its Motion provides no basis to question the estimation record or the Court's decision. The Motion should therefore be denied in total.

## I.      THE COMMITTEE MUST SHOW THAT ITS "NEW EVIDENCE" IS MATERIAL AND WAS NOT AVAILABLE DURING THE ESTIMATION TRIAL THROUGH DUE DILIGENCE

The Committee argues the estimation record should be reopened because of "new evidence." Committee Br. at 7. But even if the Estimation Opinion is interlocutory, the identification of "new evidence" does not by itself justify reopening.[3] The Committee concedes

---

[3] If the Estimation Opinion is instead a final order, the Committee's Motion is untimely. Motions to amend a final order are governed by Fed. R. Civ. P. 52(b), and must be filed within 28 days, *id.*, which the Committee did not do. A number of courts have treated estimation orders as final judgments. *Konop v. Hawaiian Airlines, Inc.* (*In re Hawaiian Airlines*), 355 B.R. 225, 228-29 (D. Haw. 2006) (holding that bankruptcy court order estimating unliquidated claim of creditor was final order); *Armstrong v. Rushton* (*In re Armstrong*), 294 B.R. 344, 353 (B.A.P. 10th Cir. 2003) (treating an order estimating claims for voting purposes as final and noting that "[t]he bankruptcy court's [estimation] order is a final order subject to appeal under 28 U.S.C. § 158(a)(1)"); *see also Foster v. Granite Broadcasting Corp.* (*In re Granite Broadcasting Corp.*), 385 B.R. 41, 43 (S.D.N.Y. 2008) (affirming estimation order appealed prior to issuance of confirmation order, and concluding subsequent appeal of confirmation order was moot).

that courts look to "the general principles of Rules 59(e) and 60(b) [for] guidance" in

determining whether to reopen the evidentiary record underlying an interlocutory order.

Committee Br. at 5 (citing *Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F. Supp. 2d

298, 331-32 (D. Md. 2000)). Under Rule 59(e), a court may alter or amend a judgment if the

movant shows "(1) an intervening change in the controlling law, (2) new evidence that was not

available at trial, or (3) that there has been a clear error of law or a manifest injustice." *Robinson

v. Wix Filtration Corp., LLC*, 599 F.2d 403, 407 (4th Cir. 2010); *see also Am. Canoe Ass'n v.

Murphy Farms, Inc.*, 326 F.3d 505,  515 (4th Cir. 2003) (identifying "substantially different

evidence," changes in controlling law and clear error or manifest injustice as factors that district

courts should consider in "guiding" their discretion to revisit interlocutory orders). Rule 60

affords relief in similar circumstances. *See* Fed. R. Civ. Proc. 60(b).

> Courts have held that the "new evidence" must meet the following standards :
>
> (1) the evidence is newly discovered since the judgment was entered; (2) due
> diligence on the part of the movant to discover new evidence has been exercised;
> (3) the evidence is not merely cumulative or impeaching; (4) the evidence is
> material; and (5) the evidence is such that it is likely to produce a new outcome if
> the case were retried, or is such that would require the judgment to be amended.

*Boryan v. United States*, 884 F.2d 767, 771 (4th Cir. 1989). "[T]he movant is *obliged* to show

not only that this evidence was newly discovered or unknown to it until after the hearing, but

also that it could not with reasonable diligence have discovered and produced such evidence at

the hearing. . . . Evidence that is available to a party prior to entry of judgment, therefore, is not a

basis for granting a motion for reconsideration as a matter of law." *Id.* (denying motion for

reconsideration when movant could have discovered evidence before judgment using reasonable

diligence) (quotation omitted).

When examined in the context of the estimation record, none of the "new evidence"
relied upon by the Committee can meet these standards. The evidence does not even purport to
relate to nearly all the key findings made by the Court in its Estimation Opinion, meaning the
Committee cannot possibly show that "the evidence is such that it is likely to produce a new
outcome if the case were retried, or is such that would require the judgment to be amended."
*Boryan*, 884 F.2d at 771 (also requiring that the evidence be material and not cumulative). Nor
does the evidence cast the slightest doubt on the few findings the Committee purports to
challenge, as described in detail below. Finally, as also explained in detail below, the Committee
had access to all of this evidence during the estimation trial, but took the trouble to gather it only
after the Court entered its Estimation Opinion. *See id.* ("new evidence" must be newly
discovered and party must exercise due diligence). The evidence provides no basis for reopening
the record, and absolutely no basis for the inflammatory allegation that Debtors committed a
"fraud upon the Court."

II.     **THE COMMITTEE'S *TREGGETT* ARGUMENT SUPPORTS RATHER THAN
        UNDERMINES THE COURT'S FINDINGS, AND RELIES ON INFORMATION
        THAT WAS IN THE COMMITTEE'S CONTROL THROUGHOUT THE
        ESTIMATION TRIAL**

With respect to *Treggett*, the Committee claims that Debtors misled the Court by
withholding from the Committee old depositions and purchase orders from cases other than
*Treggett* dating back to the 1970s. Far from undermining the Court's findings about *Treggett*,
this evidence if anything shows further that plaintiff's counsel concealed exposure evidence from
Garlock and made misrepresentations to the jury. Moreover, Garlock cannot have hidden this
evidence from the Committee, as it was in the possession of the Committee's consulting expert
who attended the estimation trial, as well as trial counsel for the Committee, Waters & Kraus,
which had its own discovery obligation and did not produce this evidence to Debtors.

9

A.     **The new evidence supports the Court's finding that Garlock was prejudiced by plaintiff firms' failure to disclose exposure evidence**

In the Estimation Opinion, the Court made detailed findings regarding the *Treggett* case, which was the largest verdict against Garlock in its history:

> In a California case involving a former Navy machinist mate aboard a nuclear submarine, Garlock suffered a verdict of $9 million in actual damages. The plaintiff did not admit to any exposure from amphibole insulation, did not identify any specific insulation product and claimed that 100% of his work was on gaskets. Garlock attempted to show that he was exposed to Unibestos amphibole insulation manufactured by Pittsburgh Corning. The plaintiff denied that and, moreover, the plaintiff's lawyer fought to keep Pittsburgh Corning off the verdict form and even affirmatively represented to the jury that there was no Unibestos insulation on the ship. But, discovery in this case disclosed that after that verdict, the plaintiff's lawyers filed 14 Trust claims, including several against amphibole insulation manufacturers. And most important, the same lawyers who represented to the jury that there was no Unibestos insulation exposure had, seven months *earlier*, filed a ballot in the Pittsburgh Corning bankruptcy that certified "under penalty of perjury" that the plaintiff had been exposed to Unibestos insulation. In total, these lawyers failed to disclose exposure to 22 other asbestos products.

Estimation Opinion at 84 (emphasis in original).

The Committee does not contest the fact that Waters & Kraus failed to disclose 22 exposures and told the jury it was "not true" Unibestos was on board the USS John Marshall after certifying under penalty of perjury that Mr. Treggett was exposed to Unibestos. In fact, the Committee does not challenge any of the Court's findings about *Treggett*.

Instead, the Committee argues that Debtors misled the Court by maintaining that they "had no other means of proving" Mr. Treggett's exposure to Unibestos, when in fact they allegedly knew about (and intentionally concealed) certain evidence from cases other than *Treggett* showing Unibestos was on board the USS John Marshall. Committee Br. at 8-9. The evidence the Committee relies upon consists of (a) one deposition from a Newport News case in 1978, three depositions taken in Texas for a Newport News case in 1985, and one deposition in a Texas case in 2000, in each of which the witness testified to installing Unibestos pipe insulation

on the John Marshall during the overhaul in 1967-68; and (b) purchase orders and receipts from

the Norfolk shipyard in the 1960s showing delivery of Unibestos for the John Marshall.[4]

### 1.   The Committee misrepresents the prejudice Debtors suffered from the concealment of evidence in *Treggett*

The Committee nowhere explains why Debtors would have any wish to conceal evidence

that supports the contentions Garlock advanced at the *Treggett* trial, and shows further that Mr.

Eddins misled the jury when he said it was "not true" Unibestos was on the John Marshall.

Debtors' witnesses testified they *did* make efforts to develop independent evidence of plaintiffs'

exposures when plaintiffs stopped identifying them, but such efforts were undermined when

plaintiffs continued to dispute facts they had already stipulated to in ballots and Trust claims,

exposing Garlock to unwarranted trial risk and elevated defense costs. Mr. Magee testified, "[I]f

Garlock wasn't going to be able to demonstrate [alternative exposures] at trial and demonstrate

that through acknowledgment from the claimant, then it was going to be a much more difficult

case for Garlock to prevail on by showing the bucket and the ocean. If the claimant wasn't

acknowledging the ocean, **Garlock was still going to try to show it and do everything it could**

**to show it, but it was going to be much more difficult and it was going to present trial**

**risk**."[5]

This is exactly what happened in *Treggett*. As the Court found, Mr. Treggett "did not

admit to any exposure from amphibole insulation" and "did not identify any specific insulation

product," despite casting a ballot in the Pittsburgh Corning bankruptcy case certifying exposure

to the amosite insulation product Unibestos seven months before trial. Estimation Opinion at 84.

According to Mr. Magee, to fill that gap, Garlock nevertheless "tried at trial diligently to

---

[4] The Committee misleadingly focuses on Mr. Treggett's exposures during the John Marshall overhaul. Committee Br. at 8. In fact, as the Court found in its Estimation Opinion, Mr. Treggett at trial emphasized his work with gaskets during the much longer period of time when he was away from port.
[5] Tr. 3087:12-20 (Magee) (emphasis added).

demonstrate that it was Unibestos and the type of asbestos that he was—the type of insulation asbestos he was exposed to on that ship and in other places."[6] Garlock relied on two experts to demonstrate Unibestos was on board the John Marshall and Mr. Treggett was exposed to it.[7]

Despite these efforts, Garlock was stymied by Mr. Eddins. Mr. Magee testified as follows:

> Q. We've heard argument by the Committee in this case that Garlock didn't really need the plaintiff to tell him what the exposures were because Garlock knew what was on the site of where the plaintiff worked. Is this a case where Garlock had evidence of what was used on the ships where Mr. Treggett served?

> A. Yes, it was. And that's what's so frustrating about this. If you'll turn to the next slide. Garlock spent lots of time at trial trying to demonstrate that that was the source of the disease. Mr. Treggett was represented by Ron Eddins, then of the Waters and Kraus firm. And in his closing argument, he argued over and over that there wasn't—he had succeeded in keeping Unibestos off the verdict form. And he argued over and over that there—Unibestos wasn't on the verdict form because Garlock didn't bring the proof, despite bringing in testimony about what would have been on the ship. But we didn't have specific proof that Unibestos was on that specific ship.

> And he further testified—this is what really galled me about this case is that Mr. Eddins in his closing argument actually testified to the jury that we couldn't—we couldn't do that because it's not true. He made a representation that it was not true to the jury. And he said there's not a single piece of evidence that puts Unibestos aboard the boat. So not only did he argue that we hadn't proven that; he told the jury that it wasn't true. So that was very, very frustrating.

> . . .

> Q. Outside Unibestos, did Garlock also argue that the insulation on the ship, whether it was Unibestos or not, that it was amosite? That it had to be, because that's what the insulation on a ship was?

> A. Garlock did—in fact, again, this is what's so—this is what's so frustrating. You know, there's lots of questions being raised about whether this is really—this was really important to Garlock and whether this is really how Garlock tried its case. And you can see this is a transcript from Mr. Eddins' closing argument. And you see the highlighted item there where he said, "You see, they sought to talk about Unibestos throughout the whole trial over and over and over." In other

---

[6] Tr. 3070:5-8 (Magee).
[7] Tr. 4580:15-4581:3 (Glaspy); Tr. 3295:21-3296:3 (Magee).

words, Garlock was trying to demonstrate that presence of Unibestos. And then at the end of this slide he's talking about, "no blankets, no pads, no Unibestos, no amosite."

Q.  Did he characterize Garlock's position that there was amosite or Unibestos on the ship in any other way and call it hearsay?

A.  Yeah. Again, you've put up here some—a transcript of his testimony. And again, he was—obviously, he had succeeded in keeping Unibestos off the verdict form and, obviously, also convinced the jury that it wasn't true and that Garlock was just trying to blame somebody else for something that he alleged was Garlock's fault.[8]

Disclosure of the certification to Unibestos exposure in the Pittsburgh Corning ballot cast by

Waters & Kraus for Mr. Treggett seven months before trial would have eliminated the prejudice

caused by Mr. Eddins's disputing exposures Waters & Kraus had already certified, as Mr. Magee

testified:

> Mr. Eddins certainly could not have testified to the jury that Unibestos was not on the ship if the Court knew and if the jury was allowed to know that just seven months earlier there had been a ballot filed in the Pittsburgh Corning case on behalf of Mr. Treggett. If the jury had been permitted to know that Mr. Treggett was going to file trust claims against lots of insulation defendants, then all of a sudden it wouldn't have been Garlock—you saw Mr. Eddins' words about how Garlock's the one trying to point to amosite; Garlock's the one trying to blame somebody else. If that had been the case, the jury would have known that Mr. Treggett acknowledged amphibole insulation exposure and it wouldn't have been just Garlock trying to demonstrate it. It would have been coming from the claimant's mouth himself.[9]

The Committee called *no witnesses* to rebut Mr. Magee's account of what happened in

*Treggett* and the prejudice Garlock suffered from Waters & Kraus's failure to disclose

Mr. Treggett's Unibestos exposure.

---

[8] Tr. 3070:21-3071:23, 3072:19-3073:20 (Magee).
[9] Tr. 3077:16-3078:7 (Magee).

### 2. The new evidence the Committee relies on would not have cured the prejudice caused by concealing the Unibestos evidence

The old deposition transcripts and purchase orders from other cases relied upon by the Committee would not have altered the fundamental prejudice to Garlock from Mr. Eddins's misrepresentation, even if Garlock had known about them (which it did not, as discussed below). First, despite the Committee's assumption in a footnote in their brief, it is far from clear that these materials would have been admissible at the *Treggett* trial. Mr. Turlik testified at the estimation trial that these kinds of materials are *not* admissible in his experience: "If we had a transcript from 20 years ago that that plaintiff in the room was not able to be present, was not a party to that lawsuit, that transcript's not admissible against him. So, we—our hands were really tied."[10] *See also* Tr. 2255:10-23 (Turlik) (same). Mr. Glaspy, who participated in the defense of the *Treggett* case, testified at his deposition that his experience with respect to the admissibility of old depositions against a plaintiff was the same, which was one reason why he did not look for that kind of evidence when he was defending cases.[11]

The Committee argues (in a footnote) that the depositions would have been admissible against Mr. Treggett, first citing California's former testimony exception to the hearsay rule. Committee Br. at 21 n.35. But that rule requires a demonstration of both unavailability of the witness and that "[t]he issue is such that the party to the action or proceeding in which the former testimony was given had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which the party against whom the testimony is offered has at the hearing." Cal. Evid. Code § 1292. A California appellate court applied this requirement in an asbestos action to exclude a deposition taken in a prior asbestos action and prevent it from being used against a party that was not present, holding that "similarity of interest and motive must be

---

[10] Tr. 2254:17-21 (Turlik).
[11] 6/25/13 Glaspy Dep. Tr. 59:17-61:8, 84:3-9, 112:4-17 (excerpts attached as **Ex. A**).

determined *on practical considerations*, not merely the similar position of the parties in the two cases." *Gatton v. A.P. Green Services, Inc.*, 64 Cal. App. 4th 688, 692, 694-95 (Cal. Ct. App. 1st Dist. 1998). The court also stated that a discovery deposition inherently does not present the same incentive for cross-examination as a trial or other fully adversarial hearing, making it more problematic for purposes of the hearsay exception. *Id.* One can easily imagine Mr. Eddins—fond of hearsay objections at the *Treggett* trial—relying on this case to argue against the admissibility of these depositions.[12]

The Committee states in its brief that depositions such as these are admissible against plaintiffs in subsequent cases in Newport News. Committee Br. at 16. In the first place, the *Treggett* case was tried in Los Angeles, not Newport News, and the case management order the Committee relies on did not apply in Los Angeles.

Second, the Committee misstates the rule in Newport News. Depositions are usable against defendants such as Garlock, *but not* against plaintiffs who were not parties to the depositions, i.e. any plaintiff in a future case. The Committee misleads this Court by paraphrasing the relevant CMO provision and leaving out the crucial phrase: "All . . . depositions taken . . . may be used by or against any party **who was then a party** to any proceedings herein . . . ."[13] Plaintiffs in Newport News have successfully opposed use of depositions from prior cases against them. The motion in limine attached as **Exhibit B**, which was signed by, among other attorneys, Mr. Robert Hatten, demonstrates the futility of defendants' attempts to use old depositions against new plaintiffs in Newport News. Mr. Hatten is a consulting expert to the Committee and (as described below) gave the Committee all the Newport News materials it

---

[12] The Committee cites three trial court orders that do nothing more than recite the standard in the California rule, without any basis to show that the depositions admitted in those cases were similar to the ones the Committee relies on here.

[13] Initial Pretrial Order, *Thornton v. Johns-Manville Corp.*, No. 76-590 (E.D. Va. Aug. 25, 1977) ¶ 9 (Ex. 6 to Committee Br.) (emphasis added).

relies upon in the Motion. Mr. Hatten's motion in limine contains a long citation to cases where such motions in limine precluding the use of depositions against new plaintiffs were granted. *See* Ex. B at 2. It demonstrates well why this kind of evidence was not sufficient to cure plaintiffs' failure to disclose exposure evidence.

The Committee also argues, without any citation, that the depositions would have provided a basis for expert testimony that Unibestos was on board the John Marshall. Committee Br. at 21 n.35. In fact, in *Treggett*, when defendants attempted to present evidence of that nature, Mr. Eddins successfully objected on hearsay grounds.[14] Moreover, in California, experts may *rely* on facts that are hearsay in forming their opinions, but they are not permitted to *disclose* the hearsay to the jury. *See Korsak v. Atlas Hotels, Inc.*, 2 Cal. App. 4th 1524-25 (Cal. Ct. App. 4th Dist. 1992) ("Although experts may properly rely on hearsay in forming their opinions, they may not relate the out-of-court statements of another as independent proof of the fact."). Garlock could not have gotten this evidence admitted through experts either.

The Committee next argues the purchase orders could have been admitted under the business records exception to the hearsay rule. Committee Br. at 21 n.35. But that exception requires that "[t]he custodian or other qualified witness testifies to its identity and the mode of its preparation," Cal. Evid. Code § 1271, and the Committee provides no evidence that Garlock had the ability to get this testimony for purposes of *Treggett*. The Committee also argues, without citation, that the "ancient writings" exception to the hearsay rule would have applied. But the California exception for ancient writings is not as permissive as the federal one, and also requires, in addition to age, that "the statement has been since generally acted upon as true by persons having an interest in the matter." Cal. Evid. Code § 1331. Without the depositions being admissible, it is unclear how Garlock could have made this showing. And Mr. Eddins, for one,

---

[14] 9/27/04 Treggett Tr. 3096:26-3100:20 (GST-5449).

vehemently disputed whether the statements contained in those documents were "true" at the *Treggett* trial.

Most important of all, the Committee does not explain why Garlock should have had to develop independent evidence of Mr. Treggett's Unibestos exposure, when Waters & Kraus *had already certified* that exposure seven months earlier in the Pittsburgh Corning ballot. Even if Garlock had known about all this evidence, with Mr. Eddins saying it was "not true," Garlock still ran the risk that the court would not admit the evidence and, even if admitted, that the jury would not believe it. The Committee's speculation about other ways Garlock may have mitigated the harm from Mr. Eddins's misrepresentation does not undermine the fundamental point that he made it, thereby preventing the *Treggett* jury from hearing a true picture of Mr. Treggett's exposure to asbestos. As the Court rightly found, this rendered that verdict and settlements influenced by that verdict an inaccurate guide to Garlock's liability for mesothelioma claims.

### 3.    The transcripts and purchase orders only further prove Mr. Eddins misled the *Treggett* jury

The Committee seems not to recognize that, far from demonstrating that Debtors were not harmed in *Treggett* by Mr. Eddins's misrepresentation about Unibestos, the evidence the Committee now points to in fact exacerbates its gravity. The 2000 deposition the Committee relies upon was of a Waters & Kraus witness named Henderson Roberts. Waters & Kraus took the deposition, and used Mr. Roberts on multiple occasions as a product identification witness.[15] They paid for him to fly to Texas to give the 2000 deposition,[16] and he was clearly well known to Waters & Kraus who called upon him from time to time to provide product identification evidence on submarines in Newport News. The possession by Waters & Kraus of evidence

---

[15] 10/17/00 Roberts Dep. Tr. at 3, 14, 131:4-17, 132:12-15, 133:7-23, 217:13-20 (excerpts attached as **Ex. C**).
[16] *Id.* at 149, 163, 217.

showing Unibestos was on the John Marshall only makes it more likely that Mr. Eddins's

misrepresentation was an intentional one.

The Committee's admission that Unibestos was on board the John Marshall is a stunning

reversal of its position at the estimation trial. In post-trial briefing, the Committee took Garlock

to task for "not contend[ing] that even today it has any proof that Unibestos was in fact on board

the USS Marshall."[17] At the time, the Committee was attempting to argue that Mr. Eddins did

not misrepresent anything to the *Treggett* jury because there still was no proof Unibestos was on

the ship.

Now that the Court has rejected the Committee's attempt to defend Mr. Eddins, the

Committee is trying another tack. It apparently *concedes* that Mr. Eddins misled the Treggett

jury when he stated it was "not true" Unibestos was on the boat. Such a concession only makes it

clearer that the *Treggett* jury did not have an accurate view of Mr. Treggett's exposures to

asbestos when it rendered its verdict against Garlock. More evidence of intentional

misrepresentation by Mr. Eddins and Waters & Kraus certainly provides no reason to reopen the

estimation record.

### 4.    Garlock did not know about the transcripts during *Treggett* or the estimation trial

The Committee builds its case for "fraud on the court" on Mr. Magee's statement that

"we didn't have specific proof that Unibestos was on that specific ship," arguing that in fact

Debtors knew about the deposition transcripts and purchase orders.[18] But the Committee never

explains why Debtors would have any interest in concealing from the Committee or Court

---

[17] Appendix II to Post-Hearing Brief of the Official Committee of Asbestos Personal Injury Claimants for
Estimation of Pending and Future Mesothelioma Claims at 6 (Docket No. 3200).

[18] In fact, it is clear from context that Mr. Magee was describing what Mr. Eddins argued to the court to keep
Pittsburgh Corning off the jury form—not what Garlock did or did not have. Both before and after that quote,
Mr. Magee was recounting what Mr. Eddins said (the Committee conveniently leaves out the subsequent paragraph).
And indeed, that is what Mr. Eddins said at the *Treggett* trial to keep Pittsburgh Corning off the verdict form. *See*
10/6/04 Treggett Tr. 5183-84 (GST-5437).

evidence that supports what Garlock was trying to prove in *Treggett* and was prevented from doing by Mr. Eddins, and further, that suggests Mr. Eddins intentionally lied.

Quite simply, Debtors did not produce this evidence because they did not know it had anything to do with *Treggett* and it was not part of the *Treggett* file. Mr. Glaspy, who participated in Garlock's defense in *Treggett*, testified in his deposition that he did not look for old depositions for two reasons: they were not admissible, and they were generally not useful because they did not establish that a product was in the breathing zone of the plaintiff.[19]

Nor did Mr. Glaspy have any reason to know about these materials. All the depositions took place years before the *Treggett* trial—one more than two decades before. Garlock did not have counsel present at the three 1985 depositions. Garlock's counsel was present at the 1978 and 2000 depositions, but not counsel from Mr. Glaspy's firm (or the firm of Garlock's Los Angeles counsel, Mr. Baronian). The depositions all took place in Virginia and Texas. The Committee claims that the purchase orders were on the Newport News plaintiff's master exhibit list "well into the 1990s," Committee Br. at 14, but the *Treggett* trial was in 2004, in a different state.

The Committee places heavy reliance on the listing by Dana Corporation in the *Little* case of the three 1985 depositions where Garlock was not present, and Garlock's boilerplate adoption of the witness list of all other defendants. Committee Br. at 19-20. But as the Committee concedes, Mr. Little admitted Unibestos exposure so the depositions were irrelevant to that issue in that case, and Garlock had no reason to notice they might be relevant to *Treggett*. Moreover, because of the rule in Newport News that depositions are not admissible against the plaintiff, Garlock had even less reason to pay attention to them. Indeed, the motion in limine to preclude the use of prior depositions against plaintiffs in Newport News, signed by Mr. Hatten

---

[19] 6/25/13 Glaspy Dep. Tr. 59:17-61:8, 84:3-9, 112:4-17 (Ex. A).

and attached as Exhibit B, states that the plaintiff successfully precluded use of prior depositions in the *Little* case. *See id.* at 2.

The Committee seems to operate under the assumption that Garlock was aware of everything said in every deposition its counsel ever attended, and every document ever served upon it in asbestos litigation. This is simply not true. Garlock was party to hundreds of thousands of asbestos cases. It was not possible for it and all its counsel to know about everything that happened in every case at all times, much less about its impact on each of the thousands of other cases. This was especially true because these old materials were not useful, as Debtors' witnesses testified. That was why it was so important to Garlock for plaintiffs to be truthful about their admitted exposures.

> **5.    The Committee does not attack the Court's other findings about *Treggett***

Finally, the evidence is also immaterial because the Committee does not even attempt to attack any of the Court's many other findings about *Treggett*. The Court also found that Waters & Kraus failed to disclose exposure to 22 asbestos products, including products evidenced by 14 Trust claims, several against companies responsible for amphibole insulation that Mr. Eddins had maintained did not cause Mr. Treggett's disease. Estimation Opinion at 84. Notably, even if Garlock could have proved that Unibestos was on the John Marshall, Mr. Eddins disputed that Mr. Treggett was exposed to amosite asbestos in his breathing zone—a fact the documents the Committee now relies on would not have helped Garlock prove.

At trial, Debtors presented evidence through witnesses the Court found credible about even more misrepresentations that the Court did not find necessary to cite in its estimation opinion. For example, Mr. Treggett and his attorneys stated he was not exposed to asbestos of

any kind when he was stationed at Mare Island shipyard, but later filed Trust claims alleging asbestos exposure there.[20]

For all these reasons, the Committee's "new evidence" is utterly immaterial and does not meet the standard for reopening. *See Boryan*, 884 F.2d at 771.

> **B.     The Committee had the same opportunity to obtain this evidence and failed to produce it despite being subject to the same discovery obligations as Debtors**

Not only does the "new evidence" not impact the Court's findings about *Treggett*, it also was not hidden from the Committee. The Committee had access to these documents through their consulting expert and the Waters & Kraus firm, and thus could have found them through reasonable diligence (as they did after entry of the Estimation Opinion). This precludes use of this evidence to meet the standard for reopening. *See Boryan*, 884 F.2d at 771 (evidence that could have been found with reasonable diligence does not meet standard for "new evidence").

Moreover, both the Committee and Waters & Kraus had the same discovery obligations as Debtors with respect to documents from Treggett, and failed to produce them to Debtors. Debtors should not be held to a different standard. No discovery request from the Committee requested that Debtors examine every transcript from all past cases to determine if information about Mr. Treggett's ships was contained in any of them. Such a request would have been overbroad and unduly burdensome on its face. The fact that the Committee and Waters & Kraus did not produce the documents in response to Debtors' similarly worded requests for documents concerning Mr. Treggett's exposures demonstrates that these old documents from other cases were not reasonably within the ambit of anyone's discovery requests.

---

[20] Tr. 4581:9-22, 4583:4-9 (Glaspy)

### 1. The Committee's expert as well as its trial counsel Waters & Kraus had these documents

The Committee admits it obtained these documents from Patten, Wornom, Hatten & Diamonstein, L.C. *See* Letter from Mr. Swett to Mr. Cassada (attached as **Exhibit D**). Mr. Robert Hatten is a partner in the Patten Wornom firm, was present at the 1978 deposition, asked questions for the plaintiff in the three 1985 depositions, and was attorney for Henderson Roberts, who gave the 2000 deposition (as well as took Mr. Roberts's 1985 deposition).[21] Mr. Hatten also was a consulting expert for the Committee before and during the estimation trial, and attended the estimation trial. *See, e.g.*, Beckett Dep. Tr. 15:22-25 (attached as **Exhibit E**) (Mr. Finch stating that Mr. Hatten "is a consulting expert for ACC for purposes of the Garlock bankruptcy case"); Tr. 1580:13-22 (noting that Mr. Hatten was in the courtroom during the estimation trial).

The Committee fails to explain why it did not obtain these documents from Mr. Hatten, its expert, before the estimation trial if it judged them important. It knew what Debtors' contentions were regarding the *Treggett* case, and what the facts of the case were, months before trial, including that it involved the Newport News shipyard. More likely, the Committee had no interest at all in showing Unibestos actually was on the John Marshall. As described above, the evidence helps Debtors, showing further that Mr. Eddins made a misrepresentation to the *Treggett* jury about Mr. Treggett's Unibestos exposure. Indeed, it was an important part of the Committee's defense of Mr. Eddins to argue that Garlock still did not have specific proof Unibestos was on board the John Marshall.[22]

---

[21] 2/23/78 Oman Dep. Tr. at 120 (excerpts attached as **Ex. F**); 10/15/85 Oman Dep. Tr. at 1 (excerpts attached as **Ex. G**); 10/15/85 Roberts Dep. Tr. at 1, 4 (excerpts attached as **Ex. H**); 10/16/85 Garris Dep. Tr. at 1 (excerpts attached as **Ex. I**); 10/17/00 Roberts Dep. Tr. at 129-130 (Ex. C).
[22] Appendix II to Post-Hearing Brief of the Official Committee of Asbestos Personal Injury Claimants for Estimation of Pending and Future Mesothelioma Claims at 6 (Docket No. 3200).

The Committee also could have obtained the documents from Waters & Kraus, retained
counsel for the Committee and trial counsel at the estimation trial. Waters & Kraus took the 2000
Henderson Roberts deposition and used him as a product identification witness on multiple
occasions. If Garlock is charged with knowledge of these documents because distant counsel
unrelated to the *Treggett* trial attended depositions in cases years earlier in Virginia and Texas,
Waters & Kraus (which actually took one of the depositions, was Mr. Treggett's trial counsel,
and was obligated to produce relevant exposure evidence in the *Treggett* case) must certainly be
charged with that knowledge as well, precluding the Committee from showing it used
"reasonable diligence" to obtain the allegedly new evidence. *See Boryan*, 884 F.2d at 771.

### 2. The Committee and Waters & Kraus had the same discovery obligation as Debtors, yet failed to produce these documents

In discovery before the estimation trial, to ensure a complete record and in part to
preclude the kind of game the Committee is now attempting, Debtors issued reciprocal discovery
requests to both the Committee and Waters & Kraus for any documents evidencing the exposures
of Mr. Treggett (as well as other Designated Plaintiffs).

In their First Request for Production of Documents to the Committee, Debtors requested:

> All documents generated in litigation pursued by any Asbestos Claimant
> (including complaints, answers to interrogatories, deposition transcripts,
> responses to requests for admission, and trial transcripts) that you have obtained
> from any source other than the Debtors. The Asbestos Claimants covered by this
> Request include, without limitation (a) Asbestos Claimants who voted in asbestos
> bankruptcy cases through ballots disclosed by Debtors to you (or otherwise
> obtained by you), (b) Asbestos Claimants subject to the Order Authorizing the
> Debtors to Issue Questionnaire to Holders of Pending Mesothelioma Claims and
> Governing the Confidentiality of Information Provided in Responses (Docket No.
> 1390), and (c) Asbestos Claimants for whom documents generated in tort
> litigation have been produced by Debtors to you.

The Committee lodged an undue burden objection, but agreed to "search for and produce

documents within its possession, custody, or control that are responsive to this Request and not

privileged or otherwise protected." This Request applied to the *Treggett* case by its terms.

In their Second Request for Production of Documents to the Committee, Debtors

requested that the Committee produce

> All Claim File Materials for any Mesothelioma Claim for which Debtors have
> made production to the ACC or FCR in response to a formal or informal
> discovery request made by the ACC or FCR.

The Committee objected but agreed to produce "all Claim File Materials received from any

sources other than the Debtors or Rust Consulting that are responsive to this Request and not

privileged or otherwise protected." This Request also applied to the *Treggett* case by its terms.

Finally, in the Amendment to Stipulation and Order governing production of documents

pertaining to claimants on Debtors' RFA lists, the Committee and FCR stipulated that they "shall

produce to Debtors, for any claimant identified by Debtors pursuant to the RFA Stipulation,

documents within the same categories of documents Debtors are required to produce pursuant to

the RFA Stipulations but were not received by the Committee or FCR from Debtors. Such

production shall be made on a rolling basis and shall be complete no later than 60 days after

Debtors have completed their production pursuant to the RFA Stipulation."[23]

Despite no fewer than three discovery requests implicating *Treggett*, and despite the

possession of these documents by a law firm that serves on the Committee (Waters & Kraus) and

the Committee's consulting expert (Mr. Hatten of Patten Wornom), the Committee produced

none of these documents to Debtors before the estimation trial. The Committee should not be

heard to complain that Debtors did not produce the documents to it.

---

[23] Amendment to Stipulation and Order Resolving Motion of the Official Committee of Asbestos Personal Injury
Claimants to Determine Insufficiency of the Debtors' Answers to the Committee's First Requests for Admission and
to Compel Debtors to Respond to Certain Discovery Requests ¶ 6 (Docket No. 2585).

In addition to the discovery obligations it had as a member of the Committee and trial

counsel for the Committee, Waters & Kraus had an independent discovery obligation to produce

documents such as these. In the subpoena Debtors served on Waters & Kraus, the firm was

required to produce, among other items, "Any other Documents evidencing any Designated

Plaintiff's exposures to any asbestos-containing product." Mr. Treggett was such a Designated

Plaintiff. Mr. Kraus, as the 30(b)(6) designee for Waters & Kraus, subsequently testified that "all

non-privileged documents responsive to this request have been produced." 1/14/13 Kraus Dep.

Tr. 29:22-23 (attached as **Exhibit J**). In addition, when Debtors asked Mr. Kraus for the reason

why Waters & Kraus cast a ballot for Mr. Treggett in the Pittsburgh Corning bankruptcy case, he

did not mention the evidence the Committee now relies upon. 1/14/13 Kraus Dep. Tr. 92:6-93:8

(Ex. J).

Yet even though Henderson Roberts was its witness on multiple occasions and it took his

2000 deposition, Waters & Kraus never produced any of the documents to Debtors. The

Committee fails to explain why Debtors should be held to a different standard.

Because the evidence the Committee relies on supports rather than undermines the

Court's finding about Mr. Eddins's misrepresentation, does nothing to undermine any of the

other findings the Court made about *Treggett*, and was fully accessible to the Committee during

the estimation trial, the Committee's *Treggett* argument provides no reason to reopen the

estimation proceeding.

III.    **THE COMMITTEE'S *TORRES* ARGUMENT DOES NOT IMPACT THE
        COURT'S *TORRES* FINDINGS, IS AN ATTEMPT TO REARGUE AN ISSUE
        ALREADY TRIED, AND CONCERNS SECOND-HAND INFORMATION THAT
        WAS NEITHER HIDDEN NOR DISPUTED**

The Committee also claims that Garlock misled the Court by withholding from the

Committee information concerning *Torres*. More specifically, the Committee complains that

25

Debtors hid from it an exhibit that was attached to the deposition of Mr. Frederick Boelter, one

of Garlock's experts, in two cases, *Torres* and *Weikel*. Committee Br. at 24, 28-29. This

document was neither an expert report nor evidence of Mr. Torres's asbestos exposures, but

rather nothing more than a summary of depositions Mr. Boelter reviewed, *i.e.*, second-hand

information. Debtors produced all of the depositions referenced in Mr. Boelter's summary during

estimation discovery. Thus, the Committee received the first-hand information.

Moreover, the information at issue was neither secret nor disputed. Garlock produced the

Boelter depositions to the Committee, but inadvertently did not include the deposition exhibits

because the electronic transcript did not include them. Williams Kherkher did the same thing

when Garlock served a subpoena on the firm requiring it to produce all evidence of Mr. Torres'

exposures to asbestos-containing products. Further, the summary was referenced repeatedly in

Mr. Boelter's deposition, and the Committee could have requested it at any time but did not.

Finally, the Committee's *Torres* argument is without merit because, in addition to being

about second-hand information that was neither hidden nor disputed, it does not undercut the

Court's *Torres* findings, and is an attempt to retry an issue the Court already decided. The

Committee knew Garlock's case in *Torres* was to try and put forth evidence of Owens Corning

and Babcock & Wilcox products in Mr. Torres' breathing zone. The harm to Garlock was that

Mr. Torres and Williams Kherkher disputed that evidence, and his attorneys failed to disclose

information demonstrating that, despite their denials in discovery, Mr. Torres actually inhaled

asbestos from those products.

### A.    The Committee does not dispute the Court's finding of evidence suppression in *Torres*

The *Torres* argument follows the Committee's familiar pattern of misdirection. The Court

made the following findings regarding *Torres*:

> In a Texas case, the plaintiff received a $1.35 million verdict against Garlock
> upon the claim that his only asbestos exposure was to Garlock crocidolite gasket
> material. His response to interrogatories disclosed no other product to which he
> was exposed. The plaintiff specifically denied any knowledge of the name
> "Babcock & Wilcox" and his attorneys represented to the jury that there was no
> evidence that his injury was caused by exposure to Owens Corning insulation.
> Garlock's discovery in this case demonstrated that the day before the plaintiff's
> denial of any knowledge of Babcock & Wilcox, his lawyers had filed a Trust
> claim against it on his behalf. Also, after the verdict, his lawyers filed a claim
> with the Owens Corning Trust. Both claims were paid – upon the representation
> that the plaintiff had handled raw asbestos fibers and fabricated asbestos products
> from raw asbestos on a regular basis.

Estimation Opinion at 84. The misdirection here is that the Committee does not contest the above

findings, *i.e.*, that Torres' counsel concealed exposure evidence that was later the basis for paid

Trust claims. Rather, the Committee once again repeats its argument that Garlock had

independent means to develop this evidence, and "misled the Court" because it "already had the

proof it says it needed." Committee Br. at 24.

The first flaw in this approach is fundamental: as with *Treggett*, the Committee fails to

address the basis for the Court's finding that suppression of evidence occurred in *Torres*. At the

estimation trial Garlock presented the *Torres* suppression evidence via Mr. Magee and Professor

Brickman.[24] Neither the Committee nor the FCR offered any evidence from their own witnesses

about *Torres*, and neither party cross-examined Professor Brickman about that case. The

Committee did cross-examine Mr. Magee about *Torres*, which cross-examination attempted to

suggest that Mr. Torres and Williams Kherkher fully disclosed insulation exposure.[25] But Mr.

Magee noted then how Williams Kherkher emphasized that Garlock was the only product that

Mr. Torres handled hands-on and also minimized his thermal insulation exposure.[26] Mr. Magee

had earlier testified that at no point did Mr. Torres or his attorneys disclose his handling of raw

---

[24] Tr. 3082:11-3084:6 (Magee); Tr. 1196:9-12; 1197: 5-12; 1201:23-1204:20 (Brickman).
[25] Tr. 3350:10-3363:6 (Magee Cross).
[26] Tr. 3352:17-3354:4 (Magee Cross).

asbestos fibers, alleged in his Trust claims.[27] Based on the evidence presented, the Court found

that Mr. Torres and Williams Kherkher's vague, minimized disclosures, combined with the

statements made in the paid Trust claims, amounted to suppression of evidence. The

Committee's accusations about missing expert summaries do not challenge this finding.

### B.     The Court has already rejected the argument that Garlock could have removed the prejudice from suppression of evidence by developing the evidence on its own

The second flaw with the Committee's *Torres* argument is that it is a thinly veiled

attempt to reargue, once again, that Garlock was not prejudiced by suppression of evidence

because it could have developed the evidence on its own. The Committee continues to contend

that all exposure evidence is the same, thereby ignoring the ability of plaintiffs and their counsel

to control and manipulate that evidence. To be sure, Garlock, at considerable expense, was able

to develop some evidence of Kaylo insulation and Babcock & Wilcox insulated boilers at Union

Carbide's Brownsville Plant.[28] But the problem was that Garlock could not develop evidence of

Kaylo insulation and Babcock & Wilcox insulated boilers *in Mr. Torres' breathing zone*. That is

the evidence that Mr. Torres and his counsel, Williams Kherkher, concealed from Garlock—

allowing them to convince the jury that no liability should be apportioned to Owens Corning for

Kaylo and keeping Babcock & Wilcox off the verdict form altogether—in order to obtain a $1.35

million verdict. Proof of this concealment occurred when Williams Kherkher filed Trust claims

for Mr. Torres, claiming exposure to Kaylo and Babcock & Wilcox, which claims were paid.

As described above, throughout the estimation trial the parties debated the relative

importance of exposure evidence disclosed by the plaintiff versus evidence that Garlock

---

[27] Tr. 3083:24-3083:7 (Magee).

[28] In fact, the evidence suppression practiced by plaintiffs' firms also prejudiced Garlock because it increased Garlock's defense costs. Garlock offered undisputed evidence at trial that the widespread refusal by plaintiffs to acknowledge their exposures to bankrupts' products drove up Garlock's defense costs which in turn greatly inflated settlement values. The Court found that Garlock settled the overwhelming majority of cases against it "without regard to liability and virtually entirely for cost avoidance." Estimation Opinion at 39.

developed from other sources. After considering the testimony concerning this proposition, the

Court found that "the last ten years of [Garlock's] participation in the tort system was infected by

the manipulation of exposure evidence by plaintiffs and their lawyers." Estimation Opinion at

82. Further, the Court found that this practice of plaintiffs suppressing evidence "prejudiced

Garlock in the tort system." *Id.* at 86. The Court thus concluded that the plaintiff's evidence

about other exposures is of paramount importance.

This finding necessarily means that the Committee's misdirection arguments—that

Garlock "already had the proof it says it needed" and thus "misled the Court"—are dead on

arrival. The Court already has rejected the Committee's contentions on this issue, and the

Committee's attempt to rehash them should fail.

### C. **Mr. Boelter's summaries add nothing to the Committee's proof and were not hidden from the Committee**

In addition to their flawed misdirection strategy, the Committee cannot show that it was

denied first-hand information, that the information at issue was hidden, or that it even concerned

disputed facts. The Committee contends that somehow it was prejudiced because Garlock did not

produce what the Committee characterizes as the "report" of a Garlock expert, Mr. Frederick

Boelter, in two cases, *Torres* and *Weikel*. The threshold point to note about these so-called

"reports" is that they are not expert reports. A cursory review shows that they are a listing and

summary of information that Mr. Boelter received from Garlock's counsel. They do not contain

any of Mr. Boelter's opinions or analysis.

But more importantly, the summaries are just that—summaries of other information,

namely deposition transcripts. Debtors produced in estimation discovery the deposition

transcripts to which the Committee refers when it discusses the Boelter summaries.[29] Committee

---

[29] <u>Torres</u>:

Br. at 25-29. Thus, the Committee received in discovery the first-hand information referenced in the summaries.

The second point about Mr. Boelter's summaries is that they were not hidden. The Committee admits that Debtors produced Mr. Boelter's *Torres* deposition, but complains that "Mr. Boelter did not discuss in that testimony the evidence related to Kaylo and Babcock & Wilcox." Committee Br. at 25. What the Committee does not point out is that Mr. Boelter's summary was Exhibit 1 to his deposition, was referred to repeatedly in the transcript as "this 37-page document," and was the subject of thorough questioning. *See* Excerpts from Boelter Deposition Transcript at 8-30, 217-21 (attached as **Exhibit K**) ("Boelter Tr."). As a result, the non-production of the summary was evident from the transcript that Debtors produced, and all the Committee had to do to obtain the summary would have been to pick up the telephone and call Debtors' counsel. This it did not do. Or it could have obtained the summary from Williams Kherkher, the Committee's co-party in the fraud suit, which is where the Committee admits it got the summary now. *See* Ex. D. Williams Kherkher did not produce the exhibits to the Boelter deposition when they produced it to Debtors in response to Debtors' subpoena requesting such

---

- Gibson (GST-EST-0451092)
- Weikel (GST-EST-0453510)
- Valenzuela (GST-EST-0467601)
- Rodriguez (GST-EST-0528520)
- Robledo (GST-EST-0528758)

Weikel:
- Weikel (GST-EST-0546325)
- Ketchum (GST-EST-0545629, GST-EST-0545732)
- Terry (GST-EST-0546326)
- Ara (GST-EST-0546324)

information, and the Committee again fails to explain why Debtors should be held to a different standard.[30]

Moreover, the Committee's assertion that Mr. Boelter's deposition testimony in *Torres* "did not discuss . . . the evidence related to Kaylo and Babcock & Wilcox" (Committee Br. at 25) is incorrect. While Mr. Boelter did not mention those two companies by name, he testified extensively about thermal insulation and friable insulation materials. *See, e.g.*, Boelter Tr. at 97-98, 185-186. In addition, in testifying about insulation at the site, Mr. Boelter specifically referred to his summary, *id.* at 217, and at one point even quoted the summary, *id.* at 220. As a result, the document that the Committee did have—the Boelter deposition—disclosed the very subject matter that the Committee now says was hidden from them. Thus, the Boelter summary not only was "hidden in plain view," but it also was not a unique source of information—both because it summarized depositions the Committee received, and because it was referenced throughout Mr. Boelter's deposition. The inescapable conclusion is that the Committee, assuming it reviewed the Boelter deposition in preparation for the estimation trial, did not think that the Boelter summary was important enough to ask for it and the other Boelter deposition exhibits.

The irony here is that the Committee's pre-trial analysis of the Boelter summary was correct: it was not important to its case because it did not concern a disputed issue in the *Torres* trial. Both sides in *Torres* knew that there was evidence of Owens Corning and Babcock & Wilcox products at the worksite. What was in dispute was whether Owens Corning and Babcock & Wilcox products *were in Mr. Torres' breathing zone*. Mr. Torres and his lawyers denied that fact, and hid the evidence that they later used to recover on his Trust claims. By contrast, the Boelter summary did not refer to exposure evidence that would have put Owens Corning and

---

[30] Like the Debtors, Williams Kherkher produced a copy of Mr. Boelter's deposition without exhibits.

Babcock & Wilcox products in Mr. Torres' breathing zone. Thus, the Boelter summary would not have helped the Committee rebut Garlock's evidence in the estimation trial because in the *Torres* case, the Boelter summary referred merely to cumulative evidence of undisputed facts.

Moving to the specific deposition testimony that the Committee cites in the Boelter report—again, depositions that Garlock produced in estimation discovery—the 1996 deposition of Willie Joe Gibson (Committee Br. at 25) concerned a man who did not work at the Brownsville plant and thus could not have been used to put Kaylo in Mr. Torres' breathing zone. Similarly, Garlock did not use the 2006 deposition of Kerry Weikel (Committee Br. at 25-26, incorrectly referenced by the Committee as occurring in 1996) concerning Babcock & Wilcox because his testimony did not put its boilers in Mr. Torres' breathing zone. Garlock did not use Mr. Weikel's 2006 deposition regarding Kaylo because it had his 2009 deposition in *Torres*. The problem with Mr. Weikel's testimony was that, although Garlock did what it could with his testimony, the thrust of the testimony was against Garlock.

The bottom line is that, having been denied full disclosure by Mr. Torres and his lawyers, Garlock put on the best evidence it had and suffered an adverse verdict. The Committee had this evidence before the estimation trial, and the Boelter summary would have added nothing to the Committee's case. It was a second-hand reference to exposure evidence that was not in dispute in the *Torres* trial.

The Committee's complaint about not receiving Mr. Boelter's summary in *Weikel* is just as insignificant. Committee Br. at 28. This summary was Exhibit 3 to Mr. Boelter's *Weikel* deposition, which Garlock also produced in estimation discovery. So again, had the Committee wanted the summary after reviewing Mr. Boelter's transcript, all it had to do was call Debtors' counsel and ask for the missing exhibits.

Further, as with the depositions that Mr. Boelter referenced in his *Torres* summary, Garlock produced in estimation discovery the depositions referenced in the *Weikel* summary. Moreover, as with the depositions in *Torres*, the *Weikel* depositions that the Committee cites were irrelevant and/or unhelpful concerning alternative exposures. The depositions of Melvin Ketchum (incorrectly referred to by the Committee as William Ketchum), Robert Terry, and Louis Ara were not as strong as the Weikel deposition that Garlock already had in *Torres*, so Garlock did not use them. As the Committee notes, Judge Davidson does permit use of depositions against plaintiffs in some circumstances, unlike other courts (such as Newport News). But admissibility was not the issue with these depositions. The problem was that they were weaker evidence than Mr. Weikel's 2009 deposition, which was too weak to overcome the concealment of evidence.

Accordingly, the Boelter expert summaries are a classic example of the Committee trying to make a mountain out of a mole hill. Garlock could not use the Boelter summaries in *Torres* to overcome Williams Kherkher's concealment, and the Committee, even if it had asked Garlock to produce these missing deposition exhibits, would have obtained nothing to rebut Garlock's case at the estimation trial. The *Torres* argument fails.

IV.    **THE REPORT OF MARC SCARCELLA—AN EXPERT FOR A DIFFERENT PARTY IN A DIFFERENT CASE, AND NOT AN EXPERT FOR DEBTORS AT THE ESTIMATION TRIAL—IS CONSISTENT WITH THE VIEW OF TRUST CLAIMS ADVANCED BY DEBTORS AND ACCEPTED BY THE COURT**

The Committee also accuses Debtors of committing fraud by taking the position that asserting site-list claims against asbestos Trusts requires claimants to contend that they were exposed to products for which Trusts are liable. As support, the Committee cites a report written by Marc C. Scarcella, a Bates White employee, filed on May 20, 2014 in a state-court action by an undisclosed defendant. The Committee wrongly states that Debtors' own experts have

contradicted its position on site-list claims. The Committee uses the alleged contradiction to accuse Debtors of offering a false account of how site-list claims work and to rehash the same unmeritorious positions it took at the estimation trial.

The Committee's arguments on this point are wrong for numerous reasons. Mr. Scarcella was not an expert for Debtors at the estimation trial and his report does not contradict their position.

More important, based on evidence offered by Debtors and the Committee regarding site-list claims, the Court fully understood that Trusts with Approved Site Lists make presumptions about claimants' product exposures. The Court properly placed this evidence in context. The evidence at trial was overwhelming that exposure evidence (particularly evidence of exposures to friable, amphibole asbestos insulation products) that was readily disclosed by plaintiffs in cases filed against Garlock prior to the bankruptcy wave largely disappeared in the 2000s. The Committee offered no evidence at trial, and offers none now, that rebuts this fact. When placed under oath, lawyers representing the Designated Plaintiffs admitted that their clients had an interest in concealing Trust claims from Garlock and that, by delaying Trust claims, they successfully concealed them.[31] The evidence showed that many of the delayed claims were supported by sworn statements by plaintiffs and other witnesses describing plaintiffs' exposures to Trust products; some were site-list claims in which plaintiffs alleged exposure to the Trust's products at specific locations and during specific time periods; others were placeholder claims; and others were only partially completed claims.

---

[31] 2/1/13 Cooper Dep. at 45:2-13 (excerpts attached as **Ex. L**) (testifying that Trust claims were delayed to "represent the client as well as possible"); 1/14/13 Kraus Dep. at 41:24-42:14 (Ex. J) (testifying that Trust claims were delayed so defendants could not offer the claims as admissions and place the Trusts on verdict forms).

Taking into account all of the evidence, the Court acknowledged that there were different types of Trust claims, but that any claim paid by Trusts was based on meaningful and credible exposure evidence:

> The [Committee] correctly notes that the standard for making Trust claims is different than for establishing a tort claim. Trusts permit "placeholder" claims and also often allow claims based upon working at a certain location where asbestos exposure was presumed. But, relaxed Trust claiming rules do not explain or exculpate the "disappearance" of exposure evidence noted here. Whether "bare bones," "placeholder" or "presumptive," the Trusts require some "meaningful and credible" exposure evidence to pay a claim.

Estimation Opinion at 86. The Court considered this evidence, and more, in concluding that the Committee had failed to prove Garlock's settlement history in the 2000s is a reliable basis for estimating allowed claims. The Scarcella report provides no basis for re-examining these findings.

**A.      The Scarcella report does not contradict Garlock's contentions or the Court's findings regarding site list claims**

The issue of the meaning of an Approved Site List was vigorously contested at trial. Garlock introduced evidence uncovered in case after case against it in which plaintiffs who denied or failed to disclose exposures to bankrupts' products in pre-trial discovery filed a dozen or more Trust claims in which they unequivocally asserted that they did in fact have exposure to bankrupts' products. Many of the claims were supported by affidavits that flatly contradicted interrogatory answers and sworn testimony in their tort cases against Garlock.[32] Other Trust claims were supported by reference to worksites on Approved Site Lists, but even in these claims the claimants often identified bankrupt products to which they were exposed and locations and durations of exposure.

---

[32] Estimation Opinion at 85.

At trial, Garlock offered extensive factual and expert evidence regarding the content and meaning of Trust claims. Garlock demonstrated that filing a Trust claim required two discrete actions: (1) claimants must assert that they have injuries caused by exposure to asbestos or asbestos-containing products for which a Trust is responsible, and (2) claimants must provide evidence that they have asbestos diseases that meet the Trust's medical criteria and "meaningful and credible evidence" of exposure to the Trust's products.[33] Although Trusts normally require a sworn statement by the injured person or other competent witness, some Trusts apply a relaxed standard that presumes exposure for claimants who worked at Approved Sites. Garlock demonstrated that Approved Site Lists provide a shortcut to proof of exposure. Claimants who assert they were exposed to Trust products can prove it by showing they worked at an Approved Site.[34]

Notably, Garlock's position regarding site-list claims is supported by the purpose of the Trusts and plain language of the Trust claim forms themselves. Trusts are created under the Bankruptcy Code to pay the debtors' liability for injuries caused by asbestos or asbestos-containing products.[35] The claim forms explicitly require claimants to assert under penalty of perjury that they had exposure to products for which the debtors have liability. The forms make clear that the purpose of Approved Site Lists is to meet the requirement that claimants provide evidence to support their exposure allegations. Even claimants who rely on Approved Site Lists must identify the places "where exposure occurred;" and the "Date Exposure Began" and Date

---

[33] *See, e.g.*, Tr. 2266:5-2267:20 (Turlik).
[34] *Id.*
[35] *See* 11 U.S.C. § 524(g)(2)(B)(i)(I).

Exposure Ended."[36] Finally, the Trust forms require claimants or their lawyers to certify under

penalty of perjury that the information is "accurate and complete."[37]

The Committee contended at trial that claimants who make site-list claims do not contend

that the Trusts' products actually caused their injuries but are simply taking advantage of a

system that pays injured claimants who worked at specific job sites. The Committee argued that

site-list claims by Garlock mesothelioma claimants should not be considered in estimating

Garlock's liability for mesothelioma claims. But Mr. Patton, called by the Committee as an

expert on the Trust claiming process, admitted that (1) persons who rely on presumed sites would

most assuredly be able to prove exposure to the debtor's product if required to do so;[38] (2) Trusts

presume that people who rely on a presumed site were exposed to the product because presumed

sites are ones where companies had been paying claims, acknowledged they had asbestos-

containing materials present, and had been held liable;[39] and (3) the claim form of the ACandS

Trust—a Trust Mr. Patton helps administer—assumes that claimants who rely on a presumed site

are alleging exposure to debtors' products at the sites.[40] As Professor Brickman pointed out,

language from most Trust claim forms contains language making clear that the person filing a

claim is alleging exposure.[41]

At the end of the day, the Court heard several hours of testimony on this point and

considered substantial documentary evidence. Taking all of the evidence into account, the Court

acknowledged the relaxed standard for site-list claims but concluded that the claims were still

---

[36] *See, e.g.*, GST-5481 (Treggett Babcock & Wilcox Trust claim), at Waters 02490-91; GST-2783 (Flynn Fibreboard Trust claim), at Waters 03024.
[37] *See, e.g.*, GST-5484 (Treggett Eagle-Picher Trust claim), at Waters 02542; GST-5485 (Treggett Fibreboard Trust claim), at Waters 02570.
[38] Tr. 3736:24-3737:21 (Patton).
[39] Tr. 3737:22-3739:5 (Patton).
[40] Tr. 3739:6-3740:23 (Patton).
[41] Tr. 1174:23-1175:2 (Brickman).

based on "meaningful and credible" exposure and therefore relevant to estimation of allowed mesothelioma claims against Garlock.[42]

The Committee now makes its second attempt to advance the same arguments the Court took into account in its findings. In spite of the plain language of Trust distribution procedures and Trust claim forms supporting Garlock's position, the Court's findings, and testimony from the Committee's own witnesses, this time the Committee argues that Garlock's position is not only wrong but also fraudulent. As evidence, the Committee points to Mr. Scarcella's report in *Burns v. Hajoca Corp*., a case pending in Pennsylvania state court. In the report, Mr. Scarcella explains how claimants can use Approved Site Lists as proof of exposure for their claims against Trusts. ("As an alternative to sworn statements or product or operations exposure allegations, some Trusts will accept evidence of presumed exposures at a qualifying Approved Site."[43]) The Committee asserts that this opinion contradicts Garlock's proof at trial and proves that Garlock knew that its contentions were wrong.

As it did at trial, however, the Committee mistakenly collapses two parts of the Trust filing process into one. Approved Site Lists spare claimants from having to provide an affidavit or other evidence, but they do not excuse the claimant from having to take the first step of submitting a Trust claim contending exposure to Trusts' products. Mr. Scarcella's report does not support the Committee's position.

Dr. Bates explained the meaning of Approved Site Lists in the same way during his deposition testimony:

> Q. The naming of an entity in the complaint was not an event that would cause you to include that entity in your mix of defendants in the report?
>
> A. That's correct.

---

[42] Estimation Opinion at 86.
[43] Scarcella Report ¶ 10 (attached as Exhibit 25 to Committee Br.).

Q. But the naming of a trust on a trust claim form would cause you to include the trust in that mix, right?

A. Absolutely.

Q. What's the difference?

A. Well, one you're clearly signing a form that asserts exposure to the products -- the asbestos-containing products of the company. It's what the trust form submissions say. To the history of the claims filed against the company as both studied by Dr. Peterson, Dr. Rabinovitz and myself is a large number of those claimants did in fact have exposure to those companies. And so it's a reasonable assumption to make, even absent their attestations to the fact that they were exposed to the products. That's what the purpose of the TDPs are.

Q. And what do you do, sir, in that step in the analysis with trust claims that are based exclusively on approved site lists?

A. The trust claim based on approved site list is just the short cut way of establishing the presumptive criteria. It says the individual says that I was exposed to the products of the company and the only proof required by the trust is to establish that they were in fact on the approved site list. But they still have to assert that they were exposed to the products of the company.[44]

Mr. Scarcella makes the same point. He first explains that Trusts pay injured claimants who offer meaningful and credible evidence of exposure to products for which such Trusts are liable.[45] He then explains that, if an injured claimant who files a Trust claim demonstrates that he worked at a site on an Approved Site List, the Trust has determined that that "establishes enough evidence to presume that any individual in the direct proximity was likely exposed to the former defendant's products or operations."[46] Mr. Scarcella's opinions are also identical to the Court's findings—"[Trusts] also often allow claims based upon working at a certain location where asbestos exposure was presumed."[47]

---

[44] Bates Dep. at 201:21-203:8 (excerpts attached as **Ex. M**).
[45] Scarcella Report ¶ 9.
[46] *Id.* ¶ 10.
[47] Estimation Opinion at 86.

Importantly, Mr. Scarcella does not opine or even suggest that claimants can be paid on site-list claims without alleging that they were exposed to Trusts' products.

The Committee fails to show how Mr. Scarcella's report in the *Burns* case, if available at the estimation trial, was inconsistent with Debtors' position or how it would have made any difference in the Court's findings.

**B.      Debtors did not advance a false account of how Trust claims work**

Even if Mr. Scarcella's report contradicted Debtors' position at trial, the report would provide no basis for concluding that Debtors committed fraud or that the estimation record should be reopened. Debtors did not offer any expert or other testimony from Mr. Scarcella at trial. There is no evidence that Garlock had any interest or involvement in, or knowledge of, Mr. Scarcella's work in the *Burns* case. If Mr. Scarcella's report can fairly be interpreted as saying something different from Dr. Bates or Professor Brickman, there is no evidence that Debtors or its experts agree with Mr. Scarcella. And there is no basis for permitting an opinion offered by Mr. Scarcella in another case to be offered against Debtors in the estimation case, especially over 10 months after conclusion of trial and six months after the court's decision.

The Court considered overwhelming evidence offered by Debtors and the Committee to explain the meaning of Trust claims, including copies of Trust claims and Trust distribution procedures and expert and fact testimony from Professor Brickman, Dr. Bates, Mr. Glaspy, Mr. Turlik, and Mr. Magee regarding the meaning of Trust claims and how they could be used in state courts by Garlock to defend itself. Debtors also demonstrated that the interpretation of site-list claims that the Committee now calls fraudulent has been followed by state courts and that the Committee's interpretation has been roundly rejected.

More specifically, the Committee is wrong in asserting that Garlock, through Professor Brickman, provided a false account of "how trust claims work." In the testimony quoted on page

40

34 of the Committee's Memorandum, Professor Brickman was responding to Mr. Inselbuch's

attempt in cross examination to advance the Committee's contention that an Approved Site List

claim does not require a claimant to assert exposure to Trust products but just that the claimant

worked at an Approved Site. Mr. Inselbuch confronted Professor Brickman with a site-list claim

filed by Waters & Kraus for Mr. Treggett, who had not identified exposure to Babcock &

Wilcox's products during discovery in the case against Garlock but subsequently filed a Babcock

& Wilcox claim based on the Trust's Approved Site List. Mr. Inselbuch attempted to get

Professor Brickman to admit that the claim form contained no contention by Mr. Treggett

regarding Babcock & Wilcox exposures but just that Mr. Treggett had worked at an "Approved

B&W Site." Mr. Inselbuch argued that the sites at which Mr. Treggett worked were disclosed in

Mr. Treggett's answers to interrogatories, so that the Babcock & Wilcox Trust claim, if it had

been disclosed to Garlock, would have provided no information that Garlock did not already

have:

> Q. (By Mr. Inselbuch) I haven't asked the question yet. Now, the trust form for
> Babcock and Wilcox, now at his deposition -- in his claim form, he asserts
> exposure. And when he asserts exposure, page -- this is a claim form for Babcock
> and Wilcox, 02490, the page. "Approved B&W site: 33018035, Great Lakes
> Naval Training Center. Machinist mate."
>
> And he says on a similar page, page 33042437, "United States Naval Submarine
> Base New London."
>
> And another page, 33038275, "Southern Pacific Company, Los Angeles."
>
> Now, was all of this information already available in the discovery?[48]

Professor Brickman did not answer the question because Mr. Inselbuch only had one copy of the

B&W claim filed by Mr. Treggett.

---

[48] Tr. 1312:22-1313:11 (Brickman).

During redirect examination, however, in the testimony quoted by the Committee,

Professor Brickman explained that filed Trust claims, regardless of the evidence claimants offer

to prove exposure, constitute claimants' assertions that they were exposed to a specific

company's products that, if not disclosed in tort discovery, are "inconsistent and possibly

deceitful." In testimony that follows, Professor Brickman demonstrated that the Babcock &

Wilcox claim Mr. Inselbuch had focused on, even though based on an approved Babcock &

Wilcox site, contained specific exposure evidence (including the Babcock & Wilcox products to

which Mr. Treggett claimed exposure and the locations and durations of this exposure). None of

this information was disclosed by Waters & Kraus or Mr. Treggett in the tort case against

Garlock:

> MR. CASSADA: Can we have a copy of the Babcock and Wilcox claim form.
>
> Q. Here's the Babcock and Wilcox claim form that Mr. Inselbuch showed you. Did you have time to note on it that Mr. Treggett's lawyers on behalf of Mr. Treggett actually identified specific asbestos-containing products of Babcock and Wilcox to which Mr. Treggett was exposed.
>
> A. Yes.
>
> Q. Babcock Wilcox boilers and asbestos cloth. Do you see that?
>
> A. Yes.

| Name of B&W product(s), if applicable, to which the injured party is alleging exposure: |
| --- |
| BW Boilers & asbestos cloth |
| |
| 2. Date Exposure Began: 06/1965       Date Exposure Ended: 06/1965 |
| (mm/yyyy)                                          (mm/yyyy) |

(Excerpt of Babcock & Wilcox Trust claim.[49])

> Q. And does it say date exposure began and date exposure ended?

---

[49] GST-5481 (Treggett Babcock & Wilcox Trust claim), at Waters 02491. This Babcock & Wilcox Trust claim also disclosed Mr. Treggett's exposure to Babcock & Wilcox boilers and asbestos cloth at the New London Naval Base in 1967, and eighteen years of exposure to Babcock & Wilcox boilers at the Southern Pacific railroad company. *Id.* at Waters 02493-96.

A. Yes, it does.

Q. And is there also language in the form itself that makes clear when you're asserting a work site exposure, you're alleging you were exposed to the product of the debtor at that site and you're using the site itself to prove that point?

A. Yes.

MR. CASSADA: Can we display that language?

---

*For B&W exposures, a list of approved B&W sites is available on the Trust website ([www.bwasbestostrust.com](www.bwasbestostrust.com)). Please reference this list and enter the Approved B&W Site Code in item # 1 below.*

*If the site you are alleging exposure to B&W products or services is not on the approved B&W list, provide independent documentation of meaningful and credible evidence of exposure to asbestos-containing products manufactured by B&W or for which B&W is liable. This may be established by documentation including, but not limited to, the following:*

- *An affidavit of the injured party (an example is included in the filing instruction)*
- *An affidavit of a co-worker*
- *An affidavit of a family member in the case of a deceased claimant*
- *Invoices*
- *Construction or similar records*
- *Sworn statement, interrogatory answers, sworn work history, or deposition*

---

(Excerpt of Babcock & Wilcox Trust claim.[50])

Q. This is the claim form. Do you see the language there? It says, "If the site you are alleging exposure to B&W products and services is not on the approved site list, provide independent documentation."

A. Yes.

Q. But this allows you to actually identify exposure by the work site, right?

A. As do many of the trusts. This -- the Babcock and Wilcox trust allows a proof of claim to be asserted by identifying a work site that's listed in the TDPs. So if you worked at that site, that's proof of exposure to a Babcock and Wilcox product.[51]

The Committee's accusation that Professor Brickman's testimony was false is completely

lacking in merit. In fact, his testimony is in accord with the views of courts that hear individual

asbestos cases:

- "[W]hile the proofs of claim are partially settlement documents, they are also presumably accurate statements of the facts concerning asbestos exposure of the

---

[50] *Id.* at Waters 02490.
[51] Tr. 1321:17-1322:23 (Brickman).

plaintiffs. While they may he filed by the attorneys, the attorneys do stand in the shoes of the plaintiffs and an attorney's statement is an admission under New York law. Therefore, any factual statements made in the proofs of claim about alleged asbestos exposure of the plaintiff to one of the bankrupt's products should be made available to the defendants who are still in the cases."[52]

- "Most of the bankruptcy trust forms, (herein 'BTF'), contain statements alleging exposure to the product of the bankrupt party. . . . I have consistently received into evidence BTFs . . . as a statement of a party opponent as proof of exposure to the product of [the bankrupt entity]. . . . I will continue to find a written statement by a Plaintiff to a bankruptcy trust as evidence of exposure."[53]

Like all Trust claim forms, the claimant or the claimant's lawyer or representative, by signing the Babcock & Wilcox form, certifies under penalty of perjury that information contained in the form is accurate and complete:

---

**BABCOCK & WILCOX COMPANY AS BESTOS PERSONAL INJURY SETTLEMENT TRUST
PROOF OF CLAIM FORM**

**Part 9: Signature Page**

**All claims must be signed by the claimant, or the person filing on his/her behalf (such as the personal representative or attorney).**

If signed by the claimant or the personal representative: I (the claimant or personal representative) have reviewed the information submitted on this claim form and all of the documents submitted in support of this claim. To the best of my knowledge, under penalty of perjury, the information submitted is accurate and complete.

If signed by the claimant's counsel: Upon information and belief, I hereby certify, under penalty of perjury, that the information submitted is accurate and complete.

---

(Excerpt of Babcock & Wilcox Trust claim.[54])

Finally, in other evidence offered at the estimation trial, Garlock showed that the Committee's assertion that site-list claims are not considered admissions of exposures to bankrupts' products was flatly rejected when advanced in state court by Waters & Kraus, the same firm that concealed Mr. Treggett's exposures to bankrupts' products in the California case

---

[52] *Negrepont v A.C. & S., Inc.*, No. 120894/01 (N.Y. Sup. Ct. N.Y. County Dec. 11, 2003) (Freedman, J.) (GST-6492).

[53] Letter Ruling at 5, *In re Asbestos Litig.*, MDL No. 2004-03964 (Tex. Dist. Ct. Harris County Jan. 16, 2009) (Davidson, J.) (GST-6481).

[54] GST-5481 (Treggett Babcock & Wilcox Trust claim), at Waters 02500; *see also, e.g.*, GST-5484 (Treggett Eagle-Picher Trust claim), at Waters 02542; GST-5485 (Treggett Fibreboard Trust claim), at Waters 02570; GST-5488 (Keene Trust claim), at Waters 02658; GST-5489 (Treggett Owens Corning Trust claim), at Waters 02694.  Like some Trust claims, Waters & Kraus filed Mr. Treggett's Babcock & Wilcox Trust claim electronically, without signing the document, but it still made the same certifications under penalty of perjury. *See* 1/14/03 Kraus Dep. 105:3-106:2 (Ex. L).

and delayed filing Trust claims to avoid disclosure of the concealment. In *Stoeckler v American Oil Co.*,[55] Waters & Kraus failed to disclose and produce Trust claims that it had filed for its client, Chris Stoeckler, prior to trial. When the Trust claims were discovered, Mr. Jeffrey Simon (then with Waters & Kraus) attempted to advance the very position advanced by the Committee here that the Trust claims provided nothing new because of "the way these bankrupt submissions work," and did not actually demonstrate exposure to the Trust's products.[56]

The judge quickly saw through this contention by doing precisely what Professor Brickman did at the estimation trial: he looked at the claim form Mr. Simon referred to and observed that Mr. Stoeckler had identified in the form a specific product to which he claimed exposure:

> [W]e have a single page here that appears to be attached to part four, occupational exposure to Eagle Picher products. And the last sentence on that page is, describe how injured party was exposed to Eagle Picher product. Claimant made repairs and maintained machinery which contained asbestos insulation. Name the Eagle Picher products to which injured party was exposed. And this has, Super 66, hylo cement, cement pipe covering, block insulation.[57]

When the firm next tried to contend that their client had never seen the form and did not know what it contained, the court said that went to "the Code of Professional Conduct" and recessed the trial, which never reconvened.[58]

The point is that even Trust claims based on Trust presumptions reflect claimants' assertions about exposures that caused their diseases. Mr. Kraus implicitly acknowledged this point. He admitted that Waters & Kraus decided to adopt a practice of delaying its clients' Trust claims until after their clients' tort cases are resolved because courts might accept the position the Committee characterizes as false in this case:

---

[55] Transcript of Proceedings at 62-74, No. 23,451 (Tex. Dist. Ct. Angelina County Jan. 28, 2004) (GST-0661).
[56] *Id.* at 71.
[57] *Id.* at 73-74.
[58] *Id.*

> If I felt like there are certain several liability jurisdictions where the defendants
> will argue that the filing of the claim regardless of what evidence is attached is
> some sort of admission and that the court should place the bankrupt defendants'
> products on the verdict form and allow the defendants in the litigation case to
> argue for a smaller share of the several liability in that case, if I feel there is a
> substantial risk of that and the law allowed it, I might in that circumstance delay
> the filing of the bankruptcy claim.[59]

As Garlock proved, this was precisely the practice that Waters & Kraus and other firms used in

cases against Garlock during the 2000s. Garlock's evidence on Trust claims was not false.

### C.   The Committee's remaining arguments regarding the meaning of Trust claims, ballots and Rule 2019 Statements improperly rehash positions the Committee took at trial or make inaccurate statements about the evidence

None of the Committee's remaining arguments relate to the Scarcella report and site-list

claims, and most rehash points that were presented at trial and argued in the Committee's post-

trial briefs.[60] Garlock refers to its previous responses to those points.[61]

Without citing to the record, the Committee claims to summarize evidence that does not

exist. After wrongly disparaging site-list claims as having no relationship to actual asbestos-

product exposures, the Committee states that site lists were the "sole basis for Garlock's

contention that another 72 cases were settled on an inflated basis due to disclosure failures by

plaintiffs or their counsel."[62] The DCPF data proved that these claimants filed numerous Trust

claims based on alleged exposures that were denied or not disclosed in pre-trial discovery in

cases against Garlock. But the types of Trust claims filed by the 72 claimants are unknown to the

Court and Garlock and not in the record, because the Committee successfully objected to

---

[59] 1/14/13 Kraus Dep. at 42:3-14 (Ex. J).
[60] *See* Committee's Post-Hearing Brief of the Official Committee of Asbestos Personal Injury Claimants for Estimation of Pending and Future Mesothelioma Claims at 37-42 (Docket No. 3198) (discussing site-list claims, ballots and Rule 2019 statements).
[61] *See, e.g.*, Debtors' Response to Post-Trial Briefs of Committee and FCR at 28-41 (Docket No. 3249) (responding to Committee's contentions).
[62] Committee Br. at 36.

Garlock's attempt to obtain production of these claims. The Committee does not explain the basis for the allegation it now makes in the Motion.

The Committee also focuses on a single Designated Plaintiff case, the case of Robert Flynn represented by Belluck & Fox and Waters & Kraus, to attempt to demonstrate that six of his Trust claims that were not based on site lists contained exposure information already disclosed or known to Garlock: Kaiser Aluminum; Celotex; Eagle-Picher; UNR Industries; and Porter Hayden. Consistent with their practice, Belluck & Fox and Waters & Kraus delayed filing the claims until after the resolution of Mr. Flynn's tort case and failed to disclose that Mr. Flynn was exposed to the friable, amphibole asbestos products of these bankrupt companies.

The Committee asserts that these claims do not support Garlock's position because they simply attached evidence that Garlock already possessed, such as Mr. Flynn's deposition, which Garlock attended, and depositions of other persons that Garlock also attended.[63] Neither Mr. Flynn's deposition nor the other depositions attached to the claim forms disclosed that Mr. Flynn was exposed to the products of these Trusts. Mr. Flynn's Trust claims themselves, however, contain affirmative and specific statements of product exposures—shown below—that were not disclosed to Garlock in interrogatory responses or deposition:

---

[63] In two footnotes, the Committee once again alleges that Debtors violated their discovery obligations by not producing deposition transcripts that were attached to two of Mr. Flynn's Trust claims. These depositions were of workers at the massive Brooklyn Naval Shipyard, where Mr. Flynn also worked. But, as Debtors have already shown, these types of depositions were not admissible or readily discoverable. *See* Part II, *supra*. Further, the Committee does not explain why Waters & Kraus and the Committee—who were under the same discovery obligations as Garlock—failed to produce these documents during the estimation proceeding. *See id.*

## Kaiser Aluminum Trust Claim[64]

Name of all KACC Asbestos PI Trust products to which injured party was exposed

Kaiser Aluminum & Chemical products including but not limited to Kaiser Vee Block Mix and Kaiser Plastic Chrome Ore.

Describe the circumstances of asbestos exposure ( Max 1000 Characters )

While serving in the U.S. Navy, Mr. Flynn repaired and built boilers in naval vessels drydocked at Brooklyn Navy Yard.  He would remove and replace asbestos containing insulation products including the Kaiser products mentioned above.

## Celotex Trust Claim[65]

Describe how injured party was exposed to Celotex or Carey Canada product(s) or operations:
MAINTAINING OPERATING AND REPAIRING BOILERS ASSOCIATED STEAM LINES, PUMPS, VALVES AND OTHER EQUIPMENT IN THE BOILER ROOMS AND VARIOUS OTHER LOCATIONS IN THE SHIPYARD

Name of Celotex or Carey Canada product(s) or operations to which injured party was exposed:
INSULATING CEMENT, FIREPROOFING, PIPE COVERING

## Eagle-Picher Trust Claim[66]

Describe how injured party was exposed to Eagle-Picher product:
Maintaining, operating, and repairing boilers, associated steam lines, pumps, valves and other equipment in the boiler rooms .

Name of Eagle-Picher product(s) to which injured party was exposed:
INSULATING CEMENT, FIREPROOFING

## UNR Industries Trust Claim[67]

| 9. EXPOSURE TO UNR ASBESTOS PRODUCTS: | | | |
|---|---|---|---|
| Date of Exposure | Location (Shipyard, Company Name, Government, Factory, etc.) | Trade or Job Classification | Specific UNR Products Exposed to |
| 1952-1965 | BROOKLYN NAVAL SHIPYARD | LABORER, SHIPFITTER, BOILER MAKER, SHEETMETAL WORKER | PIPECOVERING Insulating cement |
| | | | |

---

[64] GST-2786, at Waters 03086.
[65] GST-2781, at Waters 02988.
[66] GST-2782, at Waters 03006-07.
[67] GST-2791, at Waters 03206.

Porter Hayden Trust Claim[68]

| Describe any exposure to Porter Hayden Asbestos at this Site |
| --- |
| Johns-Manville |

Mr. Flynn's lawyers at Waters & Kraus signed each of the claims, certifying, for example, "under penalty of perjury, that this information is accurate and complete to the best of knowledge"[69] or "to the best of knowledge under penalty of perjury, the information submitted is accurate and complete."[70] This concealed exposure evidence is exactly what the Court considered during the estimation proceeding, and found to constitute "demonstrable misrepresentation."[71]

## V.     THE SIMON GREENSTONE EMAILS PROVIDE NO BASIS TO REOPEN THE ESTIMATION TRIAL

Simon Greenstone, through Jeffrey Simon, is a member of the Committee and assists in directing its actions. With the exception of Waters & Kraus, which served as co-counsel to the Committee at the Estimation Trial, there is not a single person or firm that has been more involved in pressing the interests of the Committee than Mr. Simon and Simon Greenstone. To the extent the Committee has "principals," Mr. Simon and his firm are two of them. In February 2011, early in this case, the Committee brought Mr. Simon to court to testify about the history of asbestos litigation against Garlock and describe, among other things, Simon Greenstone's negotiations of settlements of mesothelioma cases with David Glaspy. [72] In response to Mr. Simon's 2011 testimony, Debtors called Mr. Glaspy as a witness, and he likewise testified about, among other things, his negotiations of settlements with Simon Greenstone. Thus, long prior to

---

[68] GST-2789, at Waters 03170.
[69] GST-2786 (Kaiser Aluminum Trust claim), at Waters 03097.
[70] GST-2781 (Celotex Trust claim), at Waters 02994.
[71] Estimation Opinion at 86.
[72] 2/17/11 Tr. at 41:19-20. At the Estimation Trial, the Committee designated Mr. Simon as a live trial witness, but did not call him.

trial—and even before estimation trial discovery—both Jeffrey Simon (for the Committee) and

Mr. Glaspy (for Debtors) testified in this case about settlement negotiations between one another.

Against this backdrop, remarkably, the Committee's last accusation is that Debtors

intentionally misled the Court in testimony from Mr. Glaspy (and others) of their account of the

settlement process. It levels this allegation based on 11 pages of emails the Committee obtained

from Simon Greenstone that they allege Debtors intentionally withheld.[73]

In response to the Committee's assertions, Robinson Bradshaw & Hinson ("RBH")

audited Debtors' discovery production. During the case, RBH produced to the Committee over

1200 pages of settlement communications between numerous law firms who represented Garlock

and numerous plaintiffs' firms representing plaintiffs. These productions concerned nearly 400

asbestos claimants. Based on its audit, RBH concluded that 3½ pages of the emails the

Committee identified were not in the possession of Mr. Glaspy or Debtors because they had long

been discarded in the ordinary course. RBH also determined that 26 pages of documents (some

email messages and some other documents, such as letter agreements) that were settlement

communications exchanged between Mr. Glaspy and Simon Greenstone that were delivered to

RBH, through inadvertence, were not produced. (Details of this audit, reasons for the

inadvertence, and copies of the unproduced documents are provided in the attached **Exhibit N**).

The audit further revealed that there were no unproduced responsive documents that originated

from any other source and no other unproduced documents than those identified in the attached.

Mr. Glaspy fully complied with the Committee's discovery requests. During his June 25,

2013 deposition, he went so far as to volunteer to the Committee's counsel to investigate whether

there were any unproduced emails that existed on backup files at his office. (The Committee

never accepted Mr. Glaspy's offer to do so.)

---

[73] *See* Committee Br. at 38-50 & Exhibit 26.

The emails cited in the Committee's Brief are a handful of settlement communications that do not challenge, in any respect, the Court's fundamental findings that the Committee's settlement approach to estimation was not reliable and should be rejected. Specifically, the emails do not address the Court's findings that plaintiffs' counsel suppressed evidence that altered Garlock's ability to present its defenses at trial, nor do they question the Court's conclusion that Garlock's settlements represented "cost avoidance rather than its liability."[74] The emails are documents that were held by Committee principals before trial that are merely cumulative of the trial record.  The Committee's raising them in its Motion is a misplaced attempt to revisit points already made, or could have already been made, in pre-trial discovery or at trial.

A.      **The Simon Greenstone emails would not produce a new outcome, nor would they require the judgment to be amended**

The Committee's heavy burden to justify re-opening the estimation trial applies to its arguments concerning the Simon Greenstone emails as well. The Committee must show that (1) the emails were newly discovered since the judgment was entered; (2) due diligence on the part of the Committee to discover the emails was exercised; (3) the emails are not merely cumulative or impeaching; (4) they are material; and (5) the emails are such that their admission into evidence would likely produce a new outcome if the case were retried, or is such that would require the judgment to be amended. *See Boryan*, 884 F.2d at 771; *see also supra* Part I (discussing legal standard). The test is *conjunctive*, thus, the failure of the Committee to show that the Simon Greenstone emails meet any one of these elements means the Motion must be denied.

---

[74] Estimation Opinion at 94.

Like with its other arguments, the Committee levels bombastic, unsupported accusations of intentional wrongdoing against Debtors. These allegations are not true. The Committee, in pressing its Motion, badly misses the mark. In the seventeen pages of its Brief in which it discusses these emails, it never once explains how they would impact the Court's findings.

1.      **The Designated Plaintiff cases discussed in the SEG emails reflect instances of suppression of evidence that support the Court's findings in its Estimation Opinion**

The email exchanges that the Committee features in its brief principally concern two exchanges between Glaspy & Glaspy and Simon Greenstone. One exchange consists of emails in August 2008 concerning a group of cases that included Designated Plaintiff *Ornstein. See* Committee Br. at 40-43.[75] The other consists of emails exchanged on January 25, 2007 concerning a group settlement to which Mr. Eddins proposed to add Designated Plaintiff *White.* Committee Br. at 47-50.[76] To the extent that these exchanges involved other claimants, those were cases for which Garlock was not allowed discovery of Trust claims, ballots, and other evidence of asbestos exposure. For *Ornstein* and *White* (and a third case, *Reed*), the evidence admitted at trial showed that those cases represented prime examples of the suppression of evidence the Court cited as a basis to reject the Committee's settlement theory of liability. *See* Estimation Opinion at 85.

In the first case, *Ornstein*, the plaintiff was a navy electronics technician stationed aboard ships. Interrogatory answers prepared by Simon Greenstone denied exposure of the plaintiff to any asbestos containing products for which bankruptcy Trusts would be responsible, including any amphibole-containing insulation products.[77] At deposition, Mr. Ornstein testified that *he*

---

[75] As explained in Exhibit N, neither Glaspy & Glaspy nor Debtors retained these documents.
[76] As explained in Exhibit N, Debtors inadvertently marked some of these emails as non-responsive during the rolling production process.
[77] *See* Trial Exhibit GST-3741 (Ornstein Interrogatory Responses).

*never saw anyone installing or removing pipe insulation* during the overhaul of the USS Estes[78]

(a ship to which he was assigned) and that *he never saw a boiler* during his service in the Navy.

Defendants thoroughly examined Mr. Ornstein at deposition on these points.[79] For instance, Mr.

Ornstein was asked at least seven times about exposure to asbestos products located in high-heat

areas such as the engine room, the boiler room, or the fire room where asbestos insulation

products were found and he denied exposure each time. In fact, he went so far as to say that he

never went into those spaces on the ship:

> Q.    When you went on board ship, do you have an understanding that the
>        Estes had a boiler?
> A.    Yes.
> Q.    Did you ever see that boiler?
> A.    No.[80]
>
> . . .
>
> Q.    During your time on the Estes, did you ever have any occasion to work in
>        the engine room or the fire room or boiler room?
> A.    No, I didn't work in any of that area.
> Q.    Do you have any reason to believe you may have been exposed to any
>        asbestos in the engine room or the fire room or the boiler room on the
>        Estes?
> A.    No.[81]
>
> . . .
>
> Q.    I believe you told us yesterday that you never went into the engine room
>        on board the Estes?
> A.    Correct.
> Q.    You never went into the boiler room?
> A.    Correct.[82]
>
> . . .

---

[78] 6/3/08 Ornstein Dep. at 228-30, 237 (GST-3832); 6/5/08 Ornstein Dep. at 525-27 (GST-3834).
[79] Tr. 4573:5-4575:1 (Glaspy) (describing denial of boiler exposure); Glaspy Demonstrative Slides at 18-23 (GST-8024).
[80] 6/2/08 Ornstein Dep. at 39 (GST-3831).
[81] 6/3/08 Ornstein Dep. at 107 (GST-3832).
[82] 6/4/08 Ornstein Dep. at 321-22 (GST-3833).

Q.      Okay. You mentioned previously that when you were on the Estes, you
        never went into the boiler room, the engine room, or the fire rooms. I
        understand that, and my question may seem silly, but I have to ask it
        anyway. To the best of your knowledge, did you ever work with or around
        any type of boilers when you were on the Estes?

A.      No.[83]

. . .

Q.      And if I understand correctly, you've never been around the boilers; right?

A.      Right.[84]

On this record, Garlock settled the case for $450,000. Thereafter, Simon Greenstone filed

eleven Trust claims on Mr. Ornstein's behalf that were based on exposures never identified in

Mr. Ornstein's tort case. Seven of the claims were based on declarations drafted by Simon

Greenstone itself that contained Mr. Ornstein's personal testimony to his knowledge of

exposures to those products. Contrary to Simon Greenstone's discovery responses and contrary

to Mr. Ornstein's deposition testimony, those Trust claims included Mr. Ornstein's sworn

statements about how he personally removed and replaced asbestos insulation, including

amphibole insulation such as Armstrong 85% Magnesia Pipe Covering and Block, Eagle Picher

85% Magnesia Pipe Covering, Keene Pipe Covering, Pabco 85% Magnesia Pipe Covering, and

Kaylo Pipe Covering.[85] Contrary to his deposition testimony that he never entered ship

engineering spaces where asbestos insulation was prevalent, the claims Simon Greenstone

submitted included sworn testimony about how he regularly stood watch in those spaces. He

---

[83] 6/4/08 Ornstein Dep. at 363-64 (GST-3833).

[84] 6/5/08 Ornstein Dep. at 527 (GST-3834).

[85] Declaration of Howard Ornstein (June 18, 2009), at Simon 28055 (GST-3873) (Armstrong 85% Magnesia Pipe
Covering and Block and Armstrong Hi-Temp Pipe Covering); Declaration of Howard Ornstein (Mar. 12, 2009), at
Simon 28140 (GST-3876) (same); Declaration of Howard Ornstein (March 12, 2009), at Simon 28372 (GST-3880)
(Worthington Pumps); Declaration of Howard Ornstein (Mar. 12, 2009), at Simon 28226 (GST-3878) (Combustion
Boilers); Declaration of Howard Ornstein (Mar. 12, 2009), at Simon 28488 (GST-3882) (Eagle Picher 85%
Magnesia Pipe Covering); Declaration of Howard Ornstein (Mar. 12, 2009), at Simon 28674 (GST-3885) (HKP
Asbestos Cloth); Declaration of Howard Ornstein (Mar. 12, 2009), at Simon 28767 (GST-3888) (Keene Pipe
Covering); Declaration of Howard Ornstein (Mar. 12, 2009), at Simon 28863 (GST-3890) (Pabco 85% Magnesia
Pipe Covering and Kaylo Pipe Covering).

specifically testified that he was exposed to "Combustion Engineering Boilers" while "standing fire watch during the overhaul of the USS Estes."[86]

In *White*, a case that Garlock settled for $250,000, Simon Greenstone prepared interrogatory responses that similarly failed to identify exposures to asbestos products for which bankruptcy Trusts were responsible.[87] At deposition, Mr. White identified only one product (a pump) for which a bankruptcy Trust was responsible.[88] He testified that when he was assigned to a shipyard where asbestos-insulating products may have been prevalent, he spent his time in a machine shop, away from insulation work, where other workers brought him equipment from which he removed gaskets.[89] He testified that he never went aboard ships or saw asbestos insulation being installed or removed.[90] Further, Mr. White testified, during his year-long service in the Coast Guard he was not exposed to asbestos products.

After Simon Greenstone settled with Garlock, however, Mr. White filed Trust claims against twenty-four Trusts. The exposures that formed the basis of twenty-two of those claims were never disclosed during tort discovery. Four claims based on undisclosed exposures were supported by sworn statements from Mr. White himself attesting to his knowledge of exposure to dust from specific asbestos-containing products that he inhaled.[91] Statements also included testimony about asbestos exposure in the Coast Guard that he had denied.[92] Mr. White's widow, for other claims, provided affidavit testimony that Mr. White did, in fact, work aboard ships for

---

[86] Declaration of Howard Ornstein (Mar. 12, 2009) at Simon 28226 (GST-3878).

[87] Plaintiff's Answers to Master Discovery Requests to All Defendants in All Asbestos-Related Personal Injury and Death Cases Filed in Harris County and Responses to All Defendants' Rule 194 Requests for Disclosure at 5-7, 8-9, 14-16, Ex. 4 (July 31, 2006) (GST-5655).

[88] 8/11/06 White Dep. Tr. at 29:3-21 (GST-5612).

[89] 8/11/06 White Dep. Tr. at 24:23-25:12, 26:1-11.

[90] 8/11/06 White Dep. Tr. at 112:7-113:6.

[91] Affidavit of Charles C. White (Sept. 25, 2007), at Simon 27492 (AWl) (GST-5980); Affidavit of Charles C. White (Sept. 25, 2007), at Simon 27639 (USG) (GST-5989); Affidavit of Charles C. White (Sept. 25, 2007), at Simon 28012 (NGC) (GST-5998); Affidavit of Charles White (Oct. 27, 2008), at Simon 27627 (THAN) (GST-5988).

[92] Affidavit of Charles C. White (Aug., 12, 2008), at Simon 27505 (B&W) (GST-5981); Affidavit of Charles C. White (Aug., 12, 2008), at Simon 27977 (Bartells) (GST-5994).

extended periods of time, including assignments to two particular ships. Her affidavits revealed

admissions by Mr. White that he "observed shipboard activities with and around insulation

materials, including but not limited to pipe insulation" and was with and around tradesmen who

were "installing and tearing out asbestos-containing products, including but not limited to pipe

insulation."[93] Affidavit testimony supporting Trust claims, in contradiction to tort-system

testimony, also asserted that it was Mr. White's exposure to asbestos on board ship and in the

ship's boiler room that contributed to his mesothelioma.[94]

Simon Greenstone was deposed about both of these cases, and the testimony offered by

that firm's designee, Jeffrey Simon, confirmed that the firm knew well that evidence of exposure

to amphibole asbestos products was a key feature to Garlock's defense and that the existence of

evidence of this exposure would have figured prominently in Garlock's defense in both *White*

and *Ornstein* (as well as most of Simon Greenstone's other cases against Garlock).[95] When

questioned about these cases in particular, Mr. Simon conceded, on behalf of the firm, that

exposures to amphibole asbestos-products that were the basis of post-settlement Trust claims in

both *Ornstein* and *White* were not disclosed to Garlock.

The Court cited this evidence specifically in paragraphs 63 and 65 (Cases No. 5 and 7) of

the Estimation Opinion.[96] The Committee's Brief does not defend or even dispute the nature of

Simon Greenstone's conduct in these cases. It was this factual circumstance the Court described

as suppression of evidence that warranted rejection of the Committee's settlement based theory:

> But, most important, while it is not suppression of evidence for a plaintiff to be
> unable to identify exposures, it *is* suppression of evidence for a plaintiff to be
> unable to identify exposure in the tort case, but then later (and in some cases

---

[93] Declaration of Barbara Lorton (Apr. 1, 2010), at Simon 27923 (Western) (GST-5991); Declaration of Barbara
Lorton (June 18, 2009), at Simon 27822 (Thorpe) (GST-5990).
[94] Declaration of Barbara Lorton (June 18, 2009), at Simon 27822 (Thorpe) (GST-5990).
[95] 1/4/13 Simon Dep. at 27:18-28:2; 42:7-42:12; 42:15-42:17; 42:20; 42:22-43:21 (excerpts attached as **Ex. O**).
[96] Estimation Opinion at 84-85.

previously) to be able to identify it in Trust claims. It is that practice that
prejudiced Garlock in the tort system – and makes its settlement history an
unreliable predictor of its true liability.

Estimation Opinion at 86 (emphasis in Court's Order). The Simon Greenstone emails brought

forward by the Committee do not challenge these findings in any respect.

### 2. The Simon Greenstone emails do not overcome the evidence at trial that third-party exposure evidence was material to Garlock in tort cases

The notion that the handful of emails the Committee has obtained from Simon

Greenstone shows that Garlock did not consider evidence of non-Garlock exposures material is

difficult to take seriously. First, that position contradicts the testimony of the plaintiffs' lawyers

who litigated against Garlock. The testimony from the depositions of three separate plaintiffs'

attorneys that sat across the bargaining table from Garlock (across from Mr. Glaspy, specifically)

was unanimous that, in their experience, third-party exposure evidence was critical to Garlock.

Jeffrey Simon, who the Committee held out as "very experienced in settling Garlock cases,"[97]

testified as Simon Greenstone's 30(b)(6) designee that the firm was aware that third-party

exposure evidence was important to Garlock, and important in the *Ornstein* case specifically. He

testified that the evidence was a common part of Garlock's strategy, and at issue in *Ornstein* in

particular:

> Q. Do you agree that a common defense raised by defendants in cases are that a
> claimant's mesothelioma was not caused by chrysotile products but rather amosite
> or crocidolite products?
>
> A. Yes, I agree that that defense is often raised by defendants in asbestos cases.
>
> Q. And that's a defense that Garlock often raised in your experience in cases that
> you brought against Garlock?
>
> A. Yes, sir.

---

[97] 2/17/11 Tr. at 41:19-20.

. . .

Q. In fact, that theme was present in just about every case that you represented a
plaintiff against Garlock; is that correct?

A. Navy cases, certainly. And I believe that the Ornstein and Reed cases involved
Navy exposure. [98]

Similarly, plaintiffs' attorney Peter Kraus, the designee of Waters & Kraus, testified that it was

his firm's experience that in cases he pressed against Garlock, part of Garlock's defense was

putting forward evidence of exposures to other companies' products including, in particular,

exposures to amphibole thermal insulation products.[99] At his deposition, he specifically recalled

a trial experience where Garlock sought and obtained that evidence, which yielded a trial success

for Garlock.[100]

Plaintiffs' attorney Mark Iola, affiliated with Waters & Kraus, gave additional testimony

about the importance of third-party exposure evidence to Garlock. He said that Garlock's defense

hinged on showing that plaintiffs' exposures to other companies' products dwarfed their contact

with Garlock's products:

So from day one, I understood that the way Garlock was going to defend these
cases was to try to demonstrate to juries that Garlock was either *de minimis*,
shouldn't count at all, or if they should count, they should count at a very
diminished rate as compared to the rest of his exposures.[101]

The same story came from Committee trial witness Paul Hanly, a lawyer who previously

managed the defense of asbestos giant, Turner & Newall ("T&N") (later Federal Mogul), who is

now a plaintiffs' mass tort lawyer. On cross-examination on the subject of managing the defense

of T&N gasket maker subsidiary, Flexitallic, he conceded that evidence of exposure to other

companies' products was "crucial" to that gasket-maker's defense. When asked whether

---

[98] 1/4/13 Simon Dep. at 27:18-28:2 (Ex. O).
[99] 1/14/13 Kraus Dep. at 21:18-22:3 (Ex. J).
[100] 1/14/13 Kraus Dep. at 22:4-22:25 (Ex. J) (discussing *Hines* case).
[101] 1/15/13 Iola Dep. at 59:10-16 (excerpts attached as **Ex. P**).

exposure evidence was, in fact, "crucial to the defense theory for all low-dose chrysotile

defendants," Hanly said, "[i]t's certainly crucial in *many low-dose cases*, I certainly will give

you that."[102]

Second, third-party exposure evidence was important to Garlock because scientific

testimony accepted by courts shows it is important and impacts the outcome of litigated cases.

The Court's Estimation Opinion, for example, reviewed scientific testimony concerning whether

Garlock's products, as a matter of legal causation, caused asbestos-related mesothelioma and

concluded that "[i]t is clear that Garlock's products resulted in a relatively low exposure to

asbestos to a limited population and that its legal responsibility for causing mesothelioma is

relatively de minimus." Estimation Opinion at 73. Likewise, the Sixth Circuit Court of Appeals

in *Moeller v. Garlock Sealing Technologies LLC*, held that the assertion that Garlock's products

were "a substantial cause of [the plaintiff's] mesothelioma would be akin to saying that one who

pours a bucket of water into the ocean has substantially contributed to the ocean's volume."

*Moeller*, 660 F.3d 950, 955 (6th Cir. 2011). Both of these courts made these rulings on the

understanding that other companies' dusty, dangerous products were the cause of plaintiffs'

asbestos disease. This evidence is important to courts—of course it was material to Garlock.

Witness after witness testified about the importance of this evidence to Garlock. John

Turlik, Garlock's trial and eastern regional counsel, testified about its significance in Garlock's

trials and how the absence of that evidence impacted settlements and verdicts:

> These thermal insulation products by and large were [ ] amphiboles, so, a very
> potent form of asbestos, and they were all high dose in their usage. So it was very
> important to show not only [Garlock] didn't do it, [Garlock] couldn't cause the
> disease, but to give the jury who actually did cause the disease. So it was an
> important part of the defense.[103]

---

[102] Tr. 3829: 15-19 (Hanly) (emphasis added)
[103] Tr. 2239:13-19 (Turlik).

David Glaspy, who maintained an exemplary trial record, also testified. His trial record, prior to

the Bankruptcy Wave, was nineteen wins with only one loss, a verdict that assigned Garlock

only 2% of the judgment.[104] He likewise emphasized in his testimony: "[I]t became obvious to

me it was imperative that you had to tell the jury up front right away what was the cause of that

plaintiff's mesothelioma."[105] Mr. Glaspy further testified, "Every case that I tried for Garlock, the

first issue as I said, is to show the exposure to the amphibole-containing insulation product as the

undisputed cause of disease."[106]

Mr. Magee explained that evidence about plaintiffs' exposures to friable products was as

important to fact finders as evidence that Garlock's low-dose chrysotile products did not cause

mesothelioma:

> [T]he defense was that [Garlock's] products didn't cause disease and, secondly,
> and importantly, was the bucket in the ocean; the fact that its product didn't cause
> disease and that in pointing to and identifying what products did. Obviously,
> [Garlock] could demonstrate the bucket. It also needed to demonstrate the ocean,
> and that's what we did. That was Garlock's defense at trial all the time.
>
> . . .
>
> [P]eople involved in litigation knew that's what the litigation was about. The
> litigation was about exposures. It was about -- it was about relative exposures.[107]

Witnesses called by both sides at the Estimation Trial testified that third-party exposure evidence

was material to Garlock's defense and resolution of claims. The handful of emails that the

Committee cites does not challenge this evidence in any respect.

---

[104] 3/3/11 Tr. 21:25-22:11. Frequent adversary Kazan, McClain, Satterley, & Greenwood (whose principal David McClain testified at trial), has lost every trial opposite Mr. Glaspy. Tr. 3503:21-3506:15 (McClain).
[105] Tr. 4529:12-15 (Glaspy).
[106] Tr. 4530: 5-7 (Glaspy).
[107] Tr. 2563:24-2564:5, 2564:15-18 (Magee); *see also* Tr. 2571:23-2572:3 (Magee) ("Jurors want to figure out what happened. It's not enough for a lot of jurors to know that Garlock's product didn't cause the disease. They want to know what product did cause the disease. It was important for Garlock to be able to identify thermal insulation as part of its defense."); Tr. 1409:6-9 (Magee) (testifying that cases where "claimants would demand much higher payments," or force Garlock to trial, "in those cases, it was very important what that exposure evidence was.").

3.      **The Committee's arguments have no merit; they raise cumulative information already in the record and revisit arguments already tried by the Committee**

The specifics of the Committee's argument, as it pertains to the Simon Greenstone emails, are unpersuasive. The Committee first tries to argue that because the Simon Greenstone emails show that Mr. Glaspy proposed to settle *Ornstein* before plaintiffs' experts were deposed, Garlock was unconcerned with the existence of third-party exposure evidence.[108] The point that Garlock proposed a settlement at that stage of a case is merely repetitive of the substantial evidence at trial—namely, that Garlock sought to settle cases to avoid costs.[109] This point is particularly cumulative as it applies to Mr. Glaspy. He testified at deposition that he routinely initiated settlement discussions with Simon Greenstone in particular, and by doing so, avoided costs:

| | |
|---|---|
| Counsel: | Did you initiate the settlement process? |
| | [objection omitted] |
| Mr. Glaspy: | I suspect sometimes I did. Most of the times, no. You get a demand, and that starts the process. |
| Counsel: | Is that how it normally works, you receive a demand and then you respond? |
| Mr. Glaspy: | That's the normal approach in most tort cases, non-asbestos included. I was a little bit more proactive trying to avoid the 60 day expensive period before trial, and I would call or send an E-mail, depending upon the plaintiff's attorney. We went through the E-mails. If it was Ron Eddins I would say, "I think it's time we talked. Here's a list of cases," and get it started. |
| Counsel: | So it wasn't unusual for you to start that process? |
| Mr. Glaspy: | It was not unusual.[110] |

---

[108] Committee Br. at 40-43.
[109] Estimation Opinion at 87.
[110] 6/25/13 Glaspy Dep. at 164:23-165:16 (Ex. A).

There is no significance to the fact that Garlock initiated settlement discussions in cases, but if the Committee believed that there was, it could have argued the point based on the record at trial.

The Committee's argument also ignores material facts about the *Ornstein* case. There, at the time Mr. Glaspy proposed settlement, Simon Greenstone had served discovery responses denying exposures, and Mr. Ornstein had been deposed and likewise denied exposures.[111] His Trust claims, later filed by Simon Greenstone, revealed that these responses were concealment that the Committee does not defend. Mr. Glaspy's testimony at trial was that, had he had the information Simon Greenstone concealed, he would have tried the case and made no offer at all.[112] The fact that Simon Greenstone suppressed evidence at the heart of this case underscores that Simon Eddins knew the evidence was material to Garlock at trial and in resolution of the case.

The Committee's second argument likewise lacks merit. Here it cites a discussion between Mr. Glaspy and Mr. Eddins concerning the resolution of a group settlement, and the idea of consolidating negotiations between them, thereby increasing the number of cases they negotiate and resolve on behalf of their clients.[113] The Committee argues that because in this exchange Mr. Glaspy did not express that he was "dissatisfied" with Simon Greenstone or that "he thought SEG was deliberately suppressing evidence," that third-party exposure evidence must not have mattered to Garlock.[114]

This argument too ignores a line of deposition questioning that the Committee and FCR previously tried, asking Mr. Glaspy about his dealings with Waters & Kraus. In Mr. Glaspy's

---

[111] *See* discussion of *Ornstein supra* at Part V.A.1.
[112] Tr. 4562:5-6 (Glaspy).
[113] Committee Br. at 44-48.
[114] Committee Br. at 48.

second deposition, counsel asked him this group of questions, trying to test whether he discussed or challenged the existence of exposure evidence. He testified that he did:

| | |
|---|---|
| Counsel: | When you settled those [Waters & Kraus] cases, did you say to the law firm, "Well, we all know that your client was exposed to these other products?" |
| Mr. Glaspy: | I'm sure I did. Are you talking about Waters & Kraus now? |
| Counsel: | Yeah. |
| Mr. Glaspy: | I'm sure I did. |
| Counsel: | And what reaction did you get? |
| Mr. Glaspy: | "Prove it."[115] |

The Committee apparently did not like Mr. Glaspy's answer, because it did not ask him about this subject at trial, and flatly ignored this testimony in its Brief.

In any case, the fact that Mr. Glaspy did not accuse Simon Greenstone of fraud says nothing about whether third-party exposure evidence was important to Garlock. If the Committee believed that was the implication from settlement communications, it could have selected from the thousands of pages of settlement communications it identified as evidence for trial to make the same point. Moreover, highlighting to Garlock's adversary in settlement discussions that evidence of third-party exposures was lacking would display weakness in Garlock's case that would make negotiations more difficult. Further considering Mr. Glaspy's objective was to resolve cases at the lowest possible cost, it is also possible that he tabled the notion of a confrontation because he did not want to risk poisoning the relationship in a way that would increase settlement costs. Mr. Glaspy was entitled to take Simon Greenstone at its word; and to the extent he doubted Mr. Eddins, he had no obligation to confront him.

---

[115] 6/25/13 Glaspy Dep. 256:17-257 (Ex. A).

It is worth noting that Mr. Eddins tried to resolve *White* with the settlement group discussed in the very exchange cited by the Committee. As already detailed, suppression of evidence in that case was proven at trial. The Committee's contention that this dialogue was "sophisticated, experienced, and well-informed,"[116] is belied by evidence at trial that for one of the principal cases under discussion (*White*), Simon Greenstone would soon hold fists full of affidavit testimony that contradicted its representations and were not disclosed.

Finally, the Committee points to emails where Mr. Glaspy discusses valuation factors other than third-party exposures that it says proves Garlock did not genuinely consider the availability of third party exposure evidence in resolving cases. Committee Br. 49-50. Mr. Glaspy's discussion in the Simon Greenstone emails is not "new evidence" to the case. He has testified about the factors that influenced his valuation before, including when he testified in March 2011 opposite Mr. Simon. There he outlined a similar list of factors.[117] Any number of reasons might explain why that exposure evidence was not cited in communications with Garlock's adversaries as a factor of negotiations. As noted above, a need to de-emphasize a weakness in the case or a desire to avoid accusations that may prove counterproductive would be obvious rationales.

Importantly, the testimony of the only witness the Committee called at trial who negotiated with Mr. Glaspy, David McClain, of Kazan, McClain, Satterley & Greenwood, contradicted the Committee's argument. He testified, specifically, that non-Garlock exposures were among the items he and Mr. Glaspy discussed:

> The first thing you do, when you sit down and discuss settlement, you talk about every individual case. I would send them the facts or analysis first of what we thought the case was about, the **exposures**, where there was high value or not.

---

[116] Committee Br. at 48.
[117] *See, e.g.*, 3/3/11 Tr. 19-23, 29-33 (Glaspy).

. . .

> Who – and when **Mr. Glaspy will say, well, these other people should pay the**
> **vast majority of the case** – of the value of the case. I should only pay "X." I
> would say, well, you can't prove any liability on them. You can't prove liability
> on them. So we would discuss Garlock's share.[118]

According to Mr. McClain, exposures were not only discussed, they were material to

negotiations. As he specifically said, Garlock would need that evidence to prove others'

responsibility for the plaintiff's disease. His testimony only emphasizes the material nature of

that evidence to Garlock in every case.

### 4. The Committee cross-examined Mr. Glaspy about other communications with Simon Greenstone, similar in content to the ones discussed in the Committee's Brief

At both deposition and trial, Committee counsel examined Mr. Glaspy over email

exchanges with Simon Greenstone concerning group settlements. The discussions covered

multiple cases, including the *Reed* case, one of the fifteen the cases Court found was an example

of Simon Greenstone's practice of suppressing evidence. The exchanges about which Mr. Glaspy

was examined are similar to the ones in the Committee's Brief in terms of time, in that they are

discussions from January, April, and June 2008 (the middle of the period covered by emails in

the Committee's Brief) and similar in content, in that they reflect group settlement discussions

that show the same elements the Committee cites as "new evidence" in its Brief.

For instance, the first group of emails, exchanged in January 2008, describes the

settlement of a group of cases that included *Reed*.[119] Although the Committee argues in its Brief

that it is "new evidence" that Mr. Glaspy initiated settlement discussions in *Ornstein*,[120] the

---

[118] Tr. 3495:11-15, 21-25 (McClain) (emphasis added).
[119] *See* ACC-236 at GST-EST-0337658-62.
[120] Committee Br. at 42-43.

exhibit about which Mr. Glaspy was questioned at deposition and trial[121] provides another

example of Mr. Glaspy initiating settlement discussions. Below is the first email from trial

exhibit ACC-236, where Mr. Glaspy initiates a settlement dialogue:

> From: David Glaspy
> Sent: Friday, January 11, 2008 2:41 PM
> To: reddlns@seglaw.com
> Subject: Garlock Settlements
>
> Dear Ron: Now that the Holidays are over, and we are into a new year, I thought
> we should talk about your cases set for trial in California. I have eight by my
> count. They are:
>
> [listing cases including *Reed*]
>
> Did I miss any? The sooner we can reach agreement the easier it will be for me to
> get money, as we will not have wasted much on experts and lawyers. Thanks
> Dave G.[122]

Likewise, in the next group of emails, from April 2008, Mr. Glaspy and Mr. Eddins

discuss an expanded settlement relationship consolidating discussions of Simon Greenstone

cases in a "global deal."[123] This idea is similar in concept to the arrangements discussed in the

January 25, 2007 emails cited in the Committee's Brief.[124] In these discussions, like those,

Mr. Eddins and Mr. Glaspy discuss an expanded settlement posture and display a cordial

relationship. Also like those emails, Mr. Glaspy does not confront Simon Greenstone about its

now apparent fraud. At trial, the Committee could have tried the same arguments it now makes

in its Brief based on this record. It nevertheless declined to do so. The emails from the

Committee's Brief are not "new evidence."

---

[121] Tr. 4618:10-46:19 (questioning Mr. Glaspy about ACC-236).
[122] *See* ACC-236 at GST-EST-0337659-60.
[123] See ACC-236 at GST-EST-0337663-64.
[124] Committee Br. 45-48.

**5.      The emails are cumulative of the substantial number of settlement communications available to the Committee and immaterial in the context of the massive trial record**

Debtors produced more than 1200 pages of settlement communications related to 392 unique cases for the benefit of the Committee. Two-hundred and fifty of those cases were cases hand-picked by the Committee. From those documents, the Committee identified 134 trial exhibits containing settlement communications that it intended to offer at trial. Those trial exhibits, in total, numbered 1,196 pages. The handful of emails identified in the Committee's Brief are immaterial to the record of this aggregate proceeding.

The Committee before and during trial cross-examined multiple Garlock witnesses about settlement communications. This was a recurring activity, and the Committee does not deny that it fully developed evidence of this type, on an aggregate basis, on many fronts. Committee counsel, for instance, elicited testimony about settlement communications from *eight* different Garlock witnesses.[125] At trial, for instance, in addition to its examination of Mr. Glaspy, the Committee cross-examined John Turlik extensively concerning his settlement communications with the Belluck & Fox firm.[126]

The Committee, during discovery and trial, also cross-examined Mr. Glaspy over multitudes of communications independent of those exchanged with Simon Greenstone. At his first deposition, the Committee examined Mr. Glaspy about settlement communications with Waters & Kraus (through Mark Iola),[127] Levin Simes Kaiser,[128] and Brayton Purcell, in addition

---

[125] In addition to the depositions of Messrs. Glaspy and Turlik, six other Garlock witnesses were questioned about settlement communications. *See, e.g.*, 11/7/2012 Drake Dep. Tr. 125:19-127:15 (excerpts attached as **Ex. Q**); 11/14/2012 Henzel Dep. Tr. 96:20-97:18 (excerpts attached as **Ex. R**); 1/21/13 Hennessy Dep. Tr. 97:21-100:2, (excerpts attached as **Ex. S**); 12/12/2012 Grant Dep. Tr. 138:25-139:20 (excerpts attached as **Ex. T**); 2/22/13 O'Reilly Dep. Tr. 122:23-127:5 (excerpts attached as **Ex. U**).
[126] *See, e.g.*, Tr. 2448:2-2451:1.
[127] *See* Exs. 2-11 of 1/22/13 Dep. (attached as **Ex. V**).
[128] See Exs. 15-17 to 1/22/13 Dep. (Ex. V).

to other settlement communications with Simon Greenstone.[129] At trial, on top of questions

about Simon Greenstone exchanges, Committee counsel asked Mr. Glaspy about

communications with the Kazan McClain firm. The emails from the Committee's Brief are an

immaterial speck compared to the massive trial record.

> ### 6.    The Committee could have, through diligence, obtained the Simon Greenstone emails and presented them at trial but declined to do so

Simon Greenstone and Jeffrey Simon have been active participants on the Committee's

team. If the Committee desired to present a fuller record of settlement dialogue that included

these emails in particular, it could have, and should have, gotten them from Simon Greenstone in

the first place.

Compared to other Committee members, Mr. Simon has been extensively involved in the

Committee's management of its case and the Estimation Trial specifically. As noted, in February

2011, the Committee called him to testify in opposition to Garlock discovery motions on the

basis that he was the exemplar counterparty to Garlock in settling cases. "He is very experienced

in settling Garlock cases," the Committee said, and called him to testify because he was able to

describe how settlements were made in the "real world." [130]

In other episodes of the case, Simon Greenstone stood alongside the Committee to

oppose Debtors—objecting to questionnaire discovery, for example, and objecting to Garlock's

subpoena that required production of documents for the *White, Ornstein*, and *Reed* cases.

Mr. Simon was designated the 30(b)(6) representative of Simon Greenstone. The Committee

appeared at Mr. Simon's deposition, and used that deposition to authenticate *other settlement*

---

[129] *See* Ex. 12 to 1/22/13 Dep. (Ex. V).
[130] 2/17/11 Tr. at 41:19-20.

*emails* it obtained from Simon Greenstone for use at trial.[131] The Committee listed Mr. Simon as a live fact witness on its final witness list (although it declined to call him).

There is no question that Mr. Simon and Simon Greenstone are fairly considered principals of the Committee. Yet the Committee, for its own reasons, either did not seek these emails from Simon Greenstone before trial or chose not to use them at trial. The Committee's Brief does not deny that it had full access to any emails Simon Greenstone could have provided.

Before filing this response, Debtors asked Committee counsel about the circumstances of the emails' discovery, their availability, and other details. Committee counsel refused to answer. The Committee's Brief omits to explain (or provide any evidence about) whether the Committee ever searched for emails held by Simon Greenstone or whether and when Committee counsel obtained them. It is significant that the Committee *had its own obligation* to produce these documents and any other similar documents to Debtors before trial but never did so.[132]

These were emails concerning cases that the Committee had notice (*White, Ornstein, Reid* and others) would be part of the evidence offered at trial, and held by the very firm it said (in 2011) was best-suited to testify about settling cases with Garlock. They are email messages sent and received by the Committee's own principals in the possession, custody, or control of those principals. They were fully available to the Committee before trial. These circumstances, as much as any other, fail to show diligence by the Committee required to reopen the Estimation Trial.

---

[131] *See* Exs. 7 & 8 to 3/26/13 Simon Dep. (attached as **Exhibit W**) (correspondence related to the settlement of the *White & Belt* cases obtained from Simon Eddins & Greenstone).

[132] The Committee produced very few settlement communication documents. It obtained and produced settlement communications from some firms (e.,g., Weitz & Luxenberg, Belluck & Fox,) but did not produce settlement communications concerning any Simon Greenstone claimant. *See, e.g.*, ACC-EST-0038730 and ACC-EST-0038703 (Weitz & Luxemburg) and ACC-EST-0039011-95 (Belluck & Fox).

### 7. The Committee declined to call witnesses that negotiated opposite Mr. Glaspy.

For all of the Committee's rhetoric that trial testimony by Mr. Glaspy (and others) about the absence of third-party exposure evidence was "false," "revisionist story-telling," a "corporate fiction," and the like, the Committee overlooks entirely that the nature of Mr. Glaspy's testimony at trial was disclosed well before trial, and that the Committee did not call a single plaintiffs' attorney to dispute it.

Mr. Glaspy, for his part, has offered as much testimony as any witness in this case. Debtors called him to testify in March 2011, when Committee counsel cross-examined him. He sat for two depositions, the second of which allowed the Committee the opportunity (over Debtors' objections) to elicit testimony concerning privileged information surrounding identified cases. The nature of his testimony also was disclosed through a pretrial report about which he was deposed before trial. In plain terms, the Committee cannot contend it was lacking in opportunity to prepare to present evidence that challenged what Mr. Glaspy had to say.

The Committee listed on its final pre-trial witness list three witnesses, Jeffrey Simon, Peter Kraus, and Mark Iola, all of whom negotiated with Mr. Glaspy and were deposed before trial. [133] The Committee declined to call any of them. Instead, the Committee chose to call David McClain, who was a surprise witness who was not subject to pre-trial document discovery. [134] As explained above, Mr. McClain did not contest Mr. Glaspy's testimony on the points raised in the Committee's Brief. In fact, his testimony affirmed the validity of Garlock's position. That the Committee did not call a witness who contradicted Mr. Glaspy on the issues it now raises, underscores the frivolous nature of the Committee's Motion.

---

[133] *See* Witness List of the Official Committee of Asbestos Personal Injury Claimants for the Estimation Trial (July 3, 2013) (attached as **Ex. X**).
[134] Debtors were allowed to take Mr. McClain's deposition on the eve of his testimony. Debtors did not have an opportunity to subpoena documents from his firm to examine that firm's Trust filing practices.

## CONCLUSION

For the foregoing reasons, Debtors respectfully request that the Court enter an order in the form of **Exhibit Y** denying the Committee's Motion.

This 27th day of June, 2014.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Garland S. Cassada
Garland S. Cassada
N.C. Bar No. 12352
Jonathan C. Krisko
N.C. Bar No. 28625
Richard C. Worf, Jr.
N.C. Bar No. 37143

ROBINSON BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone:     (704) 377-2536
Facsimile:     (704) 378-4000

gcassada@rbh.com
jkrisko@rbh.com
rworf@rbh.com

*Special Corporate and Litigation Counsel to the Debtors Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served on the counsel of record in this action by electronic mail.

This 27th day of June, 2014.

/s/ Garland S. Cassada
Garland S. Cassada