**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC, et al.,<br><br>     Debtors.[1] | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered |

**DEBTORS' SUR-REPLY TO THE MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO REOPEN THE RECORD OF THE ESTIMATION PROCEEDING**

Garland S. Cassada
N.C. Bar No. 12352
Jonathan C. Krisko
N.C. Bar No. 28625
Richard C. Worf, Jr.
N.C. Bar No. 37143

Robinson Bradshaw & Hinson, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246

gcassada@rbh.com
jkrisko@rbh.com
rworf@rbh.com

*Special Corporate and Litigation Counsel to the Debtors Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company*

---

[1] The debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ...................................................................................................... 1

I.    The Committee cannot make the "extraordinary" showing required for Rule
      60(b)(3) relief, which it claims for the first time in its Reply ........................... 7

II.   The old depositions and purchase orders are not material to the Court's *Treggett*
      findings and Debtors had no obligation to find and produce them ..................... 13

      A.    The Committee distorts the significance of documents showing a product
            was on a work site .................................................................................. 14

      B.    The Committee has abandoned its allegation that Mr. Magee helped
            Debtors commit a "fraud on the court" ..................................................... 21

      C.    The Committee's argument about Debtors' discovery obligation relies on
            the same erroneous conflation of work site evidence and exposure
            evidence .................................................................................................. 21

III.  The Committee once again fails to show that the Boelter summaries contain any
      new evidence whatsoever, much less that they shake the Court's *Torres* findings ......... 25

      A.    Williams Kherkher did dispute Mr. Torres' Kaylo exposure ...................... 28

      B.    The *Torres* Trust claims do contain significant evidence that was
            concealed ................................................................................................. 33

IV.   The Committee's allegations about *Ornstein* and *White* are belied by record
      evidence .................................................................................................... 37

V.    The Committee continues to lack any evidence supporting its interpretation of
      Trust claims ............................................................................................... 41

VI.   Debtors did not fail to produce emails the Committee has obtained from its trial
      counsel Waters & Kraus, nor do such emails affect this Court's findings in any
      respect ...................................................................................................... 46

      A.    Debtors did not fail to produce any responsive Waters & Kraus settlement-
            related emails in their possession, custody, or control ............................... 47

      B.    The Committee had every possible opportunity to investigate and present
            evidence on the settlement relationship between Garlock and Waters &
            Kraus ....................................................................................................... 48

      C.    The Committee is wrong that alternative exposure evidence did not matter
            to Garlock ................................................................................................ 49

      D.    The Committee's allegations about Simon Greenstone and Belluck & Fox
            are also incorrect ..................................................................................... 56

CERTIFICATE OF SERVICE ...................................................................................... 60

# TABLE OF AUTHORITIES

Page

**Cases**

*Boryan v. United States*, 884 F.2d 767 (4th Cir. 1989) ................................................. 8, 45, 49, 57

*Boyd v. Bulala*, 905 F.2d 764 (4th Cir. 1990) ............................................................. 10

*Fleming v. New York University*, 865 F.2d 478 (2d Cir. 1989) ......................................... 15, 29, 42

*Gibson v. Total Car Franchising Corp.*, 223 F.R.D. 265 (M.D.N.C. 2004) .................................. 9

*Great Coastal Express, Inc. v. Int'l Brotherhood of Teamsters,* 675 F.2d 1349 (4th Cir. 1982) ...................................................................................................... 9

*In re Garlock Sealing Techs. LLC, et al.*, 504 B.R. 71 (Bankr. W.D.N.C. 2014) ................... 6, 10

*In re Silica Products Liab. Litig.*, 398 F. Supp. 2d 563 (S.D. Tex. 2005) ...................................... 7

*McLawhorn v. John W. Daniel & Co., Inc.*, 924 F.2d 535 (4th Cir. 1991) .......................... passim

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersystems Gmbh,* No. 98 C 1072, 2008 WL 410413, at *1 (D. Colo. Feb. 12, 2008) ................................................. 6

*Regency Health Servs. v. Superior Court*, 64 Cal. App. 4th 1496 (Cal. App. 2d Dist. 1998) ...................................................................................................... 4

*Smith v. Superior Court of San Joaquin County*, 189 Cal. App. 2d 6 (Cal. App. 3d Dist. 1961) ...................................................................................................... 4

*SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Properties LLC*, 2002 WL 1163577 (S.D.N.Y. 2002) ...................................................................................................... 6

*U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 540 F. Supp. 2d 994 (N.D. Ill. 2008) ................................................................................. 6

**Other Authorities**

Peggy L. Ableman, *The* Garlock *Decision Should be Required Reading for All Trial Court Judges in Asbestos Cases*, 37 American Journal of Trial Advocacy 479 (2014) ...................................................................................................... 7

Debtors hereby submit this Sur-Reply to the Committee's 68-page Reply in Support of

Motion of the Official Committee of Asbestos Personal Injury Claimants to Reopen the Record

of the Estimation Proceeding (the "Committee Reply").

## INTRODUCTION

Since the Court's January 10, 2014 estimation decision, law firms serving on the

Committee have scoured their files searching for "newly discovered" evidence supposedly not

available to the Committee at trial to undercut the Court's finding that certain asbestos plaintiff

firms successfully obtained higher settlements from Garlock by suppressing evidence that their

clients' diseases were caused by friable, more potent asbestos-containing products of other

companies. The Committee's Reply relies on yet more of this "evidence," but its arguments

remain the same. It alleges Trust claims and ballots do not mean what they say, blames Garlock

for not discovering the suppression of evidence, and asserts the concealed evidence did not

matter to Garlock's settlement decisions anyway.

The Committee's contentions continue to be completely devoid of merit. As the Court

found, the evidence at the estimation trial demonstrated a startling pattern and practice of

evidence suppression, consisting in among other things:

- The admission of plaintiffs' law firms that they routinely delayed filing Trust claims to
  undercut Garlock's ability to prove that their clients' diseases were caused by other
  companies;[2]

- The admission of a prominent referral firm that trial firms routinely urged them to delay
  filing Trust claims for their mutual clients in order to advance the interests of such clients
  at trial;[3]

---

[2] 1/14/13 Kraus Dep. at 41:5-42:14 (Ex. J. to Debtors' Opposition; 1/16/13 Shein Dep. at 43:20-45:2 (excerpts attached as **Ex. A**).

- Trust claims in which plaintiffs swore under penalty of perjury to exposures to particular asbestos products never disclosed in response to interrogatories asking about all known exposures to asbestos;[4]\

- Trust claims and certified ballots (in the case of *Treggett*) that squarely contradicted the plaintiff's theory of the case in the largest verdict ever obtained against Garlock (*Treggett*) and the only significant mesothelioma verdict in the five years before its petition (*Torres*);[5]

- The script memorandum created by Baron & Budd—the progenitor of many of the law firms that engaged in these practices—encouraging plaintiffs not to testify about exposures to products manufactured by companies not named in the lawsuit; and

- The admission of one plaintiff firm that lawyers in such firm who gathered evidence to support Trust claims intentionally did not share that evidence with lawyers preparing for trial because doing so would disserve their obligation to maximize their client's recoveries at trial.[6]

The notion that this concealment of evidence did not matter to Garlock is belied by the admissions of the Committee's own plaintiff lawyer witnesses that evidence of alternative exposures was important to Garlock at trial and in settlement negotiations.[7] It is also belied by common sense, given the nature of Garlock's defense.

As a last resort, the Committee blames Garlock, claiming that it should have been able to discover the evidence concealment, and did not need plaintiffs to be candid about the exposures

---

[3] 2/1/13 Cooper Dep. at 44:21-45:13 (Ex. L to Debtors' Opposition).
[4] See, for example, Trust claims filed by the Simon Greenstone firm in the *Ornstein* case and on behalf of a Simon Greenstone client in the *White* case, and Trust claims filed by Shein Law Center in the *Golini* case and on behalf of a Shein Law Center client in the *Massinger* case.
[5] See documents from the *Treggett* and *Torres* cases.
[6] 1/16/13 Shein Dep. 64:22-65:16 (Ex. A).
[7] 1/4/13 Simon Dep. at 27:18-28:2 (Ex. O to Debtors' Opposition); 1/14/13 Kraus Dep. at 21:18-22:25 (Ex. J to Debtors' Opposition); 1/15/13 Iola Dep. at 59:10-16 (Ex. P to Debtors' Opposition); Tr. 3829:15-19 (Hanly).

they would later attest to in Trust claims and ballots. Its Reply claims that requiring candor from

plaintiff attorneys before courts and juries "rewrite[s] the law of discovery and the burden of

proof" and "assign[s] plaintiffs' counsel the job of proving non-Garlock exposures."[8]

Presumably, in the Committee's view of the world, plaintiffs are free to deny exposures they

have verified elsewhere so long as defendants do not catch them doing so.

The Court should reject the Committee's misguided view of litigation and the attorney's

role. Suppression of exposure evidence is not about "burdens of proof": it is about candor to the

tribunal, compliance with discovery obligations, and professional responsibility. The premise of

the Committee's argument seems to be that a plaintiff attorney's duty to provide zealous

representation overrides these duties, permitting him to *avoid* doing anything that will benefit the

defendant—such as disclosing relevant material evidence that may weaken the plaintiff's case—

and *permits* the plaintiff attorney to do anything in service of that goal so long as he is not

caught. But that view of ethics simply is not correct. Attorneys are not permitted to do anything

and everything to benefit their clients, as the Court recognized when it characterized as "some

perverted ethical duty" one plaintiff attorney's testimony that he delayed Trust claims to deprive

defendants of relevant information because his "duty to these clients is to maximize their

recovery."[9]

The Court's conclusion is, in fact, the law. In California, the jurisdiction where the case

the Committee focuses on (*Treggett*) was tried, attorneys have affirmative duties to disclose

evidence and express candor to the court. California's ethics rules provide that members of the

California bar "[s]hall employ, for the purpose of maintaining the causes confided to the member

such means only as are consistent with truth." In particular, a California attorney "[s]hall not

---

[8] Committee Reply at 6.
[9] Estimation Opinion at 84.

seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law" and "[s]hall not assert personal knowledge of the facts at issue, except when testifying as a witness."[10] Further, a California lawyer "shall not suppress any evidence that the member or the member's client has a legal obligation to reveal or to produce."[11] Attorneys answering interrogatories in California have a duty to disclose facts known to them, even if the client does not know them.[12] In *Treggett*, Mr. Ron Eddins on behalf of Waters & Kraus violated all of these canons when he affirmatively stated to the jury that it was "not true" Unibestos was on board the John Marshall, and disputed Mr. Treggett's exposure to amosite asbestos of any kind, even though his firm had already cast a ballot for Mr. Treggett certifying under penalty of perjury that he was exposed to Unibestos.

It therefore does not much matter that the Committee now believes Garlock should have discovered Mr. Eddins's misrepresentation in *Treggett*. Garlock wishes it had; perhaps if it could have discovered the subterfuge in *Treggett* and the dozens of other cases where the Court found evidence was suppressed, it would not be in bankruptcy today. But nothing excuses the conduct that this Court found and the Committee's Motion does not seriously dispute.

And in fact, suppressing evidence did hurt Garlock, as this Court found. Why else would plaintiff firms engage in it? The lack of such exposure evidence increased Garlock's trial risk and its defense costs. In particular, at the estimation trial, Debtors' witnesses explained in detail why the old depositions evidencing products at work sites (which the Committee now relies on to show that "Garlock should have known") were inadequate when plaintiffs denied their exposures to those products. Although Garlock could attempt to offer work site evidence, even if

---

[10] California Rule of Professional Responsibility 5-200.
[11] *Id.*
[12] *See Regency Health Servs. v. Superior Court*, 64 Cal. App. 4th 1496, 1505 (Cal. App. 2d Dist. 1998); *Smith v. Superior Court of San Joaquin County*, 189 Cal. App. 2d 6, 11-12 (Cal. App. 3d Dist. 1961); *see also* Tr. 3502:16-3503:3 (McClain) (same).

it was admissible (which often was not the case), it did not tie the product to the plaintiff's breathing zone and, moreover, was not the same as evidence showing the plaintiff admitted the exposure (as Trust claims and ballots did). In addition, Garlock's defense costs increased substantially when it was forced to litigate around suppressed evidence, as it had to search for other ways to prove its case and retain expensive experts to attempt to fill the gap left by the concealment of evidence. Missing evidence that weakens a defendant's case and increases its costs indisputably affects settlements.

The Committee also still does not grapple with the fact that it offered no affirmative evidence at trial to prove that settlements *were* a reliable indicator of Garlock's liability. The Court, in addition to finding that Garlock's settlements were tainted by concealment of evidence, also found that the vast majority of Garlock's settlements were motivated by defense cost avoidance. The Committee's own expert acknowledged that this was true.[13] And Simon Greenstone, in a recent press release relating to the lawsuit Garlock brought against it, admitted that Garlock's settlements were "an effort to keep its legal expenses down" (the same release, notably, did not dispute that Simon Greenstone concealed exposure evidence in cases against Garlock, though puzzlingly claimed "Garlock has no one but itself to blame for bankruptcy").[14] The lack of any evidence supporting the settlement approach and uncontested evidence that settlements were made predominantly to avoid costs also sank the Committee's case at trial, and none of the new documents that Committee law firms have retrieved from their files would have solved this problem of proof had they searched for and offered the documents at trial. Nor do they change the fact that Debtors offered a merits-based estimation approach that the Court

---

[13] *See* Tr. 3982:24-3983:13 (Peterson) (recounting prior testimony: "That's why 99.9 percent of the cases settle, rather than going to trial, because both sides know that these are expensive propositions.").

[14] Press release available at http://www.prnewswire.com/news-releases/garlock-has-no-one-but-itself-to-blame-for-bankruptcy-says-attorney-for-asbestos-plaintiffs-law-firm-281352551.html.

found to be a "reasonable and reliable estimate of Garlock's aggregate liability" to pending and

future mesothelioma claimants.[15]

Ultimately, the Committee's attempt to distract from plaintiff firms' conduct by blaming

Garlock fails to realize that litigation is not a no-holds-barred contest to maximize a client's

recovery, but a search for truth. Zealous advocacy generally promotes that goal, but crosses the

line when it leads to suppressing evidence or making false statements of fact to a tribunal:

> [A]dvocacy based on factually misleading representations . . .  subverts the search
> for justice. It also is an inappropriate use of limited judicial resources. . . . The
> court, the parties, opposing counsel, and the public deserve the truth, a fair
> recitation of applicable law, and careful adherence to procedural rules. Zealous
> advocacy, in other words, can only go so far. Counsel cannot comply with the
> rules and fairly state the facts and the governing law within the bounds of
> permissible advocacy only when it serves his client's interests. To do so subverts
> the search for justice and prevents the court from efficiently and appropriately
> deciding cases. *See Medtronic Navigation, Inc. v. BrainLAB Medizinische
> Computersystems Gmbh,* No. 98 C 1072, 2008 WL 410413, at *1 (D. Colo. Feb.
> 12, 2008) ("The fairness of the adversary system of adjudication depends upon
> the assumption that trial lawyers will temper zealous advocacy of their client's
> cause with an objective assessment of its merit and be candid in presenting it to
> the court and to opposing counsel").

*U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 540 F. Supp. 2d 994,

1014, 1017 (N.D. Ill. 2008). *See also SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Properties

LLC*, 2002 WL 1163577 (S.D.N.Y. 2002) ("Several hundred years ago, Lord Chief Justice Coke

observed that truth is 'the mother of justice.' Sir Edward Coke, Second Institute 524. Our system

of justice is founded on the principle that litigation is to be a search for the truth; it is not some

type of intellectual game that is circumscribed by the inflexible rules that define it."). Judge Jack

in the silica MDL relied on this same principle, holding that "[t]he word 'litigation' implies (or

should imply) the search for truth and the quest for justice. But it is apparent that truth and

justice had very little to do with these diagnoses. . . . Instead, these diagnoses were driven by

---

[15] *In re Garlock Sealing Techs. LLC, et al.*, 504 B.R. 71, 96-97 (Bankr. W.D.N.C. 2014) ("Estimation Opinion").

neither health nor justice: they were manufactured for money." *In re Silica Products Liab. Litig.*, 398 F. Supp. 2d 563, 635-36 (S.D. Tex. 2005).

This Court's Estimation Decision likewise took a stand for truth over obfuscation and distortion. At the end of the day, the Court recognized that plaintiffs and law firms were not telling Garlock the full story of their exposures in pretrial discovery during the 2000s. Courts and juries hearing Garlock cases—including the *Treggett* case—did not receive the full story either, and settlements before trial were inflated because the evidentiary record that would have been presented to courts and juries was incomplete. Garlock did not have the opportunity to obtain just and fair results, and settlements and verdicts based on those distorted records are not an appropriate guide to Garlock's liability for mesothelioma claims. *See* Peggy L. Ableman, *The* Garlock *Decision Should be Required Reading for All Trial Court Judges in Asbestos Cases*, 37 American Journal of Trial Advocacy 479, 487 (2014) ("[J]udges need to send a strong message to the asbestos bar that full disclosure of all facts is mandatory from the very inception of the litigation, since even the settlement strategies of these defendants are profoundly affected by the factual circumstances of a particular plaintiff's *overall* exposure. . . . [S]tate courts should be unwilling to ignore instances of fraudulent activity, if for no other reason than to show respect for the truth-seeking function of the courts.") (emphasis in original).

For all these reasons, and the particular reasons described in detail below, the Court should deny the Committee's motion.

## I.   The Committee cannot make the "extraordinary" showing required for Rule 60(b)(3) relief, which it claims for the first time in its Reply

As an initial matter, the Committee's explanation of the legal basis for its motion continues to shift in its Reply. In its Initial Brief, the Committee relied on allegations about "new evidence," *see* Committee Initial Brief at 7, 33, 55 (referring to "new evidence"), which requires

showing, among other things, that the movant used due diligence to discover the new evidence,

that the evidence is "not merely cumulative or impeaching," that it is "material," and that it is

"such that it is likely to produce a new outcome if the case were retried, or is such that would

require the judgment to be amended." *Boryan v. United States*, 884 F.2d 767, 771 (4th Cir.

1989). For all the reasons discussed in Debtors' Opposition, the Committee cannot meet any of

these factors.[16]

The Committee also stated in its Initial Brief that "Garlock has committed a fraud upon

the Court." Committee Initial Brief at 1. But:

> Fraud on the court under Rule 60(b) is materially different from the fraud or
> misconduct referred to in Rule 60(b)(3). . . . As the Fourth Circuit has explained,
> '[n]ot all fraud is fraud on the court.' . . . [C]ourts have ordinarily limited the term
> 'to the most egregious cases, such as bribery of a judge or juror, or improper
> influence exerted on the court by an attorney, in which the integrity of the court
> and its ability to function impartially is directly impinged.' *Great Coastal
> Express,* 675 F.2d at 1356.

*Gibson v. Total Car Franchising Corp.*, 223 F.R.D. 265, 281 (M.D.N.C. 2004). The

Committee's motion contained no facts supporting "fraud on the court," calling into question

why it used that charged term in the first place.

Now, having failed to show that "new evidence" or "fraud on the court" justifies

reopening, the Committee in its Reply—for the first time—cites Rule 60(b)(3) as its basis to try

to reopen the estimation record. Committee Reply at 3. Rule 60(b)(3) provides that a party may

obtain relief from a judgment for "fraud (whether previously called intrinsic or extrinsic),

misrepresentation, or misconduct by an opposing party."

This contention should be denied because the Committee first raised it in its reply brief,

never citing it in its Motion or brief. In any event, the Committee fails to mention the restricted

---

[16] The Committee attempts to distinguish *Boryan* on its facts, Committee Reply at 4 n.4, but does not address the
factors *Boryan* adopted.

circumstances under which Rule 60(b)(3) relief is available in the Fourth Circuit, which do not

exist here. In general, Rule 60 relief is "a remedy that is extraordinary and is only to be invoked

upon a showing of exceptional circumstances," and is "within the discretion of" the trial court.

*McLawhorn v. John W. Daniel & Co., Inc.*, 924 F.2d 535, 538 (4th Cir. 1991) (citation and

punctuation omitted). A party seeking relief under Rule 60(b)(3) "must prove the misconduct

complained of by clear and convincing evidence and demonstrate that such misconduct

prevented him from fully and fairly presenting his claim or defense." *Id.* (citation and

punctuation omitted). Such relief also is not available if the judgment rests on a basis

independent of the alleged misconduct. *See id.*; *see also Boyd v. Bulala*, 905 F.2d 764, 769 (4th

Cir. 1990) (any relief under Rule 60 requires showing of "meritorious defense or claim").

Furthermore, a Rule 60(b)(3) motion must be timely brought; the Fourth Circuit has "held on

several occasions that a Rule 60(b) motion is not timely brought when it is made three to four

months after the original judgment and no valid reason is given for the delay." *McLawhorn*, 924

F.2d at 538.

For the reasons outlined in Debtors' Opposition, the Committee's Motion does not

warrant relief, even under its new theory. First, the Court's judgment rests on numerous bases

independent of the findings the Committee now challenges. *See id.* at 538. The Court found that

evidence had been suppressed in mesothelioma cases against Garlock for many reasons that go

unmentioned by the Committee in its motion, including the thirteen Designated Plaintiff cases

other than *Treggett* and *Torres* where evidence was suppressed; the dozens of other RFA list

cases; the admitted practice of plaintiff firms delaying Trust claims to deprive defendants and

courts of the evidence contained therein; the Baron & Budd witness-coaching memorandum; the

credible testimony of Mr. Magee, Mr. Turlik, and Mr. Glaspy; and the success Garlock had in

cases where it obtained Trust claims. Estimation Opinion at 84-86.[17] Moreover, the Court's

rejection of the Committee's settlement-based theory rested on the independent ground that

Garlock's mesothelioma cases were motivated in large degree by the desire to avoid defense

costs. *Id.* at 73, 87, 94. Finally, the Court's adoption of the merit-based theory rested on its

independent conclusions that Garlock's products "resulted in a relatively low exposure to

asbestos to a limited population and that its legal responsibility for causing mesothelioma is

relatively de minimus," Estimation Opinion at 73, and that Dr. Bates had presented a reasonable

and reliable method of estimating Debtors' liability taking into account "causation, limited

exposure and the contribution of exposures to other products," *id*. Because the Committee's

motion affects none of these aspects of the Court's decision, under Fourth Circuit law, it cannot

provide a basis for Rule 60(b)(3) relief.

 Second, the Committee has failed to prove by "clear and convincing" evidence that

Debtors committed any misconduct, much less "fraud."  *McLawhorn*, 924 F.2d at 538.

- As set forth in Debtors' Opposition, Debtors did not know about the old purchase orders

   and depositions from Newport News, some of which were decades old. Moreover, as

   discussed in Part II below, those documents were not even responsive to discovery

   requesting documents concerning Mr. Treggett's "exposures," as they did not refer to Mr.

   Treggett at all. Further demonstrating the lack of any misconduct, Waters & Kraus, the

   Committee's trial counsel, was subject to the same discovery request and did not produce

   the identical documents which were admittedly in their possession.

- The Boelter summaries from *Torres* and *Weikel* summarized firsthand information that

   Debtors produced to the Committee. Though the summaries were inadvertently not

---

[17] Page citations to the Estimation Opinion are to *In re Garlock Sealing Technologies, LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014).

produced because they were exhibits to an electronic copy of the Boelter deposition, the Boelter deposition that was produced referred extensively to the summary and the Committee could have obtained it from Debtors at any time had it been material (which it was not). Moreover, further demonstrating the absence of misconduct, Williams Kherkher did not produce the same summaries, despite having an identical discovery obligation. Finally, as discussed below, another expert for Garlock in the *Torres* case, Mr. John Henshaw, provided a summary of the very same information in the Boelter summary, which Debtors produced to the Committee in this case but the Committee did not even choose to use at the estimation trial.

- The Scarcella report did not exist at the time of the estimation trial, nor was it subject to any discovery request. Debtors never had possession of the report.

- A small number of Simon Greenstone settlement-related emails were not produced because of an inadvertent mistake during a rolling production. The lack of any intentionality is demonstrated not only by the facts outlined in Debtors' Opposition, but also by Debtors' production to the Committee of over 1,200 pages of materially identical settlement correspondence.

Third and most important, the Committee was not prevented from "fully and fairly presenting" its settlement-based theory of estimation. *McLawhorn*, 924 F.2d at 538. The Committee received discovery about every aspect of Debtors' settlements. The Committee received Debtors' claims database, obtained over 1,200 pages of settlement communications from Debtors, deposed all Debtors' in-house counsel who dealt with asbestos settlements (in the case of Mr. Magee and Mr. Grant more than once), deposed Debtors' principal outside counsel (in the case of Mr. Turlik and Mr. Glaspy more than once), received full claim files for all RFA

cases (and the productions the plaintiff law firms made on the Designated Plaintiff cases), even

received Debtors' privileged internal memoranda about the RFA cases (the MEAs and TEFs),

and had the opportunity to cross-examine Debtors' witnesses about them.

The Committee also had full access to and could have called as witnesses any of the

significant plaintiff's counsel who negotiated those settlements with Debtors, most of whom

serve on the Committee. Indeed, all the documents the Committee now relies on were in the

possession of Committee law firms (the Newport News documents in the hands of Committee

trial counsel Waters & Kraus and the Committee's consulting expert Mr. Hatten, the Simon

Greenstone correspondence in the hands of Committee member Simon Greenstone) or its co-

party in the fraud suit (the Boelter summaries in the hands of Williams Kherkher) and could have

been obtained by the Committee at any time. In addition, none of the documents challenge the

conclusion that exposure evidence was concealed from Debtors during mesothelioma litigation

in the past decade, for all the reasons discussed in Debtors' Opposition and this Sur-Reply.

Finally, the Committee's motion is untimely. It waited almost five months to bring its

motion, despite all the documents being within its possession or that of its privies, which

precludes Rule 60(b)(3) relief. *See McLawhorn*, 924 F.2d at 538. Debtors have now proposed a

plan of reorganization based on the estimate, and the orderly administration of the case also

argues in favor of denying the Committee's motion.

Thus, regardless of the shifting legal basis for the Committee's motion, it has no merit.

The rest of this Sur-Reply addresses more particularly the points raised in the Committee's

Reply.

II.    **The old depositions and purchase orders are not material to the Court's _Treggett_ findings and Debtors had no obligation to find and produce them**

The Committee's Reply once again fails to cast any doubt on the Court's findings about the _Treggett_ case, or show that the old depositions and purchase orders it brings forward now related to the USS John Marshall would have any effect on those findings. The Court correctly found that Mr. Treggett's counsel told the jury his client was not exposed to Unibestos or amosite insulation, although the firm already had verified under penalty of perjury that Mr. Treggett was exposed to Unibestos and later filed Trust claims seeking compensation from numerous amosite manufacturers based on asserted exposure.[18] The Committee does not challenge these findings of evidence suppression, and its other arguments are therefore all beside the point.

In fact, the old depositions and purchase orders the Committee obtained from its consulting expert do not call into question the harm Garlock suffered from the suppression of evidence. Even if Garlock had been aware of the Committee's documents when it litigated _Treggett_ (which it was not), and even if the documents had been admissible (which they most likely were not, as set out in Debtors' Opposition), they establish at most that Unibestos was on board the John Marshall—_not_ that Mr. Treggett was exposed to it or any other amosite product. The Committee's argument incorrectly conflates evidence putting a product on a work site with evidence demonstrating the plaintiff was exposed to a product, but attorneys for both plaintiffs and defendants testified about the importance of that distinction at the estimation trial.

The Committee's assertion that Debtors had some obligation to produce these documents is based on a similar misconception. The RFA order and stipulation the Committee cites required

---

[18] _See_ GST-5437 (_Treggett_ Trial Transcript) at 5212:28-5213:5; 5228:16-21 (closing argument of Mr. Eddins) ("Where is the evidence that he even was exposed to amosite?"); 5233:4-11; GST-5440 at 5743:27-5744:22 ("They [the defendants] thought we'll try to prove this amosite thing and say it's all that amosite, and they didn't do it, and they couldn't do it, because it's not true.") (closing argument of Mr. Eddins).

Debtors to produce evidence within their possession of Mr. Treggett's *exposures*, not all

evidence ever generated about asbestos products at all of his work sites. If that were the

obligation, when extended to all the hundreds or perhaps thousands of work sites implicated by

the RFA cases, it would have been patently objectionable. Debtors disclosed all evidence in their

possession about Mr. Treggett's *exposures*, and thus complied with their discovery obligation.

The Committee also continues to ignore the true meaning of the documents it now cites.

They were in the possession of Waters & Kraus, and therefore only reinforce the conclusion that

Mr. Eddins misled the *Treggett* jury when he said it was "not true" Unibestos was on board the

John Marshall. The Committee's *Treggett* argument provides no basis upon which to reopen the

record.

**A.** **The Committee distorts the significance of documents showing a product was on a work site**

At the root of the Committee's argument lies its repeated, mistaken notion that

documents showing a product was on the John Marshall is equivalent to evidence of Mr.

Treggett's exposure to that product. *See* Committee Reply at 9 ("Plaintiffs' lawyers and defense

counsel had access to the *same* materials to prove particular product exposures at particular sites:

historical documents and past testimony") (emphasis in original).[19] At the estimation trial, the

Committee made this same argument to try to excuse plaintiffs from their failures to

acknowledge product exposures. *See* Committee Post-Trial Brief at 34 ("Even if plaintiffs were

unable to recite the brand names of non-Garlock products that they were exposed to, Garlock had

access to a wealth of information about plaintiffs' non-Garlock exposures. Garlock was well

represented by able counsel who could use the tools available to discover a plaintiff's exposures.

. . . Garlock's counsel maintained databases of discovery conducted in past cases, and used these

---

[19] Committee Reply at 9.

resources to identify what products had previously been identified at job sites."). The Court

rejected it. By rehashing this same point, the Committee's motion attempts to relitigate the

estimation trial, which is improper. *See Fleming v. New York University*, 865 F.2d 478, 484 (2d

Cir. 1989) (holding that motion under Rule 60(b)(3) "cannot serve as an attempt to relitigate the

merits").

In addition to being a kind of victim-blaming argument, the Committee's argument had

no merit then (and has no merit now) because all of the witnesses at trial, on both sides, testified

that merely putting a product on a work site through third party evidence is not the same as a

plaintiff's admission of exposure to a product, as contained in Trust claims or ballots. For

example, Mr. Turlik explained how documentary evidence about products at work sites could not

fill the gap left by plaintiffs' failure to acknowledge their exposures to such products after 2000:

> Q. How did Garlock respond to these changes?
>
> A. Well, we—when we realized that this was happening, we did a number of things. We beefed up our defense. We started trying to get this evidence back into the litigation. We hired experts. . . . We tried to look at various historical documents. We looked at sales records at plants; what they had in the plant. We got old deposition transcripts. And we tried to find co-workers. We tried—we hired investigators to try to find evidence. We did various things like that.
>
> Q. Okay. And was—were those efforts successful?
>
> A. Largely, not. The problem with those efforts were that they—**most of this evidence was not admissible and it also wasn't persuasive**. The best evidence as to exposure comes from the plaintiff himself or the actual co-worker that worked with him. These historical documents really are inadequate. They don't—they put the product at the site but they don't put it being manipulated by or around this person. **It doesn't put him breathing those products, the fibers from those products**. . .[20]

Mr. Turlik's testimony on this subject continued:

---

[20] Tr. 2253:3-2254:6 (Turlik) (emphasis added).

Q. Mr. Hanly, who I described, has disclosed that he will testify that product lists, ship records and co-worker depositions are an acceptable substitute for a plaintiff's disclosure.

A. No.

Q. Do you agree?

A. No. He's absolutely wrong. As I've already shown or said, the rules of evidence don't allow some of these documents to be admitted and they're not persuasive. The best evidence comes from the plaintiff or the co-worker, the people that were right there and are able to testify that the product was manipulated and that the fibers were breathed. Those documents don't do that, so they're not acceptable substitutes.[21]

In the face of Mr. Turlik's testimony, the Committee did not even elicit the forecasted opinion from Mr. Hanly at trial.[22]

Mr. Turlik then presented cases from Pennsylvania, New York, and New Jersey that "stand for this really common-sense proposition that the fact that a product was shipped to a plant isn't enough to prove exposure, that you have to breathe it."[23] He further testified that "even when we were able to get this type of evidence into the jury, it wasn't really persuasive because we didn't have that next part that the person actually breathed it. So it really, really wasn't very helpful to us. And some of it was clearly inadmissible. If we had a transcript from 20 years ago that that plaintiff in the room was not able to be present, was not a party to that lawsuit, that transcript's not admissible against him. So, we—our hands were really tied."[24]

Mr. Turlik even reviewed a specific Designated Plaintiff case where these kinds of documents did not remedy a plaintiff's failure to disclose exposure evidence that would later be evidenced by Trust claims:

---

[21] Tr. 2255:10-2255:23 (Turlik).
[22] *See also* Report of Paul Hanly (ACC-636) at 2, 7-8 (containing opinion not elicited at trial).
[23] Tr. 2254:7-21 (Turlik).
[24] *Id.*

Q. So what did—did Garlock try to do anything to try to establish Mr. Homa's exposure to trust products?

A. Yes. We did what we did in many cases and that is we embarked upon investigation. One of the things we did was we retained Captain Wasson to look at the maritime records. We were able to develop some of those records, not—they didn't mention Mr. Homa by name, but they mentioned the ships he was on.

Q. Okay. And how—was that effort successful?

A. Well, we attempted to use it. We actually confronted plaintiff's expert, Mr. Hatfield. . . . [B]ut the plaintiff successfully refuted that.[25]

Mr. Turlik then reviewed a slide showing how plaintiffs' counsel explained away the ship records because "Mr. Homa never testified about pipe covering on that ship, block material on that ship. . . ."[26]

Mr. Magee likewise addressed this issue. He also testified that putting a product on the site was not the same thing as proving a plaintiff was exposed:

Q. Focusing in on the general proposition of the trust and the fact that they have site lists. Mr. Swett asked you whether it wasn't true that you could have looked at a trust and seen what sites at which they've paid claims, what he calls the "presumed site list" cases. Was that enough for Garlock to establish exposure of a plaintiff in a specific case?

A. I think we've heard over and over testimony about how just putting the claimant at a site where products were was not sufficient to get that to the jury. We've heard all these lawyers testify about how you had to put the claimant -- put the product of those potential defendants in the breathing zone of that claimant in order to get them on the jury form and have them -- and, more importantly, to have them attribute liability to demonstrate the part of Garlock's case that was so important to it, to demonstrate what product had caused the disease.[27]

As discussed in Debtors' Opposition, Mr. Magee cited the *Treggett* case as a prime example where Garlock tried to prove a plaintiff's exposure by putting a product on a work site, in that

---

[25] Tr. 2308:17-2310:3 (Turlik).
[26] GST-8000 at 41.
[27] Tr. 3391:6-23 (Magee).

17

case, Unibestos on the John Marshall.[28] *See also* Tr. 3070:12-15 (Magee) (Unibestos "was

specified for use on Navy ships. So, obviously, Garlock knew that that was the material on the

ship and it spent time at trial trying to demonstrate that that was the cause of the disease"). But

those efforts were successfully resisted by Mr. Eddins, despite Waters & Kraus already having

cast a ballot in the Pittsburgh Corning bankruptcy case in which the law firm verified, under

penalty of perjury, that Mr. Treggett in fact had Unibestos *exposure*—not just that Unibestos was

present on the John Marshall.

Mr. Glaspy, during his initial testimony before the Court in early 2011—two years before

the estimation trial—made the same point about the difference between evidence showing

products were on work sites and evidence showing a plaintiff was exposed to those products,

upon cross-examination by Mr. Swett:

> Q. And of course you have the tools of discovery to build that case for the court
> trial?
>
> A. Product I.D. evidence was primarily controlled by the plaintiffs. To answer
> your question, no.
>
> Q. You are saying you didn't have discovery tools available to you to go out and
> try and find product identification evidence against co-defendants?
>
> A. Product I.D. of a worker in a huge shipyard thirty to forty years ago doesn't
> just require you to find a party that might have been there but has been there in
> the breathing zone of this plaintiff, and that is like looking for a needle in a
> haystack.[29]

Mr. Glaspy again testified in his deposition that old depositions putting products at work

sites did not remedy plaintiffs' failure to acknowledge exposures:

> It doesn't do you any good. No. 1, if the plaintiff wasn't in that case, they object
> to using the deposition. No. 2, the deposition isn't good enough. You've got to
> have that witness 20 years ago have said, "I worked right next to the current
> plaintiff." It never happens. You can't just say a gasket or a piece of whatever

---

[28] *See* Debtor Opposition at 11-13.
[29] 3/3/11 Tr. 97 (Glaspy).

> went out to an oil refinery that's 300 acres big. You've got to put that product at
> the same time in this plaintiff's breathing zone. The deposition will not do that for
> you.
> . . .
> It's not admissible at trial. What I know. It's not admissible at trial what a depo
> we've taken in a different case is. You need a live witness that connects the
> plaintiff to that product in that workplace.[30]

At trial, like Mr. Magee, Mr. Glaspy testified that Garlock made independent efforts to prove the plaintiff's exposures to amphibole products in the *Treggett* case, but they were unsuccessful in showing that Mr. Treggett was exposed to Unibestos, a fact he already had admitted in his submission to the Pittsburgh Corning court but did not disclose to Garlock.[31]

The plaintiff attorneys deposed in this case agreed with Mr. Turlik, Mr. Magee, and Mr. Glaspy on the difference between putting a product at a work site and a plaintiff's exposure to that product. Mr. Simon testified, "Just because there's a product at a job site does not mean that a person was exposed to it, right?"[32] Mr. Kraus and Mr. Shein testified similarly.[33] At trial, Mr. McClain, the Committee's plaintiff attorney witness, testified that putting a product at a site "does not get me in the tort system to prove a case."[34]

In contrast, the Trust claims and ballots suppressed by plaintiff firms *do* contain plaintiffs' acknowledgment of *exposure* to the debtor's products. Mr. Turlik testified, "I've already shown how important it is to have that exposure evidence from a plaintiff or from his co-worker, but we're not getting that. So there's an alternative way we can get that information and that's from the trust filings. So, it is—that is an available means to show the exposures, the full

---

[30] Glaspy 6/25/13 Depo. at 60, 112 (excerpts attached as **Ex. B**). Mr. Glaspy testified identically about old depositions at his January 2013 deposition: "You know, if—unless that [co-worker] witness 20 years ago remembers your plaintiff now and testified back then about being next to him when he used a product it doesn't do you any good. Just because a person was in the same gigantic job site doesn't tie the knot, so to speak."  Glaspy 1/22/13 Depo. at 41:20-42:2 (Ex. B).
[31] Tr. 4580:12-4581:8 (Glaspy).
[32] 1/4/13 Simon Dep. 32:12-14 (excerpts attached as **Ex. C**).
[33] Shein Dep. 18:6-19:2, 193:25-194:6 (Ex. A); Kraus Dep. 131:12-20 (excerpts attached as **Ex. D**).
[34] Tr. 3519:3-5 (McClain).

story of the exposures, that these people had."[35] In court, Mr. Turlik reviewed actual claim

forms, which "clearly show that there must be exposure to those products, and they're actually

admissions of exposure."[36] Mr. Magee likewise testified that Trust claim forms reviewed in the

estimation trial universally contained attestations of exposure to the Trust's products.[37]

 With respect to *Treggett* in particular, Mr. Magee testified that if the information

contained in Trust claims and ballots had been disclosed, "the jury would have known that Mr.

Treggett acknowledged amphibole insulation exposure and it wouldn't have been just Garlock

trying to demonstrate it. It would have been coming from the claimant's mouth himself."[38] Mr.

Glaspy testified that with the evidence in the *Treggett* ballots and Trust claims, "I firmly believe

we would have defensed this case [i.e. achieved a defense verdict] like we defensed other cases

with similar exposure."[39]  The Court recognized the significance of Trust claims in its Estimation

Decision, finding that the Committee's attempt to minimize their importance "is belied by

examples of cases where exposure evidence was withheld."[40]

 The depositions and purchase orders provided to the Committee by its consultant (Mr.

hatten) and its counsel (and member, Waters & Kraus) do not diminish the harm caused to

Garlock by Mr. Eddins. Even if Garlock had known about the documents, which it did not, and

even if they had been admissible—doubtful, as set out in Debtors' Opposition—they would not

have bridged the gap between putting Unibestos on the ship and proving Mr. Treggett's exposure

to it, which Mr. Eddins disputed. The documents do not impeach the unanimous testimony from

plaintiff and defense attorneys that there is no equivalence between work site evidence and

---

[35] Tr. 2262:1-7 (Turlik).
[36] Tr. 2266:2-4 (Turlik).
[37] Tr. 3391:24-3392:19 (Magee).
[38] Tr. 3078:2-7 (Magee).
[39] Tr. 4584:1-2 (Glaspy).
[40] Estimation Opinion at 84.

exposure evidence. Indeed, Garlock put on work site evidence at the *Treggett* trial, through

experts, and it was not enough to cure the prejudice caused by the suppression of evidence of Mr.

Treggett's exposure to Unibestos and other amphibole asbestos or Mr. Eddins's

misrepresentations. The Committee has failed to show why these additional documents would

impact the Court's decision in any respect.

### B. The Committee has abandoned its allegation that Mr. Magee helped Debtors commit a "fraud on the court"

The Court should note that in its Reply, the Committee has wholly abandoned the

argument that headlined its Initial Brief: that Mr. Magee helped Debtors commit a "fraud on the

Court." The Committee hung its argument on Mr. Magee's testimony that "we didn't have

specific proof that Unibestos was on that specific ship."[41]

As Debtors showed in their Opposition, Mr. Magee in fact testified exactly to the

contrary: that *Treggett* "was" a case where Garlock "knew what was on the site of where the

plaintiff worked," and attempted to prove it with expert testimony.[42]  Debtors showed that the

line the Committee quoted was not Garlock's position, but rather Mr. Magee summarizing Mr.

Eddins's false representation to the court at the *Treggett* trial that kept Pittsburgh Corning off the

verdict form.[43]

The collapse of the allegation that led off the most inflammatory part of the Committee's

Motion speaks volumes.

---

[41] As described above, the Committee also misused the term "fraud on the Court."
[42] Tr. 3070:21-3071:5 (Magee).
[43] Debtor Opposition at 18 n.18.

### C.    The Committee's argument about Debtors' discovery obligation relies on the same erroneous conflation of work site evidence and exposure evidence

The Committee's argument that Debtors committed a discovery violation repeats the same fundamental flaw as its other argument: it mistakenly conflates evidence that Unibestos was *on the John Marshall* with evidence of Mr. Treggett's *exposures*. The order and stipulation called for the production of *exposure evidence*, not all evidence relating to RFA claimants' work sites. Specifically, it required Debtors to produce "any documents produced to the Debtors or obtained by the Debtors from any other source concerning the claimant's or injured person's **exposures to asbestos-containing products** or the **identification of any products involved in such exposures**."[44]  Debtors fully complied with that obligation by collecting and producing the *Treggett* claim file, which had all evidence in Debtors' possession regarding Mr. Treggett's exposures to asbestos. The documents the Committee relies on contain nothing about Mr. Treggett's exposures, were not in Mr. Treggett's claim file, and do not even mention Mr. Treggett.

The discovery obligation did *not* require Debtors to produce all documents relating to any products ever identified by any claimant or other witness at work sites where Mr. Treggett worked. The order and stipulation simply does not say that; it refers to "the claimant's or injured person's **exposures**." It could not have required production of all documents relating to all work sites. Such an obligation, when applied to the hundreds of claimants on the RFA list, would have implicated hundreds or even thousands of work sites throughout the United States, and would have been patently unreasonable. The fact that Waters & Kraus did not produce the documents the Committee presents either, despite Debtors' nearly identical discovery request to that firm

---

[44] Stipulation and Order Resolving Motion of the Official Committee of Asbestos Personal Injury Claimants to Determine Insufficiency of the Debtors' Answers to the Committee's First Requests for Admission and to Compel Debtors to Respond to Certain Discovery Requests ¶ 5(f) (emphasis added) (Docket No. 2415).

and the Committee, confirms that the documents were not even responsive. The Committee has

failed to show by "clear and convincing" evidence, as required by Rule 60(b)(3), that Debtors

withheld documents responsive to discovery. *See McLawhorn*, 924 F.2d at 538.

The Committee also doubts Debtors' verification that they were not aware of these

documents, either during *Treggett* or this bankruptcy case. It again incorrectly assumes that

Garlock's counsel were aware of everything said in every deposition in each of the hundreds of

thousands of cases to which it was a party.[45] Garlock in fact had little reason to care about these

old depositions, or to be aware of them, as they were generally not admissible. In addition, as

Mr. Magee and Mr. Glaspy testified, Garlock attempted to prove Unibestos was on the John

Marshall through expert testimony, and that effort was unsuccessful because Mr. Eddins disputed

facts his firm had already verified under penalty of perjury to the Pittsburgh Corning court.

The Committee places special reliance on the *Little* case, where the depositions were

listed on one party's exhibit list. The Committee, however, fails to acknowledge Debtors' point

that old depositions are not admissible in evidence when offered against plaintiffs in subsequent

cases in Newport News, so that Garlock had no reason to review them for use in later cases.[46]

After Debtors corrected the Committee's characterization of the rule, using a document filed by

the Committee's own consulting expert, *see* Debtor Opposition at 19-20, the Committee now

disclaims its failed contention. But it did make that argument, prominently, in its Initial Brief.[47]

The Committee has various excuses for why neither it nor Waters & Kraus, which held

these documents, did not produce them during the estimation case despite being subject to

---

[45] Committee Reply at 13-14.

[46] *See* Debtor Opposition at 15-16, 19-20.

[47] *See* Committee Initial Brief at 16 (Newport News order "permitted interrogatories rendered and depositions taken under the master caption of C/P 77-1 to be used by or against anyone who was party to any case on that docket, who was present or had notice, or was represented or noticed through liaison counsel. **Standing orders incorporated the same approach for more than thirty years**.") (emphasis added).

reciprocal discovery obligations.[48] The Committee, for example, asserts that Waters & Kraus's

obligation extended only to a plaintiff's file.[49] But the Committee does not say why a different

standard applied to Debtors.

The most important point is more basic. If these documents had been truly material to the

estimation case, the Committee had them ready at hand. It was not denied a fair opportunity to

use them if it chose to do so.  The Committee knew Debtors' concerns about Waters & Kraus's

misrepresentations in the *Treggett* case years before the estimation trial. Mr. Glaspy described

them during his March 3, 2011 testimony before this Court, before Debtors received any

discovery about the case. Then, after Debtors received discovery, they specified the

misrepresentations with particularly during a 30(b)(6) deposition of Garlock on January 24,

2013.[50]

Had the Committee cared whether historical documents showed Unibestos on board the

John Marshall, it could have obtained them at any time from either of the professionals assisting

it in discovery and trial: Waters & Kraus or its consulting expert, Mr. Hatten, who ultimately

provided them. Indeed, Waters & Kraus is not only a Committee firm: it was retained trial

counsel for the Committee in the estimation proceeding, and also handled the *Treggett* case. The

Committee cannot fabricate an obstacle between itself and its own professionals to claim it was

denied access to these documents before the estimation trial.

In truth, the Committee had no interest in showing that Unibestos was on board the John

Marshall during the estimation trial. As Debtors showed in their Opposition, the Committee

criticized Debtors for *not* having proof of Unibestos aboard the John Marshall.[51] The evidence

---

[48] Committee Reply at 17-20.
[49] *Id.*
[50] *See* Ex. 13 to 1/24/13 Hennessy Deposition (attached as **Ex. E**).
[51] *See* Debtor Response Brief at 18.

matters to the Committee now only because its original argument—that there was no

misrepresentation—failed. Now the Committee admits that Mr. Eddins made a

misrepresentation, but fails to describe how that helps their case.

 The Committee does not even address the real import of these documents, which is to

underscore the depth of Mr. Eddins' misstatements to the *Treggett* jury.[52] In reviewing the

Committee's documents, Debtors realized that the *same* Waters & Kraus lawyer who took the

Henderson Roberts deposition (one of the deposition transcripts put at issue by the Committee's

Motion) was a member of the Waters & Kraus trial team in *Treggett*. At the *Treggett* trial, Mr.

Eddins represented, in response to an inquiry from the court, that Mr. Troyce Wolf, who took the

Roberts deposition, was a person "with whom you have consulted and reasonably expect to

consult on strategy matters in this case."[53] The Committee does not explain why Mr. Eddins told

the jury it was "not true" Unibestos was on board the John Marshall, and never corrected the

misstatement, when a member of his trial team had, not long before the *Treggett* trial, secured,

paid for the flight of, and deposed a witness Waters & Kraus had used before, who testified that

Unibestos was on board the John Marshall.[54]

 As explained above, it does not "shift the burden," as the Committee insists, to require

candor and truthfulness from officers of the court. The Committee has failed to undermine the

Court's findings about *Treggett* in any respect.

---

[52] Committee Reply at 5.
[53] GST-5441 at 7369:23-7370:13 (*Treggett* trial transcript). The purpose of the identification was to define the scope of a protective order that limited certain material to attorneys working on the *Treggett* case.
[54] Exhibit C to Debtors' Opposition mistakenly included pages from the earlier Henderson Roberts deposition. **Exhibit F** to this Reply contains the excerpts from the 2000 deposition showing that Mr. Wolf took the deposition, that Mr. Roberts provided testimony for Waters & Kraus on multiple occasions, and that Waters & Kraus paid for Mr. Roberts's flight to Texas for the 2000 deposition.

III.    **The Committee once again fails to show that the Boelter summaries contain any new evidence whatsoever, much less that they shake the Court's *Torres* findings**

In its Reply, the Committee does not dispute that the Boelter documents from *Torres* and *Weikel* are merely summaries of other, detailed evidence Debtors produced and the Committee had before trial. Instead, the Committee claims that its having access to this detailed evidence is "beside the point" because the summaries show Garlock "had accumulated large amounts of evidence regarding non-Garlock products at that site and in fact made active use of that evidence in *Torres*."[55] The Committee never explains why the summaries show this, but the evidence summarized, which was in their possession, did not.

In fact, as Debtors showed in their Response, Garlock's reliance on third-party co-worker testimony at the *Torres* trial was no secret: it was part of the *Torres* trial record that Debtors produced to the Committee. Because Mr. Torres failed to identify any brands of products other than Garlock crocidolite gaskets, Garlock had to rely on third-party evidence at the *Torres* trial, such as Mr. Weikel's testimony that Kaylo was present at the Union Carbide plant.[56] The Committee nonetheless pretends the Boelter summary reveals Garlock's reliance on third-party evidence in *Torres* for the first time, but it does not. Debtors produced the first-hand evidence, the *Torres* trial record and depositions, during estimation discovery. The Committee, in fact, freely cited to this same evidence in post-trial briefing—citing the Weikel, Robledo, and Valenzuela depositions that it now cites in its motion.[57] The Boelter document merely

---

[55] Committee Reply at 38.

[56] GST-4855 at 65-67 (playing of Weikel cross-examination at *Torres* trial). As Debtors explained in their response, relying on Mr. Weikel's testimony was problematic because Mr. Weikel also supported Mr. Torres's identification of Garlock crocidolite gaskets. But it was the best evidence Garlock had, and the Committee was aware of it.

[57] Post-Hearing Brief of the Official Committee of Asbestos Personal Injury Claimants for Estimation of Pending and Future Mesothelioma Claims ("Committee Post-Trial Brief") at 31 n.125; Appendix II to Post-Hearing Brief of the Official Committee of Asbestos Personal Injury Claimants for Estimation of Pending and Future Mesothelioma Cases ("Committee Appendix II") at 51-2 (citing depositions of Weikel, Robledo, and Valenzuela, and noting that "Mr. Weikel, a witness for the plaintiff, testified at his deposition to the presence of Kaylo insulation, which was produced by Owens Corning, at the Union Carbide plant . . .").

summarized this deposition testimony and contains no information the Committee did not already know.

For this reason, each time the Committee cites to the Boelter summary in its Reply, it is in reality citing evidence that has long been disclosed to and known by the Committee. For example, the Committee claims the Boelter summary informed them for the first time that Mr. Weikel "testified in his father's case that Babcock & Wilcox boilers were present at the plant and were covered in Kaylo."[58] But the Boelter summary does not provide that fact: Mr. Weikel's deposition does, and it was admitted at the *Torres* trial; produced to the Committee before the estimation trial, both on its own and in the form in which it was admitted on the record in the *Torres* trial; and cited by the Committee in its estimation briefing.

Although the Committee tries to claim there is something special about an expert's summary of evidence,[59] it fails to note that another Garlock expert did precisely the same thing, and the Committee *never even cited or relied on* that evidence during the estimation trial, though the deposition was part of the exhibits the Committee submitted to the Court. Mr. Henshaw, another expert retained by Garlock in *Torres*, was also deposed in that case, and Debtors produced his deposition to the Committee. In that deposition, Mr. Henshaw testified that his opinions were based on, in part, the Weikel, Rodriguez, Robledo, Gibson, and Valenzuela depositions that the Committee relies on so heavily in the Boelter summary.[60] Mr. Henshaw then testified that in his opinion, Mr. Torres "was exposed to asbestos-containing insulation during the time he was at Union Carbide, and that would include **kaylo [sic] or pipe insulation**, block insulation, refractory, sprayed on, fireproofing."[61] The Committee never even cited this Henshaw

---

[58] Committee Reply at 24.
[59] Committee Reply at 22.
[60] ACC-6208 at 12:8-14:14 (deposition of Mr. Henshaw).
[61] *Id.* at 58.

testimony during the estimation trial (but did include it on its exhibit list). The Committee fails to

explain why the Boelter summary containing identical information is anything more than

cumulative, and something it would have used at trial, when it did not make use of the Henshaw

testimony at the estimation trial. Nor does the Committee explain why Debtors would have

produced the Henshaw deposition while allegedly concealing the Boelter summary.

The absence of anything new in the Boelter summary renders incredible the Committee's

claim that it has "forced Garlock to reverse field" and admit that both sides knew about evidence

showing Owens Corning and Babcock & Wilcox products were at the Union Carbide plant.[62] To

the contrary, the presence of those products at that worksite was evident from the face of the

*Torres* trial record, and Debtors never have and never would have disputed it. The evidence

concealed in *Torres* was admissions of Mr. Torres's *exposures* to those products, which he and

his attorneys denied. That has been Debtors' position all along, it is the basis for the Court's

finding, and it remains Debtors' position.

Underscoring the immateriality of the Boelter summary, the Committee spends nearly the

entirety of the eighteen pages of the *Torres* section of its Reply making arguments it already

advanced during post-trial briefing, using evidence it had during the estimation trial. This reveals

yet again that the Committee's motion to re-open is nothing more than a belated and improper

attempt to relitigate the estimation trial. *See Fleming*, 865 F.2d at 484. Debtors will show once

again why these arguments have no merit.

### A.    Williams Kherkher did dispute Mr. Torres' Kaylo exposure

First, the Committee claims that Williams Kherkher "never argued to the jury that there

was no evidence his injury was caused by exposure to Kaylo," instead claiming that only

---

[62] Committee Reply at 23.

Garlock's co-defendant at trial, Union Carbide, made that argument.[63] The Committee made this

exact argument in post-trial briefing. *See* Committee Appendix II at 54 ("Garlock

mischaracterizes the trial record. Mr. Torres' attorney, Mr. Chandler, did not 'vigorously deny'

that Mr. Torres was exposed to Owens Corning's product, Kaylo.").

And as the Court correctly found, the Committee's contention is incorrect. Williams

Kherkher vigorously disputed Mr. Torres' exposure to Kaylo. Mr. Kherkher moved to keep

Owens Corning and Johns-Manville off the verdict form, specifically arguing that there was no

evidence of Mr. Torres's exposure:

> It's my understanding both defendants want Johns-Manville and Owens Corning
> on there as a responsible third party, **but there is legally insufficient evidence
> that they're on there—excuse me, that they were exposed, that they were a
> cause of Mr. Torres' mesothelioma.**[64]

The defendants responded to Mr. Kherkher's argument by citing testimony that Kaylo was on the

Union Carbide site.[65]

Later, during the colloquy about the jury charge, Mr. Kherkher again argued Mr. Torres

was not exposed to Owens Corning products, objecting to the submission of Owens Corning and

Johns-Manville because "there is no evidence or legally insufficient evidence that Owens

Corning or Johns-Manville was negligent and was a proximate cause of Mr. Torres'

mesothelioma."[66]

Finally, Mr. Chandler in his closing argument to the jury directly disputed that Mr. Torres

was exposed to Kaylo:

> Owens Corning and Johns-Manville, companies who you've heard very little in
> this case, for whom you saw very few documents, **for whom we don't even
> know if that was the thermal insulation that exposed Mr. Torres**, quit making

---

[63] Committee Reply at 32.
[64] GST-4859 at 254:14-19 (emphasis added).
[65] *Id.* at 255:1-3.
[66] GST-4860 at 21:5-22.

products that contained asbestos in 1972. And they will argue to you it's their fault. They made asbestos products until the 21st century, but they're fine.[67]

Mr. Chandler further urged that "The answer to the marketing defect question as to Garlock is 'yes'; as to Johns-Manville and Owens Corning is 'no' because they quit manufacturing before Mr. Torres ever stepped foot on the plant. How can they be held responsible when they didn't deliver for three years, at least, before Mr. Torres got there?"[68] Even the expert Mr. Torres called at trial questioned Mr. Torres's Kaylo exposure. When Garlock's lawyers cross-examined him, he said, "I don't know if [Mr. Torres] was actually exposed to Kaylo."[69]

In sum, contrary to the Committee's argument, Williams Kherkher did everything possible to dispute Mr. Torres's Kaylo exposure even though Williams Kherkher filed a claim against and obtained a payment from the Owens Corning Trust based on that exposure a short time after verdict. The Court's finding that "[Mr. Torres's] attorneys represented to the jury that there was no evidence that his injury was caused by exposure to Owens Corning insulation" is right and the Committee's argument is wrong.

The Committee tries to argue that Mr. Torres's failure to acknowledge Kaylo exposure did not matter to Garlock because it claims Garlock's trial counsel "drew back" from that contention in closing argument.[70] He did nothing of the sort. Garlock successfully argued for inclusion of Owens Corning on the verdict form. Then in closing, in a portion of the transcript omitted by the Committee, Garlock's counsel expressly argued that Mr. Torres' Kaylo exposure, and not Garlock's gaskets, was the cause of his mesothelioma: "Now, what was the cause here?

---

[67] *Id.* at 56:15-22 (emphasis added).
[68] *Id.* at 58:13-18.
[69] GST-4853 at 94:8-14.
[70] Committee Reply at 36.

It was by Owens Corning, Kaylo Insulation. . . . And you have the testimony of Mr. Weikel and others that this was one of the major brands of insulation out there."[71]

The Committee also takes issue with Mr. Magee's testimony that Mr. Torres "claimed his only asbestos product exposure was to Garlock crocidolite gaskets."[72] This argument is another one that the Committee tried during post-trial briefing, citing the same portions of the trial record it cites here. *See* Committee Appendix II at 50 ("And Mr. Magee grossly misstated the record: Mr. Torres did not claim that his only product exposure was to Garlock gaskets."); *see also* Post-Hearing Response Brief of the Official Committee of Asbestos Personal Injury Claimants at 39 (same). As Debtors stated in their post-trial briefing, Mr. Magee "did not misstate the record, but merely did not qualify his answer as to products that Mr. Torres directly worked with." Debtors' Reply to Committee's Appendix II ("Debtor Appendix II") at 14 n.120. The demonstrative slide that was displayed during Mr. Magee's testimony about *Torres* did contain this qualification, and Debtors included a copy of that slide on page 46 of their Post-Trial Brief, as follows:

---

[71] GST-4860 at 113:15-16, 20-21; *see also id.* at 112:1-3 (posing question "If he hadn't had the exposure to insulation, **the Kaylo brand of insulation**, would he have developed the mesothelioma?") (emphasis added).
[72] Tr. 3082:19-20 (Magee).



Mr. Swett in his cross-examination of Mr. Magee made the identical point.[73]

Williams Kherkher in fact took great pains to establish that the only product Mr. Torres directly handled was Garlock crocidolite gaskets, in order to focus as much liability as possible on Garlock. Mr. Chandler stated in his opening that "[t]he only asbestos product Oscar actually worked with himself was the Garlock gaskets."[74] In his part of the closing, Mr. Kherkher said the same thing, arguing that Garlock should bear 65 to 70 percent fault (and should be the only product manufacturer assigned blame), and stating that "The reason why Garlock is more of a cause is because the only product that Oscar used hands-on was Garlock, and that product in and of itself contained the most potent asbestos fiber there is, 500 times, okay?"[75]

As it did after the estimation trial, the Committee also grossly overstates the identification of insulation exposure by Mr. Torres. Mr. Torres testified that as a pipefitter he neither installed

---

[73] Tr. 3351:23-3353:9 (Magee).
[74] GST-4850 at 45:20-22.
[75] GST-4860 at 69:2-7, 69:21-70:2.

nor removed insulation, despite the testimony of his co-workers that all pipefitters would have

done so.[76] Mr. Boelter during his deposition in the *Torres* case noted the paucity of Mr. Torres'

testimony about insulation. *See* ACC-6206 at 218:2-9 ("[T]he testimony with regard to activities

which cause exposure is largely from everybody but Mr. Torres, and I've also listed off what

other people said about what insulators were doing and this is coming from coworkers, so that's

something I saw throughout the case is Mr. Torres didn't really talk about exposure, his

coworkers did.").

The Committee cites Mr. Torres' and his co-workers' testimony indiscriminately as if

they had the same value, *see, e.g.*, Committee Reply at 22-23, but consistent with Garlock's long

experience, at trial the difference was significant. When Garlock cross-examined plaintiff's

expert Dr. Richard Lemen, he chose to believe Mr. Torres' account of his insulation exposure

rather than his co-workers, demonstrating once again how important the plaintiff's own

testimony is at trial (and how significant the Trust claims from Mr. Torres attesting to Owens

Corning exposure would have been):

> Q. I would like to show you the testimony of Mr. Rodriguez, who testified in this
> case. And did you ever cut open pipe insulation in order to do your work as a pipe
> fitter? Answer, yes. And is that something that all the pipe fitters did at Union
> Carbide? Yes.
>     Do you have any reason to believe that Mr. Torres was not like all the other
> pipe fitters at Union Carbide?
> A. I think I have to believe what Mr. Torres said.
> Q. You believe the co-workers.
> A. I'm not going to get into an argument between what Mr. Rodriguez said they
> did and Mr. Torres. I think Mr. Torres is in the best position to say what he did.[77]

The absence of testimony from Mr. Torres himself about insulation exposure permitted Union

Carbide to argue in its closing that Mr. Torres was never exposed to insulation at all, despite co-

worker testimony to the contrary relied upon by Garlock. Union Carbide's counsel stated, "Oscar

---

[76] GST-4855 at 158:20-22, 170:19-171:5.
[77] GST-4853 at 141:12-142:2 (testimony of Dr. Lemen).

Torres did not claim he was exposed to insulation, did not describe being exposed to insulation, was not exposed to insulation by his own testimony."[78]

In short, Williams Kherkher did all it could at the *Torres* trial to focus liability on Garlock. It disputed Mr. Torres' Owens Corning exposure, minimized his overall insulation exposure, claimed Garlock gaskets were the only asbestos product he handled, and argued that Garlock should be the only product manufacturer held liable, with 65-70 percent of the fault. As the Court correctly found, these representations would subsequently all be contradicted by his Trust claims.

### B.    The *Torres* Trust claims do contain significant evidence that was concealed

The Committee also disputes the evidentiary significance of Mr. Torres' Trust claims, the same position it took during the estimation trial.[79] First, the Committee argues that Mr. Torres's certifications in Trust claims that he "handled raw asbestos fibers on a regular basis" and "fabricated asbestos-containing products such that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers" did not mean what they say. These certifications directly contradict Mr. Chandler's statement at trial that the only asbestos-containing products Mr. Torres handled were Garlock gaskets.[80] The Committee tries to claim that Mr. Chandler, in his deposition in this case, resolved the contradiction when he said that the "raw asbestos fibers" referenced in the Trust claims were "raw asbestos fibers from the Garlock gaskets" and other finished products.[81]

Mr. Chandler's after-the-fact twisting of the term "raw asbestos" to refer to asbestos released from a finished product is facially implausible. Moreover, it contradicts Mr. Chandler's

---

[78] GST-4860 at 89:13-16.
[79] *See* Committee Appendix II at 53-54.
[80] Torres Babcock & Wilcox Trust Claim at WK 0006 (GST-4927); Torres DII (Halliburton) Trust Claim at WK 0047 (GST-4928); Torres Owens Corning Trust Claim at WK 0092 (GST-4929).
[81] Committee Reply at 27-28 (quoting Mr. Chandler's deposition testimony).

own words in his closing argument at the *Torres* trial, distinguishing contact with raw asbestos from contact with finished asbestos products:

> Now, I will agree with Mr. Terry [Union Carbide's counsel] on one thing, because I think Union Carbide agrees that it's the supplier of the product that needs to be the expert. And Union Carbide—**raw asbestos didn't get to Mr. Torres. It was the Garlock product that got to Mr. Torres . . .**

GST-4860 at 60:20-24 (closing argument of Mr. Chandler) (emphasis added). There is no reason to doubt the Court's finding that attorneys in *Torres* concealed evidence of Mr. Torres's exposure to raw asbestos.

The Committee also repeats the argument it made during the estimation trial that the Owens Corning and Babcock claims are mere "site list claims" that do not contain anything of evidentiary value. This is belied by the Trust claim forms themselves, which do contain allegations that Mr. Torres was exposed to asbestos products for which the Trusts are responsible.[82]

The Committee also relies on Judge Davidson's ruling that a Trust claim form by itself may not be enough to satisfy Texas's stringent dose requirement for putting a company on the verdict form.[83] But this argument ignores what Judge Davidson had to say in making his ruling. In the very document the Committee cites, Judge Davidson expressly found that Trust claim forms *are* evidence of a plaintiff's exposure to products for which the Trust is responsible, holding that "[m]ost of the bankruptcy trust forms . . . contain statements alleging exposure to the product of the bankrupt party," that he has "consistently received into evidence [bankruptcy trust forms] (when offered by the Defendants over the objection of the Plaintiffs) as a statement of a party opponent as proof of exposure to the product of an alleged [responsible third party],"

---

[82] *See* Torres Babcock & Wilcox Trust Claim at WK 0005-6 (GST-4927) (noting "Date Exposure Began" as "03/1975" and "Date Exposure Ended" as "08/1977" and "Occupation at time of exposure" as "Pipefitter"); Torres Owens Corning Trust Claim at WK 0090-92 (GST-4929) (same).
[83] Committee Reply at 30.

and that he "will continue to find a written statement by a Plaintiff to a bankruptcy trust as evidence of exposure."[84]

Judge Davidson handled pre-trial matters in the *Torres* case and would have treated the Trust claim forms as evidence of exposure, demonstrating the materiality of the evidence contained therein. It is irrelevant that the forms possibly would not have been enough by themselves to put Owens Corning on the jury form. Garlock *succeeded* in getting Owens Corning on the verdict form using co-worker testimony. The harm came when Mr. Chandler was allowed to dispute that Mr. Torres was exposed to Owens Corning products, which would not have been possible if the exposure evidence in the Owens Corning form had been disclosed. And if Garlock had received the evidence of exposure in the Babcock form, it would have had the opportunity to satisfy the dose requirement using other means, such as co-worker testimony. As it stood, Garlock could not get to first base, as it did not have proof of Mr. Torres' exposure to asbestos from Babcock products.

The Committee also attributes significance to the fact that the Owens Corning and Babcock claim forms do not mention Kaylo or boilers.[85] This too is beside the point. Garlock had evidence that Kaylo and boilers were on the vast Union Carbide site, but lacked a link between those products and Mr. Torres. The Trust claim forms provide that link.

The Committee also maintains that the concealed evidence of Owens Corning and other exposures would have made no difference at trial because the evidence showed that Mr. Torres had crocidolite fibers in his lungs that only could have come from Garlock's gaskets, which inevitably would have resulted in liability for Garlock.[86] But in fact, at the *Torres* trial, Garlock disputed both whether he had crocidolite fibers in his lungs, and whether any crocidolite came

---

[84] Ex. 9 to Committee Reply at 6.
[85] Committee Reply at 26.
[86] *Id.* at 21.

from Garlock crocidolite gaskets, which Garlock showed were never specified for the activities

Mr. Torres engaged in.[87] If Mr. Chandler and Mr. Kherkher had been unable to deny that Mr.

Torres was exposed to Kaylo, the jury would have been more likely to believe that Kaylo was the

cause, and also more likely to accept Garlock's independent evidence that Mr. Torres was never

even exposed to asbestos from its crocidolite gaskets.

Finally, the Committee disputes the significance of the AMF proof of claim and DII Trust

claim form. The Court did not discuss these claims in its findings about *Torres*, but the

Committee claims they inflated by two the Court's tally of withheld exposure evidence, found in

the subsequent paragraph of the opinion. The Committee asserts the DII Trust claim was based

on the fact that Brown & Root was Mr. Torres' employer, not on a separate product exposure,

and claims Debtors were "well aware" of this.[88] But Mr. Chandler, for one, did not support the

Committee's view. He testified that the claim "could also be related to products that were at the

Brownsville plant."[89] In addition, the claim form itself states that Mr. Torres did *not* "experience

the asbestos exposure identified in this Part 3 during a period of time when the Injured Party was

an employee" of the Trust's predecessor, indicating the claim was not based on Mr. Torres's

Brown & Root employment.[90] The Committee again misstates the facts.

The Committee claims the AMF form should not count because it was an insulation

contractor rather than a product manufacturer. But Williams Kherkher would have had to know

about a brand of insulation for which AMF was responsible for installing in order to file the

proof of claim, and no such insulation was disclosed in the tort case. The AMF form thus

represented another exposure suppressed by Williams Kherkher.

---

[87] GST-4860 at 112:20-113:14, 117:3-118:11, 118:19-119:18, 126:2-17, 126:25-127:10 (closing argument of Mr. Schachter).
[88] Committee Reply at 36-37.
[89] Chandler Depo. Tr. at 88:4-5 (excerpts at **Ex. G**).
[90] Torres DII (Halliburton) Trust Claim at WK 0047 (GST-4928).

For all these reasons, the Boelter summary contains only information that the Committee already had, and does not call into question any of the Court's findings about *Torres*. To the extent the Committee is now relying on Rule 60(b)(3), it has failed to prove by clear and convincing evidence that Debtors withheld evidence, or that it was denied a full and fair opportunity to present its claims regarding *Torres. See McLawhorn*, 924 F.2d at 538.

**IV.   The Committee's allegations about *Ornstein* and *White* are belied by record evidence**

The Committee also once again rehashes arguments about the *Ornstein* case that it admits it made during the estimation proceeding, and which this Court rejected.[91] Such re-argument more than a year after trial in the context of a motion apparently relying on Rule 60(b)(3) is improper, *see Fleming*, 865 F.2d at 484, and the arguments are equally unpersuasive this time around.

The Committee, for instance, tries again to defend Mr. Ornstein's denials that he was ever around shipboard boilers, despite Trust claims based on sworn exposure to shipboard boilers. The Committee speculates that Mr. Ornstein could have been exposed to asbestos from boilers without actually having gone into the boiler room.[92] The Committee alleges that would not be inconsistent with his testimony (summarized in Debtors' Opposition) that he never saw a boiler, was never even in a boiler room, and was never exposed to asbestos there.[93]

Once again, the Committee ignores what the documents actually say. Mr. Ornstein submitted a declaration to the Combustion Engineering Trust under penalty of perjury, on personal knowledge, swearing he was exposed to asbestos from Combustion Engineering boilers

---

[91] *See* Committee Reply at 39 n.89 (admitting that the Committee made these arguments already).
[92] Committee Reply at 39.
[93] *See* Debtors' Opposition at 53-54.

on ship, directly belying the Committee's contention.[94] His declaration submitted to the AC&S Trust likewise contained a declaration under penalty of perjury, on personal knowledge, that he "would help and work near other trades **including boiler tenders**, machinist mates, insulators and pipefitters while they were repairing and maintaining equipment **including but not limited to boilers**, pumps and valves."[95] The Committee fails to explain how Mr. Ornstein could have worked around boiler tenders repairing and maintaining boilers without being in the boiler room.

In straining to explain these blatant inconsistencies, the Committee now even attempts to characterize the *Ornstein* Trust claims as "site list claims" that, in the Committee's view, do not actually allege exposure. But Mr. Ornstein's claims included declarations signed by Mr. Ornstein himself based on his personal knowledge and under penalty of perjury, attesting to exposures to particular brands of asbestos products and describing how he was exposed.[96] The Committee will apparently call any Trust claim a "site list claim," no matter what it actually says.

The Committee also attempts to explain the *Ornstein* case by arguing, for the first time, that the standard Los Angeles County interrogatories did not require Mr. Ornstein to disclose his exposures to products manufactured by bankrupts, but instead only asked plaintiffs to disclose exposures to raw asbestos manufactured by non-defendants.[97] The Committee fails to explain why the court would have adopted an interrogatory so limited. And in fact, it did not. The *Ornstein*-era interrogatory does not restrict itself to raw asbestos, but instead asked "If you have ever worked with **asbestos** manufactured, produced, prepared, distributed or sold by any other entity not named as a defendant in this lawsuit, identify each such entity."[98] The defined term "asbestos" in those interrogatories "includes the naturally occurring mineral, in any form,

---

[94] GST-1199 (Declaration of Howard Ornstein).
[95] GST-3873 (Declaration of Howard Ornstein) (emphasis added).
[96] Committee Reply at 41 n.95.
[97] *Id.* at 39-40.
[98] GST-3741 at 13.

whether you understand it to be dust, fibers, or particles, **or any product or substance manufactured from or containing asbestos or asbestos fibers**."[99] The Committee also overlooks the very next interrogatory, number 28, which is a catch-all requiring plaintiffs to describe any exposures to asbestos or asbestos-containing products not identified in response to interrogatories 26 or 27.[100] If interrogatory 27 did not require plaintiffs' disclosure of exposure to bankrupt companies' products, interrogatory 28 did.

Mr. Glaspy testified about these interrogatories at the estimation trial, noting that together interrogatories 26, 27, and 28 required disclosure of all exposures and were intended to prevent "semantic games" that lawyers might otherwise play.[101] His testimony was not contradicted or challenged on cross-examination. To the contrary, the Committee's own plaintiff lawyer witness, Mr. McClain, agreed with Mr. Glaspy that throughout California plaintiffs have to identify *all* exposures:

> Q. Let's talk about the discovery responses. You said, I think, in your testimony, that in California you have to list every single exposure in the interrogatory responses; is that right?
> A. That's true in Alameda County, that's correct. **I believe that's true in almost every other county that I'm aware of.**[102]

Plaintiff lawyer Mr. Simon in his deposition declined to adopt the view the Committee now espouses to defend his firm. Mr. Simon testified that Mr. Ornstein's answer to interrogatory 27 ("upon information and belief, no") meant that "the existing understanding was of the plaintiff, that he or she, he in this case, had identified the **asbestos products** that he believed he had

---

[99] Sample Interrogatories to Plaintiff at 2 ¶ G (attached as **Ex. H**) (emphasis added).
[100] *See id.* at 8.
[101] Tr. 4537:10-4538:24 (Glaspy).
[102] Tr. 3502:16-21 (McClain) (emphasis added).

worked with."[103] He did not offer a view that a plaintiff's disclosure obligation in that context was limited to "raw asbestos."

Finally, the Committee argues that Mr. Simon in his deposition testimony in this case did not concede that Trust claims filed on behalf of Mr. White and Mr. Ornstein were based on undisclosed exposures.[104] This too is false.  Mr. Simon explicitly admitted that numerous White exposures were not disclosed. *See, e.g.*, 1/4/13 Simon Dep. at 94:12-21 ("there was no disclosure" of statements in Lorton affidavit attached to Trust claim); 104:3-106:6 (Simon Greenstone did not disclose that Mr. White worked on USS Mountrail); 110:11-111:5 (White exposures to Armstrong products not disclosed in tort case); 116:14-17 (Kelly Moore exposure not disclosed in tort case); 117:13-118:9 (other joint compound exposure not disclosed in tort case); 130:14-131:21 (Gold Bond exposure not disclosed in tort case) (Ex. C). With respect to *Ornstein*, Mr. Simon struggled to identify where the plaintiff disclosed the exposures later evidenced by sworn statements and Trust claims. The best he could say was that defendant expert reports opined about what the plaintiff must have been exposed to. Mr. Simon overlooked that a defendant's expert report could not reflect any disclosure by a plaintiff. He also ignored that his firm vigorously contested that plaintiffs were exposed to products identified by defendants' experts.[105]

The Committee still has offered nothing to affect the Court's findings about these cases.

## V.    The Committee continues to lack any evidence supporting its interpretation of Trust claims

With respect to Trust claims, the Committee's Reply re-argues the points in its initial brief, which in turn repeated the arguments the Committee made during the estimation trial about

---

[103] 1/4/13 Simon Dep. 140:16-143:16 (emphasis added) (Ex. C).
[104] Committee Reply at 40.
[105] *See, e.g.*, 1/4/13 Simon Dep. 154:18-155:22 (Ex. C).

why Trust claims were "disconnected from exposure evidence." Estimation Opinion at 84.

Again, such reargument in the guise of a motion to reopen is improper. *See Fleming*, 865 F.2d at

484.

The Committee still ignores the evidence of record as well as what Trust claims actually

say. The Committee characterizes Trust claims as no more significant than a complaint.[106] But

unlike a complaint, Trust claim forms are typically signed under penalty of perjury.[107]

The Committee also fails to grapple with the following basic facts about Trust claims:

- Every significant Trust requires the claimant to submit "meaningful and credible"
  evidence of exposure to the debtor's products. Estimation Opinion at 86.

- Many courts considering the issue have begun to require plaintiffs to disclose Trust claim
  forms, recognizing they are relevant to the basic question of exposure.[108]

- Plaintiff firms admittedly delay Trust claims in order to conceal them from defendants
  and prevent courts and juries from drawing conclusions about exposure based on the
  Trust claim forms. Estimation Opinion at 84.

- Plaintiff firms in litigation against Garlock routinely failed to disclose exposure evidence
  that would eventually be found in Trust claim forms and attachments. Estimation Opinion
  at 84-86.

- Garlock enjoyed great success at trial in cases where it had Trust claim evidence.
  Estimation Opinion at 86.

- Every court that has discovered a plaintiff firm concealing Trust claims has treated it as a
  serious discovery violation.[109]

---

[106] Committee Reply at 43.
[107] *See, e.g.*, GST-2781 at Waters 02988 (Flynn Celotex claim); GST-2782 at Waters 03006-7 (Flynn Eagle Picher claim); GST-2786 at Waters 03086 (Flynn Kaiser claim).
[108] *See, e.g.*, GST-6508 at 5-6 (DE standing order); GST-6509 at 1-2 (Wayne County standing order); GST-6511 (West Virginia); GST-6512 (Philadelphia); GST-6516 at 48 (New York City); GST-6518 at 52-53 (Massachusetts).

Against this evidence showing that Trust claims contain significant exposure evidence, the Committee fails to cite a *single source* supporting its view that a plaintiff can recover from a Trust without even acknowledging exposure to the debtors' products, simply because he worked at a large industrial site on a site list. No courts have so found, because Trusts are not in the business of paying people who were not exposed to the debtor's products. *See* Tr. 2385:16-18 (Turlik) ("I don't think the trusts are in the business to pay people who weren't exposed to their products."). Rather, Trusts pay claimants who certify exposure to the debtor's products. Trusts sometimes use site lists as shortcuts to corroborate the claims of persons who so verify, but site lists do not excuse plaintiffs from certifying exposure.

The Committee pretends that all Trust claims contain nothing more than the names of sites where the claimant was exposed. In fact, as the Trust claims obtained for the Designated Plaintiffs show, Trust claims contain much more information than that. Trust claims are often supported with affidavits attesting to personal knowledge of exposures to particular products.[110]

Even so-called "site list claims" contain extensive information a claimant certifies concerning when and how the claimant was exposed to the debtor's products at a site. Many times the certifications specify the type and brand of asbestos-containing products to which the claimant was exposed. The Committee points to Mr. Flynn's Celotex, Eagle Picher, UNR, Kaiser, and Porter Hayden claims as examples of claims containing nothing more than the name of a site,[111] but they in fact contained much more:

- In the Celotex claim form, when asked the "Name of Celotex or Carey Canada product(s) or operations to which injured party was exposed," Waters & Kraus stated under penalty

---

[109] *See* Tr. 1176:6-1192:22 (Brickman) (and summarizing comments of Judge Peggy Ableman that "This is trying to defraud. It happens a lot in this litigation.").
[110] *See* Estimation Opinion at 84-86.
[111] Committee Reply at 45-47.

of perjury that Mr. Flynn was exposed to "insulating cement, fireproofing, pipe covering" and stated that such exposure began in 1952 and ended in 1965.[112]

- In the Eagle Picher claim form, when asked the "Name of Eagle-Picher product(s) to which injured party was exposed," Waters & Kraus stated under penalty of perjury that Mr. Flynn was exposed to "insulating cement and fireproofing," stated that "Eagle Picher's product was used to insulate and patch high-temperature steam lines and related equipment described above," and stated Mr. Flynn was exposed to the product when "[m]aintaining, operating, and repairing boilers, associated steam lines, pumps, valves and other equipment in the boiler rooms."[113]

- In the UNR form, when asked to name "Specific UNR Products Exposed to," Waters & Kraus stated under penalty of presenting a false claim under 18 U.S.C. § 152 that Mr. Flynn was exposed to "pipecovering" and "insulating cement."[114]

- In the Kaiser form, when asked the "Name of all KACC Asbestos PI Trust products to which injured party was exposed," Waters & Kraus stated under penalty of perjury "Kaiser Aluminum & Chemical products including but not limited to Kaiser Vee Block Mix and Kaiser Plastic Chrome Ore," stated that Mr. Flynn "would remove and replace asbestos containing insulation products including the Kaiser products mentioned above," stated such exposure occurred from 1941 to 1943, and had similar statements with respect to two other sites.[115]

---

[112] GST-2781 at Waters 02988 (Flynn Celotex claim).
[113] GST-2782 at Waters 03006-7 (Flynn Eagle Picher claim).
[114] GST-2791 at Waters 03206 (Flynn UNR claim).
[115] GST-2786 at Waters 03086 (Flynn Kaiser claim).

- In the Porter Hayden form, when asked to "Describe any exposure to Porter Hayden Asbestos at this Site," Waters & Kraus stated "Johns-Manville" and stated Mr. Flynn was exposed from 1952 to 1965.[116]

Not even the Committee's cherry-picked forms support its theory of Trust claims.[117]

Finally, the Committee attacks Bates White's analysis of the 205 RFA cases. The Committee had Bates White's data months before trial; had the opportunity to depose Dr. Bates and Dr. Gallardo-Garcia; had the opportunity to cross-examine Dr. Bates and Dr. Gallardo-Garcia twice each at trial, and had the opportunity to cross-examine Mr. Magee, who presented the results of the analysis. The Committee did not object to introduction of the analysis, conducted no cross-examination on the points it now raises, and presented no witness who testified to any contrary analysis. It should not be heard to raise these arguments now, more than a year after the trial. Arguments that could have been raised at trial provide no basis for reopening under Fourth Circuit precedent. *See Boryan*, 884 F.2d at 771; *McLawhorn*, 924 F.2d at 538.

Nor do the Committee's criticisms have any merit. The Committee repeats its tired—and rejected—arguments that Trust claims and ballots are not evidence of a plaintiff's exposure. But it identifies only a single instance where it claims Bates White's count was incorrect. It claims AC&S should not have been counted as an omitted exposure in the *Keever* case because AC&S was a contractor that installed Armstrong products, and the claim may have been based on

---

[116] GST-2789 at Waters 03170 (Porter Hayden claim).

[117] Furthermore, the statement from Mr. Scarcella that the Committee claims is a bombshell is not new evidence. It elicited the same from Dr. Gallardo-Garcia at the estimation trial:

Q. These approved site lists are lists of sites that if you worked at them, a trust will presume that you had exposure to the product the trust is responsible for, right?

A. That's my understanding.

Tr. 2697:5-13 (and noting Mr. Scarcella does work using site lists). Then Dr. Bates, as he did in his deposition, testified that a Trust claim also entails a verification of exposure by the plaintiff. *See* Tr. 2796:10-17 (Bates).

that.[118] The Committee's argument is speculation, because Mr. Keever's Trust claims were not

available to Debtors and not offered by the Committee. The Committee has no basis, one way or

another, to assert that an Armstrong exposure was the reason why Mr. Keever filed his AC&S

claim. Even if the Committee's speculation were correct, this is a single instance that does not

undermine the analysis of 205 cases of which *Keever* was a part.

The Committee also claims the records upon which the analysis was based were not

complete.[119]  But Dr. Gallardo-Garcia testified at length about how these claim files were

collected and analyzed, and the Committee offered no criticism at trial or even any cross-

examination on that topic.[120]  The Committee cannot at this late date argue that Bates White's

analysis relied on incomplete data.

In short, the Committee does not come close to challenging the basic conclusion that

suppression of exposure evidence was a significant feature of mesothelioma litigation against

Garlock, rendering any estimation based on Garlock's settlements unreliable. The Committee's

Trust claim arguments also provide no basis to re-open the estimation.

## VI.    Debtors did not fail to produce emails the Committee has obtained from its trial counsel Waters & Kraus, nor do such emails affect this Court's findings in any respect

Finally, the Committee's Reply includes the new allegation that Debtors failed to produce

settlement correspondence between Garlock's outside counsel and Waters & Kraus. The

Committee obtained these documents from Waters & Kraus, a Committee member and its trial

counsel at the estimation trial. [121]

---

[118] Committee Reply at 49-50.
[119] *Id.* at 50.
[120] Tr. 2655:21-2658:11 (Gallardo-Garcia); *see also* Tr. 2797:8-2798:9 (Bates) (describing claim files for high value cases).
[121] Committee Reply at 54.

Debtors deny this allegation absolutely. This correspondence, between Waters & Kraus and its representatives and Garlock's outside counsel David Glaspy, was not retained by Mr. Glaspy, and therefore was not accessible to Debtors for production. The Committee cannot prove by clear and convincing evidence that Debtors withheld any of these documents. *See McLawhorn*, 924 F.2d at 538.

Moreover, the Committee had full access to these emails before and during the estimation trial. Waters & Kraus, in a real sense, *is* the Committee. Waters & Kraus serves on the Committee; the lawyers who negotiated the settlements for Waters & Kraus were on the Committee's witness list (but were not called by the Committee), and Waters & Kraus was estimation trial counsel for the Committee. The Committee could have obtained this correspondence at any time before trial, and could have called Mr. Kraus or Mr. Iola to testify about it. Yet the Committee neither obtained documents from Waters & Kraus nor called Mr. Kraus or Mr. Iola—perhaps because doing so would have exposed them to cross-examination.

The contentions the Committee makes based on the correspondence are also incorrect. The Committee tries (again) to assert that the correspondence somehow shows Garlock did not consider alternative exposure evidence in settling cases. Such a contention contradicts the evidence of record at the estimation trial, including the testimony of Mr. Iola himself about the importance of alternative exposure evidence. He negotiated settlements on behalf of Waters & Kraus opposite Mr. Glaspy and testified that he negotiated cases individually with Garlock, in which exposure evidence—including identifications of bankrupt products—was crucial to those negotiations. Thus, not even the Committee's own witness would support what it now alleges.

**A.      Debtors did not fail to produce any responsive Waters & Kraus settlement-related emails in their possession, custody, or control**

The Committee's allegation that Debtors failed to produce responsive documents simply is not true. In the first place, the Committee admits that much of the correspondence it cites in its Reply was not even response to discovery requests the Committee made because they did not concern so-called RFA-list claims.[122]

In the second place, none of the correspondence the Committee now cites was retained. As Debtors explained in their Opposition, Mr. Glaspy provided to Debtors all correspondence with plaintiffs' firms that he had retained.[123] Debtors' counsel then reviewed the emails for responsiveness. A small number of Simon Greenstone emails were not produced because of a reviewer's mistake, as described in Debtors' Opposition.[124] But the documents the Committee now cites were not retained and therefore could not be produced.

The Committee tries, but fails, to impugn Mr. Glaspy. He provided all his correspondence to Debtors for review and production, and (as recounted in Debtors' Opposition) when asked about the availability of additional documents by Committee counsel at his deposition, offered to investigate his computer backup files and take other measures to try to identify more documents for the Committee to consider.[125] The Committee never took him up on that offer, and should not now be heard to question his good faith.

**B.      The Committee had every possible opportunity to investigate and present evidence on the settlement relationship between Garlock and Waters & Kraus**

In addition, the emails provide no basis to reopen the estimation proceeding because the Committee has failed to demonstrate that it could not have obtained them through reasonable

---

[122] *See id.* (acknowledging that some of the correspondence "may not have been encompassed by that discovery").
[123] *See* Exhibit N to Debtors' Opposition.
[124] *Id.*
[125] *See* Debtors' Opposition at 52-53.

diligence. *See Boryan*, 884 F.2d at 771. Like Simon Greenstone, Waters & Kraus was at the

Committee's full disposal before and during the estimation trial. Waters & Kraus serves on the

Committee. The Committee obtained settlement correspondence between Garlock and Waters &

Kraus and presented it to the Court years before the estimation trial, and before discovery from

Garlock even commenced.  *See* Docket No. 1143-3 (Feb. 10, 2011) (settlement correspondence

from Waters & Kraus to Segal McCambridge). The Committee placed Mr. Peter Kraus, head of

Waters & Kraus, and Mr. Mark Iola, who negotiated all of Waters & Kraus's settlements with

Garlock, on its witness list filed before trial.[126] Mr. Iola even appeared on the Committee's final

order of witnesses filed on the first day of trial, but it chose not to call him.[127] Waters & Kraus

served as trial counsel to the Committee before and during the estimation trial. The Committee

could have obtained the correspondence it cites at any time before trial.

For Debtors' part, they provided the Committee extensive discovery with respect to the

Waters & Kraus relationship. Debtors produced 45 pages of correspondence between Mr. Glaspy

and Waters & Kraus.[128] The Committee deposed Mr. Glaspy, Mr. Magee, and Mr. Grant at

length about the relationship with Waters & Kraus (Mr. Glaspy and Mr. Magee multiple

times).[129] Then, over Debtors' objection, the Committee obtained Debtors' privileged MEAs

pertaining to the Waters & Kraus cases appearing on the RFA lists.[130] The Committee cross-

examined Mr. Magee and Mr. Glaspy about the Waters & Kraus relationship at trial. The

Committee cited the Waters & Kraus relationship in its post-trial filings.[131] The Committee also

---

[126] *See* Ex. X to Debtors' Opposition.
[127] *See* Docket No. 3058.
[128] GST-EST-0337670-GST-EST-0337708; GST-EST-0337908-GST-EST-0337909; GST-EST-0512168-GST-EST-0512169; GST-EST-0513127; GST-EST-0513128.
[129] *See* 1/22/13 Glaspy Dep. at 96-132 (Ex. B); 6/25/13 Glaspy Dep. at 257-59 (Ex. B); 6/28/13 Magee Dep. at 192-205 (excerpts attached as **Ex. I**); 4/11/13 Magee Dep. at 316-334, 382 (Ex. I); 12/12/12 Grant Dep. at 137-39 (excerpts attached as **Ex. J**); 1/21/13 Hennessy Dep. at 217-18 (excerpts attached as **Ex. K**).
[130] GST-EST-0556272; GST-EST-0556273; GST-EST-0556274; GST-EST-0556276; GST-EST-0556357-59.
[131] Committee Appendix II at 15.

participated in the deposition of Mr. Iola, during which Debtors examined Mr. Iola at length

regarding the Waters & Kraus relationship (see below).

In short, the Committee had every opportunity to present any details about Garlock's

relationship with Waters & Kraus. The Court should not at this late date entertain new arguments

that the Committee could easily have presented at the estimation trial. *See Boryan*, 884 F.2d at

771.

C. <u>**The Committee is wrong that alternative exposure evidence did not matter to
Garlock**</u>

In any event, the conclusions the Committee draws from the correspondence it has

obtained from Waters & Kraus are incorrect. The Committee alleges that, after the *Treggett* case

was settled in 2006, Garlock and Waters & Kraus entered into a capped deal under which cases

were not worked up and exposure evidence did not matter to settlements. *See* Committee Reply

at 65 ("Third-party exposures were irrelevant to the negotiation and resolution of claims within

the contractual framework."). The Committee claims the communications "show Garlock paid

no attention to that subject in resolving cases with Waters & Kraus after June 2005." *Id.* The

Committee therefore argues that the 22 Waters & Kraus cases that appeared on the RFA list and

were settled for more than $250,000, but were settled after the deal was in place, should not have

been counted among the cases where Mr. Magee testified exposure evidence was suppressed.

The Committee notably does not contest the fact that exposure evidence was suppressed in those

cases.

The Committee's account of the Waters & Kraus relationship is both implausible and

false. As the Court found, alternative exposure evidence was highly important to Garlock

because it was vital to Garlock's defense.[132] Not surprisingly, under the Waters & Kraus deal

that emerged as a result of *Treggett*, exposure evidence was important. The "deal" that the

Committee portrays as a global settlement, obviating inquiry into the facts of cases, was in fact

merely a framework for negotiation. Waters & Kraus agreed to a cap on aggregate annual

settlements for trial-listed cases. But cases would be "individually negotiated" and "[t]he parties

shall use whatever factors they have historically used to determine a negotiated value,"

recognizing that "the factors used by W&K and those used by Garlock to value cases may

differ."[133] Plaintiffs had the right to opt out of the deal.[134] And if the cap was exceeded, the cases

would still be paid, just in a subsequent year.[135]

Thus, the deal was, according to Mr. Iola's testimony, nothing more than a "cash flow

agreement" that gave more certainty to Garlock.[136] It did not obviate individual negotiation of

cases based on their facts. Mr. Iola was adamant that, as the deal stated, all his settlements with

Garlock were still individually negotiated. When asked whether he negotiates individual or

group settlements, he insisted that "I always negotiate individual settlements."[137] *See also id.*

("Q. Is that to say that you are not involved in negotiating group settlements? A. That's

correct."). Specifically, when asked "So when you were negotiating with Mr. Glaspy from late

2005 forward, were you talking about specific individual cases?" Mr. Iola testified "Always."[138]

*See also id.* ("Q. And did you discuss the circumstances of individual cases? A. We did.").

Mr. Iola reiterated this a third time:

> Q. Did the deal require you to negotiate, continue to negotiate cases on a case by
> case basis?

---

[132] Estimation Opinion at 83.
[133] ACC-587 at 2-4 (attached as **Ex. L**).
[134] *Id.*
[135] *Id.*
[136] Iola Dep. at 106-7 (excerpts attached as **Ex. M**).
[137] *Id.* at 33.
[138] *Id.*

A. Absolutely it did, spelled that out specifically, and we continued to do that. I continued to provide the same information I provided to him previously. I continued to make individual demands to him in the same manner. We sat down and discussed the cases with essentially the same rigor and vigorousness that we did previously, and everything remained the same with the exception that I had to moderate the amount of money I could receive to fit within the cash flow agreement that we had signed.[139]

Mr. Iola emphasized that these settlements were individually negotiated based on trial risk: "I'm working off of trying to price the case based on what risk I can place upon defendants off the trial docket. That's our practice. Q. So you are focused on risk—A. Yes. Q. Off of the trial docket? A. Yes."[140]

Consistent with the testimony of Mr. Magee, Mr. Glaspy, and Mr. Turlik upon which the Court relied, Mr. Iola testified that the whole picture of exposure evidence was of crucial importance in those negotiations to both plaintiffs and defendants. In settling cases, he testified that he considered "the same factors in the marketplace that the defendants do," which included "[h]ow does the exposure of this particular defendant—in this case you asked me about Garlock—fit into the total exposure in the case."[141] When asked "So the existence of product ID for bankrupt companies is a factor in the outcome of a case?" he answered "No question."[142]

The testimony of Mr. Magee and Mr. Glaspy was consistent with Mr. Iola's. Mr. Magee testified in deposition that under the Waters & Kraus deal, settlements still involved "figuring out the risk to Garlock in general and then figuring out what the factors that would contribute to the value of a case to a jury if there was a loss. All those factors would have had to have been, you know, examined on a case-by-case basis . . . . [I]t's a pretty complicated exercise."[143] That

---

[139] *Id.* at 112-13.
[140] *Id.* at 117.
[141] *Id.* at 32.
[142] *Id.* at 45.
[143] 6/28/13 Magee Dep. at 164 (Ex. I).

trial risk depended on "[w]hat exposures would the claimant or others at the site acknowledge that the claimant was exposed to . . . That's what these cases were about."[144]

The ability of parties to opt out cases was another reason why cases had to be individually negotiated. *See id.* at 194 ("[I]t was more like a letter of intent. . . . Both sides had the ability to pull cases out."); 4/11/13 Magee Dep. at 317 ("[I]f it had resolved all the cases and both sides were bound to that resolution without any ability to—to withdraw cases, then there wouldn't have been reasons for them to continue to sit down, but it was not that kind of an agreement.") (Ex. I); Tr. 3280:13-15 (Magee) (cases under Waters & Kraus deal would be individually negotiated within a capped obligation). For this reason, Mr. Glaspy testified that he individually priced the Taylor case (one of the RFA 1.A cases).[145]

Contrary to the Committee's Reply, the facts of the cases were important to Garlock in the cases it settled, especially alternative exposure evidence. Garlock was a participant in pre-trial discovery in all 22 RFA cases the Committee alleges should not be included because Garlock supposedly was not concerned with the facts of those cases. In each one, Garlock retained plaintiff's answers to interrogatories, where plaintiffs were supposed to identify all known exposures to asbestos. In at least eleven of the cases, a Garlock lawyer appeared at the plaintiff's deposition, which often lasted several days.[146] In one case, Garlock appeared at a co-

---

[144] *Id.* at 167.

[145] 6/25/13 Glaspy Dep. at 188-97 (Ex. B).

[146] Garlock did not necessarily purchase or obtain summaries of all depositions where its counsel attended, so this likely understates the degree of Garlock's participation. The cases where Debtors have a deposition or summary are *Bradley* (GST-EST-0329609 at 159, 238-40); *Brassfield* (GST-EST-0328610 at 6); *Brewer* (GST-EST-0498415); *Cardaro* (GST-EST-0175954 at 6); *Jamrom* (GST-EST-0177232, GST-EST-0177234); *Lervold* (GST-EST-0327392, GST-EST-0327393); *O'Neill* (GST-EST-0165414 at 6); *Taylor* (GST-EST-0179861 at 10); *Thomas* (GST-EST-0385716); *Williams* (GST-EST-0131768, GST-EST-0131769); and *Gilcrease* (GST-EST-0260225, GST-EST-026022) (excerpts attached as **Ex. N**).

worker deposition.[147] In another (*Gilcrease*), Garlock litigated the case to verdict before reaching

a settlement. It was not settled until after a new trial was ordered on appeal.[148]

Garlock's questioning of plaintiff Weldon Bradley in one of the cases illustrates the

importance to Garlock of alternative exposure evidence in these cases:

> Q. The last attorney asked you a few questions about brands of insulation, and I
> just want to throw out a few more.  Do you remember seeing any Armstrong pipe
> insulation at the Devil's River plant?
> A. No.
> Q. Do you remember seeing Armstrong block insulation?
> A. No.
> . . .
> Q. Okay. Do you remember seeing any Unibestos pipe insulation at any of the
> plants?
> A. No.
> Q. How about Quigley?
> A. No.
> Q. Okay.  Now I'm going to move on to the cement. Did you see any Harbison
> Walker asbestos cement at any facilities?
> A. No.
> Q. That name doesn't ring a bell?
> A. No.
> Q. Okay. How about Quigley cement?
> A. No.
> Q. The last one I have is Celotex?
> A. No.
> Q. That doesn't ring a bell?
> A. No.[149]

Despite these answers, and despite never identifying these companies' products in answers to

interrogatories, Mr. Bradley filed Trust claims against the Armstrong and Harbison Walker

Trusts and voted in the Pittsburgh Corning bankruptcy case.[150] The discovery record of his case

demonstrates numerous other omissions, as well.

---

[147] *Jamrom* (GST-EST-0177127, GST-EST-0177127) (Ex. N).
[148] 12/12/12 Grant Dep. at 42:3-43:23 (Ex. J).
[149] GST-EST-0329067 at 238-40 (Ex. N).
[150] GST-8002 (Trust claim data); Pittsburgh Corning ballot (excerpt attached as Ex. O).

In reality, the Waters & Kraus deal was motivated in large part by a significant adverse

verdict where evidence was suppressed (*Treggett*), and it was sustained by a constant flow of

similar cases that put trial risk on Garlock and maintained the inflated values Waters & Kraus

desired. It was important for Waters & Kraus to continue presenting those cases, not merely

because cases were still individually negotiated under the three-year deal, but also because that

deal was periodically renewed and Waters & Kraus had to prove it could still impose artificial

trial risk on Garlock.

The contrary conclusions the Committee tries to draw from the correspondence it

obtained from Waters & Kraus are unpersuasive. It points out that emails demonstrate a desire on

Garlock's part to abate discovery and save defense costs.[151] Of course they did. That is consistent

with the testimony Debtors offered at trial.

The Court found that defense costs were one of the largest factors motivating Garlock's

settlements. Estimation Opinion at 87. Mr. Magee and Mr. Glaspy both testified that a major

purpose of the Waters & Kraus deal was to permit earlier settlement of cases and thus save trial

preparation costs. Mr. Magee testified in deposition that a principal benefit of the Waters &

Kraus deal was "the large savings of trial preparation costs, which were—which were very, very

expensive and they were especially expensive in a Waters & Kraus case because it was very

expensive to work up and try a case against them."[152] *See also* Tr. 3227:11-15 (Magee) ("Q. One

of Garlock's prime objectives in settling is to cut off the expenses of proceeding with further

discovery in trial. A. Absolutely. That's its primary desire in settling is to cut off those further

expenses as early as it can."). Mr. Glaspy also testified that the purpose of the deal was to save

---

[151] Committee Reply at 58-63.
[152] 4/11/13 Magee Dep. at 318 (Ex. I).

litigation costs by permitting earlier settlements of cases.[153] Mr. Magee and Mr. Glaspy's attention to saving costs for Garlock is not news—it was part of Debtors' case in chief at the estimation trial. Nor does it diminish the importance of evidence suppression in these cases. Debtors' witnesses testified that plaintiffs' concealment of evidence increased the defense costs Debtors were trying to avoid and artificially inflated Garlock's trial risk.

The Committee also argues the emails show that alternative exposures did not matter to Garlock, because the emails did not discuss alternative exposures.[154] But there was no reason for them to do so. Most of the emails are about the terms of the framework for negotiation—the so-called global deal—not settlement of actual cases. The deal itself stipulated that Garlock and Waters & Kraus would value cases individually according to their historical valuation practices, and negotiations between Mr. Glaspy and Mr. Iola took place face to face.

Nor is it significant that some emails discussed Garlock product ID and not alternative exposures. The only cases eligible for settlement under the Waters & Kraus deal (or any Garlock settlements) were those with Garlock product ID. *See* Ex. L at 3 ("Once it has been established that there is valid Garlock and related entity id . . . settlement negotiations will take place between Mark and David (as soon as practicable) . . ."). Cases did not get to the negotiation stage between Mr. Glaspy and Mr. Iola if they lacked that feature. Mr. Glaspy's statements about Garlock ID in the emails were defining the universe of cases that Mr. Glaspy and Mr. Iola would negotiate in person. *See, e.g.*, ACC Ex. 29 at 20 (Mr. Glaspy: "The comments of 'good case' are mine. That just means there is obvious exposure and it is appropriate for settlement."). Discussion of the detailed facts of cases, including the lack of alternative exposure evidence,

---

[153] 1/22/13 Glaspy Dep. at 114:20-24 ("From my point of view what it did is it stopped us from having to pay lawyers across the country to work up and defend all these Waters & Kraus cases; it was going to save millions.") (Ex. B).
[154] Committee Reply at 63-64.

would have either taken place at the face-to-face meetings between Mr. Glaspy and Mr. Iola, or

not happened at all, given that the unavailability of alternative exposure evidence was a

weakness in Garlock's case that Mr. Glaspy would not have emphasized in a bargaining context.

*See* 1/22/13 Glaspy Dep. at 245:5-7 ("Sir, when I negotiate with another attorney I am going to

downplay his case as best I can.") (Ex. B); 6/25/13 Glaspy Dep. 257:9-17 ("Q. When you settled

those cases, did you say to the law firm, 'Well, we all know that your client was exposed to these

other products'? A.  I'm sure I did. Are you talking about Waters & Kraus now? Q. Yeah. A. I'm

sure I did. Q. And what reaction did you get? A. 'Prove it.'") (Ex. B). One would not expect such

a discussion in emails limited to the global negotiation process and the task of defining the cases

subject to the deal.

The suppression of evidence in Waters & Kraus' cases negotiated within the agreed

framework was significant. There is no basis to question the Court's findings. The Committee

had access to these documents at all times, but it declined to examine them. In any event, they

are immaterial. For both reasons, they provide no basis to reopen the record. *See Boryan*, 884

F.2d at 771; *McLawhorn*, 924 F.2d at 538.

### D.      The Committee's allegations about Simon Greenstone and Belluck & Fox are also incorrect

The Committee also attacks Debtors' response regarding the small number of Simon

Greenstone emails that were inadvertently not produced. The Committee, however, offers no

basis to question Debtors' explanation, which was that there was a mistake during the rolling

production of those materials. The Committee complains that a certain email is "still unproduced

by Garlock" and "Garlock has said nothing about that omission."[155] That was the final email in a

January 2007 email string that Debtors received from Mr. Glaspy and attached to Exhibit N to

---

[155] Committee Reply at 53-54.

their Opposition. It was not attached because it was not available to Debtors, as it was not part of the copy of the email string retained by Mr. Glaspy.[156]

The Committee also makes allegations about Simon Greenstone cases on RFA list 1 that are similar to its allegations about the Waters & Kraus cases.[157] Debtors addressed the importance of alternative exposure evidence in Simon Greenstone cases in their Opposition. In addition, just like the Waters & Kraus cases, the Simon Greenstone cases were individually negotiated, within an informal cap, as Mr. Glaspy testified:

> Q. You negotiated resolutions of individual cases in small groups with this $5 million annual cap as a at least informal understanding with the Simon Eddins firm?
> A. Yes.
> Q. So the same dynamic applied with respect to fitting cases into a cap; that is, you had to negotiate individual resolutions during the year with an eye to that cap; is that correct?
> A. That's how it worked, yes, sir.[158]

Mr. Glaspy testified that he negotiated the cases in the group that included the *Ornstein* case individually and formulated his recommendations "based upon my review of each of the cases, the evidence, the exposures, the lack of offsets, the lack of empty chairs we could point to. All of it. It's all the same factors." 6/25/13 Glaspy Dep. at 199-200 (Ex. B). He discussed with Garrison Mr. Ornstein's non-Garlock exposures, and the concealment of evidence impacted his evaluation of the case. *Id.* at 203-5. *See also* 6/28/13 Magee Dep. at 185 (before entering Simon group settlement, would have analyzed "What were the risk profiles of the cases on the trial list. How were they teeing us up, as we used to call it. What was the case going to look like.") (Ex. I); *id.* at 186-87 (discussed internally absence of alternative exposure evidence in *Ornstein* case and problems that posed for defense).

---

[156] Which makes sense, given the last email in the Committee's copy was sent by Mr. Glaspy, and would not have appeared in his email inbox.
[157] Committee Reply at 66.
[158] 1/22/13 Glaspy Dep. at 134-35 (Ex. B).

As with the Waters & Kraus cases, in the Simon Greenstone cases (and the three Belluck & Fox cases the Committee points to) Garlock was attentive to the facts and participated in discovery to learn those facts. In each of the eight Simon Greenstone cases the Committee claims were improperly included in the list of 205 RFA-list cases, Garlock's files contain answers to interrogatories, in which plaintiffs were supposed to (but failed to) identify all their exposures. In all eight of the cases, Garlock also attended the plaintiff's deposition.[159] In all three Belluck & Fox cases the Committee points to, Garlock's files contain answers to interrogatories, and in at least two of the cases, a Garlock attorney attended the plaintiff's deposition.[160]

The Committee's attempt to relitigate the estimation trial therefore does not succeed. Alternative exposure evidence was of the highest importance to Garlock in litigation and in settlements based on that litigation. The suppression of that evidence, which the Committee does not seriously challenge, inflated Garlock's settlements, as the Court rightly found in its Estimation Opinion, rendering settlements an inaccurate measure of Garlock's liability for mesothelioma claims. The Committee's motion does not show that Debtors suppressed any evidence or that the Committee was denied any opportunity to fully litigate its settlement-based theory, and the motion should be denied.

---

[159] *Lange* (GST-EST-0328233 at 259); *Lindquist* (GST-EST-0499042); *Munn* (GST-EST-0328422 at 2); *Ornstein* (Simon 22226, Simon 22232); *Reed* (GST-EST-0174986, GST-EST-0174987); *Robison* (GST-EST-0499265); *Slaughter* (GST-EST-0328620 at 6); *Smith* (GST-EST-0399786 at 4) (excerpts attached as **Ex. P**).
[160] *Beltrami* (GST-EST-0165373 at 2); *Seitz* (GST-EST-0165481 at 9) (excerpts attached as **Ex. Q**).

This 7th day of November, 2014.

Respectfully submitted,

/s/ Garland S. Cassada
Garland S. Cassada
N.C. Bar No. 12352
Jonathan C. Krisko
N.C. Bar No. 28625
Richard C. Worf, Jr.
N.C. Bar No. 37143

ROBINSON BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone:     (704) 377-2536
Facsimile:     (704) 378-4000

gcassada@rbh.com
jkrisko@rbh.com
rworf@rbh.com

*Special Corporate and Litigation Counsel to the
Debtors Garlock Sealing Technologies LLC,
Garrison Litigation Management Group, Ltd., and
The Anchor Packing Company*