## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC, et al.,<br><br>Debtors.[1] | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered |

### DEBTORS' SECOND AMENDED PLAN OF REORGANIZATION

**THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR ISSUANCE OF INJUNCTIONS UNDER THE BANKRUPTCY CODE APPLICABLE TO GST ASBESTOS CLAIMS AS MORE FULLY DESCRIBED HEREIN.**

RAYBURN COOPER & DURHAM, P.A.

C. Richard Rayburn, Jr. (N.C. Bar No. 6357)
Albert F. Durham (N.C. Bar No. 6600)
John R. Miller, Jr. (N.C. Bar No. 28689)

1200 Carillion, 227 West Trade Street
Charlotte, NC 28202
Telephone: (704) 334-0891

*Counsel to the Debtors Garlock Sealing Technologies, LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company*

ROBINSON, BRADSHAW & HINSON, P.A.

Garland S. Cassada (N.C. Bar No. 12352)
Jonathan C. Krisko (N.C. Bar No. 28625)
Richard C. Worf (N.C. Bar No. 37143)

101 North Tryon Street, Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-2536

*Special Corporate and Litigation Counsel to the Debtors Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company*

- Co-Counsel for the Debtors and Debtors-in-Possession -

Dated: January 14, 2015

---

[1] The debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

# TABLE OF CONTENTS

**Page**

## ARTICLE 1.

### DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS, AND ANCILLARY DOCUMENTS

1.1    DEFINED TERMS ................................................................. 1
1.2    OTHER TERMS/INTERPRETATION ........................................ 18
1.3    THE PLAN DOCUMENTS ...................................................... 19
1.4    ANCILLARY DOCUMENTS ..................................................... 19

## ARTICLE 2.

### CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

2.1    OVERVIEW ........................................................................ 20
2.2    SUMMARY ......................................................................... 22
    2.2.1   Class 1 Priority Claims .............................................. 24
    2.2.2   Class 2 Secured Claims ............................................. 24
    2.2.3   Class 3 Settled GST Asbestos Claims .......................... 25
    2.2.4   Class 4 Current GST Asbestos Claims .......................... 25
    2.2.5   Class 5 Future GST Asbestos Claims ........................... 27
    2.2.6   Class 6 Pre-Petition Judgment GST Asbestos Claims ...... 28
    2.2.7   Class 7 General Unsecured Claims .............................. 30
    2.2.8   Class 8 Anchor Claims .............................................. 31
    2.2.9   Class 9 Intercompany Claims ..................................... 31
    2.2.10  Class 10 GST Equity Interests ................................... 31
    2.2.11  Class 11 Garrison Equity Interests .............................. 32
    2.2.12  Class 12 Anchor Equity Interest ................................. 32

## ARTICLE 3.

### MODIFICATION OR WITHDRAWAL OF PLAN

3.1    MODIFICATION OF PLAN; AMENDMENT OF PLAN DOCUMENTS .................. 32
    3.1.1   Modification of Plan ................................................. 32
    3.1.2   Amendment of Plan Documents .................................. 33
3.2    WITHDRAWAL OF PLAN ...................................................... 33
    3.2.1   Right to Withdraw Plan ............................................ 33
    3.2.2   Effect of Withdrawal ............................................... 33

# TABLE OF CONTENTS
(continued)

**Page**

## ARTICLE 4.

### PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

4.1     UNCLASSIFIED CLAIMS ................................................................... 33
4.2     ALLOWED ADMINISTRATIVE EXPENSE CLAIMS ............................ 33
4.3     ALLOWED PRIORITY TAX CLAIMS .................................................. 34

## ARTICLE 5.

### PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS

5.1     OBJECTIONS TO CLAIMS; PROSECUTION OF DISPUTED CLAIMS ................... 34
        5.1.1  Amendments to Claims ................................................................. 35
5.2     DISTRIBUTION ON ACCOUNT OF DISPUTED CLAIMS ...................... 35
5.3     BAR DATES FOR ADMINISTRATIVE EXPENSE CLAIMS .................... 35
        5.3.1  Administrative Expense Claims ..................................................... 35
        5.3.2  Fee Claims ................................................................................. 36

## ARTICLE 6.

### ACCEPTANCE OR REJECTION OF THIS PLAN

6.1     IMPAIRED CLASSES TO VOTE ......................................................... 36
6.2     PRESUMED ACCEPTANCE OF THIS PLAN ........................................ 37
6.3     PURPOSE OF VOTE BY CLASSES 3, 4, 5, 6, AND 7 .......................... 37
6.4     NONCONSENSUAL CONFIRMATION ................................................ 37
        6.4.1  Cramdown ................................................................................. 37
        6.4.2  General Reservation of Rights ...................................................... 37
6.5     OBJECTIONS TO VOTING ............................................................... 37

## ARTICLE 7.

### IMPLEMENTATION OF THIS PLAN

7.1     VESTING OF ASSETS OF THE DEBTORS ........................................... 37
7.2     CORPORATE GOVERNANCE OF DEBTORS ....................................... 38
        7.2.1  Amendment of Certificates of Incorporation of the Debtors ............... 38
        7.2.2  D&O and Fiduciary Liability Tail Coverage Policies ....................... 38
7.3     THE SETTLEMENT FACILITY AND LITIGATION FUND ..................... 39
        7.3.1  Creation of Settlement Facility and Funding of Litigation Fund ......... 39
        7.3.2  Obligations of Reorganized Debtors for GST Asbestos Claims ........... 39

# TABLE OF CONTENTS

(continued)

**Page**

|  | 7.3.3 | Obligations of Settlement Facility | 40 |
|---|---|---|---|
|  | 7.3.4 | Obligations of Reorganized Garrison With Respect to Litigation Option Claims | 41 |
|  | 7.3.5 | Contingent Litigation Fund Contributions | 43 |
|  | 7.3.6 | Appointment and Termination of Settlement Facility Trustee | 50 |
| 7.4 | APPROVAL OF PARENT SETTLEMENT | | 50 |
| 7.5 | DISSOLUTION OF ANCHOR | | 50 |
|  | 7.5.1 | Dissolution upon the Effective Date | 50 |
| 7.6 | PAYMENTS AND DISTRIBUTIONS UNDER THIS PLAN | | 50 |
|  | 7.6.1 | Settlement Option and Litigation Option Payments and Plan Distributions | 50 |
|  | 7.6.2 | Timing of Plan Distributions | 51 |
|  | 7.6.3 | Manner of Payments under Plan | 51 |
| 7.7 | DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS | | 51 |
|  | 7.7.1 | Delivery of Distributions in General | 51 |
|  | 7.7.2 | Undeliverable Distributions by the Reorganized Debtors | 51 |
|  | 7.7.3 | Undeliverable Distributions by the Settlement Facility and Reorganized Garrison | 52 |
| 7.8 | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | 52 |
|  | 7.8.1 | Conditions to Confirmation | 52 |
|  | 7.8.2 | Conditions to Effective Date | 53 |
| 7.9 | MANAGEMENT OF THE REORGANIZED DEBTORS | | 54 |
| 7.10 | CORPORATE ACTION | | 54 |
| 7.11 | EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS | | 54 |
| 7.12 | NO SUCCESSOR LIABILITY | | 55 |

# ARTICLE 8.

## INJUNCTIONS, RELEASES & DISCHARGE

| 8.1 | DISCHARGE | | 55 |
|---|---|---|---|
|  | 8.1.1 | Discharge of Debtors and Related Discharge Injunction | 55 |
|  | 8.1.2 | Disallowed Claims and Disallowed Equity Interests | 57 |
|  | 8.1.3 | Reservation of Rights of the PBGC | 57 |
| 8.2 | PARENT SETTLEMENT ENFORCEMENT INJUNCTION | | 57 |
| 8.3 | TERM OF CERTAIN INJUNCTIONS AND AUTOMATIC STAY | | 59 |
|  | 8.3.1 | Injunctions and/or Automatic Stays in Existence Immediately prior to Confirmation | 59 |
|  | 8.3.2 | Injunctions Provided for in this Plan | 59 |
| 8.4 | EXCULPATION | | 59 |

# TABLE OF CONTENTS

(continued)

**Page**

## ARTICLE 9.

### EXECUTORY CONTRACTS, UNEXPIRED LEASES, GUARANTIES, AND INDEMNITY AGREEMENTS

9.1   ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....... 60
9.2   LETTERS OF CREDIT, SURETY BONDS, GUARANTIES, AND CERTAIN INDEMNITY AGREEMENTS ................................................................ 61
9.3   COMPENSATION AND BENEFITS PROGRAM ....................................... 62

## ARTICLE 10.

### RETENTION OF JURISDICTION

10.1   GENERAL ............................................................................................. 62
10.2   SPECIFIC PURPOSES ........................................................................... 62
    10.2.1  Plan Documents ......................................................................... 63
    10.2.2  Disputed Claims Allowance/Disallowance ................................. 63
    10.2.3  Enforcement/Modification of this Plan ....................................... 63
    10.2.4  Compensation of Professionals .................................................. 64
    10.2.5  Settlements ................................................................................ 64
    10.2.6  Taxes ......................................................................................... 64
    10.2.7  Specific Purposes ...................................................................... 64
    10.2.8  Insurance Matters ..................................................................... 64
10.3   ORDERS CLOSING CHAPTER 11 CASES .............................................. 64

## ARTICLE 11.

### MISCELLANEOUS PROVISIONS

11.1   AUTHORITY OF THE DEBTORS ........................................................... 65
11.2   PAYMENT OF STATUTORY FEES ......................................................... 65
11.3   RETAINED CAUSES OF ACTION .......................................................... 65
    11.3.1  Maintenance of Causes of Action ............................................... 65
    11.3.2  Preservation of Causes of Action ............................................... 65
11.4   THIRD-PARTY AGREEMENTS ............................................................. 66
11.5   DISSOLUTION OF THE UNSECURED CREDITORS' COMMITTEE, AND THE ASBESTOS COMMITTEE; CONTINUED RETENTION OF THE FUTURE CLAIMANTS' REPRESENTATIVE ............................................. 67
11.6   TITLE TO ASSETS ................................................................................ 67
11.7   NOTICES .............................................................................................. 67
11.8   HEADINGS ........................................................................................... 69

-iv-

# TABLE OF CONTENTS

(continued)

**Page**

11.9     GOVERNING LAW........................................................................................... 69

11.10   FILING OF ADDITIONAL DOCUMENTS..................................................... 69

11.11   COMPLIANCE WITH TAX REQUIREMENTS ............................................ 69

11.12   EXEMPTION FROM TRANSFER TAXES .................................................... 70

11.13   FURTHER ASSURANCES ............................................................................ 70

11.14   FURTHER AUTHORIZATIONS .................................................................. 70


Exhibit A        Settlement Facility Agreement

Exhibit B        CMO

Exhibit C        Schedule of Affiliates

Exhibit D        Retained Causes of Action

Garlock Sealing Technologies LLC and the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby propose the following Second Amended Plan of Reorganization (the "Plan") pursuant to the provisions of chapter 11 of title 11 of the United States Code.

Reference is hereby made to the Disclosure Statement, as hereinafter defined, of the Debtors, which discusses the history of the Debtors; their businesses, properties, results of operations, and projections for future operations; and risks associated with the Plan. The Disclosure Statement also provides a summary of this Plan. **YOU ARE URGED TO READ THE DISCLOSURE STATEMENT WITH CARE IN EVALUATING HOW THIS PLAN WILL AFFECT YOUR CLAIM(S).**

## ARTICLE 1.

## DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS, AND ANCILLARY DOCUMENTS

### 1.1   DEFINED TERMS

Capitalized terms defined herein apply to the Plan, the Disclosure Statement and all other Plan Documents except where specifically provided for otherwise. Capitalized terms in this Plan not defined herein have the meaning assigned in the Bankruptcy Code.

1.1.1.   **"Administrative Expense Claim"** means a cost or expense of the type described in Bankruptcy Code § 503 and all fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930, other than a Fee Claim.

1.1.2.   **"Administrative Expense Claimant"** means a Holder of an Administrative Expense Claim.

1.1.3.   **"Affiliate"** means (i) any Entity that is an "affiliate" (within the meaning of Bankruptcy Code § 101(2)), (ii) any other Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by, or is under common control with, a Debtor, and/or (iii) any Entity listed on Exhibit C, Schedule of Affiliates.

1.1.4.   **"Allowance Date"** means the date on which a Claim becomes an Allowed Claim.

1.1.5.   **"Allowed"** means, with respect to a Claim, all or a portion thereof:

(a)   That has been agreed to by the Claimant and the Debtors (including under the Litigation Option between a Litigation Option Claimant and Reorganized Garrison within the limits of Reorganized Garrison's settlement authority under this Plan);

(b)   That has been allowed by Final Order, including Litigation Option Claims allowed by Final Order pursuant to the CMO;

(c)    That has been estimated for purposes of allowance pursuant to Bankruptcy Code § 502(c);

(d)    That either (i) is listed in the Schedules, other than a Claim that is listed as "disputed," "contingent," "unliquidated," "zero," or "undetermined" and is not removed from the Schedules by an amendment to such Schedules by a Debtor, or (ii) the proof of which has been timely Filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Court, (x) to which no objection to the allowance thereof has been interposed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, or (y) to which an objection to the allowance thereof has been interposed within such time as is set by the Bankruptcy Court pursuant to the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, and such objection has been (A) overruled in whole or in part by a Final Order of the Bankruptcy Court, (B) resolved by agreement of the relevant parties, or (C) resolved via settlement, mediation, litigation, or otherwise pursuant to the terms of any alternative dispute resolution program that is implemented in the Chapter 11 Cases;

(e)    That is a Settlement Option Claim that the Settlement Facility has determined is entitled to payment pursuant to the CRP;

(f)    That is expressly allowed in this Plan; or

(g)    That is asserted to constitute an Administrative Expense Claim and (i) Debtors or the Reorganized Debtors determine such Claim constitutes an Administrative Expense Claim, or (ii) such Claim is allowed in whole or in part by a Final Order of the Bankruptcy Court and only to the extent that such allowed portion is deemed, pursuant to a Final Order of the Bankruptcy Court, to constitute a cost or expense of administration under Bankruptcy Code §§ 503 or 1114.

1.1.6.    **"Allowed Amount"** means the lesser of: (i) the dollar amount of an Allowed Claim; or (ii) the estimated amount of a Claim, but only to the extent that the Court has expressly estimated such Claim for purposes of distribution.

1.1.7.    **"Anchor"** means Debtor The Anchor Packing Company and any predecessor Entity or successor Entity or predecessor in interest or successor in interest respecting such Debtor.

1.1.8.    **"Anchor Claim"** means a Claim for which Anchor is alleged to have liability. Anchor Claims shall not include Intercompany Claims.

1.1.9.    **"Anchor Claimant"** means the Holder of an Anchor Claim.

1.1.10.    **"Articles of Incorporation"** means the articles of incorporation of any specified Entity, as amended as of the Effective Date or thereafter.

1.1.11.    **"Asbestos Claims Bar Date"** means the date that the Court establishes as the last day for Filing proofs of Current GST Asbestos Claims.

1.1.12.    **"Asbestos Committee"** means the Official Committee of Asbestos Personal Injury Claimants appointed in the Chapter 11 Cases.

1.1.13.    **"Asbestos Insurance Company"** means any insurance company, insurance broker, private or state guaranty association, reinsurer or any other Entity (whether solvent or insolvent) with demonstrated or potential liability, contractual or otherwise, to the Debtors, the Reorganized Debtors, or the Settlement Facility under a policy that may afford the Debtors indemnity, defense, or other insurance coverage for any Claim whose Holder asserts an asbestos-related injury. "Asbestos Insurance Company" does not include any of the Debtors or their Affiliates.

1.1.14.    **"Available Shared Insurance"** means as of January 14, 2015, any right to approximately one hundred million and one dollars ($101,000,000) from solvent Asbestos Insurance Companies and any additional amount from insolvent Asbestos Insurance Companies of (a) coverage under or reimbursement pursuant to the terms of certain general liability insurance policies listed below, which were in effect during the period 1976 to 1984 to cover losses associated with, among other things, product liability claims against the Parent and certain of its subsidiaries, including GST, and (b) the proceeds of any receivables from or settlement agreements with Asbestos Insurance Companies responsible for such insurance policies.

| Insurance Carrier | S&P Debt Rating | AM Best Rating | Remaining Amount $ in 000 |
|---|---|---|---|
| Aetna Casualty and Surety (Travelers) | AA | A+ | 4,213 |
| AIG | A+ | A | 62,000 |
| Employers Mutual Assurance Co. | BBBpi | A | 10,000 |
| Fireman's Fund | A | A | 8,762 |
| London Carriers – Other | A+ | A | 708 |
| Republic Insurance Co. | A+ | A- | 10,000 |
| Safety Insurance Co. | Api | A | 5,000 |
| **Total (Solvent Carriers)** | | | **100,683** |

1.1.15.    **"Avoidance Actions"** mean any and all claims, rights, defenses or other causes of action of any Debtor or its Estate arising under any section of chapter 5 of the Bankruptcy Code or other applicable law, including, without limitation, Bankruptcy Code §§ 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 or under similar or related state or federal statutes and common law, including fraudulent transfer laws and principles of equitable subordination, whether or not litigation has been commenced to prosecute such causes of action as of the Effective Date or such actions are described in the Disclosure Statement or the Debtors'

Schedules and Statements of Financial Affairs, all as may be amended or supplemented.

1.1.16. **"Ballot"** means the form or forms distributed to certain Holders of Claims and Equity Interests by which such parties may indicate acceptance or rejection of the Plan.

1.1.17. **"Bankruptcy Administrator"** means the office of the United States Bankruptcy Administrator for the Western District of North Carolina.

1.1.18. **"Bankruptcy Code"** means title 11 of the United States Code, as set forth in §§ 101 *et seq.*, and applicable portions of titles 18 and 28 of the United States Code.

1.1.19. **"Bankruptcy Court"** means the United States Bankruptcy Court for the Western District of North Carolina.

1.1.20. **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases.

1.1.21. **"Board of Directors"** means the board of directors, managers, or equivalent thereof of any of the Debtors, or any of the Reorganized Debtors, as the case may be, as it may exist from time to time.

1.1.22. **"Business Day"** means any day other than a Saturday, Sunday, or legal holiday (as defined in Bankruptcy Rule 9006(a)) in the United States of America.

1.1.23. **"By-Laws"** means the by-laws or operating agreements of any of the specified Entities, as amended as of the Effective Date or thereafter.

1.1.24. **"Case Management Order"** or **"CMO"** means the order to be entered by the Bankruptcy Court pursuant to which Litigation Option Claims shall be Allowed or Disallowed, which order shall be in substantially the form attached as an exhibit to this Plan.

1.1.25. **"Cash"** means lawful currency of the United States of America.

1.1.26. **"Certificate of Incorporation"** means the articles of incorporation, articles of organization, or equivalent document of any of the Debtors, as applicable, as amended as of the Effective Date or thereafter.

1.1.27. **"Chapter 11 Cases"** or **"Cases"** means the cases commenced by the Filing, on the Petition Date, by the Debtors of voluntary petitions for relief under chapter 11 of the Bankruptcy Code, jointly administered under Case No. 10-31607, United States Bankruptcy Court for the Western District of North Carolina.

1.1.28. **"Claim"** means a claim (as defined in Bankruptcy Code § 101(5)) against a Debtor, including any right to: (i) payment from any of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (ii) an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

1.1.29.    **"Claimant"** means the Holder of a Claim.

1.1.30.    **"Claims Resolution Procedures"** or **"CRP"** means the procedures, in the form attached to the Settlement Facility Agreement, to be implemented by the Settlement Facility pursuant to the terms and conditions of the Plan and the Settlement Facility Agreement, to process, review, and pay (if Allowed) Settlement Option Claims.

1.1.31.    **"Class"** means any group of Claims or Equity Interests classified by the Plan pursuant to Bankruptcy Code § 1122(a)(1).

1.1.32.    **"Confirmation Date"** means the date the clerk of the Court enters on the docket an order entering the Confirmation Order.

1.1.33.    **"Confirmation Order"** means the order(s) entered by the Court on the Confirmation Date confirming the Plan.

1.1.34.    **"Confirmation Procedures Order"** means the order(s) of the Bankruptcy Court (i) approving procedures relating to provision of notice of any hearing on confirmation of the Plan and the solicitation and tabulation of votes with respect to the Plan; and (ii) providing or establishing the basis for estimating the amount of any Claim or Equity Interest for voting purposes.

1.1.35.    **"Contingent Claim"** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened, or been triggered, as of the date on which such Claim is sought to be estimated or an objection to such Claim is Filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the Debtor now or hereafter exists or previously existed.

1.1.36.    **"Contingent Litigation Fund Contributions"** means contingent contributions by the Reorganized Debtors to the Litigation Fund pursuant to Section 7.3.5

1.1.37.    **"Court"** means either the Bankruptcy Court or the District Court, as appropriate.

1.1.38.    **"CRP"** means the Claims Resolution Procedures attached to the Settlement Facility Agreement and this Plan.

1.1.39.    **"CRP Value"** means the upper limit of the Settlement Facility's obligation for Litigation Option Expenditures with respect to a particular Litigation Option Claim, amounting to the larger of the payment prescribed by the calculations in CRP Appendix I (Expedited Review) or Appendix II (Individual Review) for the

Claimant, which calculations are defined more particularly in the Settlement Facility Agreement.

1.1.40.  **"CRP Value Calculation Date"** means the date the Settlement Facility is required to calculate the CRP Value for purposes of determining its obligation for Litigation Option Expenditures, defined as fourteen (14) days after the date when Reorganized Garrison provides the documents required by this Plan and the Settlement Facility Agreement with respect to a particular Litigation Option Claim. In the case of Pre-Petition Judgment GST Asbestos Claims whose Holders elect to complete state court appeals, the CRP Value Calculation Date shall be twenty-eight (28) days after the date the Holder makes such election, and Reorganized Garrison shall provide the complete case file pertaining to that Claim no later than fourteen (14) days after the date the Holder makes such election.

1.1.41.  **"Current GST Asbestos Claim"** means a GST Asbestos Claim that is not a Settled GST Asbestos Claim or Pre-Petition Judgment GST Asbestos Claim, and for which an alleged asbestos-related injury has manifested, become evident, or been diagnosed as of the date the Confirmation Order is entered by the Court.

1.1.42.  **"Current GST Asbestos Claimant"** means the Holder of a Current GST Asbestos Claim.

1.1.43.  **"Debtor-in-Possession"** or **"Debtors-in-Possession"** means one or more of the Debtors, each in its capacity as a debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

1.1.44.  **"Debtors"** mean, collectively, Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

1.1.45.  **"Disallowed"** means, with respect to a Claim:

(a)   Any Claim that is disallowed by Final Order, including a Litigation Option Claim disallowed by Final Order pursuant to the CMO;

(b)   Any Claim for which a proof of claim was not Filed within any applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Court; or

(c)   Any Claim that is asserted to constitute an Administrative Expense Claim or a Fee Claim, and that is disallowed in whole or in part by a Final Order of the Bankruptcy Court.

1.1.46.  **"Discharge Injunction"** means the injunction described in Section 8.1.1 under Bankruptcy Code § 524(a).

1.1.47.  **"Disclosure Statement"** means the disclosure statement relating to the Plan, including all exhibits, appendices and schedules thereto, approved by order of the

6

Bankruptcy Court in connection with the Plan pursuant to Bankruptcy Code § 1125, together with any amendments and supplements thereto.

1.1.48. **"Disclosure Statement Order"** means the order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code § 1125.

1.1.49. **"Disputed Claim"** means a Claim that is neither Allowed nor Disallowed. For the purposes of the Plan, all Current GST Asbestos Claims, Future GST Asbestos Claims, and Pre-Petition Judgment GST Asbestos Claims shall be considered Disputed Claims until they are Allowed or Disallowed, and the Debtors' right to object to allowance of such Claims (including after the Confirmation Date) is expressly preserved by this Plan. Furthermore, any other Claim shall be considered a Disputed Claim (a) before the time that an objection has been or may be filed if: (i) the amount or classification of the Claim specified in the relevant proof of claim or request for payment of the Claim exceeds the amount or is different from the classification of any corresponding Claim scheduled by the relevant Debtor in its Schedules; (ii) any corresponding Claim scheduled by the relevant Debtor has been scheduled as disputed, contingent or unliquidated; or (iii) no corresponding Claim has been scheduled by the relevant Debtor in its Schedules; (b) if such Claim is the subject of an objection not yet resolved by a Final Order; or (c) if an Avoidance Action asserted against the Holder of such Claim has not been resolved by a Final Order.

1.1.50. **"Distribution"** means the payment, distribution, or assignment under the Plan by the Reorganized Debtors or Settlement Facility of property or interests in property to any Holder of an Allowed Claim or allowed Equity Interest.

1.1.51. **"Distribution Date"** means, with respect to an Allowed Claim, the date which is as soon as reasonably practicable after the later of: (i) the Effective Date, (ii) the Allowance Date, or (iii) such other date agreed to in writing by such Claimant and the Reorganized Debtor or Settlement Facility, as applicable.

1.1.52. **"District Court"** means the United States District Court for the Western District of North Carolina.

1.1.53. **"Effective Date"** means the first Business Day after the date on which all of the conditions precedent to the effectiveness of the Plan specified in Section 7.8.2 hereof shall have been satisfied or waived or, if a stay of the Confirmation Order is in effect on such date, the first Business Day after the expiration, dissolution, or lifting of such stay.

1.1.54. **"EnPro"** means EnPro Industries, Inc.

1.1.55. **"EnPro Contribution"** means the portion of the Parent Settlement Consideration contributed by EnPro on the Effective Date.

7

1.1.56.    **"Entity"** means any person, individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, the Bankruptcy Administrator, or any governmental unit or any political subdivision thereof.

1.1.57.    **"Estate"** means the relevant estate of any Debtor created in its Chapter 11 Case pursuant to Bankruptcy Code § 541.

1.1.58.    **"Equity Interest"** means any interest in any Entity that is an "equity security" within the meaning of Bankruptcy Code § 101(16), or any similar interest in an Entity that is recognized under applicable law.

1.1.59.    **"Exhibit Book"** means the exhibits to the Plan, as such exhibits may be amended, supplemented, or modified from time to time.

1.1.60.    **"Exhibit Book Supplement"** means a supplement of Plan-related documents, as amended from time to time.

1.1.61.    **"Expedited Review"** means the process for determining settlement offers under the Settlement Option as set forth in Appendix I to the CRP.

1.1.62.    **"Fee Claim"** means all Claims subject to Bankruptcy Court approval under Bankruptcy Code § 1129(a)(4), including claims of Professionals, whether or not Administrative Expense Claims, for the payment of fees and expenses incurred since the Petition Date in connection with the Debtors' Estates or assets.

1.1.63.    **"Fee Order"** means the Bankruptcy Court's Administrative Order, Pursuant To Sections 105(a) and 331 of the Bankruptcy Code, Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals dated July 15, 2010 [Docket No. 233], in the Chapter 11 Cases, as may have been amended or supplemented from time to time.

1.1.64.    **"File"** or **"Filed"** or **"Filing"** means file or filed or filing with the Court in the Chapter 11 Cases.

1.1.65.    **"Final Order"** means an order, judgment, ruling, or decree that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing by all Entities possessing such right, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or from which reargument or rehearing was sought or certiorari has been denied, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; provided that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or

8

any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.

1.1.66.  **"Future Claimants' Representative"** or **"FCR"** means Joseph W. Grier, III (or any court-appointed successor), appointed as the legal representative to represent the interests of, appear on behalf of, and be a fiduciary to the Holders of Future GST Asbestos Claims in the Order Granting Debtors' Motion for Appointment of Joseph W. Grier, III as Future Asbestos Claimants' Representative [Docket No. 512].

1.1.67.  **"Future GST Asbestos Claim"** means a GST Asbestos Claim for which an alleged asbestos-related injury has not manifested, become evident, or been diagnosed as of the date the Confirmation Order is entered by the Court.

1.1.68.  **"Future GST Asbestos Claimant"** means the Holder of a Future GST Asbestos Claim.

1.1.69.  **"Garrison"** means Debtor Garrison Litigation Management Group, Ltd. and any predecessor Entity or successor Entity or predecessor in interest or successor in interest respecting such Debtor.

1.1.70.  **"Garrison Equity Interests"** mean Equity Interests in Garrison.

1.1.71.  **"General Unsecured Claim"** means any Claim against GST or Garrison in the Chapter 11 Cases that is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Claim, Intercompany Claim, or GST Asbestos Claim.

1.1.72.  **"General Unsecured Claimant"** means a Holder of a General Unsecured Claim.

1.1.73.  **"GST"** means Debtor Garlock Sealing Technologies LLC and any predecessor Entity or successor Entity or predecessor in interest or successor in interest respecting such Debtor.

1.1.74.  **"GST Asbestos Claim"** means a Claim against any of GST or Garrison, whether or not such Claim is reduced to judgment, liquidated, unliquidated, fixed, settled, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, whether the disease or condition upon which the claim is based had manifested, become evident, or been diagnosed before or after the Petition Date or Confirmation Date, and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement, or indemnity, or any other statute or theory of law, equity, admiralty, or otherwise (including piercing the corporate veil, alter ego, and similar theories), including (i) all related claims, debts, rights, remedies, liabilities, or obligations for compensatory (including general, special, proximate, or consequential damages, loss of consortium, lost wages or other opportunities, wrongful death, medical monitoring, or survivorship), punitive or exemplary damages, or costs or expenses, and (ii) all cross-claims, contribution claims, subrogation claims, reimbursement claims, or indemnity claims, in each case for, based on, arising out of, resulting from,

attributable to, or arising under the laws of any jurisdiction, by reason of, in whole or in part, directly or indirectly:

(a)    death, wrongful death, personal or bodily injury (whether physical, emotional, or otherwise), sickness, illness, ailment, disease, medical monitoring for increased risk, fear of or increased risk of any of the foregoing, loss of consortium, lost wages or other opportunities, survivorship, or other personal injuries (whether physical, emotional, or otherwise) or other damages (including medical, legal, and other expenses or punitive damages), caused or allegedly caused by, based on or allegedly based on or arising or allegedly arising from or attributable to, directly or indirectly, in whole or in part, acts or omissions of GST or Garrison (or any of their respective predecessors, successors, or assigns), or any other Entity for whose products or operations GST or Garrison allegedly has liability or is otherwise liable, including any past or present Affiliate; and

(b)    the presence of, exposure to, or contact with, at any time before the Petition Date, asbestos or any asbestos-containing products, manufacturing processes, improvements to real property, materials, or other things that were mined, processed, consumed, used, stored, manufactured, fabricated, constructed, designed, engineered, sold, assembled, supplied, produced, specified, selected, distributed, released, maintained, repaired, purchased, owned, occupied, serviced, removed, replaced, disposed of, installed by, or in any way marketed by, or on behalf of, GST or Garrison (or (i) any of their respective predecessors, successors, or assigns, or (ii) any other Entity for whose products or operations GST or Garrison allegedly has liability or is otherwise liable, including any past or present Affiliate).

Without limiting the foregoing, GST Asbestos Claims include Settled GST Asbestos Claims, Current GST Asbestos Claims, Future GST Asbestos Claims, and Pre-Petition Judgment GST Asbestos Claims. Notwithstanding the foregoing, the definition of GST Asbestos Claim does not include Workers' Compensation Claims.

1.1.75.    **"GST Asbestos Claimant"** means the Holder of a GST Asbestos Claim.

1.1.76.    **"GST Corporate Documents"** means (a) the amendments to the Articles of Incorporation and By-Laws of GST and (b) other related documents to be executed, delivered, and filed with the appropriate governmental authorities under the Plan, Plan Documents, and applicable state law by the Effective Date, which are necessary or appropriate for the implementation of the Plan, including, without limitation, the authorization and issuance of the Reorganized GST Equity Interests.

1.1.77.    **"GST Equity Interests"** means Equity Interests in GST.

1.1.78.    **"Holder"** means any Entity owning any Claim or Equity Interest and, with respect to a vote on the Plan, shall mean the beneficial owner on the voting record date or any authorized signatory who has completed and executed a Ballot.

1.1.79.    **"Individual Review"** means the process for determining settlement offers under the Settlement Option as set forth in Appendix II to the CRP.

1.1.80.    "**Intercompany Claim**" means a Claim between or among the Debtors, but excluding GST Asbestos Claims.

1.1.81.    **"IRC"** means the Internal Revenue Code of 1986, as amended, and any applicable regulations (including temporary and proposed regulations) promulgated thereunder by the United States Treasury Department.

1.1.82.    **"IRS"** means the United States Internal Revenue Service.

1.1.83.    **"Litigation Expenses"** means costs incurred by Reorganized Garrison in prosecuting objections to a particular Litigation Option Claim (and, in the case of Pre-Petition Judgment GST Asbestos Claimants, expenses incurred in completing state court appeals). Litigation Expenses shall include fees for defense attorneys, other advisors, testifying and consulting experts, court costs, and any other costs attributable to particular Litigation Option Claims (or Pre-Petition Judgment GST Asbestos Claims whose Holders elect to complete state court appeals).

1.1.84.    **"Litigation Fund"** means the fund in the initial amount of $30 million held by Reorganized Garrison for payment of Litigation Option Expenditures associated with Litigation Option Claims (or the completion of appeals for Pre-Petition Judgment GST Asbestos Claims) in excess of the CRP Value for such Claims, as well as Litigation Management Fees.

1.1.85.    **"Litigation Fund Contribution"** means a contribution by the Reorganized Debtors to the Litigation Fund in the amount of $30 million, payable in Cash on the Effective Date.

1.1.86.    **"Litigation Management Fees"** means reasonable fees charged by Reorganized Garrison to the Litigation Fund for services rendered by Reorganized Garrison in connection with the management and administration of the Litigation Option and prosecution of objections to Litigation Option Claims.

1.1.87.    **"Litigation Management Services Fee Agreement"** means a written agreement in form and substance reasonably satisfactory to the Debtors and FCR setting forth the method by which Litigation Management Fees shall be determined and reimbursed.

1.1.88.    **"Litigation Option"** means the option of each Holder of a Current GST Asbestos Claim, Future GST Asbestos Claim, or Pre-Petition Judgment GST Asbestos Claim (the latter under certain circumstances described herein) to elect to have his or her Claim Allowed through litigation after the Confirmation Date pursuant to the CMO.

1.1.89.    **"Litigation Option Claim"** means a Current GST Asbestos Claim, Future GST Asbestos Claim, or Pre-Petition Judgment GST Asbestos Claim whose Holder elects the Litigation Option.

1.1.90.    **"Litigation Option Claimant"** means the Holder of a Litigation Option Claim.

1.1.91.    **"Litigation Option Expenditures"** mean, with respect to any Litigation Option Claim, all Litigation Expenses, plus the Allowed Amount (if Allowed) of such Litigation Option Claim whether determined by Final Order or by settlement between Reorganized Garrison and the Litigation Option Claimant within the limits of Reorganized Garrison's settlement authority as defined by this Plan.

1.1.92.    **"Non-Asbestos Bar Date Order"** means the Bankruptcy Court's Order (i) Establishing Bar Dates for Filing Proofs of Claim for Non-Asbestos Claims (ii) Approving Bar Date Notices and Mailing Procedures and (iii) Providing Certain Supplemental Relief, dated September 7, 2011 (Docket No. 1478), which established the bar date for certain non-asbestos Claims as December 12, 2011.

1.1.93.    **"Parent"** means Coltec Industries, Inc.

1.1.94.    **"Parent Contribution"** means $30 million.

1.1.95.    **"Parent Settlement"** means the settlement between Debtors, EnPro, and the Parent, for themselves and on behalf of certain Released Parties, pursuant to which the Parent and EnPro shall provide the Parent Settlement Consideration in full satisfaction and extinguishment of (a) any and all claims that are or would have been property of any Debtor's Estate against any Released Party, including, without limitation, pursuant to Chapter 5 of the Bankruptcy Code, any one or more of Bankruptcy Code §§ 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553; (b) any and all claims that are or would have been property of any Debtor's Estate against any Released Party arising under non-bankruptcy law relating to any allegedly preferential or fraudulent transfers or relating to any allegedly unlawful payments or transfers or distributions of property to such Released Party; (c) any and all claims that are or would have been property of any Debtor's Estate, regardless of the legal theory upon which such claims may be predicated, for which any Released Party is asserted to be or to have been derivatively liable for any GST Asbestos Claim including, without limitation, any claim arising under a theory that (i) any Released Party is a successor to any Debtor, (ii) any Debtor's separate corporate existence should be disregarded, or (iii) any Released Party is an alter ego of any Debtor, and (d) any and all claims in (a)-(c) above where, in the absence of the Debtors' Chapter 11 Cases, such claims might, under substantive law of any jurisdiction, have been treated as claims maintainable not only by the Debtors or the Debtor's Estates themselves, but by creditors of or claimants against the Debtors. The Parent Settlement shall be evidenced by the Parent Settlement Agreement. In addition, as part of the Parent Settlement, the Parent's GST Equity Interests and Garrison Equity Interests will be cancelled or surrendered and equity interests in Reorganized GST will be issued to a new subsidiary to be formed by EnPro or, alternatively and at the Parent's election, the Parent will transfer its existing equity interests in GST to such newly formed subsidiary of EnPro.

1.1.96.    **"Parent Settlement Agreement"** means the written settlement agreement in the form and substance satisfactory to the Parent, EnPro, and Reorganized GST and approved by the Bankruptcy Court which evidences the Parent Settlement.

1.1.97.    **"Parent Settlement Consideration"** includes (a) the Parent Contribution to the Settlement Facility in Cash on the Effective Date, (b) the funding by the Parent of Anchor's costs of dissolution, up to $500,000, (c) the agreement of EnPro to guarantee all contributions to the Settlement Facility and Litigation Fund by the Reorganized Debtors scheduled to occur after the Effective Date, and (d) the agreement of the Parent and Affiliates to subordinate their interests in the Available Shared Insurance to the Reorganized Debtors' obligations to make payments after the Effective Date to the Settlement Facility and Litigation Fund under this Plan.

1.1.98.    **"Parent Settlement Enforcement Injunction"** means the order(s) entered by the Court (including, as appropriate, any provision of the Confirmation Order) permanently and forever staying, restraining, and enjoining any Entity from taking any action against any Released Party for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Released Claim, the form of which Parent Settlement Enforcement Injunction shall be acceptable to the Debtors, the Reorganized Debtors, and the Parent. The Parent Settlement Enforcement Injunction is further described in Section 8.2 of the Plan.

1.1.99.    **"Petition Date"** means June 5, 2010, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

1.1.100.    **"Plan"** means Debtors' Second Amended Plan of Reorganization under chapter 11 of the Bankruptcy Code, dated as of January 14, 2015, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules to the foregoing, as the same may be in effect from time to time.

1.1.101.    **"Plan Documents"** means the Plan, the Disclosure Statement, and all exhibits in the Exhibit Book and Exhibit Book Supplement, either in their present form or as each may be amended, supplemented, or otherwise modified from time to time.

1.1.102.    **"Pre-Petition Judgment GST Asbestos Claim"** means a GST Asbestos Claim against a Debtor evidenced by a written judgment entered before the Petition Date that was not yet subject to a Final Order as of the Confirmation Date.

1.1.103.    **"Pre-Petition Judgment GST Asbestos Claimant"** means the Holder of a Pre-Petition Judgment GST Asbestos Claim.

1.1.104.    **"Priority Claim"** means any Claim against GST or Garrison (other than an Administrative Expense Claim or Priority Tax Claim) to the extent such Claim is entitled to priority in right of payment under Bankruptcy Code § 507.

1.1.105.    **"Priority Tax Claim"** means a Claim that is of a kind specified in Bankruptcy Code §§ 502(i) or 507(a)(8).

1.1.106.   **"Professional"** means an Entity (i) employed pursuant to a Final Order in accordance with Bankruptcy Code §§ 327, 328, 363, 524(g)(4)(B)(i) and/or 1103 and to be compensated for services rendered prior to the Confirmation Date, pursuant to Bankruptcy Code §§ 327, 328, 329, 330 and 331, or (ii) for which compensation and reimbursement have been allowed by the Bankruptcy Court pursuant to Bankruptcy Code § 503(b)(4).

1.1.107.   **"Qualified Settlement Fund"** or **"QSF"** means a qualified settlement fund as defined by Treasury Regulation Section 1.468B-1 *et seq*.

1.1.108.   **"Related"** means, with respect to a GST Asbestos Claim, all GST Asbestos Claims based on a particular injured party's injury (such as Claims by the injured party, his or her estate, and family members with loss of consortium, wrongful death, or similar related Claims).

1.1.109.   **"Released Claims"** mean (a) any and all claims that are or would have been property of any Debtor's Estate against any Released Party, including, without limitation, pursuant to Chapter 5 of the Bankruptcy Code, any one or more of 11 U.S.C. §§ 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553; (b) any and all claims that are or would have been property of any Debtor's Estate against any Released Party arising under any non-bankruptcy law relating to allegedly preferential or fraudulent transfers or relating to any allegedly unlawful payments or transfers or distributions of property to such Released Party; (c) any and all claims that are or would have been property of any Debtor's Estate, regardless of the legal theory upon which such claim may be predicated, by which any Released Party is asserted to be or have been derivatively liable for any Claim, including, without limitation, any GST Asbestos Claim including, without limitation, any claim arising under a theory that (i) any Released Party is a successor to any Debtor, (ii) any Debtor's separate corporate existence should be disregarded, or (iii) any Released Party is an alter ego of any Debtor, and (d) any and all claims in (a)-(c) above where, in the absence of the Debtors' Chapter 11 Cases, such claims might, under substantive law of any jurisdiction, have been treated as claims maintainable not only by the Debtors or the Debtors' Estates themselves, but by creditors of or claimants against the Debtors. For the avoidance of doubt, the Debtors do not intend or purport to release or bar any claim against any Released Party that is (a) based upon such Released Party's independent liability to any person and (b) would not be a GST Asbestos Claim or an Anchor Claim in these Chapter 11 Cases if it were to be asserted directly against one or more Debtors.

1.1.110.   **"Released Parties"** mean the Parent; any past, present, or future Representatives of the Parent; EnPro; any past, present, or future Representatives of EnPro; any Affiliate; and any past, present, or future Representative of any Affiliate or the Debtors.

1.1.111.   **"Reorganized Debtor"** and **"Reorganized Debtors"** means Reorganized GST and Reorganized Garrison.

14

1.1.112.   **"Reorganized Anchor"** means Debtor The Anchor Packaging Company from and after the Effective Date.

1.1.113.   **"Reorganized Garrison"** means Debtor Garrison Litigation Management Group, Ltd. from and after the Effective Date.

1.1.114.   **"Reorganized GST"** means Debtor Garlock Sealing Technologies LLC from and after the Effective Date.

1.1.115.   **"Representatives"** means, with respect to any Entity, the past, present or future managers, directors, members, trustees, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents of that Entity, or any other representatives or professionals of that Entity or of any of those directors, members, trustees, officers, employees, accountants (including independent registered public accountants), advisors, attorneys, consultants, or other agents.

1.1.116.   **"Retained Causes of Action"** means the actual and potential causes of action that the Reorganized Debtors shall retain, on and after the Effective Date, on behalf of the Debtors, to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, whether such causes of action accrued before or after the Petition Date, including, without limitation, any actions that may be listed in the Exhibit Book or Exhibit Book Supplement.

1.1.117.   **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors-in-Possession with the Bankruptcy Court, as required by Bankruptcy Code § 521 and the Bankruptcy Rules, as such schedules and statements may be amended by the Debtors-in-Possession from time to time in accordance with Bankruptcy Rule 1007.

1.1.118.   **"Secured Claim"** means a Claim against GST or Garrison that is: (i) secured by a lien (as such term is defined in Bankruptcy Code § 101(37)) on property in which the Debtors have an interest, which lien is valid, perfected, and enforceable under applicable law or by reason of a Final Order, or (ii) entitled to setoff under Bankruptcy Code § 553, to the extent of (A) the value of the Claimant's interest in the Debtor's interest in such property or (B) the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code § 506(a).

1.1.119.   **"Secured Tax Claim"** means a Secured Claim for the payment of taxes to a governmental Entity.

1.1.120.   **"Securities Act"** means the Securities Act of 1933, as amended.

1.1.121.   **"Settled GST Asbestos Claim"** means a GST Asbestos Claim that, as of the Petition Date, was subject to a settlement agreement enforceable under applicable law between GST and the Holder of such GST Asbestos Claim, or for which a judgment has become Final.

15

1.1.122. **"Settled GST Asbestos Claim Bar Date"** means the Bankruptcy Court's order establishing a bar date for Settled GST Asbestos Claims.

1.1.123. "**Settled GST Asbestos Claims Surplus**" means an amount equal to the difference between $10 million and the aggregate amount of Allowed Settled GST Asbestos Claims, if the Allowed Amount of Settled GST Asbestos Claims is less than $10 million.

1.1.124. **"Settlement Facility"** means the trust to be established in accordance with this Plan and the Settlement Facility Agreement that will, among other things, process, review, and pay (if Allowed) all Settlement Option Claims.

1.1.125. **"Settlement Facility Agreement"** means the agreement pursuant to which the Settlement Facility shall be established and governed, and process and pay Settlement Option Claims and certain Litigation Option Expenditures.

1.1.126. **"Settlement Facility Contributions"** means contributions in the aggregate amount of $297.5 million by the Reorganized Debtors to the Settlement Facility, payable as follows: $220 million on the Effective Date; $25 million on the first anniversary of the Effective Date; $25 million payable on the third anniversary of the Effective Date; $15 million payable on the fifth anniversary of the Effective Date; and $12.5 million payable on the seventh anniversary of the Effective Date. The Reorganized Debtors shall pay interest on each Settlement Facility Contribution due and payable after the Effective Date, which shall accrue at the rate that the Settlement Facility achieves on its cash balances from the Effective Date to the date of such payment.

1.1.127. **"Settlement Facility Expenses"** means the administrative and other expenses incurred by the Settlement Facility in performing its obligations under this Plan and the Settlement Facility Agreement.

1.1.128. **"Settlement Option"** means the option of each Holder of a Current GST Asbestos Claim, Future GST Asbestos Claim, and Pre-Petition Judgment GST Asbestos Claim to elect to have his or her Claim evaluated by the Settlement Facility under the processes and procedures established by the CRP.

1.1.129. **"Settlement Option Claim"** means a Current GST Asbestos Claim, Future GST Asbestos Claim, or Pre-Petition Judgment GST Asbestos Claim whose Holder elects the Settlement Option, and which will therefore be processed and (if Allowed) paid by the Settlement Facility.

1.1.130. **"Settlement Option Claimant"** means the Holder of a Settlement Option Claim.

1.1.131. **"Settlement Option Release"** means the release that must be executed by a Settlement Option Claimant prior to receiving a payment from the Settlement Facility. The Settlement Option Release shall be a full release of the Claimant's GST Asbestos Claim, as well as a full release from any family members or similar parties for Claims derivative of the GST Asbestos Claim. Such release shall comply with applicable state or other law and shall acknowledge that the settlement payment

extinguishes the GST Asbestos Claim and all derivative claims against the Reorganized Debtors, any Affiliate of the Reorganized Debtors, the FCR and any of his or her Representatives, and the Settlement Facility, and shall relinquish such Claimant's and all Related Claimants' right to pursue a remedy from the Reorganized Debtors, any Affiliate, or the Settlement Facility on account of such GST Asbestos Claim and any derivative claims. The Settlement Option Release shall be in a form that protects the Reorganized Debtors, any Affiliate, the FCR and any of his or her Representatives, and the Settlement Facility from any contribution or other third-party claims by other asbestos defendants under applicable law. Settlement Option Claimants whose Claims are based on non-malignant conditions shall not, however, be required to release GST Asbestos Claims based on future asbestos-related cancer. The protection afforded by the Settlement Option Release is supplemental to, and does not derogate from or imply any deficiency in, the protection provided by the Discharge Injunction and the Parent Settlement Enforcement Injunction.

1.1.132.   **"Unknown Causes of Action"** mean any Retained Causes of Action of which the Debtors are unaware at the time any schedule of Retained Causes of Action is filed as an exhibit in the Exhibit Book or Exhibit Book Supplement, and are therefore not listed on that Exhibit.

1.1.133.   **"Unliquidated Claim"** means: (i) any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be fixed, or (ii) any Claim for which no Allowed Amount has been determined.

1.1.134.   **"Unsecured Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed by order of the Bankruptcy Court dated June 17, 2011 [Docket No. 104], as subsequently amended, in the Chapter 11 Cases pursuant to Bankruptcy Code § 1102.

1.1.135.   **"Voting Agent"** means the balloting agent appointed by the Bankruptcy Court to whom all Ballots should be submitted.

1.1.136.   **"Voting Deadline"** means ____ _.M. Eastern Time on _____ __, 2015, which is the deadline by which anyone seeking to cast a Ballot must submit such Ballot, so that it is received by the Voting Agent.

1.1.137.   **"Voting Record Date"** means two (2) Business Days after the entry of the Disclosure Statement Order.

1.1.138.   **"Workers' Compensation Claims"** means any Claim: (i) for benefits under a state-mandated workers' compensation system, which a past, present, or future employee of Garlock Sealing Technologies LLC or Garrison Litigation Management Group, Ltd. or their predecessors is receiving, or may in the future have a right to receive and/or (ii) for reimbursement brought by any insurance company or state agency as a result of payments made to or for the benefit of such employees under such a system

17

and fees and expenses incurred under any insurance policies or laws or regulations covering such employee claims. For the avoidance of doubt, Workers' Compensation Claims shall not include any right of such employee that exists outside of such state workers' compensation system.

### 1.2    OTHER TERMS/INTERPRETATION

(a)    Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the other genders.

(b)    When used in this Plan, the term "Claim" shall be broadly construed to include all manner and type of Claim, whenever and wherever such Claim may arise.

(c)    Any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.

(d)    Any specific references to promissory notes, deeds of trust, or other instruments of indebtedness or security shall include any amendments, modifications and extensions thereto.

(e)    Nothing contained in this Plan or the Plan Documents shall constitute an admission by any party of either liability for or the validity, priority, or extent of any Claim asserted against the Debtors or against any third party.

(f)    Any reference in this Plan to an existing document or exhibit in the Exhibit Book or Exhibit Book Supplement Filed or to be Filed shall mean the document or exhibit as it may have been or may be amended, modified, or supplemented.

(g)    Any reference to an Entity as a Holder of a Claim shall include that Entity's successors, assigns and affiliates.

(h)    The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

(i)    The word "including" (and, with correlative meaning, the forms of the word "include") shall mean including, without limiting the generality of any description preceding that word; and the words "shall" and "will" are used interchangeably and have the same meaning.

(j)    Unless otherwise indicated herein, all references to dollars are to United States dollars.

(k)      An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.

(l)      The descriptive headings contained in this Plan are included for convenience of reference only and are not intended to be a part of and shall not affect in any way the meaning or interpretation of this Plan.

(m)      All references in this Plan to sections, articles, and exhibits are references to sections, articles and exhibits of or to this Plan unless otherwise specified.

(n)      Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

(o)      The rules of construction set forth in Bankruptcy Code § 102 shall apply.

## 1.3      THE PLAN DOCUMENTS

The Plan Documents, once Filed, shall also be available for review:

(a)      in the office of the clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court; by download from the following website: _____;

(b)      on Business Days from 9:00 a.m. through 5:00 p.m. (Eastern Standard Time) at the following addresses:

RAYBURN COOPER & DURHAM, P.A.          ROBINSON, BRADSHAW & HINSON, P.A.
1200 Carillion, 227 West Trade Street          101 North Tryon Street, Suite 1900
Charlotte, NC 28202                          Charlotte, NC 28246
Telephone: (704) 334-0891                    Telephone: (704) 377-2536
Attn: John R. Miller, Jr.                     Attn: Richard C. Worf

Holders of Claims may also obtain a copy of the Plan Documents following their Filing with the clerk of the Bankruptcy Court by contacting counsel for the Debtors by a written request sent to the above address.

## 1.4      ANCILLARY DOCUMENTS

Each of the Plan Documents is an integral part of this Plan and is hereby incorporated by reference and made a part of this Plan.

# ARTICLE 2.

## CLASSIFICATION AND TREATMENT
## OF CLAIMS AND EQUITY INTERESTS

### 2.1    OVERVIEW

This Plan provides for (a) payment in full, in Cash, of Allowed Amounts of all Claims against GST and Garrison and (b) cancellation of existing GST Equity Interests and Garrison Equity Interests and distribution of equity in GST and Garrison to newly formed subsidiaries of EnPro Industries, Inc. The Plan provides that Anchor, a dormant Entity that has not had any property or paid any asbestos-related claims in over a decade, will be dissolved and liquidated, with no distribution of property to creditors.

The Plan contains four principal classes of asbestos personal injury Claims: Current GST Asbestos Claims (Class 4), Future GST Asbestos Claims (Class 5), Pre-Petition Judgment GST Asbestos Claims (Class 6), and Settled GST Asbestos Claims (Class 3). In addition, there are some asbestos personal injury Claims in the class of Anchor Claims (Class 9).

Current GST Asbestos Claims and Future GST Asbestos Claims are all disputed, contingent, and unliquidated. These Claims are classified separately because of the divergent interests between Claimants whose alleged asbestos-related conditions have manifested by the Confirmation Date and Claimants whose conditions have not so manifested (and who are therefore represented by the FCR). Allowance and payment of Current GST Asbestos Claims and Future GST Asbestos Claims (as Allowed) will take place after the Effective Date. Such Claimants will have the opportunity to elect either the Litigation Option or the Settlement Option. Their rights to have their Claims Allowed through litigation pursuant to the Bankruptcy Code are fully preserved by this Plan, in the form of the Litigation Option.

Claimants who choose the Settlement Option will submit their Claims to the Settlement Facility for processing pursuant to the CRP and, as a condition to payment from the Settlement Facility, voluntarily waive their rights to have their Claims Allowed through litigation, including the right to jury trial. The Settlement Facility will be a trust governed by the Settlement Facility Agreement. It will be managed by a trustee who must meet independence criteria contained in the Settlement Facility Agreement.

The CRP prescribe predetermined settlement offers, without the expense and delay of litigation, based on defined, objective factors. Settlement Option Claimants will have the option of choosing Expedited Review or Individual Review, each of which defines settlement offers based on objective factors relating to the Claimant's exposure history and demographic characteristics. Expedited Review requires submission of less information than Individual Review and for most Claimants will result in higher settlement offers. Individual Review requires submission of more information but could produce higher settlement offers for certain Claimants. To receive a payment, Settlement Option Claimants must execute a Settlement Option Release. Settlement Option Claimants who do not receive a settlement offer under the CRP or who choose not to accept the settlement offer may still elect the Litigation Option.

The Settlement Facility will receive aggregate funding of $327.5 million, for payment of Claims and Settlement Facility Expenses from two sources. The Reorganized Debtors will contribute $297.5 million (the Settlement Facility Contributions) and the Parent will contribute the Parent Contribution of $30 million pursuant to the Parent Settlement. The Parent Settlement is a settlement of the Released Claims against the Released Parties.

Claimants who choose the Litigation Option will have their Claims Allowed or Disallowed through litigation, pursuant to the CMO, which preserves Claimants' rights to jury trial and trial in the district court (28 U.S.C. §§ 157(b)(5), 1411). Reorganized Garrison will object to Litigation Option Claims and prosecute such objections. Pretrial proceedings will take place in the Bankruptcy Court, which will refer any Claimant entitled to trial to the District Court. Both Claimants and Reorganized Garrison will be required to answer standard discovery requests, to be followed by fact and expert depositions. The CMO contains procedures designed to prevent "the manipulation of exposure evidence by plaintiffs and their lawyers," which the Bankruptcy Court found before the Petition Date "had a profound impact on a number of Garlock's trials and many of its settlements such that the amounts recovered were inflated." *In re Garlock Sealing Technologies LLC, et al.*, 504 B.R. 71, 82 (Bankr. W.D.N.C. 2014).

Any Litigation Option Claim Allowed by Final Order will be paid in full, while any Litigation Option Claim Disallowed will not receive any payment. The Settlement Facility will be responsible for paying all Litigation Option Expenditures up to the CRP Value for a Litigation Option Claimant (since such funds will not be needed to make a settlement offer to the Claimant). Reorganized Garrison will pay any additional Litigation Option Expenditures from the Litigation Fund.

Claimants may not simultaneously pursue the Settlement Option and Litigation Option, provided, however, Claimants may change their election of the Settlement Option or Litigation Option. Should a Claimant, at any point, change his election from the Litigation Option to the Settlement Option, any settlement offer made by the Settlement Facility pursuant to the CRP will be reduced by the amount of Litigation Expenses incurred by Reorganized Garrison on account of such Claimant's Claim prior to notification of Reorganized Garrison of the Claimant's decision to elect the Settlement Option. Moreover, the authority of Reorganized Garrison to settle Litigation Option Claims will be limited to the CRP Value less any Litigation Expenses incurred by Reorganized Garrison prior to the date of any settlement. This settlement authority will therefore decrease as litigation of a Litigation Option Claim progresses.

The class of Pre-Petition Judgment GST Asbestos Claims includes Claimants who obtained judgments against GST currently on appeal. These Claimants will have the option after the Effective Date of electing the Settlement Option or completing appeals in state court. If a judgment is affirmed by the appellate court, it will be paid in full, first by the Settlement Facility up to the CRP Value (along with any Litigation Expenses), then by Reorganized Garrison from the Litigation Fund (with a guaranty of collection by Reorganized GST) to the extent the judgment plus Litigation Expenses exceeds the CRP Value. If a judgment is reversed by the appellate court and judgment entered in favor of Reorganized GST, the Claim will be Disallowed, with Litigation Expenses paid by the Settlement Facility up to the CRP Value and by Reorganized Garrison from the Litigation Fund to the extent Litigation Expenses exceed the CRP Value. If a judgment is reversed and such Claim is not dismissed or Disallowed as a result

of such reversal (for example, if the Claim is remanded for new trial), the Claimant will be treated like any other Current GST Asbestos Claimant, with the option of pursuing the Settlement Option or the Litigation Option (the latter pursuant to the CMO).

Allowed Settled GST Asbestos Claims will be paid in full and with post-petition interest by Reorganized GST on the Distribution Dates applicable to such Claims. Settled GST Asbestos Claimants whose Claims are Disallowed as not settled will nonetheless continue to hold Current GST Asbestos Claims and may elect the Settlement Option or Litigation Option, subject to any applicable defenses.

Apart from their obligations under the Plan to pay the Settlement Facility Contributions, the Litigation Fund Contribution, and Contingent Litigation Fund Contributions, and payments to Settled GST Asbestos Claimants (as well as Reorganized GST's guaranty of collection of any Pre-Petition Judgment GST Asbestos Claim affirmed on appeal in state court), Reorganized GST and Reorganized Garrison will have no additional or further obligation for GST Asbestos Claims, Settlement Facility Expenses, or Litigation Expenses. After the Effective Date, all Claims against the Debtors will be discharged and the Reorganized Debtors will be protected by the Discharge Injunction described in section 8.1. The Reorganized Debtors' obligations will be limited to those expressly set forth in this Plan.

Other Claims will be treated as described below.

## 2.2   SUMMARY

Claims and Equity Interests are classified for all purposes, including voting, confirmation, and Distribution pursuant to this Plan and pursuant to Bankruptcy Code §§ 1122 and 1123(a)(1), as follows:

| CLASSIFICATION | | IMPAIRMENT AND VOTING |
|---|---|---|
| Class 1 | Priority Claims | Unimpaired – deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 2 | Secured Claims | Unimpaired – deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 3 | Settled GST Asbestos Claims | Debtors contend that Class 3 Settled GST Asbestos Claims are unimpaired and should be deemed to have voted to accept the Plan. The votes of Class 3 Claimants are being solicited in the event the Court determines that Class 3 Claims are impaired or the Court determines the votes are otherwise relevant to confirmation of the Plan. |

| CLASSIFICATION | | IMPAIRMENT AND VOTING |
|---|---|---|
| Class 4 | Current GST Asbestos Claims | Debtors contend that Class 4 Current GST Asbestos Claims are unimpaired and should be deemed to have voted to accept the Plan. The votes of Class 4 Claimants are being solicited in the event the Court determines that Class 4 Claims are impaired or the Court determines the votes are otherwise relevant to confirmation of the Plan. |
| Class 5 | Future GST Asbestos Claims | Debtors contend that Class 5 Future GST Asbestos Claims are unimpaired and should be deemed to have voted to accept the Plan. The votes of Class 5 Claimants are being solicited, through the FCR, in the event the Court determines that Class 5 Claims are impaired or the Court determines the votes are otherwise relevant to confirmation of the Plan. |
| Class 6 | Pre-Petition Judgment GST Asbestos Claims | Debtors contend that Class 6 Pre-Petition Judgment GST Asbestos Claims are unimpaired and should be deemed to have voted to accept the Plan. The votes of Class 6 Claimants are being solicited in the event the Court determines that Class 6 Claims are impaired or the Court determines the votes are otherwise relevant to confirmation of the Plan. |
| Class 7 | General Unsecured Claims | Debtors contend that Class 7 General Unsecured Claims are unimpaired and should be deemed to have voted to accept the Plan. The votes of Class 7 Claimants are nevertheless being solicited in the event the Court determines that Class 7 Claims are impaired or the Court determines the votes are otherwise relevant to confirmation of the Plan. |
| Class 8 | Anchor Claims | Unimpaired – deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 9 | Intercompany Claims | Unimpaired – deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 10 | GST Equity Interests | Impaired – vote to accept or reject the Plan being solicited. |
| Class 11 | Garrison Equity Interests | Impaired – vote to accept or reject the Plan being solicited. |

| CLASSIFICATION | IMPAIRMENT AND VOTING |
|---|---|
| Class 12        Anchor Equity Interest | Unimpaired – deemed to have voted to accept the Plan; no separate vote being solicited. |

### 2.2.1   Class 1     Priority Claims

(a)     Classification

Class 1 consists of all Priority Claims.

(b)     Treatment

Each Holder of an Allowed Class 1 Claim shall be paid the Allowed Amount of its Allowed Priority Claim either (i) in full, in Cash, on the Distribution Date, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Priority Claim and the Reorganized Debtors.

(c)     Impairment and Voting

Class 1 is unimpaired. The Holders of Class 1 Priority Claims are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 2.2.2   Class 2     Secured Claims

(a)     Classification

Class 2 consists of all Secured Claims.

(b)     Treatment

(i)     Non-Tax Secured Claim. Subject to the provisions of Bankruptcy Code §§ 502(b) and 506(d) and the terms herein, each Holder of an Allowed Class 2 Claim shall, at the option of the Reorganized Debtors, receive treatment according to the following alternatives: (i) the Plan will leave unaltered the legal, equitable and contractual rights to which the Holder of such Claim is entitled, (ii) the Reorganized Debtors shall pay the Allowed Claim in full on the Effective Date or as soon thereafter as reasonably practicable; or (iii) the Reorganized Debtors shall provide such other treatment as is agreed to in writing between the Debtors or the Reorganized Debtors and the Holders of such Allowed Secured Claim.

(ii)     Secured Tax Claim. Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a different treatment, each Holder of an Allowed Secured Tax Claim shall receive 100% of the unpaid amount of such Allowed Secured Tax Claim in Cash from the Debtors or Reorganized Debtors on the Distribution Date.

(c)      Impairment and Voting

Class 2 is unimpaired. The Holders of Class 2 Secured Claims are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 2.2.3   Class 3      Settled GST Asbestos Claims

(a)      Classification

Class 3 consists of all Settled GST Asbestos Claims.

(b)      Treatment

Each Allowed Settled GST Asbestos Claim shall be paid the Allowed Amount of such Claimant's Settled GST Asbestos Claim on the Distribution Date. Such payment shall be (i) in full, in Cash, plus post-petition interest at the federal judgment rate in effect on the Petition Date, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Settled GST Asbestos Claim and the Reorganized Debtors.

Post-petition interest shall accrue from the latter of the Petition Date and the date such payment was due through the date of payment and shall be at the federal judgment rate in effect on the Petition Date.

Settled GST Asbestos Claimants whose Claims are Disallowed as not settled shall nonetheless continue to hold Current GST Asbestos Claims and may elect the Settlement Option or Litigation Option.

(c)      Impairment and Voting

Debtors contend that Class 3 is unimpaired and should be deemed to have voted to accept the Plan. The votes of Class 3 Claimants are nevertheless being solicited in the event the Court determines that Class 3 Claims are impaired or the Court determines the votes are otherwise relevant to confirmation of the Plan.

### 2.2.4   Class 4      Current GST Asbestos Claims

(a)      Classification

Class 4 consists of all Current GST Asbestos Claims.

(b)      Treatment

(i)      All Current GST Asbestos Claimants shall have the option to elect the Settlement Option or the Litigation Option. A Current GST Asbestos Claimant shall elect the Settlement Option by Filing a Claim Form (as defined in the CRP) with the Settlement Facility, or shall elect the Litigation Option by Filing a Proof of Claim in the form of Official Form No. 10 on the docket of *In re Garlock Sealing Technologies LLC*, No. 10-31607 (Bankr. W.D.N.C.). A Current GST Asbestos Claimant who already filed a Proof of Claim in response to the

Asbestos Claims Bar Date shall elect the Litigation Option by Filing a notice of such election on the docket.

(ii)    To be eligible for the Settlement Option, all Current GST Asbestos Claims that are Related to the Current GST Asbestos Claim must also elect the Settlement Option. Conversely, so long as any Current GST Asbestos Claimant elects the Litigation Option, all Related Claimants will be deemed to have elected the Litigation Option.

(iii)    Current GST Asbestos Claimants who elect the Settlement Option shall have their Claims processed by the Settlement Facility in accordance with the terms, provisions, and procedures of the CRP, which describe in full detail the criteria for qualifying for payment. If Allowed under the CRP, the Claim shall be paid in full, in Cash, by the Settlement Facility pursuant to the terms of the CRP. To receive payment, the Current GST Asbestos Claimant must execute a Settlement Option Release in form and substance acceptable to the Settlement Facility. Any Current GST Asbestos Claimant who elects the Settlement Option (including any Claimant who does not receive a settlement offer under the CRP or is dissatisfied with such offer) may rescind such election and elect the Litigation Option by Filing a Proof of Claim pursuant to the CMO and serving it on the Settlement Facility.

(iv)    Current GST Asbestos Claimants who elect the Litigation Option shall retain their rights to seek allowance of their Claims through litigation, and will proceed to allowance litigation under the terms of the CMO. The CMO preserves all such Claimants' rights in allowance litigation under the Bankruptcy Code. Litigation Option Claims, if Allowed, shall be paid in full, in Cash, and if Disallowed, shall receive no distribution. The Settlement Facility will pay any Litigation Option Expenditures up to the CRP Value, and Reorganized Garrison will pay from the Litigation Fund any Litigation Option Expenditures in excess of the CRP Value.

(v)    Any Current GST Asbestos Claimant who elects the Litigation Option may rescind such election at any time by filing a Claim Form with the Settlement Facility and providing written notice and a copy of the completed Claim Form to Reorganized Garrison. Any settlement offer made by the Settlement Facility pursuant to the CRP will be reduced by the amount of Litigation Expenses incurred by Reorganized Garrison prior to the date the Claimant provides written notice of filing of a Claim Form to Reorganized Garrison. Reorganized Garrison's authority to settle any Litigation Option Claim shall be limited to the CRP Value less Litigation Expenses prior to the date of any settlement, and Reorganized Garrison shall not be obligated to offer the Litigation Option Claimant any settlement. If Reorganized Garrison makes, and the Litigation Option Claimant accepts, any settlement, the Settlement Facility will pay the settlement to the Claimant after paying Litigation Expenses incurred before the date of settlement, with the Settlement Facility's aggregate responsibility not to exceed the CRP Value.

(c)    **Injunctions**

**Current GST Asbestos Claims shall be discharged and subject to the Discharge Injunction described in section 8.1 and may not under any circumstance assert their Claims against the Reorganized Debtors.**

26

**Pursuant to the Parent Settlement, Current GST Asbestos Claimants shall be subject to the Parent Settlement Enforcement Injunction described in section 8.2 and may not under any circumstances assert Released Claims against any Released Parties.**

(d)    Impairment and Voting

Debtors contend that Class 4 is unimpaired and should be deemed to have voted to accept the Plan. The votes of Class 4 Claimants are nevertheless being solicited in the event the Court determines that Class 4 Claims are impaired or the Court determines the votes are otherwise relevant to confirmation of the Plan.

### 2.2.5    Class 5    Future GST Asbestos Claims

(a)    Classification

Class 5 consists of all Future GST Asbestos Claims.

(b)    Treatment

(i)    All Future GST Asbestos Claimants shall have the option to elect the Settlement Option or the Litigation Option. A Future GST Asbestos Claimant shall elect the Settlement Option by Filing a Claim Form (as defined in the CRP) with the Settlement Facility, or shall elect the Litigation Option by Filing a Proof of Claim in the form of Official Form No. 10 on the docket of *In re Garlock Sealing Technologies LLC*, No. 10-31607 (Bankr. W.D.N.C.).

(ii)    To be eligible for the Settlement Option, all Future GST Asbestos Claims that are Related to the Future GST Asbestos Claim must also elect the Settlement Option. Conversely, so long as any Future GST Asbestos Claimant elects the Litigation Option, all Related Claimants will be deemed to have elected the Litigation Option.

(iii)    Future GST Asbestos Claimants who elect the Settlement Option shall have their Claims processed by the Settlement Facility in accordance with the terms, provisions, and procedures of the CRP, which describe in full detail the criteria for qualifying for payment. If Allowed under the CRP, the Claim shall be paid in full, in Cash, by the Settlement Facility pursuant to the terms of the CRP. To receive payment, the Future GST Asbestos Claimant must execute a Settlement Option Release in form and substance acceptable to the Settlement Facility. Any Future GST Asbestos Claimant who elects the Settlement Option (including any Claimant who does not receive a settlement offer under the CRP or is dissatisfied with such offer) may rescind such election and elect the Litigation Option by Filing a Proof of Claim pursuant to the CMO and serving it on the Settlement Facility.

(iv)    Future GST Asbestos Claimants who elect the Litigation Option shall retain their rights to seek allowance of their Claims through litigation, and will proceed to allowance litigation under the terms of the CMO. The CMO preserves all such Claimants' rights in allowance litigation under the Bankruptcy Code. Litigation Option Claims, if Allowed, shall be paid in full, in Cash, and if Disallowed, shall receive no distribution. The Settlement Facility will pay any Litigation Option Expenditures up to the CRP Value, and Reorganized Garrison

will pay from the Litigation Fund any Litigation Option Expenditures in excess of the CRP Value.

(v)     Any Future GST Asbestos Claimant who elects the Litigation Option may rescind such election at any time by filing a Claim Form with the Settlement Facility and providing written notice and a copy of the completed Claim Form to Reorganized Garrison. Any settlement offer made by the Settlement Facility pursuant to the CRP will be reduced by the amount of Litigation Expenses incurred by Reorganized Garrison prior to the date the Claimant provides written notice of filing of a Claim Form to Reorganized Garrison. Reorganized Garrison's authority to settle any Litigation Option Claim shall be limited to the CRP Value less Litigation Expenses prior to the date of any settlement, and Reorganized Garrison shall not be obligated to offer the Litigation Option Claimant any settlement. If Reorganized Garrison makes, and the Litigation Option Claimant accepts, any settlement, the Settlement Facility will pay the settlement to the Claimant after paying Litigation Expenses incurred before the date of settlement, with the Settlement Facility's aggregate responsibility not to exceed the CRP Value.

### (c)     Injunctions

**Future GST Asbestos Claims shall be discharged and subject to the Discharge Injunction described in section 8.1 and may not under any circumstance assert their Claims against the Reorganized Debtors.**

**Pursuant to the Parent Settlement, Future GST Asbestos Claimants shall be subject to the Parent Settlement Enforcement Injunction described in section 8.2 and may not under any circumstances assert Released Claims against any Released Parties.**

(d)     Impairment and Voting

Debtors contend that Class 5 is unimpaired and should be deemed to have voted to accept the Plan. The votes of Class 5 Claimants are nevertheless being solicited, through the FCR, in the event the Court determines that Class 5 Claims are impaired or the Court determines the votes are otherwise relevant to confirmation of the Plan.

### 2.2.6   Class 6     Pre-Petition Judgment GST Asbestos Claims

(a)     Classification

Class 6 consists of all Pre-Petition Judgment GST Asbestos Claims.

(b)     Treatment

(i)     All Pre-Petition Judgment GST Asbestos Claimants shall in the first instance have the option to elect the Settlement Option or instead litigate to conclusion the pending appeals of their judgments.

(ii)     If such a Claimant chooses to litigate the pending appeal of a judgment to conclusion, and the judgment is affirmed on appeal, the judgment will be paid in full, plus post-petition interest at the rate applicable to judgments in the jurisdiction in which the

judgment was obtained, as of the Petition Date, with the Settlement Facility paying any judgment and Litigation Expenses as incurred up to the CRP Value, then Reorganized Garrison paying any additional amount from the Litigation Fund (with a guaranty of collection by Reorganized GST). If the judgment is reversed by the appellate court and judgment entered in favor of Reorganized GST, the Claim will be Disallowed, with the Settlement Facility paying any Litigation Expenses incurred after the Effective Date up to the value of the CRP Value and Reorganized Garrison paying any further Litigation Expenses from the Litigation Fund. If a judgment is reversed and such Claim is not Disallowed as a result of such reversal (for example, if the Claim is remanded for new trial), the Claimant will be treated like any other Current GST Asbestos Claimant, with the option of electing the Settlement Option or the Litigation Option (the latter pursuant to the CMO).

(iii)     To be eligible for the Settlement Option, all Pre-Petition Judgment GST Asbestos Claims that are Related to the Pre-Petition Judgment GST Asbestos Claim must also elect the Settlement Option. Conversely, so long as any Pre-Petition Judgment GST Asbestos Claimant elects to litigate appeals to conclusion or (after reversal on appeal that does not result in Disallowance) the Litigation Option, all Related Claimants will be deemed to have elected to litigate appeals to conclusion or, if applicable, the Litigation Option.

(iv)     Pre-Petition Judgment GST Asbestos Claimants who elect the Settlement Option (either in lieu of litigating appeals of a judgment to conclusion, or after reversal of any judgment on appeal that does not result in Disallowance) shall have their Claims processed by the Settlement Facility in accordance with the terms, provisions, and procedures of the CRP, which describe in full detail the criteria for qualifying for payment. If Allowed under the CRP, the Claim shall be paid in full, in Cash, by the Settlement Facility pursuant to the terms of the CRP. To receive payment, the Pre-Petition Judgment GST Asbestos Claimant must also provide a Settlement Option Release in form and substance acceptable to the Settlement Facility. Any Pre-Petition Judgment GST Asbestos Claimant who elects the Settlement Option (including any Pre-Petition Judgment GST Asbestos Claimant who does not receive a settlement offer under the CRP or is dissatisfied with such offer) may rescind such election and elect the Litigation Option by Filing a Proof of Claim pursuant to the CMO and serving it on the Settlement Facility.

(v)     Pre-Petition Judgment GST Asbestos Claimants who elect the Litigation Option after reversal of any judgment on appeal that does not result in Disallowance shall retain their rights to seek allowance of their Claims through litigation, and will proceed to allowance litigation under the terms of the CMO. The CMO preserves all such Claimants' rights in allowance litigation under the Bankruptcy Code. Litigation Option Claims, if Allowed, shall be paid in full, in Cash, and if Disallowed, shall receive no distribution. The Settlement Facility will pay any Litigation Option Expenditures up to the CRP Value, and Reorganized Garrison will pay from the Litigation Fund any Litigation Option Expenditures in excess of the CRP Value.

(vi)     Any Pre-Petition Judgment GST Asbestos Claimant who elects the Litigation Option may rescind such election at any time by filing a Claim Form (as defined in the CRP) with the Settlement Facility and providing written notice and a copy of the completed Claim Form to Reorganized Garrison. Any settlement offer made by the Settlement Facility

pursuant to the CRP will be reduced by the amount of Litigation Expenses incurred by Reorganized Garrison prior to the date the Claimant provides written notice of filing of a Claim Form to Reorganized Garrison. Reorganized Garrison's authority to settle any Litigation Option Claim shall be limited to the CRP Value less Litigation Expenses prior to the date of any settlement, and Reorganized Garrison shall not be obligated to offer the Litigation Option Claimant any settlement. If Reorganized Garrison makes, and the Litigation Option Claimant accepts, any settlement, the Settlement Facility will pay the settlement to the Claimant after paying Litigation Expenses incurred before the date of settlement, with the Settlement Facility's aggregate responsibility not to exceed the CRP Value.

(c)    **Injunctions**

**Pre-Petition Judgment GST Asbestos Claims shall be discharged and subject to the Discharge Injunction described in section 8.1 and may not under any circumstance assert their Claims against the Reorganized Debtors except as permitted by this Plan.**

**Pursuant to the Parent Settlement, Pre-Petition Judgment GST Asbestos Claimants shall be subject to the Parent Settlement Enforcement Injunction described in section 8.2 and may not under any circumstances assert Released Claims against any Released Parties.**

(d)    Impairment and Voting

Debtors contend that Class 6 is unimpaired and should be deemed to have voted to accept the Plan. The votes of Class 6 Claimants are nevertheless being solicited in the event the Court determines that Class 6 Claims are impaired or the Court determines the votes are otherwise relevant to confirmation of the Plan.

### 2.2.7    Class 7    General Unsecured Claims

(a)    Classification

Class 7 consists of all General Unsecured Claims.

(b)    Treatment

Each Holder of an Allowed Class 7 Claim shall be paid the Allowed Amount of its General Unsecured Claim on the Distribution Date. Such payment shall be (i) in full, in Cash, plus post-petition interest at the federal judgment rate in effect on the Petition Date, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed General Unsecured Claim and the Reorganized Debtors.

Post-petition interest shall accrue from the Petition Date through the date of payment and shall be at the federal judgment rate in effect on the Petition Date.

(c)    Impairment and Voting

Debtors contend that Class 7 is unimpaired and should be deemed to have voted to accept the Plan. The votes of Class 7 Claimants are nevertheless being solicited in the event the Court

determines that Class 7 Claims are impaired or the Court determines the votes are otherwise relevant to confirmation of the Plan.

### 2.2.8   Class 8          Anchor Claims

    (a)      Classification

Class 8 consists of all Anchor Claims.

    (b)      Treatment

Each Holder of a Class 8 Claim shall be entitled to assert such Claim against Anchor in accordance with the provisions of Article 14 of Chapter 55 of the North Carolina Business Corporation Act.

    (c)      Impairment and Voting

Class 8 is unimpaired. The Holders of Class 8 Anchor Claims are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 2.2.9   Class 9     Intercompany Claims

    (a)      Classification

Class 9 consists of all Intercompany Claims.

    (b)      Treatment

On the Effective Date, all Intercompany Claims between and among the Debtors shall be preserved by this Plan.

    (c)      Impairment and Voting

Class 9 is unimpaired. The Holders of Class 9 Allowed Intercompany Claims are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 2.2.10  Class 10   GST Equity Interests

    (a)      Classification

Class 10 consists of the GST Equity Interests, 100% of which are held by the Parent.

    (b)      Treatment

On the Effective Date, Class 10 GST Equity Interests as a result of transactions and agreements between the Parent and the Debtors will be canceled and new equity interests will be distributed to a newly formed subsidiary of EnPro.

(c)      Impairment and Voting

Class 10 is impaired. Debtors are soliciting the vote of the Parent to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 2.2.11  Class 11    Garrison Equity Interests

(a)      Classification

Class 11 consists of Garrison Equity Interests, 100% of which are held by the Parent.

(b)      Treatment

On the Effective Date, Class 11 Garrison Equity Interests as a result of transactions and agreements between the Parent and the Debtors will be canceled and new equity interests will be distributed to a newly formed subsidiary of EnPro.

(c)      Impairment and Voting

Class 11 is impaired. Debtors are soliciting the vote of the Parent to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 2.2.12  Class 12    Anchor Equity Interest

(a)      Classification

Class 12 consists of the Anchor Equity Interest.

(b)      Treatment

On the Effective Date, Reorganized Garrison shall retain the Anchor Equity Interest.

(c)      Impairment and Voting

Class 12 is unimpaired. The Holder of the Class 12 Anchor Equity Interest is deemed to have voted to accept this Plan and, accordingly, its separate vote will not be solicited.

## ARTICLE 3.

## MODIFICATION OR WITHDRAWAL OF PLAN

## 3.1    MODIFICATION OF PLAN; AMENDMENT OF PLAN DOCUMENTS

### 3.1.1  Modification of Plan

The Debtors may alter, amend, or modify this Plan, or any other Plan Document, under Bankruptcy Code § 1127(a) at any time prior to the Confirmation Date so long as this Plan, as modified, meets the requirements of Bankruptcy Code §§ 1122 and 1123 or the Court has

approved such modifications to the Plan. After the Confirmation Date, and prior to the Effective Date, the Debtors may alter, amend, or modify this Plan in accordance with Bankruptcy Code § 1127(b). The FCR must consent to any material modifications of this Plan.

### 3.1.2   Amendment of Plan Documents

From and after the Effective Date, the authority to amend, modify, or supplement the Plan Documents shall be as provided in this Plan or such documents. The FCR must consent to any material modifications of the Plan Documents.

## 3.2     WITHDRAWAL OF PLAN

### 3.2.1   Right to Withdraw Plan

The Debtors reserve the right, in the exercise of their sole discretion, to withdraw the Plan at any time prior to the Confirmation Date with the consent of the FCR. In addition, following entry of an order on Debtors' Motion For Entry of Order Approving Solicitation and Confirmation Procedures and Schedule (Dkt. No. 3802), the FCR's Motion for Asbestos Claims Bar Date and Related Relief  (Dkt. No. 4247) and the Disclosure Statement Order, if Debtors reach agreement on the terms of a plan of reorganization with the Asbestos Committee that the Debtors believe, in good faith, provides for the fair and equal treatment of Future GST Asbestos Claims, Debtors may withdraw the Plan after ten (10) days' written notice to the FCR. If Debtors thereafter propose an amended plan of reorganization not acceptable to the FCR, the FCR will have all rights and arguments to object to such new Plan.

### 3.2.2   Effect of Withdrawal

If this Plan is withdrawn prior to the Confirmation Date, this Plan shall be deemed null and void. In such event, nothing contained herein or in any of the Plan Documents shall be deemed to constitute a waiver or release of any claims or defenses of, or an admission or statement against interest by, the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

## ARTICLE 4.

## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

## 4.1     UNCLASSIFIED CLAIMS

In accordance with Bankruptcy Code § 1123(a)(1), Administrative Expense Claims and Priority Tax Claims, as described below, have not been classified in Article 2.

**4.2      ALLOWED ADMINISTRATIVE EXPENSE CLAIMS**

Subject to the terms herein and unless otherwise agreed to by the Holder of an Allowed Administrative Expense Claim (in which event such other agreement shall govern), Allowed Administrative Expense Claims shall be provided for as follows:

(a)      if such Claim is for goods sold or services rendered representing liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases involving customers, suppliers, trade or vendor Claims, such Claim shall be paid by the Debtors or the Reorganized Debtors in the ordinary course in accordance with the terms and conditions of any agreements relating thereto;

(b)      if such Claim is for amounts necessary to cure executory contracts and unexpired leases assumed by the Debtors, such Claim shall be paid by the Debtors or Reorganized Debtors as soon as practicable after the Effective Date or as ordered by the Bankruptcy Court;

(c)      amounts due Holders of other Allowed Administrative Expense Claims, including, without limitation, Fee Claims or Claims arising pursuant to Bankruptcy Code § 503(b)(9), shall be paid as agreed between the Debtors and such Holders, as soon as practicable after the Effective Date or as ordered by the Bankruptcy Court;

(d)      Administrative Expense Claims of the Bankruptcy Administrator for fees pursuant to 28 U.S.C. § 1930(a)(6) and (7) shall be paid in accordance with the applicable schedule for payment of such fees by Debtors; and

(e)      other Allowed Administrative Expense Claims shall be paid in full, in Cash on the Distribution Date.

**4.3      ALLOWED PRIORITY TAX CLAIMS**

Subject to the terms herein, each Holder of an Allowed Priority Tax Claim shall be paid 100% of the unpaid Allowed Amount of such Allowed Priority Tax Claim in Cash by the Reorganized Debtors on the Distribution Date. Any claim or demand for penalty relating to any Priority Tax Claim (other than a penalty of the type specified in Bankruptcy Code § 507(a)(8)(G)) shall be Disallowed, and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtors, or their Estates or assets.

**ARTICLE 5.**

**PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS**

**5.1      OBJECTIONS TO CLAIMS; PROSECUTION OF DISPUTED CLAIMS**

Prior to the Effective Date, the Debtors or Reorganized Debtors, as applicable, the Bankruptcy Administrator and any other party-in-interest may object to the allowance of any

Administrative Expense Claim, Priority Tax Claim, Class 1 Priority Claim, Class 2 Secured Claim, Class 3 Settled GST Asbestos Claim, or Class 7 General Unsecured Claim Filed with the Bankruptcy Court or to be otherwise resolved by the Debtors or Reorganized Debtors pursuant to any provisions of this Plan with respect to which they dispute liability, in whole or in part. The Debtors' pending objections to any such Claims shall be transferred to the Reorganized Debtors for final resolution.

All objections to such Claims that are Filed and prosecuted by the Reorganized Debtors as provided herein may be: (i) compromised and settled in accordance with the business judgment of the Reorganized Debtors without approval of the Bankruptcy Court or (ii) litigated to Final Order by the Reorganized Debtors. After the Effective Date, only the Reorganized Debtors shall be permitted to prosecute objections to such Claims. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by the Reorganized Debtors to such Claims shall be served and Filed no later than six (6) months after the Effective Date, subject to any extensions granted pursuant to a further order of the Bankruptcy Court with respect to any Claims filed after the Effective Date. Such further order may be obtained by the Reorganized Debtors without a hearing or notice. The Debtors reserve the right to designate, upon notice to the Holders of such Claim, any Claim as a Disputed Claim on or before the Confirmation Date.

To the extent that the Court enters an alternative dispute resolution order which contemplates that an order shall survive confirmation of this Plan, such order shall be controlling.

All Current GST Asbestos Claims, Future GST Asbestos Claims, and Pre-Petition Judgment GST Asbestos Claims shall be regarded as disputed, contingent, and unliquidated. The Reorganized Debtors shall be deemed to object to all such Claims (including any Current GST Asbestos Claims and Pre-Petition Judgment GST Asbestos Claims Filed pursuant to the Asbestos Claims Bar Date), whenever they may be Filed, and Reorganized Garrison will expressly have the authority to object to any Litigation Option Claims Filed at any time after the Confirmation Date, and will be deemed to so object.

### 5.1.1   Amendments to Claims

After the Confirmation Date, no Claim (other than Settlement Option Claims and Litigation Option Claims) may be Filed or amended to increase the amount or a lien or priority demanded unless otherwise provided by order of the Bankruptcy Court. Unless otherwise provided herein, any such new or amended Claim Filed after the Confirmation Date shall be disregarded and deemed Disallowed in full and expunged without need for objection, unless the Holder of such Claim has obtained prior Bankruptcy Court authorization for the filing. Submission and amendment of Settlement Option Claims and Litigation Option Claims shall be governed by the CRP and CMO, as applicable.

### 5.2   DISTRIBUTION ON ACCOUNT OF DISPUTED CLAIMS

Notwithstanding Section 5.1 hereof, a Distribution shall be made to the Holder of a Disputed Claim only when, and to the extent that, such Disputed Claim becomes Allowed and pursuant to the appropriate provisions of this Plan covering the Class of which such Disputed

Claim is a part. No Distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 5.1 hereof.

### 5.3    BAR DATES FOR ADMINISTRATIVE EXPENSE CLAIMS

#### 5.3.1   Administrative Expense Claims

All parties seeking payment of an Administrative Expense Claim that is not a Fee Claim must File with the Bankruptcy Court and serve upon the Debtors a request for payment of such Administrative Expense Claim prior to the applicable deadline set forth below; provided, however, that parties seeking payment of postpetition ordinary course trade obligations, postpetition payroll obligations incurred in the ordinary course of a Debtor's postpetition business, and amounts arising under agreements approved by the Bankruptcy Court or the Plan need not File such a request.

**All Holders of Administrative Expense Claims must File with the Bankruptcy Court and serve on the Debtors a request for payment of such Claim so as to be received on or before 4:00 p.m. (Eastern Time) on the date that is the first Business Day after the date that is thirty (30) days after the Effective Date, unless otherwise agreed to by the appropriate Debtor or Reorganized Debtor, without further approval by the Bankruptcy Court. Failure to comply with these deadlines shall forever bar the holder of an Administrative Expense Claim from seeking payment thereof.**

**Any Holder of an Administrative Expense Claim that does not assert such Claim in accordance with this Section shall have its Claim deemed Disallowed under this Plan and be forever barred from asserting such Claim against any of the Debtors, their Estates or their assets. Any such Claim and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, recoup, or recover such Claim.**

#### 5.3.2   Fee Claims

All parties seeking payment of a Fee Claim must File with the Bankruptcy Court and serve upon the Debtors a proof or application for payment of such Fee Claim in accordance with the Fee Order by the date that is the first Business Day after the date that is ninety (90) days after the Effective Date unless otherwise agreed to by the Debtors, without further approval by the Bankruptcy Court. Failure to comply with these deadlines shall forever bar the Holder of a Fee Claim from seeking payment thereof.

**Any Holder of a Fee Claim that does not assert such Claim in accordance with the Fee Order and this Section shall have its Claim deemed Disallowed under this Plan and be forever barred from asserting such Claim against any of the Debtors, their Estates or their assets. Any such Claim and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such claim.**

**The Debtors and Reorganized Debtors expressly preserve the right to object to any Fee Claim prior to and after the Effective Date, subject to the provisions of this Plan.**

36

## ARTICLE 6.

## ACCEPTANCE OR REJECTION OF THIS PLAN

### 6.1     IMPAIRED CLASSES TO VOTE

Classes 10 and 11 are impaired. Debtors are soliciting the vote of the Parent to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 6.2     PRESUMED ACCEPTANCE OF THIS PLAN

Claims and Interests in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, and 12 are unimpaired. Under Bankruptcy Code § 1126(f), the Holders of Claims in such Classes are conclusively presumed to have voted to accept the Plan.

### 6.3     PURPOSE OF VOTE BY CLASSES 3, 4, 5, 6, AND 7

Debtors contend that Claims in Classes 3, 4, 5, 6, and 7 are unimpaired and should be conclusively presumed to have voted to accept the Plan. Debtors are nevertheless soliciting, pursuant to the Confirmation Procedures Order, the votes of Classes 3, 4, 5, 6, and 7 in the event the Court determines that Claims in these Classes are impaired or the Court determines their votes are otherwise relevant to confirmation of the Plan.

### 6.4     NONCONSENSUAL CONFIRMATION

#### 6.4.1   Cramdown

To the extent necessary, the Debtors hereby request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code § 1129(b) with respect to any impaired Class of Claims, including Classes of Claims created pursuant to amendments to this Plan, that fail to accept this Plan in accordance with Bankruptcy Code §§ 1126 and 1129(a). Subject to Bankruptcy Code § 1127, the Debtors reserve the right to modify the Plan to the extent that confirmation pursuant to Bankruptcy Code § 1129(b) requires modification.

#### 6.4.2   General Reservation of Rights

Should this Plan fail to be accepted by the requisite number and amount of the Holders of Claims and Equity Interests required to satisfy Bankruptcy Code § 1129, then, notwithstanding any other provision of this Plan to the contrary, the Debtors reserve the right to amend this Plan.

### 6.5     OBJECTIONS TO VOTING

The Debtors may examine any Claim and object to the right of any Holder of such Claim to vote or seek to estimate any Claim for voting purposes. The failure by the Debtors to object to any Holder's right to vote shall not be deemed a waiver of the right of the Debtors, the Reorganized Debtors, or the Settlement Facility, as the case may be, to object to the allowance of such Holder's Claim in whole or part.

# ARTICLE 7.

# IMPLEMENTATION OF THIS PLAN

## 7.1    VESTING OF ASSETS OF THE DEBTORS

On the Effective Date pursuant to Bankruptcy Code § 1141(b), except as otherwise expressly provided in this Plan or in the Confirmation Order, the assets and property of the Debtors shall vest or revest in the appropriate Reorganized Debtors for use, sale and distribution in accordance with operation of the Reorganized Debtors' business and this Plan.

As of the Effective Date, all assets vested or revested, and all assets dealt with by the Plan, shall be free and clear of all Claims, liens, and interests except as otherwise specifically provided in the Plan and/or the Confirmation Order.

From and after the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, sell and otherwise dispose of property without supervision or approval of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the guidelines and requirements of the Bankruptcy Administrator, other than those restrictions expressly imposed by the Plan or the Confirmation Order; provided, however, that nothing herein restricts the right of the Reorganized Debtors to seek Bankruptcy Court approval for the sale, assignment, transfer, or other disposal of certain of the Reorganized Debtors' assets after the Confirmation Date in the event that such Court approval is deemed to be beneficial or advisable.

All Retained Causes of Action and Unknown Causes of Action are expressly preserved for the benefit of the Reorganized Debtors pursuant to section 11.3.

## 7.2    CORPORATE GOVERNANCE OF DEBTORS

### 7.2.1    Amendment of Certificates of Incorporation of the Debtors

The Certificates of Incorporation, By-Laws, or Articles of Organization, as applicable, of each of the Debtors shall be amended as of the Effective Date as needed to effectuate the terms of the Plan and the requirements of the Bankruptcy Code. The amended Certificates of Incorporation, By-Laws, or Articles of Organization, as applicable, of the Debtors shall, among other things: (i) prohibit the issuance of nonvoting equity securities as required by Bankruptcy Code § 1123(a)(6), and subject to further amendment as permitted by applicable law; (ii) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends; and (iii) effectuate any other provisions of this Plan. The amended Certificates of Incorporation of Garrison and Anchor and Articles of Organization of GST shall be filed with the Secretary of State or equivalent official in their respective jurisdictions of incorporation on or prior to the Effective Date and be in full force and effect without any further amendment as of the Effective Date.

### 7.2.2    D&O and Fiduciary Liability Tail Coverage Policies

The Reorganized Debtors, with the assistance, if necessary, of the Parent and its Affiliates, shall maintain continuous directors and officers liability insurance coverage with regard to any liabilities, losses, damages, claims, costs and expenses they or any current or former officer, manager, or director of any of the Debtors may incur, including but not limited to attorneys' fees, arising out of or due to the actions or omissions of any of them or the consequences of such actions or omissions, including, without limitation, service as an officer, manager, or director, other than as a result of their willful misconduct or fraud. Each such policy shall cover each current and former officer, manager, or director of any of the Debtors.

Except as otherwise specifically provided herein, any obligations of the Debtors to indemnify their present and former directors, managers, officers, employees or professionals under their Certificates of Incorporation, By-Laws, employee indemnification policy, or under state law or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall be deemed assumed by the Reorganized Debtors on the Effective Date, and shall survive and be unaffected by this Plan's confirmation, and remain an obligation of the Reorganized Debtors, regardless of whether the right to indemnification arose before or after the Petition Date.

## 7.3    THE SETTLEMENT FACILITY AND LITIGATION FUND

### 7.3.1    Creation of Settlement Facility and Funding of Litigation Fund

On the Effective Date, the Reorganized Debtors shall execute and deliver the Settlement Facility Agreement, thereby establishing the Settlement Facility, and make in Cash the first Settlement Facility Contribution in the amount of $220 million to the Settlement Facility. If the Parent Settlement is approved, the Parent shall execute and deliver the Parent Settlement Agreement and transfer the $30 million in Cash to the Settlement Facility as the Parent Contribution.

On the Effective Date, the Reorganized Debtors shall also transfer the Litigation Fund Contribution of $30 million in Cash to the Litigation Fund.

In the event the Effective Date occurs after March 31, 2016, the Reorganized Debtors shall pay interest on the Settlement Facility Contribution, the Parent Contribution, and the Litigation Fund Contribution from March 31, 2016 to the Effective Date at the greater of the applicable one-year Treasury rate or the rate that the Debtors achieve on their cash balances during that period.

Except for the obligations of the Settlement Facility pursuant to this Plan, the Settlement Facility Contribution and the Parent Contribution shall be vested in the Settlement Facility free and clear of all Claims, Equity Interests, encumbrances, and other claims or interests of any Entity. Except for the obligations of Reorganized Garrison pursuant to this Plan, the Litigation Fund shall be vested in Reorganized Garrison free and clear of all Claims, Equity Interests, encumbrances, and other claims or interests of any Entity.

### 7.3.2    Obligations of Reorganized Debtors for GST Asbestos Claims

After the Settlement Facility and Litigation Fund have been established and funded on the Effective Date, the obligations of the Reorganized Debtors under this Plan with respect to GST Asbestos Claims shall consist solely of the following:

(a)    The Reorganized Debtors shall pay Allowed Settled GST Asbestos Claims;

(b)    The Reorganized Debtors shall make the following additional Settlement Facility Contributions payable after the Effective Date, with accrued interest on each Settlement Facility Contribution at the rate the Settlement Facility achieves on its cash balances from the Effective Date to the date of such Settlement Fund Contribution: $25 million payable on the first anniversary of the Effective Date; $25 million payable on the third anniversary of the Effective Date; $15 million payable on the fifth anniversary of the Effective Date; and $12.5 million payable on the seventh anniversary of the Effective Date;

(c)    In the event the Effective Date occurs after March 31, 2016, the Reorganized Debtors shall pay interest on the Settlement Facility Contributions described in the immediately preceding subparagraph (b) from March 31, 2016 to the Effective Date at the greater of the applicable one-year Treasury rate or the rate that the Debtors achieve on their cash balances during that period;

(d)    The Reorganized Debtors shall transfer the Settled GST Asbestos Claims Surplus to the Settlement Facility, if any, within 60 days of final liquidation of the last disputed Settled GST Asbestos Claim;

(e)    The Reorganized Debtors shall make Contingent Litigation Fund Contributions that become due and payable under Section 7.3.5 of this Plan, if any;

(f)    Reorganized Garrison shall be obligated to object to and prosecute objections to Litigation Option Claims; pay Litigation Option Expenditures in excess of the CRP Value, solely from the Litigation Fund; and otherwise administer the Litigation Fund as set forth in Section 7.3.4 below;

(g)    Reorganized Garrison shall prosecute the appeal of any Pre-Petition Judgment GST Asbestos Claim if such Claimant elects to complete state court appeals, and pay Litigation Expenses and any judgment affirmed by a state court from the Litigation Fund (with a guaranty of collection by Reorganized GST); and

(h)    Reorganized Garrison shall perform its consultation obligations under the Settlement Facility Agreement.

The Reorganized Debtors' obligations to make Settlement Facility Contributions payable after the Effective Date and Contingent Litigation Fund Contributions in accordance with Section 7.3.5 of this Plan are guaranteed by EnPro as a portion of the EnPro Contribution.

Other than these obligations, the Reorganized Debtors shall have no further financial or other responsibility for any GST Asbestos Claim.

### 7.3.3   Obligations of Settlement Facility

On the Effective Date, without any further action of any Entity, the Settlement Facility shall assume all liabilities, obligations, and responsibilities for all Settlement Option Claims, and shall also assume all Litigation Option Expenditures up to the CRP Value for Litigation Option Claims.

The Settlement Facility shall assume full and exclusive responsibility, pursuant to the Settlement Facility Agreement and CRP, for processing and reviewing all Settlement Option Claims and paying those that become Allowed. Settlement Option Claimants shall elect the Settlement Option by filing a Claim Form with the Settlement Facility.

The Settlement Facility also shall assume financial responsibility for Litigation Option Expenditures up to the amount of the CRP Value for such Claims. Reorganized Garrison shall retain full control of prosecuting objections to Litigation Option Claims. The timing of calculation of the CRP Value is described in the Settlement Facility Agreement.

Litigation Option Claimants may rescind their election of the Litigation Option by filing a Claim Form (as defined in the CRP) with the Settlement Facility and providing written notice and a copy of the completed Claim Form to Reorganized Garrison. The Settlement Facility shall pay such a Claimant the payment prescribed by the CRP less Litigation Expenses incurred prior to the date the Claimant provides written notice of filing of a Claim Form to Reorganized Garrison.

Reorganized Garrison's authority to settle any Litigation Option Claim shall be limited to the CRP Value less Litigation Expenses to the date of any settlement but Reorganized Garrison shall not be obligated to offer the Litigation Option Claimant any settlement. If Reorganized Garrison makes, and the Litigation Option Claimant accepts, any settlement, the Settlement Facility will pay the settlement to the Claimant after paying any Litigation Expenses incurred before the date of settlement, with the Settlement Facility's aggregate responsibility not to exceed the CRP Value.

The Settlement Facility shall be responsible for fulfilling all other obligations under the Settlement Facility Agreement and shall be exclusively responsible for paying all Settlement Facility Expenses.

The Settlement Facility Agreement will include provisions requiring the Settlement Facility to defend and indemnify Reorganized GST, Reorganized Garrison, the Parent, and the other Released Parties from and against any GST Asbestos Claims asserted against them after the Effective Date and hold Reorganized GST, Reorganized Garrison, the Parent, and other Released Parties harmless from any losses associated with such Claims. The defense and indemnity obligation of the Settlement Facility, however, will not apply to Pre-Petition Judgment GST Asbestos Claims whose Holders elect to complete state court appeals, or Settled GST Asbestos Claims.

The Settlement Facility shall be a "qualified settlement fund" for federal income tax purposes within the meaning of IRC § 468B and regulations issued pursuant to IRC § 468B.

### 7.3.4   Obligations of Reorganized Garrison With Respect to Litigation Option Claims

On the Effective Date, without any further action of any Entity, Reorganized Garrison shall assume responsibility for managing the Litigation Option and prosecuting objections to all Litigation Option Claims and shall assume responsibility for paying from the Litigation Fund (a) Litigation Management Fees and (b) any Litigation Option Expenditures in excess of the CRP Value for each Litigation Option Claim. Reorganized Garrison shall be able to assert all objections to such Claims that the Debtors could have asserted during the bankruptcy case. This Plan does not affect any attorney-client, work product, or other privilege of the Debtors, and Reorganized Garrison may assert any such privilege that Debtors would have possessed absent this Plan.

Reorganized Garrison shall have no liability, obligation, or responsibility for Litigation Option Expenditures independent of its obligation to pay such Litigation Option Expenditures from the Litigation Fund. Reorganized Garrison shall have no liability for any Settlement Option Claim. Reorganized Garrison shall be entitled to collect Litigation Management Fees from the Litigation Fund.

Litigation Option Claimants shall elect the Litigation Option by Filing a Proof of Claim in the form of Official Form No. 10 on the docket of *In re Garlock Sealing Technologies LLC*, No. 10-31607 (Bankr. W.D.N.C.). Such filing must comply with any statutes of limitation and repose under applicable law. Litigation Option Claimants who already filed a proof of claim in response to the Asbestos Claims Bar Date shall elect the Litigation Option by filing a Notice of Election of Litigation Option. In the case of each Litigation Option Claim, Reorganized Garrison shall object to the Claim (and be deemed to object to the Claim) and prosecute such objection under the procedures set forth in the CMO.

As set forth above and in more detail in the Settlement Facility Agreement, the Settlement Facility shall assume financial responsibility for Litigation Option Expenditures up to the amount of the CRP Value for such Claims.

A Litigation Option Claimant may rescind his election of the Litigation Option by filing a Claim Form (as defined in the CRP) with the Settlement Facility and providing written notice and a copy of the completed Claim Form to Reorganized Garrison. Any settlement offer made by the Settlement Facility pursuant to the CRP will be reduced by the amount of Litigation Expenses incurred by Reorganized Garrison prior to the date the Claimant provides written notice of filing of a Claim Form to Reorganized Garrison. The Settlement Facility shall pay such Litigation Expenses, up to the CRP Value.

Reorganized Garrison's authority to settle any Litigation Option Claim shall be limited to the CRP Value less Litigation Expenses to the date of any settlement but Reorganized Garrison shall not be obligated to offer the Litigation Option Claimant any settlement.

Any such settlement offer by Reorganized Garrison shall be in the form of an offer of judgment under Federal Rule of Civil Procedure 68 and Federal Rule of Bankruptcy Procedure 7068. If any judgment the GST Asbestos Claimant obtains under the Litigation Option is not more favorable than the unaccepted offer, the GST Asbestos Claimant must, consistent with Rule 68(d), pay the costs incurred by Reorganized Garrison after the offer was made. If the GST Asbestos Claimant elects the Litigation Option after rejecting a settlement offer made by the Settlement Facility under these CRP, Reorganized Garrison shall make an offer of judgment in the amount of the Settlement Facility's settlement offer.

If Reorganized Garrison makes, and the Litigation Option Claimant accepts, any settlement, the Settlement Facility will pay the settlement to the Claimant after paying any Litigation Expenses incurred before the date of settlement, with the Settlement Facility's aggregate responsibility not to exceed the CRP Value.

Reorganized Garrison shall deposit Cash in the Litigation Fund in a separate account maintained by, and in the name of, Reorganized Garrison as custodian of the Litigation Fund. Reorganized Garrison shall conserve and protect the Litigation Fund and use it solely to pay Litigation Option Expenditures and Litigation Management Fees. Pending determination by the Settlement Facility of the CRP Value and its obligation for Litigation Option Expenditures, Reorganized Garrison may make interim payments for Litigation Expenses using the Litigation Fund, to be reimbursed by the Settlement Facility up to the amount of the CRP Value.

Reorganized Garrison may periodically withdraw amounts from the Litigation Fund to pay Litigation Management Fees as provided for by the Litigation Management Services Fee Agreement.

Reorganized Garrison shall have the right to invest the Litigation Fund, but shall do so only in the manner in which individuals of ordinary prudence, discretion, and judgment would act in the management of their own affairs.

Reorganized Garrison's obligations under this Plan shall not preclude Reorganized Garrison from offering claims management services to other Entities, including Affiliates, so long as Reorganized Garrison uses none of the Litigation Fund in the performance of such other claims management services.

Reorganized Garrison shall have the power and authority to do all other acts and things not inconsistent with the provisions of this Plan or applicable law, including but not limited to employing and compensating legal counsel, expert witnesses, and other parties necessary in the sole discretion of Reorganized Garrison to prosecute objections to Litigation Option Claims; to reimburse witnesses for expenses; to indemnify employees and agents of Reorganized Garrison and to purchase insurance; and to hire employees, experts, counsel, and agents as deemed necessary to perform Reorganized Garrison's obligations under this Plan.

As soon as practicable after the commencement of each Fiscal Year, Reorganized Garrison shall cause to be prepared budget and cash flow projections relating to the defense of and indemnity for Litigation Option Claims, and make them available to the Trustee of the Settlement Facility and the FCR. Reorganized Garrison shall also cause to be prepared at the end

of each Fiscal Year an annual accounting of the Litigation Fund and a statement of receipts and disbursements charged to the Litigation Fund. Reorganized Garrison shall file this accounting with the Bankruptcy Court no later than ninety (90) days after the end of each Fiscal Year. The accounting shall include the balance of the Litigation Fund at the commencement and conclusion of such Fiscal Year, a report containing a summary of the number of resolved Litigation Option Claims, the total amount paid with respect thereto from the Effective Date to the end of the period covered by the accounting, and a certification by the President of Reorganized Garrison that, to the best of his or her knowledge, all such payments were made in accordance with the terms of this Plan.

### 7.3.5    Contingent Litigation Fund Contributions

The Reorganized Debtors shall be obligated to make Contingent Litigation Fund Contributions on certain anniversaries of the Effective Date, depending on the balance of funds in the Litigation Fund on such dates, as follows:

| Anniversary of Effective Date | Contingent Litigation Fund Contribution |
|---|---|
| 4th | If the Litigation Fund is less than $15 million, the lesser of (a) $5 million or (b) the difference between $15 million and the Litigation Fund balance |
| 5th | If the Litigation Fund is less than $15 million, the lesser of (a) $5 million or (b) the difference between $15 million and the Litigation Fund balance |
| 6th | If the Litigation Fund is less than $15 million, the lesser of (a) $5 million or (b) the difference between $15 million and the Litigation Fund balance |
| 7th | If the Litigation Fund is less than $15 million, the lesser of (a) $5 million or (b) the difference between $15 million and the Litigation Fund balance |

| | |
|---|---|
| 8th | If the Litigation Fund is less than $15 million, the lesser of (a) $5 million or (b) the difference between $15 million and the Litigation Fund balance |
| 9th | If the Litigation Fund is less than $12 million, the lesser of (a) $5 million or (b) the difference between $12 million and the Litigation Fund balance |
| 10th | If the Litigation Fund is less than $12 million, the lesser of (a) $5 million or (b) the difference between $12 million and the Litigation Fund balance |
| 11th | If the Litigation Fund is less than $12 million, the lesser of (a) $5 million or (b) the difference between $12 million and the Litigation Fund balance |
| 12th | If the Litigation Fund is less than $12 million, the lesser of (a) $5 million or (b) the difference between $12 million and the Litigation Fund balance |
| 13th | If the Litigation Fund is less than $12 million, the lesser of (a) $5 million or (b) the difference between $12 million and the Litigation Fund balance |
| 14th | If the Litigation Fund is less than $12 million, the lesser of (a) $5 million or (b) the difference between $12 million and the Litigation |

| | |
|---|---|
| | Fund balance |
| 15th | If the Litigation Fund is less than $12 million, the lesser of (a) $5 million or (b) the difference between $12 million and the Litigation Fund balance |
| 16th | If the Litigation Fund is less than $10 million, the lesser of (a) $4 million or (b) the difference between $10 million and the Litigation Fund balance |
| 17th | If the Litigation Fund is less than $10 million, the lesser of (a) $4 million or (b) the difference between $10 million and the Litigation Fund balance |
| 18th | If the Litigation Fund is less than $10 million, the lesser of (a) $4 million or (b) the difference between $10 million and the Litigation Fund balance |
| 19th | If the Litigation Fund is less than $10 million, the lesser of (a) $4 million or (b) the difference between $10 million and the Litigation Fund balance |
| 20th | If the Litigation Fund is less than $10 million, the lesser of (a) $4 million or (b) the difference between $10 million and the Litigation Fund balance |
| 21st | If the Litigation Fund is less than $7 million, the lesser of (a) $4 million or (b) the |

|  |  |
|---|---|
|  | difference between $7 million and the Litigation Fund balance |
| 22nd | If the Litigation Fund is less than $7 million, the lesser of (a) $4 million or (b) the difference between $7 million and the Litigation Fund balance |
| 23rd | If the Litigation Fund is less than $7 million, the lesser of (a) $4 million or (b) the difference between $7 million and the Litigation Fund balance |
| 24th | If the Litigation Fund is less than $7 million, the lesser of (a) $4 million or (b) the difference between $7 million and the Litigation Fund balance |
| 25th | If the Litigation Fund is less than $7 million, the lesser of (a) $4 million or (b) the difference between $7 million and the Litigation Fund balance |
| 26th | If the Litigation Fund is less than $7 million, the lesser of (a) $4 million or (b) the difference between $7 million and the Litigation Fund balance |
| 27th | If the Litigation Fund is less than $7 million, the lesser of (a) $4 million or (b) the difference between $7 million and the Litigation Fund balance |

| | |
|---|---|
| 28th | If the Litigation Fund is less than $5 million, the lesser of (a) $2 million or (b) the difference between $5 million and the Litigation Fund balance |
| 29th | If the Litigation Fund is less than $5 million, the lesser of (a) $2 million or (b) the difference between $5 million and the Litigation Fund balance |
| 30th | If the Litigation Fund is less than $5 million, the lesser of (a) $2 million or (b) the difference between $5 million and the Litigation Fund balance |
| 31st | If the Litigation Fund is less than $5 million, the lesser of (a) $2 million or (b) the difference between $5 million and the Litigation Fund balance |
| 32nd | If the Litigation Fund is less than $5 million, the lesser of (a) $2 million or (b) the difference between $5 million and the Litigation Fund balance |
| 33rd | If the Litigation Fund is less than $5 million, the lesser of (a) $2 million or (b) the difference between $5 million and the Litigation Fund balance |
| 34th | If the Litigation Fund is less than $5 million, the lesser of (a) $2 million or (b) the difference between $5 million and the Litigation |

| | |
|---|---|
| | Fund balance |
| 35th | If the Litigation Fund is less than $5 million, the lesser of (a) $2 million or (b) the difference between $5 million and the Litigation Fund balance |
| 36th | If the Litigation Fund is less than $2 million, the lesser of (a) $2 million or (b) the difference between $2 million and the Litigation Fund balance |
| 37th | If the Litigation Fund is less than $2 million, the lesser of (a) $2 million or (b) the difference between $2 million and the Litigation Fund balance |
| 38th | If the Litigation Fund is less than $2 million, the lesser of (a) $2 million or (b) the difference between $2 million and the Litigation Fund balance |
| 39th | If the Litigation Fund is less than $2 million, the lesser of (a) $2 million or (b) the difference between $2 million and the Litigation Fund balance |

Any Contingent Litigation Fund Contribution that accrues under this schedule shall be payable no later than forty-five (45) days after the applicable anniversary of the Effective Date. The maximum nominal amount of Contingent Litigation Fund Contributions, if the maximum amounts are due under the schedule above, is $132 million.

If the balance of funds in the Litigation Fund equals or exceeds the amount specified in the schedule above on a given anniversary of the Effective Date, no Contingent Litigation Fund Contribution shall accrue for such year, and the Contingent Litigation Fund Contribution provided in the schedule for that year shall expire and shall not be carried over to subsequent

years. Further, if the balance of funds in the Litigation Fund is less than the amount specified in the schedule above on a given anniversary of the Effective Date, but the difference between such amount and the balance of funds is not sufficient to require Reorganized GST to contribute the full amount of such Contingent Litigation Fund Contribution, the unaccrued portion of such Contingent Litigation Fund Contribution shall expire and shall not be carried over to subsequent years.

The Reorganized Debtors' obligation to make Contingent Litigation Fund Contributions is guaranteed by EnPro as a portion of the EnPro Contribution.

If at any time after the fortieth (40th) anniversary of the Effective Date Reorganized Garrison reasonably believes it is unlikely that there will be any further Litigation Option Claims, and there are no pending Settlement Option Claims or likely future Settlement Option Claims, it shall transfer the remaining balance of the Litigation Fund to the Settlement Facility for distribution pursuant to the Settlement Facility Agreement and CRP to Settlement Option Claimants who have already been paid.

### 7.3.6    Appointment and Termination of Settlement Facility Trustee

On or before the Confirmation Date, after consultation with the FCR, Debtors shall nominate an individual meeting the independence criteria of the Settlement Facility Agreement to serve as trustee of the Settlement Facility. The Bankruptcy Court, after notice and opportunity for hearing, shall be asked to appoint this individual to serve as Settlement Facility trustee effective as of the Effective Date. Upon termination of the Settlement Facility, the trustee's employment shall be deemed terminated and the trustee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases. The Settlement Facility Agreement provides procedures for the replacement of the trustee of the Settlement Facility.

### 7.4    APPROVAL OF PARENT SETTLEMENT

The Confirmation Order shall include provisions approving the Parent Settlement and its implementation pursuant to the Plan and extinguishing all Released Claims against the Released Parties. Approval of the Parent Settlement Agreement is a condition precedent to the Parent's obligations to pay $30 million in Cash to the Settlement Facility and make up to $500,000 available for the expenses of Anchor's dissolution, and for EnPro to guarantee Settlement Facility Contributions and Contingent Litigation Fund Contributions scheduled to occur after the Effective Date and for the Parent and all Affiliates to agree to subordinate their interests in the Available Shared Insurance to the Reorganized Debtors' obligations to make payments after the Effective Date to the Settlement Facility and Litigation Fund under this Plan. On the Effective Date, if the Parent Settlement is approved, the Parent shall execute the Parent Settlement Agreement and deliver the Parent Settlement Consideration in full satisfaction and extinguishment of all Released Claims against any Released Party as set forth in Section 11.3.3.

### 7.5     DISSOLUTION OF ANCHOR

#### 7.5.1   Dissolution upon the Effective Date

As of the Effective Date, Anchor shall be dissolved under North Carolina General Statutes §§ 55-14-01 *et seq*. Such dissolution shall occur as soon as reasonably practicable following the Effective Date. Anchor, through its directors and officers, shall commence winding down its businesses and affairs, including, without limitation, marshaling its assets for the benefit of all constituencies. All Holders of Class 8 Anchor Claims shall be permitted, after the Effective Date, to assert and pursue Claims against Anchor, and such Claims shall be fully reinstated to the *status quo ante* as of the Petition Date.

### 7.6     PAYMENTS AND DISTRIBUTIONS UNDER THIS PLAN

#### 7.6.1   Settlement Option and Litigation Option Payments and Plan Distributions

Payments to Settlement Option Claimants and Litigation Option Claimants shall be made by the Settlement Facility or Reorganized Garrison (from the Litigation Fund) in accordance with the Plan, Settlement Facility Agreement, CRP, and CMO, as applicable. All other Distributions or payments required or permitted to be made under this Plan (other than payments to Professionals) shall be made by the Reorganized Debtors in accordance with the treatment for each such Holder as specified herein (unless otherwise ordered by the Bankruptcy Court). Distributions shall be deemed actually made on the Distribution Date if made either (i) on the Distribution Date or (ii) as soon as practicable thereafter. Professionals shall be paid by the Debtors or Reorganized Debtors pursuant to orders of the Bankruptcy Court.

#### 7.6.2   Timing of Plan Distributions

Whenever any Distribution to be made under this Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without the accrual of any additional interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

#### 7.6.3   Manner of Payments under Plan

Unless the Entity receiving a Distribution or payment agrees otherwise, any such Distribution or payment in Cash to be made by the Reorganized Debtors or the Settlement Facility shall be made, at the election of the Reorganized Debtors or the Settlement Facility (as applicable) by check drawn on a domestic bank or by wire transfer from a domestic bank.

### 7.7     DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS.

#### 7.7.1   Delivery of Distributions in General

Payments by the Settlement Facility and Reorganized Garrison to Settlement Option Claimants and Litigation Option Claimants shall be made in accordance with this Plan, the

Settlement Facility Agreement, the CRP, and the CMO, as applicable. All other Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as set forth on the Schedules, or as set forth (i) in another writing Filed in the Chapter 11 Cases notifying the Reorganized Debtors of a change of address prior to the Distribution Date (including, without limitation, any timely proof of claim) or (ii) in a request for payment of an Administrative Expense Claim, as the case may be.

### 7.7.2    Undeliverable Distributions by the Reorganized Debtors

Any Cash, assets, and other properties distributed by the Reorganized Debtors under this Plan to Holders of Claims that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before one year after the Distribution Date, shall become vested in, and shall be transferred and delivered to, the Reorganized Debtors on the date that is one year after the Distribution Date. In such event, such Entity's Claim shall no longer be deemed to be Allowed, and such Entity shall be deemed to have waived its rights to such payments or Distributions under this Plan pursuant to Bankruptcy Code § 1143, shall have no further Claim in respect of such Distribution, and shall not participate in any further Distributions under this Plan with respect to such Claim.

### 7.7.3    Undeliverable Distributions by the Settlement Facility and Reorganized Garrison

Any Cash, assets or other properties distributed by the Settlement Facility or Reorganized Garrison to Settlement Option Claimants or Litigation Option Claimants that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before one year after the Distribution Date, shall re-vest in the Settlement Facility or Litigation Fund (as applicable) and become available for distribution to other Settlement Option Claims or Litigation Option Claims that are Allowed, or payment of Litigation Expenses, on the date that is one year after the Distribution Date. In such event, such Entity's Claim shall no longer be deemed to be Allowed, and such Entity shall be deemed to have waived its right to such payments or Distributions under this Plan, the Settlement Facility Agreement, CRP, and CMO, as applicable, pursuant to Bankruptcy Code § 1143, shall have no further Claim in respect of such Distribution, and shall not participate in any further Distributions under this Plan, the Settlement Facility Agreement, CRP, and CMO, as applicable, with respect to such Claim.

### 7.8    CONDITIONS    PRECEDENT    TO    CONFIRMATION    AND CONSUMMATION OF THE PLAN

#### 7.8.1    Conditions to Confirmation

The Bankruptcy Court will not enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived by the Debtors and the FCR:

(a)    The Confirmation Order, and Findings of Fact and Conclusions of Law in support thereof, shall be in form and substance acceptable to the Debtors and the FCR.

(b)     The Bankruptcy Court shall have approved entry of the CMO in form and substance proposed or, if amended, in form and substance acceptable to the Debtors and the FCR.

(c)     The Confirmation Order shall approve and provide for the implementation of the other Plan Documents.

(d)     The Confirmation Order shall have found that all GST Asbestos Claims are "claims" within the meaning of 11 U.S.C. § 101(5) and are subject to the Discharge Injunction.

(e)     The Bankruptcy Court shall have found and concluded that the Released Claims are property of the Debtors' estates and that the terms of the Parent Settlement are fair and reasonable and should be approved, and shall have approved entry of the Parent Settlement Enforcement Injunction in form and substance acceptable to the Debtors and the Parent. This condition may be waived only with the consent of the Debtors, the Parent, and the FCR.

(f)     The Bankruptcy Court shall have approved the GST Asbestos Claims notice program and found that such notice program accords due process to all GST Asbestos Claimants.

(g)     The Bankruptcy Court shall find that the FCR has adequately represented Future GST Asbestos Claimants.

### 7.8.2   Conditions to Effective Date

The Effective Date shall not occur, and this Plan shall not be consummated unless and until each of the following conditions have been satisfied or duly waived by the Debtors, EnPro, the Parent, and the FCR:

(a)     The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall have become a Final Order; provided that, at the option of the Debtors, the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order unless the effectiveness of the Confirmation Order has been stayed or vacated, in which case, at the option of the Debtors, the Effective Date may be the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

(b)     The Parent Settlement Enforcement Injunction shall have been approved or affirmed (as applicable) and any such order shall contain findings of fact and conclusions of law supporting such injunction in form and substance satisfactory to the Debtors, EnPro, and the Parent and such order shall have become a Final Order; provided that at the option of the Debtors, EnPro, and the Parent, the Effective Date may occur if the applicable court does not enter the Parent Settlement Enforcement Injunction or the order embodying the Parent Settlement Enforcement Injunction has not become a Final Order with respect to the Parent Settlement Enforcement Injunction.

(c)      The Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) approving and authorizing the Debtors and Reorganized Debtors to take all actions necessary or appropriate to implement the Plan, including, if applicable, the Parent Settlement and all actions necessary to consummate the Parent Settlement.

(d)      The Debtors or the Parent shall have received from the Internal Revenue Service a ruling reasonably satisfactory to Debtors regarding the following matters: (i) the Settlement Facility will be treated as a qualified settlement fund within the meaning of section 468B of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder; (ii) the payments to be made from the Litigation Fund will be fully deductible by the Reorganized Debtor at the time of (or before) each such disbursement; and (iii) such other matters as tax counsel for the Debtors may reasonably require.

(e)      The Plan Documents necessary or appropriate to implement this Plan shall have been executed, in the forms proposed or, if amended in forms acceptable to the Debtors and the FCR and, where applicable, filed with the appropriate governmental or supervisory authorities.

(f)      The Certificates of Incorporation and By-Laws, as applicable, of each of the Debtors, as amended in accordance with this Plan, shall be in full force and effect.

(g)      The Parent Settlement shall have been approved as part of the Confirmation Order and the Confirmation Order shall have become a Final Order, and the Parent Settlement Agreement executed. This condition may be waived only with the consent of the FCR, as well as Debtors and the Parent.

The Effective Date shall not occur unless and until each of the foregoing conditions is either satisfied or waived by the Debtors, EnPro, the Parent, and any other Entity whose consent is required by the Plan. Notice of the occurrence of the Effective Date reflecting that the foregoing conditions have been satisfied or waived shall: (i) be signed by the Debtor, EnPro, the Parent, and each Entity whose consent is required pursuant to this Plan; (ii) state the date of the Effective Date; and (iii) be Filed with the Bankruptcy Court by the Debtors' counsel. No waiver shall be effective unless it complies with the requirements of this provision.

## 7.9      MANAGEMENT OF THE REORGANIZED DEBTORS

On and after the Effective Date, the business and affairs of the Reorganized Debtors will be managed by their respective Boards of Directors. Upon the Effective Date, the Board of Directors of each of the Reorganized Debtors shall be composed of at least one (1) director or manager, as applicable. Each Debtor shall specify the director(s) or manager(s) of such Reorganized Debtor upon the Effective Date in the Exhibit Book Supplement. The director(s) or manager(s) may be replaced by action of the shareholder or member, as applicable. In addition, as will be specified in the Exhibit Book Supplement, certain key members of current management are expected to continue to be employed by the Reorganized Debtors. On and after the Effective Date, there shall be no restrictions on the management of the business and affairs of the Reorganized Debtors pursuant to this Plan or any Order entered in these Cases, other than the Reorganized Debtors' obligations under this Plan and the Confirmation Order.

### 7.10   CORPORATE ACTION

On or prior to the Effective Date, the Boards of Directors of the respective Debtors that are corporations shall adopt an amendment to their respective By-Laws and Certificates of Incorporation or Articles of Organization, as applicable, and such corporate actions shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order, or rule. On the Effective Date or as soon thereafter as is practicable, the Debtors shall file with the Secretary of State or equivalent governmental entity of the state of such Debtor's incorporation or organization, in accordance with applicable law, such amendment to their Certificate of Incorporation or Articles of Organization. On the Effective Date, the approval and effectiveness of matters provided under this Plan involving the corporate structure of the Reorganized Debtors or corporate action by the Reorganized Debtors shall be deemed to have occurred and to have been authorized, and shall be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order, or rule, including any action by the stockholders, directors, managers, or members (as applicable) of the Debtors, the Debtors-in-Possession, or the Reorganized Debtors.

### 7.11   EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS

Each of the officers of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and to take such actions as may be necessary or appropriate, for and on behalf of the Debtors and the Reorganized Debtors, to effectuate and further evidence the terms and conditions of this Plan, the transactions contemplated by this Plan, and any securities issued pursuant to this Plan.

### 7.12   NO SUCCESSOR LIABILITY

Except as otherwise expressly provided in this Plan, neither the Debtors, the Reorganized Debtors, the Asbestos Committee, the FCR, the Settlement Facility, nor the Released Parties will, pursuant to this Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations either (i) as such liabilities or obligations may relate to or arise out of the operations of the assets of the Debtors, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date, or (ii) as such liabilities or obligations may relate to or arise from the Released Claims. Neither the Reorganized Debtors, the Released Parties, nor the Settlement Facility are, or shall be deemed to be, successors-in-interest to the Debtors by reason of any theory of law or equity, and none of them shall have any successor or transferee liability of any kind or character, except that (i) the Reorganized Debtors and the Settlement Facility shall assume the obligations specified in this Plan and the Confirmation Order, and (ii) the Released Parties shall cause the Parent to pay the Parent Settlement Consideration and otherwise to perform the terms of the Parent Settlement Agreement, if approved. For the avoidance of doubt, the Debtors do not intend or purport to release or bar any claim against any Released Party that is (a) based upon such Released Party's independent liability to any person and (b) would not be a GST Asbestos Claim or an Anchor Claim in these Chapter 11 Cases if it were to be asserted directly against one or more Debtors.

# ARTICLE 8.

## INJUNCTIONS, RELEASES & DISCHARGE

**8.1      DISCHARGE**

### 8.1.1      Discharge of Debtors and Related Discharge Injunction

The rights afforded in this Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims (including, without limitation, all GST Asbestos Claims) and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the Debtors-in-Possession, or their Estates, assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date, the Debtors shall be discharged from and their liability shall be extinguished completely in respect of any Claim, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, that arose from any agreement of the Debtor entered into or obligation of the Debtor incurred before the Confirmation Date, or from any conduct of the Debtor prior to the Confirmation Date, or that otherwise arose before the Confirmation Date, including, without limitation, all interest, if any, on any such Claims, whether such interest accrued before or after the date of commencement of the Case.

The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors-in-Possession except those expressly assumed by the Reorganized Debtors pursuant to this Plan. All Entities shall be precluded and forever barred from asserting against the Debtors and the Reorganized Debtors, or their assets, properties, or interests in property any other or further Claims or claims based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Confirmation Date, whether or not the facts of or legal bases therefor were known or existed prior to the Confirmation Date, except as expressly provided in this Plan.

**With respect to any debts discharged by operation of law under Bankruptcy Code § 1141, including but not limited to any and all liability for any GST Asbestos Claims, the discharge of the Debtors operates under Bankruptcy Code § 524(a) as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the Debtor, whether or not the discharge of such debt is waived; provided, however, that the obligations of the Reorganized Debtors under this Plan are not so discharged.**

**Accordingly, Holders of GST Asbestos Claims shall have no right whatsoever at any time to assert any such Claim against the Reorganized Debtors, their Estates, or any property or interest (including any Distributions made pursuant to this Plan) in any property of any Reorganized Debtor, except as expressly provided in this Plan.**

**Without limiting the generality of the foregoing, from and after the Effective Date, the Discharge Injunction shall apply to all GST Asbestos Claims, and all such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any of the**

**following actions against the Debtors or the Reorganized Debtors for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any GST Asbestos Claims, except as expressly permitted by this Plan, including but not limited to:**

(a)     commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Reorganized Debtor, or any property or interest in property of any Reorganized Debtor;

(b)     enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Reorganized Debtor, or any property or interest in property of any Reorganized Debtor;

(c)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Reorganized Debtor, or any property or interest in property of any Reorganized Debtor;

(d)     setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Reorganized Debtor, or any property or interest in property of any Reorganized Debtor; and

(e)     proceeding in any other manner against any Reorganized Debtor with regard to any matter that is subject to resolution pursuant to the Plan, Settlement Facility Agreement, CRP, and CMO, except in conformity and compliance with such Plan Documents.

Except as otherwise expressly provided in this Plan, nothing contained in this Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Affiliates, the Reorganized Debtors, or the Settlement Facility may have against any Entity in connection with or arising out of or related to any GST Asbestos Claim.

### 8.1.2    Disallowed Claims and Disallowed Equity Interests

On and after the Effective Date, the Debtors, the Reorganized Debtors and their Representatives shall be fully and finally discharged of any liability or obligation on a Disallowed Claim, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to Bankruptcy Code § 502 or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

### 8.1.3    Reservation of Rights of the PBGC

Nothing contained in this Plan, Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release or relieve the Debtors, or any other party, in any capacity, from any liability or responsibility to the Pension Benefit Guaranty Corporation ("PBGC") with

respect to any ongoing, defined benefit pension plans to which Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA") applies (the "Pension Plans") under any law, governmental policy, or regulatory provision. The PBGC shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of this Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases. Notwithstanding the foregoing, neither the PBGC nor any other Entity shall have any right to assert any liability or responsibility with respect to the Pension Plans under any law, governmental policy or regulatory provisions against, and such liability or responsibility shall not attach to any Entity created pursuant to the Plan including, without limitation, the Settlement Facility or any assets held by that entity.

### 8.2    PARENT SETTLEMENT ENFORCEMENT INJUNCTION

In consideration of the Parent Settlement Consideration, and pursuant to the Court's powers under Bankruptcy Code §§ 105, 362, and 1141, Rule 9019 of the Bankruptcy Rules, and the Court's supplemental jurisdiction under 28 U.S.C. §§ 1367 and 1651, all Entities shall be permanently enjoined on and after the Effective Date from:

(a)    commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Released Party, or any property or interest in property of any Released Party, on account of any Released Claim;

(b)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Released Party, or any property or interest in property of any Released Party, on account of any Released Claim;

(c)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Released Party, or any property or interest in property of any Released Party, on account of any Released Claim;

(d)    setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Released Party, or any property or interest in property of any Released Party, on account of any Released Claim.

The Entities protected by the Parent Settlement Enforcement Injunction are the "Released Parties," defined in Section 1.1.108, which include the Parent (Coltec Industries Inc.), Affiliates (a term defined in Section 1.1.3 of the Plan that includes EnPro Industries, Inc. and other entities related to Debtors and the Parent that are enumerated and described in Section 1.1.3), and past, present, and future Representatives of the Parent and the Affiliates.

The Entities subject to the Parent Settlement Enforcement include any Claimant, Interest Holder or party in interest in these Cases, including any GST Asbestos Claimant.

The purpose of the Parent Settlement Enforcement Injunction is to facilitate the Parent Settlement by inducing the Parent to enter into such settlement and deliver the Parent Settlement Consideration, which will enhance the amounts of settlement payments that can be made under the Plan to GST Asbestos Claimants who elect to resolve their Claims under the Settlement Option. The Parent Settlement Enforcement Injunction does so by permanently prohibiting all GST Asbestos Claimants from pursuing a remedy from any Released Party based on any "Released Claims," which are defined in Section 1.1.107 of the Plan and include claims based on legal theories such as fraudulent transfer, successor liability, and alter ego, piercing the corporate veil, and similar theories that seek to disregard the separate legal existence of GST and Garrison and impose their liabilities on the Parent or any other Released Party. The Parent Settlement, the Confirmation Order, and the Parent Settlement Enforcement Injunction are intended to preclude and will preclude the assertion of Released Claims even in those jurisdictions where, in the absence of the Debtors' Chapter 11 Cases, some of such Released Claims might, under the substantive law of such jurisdictions, have been treated as claims maintainable not by the Debtors themselves, but by creditors of or claimants against the Debtors.

The Court shall retain jurisdiction with respect to all matters relating to the Parent Settlement Enforcement Injunction. In the event any Person takes any action that is prohibited by, or is otherwise inconsistent with the provisions of this section 8.2, then, upon notice to the Court by an affected Released Party, the Court shall take such actions necessary to enforce the Parent Settlement Enforcement Injunction, including, without limitation, ordering such Person to discontinue the action or proceeding in which the Claim of such Entity is asserted.

### 8.3     TERM OF CERTAIN INJUNCTIONS AND AUTOMATIC STAY

#### 8.3.1   Injunctions and/or Automatic Stays in Existence Immediately prior to Confirmation

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to Bankruptcy Code §§ 105, 362, or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the injunctions set forth in this Plan become effective, and thereafter if so provided by this Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, the Reorganized Debtors may seek such further orders as they may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

#### 8.3.2   Injunctions Provided for in this Plan

Each of the injunctions provided for in this Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter. Notwithstanding anything to the contrary contained in this Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

### 8.4     EXCULPATION

None of the Debtors, the Reorganized Debtors, the Affiliates, the Settlement Facility or its trustee, the Asbestos Committee, the Unsecured Creditors' Committee, the FCR, or any of

their respective Representatives are to have or incur any liability to any Entity for any pre- or post-Petition Date act or omission in connection with, related to, or arising out of the administration of these Chapter 11 Cases, the negotiation of this Plan or the Plan Documents, the pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan so long as, in each case such action, or failure to act, did not constitute willful misconduct. In all respects, all such Entities shall be entitled to rely upon the advice of counsel and financial and other experts or professionals employed by them, and such reliance shall conclusively establish good faith. In any action, suit, or proceeding by any Claimant, Interest Holder, or other party in interest contesting the action by, or non-action of, Debtors, Reorganized GST, Reorganized Garrison, Reorganized Anchor, the Asbestos Committee, the UCC, the FCR, or the respective Representatives of any such Entity, as amounting to willful misconduct or not being in good faith, the reasonable attorney's fees and costs of the prevailing party shall be paid by the losing party and, as a condition of going forward with such action, suit, or proceeding, at the onset thereof, all parties thereto shall be required to provide appropriate proof and assurances of their capacity to make such payments of reasonable attorney's fees and costs in the event they fail to prevail. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute willful misconduct. This section is not intended to preclude a governmental entity from enforcing its police and regulatory powers.

## ARTICLE 9.

### EXECUTORY CONTRACTS, UNEXPIRED LEASES, GUARANTIES, AND INDEMNITY AGREEMENTS

**9.1    ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Except for (i) executory contracts and unexpired leases that the Debtors reject prior to the entry of the Disclosure Statement Order and (ii) agreements, to the extent executory, providing for indemnification of third parties for GST Asbestos Claims, all executory contracts and unexpired leases, including asbestos-related insurance from any Asbestos Insurance Company, not previously assumed by the Debtors pursuant to Bankruptcy Code § 365, shall be deemed to have been assumed by the Reorganized Debtors on the Effective Date, and this Plan shall constitute a motion to assume such executory contracts and unexpired leases as of the Effective Date.

Pursuant to the terms of the Non-Asbestos Bar Date Order and Bankruptcy Rule 3002(c)(4), and except as otherwise ordered by the Bankruptcy Court, a proof of claim for each Claim arising from the rejection of an executory contract or unexpired lease pursuant to this Plan or otherwise shall be Filed with the Bankruptcy Court within thirty (30) days of the later of: (i) the date of the entry of an order, prior to the Confirmation Date, approving such rejection, (ii) the Confirmation Date, or (iii) service of notice of rejection if such party is an affected party as described in the paragraph immediately above. Any Claims not Filed within such applicable time period shall be forever barred from assertion. All Allowed Claims for damages arising from

the rejection of an executory contract or unexpired lease shall be included in Class 7 and shall be treated in accordance with Article 2 herein.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumptions pursuant to Bankruptcy Code § 365(a) and a finding by the Court that each such assumption is in the best interests of the Debtors, their Estates, and all parties in interest in the Chapter 11 Cases.

With respect to each such executory contract or unexpired lease assumed by the Reorganized Debtors, unless otherwise determined by the Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, any defaults of the Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtors' business promptly after any such default becomes known to the Debtors and, if the cure amount is disputed, such cure amount shall be established pursuant to applicable law, and the assumed executory contracts or leases shall be binding upon and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder. Subject to the occurrence of the Effective Date, upon payment of such cure amount, all defaults of the Debtors existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

**To the extent executory, all agreements providing for indemnification of third parties for GST Asbestos Claims shall be deemed rejected by operation of entry of the Confirmation Order unless expressly identified and assumed pursuant to an order of the Bankruptcy Court. The Released Parties shall retain any and all rights to indemnification for any Claim.**

Executory contracts and unexpired leases previously assumed by the Debtors during the case pursuant to Bankruptcy Code § 365 shall be governed by and subject to the provisions of the order of the Court authorizing the assumption thereof.

The Bankruptcy Court shall retain jurisdiction to hear and determine any and all motions or applications for the assumption and/or assignment or rejection of (i) executory contracts, (ii) unexpired leases, (iii) letters of credit, (iv) surety bonds, (v) guaranties (which for purposes of this Section 9.1 include contingent liabilities arising in connection with assigned executory contracts and unexpired leases), or (vi) written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date to which the Debtors are parties or with respect to which the Debtors may be liable that are pending on the Confirmation Date, and to review and determine all Claims resulting from the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date.

## 9.2    LETTERS OF CREDIT, SURETY BONDS, GUARANTIES, AND CERTAIN INDEMNITY AGREEMENTS

Unless otherwise designated by the Debtors in the Exhibit Book Supplement, agreed to in writing by the affected parties, or modified by order of the Court, the Debtors' obligations under letters of credit, surety bonds, guaranties (which for purposes of this Section 9.2 include contingent liabilities arising in connection with assigned executory contracts and unexpired

leases), or written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under this Plan. The Debtors' obligations under such letters of credit, surety bonds, guaranties, and indemnity agreements shall be deemed assumed pursuant to Bankruptcy Code § 365(a), survive entry of the Confirmation Order and occurrence of the Effective Date, remain unaffected thereby (except as provided in this Section 9.2), and not be discharged in accordance with Bankruptcy Code § 1141.

Pursuant to the terms of the Non-Asbestos Bar Date Order and Bankruptcy Rule 3002(c)(4), and except as otherwise ordered by the Bankruptcy Court, a proof of claim for each Claim arising from the rejection of a: (i) letter of credit, (ii) surety bond, (iii) guaranty, or (iv) written indemnity agreement with respect to a letter of credit, surety bond or guaranty existing as of the Effective Date shall be Filed with the Bankruptcy Court within thirty (30) days of the later of: (a) the date of the entry of an order, prior to the Confirmation Date, approving such rejection, or (b) the Confirmation Date. Any Claims not Filed within such applicable time period shall be forever barred from assertion. All Allowed Claims for damages arising from the rejection of a letter of credit, surety bond, guaranty, or written indemnity agreement with respect to a letter of credit, surety bond or guaranty existing as of the Effective Date shall be included in Class 7 and shall be treated in accordance with Article 2 herein.

The Reorganized Debtors shall have the right to cure any defaults existing as of the Effective Date under any such letters of credit, surety bonds, guaranties, or written indemnity agreements with respect to letters of credit, surety bonds, or guaranties existing as of the Effective Date promptly after any such default becomes known to the Debtors or Reorganized Debtors and, if disputed, established pursuant to applicable law. All letters of credit, surety bonds, guaranties, or written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date shall be deemed reinstated on the Effective Date notwithstanding any default therein by the Debtors, any delay in the cure thereof by the Debtors, or the Filing or existence of the Chapter 11 Cases, or any action taken in connection therewith, and shall be binding upon, and enforceable against, all parties thereto, subject to any rights and defenses existing thereunder. All undrawn or partially drawn letters of credit, including letters of credit outstanding under the Debtors' pre-petition credit facilities, will be replaced as soon as practicable with new or replacement letters of credit under a new facility.

Nothing in Article 9, however, shall constitute a reinstatement, continuation or assumption of any warranty provision, guaranty or any contractual or other obligation or Claim by the Reorganized Debtors to the extent that the Claim or obligation constitutes a GST Asbestos Claim.

### 9.3    COMPENSATION AND BENEFITS PROGRAM

Unless otherwise agreed to by the affected parties, or modified by order of the Court, all of the Debtors' obligations under employment and severance contracts and policies, and all compensation and benefit plans, policies, and programs, shall be treated as though they are executory contracts that are deemed assumed under this Plan.

# ARTICLE 10.

# RETENTION OF JURISDICTION

## 10.1    GENERAL

The Bankruptcy Court (and, to the extent the Bankruptcy Court is found to lack jurisdiction or authority, the District Court) shall retain the fullest and most extensive jurisdiction permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out. Moreover, the Settlement Facility shall be subject to the continuing jurisdiction of the Bankruptcy Court in accordance with the requirements of IRC § 468B and regulations issued pursuant thereto.

## 10.2    SPECIFIC PURPOSES

In addition to the foregoing and except as provided in Article 10.3, the Bankruptcy Court (and the District Court to the extent the Bankruptcy Court is found not to have authority or jurisdiction) shall retain jurisdiction for the following specific purposes after the Confirmation Date:

### 10.2.1  Plan Documents

To interpret, enforce, and administer the terms of the Plan Documents (and all annexes and exhibits thereto);

### 10.2.2  Disputed Claims Allowance/Disallowance

To hear and determine any objections to: (i) the allowance of Claims, including any objections to the classification of any Claim; (ii) to Allow or Disallow any Disputed Claim in whole or in part pursuant to 28 U.S.C. § 157(b)(2)(B); and (iii) to Allow or Disallow any Litigation Option Claim pursuant to the terms of the CMO;

### 10.2.3  Enforcement/Modification of this Plan

(a)    To issue such orders in aid of execution of this Plan to the extent authorized or contemplated by Bankruptcy Code § 1142;

(b)    To consider and approve any modifications of this Plan or Plan Documents, remedy any defect or omission, or reconcile any inconsistency in any order of the Court, including the Confirmation Order;

(c)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with this Plan or any other Plan Documents or their interpretation, implementation, enforcement, or consummation;

(d)    To hear and determine all objections to the termination of the Settlement Facility;

(e)     To determine such other matters that may be set forth in, or that may arise in connection with, this Plan, the Confirmation Order, the Discharge Injunction, the Parent Settlement Enforcement Injunction, or the Settlement Facility Agreement, including any disputes related to the Settlement Facility Agreement or CRP or disputes relating to the administration of the Settlement Facility or Litigation Fund or the Litigation Management Services Fee Agreement;

(f)     To hear and determine any proceeding that involves the Discharge Injunction or the Parent Settlement Enforcement Injunction, including the validity, application, construction, or enforcement of the Discharge Injunction or Parent Settlement Enforcement Injunction;

(g)     To enter an order or final decree closing the Chapter 11 Cases;

(h)     To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of all orders entered by the Court in the Chapter 11 Cases;

(i)     To enter orders authorizing immaterial modifications to this Plan which are necessary to comply with IRC § 4688;

### 10.2.4  Compensation of Professionals

To hear and determine all applications for allowance of compensation and reimbursement of expenses of Professionals under Bankruptcy Code §§ 327, 328, 329, 330, 331 and 363 and any other fees and expenses authorized to be paid or reimbursed under this Plan;

### 10.2.5  Settlements

To the extent that Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against the Debtors, Reorganized Debtors, or Settlement Facility;

### 10.2.6  Taxes

To hear and determine matters concerning state, local, and federal taxes (including the amount of net operating loss carry forwards), fines, penalties, or additions to taxes for which the Debtors or Debtors-in-Possession may be liable, directly or indirectly, in accordance with Bankruptcy Code §§ 346, 505, and 1146;

### 10.2.7  Specific Purposes

To hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order; and

### 10.2.8  Insurance Matters

To hear and determine matters concerning asbestos-related insurance from any Asbestos Insurance Company; provided that the Court shall have nonexclusive jurisdiction over such matters.

### 10.3    ORDERS CLOSING CHAPTER 11 CASES

Any order entered pursuant to Bankruptcy Code § 350(a) and Bankruptcy Rule 3022 closing the Chapter 11 Cases shall provide that, notwithstanding the closure of the Chapter 11 Cases: (a) the Court expressly retains jurisdiction over the matters described in Sections 10.1 and 10.2, including, without limitation, jurisdiction to (i) enforce any of its orders issued in the Chapter 11 Cases; (ii) resolve any cases, controversies, suits or disputes that may arise in connection with the interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or that resolves any claim objections or other disputes relating to the Debtors; (iii) hear any matters related to the Allowance or Disallowance of Claims by Holders who pursue the Litigation Option pursuant to the CMO; (iv) resolve any other claim objections or other disputes relating to the Debtors; (v) supervise the Settlement Facility as contemplated by the Settlement Facility Agreement; and (vi) consider any proper requests to reopen the Chapter 11 Cases under Bankruptcy Code § 350(b); and (b) the clerk of the Court shall accept for filing on the docket of Case No. 10-BK-31607, without the requirement that any party in interest file a request to reopen the Chapter 11 Cases, the annual reports of the Settlement Facility and Litigation Fund and any pleadings, motions, subpoenas, or other papers pursuant to which any party in interest seeks to invoke the exclusive jurisdiction that the Bankruptcy Court retains pursuant to Section 10.1 and Section 10.2 of this Plan, including allowance litigation concerning Claims electing the Litigation Option pursuant to the CMO.

## ARTICLE 11.

## MISCELLANEOUS PROVISIONS

### 11.1    AUTHORITY OF THE DEBTORS

On the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement effectively (i) the provisions of this Plan and (ii) the creation of the Settlement Facility.

### 11.2    PAYMENT OF STATUTORY FEES

All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Court at the hearing on confirmation of this Plan, shall be paid by the Debtors on or before the Effective Date.

### 11.3    RETAINED CAUSES OF ACTION

#### 11.3.1  Maintenance of Causes of Action

Nothing in this Section 11.3 of this Plan shall be deemed to be a transfer by the Debtors or the Reorganized Debtors of any claims, causes of action, or defenses relating to assumed executory contracts, or otherwise which are required by the Reorganized Debtors to conduct their businesses in the ordinary course subsequent to the Effective Date. Moreover, except as otherwise expressly contemplated by this Plan or other Plan Documents, from and after the Effective Date, the Reorganized Debtors shall have and retain any and all rights to commence and pursue any and all claims, causes of action, including the Retained Causes of Action, Unknown Causes of Action, or defenses against any parties, including Claimants and Holders of Equity Interests, whether such causes of action accrued before or after the Petition Date.

The Reorganized Debtors shall retain and may exclusively enforce any and all such claims, rights or causes of action, including Retained Causes of Action and Unknown Causes of Action, and commence, pursue and settle the causes of action in accordance with this Plan. The Reorganized Debtors shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and causes of action, including Retained Causes of Action and Unknown Causes of Action, without the consent or approval of any third party and without any further order of the Court, including, without limitation, the right to assign and/or transfer any Retained Causes of Action or Unknown Causes of Action to any Entity as such Reorganized Debtor deems appropriate in its sole discretion.

#### 11.3.2  Preservation of Causes of Action

The Debtors are currently litigating causes of action against certain Entities, and continue to investigate whether to pursue potential causes of action against other Claimants or Entities. That additional investigation has not been completed to date, and, under this Plan, the Reorganized Debtors retain the right on behalf of the Debtors to commence and pursue any and all Retained Causes of Action. The current litigation and other potential causes of action currently being investigated by the Debtors, which may, but need not, be pursued by the Debtors before the Effective Date, or by the Reorganized Debtors after the Effective Date, are described more fully in Section 2.3.5 of the Disclosure Statement. **In addition, there may be numerous Unknown Causes of Action. The failure to list any such Unknown Causes of Action in the Disclosure Statement, or as an exhibit in the Exhibit Book or Exhibit Book Supplement, is not intended to limit the rights of the Reorganized Debtors to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors after the entry of the Disclosure Statement Order.**

**Unless a claim or cause of action against a Claimant or other Entity is expressly waived, relinquished, released, compromised, or settled in this Plan or any Final Order, the Debtors expressly reserve such claim, Retained Cause of Action or Unknown Cause of Action for later adjudication by the Debtors or Reorganized Debtors, as applicable. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such claims, Retained Causes of Action or Unknown**

Causes of Action upon or after the Confirmation Date or Effective Date of this Plan based on the Plan Documents or the Confirmation Order, except where such claims or Retained Causes of Action have been released in this Plan or other Final Order. In addition, the Debtors, the Reorganized Debtors, and the successor entities under this Plan expressly reserve the right to pursue or adopt any claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Entity, including the plaintiffs or codefendants in such lawsuits.

Any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Debtors or the Reorganized Debtors, and may, if appropriate, be the subject of an action after the Effective Date (unless such claim or cause of action of the Debtor was released, settled, or abandoned prior to the Confirmation Date pursuant to Order of the Bankruptcy Court), whether or not (i) such Entity has Filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) such Claimant's proof of claim has been objected to; (iii) such Claimant's Claim was included in the Debtors' Schedules; or (iv) such Claimant's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as a Disputed Claim, a Contingent Claim, or an Unliquidated Claim.

## 11.4    THIRD-PARTY AGREEMENTS

The Distributions to the various classes of Claims hereunder will not affect the right of any Entity to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto will remain in full force and effect.

## 11.5    DISSOLUTION OF THE UNSECURED CREDITORS' COMMITTEE, AND THE ASBESTOS COMMITTEE; CONTINUED RETENTION OF THE FUTURE CLAIMANTS' REPRESENTATIVE

On the Effective Date, the Asbestos Committee and the Unsecured Creditors' Committee shall each thereupon be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases, and such committee shall be deemed dissolved.

Notwithstanding the foregoing, if the Effective Date occurs prior to the entry of a Final Order with respect to final fee applications of Professionals retained by order of the Bankruptcy Court during the Chapter 11 Cases, the Unsecured Creditors' Committee and the Asbestos Committee may, at their option, continue to serve until a Final Order is entered with respect to such proceedings.

The FCR shall continue to serve through the termination of the Settlement Facility in order to perform the functions required by the Settlement Facility Agreement. Upon termination of the Settlement Facility, the FCR's employment shall be deemed terminated and the FCR shall

be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases.

All reasonable and necessary post-Effective Date fees and expenses of the Professionals retained by the Unsecured Creditors' Committee or Asbestos Committee shall be paid by the Reorganized Debtors. If any dispute regarding the payment of such fees and expenses arises, the parties shall attempt to resolve such dispute in good faith. If they fail to resolve such dispute, they shall submit the dispute to the Bankruptcy Court for resolution.

### 11.6    TITLE TO ASSETS

Upon the transfer of the payments to the Settlement Facility, each such transfer shall be vested in the Settlement Facility free and clear of all Claims, Equity Interests, encumbrances, and other interests of any Entity. Except as otherwise provided in this Plan and in accordance with Bankruptcy Code § 1123(b)(3), on the Effective Date, title to all of the Debtors' assets and properties and interests in property, including the Retained Causes of Action and Unknown Causes of Action, shall vest in the Reorganized Debtors free and clear of all Claims, Equity Interests, encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors.

### 11.7    NOTICES

Any notices, statements, requests, and demands required or permitted to be provided under this Plan, in order to be effective, must be: (i) in writing (including by facsimile transmission), and unless otherwise expressly provided herein, shall be deemed to have been duly given or made (a) if personally delivered or if delivered by facsimile or courier service, when actually received by the Entity to whom notice is sent, (b) if deposited with the United States Postal Service (but only when actually received), at the close of business on the third business day following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, or (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid) (but only when actually received) and (ii) addressed to the appropriate Entity or Entities to whom such notice, statement, request or demand is directed (and, if required, its counsel), at the address of such Entity or Entities set forth below (or at such other address as such Entity may designate from time to time by written notice to all other Entities listed below in accordance with this Section 11.7):

| If to the Debtors: | GARLOCK SEALING TECHNOLOGIES LLC<br>c/o Elizabeth Barry, Chief Restructuring Officer<br>349 West Commercial St., Ste 3050<br>East Rochester, NY  14445 |
|---|---|

68

| With a copy to: | RAYBURN COOPER & DURHAM, P.A.<br>1200 Carillion, 227 West Trade Street<br>Charlotte, NC 28202<br>Telephone: (704) 334-0891<br>Attn: John R. Miller, Jr.<br><br>and<br><br>ROBINSON, BRADSHAW & HINSON, P.A.<br>101 North Tryon Street, Suite 1900<br>Charlotte, NC 28246<br>Telephone: (704) 377-2536<br>Attn: Garland S. Cassada |
|---|---|
| **If to the Asbestos Committee:** | CAPLIN & DRYSDALE, CHARTERED<br>One Thomas Circle N.W., Suite 1100<br>Washington, DC 20005<br>Telephone: (202) 862-5000<br>Attn: Trevor W. Swett |
| **If to the Future Claimants' Representative:** | GRIER FURR & CRISP, PA<br>101 North Tryon Street, Suite 1240<br>Charlotte, NC 28246<br>Telephone: (704) 375-3720<br>Attn: Joseph W. Grier, III |
| **With a copy to:** | ORRICK HERRINGTON & SUTCLIFFE, LLP<br>Columbia Center<br>1152 15th Street, N.W.<br>Washington, DC 20005<br>Telephone: (202) 339-8400<br>Attn: Jonathan P. Guy |
| **If to the Unsecured Creditors' Committee:** | FSB FISHERBROYLES, LLP<br>6000 Fairview Road, Suite 1200<br>Charlotte, NC 28210<br>Telephone: (704) 464-6954<br>Attn: Deborah L. Fletcher |

| **If to Coltec Industries Inc.:** | PARKER POE ADAMS & BERNSTEIN PLLC<br>Attn: Daniel G. Clodfelter, Esq.<br>Three Wells Fargo Center<br>401 South Tryon St., Suite 3000<br>Charlotte, NC  28202<br><br>AND<br><br>MOORE & VAN ALLEN, PLLC<br>Attn: Hillary Crabtree, Esq.<br>Suite 4700, 100 North Tryon St.<br>Charlotte, NC  28202 |
|---|---|

### 11.8   HEADINGS

The headings used in this Plan are inserted for convenience only and neither constitute a portion of this Plan nor in any manner affect the construction of the provisions of this Plan.

### 11.9   GOVERNING LAW

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of North Carolina, without giving effect to any conflicts of law principles thereof that would result in the application of the laws of any other jurisdiction, shall govern the construction of this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise expressly provided in such instruments, agreements, or documents.

### 11.10   FILING OF ADDITIONAL DOCUMENTS

On or before the Effective Date, the Debtors shall File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

### 11.11   COMPLIANCE WITH TAX REQUIREMENTS

In connection with this Plan, the Debtors, the Reorganized Debtors and the Settlement Facility will comply with all applicable withholding and reporting requirements imposed by federal, state, and local taxing authorities, and all Distributions hereunder or under any Plan Document shall be subject to such withholding and reporting requirements, if any. Notwithstanding any other provision of this Plan, each Entity receiving a Distribution pursuant to this Plan, or any other Plan Document, will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental entity, including income tax and other obligations, on account of that Distribution.

## 11.12   EXEMPTION FROM TRANSFER TAXES

Pursuant to Bankruptcy Code § 1146(c), the issuance, transfer, or exchange of notes or equity securities under this Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, shall be exempt from all taxes as provided in Bankruptcy Code § 1146(c).

## 11.13   FURTHER ASSURANCES

The Debtors, the Reorganized Debtors, the Affiliates, the Released Parties, the Asbestos Insurance Companies, the Settlement Facility, and all Holders of Claims receiving Distributions under this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of this Plan as may be necessary to effectuate the provisions and intent of this Plan, with each such Entity to bear its own costs incurred in connection therewith.

## 11.14   FURTHER AUTHORIZATIONS

The Debtors, and, after the Effective Date, the Reorganized Debtors, and the Settlement Facility, if and to the extent necessary, may seek such orders, judgments, injunctions, and rulings that any of them deem necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, this Plan, with each such Entity to bear its own costs in connection therewith.

Respectfully submitted,

**GARLOCK SEALING TECHNOLOGIES LLC**


By:      /s/ Elizabeth Barry
Name: Elizabeth Barry
Title:   Chief Restructuring Officer


**GARRISON LITIGATION MANAGEMENT GROUP, LTD.**


By:      /s/ Elizabeth Barry
Name: Elizabeth Barry
Title:   Vice President and General Manager


**THE ANCHOR PACKING COMPANY**


By:      /s/ Elizabeth Barry
Name: Elizabeth Barry
Title:   Vice President and General Manager

[Signature Page to Debtors' Second Amended Plan of Reorganization]

# EXHIBIT A

**TRUST AND SETTLEMENT
FACILITY AGREEMENT**

*Between*

**Garlock Sealing Technologies LLC
and _____,
as the Trustee**

**Pursuant to the
Second Amended Plan of Reorganization of
Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd., and
The Anchor Packing Company
Dated January 13, 2015**

**Reorganized Debtors in Chapter 11 Case Nos. 10- 31606, 10-31607, and 10-31608
In the United States Bankruptcy Court
For the Western District of North Carolina
Charlotte Division**

**Dated as of _____, 201_**

# TABLE OF CONTENTS

**Page**

## ARTICLE 1.

### DEFINITIONS

1.1    Definitions.................................................................................................... 2
1.2    Additional Definitions ................................................................................ 2
      (a)    "Allowed Settlement Option Claims".............................................. 2
      (b)    "Asbestos Insurance Policy"............................................................ 2
      (c)    "CAC"............................................................................................. 2
      (d)    "Claims Resolution Procedures" or "CRP" .................................... 2
      (e)    "CRP Value" ................................................................................... 2
      (f)    "CRP Value Calculation" ............................................................... 2
      (g)    "CRP Value Calculation Date"........................................................ 2
      (h)    "CRP Value Calculation Documents" ............................................ 2
      (i)    "Litigation Option Expenditures" ................................................... 2
      (j)    "Reorganized Debtors" ................................................................... 3
      (k)    "Settlement Facility" or the "Trust" ............................................... 3
      (l)    "Settlement Facility Assets" ........................................................... 3
      (m)    "Settlement Facility Accounts"........................................................ 3
      (n)    "Settlement Facility Expenses"........................................................ 3
      (o)    "Settlement Facility Payment Obligations" .................................... 3

## ARTICLE 2.

### AGREEMENT OF TRUST

2.1    Creation and Name .................................................................................... 3
2.2    Purpose....................................................................................................... 3
2.3    Claims Resolution Procedures ................................................................... 4
2.4    Transfer of Assets ...................................................................................... 4
2.5    Allocation of Funds.................................................................................... 4
2.6    Acceptance of Assets and Assumption of Liabilities ................................ 4

## ARTICLE 3.

### POWERS, TRUST ADMINISTRATION & REPORTING

3.1    Powers........................................................................................................ 4
3.2    General Administration and Obligations of the Trustee ............................ 8
3.3    Claims Administration .............................................................................. 11
3.4    Indemnification of Reorganized GST, Reorganized Garrison, Released Parties,
      Trustee, FCR and Their Representatives ................................................... 12

# TABLE OF CONTENTS
(continued)

**Page**

## ARTICLE 4.

### ACCOUNTS, INVESTMENTS, AND PAYMENTS

4.1    Accounts ................................................................................................................ 13
4.2    Investments ........................................................................................................... 13
4.3    Source of Payments.............................................................................................. 14
4.4    Indemnification ..................................................................................................... 15

## ARTICLE 5.

### TRUSTEE

5.1    Appointment ......................................................................................................... 15
5.2    Term of Service.................................................................................................... 15
5.3    Appointment of Successor Trustee(s)................................................................. 15
5.4    Liability of Trustee, Officers and Employees .................................................... 16
5.5    Compensation and Expenses of Trustee ............................................................ 16
5.6    Trustee's Employment of Professionals ............................................................. 16
5.7    Trustee Qualifications and Independence ........................................................... 16
5.8    Bond...................................................................................................................... 17

## ARTICLE 6.

### THE FUTURE CLAIMANTS' REPRESENTATIVE

6.1    Duties ................................................................................................................... 17
6.2    Term of Office ..................................................................................................... 18
6.3    Appointment of Successor .................................................................................. 18
6.4    Future Claimants' Representative's Employment of Professionals.................... 18
6.5    Compensation and Expenses of the Future Claimants' Representative............ 18

## ARTICLE 7.

### CLAIMANTS ADVISORY COMMITTEE

7.1    Formation and Number ........................................................................................ 19
7.2    Role....................................................................................................................... 19
7.3    Term of Office ..................................................................................................... 19
7.4    Appointment of Successors.................................................................................. 20
7.5    Compensation for Attendance at Meetings and Expenses of the CAC ........... 20

# TABLE OF CONTENTS
(continued)

**Page**

## ARTICLE 8.

## GENERAL PROVISIONS

| | | |
|---|---|---|
| 8.1 | Irrevocability | 20 |
| 8.2 | Termination | 20 |
| 8.3 | Amendments | 21 |
| 8.4 | Severability | 21 |
| 8.5 | Notices | 21 |
| 8.6 | Successors and Assigns | 23 |
| 8.7 | Limitation on Claim Interests for Securities Laws Purposes | 23 |
| 8.8 | Entire Agreement; No Waiver | 24 |
| 8.9 | Headings | 24 |
| 8.10 | Governing Law | 24 |
| 8.11 | Dispute Resolution | 24 |
| 8.12 | Enforcement and Administration | 24 |
| 8.13 | Effectiveness | 24 |
| 8.14 | Counterpart Signatures | 24 |
| 8.15 | Notices Under Plan Documents | 24 |

ANNEX A – Claims Resolution Procedures

## TRUST AND SETTLEMENT FACILITY
## <u>AGREEMENT</u>

This Trust and Settlement Facility Agreement (this "<u>Settlement Facility Agreement</u>") is by and among Garlock Sealing Technologies LLC ("<u>Garlock</u>," as reorganized, "<u>Reorganized GST</u>"), as debtor pursuant to Debtors' Second Amended Plan of Reorganization in Case Numbers 10-31606, 10-31607, and 10-31608 (the "<u>Plan</u>") in the United States Bankruptcy Court for the Western District of North Carolina (the "<u>Bankruptcy Court</u>"), and the Trustee named on the signature pages hereof (the "<u>Trustee</u>").

## RECITALS

A.      The Plan provides, *inter alia*, for the creation of the Settlement Facility pursuant to the Confirmation Order and Plan for the purpose of receiving, investing, and using funds contributed by Garlock and its parent corporation, Coltec Industries, Inc. (the "<u>Parent</u>"), for the resolution and payment of GST Asbestos Claims (other than Settled GST Asbestos Claims). This Settlement Facility is a North Carolina trust subject to continuing Bankruptcy Court supervision and managed by the Trustee, who must meet the independence criteria contained herein.

B.      Pursuant to the Plan, Reorganized GST and the Parent will make contributions to the Settlement Facility in the aggregate amount of $327.5 million, over time as set forth in the Plan, with the potential to be increased by the Settled Claims Surplus as described in the Plan and by transfer of the remaining balance of the Litigation Fund upon certain conditions identified in the Plan.

C.      Under the Plan, GST Asbestos Claimants (other than Settled GST Asbestos Claimants) may elect to submit their claims to the Settlement Facility for settlement under the Claims Resolution Procedures (Settlement Option Claims) or file proofs of claim in the Bankruptcy Court and obtain resolution of their GST Asbestos Claims through allowance litigation governed by the Case Management Order (Litigation Option Claims).

D.      Under the Plan, the Settlement Facility has assumed exclusive responsibility for processing and paying Settlement Option Claims pursuant to the CRP. In addition, the Settlement Facility has assumed responsibility for paying the costs of resolving Litigation Option Claims defended by Reorganized Garrison, up to the CRP Value of such Litigation Option Claim.

E.      Pursuant to the Plan and the Confirmation Order, this Settlement Facility Agreement establishes the Settlement Facility.

NOW, THEREFORE, in accordance with the Plan and the Confirmation Order, it is agreed as follows:

# ARTICLE 1.

## DEFINITIONS

**1.1**    <u>**Definitions**</u>.  All capitalized terms used in this Settlement Facility Agreement and not otherwise defined herein shall have the meanings assigned in the Plan, and the Claims Resolution Procedures.

**1.2**    <u>**Additional Definitions**</u>.

(a)    "<u>Allowed Settlement Option Claims</u>" means Settlement Option Claims that have become Allowed pursuant to the CRP.

(b)    "<u>Asbestos Insurance Policy</u>" means an insurance policy issued by an Asbestos Insurance Company.

(c)    "<u>CAC</u>" means the Claimants Advisory Committee.

(d)    "<u>Claims Resolution Procedures</u>" or "<u>CRP</u>" means the Claims Resolution Procedures attached hereto as **Annex A**.  The CRP are expressly incorporated herein by reference and are a part of this Settlement Facility Agreement.

(e)    "<u>CRP Value</u>" means the upper limit of the Settlement Facility's obligation for Litigation Option Expenditures with respect to a particular Litigation Option Claim, amounting to the larger of the payment prescribed by the calculations in CRP Appendix I (Expedited Review) or Appendix II (Individual Review) for the Claimant.

(f)    "<u>CRP Value Calculation</u>" means the determination of the CRP Value using the CRP Value Calculation Documents.

(g)    "<u>CRP Value Calculation Date</u>" means the date the Settlement Facility is required to calculate the CRP Value for purposes of determining its obligation for Litigation Option Expenditures, defined as fourteen (14) days after the date when Reorganized Garrison provides the CRP Value Calculation Documents with respect to a particular Litigation Option Claim (or, in the case of Pre-Petition Judgment GST Asbestos Claims whose Holders elect to complete state court appeals, fourteen (14) days after the date Reorganized Garrison provides the case file to the Settlement Facility).

(h)    "<u>CRP Value Calculation Documents</u>" means, with respect to any Litigation Option Claim, the interrogatories and documents produced in discovery by a Litigation Option Claimant and provided to the Settlement Facility by Reorganized Garrison.

(i)    "<u>Litigation Option Expenditures</u>" means, with respect to any Litigation Option Claim, all Litigation Expenses, plus the Allowed Amount (if Allowed) of such Litigation Option Claim whether determined by Final Order or by settlement between Reorganized Garrison and the Litigation Option Claimant within the limits of Reorganized Garrison's settlement authority as defined by the Plan.

(j)      "<u>Reorganized Debtors</u>" means both of Reorganized GST and Reorganized Garrison.

(k)      "<u>Settlement Facility</u>" or the "<u>Trust</u>" means the trust, known as the "GST Settlement Facility" created hereunder.

(l)      "<u>Settlement Facility Assets</u>" means the monies paid to the Settlement Facility under the terms of the Plan.

(m)      "<u>Settlement Facility Accounts</u>" means such accounts established by the Trustee pursuant to **Section 4.1**.

(n)      "<u>Settlement Facility Expenses</u>" means expenses of administering the Settlement Facility and CRP incurred by the Settlement Facility in connection with the performance of the obligations of the Settlement Facility under this Settlement Facility Agreement, the CRP, and the Plan.

(o)      "<u>Settlement Facility Payment Obligations</u>" means Allowed Settlement Option Claims and Litigation Option Expenditures up to the CRP Value for a particular Litigation Option Claim.

## ARTICLE 2.

## <u>AGREEMENT OF TRUST</u>

**2.1    <u>Creation and Name</u>**.   Garlock hereby creates a trust known as the "GST Settlement Facility" as a North Carolina trust, effective as of the Effective Date.  The Trustee shall transact the business and affairs of the GST Settlement Facility in the name "GST Settlement Facility."

**2.2    <u>Purpose</u>**.  The purposes of the Settlement Facility are to:

(a)      assume full and exclusive responsibility, pursuant to the Plan, this Settlement Facility Agreement, and the CRP, for processing and reviewing Settlement Option Claims;

(b)      make payments of Allowed Settlement Option Claims, in accordance with the Plan, this Settlement Facility Agreement, and the CRP;

(c)      collect, invest, and distribute funds for the benefit of Holders of Settlement Option Claims;

(d)      pay expenses and costs, including Settlement Facility Expenses, in accordance with the terms of this Settlement Facility Agreement, the CRP, and the Plan;

(e)      for Litigation Option Claims, determine the CRP Value and pay Litigation Option Expenditures as required by this Settlement Facility Agreement and the Plan;

(f)     defend the Reorganized Debtors, their Representatives, and the Released Parties from any GST Asbestos Claims asserted against them and indemnify such Entities from any losses associated with such Claims;

(g)     at all times qualify as a Qualified Settlement Fund ("QSF") pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder; and

(h)     otherwise carry out the provisions of this Settlement Facility Agreement, the CRP, the Plan, and any other agreements into which the Trustee has entered or will enter in connection with the Plan.

### 2.3     **Claims Resolution Procedures**.

In furtherance of the purposes of the Settlement Facility, as set forth above in **Section 2.2**, the Trustee shall be responsible for supervising and administering payment of Allowed Settlement Option Claims pursuant to the CRP, and performing all other purposes of the Settlement Facility.

### 2.4     **Transfer of Assets**.  All assets received by the Settlement Facility pursuant to the Plan shall be administered, held and distributed in accordance with the terms of this Settlement Facility Agreement, the CRP, and the Plan.

### 2.5     **Allocation of Funds**.  The funds of the Settlement Facility shall be distributed to GST Asbestos Claimants and allocated for administrative and other expenses and costs in accordance with the terms of this Settlement Facility Agreement, the CRP, and the Plan.

### 2.6     **Acceptance of Assets and Assumption of Liabilities**.

(a)     In connection with and in furtherance of the purposes of the Settlement Facility, the Trustee, on behalf of the Settlement Facility, hereby expressly accepts the transfer, issuance and assignment, as applicable, to the Settlement Facility of the Settlement Facility Assets at the time and in the manner contemplated by the Plan and this Settlement Facility Agreement.

(b)     In furtherance of the purposes of the Settlement Facility, the Trustee, on behalf of the Settlement Facility, hereby expressly assumes liability for all Settlement Option Claims, for Litigation Option Expenditures related to Litigation Option Claims up to the CRP Values of such Claims, and for any other liabilities or obligations that are to be assumed by the Settlement Facility under the Plan or this Settlement Facility Agreement.

### ARTICLE 3.

### POWERS, TRUST ADMINISTRATION & REPORTING

### 3.1     **Powers**.

(a)     The Trustee is and shall act as a fiduciary to the Settlement Facility in accordance with the provisions of this Settlement Facility Agreement, the Plan, and applicable law.  The Trustee shall, at all times, administer the Settlement Facility in accordance with **Article 3** of this

4

Settlement Facility Agreement.  Subject to the limitations set forth in this Settlement Facility Agreement and the CRP, the Trustee shall have the power to take any and all actions that, in his/her reasonable judgment, are necessary, proper or convenient to effectuate the purposes of the Settlement Facility, including, without limitation, each power expressly granted in this **Section 3.1**, any power reasonably incidental thereto, and any trust power now or hereafter permitted under applicable law.

(b)      Except as required by applicable law or as otherwise specified herein, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)      Without limiting the generality of **Section 3.1(a)** above, and except as limited herein, the Trustee shall have the power:

(i)      to hold, administer, and distribute the Settlement Facility Assets;

(ii)      to invest and reinvest the Settlement Facility Assets and other monies held from time to time by the Settlement Facility;

(iii)      to delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Settlement Facility Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except to the extent it constitutes willful misconduct;

(iv)      to administer the Settlement Facility, including the consideration of Settlement Option Claims, in accordance with this Settlement Facility Agreement, the CRP, and the Plan;

(v)      to administer and implement the CRP and the terms of this Settlement Facility Agreement all in accordance with the terms thereof;

(vi)      to pay Allowed Settlement Option Claims;

(vii)      for Litigation Option Claims, to determine the CRP Values of such Claims and to pay Litigation Option Expenditures as required by this Settlement Facility Agreement and the Plan;

(viii)      to pay Settlement Facility Expenses and other liabilities and expenses of the Settlement Facility;

(ix)      to acquire, own, lease, and convey real and personal property as deemed necessary or desirable;

(x)      to adopt and amend by-laws and other rules and procedures not inconsistent with this Settlement Facility Agreement, the CRP, and the Plan;

5

(xi)     to sell, transfer, or exchange any or all of the Settlement Facility Assets at such prices and upon such terms as the Trustee may consider proper, consistent with the other terms of this Settlement Facility Agreement;

(xii)    to establish such funds, reserves and accounts in the name of the Settlement Facility, as useful in carrying out the purposes of the Settlement Facility;

(xiii)   to sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding or legal action;

(xiv)    to defend against and pay all costs and fees (including attorneys' fees) for the defense of any and all claims that relate to the operations of the Settlement Facility and the actions of its employees and agents;

(xv)     to appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing and forecasting, and other consultants and agents as the business of the Settlement Facility requires, and to delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his/her discretion, deems advisable or necessary in order to carry out the terms of the Settlement Facility;

(xvi)    to pay employees, legal, financial, accounting, investment, auditing and forecasting, and other consultants, advisors, and agents reasonable compensation, including without limitation, compensation at rates approved by the Trustee for services rendered prior to the execution hereof;

(xvii)   to earn reasonable compensation and compensate the FCR and CAC members and reimburse out of pocket costs and expenses authorized by this Settlement Facility Agreement;

(xviii)  to execute and deliver such instruments proper in administering the Settlement Facility;

(xix)    to enter into such other arrangements with third parties as are deemed useful in carrying out the purposes of the Settlement Facility, provided, however, such arrangements do not conflict with any other provision of the Plan, the Confirmation Order, this Settlement Facility Agreement, or the CRP;

(xx)     to indemnify the Entities to be indemnified under **Section 3.4** to the fullest extent that a corporation or trust organized under the laws of the State of North Carolina is from time to time entitled to indemnify and/or insure its officers, employees, and agents;

(xxi)    to purchase insurance for the Settlement Facility and those Entities for whom the Settlement Facility has an indemnification obligation hereunder;

6

(xxii)  to consult with the FCR, the CAC, and Reorganized Garrison or their successors at such times and with respect to such issues relating to the conduct of the Settlement Facility as the Trustee considers desirable;

(xxiii) to procure insurance policies and establish claims handling agreements and other arrangements as provided in **Section 8.2** of this Settlement Facility Agreement;

(xxiv) to obtain a tax identification number for the Settlement Facility, communicate with the IRS and state and local taxing authorities on behalf of the Settlement Facility, make payment of taxes on behalf of the Settlement Facility, and file all applicable tax returns for the Settlement Facility;

(xxv)  to enter into an agreement with Reorganized Garrison whereby the Settlement Facility will provide its books and records to Reorganized Garrison so as to fully enable Reorganized Garrison to recover any amounts available under any Asbestos Insurance Policy;

(xxvi) to determine and apply the Maximum Annual Payment as provided in the CRP;

(xxvii) to increase or decrease Matrix Amounts for the purpose of ensuring substantially equivalent treatment of all present and future Settlement Option Claims, as provided in the CRP;

(xxviii) to determine that increases in Matrix Amounts are too little to warrant payments to Settlement Option Claimants already paid, as provided in the CRP;

(xxix) to establish a Trust Claims Payment Ratio as provided in the CRP;

(xxx)  to develop and modify Claim Forms and claim filing procedures;

(xxxi) to establish procedures for Medicare reporting if the Trustee deems it necessary, and to adopt procedures to protect the Settlement Facility from Medicare reimbursement claims;

(xxxii) to designate Settlement Option Claims as Hardship Claims as provided in the CRP;

(xxxiii)  to respond to subpoenas; and

(xxxiv) to do all other acts and things not inconsistent with the provisions of this Settlement Facility Agreement, the CRP, the Plan, or applicable law.

(d)    The Trustee shall not have the power to guarantee any debt of any other Entity.

**3.2**    **General Administration and Obligations of the Trustee**.

(a)    <u>Tax Returns and Reports</u>.

(i)    The Trustee shall cause to be obtained, at the cost and expense of the Settlement Facility, a Federal Employer Identification Number ("<u>FEIN</u>"), and relevant state tax identification numbers, for the Settlement Facility and shall cause such income tax and other returns and statements as are required by the applicable provisions of the IRC and the Treasury Regulations and such other state or local laws and regulations as may be applicable to be timely filed on behalf of the Settlement Facility on the basis of a December 31 year end.  The Trustee shall take all steps necessary to ensure that any tax obligations imposed upon the Settlement Facility are paid and shall otherwise comply with Section 1.468B-2 of the Treasury Regulations and all other reporting obligations of the Settlement Facility.  The Trustee shall comply with all applicable withholding obligations as required under the applicable provisions of the IRC and such other state and local laws as may be applicable, and the regulations promulgated thereunder.

(ii)    The Trustee shall cause the Settlement Facility to qualify and maintain qualification as a QSF.

(iii)    Within seventy-five (75) days (or earlier if required by law) after the end of each calendar year, the Settlement Facility shall cause to be prepared and mailed such information as required by law to enable payees to complete and file each of their respective federal, state and local income and other tax returns. The Trustee also shall provide a copy of any filed tax returns of the Settlement Facility to the FCR, CAC, and Reorganized Garrison when such return is filed.

(b)    <u>Reports</u>. The Trustee shall prepare and file with the Bankruptcy Court the following reports.  The Trustee shall provide a copy of such reports to the FCR, CAC, and Reorganized Garrison when such reports are filed with the Bankruptcy Court.

(i)    <u>Financial Reports</u>. As soon as available, but, in any event, no later than one hundred twenty (120) days following the end of each fiscal year, the Trustee shall cause to be prepared an annual report containing financial statements of the Settlement Facility (including, without limitation, a balance sheet of the Settlement Facility as of the end of such fiscal year, a statement of operations for such fiscal year, and information required by **Section 5.5(c)**) audited by a firm of independent registered public accountants selected by the Trustee and accompanied by an opinion of such firm that such financial statements present fairly in all material respects the financial position of the Settlement Facility as of such year end and the results of its operations as of the year then ended in conformity with accounting principles generally accepted in the United States.

8

(ii)    <u>Claim Administration Reports</u>. As soon as available, but, in any event, no later than sixty (60) days following the end of every quarter, the Trustee shall cause to be prepared a report that provides a summary of the number and amount of Claims submitted to and paid by the Settlement Facility and the number and amount of Litigation Option Expenditures made by the Settlement Facility, with all such information classified by disease type.

(iii)    Pursuant to Bankruptcy Code § 107(a), all materials required by this **Section 3.2(b)** shall be filed in the Chapter 11 Cases on the docket of the Bankruptcy Court and accordingly shall be public records and open to examination by an Entity at reasonable times without charge.

(c)    The Trustee and all parties to this Settlement Facility Agreement agree to cooperate to the maximum extent reasonably possible in conducting any matters involving taxes, including the preparation of any necessary tax returns or reports, the furnishing of information necessary to prepare tax returns or reports, the administration of any tax audit or review, and the conduct of any tax contest. If it shall become necessary to contest any disputed tax, the party primarily liable for such potential tax liability shall be entitled to control such contest, and the other parties shall cooperate with such controlling party to the maximum extent reasonably possible.

(d)    The Trustee, on behalf of the Settlement Facility, shall enter into a cooperation agreement with Reorganized Garrison pursuant to which:  (a) Reorganized Garrison shall provide to the Settlement Facility the non-privileged books and records of the Debtors and Reorganized Garrison that pertain directly to Settlement Option Claims and the Garlock Analytical Database prepared during the bankruptcy case, and (b) the Settlement Facility shall provide to Reorganized Garrison books and records of the Settlement Facility that pertain to GST Asbestos Claims so as to fully enable Reorganized Garrison to defend Litigation Option Claims, to enable Reorganized Garrison to make any claim, recover any amounts available, or assert any right under any Asbestos Insurance Policy, or to carry out any other purpose of this Settlement Facility Agreement or the Plan.

(e)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow to the FCR and Reorganized Garrison.

(f)    The Trustee shall consult with the FCR and Reorganized Garrison and may, at a regular meeting or specially called meeting, seek information and advice from the CAC, the FCR, and Reorganized Garrison (i) on the implementation and administration of the CRP, (ii) on the implementation and administration of the Settlement Facility, and (iii) on any other matter the Trustee wishes. The Trustee shall meet with the FCR, CAC, and Reorganized Garrison not fewer than four (4) times each calendar year during the first two (2) years following the Effective Date and then two (2) times each calendar year thereafter, which shall be at a regular or special meeting as mutually agreed to by the Trustee, FCR, CAC, and Reorganized Garrison, to discuss general matters regarding the administration of the Settlement Facility, the review, allowance, and payment of Claims, and the condition of the Settlement Facility Assets.

(g)    In addition to the other provisions contained in this Settlement Facility Agreement or in the CRP, the Trustee shall be required to obtain the approval of the Bankruptcy Court, following consultation with the FCR and Reorganized Garrison and notice to the CAC to:

(i)    amend any provision of this Settlement Facility Agreement;

(ii)    terminate the Settlement Facility pursuant to **Section 8.2** hereof;

(iii)    change the compensation of the Trustee (other than mere cost-of-living increases); or

(iv)    amend or modify the CRP (unless otherwise provided in the CRP).

(h)    The Trustee shall consult with the FCR and Reorganized Garrison, and provide notice to the CAC before:

(i)    adopting or amending by-laws and other rules and procedures;

(ii)    selling, transferring, or exchanging any or all of the Settlement Facility Assets;

(iii)    suing or participating, as a party or otherwise (not including responding to discovery requests or subpoenas), in any judicial, administrative, arbitrative, or other proceeding or legal action;

(iv)    defending against or paying costs and fees (including attorneys' fees) for the defense of any and all claims that relate to the operations of the Settlement Facility and the actions of its employees and agents;

(v)    indemnifying the Entities to be indemnified under Section 3.4;

(vi)    procuring insurance policies or establishing claims handling agreements and other arrangements as provided in Section 8.2 of this Settlement Facility Agreement;

(vii)    making payment of taxes on behalf of the Settlement Facility;

(viii)    increasing or decreasing Matrix Amounts for the purpose of ensuring substantially equivalent treatment of all present and future Settlement Option Claims, as provided in the CRP;

(ix)    determining that increases in Matrix Amounts are too little to warrant payments to Settlement Option Claimants already paid, as provided in the CRP;

(x)    establishing a Trust Claims Payment Ratio as provided in the CRP;

(xi)     establishing procedures for Medicare reporting if the Trustee deems it necessary, or adopting procedures to protect the Settlement Facility from Medicare reimbursement claims;

(i)     The Trustee may, but shall not be required to, at a regular meeting or specially called meeting, seek information or advice from the CAC prior to taking any action for which notice to the CAC is required by **Section 3.2(g) and (h).**

(j)     The Trustee, upon notice from the FCR, CAC, or Reorganized Garrison requesting consideration of one or more issues, shall at the next regular meeting or, if appropriate, at a specially called meeting, place on the agenda and consider such issues.

**3.3     Claims Administration.**

(a)     Determination and Payment of Allowed Settlement Option Claims. The Settlement Facility shall consider and make determinations whether Settlement Option Claims should be Allowed in accordance with this Settlement Facility Agreement and the CRP and shall pay Allowed Settlement Option Claims. This Settlement Facility Agreement and the CRP provide the exclusive criteria for evaluating, liquidating, allowing, and paying Settlement Option Claims.  Only those Settlement Option Claims that satisfy the eligibility criteria specified in the CRP are eligible to become Allowed Settlement Option Claims and receive payment.

(b)     Litigation Option Expenditures.

(i)     For each Litigation Option Claim, the Settlement Facility shall:

(A)     on or before the CRP Value Calculation Date (following the receipt of the CRP Value Calculation Documents from Reorganized Garrison) make the CRP Value Calculation and notify Reorganized Garrison of the CRP Value and the basis therefor; and

(B)     pay Litigation Option Expenditures, when due, on account of such Litigation Option Claim up to the Claim's CRP Value.

(ii)     Any dispute between the Settlement Facility and Reorganized Garrison regarding the calculation of the CRP Value for any Litigation Option Claim or the Settlement Facility's obligation for Litigation Option Expenditures shall be decided by the Bankruptcy Court.

(c)     The Trustee may, in his/her discretion, implement such additional procedures and routines as necessary to implement the CRP and make payments of Settlement Option Claims and Litigation Option Expenditures consistent with the terms of this Settlement Facility Agreement, the CRP, and the Plan.

(d)     The Settlement Facility shall pay all Settlement Facility Expenses incurred in connection with the administration of the Settlement Facility.

**3.4    Indemnification of Reorganized GST, Reorganized Garrison, Released Parties, Trustee, FCR and Their Representatives**.

(a)    The Settlement Facility shall defend, indemnify, and hold harmless Reorganized GST, Reorganized Garrison, the FCR, their Representatives, and the Released Parties from and against any and all losses arising out of, related to, or associated with any GST Asbestos Claims asserted, commenced or continued against Reorganized GST, Reorganized Garrison, or any Released Party after the Effective Date, including without limitation, any losses arising from, related to, or associated with actions taken by, or for the benefit of, any GST Asbestos Claimant in violation of the Plan, the Discharge Injunction, the Parent Settlement, or the Parent Settlement Enforcement Injunction; provided, however, that this provision shall not apply to Litigation Option Claims asserted against Reorganized Garrison pursuant to the Plan and CMO; Pre-Petition Judgment GST Asbestos Claims whose Holders elect to complete state court appeals; or Settled GST Asbestos Claims.

(b)    The Settlement Facility shall defend, indemnify, and hold harmless the Trustee, the FCR, Reorganized Garrison, and their Representatives to the fullest extent available under law against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder. Notwithstanding the foregoing, neither the Trustee, the FCR, Reorganized Garrison, or their Representatives shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss as a result of their willful misconduct.

(c)    The Settlement Facility shall defend, indemnify, and hold harmless the FCR and his Representatives to the fullest extent available under the law  against any and all liabilities, expenses, claims, damages or losses arising out of, related to, or associated with any pre-or post-Petition Date act or omission in connection with, related to, or arising out of the administration of the Chapter 11 Cases, the negotiation of the Plan or the Plan Documents, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration the Plan or the property to be distributed under the Plan.  Notwithstanding the foregoing, neither the FCR or his Representatives shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss as a result of their willful misconduct.

(d)    Reasonable expenses, costs, and fees (including reasonable attorneys' fees and costs) incurred by or on behalf of Reorganized GST, Reorganized Garrison, any Released Party, the Trustee, the FCR, or their Representatives in connection with any action, suit, or proceeding, whether civil, administrative or arbitrative from which he or she is indemnified by the Settlement Facility pursuant to this **Section 3.4(a)**, shall be paid by the Settlement Facility in advance of the final disposition thereof; provided, however, with respect to **Section 3.4(b)**, such reasonable expenses, costs, and fees shall not be advanced for the benefit of any of the Trustee, the FCR, Reorganized Garrison, or their Representatives in litigation pertaining to the performance of their duties hereunder until such Entity shall have delivered a written undertaking to the Settlement Facility to repay such reasonable expenses, costs, and fees advanced on such Entity's behalf in the event that it shall be determined ultimately by Final Order that such Entity is not entitled to be indemnified by the Settlement Facility.

(e)    The Trustee may purchase and maintain reasonable amounts and types of insurance on behalf of the Settlement Facility and pay any Entity who is or was a Trustee, a

Settlement Facility Party, the FCR, Reorganized Garrison, or their Representatives against liability asserted against or incurred by such Entity in the performance of such parties' duties hereunder.

## ARTICLE 4.

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**4.1** **Accounts**.  The Trustee may, from time to time, establish and maintain such accounts and reserves within the Settlement Facility Assets as he/she may deem necessary, prudent, or useful in order to provide for the payment of Settlement Facility Payment Obligations and Settlement Facility Expenses payable hereunder in accordance with this Settlement Facility Agreement, the CRP, and the Plan, and may, with respect to any such account or reserve, restrict the use of monies therein.

**4.2** **Investments**.  Investment of monies held in the Settlement Facility shall be administered in the manner in which individuals of ordinary prudence, discretion, and judgment would act in the management of their own affairs, subject to the following limitations and provisions:

(a)     The Settlement Facility shall not acquire, directly or indirectly, equity in any Entity or business enterprise if, immediately following such acquisition, the Settlement Facility would hold more than 5% of the equity in such Entity or business enterprise.  The Settlement Facility shall not hold, directly or indirectly, more than 10% of the equity in any Entity or business enterprise.

(b)     The Settlement Facility shall not acquire or hold any long-term debt securities unless (i) such securities are rated "A" or higher by Moody's Investors Services, Inc. ("Moody's") or by Standard & Poor's Corporation ("S&P"), or (ii) such securities have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(c)     The Settlement Facility shall not acquire or hold any commercial paper unless such commercial paper is rated "P-1" or higher by Moody's or "A-1" or higher by S&P or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)     The Settlement Facility shall not acquire or hold any promissory note of a domestic corporation unless such note is rated "A" or higher by Moody's or S&P.

(e)     The Settlement Facility shall not acquire or hold any foreign or domestic banker's acceptance, certificate of deposit, time deposit, or note, unless that instrument is rated "A" or higher by Moody's or S&P.

(f)     The Settlement Facility may acquire issue which is a direct or indirect obligation of any state, county, city or other qualifying entity.  A short term issue may be rated no lower than "MIG 1" or "SP-1"; a long-term issue may be rated no lower than "A" by S&P or Moody's.

(g)    The Settlement Facility may invest in a money market fund if the fund has minimum net assets of $550 million.

(h)    The Settlement Facility shall not acquire or hold any common or preferred stock or convertible securities unless such stock or securities are rated "A" or higher by Moody's or "A" or higher by S&P's.

(i)    The Settlement Facility shall not acquire any securities or other instruments issued by any Entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) if, following such acquisition, the aggregate fair market value as determined in good faith by the Trustee of all securities and instruments issued by such Entity held by the Settlement Facility would exceed 2% of the aggregate value of the Settlement Facility.  The Settlement Facility shall not hold any securities or other instruments issued by any Entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) to the extent that the aggregate fair market value as determined in good faith by the Trustee of all securities and instruments issued by such Entity and held by the Settlement Facility would exceed 5% of the aggregate value of the Settlement Facility.

(j)    The Settlement Facility shall not acquire or hold any certificates of deposit unless all publicly-held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in **Section 4.2(b)**.

(k)    The Settlement Facility shall not acquire or hold any options or derivatives.

(l)    The Settlement Facility shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustee, they are adequately collateralized.

(m)    Notwithstanding the foregoing, the Settlement Facility may (A) acquire and hold equity or debt securities or instruments of the type(s) described in clauses (a) through (*l*) of this **Section 4.2** which are issued by the Debtors, Reorganized Garrison, or any of their Affiliates, or successors, (B) may hold EnPro stock, and (C) may acquire and hold any other property or asset included in kind in the Settlement Facility Assets, in each case without regard to any of the limitations set forth in such clauses (a) through (*l*).

**4.3**    **Source of Payments**.  All Settlement Facility Expenses and all liabilities with respect to each of the Settlement Facility Payment Obligations shall be payable by the Settlement Facility out of the Settlement Facility Accounts.  Neither the Debtors, Reorganized GST, Reorganized Garrison, their respective Affiliates or subsidiaries, any successor in interest or the present or former stockholders, shareholders, members of the Debtors, Reorganized GST, Reorganized Garrison, or their Affiliates, nor the Trustee, the FCR, nor any directors, officers, employees, or agents of the foregoing shall be liable for the payment of any Settlement Facility Payment Obligations, Settlement Facility Expenses, or any other liability of the Settlement Facility.

**4.4**     __Indemnification__.  Any claim for indemnification from the Settlement Facility and all costs and expenses associated therewith (except for an indemnification claim which is also a GST Asbestos Claim) shall be satisfied from the Settlement Facility Assets.  Nothing herein is intended to be, nor shall it be construed as, an admission as to the validity or enforceability of any particular claim for indemnification, including any claim for indemnification by any Holder of a GST Asbestos Claim.

## ARTICLE 5.

## __TRUSTEE__

**5.1**     __Appointment__.   The initial Trustee shall be nominated by the Debtors, after consultation with the FCR, on or before the Confirmation Date.  The Bankruptcy Court, after notice and opportunity for hearing, shall appoint the Trustee nominated by the Debtors to serve as the Trustee of the Settlement Facility effective as of the Effective Date.  To become eligible, the Trustee must meet the qualification requirements of **Section 5.7**.

**5.2**     __Term of Service__.

(a)     The initial Trustee shall serve from the Effective Date and each successor Trustee named to fill a vacancy shall serve from the date of appointment until the earlier of (i) his or her death, (ii) the end of the calendar year in which he or she reaches age 75, (iii) his or her resignation pursuant to **Section 5.2(b)**, (iv) his or her removal pursuant to **Section 5.2(c)**, or (v) the termination of the Settlement Facility pursuant to **Section 8.2**.

(b)     The Trustee may resign at any time by written notice to the FCR and Reorganized Garrison.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Trustee may be removed in the event that he/she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause.  Good cause shall be deemed to include any substantial failure to comply with **Sections 3.2 or 3.3**, a consistent pattern of neglect and/or failure to perform the duties of a trustee hereunder, or repeated non-attendance at scheduled meetings.  Such removal shall be made by order of the Bankruptcy Court, upon motion by the FCR, CAC, or Reorganized Garrison.

**5.3**     __Appointment of Successor Trustee(s)__.

(a)     In the event of a vacancy in the position of a Trustee, the FCR shall nominate a successor, after consultation with Reorganized Garrison and the CAC.  The Bankruptcy Court, after notice and opportunity for hearing, shall appoint any successor Trustee so nominated.  To become eligible, the successor Trustee must meet the qualification requirements of **Section 5.7**.

(b)     Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.

**5.4    Liability of Trustee, Officers and Employees**.    Neither the Trustee, the Settlement Facility, nor its Representatives shall be liable to the Settlement Facility, to any Entity holding a Claim, or to any other Entity except for such individual's willful misconduct.

**5.5    Compensation and Expenses of Trustee**.

(a)    The Trustee shall receive compensation from the Settlement Facility for his or her services as a Trustee in the amount of $50,000 per annum plus payment for his or her services at a reasonable hourly rate to be determined by the Bankruptcy Court.   The compensation payable to the Trustee hereunder shall be reviewed every three (3) years and appropriately adjusted by order of the Bankruptcy Court upon the motion of the Trustee, after consultation with the FCR and Reorganized Garrison, and notice to the CAC.

(b)    The Settlement Facility shall promptly reimburse the Trustee on a monthly basis for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his or her duties and authorized hereunder.

(c)    The Settlement Facility shall include a description of the amounts paid under this **Section 5.5** in the report to be filed pursuant to **Section 3.2(b)** of this Settlement Facility Agreement.

**5.6    Trustee's Employment of Professionals**.    The Trustee may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, and professionals related to the administration of the payment of Settlement Facility Payment Obligations and Settlement Facility Expenses including but not limited to medical professionals and other Entities deemed by the Trustee to be qualified as experts on the matters submitted to them, and the opinion of any such Entities on any matters submitted to them by the Trustee shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of any such Entity, in the absence of gross negligence.

**5.7    Trustee Qualifications and Independence**.    The Trustee shall be (i) an individual over the age of 35 whose experience and background are appropriate for the responsibilities hereunder, and (ii) at the time of appointment and at all times during the term of service, independent. For purposes of this Settlement Facility Agreement, a person is not independent if such person:

(a)    is or was an attorney who represented a plaintiff or a defendant in an asbestos-related personal injury or wrongful death case;

(b)    is or was at any time a Holder or a representative of a Holder of any claim against any Debtor or any other Released Party;

(c)    has or had a relationship with the Holder of any claim against the Debtors or any Released Party such that the person's impartiality in serving as Trustee could reasonably be questioned;

16

(d)     is or was at any time, an investment banker, financial advisor, accountant or attorney for the Holder of any claim against the Debtor or any other Released Party, or an officer, director, employee or agent of any person or entity that provides or provided investment banking, financial advice, accounting or legal services to the Holder of any claim against the Debtor or any other Released Party;

(e)     is an individual who serves or served as a future claimants' representative, member of a trust advisory committee (or similar committee), or trustee of any asbestos personal injury trust;

(f)     is or was a professional (such as an expert who made projections or analysis of asbestos-related claims or an attorney of a law firm) that was engaged by or advised a debtor, official or unofficial group of asbestos personal injury creditors, trust advisory committee (or similar committee), or future claimants' representative in an asbestos-related bankruptcy proceeding or in connection with a trust or other facility created as a result of such bankruptcy;

(g)     is a Holder of any equity interest (other than interests held indirectly through publicly-traded mutual funds) in a Debtor or any other Released Party;

(h)     is or was an officer, director, employee or agent of a Debtor or any other Released Party or otherwise is or was an "insider," as defined in the Bankruptcy Code, with respect to a Debtor or any other Released Party; or

(i)     is or was an investment banker, financial advisor, accountant or attorney for a Debtor or any other Released Party, or an officer, director, employee or agent of any person or entity that provides or provided investment banking, financial advice, accounting or legal services to a Debtor or any other Released Party.

**5.8**     **Bond**.  The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

## ARTICLE 6.

## THE FUTURE CLAIMANTS' REPRESENTATIVE

**6.1**     **Duties**.  The FCR is the FCR appointed by the Court by order dated September 16, 2010 or his successor.  The FCR shall represent the interests of, appear on behalf of, and be a fiduciary to persons that might subsequently assert Claims against the Settlement Facility. The FCR is a party in interest in the bankruptcy case, and has standing under 1109(b) of the Bankruptcy Code to raise issues, to appear, and to be heard in connection with the bankruptcy case in matters for which the Court retains jurisdiction and for which rights of persons that might subsequently assert Claims against the Settlement Facility are affected.

### 6.2     **Term of Office**.

(a)     The FCR shall serve until the earlier of (i) his or her death, (ii) the end of the calendar year in which he or she reaches age 75, (iii) his or her resignation pursuant to **Section**

**6.2(b)**, (iv) his or her removal pursuant to **Section 6.2(c),** or (v) the termination of the Settlement Facility pursuant to **Section 8.2**.

(b)        The FCR may resign at any time by written notice to the Trustee.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)        The FCR may be removed in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause.  Good cause shall be deemed to include a consistent pattern of neglect and failure to perform or to participate in performing the duties of the FCR hereunder and under the CRP, such as repeated nonattendance at scheduled meetings.  Such removal shall be made by order of the Bankruptcy Court, upon motion by the Trustee.

**6.3        Appointment of Successor**.  A successor FCR shall be appointed by order of the Court, upon the nomination by the Trustee after consultation with Reorganized Garrison and notice to the CAC.

**6.4        Future Claimants' Representative's Employment of Professionals**.  With the consent of the Trustee, or absent consent of the Trustee, upon the motion of the FCR and order of the Bankruptcy Court, the FCR may retain counsel or other relevant professionals to advise the FCR in connection with his/her performance of his/her duties as FCR, with expenses to be paid by the Settlement Facility.

**6.5        Compensation and Expenses of the Future Claimants' Representative**.

(a)        The FCR shall receive compensation from the Settlement Facility for his or her services in the form of the FCR's normal hourly rate for services performed, consistent with the Bankruptcy Court's order approving his appointment, such compensation being subject to an annual review, adjustment, and approval by the Trustee.

(b)        The Settlement Facility shall promptly reimburse, or pay directly if so instructed, the FCR for all reasonable out-of-pocket costs and expenses, including (i) fees and costs associated with the employment of professionals pursuant to **Section 6.4**,  (ii) reasonable fees and costs incurred in connection with the performance of his or her duties hereunder, and (iii) reasonable fees and costs associated with the procurement and maintenance of insurance incurred by the FCR in connection with the performance of his or her duties hereunder.  All such reimbursements or direct payments shall be subject to approval by the Trustee and shall be deemed Settlement Facility Expenses.

**6.6        Liability of Future Claimants' Representative**.  Neither the FCR nor his Representatives shall be liable to the Settlement Facility, to any Entity holding a Claim, or to any other Entity except for such individual's willful misconduct.

## ARTICLE 7.

## CLAIMANTS ADVISORY COMMITTEE

**7.1     Formation and Number**.  The CAC shall be formed pursuant to the Plan as of the Effective Date.  The CAC shall be composed of three (3) members who are lawyers presently representing asbestos personal injury claimants. The initial CAC members shall be appointed and identified in the order confirming a plan of reorganization. The CAC shall have a chairperson who shall act as the CAC's liaison with the Settlement Facility, the FCR, and Reorganized Garrison, coordinate and schedule meetings of the CAC, and handle all administrative matters that come before the CAC.

**7.2     Role**.  The members of the CAC shall provide advice and information on issues concerning present Holders of GST Asbestos Claims to the extent solicited by the Trustee. Members of the CAC shall serve in an advisory role only and shall not owe any duties to the Trustee or Settlement Facility.  Members of the CAC shall not undertake any additional obligation or role as a member of the CAC to act on behalf of or in the interests of any Entity, including any Holder of a GST Asbestos Claim or any class or group of Holders of GST Asbestos Claims. The CAC does not constitute a committee under Section 1103 of the Bankruptcy Code and neither the CAC, nor any member of the CAC by virtue of service on the CAC, has standing to raise issues, to appear, or to be heard on issues in the bankruptcy case.

**7.3     Term of Office**.

(a)     Each member of the CAC shall serve until the earlier of (i) his or her death, (ii) the end of the calendar year in which he or she retires from the practice of law or ceases representing asbestos personal injury claimants, (iii) the expiration of 5 years since his/her appointment; (iv) his or her resignation pursuant to **Section 7.3(b)**, (v) his or her removal pursuant to **Section 7.3(c)** or (vi) the termination of the Settlement Facility pursuant to **Section 8.2**.

(b)     Any member of the CAC may resign at any time by written notice to each of the remaining members of the CAC, the Trustee, the FCR, and Reorganized Garrison.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     Any member of the CAC may be removed in the event he or she becomes unable to serve hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include repeated non-attendance at scheduled meetings.  Such removal shall be made by order of the Bankruptcy Court, upon motion by the Trustee.

**7.4     Appointment of Successors**.  A successor CAC member shall be an individual and shall be nominated by the Trustee after consultation with the FCR and Reorganized Garrison, and approved by the Bankruptcy Court.

**7.5     Compensation for Attendance at Meetings and Expenses of the CAC**.  The members of the CAC shall be compensated for attendance at regular meetings and specially

called meetings in the form of a reasonable hourly rate set by the Trustee, such compensation being subject to an annual review, adjustment, and approval by the Trustee. The Settlement Facility shall promptly reimburse, or pay directly if so instructed, each respective CAC member for out-of-pocket costs associated with attending such meetings.

<div align="center">

**ARTICLE 8.**

**GENERAL PROVISIONS**

</div>

**8.1**    **Irrevocability**.  This Trust is irrevocable.

**8.2**    **Termination**.

(a)    The Settlement Facility shall automatically terminate on the date ninety (90) days after the first to occur of the following events (the "Termination Date"):

>   (i)    upon the motion of the Trustee and order of the Bankruptcy Court, in his/her discretion, because (A) he/she deems it unlikely that new Settlement Option Claims will be filed or Litigation Option Expenditures will be incurred, and (B) all Allowed Settlement Option Claims and Litigation Option Expenditures have been paid to the extent provided in this Settlement Facility Agreement and the CRP; or

>   (ii)    if the Trustee has procured and has in place irrevocable insurance policies and has established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Settlement Facility in a manner consistent with this Settlement Facility Agreement and the CRP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order.

(b)    On the Termination Date after payment of all the Settlement Facility's liabilities, after all Settlement Facility Payment Obligations and Settlement Facility Expenses have been paid, and after liquidation of all properties and other non-cash Settlement Facility Assets then held by the Settlement Facility, all monies remaining in the Settlement Facility estate shall be given to such organization(s) exempt from federal income tax under IRC § 501(c)(3), which tax-exempt organization(s) shall be selected by the Trustee using his/her reasonable discretion; provided, however, that (i) if practicable, the tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related lung disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to Reorganized Debtors within the meaning of IRC § 468B(d)(3).   Notwithstanding any other provision of the Plan Documents, this **Section 8.2(b)** cannot be modified or amended.

**8.3**    **Amendments**.  The Bankruptcy Court, upon a motion of the Trustee (after consultation with the FCR and Reorganized Garrison) may modify or amend this Settlement Facility Agreement or any document annexed to it, including the CRP (provided, however, the provisions of the CRP, if any, regarding any such modification or amendment are also followed) based on proof that such modification or amendment is necessary to achieve the purposes of the

<div align="center">20</div>

Settlement Facility. Except as modified by an order of the Bankruptcy Court, no amendment or modification of this Settlement Facility Agreement may be made. Notwithstanding the foregoing, neither this Settlement Facility Agreement, the CRP, nor any document annexed thereto shall be modified or amended in any way that:

(a)    purports to modify any right or obligation under the Plan (except rights or obligations under this Settlement Facility Agreement or the CRP, modified according to their terms);

(b)    modifies the rights, duties, or obligations (except for the payment of compensation) of the FCR, the CAC, or the Reorganized Debtors, hereunder;

(c)    favors any claim, or class of claims, over any other claim, or class of claims;

(d)    affects the Settlement Facility's obligation to make information available to Reorganized Garrison or to make financial and other reports required by this Settlement Facility Agreement available to the public;

(e)    changes the Settlement Facility's responsibility for Litigation Option Expenditures;

(f)    changes the release requirements in the CRP.

**8.4    Severability**.    Should any provision in this Settlement Facility Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Settlement Facility Agreement.

**8.5    Notices**.    Notices to Entities asserting Settlement Option Claims shall be given at the address of such Entity, or, where applicable, such Entity's representative, in each case as provided on such person's claim form submitted to the Settlement Facility with respect to his or her or its Claim or as otherwise provided to the Settlement Facility.  Any notices or other report required or permitted by this Settlement Facility Agreement must be in (i) writing and is deemed given (a) when delivered personally to the recipient, (b) when sent by facsimile before 5:00 p.m. prevailing eastern time on a business day with a copy of such facsimile sent on the same day to the recipient by reputable overnight courier service (charges prepaid), (c) five (5) days after deposit in the U.S. mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after being sent to the recipient by reputable overnight courier service (charges prepaid); and (ii) addressed to the other Entities at the addresses set forth below, or at such other address as such Entity now designates from time to time in writing in accordance with this **Section 8.5**.

To the Settlement Facility through the Trustee:

   _____
   _____
   _____
   Attention: _____
   Fax: _____


To the Future Claimants' Representative:

   _____
   _____
   _____
   Attention: _____
   Fax: _____

With a copy to:

   _____
   _____
   _____
   Attention: _____
   Fax: _____

To the CAC:

   _____
   _____
   _____
   Attention: _____
   Fax: _____

With a copy to:

<div style="margin-left:2em">

_____

_____

_____

Attention:  _____

Fax:  _____

</div>

To Debtors, Reorganized Debtors, or Reorganized Garrison:

<div style="margin-left:2em">

_____

_____

_____

Attention:  _____

Fax:  _____

</div>

With a copy to:

<div style="margin-left:2em">

Rayburn Cooper & Durham, P.A.
1200 Carillion, 227 West Trade Street
Charlotte, NC  28202
Attention: John R. Miller, Jr.
Fax:  _____

and

Robinson, Bradshaw & Hinson, P.A.
101 North Tryon Street, Suite 1900
Charlotte, NC  28246
Attention: _____
Fax:  _____

</div>

All such notices and communications, if delivered personally or via overnight courier or if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return electronic transmission.

**8.6**    **Successors and Assigns**.  The provisions of this Settlement Facility Agreement shall be binding upon and inure to the benefit of the Debtors, Reorganized Debtors, the Settlement Facility, and the Trustee and their respective successors and assigns, except that the Debtors, the Settlement Facility, or the Trustee may not assign or otherwise transfer any of its, or his or her rights or obligations under this Settlement Facility Agreement, except, in the case of the Settlement Facility and the Trustee, as contemplated by **Sections 3.1** and **8.2**.

**8.7**    **Limitation on Claim Interests for Securities Laws Purposes**.  Claims and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of

descent and distribution, (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

       **8.8**    **Entire Agreement; No Waiver**.  The entire agreement of the parties relating to the subject matter of this Settlement Facility Agreement is contained herein and in the documents referred to herein, and this Settlement Facility Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity, except as otherwise provided in the Discharge Injunction and Parent Settlement Enforcement Injunction.

       **8.9**    **Headings**.  The headings used in this Settlement Facility Agreement are inserted for convenience only and neither constitute a portion of this Settlement Facility Agreement, nor in any manner affect the construction of the provisions of this Settlement Facility Agreement.

       **8.10**    **Governing Law**.  This Settlement Facility Agreement shall be governed by, and construed in accordance with, the laws of the State of North Carolina without regard to its conflict of laws principles.

       **8.11**    **Dispute Resolution**.  Any disputes that arise under this Settlement Facility Agreement or under the CRP shall be resolved by the Bankruptcy Court pursuant to the Plan, except as otherwise provided herein, or in the CRP.  Notwithstanding anything else herein contained, to the extent any provision of this Settlement Facility Agreement is inconsistent with any provision of the Plan, the Plan shall control.

       **8.12**    **Enforcement and Administration**.  The provisions of this Settlement Facility Agreement and the annexes hereto shall be enforced by the Bankruptcy Court pursuant to the Plan, and may be enforced by any beneficiary of the Settlement Facility, the FCR, or Reorganized Garrison.  The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustee.

       **8.13**    **Effectiveness**.  This Settlement Facility Agreement shall not become effective until such time as it has been approved by the Bankruptcy Court and executed and delivered by all the parties hereto, and the Effective Date of the Plan has occurred. Nothing in this Settlement Facility Agreement shall prohibit the FCR from seeking relief any relief available under applicable law with respect to the provisions of the Settlement Facility Agreement, the CRP, and the operation of the Settlement Facility.

       **8.14**    **Counterpart Signatures**.  This Settlement Facility Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

       **8.15**    **Notices Under Plan Documents**.  Unless otherwise addressed by this Settlement Facility Agreement, the Trustee shall deliver to the FCR, the CAC, and Reorganized Garrison a copy of all written notices that the Settlement Facility or the Trustee give or receive under any of the Plan Documents (other than the CRP) promptly after receipt of the same.  Notices to the

FCR, the CAC, or Reorganized Garrison under the CRP shall be governed by the provisions of the CRP.

[signature page to follow]

IN WITNESS WHEREOF, the parties have executed this Settlement Facility Agreement this ___ day of _____, 2014.

**GARLOCK SEALING TECHNOLOGIES LLC, DEBTOR**

By: _____

Name: _____

Title: _____

**TRUSTEE:**

_____

Name:

## ANNEX A

## CLAIMS RESOLUTION PROCEDURES

# SETTLEMENT FACILITY
# CLAIMS RESOLUTION PROCEDURES

# TABLE OF CONTENTS

Page

## SECTION 1

## INTRODUCTION

1.1   Interpretation ........................................................................................................ 1
1.2   Definitions ............................................................................................................ 1
      1.2(a)   "Asbestos Claims Bar Date" ............................................................. 1
      1.2(b)   "Bankruptcy Court" ........................................................................... 1
      1.2(c)   "Claim" ............................................................................................... 1
      1.2(d)   "Claimant" .......................................................................................... 1
      1.2(e)   "Claimant Advisory Committee" or "CAC" ................................... 2
      1.2(f)   "Claim Form" ..................................................................................... 2
      1.2(g)   "Direct Claim" .................................................................................... 2
      1.2(h)   "Entity" ............................................................................................... 2
      1.2(i)   "Expedited Review" .......................................................................... 2
      1.2(j)   "Future Claimants' Representative" or "FCR" ............................... 2
      1.2(k)   "Indirect Claim" ................................................................................ 2
      1.2(l)   "Individual Review" .......................................................................... 3
      1.2(m)   "Injured Party" or "IP" ...................................................................... 3
      1.2(n)   "GST Product(s)" ............................................................................... 3
      1.2(o)   "Litigation Expenses" ....................................................................... 3
      1.2(p)   "Litigation Option" ............................................................................ 3
      1.2(q)   "Litigation Option Claim" ................................................................ 3
      1.2(r)   "Matrix Amount" ............................................................................... 3
      1.2(s)   "Other Claims" ................................................................................... 3
      1.2(t)   "Related" ............................................................................................. 3
      1.2(u)   "Trust" ................................................................................................. 4

## SECTION 2

## ELECTION OF SETTLEMENT OPTION OR LITIGATION OPTION

2.1   Option to Elect Settlement or Litigation ........................................................ 4
2.2   Election of Settlement Option or Litigation Option ...................................... 4
2.3   Changing Election of Settlement Option or Litigation Option .................... 4
2.4   Consequences of Changing Election of Settlement Option or Litigation Option ............. 5
2.5   Internet Calculator ............................................................................................. 6
2.6   Persons Bound by Election of Settlement Option or Litigation Option ........................... 6

## SECTION 3

## OVERVIEW OF SETTLEMENT OPTION

3.1   CRP Goals ............................................................................................................ 6
3.2   Matrix Amounts .................................................................................................. 7
3.3   Claims Liquidation Procedures ........................................................................ 8
3.4   Trustee's Determination of Maximum Annual Payment .............................. 8

i

# TABLE OF CONTENTS

(continued)

Page

3.5   Adjustment of Matrix Amounts to Ensure Equal Treatment ............................................. 9
3.6   Trust Claims Payment Ratio ...................................................................................... 10
3.7   Indirect Claims ...................................................................................................... 11
3.8   CAC, FCR, and Reorganized Garrison Representative ................................................. 11

## SECTION 4

## RESOLUTION OF CLAIMS

4.1   Ordering, Processing, and Payment of Claims ........................................................... 12
      4.1(a)   Establishment of the FIFO Processing Queue ................................................. 12
      4.1(b)   Effect of Statutes of Limitations and Repose .................................................. 12
      4.1(c)   Processing of Claims ................................................................................. 13
      4.1(d)   Payment of Settlement Option Claims ........................................................... 14
      4.1(e)   Deceased or Incompetent Claimant ............................................................. 14
      4.1(f)    Same Day Liquidation ............................................................................... 14
      4.1(g)   Hardship Claims ...................................................................................... 14

4.2   Resolution of Unliquidated Claims ........................................................................... 15
4.3   Settlement Review Process ...................................................................................... 15
      4.3(a)   Claimant's Choice of Expedited or Individual Review ....................................... 15
      4.3(b)   Expedited Review and Individual Review Distinguished ..................................... 15
      4.3(c)   Payment of Claims Accepting Settlement Offers ............................................. 16
      4.3(d)   Submission Requirements ........................................................................... 16

4.4   Threshold Eligibility Criteria for All Settlement Option Claimants ................................. 16
4.5   Medical and Contact Requirements Under Expedited and Individual Review ................. 17
      4.5(a)   Documentation of Disease ........................................................................... 17
      4.5(b)   Second Disease (Malignancy) Claims ........................................................... 19
      4.5(c)   GST Product Contact Requirement ............................................................... 19

4.6   Additional Documentation and Information for Individual Review ................................. 22
      4.6(a)   Information on Other Claims ...................................................................... 22
      4.6(b)   Information Provided About Other Claims ...................................................... 23
      4.6(c)   Form of Individual Review Claim Form .......................................................... 23
      4.6(d)   Authorization for Release of Information ........................................................ 23
      4.6(e)   Attorney's Certification ............................................................................. 24

4.7   Releases ................................................................................................................ 24
4.8   Audit Program ....................................................................................................... 26
      4.8(a)   Inconsistent Information ............................................................................. 26
      4.8(b)   Fraud .................................................................................................... 26

# TABLE OF CONTENTS
(continued)

Page

## SECTION 5

### REVIEW OF SETTLEMENT FACILITY SETTLEMENT OFFERS

5.1   Supplementation of Claim Form ....................................................................... 27
5.2   Election of Litigation Option .......................................................................... 27

## SECTION 6

### INDIRECT CLAIMS

6.1   Indirect Claims ............................................................................................. 27
6.2   Presumptively Valid Indirect GST Asbestos Claims ..................................... 28
       6.2(a)   Not Disallowed ............................................................................. 28
       6.2(b)   Payment of and Release by Direct Claimant ................................ 28
       6.2(c)   Establishing Indirect Claim .......................................................... 28
6.3   Otherwise Valid Indirect Claims .................................................................. 29
6.4   Processing and Payment of Indirect Claims ................................................. 29

## SECTION 7

### CLAIM FORMS

7.1   Claim Forms .................................................................................................. 29
7.2   Filing of Claims ............................................................................................ 30
7.3   Modification of Claim Forms ....................................................................... 30
7.4   Reliability of Claim Information .................................................................. 30
7.5   Requests for Information by Co-Defendants; Confidentiality of Settlement
       Materials ....................................................................................................... 31

## SECTION 8

### MISCELLANEOUS

8.1   Medicare ....................................................................................................... 32
8.2   No Attorney Necessary ................................................................................. 32
8.3   Amendments .................................................................................................. 32
8.4   Severability ................................................................................................... 33
8.5   Governing Law .............................................................................................. 33
8.6   Relation to Other Plan Documents ............................................................... 33

Appendix I—Expedited Review Settlement
Appendix II—Individual Review Settlement
Appendix III—Contact Groups
Appendix IV—Authorization to Obtain Trust Submissions

## SETTLEMENT FACILITY CLAIMS RESOLUTION PROCEDURES

These Claims Resolution Procedures ("CRP") were adopted as part of Debtors' Second Amended Plan of Reorganization (the "Plan") and the associated Settlement Facility Agreement. They outline the criteria that GST Asbestos Claimants who elect the Settlement Option under the Plan ("Settlement Option Claimants," and their Claims, "Settlement Option Claims") must meet to receive defined settlement payments without the expense or delay of litigation. The Trustee will administer these CRP consistent with the terms of the Plan and Settlement Facility Agreement.

### Section 1

### Introduction

1.1    **Interpretation**. Nothing in these CRP shall be deemed to create a substantive right for any Settlement Option Claimant, beyond the right of a Settlement Option Claimant who is treated under these CRP to enforce their terms.

1.2    **Definitions**. The following defined terms apply to these CRP. All capitalized terms used herein but not otherwise defined shall have the respective meanings given to such terms in the Plan, and such definitions are incorporated herein by reference.

1.2(a)  **"Asbestos Claims Bar Date"** means the bar date for unliquidated GST Asbestos Claims ordered by the Bankruptcy Court in the bankruptcy case.

1.2(b)  **"Bankruptcy Court"** means the United States Bankruptcy Court for the Western District of North Carolina.

1.2(c)  **"Claim"** means a Settlement Option Claim.

1.2(d)  **"Claimant"** means a Settlement Option Claimant.

1.2(e)  **"Claimant Advisory Committee" or "CAC"** means a three-member committee established pursuant to the Settlement Facility Agreement to provide advice and information to the Trustee concerning present Holders of Settlement Option Claims to the extent solicited by the Trustee.

1.2(f)  **"Claim Form"** means the submission of information and documents, in the form to be developed by the Trustee, by which the Settlement Option Claimant initiates processing of his or her Claim.

1.2(g)  **"Direct Claim"** means a Settlement Option Claim asserted by a person seeking a remedy for personal injury or wrongful death.

1.2(h)  **"Entity"** means any person, individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, the Bankruptcy Administrator or any governmental unit or any political subdivision thereof.

1.2(i)  **"Expedited Review"** means the process for determining Matrix Amounts as set forth in Appendix I to these CRP.

1.2(j)  **"Future Claimants' Representative" or "FCR"** means Joseph W. Grier, III (or any court-appointed successor), appointed as the legal representative to represent the interests of, appear on behalf of, and be a fiduciary to the Holders of Future GST Asbestos Claims in the Order Granting Debtors' Motion for Appointment of Joseph W. Grier, III as Future Asbestos Claimants' Representative [Docket No. 512].

1.2(k)  **"Indirect Claim"** means a Settlement Option Claim that is asserted as a third-party indemnification or contribution claim by an Entity that has paid in full the Holder of a Direct Claim to which the Settlement Facility would otherwise have had an obligation.

2

1.2(l)  **"Individual Review"** means the process for determining Matrix Amounts as set forth in Appendix II to these CRP.

1.2(m) **"Injured Party" or "IP"** means the individual whose alleged injury is the subject of the Claim.

1.2(n) **"GST Product(s)"** means asbestos-containing products supplied or manufactured by GST and that form the basis for the GST Asbestos Claim.

1.2(o) **"Litigation Expenses"** means costs incurred by Reorganized Garrison in defending against or prosecuting objections to a particular Litigation Option Claim, as defined in the Plan.

1.2(p) **"Litigation Option"** means the option of GST Asbestos Claimants under the Plan (other than Settled GST Asbestos Claimants) to elect to pursue allowance litigation pursuant to the CMO.

1.2(q) **"Litigation Option Claim"** means a GST Asbestos Claim whose Holder elects the Litigation Option (such Holder a "Litigation Option Claimant").

1.2(r) **"Matrix Amount"** means the settlement offer determined under Expedited Review or Individual Review, as adjusted by the Trustee to ensure current and future Claimants are treated similarly.

1.2(s) **"Other Claims"** means claims for compensation against Entities other than Garlock Sealing Technologies LLC ("GST") or Garrison Litigation Management Group, Ltd. ("GLM") that relate directly or indirectly to the alleged injuries that are the subject of a Settlement Option Claim.

1.2(t) **"Related"** means, with respect to a GST Asbestos Claim, all GST Asbestos Claims based on a particular Injured Party's injury (such as Claims by the Injured

Party, his or her estate, and family members for loss of consortium, wrongful death, or similar

related Claims).

1.2(u) **"Trust"** means a post-confirmation organization established pursuant to

the Bankruptcy Code to assume and pay the asbestos-related liability of a debtor, such as,

without limitation, a trust established pursuant to Bankruptcy Code § 524(g).

## Section 2

### Election of Settlement Option or Litigation Option

2.1    **Option to Elect Settlement or Litigation**. As described in the Plan, GST

Asbestos Claimants other than Settled GST Asbestos Claimants shall have the opportunity to

elect the Settlement Option or Litigation Option.[1] These CRP do not apply to Settled GST

Asbestos Claims, which are to be paid by Reorganized GST under the Plan, and Settled GST

Asbestos Claims are not entitled to any distribution from the Settlement Facility.

2.2    **Election of Settlement Option or Litigation Option**. GST Asbestos Claimants

will initiate the Settlement Option by filing a Claim Form with the Settlement Facility. GST

Asbestos Claimants will initiate the Litigation Option by filing a Proof of Claim on the docket of

the Bankruptcy Court, pursuant to the CMO adopted in connection with confirmation of the Plan.

GST Asbestos Claimants who filed a Proof of Claim in connection with the Asbestos Claims Bar

Date will instead file a notice that they elect the Litigation Option.

2.3    **Changing Election of Settlement Option or Litigation Option**. A GST

Asbestos Claimant cannot simultaneously pursue the Settlement Option and Litigation Option,

but may change his or her election as follows:

---

[1] Pre-Petition Judgment GST Asbestos Claimants may elect the Litigation Option only after electing to complete
state appeals, resulting in reversal of the judgment but not Disallowance.

4

2.3(a)   A GST Asbestos Claimant who has elected the Settlement Option may, at any time, elect the Litigation Option by filing a Proof of Claim pursuant to the CMO and serving it on the Settlement Facility. The Settlement Facility shall have no further obligation to process the claim unless the GST Asbestos Claimant re-elects the Settlement Option by filing a Claim Form.

2.3(b)   A GST Asbestos Claimant who has elected the Litigation Option may, at any time, elect the Settlement Option by filing a Claim Form with the Settlement Facility and providing notice of such filing to Reorganized Garrison.

2.4   **Consequences of Changing Election of Settlement Option or Litigation Option**. Switching between the Settlement Option and Litigation Option carries the following consequences:

If a GST Asbestos Claimant elects the Settlement Option after pursuing the Litigation Option, the GST Asbestos Claimant's settlement offer under these CRP will be reduced by any Litigation Expenses incurred by Reorganized Garrison prior to its receipt of notice of the GST Asbestos Claimant's election of the Settlement Option. Each election of the Settlement Option shall require a new filing fee; i.e., a Claimant who elects the Settlement Option after already switching from the Settlement Option to the Litigation Option shall pay a second filing fee, with only the second fee to be refunded if the Claimant receives an offer from the Settlement Facility.

If a GST Asbestos Claimant elects the Litigation Option, including after electing the Settlement Option, Reorganized Garrison's settlement authority shall be limited to the highest settlement offer for which the GST Asbestos Claimant is eligible under these CRP, minus any Litigation Expenses incurred by Reorganized Garrison to date. Any such settlement offer by Reorganized Garrison shall be in the form of an offer of judgment under Federal Rule of Civil

5

Procedure 68 and Federal Rule of Bankruptcy Procedure 7068. If any judgment the GST Asbestos Claimant obtains under the Litigation Option is not more favorable than the unaccepted offer, the GST Asbestos Claimant must, consistent with Rule 68(d), pay the costs incurred by Reorganized Garrison after the offer was made. If the GST Asbestos Claimant elects the Litigation Option after rejecting a settlement offer made by the Settlement Facility under these CRP, Reorganized Garrison shall make an offer of judgment in the amount of the Settlement Facility's settlement offer.

2.5     **Internet Calculator**. To assist GST Asbestos Claimants in deciding whether to elect the Settlement Option or Litigation Option, the Settlement Facility's website shall include a calculator tool that GST Asbestos Claimants or their attorneys may use to determine an estimate of the amount such GST Asbestos Claimant would receive (assuming the information is verified) if the GST Asbestos Claimant qualified for an offer under each of the Expedited Review and Individual Review processes available under the Settlement Option.

2.6     **Persons Bound by Election of Settlement Option or Litigation Option**. Related GST Asbestos Claims cannot be split between the Settlement Option and the Litigation Option. To elect the Settlement Option, all Related GST Asbestos Claimants must elect the Settlement Option. If any GST Asbestos Claimant elects the Litigation Option, all GST Asbestos Claimants whose Claim is based on the same Injured Party's injury will be deemed to have elected the Litigation Option.

## Section 3

## Overview of Settlement Option

3.1     **CRP Goals**. The Claims of all Settlement Option Claimants shall be resolved under the terms of these CRP. The CRP set forth procedures for processing and paying Claims

on an impartial, first-in-first-out ("FIFO") basis. These procedures are designed to generate settlement offers to Claimants that are fair and expeditious, result in a minimum of expense to Claimants and the Settlement Facility, and treat holders of current and future Claims as similarly as possible.

The medical and GST Product Contact requirements and other provisions of these CRP are predicated on current medical, financial, and other information. It is expected, however, that Claims will be filed for processing under these CRP for decades to come. To account for developments in medical science over that period, including with respect to the diagnosis and causation of diseases, the Trustee may seek Bankruptcy Court approval for changes to the medical criteria, upon consulting with the FCR and Reorganized Garrison and providing notice to the CAC. The Trustee may also seek Bankruptcy Court approval for changes to other CRP requirements to reflect changes in law or other factors, including changing the Jurisdiction Factor in IR to take into account jurisdiction-specific changes in law, average verdicts, or other factors.

3.2    **Matrix Amounts**. These CRP establish medical and GST Product Contact requirements to qualify for settlements and formulas for determining Matrix Amounts based upon the characteristics of Claims. The diseases compensated under these CRP, upon meeting the criteria described herein and in Appendices I and II, are pleural mesothelioma, peritoneal mesothelioma, asbestos-related lung cancer, asbestos-related laryngeal cancer, and asbestosis. All such Claimants may elect Expedited Review, and Claimants alleging pleural mesothelioma, peritoneal mesothelioma, asbestos-related lung cancer, or asbestos-related laryngeal cancer may elect Individual Review.

Expedited Review requires less information, entails a simplified verification process, and will result in higher Matrix Amounts for the vast majority of Claimants. Individual Review may

result in significantly higher Matrix Amounts for Claimants who document a work history of extraordinary contact with GST Products and whose complete job and exposure history does not demonstrate extensive exposure to alternative sources of asbestos or a significant number of other potentially responsible parties. Claimants who elect Individual Review must provide more detailed information and comply with a more extensive verification process. Within Expedited Review and Individual Review, Matrix Amounts also depend upon objective criteria including age, economic loss, number of dependents, and nature of GST Product Contact.

      3.3    **Claims Liquidation Procedures**. All Claimants must file a Claim Form with the Settlement Facility, in a form to be developed by the Trustee. To be processed by the Settlement Facility, the Claimant must submit a filing fee of $250, which will be refunded to Claimants who receive a settlement offer from the Settlement Facility. The Claimant must also provide a contact address (which may be an attorney) at which the Claimant may receive notices from the Settlement Facility, including an email and street address. For any notices the Trust is required to send to Claimants under these CRP or the Plan, the Trust may serve the notice by email. The Settlement Facility shall take steps to liquidate all Claims efficiently and expeditiously under these CRP.

      3.4    **Trustee's Determination of Maximum Annual Payment.** Prior to making any payments, the Trustee shall estimate or model the amount of cash flow anticipated to be necessary over the entire life of the Settlement Facility to ensure that sufficient funds will be available to treat all present and future Claimants as similarly as possible. In each year, the Trustee will be empowered to disburse funds calculated so that the application of such funds over the life of the Settlement Facility shall correspond with the needs created by the anticipated flow of Claims (the "Maximum Annual Payment"). The Settlement Facility's distributions to

Claimants for each year shall not exceed the Maximum Annual Payment determined for that year. In determining the Maximum Annual Payment for each year, including the first year that payments are made, the Trustee shall determine current estimates of the number, types, and Matrix Amounts of present and future Claims, the value and liquidity of the assets then available to the Settlement Facility for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to provide equal treatment to all holders of Claims, present and future.

In the event there are insufficient funds in any year to pay the liquidated Claims, the available funds shall be paid to the maximum extent to Claimants based on their place in the FIFO Payment Queue described below. Claims for which there are insufficient funds will be carried over to the next year where they will be placed at the head of the FIFO Payment Queue. If there are excess funds because there was an insufficient amount of liquidated Claims to exhaust the respective Maximum Annual Payment amount, then the excess funds will be rolled over.

3.5    **Adjustment of Matrix Amounts to Ensure Equal Treatment.** To ensure all present and future Claimants are treated as similarly as possible, the Trustee shall have discretion to increase or decrease proportionally the Matrix Amounts set forth in Appendix I and II, upon thirty (30) days notice to the CAC, FCR, and Reorganized Garrison. Prior to making payments to any Claimants and thereafter no less than once every three years, the Trustee shall determine current estimates of the number, types, and Matrix Amounts of present and future Claims, the value and liquidity of the assets then available to the Settlement Facility for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to provide equal treatment to all holders of Claims,

present and future, and shall increase or decrease the Matrix Amounts proportionally to ensure such equal treatment. When making these determinations, the Trustee shall exercise common sense and flexibly evaluate all relevant factors.

If the Matrix Amounts are increased over time, Claimants who have previously been paid by the Settlement Facility will receive a proportional additional payment unless the Trustee, upon notice to the CAC, FCR, and Reorganized Garrison, concludes that the amount is so modest and the administrative costs and burdens are so great in comparison to the benefits to Claimants that such additional payments shall be omitted or deferred.

3.6    **Trust Claims Payment Ratio.** The Trustee shall also have discretion to establish a Disease Category Claims Payment Ratio for (i) "Category A" Claims, which consist of Claims involving pleural or peritoneal mesothelioma that were unliquidated as of the Petition Date, (ii) "Category B" Claims, which consist of Claims involving non-mesothelioma malignancies that were unliquidated as of the Petition Date, and (iii) "Category C" Claims, which consist of Claims involving non-malignant conditions that were unliquidated as of the Petition Date. If the Trustee establishes a Claims Payment Ratio, then the Claims Payment Ratio shall be applied to the Maximum Annual Payment in each year. The Trustee, in fixing the Claims Payment Ratio, shall give consideration to the experience of GST and Garrison in the tort system for three years prior to the Petition Date, 2008 through 2010.

In the event a Claims Payment Ratio is set and there are insufficient funds in any year to pay the Claims within any or all of the Disease Categories, the available funds within the particular Disease Category shall be paid to the maximum extent to Claimants in the particular Disease Category based on their place in the FIFO Payment Queue described in Section 4.1 based upon the date of Claim liquidation. Claims for which there are insufficient funds will be

carried to the next year where they will be placed at the head of the FIFO Payment Queue. If there are excess funds in either or both Disease Category, because there was an insufficient amount of liquidated Claims to exhaust the respective Maximum Annual Payment amount for that Disease Category, then the excess funds for such Disease Category will be rolled over and remain dedicated to the respective Disease Category to which they were originally allocated, so long as the Claims Payment Ratio remains in place.

3.7     **Indirect Claims**. As set forth in Section 6, upon satisfying threshold criteria for allowance of contribution or indemnification claims, Indirect Claims shall be subject to the same options, categorization, evaluation, and payment provisions of these CRP as all other Settlement Option Claims.

3.8     **CAC, FCR, and Reorganized Garrison Representative**. Pursuant to the Plan and Settlement Facility Agreement, these CRP will be administered by the Trustee in consultation with an FCR who represents the interests of holders of Claims that will be asserted in the future and a representative of Reorganized Garrison, and the Trustee may also seek information from a three-member CAC that will be available to provide information about the interests of Holders of present Claims. The matters upon which the Trustee shall consult with the FCR and Reorganized Garrison are set forth in the Settlement Facility Agreement. The initial members of the CAC, the initial FCR, and the initial representative of Reorganized Garrison are identified in the Settlement Facility Agreement.

**Section 4**

**Resolution of Claims**

4.1      **Ordering, Processing, and Payment of Claims**

4.1(a)   **Establishment of the FIFO Processing Queue**. The Settlement Facility

will order Claims to be reviewed for processing purposes on a FIFO basis except as otherwise

provided herein (the "FIFO Processing Queue"). A Claimant's position in the FIFO Processing

Queue shall be determined according to the date that the Claim Form with respect to the specific

Claim is filed with the Settlement Facility, with an earlier filing date given priority over a later

filing date. If any Claims are filed or are deemed to be filed on the same date, the Claimant's

position in the FIFO Processing Queue shall be determined by the date of diagnosis of the

asbestos-related disease, with an earlier diagnosis date given priority over a later diagnosis date.

4.1(b)   **Effect of Statutes of Limitations and Repose**.

4.1(b)(1)      **Filing Deadline for Claims Subject to Bar Date**. Claims

subject to the Asbestos Claims Bar Date (i.e., those where the alleged disease was diagnosed

prior to _____, 2015) and that were submitted to the Bankruptcy Court in

compliance with the Asbestos Claims Bar Date must be submitted within the later of (i) the

statute of limitations in the jurisdiction where a claim against a Debtor was filed or, if not filed,

could have been timely and properly filed, and (ii) one year after the Settlement Facility first

makes Claim Forms available and provides notice of such date on its website. Claims that were

subject to the Asbestos Claims Bar Date but that were not submitted to the Bankruptcy Court

prior to the Asbestos Claims Bar Date are barred, unless relief has been obtained from the

Bankruptcy Court, in which case the Claim must be submitted within the deadline described in

the previous sentence. In determining the Maximum Annual Payment, the Matrix Amounts, and

the Claims Payment Ratio, and in advance of making any payments, the Trustee shall give full consideration to the information provided in response to the Asbestos Claims Bar Date.

4.1(b)(2)        **Filing Deadline for Claims Not Subject to Bar Date**. Claims not subject to the Asbestos Claims Bar Date (i.e., those where the alleged disease was diagnosed after _____, 2015) must be filed within the later of (i) the statute of limitations in the jurisdiction where a claim against a Debtor could have been timely and properly filed, and (ii) one year after the Settlement Facility first makes Claim Forms available and provides notice of such date on its website.

4.1(b)(3)        **Litigation Option Statute Tolled.** The statute of limitations applicable to the Litigation Option shall be tolled between the time a Claim Form is filed with the Settlement Facility and sixty (60) days after the Settlement Facility makes a settlement offer under these CRP.

4.1(b)(4)        **Claim Deemed "Filed."** A Claim shall be deemed filed on the date the Claimant places the Claim Form in the mail, or the date upon which the Claimant submits the Claim Form electronically.

4.1(c)   **Processing of Claims**. As a general practice, the Settlement Facility will review its Claims files on a regular basis and notify all Claimants whose Claims are likely to come up in the FIFO Processing Queue in the near future. The Settlement Facility shall, upon determining that a Claim qualifies for a settlement offer, tender to the Claimant an offer of payment of the amount determined under these procedures, together with a form of Settlement Option Release (as defined in the Plan), such release approved by the Trustee and reasonably acceptable in form and substance to the Reorganized Debtors. (The protection afforded by such

13

release is supplemental to, and does not derogate from or imply any deficiency in, the protection provided by the Discharge Injunction and the Parent Settlement Enforcement Injunction.)

4.1(d)  **Payment of Settlement Option Claims**. Settlement Option Claims shall be paid in FIFO order based on the date the Settlement Facility received an acceptable release (the "FIFO Payment Queue"), regardless of whether liquidation occurred under Expedited Review or Individual Review.

4.1(e)  **Deceased or Incompetent Claimant**. Where the Claimant is deceased or incompetent, and the settlement and payment of his or her Claim must be approved by a court of competent jurisdiction prior to acceptance of an offer by the Claimant's representative, such offer shall remain open so long as proceedings before that court remain pending, provided that the Settlement Facility has been furnished with evidence that the settlement offer has been submitted to such court for approval. If the offer is ultimately approved by that court and accepted by the Claimant's representative, the Settlement Facility shall pay the Claim in the amount so offered.

4.1(f)  **Same Day Liquidation**. If any Claims are liquidated on the same date, each such Claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of such Claimant's asbestos-related disease, with earlier diagnosis dates given priority over later diagnosis dates.

4.1(g)  **Hardship Claims**. The Settlement Facility may liquidate and pay certain Claims that qualify as Hardship Claims at any time. Such Claims may be considered separately no matter what the order of processing otherwise would have been under these CRP. A Hardship Claim, following its liquidation, shall be placed at the head of the FIFO Payment Queue for its Disease Category for purposes of payment, subject to the Maximum Annual Payment and Claims

Payment Ratio described above. A Claim qualifies for payment as a Hardship Claim if the Trustee, in his or her sole discretion, determines (a) that the Claimant needs financial assistance on an immediate basis based on the Claimant's expenses and all sources of available income, and (b) that the Claimant's dire financial condition is a result of the Claimant's asbestos-related disease.

      4.2    **Resolution of Unliquidated Claims**. Within three (3) months after the Effective Date, the Trustee shall implement procedures that are consistent with these CRP for reviewing and liquidating all unliquidated Settlement Option Claims, which shall include deadlines for processing such Claims.

      4.3    **Settlement Review Process**. The CRP review process is designed to provide a fair, expeditious, efficient, and inexpensive method for liquidating GST Asbestos Claims based on the characteristics of the Claims without the expense or delay of allowance litigation. It provides Claimants a substantially less burdensome process for pursuing their Claims than does allowance litigation.

      4.3(a)  **Claimant's Choice of Expedited or Individual Review**. A Claimant may submit the Claim for either Expedited Review or Individual Review at the time the Claimant submits a Claim Form to the Settlement Facility. Matrix Amounts pursuant to Expedited Review are determined pursuant to a formula set forth in Appendix I to these CRP. Matrix Amounts pursuant to Individual Review are determined pursuant to a formula set forth in Appendix II to these CRP. Only Claims satisfying the criteria set forth in either Appendix I or Appendix II, as well as all other criteria in these CRP, are eligible for settlement offers under these CRP.

      4.3(b)  **Expedited Review and Individual Review Distinguished**. Expedited Review requires less information and takes into account comparatively fewer variables than

Individual Review. Moreover, Claims submitted for Individual Review are subject to additional

verification and documentation requirements set forth in Section 4.6 of these CRP. Although

some Claimants will receive higher settlement offers by electing Individual Review, it is

anticipated that most Claimants will receive higher settlement offers by electing Expedited

Review.

4.3(c) **Payment of Claims Accepting Settlement Offers**. If the Settlement

Facility determines the Claim is eligible for payment under Expedited Review or Individual

Review (as applicable) and the Claimant executes the release, the Claim shall be placed in the

FIFO Payment Queue, in accordance with Section 4.1 of these CRP, following which the

Settlement Facility shall disburse payment.

4.3(d) **Submission Requirements**. Whether a Claim is submitted under either

Expedited Review or Individual Review, it must meet the threshold requirements set forth below

in Section 4.4 and the medical requirements and GST Product Contact requirements set forth

below in Section 4.5 and must be submitted with information sufficient to provide the data

necessary to determine a settlement offer under the procedures described in Appendix I (for

Claims submitted for Expedited Review) or Appendix II (for Claims submitted for Individual

Review). The Trustee shall develop the form of Claim Form required for Expedited and

Individual Review that is consistent with these CRP.

4.4     **Threshold Eligibility Criteria for All Settlement Option Claimants**. To be

eligible for a payment under these CRP, the Settlement Option Claimant must satisfy the

following criteria in addition to the specific criteria applicable under Expedited and Individual

Review:

(a)     The Claimant (or the Claimant's predecessor) has not released the
Claim against the Debtors, the Reorganized Debtors, the Settlement Facility, or

16

Reorganized Garrison (or had such Claim resolved by final judgment, dismissal, or order), subject to the exception for Second Disease Claims described in Section 4.5(b);

(b)     The Claimant has not obtained a judgment based on the asbestos-related injury alleged in the Claim that has been fully satisfied;

(c)     The Claim has not been disallowed by the Bankruptcy Court, except that Settled GST Asbestos Claimants whose claims are disallowed by the Bankruptcy Court as not settled may nevertheless seek to exercise the Settlement Option, subject to all criteria contained herein;

(d)     The Claimant has not transferred his or her right to recover with respect to the Claim such that the Claim can be asserted by another person. (The fact that a Claimant has executed a "subrogation agreement" with a health insurer or that a statutory provision grants to any governmental entity rights of subrogation shall not of itself be construed as a transfer of the Claimant's right to recover);

(e)     The Claim is not barred under the terms of the Asbestos Claims Bar Date.

4.5     **Medical and Contact Requirements Under Expedited and Individual Review**.

4.5(a) **Documentation of Disease**. All Settlement Option Claimants must support their Claims with the medical documentation described in Appendices I and II applicable to the condition they allege. All diagnoses must be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos and the diagnosis, or (ii) a history of exposure to asbestos sufficient to establish a 10-year latency period. In addition, Claims shall be compensable under Expedited Review only when the Injured Party experienced GST Product Contact before December 31, 1982, but Claimants may pursue Individual Review if all GST Product Contact occurred on or after December 31, 1982.

Medical evidence provided in support of the Claim must be credible and consistent with recognized medical standards. Each diagnosis must be made by a board-certified physician in an appropriate specialty, whose license and certification are not on inactive status, to a level of

17

reasonable medical probability. Pulmonary function testing, where required, must be performed using equipment, methods of calibration, and techniques that meet the lung function testing criteria adopted by the American Thoracic Society current as of the date the test is performed. Any diagnosis of asbestosis (including in connection with asbestos-related lung cancer or laryngeal cancer) must be made by (i) a board-certified pathologist, who personally reviewed the Injured Party's pathology, or (ii) a board-certified internist, pulmonologist or occupational medicine physician who actually examined the Injured Party, with findings contained in a detailed narrative written report. In assessing the reliability of a diagnosis, the Settlement Facility may consider whether the diagnosis discusses the basis for the opinion and the reason for rejection of other reasonably possible diagnoses.

With respect to pleural or peritoneal mesothelioma, the Settlement Facility in assessing the reliability of a diagnosis may also consider the following:

- Whether the pathologist or laboratory has performed a panel of appropriate immunohistochemical stains on tumor tissue from a biopsy, and if not, whether there is good cause and whether the laboratory has instead performed a panel of appropriate immunohistochemical stains on a specimen obtained from exfoliative or aspiration cytology preparations;

- Whether the pathological report identifies the morphologic form of the tumor; that is, whether the tumor is epithelial (also referred to as epithelioid), sarcomatous (also referred to as sarcomatoid), or mixed epithelial and sarcomatous (sometimes referred to as biphasic or bimorphic);

- Whether all treating physicians who expressed a diagnosis in the records concurred that the Injured Party had diffuse malignant mesothelioma originating in the pleura or peritoneum;

- Whether the treating physician finds that the gross distribution of tumor in the Injured Party's thorax is typical of malignant pleural or peritoneal mesothelioma; and

- Whether there is a report by a board-certified radiologist documenting that the gross distribution of tumor based on CT scans or PET scans of the Injured Party's thorax is typical of malignant mesothelioma.

With respect to all disease Claims, the Trustee may require the submission of x-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and must require that medical evidence submitted comply with recognized medical standards regarding equipment, testing, methods, and procedure to assure that such evidence is reliable.

4.5(b)  **Second Disease (Malignancy) Claims**. The Holder of a Claim involving asbestosis may file a new Claim based on pleural mesothelioma, peritoneal mesothelioma, asbestos-related lung cancer, or asbestos-related laryngeal cancer that is subsequently diagnosed. The Settlement Option Release shall not require such a Claimant to release the subsequent disease Claim.

4.5(c)  **GST Product Contact Requirement**.

4.5(c)(1)      **GST Product Contact**. To be eligible for payment from the Settlement Facility, the Claimant must allege that the alleged Injured Party experienced GST Product Contact that the Claimant reasonably believes contributed to causing his or her asbestos-related condition, and the Claim Form must require certification of such allegation. The Claimant

19

must demonstrate that the Injured Party had at least six (6) months of GST Product Contact, which requires demonstrating at least six months (combined) of Direct GST Product Contact, Bystander GST Product Contact, or Secondary GST Product Contact. "Direct GST Product Contact" means performance by the Injured Party himself of one of the following workplace activities that the Bankruptcy Court has found have the potential to release asbestos fibers: (a) removal of Garlock asbestos gaskets that required scraping or brushing, (b) cutting individual gaskets from Garlock asbestos sheet material, or (c) cutting or removal of Garlock asbestos packing.

"Bystander GST Product Contact" means the Injured Party's performance of job duties within ten (10) feet of a worker engaged in one of the following activities: (a) removal of Garlock asbestos gaskets that required scraping or brushing, (b) cutting individual gaskets from Garlock asbestos sheet material, or (c) cutting or removal of Garlock asbestos packing.

"Secondary GST Product Contact" means alleged contact with asbestos fibers from GST Products through contact with someone who had Direct GST Product Contact or Bystander GST Product Contact. The Claimant must demonstrate that the occupationally exposed person experienced Direct GST Product Contact or Bystander GST Product Contact.

For all GST Product Contact, Claimants must provide (i) identification (by name, address or other description) of the residence(s), plant(s), or commercial building site(s), and the city and state where GST Product Contact allegedly occurred; (ii) the year(s) GST Product Contact began and ended; (iii) the Injured Party's occupation, job title, and employer(s) at the time of GST Product Contact (or, in the case of Secondary GST Product Contact, the occupation, job title, and employer(s) of the occupationally exposed person at the time of GST Product Contact); (iv)

identification of the type of GST Product with which the Injured Party had contact; and (v) the manner in which the Injured Party experienced GST Product Contact.

Claims based on conspiracy theories that do not involve GST Product Contact are not compensable under these CRP.

Claims based on alleged exposure to asbestos fibers from GST Products that occurred outside of the United States and its territories and possessions and outside the provinces and territories of Canada ("Foreign Claims") are not compensable under these CRP. Foreign Claims do not include Claims based on asbestos exposure aboard U.S. Navy ships. To receive a payment from the Settlement Facility, Claims based on exposure to asbestos fibers from GST Products that occurred within the provinces and territories of Canada must demonstrate that in the absence of GST and Garrison's bankruptcy case, the Claimant would have had a remedy against GST or Garrison in a United States court, and would not have been subject to dismissal on grounds of forum non conveniens or similar rules of law.

        4.5(c)(2)      **Documentation of GST Product Contact.** All information required by 4.5(c)(1) must be evidenced by (a) interrogatories, declarations, or other sworn statements verified or made under penalty of perjury by a person who is competent to testify to the information contained therein, providing sufficient background information to explain how such person acquired the personal direct knowledge of such facts and allowing the Settlement Facility to determine the credibility of the person making the sworn statement, or (b) other credible and authentic documents (such as military records, social security records, etc.). The Claimant must also provide copies of any interrogatory answers submitted by the Claimant or Injured Party in any asbestos litigation relating to the alleged asbestos-related injury. The

Settlement Facility may request copies of other documents necessary for assessing the credibility of the allegation of GST Product Contact.

        4.5(c)(3)      **Prohibition on Site List Presumptions.** Evidence that GST asbestos products were used at a plant, facility, or other worksite where the Injured Party worked is, in and of itself, not sufficient to identify GST Product Contact or provide the showing required by 4.5(c)(1). The Settlement Facility is therefore prohibited from relying on "site lists" or other similar proof as a substitute for the showing required by 4.5(c)(1) and 4.5(c)(2), and a Claimant who can only demonstrate that the Injured Party worked at a site where GST asbestos products were used is not entitled to payment. The Claimant must in all cases provide all information required by 4.5(c)(1) and 4.5(c)(2).

        4.6      **Additional Documentation and Information for Individual Review**. A Claim submitted for Individual Review must provide the following additional information:

        4.6(a)  **Information on Other Claims**. A Claimant seeking Individual Review must submit the information described in Section 4.6(b) about all Other Claims that relate in any way to the alleged injuries for which the Claimant seeks compensation. Other Claims about which information must be submitted include claims by the Claimant, the Claimant's decedent, any current or past Holder of the Claim, or an attorney or claims representative representing any of them. Other Claims include, but are not limited to, the following: (a) lawsuits filed in any court, arbitration proceedings before any panel or tribunal, and administrative proceedings (such as Worker's Compensation claims) before any governmental or quasi-governmental body; (b) claims that were resolved or settled without the institution of litigation (such as pre-filing settlements reached after notification of the existence of a claim without the need to file a

lawsuit); and (c) claims that have been submitted in bankruptcy proceedings or to Trusts or claims resolution Entities that resulted from bankruptcy proceedings.

4.6(b) **Information Provided About Other Claims**. The Claimant shall submit the following information for each Other Claim: (a) the name of the Entity against whom the Other Claim was made, (b) the date of the Other Claim, and (c) the amounts of all payments received or to be received from the Entity to whom the Other Claim was submitted. The Claimant must also submit copies of any documents submitted to or served upon any such Entity containing information regarding the alleged Injured Party's contact with or exposure to asbestos or asbestos-containing products, including without limitation any claim forms submitted to Trusts (along with any attachments), ballots submitted by or on behalf of the Claimant in any bankruptcy case, and any discovery response filed or served in tort litigation. The Claimant shall also certify that, to the best of his knowledge, at that time, with the exception of the Other Claims that have been expressly disclosed and identified by the Claimant, no other Entity is known to the Claimant to be potentially responsible for the alleged injuries that are the basis of the Claim.

4.6(c) **Form of Individual Review Claim Form**. The specific information required by the Settlement Facility to process a Claim under Individual Review shall be set forth on a Claim Form to be developed by the Trustee consistent with the requirements of these CRP. The Claimant must certify under penalty of perjury that the information submitted is complete and accurate.

4.6(d) **Authorization for Release of Information**. The Claimant seeking Individual Review shall execute a release of information form in favor of the Settlement Facility, in the form attached as Appendix IV, authorizing all Trusts against whom an Other Claim has

been made or asserted based on the Injured Party's injury to release to the Settlement Facility all information submitted to it by the person or Entity who made the Other Claim and to disclose the status of any such claim and the amount and date of any payment on the claim. The release of information form shall authorize the Settlement Facility to obtain all submissions made by the Claimant or his heirs, executors, successors, or assigns in the future to any Trust. The Settlement Facility may amend the form attached as Appendix IV from time to time to add newly established Trusts. These authorizations will be used not only to verify information provided in connection with particular Claims, but also in connection with the Settlement Facility's periodic audits for fraud.

      4.6(e) **Attorney's Certification**. If the Claimant seeking Individual Review (or any Related Claimant) is or has been represented by an attorney in any litigation or in the filing of Trust claims based on the injury that forms the basis for the Claim, the Claimant shall provide a certification under penalty of perjury of such attorney. The certification shall affirm that the attorney has fully investigated the alleged injuries that are the basis of the Claim, including conferring with any other attorneys who represent the Claimant with respect to claims against Trusts or any other Entity, and that no good-faith basis exists, at the time the certification is executed, to bring a claim against any Entity that is not identified in the Claimant's Claim Form.

      If the Claimant seeking Individual Review (or any Related Claimant) has not been represented by an attorney in any litigation or in the filing of Trust claims based on the injury that forms the basis for the Claim, the Claimant shall provide a certification under penalty of perjury that he or she has fully investigated the alleged injuries that are the basis of the Claim, and that no good-faith basis exists, at the time the certification is executed, to bring a claim against any Entity that is not identified in the Claimant's Claim Form.

4.7      **Releases**. As a condition to making a payment to any Claimant, the Settlement

Facility shall obtain from such Claimant a Settlement Option Release (as defined in the Plan),

such release approved by the Trustee and reasonably acceptable in form and substance to the

Reorganized Debtors. (The protection afforded by such release is supplemental to, and does not

derogate from or imply any deficiency in, the protection provided by the Discharge Injunction

and the Parent Settlement Enforcement Injunction.) The Settlement Option Release shall be a full

release of the Claimant's GST Asbestos Claim, as well as a full release from any family

members or similar parties for Related Claims, and shall include all claims related to the Injured

Party, with the exception of Second Disease Claims as described above. Such release shall

comply with applicable state or other law and shall acknowledge that the settlement payment

extinguishes the GST Asbestos Claim and all Related Claims against the Reorganized Debtors,

any Released Party (as defined in the Plan), the FCR and his or her representatives, and the

Settlement Facility, and shall relinquish such Claimant's and all Related Claimants' right to

pursue a remedy from the Reorganized Debtors, any Released Party, the FCR and his or her

representatives, or the Settlement Facility on account of such GST Asbestos Claim and any

derivative claims. The Settlement Facility shall obtain a release in a form that protects the

Reorganized Debtors, any Released Party, the FCR and his or her representatives, and the

Settlement Facility from any contribution or other third-party claims by other asbestos

defendants under applicable law, such as by obtaining a pro rata release that requires the

Claimant to release the Settlement Facility's share of any damages the Claimant may obtain from

another defendant. The payment draft or check sent to the Claimant shall be printed on a

document that specifies and clearly advises the Claimant that endorsement and cashing of the

check or draft shall be deemed to serve as additional documentation of the release of the

Reorganized Debtors, the Released Parties, the FCR and his or her representatives, and the Settlement Facility.

4.8    **Audit Program**. The Trustee shall develop methods for auditing the claims process, including, but not limited to, the evaluation, ordering, processing, or payment of Claims. The Trustee shall also develop methods for auditing (i) the reliability of medical evidence, including additional reading of x-rays, CT scans, and verification of pulmonary function tests, (ii) the reliability of evidence of GST Product Contact, and (iii) the reliability of evidence of sources of asbestos exposure, by reference to audit procedures adopted by other Trusts.  All such methods shall be implemented by the Settlement Facility.

4.8(a)    **Inconsistent Information**. In the event that the Trustee reasonably determines that any individual or Entity has engaged in a pattern or practice of providing inconsistent or unreliable medical or GST Product Contact evidence and sources of asbestos exposure to the Settlement Facility, co-defendants in the tort actions, or to Trusts established in connection with other chapter 11 cases, it may decline to accept additional evidence from such provider.

4.8(b)    **Fraud**. To deter potential fraud, all Claim Forms, including all parts requesting information required for Expedited Review or Individual Review, must be signed under penalty of perjury. Further, in the event that an audit reveals that fraudulent information has been provided to the Settlement Facility, the Trustee may penalize any Claimant or Claimant's attorney by Disallowing the Claim or by other means including, but not limited to, (i) reordering the priority of payment of all affected Claimants' Claims, (ii) raising the level of scrutiny of additional information submitted from the same source or sources, (iii) refusing to accept additional evidence from the same source or sources, (iv) refusing to accept Claims filed

by a particular law firm, (v) seeking the prosecution of the Claimant or Claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, (vi) seeking sanctions from the Bankruptcy Court, and (vii) filing complaints for disciplinary action with appropriate State Bar organizations.

## Section 5

### Review of Settlement Facility Settlement Offers

5.1      **Supplementation of Claim Form**. The Settlement Facility, upon rejecting any Claim, shall provide the Claimant with a list of deficiencies in the Claim Form that preclude a settlement offer. The Claimant shall have six (6) months in which to cure these deficiencies to attempt to obtain a settlement offer. This provision will not preclude the assertion of Second Disease Claims.

5.2      **Election of Litigation Option.** A Claimant who rejects the settlement offer made by the Settlement Facility under these CRP, or who is not eligible for a settlement offer under these CRP, may elect the Litigation Option and pursue allowance litigation pursuant to the CMO. Section 2.3 above describes how to make this election, Reorganized Garrison's settlement authority, the effects of any such settlement offer, and the Settlement Facility's responsibility for Reorganized Garrison's Litigation Expenses and any judgments.

## Section 6

### Indirect Claims

6.1      **Indirect Claims**. Indirect Claims choosing the Settlement Option shall be subject to the same options, categorization, evaluation, and payment provisions of these CRP as all other Settlement Option Claims, subject to the criteria in this Section 6. Indirect Claimants shall elect the Settlement Option in the same manner as Direct Claimants.

6.2    **Presumptively Valid Indirect GST Asbestos Claims**. Indirect Claims shall be treated as presumptively valid and paid by the Settlement Facility if they meet the following requirements.

6.2(a)    **Not Disallowed**. Such Claim satisfied the requirements of any bar date for such Claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Bankruptcy Code or subordinated under Section 509(c) of the Bankruptcy Code.

6.2(b)    **Payment of and Release by Direct Claimant**. The Holder of such Claim (the "Indirect Claimant") establishes to the satisfaction of the Settlement Facility that (i) the Indirect Claimant has paid in full the Holder of a Direct Claim for which the Settlement Facility would otherwise have had a liability or obligation under these CRP (the "Direct Claimant"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Settlement Facility from any liability to the Direct Claimant, and (iii) the Claim is not otherwise barred by a statute of limitation or repose or by other applicable law.

6.2(c)    **Establishing Indirect Claim**. To establish a presumptively valid Indirect Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's Claim must also have been fixed, liquidated, and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the Settlement Facility and all other parties referenced in Section 4.1(c) *supra*) or a Final Order (as defined in the Plan) provided that such Claim is valid under applicable law. In any case where the Indirect Claimant has satisfied the Claim of a Direct Claimant against the Settlement Facility under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Settlement Facility a release in form and substance satisfactory to the Settlement Facility.

6.3      **Otherwise Valid Indirect Claims**. If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Settlement Facility with a full release of the Direct Claimant's Claim, the Indirect Claimant may request that the Settlement Facility review the Indirect Claim to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a Direct Claim. If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the Settlement Facility shall process such Indirect Claim on the same basis as the Settlement Facility would have processed the underlying Direct Claim in the absence of payment by such Indirect Claimant to the Direct Claimant. In no event, however, shall payment to the Indirect Claimant be greater than (a) the amount to which the Direct Claimant would have otherwise been entitled, or (b) the amount paid by such Indirect Claimant on account of such Direct Claim.

6.4      **Processing and Payment of Indirect Claims**. Indirect Claims that are entitled to payment from the Settlement Facility shall be processed and paid in accordance with procedures to be developed and implemented by the Settlement Facility consistent with the provisions of this Section 6, which procedures shall, consistent with the threshold requirements of this Section 6, provide the same Expedited and Individual Review and payment procedures and rights to the Holders of such Claims as the Settlement Facility would have afforded the Holders of the underlying Direct Claims.

## Section 7

## Claim Forms

7.1      **Claim Forms**. The Trustee shall prepare suitable and efficient Claim Forms for all Settlement Option Claims consistent with these CRP, and shall post the materials to the

29

Settlement Facility's website and provide such Claim Forms upon a written request to the Settlement Facility for such materials. The Claim Forms shall include such instructions as the Trustee shall approve. All Claim Forms shall be signed under penalty of perjury.

7.2    **Filing of Claims**. In developing its claim filing procedures, the Settlement Facility shall make every effort to provide Claimants with the opportunity to utilize currently available technology at their discretion, including filing Claims and supporting documentation over the internet and electronically by disk or CD-ROM.

7.3    **Modification of Claim Forms**. The Trustee may subsequently modify any of the Claim Forms so long as any modifications are consistent with the goals, principles and provisions of these CRP.

7.4    **Reliability of Claim Information**. Information submitted in support of a Claim must comply with recognized medical standards (including, but not limited to, standards regarding equipment, testing methods, and procedures) and legal evidentiary and authenticity standards.

7.4(a)  Although the Settlement Facility will not strictly apply rules of evidence, information provided in support of Claims must be reliable and credible so that the Settlement Facility is fully informed regarding the foundations for facts asserted in support of Claims. The Settlement Facility normally will accept copies instead of authenticated copies of x-ray reports, laboratory tests, medical examinations, and other medical records and reviews that otherwise comply with recognized medical and legal standards unless circumstances indicate that the copies of the tests, reports, and/or review are not authentic or are otherwise unreliable.

7.4(b) The Settlement Facility normally will accept copies instead of authenticated copies of deposition testimony, invoices, affidavits, business records, deck logs,

military service records (including leave records) or other credible indirect or secondary evidence in a form otherwise acceptable to the Settlement Facility that establishes an Injured Party's occupation, occupational history, business or other losses, or the Injured Party's presence at a particular ship, facility, job site, building or buildings, or location during a time period in which the GST Product was present, unless circumstances show that the information being submitted is unreliable.

7.4(c)  Examples of unreliable information include where the circumstances raise questions of authenticity of copies or where persons preparing Claims or verifying facts offered in support of a Claim lack direct knowledge of such facts, but fail to reveal and describe what facts and how and from what sources they learned those facts, which they relied upon as the basis for their assertion of such facts. Under these circumstances, the Settlement Facility shall apply the rules of evidence to exclude and disregard evidence where the witness or verifying party declines to provide such foundational information, e.g., on grounds that the information relied upon is privileged or confidential.

7.5     **Requests for Information by Co-Defendants; Confidentiality of Settlement Materials**. To lower administrative costs caused by third-party requests for information, while protecting confidential Claimant information, the Settlement Facility shall only publish on its website the names of Claimants (and associated Injured Parties) who file Claims against the Settlement Facility, the last four digits of such individuals' social security numbers, their claimed disease, and the nature of their alleged GST Product Contact. The Settlement Facility reserves all rights with respect to subpoenas seeking additional information.

**Section 8**

**Miscellaneous**

8.1    **Medicare**. The Trustee shall have authority and discretion to establish procedures to comply with any reporting obligations that may apply to the Settlement Facility under 42 U.S.C. § 1395y et seq. or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or relating thereto, including Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2008 (P. L. 110-173), or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or relating thereto. The Trustee will fully cooperate with and share any relevant information with any other Entity determined to have a reporting obligation under such statutes or regulations with respect to payments made by the Settlement Facility, including any Reorganized Debtor. The Trustee shall also have authority and discretion to establish procedures reasonably designed to protect the Settlement Facility from any Medicare reimbursement claims.

8.2    **No Attorney Necessary**. These CRP establish an administrative procedure for making defined payments to Claimants based on objective criteria. Furthermore, these CRP are designed so that Claimants can file their Claims without the assistance of an attorney. The Settlement Facility shall not require Claimants to retain an attorney in order to file Claims with the Settlement Facility. In addition, the Trustee shall administer these CRP so as to encourage and facilitate Claimants filing Claims without the assistance of an attorney. In no event shall the valuation of any Claimant's Claim depend on the identity of the Claimant's attorney.

8.3    **Amendments**. Amendments to the CRP shall be governed by the Settlement Facility Agreement.

8.4      **Severability**. Should any provision contained in these CRP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these CRP.

8.5      **Governing Law**. For all purposes, these CRP and their administration shall be governed by, and construed in accordance with, the internal laws of the State of North Carolina without regard to its conflict of laws provisions.

8.6      **Relation to Other Plan Documents**. In the event that these CRP conflict with the Plan or the Settlement Facility Agreement, the Plan or the Settlement Facility Agreement, as applicable, shall control.

## APPENDIX I: EXPEDITED REVIEW

### Introduction

This Appendix describes how the Settlement Facility will calculate Matrix Amounts under Expedited Review. Nothing herein alters or amends the requirements for Expedited Review that are contained in the CRP.

Under this process, the Settlement Facility will make settlement offers to qualifying Claimants based on the alleged Injured Party's ("IP") demographic and medical characteristics, the occupation and industry in which they allege contact with GST products, and the time duration working in such occupation and industry.

It is anticipated that most Claimants will receive higher Matrix Amounts by electing Expedited Review rather than Individual Review. Claimants whose IP experienced Secondary GST Product Contact but not Direct GST Product Contact or Bystander GST Product Contact are only eligible for Expedited Review, not Individual Review (though Claimants who experienced either Direct GST Product Contact or Bystander GST Product Contact in addition to Secondary GST Product Contact are eligible for Individual Review).

To assist Claimants in making the election between Expedited Review and Individual Review, the Settlement Facility will establish a website containing a calculator tool that Claimants can use to determine an estimate of the amount such Claimant would receive (assuming the information is verified) if the Claimant qualified for an offer under each of the Expedited Review and Individual Review processes.

To qualify for a settlement offer, the Claimant must demonstrate that the IP had at least six months of GST Product Contact, as defined in the CRP, and must meet the medical criteria described herein.

I-1

Claimants alleging pleural mesothelioma, peritoneal mesothelioma, asbestos-related lung cancer, or asbestos-related laryngeal cancer are eligible for settlement offers calculated under sections I.A, I.B, and I.C. upon meeting the medical criteria described in I.B.1 below. Claimants alleging asbestosis, asbestos-related lung cancer, and asbestos-related laryngeal cancer who meet the medical criteria in I.D below will receive fixed settlement offers.

**I.A      Occupation and Industry Groups**

The Settlement Facility will determine the IP's Contact Group based on the IP's industry and occupation during which the IP had GST Product Contact. The Contact Groups for each industry and occupation combination are contained in Appendix III to these CRP. The Contact Groups have been defined based on the potential frequency and intensity of the IP's contact with asbestos-containing gasket or packing products, as follows:

- Group 1: Occupations in which there is relatively high frequency of gasket or packing removal work.

- Group 2: Occupations in which there is some gasket or packing removal work with significantly less frequency than in Group 1; close bystander contact from gasket or packing removal is likely.

- Group 3: Gasket or packing removal work is not frequent; potential for bystander contact from gasket or packing removal exists, but is not frequent.

- Group 4: Occasional bystander contact with gaskets or packing or extensive insulation exposure; job does not involve gasket or packing removal work, or minimal compared to Group 3; bystander contact from gasket or packing removal work is possible, but unlikely.

- Group 5: Occupation and industry combination is unlikely to be encountered or contact with gasket or packing removal is very unlikely. Secondary GST Product Contact will also be treated as Group 5.

The Settlement Facility will offer Claimants in each Contact Group a settlement no higher than the maximum settlement value allowed for the Contact Group (the "Maximum Settlement"):

| Contact Group | Maximum Settlement |
|---|---|
| Group 1 | $200,000 |
| Group 2 | $60,000 |
| Group 3 | $25,000 |
| Group 4 | $12,500 |
| Group 5 | $1,000 |

In Groups 1, 2, 3, and 4, the Claimant's Expedited Review settlement offer will be the Maximum Settlement for the Claimant's Contact Group multiplied by the IP Factors Index described below. The IP Factors Index varies based on the IP's alleged disease and medical information, demographic characteristics, economic loss (if Claimant elects to report and document any), and the length of time the IP spent in the activity or activities in which the alleged GST Product Contact occurred. In Group 5, the Claimant's Expedited Review settlement offer will be the Maximum Settlement for Group 5, without a discount based on the IP Factors Index.

If the IP had GST Product Contact in more than one Contact Group, then the Settlement Facility will calculate a separate settlement offer based on the IP's time in each Contact Group (taking into account all years in that Contact Group, whether in the same or different industries/occupations and whether or not continuous) by calculating a separate IP Factors Index for each Contact Group and multiplying it by the Maximum Settlement for that Contact Group (or, in the case of Group 5, assigning a settlement value of $1000). The Settlement Facility will offer the Claimant the highest of the settlement offers yielded by this calculation.

### I.B    Alleged Injured Party Factors Index

The Settlement Facility will calculate an IP Factors Index by calculating the Medical Information Factor, Age Factor, Life Status Factor, Dependents Factor, Economic Loss Factor, and Duration of GST Product Contact Factor according to the rules set forth below.

### I.B.1   Medical Information Factor

The Settlement Facility will assign a Medical Information Factor based on the following medical criteria (Claimants who meet none of these criteria receive a Medical Information Factor of 0):

**Pleural Mesothelioma (Medical Information Factor = 1.0)**

1. Diagnosis of diffuse malignant mesothelioma originating in the pleura by a board-certified pathologist

2. Either:

a. An affirmation that the Injured Party is being treated for diffuse malignant mesothelioma originating in the pleura as of the date the Claim is submitted; or

b. A death certificate indicating the cause of death is diffuse malignant mesothelioma originating in the pleura

**Peritoneal Mesothelioma (Medical Information Factor = 0.34)**

1. Diagnosis of diffuse malignant mesothelioma originating in the peritoneum by a board-certified pathologist

2. Either:

a. An affirmation that the Injured Party is being treated for diffuse malignant mesothelioma originating in the peritoneum as of the date the Claim is submitted; or

b. A death certificate indicating the cause of death is diffuse malignant mesothelioma originating in the peritoneum

**Asbestos-Related Lung Cancer (Medical Information Factor = 0.1)**

1. Diagnosis of primary lung cancer by board-certified pathologist, internist, pulmonologist, medical oncologist, surgical oncologist, or occupational medicine physician, affirming that asbestos exposure was a substantial cause of the Injured Party's lung cancer

2. Credible evidence that the Injured Party never smoked or used tobacco products

3. Either (a) diagnosis of asbestosis or, (b) an elevated amphibole lung tissue fiber burden

4. A diagnosis of asbestosis must be by a board-certified pulmonologist or board-certified internist and must be supported by either pathology or radiology:

    a. If by pathology, a board-certified pathologist must diagnose asbestosis pursuant to the histologic criteria outlined in Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the Asbestosis Committee of the College of American Pathologists and Pulmonary Pathology Society, Arch Pathol Lab Med—Vol 134, March 2010;

    b. If by radiology, the Claimant must provide a roentgenographic interpretation report of a NIOSH-certified B-reader verifying that the Injured Party has a quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/0 or higher finding bilateral interstitial infiltrative profusion of 1/0 or greater (Section 2B of the current NIOSH form).

5. An elevated amphibole lung tissue fiber burden must be documented by the report of a board-certified pathologist of a retained amphibole asbestos fiber burden determined by a laboratory employing procedures and the method of determining reference range values described in Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the Asbestosis Committee of the College of American Pathologists and Pulmonary Pathology

Society, Arch Pathol Lab Med—Vol 134, March 2010. The laboratory findings must report either:

a. A retained amphibole fiber count equivalent to at least 1 million amphibole fibers greater than 5 microns in length per gram of dry lung tissue (values reported as fibers greater than 5 microns in length per gram wet lung may be multiplied by a factor of 10 to convert to dry lung measurement); or

b. A retained amphibole fiber count within the reference range values of the testing laboratory for bona fide cases of asbestosis.

### Asbestos-Related Laryngeal Cancer (Medical Information Factor = 0.1)

1. Diagnosis of laryngeal cancer by board-certified pathologist, internist, pulmonologist, medical oncologist, surgical oncologist, or occupational medicine physician, affirming that asbestos exposure was a substantial cause of the Injured Party's lung cancer

2. Credible evidence that the Injured Party never smoked or used tobacco products

3. Either (a) diagnosis of asbestosis or, (b) an elevated amphibole lung tissue fiber burden

4. A diagnosis of asbestosis must be by a board-certified pulmonologist or board-certified internist and must be supported by either pathology or radiology:

a. If by pathology, a board-certified pathologist must diagnose asbestosis pursuant to the histologic criteria outlined in Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the Asbestosis Committee of the College of American Pathologists and Pulmonary Pathology Society, Arch Pathol Lab Med—Vol 134, March 2010;

b. If by radiology, the Claimant must provide a roentgenographic interpretation report of a NIOSH-certified B-reader verifying that the Injured Party has a quality 1 or 2 chest x-

ray that has been read by a certified B-reader according to the ILO system of classification as showing bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/0 or higher finding bilateral interstitial infiltrative profusion of 1/0 or greater (Section 2B of the current NIOSH form).

5. An elevated amphibole lung tissue fiber burden must be documented by the report of a board-certified pathologist of a retained amphibole asbestos fiber burden determined by a laboratory employing procedures and the method of determining reference range values described in Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the Asbestosis Committee of the College of American Pathologists and Pulmonary Pathology Society, Arch Pathol Lab Med—Vol 134, March 2010. The laboratory findings must report either:

a. A retained amphibole fiber count equivalent to at least 1 million amphibole fibers greater than 5 microns in length per gram of dry lung tissue (values reported as fibers greater than 5 microns in length per gram wet lung may be multiplied by a factor of 10 to convert to dry lung measurement); or

b. A retained amphibole fiber count within the reference range values of the testing laboratory for bona fide cases of asbestosis.

### I.B.2   Age Factor

Claimants with younger IPs receive higher settlement offers than Claimants with older IPs. The Settlement Facility will determine the Age Factor based on the earlier of the IP's diagnosis date and death date (the "IP Age"). The Settlement Facility will assign an Age Factor of 1 for an IP Age of 75. The Settlement Facility will decrease the Age Factor by 0.015 for every IP Age year above 75, but will not decrease the Age Factor below 0.7. The Settlement Facility

will increase the Age Factor by 0.015 for every IP Age year below 75, but will not increase the Age Factor above 1.4.

### I.B.3   Life Status Factor

If the IP is alive at the time the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Life Status Factor of 1.3. If the IP is deceased at the time the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Life Status Factor of 1.

### I.B.4   Dependents Factor

If the IP does not have a spouse or other dependents (minor children, adult disabled dependent children, or dependent minor grandchildren) as of the date the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Dependents Factor of 0.8. If the IP has a spouse but no other dependents as of the date the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Dependents Factor of 1. Finally, if the IP has dependents (minor children, adult disabled dependent children, or dependent minor grandchildren) living with the IP at the time the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Dependents Factor of 1.5.

### I.B.5   Economic Loss Factor

Claimants may elect (but are not required) to document economic losses related to the IP's loss of earnings, pension, social security, home services, medical expenses, and funerary expenses. If the Claimant does not document economic loss or for which the economic loss amount is $200,000 or less, the Settlement Facility will assign an Economic Loss Factor of 1.0. If the documented economic loss amount is greater than $200,000, the Settlement Facility will adjust the Economic Loss Factor upward by 0.001 for every thousand dollars of economic loss

over $200,000, up to a maximum Economic Loss Factor of 2. All claimed economic loss over $200,000 must be supported by adequate documentation.

### I.B.6   Duration of GST Product Contact Factor

If the IP spent 10 years or more performing the activity or activities in which he had GST Product Contact in the Contact Group, the Settlement Facility will assign a Duration of GST Product Contact Factor of 1. If the IP spent less than 10 years performing the activity or activities in which he had GST Product Contact in the Contact Group, the Settlement Facility will assign a Duration of GST Product Contact Factor decreased downward by 0.1 for every year under 10 years.

### I.B.7   Calculation of IP Factors Index

To calculate the IP Factors Index, the Settlement Facility will multiply the Medical Information Factor, Age Factor, Life Status Factor, Dependents Factor, Economic Loss Factor, and Duration of GST Product Contact Factor, and divide by 5.46, which is the maximum possible value of the product of those factors.[2] The range of the IP Factors Index is 0% to 100%.

### I.C      Settlement Offer Determination

For Groups 1, 2, 3, and 4, the Settlement Facility will determine the Expedited Review Matrix Amount by multiplying the Maximum Settlement for the Claimant's Contact Group by the IP Factors Index. For Group 5, the settlement offer in Expedited Review is $1000. If the IP had GST Product Contact in more than one Contact Group, then the Settlement Facility will determine a separate settlement offer based on the IP's time in each Contact Group (taking into account all years in that Contact Group, whether in the same or different industries/occupations and whether or not continuous) by calculating a separate IP Factors Index for each Contact

---

[2] 5.46 = 1.0 (Medical Information Factor) x 1.3 (Life Status Factor) x 1.5 (Dependents Factor) x 1.4 (Age Factor) x 2.0 (Economic Loss Factor) x 1.0 (Duration of GST Product Contact Factor).

Group and multiplying it by the Maximum Settlement for that Contact Group (or, in the case of Group 5, assigning a value of $1000). (For example, if the IP had five years in Group 1 and ten years in Group 2, the Settlement Facility will calculate separate settlement offers for the time in Group 1 and the time in Group 2.) The Settlement Facility will offer the Claimant the highest of the settlements yielded by this calculation.

If the calculation for a Claimant alleging asbestos-related lung cancer or laryngeal cancer who meets the medical criteria in section I.B.1 is less than $750, the Settlement Facility will offer the Claimant $750.

**I.D     Medical Criteria for Fixed Payment**

Claimants alleging asbestosis or who allege asbestos-related laryngeal cancer or lung cancer but do not meet the criteria in I.B.1 will receive a fixed settlement offer upon demonstrating at least six months of GST Product Contact and meeting the following medical criteria:

**<u>Asbestos-Related Lung Cancer ($750 payment)</u>**

1. Diagnosis of primary lung cancer by board-certified pathologist, internist, pulmonologist, medical oncologist, surgical oncologist, or occupational medicine physician, affirming that asbestos exposure was a substantial cause of the Injured Party's lung cancer

2. Either (a) diagnosis of asbestosis or, (b) an elevated amphibole lung tissue fiber burden

3. A diagnosis of asbestosis must be by a board-certified pulmonologist or board-certified internist and must be supported by either pathology or radiology:

a. If by pathology, a board-certified pathologist must diagnose asbestosis pursuant to the histologic criteria outlined in Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the Asbestosis Committee of the College of American

Pathologists and Pulmonary Pathology Society, Arch Pathol Lab Med—Vol 134, March

2010;

b. If by radiology, the Claimant must provide a roentgenographic interpretation report of

a NIOSH-certified B-reader verifying that the Injured Party has a quality 1 or 2 chest x-

ray that has been read by a certified B-reader according to the ILO system of

classification as showing bilateral small irregular opacities (s, t, or u) with a profusion

grading of 1/0 or higher finding bilateral interstitial infiltrative profusion of 1/0 or greater

(Section 2B of the current NIOSH form).

4. An elevated amphibole lung tissue fiber burden may be documented by the report of a board-

certified pathologist of a retained amphibole asbestos fiber burden determined by a laboratory

employing procedures and the method of determining reference range values described in

Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the

Asbestosis Committee of the College of American Pathologists and Pulmonary Pathology

Society, Arch Pathol Lab Med—Vol 134, March 2010. The laboratory findings must report

either:

a. A retained amphibole fiber count equivalent to at least 1 million amphibole fibers

greater than 5 microns in length per gram of dry lung tissue (values reported as fibers

greater than 5 microns in length per gram wet lung may be multiplied by a factor of 10 to

convert to dry lung measurement); or

b. A retained amphibole fiber count within the reference range values of the testing

laboratory for bona fide cases of asbestosis.

**Asbestos-Related Laryngeal Cancer ($750 payment)**

1. Diagnosis of laryngeal cancer by board-certified pathologist, internist, pulmonologist, medical oncologist, surgical oncologist, or occupational medicine physician, affirming that asbestos exposure was a substantial cause of the Injured Party's lung cancer.

2. Either (a) diagnosis of asbestosis or, (b) an elevated amphibole lung tissue fiber burden

3. A diagnosis of asbestosis must be by a board-certified pulmonologist or board-certified internist and must be supported by either pathology or radiology:

> a. If by pathology, a board-certified pathologist must diagnose asbestosis pursuant to the histologic criteria outlined in Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the Asbestosis Committee of the College of American Pathologists and Pulmonary Pathology Society, Arch Pathol Lab Med—Vol 134, March 2010;

> b. If by radiology, the Claimant must provide a roentgenographic interpretation report of a NIOSH-certified B-reader verifying that the Injured Party has a quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/0 or higher finding bilateral interstitial infiltrative profusion of 1/0 or greater (Section 2B of the current NIOSH form).

4. An elevated amphibole lung tissue fiber burden may be documented by the report of a board-certified pathologist of a retained amphibole asbestos fiber burden determined by a laboratory employing procedures and the method of determining reference range values described in Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the Asbestosis Committee of the College of American Pathologists and Pulmonary Pathology

Society, Arch Pathol Lab Med—Vol 134, March 2010. The laboratory findings must report either:

a. A retained amphibole fiber count equivalent to at least 1 million amphibole fibers greater than 5 microns in length per gram of dry lung tissue (values reported as fibers greater than 5 microns in length per gram wet lung may be multiplied by a factor of 10 to convert to dry lung measurement); or

b. A retained amphibole fiber count within the reference range values of the testing laboratory for bona fide cases of asbestosis.

**<u>Asbestosis ($500 payment)</u>**

1. Diagnosis of bilateral diffuse interstitial fibrosis of the lungs caused by inhalation of asbestos fibers, by board-certified pulmonologist, internist, or occupational medicine physician, based on either:

a. A quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing: bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/0 or higher; or

b. Pathological asbestosis graded 1(B) or higher under the criteria published in "Asbestos-Associated Diseases," 106 Archives of Pathology and Laboratory Medicine 11, Appendix 3 (October 8, 1982)

2. In addition to (1), asbestos-related pulmonary impairment, as demonstrated by pulmonary function testing showing either:

a. Forced vital capacity below the lower limit of normal or below 80 percent of predicted and FEV1/FVC ratio (using actual values) at or above the lower limit of normal or at or above 65 percent; or

b. Total lung capacity, by plethysmography or timed gas dilution, below the lower limit of normal or below 80 percent of predicted.

3. If the pulmonary impairment standards are not met, verification that the Injured Party has a quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing bilateral small irregular opacities (s, t, or u) with a profusion grading of 2/1 or higher.

**APPENDIX II: INDIVIDUAL REVIEW**

**Section II**

**Introduction**

This Appendix describes how the Settlement Facility will calculate Matrix Amounts for Claimants electing Individual Review. Claimants alleging pleural mesothelioma, peritoneal mesothelioma, asbestos-related lung cancer, and asbestos-related laryngeal cancer may elect Individual Review. Claimants whose IP only experienced Secondary GST Product Contact are not eligible for Individual Review. Nothing herein alters or amends the requirements for Individual Review that are contained in the CRP.

Under Individual Review, qualifying Claimants will receive a settlement offer based on the alleged IP's demographic and medical characteristics, the IP's complete job and exposure history, and information regarding the Claimant's claim(s) in the tort system.

In Individual Review, the maximum allowed settlement offer (the "Maximum Settlement") is $2,500,000. The Settlement Facility will use information provided by the Claimant to calculate three indices that, together, determine the percentage of the Maximum Settlement that the Settlement Facility will offer the Claimant. The indices are the IP Factors Index, the Garlock Contact Index, and the Non-Garlock Exposure Index. These indices are defined below.

Although some Claimants will receive higher Matrix Amounts by electing Individual Review, it is anticipated that most Claimants will receive higher settlement offers by electing Expedited Review. To assist Claimants in making this election, the Settlement Facility will establish a website containing a calculator tool that Claimants can use to determine an estimate of the amount such Claimant would receive (assuming the information is verified) if the

Claimant qualified for an offer under each of the Expedited Review and Individual Review processes.

To qualify for a settlement offer, the Claimant must demonstrate that the IP had at least six months of GST Product Contact, as defined in the CRP, and must meet the medical criteria described herein.

### II.A    Alleged Injured Party Factors Index

The Settlement Facility shall calculate an IP Factors Index by first calculating the Medical Information Factor, Age Factor, Life Status Factor, Dependents Factor, Economic Loss Factor, and Jurisdiction Factor according to the rules set forth below.

### II.A.1  Medical Information Factor

The Settlement Facility will assign a Medical Information Factor based on the following medical criteria (Claimants who meet none of these criteria receive a Medical Information Factor of 0 in Individual Review):

**Pleural Mesothelioma (Medical Information Factor = 1.0)**

1. Diagnosis of diffuse malignant mesothelioma originating in the pleura by a board-certified pathologist.

2. Either:

a. An affirmation that the Injured Party is being treated for diffuse malignant mesothelioma originating in the pleura as of the date the Claim is submitted; or

b. A death certificate indicating the cause of death is diffuse malignant mesothelioma originating in the pleura.

**Peritoneal Mesothelioma (Medical Information Factor = 0.34)**

1. Diagnosis of diffuse malignant mesothelioma originating in the peritoneum by a board-certified pathologist.

2. Either:

a. An affirmation that the Injured Party is being treated for diffuse malignant mesothelioma originating in the peritoneum as of the date the Claim is submitted; or

b. A death certificate indicating the cause of death is diffuse malignant mesothelioma originating in the peritoneum.

**Asbestos-Related Lung Cancer (Medical Information Factor = 0.1)**

1. Diagnosis of primary lung cancer by board-certified pathologist, internist, pulmonologist, medical oncologist, surgical oncologist, or occupational medicine physician, affirming that asbestos exposure was a substantial cause of the Injured Party's lung cancer and either affirming that the laryngeal cancer is likely not survivable or enclosing a death certificate indicating cause of death is laryngeal cancer.

2. Credible evidence that the Injured Party never smoked or used tobacco products.

3. Either (a) diagnosis of asbestosis or, (b) an elevated amphibole lung tissue fiber burden.

4. A diagnosis of asbestosis must be by a board-certified pulmonologist or board-certified internist and must be supported by either pathology or radiology:

a. If by pathology, a board-certified pathologist must diagnose asbestosis pursuant to the histologic criteria outlined in Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the Asbestosis Committee of the College of American Pathologists and Pulmonary Pathology Society, Arch Pathol Lab Med—Vol 134, March 2010;

b. If by radiology, the Claimant must provide a roentgenographic interpretation report of a NIOSH-certified B-reader verifying that the Injured Party has a quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/0 or higher finding bilateral interstitial infiltrative profusion of 1/0 or greater (Section 2B of the current NIOSH form).

5. An elevated amphibole lung tissue fiber burden may be documented by the report of a board-certified pathologist of a retained amphibole asbestos fiber burden determined by a laboratory employing procedures and the method of determining reference range values described in Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the Asbestosis Committee of the College of American Pathologists and Pulmonary Pathology Society, Arch Pathol Lab Med—Vol 134, March 2010. The laboratory findings must report either:

a. A retained amphibole fiber count equivalent to at least 1 million amphibole fibers greater than 5 microns in length per gram of dry lung tissue (values reported as fibers greater than 5 microns in length per gram wet lung may be multiplied by a factor of 10 to convert to dry lung measurement); or

b. A retained amphibole fiber count within the reference range values of the testing laboratory for bona fide cases of asbestosis.

## Asbestos-Related Laryngeal Cancer (Medical Information Factor = 0.1)

1. Diagnosis of laryngeal cancer by board-certified pathologist, internist, pulmonologist, medical oncologist, surgical oncologist, or occupational medicine physician, affirming that asbestos exposure was a substantial cause of the Injured Party's lung cancer, and either affirming that the

laryngeal cancer is likely not survivable or enclosing a death certificate indicating cause of death is laryngeal cancer.

2. Credible evidence that the Injured Party never smoked or used tobacco products.

3. Either (a) diagnosis of asbestosis or, (b) an elevated amphibole lung tissue fiber burden.

4. A diagnosis of asbestosis must be by a board-certified pulmonologist or board-certified internist and must be supported by either pathology or radiology:

> a. If by pathology, a board-certified pathologist must diagnose asbestosis pursuant to the histologic criteria outlined in Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the Asbestosis Committee of the College of American Pathologists and Pulmonary Pathology Society, Arch Pathol Lab Med—Vol 134, March 2010;

> b. If by radiology, the Claimant must provide a roentgenographic interpretation report of a NIOSH-certified B-reader verifying that the Injured Party has a quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/0 or higher finding bilateral interstitial infiltrative profusion of 1/0 or greater (Section 2B of the current NIOSH form).

5. An elevated amphibole lung tissue fiber burden may be documented by the report of a board-certified pathologist of a retained amphibole asbestos fiber burden determined by a laboratory employing procedures and the method of determining reference range values described in Roggli, et al., Pathology of Asbestosis—An Update of the Diagnostic Criteria Report of the Asbestosis Committee of the College of American Pathologists and Pulmonary Pathology

Society, Arch Pathol Lab Med—Vol 134, March 2010. The laboratory findings must report either:

> a. A retained amphibole fiber count equivalent to at least 1 million amphibole fibers greater than 5 microns in length per gram of dry lung tissue (values reported as fibers greater than 5 microns in length per gram wet lung may be multiplied by a factor of 10 to convert to dry lung measurement); or

> b. A retained amphibole fiber count within the reference range values of the testing laboratory for bona fide cases of asbestosis.

### II.A.2  Age Factor

Claimants with younger IPs receive higher settlement offers than Claimants with older IPs. The Settlement Facility will determine the Age Factor based on the earlier of the IP's diagnosis date and death date (the "IP Age"). The Settlement Facility will assign an Age Factor of 1 for an IP Age of 75. The Settlement Facility will decrease the Age Factor by 0.015 for every IP Age year above 75, but will not decrease the Age Factor below 0.7. The Settlement Facility will increase the Age Factor by 0.015 for every IP Age year below 75, but will not increase the Age Factor above 1.4.

### II.A.3  Life Status Factor

If the IP is alive at the time the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Life Status Factor of 1.3. If the IP is deceased at the time the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Life Status Factor of 1.

### II.A.4  Dependents Factor

If the IP does not have a spouse or other dependents (minor children, adult disabled dependent children, or dependent minor grandchildren) as of the date the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Dependents Factor of 0.8. If the IP has a spouse but no other dependents as of the date the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Dependents Factor of 1. Finally, if the IP has dependents (minor children, adult disabled dependent children, or dependent minor grandchildren) living with the IP at the time the Claim Form is filed with the Settlement Facility, the Settlement Facility will assign a Dependents Factor of 1.5.

### II.A.5  Economic Loss Factor

Claimants may elect (but are not required) to document economic losses related to the IP's loss of earnings, pension, social security, home services, medical expenses, and funerary expenses. If the Claimant does not document economic loss or for which the economic loss amount is $200,000 or less, the Settlement Facility will assign an Economic Loss Factor of 1.0. If the documented economic loss amount is greater than $200,000, the Settlement Facility will adjust the Economic Loss Factor upward by 0.001 for every thousand dollars of economic loss over $200,000, up to a maximum Economic Loss Factor of 2. All claimed economic loss over $200,000 must be supported by adequate documentation.

### II.A.6  Jurisdiction Factor

If the Claimant has filed a lawsuit in the tort system based on the injury that is the subject of the Settlement Option Claim, the Settlement Facility will assign a Jurisdiction Factor based on the state where the lawsuit was filed, assigning a Jurisdiction Factor of 1 for states in Region 1; a Jurisdiction Factor of 0.6 for states in Region 2; and a Jurisdiction Factor of 0.22 for

states in Region 3. If the Claimant has not filed a lawsuit in the tort system based on the injury that is the subject of the Settlement Option Claim, the Settlement Facility will assign a Jurisdiction Factor based on the IP's residence or location of GST Product Contact, whichever yields the higher Jurisdiction Factor.

| Region | Jurisdiction Factor | States |
|--------|--------------------|--------|
| Region 1 | 1 | CA, IL, MD, NJ, NY, PA, TX, VA |
| Region 2 | 0.6 | CT, DE, FL, GA, KY, LA, MI, MN, MO, OH, TN, UT, WI |
| Region 3 | 0.22 | AL, AR, AZ, DC, HI, IA, ID, IN, MA, ME, MS, MT, NC, ND, NE, NH, NM, NV, OK, OR, RI, SC, SD, WA, WV, WY, others |

### II.A.7  Calculation of IP Factors Index

To calculate the IP Factors Index, the Settlement Facility will multiply the Medical Information Factor, Age Factor, Life Status Factor, Dependents Factor, Economic Loss Factor, and Jurisdiction Factor, and divide by 5.46, which is the maximum possible value of the product of those factors.[3] The range of the IP Factors Index is 0% to 100%.

### II.B  Garlock Contact Index

To receive a settlement offer under Individual Review, the Claimant must have GST Product Contact as defined in the CRP. Further, the Settlement Facility will calculate the Garlock Contact Index based on the IP's contact with asbestos-containing GST Products. It has two components: contact group and length, and contact source. This procedure calculates a factor for each of these two components, which multiplied together form the Garlock Contact Index. The two components of this index are defined below.

### II.B.1  Contact Group and Length

The Settlement Facility will classify each of the IP's job or contact spells in which he had GST Product Contact in one of five Contact Groups, based on the industry and

---

[3] 5.46 = 1.0 (Medical Information Factor) x 1.3 (Life Status Factor) x 1.5 (Dependents Factor) x 1.4 (Age Factor) x 2.0 (Economic Loss Factor) x 1.0 (Jurisdiction Factor).

occupation of that spell. The Contact Groups are contained in Appendix III to these CRP. The

Contact Groups have been defined based on the potential frequency and intensity of the IP's

contact with asbestos-containing gasket and packing products, as follows:

- Group 1: Occupations in which there is relatively high frequency of gasket or packing removal work.

- Group 2: Occupations in which there is some gasket or packing removal work with significantly less frequency than in Group 1; close bystander contact from gasket or packing removal is likely.

- Group 3: Gasket or packing removal work is not frequent; potential for bystander contact from gasket or packing removal exists, but is not frequent.

- Group 4: Occasional bystander contact with gaskets or packing or extensive insulation exposure; job does not involve gasket or packing removal work, or minimal compared to Group 3; bystander contact from gasket or packing removal work is possible, but unlikely.

- Group 5: Occupation and industry combination is unlikely to be encountered or contact from gasket or packing removal is very unlikely. Secondary GST Product Contact will also be treated as Group 5.

Spells in each Contact Group are assigned a Contact Group Factor, according to the

following table.

| Contact Group | Contact Group Factor |
|---------------|---------------------|
| Group 1 | 1 |
| Group 2 | 0.3 |
| Group 3 | 0.125 |
| Group 4 | 0.0625 |
| Group 5 | 0.005 |

### II.B.2  Contact Source

For each GST Product Contact spell, the Settlement Facility will assign a Contact

Source Factor of 1.0 if the IP had Direct GST Product Contact, a Contact Source Factor of 0.1 if

the IP had Bystander GST Product Contact, and a Contact Source Factor of 0.05 if the IP had

Secondary GST Product Contact.

### II.B.3  Garlock Contact Index Calculation

The Settlement Facility will calculate the Garlock Contact Index by selecting the ten GST Product Contact years with the highest Contact Group Factor and Contact Source Factor (multiplied together). If the IP had fewer than ten GST Product Contact years, the Settlement Facility will perform the calculation using all GST Product Contact years available. Then, to calculate the total Garlock Contact Index, the Settlement Facility will multiply the Contact Group Factor, the spell duration in years, and the Contact Source Factor for the selected years, and divide that by 10 (the highest possible product of those factors). The Garlock Contact Index may range from 0% to 100%.

### II.C    Non-Garlock Exposure Index

The Non-Garlock Exposure Index takes into account the asbestos exposure the IP experienced from other parties' products. The Settlement Facility will calculate the Non-Garlock Exposure Index as the geometric mean of two indices: the Alternative Exposure Index and the Codefendant and Other Parties' Contribution Index. The Non-Garlock Exposure Index ranges between 1% and 100%.

### II.C.1  Alternative Exposure Index

The Alternative Exposure Index takes into account the IP's exposure to other sources of asbestos. Each industry/occupation combination in Appendix III has an Alternative Exposure Intensity Factor assigned, based on the relative exposure to asbestos-containing products other than gaskets and packing in that industry and occupation:

| Intensity Level | Alternative Exposure Intensity Factor |
|---|---|
| High | 10 |
| Medium | 6.6 |
| Low | 3.3 |
| Very Low | 1.0 |

Periods of Secondary GST Product Contact will be assigned an Alternative Exposure Intensity Factor of 1.0.

The Settlement Facility will calculate the Alternative Exposure Index by multiplying the number of years the IP spent in each industry and occupation by the Alternative Exposure Intensity Factor related to that industry and occupation; summing together the result for all spells; and then dividing one by that result. For example, if an IP spent one year as a foundry worker in the textile industry and one year as a heavy equipment operator in the aerospace industry, his Alternative Exposure Index would be $(1 / (1*6.6 + 1*3.3)) = 0.101$. If, however, the result of this calculation is greater than 1, it will be deemed to equal 1.

The Alternative Exposure Index ranges between 0% and 100%, with Claimants whose IP had industry/occupation combinations with lower alternative exposures closer to 100%.

### II.C.2  Codefendant and Other Parties' Contribution Index

The Settlement Facility will calculate the Codefendant and Other Parties' Contribution Index based on the number of companies that contributed to the IP's exposure to asbestos-containing products. Based on information provided by the Claimant in compliance with the CRP, the Settlement Facility will calculate the total number of such parties as (a) the number of companies whose products are identified as a source of the IP's asbestos exposure in tort discovery (including in interrogatory answers and depositions), (b) if not already included in (a), the number of Trusts where the Claimant has filed or expresses an intention to file a claim, and (c) if not already included in (a) or (b), the asbestos defendants in whose bankruptcy proceedings the Claimant cast a ballot, unless the Claimant verifies that he will not file a claim against such defendant's Trust. The Settlement Facility will calculate the Codefendant and Other Parties' Contribution Index as the inverse of the number of contributing parties. The

Codefendant and Other Parties' Contribution Index ranges between 0% and 100%, with Claims where no other parties contributed to the IP's asbestos exposure receiving a Codefendant and Other Parties' Contribution Index of 100%.

Finally, to calculate the Non-Garlock Exposure Index, the Settlement Facility will calculate the geometric mean (that is, the square root of the product) of the Alternative Exposure Index and the Codefendant and Other Parties' Contribution Index.

**II.D    Settlement Offer Determination**

To calculate the settlement offer under Individual Review, the Settlement Facility will multiply the Maximum Settlement in Individual Review ($2,500,000) by the product of the IP Factors Index, the Garlock Contact Index, and the Non-Garlock Exposure Index.

## APPENDIX III: INDUSTRY/OCCUPATION CLASSIFICATION
## INTO CONTACT GROUPS

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-01 BOILER TECHNICIAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-06 CHEMICAL | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-08 IRON / STEEL | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-09 LONGSHORE | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-10 MARITIME | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-14 RAILROAD | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-16 TEXTILE | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-18 U.S. NAVY | 2 | 10.0 |
| N-01 BOILER TECHNICIAN | I-19 UTILITIES | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-21 N/A | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-22 OTHER | 5 | 1.0 |
| N-01 BOILER TECHNICIAN | I-23 UNKNOWN | 5 | 1.0 |
| N-02 BOILER MAKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-02 BOILER MAKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-02 BOILER MAKER | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-02 BOILER MAKER | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-02 BOILER MAKER | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-02 BOILER MAKER | I-06 CHEMICAL | 5 | 1.0 |
| N-02 BOILER MAKER | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-02 BOILER MAKER | I-08 IRON / STEEL | 5 | 1.0 |
| N-02 BOILER MAKER | I-09 LONGSHORE | 5 | 1.0 |
| N-02 BOILER MAKER | I-10 MARITIME | 5 | 1.0 |
| N-02 BOILER MAKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-02 BOILER MAKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-02 BOILER MAKER | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-02 BOILER MAKER | I-14 RAILROAD | 5 | 1.0 |
| N-02 BOILER MAKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |

III-1

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-02 BOILER MAKER | I-16 TEXTILE | 5 | 1.0 |
| N-02 BOILER MAKER | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-02 BOILER MAKER | I-18 U.S. NAVY | 2 | 10.0 |
| N-02 BOILER MAKER | I-19 UTILITIES | 5 | 1.0 |
| N-02 BOILER MAKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-02 BOILER MAKER | I-21 N/A | 5 | 1.0 |
| N-02 BOILER MAKER | I-22 OTHER | 5 | 1.0 |
| N-02 BOILER MAKER | I-23 UNKNOWN | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-06 CHEMICAL | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-08 IRON / STEEL | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-09 LONGSHORE | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-10 MARITIME | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-14 RAILROAD | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-16 TEXTILE | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-18 U.S. NAVY | 3 | 10.0 |
| N-03 DAMAGE CONTROLMAN | I-19 UTILITIES | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-03 DAMAGE CONTROLMAN | I-21 N/A | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-22 OTHER | 5 | 1.0 |
| N-03 DAMAGE CONTROLMAN | I-23 UNKNOWN | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-06 CHEMICAL | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-08 IRON / STEEL | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-09 LONGSHORE | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-10 MARITIME | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-14 RAILROAD | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-16 TEXTILE | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-18 U.S. NAVY | 3 | 10.0 |
| N-04 ELECTRICIAN'S MATE | I-19 UTILITIES | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-21 N/A | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-22 OTHER | 5 | 1.0 |
| N-04 ELECTRICIAN'S MATE | I-23 UNKNOWN | 5 | 1.0 |
| N-05 ENGINEMAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-05 ENGINEMAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-05 ENGINEMAN | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-05 ENGINEMAN | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-05 ENGINEMAN | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-05 ENGINEMAN | I-06 CHEMICAL | 5 | 1.0 |
| N-05 ENGINEMAN | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-05 ENGINEMAN | I-08 IRON / STEEL | 5 | 1.0 |
| N-05 ENGINEMAN | I-09 LONGSHORE | 5 | 1.0 |
| N-05 ENGINEMAN | I-10 MARITIME | 5 | 1.0 |
| N-05 ENGINEMAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-05 ENGINEMAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-05 ENGINEMAN | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-05 ENGINEMAN | I-14 RAILROAD | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-05 ENGINEMAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-05 ENGINEMAN | I-16 TEXTILE | 5 | 1.0 |
| N-05 ENGINEMAN | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-05 ENGINEMAN | I-18 U.S. NAVY | 2 | 10.0 |
| N-05 ENGINEMAN | I-19 UTILITIES | 5 | 1.0 |
| N-05 ENGINEMAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-05 ENGINEMAN | I-21 N/A | 5 | 1.0 |
| N-05 ENGINEMAN | I-22 OTHER | 5 | 1.0 |
| N-05 ENGINEMAN | I-23 UNKNOWN | 5 | 1.0 |
| N-06 FIREMAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-06 FIREMAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-06 FIREMAN | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-06 FIREMAN | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-06 FIREMAN | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-06 FIREMAN | I-06 CHEMICAL | 5 | 1.0 |
| N-06 FIREMAN | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-06 FIREMAN | I-08 IRON / STEEL | 5 | 1.0 |
| N-06 FIREMAN | I-09 LONGSHORE | 5 | 1.0 |
| N-06 FIREMAN | I-10 MARITIME | 5 | 1.0 |
| N-06 FIREMAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-06 FIREMAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-06 FIREMAN | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-06 FIREMAN | I-14 RAILROAD | 5 | 1.0 |
| N-06 FIREMAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-06 FIREMAN | I-16 TEXTILE | 5 | 1.0 |
| N-06 FIREMAN | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-06 FIREMAN | I-18 U.S. NAVY | 2 | 10.0 |
| N-06 FIREMAN | I-19 UTILITIES | 5 | 1.0 |
| N-06 FIREMAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-06 FIREMAN | I-21 N/A | 5 | 1.0 |
| N-06 FIREMAN | I-22 OTHER | 5 | 1.0 |
| N-06 FIREMAN | I-23 UNKNOWN | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-05 AUTOMOTIVE | 5 | 1.0 |

III-4

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-06 CHEMICAL | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-08 IRON / STEEL | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-09 LONGSHORE | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-10 MARITIME | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-14 RAILROAD | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-16 TEXTILE | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-18 U.S. NAVY | 3 | 10.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-19 UTILITIES | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-21 N/A | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-22 OTHER | 5 | 1.0 |
| N-07 GAS TURBINE SYSTEM TECHNICIAN | I-23 UNKNOWN | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-06 CHEMICAL | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-07 CONSTRUCTION TRADES | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-08 HULL MAINTENANCE TECHNICIAN | I-08 IRON / STEEL | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-09 LONGSHORE | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-10 MARITIME | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-14 RAILROAD | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-16 TEXTILE | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-18 U.S. NAVY | 3 | 6.6 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-19 UTILITIES | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-21 N/A | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-22 OTHER | 5 | 1.0 |
| N-08 HULL MAINTENANCE TECHNICIAN | I-23 UNKNOWN | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-06 CHEMICAL | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-08 IRON / STEEL | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-09 LONGSHORE | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-10 MARITIME | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-14 RAILROAD | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-16 TEXTILE | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-18 U.S. NAVY | 4 | 6.6 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-19 UTILITIES | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-21 N/A | 5 | 1.0 |
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-22 OTHER | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-09 INTERIOR COMMUNICATIONS ELECTRICIAN | I-23 UNKNOWN | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-06 CHEMICAL | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-08 IRON / STEEL | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-09 LONGSHORE | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-10 MARITIME | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-14 RAILROAD | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-16 TEXTILE | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-18 U.S. NAVY | 3 | 10.0 |
| N-10 INSTRUMENTMAN | I-19 UTILITIES | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-21 N/A | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-22 OTHER | 5 | 1.0 |
| N-10 INSTRUMENTMAN | I-23 UNKNOWN | 5 | 1.0 |
| N-11 MOLDER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-11 MOLDER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-11 MOLDER | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-11 MOLDER | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-11 MOLDER | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-11 MOLDER | I-06 CHEMICAL | 5 | 1.0 |
| N-11 MOLDER | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-11 MOLDER | I-08 IRON / STEEL | 5 | 1.0 |
| N-11 MOLDER | I-09 LONGSHORE | 5 | 1.0 |
| N-11 MOLDER | I-10 MARITIME | 5 | 1.0 |
| N-11 MOLDER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-11 MOLDER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-11 MOLDER | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-11 MOLDER | I-14 RAILROAD | 5 | 1.0 |
| N-11 MOLDER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-11 MOLDER | I-16 TEXTILE | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-11 MOLDER | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-11 MOLDER | I-18 U.S. NAVY | 4 | 3.3 |
| N-11 MOLDER | I-19 UTILITIES | 5 | 1.0 |
| N-11 MOLDER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-11 MOLDER | I-21 N/A | 5 | 1.0 |
| N-11 MOLDER | I-22 OTHER | 5 | 1.0 |
| N-11 MOLDER | I-23 UNKNOWN | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-06 CHEMICAL | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-08 IRON / STEEL | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-09 LONGSHORE | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-10 MARITIME | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-14 RAILROAD | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-16 TEXTILE | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-18 U.S. NAVY | 1 | 10.0 |
| N-12 MACHINIST'S MATE | I-19 UTILITIES | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-21 N/A | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-22 OTHER | 5 | 1.0 |
| N-12 MACHINIST'S MATE | I-23 UNKNOWN | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-06 CHEMICAL | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-13 MACHINERY REPAIRMAN | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-08 IRON / STEEL | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-09 LONGSHORE | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-10 MARITIME | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-14 RAILROAD | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-16 TEXTILE | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-18 U.S. NAVY | 1 | 10.0 |
| N-13 MACHINERY REPAIRMAN | I-19 UTILITIES | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-21 N/A | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-22 OTHER | 5 | 1.0 |
| N-13 MACHINERY REPAIRMAN | I-23 UNKNOWN | 5 | 1.0 |
| N-14 OPTICALMAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-14 OPTICALMAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-14 OPTICALMAN | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-14 OPTICALMAN | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-14 OPTICALMAN | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-14 OPTICALMAN | I-06 CHEMICAL | 5 | 1.0 |
| N-14 OPTICALMAN | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-14 OPTICALMAN | I-08 IRON / STEEL | 5 | 1.0 |
| N-14 OPTICALMAN | I-09 LONGSHORE | 5 | 1.0 |
| N-14 OPTICALMAN | I-10 MARITIME | 5 | 1.0 |
| N-14 OPTICALMAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-14 OPTICALMAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-14 OPTICALMAN | I-13 PETROCHEMICAL | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-14 OPTICALMAN | I-14 RAILROAD | 5 | 1.0 |
| N-14 OPTICALMAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-14 OPTICALMAN | I-16 TEXTILE | 5 | 1.0 |
| N-14 OPTICALMAN | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-14 OPTICALMAN | I-18 U.S. NAVY | 4 | 6.6 |
| N-14 OPTICALMAN | I-19 UTILITIES | 5 | 1.0 |
| N-14 OPTICALMAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-14 OPTICALMAN | I-21 N/A | 5 | 1.0 |
| N-14 OPTICALMAN | I-22 OTHER | 5 | 1.0 |
| N-14 OPTICALMAN | I-23 UNKNOWN | 5 | 1.0 |
| N-15 PATTERNMAKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-15 PATTERNMAKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-15 PATTERNMAKER | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-15 PATTERNMAKER | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-15 PATTERNMAKER | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-15 PATTERNMAKER | I-06 CHEMICAL | 5 | 1.0 |
| N-15 PATTERNMAKER | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-15 PATTERNMAKER | I-08 IRON / STEEL | 5 | 1.0 |
| N-15 PATTERNMAKER | I-09 LONGSHORE | 5 | 1.0 |
| N-15 PATTERNMAKER | I-10 MARITIME | 5 | 1.0 |
| N-15 PATTERNMAKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-15 PATTERNMAKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-15 PATTERNMAKER | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-15 PATTERNMAKER | I-14 RAILROAD | 5 | 1.0 |
| N-15 PATTERNMAKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-15 PATTERNMAKER | I-16 TEXTILE | 5 | 1.0 |
| N-15 PATTERNMAKER | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-15 PATTERNMAKER | I-18 U.S. NAVY | 4 | 6.6 |
| N-15 PATTERNMAKER | I-19 UTILITIES | 5 | 1.0 |
| N-15 PATTERNMAKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-15 PATTERNMAKER | I-21 N/A | 5 | 1.0 |
| N-15 PATTERNMAKER | I-22 OTHER | 5 | 1.0 |
| N-15 PATTERNMAKER | I-23 UNKNOWN | 5 | 1.0 |
| N-16 PIPEFITTER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-16 PIPEFITTER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-16 PIPEFITTER | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-16 PIPEFITTER | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-16 PIPEFITTER | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-16 PIPEFITTER | I-06 CHEMICAL | 5 | 1.0 |
| N-16 PIPEFITTER | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-16 PIPEFITTER | I-08 IRON / STEEL | 5 | 1.0 |
| N-16 PIPEFITTER | I-09 LONGSHORE | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| N-16 PIPEFITTER | I-10 MARITIME | 5 | 1.0 |
| N-16 PIPEFITTER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-16 PIPEFITTER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-16 PIPEFITTER | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-16 PIPEFITTER | I-14 RAILROAD | 5 | 1.0 |
| N-16 PIPEFITTER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-16 PIPEFITTER | I-16 TEXTILE | 5 | 1.0 |
| N-16 PIPEFITTER | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-16 PIPEFITTER | I-18 U.S. NAVY | 1 | 10.0 |
| N-16 PIPEFITTER | I-19 UTILITIES | 5 | 1.0 |
| N-16 PIPEFITTER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-16 PIPEFITTER | I-21 N/A | 5 | 1.0 |
| N-16 PIPEFITTER | I-22 OTHER | 5 | 1.0 |
| N-16 PIPEFITTER | I-23 UNKNOWN | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-04 ASBESTOS MINING | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-05 AUTOMOTIVE | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-06 CHEMICAL | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-08 IRON / STEEL | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-09 LONGSHORE | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-10 MARITIME | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-13 PETROCHEMICAL | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-14 RAILROAD | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-16 TEXTILE | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-17 TIRE / RUBBER | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-18 U.S. NAVY | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-19 UTILITIES | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-21 N/A | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-22 OTHER | 5 | 1.0 |
| N-17 OTHER (DESCRIBE) | I-23 UNKNOWN | 5 | 1.0 |
| O-00 GASKET CUTTER | I-00 GASKET DISTRIBUTOR | 1 | 0.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 3.3 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-04 ASBESTOS MINING | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-06 CHEMICAL | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-08 IRON / STEEL | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-09 LONGSHORE | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-10 MARITIME | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-14 RAILROAD | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-16 TEXTILE | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-17 TIRE / RUBBER | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-18 U.S. NAVY | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-19 UTILITIES | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-21 N/A | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-22 OTHER | 5 | 1.0 |
| O-01 NON-OCCUPATIONAL / RESIDENTIAL / DO-IT-YOURSELF (DIY) | I-23 UNKNOWN | 5 | 1.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 6.6 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-03 AEROSPACE / AVIATION | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-05 AUTOMOTIVE | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-06 CHEMICAL | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-07 CONSTRUCTION TRADES | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-08 IRON / STEEL | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-09 LONGSHORE | 5 | 1.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-10 MARITIME | 3 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-13 PETROCHEMICAL | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-14 RAILROAD | 3 | 1.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-16 TEXTILE | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-17 TIRE / RUBBER | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-18 U.S. NAVY | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-19 UTILITIES | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-21 N/A | 5 | 1.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-22 OTHER | 5 | 1.0 |
| O-02 AIR CONDITIONING AND HEATING INSTALLER / MAINTENANCE | I-23 UNKNOWN | 5 | 1.0 |
| O-03 ASBESTOS MINER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-03 AEROSPACE / AVIATION | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-05 AUTOMOTIVE | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-06 CHEMICAL | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-07 CONSTRUCTION TRADES | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-08 IRON / STEEL | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-09 LONGSHORE | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-10 MARITIME | 5 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-03 ASBESTOS MINER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-13 PETROCHEMICAL | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-14 RAILROAD | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-16 TEXTILE | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-17 TIRE / RUBBER | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-18 U.S. NAVY | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-19 UTILITIES | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-21 N/A | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-22 OTHER | 5 | 10.0 |
| O-03 ASBESTOS MINER | I-23 UNKNOWN | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-03 AEROSPACE / AVIATION | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-05 AUTOMOTIVE | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-06 CHEMICAL | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-07 CONSTRUCTION TRADES | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-08 IRON / STEEL | 5 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-09 LONGSHORE | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-10 MARITIME | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-13 PETROCHEMICAL | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-14 RAILROAD | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-16 TEXTILE | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-17 TIRE / RUBBER | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-18 U.S. NAVY | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-19 UTILITIES | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-21 N/A | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-22 OTHER | 5 | 10.0 |
| O-04 ASBESTOS PLANT WORKER / ASBESTOS MANUFACTURING WORKER | I-23 UNKNOWN | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-03 AEROSPACE / AVIATION | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-05 AUTOMOTIVE | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-06 CHEMICAL | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-07 CONSTRUCTION TRADES | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-08 IRON / STEEL | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-09 LONGSHORE | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-10 MARITIME | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-13 PETROCHEMICAL | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-14 RAILROAD | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-16 TEXTILE | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-17 TIRE / RUBBER | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-18 U.S. NAVY | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-19 UTILITIES | 5 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-21 N/A | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-22 OTHER | 5 | 10.0 |
| O-05 ASBESTOS REMOVAL / ABATEMENT | I-23 UNKNOWN | 5 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-03 AEROSPACE / AVIATION | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-05 AUTOMOTIVE | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-06 CHEMICAL | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-07 CONSTRUCTION TRADES | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-08 IRON / STEEL | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-09 LONGSHORE | 5 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-10 MARITIME | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-13 PETROCHEMICAL | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-14 RAILROAD | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-16 TEXTILE | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-17 TIRE / RUBBER | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-18 U.S. NAVY | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-19 UTILITIES | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-21 N/A | 5 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-22 OTHER | 5 | 10.0 |
| O-06 ASBESTOS SPRAYER / SPRAY GUN MECHANIC | I-23 UNKNOWN | 5 | 10.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-03 AEROSPACE / AVIATION | 3 | 3.3 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-05 AUTOMOTIVE | 3 | 3.3 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-06 CHEMICAL | 3 | 6.6 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-08 IRON / STEEL | 3 | 6.6 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-09 LONGSHORE | 5 | 1.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-10 MARITIME | 5 | 1.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 3.3 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-13 PETROCHEMICAL | 3 | 6.6 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-14 RAILROAD | 3 | 1.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-16 TEXTILE | 3 | 3.3 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-17 TIRE / RUBBER | 3 | 6.6 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-18 U.S. NAVY | 5 | 1.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-19 UTILITIES | 3 | 1.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-21 N/A | 5 | 1.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-22 OTHER | 5 | 1.0 |
| O-07 ASSEMBLY LINE / FACTORY / PLANT WORKER | I-23 UNKNOWN | 5 | 1.0 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 3.3 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-03 AEROSPACE / AVIATION | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-05 AUTOMOTIVE | 5 | 3.3 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-06 CHEMICAL | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-07 CONSTRUCTION TRADES | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-08 IRON / STEEL | 5 | 6.6 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-09 LONGSHORE | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-10 MARITIME | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 3.3 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 3.3 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-13 PETROCHEMICAL | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-14 RAILROAD | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-16 TEXTILE | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-17 TIRE / RUBBER | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-18 U.S. NAVY | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-19 UTILITIES | 5 | 6.6 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-21 N/A | 5 | 1.0 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-22 OTHER | 5 | 1.0 |
| O-08 AUTO MECHANIC / BODYWORK / BRAKE REPAIRMAN | I-23 UNKNOWN | 5 | 1.0 |
| O-09 BOILERMAKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 1.0 |
| O-09 BOILERMAKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-09 BOILERMAKER | I-03 AEROSPACE / AVIATION | 2 | 10.0 |
| O-09 BOILERMAKER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-09 BOILERMAKER | I-05 AUTOMOTIVE | 2 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-09 BOILERMAKER | I-06 CHEMICAL | 2 | 10.0 |
| O-09 BOILERMAKER | I-07 CONSTRUCTION TRADES | 2 | 10.0 |
| O-09 BOILERMAKER | I-08 IRON / STEEL | 2 | 10.0 |
| O-09 BOILERMAKER | I-09 LONGSHORE | 5 | 1.0 |
| O-09 BOILERMAKER | I-10 MARITIME | 2 | 10.0 |
| O-09 BOILERMAKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 2 | 10.0 |
| O-09 BOILERMAKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 2 | 10.0 |
| O-09 BOILERMAKER | I-13 PETROCHEMICAL | 2 | 10.0 |
| O-09 BOILERMAKER | I-14 RAILROAD | 2 | 10.0 |
| O-09 BOILERMAKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 2 | 10.0 |
| O-09 BOILERMAKER | I-16 TEXTILE | 2 | 10.0 |
| O-09 BOILERMAKER | I-17 TIRE / RUBBER | 2 | 10.0 |
| O-09 BOILERMAKER | I-18 U.S. NAVY | 2 | 10.0 |
| O-09 BOILERMAKER | I-19 UTILITIES | 2 | 10.0 |
| O-09 BOILERMAKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 2 | 10.0 |
| O-09 BOILERMAKER | I-21 N/A | 5 | 1.0 |
| O-09 BOILERMAKER | I-22 OTHER | 5 | 1.0 |
| O-09 BOILERMAKER | I-23 UNKNOWN | 5 | 1.0 |
| O-10 BOILER REPAIRMAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 6.6 |
| O-10 BOILER REPAIRMAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-10 BOILER REPAIRMAN | I-03 AEROSPACE / AVIATION | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-10 BOILER REPAIRMAN | I-05 AUTOMOTIVE | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-06 CHEMICAL | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-07 CONSTRUCTION TRADES | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-08 IRON / STEEL | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-09 LONGSHORE | 5 | 1.0 |
| O-10 BOILER REPAIRMAN | I-10 MARITIME | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-13 PETROCHEMICAL | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-14 RAILROAD | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-16 TEXTILE | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-17 TIRE / RUBBER | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-18 U.S. NAVY | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-19 UTILITIES | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 2 | 10.0 |
| O-10 BOILER REPAIRMAN | I-21 N/A | 5 | 1.0 |
| O-10 BOILER REPAIRMAN | I-22 OTHER | 5 | 1.0 |
| O-10 BOILER REPAIRMAN | I-23 UNKNOWN | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 1.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-03 AEROSPACE / AVIATION | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-05 AUTOMOTIVE | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-06 CHEMICAL | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-07 CONSTRUCTION TRADES | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-08 IRON / STEEL | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-09 LONGSHORE | 5 | 1.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-10 MARITIME | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-13 PETROCHEMICAL | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-14 RAILROAD | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-16 TEXTILE | 2 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-17 TIRE / RUBBER | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-18 U.S. NAVY | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-19 UTILITIES | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-20 ASBESTOS MANUFACTURE OR MILLING | 2 | 10.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-21 N/A | 5 | 1.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-22 OTHER | 5 | 1.0 |
| O-11 BOILER WORKER / CLEANER / INSPECTOR / ENGINEER / INSTALLER | I-23 UNKNOWN | 5 | 1.0 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-03 AEROSPACE / AVIATION | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-05 AUTOMOTIVE | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-06 CHEMICAL | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-07 CONSTRUCTION TRADES | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-08 IRON / STEEL | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-09 LONGSHORE | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-10 MARITIME | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-13 PETROCHEMICAL | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-14 RAILROAD | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-16 TEXTILE | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-17 TIRE / RUBBER | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-18 U.S. NAVY | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-19 UTILITIES | 3 | 6.6 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-21 N/A | 5 | 1.0 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-22 OTHER | 5 | 1.0 |
| O-12 BUILDING MAINTENANCE / BUILDING SUPERINTENDENT | I-23 UNKNOWN | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-13 BRAKE MANUFACTURER / INSTALLER | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-05 AUTOMOTIVE | 5 | 3.3 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-06 CHEMICAL | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-08 IRON / STEEL | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-09 LONGSHORE | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-10 MARITIME | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-14 RAILROAD | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-16 TEXTILE | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-18 U.S. NAVY | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-13 BRAKE MANUFACTURER / INSTALLER | I-19 UTILITIES | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-21 N/A | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-22 OTHER | 5 | 1.0 |
| O-13 BRAKE MANUFACTURER / INSTALLER | I-23 UNKNOWN | 5 | 1.0 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-03 AEROSPACE / AVIATION | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-05 AUTOMOTIVE | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-06 CHEMICAL | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-07 CONSTRUCTION TRADES | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-08 IRON / STEEL | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-09 LONGSHORE | 5 | 1.0 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-10 MARITIME | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-13 PETROCHEMICAL | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-14 RAILROAD | 4 | 1.0 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-16 TEXTILE | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-17 TIRE / RUBBER | 4 | 3.3 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-18 U.S. NAVY | 4 | 6.6 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-19 UTILITIES | 4 | 3.3 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-21 N/A | 5 | 1.0 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-22 OTHER | 5 | 1.0 |
| O-14 BRICK MASON / LAYER / HOD CARRIER | I-23 UNKNOWN | 5 | 1.0 |
| O-15 BURNER OPERATOR | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-15 BURNER OPERATOR | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-15 BURNER OPERATOR | I-03 AEROSPACE / AVIATION | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-15 BURNER OPERATOR | I-05 AUTOMOTIVE | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-06 CHEMICAL | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-07 CONSTRUCTION TRADES | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-08 IRON / STEEL | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-09 LONGSHORE | 5 | 1.0 |
| O-15 BURNER OPERATOR | I-10 MARITIME | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-13 PETROCHEMICAL | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-14 RAILROAD | 3 | 1.0 |
| O-15 BURNER OPERATOR | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 1.0 |
| O-15 BURNER OPERATOR | I-16 TEXTILE | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-17 TIRE / RUBBER | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-18 U.S. NAVY | 3 | 1.0 |
| O-15 BURNER OPERATOR | I-19 UTILITIES | 3 | 6.6 |
| O-15 BURNER OPERATOR | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |
| O-15 BURNER OPERATOR | I-21 N/A | 5 | 1.0 |
| O-15 BURNER OPERATOR | I-22 OTHER | 5 | 1.0 |
| O-15 BURNER OPERATOR | I-23 UNKNOWN | 5 | 1.0 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 3.3 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-03 AEROSPACE / AVIATION | 4 | 6.6 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-05 AUTOMOTIVE | 4 | 6.6 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-06 CHEMICAL | 4 | 6.6 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-07 CONSTRUCTION TRADES | 4 | 10.0 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-08 IRON / STEEL | 4 | 6.6 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-09 LONGSHORE | 5 | 6.6 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-10 MARITIME | 4 | 6.6 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 6.6 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 3.3 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-13 PETROCHEMICAL | 4 | 6.6 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-14 RAILROAD | 4 | 6.6 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 10.0 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-16 TEXTILE | 4 | 6.6 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-17 TIRE / RUBBER | 4 | 6.6 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-18 U.S. NAVY | 4 | 6.6 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-19 UTILITIES | 4 | 6.6 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-21 N/A | 5 | 1.0 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-22 OTHER | 5 | 1.0 |
| O-16 CARPENTER / WOODWORKER / CABINETMAKER | I-23 UNKNOWN | 5 | 1.0 |
| O-17 CHIPPER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-17 CHIPPER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-17 CHIPPER | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-17 CHIPPER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-17 CHIPPER | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-17 CHIPPER | I-06 CHEMICAL | 5 | 1.0 |
| O-17 CHIPPER | I-07 CONSTRUCTION TRADES | 5 | 3.3 |
| O-17 CHIPPER | I-08 IRON / STEEL | 5 | 1.0 |
| O-17 CHIPPER | I-09 LONGSHORE | 5 | 1.0 |
| O-17 CHIPPER | I-10 MARITIME | 5 | 1.0 |
| O-17 CHIPPER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-17 CHIPPER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-17 CHIPPER | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-17 CHIPPER | I-14 RAILROAD | 5 | 1.0 |
| O-17 CHIPPER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| O-17 CHIPPER | I-16 TEXTILE | 5 | 1.0 |
| O-17 CHIPPER | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-17 CHIPPER | I-18 U.S. NAVY | 5 | 1.0 |
| O-17 CHIPPER | I-19 UTILITIES | 5 | 1.0 |
| O-17 CHIPPER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-17 CHIPPER | I-21 N/A | 5 | 1.0 |
| O-17 CHIPPER | I-22 OTHER | 5 | 1.0 |
| O-17 CHIPPER | I-23 UNKNOWN | 5 | 1.0 |
| O-18 CLERICAL / OFFICE WORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-18 CLERICAL / OFFICE WORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-18 CLERICAL / OFFICE WORKER | I-03 AEROSPACE / AVIATION | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-18 CLERICAL / OFFICE WORKER | I-05 AUTOMOTIVE | 4 | 3.3 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-18 CLERICAL / OFFICE WORKER | I-06 CHEMICAL | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-07 CONSTRUCTION TRADES | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-08 IRON / STEEL | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-09 LONGSHORE | 5 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-10 MARITIME | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-13 PETROCHEMICAL | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-14 RAILROAD | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-16 TEXTILE | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-17 TIRE / RUBBER | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-18 U.S. NAVY | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-19 UTILITIES | 4 | 3.3 |
| O-18 CLERICAL / OFFICE WORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-18 CLERICAL / OFFICE WORKER | I-21 N/A | 5 | 1.0 |
| O-18 CLERICAL / OFFICE WORKER | I-22 OTHER | 5 | 1.0 |
| O-18 CLERICAL / OFFICE WORKER | I-23 UNKNOWN | 5 | 1.0 |
| O-19 CONSTRUCTION - GENERAL | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 3.3 |
| O-19 CONSTRUCTION - GENERAL | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-19 CONSTRUCTION - GENERAL | I-03 AEROSPACE / AVIATION | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-04 ASBESTOS MINING | 3 | 10.0 |
| O-19 CONSTRUCTION - GENERAL | I-05 AUTOMOTIVE | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-06 CHEMICAL | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-07 CONSTRUCTION TRADES | 3 | 6.6 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-19 CONSTRUCTION - GENERAL | I-08 IRON / STEEL | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-09 LONGSHORE | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-10 MARITIME | 3 | 10.0 |
| O-19 CONSTRUCTION - GENERAL | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 10.0 |
| O-19 CONSTRUCTION - GENERAL | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-13 PETROCHEMICAL | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-14 RAILROAD | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 10.0 |
| O-19 CONSTRUCTION - GENERAL | I-16 TEXTILE | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-17 TIRE / RUBBER | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-18 U.S. NAVY | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-19 UTILITIES | 3 | 6.6 |
| O-19 CONSTRUCTION - GENERAL | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |
| O-19 CONSTRUCTION - GENERAL | I-21 N/A | 5 | 1.0 |
| O-19 CONSTRUCTION - GENERAL | I-22 OTHER | 5 | 1.0 |
| O-19 CONSTRUCTION - GENERAL | I-23 UNKNOWN | 5 | 1.0 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 1.0 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-03 AEROSPACE / AVIATION | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-05 AUTOMOTIVE | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-06 CHEMICAL | 5 | 3.3 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-07 CONSTRUCTION TRADES | 4 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-08 IRON / STEEL | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-09 LONGSHORE | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-10 MARITIME | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-13 PETROCHEMICAL | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-14 RAILROAD | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-16 TEXTILE | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-17 TIRE / RUBBER | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-18 U.S. NAVY | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-19 UTILITIES | 5 | 3.3 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-21 N/A | 5 | 1.0 |
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-22 OTHER | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-20 CUSTODIAN / JANITOR IN OFFICE / RESIDENTIAL BUILDING | I-23 UNKNOWN | 5 | 1.0 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-03 AEROSPACE / AVIATION | 3 | 6.6 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-04 ASBESTOS MINING | 3 | 10.0 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-05 AUTOMOTIVE | 3 | 6.6 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-06 CHEMICAL | 3 | 6.6 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-07 CONSTRUCTION TRADES | 3 | 1.0 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-08 IRON / STEEL | 3 | 6.6 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-09 LONGSHORE | 3 | 1.0 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-10 MARITIME | 3 | 6.6 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 6.6 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 6.6 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-13 PETROCHEMICAL | 3 | 6.6 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-14 RAILROAD | 3 | 1.0 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 6.6 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-16 TEXTILE | 3 | 6.6 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-17 TIRE / RUBBER | 3 | 6.6 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-18 U.S. NAVY | 3 | 1.0 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-19 UTILITIES | 3 | 6.6 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-21 N/A | 5 | 1.0 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-22 OTHER | 5 | 1.0 |
| O-21 CUSTODIAN / JANITOR IN PLANT / MANUFACTURING FACILITY | I-23 UNKNOWN | 5 | 1.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 6.6 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-03 AEROSPACE / AVIATION | 3 | 10.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-04 ASBESTOS MINING | 3 | 10.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-05 AUTOMOTIVE | 3 | 6.6 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-06 CHEMICAL | 3 | 6.6 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-07 CONSTRUCTION TRADES | 3 | 10.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-08 IRON / STEEL | 3 | 6.6 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-09 LONGSHORE | 3 | 6.6 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-10 MARITIME | 3 | 10.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 10.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 6.6 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-13 PETROCHEMICAL | 3 | 6.6 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-14 RAILROAD | 3 | 6.6 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 10.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-16 TEXTILE | 3 | 6.6 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-17 TIRE / RUBBER | 3 | 6.6 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-18 U.S. NAVY | 3 | 10.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-19 UTILITIES | 3 | 10.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-21 N/A | 5 | 1.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-22 OTHER | 5 | 1.0 |
| O-22 ELECTRICIAN / INSPECTOR / WORKER | I-23 UNKNOWN | 5 | 1.0 |
| O-23 ENGINEER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-23 ENGINEER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-23 ENGINEER | I-03 AEROSPACE / AVIATION | 4 | 3.3 |
| O-23 ENGINEER | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-23 ENGINEER | I-05 AUTOMOTIVE | 4 | 3.3 |
| O-23 ENGINEER | I-06 CHEMICAL | 3 | 3.3 |
| O-23 ENGINEER | I-07 CONSTRUCTION TRADES | 3 | 3.3 |
| O-23 ENGINEER | I-08 IRON / STEEL | 3 | 3.3 |
| O-23 ENGINEER | I-09 LONGSHORE | 4 | 1.0 |
| O-23 ENGINEER | I-10 MARITIME | 3 | 3.3 |
| O-23 ENGINEER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 3.3 |
| O-23 ENGINEER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 3.3 |
| O-23 ENGINEER | I-13 PETROCHEMICAL | 3 | 3.3 |
| O-23 ENGINEER | I-14 RAILROAD | 4 | 3.3 |
| O-23 ENGINEER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 3.3 |
| O-23 ENGINEER | I-16 TEXTILE | 4 | 3.3 |
| O-23 ENGINEER | I-17 TIRE / RUBBER | 4 | 3.3 |
| O-23 ENGINEER | I-18 U.S. NAVY | 3 | 1.0 |
| O-23 ENGINEER | I-19 UTILITIES | 3 | 3.3 |
| O-23 ENGINEER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-23 ENGINEER | I-21 N/A | 5 | 1.0 |
| O-23 ENGINEER | I-22 OTHER | 5 | 1.0 |
| O-23 ENGINEER | I-23 UNKNOWN | 5 | 1.0 |
| O-24 FIREFIGHTER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 3.3 |
| O-24 FIREFIGHTER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-24 FIREFIGHTER | I-03 AEROSPACE / AVIATION | 4 | 3.3 |
| O-24 FIREFIGHTER | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-24 FIREFIGHTER | I-05 AUTOMOTIVE | 4 | 3.3 |
| O-24 FIREFIGHTER | I-06 CHEMICAL | 4 | 3.3 |
| O-24 FIREFIGHTER | I-07 CONSTRUCTION TRADES | 4 | 3.3 |
| O-24 FIREFIGHTER | I-08 IRON / STEEL | 4 | 3.3 |
| O-24 FIREFIGHTER | I-09 LONGSHORE | 4 | 3.3 |
| O-24 FIREFIGHTER | I-10 MARITIME | 4 | 3.3 |
| O-24 FIREFIGHTER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 3.3 |
| O-24 FIREFIGHTER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 3.3 |
| O-24 FIREFIGHTER | I-13 PETROCHEMICAL | 4 | 3.3 |
| O-24 FIREFIGHTER | I-14 RAILROAD | 4 | 3.3 |
| O-24 FIREFIGHTER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 3.3 |
| O-24 FIREFIGHTER | I-16 TEXTILE | 4 | 3.3 |
| O-24 FIREFIGHTER | I-17 TIRE / RUBBER | 4 | 3.3 |
| O-24 FIREFIGHTER | I-18 U.S. NAVY | 4 | 6.6 |
| O-24 FIREFIGHTER | I-19 UTILITIES | 4 | 3.3 |
| O-24 FIREFIGHTER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-24 FIREFIGHTER | I-21 N/A | 5 | 1.0 |
| O-24 FIREFIGHTER | I-22 OTHER | 5 | 1.0 |
| O-24 FIREFIGHTER | I-23 UNKNOWN | 5 | 1.0 |
| O-25 FIREMAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 3.3 |
| O-25 FIREMAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-25 FIREMAN | I-03 AEROSPACE / AVIATION | 3 | 3.3 |
| O-25 FIREMAN | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-25 FIREMAN | I-05 AUTOMOTIVE | 3 | 3.3 |
| O-25 FIREMAN | I-06 CHEMICAL | 2 | 6.6 |
| O-25 FIREMAN | I-07 CONSTRUCTION TRADES | 3 | 6.6 |
| O-25 FIREMAN | I-08 IRON / STEEL | 3 | 6.6 |
| O-25 FIREMAN | I-09 LONGSHORE | 5 | 3.3 |
| O-25 FIREMAN | I-10 MARITIME | 2 | 6.6 |
| O-25 FIREMAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 2 | 6.6 |
| O-25 FIREMAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 3.3 |
| O-25 FIREMAN | I-13 PETROCHEMICAL | 2 | 6.6 |
| O-25 FIREMAN | I-14 RAILROAD | 3 | 3.3 |
| O-25 FIREMAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 2 | 6.6 |
| O-25 FIREMAN | I-16 TEXTILE | 3 | 3.3 |
| O-25 FIREMAN | I-17 TIRE / RUBBER | 3 | 3.3 |
| O-25 FIREMAN | I-18 U.S. NAVY | 3 | 6.6 |
| O-25 FIREMAN | I-19 UTILITIES | 2 | 6.6 |
| O-25 FIREMAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-25 FIREMAN | I-21 N/A | 5 | 1.0 |
| O-25 FIREMAN | I-22 OTHER | 5 | 1.0 |
| O-25 FIREMAN | I-23 UNKNOWN | 5 | 1.0 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-03 AEROSPACE / AVIATION | 5 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-05 AUTOMOTIVE | 5 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-06 CHEMICAL | 5 | 6.6 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-07 CONSTRUCTION TRADES | 4 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-08 IRON / STEEL | 5 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-09 LONGSHORE | 5 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-10 MARITIME | 5 | 6.6 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-13 PETROCHEMICAL | 5 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-14 RAILROAD | 5 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 6.6 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-16 TEXTILE | 5 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-17 TIRE / RUBBER | 5 | 3.3 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-18 U.S. NAVY | 5 | 6.6 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-19 UTILITIES | 5 | 6.6 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-21 N/A | 5 | 1.0 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-22 OTHER | 5 | 1.0 |
| O-26 FLOORING INSTALLER / TILE INSTALLER / TILE MECHANIC | I-23 UNKNOWN | 5 | 1.0 |
| O-27 FOUNDRY WORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-27 FOUNDRY WORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-27 FOUNDRY WORKER | I-03 AEROSPACE / AVIATION | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-27 FOUNDRY WORKER | I-05 AUTOMOTIVE | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-06 CHEMICAL | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-07 CONSTRUCTION TRADES | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-08 IRON / STEEL | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-09 LONGSHORE | 5 | 1.0 |
| O-27 FOUNDRY WORKER | I-10 MARITIME | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-13 PETROCHEMICAL | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-14 RAILROAD | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-16 TEXTILE | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-17 TIRE / RUBBER | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-18 U.S. NAVY | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-19 UTILITIES | 4 | 6.6 |
| O-27 FOUNDRY WORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-27 FOUNDRY WORKER | I-21 N/A | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-27 FOUNDRY WORKER | I-22 OTHER | 5 | 1.0 |
| O-27 FOUNDRY WORKER | I-23 UNKNOWN | 5 | 1.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 6.6 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-03 AEROSPACE / AVIATION | 4 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-05 AUTOMOTIVE | 4 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-06 CHEMICAL | 3 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-07 CONSTRUCTION TRADES | 3 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-08 IRON / STEEL | 3 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-09 LONGSHORE | 4 | 1.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-10 MARITIME | 3 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-13 PETROCHEMICAL | 3 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-14 RAILROAD | 4 | 1.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-16 TEXTILE | 4 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-17 TIRE / RUBBER | 4 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-18 U.S. NAVY | 3 | 1.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-19 UTILITIES | 3 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-21 N/A | 5 | 1.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-22 OTHER | 5 | 1.0 |
| O-28 FURNACE WORKER / REPAIRMAN / INSTALLER | I-23 UNKNOWN | 5 | 1.0 |
| O-29 GLASS WORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-29 GLASS WORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-29 GLASS WORKER | I-03 AEROSPACE / AVIATION | 4 | 6.6 |
| O-29 GLASS WORKER | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-29 GLASS WORKER | I-05 AUTOMOTIVE | 4 | 6.6 |
| O-29 GLASS WORKER | I-06 CHEMICAL | 4 | 6.6 |
| O-29 GLASS WORKER | I-07 CONSTRUCTION TRADES | 4 | 6.6 |
| O-29 GLASS WORKER | I-08 IRON / STEEL | 4 | 6.6 |
| O-29 GLASS WORKER | I-09 LONGSHORE | 4 | 1.0 |
| O-29 GLASS WORKER | I-10 MARITIME | 4 | 6.6 |
| O-29 GLASS WORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 6.6 |
| O-29 GLASS WORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 6.6 |
| O-29 GLASS WORKER | I-13 PETROCHEMICAL | 4 | 6.6 |
| O-29 GLASS WORKER | I-14 RAILROAD | 4 | 6.6 |
| O-29 GLASS WORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 6.6 |
| O-29 GLASS WORKER | I-16 TEXTILE | 4 | 6.6 |
| O-29 GLASS WORKER | I-17 TIRE / RUBBER | 4 | 6.6 |
| O-29 GLASS WORKER | I-18 U.S. NAVY | 4 | 1.0 |
| O-29 GLASS WORKER | I-19 UTILITIES | 4 | 6.6 |
| O-29 GLASS WORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-29 GLASS WORKER | I-21 N/A | 5 | 1.0 |
| O-29 GLASS WORKER | I-22 OTHER | 5 | 1.0 |
| O-29 GLASS WORKER | I-23 UNKNOWN | 5 | 1.0 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-03 AEROSPACE / AVIATION | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-05 AUTOMOTIVE | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-06 CHEMICAL | 4 | 3.3 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-07 CONSTRUCTION TRADES | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-08 IRON / STEEL | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-09 LONGSHORE | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-10 MARITIME | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-13 PETROCHEMICAL | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-14 RAILROAD | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-16 TEXTILE | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-17 TIRE / RUBBER | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-18 U.S. NAVY | 4 | 3.3 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-19 UTILITIES | 4 | 3.3 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-21 N/A | 5 | 1.0 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-22 OTHER | 5 | 1.0 |
| O-30 HEAVY EQUIPMENT OPERATOR (INCLUDES TRUCK, FORKLIFT, & CRANE) | I-23 UNKNOWN | 5 | 1.0 |
| O-31 INSULATOR | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 10.0 |
| O-31 INSULATOR | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-31 INSULATOR | I-03 AEROSPACE / AVIATION | 4 | 10.0 |
| O-31 INSULATOR | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-31 INSULATOR | I-05 AUTOMOTIVE | 4 | 10.0 |
| O-31 INSULATOR | I-06 CHEMICAL | 4 | 10.0 |
| O-31 INSULATOR | I-07 CONSTRUCTION TRADES | 4 | 10.0 |
| O-31 INSULATOR | I-08 IRON / STEEL | 4 | 10.0 |
| O-31 INSULATOR | I-09 LONGSHORE | 4 | 1.0 |
| O-31 INSULATOR | I-10 MARITIME | 4 | 10.0 |
| O-31 INSULATOR | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 10.0 |
| O-31 INSULATOR | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 10.0 |
| O-31 INSULATOR | I-13 PETROCHEMICAL | 4 | 10.0 |
| O-31 INSULATOR | I-14 RAILROAD | 4 | 10.0 |
| O-31 INSULATOR | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 10.0 |
| O-31 INSULATOR | I-16 TEXTILE | 4 | 10.0 |
| O-31 INSULATOR | I-17 TIRE / RUBBER | 4 | 10.0 |
| O-31 INSULATOR | I-18 U.S. NAVY | 4 | 10.0 |
| O-31 INSULATOR | I-19 UTILITIES | 4 | 10.0 |
| O-31 INSULATOR | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-31 INSULATOR | I-21 N/A | 5 | 1.0 |
| O-31 INSULATOR | I-22 OTHER | 5 | 1.0 |
| O-31 INSULATOR | I-23 UNKNOWN | 5 | 1.0 |
| O-32 IRON WORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-32 IRON WORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-32 IRON WORKER | I-03 AEROSPACE / AVIATION | 4 | 3.3 |
| O-32 IRON WORKER | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-32 IRON WORKER | I-05 AUTOMOTIVE | 4 | 3.3 |
| O-32 IRON WORKER | I-06 CHEMICAL | 4 | 3.3 |
| O-32 IRON WORKER | I-07 CONSTRUCTION TRADES | 4 | 6.6 |
| O-32 IRON WORKER | I-08 IRON / STEEL | 4 | 6.6 |
| O-32 IRON WORKER | I-09 LONGSHORE | 4 | 1.0 |
| O-32 IRON WORKER | I-10 MARITIME | 4 | 6.6 |
| O-32 IRON WORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 6.6 |
| O-32 IRON WORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 3.3 |
| O-32 IRON WORKER | I-13 PETROCHEMICAL | 4 | 6.6 |
| O-32 IRON WORKER | I-14 RAILROAD | 4 | 6.6 |
| O-32 IRON WORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 6.6 |
| O-32 IRON WORKER | I-16 TEXTILE | 4 | 6.6 |
| O-32 IRON WORKER | I-17 TIRE / RUBBER | 4 | 6.6 |
| O-32 IRON WORKER | I-18 U.S. NAVY | 4 | 1.0 |
| O-32 IRON WORKER | I-19 UTILITIES | 4 | 6.6 |
| O-32 IRON WORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-32 IRON WORKER | I-21 N/A | 5 | 1.0 |
| O-32 IRON WORKER | I-22 OTHER | 5 | 1.0 |
| O-32 IRON WORKER | I-23 UNKNOWN | 5 | 1.0 |
| O-33 JOINER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-33 JOINER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-33 JOINER | I-03 AEROSPACE / AVIATION | 5 | 3.3 |
| O-33 JOINER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-33 JOINER | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-33 JOINER | I-06 CHEMICAL | 5 | 1.0 |
| O-33 JOINER | I-07 CONSTRUCTION TRADES | 4 | 3.3 |
| O-33 JOINER | I-08 IRON / STEEL | 5 | 1.0 |
| O-33 JOINER | I-09 LONGSHORE | 5 | 1.0 |
| O-33 JOINER | I-10 MARITIME | 4 | 10.0 |
| O-33 JOINER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 1.0 |
| O-33 JOINER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-33 JOINER | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-33 JOINER | I-14 RAILROAD | 5 | 1.0 |
| O-33 JOINER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 10.0 |
| O-33 JOINER | I-16 TEXTILE | 5 | 1.0 |
| O-33 JOINER | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-33 JOINER | I-18 U.S. NAVY | 4 | 1.0 |
| O-33 JOINER | I-19 UTILITIES | 5 | 1.0 |
| O-33 JOINER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-33 JOINER | I-21 N/A | 5 | 1.0 |
| O-33 JOINER | I-22 OTHER | 5 | 1.0 |
| O-33 JOINER | I-23 UNKNOWN | 5 | 1.0 |
| O-34 LABORER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-34 LABORER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-34 LABORER | I-03 AEROSPACE / AVIATION | 3 | 6.6 |
| O-34 LABORER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-34 LABORER | I-05 AUTOMOTIVE | 3 | 6.6 |
| O-34 LABORER | I-06 CHEMICAL | 3 | 10.0 |
| O-34 LABORER | I-07 CONSTRUCTION TRADES | 3 | 10.0 |
| O-34 LABORER | I-08 IRON / STEEL | 3 | 10.0 |
| O-34 LABORER | I-09 LONGSHORE | 4 | 6.6 |
| O-34 LABORER | I-10 MARITIME | 3 | 10.0 |
| O-34 LABORER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 10.0 |
| O-34 LABORER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 6.6 |
| O-34 LABORER | I-13 PETROCHEMICAL | 3 | 6.6 |
| O-34 LABORER | I-14 RAILROAD | 3 | 6.6 |
| O-34 LABORER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 10.0 |
| O-34 LABORER | I-16 TEXTILE | 3 | 6.6 |
| O-34 LABORER | I-17 TIRE / RUBBER | 3 | 6.6 |
| O-34 LABORER | I-18 U.S. NAVY | 3 | 10.0 |
| O-34 LABORER | I-19 UTILITIES | 3 | 10.0 |
| O-34 LABORER | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |
| O-34 LABORER | I-21 N/A | 5 | 1.0 |
| O-34 LABORER | I-22 OTHER | 5 | 1.0 |
| O-34 LABORER | I-23 UNKNOWN | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-35 LONGSHOREMAN | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-35 LONGSHOREMAN | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-06 CHEMICAL | 4 | 3.3 |
| O-35 LONGSHOREMAN | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-08 IRON / STEEL | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-09 LONGSHORE | 4 | 3.3 |
| O-35 LONGSHOREMAN | I-10 MARITIME | 4 | 3.3 |
| O-35 LONGSHOREMAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-13 PETROCHEMICAL | 4 | 3.3 |
| O-35 LONGSHOREMAN | I-14 RAILROAD | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 6.6 |
| O-35 LONGSHOREMAN | I-16 TEXTILE | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-35 LONGSHOREMAN | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-18 U.S. NAVY | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-19 UTILITIES | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-35 LONGSHOREMAN | I-21 N/A | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-22 OTHER | 5 | 1.0 |
| O-35 LONGSHOREMAN | I-23 UNKNOWN | 5 | 1.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 1.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-03 AEROSPACE / AVIATION | 3 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-04 ASBESTOS MINING | 3 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-05 AUTOMOTIVE | 3 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-06 CHEMICAL | 3 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-07 CONSTRUCTION TRADES | 3 | 6.6 |
| O-36 MACHINIST / MACHINE OPERATOR | I-08 IRON / STEEL | 3 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-09 LONGSHORE | 3 | 6.6 |
| O-36 MACHINIST / MACHINE OPERATOR | I-10 MARITIME | 2 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-11 MILITARY (OTHER THAN U.S. NAVY) | 2 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-13 PETROCHEMICAL | 3 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-14 RAILROAD | 3 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 2 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-16 TEXTILE | 3 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-17 TIRE / RUBBER | 3 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-18 U.S. NAVY | 2 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-19 UTILITIES | 2 | 10.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-36 MACHINIST / MACHINE OPERATOR | I-21 N/A | 5 | 1.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-22 OTHER | 5 | 1.0 |
| O-36 MACHINIST / MACHINE OPERATOR | I-23 UNKNOWN | 5 | 1.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-03 AEROSPACE / AVIATION | 3 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-04 ASBESTOS MINING | 3 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-05 AUTOMOTIVE | 3 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-06 CHEMICAL | 2 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-07 CONSTRUCTION TRADES | 3 | 1.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-08 IRON / STEEL | 3 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-09 LONGSHORE | 3 | 1.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-10 MARITIME | 2 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 2 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-13 PETROCHEMICAL | 2 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-14 RAILROAD | 3 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 2 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-16 TEXTILE | 2 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-17 TIRE / RUBBER | 3 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-18 U.S. NAVY | 2 | 1.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-19 UTILITIES | 2 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-21 N/A | 5 | 1.0 |
| O-37 MILLWRIGHT / MILL WORKER | I-22 OTHER | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-37 MILLWRIGHT / MILL WORKER | I-23 UNKNOWN | 5 | 1.0 |
| O-38 MIXER / BAGGER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-38 MIXER / BAGGER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-38 MIXER / BAGGER | I-03 AEROSPACE / AVIATION | 4 | 6.6 |
| O-38 MIXER / BAGGER | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-38 MIXER / BAGGER | I-05 AUTOMOTIVE | 4 | 6.6 |
| O-38 MIXER / BAGGER | I-06 CHEMICAL | 4 | 10.0 |
| O-38 MIXER / BAGGER | I-07 CONSTRUCTION TRADES | 4 | 6.6 |
| O-38 MIXER / BAGGER | I-08 IRON / STEEL | 4 | 6.6 |
| O-38 MIXER / BAGGER | I-09 LONGSHORE | 4 | 1.0 |
| O-38 MIXER / BAGGER | I-10 MARITIME | 4 | 10.0 |
| O-38 MIXER / BAGGER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 10.0 |
| O-38 MIXER / BAGGER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 10.0 |
| O-38 MIXER / BAGGER | I-13 PETROCHEMICAL | 4 | 10.0 |
| O-38 MIXER / BAGGER | I-14 RAILROAD | 4 | 6.6 |
| O-38 MIXER / BAGGER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 10.0 |
| O-38 MIXER / BAGGER | I-16 TEXTILE | 4 | 6.6 |
| O-38 MIXER / BAGGER | I-17 TIRE / RUBBER | 4 | 6.6 |
| O-38 MIXER / BAGGER | I-18 U.S. NAVY | 4 | 1.0 |
| O-38 MIXER / BAGGER | I-19 UTILITIES | 4 | 10.0 |
| O-38 MIXER / BAGGER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-38 MIXER / BAGGER | I-21 N/A | 5 | 1.0 |
| O-38 MIXER / BAGGER | I-22 OTHER | 5 | 1.0 |
| O-38 MIXER / BAGGER | I-23 UNKNOWN | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-39 NON-ASBESTOS MINER | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-04 ASBESTOS MINING | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-06 CHEMICAL | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-08 IRON / STEEL | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-09 LONGSHORE | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-10 MARITIME | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-39 NON-ASBESTOS MINER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-14 RAILROAD | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-16 TEXTILE | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-18 U.S. NAVY | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-19 UTILITIES | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-39 NON-ASBESTOS MINER | I-21 N/A | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-22 OTHER | 5 | 1.0 |
| O-39 NON-ASBESTOS MINER | I-23 UNKNOWN | 5 | 1.0 |
| O-40 PAINTER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 3.3 |
| O-40 PAINTER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-40 PAINTER | I-03 AEROSPACE / AVIATION | 4 | 3.3 |
| O-40 PAINTER | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-40 PAINTER | I-05 AUTOMOTIVE | 4 | 3.3 |
| O-40 PAINTER | I-06 CHEMICAL | 4 | 6.6 |
| O-40 PAINTER | I-07 CONSTRUCTION TRADES | 4 | 6.6 |
| O-40 PAINTER | I-08 IRON / STEEL | 4 | 6.6 |
| O-40 PAINTER | I-09 LONGSHORE | 4 | 3.3 |
| O-40 PAINTER | I-10 MARITIME | 4 | 6.6 |
| O-40 PAINTER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 3.3 |
| O-40 PAINTER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 3.3 |
| O-40 PAINTER | I-13 PETROCHEMICAL | 4 | 6.6 |
| O-40 PAINTER | I-14 RAILROAD | 4 | 3.3 |
| O-40 PAINTER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 6.6 |
| O-40 PAINTER | I-16 TEXTILE | 4 | 3.3 |
| O-40 PAINTER | I-17 TIRE / RUBBER | 4 | 3.3 |
| O-40 PAINTER | I-18 U.S. NAVY | 4 | 6.6 |
| O-40 PAINTER | I-19 UTILITIES | 4 | 3.3 |
| O-40 PAINTER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-40 PAINTER | I-21 N/A | 5 | 1.0 |
| O-40 PAINTER | I-22 OTHER | 5 | 1.0 |
| O-40 PAINTER | I-23 UNKNOWN | 5 | 1.0 |
| O-41 PIPEFITTER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 6.6 |
| O-41 PIPEFITTER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-41 PIPEFITTER | I-03 AEROSPACE / AVIATION | 1 | 10.0 |
| O-41 PIPEFITTER | I-04 ASBESTOS MINING | 2 | 10.0 |
| O-41 PIPEFITTER | I-05 AUTOMOTIVE | 1 | 10.0 |
| O-41 PIPEFITTER | I-06 CHEMICAL | 1 | 10.0 |
| O-41 PIPEFITTER | I-07 CONSTRUCTION TRADES | 1 | 10.0 |
| O-41 PIPEFITTER | I-08 IRON / STEEL | 1 | 10.0 |
| O-41 PIPEFITTER | I-09 LONGSHORE | 2 | 1.0 |
| O-41 PIPEFITTER | I-10 MARITIME | 1 | 10.0 |
| O-41 PIPEFITTER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 1 | 10.0 |
| O-41 PIPEFITTER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 1 | 10.0 |
| O-41 PIPEFITTER | I-13 PETROCHEMICAL | 1 | 10.0 |
| O-41 PIPEFITTER | I-14 RAILROAD | 1 | 10.0 |
| O-41 PIPEFITTER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 1 | 10.0 |
| O-41 PIPEFITTER | I-16 TEXTILE | 1 | 10.0 |
| O-41 PIPEFITTER | I-17 TIRE / RUBBER | 1 | 10.0 |
| O-41 PIPEFITTER | I-18 U.S. NAVY | 1 | 10.0 |
| O-41 PIPEFITTER | I-19 UTILITIES | 1 | 10.0 |
| O-41 PIPEFITTER | I-20 ASBESTOS MANUFACTURE OR MILLING | 1 | 10.0 |
| O-41 PIPEFITTER | I-21 N/A | 5 | 1.0 |
| O-41 PIPEFITTER | I-22 OTHER | 5 | 1.0 |
| O-41 PIPEFITTER | I-23 UNKNOWN | 5 | 1.0 |
| O-42 PLASTERER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 6.6 |
| O-42 PLASTERER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-42 PLASTERER | I-03 AEROSPACE / AVIATION | 4 | 1.0 |
| O-42 PLASTERER | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-42 PLASTERER | I-05 AUTOMOTIVE | 4 | 1.0 |
| O-42 PLASTERER | I-06 CHEMICAL | 4 | 1.0 |
| O-42 PLASTERER | I-07 CONSTRUCTION TRADES | 4 | 6.6 |
| O-42 PLASTERER | I-08 IRON / STEEL | 4 | 1.0 |
| O-42 PLASTERER | I-09 LONGSHORE | 4 | 1.0 |
| O-42 PLASTERER | I-10 MARITIME | 4 | 1.0 |
| O-42 PLASTERER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 1.0 |
| O-42 PLASTERER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 1.0 |
| O-42 PLASTERER | I-13 PETROCHEMICAL | 4 | 1.0 |
| O-42 PLASTERER | I-14 RAILROAD | 4 | 1.0 |
| O-42 PLASTERER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 1.0 |
| O-42 PLASTERER | I-16 TEXTILE | 4 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-42 PLASTERER | I-17 TIRE / RUBBER | 4 | 1.0 |
| O-42 PLASTERER | I-18 U.S. NAVY | 4 | 1.0 |
| O-42 PLASTERER | I-19 UTILITIES | 4 | 1.0 |
| O-42 PLASTERER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-42 PLASTERER | I-21 N/A | 5 | 1.0 |
| O-42 PLASTERER | I-22 OTHER | 5 | 1.0 |
| O-42 PLASTERER | I-23 UNKNOWN | 5 | 1.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 6.6 |
| O-43 PLUMBER - INSTALL / REPAIR | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-03 AEROSPACE / AVIATION | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-04 ASBESTOS MINING | 3 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-05 AUTOMOTIVE | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-06 CHEMICAL | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-07 CONSTRUCTION TRADES | 1 | 6.6 |
| O-43 PLUMBER - INSTALL / REPAIR | I-08 IRON / STEEL | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-09 LONGSHORE | 3 | 1.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-10 MARITIME | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-11 MILITARY (OTHER THAN U.S. NAVY) | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-13 PETROCHEMICAL | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-14 RAILROAD | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-16 TEXTILE | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-17 TIRE / RUBBER | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-18 U.S. NAVY | 1 | 1.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-19 UTILITIES | 1 | 10.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-20 ASBESTOS MANUFACTURE OR MILLING | 1 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-43 PLUMBER - INSTALL / REPAIR | I-21 N/A | 5 | 1.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-22 OTHER | 5 | 1.0 |
| O-43 PLUMBER - INSTALL / REPAIR | I-23 UNKNOWN | 5 | 1.0 |
| O-44 POWER PLANT OPERATOR | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-44 POWER PLANT OPERATOR | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-44 POWER PLANT OPERATOR | I-03 AEROSPACE / AVIATION | 3 | 6.6 |
| O-44 POWER PLANT OPERATOR | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-44 POWER PLANT OPERATOR | I-05 AUTOMOTIVE | 3 | 6.6 |
| O-44 POWER PLANT OPERATOR | I-06 CHEMICAL | 3 | 10.0 |
| O-44 POWER PLANT OPERATOR | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-44 POWER PLANT OPERATOR | I-08 IRON / STEEL | 3 | 6.6 |
| O-44 POWER PLANT OPERATOR | I-09 LONGSHORE | 5 | 10.0 |
| O-44 POWER PLANT OPERATOR | I-10 MARITIME | 5 | 10.0 |
| O-44 POWER PLANT OPERATOR | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 6.6 |
| O-44 POWER PLANT OPERATOR | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 6.6 |
| O-44 POWER PLANT OPERATOR | I-13 PETROCHEMICAL | 3 | 10.0 |
| O-44 POWER PLANT OPERATOR | I-14 RAILROAD | 3 | 10.0 |
| O-44 POWER PLANT OPERATOR | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 10.0 |
| O-44 POWER PLANT OPERATOR | I-16 TEXTILE | 3 | 6.6 |
| O-44 POWER PLANT OPERATOR | I-17 TIRE / RUBBER | 3 | 6.6 |
| O-44 POWER PLANT OPERATOR | I-18 U.S. NAVY | 3 | 10.0 |
| O-44 POWER PLANT OPERATOR | I-19 UTILITIES | 3 | 6.6 |
| O-44 POWER PLANT OPERATOR | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |
| O-44 POWER PLANT OPERATOR | I-21 N/A | 5 | 1.0 |
| O-44 POWER PLANT OPERATOR | I-22 OTHER | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-44 POWER PLANT OPERATOR | I-23 UNKNOWN | 5 | 1.0 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-03 AEROSPACE / AVIATION | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-05 AUTOMOTIVE | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-06 CHEMICAL | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-07 CONSTRUCTION TRADES | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-08 IRON / STEEL | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-09 LONGSHORE | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-10 MARITIME | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-13 PETROCHEMICAL | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-14 RAILROAD | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-16 TEXTILE | 5 | 3.3 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-17 TIRE / RUBBER | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-18 U.S. NAVY | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-19 UTILITIES | 5 | 3.3 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-21 N/A | 5 | 1.0 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-22 OTHER | 5 | 1.0 |
| O-45 PROFESSIONAL (E.G., ACCOUNTANT, ARCHITECT, PHYSICIAN) | I-23 UNKNOWN | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-06 CHEMICAL | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-08 IRON / STEEL | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-09 LONGSHORE | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-10 MARITIME | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-14 RAILROAD | 3 | 6.6 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-16 TEXTILE | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-18 U.S. NAVY | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-19 UTILITIES | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-21 N/A | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-22 OTHER | 5 | 1.0 |
| O-46 RAILROAD WORKER / CARMAN / BRAKEMAN / MACHINIST / CONDUCTOR | I-23 UNKNOWN | 5 | 1.0 |
| O-47 REFINERY WORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-47 REFINERY WORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-47 REFINERY WORKER | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-47 REFINERY WORKER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-47 REFINERY WORKER | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-47 REFINERY WORKER | I-06 CHEMICAL | 2 | 1.0 |
| O-47 REFINERY WORKER | I-07 CONSTRUCTION TRADES | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-47 REFINERY WORKER | I-08 IRON / STEEL | 5 | 1.0 |
| O-47 REFINERY WORKER | I-09 LONGSHORE | 4 | 1.0 |
| O-47 REFINERY WORKER | I-10 MARITIME | 5 | 1.0 |
| O-47 REFINERY WORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-47 REFINERY WORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-47 REFINERY WORKER | I-13 PETROCHEMICAL | 2 | 6.6 |
| O-47 REFINERY WORKER | I-14 RAILROAD | 5 | 1.0 |
| O-47 REFINERY WORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| O-47 REFINERY WORKER | I-16 TEXTILE | 5 | 1.0 |
| O-47 REFINERY WORKER | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-47 REFINERY WORKER | I-18 U.S. NAVY | 5 | 1.0 |
| O-47 REFINERY WORKER | I-19 UTILITIES | 5 | 1.0 |
| O-47 REFINERY WORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-47 REFINERY WORKER | I-21 N/A | 5 | 1.0 |
| O-47 REFINERY WORKER | I-22 OTHER | 5 | 1.0 |
| O-47 REFINERY WORKER | I-23 UNKNOWN | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-06 CHEMICAL | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-08 IRON / STEEL | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-09 LONGSHORE | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-10 MARITIME | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-14 RAILROAD | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-48 REMOVER / INSTALLER OF GASKETS | I-16 TEXTILE | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-18 U.S. NAVY | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-19 UTILITIES | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-21 N/A | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-22 OTHER | 5 | 1.0 |
| O-48 REMOVER / INSTALLER OF GASKETS | I-23 UNKNOWN | 5 | 1.0 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-03 AEROSPACE / AVIATION | 4 | 3.3 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-05 AUTOMOTIVE | 4 | 3.3 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-06 CHEMICAL | 4 | 3.3 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-07 CONSTRUCTION TRADES | 4 | 6.6 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-08 IRON / STEEL | 4 | 3.3 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-09 LONGSHORE | 4 | 3.3 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-10 MARITIME | 4 | 10.0 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 6.6 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 3.3 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-13 PETROCHEMICAL | 4 | 3.3 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-14 RAILROAD | 4 | 3.3 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 6.6 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-16 TEXTILE | 4 | 3.3 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-17 TIRE / RUBBER | 4 | 3.3 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-49 RIGGER / STEVEDORE / SEAMAN | I-18 U.S. NAVY | 4 | 1.0 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-19 UTILITIES | 4 | 3.3 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-21 N/A | 5 | 1.0 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-22 OTHER | 5 | 1.0 |
| O-49 RIGGER / STEVEDORE / SEAMAN | I-23 UNKNOWN | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-50 RUBBER / TIRE WORKER | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-50 RUBBER / TIRE WORKER | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-06 CHEMICAL | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-08 IRON / STEEL | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-09 LONGSHORE | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-10 MARITIME | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-14 RAILROAD | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-16 TEXTILE | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-17 TIRE / RUBBER | 3 | 3.3 |
| O-50 RUBBER / TIRE WORKER | I-18 U.S. NAVY | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-19 UTILITIES | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-50 RUBBER / TIRE WORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-50 RUBBER / TIRE WORKER | I-21 N/A | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-22 OTHER | 5 | 1.0 |
| O-50 RUBBER / TIRE WORKER | I-23 UNKNOWN | 5 | 1.0 |
| O-51 SANDBLASTER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-51 SANDBLASTER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-51 SANDBLASTER | I-03 AEROSPACE / AVIATION | 4 | 3.3 |
| O-51 SANDBLASTER | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-51 SANDBLASTER | I-05 AUTOMOTIVE | 4 | 3.3 |
| O-51 SANDBLASTER | I-06 CHEMICAL | 4 | 10.0 |
| O-51 SANDBLASTER | I-07 CONSTRUCTION TRADES | 4 | 10.0 |
| O-51 SANDBLASTER | I-08 IRON / STEEL | 4 | 10.0 |
| O-51 SANDBLASTER | I-09 LONGSHORE | 4 | 10.0 |
| O-51 SANDBLASTER | I-10 MARITIME | 4 | 10.0 |
| O-51 SANDBLASTER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 6.6 |
| O-51 SANDBLASTER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 6.6 |
| O-51 SANDBLASTER | I-13 PETROCHEMICAL | 4 | 10.0 |
| O-51 SANDBLASTER | I-14 RAILROAD | 4 | 6.6 |
| O-51 SANDBLASTER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 10.0 |
| O-51 SANDBLASTER | I-16 TEXTILE | 4 | 6.6 |
| O-51 SANDBLASTER | I-17 TIRE / RUBBER | 4 | 6.6 |
| O-51 SANDBLASTER | I-18 U.S. NAVY | 4 | 10.0 |
| O-51 SANDBLASTER | I-19 UTILITIES | 4 | 10.0 |
| O-51 SANDBLASTER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |
| O-51 SANDBLASTER | I-21 N/A | 5 | 1.0 |
| O-51 SANDBLASTER | I-22 OTHER | 5 | 1.0 |
| O-51 SANDBLASTER | I-23 UNKNOWN | 5 | 1.0 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-03 AEROSPACE / AVIATION | 4 | 3.3 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-04 ASBESTOS MINING | 4 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-05 AUTOMOTIVE | 4 | 3.3 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-06 CHEMICAL | 3 | 6.6 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-07 CONSTRUCTION TRADES | 3 | 10.0 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-08 IRON / STEEL | 3 | 6.6 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-09 LONGSHORE | 4 | 1.0 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-10 MARITIME | 3 | 6.6 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 6.6 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 3.3 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-13 PETROCHEMICAL | 4 | 6.6 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-14 RAILROAD | 4 | 3.3 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 6.6 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-16 TEXTILE | 4 | 3.3 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-17 TIRE / RUBBER | 4 | 3.3 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-18 U.S. NAVY | 3 | 10.0 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-19 UTILITIES | 3 | 6.6 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-21 N/A | 5 | 1.0 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-22 OTHER | 5 | 1.0 |
| O-52 SHEET METAL WORKER / SHEET METAL MECHANIC | I-23 UNKNOWN | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-06 CHEMICAL | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-07 CONSTRUCTION TRADES | 2 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-08 IRON / STEEL | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-09 LONGSHORE | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-10 MARITIME | 2 | 10.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 2 | 10.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-13 PETROCHEMICAL | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-14 RAILROAD | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 2 | 10.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-16 TEXTILE | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-18 U.S. NAVY | 2 | 10.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-19 UTILITIES | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-21 N/A | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-22 OTHER | 5 | 1.0 |
| O-53 SHIPFITTER / SHIPWRIGHT / SHIP BUILDER | I-23 UNKNOWN | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-06 CHEMICAL | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-07 CONSTRUCTION TRADES | 3 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-08 IRON / STEEL | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-09 LONGSHORE | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-10 MARITIME | 2 | 10.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-11 MILITARY (OTHER THAN U.S. NAVY) | 2 | 10.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-14 RAILROAD | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 10.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-16 TEXTILE | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-18 U.S. NAVY | 2 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-19 UTILITIES | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-21 N/A | 5 | 1.0 |
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-22 OTHER | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-54 SHIPYARD WORKER (MAINLAND REPAIR, MAINTENANCE) | I-23 UNKNOWN | 5 | 1.0 |
| O-55 STEAMFITTER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 4 | 6.6 |
| O-55 STEAMFITTER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-55 STEAMFITTER | I-03 AEROSPACE / AVIATION | 1 | 10.0 |
| O-55 STEAMFITTER | I-04 ASBESTOS MINING | 2 | 10.0 |
| O-55 STEAMFITTER | I-05 AUTOMOTIVE | 1 | 10.0 |
| O-55 STEAMFITTER | I-06 CHEMICAL | 1 | 10.0 |
| O-55 STEAMFITTER | I-07 CONSTRUCTION TRADES | 1 | 10.0 |
| O-55 STEAMFITTER | I-08 IRON / STEEL | 1 | 10.0 |
| O-55 STEAMFITTER | I-09 LONGSHORE | 2 | 10.0 |
| O-55 STEAMFITTER | I-10 MARITIME | 1 | 10.0 |
| O-55 STEAMFITTER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 1 | 10.0 |
| O-55 STEAMFITTER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 1 | 10.0 |
| O-55 STEAMFITTER | I-13 PETROCHEMICAL | 1 | 10.0 |
| O-55 STEAMFITTER | I-14 RAILROAD | 1 | 10.0 |
| O-55 STEAMFITTER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 1 | 10.0 |
| O-55 STEAMFITTER | I-16 TEXTILE | 1 | 10.0 |
| O-55 STEAMFITTER | I-17 TIRE / RUBBER | 1 | 10.0 |
| O-55 STEAMFITTER | I-18 U.S. NAVY | 1 | 10.0 |
| O-55 STEAMFITTER | I-19 UTILITIES | 1 | 10.0 |
| O-55 STEAMFITTER | I-20 ASBESTOS MANUFACTURE OR MILLING | 1 | 10.0 |
| O-55 STEAMFITTER | I-21 N/A | 5 | 1.0 |
| O-55 STEAMFITTER | I-22 OTHER | 5 | 1.0 |
| O-55 STEAMFITTER | I-23 UNKNOWN | 5 | 1.0 |
| O-56 STEELWORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-56 STEELWORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-56 STEELWORKER | I-03 AEROSPACE / AVIATION | 5 | 6.6 |
| O-56 STEELWORKER | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-56 STEELWORKER | I-05 AUTOMOTIVE | 5 | 6.6 |
| O-56 STEELWORKER | I-06 CHEMICAL | 5 | 6.6 |
| O-56 STEELWORKER | I-07 CONSTRUCTION TRADES | 3 | 6.6 |
| O-56 STEELWORKER | I-08 IRON / STEEL | 3 | 6.6 |
| O-56 STEELWORKER | I-09 LONGSHORE | 5 | 1.0 |
| O-56 STEELWORKER | I-10 MARITIME | 5 | 10.0 |
| O-56 STEELWORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-56 STEELWORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 6.6 |
| O-56 STEELWORKER | I-13 PETROCHEMICAL | 5 | 6.6 |
| O-56 STEELWORKER | I-14 RAILROAD | 5 | 6.6 |
| O-56 STEELWORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 10.0 |
| O-56 STEELWORKER | I-16 TEXTILE | 5 | 6.6 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-56 STEELWORKER | I-17 TIRE / RUBBER | 5 | 6.6 |
| O-56 STEELWORKER | I-18 U.S. NAVY | 5 | 1.0 |
| O-56 STEELWORKER | I-19 UTILITIES | 5 | 10.0 |
| O-56 STEELWORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-56 STEELWORKER | I-21 N/A | 5 | 1.0 |
| O-56 STEELWORKER | I-22 OTHER | 5 | 1.0 |
| O-56 STEELWORKER | I-23 UNKNOWN | 5 | 1.0 |
| O-57 WAREHOUSE WORKER | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-57 WAREHOUSE WORKER | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-57 WAREHOUSE WORKER | I-03 AEROSPACE / AVIATION | 4 | 3.3 |
| O-57 WAREHOUSE WORKER | I-04 ASBESTOS MINING | 4 | 10.0 |
| O-57 WAREHOUSE WORKER | I-05 AUTOMOTIVE | 4 | 3.3 |
| O-57 WAREHOUSE WORKER | I-06 CHEMICAL | 4 | 6.6 |
| O-57 WAREHOUSE WORKER | I-07 CONSTRUCTION TRADES | 4 | 6.6 |
| O-57 WAREHOUSE WORKER | I-08 IRON / STEEL | 4 | 6.6 |
| O-57 WAREHOUSE WORKER | I-09 LONGSHORE | 4 | 3.3 |
| O-57 WAREHOUSE WORKER | I-10 MARITIME | 4 | 6.6 |
| O-57 WAREHOUSE WORKER | I-11 MILITARY (OTHER THAN U.S. NAVY) | 4 | 6.6 |
| O-57 WAREHOUSE WORKER | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 4 | 3.3 |
| O-57 WAREHOUSE WORKER | I-13 PETROCHEMICAL | 4 | 6.6 |
| O-57 WAREHOUSE WORKER | I-14 RAILROAD | 4 | 3.3 |
| O-57 WAREHOUSE WORKER | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 4 | 6.6 |
| O-57 WAREHOUSE WORKER | I-16 TEXTILE | 4 | 3.3 |
| O-57 WAREHOUSE WORKER | I-17 TIRE / RUBBER | 4 | 3.3 |
| O-57 WAREHOUSE WORKER | I-18 U.S. NAVY | 4 | 6.6 |
| O-57 WAREHOUSE WORKER | I-19 UTILITIES | 4 | 6.6 |
| O-57 WAREHOUSE WORKER | I-20 ASBESTOS MANUFACTURE OR MILLING | 4 | 10.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-57 WAREHOUSE WORKER | I-21 N/A | 5 | 1.0 |
| O-57 WAREHOUSE WORKER | I-22 OTHER | 5 | 1.0 |
| O-57 WAREHOUSE WORKER | I-23 UNKNOWN | 5 | 1.0 |
| O-58 WELDER / BLACKSMITH | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-58 WELDER / BLACKSMITH | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-58 WELDER / BLACKSMITH | I-03 AEROSPACE / AVIATION | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-04 ASBESTOS MINING | 3 | 10.0 |
| O-58 WELDER / BLACKSMITH | I-05 AUTOMOTIVE | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-06 CHEMICAL | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-07 CONSTRUCTION TRADES | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-08 IRON / STEEL | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-09 LONGSHORE | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-10 MARITIME | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-11 MILITARY (OTHER THAN U.S. NAVY) | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-13 PETROCHEMICAL | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-14 RAILROAD | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-16 TEXTILE | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-17 TIRE / RUBBER | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-18 U.S. NAVY | 3 | 10.0 |
| O-58 WELDER / BLACKSMITH | I-19 UTILITIES | 3 | 6.6 |
| O-58 WELDER / BLACKSMITH | I-20 ASBESTOS MANUFACTURE OR MILLING | 3 | 10.0 |
| O-58 WELDER / BLACKSMITH | I-21 N/A | 5 | 1.0 |
| O-58 WELDER / BLACKSMITH | I-22 OTHER | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-58 WELDER / BLACKSMITH | I-23 UNKNOWN | 5 | 1.0 |
| O-59 N/A | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-59 N/A | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-59 N/A | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-59 N/A | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-59 N/A | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-59 N/A | I-06 CHEMICAL | 5 | 1.0 |
| O-59 N/A | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-59 N/A | I-08 IRON / STEEL | 5 | 1.0 |
| O-59 N/A | I-09 LONGSHORE | 5 | 1.0 |
| O-59 N/A | I-10 MARITIME | 5 | 1.0 |
| O-59 N/A | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-59 N/A | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-59 N/A | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-59 N/A | I-14 RAILROAD | 5 | 1.0 |
| O-59 N/A | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| O-59 N/A | I-16 TEXTILE | 5 | 1.0 |
| O-59 N/A | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-59 N/A | I-18 U.S. NAVY | 5 | 1.0 |
| O-59 N/A | I-19 UTILITIES | 5 | 1.0 |
| O-59 N/A | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-59 N/A | I-21 N/A | 5 | 1.0 |
| O-59 N/A | I-22 OTHER | 5 | 1.0 |
| O-59 N/A | I-23 UNKNOWN | 5 | 1.0 |
| O-60 N/A | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-60 N/A | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-60 N/A | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-60 N/A | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-60 N/A | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-60 N/A | I-06 CHEMICAL | 5 | 1.0 |
| O-60 N/A | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-60 N/A | I-08 IRON / STEEL | 5 | 1.0 |
| O-60 N/A | I-09 LONGSHORE | 5 | 1.0 |
| O-60 N/A | I-10 MARITIME | 5 | 1.0 |
| O-60 N/A | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-60 N/A | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-60 N/A | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-60 N/A | I-14 RAILROAD | 5 | 1.0 |
| O-60 N/A | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| O-60 N/A | I-16 TEXTILE | 5 | 1.0 |
| O-60 N/A | I-17 TIRE / RUBBER | 5 | 1.0 |

| Occupation | Industry | Contact Group | Alternative Exposure Intensity Factor |
|---|---|---|---|
| O-60 N/A | I-18 U.S. NAVY | 5 | 1.0 |
| O-60 N/A | I-19 UTILITIES | 5 | 1.0 |
| O-60 N/A | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-60 N/A | I-21 N/A | 5 | 1.0 |
| O-60 N/A | I-22 OTHER | 5 | 1.0 |
| O-60 N/A | I-23 UNKNOWN | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-01 RESIDENTIAL / DO-IT-YOURSELF (DIY) | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-02 ASBESTOS ABATEMENT / REMOVAL | 5 | 10.0 |
| O-61 OTHER (DESCRIBE) | I-03 AEROSPACE / AVIATION | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-04 ASBESTOS MINING | 5 | 10.0 |
| O-61 OTHER (DESCRIBE) | I-05 AUTOMOTIVE | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-06 CHEMICAL | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-07 CONSTRUCTION TRADES | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-08 IRON / STEEL | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-09 LONGSHORE | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-10 MARITIME | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-11 MILITARY (OTHER THAN U.S. NAVY) | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-12 NON-ASBESTOS PRODUCTS MANUFACTURING | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-13 PETROCHEMICAL | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-14 RAILROAD | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-15 SHIPYARD-CONSTRUCTION / REPAIR | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-16 TEXTILE | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-17 TIRE / RUBBER | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-18 U.S. NAVY | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-19 UTILITIES | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-20 ASBESTOS MANUFACTURE OR MILLING | 5 | 10.0 |
| O-61 OTHER (DESCRIBE) | I-21 N/A | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-22 OTHER | 5 | 1.0 |
| O-61 OTHER (DESCRIBE) | I-23 UNKNOWN | 5 | 1.0 |

**APPENDIX IV: AUTHORIZATION FOR SETTLEMENT FACILITY TO OBTAIN
TRUST RECORDS**

## AUTHORIZATION FOR RELEASE OF RECORDS OF BANKRUPTCY TRUSTS AND CLAIMS RESOLUTION FACILITIES

TO WHOM IT MAY CONCERN:

The Claimant named below hereby authorizes each Trust and Claim Resolution Facility listed in the attachment hereto to provide directly to the GST Settlement Facility ("Settlement Facility"), or any of its representatives, all submissions made by Claimant and (if different from the Claimant) the party whose injury forms the basis of the claim (the "Injured Party") to the Trust, including claim forms, any attachments to claim forms, and any amended or supplemental claim forms. Claimant expressly acknowledges that the Trust or Claim Resolution Facility may provide such documents directly to the Settlement Facility and need not obtain any further authorization from the Claimant or his/her representatives.

A copy of this Authorization shall be as valid as the original. This Authorization contains no expiration date and may be exercised by the Settlement Facility at any time. If Claimant's representative has signed this Authorization, a notarized power of attorney is attached.

Name of Claimant: _____

Social Security No.: _____

Date of Birth: _____

Name of Injured Party (if different from Claimant): _____

Social Security No.: _____

Date of Birth: _____

Name of representative for Claimant or Injured Party: _____

Signing party: _____

Signature: _____

Date: _____

Notarized:

Attachment: List of Trusts and Claim Resolution Facilities

## List of Trusts and Claim Resolution Facilities

| | | |
|---|---|---|
| A&I Corp. Asbestos Bodily Injury Trust | Forty-Eight Insulations Qualified Settlement Trust | Raytech Corp. Asbestos Personal Injury Settlement Trust |
| A-Best Asbestos Settlement Trust | Fuller-Austin Asbestos Settlement Trust | Rock Wool Mfg Company Asbestos Trust |
| AC&S Asbestos Settlement Trust | G-I Asbestos Settlement Trust | Rutland Fire Clay Company Asbestos Trust |
| Amatex Asbestos Disease Trust Fund | H.K. Porter Asbestos Trust | Shook & Fletcher Asbestos Settlement Trust |
| APG Asbestos Trust | Hercules Chemical Company, Inc. Asbestos Trust | Skinner Engine Co. Asbestos Trust |
| API, Inc. Asbestos Settlement Trust | J.T. Thorpe Settlement Trust | Stone and Webster Asbestos Trust |
| Armstrong World Industries Asbestos Personal Injury Settlement Trust | JT Thorpe Company Successor Trust | Swan Asbestos and Silica Settlement Trust |
| ARTRA 524(g) Asbestos Trust | Kaiser Asbestos Personal Injury Trust | T H Agriculture & Nutrition, LLC Industries Asbestos Personal Injury Trust |
| ASARCO LLC Asbestos Personal Injury Settlement Trust | Keene Creditors Trust | Thorpe Insulation Company Asbestos Personal Injury Settlement Trust |
| Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust | Lummus 524(g) Asbestos PI Trust | United States Gypsum Asbestos Personal Injury Settlement Trust |
| Bartells Asbestos Settlement Trust | Lykes Tort Claims Trust | United States Lines, Inc. and United States Lines (S.A.) Inc. Reorganization Trust |
| Brauer 524(g) Asbestos Trust | M.H. Detrick Company Asbestos Trust | United States Mineral Products Company Asbestos Personal Injury Settlement Trust |
| Burns and Roe Asbestos Personal Injury Settlement | Manville Personal Injury | UNR Asbestos-Disease |

| Trust | Settlement Trust | Claims Trust |
|---|---|---|
| C.E. Thurston & Sons Asbestos Trust | Muralo Trust | Utex Industries, Inc. Successor Trust |
| Celotex Asbestos Settlement Trust | NGC Bodily Injury Trust | Wallace & Gale Company Asbestos Settlement Trust |
| Combustion Engineering 524(g) Asbestos PI Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (OC Sub-Fund) | Western MacArthur-Western Asbestos Trust |
| Congoleum Plan Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (FB Sub-Fund) | W.R. Grace Trust |
| DII Industries, LLC Asbestos PI Trust | PLI Disbursement Trust | Pittsburgh Corning Trust |
| Eagle-Picher Industries Personal Injury Settlement Trust | Plibrico Asbestos Trust | |
| Federal Mogul U.S. Asbestos Personal Injury Trust | Porter Hayden Bodily Injury Trust | |

# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE: | Case No. 10-BK-31607 |
| GARLOCK SEALING TECHNOLOGIES LLC, et al., | Chapter 11 |
| Debtors.[1] | Jointly Administered |

## CASE MANAGEMENT ORDER FOR POST-CONFIRMATION ALLOWANCE OF DISPUTED GST ASBESTOS CLAIMS ELECTING LITIGATION OPTION

Upon Debtors' motion (the "CMO Motion") seeking entry of a case management order establishing protocols for post-confirmation allowance of disputed GST Asbestos Claims whose holders elect the Litigation Option,[2] and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of this proceeding and the CMO Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of the CMO Motion having been given; and it appearing that no other notice need be given; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.    The CMO Motion is granted.

2.    This Order shall be applicable to holders of GST Asbestos Claims who elect the Litigation Option under the terms of the Debtors' Second Amended Plan of Reorganization ("Litigation Option Claimants").  Under the Plan, GST Asbestos Claimants other than Settled GST Asbestos Claimants are entitled to elect the Litigation Option in lieu of electing the

---

[1] The Debtors in these jointly administered cases are Garlock Sealing Technologies LLC ("Garlock"), Garrison Litigation Management Group, Ltd., and The Anchor Packing Company (collectively, the "Debtors").
[2] Capitalized terms not defined herein shall have the same meaning as in the Debtors' Second Amended Plan of Reorganization (the "Plan").

1

Settlement Option and having their claims processed by the Settlement Facility.[3] Garrison

Litigation Management Group, Ltd. ("Garrison") will object to any Claims asserted by Litigation

Option Claimants and be responsible for prosecuting such objections, and the Settlement Facility

and Garrison will pay any Claims that are allowed through litigation (with payments for which

Garrison is responsible made from the Litigation Fund), pursuant to the terms of the Plan.[4]

   3.  This Court has jurisdiction over pretrial proceedings involving allowance of

Litigation Option Claims. The exercise of this jurisdiction is necessary and essential to the

implementation of the Second Amended Plan of Reorganization.

   4.  The last ten years of Garlock's participation in the tort system was infected by the

manipulation of exposure evidence by plaintiffs and their lawyers. This tactic, though not

uniform, had a profound impact on a number of Garlock's trials and many of its settlements.

Some plaintiffs and their lawyers withheld evidence of exposure to other asbestos products and

delayed filing claims against bankrupt defendants' asbestos trusts until after obtaining recoveries

from Garlock and other viable defendants. The withholding of exposure evidence by plaintiffs

and their lawyers was significant and had the effect of unfairly inflating the recoveries against

Garlock from 2000 through 2010.

   5.  One major purpose of this Order is to ensure that in any allowance litigation

involving GST Asbestos Claims, evidence will not be withheld and the fact finder will have

access to all relevant information about the Litigation Option Claimant's exposures to asbestos

and asbestos-containing products. Centralization of pretrial litigation will also enable uniform

procedures that will decrease litigation costs for both Litigation Option Claimants and Garrison.

---

[3] Pre-Petition Judgment GST Asbestos Claimants may elect the Litigation Option only if they elect to complete state court appellate proceedings and such proceedings result in reversal of the judgment but not judgment in favor of Reorganized GST (such as a remand for new trial).
[4] Under the Plan, the Settlement Facility's obligation for any Litigation Option Claim and associated Litigation Expenses is limited to the CRP Value (defined in the Plan).

6.      A Litigation Option Claimant shall commence allowance litigation by filing a proof of claim, using Official Form No. 10, on the docket of *In re Garlock Sealing Technologies LLC*, No. 10-31607 (Bankr. W.D.N.C.). Such filing must comply with any statutes of limitation and repose under applicable law. Debtors expressly reserved their right to object to GST Asbestos Claims, including post-confirmation, and have a standing objection to any such claims filed. Therefore, Garrison is deemed to object to the Claim and will prosecute such objection. Litigation Option Claimants who filed a proof of claim before the Confirmation Date shall commence allowance litigation by filing a Notice of Election of Litigation Option on the docket.

7.      Within 180 days after filing a Proof of Claim, the Litigation Option Claimant shall serve on Garrison:

   a.  A certification by the Litigation Option Claimant under penalty of perjury attesting that the Litigation Option Claimant has filed any and all claims against asbestos bankruptcy trusts ("Trust Claims") that are available to him or her;

   b.  A certification from the Litigation Option Claimant's attorney that (i) he has conducted a good faith investigation of all Trust Claims that may be available to the Litigation Option Claimant, (ii) to his knowledge all such claims have been filed, (iii) he has consulted with all other attorneys representing the Claimant in asbestos litigation or in making claims against trusts, and (iv) such other attorneys reported no additional Trust Claims available to the Litigation Option Claimant;

   c.  Answers to the interrogatories attached as **Exhibit A** to this Order;

   d.  Responses to the requests for production of documents attached as **Exhibit B** to this Order; and

3

e.  A signed copy of the release of information forms attached as **Exhibit C** to this

Order;

No Litigation Option Claim will be referred to the District Court for trial absent good faith

compliance with these requirements.

8.      Within 30 days after the Proof of Claim is filed, Garrison shall serve on the

Litigation Option Claimant those answers to the interrogatories attached as **Exhibit D** to this

Order and those responses to the requests for production of documents attached as **Exhibit E** to

this Order that do not depend on the Claimant's discovery responses, and within 30 days after the

Litigation Option Claimant serves the items described in paragraph 7, shall supplement those

answers and responses to include those that do depend on the Claimant's discovery responses.

9.      The Litigation Option Claimant and Garrison may serve additional interrogatories

or requests for production of documents with leave of Court.

10.      The Litigation Option Claimant must notify Garrison of any procedure that has

resulted in the collection of pathology or other diagnostic materials and provide advance notice

of any testing on pathology or diagnostic materials that will be done by the claimant or

claimant's experts.

11.      Any motions to compel answers to interrogatories or responses to requests for

production of documents shall be filed within 270 days after the Proof of Claim is filed. The

period for deposition discovery shall not commence until any such motions have been disposed

of.

12.      The number and manner of depositions shall be governed by Rules 7026 and 7030

absent Court order to the contrary. When deposition discovery commences, parties shall have

ninety days to conduct fact depositions.

4

13.     No later than 60 days after fact depositions have ended, Garrison and the Litigation Option Claimant shall serve expert reports required by Rule 7026. The parties will then have 60 days to conduct expert depositions.

14.     Any dispositive motions and motions under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) shall be filed no later than 60 days after the end of expert depositions. At that time, the Court shall refer the Litigation Option Claim to the District Court for disposition or trial. The District Court shall determine the venue of any such trial.

15.     Garrison may assert any privilege (including attorney-client, work product, and joint defense privileges) that Debtors could have asserted prior to the Petition Date, as well as any privilege that has arisen since that date.

16.     Nothing in this Order prejudices rights any party has under the Federal Rules of Civil and Bankruptcy Procedure and the applicable Rules of this Court and the District Court, except to the extent modified by this Order.

17.     This Court shall retain jurisdiction to hear and determine all matters arising from implementation of this Order.

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC,<br>et al.,<br><br>             Debtors.[1] | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered |

## MASTER SET OF INTERROGATORIES TO CLAIMANT

Pursuant to Rule 7033 of the Federal Rules of Bankruptcy Procedure, Garrison Litigation Management Group, Ltd. ("Garrison"), through counsel, requests that Claimant answer the following Interrogatories, in writing and under oath, in accordance with the Case Management Order for Post-Confirmation Allowance of Disputed GST Asbestos Claims Electing Litigation Option.

DEFINITIONS AND INSTRUCTIONS

1.      "*Asbestos*" means any of the naturally-occurring fibrous silicate minerals, including both serpentine forms (chrysotile) and amphibole forms (amosite, crocidolite, tremolite, anthophyllite, and actinolite), whether referred to by their scientific names or by synonyms such as brown (amosite), white (chrysotile) or blue (crocidolite) asbestos.

2.      "*Asbestos-containing product*" means any product or material that contains asbestos in any form. Such products include, but are not limited to, pipe covering, turbines, cement, block, gaskets, packing, plaster, joint compound, floor and ceiling tiles, mastics, raw fibers, fireproofing, shingles, panels, sheets, boards, millboard, refractory cement, boilers, firebrick, brake and clutch linings, finishing compound, texture, drilling mud, "hot tops," and other construction, building, drywall, lath, and insulation materials.

3.      "*Claim*" means the GST Asbestos Claim.

4.      "*Claimant*" or "*you*" means the GST Asbestos Claimant electing the Litigation Option, as well as all other claimants asserting a GST Asbestos Claim on the basis of the same asbestos-related injury, such as claimants alleging wrongful death or loss of consortium.

5.      "*Describe*" means to provide a comprehensive, full, frank, fair, complete, accurate, and detailed description of the matter inquired of.

6.      "*Document*" refers to all items subject to discovery under Rule 34 of the Federal Rules of Civil Procedure, including, but not limited to, any written or recorded material of any

---

[1] The Debtors in these jointly administered cases are Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company (collectively, the "Debtors").

1

kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise; notations of any sort of conversations, telephone calls, meetings or other communications; all graphic or oral records or representations of any kind; and electronic, mechanical, magnetic, optical or electric records or representations of any kind (including without limitation, computer files and programs, tapes, cassettes, discs, recordings), including metadata.

7.    "*Household Exposure*" means exposure to asbestos dust or fibers in a non-occupational setting as a result of exposure to the person or personal articles of a worker who was occupationally exposed to asbestos dust or fibers.

8.    "*Identify*" means:

    (a)    In the case of a person, to state his or her full name, present or last-known home and business address, and his or her present or last-known employer and job title.

    (b)    In the case of a business concern, to state its name and its present or last-known address, and the nature of such business concern (*e.g.*, partnership, corporation, etc.).

    (c)    In the case of a document, to state its date, its author, its recipient or the person for whom it was prepared, the type of document (*e.g.*, letter, memorandum, chart, or other category), its present location or custodian, a summary of its contents, and any other information necessary to render the document distinguishable from all others and subject to ready location.  In lieu of identifying a document, a copy of the document may be supplied.

    (d)    In the case of a communication or act, to identify the person(s) present when the communication or act occurred, the date and location of such communication or act, the substance of such communication or act, and all documents which record, refer to, or otherwise concern such communication or act.

    (e)    In the case of a product, to identify the name and type of product, its identifying features and characteristics, the name of the manufacturer, and the date of manufacture.

9.    "*Injured Party*" means the person whose alleged asbestos-related injury forms the basis of the Claim.

10.    "*Trust*" means an entity established under the Bankruptcy Code (including under section 524(g)) to pay asbestos personal injury claims.

11.    If an interrogatory or definition or instruction is objected to in whole or in part, specify all grounds on which objection rests. Respond to all portions of each such request to which no objection is asserted. In addition, state whether any responsive information has been

omitted from an interrogatory response or whether and in what way the search for responsive information has been delimited or circumscribed on the basis of any such objection.

12.     If Claimant contends that an answer to any interrogatory herein is privileged in whole or in part, or otherwise objects to any part of any interrogatory, identify:

      (a)     the reason(s) for each objection, claim of privilege or immunity, or ground for exclusion;

      (b)     each person having knowledge of the factual basis, if any, on which the claim of privilege or immunity or other ground is based; and

      (c)     in the case of a document, identify the document as defined in paragraphs 3(c) and (d) of the instructions to these interrogatories.

13.     These interrogatories are continuing in character and require you to file supplementary answers if you obtain further or different information after serving your initial answers and before trial, including in such supplemental answers the date upon and the manner in which such further or different information came to your attention.

14.     You are required to furnish factual information in the possession of any of your lawyers in response to these interrogatories.

15.     If the Injured Party is alleging Household Exposure, in response to any interrogatories requesting information about the Injured Party's exposure to asbestos or asbestos-containing products, please answer with respect to the worker from which the Injured Party received Household Exposure.

## INTERROGATORIES

1.     Provide the following information for the Injured Party:

      (a)     full name;

      (b)     address of current residence;

      (c)     social security number(s);

      (d)     date of birth;

      (e)     name of spouse;

      (f)     spouse's residential address, if different from Injured Party's;

      (g)     date of death (if applicable); and

      (h)     cause of death (if applicable).

ANSWER:

2.       If the Claimant is different from the Injured Party, provide the following information:

     (a)       full name;

     (b)       address of current residence;

     (c)       social security number(s);

     (d)       date of birth; and

     (e)       relationship to Injured Party.

<u>ANSWER:</u>

3.       Identify all law firms that represent or have represented the Claimant or Injured Party in any litigation involving an asbestos-related condition or with respect to any claims against Trusts, and provide the following information:

     (a)       name of firm;

     (b)       firm mailing or street address;

     (c)       firm phone number;

     (d)       name of firm contact; and

     (e)       phone number and email address of firm contact.

<u>ANSWER:</u>

4.       For all wrongful death or survival claims,

     (a)       state the date and place of death;

     (b)       state whether the Injured Party had a Last Will and Testament and whether any administration has been had on the Injured Party's estate;

4

(c)      if any administration of the estate or probate proceedings were initiated, state the name of the executor or administrator of the estate, the date the executor or administrator first qualified, and the title and location of each court that has granted letters, orders, or other authority to the executor or administrator;

(d)      the name, age, and address of each child and each heir of the Injured Party;

(e)      state whether an autopsy was performed on the Injured Party and if so, identify the person who performed the autopsy and the facility where the autopsy was performed or provide a copy of the autopsy; and

(f)      state the cause of death.

ANSWER:

5.      State the present name, age, date of birth, and current address of any person, including children, who is in any way financially dependent upon the Injured Party for support, including, but not limited to, parents, in-laws, relatives, or other people; for each such person, including children, state the extent to which such person is dependent upon the Injured Party for financial support or maintenance.

ANSWER:

6.      State the Injured Party's income and the source(s) of the Injured Party's income for each year of the last five years. If the Injured Party's spouse is employed or has been employed, state his or her income for each year of the last five years.

ANSWER:

7.      If the Claimant is making a claim for lost wages or lost earning capacity, either past or future, as a result of alleged exposure to asbestos-containing products, identify the factual basis for such a claim and the monetary amount claimed to have been lost in the past or that will be lost in the future.

ANSWER:

5

8.      Describe the amount and any method of calculating claimed economic damages.

<u>ANSWER:</u>

9.      State the following with respect to the Injured Party:

(a)      the asbestos-related injury or injuries claimed;

(b)      the first date of diagnosis of each of the Injured Party's asbestos-related condition(s); and

(c)      name and address of the physician/health care provider(s) who rendered the diagnosis or diagnoses.

<u>ANSWER:</u>

10.      Identify all doctors, hospitals, and other health care providers or facilities that have treated the Injured Party for any heart, lung, chest-related injury, or cancer and all doctors, hospitals, and other health care providers or facilities where the Injured Party has been treated at any time during the preceding ten (10) years, to include:

(a)      the approximate dates of the treatment;

(b)      the names and current addresses of the doctors, hospitals or other healthcare providers; and

(c)      the reasons for the treatment and diagnosis.

The Claimant may refer Garrison to medical records if such records contain the same information requested above.

<u>ANSWER:</u>

6

11.     State the Injured Party's tobacco use history, including quantity, product used, and when the Injured Party started and stopped.

ANSWER:

12.     Please list all medical expenses, if any, incurred as a result of the Injured Party's alleged exposure to asbestos-containing products and the approximate date such expenses were incurred. "Medical expenses" includes, but is not limited to, all charges for care, treatment or diagnosis by a physician, nurse, or other health care specialist; all hospital costs, charges, and expenses; and all medication expenses. The Claimant may alternatively provide access to medical bills identifying all medical expenses.

ANSWER:

13. Describe the Injured Party's employment history, including the following:

>       (a)     the name and address of each employer for whom the Injured Party worked;

>       (b)     the dates when the Injured Party worked for each employer;

>       (c)     the location and name of each jobsite where the Injured Party was employed;

>       (d)     the starting and ending dates of the Injured Party's work at the site;

>       (e)     the Injured Party's occupation at each jobsite; and

>       (f)     the industry in which the Injured Party worked at each jobsite.

If the Injured Party alleges Household Exposure, please answer with respect to the occupationally exposed person's job or occupation.

ANSWER:

14.     Describe the Injured Party's occupational exposure to asbestos or asbestos-containing products, including the following:

7

(a)      the name of each jobsite where the Injured Party was exposed to asbestos;

(b)      each type of asbestos-containing product with which the Injured Party had contact at the jobsite or from which the Injured Party received asbestos exposure (i.e., pipe covering, block insulation, blankets, felt, raw asbestos, fireproofing, etc.);

(c)      the manufacturer, supplier, distributor, and brand name of each asbestos-containing product identified in subpart (b);

(d)      for each product identified in subparts (b) and (c), whether the Injured Party worked directly with the product or was exposed as a bystander;

(e)      for each product identified in subparts (b) and (c), a list of the tasks during which the Injured Party was exposed to asbestos from the product (i.e., installing, mixing, sanding, cutting, pouring, etc.);

(f)      how frequently (in terms of times per day and days per year) the Injured Party performed each task identified in subpart (e);

(g)      if a product identified in subparts (b) and (c) is asbestos-containing gaskets or packing, state the number of asbestos-containing gaskets or packing the Injured Party cut or removed during a typical year when that activity was performed.

ANSWER:

15.      Describe the Injured Party's union membership, if any, at any point during his or her working life, and the dates of membership.

ANSWER:

16.      Describe any non-occupational exposure to asbestos that the Injured Party experienced, including the following:

(a)      the location of any asbestos exposure experienced by the Injured Party outside an occupational setting;

(b)      the dates of any such exposure;

8

(c)      each type of asbestos-containing product with which the Injured Party had contact or to which the Injured Party was exposed outside an occupational setting;

(d)      the manufacturer, supplier, distributor, and brand name of each asbestos-containing product identified in subpart (c);

(e)      for each product identified in subparts (c) and (d), whether the Injured Party worked directly with the product or was exposed as a bystander;

(f)      for each product identified in subparts (c) and (d), a list of the tasks during which the Injured Party was exposed to asbestos from the product (i.e., installing, mixing, sanding, cutting, pouring, etc.); and

(g)      how frequently (in terms of times per day and days per year) the Injured Party performed each task identified in subpart (f).

ANSWER:

17.      Identify whether the Injured Party ever worked with or around asbestos-containing materials that were manufactured, sold, produced, prepared, or distributed by any of the following entities or any companies related to these entities, or for which any such entity is otherwise responsible:

| ABB Lummus Global, Inc. | GIT / Harbison-Walker / A.P. Green | Raymark Corp. / Raytech Corp. |
|---|---|---|
| A-Best Products | Harnischfeger Corp. | Rock Wool Manufacturing |
| ACandS, Inc. | Hercules Chemical Co. | Rutland Fire Clay Co. |
| Amatex Corp. | Hillsborough Holdings | Shook & Fletcher Insulation Co. |
| American Shipbuilding Co. | H.K. Porter Co. | Skinner Engine Co. |
| A.P.I., Inc. | Insul Co. | Special Electric Co. |
| Armstrong World Industries | Johns-Manville Corp. | Special Metals Corp. |
| Artra Group, Inc. | J.T. Thorpe Co. | Specialty Products Holding Corp. / Bondex International |

| ASARCO, LLC | J.T. Thorpe, Inc. | Standard Insulations, Inc. |
|---|---|---|
| Asbestos Claims Management Corp. | Kaiser Aluminum Corp. | State Insulation Corp. |
| Babcock & Wilcox Co. | Keene Corp. | Swan Transportation Co. |
| Brauer Supply Co. | Kentile Floors, Inc. | T H Agriculture & Nutrition, LLC |
| Burns & Roe | Leslie Controls, Inc. | Thorpe Insulation Co. |
| Carey Canada, Inc. | Lloyd E. Mitchell Co. | Triple A Machine Shop, Inc. |
| Celotex Corp. | Lykes Bros. Steamship Co. | United Gilsonite Laboratories |
| C.E. Thurston | M.H. Detrick | United States Lines |
| Chicago Fire Brick | Mid-Valley, Inc. / Halliburton / DII Industries | United States Mineral Products |
| Christy Refractories Co. LLC | The Muralo Co. | UNR Industries, Inc. |
| Combustion Engineering | Murphy Marine Services, Inc. | USG Corp. |
| Congoleum Corp. | National Gypsum Co. / Ancor Holdings Inc. | Utex Industries |
| C.P. Hall Company | National Service Industries | Wallace & Gale |
| Dana Corp. | North American Refractories Corp. (NARCO) | Waterman Steamship Corp. |
| Delaware Insulations Distributors | Nicolet, Inc. | Western Macarthur / Western Asbestos |
| Durabla Manufacturing Co. | Oglebay Norton Co. | W.R. Grace Co. |
| Eagle-Picher Industries | Owens Corning / Fibreboard | |
| E.J. Bartells Co., Inc. | Philadelphia Asbestos Corp. (Pacor, Inc.) | |
| Federal-Mogul | Pittsburgh Corning Corp. | |
| Flintkote Co. | Plant Insulation Co. | |

| | | |
|---|---|---|
| Forty-Eight Insulations | Plibrico Co. | |
| Fuller-Austin Insulation Co. | Porter-Hayden Co. | |
| Gatke Corp. | Prudential Lines, Inc. | |
| General Motors Corp. | Pulmosan Safety Equip. Corp. | |
| G-I Holdings (GAF) | Quigley Co. | |

ANSWER:

18.     If the Injured Party has ever served in any capacity in the military service, state:

(a)     the dates, rank, service number, and branch of service;

(b)     MOS (Military Occupational Specialty) or equivalent;

(c)     each location where the Injured Party was stationed;

(d)     the Injured Party's duties at each location;

(e)     date and type of discharge from each tour of duty or enlistment; and

(f)     type of disability and pension the Injured Party has received or is receiving, if any.

If military service included service upon vessels, provide ship names and dates of service on each vessel.

ANSWER:

19.     During the time when the Injured Party was exposed to asbestos, if the Injured Party was ever warned or given any information about hazards or potential hazards relating to asbestos by an employer for whom the Injured Party worked, a union of which the Injured Party was a member, or any other person or entity, please state the following:

(a)    each date that the Injured Party was provided with a warning or other information;

(b)    the person who provided such warning;

(c)    whether the warning or other information was in writing;

(d)    the content of the warning or other information; and

(e)    what action the Injured Party took or refrained from taking as a result of the warning or other information.

ANSWER:

20.    Identify any lawsuit filed or claim (including claims made through workers compensation or with the Veteran's Administration) made in any jurisdiction in which the Claimant or Injured Party claimed a personal injury affecting his/her lungs or pleura (including, but not limited to, any asbestos-related, silica-related, mixed-dust related or welding-fume related condition) including:

(a)    the identity of each entity against whom any such lawsuit was filed or against whom any claim was made;

(b)    the full style, including name, cause number and court, in which the lawsuit, if any, was filed, and identifying information such as claim number and dates of claim(s) for any claims made;

(c)    counsel, if any, that represented the Injured Party or Claimant in any such lawsuit(s) or claim(s);

(d)    the current status and result of any such lawsuit(s) or claim(s); and

(e)    the amount, if any, received in resolution or settlement of any such lawsuit(s) or claim(s) and from whom received.

ANSWER:

21.    Identify any claim or settlement made or anticipated to be made with any Trust, including:

(a)      the full identity of the entity against whom such claim was or will be made; and

(b)      the date such claim was made and current status (i.e., claim made and pending, claim approved, claim paid).

The Trusts with respect to which the Claimant should answer include, but are not limited to, the following:

| | | |
|---|---|---|
| A&I Corp. Asbestos Bodily Injury Trust | Forty-Eight Insulations Qualified Settlement Trust | Raytech Corp. Asbestos Personal Injury Settlement Trust |
| A-Best Asbestos Settlement Trust | Fuller-Austin Asbestos Settlement Trust | Rock Wool Mfg Company Asbestos Trust |
| AC&S Asbestos Settlement Trust | G-I Asbestos Settlement Trust | Rutland Fire Clay Company Asbestos Trust |
| Amatex Asbestos Disease Trust Fund | H.K. Porter Asbestos Trust | Shook & Fletcher Asbestos Settlement Trust |
| APG Asbestos Trust | Hercules Chemical Company, Inc. Asbestos Trust | Skinner Engine Co. Asbestos Trust |
| API, Inc. Asbestos Settlement Trust | J.T. Thorpe Settlement Trust | Stone and Webster Asbestos Trust |
| Armstrong World Industries Asbestos Personal Injury Settlement Trust | JT Thorpe Company Successor Trust | Swan Asbestos and Silica Settlement Trust |
| ARTRA 524(g) Asbestos Trust | Kaiser Asbestos Personal Injury Trust | T H Agriculture & Nutrition, LLC Industries Asbestos Personal Injury Trust |
| ASARCO LLC Asbestos Personal Injury Settlement Trust | Keene Creditors Trust | Thorpe Insulation Company Asbestos Personal Injury Settlement Trust |
| Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust | Lummus 524(g) Asbestos PI Trust | United States Gypsum Asbestos Personal Injury Settlement Trust |
| Bartells Asbestos Settlement Trust | Lykes Tort Claims Trust | United States Lines, Inc. and United States Lines (S.A.) Inc. Reorganization Trust |

| | | |
|---|---|---|
| Brauer 524(g) Asbestos Trust | M.H. Detrick Company Asbestos Trust | United States Mineral Products Company Asbestos Personal Injury Settlement Trust |
| Burns and Roe Asbestos Personal Injury Settlement Trust | Manville Personal Injury Settlement Trust | UNR Asbestos-Disease Claims Trust |
| C.E. Thurston & Sons Asbestos Trust | Muralo Trust | Utex Industries, Inc. Successor Trust |
| Celotex Asbestos Settlement Trust | NGC Bodily Injury Trust | Wallace & Gale Company Asbestos Settlement Trust |
| Combustion Engineering 524(g) Asbestos PI Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (OC Sub-Fund) | Western MacArthur-Western Asbestos Trust |
| Congoleum Plan Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (FB Sub-Fund) | W.R. Grace Trust |
| DII Industries, LLC Asbestos PI Trust | PLI Disbursement Trust | Pittsburgh Corning Trust |
| Eagle-Picher Industries Personal Injury Settlement Trust | Plibrico Asbestos Trust | |
| Federal Mogul U.S. Asbestos Personal Injury Trust | Porter Hayden Bodily Injury Trust | |

ANSWER:

22.    If the Claimant or Injured Party has entered into any settlement agreement with respect to the asbestos-related injury, or if a defendant, Trust, or any third party has agreed to make payment to the claimant/decedent for his/her asbestos-related condition, please state:

(a)    the full name of the party or person with whom the Claimant or Injured Party entered into an agreement;

14

(b)      the date of the agreement; and

(c)      the amount of money each person or party has paid or agreed to pay.

<u>ANSWER:</u>

23.      Identify each person Claimant may call as a fact witness at the trial of this matter or upon whose sworn statement or testimony Claimant may rely at trial; fully identify any claim or lawsuit where such witness asserted or claimed his/her own asbestos-related illness or condition; and list all prior depositions of the witness, whether as a plaintiff or witness, in any case alleging asbestos exposure.

<u>ANSWER:</u>

24.      Identify each person Claimant may call as an expert witness at the trial of this matter, and with respect to each such person identify:

(a)      the subject matter about which the expert is expected to testify;

(b)      the substance of the facts and opinions about which the expert is expected to testify;

(c)      the grounds for each opinion about which the expert is expected to testify; and

(d)      all documents provided to the expert in connection with this matter.

<u>ANSWER:</u>

25.      Identify any other persons having knowledge of facts relating to the subject matter of this action and, as to each such person, set forth a summary of the important facts known or observed by such person and state whether any written or recorded statement was taken from such person concerning any of the subject matter of this action.

<u>ANSWER:</u>

15

16

# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE: | Case No. 10-BK-31607 |
| GARLOCK SEALING TECHNOLOGIES LLC, et al., | Chapter 11 |
| Debtors.[1] | Jointly Administered |

## MASTER SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO CLAIMANT

Pursuant to Rule 7034 of the Federal Rules of Bankruptcy Procedure, Garrison Litigation Management Group, Ltd. ("Garrison"), through counsel, requests that claimant respond to the following requests for production of documents in accordance with the Case Management Order for Post-Confirmation Allowance of Disputed GST Asbestos Claims Electing Litigation Option.

DEFINITIONS AND INSTRUCTIONS

1.      "*Asbestos*" means any of the naturally-occurring fibrous silicate minerals, including both serpentine forms (chrysotile) and amphibole forms (amosite, crocidolite, tremolite, anthophyllite, and actinolite), whether referred to by their scientific names or by synonyms such as brown (amosite), white (chrysotile) or blue (crocidolite) asbestos.

2.      "*Asbestos-containing product*" means any product or material that contains asbestos in any form. Such products include, but are not limited to, pipe covering, turbines, cement, block, gaskets, packing, plaster, joint compound, floor and ceiling tiles, mastics, raw fibers, fireproofing, shingles, panels, sheets, boards, millboard, refractory cement, boilers, firebrick, brake and clutch linings, finishing compound, texture, drilling mud, "hot tops," and other construction, building, drywall, lath, and insulation materials.

3.      "*Claim*" means the GST Asbestos Claim.

4.      "*Claimant*" or "*you*" means the GST Asbestos Claimant electing the Litigation Option, as well as all other claimants asserting a GST Asbestos Claim on the basis of the same asbestos-related injury, such as claimants alleging wrongful death or loss of consortium.

5.      "*Document*" refers to all items subject to discovery under Rule 34 of the Federal Rules of Civil Procedure, including, but not limited to, any written or recorded material of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise; notations of any sort of conversations, telephone calls, meetings or other communications; all graphic or oral records or representations

---

[1] The Debtors in these jointly administered cases are Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company (collectively, the "Debtors").

1

of any kind; and electronic, mechanical, magnetic, optical or electric records or representations of any kind (including without limitation, computer files and programs, tapes, cassettes, discs, recordings), including metadata.

6.     "*Household Exposure*" means exposure to asbestos dust or fibers in a non-occupational setting as a result of exposure to the person or personal articles of a worker who was occupationally exposed to asbestos dust or fibers.

7.     "*Identify*" means:

   (a)     In the case of a person, to state his or her full name, present or last-known home and business address, and his or her present or last-known employer and job title.

   (b)     In the case of a business concern, to state its name and its present or last-known address, and the nature of such business concern (*e.g.*, partnership, corporation, etc.).

   (c)     In the case of a document, to state its date, its author, its recipient or the person for whom it was prepared, the type of document (*e.g.*, letter, memorandum, chart, or other category), its present location or custodian, a summary of its contents, and any other information necessary to render the document distinguishable from all others and subject to ready location.  In lieu of identifying a document, a copy of the document may be supplied.

   (d)     In the case of a communication or act, to identify the person(s) present when the communication or act occurred, the date and location of such communication or act, the substance of such communication or act, and all documents which record, refer to, or otherwise concern such communication or act.

   (e)     In the case of a product, the name and type of product, its identifying features and characteristics, the name of the manufacturer, and the date of manufacture.

8.     "*Injured Party*" means the person whose alleged asbestos-related injury forms the basis of the Claim.

9.     "*Trust*" means an entity established under the Bankruptcy Code (including under section 524(g)) to pay asbestos personal injury claims.

10.     If a document request or definition or instruction is objected to in whole or in part, specify all grounds on which objection rests. Respond to all portions of each such request to which no objection is asserted.

11.     If Claimant contends that any documents requested are privileged in whole or in part, or otherwise objects to any part of any document request, identify:

2

(a)      the reason(s) for each objection, claim of privilege or immunity, or ground for exclusion;

(b)      each person having knowledge of the factual basis, if any, on which the claim of privilege or immunity or other ground is based; and

(c)      identify the document.

12.      If the Injured Party is alleging Household Exposure, in response to any requests for documents relating to the Injured Party's exposure to asbestos or asbestos-containing products, please respond with respect to the worker from which the Injured Party received Household Exposure.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      Detailed Social Security earnings records for the Injured Party, as supplied by the Social Security Administration.

RESPONSE:

2.      All medical records and diagnosing letters or reports, relating to the asbestos-related condition that forms the basis for the Claim, regardless of when received, and medical records relating to any prior medical treatment received by the Injured Party during the past five years.

RESPONSE:

3.      Any original biological samples, tissue, paraffin blocks, slides, electron micrographs, and chest x-rays from examining and/or treating physicians, hospitals, clinics, or other health care providers.

RESPONSE:

4.      With respect to any Injured Party asserting a claim of cancer or other malignancy, if no pathological materials are readily available from medical providers, an agreement stating that any pathological materials may be obtained for independent evaluation at the election of Garrison.

3

RESPONSE:

     5.      Payroll and employment records relating to the Injured Party's employment identified in the Claimant's Answers to Interrogatories, including military service records.

RESPONSE:

     6.      The Injured Party's income tax returns for the preceding five (5) years.

RESPONSE:

     7.      Veteran's Administration records and all military and ship service records relating to the Injured Party.

RESPONSE:

     8.      Any reports or letters from any physician, medical provider, or any expert concerning the Injured Party or his medical condition.

RESPONSE:

     9.      All documents, including, but not limited to, sales receipts, product lists, contracts, naval records, specifications, product labels, invoices, purchase orders, work orders, receipts, catalogues, photographs, videotapes, product packaging, and brochures that evidence the Injured Party's exposure to asbestos or relate to the products, work, or work sites described in the Answers to Interrogatories.

RESPONSE:

10.    If the Injured Party has died, provide:

(a)    the death certificate(s);

(b)    the report of autopsy (including private autopsy), if any, and autopsy photos;

(c)    letters testamentary; and

(d)    application and court orders from each jurisdiction where a representative has requested appointment, and documents showing the appointment of a representative of the estate.

<u>RESPONSE:</u>

11.    A copy of the current resume and bibliography of each expert identified in the Answers to Interrogatories.

<u>RESPONSE:</u>

12.    All documents that have been provided to, reviewed by, or prepared by or for an expert identified in the Answers to Interrogatories.

<u>RESPONSE:</u>

13.    All statements, invoices, and other billing records that evidence or relate to any fees and expenses charged by any expert identified in the Answers to Interrogatories for time spent, or services rendered, in support of this Claim.

<u>RESPONSE:</u>

14.     A copy of the expert report rendered by any expert identified in the Answers to Interrogatories.

<u>RESPONSE:</u>

15.     A copy of any written statements or recorded statements, witness statements, and affidavits given or made by the Injured Party or Claimant relating to asbestos exposure or asbestos-related injury or disease, including those made in any lawsuit, regardless of whether the Injured Party or Claimant was a party.

<u>RESPONSE:</u>

16.     Copies of any photographs, videotapes, or films depicting any of the sites at which the Injured Party was exposed to asbestos or asbestos-containing products.

<u>RESPONSE:</u>

17.     All documents that the Claimant may seek to introduce into evidence at trial.

<u>RESPONSE:</u>

18.     All documents that support the contention that the Injured Party lost wages or incurred lost earning capacity as a result of the alleged asbestos-related injury.

<u>RESPONSE:</u>

19.      All documents containing, depicting, describing, evidencing, or relating to any warnings, cautions, protections, instructions, rules, procedures, or guidelines relating to asbestos or dust and provided to the Injured Party during his or her working career by any employer, union, general contractor, premises owner or occupier, or other person or entity.

<u>RESPONSE:</u>

20.      Copies of all petitions, complaints, and other pleadings (including all amended and supplemental petitions, complaints, and pleadings) and all interrogatory and other discovery responses (including all amended and supplemented responses) served or filed, or authorized to be served or filed, by the Claimant or Injured Party or on their behalf in any court or administrative agency, in any lawsuit or proceeding in which he/she alleges that the Injured Party suffered from any exposure to asbestos or any other occupational dust, gases, or chemicals.

<u>RESPONSE:</u>

21.      All transcripts and videotapes of any prior deposition, trial, or other sworn testimony in any lawsuit, proceeding, or claim involving or relating to asbestos, given by the Claimant or Injured Party or any person identified by them in this lawsuit as being a person with knowledge of relevant facts.

<u>RESPONSE:</u>

22.      All documents that describe, depict, or reference any dust mask, respirator, or other respiratory protection product ever used by the Injured Party, including any dust mask, respirator, or other respiratory protection in the Injured Party's possession.

<u>RESPONSE:</u>

23.      All documents evidencing, reflecting, showing results of, or otherwise relating to any air monitoring, sampling, or testing for the presence or level of asbestos fibers or dust in general on any premises on which the Injured Party was exposed to asbestos.

RESPONSE:

 

 

 

24.      All claim forms submitted by the Claimant or Injured Party or on their behalf to any Trust, including any attachments to such forms and any new or amended versions of such submissions.

RESPONSE:

 

 

 

25.      All other documents submitted to or served upon any Trust containing any information regarding the Injured Party's contact with or exposure to asbestos or asbestos-containing products.

RESPONSE:

 

 

 

26.      All ballots submitted by the Injured Party or Claimant or on their behalf in any bankruptcy case on the basis of an alleged asbestos-related personal injury claim.

RESPONSE:

 

 

 

27.      All documents constituting, reflecting, memorializing, evidencing, or relating to settlement agreements, contracts, deals, or any other type of agreement or understanding (whether or not reduced to final form and whether or not fully performed, paid, or satisfied) which the Claimant or Injured Party has entered into, or agreed to enter into, with any person or company or other entity, to compromise, settle, release, or otherwise resolve any claim or potential claim (including any lawsuit, other legal proceeding, worker's compensation claim, or other claim) relating to any asbestos-related injury.

RESPONSE:

# EXHIBIT C

OMB Number: 2900-0260
Estimated Burden: 2 minutes

| **VA** Department of Veterans Affairs | **REQUEST FOR AND AUTHORIZATION TO RELEASE MEDICAL RECORDS OR HEALTH INFORMATION** |

Privacy Act and Paperwork Reduction Act Information: The execution of this form does not authorize the release of information other than that specifically described below. The information requested on this form is solicited under Title 38, U.S.C. The form authorizes release of information in accordance with the Health Insurance Portability and Accountability Act, 45 CFR Parts 160 and 164, 5 U.S.C. 552a, and 38 U.S.C. 5701 and 7332 that you specify. Your disclosure of the information requested on this form is voluntary. However, if the information including Social Security Number (SSN) (the SSN will be used to locate records for release) is not furnished completely and accurately, Department of Veterans Affairs will be unable to comply with the request. The Veterans Health Administration may not condition treatment, payment, enrollment or eligibility on signing the authorization. VA may disclose the information that you put on the form as permitted by law. VA may make a "routine use" disclosure of the information as outlined in the Privacy Act systems of records notices identified as 24VA10P2 "Patient Medical Record - VA" and in accordance with the VHA Notice of Privacy Practices. You do not have to provide the information to VA, but if you don't, VA will be unable to process your request and serve your medical needs. Failure to furnish the information will not have any affect on any other benefits to which you may be entitled. If you provide VA your Social Security Number, VA will use it to administer your VA benefits. VA may also use this information to identify veterans and persons claiming or receiving VA benefits and their records, and for other purposes authorized or required by law. The Paperwork Reduction Act of 1995 requires us to notify you that this information collection is in accordance with the clearance requirements of section 3507 of the Paperwork Reduction Act of 1995. We may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a valid OMB number. We anticipate that the time expended by all individuals who must complete this form will average 2 minutes. This includes the time it will take to read instructions, gather the necessary facts and fill out the form.

**ENTER BELOW THE PATIENT'S NAME AND SOCIAL SECURITY NUMBER IF THE PATIENT DATA CARD IMPRINT IS NOT USED.**

TO: DEPARTMENT OF VETERANS AFFAIRS (Print or type name and address of health care facility)

Veterans Health Administration

PATIENT NAME (Last, First, Middle Initial)

SOCIAL SECURITY NUMBER

NAME AND ADDRESS OF ORGANIZATION, INDIVIDUAL OR TITLE OF INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED

Social Security Administration (SSA)

**VETERAN'S REQUEST:** I request and authorize Department of Veterans Affairs to release the information specified below to the organization, or individual named on this request. I understand that the information to be released includes information regarding the following condition(s):

[X] DRUG ABUSE   [X] ALCOHOLISM OR ALCOHOL ABUSE   [X] TESTING FOR OR INFECTION WITH HUMAN IMMUNODEFICIENCY VIRUS (HIV)   [X] SICKLE CELL ANEMIA

INFORMATION REQUESTED (Check applicable box(es) and state the extent or nature of the information to be disclosed, giving the dates or approximate dates covered by each)

[ ] COPY OF HOSPITAL SUMMARY   [ ] COPY OF OUTPATIENT TREATMENT NOTE(S)   [X] OTHER *(Specify)*

Pertinent health information from electronic health record including information created within 24 months after the signature date of this authorization.

PURPOSE(S) OR NEED FOR WHICH THE INFORMATION IS TO BE USED BY INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED

To obtain information through the eHealth Exchange for disability determination.

**NOTE: ADDITIONAL ITEMS OF INFORMATION DESIRED MAY BE LISTED ON THE BACK OF THIS FORM**

**AUTHORIZATION:** I certify that this request has been made freely, voluntarily and without coercion and that the information given above is accurate and complete to the best of my knowledge. I understand that I will receive a copy of this form after I sign it. I may revoke this authorization, in writing, at any time except to the extent that action has already been taken to comply with it. Written revocation is effective upon receipt by the Release of Information Unit at the facility housing the records. Rediscosure of my medical records by those receiving the above authorized information may be accomplished without my further written authorization and may no longer be protected. Without my express revocation, the authorization will automatically expire: (1) upon satisfaction of the need for disclosure; (2) on _____ (date supplied by patient); (3) under the following condition(s):

Two years from the date of signature.

**I understand that the VA health care practitioner's opinions and statements are not official VA decisions regarding whether I will receive other VA benefits or, if I receive VA benefits, their amount. They may, however, be considered with other evidence when these decisions are made at a VA Regional Office that specializes in benefit decisions.**

DATE *(mm/dd/yyyy)*

SIGNATURE OF PATIENT OR PERSON AUTHORIZED TO SIGN FOR PATIENT (Attach authority to sign, e.g., POA)

**FOR VA USE ONLY**

IMPRINT PATIENT DATA CARD (or enter Name, Address, Social Security Number)

TYPE AND EXTENT OF MATERIAL RELEASED

| DATE RELEASED | RELEASED BY |

**VA FORM**
MAR 2013   **10-5345 SSA**

**Authorization to Disclose Health Information to SSA Notice**

In order to process an Authorization to permit disclosure of your electronic health information to the Social Security Administration (SSA) through the eHealth Exchange for disability benefits, the Authorization must cover all types of health information, including information related to Human Immunodeficiency Virus (HIV), sickle cell anemia, drug abuse and alcoholism or alcohol abuse. VA is unable to remove HIV, sickle cell anemia, drug abuse and alcoholism or alcohol abuse information from your electronic health record prior to it being sent to SSA.

All of the boxes for the four  protected conditions, drug abuse, alcoholism or alcohol abuse, testing for or infection with Human Immunodeficiency Virus (HIV), and sickle cell anemia under the VETERAN'S REQUEST section have been checked for you.  **If you do not want to authorize the sharing of drug abuse, alcoholism or alcohol abuse, HIV or sickle cell anemia, you should not complete this Authorization.**

Even if you do not have any condition or information in your health record related to drug abuse, alcoholism or alcohol abuse, HIV or sickle cell anemia at this time, this Authorization must include permission to disclose this type of information.  This means that if you acquire any of these conditions in the future, this Authorization will allow VA to share that information.  Your Authorization will be valid for 2 years from the date of signature and will permit the disclosure of existing health information and health information created after you sign this Authorization.  This includes diagnosis of HIV or sickle cell anemia, and treatment for drug abuse and alcoholism or alcohol abuse that occurs after the signature of this Authorization.

By completing this Authorization you are authorizing VA to share your electronic health information with SSA through eHealth Exchange for the purposes relating to obtaining disability benefits.  VA will continue to share your electronic health information through the eHealth Exchange with SSA until this authorization expires (2 years from signature) or you revoke it.

**VA** FORM
MAR 2013    **10-5345 SSA**

Form **4506**

(Rev. September 2013)

Department of the Treasury
Internal Revenue Service

# Request for Copy of Tax Return

OMB No. 1545-0429

▶ **Request may be rejected if the form is incomplete or illegible.**

**Tip.** You may be able to get your tax return or return information from other sources. If you had your tax return completed by a paid preparer, they should be able to provide you a copy of the return. The IRS can provide a **Tax Return Transcript** for many returns free of charge. The transcript provides most of the line entries from the original tax return and usually contains the information that a third party (such as a mortgage company) requires. See **Form 4506-T, Request for Transcript of Tax Return,** or you can quickly request transcripts by using our automated self-help service tools. Please visit us at IRS.gov and click on "Order a Return or Account Transcript" or call 1-800-908-9946.

| | |
|---|---|
| **1a**  Name shown on tax return. If a joint return, enter the name shown first. | **1b**  First social security number on tax return, individual taxpayer identification number, or employer identification number (see instructions) |
| **2a**  If a joint return, enter spouse's name shown on tax return. | **2b**  Second social security number or individual taxpayer identification number if joint tax return |

**3**  Current name, address (including apt., room, or suite no.), city, state, and ZIP code (see instructions)

**4**  Previous address shown on the last return filed if different from line 3 (see instructions)

**5**  If the tax return is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number.

**Caution.** *If the tax return is being mailed to a third party, ensure that you have filled in lines 6 and 7 before signing. Sign and date the form once you have filled in these lines. Completing these steps helps to protect your privacy. Once the IRS discloses your tax return to the third party listed on line 5, the IRS has no control over what the third party does with the information. If you would like to limit the third party's authority to disclose your return information, you can specify this limitation in your written agreement with the third party.*

**6**  **Tax return requested.** Form 1040, 1120, 941, etc. and all attachments as originally submitted to the IRS, including Form(s) W-2, schedules, or amended returns. Copies of Forms 1040, 1040A, and 1040EZ are generally available for 7 years from filing before they are destroyed by law. Other returns may be available for a longer period of time. Enter only one return number. If you need more than one type of return, you must complete another Form 4506. ▶ _____

  **Note.** *If the copies must be certified for court or administrative proceedings, check here* . . . . . . . . . ☐

**7**  **Year or period requested.** Enter the ending date of the year or period, using the mm/dd/yyyy format. If you are requesting more than eight years or periods, you must attach another Form 4506.

  _____    _____    _____    _____

  _____    _____    _____    _____

**8**  **Fee.** There is a $50 fee for each return requested. **Full payment must be included with your request or it will be rejected. Make your check or money order payable to "United States Treasury." Enter your SSN, ITIN, or EIN and "Form 4506 request" on your check or money order.**

| | | | |
|---|---|---|---|
| **a** | Cost for each return . . . . . . . . . . . . . . . . . . . . | $ | 50.00 |
| **b** | Number of returns requested on line 7 . . . . . . . . . . . . . | | |
| **c** | Total cost. Multiply line 8a by line 8b . . . . . . . . . . . . | $ | |

**9**  If we cannot find the tax return, we will refund the fee. If the refund should go to the third party listed on line 5, check here . . . . . ☐

**Caution.** Do not sign this form unless all applicable lines have been completed.

**Signature of taxpayer(s).** I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax return requested. If the request applies to a joint return, at least one spouse must sign. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506 on behalf of the taxpayer. **Note.** *For tax returns being sent to a third party, this form must be received within 120 days of the signature date.*

Phone number of taxpayer on line 1a or 2a

**Sign Here**

▶ _____    _____
  **Signature** (see instructions)            Date

  _____
  **Title** (if line 1a above is a corporation, partnership, estate, or trust)

▶ _____    _____
  **Spouse's signature**                  Date

For Privacy Act and Paperwork Reduction Act Notice, see page 2.          Cat. No. 41721E          Form **4506** (Rev. 9-2013)

Form 4506 (Rev. 9-2013)

Page **2**

Section references are to the Internal Revenue Code unless otherwise noted.

## Future Developments

For the latest information about Form 4506 and its instructions, go to *www.irs.gov/form4506*. Information about any recent developments affecting Form 4506, Form 4506T and Form 4506T-EZ will be posted on that page.

## General Instructions

**Caution.** Do not sign this form unless all applicable lines have been completed.

**Purpose of form.** Use Form 4506 to request a copy of your tax return. You can also designate (on line 5) a third party to receive the tax return.

**How long will it take?** It may take up to 75 calendar days for us to process your request.

**Tip.** Use Form 4506-T, Request for Transcript of Tax Return, to request tax return transcripts, tax account information, W-2 information, 1099 information, verification of non-filing, and records of account.

**Automated transcript request.** You can quickly request transcripts by using our automated self-help service tools. Please visit us at IRS.gov and click on "Order a Return or Account Transcript" or call 1-800-908-9946.

**Where to file.** Attach payment and mail Form 4506 to the address below for the state you lived in, or the state your business was in, when that return was filed. There are two address charts: one for individual returns (Form 1040 series) and one for all other returns.

If you are requesting a return for more than one year and the chart below shows two different addresses, send your request to the address based on the address of your most recent return.

## Chart for individual returns (Form 1040 series)

| If you filed an individual return and lived in: | Mail to: |
|---|---|
| Alabama, Kentucky, Louisiana, Mississippi, Tennessee, Texas, a foreign country, American Samoa, Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands, the U.S. Virgin Islands, or A.P.O. or F.P.O. address | Internal Revenue Service RAIVS Team Stop 6716 AUSC Austin, TX 73301 |
| Alaska, Arizona, Arkansas, California, Colorado, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Utah, Washington, Wisconsin, Wyoming | Internal Revenue Service RAIVS Team Stop 37106 Fresno, CA 93888 |
| Connecticut, Delaware, District of Columbia, Florida, Georgia, Maine, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia, West Virginia | Internal Revenue Service RAIVS Team Stop 6705 P-6 Kansas City, MO 64999 |

## Chart for all other returns

| If you lived in or your business was in: | Mail to: |
|---|---|
| Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Hawaii, Idaho, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wyoming, a foreign country, or A.P.O. or F.P.O. address | Internal Revenue Service RAIVS Team P.O. Box 9941 Mail Stop 6734 Ogden, UT 84409 |
| Connecticut, Delaware, District of Columbia, Georgia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia, West Virginia, Wisconsin | Internal Revenue Service RAIVS Team P.O. Box 145500 Stop 2800 F Cincinnati, OH 45250 |

## Specific Instructions

**Line 1b.** Enter your employer identification number (EIN) if you are requesting a copy of a business return. Otherwise, enter the first social security number (SSN) or your individual taxpayer identification number (ITIN) shown on the return. For example, if you are requesting Form 1040 that includes Schedule C (Form 1040), enter your SSN.

**Line 3.** Enter your current address. If you use a P.O. box, please include it on this line 3.

**Line 4.** Enter the address shown on the last return filed if different from the address entered on line 3.

**Note.** If the address on Lines 3 and 4 are different and you have not changed your address with the IRS, file Form 8822, Change of Address. For a business address, file Form 8822-B, Change of Address or Responsible Party — Business.

**Signature and date.** Form 4506 must be signed and dated by the taxpayer listed on line 1a or 2a. If you completed line 5 requesting the return be sent to a third party, the IRS must receive Form 4506 within 120 days of the date signed by the taxpayer or it will be rejected. Ensure that all applicable lines are completed before signing.

*Individuals.* Copies of jointly filed tax returns may be furnished to either spouse. Only one signature is required. Sign Form 4506 exactly as your name appeared on the original return. If you changed your name, also sign your current name.

*Corporations.* Generally, Form 4506 can be signed by: (1) an officer having legal authority to bind the corporation, (2) any person designated by the board of directors or other governing body, or (3) any officer or employee on written request by any principal officer and attested to by the secretary or other officer.

*Partnerships.* Generally, Form 4506 can be signed by any person who was a member of the partnership during any part of the tax period requested on line 7.

*All others.* See section 6103(e) if the taxpayer has died, is insolvent, is a dissolved corporation, or if a trustee, guardian, executor, receiver, or administrator is acting for the taxpayer.

*Documentation.* For entities other than individuals, you must attach the authorization document. For example, this could be the letter from the principal officer authorizing an employee of the corporation or the letters testamentary authorizing an individual to act for an estate.

**Signature by a representative.** A representative can sign Form 4506 for a taxpayer only if this authority has been specifically delegated to the representative on Form 2848, line 5. Form 2848 showing the delegation must be attached to Form 4506.

**Privacy Act and Paperwork Reduction Act Notice.** We ask for the information on this form to establish your right to gain access to the requested return(s) under the Internal Revenue Code. We need this information to properly identify the return(s) and respond to your request. If you request a copy of a tax return, sections 6103 and 6109 require you to provide this information, including your SSN or EIN, to process your request. If you do not provide this information, we may not be able to process your request. Providing false or fraudulent information may subject you to penalties.

Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation, and cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103.

The time needed to complete and file Form 4506 will vary depending on individual circumstances. The estimated average time is: **Learning about the law or the form,** 10 min.; **Preparing the form,** 16 min.; and **Copying, assembling, and sending the form to the IRS,** 20 min.

If you have comments concerning the accuracy of these time estimates or suggestions for making Form 4506 simpler, we would be happy to hear from you. You can write to:

Internal Revenue Service
Tax Forms and Publications Division
1111 Constitution Ave. NW, IR-6526
Washington, DC 20224.

Do not send the form to this address. Instead, see *Where to file* on this page.

Social Security Administration

Form Approved
OMB No. 0960-0525

# REQUEST FOR SOCIAL SECURITY EARNINGS INFORMATION

*Use This Form If You Need

**1. Certified/Non-Certified Detailed Earnings Information**
   Includes periods of employment or self-employment
   and the names and addresses of employers.

**OR**

**2. Certified Yearly Totals of Earnings**
   Includes total earnings for each year but does not
   include the names and addresses of employers.

<div style="border:1px solid">

**DO NOT USE THIS FORM TO REQUEST
YEARLY EARNINGS TOTALS**

Yearly earnings totals are FREE to the public
if you do not require certification.

To obtain FREE yearly totals of earnings,
visit our website at www.ssa.gov/myaccount.

</div>

## Privacy Act Statement
### Collection and Use of Personal Information

Section 205 of the Social Security Act, as amended, authorizes us to collect the information on this form. We will use the information you provide to identify your records and send the earnings information you request. Completion of this form is voluntary; however, failure to do so may prevent your request from being processed.

We rarely use the information in your earnings record for any purpose other than for determining your entitlement to Social Security benefits. However, we may use it for the administration and integrity of Social Security programs. We may also disclose information to another person or to another agency in accordance with approved routine uses, which include but are not limited to the following:
1. To enable a third party or an agency to assist Social Security in establishing rights to Social Security benefits and/or coverage;
2. To comply with Federal laws requiring the release of information from Social Security records (e.g., to the Government Accountability Office and Department of Veterans' Affairs);
3. To make determinations for eligibility in similar health and income maintenance programs at the Federal, State, and local level; and,
4. To facilitate statistical research, audit, or investigative activities necessary to assure the integrity and improvement of Social Security programs.

A complete list of routine uses for earnings information is available in our Systems of Records Notices entitled, the Earnings Recording and Self-Employment Income System (60-0059), the Master Beneficiary Record (60-0090), and the SSA-Initiated Personal Earnings and Benefit Estimate Statement (60-0224).
In addition, you may choose to pay for the earnings information you requested with a credit card. 31 C.F.R. Part 206 specifically authorizes us to collect credit card information. The information you provide about your credit card is voluntary.  Providing payment information is only necessary if you are making payment by credit card. You do not need to fill out the credit card information if you choose another means of payment (for example, by check or money order). If you choose the credit card payment option, we will provide the information you give us to the banks handling your credit card account and the Social Security Administration's (SSA) account.

Routine uses applicable to credit card information, include but are not limited to:
(1) to enable a third party or an agency to assist Social Security to effect a salary or an administrative offset or to an agent of SSA that is a consumer reporting agency for preparation of a commercial credit report in accordance with 31 U.S.C. §§ 3711, 3717 and 3718; and (2) to a consumer reporting agency or debt collection agent to aid in the collection of outstanding debts to the Federal Government.
A complete list of routine uses for credit card information is available in our System of Records Notice entitled, the Financial Transactions of SSA Accounting and Finance Offices (60-0231). The notice, additional information regarding this form, routine uses of information, and our programs and systems is available on-line at www.socialsecurity.gov or at your local Social Security office.

**Paperwork Reduction Act Statement -** This information collection meets the requirements of 44 U.S.C. § 3507, as amended by section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 11 minutes to read the instructions, gather the facts, and answer the questions. ***Send only comments relating to our time estimate above to:*** SSA, 6401 Security Blvd, Baltimore, MD  21235-6401.

# REQUEST FOR SOCIAL SECURITY EARNINGS INFORMATION

1. Provide your name as it appears on your most recent Social Security card or the name of the individual  whose earnings you are requesting.

First Name:

Middle Initial:

Last Name:

Social Security Number (SSN)   __ __ __ - __ __ - __ __ __ __   One SSN per request

Date of Death:   __ __ / __ __ / __ __ __ __   Date of Birth:   __ __ / __ __ / __ __ __ __

Other Name(s) Used
(Include Maiden Name)

2. What kind of earnings information do you need? (Choose **ONE** of the following types of earnings or SSA must return this request.)

☐ **Itemized Statement of Earnings $102**

   (Includes the names and addresses of employers)

   If you check this box, tell us why you need this information below.

Year(s) Requested:  __ __ __ __  to  __ __ __ __

Year(s) Requested:  __ __ __ __  to  __ __ __ __

☐ Check this box if you want the earnings information
**CERTIFIED** for an additional $32.00 fee.

☐ **Certified Yearly Totals of Earnings $32**

   (Does not include the names and addresses of employers)
   Yearly earnings totals are FREE to the public if you do not
   require certification. To obtain FREE yearly totals of
   earnings, visit our website at www.ssa.gov/myaccount.

Year(s) Requested:  __ __ __ __  to  __ __ __ __

Year(s) Requested:  __ __ __ __  to  __ __ __ __

3. If you would like this information **sent to someone else**, please fill in the information below.

   I authorize the Social Security Administration to release the earnings information to:

Name

Address                                                          State

City                                                             ZIP Code

4. I am the individual to whom the record pertains (or a person authorized to sign on behalf of that individual). I understand that any false representation to knowingly and willfully obtain information from Social Security records is punishable by a fine of not more than $5,000 or one year in prison.

**Signature of Individual or legal guardian**

*SSA must receive this form within 60 days from the date signed*

Date:  __ __ / __ __ / __ __ __ __

Relationship (if applicable, you must attach proof)          Daytime Phone:

Address                                                          State

City                                                             ZIP Code

Witnesses must sign this form ONLY if the above signature is by marked (X). If signed by mark (X), two witnesses to the signing who know the signee must sign below and provide their full addresses. Please print the signee's name next to the mark (X) on the signature line above.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address *(Number and Street, City, State and ZIP Code)* | Address *(Number and Street, City, State and ZIP Code)* |

# REQUEST FOR SOCIAL SECURITY EARNINGS INFORMATION

## INFORMATION ABOUT YOUR REQUEST

You may use this form to request earnings information for **only ONE** Social Security Number (SSN)

### How do I get my earnings statement?

You must complete the attached form to tell us the specific years of earnings you want and provide **ONE** mailing address.  Mail the completed form to SSA within 60 days of signature. If you sign with an "X", your mark must be witnessed by two impartial persons who must provide their name and address in the spaces provided.
Select **ONE** type of earnings statements and include the appropriate fee.
**1. Certified/Non-Certified Itemized Statement of Earnings**
    This statement includes years of self-employment or employment and the names and addresses of employers.
**2. Certified Yearly Totals of Earnings**
    This statement includes the total earnings for each year requested but *does not* include the names and addresses of employers.

If you require one of each type of earnings statement, you must complete two separate forms. Mail each form to SSA with one form of payment attached to each request.

### How do I get someone else's earnings statement?

You may get someone else's earnings information if you meet one of the following criteria, attached the necessary documents to show your entitlement to the earnings information and include the appropriate fee.

**1. Someone Else's Earnings**
    The natural or adoptive parent or legal guardian of a minor child, or the legal guardian of a legally declared incompetent individual, may obtain earnings information if acting in the best interest of the minor child or incompetent individual. You must include proof of your relationship to the individual with your request. The proof may include a birth certificate, court order, adoption decree, or other legally binding document.

**2. A Deceased Person's Earnings**
    You can request earnings information from the record of a deceased person if you are:
    • The legal representative of the estate;
    • A survivor (that is, the spouse, parent, child, divorced spouse of divorced parent); or
    • An individual with a material interest (e.g., financial) who is an heir at law, next of kin, beneficiary under the will or donee of property of the decedent.

    You must include proof of death and proof of your relationship to the deceased with your request.

### Is There A Fee For Earnings Information?

Yes. We charge a $102 fee for providing information for purposes unrelated to the administration of our programs.

**1. Certified or Non-Certified Itemized Statement of Earnings**
    In most instances, individuals request itemized statements of earnings for purposes unrelated to our programs such as for a private pension plan or personal injury suit. Private pension plans may email OCO.Pension.Fund@ssa.gov for an alternate method of obtaining itemized earnings information.

    We will **certify** the itemized earnings information for an additional $32.00 fee. Certification is usually not necessary unless you are specifically requested to obtain a certified earnings record.

    Sometimes, there is no charge for itemized earnings information.  If you have reason to believe your earnings are not correct (for example, you have previously received earnings information from us and it does not agree with your records), we will supply you with more detail for the year(s) in question.  Be sure to show the year(s) involved on the request form and explain why you need the information. If you do not tell us why you need the information, we will charge a fee.

**2. Certified Yearly Totals of Earnings**
    We charge $32 to certify yearly totals of earnings. However, if you do not want or need certification, you may obtain yearly totals *FREE* of charge at www.ssa.gov/myaccount.  Certification is usually not necessary unless you are advised specifically to obtain a certified earnings record.

### Method of Payment
### DO NOT SEND CASH.

You may pay by credit card, check or money order.
• Credit Card Instructions
    Complete the credit card section on page 4 and return it with your request form.

• Check or Money Order Instructions
    Enclose one check or money order per request form payable to the Social Security Administration and write the Social Security number in the memo.

### How long will it take SSA to process my request?

Please allow SSA 120 days to process this request.  After 120 days, you may contact 1-800-772-1213 to leave an inquiry regarding your request.

## REQUEST FOR SOCIAL SECURITY EARNINGS INFORMATION

- **Where do I send my complete request?**

| Mail the completed form, supporting documentation, and applicable fee to: | If using private contractor such as FedEx mail form, supporting documentation and applicable fee to: |
|---|---|
| **Social Security Administration**<br>Division of Earnings Record Operations<br>P.O. Box 33003<br>Baltimore, Maryland  21290-3003 | **Social Security Administration**<br>Division of Earnings Record Operations<br>300 N. Greene St.<br>Baltimore, Maryland  21290-0300 |

- **How much do I have to pay for an Itemized Statement of Earnings?**

| **Non-Certified** Itemized Statement of Earnings | **Certified** Itemized Statement of Earnings |
|---|---|
| $102.00 | $134.00 |

- **How much do I have to pay for certified yearly totals of earnings?**

Certified yearly totals of earnings cost $32.00.  You may obtain non-certified yearly totals *FREE* of charge at www.ssa.gov/myaccount. Certification is usually not necessary unless you are specifically asked to obtain a certified earnings record.

## YOU CAN MAKE YOUR PAYMENT BY CREDIT CARD

As a convenience, we offer you the option to make your payment by credit card.  However, regular credit card rules will apply. You may also pay by check or money order. Make check payable to Social Security Administration.

| CHECK ONE | ☐ Visa                    ☐ American Express<br><br>☐ MasterCard          ☐ Discover |
|---|---|
| Credit Card Holder's Name<br>(Enter the name from the credit card) | <br>First Name, Middle Initial, Last Name |
| Credit Card Holder's Address | Number & Street<br><br>City, State, & ZIP Code |
| Daytime Telephone Number | ( ☐☐☐ )  ☐☐☐ - ☐☐☐☐<br>Area Code |
| Credit Card Number | ☐☐☐☐ - ☐☐☐☐ - ☐☐☐☐ - ☐☐☐☐ |
| Credit Card Expiration Date | _____<br>(MM/YY) |
| Amount Charged<br>See above to select the correct fee for your request.<br>Applicable fees are $32, $102 or $134.<br><u>SSA will return forms without the appropriate fee.</u> | $ |
| Credit Card Holder's Signature | |

| **DO NOT WRITE IN THIS SPACE**<br>**OFFICE USE ONLY** | Authorization |
|---|---|
|  | Name                              \| Date |
|  | Remittance Control # |

Standard Form 180 (Rev. 5/12) (page 1)
Prescribed by NARA (36 CFR 1228.168(b))

Authorized for Local Reproduction
Previous edition unusable

OMB No. 3095-0029 Expires 01/31/2015

# REQUEST PERTAINING TO MILITARY RECORDS

* Requests from veterans or deceased veteran's next-of-kin may be submitted online by using eVetRecs at http://www.archives.gov/veterans/military-service-records/*

*(To ensure the best possible service, please thoroughly review the accompanying instructions before filling out this form. Please print clearly or type.)*

## SECTION I - INFORMATION NEEDED TO LOCATE RECORDS (Furnish as much as possible.)

| 1. NAME USED DURING SERVICE (last, first, and middle) | 2. SOCIAL SECURITY NO. | 3. DATE OF BIRTH | 4. PLACE OF BIRTH |
|---|---|---|---|
|  |  |  |  |

**5. SERVICE, PAST AND PRESENT**   (For an effective records search, it is important that all service be shown below.)

| | BRANCH OF SERVICE | DATE ENTERED | DATE RELEASED | OFFICER | ENLISTED | SERVICE NUMBER (If unknown, write "unknown") |
|---|---|---|---|---|---|---|
| a. ACTIVE COMPONENT |  |  |  |  |  |  |
| b. RESERVE COMPONENT |  |  |  |  |  |  |
| c. NATIONAL GUARD |  |  |  |  |  |  |

6. IS THIS PERSON DECEASED?  If "YES" enter the date of death.
☐ NO   ☐ YES _____

7. IS (WAS) THIS PERSON RETIRED FROM MILITARY SERVICE?
☐ NO   ☐ YES

## SECTION II – INFORMATION AND/OR DOCUMENTS REQUESTED

**1. CHECK THE ITEM(S) YOU ARE REQUESTING:**

☐ **DD Form 214 or equivalent.** When was the DD Form(s) 214 issued?  YEAR(S): _____
If more than one period of service was performed, even in the same branch, there may be more than one DD214.

This form contains information normally needed to verify military service. A copy may be sent to the veteran, the deceased veteran's next of kin, or other persons or organizations if authorized in Section III, below. **An UNDELETED DD214 is ordinarily required to determine eligibility for benefits.** Sensitive items, such as, the character of separation, authority for separation, reason for separation, reenlistment eligibility code, separation (SPD/SPN) code, and dates of time lost are usually shown.

**An undeleted copy will be sent unless you specify a deleted copy.  Indicate here if you want a deleted copy of the DD Form 214 .** ☐.

The following items are deleted:  authority for separation, reason for separation, reenlistment eligibility code, separation (SPD/SPN) code, and for separations after June 30, 1979, character of separation and dates of time lost.

☐ **All Documents in Official Military Personnel File (OMPF)**

☐ **Medical Records** (Includes Service Treatment Records, Health (outpatient) and dental records.)  If hospitalized (inpatient), the facility name and date for each admission **must** be provided: _____

☐ **Other** (Specify):

**2. PURPOSE:**  (An explanation of the purpose of the request is **strictly voluntary**; however, such information may help to provide the best possible response and may result in a faster reply.  Information provided will in no way be used to make a decision to deny the request.)  Check appropriate box:

☐ Benefits   ☐ Employment   ☐ VA Loan Programs   ☐ Medical   ☐ Genealogy   ☐ Correction   ☐ Personal
☐ Other, explain:

## SECTION III - RETURN ADDRESS AND SIGNATURE

**1. REQUESTER IS:**  (*Signature Required in # 3 below of veteran, next of kin, legal guardian, authorized government agent or "other" authorized representative.  If "other" authorized representative, provide copy of authorization letter.)   No signature required for Archival records.*

☐ Military service member or veteran identified in Section I, above
☐ Next of kin of deceased veteran: _____
(*Relationship*)

☐ Legal guardian (Must submit copy of court appointment.)
☐ Other (specify) _____

**MUST HAVE PROOF OF DEATH** - See item 2a on instruction sheet.

**2. SEND INFORMATION/DOCUMENTS TO:**
*(Please print or type.  See item 4 on accompanying instructions.)*

**3. AUTHORIZATION SIGNATURE WHEN REQUIRED** (*See items 2a or 3a on accompanying instructions.*)  I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the information in this Section III is true and correct.  No signature required for Archival records.

| Name | **Signature Required** - Do not print | **Date** |
|---|---|---|
| Street                    Apt. | (     ) Daytime phone        (     ) Fax Number |  |
| City            State     Zip Code | Email address |  |

*This form is available at *http://www.archives.gov/research/order/standard-form-180.pdf* on the National Archives and Records Administration (NARA) web site.*

Standard Form 180 (Rev. 5/12) (Page 2)
Prescribed by NARA (36 CFR 1228.168(b))

Authorized for local reproduction
Previous edition unusable

OMB No. 3095-0029  Expires 01/31/2015

# LOCATION OF MILITARY RECORDS

The various categories of military service records are described in the chart below. For each category there is a code number which indicates the address at the bottom of the page to which this request should be sent.  Please refer to the Instruction and Information Sheet accompanying this form as well.

| BRANCH | CURRENT STATUS OF SERVICE MEMBER | ADDRESS CODE | |
|---|---|---|---|
| | | Personnel Record | Medical or Service Treatment Record |
| **AIR FORCE** | Discharged, deceased, or retired before 5/1/1994 | 14 | 14 |
| | Discharged, deceased, or retired 5/1/1994 – 9/30/2004 | 14 | 11 |
| | Discharged, deceased, or retired on or after 10/1/2004 | 1 | 11 |
| | Active (including National Guard on active duty in the Air Force), TDRL, or general officers retired with pay | 1 | |
| | Reserve, retired reserve in nonpay status, current National Guard officers not on active duty in the Air Force, or National Guard released from active duty in the Air Force | 2 | |
| | Current National Guard enlisted not on active duty in the Air Force | 13 | |
| **COAST GUARD** | Discharge , deceased, or retired before 1/1/1898 | 6 | |
| | Discharged, deceased, or retired 1/1/1898 – 3/31/1998 | 14 | 14 |
| | Discharged, deceased, or retired on or after 4/1/1998 | 14 | 11 |
| | Active, reserve, or TDRL | 3 | |
| **MARINE CORPS** | Discharged, deceased, or retired before 1/1/1905 | 6 | |
| | Discharged, deceased, or retired 1/1/1905 – 4/30/1994 | 14 | 14 |
| | Discharged, deceased, or retired 5/1/1994 – 12/31/1998 | 14 | 11 |
| | Discharged, deceased, or retired on or after 1/1/1999 | 4 | 11 |
| | Individual Ready Reserve | 5 | |
| | Active, Selected Marine Corps Reserve, TDRL | 4 | |
| **ARMY** | Discharged, deceased, or retired before 11/1/1912 (enlisted) or before 7/1/1917 (officer) | 6 | |
| | Discharged, deceased, or retired 11/1/1912 – 10/15/1992 (enlisted) or 7/1/1917 – 10/15/1992 (officer) | 14 | |
| | Discharged, deceased, or retired after 10/16/1992 | 14 | 11 |
| | Active enlisted, officers | 7 | |
| | Former National Guard/USAR personnel | 14 | |
| **NAVY** | Discharged, deceased, or retired before 1/1/1886 (enlisted) or before 1/1/1903 (officer) | 6 | |
| | Discharged, deceased, or retired 1/1/1886 – 1/30/1994 (enlisted) or 1/1/1903 – 1/30/1994 (officer) | 14 | 14 |
| | Discharged, deceased, or retired 1/31/1994 – 12/31/1994 | 14 | 11 |
| | Discharged, deceased, or retired on or after 1/1/1995 | 10 | 11 |
| | Active, reserve, or TDRL | 10 | |
| **PHS** | Public Health Service  -  Commissioned Corps officers only | 12 | |

## ADDRESS LIST OF CUSTODIANS (BY CODE NUMBERS SHOWN ABOVE) – Where to write/send this form

1. Air Force Personnel Center
HQ AFPC/DPSIRP
550 C Street West, Suite 19
Randolph AFB, TX 78150-4721

2. Air Reserve Personnel Center
Records Management Branch
(DPTARA)
18420 E. Silver Creek Ave.
Bldg. 390 MS 68
Buckley AFB, CO 80011

3. Commander,  Personnel Service Center
(PSD-MR) MS7200
US Coast Guard
4200 Wilson Blvd., Suite 1100
Arlington, VA 29598-7200
http://uscg.mil/psc/adm

4. Headquarters U.S. Marine Corps
Manpower Management Support Branch
(MMSB-10)
2008 Elliot Road
Quantico, VA 22134-5030

5. Marine Forces Reserve
4400 Dauphine St.
New Orleans, LA 70146-5400

6. National Archives & Records Administration
Old Military and Civil Records (NWCTB-Military)
Textual Services Division
700 Pennsylvania Ave., N.W.
Washington, DC 20408-0001

7. US Army Human Resources Command
ATTN:  AHRC-PDR-V
1600 Spearhead Division Ave., Dept 420
Fort Knox, KY 40122-5402
askhrc.army@us.army.mil

8. Reserved.

9. Reserved.

10. Navy Personnel Command (PERS-312E)
5720 Integrity Drive
Millington, TN 38055-3120

11. Department of Veterans Affairs
Records Management Center
P.O. Box 5020
St. Louis, MO 63115-5020

12. Division of Commissioned Corps Officer Support
ATTN:  Records Officer
1101 Wooton Parkway, Plaza Level, Suite 100
Rockville, MD 20852

13. Reserved.

14. National Personnel Records Center
(Military Personnel Records)
1 Archives Dr.
St. Louis, MO 63138-1002

eVetRecs!
http://www.archives.gov/veterans/military-service-records/

Social Security Administration

**Consent for Release of Information**

Form Approved
OMB No. 0960-0566

You must complete all required fields.  We will not honor your request unless all required fields are completed.  (*signifies a required field).

**TO:  Social Security Administration**

_____    _____    _____
        **\*My Full Name**                   **\*My Date of Birth**            **\*My Social Security Number**
                              **(MM/DD/YYYY)**

I authorize the Social Security Administration to release information or records about me to:

**\*NAME OF PERSON OR ORGANIZATION:**        **\*ADDRESS OF PERSON OR ORGANIZATION:**

**\*I want this information released because:** _____

  We may charge a fee to release information for non-program purposes.

**\*Please release the following information selected from the list below:**

You must specify the records you are requesting by checking at least one box.  We will not honor a request for "any and all records" or "my entire file."  Also, we will not disclose records unless you include the applicable date ranges where requested.

1. ☐ Social Security Number
2. ☐ Current monthly Social Security benefit amount
3. ☐ Current monthly Supplemental Security Income payment amount
4. ☐ My benefit or payment amounts from date _____ to date _____
5. ☐ My Medicare entitlement from date _____ to date _____
6. ☐ Medical records from my claims folder(s) from date_____ to date_____

    If you want us to release a minor child's medical records, do not use this form.  Instead, contact your local Social Security office.

7. ☐ Complete medical records from my claims folder(s)
8. ☐ Other record(s) from my file **(you must specify the records you are requesting, e.g., doctor report, application, determination or questionnaire)**

I am the individual, to whom the requested information or record applies, or the parent or legal guardian of a minor, or the legal guardian of a legally incompetent adult.  I declare under penalty of perjury (28 CFR § 16.41(d)(2004)) that I have examined all the information on this form, and any accompanying statements or forms, and it is true and correct to the best of my knowledge.  I understand that anyone who knowingly or willfully seeks or obtain access to records about another person under false pretenses is punishable by a fine of up to $5,000.  I also understand that I must pay all applicable fees for requesting information for a non-program-related purpose.

**\*Signature:** _____    **\*Date:** _____

**\*Address:** _____

  **Relationship (if not the subject of the record):** _____    **\*Daytime Phone:** _____

Witnesses must sign this form ONLY if the above signature is by mark (X). If signed by mark (X), two witnesses to the signing who know the signee must sign below and provide their full addresses. Please print the signee's name next to the mark (X) on the signature line above.

| 1.Signature of witness | 2.Signature of witness |
|---|---|
| Address(Number and street,City,State, and Zip Code) | Address(Number and street,City,State, and Zip Code) |

**Form SSA-3288** (07-2013) EF (07-2013)

## AUTHORIZATION FOR RELEASE OF RECORDS OF BANKRUPTCY TRUSTS AND CLAIM RESOLUTION FACILITIES

TO WHOM IT MAY CONCERN:

The Claimant named below hereby authorizes each Trust and Claim Resolution Facility listed in the attachment hereto to provide directly to Garrison Litigation Management Group, Ltd. ("Garrison"), or any of its representatives, all submissions made by Claimant and (if different from the Claimant) the party whose injury forms the basis of the claim (the "Injured Party") to the Trust, including claim forms, any attachments to claim forms, and any amended or supplemental claim forms. Claimant expressly acknowledges that the Trust or Claim Resolution Facility may provide such documents directly to Garrison and need not obtain any further authorization from the Claimant or his/her representatives.

A copy of this Authorization shall be as valid as the original. This Authorization contains no expiration date and may be exercised by Garrison at any time. If Claimant's representative has signed this Authorization, a notarized power of attorney is attached.

Name of Claimant: _____

Social Security No.: _____

Date of Birth: _____

Name of Injured Party (if different from Claimant): _____

Social Security No.: _____

Date of Birth: _____

Name of representative for Claimant or Injured Party: _____

Signing party: _____

Signature: _____

Date: _____

Notarized:

Attachment: List of Trusts and Claim Resolution Facilities

1

## List of Trusts and Claim Resolution Facilities

| | | |
|---|---|---|
| A&I Corp. Asbestos Bodily Injury Trust | Forty-Eight Insulations Qualified Settlement Trust | Raytech Corp. Asbestos Personal Injury Settlement Trust |
| A-Best Asbestos Settlement Trust | Fuller-Austin Asbestos Settlement Trust | Rock Wool Mfg Company Asbestos Trust |
| AC&S Asbestos Settlement Trust | G-I Asbestos Settlement Trust | Rutland Fire Clay Company Asbestos Trust |
| Amatex Asbestos Disease Trust Fund | H.K. Porter Asbestos Trust | Shook & Fletcher Asbestos Settlement Trust |
| APG Asbestos Trust | Hercules Chemical Company, Inc. Asbestos Trust | Skinner Engine Co. Asbestos Trust |
| API, Inc. Asbestos Settlement Trust | J.T. Thorpe Settlement Trust | Stone and Webster Asbestos Trust |
| Armstrong World Industries Asbestos Personal Injury Settlement Trust | JT Thorpe Company Successor Trust | Swan Asbestos and Silica Settlement Trust |
| ARTRA 524(g) Asbestos Trust | Kaiser Asbestos Personal Injury Trust | T H Agriculture & Nutrition, LLC Industries Asbestos Personal Injury Trust |
| ASARCO LLC Asbestos Personal Injury Settlement Trust | Keene Creditors Trust | Thorpe Insulation Company Asbestos Personal Injury Settlement Trust |
| Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust | Lummus 524(g) Asbestos PI Trust | United States Gypsum Asbestos Personal Injury Settlement Trust |
| Bartells Asbestos Settlement Trust | Lykes Tort Claims Trust | United States Lines, Inc. and United States Lines (S.A.) Inc. Reorganization Trust |
| Brauer 524(g) Asbestos Trust | M.H. Detrick Company Asbestos Trust | United States Mineral Products Company Asbestos Personal Injury Settlement Trust |

| | | |
|---|---|---|
| Burns and Roe Asbestos Personal Injury Settlement Trust | Manville Personal Injury Settlement Trust | UNR Asbestos-Disease Claims Trust |
| C.E. Thurston & Sons Asbestos Trust | Muralo Trust | Utex Industries, Inc. Successor Trust |
| Celotex Asbestos Settlement Trust | NGC Bodily Injury Trust | Wallace & Gale Company Asbestos Settlement Trust |
| Combustion Engineering 524(g) Asbestos PI Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (OC Sub-Fund) | Western MacArthur-Western Asbestos Trust |
| Congoleum Plan Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (FB Sub-Fund) | W.R. Grace Trust |
| DII Industries, LLC Asbestos PI Trust | PLI Disbursement Trust | Pittsburgh Corning Trust |
| Eagle-Picher Industries Personal Injury Settlement Trust | Plibrico Asbestos Trust | |
| Federal Mogul U.S. Asbestos Personal Injury Trust | Porter Hayden Bodily Injury Trust | |

## AUTHORIZATION TO RELEASE PROTECTED HEALTH INFORMATION

Patient Name: _____

Date of Birth: _____   Social Security Number: _____

1.      I authorize the use or disclosure of the above individual's health information as described below.

2.      The following individual or organization is authorized to make the disclosure:

_____

_____

_____

to disclose records obtained in the course of my evaluation and/or treatment from date
_____ to date _____.

3.      The type and amount of information to be used or disclosed is as follows: (include dates where appropriate)

☐  Abstract/Pertinent Information        ☐  Emergency Room
☐  Lab                                   ☐  x-ray and imaging reports
☐  Treatment Plans                       ☐  consultation reports
☐  Discharge Plans                       ☐  billing records
☐  Progress Notes                        ☐  entire record <u>INCLUDING</u> HIV Testing
                                            &
☐  treatment order(s)                       Chemical Dependency.
☐  Psychological/Psychiatric Evaluation  ☐  Other: _____
☐  most recent discharge summary         ☐  Other: _____
                                         ☐  Other: _____

4.      Name/Address of person/ organization to which disclosure is to be made:

        To: _____
        Address _____
        City, State, Zip _____

5.      I understand that the information authorized for release may indicate the presence of a communicable or
venereal disease which may include, but is not limited to diseases such as hepatitis, syphilis, gonorrhea or
the Human Immunodeficiency Virus (HIV), also known as Acquired Immune Deficiency Syndrome
(AIDS).  I hereby authorize the above-named health care provider to disclose records obtained in the course
of my evaluation and/or treatment, and to send them by U.S. mail service and/or electronic facsimile to:

_____

        For the following purpose: _____

6.      I understand that I have a right to revoke this authorization at any time.  I understand that if I revoke this
authorization I must do so in writing and present my written revocation to the medical records department

1

practitioner.  I understand that the revocation will not apply to information that has already been released in response to this authorization.  Unless otherwise revoked, this authorization will commence on the date indicated below and will expire on the following date, event, or condition: _____.  If I fail to specify an expiration date, event or condition, this authorization will expire after one year.

7.      I understand that authorizing the disclosure of this health information is voluntary.  I understand that my healthcare and the payment of my healthcare will not be affected if I refuse to sign this authorization.  I understand that I may inspect or copy the information to be used or disclosed.  I understand that any disclosure of information carries with it the potential for an unauthorized redisclosure and the information may not be protected by federal confidentiality rules.  If I have questions about disclosure of my health information, I can contact this facility's privacy officer.


_____       _____

Signature of Patient or Legal Representative          Date


_____

If Signed by Legal Representative, Relationship to Patient

**\*\*A PHOTOSTATIC COPY OF THIS RELEASE SHALL BE CONSIDERED AS VALID AS**

**THE ORIGINAL**

2

## PAYROLL AND PERSONNEL RECORDS AUTHORIZATION

**TO WHOM IT MAY CONCERN:**

I hereby authorize you to provide to:

_____

at this address:

_____

_____

a complete copy of all records pertaining to my employment, including, but not limited to, all

personnel, payroll, medical or hospital records pertaining to:

Full Name: _____

Date of Birth: _____        Social Security No: _____

My dates of employment were from _____ to _____

I worked in the following departments:

_____

_____

I was employed at the following office:

_____

_____

SIGNED: _____

DATE: _____

1

## AUTHORIZATION FOR RELEASE OF RECORDS OF BANKRUPTCY TRUSTS AND CLAIM RESOLUTION FACILITIES

TO WHOM IT MAY CONCERN:

The Claimant named below hereby authorizes each Trust and Claim Resolution Facility listed in the attachment hereto to provide directly to Garrison Litigation Management Group, Ltd. ("Garrison"), or any of its representatives, all submissions made by Claimant and (if different from the Claimant) the party whose injury forms the basis of the claim (the "Injured Party") to the Trust, including claim forms, any attachments to claim forms, and any amended or supplemental claim forms. Claimant expressly acknowledges that the Trust or Claim Resolution Facility may provide such documents directly to Garrison and need not obtain any further authorization from the Claimant or his/her representatives.

A copy of this Authorization shall be as valid as the original. This Authorization contains no expiration date and may be exercised by Garrison at any time. If Claimant's representative has signed this Authorization, a notarized power of attorney is attached.

Name of Claimant: _____

Social Security No.: _____

Date of Birth: _____

Name of Injured Party (if different from Claimant): _____

Social Security No.: _____

Date of Birth: _____

Name of representative for Claimant or Injured Party: _____

Signing party: _____

Signature: _____

Date: _____

Notarized:

Attachment: List of Trusts and Claim Resolution Facilities

## List of Trusts and Claim Resolution Facilities

| | | |
|---|---|---|
| A&I Corp. Asbestos Bodily Injury Trust | Forty-Eight Insulations Qualified Settlement Trust | Raytech Corp. Asbestos Personal Injury Settlement Trust |
| A-Best Asbestos Settlement Trust | Fuller-Austin Asbestos Settlement Trust | Rock Wool Mfg Company Asbestos Trust |
| AC&S Asbestos Settlement Trust | G-I Asbestos Settlement Trust | Rutland Fire Clay Company Asbestos Trust |
| Amatex Asbestos Disease Trust Fund | H.K. Porter Asbestos Trust | Shook & Fletcher Asbestos Settlement Trust |
| APG Asbestos Trust | Hercules Chemical Company, Inc. Asbestos Trust | Skinner Engine Co. Asbestos Trust |
| API, Inc. Asbestos Settlement Trust | J.T. Thorpe Settlement Trust | Stone and Webster Asbestos Trust |
| Armstrong World Industries Asbestos Personal Injury Settlement Trust | JT Thorpe Company Successor Trust | Swan Asbestos and Silica Settlement Trust |
| ARTRA 524(g) Asbestos Trust | Kaiser Asbestos Personal Injury Trust | T H Agriculture & Nutrition, LLC Industries Asbestos Personal Injury Trust |
| ASARCO LLC Asbestos Personal Injury Settlement Trust | Keene Creditors Trust | Thorpe Insulation Company Asbestos Personal Injury Settlement Trust |
| Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust | Lummus 524(g) Asbestos PI Trust | United States Gypsum Asbestos Personal Injury Settlement Trust |
| Bartells Asbestos Settlement Trust | Lykes Tort Claims Trust | United States Lines, Inc. and United States Lines (S.A.) Inc. Reorganization Trust |
| Brauer 524(g) Asbestos Trust | M.H. Detrick Company Asbestos Trust | United States Mineral Products Company Asbestos Personal Injury Settlement Trust |

2

| | | |
|---|---|---|
| Burns and Roe Asbestos Personal Injury Settlement Trust | Manville Personal Injury Settlement Trust | UNR Asbestos-Disease Claims Trust |
| C.E. Thurston & Sons Asbestos Trust | Muralo Trust | Utex Industries, Inc. Successor Trust |
| Celotex Asbestos Settlement Trust | NGC Bodily Injury Trust | Wallace & Gale Company Asbestos Settlement Trust |
| Combustion Engineering 524(g) Asbestos PI Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (OC Sub-Fund) | Western MacArthur-Western Asbestos Trust |
| Congoleum Plan Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (FB Sub-Fund) | W.R. Grace Trust |
| DII Industries, LLC Asbestos PI Trust | PLI Disbursement Trust | Pittsburgh Corning Trust |
| Eagle-Picher Industries Personal Injury Settlement Trust | Plibrico Asbestos Trust | |
| Federal Mogul U.S. Asbestos Personal Injury Trust | Porter Hayden Bodily Injury Trust | |

## AUTHORIZATION TO RELEASE PROTECTED HEALTH INFORMATION

Patient Name:  _____

Date of Birth:  _____    Social Security Number:  _____

1.      I authorize the use or disclosure of the above individual's health information as described below.

2.      The following individual or organization is authorized to make the disclosure:

_____

_____

_____

to disclose records obtained in the course of my evaluation and/or treatment from date
_____ to date _____.

3.      The type and amount of information to be used or disclosed is as follows: (include dates where appropriate)

| | | |
|---|---|---|
| ☐ Abstract/Pertinent Information | ☐ | Emergency Room |
| ☐ Lab | ☐ | x-ray and imaging reports |
| ☐ Treatment Plans | ☐ | consultation reports |
| ☐ Discharge Plans | ☐ | billing records |
| ☐ Progress Notes | ☐ | entire record INCLUDING HIV Testing & |
| ☐ treatment order(s) | | Chemical Dependency. |
| ☐ Psychological/Psychiatric Evaluation | ☐ | Other: _____ |
| ☐ most recent discharge summary | ☐ | Other: _____ |
| | ☐ | Other: _____ |

4.      Name/Address of person/ organization to which disclosure is to be made:

To:  _____
Address  _____
City, State, Zip  _____

5.      I understand that the information authorized for release may indicate the presence of a communicable or
venereal disease which may include, but is not limited to diseases such as hepatitis, syphilis, gonorrhea or
the Human Immunodeficiency Virus (HIV), also known as Acquired Immune Deficiency Syndrome
(AIDS).  I hereby authorize the above-named health care provider to disclose records obtained in the course
of my evaluation and/or treatment, and to send them by U.S. mail service and/or electronic facsimile to:

_____

For the following purpose:  _____

6.      I understand that I have a right to revoke this authorization at any time.  I understand that if I revoke this
authorization I must do so in writing and present my written revocation to the medical records department

1

practitioner.  I understand that the revocation will not apply to information that has already been released in response to this authorization.  Unless otherwise revoked, this authorization will commence on the date indicated below and will expire on the following date, event, or condition: _____.  If I fail to specify an expiration date, event or condition, this authorization will expire after one year.

7.      I understand that authorizing the disclosure of this health information is voluntary.  I understand that my healthcare and the payment of my healthcare will not be affected if I refuse to sign this authorization.  I understand that I may inspect or copy the information to be used or disclosed.  I understand that any disclosure of information carries with it the potential for an unauthorized redisclosure and the information may not be protected by federal confidentiality rules.  If I have questions about disclosure of my health information, I can contact this facility's privacy officer.


_____          _____

Signature of Patient or Legal Representative                    Date


_____

If Signed by Legal Representative, Relationship to Patient

**A PHOTOSTATIC COPY OF THIS RELEASE SHALL BE CONSIDERED AS VALID AS

THE ORIGINAL

2

## PAYROLL AND PERSONNEL RECORDS AUTHORIZATION

**TO WHOM IT MAY CONCERN:**

I hereby authorize you to provide to:

_____

at this address:

_____

_____

a complete copy of all records pertaining to my employment, including, but not limited to, all

personnel, payroll, medical or hospital records pertaining to:

Full Name: _____

Date of Birth: _____    Social Security No: _____

My dates of employment were from _____ to _____

I worked in the following departments:

_____

_____

I was employed at the following office:

_____

_____

SIGNED: _____

DATE: _____

1

# EXHIBIT D

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE: | Case No. 10-BK-31607 |
| GARLOCK SEALING TECHNOLOGIES LLC, et al., | Chapter 11 |
| Debtors.[1] | Jointly Administered |

## MASTER SET OF INTERROGATORIES TO GARRISON

Pursuant to Rule 7033 of the Federal Rules of Bankruptcy Procedure, Claimant, through counsel, requests that Garrison Litigation Management Group, Ltd. answer the following Interrogatories, in writing and under oath, in accordance with the Case Management Order for Post-Confirmation Allowance of Disputed GST Asbestos Claims Electing Litigation Option.

DEFINITIONS AND INSTRUCTIONS

1.     "*Asbestos*" means any of the naturally-occurring fibrous silicate minerals, including both serpentine forms (chrysotile) and amphibole forms (amosite, crocidolite, tremolite, anthophyllite, and actinolite), whether referred to by their scientific names or by synonyms such as brown (amosite), white (chrysotile) or blue (crocidolite) asbestos.

2.     "*Asbestos-containing product*" means any product or material that contains asbestos in any form. Such products include, but are not limited to, pipe covering, turbines, cement, block, gaskets, packing, plaster, joint compound, floor and ceiling tiles, mastics, raw fibers, fireproofing, shingles, panels, sheets, boards, millboard, refractory cement, boilers, firebrick, brake and clutch linings, finishing compound, texture, drilling mud, "hot tops," and other construction, building, drywall, lath, and insulation materials.

3.     "*Claim*" means the GST Asbestos Claim.

4.     "*Claimant*" means the GST Asbestos Claimant electing the Litigation Option, as well as all other claimants asserting a GST Asbestos Claim on the basis of the same asbestos-related injury, such as claimants alleging wrongful death or loss of consortium.

5.     "*Describe*" means to provide a comprehensive, full, frank, fair, complete, accurate, and detailed description of the matter inquired of.

6.     "*Document*" refers to all items subject to discovery under Rule 34 of the Federal Rules of Civil Procedure, including, but not limited to, any written or recorded material of any

---

[1] The Debtors in these jointly administered cases are Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company (collectively, the "Debtors").

1

kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise; notations of any sort of conversations, telephone calls, meetings or other communications; all graphic or oral records or representations of any kind; and electronic, mechanical, magnetic, optical or electric records or representations of any kind (including without limitation, computer files and programs, tapes, cassettes, discs, recordings), including metadata.

      7.    "*Garlock*" means Garlock Sealing Technologies LLC.

      8.    "*Garrison*" or "*you*" means Garrison Litigation Management Group, Ltd.

      9.    "*Identify*" means:

      (a)    In the case of a person, to state his or her full name, present or last-known home and business address, and his or her present or last-known employer and job title.

      (b)    In the case of a business concern, to state its name and its present or last-known address, and the nature of such business concern (*e.g.*, partnership, corporation, etc.).

      (c)    In the case of a document, to state its date, its author, its recipient or the person for whom it was prepared, the type of document (*e.g.*, letter, memorandum, chart, or other category), its present location or custodian, a summary of its contents, and any other information necessary to render the document distinguishable from all others and subject to ready location.  In lieu of identifying a document, a copy of the document may be supplied.

      (d)    In the case of a communication or act, to identify the person(s) present when the communication or act occurred, the date and location of such communication or act, the substance of such communication or act, and all documents which record, refer to, or otherwise concern such communication or act.

      (e)    In the case of a product, to identify the name and type of product, its identifying features and characteristics, the name of the manufacturer, and the date of manufacture.

      10.    "*Injured Party*" means the person whose alleged asbestos-related injury forms the basis of the Claim.

      11.    If an interrogatory or definition or instruction is objected to in whole or in part, specify all grounds on which objection rests. Respond to all portions of each such request to which no objection is asserted. In addition, state whether any responsive information has been omitted from an interrogatory response or whether and in what way the search for responsive information has been delimited or circumscribed on the basis of any such objection.

12.    If Garrison contends that an answer to any interrogatory herein is privileged in whole or in part, or otherwise objects to any part of any interrogatory, identify:

(a)    the reason(s) for each objection, claim of privilege or immunity, or ground for exclusion;

(b)    each person having knowledge of the factual basis, if any, on which the claim of privilege or immunity or other ground is based; and

(c)    in the case of a document, identify the document as defined in paragraphs 3(c) and (d) of the instructions to these interrogatories.

13.    These interrogatories are continuing in character and require you to file supplementary answers if you obtain further or different information after serving your initial answers and before trial, including in such supplemental answers the date upon and the manner in which such further or different information came to your attention.

## INTERROGATORIES

1.    When and how did Garlock first learn that inhalation of asbestos fibers can lead to the development of each of the following asbestos-related diseases:

a.    asbestosis,

b.    pleural plaques,

c.    lung cancer,

d.    kidney cancer,

e.    laryngeal cancer,

f.    esophageal cancer,

g.    stomach cancer,

h.    colon cancer, and

i.    mesothelioma?

<u>ANSWER:</u>

2.    Please list all trade organizations, trade associations, and any other groups to which Garlock belonged in which information relating to the hazards of asbestos or nuisance dust in general was discussed, disseminated, or in any way published before 1980. This list

3

should include (but is not limited to) any membership in the American Hygiene Foundation, Industrial Hygiene Foundation, Chemical Manu. Association (or its predecessor, the MCA), American Chemical Council, American Petroleum Institute, Texas Chemical Council, National Safety Council, American National Standards Institute (ANSI), Asbestos Information Association, Industrial Medical Association, American Society of Mechanical Engineers, American Society for Testing and Materials, Chlorine Institute, American Industrial Hygiene Association, National Insulation Manu. Association, Asbestos Textile Institute, Society of Automotive Engineers, Society of Petrol Engineers, ACGIF American Occupational Medicine Association, American Public Health Association, Friction Materials Standards Institute, Brake Lining Manufacturer's Association, American Medical Association, NIOSH and any state safety organizations.  As to each listed group, please state:

      a.      the time period when Garlock was a member;

      b.      the identity of Garlock's employees, former employees, or representatives who attended any of the meetings held by each listed group, as well as the dates and locations of the meetings they attended;

      c.      the identity of Garlock's employees, former employees, or representatives who served on any committees or subcommittees of any listed group (e.g., a medical advisory committee or legal committee); and

      d.      the name of the committee or subcommittee on which such person served and the position occupied on the committee, if applicable.

ANSWER:

      3.      Please identify each of Garlock's employees, former employees, or representatives who attended any proceeding, symposium, or conference of a scientific, medical, or technical nature, before 1972, during which information relating to the hazards of asbestos or nuisance dust in general was discussed, disseminated, or in any way published (e.g., the effects of human or non-human exposure to asbestos, populations at risk, etc.). A response to this Interrogatory should include any attendance at the Seventh Saranac Symposium in 1952, the Proceedings of the New York Academy of Sciences in October of 1964, any meetings held by the Exxon Corporation in Houston, Texas, or meetings of any organization listed in Garrison's response to Interrogatory No. 2. For each person identified in the response to this Interrogatory, please also list the proceeding, symposium, or conference the person attended; provide the date and location of the proceeding, symposium, or conference; provide the identity of the person within Garlock's organization who received or was designated to receive the attending person's report of the information gathered at such proceeding, symposium, or conference; and describe the manner in which such reports were made.

ANSWER:

4.      Please describe Garlock's medical, safety, and industrial hygiene programs from Garlock's inception through the current time. Specifically, please state when Garlock first established each of its medical departments, safety departments, and/or industrial hygiene departments. Please also provide the name or designation of each department. For each department identified in the response to this Interrogatory, please identify each person associated with the department, including, but not limited to, the director, manager, physician, nurse, medical personnel, safety engineer, industrial hygienist, safety personnel, and other employees in such department who were employed by Garlock or contracted with Garlock at any time.

ANSWER;

5.      Has Garlock ever been investigated or cited by OSHA or any other local, state, or federal governmental agency for any matter related to asbestos or asbestos exposure? If so, please provide the dates of such investigations, the results that were communicated to Garlock, and the remedial measures (if any) which were undertaken by Garlock.

ANSWER:

6.      Please provide Garlock's complete corporate history, including its ownership, sale, acquisition, or divestiture, and any mergers, acquisitions, consolidations, or other similar events involving Garlock at any time during its history.

ANSWER:

7.      Please identify each person who has supplied any information or assisted in locating any documents or tangible things used in answering or responding to all discovery pursuant to the Case Management Order, and provide a year-by-year list of all positions or job titles held by each person.

ANSWER:

8.      When was the first time Garlock became familiar with the concept of a threshold limit value, or TLV, for airborne dust, and how was Garlock first made aware of this concept?

ANSWER:

9.      Please identify each asbestos-containing product that Garlock mined, manufactured, marketed, produced, researched, sold, distributed, or patented at any time. For each product identified, please provide the following information:

a.       the trade name or brand name of the product mined, manufactured, marketed, produced, researched, sold, distributed, and/or patented;

b.       the date the product was patented (if patented), placed on the market (if marketed), and the inclusive dates of the product's manufacture or sale (if manufactured or sold);

c.       the physical and chemical composition of the product, including the type of asbestos contained in the product and the percentage or amount of asbestos in each product;

d.       the date Garlock stopped mining manufacturing, marketing, producing, researching, selling, and/or distributing the product;

e.       the date the product was removed from the market (if marketed) and no longer sold or distributed and the reasons therefor;

f.       the date asbestos was removed from the product, if ever, and the reasons for removing it;

g.      the seller(s), distributor(s) and/or supplier from whom Garlock purchased the asbestos used in each particular product, and the type (example: amosite, chrysotile) and quantity of asbestos Garlock purchased from the seller(s);

h.      whether Garlock ever conducted any testing on the product to determine whether it posed any potential hazard to human or non-human health;

i.      the plant or facility where the product was mined, manufactured, produced, or researched;

j.      the foreseeable users of the product (such as insulators, helpers, pipefitters, boilermakers, welders, machinists, plasterers, drywall finishers, carpenters, shipwrights, etc.); and

k.      a description of any warnings that Garlock placed on the product or its packaging, operating manuals, brochures, catalogs, or other related printed material. This description should include the precise language of the warning, the size of the warning, the location on the product or its packaging where the warning was printed, and when the warning was first placed on the product.

ANSWER:

10.     As to any asbestos-containing product mined, manufactured, marketed, produced, researched, sold, distributed, or patented by Garlock at any time, were such products ever further distributed, marketed, packaged, labeled, or sold by companies or individuals other than Garlock? If so, please identify such companies or individuals, provide the dates those companies or individuals further distributed, marketed, packaged, labeled, or sold Garlock asbestos-containing products, and identify the specific asbestos-containing products involved.

ANSWER:

11.     As to each asbestos-containing product mined, manufactured, marketed, produced, researched, sold, distributed or patented by Garlock at any time, was each such product generally expected to reach, or packaged to reach, the consumer or user without substantial change in the condition in which it was sold? If not, with respect to each such product, please explain in what way Garrison claims such product was to be altered or substantially changed alter sale or distribution and before reaching the consumer or user.

ANSWER:

12.     As to each asbestos-containing product mined, manufactured, marketed, produced, researched, sold, distributed, or patented by Garlock at any time, does Garrison contend that any of the products can be generally utilized without liberating asbestos fibers into the air? If so, please identify each such product, generally describe the intended use of the product, and explain how such use would not tend to liberate asbestos fibers into the air.

ANSWER:

13.     Was it foreseeable to Garlock, at the time each asbestos-containing product mined manufactured, marketed, produced, researched, sold, distributed, or patented by Garlock was released for sale and distribution, that the product might be removed, stripped, ripped out, or replaced at some time after installation?

ANSWER:

14.     Before 1970, did Garlock mine, manufacture, market, produce, research, sell, distribute, or patent any product which did not contain asbestos and which could be substituted for any asbestos-containing product? If so, please identify such asbestos-free product, and state the date such product was first placed on the market.

ANSWER:

15.     As to each asbestos-containing product mined, manufactured, marketed, produced, researched, sold, distributed, or patented by Garlock at any time, when did Garlock become aware of asbestos-free substitutes or alternatives for such product (e.g. mineral wool), regardless of Garlock's belief in the viability of substitutes or alternatives?

ANSWER:

16.     If it is your contention that Garlock took the proper precautions to protect users of its asbestos-containing product(s) from potential hazards associated with the use of said asbestos containing product(s), please identify any such precautions and actions taken.

ANSWER:

17.     As to each and every asbestos-containing product identified in Response to Interrogatory No. 9, please list each and every asbestos fiber supplier to Garlock.

ANSWER:

18.     Beginning in the year that Garlock first manufactured, marketed, produced, researched, sold, distributed, or patented any asbestos-containing product, and continuing through the present day, please identify each person who has held the position of corporate medical director, corporate safety director, and corporate industrial hygienist, however characterized. For each person identified, please also provide the person's current or last known address and whether the person is currently alive or dead, if known.

ANSWER:

19.     If it is your contention that Garlock's product was not or could not have been sold, distributed or otherwise present on any job site at which Claimant claims exposure to asbestos, please state the reasons for this contention and the underlying basis for it.

ANSWER:

20.     If you intend to make the contention at the trial of this case that your products were not or could not have been present on any job sites to which Claimant claims exposure to asbestos, please identify the individual or individuals who will testify to this contention and the underlying basis for their testimony.

ANSWER:

21.     If it is your contention that the Claimant's description of your asbestos-containing product(s) or his/her use of your asbestos-containing product(s) is not a proper description and/or use please state the bases for this contention.

ANSWER:

# EXHIBIT E

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE: | Case No. 10-BK-31607 |
| GARLOCK SEALING TECHNOLOGIES LLC, et al., | Chapter 11 |
| Debtors.[1] | Jointly Administered |

**MASTER SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO GARRISON**

Pursuant to Rule 7034 of the Federal Rules of Bankruptcy Procedure, Claimant, through counsel, requests that Garrison Litigation Management Group, Ltd. respond to the following requests for production of documents in accordance with the Case Management Order for Post-Confirmation Allowance of Disputed GST Asbestos Claims Electing Litigation Option.

DEFINITIONS AND INSTRUCTIONS

1.      "*Asbestos*" means any of the naturally-occurring fibrous silicate minerals, including both serpentine forms (chrysotile) and amphibole forms (amosite, crocidolite, tremolite, anthophyllite, and actinolite), whether referred to by their scientific names or by synonyms such as brown (amosite), white (chrysotile) or blue (crocidolite) asbestos.

2.      "*Asbestos-containing product*" means any product or material that contains asbestos in any form. Such products include, but are not limited to, pipe covering, turbines, cement, block, gaskets, packing, plaster, joint compound, floor and ceiling tiles, mastics, raw fibers, fireproofing, shingles, panels, sheets, boards, millboard, refractory cement, boilers, firebrick, brake and clutch linings, finishing compound, texture, drilling mud, "hot tops," and other construction, building, drywall, lath, and insulation materials.

3.      "*Claim*" means the GST Asbestos Claim.

4.      "*Claimant*" means the GST Asbestos Claimant electing the Litigation Option, as well as all other claimants asserting a GST Asbestos Claim on the basis of the same asbestos-related injury, such as claimants alleging wrongful death or loss of consortium.

5.      "*Document*" refers to all items subject to discovery under Rule 34 of the Federal Rules of Civil Procedure, including, but not limited to, any written or recorded material of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise; notations of any sort of conversations, telephone calls, meetings or other communications; all graphic or oral records or representations

---

[1] The Debtors in these jointly administered cases are Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company (collectively, the "Debtors").

1

of any kind; and electronic, mechanical, magnetic, optical or electric records or representations of any kind (including without limitation, computer files and programs, tapes, cassettes, discs, recordings), including metadata.

6.    "*Garlock*" means Garlock Sealing Technologies LLC.

7.    "*Garrison*" or "*you*" means Garrison Litigation Management Group, Ltd.

8.    "*Identify*" means:

(a)    In the case of a person, to state his or her full name, present or last-known home and business address, and his or her present or last-known employer and job title.

(b)    In the case of a business concern, to state its name and its present or last-known address, and the nature of such business concern (*e.g.*, partnership, corporation, etc.).

(c)    In the case of a document, to state its date, its author, its recipient or the person for whom it was prepared, the type of document (*e.g.*, letter, memorandum, chart, or other category), its present location or custodian, a summary of its contents, and any other information necessary to render the document distinguishable from all others and subject to ready location.  In lieu of identifying a document, a copy of the document may be supplied.

(d)    In the case of a communication or act, to identify the person(s) present when the communication or act occurred, the date and location of such communication or act, the substance of such communication or act, and all documents which record, refer to, or otherwise concern such communication or act.

(e)    In the case of a product, to identify the name and type of product, its identifying features and characteristics, the name of the manufacturer, and the date of manufacture.

9.    "*Injured Party*" means the person whose alleged asbestos-related injury forms the basis of the Claim.

10.    If a document request or definition or instruction is objected to in whole or in part, specify all grounds on which objection rests. Respond to all portions of each such request to which no objection is asserted.

11.    If Garrison contends that any documents requested are privileged in whole or in part, or otherwise objects to any part of any document request, identify:

(a)    the reason(s) for each objection, claim of privilege or immunity, or ground for exclusion;

(b)      each person having knowledge of the factual basis, if any, on which the claim of privilege or immunity or other ground is based; and

(c)      identify the document.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      Please produce all documents and tangible things that indicate the time and/or manner in which Garlock learned inhalation of asbestos fibers by humans lead to the development of the following asbestos-related diseases:

a.      asbestosis,

b.      pleural plaques,

c.      lung cancer,

d.      kidney cancer,

e.      laryngeal cancer,

f       esophageal cancer,

g.      stomach cancer,

h.      colon cancer, and

i.      mesothelioma.

RESPONSE:

2.      Please produce all documents and tangible things containing any information Garlock received before 1980, relating to the hazards of asbestos or nuisance dust in general that was discussed, disseminated, or in any way published by any organization, association, or group listed in Garlock's response to Interrogatory No. 2, or by any other trade organization or group.

RESPONSE:

3.      Please produce all documents and tangible things related to any meeting, attended by any of Garlock's employees, former employees, or representatives, that indicate any discussion, consideration, or information regarding asbestos or nuisance dust in general. This

Request for Production specifically seeks, but is not limited to: meeting agendas, minutes, notes or memoranda from any proceeding, symposium or conference listed in Garlock's response to Interrogatory No. 2, as well as from safety committees, purchasing committees or other groups within Garlock's organization generated before 1972.

RESPONSE:

      4.     Please produce all documents and tangible things relating to Garlock's establishment of medical, safety, and industrial hygiene departments. This Request for Production specifically seeks, but is not limited to, any policies, procedures or guidelines given to each such department by Garlock's management, and any product testing, or other actions taken by each such department regarding the hazards of asbestos or nuisance dust in general.

RESPONSE:

      5.     Please produce all documents and tangible things relating to health or safety inspections of Garlock, by local, state or federal regulatory agencies. This Request for Production specifically seeks, but is not limited to: all documents and tangible things relating to any violations, citations, or warnings, and include inspections for asbestos and other dust hazards.

RESPONSE:

      6.     Please produce all the closing binders and/or final transaction documents related to all transactions in which Garlock acquired any business entity which manufactured, mined, distributed, supplied, or sold asbestos-containing products.

RESPONSE:

      7.     Please produce all the closing binders and/or final transaction documents related to all transactions in which Garlock was acquired by another entity.

RESPONSE:

4

8.    Please produce all the closing binders and/or final transaction documents related to all transactions in which Garlock agreed to assume tort liabilities of any third party which manufactured, mined, distributed, supplied, or sold asbestos-containing products.

RESPONSE:

9.    Please produce all the closing binders and/or final transaction documents related to all transactions in which Garlock agreed to indemnify, defend or hold harmless the tort liabilities of any third party which manufactured, mined, distributed, supplied or sold asbestos-containing products.

RESPONSE:

10.    Please produce all the closing binders and/or final transaction documents related to all transactions in which Garlock changed its name.

RESPONSE:

11.    Please produce all documents and tangible things, received or obtained by Garlock before 1972, that indicate that inhaled asbestos fibers can be hazardous to human or non-human health. This Request for Production specifically seeks, but is not limited to: all responsive books, articles, reports, pamphlets and manufacturer's instructions.

RESPONSE:

12.    Please produce all documents and tangible things relating to the inventories of all Garlock's libraries, research repositories, or other archives that contain magazines, journals, books, publications or other documents related to asbestos, pneumoconiosis, or any other dust-related disease (including, but not limited to, the effects of exposure to asbestos, industrial

5

hygiene measures relating to asbestos dust, and medical information or research relating to asbestos or its effects on animals or humans, populations at risk, etc.). This Request for Production specifically seeks, but is not limited to: all card catalogs, indices, holding lists, databases, other record management systems, and subscription lists for periodicals such as: <u>Journal of the American Medical Association,</u> <u>Industrial Medicine,</u> <u>Journal of Industrial Hygiene and Toxicology,</u> <u>National Safety News,</u> <u>Industrial Hygiene Foundation Digest</u> and <u>Public Health Reports of the United States.</u>

<u>RESPONSE:</u>

13.     Please produce all documents and tangible things containing information concerning the hazards of asbestos or nuisance dust in general that Garlock received at any time.

<u>RESPONSE:</u>

14.     Please produce all documents and tangible things containing information concerning the hazards of asbestos or nuisance dust in general that Garlock published, distributed, or disseminated at any time.

<u>RESPONSE:</u>

15.     Please produce all documents and tangible things, created by any of Garlock's employees, former employees, or representatives at any time, that refer to any documents or tangible things responsive to the Request for Production immediately above.

<u>RESPONSE:</u>

16.     Please produce all documents and tangible things generated by Garlock before 1972 that discuss or refer to the Fleischer-Drinker Report.

<u>RESPONSE:</u>

17.    Please produce all documents and tangible things generated by Garlock before 1972 that discuss or refer to the Dreessen Report.

RESPONSE:

18.    Please produce all documents and tangible things relating to Garlock's document and record retention (and/or destruction) policies or procedures, including, but not limited to:

    a.    any supplements, addenda, memoranda, operating bulletins, revisions, or any other superseding instructions that refer to the stoppage, suspension or resumption of responsive policies or procedures; and

    b.    policies or procedures regarding documents or records created, maintained, or stored by electronic, digital, optical and/or magnetic means (such as microfilm, microfiche, imaging, scanning, or storage on tapes, disks, CD or DVD-based media, databases, or on any computer hardware, backup system, download system, file dumping or other system of information management, whether on-site or off site).

RESPONSE:

19.    Please produce all demonstrative aids that Garrison plans to use at trial in this matter.

RESPONSE:

20.    Please produce all documents and tangible things relating to communications between Garlock and any of its worker's compensation insurance carriers or any other insurance companies, made at any time, regarding asbestos-containing products, the hazards of asbestos or nuisance dust in general and any asbestos-related studies, analyses or testing conducted by any insurance carriers.

RESPONSE:

21.     Please produce copies of all affidavits, depositions, and trial transcripts of Garlock's employees, former employees, or representatives taken in any matter involving an alleged injury or claimed property damage, incurred at any time, due to asbestos.

RESPONSE:

22.     Please produce all documents and tangible things related to inventory, stock-on-hand, warehousing, or other storage of asbestos or asbestos-containing products at any location owned, operated, or controlled by Garlock between 1972 and the present day.

RESPONSE:

23.     Please produce all documents and tangible things that indicate Garlock's participation in, or funding of, any research regarding the health effects of asbestos exposure.

RESPONSE:

24.     Please produce all documents and tangible things indicating any industrial hygiene advice, related to the hazards of asbestos, which Garlock received from any insurance carrier at any time.

RESPONSE:

25.     Please produce the personnel records of all witnesses listed in Garrison's Answers to Interrogatories.

RESPONSE:

26.     Please produce all documents and tangible things Garrison's counsel provided to any of its expert or fact witnesses as a result of the filing of this Claim.

RESPONSE:

27.     Please produce a copy of the current resume and bibliography of each expert identified in Garrison's Answers to Interrogatories.

RESPONSE:

28.     Please produce all statements, invoices, and other billing records that evidence or relate to any fees and expenses charged by any expert identified in Garrison's Answers to Interrogatories for time spent, or services rendered, with respect to this Claim.

RESPONSE:

29.     Please produce a copy of the expert report rendered by any expert identified in Garrison's Answers to Interrogatories.

RESPONSE:

30.     Please produce all responses to written discovery made by Garlock or Garrison in all previous or pending asbestos-related lawsuits.

RESPONSE:

31.     Please produce all agreements between Garlock and any manufacturer of asbestos-containing products in which Garlock agreed to act on the manufacturer's behalf in representing, selling, or distributing the manufacturer's products.

RESPONSE:

32.     Please produce all documents and tangible things relating to Garlock's mining, manufacture, marketing, production, research, sale, distribution, or patenting of any asbestos-containing product at any time. This Request for Production specifically seeks, but is not limited to:  packaging, instructions, package inserts, warnings, advertisements, and records of safety or health testing for each such product.

RESPONSE:

33.     Please produce all documents and tangible things that indicate, in any way, the dust-creating potential of any asbestos-containing product mined, manufactured, marketed, produced, researched, sold, distributed, or patented by Garlock at any time.

RESPONSE:

34.     Please produce all documents and tangible things that indicate, in any way, Garlock's knowledge or awareness of asbestos-free substitutes or alternatives for any product mined, manufactured, marketed, produced, researched, sold, distributed, or patented by Garlock regardless of Garlock's belief of the viability of such substitutes or alternatives.

RESPONSE:

35.     Please produce all documents and tangible things relating to cost-risk analyses, cost-benefit analyses, or any other study, analysis, report, or document generated or obtained by Garlock at any time, that discusses the cost of abating, removing, replacing, or encapsulating asbestos or implementing any safeguards or engineering controls designed to protect persons from the hazards of asbestos or nuisance dust in general.

10

RESPONSE:

36.     Please produce all documents and tangible things evidencing health surveys, epidemiological studies, environmental testing, air monitoring, or dust level counts conducted at any time by Garlock or at Garlock's request related to the use of Garlock's asbestos-containing products.

RESPONSE:

37.     Please produce any and all documents identifying precautions taken by Garlock to protect users of its asbestos-containing product(s) from the potential hazards associated with asbestos.

RESPONSE:

38.     Please produce any and all advertisements, brochures, product manuals, or any other such documents relating to any asbestos containing product(s) manufactured, sold, or otherwise distributed by Garlock.

RESPONSE:

39.     Please produce all documents and tangible things that indicate, in any way, each and every asbestos fiber supplier to Garlock.

RESPONSE:

# EXHIBIT C

**EXHIBIT C**

**Schedule of Non-Debtor Affiliates**

(Shanghai) Co. Ltd.
Allwest Compressor Products ULC
CAB Compressores Indústria e Comércio Ltda.
Coltec do Brasil Productos Industriais Ltda.
Coltec Finance Company Limited
Coltec Industrial Products LLC
Coltec Industries Inc
Coltec Industries Pacific Pte Ltd
Coltec International Services Co.
Compressor Products Holdings, Inc.
Compressor Products Holdings, Limited
Compressor Products Int'l (Shanghai) Co., Ltd.
Compressor Products International Ltd.
Compressor Products International Ltda.
Compressor Sales & Service Co., Ltd.
Compressor Services Holdings, Inc.
Corrosion Control Corporation
Corrosion Control Corporation (D/B/A Pikotek)
CPI Asia Co., Ltd.
CPI Investments Limited
CPI Pacific Pty Limited
CPI-LIARD SAS
EnPro Corporate Management Consulting
EnPro Hong Kong Holdings Company Limited
EnPro India Private Limited
EnPro Industries Int'l Trading (Shanghai) Co., Ltd.
EnPro Industries, Inc.
Garlock (Great Britain), Limited
Garlock de Mexico, S.A. De C.V.
Garlock France, SAS
Garlock GMBH
Garlock International Inc
Garlock of Canada Ltd
Garlock of Canada Ltd. - Sherbrooke
Garlock Overseas Corporation
Garlock PTY Limited
Garlock Sealing Technologies (Shanghai) Co., Ltd.
GGB LLC
Link Seal Japan Ltd.
Pipeline Seal & Insulator Co. Limited
Player & Cornish P.E.T. Limited
PSI [SEA] SDN BHD
Robix Limited
Stemco Delaware LP
Stemco Holdings Delaware, Inc.
Stemco Holdings, Inc.
Stemco LP
Stemco, LLC

Stempro de Mexico, S. de R.L. de C.V.
Texflo Compressor Services, ULC
Wide Range Elastomers Limited

2

# EXHIBIT D

## EXHIBIT D
## RETAINED CAUSES OF ACTION

*Garlock Sealing Technologies LLC, et al.  v. Chandler,  et al.*
Case No. 12-AP_03137 (Bankr. W.D.N.C.)

*Garlock Sealing Technologies LLC v. Delores Ann Robertson, et al.*
Case No. 12-CI-004046 (Circuit Court of Jefferson Cty., Ky.)

*Garlock Sealing Technologies LLC, et al.  v. Shein Law Center, Ltd.*, *et al.*
Case No. 3:14-cv-00137 (W.D.N.C.)

*Garlock Sealing Technologies LLC, et al.  v. Belluck & Fox, LLP*, et al.
Case No. 3:14-cv-00118 (W.D.N.C.)

*Garlock Sealing Technologies LLC, et al.  v. Simon Greenstone Panatier Bartlett, APLC*, et al.
 Case No. 3:14-cv-00116 (W.D.N.C.)

*Garlock Sealing Technologies LLC, et al.  v. Estate of Ronald C. Eddins, e*t al.
Case No. 3:14-cv-00130 (W.D.N.C.)