**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC, et al.,<br><br>Debtors.[1] | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered |

**DEBTORS' BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE OR STRIKE
COMMITTEE AND FCR ESTIMATION EXPERT WITNESS OPINIONS**

---

[1] The debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company (hereinafter "Garlock" or "Debtors").

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................................ 1

ARGUMENT ....................................................................................................... 6

I. PETERSON AND RABINOVITZ'S OPINIONS DO NOT FIT THE QUESTIONS
    BEFORE THE COURT ................................................................................ 6

    A. The Questions Before the Court at the Estimation Trial................................ 7

    B. Peterson and Rabinovitz Fail to Connect Their Estimates to Debtors' Liability
        for Claims................................................................................................ 10

    C. It Is Far From Self-Evident that Garlock's Settlements Equate to Its Liability
        Under State Law .................................................................................... 11

    D. Peterson and Rabinovitz Have Erred By Uncritically Applying Methods Used
        for Different Purposes in Previous Cases ............................................. 14

    E. Peterson and Rabinovitz Fail to Connect Their Estimates to the Cost of
        Resolving Claims in Bankruptcy ........................................................ 16

II. PETERSON AND RABINOVITZ FAIL TO USE RELIABLE METHODS ...................... 17

    A. Peterson and Rabinovitz's Method for Predicting Future Settlements ...................... 18

    B. Peterson and Rabinovitz Fail to Provide Any Basis for Expecting that Future
        Settlement Behavior Would Resemble the Immediate Past ................................ 19

    C. It Is Far From Self-Evident That Future Settlements Would Resemble the
        Recent Past........................................................................................... 21

    D. Peterson Says Garlock's Settlements Increased Over the Past Decade for a
        "Dozen" Reasons, and Cannot Disentangle Them, Much Less Determine
        Whether They Would Persist in the Future or Impact Future Settlements .......... 22

    E. Rabinovitz Has No Opinion About Why Garlock's Settlements Varied Over
        the Decade Before Its Petition ............................................................. 24

    F. Application of Their Simple Extrapolation Methodology Has Led to Massive
        Overstatements of Liability in Previous Cases .................................... 27

III. PETERSON AND RABINOVITZ HAVE NOT RELIABLY APPLIED THEIR
     METHODS TO THE FACTS OF THIS CASE ........................................... 29

CONCLUSION................................................................................................... 31

# TABLE OF CASES AND AUTHORITIES

## Cases

*A.H. Robins Co. v. Piccinin (In re A.H. Robins Co.)*, 788 F.2d 994 (4th Cir. 1986) ............... 3, 16

*Bittner v. Borne*, 691 F.2d 134 (3d Cir. 1982) ................................................................ 8

*Borg-Warner Corp. v. Flores*, 232 S.W.3d 765 (Tex. 2007) ............................................ 8

*Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469 (4th Cir. 2005) ............................ 17, 19

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194 (4th Cir. 2001) .................................... 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ........................... 1, 6, 7, 29

*ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807 (E.D. Va. 2011), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012) ........................................................................................................ 7

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ............................................................... 17

*Georgia-Pacific Corp. v. Bostic*, 320 S.W.3d 588 (Tex. App. 2010) ............................ 8

*Gregg v. V-J Auto Parts Co.*, 943 A.2d 216 (Pa. 2007) ............................................... 8

*In re Armstrong World Industries, Inc.*, 348 B.R. 111 (D. Del. 2006) ......................... 14

*In re Aspen Limousine Servs., Inc.*, 193 B.R. 325 (D. Colo. 1996) ............................. 9

*In re Dow Corning Corp.*, 211 B.R. 545 (Bankr. E.D. Mich. 1997) ............................ 7

*In re Dow Corning Corp.*, 215 B.R. 346 (Bankr. E.D. Mich. 1997) ............................ 8

*In re Farley, Inc.*, 146 B.R. 748 (Bankr. N.D. Ill. 1992) ........................................... 7, 9

*In re Federal-Mogul Global, Inc.*, 330 B.R. 133 (D. Del. 2005) ................................. 14

*In re USG Corp.*, 290 B.R. 223 (Bankr. D. Del. 2003) ............................................. 7

*In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503 (Bankr. E.D.N.Y. 1994) ........ 9

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ........................................ 6

*Oglesby v. Gen. Motors Corp.*, 190 F.3d 244 (4th Cir. 1999) ................................... 17, 19, 29

*Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719 (D. Del. 2005) ............... 14

*Seaboard Lumber Co. v. United States*, 308 F.3d 1283 (Fed. Cir. 2002) ................... 6

*Sherman v. Westinghouse Savannah River Co.*, 263 Fed. App'x 357 (4th Cir. 2008) ..... 7

*Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684 (W.D.N.C. 2003) ..................................... 6

*Snoznik v. Jeld-Wen, Inc.*, No. 1:09CV42, 2010 WL 1924483, (W.D.N.C. May 12, 2010) ........ 29

*United States v. Scholl*, 166 F.3d 964 (9th Cir. 1999) .................................................................. 7

**Statutes**

11 U.S.C. § 502(b)(1) ............................................................................................................... 1, 7

Del. Code Ann., tit. 10, §§ 6301, 6302(a), 6304(a), 6304(b) (2012) ............................................ 8

Ga. Code Ann. § 51-12-33 (2012) .................................................................................................. 8

Ind. Code § 34-20-8-1 (2012) ......................................................................................................... 8

Md. Code Ann., Cts. & Jud. Proc. §§ 3-1404, -1402(a), -1405 (2012) ......................................... 8

**Rules**

Fed. R. Evid. 408 ...................................................................................................................... 13, 14

Fed. R. Evid. 702 ............................................................................................................................. 1

Fed. R. Evid. 702(d) ...................................................................................................................... 31

## SUMMARY OF ARGUMENT

Since the beginning of these cases, the Official Committee of Asbestos Personal Injury

Claimants (the "Committee") and the Future Claimants' Representative (the "FCR") have

portrayed their "settlement approach" to estimation as a panacea: simple, quick, and requiring no

data other than the Debtors' own claims database. Debtors, by contrast, have consistently

asserted their right to dispute the merits of the mesothelioma claims that may be asserted against

them. Debtors have long predicted that the Committee/FCR approach would ultimately provide

no assistance to the Court in determining the number and amount of mesothelioma claims that

have merit under state law—the test for allowance under the Bankruptcy Code. 11 U.S.C. §

502(b)(1).

Now, after the Committee and FCR's experts have submitted expert reports and been

deposed, it is clear that their approach not only is no panacea: it is not even admissible under the

well-settled standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Expert testimony is not admissible in federal court

unless (a) the testimony is connected to the matters at issue before the Court, (b) the expert has

applied reliable methods, and (c) the expert has reliably applied those methods to the facts of the

case. The opinions of Dr. Mark Peterson (expert for the Committee) and Dr. Francine Rabinovitz

(expert for the FCR) fail on all three counts.

First, Peterson and Rabinovitz have failed to connect their opinions to the issues before

the Court. In its Order for Estimation of Mesothelioma Claims (Docket No. 2102) (the

"Estimation Order"), the Court ordered estimation (a) for "allowance purposes pursuant to

section 502(c)," and (b) for "making a reliable and reasonable estimate of the aggregate amount

of money that Garlock will require to satisfy present and future mesothelioma claims." *Id.* ¶¶ 9,

10. The number and amount of allowed claims depend upon the number of claimants who have valid claims under state law—i.e., claimants who can carry their burden of proving that Garlock's products caused their disease—and Garlock's share of any damages owed to such claimants. The aggregate amount of money that will be required to satisfy present and future claims depends upon what it would cost Garlock to resolve claims in bankruptcy.

Peterson and Rabinovitz have not rendered expert opinions relevant to either issue. Both purport to measure what it would have cost Garlock to settle mesothelioma claims if it had never filed for bankruptcy. But they fail to link "settlement cost outside of bankruptcy" to either the allowed amount of claims or the cost of resolving claims in bankruptcy:

- Peterson and Rabinovitz have no opinion on the number of persons whose mesothelioma was caused by a Garlock product.

- They also have no opinion about the damages Garlock owes to persons whose mesothelioma may have been caused by a Garlock product, nor about the facts relevant to Garlock's share of any damages, including (a) the total damages such mesothelioma claimants could receive, (b) the number of other parties responsible for any such damages, and (c) the likelihood that any such claimants would succeed at trial against Garlock.

- Peterson and Rabinovitz blindly equate Garlock's settlements with its liability for claims under state law, despite the recognition by courts, law and economics scholars, and Peterson himself that settlements are motivated by many factors other than liability, including the cost of defense.

- Neither Peterson nor Rabinovitz analyzes or determines the impact that these other factors had on Garlock's settlements, or attempts to tease out what trial risk was embedded in Garlock's settlements.

- Likewise, Peterson and Rabinovitz offer no opinion on the cost of resolving claims in bankruptcy. To the contrary, their opinions are conditioned upon Garlock counterfactually *never filing* for bankruptcy. In fact, they do not make any attempt to link the cost of resolving claims outside of bankruptcy to the cost of resolving claims inside bankruptcy.

- They fail to make this connection despite there being every reason to expect that resolution costs are lower within bankruptcy, since the purpose of bankruptcy is to save transaction costs for the benefit of all parties with interests in the estate. *See A.H. Robins Co. v. Piccinin (In re A.H. Robins Co.)*, 788 F.2d 994,1013 (4th Cir. 1986) (holding that purpose of mass tort bankruptcy is to save transaction costs for benefit of all parties).

- All the more striking, Peterson himself admitted in prior asbestos bankruptcy cases that asbestos Trusts can resolve claims for billions of dollars less than the debtor could resolve claims in the tort system. Yet he still made no attempt to estimate the costs of resolving mesothelioma claims in bankruptcy here.

Peterson and Rabinovitz's opinions are independently inadmissible under Rule 702 and *Daubert* because they fail to apply reliable methods to determine the cost of settlements outside of bankruptcy—the question they purport to address:

- Peterson and Rabinovitz follow a common method, which consists of selecting a period of several years—a "calibration period"—from Garlock's recent past. They then assume

that Garlock would have continued settling claims at the same rate and for the same

amounts for the next forty years. The periods they choose happen to yield high numbers.

- But neither Peterson nor Rabinovitz provides any analysis showing that their calibration

    period characterizes the future, despite admitting that asbestos case settlement practices

    are volatile and have been affected by numerous ever-changing factors, including co-

    defendant bankruptcies, changes in law, revelation of abusive practices, changes in court

    procedures, and changes in defense costs.

- Indeed, despite using Garlock's past settlements to predict the future, neither Peterson nor

    Rabinovitz could explain why Garlock's settlements varied in the past. They have no

    objective methodology for determining why the settlements varied, and certainly have no

    objective methodology for deciding whether factors that influenced past settlements will

    persist and, if so, what impact they would have on settlements. Most notably, Peterson

    and Rabinovitz have no ability to determine the effect that over $30 billion in future

    payments by asbestos Trusts would have had on Garlock's settlements. Their estimation

    opinions ultimately amount to nothing more than a fallacious assumption that the future

    will resemble the past.

- Finally, Peterson and Rabinovitz's use of their simple extrapolation method has led to

    grievous errors in the past. Both failed to predict the precipitous decline in non-malignant

    claims during the middle part of the past decade—even *after* that decline had already

    begun. This resulted in forecasts that differed from reality by an order of magnitude.

Peterson and Rabinovitz's untested and unverified assumptions that the future will resemble the

past, followed by simple algebra to produce their estimates, are not admissible expert testimony

under Rule 702 and *Daubert*. Their forecasts have no more validity than an opinion valuing a stock for the next forty years based upon nothing more than its most recent market performance.

Finally, Peterson and Rabinovitz fail to reliably apply their methods to the facts of this case. They make basic mistakes of fact in applying their method that result in their estimates being hundreds of millions of dollars too high. This defect is additional to their failure to connect their opinions to the matters at issue in this case and their failure to follow a reliable methodology for predicting future settlements.

For all these reasons, the expert opinions offered by the Committee and FCR are not legitimate approaches to estimation in this case. The opinions fail to connect to either the allowed amount of claims or the cost of resolving claims in bankruptcy; blindly extrapolate recent settlement history to determine what settlements outside of bankruptcy would have been for the next forty years; and make basic mistakes of fact in doing so.

The only legitimate way for the Court to estimate Garlock's liability for mesothelioma claims is to apply the law. As Debtors will set forth in detail in their trial brief due on July 8, Debtors will offer reliable evidence of the asbestos exposures that current and future claimants experienced (both to Garlock's products and to other products), the number of current and future claimants who can demonstrate causation given those exposures, and Garlock's share of damages given all the other companies that contributed to the harm. The Committee and FCR have no such evidence, and have failed to link their experts' opinions to the matters before this Court. Their promised shortcut is a dead end.

## ARGUMENT

### I. Peterson and Rabinovitz's Opinions Do Not Fit the Questions Before the Court

Most fundamentally, Peterson and Rabinovitz's opinions are inadmissible because they fail to link those opinions to the questions before the Court. Even if they had performed their forecasts of future settlements outside of bankruptcy reliably (which they did not), the lack of connection to the estimation of allowed claims renders their opinions inadmissible.

Federal Rule of Evidence 702 (applicable in this proceeding under Federal Rule of Bankruptcy Procedure 9017) provides that an expert may testify only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." The Court has a duty under Rule 702 to determine the admissibility of any expert testimony under these standards (although Debtors fully expect that the Court in this case will hear the evidence at trial before making rulings on *Daubert* issues). *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert*, 509 U.S. at 597 (describing court's "gatekeeping" role with respect to expert testimony). The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of proof. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 194 (4th Cir. 2001); *Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 691 (W.D.N.C. 2003). Rule 702 and *Daubert* apply to all federal civil proceedings, including bench trials and jury trials. *See Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1301-2 (Fed. Cir. 2002).

The Supreme Court has described the first requirement of Rule 702 as "fit"—that is, whether the expert's testimony is "sufficiently tied to the facts of the case." *Daubert*, 509 U.S. at

591. Stated differently, Rule 702 requires "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92. Expert opinion that is not connected to the relevant questions at issue must be excluded. *See, e.g.*, *Sherman v. Westinghouse Savannah River Co.*, 263 Fed. App'x 357, 362 (4th Cir. 2008) (affirming trial court's exclusion of expert testimony where there was "no fit whatsoever between his analysis and the limited issue in this case"); *United States v. Scholl*, 166 F.3d 964, 970-72 (9th Cir. 1999) (same); *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 812-16 (E.D. Va. 2011), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012).

## A. The Questions Before the Court at the Estimation Trial

There are two questions before the Court at the estimation trial. The first purpose of the trial is "to estimate Garlock's mesothelioma asbestos liability for allowance purposes pursuant to section 502(c)." Estimation Order ¶ 9. Current and future mesothelioma claims cannot be allowed to the extent they are "unenforceable against the debtor and property of the debtor, under . . . applicable law." 11 U.S.C. § 502(b)(1). The applicable law here is state substantive law. *See In re USG Corp.*, 290 B.R. 223, 225 (Bankr. D. Del. 2003) ("It is basic that federal bankruptcy jurisdiction does not oust state law governing claims on a debtor's estate. . . . An unbroken line of authority holds that state law claims remain governed by state law, even after the debtor invokes federal bankruptcy protection.").

Thus, estimation must determine the number and amount of claims that can meet the requirements of state substantive law. *See In re Dow Corning Corp.*, 211 B.R. 545, 560 n.13 (Bankr. E.D. Mich. 1997); *see also id.* at 566 ("While estimation may be a somewhat abbreviated form of liquidation, they are still generally duplicative processes."); *In re Farley, Inc.*, 146 B.R. 748, 753 (Bankr. N.D. Ill. 1992) ("In determining the claims' value, the Court 'is bound by the

legal rules which may govern the ultimate value of the claim.'"). The estimation of the allowed amount of claims necessarily "includes the determination of whether the debtor is liable on the claim—that is, whether the claim is valid." *In re Dow Corning Corp.*, 215 B.R. 346, 354 (Bankr. E.D. Mich. 1997); *see also Bittner v. Borne*, 691 F.2d 134, 135 (3d Cir. 1982) (estimating court is "bound by the legal rules which may govern the ultimate value of the claim.").

As Debtors have previously shown, mesothelioma claimants in every state have the burden of proving causation: i.e., that a Garlock product was a significant contributing factor to the claimants' diseases. *See, e.g.*, *Gregg v. V-J Auto Parts Co.*, 943 A.2d 216, 226 (Pa. 2007); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770 (Tex. 2007); *Georgia-Pacific Corp. v. Bostic*, 320 S.W.3d 588, 596 (Tex. App. 2010); *see generally* State Law Appendix to Debtors' Reply in Support of Motions for Estimation and Bar Date (Docket No. 1818).

If any claimants can prove causation, the question then becomes Garlock's share of their damages, given the other companies that also contributed. In all states, Garlock is protected from bearing more than its share of damages, given all the companies that contributed to the injury, although in joint and several jurisdictions Garlock and other defendants may be responsible for amounts that insolvents cannot pay. *See, e.g.*, Del. Code Ann., tit. 10, §§ 6301, 6302(a), 6304(a), 6304(b) (2012) (joint and several liability, but defendant is protected from bearing more than pro rata share by setoff and contribution rights); Md. Code Ann., Cts. & Jud. Proc. §§ 3-1404, -1402(a), -1405 (2012) (same); Ga. Code Ann. § 51-12-33 (2012) (defendants found liable responsible only for their proportional fault); Ind. Code § 34-20-8-1 (2012) (same). *See generally* Memorandum from Robinson Bradshaw & Hinson, P.A. to Bates White re: Law of Apportioning Damages (Feb. 5, 2013) (attached as **Ex. A**).

Thus, in all states, Garlock's share of any damages depends upon (a) the total amount of the potential verdict, (b) the number of other parties that contributed to the harm, and (c) the likelihood of the plaintiff obtaining a liability finding against Garlock. Estimation cases have recognized that these are the factors relevant to the estimation of contingent claims, including tort claims. *See, e.g.*, *In re Farley, Inc.*, 146 B.R. 748, 750-52, 754-56 (Bankr. N.D. Ill. 1992) (estimating tort claims by determining claimants' likelihood of success and probability of damages); *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 520, 524, 528, 531, 536 (Bankr. E.D.N.Y. 1994) (same); *In re Aspen Limousine Servs., Inc.*, 193 B.R. 325, 337, 339 (D. Colo. 1996) (same). *See generally* Appendix of Estimation Cases, Debtors' Brief Concerning Scope and Purpose of Estimation of Mesothelioma Claims Pursuant to Bankruptcy Code Section 502(c) (Docket No. 2009).

In addition to the allowed amount of claims, the Court's Estimation Order also demonstrates an interest in what it will cost Debtors to resolve the mesothelioma claims in bankruptcy. *See* Estimation Order ¶ 10 ("The court anticipates hearing appropriate evidence for the purpose of making a reliable and reasonable estimate of the aggregate amount of money that Garlock will require to satisfy present and future mesothelioma claims"). The Court expressed indifference about how the claims are resolved, but clearly indicated that they will be resolved within the context of bankruptcy law. *See id.* ("Whether those claims are satisfied through Garlock's Plan or that anticipated by the ACC and FCR; whether they are satisfied through litigation, settlement or a 524(g) Trust; or whether some as yet unanticipated process is necessary"). Simply put, Debtors did file for bankruptcy on June 5, 2010, and it would be incorrect to assume otherwise.

Thus, for their opinions to be admissible, Peterson and Rabinovitz must make a connection to the questions before the Court: the allowed amount of claims, or the cost of resolving claims in bankruptcy.

**B. Peterson and Rabinovitz Fail to Connect Their Estimates to Debtors' Liability for Claims**

First, Peterson and Rabinovitz fail to provide any basis that would permit the Court to connect their projection of "settlements outside of bankruptcy" to the allowed amount of claims. Both Peterson and Rabinovitz admit that their method predicts nothing more than what Garlock would have paid to settle claims outside of bankruptcy. Peterson Dep. 26:17-26:24, 86:3-87:18; Rabinovitz Dep. 51:18-52:10 (excerpts from Peterson deposition attached as **Ex. B**, Peterson initial report attached as **Ex. C**, excerpts from Rabinovitz deposition attached as **Ex. D**, Rabinovitz initial report attached as **Ex. E**). But Peterson and Rabinovitz provide no connection between this projection of settlements outside bankruptcy and Garlock's liability for claims under applicable law: the question before the Court.

To the contrary, both Peterson and Rabinovitz *disclaim* any ability to connect their projections to the facts relevant under applicable state law. The first such fact is the number of claimants who can demonstrate that a Garlock product caused or substantially contributed to their mesothelioma. Claimants have the burden of proving this under the law of every state. *See* State Law Appendix, *supra*. But Peterson and Rabinovitz admit that their methods cannot estimate how many cases of mesothelioma were caused or contributed to by Garlock's products. Peterson Dep. 64:5-64:24; Rabinovitz Dep. 47:2-48:14.

Then, for the population of claimants who can demonstrate that a Garlock product caused or substantially contributed to their mesothelioma, the relevant question is Garlock's share of damages under the apportionment scheme applicable in that state. *See supra*. Peterson and

Rabinovitz admit they have no opinion about the facts relevant to Garlock's share of any damages either:

- They have not studied or attempted to determine the total damages that mesothelioma claimants might recover. Peterson Dep. 65:1-65:12; Rabinovitz Dep. 64:22-65:1.

- Nor have they estimated the number of other responsible parties in cases where Garlock might be found liable, or developed any opinion on the number of asbestos products to which a typical mesothelioma claimant was exposed. Peterson Dep. 66:25-67:16, 246:3-246:7, 251:17-252:1; Rabinovitz Dep. 65:2-65:9, 251:10-251:15, 259:2-260:2 ("I don't know what the typical claimant looks like. I don't have a methodology for establishing the typical claimant."), 260:4-260:13.

- Nor have Peterson and Rabinovitz done any reliable quantification of the likelihood that a plaintiff would succeed against Garlock. Peterson did nothing more than look at Garlock's verdict history in the 2000s, but admits that those verdicts are selected and are not representative of the total Garlock claiming population. Peterson Dep. 67:17-70:19. Rabinovitz has no opinion on likelihood of success. Rabinovitz Dep. 65:11-65:14.

In short, Peterson and Rabinovitz admit their methods have nothing to say about what claimants who could reach trial on the causation issue could compel Garlock to pay after a trial. Peterson Dep. 71:7-71:15.

**C. It Is Far From Self-Evident that Garlock's Settlements Equate to Its Liability Under State Law**

Peterson and Rabinovitz's failure to make any effort to connect settlements to liability is all the more egregious because settlements do not equate to liability, a fact that is well recognized by courts, a decades-old body of law and economics literature, and Peterson himself.

Specifically, courts and other authorities recognize that parties often settle not because of

liability concerns, but because it is less costly than continuing to defend the cases:

- The advisory notes to Federal Rule of Evidence 408 state that settlements are not

  admitted to prove liability for or the amount of a disputed claim in part because "[t]he

  evidence is irrelevant, since the offer may be motivated by a desire for peace rather than

  from any concession of weakness of position." Fed. R. Evid. 408 advisory committee

  notes.

- As summarized in the Rebuttal Report of Professor George L. Priest (one of the founding

  fathers of the discipline of law and economics), "In the widely accepted economic model

  of litigation and settlement, the maximum offer of a defendant is determined by the

  defendant's estimate of the likelihood of an adverse judgment times the defendant's

  estimate of the magnitude of that judgment, plus the difference between the costs of

  litigation and the costs of settlement. . . . The impact of litigation costs means there is no

  necessary connection between settlements and the outcomes of trials." Priest Rebuttal at

  6-7 (attached as **Ex. F**) (citing works by Landes, Posner, Priest, and Klein).

Indeed, Peterson acknowledged in his report that settlements do not equate to liability.

Peterson Rep. at 9 n.2. Then, at his deposition, he recognized that cost is "one of the motivators

of reaching a settlement"; that a defendant believing it had *no* chance of losing at trial might still

pay a settlement to avoid the cost of trial; and that Garlock witnesses testified at their depositions

that defense cost was one of the main factors underlying settlements. Peterson Dep. 59:10-59:19,

76:13-76:16, 106:18-106:21, 108:7-108:14. Yet Peterson made no attempt to determine whether

or how Garlock's settlements reflected avoidance of defense costs, apart from lodging (in his

rebuttal report) ad hoc criticisms of Bates's modeling of that relationship. Peterson Dep. 62:20-

63:1. Peterson did not take the first step toward determining that Garlock's settlements had

anything to do with its liability.[2]

Rabinovitz, by contrast, appeared not to understand that settlements do not equate to

liability. In her deposition, she stated, "We're assuming that the claimant's representative and

doctor and the company have decided together, if they've settled that claim, that the claimant has

that disease, that the company's product has contributed to it. . . . Together in the terms of

settlement or verdict they've decided or a jury has decided that this is somebody with

mesothelioma and that the product of the company was related to or caused it to some degree or

100 percent." Rabinovitz Dep. 48:6-50:5; *see also id.* at 50:6-51:1 ("I guess my experience from

the beginning is that in each of these circumstances where people settle claims, they've signed

certain things which say, yes, they have the disease; yes, the company caused it.").

Rabinovitz does not understand the most basic fact about Debtors' settlements: not only

can they not be used to establish liability for the claims under Rule 408 and its state analogues,

but Debtors required claimants in *every release* to acknowledge that the settlement was *not* an

admission of liability by the Debtors. She thus completely ignores the question about how

Debtors' settlements relate to their liability under state law, and performs no analysis of that

question.[3]

Ultimately, neither Peterson nor Rabinovitz make *any attempt at all* to link Garlock's

settlements and its liability under applicable law. Peterson opined in his report that "most claims

present a probability of a verdict adverse to Garlock that is greater than 0 but less than 1." But he

---

[2] Debtors have separately and consistently objected to the use of their settlements to prove their liability for claims, under Federal Rule of Evidence 408, and nothing in this brief or its associated motion waives that continuing objection. Even apart from that objection, Peterson and Rabinovitz have failed to connect their opinions to the question before the Court: Debtors' liability for claims.
[3] Nor did Peterson or Rabinovitz analyze whether Garlock's settlements were based on less than full information about plaintiffs' exposures to other defendants' products, the conclusion reached by Prof. Lester Brickman based on his study of discovery obtained in this case. *See* Expert Report of Lester Brickman (April 23, 2013) (attached as **Ex. G**).

admitted he performed no quantitative analysis to verify this unsupported *ipse dixit*. Peterson

Dep. 110:7-111:12.

In fact, Peterson and Rabinovitz in essence admit to the lack of fit between the opinions

they offer on "settlements outside bankruptcy" and the question before the Court. Both admit

that what they are really doing is estimating a stream of *contract* claims that *would have been*

*created* if Garlock had not filed for bankruptcy—they are not estimating tort claims within

bankruptcy. Peterson Dep. 50:8-50:13, 86:3-87:18; Rabinovitz Dep. 62:10-63:16 (describing her

task as estimating a stream of future agreements).

But of course, the asbestos claims in this case are not contract claims. They are disputed,

contingent, and unliquidated tort claims governed by the state law applicable to *tort claims*, not

hypothetical contract claims in a counterfactual world where Garlock never filed for bankruptcy.

The claims are not allowable unless claimants carry their burden of demonstrating causation, and

even then only to the extent of Garlock's share of the damages. Because Peterson and Rabinovitz

offer no assistance to the Court on those issues, their opinions are inadmissible under *Daubert*.

**D. Peterson and Rabinovitz Have Erred By Uncritically Applying Methods Used for
Different Purposes in Previous Cases**

Peterson and Rabinovitz appear to have uncritically used methods they have applied in

previous cases to the questions raised by this bankruptcy case. But as the Court recognized in its

Estimation Order, previous estimations were far different: the debtors did not dispute their

liability for claims, and the estimations were not for purposes of allowance and did not call on

the court to determine which claims were valid and their amount. *See* Estimation Order ¶ 6

(explaining that estimations in *In re Armstrong World Industries, Inc.*, 348 B.R. 111 (D. Del.

2006), *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719 (D. Del. 2005), and *In re*

*Federal-Mogul Global, Inc.*, 330 B.R. 133 (D. Del. 2005) were for purposes other than

allowance); Estimation Order ¶ 15 (recognizing that in each previous estimation using settlements, "the estimation was not contested by the debtor").

The Court's Estimation Order made clear that the estimation this Court ordered was different. By contrast to the cases that the Committee and FCR argued should be the model for estimation here, the Court ordered that this estimation *would be* for "allowance purposes." Estimation Order ¶ 9 ("[I]t appears proper here to estimate Garlock's mesothelioma asbestos liability for allowance purposes pursuant to section 502(c)."). Garlock's product was also fundamentally different from the products involved in previous cases: a gasket with encapsulated asbestos, not friable insulation or other dusty products.

Notwithstanding the ruling reflected in the Estimation Order—which overruled the Committee's and FCR's pleas for a theory that avoided the merits of claims—Peterson and Rabinovitz have not adjusted their approach. They have instead persisted in offering a decidedly *non-merits* approach to determining the "allowed amount" of Debtors' liability for claims. It is the same approach they used for the "dusty" bankrupt defendants in support of a consensual plan. If that approach were accepted here, it would include a *presumption* that Garlock would be found liable in every case it settled for the amount of the settlement. Their "settlement approach," in other words, tries to equate Garlock's past agreements to settle cases to *findings* by courts and juries that Garlock's products were a substantial cause of plaintiffs' mesothelioma. No party, however, contends that Garlock, on the merits, would be held liable in all of the cases it settled. Yet Peterson and Rabinovitz fail to take the necessary next step of linking the settlements they project to the number and amount of allowed claims. Thus, their opinions are inadmissible on "fit" grounds.

**E. Peterson and Rabinovitz Fail to Connect Their Estimates to the Cost of Resolving Claims in Bankruptcy**

Similarly, Peterson and Rabinovitz offer no opinion on the cost of resolving claims within bankruptcy or under a plan. To the contrary, their opinions are expressly conditioned on the counterfactual assumption that the Debtors *never filed* their petitions. Peterson Dep. 26:17-26:24, 86:3-87:18; Rabinovitz Dep. 51:18-52:10; *see also* Rabinovitz Dep. 69:17-69:20 (she did not estimate what claims would receive under a Trust mechanism).

Nor did Peterson and Rabinovitz make any attempt to link "settlements outside of bankruptcy" to the cost of resolving claims in bankruptcy or under a plan. Such a link is neither self-evident nor even likely. The purpose of bankruptcy is to reduce transaction costs, permitting *all* parties with interests in the estate to be better off than they would be outside of bankruptcy. *See* Priest Rebuttal at 11 ("The purpose of bankruptcy is to save costs in order to maximize payouts to worthy creditors. . . . Of course, there are expenses necessary to operate a bankruptcy trust, but they are miniscule compared to the expense necessary to defend cases with multiple asbestos defendants."); *A.H. Robins Co. v. Piccinin (In re A.H. Robins Co.)*, 788 F.2d 994,1013 (4th Cir. 1986) (holding that purpose of mass tort bankruptcy is to save transaction costs for benefit of all parties). Debtors have proposed a plan of reorganization that will do exactly that, by reducing the costs of obtaining information about claimants' exposures and thus drastically reducing transaction and resolution costs, for the benefit of all parties with an interest in the estate. *See* Report of Charles E. Bates at 118-123 (attached as **Ex. H**).

Indeed, in his prior opinions, Peterson has recognized that bankruptcy decreases costs. In 2009, he rendered an opinion analyzing the savings in resolution costs that the W.R. Grace Trust would achieve. He opined that the costs of the Trust would likely be as much as *$1 billion* less than what W.R. Grace would have paid to resolve claims in the tort system, in part because the

Trust would impose stricter exposure requirements. *See* Mark A. Peterson, Preliminary Expert Report on W.R. Grace Trust at 1, 5 (March 2009) (attached as **Ex. I**); Peterson Dep. 136:23-137:14.

Thus, Peterson and Rabinovitz offer no help on the other question that may interest the Court: the costs of resolving mesothelioma claims in bankruptcy. Once again, this is because they willfully ignore the crucial fact that Debtors did file for bankruptcy and will resolve claims there, through means that will necessarily be less costly than what they would have paid outside of bankruptcy.

## II. Peterson and Rabinovitz Fail to Use Reliable Methods

Expert testimony, to be admissible, must also be "the product of reliable principles and methods." Federal Rule of Evidence 702. This means expert testimony must be based on a reliable methodology, not the *ipse dixit* of the testifying expert. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Expert testimony based on unreliable methodology, speculation, or mere belief must be excluded. *See Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005); *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).

Both Peterson and Rabinovitz claim that their forecasts are scientific, and agree that their estimates should be judged by the standards of science, including predictive value. Peterson Dep. 28:21-28:24, 38:12-38:22; Rabinovitz Dep. 55:25-56:11. But Peterson and Rabinovitz's extrapolations of Debtors' settlement history to predict settlements outside of bankruptcy are completely unscientific. They are based on nothing more than Peterson and Rabinovitz's unsupported assumption that future settlements will resemble the immediate past. Their forecasts have no more scientific validity than a straight-line projection of a stock's value for the next forty years on the basis of its most recent performance.

17

**A. Peterson and Rabinovitz's Method for Predicting Future Settlements**

Peterson and Rabinovitz use similar methods to predict Garlock's future settlements outside of bankruptcy. *See generally* Peterson Rep.; Rabinovitz Rep.; Rabinovitz Dep. 90:19-93:14 (explaining method).

1) First, they use epidemiological models developed by Dr. Nicholson and (in the case of Rabinovitz) a team at KPMG that included Dr. Charles Bates to determine the total future number of persons who will be diagnosed with mesothelioma.

2) All subsequent steps have nothing to do with epidemiology. They next choose a "calibration period"—a period from Garlock's past settlement history that they believe characterizes how Garlock would settle claims in the future.

3) Third, they calculate the average percentage of people diagnosed with mesothelioma in the years during the calibration who sued Garlock (the "propensity to sue"), the average percentage of those people whom Garlock paid (the "settlement rate"), and the average settlement amount paid to those persons (the "average settlement").

4) They then project those average propensities to sue, settlement rate, and average settlement forty years into the future, applying those figures to the total future incidence.

5) They then apply inflation and discount rates to obtain the present value of their forecasts.

6) They also assign values to the pending mesothelioma claims using the settlement rates and averages that they calculated from their calibration periods.

Peterson and Rabinovitz apply their methods somewhat differently, resulting in ultimate conclusions that vary by more than $300 million (NPV).[4] For example, Peterson, for the earliest

---

[4] Rabinovitz in her rebuttal report characterizes their estimates as "similar," but that is only because she inexplicably includes in her forecast an estimate of what Garlock would have paid to defend cases in the tort system, which Peterson does not include. When those defense costs are removed, Peterson's forecast is more than $300 million (NPV) (or approximately 33%) greater than Rabinovitz's. *See* Rabinovitz Dep. 87:21-89:20.

years of his forecast, applies a higher propensity to sue than in his calibration period (without

any support, *see infra*). *See* Peterson Rep. at 26-28.

But the essence of their method is the same. Peterson and Rabinovitz choose a calibration

period, then assume that the propensity to sue, settlement rate, and average settlement would

have persisted for the next forty years. *See* Rabinovitz Dep. 96:8-97:15 (describing choice of

calibration period as the most important expert decision she made).

**B. Peterson and Rabinovitz Fail to Provide Any Basis for Expecting that Future Settlement Behavior Would Resemble the Immediate Past**

Given the fact that their forecasts are completely determined by their choice of

calibration period, to be admissible, Peterson and Rabinovitz would have to supply a reliable

scientific methodology for showing that their choice of calibration period in fact does reliably

predict future settlements. That method would have to be verifiable and subject to objective

testing. *See Bryte*, 429 F.3d at 477 ("*Daubert* aims to prevent expert speculation.").

But Peterson and Rabinovitz supply *no* objective method for picking their calibration

periods—only their own, untested judgment. Peterson admitted that his *only* basis for picking his

"calibration period" was its recency. Peterson Dep. 152:23-154:24. He performed *no* analysis to

show that future claiming and settling behavior would resemble this period. To the contrary, he

admitted that "of course" the future will be "different from the recent past," Peterson Dep.

154:25-155:16, but made no attempt to determine in what ways it would differ. The only

substance to Peterson's opinion is his "judgment" about what the proper calibration period is—

an *ipse dixit* that is the epitome of inadmissible expert testimony under the Federal Rules.

*Compare* Peterson Dep. 102:2-102:16 ("These are all matters of judgment."), *with Oglesby*, 190

F.3d at 250 ("A reliable expert opinion must be based on scientific, technical, or other

specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods.") (emphasis in original).

Like Peterson, Rabinovitz admitted that the choice of a calibration period rests only on her judgment. Rabinovitz Dep. 97:1-97:5. Also like Peterson, she simply chose the most recent period for her calibration period—in her case 2005-2010—on the unsupported assumption that the recent past is most similar to the next forty years. *See* Rabinovitz Dep. 97:6-97:11 (testifying that "[w]e believe that the best predictor of the future is the past," and asserting there is "always a period" that characterizes the future); *see also id.* at 142:2-142:6 ("I'm most interested in the recent history because that's the history which is most likely to predict the future."); *id.* at 142:8-142:25 ("I think it's correct to believe—that the most recent history is the most dispositive about the prediction for the future.").

But like Peterson, Rabinovitz performed no objective test or analysis to verify that her calibration period actually *does* resemble the future. The only quantitative analysis she performed in picking her period was to look at the percentage of claims Garlock paid in each year since 2002, and surmise based on the settlement rates that a "strategic change" occurred in 2005 that made it appropriate to use 2005-2010 as the calibration period. Rabinovitz Dep. 113:3-118:10. But Rabinovitz denied that the nature of what changed had any importance for her work. She testified that "I don't think I ever investigate" the factors that change settlements over time, and that such factors are at best "secondarily" important to her work. Rabinovitz Dep. 117:17-118:10. Thus, like Peterson, Rabinovitz simply assumed that the next forty years will be like the most recent few, without any objective support. Her opinion, like Peterson's, is based on nothing more than *ipse dixit*—simply because she says so.

**C. It Is Far From Self-Evident That Future Settlements Would Resemble the Recent Past**

In any expert context, assuming that the future will resemble the immediate past, without performing any further analysis, is on its face fallacious. But that is especially true in the context of asbestos litigation, where claiming and settlement behavior is constantly changing, in ways that prevent *any* simple assumption that the past will resemble the future.

Peterson and Rabinovitz agreed that the claiming and settling behavior of plaintiffs, defendants, and their attorneys is highly complex and variable. They agree that these behaviors can be influenced by a wide variety of factors, including:

- Bankruptcies of co-defendants, Peterson Dep. 91:10-92:20, Rabinovitz Dep. 71:19-71:22;

- Changes in law, Peterson Dep. 88:5-88:16, Rabinovitz Dep. 70:9-70:15;

- Revelation of abusive practices in asbestos litigation, Peterson Dep. 90:2-91:7, Rabinovitz Dep. 70:20-71:9;

- Pending legislation that has not yet been passed, Peterson Dep. 92:21-93:14;

- Changes in a defendant's cost of defending a claim, Rabinovitz Dep. 70:16-70:19; and

- Changes in court procedures, Rabinovitz Dep. 71:23-71:25.

As the Court is well aware, changes in claiming and settling behavior have resulted in a high degree of volatility in Garlock's settlement history. For example, during the 1990s, Garlock's overall average resolution amount for mesothelioma claims was $5,000. Bates Rep. at 37. But after Garlock's main co-defendants filed for bankruptcy beginning in 2000, its average cost to settle a mesothelioma claim rose to approximately $35,000 within two years. *Id.* at 39. That average continued to rise over the decade. Garlock was also sued in far more mesothelioma cases after the bankruptcies of its major co-defendants than it had been before. *Id.* at 35-37.

At a bare minimum, then, an expert purporting to predict future asbestos settlements on the basis of settlements from the past decade would have to understand and provide a reliable method for assessing:

1) The factors that caused Garlock's settlements to rise over the past decade;

2) The relative contribution each of those factors made to the variance in Garlock's settlements;

3) Whether each such factor is likely to be present or absent in the future; and

4) The impact that those factors will have on future settlements.

Yet Peterson and Rabinovitz admit they can perform none of these tasks.

**D. Peterson Says Garlock's Settlements Increased Over the Past Decade for a "Dozen" Reasons, and Cannot Disentangle Them, Much Less Determine Whether They Would Persist in the Future or Impact Future Settlements**

Peterson claims there were at least a "dozen" factors that increased Garlock's settlements during the decade before the petition. Peterson 167:19-168:22; *see also id.* at 168:23-170:12 ("a dozen or more events" contributed to rise in Garlock's average settlement).

Yet Peterson disclaims any ability to determine which of these dozen factors actually mattered, much less any ability to quantify the impact that any of them had or will have on Garlock's settlements. He testified, "[Y]ou can't determine or isolate how much any one of those things by itself affected the outcome. It's impossible. You can't do that." *Id.* at 193:8-195:3. He performed no objective test of the impact *any* of these alleged dozen factors had on Garlock's settlements. *Id.*; *see also id.* at 167:19-168:22 ("No one has the capability of disaggregating the effects of any one of those matters . . . . You can't do it. You can't disaggregate it. All kinds of things were going on at that period of time, and during that period of time, also, Garlock was paying more money.").

Thus, in the face of the complexity of the asbestos litigation system, and the admitted complexity of what happened to Garlock over the past decade, Peterson throws up his hands. He is unable to explain why Garlock's settlements varied over the decade before the petition. Presumably he *assumes* that those "dozen factors" will persist in the future, but he has performed no objective test to show that will be the case, much less an analysis of *which* factors actually mattered or will matter.

The utter lack of substance in Peterson's method is shown by his opinion about the effect of co-defendant bankruptcies on Garlock. In numerous prior asbestos bankruptcy case engagements, he opined that settlements in the tort system increased because of the bankruptcies of the "top tier defendants" who paid most of the money to asbestos claimants before 2000, as well as a wave of subsequent bankruptcies. *See, e.g.*, Mark A. Peterson, ASARCO Projected Liabilities for Asbestos Personal Injury Claims at 14-15 (May 2007) (attached as **Ex. J**); Mark A. Peterson, W.R. Grace Projected Liabilities for Asbestos Personal Injury Claims as of April 2001 at 25-26 (June 2007, revised January 2009) (attached as **Ex. K**); Mark A. Peterson, Turner and Newall Inc. Projected Liabilities for Asbestos Personal Injury Claims at 10-11 (Nov. 29, 2004) (attached as **Ex. L**). Peterson admits that these bankruptcies were one of the "dozen" factors that increased Garlock's settlement average in mesothelioma cases after 2000. Peterson Dep. 176:2-176:17.

In the future, this factor will be partially reversed: Trusts for Garlock's former co-defendants have been funded with over $30 billion to pay current and future asbestos claimants, and will pay that money. Bates Rep. at 65. Peterson asserts that these payments would have had no "material" impact on Garlock's settlements. Peterson 178:21-179:4. But he performed no test

to quantify that impact, *id.* (admitting he had done no modeling of the impact of Trust

payments), even though he *admits* there "may" be some impact. *Id.*

Indeed, Peterson did not even perform the most basic factual research necessary to reach

a conclusion on the crucial issue of the impact that Trust payments would have on Garlock's

settlements. He admitted he has no opinion on the aggregate money that a typical mesothelioma

claimant will receive from Trusts. Peterson Dep. 181:2-181:6. Peterson did not even look at the

data bearing directly on that topic from the Supplemental Settlement Payment Questionnaire

ordered by this Court, which required 1,000 pending mesothelioma claimants to provide

information on the aggregate payments they have received from Trusts and tort defendants.

Peterson Dep. 181:21-182:4.

Ultimately, Peterson's opinion amounts to nothing more than rank speculation. He

assumes the future will look like the past, but he does not understand what happened in the past,

why it happened, whether it will persist in the future, and if it does, what the impact will be. He

has no objective methodology. His opinion is inadmissible under Rule 702.

**E. Rabinovitz Has No Opinion About Why Garlock's Settlements Varied Over the Decade Before Its Petition**

Rabinovitz, in contrast, has *no* opinion about why Garlock's settlements increased from

the 1990s to the 2000s. Rabinovitz Dep. 139:3-139:14, 140:24-141:2. Indeed, the first year she

discusses in her report is 2002, which was after the crucial shift in Garlock's settlements had

already occurred. *Id.* at 139:15-139:17. Her reason for not examining this major change in

Garlock's history was the same fallacy that informs her choice of calibration period: that recent

periods are necessarily more likely to be like the future than earlier periods. *Id.* at 139:18-140:5

("[B]ecause it's not contemporaneous, it's not likely to be a good predictor of the future, so I'm

less concerned about it."); *see also id.* at 142:2-142:6 ("I'm most interested in the recent history

because that's the history which is most likely to predict the future."). Rabinovitz fails to account for the possibility that the abrupt change in Garlock's settlements between the late 1990s and 2002 might be a condition that will not persist in the future, perhaps because of the impact of Trusts. She certainly did not analyze or rule out that possibility.

Rabinovitz's failure to examine why Garlock's settlements increased between 1999 and 2002 is all the more striking because in 2007 in the ASARCO asbestos bankruptcy case—a case where she admittedly applied the same methodology she applies here—Rabinovitz opined that "the recent availability of $30 billion in new asbestos trust assets would now place considerable downward pressure on indemnity values," and described Trust payments as "huge future setoffs." Rabinovitz Dep. 146:18-147:18; *see also id.* at 151:14-152:2. In reaching this conclusion, she relied on a legal memorandum showing that ASARCO would be entitled to setoff for Trust payments under the law of significant states. *Id.* at 150:3-151:5.

Yet when it came time to analyze Garlock's future settlements, she did not even *consider* the possibility that Garlock's settlements had increased in the past because of the bankruptcies and that Garlock's settlements would have decreased because of the "considerable downward pressure" caused by $30 billion in Trust payments. In addition to testifying that she did not examine the period before 2002, Rabinovitz testified that:

- When she was engaged as an expert in this case, she was neutral on whether Garlock's future settlements might decrease as a result of $30 billion in Trust assets, Rabinovitz Dep. 156:15-156:21;

- Yet she did not consider or address the issue of whether this would cause Garlock's future settlements to decrease until after receiving Dr. Bates's report and submitting both

her initial and rebuttal report—obviously long after she picked her calibration period, Rabinovitz Dep. 156:22-157:22, 158:25-160:23, 161:25-162:5;

- Rabinovitz now believes that companies have not yet received relief, but has had that belief for no more than two weeks before her deposition, when she received an email from an insurance conference that caused her to look at previous conference materials that appeared to indicate to her that insurance companies have raised their asbestos reserves, *id.* at 152:12-155:9, 156:22-157:22, although she did no independent analysis of why they may have been raised;

- She has never analyzed Garlock's data to determine whether Trusts will have an impact, *id.* at 166:2-166:7;

- She does not know how to design a research project to determine whether relief actually is happening yet, or what data she would use, 269:1-269:11;

- She still has an "open mind" about whether the Trusts will someday provide relief, *id.* at 157:23-158:6, 168:16-169:20;

- It is logical that there would be relief, *id.* at 170:6-170:10;

- She does not know why the impact she predicted in 2007 has not occurred, *id.* at 219:16-219:21; and

- She admits that a lack of Trust transparency could be the cause, *id.* at 219:15-219:21 ("I'm perfectly open to the notion that if they got more transparency, the results would change."); *see also id.* at 163:10-164:9 (admitting that Trust transparency is a very important national issue in asbestos litigation).

In short, despite confidently predicting in 2007 that the $30 billion in Trust payments would exert "considerable downward pressure," Rabinovitz, before rendering her report in this

matter, did not analyze why Garlock's settlements increased after 2000, did not consider whether

Garlock would receive relief from the billions of dollars in Trust payments, has only the

slimmest and most happenstance proof that relief is not occurring already, has not examined

Garlock's data to determine whether downward pressure on Garlock's settlements was already

happening before the petition, does not understand why relief is not occurring (if it isn't), and

still admits the possibility that relief will occur but has done nothing to analyze the reasons why

it may or may not. Clearly, Rabinovitz did not attempt to understand anything about why

Garlock's settlements varied in the past, and she has no basis for drawing any conclusions about

what Garlock's settlements would have looked like in the future.

      Rabinovitz's work does not meet the standards for expert testimony in federal court.

## F. Application of Their Simple Extrapolation Methodology Has Led to Massive Overstatements of Liability in Previous Cases

      The ultimate test for any scientific method is its predictive value, and Rabinovitz and

Peterson both agreed that their work should be judged by its predictive value. Peterson Dep.

28:21-28:24, 38:12-38:22; Rabinovitz Dep. 55:25-56:11. But as one would expect with a method

that simply blindly extrapolates the past, their methods have given rise to massive errors in the

past.

      Most notably, both Peterson and Rabinovitz failed to understand the non-malignant

claiming phenomenon and failed to predict the abrupt disappearance of most non-malignant

claims after 2004. Their simple extrapolation opinions—some rendered *during or long after* the

decline—thus overstated future settlements outside of bankruptcy by orders of magnitude.

      For example, Rabinovitz in the Owens Corning bankruptcy case in 2004 predicted that

Owens Corning would have received over 600,000 future non-malignant claims if it had

remained in the tort system, based on extrapolation from Owens Corning's recent history. She

predicted that Owens Corning would have received at least 31,631 such claims in 2004, 30,615

in 2005, 29,523 in 2006, 28,371 in 2007, 27,263 in 2008, and 25,105 in 2009. *See* Francine

Rabinovitz, Estimated Number and Value of Pending and Future Asbestos Personal Injury

Claims Against the Owens Corning Corporation, Appendix 3 (Oct. 15, 2004) (attached as **Ex.**

**M**).

In fact, the future looked nothing like this, as Rabinovitz admitted in her deposition.

Rabinovitz Dep. 78:16-79:21. Garlock—which remained in the tort system and received a large

portion of the mesothelioma claims and likely received a large portion of the non-malignant

claims too—received less than 30,000 non-malignant claims in 2004, less than 20,000 in 2005,

and much less than 10,000 in 2006, 2007, 2008, and 2009. Rebuttal Report of Charles E. Bates,

PhD at 59 (attached as **Ex. N**). Rabinovitz was unable to predict this change, *as it was*

*happening*, because she was wedded to an extrapolation methodology and failed to identify and

analyze the factors that influenced non-malignant claims filings.

Peterson likewise failed to predict the change because of his extrapolation methodology.

In his Owens Corning report in 2004, he actually *increased* the non-malignant claiming rate

above its historical highs, predicting that Owens Corning would have received more than

850,000 non-malignant claims had it remained in the tort system. *See* Mark A. Peterson, Owens

Corning and Fibreboard Projected Liabilities for Asbestos Personal Injury Claims as of October

2000, at B-3 (October 15, 2004) (attached as **Ex. O**). His numbers for 2004-2009 were thus even

more out of whack with what actually happened in the tort system than Rabinovitz's were:

42,941 claims in 2004, 46,874 in 2005, 45,661 in 2006, 44,449 in 2007, 42,739 in 2008, and

41,029 in 2009.

*As late as 2009*—years after the decline had occurred—Peterson continued to predict

non-malignant claims in line with historic highs, predicting over 500,000 future non-malignant

claims for W.R. Grace in a 2009 expert report. *See* Peterson Grace 2009 Estimation Rep. at C-3.

He predicted (retrospectively) 27,887 claims in 2004, 27,208 in 2005, 26,528 in 2006, 25,849 in

2007, 24,868 in 2008, and 23,888 claims in 2009. *Id.* A very large majority of these claims

simply did not exist in the tort system.

As Bates explains in his rebuttal report, these massive errors in Rabinovitz and Peterson's

previous forecasts stem from the same basic methodological error: a failure to understand or

even engage with the reasons why settlements in the tort system vary, leading to an inability to

predict whether future settlements would resemble the past. Bates Rebuttal at 58-61. Just as they

do here with respect to mesothelioma claims against Garlock, Peterson and Rabinovitz blindly

extrapolated the past into the future. Neither Peterson nor Rabinovitz has a reliable method for

predicting future settlements, and their opinions should be excluded for this reason.

## III. Peterson and Rabinovitz Have Not Reliably Applied Their Methods to the Facts of this Case

Finally, experts in federal court must reliably apply their "principles and methods to the

facts of the case." Fed. R. Evid. 702(d). Thus, as part of its gatekeeping function, the Court must

assess whether Peterson and Rabinovitz's methodology "properly can be applied to the facts in

issue." *Daubert*, 509 U.S. at 592-93. Courts in the Fourth Circuit routinely exclude expert

testimony when the expert fails to reliably apply his or her methods to the case's facts. *See, e.g.*,

*Oglesby*, 190 F.3d at 249–51 (affirming trial court's exclusion of expert testimony because "it

depended on an imperfect syllogism constructed from unsupported suppositions"); *Snoznik v.*

*Jeld-Wen, Inc*., No. 1:09CV42, 2010 WL 1924483, at *12 (W.D.N.C. May 12, 2010) (excluding

expert testimony regarding allegedly defective window, in part, because of flaws in expert's testing and methodology).

In addition to lacking fit and a reliable methodology, Peterson and Rabinovitz have made numerous errors in applying their methods to the facts of this case. These errors are summarized in the Bates rebuttal report, and include (but are not limited to) the following:

- Rabinovitz and Peterson ignore explicit statements in Personal Injury Questionnaires returned pursuant to this Court's orders saying that the claimants in question do not have pending mesothelioma claims, which inflates their forecasts, Bates Rebuttal at 95-96;

- Rabinovitz and Peterson incorrectly assign payment years to several large payments, resulting in parameters in their forecasts that are too high, *id.*;

- Peterson and Rabinovitz assume claims will settle too quickly, given the history of how Garlock resolved claims, which results in payments being made in earlier years and not being discounted enough, inflating the forecast, *id.* at 97-98;

- Peterson and Rabinovitz incorrectly value the pending claims, applying the average settlement and average payment rate from their calibration periods to the pending claims, even though those claims have been pending longer than the average resolved claim, and claims pending for longer settle for less, *id.* at 98-101;

- In addition, Peterson and Rabinovitz apply the average settlement from their calibration period to the pending claims, but fail to recognize that those claims are on average in jurisdictions where claimants received lower settlements, distorting their forecasts upward, *id.* at 103-104;

- Peterson and Rabinovitz, in combination with the discount rate experts upon whom they rely, apply inconsistent risk-free discount and inflation rates—i.e., they draw their

discount rates from a particular Treasury instrument, but use a long-term inflation rate instead of the lower inflation rate that was embedded in the interest rate for those securities, *id.* at 101-102;

- Peterson increases propensity to sue in the first years of his forecast, without any statistically sound basis for doing so, significantly inflating his forecast, *id.* at 102-103;

- Peterson and Rabinovitz fail to take into account a trend, apparent from the DCPF data ordered by this Court, showing that more and more claimants against Garlock are filing their Trust claims earlier, which results in lower settlements from Garlock, *id.* at 104.

When these and other basic corrections are made, the forecasts of Peterson and Rabinovitz each result in an estimate of less than $400 million. *See id.* at 107 (summary chart).

Errors of this magnitude not only affect the credibility of Peterson and Rabinovitz's forecasts: they indicate a failure to reliably apply their methods to the facts of this case, rendering their opinions subject to exclusion under Rule 702 and *Daubert*. All the more so, when combined with their failure to provide any connection between their opinions and the matters at issue in this case, and their failure to use a reliable methodology that is anything more than their say-so about what the future would have held if Garlock had not filed for bankruptcy.

**CONCLUSION**

For the foregoing reasons, the Court should exclude or strike the Committee and FCR estimation expert witness opinions.

This 3rd day of July, 2013.

Respectfully submitted,


/s/ Garland S. Cassada
Garland S. Cassada
N.C. Bar No. 12352
Jonathan C. Krisko
N.C. Bar No. 28625
Richard C. Worf, Jr.
N.C. Bar No. 37143

ROBINSON BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000

gcassada@rbh.com
jkrisko@rbh.com
rworf@rbh.com

*Special Corporate and Litigation Counsel to the
Debtors Garlock Sealing Technologies LLC,
Garrison Litigation Management Group, Ltd., and
The Anchor Packing Company*

Cary Schachter
Raymond P. Harris, Jr.

SCHACHTER HARRIS, LLP
600 North Pearl, Suite 2300
Dallas, TX 75201
Telephone: (214) 999-5700
Facsimile: (214) 999-5747

cschachter@schachterharris.com
rharris@schachterharris.com

*Special Litigation Counsel to the Debtors Garlock
Sealing Technologies LLC, Garrison Litigation
Management Group, Ltd., and The Anchor Packing
Company*

# EXHIBIT A

# ROBINSON BRADSHAW

# Memorandum

| | |
|---|---|
| **TO:** | Bates White |
| **FROM:** | Robinson, Bradshaw & Hinson, P.A. |
| **DATE:** | February 5, 2013 |
| **RE:** | Law of Apportioning Damages in Asbestos Cases in Fifty States and District of Columbia, and Under Admiralty Law |

## I. Executive Summary

This memorandum summarizes the law of apportioning damages in asbestos cases in all fifty states and the District of Columbia, as well as under admiralty law. The most fundamental distinction in the law of apportioning damages is between jurisdictions imposing joint and several liability and those that impose several liability.

### A. Joint and Several Liability Jurisdictions

In joint and several liability jurisdictions, the plaintiff may pursue any defendant found liable for the plaintiff's entire damages. The non-settling defendant typically receives credit (and is protected from liability) on account of the plaintiff's settlements with other joint tortfeasors, either in the amount of the settlements or (if greater) in the amount of the settling joint tortfeasors' shares of liability. In addition, with the exception of Alabama, a defendant forced to pay more than its share of damages also has a right to obtain contribution from other joint tortfeasors (including ones the plaintiff did not pursue or settle with) for their shares of the judgment.

One of the major economic consequences of joint and several liability is that solvent joint tortfeasors are responsible for bearing shares of liability attributable to bankrupt joint tortfeasors that the bankrupt joint tortfeasors cannot pay. That is, the defendant bears the risk of co-defendant insolvency.

The U.S. jurisdictions following some form of joint and several liability in asbestos cases are the following:

| |
|---|
| AL |
| CA (economic damages) |
| CT |
| DE |
| FL (economic damages, cases filed before April 26, 2006) |
| HI |

**Robinson Bradshaw & Hinson, P.A.** ▪ Attorneys at Law ▪ 101 North Tryon Street, Suite 1900 ▪ Charlotte, NC 28246 ▪ 704.377.2536

**Charlotte ▪ Research Triangle ▪ Rock Hill**

| |
| --- |
| IL |
| IA (fault greater than or equal to 50 percent) |
| LA |
| ME |
| MD |
| MA |
| MN (but no more than 4 times percentage fault if party less than 15 percent at fault) |
| MO (fault 51 percent or greater) |
| MT (fault 50 percent or greater) |
| NH (fault 50 percent or greater) |
| NE (economic damages) |
| NV |
| NJ (fault 60 percent or greater) |
| NY (economic damages, noneconomic damages if fault 50 percent or greater) |
| NC |
| OH (economic damages, fault greater than 50 percent) |
| PA (cases where injury manifested before June 28, 2011; cases where injury manifested after June 28, 2011, economic damages, fault greater than 60 percent) |
| RI |
| SC (fault 50 percent or greater) |
| SD |
| TX (fault greater than 50 percent) |
| VA |
| WA |
| WI (fault 51 percent or greater) |
| WV |
| D.C. |
| Admiralty |

Subsequent sections in this Part describe variations in how joint and several liability is applied in U.S. jurisdictions.

*1. Jurisdictions Imposing Joint and Several Liability Above a Certain Percentage of Fault*

Some jurisdictions impose joint and several liability only where a defendant is found liable for a percentage of fault exceeding some threshold (see below). The parenthetical contains the degree of fault that must be exceeded for joint and several liability to apply.

| |
|---|
| FL (economic damages, cases filed before April 26, 2006, when fault equal to or greater than 10 percent; then, joint and several up to $500,000 if fault less than 25 percent, up to $1,000,000 if fault less than or equal to 50 percent, and up to $2,000,000 if fault greater than 50 percent) |
| IA (fault greater than or equal to 50 percent) |
| MO (fault 51 percent or greater) |
| MT (fault 50 percent or greater) |
| NH (fault 50 percent or greater) |
| NJ (fault greater than or equal to 60 percent) |
| NY (economic damages and non-economic damages where fault 50 percent or greater) |
| OH (economic damages, fault greater than 50 percent) |
| PA (cases before June 28, 2011; cases after June 28, 2011, economic damages, fault greater than 60 percent) |
| SC (fault greater than or equal to 50 percent) |
| TX (fault greater than 50 percent) |
| WI (fault 51 percent or greater) |

*2. Jurisdictions Permitting Settlement Credit Only When the Settling Party Is Found Liable*

In most joint and several liability jurisdictions, a non-settling defendant receives automatic credit for payments made by others allegedly responsible for the plaintiff's injury, in an amount equal to the greater of the payment or another amount agreed upon between the plaintiff and settling defendant in the release. *See* Restatement (2d) of Torts § 885(3) ("A payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment."); *see also* 47 Am. Jur. 2d Judgments § 826; *Quick v. Crane*, 111 Idaho 759, 784 (1986) (describing

3

credit for settlements without liability finding as "majority view"); *Duncan v. Pennington County H.A.*, 283 N.W.2d 546, 550-51 (S.D. 1979) (same).

Certain jurisdictions, however, depart from this rule and require the settling defendant to be assigned at least some fault before a non-settling defendant receives a settlement credit. Those jurisdictions are the following:

| DE |
| --- |
| MD |
| OH (in cases where liability is joint and several) |

This requirement is not necessarily an onerous one. *See, e.g.*, *Medical Ctr. v. Mullins*, 637 A.2d 6, 10 (Del. 1994) (settlement credit applies if settling defendant found "even as little as one percent liable"); *In re Miamisburg Train Derailment Litig.*, 132 Ohio App. 3d 571, 588 (1999) (plaintiff estopped from denying fault of any party against whom he made a claim).

### 3. Joint and Several Liability Jurisdictions With Proportional Liability

The default rule in joint and several liability jurisdictions is to assign each joint tortfeasor an equal, pro rata (1/N) share of liability. A defendant forced to pay more than its pro rata share then has a right to obtain contribution from other joint tortfeasors for their pro rata shares of liability. A defendant receives credit for settlements either in the amount of the settlement payment or the pro rata share of the settling defendant (which may depend upon the form of the release and whether it cuts off contribution claims or not).

Some joint and several liability jurisdictions have, however, abandoned pro rata liability in favor of proportional joint and several liability. The jury assigns proportional shares of liability to joint tortfeasors. Then, a defendant forced to pay more than its proportional share has a right to obtain contribution from other joint tortfeasors for their proportional shares. A defendant may receive credit for settlements either in the amount of the settlement payment or the proportional share of the settling defendant.

Joint and several liability jurisdictions adopting proportional joint and several liability instead of pro rata liability are:

| CA (economic damages) |
| --- |
| CT |
| FL (economic damages, cases filed before April 26, 2006) |
| IA (fault greater than or equal to 50 percent) |
| ME |
| MN |
| MO (fault 51 percent or greater) |
| MT (fault 50 percent or greater) |
| NY (economic damages, noneconomic damages if fault 50 |

4

| |
|---|
| percent or greater) |
| NH (fault 50 percent or greater) |
| NJ (fault 60 percent or greater) |
| OH (economic damages, fault greater than 50 percent) |
| WV |
| WI (fault 51 percent or greater) |

*4. Risk of Bearing Liability Shares of Settling Defendants*

In some joint and several liability states, non-settling defendants are at risk of bearing any shortfall between a settling defendant's settlement and its share of liability. In these states, a good faith settlement between the plaintiff and a defendant cuts off contribution claims against the defendant (or, in the case of Alabama, contribution claims are not recognized) and, moreover, the non-settling defendant receives credit for at most the defendant's settlement payment (or a greater amount stipulated in the release). Such a non-settling defendant faces the risk that a settlement will be less than the settling defendant's share of liability and it will not have the opportunity to receive contribution from the settling defendant to make up the shortfall. (In most such jurisdictions, the non-settling defendant also benefits when the settlement exceeds the settling defendant's share of liability.) Jurisdictions where this risk exists are the following:

| |
|---|
| AL |
| CA (economic damages) |
| FL (economic damages, cases filed before April 26, 2006) |
| HI |
| MA |
| MO (fault 51 percent or greater) |
| NV |
| NH (fault 50 percent or greater) |
| NC |
| OH (economic damages, fault greater than 50 percent) |
| SC (fault 50 percent or greater) |
| TX (fault greater than 50 percent) |
| VA |
| WA |
| WV |

In other joint and several liability jurisdictions, a non-settling defendant is absolutely protected against bearing settling defendants' shares of liability. In some of these states, the non-settling defendant receives automatic credit for the settling defendant's share of liability, rendering contribution from settling joint tortfeasors unnecessary. In other states, the non-settling defendant has a right to receive contribution from a settling defendant unless the settling defendant obtained from the plaintiff a release of the settling defendant's share of liability, for

5

which the non-settling defendant then receives credit. Either way, the non-settling defendant is protected against bearing the settling defendant's liability share. Jurisdictions where a non-settling defendant is so protected are the following:

| |
|---|
| CT |
| DE |
| IA (fault greater than or equal to 50 percent) |
| LA |
| ME |
| MD |
| MN |
| MT (fault 50 percent or greater) |
| NE (economic damages) |
| NJ (fault 60 percent or greater) |
| NY (economic damages, noneconomic damages if fault 50 percent or greater) |
| PA (cases before June 28, 2011; cases after June 28, 2011, economic damages, fault greater than 60 percent; but no protection for shortfall in share of asbestos Trust) |
| RI |
| SD |
| WI (fault 51 percent or greater) |
| D.C. |
| Admiralty |

### B. Several Liability Jurisdictions

An increasing number of U.S. jurisdictions have abandoned traditional joint and several liability in favor of several liability, under which a defendant found liable must bear only that portion of damages assigned by the jury, usually proportional to its percentage fault as determined by the jury (hereinafter, "proportional liability"). Settlement credits are generally irrelevant in proportional liability states, because parties remaining at verdict can be held liable only for their percentage fault. *See, e.g.*, *Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 508 (1996) (under several or proportional liability, "offsetting a plaintiff's damages by the amount of a non-party's settlement is unnecessary because the defendant pays only his share of the damages").

Jurisdictions following proportional liability are the following:

| |
|---|
| AK |
| AR |
| CA (noneconomic damages) |

| |
|---|
| CO |
| FL (cases filed on or after April 26, 2006; noneconomic damages in cases filed before then as well as economic damages where fault 10 percent or less) |
| GA |
| ID |
| IN |
| IA (fault less than 50 percent) |
| KS |
| MI |
| MS |
| MO (fault less than 51 percent) |
| MT (fault less than 50 percent) |
| NE (non-economic damages) |
| NH (fault less than 50 percent) |
| NJ (fault less than 60 percent) |
| NM |
| NY (non-economic damages, fault less than 50 percent) |
| ND |
| OH (noneconomic damages and economic damages where fault 50 percent or less) |
| OK |
| OR |
| PA (cases where disease manifests after June 28, 2011, noneconomic damages, economic damages fault 60 percent or less) |
| SC (fault less than 50 percent) |
| TN |
| TX (fault 50 percent or less) |
| UT |
| VT |
| WI (fault less than 51 percent) |
| WY |

Subsequent sections in this Part describe variations in how proportional liability is applied in U.S. jurisdictions.

*1. Allocating Fault to Non-Parties*

7

The general rule is that non-parties, including bankrupts, can be allocated fault in proportional liability jurisdictions. A few jurisdictions, however, may restrict this, as summarized below:

| |
|---|
| AR (fault may not be apportioned to non-parties) |
| CO (fault may not be apportioned to non-parties) |
| IA (apportionment limited to defendants remaining at verdict and settled parties) |
| KY (apportionment limited to defendants, third-party defendants, and persons released from liability) |
| MT (apportionment limited to parties and settling parties) |
| NE (only defendants remaining at verdict may be apportioned liability) |
| NJ (parties the plaintiff has not sued and with whom plaintiff has not settled cannot be apportioned fault) |
| OR (may not apportion fault to entities from whom plaintiff has not sought recovery and that cannot be joined to the action) |
| PA (may apportion to parties to the action and entities with whom plaintiff has settled) |
| VT (fault may not be apportioned to non-parties, even those who settled in a separate action) |

None of these jurisdictions, however, have considered whether bankrupts and asbestos Trusts (especially Trusts against which the plaintiff has made claims) qualify as parties or can otherwise be allocated fault. Indeed, courts in Kentucky, whose statute could be read to preclude assignment of fault to bankrupts and Trusts, permit allocation of fault to bankrupts and Trusts. Most of these states do not receive large numbers of asbestos claims.

*2. Jurisdictions Permitting Reallocation of Uncollectible Portions of a Judgment*

Some jurisdictions follow proportional liability, but permit plaintiffs to collect all or part of the uncollectible portion of a judgment (for example, shares attributed to bankrupt parties) from solvent joint tortfeasors. These jurisdictions are the following:

| |
|---|
| AR (fault may not be increased if less |

| |
|---|
| than 10 percent, may be increased by no more than 10 percent if fault greater than 10 percent and less than 50 percent, and may be increased by no more than 20 percent if fault 50 percent or greater) |
| MN |
| NJ (reallocated in the ratio of apportioned fault) |
| OR (only if a party's percentage of fault is greater than 25 percent) |

### C. Unique Jurisdictions

Several jurisdictions follow idiosyncratic apportionment rules, summarized below.

#### 1. California

Because California imposes joint and several liability for economic damages and several liability for noneconomic damages, there is a special calculation for settlement credits against economic damages. Settlements are first reduced by settlement amounts attributable to settlement of a future wrongful death action in the case of living mesothelioma plaintiffs (no more than 40 percent according to local practitioners). Then, the setoff for economic damages is determined by the ratio between the jury's finding on economic damages and total damages found by the jury.

#### 2. Florida

Defendants may, under certain circumstances, be jointly and severally liable for economic damages. The case must have been filed before April 26, 2006, and the defendant must be greater than 10 percent at fault. Then, liability is joint and several up to $500,000 if the defendant's fault is less than 25 percent; joint and several up to $1,000,000 if the defendant's fault is less than or equal to 50 percent; and joint and several up to $2,000,000 if the defendant's fault is greater than 50 percent.

Where joint and several liability applies, settlement credits are calculated by multiplying settlements by the ratio of economic damages to total damages.

#### 3. Louisiana

In Louisiana asbestos cases, a defendant found liable pays a virile share of the verdict, determined by dividing the verdict by the number of total defendants and settling parties found liable, which includes settling asbestos Trusts.

#### 4. Missouri

In Missouri, settlements are deducted from the verdict before percentages of fault are applied. Thus, it is a rare proportional liability state where settlement credits matter.

9

*5. Nebraska*

In Nebraska, where liability for economic damages is joint and several, a party receives credit for the settling party's percentage of fault, rather than the amount of the settlement.

*6. New York*

New York is probably the most complicated state for calculating damages. The method for calculating damages is summarized in *Dominguez v. Fixrammer Corp.*, 172 Misc. 2d 868, 872-75 (N.Y. Sup. Ct. 1997).

Setoffs for settling defendants are first applied to the verdict. The setoff equals the greater of the settling defendants' payments or their degrees of fault. For example, if the verdict is $3 million ($1 million economic, $2 million non-economic), and there are two settling defendants, each apportioned 25 percent of the fault, the setoff will be the greater of $1.5 million or the settlement amount (whatever that may be). In this way, non-settling defendants are absolutely protected from bearing settling defendants' shares of liability.

"Total remaining economic damages" are then calculated by multiplying the remaining total liability after setoff (in the example above, $1.5 million) by the ratio of economic to non-economic damages. In the example, remaining economic damages are $500,000: one-third of the remaining $1.5 million. They would be allocated proportionally, but jointly and severally, to non-settling defendants. For example, if two non-settling defendants are each 25 percent responsible in the example, they would each pay $250,000 in economic damages. To the extent one joint tortfeasor is forced to pay more than its share of economic damages, it has a right to receive contribution from joint tortfeasors.

Finally, "total remaining non-economic damages" are calculated by multiplying the remaining total liability (in the example, $1.5 million) by the ratio of non-economic damages to the total verdict. Here, remaining non-economic damages are $1 million. Because liability for non-economic damages is proportional, however, a party can be required to pay no more than its percentage fault multiplied by total non-economic damages: here, $500,000 for each of the two defendants allocated 25 percent of the total fault, i.e. 25 percent of $2 million. Each non-settling defendant in the example would pay $750,000 total: $500,000 in non-economic damages and $250,000 in economic damages.

If settlements are large, it is possible for non-settling defendants to pay even less non-economic damages than their percentage fault. If in the example each settling defendant paid $1.2 million to settle the case, remaining total liability remaining after setoff would be $600,000. $200,000 of that would be allocated to remaining economic damages, and each non-settling defendant would pay $100,000. $400,000 would be allocated to remaining non-economic damages, and each non-settling defendant would pay $200,000, less than the cap on their non-economic damages.

10

## II. Detailed Summaries of the Law of Apportioning Damages in Fifty-Two Jurisdictions

The remainder of this memorandum contains detailed summaries of the law of apportioning damages in all fifty states and the District of Columbia, as well as under admiralty law.

### 1. Alabama

Defendants found liable in Alabama are jointly and severally liable for all categories of damages. *Nelson Bros., Inc. v. Busby*, 513 So. 2d 1015, 1017 (Ala. 1987). Defendants receive credit for settlement payments, regardless of whether the settling defendants are found liable at trial. *Ex parte Goldsen (Goldsen v. Simpson)*, 783 So. 2d 53, 54-56 (Ala. 2000).

Alabama does not recognize contribution among joint tortfeasors. *See Humana Medical Corp. v. Bagby Elevator Co.*, 653 So. 2d 972, 974 (Ala. 1995). Thus, a non-settling defendant in Alabama is exposed to the risk of bearing settling defendants' shares of liability to the extent those shares exceed the settlement amounts.

### 2. Alaska

Defendants found liable in Alaska are responsible only for their proportional share of all categories of damages. Alaska Stat. § 09.17.080 (2012). By statute, fault can be assigned to potentially responsible persons not parties to the action. Alaska Stat. § 09.17.080(a)(2) (2012). Because non-settling defendants bear only their proportional share of damages, they do not receive credit for settlement payments. *Sowinski, et al. v. Walker, et al.*, 198 P.3d 1134, 1156-57 (Alaska 2008).

### 3. Arizona

Defendants found liable in Arizona are responsible only for their proportional share of all categories of damages. Ariz. Stat. Ann. § 12-2506 (2012). By statute, non-parties can be assigned fault. *Id.*; *see also Dietz v. Gen. Elec. Co.*, 169 Ariz. 505, 510 (1991). Defendants do not receive credit for settlement payments. *See Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 508 (1996).

### 4. Arkansas

Defendants found liable in Arkansas are responsible only for their proportional share of all categories of damages. Ark. Code Ann. §§ 16-55-201, -202, -205 (2012). The Arkansas Supreme Court ruled that the provision permitting assignment of fault to non-parties is unconstitutional on separation of powers grounds. *Johnson v. Rockwell Automation, Inc.*, 2009 Ark. 241, at * 6 (2009); *McCoy v. Augusta Fiberglass Coatings*, 593 F.3d 737, 744 (8th Cir. 2010). Arkansas has not yet considered whether asbestos Trusts can be apportioned fault.

If parts of a several share remain uncollectible (presumably including through bankruptcy), the court may readjust the apportionment. Ark. Code Ann. § 16-55-203 (2012). If a party's fault is 10 percent or less, fault may not be adjusted upward; if a party's fault is greater than 10 percent but less than 50 percent, the court may increase it by no more than 10 percent;

11

and if the party's fault is 50 percent or greater, the percentage of fault may be increased by no more than 20 percent. *Id.*

Arkansas courts would likely hold (following states with similar regimes) that defendants do not receive credit for settlement payments.

## 5. California

Defendants found liable in California are responsible only for their proportional share of non-economic damages, and are jointly and severally liable for economic damages. Cal. Civ. Code. §§ 1431, 1431.2 (2012).

With respect to noneconomic damages, any parties can be added to the verdict sheet and apportioned liability, including bankrupt firms, the Navy, and settling solvent parties. *DaFonte v. Up-Right, Inc.*, 2 Cal. 4th 593 (1992); *Taylor v. John Crane, Inc.*, 113 Cal. App. 4th 1063, 1071 (2003). Defendants do not receive credit for that portion of settlements attributable to noneconomic damages. *McComber v. Wells*, 72 Cal. App. 4th 512, 518 (Cal. App. 4th Dist. 1999).

With respect to economic damages, non-settling parties receive credit for that portion of settlements attributable to economic damages, which is calculated by deducting from the settlements amounts attributable to wrongful death and loss of consortium claims (no more than 40 percent of settlements according to local practitioners), and then multiplying the remaining portion by the ratio of economic to total damages (as determined by the finder of fact). *Wilson v. John Crane*, 81 Cal. App. 4th 847, 861-64 (Cal. App. 2000); *Greathouse v. Amcord*, 35 Cal. App. 4th 831 (Cal. App. 1995). The non-settling defendant does not need to prove the liability of the settling party in order to receive this credit. *McComber*, 72 Cal. App. 4th at 516-17.

A non-settling defendant forced to pay more than its share of economic damages has a right to receive contribution from joint tortfeasors. Cal. Civ. Code § 1432 (2012). But the plaintiff's good faith settlement with a defendant cuts off contribution claims against the settling defendant. Cal. Civ. Proc. Code § 877; *Oliveira v. Kiesler*, 206 Cal. App. 4th 1349, 1356 (2012). Thus, a non-settling defendant is exposed to the risk that settlement amounts attributable to economic damages will be less than the settling defendant's share of economic damages (although the non-settling defendant benefits if settlement amounts attributable to economic damages exceed the settling defendant's share of economic damages).

## 6. Colorado

Defendants found liable in Colorado are responsible only for their proportional share of all categories of damages. Colo. Rev. Stat. § 13-21-406 (2012). Non-parties cannot be apportioned fault. *See Perlmutter v. United States Gypsum Co.*, 4 F.3d 864, 873-74 (10th Cir. 1993). But Colorado has not considered whether asbestos Trusts can be apportioned fault. Defendants do not receive credit for settlements. *Smith v. Zufelt*, 880 P.2d 1178, 1187 (Colo. 1994).

## 7. Connecticut

Defendants found liable in products liability cases in Connecticut are jointly and severally liable for all categories of damages. Conn. Gen. Stat. § 52-572o(d) (2012); *Robillard v.*

12

*Asahi Chem. Indus. Co.*, 44 Conn. Supp. 510, 526 (Conn. Super. 1995). The jury determines each defendant's percentage of fault, and a defendant paying more than its percentage of fault has a right to receive contribution from joint tortfeasors. Conn. Gen. Stat. § 52-572o(c), (e) (2012). But rather than having a right of contribution against a settling joint tortfeasor, a non-settling defendant has a right to receive credit for the settling joint tortfeasor's percentage of responsibility. *See Stefano v. Smith*, 705 F. Supp. 733, 737-38 (D. Conn. 1989). Thus, a non-settling defendant in Connecticut has no need of contribution from settling co-defendants, because it is absolutely protected from bearing a solvent settling defendant's percentage of liability.

No Connecticut case appears to have discussed how an asbestos Trust should be treated, specifically whether a non-settling defendant should receive credit for a settling Trust's percentage of liability or only for the amount of its settlement with the plaintiff. But a non-settling defendant would at the very least receive credit for Trust payments (and would have a right of contribution against a Trust that has not paid the plaintiff). *See Gionfriddo v. Gartenhaus Café*, 15 Conn. App. 392, 400 (1988).

## 8. Delaware

Defendants found liable in Delaware are jointly and severally liable for all categories of damages. Del. Code Ann., tit. 10, § 6301 (2012). Defendants receive credit for settlement payments (or a greater share stipulated in a release). *Id.* § 6304(a). A settling party must be found liable "either judicially or by an admission" for the non-settling defendant to receive credit. *Medical Ctr. v. Mullins*, 637 A.2d 6, 6-9 (Del. 1994). But a finding that a settling party is "even as little as one percent liable" results in credit. *Id.* at 10.

A non-settling defendant that pays more than its pro rata share of a judgment has the right to receive contribution from joint tortfeasors. Del. Code Ann., tit. 10, § 6302(a) (2012). A settling defendant is not protected against contribution claims unless the plaintiff's release of that defendant "provides for a reduction, to the extent of the pro rata share of the released tortfeasor, of the injured person's damages recoverable against all the other tortfeasors." *Id.* § 6304(b). Thus, a non-settling defendant is absolutely protected from bearing settling defendants' pro rata shares of liability: either by the plaintiff's release of settling defendants' pro rata shares or by the non-settling defendant's right to seek contribution from a settling defendant who failed to obtain a release that cut off contribution claims.

## 9. Florida

In cases filed on or after April 26, 2006, defendants found liable in Florida are responsible only for their proportional share of all categories of damages. Fla. Stat. § 768.81(3) (2012). By statute, non-parties can be apportioned fault. *Id.* § 768.81(3)(a); *see also W.R. Grace & Co.-Conn. v. Dougherty*, 636 So. 2d 746, 748 (Fla. Dist. Ct. App. 2d Dist. 1994).

In cases filed before April 26, 2006, defendants found liable in Florida are jointly and severally liable for economic damages and responsible for their proportional share of non-economic damages. Fla. Stat. § 768.81(3)(b) (2005). Liability for economic damages is, however, proportional if the defendant's fault is less than 10 percent; proportional above $500,000 total economic damages if the defendant's fault is equal to or greater than 10 but less than 25 percent; proportional above $1,000,000 total economic damages if the defendant's fault

13

is equal to or greater than 25 but less than or equal to 50 percent; and proportional above $2,000,000 total economic damages if the defendant's fault is greater than 50 percent. *Id.* The portion of settlements representing economic damages is credited against economic damages. *D'Angelo v. Fitzmaurice*, 863 So. 2d 311, 314-15 (Fla. 2003). The allocation of settlements between economic and noneconomic damages is determined by the ratio of economic damages to the total jury award. *Id.* This credit is available even when the settling party has not been found liable, so long as the settling party is not found not liable. *Id.* at 318. Defendants do not receive credit for the portion of settlements attributable to noneconomic damages (or, in post-April 26, 2006 cases, any credit whatsoever). *Wells v. Tallahassee Mem'l Reg'l Med. Ctr.*, 659 So. 2d 249, 252 (Fla. 1995).

A defendant found jointly and severally liable for economic damages in a case filed before April 26, 2006 and forced to pay more than its proportional share has a right to receive contribution from joint tortfeasors. Fla. Stat. § 768.31 (2012); *Gouty v. Schnepel*, 795 So. 2d 959, 964 (Fla. 2001). But a good faith settlement cuts off contribution claims against a settling defendant. Fla. Stat. § 768.31(5) (2012). Thus, a non-settling defendant is exposed to the risk that, in the event of joint and several liability, the portion of a co-defendant's settlement attributable to economic damages will be less than its share of economic damages (although the non-settling defendant also benefits if the settlement is greater than the settling party's share of economic damages).

### 10. Georgia

Defendants found liable in Georgia are responsible only for their proportional share of all categories of damages. Ga. Code Ann. § 51-12-33 (2012). By statute, non-parties can be apportioned fault. *Id.*; *see also Union Carbide Corp. v. Fields*, 315 Ga. App. 554, 556 (2012). Georgia courts would likely hold (following states with similar regimes) that defendants do not receive credit for settlements.

### 11. Hawaii

Defendants found liable in asbestos cases in Hawaii are jointly and severally liable for all categories of damages. Hawaii Rev. Stat. § 663-10.9(2)(C) (2012); *see also In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 818 (9th Cir. 1992). Defendants receive credit for settlement payments (or a greater amount specified in a release). *Nobriga v. Raybestos-Manhattan, Inc.*, 67 Haw. 157, 163 (1984).

A non-settling defendant forced to pay more than its pro rata share of a judgment has a right to receive contribution from joint tortfeasors, but a plaintiff's good faith settlement with a defendant cuts off contribution claims against the settling defendant. Hawaii Rev. Stat. § 663-15.5(a)(3) (2012). Thus, a non-settling defendant is exposed to the risk that a settlement will be less than the settling defendant's share of liability.

### 12. Idaho

Defendants found liable in Idaho are responsible only for their proportional share of all categories of damages. Idaho Code Ann. § 6-803 (2012). Non-parties may be allocated fault. *Van Brunt v. Stoddard*, 136 Idaho 681, 687 (Idaho 2001) ("[T]rue apportionment cannot be achieved

unless it includes all tortfeasors guilty of causal negligence either causing or contributing to the occurrence in question, whether or not they are parties to the case."). Idaho courts would likely hold (following states with similar regimes) that defendants do not receive credit for settlements.

### 13. Illinois

Defendants found liable in asbestos cases in Illinois are jointly and severally liable for all categories of damages. 735 Ill. Comp. Stat. 5/2-1117, -1118 (2012). Defendants receive credit for settlement payments (or a greater amount specified in a release), with no finding of liability necessary. 740 ILCS 100/2(c); *see also Nguyen v. Tilwalli*, 144 Ill. App. 3d 968, 972-73 (1986).

A defendant forced to pay more than its pro rata share of a judgment has a right to receive contribution from joint tortfeasors. 740 ILCS 100/2(a), (b) (2012). But the plaintiff's good faith settlement cuts off contribution claims against the settling defendant. *Id.* 100/2(d). Thus, a non-settling defendant is exposed to the risk that a settlement will be less than the settling defendant's share of liability (although the non-settling defendant also benefits if the settlement amount is greater than the settling party's share of liability).

### 14. Indiana

Defendants found liable in Indiana are responsible only for their proportional share of all categories of damages. Ind. Code § 34-20-8-1. By statute, non-parties (including bankrupts) can be apportioned fault. *Id.*; *see also Bondex Int'l v. Ott*, 774 N.E.2d 82, 83-84 (Ind. Ct. App. 2002) (finding that such allocation does not offend automatic stay). Defendants do not receive credit for settlements. *R.L. McCoy v. Jack*, 772 N.E.2d 987, 987-88 (Ind. 2002).

### 15. Iowa

Defendants found liable in Iowa are responsible only for their proportional share of all categories of damages when their fault is below 50 percent, and are jointly and severally liable for all categories of damages when their fault is greater than or equal to 50 percent. Iowa Code § 668.4. Iowa restricts apportionment of fault, however, to defendants remaining at verdict and settled parties. *See, e.g.*, *Dumont v. Keota Farmers Coop*, 447 N.W.2d 402, 404 (Iowa App. 1989); *Payne Plumbing v. Bob McKinness Excavating*, 382 N.W.2d 156, 159 (Iowa 1989); *Thomas v. Solberg*, 442 N.W.2d 73, 77 (Iowa 1989). The Iowa Supreme Court held that the Manville Trust could not be put on the verdict form when the plaintiff had not yet settled with the Trust. *Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 862 (Iowa 1994). But nothing in Iowa law precludes apportioning fault to asbestos Trusts with whom the plaintiff had settled.

A defendant forced to pay more than its proportional share of a judgment has a right to receive contribution from joint tortfeasors. Iowa Code § 668.5 (2012). Because a non-settling defendant receives credit for a settling joint tortfeasor's proportional share of liability, contribution from settling defendants is unnecessary and non-settling defendants are absolutely protected against bearing a settling defendant's proportional share of liability. *Id.* § 668.7; *see also Wadle v. Jones*, 312 N.W.2d 510, 514-15 (Iowa 1981) (defendant jointly and severally liable also receives credit for settlements, without finding that settling parties are liable).

15

### 16. Kansas

Defendants found liable in Kansas are responsible only for their proportional share of all categories of damages. K.S.A. § 60-258a (2012); *Brown v. Keill*, 224 Kan. 195, 203-4 (1978). Fault can be apportioned to non-parties. *Id.* at 207; *Miles v. West*, 224 Kan. 284, 287 (1978) ("The ill fortune of being injured by an immune or judgment-proof person now falls upon plaintiffs rather than upon the other defendants. . . . The risk of such ill fortune is the price plaintiffs must pay for being relieved of the burden formerly placed upon them by the complete bar to recovery based on contributory negligence."). Defendants do not receive credit for settlements. *Glenn v. Fleming*, 240 Kan. 724, 731 (1987).

### 17. Kentucky

Defendants found liable in Kentucky are responsible only for their proportional share of all categories of damages. KY Rev. Stat. Ann. § 411.182 (2012). Fault may be apportioned to defendants, third-party defendants, and persons released from liability. *Id.* Thus, non-parties other than settling parties ordinarily cannot be apportioned liability. *Baker v. Webb*, 883 S.W.2d 898, 899-900 (Ky. Ct. App. 1994); *see also Owens Corning Fiberglas Corp. v. Parrish*, 58 S.W.3d 467, 471 n.5, 480 (Ky. 2001). Courts do, however, permit assignment of fault to bankrupt entities and Trusts. *See CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 69-70 (Ky. 2010); *Cardinal Indus. Insulation Co. v. Norris*, 2009 WL 562614, at *2 (Ky. Ct. App. 2009); *R.T. Vanderbilt Co. v. Franklin*, 290 S.W.3d 654, 657 (Ky. Ct. App. 2009).

Kentucky courts would likely hold (following states with similar regimes) that defendants do not receive credit for settlement payments.

### 18. Louisiana

Louisiana follows a unique apportionment scheme in asbestos cases. A non-settling defendant found liable pays a virile share of the verdict, determined by dividing the verdict by the number of total defendants and settling parties found liable. *Palermo v. Port of New Orleans*, 951 So. 2d 425, 432 (La. App. 4th Cir. 2007). Asbestos Trusts with whom the plaintiff settles are assigned a virile share. *Id.* at 430, 430 n.2, 432; *see also Abadie v. Metropolitan Life Ins. Co.*, 784 So. 2d 46, 84-85 (La. App. 5th Cir. 2001). The shortfall between the virile share and the Trust's payment is borne by the plaintiff. *Id.* Thus, a defendant in Louisiana is absolutely protected against the risk that a settling defendant's settlement payment is less than its virile share of liability. A defendant in Louisiana forced to pay more than its virile share also has a right to receive contribution from joint tortfeasors. *See Cole v. Celotex Corp.*, 588 So. 2d 376, 384-85 (La. App. 3d Cir. 1991).

### 19. Maine

Defendants found liable in Maine are jointly and severally liable for all categories of damages. 14 Me. Rev. Stat. Ann. § 156 (2012). Defendants receive credit for settlement payments (or a greater amount stipulated in a release). 14 Me. Rev. Stat. Ann. § 163 (2012). A non-settling defendant receives credit so long as the settling party was not found to be without causative fault. *Hewitt v. Bahmueller*, 584 A.2d 664, 666 (Me. 1991); *see also Thurston v. 3K*

16

*Kamper Ko., Inc.*, 482 A.2d 837, 842 (Me. 1984) (no credit where settling party is exculpated); *but see id.* at 843 (dissent noting that even that rule is "against the trend of modern authority").

The jury in Maine determines each defendant's percentage of fault. 14 Me. Rev. Stat. Ann. § 156 (2012). A non-settling defendant forced to pay more than its percentage of fault has a right to receive contribution from joint tortfeasors. *Id.* A settling defendant is not protected against contribution claims unless the plaintiff's release of that defendant "precludes the plaintiff from collecting against remaining parties that portion of any damages attributable to the released defendant's share of responsibility." *Id.* Thus, a non-settling defendant is absolutely protected from bearing settling defendants' proportional shares of liability: either by the plaintiff's release of settling defendants' shares of responsibility or by the non-settling defendant's right to seek contribution from a settling defendant who failed to obtain a release that cut off contribution claims.

### 20. Maryland

Defendants found liable in Maryland are jointly and severally liable for all categories of damages, with verdicts reduced by settlement payments or a greater amount specified in a release. Md. Code Ann., Cts. & Jud. Proc. § 3-1404 (2012). To receive credit, a non-settling defendant must prove the liability of the settling party. *Porter Hayden Co. v. Bullinger*, 350 Md. 452, 470-71 (1998).

A non-settling defendant forced to pay more than its pro rata share of the verdict has a right to receive contribution from joint tortfeasors. Md. Code Ann., Cts. & Jud. Proc. § 3-1402(a) (2012). A settling defendant is not protected against contribution claims unless the plaintiff's release of that defendant, among other things, "[p]rovides for a reduction, to the extent of the pro rata share of the released tort-feasor, of the injured person's damages recoverable against all other tort-feasors." *Id.* § 3-1405. Thus, a non-settling defendant is absolutely protected from bearing settling defendants' pro rata shares of liability: either by the plaintiff's release of settling defendants' shares or by the non-settling defendant's right to seek contribution from a settling defendant who failed to obtain a release that cut off contribution claims.

### 21. Massachusetts

Defendants found liable in Massachusetts are jointly and severally liable for all categories of damages. Mass. Gen. Laws ch. 231B §§ 1-2 (2012). Defendants receive credit for settlement payments or a greater amount stipulated in a release. Mass Gen. Laws ch. 231B § 4 (2012).

A non-settling defendant forced to pay more than its pro rata share of the verdict has a right to receive contribution from joint tortfeasors. Mass. Gen. Laws ch. 231B § 1 (2012). But a good faith settlement cuts off contribution claims against a settling defendant. Mass. Gen. Laws ch. 231B § 4 (2012). Thus, a non-settling defendant is exposed to the risk that a settlement may be less than the settling defendant's share of liability (although the non-settling defendant also benefits if a settlement amount exceeds the settling party's share of liability).

## 22. Michigan

Defendants found liable in Michigan are responsible only for their proportional share of all categories of damages. Mich. Comp. Laws §§ 600.6304, 600.6312 (2012). Non-parties—including unidentifiable non-parties responsible for harm—may be apportioned fault. *Id.* § 600.6304(1)(b); *Rinke v. Potrzebowski*, 254 Mich. App. 411, 414 (2002).

Michigan courts would likely hold (following states with similar regimes) that defendants do not receive credit for settlement payments.

## 23. Minnesota

Defendants found liable in asbestos cases in Minnesota are jointly and severally liable for all categories of damages, but a party less than 15 percent at fault is liable for no more than four times its percentage fault. Minn. Stat. § 604.02 (1991); *Newinski v. John Crane, Inc.*, 2009 Minn. App. Unpub. LEXIS 674, at *18-20 (Minn. Ct. App. 2009) (confirming that this version of statute applies to asbestos cases). Uncollectible portions of a judgment may be reallocated in accordance with parties' percentage fault. Minn. Stat. § 604.02 (1991). A non-settling defendant receives credit for settling defendants' percentages of fault, not the amount of their settlements. *Rambaum v. Swisher*, 435 N.W.2d 19, 23 (Minn. 1989). No Minnesota decision appears to have addressed whether a defendant receives credit for a settling asbestos Trust's percentage of fault rather than the amount of its settlement, but there is no reason to suspect that Minnesota would give anything less than dollar-for-dollar credit.

A non-settling defendant forced to pay more than its share of liability has a right to receive contribution from joint tortfeasors, but settling defendants that obtain so-called *Pierringer* releases (in which the plaintiff releases the settling defendant's share of liability) are protected against contribution claims. *See Bunce v. A.P.I., Inc.*, 696 N.W.2d 852, 855 (Minn. Ct. App. 2005). A non-settling defendant receives credit for a *Pierringer* releasee's share of liability, rendering contribution from such a defendant unnecessary. *Id.* In this way, a non-settling defendant is absolutely protected against bearing a settling defendant's share of liability.

## 24. Mississippi

Defendants found liable in Mississippi are responsible only for their proportional share of all categories of damages. Miss. Code Ann. § 85-5-7 (2012). Non-parties may be assessed fault. *Mack Trucks, Inc. v. Tackett*, 841 So. 2d 1107, 1113 (Miss. 2003); *Estate of Hunter v. GMC*, 729 So. 2d 1264, 1273-74 (Miss. 1999).

A Mississippi court would likely hold (following states with similar regimes) that defendants do not receive credit for settlement payments.

## 25. Missouri

Defendants found liable in Missouri are jointly and severally liable for all categories of damages if found 51 percent or more at fault, and are responsible only for their proportional share of all categories of damages if found less than 51 percent at fault. Mo. Stat. § 537.067 (2012). Only the fault of defendants at trial is considered. *Wagner v. Bondex Int'l, Inc.*, 368 S.W.3d 340, 361-62 (Mo. Ct. App. 2012). Defendants receive credit for settlements (or such

18

greater amount stipulated in a release), then the fault of the non-settling defendants is applied to the remaining verdict. *Id.*

A defendant found jointly and severally liable and forced to pay more than its share has a right to receive contribution from joint tortfeasors. Mo. Stat. § 537.060 (2012). But a good faith settlement cuts off contribution claims against a settling defendant. *Id.* Thus, a non-settling defendant is exposed to the risk that, in the event of joint and several liability, a settlement will be less than the settling party's share of liability (although the non-settling defendant also benefits if the settlement is greater than the settling party's share of liability).

## 26. Montana

Defendants found liable in Montana are responsible only for their proportional share of all categories of damages if found less than 50 percent at fault, and otherwise are jointly and severally liable for all categories of damages. Mont. Code Ann. §§ 27-1-703. Montana courts have held that the statutory provision permitting allocation of fault to third parties not jointed to the litigation is unconstitutional. *Bell v. Glock, Inc. (USA)*, 92 F. Supp. 2d 1067, 1068-69 (D. Mont. 2000); *Newville v. Department of Family Servs.*, 267 Mont. 237, 252 (1994). Releasees and settling parties can, however, be apportioned fault. *Messick v. Patrol Helicopters, Inc.*, 2007 U.S. Dist. LEXIS 63839, at *3-9 (D. Mont. 2007). There is not a reported case considering apportionment of fault to an asbestos Trust. Defendants that are only found liable for their proportional share of damages do not receive credit for settlements. *Funke v. Schultz*, 2008 Mont. Dist. LEXIS 671, at *4-5 (Mont. Dist. Ct. 2008).

A defendant found jointly and severally liable receives credit for the proportional shares of all settling parties. Mont. Code Ann. § 27-1-703, -704 (2012). Thus, contribution against settling parties is not necessary, and a non-settling defendant faces no risk of bearing the liability shares of settling defendants. A defendant forced to pay more than its proportional share also has a right to receive contribution from joint tortfeasors. *State Farm Fire & Cas. Co. v. Bush Hog, LLC*, 353 Mont. 173, 177 (2009).

## 27. Nebraska

Defendants found liable in Nebraska are jointly and severally liable for economic damages and responsible for their proportional share of non-economic damages. Neb. Rev. Stat. § 25-21,185.10 (2012). The only parties that can be apportioned liability for non-economic damages are defendants in the case at the time of verdict; not even settling defendants may be apportioned liability. *Richter v. Slaughter*, 2009 Neb. App. LEXIS 8, at *15-17 (Neb. Ct. App. 2009). No reported decision has, however, considered whether an asbestos Trust can be apportioned fault.

A party's liability for economic damages is reduced by the percentage of fault assigned to a settling party, not by the amount of the settlement. *Tadros v. City of Omaha*, 273 Neb. 935, 940-41 (2007); Neb. Rev. Stat. § 25-21,185.11 (2012). Thus, a non-settling defendant in Nebraska is absolutely protected from bearing settling co-defendants' shares of economic damages, and needs no right of contribution against settling defendants. A defendant forced to pay more than its proportional share of economic damages also has a right to receive contribution from joint tortfeasors. *See Estate of Powell ex rel. Powell v. Montange*, 277 Neb. 846, 849-50, 856 (2009).

19

### 28. Nevada

Defendants found liable in Nevada asbestos cases are jointly and severally liable for all categories of damages (there is an "emission, disposal or spillage of a toxic or hazardous substance" exception to proportional liability). Nev. Rev. Stat. § 41.141 (2012). Defendants receive credit for settlements or any greater amount stipulated in a release. Nev. Rev. Stat. § 17.245 (2012).

Defendants in Nevada forced to pay more than their pro rata share of a judgment have a right to receive contribution from joint tortfeasors. Nev. Rev. Stat. § 17.225. But the plaintiff's good faith settlement cuts off contribution claims against a settling defendant. Nev. Rev. Stat. § 17.245. Thus, a non-settling defendant in Nevada is exposed to the risk that a settlement is less than the settling defendant's share of liability (although the non-settling defendant also benefits if a settlement is greater than the settling party's share of liability).

### 29. New Hampshire

Defendants found liable in New Hampshire are only responsible for their proportional share of all categories of damages when found less than 50 percent at fault, and otherwise are jointly and severally liable for all categories of damages. N.H. Rev. Stat. Ann. § 507:7-e (2012). Non-parties may be apportioned fault. *Ocasio v. Fed. Express Corp.*, 162 N.H. 436, 442-43 (2011).

A non-settling defendant found jointly and severally liable that pays more than its proportionate share of a judgment has a right to receive contribution from joint tortfeasors. N.H. Rev. Stat. Ann. § 507:7-f (2012). But the plaintiff's good faith settlement cuts off contribution claims against a settling defendant. *Id.* § 507:7-h (2012). Thus, a non-settling defendant in New Hampshire is exposed to the risk that a settlement will be less than the settling defendant's share of liability (although the non-settling defendant also benefits if the settlement is greater than the settling defendant's share of liability).

### 30. New Jersey

Defendants found liable in New Jersey are responsible only for their proportional share of all categories of damages when found less than 60 percent at fault, and otherwise are jointly and severally liable for all categories of damages. N.J. Stat. Ann. § 2A:15-5.3(a), (c) (2012). Parties that the plaintiff sues but that become bankrupt before verdict can be apportioned fault. *Brodsky v. Haulers*, 362 N.J. Super. 256, 274-75 (N.J. App. Div. 2003). But parties the plaintiff has not sued and with whom the plaintiff has not settled may not be apportioned fault. *Higgins v. Owens-Corning Fiberglas Corp.*, 282 N.J. Super. 600, 609-10 (N.J. App. Div. 1995). Nothing, however, appears to preclude assigning fault to an asbestos Trust against which a plaintiff has made a claim or with whom the plaintiff has settled, although no reported cases deal specifically with Trust claims.

In asbestos actions, amounts that the plaintiff cannot recover can be reallocated in the ratio of apportioned fault. N.J. Stat. Ann. § 2A:15-5.3(d)(2) (2012); *Stevenson v. Keene Corp.*, 254 N.J. Super. 310, 312 (N.J. App. Div. 1992). A defendant found liable only for its

proportional share of damages does not receive credit for settlements. *Johnson v. American Homestead Mortg. Corp.*, 306 N.J. Super. 429, 436-37 (N.J. App. Div. 1997).

A defendant found jointly and severally liable that is forced to pay more than its proportional share of a judgment has a right of contribution against joint tortfeasors. N.J. Stat. Ann. § 2A:15-5.3(e). A defendant found jointly and severally liable is entitled to receive credit for the greater of a settling defendant's percentage of fault or the amount of the settlement. *See Kuna v. Hollman*, 137 N.J. Super. 199, 205 (1975). Thus, a non-settling defendant in New Jersey is absolutely protected from bearing a settling defendant's proportional share of liability.

### 31. New Mexico

Defendants found liable in New Mexico are responsible only for their proportional share of all categories of damages. N.M. Stat. § 41-3A-1 (2012). By statute, non-parties can be apportioned fault. *Id.* Defendants do not receive credit for settlements. *Wilson v. Galt*, 100 N.M. 227, 231 (N.M. Ct. App. 1983).

### 32. New York

Defendants found liable in New York are jointly and severally liable for economic damages and responsible only for their proportional share of non-economic damages if found less than 50 percent at fault, and otherwise are jointly and severally liable for non-economic damages. N.Y. C.P.L.R. § 1601 (2012). Bankrupts can be allocated fault, and the plaintiff must bear their shares of non-economic damages if no defendant is allocated fault equal to or greater than 50 percent. *N.Y. City Asbestos Litig. v. A.C.&S.*, 194 Misc. 2d 214, 225-26 (N.Y. Sup. Ct. 2002).

Calculating a liable defendant's share of damages is complicated, and is summarized in *Dominguez v. Fixrammer Corp.*, 172 Misc. 2d 868, 872-75 (N.Y. Sup. Ct. 1997). First, the cap on non-economic damages is determined by multiplying total non-economic damages by the defendant's percentage of fault. Second, settlement credit is determined by multiplying the total verdict by the settling defendant's share of fault; the setoff is the greater of this or the amount of the settlement. Third, the total verdict is reduced by the settlement credit, yielding total liability remaining after setoff. Fourth, total remaining economic damages are calculated by multiplying the liability remaining after setoff by the percent of the total verdict that the jury assigned to economic damages; liable defendants are jointly and severally liable for this amount. Finally, non-economic damages are calculated by multiplying liability remaining after setoff by the percent of the total verdict that the jury assigned to non-economic damages, which yields the total remaining non-economic damages that the plaintiff can collect from non-settling defendants. Each defendant is responsible for no more than the liability cap calculated in the first step, and may be responsible for less if total remaining non-economic damages are less.

A defendant in New York forced to pay more than its proportional share of economic damages has a right of contribution against joint tortfeasors. *Miloscia v. B.R. Guest Holdings LLC*, 33 Misc. 3d 466, 481 (N.Y. Sup. 2011). But a plaintiff's good faith settlement with a joint tortfeasor cuts off contribution claims against the joint tortfeasor. N.Y. Gen. Oblig. Law § 15-108 (2012). Still, because of the way damages are apportioned in New York, with non-settling defendants receiving credit for the greater of settling defendants' share of damages or the amount

of their settlements, non-settling defendants are absolutely protected against bearing the liability shares of settling defendants. *See Dominguez*, 172 Misc. 2d at 872-75.

### 33. North Carolina

Defendants found liable in North Carolina are jointly and severally liable for all categories of damages. *Bowen v. Iowa Nat. Mut. Ins. Co.*, 270 N.C. 486, 492 (1967). Defendants receive automatic credit for settlement payments made by settling defendants, or such greater amount stipulated in the release. *Holland v. Southern Public Utilities Co.*, 208 N.C. 289, 291 (1935); *Ryals v. Hall-Lane Moving & Storage Co., Inc.*, 122 N.C. App. 134, 141-42 (1996); N.C. Gen. Stat. § 1B-4.

A non-settling defendant forced to bear more than its pro rata share of a judgment has a right to receive contribution from joint tortfeasors. N.C. Gen. Stat. § 1B-1 (2012). But the plaintiff's good faith settlement with a joint tortfeasor cuts off contribution claims against the settling joint tortfeasor. *Id.* § 1B-4. Thus, a non-settling defendant is exposed to the risk that a settlement will be less than the settling defendant's share of damages (although the non-settling defendant also benefits if a settlement is greater than the settling party's share of damages).

### 34. North Dakota

Defendants found liable in North Dakota are responsible only for their proportional share of all categories of damages. N.D. Cent. Code § 32-03.2-02 (2012). Defendants do not receive credit for settlements. *See Bartels v. Williston*, 276 N.W.2d 113, 122 (N.D. 1979).

### 35. Ohio

Defendants found liable in Ohio are responsible only for their proportional share of noneconomic damages. Ohio Rev. Code Ann. § 2307.22(C). They are responsible for their proportional share of economic damages where their fault is 50 percent or less, and are jointly and severally liable for economic damages when their fault exceeds 50 percent. *Id.* at § 2307.22(A)(1). Non-parties may be considered in the allocation of fault. *Id.* at § 2307.23(A)(2). Non-settling defendants found jointly and severally liable for economic damages are entitled to credit for settlement payments (or a greater amount specified in the release). *Id.* § 2307.28. But the settling defendant must have at least minimal fault for credit to apply, although the plaintiff should be estopped from denying fault where he named the party in the complaint or accepted a settlement. *See In re Miamisburg Train Derailment Litig.*, 132 Ohio App. 3d 571, 588 (1999).

A defendant found jointly and severally liable for economic damages and forced to pay more than its proportional share has a right to receive contribution from joint tortfeasors. Ohio Rev. Code Ann. § 2307.25 (2012). But the plaintiff's good faith settlement cuts off contribution claims against the settling defendant. *Id.* § 2307.28. Thus, a non-settling defendant is exposed to the risk that a settlement will be less than the settling defendant's share of damages (although the non-settling defendant also benefits if a settlement is greater than the settling defendant's share of damages).

### 36. Oklahoma

22

Defendants found liable in Oklahoma are responsible only for their proportional share of all categories of damages. 23 Okl. St. § 15 (2012). Oklahoma courts would likely hold (following states with a similar regime) that defendants do not receive credit for settlements.

### 37. Oregon

Defendants found liable in Oregon are responsible only for their proportional share of all categories of damages. Or. Rev. Stat. § 31.610 (2012). Defendants do not receive credit for settlement payments. Or. Rev. Stat. § 31.610(2) (2012). Uncollectible shares of liability can be reallocated to other parties in accordance with their percentage of fault, but not if a party's percentage of fault is 25 percent or less. Or. Rev. Stat. § 31.610(3), (4)(b) (2012). Non-parties may be allocated fault under most circumstances, although asbestos Trusts against whom the plaintiff never seeks recovery probably would not qualify, as they are not a party "against whom recovery is sought" and cannot be joined as a third-party defendant. Or. Rev. Stat. § 31.600(2).

### 38. Pennsylvania

In cases where disease manifested after June 28, 2011, defendants found liable in Pennsylvania are responsible only for their proportional share of all categories of damages if found 60 percent or less at fault, and otherwise are jointly and severally liable for all categories of damages. 42 Pa. C.S. § 7102(a.1) (2012). All entities with whom the plaintiff has settled, including presumably bankrupts and asbestos Trusts, may be apportioned liability. 42 Pa. C.S. § 7102(a.2) (2012). Pennsylvania courts would likely hold (following states with similar regimes) that a defendant liable only for its proportional share does not receive credit for settlement payments.

In cases where disease manifests before June 28, 2011, defendants found liable in Pennsylvania are jointly and severally liable for all categories of damages, and receive credit for settlement payments, including those by Trusts, or any greater amount specified in a release. 42 Pa. C.S. § 8326 (2012); *Reed v. Allied Signal*, 2010 Phila. Ct. Com. Pl. LEXIS 410, at *13-14 (2010).

Whether under old law or current law, a defendant found jointly and severally liable that pays more than its share of a judgment has a right to receive contribution from joint tortfeasors. *See* 42 Pa. C.S. § 7102(a.1)(4) (2012). A settling joint tortfeasor remains liable for contribution unless the release provides for a reduction to the extent of the pro rata share of the released tortfeasor of the plaintiff's damages recoverable against all other tortfeasors. *Id.* § 8327 (2012). Thus, a non-settling defendant is absolutely protected from bearing settling defendants' pro rata shares of liability: either by the plaintiff's release of settling defendants' shares or by the non-settling defendant's right to seek contribution from a settling defendant who failed to obtain a release that cuts off contribution claims. A non-settling defendant found jointly and severally liable is, however, responsible for bearing the shortfall between an asbestos Trust's share of liability and a settlement payment made by the Trust to the plaintiff. *See Baker v. AC&S, Inc.*, 562 Pa. 290, 305-6 (2000).

### 39. Rhode Island

Defendants found liable in Rhode Island are jointly and severally liable for all categories of damages. *Wilson v. Krasnoff*, 560 A.2d 335, 339 (R.I. 1989). Defendants receive credit for all settlement payments (or any greater amount specified in a release) without proof of liability. R.I. Gen. Laws § 10-6-7; *Shepardson v. Consolidated Med. Equip.*, 714 A.2d 1181, 1183-84 (R.I. 1998).

A defendant forced to pay more than its pro rata share of a judgment has a right to receive contribution from joint tortfeasors. R.I. Gen. Laws § 10-6-3 (2012). A settling defendant remains liable for contribution unless the release provides for a reduction, to the extent of the pro rata share of the released tortfeasor, of the plaintiff's damages recoverable against all other tortfeasors. *Id.* § 10-6-8 (2012). Thus, a non-settling defendant is absolutely protected from bearing settling defendants' pro rata shares of liability: either by the plaintiff's release of settling defendants' shares or by the non-settling defendant's right to seek contribution from a settling defendant who failed to obtain a release that cut off contribution claims.

### 40. South Carolina

Defendants found liable in South Carolina are responsible only for their proportional share of all categories of damages if found less than 50 percent at fault, and otherwise are jointly and severally liable for all categories of damages. S.C. Code Ann. § 15-38-15 (2012). Non-parties can be apportioned fault. *Id.* Defendants also receive automatic credit for settlement payments. *Smith v. Widener*, 397 S.C. 468, 471-72 (S.C. Ct. App. 2012).

A defendant found jointly and severally liable that is forced to pay more than its pro rata share of liability has a right to receive contribution from joint tortfeasors. S.C. Code Ann. § 15-38-20 (2012). But the plaintiff's good faith settlement cuts off contribution claims against the settling defendant. *Id.* § 15-38-50. Thus, a non-settling defendant found jointly and severally liable is exposed to the risk that a settlement will be less than the settling defendant's share of damages (although the non-settling defendant also benefits if a settlement is greater than the settling defendant's share of damages).

### 41. South Dakota

Defendants found liable in South Dakota are jointly and severally liable for all categories of damages. *See Duncan v. Pennington County H.A.*, 283 N.W.2d 546, 550 (S.D. 1979). Credit for settlements (or a greater amount stipulated in the release) is available regardless of whether the settling party is found to be a joint tortfeasor. *Id.* at 550-51; S.D. Codified Laws § 15-8-17.

A defendant forced to pay more than its pro rata share of a judgment has a right to receive contribution from other joint tortfeasors. S.D. Codified Laws § 15-8-12 (2012). A settling joint tortfeasor remains liable for contribution unless the release provides for a reduction, to the extent of the pro rata share of the released tortfeasor, of the plaintiff's damages recoverable against all other tortfeasors. *Id.* § 15-8-18 (2012). Thus, a non-settling defendant is absolutely protected from bearing settling defendants' pro rata shares of liability: either by the plaintiff's release of settling defendants' shares or by the non-settling defendant's right to seek contribution from a settling defendant who failed to obtain a release that cut off contribution claims.

### 42. Tennessee

Defendants found liable in Tennessee are responsible only for their proportional share of all categories of damages. *Owens v. Truckstops of Am.*, 915 S.W.2d 420, 433 (Tenn. 1996). Fault may be apportioned to identifiable non-parties. *Brown v. Wal-Mart Discount Cities*, 12 S.W.3d 785, 787 (Tenn. 2000). Defendants do not receive credit for settlements. *McIntyre v. Balentine*, 833 S.W.2d 52, 58 (Tenn. 1992).

### 43. Texas

Defendants found liable in Texas are responsible only for their proportional share of all categories of damages if found 50 percent or less at fault, and otherwise are jointly and severally liable for all categories of damages. Tex. Civ. Prac. & Rem. Code Ann. § 33.013. Third parties, including bankrupts or asbestos Trusts, can be apportioned fault. *Id.* at § 33.003. Defendants are also entitled to credit for all settlements, with no liability finding required. *Id.* at § 33.012(b); *Lubbock Mfg. Co. v. Perez*, 591 S.W.2d 907, 923-24 (Tex. App. 10th Dist. 1979). Because the plaintiff can never recover more than the verdict, a defendant found liable may pay less than its proportional share of damages if settlement credits are sufficiently large.

A defendant found jointly and severally liable that is forced to pay more than its proportional share has a right to receive contribution from joint tortfeasors. Tex. Civ. Prac. & Rem. Code Ann. § 33.015 (2012). But a settlement cuts off contribution claims against the settling defendant. *Id.* § 33.015(d). Thus, a non-settling defendant found jointly and severally liable is exposed to the risk that a settlement will be less than the settling defendant's share of damages (although the non-settling defendant also benefits if a settlement is greater than the settling defendant's share of damages).

### 44. Utah

Defendants found liable in Utah are responsible only for their proportional share of all categories of damages. Utah Code Ann. §§ 78B-5-819, -820 (2012). Fault may be apportioned to non-parties. *Id.* at § 78B-5-821(4). Utah courts would likely find (following states with similar regimes) that defendants do not receive credit for settlements.

### 45. Vermont

Defendants found liable in Vermont are responsible only for their proportional share of all categories of damages. 12 Vt. Stat. Ann. § 1036 (2012). The state does not, however, permit fault to be apportioned to non-parties to the action. *See Levine v. Wyeth*, 944 A.2d 179, 195-96 (Vt. 2006). But the state has not considered whether asbestos Trusts can be apportioned liability. Vermont courts would likely find (following states with similar regimes) that defendants do not receive credit for settlements.

### 46. Virginia

Defendants found liable in Virginia are jointly and severally liable for all categories of damages. Va. Code Ann. § 8.01-443. Defendants receive credit for settlements (or any greater amount specified in the release). *Id.* at § 8.01-35.1(A)(1).

25

A non-settling defendant forced to pay more than its pro rata share of a judgment has a right to receive contribution from joint tortfeasors. Va. Code Ann. § 8.01-34 (2012). But the plaintiff's good faith settlement cuts off contribution claims against the settling defendant. *Id.* § 8.01-35.1(A)(2). Thus, a non-settling defendant is exposed to the risk that a settlement will be less than the settling defendant's share of damages (although the non-settling defendant also benefits if a settlement is greater than the settling defendant's share of damages).

### 47. Washington

Defendants found liable in Washington are jointly and severally liable for all categories of damages. *Sofie v. Fibreboard Corp.*, 112 Wn. 2d 636, 669 (1989). Defendants receive credit for settlements, including for asbestos Trust payments. *Brewer v. Fibreboard Corp.*, 127 Wn. 2d 512, 522-23 (1995).

A defendant forced to pay more than its pro rata share of a judgment has a right to receive contribution from joint tortfeasors. *Glover for Cobb v. Tacoma General Hosp.*, 98 Wash. 2d 708, 711 (1983), *overruled on other grounds*, *Crown Controls, Inc. v. Smiley*, 110 Wash. 2d 695 (1988). But a reasonable settlement cuts off contribution claims against the settling defendant. *Id.* at 711. Thus, a non-settling defendant is exposed to the risk that a settlement will be less than the settling defendant's share of damages (although the non-settling defendant also benefits if a settlement is greater than the settling defendant's share of damages).

### 48. West Virginia

Defendants found liable in West Virginia are jointly and severally liable for all categories of damages. W. Va. Code § 55-7-24(b)(4) (2012). Defendants receive credit for settlements regardless of the settling party's fault. *Board of Educ. v. Zando, Martin & Milstead, Inc.*, 182 W. Va. 597, 606 (1990).

A non-settling defendant forced to pay more than its proportionate share of fault can seek contribution from joint tortfeasors. W. Va. Code § 55-7-24(a)(1); *Sitzes v. Anchor Motor Freight, Inc.*, 289 S.E.2d 679 (W. Va. 1982). But the plaintiff's good faith settlement cuts off contribution claims against the settling defendant. *Zando*, 182 W. Va. at 604, 606. Thus, a non-settling defendant is exposed to the risk that a settlement will be less than the settling defendant's share of damages (although the non-settling defendant also benefits if a settlement is greater than the settling defendant's share of damages).

### 49. Wisconsin

Defendants found liable in Wisconsin are responsible only for their proportional share of all categories of damages if found less than 51 percent at fault, and otherwise are jointly and severally liable for all categories of damages. Wis. Stat. § 895.045(3) (2012). Defendants found liable only for their proportional share of damages are not entitled to credit for settlements. *Simms v. Thiede*, 1990 Wisc. App. LEXIS 1031 (Ct. App. Wisc. 3d Dist. 1990).

A defendant found jointly and severally liable that is forced to pay more than its share of liability has a right to receive contribution from joint tortfeasors, but settling defendants that obtain so-called *Pierringer* releases (which release the settling defendant's share of liability) are protected against contribution claims. *See VanCleve v. City of Marinette*, 250 Wis. 2d 121, 126,

26

132-33 (2001). A non-settling defendant receives credit for a *Pierringer* releasee's share of liability, rendering contribution unnecessary. *Id.* In this way, a non-settling defendant is absolutely protected against bearing a settling defendant's share of liability.

### 50. Wyoming

Defendants found liable in Wyoming are responsible only for their proportional share of all categories of damages, and do not receive credit for settlements. Wyo. Stat. Ann. § 1-1-109(e) (2012); *Rudy v. Bossard*, 997 P.2d 480 (Wyo. 2000). Any party to an occurrence may be apportioned fault, even if not party to the action. *Bd. of County Comm'rs v. Ridenour*, 623 P.2d 1174, 1188-89 (Wyo. 1981).

### 51. District of Columbia

Defendants found liable in D.C. are jointly and severally liable for all categories of damages, and receive automatic pro rata credit for the shares of settling parties adjudicated to be joint tortfeasors. *Martello v. Hawley*, 300 F.2d 721, 724 (D.C. Cir. 1962); *Washington Healthcare Corp. v. Barrow*, 531 A.2d 226, 230 (D.C. 1987). If a settling party is not adjudicated a joint tortfeasor, the non-settling defendant still receives dollar-for-dollar credit. *Barrow*, 531 A.2d at 231.

A defendant forced to pay more than its pro rata share has a right to receive contribution from joint tortfeasors. *George Washington University v. Bier*, 946 A.2d 372, 375 (D.C. 2008). D.C. does not appear to have addressed whether a good faith settlement cuts off contribution claims against a settling defendant. But because a non-settling defendant receives pro rata credit for a settling joint tortfeasor's share of liability, *see Martello*, 300 F.2d at 724, contribution from settling defendants should be unnecessary in D.C.

### 52. Admiralty

Under admiralty law, defendants found liable are jointly and severally liable for all categories of damages, but receive credit for settling parties' proportional share of the damages (not just their settlement payments or a pro rata credit). *See McDermott, Inc. v. Amclyde*, 511 U.S. 202, 217, 220-21 (1994). The leading asbestos case on this topic, however, from the MARDOC MDL, adopted a different approach that appears to be inconsistent with *McDermott*: joint and several liability with dollar-for-dollar credit for settlements (including asbestos Trust payments), although with the opportunity for defendants forced to pay more than their proportional share of damages to seek contribution. *Lewin v. Am. Exp. Lines, Inc.*, 224 F.R.D. 389, 394 (N.D. Ohio 2004). No case has been appealed challenging *Lewin*'s interpretation of *McDermott*. Either way, a defendant under admiralty law is absolutely protected from bearing settling defendants' proportional shares of liability, and a non-settling defendant may seek contribution from other non-settling parties for their shares of liability.

# EXHIBIT B

1

1    IN THE UNITED STATES BANKRUPTCY COURT

2    FOR THE WESTERN DISTRICT OF NORTH CAROLINA

3    Charlotte Division

4  IN RE:                                )
   GARLOCK SEALING TECHNOLOGIES          )Case No.
5  LLC,et al.                            )10-BK-31607
                                         )Chapter 11
6                          DEBTORS. )Jointly Administered
   _____)

7

8

9

10

11

12    VIDEOTAPED DEPOSITION OF MARK A. PETERSON, PHD

13    TAKEN THURSDAY, JUNE 20, 2013

14    LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22    Reported by Audra E. Cramer, CSR No. 9901
                  Job No. 26893
23

24

25

1    they abandoned it, and no one else has tried it since.

2         But, basically, I think since -- certainly

3    since the mid-'90s, every defendant I'm aware of does

4    some variant on the general process I've described, and

5    for Garlock I think it's the only viable process for

6    defendants to use.

7         And they all do something like that, as far as

8    I know.  There may be small or weird defendants here and

9    there that don't.  I'm amazed at all the defense that

10   keep popping up.

11   BY MR. CASSADA:

12        Q.   Okay.  Let me ask you about your work in this

13   particular case then.

14        I believe you call your estimation method the

15   standard method.  Do that I have right?

16        A.   Yes.

17        Q.   And from your report, as I understand it,

18   you're measuring the present value of payments that

19   Garlock would have to make to pending and future

20   asbestos bodily injury claims to resolve their claims

21   outside of bankruptcy; is that correct?

22        A.   It sounds like you read that out of my report.

23        Q.   I did.  That's a quote.

24        A.   I would agree with that, yeah.

25        Q.   And is it correct that the method that you've

1    applied the same method.  The standard method in the

2    Garlock case is no different than the methods that

3    you've applied in other cases?

4         A.    Generally, that's correct.

5         Q.    Okay.

6         A.    The parameters differ.  The implementation of

7    the method is different because it has to be responsive

8    to the nature of that particular litigation and

9    settlement practices of the defendant.

10        Q.    Okay.  Was there anything unique about the

11   application as it related to Garlock?

12        A.    Yes.

13        Q.    Tell me about that.

14        A.    Every case is unique.

15        Q.    Well, what are the --

16        A.    Its experience is unique.  Its data are unique.

17   Its tactics are unique.  Has timing are unique.  So all

18   of those matters are -- will differ for Garlock from

19   other defendants.

20        Q.    Okay.  We'll get into that.

21              Do you regard your method as a scientific

22   method?

23        A.    Yes.

24        Q.    What science are you applying?

25        A.    Well, I draw upon epidemiology, and I apply

38

1    these claims, and the way that the courts base -- in

2    every case that I've been involved in and what I've read

3    is that the court base the values of those claims based

4    upon the rights of the claimants and Garlock in the

5    litigation system of this country.  And so you have to

6    assume that these cases would be resolved in the way

7    they've been resolved in the past or would be resolved

8    within the tort system, even though it's unlikely that

9    Garlock will ever return to the tort litigation system.

10           That's the difficulty I have with your

11   question.

12       Q.   All right.  Would you agree that your methods

13   should be judged by the standards of science?

14       A.   Yes, of course.

15       Q.   Okay.  Is the predictive model of your value an

16   important test in judging its reliability?

17       A.   It is ultimately the only important test, but

18   unfortunately, it's not one that can be done now,

19   because it's a prediction.  By definition, a prediction

20   is talking about future events.  Sitting here today, we

21   cannot look at what's the outcome, how effective the

22   predictions are.

23       Q.   But you've applied the method to the

24   liabilities of other defendants?

25       A.   I have.

50

1       Q.   Is there academic or other committee with

2   authority to pass on the quality of the techniques that

3   you practice?

4       A.   I don't know.

5       Q.   You're not aware of any?

6       A.   I'm not aware of any such body of taking an

7   interest to do that.

8       Q.   Am I correct that you've described your work

9   previously as valuing a stream of contract claims that

10  would have been created if the debtor hadn't filed for

11  bankruptcy?

12      A.   Those words don't sound familiar with me; the

13  concept does.

14      Q.   Would you agree there's not a single

15  universally accepted technique for estimating asbestos

16  liability?

17          THE WITNESS:  Read that back, please.

18          (Record read.)

19          THE WITNESS:  Currently?

20  BY MR. CASSADA:

21      Q.   Correct.

22      A.   I think there is almost a consensus that the

23  Nicholson method, the standard method, is a -- is an

24  appropriate way to do the forecasting.  There are other

25  methods that differ slightly from it.  It's called the

59

```
1    group of claims and probably have a sense of an order of

2    magnitude of it:  Is it a lot?  Is it a little?

3    Whatever.  However they define that.

4          So it is considered.  It's an important

5    component.  It's the driving force for those

6    settlements, so certainly it's considered.  But I don't

7    believe it's quantified, and it's not quantified at an

8    individual level.

9    BY MR. CASSADA:

10     Q.   Would it also be true that in the settlements

11   the parties would consider the possibility of avoiding

12   the cost of actually taking cases to trial?

13         THE WITNESS:  Could you read the question,

14   please.

15         (Record read.)

16         THE WITNESS:  As a part of the settlement

17   process, certainly each side is aware of its own costs

18   and what it would -- and that's one of the motivators of

19   reaching a settlement.

20   BY MR. CASSADA:

21     Q.   Okay.  And there are other factors that go into

22   making decisions to settle.  You would agree with that;

23   right?

24     A.   Most certainly.

25     Q.   Okay.  You described yourself as an empiricist
```

62

 1   BY MR. CASSADA:

 2       Q.   Have you undertaken any analysis to determine

 3   the impact of defense cost on Garlock settlements?

 4       A.   Yes.

 5       Q.   Do you have work papers that reflect that

 6   analysis?

 7       A.   I don't know that I have any documents

 8   independent of drafts of the reports that address that.

 9   I may have made notes here and there, but I don't recall

10   any sitting here.

11       Q.   Is there any data that you've considered to

12   determine the impact of Garlock's defense cost on its

13   settlements?

14       A.   It's been -- I've looked at their defense

15   costs.  I've looked at their settlement information,

16   their indemnity payments.  I believe I've looked at

17   the -- to the degree that the financial statements

18   discussed them, I've looked in there; I know I have.  So

19   those are data, but -- so I've done that, yes.

20       Q.   Have you done any work to model the

21   relationship between Garlock's settlements and its

22   defense cost?

23       A.   Not separate from the work on the rebuttal to

24   Dr. Bates's report.  I can't think of any, but let me

25   think a minute.

63

1           I don't think so.

2      Q.   Have you done any modeling from the plaintiff

3    side on the impact of plaintiff defense cost on

4    settlements?

5      A.   How are you using the word modeling?  I don't

6    know that I understand what you mean.

7      Q.   Have you tried to construct any kind of

8    empirical framework to help you understand the

9    relationship between plaintiffs' cost and settlement?

10     A.   Sure.

11     Q.   What have you done?

12     A.   Well, the -- I've looked at -- tried to assess

13   the quantitative effect of the time value of money to

14   defendants -- plaintiffs rather, and defendants, and how

15   that relates to the relationship between settlements and

16   expected outcomes, trial outcomes.

17     Q.   Anything else?

18     A.   Well, I've looked at the relationship between

19   plaintiffs' costs, defense costs and expected outcomes

20   and how that would relate to a theory of settlements.

21   I'm not sure I agree with the theory.  I don't think I

22   agree with the theory, but I've looked at that.

23          We may have done some analyses on trying to

24   quantify the risk aversion.  I'm not sure if we've done

25   that yet or not.

64

1              Those come to mind.

2         Q.    Okay.  I'll ask you more about that later, but

3    let me ask you a few more things about your methodology

4    and the work you've done in our case.

5              Is it true that your method does not estimate

6    how many cases of mesothelioma were caused or

7    contributed by Garlock --

8              MR. SWETT:  Objection --

9    BY MR. CASSADA:

10        Q.    -- caused or contributed to by Garlock's

11   products?

12             MR. SWETT:  Objection to the form of the

13   question.

14             THE WITNESS:  Both because we've not been asked

15   to do it and because you can't do that, there's no way I

16   can do that, Dr. Bates can do that, anyone can do that.

17   No one can do that.  And I have not done so.  That's why

18   you have trials.

19   BY MR. CASSADA:

20        Q.    So, in any event, your methodology does not

21   permit you to do that?

22        A.    No one's methodology permits them to do that.

23        Q.    Okay.  Have you --

24        A.    And so mine doesn't.

25        Q.    Good.

65

1          Have you attempted or have you studied the

2    total damages that current and future mesothelioma

3    claimants might expect to recover from all sources?  And

4    I'm talking about claimants against Garlock.

5          A.   Present and future?

6          Q.   Yes.

7          A.   Again, that's impossible.  No one can do that.

8    I think I so testified earlier in this case.

9          Q.   Okay.  So -- but you haven't attempted to do

10   that then in this case?

11         A.   I try to avoid billing the estate for

12   undertaking the impossible.

13         Q.   Okay.  In past cases you've relied on the

14   testimony of Dan Myer; is that correct?

15         A.   I have.

16         Q.   And I've seen him mentioned prominently in all

17   of your reports until -- at least until this one.

18              How did he come to disappear in our report?

19              MR. SWETT:  Objection to the form of the

20   question.

21              THE WITNESS:  He's not in my disfavor.  I

22   continue to think he's a remarkably insightful person.

23   I just had no reason to -- I don't recall why I might

24   have used him.  This report is not identical to my other

25   reports.  There's no reason one way or another.

66

```
 1    BY MR. CASSADA:

 2        Q.   But you did rely on him in past reports?

 3        A.   I have.

 4        Q.   And you've relied on him to undertake the

 5    impossible undertaking that you described earlier of

 6    determining the aggregate recoveries of claimants?

 7             MR. SWETT:  Objection to the form of the

 8    question.

 9             THE WITNESS:  No, that question is not correct.

10             MR. SWETT:  Let me know when you're at a good

11    break point.

12             MR. CASSADA:  How long have we been at it.

13             MR. SWETT:  I think we've been at it more than

14    an hour, but I'm not punctilious about it.  You can

15    continue as you wish until you come to a sensible time

16    to break.

17             MR. CASSADA:  We can break now.

18             THE VIDEOGRAPHER:  The time is 10:55 a.m.

19    We're off record.  This is the end of Disc 1.

20             (Recess taken.)

21             THE VIDEOGRAPHER:  This is the beginning of

22    Disc No. 2.  The time is 11:15 a.m.  We're back on

23    record.

24    BY MR. CASSADA:

25        Q.   Dr. Peterson, have you studied the likely
```

1   number of other responsible parties in current and

2   future mesothelioma cases where Garlock might be found

3   liable?

4        A.   What do you mean by "studied"?

5        Q.   Have you undertaken to estimate the number of

6   other responsible parties in cases where Garlock might

7   be found liable?

8        A.   No.

9        Q.   You have not?

10        A.   No.

11        Q.   Are you planning on studying that?

12        A.   I don't think it's something that one can

13   identify.  It involves some of the same judgments about

14   trying to deal with the question of causation -- I'll

15   leave it at that.  There are other problems with that

16   approach.

17        Q.   Have you studied the likelihood that plaintiffs

18   would succeed in obtaining a liability finding against

19   Garlock?

20            MR. SWETT:  Objection to the form of the

21   question.

22            THE WITNESS:  Could you read the question,

23   please.

24            (Record read.)

25            THE WITNESS:  You mean at trial?

1    BY MR. CASSADA:

2        Q.    In pending and future cases, yes, at trial?

3        A.    Sure.

4        Q.    What studies have you undertaken?

5        A.    I've looked at the historic experience.

6        Q.    So you're talking about you looked at the

7    experience in the cases actually tried?

8        A.    Yes.

9        Q.    And have you reached any conclusions or

10   estimate regarding the likelihood that plaintiffs

11   current and future would succeed in obtaining a

12   liability finding against Garlock?

13       A.    Yes.

14       Q.    What conclusions have you reached?

15       A.    I think it's variable.  It depends upon the

16   settlement practices of both sides.  And if it's

17   consistent with recent history, it would be in the range

18   of 36 percent, something like that, give or take, as

19   experienced in the 2000s.

20       Q.    Have you undertaken a study to determine

21   whether the cases that were actually tried against

22   Garlock are representative of the entire claiming

23   population?

24       A.    I think we've looked at that, yes.

25       Q.    What study have you done?

69

1      A.   We just looked at the characteristics of the

2   claims tried and those not tried in the database.   But,

3   in any event, I have no expectations that they're all

4   representative of it.

5      Q.   Have you undertaken any quantitative

6   analysis --

7      A.   Yes.

8      Q.   -- of the representative --

9      A.   Yes.   I've discussed it.

10     Q.   You've done work on that?

11     A.   Yes.

12     Q.   Is that work you can turn over?

13     A.   I'd have to see if we still have it, but yes.

14          It's basically just looking at the

15   distribution, at the differences in the frequencies of

16   variables for tried and untried cases.   I believe we've

17   done that.   I'd have to go back and look at it.   It's

18   not an issue that's material to my forecast.

19     Q.   Did you reach a conclusion with respect to

20   whether the tried cases were representative?

21     A.   I haven't changed my conclusion based on any

22   analysis.   The conclusion is that of course they're not

23   representative.

24     Q.   So your concluding that the tried cases are not

25   representative of the overall population of claimants

70

1    against Garlock?

2        A.    That's correct -- the tried cases.  Yes, I

3    would agree that they are not representative.

4        Q.    Okay.  What quantitative analysis have you done

5    to determine the likelihood that -- the overall

6    likelihood that plaintiffs against Garlock would succeed

7    in obtaining a liability finding against Garlock?

8            MR. SWETT:  Objection to the form of the

9    question.

10           THE WITNESS:  I think I've already described

11   that.  We looked at the past experience.

12   BY MR. CASSADA:

13       Q.    In the tried cases?

14       A.    Yes.

15       Q.    But, in any event, you believe that you have

16   working papers of your quantitative analysis still?

17       A.    I believe we've looked at that issue.  I'm not

18   absolutely certain of that.  If we haven't done it or we

19   don't have papers, I'll let you know.

20       Q.    Okay.  Is it true that your methodology does

21   not estimate what claims might yield if they went to

22   trial?

23       A.    I don't think that's entirely true.

24       Q.    Well, in what respect is it true?

25       A.    Well, we've certainly looked at what the

1    historical experiences are, which is the only data that

2    we've got with what happened with regard to people

3    trying cases, the variability, the trends, those things,

4    and that's a background to what I do.  It's a basic part

5    of understanding litigation.

6            So I would say that I have done that.

7        Q.   Okay.  Let me make sure you understand my

8    question.

9            I didn't ask you what you'd looked at, what

10   you'd consider.  I asked you whether your methodology

11   estimates what claims might yield if they went to trial.

12       A.   Other than looking at the historical

13   experience, we have not -- with the assumption that that

14   would be indicative of what might happen in the future,

15   we have not done such an estimation, no.

16       Q.   Okay.  Do you recall testifying in the Grace

17   case that it would be a naive and inaccurate description

18   of the settlement process to think that it actually did

19   try to mirror what claims might yield if they went to

20   trial?

21       A.   Is there a statement you want to show me?

22       Q.   You don't recall any such statement to that

23   effect?

24       A.   I don't recall one way or the other.

25       Q.   Okay.  It's true, though, isn't it, that the

1    risk of loss at trial would settle the case to avoid the

2    cost of trial.

3           MR. SWETT:  Objection to the form of the

4    question.

5           THE WITNESS:  The full question -- that's kind

6    of a premise.  What's is your question about the suit?

7    BY MR. CASSADA:

8       Q.   Yeah.  Do you agree with that?

9       A.   I'm sorry.  You got to either read it or give

10   it to me again.

11      Q.   Okay.  Do you agree --

12      A.   The seriatim's difficult.

13      Q.   Do you agree that a defendant that believed

14   that it had no chance of losing at trial would pay a

15   settlement to avoid the cost of going to trial?

16      A.   Might.

17      Q.   That's a topic of the literature that we've

18   discussed.

19      A.   Sure.  It's considered.  It's artificial.

20      Q.   What's artificial about it?

21      A.   Well, I don't think that any sensible defendant

22   just operates on his own belief without some

23   understanding of the risks and uncertainties of that

24   belief.  There's no certainty in asbestos litigation.

25   You don't know what's going to be the trial outcome.

86

1    indefinite term is its problem.

2    BY MR. CASSADA:

3        Q.   Let me ask you, Dr. Peterson, to look at

4    Peterson Exhibit 1.

5            This is your initial report?

6        A.   Yes.

7        Q.   And turn if you would to page 1, Section 1,

8    "Overview of Report."

9        A.   Yes, I have it.

10       Q.   Let me ask you to read the first sentence in

11   the first paragraph out loud.

12       A.   "This report summarizes results of analyses to

13   estimate the liability of Garlock Sealing Technologies

14   ('Garlock') for mesothelioma claims that had been filed

15   and were unresolved ('pending claims') and claims that

16   would be filed in the future ('future claims') as of the

17   date of Garlock's bankruptcy petition, June 5, 2010."

18           And I left out the "LLC" after "Garlock Sealing

19   Technologies."

20       Q.   You use the word liability in that sentence;

21   correct?

22       A.   I do.

23       Q.   What do you mean?

24       A.   Well, most properly, it means the sum of

25   liabilities reached through final judgment, legal tort

87

1    liabilities and contract liabilities.  I mean, that's a

2    proper use of the term.  It also -- I think I was

3    probably using it in kind of a colloquial sense.

4        Q.   So you were estimating there future judgment

5    and future settlements?

6        A.   Yes.

7        Q.   And how many judgments are included in that

8    estimate?

9        A.   Well, they're not separately estimated.

10   They're basically assumed to be -- have the same

11   frequency and relative value in the future as they have

12   been in the past --

13       Q.   So the --

14       A.   -- relative to the settlement values.

15       Q.   Okay.  So the lion's share of the estimate

16   would cover the contract claims you talked about?

17       A.   Yes.  The contractual liabilities from

18   settlements, yes.

19       Q.   Would you agree that most variations in

20   asbestos settlements are because of changes in behavior

21   and not changes in disease or biology?  And I'm talking

22   about variations over time in settlements.

23            MR. SWETT:  Objection to the form of the

24   question.

25            THE WITNESS:  I don't think I can answer that

88

1    question.

2             MR. CASSADA:  All right.  Let me be more

3    specific.

4    BY MR. CASSADA:

5        Q.   Would you agree that plaintiffs' and

6    defendants' decisions to settle and the amounts they

7    settle for can be affected by changes in the law?

8        A.   They can be.

9        Q.   Okay.  And they have been, haven't they, in the

10   history of asbestos litigation?

11       A.   The decisions to settle and the amounts of

12   settlement?

13       Q.   Yeah.

14       A.   Probably, yes.

15       Q.   Okay.

16       A.   I would expect they would have.

17       Q.   And they can change based on changes in the

18   cost of defending claims?

19       A.   Not necessarily.

20       Q.   But they could?

21       A.   I don't think I can answer that abstractly.

22       Q.   If there are events that result in a

23   defendant's cost of defending claims increasing

24   dramatically, then that would be expected to increase

25   the settlements that that defendant would be expected to

90

1   BY MR. CASSADA:

2       Q.   Okay.  Would you agree that the revelation of

3   abusive practices in the litigation can affect

4   settlement cost?

5           MR. SWETT:  Objection to the form of the

6   question.

7           THE WITNESS:  Yeah, I can't -- it's too general

8   a question.  It's an indefinite question.

9   BY MR. CASSADA:

10      Q.   Well, you would agree that that has happened in

11  the course of asbestos litigation, hasn't it, in the

12  silica MDL?  Abusive practices of medical screening

13  firms and law firms affected the settlements of

14  nonmalignant claims?

15          MR. SWETT:  Objection to the form of the

16  question.

17          THE WITNESS:  Read the question back if you

18  would.

19          (Record read.)

20          THE WITNESS:  I don't think there's -- that's a

21  complex question.  I don't think there's a single

22  outcome of it that I would characterize as a one-to-one

23  relationship.  Lots of things could have happened, and I

24  don't think necessarily that it created an overall

25  reduction in the expected costs of any particular

1    defendant.  It may have affected a particular claim.

2    BY MR. CASSADA:

3        Q.   I'm asking whether it affected the decisions to

4    settle and the settlement amounts of nonmalignant

5    claims.

6        A.   It could have for some law firms, plaintiffs

7    law firms in particular.

8        Q.   In fact, it did, didn't it?

9        A.   I haven't studied that issue.

10       Q.   The bankruptcies of codefendants, does that

11   effect settlements?

12       A.   The bankruptcies of codefendants have broad

13   effects.

14       Q.   On the settlements of surviving or remaining

15   defendants?

16       A.   Well, the entire litigation process.  It

17   changed the litigation process.  It always has.  It's

18   done that since 1982.  It changes what cases probably

19   would get filed, who they get filed against.  Could

20   change what lawyers are filing them.  They have

21   pervasive effects.  It changes how the cases are

22   processed the remaining -- against the remaining people.

23   It changes the nature of cases.

24           And so would some of those have implications

25   for settlements?  Yes, in the aggregate, probably would.

1    But you also can't isolate the effects of those, because

2    there are also contemporaneous events happening at the

3    same time.  You can make an inference that they have

4    that because we know something about the litigation

5    process.  I don't think you can have a definitive proof

6    of it in a scientific sense.

7        Q.    But it's true that bankruptcies of codefendants

8    affect a defendants' settlement.

9        A.    Directly and indirectly --

10       Q.    Okay.

11       A.    -- in many ways.  They have complex changes.

12   They -- depends.  It depends on the defendant.  If it's

13   the ABC Insulation Contracting Company in Santa Monica,

14   perhaps not, but if it's a significant defendant, it

15   potentially has big effects.  And it depends when it

16   happens.

17            It's such a general term.  It's almost

18   impossible -- question.  It's almost impossible to

19   answer.  It's not something I believe is usefully

20   considered at such an abstract level.

21       Q.    We'll talk more about that later.

22            But there are other events that have affected

23   settlement decisions, aren't there?  Pending

24   legislation?

25            Even legislation that is not actually passed,

Peterson, Mark - 06/20/13

93

1    that has affected claiming behavior and settlement

2    behavior, has it not?

3        A.   Some pending legislation may have had an

4    impact.  I don't know how much.

5        Q.   Well, you've testified before about the

6    Fair Act; that that had a profound impact on the filings

7    of claims and decisions to settle.

8        A.   It may have accelerated the filings of certain

9    claims.  I don't -- that's a hypothesis; that's not a

10   proven fact.

11       Q.   Well, it's a conclusion that you've reached and

12   testified about before.

13       A.   I would state that it's a hypothesis.  I don't

14   think -- I don't have definitive evidence of it.

15       Q.   So before you reach a conclusion, you like to

16   have definitive evidence?

17       A.   If I can get evidence about it, it's always

18   better.

19       Q.   Okay.  Has there been a period -- say a period

20   in five years in the history of asbestos litigation that

21   has not seen a major change in claiming and settlement

22   behavior?

23       A.   Well, I think that one of the fascinating

24   aspects and the real strengths of the litigation

25   process, it's dynamic, it's always changing, and so that

102

1    BY MR. CASSADA:

2        Q.    I'm just trying to understand the standard that

3    you apply as an empiricist in reaching conclusions about

4    the future and how it's going to compare to the present.

5        A.    As I've repeatedly stated, if you have data

6    that's clear, you can argue about that, of course.

7    Dr. Bates and I often do.  But if you have observable

8    data at something, that may or may not be pertinent.  I

9    mean, if it's wholly new out of the void and not

10   something that's happening before, I'm not sure whether

11   it's appropriate to consider it.  But kind of what

12   constitutes that, I mean, that's a judgment.

13           These are -- experts exercise judgments.

14   Courts exercise judgments.  These are all matters of

15   judgment, and they don't -- there is not a cookbook

16   answer to some of your questions.

17       Q.    Okay.  We'll get more on that later.  Let me

18   ask you, actually, to go back to your initial report.

19           In Section 4 you describe Garlock's asbestos

20   litigation.

21       A.    Yes, I do.

22       Q.    Okay.  What was the source of your information

23   for this section of your report?

24       A.    I can't recall all of them.  Certainly a lot of

25   it was -- it was the record available in the case up

106

1   kinds of considerations?

2       A.   All settled claims.

3       Q.   Okay.  You've heard counsel say that?

4       A.   Yes.

5       Q.   Okay.  Where would I find those statements?

6       A.   The depositions of Mr. Mahoney and

7   Mr. O'Reilly.

8       Q.   You recall specific testimony to that effect,

9   "in all cases"?

10      A.   Yes.

11      Q.   Okay.

12      A.   I don't know if they ever said, "There wasn't

13  one case we settled where there was no liability,"

14  because, in fact, these are group processes, and it's

15  not necessarily the individual consideration of the

16  claims.  They're buying out a portfolio of claims.

17  That's the process.

18      Q.   You heard Garlock's witnesses testify that

19  the -- one of the main factors they considered was the

20  desire to avoid defense cost?

21      A.   I read that.

22           MR. SWETT:  Objection to the form of the

23  question.

24           THE WITNESS:  I'm sorry.  Could you read the

25  question back.

108

1    by every witness of Garlock, so I can't answer that

2    general question.  I did see statements -- and now I

3    even forgot what the question was now.

4            I've seen the statements.  Whatever they are,

5    they are.

6    BY MR. CASSADA:

7        Q.   Okay.  You've seen consistent statements that

8    the primary factor or the most important factor that

9    Garlock considered was the avoidance of defense costs?

10           MR. SWETT:  Objection to the form of the

11   question.

12   BY MR. CASSADA:

13       Q.   Have you seen statements to that effect?

14       A.   I've seen statements to that effect.

15       Q.   Let me take you to the first full paragraph on

16   page 7.  There's a sentence there about a third of the

17   way down.  It begins "our forecasts."

18           "Our forecasts, like the practices used by

19   Garlock and all defendants in actually resolving claims,

20   recognize that most asbestos claims are to a greater or

21   lesser extent uncertain and disputed; that most claims

22   present a probability of a verdict adverse to Garlock

23   that is greater than 0 but less than 1, with a similar

24   complimentary range for the Plaintiff; and that the

25   settlement values attached to the claim by the parties

110

1    one can understand and get some sense of what was going

2    on there.  There were the statements of plaintiffs

3    lawyers about how the group settlement process worked.

4    There is my history of studying settlements and group

5    settlements now for several decades.  So all of those

6    are a source.

7        Q.   What quantitative analysis did you do to reach

8    the conclusion that most claims present a probability of

9    a verdict adverse to Garlock that is greater than 0 but

10   less than 1?

11       A.   There are examples of it.  You can't do a

12   definitive study.  You would have to try every case, so

13   you obviously can't do that, but there are examples of

14   it.  An example of them is provided by Mr. O'Reilly in

15   his deposition where he talks about a case that was --

16   that was -- what Dr. Bates would say has no value.

17            And it was in a group settlement, and it had a

18   settlement value of $1,250, I think, a Baron & Budd

19   case; that Baron & Budd pulled out of the settlement

20   because of what was going on in a different

21   jurisdiction, according to Mr. O'Reilly, and they tried

22   the case, and they got a $10 million verdict against

23   them.  It's an example of the unpredictability and the

24   possibility that even cases with modest or little value,

25   according to Dr. Bates, no value, have value.  So there

1    are examples of that.

2        Q.   So you did not undertake any kind of

3    quantitative analysis?

4        A.   The only way to get a definitive quantitative

5    analysis is to try all these cases, and that's

6    impossible.  It doesn't exist.

7        Q.   Okay.  So you didn't --

8        A.   I looked at what was available.

9        Q.   Okay.  You didn't do that; you didn't do

10   anything to quantify?

11       A.   Again, I try not to undertake pointless

12   exercises.  It's burdensome on the estate.

13       Q.   And what is the basis for your conclusion that

14   the settlement values attached to the claim by the

15   parties are the product of each side's assessment of the

16   probability of liability and their assessment of

17   potential damages, their views about risk, and their

18   sense of the time value of the money?

19       A.   Well, it is a result of both statements by --

20   it's a result of many things.

21       Q.   I didn't ask you what it's the result of.  I

22   asked you what the basis for that conclusion is.

23           MR. SWETT:  Objection.  Argumentative.

24           THE WITNESS:  The statement is a result of the

25   consideration of the record in this case by

136

1        A.    W.R. Grace.  I'm sorry.

2        Q.    All right.

3        A.    Now, I'm confused.  W.R. Grace.

4              So that it is -- the estimation for the

5    bankruptcy was, What would be the liability of

6    W.R. Grace -- thank you for the correction -- were

7    W.R. Grace to continue in litigation?  That's one

8    report.  That's the report of June 2009.

9              This report addresses two different questions.

10   One is, What would be -- in each case, What would be the

11   liability of the trust were it to return to litigation?

12   And that was, I think, being proposed by the Libby

13   claimants, but I'm not certain of that.

14             And the second would be, What would be the

15   liability under the TDP?

16       Q.    Okay.

17       A.    And they were based upon using the same

18   forecasted number of claims for all three and taking the

19   values of the June 2009 report and changing them from

20   the 2001 -- their NPV to 2001 and updating it to 2010,

21   which is the NPV date we used so it would all be apples

22   to apples to apples.

23       Q.    Okay.  But, in any event, you concluded that a

24   trust under the TDP would be able to resolve claims for

25   less than resolutions in the tort system, likely?

137

1      A.   Well, likely less or the same as.  That's the

2   specific conclusion.

3      Q.   The likely adjective replied to the less

4   though; right?

5      A.   I don't recall how I -- I don't remember the

6   content of this.  Sorry.  I can't speak to that.

7      Q.   Okay.  Well, I was just looking at the sentence

8   that you read:  "In short, the trust total liability

9   under the TDB [sic] is likely worse less than but at

10  worst about the same as what the trust liability would

11  be were it to resolve claims within continuing tort

12  litigation."

13     A.   That may be, because the various estimates are

14  on the next page.  You can just see them there.

15     Q.   Now, you were assessing the trust distribution

16  procedures, and part 4 you talked about that, and you

17  characterized the proposed trust distribution procedures

18  as the "standard TDP provisions."

19          You see that, page 5, Section 4?

20     A.   I see the language.  I see the second paragraph

21  in Section 4.1.

22     Q.   Okay.  So you're familiar with the standard TDP

23  provisions and the standard form used for almost every

24  asbestos trust created since 2002?

25     A.   I wouldn't say every one.

152

1    requirement that, to be paid, you have to show

2    meaningful and credible evidence of exposure?

3           MR. SWETT:  Objection to the form of the

4    question.

5           THE WITNESS:  If you give me a copy of the TDP,

6    I can look at that.  Without it I won't answer it.

7    BY MR. CASSADA:

8      Q.   What about with the benefit of your report on

9    the TDP, Exhibit 5?

10     A.   My report doesn't give the paragraph that is

11   cited.  I've not seen it, looked at that in years, and

12   you're asking me now my opinion about it.

13          I will tell you that the report says what the

14   report says, but beyond that, I can't say anything more.

15   You haven't given me the basis for doing that, and I

16   don't have it in my head.

17     Q.   Let's go back to Exhibit 1.

18     A.   We're done with 5 for the moment?

19     Q.   For the moment, yes.

20     A.   I have 1.

21     Q.   You do?

22     A.   I do.

23     Q.   Would you review -- in the overview of the

24   report, the last paragraph of that, you actually set

25   forth your conclusion about the net present value under

153

1    your forecast.

2        A.    Do you want me to -- do you have a page number?

3        Q.    Page 1?

4        A.    Page 1.  1 carry over to 2.

5        Q.    Yes.  That paragraph.  I'm looking at the last

6    full sentence on page 1.  I'm going to read it to you:

7    "I expect that Garlock's continuing asbestos experiences

8    would likely be close to its most recent past" --

9        A.    I'm sorry.

10            Oh, thank you.

11       Q.    You there?

12       A.    I see it.  The bottom of page 1, the last full

13   sentence, yes.

14       Q.    Right.  You write, "I expect that Garlock's

15   continuing asbestos experiences would likely be close to

16   its most recent past, which is the period from which we

17   obtained the parameters for our primary forecast."

18            What was your basis for concluding that

19   Garlock's continuing asbestos experiences would likely

20   be close to its most recent past?

21       A.    Temporal propinquity.

22       Q.    What does that mean?

23       A.    The events -- the day after the bankruptcy the

24   status of the litigation, the nature of the litigation

25   was most similar to what it was the day before the

154

1    bankruptcy was filed, and on an ongoing basis that's

2    your starting point.  You would expect it would continue

3    as the way the system was at the time the bankruptcy was

4    filed, not what it was 15 years before.  Because the

5    litigation is -- as I've discussed and as many people

6    have pointed out, the litigation is dynamic and changed

7    enormously in that period of time.

8        Q.    Okay.  So are you saying that it would always

9    be appropriate to pick the time most recent to the

10   petition to estimate what the future would look like?

11       A.    I'm only speaking about this case.

12       Q.    Okay.  But haven't you used that same principal

13   in every case and in all of these reports that you've

14   identified here today?

15       A.    I've used different periods of -- for

16   calculating the propensities of the parameters.  I've

17   used -- in some cases I use different periods for

18   different parameters, depending upon the facts of the

19   case.  It's a fact-specific examination.

20            But as a general principle in forecasting, you

21   would expect that the continuing situation and

22   continuing outcomes will be most similar to what they

23   were at the time that you stopped, and you begin to make

24   your forecast.

25       Q.    But hasn't your experience in each of these

1    cases proven that that's never been correct; that the

2    future has never looked like the recent past for any of

3    these debtors?

4        A.   It looks more like the recent past than the

5    distant past.

6        Q.   Okay.

7        A.   And all you're asking me about now -- it's a

8    different question:  Is the future different from the

9    recent past?  Of course it will be different, and we

10   can't know what it is.  That's why it's called a

11   forecast, and that's why we don't speculate about

12   changes.

13        We could say that we'll start off there, but

14   over time, I mean, gladly admit that there are lots of

15   uncertainties in forecasting, one of which is the future

16   may differ in unanticipated ways from the past.

17       Q.   If Garlock had chosen to file a bankruptcy

18   petition in 1999, would its forecast -- under the

19   standard method of its mesothelioma liabilities be any

20   different than the forecast you've rendered in this

21   case?

22       A.   First of all, I don't know.  I haven't made a

23   forecast, so I can't tell you what it would be.  But its

24   circumstances in 1999 were quite dissimilar to what they

25   were in 2010, so just as an assumption, they likely