**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE: | Case No. 10-BK-31607 |
| GARLOCK SEALING TECHNOLOGIES LLC, et al., | Chapter 11 |
| Debtors.[1] | Jointly Administered |

## MOTION FOR LEAVE TO SERVE SUBPOENA ON MANVILLE TRUST

Debtors through this motion (the "Motion") seek leave to serve a subpoena on the

Manville Trust to obtain limited, non-privileged data about persons asserting non-mesothelioma

claims against Garlock. The Court already approved discovery of similar kinds of information in

connection with its estimation of mesothelioma claims, and the data are plainly relevant to

estimation of Garlock's non-mesothelioma asbestos liabilities as well as the feasibility of

Debtors' Second Amended Plan of Reorganization (the "Plan"). Moreover, the subpoena will

pose no undue burden on the Manville Trust, which maintains the data in an easily accessible

electronic form and as a matter of published practice makes the data available to asbestos

defendants without objection upon payment of its expenses.

### Background

1.      On January 14, 2014, the Court entered its order estimating Garlock's liability for

mesothelioma claims. 504 B.R. 71 (Bankr. W.D.N.C. 2014) (the "Estimation Opinion"). Prior to

the mesothelioma estimation trial, Debtors obtained a significant amount of discovery

---

[1] The debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company (hereinafter "Garlock" or "Debtors").

concerning both pending and settled mesothelioma claims against Garlock. The data formed the foundation of the estimate that the Court ultimately adopted:

> Garlock's estimate was derived in large part from its Analytical Database. That database was constructed primarily from questionnaires ("PIQ's") and two supplemental questionnaires sent to the current claimants' law firms.

> The responses were far from complete, but as the ACC described, the response was "robust." This was a sizeable discovery request (or social science survey) and produced a wealth of data. The data included: job histories, asbestos exposure information relating to Garlock's and third-parties' products, claims and recoveries made in the tort system and claims made to Trusts. It was supplemented with data from certain Trusts and from some bankruptcy cases. The result was the most extensive database about asbestos claims and claimants that has been produced to date. It is the most current data available and is the only data that accurately reflects the pool of claims against Garlock. It represents a reasonable and representative sample of claims against Garlock.

> Using in large part Garlock's Analytical Database its expert, Dr. Charles Bates, calculated his estimate of its liability based on a number of factors . . . .

Estimation Opinion at 95.

2.      At the confirmation hearing scheduled to begin on June 20, 2016, Debtors expect the Court will be called upon to estimate the aggregate amount of allowed non-mesothelioma claims. *See* Estimation Opinion at 74 (noting that estimation of mesothelioma claims was necessary to consideration of Debtors' plan or any competing plan). An estimate of the aggregate allowed amount of non-mesothelioma claims will be relevant both to the feasibility of the Plan and to whether the Plan pays non-mesothelioma claimants in full (a fact relevant to various confirmation tests).

3.      Debtors intend to offer Dr. Charles Bates to render an estimate of the aggregate amount of allowed non-mesothelioma claims, using the same estimation method the Court already accepted with respect to mesothelioma claims. As before, the method will depend on non-mesothelioma claimants' "job histories, asbestos exposure information relating to Garlock's

and third-parties' products, claims and recoveries made in the tort system and claims made to Trusts." Estimation Opinion at 95.

4.      In addition, the Official Committee of Asbestos Personal Injury Claimants (the "Committee") has already objected to the feasibility of Debtors' Plan. *See* Preliminary Confirmation Objections of the Official Committee of Asbestos Personal Injury Claimants to the Debtors' Second Amended Plan of Reorganization ¶ 3 (Docket No. 4586). In response, Debtors' experts will render opinions projecting the payments that will be made to claimants under the Plan, including under the Claims Resolution Procedures (the "CRP") that will govern the Settlement Option, in order to show that the Plan sets aside assets much more than sufficient to meet Debtors' Plan obligations. Under the CRP, payments to non-mesothelioma claimants depend on disease, the strength of the diagnosis, the history of exposure to asbestos (including occupation and industry), and age, among other factors. *See* CRP Appendix I, II.

5.      Because the previous estimation proceeding was limited to mesothelioma claims, *see* Estimation Opinion at 75, Debtors have not yet obtained any discovery pertaining to non-mesothelioma claims against Garlock. The information currently available in their claims database with respect to such claims is limited, generally consisting only of the claimant's name, law firm, jurisdiction, and alleged disease. Thousands of the records do not even indicate the claimant's alleged disease (which often was not specified in the complaint).

6.      Accordingly, Debtors through this Motion seek data relevant to estimation of non-mesothelioma claims and Plan feasibility. The data requested are similar to data upon which the Court based its estimate of mesothelioma claims.

7.      Specifically, Debtors seek leave to serve a subpoena, with exhibit substantially in the form of **Exhibit A** attached hereto, on the Manville Trust. The exhibit requests production of

the following data with respect to claimants in the Manville Trust database who match one of the approximately 91,000 individuals listed as having pending non-mesothelioma or unidentified disease claims in Debtors' claims database (the "Database Claimants") and, after the bar date has passed on October 6, claimants in the Manville Trust database who match any additional non-mesothelioma claimants who have filed claims in this bankruptcy case (the "Additional Bar Date Claimants"):

- Social Security number;

- Date of birth;

- Gender;

- Address and contact information;

- Date of death (if applicable);

- Whether death was asbestos-related (if applicable);

- Personal representative (if any);

- Law firm representing claimant;

- Status of Manville Trust claim (and any related database fields);

- Date Manville Trust claim was filed;

- Disease level, both as filed and as approved, and related database fields including diagnosis date, diagnosing doctor, diagnosing facility, claimant B-reader, medical audit, disease category, and PFT;

- Claim type (i.e., first injury claim or second injury claim);

- Manville settlement offer (and any related database fields);

- Database fields containing exposure information, including occupation, industry, dates of exposure, and related database fields in the "exposure" table;

- Database fields containing information about tort suit, including jurisdiction and other such database fields;

- Smoking history;

- Nature of co-worker's exposure (if applicable);

- Copies of medical records, exposure affidavits, death certificates, and other non-privileged documents maintained by the Trust and typically provided to co-defendants upon request.

8.    The Manville Trust has a published practice of providing exactly this kind of information, as a matter of course, to requesting tort defendants with respect to any person who asserts a claim against such defendant. *See* Frequently Asked Questions Related to Third Party Discovery of Information and Documents Pursuant to the 2002 Manville Trust TDP (attached as **Ex. B**) ("Manville FAQ"). The Trust provides the information in response to a subpoena (even an out-of-state subpoena), without objection (though it will stay production pending resolution of a timely filed objection by an individual claimant). *Id.* at 2-3. Thus, in civil discovery outside of bankruptcy, Garlock would be able to subpoena this information from the Manville Trust for those claimants who have lodged claims against it (like the Database Claimants and Additional Bar Date Claimants here).

9.    The requested data are indisputably relevant to estimation of non-mesothelioma claims and Plan feasibility. Most of these data are identical to information the Court ordered all pending mesothelioma claimants to provide in response to the original mesothelioma PIQ and that formed the foundation of the Analytical Database upon which the Court's mesothelioma estimate rests. *See* Order Authorizing the Debtors to Issue Questionnaire to Holders of Pending Mesothelioma Claims and Governing the Confidentiality of Information Provided in Responses

(Docket No. 1390) (requiring claimants to provide information including social security number, date of birth, gender, address and contact information, date of death, personal representative, status of Manville Trust claim, date Manville Trust claim was filed, disease level, occupation and industry, duration of exposure, and information about tort suit).

10.     The limited additional data not requested in the original mesothelioma PIQ are, under the Manville Trust's published practice, provided upon request to asbestos defendants, *see supra*, and are similar to information collected through the PIQ (gender), were requested through the Supplemental Exposure Questionnaire issued to a sample of mesothelioma claimants (exposure affidavits, nature of co-worker's exposure), or were not relevant to mesothelioma estimation but are relevant to non-mesothelioma estimation and feasibility. For example, the PIQ did not collect information regarding smoking history because smoking is not generally regarded as an alternative cause of mesothelioma. But smoking is a well-recognized alternative cause of non-mesothelioma diseases such as lung cancer, making smoking history relevant to estimation of non-mesothelioma claims. Smoking history is also relevant to non-mesothelioma claimants' eligibility for settlement payments under the CRP, and thus is relevant to feasibility. *See* CRP, Appendix I and II.

11.     Similarly, the original PIQ did not request claimants' medical records because the parties accepted claimants' allegations of mesothelioma for purposes of the estimation trial. By contrast, it will be important to understand the nature of medical records supporting non-mesothelioma conditions, which are highly relevant to the strength of those claims. *See* Estimation Opinion at 83 (noting with respect to "claims for lung cancer, asbestosis, and other diseases," "[t]here were some abuses involving mass screenings of potential claimants and bogus diagnoses of the disease"). Moreover, the diagnoses are relevant to feasibility because the

eligibility of non-mesothelioma claimants for CRP offers depends on certain characteristics of their diagnoses. *See, e.g.*, CRP, Appendix I and II (settlement offers to lung cancer and laryngeal claimants depend on, among other things, whether diagnosing doctor is board-certified, whether diagnosis is supported by underlying asbestosis or elevated amphibole lung tissue fiber burden, and whether such support is appropriately documented according to enumerated criteria).

12.     Obtaining this information from the Manville Trust is a cost-effective alternative to a new PIQ for non-mesothelioma claimants. It will permit Debtors to resort to a single source, instead of collecting data from 91,000 individual claimants. It will also spare law firms and claimants the unnecessary burden of assembling information they have already submitted to the Manville Trust. Debtors will reimburse the Manville Trust for its reasonable costs in providing such information.

13.     The data will be underinclusive, because Debtors do not expect that all persons who assert non-mesothelioma claims against them will have asserted Manville claims. But Debtors' experts believe the Database Claimants and Additional Bar Date Claimants will provide a sufficient sample because it is widely acknowledged that most asbestos claimants assert claims against the Manville Trust, which is responsible for the liabilities of the most prominent former asbestos defendant. *See, e.g.*, Estimation Opinion at 83 ("[T]he largest participant in the asbestos tort litigation system was Johns Manville Corporation. . . . Manville had—by far—the largest share of the United States asbestos market as a manufacturer of asbestos insulation along with other end-use asbestos products and asbestos materials used for manufacture by others."); Mark A. Peterson (Expert for Committee), USG Corporation Projected Liabilities for Asbestos Personal Injury Claims (May 2006), Estimation Trial Exhibit GST-6575, at 30 ("Manville data are universally regarded as the most comprehensive data on asbestos claims filing and have been

used repeatedly by analysts in forecasting liabilities for other defendants. . . . Further, the Manville data are remarkably 'clean'. . .").

14.     The subpoena will not impose an undue burden on the Manville Trust. The Manville Trust maintains the requested information in database form, and provides it routinely to co-defendants in asbestos litigation. *See* Manville FAQ, Ex. B at 3-4 (data are maintained in database form, and medical records, exposure affidavits, and other documents "are imaged upon receipt and filed by POC number in a document management system").

15.     In addition, Debtors' experts are familiar with the Manville Trust database and would be willing and able to give the Manville Trust any necessary assistance. Through 2002, the Manville Trust sold complete copies of its claims database to members of the public, including Bates White, for a $10,000 fee. Then, between 2002 and 2007, the Manville Trust routinely licensed complete copies of its claims database to members of the public (including Bates White) for $10,000. Bates White possesses a copy of the 2002 Manville database, is familiar with its structure and contents, and would be available to consult with the Manville Trust as needed. *See* Report of Jorge R. Gallardo-Garcia, PhD, Estimation Trial Exhibit GST-8004 at 33 (noting that Bates White possesses and uses a copy of 2002 Manville Trust database).

16.     In Exhibit A, Debtors also propose a procedure for claimant objections similar to the procedure followed after the Court granted Debtors' motion for leave to serve a subpoena on the Delaware Claims Processing Facility and its ten constituent Trusts.[2] That subpoena sought information pertaining to the 11,000 mesothelioma claimants who settled with Debtors between 1999 and 2010. The DCPF Trusts matched the 11,000 mesothelioma claimants to their

---

[2] *See* Order Granting in Part and Overruling in Part Objections to Subpoena by Delaware Claims Processing Facility, LLC and Associated Trusts, Establishing Claimant Objection Procedures, and Governing the Confidentiality of Information Provided in Response to the Subpoena (Docket No. 2430) ("Order Enforcing Trust Subpoena").

databases; provided electronic notice to each claimant's lawyer; and provided a list of the law firms to Debtors, who then served notice of a hearing seventeen days later to consider any claimants' objections to release of the data. *See id.* Only four objections were filed, and the Court overruled them in a short order. *See* Order Overruling Objections By Individual Claimants to Subpoena of Information from Delaware Claims Processing Facility, LLC and Associated Trusts (Docket No. 2466).

17.     To permit a similar objection process here, the proposed subpoena requests that the Manville Trust first produce, within fourteen (14) days after service, the names and addresses of law firms representing Database Claimants. Debtors will serve these law firms (as well as any other asbestos plaintiff firms that Debtors know about) with notice of a hearing on the next available Garlock hearing date to consider any claimant objections to production of their data. After the hearing, the Manville Trust will produce the requested data for any Database Claimants who do not object or whose objections are overruled, and after the bar date, will produce the requested data for any Additional Bar Date Claimants.

18.     Finally, in conformity with the Court's Order on Motions to Seal Materials in Record of Estimation Proceeding and Protocol for Redaction of Record (Docket No. 4195), Debtors will move for entry of a protective order prohibiting Debtors from disclosing and requiring Debtors to redact the following information received in the Manville Trust production before making any of the produced data public, including at trial:

   a.   Social Security numbers (except last four digits);

   b.   Dates of birth (except year);

   c.   Names of identifiable minors (except for their initials);

   d.   Financial account numbers (except last four digits); and

e. Medical information (except claimed disease, such as "mesothelioma," "asbestosis," or "lung cancer").

## Jurisdiction

19.     The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

20.     Debtors seek leave to file the subpoena described above, with exhibit substantially in the form of **Exhibit A**, on the Manville Trust.

21.     Because the confirmation hearing is a contested matter, it is proper for parties to subpoena relevant evidence from third parties pursuant to Rule 9016. *See* Fed. R. Bankr. P. 9016 ("Rule 45 F.R. Civ. P. applies in cases under the Code"); *In re Symington*, 209 B.R. 678, 688-89 (Bankr. D. Md. 1997); *In re Sunridge Assocs.*, 202 B.R. 761, 762 (Bankr. E.D. Cal. 1996) ("[P]roduction of documents in connection with an adversary proceeding or a contested matter can be compelled under Rule 7034 as to a party or Rule 9016 as to a non-party").

22.     The information requested is indisputably relevant to estimation of non-mesothelioma claims and the feasibility of Debtors' Plan. The scope of discovery "is construed liberally. . . . Discovery requests are undoubtedly proper when they lead to relevant or potentially relevant information that will advance the litigation by clarifying a party's contentions and apprising a party of what it must seek to disprove." *Belmont Textile Mach. Co. v. Superba, S.A.*, 48 F. Supp. 2d 521, 524 (W.D.N.C. 1999). The scope of relevance is equally broad when evidence is proposed to be subpoenaed from third parties. *See Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 541 n.2 (N.D. Ill. 2004) ("Rule 45 draws no distinction between parties and non-

parties concerning the scope of discovery"); *Bridges v. Murray*, 2009 U.S. Dist. LEXIS 46530 at *6 (W.D.N.C. 2009).

23.     The information sought through this Motion easily meets these standards. The Court previously approved discovery of virtually the same information for purposes of the mesothelioma estimation trial. Those data were not only relevant in the discovery sense, they were material to the Court's decision. The Court adopted the estimate based on the data collected, and furthermore, criticized claimants' experts for not considering it. *See* Estimation Opinion at 94-95.

24.     During discovery for the mesothelioma estimation trial, the Court also recognized the propriety of reasonable data requests from Trusts. *See* Order Enforcing Trust Subpoena. Like Debtors' earlier request authorized by the Court, the proposed subpoena is narrowly tailored and will not cause any undue burden. It seeks only information that the Manville Trust maintains in database form and discloses as a matter of published practice to asbestos defendants without objection pursuant to subpoena. *See* Manville FAQ, Ex. B. And as described above, Debtors will provide a reasonable time for compliance and will reimburse the Trust's reasonable expenses. Moreover, the proposed subpoena process provides an opportunity for claimant objections and will protect from public view the information the Court has decided should be kept confidential in this context, and Debtors will make experts familiar with the Manville database available to the Trust if necessary to facilitate the efficient production of information.

25.     Debtors provided notice of this request to the Committee and FCR. The FCR does not object. Debtors met and conferred with counsel for the Committee concerning the request, and counsel later informed Debtors that the Committee does not anticipate objecting. Debtors also expect to confer with counsel for the Manville Trust after service of the subpoena.

## <u>CONCLUSION</u>

For the foregoing reasons, Debtors respectfully request that the Court grant Debtors leave to serve the attached subpoena.

This 8th day of May, 2015.

Respectfully submitted,

<u>/s/ Garland S. Cassada</u>
Garland S. Cassada
N.C. Bar No. 12352
Jonathan C. Krisko
N.C. Bar No. 28625
Richard C. Worf, Jr.
N.C. Bar No. 37143

ROBINSON BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile:  (704) 378-4000

gcassada@rbh.com
jkrisko@rbh.com
rworf@rbh.com

*Special Corporate and Litigation Counsel to the*
*Debtors Garlock Sealing Technologies LLC,*
*Garrison Litigation Management Group, Ltd., and*
*The Anchor Packing Company*