## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| In re: | Case No. 10-BK-31607 |
| GARLOCK SEALING TECHNOLOGIES, LLC, *et al.* | Chapter 11 |
| Debtors.[1] | Jointly Administered |

### RESPONSE AND LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO DEBTORS' MOTION FOR LEAVE TO SERVE SUBPOENA ON MANVILLE TRUST

The Official Committee of Asbestos Personal Injury Claimants (the "**Committee**") respectfully submits this Response to Debtors' Motion for Leave to Serve Subpoena on Manville Trust, filed May 8, 2015 [Dkt. No. 4599] (the "**Motion**").[2]

The Debtors seek the imprimatur of the Court for a subpoena that would call upon the Manville Trust (the "**Trust**") to produce comprehensive claims data and medical records regarding (1) some 91,000 individuals who, according to the Debtors' database, hold open claims against them for diseases other than mesothelioma, and (2) all other individuals who submit such claims in this case under the October 6, 2015 bar date. The Manville Trust ("**Trust**") has objected to the Motion, urging that it be denied without prejudice to the Debtors' right to propose

---

[1] The Debtors are Garlock Sealing Technologies LLC ("**Garlock**"), Garrison Litigation Management Group, Ltd., and The Anchor Packing Company.

[2] The Committee's response deadline was extended until June 8, 2015, by agreement with the Debtors so that the Committee could focus on an effort to resolve this matter by agreement. Unfortunately, agreement has proven elusive.

1623612

a much narrower subpoena under appropriate confidentiality constraints. *See* Objection of Non-Party Manville Personal Injury Settlement Trust to the Debtors' Motion for Leave to Serve Subpoena, filed June 4, 2015 [Dkt. No. 4638]. The Committee supports the Trust's objection. Although the Committee is not reflexively opposed to the Debtors seeking discovery from the Trust within a reasonable scope and on reasonable terms, the proposed subpoena is patently excessive and should not be permitted.

Discovery of claims information on the grandiose scale the Debtors would seek can serve no legitimate need in the confirmation proceeding that could not be met much more efficiently and with much less expense by sampling Trust claims information, rather than sweeping in third-party data and records for all claimants. Furthermore, if the Trust is ultimately required to render any production in this case, it has the right to designate the information produced as confidential for discovery purposes. The Debtors have wrongly insisted that they would be entitled to make public use of any such information, but that is a question that will be debated at the evidentiary stage of the confirmation proceeding and should not be prejudged at the discovery stage. In light of the Debtors' evident intention to use a Trust production publicly, if any such discovery is ultimately allowed, the Court should establish a procedure to hear and determine in advance any objection to such a use, so that the Debtors will not be able to render any such disagreement moot by unilateral action. This is the approach Judge Hodges took when he allowed the Debtors to issue a questionnaire to holders of pending mesothelioma claims, but required that questionnaire responses be treated as confidential and used only for the estimation proceeding. *See* Hr'g Tr. at 188:17-189:4, Apr. 28, 2011.

I. **Third-Party Discovery Into Tens of Thousands of Individual Claims Would Be Grossly Disproportionate for Any Proper Purpose in the Confirmation Proceeding**

Pursuant to Rule 26, this Court may limit discovery if:

> the burden and expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C)(iii). "A court can limit discovery when the burden of the discovery would outweigh the benefits." *Dawson v. Bush*, 2014 WL 3349835, at *3 (E.D.N.C. July 9, 2014). Requests must be "proportional" in light of the relevance and purpose of the discovery and the burdens of discovery. *In re Jemsek Clinic, P.A.*, 2013 WL 3994663, at *7-8 (Bankr. W.D.N.C. Aug. 2, 2013). The burden need not be a financial one, but can involve intangibles. *Dawson*, 2014 WL 3349835, at *3.

The Debtors assert that the purpose of this discovery is to permit their expert, Dr. Charles Bates, to estimate "the aggregate amount of allowed non-mesothelioma claims," Motion at 2, including the value of the claims under the Claims Resolution Procedures of the Debtors' Second Amended Plan of Reorganization (the "**Plan**"). But the Motion does not explain why Dr. Bates needs data on the individual claims of each of 91,000 claimants plus the unknown number of additional claimants who will submit claims for diseases other than mesothelioma under the compulsion of the bar date.

This Court cannot possibly make individualized determinations on the allowable amounts of 91,000 non-mesothelioma claims in this confirmation proceeding. Evaluating each claim would require case-by-case attention to exposure, medical records, and ultimately individualized expert testimony. Making any meaningful determination on the merits of what could be substantially more than 100,000 claims once the bar date arrives would take much more time

than this Court can provide or these Chapter 11 cases can bear. If, for the limited purposes of plan confirmation proceedings in this mass-tort bankruptcy, the Debtors' expert wishes to posit average values for groups or types of non-mesothelioma claims using data from sources like the Manville Trust, there is no reason why he could not do so on the basis of a statistically valid sample. Such a sample would not involve anywhere near the more than 100,000 claims targeted by the Debtors' draft subpoena in the form proposed.

If the Debtors insist that their expert, Bates White, could indeed value more than 100,000 claims *individually* based mainly on data points and medical records to be obtained from the Trust – and do so within a space of time that would be realistic for purposes of the confirmation proceeding – the proposition is both too implausible and too important for the Court to take on faith, or to give the expert a free hand now with the idea of sorting out the issues later. For the Court to *assume* the soundness of that startling idea as the basis for deciding a request for leave to issue a subpoena would be to let the tail wag the dog. Taking that proposition seriously would require a close analysis of the methodology the expert proposes to employ and whether that methodology is practicable given the number and nature of the claims involved. The Court may wish to invite briefing on this subject before deciding whether or not to authorize the requested subpoena to the Trust.

It would *not* be a sufficient answer for the Debtors to say that the methodology their expert will use for non-mesothelioma claims will be the same one he used, and the Court accepted, in the estimation of mesothelioma claims. The Mesothelioma Claim Questionnaire went to only about 5,000 claimants (producing in the end about 4,000 pending claims, according to the analysis of the Debtors' expert). By contrast, the Debtors' database identifies 91,000 claimants for other diseases or unspecified diseases, to say nothing of the indeterminate number

- 4 -

of claims to be newly filed under the bar date. But numerosity on a far different scale is not the only problem the Court will encounter if the Debtors attempt to engraft their mesothelioma estimation methodology onto the non-mesothelioma claims without significant adaptation. Another key difference is that, as the Debtors have freely admitted before now, diagnosis is not usually contested in mesothelioma cases. As a result, factual disputes about the presence of that disease in particular cases were not a significant factor in the analysis of the Debtors' expert in the mesothelioma estimation proceeding. By contrast, diagnoses of non-malignant asbestos-related diseases are a source of factual disputes. Indeed, for claims alleging asbestosis, the validity and meaning of the medical evidence may be one of the most hotly contested issues, while the interplay of tobacco use and asbestos exposure is a perennial issue in lung cancer cases. If the Debtors' expert proposes to value individual claims by drawing inferences about the claimants' diagnoses, fairness would dictate that each claimant be given the chance to respond with medical experts of his or her own. The sharp distinction between aggregate estimation and individual allowance is vital to the fair, efficient, and timely administration of the confirmation proceeding, but that distinction would be strained to the breaking point if the Debtors were permitted to push their analysis too far in the direction of individual case analysis of tens of thousand of claims. Furthermore, if the Debtors' intended methodology presumes to suggest merits determinations for individual personal injury tort and wrongful death claims, it will violate claimants' procedural rights enshrined in the statutory structure and limited adjudicative authority of the bankruptcy court,[3] as well as their constitutionally and statutorily protected jury-trial right.[4]

---

[3] Both the allowance of personal injury tort and wrongful death claims and the estimation of such claims for distribution purposes are non-core matters that lie outside the zone of the
*(Footnote continued on next page.)*

- 5 -

Setting aside these practical and legal difficulties, there is the matter of cost. The Debtors have taken to complaining at every turn about the expense of these Chapter 11 cases. But the approach reflected in their proposed subpoena to the Trust portends massive expense. Even assuming the data and documents are examined at a superficial level, processing, examining, and testifying about more than 100,000 claims will result in enormous fees for experts. Bates White's previous work estimating approximately 4,000 current mesothelioma claims cost the estate on the order of $10 million. Non-mesothelioma claims represent a smaller share of the Debtors' overall asbestos liability than mesothelioma claims. In the last five years before the Debtors filed for bankruptcy, non-mesothelioma claims represented less than a quarter of Debtors' overall claim payments. Yet, the Debtors here propose to multiply claims discovery 20 times over for non-mesothelioma claims.

It is not only the Debtors who will incur inordinate costs if their Trust discovery is unconstrained. Inevitably, the Committee will be forced to deal with any Trust production through data processors, analysts, and experts of its own. Beyond these direct costs, the proposed subpoena will also result in large indirect costs and delays. For example, the Debtors' motion talks about redacting medical records prior to public use at a confirmation hearing. Motion at 9. A similar redaction process for documents related to 4,000 claims in the mesothelioma estimation proceeding took a team of 81 reviewers more than six months to complete and cost more than $500,000. There is no telling what redacting more than 100,000

---

*(Footnote continued from previous page.)*
Bankruptcy Court's adjudicative authority. *See* 28 U.S.C. § 157(b)(2)(B); *id*. § 157(b)(5).

4    28 U.S.C. § 1411(a).

sets of claimant medical records would cost and no assurance that this could be accomplished on a timetable compatible with holding the confirmation hearing in June 2016 as scheduled.

The Debtors have informed the Committee, without details, that they contemplate taking claims-related discovery on a sampling basis from sources other than the Trust. There is no valid methodological, statistical, or legal reason why any discovery they seek from the Trust should not be restricted to a sample as well.

## II. The Manville Trust is Entitled to Produce Discovery Documents on a Confidential Basis

Even if the Court concludes that the proposed subpoena, or a narrower one, may be served, an important issue remains: the Trust's desire to have the production, whatever its permitted scope, treated as confidential. The Debtors have in mind redacting only those few details that Bankruptcy Rule 9037 requires be masked before materials may be filed of record and thereby subjected to the "public access" regime of 11 U.S.C. § 107 and the doctrines underlying that statute. But discovery productions are made privately, not through filings in court; for that reason, no public right of access attaches to mere discovery materials, as such. The issue at this point is not public access, but merely the right of a third party to designate its production as confidential under recognized rules and customs.

The Trust's papers responsive to the Motion explain the basis for designating as confidential any large-scale production of information from its database. Existing orders in this case accommodate that designation. The Stipulated Protective Order entered early in this bankruptcy to facilitate discovery in all phases of the Debtors' Chapter 11 cases recognizes that any entity rendering discovery may designate as confidential any discovery materials that it believes in good faith "contain information that has not been made public and which the Producing Party would not make public in the ordinary course of its activities . . . ." Stipulated

Protective Order §1(g), entered March 22, 2011 [Dkt. No. 1225] ("**SPO**").[5] This right certainly extends to any "wholesale" production of claims data by the Trust. Indeed, the Debtors themselves insisted at the outset that their own claims database be protected as confidential, as the SPO expressly memorializes. *See id.* § 1(g) & (j). That the Debtors later voluntarily withdrew that designation for portions of their database can hardly serve to justify their attempt to deprive the Trust of the right to insist on the confidentiality of any information it produces for discovery purposes if this Court ultimately authorizes the Debtors to issue a subpoena.

In conference with the Committee, the Debtors have described their proposed subpoena as serving the same function for non-mesothelioma claims that the Mesothelioma Claim Questionnaire served in the estimation proceeding. It is noteworthy, therefore, that the order authorizing the Debtors to issue the Questionnaire not only provided that claimants' questionnaire responses would be confidential, but also spelled out specific protections to ensure the efficacy of that treatment. Order Authorizing Debtors to Issue Questionnaire to Holders of Pending Mesothelioma Claims and Governing the Confidentiality of Information Provided in Responses, entered June 21, 2011 [Dkt. No. 1390] ("**Questionnaire Order**"). For instance, the Questionnaire Order strictly delineated the categories of persons who would be entitled to have access to the responses; forbade any use of the responses except for purposes of the estimation; required recipients to ensure the segregated maintenance and secure handling of the information; and mandated that if digitized images of the responses or electronic information derived therefrom were merged into another database, that merged database would be subject to the same

---

[5] The SPO was amended to make clear that third parties called upon to render discovery have the same right as the principal parties to designate information and materials they produce as confidential. Amendment to Stipulated Protective Order, entered December 19, 2012 [Dkt. No. 2704].

use restrictions and confidentiality constraints as the responses themselves. *Id.* §§ 5(i), 11-12. Subsequent orders authorizing supplemental questionnaires to elicit product exposure information and settlement information from smaller subsets of mesothelioma claimants incorporated the same confidentiality strictures and procedures.

As a result, questionnaire responses remained confidential throughout the discovery phase. When the estimation progressed to the evidentiary hearing, a new and separate question arose, namely, whether the Debtors were required to place questionnaire responses or other confidential discovery materials under seal when using them in court or otherwise introducing them into the public record. This Court imposed a seal over the objection of Legal Newsline, an internet publisher owned by the US Chamber of Commerce, with whom the Debtors cooperated in hopes of publicizing their presentation at the hearing. Later, after this Court handed down its order estimating Garlock's aggregate liability for mesothelioma claims, solvent defendants and insurers, working closely with the Debtors and Legal Newsline, pressed the question of whether the sealing of evidentiary materials pertaining to mesothelioma claims had been procedurally improper and substantively incorrect under rules and doctrines of public access to court proceedings. On appeal, the District Court specifically recognized the propriety (and common usage) of protective orders to facilitate discovery. Memorandum of Decision and Order at 5-6, *Legal Newsline v. Garlock Sealing Technologies, LLC*, No. 3:13-cv-00464 (W.D.N.C. July 23, 2014) [Dkt. No. 90]. The District Court determined, however, that at the evidentiary stage, that parties wishing to have evidence sealed should have been required to move for that relief under legal standards explicated in that court's ruling. On remand, parties and claimants were afforded an opportunity to so move. Various claimants made motions to seal, and the Debtors, for their part, moved to seal their settlement evaluation records while opposing the sealing of any

claimant information except for the narrow details required to be redacted under Bankruptcy Rule 9037. After briefing and hearing, this Court rejected all sealing requests while enforcing the redactions required by the rule. Order on Motions to Seal Materials in Record of Estimation Proceeding and Protocol for Redaction of Record, entered October 31, 2014 [Dkt. No. 4195]. Given the magnitude of the record, the redaction process was necessarily lengthy and expensive, and the Debtors, solvent defendants, and insurers again displayed their solidarity by sharing the costs.

The Debtors have suggested to the Committee that the rulings that compelled the unsealing of the estimation record should preclude anyone from designating as confidential in the discovery process any of the claimant information that their proposed subpoena to the Trust would elicit. But the Debtors are mistaken. Those rulings rested on doctrines of public access to in-court proceedings, and on Bankruptcy Rule 9037, which derives from those doctrines and from section 107 of the Bankruptcy Code. Those doctrines, sections 107 and Rule 9037 have nothing to do with discovery materials at any stage before those materials have been used of record in the courtroom. *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009) ("Generally speaking, the public has no constitutional, statutory (rule-based), or common-law right of access to *unfiled* discovery.") (emphasis by the court); *Anderson v. Cryovac*, 805 F.2d 1, 13 (1st Cir. 1986) ("[T]he common law presumption [of public access] does not encompass discovery materials"); *In re Gitto/Global Corp.*, 321 B.R. 367, 374 (Bankr. D. Mass. 2005) (section 107 inapplicable to "discovery documents [because they] are not papers filed with a court"). This Court expressly recognized that distinction and limitation when Judge Hodges denied a public-access motion by Bondex to the extent that it sought ballot materials from other cases that, in the context of this case, remained mere discovery materials that had not found their way into the

evidentiary record.  Hr'g Tr. at 59:1-4, Apr. 17, 2014 ("The ballot materials, I don't believe I can allow because they are not public records here, although they are discovery materials here and I think that's probably not, that's not something that we ought to allow.") (Hodges, B. J.).

The Trust, then, already has the right to designate as confidential any information it may be required to produce from its claims database in response to a subpoena from the Debtors. Indeed, the Debtors themselves have exercised that right frequently and broadly throughout their bankruptcy, including by designating their own claims database as confidential in the first instance and maintaining that designation until they chose to introduce that database (or rather extensive selected portions of it) into the evidentiary record of the estimation hearing.  If the Debtors seek eventually to introduce into the evidentiary record of the confirmation hearing data or documents produced by the Trust under a confidentiality designation, the questions then arising will be whether the Debtors have (1) any legitimate purpose for doing so, or (2) any reason why such a purpose could not be satisfied by anonymizing the data—stripping it of all personally identifying details—before casting it in the form of evidentiary exhibits.

Both the Trust and the Committee should have an opportunity to be heard on those issues reasonably in advance of the confirmation hearing.  One can conceive of plausible motivations for entities in the Debtors' position to misuse evidentiary hearings in their bankruptcy as an excuse to create public access to a large cache of data where such access would not otherwise exist.  For example, principals of the Bates White firm (the Debtors' claims expert) have in the past held an interest in a business that sought to traffic in risk management services for asbestos defendants and to market an approach to resolving asbestos claims that would be cheaper for their customers than section 524(g) reorganizations.  Supplemental Declaration of Charles E. Bates, Ph.D. in Support of Debtors' Application to Authorize the Retention of Bates White, LLC

as Consultant for the Debtors, ¶ 6, filed December 10, 2010 [Dkt. No. 868]. Access to large portions of the Trust's database without restrictions would certainly confer an advantage on such an enterprise, but there would be no valid reorganization purpose in the Debtors' placing Trust data on the public record of their Chapter 11 cases to assist their expert in such an extracurricular venture. Because the Debtors ultimately introduced Mesothelioma Claim Questionnaire responses into the evidentiary record for estimation as part of their expert's massive "Garlock Analytical Database," solvent defendants now have access on the internet to amounts received by thousands of mesothelioma victims in settlements with other parties. That undoubtedly gives those defendants a new advantage in their own settlement negotiations with those victims. Yet, as Judge Hodges expressly recognized, that sort of information is traditionally "held secret."[6]

It would be improper for the Debtors gratuitously to place claimants' information on the record of the confirmation proceeding not to meet any genuine evidentiary need of their own, but merely to injure claimants in dealings with other defendants. *See, e.g., Pittston v. United States*, 2002 WL 32158052, at *2 (E.D. Va. Oct. 2, 2002) (recognizing that a party to a discovery protective order is not free to destroy the protections by unilaterally using the discovery materials publicly in motions practice), *aff'd*, 368 F.3d 385, 406 (4th Cir. 2004) (finding that, in so recognizing, the court below did not abuse its discretion).

If the Court overrules the Trust's objection to the Motion, or permits the Debtors to serve a narrowed subpoena, the Debtors may or may not eventually have good reason to use information from a Trust production in Court. That evidentiary question is not something that need be determined now at the discovery stage. But given the Debtors' refusal to acknowledge

---

[6] Order Denying Motion for Production of Information for Counsel Representing Garlock Claimants ¶ 2, entered March 4, 2011, [Dkt. No. 1201].

voluntarily any constraints on their uses of a Trust production, the Court should promulgate a procedure whereby it can consider in advance, after notice and hearing, the appropriateness of any public use the Debtors may propose to make of Trust discovery materials without the Trust's consent.  This is the approach Judge Hodges took when authorizing the Mesothelioma Claim Questionnaire.  See Hr'g Tr. at 188:23-189:2, Apr. 28, 2011 (imposing confidentiality and use restrictions and holding, "The purpose for the information is to be used for aggregation.  If there are other purposes for which anybody is interested in using it, I think you ought to ask and we can rule on that when the parties that are involved know what the request is and that kind of thing.").  Whether such a procedure should be built into an order disposing of the Motion or should instead be established by a separate order after further briefing are questions to discuss at the June 17 hearing.

## **CONCLUSION**

The Trust's objection should be sustained and the Motion denied.  The Debtors' subpoena to the Trust should not issue in the form proposed.

Dated: June 8, 2015

Respectfully submitted,

**CAPLIN & DRYSDALE, CHARTERED**

By: */s/ Trevor W. Swett*
Trevor W. Swett III
(tswett@capdale.com)
James P. Wehner
(jwehner@capdale.com)
One Thomas Circle, N.W.
Washington, DC  20005
Telephone:  (202) 862-5000

Elihu Inselbuch
(einselbuch@capdale.com)
600 Lexington Avenue, 21st Floor
New York, NY  10022
Telephone:  (212) 379-0005


**MOON WRIGHT & HOUSTON, PLLC**

By: */s/ Travis W. Moon*
Travis W. Moon
(tmoon@mwhattorneys.com)
227 West Trade Street
Suite 1800
Charlotte, NC  28202
Telephone:  (704) 944-6560

*Co-Counsel for the Official Committee of Asbestos Personal Injury Claimants*