Declaration of Charles E. Bates, Ph.D.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| **IN RE:** | **Chapter 11** |
| **GARLOCK SEALING TECHNOLOGIES LLC, et al.,**[1] | **Case No. 10-BK-31607** |
| **Debtors.** | **(Jointly Administered)** |

## DECLARATION OF CHARLES E. BATES, PH.D.

I, CHARLES E. BATES, declare as follows:

(1)    I am Chairman of Bates White, LLC, which is an economic consulting firm with its primary office located in Washington, DC.  The Court approved the employment of Bates White as Asbestos Claims Consultant for the Debtors on July 21, 2010.  I have been asked by Robinson, Bradshaw & Hinson, P.A. ("RBH") to submit the present declaration (the "Declaration") in relation to Debtors' Motion for Relief from Solicitation Order and Modification of Criteria for Temporary Allowance of Class 4 Claims for Voting Purposes (the "Motion").  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

(2)    I received my Ph.D. and M.A. in economics from the University of Rochester and my B.A. in economics and mathematics with high honors from the University of California, San Diego.  I have taught courses in advanced statistical economic analysis and trade theory while on the faculty of Johns Hopkins University and have published papers on advanced topics in estimation theory in peer-reviewed journals.  I specialize in the application of statistics and computer modeling to economic and financial issues.  I have more than 20 years of

---

[1]    The Debtors are Anchor Packing Company, Garlock Sealing Technologies LLC, and Garrison Litigation Management Group Ltd.

Declaration of Charles E. Bates

experience in a wide range of litigation and commercial consulting areas.  Much of my work has involved the design and implementation of statistical and computer modeling methods to analyze large quantities of data and to estimate the value of product liability claims against companies.  Attached as Exhibit A is my curriculum vitae.

(3)     In this matter, I am the asbestos claims estimation expert retained by the Debtors and testified regarding GST's mesothelioma liabilities in the Estimation Trial in front of the Hon. Judge George Hodges.  Further, I am the expert retained by the Debtors who will estimate GST's non-mesothelioma liability and will assess the Debtors' Second Amended Plan of Reorganization (the "Plan") in the upcoming Confirmation Hearing in front of this Court.

(4)     In this Declaration I address several problematic issues that are present within the Class 4 ballots submitted by claimants in response to the Order Approving Disclosure Statement and Establishing Asbestos Claims Bar Date and Procedures for Solicitation (Docket No. 4542) (the "Solicitation Order") through October 6, 2015 that render a tabulation of votes from Class 4 ballots meeting the Court's temporary allowance criteria unreliable with the information currently available for such ballots.  A few days after the bar date, Bates White received from Rust Consulting ("Rust"), the balloting agent in this matter, a report that was represented to include all Proof of Claim forms ("POCs") and ballots submitted by claimants in response to the Solicitation Order.

(5)     The total number of asbestos-related POCs submitted was almost 180,000 of which more than 130,000 were submitted as Class 4 ballots.  This massive number of ballots was highly concentrated among a small number of firms.  More than half of the Class 4 ballots were submitted by only 8 law firms, averaging more than 8,700 ballots per firm, with one firm (Kelley & Ferraro) submitting almost 15,000 ballots and another firm (Peter Nicholl) submitting more than 19,000 ballots.  In total, the number of ballots cast was many times higher than any number of claims that could be expected to be able to allege a valid asbestos-related disease diagnosis and to allege contact with GST asbestos-containing products ("ACPs").

(6)     Bates White began to analyze the information provided as part of the ballots along with other asbestos claims information available in this matter.  As I explain in detail below, over 74,000 ballots—over 90% of the Class 4 ballots cast in this matter from claims where we have information other than the ballot—are from claims that either never had an active claim against GST or no longer had an active claim against GST by the ballot date.  This conclusion is based on having found that tens of thousands of the ballots cast are for claims that were settled and paid before GST's bankruptcy petition, were the subject of final judgments pre-petition, were dismissed without payment pre-petition, are associated to a doctor with suspect diagnosing practices, are time-barred, submitted more than one vote, are

Declaration of Charles E. Bates

foreign claims, or submitted a deficient ballot.  Further, at least, several thousand ballots are from claimants who likely have no asbestos-related impairment.

(7)   That the vast majority of the Class 4 ballots cast do not represent current and valid claims against GST is consistent with the outcome of the mesothelioma Personal Injury Questionnaire ("PIQ") process that occurred in this matter for records that appeared to represent unresolved claims as of the petition date in GST's claims database.  That process began with 5,813 mesothelioma claims that were required to answer the PIQ.  The PIQ required mesothelioma claimants to provide their work histories and the nature of their contact with GST ACPs.  They were required to reveal if that exposure was the result of directly working with GST ACPs, a bystander working in the vicinity of another worker using GST ACPs, or as secondary exposure (say, exposure from the clothes of a worker).  In addition, they provided information on the length of their contact with GST ACPs.  In this context, where the information submitted by claimants was extensively vetted and studied, only 928 claimants who provided a basis for contact with GST ACPs of the original 5,813 purportedly open mesothelioma claims against GST submitted a Class 4 ballot.  Therefore, only 16% of the records that appeared in the GST claims database as pending mesothelioma claims are associated with a current claim against GST in which the claimant attests to having had contact to GST ACPs and identified exposure in the PIQ.  In addition to these 928 claimants who provided a GST ACPs exposure basis in their PIQ, 281 mesothelioma claims pending at the petition date either did not provide a basis for contact with GST ACPs in their PIQ or did not submit a PIQ, but submitted a Class 4 ballot.  Even including these additional 281 claims whose current assertion of exposure to GST ACPs is not supported by their PIQ, only 20% of the pre-petition pending mesothelioma claimants attempted to vote a Class 4 ballot attesting to exposure to GST ACPs.

(8)   In the remainder of this Declaration, I cover the following topics:

- Explain the process followed by Bates White to match the Class 4 ballots data to the Garlock Analytical Database and other asbestos claims data sources

- Explain the criteria used for classifying the Class 4 ballots claims into one or more categories determined to be problematic

- Provide summary statistics of my findings regarding the number of problematic Class 4 ballots

Declaration of Charles E. Bates

**The process followed by Bates White to match the Class 4 ballots data to the Garlock Analytical Database and other asbestos claims data sources**

(9)     Bates White received several MS Excel files containing the information that Rust collected from the POCs and ballots submitted by claimants in response to the Solicitation Order.[2] Bates White processed the electronic data and identified the potential asbestos-related claims based on the ballot class (Class 3, Class 4, Class 5, and Class 6), the "claim category" (generally, those referring to "asbestos claims" or "personal injury claims") as recorded by Rust, and on the "basis for claim" (generally, bases containing legends of "personal injury," "wrongful death," or the name of an asbestos-related disease) as recorded by Rust.  The data files provided by Rust listed 179,871 asbestos-related claims submitted as POCs/ballots of which 130,153 were submitted as Class 4 ballots (the "POC Data").  These files had nearly 9,000 records identical to another record in the data.  These duplicate records were removed from the data prior to addition to the Garlock Analytical Database.  The table below shows the number of POCs and ballots received in each of the classes considered in our analysis by alleged disease category.

| Alleged disease | Class 3 ballot | Class 4 ballot[3] | Class 5 ballot | Class 6 ballot | B-10 POC | Total |
|---|---|---|---|---|---|---|
| Mesothelioma | 34 | 8,748 | - | - | 1,265 | 10,047 |
| Lung cancer | 4 | 15,864 | - | - | 3,014 | 18,882 |
| Other cancer | - | 832 | - | - | 1,850 | 2,682 |
| Non-malignant | 5 | 103,928 | - | 1 | 27,714 | 131,648 |
| No disease identified | 942 | 129 | 92 | 11 | 6,509 | 7,683 |
| **Total** | **985** | **129,501** | **92** | **12** | **40,352** | **170,942** |

(10)    Bates White processed and standardized the POC Data to match the list of asbestos POCs and ballots to the Garlock Analytical Database and other asbestos claims data sources to identify additional information pertaining to the parties related to the claims submitted.  The standardization of the POC Data included, for instance, parsing the names of injured parties, claimants, creditors, and representatives into first name, middle name (or middle initial), and last name, as available, and standardizing representing law firm names in the POC Data to match the law firm naming convention in other asbestos claims data sources.

---

2   The files containing the POCs and ballots information used for this Declaration's analysis were provided by Rust to Bates White in a report on October 13, 2015.  In addition to that report Bates White received copies of the Master Ballots cast by plaintiff law firms for Class 4 claims in native form on October 19, 2015 and a report on the claims submitted by the Jaques Admiralty law firm received on November 2, 2015.

3   For Class 4 ballots, the "Other cancer" category represents "Laryngeal cancer" claims and the "Non-malignant" category represents "Asbestosis" claims.  For the other ballot classes and B-10s, these categories represent a broader range of alleged disease categories.

Declaration of Charles E. Bates

(11)    In order to supplement the data submitted for the Class 4 ballots, Bates White matched the POC Data to the following asbestos claims data sources:

- Garlock Analytical Database: this is the database I used in my analysis for GST's mesothelioma asbestos liability Estimation Trial;[4]

- Manville Trust 2002 database: a copy of the electronic database maintained by the Manville Trust with claims filed through 2001;[5]

- Manville Trust 2015 database: information included in the First Anonymized Matched Production as defined in the Order Granting in Part and Denying in Part Debtors' Motion for Leave to Serve Subpoena on Manville Trust (Dkt. No. 4721) used in compliance with this order;

- Other asbestos defendants' bankruptcy ballots ("Other BK Ballots"): data from ballot records from bankruptcy proceedings involving 23 other asbestos defendants;[6] and

- Bates White Master Database: a database with publicly available information on asbestos claims compiled by Bates White over time.

(12)    The match between the POC Data and the other asbestos claims data sources was performed by using a standard matching algorithm that relies on a sequential series of matching rounds with each of these rounds based on a set of claimant identifying fields including Social Security Number ("SSN") (limited to only last four digits here), injured party/claimant/creditor name, alleged disease category, state of residence/filing, and representing law firm.

(13)    In general terms, the matching algorithm first identifies potential matches by comparing sets of claimant-identifying fields across the data sets being matched and then runs a series of more restrictive tests to evaluate the validity of such potential matches. This multistep process is an iterative one and relies on a combination of computer code and expert judgment in order to ensure the reliability of the resulting matches. On each matching round, the algorithm proceeded in three steps:

- Step 1: Potential matches are identified by comparing a combination of the data fields considered across the two data sets. For example, records that share the same last four digits of SSN, same state of filing/residency, same last name, and same first

---

[4]    *See* Dr. Jorge Gallardo-Garcia's Expert Report in this matter (Estimation Trial Exhibit GST-8004) for a detailed description of the construction and sources comprising the Garlock Analytical Database.

[5]    Bates White purchased this copy of the Manville Database from the Claims Resolution Management Corporation in 2002.

[6]    *See* Dr. Jorge Gallardo-Garcia's Expert Report in this matter (Estimation Trial Exhibit GST-8004) for a detailed description of these ballots data.

Declaration of Charles E. Bates

initial are considered a potential match.  In this example, merging on first initial alone (instead of full first name) allows us to identify potential matches with some first name variations such as Will and William.  In this step, we only allow merges on records that have available information on all of the matching data fields considered in the matching round.

- Step 2: Additional fields are compared by the algorithm to identify potential conflicts in other data fields.  In this step, the data values need not be identical because the algorithm allows for matches across values with slight misspellings.  The algorithm calculates the number of digits that are different between two values in a data field and accepts as a match those values that have three or fewer different digits.  For instance, in this matching round, an algorithm that checks for conflicts in middle name initial would confirm that middle name initials between the potential matching records do not conflict across the two databases.  In summary, the algorithm rejects potential matches identified in Step 1 by testing conflicts on other fields in Step 2.

- Step 3: The algorithm identifies records that should be visually inspected to confirm or reject matches.  This step is part of the quality control process of the matching of data sets and it is essential to ensure that most matching records are identified through the matching algorithm while minimizing the number of potential false positives, given the information available in the POC Data for the match.

(14)   The matching exercise described above was performed between the POC Data and each of the other asbestos claims data sources considered.  The matching criteria used in each one of the matches were strict so that the number of potential false positives was minimized.  Further, matches were restricted to records with the same alleged disease or where the alleged disease in one record is available but it is not in the other record.  However, given the limited amount of data provided in each Class 4 ballots, some records belonging to the same claims were not identified as a match while some records belonging to different claims may have been identified as a match.  In this sense, the additional information sought by the Motion would be useful to improve on the matching of claims and on the better identification of potentially problematic claims.  The matching process would be simplified and the quality of the matches improved if all Class 4 ballots were required to provide full SSN of the injured party.

**The criteria used for classifying the Class 4 ballots claims into one or more categories determined to be problematic**

(15)   As tabulated below, 92% of the Class 4 ballots submitted in this matter (setting aside for the moment 48,462 ballots for which we do not have sufficient information to evaluate) fall into

Declaration of Charles E. Bates

one of the following problematic categories, based on the matching records identified and on the available information about those claims:

- Duplicate ballots: instances in which multiple votes were submitted for the same claim either by the same law firm or by more than one law firm – these are in addition to the identical data records removed prior to inclusion of the Rust data files into the Garlock Analytical Database.  Such records typically differ on some piece of information from one record so as not to be identical to its match, but are clearly for the same individual appearing twice in the database.

- Dismissed claims: claims that were dismissed without payment in the Garlock Analytical Database with a date of resolution before June 5, 2009.[7]

- Verdict claims: claims that were subject of final judgments pre-petition.

- Settled claims: claims that were settled and paid in the Garlock Analytical Database pre-petition.

- Suspect diagnosis claims: claims associated to physicians or medical facilities that were involved in the mass recruitment of claims for litigation purposes.[8]

- Stale claims: claims filed against GST prior to 2005 which were never pursued while GST was in the tort system.

- Time-barred claims: claims never filed against GST in the tort system and that were filed or asserted against other parties several years before GST's petition date.[9]

- Foreign claims: claims brought by Canadian claimants.

- Unimpaired claimants: claims related to claimants that are not impaired with an asbestos-related disease.  Because detailed disease information is not yet available for

---

[7]  The June 5, 2009 cut-off date was provided by RBH to account for the one-year additional period that claimants dismissed without prejudice, in certain jurisdictions, have to refile their claim again against a defendant.  More than 99% of these cases were not only dismissed more than a year before petition date but also were filed against GST more than three years before petition date.

[8]  The physician and medical facilities data used in this analysis is from the Manville Trust 2002 database and from the information in the Manville Trust 2015 database limited to the claimants in the First Anonymized Matched Production.  Physicians in this category included Drs. Ray Harron, Andrew Harron, and James Ballard.

[9]  Class 4 ballots were classified as time-barred if they did not appear in the Garlock Analytical Database but appeared as filed or submitted as ballots in one of the databases used to supplement the data (Manville Trust 2002, Other BK Ballots, and the Bates White Master Database).  To take into account the statute of limitations that claimants have to file a claim against a defendant, RBH provided the following jurisdictional cut-off time frames: 6 years for Maine, Minnesota, and North Dakota; 5 years for Missouri; 4 years for Florida, Nebraska, and Wyoming; and, 3 years for all other states.

Declaration of Charles E. Bates

Class 4 claims, we classified as unimpaired those Class 4 ballots with Manville Trust disease data available that fall in categories zero, I, and II.[10]

- Deficient claims: claims submitted with deficient information lacking either a disease category, the last four digits of an SSN, a vote, or a certification.

**Summary statistics of findings regarding the number of problematic Class 4 ballots**

(16)   Some Class 4 ballots fall into more than one problematic category.  For instance, claims associated with suspect diagnoses may also be likely time-barred.  The following table shows the number of Class 4 ballots that fall into each one of the problematic categories.  Note that some ballots fall into more than one problematic category and the table below includes them in all categories such ballots fall.  When accounting for overlap across problematic categories among the Class 4 ballots, about 92% of the 81,039 Class 4 ballots submitted in this matter, after setting aside the 48,462 ballots for which we do not have sufficient information to evaluate, are problematic.

| Issue | Mesothelioma | Lung cancer | Laryngeal cancer | Asbestosis/ Unknown | Total |
|---|---|---|---|---|---|
| PIQ claims with no exposure | 281 | - | - | - | **281** |
| Duplicate ballots | 11 | 9 | 1 | 442 | **463** |
| Dismissed claims[11] | 515 | 1,390 | 58 | 13,866 | **15,829** |
| Verdict claims | 8 | 14 | 1 | 1,042 | **1,065** |
| Settled claims | 229 | 414 | 13 | 5,813 | **6,469** |
| Suspect diagnosis claims | 4 | 511 | 39 | 13,732 | **14,286** |
| Unimpaired | - | - | - | 7,807 | **7,807** |
| Stale claims | 67 | 721 | 53 | 15,874 | **16,715** |
| Time-barred claims | 1,046 | 3,141 | 215 | 19,080 | **23,482** |
| Foreign claims | 930 | 304 | 3 | 780 | **2,017** |
| Deficient claims | 466 | 1,418 | 35 | 8,856 | **10,775** |

---

[10]   Disease categories' definitions according to the Manville Trust 2002 Trust Resolution Procedures and the Manville Trust data dictionary: Level 0 "non-compensable;" Level I "other asbestos disease (cash discount payment);" Level II "asbestosis/pleural disease" without medical tests requirement; Level III "asbestosis/pleural disease" with medical tests requirement; Level IV "severe asbestosis disease;" Level V "other cancer;" Level VI "lung cancer (one)" non-compensable; Level VII "lung cancer (two)" compensable under Manville Trust TDP; and Level VIII "mesothelioma." The disease categories data used in this analysis is from the Manville Trust 2002 database and from the information in the Manville Trust 2015 database limited to the claimants on the First Anonymized Matched Production.

[11]   This category includes 131 claims "administratively closed" and 406 claims "inactive" based on the status field from GST's asbestos claims database (the Garrison database).

Declaration of Charles E. Bates

(17)   As referenced above, there are 48,462 ballots for which there is no available information other than the bare minimum required by the Class 4 ballot form.  At this time, we do not know how many of those ballots would fall into one of the problematic categories identified above which is likely given their sheer volume, incompatible with any number of claims that could be expected to be able to allege a valid asbestos-related disease diagnosis and to allege contact with GST ACPs.  Therefore, additional information is important to evaluate the validity of these claims and the validity of those claims identified in the problematic categories above.  The additional information sought by the Motion would be useful in determining the number of Class 4 ballots that, indeed, are related to actual Current GST Asbestos Claims for which GST Asbestos Exposure was present, and for which a valid diagnosis is available.

(18)   In the event that the Court seeks a more detailed understanding of my opinions, I am available to appear before the Court.

I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct.

Dated on this 5th day of November, 2015.

_____
          Charles E. Bates, PhD

# EXHIBIT A



1300 Eye Street NW, Suite 600, Washington, DC 20005   **main** 202.408.6110   **fax** 202.408.7838



## CHARLES E. BATES, PHD
Chairman

### AREAS OF EXPERTISE

- Asbestos liability estimation
- Economic analysis
- Econometrics
- Statistical analysis
- Microsimulation modeling
- Database design/applications

## SUMMARY OF EXPERIENCE

Charles E. Bates has extensive experience in statistics, econometric modeling, and economic analysis. He specializes in the application of statistics and computer modeling to economic and financial issues. Dr. Bates has more than 20 years of experience and provides clients with a wide range of litigation and commercial consulting services, including expert testimony and guidance on economic and statistical issues.

Dr. Bates is a recognized expert in asbestos-related matters. He speaks in national and international forums on the asbestos litigation environment and estimation issues. Dr. Bates is frequently retained to serve as an expert on such matters in large litigations and has testified before the United States Senate Judiciary Committee and Federal Bankruptcy Court.

## SELECTED ASBESTOS AND PRODUCT LIABILITY EXPERIENCE

- Served as an asbestos liability valuation expert on behalf of Garlock Sealing Technologies in its bankruptcy proceedings. Testified before the US Bankruptcy Court for the Western District of North Carolina both in preliminary case hearings and at trial.

- Served as an asbestos liability valuation expert on behalf of Specialty Products Holding Corp./Bondex International in its bankruptcy proceedings.

- Retained as an asbestos liability valuation expert on behalf of the Official Committee of Unsecured Creditors of Motors Liquidation Company (f/k/a General Motors Corporation) in its bankruptcy proceedings.

- Authored expert report and provided deposition testimony regarding the value of diacetyl claims on behalf of the Official Committee of Equity Security Holders in the Chemtura Corporation bankruptcy proceedings.

- Testified in deposition on behalf of the ASARCO Unsecured Creditors Committee in the ASARCO bankruptcy proceedings regarding the valuation of past and future asbestos-related personal injury claims.

- Authored expert report and provided deposition testimony on behalf of the policyholder in the matter of *Imo Industries, Inc. v. Transamerica Corp.*

- Currently retained as an expert by Fortune 500 companies to produce asbestos expenditure estimates for annual and quarterly financial statements. Estimations aid clients with Sarbanes-Oxley compliance.

- Currently retained as an expert in asbestos estimation and insurance valuation, for numerous asbestos litigation matters, on behalf of insurance companies, corporations, and financial creditors' committees of federal bankruptcy proceedings.

- Testified before the Senate Judiciary Committee on the economic viability of the Trust Fund proposed under S.852, the Fairness in Asbestos Injury Resolution (FAIR) Act of 2005. Testimony clarified Bates White's independent analysis on the estimate of potential entitlements created by the administrative no-fault trust fund that uses medical criteria for claims-filing eligibility.

- Testified in deposition on behalf of Liberty Mutual Insurance Company in the Plibrico bankruptcy proceedings regarding the valuation of past and future asbestos personal injury claims and exposure criteria in plan proponents proposed trust distribution procedures.

- Testified at deposition on behalf of the joint insurers defense committee to address the fraction of expenditures associated with the company's asbestos installation operations in *Owens Corning v. Birmingham Fire Insurance Company of Pennsylvania.*

- Testified in the Babcock & Wilcox bankruptcy confirmation hearing on behalf of the Insurers Joint Defense Group to address asbestos liability. Developed claims criteria evaluation framework to assess asbestos liability forecasts and trust distribution procedures.

- Testified at deposition on behalf of Sealed Air in the fraudulent conveyance matter regarding the 1998 acquisition of Cryovac from W.R. Grace. Directed estimation of foreseeable asbestos liability for fraudulent conveyance matter to advise the debtor in the bankruptcy of a defendant with over $200 million in annual asbestos payments. Developed asbestos liability forecasting model and software. Directed industry research and interviewed industry experts.

- Testified at deposition on behalf of Hartford Financial Services Group to address the asbestos liability of MacArthur Company and Western MacArthur Company. Estimated asbestos liability in the context of bankruptcy proceedings.

- Testified at deposition on behalf of the Center for Claims Resolution in arbitration proceedings of *GAF v. Center for Claims Resolution*.

- Served as testifying expert on behalf of CSX Transportation on the suitability of asbestos claim settlements for arbitration proceedings of *CSX Transportation, Inc. v. Lloyd's, London.*

- Developed an econometric model of property damage lawsuits for estimating the future liability of a former asbestos manufacturer arising from the presence of its asbestos products in buildings.

## SELECTED LITIGATION AND CONSULTING EXPERIENCE

- Testified in United States Tax Court on behalf of the taxpayers on the statistical basis and accuracy of shrinkage accruals in *Kroger v. Commissioner*.

- Served as consulting expert and performed statistical and quantitative analyses to assess the merits of a class action alleging payment of fees to mortgage brokers for referral of federally related mortgage loans.

- Testified in United States Tax Court on behalf of the taxpayer analyzing the statistical prediction of bond ratings using company financial data in *Nestlé Holdings Inc. v. Commissioner*.

- Submitted written expert testimony on the statistical and financial analysis of option transactions and an analysis of alternative stock option hedges in *McMahon, Brafman, and Morgan v. Commissioner*.

- Testified in United States Tax Court on behalf of the taxpayers of IRS experts on the statistical basis and accuracy of shrinkage accruals in *Wal-Mart v. Commissioner*.

- Served as consulting expert and analyzed the racial composition for a large manufacturing corporation using EEO data and employed sophisticated statistical analysis and modeling to determine the validity and strength of an employment discrimination claim.

- Testified on behalf of VNC in the arbitration hearing of *VNC v. MedPartners*.

- Provided expert testimony in California Superior Court on the validity of economic comparability adjustments for pipeline easement rents in *Southern Pacific Transportation Corp. v. Santa Fe Pacific Corp.*

- Served as statistical expert and developed detailed statistical analysis of customs trade data for use in criminal transfer-pricing litigation.

- Submitted written testimony in United States Tax Court on the beneficial life of company credit card in a tax matter for a large retailer drawing on the company's point-of-sale data, credit card data, and customer demographic information.

- Developed state-of-the-art models to account for default correlation for underwriting credit insurance; models became the standard tools for the country's largest credit insurance firm.

- Led a team of economists that provided litigation-consulting services in one of the largest US price-fixing cases. Case involved the development of state-of-the-art economic models, damages' analyses, client presentations, pretrial discovery, industry research, preparation of evidence and testimony, depositions, and a critique of opposing expert analyses and reports.

- For a start-up global telecommunications enterprise, provided consulting services and developed a comprehensive computer model to evaluate the firm's financial plan. Model incorporated marketing, pricing, and communications traffic in a single modeling framework to facilitate sensitivity analysis by creditors and to evaluate the risk associated with the strategic business plan.

■ Served as senior economic advisor on issues of analytical methodology for numerous pharmacoeconometric and health outcomes research projects. Provided expertise in the development of decision tools and the creative use of modeling applications for pharmacoeconomics and outcomes research.

## PROFESSIONAL EXPERIENCE

Prior to founding Bates White, Dr. Bates served as a Vice President of A.T. Kearney. Previously, he was the Partner in Charge of the Economic Analysis group at KPMG. Dr. Bates began his career on the faculty of Johns Hopkins University's Department of Economics, where he taught courses in advanced statistical economic analysis and trade theory.

## EDUCATION

■ Harvard School of Public Health, Advanced Seminar in Pharmacoeconomics

■ PhD, Economics, University of Rochester

■ MA, Economics, University of Rochester

■ BA, Economics and Mathematics (High Honors), University of California, San Diego

## PUBLICATIONS

■ Bates, Charles E., Charles H. Mullin, and Marc C. Scarcella. "The Claiming Game." *Mealey's Litigation Report: Asbestos* 25, no. 1 (February 3, 2010).

■ Bates, Charles E., Charles H. Mullin, and A. Rachel Marquardt. "The Naming Game." *Mealey's Litigation Report: Asbestos* 24, no. 15 (September 2, 2009).

■ Bates, Charles E., and Charles H. Mullin. "State Of The Asbestos Litigation Environment — October 2008." Mealey's Litigation Report: Asbestos 23, no. 19 (November 3, 2008).

■ Bates, Charles E., and Charles H. Mullin. "Show Me The Money." *Mealey's Litigation Report: Asbestos* 22, no. 21 (December 3, 2007).

■ Bates, Charles E., and Charles H. Mullin. "The Bankruptcy Wave Of 2000—Companies Sunk By An Ocean Of Recruited Asbestos Claims." *Mealey's Litigation Report: Asbestos* 21, no. 24 (January 24, 2007).

■ Bates, Charles E., and Charles H. Mullin. "Having Your Tort and Eating It Too?" *Mealey's Asbestos Bankruptcy Report* 6, no. 4 (November 2006).

■ Bates, Charles E., and Halbert White. "Determination of Estimator with Minimum Asymptotic Covariance Matrices." *Econometric Theory* 9 (1993).

■ Bates, Charles E., and Halbert White. "Efficient Instrumental Variables Estimation of Systems of Implicit Heterogeneous Nonlinear Dynamic Models with Nonspherical Errors." In *International Symposia in Economic Theory and Econometrics,* vol. 3, edited by W.A. Barnett, E.R. Berndt and H. White. New York: Cambridge University Press, 1988.

■ Bates, Charles E. "Instrumental Variables." In *The New Palgrave: A Dictionary of Economics,* edited by John Eatwell, Murray Milgate, and Peter Newman. London: Macmillan, 1987.

■ Bates, Charles E., and Halbert White. "An Asymptotic Theory of Consistent Estimation for Parametric Models." *Econometric Theory* 1 (1985).

## SELECTED SPEAKING ENGAGEMENTS

■ "The Top Emerging Trends in 2015 Asbestos Litigation." Perrin Conferences Cutting-Edge Issues in Asbestos Litigation Conference, March 15–17, 2015.

■ "Asbestos Bankruptcy: A Discussion of the Top Trends in Today's Chapter 11 Cases." Perrin Conferences Asbestos Litigation Conference: A National Overview & Outlook, Sept. 8–10, 2014.

■ "An asbestos defendant's legal liability—the experience in Garlock's bankruptcy asbestos estimation trial." Bates White webinar, July 29, 2014.

■ "Concussion Suits Against the NFL, NCAA, and Uniform Equipment Manufacturers." Perrin Conferences' Legal Webinar Series, May 24, 2012.

■ "An Update on US Mass Tort Claims." Perrin Conferences' Emerging Risks on Dual Frontiers: Perspectives on Potential Liabilities in the New Decade, April 12–13, 2012, London, United Kingdom.

■ "The Next Chapter of Asbestos Bankruptcy: New Filings, Confirmations, & Estimations." Perrin Conferences' Asbestos Litigation Conference: A National Overview & Outlook, September 13–15, 2010, San Francisco, CA.

■ "Trust Online: The Impact of Asbestos Bankruptcies on the Tort System." Perrin Conferences' Asbestos Bankruptcy Conference: Featuring a Judicial Roundtable on Asbestos Compensation, June 21, 2010, Chicago, IL.

■ "Current Litigation Trends that are Impacting Asbestos Plaintiffs, Defendants, & Insurers." Perrin Conferences' Asbestos Litigation Mega Conference, September 14–16, 2009, San Francisco, CA.

■ "Verdicts, Settlements, and the Future of Values: Where Are We Heading? A Roundtable Discussion." HB Litigation Conferences' Emerging Trends in Asbestos Litigation, March 9–11, 2009, Los Angeles, CA.

■ "Role of Bankruptcy Trusts in Civil Asbestos." Mealey's Emerging Trends in Asbestos Litigation Conference, March 3–5, 2008, Los Angeles, CA.

- "The Intersection between Traditional Litigation & the New Bankruptcy Trusts." Mealey's Asbestos Bankruptcy Conference, June 7–8, 2007, Chicago, IL.
- ABA's Insurance Coverage Litigation Committee Conference, March 1–4, 2007, Tucson, AZ.
- Mealey's Asbestos Conference: The New Face of Asbestos Litigation, February 8–9, 2007, Washington, DC.
- Mealey's Asbestos Bankruptcy Conference, December 4–5, 2006, Philadelphia, PA.
- "Seeking Solutions to European Asbestos Claiming: Will it be FAIR?" Keynote address, Mealey's International Asbestos Conference, November 1–2, 2006, London, United Kingdom.
- Mealey's Asbestos Bankruptcy Conference, June 9, 2006, Chicago, IL.
- Harris Martin Publishing Asbestos Litigation Conference, March 2, 2006, Washington, DC.
- Mealey's Wall Street Forum: Asbestos Conference, February 8, 2006, New York, NY.
- Mealey's Asbestos Legislation Teleconference, February 7, 2006.

## PROFESSIONAL ASSOCIATIONS

- National Association of Business Economists
- American Economic Association
- Econometric Society