Declaration of Charles E. Bates, Ph.D.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| **IN RE:** | **Chapter 11** |
| **GARLOCK SEALING TECHNOLOGIES LLC, et al.,**[1] | **Case No. 10-BK-31607** |
| **Debtors.** | **(Jointly Administered)** |

**DECLARATION OF CHARLES E. BATES, PH.D.**

I, CHARLES E. BATES, declare as follows:

## I.  Summary of qualifications and experience

(1)  I am the Chairman of Bates White, LLC, which is an economic consulting firm with its primary office located in Washington, DC.  I specialize in the application of statistics and computer modeling to economic and financial issues and have extensive experience working on asbestos-related claims and liability valuation issues.  I have more than 25 years of experience in asbestos claims valuation matters, including SPHC & Bondex, Motors Liquidation (aka General Motors), ASARCO, Plibrico, Western MacArthur, Babcock & Wilcox, W. R. Grace, Owens Corning, USG, NGC, T&N, Fibreboard, Federal Mogul, Abex, and numerous others. I am regularly asked to speak at conferences on asbestos claims valuation matters and have published articles on my research in the asbestos litigation environment. From 2004 through 2010, I served as Garlock's asbestos claims valuation

---

[1]  The debtors in these jointly administered cases are Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., The Anchor Packing Company and OldCo, LLC, successor by merger to Coltec Industries Inc.

Declaration of Charles E. Bates, Ph.D.

expert for providing asbestos-related expenditures for SEC financial reporting purposes.

(2) I began my research on asbestos claims valuation estimation in 1991, when I was retained by KPMG to assist in developing methods to estimate the value of present and future asbestos personal injury and property damage claims as part of the National Gypsum Company reorganization proceedings. Prior to that time, I had been on the faculty of the Economics Department of Johns Hopkins University, where I specialized in research and teaching econometric estimation methodology. My background made me ideally suited for the assignment at KPMG, where I was part of the small team that developed the microsimulation computer models that became the standard for estimating asbestos claims expenditures for many years. Over the last twenty-five years, I have continued my research into improving asbestos claims valuation estimation methods, updating those methods to account for new scientific information as it has become available, and to adapt them for alternative circumstances as warranted.

(3) I specialize in the application of statistics and computer modeling to economic and financial issues and have extensive experience working on asbestos-related claims and liability valuation issues. I have more than 25 years of experience in a wide range of litigation and commercial consulting areas.

(4) I received my PhD and MA in Economics from the University of Rochester and my BA in Economics and Mathematics, with high honors, from the University of California, San Diego. I have taught courses in advanced statistical economic analysis and trade theory while a professor at Johns Hopkins University and have published papers on advanced topics in estimation theory in peer-reviewed journals.

(5) Prior to founding Bates White, I was a Vice President at A.T. Kearney. Prior to that, I was the Partner in Charge of the Economic Analysis Group at KPMG.

(6) As detailed in my curriculum vitae, which is attached to this declaration (the "Declaration") as Appendix A, I have been retained as an asbestos and tort claims valuation expert and have valued asbestos-related expenditures in numerous bankruptcy proceedings. I have also been retained for my economics and statistics expertise in numerous other types of matters. Some highlights include the following:

- Testified before the Senate Judiciary Committee on the economic viability of the Trust Fund proposed under S.852, the Fairness in Asbestos Injury Resolution (FAIR) Act of 2005;

- Conducted an analysis to determine whether asbestos trusts would have sufficient funds to pay future asbestos claimants;

Declaration of Charles E. Bates, Ph.D.

- Conducted due diligence evaluations of asbestos liability in the context of mergers and acquisitions;

- Served as an asbestos estimation methodology expert on behalf of Sealed Air in the fraudulent conveyance matter regarding the 1998 acquisition of Cryovac from W.R. Grace. This matter stemmed from Grace's asbestos-related bankruptcy;

- Served as an expert on behalf of CSX Transportation on the suitability of asbestos claims settlements for arbitration proceedings of CSX Transportation, Inc. v. Lloyd's, London; and

- Served as an expert on behalf of the Center for Claims Resolution (CCR) in the arbitration proceedings of GAF v. Center for Claims Resolution.

(7)   The Court in this matter approved the employment of Bates White as Asbestos Claims Consultant for the Debtors on July 21st, 2010 and on February 3, 2017.[2]  Since 2010, I have served as Garlock Sealing Technologies' (hereafter "Garlock's") asbestos claims valuation expert for providing the estimate of its asbestos liabilities and for providing expert opinion regarding the financial feasibility of the Garlock Trust under the Claims Resolution Procedures (the "CRP") set forth in four plans of reorganization that have been presented to the Court.  Most recently, I evaluated the financial feasibility of the Garlock Trust implementing the version of the CRP provided for under the Plan.  Because of that work, I am well familiar with Garlock's asbestos claims history, its historical claims database, and the estimates that Hon. Judge George Hodges adopted in his decision on Garlock's mesothelioma claims liability.

(8)   In addition to other relevant experience, my vitae includes a listing of all of the publications I have authored within the past 10 years and all of the cases in which I have testified, either at trial or deposition, within the past four years.  Bates White is being paid $900 per hour for the time I bill to this matter.  In addition to my time, I directed the work of other professionals on my staff in performing these analyses.[3]  Neither my compensation nor Bates White's compensation is contingent on the outcome of this matter.

---

[2]   *See* Final Order Authorizing the Retention and Employment of Bates White, LLC As Consultant For The Debtors, In re Garlock Sealing Technologies LLC, July 21, 2010.

*See* Order Authorizing Retention and Employment of Bates White, LLC As Asbestos Claims Consultant, In re OldCo, LLC, successor by merger to Coltec Industries Inc., February 3, 2017.

[3]   Bates White's fees on this matter are based upon the time actually spent by each assigned staff member at their standard billing rate, on an hourly basis.  Our current rates by staff classification range from $180 per hour to $1,250 per hour.

Declaration of Charles E. Bates, Ph.D.

(9)     I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

## II.  Scope of charge

(10)    I have been asked by Robinson, Bradshaw & Hinson, P.A. ("RBH") to submit the present Declaration regarding my conclusions with respect to whether holders of Asbestos Claims individually and collectively will receive an amount of money under the Chapter 11 Revised Joint Plan of Reorganization (the "Plan")[4] that, as of the effective date of the Plan, is equal to or greater than the amount they would receive if Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

(11)    Debtors' counsel requested such assessment under the following assumptions under Chapter 7 liquidation:

  ⟩  A Trustee for each Debtor entity would be appointed by the Court.

  ⟩  The Trustee(s) would have the authority to defend, resolve and, if necessary, settle personal injury and wrongful death asbestos claims against each of the Debtor entities.

  ⟩  At the Trustee(s)' request, the Court would enter a Case Management Order ("CMO"; hereinafter, the Trustee CMO, "TCMO") that, like the CMO proposed by Debtors in their Amended Plan of Reorganization,[5] would require claimants to disclose all relevant medical and exposure evidence (including their claims against asbestos trusts and tort entities).

  ⟩  The Trustees for each entity, per their fiduciary duty, would attempt to minimize the cost to the estates of defending and resolving personal injury and wrongful death asbestos claims such that they would coordinate, acting as one Trustee, and would jointly defend asbestos claims asserted against the Garlock and Coltec estates.

  ⟩  There would be some indeterminate delay between the time the case is converted to a Chapter 7 liquidation and the time when the Bankruptcy Court authorizes the Trustees

---

[4]   Modified Joint Plan of Reorganization of Garlock Sealing Technologies LLC, et al. and OldCo, LLC, Proposed Successor by Merger to Coltec Industries Inc, Dkt. No. 5443, July 29, 2016, as amended at Dkt. No. 5594 and Dkt. No. 5795.

Settlement Facility Claims Resolution Procedures, Dkt. No. 5443-3, July 29, 2016 (the "Plan's CRP").

[5]   Debtors Joint Plan of Reorganization, *In re* Garlock Sealing Technologies LLC, Nov. 28, 2011.

Declaration of Charles E. Bates, Ph.D.

to pay claims.  I understand from RBH that certain steps would need to take place during a Chapter 7 liquidation before any payments could be made, including appointing Trustees, setting one or more bar dates for filing claims, marshaling the assets of each estate, commencing and likely completing some part of the claims allowance process, and obtaining authority from the Bankruptcy Court to make interim payments on allowed claims.  It is possible that the Bankruptcy Court would not authorize the Trustees to pay claims until all claims have been resolved and liquidated.

⟩ The settled or otherwise liquidated claims will accrue the federal statutory rate for interest on judgments as of the entity's bankruptcy petition date.

## III.  Summary of analysis and opinions

(12)   My analysis of the available data, the Plan's CRP, and Debtors' asbestos tort litigation history indicates that holders of Asbestos Claims against Garlock and Coltec ("Asbestos Claimants") individually and collectively will receive as of the effective date of the Plan greater value under the Chapter 11 Plan than they would receive if Debtors were liquidated under Chapter 7.  My conclusion employs the assumptions provided by RBH as described above.

(13)   In the remainder of this Declaration, I provide detail on the approach I followed for reaching my conclusions.  I provide detail on the analysis I performed for comparing the amounts that Asbestos Claimants would receive under the Plan and under Chapter 7.  In particular, I followed the following steps:

⟩ I estimated the expected value of all current and future Asbestos Claims under the Plan's CRP.

⟩ I estimated the expected value of all current and future Asbestos Claims under Chapter 7 where these claims would be defended and resolved jointly by a Trustee following the TCMO.

⟩ Finally, I compared the results in the two steps above to reach my conclusion that Asbestos Claimants are better off under the Plan's CRP than under a Chapter 7 liquidation.

(14)   My work on this matter is ongoing.  I reserve the right to update or supplement my Declaration at the request of counsel, or in the event that I receive any new information that has a material impact on my opinions.

Declaration of Charles E. Bates, Ph.D.

## IV.  Best interest test for Asbestos Claimants

(15)   As requested by Debtors, I assessed whether holders of Asbestos Claims individually and collectively will receive an amount of money under the Chapter 11 Plan that, as of the effective date of the Plan, is equal to or greater than the value of what they would receive if Debtors were liquidated under Chapter 7.  As outlined above, this assessment required me to estimate the amounts that Asbestos Claimants would receive from the Trust and to estimate the amounts that such claimants would receive from the Debtors' estates under Chapter 7.  Some components of the technical analyses required by this assessment have already been performed and presented to the Court; therefore, in this Declaration I refer to those prior results and provide a summary of the analysis performed.  Should the Court require additional detail regarding any of these analyses, I am available to provide such detail in person.[6]

### a.  Estimating the expected value of all current and future Asbestos Claims under the Plan's CRP

(16)   As part of the analysis Bates White performed while supporting Debtors during the settlement negotiations of the Plan, I estimated the expected value of the current and future Asbestos Claims to be filed against the Trust under the Plan's CRP.  Preliminary results of this analysis were presented by Debtors' counsel to the Court in the July 27, 2016 hearing.  After the July 27, 2016 hearing, I continued refining my estimates to reach the results presented in this Declaration.  These results are quantitatively and qualitatively very similar to those already presented to the Court.  My analysis indicates that at claim values determined from valuation parameters as initially specified in the Plan's CRP (the preliminary Medical Information Factors ("MIFs") and Maximum Settlement Values ("MSVs"), the Trust is expected to spend about $371 million in net present value.[7]  Of the total expenditures, $282 million will be for settlements paid to qualifying claimants who currently have unliquidated claims, $79 million for Trust administrative costs, and $11 million to cover the expected value of settlements allegedly made by Garlock before bankruptcy petition and for a pending judgment.

(17)   Because the Plan provides that the Trust will be funded with $480 million, my analysis shows that the Trust is expected to have, at least, a 30% surplus of about $108 million in net present value.  This surplus can be available for: 1) covering any downside risk that may exist, such as a higher number of claims than expected; or, 2) paying additional amounts to qualifying

---

[6]   This Declaration does not address the potential indemnification claims of Century Indemnity Company, which are addressed in a separate declaration on that topic.

[7]   The net present value of the Trust expense flows was calculated based on a 4.5% annual discount rate.

Declaration of Charles E. Bates, Ph.D.

Asbestos Claims, which would result in a payment with respect to the current Plan's CRP of at least 130%. Therefore, accounting for this surplus, the expected CRP settlement amounts that claimants will receive from the Trust would be about $390 million. In this Declaration, I do not account for the additional expected Trust payments that Asbestos Claimants would receive from the surplus. As I show below, accounting for the expected increase in CRP settlements with respect to those estimated at the current MIFs and MSVs is not necessary to demonstrate that Asbestos Claimants are better off under the Chapter 11 Plan than under Chapter 7 liquidation.

(18) I estimated the number of Current Claims that would qualify for a payment from the Trust by applying the CRP qualification criteria. These include the requirements that claimants have a Current Claim,[8] have a diagnosis of a qualified disease, and allege contact with Garlock and/or Coltec ACPs.[9] In estimating the number of qualifying Current Claims, I used the information on Garlock claims that submitted a Proof of Claim ("POC") in response to the Solicitation Order by the October 6, 2015 deadline,[10] and the information submitted by pending mesothelioma claimants through the Personal Injury Questionnaire ("PIQ") process.[11] In addition, I used data Debtors received in discovery from the Manville Trust regarding non-mesothelioma claimants who appeared as having an unresolved claim filed before the petition date in the Garlock Analytical Database and for non-mesothelioma claimants who submitted POCs but who did not previously appear in the Garlock Analytical Database. In addition to these claims, I determined the number of Current Coltec Claims that may allege exposure to Coltec Entities' ACPs but not to Garlock ACPs (the "Coltec-only" claims). I estimated these Coltec-only claims by using the Debtors' record of such claims.[12]

---

[8] A claimant has a Current Claim against Garlock if he submitted a POC before the Bar Date and such claim has not been otherwise time-barred or already resolved (settled or dismissed and not cured within a year of being dismissed). *See* Declaration of Charles E. Bates in relation to Debtors' Motion for Relief from Solicitation Order and Modification of Criteria for Temporary Allowance of Class 4 Claims for Voting Purposes, November 5, 2015 ("First Ballots Declaration"); and Declaration of Charles E. Bates in relation to the Response of the Official Committee of Asbestos Personal Injury Claimants to Debtors' Motion Seeking Relief from Solicitation Order and Modification of Criteria for Temporary Allowance of Class 4 Claims for Voting Purposes, December 8, 2015 ("Second Ballots Declaration").

[9] *See* Plan's CRP at §§6.5–6.7.

[10] *See* First Ballots Declaration and Second Ballots Declaration.

[11] Dr. Jorge Gallardo-Garcia Expert Report, GST-8004, Feb. 15, 2013.

[12] Debtors provided Bates White with a copy of the Garrison Database that includes Coltec-related, Anchor, and Belmont claim records, as well as some EnPro records. This database has the same structure as the Garrison Database for Garlock claims and includes many of the data fields that such Garlock claims database includes.

In addition to the Garrison data available, Coltec claimants submitted ballots on December 5, 2016 and POCs on March 28, 2017. The number of ballots and POCs submitted under allegations of exposure to Coltec businesses' products is significantly higher than what was historically observed in the tort system. In fact, the data suggests that a large number of the ballots cast for Coltec may not have exposure to Coltec businesses' products other than Garlock; according to data compiled by OMNI/Rust Consulting, certain law firms submitted thousands of ballots in which both the Garlock and the Coltec boxes were checked for all of their clients. Historically, law firms were more selective when making a distinction between naming Garlock and Coltec. Using these data without additional information on the basis for alleging exposures to Coltec businesses' products would overestimate the potential number of Coltec businesses' claims that would have arisen after Garlock's Petition Date.

Declaration of Charles E. Bates, Ph.D.

Through my analysis of the available data on these claims, I estimated that about 36,000 Current Garlock and Coltec Claims are expected to qualify for payment from the Trust; Exhibit 1 provides detail of the number of expected qualifying Current Claims by disease category.

**Exhibit 1: Estimated qualifying Current Claims**

| CRP Disease | Current claims |
|---|---:|
| Mesothelioma | 3,976 |
| Asbestos-related lung cancer | 4,019 |
| Asbestos-related other cancer | 510 |
| Severe Asbestosis | 330 |
| Disabling Asbestosis | 11,547 |
| Non-Disabling Asbestosis | 15,797 |
| **Total** | **36,179** |

(19)    I forecast the number of Future Claims that would qualify for payment from the Trust, using the Bates White Incidence Model (the "IM")[13] to extrapolate the number of qualifying Current Claims by disease and Contact Group.  I estimated that about 51,000 Future Garlock and Coltec Claims are expected to qualify for payment from the Trust; Exhibit 2 provides detail of the number of expected qualifying Future Claims by disease category.

**Exhibit 2: Estimated qualifying Future Claims**

| CRP Disease | Future claims |
|---|---:|
| Mesothelioma | 7,509 |
| Asbestos-related lung cancer | 6,841 |
| Asbestos-related other cancer | 759 |
| Severe Asbestosis | 479 |
| Disabling Asbestosis | 10,891 |
| Non-Disabling Asbestosis | 24,185 |
| **Total** | **50,665** |

(20)    I then estimated the CRP settlement amounts that qualifying Current and Future Claims would receive from the Trust by applying the valuation rules identified by the CRP,[14] using

---

[13]    The IM actually estimates the total number of mesothelioma diagnoses, including those unrelated to ACPs exposure. This model is explained in detail in sections V.3.9 and VI.3.2 of my Mesothelioma Expert Report.  After the year 2059, it is unlikely that there will be any significant occupational asbestos exposure-related incidence of mesothelioma given that the vast majority of the occupationally exposed population will be deceased by then.

The IM model also estimates the relative number of excess lung cancer and other cancer diagnoses related to ACPs exposure as well as the fraction of the population still alive who worked in occupations and industries where exposure to asbestos occurred (the "Alive Exposed Population").  The Alive Exposed Population is then used as the basis for estimating future non-malignant claims.

[14]    *See* Plan's CRP at Appendix I.

Declaration of Charles E. Bates, Ph.D.

the preliminary MIFs and MSVs contained in the Plan's CRP.[15]  I performed a claim-by-claim valuation for Current Claims with sufficient available information; I then valued Current Claims with incomplete information and Future Claims using the values distributions for Current Claims with sufficient information by disease category, Contact Group, and age cohorts.  I further estimated the net present value of the Future Claims.[16]  Exhibit 3 shows the net present value as of the Effective Date of the Plan of the estimated settlements to qualifying Current and Future Claims by disease category at the preliminary MIFs and MSVs stated in the Plan.

**Exhibit 3: Estimated settlements for Current and Future Claims at the preliminary MIFs and MSVs in the Plan**

| CRP Disease | Current claims (NPV) | Future claims (NPV) | Total (NPV) |
|---|---|---|---|
| Mesothelioma | $102,000,000 | $130,000,000 | $232,000,000 |
| Asbestos-related lung cancer | $16,000,000 | $15,000,000 | $31,000,000 |
| Asbestos-related other cancer | $800,000 | $600,000 | $1,400,000 |
| Severe Asbestosis | $1,500,000 | $1,100,000 | $2,600,000 |
| Disabling Asbestosis | $4,700,000 | $2,700,000 | $7,400,000 |
| Non-Disabling Asbestosis | $3,700,000 | $3,500,000 | $7,200,000 |
| **Total** | **$128,700,000** | **$152,900,000** | **$281,600,000** |

(21)   In addition to settlements for qualifying claimants, the Trust will incur administrative expenses.  Based on my comparative analysis to other asbestos trusts that are currently active, along with my estimates for Current and Future Claims' activity, I have estimated that the Trust will spend approximately $79 million in net present value to operate.[17]  These estimates are based on an analysis of four primary trust expenditures:

⟩ Claim Processing, which includes claim review, qualification, and payment, as well as claim management system development;

⟩ Trust Operations, which includes costs associated with general administration, management, information technology support, accounting services, rent for office space, and other forms of trust overhead;

---

[15]   The Plan's CRP states the following preliminary MIFs: 1.0 for Mesothelioma; 0.25 for Asbestos-related Lung Cancer; 0.25 for Severe Asbestosis; 0.10 for Asbestos-related Other Cancer; 0.03 for Disabling Asbestosis; and, 0.02 for Non-Disabling Asbestosis.  See the disease definitions and medical qualification requirements in the Plan's CRP (Settlement Facility Claims Resolution Procedures, Dkt. No. 5443-3, July 29, 2016, at Appendix I).

[16]   The net present value of the settlements was calculated using a 2% inflation rate and a 4.5% discount rate.

[17]   The net present value of the administrative expenses was calculated using a 2% inflation rate and a 4.5% discount rate.

Declaration of Charles E. Bates, Ph.D.

〕 Trust Oversight, which includes costs associated with trust governance, such as trustee board fees and trust advisor fees; and,

〕 Legal & Professional, which includes fees from trust counsel and professional services the trust may retain.

(22) The Trust will also cover amounts related to pre-petition settlements made by Garlock that were not paid to claimants, and the final value of a judgment against Garlock currently on appeal. These two Trust expense categories have an expected value of less than $11 million: less than $10 million[18] for pre-petition settlements and about $1 million[19] for the pending judgment. For purposes of this declaration, I take the expected value of these claims to be $11 million. The Plan's CRP specifies that the Trustee will set a "payment percentage" that will be applied to the unpaid liquidated amount of the pre-petition settlements.[20] The CRP indicates that such payment percentage will be "based on the estimated tort system value of the Claims channeled to the Settlement Facility and the assets available to pay such liabilities."[21] According to the Mesothelioma Estimation Trial Order, Garlock's tort liability for mesothelioma claims is $125 million. Further, the parties in these cases have stipulated that Garlock's non-mesothelioma tort liabilities are 17.65% of the mesothelioma value, which is approximately $25 million. Thus, the tort system value of the Claims to be channeled to the Trust is $150 million. As the Trust will be funded with $480 million, the payment percentage that the Trustee would reasonably set is 100%.

(23) Finally, Current and Future Claimants have the option of pursuing their claims against the Trust in the tort system. However, the CRP requires that the claimants engage in non-binding arbitration with the Trust before filing a lawsuit. If a claimant decided to pursue his claim

---

[18] Appendix VI to the CRP provides a list of 2,356 alleged pre-petition settlements with a total face value indicated by claimants of $17.1 million. Debtors have assessed these settlements individually and have classified them in three categories: 1) claims that Debtors expect to be paid, with a face value of $6.5 million; 2) invalid or withdrawn claims that will not be paid, with a face value of $2.3 million; and, 3) claims for which Debtors lack specific expectation of payment, with a face value of $8.3 million. Based on their review of the claims, Debtors expect that no more than approximately 33% of the face value of the category 3) claims will ultimately qualify for payment as pre-petition settlements. This expectation is based on Debtors' experience in evaluating these claims, the failure of these claimants to provide sufficient documentation to confirm that a settlement was made with Debtors before Garlock's Petition Date, or the failure of these claimants to provide information that would enable the claim to qualify for payment. Thus, the expected value of categories 1) and 3) is $9.2 million. For purposes of my analysis, I assume that the claims in categories 1) and 3) will be paid by the Trust the limit amount considered by the Plan: $10 million. However, based on Debtors' assessment, the ultimate payments to these claimants likely will be less than $10 million.

[19] The pre-petition judgment currently on appeal is the Torres case. Garlock's share was $1,350,000. Debtors estimate that, should the claimant prevail on appeal, the face value of this judgment with post-judgment interests, as of the Effective Date, would be $1,934,194. Historically, when Garlock had plaintiff verdicts in the tort system, a significant portion of them were later overturned or reduced after appeal. Garlock's data show that Garlock's final payments on mesothelioma plaintiff verdicts in the 2000s were about 46% of the initial value of the judgments assigned to Garlock. Therefore, for my analysis, I use the expected value of the judgment at about $1 million ($2 million x 50%).

[20] *See* Plan's CRP at pg. 15.

[21] *See* Plan's CRP at pgs. 15-16.

Declaration of Charles E. Bates, Ph.D.

after engaging in arbitration with the Trust, the Trust would be able to use all the information submitted by the claimant to the Trust, and would also have the right to take standard discovery from the claimant. In the event of a plaintiff verdict against the Trust, the claimant would receive the Trust's share of the award in installments, first, receiving up to the last settlement offer from the Trust (or, if greater, the award the claimant declined in non-binding arbitration) and, if any monies were still owed, in five installments five years after the initial payment without accruing interest. The amounts paid would be capped at the Maximum Settlement Value for the applicable Contact Group under Expedited Claim Review. As shown in the analysis presented during the Mesothelioma Estimation Trial, just as for Garlock, the Trust's expected share of a judgment would be low, and this, along with the arbitration process, the delayed payments of any award, and the cap on judgments, will incentivize claimants to accept the settlement offer from the Trust instead of pursuing the claim through judgment. Thus, I estimate that the Trust expenditures on judgments and defense costs from defending claims taken to trial will not be significant.

(24) In summary, Exhibit 4 shows the total expenditures by the Trust at claim values determined from valuation parameters as initially specified in the Plan's CRP and shows that there is an expected $108 million surplus with respect to the total Trust funding under the Plan. Thus, the expected amounts that Asbestos Claimants will receive from the Trust would be higher by the amount of the estimated surplus.

**Exhibit 4: Summary of estimated payments by the Trust at the preliminary MIFs and MSVs in the Plan**

| Trust expense category | Total amount NPV |
|---|---|
| Settlements to unliquidated Current and Future Claims | $281,600,000 |
| Pre-petition settled claims and pending judgment | $11,000,000 |
| Administrative costs | $79,000,000 |
| **Total** | **$371,600,000** |
| **Trust surplus** | **$108,400,000** |

## b. Estimating the expected value of all current and future Asbestos Claims under Chapter 7 liquidation

(25) As noted in the assumptions provided by Debtors' counsel, under Chapter 7 liquidation, the Trustee(s) would defend Garlock and Coltec claims jointly and the litigation of those claims would be governed by the TCMO. Under the TCMO claimants would be required to submit all evidence and information regarding exposure histories to Defendants' ACPs and other ACPs, information about settlements with tort defendants and other parties, claims made or

Declaration of Charles E. Bates, Ph.D.

to be made against other asbestos 524(g) trusts, and evidence of a valid asbestos-related disease. As such, the Trustee(s) would be able to resolve and settle claims in a similar manner and for similar amounts to what Garlock experienced before the bankruptcy wave of the early 2000s when claimants were willingly providing comparable information in prosecuting their asbestos claims against the Debtors' former insulation-products co-defendants. With the bankruptcy reorganization filings of these former co-defendants in the early 2000s, asbestos plaintiffs ceased to affirmatively provide the exposure case against such high exposure products that were routinely used in proximity to Debtors' products. As such, the cost of developing the testimony regarding and the factual basis for claimants' sources of high asbestos exposure fell to Debtors in the 2000s, which greatly increased Debtors' defense costs and, consequently, as I testified in the Mesothelioma Estimation Trial, significantly increased Debtors' asbestos settlements. If asbestos claimants are required to affirmatively provide such exposure information once again, as required by the TCMO, settlement values of the Trustee(s) will by-and-large return to levels comparable to or below the levels Debtors experienced in the 1990s, after accounting for the effect of monetary inflation.

(26)   During my testimony at the Mesothelioma Estimation Trial, I presented an estimate of the mesothelioma settlement and judgment payments that Garlock would incur in the tort system with complete information about the claimant's exposures to ACPs.[22] That estimate ranged from $146 million to $209 million for mesothelioma claims.[23] For the value of settlements of other disease categories, I use the stipulation made by the parties in this case in which the value of non-mesothelioma claims was specified at 17.65% of that of mesothelioma claims.[24] Thus, the tort expenditures for Garlock's non-mesothelioma claims under this information regime range from $26 million to $37 million.

(27)   As mentioned before, the estimated liquidated value of pre-petition settlements made by Garlock and that were not paid to claimants and the expected value of a judgment against Garlock currently on appeal is less than $11 million. Under Chapter 7 liquidation, those claims would be valued at their unpaid liquidated value. However, as stated in the assumptions provided by RBH above, there would be some indeterminate delay in payments on those claims, and it is possible that the Bankruptcy Court would not authorize the Trustee to pay claims until all claims have been resolved and liquidated. These claims will accrue the federal statutory rate for interest on judgments as of the entity's bankruptcy petition date.

---

[22]   *See* Testimony of Dr. Charles E. Bates, In re: Garlock Sealing Technologies LLC, et al., GST-8005, at pgs. 61 and 78; and, Rebuttal Testimony of Dr. Charles E. Bates, In re: Garlock Sealing Technologies LLC, et al., GST-8026, at pgs. 33 and 44.

[23]   My testimony presented a range of $140 million to $200 million NPV at a 2.5% inflation rate and a 5.575% discount rate (for a real discount rate of 3%). In the Plan and other calculations in the Case, parties have used an inflation rate of 2% and a discount rate of 4.5% (for an approximate real discount rate of 2.5%). The numbers used in this Declaration are adjusted to reflect the different inflation and discount rates.

[24]   Stipulation and Order, Dkt. No. 5134, December 8, 2015.

Declaration of Charles E. Bates, Ph.D.

RBH has provided me with a statutory rate of 0.36% per year as the applicable rate to the pre-petition settlements and pending judgment. Thus, taking the expected value of the claims at $11 million for purposes of this analysis, the liquidated value of these claims as of the expected Effective Date is about $11.3 million.[25] However, the net present value of these claims as of the Effective Date—given that they would not be paid immediately, and might not be paid until all other claims are resolved and liquidated—would be less than $11.3 million. For instance, assuming the 4.5% discount rate that has been used for evaluating the Trust financial feasibility, a 1-year delay would result in a net present value for these claims, as of the Effective Date, of less than $10.9 million.[26] However, I expect that asbestos claims would be pursued against the estates for decades, which would further reduce the net present value of these claims.

(28)   Coltec claims can be divided into two groups: 1) those that also named Garlock, and 2) those that did not name Garlock. Coltec claims that also named Garlock were defended and resolved (with or without payment) by Garlock. As such, any expected settlements that those claims would receive in Chapter 7 liquidation are already included in the estimated range of Garlock's tort expenditures under the TCMO. Coltec claims that historically did not name Garlock were never pursued by claimants and never received settlements from Coltec entities. As such, these Coltec-only claims would not be expected to receive settlements from the estate in a litigation setting under the TCMO. Therefore, under the TCMO and jointly defended with Garlock claims, the Coltec claims are not expected to increase the settlements made by the Trustee(s) in Chapter 7.

(29)   Thus, in summary, I estimate that the total settlements by the estates for resolving Garlock and Coltec claims under the TCMO will range from $170 million to $245 million, and the value of pre-petition unpaid liquidated settlements and judgment will be less than $11 million.

### c. Best interest test for current and future Asbestos Claims

(30)   My analyses in the two sections above show that the Garlock and Coltec Claims will receive significantly higher amounts from the Trust under the CRP in Chapter 11 than they would in Chapter 7 with a Trustee that defends and resolves cases under the TCMO. Specifically, under the Chapter 11 Plan, claimants are expected to receive $390 million, inclusive of the $108 million expected surplus at payment levels initially specified in the CRP. In contrast,

---

[25]   This amount was calculated applying a compounded interest per year of 0.36% from Garlock's Petition Date to the Plan's Effective Date (August 1, 2017).

[26]   This result holds with a discount rate as low as 2.98%. At a two-year delay in payment, the NPV of these claims would be less than their initial face value at a discount rate as low as 1.66%.

Declaration of Charles E. Bates, Ph.D.

under Chapter 7, claimants would receive between $170 million and $245 million.  Further, pre-petition liquidated settlements and pending judgment will receive the expected face value of their claims under the Chapter 11 Plan whereas those claims would get less than that, in NPV terms, under Chapter 7 liquidation due to the delay in payment of liquidated claims. These figures show that claimants as a whole are expected to receive more money under the Chapter 11 Plan than in Chapter 7 under the TCMO.

(31)   Individually, Garlock and Coltec claimants will also receive higher amounts from the Trust than in Chapter 7 liquidation under the TCMO.  This is because the Trust CRP, through an administrative process, allows many claimants to receive a settlement without incurring significant costs.  Also, thousands of claimants that may qualify for payment from the Trust under the Plan (particularly, non-mesothelioma claimants) would not receive any payments from the estates under Chapter 7 because they would not be willing to incur the cost of pursuing their claim against the estates under the TCMO.  Regarding mesothelioma claimants, under the TCMO, their expected recoveries from the estates under Chapter 7 liquidation would be lower than what they would receive from the Trust in the Chapter 11 Plan because the Plan's payments include a premium over what those claimants would receive in litigation with full disclosure of exposures.  Furthermore, under Chapter 7 liquidation, the payments that mesothelioma claimants would receive would be delayed, perhaps until all claims have been resolved and liquidated, which for most claimants could result in decades of delay.[27]

(32)   In summary, Current and Future Asbestos Claimants, including pre-petition liquidated settled claimants and the single pending judgment claimant, individually and collectively will receive an amount of money equal or greater under the Chapter 11 Plan than the amount they would receive should Debtors be liquidated under Chapter 7.

(33)   In the event that the Court seeks a more detailed understanding of my opinions, I am available to appear before the Court.

---

[27]   I estimate that asbestos claims alleging asbestos exposure to Debtors' ACPs will arise for decades to come.  Specifically, the Bates White Incidence Model estimates that diagnoses related to ACPs exposure will continue until the late 2050s. My estimates of claims against Debtors show most claims being resolved in the next few years.  Specifically, I estimate that almost 75% of mesothelioma claims to be pursued against the estates under Chapter 7 liquidation would be resolved and liquidated within the first ten years.

Declaration of Charles E. Bates, Ph.D.

I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct.

Dated on this 2nd day of May, 2017.

_____
Charles E. Bates, PhD

# APPENDIX A



1300 Eye Street NW, Suite 600, Washington, DC 20005   **main** 202.408.6110   **fax** 202.408.7838



## CHARLES E. BATES, PHD
Chairman

**AREAS OF EXPERTISE**

- Asbestos liability estimation
- Economic analysis
- Econometrics
- Statistical analysis
- Microsimulation modeling
- Database design/applications

## SUMMARY OF EXPERIENCE

Charles E. Bates has extensive experience in statistics, econometric modeling, and economic analysis. He specializes in the application of statistics and computer modeling to economic and financial issues. Dr. Bates has more than 20 years of experience and provides clients with a wide range of litigation and commercial consulting services, including expert testimony and guidance on economic and statistical issues.

Dr. Bates is a recognized expert in asbestos-related matters. He speaks in national and international forums on the asbestos litigation environment and estimation issues. Dr. Bates is frequently retained to serve as an expert on such matters in large litigations and has testified before the United States Senate Judiciary Committee and Federal Bankruptcy Court.

## SELECTED ASBESTOS AND PRODUCT LIABILITY EXPERIENCE

- Served as an asbestos liability valuation expert on behalf of Garlock Sealing Technologies in its bankruptcy proceedings. Testified before the US Bankruptcy Court for the Western District of North Carolina both in preliminary case hearings and at trial.

- Served as an asbestos liability valuation expert on behalf of Specialty Products Holding Corp./Bondex International in its bankruptcy proceedings.

- Retained as an asbestos liability valuation expert on behalf of the Official Committee of Unsecured Creditors of Motors Liquidation Company (f/k/a General Motors Corporation) in its bankruptcy proceedings.

- Authored expert report and provided deposition testimony regarding the value of diacetyl claims on behalf of the Official Committee of Equity Security Holders in the Chemtura Corporation bankruptcy proceedings.

- Testified in deposition on behalf of the ASARCO Unsecured Creditors Committee in the ASARCO bankruptcy proceedings regarding the valuation of past and future asbestos-related personal injury claims.

- Authored expert report and provided deposition testimony on behalf of the policyholder in the matter of *Imo Industries, Inc. v. Transamerica Corp.*

- Currently retained as an expert by Fortune 500 companies to produce asbestos expenditure estimates for annual and quarterly financial statements. Estimations aid clients with Sarbanes-Oxley compliance.

- Currently retained as an expert in asbestos estimation and insurance valuation, for numerous asbestos litigation matters, on behalf of insurance companies, corporations, and financial creditors' committees of federal bankruptcy proceedings.

- Testified before the Senate Judiciary Committee on the economic viability of the Trust Fund proposed under S.852, the Fairness in Asbestos Injury Resolution (FAIR) Act of 2005. Testimony clarified Bates White's independent analysis on the estimate of potential entitlements created by the administrative no-fault trust fund that uses medical criteria for claims-filing eligibility.

- Testified in deposition on behalf of Liberty Mutual Insurance Company in the Plibrico bankruptcy proceedings regarding the valuation of past and future asbestos personal injury claims and exposure criteria in plan proponents proposed trust distribution procedures.

- Testified at deposition on behalf of the joint insurers defense committee to address the fraction of expenditures associated with the company's asbestos installation operations in *Owens Corning v. Birmingham Fire Insurance Company of Pennsylvania.*

- Testified in the Babcock & Wilcox bankruptcy confirmation hearing on behalf of the Insurers Joint Defense Group to address asbestos liability. Developed claims criteria evaluation framework to assess asbestos liability forecasts and trust distribution procedures.

- Testified at deposition on behalf of Sealed Air in the fraudulent conveyance matter regarding the 1998 acquisition of Cryovac from W.R. Grace. Directed estimation of foreseeable asbestos liability for fraudulent conveyance matter to advise the debtor in the bankruptcy of a defendant with over $200 million in annual asbestos payments. Developed asbestos liability forecasting model and software. Directed industry research and interviewed industry experts.

- Testified at deposition on behalf of Hartford Financial Services Group to address the asbestos liability of MacArthur Company and Western MacArthur Company. Estimated asbestos liability in the context of bankruptcy proceedings.

- Testified at deposition on behalf of the Center for Claims Resolution in arbitration proceedings of *GAF v. Center for Claims Resolution.*

- Served as testifying expert on behalf of CSX Transportation on the suitability of asbestos claim settlements for arbitration proceedings of *CSX Transportation, Inc. v. Lloyd's, London.*

- Developed an econometric model of property damage lawsuits for estimating the future liability of a former asbestos manufacturer arising from the presence of its asbestos products in buildings.

## SELECTED LITIGATION AND CONSULTING EXPERIENCE

- Testified in United States Tax Court on behalf of the taxpayers on the statistical basis and accuracy of shrinkage accruals in *Kroger v. Commissioner*.

- Served as consulting expert and performed statistical and quantitative analyses to assess the merits of a class action alleging payment of fees to mortgage brokers for referral of federally related mortgage loans.

- Testified in United States Tax Court on behalf of the taxpayer analyzing the statistical prediction of bond ratings using company financial data in *Nestlé Holdings Inc. v. Commissioner*.

- Submitted written expert testimony on the statistical and financial analysis of option transactions and an analysis of alternative stock option hedges in *McMahon, Brafman, and Morgan v. Commissioner*.

- Testified in United States Tax Court on behalf of the taxpayers of IRS experts on the statistical basis and accuracy of shrinkage accruals in *Wal-Mart v. Commissioner*.

- Served as consulting expert and analyzed the racial composition for a large manufacturing corporation using EEO data and employed sophisticated statistical analysis and modeling to determine the validity and strength of an employment discrimination claim.

- Testified on behalf of VNC in the arbitration hearing of *VNC v. MedPartners*.

- Provided expert testimony in California Superior Court on the validity of economic comparability adjustments for pipeline easement rents in *Southern Pacific Transportation Corp. v. Santa Fe Pacific Corp.*

- Served as statistical expert and developed detailed statistical analysis of customs trade data for use in criminal transfer-pricing litigation.

- Submitted written testimony in United States Tax Court on the beneficial life of company credit card in a tax matter for a large retailer drawing on the company's point-of-sale data, credit card data, and customer demographic information.

- Developed state-of-the-art models to account for default correlation for underwriting credit insurance; models became the standard tools for the country's largest credit insurance firm.

- Led a team of economists that provided litigation-consulting services in one of the largest US price-fixing cases. Case involved the development of state-of-the-art economic models, damages' analyses, client presentations, pretrial discovery, industry research, preparation of evidence and testimony, depositions, and a critique of opposing expert analyses and reports.

- For a start-up global telecommunications enterprise, provided consulting services and developed a comprehensive computer model to evaluate the firm's financial plan. Model incorporated marketing, pricing, and communications traffic in a single modeling framework to facilitate sensitivity analysis by creditors and to evaluate the risk associated with the strategic business plan.

- Served as senior economic advisor on issues of analytical methodology for numerous pharmacoeconometric and health outcomes research projects. Provided expertise in the development of decision tools and the creative use of modeling applications for pharmacoeconomics and outcomes research.

## PROFESSIONAL EXPERIENCE

Prior to founding Bates White, Dr. Bates served as a Vice President of A.T. Kearney. Previously, he was the Partner in Charge of the Economic Analysis group at KPMG. Dr. Bates began his career on the faculty of Johns Hopkins University's Department of Economics, where he taught courses in advanced statistical economic analysis and trade theory.

## EDUCATION

- Harvard School of Public Health, Advanced Seminar in Pharmacoeconomics
- PhD, Economics, University of Rochester
- MA, Economics, University of Rochester
- BA, Economics and Mathematics (High Honors), University of California, San Diego

## PUBLICATIONS

- Bates, Charles E., Charles H. Mullin, and Marc C. Scarcella. "The Claiming Game." *Mealey's Litigation Report: Asbestos* 25, no. 1 (February 3, 2010).

- Bates, Charles E., Charles H. Mullin, and A. Rachel Marquardt. "The Naming Game." *Mealey's Litigation Report: Asbestos* 24, no. 15 (September 2, 2009).

- Bates, Charles E., and Charles H. Mullin. "State Of The Asbestos Litigation Environment — October 2008." Mealey's Litigation Report: Asbestos 23, no. 19 (November 3, 2008).

- Bates, Charles E., and Charles H. Mullin. "Show Me The Money." *Mealey's Litigation Report: Asbestos* 22, no. 21 (December 3, 2007).

- Bates, Charles E., and Charles H. Mullin. "The Bankruptcy Wave Of 2000—Companies Sunk By An Ocean Of Recruited Asbestos Claims." *Mealey's Litigation Report: Asbestos* 21, no. 24 (January 24, 2007).

- Bates, Charles E., and Charles H. Mullin. "Having Your Tort and Eating It Too?" *Mealey's Asbestos Bankruptcy Report* 6, no. 4 (November 2006).

- Bates, Charles E., and Halbert White. "Determination of Estimator with Minimum Asymptotic Covariance Matrices." *Econometric Theory* 9 (1993).

- Bates, Charles E., and Halbert White. "Efficient Instrumental Variables Estimation of Systems of Implicit Heterogeneous Nonlinear Dynamic Models with Nonspherical Errors." In *International Symposia in Economic Theory and Econometrics,* vol. 3, edited by W.A. Barnett, E.R. Berndt and H. White. New York: Cambridge University Press, 1988.

- Bates, Charles E. "Instrumental Variables." In *The New Palgrave: A Dictionary of Economics,* edited by John Eatwell, Murray Milgate, and Peter Newman. London: Macmillan, 1987.

- Bates, Charles E., and Halbert White. "An Asymptotic Theory of Consistent Estimation for Parametric Models." *Econometric Theory* 1 (1985).

## SELECTED SPEAKING ENGAGEMENTS

- "The Top Emerging Trends in 2015 Asbestos Litigation." Perrin Conferences Cutting-Edge Issues in Asbestos Litigation Conference, March 15–17, 2015.

- "Asbestos Bankruptcy: A Discussion of the Top Trends in Today's Chapter 11 Cases." Perrin Conferences Asbestos Litigation Conference: A National Overview & Outlook, Sept. 8–10, 2014.

- "An asbestos defendant's legal liability—the experience in Garlock's bankruptcy asbestos estimation trial." Bates White webinar, July 29, 2014.

- "Concussion Suits Against the NFL, NCAA, and Uniform Equipment Manufacturers." Perrin Conferences' Legal Webinar Series, May 24, 2012.

- "An Update on US Mass Tort Claims." Perrin Conferences' Emerging Risks on Dual Frontiers: Perspectives on Potential Liabilities in the New Decade, April 12–13, 2012, London, United Kingdom.

- "The Next Chapter of Asbestos Bankruptcy: New Filings, Confirmations, & Estimations." Perrin Conferences' Asbestos Litigation Conference: A National Overview & Outlook, September 13–15, 2010, San Francisco, CA.

- "Trust Online: The Impact of Asbestos Bankruptcies on the Tort System." Perrin Conferences' Asbestos Bankruptcy Conference: Featuring a Judicial Roundtable on Asbestos Compensation, June 21, 2010, Chicago, IL.

- "Current Litigation Trends that are Impacting Asbestos Plaintiffs, Defendants, & Insurers." Perrin Conferences' Asbestos Litigation Mega Conference, September 14–16, 2009, San Francisco, CA.

- "Verdicts, Settlements, and the Future of Values: Where Are We Heading? A Roundtable Discussion." HB Litigation Conferences' Emerging Trends in Asbestos Litigation, March 9–11, 2009, Los Angeles, CA.

- "Role of Bankruptcy Trusts in Civil Asbestos." Mealey's Emerging Trends in Asbestos Litigation Conference, March 3–5, 2008, Los Angeles, CA.

- "The Intersection between Traditional Litigation & the New Bankruptcy Trusts." Mealey's Asbestos Bankruptcy Conference, June 7–8, 2007, Chicago, IL.

- ABA's Insurance Coverage Litigation Committee Conference, March 1–4, 2007, Tucson, AZ.

- Mealey's Asbestos Conference: The New Face of Asbestos Litigation, February 8–9, 2007, Washington, DC.

- Mealey's Asbestos Bankruptcy Conference, December 4–5, 2006, Philadelphia, PA.

- "Seeking Solutions to European Asbestos Claiming: Will it be FAIR?" Keynote address, Mealey's International Asbestos Conference, November 1–2, 2006, London, United Kingdom.

- Mealey's Asbestos Bankruptcy Conference, June 9, 2006, Chicago, IL.

- Harris Martin Publishing Asbestos Litigation Conference, March 2, 2006, Washington, DC.

- Mealey's Wall Street Forum: Asbestos Conference, February 8, 2006, New York, NY.

- Mealey's Asbestos Legislation Teleconference, February 7, 2006.

## PROFESSIONAL ASSOCIATIONS

- National Association of Business Economists

- American Economic Association

- Econometric Society

# APPENDIX B



# Technical appendix to Best Interest Test for Asbestos Claimants

## In re: Garlock Sealing Technologies LLC, et al.

2

## Appendix contents

1. Chapter 11 forecast: Estimates of Garlock and Coltec Present and Future Asbestos Claims settlements under Plan's CRP

2. Chapter 11 forecast: Estimates of the Plan Trust's administrative expenses

3. Chapter 7 forecast: Estimates of Garlock and Coltec Present and Future tort settlements under the TCMO



# 1. Chapter 11 forecast: Estimates of Garlock and Coltec Present and Future Asbestos Claims settlements under Plan's CRP



4

# CRP compensable diseases

- **Malignant mesothelioma**

- **Asbestos-related cancers**

  - Lung

  - Colo-rectal

  - Laryngeal

  - Esophageal

  - Pharyngeal

  - Stomach

- **Asbestosis**
  - Severe asbestosis
  - Disabling asbestosis
  - Non-disabling asbestosis



5

## CRP eligibility requirements

- **Claim cannot be previously resolved or time barred**

- **Coltec/GST Product Contact requirement**

  - Demonstrate that the injured party experienced Coltec/GST Product Contact that could have credibly contributed to the alleged disease

  - Minimum contact duration of 6 months for all diseases other than malignant mesothelioma

- **Medical requirement**

  - Support claim with medical evidence described in CRP Appendix I, as applicable to the alleged disease

- **All claimants are required to pay a filing fee that depends on alleged disease and is reimbursable if the claimant receives a settlement offer**



# Claimant options

- **Settlement**
  - Expedited Claim Review
  - Extraordinary Claim Review

- **Binding or non-binding arbitration**
  - After Expedited Claim Review is rejected

- **Litigation**
  - After non-binding arbitration outcome is rejected



# Expedited Claim Review at Initially Specified MSV

- **The determination of settlement offer follows a formulaic framework**
- **The exposed person's occupation/industry defines the claim's MSV**

| Contact Group | MSV |
|---|---|
| Group 1 | $148,000 |
| Group 2 | $44,400 |
| Group 3 | $18,500 |
| Group 4 | $9,250 |
| Group 5 | $740 |

- **Settlement offer is a percentage of the initially specified MSV, calculated based on the IP's:**
  - Medical Information Factor
  - Age Factor
  - Life Status Factor
  - Dependents Factor
  - Economic Loss Factor
  - Duration of Coltec/GST Product Contact Factor
  - Jurisdiction Factor (Present Claims only)
  - Law Firm Factor (Present Claims only)



8

# Medical Information Factor (MIF)

| CRP Disease | MIF |
|---|---|
| Mesothelioma | 1.00 |
| Asbestos-Related Lung Cancer | 0.25 |
| Asbestos-Related Other Cancer | 0.10 |
| Severe Asbestosis | 0.25 |
| Disabling Asbestosis | 0.03 |
| Non-Disabling Asbestosis | 0.02 |



# Extraordinary Claim Review

- **Only claimants alleging malignant diseases are eligible**

- **Maximum potential settlement value is 5x Expedited Claim Review MSV**

- **Settlement determination**
  - Trustee will have complete discretion to determine the percentage to apply to the maximum potential settlement value
  - The Trustee's decision will be final – no appeal

- **Settlement offer depends on the IP's information**
  - All information required by Expedited Claim Review
  - Additional information:
    - Complete job and exposure history
    - Identification of other sources of asbestos exposure, including other settlements and Trust claims filed



10

# Data sources used for estimation

- **2013 Garlock Analytical Database**

  - Including the PIQ information

- **Proof of Claim forms (POCs) and ballots submitted in response to the Solicitation Order ("First Solicitation") by the October 6, 2015 bar date**

- **Data and medical documents received in discovery from the Manville Trust regarding non-mesothelioma claimants**

- **Coltec-related claims data from the Garrison databases**



# Estimate settlements under the CRP options

- **Filing fee will deter non-qualifying claims from being filed**
  - Incentivizes self selection: Only claims that qualify for a settlement offer will file a claim
- **Claim filing resolutions**
  - Most claimants are expected to file for Expedited Claim Review
  - A small number of mesothelioma claimants may file for Extraordinary Claim Review
  - Claimants are incentivized to accept the Trust settlement offer instead of pursuing the claim through judgment



12

# Identify the number of Present Claims to be filed with the Trust

- **Garlock claims**
  - Current GST asbestos claims with a diagnosis on or before August 1, 2014 were to file a POC
  - Approximately 180,000 POCs were filed
  - GST Present Claims estimation is based on a detailed analysis of the GST POCs and ballots
    - Analyzed in Dr. Bates' November 5, 2015 and December 9, 2015 declarations

- **Coltec-only claims**
  - Most Coltec claims named Garlock, or filed a GST ballot or POC
    - These are included in the Garlock claims
  - Identification of Coltec-only claims (that did not name Garlock) relies on Coltec-related claims data from the Garrison database
    - Second Solicitation ballots do not provide sufficient information for estimation purposes



13

## Categories of Garlock POCs submitted for asbestos claims

- Most POCs were submitted along with a ballot (Class 3, 4, or 6)

| Disease | Class 3 | Class 4 | Class 6 | B-10 | Total |
|---|---|---|---|---|---|
| Mesothelioma | 35 | 8,749 | 0 | 1,242 | 10,026 |
| Lung cancer | 6 | 15,598 | 0 | 3,217 | 18,821 |
| Other cancer | 0 | 840 | 0 | 1,884 | 2,724 |
| Non-malignant | 6 | 101,351 | 1 | 28,833 | 130,191 |
| Unknown | 937 | 62 | 11 | 5,504 | 6,514 |
| **Total** | **984** | **126,600** | **12** | **40,680** | **168,276** |



14

# Only Class 4 ballots from the First Solicitation are included in the Garlock Present Claims

- **First Solicitation Class 4 ballot requirements:**
  - Hold a Current GST Asbestos Claim
  - Has diagnosis of pleural/peritoneal mesothelioma, lung/laryngeal cancer, or asbestosis supported by medical records and documents
  - Alleged GST Asbestos Exposure
- **Claims that fail one or more requirements are not eligible for CRP settlement**
  - POCs not asserting Class 4 ballots qualifications are excluded from estimation
  - Exception: POCs indicating "other cancer" are included in estimation calculations because claimants with cancers other than lung and laryngeal were not eligible to submit Class 4 ballots



15

# First Solicitation Class 4 ballots by time period

| Time period classification | Mesothe-lioma | Lung cancer | Other cancer | Non-malignant | Unknown | Total |
|---|---|---|---|---|---|---|
| Open - filed before 2005 | 817 | 2,572 | 128 | 36,476 | 8 | 40,001 |
| Open - filed from 2005 through petition date | 1,370 | 1,449 | 69 | 9,264 | 0 | 12,152 |
| Post-petition claims | 6,562 | 11,577 | 643 | 55,611 | 54 | 74,447 |
| **Total** | **8,749** | **15,598** | **840** | **101,351** | **62** | **126,600** |



16

# Identifying the number of problematic Class 4 ballots

- Analysis of the ballots' claim characteristics indicates that many are not eligible for CRP settlement
- Problematic categories identified below are described in Dr. Bates's November 5, 2015 and December 9, 2015 declarations

| Ballot category | Mesothe-lioma | Lung cancer | Other cancer | Non-malignant | Unknown | Total |
|---|---|---|---|---|---|---|
| **Initial ballots** | **8,749** | **15,598** | **840** | **101,351** | **62** | **126,600** |
| Duplicate | 27 | 11 | 1 | 318 | 0 | 357 |
| Resolved | 747 | 1,796 | 69 | 20,538 | 0 | 23,150 |
| PIQ no exposure | 281 | 0 | 0 | 0 | 0 | 281 |
| Time barred | 849 | 3,988 | 253 | 20,716 | 8 | 25,814 |
| Foreign | 1,036 | 308 | 3 | 792 | 1 | 2,140 |
| **Remaining ballots** | **5,809** | **9,495** | **514** | **58,987** | **53** | **74,858** |



# Coltec-only claims filed between 2006 and 2009 by disease

- **Use of flows for estimating propensity to sue (PTS)**

| Disease | Coltec-only claims |
|---|---:|
| Mesothelioma | 46 |
| Lung cancer | 72 |
| Other cancer | 26 |
| Non-malignant | 50 |
| Unknown | 22 |
| **Total** | **216** |



# Coltec-only pre-petition pending claims by disease

| Disease | Coltec-only claims |
|---|---|
| Mesothelioma | 44 |
| Lung cancer | 66 |
| Other cancer | 18 |
| Non-malignant | 422 |
| Unknown | 3,505 |
| **Total** | **4,055** |



19

# Estimate the number of Present Claims that are expected to have Coltec/GST Product Contact

- **PIQ contact percentages**
  - Fraction of PIQ mesothelioma claims that were able to establish any basis for contact to GST ACPs, for each of the three filing periods
- **PIQ contact percentages are applied to the Garlock remaining ballots and the Coltec-only pending claims for all diseases**

| GST claim filing period | PIQ claim filing date used to calculate percentages | PIQ contact percentage |
|---|---|---|
| Prior to 2005 | Prior to 2005 | 57% |
| From 2005 to petition | From 2005 to petition | 49% |
| Post-petition | 2009 to petition | 60% |



# Estimate number of Present Claims that will meet the CRP medical criteria

- **Medical qualification percentages**
  - Mesothelioma rate assumed to be 100%
  - Other disease rates were derived from comparing a representative sample of claimants' Manville Trust database records and medical documents to the CRP medical requirements

| CRP disease | Medical characteristics | Qualification rate |
|---|---|---|
| Asbestos-Related Lung Cancer | Lung cancer | 69% |
| Asbestos-Related Other Cancer | Other cancer | 83% |
| Severe Asbestosis | Manville Category L4 | 100% |
| Disabling Asbestosis | Manville Category L3 | 100% |
| Non-Disabling Asbestosis | Manville Category L2 | 71% |
| Non-Disabling Asbestosis | Manville Category L1 | 35% |



BATES WHITE
ECONOMIC CONSULTING

# Estimate number of qualifying Garlock and Coltec entities' Present Claims

- **The number of claims qualified for CRP settlements:**
  - After applying Coltec/GST contact and medical qualification rates
  - Include an estimate of the Coltec-only post-petition claims
    - Number of tort claims that would have been filed post-petition but-for the bankruptcy stay and are expected to qualify for CRP settlement

| CRP Disease | Qualified claims |
|---|---|
| Mesothelioma | 3,976 |
| Asbestos-Related Lung Cancer | 4,019 |
| Asbestos-Related Other Cancer | 510 |
| Severe Asbestosis | 330 |
| Disabling Asbestosis | 11,547 |
| Non-Disabling Asbestosis | 15,797 |
| **Total** | **36,179** |



22

# Estimate number of qualifying Future Garlock and Coltec Claims

- **Step 1: Use the Bates White Incidence Model (IM) to estimate the number of people who will be diagnosed or may allege a CRP disease**

  - The IM generates separate incidence forecasts of ACPs-related mesothelioma, ACPs-related excess lung cancer, and ACPs-related excess other cancer for each year through 2059

  - The IM also estimates the fraction of the population still alive who worked in occupations and industries where exposure to ACPs occurred ("Alive Exposed Population") for estimation of future non-malignant claims

  - The IM parsed future diagnoses into the five Contact Groups as defined by the Modified Plan

  - Future claims will be filed on average one year after diagnosis



# Mesothelioma incidence by Contact Group



24

# Normalized incidence of asbestos-related cancers and Alive Exposed Population



# Estimate number of qualifying Future Garlock and Coltec Claims (continued)

- **Step 2: Estimate the number of people from those estimated in Step 1 that will qualify for a CRP settlement**
  - Garlock future claims
    - Extrapolate the number of qualifying post-petition pending claims into the future based on the IM estimates
      - Numerator: Qualified pending claims filed post-petition
      - Denominator: IM estimates from June 2010 through December 2014
  - Coltec-only claims
    - Extrapolate expected number of tort filings qualified for the CRP requirements in the 2006-2009 period into the future based on the IM estimates
      - Numerator: Coltec claims filed in 2006-2009 that did not name Garlock, after applying the Coltec/GST percentages and the medical qualification percentages
      - Denominator: IM estimates from 2006 to 2009



# Future qualifying mesothelioma claims by Contact Group



# Qualifying Future Claims

- Accounts for GST contact percentages, likelihood of claim filing, and qualification rates

| CRP Disease | Qualifying claims |
|---|---|
| Mesothelioma | 7,509 |
| Asbestos-Related Lung Cancer | 6,841 |
| Asbestos-Related Other Cancer | 759 |
| Severe Asbestosis | 479 |
| Disabling Asbestosis | 10,891 |
| Non-Disabling Asbestosis | 24,185 |
| **Total** | **50,665** |



# Valuation of qualifying claims

- **Present Claims are valued individually using the own claimants' data, accounting for alleged disease, Contact Group, and claimants' demographic characteristics**

- **When the claimants' information is not available, estimate statistically**

  - Diagnosis age

    - Use average diagnosis age from other claimants of same disease

  - Life status

    - For mesothelioma and cancers, use probit models to estimate the likelihood of a claimant being alive based on age

    - For non-malignant diseases, use mortality rates of the US general population from the US Social Security Administration to estimate the likelihood of a claimant being alive based on age



# Valuation of qualifying claims (continued)

- **Jurisdiction Factor and Law Firm Factor**

  - All Present Claims assumed to have maximum values in both Factors

  - These Factors do not apply to Future Claims

- **Dependents Factor**

  - Use statistics from the U.S. Census Current Population Survey by age group

- **Economic Loss Factor**

  - Use economic loss estimates developed by Dr. Jeff Brown

    - Approach to calculation based on previous analysis for the 2013 Mesothelioma Confirmation Hearing

    - Updated for the Modified CRP and additional diseases



# Statistics used for determining dependent status

- **Available data provide no information in this regard**

- **Apply a statistical methodology to all claimants based on age**

| Total percent | 30-34 years | 35-39 years | 40-44 years | 45-49 years | 50-54 years | 55-64 years | 65-74 years | 75+ years |
|---|---|---|---|---|---|---|---|---|
| No dependents | 4% | 2% | 3% | 4% | 4% | 4% | 2% | 5% |
| Dependent children | 77% | 83% | 78% | 62% | 36% | 15% | 7% | 3% |
| Spouse only | 19% | 14% | 19% | 35% | 59% | 82% | 91% | 92% |

*Source: US Census Current Population Survey 2010 Annual Social and Economic (ASEC)
Supplement*



# Economic Loss estimates

| Age at diagnosis | Mesothelioma | | Lung cancer | | Laryngeal cancer | | Severe asbestosis | |
|---|---|---|---|---|---|---|---|---|
| | Avg. Econ. loss | Claims valued | Avg. Econ. loss | Claims valued | Avg. Econ. loss | Claims valued | Avg. Econ. loss | Claims valued |
| 45 and younger | $2,543,000 | 244 | $2,565,000 | 400 | $2,054,000 | 1 | | |
| 46-55 | $1,806,000 | 1,194 | $1,799,000 | 2,513 | $1,547,000 | 18 | $2,025,000 | 4 |
| 56-65 | $1,193,000 | 3,797 | $1,184,000 | 7,808 | $1,115,000 | 47 | $1,128,000 | 30 |
| 66-75 | $684,000 | 6,069 | $664,000 | 9,717 | $568,000 | 60 | $657,000 | 53 |
| 76-80 | $504,000 | 2,653 | $486,000 | 2,774 | $417,000 | 20 | $472,000 | 23 |
| Over 80 | $401,000 | 2,010 | $391,000 | 1,362 | $352,000 | 12 | $375,000 | 26 |



# Estimate the value of qualifying claims that will file for Extraordinary Claims Review

- **Estimate the fraction of mesothelioma claims expected to file for Extraordinary Claim Review**

  - Denominator: Garlock mesothelioma claims resolved between 2006-2009

  - Numerator: the number among those claims with settlements net of avoidable costs ($250,000) exceeding their would-be CRP settlement offer under Expedited Claim Review

- **The value of an Extraordinary Claim is calculated by applying a multiplier to its Expedited Claim Review settlement offer**

  - The multiplier is calculated for each Contact Group as the average ratio of settlement amounts, net of avoidable costs, to CRP Expedited Review settlements



# Timing of CRP settlement payments

- **Claims processing**
  - Settlement Facility is assumed to begin operating in January 2018
  - Garlock and Coltec Present Claims will be processed in the first three years of operation
  - The Settlement Facility will start processing Future Claims in the inventory in the fourth year, with the number of processed claims in each year not exceeding the average claims processed per year while processing Present Claims
  - After Future Claims in the inventory are cleared, subsequent Future Claims will be processed in the year they are filed
- **Inflation and discounting**
  - Inflation rate of 2% is applied to MSVs every year after 2018
  - NPV is calculated with a 4.5% discount rate as of the Effective Date



34

# Present Claims valuation at initially specified MSVs

| CRP Disease | Qualifying claims | Avg. settlement amounts (NPV) | Total settlements (NPV) |
|---|---|---|---|
| Mesothelioma | 3,976 | $25,603 | $102,000,000 |
| Lung cancer | 4,019 | $3,858 | $16,000,000 |
| Other cancer | 510 | $1,490 | $760,000 |
| Severe asbestosis | 330 | $4,558 | $1,500,000 |
| Disabling asbestosis | 11,547 | $409 | $4,700,000 |
| Non-disabling asbestosis | 15,797 | $234 | $3,700,000 |
| **Total** | **36,179** | **$3,537** | **$128,660,000** |



# Future Claims valuation at initially specified MSVs

| CRP Disease | Qualifying claims | Avg. settlement amounts (NPV) | Total settlements (NPV) |
|---|---|---|---|
| Mesothelioma | 7,509 | $17,319 | $130,000,000 |
| Lung cancer | 6,841 | $2,252 | $15,000,000 |
| Other cancer | 759 | $783 | $590,000 |
| Severe asbestosis | 479 | $2,372 | $1,100,000 |
| Disabling asbestosis | 10,891 | $250 | $2,700,000 |
| Non-disabling asbestosis | 24,185 | $143 | $3,500,000 |
| **Total** | **50,665** | **$3,027** | **$152,890,000** |



# Total Claims valuation at initially specified MSVs

| CRP Disease | Qualifying claims | Avg. settlement amounts (NPV) | Total settlements (NPV) |
|---|---|---|---|
| Mesothelioma | 11,485 | $20,186 | $232,000,000 |
| Lung cancer | 10,861 | $2,846 | $31,000,000 |
| Other cancer | 1,269 | $1,067 | $1,350,000 |
| Severe asbestosis | 809 | $3,264 | $2,600,000 |
| Disabling asbestosis | 22,438 | $332 | $7,400,000 |
| Non-disabling asbestosis | 39,983 | $179 | $7,200,000 |
| **Total** | **86,844** | **$3,240** | **$281,550,000** |



# Pre-petition settlements that were not paid before petition

- **2,356 settlements allegedly made by Garlock before bankruptcy petition for about $17.1 million**

- **Debtors have classified these settlements into**
  - Category 1: Claims expected to be paid (face value of $6.5 million)
  - Category 2: Invalid or withdrawn claims that will not be paid (face value of $2.3 million)
  - Category 3: Claims for which Debtors lack specific expectation of payment (face value of $8.3 million)
    - Based on individual case review, Debtors expect that no more than 33% of the face value of Category 3 settlements will qualify for payment as pre-petition settlements

- **Categories 1 and 3 have an expected face value of less than $10 million**



38

# Pre-petition pending judgment

- **Torres plaintiff verdict is currently on appeal**

- **Current face value of the judgment is about $2 million**
  - $1,350,000 for Garlock's share
  - Post-judgment interest at 5% per year through Effective Date

- **The expected value of the final judgment is about $1 million**
  - Garlock's historical mesothelioma verdicts show that Garlock paid 46% of its initial share, after appeal



39

# 2. Chapter 11 forecast: Estimates of the Plan Trust's administrative expenses



# Data used

- **Annual expense data for 50+ asbestos trust that provide detailed cost exhibits as part of audited financial statements**

- **Summaries of annual claim activity reported by 40+ asbestos trusts as part of their annual reports**



41

# Claim processing costs

- **Costs related to claim review, qualification, payment, and development of a claim management system**

- **Based on CRP requirements and comparability to the Western Asbestos Settlement (WAS) trust, the Trust review cost is expected to be at about $500 per claim**

  - Formulaic framework for Expedited Claim Review claims valuation is structurally similar to the resolution procedures of the WAS trust

  - WAS trust's average claim processing cost between 2007 and 2012 was $517 per claim

- **Number of forecast claims to be filed with the Trust are used to estimate annual claim processing costs**



# Trust operation costs

- **Costs associated with general administration, management, accounting services, rent for office space, and other forms of trust overhead**

- **Applied an initial operations expenditure level of $1 million**

  - WAS trust average gross operation costs are $1.2 million/year

    - That trust includes administering a joint-facility model that is not anticipated to apply to the Trust

    - With a more efficient joint facility model, the WAS trust's net operating expenditures averaged $625,000 per year

    - Across 50+ trusts, the average annual operations expenditures are estimated at $850,000

- **Assume trust operations expenses will be reduced every 10 years based on claims' processing activity**



43

# Trust oversight costs

- **Costs associated with trust governance, such as trustee fees and trust advisory fees**

- **Annual oversight expenses are estimated at $275,000 throughout the operational life of the trust**

  - The Trust will not have a Trust Advisory Committee (TAC)

  - The Trust will have only one trustee



44

# Trust legal and professional fees

- **Fees from trust counsel and professional services**

- **Yearly legal fees for Settlement Facility estimated at $500,000**

  - All operating trusts: fees average about $880,000 per year

  - 11 trusts established in 2006: fees average about $700,000 per year

  - Given settlement amounts offered by the Trust and its process for the Litigation option, the Trust is not expected to face a significant amount of legal costs

- **Yearly professional fees for Settlement Facility estimated at $500,000**

  - All operating trusts: fees average about $360,000 per year

  - 11 trusts established in 2006: fees average about $575,000 per year

- **Estimated reductions in expenses applied every 10 years, based on expected decreases in claims processing activity**



# Trust cost estimates

| Trust expense category | Base input | Years 1-5 | Years 6-10 | Years 11-20 | Years 21-43 | Total | NPV |
|---|---|---|---|---|---|---|---|
| Claims processing | $500/claim | $29.1 M | $8.3 M | $7.0 M | $4.5 M | $49.0 M | $37.7 M |
| Operations | $1.0M per year | $5.2 M | $5.7 M | $8.9 M | $11.9 M | $31.7 M | $16.7 M |
| Trust Oversight | $0.275M per year | $1.4 M | $1.6 M | $3.7 M | $11.8 M | $18.5 M | $7.3 M |
| Legal & Professional | $1.0M per year | $5.2 M | $5.7 M | $8.9 M | $11.9 M | $31.7 M | $16.7 M |
| **Total** | | **$41.0 M** | **$21.4 M** | **$28.5 M** | **$40.1 M** | **$130.9 M** | **$78.5 M** |
| Average annual expense | | $8.2 M | $4.3 M | $2.8 M | $1.7 M | $3.0 M | $1.8 M |



46

# 3. Chapter 7 forecast: Estimates of Garlock and Coltec Present and Future tort settlements under the TCMO



# Estimate Garlock and Coltec tort settlements under the TCMO

- **The TCMO has features that would eliminate the withholding of exposure information and that would reduce the cost of defending cases for the Trustee, reducing settlement amounts generally**

  - Require claimants to disclose all relevant medical and exposure evidence

- **An approximation of the settlements that are expected under the TCMO is Garlock's resolution and settlement history in the tort system before the bankruptcy wave of the early 2000s**



# Expenditures in Alternative Information Regimes

$700

**Payment extrapolation with trust disclosures as in mid-2000s – upper end of financial reporting range**

$600

**Payment extrapolation with trusts able to pay claimants on a contemporaneous basis with tort claims – middle of financial reporting range**

$500

**Payment extrapolation with full trust transparency as part of tort discovery – low end of financial reporting range**

$400

$300

**Garlock Plan: $270 Million – Required disclosure of exposures without tort discovery expense**

$200

**Payment extrapolation with plaintiff avowing exposure to asbestos products as they did in 1990s: $140-$200 Million**

$100

**Garlock Asbestos Liabilities: <$125 Million**

Bates Direct (p. 61 & 78) and Rebuttal (p. 33 & 44) testimony in Mesothelioma Estimation Trial



49

# Source of Garlock's settlement changes through the bankruptcy wave in the early 2000s

| Case type | Time period | Number of mesothelioma cases | Average settlement | Saved defense costs | Average trial risk | Average potential award |
|---|---|---|---|---|---|---|
| Cases with no trial risk (~95% of cases) | pre-2000 | 5,937 | $3,300 | $5,600 | nil | N/A |
| | 2000–2010 | 9,882 | $37,000 | $65,000 | nil | N/A |
| Cases with potential trial risk (~5% of cases) | pre-2000 | 349 | $36,000 | $63,000 | 7% | $2.1 million |
| | 2000–2010 | 430 | $335,000 | $430,000 | 17% | $5.6 million |

Bates Rebuttal Report, pp. 67-73.



# Estimating Garlock and Coltec tort settlements under the TCMO

1.  **Compile historical claims record for Garlock and Coltec claims**

    - Updated Garlock Analytical Database

2.  **Establish baseline trends using Bates White Incidence Model**

    - ACPs-related mesothelioma, excess lung cancer, excess other cancer, and non-malignant diseases separately

3.  **Estimate the portion of disease/exposed population likely to sue the Estate using claims history and epidemiological trends for each disease category**

4.  **Estimate fraction of claims that would be resolved using Garlock's resolution experience for each disease category**

    - Resolution rates based on Garlock's pre-2000s history are applied to current and future claims



# Estimating Garlock and Coltec tort settlements under the TCMO

5. **Estimate average settlement amounts using Garlock's settlement experience in the 1990s for each disease category**

6. **Apply the estimates in prior steps to estimate resolutions for current and future claims, taking into account future inflation**



# Problematic ballots from First Solicitation

- **Problematic ballots are excluded from valuation**
  - Recall that many of the Class 4 ballots from the First Solicitation are not eligible for CRP settlement because they would not meet the medical and exposure criteria
  - The ballots within those problematic categories will have insufficient basis to file tort claims under the TCMO

| Disease | Remaining ballots |
|---|---|
| Mesothelioma | 5,809 |
| Lung Cancer | 9,495 |
| Other Cancer | 514 |
| Non-malignant | 58,987 |
| Unknown | 53 |
| **Total** | **74,858** |



53

# Not all the current claims and projected filings against Garlock will resolve in the future

- **Resolution rates are used to estimate the percentage of current and future filings that will eventually resolve**
  - Examine the status of claims filed in the period 4 to 16 years before petition
  - Divide the number of resolved claims by the total number of claims filed in that period

| Disease | Resolution rate |
|---------|-----------------|
| Mesothelioma | 93% |
| Lung cancer | 84% |
| Other cancer | 66% |
| Non-malignant/unknown | 86% |



54

# Estimate average settlement amounts using Garlock's experience before the bankruptcy wave of the early 2000s

- **The settlement rate and average settlement amounts are calculated as the percentage of resolved claims that were settled**
  - Malignant diseases: claims resolved in the 1990s
  - Non-malignant/unknown: Claims resolved within one year prior to the Petition Date

|  | Mesothelioma | Lung cancer | Other cancer | Non-malignant |
|---|---|---|---|---|
| Settlement rate | 94% | 89% | 5% | 13% |
| Average settlement amount | $11,286 | $3,830 | $33,856 | $2,793 |
| Average resolution amount | $10,591 | $3,421 | $1,808 | $351 |

Note: The amounts are adjusted for inflation by using the CPI to 2017.



BATES WHITE
ECONOMIC CONSULTING

# Estimate the number of future claims that will file against the Estates

- **Step 1: Use the Bates White Incidence Model (IM) to estimate the number of people who will be diagnosed or may allege an asbestos-related injury**
  - The IM generates separate incidence forecasts of ACPs-related mesothelioma, ACPs-related excess lung cancer, and ACPs-related excess other cancer for each year through 2059
  - The IM also estimates the Alive Exposed Population as explained before
- **Step 2: Extrapolate the number of post-petition claims into the future based on the IM estimates**
  - Numerator: Post-petition non-problematic ballots from First Solicitation
  - Denominator: the IM estimates from June 2010 through December 2014



# ACPs-related mesothelioma incidence



# Normalized incidence of asbestos-related cancers and Alive Exposed Population



58

# Future claims

- **Apply resolution rates and settlement rates to projected filings**

| Disease | Filings | Expected number of settled claims |
|---|---|---|
| Mesothelioma | 8,387 | 7,345 |
| Lung cancer | 6,863 | 5,174 |
| Other cancer | 690 | 24 |
| Non-malignant | 11,331 | 1,218 |
| **Total** | **27,271** | **13,761** |



# Expected number of settled claims

| Disease | Ballots | Claims arising in 2015-2017 | Future claims |
|---|---|---|---|
| Mesothelioma | 4,803 | 1,218 | 7,345 |
| Lung Cancer | 4,370 | 1,067 | 5,174 |
| Other Cancer | 20 | 5 | 24 |
| Non-malignant | 1,096 | 268 | 1,218 |
| **Total** | **10,289** | **2,557** | **13,761** |

- **The resolution timing for these claims is based on a resolution distribution for each disease based on Garlock's historical tort experience**



# Number of settled current claims by resolution year



# Number of settled future claims by resolution year



# Estimated settlements by resolution year



# Projected settlements

| Disease | Nominal | NPV |
|---------|---------|-----|
| Current | $   96 M | $   90 M |
| Future | $ 134 M | $   84 M |
| **Total** | **$ 230 M** | **$ 174 M** |





# Technical appendix to Best Interest Test for Asbestos Claimants

## In re: Garlock Sealing Technologies LLC, et al.